UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

**In Re: Highland Capital Management, L.P.**

§

§ Case No **19-34054-SGJ-11**

**The Dugaboy Investment Trust**
**- Appellant**

§

vs.    §

**Highland Claimant Trust**
-Appellee

§    **3:25-CV-02724-L**

§

[4401] Order Granting Motion for Order Fixing Allowed Amount of Class 11 Interests (related document # 4362) Entered on 9/22/2025.

# Volume 4
# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

*INDEX*

**Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and Amended Designation of Items to be Included in the Record on Appeal From the Bankruptcy Court's Order Fixing Allowed Amount of Class 11 Interests**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4423] on October 6, 2025, from the Bankruptcy Court's September 22, 2025 *Order Fixing Allowed Amount of Class 11 Interests* [Docket No. 4401], and having received the Clerk's letter of October 23, 2025 requesting corrections to the record designations, submits this *Statement of Issues to be Presented and Amended Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.[1]

### STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.  Did the Bankruptcy Court misapply the absolute-priority rule in determining that the Hunter Mountain Investment Trust's (HMIT's) Class 10 interests were entitled to 100% of any excess funds left over after all senior creditor classes were paid in full, in disregard of equity interests that allocated 99.5% to HMIT and 0.5% to Dugaboy?

2.  Did the Bankruptcy Court err when it allocated potential excess funds in a way that effectively gave HMIT *more than* 100% of what it was entitled to, in contravention of black-letter law holding that a senior class cannot receive more than 100% without the consent of the junior class? *See In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009).

3.  Did the Bankruptcy Court err in determining the value of Dugaboy's interest only as a fixed dollar amount, rather than a *pro rata* percentage reflecting its equity ownership share?

4.  Did the Bankruptcy Court err in allowing Highland to use a valuation methodology for determining the allowed amount of Dugaboy's claim based on limited partners' pre-petition capital accounts, which were derived from untested and unvetted figures created for tax purposes that bore little if any relation to true market value, when nothing in the confirmed Reorganization Plan allowed for such a method?

5.  Did the Bankruptcy Court err in believing that "res judicata" required it to use the same methodology to value Dugaboy's Class 11 interests as it had previously used to value HMIT's Class 10 interests?

---

[1] Because of its voluminous nature, Docket No. 4255 will be delivered to the Clerk on a flash drive that will arrive tomorrow.

1

6.   Did the Bankruptcy Court err at the hearing on September 18, 2025, when it invoked "res judicata" to threaten Dugaboy's counsel with Rule 11 sanctions for "recycling" arguments previously made by the "revolving door of lawyers" that had represented Dugaboy over the previous several years, thus seeking to impose a chilling effect on Dugaboy's right to zealous advocacy by its chosen counsel?

7.   Did the Bankruptcy Court's Order Fixing Allowed Amount of Class 11 Interests (Docket No. 4401) constitute a "final" judgment or order, thereby giving the District Court jurisdiction for appellate review of the Bankruptcy Court's Order denying Dugaboy's Motion to Recuse?

### DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4423] filed by Appellant;

*000009*

2. Bankruptcy Court's *Order Fixing Allowed Amount of Class 11 Interests* [Docket No. 4401];

*000013*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact, and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s) 1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 9/14/2022 | 3521-5 | Claimant Trust Agreement |
| 2/27/2024 | 4199 | Stipulated and Agreed Order resolving (A) HCLOM, Ltd.'s Scheduled claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a bad faith |

*000619*
*000780*
*000820*

| | | | |
|---|---|---|---|
| Vol. 2 | | | finding and an award of attorney's fees against HCLOM, Ltd., and James Dondero in connection therewith (related document #3657, 4176) Entered on 12/27/2024. (Dugan, Sue) |
| 000827 | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| 000845 | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| 000848 | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| Vol. 3 | | | |
| 000873 | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| 000881 | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s) 4230 Objection). (Lang, Michael) |
| 000883 | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s) 4230 Objection). (Lang, Michael) |
| 000885 Thru Vol 5 | 6/20/2025 | 4255 *(to be submitted to* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related |

| | *Clerk on flash drive*) | document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 |

VOL. 6
003542

4

| | | | |
|---|---|---|---|
| | | | U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| *Vol. 6*<br>*0035415* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 7*<br>*0038665* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *0038889* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s) 4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8, 8, Exhibit 9 (Curry, David) |
| *0040/6* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *0040B1* | 6/23/2025 | 4275 | Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| *0040/2* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |

*Vol. B*

*004259*

| | | | |
|---|---|---|---|
| | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *004270* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)).        (Attachments:#1 Exhibit 126 (Annable, Zachery) |
| *004295* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *004296* | 6/25/2025 | 4296 | Transcript of hearing held June 25, 2025, before Chief Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297] |
| *004562* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4223 Objection). (Annable, Zachery) |
| *004291* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an |

6

|  |  |  | order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
|---|---|---|---|
|  | 6/30/2025 | 4297 | Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025. (Okafor, M.) |
|  | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
|  | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
|  | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
|  | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
|  | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s) 4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |

*(handwritten margin notes: Vol. 8, 0004577, 0004581, 0004583, 0004592, 0004594, Vol. 9, 0004690)*

7

*Vol 10*

| | | | |
|---|---|---|---|
| *0049 63* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s) 4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *0049 79* | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: # 1 Exhibit A) (Harper, Geoffrey) |
| *0050 01* | 8/8/2025 | 4362 | Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) Filed by Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A--Proposed Order) (Annable, Zachery) |
| *0050 12.* | 8/12/2025 | 4368 | Amended appellant designation of contents for inclusion in record on appeal and statement of issues on appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4365 Appellant designation). (Harper, Geoffrey) |
| *0050 23* | 8/15/2025 | 4371 | Notice of hearing filed by Other Professional Highland Claimant Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) Filed by Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 9/18/2025 at 02:30 PM at https://us-courts.webex.com/meet/jerniga for 4362, (Annable, Zachery) |
| *0050 29* | 8/29/2025 | 4378 | Order Approving Motion to Conform Plan to Fifth Circuit Mandate (related document # 4302) Entered on 8/29/2025. (Okafor, M.) |
| *0050 32* | 9/8/2025 | 4384 | Response opposed to (related document(s): 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust) filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| *0050 47* | 9/11/2025 | 4389 | Stipulation by Highland Claimant Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust (RE: related document(s) 4384 Response). (Annable, Zachery) |
| *0050 51* | 9/15/2025 | 4393 | Reply to (related document(s): 4384 Response filed by Creditor The Dugaboy Investment Trust) (Reply in Support of Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust. (Annable, Zachery) |

| | 9/15/2025 | 4394 | Amended Witness and Exhibit List (Highland Claimant Trust's Witness and Exhibit List with Respect to Hearing to Be Held on September 18, 2025) filed by Other Professional Highland Claimant Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10) (Annable, Zachery) |
|---|---|---|---|
| | 9/15/2025 | 4395 | Witness and Exhibit List for Hearing to be Held on September 18, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests)). (Harper, Geoffrey) |
| | 9/18/2025 | 4398 | Court admitted exhibits date of hearing September 18, 2025 (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust (Court Admitted Debtors/Highland Capital Mgmt., L.P. exhibits #1, #2, #3, #4, #5, #6, #7, #8, #9 & #10 offered by attorney John Morris, found at doc. #4394.) (Edmond, Michael) |
| | 9/22/2025 | 4401 | Order Granting Motion for Order Fixing Allowed Amount of Class 11 Interests (related document # 4362) Entered on 9/22/2025. (Grandstaff, Travis) |

*(handwritten in left margin:)* Vol 10    005061    005213    005216    005217

Dated: October 23, 2025             Respectfully submitted,

                                    **WINSTON & STRAWN LLP**

                                    By: */s/ Geoffrey S. Harper*

                                    Geoffrey S. Harper
                                    Texas Bar No. 00795408
                                    gharper@winston.com
                                    John Michael Gaddis
                                    Texas Bar No. 24069747
                                    mgaddis@winston.com
                                    2121 N. Pearl Street, Suite 900
                                    Dallas, TX 75201
                                    (214) 453-6500
                                    (214) 453-6400 (fax)

                                    *Counsel for Appellant*
                                    *The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on October 23, 2025, a copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

                                    */s/ Geoffrey S. Harper*
                                    Geoffrey S. Harper

IT IS HEREBY AGREED.

PATRICK HAGAMAN DAUGHERTY

_____

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:       _____
Name:   _____
Its:       _____


HIGHLAND CLAIMANT TRUST

By:       _____
Name:   _____
Its:       _____

001542

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____

Its: _____

**HIGHLAND CLAIMANT TRUST**

By: _____

Name: _____

Its: _____

001543

**EXHIBIT 61**

001544

## AMENDMENT NO. 1 TO TOLLING AGREEMENT
## <u>EXTENDING CLAIM OBJECTION DEADLINE</u>

This Amendment No. 1 (the "<u>Amendment</u>"), dated as of December 21, 2022, to that certain Tolling Agreement Extending Claim Objection Deadline, dated as of July 27, 2022 (the "<u>Agreement</u>"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

## <u>RECITALS</u>

WHEREAS, the Parties entered into the Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1.      <u>Extension of Objection Deadline</u>.  The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) December 31, 2023, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2.      <u>Representations and Warranties</u>.  Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3.      <u>Effectiveness of Agreement; No Other Changes</u>.  Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms.  If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

001545

**IT IS HEREBY AGREED.**

PATRICK HAGAMAN DAUGHERTY

_____

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   _____
Name:        James P. Seery, Jr.
Its:               CEO

HIGHLAND CLAIMANT TRUST

By:   _____
Name:        James P. Seery, Jr.
Its:           Claimant Trustee

001546

**EXHIBIT 6**

## AMENDMENT NO. 2 TO TOLLING AGREEMENT
## <u>EXTENDING CLAIM OBJECTION DEADLINE</u>

This Amendment No. 2 (the "<u>Amendment</u>"), dated as of November 6, 2023, to that certain Tolling Agreement Extending Claim Objection Deadline, dated as of July 27, 2022 (the "<u>Tolling Agreement</u>"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other.  Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

## <u>RECITALS</u>

WHEREAS, the Parties entered into the Tolling Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, the Parties entered into that certain *Amendment No. 1 to Tolling Agreement Extending Claim Objection Deadline* on December 21, 2022, further extending the deadline to object to the Reserved Claim to December 31, 2023 (or earlier if certain conditions were satisfied) (the "<u>First Amendment</u>," and together with the Tolling Agreement, the "<u>Agreement</u>").

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1.      <u>Extension of Objection Deadline</u>.  The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) December 31, 2024, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2.      <u>Representations and Warranties</u>.  Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3.      <u>Effectiveness of Agreement; No Other Changes</u>.  Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms.  If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

001548

**IT IS HEREBY AGREED.**

PATRICK HAGAMAN DAUGHERTY

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

HIGHLAND CLAIMANT TRUST

By: _____
Name: _____
Its: _____

001549

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____James P. Seery, Jr._____

Its: _____CEO_____

**HIGHLAND CLAIMANT TRUST**

By: _____

Name: _____James P. Seery, Jr._____

Its: _____Claimant Trustee_____

001550

**EXHIBIT 6**

## AMENDMENT NO. 3 TO TOLLING AGREEMENT
## EXTENDING CLAIM OBJECTION DEADLINE

This Amendment No. 3 (the "Amendment"), dated as of November 20, 2024, to that certain *Tolling Agreement Extending Claim Objection Deadline*, dated as of July 27, 2022 (the "Tolling Agreement"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

## RECITALS

WHEREAS, the Parties entered into the Tolling Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, the Parties entered into that certain *Amendment No. 1 to Tolling Agreement Extending Claim Objection Deadline* on December 21, 2022, further extending the deadline to object to the Reserved Claim to December 31, 2023 (or earlier if certain conditions were satisfied) (the "First Amendment").

WHEREAS, the Parties entered into that certain *Amendment No. 2 to Tolling Agreement Extending Claim Objection Deadline* on November 6, 2023, further extending the deadline to object to the Reserved Claim to December 31, 2024 (or earlier if certain conditions were satisfied) (the "Second Amendment," and together with the Tolling Agreement and the First Amendment, the "Agreement").

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1.     Extension of Objection Deadline. The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) June 30, 2025, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2.     Representations and Warranties. Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3.     Effectiveness of Agreement; No Other Changes. Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

001552

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name:  James P. Seery, Jr.
Its:  Chief Executive Officer

**HIGHLAND CLAIMANT TRUST**

By: _____
Name:  James P. Seery, Jr.
Its:  Claimant Trustee

001553

**EXHIBIT 6**

001554

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** RE: John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.
**Date:** Mon, 6 Jan 2025 17:10:00 +0000
**Importance:** Normal
**Inline-Images:** image004.png; image003.png

---

Happy New Year, John.  Answer, No.  We have a draft ready, but have reviewed the rules and think the deadline is 14 days, and therefore Friday (9023(b) A motion for a new trial or to alter or amend a judgment must be filed within 14 days after the judgment is entered).  We plan to circulate before filing.  Happy to visit.


**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, January 6, 2025 10:47 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Subject:** RE: John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.

HCMLPHMIT00000008

EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.

Good morning and Happy New Year.

Do you anticipate filing anything today?

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, December 30, 2024 10:15 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Subject:** John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

**EXHIBIT 6**

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Cc:** "Dan.Elms@gtlaw.com" <Dan.Elms@gtlaw.com>, "Hayley R. Winograd"
<hwinograd@pszjlaw.com>
**Subject:** RE: DRAFT Motion to Reconsider HCLOM Stipulated Order
**Date:** Sat, 11 Jan 2025 03:48:31 +0000
**Importance:** Normal
**Inline-Images:** image005.jpg; image006.png; image002.png

---

John,

We think the ground for the change of lawyers for HCLOM is self-evident.

This is to advise that we will not be filing the motion Amelia sent around earlier (which she sent as a
courtesy as I told you we would circulate). Hope to visit soon.


**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18
U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the
use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually
receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the
communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225)
381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be
used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose
of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, January 10, 2025 3:43 PM

001558



**To:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Cc:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Dan.Elms@gtlaw.com; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: DRAFT Motion to Reconsider HCLOM Stipulated Order

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Thank you, Amelia.

I honestly don't know what to make of all of this—including Mr. Elms suddenly representing HCLOM rather than Ms. Deitsch Perez—but please confirm that neither HMIT nor HCLOM is making any request of Highland at this time.

Assuming that to be the case, Highland will wait to see what gets filed, if anything, and otherwise reserves all of its rights at law and in equity.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Sent:** Friday, January 10, 2025 4:19 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Dan.Elms@gtlaw.com
**Subject:** DRAFT Motion to Reconsider HCLOM Stipulated Order

Good afternoon,

Per Louis, we said that we would circulate the attached draft before filing. We think our deadline is today but we are actively working with Mr. Elms who has been recently retained by HCLOM to resolve without necessity of litigating. But in case we do not reach a resolution this evening and as we said we would circulate a draft prior to filing, we wanted to get this draft to you.

thanks,

Amelia

**Amelia L. Hurt**

001559

*Associate*



400 POYDRAS STREET SUITE 1812
NEW ORLEANS, LOUISIANA 70130
T.  504.522.1812
M. 630.292.6652
*amelia.hurt@kellyhart.com*
*www.kellyhart.com*

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of ths communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

001560

**EXHIBIT 66**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

## HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR (A) A BAD FAITH FINDING AND (B) AN AWARD OF ATTORNEYS' FEES AGAINST HIGHLAND CLO MANAGEMENT, LTD. AND JAMES DONDERO IN CONNECTION WITH HCLOM CLAIMS 3.65 AND 3.66

---

[1] Highland's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

001562

HCMLPHMIT00000441

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ..................................................................................1

II. RELEVANT BACKGROUND .................................................................................5

    A.  The Bankruptcy Case: The HCLOM Claim, the Objection, and the Response ...................................................................................................................5

    B.  Dondero Terminates Terry and the Parties Execute the Participation Agreement ........................................................................................................6

    C.  The Note is Assigned to HCLOM Ltd. Under False Pretenses in Exchange for HCLOM Ltd. Agreeing to Become the Successor Manager of the CLOs ........................................................................................................................10

    D.  The Note and Payment of Acis Participation Interests are Part of One Integrated Transaction .................................................................................14

    E.  Undisputed Evidence Proves that HCLOM Ltd. and Acis Breached the Transfer Agreement and Acis Breached the Participation Agreement ..................16

    F.  The Undisputed Evidence Shows that HCLOM LLC Was To Be the Acis Successor Manager ........................................................................................17

    G.  The Parties' Post-Transfer Agreement Conduct Shows that the HCLOM Parties Knew Neither Acis Nor HCLOM Ltd. Would Perform under the Transfer Agreement or Participation Agreement After Terry Received His Arbitration Award ..........................................................................................19

    H.  Waterhouse was Unprepared to Testify as HCLOM Ltd.'s Rule 30(b)(6) Witness and Otherwise Lacked Personal Knowledge Such that he Cannot Testify in Good Faith ......................................................................................21

    I.  Dondero Cannot Testify in Good Faith ........................................................22

III. ARGUMENT .........................................................................................................24

    A.  The HCLOM Parties' Prosecution of the HCLOM Claim Constitutes Bad Faith and Willful Abuse of the Judicial Process ...................................................24

        1.  HCLOM Ltd.'s Prosecution of the HCLOM Claim Despite Admitting that it Breached its Obligations Under the Transfer Agreement Constitutes Bad Faith ...........................................................24

            a.  The Note is Unenforceable Because HCLOM Ltd. Provided No Consideration ..............................................................25

            b.  The Note is Unenforceable Because HCLOM Ltd. Materially Breached its Obligations under The Transfer Agreement ..................................................................................27

            c.  Acis Breached its Obligation to Pay the Acis Participation Interest to Highland .......................................................29

4880-1728-2300.13 36027.003

HCMLPHMIT00000442

2.  HCLOM Ltd.'s Designation of Waterhouse as its Rule 30(b)(6) Witness Constitutes Bad Faith and a Willful Abuse of the Judicial Process ......................................................................................................... 30

3.  Dondero's Involvement in the Prosecution of the HCLOM Claim Constitutes Bad Faith and a Willful Abuse of the Judicial Process ........... 30

B.  Highland is Entitled to Attorneys' Fees from the HCLOM Parties for Costs Incurred in Connection with the Bad Faith Prosecution of the HCLOM Claim .............................................................................................................. 31

CONCLUSION ................................................................................................................. 32

001564

HCMLPHMIT00000443

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

<u>**CASES**</u>

*ASARCO, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.),*
   751 F.3d 291 (5th Cir. 2014) ............................................................ 32

*Baker Botts L.L.P. v. ASARCO LLC,*
   576 U.S. 121 (2015) ........................................................................ 32

*Barclays Bank Plc v. Kenton Capital*
   [1994-95 CILR 489] ....................................................................... 25

*Blue v. Ashley*
   [2017] EWHC 1928 (Comm) Leggatt J ........................................... 25

*Dondero v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt. L.P.),*
   105 F.4th 830 (5th Cir. 2024) ......................................................... 32

*Folkvang Ltd v. Valorte Capital*
   (unreported, 29 February 2024, FSD 199 of 2023, Parker J) ........... 25

*Golfco Limited v. Borden*
   [2002 CILR 1], Kellock Ag. J ......................................................... 27

*H.E.B. Enterprises Ltd and Bodden Jr v. Richards*
   [2023] UKPC 7 .............................................................................. 26

*Heyman v. Darwins Ltd.*
   [1942] AC 356 ............................................................................... 26

*Hongkong Fir Shipping Co Ltd v. Kawasaki Kisen Kaisha Ltd*
   [1962] 2 W.L.R. 474 ...................................................................... 27

*In re Brown,*
   444 B.R. 691 (E.D. Tex. 2009) ...................................................... 31

*In re Cleveland Imaging & Surgical Hosp., L.L.C.,*
   26 F.4th 285 (5th Cir. 2022) ..................................................... 24, 31

*In re Monteagudo,*
   536 F. App'x 456 (5th Cir. 2013) .................................................. 32

*In re Paige,*
   365 BR 632 (Bankr. N.D. Tex. 2007) ........................................ 31, 32

*In re Yorkshire, LLC,*
   540 F.3d 328 (5th Cir. 2008) ......................................................... 31

001565

HCMLPHMIT00000444

*Johnson v. Agnew*
    [1980] A.C. 367 ............................................................................................. 27

*Lopez v. Portfolio Recovery Assocs. (In re Lopez),*
    576 B.R. 84 (S.D. Tex. 2017) ...................................................................... 32

*McDonald v. Dennys Lascelles Ltd*
    (1933), 48 C.L.R. 457 ................................................................................. 27

*Richards v. H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] ..................................... 26

*Schermerhorn v. Kubbernus (In re Skyport Glob. Commc'n, Inc.),*
    642 F. App'x 301 (5th Cir. 2016) ................................................................ 32

*Tempo Group Ltd and others v. Fortuna Development Corporation*
    (unreported, 31 March 2015, FSD 125 of 2012, Henderson J ...................... 28

001566

HCMLPHMIT00000445

Highland Capital Management, L.P. ("Highland"), the reorganized debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), by and through its undersigned counsel, hereby files this *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* (the "Motion") against Highland CLO Management, Ltd. ("HCLOM Ltd.") and James Dondero ("Dondero" and together with HCLOM Ltd., the "HCLOM Parties"). In support of its Motion, Highland states as follows:

## I.   PRELIMINARY STATEMENT[1]

1.   The undisputed facts adduced during discovery show that the HCLOM Ltd. Claim is baseless and HCLOM Ltd. lacks a good faith basis to continue prosecuting its claim.

2.   HCLOM Ltd. holds the Note at issue.[2] *There is no dispute that (a) HCLOM Ltd. never gave anything of value to Highland (or Acis) for the Note, (b) HCLOM Ltd. never performed any of its obligations under the Transfer Agreement or even attempted the necessary steps to enable it to do so, (c) HCLOM Ltd. never paid Highland any Acis Participation Interests, and (d) Acis failed to pay any Acis Participation Interests after the Transfer Agreement was executed.* Despite Highland not receiving the promised Acis Participation Interests and HCLOM Ltd. providing no consideration and breaching the Transfer Agreement, HCLOM Ltd. offers three reasons why it thinks it can nevertheless enforce the Note against Highland; each reason is meritless.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[2] Incredibly, at the time of his deposition, Dondero claimed he did not know who held the Note or who was responsible for prosecuting this litigation on HCLOM Ltd.'s behalf. (Ex. 62 at 8:7-14; 14:10-14; 19:22-20:15; 110:2-19). At the hearing, Highland respectfully requests that Stinson be directed to disclose the identity of the individual(s) instructing it in this matter on HCLOM Ltd.'s behalf and who is paying its fees.

001567
HCMLPHMIT00000446

3.      *First*, HCLOM Ltd. contends that the Note is a stand-alone document, enforceable without reference to the Participation Agreement or Transfer Agreement and without regard to whether HCLOM Ltd. provided any consideration or performed its obligations under those agreements.  Response ¶¶ 16-24. This contention lacks any legal basis and is contradicted by the plain and unambiguous terms of (a) the Participation Agreement, pursuant to which Acis agreed to "participate" a portion of its Servicing Fees to Highland in exchange for a downpayment and deferred payments under the Note; (b) the Note which accompanied the Participation Agreement and conditioned its own effectiveness on the effectiveness of the Participation Agreement; and (c) the Transfer Agreement (concocted just days after Terry obtained an $8 million arbitration award against Acis), pursuant to which HCLOM Ltd. was to "step into the shoes of Acis" by becoming Acis' Successor Manager in exchange for the Note.  There can be no credible dispute that these agreements were inextricably intertwined as part of one integrated transaction pursuant to which mutually dependent payments were to be made.  Dondero and Waterhouse confirmed this point during their depositions.  As Dondero testified, "it was essentially a trade of promises, and one side wouldn't have signed if they didn't get the promises of the other side."[3]  HCLOM Ltd.'s contention that the Note is somehow enforceable as a separate, unrelated binding agreement, without regard to the others, is thus unsupported and belied by the documentary and testimonial evidence.[4]

---

[3] Ex. 62 at 50:7-21; *see also id.* at 50:23-51:12.

[4] Notwithstanding HCLOM Ltd.'s new tale, Dondero confirmed these facts under oath in direct examination by his own lawyer in the Acis case in 2018: "Q…it's Mr. Terry's position … that [the Note] does not condition payment by Highland of the promissory note to receipt of service fees from Acis. So what is your response to that contention? A. [Dondero] It was always a – it was always a paired transaction, and the tying of the two together and a recommendation for unwinding or whatever you want to call it, selling the note came to me from counsel and advisors.  I mean does that not answer?"  [Ex. 76 at 151:4-12].

001568

HCMLPHMIT00000447

4.      **Second**, HCLOM Ltd. blames the Acis bankruptcy, this Court's June 2018 injunction, and the subsequent Acis plan injunction for its failure to become Acis' Successor Manager.  Response ¶¶ 25-32. This contention is likewise false.  It is indisputable that a different entity with a strikingly similar name—Highland CLO Management, LLC ("HCLOM LLC")—*was* created by Highland weeks before HCLOM Ltd. and *was* specifically organized, authorized, and equipped to serve as Acis' Successor Manager. But, HCLOM Ltd. and HCLOM LLC were completely separate entities, and HCLOM Ltd. never did, never could, and never would serve in the Acis replacement manager role—a fact Dondero admitted in the Acknowledgement and Waiver Agreement he signed eleven days *before* the Acis bankruptcy petition was even filed.[5]

5.      **Finally**, HCLOM Ltd. contends that the Note is enforceable because Highland included it on its Schedules and Seery supposedly testified during the Acis 9019 hearing that the Note was enforceable.  Response ¶¶ 33-49.  These contentions are equally meritless.  By its terms, the Schedules are subject to an extensive reservation of rights "including, but not limited to, the right to dispute or assert offsets or defenses to any claim reflected on the SoFA and Schedules as to amount, liability, or classification of the claim, or to otherwise subsequently designate any claim as 'disputed,' 'contingent' or 'unliquidated.'"[6]   As HCLOM Ltd. acknowledges, while the

---

[5] Ex. 7.  As shown below, the indisputable evidence proves that HCLOM LLC was created and specifically constructed and enabled to serve as Acis' Successor Manager for the resetting and refinancing of the Acis CLOs. *See infra* ¶¶ 43-51. Incredibly, despite being designated as HCLOM Ltd.'s Rule 30(b)(6) witness, Waterhouse did not recall that there was an entity named "Highland CLO Management, LLC" and another entity named "Highland CLO Management, Ltd." (Ex. 3 at 6:2-11; 25:21-26:5). Whether negligently or deceitfully, HCLOM Ltd.'s Response completely and nonsensically confuses HCLOM Ltd. and HCLOM LLC. That confusion or deceit is also reflected in Dondero's recent verified interrogatories in the Acis case where, completely contradicting the terms of the Transfer Agreement and HCLOM Ltd.'s position here, he stated: "Highland CLO Management LLC ("Highland Management") was established to assume management of the Acis CLOs post-reset, including taking on Acis obligation to pay 50% of the Acis CLO fees to Highland Capital as well as becoming payee on Highland Capital's the [*sic*] Promissory Note. In accordance with the above, Acis, on November 7, [*sic*] 2017 agreed to transfer the Promissory Note to Highland Management [LLC] and also agreed to transfer to Highland Management [LLC], when it became manager of the Acis CLO's [*sic*] post-reset, to pay 50% of the CLO management fees to Highland Capital." Ex. 65 (response to Interrogatory No. 4).

[6] *Notice of Filing of Debtor's Amended Schedules*, Docket No. 1082, Ex. 1 at 2.

001569

HCMLPHMIT00000448

HCLOM Claim may be prima facie valid, Highland's Objection and the evidence adduced herein (and at trial) shifts the burden of proof back to HCLOM Ltd. to establish the validity and amount of its claim.[7] And Seery will testify that his testimony during the Acis 9019 hearing was based on the erroneous notion that Highland owned HCLOM Ltd. at the time, a notion HCLOM Ltd.'s own corporate representative ironically still believes is true.[8]

6.      In addition to pursuing a baseless claim, HCLOM Ltd.'s witnesses—Dondero and Waterhouse, both individually and as HCLOM Ltd.'s Rule 30(b)(6) witness—were so uninformed and unprepared to testify that sanctions are warranted. *See infra* ¶¶ 52-59.  Dondero deserves special focus because while he attempted to distance himself from virtually everything, (a) his family trust, The Dugaboy Investment Trust ("Dugaboy"), was the majority ultimate beneficial owner of Acis and therefore the primary beneficiary of the tax-driven strategy that lead to the Participation Agreement, (b) through Dugaboy, he indirectly owns a majority interest in HCLOM Ltd. and therefore has the largest stake in the outcome of this litigation, and (c) while he claimed to be unaware of it, Dondero was, and apparently remains, the President of HCLOM Ltd.

7.      Discovery is complete.  HCLOM Ltd. knows that there is no genuine dispute that the HCLOM Claim is invalid and will be disallowed; the continued pursuit of the HCLOM Claim is now just another vexatious abuse of the judicial process.  HCLOM Ltd. should immediately consent to the entry of an order disallowing the HCLOM Claim—and all the factual and legal theories upon which it is based—with prejudice.  If it fails to do so, Highland requests that the

---

[7] Ex. 20 ¶¶ 13-15.

[8] Ex. 3 at 36:7-22.

001570
HCMLPHMIT00000449

Court enter a finding of bad faith and an award of attorneys' fees[9] jointly and severally against
HCLOM Ltd. and Dondero.[10]

## II.    RELEVANT BACKGROUND

**A.    The Bankruptcy Case: The HCLOM Claim, the Objection, and the Response**

8.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for
relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of
Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9.    On December 4, 2019, the Delaware Court entered an order transferring venue of
the Debtor's Bankruptcy Case to this Court [Docket No. 186].[3]

10.    On December 13, 2019, Highland filed its schedule of unsecured claims that
identified "Highland CLO Holdco" as a creditor with claims under a note.  Docket No. 247
(Schedule E/F, Part 3.64 and 3.65) (the "Initial HCLOM Claim").

11.    On September 22, 2020, Highland filed a *Notice of Filing of Debtor's Amended
Schedules* in which it, among other things, replaced Highland CLO Holdco as the creditor with the
Initial HCLOM Claim with HCLOM Ltd., an entity Highland's independent directors then
believed was owned directly or indirectly by Highland.  Docket No. 1082 (Schedule E/F, Part 3.65
and 3.66) (the "HCLOM Claim").

---

[9] Highland reserves the right to offer proof of the legal fees it has incurred during the evidentiary hearing currently
scheduled for December 18, 2024.

[10] As the Court will recall, Highland moved for similar relief against HCRE but only after the evidentiary hearing was
completed and the Court rendered a decision on the merits.  *See* Docket No. 3851. To be more efficient; because the
evidence supporting Highland's Objection and this Motion will be the same; and to give HCLOM Ltd. fair notice of
the relief requested, Highland files this Motion in advance of the hearing.  While HCLOM Ltd. technically has 21
days to oppose the Motion, Highland has no objection to HCLOM Ltd. filing its response on December 16, 2024, to
take into account the Thanksgiving holiday.  Highland reserves the right to offer and rely on such further evidence
that is adduced at trial in support of this Motion.

001571

HCMLPHMIT00000450

12.     On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "<u>Confirmation Order</u>"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "<u>Plan</u>").  The Plan became effective on August 11, 2021 (the "<u>Effective Date</u>") [Docket No. 2700].

13.     Following the Effective Date and in furtherance of the Plan, Highland began reviewing the available information to determine the validity, amount, and priority of all unresolved claims.  The evidence will show that, as part of the process, Highland discovered, among other things, that (a) it only held a 1% economic interest in HCLOM Ltd.,[11] (b) HCLOM Ltd. provided no consideration for the Note, (c) HCLOM Ltd. never performed its obligations under the Transfer Agreement and could never have done so, and (d) Acis failed to perform its obligations under the Participation Agreement and the Transfer Agreement, all of which vitiated any obligations Highland may have had under the Participation Agreement, the Note, or the Transfer Agreement.  Based on these facts, among others, Highland filed its objection to the HCLOM Claim on February 2, 2023 (the "<u>Objection</u>").  Ex. 1.

14.     On April 3, 2023, HCLOM Ltd. filed its response to the Objection (the "<u>Response</u>").  Ex. 20.

**B.      <u>Dondero Terminates Terry and the Parties Execute the Participation Agreement</u>**

15.     This dispute arises from a series of intercompany agreements and machinations orchestrated in the "Highland Complex" while James Dondero ("<u>Dondero</u>") was firmly in control of all sides of the enterprise.

---

[11] It also held 99% of the voting, non-economic interests in HCLOM Ltd.

001572

HCMLPHMIT00000451

16.     Prior to the Petition Date, Acis Capital Management, L.P. ("Acis"), then an affiliate of Highland, provided portfolio management services to the issuers of certain collateralized loan obligations ("CLOs") in exchange for management fees ("Servicer Fees") to be paid under portfolio management agreements (the "PMA's").[12] The PMA's prohibit the portfolio manager from assigning any of its rights or obligations under the PMA's without permission and the satisfaction of certain conditions.[13] At all relevant times, Dondero controlled Acis and Highland.

17.     Since Acis had no employees of its own, Highland provided back- and middle-office services as well as investment advisory services to Acis pursuant to certain Shared Services and Sub-Advisory Agreements (the "SSA" and "SAA", respectively, and together, the "HCMLP Services Agreements," as amended). The services provided under the HCMLP Services Agreements enabled Acis to perform under the PMA's. Joshua Terry ("Terry"), a Highland employee, was also an officer and portfolio manager of Acis until 2016.

18.     On June 9, 2016, Dondero, acting through Highland, terminated Terry and as a result, Dondero and Frank Waterhouse ("Waterhouse") remained as the sole officers of Acis' general partner. *See* Ex. 9.

19.     On July 29, 2016, Highland and Acis amended the HCMLP Services Agreements pursuant to which, among other things, Acis agreed to pay Highland a fee at the following rates for each of the Acis CLOs: (a) 20 basis points for sub-advisory services; and (a) 15 basis points for shared services, for a total of 35 basis points, with the rates applied retroactively to January 1, 2016. *See* Ex.10 at HCLOM00535306 (20 bps for sub-advisory services), HCLOM00535321 (15

---

[12] Fees under the PMA's are calculated by multiplying the fee earning assets in a given CLO by the fee rate, expressed in basis points. The CLO issuers were obligated to pay Acis the following under the Acis managed CLOs: Acis CLO 2013-1, Ltd. 50 bps; Acis CLO 2014-3, Ltd. 40 bps; Acis CLO 2014-4, Ltd. 40 bps, Acis CLO 2014-5, Ltd. 40 bps; and Acis CLO 2015-6, Ltd. 40 bps. *See* Ex. 13 (Schedule A under "Total Servicer Fee").

[13] *See* Ex. 32 §14; Ex. 34 §14; Ex. 36 §14; Ex. 38 § 14.

001573

HCMLPHMIT00000452

bps for shared services).[14]  These fee amendments roughly doubled the aggregate annual fees
Highland was to receive from Acis and the retroactive nature of the agreements immediately
saddled Acis with approximately $3 million in additional payables to Highland.

20.    In or around September 2016, Dondero caused Highland to sue Terry in Texas state
court.  Terry moved to compel arbitration, and his motion was granted. *See* Ex. 25.  As discussed
below, the arbitration was conducted in September 2017.

21.    On October 7, 2016, Dondero caused Acis and Highland to enter into an *Agreement
for Purchase and Sale of CLO Participation Interests* (the "Participation Agreement"). Ex. 13.
The Participation Agreement was not an arms' length economic transaction but was adopted for
the tax-driven purpose of converting ordinary income into capital gains for the benefit of Acis'
ultimate beneficial owners—Dugaboy and Mark Okada—of up to 20%.[15]  As Dondero previously
testified: "So immediately upon Josh's [Terry] leaving back in June [2016], the partnership became
just Mark and I, 75/25. What this transaction was and was meant to be and never anything more
was a tax-planning strategy to reduce taxes. Because Acis was a full taxpaying entity and Highland
wasn't. You know, the creation of the note of Highland paying Acis a note, that note—**Highland
never got any monies for it. Highland never got any value for it, other than a promise for
Acis to pay its management fees over time.**" Ex. 76 at 133:23-134:7 (emphasis added).

22.    In order to try to achieve the desired tax savings under the Participation Agreement,
Acis agreed to participate to Highland a portion of the Servicer Fees (the participated portion, the
"Acis Participation Interests") for a finite period of time in exchange for Highland's payment to

---

[14] Dondero signed the amendments to the HCMLP Services Agreements on behalf of Acis and Highland.

[15] Dondero admitted that Acis and Highland were "pass through" entities and that the purpose of the Participation
Agreement was to defer or recharacterize taxes for the benefit of the ultimate beneficial owners.  (Ex. 62 at 35:10-
36:16, 37:4-19;  *see also*  Ex. 3  at 79:19-80:24, 83:1-6,85:22-86:16 (Waterhouse testified that the Participation
Agreement was a "tax-driven strategy" that also provided certain cash management benefits to Highland)).

001574
HCMLPHMIT00000453

Acis of $666,655 in cash (the "<u>Cash Purchase Price</u>") and the payment of deferred annual installments under a note in favor of Acis, in the original principal amount of $12,666,446.00 (the "<u>Note</u>"). *See id.* §§ 1, 1.1; *see also* Ex. 14.[16] While the Note references "advances" by Acis, no money was ever loaned to Highland. The Note simply reflected amounts that would be paid back to Acis by Highland—a "wash" according to Dondero—after Highland received payment of the Acis Participation Interests.[17]

23.     Despite Terry's contentious departure in 2016 and the public litigation Highland launched against him later that year, it was "business as usual" for Acis. (*See* Ex. 3 at 68:7-69:24). For example, Acis continued serving as the portfolio manager for the CLOs, managing billions of dollars of bank loans and paying the Acis Participation Interests to Highland in exchange for the installment payments under the Note, all as required under the Participation Agreement. In March 2017, Dondero caused Highland and Acis to further amend the HCMLP Services Agreements. *See* Ex. 11 (Fourth Amended and Restated Shared Services Agreement, dated March 17, 2017); Ex. 12 (Third Amended and Restated Sub-Advisory Agreement, Dated March 17, 2017). The next month, Acis even completed a new, risk-retention compliant CLO ("<u>Acis 7</u>"), using an indirect

---

[16] The Note called for annual payments to be made on May 31, 2017, 2018, and 2019. Ex. 14. The evidence will show that Acis and Highland performed their respective obligations under the Participation Agreement and the Note until the Transfer Agreement was executed in November 2017. After that, even though Dondero controlled Acis until the appointment of a trustee, Acis stopped remitting the Acis Participation Interests to Highland as required under the Participation Agreement, Highland stopped making payments to Acis under the Note and HCLOM Ltd. did absolutely nothing.

[17] In response to his attorney's questioning in the Acis case, Dondero testified as follows: "Q. "This is not like I – for example, I refinanced my house recently, give a note to the bank, but I get cash money at closing from the bank. Are you saying that did not happen here? A. [Dondero] Correct. In October. Highland got nothing other than a promise for Acis to pay. And all the payment schedule – the amortization on the note was timed exactly to match the expected management fees as Acis got them in." Ex. 76 at 134:13-20. Dondero continued: "**It's essentially a wash. They're – yes, it doesn't matter which pocket it goes into**." *Id.* at 152:23-24 (emphasis added). On cross, Dondero insisted: "A. I'm saying it was paired together, it was a tax transaction, it was supposed to have very little net value, there was supposed to be offsetting flows, and the recommendation on the sale was all guided by counsel, internal and external…." *Id.* at 36:10-14.

001575

HCMLPHMIT00000454

subsidiary, Acis CLO Management, LLC ("ACLOM LLC"), as the portfolio manager. Ex. 15 (Portfolio Management Agreement between Acis CLO 2017-7, Ltd. and ACLOM LLC).[18]

24.    Things went south in 2017 as summer turned to fall. Dondero and his team spent 10 days opposing Terry's arbitration in September. Clearly sensing that the arbitration was not going well for him, Dondero instructed his attorneys to eliminate arbitration clauses in existing and future contracts. Even more tellingly, on October 19, 2017, Highland formed HCLOM LLC as a Delaware LLC to replace ACLOM LLC for future CLO issuances and resets of existing managed CLOs. Ex. 87. The next day, on October 20, 2017, Terry was awarded an $8 million arbitration award against Acis (the "Arbitration Award"). Ex. 26.[19]

## C.    The Note is Assigned to HCLOM Ltd. Under False Pretenses in Exchange for HCLOM Ltd. Agreeing to Become the Successor Manager of the CLOs

25.    Despite having formed HCLOM LLC a week earlier and inserting that entity as successor manager into draft agreements and memoranda, on October 27, 2017, Highland also formed HCLOM Ltd. as a Cayman entity with Summit Management Limited ("Summit") appointed by Highland as HCLOM Ltd.'s initial and sole director. *See* Ex. 5. The creation of this entity in the Cayman Islands was no accident: its sole purpose was to secretly hold the Note and—according to Isaac Leventon, Highland's then-Assistant General Counsel in charge of litigation—cause Terry to spend "multiple years to collect" on his Arbitration Award. Ex. 69; Ex. 83.[20]

---

[18] Dondero stubbornly clings to the notion that all of the asset transfers away from Acis were required because the Acis brand was "toxic." As the Court will recall, during the Acis case, the Highland team under Dondero's leadership attempted to tag HarbourVest with the "toxicity" concept, but that effort failed. During his deposition, he tried to tag Goldman Sachs with the concept despite having no personal knowledge to support it. In fact, the documentary and testimonial evidence is to the contrary.

[19] Even though the Panel found that—under Dondero's watch—Highland concocted pretextual arguments for denying Terry his benefits and interfering with his economic rights, and that Acis breached its contractual and fiduciary duties (Ex. 26 at 21-22), Dondero inexplicably insists that he has never read the Arbitration Award and is unfamiliar with the findings. Ex. 62 at 67:11-22, 70:3-20).

[20] During his deposition, Dondero repeatedly disavowed responsibility for anything related to Terry's termination or arbitration or any of the events that followed; instead, he tried to point the finger at Thomas Surgent and Tim Cournoyer (two current employees of Highland). While the issue is legally irrelevant (it does not matter who caused

001576
HCMLPHMIT00000455

26.     On November 3, 2017, roughly two weeks after the Arbitration Award was rendered, a meeting was held with Dondero in his office to discuss the "Terry Arbitration" and the "Acis Restructuring." *See* Ex. 69 (11/3/17 email among Leventon, Ellington, and Welton detailing "[d]raft bullets for internal management discussion"); Ex. 83 (final version of the bullet points); Ex. 81 (acceptance of meeting invite).

27.     Sometime during or immediately after the November 3, 2017 meeting, Dondero executed the *Assignment and Transfer Agreement* (the "Transfer Agreement" or "Assignment") on behalf of Highland[21] and Acis; Summit (acting at the direction of Dondero-controlled Highland) executed the Transfer Agreement on HCLOM Ltd.'s behalf. *See* Ex. 16.

28.     Pursuant to the Transfer Agreement, which falsely stated that Highland notified Acis that Highland was unwilling to continue providing services to Acis under the HCMLP Services Agreements and, therefore, Acis was unable to fulfill its portfolio management duties to the applicable CLO's,[22] (a) HCLOM Ltd. agreed to become the CLOs' Successor Manager (as defined in the Transfer Agreement); (b) Acis and HCLOM Ltd. agreed to remit the Acis Participation Interests to Highland; and (c) the Note was assigned to HCLOM Ltd. Significantly, the Transfer Agreement Assignment provides: "HCLOM, a qualified Successor Manager, irrevocably commits to be appointed as Successor Manager *in consideration of Acis assigning to it the Note*." Ex. 16 at 1 (emphasis added).

---

HCLOM Ltd. not to provide consideration for the Note or perform under the Transfer Agreement), it weighs on credibility or the lack thereof. The evidence will establish that Scott Ellington—with Dondero's knowledge—dictated that Leventon and an outside attorney, Jamie Welton, were to be solely responsible for working on the Terry case (Ex. 68), and that's exactly what happened (*see, e.g.*, Ex. 69).

[21] Section 5.1 of the Participation Agreement requires Highland's written consent to an assignment by Acis of any of its rights or obligations thereunder.

[22] Written notice of termination was required under the HCMLP Services Agreements, but no such notice was ever given and, in fact, Highland continued to perform the services under the HCMLP Services Agreements until the summer of 2018 when a new service provided took over following the appointment of the Acis trustee.

001577

HCMLPHMIT00000456

29.     According to Waterhouse, the Transfer Agreement was intended to authorize HCLOM Ltd. to take the necessary steps to become Acis' Successor Manager so that it would receive the Servicing Fees and remit them to Highland in exchange for the expected cash streams due under the Note.  Ex. 3 at 135:24-136:24.

30.     The Transfer Agreement also required (a) Acis (again, then under Dondero's control) to "promptly provide the Controlling Class (as defined in the CLO Indentures) with notice requesting the appointment of HCLOM [Ltd.] as Portfolio Manager pursuant to the requirements of the CLO Documents," and (b) each of Acis and HCLOM Ltd. to "promptly pursue Successor Manager appointment of HCLOM [Ltd.] in respect of each CLO." *Id*. §§ 1, 2.  None of this occurred.

31.     Section 3 of the Transfer Agreement provides:

**3.     Assignment and Transfer of the Promissory Note; Stabilization Payments.**

a. Effective immediately upon execution of this Agreement by the Parties, all right, title and interest of Acis under the Note, including the right to any and all Stabilization Payments not yet paid to Acis, are hereby irrevocably assigned and transferred by Acis to HCLOM [Ltd.], it being understood that from the date of such assignment, HCLOM [Ltd.] shall become the "Payee" thereunder.

b. For so long as Acis shall receive Servicer Fees following the date hereof, Acis shall remit to H[ighland] the HCM Stabilization Fees [*i.e.*, the Acis Participation Interests] pursuant to the Note Purchase Agreement [*i.e.*, the Participation Agreement].

c. For so long as HCLOM [Ltd.] receives any Servicer Fees following any Appointment, then HCLOM [Ltd.] shall remit to H[ighland] any portion of such fees that would otherwise have constituted HCM Stabilization Fees pursuant to the Note Purchase Agreement if Acis was the recipient of such fees.

d. HCLOM [Ltd.] shall sign a joinder to Note Purchase Agreement upon HCM's written notice thereof.

Transfer Agreement, § 3 (emphasis added).

001578
HCMLPHMIT00000457

32.     Thus, the Transfer Agreement provided that HCLOM Ltd. would receive Acis's rights under the Note, subject to HCLOM Ltd. becoming the Successor Manager, and Acis and HCLOM Ltd. continuing to remit Acis Participation Interests to Highland.  According to Dondero, from Acis' and Highland's perspective, the purpose of the Transfer Agreement was to replace Acis as Portfolio Manager. Ex. 3 at 83:23-84:11.[23]

33.     Although Dondero signed the Transfer Agreement, he now says he has no knowledge of any facts underlying its execution.  For instance, Dondero says he does not recall (a) the document or reading it before he signed it, (Ex. 62 at 79:4-18; 83:12-19); (b) receiving any advice before signing, (*id.* at 100:4-10); or (c) taking any steps to make sure the Transfer Agreement accurately reflected the facts, (*id.* at 108:16-25).  Dondero also says he does not know who John Cullinane is and never communicated with him, or anyone authorized to act on HCLOM Ltd.'s behalf, before executing the Transfer Agreement, (*id.* at 79:19-81:19; 82:24-83:3).

34.     During his deposition, Dondero (a) could not recall if he expected Highland to receive *any* benefit under the Transfer Agreement, (*id.* at 84:22-25); (b) was unable to identify *anything* of value HCLOM. Ltd. provided to Highland pursuant to the Transfer Agreement, (*id.* at 88:15-89:2); and (c) did not know if HCLOM Ltd. *ever* gave anything of value to Highland for any purpose, (*id.* at 89:20-91:5).  In fact, Dondero (x) was initially unaware that Highland was a party to the Transfer Agreement; (y) could not identify a benefit Highland was to receive even after reviewing the Agreement; and (z) has "no idea" why he signed the Agreement on behalf of Acis and Highland.  *Id.* 85:8-86:15.

---

[23] The Transfer Agreement created a new consolidated defined term—"Note Purchase Agreement"—that provided further evidence that the Note and the Participation Agreement (what was being referred to in the Transfer Agreement as the "Purchase Agreement") are one integrated and mutually dependent agreement.

001579

HCMLPHMIT00000458

**D.**    **The Note and Payment of Acis Participation Interests are Part of One Integrated Transaction**

35.    Contrary to HCLOM Ltd.'s unsupported contentions, the evidence will show that the Note and payment of Acis Participation Interests under the Participation Agreement and Transfer Agreement are inextricably intertwined as one integrated transaction. The Participation Agreement attached a copy of the Note as an exhibit and made repeated references to the Note. *See, e.g.*, Ex. 13 § 1.1 ("In consideration of the sale of the Acis Participation Interests to the Purchase, the Purchaser shall" pay the Cash Purchase Price and deliver the Note); § 1.3 (the Purchase Price "reflects the arm's length value of the Acis Participation Interests as of the date of this Agreement…").  Unlike the many promissory notes that were issued and separately litigated in the Highland bankruptcy, the Note was not tendered in exchange for a cash advance; rather it was tendered solely for the promise of future Acis Participation Interests.[24]

36.    The Note also refers to, and depends on, the Participation Agreement.  By its terms, the Note was to become effective only upon the effectiveness of the Participation Agreement, which was executed contemporaneously by Highland and Acis.[25]  A condition precedent to the effectiveness of the Note provides:

> ***This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until*** Payee has received each of the following in form and substance acceptable to Payee:
>
> ....

---

[24] Dondero under oath at deposition in the Acis case: "A. What did Highland get when the note was put in place? It's a $12 million note.  Did Highland get $12 million? Did Highland get $13 million? Did Highland get an asset? No. Highland got a promise from Asis to pay it management fees that Acis was gonna get over the next three or four years, and the amortization [of the Note] was tied to the fees as they came in, and Highland got them. So when Highland got fees, it paid down – it paid the money to Acis to pay off the note." Ex. 78 at 12:8-19.

[25] Dondero on direct in the Acis case: "Q. And I think this is obvious, by why are Exhibits 14 [the Participation Agreement] and 15 [the Note] dated October 7, 2016? A, (Dondero) Because they're paired together." Ex. 76 at 141:6-8.

001580

HCMLPHMIT00000459

(b) the Agreement for Purchase and Sale of CLO Participation Interests dated of even date herewith (the "Purchase Agreement"), by and between Maker and Acis Capital Management, LP, a Delaware limited partnership ("Highland") [*sic*], and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that ***all conditions to the effectiveness of the Purchase Agreement have been or will be fulfilled contemporaneously with the initial advance under this Note***;

Ex. 14 (Note) at 1 (emphases added).

37.     The Transfer Agreement was ostensibly intended to assign Acis' rights and obligations under the Participation Agreement to HCLOM Ltd.  Pursuant to the Transfer Agreement, HCLOM Ltd. would step into Acis' shoes as Successor Manager.  And, as noted above, the Transfer Agreement combines the Note and the Participation Agreement into one agreement—the "Note Purchase Agreement"—and treats them as the fully integrated transaction they were intended to be.

38.     In addition to the plain and unambiguous terms of the Note, Participation Agreement, and Transfer Agreement, Waterhouse—the former Treasurer of Acis and CFO of Highland—admitted that (a) "Highland is giving the Cash Purchase Price and the Note to Acis *in exchange* for Acis' promise to share the Acis' Participation Interest as defined in th[e] agreement," (Ex. 3 at 104:16-105:24 (emphasis added)), and (b) the Note and Participation Agreement "were part and parcel of the same overall transaction," (*id.* at 111:9-112:1).  Regarding the Transfer Agreement, Waterhouse acknowledged "that the reason Highland agreed to transfer the note to HCLOM [Ltd.] is because HCLOM [Ltd.] was agreeing to become the new portfolio manager for the Acis CLOs and would share the servicing fees after that happened."  (Ex. 3 at 150:13-23).

39.     Dondero also (once again) confirmed that these agreements all constituted one integrated transaction.  According to Dondero, under the Participation Agreement, Acis was to participate a portion of its expected Servicing Fees for cash and a Note for the purpose of reducing the taxes owed by the beneficial owners.  (Ex. 62 at 35:13-41:25; 43:20-25; *see also* Ex. 3 at 79:19-

001581

HCMLPHMIT00000460

80:24, 83:1-6, 85:22-86:16). As Dondero stated: "one side wouldn't have signed if they didn't get the promises of the other side" (Ex. 62 at 50:7-12; *see also* 50:23-51:12); *see also* (Ex. 28) (opinion letter from Hunton & Williams that conditions favored tax treatment on the continued exchange of Acis Participation Interests for payments under the Note).

E.   **Undisputed Evidence Proves that HCLOM Ltd. and Acis Breached the Transfer Agreement and Acis Breached the Participation Agreement**

40.    The overwhelming, undisputed evidence proves that HCLOM Ltd. breached the Transfer Agreement. HCLOM Ltd. never began, let alone fulfilled, its purported commitment to serve as the Successor Manager—the only "thing of value" that HCLOM Ltd. contends it "gave" to Highland in exchange for agreeing to the transfer of the Note. Ex. 21 (Response to Interrogatory 1) (when asked to identify each thing of value HCLOM Ltd. gave to Highland in exchange for the Note, HCLOM Ltd. stated that it "irrevocably committed in the Assignment to be appointed as successor manager and then took steps to effectuate the transfer as promised."). Contrary to its contention, HCLOM Ltd. never took any steps, nor did it ever have the operational capacity, to be appointed Successor Manager because it:

- had no employees, (Ex. Ex. 3 at 22:1-2);

- was never a registered investment advisor and earned no fees, (Ex. 3 at 26:17-19; Ex. 62 at 91:23-25);

- had no shared services or sub-advisory agreement and therefore could never fulfill its duties as portfolio manager, (Ex. 3 at 22:3-9; Ex. 62 at 93:6-19);

- was not "qualified" pursuant to PMAs and Indentures, (*see* Ex. 62 at 104:24-105:2);

- had no risk retention financing, nor ever tried to obtain any;

- never engaged an investment bank to arrange any reset or refinancing, reissue, refinancing, or new underwriting of any CLO or other vehicle or business;

- was never capitalized and had no bank account or bank relationship, (Ex. 3

001582
HCMLPHMIT00000461

at 26:6-10);

- never maintained financial statements or books and records, (Ex. 3 at 11-16); and

- never sought the consents required to become the Successor Manager.

41.    In fact, *HCLOM Ltd. admits that it failed to perform any of its obligations under the Transfer Agreement* because it never (a) became Successor Manager, (b) managed the Acis CLOs, or (c) remitted any Acis Participation Interests to Highland. *See* Ex. 21 (Responses to Interrogatories 4-6 and RFAs 2, 4, and 6); Ex. 3 at 20:25-21:20, 31:14-24, 156:15-157:6; Ex. 62 at 106:14-16; 107:1-10.[26]

42.    Notably, Acis—while under Dondero's control—also breached the Transfer Agreement.  Between November 3, 2017 (when the Transfer Agreement was executed) and April 13, 2018, the time Dondero lost control of Acis with the granting of the order for relief and the appointment of the Acis trustee, Acis continued to receive Servicing Fees in its capacity as the CLO portfolio manager but failed to remit the Acis Participation Interests to Highland as required under both the Participation Agreement and the Transfer Agreement. *See* Ex. 3 at 120:10-18.

**F.    The Undisputed Evidence Shows that HCLOM LLC Was To Be the Acis Successor Manager**

43.    While HCLOM Ltd. was furtively established as a Cayman Islands entity that did nothing except enter into the Transfer Agreement and purportedly take title to the Note, HCLOM LLC (formed prior to HCLOM Ltd.) was busy actually taking the substantial steps required to become Acis' Successor Manager.  As a result, the Note was effectively hidden in the Cayman Islands entity while Highland, under Dondero's control, worked to transfer the business of running the CLOs away from Acis to a separate, same-named, Delaware entity with no obligation to pay

---

[26] Dondero could not recall ever signing a document (other than the Transfer Agreement) that contemplated that HCLOM Ltd. would serve as Acis' Successor Manager. (*See* Ex. 62 at 125:8-12).

001583

HCMLPHMIT00000462

the Acis Participation Interests to Highland. If Highland could transfer the management of the

CLO's to HCLOM LLC and abscond with the Note, Acis would no longer receive any Servicing

Fees, Acis would get no payments under the Note, and Terry would be unable to collect on his

Arbitration Award.

44.    In the weeks after Terry obtained his Arbitration Award:

- On November 15, 2017, HCLOM LLC entered into an agreement with Mizuho pursuant to which HCLOM LLC would serve as the manager of the Acis CLOs and Mizuho would serve as the placement agent for the resets and refinancings of certain of the applicable CLOs, (Ex. 64);[27]

- On December 19, 2017, HCLOM LLC entered into Shared Services and Sub-Advisory Agreements with Highland so that it was prepared to fulfill its expected duties as the manager of the applicable CLOs, (Ex. 85, Ex. 86);

- On January 19, 2018, HCLOM LLC signed a Custodial Agreement in order to be able to hold the securities required of it under the U.S. "risk retention" rules then in effect, (Ex. 27); and

- Later in January, HCLOM LLC entered into certain agreements (executed by Dondero) to obtain "risk retention" financing that would enable it to reset Acis-3, (Exs. 72, 73).

45.    The Acis involuntary petition and the section 303(f) order did undercut the

willingness of bankers to participate in resetting the CLO's away from Acis' control and,

ultimately, the order for relief and the injunction prevented HCLOM LLC from continuing its plan

to replace Acis as Successor Manager but—contrary to the Response (Ex. 20 ¶¶ 27-28)—neither

the involuntary, the 303(f) order, nor the order for relief and the ultimate plan injunction had *any*

impact on HCLOM Ltd.'s failure to perform it obligations under the Transfer Agreement because

---

[27] *See also* Ex. 62 at 119:18-120:4; 122:5-11; 123:19-124:7 (despite signing the Mizuho Agreement, Dondero (a) did not know where HCLOM LLC obtained authority to enter in that Agreement, (b) acknowledged that HCLOM Ltd. is not mentioned in the document; and (c) does not know why HCLOM LLC entered into the Agreement rather than HCLOM Ltd.).

001584

HCMLPHMIT00000463

HCLOM Ltd. was never going to, nor did it take affirmative steps to, serve in that Successor Manager role.

### G. The Parties' Post-Transfer Agreement Conduct Shows that the HCLOM Parties Knew Neither Acis Nor HCLOM Ltd. Would Perform under the Transfer Agreement or Participation Agreement After Terry Received His Arbitration Award

46. The parties' conduct further demonstrates that, following the issuance of the Arbitration Award, neither HCLOM Ltd. nor Acis would ever satisfy their obligations to Highland under the Participation Agreement or the Transfer Agreement.

47. For example, on January 19, 2018—before the Acis bankruptcy was commenced—Dondero signed an Acknowledgement and Waiver Agreement in which he (a) acknowledged that HCLOM LLC would succeed Acis rather than HCLOM Ltd., and (b) recognized that HCLOM Ltd.'s failure to serve as Acis' successor constituted a material breach of its obligations under the Transfer Agreement.[28] While purporting to waive HCLOM Ltd.'s breach, Dondero was unaware of anything Highland received in exchange for such waiver (*i.e.*, Highland's waiver of HCLOM Ltd.'s material breach was unsupported by any consideration).[29]

48. The undisputed evidence will also show that both before and immediately upon the filing of the Acis involuntary petition, while Dondero continued to firmly control both Highland and Acis, Highland eliminated all payments to and from Acis under the Participation Agreement from its internal weekly cash flow forecasts. (*Compare* Ex. 44 at 6 (showing "Stability Transaction" payments during the projection period) *with* Ex. 45 at 3, 6 (showing the removal of the "stability" payments) and Exs. 46-61 (no reference to any stability payments in any forecast

---

[28] Although Dondero signed the Acknowledgement and Waiver Agreement, he does not remember reading it before signing it or discussing it with anyone (Ex. 62 at 129:10-130:7; 134:15-23).

[29] At deposition, Dondero testified that (a) he did not know what Highland received from HCLOM Ltd. in exchange for the waiver; (b) he never asked; and (c) no one ever explained what benefit Highland received for waiving the breaches of the Transfer Agreement (Ex. 62 at 135:18-136:6).

001585
HCMLPHMIT00000464

through May 31, 2018 the date the next amortization payment was due under the Note).  The evidence will also show that Acis removed both the Note (asset) and the Participation Agreement (liability) from its financial statements and both Acis and Highland stopped making any payments related to the transaction.[30]

49.     Further, under Dondero's leadership, Highland filed unsecured, priority, and administrative claims in the Acis bankruptcy case for fees due under the HCMLP Services Agreements, (Exs. 17, 67), yet Highland *never* filed a claim for the Acis Participation Interests due under the Participation Agreement.

50.     Finally, while HCLOM Ltd. now claims it can seek payment under the Note notwithstanding the lack of consideration or performance, it abandoned whatever claims it may have had well before Highland filed its Objection.  In fact, rather than trying to declare a default under the Note or suing to collect, HCLOM Ltd. signed "forbearance" agreements pursuant to which it agreed not to collect under the Note in exchange for Highland's promise not to demand the Acis Participation Interests.  Exs. 18, 19. But this made no sense because Dondero had already acknowledged that HCLOM Ltd. would never succeed Acis and therefore would never receive any Servicing Fees.  If HCLOM Ltd.'s current position had any merit (and it doesn't), HCLOM Ltd. should have been trying to enforce its purported rights under the Note.  Waterhouse testified that the benefit HCLOM Ltd. received from entering into the forbearance was "preserv[ing] that relationship [with Highland]."[31]  The Court can assess the credibility of that testimony.

---

[30] *See, e.g.*, Ex. 76 at 147:6-150:12.  Dondero specifically testified that the Transfer Agreement effectively cancelled the Participation Agreement and the Note: "The unwinding of the note plus the unwinding of the liabilities [the participation] which netted each other . . . were never really of any net value anyway."  *Id.* at 147:6-9.

[31] Because "everyone knew" HCLOM Ltd. would never receive any Servicing Fees, Waterhouse could not identify any benefit it received from the forbearance agreements other than supposedly "preserving the relationship," even though the same people were making the decisions on behalf of both parties and HCLOM Ltd. was an empty box on a piece of paper.  (Ex. 3 at 165:21-168:22, 171:25-172:3, 182:19-184:21).

001586
HCMLPHMIT00000465

51.     Waterhouse admitted that he was unaware "of any discussion or attempt by anybody in the world after January 19, 2018 to install HCLOM Ltd. as the portfolio manager of the CLOs." (Ex. 3 at 172:4-173:11). Thus, whether by neglect or design, HCLOM Ltd.'s contention that the Acis bankruptcy and this Court's injunction prevented HCLOM Ltd. from becoming Acis' Successor Manager so that it could perform under the Transfer Agreement is simply untrue.

**H.      Waterhouse was Unprepared to Testify as HCLOM Ltd.'s Rule 30(b)(6) Witness and Otherwise Lacked Personal Knowledge Such that he Cannot Testify in Good Faith**

52.     Waterhouse testified as HCLOM Ltd.'s Rule 30(b)(6) witness but was so uninformed and unprepared that he cannot testify at trial in good faith. In fact, even his verification of HCLOM Ltd.'s interrogatory responses was false.[32]

53.     Attached as **Exhibit A** is a demonstrative exhibit that summarizes Waterhouse's deposition testimony (the transcript of which is offered as Ex. 3). As shown therein, Waterhouse testified that the only thing he did to prepare to testify as HCLOM Ltd.'s Rule 30(b)(6) witness was meet with the Stinson lawyers for a few hours and review the primary transaction documents at issue. He (a) did not review a single email or speak with anyone other than counsel, and (b) testified about whole topics with no personal knowledge or preparation. (Ex. 3 at 6:18-8:9, 7:15-16, 9:15-17, 9:21-11:5, 41:9-42:7, 124:24-126:3).[33]

54.     Reflecting his lack of preparation, Waterhouse testified, among other things, that:

- he did not know that there is an entity called "Highland CLO Management,

---

[32] During his deposition, Waterhouse was forced to admit that (a) his verification falsely stated that it was based on discussions with people with personal knowledge concerning the events at issue and (b) it would be accurate to say that he only spoke with counsel, people he admitted lacked personal knowledge. (*Compare* Ex. 10 (last page) *with* Ex. 3 at 176:4-178:13). Waterhouse also sheepishly admitted he did nothing to verify the accuracy of the interrogatory responses except to take "what counsel provided as correct." As it turns out, certain of the discovery responses were unresponsive or lacked any basis that Waterhouse knew of. (Ex. 3 at 178:21-180:1, 180:14-181:12, 182:3-18).

[33] Waterhouse admitted that he never spoke with Dondero, Cullinane, Sevilla, Ellington or Leventon and read nothing but the primary documents at issue. (Ex. 3 at 9:21-11:5)

001587
HCMLPHMIT00000466

Ltd." and a different entity called "Highland CLO Management, LLC," (*id.* at 6:2-11; 25:21-26:5);

- he did not know if he ever served as an officer of HCLOM Ltd. and did not know if he was an officer of HCLOM Ltd. at the time of the deposition, (*id.* at 14:13-17);[34]

- despite being Acis' Treasurer at the time, and despite causing the Acis bankruptcy and its destructive and continuing aftermath, Waterhouse claimed to have no recollection of Acis transferring its assets to other Highland entities in the fourth quarter of 2017, (*id.* at 131:1-15); and

- he did not know if HCLOM LLC or HCLOM Ltd. was doing the resets and could not competently testify about the meaning, intent or terms of the Acknowledgement and Waiver Agreement, (*id.* at 157:7-163:2).

55.     A fair reading of Waterhouse's deposition transcript shows he lacks a good faith basis to testify in this matter.

**I.     Dondero Cannot Testify in Good Faith**

56.     Dondero is one of two witnesses HCLOM Ltd. intends to call at the evidentiary hearing in this matter.  Ex. 21 (response to Interrogatory No. 10).  Given that (a) he controlled Highland, Acis, and HCLOM LLC at all relevant times, (b) has served as HCLOM Ltd.'s President beginning on February 7, 2018, (Ex. 6), and (c) executed many of the relevant agreements on those entities' behalf, that is not surprising.  But other than providing certain broad perspectives (all of which undermine HCLOM Ltd.'s contentions), Dondero lacks such basic knowledge, and his testimony will be so disingenuous, that he cannot testify in good faith.

57.     Attached as **Exhibit B** is a demonstrative exhibit that summarizes Dondero's deposition testimony (the transcript of which is offered as Ex. 62).  As shown therein, Dondero testified, among other things, that:

- he did not know who holds the Note that is the subject of this litigation, (Ex.

---

[34] Of course, Waterhouse (a) has served as HCLOM Ltd.'s Treasurer since February 7, 2018 (Ex. 6), and (b) signed an agreement waiving HCLOM Ltd.'s purported right to collect on the Note at issue for a period of time (Ex. 19).

001588
HCMLPHMIT00000467

62 at 8:7-14; 14:10-14);

- he did not know anything about HCLOM Ltd. or HCLOM LLC other than that they were supposed to be involved in the Acis resets and refinancings, (*id*. at 9:24-10:22, 11:19-12:2);

- he did not know whether HCLOM Ltd. and HCLOM LLC are related in any way, (*id*. at 12:13-13:5);

- he could not identify the ultimate beneficial owners of HCLOM Ltd. or who controls it (and never asked) and did not know if he was authorized to act on its behalf, (*id*. at 14:15-16:13), (again, Dondero has been HCLOM Ltd.'s President for nearly seven years (Ex. 6));

- he never saw HCLOM's Response and does not know who is instructing Stinson in this litigation on HCLOM Ltd.'s behalf, (*id*. at 16:14-23, 18:8-19:13, 19:22-20:15, 110:20-111:3);

- he did not recall if he was an officer of Acis or if he controlled that entity, (*id*. at 24:21-25:6);[35]

- he claimed to have never read the Arbitration Award and was unfamiliar with the Panel's findings that the entities he controlled took actions under false pretenses and breached various agreements and fiduciary duties, (*id*. at 67:11-22, 70:3-20);

- he never communicated with Summit or Cullinane, the counterparty to the Transfer Agreement and related documents, (*id*. at 79:19-81:19, 82:24-83:3);

- he did not recall that Highland was a party to the Transfer Agreement, has "no idea" why he signed it, and could not identify any benefit Highland was expected to obtain even after reviewing the document, (*id*. at 84:22-86:14, 88:15-89:2, 89:20-91:5);

- he claimed to have no personal knowledge about the Notification, who gave it, or why Highland was unwilling to support Acis, (*id*. at 94:24-95:18, 98:12-16, 100:11-14);[36]

---

[35] As Waterhouse acknowledged, Dondero controlled Acis at all times from at least June 10, 2016 (the day after Terry's ouster) until the trustee was appointed in the Acis bankruptcy case. (Ex. 3 at 47;16-21; Ex. 9 (Acis consent showing Dondero's appointment as President)).

[36] "Notification" is defined in the Transfer Agreement and refers to the alleged fact that Highland was unwilling to continue providing services to Acis—the whole premise for the Transfer Agreement. Ex. 13 (third "Whereas" clause). Given that Dondero controlled both entities at the time, he either abdicated responsibility or gave false testimony. In fact, Waterhouse testified that Dondero made the decision to give the Notification. (Ex. 3 at 138:3-13). As noted above, there is no evidence that a written Notification was ever given as required by the HCMLP Services Agreements.

001589

HCMLPHMIT00000468

- he took no steps to make sure the assertions set forth in the Transfer Agreement were true and accurate, (*id*. at 108:6-25); and

- he could not identify anything of value Highland received in exchange for its purported waiver of HCLOM Ltd.'s breaches of the Transfer Agreement, (id. at 135:18-136:6).

58. As will be shown at trial, Dondero's deposition testimony in this case directly contradicts his sworn testimony in the Acis bankruptcy case (including in the ongoing adversary proceeding) as well as his sworn responses to interrogatories.

59. This is not just a matter of "credibility." Dondero's testimony is so uninformed and disingenuous that he cannot testify in good faith.

## III.     ARGUMENT

### A.     The HCLOM Parties' Prosecution of the HCLOM Claim Constitutes Bad Faith and Willful Abuse of the Judicial Process

60. Based on clear and convincing evidence, the HCLOM Parties' prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process. *See In re Cleveland Imaging & Surgical Hosp., L.L.C.*, 26 F.4th 285, 297 (5th Cir. 2022) (noting that a bankruptcy court may sanction litigants if it finds, "by clear and convincing evidence, that they acted in bad faith or willfully abused the judicial process.").

#### 1.     HCLOM Ltd.'s Prosecution of the HCLOM Claim Despite Admitting that it Breached its Obligations Under the Transfer Agreement Constitutes Bad Faith

61. There is no dispute that HCLOM Ltd. failed to perform its obligations under the Transfer Agreement. *See supra* ¶¶ 40-42. Even Dondero and Waterhouse acknowledge that the Note is part of a fully integrated transaction with the Participation Agreement and Transfer Agreement. In fact, the Note represents those deferred payments that Highland was to make in exchange for the deferred Acis Participation Interest payments Acis was able to make under the Participation Agreement. The Note is unenforceable because HCLOM Ltd. (a) provided no

001590

HCMLPHMIT00000469

consideration, (b) both Acis and HCLOM Ltd. materially breached their obligations under the Transfer Agreement, and (c) Acis breached its obligation to pay the Acis Participation Interests to Highland. HCLOM Ltd. knows this because Dondero caused the breaches for each entity which caused a complete failure of consideration to Highland for any purported obligations. Nevertheless, HCLOM Ltd. continues to prosecute the HCLOM Claim without any legal or factual basis.

### a. The Note is Unenforceable Because HCLOM Ltd. Provided No Consideration

62.    The Note is unenforceable because HCLOM Ltd. failed to provide any consideration in exchange for its assignment. Under Cayman Islands law,[37] "[a] compromise like any agreement, must be supported by consideration…" *Folkvang Ltd v Valorte Capital* (unreported, 29 February 2024, FSD 199 of 2023, Parker J. at ¶ 99);[38] *see also Blue v Ashley* [2017] EWHC 1928 (Comm) Leggatt J at ¶ 49 ("The basic requirements of a contract are that: (i) the parties have reached an agreement, which (ii) is intended to be legally binding, (iii) is supported by consideration, and (iv) is sufficiently certain and complete to be enforceable…").[39] Thus, an agreement is unenforceable for lack of consideration where one party's promised performance fails. *See Barclays Bank Plc v. Kenton Capital* [1994-95 CILR 489]: the Grand Court of the Cayman Islands, per Smellie J at page 499 ("... It may also be the case that the depositors would be entitled to recover, as against Kenton in claims at common law, for moneys had and

---

[37] The Transfer Agreement is governed by the laws of the Cayman Islands. *See* Ex. 65, § 6(d).

[38] *See Declaration of Hayley R. Winograd in Support of the Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with Scheduled Claims 3.65 and 3.66* (the "Winograd Dec.") (being filed concurrently herewith), **Exhibit 1**.

[39] *See* Winograd Dec., **Exhibit 1**. *"Winograd Dec."* refers to the *Declaration of Hayley R. Winograd in Support of the Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with Scheduled Claims 3.65 and 3.66,* being filed concurrently herewith.

001591

HCMLPHMIT00000470

received on the basis that the consideration on which the agreement is based has failed.");[40] *H.E.B.*

*Enterprises Ltd and Bodden Jr v Richards* [2023] UKPC 7, ¶ 58 ("money had and received to the

claimant's use can be recovered where the basis (there referred to as consideration) has wholly

failed.");[41] *Richards v H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] ¶¶ 102-4 (finding

a total failure of consideration to have occurred in the context of two agreements (namely a

sale/purchase agreement and a loan agreement) which, contrary to the defendant's argument, the

Court found to constitute one agreement, and holding, "…[a]ccordingly, it is correctly submitted

that under the terms of the agreements, there has still been a total failure of consideration on the

sale of the parcels.")[42]

63. Here, in order to transfer any of the rights or obligations under the Participation

Agreement, Highland's prior written consent was required. *See* Ex. 13, § 5.1. HCLOM Ltd.

obtained Highland's agreement to enter into the Transfer Agreement through the commitments of

HCLOM Ltd. set out in the agreement. HCLOM Ltd. admits that it failed to satisfy any of its

obligations under the Transfer Agreement, the very document pursuant to which HCLOM Ltd.

was assigned the Note. The ostensible purpose of the Transfer Agreement, *i.e.*, for HCLOM Ltd.

to succeed Acis as Successor Manager, was never realized (indeed, *no* steps were ever taken to

enable HCLOM Ltd. to become Acis' Successor Manager). *See supra* ¶¶ 40-51. HCLOM Ltd.

thus failed to perform its promised obligation under the Transfer Agreement, and as a result, the

consideration on which the Transfer Agreement is based has failed. *See Richards v H.E.B*

*Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] per Williams J at ¶ 72, applying *Heyman v*

*Darwins Ltd*. [1942] AC 356, per Lord Porter at page 399 ("Strictly speaking, to say that, upon

---

[40] *See* Winograd Dec., **Exhibit 2**.

[41] *See* Winograd Dec., **Exhibit 3**.

[42] *See* Winograd Dec., **Exhibit 4**.

001592

HCMLPHMIT00000471

acceptance of the renunciation of a contract, the contract is rescinded is incorrect. In such a case the injured party may accept the renunciation as a breach going to the root of the whole of the consideration. By that acceptance he is discharged from further performance and may bring an action for damages, but the contract itself is not rescinded.")[43]   HCLOM Ltd.'s failure of its promised performance under the Transfer Agreement renders the Note unenforceable by HCLOM Ltd.  Based on the evidence adduced in discovery, including HCLOM Ltd.'s extensive admissions, HCLOM Ltd.'s continued prosecution of its HCLOM Claim, with knowledge that it provided no consideration for the Note, constitutes bad faith and a willful abuse of the judicial process.

### b.   The Note is Unenforceable Because HCLOM Ltd. Materially Breached its Obligations under The Transfer Agreement

64.    It is also undisputed that HCLOM Ltd. materially breached its obligations under the Transfer Agreement.  For this additional reason, the Note is unenforceable.  Under Cayman law, a non-breaching party is relieved of performing its obligations where the counterparty materially breaches its obligations. *See Beach Club Enterprises Limited v Horizon Management Limited* [1980-83 CILR 223], Carberry J.A. at page 235 (an innocent party's termination following a breach of a condition excuses future performance) applying *McDonald v Dennys Lascelles Ltd.* (1933), 48 C.L.R. 457 as approved in *Johnson v Agnew* [1980] A.C. 367;[44] *Hongkong Fir Shipping Co Ltd v Kawasaki Kisen Kaisha Ltd* [1962] 2 W.L.R. 474, Lord Diplock, at pages 493-494 (noting that a breach of a condition in a contract provides the innocent party with an immediate, unequivocal right to terminate future performance of the contract);[45] *Golfco Limited v Borden* [2002 CILR 1], Kellock Ag. J at ¶ 25 (finding that the purchaser of an apartment block's

---

[43] *See* Winograd Dec., **Exhibit 5**.

[44] *See* Winograd Dec., **Exhibit 6**.

[45] *See* Winograd Dec., **Exhibit 7**.

001593

HCMLPHMIT00000472

failure: (a) to pay certain instalments to the seller pursuant to the contract for the sale of land; and (b) to remedy their breach within 28 days of receiving a written notice to do so (in accordance with clause 11(1) of the contract of sale) from the seller "*would have had to be regarded as a fundamental breach*");[46] *In the Matter of Re Indies Suites Ltd* [2004-05 CILR 498], Smellie C.J. at ¶ 22, (accepting that termination excuses future performance, together with a right of the innocent party to claim damages by way of compensation for the loss sustained in consequence of the non-performance of the contract in the future, applying the English case of *Photo Production Ltd. v Securicor Transport Ltd.* [1980] A.C. 827).[47]

65.    A breach is "material" when it goes to the "root" of the contract or forms an essential condition of performance. *See Tempo Group Ltd and others v. Fortuna Development Corporation* (unreported, 31 March 2015, FSD 125 of 2012, Henderson J at ¶ 296) ("[a]n act of repudiation must go to the root of the contract ... The repudiatory breach must deprive the innocent parties of substantially the whole benefit which they would have obtained from due performance of the contract…");[48] *Chitty on Contracts*, 35th Ed. Chapter 28-014 (a "condition" of a contract is that of "an essential stipulation of the contract which one party guarantees is true or promises will be fulfilled.").[49]

66.    Here, it is undisputed that HCLOM Ltd. materially breached the Transfer Agreement by failing to (a) "provide the Controlling Class (as defined in each of the CLO Indentures) with notice requesting the appointment of HCLOM as Portfolio Manager," as required by Section 1 of the Transfer Agreement; (b) "promptly pursue Successor Manager appointment,"

---

[46] *See* Winograd Dec., **Exhibit 8**.

[47] *See* Winograd Dec., **Exhibits 9 and 10**.

[48] *See* Winograd Dec., **Exhibit 11**.

[49] *See* Winograd Dec., **Exhibit 12**.

001594
HCMLPHMIT00000473

as required by Section 2 of the Assignment; (c) "achiev[e] all conditions precedent required by the CLO Documents," as required by Section 2 of the Transfer Agreement; and (d) execute a joinder to the to the Participation Agreement [referred to as the "Purchase Agreement" in the Transfer Agreement], as required by Section 3.d of the Transfer Agreement.

67.     If there was any doubt—and there isn't—Dondero agreed on behalf of Highland that HCLOM Ltd. and Acis breached the Transfer Agreement in the Waiver and Acknowledgment Agreement (although he purportedly waived those breaches for no consideration).  Ex. 7.

68.     Based on the documentary evidence adduced during discovery, including the Waiver Agreement, HCLOM Ltd. is prosecuting its HCLOM Claim based on the Participation Agreement, the Note and the Transfer Agreement despite knowing that it materially breached its obligations the Transfer Agreement.  HCLOM Ltd.'s material breaches of the Transfer Agreement excused Highland's obligations under the related Note.  HCLOM Ltd.'s continued prosecution of this claim, despite knowing it materially breached the Transfer Agreement, constitutes bad faith and willful abuse of the judicial process.

        **c.**      **Acis Breached its Obligation to Pay the Acis Participation Interest to Highland**

69.     As soon as Terry received the Arbitration Award and the Transfer Agreement was executed, Acis and HCLOM Ltd. breached their obligations under the Participation Agreement and the Transfer Agreement.  In addition to the breaches of the Transfer Agreement by HCLOM Ltd. described above, Dondero-controlled Acis ceased paying any Acis Participation Interests to Highland.  That failure of consideration continued after the Acis order for relief was entered.  The complete failure of Acis and HCLOM Ltd to provide Highland with the consideration it was to receive under Participation Agreement and the Transfer Agreement—the Acis Participation Interests—vitiates any obligation Highland may have had under the Participation Agreement or its

001595

HCMLPHMIT00000474

Note.  As recognized in the Participation Agreement, Highland bore the risk of payment of the Note *other than* in the event that Highland it did not receive the Acis Participation Interests "as a result of the Seller [Acis] breaching its covenants [including to promptly remit the Acis Participation Interests] under this Agreement or as result of the fraud or willful misconduct or the Seller." Ex. 13 §3.6.  Acis' and HCLOM Ltd.'s breach of their obligations under the Participation Agreement and the Transfer Agreement relieved Highland of any duty to make any further payments under the Note.[50]

### 2.    HCLOM Ltd.'s Designation of Waterhouse as its Rule 30(b)(6) Witness Constitutes Bad Faith and a Willful Abuse of the Judicial Process

70.    HCLOM Ltd.'s designation of Waterhouse as its Rule 30(b)(6) further demonstrates that HCLOM Ltd. is prosecuting the HCLOM Claim in bad faith.  As discussed above, Waterhouse was wholly unprepared to testify on behalf of HCLOM Ltd.  He lacked knowledge of critical facts underlying the HCLOM Claim, including, for instance, (a) whether he was an officer of HCLOM Ltd. at the time of his deposition; (b) the purpose of the agreements at issue in the HCLOM Claim; and (c) that HLCOM LLC and HCLOM Ltd. were different entities. *See supra* ¶¶ 52-55.  It is untenable for a 30(b)(6) witness to lack such fundamental information about the entity it represents.

### 3.    Dondero's Involvement in the Prosecution of the HCLOM Claim Constitutes Bad Faith and a Willful Abuse of the Judicial Process

71.    Dondero's involvement in the prosecution of the HCLOM Claims is likewise in bad faith.  As set forth above, Dondero cannot testify in good faith on behalf of HCLOM Ltd.  He, like HCLOM Ltd.'s 30(b)(6) witness, lacks critical knowledge underlying the facts of this case, including those as fundamental as, among other things, who holds the Note that is the subject of

---

[50] The Participation Agreement and the Note are governed by Texas law.

001596

HCMLPHMIT00000475

this litigation and why he signed the very agreements that are the subject of this litigation. *See supra* ¶¶ 56-59. Dondero's testimony is not credible, is directly contradicted by his sworn testimony and interrogatory responses given in the Acis case, and is otherwise uncorroborated; he simply cannot testify in good faith on behalf of HCLOM Ltd. Dondero's continued involvement in the prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process.

**B.** **Highland is Entitled to Attorneys' Fees from the HCLOM Parties for Costs Incurred in Connection with the Bad Faith Prosecution of the HCLOM Claim**

72.     The HCLOM Parties should be sanctioned for their bad faith prosecution of the HCLOM Claim by reimbursing Highland for attorneys' fees and expenses incurred in connection with litigating the HCLOM Claim.

73.     Bankruptcy courts possess inherent authority under section 105 of the Bankruptcy Code to issue sanctions after making a finding of bad faith. *See In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008) (affirming bankruptcy court's imposition of sanctions for bad faith filing "following an extensive hearing in which the bankruptcy court heard testimony from the parties and witnesses and made certain credibility determines," and made specific findings that Appellants acted in bad faith."); *In re Brown*, 444 B.R. 691, 695 (E.D. Tex. 2009) (issuing sanctions against party and their counsel, and relying on section 105(a) of the Bankruptcy Code as a basis for awarding attorney's fees against parties for acting "with reckless disregard of their duty to this Court"); *In re Paige*, 365 BR 632, 640 (Bankr. N.D. Tex. 2007) (awarding attorneys' fees against debtor for their "bad faith" conduct during bankruptcy case, noting "[t]he sanction here is derived from the Court's inherent power to sanction" under section 105(a)); *Cleveland Imaging*, 26 F.4th at 297 (noting that a bankruptcy court may sanction litigants "if it finds, by clear and convincing evidence, that they acted in bad faith or willfully abused the judicial process") ; *Schermerhorn v.*

001597

HCMLPHMIT00000476

*Kubbernus (In re Skyport Glob. Commc'n, Inc.)*, 642 F. App'x 301, 304 (5th Cir. 2016) (same);

*(Lopez v. Portfolio Recovery Assocs. (In re Lopez)*, 576 B.R. 84, 93 (S.D. Tex. 2017) (same).

74.     A bankruptcy court has "broad discretion" to determine reasonable attorneys' fees.
*See In re Monteagudo*, 536 F. App'x 456, 459 (5th Cir. 2013) (sanctions orders granted under
bankruptcy court's inherent powers are reviewed for "abuse of discretion"); *ASARCO, L.L.C. v.
Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.)*, 751 F.3d 291, 294 (5th
Cir. 2014), *aff'd sub nom.*, *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) ("A
bankruptcy court has 'broad discretion' to determine reasonable attorneys' fees, as the bankruptcy
court is familiar "with the actual services performed" and is well positioned to determine "what is
just and reasonable") (internal quotations omitted); *In re Paige*, 365 B.R. 632, 637-640 (Bankr.
N.D. Tex. 2007) (awarding attorneys' fees against debtor for their "bad faith" conduct during
bankruptcy case, noting "[t]he sanction here is derived from the Court's inherent power to
sanction" under section 105(a)); *Lopez v. Portfolio Recovery Assocs., LLC (In re Lopez)*, 576 B.R.
84, 93 (S.D. Tex. 2017) (same); *Dondero v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
Mgmt. L.P.)*, 105 F.4th 830, 841 (5th Cir. 2024) ("Undergirding our analysis of the sanctions award
here is a recognition of the goal of such awards everywhere: "to do rough justice.' ... Complete
accuracy is neither required nor expected. The bankruptcy court's judgments in these matters are
entitled to our 'substantial deference.'") (internal quotations omitted).

75.     Here, the Bankruptcy Court should award sanctions against HCLOM Ltd. and
Dondero in the form of attorneys' fees and expenses incurred by Highland in connection with the
bad faith prosecution of the HCLOM Claim, in an amount to be determined at trial.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Highland respectfully requests that the Court
enter an order, in the form attached hereto as **Exhibit C**, (a) finding that HCLOM Ltd. and Dondero

001598

HCMLPHMIT00000477

prosecuted the HCLOM Claim in bad faith, (b) entering sanctions jointly and severally against

HCLOM Ltd. and Dondero in the form of reimbursement to Highland of Highland's costs and

expenses incurred in objecting to HCLOM Ltd.'s HCLOM Claim in an amount to be determined

at trial; and (c) granting such other and further relief that the Court deems just and proper under

the circumstances.

Dated: November 21, 2024      **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:jpomerantz@pszjlaw.com
    jmorris@pszjlaw.com
    gdemo@pszjlaw.com
    hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

001599

HCMLPHMIT00000478

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on November 19 and 20, 2024, counsel for Highland Capital Management, L.P., John A. Morris, corresponded with counsel for Highland CLO Management, Ltd., Deborah Deitsch-Perez and Michael Aigen, regarding the relief requested in the foregoing Motion.  As of the filing of the Motion, it is assumed that Highland CLO Management, Ltd. is **OPPOSED** to the relief requested in the Motion.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

001600
HCMLPHMIT00000479

# EXHIBIT A

HCMLPHMIT00000480

## WATERHOUSE DEPOSITION DIGEST[1]

- **FW does not know that there is an entity called   Highland CLO Management, Ltd.  and a different entity called   Highland CLO Management, LLC   (6:2-11; 25:21-26:5)**

## WATERHOUSE DID NOT PROPERLY PREPARE TO TESTIFY

- To prepare, FW met with counsel and reviewed the Note, the Purchase and Sale Agreement, the Transfer Agreement, the Rule 30(b)(6) notice and the pleadings; he also reviewed portions of Dondero's deposition transcript from the Acis case. (6:18-8:9); FW met with counsel a few weeks before for 2-3 hours (41:9-42:7)

- But FW didn't review any emails (7:15-16); was unaware that there is ongoing, current litigation between Acis and Dondero (9:15-17); spoke with nobody other than counsel to prepare, including Dondero, Cullinane, Sevilla, Ellington or Leventon; and read nothing but the primary documents.  (9:21-11:5)

- Even though "resets" were a Rule 30(b)(6) topic, FW looked at no documents to prepare, talked to no one other than counsel, and has no personal knowledge on the topic.  (124:24-126:3)

- **FW DNR if he ever served as an officer of HCLOM Limited, and did not know if he was an officer of HCLOM Limited at the time of the deposition.  (14:13-17)**

- FW DNR seeing HCLOM Limited resolutions; DNK how Summit Management became Limited's director at formation.  (15:4-16:20)

- FW DNK who formed HCLOM Limited and DNK of any communications with Summit or Cullinane on the topic.  (16:21-17:7)

- FW discussed with Dondero and legal team the need to form HCLOM because Acis could not continue to serve as CLO manager following Terry's arbitration award. (17:11-18:13)

- Needed to create successor manager.  (18:14-23)

- **FW claims Acis couldn't continue because Highland wouldn't support it and investors did not want to be associated with it.  (18:24-19:13)**

---

[1] "FW" refers to Frank Waterhouse.  "DNR" means "does not recall" or "does not remember."  "DNK" means "does not know." Citations are to the transcript of Waterhouse's deposition marked as Ex. 3.

001602

HCMLPHMIT00000481

- **FW can't identify any specific person who told him investors did not want to be associated with Acis, nor could he identify any particular investors (19:10-20:17)**

- **FW DNR why Highland was unwilling to service Acis.  (20:18-20)**

- **HCLOM Limited never served as Successor CLO Services for Acis and DNK if it ever generated a dollar of revenue.  (20:25-21:10)**

- Other than formation expenses, FW DNK if HCLOM Limited ever incurred any expenses.  (21:11-23)

- **FW DNK if he was HCLOM Limited's Treasurer.  (21:24-25)**

- **FW DNR whether HCLOM Limited had any employees or a shared services agreement.  (22:1-9)**

- **FW DNR seeing 2 7 18 HCLOM Limited resolutions; they show he is the Treasurer (22:11-23:7).  This was a Rule 30(b)(6) topic, yet FW has no knowledge concerning HCLOM Limited's officers.  (23:8-24:8)**

- **FW does not know if HCLOM Limited or HCLOM LLC was the entity that tried to take steps to become the Successor Manager.  (24:14-25:20)**

- **FW DNR that HCLOM Limited had a bank account; prepared financial statements; maintained books and records; was a registered financial advisor.  (26:6-19)**

- **FW never saw a document concerning resets where HCLOM Limited was identified as the proposed portfolio manager rather than LLC.  (27:4-7)**

- The Acknowledgement and Waiver Agreement was signed about 10 weeks after the Transfer Agreement by Dondero and Cullinane.  (27:14-29:4)

- FW not aware of anything inaccurate or incorrect.  (29:5-8)

- **FW has no independent knowledge of the Acknowledgement and Waiver Agreement; it says what it says.  (29:9-31:4)**

- **FW admits that the Notices and Appointments re uired under the Transfer Agreement never occurred.  (31:14-24)**

- **Dugaboy and Okada own HCLOM Limited.  (34:7-10)**

- **FW has no facts to support speculation that Limited and LLC are affiliates.  (33:15-36:1)**

001603

HCMLPHMIT00000482

- **HCMLP had an ownership interest in Limited until 2022. (36:7-22)**

- FW DNK if LLC ever had an ownership interest in Limited. (37:15-19)

- FW's understanding is that Highland owned LLC until 2022. (37:20-38:25)

- **FW was likely Treasurer of Acis. (43:14-17)**

- **FW admits that on June 10, 2016, the day after Terry was terminated, he and Dondero were Acis' sole remaining officers. (44:2-45:14)**

- **FW has never discussed Acis with Nancy Dondero even though she is the Dugaboy trustee, which owned Acis, and FW was one of only two officers of Acis. (45:24-46:14)**

- **FW agrees that JD controlled Acis at all times from at least 6 10 16 until Phalen is appointed. (47:16-21)**

- If FW needed approval to do something as Treasurer of Acis, he'd turn to Dondero. (48:12-16)

- **Acis had no employees but did have shared services and sub-advisory agreements with Highland enabled Acis to fulfill its duties as portfolio manager. (48:22-50:1)**

- **Dondero signed amended SSA and Sub-Advisory Agreements the month after Terry is terminated. (50:6-51:10)**

- Despite being Highland's CFO and Acis' Treasurer, FW testified that he wasn't involved in amending the service agreements. (51:11-52:9)

- Dondero would have to approve the 20-BPS formula for Acis and Highland. (59:2-7)

- **FW does not know if Highland ever gave written notice of termination of the SSA pursuant to Section 14(b). (60:2-16)**

- Acis was to pay Highland an aggregate of 35 basis points for shared and sub-advisory services. (64:21-65:4)

- **FW DNR Highland providing written notice of termination of the sub-advisory agreement in accordance with Section 7.02. (65:4-66:7)**

- Shared Services and Sub-Advisory Agreements were amended again in March 2017; Dondero signed the amended agreements so, again, Acis is still paying 35 basis points for services. (66:8-68:6)

001604

HCMLPHMIT00000483

- **So as of March 2017, Acis was still the vehicle through which the Acis CLOs were expected to be managed. (68:7-69:6)**

- **FW does not recall anyone expressing concerns over Acis until 2018. (69:7-24)**

- **FW DNR either party ever giving written notice of termination of the service agreements. (69:25-70:16)**

- FW DNR shared services agreement being amended. (72:4-22)

- FW DNR Highland assigning or delegating any rights or obligations. (72:23-75:2)

- **FW DNR sub-advisory agreement being the subject of a written notice of termination. (75:16-76:21)**

- FW DNR Sub-Advisory Agreement ever being amended. (76:22-77:10)

- FW DNR Sub-Advisory Agreement ever being assigned. (77:11-21)


## CLO PARTICIPATION AGREEMENT

- "Highland purchased an … interest in Acis' management fees." (78:10-22)

- **Whole concept was a  tax-driven strategy  that also gave Highland a cash management benefit because it would receive the Servicing Fees before it paid out on the Note. (79:19-80:24; 83:1-6)**

- FW discussed tax planning and cash management aspects with tax group and Dondero. (82:4-25)

- **Because Acis is a pass-through entity, Acis' ultimate beneficial owners were the beneficiaries of the expected tax benefits on the Acis side; same was true on the Highland side. (85:22-86:16)**

- **Unpredictability and instability of Servicing Fees never caused Acis to default or breach obligations. (98:14-22)**

- **FW cannot identify any adverse conse uence to Acis from the alleged unpredictability and instability of Servicing Fees. (99:23-25)**

- Terry, Okada, and Dondero were the only people who could make decisions on Acis' behalf because they were the owners; after Terry was terminated, Dondero and Okada remained in control until Phalen was appointed Trustee. (101:13-102:6)

- **FW DNR the issuers ever breaching their obligation to pay servicing fees to Acis or Acis ever declaring a default. (102:7-14)**

001605

HCMLPHMIT00000484

- **Schedule A of the Transfer Agreement identifies the CLOs subject to the Agreement. Based on the figures in Schedule A, and the fees due under the Shared and Sub-Advisory Service Agreements, FW agrees that Acis was obligated to pay to Highland more than it expected to receive in servicing fees. (102:15-104:15)**

- **As Treasurer of Acis and the CFO of Highland, FW admits that Highland is giving the Cash Purchase Price and the Note to Acis in exchange for Acis' promise to share the Acis Participation Interest as defined in th e agreement (104:16-105:24)**

- FW DNR how the Cash Purchase Price and initial principal balance of the Note were determined; whether they equaled the value of the Participation interests; or whether they were the subject of negotiation. (106:1-16)

**<u>NOTE</u>**

- **The Note was executed at the same time as the Participation Agreement, both of which were part and parcel of the same overall transaction. (111:9-112:1)**

- **The same people made decisions on behalf of Acis and Highland in connection with the Participation Agreement and Note. (112:10-21)**

- Highland did not have a dedicated team looking out for its interests; while H&W was involved, they were engaged solely by Acis. (112:22-113:10)

- HCLOM Limited never paid servicing fees because it never became the collateral manager of the CLOs. (118:7-15)

- FW still insists that HCLOM Ltd. didn't become collateral manager of CLOs because of the Acis bankruptcy. (118:7-18)

- **Highland made the first payment under the Note, but not the second payment due of 5 31 18; HCLOM did not declare a default but entered into the forbearance agreement instead. (118:20-119:12)**

- **Dondero and FW were the sole officers of Acis from at least November 1, 2017 until Phelan was appointed in the Spring or Summer of 2018. (120:3-9)**

- **Acis continued to receive uarterly servicing fees from the CLOs after November 1, 2017. (120:10-15)**

- **FW DNR if Acis remitted servicing fees to Highland after 11 1 17. (120:16-18)**

- **In April 2017, under Dondero's direction, Acis launched a brand-new CLO (Acis-7). (121:11-21)**

001606
HCMLPHMIT00000485

- **FW admits that Dondero would not have launched a brand-new CLO if he didn't believe Acis could not perform. (121:18-25)**

- FW DNR recall (a) anyone expressing any concern about Acis' ability to perform or (b) how Acis funded the risk retention amount (or whether Highland loaned the money). (122:1-23)

- Acis looking to reset Acis-3 in late 2017. (123:13-124:2)

## ASSIGNMENT AND TRANSFER AGREEMENT

- **Despite being the CFO of Acis, FW has no recollection of Acis transferring its assets to other Highland entities in the fourth  uarter of 2017. (131:1-15)**

- **FW had no recollection that Highland caused a Delaware entity called Highland CLO Management, LLC  to be created in October 2007. (131:16-132:7)**

- **FW DNK who authorized the creation of LLC or what its purpose was. (132:4-13)**

- **FW DNK why the Transfer Agreement was entered on 11 3 17 except that (a) Terry got his award and (b) Highland said it wouldn't support Acis; those are the only two reasons why this Agreement was entered. (132:22-134:25)**

- **Dondero made the decision to enter the Transfer Agreement on behalf of Highland and Acis, and Cullinane made the decision on behalf of HCLOM Limited. (135:1-10)**

- **The only purpose of the Transfer Agreement was to transfer the participation interest (i.e., the servicing fees) and the Note. (135:24-136:13)**

- **FW admitted that HCLOM Ltd. had to become the manager of the Acis CLOs  to receive the servicing fees to then in turn remit the participation interest to Highland. That was it.  (136:14-24)**

- FW DNK if Transfer Agreement was negotiated or what role, if any, Cullinane played in drafting or negotiating the Agreement and despite being the Rule 30(b)(6) witness, FW made no effort to ascertain Cullinane's thoughts concerning the Agreement. (136:25-138:2)

- **Dondero made the decision on behalf of Highland to stop supporting Acis, as set forth in the third recital. (138:3-13)**

- The team managing the Acis CLOs was the same the day after Terry left as it was on 11/3/17, lead by Dondero (139:23-140:24)

001607

HCMLPHMIT00000486

- **In fact, despite Terry's departure and the public litigation that Highland initiated, Dondero still had enough confidence in the Acis brand that he entered into new service agreements and launched a new CLO with the Acis name. (140:25-142:13)**

- **The award was the sole reason FW could identify for entering into the Assignment and Transfer Agreement. (142:14-21)**

- FW DNK who gave the Notice on behalf of Highland or who received it on behalf of Acis, although Dondero did control both entities at the time. (142:22-143:6)

- FW has no knowledge that Acis ever defaulted under either the SSA or Sub-Advisory Agreement. (143:7-144:8)

- **Dondero made the decision on Highland's behalf not to support Acis, and then made the decision on behalf of Acis that it couldn't continue. (144:9-145:10)**

- **FW cannot identify any  damage to the Acis brand  other than the damage allegedly caused by the Acis arbitration award. (145:11-22)**

- **Acis  simply accepted Highland's notification and said, okay, we're done without seeking alternatives or declaring a default on Highland's part. (146:13-10)**

- **And despite allegedly giving notice, Highland continued to perform under the service agreements until Phalen was appointed. (147:11-21)**

- **HCLOM was  going to step into Acis' shoes  and would  have the obligation under the CLO participation interest agreement to remit    that 20 bases point over to Highland.   (149:18-150:12)**

- **FW agrees that it's fair to say   that the reason Highland agreed to transfer the note to HCLOM is because HCLOM was agreeing to become the new portfolio manager for the Acis CLOs and would share the servicing fees after that happened.   (150:13-23)**

- **The planning contemplated the sale of the CLO participation interest and a note to the CLO manger.   (152:1-13)**

- FW has no knowledge concerning the proofs of claim Highland filed in the Acis bankruptcy case. (153:20-155:25)

- **FW admits that the obligations under sections 1 and 2 of the Transfer Agreement were never fulfilled. (156:15-157:6)**

001608

HCMLPHMIT00000487

- **FW has no idea if HCLOM LLC or HCLOM Limited was doing the resets and cannot competently testify about the meaning, intent or terms of the Acknowledgement and Waiver document. (157:7-163:2)**

## FORBEARANCE AGREEMENT

- FW signed – but doesn't know if its electronic signature or a wet signature (163:3-21)

- **FW DNR (a) the circumstances surrounding his execution of the document or (b) why highland did not make the payment due on 5 31 18. (163:22-164:4)**

- **FW DNR HCLOM Limited (a) making a demand under the Note, (b) declaring a default, or (c) exercising any remedies. (164:11-20)**

- FW DNR (a) reviewing before signing, (b) discussing the document with anyone before signing, (c) who asked him to sign it, or (d) where the idea originated. (164:21-165:20)

- **FW admits that everyone knew HCLOM Ltd. wasn't receiving fees under the portfolio management agreement and was relieved of the obligation to make payments, so HCLOM received no benefit under the Forbearance Agreement. (165:21-167:11)**

- **The only thing Waterhouse could identify that HCLOM Ltd. received from entering into the Forbearance Agreement was somehow helping Highland preserve its relationships with the investors in the CLOs. (167:12-168:22)**

## AMENDED FORBEARANCE AGREEMENT

- Signed by FW on behalf of both Highland and HCLOM Limited after the Acis plan is confirmed and there is no prospect for Acis reset. (170:5-24)

- **FW admits that by this time, there is no chance HCLOM Limited will ever become the portfolio manager of Acis. (170:25-171:13)**

- **FW DNR HCLOM Limited ever being identified as a portfolio manager in 2019. (171:14-24)**

- **Only alleged benefit to HCLOM Limited from Forbearance Agreement is reserv ation of the relationship. (171:25-172:3)**

- **FW is not aware of any discussion or attempt by anybody in the world after January 19, 2018 to install HCLOM, Ltd. as the portfolio manager of the CLOs. (172:4-173:11)**

001609

HCMLPHMIT00000488

**RESPONSE**

- FW read it before and is unaware of any mistakes.  (174:13-175:1)

- **FW is not aware of any amendments needed to fully and accurately set forth HCLOM's factual and legal bases for responding to the Objection or of any intended amendments.  (175:2-9)**

**HCLOM'S DISCOVERY RESPONSES**

- Served before FW reviewed and verified.  (176:4-177:1)

- **The verification falsely states that FW spoke with people with  personal knowledge  about the responses.  (177:2-178:13)**

- **FW does not believe the Responses need to be amended or modified to make them more accurate.  (178:14-20)**

- **FW did not verify the accuracy of the Response to Interrogatory No. 2, he just  took what counsel provided as correct.    (178:21-180:1)**

- **FW then admits the response to Interrogatory No. 2 is unresponsive; he doesn't know if the Transfer Agreement was subject to negotiations; and he did nothing to find out.  (180:14-181:2)**

- **FW DNK basis for the denial of the Firs Re  uest to Admit.  (182:3-18)**

- **The  consideration  HCLOM gave was the  preservation of the relationship even though the same people making the same decisions on behalf of both entities.  (182:19-184:21)**

- Dondero, Ellington & Waterhouse.  (184:22-185-22)

001610

HCMLPHMIT00000489

# EXHIBIT B

001611

HCMLPHMIT00000490

## <u>DONDERO DEPOSITION DIGEST</u>[1]

- **JD does not know who holds the Note that is the subject of the litigation. (8:7-14; 14:10-14)**

- JD didn't do anything to prepare other than meet with counsel, an hour the Friday before and 15 minutes today; didn't review documents; didn't speak with anyone other than counsel (including FW).  (8:15-9:23).

- **JD doesn't know anything about HCLOM Limited other than it was one of the entities that was going to be involved in refinancing or resetting of the CLOS.  (9:24-10:22)**

- **JD doesn't know when Limited was formed; formed by  the lawyers. (10:23-11:18)**

- **JD is aware that LLC exists and speculates that it was an onshore entity involved in resets and refinancings.  (11:19-12:2)**

- **JD doesn't know if LLC Limited have common ownership or had any contractual relationship.  (12:13-13:5)**

- JD never asked why there were entities with similar names because he "wasn't specifically involved in any of the details on a transaction of this size," and DNR anyone ever explaining why.  (13:10-14:1)

- **JD can't identify the ultimate beneficial owners of HCLOM Limited as of today or at the time of formation.  (14:15-15:17)**

- **JD DNK who controls HCLOM Limited:   This is a small transaction.  I wasn't involved in the details,  and he never asked anyone.  JD doesn't even know if he's authorized to act on behalf of HCLOM Limited.  (15:18-16:13)**

- **JD never saw HCLOM's Response; DNR seeing before filed.  (16:14-23; 18:8-19:13)**

- **JD doesn't know who, within his organization, is responsible for handling this litigation on behalf of HCLOM Limited; he never designated anyone; no one ever told him who that person was; and he never spoke with anyone internally concerning this litigation.  (19:22-20:15)**

---

[1] "<u>JD</u>" refers to James Dondero.  "<u>DNR</u>" means "does not recall" or "does not remember."  "<u>DNK</u>" means "does not know."  Citations are to the transcript of Dondero's deposition in this matter, marked as Ex. 62.

001612

HCMLPHMIT00000491

- Acis: formed in 2011 by Dondero, Terry & Okada to be a RIA and manage and invest in CLOs. (22:4-16)

- Acis obtained role as CLO Manager through management agreements with issuers and would receive fees for services. (22:17-23:13)

- **JD DNR if he was an officer of Acis or controlled that entity. (24:21-25:6)**

- **JD doesn't remember if he fired Josh Terry for cause. (25:7-22)**

- Terry's interests in Acis were allocated between entities owned or controlled by Dondero and Okada, but JD believes the decisions were made by an unnamed in-house lawyer; JD did not delegate to a particular person the responsibility for addressing issues arising from Terry's departure. (26:3-27:13)

- JD DNR delegating or designating anyone to act on behalf of Acis after Terry departs. (29:5-10)

- JD controlled HCMLP at all times until Independent Board appointed in 1/20, and authorized HCMLP to file for bankruptcy. (31:6-17)

- JD acknowledges that Terry left in June 2016, HCMLP sued him based on JD's authority, and Terry moved to compel arbitration on 9/12/16. (31:18-32:23)

- **JD DNR Acis and Highland entering into the Participation Agreement. (31:18-33:3)**

## PARTICIPATION AGREEMENT

- JD signed but did not read before doing so. (35:2-9)

- **Purchase of expected fees for a note in order to recharacterize short-term income as capital gains. Tax advantage. (35:13-36:6)**

- **Acis is a pass-thru entity; not a tax-paying entity; tax liability goes to owners. (36:7-16)**

- **Highland was also pass through entity so neither Acis nor Highland were the tax-paying entities. (37:4-19)**

- When JD signed, he understood that Acis "was agreeing to pay to Highland a portion of the servicing fees that it was going to receive from serving as the portfolio manager of the CLOs." (38:18-23)

001613

HCMLPHMIT00000492

- **Schedule A:   In exchange for the Acis participation interests, as set forth on Schedule A, Highland agreed to give some cash and a note.   (38:24-41:14; 41:10-25; 43:20-25)**

- **JD doesn't know the  nuts and bolts  that it takes  to be bona fide for tax purposes  so can't say if you needed cash going both ways. (42:1-13)**

## PROMISSORY NOTE

- JD signed.  (42:24-43:9)

- **JD doesn't know how principal amount of the Note was calculated; he  wouldn't have been involved with that.   (44:1-6)**

- **JD does not know if there is a relationship between cash flow to from Highland.  (46:4-12)**

- Benefit to Highland was tax deferral and/or recharacterization of income.  (46:14-25)

- **JD can't   uantify the tax benefit to Highland; he didn't ask anyone what it would be; he doesn't know expected rate of return; he didn't ask; DNR if anyone ever told him IRR.  (47:1-17)**

- **Idea originated with tax group, but can't name a person.  (49:15-22)**

- **The Note was an integral part of the Participation Agreement:**

  - **Exchange of promises:   one side wouldn't have signed if they didn't get the promises of the other side.   (50:7-21)**

  - **Wouldn't have agreed without the promises. (50:23-51:12)**

  - JD DNK if HCMLP made any payments under the amortization schedule; he wasn't involved.  (52:5-18)

## SHARED SERVICES AND SUB-ADVISORY AGREEMENTS

- JD signed but DNK why he did so.  (55:13-56:8)

- **Goldman says brand toxic; JD has no personal knowledge; can't even remember who told him. (57:11-59:14; 61:18-62:21; 64:3-13)**

001614

HCMLPHMIT00000493

## ARBITRATION AWARD

- **JD has never read it.  (67:11-22)**

- **Not familiar with findings, only that it was against Acis.  (70:3-20)**

- **Recalls that just after Award rendered, he signed the Transfer Agreement. (78:23-79:3)**


## TRANSFER AGREEMENT

- **JD signed.  (79:4-18)**

- **JD DNR Summit or Cullinane.  (79:19-81:2)**

- **JD DNR ever meeting or communicating with Cullinane.  (81:3-19)**

- **JD does not know if agreement was negotiated;  not involved.   (82:16-18)**

- **JD never spoke with anyone authorized to act on HCLOM Limited's behalf before it was executed.  (82:24-83:3)**

- **JD doesn't recall the document; didn't recall if he read it.  (83:12-19)**

- **From Acis and Highland's perspective, JD's understanding is that the purpose of the agreement was to replace Acis as portfolio manager.  (83:23-84:11)**

- JD had no opinion when signing whether Highland would continue to receive serving fees in exchange for payments under the Note.  (84:12-20)

- **JD does not recall if he expected Highland to receive any benefit under this Agreement.  (84:22-25)**

- **JD was unaware that Highland was a party to the Agreement; could not identify a benefit Highland was to receive even after reviewing the document. (85:8-86:4)**

- **JD has   no idea   why he signed the document on behalf of Acis and Highland.  (86:5-14)**

- **Based on his reading of Sections 3(b) and (c), the Agreement is   just trying to make sure the promises and the obligations of Acis transfer to the new entity.   (87:4-24)**

001615

HCMLPHMIT00000494

- Asked to identify anything of value that HCLOM Limited provided to Highland pursuant to this Agreement, JD referred to  shared servicer fees but didn't know if HCLOM Limited had a shared services agreement. (88:15-89:2)

- JD has no idea if HCLOM Limited ever gave anything of value to Highland for any purpose. (89:20-91:5)

- HCLOM Limited wasn't a registered investment advisor and had no fees. (91:23-25)

- JD DNK if HCLOM Limited ever entered into SSA or sub-advisory agreement with anyone. (93:6-19)

- JD has no personal knowledge about the Notification (as defined in Transfer Agreement.). (94:24-95:6)

- JD DNK who gave the Notification on Highland's behalf or who received it on Acis' behalf. (95:7-12)

- JD DNK why Highland was unwilling to support Acis. (95:13-18)

- JD has no opinion as to whether agreement was  neutral  to Acis. (97:16-24)

- JD DNK who made the decision on Highland's behalf not to service Acis – but it wasn't him. (98:12-16)

- The Terry relationship and litigation was handled by Surgent. (99:4-18)

- JD DNR any advice he received before signing the Agreement. (100:4-10)

- JD DNK who was authorized to give the Notification. (100:11-14)

- JD DNK if HCLOM Limited was a  ualified Successor Manager. (104:24-105:2)

- DNK if HCLOM Limited ever appointed Successor Manager. (106:14-16)

- DNK if HCLOM Limited or HCLOM LLC took steps to become Successor Manager. (107:1-10)

- JD wouldn't have signed the Agreement if he thought there were errors in it (and there were: among other things, HCLOM Limited was not  ualified ). (108:6-14)

- Yet, took no steps to make sure the Agreement reflected the facts; just  trusted internal counsel,  without asking any  uestions at all. (108:16-25)

001616

HCMLPHMIT00000495

- JD's understanding is that the Transfer Agreement was intended to simply let HCLOM Limited step into the shoes of Acis. **(109:22-110:1)**

- **JD DNK who is managing the litigation on behalf of HCLOM Limited and never asked. (110:2-19)**

- **JD DNK who owns HCLOM Limited or who its officers are or who is authorized to act on its behalf. (110:20-111:3)**

- JD not involved in reset/refinance process. (112:13-22)

- One piece of the resets was that Acis would be replaced as portfolio manager and lose the right to receive the serving fees; the fees would go to the Successor Manager. (113:10-25)

- **JD did not authorize or instruct anyone to pursue the resetting of the CLOs. (114:1-115:11).**

- **JD DNK who was authorized to have Acis reset the CLOs in 11 17. (116:12-15)**


## MIZUHO AGREEMENT

- JD signed but DNR ever reading before. (119:18-120:4)

- **JD DNK where HCLOM LLC got the authority to engage Mizuho or why HCLOM Limited was designated as the Company for this purpose. (122:5-11)**

- **JD admits that HCLOM Limited is not referred to in the Agreement and he has no knowledge that HCLOM Limited was going to play a role in the transactions subject to the document. (123:19-124:7)**

- **JD DNK why LLC is the signatory and not Limited and never asked. (124:9-14)**

- **JD DNR ever signing a document (other than the Transfer Agreement) that contemplated that Limited would serve as Acis' successor portfolio manager. (125:8-12)**


## CUSTODIAL AGREEMENT

- JD signed but DNR doing so. (126:15-127:3)

001617

HCMLPHMIT00000496

- Every deal needs a custodial bank; it's a different role than placement agent. (127:25-128:14)

## ACKNOWLEDGEMENT AND WAIVER

- **JD signed it but doesn't remember seeing it; reading it before he signed it; or discussing it with anyone. (129:10-130:7; 134:15-23)**

- **JD has no reason to believe paragraph 3 is incorrect in any way. (131:6-13)**

- **JD DNK if Acis ever promptly gave notice to the controlling class of each CLO. (133:9-14)**

- **JD DNK if Acis and HCLOM ever promptly pursued an appointment for each CLO. (133:16-25)**

- **JD did not have a specific awareness that he was waiving breaches of the Transfer Agreement on Highland's behalf. (135:4-11)**

- **JD DNK what Highland received in exchange for the waiver; he never asked; and no one ever explained what benefit Highland would receive by waiving the breaches of the Transfer Agreement. (135:18-136:6)**

001618

HCMLPHMIT00000497

**EXHIBIT C**

001619

HCMLPHMIT00000498

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |

## ORDER GRANTING HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR (A) A BAD FAITH FINDING AND (B) AN AWARD OF ATTORNEYS' FEES AGAINST HIGHLAND CLO MANAGEMENT, LTD. AND JAMES DONDERO IN CONNECTION WITH HCLOM CLAIMS 3.65 AND 3.66

Before the Court is the *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys'*

*Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM*

*Claims 3.65 and 3.66* [Docket No. ___] (the "Motion"),[2] filed by Highland Capital Management,

L.P. ("Highland"), in which Highland requests that this Court enter an order (a) finding that

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not defined herein shall take on the meaning ascribed to them in the Motion.

001620

HCMLPHMIT00000499

HCLOM Ltd. and Dondero prosecuted the HCLOM Claim in bad faith, and (b) entering sanctions against HCLOM Ltd. and Dondero, jointly and severally, in the form of reimbursement to Highland of Highland's costs and expenses incurred in objecting to the HCLOM Claim.  Having considered (a) the Motion, (b) the evidence in support thereof, and (c) all arguments and evidence heard at the hearing on the Motion on December 18, 2024 (the "Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1409; and this Court having found that Highland's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.  The Motion is **GRANTED**.

2.  The clear and convincing evidence supports a finding that HCLOM Ltd.'s and Dondero's prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process.

3.  HCLOM Ltd. and Dondero are hereby ordered, jointly and severally, to reimburse Highland for Highland's costs and expenses incurred in objecting to the HCLOM Claim in the aggregate amount of $[__].

4.  The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

###End of Order###

001621

HCMLPHMIT00000500

**EXHIBIT 6**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
|  | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) December 18, 2024 |
|  | ) 9:00 a.m. Docket |
| Reorganized Debtor. | ) |
|  | ) - OBJECTION TO SCHEDULED |
|  | )   CLAIMS [3657] |
|  | ) - MOTION FOR A BAD FAITH |
|  | )   FINDING [4176] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Reorganized Debtor: | John A. Morris<br>Hayley R. Winograd<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Reorganized Debtor: | Zachery Z. Annable<br>HAYWARD, PLLC<br>10501 N. Central Expressway,<br>  Suite 106<br>Dallas, TX 75231<br>(972) 755-7108 |
| For the Reorganized Debtor: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd.,<br>  13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Highland CLO Management, Ltd. and James Dondero: | Deborah Rose Deitsch-Perez<br>Michael P. Aigen<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX 75201<br>(214) 560-2201 |


1934054241219000000000001

001623

HCMLPHMIT00003829

Case 19-34054-sgj11 Doc 4057 Filed 12/09/25 Entered 12/09/25 12:22:29 Desc
Main Document Page 232 of 31 Page 95 of 1011 PageID 1994

2

```
 1   Recorded by:              Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
 2                             1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
 3                             (214) 753-2062

 4   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
 5                             Shady Shores, TX  76208
                               (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25         Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
```

001624

HCMLPHMIT00003830

Case 19-34054-sgj11 Doc 4255-7 Filed 12/09/25 Entered 12/09/25 12:23:59 Desc
Case 3:25-cv-02724-L Document 17 Main Document Page 232 of 31 Page 96 of 1011 PageID 1995

3

```
 1              DALLAS, TEXAS - DECEMBER 18, 2024 - 9:05 A.M.

 2              THE CLERK:  All rise.  The United States Bankruptcy

 3    Court for the Northern District of Texas, Dallas Division, is

 4    now in session, the Honorable Stacey Jernigan presiding.

 5              THE COURT:  Good morning, everyone.  Please be

 6    seated.

 7         All right.  We have a hearing all day today scheduled for

 8    Highland, an objection to the scheduled claim of what I'm

 9    going to call HCLOM.  You all tell me today if you want to

10    call it something different.  For the record, this is Case No.

11    19-34054.  So let's start out by getting appearances from our

12    lawyers.

13              MR. MORRIS:  Good morning, Your Honor.  It's been a

14    while.  Nice to see you.  John Morris from Pachulski Stang

15    Ziehl & Jones for Highland Capital Management, LP.  I'm joined

16    here today by my colleagues, Jeffrey Pomerantz, Hayley

17    Winograd, and Zachery Annable.

18              THE COURT:  Okay.  Good morning to all.

19              MS. DEITSCH-PEREZ:  Good morning, Your Honor.  I'm

20    Deborah Deitsch-Perez from Stinson representing HCLOM, which I

21    will sometimes refer to as Limited to distinguish it from

22    HCLOM, LLC.  So I'll call one Limited and the other LLC,

23    hopefully.

24              THE COURT:  Okay.

25              MS. DEITSCH-PEREZ:  I'm here with my colleague Mike
```

HCMLPHMIT00003831

Case 19-34054-sgj11 Doc 4255-7 Filed 06/09/25 Entered 06/09/25 12:23:59 Desc
Case 3:25-cv-02724-L   Document 17 Exhibit 7 Page 232 of 31 Page 97 of 1011   PageID 1996

4

1   Aigen, and Patricia Tomasky, who's a paralegal, and Fred

2   Jones, who are assisting.

3           THE COURT:  Okay.

4           MS. DEITSCH-PEREZ:  Thank you.

5           THE COURT:  Good morning to all.

6       All right.  I presume those are the only appearances, and

7   anyone else on the WebEx is an observer.

8       Do we have a housekeeping matters or shall we go to

9   opening statements?

10          MS. DEITSCH-PEREZ:  I have one housekeeping matter

11  I'd like to raise.  And this is really because Your Honor has

12  on many occasions chided us and said, why are you here, have

13  you done anything to try not to be here?

14      And this is not in the nature of settlement, but certain

15  things happened last week.  Last week, it became clear that

16  $73-odd million is going to come out of the Registry of the

17  Court into the estate, and another several million dollars is

18  going to come out because of the administrative claims,

19  because the Fifth Circuit just ruled, so it's another roughly

20  $80 million in the estate.  And there's already $80 million or

21  so in the estate, and there's $80-ish million left in claims.

22      And so what we had proposed is that, rather than spending

23  time and money fighting about all of this, we would agree to

24  put HCLOM's claim behind Class 8, which I believe has

25  otherwise been fully paid, and Class 9, because otherwise what

HCMLPHMIT00003832

```
 1   the estate is doing here is bringing in money that's going to
 2   be the residual left over for former equity, and we're willing
 3   to put HCLOM back there anyway.  And then we wouldn't be
 4   spending your time and our time and money to fight this, and
 5   particularly with a sanctions motion to try and get fees from
 6   Mr. Dondero.
 7       I mean, honestly, Your Honor, what is the point, when
 8   there's enough money there to pay everyone and basically
 9   you're moving it from one pocket to the other, because at the
10   end of the day there's going to be money left over for former
11   equity?
12       And so I would ask that you use your ability to control
13   your docket and send us all home.
14           THE COURT:  Okay.  And by the way, I neglected to
15   ask, does Mr. Dondero have separate counsel today --
16           MS. DEITSCH-PEREZ:  No, I'm here --
17           THE COURT:  -- or you are also his counsel?
18           MS. DEITSCH-PEREZ:  Yes, I'm here for Mr. Dondero
19   also.
20           THE COURT:  All right.  So what I have heard is there
21   is an agreement by your client to essentially have a
22   subordinated claim behind all --
23           MS. DEITSCH-PEREZ:  Yes.
24           THE COURT:  -- Class 8, all Class 9?
25           MS. DEITSCH-PEREZ:  Yep.
```

001627

HCMLPHMIT00003833

Case 19-34054-sgj11  Doc 4557  Filed 07/09/25  Entered 07/09/25 12:23:59  Desc
Case 3:25-cv-02724-L  Document 17  Main Document  Page 99 of 1011  Page 99 of 1011  PageID 1998

6

 1              THE COURT:  It would come above equity.

 2              MS. DEITSCH-PEREZ:  Uh-huh.

 3              THE COURT:  Strand, I guess, or --

 4              MS. DEITSCH-PEREZ:  Yeah, the 10 and 11, --

 5              THE COURT:  I think I still remember this --

 6              MS. DEITSCH-PEREZ:  Yeah.

 7              THE COURT:  -- organizational structure.  And that,

 8  of course, eliminates the sanction component of this.

 9       What do you have to say, Mr. Morris?

10              MR. MORRIS:  Sure.  I'm just going to come to the

11  podium.  I'm more comfortable there.

12              THE COURT:  Uh-huh.

13              MR. MORRIS:  I'm surprised and disappointed that

14  we're hearing this now.  This is something that could have

15  been raised the day after we filed our objection.  Instead of

16  raising this issue then, they filed a response, and we have

17  spent more than $600,000 litigating this matter.  She's opened

18  the door now.  Before there was a deposition taken, Your

19  Honor, we offered to pay them a half a million dollars for the

20  withdrawal of this claim.  That was not accepted.

21       Here we are now.  When I received this missive on

22  Saturday, saying, gee, it's not -- not complete what's being

23  said here.  She also directed us to pay the Class 8 and Class

24  9 in full, which we're not going to do unless and until the

25  Trustee determines that's in the estate's best interest.  We

001628

HCMLPHMIT00003834

Case 19-34054-sgj11 Doc 4255-7 Filed 12/09/25 Entered 12/09/25 22:39:29 Desc
Case 3:25-cv-02724-L Document 6 Exhibit 6 Page Page 64 of 31 Page 100 of 1011 PageID 1999

7

 1   responded by saying, if that's what you want to do, then just

 2   withdraw your claim with prejudice and we will withdraw our

 3   bad faith motion.

 4       So, instead of accepting that, they pushed on.  Right?

 5   Because it doesn't matter.  If they're going to subordinate

 6   that claim to 8 and 9, the claim becomes irrelevant, because

 7   if there's ever a distribution to the Class 10, that's the

 8   same person.  It's Jim Dondero.  Right?  We don't have to play

 9   games here.

10       So I said, withdraw your claim with prejudice, we'll

11   withdraw our bad faith motion with prejudice, and we will have

12   no trial.  Not acceptable.

13       So here we are.  We've now spent the time.  They could

14   have made this proposal two years ago.  They didn't.  They

15   didn't accept the very generous offer that we made before a

16   deposition was taken in this case.  They've got no case here.

17   There's no legal basis for this claim.  There is no factual

18   basis for this claim.  We were prepared to actually write a

19   meaningful check and avoid the whole thing.  Not acceptable.

20   We're forced to go through it.

21       This is like HCRE all over again, where, like, I don't

22   know why we're here.  I really don't know why we're here.

23   It's the same person.  Right?

24       But they pushed me here, and I think we ought to, as long

25   as everybody's here, we ought to just get on with it and be

HCMLPHMIT00003835

Case 19-34054-sgj11 Doc 4557 Filed 12/09/25 Entered 12/09/25 12:22:29 Desc
Case 3:25-cv-02724-L Document 67 Main Document Page 632 of 31 Page 101 of 1011 PageID 2000

8

 1  done today.

 2          THE COURT:  Well, I'm trying to figure out if it's

 3  just a mechanical thing at this point.  I mean, I'm hearing

 4  that your proposal is the claim be subordinated.

 5          MS. DEITSCH-PEREZ:  Uh-huh.

 6          THE COURT:  And --

 7          MS. DEITSCH-PEREZ:  And the reason we don't agree

 8  with Mr. Morris, and I'll correct a few of the things he said,

 9  is there are some differences between HCLOM and former equity,

10  and we don't know what kind of tax or other implications there

11  would be from changing it from HCLOM's claim to dumping it

12  into some other category.

13      But as a practical and economic matter for the estate,

14  we're willing to have it at the back.  So it's no difference

15  to the estate.

16      And the reason we didn't make this proposal initially and

17  we made it last week is because of the very material change

18  that the estate suddenly has $80 million more.  And it should

19  be clear to everybody that there's enough money to pay

20  everyone.

21      It is also not true that I said to Mr. Morris that he had

22  to pay everybody this minute to make this claim, because then

23  I would be saying, oh, pay me next week.  That's not what I

24  said.  What I said was we would agree that if it turns out, as

25  we firmly believe and we're putting our money where our mouth

Case 19-34054-sgj11 Doc 4159-7 Filed 06/09/25 Entered 06/09/25 12:29:59 Desc
Case 3:25-cv-02724-L    Document 67 Filed 06/09/25 Page 102 of 1011    PageID 2001

9

1  is, that there's enough money to pay everyone, then pay HCLOM

2  then.  They've already reserved the money for it.

3      And for them to say this is a ridiculous claim is itself

4  ridiculous.  This is not a proof of claim.  This is a claim

5  that Highland scheduled, not just when Mr. Dondero was at the

6  helm but when Mr. Seery was at the helm.  And then he

7  reaffirmed it for years afterwards.  It's only when they

8  realized that allowing the claim would benefit Mr. Dondero,

9  among others, that they did an about-face and said, oh, no,

10  now we object to the claim.

11           THE COURT:  Okay.  Now we're getting into argument.

12           MS. DEITSCH-PEREZ:  Okay.

13           THE COURT:  And I promise you, I've read every single

14  --

15           MS. DEITSCH-PEREZ:  Okay.

16           THE COURT:  -- sentence of every single pleading.

17           MR. MORRIS:  Yeah.

18           THE COURT:  So I know what the counter-arguments are.

19           MS. DEITSCH-PEREZ:  And --

20           THE COURT:  I'm going to suggest this.  Can we take a

21  15-minute break?  And we are pressed for time today, because I

22  think I told you all, or maybe, I mean, not me, but Traci

23  probably told you all that I have a presentation at 6:00

24  o'clock tonight.  It's five minutes away, but --

25           MR. MORRIS:  I think --

HCMLPHMIT00003837

Case 19-34054-sgj11 Doc 4255-7 Filed 12/19/25 Entered 12/19/25 12:23:29 Desc
Case 3:25-cv-02724-L    Document 17 Exhibit Trial page 103 of 1011    PageID 2002
Exhibit Trial Tr page 33 of 91    Page 103 of 1011

10

```
 1          THE COURT:  What I'm really afraid of is you

 2   mentioned HCRE.  I remember when we were in the devil-is-in-

 3   the-details kind of situation there, where we didn't really

 4   have a meeting of the minds on what might happen with a

 5   withdrawal of that claim.

 6      So might I suggest a 15-minute break, and you can write it

 7   down and sign it in blood.  I hate to say it.  But if it's

 8   something that you both can get to the same point on.

 9          MR. MORRIS:  I'm happy to do it, but I just want to

10   make this really clear on the record.  The reason that we were

11   prepared to agree to withdrawal of our bad faith motion in

12   exchange for disallowance of the scheduled claim is because we

13   would have no theoretical let alone legal duty to HCLOM.  And

14   that's where we need to get to.  That's why we're going

15   forward today.  That's why their settlement proposal was

16   unacceptable.

17      We probably -- I'd have to confer with my client, but we

18   probably would still be willing to withdraw the bad faith

19   motion with the disallowance of the scheduled claims.  But the

20   subordination of it, to leave it hanging out there to create

21   new arguments that we owe some kind of duty is unacceptable.

22          MS. DEITSCH-PEREZ:  And that --

23          THE COURT:  All right.  Wouldn't you know at this

24   point in time if there's a tax consequence or some sort of

25   negative consequence from withdrawal?  Withdrawal seems weird
```

HCMLPHMIT00003838

Case 19-34054-sgj11 Doc 4355-7 Filed 06/20/25 Entered 06/20/25 22:32:29 Desc
Case 3:25-cv-02724-L Document Exhibit Filed Page 26 of 91 Page 104 of 1011 PageID 2003

11

```
 1   because it's a scheduled claim.
 2           MR. MORRIS:  That's why I say disallowance.
 3           MS. DEITSCH-PEREZ:  It's --
 4           THE COURT:  Disallowance versus subordination?
 5           MS. DEITSCH-PEREZ:  We don't know.  And there's
 6   really no --
 7           THE COURT:  Why wouldn't you, after all of this time?
 8           MS. DEITSCH-PEREZ:  Because this only came up last
 9   week, and I don't know how many other things one would have to
10   look at to know that, Your Honor.
11      But the bottom line is we don't.  And there's also no
12   reason, because it is economically no different for the Debtor
13   to put us behind 9 than to disallow it, because there's going
14   to be --
15           THE COURT:  Oh, okay.  Well, --
16           MS. DEITSCH-PEREZ:  -- money left over.
17           THE COURT:  -- I still want the 15-minute break, --
18           MR. MORRIS:  Okay.
19           THE COURT:  -- because it seems like there's a
20   mechanic, such as I think the HCRE issue was --
21           MR. MORRIS:  They were saving claims for another day.
22           MS. DEITSCH-PEREZ:  And --
23           MR. MORRIS:  That's what we want to avoid doing here
24   today.
25           THE COURT:  Yes.  That this claim would never be used
```

001633

HCMLPHMIT00003839

Case 19-34054-sgj11 Doc 4255-57 Filed 06/09/25 Entered 06/09/25 12:39:29 Desc
Case 3:25-cv-02724-L    Document 17-6 on Entered 06/08/23 of 91    Page 105 of 1011    PageID 2004

12

```
 1   --
 2            MR. MORRIS:  We want to make sure that we have
 3   finality, --
 4            THE COURT:  -- in litigation.
 5            MR. MORRIS:  -- that we're never going to see this
 6   again.
 7            THE COURT:  It would never be used in any future
 8   litigation.
 9            MS. DEITSCH-PEREZ:  Right.  That I could -- as I
10   stand here now, I don't know of any claims that HCLOM has
11   other than this.  And the time to make them is long past.  I
12   mean, the bar date has passed.  The schedules are the
13   schedules.
14            THE COURT:  But that would be against Highland, not
15   against who knows who else.  I mean, I don't know.
16            MS. DEITSCH-PEREZ:  But why does the Debtor -- I
17   mean, why does that matter to the Debtor?
18            THE COURT:  Well, --
19            MS. DEITSCH-PEREZ:  I mean, I also don't know of any
20   claims HCLOM has against anybody else, but why is --
21            THE COURT:  Mr. Seery has been the subject of a lot
22   of claim litigation.  Or trying to assert a claim.
23            MR. MORRIS:  Your Honor?
24            THE COURT:  Fifteen-minute break.
25            MS. DEITSCH-PEREZ:  I'll give you an example.
```

HCMLPHMIT00003840

Case 19-34054-sgj11 Doc 4355-67 Filed 06/30/25 Entered 06/30/25 12:22:59 Desc
Case 3:25-cv-02724-L    Document Exhibit 67 Page 426 of 91    Page 106 of 1011    PageID 2005

13

```
1              MR. MORRIS:  Can we take that 15-minute break?

2              THE COURT:  Yes.  Yes.

3              MR. MORRIS:  Yes.  Thank you.

4              THE COURT:  All right.  Thank you.

5              THE CLERK:  All rise.

6         (A recess ensued from 9:18 a.m. until 9:47 a.m.)

7              THE CLERK:  All rise.

8              THE COURT:  All right.  Please be seated.

9         All right.  Do we have anything that looks like a

10   compromise and settlement, or no?

11             MS. DEITSCH-PEREZ:  We do.  Can I take your computer?

12             MR. MORRIS:  Sure.

13             MS. DEITSCH-PEREZ:  Or somebody's computer?

14             MR. MORRIS:  It's Hayley's.  But you can read it if

15   you want.

16             MS. DEITSCH-PEREZ:  Okay.

17             MR. MORRIS:  Your Honor, just context, we greatly

18   appreciate the Court's indulgence of time.  It was used

19   constructively.  I believe that we have reached an agreement

20   to resolve today's matter.

21        And with that, I'm going to have Ms. Deitsch-Perez read

22   the written terms that we have right now.  Obviously, it'll be

23   subject to definitive documentation, which we would work on

24   promptly today.

25        But why don't you take it from here?
```

HCMLPHMIT00003841

Case 19-34054-sgj11 Doc 4259-57 Filed 06/30/25 Entered 06/30/25 12:22:59 Desc
Case 3:25-cv-02724-L    Document 170 of 131 Filed 06/26/32 Page 107 of 1011    PageID 2006

14

```
 1              MS. DEITSCH-PEREZ:  Okay.

 2              THE COURT:  Okay.

 3              MS. DEITSCH-PEREZ:  And I'm not going to include your

 4    asterisks.  The --

 5              THE COURT:  And can I ask you to come to the podium

 6    and speak into the mic?  I just want it crystal clear on the

 7    record whatever is said.

 8              MS. DEITSCH-PEREZ:  Okay.  Come.  Yes.  Come.

 9       Okay.  The HCLOM claim would be converted to a Class 10

10    interest in the same amount.

11              THE COURT:  Okay.

12              MS. DEITSCH-PEREZ:  Okay.  HCLOM would release

13    protected parties.

14              MR. MORRIS:  It would be a general release.

15              THE COURT:  Uh-huh.

16              MS. DEITSCH-PEREZ:  But only by HCLOM.

17              MR. MORRIS:  Correct.  Only HCLOM Limited.

18              MS. DEITSCH-PEREZ:  HCLOM would not separately make

19    equity motions, like Hunter Mountain.  However, because of the

20    change in circumstances, I just want this to be clear.  Hunter

21    Mountain or Dugaboy may have -- may want to bring to the

22    Court's attention the change in the finances in the estate.

23              MR. MORRIS:  Your Honor, --

24              MS. DEITSCH-PEREZ:  But it would --

25              MR. MORRIS:  -- I really would prefer that we just
```

001636

HCMLPHMIT00003842

Case 19-34054-sgj11 Doc 4255-7 Filed 06/09/25 Entered 06/09/25 12:29:59 Desc
Case 3:25-cv-02724-L    Document 17   Exhibit   Page 108 of 1011    PageID 2007

15

1    read the terms of the agreement, and then she can put down the

2    commentary.  I'm going to do this the way we have -- the way

3    we have it written, and then she can provide whatever

4    commentary she'd like.

5        There's five elements to this settlement.

6            THE COURT:  Okay.

7            MR. MORRIS:  HCLOM claim will be converted to a Class

8    10 interest in the amount of the claim.

9        Number 2, there shall be a general release of all

10   Protected Parties, as that term is defined in the plan.

11       There will be no "equity" type motion by HCLOM Limited.

12   HCLOM Limited shall take no position in connection with this

13   case, including but not limited to in connection with this

14   scheduled claim, as a holder of a Class 10 interest.

15       Number 4, no estate fiduciary, Highland Capital

16   Management, LP, will owe any duty of any kind, whether it's

17   contractual, fiduciary, or otherwise, now or forever.

18       And Number 5, there shall be no reserve established.

19           THE COURT:  Let me -- let me --

20           MS. DEITSCH-PEREZ:  Let --

21           THE COURT:  -- make sure I heard that point.

22           MR. MORRIS:  Uh-huh.

23           THE COURT:  No estate fiduciary or Highland.  What --

24           MS. DEITSCH-PEREZ:  Other than this agreement.  I

25   mean, --

001637

HCMLPHMIT00003843

Case 19-34054-sgj11 Doc 4255-7 Filed 06/09/25 Entered 06/09/25 12:29:59 Desc
Case 3:25-cv-02724-L Document Exhibit 7 Page 25 of 81 Page 109 of 1011 PageID 2008

16

1          MR. MORRIS:  Sure.

2          THE COURT:  Just, if you could just repeat what you

3     said.

4          MR. MORRIS:  There -- no estate fiduciary or Highland

5     Capital Management or the Trust shall owe any duty of any kind

6     to HCLOM Limited, including but not limited to contractual,

7     fiduciary, or any other duty.

8          MS. DEITSCH-PEREZ:  Except the duties owed as a

9     result of this agreement.  In other words, you're not saying

10    we'll make this agreement but, ha ha, you can't enforce it?

11    That's all.

12         MR. MORRIS:  The only thing that would be enforced is

13    they would have a Class 10 interest.

14         MS. DEITSCH-PEREZ:  Right.

15         MR. MORRIS:  Right?

16         MS. DEITSCH-PEREZ:  It would have its Class 10

17    rights.

18         MR. MORRIS:  Period, full stop.  So that's fine.

19       And then no reserve shall be established.

20       There actually has been a reserve.  That reserve can be

21    released.  There will be no further reserve with respect to

22    this 10 interest.

23       And, you know, we need to make sure, and I don't know that

24    counsel has the authority to do that today, but we need to

25    make sure that neither HMIT nor Dugaboy, the Class 10 and

001638

HCMLPHMIT00003844

Case 19-34054-sgj11 Doc 4515-7 Filed 06/30/25 Entered 06/30/25 12:23:59 Desc
Case 3:25-cv-02724-L    Document 17  Exhibit  Filed 07/28/25  Page 110 of 1011    PageID 2009

17

```
 1  Class 11 interest holders, have any objection to this.  It's
 2  got to be subject to their consent.
 3          MS. DEITSCH-PEREZ:  Although I guess I still don't
 4  quite understand, because right now HCLOM is ahead of them,
 5  but I -- so now they're moving into --
 6          MR. MORRIS:  Because if we had the trial today, I'm
 7  fairly confident that the claim would be disallowed.
 8          MS. DEITSCH-PEREZ:  And I'm equally confident that it
 9  would not be --
10          MR. MORRIS:  Okay.  So --
11          MS. DEITSCH-PEREZ:  -- and that it would be ahead.
12          MR. MORRIS:  So we're having a settlement that could
13  impact them.  So --
14      Just to state this really simply, Your Honor, because I
15  want intent to be really clear on the record:  HCLOM Limited
16  is going to walk away with the economic interest of having an
17  allowed Class 10 interest in the amount of the claim and
18  nothing more, as if we actually tried the case today and the
19  scheduled claim was disallowed.  That's the point that we
20  continue to make, that if we had this case, the reason why we
21  really wanted to push forward to this case today and really
22  what we were talking about before we took the break is we
23  didn't want any continuing duty of any kind.
24      So this is why -- this is the compromise here.  Highland
25  gets what it wants, and that is, as a legal matter, the claim
```

HCMLPHMIT00003845

Case 19-34054-sgj11 Doc 4155-7 Filed 06/09/25 Entered 06/09/25 12:23:29 Desc
Case 3:25-cv-02724-L    Document 17  Filed 06/09/25  Page 111 of 1011    PageID 2010

18

 1   has been effectively disallowed.  HCLOM gets what it wants,

 2   because, as an economic matter, when and if Class 10 claim --

 3   interest holders get paid, they'll get a distribution,

 4   presumably prorated with HMIT if HMIT is ultimately found to

 5   have, you know, an allowed claim.

 6       That's really it.  We want the protection as if the claim

 7   had been disallowed in full, no strings attached.  And they're

 8   going to get, in exchange for that, they're going to get the

 9   economic benefit of holding a Class 10 interest.

10           THE COURT:  Okay.  Let me ask the obvious question.

11   It seemed to the Court that standing was the issue.  When we

12   had this back and forth before the break, Highland wanted

13   disallowance.  Your client wanted subordination.  And we all

14   know that there have been many adversary proceedings and many

15   appeals where the standing of the plaintiff, the standing of

16   the appellant, was challenged.  And some court, maybe this

17   one, maybe an appellate court, said no standing of Mr.

18   Dondero.  Hunter Mountain.  You know.

19           MS. DEITSCH-PEREZ:  These are --

20           THE COURT:  Is this the rub here, or are we in

21   agreement from these five elements that HCLOM will not have

22   standing to bring actions or to pursue appeals that involve --

23           MS. DEITSCH-PEREZ:  We're --

24           THE COURT:  -- somehow Highland?

25           MS. DEITSCH-PEREZ:  We're basically -- and this is

001640

HCMLPHMIT00003846

Case 19-34054-sgj11 Doc 4255-7 Filed 12/06/25 Entered 12/06/25 12:23:29 Desc
Case 3:25-cv-02724-L    Document 17 Exhibit Entered page 20 of 91    Page 112 of 1011    PageID 2011

19

1  why I was trying to give a little color earlier, which is to

2  say circumstances have changed.

3      So former equity, Classes 10 and 11, are in a position to

4  say, Your Honor, look, see how much money there is in the

5  estate.  Now can you agree that we have standing?  But we're

6  not going to rely on the addition of HCLOM to say it's somehow

7  different than if Hunter Mountain had done it or Dugaboy had

8  done it.  Is that -- is that clear?

9          MR. MORRIS:  Let me make sure that I understand.

10  This settlement has no impact on Dugaboy or HMIT.  It doesn't.

11  They've done whatever they wanted.  They'll continue to do

12  whatever they wanted, unfortunately.  But what the third

13  bullet point says is that HCLOM Limited shall take no position

14  in connection with this case.  Period, full stop.

15          MS. DEITSCH-PEREZ:  Other than --

16          MR. MORRIS:  Other than -- other than if, you know,

17  if we gave a distribution to HMIT but didn't give it to HCLOM

18  Limited, they can come in and complain about that.  That's

19  their economic right.

20          MS. DEITSCH-PEREZ:  Right.  We could complain about

21  --

22          MR. MORRIS:  Economic right.

23          MS. DEITSCH-PEREZ:  -- the economic -- about whether

24  we get or don't get what we've just agreed to.  I mean, we

25  have rights arising out of this agreement.

001641

HCMLPHMIT00003847

Case 19-34054-sgj11 Doc 4255-67 Filed 06/30/25 Entered 06/30/25 12:32:59 Desc
Case 3:25-cv-02724-L    Document 17    Exhibit MIT Page 32 of 81    Page 113 of 1011    PageID 2012

20

```
1              THE COURT:  Okay.  Would it be -- it might be
2    superfluous, but any problem with either one of you just
3    saying in this agreement, This compromise and settlement
4    agreement does not operate to give HCLOM standing in
5    connection with any adversary, any appeal?
6              MS. DEITSCH-PEREZ:  Not if it related to a violation
7    of the settlement.  So I think it's an unnecessary thing to
8    say.
9              THE COURT:  Except to enforce the settlement
10   agreement?  Could it have that proviso?
11      Because here's where I'm standing.  Standing.  No pun
12   intended, actually.  I mean, you mentioned that I have an
13   obligation or duty to manage my docket.  But I feel like I
14   also have a duty not to clog the court system, including the
15   appellate system, by entering an agreed order that might be
16   construed later, look, --
17             MS. DEITSCH-PEREZ:  Well, --
18             THE COURT:  -- she acknowledged we have a Class 10
19   interest and therefore we have standing.  Okay?
20             MS. DEITSCH-PEREZ:  Your Honor?
21             THE COURT:  Do you see what I'm saying?  I have some
22   duty here, too, to make sure I have not created a standing
23   argument where one --
24             MS. DEITSCH-PEREZ:  There --
25             THE COURT:  -- might not have existed.
```

HCMLPHMIT00003848

Case 19-34054-sgj11  Doc 4157-57 Filed 12/06/23  Entered 12/06/23 22:29:29  Desc
Case 3:25-cv-02724-L    Document 17 Exhibit Entered 11/28/25  Page 114 of 1011    PageID 2013

21

1          MS. DEITSCH-PEREZ:  There's nothing about this

2     agreement that creates any standing other than with respect to

3     the agreement itself.  And I would be loath to say something

4     that might be misconstrued about that.  It's simply

5     unnecessary.

6          And it's not, it's not clogging the courts for parties to

7     appeal those decisions with which they disagree.  And this

8     settlement is actually efficient, in the sense that surely

9     everybody here is aware that if we went forward on this case,

10    whoever lost would appeal.

11         So this is managing both this docket and lessening the

12    flow of --

13              THE COURT:  So, --

14              MS. DEITSCH-PEREZ:  -- cases into the future.

15              THE COURT:  -- to make me feel like I have done my

16    duty, you all would add a sentence that this order, this

17    agreed order, whatever you're calling the document, does not

18    operate to give standing to HCLOM for any purposes related to

19    the Highland estate except to allow it to enforce this order?

20              MS. DEITSCH-PEREZ:  I mean, I'll have to go back and

21    ask, but that sounds -- that sounds okay.  You know, as in

22    this case, you're right, the devil is always in the details,

23    but that sounds like what we've been saying.

24              THE COURT:  Okay.

25              MR. MORRIS:  I just --

HCMLPHMIT00003849

Case 19-34054-sgj11 Doc 4359-57 Filed 06/09/25 Entered 06/09/25 12:32:59 Desc
Case 3:25-cv-02724-L    Document 17-1    Exhibit Filed 08/28/25    Page 115 of 1011    PageID 2014

22

1          THE COURT:  You'll have to ask your client?  I think

2     I saw him here earlier.  Has he left?

3          MS. DEITSCH-PEREZ:  If he is, I'll go -- I'll go and

4     call him in the hall.

5          THE COURT:  Okay.  Okay.

6          MR. MORRIS:  I just added a sixth clause that says,

7     This order shall not operate -- does not and shall not operate

8     -- does not and shall not operate to give standing to HCLOM

9     Limited for any purpose against Highland -- against the

10    Highland estate except to enforce this order.

11         THE COURT:  Uh-huh.

12         MR. MORRIS:  And I just, I just need to respond to

13    that last comment.  Right?  We know they've appealed your

14    gatekeeper order.  We know that they've, you know, we're in

15    the Fifth Circuit now on recusal.  There's no indication

16    whatsoever that this case is nearing a conclusion.  We have no

17    more contested matters before you, at least as of this moment,

18    Your Honor.  There's no more adversary proceedings that I know

19    of at this moment.  I'm going to cross my fingers and hope

20    that the appellate court upholds the orders of this Court, the

21    orders that have -- from the district court that affirmed your

22    orders.

23         But, clearly, Mr. Dondero still has an appetite for

24    litigation.  He is still pursuing, you know, attacking the

25    gatekeeper.  He's still pursuing your recusal.  So I think --

001644

HCMLPHMIT00003850

Case 19-34054-sgj11 Doc 4215-7 Filed 06/20/25 Entered 06/20/25 12:29:59 Desc
Case 3:25-cv-02724-L    Document Exhibit on File Page 2332 of 91    Page 116 of 1011    PageID 2015

23

```
 1   I think the --
 2           THE COURT:  You know, I don't keep --
 3           MR. MORRIS:  Yeah.
 4           THE COURT:  -- as close tabs --
 5           MR. MORRIS:  Yeah.
 6           THE COURT:  -- as lawyers might think I --
 7           MR. MORRIS:  Right.
 8           THE COURT:  -- do on appeals.
 9           MR. MORRIS:  Uh-huh.
10           THE COURT:  But I do think I read where the recusal
11   order was -- was --
12           MS. DEITSCH-PEREZ:  It --
13           THE COURT:  It's a done deal.  They --
14           MS. DEITSCH-PEREZ:  No, Your Honor.
15           MR. MORRIS:  No.  No, they brought in Jonathan
16   Mitchell, the former Solicitor General of the State of Texas,
17   and John Ashcroft, the former Attorney General of the United
18   States.
19           THE COURT:  He's still alive?  I don't mean to be
20   rude, but --
21           MR. MORRIS:  I thought it was his son.
22           MS. DEITSCH-PEREZ:  No, Your Honor.
23           MR. MORRIS:  It's a great question.  With all due
24   respect to Mr. Ashcroft, --
25           THE COURT:  Yes?
```

HCMLPHMIT00003851

```
1        MR. MORRIS:  -- I mean no disrespect whatsoever, --
2        THE COURT:  Uh-huh.
3        MR. MORRIS:  -- but when I heard that I thought it
4   was his son, too.  But yes, --
5        MS. DEITSCH-PEREZ:  No.
6        MR. MORRIS:  -- they're on the brief, and they filed
7   a motion for a petition for a rehearing en banc.
8        MS. DEITSCH-PEREZ:  And --
9        MR. MORRIS:  And our answer is due on December 26th.
10       MS. DEITSCH-PEREZ:  Yeah.  But --
11       MR. MORRIS:  So we'll see where that goes.  But the
12  point being that it validates Mr. Seery and Highland's
13  concerns that there be no ability to create another vehicle,
14  to create more litigation, and it validates the very concern
15  that Your Honor was addressing earlier on the same topic.
16      I think we're in agreement here, --
17       MS. DEITSCH-PEREZ:  Right.
18       MR. MORRIS:  -- but I want there to be context for
19  why we're so insistent that there be no duty of any kind and
20  no ability of HCLOM all of a sudden to start raising its hand
21  and commencing litigation.
22       MS. DEITSCH-PEREZ:  Okay.  And I do want to thank Mr.
23  Morris for bringing this up and making the recusal status --
24  correcting it.
25      And for all of the complaints and saying these appeals are
```

001646

HCMLPHMIT00003852

Case 19-34054-sgj11 Doc 4255-7 Filed 06/09/25 Entered 06/09/25 12:32:59 Desc
Case 3:25-cv-02724-L Document 17 Exhibit 7 Entered page 26532 Page 118 of 1011 PageID 2017

25

```
 1   not well-founded, it is not often that the Fifth Circuit

 2   actually asks a respondent to answer an en banc petition, much

 3   less require them to do it the day after Christmas, which I am

 4   sorry about.  They're an equal opportunity lawyer

 5   inconveniencer.

 6       So I would just ask that we -- that Highland tone down the

 7   attacks on the appeals, because there have been ones that have

 8   been upheld.

 9             THE COURT:  Okay.  I, you know, --

10             MS. DEITSCH-PEREZ:  That's all.

11             THE COURT:  -- I didn't think Highland's lawyer's

12   tone was at all, you know, angry or elevated or whatever

13   you're thinking.

14             MS. DEITSCH-PEREZ:  I --

15             THE COURT:  Okay?  I have been approached by judge

16   colleagues in the circuit who have told me there have been

17   more appeals out of the Highland bankruptcy than any other

18   bankruptcy in Fifth Circuit history.  Okay?  So to say there

19   have been a whole lot of appeals is just factually correct.  I

20   don't know the number.

21             MR. MORRIS:  It's 15, Your Honor.  And there's more

22   in the pipeline.

23             THE COURT:  There -- what?

24             MR. MORRIS:  There have been 15 so far.  There's more

25   in the pipeline.
```

001647

HCMLPHMIT00003853

Case 19-34054-sgj11  Doc 4557  Filed 12/09/25  Entered 12/09/25 12:23:59  Desc
Case 3:25-cv-02724-L  Document 17  Main Document  Page 263 of 91  Page 119 of 1011  PageID 2018

26

 1          THE COURT:  Wait, wait.  Okay.  You're talking at the
 2    Fifth Circuit?
 3          MR. MORRIS:  Correct.
 4          THE COURT:  But --
 5          MR. MORRIS:  Oh, there has been dozens in the
 6    district.
 7          THE COURT:  I think at one point a year or two ago
 8    you told --
 9          MR. MORRIS:  Yeah.
10          THE COURT:  -- me 50-plus.
11          MR. MORRIS:  Right, right.  I am just -- I am just
12    talking about the Fifth Circuit.  I've never heard of a
13    circuit court in the United States of America that's had 15
14    appeals from any case, let alone a bankruptcy case.
15          MS. DEITSCH-PEREZ:  Hmm.
16          THE COURT:  So, anyway, it is what it is.  But part
17    of the reason I'm engaging in this back and forth is, again,
18    we all have our duties.  You have duties to your clients.  I
19    have duties to the system, okay.  And if I sign anything that
20    all of a sudden is going to create standing where it might not
21    have existed had I allowed this to be litigated today, then I
22    think I've been derelict in my duties.  So it's essential, as
23    far as I'm concerned.
24       So do we need a five-minute break?  I'm telling you, if we
25    have to go forward today, which it's looking like we won't,

HCMLPHMIT00003854

Case 19-34054-sgj11 Doc 4259-57 Filed 06/20/25 Entered 06/20/25 22:29:59 Desc
Case 3:25-cv-02724-L   Document Exhibit 57 Page 28 of 31 Page 120 of 1011   PageID 2019

27

1   but if we have to, it's going to be compressed, because we've

2   got to finish --

3          MR. MORRIS:  Right.

4          THE COURT:  -- by 5:30.

5          MR. MORRIS:  I think the only thing I would request

6   is that Ms. Deitsch-Perez just confirm --

7          MS. DEITSCH-PEREZ:  Ask about the sixth.

8          MR. MORRIS:  -- that -- confirm that Number 6 is

9   acceptable.

10         THE COURT:  Okay.  She suggested she might need to

11  run it by --

12         MR. MORRIS:  Yeah.

13         MS. DEITSCH-PEREZ:  Yeah.

14         THE COURT:  -- the client.

15         MS. DEITSCH-PEREZ:  Let's -- can we take five

16  minutes?

17         THE COURT:  Five minutes.

18         MR. MORRIS:  Thank you, Your Honor.

19         THE COURT:  Okay.  Thank you.

20         THE CLERK:  All rise.

21     (A recess ensued from 10:05 a.m. until 10:12 a.m.)

22         THE CLERK:  All rise.

23         THE COURT:  Okay.  Please be seated.

24     All right.  We're back on the record in Highland.  Have we

25  gotten to closure on all the issues or not?

001649

HCMLPHMIT00003855

Case 19-34054-sgj11 Doc 4355-7 Filed 12/09/25 Entered 12/09/25 12:29:59 Desc
Case 3:25-cv-02724-L    Document 17    Exhibit 10 Filed Page 232 of 91    Page 121 of 1011    PageID 2020

28

 1          MS. DEITSCH-PEREZ:  We have, Your Honor.

 2          THE COURT:  Okay.

 3          MR. MORRIS:  And so what we'd like to do is Highland

 4  is going to take the laboring oar of doing an initial draft of

 5  a stipulated order.  We expect to get that to Stinson today.

 6  And we'd like to just put a loose deadline to report to the

 7  Court if we're unable to file this document, let's just say by

 8  the 24th, next -- I think it's Tuesday.

 9      And if we're unable to do it by then, we'll ask for

10  another date for coming back.  But I do just want to keep a

11  deadline there just so --

12          MS. DEITSCH-PEREZ:  I think it's a week.  Okay.

13          MR. MORRIS:  A week is -- it's six days instead of

14  five days because I didn't want to take Christmas.  That's

15  just me.

16          THE COURT:  Okay.  Sounds reasonable to me.

17          MR. MORRIS:  Yeah.

18          THE COURT:  Sounds more than reasonable that you can

19  work this out --

20          MR. MORRIS:  Yeah.

21          THE COURT:  -- with language within six days.

22          MR. MORRIS:  I do appreciate Ms. Deitsch-Perez's

23  listening and getting to yes on this.  It's a good result.

24          THE COURT:  Okay.

25          MR. MORRIS:  Thank you, Your Honor.

001650

HCMLPHMIT00003856

```
1              MS. DEITSCH-PEREZ:  Thank you, Your Honor.
2              THE COURT:  Anything you want to add, or you're in
3     agreement with everything you just heard, Ms. Deitsch-Perez?
4              MS. DEITSCH-PEREZ:  Yes.
5              THE COURT:  Okay.
6              MR. MORRIS:  Deborah?
7              MS. DEITSCH-PEREZ:  What?
8              MR. MORRIS:  I assume part of this is withdrawing the
9     bad faith motion?
10             MS. DEITSCH-PEREZ:  Oh, yes.
11             MR. MORRIS:  Yes.  I can confirm that that's Element
12    Number 7.  The bad faith motion will be deemed withdrawn.
13             THE COURT:  Okay.  All right.  Well, --
14             MS. DEITSCH-PEREZ:  Well, will be withdrawn.
15             MR. MORRIS:  Yeah.  Thank you.
16             THE COURT:  All right.  I would have been happy to
17    spend a whole day with you all, but we can now go on and take
18    care of other business, I guess.
19        So I thank you all for getting this resolved.  And I'm not
20    going to be a happy camper if I don't see an order.  I mean,
21    the battle of the forms, I really don't think we need to have
22    that here.  Okay?
23             MR. MORRIS:  Yep.
24             THE COURT:  So, --
25             MR. MORRIS:  Thank you, Your Honor.
```

001651

HCMLPHMIT00003857

Case 19-34054-sgj11 Doc 4355-7 Filed 06/20/25 Entered 06/20/25 12:32:59 Desc
Case 3:25-cv-02724-L    Document 17-4 Filed 06/20/25    Page 123 of 1011    PageID 2022

30

1          THE COURT:  All right.  Happy holidays to everyone.

2          MR. MORRIS:  You, too.

3          MS. DEITSCH-PEREZ:  You, too.

4          THE CLERK:  All rise.

5      (Proceedings concluded at 10:15 a.m.)

6                          --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22 above-entitled matter.

23   **/s/ Kathy Rehling**                     **12/19/2024**

24 _____      _____
Kathy Rehling, CETD-444                   Date
25 Certified Electronic Court Transcriber

**001652**
HCMLPHMIT00003858

31

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                      29

END OF PROCEEDINGS                                           30

INDEX                                                        31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

001653
HCMLPHMIT00003859

**EXHIBIT 68**



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 27, 2024**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

### STIPULATED AND AGREED ORDER RESOLVING (A) HCLOM, LTD.'S SCHEDULED CLAIMS 3.65 AND 3.66; AND (B) HIGHLAND CAPITAL MANAGEMENT, L.P.'S (1) OBJECTION AND (2) MOTION FOR A BAD FAITH FINDING AND AN AWARD OF ATTORNEYS' FEES AGAINST HCLOM, LTD. AND JAMES DONDERO IN CONNECTION THEREWITH [DOCKET NOS. 3657, 4176]

WHEREAS, on December 13, 2019, Highland Capital Management, L.P. ("Highland"),

the reorganized debtor in the above-captioned Chapter 11 case (the "Bankruptcy Case"), filed its

schedule of unsecured claims that identified "Highland CLO Holdco" as a creditor with claims

arising under a note. Docket No. 247 (Schedule E/F, Part 3.64 and 3.65) (the "Initial HCLOM

Claim");

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

4933-5155-3032.2 36027.003



1934054241227000000000001

**001655**

HCMLPHMIT00003860

WHEREAS, on September 22, 2020, Highland filed a *Notice of Filing of Debtor's Amended Schedules* in which it, among other things, replaced Highland CLO Holdco as the creditor on the Initial HCLOM Claim with Highland CLO Management, Ltd. ("HCLOM Ltd.," and together with Highland, the "Parties"). [Docket No. 1082] (Schedule E/F, Part 3.65 and 3.66, the "HCLOM Claim");

WHEREAS, on February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "Plan"). The Plan became effective on August 11, 2021 (the "Effective Date") [Docket No. 2700];

WHEREAS, as required under the Plan, Highland created a reserve for the HCLOM Claim (the "Reserve");

WHEREAS, on February 2, 2023, Highland filed its objection to the HCLOM Claim [Docket No. 3657] (the "Objection");

WHEREAS, on April 3, 2023, HCLOM Ltd. filed its response to the Objection [Docket No. 3751] (the "Response");

WHEREAS, on November 21, 2024, Highland filed its *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* [Docket No. 4176] (the "Bad Faith Motion," and collectively with the HCLOM Claim and the Objection, the "HCLOM Litigation");

WHEREAS, an evidentiary hearing on the HCLOM Litigation was scheduled for December 18, 2024 (the "Hearing");

001656

HCMLPHMIT00003861

WHEREAS, the Parties desire to settle and resolve the HCLOM Litigation pursuant to the terms of this Stipulated and Agreed Order (the "Agreement");

WHEREAS, the Court finds and concludes that: (a) the Court has jurisdiction to consider the terms contained in this Stipulated and Agreed Order; (b) venue is proper under 28 U.S.C. §1409; (c) the Parties' Stipulated and Agreed Order is binding; and (d) the relief requested in the Stipulated and Agreed Order is appropriate;

ACCORDINGLY:

IT IS HEREBY ORDERED that:

1. The HCLOM Claim is hereby converted to a Class 10 interest[2] in the amount of $10,140,633.26.

2. Upon the Effective Date, and to the maximum extent permitted by law, except for claims arising out of an failure to abide this Order, HCLOM Ltd. hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates the Protected Parties,[3] individually and collectively, from, and waives and relinquishes, any and all Claims, which HCLOM Ltd. ever had, now has, or hereafter can, shall, or may have against any of the Protected Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management of the Highland Entities, or the Highland Entities' property and including any defense, affirmative defenses, and right to setoff

---

[2] "Class 10" shall have the meaning ascribed to that term in Article III.H. ¶ 10 of the Plan.

[3] "Protected Parties" shall have the meaning ascribed to that term in Article I.B ¶ 105 of the Plan.

001657

HCMLPHMIT00003862

arising out of, or otherwise related to, any of the foregoing (collectively, "HCLOM Ltd.'s Released

Claims").

**FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASE IS INTENDED TO BE GENERAL AND INCLUDES, WITHOUT LIMITATION, A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE EFFECTIVE DATE.**

3.     To the maximum extent permitted by law, HCLOM Ltd. waives the benefit of any

statute or other principle of law or equity that limits the applicability of a release with respect to

claims that the releasing party does not know or suspect to exist in his, her or its favor at the time

of executing the release.

4.     Without limiting the scope of the foregoing waiver, in connection with the

foregoing release, HCLOM Ltd. waives the benefits of Section 1542 of the California Civil Code

(to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as

follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

5.     HCLOM Ltd. hereby agrees that the provisions of Section 1542 of the Civil Code

of the State of California and all similar federal or state law, rights, rules or legal principles, legal

or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY**

**KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY HCLOM**

**LTD.** to the full extent that such rights and benefits pertaining to the matters released herein may

4933-5155-3032.2 36027.003

**001658**

HCMLPHMIT00003863

be waived, and HCLOM Ltd., on its own behalf and on behalf of the HCLOM Ltd. Releasors, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

6.      Except for the limited purpose of enforcing this Order, HCLOM, Ltd. shall file no pleading, motion, adversary proceeding, or other paper in this Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), including but not limited to, in connection with the HCLOM Claim as a holder of a Class 10 interest.

7.      The Protected Parties, individually and collectively, shall owe no duty to HCLOM, Ltd. (whether contractual, fiduciary, equitable, statutory or otherwise) except as arising out of this Order.

8.      Highland is authorized to release the Reserve, and no reserve shall be established for HCLOM, Ltd.'s Class 10 interest.

9.      This Stipulated and Agreed Order does not and shall not operate to give HCLOM Ltd. standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except in connection with the enforcement of this Order.

10.     The Bad Faith Motion is deemed withdrawn with prejudice.

**THE PARTIES UNDERSTAND AND AGREE THAT THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF EITHER PARTY OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.    THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS, EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.**

### ### END OF ORDER ###

4933-5155-3032.2 36027.003

001659

HCMLPHMIT00003864

STIPULATED AND AGREED THIS 23RD DAY OF DECEMBER 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569) 10100
Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110

*Counsel for Plaintiff Highland Capital
Management, L.P.*

4933-5155-3032.2 36027.003

001660

HCMLPHMIT00003865

- and -

**STINSON LLP**
*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Highland CLO Management, Ltd. and James Dondero*

- and -

**STINSON LLP**
*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust and Dugaboy Investment Trust (approved as to form and substance)*

001661
HCMLPHMIT00003866

**EXHIBIT 6**

## INTERCREDITOR AND PARTICIPATION AGREEMENT

This Intercreditor and Participation Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between Highland CLO Management, Ltd. (together with its successors and assigns in such capacities, "HCLOM Ltd.") and Hunter Mountain Investment Trust (together with its successors and assigns in such capacities, "HMIT"). HCLOM Ltd. and HMIT are each referred to herein individually as a "Party" and jointly as the "Parties."

## RECITALS

WHEREAS, on September 22, 2020, Highland Capital Management, L.P. filed a Notice of Filing of Debtor's Amended Schedules in its pending Chapter 11 Case No. 19-34054-sgj11 (the "Bankruptcy Case") in which it, among other things, scheduled a creditor's claim by HCLOM Ltd. (the "HCLOM Claim"); and

WHEREAS, on December 27, 2024, the Bankruptcy Court entered a Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award of Attorneys' Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4176] in the Bankruptcy Case (the "Stipulation and Agreed Order"); and

WHEREAS, the Stipulation and Agreed Order converted the HCLOM Claim to a Class 10 interest/claim (as such is defined in Article III.H. ¶ 10 of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) in the Bankruptcy Case) (the "Plan") in the amount of $10,140,633.26; and

WHEREAS, the Parties have agreed to certain rights and priorities solely as between themselves regarding HCLOM Ltd.'s participation in the payment of Class 10 interests/claims;

THEREFORE, for and in consideration of the promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.     **HMIT Payment Obligation to HCLOM Ltd.** Upon HMIT's receipt of distributions on account of its Class 10 interest/claim (the "Distributions"), HMIT will pay to HCLOM Ltd. an amount equal to five percent (5%) of the funds received by HMIT within two (2) business days after receipt of indefeasible funds by HMIT (the "HMIT Payment Obligation"). HMIT shall be entitled to deduct from the Distributions the fees and expenses billed by Kelly Hart Hallman, LLP which directly relate to the Stipulation and Agreed Order or this Agreement (the "HMIT Expenses") until all HMIT Expenses are paid in full.

2.     **No Additional Duties to HCLOM Ltd.** HMIT shall retain and have the sole discretion to act with respect to its Class 10 interest/claim, and shall owe no additional duties to HCLOM Ltd. or any other person or entity, including without limitation, with respect to (i) the amount of Distributions or recovery by HMIT on account of its Class 10 interests/claims,

1

001663

HCMLPHMIT00003868

(ii) the amount of Distributions that could be received by any holder of Class 10 interests/claims, (iii) the rights of any holder of Class 10 interests/claims, or (iv) any pleading or document that could or should be filed in any way related to the Bankruptcy Case, the Plan, or the HMIT Class 10 interests/claims.

      3.    **No Liens or Encumbrances**. HMIT will not take any action that could reasonably be expected to encumber HMIT's Class 10 interests/claims, limit or affect HMIT's right or ability to fulfil and perform the HMIT Payment Obligation, or limit or affect HCLOM Ltd.'s right to receive the Distributions.

      4.    **This Agreement Supersedes the Effects of the Stipulated and Agreed Order Among the Parties**. HCLOM acknowledges and agrees that, notwithstanding the Stipulated and Agreed Order, the terms of this Agreement amends and supersedes the effect of the Stipulation and Agreed Order as between the Parties and HCLOM's rights to payment under the Plan are limited solely to the HMIT Payment Obligation.

      5.    **Non-Interference; No Cause of Action**. Notwithstanding Paragraph 3, HCLOM will not have any rights to object to or otherwise interfere with the rights of HMIT as a holder of Class 10 interest to reach a settlement with Highland Capital Management, LP ("Highland"). HCLOM acknowledges that it shall have no right to notice or approval of such a settlement nor will it have any cause of action against HMIT arising out of any such settlement.

      6.    **Remittance Agreement**. The Parties acknowledge that contemporaneously herewith NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO") have entered into that certain Remittance Agreement effective January 10, 2025 (the "Remittance Agreement"). HCLOM agrees that if NexPoint Small Bay fails to make the DAF Bridge Equity Payment (as defined in the Remittance Agreement) pursuant to the terms of the Remittance Agreement, HMIT will have no obligations to make the HMIT Payment Obligation, and HMIT shall not receive any distribution from HMIT or any other party related to any Class 10 interest/claim. Notwithstanding any failure of NexPoint Small Bay to adhere to the terms of the Remittance Agreement, HCLOM acknowledges that by executing this Agreement, it shall have no other recourse or rights to payment under the Plan other than the terms of this Agreement.

      7.    **Choice of Law; Jurisdiction; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

      8.    **Amendments; Waivers**. No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

001664

HCMLPHMIT00003869

9.      **Binding Effect**. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

10.      **Entire Agreement**. The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Agreement.

11.      **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Intercreditor and Participation Agreement as of the Effective Date set forth above and in the capacities set forth below.

001665
HCMLPHMIT00003870

HIGHLAND CLO MANAGEMENT, LTD.

By: _____

Name:_ James Dondero _____

Title:___ President _____


HUNTER MOUNTAIN INVESTMENT TRUST

By: _____

Name:___ Mark Patrick _____

Title:___ Administrator _____

001666

HCMLPHMIT00003871

**EXHIBIT**

001667

TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1.    Definitions.  Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16.  Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

HCMLPHMIT00004103

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2.  <u>Scope</u>. This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising.  Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3.  <u>Name; Certificate of Trust</u>.  The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided.  The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act.  It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4.  <u>Account Establishment</u>.  The Administrator shall establish and control the Account.  The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5.  <u>Beneficial Owner; Liability of Beneficial Owner</u>.  The beneficial owner of the trust shall be Beacon Mountain LLC.  Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6.  <u>Title to Trust Property</u>.  Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator. Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

2

001669

HCMLPHMIT00004104

7.    <u>Purpose and Powers of the Trust; Administrator's Powers</u>.  The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement.  The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust.   The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement.  The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8.    <u>Fiduciary Duties of Administrator</u>.  (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b)    The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust.  For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c)    To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d)    Unless otherwise expressly provided herein:

(i)    whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii)    whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

001670

HCMLPHMIT00004105

(e)    Notwithstanding any other provision of this Trust Agreement or otherwise applicable law, whenever in this Trust Agreement the Administrator is permitted or required to make a decision:

(i)    in his "discretion" or under a grant of similar authority, the Administrator shall be entitled to consider such interests and factors as it desires, including its own interest, and, to the fullest extent permitted by applicable law, shall have no duty or obligation to give any consideration to any interest of or factors affecting the Trust or any other Person; or

(ii)    in his "good faith" or under another express standard, the Administrator shall act, under such express standard and shall not be subject to any other or different standard. The term "good faith" as used in this Trust Agreement shall mean subjective good faith as such term is understood and interpreted under Delaware law.

(f)    The Administrator and any of his affiliates may engage in or possess an interest in other profit-seeking or business ventures of any nature or description, independently or with others, whether or not such ventures are competitive with the Trust and the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to the Administrator. The Administrator insofar as he acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Trust shall not have any duty to communicate or offer such opportunity to the Trust, and the Administrator shall not be liable to the Trust or to the beneficial owners for breach of any fiduciary or other duty by reason of the fact that the Administrator pursues or acquires for, or directs such opportunity to another Person or does not communicate such opportunity or information to the Trust. Neither the Trust nor any beneficial owner shall have any rights or obligations by virtue of this Trust Agreement or the trust relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the activities of the Trust, shall not be deemed wrongful or improper.  The Administrator may engage or be interested in any financial or other transaction with the Trust or any affiliate of the Trust, or may act as depositary for, trustee or agent for, or act on any committee or body of holders of, securities or other obligations of the Trust or its affiliates.

9.    <u>Recordkeeping and Accounting</u>.  The Administrator shall maintain appropriate records in which he shall record the Trust Property and the acquisition and disposition of Limited Partnership Interests.

10.    <u>Tax Treatment</u>.  The Sponsor and the Administrator acknowledge and agree that for United States Federal Income Tax purposes (i) the Trust shall be disregarded as an entity for federal income tax purposes.  The Administrator shall comply with the information reporting requirements applicable to the Trust under the Internal Revenue Code and prepare and furnish to Beacon Mountain LLC any appropriate Internal Revenue Service forms required to be provided to Beacon Mountain LLC as beneficial owner of the Trust.

001671
HCMLPHMIT00004106

11.  No Other Interests

(a)  The Sponsor acknowledges that it has no rights or claims to specific Trust Property, including funds in the Account, and otherwise has no interest in the Trust Property or the Account other than a beneficial interest in the Trust Property and the Account.

(b)  The Administrator acknowledges that he has no right, title, or interest in the Trust, the Trust Property, or the Account in his personal capacity and has no beneficial interest in the Trust.

12.  Compensation; Administrator Liability.  The Administrator shall not receive any compensation for his role as Administrator.  Nothing herein shall be construed to limit the Administrator's ability to receive compensation pursuant to other agreements for services he may provide other than his role as Administrator.  The Administrator shall be indemnified, defended and held harmless by the Trust for any liability incurred by him while acting hereunder, and shall not be liable to the Trust or the Sponsor, except for a breach of his fiduciary duties hereunder, his own bad faith, willful misconduct or gross negligence in the performance of his express duties under this Trust Agreement.

13.  Amendment.  The Administrator, solely with the consent of the beneficial owner, shall have the right at any time or times to amend or supplement the provisions of this Trust Agreement, in each case by a writing or writings signed by the Administrator; provided that no such amendment shall be permitted if it would subject any amount held hereunder to any right, charge, security interest, lien or claim by, of or for the benefit of any creditor or creditors of the Sponsor or its subsidiaries and affiliates in its corporate or personal capacity.  If any such amendment or supplement affects the rights, immunities or obligations of the Delaware Trustee, the Administrator shall be required to obtain the prior written consent of the Delaware Trustee.

14.  Duration.  The Trust shall be perpetual unless otherwise dissolved and terminated pursuant to paragraph 15 below.

15.  Termination.  The Administrator shall have the power solely upon the prior written consent of the beneficial owner to dissolve the Trust and to distribute all Trust Property held in the Account to, or for the benefit of, such persons (including the Sponsor) as the Administrator shall determine in his sole discretion and after satisfying the claims and obligations of the Trust in accordance with the Delaware Act.  Following any such dissolution, the Administrator shall proceed to wind up the affairs of the Trust in an orderly manner and within a reasonable period of time considering relevant circumstances and shall have the powers necessary to wind up the Trust's affairs, including but not limited to the power to fulfill or discharge the contracts of the Trust, collect its assets, sell, convey, exchange or otherwise dispose of all or any part of the remaining property of the Trust to one or more Persons at public or private sale (for consideration which may consist in whole or part of cash, securities or other property of any kind), discharge or pay its liabilities, defend or prosecute suits or administrative proceedings and do all other acts appropriate to the winding up and liquidation of the property and affairs of the Trust.  After paying or making reasonable provision for the payment of all claims and obligations of the Trust as required by the Delaware Act, and upon receipt of such releases, indemnities or like documentation as the Administrator may reasonably deem necessary

5

001672
HCMLPHMIT00004107

for the protection of the Administrator, the Administrator shall distribute the remaining property of the Trust as contemplated by this Trust Agreement. Upon the completion of winding up, the Trust shall terminate and the Administrator shall provide written notice directing the Delaware Trustee to file an appropriate form of Certificate of Cancellation to be filed in the Office of the Secretary of State of the State of Delaware by the Delaware Trustee.

16.   Removal of Administrator.   Upon any Honis Trigger Event, the Administrator shall immediately be removed without any action by the Delaware Trustee or any other party.

17.   Successor Administrator.   The Administrator may resign as Administrator hereunder, without leave of court, at any time, and, in such event, the Administrator shall appoint a successor Administrator unless, prior to the effective date of his resignation, the Administrator dissolves the Trust in accordance with paragraph 15 above. Any appointment of a successor Administrator shall be in writing signed by the appointing Administrator, or by a duly authorized officer or officers of the appointing Administrator, if an entity. Whenever this Trust Agreement refers to the Administrator, such reference shall include any successor Administrator appointed under this paragraph. All powers hereby granted to the Administrator shall be exercisable by any successor Administrator, and each successor Administrator shall be deemed to have assumed the duties hereby undertaken by the Administrator.

Upon the termination of the Administrator in accordance with paragraph 16 above, Beacon Mountain, LLC shall appoint a successor Administrator within a reasonable period of time.

The Administrator shall not be required to furnish any bond or surety. No one dealing with the Administrator need inquire concerning the validity of anything the Administrator purports to do or see to the application of any money paid upon the Administrator's order.

18.   Delaware Trustee.

(a)   For purposes of satisfying Sections 3807 of the Delaware Act, during the existence of the Trust, there shall at all times be a "Delaware Trustee" hereunder who shall, in the case of a natural person, be a person who is a resident of the State of Delaware, or, in all other cases, is a trustee with its principal place of business in the State of Delaware. The Delaware Trustee shall not have any duties (including fiduciary duties) or liabilities except to the extent and for the limited purposes described in this paragraph. Accordingly, no reference in this Trust Agreement to the "Administrator" shall include, or be deemed to refer to, the Delaware Trustee. The sole power and duty of the Delaware Trustee shall be to accept service of process in accordance with Section 3804 of the Delaware Act and to execute and deliver for filing all documents required to be filed with the State of Delaware as required by the Delaware Act.

(b)   The Sponsor and the Administrator hereby appoint Wilmington Trust, National Association as the initial Delaware Trustee. The initial Delaware Trustee and any successor Delaware Trustee may resign and may be removed by the Sponsor then serving for any reason, with or without cause. If the Delaware Trustee resigns or is removed, or if there is no Delaware Trustee serving at any time for any other reason, the Administrator shall appoint a successor Delaware Trustee who qualifies under the terms of this paragraph 18. Upon each

6

appointment of a successor Delaware Trustee, the Administrator shall cause an amendment to the Certificate of Trust of the Trust that reflects such change to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware Act.

(c)    By its execution hereof, the Delaware Trustee accepts its appointment hereunder.  Except as otherwise expressly required by clause (a) above, the Delaware Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust Property or the payment of any distributions of income or principal to the beneficial owners.

(d)    The Delaware Trustee shall not be liable for the acts or omissions of the Administrator, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of or performing the duties and obligations of the Administrator, the Sponsor or the Trust under this Trust Agreement or any other document.  The Delaware Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence in the performance of its express duties under this Trust Agreement.  In particular, but not by way of limitation:

(i)    the Delaware Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes gross negligence on its part;

(ii)    no provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder, if the Delaware Trustee shall have reasonable grounds for believing that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii)    under no circumstances shall the Delaware Trustee be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Trust;

(iv)    the Delaware Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Sponsor or the Administrator;

(v)    the Delaware Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties.  The Delaware Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect.  As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Delaware Trustee may for all purposes hereof rely on a certificate, signed by the Administrator, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

7

001674
HCMLPHMIT00004109

(vi)   in the exercise or administration of the Trust hereunder, the Delaware Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Delaware Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Delaware Trustee in good faith and with due care and (b) may consult with counsel, accountants and other skilled persons to be selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons; and

(vii)   except as expressly provided in this Section, in accepting and performing the Trust hereby created the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or the Trust Agreement shall look only to the Trust's property for payment or satisfaction thereof.

(e)   The Delaware Trustee (or any successor Delaware Trustee) shall be entitled to receive compensation from the Sponsor or from the Trust for its services in accordance with such fee agreements and schedules as shall have been separately agreed to from time to time by the Delaware Trustee and the Sponsor. The Delaware Trustee may consult with counsel (who may be counsel for the Sponsor or for the Delaware Trustee). The reasonable legal fees incurred in connection with such consultation shall be reimbursed to the Delaware Trustee pursuant to this Section, provided that no such fees shall be payable to the extent that they are incurred as a result of the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(f)   The Delaware Trustee shall serve for the duration of the Trust and until the earlier of (i) the effective date of the Delaware Trustee's resignation, or (ii) the effective date of the removal of the Delaware Trustee. The Delaware Trustee may resign at any time by giving thirty (30) days written notice to the Administrator; provided, however, said resignation shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. The Delaware Trustee may be removed at any time by the Administrator by providing thirty (30) days written notice to the Delaware Trustee; provided, however, such removal shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. Upon the resignation or removal of the Delaware Trustee, the Administrator shall appoint a successor Delaware Trustee. If no successor Delaware Trustee shall have been appointed and shall have accepted such appointment within forty five (45) days after the giving of such notice of resignation or removal, the Delaware Trustee may, at the expense of the Sponsor, petition any court of competent jurisdiction for the appointment of a successor Delaware Trustee. Any successor Delaware Trustee appointed pursuant to this Section shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section, shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Delaware Trustee.

(g)   The Delaware Trustee or any officer, affiliate, director, employee, or agent of the Delaware Trustee (each an "Indemnified Person") shall be entitled to indemnification from the Sponsor, to the fullest extent permitted by law, from and against any and all losses, claims, actions, suits, taxes, damages, reasonable expenses, and liabilities (including liabilities under state or federal securities laws) of any kind and nature whatsoever (collectively, "Expenses"), to

8

HCMLPHMIT00004110

the extent that such Expenses arise out of or are imposed upon or asserted against such Indemnified Persons with respect to the creation, operation or termination of the Trust, the execution, delivery or performance of this Trust Agreement or the transactions contemplated hereby; provided, however, that the Sponsor shall not be required to indemnify any Indemnified Person for any Expenses which are a result of the willful misconduct, bad faith or gross negligence of such Indemnified Person. The obligations of the Sponsor to indemnify the Indemnified Persons as provided herein shall survive the termination of this Trust Agreement and the resignation or removal of the Delaware Trustee.

(h)  The Delaware Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.

19.  Waiver of Jury Trial. THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION RELATING TO ANY CLAIM ARISING HEREUNDER OR RELATED HERETO.

20.  Governing Law. The validity and construction of this Trust Agreement and all amendments hereto shall be governed by the laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof; provided, however, that the parties hereto intend that the provisions hereof shall control over any contrary or limiting statutory or common law of the State of Delaware (other than the Delaware Act) and that, to the maximum extent permitted by applicable law, there shall not be applicable to the Trust, the Sponsor, or the Delaware Trustee any provision of the laws (statutory or common) of the State of Delaware (other than the Delaware Act) pertaining to trusts which relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Sponsor or the Delaware Trustee set forth or referenced in this Trust Agreement. Sections 3540, 3542 and 3561 of Title 12 of the Delaware Code shall not apply to the Trust.

21.  Exclusive Jurisdiction. Each of the parties hereto, to the fullest extent permitted by law, (i) irrevocably agrees that any claims, suits, actions or proceedings arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce (A) the provisions of this Agreement or (B) the duties, obligations or liabilities of the Sponsor, the Administrator and the Delaware Trustee, or (C) the rights or powers of, or

9

HCMLPHMIT00004111

restrictions on, the Trust, Sponsor, the Delaware Trustee or the Administrator, or (D) any provision of the Delaware Act, or (E) any other instrument, document, agreement or certificate contemplated by any provision of the Delaware Act relating to the Trust (regardless of whether such claims, suits, actions or proceedings (x) sound in contract, tort, fraud or otherwise, (y) are based on common law, statutory, equitable, legal or other grounds, or (z) are derivative or direct claims)), shall be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, any other court in the State of Delaware with subject matter jurisdiction, (ii) irrevocably submits to the exclusive jurisdiction of such courts in connection with any such claim, suit, action or proceeding, (iii) irrevocably agrees not to, and waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of such courts or any other court to which proceedings in such courts may be appealed, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper, (iv) expressly waives any requirement for the posting of a bond by a party bringing such claim, suit, action or proceeding, and (v) consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address set forth in the books and records of the Trust, and agrees that such service shall constitute good and sufficient service of process and notice thereof; provided, nothing in clause (v) hereof shall affect or limit any right to serve process in any other manner permitted by law.

22.  Application to Successors.  This Trust Agreement shall extend to and be binding upon the successors, executors, administrators and assigns of each of the Sponsor, the Delaware Trustee and the Administrator.

23.  Transfer of Beneficial Ownership.  Beacon Mountain LLC shall be the sole beneficial owner of the Trust to the extent provided herein and the interests of Beacon Mountain LLC hereunder shall not be represented by a certificate.  To the fullest extent permitted by law, the beneficial interest of Beacon Mountain LLC in the Trust may not be offered, sold, transferred, pledged, hypothecated or otherwise disposed of.

[SIGNATURE PAGE FOLLOWS]

10

001677
HCMLPHMIT00004112

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By:_____
Name:   John Honis
Title:   President

JOHN HONIS, as Administrator

_____
1-11-16

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By:_____
Name:
Title:

11

001678
HCMLPHMIT00004113

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By: _____
    Name:    John Honis
    Title:     President

JOHN HONIS, as Administrator

_____

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By: _____
Name:
Title:    Jennifer A. Luce
         Vice President

11

HCMLPHMIT00004114

**EXHIBIT**

001680

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3    In Re:                        )    Chapter 11
                                    )
 4    HIGHLAND CAPITAL              )    Dallas, Texas
      MANAGEMENT, L.P.,             )    Tuesday, June 8, 2021
 5                                  )    9:30 a.m. Docket
              Debtor.              )
 6                                  )    - SHOW CAUSE HEARING (2255)
                                    )    - MOTION TO MODIFY ORDER
 7                                  )      AUTHORIZING RETENTION OF
                                    )      JAMES SEERY (2248)
 8                                  )    - MOTION FOR ORDER FURTHER
                                    )      EXTENDING THE PERIOD WITHIN
 9                                  )      WHICH DEBTOR MAY REMOVE
                                    )      ACTIONS (2304)
10    _____)

11                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                   UNITED STATES BANKRUPTCY JUDGE.

13    APPEARANCES:

14    For the Debtor:          Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
15                             10100 Santa Monica Blvd.,
                                13th Floor
16                             Los Angeles, CA  90067-4003
                               (310) 277-6910
17
      For the Debtor:          John A. Morris
18                             Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
19                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
20                             (212) 561-7700

21    For the Debtor:          Zachery Z. Annable
                               HAYWARD & ASSOCIATES, PLLC
22                             10501 N. Central Expressway,
                                Suite 106
23                             Dallas, TX  75231
                               (972) 755-7104
24

25
```

001681

HCMLPHMIT00002716

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-71   Filed 08/20/25   Page 153 of 1011   PageID 2052
Exhibit 71 Page 302 of 299

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee   Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee   Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

001682

HCMLPHMIT00002717

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 1-4  Filed 12/04/2599  Page 154 of 1011    PageID 2053

Exhibit 71 Page 4 of 12

3

Transcribed by:              Kathy Rehling
                             311 Paradise Cove
                             Shady Shores, TX   76208
                             (972) 786-3063

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

            Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.

001683

HCMLPHMIT00002718

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 7-14    Filed 06/20/25    Page 155 of 1011    PageID 2054

4

1          DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M.

2          THE COURT:  All right.  We have settings in Highland

3    this morning.  We have three settings.  We have the show cause

4    hearing with regard to a lawsuit filed in the District Court.

5    We have a couple of more, I would say, ministerial matters,

6    although I think we do have objections.  I know we have

7    objections.  We have a motion to extend the removal period in

8    this case as well as a motion to modify the order authorizing

9    Mr. Seery's retention.

10         So let's go ahead and start out by getting appearances

11   from the lawyers who are participating today.  I'll get those

12   now.

13         MR. MORRIS:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. MORRIS:  John Morris from Pachulski, Stang, Ziehl

16   & Jones for the Debtor.  I'm joined with me this morning by my

17   colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable.

18         THE COURT:  Okay.

19         MR. MORRIS:  We do have a proposal on how to proceed

20   today, a substantial portion of which is in agreement with the

21   Respondents.

22         THE COURT:  Okay.

23         MR. MORRIS:  So, at the appropriate time, I'd be

24   happy to present that to the Court.

25         THE COURT:  All right.  Well, let's get all the

HCMLPHMIT00002719

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71-4   Filed 06/20/25   Page 156 of 1011   PageID 2055

5

1    appearances and then I'll hear from you on that.

2              MR. SBAITI:  Your Honor, my name is -- would you like

3    me to approach, Your Honor?

4              THE COURT:  Yes, please.

5              MR. SBAITI:  It's my first time appearing in

6    Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm

7    here on behalf of the charitable DAF Fund, CLO Holdco, and the

8    Respondents to the show cause hearing.  We are also

9    representing them as the Movants on the motion to modify the

10   Court's order appointing Mr. Seery.

11             THE COURT:  All right.  Thank you.

12             MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr.

13   Sbaiti, also representing the Charitable DAF and CLO Holdco,

14   as well as our firm that is named in the show cause order.

15             THE COURT:  Okay.

16             MR. BRIDGES:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18             MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

19   Phillips from Kelly Hart Hallman here on behalf of Mark

20   Patrick in the show cause matter.  I'm joined with my

21   colleague Michael Anderson from the Kelly Hart firm here in

22   Fort Worth.  And that's the matter that we're involved in, the

23   show cause auction.

24             THE COURT:  All right.  Thank you, Mr. Phillips.

25             MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

HCMLPHMIT00002720

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-4   Filed 07/02/25   Page 157 of 1011    PageID 2056
Exhibit 71   Page 200 of 299

6

1   of Bonds Ellis Eppich Schafer Jones here on behalf of Jim

2   Dondero.  I have Mr. Will Howell here with me from my firm.

3            THE COURT:  All right.  Thank you.

4            MR. CLEMENTE:  Good morning, Your Honor.  Matthew

5   Clemente from Sidley Austin on behalf of the Committee.  I'm

6   here with my partner, Paige Montgomery.

7            THE COURT:  Okay.  Thank you.

8            MR. CLEMENTE:  Good morning.

9            THE COURT:  All right.  Just to remind people, we do

10  have participants on the WebEx, but in setting the hearing I

11  made clear that participants today needed to be here live in

12  the courtroom.  So the WebEx participants are going to be only

13  observers.

14     We have a camera on the screen here that is poised to

15  capture both the lawyer podium as well as the witness box, and

16  then another camera on the bench.

17     So, please be mindful.  We want the lawyers to speak from

18  the podium so that they are captured and heard by the WebEx.

19  And so hopefully we don't have any cords you will trip over.

20  We've worked hard to make it easy to maneuver around the

21  courtroom.

22     All right.  So, Mr. Morris, you had a proposal on how we

23  would approach this today?

24            MR. MORRIS:  I do, Your Honor.  And it's rather

25  brief, but I think it makes a lot of sense.

HCMLPHMIT00002721

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71-1 Filed 06/20/25   Page 158 of 1011   PageID 2057
Exhibit 71 Page 302 of 299

7

```
 1        There are three motions on the calendar for today, --

 2              THE COURT:  Uh-huh.

 3              MR. MORRIS:  -- only one of which required the

 4   personal appearance of certain parties.

 5              THE COURT:  Uh-huh.

 6              MR. MORRIS:  And for that reason, and because,

 7   frankly, it was the first of the three motions filed, we

 8   believe that that ought to go first.

 9              THE COURT:  Okay.

10              MR. MORRIS:  And then it can be followed by the

11   motion for reconsideration of the July order, assuming time

12   permits, and then the motion to extend the removal deadline.

13        And with respect to the contempt motion, Your Honor, the

14   parties have agreed that each side shall have a maximum of

15   three hours to make opening statements, closing arguments,

16   direct and cross-examination of witnesses.

17        You know, I did point out to them that from time to time

18   Your Honor has used the Court's discretion to adjust the time

19   --

20              THE COURT:  Uh-huh.

21              MR. MORRIS:  -- if the Court is making inquiries, and

22   I guess we'll deal with that matter as it comes.  But as a

23   general matter, that is what we've agreed to.  And I would

24   propose that, unless anybody has any objections, that we just

25   proceed on that basis.
```

001687

HCMLPHMIT00002722

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 71-4  Filed 02/02/299   Page 159 of 1011    PageID 2058

8

```
 1              THE COURT:  Okay.

 2              MR. MORRIS:  And I could -- I could go right forward.

 3              THE COURT:  So, three hours in the aggregate?

 4              MR. MORRIS:  Uh-huh.

 5              THE COURT:  It doesn't matter how people spend it --

 6    with argument, examination, cross -- three hours in the

 7    aggregate?

 8              MR. MORRIS:  Correct.

 9              THE COURT:  Okay.  So, Nate, you'll be the timer on

10    that.

11              MR. MORRIS:  Yeah.  We thought it was very important

12    to get this done today, with people coming in from out of

13    town.

14              THE COURT:  Okay.  Sounds fine.

15              MR. MORRIS:  So does the Court want to inquire if

16    anybody has any questions or comments?

17              THE COURT:  I do.  Well, I see Mr. Bridges getting

18    up.  You confirm that that's agreeable?

19              MR. BRIDGES:  Thank you, Your Honor.  Yes, that's

20    agreeable.  We have one slight difference in our proposal.  We

21    would suggest to Your Honor that the motion for modification,

22    if Your Honor decides our way, would moot the entire motion

23    for contempt.  And we'd suggest, if that possibility is

24    realistic, that we would go first with that motion, perhaps

25    obviate having to have the evidence presented and the lengthy
```

001688

HCMLPHMIT00002723

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 02/02/25   Page 160 of 1011   PageID 2059
Exhibit 71   Page 02 of 299

9

1   hearing.

2      The motion for modification, Your Honor, asks the Court to

3   reconsider -- to modify that order because of jurisdictional

4   and other shortcomings in it that make the order

5   unenforceable.  And because that's the order that is the

6   subject of the contempt motion, we'd ask Your Honor to

7   consider putting that motion first.

8            THE COURT:  Okay.  Or second?  Ahead of the contempt

9   matter?

10            MR. BRIDGES:  Ahead of the contempt matter, --

11            THE COURT:  Uh-huh.

12            MR. BRIDGES:  -- because it has a possibility --

13            THE COURT:  We have the removal matter, which I think

14   is the shortest.  All right.

15            MR. BRIDGES:  No objection to that, Your Honor.

16   That's correct.

17            THE COURT:  Okay.  So, Mr. Morris, that's fine by

18   you?

19            MR. MORRIS:  Your Honor, that doesn't make a lot of

20   sense to us.  We don't believe there's any basis for the Court

21   to reconsider, modify, or amend in any way the July order.

22   But even if we were wrong about that, that would not

23   retroactively validate conduct which was otherwise wrongful at

24   the time it was committed.

25      The contempt motion needs to go first.  The other motion

HCMLPHMIT00002724

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71  Filed 02/02/25  Page 161 of 1011    PageID 2060
Exhibit 71 Page 12 of 299

10

1   will have no impact on whether or not there is a finding of

2   contempt of court.

3           THE COURT:  All right.  And update me on this.  There

4   was something filed yesterday, a notice of a proposed form of

5   order that the Debtor had proposed, that I think was not

6   agreed to, where there would be a change about any action that

7   goes forward, the cause of action would be in the sole

8   jurisdiction of the Court, and you all agreed to change that

9   part of the order, correct?

10          MR. MORRIS:  So, just as a division of labor for Your

11  Honor, I'm doing the contempt motion.

12          THE COURT:  Okay.  That's Mr. Pomerantz's?

13          MR. MORRIS:  Mr. Pomerantz is going to take care of

14  that.

15          MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Good

16  to see you again.

17          THE COURT:  Good to see you.

18          MR. POMERANTZ:  Yes, Your Honor, that's correct.  If

19  Your Honor recalls, there's really three aspects of the

20  January 9th and the July 16th order.  First, requiring people

21  to come to Bankruptcy Court before commencing or pursuing an

22  action.  Second, for the Bankruptcy Court to have the sole and

23  exclusive authority to determine whether the claim is a

24  colorable claim of willful negligence or gross misconduct.

25  And then third, if Your Honor passed the claim through the

HCMLPHMIT00002725

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 12/05/25    Page 162 of 1011    PageID 2061
Exhibit 71 Page 10 of 299

11

 1    gate, whether you would have jurisdiction.

 2        In Your Honor's January 9th and July 16th orders, you said

 3    you would have exclusive jurisdiction.  In the motion for

 4    reconsideration, and particularly the reply, Movants said, if

 5    you just change that and say that if passes through the gate

 6    that you'd have jurisdiction only to the extent you would

 7    otherwise have it, that would resolve the motion, in the same

 8    way that the plan of reorganization was amended.

 9        We proposed that.  They rejected it.  We put it before

10    Your Honor.  So we believe that it moots out a good portion --

11    actually, we think it should moot out the entire motion.  They

12    obviously disagree.  But we definitely agree it moots out the

13    most significant portion of their motion, which is that Your

14    Honor would take jurisdiction to adjudicate a matter on an

15    exclusive basis when you might not otherwise have jurisdiction

16    on an exclusive basis.

17            THE COURT:  Okay.  Well, --

18            MR. BRIDGES:  Your Honor, may I respond to that?

19            THE COURT:  You may.  And --

20            MR. BRIDGES:  Thank you, Your Honor.

21            THE COURT:  -- why -- could you clarify why you think

22    it would moot out the entire show cause matter?  I wouldn't be

23    retroactively changing my order.  Is that what you're

24    proposing?

25            MR. BRIDGES:  Your Honor, with all respect, we

HCMLPHMIT00002726

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-71   Filed 02/03/25   Page 163 of 1011    PageID 2062
Exhibit 71    Page 13 of 299

12

1  believe the order is defective and unenforceable and has to be

2  modified in order to fix it.  And because of the defects,

3  we're -- we're actually arguing, Your Honor, that it is

4  unenforceable in a contempt proceeding.  That is exactly what

5  our argument is.

6         THE COURT:  Okay.  I think I'm getting way farther

7  down this road than maybe I want to right now.  But I guess

8  here's the elephant in the room, I feel like:  *Republic Supply*

9  *versus Shoaf*.

10         MR. BRIDGES:  Uh-huh.

11         THE COURT:  The U.S. Supreme Court *Espinosa* case, for

12  that matter.  If I accept your argument that maybe there was a

13  flaw in those orders, that maybe they went too far, don't you

14  have a problem with those two cases?

15         MR. BRIDGES:  Your --

16         THE COURT:  The orders weren't appealed.

17         MR. BRIDGES:  I understand completely, Your Honor.

18         THE COURT:  Uh-huh.

19         MR. BRIDGES:  And I think the answer is no because of

20  the *Applewood* case from the Fifth Circuit.  The *Applewood* case

21  cited in our reply brief explains that in order for an order,

22  a final order of the Bankruptcy Court to have exculpatory

23  effect, in order for it to release claims, for example, that

24  the claims at issue must be enumerated in the order.  It's not

25  enough to have a blanket statement like the order, the July

HCMLPHMIT00002727

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Exhibit 71    Filed 04/02/25299    Page 164 of 1011    PageID 2063

13

```
 1   order has, like the January order has, saying that Mr. Seery's

 2   claims -- claims cannot be brought against him for ordinary

 3   negligence at all.  The -- Your Honor, we're delving into my

 4   argument.

 5          THE COURT:  Okay.

 6          MR. BRIDGES:  And I was hoping to do this on a

 7   preliminary basis.

 8          THE COURT:  Right.

 9          MR. BRIDGES:  I don't mean to bog you down with that.

10   But Your Honor, no, mandatory authority from the Fifth Circuit

11   after Shoaf limits Shoaf's application and says that it does

12   not extinguish the claims that are not specifically enumerated

13   in the order.  And the reason for that is because it doesn't

14   give the kind of notice to the parties that they would need to

15   make an appearance and object to those orders at the time.  It

16   actually helps to stem the amount of litigation at the time

17   rather than to encourage it.

18          THE COURT:  All right.  Well, you'll get your

19   opportunity to make your full argument on this.  But I'm not

20   convinced, preliminarily, at least, to affect my decision on

21   the sequence, okay?  So even if it potentially wastes time

22   under your view of the law, I am going to do the removal

23   matter first -- the extension of time request, I should say --

24   and then the show cause and then the motion to modify.  And I

25   realize, those last two matters, everything is kind of
```

001693

HCMLPHMIT00002728

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/05/25   Page 165 of 1011   PageID 2064
Exhibit 71 Page 165 of 299

14

```
 1  interrelated.  All right?

 2            MR. BRIDGES:  Yes, Your Honor.

 3            THE COURT:  All right.  So, with that decided, is

 4  there a desire on the part of the lawyers to make opening

 5  statements, or shall we just go to the motions?  And, of

 6  course, people can use their three hours for oral argument,

 7  however much they want to use for oral argument.

 8            MR. MORRIS:  Your Honor, the -- to be clear, the six-

 9  hour time limit only applies to the contempt proceeding.

10            THE COURT:  Oh, yes.  Yes.  Uh-huh.

11            MR. MORRIS:  And I do want to make an opening

12  statement.

13            THE COURT:  Okay.

14            MR. MORRIS:  So, as the Movant, I'd like to go first.

15            THE COURT:  You want to make opening statements?

16            MR. BRIDGES:  Yes.  Yes, Your Honor.

17            THE COURT:  Okay.  Okay.

18            MR. BRIDGES:  I believe we've got a PowerPoint

19  prepared that I think can lay out our side of it.

20            THE COURT:  Okay.

21            MR. BRIDGES:  I don't think we're participating in

22  the motion to extend the removal time.

23            THE COURT:  Okay.

24            MR. BRIDGES:  That's going first.

25            THE COURT:  All right.
```

HCMLPHMIT00002729

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 06/06/25   Page 166 of 1011   PageID 2065
Exhibit 71   Page 166 of 299

15

1          MR. BRIDGES:  So we'll wait until that is --

2          THE COURT:  Well, so we don't get confused on the

3    timing, let's just do the motion to extend right now.  And I

4    think we only had one objection.  As Mr. Sbaiti just pointed

5    out, they're not objecting on that one.  We have a Dondero

6    objection.  So let's, without starting the timer, hear that

7    one.  Okay?

8          MR. DEMO:  Good morning, Your Honor.  Greg Demo;

9    Pachulski, Stang, Ziehl & Jones.

10          THE COURT:  Good morning.

11          MR. DEMO:  I'll be arguing the removal motion and

12    then turn it over.

13      It's fairly basic and straightforward, Your Honor.  We're

14    asking for a further extension of the statutory deadline to

15    remove cases until December 14th, 2021.  The deadline is

16    procedural only.  As Your Honor is well aware, there's a lot

17    of moving parts in this case.  You know, we don't know to this

18    date, really, the full universe of what could actually be out

19    there.  So we're just asking for a short extension of the

20    removal period to cover through December.

21      I know that there was an objection from Mr. Dondero.  I

22    know that he argues that 9006 does not allow us to extend that

23    deadline past the effective date of the plan, and he cites one

24    case for that purpose, which is *Health Support*.  I think it's

25    out of Florida.  That case dealt with the extension of the

HCMLPHMIT00002730

1    two-year extension of the statute of limitations and was very

2    clear that you can't use 9 --

3              THE COURT:  You mean the 546 deadline?

4              MR. BRIDGES:  Yes.  Yes.

5              THE COURT:  Okay.

6              MR. BRIDGES:  That you can't use 9006 to extend non-

7    bankruptcy deadlines.  That's not what we're doing here, Your

8    Honor.  We're using 9006 to extend the bankruptcy deadline to

9    remove the cases.

10             THE COURT:  Uh-huh.

11             MR. DEMO:  And we'd just ask Your Honor for the

12   extension through December.

13             THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

14             MR. HOWELL:  Good morning, Judge.  Will Howell for

15   Mr. Dondero.

16        So, the argument here is not that the Court can't do this.

17   I was just pointing that there is an outside limit to what

18   we're doing.  And so if you look at the cases that the Debtor

19   cites in support of this motion, the one that is most apt was

20   when Judge Nelms did a fourth extension of time.  But those

21   were all 90-day extensions.  Here, we're in a situation where

22   the Debtor is asking for a fourth 180-day extension of time,

23   and this is really where the, you know, objection came -- or,

24   the response in opposition came from.  They specifically asked

25   that it be without prejudice to further extensions.

001696

HCMLPHMIT00002731

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 02/28/25   Page 168 of 1011   PageID 2067
Exhibit 71 Page 12 of 299

17

1      And so, at some point, you know, does 9006 have an outside

2   limit?  You know, do we need to see some sort of a light at

3   the end of the tunnel here?

4      So we would ask that the motion, at a minimum, be denied

5   in part with respect to this open-ended request for extension

6   beyond two years for a 90-day period.  The other cases that

7   they cite, they have one extension here, one extension there,

8   120 days here, but not 180 days after 180 days after 180 days,

9   and then asking specifically for without prejudice to further

10  extensions beyond two years.  So that's -- that's where this

11  comes from.

12         THE COURT:  All right.  Do you think it matters that

13  this is a very complex case?

14         MR. BRIDGES:  I --

15         THE COURT:  There's litigation here, there, and

16  everywhere.

17         MR. HOWELL:  I also think, you know, *Mirant* was

18  complex.  I think *Pilgrim's Pride* was complex.  I think, you

19  know, it is not out of bounds for the Court to grant a fourth

20  extension.

21         THE COURT:  Uh-huh.

22         MR. BRIDGES:  But to -- you know, at some point --

23  you know, maybe the Court could grant a 90-day extension and

24  make them come back a little more frequently to kind of corral

25  this thing, rather than just saying "This grant of 180 days,

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/09/25   Page 169 of 1011   PageID 2068
Exhibit 71   Page 170 of 299

18

```
 1   the fourth time, is going to be without prejudice to further
 2   extensions."  It just gets kind of large.
 3           THE COURT:  Okay.  Mr. Demo, your motion.  You get
 4   the last word.
 5           MR. DEMO:  Your Honor, I mean, it is without
 6   prejudice for further extensions, but that doesn't mean that
 7   Your Honor is granting the further extensions now.  It means
 8   we'll have to come back.  We'll have to make our case for why
 9   an extension is necessary.  And, you know, if Your Honor
10   doesn't want to give us another extension past December 2021,
11   Your Honor doesn't have to.  This is not an order saying that
12   it's a limitless grant.
13       You know, I'd also ask, you know, quite honestly, why Mr.
14   Dondero has such an issue with this.  He hasn't said that any
15   of these cases involve him.  He hasn't given any reasons why
16   this affects him.  He hasn't given any reason why this damages
17   him at all.  So I do, I guess, wonder as an initial matter
18   kind of why we're here, you know, why we're responding to Mr.
19   Dondero's request, when that request really has no impact on
20   him.
21       And then, Your Honor, to the extent that you are inclined
22   to limit this, I would say, you know, we would ask for a
23   reasonable extension of time.  We do think an extension of
24   time, because of the complexity of this case, through December
25   is warranted.  But if Your Honor for some reason does agree
```

HCMLPHMIT00002733

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/20/25299    Page 170 of 1011    PageID 2069

19

1   that a shorter extension is necessary under 9006 -- I don't

2   think it is -- we'd just ask that Your Honor grant us leave to

3   come back for further extensions of time.

4           THE COURT:  Okay.  All right.  I will -- I'll grant a

5   90-day extension, without prejudice for further extensions.

6           MR. DEMO:  Thank you, Your Honor.

7           THE COURT:  Maybe in 90 days we'll be farther down

8   the road and we won't need any more extensions, but you'll

9   have the ability to argue for more if you think it's really

10  necessary.  All right.  So that will bring us to around

11  September 14th, I guess.

12      All right.  Well, let's go ahead and hear opening

13  statements with regard to the show cause matter.  And again,

14  if you want to roll in arguments about the -- well, no, you

15  said the six hours only applies to show cause, so we'll not

16  hear opening statements with regard to the Seery retention

17  modification, just show cause.

18          MR. MORRIS:  All right.  Before I begin, Your Honor,

19  I have a small deck to guide --

20          THE COURT:  Okay.

21          MR. MORRIS:  -- to guide my opening statement.

22          THE COURT:  All right.

23          MR. MORRIS:  Can I approach the bench?

24          THE COURT:  You may.  And is your legal assistant

25  going to share her content --

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 02/02/5299    Page 171 of 1011    PageID 2070

20

```
 1              MR. MORRIS:  Yes.

 2              THE COURT:  -- so people on the WebEx will see?

 3    Okay.

 4              MR. MORRIS:  That's the intention, Your Honor.

 5              THE COURT:  Okay.

 6              MR. MORRIS:  All right.  Are you ready for me to

 7    proceed?

 8              THE COURT:  I am.  And obviously, everyone has a

 9    copy?

10              MR. MORRIS:  Yes.

11              THE COURT:  Your opponents have a copy of this?

12              MR. MORRIS:  Yep.

13              THE COURT:  Okay.  Although we hope to see it on the

14    screen.

15                 OPENING STATEMENT ON BEHALF OF THE DEBTOR

16              MR. MORRIS:  Good morning, Your Honor.  John Morris;

17    Pachulski, Stang, Ziehl & Jones; for the Debtor.

18         We're here today on the Debtor's motion to hold certain

19    entities and individuals in contempt of court for violating a

20    very clear and specific court order.  I hope to be relatively

21    brief in my opening here, Your Honor, and I'd like to begin

22    where I think we must, and that is, how do we -- how do we

23    prove this and what do we have to prove?

24         The elements of a claim for contempt of court are really

25    rather straightforward.  The Movant must establish by clear
```

001700

HCMLPHMIT00002735

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-4    Filed 06/22/25    Page 172 of 1011    PageID 2071

21

1    and convincing evidence three things.

2            THE COURT:  Let me stop you and stop the clock.

3    We're not seeing the shared content.

4            MR. MORRIS:  Uh-huh.

5            THE COURT:  Did you want her to go ahead and share

6    her content?

7            MR. MORRIS:  I did.

8            THE COURT:  Okay.

9            MR. MORRIS:  I was hoping that she'd do that.

10            THE COURT:  All right.  It says it's receiving

11    content.

12            MR. MORRIS:  There we go.  It's on my screen, anyway.

13            THE COURT:  Oh, here it is.  I don't know why it's

14    not on my Polycom.  Can you all see it out there?

15        (Chorus of affirmative replies.)

16            THE COURT:  Okay.  Very good.

17            MR. MORRIS:  Okay.

18            THE COURT:  You may proceed.

19            MR. MORRIS:  Thank you, Your Honor.

20        So, there's three elements to the cause of action for

21    contempt, for civil contempt.  We have to prove by clear and

22    convincing evidence that a court order was in effect; that the

23    order required certain conduct by the Respondents; and that

24    the Respondent failed to comply with the Court's order.

25        We've cited in the footnote the applicable case law from

001701

HCMLPHMIT00002736

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/23/25    Page 173 of 1011    PageID 2072
Exhibit 71    Page 23 of 299

22

1    the Fifth Circuit, and I don't believe that there's any

2    dispute that is indeed the legal standard.

3        The intent of the Respondents as to liability is

4    completely irrelevant.  It doesn't matter if they thought they

5    were doing the right thing.  It doesn't matter if they

6    believed in their heart of hearts that the court order was

7    invalid.  These are the three elements, and we will be able to

8    establish these elements not by clear and convincing evidence,

9    but if we ever had to, beyond reasonable doubt.

10       If we can go to the next slide, please.

11       We begin with the Court's order, the Court's July 9 order.

12   And that order states very clearly what conduct was required.

13   And the conduct that was required was that no entity could

14   commence or pursue -- those are really the magic words --

15   commence or pursue a claim against Mr. Seery without the

16   Bankruptcy Court doing certain things.  And we've referred to

17   this as the gatekeeper.  And the only question I believe the

18   Court has to ask today is whether the Respondents commenced or

19   pursued a claim against Mr. Seery without seeking Bankruptcy

20   Court approval, as set forth in this order.

21       I'll dispute that there's anything ambiguous about this.

22   I'll dispute that it could not be clearer what conduct was

23   prohibited.  It could not be clearer.  The only question is

24   whether the conduct constitutes the pursuit of a claim.

25       Let's see what they did.  If we could go to the next

HCMLPHMIT00002737

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 04/24/25   Page 174 of 1011   PageID 2073

23

```
 1   slide.  There will be no dispute about what they did.  And
 2   what they did is, a week after filing a lawsuit against the
 3   Debtor and two others arising out of the HarbourVest
 4   settlement, a settlement that this Court approved, after
 5   notice and a hearing and participation by the Respondents,
 6   after they had the opportunity to take discovery, after they
 7   had the opportunity to examine Mr. Seery about the value of
 8   HarbourVest's interest in HCLOF, after all of that, they
 9   brought a lawsuit after Mr. Patrick took control of the DAF
10   and CLO Holdco.  And that lawsuit related to nothing but the
11   HarbourVest suit, and it named in Paragraph 2, right up above,
12   Mr. Seery as a potential party.  And a week later, Your Honor,
13   they filed what we call the Seery Motion, and it was a motion
14   for leave to amend their complaint to add Mr. Seery as a
15   defendant.
16       We believe that that clearly violates the Court's July 7
17   order.  And indeed, again, these are facts.  They're not --
18   they're not in dispute.  Just look at the first sentence of
19   their motion.  The purpose of the motion was to name James
20   Seery as a defendant.  That was the purpose of the motion.
21   And the way that they made the motion, Your Honor -- and these
22   are undisputed facts -- the way they made the motion, Your
23   Honor, shows contemptuous intent.  We don't have to prove
24   intent, but I think it might be relevant when you get to
25   remedies.  Okay?
```

HCMLPHMIT00002738

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/25/25   Page 175 of 1011   PageID 2074
Exhibit 71   Page 25 of 299

24

1      And so how do I -- why do I say that?  Because they made

2    this motion, Your Honor, and they didn't have to.  Everybody

3    knows that under Rule 15 they could have amended the complaint

4    if they wanted to.  If they wanted to, they didn't need the

5    Court's permission.  What they wanted to do was try to get the

6    District Court to do what they knew they couldn't.  And that's

7    contemptuous.

8      And they did it, Your Honor, without notice to the Debtor.

9    Even after the Debtor had accepted service of the complaint,

10   even after we told them, if you go down this path, we're going

11   to file a motion for contempt, they did it anyway.  They

12   didn't serve the Debtor.  They didn't give the Debtor a

13   courtesy copy.  They didn't notify the Debtor.  The only thing

14   that happened was the next day, when the District Court

15   dismissed it without prejudice, they sent us a copy of that

16   notice.  And within three days, we were here.

17     A court order was in effect.  Mr. Patrick is going to

18   admit to that.  There's not going to be any dispute about

19   that.  The order required that the Respondents come to this

20   Court before they pursue a claim against Mr. Seery, and they

21   failed to comply with that order.  The facts, again -- if we

22   can go to the next slide.  We can look at some of the detail,

23   because the timeline is mindboggling.

24     Mr. Patrick became the Plaintiffs' authorized

25   representative on March 24th.  And folks, when I took their

HCMLPHMIT00002739

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/26/25   Page 176 of 1011   PageID 2075
Exhibit 71   Page 26 of 299

25

1   depositions, weren't specific about dates, and that's why some

2   of the entries here refer to sometime after, but there's no

3   question that the order of events is as presented here and as

4   the evidence will show today.

5       The evidence will show that sometime after Patrick became

6   the Plaintiffs' authorized representative, Mr. Dondero

7   informed Mr. Patrick that Highland had usurped an investment

8   opportunity from the Plaintiffs.  Mr. Patrick is going to

9   testify to that.  Mr. Patrick is also going to testify that,

10  without prompting, without making a request, D.C. Sauter, the

11  general counsel of NexPoint Advisors, recommended the Sbaiti

12  firm to Mr. Patrick.  Mr. Patrick considered nobody else.

13      Mr. Patrick retained the Sbaiti firm in April.  In other

14  words, within 12 days of the filing of the complaint.  They're

15  retained and they conduct an investigation.  You're going to

16  hear the assertion of the attorney-client and the common

17  interest privilege every time I ask Mr. Dondero what he and

18  Mr. Sbaiti talked about and whether they talked about naming

19  Jim Seery as a defendant.  But with Patrick's authorization,

20  the Sbaiti firm filed the complaint on April 12th, just days

21  after they were retained.

22      It's like a -- it's an enormous complaint.  I don't know

23  how they did that so quickly.  But in any event, the important

24  point is that they all worked together.  None of this happened

25  until Mr. Patrick became the authorized representative.

HCMLPHMIT00002740

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 71   Filed 02/02/25299   Page 177 of 1011    PageID 2076
Exhibit 71    Page 27 of

26

1      Mr. Patrick is going to tell you, Your Honor, he's going

2   to tell you that he had no knowledge of any wrongdoing by Mr.

3   Seery prior to the time he assumed the rein of the DAF and the

4   CLO Holdco.  He had no knowledge, Your Honor, of any claims

5   that the DAF and CLO Holdco had against the Debtor until he

6   became the Plaintiffs' authorized representative and Mr.

7   Dondero spoke to him.

8      If we can flip to the next page.  Mr. Dondero has

9   effective control of the DAF.  He has effective control of CLO

10  Holdco. You're going to be bombarded with corporate documents

11  today, because they're going to show you -- and they want you

12  to respect the corporate form, they really want you to follow

13  the rules and respect the corporate form, because only Mr.

14  Scott was responsible for the DAF and CLO Holdco until he

15  handed the reins on March 24th to Mr. Patrick.  Mr. Dondero

16  has nothing to do with this.  He's going to tell you.  He's

17  going to tell you he had nothing to do with the selection of

18  Mr. Patrick as Mr. Scott's replacement.

19     The facts are going to show otherwise, Your Honor.  The

20  DAF is a $200 million charitable organization that is funded

21  almost exclusively with assets derived from Highland or Mr.

22  Dondero or the Get Good Trust or the Dugaboy Trust.  The

23  evidence is going to show that at all times these entities had

24  shared services agreements and investment advisory agreements

25  with HCMLP.  The evidence will show that HCMLP at all times

001706

HCMLPHMIT00002741

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/26/25   Page 178 of 1011   PageID 2077
Exhibit 71   Page 28 of 299

27

1   was controlled by Mr. Dondero.

2       And it made sense.  The guy put in an awful lot of money

3   for charitable usage.  Is he really just going to say, I don't

4   really care who runs it?  The evidence is going to show that

5   between October 2020 and January 2021, Grant Scott actually

6   exercised independence.  Grant Scott was Mr. Dondero's

7   childhood friend.  They went to UVA together.  They were

8   roommates.  Mr. Scott was the best man at Mr. Dondero's

9   wedding.  But we were now in bankruptcy court.  We're now in

10  the fishbowl.  And I will -- this may be a little argument,

11  but there's no disputing the facts that Mr. Scott acted

12  independently, and he paid the price for it.  Mr. Scott did it

13  three times.

14      He did it when he amended CLO Holdco's proof of claim to

15  take it down to zero.  He did it again after he withdrew the

16  objection to the HarbourVest settlement motion.  And he did it

17  again when he settled the lawsuit that the Debtors had brought

18  against CLO Holdco.  And that -- and on each of those three

19  occasions, the evidence will show that Mr. Scott did not

20  communicate with Mr. Dondero in advance, that Mr. Dondero

21  found out about these acts of independence after the fact, and

22  that each time he found out about it he had a little

23  conversation with Mr. Scott.

24      Mr. Dondero is going to tell you about it, and he's going

25  to tell you that he told Mr. Scott each act was inappropriate.

HCMLPHMIT00002742

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71 Filed 06/20/25299 Page 179 of 1011   PageID 2078
Exhibit 71 Page 29 of

28

1   You may have heard that word before.  Each act was not in the

2   best interests of the DAF.

3      The last of those conversations happened either on or just

4   after January 26th.  And by January 31st, Mr. Scott gave

5   notice of his resignation.  And you're going to see that

6   notice of resignation.  And he asks for releases.

7      Mr. Patrick becomes, almost two months later, the

8   successor to Mr. Scott.  Mr. Dondero is going to say he has no

9   idea how that happened.  He was just told after the fact that

10  Mr. Patrick and Mr. Scott had an agreement.  He's going to

11  tell you they had an agreement and he just heard about it

12  afterwards.  He didn't really -- for two months, I guess, he

13  sat there after Mr. Scott told him that he wanted out and did

14  nothing to try to find out who's going to take control of my

15  charitable foundation with $200 million.  He wasn't

16  interested.

17     But here's the thing, Your Honor.  If we go to the next

18  slide.  Let's see what Mr. Scott said at his deposition last

19  week.  Question, "Do you know who selected Mark?"  Answer, "I

20  do not."  Question, "Do you know how Mark was selected?"  Mark

21  is a reference to Mark Patrick.  "I do not."  "Did you ever

22  ask Mark how he was selected?"  "I did not."  "Did you ever

23  ask Mark who selected him?"  "I did not."  "Did you ever ask

24  anybody at any time how Mr. Patrick was selected to succeed

25  you?"  "No, I did not."  "Did you ever ask anybody at any time

001708

HCMLPHMIT00002743

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 08/20/25   Page 180 of 1011   PageID 2079
Exhibit 71 Page 82 of 299

29

1   as to who made the decision to select Mr. Patrick to succeed

2   you?"  "No, I did not."

3       So I don't know what happened between Mr. Patrick and Mr.

4   Dondero when Mr. Patrick supposedly told Mr. Dondero that

5   there was an agreement with Mr. Scott, but that is news to Mr.

6   Scott.  He had no idea.

7       Your Honor, we are going to prove by clear and convincing

8   evidence that each of the Respondents violated a very clear

9   and specific court order.  And unless the Court has any other

10  questions, I'll stop for now.

11           THE COURT:  No questions.

12           MR. MORRIS:  Thank you, Your Honor.

13           THE COURT:  All right.  Who is making the argument

14  for the Respondents?

15           MR. SBAITI:  Your Honor, I am.  I'm just trying to

16  put the PowerPoint up on the WebEx.

17           THE COURT:  Okay.

18           MR. SBAITI:  Sorry about that.

19           MR. MORRIS:  Your Honor, I'll try not to make this a

20  practice, but can I inquire as to how much time I used?

21           THE COURT:  Oh.  Nate?

22           THE CLERK:  About thirteen minutes.

23           THE COURT:  Thirteen minutes?

24           MR. MORRIS:  Thank you very much.

25           THE COURT:  Okay.  All right.

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11 71   Filed 02/31/25   Page 181 of 1011   PageID 2080

30

1              MR. SBAITI:  Your Honor, our PowerPoint is a little

2    bit longer than that one.  May I approach with a copy?

3              THE COURT:  You may.  Uh-huh.

4         (Pause.)

5              MR. SBAITI:  Your Honor, it does feel good to be back

6    in the courtroom.

7              THE COURT:  Okay.

8              MR. SBAITI:  It's been a long time.

9              THE COURT:  Yes.  For us, too.

10             MR. SBAITI:  Jut wish it wasn't under a circumstance

11   where someone is trying to sanction me.

12        But we're going to be dividing up this oral argument a

13   little bit.  Also, to just kind of break up a little bit of

14   the monotony, because I think we have a lot to cover at the

15   opening stage of this.  And I'll try to be as expeditious as I

16   can be.

17     OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

18             MR. SBAITI:  Your Honor, the thing we -- the thing we

19   open with is the due process issue that we raised in our

20   brief.  And where this really arises from is the Court's show

21   cause order calls us violators before we've had a chance to

22   respond to the allegations and before we've obviously been

23   able to approach this hearing.  And the word violators means

24   something to us, Your Honor, because I've been a lawyer for a

25   long time, my partner has been a lawyer for a long time, our

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/82/25299  Page 182 of 1011    PageID 2081

31

 1  clients have never been sanctioned, we've never been

 2  sanctioned, and for us to be labeled violators first by

 3  counsel and then in a court order makes us wonder whether or

 4  not this process is already prejudged or predetermined.

 5          THE COURT:  I actually want to address that.  Turn

 6  off the clock.

 7      Just so you know, I looked this up a while back, because

 8  we gave a bankruptcy judges panel at some CLE.  The average

 9  bankruptcy judge in our district, back when I looked, signs

10  over 200 orders a week.

11          MR. SBAITI:  Sure.

12          THE COURT:  Many of those -- in fact, most of them --

13  are submitted by lawyers.  So, you know, a big chunk of my

14  week is signing orders.  And I obviously give more scrutiny to

15  those that are substantive in nature.  Okay?  If someone

16  submits to me a 50-page debtor-in-possession financing order,

17  I will look at that much more carefully than what I consider a

18  mere procedural order setting a hearing.

19      So I regret that that word was used, but I can assure you

20  I fairly quickly set that -- signed that, I should say --

21  regarding it as a merely procedural order setting a hearing.

22  Okay?  So it's as simple as that.  There was no hmm, I like

23  that word, violator.  I had a stack, if you will, an

24  electronic stack of probably 200 orders in front of me the day

25  I signed that.  Okay?

1       So, if that makes anyone feel any better, I don't know,
2   but that's the reality.
3       Okay.  You can start the clock again.
4           MR. SBAITI:  And I appreciate Your Honor saying that.
5   It does make us feel better, both about where the -- the
6   genesis of the order and the impact and its reflection on what
7   Your Honor thinks in terms of going into this.
8       The other thing that obviously raised concerns, and I
9   assume this comes from the same place, was four days ahead of
10  that order counsel told us the Court was going to order
11  everyone to be in person, and they had advance notice of that,
12  and we weren't sure how they had advance notice of that.  I
13  guess they assumed --
14          THE COURT:  I can assure you right here on the record
15  I never had ex parte communications with any lawyer in this
16  case, on this matter or any other matter.  Okay?  Again, those
17  are pretty strong words to venture out there with, which your
18  pleading did venture out there with those words.
19      My courtroom deputy, Traci, I think answers her phone 24
20  hours a day.  So I'm quite sure she had communications with
21  the lawyers about this, just like she probably had
22  communications with you and your firm and every other firm in
23  this case.  Okay?
24          MR. SBAITI:  Like I said, Your Honor, we appreciated
25  what Your Honor -- appreciate what Your Honor said, but that

HCMLPHMIT00002747

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/24/25   Page 184 of 1011   PageID 2083
Exhibit 71   Page 84 of 299

33

1    issue obviously stuck out -- stuck out to us, in combination.

2    So I'll move on from that issue.

3        This has to do with the lawsuit that was filed, and the

4    lawsuit, the genesis of the lawsuit, I think it's important to

5    say, because the argument has been raised in the briefing and

6    we wanted to address it upfront, why the lawsuit comes about.

7    And it comes about because of the Advisers Act and the

8    responsibilities that the Debtor has to the assets of the

9    funds that it manages.  And the Advisers Act imposes a duty

10   not only on Highland but obviously on its control people and

11   its supervised people.  And the lawsuit has to do with HCLOF,

12   which is what HarbourVest owned a piece of.  And Highland, as

13   the advisor to HCLOF and the advisor to the DAF, owed

14   fiduciary duties to CLO Holdco, which is the DAF's holding

15   entity of its assets in HCLOF, but Highland Capital was also

16   an advisor, a registered investment advisor to the DAF

17   directly at the time.  And so those federally-imposed

18   fiduciary duties lie at the crux of that lawsuit.

19       Moving on, Mr. Seery testified at the hearing that was in

20   this Court to be -- to get him appointed, and this was Exhibit

21   2 that was presented by the Debtor, and on Page 16 at the

22   bottom he says -- of the transcript, he says, I think, from a

23   high level, the best way to think about the Debtor is that

24   it's a registered investment advisor.  As a registered

25   investment advisor, which is really any advisor of third-party

HCMLPHMIT00002748

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/05/299   Page 185 of 1011   PageID 2084

34

1     money over $25 million, it has to register with the SEC, and

2     it manages funds in many different ways.

3          In the middle of the next page he says, In addition, the

4     Debtor manages about $2 billion, $2 billion in total managed

5     assets, around $2 billion in CLO assets, and then other

6     securities, which are hedge funds -- other entities, rather,

7     which are hedge funds or PE style.  Private equity style.

8          On Page 23 towards the bottom he says, As I said, the

9     Investment Advisers Act puts a fiduciary duty on Highland

10    Capital to discharge its duty to the investors.  So while we

11    have duties to the estate, we also have duties, as I mentioned

12    in my last testimony, to each of the investors in the funds.

13    CLO Holdco would be an investor in one of those funds, HCLOF.

14         He goes on to say, Some of them are related parties, and

15    those are a little bit easier.  Some of them are owned by

16    Highland.  HCLOF was not owned by Highland.  But there are

17    third-party investors in these funds who have no relation

18    whatsoever to Highland, and we owe them a fiduciary duty both

19    to manage their assets prudently but also to seek to maximize

20    value.

21         Now, the lawsuit alleges that Seery testified that the

22    HarbourVest portion of Highland CLO Funding was worth $22-1/2

23    million.  Now, Mr. Morris wants the Court to hinge on the fact

24    that, well, no one asked him whether he was lying.  But that's

25    not really the standard, and it certainly isn't the standard

001714

HCMLPHMIT00002749

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/26/25   Page 186 of 1011   PageID 2085
Exhibit 71   Page 186 of 299

35

1    when someone's an investment advisor and owes fiduciary

2    duties, which include fiduciary duties to be transparent with

3    your investors.

4         It also includes fiduciary duties not to self-deal.

5         The lawsuit also alleges that, in reality, those assets

6    were worth double that -- double that amount at the time.  We

7    found out just, you know, in late March/early April that a

8    third -- from a third party who had access to the underlying

9    valuations at the time that those values were actually double

10   and that there was a misrepresentation, giving rise to the

11   lawsuit.  That change in circumstance is the key issue behind

12   the lawsuit.

13        We allege that Mr. Seery and the Debtor, as RIAs, had a

14   duty to not self-deal and be fully transparent with that

15   information, and we think both of those things were violated

16   under the Advisers Act.

17        We don't allege that the HarbourVest settlement should be

18   undone or unwound.  We can't unscramble that egg.  We do seek

19   damages, as I believe is our right, arising out of the

20   wrongdoing and the process of pushing forth the settlement.

21        I think one of the allegations in the actual motion for

22   the show cause order was that this was going to undo all of

23   the hard work that Court had done and basically unwind and try

24   to re-piece Humpty Dumpty back together again.  But that's

25   simply not the case.  Nowhere in our allegations or in the

HCMLPHMIT00002750

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 02/07/25   Page 187 of 1011   PageID 2086
Exhibit 71 Page 37 of 299

36

1  relief that we request are we trying to undo the HarbourVest

2  settlement as such.

3      Now, whether the lawsuit should be dismissed under the

4  affirmative defenses that they bring up -- res judicata,

5  waiver, release -- all of those are questionable under the

6  Advisers Act, given the change of circumstance, and therefore

7  are also questions on the merits.  They don't go to the

8  colorability of the underlying claims in and of themselves,

9  which I think is important.

10      So we asked for leave to amend from the Court.  And what

11  they want us to do, Your Honor, is they want to sanction us

12  for asking.  They're saying asking for leave to amend is the

13  same thing as pursuing a claim.  And I'll get to the specifics

14  on that in a little bit.  But that's the frame.  Can we be

15  sanctioned for asking a court, any court, even if it's the

16  wrong court, for permission to bring the lawsuit?  They don't

17  cite a single case that says that that, in and of itself, is

18  sanctionable conduct, us asking.

19      So I'd like to introduce some of the Respondents.

20      Your Honor, may I have one of these waters?

21          THE COURT:  Certainly.

22          MR. SBAITI:  Thank you.

23          THE COURT:  That's why they're there, by the way.

24          MR. SBAITI:  I didn't know if they belonged to

25  somebody else.

HCMLPHMIT00002751

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 08/06/25   Page 188 of 1011   PageID 2087

37

1           THE COURT:  We've scattered water bottles around for

2    people.

3           MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

4           THE COURT:  So if you see these little ones, that's

5    for anyone.

6           MR. SBAITI:  So, this is an org chart, and you'll see

7    it as -- the exhibits that the Debtor's going to bring up.

8    And when we talk about the DAF, Your Honor -- I don't know if

9    that's visible to you.  We're on Slide 19, if you're looking

10   at it on paper.  There's a little number at the lower right-

11   hand corner.  The charitable DAF GP, LLP and then the

12   Charitable DAF Holdco, Ltd. together are the principles of the

13   Charitable DAF Fund, LP.  And so when we refer to the DAF or

14   the Charitable DAF, that's really the entity structure that

15   we're referring to.  And then the GP and Holdco Ltd. have a

16   managing member.  It used to be Grant Scott at the time this

17   was done.  Today, it's Mr. Mark Patrick, who's in the room,

18   sitting next to Mr. Bridges.

19       The DAF is a charitable fund.  It's funded over $32

20   million, as the evidence will show, including Dallas-Fort

21   Worth organizations, The Family Place, Dallas Children's

22   Advocacy, Center for Brain Health, the Crystal Ray Initiative,

23   Friends of the Dallas Police, Snowball Express, various

24   community and education initiatives, Dallas Arts, museums, the

25   Perot Museum, Dallas Zoo.  That evidence is undisputed, Your

HCMLPHMIT00002752

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/30/25   Page 189 of 1011   PageID 2088
Exhibit 71 Page 39 of 299

38

1   Honor.  The DAF is a real fund.  It is a real charitable fund.
2   It does real good in the community.
3        Now, Respondents -- Holdco, which you will see at the
4   bottom of that chart, is essentially the investment arm.
5   There are assets that the DAF owns in various pots, and Holdco
6   is the actual business engine that generates the money from
7   those assets that then -- that then gets passed up to the
8   charitable -- the four charitable foundations at the top.
9        I'll go back to Slide 21.  And if you look at the top,
10  Your Honor, the Dallas Foundation, Greater Kansas City
11  Community, Santa Barbara Foundation, The Community Foundation
12  of North Texas:  Those are the charities that then themselves
13  bestow the funds onto the actual recipients.  So the money
14  flows up as dividends or distributions, and then gets
15  contributed.
16       CLO Holdco invests those assets, and it's an important
17  part of the business model, so that you're not sending out
18  principal.  It's the money that CLO makes, the profits, if you
19  will, that it is able to generate that gets donated and makes
20  its way into the community.
21       So there's an important feature to the structure in that
22  it has to be able to generate money.  It's not just money that
23  sits there and waits to be distributed.  There's active
24  investing going on.
25       Mr. Mark Patrick owns the control shares of the entities

HCMLPHMIT00002753

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 07/02/25   Page 190 of 1011   PageID 2089
Exhibit 71   Page 40 of 299

39

1   comprising the DAF and CLO Holdco, as I showed you, and the

2   beneficiary charitable foundations hold what we call

3   beneficial interests, where they just get money.  They don't

4   have a vote.

5        Mr. Patrick cares about the public service the DAF engages

6   in.  He's been an advisor to the DAF, CLO Holdco, and its

7   predecessor, Mr. Scott, since its inception.  He receives no

8   compensation for the job he's doing today.  And you'll hear

9   how he became -- how he inured to the control position of the

10   DAF and CLO Holdco from him, but it doesn't involve Mr.

11   Dondero, and the absence of someone saying that it did, I

12   think, is going to be striking by the end of the presentation

13   of evidence.

14        Their only argument against you, Your Honor, is going to

15   be you just can't believe them.  But not believing witnesses

16   is not a substitute for the lack of affirmative evidence.

17        Mr. Patrick has said all along he authorized the filing of

18   the motion for leave to add Mr. Seery to the lawsuit in

19   District Court.  He doesn't believe the motion to amend

20   violated this Court's orders, for the reasons stated in our

21   responsive filings to the motions for contempt and show cause

22   order.  That's why he authorized it.

23        My firm, Sbaiti & Company, we're a small Dallas litigation

24   boutique retained by the DAF and CLO Holdco to file the

25   lawsuit.  We did an investigation.  I'm tickled to death that

HCMLPHMIT00002754

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11b4 71Filed 02/02/5299 Page 191 of 1011    PageID 2090

40

1   Mr. Morris loved our complaint so much and gave us the

2   compliment that we got it done in a short amount of time, but

3   we did get it done in a short amount of time, because, in the

4   end, it's a rather simple issue, as I was able to lay it out

5   in about three or four bullet points in a previous slide.

6       The written aspect of that doesn't take that long, as Your

7   Honor knows, but the idea that there's a suspicion that we

8   didn't write it or someone else wrote it and ghost-wrote it

9   and gave it to us, which I think is the insinuation he was

10  making, is completely unfounded.  There's no evidence of that.

11      We carefully read Your Honor's orders.  We developed a

12  good-faith basis, as required by Rule 11, that the lawsuit and

13  the motion to add Mr. Seery were not filed in bad faith or for

14  an improper purpose.  We don't think they're frivolous.  We

15  don't think they're in violation of Your Honor's orders, given

16  the current state of the law.

17      Mr. Dondero is one of the settlors of the CRT, of the

18  Charitable Remainder Trust that ultimately provided assets to

19  CLO Holdco and the DAF.  He does care about the DAF's mission.

20  I think Mr. Morris hit the nail on the head.  Of course Mr.

21  Dondero cares about what happens to it.  He's one of the

22  settlors, and it was his funds that initially were put into

23  it, so he's allowed to care.  And I don't think him caring is

24  insidious, and him caring doesn't mean he has control and

25  doesn't mean he's the driving force behind some insidious

001720

HCMLPHMIT00002755

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 02/05/299    Page 192 of 1011    PageID 2091

41

1    conspiracy that they're trying to insinuate exists.

2        He is an advisor to the DAF and CLO Holdco.  It is a lot

3    of money and it needs advice, and he's an advisor to Mr.

4    Patrick.  We don't run away from any of those facts, Your

5    Honor.

6        We also don't run away from the fact that he was the

7    source of some of the information that came in to that

8    complaint and that he relayed some of that information.  The

9    content, we do claim work product privilege and attorney-

10   client privilege, because he's an agent of our client, and as

11   lawyers doing an investigation, the content of our

12   communications is protected under the attorney-client and work

13   product privileges, as well as the joint interest privilege.

14   But the fact that we admit that those communications happened,

15   we're not running away from that fact.

16       So, what does he have to do with this?  It's interesting

17   that that opening argument you just heard spent about three

18   minutes on contempt and the other fourteen or fifteen minutes

19   or so on Mr. Dondero.  And only on Mr. Dondero.  There's a

20   negative halo effect, I believe, that they're trying to get

21   this Court to abide by.  They want to inflame Your Honor and

22   hopefully capture -- cultivate and then capitalize on whatever

23   antipathy you might have for Mr. Dondero, and then sweep us

24   all in under that umbrella and sanction everybody just because

25   he had some involvement.

HCMLPHMIT00002756

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 03/03/25    Page 193 of 1011    PageID 2092
Exhibit 71    Page 43 of 299

42

 1      But whatever involvement he has, which we admit he had

 2   some involvement in helping us marshal the facts, that's not a

 3   basis for us to be sanctioned if there isn't an actual

 4   sanctionable conduct that -- as we say there isn't.

 5      We think there's an ulterior motive.  That's why Mr.

 6   Morris just announced to Your Honor, Mr. Dondero controls it

 7   all.  The ulterior motive, I believe, is, down the line, when

 8   they want to argue some kind of alter ego theory, they want to

 9   lay that foundation here.  I don't think this is the

10   appropriate time for that foundation, and I don't think any of

11   the information and the evidence they're trying to marshal in

12   front of you is really going to be relevant to the very

13   specific question that's before Your Honor:  Does our motion

14   asking the District Court to add Mr. Seery violate your order,

15   or violate it in a way that can be -- that we can be

16   sanctioned for?  We don't believe it violates it.

17      So, the three core standards that have to be met.  First

18   of all, civil contempt requires a valid, enforceable order.

19   It's not debatable and it's not -- I don't think that's a

20   shocking statement.  Then they have to have clear and

21   convincing evidence of a violation of a specific unambiguous

22   term therein.  Mr. Morris wants his version of the word pursue

23   to be unambiguous, and I think the word pursue is unambiguous.

24   But the way he wants you to construe it makes it completely

25   ambiguous, and we'll -- I'll get to that in a moment.

HCMLPHMIT00002757

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 04/02/25   Page 194 of 1011   PageID 2093
Exhibit 71   Page 42 of 299

43

```
 1        Now, for sanctioning counsel, the Fifth Circuit has held

 2   you have to find bad faith.  We're adjudged under a slightly

 3   separate standard under the Fifth Circuit law.  So the

 4   contempt motion, though, to the extent it seeks to impose

 5   double and treble attorney's fees, those are in punitive

 6   fines.  They are not compensatory.  So criminal contempt

 7   standards are raised, and so they have to show a violation in

 8   bad faith.  In other words, our arguments that we're making

 9   have to be bad faith, not simply that we're wrong, and they

10   have to show beyond a reasonable doubt, usually in front of a

11   jury.  The U.S. Supreme Court explained the difference and the

12   different procedural protections that have to be involved if

13   they're really going to seek double and treble compensatory

14   damages.

15        Now, he's right.  Saying we intended -- saying that we

16   didn't mean to violate it isn't necessarily a defense.  But

17   what you're actually going to hear from him is the opposite

18   argument, that even though we didn't violate it, we wanted to.

19   That's what he says.  That's why he quoted you the opening

20   section of our motion asking for permission to sue Mr. Seery,

21   because that's a statement of purpose.  And he says you should

22   sanction them right there.  That's literally what he said.

23   It's right there, their purpose.  If intent is irrelevant to

24   them, it's irrelevant as to us.  The fact that we wanted to

25   sue Seery is fully admitted.  We don't deny the fact that we
```

HCMLPHMIT00002758

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-11   Filed 06/05/25   Page 195 of 1011   PageID 2094
Exhibit 71 Page 45 of 299

44

1   believe Mr. Seery should be a defendant in this lawsuit.  But

2   the fact that we didn't sue him is why we didn't violate the

3   order.  And they can't say that the fact that we eventually

4   wanted to sue him means we did violate the order.  That door

5   swings both ways, Your Honor.

6        We don't think any element is met.  The order, while writ

7   large, prohibits suing Mr. Seery without permission, and we

8   did not sue James Seery, pure and simple.  The July 12 --

9   14th, 2020 order purports to reserve exclusively to this Court

10  that which, according to the statutes and the case law, we

11  believe the Court can't exclusively reserve to itself.  And

12  Your Honor, the order prohibits commencing and pursuing a

13  claim against Jim Seery without coming here first to decide

14  the colorability of such a claim.

15       They, I believe, admit that we didn't commence a claim

16  against Jim Seery.  I think they've admitted that now.  So now

17  we're talking about what does pursue mean?  We didn't pursue a

18  claim against Jim Seery.  Is asking for leave to bring suit

19  the same thing as pursuing a claim?  That's the question

20  that's really before Your Honor.  Lawyers never talk of

21  pursuing a claim that hasn't been filed.  We don't say, I'm

22  pursuing a claim and I'm going to file it next week or next

23  year.  Usually, that type of language is in an order, because

24  when the order happens, there may already be claims against

25  Mr. Seery.  And so the pursuit of claim is supposed to attack

HCMLPHMIT00002759

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-1   Filed 06/06/25   Page 196 of 1011   PageID 2095
Exhibit 71 Page 46 of 299

45

1    those cases, to come here and show colorability, presumably,

2    before they continue on with those lawsuits.  It doesn't mean

3    asking for permission.

4       If it did mean asking for permission, then complying with

5    Your Honor's order would be a violation.  If the motion for

6    leave is a violation because it is pursuing a claim, if I had

7    filed that motion in this Court, it would still be pursuing a

8    claim without Your Honor's permission.  I'd have to get

9    permission just to ask for permission.  It puts us in this

10   endless loop of, well, if asking for permission is pursuing a

11   claim, and pursuing a claim is without permission violates the

12   Court's order, we'd always be in violation of the Court's

13   order just for asking, just for following Your Honor's edict.

14          THE COURT:  I'm just, I'm going to interject.  You

15   were supposed to, under the order, file a motion in this

16   Court.

17          MR. SBAITI:  I understand that, Your Honor, and I

18   think that we can get to the specifics on why we disagree with

19   how the motion went, Your Honor.  We hadn't sued Mr. Seery.

20   So as long as we dealt with the order, which is what our

21   position is, then we don't believe we violated the order.

22          THE COURT:  You think the order was ambiguous,

23   requiring a motion to be filed in the Bankruptcy Court?

24          MR. SBAITI:  Your Honor, what we believe is that the

25   order was ambiguous in terms of whether us asking for

HCMLPHMIT00002760

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 07/05/25    Page 197 of 1011    PageID 2096
Exhibit 71    Page 47 of 299

46

1    permission in the District Court was in and of itself a

2    violation of the order.  We don't think it was.  Actually, we

3    don't think the order's ambiguous to that extent.  The second

4    we file a suit against Mr. Seery and we don't have some

5    resolution of the issue, then I think the question of

6    sanctionability comes in.  But we never filed suit, Your

7    Honor.

8        The Court doesn't say I can't seek permission in the

9    District Court or that we can't go to the District Court with

10   -- which has general jurisdiction over this case, and has

11   jurisdiction, we believe, over the actual case and controversy

12   that's being raised.  But the idea of pursuit being a

13   violation of the order, of the letter of that order, is

14   nonsensical under that, it leads to an absurd result, and it's

15   plainly vague and ambiguous, Your Honor.

16       Asking Judge Boyle or asking a District Court for

17   permission is not a violation of this Court's order, not the

18   way it was written and not -- and I don't even believe it was

19   a violation necessarily of the Court's -- of the language that

20   the Court has.  We -- it doesn't unambiguously prevent us from

21   asking the District Court for leave.

22       The Court's order yesterday, Your Honor, applied this very

23   rule.  The TRO -- you said the TRO did not specifically state,

24   Turn your cell phone over.  And you denied motion for

25   sanctions on that.  That's basically the argument we're making

HCMLPHMIT00002761

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71 Filed 06/20/25   Page 198 of 1011   PageID 2097
Exhibit 71 Page 42 of 299

47

1    here, Your Honor.  We think that was the correct ruling, and

2    we think the same type of ruling applies here.

3        Your order yesterday also determined that the Court

4    ultimately believes that hiring lawyers to file motions should

5    not be viewed as having crossed the line into contemptuous

6    behavior.  That's essentially the argument they want you to

7    buy, that there's somehow a vindictiveness behind this and an

8    insidious plan to violate court orders, Your Honor.  We don't

9    have any evidence of that.

10            THE COURT:  Okay.  Take the words vindictiveness and

11   insidious out of the equation.  That's making things personal,

12   and I don't like that.  The key is the literal wording of the

13   order, is it not?

14            MR. SBAITI:  Your Honor, the key, I believe, is the

15   --

16            THE COURT:  No entity may commence or pursue a cause

17   of action of any kind against Mr. Seery relating in any way to

18   his role as the chief executive officer and chief

19   restructuring officer of the Debtor without the Bankruptcy

20   Court first determining, after notice, that such claim or

21   cause of action represents a colorable claim of willful

22   misconduct or gross negligence against Mr. Seery and

23   specifically authorizing such entity to bring such a claim.

24   So I'm trying to understand why you argue that filing a motion

25   asking the District Court for permission is not inconsistent

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/49/25299   Page 199 of 1011   PageID 2098

48

1   with this order.

2          MR. SBAITI:  Because it's not commencing a claim,

3   Your Honor.  It's not commencing a claim against him.

4          THE COURT:  Okay.  So is your argument that if Judge

5   Boyle authorizes amendment of the pleading to add Mr. Seery

6   and then you do it, at that point they may have grounds for a

7   motion for contempt, but not yet, because she has not actually

8   granted your motion?

9          MR. SBAITI:  Correct, Your Honor.  I mean, in a

10  nutshell.  In fact, that's one of -- I think that's probably

11  our next argument.  We think, in a sense, this argument is

12  incredibly premature.  There is three ways that this -- well,

13  I'd like to address this, so I've got -- I've got a diagram

14  that I think will actually help elucidate what our thought

15  process was.

16     There's three things she could have done.  She could have

17  referred -- referred it to Your Honor, which is what we

18  expected was likely to happen.

19          THE COURT:  But you didn't file a motion for referral

20  of the motion before her.

21          MR. SBAITI:  Well, no, I don't mean in respect of

22  enforcing the reference.  The referral we thought was most

23  likely going to happen because it's an associated case, and we

24  actually put those orders in front of her, so we expected that

25  those orders would end up -- that the question would

001728

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/30/25    Page 200 of 1011    PageID 2099

49

1    ultimately end up in front of Your Honor on that basis.

2        She could have denied our motion outright, in which case

3    we haven't filed a claim, we haven't violated it, or she could

4    have granted our motion and done one of two things.  She could

5    have granted it to the extent that she thought leave would be

6    proper but then referred it down, or she could have decided --

7    taken the decision as the court with general jurisdiction and

8    simply decided it all on her own.  She had all of those

9    options, Your Honor, and none of them results in a claim being

10   commenced or pursued without the leave of this Court, if leave

11   is absolutely necessary, Your Honor.  And that's the point

12   that we were trying to make.

13       Your Honor, the -- there's -- you know, there's no

14   evidence that, absent an order from a court with jurisdiction,

15   that we were going to file a claim against Mr. Seery, that we

16   were going to commence or pursue a claim against Mr. Seery.

17   We were cognizant of Your Honor's order.  We considered that.

18   And the reason we filed them the way we did is because,

19   according to the statutes and the case law, this is the type

20   of case that would be subject to a mandatory withdrawal of the

21   reference.

22       And so there's this paradox that arises, Your Honor.  And

23   the paradox that arises is that we show up and immediately go,

24   well, we need to be back in the District Court.  So we filed

25   our motion there, and I don't think that was contemptuous, it

HCMLPHMIT00002764

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 02/05/25    Page 201 of 1011    PageID 2100
Exhibit 71    Page 92 of 299

50

1    wasn't intended to be contemptuous of the Court, but we showed

2    the orders to the Court, made the same arguments that we have

3    been making here, that we believe that there's problems with

4    the order, we believe the order oversteps its jurisdiction and

5    maybe is unenforceable, and it's up to that District Court, as

6    it has been in almost all of these other gatekeeper order

7    cases that get filed.  None of them result in sanctions, Your

8    Honor.  What they result in is a District Court deciding,

9    well, either they refer it or they decide I don't need to

10   refer it.  But I don't think that that is the same thing as

11   commencing or pursuing a claim in the end, Your Honor, because

12   all we did was ask for permission, and permission could have

13   been denied or granted or granted in part.

14       Your Honor, they haven't cited an injury.  You've heard

15   the testimony, Your Honor, that they -- the first time they

16   knew we had filed a motion -- which I don't understand why

17   that's the first time they knew we had filed a motion; we told

18   them we were going to file the motion -- was when I forwarded

19   an email saying that it's been denied without prejudice, Your

20   Honor.  Well, that means they didn't have to do any work to

21   respond to the motion.  They didn't have to do any work to do

22   any of the other things.

23       And one hundred percent of the damages that they're going

24   to say they incurred is the litigation of this contempt

25   hearing or this sanction motion, as opposed to some other

HCMLPHMIT00002765

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 05/02/25    Page 202 of 1011    PageID 2101
Exhibit 71    Page 52 of 299

51

1    simpler remedy, like going in to Judge Boyle and saying, Your

2    Honor, all that needs to go, which is what they eventually

3    did.  But they would have had to incur those costs anyway

4    because they're now moving to enforce the reference.  They

5    filed a 12(b)(6).  That briefing would have existed regardless

6    of whether or not we had filed our motion, regardless of

7    whether the sanctions hearing had commenced.

8         Your Honor, I'm going to let my partner, Mr. Bridges,

9    address this part of it, if I could.  I think that gets into

10   more of the questions that you asked, and I think he can

11   answer them a lot better than I can.

12             THE COURT:  Okay.

13             MR. SBAITI:  Thank you.

14             THE COURT:  That's fine.

15             MR. BRIDGES:  Thank you, Your Honor.  And I do want

16   to address pointedly the questions that you're asking.  First,

17   though, I was hoping to back up to some preliminary remarks

18   that you made and say that I find the 200 orders a week just

19   mindboggling.  It amazes me, and puts the entire hearing in a

20   different perspective for me.  I'm grateful that you shared

21   that with us.

22        Your expression of regret about naming us violators was

23   very meaningful to me.  It causes me -- well, the strong words

24   in our brief were mine.  I wrote them.  And your expression of

25   regret causes me to regret some of those words.  I'm hopeful

HCMLPHMIT00002766

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/03/25   Page 203 of 1011   PageID 2102

52

1    that you can understand, at least in part, our reaction out of

2    concern.

3        And Your Honor, it's awkward for me to talk about problems

4    with your order, and that's the task that's come to me, to

5    list and talk through four of them and why we think they put

6    us in a really awkward position in deciding what to do in this

7    case, in the filing of it, in where we filed it, and in how we

8    sought leave to go forward against Mr. Seery.  That was

9    awkward and difficult for us, and I'm hopeful that I can

10   explain that and that you'll understand, if I'm blunt about

11   problems with the order, that I mean it very respectfully.

12   Two hundred orders a week is still very difficult for me to

13   get my mind around.

14       The four issues in the order start with the gatekeeping.

15   Then, secondly, in the preliminary remarks, I made mention of

16   the *Applewood* case and the notice that the order releases some

17   claims.  Its effect of --

18            THE COURT:  And by the way, I mean, you might

19   elaborate on the facts and holding of *Applewood*, because I

20   came into this thinking *Republic Supply v. Shoaf*, and for that

21   matter, as I said, *Espinosa*, were much more germane.  And so,

22   you know, you'll have to elaborate on *Applewood*.  I remember

23   that case, but it's just not one people cite as frequently as

24   those two.

25            MR. BRIDGES:  Yes, Your Honor.  And our reply brief

001732

HCMLPHMIT00002767

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 04/04/25    Page 204 of 1011    PageID 2103

53

1   devotes a page to the case, and I'm hopeful that I can

2   remember it well enough to give you what you're looking for

3   about it, but I would point you to our reply brief on that

4   topic as well.

5        The *Shoaf* case that *Applewood* quotes from and

6   distinguishes and expressly limits, the *Shoaf* case actually

7   has been cautioned and limited and distinguished numerous

8   times, if you Shepardize it, and the *Applewood* case is the

9   leading case, and it also is from the Fifth Circuit, that

10  describes and cabins the effects of *Shoaf*.  And in *Applewood*,

11  what happened is a bankruptcy confirmation order became final

12  with releases in it, and the court held that exculpatory

13  orders in a final order from the Bankruptcy Court do not have

14  res judicata effect and do not release claims unless those

15  claims are enumerated in the exculpatory order.  And --

16             THE COURT:  Okay.  So it was about specificity more

17  than anything else, right?

18             MR. BRIDGES:  Yes, Your Honor. It was a --

19             THE COURT:  Okay.

20             MR. BRIDGES:  -- a blanket release, a blanket --

21             THE COURT:  Okay.

22             MR. BRIDGES:  -- exculpatory order that didn't

23  specify what claims were released by what parties, and

24  therefore the parties didn't have the requisite notice.

25       In my mind, Your Honor, it's comparable to the Texas

HCMLPHMIT00002768

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 05/05/25299    Page 205 of 1011    PageID 2104
Exhibit 71    Page 55 of

54

1    Supreme Court's holdings on what's required in a settlement

2    release in terms of a disclaimer of reliance, --

3              THE COURT:  Okay.  But, again, --

4              MR. BRIDGES:  -- that if you aren't --

5              THE COURT:  -- it's about specificity --

6              MR. BRIDGES:  Yes, Your Honor.

7              THE COURT:  -- more than anything else?  And then

8    we've got the U.S. Supreme Court *Espinosa* case subsequent.

9              MR. BRIDGES:  Okay.  Your Honor, I'm not sure what

10   *Espinosa* you're referring to.  Can you tell me why that

11   applies?

12             THE COURT:  Well, it was a confirmation order.  It

13   was in a Chapter 13 context.  And there were provisions that

14   operated to discharge student loan debt, --

15             MR. BRIDGES:  Uh-huh.

16             THE COURT:  -- which, of course, cannot be discharged

17   without a 523 action, a separate adversary proceeding.

18   Nevertheless, the confirmation order operated to do what 523

19   suggests you cannot do, discharge student loan debt through a

20   plan confirmation order.

21        The U.S. Supreme Court says, well, that's unfortunate that

22   the confirmation order did something which it doesn't look

23   like you can do, but no one ever objected or appealed.  That's

24   my recollection of *Espinosa*.  So it seems to be the same

25   holding as *Republic Supply v. Shoaf*.  And what I -- why I

HCMLPHMIT00002769

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/05/25    Page 206 of 1011    PageID 2105
Exhibit 71 Page 56 of 299

55

1    asked you to elaborate on *Applewood* is because it does seem to

2    deal with the specificity of the order versus the

3    enforceability, no?

4              MR. BRIDGES:  Your Honor, if it's not obvious

5    already, I'm not prepared to argue *Espinosa*.  And your

6    explanation of it is very helpful to me.  I think you're right

7    that the specificity issue from *Applewood* is what we're

8    relying on.  And it sounds like --

9              THE COURT:  Okay.  So, that being the case, how was

10   this order not specific?  Okay?

11             MR. BRIDGES:  That's easy, Your Honor, because it

12   doesn't say which parties are releasing which claims.  And

13   what we're talking specifically about there -- as we go

14   through the order, I can show you the language -- but what

15   we're talking about specifically are the ordinary negligence

16   and breach of fiduciary duty claims that your order doesn't

17   provide for at all.  Rather, it says colorability of gross

18   negligence or willful wrongdoing, if I remember the words

19   precisely, that's what must be shown to pursue a case -- a

20   cause of action against Mr. Seery, thereby -- thereby

21   indicating that claims for mere negligence, not gross

22   negligence, or breach of fiduciary duty, which is an even

23   lesser standard, that those claims are prohibited entirely.

24        And by having that kind of general all-encompassing

25   release or exculpation for potential liability involving

HCMLPHMIT00002770

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document Exhibit 71 Filed 06/02/25299  Page 207 of 1011   PageID 2106

56

1  negligence, and most importantly, fiduciary duty breach under

2  the Advisers Act, that that kind of exculpation under

3  *Applewood* is not enforceable and has no res judicata effect

4  because it wasn't -- those claims weren't enumerated in the

5  order.

6      That for it to have the intended exculpatory effect, if

7  that was what was intended, that the fiduciary duty claims and

8  the parties who those claims may belong to would have to have

9  been enumerated.

10      And indeed, that kind of specificity, what was required in

11  *Applewood*, isn't even possible for a claim that hasn't yet

12  occurred for future conduct.  It's not possible to enumerate

13  the details, any details, of a future claim, because the

14  underlying act -- if the underlying basis, facts for that

15  claim, haven't yet happened.  It's something to happen in the

16  future.

17      And here, that's what we're dealing with.  We're dealing

18  with conduct that took place well after the January and July

19  2020 orders that had that exculpatory effect.  Is -- is that

20  clear?

21          THE COURT:  Understood.

22          MR. BRIDGES:  Thank you, Your Honor.  So, the four

23  areas of the order, the four functions that the order does

24  that are problematic to us that led us to do what we have done

25  are the gatekeeping function; the release; the fact that by

001736

HCMLPHMIT00002771

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 08/08/25   Page 208 of 1011   PageID 2107
Exhibit 71 Page 58 of 299

57

1   stating sole jurisdiction, that it had a jurisdiction-

2   stripping effect; and then, finally, jurisdiction asserting,

3   where, respectfully, Your Honor, we think to some extent the

4   order goes beyond what this Court's jurisdiction is.  And so

5   that not only claiming exclusive jurisdiction, but claiming

6   jurisdiction over all actions against Mr. Seery, as described

7   in the order, is going too far.

8        And those are the four issues I want to talk about one at

9   a time, and here -- I went two screens instead of one.  There

10  we go.  And here's the order.  I have numbered the highlights

11  here out of sequence because this is the sequence that I wish

12  to talk about them and that I think their significance to our

13  decision applies.

14       Before we get into the words of this July 16, 2020 order,

15  I want to mention the January order as well.  Although the

16  motion for contempt recites both orders, we don't actually

17  think the January order applies to us, because our lawsuit

18  against Mr. Seery is not about his role as a director at

19  Strand in any way.  We didn't make an issue of that, other

20  than in a footnote in our brief, because we don't think that

21  distinction matters much since the orders essentially say the

22  same things.

23       I'm not sure that it matters whether we have potentially

24  violated one order or two.  If Your Honor finds we've violated

25  one, I think we're on the hook regardless.  If Your Honor

HCMLPHMIT00002772

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/02/25    Page 209 of 1011    PageID 2108
Exhibit 71 Page 59 of 299

58

1   finds that we didn't violate the July order, I don't think you
2   will find that we violated the January order, either.  So my
3   focus is on the July order.
4       The gatekeeping function comes from the preliminary
5   language about commencing or pursuing a claim or cause of
6   action against Mr. Seery.  And it says what you want us to do
7   first before bringing such a claim.
8       The second issue of the release comes a little bit later.
9   It's the colorable claim of willful misconduct or gross
10  negligence language.  In other words, because only claims of
11  willful misconduct or gross negligence can pass the bar, can
12  pass muster under this order, that lesser claims -- ordinary
13  negligence and breach of fiduciary duty -- that those claims
14  are released by this order.  That's the second argument.
15      Third is your reference to sole jurisdiction and the
16  effect that that has of attempting to say that other courts,
17  courts of original jurisdiction, do not have jurisdiction
18  because it solely resides here.  That's the third thing I want
19  to address.
20      And then the fourth is the notion that we have to come to
21  this Court first for any action that fits the description of
22  an action against Mr. Seery, when some actions are, through
23  acts of Congress, removed from what this Court has the power
24  to address.  Under 157(d) of Title 28, Your Honor, there are
25  some kinds of actions which withdrawal of the reference is

HCMLPHMIT00002773

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/02/25   Page 210 of 1011   PageID 2109
Exhibit 71 Page 60 of 299

59

 1  mandatory, and therefore this court lacks jurisdiction to

 2  address those.

 3       And so those are the four issues I want to tackle,

 4  starting with the first, the gatekeeping.  Your Honor, Section

 5  28 -- Section 959 of Title 28 appears to be precisely on

 6  point.  It calls -- it is called by some courts an exception

 7  to the Barton Doctrine, which we believe is the only basis,

 8  the Barton Doctrine, for this Court to claim that it has

 9  jurisdiction or sole jurisdiction and can require us to come

10  here first.  We think the Barton Doctrine is the only basis

11  for that.  We haven't seen anything in the briefing from

12  opposing counsel indicating there was another basis for it.

13  We think we're talking about the Barton Doctrine here as the

14  basis for that.

15       959 is exception to the Barton Doctrine, and we think it

16  explicitly authorizes what we have done.

17       Secondly, Your Honor, the order, the gatekeeping functions

18  of the order are too broad because of its incorporation of the

19  jurisdictional problems and the release problem that we'll

20  talk about later.  But for problem number one, the key issue

21  that we're talking about is 959 as an exception to the Barton

22  Doctrine.  And I went the wrong way.

23           THE COURT:  So, we could go down a lot of rabbit

24  trails today, and I'm going to try not to do that, but are you

25  saying the very common practice of having gatekeeping

001739

HCMLPHMIT00002774

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 02/02/25299  Page 211 of 1011    PageID 2110
Exhibit 71 Page 02 of

60

1  provisions in Chapter 11 cases is just defective law under 28

2  U.S.C. § 959(a)?

3          MR. BRIDGES:  Can I say yes and no?

4          THE COURT:  Okay.

5          MR. BRIDGES:  Yes, to some extent, for some claims.

6  No as to other claims to another extent.  We are not saying

7  gatekeeping orders are altogether wrong, --

8          THE COURT:  Okay.

9          MR. BRIDGES:  -- no.

10          THE COURT:  Okay.

11          MR. BRIDGES:  There are problems with gatekeeping

12  orders that do more than what the law, Section 959 in

13  particular, allows them to do.

14          THE COURT:  Okay.  Be more explicit.  I'm not -- I

15  think you're saying, no, except when certain situations exist,

16  but I don't know what the certain situations are.

17          MR. BRIDGES:  And Your Honor, you're exactly right.

18  It's complicated, and it takes a long explanation.  Let me

19  start --

20          THE COURT:  Okay.  I really want to know, --

21          MR. BRIDGES:  Yeah, me, too.

22          THE COURT:  -- since I do these all the time, and

23  most of my colleagues do.

24          MR. BRIDGES:  Thank you, Your Honor.  And 959 is on

25  the screen.  Managers of any property --

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71 Filed 02/05/299 Page 212 of 1011   PageID 2111

61

```
 1              THE COURT:  Uh-huh.

 2              MR. BRIDGES:  -- is what we're talking about,

 3   including debtors in possession.  Now, it starts off by saying

 4   trustees, receivers.  I mean, this is exactly what the Barton

 5   Doctrine is about, right?  We're talking about trustees and

 6   receivers, but not just them.  We're also talking about

 7   managers of any property, including debtors in possession, --

 8              THE COURT:  Uh-huh.

 9              MR. BRIDGES:  -- may be sued without leave of the

10   court appointing that.  That's contrary to the Barton Doctrine

11   so far.

12      With respect to what I've numbered five here -- these

13   numbers are mine -- the quote is directly verbatim out of the

14   U.S. Code, but the numbering one through five is mine.  With

15   respect to what acts or transactions in carrying on business

16   connected with such property.

17      And so, Your Honor, what we're talking about isn't Barton

18   Doctrine is inapplicable, or you can't have a gatekeeping

19   order for any claims, but it's about managers of property.

20   And one of the hornbook examples of this is the grocery store

21   that files for bankruptcy and then, when --

22              THE COURT:  Slip-and-fall.

23              MR. BRIDGES:  You've got it, Your Honor.

24              THE COURT:  Uh-huh.

25              MR. BRIDGES:  And because they're managing property,
```

001741

HCMLPHMIT00002776

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71 Filed 06/03/25   Page 213 of 1011   PageID 2112
Exhibit 71 Page 63 of 299

62

1  --

2          THE COURT:  So your cause of action, if it went

3  forward, is the equivalent of a slip-and-fall --

4          MR. BRIDGES:  Yes, Your Honor.

5          THE COURT:  -- in a grocery store?

6          MR. BRIDGES:  Yes, Your Honor.

7          THE COURT:  Okay.  Let me skip ahead.  What about the

8  last sentence of 959(a)?

9          MR. BRIDGES:  959(b)?  Or 959(a)?

10          THE COURT:  No, of 959(a).

11          MR. BRIDGES:  What we're looking at here?

12          THE COURT:  That's the sentence that I have always

13  thought was one justification for a gatekeeper provision.  And

14  I know, you know, a lot of others feel the same.

15          MR. BRIDGES:  Are we talking about what I have listed

16  in number five here?

17          THE COURT:  No.  I'm talking about the last sentence

18  of 959(a).  Such actions, okay, shall be subject to the

19  general equity power of such court, you know, meaning the

20  Bankruptcy Court, so far as the same may be necessary to the

21  ends of justice, but this shall not deprive a litigant of his

22  right to a trial by jury.

23      Isn't that one of the provisions that lawyers sometimes

24  rely on in arguing a gatekeeper provision is appropriate?

25          MR. BRIDGES:  Certain --

001742

HCMLPHMIT00002777

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/04/25   Page 214 of 1011   PageID 2113
Exhibit 71   Page 64 of 299

63

```
1              THE COURT:  You, Bankruptcy Judge, have the power,

2     the general equity power, so far as the same may be necessary

3     to the ends of justice?

4              MR. BRIDGES:  Your Honor, you bet.  Absolutely, there

5     is equitable power to do more.  There's no doubt that there

6     are reliance -- there is reliance on that in many instances.

7     So I'm not sure -- I'm not sure I'm responding to your point.

8              THE COURT:  Well, again, I think this is the third or

9     fourth argument down the line that really you start with in

10    the analytical framework here, but I guess I'm just saying I

11    always thought a gatekeeping provision was consistent,

12    entirely consistent with 28 U.S.C. § 959(a), the last

13    sentence.

14             MR. BRIDGES:  When you're dealing --

15             THE COURT:  You disagree with that?

16             MR. BRIDGES:  I do, Your Honor.

17             THE COURT:  Okay.

18             MR. BRIDGES:  And it's not that the Court lacks

19    equitable powers to do more.  It's that those equitable powers

20    are affected by when management of other parties, third

21    parties' property is at issue.

22         What we're talking about is similar to yesterday's

23    contempt order.  When you set the basis of describing what it

24    is that Highland's business is, that they're a registered

25    investment advisor in the business of buying, selling, and
```

001743

HCMLPHMIT00002778

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-44   Filed 06/05/25   Page 215 of 1011   PageID 2114

64

 1   managing assets -- assets, of course, are property, and that

 2   property is not just Highland's, but it's third-party

 3   property, as if a railroad loses luggage belonging to its

 4   customers.  Rather than the railroad with a trustee appointed

 5   having mismanaged railroad property, we're talking about

 6   third-party property here, third-party property that belongs

 7   to the CLOs, about a billion dollars of assets in these CLO

 8   SPEs that Highland manages.

 9       And again, the slide that Mr. Sbaiti showed you showing

10   Highland, yes, they manage their own assets, the assets of the

11   Debtor, but also of the third parties, including the

12   Charitable DAF and CLO Holdco, and that the Advisers Act

13   imposes fiduciary duties on them that are unwaivable when

14   they're doing that.

15       In *Anderson*, the Fifth Circuit called 959 an exception to

16   the rule requiring court's permission for leave to sue.  In

17   *Hoffman v. City of San Diego* much more recently, relying on

18   this statute again, the court rejected a *Barton* challenge and

19   called it a statutory exception.  And in *Barton* itself, from a

20   century ago, the U.S. Supreme Court even acknowledged there

21   that where a receiver misappropriated the property of another

22   -- not the debtor's property, the property of another -- that

23   the receiver could still be sued personally, without leave of

24   court.

25       Absent *Barton*, absent applicability of the Barton

HCMLPHMIT00002779

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 71   Filed 06/06/25299   Page 216 of 1011     PageID 2115

65

1    Doctrine, Your Honor, the gatekeeper order is problematic.

2         *Barton* applies where a court has appointed a trustee, and

3    I don't think, Your Honor, under the circumstances in this

4    case, that it is fair to say Mr. Seery was appointed, as

5    opposed to approved by this Court.  And it involves a

6    trustee's actions under the powers conferred on him.  The

7    Barton Doctrine is not about a broader exculpation of the

8    trustee.

9         Here, what the Debtor asked for in its motion for

10   approval, approval of hiring Mr. Seery, what it asked for

11   specifically in the motion was that the Court not interfere

12   with corporate decisions absent a showing of bad faith, self-

13   interest, or gross negligence, and asking the Court to uphold

14   the board's decision to appoint Mr. Seery as the CEO as long

15   as they are attributable to any rationale business purpose.

16        At the hearing, Your Honor, at the hearing, we've quoted

17   your comments saying that the evidence amply shows a sound

18   business justification and reasonable business judgment on the

19   part of the Debtor in proposing that Mr. Seery be CEO and CRO.

20   Your Honor, respectfully, those words don't sound like the

21   judge using its discretion to choose -- appoint a trustee.

22   They sound like the Court exercising deference to the business

23   judgment of a business.  And appropriately so.  We don't have

24   trouble with application of the business judgment rule.  Our

25   problem is with application of it and the Barton Doctrine.

001745

HCMLPHMIT00002780

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 02/02/25    Page 217 of 1011    PageID 2116

66

1    Those two do not go together.  A trustee has protection

2    because it's acting under color of the court that appointed

3    it.  A court that merely deferred to someone else's

4    appointment, that's not what the Barton Doctrine is about.

5    The Barton Doctrine is about the court's function that the

6    trustee takes on, not deference to the business judgment of

7    the debtor in possession or the other fiduciary appointed by

8    the court.

9        Problem one was the gatekeeping.  Problem two is about the

10    release and the *Applewood* case.  Your Honor, again, ordinary

11    negligence and ordinary fiduciary duty breaches do not rise to

12    the level of gross negligence and willful misconduct.  And

13    because of that, the language of this order appears to be

14    barring them entirely.  No entity may bring a lawsuit against

15    Mr. Seery in certain circumstances without the Bankruptcy

16    Court doing what?  Determining that the cause of action

17    represents a colorable claim of willful misconduct or gross

18    negligence against Mr. Seery.

19        A breach of fiduciary duty under the Advisers Act can be

20    unintentional, it can fall short of gross negligence by miles,

21    and to exculpate Mr. Seery from those kinds of claims entirely

22    is to make him no longer a fiduciary.  A fiduciary duty that

23    is unenforceable makes someone not a fiduciary.  That's

24    plainly not what Mr. Seery thinks his role is.  It's

25    inconsistent with the Advisers Act.  And Your Honor, the

HCMLPHMIT00002781

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 171    Filed 06/08/25299 Page 218 of 1011    PageID 2117
Exhibit 71 Page 68 of

67

1   notion that he would not owe his clients fiduciary duties as

2   he manages their assets would require disclosures under the

3   SEC regulations.  It creates all kinds of problems to state

4   that a fiduciary under the Advisers Act does not have

5   enforceable fiduciary duties.  The order appears to be

6   releasing all of those.  But for *Applewood's* specificity

7   requirement, it would be doing that.

8        As an asset manager under the Advisers Act, Mr. Seery is

9   managing assets belonging to CLO Holdco and The Charitable

10  DAF.  That's precisely what the District Court action is

11  about, those fiduciary duties.  And Mr. Seery, in describing

12  these recently in testimony here -- forgive me for reading

13  through this, Your Honor, but it is pretty short -- Mr. Seery

14  testifies, I think, from a high level, the best way to think

15  about the Debtor is that it's a registered investment advisor.

16  As a registered investment advisor, which is really any

17  advisor of third-party money over $25 million, it has to

18  register with the SEC and it manages funds in many different

19  ways.  The Debtor manages approximately $200 million current

20  values -- it was more than that of the start of the case -- of

21  its own assets.

22       I'm pausing there, Your Honor.  $200 million of its own

23  assets, but we're about to talk about third-party assets.

24       It doesn't have to be a registered investment advisor for

25  those assets, but it does manage its own assets, which include

001747

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 71  Filed 06/02/25  299 Page 219 of 1011    PageID 2118
Exhibit 71 Page 102 of

68

1    directly-owned securities, loans, from mostly related entities

2    but not all, and investments in certain funds, which it also

3    manages.

4        And then here it comes:  In addition, the manager -- the

5    Debtor manages about roughly $2 billion, $2 billion in total

6    managed assets, around $2 billion in CLO assets, and then

7    other entities, which are hedge funds or PE style.

8        We also had to get a very good understanding of each of

9    the funds that we manage.  And as I said, the Investment

10   Advisers Act puts a fiduciary duty on Highland Capital to

11   discharge its duty to the investors.  So while we have duties

12   to the estate, we also have duties, as I mentioned in my last

13   testimony, to each of the investors in the funds.

14       Now, some of them are related parties, and those are a

15   little bit easier.  Some of them are owned by Highland.  But

16   there are third-party investors in these funds who have no

17   relation whatsoever to Highland, and we owe them a fiduciary

18   duty both to manage their assets prudently but also to seek to

19   manage -- maximize value.

20       Those duties do not require -- requires the opposite of

21   what I mean.  They don't merely require avoiding gross

22   negligence or willful wrongdoing.  When you're managing assets

23   of others, the fiduciary duties that you owe are far stricter

24   than that.  The highest duty known to law is a fiduciary duty.

25       The order is inconsistent with that testimony,

001748

HCMLPHMIT00002783

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11   Filed 02/02/25   Page 220 of 1011   PageID 2119

69

1   acknowledging the fiduciary duties owed to The Charitable DAF

2   and to CLO Holdco.  It appears to release the Debtor -- maybe

3   not the Debtor.  My slide may be wrong about that.  It appears

4   to release Seery from having to uphold these duties.

5       In addition to problems with the gatekeeping under the

6   Barton Doctrine, in addition to the release problem and

7   *Applewood* and the unwaivable fiduciary duties under the

8   Advisers Act, there's also a problem with telling other courts

9   that they lack jurisdiction.  Your Honor knows bankruptcy

10  court law -- bankruptcy -- and the Bankruptcy Code far better

11  than I do, I'm certain.  But a first principle, I believe, of

12  bankruptcy law is that this Court's jurisdiction is derivative

13  of the District Court's.  And the only doctrine I've heard of

14  that can allow this Court to exercise exclusive jurisdiction

15  of the District Court that it sits in is the Barton Doctrine,

16  which, again, is very problematic to apply in this case, for

17  the reasons we've discussed already.

18      By claiming to have -- by stating in the order that this

19  Court has sole jurisdiction, it appears to either be inclusive

20  of the District Court, which I understand Your Honor doesn't

21  think her order can be read that way, but if it's not read

22  that way, then it results in telling the District Court that

23  it doesn't have the original jurisdiction that Congress has

24  given it.  And that's problematic in the order as well.

25          THE COURT:  Let me ask you.  If you think the word

HCMLPHMIT00002784

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-71 Filed 07/02/25299    Page 221 of 1011    PageID 2120

70

1    "power" had been used, or "authority," versus "jurisdiction,"

2    that would have cured it?

3        MR. BRIDGES:  I think there would still have been

4    other problems.  Would it have cured this?  I don't think so,

5    Your Honor, because, again, I think the only basis for that

6    power is the Barton Doctrine.

7        THE COURT:  Okay.

8        MR. BRIDGES:  To listen to opposing counsel, you'd

9    think that our jurisdictional argument was entirely about the

10    jurisdiction stripping.  It's not.  Frankly, Your Honor,

11    that's maybe even a lesser point.  A key problem here to is

12    the assertion of jurisdiction, not over any of the claims, but

13    over all of the claims, because of 157(d), Your Honor, because

14    some claims, some causes of action, have been put outside the

15    reach of bankruptcy, the Bankruptcy Court, and those actions

16    may in some instances fit within your description of the cases

17    that are precluded here.

18        That's a problem jurisdictionally with this Court's

19    ability to say it retains jurisdiction or that it has, that it

20    asserts jurisdiction.  Over what?  Any kind of claim or cause

21    of action against Mr. Seery relating in any way to his role as

22    the chief executive officer and chief restructuring officer of

23    the Debtor.

24        Some claims that fit into that bucket also fit into the

25    description in 157(d) of cases that require both consideration

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 02/05/299   Page 222 of 1011   PageID 2121

71

1   of bankruptcy law and federal laws affecting interstate

2   commerce or regulating it.  Right?  Some cases must fall into

3   -- under 157(d), despite having something to do with Mr.

4   Seery's role as a chief executive officer.  And Your Honor,

5   the Advisers Act fiduciary duty claims asserted by Respondents

6   in the District Court are such claims.  They cannot be decided

7   without considering the Advisers Act.

8        There are also RICO claims that, of course, require

9   consideration of the RICO statute.  But the Advisers Act

10  claims absolutely require consideration of both bankruptcy law

11  and this Court's order exonerating -- exculpating Mr. Seery

12  from some liability, in addition to the unwaivable fiduciary

13  duties imposed by the Advisers Act.

14       The assertion of jurisdiction here blanketed, in a blanket

15  manner, over all claims against Mr. Seery in any way related

16  to his CEO role is a 157(d) problem that the order has no --

17  has no solution for and we see no way around.  157(d) requires

18  withdrawal of the reference, makes it mandatory, when a case

19  requires considerations of federal law implicating interstate

20  commerce.

21       Your Honor, we think we had to do it the way we did,

22  filing in the District Court instead of filing here, in order

23  to preserve our jurisdictional arguments.  To come to this

24  Court with a motion and then what?  Immediately file a motion

25  to withdraw the reference on our own motion here?  To come

HCMLPHMIT00002786

```
 1   here and ask for a decision on colorability, when first
 2   colorability would exclude the claims that we're trying to
 3   bring, at least some of them, the mere negligence, mere
 4   fiduciary duty breaches, because they don't rise to the level
 5   necessarily of gross negligence or willful wrongdoing.
 6        Your Honor, coming here and asking this Court to rule on
 7   that may well have waived our jurisdictional objections.
 8   Coming here to this Court and doing that and immediately
 9   filing a motion --
10             THE COURT:  I don't get it.
11             MR. BRIDGES:  The ordinary --
12             THE COURT:  Subject matter jurisdiction, if it's a
13   problem, it's not waivable.
14             MR. BRIDGES:  The ordinary issue -- the ordinary
15   waiver rule, Your Honor, is that when you come and ask for a
16   court to rule on something, that you waive your right to -- to
17   later -- you're estopped judicially from taking the contrary
18   position.
19             THE COURT:  Okay.  Well, again, I don't get it.  If
20   you filed your motion and I ruled in a way you didn't like,
21   you would appeal to the District Court.
22             MR. BRIDGES:  Yes, Your Honor.  An appeal to the
23   District Court, we would be entitled to do.  I understand, no
24   matter what happens here, we can appeal to the District Court.
25   That's different from whether or not, by coming here first,
```

001752

HCMLPHMIT00002787

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 04/04/25   Page 224 of 1011   PageID 2123

73

1   have we waived or have we created an estoppel situation, in

2   terms of arguing jurisdiction.

3           THE COURT:  Okay.

4           MR. BRIDGES:  Because of the problems with the order,

5   we thought we were in a situation where coming here would

6   waive rights that we could avoid waiving by asking in the

7   District Court.

8       In other words, there was a jurisdictional paradox:  How

9   does a party ask a court to do something it believes the court

10  lacks the power to do?  That's the spot we found ourselves in.

11  What were we supposed to do?

12      Your Honor, it is definitely a complex case.  And coming

13  into this matter with over 2,000 filings on the docket before

14  I had ever heard of Highland was a very daunting thing, coming

15  into this case.  And whether or not there's something that we

16  missed is certainly possible, but these orders that are the

17  subject of the contempt motion, these orders are not things

18  that we overlooked.  These are things that we studied

19  carefully, that we did not ignore or have disdain for, but

20  that affected and changed our actions.

21      And in the Slide #3 from Mr. Morris's -- from Mr. Morris's

22  presentation, in his third slide, he quotes from the first

23  page of our motion for leave, the motion that he says exhibits

24  our contemptuous behavior.

25      The second paragraph is kind of tiny print there, Your

HCMLPHMIT00002788

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/05/25    Page 225 of 1011    PageID 2124
Exhibit 71 Page 75 of 299

74

1    Honor, and it's not highlighted, but I'd like to read it.

2    Seery is not named in the original complaint, but this is only

3    out of an abundance of caution due to the Bankruptcy Court in

4    HCM's pending Chapter 11 proceeding having issued an order

5    prohibiting the filing of any causes of action against Seery

6    in any way related to his role at HCM, subject to certain

7    prerequisites.  In that order, the Bankruptcy Court also

8    asserts sole jurisdiction over all such causes of action.

9         Your Honor, our intent was not to violate the order.  Our

10    intent was to be cautious about how we proceeded, to fully

11    disclose what we were doing, and to do it in a District Court

12    that absolutely could refer the matter here to this Court for

13    a decision, but to do it in a way that didn't waive our

14    jurisdictional arguments, that didn't waive our arguments

15    regarding the release of the very claims we were trying to

16    bring, by first having to prove that they were colorful claims

17    of willful misconduct or gross negligence, when we were trying

18    to assert claims that weren't willful negligence or gross --

19    gross negligence or willful misconduct.  That was what I was

20    trying to say.

21         Your Honor, this was not disregard of your order.  If

22    we're wrong on the law, we're wrong on the law, but it's not

23    that we disregarded your order or lacked respect for it.  We

24    disclosed it.

25         Mr. Morris has argued in the briefs that we attempted to

HCMLPHMIT00002789

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-71   Filed 06/06/25   Page 226 of 1011   PageID 2125

75

 1    do this on an ex parte basis.  Your Honor, we did not attempt

 2    to do this on an ex parte basis.  And if there are errors,

 3    they probably are mine.  I know one error is mine.  On the

 4    civil cover sheet in the filing in the District Court, I noted

 5    and passed on that we should check the box for related case

 6    and list this case on there.  I did not follow up to make sure

 7    that it happened, and administratively, it didn't happen.  We

 8    did not check the box on the civil cover sheet.  Mr. Morris is

 9    correct that we failed to do that.  He's incorrect that that

10    was sneaky or intentional.  It was my error, having noticed it

11    but not followed up.

12         Your Honor, similarly, the argument that we didn't serve

13    them with the motion I think is disingenuous.  What happened,

14    Your Honor, is that counsel for the Debtor had agreed to

15    accept service of the complaint itself against the Debtor

16    before the motion for leave, and after accepting service, I

17    was under the impression that they'd be monitoring the docket,

18    especially when I emailed them, informed them that we were

19    filing the motion for leave to amend, because I was required

20    to submit a certificate of conference on that motion.  I

21    informed them in a polite email.  The polite email is not

22    quoted in their brief.  It is included in the record, and it's

23    quoted in full in our brief.

24         The email exchange indicates to them, Thank you for

25    pointing out the Court's orders.  We've carefully studied them

HCMLPHMIT00002790

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4 71 Filed 07/02/25299 Page 227 of 1011   PageID 2126

76

1   and we don't think what we're doing is a violation of those

2   orders.

3       That we didn't serve them is because we thought they

4   already knew that the motion was coming and would be

5   monitoring the docket, and we didn't know which lawyers they

6   were going to have make an appearance in that case, so we

7   wouldn't have known who to serve.  But if not serving them --

8   first, the Rules do not require that service.  But if not

9   serving them out of politeness --

10          THE COURT:  Mr. Morris is standing up.  Did --

11          MR. MORRIS:  I move to strike all of this, Your

12   Honor.  If Counsel wants to take the stand and raise his hand,

13   he should testify under oath.  I'm just going to leave it at

14   that.  He's not on their witness list.

15          THE COURT:  All right.  I overrule.  You can

16   continue.

17          MR. BRIDGES:  Thank you, Your Honor.

18       If failure to serve them was an error, it was mine.  I

19   know of no rule that requires it.

20          THE COURT:  Can I ask you, you were talking about the

21   cover sheet mistake in not checking the box.  What about your

22   jurisdictional statement in the actual complaint not

23   mentioning 28 U.S.C. § 1334 as a possible basis for subject

24   matter jurisdiction?  Do you think that was a mistake as well,

25   or was that purposeful, not necessary?

001756

HCMLPHMIT00002791

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02724-L Document 11 Filed 06/02/25 Page 228 of 1011 PageID 2127
Exhibit 71 Page 76 of 299

77

1        MR. BRIDGES:  Candidly, Your Honor, standing here

2   right now, I have no recollection whatsoever of it.

3        THE COURT:  You mention 28 U.S.C. § 1331, and then

4   1367 supplemental jurisdiction, but you don't mention 1334.

5        MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti

6   would have written that.

7        THE COURT:  Okay.

8        MR. BRIDGES:  I have no recollection of --

9        THE COURT:  Okay.

10        MR. BRIDGES:  -- making any decision at all --

11        THE COURT:  All right.

12        MR. BRIDGES:  -- with regards to that.

13        THE COURT:  Okay.

14        MR. BRIDGES:  Your Honor, you've been very patient

15   with a very long opening argument, and I'm very grateful for

16   that.  Please know that we take this Court's order seriously.

17   We voluntarily appeared here before the Court ordered us to do

18   so by filing our motion asking for a modification of the order

19   we're accused now of having been in violation of.

20      And the last thing I'd like to say, Your Honor, Mr.

21   Morris's brief claims that the first he knew of the motion,

22   the motion seeking leave to add Mr. Seery to the District

23   Court claim, the first he knew of that was when Mr. Sbaiti

24   forwarded him the District Court's order dismissing that

25   motion, denying that motion without prejudice.

001757

HCMLPHMIT00002792

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71-4 Filed 07/02/25   Page 229 of 1011   PageID 2128
Exhibit 71 Page 79 of 299

78

```
 1        Your Honor, in a civil contempt proceeding, where the
 2   issue is compensating, not punishing, if the aggrieved party
 3   didn't even know about the action until it had been denied by
 4   the District Court, we submit that there can be no harm from
 5   that having taken place.
 6        That's all I have for opening.  Thank you, Your Honor.
 7             THE COURT:  All right.  Thank you.
 8        Before we give you a time check, do we have other opening
 9   statements?
10             MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael
11   Anderson on behalf of Mr. Patrick.  If we need to take a
12   break, that's fine, too.
13             THE COURT:  Well, how long do you plan to use?
14             MR. ANDERSON:  No more than ten minutes, for sure.
15             THE COURT:  Let's go ahead and do that, and then
16   we'll take a break.
17             MR. POMERANTZ:  Your Honor, after, I would ask the
18   opportunity to respond to Mr. Bridges' argument.  Probably
19   another ten minutes.
20             THE COURT:  All right.  Let's go ahead and take a
21   ten-minute break.  And Mr. Taylor, you're going to have
22   something, because you --
23             MR. TAYLOR:  Five.
24             THE COURT:  Okay.  We'll take a ten-minute break.
25   And Nate, can you give them a time?
```

001758

HCMLPHMIT00002793

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 08/08/25   Page 230 of 1011   PageID 2129

79

```
 1              THE CLERK:  I'm showing it was about 59-1/2 minutes.

 2              THE COURT:  Fifty-nine and a half?  And is that

 3    subtracting some for my questioning?

 4              THE CLERK:  I stopped whenever you talked, maybe a

 5    little over --

 6              THE COURT:   Okay.  So he stopped it whenever I asked

 7    questions and you answered, so 59 minutes has been used by the

 8    Respondents.

 9         All right.  We'll take a ten-minute break.  We'll come

10    back at 11:35.

11              THE CLERK:  All rise.

12         (A recess ensued from 11:25 a.m. to 11:37 a.m.)

13              THE COURT:  All right.  We're going back on the

14    record in the Highland matter.  We have further opening

15    statements.  Counsel, you may proceed.

16         OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

17              MR. ANDERSON:  Thank you.  May it please the Court,

18    Counsel.  Michael Anderson on behalf of Respondent, Mark

19    Patrick.

20         Your Honor, after listening to this and looking at the

21    filings in this case, this issue of whether there's contempt

22    -- and I would argue there's not -- is ripe for decision.  We

23    have no real undisputed facts for purposes of the contempt

24    issue.  We have your Court's July order, the subject of Mr.

25    Bridge's arguments.  We have the Plaintiffs in the underlying
```

HCMLPHMIT00002794

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/02/25    Page 231 of 1011    PageID 2130
Exhibit 71 Page 81 of 299

80

1    lawsuit at issue.  They commenced the lawsuit in April of this

2    year.  There's absolutely nothing improper about that filing.

3    It's not subject to the contempt.  A week later, there is a

4    motion for leave to add Mr. Seery.  That's the issue.  There's

5    no dispute over that.  There's no dispute that Mr. Patrick

6    authorized the filing of the motion for leave.

7         And so then the question becomes we look at the Court's

8    July order, did a motion for leave, did that violate the terms

9    of the order?  The motion for leave is not commencing a

10   lawsuit.  It's also not pursuing a claim, because whether or

11   not the Court grants the motion, denies the motion, or

12   whatever the Court does, nothing happened, because the day

13   after the motion for leave was filed it was dismissed *sua*

14   *sponte* without prejudice because not all parties had been

15   served in the case.

16        It was permission asked one day.  The matter was mooted

17   the following day by the District Court.  And so that is

18   completely undisputed.

19        And so the question is, is asking permission, is that

20   commence?  I think everybody says there's no way that's

21   commencing a lawsuit because you have asked permission.  The

22   question, then, is it pursuing a claim?  And the argument,

23   well, no, that's not pursuing a claim; it's asking permission.

24        And I think it's also important to note that when the

25   motion for leave was filed, there were no secrets there.  I

HCMLPHMIT00002795

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 08/22/25   Page 232 of 1011   PageID 2131

81

1   mean, I'm coming in this after the fact, representing Mr.

2   Patrick.  You look at a motion for leave, and right there on

3   Page 1 it talks about Your Honor's order.  Page 2, it quotes

4   the order and it gives the reasons, there's arguments being

5   made as to why that order doesn't bar adding Mr. Seery as a

6   defendant in the lawsuit, many of the arguments that Mr.

7   Bridges made.

8       So that's where we are.  And so when I hear, hey, we've

9   got six hours, three hours and three hours, and we're going to

10  split this up, you know, maybe too simplistic from Fort Worth,

11  but I'm like, wait a second, this is all undisputed.  It's

12  totally undisputed.  The -- whether or not the prior order is

13  enforceable or not enforceable, those are all legal arguments.

14  You know, no witnesses are necessary for that.  And as I

15  understood, right before we broke, counsel stood up and he's

16  going to do what generally doesn't happen in opening

17  statements, which is respond to opening statements, which

18  shows that that's a legal issue.

19      And so it really does come down to undisputed facts.

20  There's no testimony.  No -- nothing is necessary.  And a lot

21  of what this comes down to is the old statement, you know, is

22  it better to ask forgiveness or permission?  And usually that

23  statement comes up when somebody has already done something:

24  Hey, I'm going to go do it anyway and I'll ask for forgiveness

25  later.  Well, what the Plaintiffs in the underlying case did

HCMLPHMIT00002796

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/02/25   Page 233 of 1011   PageID 2132

82

 1   was ask permission.  Motion for leave.  That is not

 2   contemptuous.  And there's literally no damages.  As was

 3   pointed out, by the time counsel found out, it had already

 4   been dismissed.

 5        The last thing I want to point out, Your Honor, is that

 6   the argument from opposing counsel was, well, under Rule 15 of

 7   the Federal Rules of Civil Procedure, since parties hadn't

 8   answered yet, the Plaintiffs in the underlying case could have

 9   just simply added Mr. Seery as a defendant and moved on that

10   way, but then that would be another ball of wax and then we

11   would be addressing issues as far as whether or not there is a

12   violation of the Court's order, notwithstanding Mr. Bridge's

13   arguments.  But then we would have those issues.  But that's

14   not what happened.  Everybody knows that's not what happened.

15   It was a motion for leave that was resolved the following day.

16        And so, Your Honor, for those reasons, and those

17   undisputed reasons, we would request that the Court at the end

18   of this hearing deny the request for sanctions and a contempt

19   finding against our client, Mr. Patrick.

20        Mr. Phillips is going to address one brief issue

21   bankruptcy-wise I believe that was raised earlier.

22             THE COURT:  Okay.  Mr. Phillips?

23             MR. PHILLIPS:  Your Honor, thank you very much.

24   Louis M. Phillips on behalf of Mark Patrick.

25        The only thing that I would point out, Your Honor, and I'm

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71 Filed 06/24/25    Page 234 of 1011    PageID 2133
Exhibit 71 Page 84 of 299

83

1    going to do -- try to simplistically, because that's about the

2    level at which I operate, boil down the questions about the

3    order.

4         This order was an employment order.  The problem that Mr.

5    Bridges has elucidated to Your Honor is that the precise

6    effect, one of the precise effects of that order is to bar the

7    claims of third parties that arise into the future on the

8    basis of the employment of Mr. Seery, because the order

9    required that all claims asserting gross negligence or willful

10   misconduct need to be brought before you to determine that

11   they're colorable.

12        One question I have is, does it apply to the lawsuit that

13   was filed?  Doesn't apply unless the effect of the order was

14   to release those claims and preclude any party from bringing

15   those claims at all.  And while you can say correctly that

16   this Court issues gatekeeper orders all of the time, one thing

17   I cannot imagine that you would say is that in employment

18   orders you release claims of third parties existing and as may

19   arise in the future that could be brought against the party

20   employed to be a CRO of a debtor, who, by his own testimony,

21   says we do all kinds of stuff in the billions of dollars for

22   third parties that we owe fiduciary duties to.

23        There's no way, Your Honor, that you were considering your

24   July order to bar third-party claims arising from breach of

25   fiduciary duties by Mr. Seery to third parties who held third-

001763

HCMLPHMIT00002798

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 08/25/25    Page 235 of 1011    PageID 2134
Exhibit 71 Page 85 of 299

84

1   party claims that did not involve some assertion that, in his

2   capacity as CRO, he was in some way acting within the scope of

3   his authority as CRO for the Debtor and yet committed

4   negligence against the Debtor.

5       Now, if the order was asserting that you know what a lot

6   of people in this courtroom know, that the standard of

7   liability for a CRO doing work for a debtor, just like the

8   standard of liability for the president of a corporation or an

9   officer of the corporation, is as long as you're within the

10  course and scope of your employment, your actions for the

11  corporation have -- can -- the corporation takes care of you

12  because there's no personal claim unless you're outside the

13  scope, and you're outside the scope if you commit gross

14  negligence or willful misconduct.

15      That, if you're restating the standard of care and

16  standard of liability for a CRO, we have no problem with that,

17  because Mr. Patrick did not authorize a cause of action

18  arising against Mr. Seery against the Debtors for damage to

19  the Debtors.  He authorized the filing of a complaint in the

20  District Court with jurisdiction for a third-party claim for

21  breach of a fiduciary duty to a third party that Mr. Seery

22  admits he owes, and then sought leave because they didn't

23  understand the order that Your Honor issued.  It couldn't have

24  been to release the breach of fiduciary duty claims that

25  wouldn't rise to gross negligence or willful misconduct, it

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/06/25   Page 236 of 1011   PageID 2135
Exhibit 71   Page 86 of 299

85

1    couldn't be that, but it might be.  But if it did, under an

2    employment order?  That's very different from *Espinosa*, that's

3    very different from *Shoaf*, when you're at the end of a case in

4    a confirmation of a plan and you're talking about matters

5    arising in the past.

6        This order, if it has the effect it could be read to have,

7    precludes any third party from asserting a breach of fiduciary

8    duty against Seery for actions that violate the duty to that

9    third party, when Seery's biggest job, it looks to us like, is

10   running third-party money.  That could not have been what Your

11   Honor was thinking.

12       And so all I'm pointing out is I'm trying to distill down.

13   The lawsuit doesn't involve gross negligence or willful

14   misconduct allegations.  It involves breach of fiduciary duty,

15   breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick

16   authorized that lawsuit.

17       Now, what we're here for today is to determine whether the

18   complaint, which was not against the Debtor -- which was not

19   against Seery, the motion for leave, which did not -- all they

20   did was ask for permission, not forgiveness.  And we can't

21   understand how the Debtor should be saying, all they had to do

22   was amend.  Well, if they amended, would we be in hotter water

23   than we are today for asking for permission to sue?  I think

24   we would have been, that should have been the prescribed

25   course, when we are more concerned and we are more risk-averse

HCMLPHMIT00002800

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/02/25   Page 237 of 1011   PageID 2136
Exhibit 71   Page 87 of 299

86

1    by asking for leave rather than just amending by right.

2    Absolutely, that makes no sense.  We can't be held to be more

3    contemptuous because we asked for permission, when we could

4    have just sued him, because they're saying asking for

5    permission was wrong.  Certainly, suing him would have been

6    wrong.  That would have been easier.

7              THE COURT:  But Mr. Phillips, the issue is you all

8    didn't come to the Bankruptcy Court and ask permission.

9              MR. PHILLIPS:  Look at your order, Your Honor.

10             THE COURT:  It's right in front of me.

11             MR. PHILLIPS:  Right.  That order either doesn't

12   apply to the claims that were brought or it released the

13   claims that were brought.  That's our point.  It couldn't have

14   released them.  Does it apply to them?  Thank you.

15             THE COURT:  Okay.  Mr. Taylor?

16             MR. TAYLOR:  Good morning.

17             THE COURT:  Good morning.

18             OPENING STATEMENT ON BEHALF OF JAMES DONDERO

19             MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Jim

20   Dondero.  I'll be very brief because I know we've already

21   spent a lot of time on opening argument.  But I do think it is

22   appropriate to, one, first look at who brought the lawsuit,

23   CLO Holdco & DAF.  That was authorized -- it's undisputed it

24   was authorized by Mr. Patrick.  There is no dispute about

25   that.  There's no dispute who the Plaintiffs are.  But yet my

1   client is up here as an alleged violator.

2        I think it's very clear, as all the parties have said,

3   there's no dispute as to there's an order, there was a

4   complaint, and there was a motion for leave.

5        It seems to me that the rest of the evidentiary hearing

6   that you may be about to go through is going to be about pin

7   the blame on Mr. Dondero.  It is undisputed that he is not a

8   control person for the DAF or CLO Holdco.  The only type of

9   evidence you will hear is going to be insinuation that he

10  somehow controls Mr. Patrick and used to control Mr. Scott.

11  There will be no direct evidence that he authorized this or

12  that he's the control person and the proper corporate

13  authorized representative that signed off on the --

14       It seems to me, Your Honor, first of all, that's a

15  discrete issue that should be able to be decided separately

16  from this, and the first gating issue is, was there indeed a

17  violation of this Court's order?  It would seem to me that

18  there is no disputes about those facts and that we should

19  bifurcate that, and if you then find that there is a violation

20  and find that there is any even need to move into who the

21  alleged violators are, that then we could have that

22  evidentiary portion.  But there is no reason to do that now

23  before there's even been found to be a violation.

24            THE COURT:  All right.  Thank you.

25       All right.  Well, someone made the point rebuttals in

HCMLPHMIT00002802

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 08/29/25    Page 239 of 1011    PageID 2138
Exhibit 71 Page 89 of 299

88

1   opening statements are not very common, --

2              MR. POMERANTZ:  Your -- Your --

3              THE COURT:  -- but you can use your three hours

4   however you want.

5                 OPENING STATEMENT ON BEHALF OF THE DEBTOR

6              MR. POMERANTZ:  Your Honor, I didn't intend to stand

7   up.

8              THE COURT:  Okay.

9              MR. POMERANTZ:  I also didn't intend to have the

10  motion to modify the sealing order presented to Your Honor,

11  which it was in the course of that opening argument.  And

12  despite your comments at the beginning of the hearing, the

13  Movants have taken Your Honor down a series of rabbit holes

14  that have really no relevance to the contempt motion.  And

15  notwithstanding, as I said, your ruling that basically the

16  contempt would go first and the modification would go second,

17  there they were, persistent in making all the arguments why

18  this Court should modify the order.

19     They're just really trying to obfuscate the simple issue

20  that Mr. Morris presented and raised at the beginning of the

21  hearing:  Did they violate the order by pursuing a claim?  We

22  think the answer is undoubtedly yes.

23     I'm not going to try to address each of the issues they

24  raised in connection with the modification motion in detail.

25  I have a lengthy presentation.  I'll do it at the appropriate

HCMLPHMIT00002803

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/20/25    Page 240 of 1011    PageID 2139
Exhibit 71    Page 90 of 299

89

```
 1    time.  But there are a few issues I want to address.  I want
 2    to address one of the last points Mr. Bridges raised first.
 3    If they thought that the order was a problem, they could have
 4    filed their motion to modify that order before Your Honor.
 5    They could have had that heard first.  There was no statute of
 6    limitations issue in connection with the HarbourVest matter.
 7    They could have come to Your Honor to do that.  But no, they
 8    didn't.  They went to the District Court first, and it was
 9    only after we filed our contempt motion that they came back
10    and said, well, Your Honor, you should modify the order.
11    Their argument that if they did that there would have been
12    waiver and estoppel is just an after-the-fact justification
13    for what they did and what they tried to do, which was
14    unsuccessful.  They tried to have the District Court make the
15    decision.
16        And why?  Your Honor, they've filed motions to recuse
17    before Your Honor.  They -- they -- it's no secret the disdain
18    they have for Your Honor's rulings as it relates to them.
19    They wanted to be out of this courtroom and in another
20    courtroom.
21        And their belated argument, Mr. Bridges falling on the
22    sword, that they failed to check the box, inadvertent, it's on
23    me, it's very curious.  Because if they had done so and had
24    referred to the correct 1334 jurisdictional predicate, as Your
25    Honor had mentioned, the complaint would have been referred to
```

001769
HCMLPHMIT00002804

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 09/02/25    Page 241 of 1011    PageID 2140
Exhibit 71 Page 92 of 299

90

1  this Court and the entire trajectory of the proceedings would

2  have been different.  They would have had the opportunity to

3  take their shot to go to District Court and argue that your

4  order didn't apply.

5      Your Honor, they say the January 9th order is not

6  relevant.  It is entirely relevant.  It covered the

7  independent directors and their agents.  Yes, Mr. Seery is an

8  independent director, but he was also an agent of the

9  independent directors and carried out the duties.  You heard

10 argument at the July 16th hearing that Mr. Seery had been

11 acting as the chief executive officer for several months.  And

12 why is it important?  Mr. Bridges said, well, if we violated

13 one order, we violated the other.  It's important because,

14 Your Honor, number one, Mr. Dondero supported that order.  We

15 would never have had an independent board in this case if Mr.

16 Dondero, the decision-making -- of the Debtor at that time,

17 supported that order and supported the exculpations that are

18 now claimed to have been invalid.

19     And also Your Honor heard testimony at the confirmation

20 hearing that the independent directors would never have taken

21 this job, would never have taken this job because of the

22 potential for litigation, litigation that we've now had to

23 endure for several months.  So to come back 16 months later

24 and say, well, you know, you couldn't really exculpate them,

25 it's really an employment order:  It was an employment order.

001770

HCMLPHMIT00002805

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/02/25    Page 242 of 1011    PageID 2141
Exhibit 71    Page 92 of 299

91

1    They know it.  We know it.  Your Honor knows it.  It was a

2    resolution of corporate governance issues that changed the

3    whole trajectory of the case, and luckily it -- luckily, Your

4    Honor approved it.

5        The question just is whether they violated the order,

6    period.  And I'll have a lot to say about res judicata, but I

7    won't go in too much in detail, but I will just briefly

8    address their arguments.  They're correct and the Court is

9    correct that there's a difference between *Applewood* and *Shoaf*.

10   And Your Honor got the exact difference.  In one case, a

11   release was not specific, *Applewood*.  In one case it was.

12   *Shoaf* hasn't been discredited by *Applewood*.  It was different

13   facts.  In fact, *Shoaf* relied on two Supreme Court cases, the

14   *Stoll* case and the *Chicot* case, both for the propositions that

15   a court that enters an order, a clear order, even if it didn't

16   have jurisdiction, that cannot be attacked in res judicata.

17   So here what we have is clear, unambiguous, you come to this

18   Court before commencing or pursuing a claim.  That's the

19   clarity.  The focus on the releases, that's not what we're

20   here for today, that's not what we're here for on a contempt

21   motion, on whether the release covered them or it didn't cover

22   them.  We're here on the clear issue of did they violate the

23   language, and we submit that they did.

24       And similarly, *Espinosa* applies.  Your Honor, just to

25   quote some language, "Appellees could have moved to remand the

HCMLPHMIT00002806

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/05/25   Page 243 of 1011   PageID 2142

92

1   action to state court after it improperly -- after its

2   improper removal to the federal court or challenge the

3   district court's exercise in jurisdiction on direct appeal.

4   Because they did neither, they are now barred by principles of

5   res judicata."

6       Res judicata actually does apply, and I will speak about

7   it in much more detail in the modification motion.

8       With respect to *Barton*, Your Honor, we disagree with their

9   argument that Mr. Seery is not a court-appointed agent.  We've

10  briefed it extensively in our motion to modify.  *Barton*

11  applies to debtors in possession.  *Barton* applies to general

12  partners of the debtor.  *Barton* applies to chief restructuring

13  orders -- officers who are approved by the debtor.  And it

14  applies to general counsel who are appointed by the chief

15  restructuring order.  Officer.

16      So the argument that *Barton* is somehow inapplicable is

17  just wrong.  Your Honor knows that.  Your Honor has written

18  extensively on *Barton* in connection with your *Ondova* opinion.

19      Some of the argument about 959 is all wrong, as well.

20  Your Honor got it right that 959 applies to slip-and-fall

21  cases or torts, injuries to parties that are strangers to this

22  process.  There is a legion of cases that I will cite to Your

23  Honor in connection with argument.  959 does not apply here.

24  There's nothing more core to this case than the transactions

25  surrounding the resolution of the HarbourVest claims.

001772

HCMLPHMIT00002807

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71 Filed 04/05/29 Page 244 of 1011   PageID 2143
Exhibit 71 Page 94 of 299

93

```
 1        We also disagree, Your Honor, that the complaint is
 2   subject to mandatory withdrawal of the reference.  We've --
 3   one of our exhibits in the motion to modify is our motion to
 4   enforce the reference.  We think Movants have it completely
 5   wrong.  This is not the type of case that will be subject to
 6   withdrawal -- mandatory withdrawal of the reference, and in
 7   any event, for this contempt motion, it's irrelevant.
 8        And they argue -- one of the other points Mr. Bridges
 9   raises is that, because this Court would not have had
10   jurisdiction under 157 because of the mandatory withdrawal,
11   then Your Honor could not legally act as a gatekeeper.  But
12   they haven't addressed Villegas v. Schmidt.  We've raised it
13   throughout this case.  And again, in these series of
14   pleadings, they don't even address it.  And Villegas v.
15   Schmidt was a Barton case.  It was a Barton case where the --
16   where the argument was that Barton does not apply because it's
17   a Stern claim and the Bankruptcy Court would not have
18   jurisdiction.  And Villegas said no, it does apply.  And Your
19   Honor even cited that in your Ondova case.  And why does it
20   apply?  Because there's nothing inconsistent with a Bankruptcy
21   Court having exclusive decision to make a Barton
22   determination.
23        In fact, in that case Villegas said, you can't go to the
24   District Court for that decision, it is the Bankruptcy Court's
25   decision.
```

HCMLPHMIT00002808

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 09/05/25    Page 245 of 1011    PageID 2144
Exhibit 71 Page 95 of 299

94

```
 1        So, again, it's a red herring, Your Honor.  Your Honor had

 2   the ability to act as an exclusive gatekeeper for these types

 3   of actions.

 4        With that, Your Honor, I'll leave the rest of my argument

 5   for the next motion.

 6            THE COURT:  All right.  Thanks.

 7        All right.  Nate, let's give everyone their time.

 8            THE CLERK:  That was just about eight and a half

 9   additional from the Debtor, and then altogether the other ones

10   were just shy of fourteen minutes.  Thirteen minutes and fifty

11   seconds for the other three combined.  Do you want me to --

12            THE COURT:  Yes, I meant for Debtor combined versus

13   --

14            THE CLERK:  Oh.  Oh.

15            THE COURT:  Respondents combined.

16            THE CLERK:  So that would be twenty one and a half

17   the Debtor.  Let me do the math on the other one.  Be an hour

18   twelve minutes and fifty seconds for --

19            THE COURT:  Okay.  All right.  Got that?  Debtors

20   used a total of twenty one and a half minutes; Responders have

21   used an hour twelve minutes and fifty seconds.

22        All right.  Mr. Morris, you may call your first witness.

23            MR. MORRIS:  Thank you very much, Your Honor.  The

24   Debtor calls Mark Patrick.

25            THE COURT:  All right.  Mr. Patrick?  Please approach
```

001774

HCMLPHMIT00002809

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L      Document 71   Filed 06/26/25   Page 246 of 1011      PageID 2145
Exhibit 71   Page 96 of 299

Patrick - Direct                              95

 1  our witness stand and I'll swear you in.  Please raise your

 2  right hand.

 3       (The witness is sworn.)

 4            THE COURT:  All right.  Please take a seat.

 5            MARK PATRICK, DEBTOR'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7  BY MR. MORRIS:

 8  Q    Good afternoon, Mr. Patrick.

 9  A    Good afternoon.

10  Q    Can you hear me okay?

11  A    Yes, I can.

12  Q    Okay.  You have before you several sets of binders.

13  They're rather large.  But when I deposed you on Friday, we

14  did that virtually.  Now, I may direct you specifically to one

15  of the binders or one of the documents from time to time, so I

16  just wanted you to know that those were in front of you and

17  that I may be doing that.

18       Mr. Patrick, since March 1st, 2001 [sic], you've been

19  employed by Highland Consultants, right?

20  A    I believe the name is Highgate Consultants doing business

21  as Skyview Group.

22  Q    Okay.  And that's an entity that was created by certain

23  former Highland employees, correct?

24  A    That is my understanding, correct.

25  Q    And your understanding is that Mr. Dondero doesn't have an

HCMLPHMIT00002810

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 02/02/05299    Page 247 of 1011    PageID 2146

Patrick - Direct                    96

1  ownership interest in that entity, correct?

2  A    That he does not.  That is correct.

3  Q    And your understanding is that he's not an employee of

4  that -- of Skyview, correct?

5  A    That is correct.

6  Q    Prior to joining Skyview on March 1st, you had worked at

7  Highland Capital Management, LP for about 13 years, correct?

8  A    Correct.

9  Q    Joining in, I believe, early 2008?

10  A    Correct.

11  Q    Okay.  I'm going to refer to Highland Capital Management,

12  LP from time to time as HCMLP.  Is that okay?

13  A    Yes.

14  Q    While at HCMLP, you served as a tax counselor, correct?

15  A    No, I would like to distinguish that.  I did have the

16  title tax counsel.  However, essentially all my activities

17  were in a non-lawyer capacity, being the client

18  representative.  I would engage other outside law firms to

19  provide legal advice.

20  Q    Okay.  So you are an attorney, correct?

21  A    Yes, I am.

22  Q    But essentially everything you did at Highland during your

23  13 years was in a non-lawyer capacity, correct?

24  A    Correct.

25  Q    In fact, you didn't even work in the legal department; is

001776

HCMLPHMIT00002811

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 06/20/25    Page 248 of 1011    PageID 2147
Exhibit 71    Page 98 of 299

Patrick - Direct                           97

 1  that right?

 2  A     That is correct.  I worked for the tax department.

 3  Q     Okay.  Let's talk about how you became the authorized

 4  representative of the Plaintiffs.  You are, in fact,

 5  authorized representative today of CLO Holdco, Ltd. and

 6  Charitable DAF, LP, correct?

 7  A     Charitable DAF Fund, LP.  Correct.

 8  Q     And those are the two entities that filed the complaint in

 9  the United States District Court against the Debtor and two

10  other entities, correct?

11  A     Correct.

12  Q     And may I refer to those two entities going forward as the

13  Plaintiffs?

14  A     Yes.

15  Q     You became the authorized representative of the Plaintiffs

16  on March 24th, 2021, the day you and Mr. Scott executed

17  certain transfer documents, correct?

18  A     Correct.

19  Q     And you had no authority to act on behalf of either of the

20  Plaintiffs before March 24th, correct?

21  A     Correct.

22  Q     The DAF controls about $200 million in assets, correct?

23  A     The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24  Fund, LP.

25  Q     Yes.

001777

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 09/09/25   Page 249 of 1011   PageID 2148

Patrick - Direct                                    98

1   A    Around there.

2   Q    Okay.  Let me try and just ask that again, and thank you

3   for correcting me.  To the best of your knowledge, the

4   Plaintiffs control about $200 million in assets, correct?

5   A    Net assets, correct.

6   Q    Okay.  And that asset base is derived largely from HCMLP,

7   Mr. Dondero, or Mr. Dondero's trusts, correct?

8   A    Can you restate that question again, Mr. Morris?

9   Q    Sure.  The asset base that you just referred to is derived

10  largely from HCMLP, Mr. Dondero, or donor trusts?

11  A    The way I would characterize it -- you're using the word

12  derived.  I would characterize it with respect to certain

13  charitable donations --

14  Q    Uh-huh.

15  A    -- that were -- that were made at certain time periods,

16  where the donors gave up complete dominion and control over

17  the respective assets and at that time claimed a federal

18  income tax deduction for that.

19      I do -- I do believe that, as far as the donor group, as

20  you specified, Highland Capital Management, I recall, provided

21  a donation to a Charitable Remainder Trust that eventually had

22  expired and that eventually such assets went into the

23  supporting organizations.  And then I do believe Mr. Dondero

24  also contributed to the Charitable Remainder Trust No. 2,

25  which seeded substantial amounts of the original assets that

001778

HCMLPHMIT00002813

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 71   Filed 21/00/25 299Page 250 of 1011   PageID 2149

Patrick - Direct                                99

1   were eventually composed of the $200 million.  And then from

2   time to time I do believe that Mr. Dondero's trusts made

3   charitable donations to their respective supporting

4   organizations.

5   Q    Okay.  Thank you.

6   A    Is that responsive?

7   Q    It is.  It's very responsive.  Thank you very much.  So,

8   to the best of your knowledge, the charitable donations that

9   were made that form the bases of the assets came from those

10  three -- primarily from those three sources, correct?

11  A    Well, you know, there's two different trusts.  There's the

12  Dugaboy Trust and the Get Good Trust.

13  Q    Okay.

14  A    Then you have Mr. Dondero and Highland Capital Management.

15  So I would say four sources.

16  Q    Okay.  All right.  Thank you.  Prior to assuming your role

17  as the authorized representative of the Plaintiff, you had

18  never had meaningful responsibility for making investment

19  decisions, correct?

20  A    I'm sorry.  You kind of talk a little bit fast.  Please

21  slow it down --

22  Q    That's okay.

23  A    -- and restate it.  Thank you.

24  Q    And I appreciate that.  And any time you don't understand

25  what I'm saying or I speak too fast, please do exactly what

HCMLPHMIT00002814

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71 Filed 04/01/26 299 Page 251 of 1011    PageID 2150

Patrick - Direct                     100

1    you're doing.  You're doing fine.

2        Prior to assuming your role as the authorized

3    representative of the Plaintiffs, you never had any meaningful

4    responsibility making investment decisions.  Is that correct?

5    A    To whom?

6    Q    For anybody.

7    A    Well, during my deposition, I believe I testified that I

8    make investment decisions with respect to my family.  Family

9    and friends come to me and they ask me for investment

10   decisions.  I was -- in my deposition, I indicated to you that

11   I was a board member of a nonprofit called the 500, Inc.  They

12   had received a donation of stock in Yahoo!, and the members

13   there looked to me for financial guidance.  As an undergrad at

14   the University of Miami, I was a -- I was a finance major, and

15   so I do have a variety of background with respect to

16   investments.

17   Q    Okay.  So you told me that from time to time friends and

18   family members come to you for investing advice.  Is that

19   right?

20   A    That is correct.

21   Q    And when you were a young lawyer you were on the board of

22   a nonprofit that received a donation of Yahoo! stock and the

23   board looked to you for guidance.  Is that correct?

24       THE COURT:  Just a moment.  I think there's an

25   objection.

001780

HCMLPHMIT00002815

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 02/26   Page 252 of 1011   PageID 2151

Patrick - Direct                                        101

1          MR. MORRIS:  Uh-huh.

2          THE COURT:  Go ahead.

3          MR. ANDERSON:  So far -- relevance, Your Honor.  This

4     is way out of the bounds of the contempt proceeding.  You

5     know, what he did as a young person with Yahoo! stock.  We're

6     here to -- he authorized the lawsuit.  They filed the lawsuit.

7     That's it.  Getting into all this peripheral stuff is

8     completely irrelevant.

9          THE COURT:  Your response?

10         MR. MORRIS:  My response, Your Honor, is very simple.

11    Mr. Patrick assumed responsibility, and you're going to be

12    told that he exercised full and complete authority over a $200

13    million fund that was created by Mr. Dondero, --

14         THE COURT:  Okay.

15         MR. MORRIS:  -- that funds -- that is funded

16    virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17    lovely man, and I don't mean to disparage him at all -- but he

18    has no meaningful experience in investing at all.

19         THE COURT:  All right.  Counsel, I overrule.  I think

20    there's potential relevance.

21       And may I remind people that when you're back at counsel

22    table, please make sure you speak your objections into the

23    microphone.  Thank you.

24    BY MR. MORRIS:

25    Q    When you were a young lawyer, sir, you were on the board

HCMLPHMIT00002816

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 03/26   Page 253 of 1011   PageID 2152
Exhibit 71   Page 103 of 299

Patrick - Direct                      102

```
 1    of a nonprofit that received a donation of Yahoo! stock and

 2    the board looked to you for guidance, correct?

 3    A    Yes, correct.

 4    Q    And -- but during your 13 years at Highland, you never had

 5    formal responsibility for making investment decisions,

 6    correct?

 7    A    That is correct.

 8    Q    Yeah.  In fact, other than investment opportunities that

 9    you personally presented where you served as a co-decider, you

10    never had any responsibility or authority to make investment

11    decisions on behalf of HCMLP or any of its affiliated

12    entities, correct?

13    A    That is correct.

14    Q    And at least during your deposition, you couldn't identify

15    a single opportunity where you actually had the authority and

16    did authorize the execution of a transaction on behalf of

17    HCMLP or any of its affiliates, correct?

18    A    Correct.

19    Q    And yet today you are now solely responsible for making

20    all investment decisions with respect to a $200 million

21    charitable fund, correct?

22    A    Yes, but I get some help.  I've engaged an outside third

23    party called ValueScope, and they have been as -- effectively

24    working as a "gatekeeper" for me, and I look to them for

25    investment guidance and advice, and I informally look to Mr.
```

HCMLPHMIT00002817

Patrick - Direct                                   103

 1   Dondero since the time period of when I took control on March

 2   24th for any questions I may have with respect to the

 3   portfolio.  So I don't feel like I'm all by myself in making

 4   decisions.

 5   Q    Okay.  I didn't mean to suggest that you were, sir, and I

 6   apologize if you took it that way.  I was just asking the

 7   question, you are the person now solely responsible for making

 8   the investment decisions, correct?

 9   A    Yes.

10   Q    Okay.  Let's talk about the circumstances that led to the

11   filing of the complaint for a bit.  On April 12, 2021, you

12   caused the Plaintiffs to commence an action against HCMLP and

13   two other entities, correct?

14   A    Correct.

15   Q    Okay.  One of the binders -- you've got a couple of

16   binders in front of you.  If you look at the bottom, one of

17   them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18   could grab that one and turn to Exhibit 12.  Do you have that,

19   sir?

20   A    It says -- it says the original complaint.  Is that the

21   right one?

22   Q    That is the right one.  And just as I said when we were

23   doing this virtually last Friday, if I ask you a question

24   about a particular document, you should always feel free to

25   review as much of the document as you think you need to

001783

HCMLPHMIT00002818

Patrick - Direct                                    104

1   competently and fully answer the question.  Okay?

2   A    Okay.  Thank you.

3   Q    All right.  You instructed the Sbaiti firm to file that

4   complaint on behalf of the Plaintiffs, correct?

5   A    Correct.

6   Q    And to the best of your recollection, the Plaintiffs

7   returned -- retained the Sbaiti firm in April, correct?

8   A    Correct.

9   Q    So the Sbaiti firm was retained no more than twelve days

10  before the complaint was filed, correct?

11  A    Correct.

12  Q    You personally retained the Sbaiti firm, correct?

13  A    Correct.

14  Q    And the idea of filing this complaint originated with the

15  Sbaiti firm, correct?

16  A    Correct.

17  Q    Before filing -- withdrawn.  Before becoming the

18  Plaintiffs' authorized representative, you hadn't had any

19  communications with anyone about potential claims that might

20  be brought against the Debtor arising out of the HarbourVest

21  settlement, correct?

22  A    That is correct.

23  Q    Now, after you became the Plaintiffs' authorized

24  representative, Mr. Dondero communicated with the Sbaiti firm

25  about the complaint that's marked as Exhibit 12, correct?

001784

HCMLPHMIT00002819

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-71 Filed 06/06/26   Page 256 of 1011   PageID 2155
Exhibit 71   Page 106 of 299

Patrick - Direct                                           105

1   A    Yes.  After he brought certain information to myself and

2   then that I engaged the Sbaiti firm to launch an

3   investigation, I also wanted Mr. Dondero to work with the

4   Sbaiti firm with respect to their investigation of the

5   underlying facts.

6   Q    Okay.  Mr. Dondero did not discuss the complaint with you,

7   but he did communicate with the Sbaiti firm about the

8   complaint, correct?

9   A    I believe -- yeah.  I heard you slip in at the end "the

10  complaint."  I know he communicated with the Sbaiti firm.  I

11  can't -- I can't say what he said or didn't say with respect

12  to the -- the actual complaint.

13  Q    Okay.  But Mr. Dondero got involved in the process

14  initially when he brought some information to your attention

15  concerning the HarbourVest transaction, correct?

16  A    Correct.

17  Q    And he came to you with the HarbourVest information after

18  you assumed your role as the authorized representative of the

19  Plaintiffs on March 24th, correct?

20  A    That is correct.

21  Q    At the time he came to you, you did not have any specific

22  knowledge about the HarbourVest transaction, correct?

23  A    I did not have specific knowledge with respect to the

24  allegations that were laid out and the facts with respect to

25  the original complaint.  I think I had just had a general

HCMLPHMIT00002820

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 171 Filed 07/25   Page 257 of 1011   PageID 2156
Exhibit 71   Page 107 of 299

Patrick - Direct                                    106

1   awareness that there was a HarbourVest something or other, but

2   the specific aspects of it, I was unaware.

3   Q    Okay.  And you had no reason to believe that Mr. Seery had

4   done anything wrong with respect to the HarbourVest

5   transaction at the time you became the Plaintiffs' authorized

6   representative, correct?

7   A    That is correct.

8   Q    But you recall very specifically that some time after

9   March 24th Mr. Dondero told you that an investment opportunity

10  was essentially usurped or taken away, to the Plaintiffs' harm

11  and for the benefit of HCMLP, correct?

12  A    That is correct.

13  Q    And after Mr. Dondero brought this information to your

14  attention, you hired the Sbaiti firm to launch an

15  investigation into the facts, correct?

16  A    Correct.

17  Q    You had never worked with the Sbaiti firm before, correct?

18  A    That is correct.

19  Q    And you had hired many firms as a tax counselor at HCMLP,

20  but not the Sbaiti firm until now.  Correct?

21  A    That is correct.

22  Q    You got to the Sbaiti firm through a recommendation from

23  D.C. Sauter, correct?

24  A    Correct.

25  Q    Mr. Sauter is the in-house counsel, the in-house general

HCMLPHMIT00002821

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71    Filed 10/08/25    Page 258 of 1011    PageID 2157
Exhibit 71    Page 108 of 299

Patrick - Direct                    107

1   counsel at NexPoint Advisors, correct?

2   A    Correct.

3   Q    You didn't ask Mr. Sauter for a recommendation for a

4   lawyer; he just volunteered that you should use the Sbaiti

5   firm.  Correct?

6   A    That is correct.

7   Q    And you never used -- considered using another firm, did

8   you?

9   A    When they were presented to me, they appeared to have all

10  the sufficient skills necessary to undertake this action, and

11  so I don't recall interviewing any other firms.

12  Q    Okay.  Now, after bringing the matter to your action, Mr.

13  Dondero communicated directly with the Sbaiti firm in relation

14  to the investigation that was being undertaken.  Correct?

15  A    That is correct.

16  Q    But you weren't privy to the communications between Mr.

17  Dondero and the Sbaiti firm, correct?

18  A    I did not participate in those conversations as the --

19  what I, again, considered Mr. Dondero as the investment

20  advisor to the portfolio, and he was very versant in the

21  assets.  I wanted him to participate in the investigation that

22  the Sbaiti firm was undertaking prior to the filing of this

23  complaint.

24  Q    Let's talk for a minute about the notion of Mr. Dondero

25  being the investment advisor.  Until recently, the entity

001787

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71 Filed 10/09/26    Page 259 of 1011    PageID 2158
Exhibit 71    Page 109 of 299

Patrick - Direct                                   108

1    known as the DAF had an investment advisory committee with HC

2    -- an investment advisory agreement with HCMLP.  Correct?

3    A    It's my understanding that the investment advisory

4    agreement existed with the Plaintiffs, CLO Holdco, as well as

5    Charitable DAF Fund, LP, up and to the end of February,

6    throughout the HarbourVest transaction.

7    Q    Okay.  And since February, the Plaintiffs do not have an

8    investment advisory agreement with anybody, correct?

9    A    That is correct.

10   Q    Okay.  So Mr. Dondero, if he serves as an investment

11   advisor, it's on an informal basis.  Is that fair?

12   A    After I took control, he serves as an informal investment

13   advisor.

14   Q    Okay.  So there's no contract that you're aware of between

15   either of the Plaintiffs and Mr. Dondero pursuant to which he

16   is authorized to act as the investment advisor for the

17   Plaintiffs, correct?

18   A    That is correct.

19   Q    Okay.  When you communicated with Grant Scott --

20   withdrawn.  You know who Grant Scott is, right?

21   A    Yes, I do.

22   Q    He's the gentleman who preceded you as the authorized

23   representative of the Plaintiffs, correct?

24   A    Yes.

25   Q    Okay.  You communicated with Mr. Scott from time to time

001788

HCMLPHMIT00002823

Patrick - Direct                          109

1  during February and March 2021, correct?

2  A    February and March are the dates?  Yes.

3  Q    Yeah.  And from February 1st until March 21st -- well,

4  withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5  Plaintiffs' authorized representative, correct?

6  A    Correct.

7  Q    And you have no recollection of discussing with Mr. Scott

8  at any time prior to March 24th any aspect of the HarbourVest

9  settlement with Mr. Scott.  Correct?

10 A    Correct.

11 Q    And you have no recollection of discussing whether the

12 Plaintiffs had potential claims that might be brought against

13 the Debtor.  Correct?  Withdrawn.  Let me ask a better

14 question.

15      You have no recollection of discussing with Mr. Scott at

16 any time prior to March 24th whether the Plaintiffs had

17 potential claims against the Debtor.  Correct?

18 A    That is correct.

19 Q    You and Mr. Scott never discussed whether either of --

20 either of the Plaintiffs had potential claims against Mr.

21 Seery.  Correct?

22 A    Correct.

23 Q    Okay.  At the time that you became their authorized

24 representative, you had no knowledge that the Plaintiffs would

25 be filing a complaint against the Debtors relating to the

001789

HCMLPHMIT00002824

Patrick - Direct                        110

1   HarbourVest settlement less than three weeks later, correct?

2   A    That is correct.

3   Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4   see at the top it refers to Mr. Seery as a potential party.

5   Do you see that?

6   A    Yes, I do.

7   Q    Okay.  You don't know why Mr. Seery was named --

8   withdrawn.  You don't know why Mr. Seery was not named as a

9   defendant in the complaint, correct?

10  A    No, I -- that's correct.  I do not know why he was not

11  named.  That's in the purview of the Sbaiti firm.

12  Q    Okay.  And the Sbaiti firm also made the decision to name

13  Mr. Seery on Page 2 there as a potential party when drafting

14  the complaint, correct?

15  A    That's what the document says.

16  Q    And you weren't involved in the decision to identify Mr.

17  Seery as a potential party, correct?

18  A    That is correct.  Again, I rely on the law firm to decide

19  what parties to bring a suit to -- against.

20  Q    Okay.  Okay.  Do you recall the other day we talked about

21  a document called the July order?

22  A    Yes.

23  Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24  you can turn to that.  And take a moment to look at it, if

25  you'd like.  And my first question is simply whether this is

001790

HCMLPHMIT00002825

1   the July order, as you understand it.

2        (Pause.)

3   A   Yes, it is.  I was just looking for the gatekeeper

4   provision.  It looks like it's Paragraph 5.  So, --

5   Q   Okay.  Thank you for that.  About a week after the

6   complaint was filed, you authorized the Plaintiffs to file a

7   motion in the District Court for leave to amend the

8   Plaintiffs' complaint to add Mr. Seery as a defendant.

9   Correct?

10  A   I authorized the filing of a motion in Federal District

11  Court that would ask the Federal District Court whether or not

12  Jim Seery could be named in the original complaint with

13  respect to the gatekeeper provision cited in that motion and

14  with respect to the arguments that were made in that motion.

15  Q   Okay.  Just to be clear, if you turn to Exhibit 17, the

16  next tab, --

17  A   I'm here.

18  Q   -- do you see that document is called Plaintiffs' Motion

19  for Leave to File First Amended Complaint?

20  A   Yes.

21  Q   And that's the document that you authorized the Plaintiffs

22  to file on or about April 19th, correct?

23  A   Correct.

24  Q   Okay.  And can we refer to that document as the motion to

25  amend?

HCMLPHMIT00002826

Patrick - Direct                                    112

1   A    Yes.

2   Q    Okay.  You were aware of the July order at Tab 16 before

3   you authorized the filing of the motion to amend.  Correct?

4   A    Yes, because it's cited in the motion itself.

5   Q    Okay.  And at the time that you authorized the filing of

6   the motion to amend, you understood that the July order was

7   still in effect.  Correct?

8   A    Yes, because it was referenced in the motion, so my

9   assumption would be it would still be in effect.

10  Q    Okay.  Before the motion to amend was filed, you're -- you

11  are aware that my firm and the Sbaiti firm communicated by

12  email about the propriety of filing the motion to amend?

13  A    Before it was filed?  Communications between your firm and

14  the Sbaiti firm?  I would have to have my recollection

15  refreshed.

16  Q    I'll just ask the question a different way.  Did you know

17  before you authorized the filing of the motion to amend that

18  my firm and the Sbaiti firm had engaged in an email exchange

19  about the propriety of filing the motion to amend in the

20  District Court?

21  A    It's my recollection -- and again, I could be wrong here

22  -- but I thought the email exchange occurred after the fact,

23  not before.  But again, I -- I just --

24  Q    Okay.  In any event, on April 19th, the motion to amend

25  was filed.  Correct?

HCMLPHMIT00002827

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L      Document 1-71   Filed 10/24/25   Page 264 of 1011      PageID 2163
Exhibit 71   Page 264 of 299

Patrick - Direct                                113

1    A    Correct.

2    Q    That's the document that is Exhibit 17.  And you

3    personally authorized the Sbaiti firm to file the motion to

4    amend on behalf of the Plaintiffs, correct?

5    A    Correct.

6    Q    And you authorized the filing of the motion to amend with

7    knowledge -- withdrawn.

8         Can you read the first sentence of the motion to amend out

9    loud, please?

10   A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11   15 of the Federal Rules of Civil Procedure for one purpose:

12   to name as defendant one James P. Seery, Jr., the CEO of

13   defendant Highland Capital Management, LP (HCM) and the chief

14   perpetrator of the wrongdoing that forms the basis of the

15   Plaintiffs' causes of action.

16   Q    And does that fairly state the purpose of the motion?

17            MR. SBAITI:  Objection, Your Honor.  Asks him to make

18   a legal conclusion about the purpose of the legal motion filed

19   in court that he didn't draft.

20            THE COURT:  Okay.  I overrule.  You can answer if you

21   have an answer.

22            THE WITNESS:  It's always been my general

23   understanding that the purpose of filing this motion was to go

24   to the Federal District Court and ask that Court of reference

25   to this Court whether or not Mr. Seery could be named with

HCMLPHMIT00002828

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71 Filed 09/16/25    Page 265 of 1011    PageID 2164
Exhibit 71    Page 205 of 299

Patrick - Direct                                    114

1   respect to the original complaint, citing again the gatekeeper

2   provisions and citing the various arguments that we've heard

3   much earlier.

4   BY MR. MORRIS:

5   Q    Okay.  You personally didn't learn anything between April

6   9th, when the complaint was filed, and April 19th, when the

7   motion to amend was filed, that caused you to authorize the

8   filing of the motion to amend, correct?

9   A    That is correct.

10  Q    In fact, you relied on the Sbaiti firm with respect to

11  decisions concerning the timing of the motion to amend.

12  Correct?

13  A    Correct.

14  Q    And you had no knowledge of whether anyone acting on

15  behalf of the Plaintiffs ever served the Debtor with a copy of

16  the motion to amend.  Correct?

17  A    Yes.  I have no knowledge.

18  Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19  provided my firm with a copy of the motion to amend.  Correct?

20  A    I cannot recall one way or another.

21  Q    Okay.  You never instructed anyone on behalf -- acting on

22  behalf of the Plaintiffs to inform the Debtor that the motion

23  to amend had been filed, correct?

24  A    That is correct.

25  Q    And that's because you relied on the Sbaiti firm on

001794

HCMLPHMIT00002829

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 10/16/25    Page 266 of 1011    PageID 2165
Exhibit 71    Page 2108 of 299

Patrick - Direct                          115

```
 1  procedural issues, correct?

 2  A    That is correct.

 3  Q    You didn't consider waiting until the Debtor --

 4       (Interruption.)

 5  Q    -- had appeared in the action before authorizing the

 6  filing of the motion --

 7  A    Yeah, --

 8            THE COURT:  Yes.  Y'all are being a little bit loud.

 9  Okay.

10            A VOICE:  Sorry.

11            MR. MORRIS:  No problem.

12            MR. PHILLIPS:  I've heard that before, Your Honor,

13  and I apologize.

14            THE COURT:  I bet you have.  Thank you.

15            MR. MORRIS:  Admonish Mr. Phillips, please.

16            THE COURT:  Okay.

17            MR. MORRIS:  He's always the wild card.

18            MR. PHILLIPS:  I admonish --

19            MR. MORRIS:  He's always the wild card.

20            MR. PHILLIPS:  I admonish myself.

21            THE COURT:  All right.  I think he got the message.

22  Continue.

23  BY MR. MORRIS:

24  Q    You didn't consider waiting until the Debtor had appeared

25  in the action before filing the motion to amend, correct?
```

HCMLPHMIT00002830

```
1    A    Again, I am the client and I rely upon the law firm that's

2    engaged with respect to making legal decisions as to the

3    timing and notice and appearance and what have you.  I'm a tax

4    lawyer.

5    Q    Okay.  You wanted the District Court to grant the relief

6    that the Plaintiffs were seeking.  Correct?

7    A    I wanted the District Court to consider, under the

8    gatekeeper provisions of this Court, whether or not Mr. Seery

9    could be named in the original complaint.  That's -- that,

10   from my perspective, is what was desired.

11   Q    All right.  You wanted the District Court to grant the

12   relief that the Plaintiffs were seeking, correct?

13              MR. SBAITI:  Objection, Your Honor.  Asked and

14   answered.

15              THE COURT:  Overruled.

16              THE WITNESS:  Again, I would characterize this motion

17   as not necessarily asking for specific relief, but asking the

18   Federal District Court whether or not, under the gatekeeper

19   provision, that Mr. Seery could be named on there.  What

20   happens after that would be a second step.  So I kind of -- I

21   dispute that characterization.

22   BY MR. MORRIS:

23   Q    All right.  I'm going to cross my fingers and hope that

24   Ms. Canty is on the line, and I would ask her to put up Page

25   57 from Mr. Patrick's deposition transcript.
```

001796

HCMLPHMIT00002831

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 10/28/25   Page 268 of 1011   PageID 2167
Exhibit 71   Page 208 of 299

Patrick - Direct                    117

1          THE COURT:  There it is.

2          MR. MORRIS:  There it is.  It's like magic.  Can we

3    go down to Lines 18 through 20?

4    BY MR. MORRIS:

5    Q   Mr. Patrick, during the deposition on Friday, did I ask

6    you this question and did you give me this answer?  Question,

7    "Did you want the Court to grant the relief you were seeking?"

8    Answer, "Yes."

9    A   I -- and it was qualified with respect to Lines 12 through

10   17.  In my view, when I answered yes, I was simply restating

11   what I stated in Line 12.  I wanted the District Court to

12   consider this motion as to whether or not Mr. Seery could be

13   named in the original complaint or the amended complaint

14   pursuant to the existing gatekeeper rules and the arguments

15   that were made in that motion.  That's -- that's what I

16   wanted.  And so then when I was asked, did you want the Court

17   to grant the relief that you were seeking, when I answered

18   yes, it was from that perspective.

19   Q   Okay.  Thank you very much.  If the District Court had

20   granted the relief that you were seeking, you would have

21   authorized the Sbaiti firm to file the amended complaint

22   naming Mr. Seery as a defendant if the Sbaiti firm recommended

23   that you do so.  Correct?

24   A   If the Sbaiti firm recommended that I do so.  That is

25   correct.

001797

HCMLPHMIT00002832

Patrick - Direct                          118

1   Q    Okay.  Let's talk for a little bit about the line of

2   succession for the DAF and CLO Holdco.  Can we please go to

3   Exhibit 25, which is in the other binder?  It's in the other

4   binder, sir.

5        (Pause.)

6   Q    I guess you could look on the screen or you can look in

7   the binder, whatever's easier for you.

8   A    Yeah.  I prefer the screen.  I prefer the screen.

9   Q    Okay.

10  A    It's much easier.

11  Q    All right.  We've got it in both spots.  But do you have

12  Exhibit 25 in front of you, sir?

13  A    Yes, I do.

14  Q    All right.  Do you know what it is?

15  A    This is the organizational chart depicting a variety of

16  charitable entities as well as entities that are commonly

17  referred to the DAF.  However, when I look at this chart, I do

18  not look at and see just boxes, what I see is the humanitarian

19  effort that these boxes represent.

20          MR. MORRIS:  Your Honor, may I interrupt?

21          THE COURT:  You may.

22          MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q    I appreciate that, and when your lawyers get up to ask you

25  questions, I bet they'll want to know just what you were about

001798

HCMLPHMIT00002833

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 14-71   Filed 12/22/25    Page 270 of 1011    PageID 2169
Exhibit 71    Page 212 of 299

Patrick - Direct                                    119

```
 1    to tell me.  But I just want to understand what this chart is.

 2    This chart is the DAF, CLO Holdco, structure chart.  Correct?

 3    A    Correct.

 4    Q    Okay.  And you were personally involved in creating this

 5    organizational structure, correct?

 6    A    I -- yes.

 7    Q    Okay.  And from time to time, the Charitable DAF Holdco

 8    Limited distributes cash to the foundations that are above it.

 9    Correct?

10    A    Correct.

11    Q    All right.  I want to talk a little bit more specifically

12    about how this happens.  The source of the cash distributed by

13    Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14    entity, the Cayman Islands entity near the bottom.  Correct?

15              MR. ANDERSON:  Your Honor, I have an objection.

16    Completely irrelevant.  I'm objecting on relevance grounds.

17    This has nothing to do with the contempt proceeding.  We've

18    already gone over that he authorized the filing of the

19    complaint, that he authorized the filing of the motion to

20    amend.  It's all in the record.  This is completely irrelevant

21    at this point.

22              THE COURT:  Okay.  Relevance objection.  Your

23    response?

24              MR. MORRIS:  I believe that it's relevant to the

25    Debtor's motion to hold Mr. Dondero in contempt for pursuing
```

HCMLPHMIT00002834

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 4-71 Filed 12/01/25 299 Page 271 of 1011     PageID 2170

Patrick - Direct                           120

```
 1   claims against Mr. Seery, in violation of the July 7 order.  I

 2   think an understanding of what the Plaintiffs are, how they're

 3   funded, and Mr. Dondero's interest in pursuing claims on

 4   behalf of those entities is relevant to the -- to the -- just

 5   -- it's just against him.  It's not against their clients,

 6   frankly.  It's just against Mr. Dondero.

 7           THE COURT:  I overrule.

 8           MR. MORRIS:  I'll try and -- I'll try and make this

 9   quick, though.

10   BY MR. MORRIS:

11   Q   CLO Holdco had two primary sources of capital.  Is that

12   right?

13   A   Two primary sources of capital?

14   Q   Let me ask it differently.  There was a Charitable

15   Remainder Trust that was going to expire in 2011, correct?

16   A   That is correct.

17   Q   And that Charitable Remainder Trust had certain CLO equity

18   assets, correct?

19   A   Correct.

20   Q   And the donor to that Charitable Remainder Trust was

21   Highland Capital Management, LP.  Correct?

22   A   Not correct.  After my deposition, I refreshed my memory.

23   There were two Charitable Remainder Trusts that existed, which

24   I think in my mind caused a little bit of confusion.  The

25   Charitable Remainder Trust No. 2, which is the one that
```

HCMLPHMIT00002835

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 71  Filed 02/22/26  Page 272 of 1011    PageID 2171
Exhibit 71  Page 2122/25 299

Patrick - Direct                    121

1   expired in 2011, was originally funded by Mr. Dondero.

2   Q   Okay.  So, so the Charitable Remainder Trust that we were

3   talking about on Friday wasn't seeded with capital from

4   Highland Capital Management, it came from Mr. Dondero

5   personally?

6   A   That is correct.

7   Q   Okay.  Thank you.  And the other primary source of capital

8   was the Dallas Foundation, the entity that's in the upper

9   left-hand corner of the chart.  Is that correct?

10  A   No.

11  Q   The -- you didn't tell me that the other day?

12  A   You said -- you're pointing to the Dallas Foundation.

13  That's a 501(c)(3) organization.

14  Q   I apologize.  Did you tell me the other day that the

15  Dallas Foundation was the second source of capital for HCLO

16  Hold Company?

17  A   No, I did not.  You --

18      (Pause.)

19  Q   Maybe I know the source of the confusion.  Is the Highland

20  Dallas Foundation something different?

21  A   Yes.  On this organizational chart, you'll see that it has

22  an indication, it's a supporting organization.

23  Q   Ah, okay.  So, so let me restate the question, then.  The

24  second primary source of capital for CLO Holdco, Ltd. is the

25  Highland Dallas Foundation.  Do I have that right?

001801

HCMLPHMIT00002836

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-71    Filed 12/23/25    Page 273 of 1011    PageID 2172
Exhibit 71    Page 122 of 299

Patrick - Direct                        122

1   A    Yes.

2   Q    Okay.  And the sources of that entity's capital were

3   grantor trusts and possibly Mr. Dondero personally.  Correct?

4   A    In addition -- per my refreshing my recollection from our

5   deposition, the other Charitable Remainder Trust, I believe

6   Charitable Remainder Trust No. 1, which expired later, also

7   sent a donation, if you will, or assets to -- and I cannot

8   recall specifically whether it was just the Highland Dallas

9   Foundation or the other supporting organizations that you see

10  on this chart.

11  Q    But the source of that -- the source of the assets that

12  became the second Charitable Remainder Trust was Highland

13  Capital Management, LP.  Is that right?

14  A    I think that is accurate from my recollection.  And again,

15  I'm talking about Charitable Remainder Trust No. 1.

16  Q    Okay.  So is it fair to say -- I'm just going to try and

17  summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18  is the investment arm of the organizational structure on this

19  page?

20  A    Yes.

21  Q    And is it fair to say that nearly all of the assets that

22  are in there derived from either Mr. Dondero, one of his

23  trusts, or Highland Capital Management, LP?

24  A    Yes.  It's like the Bill Gates Foundation or the

25  Rockefeller Foundation.  These come from the folks that make

HCMLPHMIT00002837

1   their donations and put their name on it.

2   Q    Okay.

3            MR. MORRIS:  Now, now, Your Honor, I'm going to go

4   back just for a few minutes to how Mr. Scott got appointed,

5   because I think that lays kind of the groundwork for his

6   replacement.  It won't take long.

7            THE COURT:  Okay.  I have a question either --

8            MR. MORRIS:  Sure.

9            THE COURT:  -- for you or the witness.  I'm sorry,

10  but --

11           MR. MORRIS:  Sure.  Yeah.

12           THE COURT:  -- the organizational chart, it's not

13  meant to show everything that might be connected to this

14  substructure, right?  Because doesn't CLO Holdco, Ltd. own

15  49.02 percent of HCLOF, --

16           MR. MORRIS:  That --

17           THE COURT:  -- which gets us into the whole

18  HarbourVest transaction issue?

19           MR. MORRIS:  You're exactly right, Your Honor.

20           THE COURT:  Okay.

21           MR. MORRIS:  But that's just an investment that HCLO

22  Holdco made.

23           THE COURT:  Right.

24           MR. MORRIS:  Right?  And so I -- let me ask the

25  witness, actually.

001803
HCMLPHMIT00002838

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 12/23/25   Page 275 of 1011   PageID 2174
Exhibit 71   Page 123 of 299

Patrick - Direct                                    124

```
 1              THE COURT:  Okay.  Thank you.  Thank you.

 2              MR. MORRIS:  Let me ask the witness.  Yeah.

 3              THE COURT:  I just want my brain --

 4              MR. MORRIS:  Right.

 5              THE COURT:  -- to be complete on this chart.

 6   BY MR. MORRIS:

 7   Q   Mr. Patrick, there are three entities under CLO Holdco,

 8   Ltd.  Do you see that?

 9   A   Yes.

10   Q   And does CLO Holdco, Ltd. own one hundred percent of the

11   interests in each of those three entities?

12   A   Yes.

13   Q   Do you know why those three entities are depicted on this

14   particular chart?  Is it because they're wholly-owned

15   subsidiaries?

16   A   Correct.

17   Q   Okay.  And CLO Holdco, Ltd. has interests in other

18   companies.  Isn't that right?

19   A   It has other investments.  That is correct.

20   Q   And the reason that they're not depicted on here is

21   because they're not wholly-owned subsidiaries, they're just

22   investments; is that fair?

23   A   That is fair.

24              MR. MORRIS:  Does that--?

25              THE COURT:  Yes.
```

HCMLPHMIT00002839

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 02/26/26   Page 276 of 1011   PageID 2175
Exhibit 71   Page 126 of 299

Patrick - Direct                                          125

 1           MR. MORRIS:  Okay.

 2           THE COURT:  Uh-huh.

 3   BY MR. MORRIS:

 4   Q    So, so let's go back to Mr. Grant for a moment.  Mr.

 5   Scott, rather.  Mr. Dondero was actually the original general

 6   partner.  If you look at this chart, while it's still up here,

 7   you see on the left there's Charitable DAF GP, LLC?

 8   A    Yes.

 9   Q    And the Charitable DAF GP, LLC is the general partner of

10   the Charitable DAF Fund, LP.  Correct?

11   A    Correct.

12   Q    And on this chart, Grant Scott was the managing member of

13   Charitable DAF GP, LLC.  Right?

14   A    Correct.

15   Q    Okay.  But Mr. Dondero was the original general partner of

16   that entity, correct?

17   A    That is correct.  But I do want to point out, I just note

18   that the GP interest is indicating a one percent interest and

19   the 99 interest to Charitable DAF Holdco.  I believe that's

20   incorrect.  It's a hundred percent by Charitable DAF Holdco,

21   Ltd., and the Charitable DAF GP interest is a noneconomic

22   interest.  So that should actually reflect a zero percent to

23   the extent it may indicate some sort of profits or otherwise.

24   Q    Okay.  Thank you for the clarification.  Can you turn to

25   Exhibit 26, please, in your binder?  And is it your

001805

HCMLPHMIT00002840

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 10/27/25   Page 277 of 1011   PageID 2176
Exhibit 71   Page 2122 of 299

Patrick - Direct                                    126

1    understanding that that is the amended and restated LLC

2    agreement for the DAF GP, LLC?

3    A    Yes.

4    Q    Okay.  And this was amended and restated effective as of

5    January 1st, 2012, correct?

6    A    Yes.

7    Q    And if you go to the last page, you'll see there are

8    signatures for Mr. Scott and Mr. Dondero, correct?

9    A    Yes.

10   Q    And Mr. Dondero is identified as the forming -- former

11   managing member and Mr. Scott is identified as the new

12   managing member.   Correct?

13   A    Correct.  That's what the document says.

14   Q    And it's your understanding that Mr. Dondero had the

15   authority to select his successor.  Correct?

16   A    Correct.

17   Q    In fact, it's based on your understanding of documents and

18   your recollection that Mr. Dondero personally selected Mr.

19   Scott as the person he was going to transfer control to,

20   correct?

21   A    Upon advice of Highland Capital Management's tax

22   compliance officer, Mr. Tom Surgent.

23   Q    What advice did Mr. Surgent give?

24   A    He gave advice that, because Mr. Dondero -- and this is

25   what I came to an understanding after the fact of this

HCMLPHMIT00002841

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 2/28/25   Page 278 of 1011   PageID 2177
Exhibit 71   Page 2128/26 299

Patrick - Direct                    127

 1   transaction, because I was not a part of it -- that by Mr.

 2   Dondero holding that GP interest, that it would be -- the

 3   Plaintiffs, if you will, would be an affiliate entity for

 4   regulatory purposes, and so he advised that if he -- if Mr.

 5   Dondero transferred his GP interest to Mr. Scott, it would no

 6   longer be an affiliate, is my recollection.

 7   Q   Okay.  You didn't appoint Mr. Scott, did you?

 8   A   No.

 9   Q   That was Mr. Dondero.  Is that right?

10   A   Yes.

11   Q   Okay.  Let's go to 2021.  Let's come back to the current

12   time.  Sometime in February, Mr. Scott called you to ask about

13   the mechanics of how he could resign.  Correct?

14   A   That is correct.

15   Q   But the decision to have you replace Mr. Scott was not

16   made until March 24th, the day you sent an email to Mr. Scott

17   with the transfer documents.  Correct?

18   A   That is correct.

19   Q   And it's your understanding that he could have transferred

20   the management shares and control of the DAF to anyone in the

21   world.  Correct?

22   A   Correct.

23   Q   That's what the docu... that he had the authority under

24   the documentation, as you understood it, to freely trade or

25   transfer the management shares.  Correct?

001807

HCMLPHMIT00002842

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71  Filed 12/29/25  Page 279 of 1011    PageID 2178
Exhibit 71  Page 129 of 299

Patrick - Direct                128

1    A    Wait.  Now, let's be precise here.

2    Q    Okay.

3    A    Are you talking about the GP interests or the management

4    shares held by Charitable DAF Holdco, Ltd.?

5    Q    Let's start with the management shares.  Can you explain

6    to the Court what the management shares are?

7            MR. ANDERSON:  Your Honor?  Hang on one second.  Your

8    Honor, I want to object again on relevance.  We're going way

9    beyond the scope of the contempt issue, whether or not --

10            MR. MORRIS:  This is about control.

11            MR. ANDERSON:  -- the motion to amend somehow

12    violated the prior order of this Court.  Getting into the

13    management structure, transfer of shares, that's way outside

14    the bounds.  I object on relevance.

15            THE COURT:  Okay.  Relevance objection?

16            MR. MORRIS:  Your Honor, they have probably 30

17    documents, maybe 20 documents, on their exhibit list that

18    relate to management and control.  I'm asking questions about

19    management and control.  Okay?  This is important, again, to

20    (a) establish his authority, but (b) the circumstances under

21    which he came to be the purported control person.

22            THE COURT:  Okay.  Overruled.  Go ahead.

23            THE WITNESS:  It might be helpful to look at the

24    organizational chart, but if not -- but I'll describe it to

25    you again.  With respect to the entity called --

001808

HCMLPHMIT00002843

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Filed 2130/26 299    Page 280 of 1011    PageID 2179

Patrick - Direct                             129

```
 1          MR. MORRIS:  Hold on one second.  Can we put up the

 2    organizational chart again, Ms. Canty, if you can?  There you

 3    go.

 4          THE WITNESS:  Okay.  So with respect to the

 5    Charitable DAF Holdco, Ltd., it is my understanding that Mr.

 6    Scott, he organized that entity when he was the independent

 7    director of the Charitable Remainder Trust, and he caused the

 8    issuance of the management shares to be issued to himself.

 9    And then those are, again, noneconomic shares, but they are

10    control shares over that entity.

11        And I think, to answer your question, is -- it -- he alone

12    decides who he can transfer those shares to.

13    BY MR. MORRIS:

14    Q    Do I have this right, that whoever holds the noneconomic

15    management shares has the sole authority to appoint the

16    representatives for each of the Charitable DAF entities and

17    CLO Holdco?  It's kind of a magic ticket, if you will?

18    A    It -- I think there's a -- the answer really is no from a

19    legal standpoint, because Charitable DAF Holdco is a limited

20    partner in Charitable DAF Fund, LP, so it does not have

21    authority -- authority under all -- the respective entities

22    underneath that.  It could cause a redemption, if you will, of

23    Charitable DAF Fund.  And so, really, the authority -- the

24    trickle-down authority that you're referencing is with respect

25    to his holding of the Charitable DAF GP, LLC interest.  It's a
```

HCMLPHMIT00002844

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 12/31/25   Page 281 of 1011   PageID 2180

Patrick - Direct                                    130

1  member-managed Delaware limited liability company.  And from

2  that, he -- that authority kind of trickles down to where he

3  can appoint directorships.

4  Q   All right.  I think I want to just follow up on that a

5  bit.  Which entity is the issuer of the manager shares, the

6  management shares?

7  A   Yeah, the -- per the organizational chart, it is accurate,

8  it's the Charitable DAF Holdco, Ltd. which issued the

9  management shares to Mr. Scott.

10 Q   Okay.  And that's why you have the arrow from Mr. Scott

11 into that entity?

12 A   Correct.

13 Q   And do those -- does the holder of the management shares

14 have the authority to control the Charitable DAF Holdco, Ltd.?

15 A   Yes.

16 Q   Okay.  And as the control person for the Charitable DAF

17 Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18 Holdco Limited owns a hundred percent of the limited

19 partnership interests of the Charitable DAF Fund, LP.

20 Correct?

21 A   Correct.

22 Q   And so does the holder of that hundred percent limited

23 partnership interest have the authority to decide who acts on

24 behalf of the Charitable DAF Fund, LP?

25 A   I would say no.  I mean, you know, just -- I would love to

HCMLPHMIT00002845

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 12/02/25   Page 282 of 1011   PageID 2181

Exhibit 71 Page 132 of 299

Patrick - Direct                           131

1   read the partnership agreement again.  But I, conceptually,

2   what I know with partnerships, I would say the limited partner

3   would not.  It would be through the Charitable DAF GP, LLC

4   interest.

5   Q    The one on the left, the general partner?

6   A    The general partner.

7   Q    I see.  So when Mr. Scott transferred to you the one

8   hundred percent of the management shares as well as the title

9   of the managing member of the Charitable DAF GP, LLC, did

10  those two events give you the authority to control the

11  entities below it?

12  A    Yes.

13  Q    Thank you.  And so prior to the time that he transferred

14  those interests to you, is it your understanding that Mr.

15  Scott had the unilateral right to transfer those interests to

16  anybody in the world?

17  A    Yes.

18  Q    Okay.  And you have that right today, don't you?

19  A    Yes, I do.

20  Q    If you wanted, you could transfer it to me, right?

21  A    Yes, I could.

22  Q    Okay.  But of all the people in the world, Mr. Scott

23  decided to transfer the management shares and the managing

24  member title of the DAF GP to you, correct?

25  A    Restate that question again?

HCMLPHMIT00002846

Patrick - Direct                    132

1    Q    Of all the people in the world, Mr. Scott decided to

2    transfer it to you, correct?

3    A    Yeah.  Mr. Scott transferred those interests to me.

4    Q    Okay.  And you accepted them, right?

5    A    Yes.

6    Q    You're not getting paid anything for taking on this

7    responsibility, correct?

8    A    I am not paid by any of the entities depicted on this

9    chart.

10   Q    And Mr. Scott used to get $5,000 a month, didn't he?

11   A    I believe that's what he testified to.

12   Q    Yeah.  But you don't get anything, right?

13   A    Correct.

14   Q    In fact, you get the exact same salary and compensation

15   from Skyview that you had before you became the authorized

16   representative of the DAF entities and CLO Holdco.  Correct?

17   A    Correct.

18          MR. MORRIS:  Okay.  Your Honor, if I may just take a

19   moment, I may be done.

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  Your Honor, I have no further questions.

23          THE COURT:  All right.  Pass the witness.  Any

24   examination of the witness?

25                        CROSS-EXAMINATION

HCMLPHMIT00002847

Patrick - Cross                        133

1   BY MR. ANDERSON:

2   Q   Mr. Patrick, I just had a few follow-up questions.  When

3   you authorized the filing of the lawsuit against Highland

4   Capital Management, LP, Highland HCF Advisor Limited, and

5   Highland CLO Funding, Limited, when that lawsuit was filed in

6   April of this year, was Mr. Seery included as a defendant?

7   A   No.

8   Q   Have the two Plaintiffs in that lawsuit, have they

9   commenced any lawsuit against Mr. Seery?

10  A   No.

11  Q   Have they pursued any lawsuit against Mr. Seery?

12  A   No.

13  Q   Have they pursued a claim or cause of action against Mr.

14  Seery?

15  A   No.

16  Q   At most, did the Plaintiffs file a motion for leave to add

17  Mr. Seery as a defendant?

18          MR. MORRIS:  Objection, Your Honor.  To the extent

19  that any of these questions are legal conclusions, I object.

20  He's using the word pursue.  If he's trying -- if he's then

21  going to argue that, But the witness testified that he didn't

22  pursue and that's somehow a finding of fact, I object.

23          THE COURT:  Okay.  I understand.

24          MR. MORRIS:  Yeah.

25          THE COURT:  But I overrule.  He can answer.

001813

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71 Filed 03/25/26   Page 285 of 1011    PageID 2184

Patrick - Cross                                      134

1           MR. MORRIS:  That's fine.

2           THE WITNESS:  Can you restate the question again?

3    BY MR. ANDERSON:

4    Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

5    Did the Plaintiffs pursue a claim or cause of action against

6    Mr. Seery?

7    A    No.

8    Q    At most, did the Plaintiffs file a motion for leave to

9    file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.

001814

1   Q    Was there any effort whatsoever to hide the prior order of

2   the Bankruptcy Court?

3   A    No.

4           MR. ANDERSON:  Pass the witness.

5           THE COURT:  Okay.  Other examination?

6           MR. SBAITI:  Yes, Your Honor.  Just a couple of

7   questions.

8                        CROSS-EXAMINATION

9   BY MR. SBAITI:

10  Q    Do you mind flipping to Exhibit 25, which I believe is the

11  org chart, the one that you were looking at before?

12  A    Okay.

13  Q    It'll still be in --

14  A    Okay.  Yeah.

15  Q    -- the defense binder.  No reason to swap out right now.

16  A    I've got the right binders.  Some of them are repeatable

17  exhibits, so --

18  Q    Yeah.

19  A    -- I have to grab the right binder.  Yes.

20  Q    As this org chart would sit today, is the only difference

21  that Grant Scott's name would instead be Mark Patrick?

22  A    Yes.

23  Q    Was there ever a period of time where Jim Dondero's name

24  would sit instead of Grant Scott's name prior?

25  A    Yes, originally, when this -- yes.

001815

HCMLPHMIT00002850

Patrick - Cross                    136

1   Q    So did Mr. Dondero both have the control shares of the GP,

2   LLC and DAF Holdco Limited?

3   A    No, I believe not.  I believe he only held the Charitable

4   DAF GP interest and that Mr. Scott at all times held the

5   Charitable DAF Holdco, LTD interest, until he decided to

6   transfer it to me.

7   Q    Can you just tell us how Mr. Scott came to hold the

8   control shares of the Charitable DAF Holdco, LTD?

9   A    When he was the independent trustee of the Charitable

10  Remainder Trust, he caused that -- the creation of that

11  entity, and that's how he became in receipt of those

12  management shares.

13  Q    And does the Charitable DAF GP, LLC have any control over

14  Charitable DAF Fund, LP's actions or activities?

15  A    Yes, it does.

16  Q    What kind of control is that?

17  A    I would describe complete control.  It's the managing

18  member of that entity and can -- and effectively owns, you

19  know, the hundred percent interest in the respective

20  subsidiaries, and so the control follows down.

21  Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22  managing member of the GP?

23  A    Well, I think as the -- and Mr. Morris had shown me with

24  respect to that transfer occurring on March 2012.

25  Q    So nine years ago?

HCMLPHMIT00002851

Patrick - Cross                    137

1   A    Yes.

2   Q    Does Mr. Dondero today exercise any control over the

3   activities of the DAF Charitable -- the Charitable DAF, GP or

4   the Charitable DAF Holdco, LTD?

5   A    No.

6   Q    Is he a board member of sorts for either of those

7   entities?

8   A    No.

9   Q    Is he a board members of CLO Holdco?

10  A    No.

11  Q    Does he have any decision-making authority at CLO Holdco?

12  A    None.

13  Q    The decision to authorize the lawsuit and the decision to

14  authorize the motion that you've been asked about, who made

15  that authorization?

16  A    I did.

17  Q    Did you have to ask for anyone's permission?

18  A    No.

19          MR. SBAITI:  No more questions, Your Honor.

20          THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21      All right.  Any redirect?

22                   REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Since becoming the authorized representative of the

25  Plaintiffs, have you ever made a decision on behalf of those

001817

HCMLPHMIT00002852

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71    Filed 09/26    Page 289 of 1011    PageID 2188
Exhibit 71 Page 2138 of 299

Patrick - Cross                                    138

1  entities that Mr. Dondero disagreed with?

2  A    I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q    Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10  A    I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13         MR. MORRIS:  Okay.  No further questions, Your Honor.

14         THE COURT:  Any further examination?  Recross on that

15  redirect?

16         MR. ANDERSON:  No further questions.

17         MR. SBAITI:  No further questions, Your Honor.

18         MR. ANDERSON:  Sorry.

19         THE COURT:  Nothing?

20         MR. ANDERSON:  I think we're good.

21         THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                    EXAMINATION BY THE COURT

24         THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

001818

Patrick - Examination by the Court                    139

1   Islands?

2              THE WITNESS:  Yeah.  I'll keep it as simple as I can,

3   even though I'm a tax lawyer, so I won't get into the tax

4   rules, but the Cayman structure is modeled after what you

5   typically see in the investment management industry, and so I

6   -- and I won't reference specific entities here with respect

7   to the Highland case, but I think you'll note some

8   similarities, if you think about it.  They're -- it's

9   described as an offshore master fund structure where you have

10  a -- and that would be the Charitable DAF Fund that's

11  organized offshore, usually in the Cayman or Bermuda Islands,

12  where the general partner, typically, in the industry, holds

13  the management --

14             THE COURT:  Yeah.  Let --

15             THE WITNESS:  Okay.

16             THE COURT:  -- me just stop you.  I've seen this

17  enough --

18             THE WITNESS:  Yeah, it's

19             THE COURT:  -- to know that it happens in the

20  investment world.  But in --

21             THE WITNESS:  Yeah.

22             THE COURT:  You know, usually, I see 501(c)(3), you

23  know, domestically-created entities for charitable purposes,

24  so I'm just curious.

25             THE WITNESS:  Yes.

001819

HCMLPHMIT00002854

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-71 Filed 11/01/25    Page 291 of 1011    PageID 2190

Patrick - Examination by the Court          140

1          THE COURT:  Uh-huh.

2          THE WITNESS:  The offshore master fund structure

3    typically will have two different types of -- they call it

4    foreign feeder funds.  One foreign feeder fund is meant to

5    accommodate foreign investors; the other foreign feeder fund

6    is meant to accommodate U.S. tax-exempt investors.

7       Why, why is it structured that way?  In order to avoid

8    something called -- I was trying not to be wonkish -- UBTI.

9    That's, let's see, Un -- Unrelated Trader Business Income.  I

10   probably have that slightly wrong.  But it's essentially,

11   it's a means to avoid active business income, which includes

12   debt finance income, which is what these CLOs tend to be, that

13   would throw off income that would be taxable normally if the

14   exempts did not go through this foreign blocker, and it

15   converts that UBTI income -- it's called (inaudible) income --

16   into passive income that flows -- that flows up to the

17   charities.

18      And so it's very typical that you'll have a U.S. tax-

19   exempt investor, when they make an investment in a fund,

20   prefer to go through an offshore feeder fund, which is

21   actually Charitable DAF Holdco, LTD.  That's essentially what,

22   from a tax perspective, represents as a UBTI blocker entity.

23   And then you have the offshore investments being held offshore

24   because there's a variety of safe harbors where the receipt of

25   interest, the portfolio interest exception, is not taxable.

001820

HCMLPHMIT00002855

Patrick - Examination by the Court                    141

1    The creation of capital gains or losses under the -- they call
2    it the trading, 864(b) trading safe harbor, is not taxable.
3    So that's why you'll find these structures operating offshore
4    to rely on those safe harbor provisions as well as -- as well
5    as what I indicated with respect to the two type blocker
6    entities.  It's very typical and industry practice to organize
7    these way.  And so when this was set --
8              THE COURT:  It's very typical in the charitable world
9    to --
10             THE WITNESS:  In the investment management --
11             THE COURT:  -- form this way?
12             THE WITNESS:  In the investment management world,
13   when you have charitable entities that are taking some
14   exposure to assets that are levered, to set this structure up
15   in this way.  It was modeled after -- they just call them
16   offshore master fund structures.  They're known as Mickey
17   Mouse structures, where you'll have U.S. investors --
18             THE COURT:  Yes.  I -- yes, I --
19             THE WITNESS:  -- enter through a U.S. partnership,
20   and the foreign investors enter through a blocker.
21             THE COURT:  It was really just the charitable aspect
22   of this that I was --
23             THE WITNESS:  Yeah.  Yeah.
24             THE COURT:  -- getting at.
25             THE WITNESS:  Yeah.  No, but I'm just trying to

001821

HCMLPHMIT00002856

Patrick - Recross                           142

```
 1   emphasize if --
 2           THE COURT:  All right.  It's --
 3           THE WITNESS:  Yeah.
 4           THE COURT:  -- neither here nor there.  All right.
 5           MR. SBAITI:  Your Honor, may I ask a slightly
 6   clarifying leading question on that, because I think I
 7   understand what he was trying to say, just for the record?
 8           THE COURT:  Well, --
 9           MR. MORRIS:  I object.
10           THE COURT:  -- I tell you what.  Anyone who wants to
11   ask one follow-up question on the judge's question can do so.
12   Okay?  You can go first.
13           MR. SBAITI:  I'll approach, Your Honor.
14           THE COURT:  Okay.
15                         RECROSS-EXAMINATION
16   BY MR. SBAITI:
17   Q    Would it be a fair summary of what you were saying a
18   minute ago that the reason the bottom end of that structure is
19   offshore is so that it doesn't get taxed before the money
20   reaches the charities on the U.S. side?
21   A    Tax -- it converts the nature of the income that is being
22   thrown off by the investments so that it becomes a tax
23   friendly income to the tax-exempt entity.  Passive income.
24   That's --
25   Q    So, essentially, --
```

001822

HCMLPHMIT00002857

```
 1                THE COURT:  Okay.  Okay.

 2                MR. SBAITI:  -- so it doesn't get taxed before it

 3    hits the --

 4                THE COURT:  I said one question.

 5                MR. SBAITI:  Sorry, Your Honor.

 6                THE COURT:  Okay.  He answered it.

 7                MR. PHILLIPS:  And I have one question, Your Honor

 8                THE COURT:  Okay.

 9                MR. PHILLIPS:  I don't know if I need to ask this

10    question, but I'd rather not ask you if I need to ask it.

11                THE COURT:  Go ahead.

12                MR. PHILLIPS:  But if I do, you know, I could --

13                THE COURT:  Go ahead.

14                MR. PHILLIPS:  Well, okay.

15                          RECROSS-EXAMINATION

16    BY MR. PHILLIPS:

17    Q    We've talked about the offshore structure.  Are the

18    foundations in the top two tiers of the organizational chart

19    offshore entities?

20    A    No.

21    Q    They're --

22    A    They're onshore entities.  They're tax-exempt entities.

23    Q    Thank you.

24    A    The investments are offshore.

25    Q    Thank you.
```

001823

HCMLPHMIT00002858

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 104-71   Filed 12/05/25   Page 295 of 1011   PageID 2194
Exhibit 71   Page 245 of 299

Patrick - Further Redirect                    144

```
 1            THE COURT:  Mr. Morris?  One question.
 2                    FURTHER REDIRECT EXAMINATION
 3   BY MR. MORRIS:
 4   Q    Do you hold yourself out as an expert on the
 5   organizational structures in the Caribbean for charitable
 6   organizations?
 7   A    I hold myself out as a tax professional versant on setting
 8   up offshore master fund structures.  It's sort of a bread-and-
 9   butter thing.  But there are plenty of people that can testify
10   that this is very typical.
11   Q    Uh-huh.  Okay.
12            THE COURT:  Okay.  Thank you.
13       All right.  You are excused, Mr. Patrick.  I suppose
14   you'll want to stay around.  I don't know if you'll
15   potentially be recalled today.
16       (The witness steps down.)
17            THE COURT:  All right.  We should take a lunch break.
18   I'm going to put this out for a democratic vote.  Forty-five
19   minutes?  Is that good with everyone?
20            MR. SBAITI:  Do we have to leave the building to eat,
21   Your Honor, or is there food in the building?
22            THE COURT:  I think --
23            MR. SBAITI:  I'm sorry to ask that question, but --
24            THE COURT:  Yes.  You know what, there used to be a
25   very bad cafeteria, but I think it closed.  Right, Mike?  So,
```

001824

HCMLPHMIT00002859

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 10/26/25   Page 296 of 1011   PageID 2195
Exhibit 71   Page 146 of 299

145

```
 1    you know, --

 2            MR. SBAITI:  Sorry I asked that.

 3            A VOICE:  Hate to miss that one.

 4            THE COURT:  Is 45 minutes not enough since you have

 5    to go off campus?  I'll give you an hour.  It just means we

 6    stay later tonight.

 7            A VOICE:  Can we just say 2:00 o'clock?

 8            MR. SBAITI:  That's fine with us, Your Honor.

 9            THE COURT:  2:00 o'clock.  That's 50 minutes.  See

10    you then.

11            MR. SBAITI:  Thank you.

12            A VOICE:  Your Honor, can we just get a time check?

13            THE COURT:  Okay.

14            THE CLERK:  Yeah.  The Debtors are at an hour and

15    eleven minutes.  Respondents at an hour nineteen.

16            THE COURT:  And hour and eleven and an hour and

17    nineteen.

18            A VOICE:  Wait, that's not right.

19            A VOICE:  That can't be right.

20            A VOICE:  Two hours?  We started at --

21            THE COURT:  Okay.  So, again, their side, the

22    collective Respondents?

23            THE CLERK:  An hour and eleven, responding to your

24    questions, --

25            A VOICE:  Yeah, he's not recording --
```

001825

HCMLPHMIT00002860

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-4 71 Filed 21/47/26 299 Page 297 of 1011    PageID 2196

146

```
 1              THE CLERK:  So an hour and eleven and an hour and
 2   nineteen.
 3              THE COURT:  But they were already over an hour --
 4              A VOICE:  Yeah.  It's been over three hours.
 5              THE COURT:  -- with opening statements.
 6              THE CLERK:  An hour and twelve.  Yes.  They were very
 7   short with the questioning.  It was only like --
 8              THE COURT:  Okay.  We'll double-check that over the
 9   break with the court reporter.
10              A VOICE:  All right.  Thank you, Your Honor.
11              THE COURT:  We'll double-check and let you know.
12              THE COURT:  All rise.
13         (A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)
14              THE COURT:  All right.  Please be seated.  We're
15   going back on the record in Highland after our lunch break.
16   I'm going to confirm time.  We've had the Debtor an aggregate
17   of an hour and eleven minutes.  The Respondents, an aggregate
18   of an hour and twenty minutes.  Okay?  So we've gone two hours
19   and thirty-one minutes.
20        If it seems like we've been going longer, it's because we
21   did not do the clock on the opening matters regarding removal,
22   extension of time.  And then when I interjected with
23   questions, we stopped the clock.  All right?  So let's go.
24        You may call your next witness, Mr. Morris.
25              MR. MORRIS:  Thank you, Your Honor.  The Debtor calls
```

001826

HCMLPHMIT00002861

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 12/18/25   Page 298 of 1011   PageID 2197

Exhibit 71   Page 298 of 299

Dondero - Direct                    147

```
 1   James Dondero.

 2             THE COURT:  All right.

 3             A VOICE:  He had to step down the hall.  We had a

 4   little trouble getting through security.  Let me --

 5             THE COURT:  All right.  Mr. Dondero, you've been

 6   called as the next witness.  So if you'll approach our witness

 7   stand, please.  All right.  Please raise your right hand.

 8        (The witness is sworn.)

 9             THE COURT:  All right.  Please be seated.

10             JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12   BY MR. MORRIS:

13   Q    Good afternoon, Mr. Dondero.

14   A    Good afternoon.

15   Q    Can you hear me?

16   A    Yes.

17   Q    Okay.  So, you were here this morning, correct?

18   A    Yes.

19   Q    All right.  So, we're going to put up -- we'll put it up

20   on the screen, but if you'd prefer to look at a hard copy in

21   the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to

22   turn to Exhibit 25.  Or you could just follow on the screen.

23   And this is a one-page document, so maybe that's easier.

24   A    Sure.

25   Q    Do you have it?  All right.
```

HCMLPHMIT00002862

Dondero - Direct                              148

1   A    Yes.

2   Q    This is the organizational chart for what's known as the

3   DAF, correct?

4   A    Yes.

5   Q    And Mark Patrick set up this structure, correct?

6   A    I believe he coordinated.  I believe it was set up by

7   third-party law firms.  I believe it was Hutton or a firm like

8   that.

9   Q    Mr. Patrick participated in the creation of this structure

10   because you gave him the task of setting up a charitable

11   entity for Highland at that time, correct?

12   A    Yes.

13   Q    And you approved of this organizational structure,

14   correct?

15   A    Yes.

16   Q    And Grant Scott was the Trustee of the DAF for a number of

17   years, correct?

18   A    I often use that word, trustee, but technically I think

19   it's managing member.

20   Q    That's right.  I appreciate that.  I was using your word

21   from the deposition.  But is it fair to say that, to the best

22   of your knowledge, Grant Scott was the sole authorized

23   representative of the entity known as the DAF from 2011 until

24   just recently?

25   A    Sole -- I would describe it more he was in a trustee

HCMLPHMIT00002863

Dondero - Direct                           149

1   function.

2   Q    Uh-huh.

3   A    Advice was being provided by Highland on the investment

4   side.  He wasn't expected to be a financial or an investment

5   expert.  And then accounting, tax, portfolio, tracking, you

6   know, compliance with all the offshore formation documents,

7   that was all done by Highland as part of a shared services

8   agreement.

9   Q    Okay.  I appreciate that, but listen carefully to my

10  question.  All I asked you was whether he was the authorized

11  representative, the sole authorized representative for the

12  ten-year period from 2011 until recently.

13  A    Yes.

14  Q    Okay.

15  A    I believe so.

16  Q    Thank you.  You served as the managing member of the DAF

17  GP, LLC before Mr. Scott, correct?

18  A    Yes.

19  Q    Okay.  And if you turn to Exhibit 26 in your binder,

20  that's the amended and restated limited liability company

21  agreement for the DAF GP, LLC, correct?

22  A    Yes.

23  Q    And on the last page, that's your signature line, right?

24  A    Yes.

25  Q    And you stepped down as the managing member on March 12,

001829

HCMLPHMIT00002864

Dondero - Direct                      150

1   2012, and were replaced by Mr. Scott, correct?

2   A    Yes.

3   Q    And as you recall it, Mr. Scott came to be appointed the

4   trustee of the DAF based on your recommendation, right?

5   A    Based on my recommendation?  Yes, I would say that's fair.

6   Q    And you made that recommendation to Mr. Patrick, right?

7   A    I -- I don't remember who I made the recommendation to.

8   But I would echo the testimony of Mark Patrick earlier that

9   the purpose of stepping down was to make the DAF unaffiliated

10  or independent versus being in any way affiliated.

11          MR. MORRIS:  I move to strike.

12  BY MR. MORRIS:

13  Q    And I'd ask you to listen carefully to my question.

14          THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q    You made the recommendation to Mr. Patrick, correct?

17  A    I would give the same answer again.

18  Q    Okay.

19          MR. MORRIS:  Can we please put up Mr. Dondero's

20  deposition transcript from last Friday at Page 297?

21      I believe, Your Honor, that the court reporter thought

22  that this was a continuation of a prior deposition, and that's

23  why the pages begin in the, you know, high in the 200s and not

24  at Page 1.  Just to avoid any confusion.

25  BY MR. MORRIS:

001830

1   Q    Mr. Dondero, do you see the transcript in front of you?

2   A    Yes.

3   Q    Okay.  Were you asked this question and did you give this

4   answer?  "Who did you make the" -- question, "Who did you make

5   the recommendation to?"  Answer, "It would have been Mark

6   Patrick."

7   A    I don't recall right now as I sit here, and it seems like

8   I was speculating when I answered, but it -- it probably would

9   have been Mark Patrick.  I just don't have a specific

10  recollection.

11  Q    You made the recommendation to Mr. Patrick because he was

12  responsible for setting up the overall structure, correct?

13  A    I -- I can't testify to why I did something I don't

14  remember.  I think that would be --

15  Q    Can we --

16  A    -- speculative.

17  Q    Are you finished, sir?

18  A    Yeah.

19  Q    Okay.

20          MR. MORRIS:  Can we go to Page 299, please?

21  BY MR. MORRIS:

22  Q    Lines 6 through 10.  Did I ask this question and did you

23  give me this answer?  Question, "But why did you select Mr.

24  Patrick as the person to whom to make your recommendation?"

25  Answer, "Because he was responsible for setting up the overall

001831

HCMLPHMIT00002866

Dondero - Direct                      152

1    structure."

2        Were you asked that question and did you give that answer

3    last Friday?

4    A    Yes.

5    Q    Thank you.  But it's your testimony that you don't really

6    know what process led to Mr. Scott's appointment, correct?

7    A    No, I -- I said I was refreshed by Mark Patrick's

8    testimony earlier.

9    Q    Yeah.  Were you refreshed that, in fact, you specifically

10   had the authority to and did appoint Grant Scott as the

11   managing member of the DAF GP, LLC?

12   A    I -- I don't know.

13   Q    Well, you're referring to Mr. Patrick's testimony and I'm

14   asking you a very specific question.  Did you agree -- is your

15   memory refreshed now that you're the person who put Grant

16   Scott in the position in the DAF?

17   A    I -- I don't know if I owned those secret shares that --

18   well, they're not secret, but shares that could appoint

19   anybody on the planet.  I guess if I was in that box at that

20   time before Grant, then I would have had that ability.  I'm

21   not denying at all that I recommended Grant.  I'm just saying

22   I don't -- I don't remember if I went specifically to him or

23   if it was Thomas Surgent that was orchestrating it at the

24   time.  I don't remember.

25   Q    Do you deny that you had the authority to and that you did

001832

HCMLPHMIT00002867

Dondero - Direct                    153

 1  appoint Grant Scott as your successor?

 2          MR. TAYLOR:  Your Honor, objection to the extent it

 3  calls for a legal conclusion.  I can't get close to a mic, so

 4  --

 5          THE COURT:  I overrule the objection.

 6          THE WITNESS:  Can you repeat the question for me?

 7  BY MR. MORRIS:

 8  Q   Do you deny that you had the authority to and that you

 9  did, in fact, appoint Grant Scott as your successor?

10  A   It'd be better to say I don't -- I don't -- no, I don't

11  remember or I didn't know the details at the time.  But,

12  again, I -- I assume I owned those shares.  And, again, I do

13  remember recommending Grant and -- but exactly how it

14  happened, I don't remember.

15  Q   Did you hear Mark Patrick say just an hour ago that you

16  appointed Grant Scott as your successor?

17          MR. SBAITI:  Objection, Your Honor.  Misstates

18  testimony.  The witness testified he transferred shares.

19  That's different than an appointment power.

20          THE COURT:  Response?  I can't remember the exact way

21  you worded it, to be honest.

22          MR. MORRIS:  Neither can I, but I'll even take it

23  that way.

24          THE COURT:  Okay.

25          MR. MORRIS:  I think he's wrong, but I'll even take

001833

HCMLPHMIT00002868

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 06/23/25   Page 305 of 1011   PageID 2204
Exhibit 71   Page 155 of 299

Dondero - Direct                              154

1    it that way.

2              THE COURT:  Okay.

3    BY MR. MORRIS:

4    Q    Mr. Dondero, did you listen to Mark Patrick say that you

5    are the person who made the decision to transfer the shares to

6    Mr. Scott in 2012?

7    A    Yes, I heard him say that.

8    Q    Okay.  So, do you -- do you dispute that testimony?

9    A    I -- I don't have any better knowledge to dispute or

10   confirm.

11   Q    You and Mr. Scott have known each other since high school,

12   correct?

13   A    Yes.

14   Q    You spent a couple of years at UVA together, correct?

15   A    Yes.

16   Q    You were housemates together, correct?

17   A    Yes.

18   Q    He was the best man at your wedding, correct?

19   A    Yes.

20   Q    He's a patent lawyer, correct?

21   A    Yes.

22   Q    He had no expertise in finance when -- when he was

23   appointed as your successor to the DAF, correct?

24   A    Correct.

25   Q    To the best of your knowledge, at the time Mr. Scott

001834

HCMLPHMIT00002869

Dondero - Direct                    155

1   assumed his position, he had never made any decisions

2   concerning collateralized loan obligations, correct?

3   A   Correct, but he wasn't hired for that.  That wasn't his

4   position.

5   Q   Was he the person who was going to make the decisions with

6   respect to the DAF's investments?

7   A   My understanding on how it was structured was the DAF was

8   paying a significant investment advisory fee to Highland.

9   Highland was doing portfolio construction and the investment

10  selection of -- or the investment recommendations for the

11  portfolio.  There is an independent trustee protocol that I

12  believe was adhered to, but it was never my direct

13  involvement.  It was always the portfolio managers or the

14  traders.

15      You have to provide three similar or at least two other

16  alternatives, and then with a rationale for each of them, but

17  a rationale for why you think one in particular is better.

18  And the trustee looks at the three, evaluates them.  And the

19  way I understand it always worked, that it works at pretty

20  much every charitable trust or trust that I'm aware of, they

21  generally, if not always, pick alongside the -- or, pick the

22  recommendation of their highly-paid investment advisory firm.

23  Q   And are you the highly-paid investment advisory firm?

24  A   Highland was at the time, yes.

25  Q   And you controlled Highland, right?

HCMLPHMIT00002870

Dondero - Direct                    156

 1   A    Yes.

 2   Q    Okay.  But at the end of the day, is it your understanding

 3   that Mr. Scott had the exclusive responsibility for making

 4   actual decisions on behalf of the charitable trust that you

 5   had created?

 6   A    Yeah, I mean, subject to the protocol I just described.

 7   Q    Yeah, okay, so let's keep going.  Mr. Scott had no

 8   experience or expertise running charitable organizations at

 9   the time you decided to transfer the shares to him, correct?

10   A    Yes, I believe that's correct.

11   Q    Okay.  You didn't recommend Mr. Scott to serve as the

12   DAF's investment advisor, did you?

13   A    No.

14   Q    And until early 2021, as you testified, I believe,

15   already, HCMLP served as the DAF's investment advisor,

16   correct?

17   A    Yes.

18   Q    And until early 2021, all of the DAF's day-to-day

19   operations were conducted by HCMLP pursuant to a shared

20   services agreement, correct?

21   A    Yes.

22   Q    And from the time the DAF was formed until January 9,

23   2020, you controlled HCMLP, correct?

24   A    Yes.

25   Q    You can't think of one investment decision that HCMLP

HCMLPHMIT00002871

Dondero - Direct                    157

 1  recommended that Mr. Scott ever rejected in the ten-year

 2  period, correct?

 3          MR. SBAITI:  Objection, Your Honor.  Lacks

 4  foundation.

 5          THE COURT:  Response?

 6          MR. MORRIS:  I'm not quite sure what to say, Your

 7  Honor.  The witness has already testified that HCMLP was the

 8  investment advisor, made recommendations to Mr. Scott, and

 9  that Mr. Scott was the one who had to make the investment

10  decisions at the end of the day.

11          MR. SBAITI:  He's not here as a witness for HCMLP.

12  He's here in his personal capacity.  There's no foundation

13  he'd have personal knowledge of which specific investments

14  were proposed, which ones were rejected or accepted.  He said

15  it was done by the portfolio manager.

16          THE COURT:  Okay.  I overrule.  He can answer if he

17  has an answer.

18  BY MR. MORRIS:

19  Q   Sir, you can't think of one investment decision that HCMLP

20  ever recommended to Mr. Scott that he rejected, correct?

21  A   I can't think of one, but I would caveat with I wouldn't

22  have expected there to be any.

23  Q   So you expected him to just do exactly what HCMLP

24  recommended, correct?

25  A   No.  I would expect him to sort through the various

001837

HCMLPHMIT00002872

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 05/09/26   Page 309 of 1011   PageID 2208

Exhibit 71   Page 159 of 299

Dondero - Direct                    158

 1   investments when he was given three or four to choose from and

 2   be able to discern that, just as we had with our expertise,

 3   which was much greater than his, discern which one was the

 4   best and most suitable investment, the best risk-adjusted

 5   investment, that he would come to the same conclusion.

 6   Q    Okay.  You can't think of an investment that Mr. Scott

 7   ever made on behalf of the DAF that didn't originate with

 8   HCMLP, correct?

 9   A    Again, no, but I wouldn't expect there to be.

10   Q    Okay.  And that's because you expected all of the

11   investments to originate with the company that you were

12   controlling, correct?

13   A    We were the hired investment advisor with fiduciary

14   responsibility --

15   Q    Uh-huh.

16   A    -- and with a vested interest in making sure the DAF

17   performance was the best it could be.

18   Q    Okay.  Let --

19   A    He was, as you said, a patent attorney.  It would have

20   been unusual for him to second-guess.  I'm sure, in any

21   private investment or any investment that was one off or

22   didn't have comps, you know, he probably sought third-party

23   valuations.  But you would have to talk to him about that, or

24   the people at Highland that did that.

25         MR. MORRIS:  I move to strike.  It's a very simple

001838

HCMLPHMIT00002873

Dondero - Direct                    159

1    question.

2            THE COURT:  Sustained.

3    BY MR. MORRIS:

4    Q    Sir, you can't think of one investment that Mr. Scott made

5    on behalf of the DAF that did not originate with HCMLP,

6    correct?

7    A    I'm going to give the same answer.

8    Q    Okay.  Let's go to Page 371 of the transcript, please.

9    Lines 7 through 11.

10           Oh, I apologize.  I think I might -- I think I meant 317.

11   I think I got that inverted.  Yeah.

12           Did I ask this question and did you give this answer:

13   "Can you think of any investment that Mr. Scott made on behalf

14   of the DAF that didn't original with HCMLP?"  Answer, "He

15   wasn't the investment advisor, but no, I don't -- I don't

16   recall."

17           Is that the answer you gave on Friday?

18   A    Yes.

19   Q    Thank you.  Let's --

20           MR. SBAITI:  Just for clarification, Your Honor, --

21           THE COURT:   Pardon?

22           MR. SBAITI:  -- the deposition was last Tuesday, not

23   on Friday.

24           MR. MORRIS:  I stand corrected, Your Honor.

25           THE COURT:  Okay.

001839

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 71   Filed 2/26/25   Page 311 of 1011     PageID 2210
Exhibit 71   Page 162 of 299

Dondero - Direct                    160

1          MR. MORRIS:  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  I apologize if the Court thinks I misled

4   it.

5   BY MR. MORRIS:

6   Q    Let's talk about Mr. Scott's decision during the

7   bankruptcy case that preceded his resignation.  After HCMLP

8   filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim,

9   correct?

10         MR. ANDERSON:  Your Honor, I haven't objected yet,

11  but we literally haven't covered anything that deals with

12  commencing or pursuing a claim or cause of action.  I'm going

13  to object.  This is way outside, again, the bounds of the

14  contempt hearing.  It's -- otherwise, it's other discovery for

15  something else.  It literally has nothing to do with pursue a

16  claim or cause of action.

17         THE COURT:  We have another relevance objection.

18  Your response?

19         MR. MORRIS:  Your Honor, the evidence is going to

20  show that Mr. Dondero told Mr. Scott on three separate

21  occasions that his conduct, which were acts of independence,

22  were inappropriate and were not in the best interests of the

23  DAF.  Within days of the third strike, he resigned.  Okay?

24     I think it's relevant to Mr. Dondero's control of the DAF.

25  I think that the moment that Mr. -- this is the argument I'm

HCMLPHMIT00002875

```
 1   going to make.  I'll make it right now.  You want me to make
 2   it now, I'll make it now.  The moment that Mr. Scott exercised
 3   independence, Mr. Dondero was all over him, and Mr. Scott
 4   left.  That's what happened.  The evidence is going to be
 5   crystal clear.
 6       And I think that that control of the DAF is exactly what
 7   led to this lawsuit.  And what led -- and I'm allowed to make
 8   my argument.  So that's why it's relevant, Your Honor, because
 9   I think it shows that Mr. Scott -- Mr. Scott, after exercising
10   independence, was forced out.
11          MR. ANDERSON:  That doesn't move the needle one bit
12   as to whether a lawsuit was commenced or a claim or cause of
13   action was pursued, which is the subject of the contempt
14   motion.  It doesn't move the needle one bit as to those two
15   issues, as to whether that has any bearing on was it commenced
16   or was it pursued.
17          MR. MORRIS:  Your Honor, I appreciate the very narrow
18   focus that counsel for a different party is trying to put on
19   this, but it is absolutely relevant to the question of whether
20   Mr. Dondero was involved in the pursuit of these claims.  All
21   right?  That's what the order says.  Pursue.
22          THE COURT:  All right.  Overruled.
23   BY MR. MORRIS:
24   Q   After HCMLP filed for bankruptcy, CLO Holdco filed a proof
25   of claim, correct?
```

HCMLPHMIT00002876

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 10/23/25   Page 313 of 1011   PageID 2212

Dondero - Direct                                    162

1  A    I believe so.

2  Q    And in the fall of 2020, Mr. Scott amended the proof of

3  claim to effectively reduce it to zero, correct?

4  A    I -- I guess.

5  Q    And Mr. Scott made that decision without discussing it

6  with you in advance, correct?

7  A    Yes.

8  Q    But you did discuss it with him after you learned of that

9  decision, correct?

10  A    I don't -- I don't recall.  I'm willing to be refreshed,

11  but I don't remember.

12  Q    Well, you told him specifically that he had given up bona

13  fide claims against the Debtor, correct?

14  A    Let me state or clarify my testimony this way.  Um, --

15          MR. MORRIS:  Your Honor, it's really just a yes or no

16  question.  His counsel can ask him if he wants to clarify, but

17  it's really just a yes or no question.

18  BY MR. MORRIS:

19  Q    You told Mr. Scott that he gave up bona fide claims

20  against the Debtor, correct?

21          THE COURT:  Okay.

22          THE WITNESS:  I don't know if I told him then with

23  regard to those claims.

24  BY MR. MORRIS:

25  Q    Okay.  Can we go to Page 321 of the transcript?  At the

HCMLPHMIT00002877

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-71 Filed 10/24/25    Page 314 of 1011    PageID 2213
Exhibit 71 Page 2164 of 299

Dondero - Direct                              163

 1  bottom, Line 21?  22, I apologize.

 2      Did I ask this question and did you give this answer?

 3  "And what do you" -- Question, "And what do you recall about

 4  your discussion with Mr. Scott afterwards?"  Answer, "That he

 5  had given up bona fide claims against the Debtor and I didn't

 6  understand why."

 7      Did I ask that question and did you give that answer last

 8  Tuesday?

 9  A   Yes.

10  Q   Okay.  A short time later, in December, the Debtor filed

11  notice of their intention to enter into a settlement with

12  HarbourVest, correct?

13  A   Yes.

14  Q   And CLO Holdco, under Mr. Scott's direction, filed an

15  objection to that settlement, correct?

16  A   Yes.

17  Q   And that settlement, the substance of that settlement was

18  that the Debtor did not have the right to receive

19  HarbourVest's interests in HCLOF at the time, correct?

20  A   I don't remember the exact substance of it.

21  Q   Okay.  But you do remember that you learned that Mr. Scott

22  caused CLO Holdco to withdraw the objection, correct?

23  A   Yes, ultimately.

24  Q   Okay.  And again, Mr. Scott did not give you advance

25  notice that he was going to withdraw the HarbourVest

HCMLPHMIT00002878

1  objection, correct?

2  A    No, he -- he did it an hour before the hearing.  He didn't

3  give anybody notice.

4  Q    You learned that Mr. Scott caused CLO Holdco to withdraw

5  its objection to the HarbourVest settlement at the hearing,

6  correct?

7  A    Yes.

8  Q    And you were surprised by that, weren't you?

9  A    I believe everybody was.

10  Q    You were sur... you were surprised by that, weren't you,

11  sir?

12  A    Yes.

13  Q    And you were surprised by that because you believed Mr.

14  Scott's decision was inappropriate, right?

15  A    Partly inappropriate, and partly because 8:00 o'clock the

16  night before he confirmed that he was going forward with the

17  objection.  And I think the DAF's objection was scheduled to

18  be first, I think.

19  Q    After you learned that Mr. Scott instructed his attorneys

20  to withdraw the CLO Holdco objection to the HarbourVest

21  settlement, you again spoke with Mr. Scott, correct?

22  A    Yes.

23  Q    And that conversation took place the day of the hearing or

24  shortly thereafter, correct?

25  A    Yes.

HCMLPHMIT00002879

Dondero - Direct                          165

1   Q    And during that conversation, you told Mr. Scott that it

2   was inappropriate to withdraw the objection, correct?

3   A    Yes.

4   Q    And in response, Mr. Scott told you that he followed the

5   advice of his lawyers, correct?

6   A    Yes.

7   Q    But that didn't -- that explanation didn't make sense to

8   you, right?

9   A    Yes.

10  Q    In fact, you believed that Mr. Scott failed to act in the

11  best interests of the DAF and CLO Holdco by withdrawing its

12  objection to the HarbourVest settlement, correct?

13  A    Yes.

14  Q    And while you didn't specifically use the words fiduciary

15  duty, you reminded Mr. Scott in your communications with him

16  that he needed to do what was in the best interests of the

17  DAF, correct?

18  A    Yes.

19  Q    You're the founder of the DAF, correct?

20  A    I put it -- I put it in motion.  Yeah.  I tasked Mark

21  Patrick and third-party law firms to do it, but if that boils

22  down to founder, I guess yes.

23  Q    Uh-huh.  And you're the primary donor to the DAF, correct?

24  A    Yes.

25  Q    You're the investment advisor to the DAF, or at least you

001845

HCMLPHMIT00002880

Dondero - Direct                    166

```
 1   were at that time?

 2   A    Yes.

 3   Q    And because you served in these roles, you expected Mr.

 4   Scott to discuss his decision to withdraw the HarbourVest

 5   objection in advance, correct?

 6   A    Yes, I -- I think it was even broader than that.  I mean,

 7   he was having health and anxiety issues, and to the extent he

 8   felt overwhelmed, I -- you know, yeah, you should do what's in

 9   the best interests at all times, but -- but yes, I thought it

10   would be helpful if he conferred with me or Mark Patrick or

11   whoever he was comfortable with.

12   Q    Mr. Dondero, you specifically believed that Mr. Scott's

13   failure to tell you that he was going to withdraw the

14   HarbourVest objection in advance was inappropriate, right?

15   A    Yes.

16   Q    Even though he was the sole authorized representative, you

17   believed that, because you were the founder of the DAF, the

18   primary donor of the DAF, and the investment advisor to the

19   DAF, he should have discussed that before he actually made the

20   decision, correct?

21   A    No.  What I'm saying is at 8:00 o'clock at night, when he

22   confirms to numerous people he's ready to go first thing with

23   his objection, and then he or counsel or some combination of

24   them change their mind and don't tell anybody before the

25   hearing, that's odd and inappropriate behavior.
```

001846

HCMLPHMIT00002881

Dondero - Direct                    167

1          MR. MORRIS:  Can we go to Page 330 of the transcript,

2     please?

3          And Your Honor, before I read the testimony, there is an

4     objection there.  So I'd like you to rule --

5               THE COURT:  Okay.

6          MR. MORRIS:  -- before I do that.  It can be found at

7     -- on Page 330 at Line 21.

8          (Pause.)

9          MR. MORRIS:  Here we go.  Page 30, beginning at Line

10    19.  330, rather.

11             THE COURT:  Okay.

12         (Pause.)

13             THE COURT:  Okay.  I overrule that objection.

14    BY MR. MORRIS:

15    Q   Mr. Dondero, were you asked this question and did you give

16    this answer last Tuesday?  Question, "Do you believe that he

17    had an obligation to inform you in advance?"  Answer, "I don't

18    know if I would use the word obligation, but, again, as the

19    founder or the primary donor and continued donor to the DAF,

20    and as the investment advisor fighting for above-average

21    returns on a daily basis for the fund, significant decisions

22    that affect the finances of the fund would be something I

23    would expect typically a trustee to discuss with the primary

24    donor."

25         Did you give that answer the other day, sir?

HCMLPHMIT00002882

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 74   Filed 06/09/26   Page 319 of 1011   PageID 2218
Exhibit 71   Page 169 of 299

Dondero - Direct                              168

```
 1   A    Yes.

 2   Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit

 3   that's in District Court, does he have an the obligation to

 4   tell you in advance?

 5   A    Again, I wouldn't use the word obligation.  But something

 6   that I think ultimately is going to be a $20 or $30 million,

 7   if not more, benefit to the DAF, to the detriment of Highland,

 8   if you were to give that up, I would expect him to have a

 9   rationale and I would expect him to get other people's

10   thoughts and opinions before he did that.

11   Q    Okay.  But does he have to get your opinion before he

12   acts?

13   A    No, he does not.

14   Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he

15   could settle the case, and if he doesn't come to you to

16   discuss it in advance, you won't be critical of him, right?

17   A    He doesn't have the obligation, but there's -- there's a

18   reasonableness in alignment of interests.  I -- a growing

19   entrepreneur sets up a trust, a lot of times they'll put their

20   wife in charge of it, and she hires investment advisers and

21   whatever, but they've got the best interests at mind for the

22   charity or the children or whatever.

23        You know, people who go rogue and move in their own self-

24   interest or panic, that stuff can happen all the time.  It

25   doesn't make it appropriate, though.
```

001848

HCMLPHMIT00002883

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71   Filed 07/02/25   Page 320 of 1011    PageID 2219
Exhibit 71    Page 172 of 299

Dondero - Direct                        169

1  Q   A couple of weeks after Mr. Scott withdraw the objection

2  to the HarbourVest settlement, he entered into a settlement

3  agreement with the Debtor pursuant to which he settled the

4  dispute between the Debtor and CLO Holdco, correct?

5  A   Yes.

6  Q   Okay.  You didn't get advance notice of that third

7  decision, correct?

8  A   No.

9  Q   Can we go to Page -- Exhibit 32 in your binder?  And this

10 is the settlement agreement between CLO Holdco and the Debtor,

11 correct?  Attached as the exhibit.  I apologize.

12 A   Yes.

13 Q   And do you understand that that's Mr. Scott's signature on

14 the last page?

15 A   Yep.

16 Q   And you learned about this settlement only after it had

17 been reached, correct?

18 A   Yep.

19 Q   And you believed Mr. Scott's decision not to pursue

20 certain claims against the Debtor or to remove HCMLP as the

21 manager of the CLOs was not in the best interests of the DAF,

22 correct?

23 A   Correct.

24 Q   And you let Mr. Scott know that, correct?

25 A   Yes.

001849

HCMLPHMIT00002884

Exhibit 71   Page 2021 of 299

Dondero - Direct                    170

1   Q    After learning about the settlement agreement on January

2   26th, you had one or two conversations with Mr. Scott on this

3   topic, correct?

4   A    Yes.

5   Q    And your message to Mr. Scott was that the compromise or

6   settlement wasn't in the DAF's best interest, correct?

7   A    It was horrible for the DAF.

8   Q    Uh-huh.  And you told him that, right?

9   A    Yes.

10  Q    Okay.  From your perspective, any time a trustee doesn't

11  do what you believe is in the trust's best interest, you leave

12  yourself open to getting sued, correct?

13  A    Who is "you" in that question?

14  Q    You.  Mr. Dondero.

15  A    Can you repeat the question, then, please?

16  Q    Sure.  From your perspective, any time you're a trustee

17  and you don't believe that the trustee is doing what's in the

18  best interests of the fund, the trustee leaves himself open to

19  getting sued, correct?

20  A    I don't know who the trustee leaves himself open to, but

21  as soon as you go down a path of self-interest or panic, you

22  -- you potentially create a bad situation.  But I don't know

23  who holds who liable.

24  Q    Did you believe that Mr. Scott was acting out of self-

25  interest or panic when he decided to settle the dispute with

HCMLPHMIT00002885

1   the Debtor on behalf of CLO Holdco?

2   A    Yes.

3   Q    Did you tell him that?

4   A    He told me that.

5   Q    He told you that he was acting out of panic or

6   desperation?  With self-int... withdrawn.  Withdrawn.  Did he

7   tell you that he was acting out of self-interest?

8   A    He was having health problems, anxiety problems, and he

9   didn't want to deal with the conflict.  He didn't want to

10  testify.  He didn't want to come to court.  He didn't want to

11  do those things.  And I told him I didn't think the settlement

12  was going to get him out of that stuff.  I think, you know, it

13  got him out of some issues, but I think you guys are going to

14  go after him for other stuff.  But he -- he panicked.

15          MR. MORRIS:  I move to strike the latter remark.

16          THE COURT:   Sustained.

17  BY MR. MORRIS:

18  Q    Shortly after you had the conversation with Mr. Scott, he

19  sent you notice of his intent to resign from his positions at

20  the DAF and CLO Holdco, correct?

21  A    Yes.

22  Q    Okay.  Let's take a look at that, please.  Exhibit 29.

23  This is Mr. Scott's notice of resignation, correct?

24  A    Yes.

25  Q    He sent it only to you, correct?

001851

HCMLPHMIT00002886

```
 1    A    Yes.

 2    Q    A couple of days before he sent this, he told you he was

 3    considering resigning; isn't that right?

 4    A    Yes.

 5    Q    Okay.  And he told you he was considering resigning

 6    because he was suffering from health and anxiety issues

 7    regarding the confrontation and the challenges of

 8    administering the DAF given the bankruptcy, correct?

 9    A    Yes.

10    Q    He didn't tell you that he made the decision -- withdrawn.

11    Did you tell him in this same conversation -- withdrawn.  Is

12    this the same conversation where you conveyed the message that

13    the compromise or settlement wasn't in the best interests of

14    the DAF?

15    A    You mean the conversation -- or the resignation? Is that

16    -- can you rephrase the question, please?

17    Q    Yeah, I apologize.  It's my fault, sir.  You testified

18    that after the January 26th hearing you had a conversation

19    with Mr. Scott where you told him that the compromise or

20    settlement was not in the best interests of the DAF, correct?

21    A    Yes.

22    Q    Okay.  Did Mr. Scott share with you his concerns about

23    anxiety and health issues in that same conversation, or was it

24    in a subsequent conversation?

25    A    It was at or around that time.  I -- I don't remember
```

001852

HCMLPHMIT00002887

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 07/14/25   Page 324 of 1011   PageID 2223
Exhibit 71   Page 2074 of 299

Dondero - Direct                          173

 1  which conversation.

 2  Q    Okay.

 3  A    But it was right at or around that time.

 4  Q    All right.  You never asked Mr. Scott to reconsider, did

 5  you?

 6  A    No.

 7  Q    You don't recall sending this notice of resignation to

 8  anyone, do you?

 9  A    No.

10  Q    You don't remember notifying anyone that you'd received

11  notice of Mr. Scott's intent to resign from the DAF, do you?

12  A    It was -- yeah, no, I -- I don't remember.  It was a busy

13  time around that time and this was a secondary issue.

14  Q    Okay.  So the fact that the person who has been running

15  the DAF for a decade gives you and only you notice of his

16  intent to resign was a secondary issue in your mind?

17  A    Yes, because when I talked to him at about that time, I

18  said, okay, well, it's going to take a while.  I don't even

19  know how the mechanism works.  But don't do anything adverse

20  to the DAF, don't do anything else until, you know, you've

21  figured out transition.

22  Q    Uh-huh.

23  A    And so once he had confirmed he wouldn't do anything

24  outside normal course until he transitioned, I didn't worry

25  about this.  I had bigger issues to worry about at the time.

001853

HCMLPHMIT00002888

Dondero - Direct                    174

1    Q    In the third paragraph of his email to you, he wrote that

2    his resignation will not be effective until he approves of the

3    indemnification provisions and obtains any and all necessary

4    releases.  Do you see that?

5    A    Yes.

6    Q    And that was the condition that on January 31st Mr. Scott

7    placed on the effectiveness of his resignation, correct?

8    A    Condition?  Yeah, I -- I think he's trying to state the

9    timing will happen after that.

10   Q    After he gets the release, right?

11   A    Yes.

12   Q    And he wanted the release because you'd told him three

13   different times that he wasn't acting in the best of the DAF,

14   correct?

15             MR. TAYLOR:  Objection, Your Honor.

16             MR. SBAITI:  Objection.  Calls for --

17             MR. TAYLOR:  Objection.  Calls for speculation.

18             THE WITNESS:  Yeah, I --

19             THE COURT:  Sustained.

20             THE WITNESS:  I can't take that jump.  Yeah.

21   BY MR. MORRIS:

22    Q    In response to this email from your lifelong friend, you

23   responded, if we could scroll up, about whether divest was a

24   synonym -- if we can look at the first one -- whether divest

25   is a synonym for resigned.  Do I have that right?

001854

1    A    (no immediate response)

2    Q    If you will look at your response on Monday morning at

3    9:50.

4    A    Yes.

5    Q    Okay.  And then after Mr. Scott responds, you respond

6    further, if we can scroll up, and you specifically told him,

7    "You need to tell me ASAP that you have no intent to divest

8    assets."  Correct?

9    A    Yes.

10   Q    And you wrote that because you believed some of his

11   behavior was unpredictable, right?

12   A    I think I wrote that because the term divest in investment

13   terms means sale or liquidate, but I guess it had a different

14   legal term in the way he was looking at it.  I wasn't aware at

15   that time of the shares that could be bequeathed to anybody,

16   and I think the divest refers to that, but I wasn't aware that

17   that's how the structure worked at that time, and I was

18   worried that divest could be the investment term and I -- it

19   wouldn't have been appropriate for him to liquidate the

20   portfolio.

21   Q    So, and you wanted to make sure he wasn't liquidating or

22   intending to liquidate any of the CLOs, correct?

23   A    Correct.

24   Q    Okay.  So he's still the authorized, the sole authorized

25   representative, but you wanted to make sure that he didn't do

001855

HCMLPHMIT00002890

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-71 Filed 07/26/299Page 327 of 1011    PageID 2226

Dondero - Direct                      176

1    anything that you thought was inappropriate.  Fair?

2    A    It's because I had talked to him before this and he said

3    he wasn't going to do anything outside normal course, and then

4    the word divest scared me, but I didn't realize it was a legal

5    term in this parlance here.

6    Q    And so after he explained, you still wanted to make sure

7    that he wasn't divesting any assets, correct?

8    A    Yes.

9    Q    Okay.  Since February 1st, you've exchanged exactly one

10   text messages with Mr. Scott; is that right?

11   A    I think there've been several, several text messages.  But

12   one on his birthday.

13   Q    Yeah.  And you haven't spoken to him in months, correct?

14   A    In a couple months, yes.

15   Q    All right.  Let's talk about the replacement of Mr. Scott.

16   With -- with Mr. Scott's notice, someone needed to find a

17   replacement, correct?

18   A    Yes.

19   Q    And the replacement was going to be responsible for

20   managing a charitable organization with approximately $200

21   million of assets, most of which was seeded directly or

22   indirectly through you, correct?

23   A    Yes.

24   Q    And the replacement was going to get his and her -- his or

25   her investment advice from you and NexPoint Advisors; do I

001856

HCMLPHMIT00002891

Dondero - Direct                        177

1   have that right?

2   A    That was the plan.

3   Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott,

4   correct?

5   A    Yes.

6   Q    But it's your testimony that you had no knowledge that Mr.

7   Patrick was going to replace Mr. Scott until after it happened

8   on March 24, 2021.  Correct?

9   A    That's correct.  I believe it happened suddenly.

10  Q    So, for nearly two months after you had received notice of

11  Mr. Scott's intent to resign, you were uninvolved in the

12  process of selecting his replacement, correct?

13  A    I was uninvolved.  I'd say the process was dormant for an

14  extended period of time until Mark Patrick came on board, and

15  then Mark Patrick ran the process of interviewing multiple

16  potential candidates.

17  Q    Mark Patrick didn't have any authority prior to March

18  24th, correct?

19  A    Is March 24th the date that he transitioned the shares to

20  himself from Grant Scott?

21  Q    Yep.

22  A    That's when he then became the trustee of the DAF, yes.

23  Q    Do you know -- do you know who was instructing Mr. Patrick

24  on who to interview or how to carry the process out?

25  A    He was doing that on his own with, I think,

HCMLPHMIT00002892

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71 Filed 07/03/26   Page 329 of 1011   PageID 2228
Exhibit 71   Page 179 of 299

Dondero - Direct                      178

1  recommendations from third-party tax firms.

2  Q   So Mr. Patrick was trying to find a successor to Mr.

3  Scott, even though he had no authority to do that, and you

4  were completely uninvolved in the whole process?  Do I have

5  that right?

6  A   I was uninvolved, yes.  He was trying to facilitate it for

7  the benefit of his friendship with Grant Scott and knowing

8  that it -- it -- with his resignation, it had to transition to

9  somebody.  And he enjoys working on the DAF, he enjoys the

10 charitable stuff in the community, and he was the most

11 appropriate person to work on helping Grant transition.

12          MR. MORRIS:  All right.  I move to strike, Your

13 Honor.  It's hearsay.

14          THE COURT:  Sustained.

15 BY MR. MORRIS:

16 Q   You're aware that Mr. Seery was appointed the Debtor's CEO

17 and CRO last summer, correct?

18 A   Yes.

19 Q   And you're aware that Mr. Seery's appointment was approved

20 by the Bankruptcy Court, correct?

21 A   Yes.

22 Q   And you were aware of that at the time it happened,

23 correct?

24 A   Yes.

25 Q   And even before that, in January of 2020, you consented to

001858

HCMLPHMIT00002893

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71 Filed 08/06/25   Page 330 of 1011    PageID 2229
Exhibit 71   Page 180 of 299

Dondero - Direct                              179

1   a settlement where you gave up control of the Debtor.

2   Correct?

3   A    To the independent board for a consensual Chapter 11

4   restructuring that would leave Highland intact.

5   Q    And do you understand that the gatekeeper provision in the

6   July order is exactly like the one that you agreed to in

7   January except that it applies to Mr. Seery instead of the

8   independent directors?

9   A    I -- I learned a lot about that today, but I don't think

10   it's appropriate to move what applied to the board to the CEO

11   of a registered investment advisor.

12   Q    Okay.  I'm just asking you, sir.  Listen carefully to my

13   question.  Were you aware in January 2020 that you agreed to a

14   gatekeeper provision on behalf of the independent board?

15   A    Generally, but not specifically.

16   Q    Okay.

17   A    Not -- not like what we've been going over today.

18   Q    Okay.  And you knew that Mr. Seery had applied to be

19   appointed CEO subject to the Court's approval, correct?

20   A    Wasn't it backdated to March?  I -- I think the hearing

21   was in June, but it was backdated for -- for money and other

22   purposes, right?  I -- that's my recollection.  I don't

23   remember otherwise.

24   Q    You do remember that Mr. Seery got -- he got -- his

25   appointment got approved by the Court, right?

001859

HCMLPHMIT00002894

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-71    Filed 10/31/25    Page 331 of 1011    PageID 2230

Dondero - Direct                                    180

1   A    Yes.  But, as far as the dates are concerned, I thought it
2   was either in March or retroactive to March.  Maybe it was
3   June or July.
4   Q    And you --
5   A    But I don't remember.
6   Q    Did you have your lawyers review the motion that was filed
7   on behalf of the Debtor?
8   A    I'm -- I assume they do their job.  I -- if they didn't, I
9   don't know.
10  Q    Okay.  That's what you hired them to do; is that fair?
11  A    Yes.
12  Q    Okay.  Can we go to Exhibit 12, please?  I think it's in
13  Binder 1.  You've seen this document before, correct?
14  A    Yes.
15  Q    In fact, you saw versions of this complaint before it was
16  filed, correct?
17  A    Yes, I saw one or two versions towards the end.  I don't
18  know if I saw the final version, but --
19  Q    Sir, you participated in discussions with Mr. Sbaiti
20  concerning the substance of this complaint before it was
21  filed, correct?
22  A    Some.  I would just use the word some.
23  Q    Okay.  Can you describe for me all of your conversations
24  with Mr. Sbaiti concerning the substance of this complaint?
25            MR. SBAITI:  Your Honor, I would object on the basis

HCMLPHMIT00002895

Dondero - Direct                    181

1   of work product privilege and attorney-client communications.

2   He was an agent for my client, the DAF, at the time he was

3   having these discussions with us, and our discussions with him

4   were work product.  So to the extent he can reveal the

5   conversations without discussing the actual content, we would

6   raise privilege objection, Your Honor.

7           THE COURT:  Mr. Morris?

8           MR. MORRIS:  Your Honor, there is no privilege here.

9   That's exactly why I asked Mr. Patrick the questions earlier

10  today.  Mr. Dondero is not party to any agreement with the DAF

11  today.  It's an informal agreement, perhaps, but there is no

12  contractual relationship, there is no privity any longer

13  between Mr. Dondero or any entity that owns and controls in

14  the DAF, as far as I know.  If they have evidence of it, I'm

15  happy to listen, but that -- that's exactly why I asked those

16  questions of Mr. Patrick earlier today.

17          THE COURT:  All right.

18          MR. SBAITI:  Your --

19          THE COURT:  That was the testimony.  There's an

20  informal arrangement, at best.

21          MR. SBAITI:  Well, Your Honor, I would suggest that

22  that doesn't necessarily mean that he isn't an agent of the

23  DAF.  It doesn't have to be a formal agreement for him to be

24  an agent of the DAF.

25      Everyone's agreed he was an advisor.  Everyone's agreed he

001861

HCMLPHMIT00002896

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 171 Filed 06/26/26   Page 333 of 1011   PageID 2232
Exhibit 71   Page 182 of 299

Dondero - Direct                          182

1  was helping out.  That is an agency relationship.  It doesn't

2  have to be written down.  It doesn't have to be a formal

3  investment advisory relationship.  He's still an agent of the

4  DAF.  He was requested to do something and agreed to do it

5  under the expectation that all of us had that those would be

6  privileged, Your Honor.  That is -- that is sufficient -- that

7  is sufficient, I would argue, to get us where we need to be.

8  The privilege should apply, Your Honor, and they don't have a

9  basis for, I would say, invading the privilege, Your Honor.

10         THE COURT:  Well, do you have any authority?  Because

11  it just sounds wrong.  He's not an employee of your client.

12  He doesn't have any contractual arrangement with your client.

13         MR. SBAITI:  Your Honor, I would dispute the idea

14  that he has no contractual arrangement with my client.  The

15  question was asked, do you have a -- do you have a written

16  agreement, and then the question was, so you don't have a

17  contract, and the answer was no, I don't have a contract,

18  building upon that first -- that first question.  But the

19  testimony as he just recounted is that there is an agreement

20  that he would advise Mr. Patrick and he would advise the DAF.

21         THE COURT:  Okay.

22         MR. SBAITI:  That's -- that's a contract.

23         THE COURT:  Okay.  My question was, do you have any

24  legal authority?  That's what I meant when I said authority.

25  Any legal authority to support the privilege applying in this

001862

HCMLPHMIT00002897

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71 Filed 2/04/25   Page 334 of 1011   PageID 2233
Exhibit 71   Page 184 of 299

Dondero - Direct                                    183

```
 1   kind of --

 2          MR. SBAITI:  In an informal arrangement, Your Honor?

 3   I don't have one at my fingertips at the moment, Your Honor,

 4   but I don't know that that should be a reason to invade the

 5   privilege.

 6       And I would just add, Your Honor, I would just add, we've

 7   already -- because of the purpose of these questions, you've

 8   heard Mr. Morris state several times that the purpose is to

 9   show that Mr. -- that Mr. Dondero had some role in advising

10   and participating in the creation of this complaint.  That's

11   been conceded by myself.  I believe it was conceded by Mr.

12   Dondero.

13       The actual specific facts, the actual specific

14   conversations, Your Honor, shouldn't be relevant at this point

15   and they shouldn't be admissible, given -- given the

16   relevancy, given the perspective of the privilege.

17          THE COURT:  Okay.

18          MR. MORRIS:  If I might --

19          THE COURT:  I overrule your objection.  I don't think

20   a privilege has been shown here --

21          MR. SBAITI:  And Your Honor, --

22          THE COURT:  -- and I think it's relevant.

23          MR. SBAITI:  -- I would ask if we could voir dire the

24   witness on the basis of the privilege, if that's --

25          THE COURT:  All right.  You may do so.
```

001863

HCMLPHMIT00002898

Dondero - Voir Dire                                184

```
 1                    VOIR DIRE EXAMINATION

 2   BY MR. SBAITI:

 3   Q    Mr. Dondero, do you have a relationship with the DAF?

 4   A    Yes.

 5   Q    How would you describe that relationship?

 6   A    I view myself and my firm as the investment advisor.  I

 7   was actually surprised by the testimony today that there

 8   wasn't a contract in place, but there should be one.  There

 9   should be one soon, in my opinion.

10   Q    Have you -- did you hear Mr. Patrick testify earlier that

11   he comes to you for advice?

12   A    Yes.

13   Q    Is that --

14   A    As he should.  Yeah.

15   Q    Is that true?

16   A    Yes.

17   Q    When you render that advice, do you render that advice

18   with some expectation about him following or listening to that

19   advice?

20   A    Okay, I think there's only been one investment or one

21   change in the DAF portfolio since Mark Patrick's been

22   involved, only one, and it was a real estate investment that I

23   wasn't directly involved in.  And so the people who put that

24   investment forward worked with Mark without my involvement,

25   and then I think Mark got third-party appraisal firms and
```

001864

Dondero - Voir Dire                          185

1   third-party valuation firms involved to make sure he was

2   comfortable, which was a good process.

3   Q    When you supplied information to Mr. Patrick, do you do so

4   under the belief that there is a contractual, informal or

5   formal, relationship?

6           MR. MORRIS:  Objection to the form of the question.

7           THE COURT:  Overruled.

8           MR. SBAITI:  What specific form?

9           THE COURT:  Overruled.

10          MR. SBAITI:  Thank you.

11          THE WITNESS:  Yes.  I believe it -- it's a

12  relationship that can and should be papered as -- soon.

13  That's my -- I mean, unless I get some reason from counsel not

14  to, I think it's something that should be memorialized.

15  BY MR. SBAITI:

16  Q    And when you have that -- in that relationship, when you

17  communicate with Mr. Patrick about matters, investment or

18  otherwise, is there an expectation of privacy?

19  A    Yes.

20  Q    When Mr. Patrick -- did Mr. Patrick request that you

21  interface with my firm and myself, as he testified earlier?

22  A    Yes.

23  Q    And when he did so, did he ask you to do so in an

24  investigatory manner?

25          MR. MORRIS:  Objection to the form of the question.

001865

HCMLPHMIT00002900

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71 Filed 08/27/25   Page 337 of 1011   PageID 2236
Exhibit 71   Page 187 of 299

Dondero - Voir Dire                              186

```
 1              THE COURT:  Sustained.  Rephrase.

 2   BY MR. SBAITI:

 3   Q    Did he tell you why he wanted you to talk to us?

 4   A    Yeah.  At that point, he had started an investigation into

 5   the HarbourVest transaction.

 6   Q    And -- and when he -- when you were providing information

 7   to us, did he tell you whether he wanted you to help the

 8   Sbaiti firm conduct the investigation?

 9   A    The -- overall, the financial numbers and tables in there

10   were prepared by not myself, but I -- I did -- I did help on

11   -- on the -- some of the registered investment advisor issues

12   as I understood them.

13   Q    Okay.  And the communications that you had with us, was

14   that part of our investigation?

15              MR. MORRIS:  Objection to the form of the question.

16              THE COURT:  Overruled.

17              THE WITNESS:  Yes.

18   BY MR. SBAITI:

19   Q    And did you understand that we had been retained by Mr.

20   Patrick on behalf of the DAF and CLO Holdco?

21   A    Yes.

22   Q    And did you appreciate or have any understanding of

23   whether or not you were helping the law firm perform its legal

24   function on behalf of the DAF and CLO Holdco?

25   A    Perform its legal function?  I was just helping with
```

HCMLPHMIT00002901

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 10/08/25   Page 338 of 1011   PageID 2237
Exhibit 71   Page 288 of 299

Dondero - Voir Dire                    187

 1   regard to the registered investment advisor aspects of the

 2   overall, you know, like that.

 3   Q    Let me ask a more simple question.  Did you -- did you

 4   appreciate that you were assisting a law firm in its

 5   representation of the DAF?

 6   A    Yes.

 7   Q    And you were helping the law -- and were you helping the

 8   law firm develop the facts for a complaint?

 9   A    Yes.  I would almost say, more importantly, I wanted to

10   make sure that there weren't errors in terms of understanding

11   either how CLOs worked or how the Investment Advisers Act

12   worked.  So I was -- it was almost more of a proofing.

13             MR. SBAITI:  Your Honor, based upon that, I mean,

14   he's helping a law firm perform its function for the client.

15   That's an agency relationship that gets cloaked.  You can call

16   him a consulting expert.  You can call him, to a certain

17   extent, a fact witness, Your Honor.  If we want to take a

18   break, I'm sure we could find authority on that basis for a

19   work product privilege pretty easily.

20        But he's an agent of the DAF.  Even if it's an informal

21   agency relationship, that's still agency.  He's in some

22   respects, I guess, an agent of the law firm, to the extent

23   he's helping us perform our legal work.  And it seems like

24   invading that privilege at this juncture is (a) unnecessary,

25   because we've already conceded that there's been

HCMLPHMIT00002902

Dondero - Voir Dire                                188

```
 1    conversations, which I think is the relationship they wanted
 2    to establish.  And it's not unusual for a law firm to use
 3    someone with specialized knowledge to understand some of the
 4    intricacies of the actual issues that they're -- that they're
 5    getting ready to litigate.
 6            THE COURT:  Okay.  I find no privilege.  All right.
 7    That's the ruling.
 8            MR. BRIDGES:  Your Honor, may I add one thing to the
 9    objection for the record?
10            THE COURT:  Okay, we have a rule, one lawyer per
11    witness.  Okay?  So, thank you.  A District Court rule, by the
12    way, not mine.
13            MR. SBAITI:  Your Honor, may we take a short recess,
14    given the Court's ruling?
15            THE COURT:  Well, I'd really like to finish this
16    witness.  How much longer do you have?
17            MR. MORRIS:  About eight more questions.
18            THE COURT:  All right.  We'll take a break after the
19    direct, okay?
20            MR. SBAITI:  Your Honor, I would ask that we -- if
21    he's going to ask him more questions about the content of the
22    communications, I ask respectfully for a recess so we can
23    figure out what to do about that.  Because, right now, there's
24    a ruling that he's going to have to reveal privileged
25    information, and we don't have a way to go around and figure
```

001868

HCMLPHMIT00002903

```
 1    out how to resolve that issue if we needed to.

 2              THE COURT:  Okay.  I've ruled it's not privilege.

 3    Okay?

 4              MR. SBAITI:  I understand that, Your Honor, but --

 5              THE COURT:  Your client is CLO Holdco and the DAF.

 6              MR. SBAITI:  Yes, Your Honor.

 7              THE COURT:  Representative, Mark Patrick.  No

 8    contract with Mr. Dondero.  The fact that he may be very

 9    involved I don't think gives rise to a privilege.  That's my

10    ruling.

11              MR. SBAITI:  I understand, Your Honor.  I understand,

12    Your Honor, but I'm asking for a recess so that we can at

13    least undertake to provide Your Honor with some case law on a

14    reconsideration before we go there, because that bell can't be

15    unrung.

16              MR. MORRIS:  Your Honor, if I may?

17              MR. SBAITI:  And it's --

18              THE COURT:  Uh-huh.

19              MR. MORRIS:  I'm happy to give them ten minutes, Your

20    Honor, as long as they don't talk to the witness.

21              THE COURT:  Okay.

22              MR. MORRIS:  I want to give them the opportunity.  Go

23    right ahead.

24              THE COURT:  All right.  We'll take a ten-minute

25    break.
```

001869

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 74 Filed 21/21/26 299  Page 341 of 1011    PageID 2240
Exhibit 71   Page 291/26

Dondero - Voir Dire                      190

  1              MR. SBAITI:  Thank you.

  2              THE COURT:  It's 3:05.

  3              THE CLERK:  All rise.

  4      (A recess ensued from 3:03 p.m. until 3:17 p.m.)

  5              THE CLERK:  All rise.

  6              THE COURT:  Okay.  Please be seated.  Going back on

  7   the record in Highland.  Mr. Sbaiti?

  8              MR. SBAITI:  Yes, Your Honor.  May I approach?

  9              THE COURT:  You may.

 10              MR. SBAITI:  Your Honor, we have some authority to

 11   support the position we'd taken.  We'd ask the Court to

 12   reconsider your ruling on the privilege.

 13        The first bit of authority is Section 70 of the

 14   Restatement (Third) of Law Governing Lawyers.  Privileged

 15   persons within the meaning of Section 68, which governs the

 16   privilege, says that those persons include either agents of

 17   either the lawyer or the client who facilitate communications

 18   between the two in order for the lawyers to perform their

 19   function.

 20        Another case that we found is 232 F.R.D. 103 from the

 21   Southern District of New York, 2005.  It's *Express Imperial*

 22   *Bank of U.S. v. Asia Pulp Company*.  And in that case, Your

 23   Honor, the consultant was a -- had a close working

 24   relationship with the company and performed a similar role to

 25   that of the employee and was assisting the law firm in

HCMLPHMIT00002905

Dondero - Voir Dire                          191

```
 1   performing their functions, and the court there found that the
 2   work product privilege -- actually, the attorney-client
 3   privilege -- attached in what they called a Functional
 4   Equivalents Doctrine, Your Honor.
 5        And here we have pretty much the same set of facts that's
 6   pretty much undisputed.  The fact that there -- and the fact
 7   that there isn't a written agreement doesn't mean there isn't
 8   a contractual arrangement for him to have rendered services
 9   and advice.  And the fact that he's, you know, recruited by us
10   to help us perform our functions puts him in the realm, as I
11   said, of something of a consulting expert.
12        Either way, the work product privilege, Your Honor, should
13   apply, and we'd ask Your Honor not to invade that privilege at
14   this point, Your Honor.  And I'll ask you to reconsider your
15   prior ruling.
16        Furthermore, I believe Mr. Morris, you know, in making his
17   argument, is trying to create separation.  The fact that he
18   has no relationship, that the privilege can be invaded, seems
19   to defeat the whole premise of his whole line of questioning.
20        So, once again, Your Honor, I just -- it's a tit for a tat
21   there, and it seems to kind of eat itself.  Either he is
22   working with us, which we've admitted he is working with us,
23   us being the law firm, and helping us do our jobs, or he's
24   not.  And if he's not, then this should be done.
25             THE COURT:  Okay.
```

001871

1          MR. MORRIS:  Your Honor, briefly?

2          THE COURT:  Well, among other things, what do you

3    want me to do?  Take a break and read your one sentence from

4    the Restatements and your one case?  And could you not have

5    anticipated this beforehand?

6          MR. SBAITI:  Your Honor, --

7          THE COURT:  This is not the way we work in the

8    bankruptcy courts, okay?  We're business courts.  We have

9    thousands of cases.  We expect briefing ahead of time.

10         MR. SBAITI:  Your Honor, this has been a rather

11   rushed process anyway.  And to be honest, --

12         THE COURT:  When was the motion filed?

13         MR. SBAITI:  Your Honor, --

14         THE COURT:  More than a month ago.

15         MR. SBAITI:  -- his deposition was a week ago.

16         THE COURT:  Well, okay.  So you could not have

17   anticipated this issue until his deposition one week ago?

18         MR. SBAITI:  Your Honor, this issue arose at the

19   deposition, obviously, because that's what he's quoting from.

20   However, at least to us, this is such a well-settled area, and

21   to be honest, --

22         THE COURT:  Such a well-settled area that you have

23   one sentence from the Restatement and one case from the

24   Southern District of New York?

25         MR. SBAITI:  No, Your Honor.  I think the work

HCMLPHMIT00002907

Dondero - Voir Dire                           193

1  product privilege lexicon -- we had ten minutes to try to find

2  something more on point than the general case law that applies

3  the work product privilege to people that work with lawyers,

4  consultants who work with lawyers, employees who work with

5  lawyers, even low-down employees who normally wouldn't enjoy

6  the privileges that attach to the corporation, when they work

7  with the company for -- when they work with the company

8  lawyers, it typically attaches.

9              THE COURT:  You know, obviously, I know a few things

10  about work product privilege, but he doesn't check any of the

11  boxes you just listed out.

12             MR. SBAITI:  I disagree, Your Honor.

13             THE COURT:  He's not an employee.  He's not a low-

14  level employee.

15             MR. SBAITI:  He's a consultant.

16             THE COURT:  With no agreement.

17             MR. SBAITI:  With a verbal agreement.  He's an

18  advisor.  And he was recruited by us, and at the request of

19  the DAF, of the head of the DAF, Mr. Patrick, to help us do

20  our job for the DAF.  I don't --

21             THE COURT:  Okay.  Mr. Morris, what do you want to

22  say?

23             MR. MORRIS:  Just briefly, Your Honor.  This issue

24  has been ripe since last Tuesday.  They directed him not to

25  answer a whole host of questions about his involvement at the

HCMLPHMIT00002908

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 10/05/25   Page 345 of 1011   PageID 2244
Exhibit 71   Page 195 of 299

Dondero - Voir Dire                            194

1   deposition last Tuesday, so they've actually had six days to

2   deal with this.  That's number one.

3       Number two, there's absolutely nothing inconsistent with

4   the Debtor's position that Mr. Dondero is participating in the

5   pursuit of claims and at the same time saying that his

6   communications with the Sbaiti firm are not privileged.

7   There's nothing inconsistent about that.

8       So the argument that he just made, that somehow because

9   we're trying to create separation, that that's inconsistent

10  with our overall arching theme that Mr. Dondero is precisely

11  engaged in the pursuit of claims against Mr. Seery, I think

12  that takes care of that argument.

13      Finally, your Honor, with respect to this consultancy

14  arrangement, not only isn't there anything in writing, but

15  either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero

16  the terms of the agreement.  Is he getting paid?  Is he doing

17  it for free?  Who retained him?  Was it Mr. -- because the --

18  there's no such thing.  There's no such thing.

19      The fact of the matter is what happened is akin to I have

20  a slip-and-fall case and I go to a personal injury lawyer and

21  I bring my brother with me because I trust my brother with

22  everything.  It's not privileged.  Any time you bring in

23  somebody who is not the attorney or the client, the privilege

24  is broken.  It's really quite simple.  Unless there's a common

25  interest.  They can't assert that here.  There is no common

HCMLPHMIT00002909

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71 Filed 06/06/25   Page 346 of 1011   PageID 2245
Exhibit 71   Page 196 of 299

Dondero - Voir Dire                    195

 1   interest.  So --

 2            THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to

 3   three more minutes to *voir dire* Mr. Dondero to try to

 4   establish some sort of agency relationship or other evidence

 5   that you think might be relevant.

 6                        VOIR DIRE, RESUMED

 7   BY MR. SBAITI:

 8   Q    Mr. Dondero, when you provided information to the law

 9   firm, were you doing so under an agency relationship?  Do you

10   know what an agency relationship is?

11   A    Generally.  When you're working on the -- or why don't you

12   tell me?

13   Q    Tell me your understanding, so we can use --

14   A    That you're working for the benefit or as a proxy for the

15   other entity or the other firm or the other person.

16   Q    Right.  So you're working for the DAF?

17   A    Yes.

18   Q    Do you do work for the DAF?

19   A    Yes.  As I stated, I'm surprised there isn't -- when we

20   reconstituted after leaving Highland, we put in shared

21   services agreements in place and asset management agreements

22   in place and tasked people with doing that for most of the

23   entities.  There might be still a few contracts that are being

24   negotiated, but I thought most of them were in place.

25        So I would imagine that there'll be an asset management

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 07/26/25   Page 347 of 1011   PageID 2246
Exhibit 71 Page 197 of 299

Dondero - Voir Dire                              196

```
 1  agreement with the DAF back to NexPoint sometime soon, so it
 2  -- it's --
 3  Q    Let me ask you this question.  When you were providing
 4  information to us and having conversations with us, were you
 5  doing that as an agent of the DAF, the way you described it,
 6  --
 7  A    Yes.
 8  Q    -- on their behalf?
 9  A    Yes.
10  Q    Were you also doing it to help us do our jobs for the DAF?
11  A    Yes.
12  Q    Did you respond to requests for information from myself?
13  A    Yes.
14  Q    Did you help coordinate other -- finding other witnesses
15  or sources of information at my request?
16  A    Yes.
17  Q    Did you do so based upon any understanding that I was
18  working on behalf of the DAF for that?
19  A    Yes.  I knew -- I knew you were working for the DAF.  No
20  one else, yeah.
21  Q    And so -- and so did you provide any expertise or any in-
22  depth understanding to myself in helping me prepare that
23  complaint?
24  A    I think so, but I give a lot of credit to your firm for
25  researching things that I -- I knew reasonably well but then
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71 Filed 08/26/25   Page 348 of 1011   PageID 2247

Dondero - Voir Dire                    197

 1  you guys researched in even more depth.

 2          MR. MORRIS:  I'd move to strike the answer as

 3  nonresponsive.

 4          THE COURT:  Sustained.

 5  BY MR. SBAITI:

 6  Q   Let me ask the question again.  When you were providing us

 7  information and expertise, were you doing so knowing you were

 8  working -- helping us work for the DAF?

 9  A   Yes.

10  Q   Now, did you demand any compensation for that?

11  A   No.

12  Q   Do you require compensation necessarily to help the DAF?

13  A   No.

14  Q   Do you do other things for the DAF sometimes without

15  compensation?

16  A   Right.  We do the right thing, whether we get paid for it

17  or not.  Yes.

18  Q   Had you known that our communications were not necessarily

19  part of an agency relationship with the DAF, as you understood

20  it, that you were just some guy out on the street, would you

21  have had the same conversations with us?

22  A   (sighs)

23  Q   Let me ask a better question.  If I had come to you

24  working for someone that wasn't the DAF, you didn't already

25  have a relationship with, would you have given us the same

HCMLPHMIT00002912

1   help?

2   A    I wouldn't have been involved if it was somebody else.

3   Q    Is the reason you got involved because we were the lawyers

4   for the DAF?

5   A    Correct.

6              MR. MORRIS:  Objection.  It's just leading.  This is

7   all leading.

8              THE WITNESS:  Correct.

9              THE COURT:  Sustained.

10             MR. SBAITI:  Can --

11             THE WITNESS:  Yeah.  Sorry.

12  BY MR. SBAITI:

13  Q    Do you get -- do -- did you -- did you do work for the --

14  did you provide the help for the DAF laboring under the

15  understanding that there was an agreement?

16             MR. MORRIS:  Objection; leading.

17             THE COURT:  Sustained.

18  BY MR. SBAITI:

19  Q    Earlier you testified you believed there was an agreement?

20  A    I thought that was an agreement, and I thought there will

21  be one shortly if there isn't one, yes.

22  Q    Okay.

23  A    And so we -- I've been operating in a bona fide way in the

24  best interests of the DAF throughout -- assuming there was an

25  agreement, but even if there wasn't a formal one, I would

001878

HCMLPHMIT00002913

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 71 Filed 2/06/25 299Page 350 of 1011    PageID 2249
Exhibit 71   Page 200 of

Dondero - Voir Dire                    199

1   still be moving in the best interests of the DAF and helping

2   your firm out or --

3   Q   And you did that because you believed there was an

4   agreement or soon would be?

5   A   Yes.

6        MR. SBAITI:  Your Honor, I mean, I believe we've

7   established a dual role here, both as an agent of the DAF and

8   as an agent of the law firm, Your Honor.

9        THE COURT:  Okay.  Just a minute.  I'm looking at

10  Texas authority on common interest privilege to see if there's

11  anything that --

12      (Pause.)

13       THE COURT:  All right.  Again, it would have been

14  very nice to get briefing ahead of time.  I think this

15  absolutely could have been anticipated.

16   I do not find the evidence supports any sort of protection

17  of this testimony under work product privilege, common

18  interest privilege.  I just haven't been given authority or

19  evidence that supports that conclusion.  So the objections are

20  overruled.

21   Mr. Morris, go ahead.

22                  DIRECT EXAMINATION, RESUMED

23  BY MR. MORRIS:

24  Q   Can you describe for the Court the substance of your

25  communications with Mr. Sbaiti concerning the complaint?

001879

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71  Filed 2024/25 299 Page 351 of 1011   PageID 2250
Exhibit 71   Page 200 of 26

Dondero - Direct                    200

```
 1    A    As I've stated, directing him toward the Advisers Act and

 2    then largely in a proofing function regarding CLO nomenclature

 3    and some of the other fund nomenclature that sometimes gets

 4    chaotic in legal briefs.

 5    Q    Did you communicate in writing at any time with anybody at

 6    the Sbaiti firm regarding any of the matters that are the

 7    subject of the complaint?

 8    A    I can't remember anything in writing.  Almost everything

 9    was verbal, on the phone.

10    Q    You don't tend to write much, right?

11    A    Periodically.

12    Q    Did you communicate with Mr. Patrick?  Did you communicate

13    with anybody in the world in writing regarding the substance

14    of anything having to do with the complaint?

15              MR. SBAITI:  Objection, Your Honor.  Argumentative.

16              THE COURT:  Overruled.

17              THE WITNESS:  I --

18              MR. SBAITI:  Your Honor, may I just -- one

19    housekeeping.  Rather than raise the same objection, may we

20    have a standing objection, just so we're not disruptive, as to

21    the privilege, just for preservation purposes, on the content

22    of these communications?  Otherwise, I'll just make the same

23    objections and we can go through it.

24              THE COURT:  Well, disruptive as it may be, I think

25    you need to object to every --
```

001880

HCMLPHMIT00002915

Dondero - Direct                          201

1            MR. SBAITI:  Okay.

2            THE COURT:  -- question you think the privilege

3    applies to.

4            MR. SBAITI:  I will do so.  Thank you, Your Honor.

5    Uh-huh.

6    BY MR. MORRIS:

7    Q    Mr. Dondero, the question was whether you've ever

8    communicated with anybody in the world in writing concerning

9    anything having to do with the complaint?

10   A    Not that I remember.

11   Q    Okay.

12           MR. MORRIS:  I will point out, Your Honor, that last

13   week, when the privilege was asserted, I had requested the

14   production of a privilege log.  I was told -- I forget exactly

15   what I was told, but we never received one.  I'll just point

16   that out as well.

17           THE COURT:  Okay.

18   BY MR. MORRIS:

19   Q    You provided comments to the drafts of the complaint

20   before it was filed, correct?

21   A    Yes, a few.

22   Q    Can you describe for the Court all of the comments that

23   you provided to earlier drafts of the complaint?

24           MR. SBAITI:  Your Honor, we object on the basis of

25   privilege and work product and joint -- joint interest

001881

1   privilege.

2            THE COURT:  Overruled.

3            THE WITNESS:  It's along the lines of things I've

4   said in this court several times.  The obligations under the

5   Advisers Act cannot be negotiated away and they cannot be

6   waived by the people involved, full stop.  I remember giving

7   the -- Mazin the example of the only reason why we're in a

8   bankruptcy is from an arbitration award that, even though we

9   did what was in the best interests of the investors, we got

10  the investors out more than whole over an extended period of

11  time, they got an arbitration award that said when we

12  purchased some of the secondary interests we should have

13  offered them up to the other 800 members in the committee

14  besides the -- the 800 investors in the fund besides the eight

15  people on the committee who had approved it and that the

16  committee couldn't approve a settlement that went against the

17  Advisers Act and the Advisers Act stipulates specifically that

18  you have to offer it up to other investors before you take an

19  opportunity for yourself.  And someday, hell or high water, in

20  this court or some other, we will get justice on that.  And

21  that was the primary point that I reminded Mazin about.

22  BY MR. MORRIS:

23  Q   And that's exactly the conversation you had with Mark

24  Patrick that started this whole thing, correct?

25  A   No.

001882

HCMLPHMIT00002917

Dondero - Direct                203

1  Q   You told Mark Patrick that you believe the Debtor had

2  usurped a corporate opportunity that should have gone to the

3  DAF, didn't you?

4  A   That was not our conversation.

5  Q   So when Mr. Patrick testified to that earlier today, he

6  just got it wrong, right?

7  A   Well, maybe later on, but it wasn't that in the beginning.

8  The beginning, any conversation I had with Mark Patrick in the

9  beginning was smelling a rat in the way that the Debtor had

10  priced the portfolio for HarbourVest.

11  Q   Hmm.  So you're the one, again, who started that piece of

12  the discussion as well, correct?

13  A   Started the -- I -- I guess I smelled a rat, but I put the

14  person who could do all the numbers in touch with the Sbaiti

15  firm.

16  Q   And was the rat Mr. Seery?

17  A   Was the rat Mr. Seery?  Or the independent board.  Or a

18  combination thereof.  I believe the independent board knew

19  exactly what Seery was doing with --

20  Q   Do you have any idea --

21  A   -- HarbourVest.

22  Q   Do you have any idea why, why the Sbaiti firm didn't name

23  the whole independent board in the -- in the motion for leave

24  to amend?

25  A   I don't know.  Maybe they will at some point.

001883

HCMLPHMIT00002918

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 2005/26 299 Page 355 of 1011   PageID 2254

Dondero - Direct                               204

1   Q    Yeah.

2   A    I don't know.

3   Q    But did you tell the Sbaiti firm that you thought the

4   whole independent board was acting in bad faith and was a rat?

5           MR. SBAITI:  Your Honor, I object on the basis of

6   privilege.

7           THE COURT:  Overruled.

8           MR. SBAITI:  All three.

9           THE WITNESS:  I knew Jim Seery was and I knew Jim

10  Seery had weekly meetings with the other independent board

11  members, so the HarbourVest settlement was significant enough

12  that it would have been approved, but I don't have direct

13  knowledge of their involvement.

14  BY MR. MORRIS:

15  Q    And so you -- but you believed Jim Seery was certainly a

16  rat, right?

17  A    Oh, I -- there was a defrauding of third-party investors

18  to the tune of not insignificant 30, 40, 50 million bucks, and

19  it was obfuscated, it was -- it was highly obfuscated in the

20  9019.

21  Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

22  A    I believe he had monthly financials.  He knew that the

23  numbers presented in the 9019 were wrong.  And if that makes

24  him a rat, that makes him a rat.  Or maybe he's just being

25  aggressive for the benefit of his incentive or for the estate.

001884

HCMLPHMIT00002919

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71    Filed 206/25/299    Page 356 of 1011    PageID 2255
Exhibit 71    Page 206 of 299

Dondero - Direct                    205

1    But I -- I believe those things wholeheartedly.

2    Q   Did you tell the Sbaiti firm you thought Jim Seery was a

3    rat?

4            MR. SBAITI:  Objection, Your Honor.  Privilege.

5            THE COURT:  Overruled.

6            THE WITNESS:  I -- I don't remember using those

7    words.

8    BY MR. MORRIS:

9    Q   Did you tell the Sbaiti Firm that you thought Jim Seery

10   had engaged in wrongful conduct?

11           MR. SBAITI:  Your Honor, objection.  Privilege.

12           THE COURT:  Overruled.

13           THE WITNESS:  I believe he violated the Advisers Act,

14   and I was clear on that throughout.

15   BY MR. MORRIS:

16   Q   Listen carefully to my question.  Did you tell the Sbaiti

17   firm that you believed that Jim Seery engaged in wrongful

18   conduct?

19           MR. SBAITI:  Objection, Your Honor.  Calls for

20   privileged communications.

21           THE COURT:  Overruled.

22           THE WITNESS:  I think I gave the answer.  I'll give

23   the same answer.  I believe he violated the Advisers Act.

24   BY MR. MORRIS:

25   Q   What other wrongful conduct did you tell the Sbaiti firm

HCMLPHMIT00002920

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 07/25   Page 357 of 1011   PageID 2256

Dondero - Direct                                206

1   you thought Mr. Seery had engaged in?

2           MR. SBAITI:  Same objection, Your Honor.

3           THE COURT:  Overruled.

4           MR. SBAITI:  Calls for privileged communications.

5           THE COURT:  Overruled.

6           THE WITNESS:  I -- I just remember the obfuscating

7   and mispricing portfolio violations of the Advisers Act was

8   all I discussed with the Sbaiti firm regarding Seery's

9   behavior.

10  BY MR. MORRIS:

11  Q   Did you talk to them about coming to this Court under the

12  gatekeeper order to see if you could get permission to sue Mr.

13  Seery?

14  A   I --

15          MR. SBAITI:  Objection, Your Honor.  Calls for

16  privileged communication.

17          THE COURT:  Overruled.

18          THE WITNESS:  I wasn't involved in any of the --

19  BY MR. MORRIS:

20  Q   Did you --

21  A   -- tactical stuff on who to sell or -- who to sue or when

22  or whatever.

23  Q   Did you tell the Sbaiti firm that you thought they should

24  sue Mr. Seery?

25          MR. SBAITI:  Objection, Your Honor.  Calls for

001886

HCMLPHMIT00002921

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 08/26 299 Page 358 of 1011   PageID 2257
Exhibit 71   Page 208 of

Dondero - Direct                    207

```
 1  privileged communication.

 2          THE COURT:  Overruled.

 3          MR. SBAITI:  I'll also say, Your Honor, the question

 4  is getting a little argumentative.

 5          THE WITNESS:  I didn't get directly --

 6          THE COURT:  Overruled.

 7          THE WITNESS:  I didn't get directly involved in who

 8  was -- who was specifically liable.

 9  BY MR. MORRIS:

10  Q   How many times did you speak with the Sbaiti firm

11  concerning the complaint?

12  A   Half a dozen times, maybe.

13  Q   Did you ever meet with them in person?

14  A   I've only met with them in person a couple, three times.

15  And I don't think any of them -- no, it was, excuse me, it was

16  on deposition or other stuff.  It wasn't regarding this.

17  Q   Did you send them any information that was related to the

18  complaint?

19  A   I did not.

20  Q   Did you ask anybody to send the Sbaiti firm information

21  that related to the complaint?

22  A   I did not.  I -- I was aware that Hunter Covitz was

23  providing the historic detailed knowledge to the firm, but it

24  -- it wasn't -- I don't believe it was me who orchestrated

25  that.
```

001887

Dondero - Direct                    208

1   Q    Did you talk to anybody at Skyview about the allegations

2   that are contained in the complaint before it was filed?

3   A    I don't -- I don't remember.

4   Q    Have you ever talked to Isaac Leventon or Scott Ellington

5   about the allegations in the complaint?

6   A    No.  They weren't involved.

7   Q    How about -- how about D.C. Sauter?  You ever speak to him

8   about it?

9   A    I don't --

10          MR. TAYLOR:  Objection, Your Honor.

11          THE WITNESS:  I don't remember.

12          MR. TAYLOR:  At this point, D.C. Sauter is indeed an

13   employee of Skybridge and is a general counsel for some of the

14   entities which he worked for.  And to the extent he's trying

15   to ask for those communications, that would be invasion of the

16   privilege.

17          MR. MORRIS:  I'll withdraw it, Your Honor.  That's

18   fair.

19          THE COURT:  Okay

20          MR. MORRIS:  That's fair.

21          THE COURT:  Question withdrawn.

22          THE WITNESS:  I thought you only had eight more

23   questions.

24          MR. MORRIS:  Opened the door.

25   BY MR. MORRIS:

HCMLPHMIT00002923

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 2012/25   Page 360 of 1011   PageID 2259
Exhibit 71   Page 210 of 299

Dondero - Direct                              209

1    Q    Can you describe the general fact -- withdrawn.  You

2    provided facts and ideas to the Sbaiti firm in connection with

3    your review of the draft complaint, correct?

4    A    Ideas and proofreading.

5    Q    Anything beyond what you haven't described already?

6    A    Nope.

7    Q    Okay.  Who is your primary contact at the Sbaiti firm, if

8    you had one?

9    A    Mazin.

10   Q    Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should

11   be named as a defendant in the lawsuit before it was filed?

12            MR. SBAITI:  Your Honor, calls for privileged

13   communication.  We object --

14            THE COURT:  Overruled.

15            MR. SBAITI:  -- to that answer.

16            MR. SBAITI:  Okay.

17            THE WITNESS:  Again, no.  I wasn't involved with the

18   tactics on who would be defendants and when or if other people

19   would be added.

20   BY MR. MORRIS:

21   Q    Did you -- are familiar with the motion to amend that was

22   filed by the Sbaiti firm?

23   A    I'm more familiar with it after today --

24   Q    Right.

25   A    -- than I was before.

HCMLPHMIT00002924

Dondero - Direct                    210

1   Q    And were you aware that that motion was going to be filed

2   prior to the time that it actually was filed?

3   A    I -- I don't remember.  Probably.

4   Q    And who would have been the source of that information?

5   Would that have been Mr. Sbaiti?

6   A    Yes.

7   Q    Okay.  And did you express any support for the decision to

8   file the motion for leave to amend in the District Court?

9   A    I -- I wasn't involved.  It was very complicated legal

10  preservation conver... -- I wasn't involved.  I knew the

11  conversations were going on between different lawyers, but I

12  wasn't involved in the ultimate decision.  I didn't encourage,

13  applaud, or even know exactly what court it was going to be

14  filed in.

15          MR. MORRIS:  All right.  I have no further questions,

16  Your Honor.

17          THE COURT:  All right.  Pass the witness.

18          MR.

19  ANDERSON:  We have no questions, Your Honor.

20          THE COURT:  Okay.  Any questions from Respondents?

21          MR. SBAITI:  No questions.

22          THE COURT:  Okay.  Mr. Taylor?

23                    CROSS-EXAMINATION

24  BY MR. TAYLOR:

25  Q    Mr. Dondero, --

001890

HCMLPHMIT00002925

Dondero - Cross                    211

```
 1   A    Yes, sir.

 2   Q    -- you are not the authorized representative of CLO

 3   Holdco, are you?

 4   A    No.

 5   Q    You're not the authorized representative for the DAF, are

 6   you?

 7   A    No.

 8   Q    Do you know who that person is as we sit here today?

 9   A    Yes.

10   Q    Who is that?

11   A    Mark Patrick.

12   Q    Thank you.

13        MR. TAYLOR:  No further questions.

14        THE COURT:  Any redirect on that cross?

15        MR. MORRIS:  I do not, Your Honor.  I would just like

16   to finish up the Debtor's case in chief by moving my exhibits

17   into evidence.

18        THE COURT:  Okay.  Mr. Dondero, you're excused.

19     (The witness steps down.)

20        THE COURT:  All right.  So you have no more

21   witnesses; you're just going to offer exhibits?

22        MR. MORRIS:  Yes, Your Honor.

23        THE COURT:  Okay.

24        MR. MORRIS:  So, at Docket #2410, --

25        THE COURT:  Uh-huh.
```

001891

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L     Document 4-71    Filed 12/13/25    Page 363 of 1011    PageID 2262
Exhibit 71    Page 213 of 299

212

```
 1          MR. MORRIS:  -- the Court will find Exhibits 1

 2   through 53.

 3          THE COURT:  Uh-huh.

 4          MR. MORRIS:  In advance, Your Honor, I've conferred

 5   with the Respondents' counsel.  They had previously objected

 6   to Exhibits 15 and 16, which I believe were the Grant Scott

 7   deposition transcripts.  They objected to them on the grounds

 8   of lack of completeness because I had taken the time to make

 9   deposition designations, but I'm happy to put the entirety of

10   both transcripts into evidence, and I hope that that will

11   remove the objections to Exhibits 15 and 16.

12          THE COURT:  All right.  Before we confirm, let's just

13   make sure we have the right one.

14          MR. MORRIS:  Oh, I apologize.

15          THE COURT:  I have 16 as the July order.

16          MR. MORRIS:  I apologize.  You're absolutely right,

17   Your Honor.  What I was referring to was -- oh, goodness.  One

18   second.  (Pause.)  I was referring to Exhibits 23 and 24.

19   Those are Mr. Scott's deposition designations.  They had

20   lodged an informal objection with me on grounds of

21   completeness.  And in order to resolve that objection, we're

22   happy to put the entirety of both transcripts in.

23          THE COURT:  All right.  So if our Respondents could

24   confirm with the agreement to put in the entire depos at 23

25   and 24, you stipulate to 1 through 53?
```

HCMLPHMIT00002927

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 41 Filed 07/24/25   Page 364 of 1011   PageID 2263
Exhibit 71 Page 214 of 299

213

```
1              MR. PHILLIPS:  We also -- Your Honor, --

2              MR. MORRIS:  Yeah, I was going to take them one at a

3    time.  Just take those two.

4              MR. PHILLIPS:  Yeah, can we just take those two?

5    Confirmed?

6              MR. MORRIS:  Okay.

7              THE COURT:  Oh, okay.

8              MR. PHILLIPS:  Because there are other -- there are

9    other -- we exchanged objections to each other's witness and

10   exhibit lists.  And so I think you can handle the rest of them

11   kind of in a bunch, right?

12             MR. MORRIS:  Yeah.  Yeah, there's two bunches,

13   actually.

14             MR. PHILLIPS:  Yeah.

15             THE COURT:  Okay.  So you have just now stipulated to

16   23 and 24 being admitted --

17             MR. MORRIS:  Correct.

18             THE COURT:  -- with the full depos?  Okay.

19             MR. PHILLIPS:  Yes, ma'am.  Thank you.

20             THE COURT:  All right.

21        (Debtor's Exhibits 23 and 24 are received into evidence.)

22             MR. MORRIS:  And then the next two that they objected

23   to are Exhibits 15 and 16.  15 is the January order and 16 is

24   the July order.  They objected on relevance grounds.  I think

25   16 -- these are the two orders that the Debtors contend the
```

HCMLPHMIT00002928

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 4-71   Filed 12/13/26     Page 365 of 1011     PageID 2264
Exhibit 71   Page 213 of 299

214

1   Respondents have violated, so I don't understand the relevance

2   objection, but that's what it was and that's my response.

3           MR. PHILLIPS:  Resolved, Your Honor.

4           THE COURT:  Okay.  15 and 16 are admitted.

5       (Debtor's Exhibits 15 and 16 are received into evidence.)

6           MR. MORRIS:  Okay.  And then the last objection

7   relates to a group of exhibits.  They're Exhibits 1 through

8   11.  Those exhibits I think either come in together or stay

9   out together.  They are exhibits that relate to the

10  HarbourVest proceedings, including deposition notices,

11  including I think the transcript from the hearing, the Court's

12  order, the motion that was filed.

13      The Debtor believes that those documents are relevant

14  because they go right to the issue of the gatekeeper order and

15  had they filed, had the Respondents followed the gatekeeper

16  order, this is -- this is why they didn't do it.  You know

17  what I mean?  That's the argument, is that the Respondents,

18  one of the reasons the Respondents -- argument -- one of the

19  reasons the Respondents didn't come to this Court is because

20  they knew this Court had that kind of record before it.  And I

21  think that's very relevant.

22          THE COURT:  All right.  Response?

23          MR. PHILLIPS:  Your Honor, we think that these

24  exhibits are not relevant.  We have a very focused, we think,

25  -- we have the Court's order.  Those objections are withdrawn.

HCMLPHMIT00002929

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4 Exhibit 71 Filed 06/06/25 299 Page 366 of 1011    PageID 2265

215

1   We have the complaint.  We have the motion to amend.  And the

2   issue is whether the motion to amend, which was dismissed one

3   day, or the next day after it was filed, constitutes criminal

4   -- constitutes contempt.

5       So we think the prior proceedings go to their underlying

6   argument, which is the lawsuit or the complaint is no good,

7   and that has nothing to do with -- there's been no foundation

8   laid and it's not relevant what happened in connection with

9   the HarbourVest settlement.  It is what it is, and there's no

10  dispute that it is what it is, but it's not relevant to

11  establish any type of -- they've even said intent is not even

12  relevant here.  So we -- that's -- we think all of that goes

13  out and simplifies the record, because it has nothing to do

14  with whether or not there was a contempt.

15          THE COURT:  Response?

16          MR. MORRIS:  We withdraw the exhibits, Your Honor.

17  I'm just going to make it simple for the Court.

18          THE COURT:  Okay.

19          MR. MORRIS:  I'm just going to make it simple for the

20  Court.

21          THE COURT:  1 through 11 are withdrawn.

22      (Debtor's Exhibits 1 through 11 are withdrawn.)

23          MR. MORRIS:  So, the balance, there was no objection.

24  So all of the Debtor's exhibits on Docket #2410 -- let me

25  restate that.  Exhibits 12 through 53 no longer have an

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 02/27/26   299   Page 367 of 1011   PageID 2266

216

1   objection.  Is that correct?

2          MR. PHILLIPS:  Yes.

3          MR. MORRIS:  Okay.  And then --

4          MR. PHILLIPS:  Confirmed.

5          THE COURT:   Okay.

6     (Debtor's Exhibits 12 through 53 are received into

7   evidence.)

8          MR. MORRIS:  Okay.  Thank you.  And then we filed an

9   amended list, I believe, yesterday --

10         THE COURT:  Uh-huh.

11         MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.

12         THE COURT:  Uh-huh.

13         MR. MORRIS:  And those exhibits are simply my firm's

14  billing records.

15         THE COURT:  Okay.

16         MR. MORRIS:  You know, we added Mr. Demo to the

17  witness list in case there was a need to establish a

18  foundation.  That's the only thing he would testify to.  I

19  don't know if there's an objection to those two exhibits,

20  because we hadn't had an opportunity to confer.

21         THE COURT:  Any objection?

22         MR. PHILLIPS:  Your Honor, we're not going to require

23  authenticity and foundation for -- we have the right, we

24  think, to say that they're not a ground -- we're not going to

25  challenge that they are the bills, and the bills say what they

HCMLPHMIT00002931

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71    Exhibit 71    Filed 02/18/25    Page 218 of 299    Page 368 of 1011    PageID 2267

217

1  say.  We don't need Mr. -- we don't need a witness to

2  authenticate those exhibits.  But we reserve all substantive

3  rights with respect to the effect of those exhibits.

4          THE COURT:  All right.  54 and 55 are admitted.

5      (Debtor's Exhibits 54 and 55 are received into evidence.)

6          MR. MORRIS:  And with that, Your Honor, the Debtor

7  rests.

8          THE COURT:  Okay.  All right.  Respondents?

9      (Counsel confer.)

10          MR. PHILLIPS:  If I could have a second?

11          THE COURT:  Okay.

12          A VOICE:  Sorry, Your Honor.

13      (Pause.)

14          MR. PHILLIPS:  Your Honor, we have filed in our

15  witness and exhibit list, and I have to say I don't have the

16  number, but we'll get the docket entry number, but we have 44

17  exhibits.  There's an objection to Exhibit #2, which is --

18  thank you -- it's Document 2411, Your Honor.  Thank you.

19          THE COURT:  Uh-huh.

20          MR. PHILLIPS:  There is a pending objection to

21  Exhibit #2 which we have not resolved.  There's no objection

22  to any other exhibit.  But in reviewing our exhibit list, I

23  found that we had some -- some mistakes and duplications.

24      So, with respect to 2411, we would withdraw Exhibit 13,

25  14, and 29, and we would offer Exhibit 1, and then 30 through

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 12/03/25   Page 369 of 1011   PageID 2268
Exhibit 71 Page 213 of 299

218

```
 1   44, with 13, 14, and 29 deleted.

 2            THE COURT:  Okay.  So 1, 3 through 12, --

 3            MR. PHILLIPS:  Yes.

 4            THE COURT:  -- 15 through 28, and then 30 --

 5            MR. PHILLIPS:  And then 30 through 44.

 6            THE COURT: -- through 44?  Do you confirm, Mr.

 7   Morris?

 8            MR. MORRIS:  Yes, Your Honor.  The only objection we

 9   have is to Exhibit #2.

10            THE COURT:  And that's -- he's not offering that?

11            MR. MORRIS:  Yeah.

12            MR. PHILLIPS:  Not at this time, Your Honor.

13            THE COURT:  Okay.

14            MR. PHILLIPS:  We would have to have testimony about

15   that.

16            THE COURT:  Okay.  All right.  So those are admitted.

17            MR. PHILLIPS:  Okay.

18       (Mark Patrick's Exhibits 1, 3 through 12, 15 through 28,

19   and 30 through 44 are received into evidence.)

20            THE COURT:  By the way, it looks like Exhibit 44 is

21   at a different docket number, Docket 2420.  Correct?  You have

22   --

23            MR. SBAITI:  Your Honor, I believe Exhibit 44 is the

24   hearing transcript from the July approval hearing.  At least

25   that's what it's supposed to be.
```

HCMLPHMIT00002933

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-71 Filed 2/20/25   Page 370 of 1011   PageID 2269
Exhibit 71   Page 220 of 299

219

```
 1              THE COURT:  Okay.

 2              MR. SBAITI:  It was Exhibit 2 on the Debtor's list,

 3   and then I think they took it off, so we had to add it.

 4              MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's

 5   right.  They -- that's correct, Your Honor.

 6              THE COURT:  Okay.

 7              MR. PHILLIPS:  Exhibit 44 was added --

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  -- because the Debtor's withdrew it,

10   and so it was added in the second -- in the supplemental and

11   amended list.  The -- the one that I was talking about was the

12   prior list.

13              THE COURT:  Okay.  So that's at Docket 2420?

14              MR. PHILLIPS:  Yes.

15              THE COURT:  You're not offering 45 or 46?

16              MR. PHILLIPS:  No, I think we'd offer 45 and 46 as

17   well.  I'm sorry.

18              THE COURT:  Okay.  Any objections, Mr. Morris?

19              MR. MORRIS:  No, Your Honor.

20              THE COURT:  Okay.  So 45 and 46 are admitted as well.

21   They're at Docket Entry 2420.

22       (Mark Patrick's Exhibits 45 and 46 are received into

23   evidence.)

24              THE COURT:  All right.  Your witnesses?

25              MR. PHILLIPS:  Your Honor, could we have five minutes
```

HCMLPHMIT00002934

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 12/21/25   Page 371 of 1011   PageID 2270
Exhibit 71 Page 221 of 299

220

1   to just see what we're -- our plan is, and then we'll be back

2   at 4:00?

3              THE COURT:  Okay.  We'll be back at 4:00.

4              MR. PHILLIPS:  Thank you.

5              THE CLERK:  All rise.

6       (A recess ensued from 3:55 p.m. until 4:04 p.m.)

7              THE CLERK:  All rise.

8              THE COURT:  Please be seated.  All right.  Back on

9   the record in Highland.  Mr. Phillips?

10             MR. PHILLIPS:  Your Honor, with the introduction of

11  the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick,

12  those Respondents, and we consider Mark Patrick a Respondent

13  although not formally named as a Respondent because he is the

14  party who authorized the filing of the Seery motion -- we

15  rest.

16             THE COURT:  You rest?  Okay.  Well, Mr. Morris,

17  closing arguments?

18             MR. MORRIS:  How much time do I have?

19             THE COURT:  You've got a lot more time than you

20  probably thought you were going to.  You're under an hour.

21             MR. MORRIS:  42 minutes?

22             THE COURT:  How much?

23             THE CLERK:  42 minutes.

24             THE COURT:  42 minutes?  Feel free not to use it all.

25             MR. SBAITI:  Out of curiosity, how long do we have?

HCMLPHMIT00002935

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-71 Filed 12/22/25   Page 372 of 1011   PageID 2271
Exhibit 71 Page 222 of 299

221

```
 1            THE COURT:  You have a lot of time, which I hope you

 2    won't use.

 3            THE CLERK:  Hour and twenty-five minutes or so.

 4            MR. SBAITI:  I was afraid it was going to be an hour

 5    and twenty, so --

 6            MR. PHILLIPS:  No, not either.

 7            MR. MORRIS:  I don't suspect I'll use all the time.

 8            THE COURT:  Okay.  Thank you.

 9            MR. MORRIS:  May I proceed?

10            THE COURT:  You may.

11             CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

12            MR. MORRIS:  Good afternoon, Your Honor.  John

13    Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd

14    like to just make some closing remarks after the evidence has

15    closed.

16       This is a very, very important motion, Your Honor.  I take

17    this stuff seriously.  It's only the second contempt motion

18    I've ever brought in my life.  I've never gone after another

19    law firm.  But these facts and circumstances require it,

20    because my client is under attack, and these orders were

21    entered to prevent that.

22       It is serious stuff.  There's no question in my mind,

23    there's no question the evidence showed, clear and

24    convincingly, beyond reasonable doubt, that they violated this

25    Court's order.
```

HCMLPHMIT00002936

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-71    Filed 223/25    Page 373 of 1011    PageID 2272
Exhibit 71    Page 223 of 299

222

1      I started off with three very simple prongs.  So simple

2  you'd think I'd remember them.  Number one, was a court order

3  in effect?  There is no dispute.  The court order was in

4  effect.

5      Number two, did the order require certain conduct by the

6  Respondent?  We believe it did.  We heard an hour-long

7  argument styled as an opening statement, but it was really

8  argument and not an opening statement, about all the defects

9  in the order.  But the one thing that is crystal clear in the

10  order are the words commence or pursue.  You've been told many

11  times by the Respondent that nobody has commenced an action

12  against Mr. Seery.  That is true.  We all know what the word

13  commence means.  We all know what the word pursue means.

14      I heard argument this morning that pursue means after a

15  claim is filed you pursue a case.  That's the way lawyers talk

16  about it.  But that doesn't make any sense, Your Honor,

17  because once you've commenced the action you've violated the

18  order.  It's commence or pursue, it's in the disjunctive, and

19  you can't read out of the order the concept of pursuit by

20  making it an event that happens after the commencement,

21  because that's exactly what they're trying to do.  They're

22  trying to read out of the order the word pursuit.

23      And I ask you to use very simple common sense.  If filing

24  a motion for leave to amend a complaint to add Mr. Seery as a

25  defendant is not pursuit, what is?  What is?  There's nothing

HCMLPHMIT00002937

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 2/24/26   Page 374 of 1011   PageID 2273
Exhibit 71   Page 224 of 299

223

1   left.  You commence an action or you do something less than

2   commencing an action when you're going after the man.  That's

3   what pursuit means.  They're going after the man.  And they

4   asked the District Court to do what they knew they couldn't.

5       Mr. Phillips is exactly right.  I made the point about

6   Rule 15 because they knew they couldn't do it.  I'm not

7   suggesting that they should have.  I'm suggesting that the

8   reason that they didn't is because they knew they were -- they

9   were in a bad place.  Because if they really just wanted to

10  name Mr. Seery as a defendant, they wouldn't have done it.

11  They knew commence was crystal clear.

12      What they're trying to do is claim that somehow there's an

13  ambiguity around the word pursuit.  Does that make any sense

14  at all?  Filing a motion for leave to amend the complaint.

15  And Mr. Patrick, to his credit, candidly admitted that if the

16  motion was granted, they were suing, yeah, as long -- as long

17  as the Sbaiti firm, you know, recommended it.  That's what

18  would have happened.

19      Those orders that you signed, nothing, absolutely

20  meaningless from their point of view.  They believed they were

21  wrong.  They believed that they were overbroad.  They believed

22  they were too narrow.  They believed they were vague.  They

23  believed they were without authority.  They don't get to be

24  the gatekeeper.  They want to be the gate -- that's this

25  Court's decision.  That's why we went through all of the

001903

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 06/20/25   Page 375 of 1011   PageID 2274
Exhibit 71   Page 225 of 299

224

1    processes that we did.  And they just flagrantly said, I don't

2    agree.  I don't agree because it's wrong this way and it's

3    wrong that way and it's wrong the other way, and therefore let

4    me go find a higher authority to validate my thinking.  That's

5    not the way this process is supposed to work.

6        The independent directors and Mr. Seery relied on the

7    gatekeeper in accepting their positions.  It was a quid pro

8    quo.  Mr. Dondero agreed to the exact same provision, the

9    exact same gatekeeper provision in the January order that he

10   now complains about today, that the DAF complains about today.

11   Where were these people?

12       As the Court knows, nobody appealed either order.  The

13   Debtor, the independent board, Mr. Seery expected that the

14   plain and unambiguous words would be honored and enforced.  I

15   think that's fair.  I think that's the way the process is

16   supposed to work.

17       Instead, we have games.  We have these linguistic

18   gymnastics.  We have statements that are too cute by half.

19   Mr. Dondero won't even admit that he appointed Mr. Scott back

20   in 2012.  I couldn't even get him to do that, really, even

21   though the documents say it, even though Mr. Patrick says it.

22       I'll take the Respondents one at a time in a moment, but I

23   just want to deal with some of the more interesting arguments

24   they make.  The order was vague because it didn't say you

25   can't seek leave from the District Court to amend your

HCMLPHMIT00002939

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 02/26/25   Page 376 of 1011   PageID 2275
Exhibit 71   Page 226 of 299

225

1    complaint to add Mr. Seery.  They said that that's what makes

2    the order vague.

3        Your Honor, if you had thought to put that language in,

4    you know what they would have done?  They would have sued Mr.

5    Seery in New York State Supreme Court, where he lives, and

6    said, the order didn't say I couldn't do that.  Where does it

7    end?

8        There's a reason why the order was crafted broadly to say

9    no commencement or pursuit without Bankruptcy Court  approval.

10   You have to bring a colorable claim.

11       We heard an argument this morning that they couldn't

12   possibly have brought that motion for reconsideration first.

13   You know, the one they filed about eight hours after we filed

14   the contempt motion.  They couldn't possibly have brought that

15   motion before the motion for leave to amend because somehow

16   they would have been estopped or they would have been found to

17   have waived some right.

18       How could it be that anybody reasonably believes that

19   complying with a court order results in a waiver of some

20   right?  It just -- these are games.  These are not good

21   arguments.  And they certainly don't carry the day on a

22   contempt motion.

23       We've heard repeatedly, the District Court denied the

24   motion without prejudice, how have you been harmed?  They

25   shouldn't be able to rely on the District Court's prudence to

HCMLPHMIT00002940

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-71    Filed 222722/25 299 Page 377 of 1011    PageID 2276

226

1    protect themselves.  The question shouldn't be, have you been

2    harmed since the District Court didn't grant the motion?  No.

3    The question should be, were we harmed by the attempt to name

4    Mr. Seery a defendant, in violation of court orders, without

5    notice?  Without notice.

6        I'm told they assumed that I'd be checking the dockets.  I

7    wasn't checking the docket, Your Honor.  I hadn't filed an

8    appearance in the case.  And, in fact, if you look at the

9    exhibits, because I could pull it out, but we put in the

10   communications between the lawyers.  The last communication

11   was from Mr. Pomerantz, and the last communication from Mr.

12   Pomerantz said, Don't do it or we're going to file a motion

13   for contempt.  That's now in the evidence.

14       So, having sent that message, I wasn't going to check the

15   docket to see if they really were going to go ahead and do it.

16   I didn't think they would.  And if they did, I certainly

17   thought I'd get notice of it.  Nothing.

18       And, again, I don't really need to establish intent at all

19   in order to meet my burden of clear and convincing evidence of

20   a contempt of court, but I think it is relevant when the Court

21   hopefully finds liability and is considering damages, because

22   that's really the most important point I have to make right

23   now, is the Court needs to enforce its own orders, because if

24   the Court doesn't, or doesn't impose a penalty that's

25   meaningful, this is just going to continue.  And Your Honor,

001906

HCMLPHMIT00002941

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-71 Filed 06/20/25    Page 378 of 1011    PageID 2277

227

1    it's all in the record.  Your Honor knows this.  Mr. Daugherty

2    has gone through it.  Right?  Mr. Terry went through it.  UBS

3    went through it.  You've seen litigation now for a year and a

4    half.  It's happening in New York, right, the Sbaiti firm is

5    reopening the Acis case.  we've got this other lawsuit that's

6    filed by an entity with like a five-tenths of one percent

7    interest who's complaining about the SSP transaction that Mr.

8    -- that the Debtor engaged in.  There's no end here.

9        We need the Court to pump the brakes.  We need the Court

10   to exercise its authority.  We need the Court to protect the

11   estate fiduciary that it approved.

12       It is true, Mr. Seery is not a trustee.  But it is also

13   true that he is a third-party outsider who came into this case

14   with the expectation and the promise in an order that he

15   wouldn't be subjected to frivolous litigation, that this Court

16   would be the arbiter of whether claims could be pursued

17   against him.  That was the code of conduct.  That was the quid

18   pro quo.  That was the deal that Mr. Seery made.  It's the

19   deal that the board members made.

20       What gives these people the right to just say, your order

21   is wrong, and because I think your order is wrong I'm going to

22   go to the District Court, and if the District Court agrees,

23   too bad, and if the District Court doesn't agree, we'll be

24   back before Your Honor, and no harm, no foul?  No.  It can't

25   be.  It can't be that that's the way this process works.  It

HCMLPHMIT00002942

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 07/23/25   Page 379 of 1011   PageID 2278
Exhibit 71   Page 229 of 299

228

1   just can't.

2        So, Your Honor, let me take the Defendants one at a time,

3   the Respondents one at a time.  CLO Holdco and the DAF are

4   corporate entities.  They've done what they've done.  Mr.

5   Patrick, bless him, I think he's a lovely man.  I don't think

6   he quite bargained for what he's getting right now, but

7   nevertheless he is where he is and he's willing to stand up

8   and be counted, and for that, at least, I admire his courage.

9   He's willing to say, I authorized those.  But you know what?

10  It's a violation of the law, it's a violation of this Court's

11  order to file that motion, and so he has -- and he was very

12  candid today.  He knew of the order.  Right?  He knew it was

13  in effect.  He pointed out that it was in their papers.

14  Right?

15       They're trying to be cute, they're trying to thread this

16  needle, but it has no hole in it.  They keep -- they keep

17  doing this.  Well, maybe if we do it this way, maybe if we do

18  it -- no.  The order was crystal clear.

19       The Sbaiti firm.  They're probably fathers and husbands

20  and good people and I wish them no ill will, but this is

21  wrong.  This is wrong.  To come into a court you've never been

22  in before and in less than twelve days to jump the shark like

23  this in twelve -- in less than twelve days, because Mr.

24  Patrick said they weren't hired until April, and the complaint

25  was filed on the 12th.

HCMLPHMIT00002943

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 10/30/25   Page 380 of 1011   PageID 2279
Exhibit 71   Page 230 of 299

229

```
 1        We're told that they understood this was an overwhelming
 2   case with two -- why don't you take your time?  What was the
 3   rush?  Why not wait until the Defendant -- the Debtor appeared
 4   in the action before rushing to do this?
 5        It's bad conduct, Your Honor, and that's really a very
 6   important point that I have to make, is that there's lots of
 7   lawyers who are engaging in highly-questionable conduct here
 8   that, from my perspective, goes well beyond the bounds of
 9   zealous advocacy.
10        It's not aggressive lawyering.  I love aggressive
11   lawyering.  I really do.  Respectful, honest -- and I don't,
12   you know, I don't want to say that they're dishonest people.
13   I don't mean to do that.  But I think, I think they made a
14   gross error in judgment, and there's no question that they
15   violated this Court's order.
16        And then that leaves Mr. Dondero.  I don't even know what
17   to say about his testimony, Your Honor.  He pursued claims
18   against Mr. Seery.  He thinks he's a rat.  He's the one who
19   started the whole process.  He's the one who put the bug in
20   Mark Patrick's ear.  All of this is uncontested.  Right?
21   Uncontested.
22        I don't have to go back in time.  We can talk about what
23   happened to Grant Scott.  It's a very sad story.  Mr. Scott, I
24   think, did his honest best to do what he believed, on the
25   advice of counsel, was in the best interest of the DAF.  And
```

001909

HCMLPHMIT00002944

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 14-71   Filed 12/31/25   Page 381 of 1011    PageID 2280
Exhibit 71   Page 230 of 299

230

 1   Mr. Dondero, as you hear time and time again when he speaks

 2   about Mr. Seery, it was inappropriate.  He's the arbiter of

 3   what's in the best interest of entities that other people

 4   control.  And they pay a price.  And they pay a price.  And so

 5   Mr. Dondero felt it was his job, even though he tries to

 6   distance himself from the DAF -- I have no responsibility, I

 7   don't -- I'm not involved -- until, until somebody wants to

 8   sue Seery and the Debtor.  Then he'll go all in on that, no

 9   matter how specious the claim may be.

10       The Debtor's not going to fold its tent because a motion

11   for leave to amend was denied without prejudice.  That's not

12   the point.  The point is that people need to respect this

13   Court, people need to respect the Court's orders, and those

14   that aid and abet or otherwise support the violation of court

15   orders ought to be held to account, Your Honor.

16       I have nothing further.

17            THE COURT:  All right.  Thank you.  Respondents?

18            CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

19            MR. SBAITI:  Your Honor, the fact that we're here on

20   a motion for leave, and the motion for leave is what they're

21   saying is pursuing a claim under the Court's order, and then

22   you hear that the mere act of investigating a claim against

23   Mr. Seery is also pursuing a claim, this goes to the infinite

24   regression problem with this word pursue the way they want to

25   construe it, Your Honor.  Asking for permission is not

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 74    Filed 03/26    Page 382 of 1011    PageID 2281
Exhibit 71    Page 232 of 299

231

```
 1    pursuing a claim and can't be the definition of pursuing a
 2    claim because it's not doing anything other than asking for
 3    permission.
 4        We didn't file a suit.  We didn't commence a suit.  I
 5    think that's established.  We did not pursue a claim.  Mr.
 6    Morris ignores, I think, the very commonsensical aspect that
 7    we put out in the opening, which is that the reason pursue --
 8    and sometimes the language in these types of orders is,
 9    instead of pursue, it's maintain -- but the reason that word
10    is there is because sometimes the case has already been
11    started when the order is entered.  And so to pursue a claim,
12    i.e., one that's already been filed as of the date of the
13    order, that would be lost if the commencement of that claim
14    hadn't happened until after the -- until the -- if the
15    commencement happened before the order was filed.  That's the
16    --
17            THE COURT:  Okay.  So are you saying it's a
18    sequential thing?
19            MR. SBAITI:  I'm not sure I understood your question,
20    Your Honor.  I'm sorry.
21            THE COURT:  Well, I'm trying to understand what it is
22    you're saying about how pursue should be interpreted.
23            MR. SBAITI:  Sure.
24            THE COURT:  I think you're saying you have to -- you
25    can either have -- well, we've got a prohibition on commencing
```

HCMLPHMIT00002946

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 114-71   Filed 03/26 299 Page 383 of 1011   PageID 2282

232

```
 1   an action.

 2            MR. SBAITI:  Yes.

 3            THE COURT:  And then the separate word pursue, I

 4   think you're saying that must refer to you already have an

 5   action that's been commenced and you're continuing on with it.

 6   Is that what you're saying?

 7            MR. SBAITI:  Yes, Your Honor.

 8            THE COURT:  Then why not use the word continue?

 9            MR. SBAITI:  Well, Your Honor, the choice of --

10            THE COURT:  Kind of like 362(a) of the Bankruptcy

11   Code, you know, is worded.

12            MR. SBAITI:  Well, Your Honor, the choice of the

13   wording of pursue at that point, Your Honor, I believe ends up

14   being ambiguous, because by filing the motion here that would

15   be pursuing a claim under that definition.  So before I got

16   permission to pursue a claim, I've got to pursue a claim.

17   That's the problem that they have with the words that they're

18   trying to get you to adopt, or the meaning of the words

19   they're trying to get you to adopt.

20       If I came to this Court and said, Judge, I need

21   permission, I need leave to file suit against Mr. Seery, and

22   then the question is, well, you're not allowed to seek leave

23   because that's pursuing the claim, it's infinitely regressive.

24   And in fact, his closing argument just proved how it's

25   infinitely regressive.
```

HCMLPHMIT00002947

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4   Exhibit 71   Filed 11/06/25   Page 234/26 299   Page 384 of 1011   PageID 2283

233

```
 1              THE COURT:  Okay.  Let me -- I'm not following this
 2   infinitely regressive or whatever the term was.
 3              MR. SBAITI:  Yes.
 4              THE COURT:  Just answer this very direct question.
 5   Why did you not file a motion for leave in the Bankruptcy
 6   Court?  That would have clearly, clearly complied with the
 7   July order.
 8              MR. SBAITI:  Your Honor, I believe we explained this
 9   in the opening.  I took a stab at it.  Mr. Bridges took a stab
10   at it.  We did not believe coming here and asking for leave
11   and asking for -- for Your Honor to do what we don't believe
12   Your Honor can do, would effectuate an estoppel or a waiver,
13   which we didn't think was in the best interest of our client
14   to have.  Your Honor, this happens -- I don't believe this is
15   the --
16              THE COURT:  Okay.  Connect the dots.  Make that clear
17   as clear can be for me.  You file a motion for leave --
18              MR. SBAITI:  Yes.
19              THE COURT:  -- to file this District Court action
20   against the Debtor and Seery, and if I say yes, everything is
21   fine and dandy from your perspective.  If I say no, tell me
22   again what your estoppel argument is.
23              MR. SBAITI:  Your Honor, the key question is whether
24   us putting the Court's ability to decide colorability and the
25   Court's gatekeeper functions, for us to invoke those functions
```

HCMLPHMIT00002948

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 03/05/25   Page 385 of 1011   PageID 2284
Exhibit 71   Page 233 of 299

234

```
 1   concerned us because there's case law that says that that

 2   effectuates an estoppel.  And so we don't get our chance in

 3   front of an Article III judge to make that in the first

 4   instance.

 5           THE COURT:  Okay.  Tell me what cases you're talking

 6   about and the exact context of those cases.

 7           MR. SBAITI:  Your Honor, I would have to defer to my

 8   partner on this one, Your Honor.

 9           THE COURT:  Okay.

10           MR. SBAITI:  So, --

11           THE COURT:  Because I'm just letting you know --

12           MR. SBAITI:  Yes.

13           THE COURT:  -- I am at a complete loss.  I'm at a

14   complete loss understanding what you're saying.  I am.

15           MR. SBAITI:  Well, Your Honor, the --

16           THE COURT:  I don't understand.  If you have followed

17   the order to the letter and I tell you no, --

18           MR. SBAITI:  Then --

19           THE COURT:  -- what, you're saying you were worried

20   you'd be estopped from appealing my order to the District

21   Court and saying abuse of discretion or invalid order in the

22   first place?  You'd be estopped from taking an appeal?

23           MR. SBAITI:  No, Your Honor.  We wouldn't be estopped

24   from taking an appeal.

25           THE COURT:  Then why didn't you follow the letter of
```

HCMLPHMIT00002949

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 41 Filed 06/26/25   Page 386 of 1011    PageID 2285
Exhibit 71    Page 236 of 299

235

1    the order?

2            MR. SBAITI:  For one thing, Your Honor, asking the

3    District Court made sense to us, given the order and given our

4    understanding of the law.  Certainly, we had other options, as

5    Your Honor is pointing out.  We could have come here.  Our

6    read of the law, our understanding of what we were doing, made

7    it -- put us in, like I said, put us in the sort of

8    jurisdictional and paradoxical position.

9            THE COURT:  This is your chance to tell me exactly

10   which law you think applies here.  What case?  What statute?

11           MR. SBAITI:  Your Honor, like I said, I don't have

12   those at the moment.

13           THE COURT:  Why not?  Your whole argument rides on

14   this, apparently.

15           MR. SBAITI:  Well, Your Honor, I don't know that our

16   whole argument rides on that.

17           THE COURT:  Okay.

18           MR. SBAITI:  I mean, our argument rides on we don't

19   think we violated the letter of the order.  I think that's

20   really what I'm -- what we're here to say, is that we didn't

21   commence a lawsuit and we didn't pursue a claim by filing for

22   leave in the District Court, just like filing for leave in

23   this Court would not be pursuing a claim.  It would be filing

24   for leave.

25           THE COURT:  I agree.  Filing a motion for leave in

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 227/26 299  Page 387 of 1011   PageID 2286

236

```
 1   this Court would be exactly what the order contemplated.

 2              MR. SBAITI:  I understand, Your Honor.

 3              THE COURT:  What you did is not exactly what the

 4   order contemplated.

 5              MR. SBAITI:  Your Honor, but we're -- we're moving

 6   back and forth between two concepts.  One, your question is

 7   why didn't we file for leave?

 8              THE COURT:  Uh-huh.

 9              MR. SBAITI:  And the answer to that, I've tried to

10   explain.  And if we -- if you'd like us to bring up the case

11   law or to give you a better articulation of our concern, I'm

12   happy to defer to my partner.

13        What I'm really here to say, Your Honor, is a very simple

14   point, though.  Just because we didn't file for leave here and

15   we filed for leave in the District Court doesn't mean we

16   violated your order, and that's the point I'm trying to make,

17   Your Honor.  And I think that's the simplest point I can make.

18   Asking the Article III judge for leave to amend, for leave to

19   amend to add Mr. Seery, doesn't violate, facially, at least as

20   we read it, Your Honor's order.  It's not commencing a suit

21   and it's not -- it's not pursuing a claim against him.  It's

22   all preliminary to pursuing a claim against him, because a

23   claim hasn't even been filed.

24        The judge could have -- the judge could have -- the

25   District Court could have denied it, the District Court could
```

HCMLPHMIT00002951

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71   Filed 12/18/25   Page 388 of 1011   PageID 2287
Exhibit 71   Page 238 of 299

237

 1  have referred it down here, the District Court could have

 2  decided part of it and then asked Your Honor to rule on some

 3  portion of it.  There are innumerable ways that could have

 4  gone.  That fork -- those forks in the road is precisely why

 5  we say this is not pursuing the claim.  Otherwise, where does

 6  it stop?

 7     Does pursuing a claim happen just when we file the motion

 8  for leave?  Why didn't it happen when we started the

 9  investigation?  If pursuing a claim means having the intent

10  and taking steps towards eventually filing a lawsuit, that's

11  the point that I'm making that it is infinitely regressive,

12  and that's exactly what Mr. Morris argued to you.

13     He said Mr. Dondero, by merely speaking to me, is pursuing

14  a claim and that violates your order.  Speaking to me.  Even

15  if we had never filed it.  Speaking is pursuing a claim.

16          THE COURT:  I don't agree with that, for what it's

17  worth.

18          MR. SBAITI:  Okay.  But that was his argument.  I'm

19  just responding to it.

20          THE COURT:  Okay.

21          MR. SBAITI:  And if that's not pursuing a claim,

22  filing a motion for leave likewise wouldn't be pursuing a

23  claim.  I understand it's an official act in a court, but we

24  did it in a Court that is an adjutant to this Court.  This

25  Court is an adjutant to that Court.  It's the Court with

HCMLPHMIT00002952

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-71   Filed 03/29/25   Page 389 of 1011   PageID 2288

238

```
 1    original jurisdiction over the matter.  So we didn't go to New

 2    York.  We didn't go to the state court in New York where I

 3    learned Mr. Seery lives.  We came to the Northern District of

 4    Texas, understanding that this Court and this Court's orders

 5    had to be -- had to be addressed.  And that's the very first

 6    thing we did.  We asked the Court to address it.

 7        That judge could either decide to send it down here, which

 8    is normally what I think -- what we understood would happen.

 9    So it's not like we were avoiding it.  But we wanted to invoke

10    the jurisdiction which we, as the Plaintiff, we believe we had

11    the right to invoke.  We're allowed to choose our forum.  So

12    that's the forum we chose for the primary case, which there's

13    not a problem, no one's raised an issue with us filing the

14    underlying lawsuit.

15        Adding Mr. Seery to that lawsuit and filing a motion for

16    leave in the same court where we actually had the lawsuit,

17    knowing that it might get -- that might get decided or

18    referred in some way, doesn't strike me as being anything

19    improper, because he didn't get sued and we don't know what

20    Judge Boyle would have said had the motion gone forward.  And

21    for them to speculate and to say that, well, this is exactly

22    the type of thing you have to protect against, I completely

23    disagree.

24        The case law that they cited for you on these -- on most

25    of these orders really do discuss the fact that you have
```

001918

HCMLPHMIT00002953

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71 Filed 12/10/25   Page 390 of 1011    PageID 2289
Exhibit 71    Page 240 of 299

239

1    somebody who is actually protecting the underlying property of

2    the Debtor.  This claim comes from a complete third party that

3    Mr. Seery himself has admitted under oath he owes a fiduciary

4    duty to.  Two third parties.  One is an investor of a fund

5    that he manages, and one to a fund that the Debtor, with Mr.

6    Seery as the head of it, was an advisor for up until recently.

7        Those fiduciary duties exist.  We felt like there was a

8    valid claim to be brought against Mr. Seery.  And the only

9    reason -- and he says this like it's a negative; I view it as

10   a positive -- the reason he wasn't named is because of Your

11   Honor's orders.  And so we asked a Court, the Court with

12   general jurisdiction, to address it for us or to tell us what

13   to do.  And I don't see how that is a violation of this

14   Court's order, nor is it contemptuous of this Court's order.

15       If every time one of these issues came up it was a

16   contempt of the court that appointed a trustee, we'd see a lot

17   more contempt orders.

18       Interestingly, the cases that were thrown out to you in

19   the opening argument by the other side, for example, *Villages*

20   [sic] *v. Schmidt*, was a trustee case, but not one that

21   involved a sanction.  And the trustee case specifically in

22   that case held that the Barton Doctrine didn't have an

23   exception for *Stern* cases, whereas the cases we cited to you,

24   *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d

25   1027, expressly held that Section 959 is an exception to the

HCMLPHMIT00002954

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 12/11/25   Page 391 of 1011   PageID 2290
Exhibit 71   Page 241 of 299

240

1    Barton Doctrine.

2        And my partner, Mr. Bridges, can walk through the issues

3    that we had on the enforceability of the order, but all -- to

4    me, all of that is sort of a secondary issue because, *prima*

5    *facie*, we didn't violate this order.  I understand it may

6    irritate the Debtor and may raise questions about why the

7    motion wasn't filed here versus the District Court.  But it

8    was a motion for leave.  In order to sanction us, Your Honor

9    would have to find that asking for permission is sanctionable

10   conduct in the gatekeeper order.  Even if we ask the wrong

11   court.  Simply asking the wrong court is sanctionable, not

12   knowing what that court would have done, not knowing what that

13   court's mindset was, not even having the benefit of the

14   argument.  And that's, I guess, where this bottom -- the

15   bottom line is for me.

16       The evidence that they put on for you, Your Honor.

17   Everything you heard was evidence in the negative.  You know,

18   they talk about the transition from Mr. Dondero to Mr. Scott

19   and Mr. Scott to Mr. Patrick, but if you actually look at the

20   evidence he wants you to see and he wants you to rule on, it's

21   the evidence that wasn't there.  It's the evidence that Mr.

22   Dondero had no control.  In fact, I believe that was the basis

23   he argued for why there should be no privilege.  And all he

24   said is that he was promoting it.

25       But the fact of the matter is, like I said, all of that is

HCMLPHMIT00002955

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 74   Filed 242/25 299Page 392 of 1011    PageID 2291
Exhibit 71 Page 242 of

241

1  secondary to the core issue that we didn't violate the order.

2  We didn't take steps to violate the order.  We took steps to

3  try to not violate the order.  And they want you to punish us

4  to send a message.  Even used words like the Court needs to

5  enforce its own orders.  And he did that as a transition away

6  from the idea that there were no damages, Your Honor, and I

7  think that has implications.

8      And then he said you have to enforce a meaningful penalty.

9  Well, Your Honor, I don't think that is the purpose of these

10  sanctions.  These sanctions are supposed to be remedial,

11  according to the case law, according to the case law that they

12  cite.  So a meaningful --

13          THE COURT:  Coercive or remedial.

14          MR. SBAITI:  Sorry?

15          THE COURT:  Coercive or remedial.  Civil contempt.

16          MR. SBAITI:  Sure, Your Honor.  But usually coercive

17  sanctions require someone to do something or they are

18  sanctioned until they do it.

19          THE COURT:  Coerced compliance.  Coerced compliance

20  --

21          MR. SBAITI:  Yes.

22          THE COURT:  -- with an existing order.

23          MR. SBAITI:  Yes.

24          THE COURT:  Uh-huh.

25          MR. SBAITI:  The last thing, he says you have to

001921

HCMLPHMIT00002956

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 242/26 299 Page 393 of 1011   PageID 2292

242

1   protect the estate of the fiduciary and his expectation -- I

2   believe he's talking about Mr. Seery -- his expectation that

3   the Court would be the gatekeeper.  And Your Honor, that

4   argument rings a little bit hollow here, given that what

5   they're really saying is that we should have come here first

6   and asked for permission.  But that insinuates that, by coming

7   here, the case is dead on arrival, which I don't think is the

8   right argument.

9       I think the issue for us has been, who do we have to ask

10  and who can we ask to deal with the Court's gatekeeper order?

11  I believe we chose a court, a proper court, a court with

12  jurisdiction, to hear the issue and decide the issue.  Your

13  Court's -- Your Honor's indication of the jurisdiction of this

14  Court we believed invoked the District Court's jurisdiction at

15  the same time.

16      And so the last thing is he said -- the last thing, and

17  getting back to the core issue, is Mr. Morris wants you to

18  believe that we intended to violate the order, and now, as an

19  afterthought, we're using linguistic gymnastics to get around

20  all of that.  But it's not linguistic gymnastics.  Linguistic

21  gymnastics is saying that pursue means doing anything in

22  pursuit of a claim.  That's a little -- I believe that's

23  almost a direct quote.  They're chasing the man.  Well, that's

24  the infinite regression that I talked about, Your Honor, that

25  it's going to be impossible in any principled way to reconcile

001922

HCMLPHMIT00002957

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71   Filed 22/22/25   Page 394 of 1011    PageID 2293

243

```
 1   Mr. Morris's or the Debtor's definition of pursue with any

 2   logical, reasonable limitation that is readable into the

 3   order, Your Honor.

 4      And I'm going to defer to my partner, Mr. Bridges -- oh,

 5   go ahead.

 6          THE COURT:  I'm going to stop you.  I mean, we have

 7   the linguistic argument.  But how do you respond to this?

 8          MR. SBAITI:  Sure.

 9          THE COURT:  What if I tell you, in my gut, this

10   appears to be an end run?  An end run.  I mean, I'm stating

11   something that should be obvious, right?  An end run around

12   this Court.  This Court spent hours, probably, reading a

13   motion to compromise issues with HarbourVest, issues between

14   the Debtor and HarbourVest.  I had objections.  An objection

15   from CLO Holdco that was very document-oriented, as I recall.

16   Right of first refusal.  HarbourVest can't transfer its 49.98

17   percent interest in HCLOF, right?  Talk about alphabet soup.

18   We definitely have it.

19          MR. SBAITI:  Yes.

20          THE COURT:  Without giving CLO Holdco the first right

21   to buy those assets.  Read pleadings.  Law clerk and I stay up

22   late.  And then, you know, we get to the hearing and there's

23   the withdrawal -- we heard a little bit about that today --

24   withdrawal of the objection.  We kind of confirmed that two or

25   three different ways on the record.  And then I remember going
```

HCMLPHMIT00002958

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 14-71 Filed 07/28/25   299Page 395 of 1011    PageID 2294

244

```
 1  to Mr. Draper, who represents the Dugaboy and Get Good Trusts.

 2  You know, are you challenging the legal propriety of doing

 3  this?  And he backed off any objection.

 4      So the Court ended up having a hearing where we went

 5  through what I would call the standard 9019 prove-up, where we

 6  looked at was it in the best interest, was it fair and

 7  equitable given all the risks, rewards, dah, dah, dah, dah.

 8  You know, HarbourVest had initially, you know, started at a

 9  $300 million proof of claim, eye-popping, but this all put to

10  bed a very complicated claim.

11              MR. SBAITI:  Yeah.

12              THE COURT:  Tell me something that would make me feel

13  better about what is, in my core, in my gut, that this is just

14  a big, giant end run around the Bankruptcy Court approval of

15  the HarbourVest settlement, which is not on appeal, right?

16  There are a gazillion appeals in this case, but I don't think

17  the HarbourVest --

18              A VOICE:  It is on -- it is on appeal, Your Honor.

19              THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I

20  may be told --

21              MR. SBAITI:  I didn't know.

22              THE COURT:  I may be told, gosh, you got it wrong,

23  Judge.  You know, that happens sometimes.

24      So, this feels like an end run.  You know, the appeal is

25  either going to prevail or not.  If it's successful, then, you
```

HCMLPHMIT00002959

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02724-L Document 4-71 Filed 06/26/25 Page 396 of 1011 PageID 2295
Exhibit 71 Page 246 of 299

245

1  know, do you really need this lawsuit?  You know, I don't --

2  okay.  Your chance.

3          MR. SBAITI:  Thank you, Your Honor.

4          THE COURT:  Uh-huh.

5          MS. SBAITI:  Your Honor, this wouldn't be the first

6  case where finality or where there was a settlement -- I'm not

7  familiar as well with bankruptcy, but certainly in litigation

8  -- where the settlement then reveals -- well, after a

9  settlement is done, after everyone thinks it's done, some new

10  facts come to light that change people's views about what

11  happened before the settlement or before the resolution.  And

12  that's what happened here, Your Honor.  This is what we've

13  pled.  And this is what we understand.

14      There were the instances of Mr. Seery's testimony where he

15  testified to the value of the HarbourVest assets.  I believe,

16  as I recall, he testified in I believe it's the approval

17  hearing that Your Honor is talking about that the settlement

18  gave HarbourVest a certain amount of claims of I think it's,

19  Series 8 and then Series 9 claims, and that those were

20  discounted to a certain dollar value that he quantified as

21  about $30, $31 million.  And the way he ratified and justified

22  the actual settlement value, the actual money or value he was

23  conferring on HarbourVest, given the critique of HarbourVest

24  claims that he was settling, is he explained it this way.  He

25  said $22-1/2 million of this whole pot that I'm giving them

HCMLPHMIT00002960

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71    Filed 12/12/25    Page 397 of 1011    PageID 2296
Exhibit 71    Page 242 of 299

246

1   pays for the HarbourVest -- HarbourVest's interests in HCLOF

2   -- it's alphabet soup again -- and Highland CLO Funding,

3   Limited.  And so it's the other $9 million that's really

4   settling their claims.  And given the amount of expense it's

5   going to take, so on and so forth, $9 million seems like a

6   reasonable amount to settle them with, especially since we're

7   just giving them claims.

8       So that $22-1/2 million everyone apparently took to the

9   bank as being the value, including CLO Holdco at the time,

10  because they didn't have the underlying valuations.  Highland

11  was supposed to give the updated valuations.

12      So, fast-forward a couple of months -- and this is what

13  we've played in our lawsuit, Your Honor; this is why I don't

14  think it's an end run -- we pled in our lawsuit just a couple

15  months later Highland -- I believe some of the people that

16  worked at Highland started leaving, according to some

17  mechanisms that I saw where Highland didn't want to keep all

18  the staff and so the staff was migrated to other places.  And

19  one of those gentlemen, I believe Mr. Dondero referred to him

20  as a gentleman named Hunter Covitz, and Hunter Covitz, who's

21  also an investor in HCLOF, he owns a small piece of HCLOF, he

22  had the data, he had some of the information that showed that,

23  actually, in January, when Mr. Seery said that the HarbourVest

24  settlement was worth 22 -- excuse me, the HarbourVest

25  interests in HCLOF were worth $22-1/2 million, that they're

HCMLPHMIT00002961

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4   Filed 2/18/25   Page 398 of 1011   PageID 2297
Exhibit 71   Page 248 of 299

247

1   actually worth upwards of $45 million.

2       And so that information, Your Honor, we believe gives us a

3   different -- a different take on what happened and what was

4   supposed to happen.  This is strictly about the lack of

5   transparency.

6              THE COURT:  Okay.  Assuming --

7              MR. SBAITI:  Yeah.

8              THE COURT:  -- I buy into your argument that this is

9   newly-discovered evidence --

10             MR. SBAITI:  Yes.

11             THE COURT:  -- CLO Holdco would not have had reason

12  to know -- I guess that's what you're saying, right?

13             MR. SBAITI:  I'm saying they -- they didn't know.

14             THE COURT:  That they didn't know.

15             MR. SBAITI:  Uh-huh.

16             THE COURT:  And didn't have reason to know.  I'm

17  trying to figure out who's damaged here.

18             MR. SBAITI:  Well, CLO Holdco, my client, is damaged,

19  Your Honor.

20             THE COURT:  How?

21             MR. SBAITI:  Because one of the aspects of the -- of

22  Highland, one of the issues under, excuse me, of Highland's

23  advisory, is that it has a fiduciary duty.  And that fiduciary

24  duty, at least here, entails two, if not, three prongs.  The

25  first prong is they have to be transparent.  You can't say --

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4 71 Filed 2/49/25 299 Page 399 of 1011    PageID 2298

248

```
 1              THE COURT:  How is -- you know, I know a lot about

 2   fiduciary duties, believe it or not.  How is CLO Holdco harmed

 3   and the DAF harmed?

 4              MR. SBAITI:  Because, Your Honor, they lost out on an

 5   investment opportunity to buy the piece of -- the HarbourVest

 6   piece.  They would have been able to go out and raise the

 7   money.  They had the opportunity --

 8              THE COURT:  Okay.

 9              MR. SBAITI:  They would have had the opportunity to

10   make a different argument.

11              THE COURT:  What you're saying, you're saying, if

12   they had known what they didn't have reason to know, that it

13   was worth, let's say, $45 million, that they would have gone

14   out and raised money and said, oh, we do want to exercise this

15   right of first refusal that we decided we didn't have and gave

16   in on, we're going to press the issue and then outbid the $22

17   million, because we know it's worth more?  Is that where

18   you're going? I'm trying to figure out where the heck you're

19   going, to be honest.

20              MR. SBAITI:  That's -- Your Honor, I'd push back on a

21   little of the phrasing, only because the way these duties --

22   the way we understand the SEC's duties work when you're an

23   investment advisor is you have a transparency obligation and

24   an obligation --

25              THE COURT:  Yes.  Yes.
```

001928

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4 71 Filed 2250/25 299 Page 400 of 1011    PageID 2299

249

```
 1              MR. SBAITI:  -- not to divert these.  So, yes, CLO
 2   Holdco would have at least had the opportunity and been
 3   offered the opportunity, which it could have taken advantage
 4   of, to, if the assets were really on the block for $22-1/2
 5   million, they should have been able to buy their percentage
 6   pro rata share of that $22-1/2 million deal.  I mean, in a
 7   nutshell, that's -- that's where we believe we've been harmed.
 8   And we believe that the obfuscation of those values and, to a
 9   certain extent, the misrepresentation of those values in the
10   settlement is not cleansable by the argument, well, you should
11   have asked.
12        Well, you should have asked is fine in normal litigation,
13   but when the person you should have asked actually owes you a
14   positive duty to inform, we believe that the should-have-asked
15   piece doesn't really apply and there's -- and that's, that's
16   the basis of our case.
17        So it's not an end run around the settlement, Your Honor.
18   I think I opened with we're not trying to undo the settlement.
19   We're not saying HarbourVest has to take its interest back.
20   We're not saying the settlement has to go on.  We're not even
21   saying any of the things that happened in Bankruptcy Court
22   need to change.  But Section 959 is pretty clear that this is
23   management of third-party property --
24              THE COURT:  I guess -- okay.  Again, rabbit trail,
25   maybe.  But CLO Holdco still owns its same 49.02 percent
```

HCMLPHMIT00002964

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71   Filed 12/14/25   Page 401 of 1011    PageID 2300
Exhibit 71    Page 252 of 299

250

```
1    interest that it did before this transaction.  So if there's

2    value galore in HCLOF, it still has its 49.02 percent

3    interest.  What am I missing?

4          MR. SBAITI:  Oh, I think Your Honor's assuming that

5    HCLOF bought the piece back from HarbourVest.  It didn't.

6          THE COURT:  No, I'm not.

7          MR. SBAITI:  Oh.

8          THE COURT:  I'm not assuming that.

9          MR. SBAITI:  Well, --

10         THE COURT:  I know that now the Debtor has, what,

11   fifty point, you know, five percent of HCLOF, whereas it only

12   had, you know, a fraction.

13         MR. SBAITI:  Point six-ish.  Yeah.

14         THE COURT:  Point six-ish, and HarbourVest had 49.98.

15         MR. SBAITI:  Right.

16         THE COURT:  So, again, please educate me.  I'm really

17   trying to figure out how this lawsuit isn't just some crazy

18   end run around a settlement I approved.  And moreover, what's

19   the damages?

20         MR. SBAITI:  Well, Your Honor, --

21         THE COURT:  What's the damages?  CLO Holdco still has

22   its 49.02 percent interest in HCLOF.

23         MR. SBAITI:  Your Honor, again, --

24         THE COURT:  What am I missing?  I must be missing

25   something.
```

HCMLPHMIT00002965

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 71 Filed 252/26 299Page 402 of 1011   PageID 2301

251

```
 1              MR. SBAITI:  I think so, Your Honor.

 2              THE COURT:  What?

 3              MR. SBAITI:  The damages is the lost opportunity, the

 4   lost opportunity to own more of HCLOF.

 5              THE COURT:  Oh, it could have owned the whole darn

 6   thing?

 7              MR. SBAITI:  I could have owned 90 -- whatever 49

 8   plus 49.98, 98.98 percent.

 9              THE COURT:  But --

10              MS. SBAITI:  Or some pro rata portion.

11              THE COURT:  But Mr. Seery had some information that

12   you think he was holding back from CLO Holdco that CLO Holdco

13   had no reason to know?

14              MR. SBAITI:  Yes, Your Honor.  The -- the -- what he

15   testified to that the value of those assets, excuse me, the

16   value of the HarbourVest interests in HCLOF or its share of

17   the underlying assets being $22-1/2 million was either, one,

18   intentionally obfuscated, or, two, and I don't think this

19   excuses it at all, he simply used ancient data and simply

20   never updated himself, not for the Court and not for any

21   representations to the investors, who he himself testified

22   under oath in this Court that he has a fiduciary duty to under

23   the Investment Advisers Act.

24              THE COURT:  This could get very --

25              MR. SBAITI:  So that's injury to my client, Your
```

HCMLPHMIT00002966

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-71 Filed 252/26 299Page 403 of 1011    PageID 2302
Exhibit 71    Page 253 of

252

1    Honor.

2              THE COURT:  This could get really dangerous.  Maybe

3    --

4              MR. SBAITI:  I'm sorry.

5              THE COURT:  This could get really dangerous.  Maybe I

6    should cut off where I'm going on this.

7              MR. SBAITI:  Okay.

8              THE COURT:  Of course, someone dangled it out there

9    in a pleading.  You know where I'm going, right?

10              MR. SBAITI:  I'm not sure I do, Your Honor.

11              THE COURT:  Hmm.  I do read the newspaper, but

12    someone put it in a pleading.  HCLOF owns MGM stock, right?

13    Is that what this is all about?  Is that what this is all

14    about?  Or shall we not do this on the record?

15              MR. SBAITI:  Well, Your Honor, this has nothing -- I

16    don't -- I don't think this has anything to do with the MGM

17    stock one way or the other.

18              THE COURT:  You don't?  OH?

19              MR. SBAITI:  Your Honor, my charge as a counsel for

20    the DAF is pretty straightforward.  We looked at the claims.

21    We looked at the newly-discovered information.  We talked to

22    the people who had it, Your Honor.  That was our

23    investigation.  We put together a complaint.  We believed that

24    we had a good basis to file suit, despite Your Honor's -- the

25    settlement approval.  We expressly, because we understand how

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 104-71   Filed 06/24/25   Page 404 of 1011   PageID 2303
Exhibit 71   Page 254 of 299

253

```
 1    finality is so critical in a bankruptcy context, we expressly
 2    didn't ask for rescission.  We expressly didn't ask for
 3    anything that would undo the settlement.
 4        Asking for damages because of how the settlement happened,
 5    through no fault of the Court's, of course, but asking for
 6    damages is not, at least not as I see it, an end run around
 7    the Court's settlement, and it's a legitimate claim.  And I
 8    don't think this is far from the first time that new evidence
 9    has come up that's allowed someone to question how something
10    was done that actually -- that actually damaged them.
11            THE COURT:  Usually, they come in for a motion to
12    reopen evidence to the court who issued the order approving
13    the settlement.
14            MR. SBAITI:  Well, Your Honor, I mean, that's --
15            THE COURT:  Newly-discovered evidence.
16            MR. SBAITI:  That would be the case in a final
17    judgment, Your Honor.  But, you know, our understanding of the
18    way the settlement worked was that that was not necessarily
19    going to be -- not the direction anybody wanted to go, but
20    seeking damages on a straight claim for damages, which we're
21    allowed to seek, which I think is our prerogative to seek, we
22    went that direction.
23            THE COURT:  Okay.  Okay.
24            MR. SBAITI:  But this --
25            THE COURT:  My last question.
```

HCMLPHMIT00002968

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4 71 Filed 06/06/25 299 Page 405 of 1011    PageID 2304

Exhibit 71 Page 255 of

254

```
 1              MR. SBAITI:  Yes, Your Honor.

 2              THE COURT:  Again, I have to know.  You have filed

 3    some sort of pleading to reopen litigation against Acis in New

 4    York?  I'm only asking this because it's part of what's going

 5    on here.  What is going on here?

 6              MR. SBAITI:  Your Honor, that's a -- that's a

 7    separate lawsuit, and it's not to reopen litigation against

 8    Acis.  It deals with post-plan confirmation mismanagement by

 9    Acis.

10              THE COURT:  Oh, okay.  Okay.

11              MR. SBAITI:  Yeah.

12              THE COURT:  All right.

13              MR. SBAITI:  But I believe there's a motion in front

14    of Your Honor, just to -- that gave notice that the suit was

15    filed, but I believe Mr. -- well, a bankruptcy lawyer filed

16    it.  I don't know.

17              THE COURT:  A motion or a notice?  I don't know.

18              MR. SBAITI:  I don't know, Your Honor.  That's above

19    my paygrade.

20              THE COURT:  I have not seen it.  Okay?

21              MR. SBAITI:  Okay.

22              THE COURT:  Maybe it's there, but no one has called

23    it to my attention.

24              MR. SBAITI:  With the Court's permission, I'm going

25    to yield time to Mr. Bridges.
```

001934

```
 1              THE COURT:  Okay.  Mr. Bridges?

 2              CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

 3              MR. BRIDGES:  Thank you, Your Honor.  I'm grateful

 4      that you asked most of those questions to Mr. Sbaiti.  I would

 5      not have been able to answer them.  The one I can answer is

 6      the one about judicial estoppel.  Apparently, I did a pretty

 7      lousy job earlier.  I think I'm prepared to do a better job

 8      now.

 9         The case law I'd like to refer you to is the Texas Supreme

10      Court's 2009 decision in Ferguson v. Building Materials, 295

11      S.W.3d 642.  And this was my concern and my issue, perhaps

12      because I used to teach it and so it was at the front of my

13      mind.  But contrary to what you would think and what you said

14      earlier, it's not your ruling against us that would create a

15      judicial estoppel problem.  It's if you ruled in our favor.

16      And I know that seems weird.  Let me explain.

17         The two things that have to take place for there to be

18      judicial estoppel are, first, successfully maintaining a

19      position in one proceeding, and then taking an inconsistent

20      position in another.  And Your Honor, what we talked about

21      earlier is the notion that your July order forecloses the key

22      claim that Mr. Sbaiti was just describing, that Mr. Seery

23      should have known.  Not that he was grossly negligent or did

24      intentional wrong, but that he breached fiduciary duties

25      because he should have known and should have disclosed.
```

HCMLPHMIT00002970

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-71    Filed 22/27/25    299 Page 407 of 1011    PageID 2306

256

1      And if your order forecloses that and we come and convince

2   you that we nonetheless have colorable claims, colorable

3   claims of gross negligence or willful wrongdoing, that we

4   ultimately are unable to prove, our lawsuit could fail, even

5   though we had proved -- in the lawsuit we had proved he should

6   have known and that he breached fiduciary duties, but we would

7   be estopped, having succeeded from coming here and asking in

8   compliance with the order and its colorability rule, that we

9   would be estopped from then saying that this Court lacked the

10  authority to have issued that order in the first place, to

11  have released the claim on the mere breach of fiduciary duty

12  or ordinary negligence.  That's the inconsistency that I was

13  concerned about.

14      By coming here rather than trying to make our objection

15  and our position known without submitting to the foreclosure

16  of that claim that is, in many ways, the most important, the

17  headliner from our District Court complaint, is the concern,

18  Your Honor.  And frankly, if Your Honor's order does foreclose

19  that, then we're in serious trouble.  That's the claim that

20  we're trying to preserve.

21      But Your Honor, I don't think it was in anyone's

22  contemplation in July of 2000 that what that order would do is

23  terminate -- 2020; sorry, Your Honor -- in July of 2020, that

24  that order would terminate future claims that might arise

25  based on future conduct that had not yet happened in Mr.

HCMLPHMIT00002971

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71  FilExhibit 71 Page 258 of 299Page 408 of 1011    PageID 2307

257

```
 1  Seery's role.  Not in his role as a manager of the Debtor's
 2  property, but in his role as a registered investment advisor
 3  on behalf of his clients and their property.  And that is the
 4  concern that the judicial estoppel argument is about.
 5          THE COURT:  I still don't understand.  I'm very well
 6  aware of judicial estoppel, the old expression, you can't play
 7  fast and loose with the court.  Take one position in one
 8  court, you're successful, and then take another position in
 9  another court.  That's the concept.
10          MR. BRIDGES:  Coming here --
11          THE COURT:  How is this judicial estoppel if you had
12  done what I think the order required and asked this Court for
13  leave?  What -- and I said fine, you have leave.  Where's the
14  judicial estoppel problem?
15          MR. BRIDGES:  If you say fine, you have leave, but
16  that leave is only, as the order states, because we have
17  colorable claims of gross negligence, colorable claims of
18  intentional wrongdoing, what happens to our mere negligence
19  and mere breach of fiduciary duty claims?  Are they
20  foreclosed?  The order on its face --
21          THE COURT:  Well, I would interpret the order to be
22  yes, and then you could appeal me, and the Court would either
23  say it's too late to appeal that because you didn't appeal it
24  in July 2020, or fine, I'll hear your appeal.  Where's the
25  estoppel?
```

001937

HCMLPHMIT00002972

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-71    Filed 05/09/25    Page 409 of 1011    PageID 2308
Exhibit 71    Page 259 of 299

258

```
 1              MR. BRIDGES:  Your Honor, our claims that this Court

 2    lacks the authority either to have made that order in the

 3    first place or the jurisdiction to rule on colorability now

 4    because of Section -- the mandatory abstention provision,

 5    whose section number I've now lost.  That if we come to you

 6    and ask you to rule on those things, have we not thereby

 7    waived on appeal our claim that you couldn't rule in the first

 8    place on those things?

 9         That is what our motion for leave in the District Court

10    argues, is that there's -- there are jurisdictional

11    shortcomings with your ability to decide what we're asking

12    that Court to decide.  And Your Honor, by coming here first

13    and then appealing, that's what we fear we would have lost.

14    And instead of coming here and appealing, what we -- what we

15    would have done, in the alternative, I guess, would be to come

16    here and ask you not to rule but move to withdraw the

17    reference of our own motion.

18         That two-step, filing here and filing a motion to withdraw

19    the reference on the thing we filed here, we didn't think was

20    required, nor could we find any case law or rule saying that

21    that was appropriate.

22              THE COURT:  Okay.

23              MR. BRIDGES:  These are not games, Your Honor.  We

24    were not trying to play games.  We aren't bankruptcy court

25    lawyers.  We're not regularly in front of the Bankruptcy
```

HCMLPHMIT00002973

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71   Filed 06/26/25   Page 410 of 1011   PageID 2309
Exhibit 71   Page 260 of 299

259

1   Court.  So the notion why didn't we come here first isn't

2   exactly at the top of our mind.  The question for trial

3   lawyers typically is, where can we file this, what are the

4   permissible venues, not why don't we come to Bankruptcy Court?

5   Especially when your order appears to say that causes of

6   action that don't rise to the level of gross negligence or

7   intentional wrongdoing are already foreclosed.

8       Your Honor, the January order, I think I have to just

9   briefly address again, even though I don't understand why it

10   makes a difference.  Apparently, counsel thinks it makes a

11   difference because Mr. Dondero apparently supported it in some

12   way.  Our position is, for whatever difference it makes, the

13   January versus the July, we don't believe there's anything in

14   the District Court complaint putting at issue Mr. Seery's role

15   as a director, so we don't understand how that order is

16   implicated.

17      Again, I'm not sure that matters at all.  I'm not raising

18   it as a defense.  I'm just telling Your Honor this is all

19   about the July order, from our perspective.  Certainly, the

20   July order puts his role as a CEO -- certainly, the District

21   Court case puts his role as a CEO at issue, and that's what

22   the July order is about.

23      Your Honor, the *Applewood* case requires specifics in order

24   to terminate our rights to sue and to bring certain causes of

25   action, and without that kind of specificity, Your Honor, we

HCMLPHMIT00002974

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-71 Filed 2/16/25    Page 411 of 1011    PageID 2310

260

1  believe that that order fails to preclude, fails to have

2  preclusive effect as to these later-arising claims.  And we

3  would submit not only that it was not contemplated, but that

4  it was not intended to have that effect, and that even Mr.

5  Seery's testimony suggests that that's not how he understood

6  that order to be effective.

7      Counsel argued that the Barton Doctrine does apply here

8  and rattled off the names of cases that don't -- to my

9  knowledge, no case, no case that I can find deals with this

10  type of deferential order where someone is asked -- where a

11  court is asked to defer to the business judgment of an entity

12  in approving an appointment, and nonetheless deciding that the

13  Barton Doctrine applies.  That's not what *Villegas* holds.

14  That's not what *Espinosa* holds.  I don't think *Barton* is

15  applicable in a situation like that.  Certainly, it's outside

16  of the context of what *Barton* anticipated itself over a

17  century ago when it was decided.

18      Your Honor, if we're wrong, please know we're wrong in

19  earnest.  These are not games.  These are not sneakiness.  No

20  such motivation is at issue here.  I was hopeful that that

21  would be plain from the text of the motion for leave itself.

22  If it's not, I'd offer this in addition.  The docket at the

23  District Court shows that immediately upon filing the motion

24  for leave, a proposed order was filed with it asking to have

25  the proposed complaint deemed filed, which as soon as I saw I

001940

HCMLPHMIT00002975

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71  Exhibit 71  Filed 06/26/25  Page 262 of 299  Page 412 of 1011    PageID 2311

261

1  asked us to immediately retract it and to substitute a new

2  proposed order that does not ask for the amended complaint to

3  be deemed filed.  That is not what we wanted.

4      And the fear was what if our motion is granted because the

5  District Court says you have the right, you don't even need

6  leave, but as to the Bankruptcy Court, you're on your own,

7  this is at your own risk, I'm not going to rule on any of the

8  jurisdictional questions that you attempt to raise?  We did

9  not want our complaint deemed filed for that reason.  What we

10  did want was for a court where we did not risk judicial

11  estoppel to decide whether or not our key claim under the

12  Advisers Act had been foreclosed by your July order, and that

13  was the key and motivating factor.

14      On top of that, Your Honor, instead of arguing the meaning

15  of the word pursue, let me just say this.  We understood

16  pursue in that context to refer to claims or causes of action,

17  not potential, unfiled, unasserted, contemplated claims or

18  causes of action.  That until a claim or cause of action is

19  actually asserted in some way, that it can't be pursued, and

20  that the reference here was to two kinds of action, those that

21  had not yet been commenced -- and your order foreclosed the

22  commencing of them without permission -- and those that had

23  been commenced.  And your order couldn't foreclose the

24  commencing of them because they hadn't been commenced yet, but

25  your order did foreclose pursuing them.

HCMLPHMIT00002976

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 10/23/25   Page 413 of 1011   PageID 2312
Exhibit 71   Page 263 of 299

262

1    And that was my reading of what that order said.  And it

2    fits with this notion that a claim or cause of action isn't

3    something you're considering or even researching.  It didn't

4    dawn on us that researching or talking to a client about a

5    potential claim could violate the order because in some

6    respect that conversation could be in pursuit of the claim.

7        By the same notion, we didn't think asking a court with

8    original jurisdiction according to Congress, asking a court to

9    decide whether or not we were foreclosed from bringing our

10   claims in a motion for leave was violating your order.

11       We don't have much else, Your Honor.  In terms of the need

12   to enforce compliance with your orders, if we understand them,

13   we sure as heck are going to follow them.  And if we've

14   misconstrued the term pursue, I'm certainly very sorry about

15   that.

16       I appreciate counsel saying he thinks we're probably good

17   people.  I did not think what we did was any kind of gross

18   error in judgment.  I thought that what we were doing was

19   preserving our clients' rights, going to a court of competent

20   jurisdiction, and asking the question, can we do what we think

21   we ought to be able to do, but is -- frankly, Your Honor,

22   we're a bit confused about because of the order that seems on

23   its face to foreclose the very lawsuit that we think we should

24   be bringing on behalf on this charitable organization that

25   foreclosed it months before the conduct at issue that gave

HCMLPHMIT00002977

1 | rise to the complaint.  And with that conundrum, knowing what
2 | to do was not obvious or easy for the lawyers or for the
3 | client who was dependent on his lawyers to give him good,
4 | sound advice.
5 |     I'm very grateful for you giving us the time and for your
6 | very pointed questions.  Thank you, Your Honor.
7 |         THE COURT:  Thank you.  All right.  Who's next?
8 |           CLOSING ARGUMENT ON BEHALF OF MARK PATRICK
9 |         MR. ANDERSON:  May it please the Court, Michael
10 | Anderson on behalf of Mr. Patrick, Mark Patrick.
11 |     You know, this is a contempt proceeding.  It's very
12 | serious.  And, you know, my stomach aches for the people here.
13 |         THE COURT:  Mine does, too, by the way.
14 |         MR. ANDERSON:  It truly aches.
15 |         THE COURT:  Uh-huh.
16 |         MR. ANDERSON:  And I mean what I said when I did
17 | opening, when I said we don't need a hearing, an evidentiary
18 | hearing.  And I still don't believe we did, because it comes
19 | down to what does the word pursue mean, because there's
20 | already been an acknowledgement --
21 |         THE COURT:  Do you all want to withdraw all your
22 | exhibits?  I've got a lot of exhibits that I now need to go
23 | through.  If I admit them into evidence, I'm going to read
24 | them.
25 |         MR. ANDERSON:  No, I understand.

HCMLPHMIT00002978

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71 Filed 02/05/25   Page 415 of 1011   PageID 2314

264

1              THE COURT:  Uh-huh.

2              MR. ANDERSON:  But it does come down to the word

3    pursue.  Counsel has already said commence doesn't do it, and

4    so then it's pursue.

5         And I could ask Your Honor, what did you mean when you

6    said pursue in the July order, but I'm not going to say that.

7    And I asked my client on the stand, you know, did you pursue a

8    claim or cause of action?  And then it was very telling.  What

9    happened with counsel?  He stood up and objected to me even

10   asking if it was pursued.  And it dawned on me, if he's going

11   to object, does pursue have some sort of legal -- that was his

12   objection.  It was he objected on legal grounds.  Does that

13   have some sort of legal meaning?

14        This is contempt.  You can't be held in contempt unless it

15   is bright-line clear that you have deviated from a standard of

16   conduct and there's no ambiguity.  Well, clearly, there is

17   ambiguity, because over on this side of the room we say filing

18   a motion for leave can't be pursue.  We can look at the order

19   and we know it doesn't mean pursue because I just heard Your

20   Honor say you should have filed a motion for leave in this

21   Court before doing anything.  All right?  So if that -- if

22   that is what without the Bankruptcy Court first determining,

23   if that's what the motion for leave is, well, then if we go up

24   to the first sentence, No entity may commence or pursue a

25   claim or cause of action, then it has this, without the

HCMLPHMIT00002979

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 71 Filed 06/06/25 299 Page 416 of 1011   PageID 2315

265

 1   Bankruptcy Court first determining, that means -- if pursue

 2   means a motion for leave, if that's what that means, then that

 3   order says you can't commence or file a motion for leave

 4   before you file a motion for leave.  Because that's what it

 5   means.  If pursue means motion for leave and you've said you

 6   should have come here and filed a motion for leave because it

 7   says, Debtor, without the Bankruptcy Court first determining

 8   that notice that such claim or cause of action represents a

 9   colorable claim, and specifically authorizing.  The vehicle to

10   do that would be a motion for leave, right?  And you can't

11   pursue anything until a motion for leave has been filed.

12        Now, where was the motion for leave?  And I understand,

13   Your Honor, you know, no expert at reading the room,

14   obviously, you're frustrated that the motion for leave was

15   filed in the District Court and not in this Court.  But it

16   doesn't change the fact, and neither did any of the evidence,

17   change anything, is what does pursue mean?

18        And if someone says, well, it's obviously clear it means

19   *x*, well, is it really obviously clear it means filing a motion

20   for leave?  Because nobody on my side, when you read it, when

21   you say pursue, can read it that way.  And if we're going to

22   have contempt sanctions being posed, and there has to be clear

23   and convincing evidence or beyond reasonable doubt, depending

24   upon, you know, I don't think you have to get to that part,

25   but clear --

001945

HCMLPHMIT00002980

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-71    Filed 12/07/25    Page 417 of 1011    PageID 2316
Exhibit 71    Page 267 of 299

266

```
 1              THE COURT:  This is not criminal contempt.

 2              MR. ANDERSON:  Clear and convincing is the civil

 3    standard for contempt.

 4              THE COURT:  Right.

 5              MR. ANDERSON:  And if pursue is open to that much

 6    interpretation, it's not the kind of thing that can be held in

 7    contempt on.  And I understand the frustration.  I hear the

 8    frustration.  I hear counsel talk about that was not their

 9    intent when they filed it.  You know, I heard Mr. Patrick get

10    up there.  I heard counsel say, hey, Mr. Patrick's doing his

11    job, he's a good guy, seems like a good guy.  Well, Mr.

12    Patrick's up there.  Look, they filed the underlying lawsuit.

13    Nobody -- there's no motion for that in this Court about the

14    underlying lawsuit.  It's only about the motion for leave.

15    That's all we're here about.

16         And so you go to that, and we've heard all these arguments

17    about it, and we've been here almost as long as the motion for

18    leave was actually on file before it was sua sponte dismissed

19    without prejudice.

20         And so I go back to that and I say that, if pursue means

21    filing a motion for leave, then that order would require an

22    order for anyone to violate -- it would be violated upon the

23    filing of a motion for leave, because you can't pursue

24    something until the Bankruptcy Court has already first

25    determined, after notice, that such claim or cause of action
```

HCMLPHMIT00002981

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71 Filed 06/26/25    Page 418 of 1011    PageID 2317
Exhibit 71    Page 268 of 299

267

```
 1   represents a colorable claim and specifically authorizing the

 2   entity to bring such a claim.  Because that -- we already know

 3   that's a motion for leave in and of itself.  Therefore,

 4   pursue, just simply filing a motion for leave will put you in

 5   that.

 6        But that gets into all these -- we don't need to be having

 7   this discussion about, you know, is a motion for leave pursue?

 8   Is pursue a motion for leave?  I've heard both arguments here.

 9   It doesn't justify contempt.  And I know -- and so certainly

10   with respect to my side, I, you know -- given that, I would

11   request that the Court deny the request for contempt.

12        And again, I want to say, too, look, we hear you.

13   Absolutely hear you.  Understand the frustration.  Totally

14   hear you on that.

15        I'm going to turn over the balance of my time to Mr.

16   Phillips, --

17             THE COURT:  Okay.

18             MR. ANDERSON:  -- unless you have any questions, Your

19   Honor.  I appreciate it.

20             THE COURT:  Okay.  I do not.

21              CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

22             MR. PHILLIPS:  Your Honor, Louis M. Phillips, and

23   I'll be brief.  I'm going to try to bring it down to -- I was

24   not involved.  We are -- we are here because of the

25   indemnification provisions of CLO Holdco representing Mr.
```

1    Patrick individually.  My firm was not involved in the

2    litigation.  We were hired to represent CLO Holdco and some of

3    the defendants in the UCC litigation, and our role has

4    expanded to do some other stuff, particularly represent Mr.

5    Patrick because of the indemnification provisions of the

6    Holdco entity documents.  He's entitled to indemnification and

7    we're providing a defense for him.  That's why we're here.

8        So I come way after the order.  We have not been involved

9    in anything.  But I think I'm just going to try to distill

10    everything about the order and about the concern and about the

11    litigation, because the Court is asking about is this an end

12    run on the settlement?  The Court is also saying, all you had

13    to do was come here first.

14        But let's look.  We're here about one thing, the motion

15    for leave.  And as Mr. Anderson pointed out, the commence or

16    pursue a claim, according to the order, commence or pursue can

17    only occur after the Court has authorized the litigation.

18    Okay.  So that's what the order says.  You can't commence or

19    pursue.

20        Counsel for the Debtors says, well, it can't be after

21    commencement because you've already commenced the action.  So

22    pursue has to mean something before the commencement of the

23    action.  It would mean something before the commencement of

24    the action under this order.

25        But it doesn't mean something before the Court approves

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-71   Filed 07/07/25   Page 420 of 1011   PageID 2319
Exhibit 71   Page 270 of 299

269

```
 1    the commencement of the action, because commence or pursue

 2    under this order does not occur before the Court has acted.

 3    That's the language of the order.  It only occurs after the

 4    Court has authorized it.  That's the context in which commence

 5    or pursue exists, after this Court has authorized.

 6        Okay.  So it can't be pursuit before the Court has

 7    authorized without commencement because it only is triggered

 8    by the Court's authorization of the action, which means,

 9    before you commence it, actions in time take time, before you

10    commence the action, you have to pursue the action to commence

11    it.  But you can't do that until you've approved it.  All

12    right?

13        That's the temporal concern and why we say the motion for

14    leave can't be pursuit of an action under this order.  It

15    might be pursuit under another definition or another order.

16    In other words, maybe an order could be issued saying, you

17    can't file a motion for leave in any other court but this one.

18    I don't know whether it'd be a good order, but the order could

19    say that.  But when you say all you had to do was file a

20    motion for leave in this Court and everything would be okay,

21    no.  The motion for leave is not, under this order, pursuit.

22    Pursuit only occurs under this order after you've done

23    something, after Your Honor has done something.

24        So if a motion for leave is violative at the District

25    Court, the motion for leave would be violative here, because
```

HCMLPHMIT00002984

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71 FilePage 270 of 299Page 421 of 1011    PageID 2320

270

1    it occurs before Your Honor has taken action.

2        Now, clearly, you want people to ask, but just as clearly,

3    and this was the point of my remarks earlier at the tail-end

4    of opening, just as clearly, I have a question, because

5    frankly, I understand what these guys are saying.  These guys

6    haven't really said it.  They're a little shame-faced at what

7    these guys are asking.  Because what these guys are asking is

8    whether or not an employee Seery, as the CRO -- and we heard,

9    oh, he bargained for it, he wouldn't have done it without

10   getting the order and the protections because -- did he

11   bargain for not having to comply with the Investor Advisory

12   Act?  Did he bargain for not having a fiduciary duty to third

13   parties?  Because the one thing that Mr. Bridges has been

14   trying to tell you is that, under this order, if it's

15   interpreted one way, you would never authorize a violation of

16   the Investment Advisory Act because it wouldn't necessarily be

17   gross negligence or willful misconduct.

18       In other words, in employing Seery, did the Debtor go out

19   in this disclosure statement and say, we are advisor to $1.2

20   billion of third-party money, and guess what, our CRO has no

21   fiduciary duty to you?  We have forestalled any claim under

22   the Investment Advisory Act in our employment order.  Did that

23   happen?

24       Because if that happened, I don't know if the Court was

25   really thinking that way, because that -- that can't happen in

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71  Exhibit 71 Filed 07/22/25 299 Page 422 of 1011    PageID 2321

271

 1    a confirmation order before, under the Fifth Circuit

 2    authority, after disclosure statement, plan, et cetera, et

 3    cetera, because that's a third party release of claims that

 4    may -- that haven't occurred yet.  You would be releasing

 5    because you would be saying you have no right.  You have no

 6    right.  This is not temporal.  This is saying you have no

 7    right, if it's saying that, to bring an Investment Advisory --

 8    Investment Advisory Act or a Breach of Fiduciary Duty Act

 9    that's not gross negligence or willful misconduct forever upon

10    an employment order.

11        Now, if that's not what it means, then we have another

12    conundrum.  The other conundrum -- and I'm new to this, maybe

13    this has been thought out by everybody, but I don't think so.

14    The other conundrum is this order doesn't apply to actions

15    that don't involve willful -- gross negligence or willful

16    misconduct.  It only applies to those types of actions.  So,

17    frankly, I don't know what the order does.

18        I think the problem -- I probably shouldn't be the

19    purviewer of who ought to know because my standard's probably

20    really low, given my capacity here.  But I'm a guy off the

21    street.  Seery gets hired to run the Debtor.  Seery testifies

22    and he admits, we've got Investment Advisory  Act all over the

23    place.  We're making lots of fees out of administering all

24    this third-party money.  Do they know?  Do they know he's

25    immune?  Do the third parties know?

HCMLPHMIT00002986

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L     Document 4 71 Filed 07/22/25     Page 423 of 1011    PageID 2322
Exhibit 71    Page 273 of 299

272

1          Now, a standard about managing the Debtor?  Absolutely.

2     That's just pure D Chapter 11, pure D corporate, pure D

3     standard liability if you're operating an entity.  You're not

4     liable for gross negligence or willful misconduct.  You're

5     not.  And so any claim for damage to the Debtor or to the

6     estate by actions taken in the CRO capacity, absolutely.

7     Absolutely.  You don't want a bunch of yoyos suing, you did

8     something against the Debtor and the Debtor is now worth $147

9     less than it was because you did something, you were negligent

10    and you forgot to put the dog out.  No.  It's got to be gross

11    negligence or willful misconduct if you are talking about

12    running the Debtor and running the estate.

13         But that's not what we have here.  And you can ask all the

14    questions you want about whether the lawsuit's any good, but

15    that's not what's up before the Court.  What's up before the

16    Court is whether filing a motion for leave is contempt.  And

17    under this order, you're saying, all you had to do is come

18    here.  Well, in one reading of it, you'd have never got relief

19    because you can't bring the kind of action.  I foreclosed it

20    by employing Seery.  He no longer has a fiduciary duty and is

21    no longer bound by the Investment Advisory Act.  Case closed.

22    Get out of here.  Unless you can formulate something around so

23    that you can establish gross negligence or willful misconduct,

24    I've done away with all those causes of action.

25         I don't think that's what happened.  And if that's not

HCMLPHMIT00002987

1   what happened, this doesn't apply because it shouldn't apply

2   to third-party actions.  It should apply to actions for damage

3   to the estate by creditors of the estate for whom Seery is

4   acting as CRO of the Debtor, who is the -- in possession of

5   the estate.  That makes perfect sense.  Perfect sense.  And

6   nobody would say that you shouldn't have sole authority to

7   determine whether a CRO who's acting for the estate and

8   damages the estate -- because that'd be a claim against the

9   estate.  That would be an administrative claim against the

10  estate.  That is just hornbook law.

11      That's the way I see this order.  And I admit I didn't

12  write it.  I admit I didn't submit it.  I admit I didn't

13  litigate it.  I admit I'm coming in late.  But sometimes maybe

14  a fresh pair of elderly, trifocal-assisted eyes doesn't hurt.

15  Because I will tell you, Judge, on one read this Court says

16  don't bother coming here because you don't have the kind of

17  claim that can be brought, even if you're a third party.  And

18  the only way that happens is if Seery's released from any

19  obligation under the Investment Advisory Act, and I think

20  everybody would like to know that.  And he can't be sued for

21  breach of fiduciary duty to third parties that he admits he

22  owes.  I think people would like to know that.

23      And if it doesn't, then this is not -- this order is not

24  about that.  But the fact -- I've been at this 40 years, and I

25  usually don't want to talk about myself.  There's really not a

HCMLPHMIT00002988

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-71    Page 273 of 299    Page 425 of 1011    PageID 2324

274

1    lot to talk about.  But I hear Mr. Morris how he's never done

2    this, he's never done that.  I hear this, I'm a good -- you

3    know, whatever.  I'm confused.  I've been doing this 41 years.

4    Bankruptcy, 39.7.  I must be crazy, but that's what I've been

5    doing.  And I'm confused because I don't even know if they

6    needed to come here.  I don't even know if, had they come

7    here, if they could have even presented an action for gross --

8    for negligence or breach of fiduciary duty, could have --

9    gross negligence or willful misconduct?  I don't know whether

10    this order just applies to Seery's duties as CRO vis-a-vis

11    creditors of the estate and property of the estate and damage

12    to the estate.  Because that's not what we're dealing with

13    here.

14        The point is, Judge, this is contempt.  And I understand

15    Your Honor knows all about contempt.  Your Honor knows about

16    *Matter of Hipp*.  Your Honor knows about civil contempt

17    authorization for bankruptcy courts.  Your Honor knows that

18    you can't operate without the right to impose civil contempt

19    sanctions.  And Your Honor knows, and I agree with Your Honor,

20    that civil contempt is both remedial and coercive.

21        But how do you coerce around my questions?  Maybe I am all

22    wet, but if I am, I don't think I am, and I don't understand

23    that I am, and that's why I'm concerned about going off into

24    this contempt wilderness and millions in fees, when the motion

25    for leave was dismissed and when the lawsuit doesn't ask for

HCMLPHMIT00002989

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71   Filed 12/08/25   Page 426 of 1011    PageID 2325
Exhibit 71   Page 278/299

275

```
 1    or includes most of its claims.  I don't even -- I have not

 2    studied the lawsuit.  I wasn't involved in it.  But if it's a

 3    breach of fiduciary duty and Advisory Act and it says what

 4    you've been told it says, that he should have pulled up

 5    different stuff, that the valuation metrics were different,

 6    that he shouldn't have used it, I don't know that they're

 7    saying fraud.  I don't know that they're saying he knew he was

 8    doing -- I think they're saying he breached the Investment

 9    Advisory Act.  And that's not gross negligence or willful

10    misconduct.  Then does this order apply or this order -- does

11    this order foreclose that?

12         The fact is, I think we could have decided this on the

13    pleadings and on the order.  We didn't.  The fact that Mr.

14    Dondero did A, B, C.  And I will tell you this.  Mr. Patrick

15    has stood up.  He's going to get a harpoon, he's going to get

16    a harpoon, subject to his right to appeal.  But he has told

17    this Court.  We represent him.  We're not trying to get him

18    out of having authorized the order.  It's very important for

19    this Court to understand.  Mr. Patrick is one of these

20    entities.  Mr. Dondero can holler and scream all he wants to.

21    Mr. -- and look, did he terminate Grant Scott?  If I'm Grant

22    Scott, and this is my best friend and I was in his wedding and

23    I was his roommate and I was his best friend and I'm doing

24    this stuff for $5,000 and I do something and $5,000 a month

25    and I do something and I get hollered at and I've got a full a
```

HCMLPHMIT00002990

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-71 Filed 07/26/25    Page 427 of 1011    PageID 2326
Exhibit 71 Page 207 of 299

276

```
1    law practice, I'm an IP lawyer, why don't I just tell him to
2    go jump in a lake, which is the other way you could look at
3    Grant Scott leaving.  I want you to jump in a lake.  I'm out
4    of here.  I don't need this.
5         Thank you.
6              THE COURT:  All right.  Thank you.
7              MR. DEMO:  Your Honor, how much time do they have
8    left, --
9              THE COURT:  Um, --
10             MR. DEMO:  -- to be honest?
11             THE COURT:  Nate, are you -- 26 minutes?  All right.
12             MR. TAYLOR:  I'll go way under, Your Honor.
13             THE COURT:  Okay.
14              CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO
15             MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on
16    behalf of Mr. Dondero.  He was named as an individual alleged
17    violator within the order.
18             THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr.
19    Anderson, who did you represent?
20             MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I
21    represent --
22             THE COURT:  You're Mr. Patrick?
23             MR. PHILLIPS:  We're Mr. Patrick.
24             THE COURT:  You're both --
25             MR. PHILLIPS:  Mr. Patrick.
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 02/28/25   Page 428 of 1011   PageID 2327
Exhibit 71   Page 278 of 299

277

```
 1          THE COURT:  Okay.  I'm sorry.  I'm getting my Fort

 2    Worth law firms mixed up.  Okay.

 3          MR. TAYLOR:  That's quite all right.  Clay Taylor

 4    from Bonds Ellis here on behalf of Mr. Dondero.  And we're

 5    here because he was named in the alleged violator motion

 6    within the order as an alleged violator.  We don't think that

 7    he is, for the reasons that we're about to explain, but we

 8    were ordered to appear --

 9          A VOICE:  No.

10          MR. TAYLOR:  -- and so therefore we are appearing and

11    telling you why we're not an alleged violator.

12       First of all, for all the reasons that Mr. Sbaiti and Mr.

13    Bridges and Mr. Phillips and Mr. Anderson said, the court

14    order was in effect.  We agree with that.  It required certain

15    conduct to be done.  Yes, it did.  It said you couldn't

16    commence something.  It said you couldn't pursue it.  I think

17    we have gone through what the pursuit and commence.  Nobody is

18    arguing that anything was commenced.  It comes down to

19    pursuit.

20       But let's talk about what the evidence shows about Mr.

21    Dondero.  It shows that Mr. Dondero believes that there have

22    been breaches of fiduciary duty.  He thinks that there has

23    been negligence committed.  He believes that actions should be

24    taken.  We don't run away from that.  He, frankly, told you

25    that.
```

HCMLPHMIT00002992

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 71 Filed 07/03/25   Page 429 of 1011   PageID 2328

278

1    But here, he didn't take any action to pursue it.  The DAF

2    did.  CLO Holdco did.  It's undisputed that he's not an

3    officer, director, or control person for either of those

4    entities.  The act we're here on is a motion for leave to file

5    an amended complaint to include Mr. Seery.  That's -- Mr.

6    Dondero didn't take any of those acts.  He believes it should

7    have been done, but he's not the authorizing person.

8        He might have -- let's just pretend that he thought he was

9    authorizing something.  It doesn't matter that he thought he

10   could authorize something or that he was trying to push for

11   it.  The fact remains he can't authorize it.  You know, he can

12   say, I declare war on Afghanistan.  Well, he can't.  Congress

13   can't.  He can write a letter to his Congressman.  He already

14   wrote a letter to his Congressman.  He talked.  He talked with

15   the head of the acting CLO -- CLO Holdco and he said, I think

16   there's something wrong here.  I think you should be looking

17   into it.  You know what, he goes, you might be right.  Go talk

18   with Mazin about it.  Give him some data.  Conduct an

19   investigation.  They did.  And then they went to the

20   authorizing person and they filed a motion for leave to

21   include Mr. Seery.  Mr. Dondero did nothing wrong in that.

22       Now, there is some personal animosity.  I think that Your

23   Honor has probably seen there seems to be some personal

24   animosity between Mr. Seery and Mr. Dondero, and that's

25   unfortunate.  But just because there's some personal animosity

HCMLPHMIT00002993

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 71 Filed 280/25 299 Page 430 of 1011   PageID 2329

279

```
 1   doesn't mean that maybe something wasn't done wrong.  Maybe
 2   that Mr. Dondero -- he's certainly allowed to at least tell
 3   people, well, I think there was something done wrong.  And if
 4   there is an action to be had, then those appropriate entities
 5   can take it.  But he didn't do those things.
 6        And so even if he says, just like Michael Scott, "I
 7   declare bankruptcy," it doesn't matter.  You have to take the
 8   certain actions.
 9             THE COURT:  I got it.  I don't know if everyone did.
10             MR. TAYLOR:  Yes, well, yeah, you have to be a *The*
11   *Office* fan.
12        But so that's where we stand.  And for all the reasons the
13   prior people have discussed, I don't think that there was any
14   violation of this Court's order.  But even if there was, Mr.
15   Dondero in this situation was not the one.  We're going to
16   have to deal with the other order that came out yesterday in
17   due course, but for this discrete issue that is before this
18   Court today, Mr. Dondero didn't violate anything.
19        Thank you.
20             THE COURT:  All right.  Mr. Morris, you get the last
21   word.
22        REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR
23             MR. MORRIS:  Thank you, Your Honor.  These are going
24   to be discrete points because it's truly rebuttal.  I'm going
25   to try to respond to certain points.
```

001959

HCMLPHMIT00002994

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L      Document 71  Filed 2381/25 299 Page 431 of 1011    PageID 2330

280

```
 1        Mr. Bridges and Mr. Phillips made extensive arguments
 2   about why they believe the order is wrong, why it's
 3   overreaching.  They tried to get into your head to think about
 4   what you intended or what you thought.  The fact of the matter
 5   is, the answer to all of those questions -- first of all, none
 6   of it's relevant to this motion because we've got the order --
 7   but the answer is very simple.  Forget about coming here to
 8   seek leave to amend to add Mr. Seery.  We can avoid Mr.
 9   Sbaiti's concerns about judicial estoppel or something.  Why
10   didn't they just file the motion for reconsideration?  They
11   filed that after they filed the motion for leave to amend,
12   after we filed the motion for contempt.  Only then did they
13   file the motion for reconsideration.
14        Now, we think it's ill-thought-out.  We think it's
15   problematic.  Probably not today, is my guess, we'll argue to
16   you as to why we think that motion ought to be denied.  But if
17   they truly believed that the order was infirm in any way,
18   wouldn't the proper thing to have been to come here and tell
19   you that?  Wouldn't the proper thing to be to come to the
20   court that issued the order that you have a problem with and
21   ask the court to review it again?  And if Your Honor overruled
22   the motion, to appeal it.
23        Why are we even doing this?  Why did they do it?  It's not
24   we.  Why did they do it?  Right?  And that solves almost
25   everything they've said.  That's point one.
```

HCMLPHMIT00002995

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-71   Filed 08/28/25   Page 432 of 1011   PageID 2331

281

1          Point two, the January order.  The January order is very

2     important.  It's important not just because it applies to

3     directors, but it's important because Mr. Dondero agreed to

4     it, and it also applies -- I want to get it -- Paragraph 10.

5     It's Exhibit 15.  It applies to the independent directors and

6     the independents directors' agents.  If a CEO is not an agent

7     of an independent director, I'm not sure what is.  The

8     independent directors are the body that appointed the CEO.

9     The CEO, Mr. Seery, is acting on behalf of the board.  This is

10    the order that Mr. Dondero agreed to.  It's the order -- take

11    out the word independent director; put in Mr. Seery -- it's

12    the order everybody's complaining about.  But even the January

13    order certainly applied to Mr. Seery.  That's point two.

14         Point three.  I've heard a lot of concerns about the

15    slippery slope and what does pursuit mean and does talking to

16    a lawyer mean pursuit and doing an investigation being

17    pursuit.  I don't know, Your Honor, and I don't care, because

18    that's not what we're here to talk about.  We're here to talk

19    about a specific act -- not a hypothetical, not a slippery

20    slope.  We're talking about the filing of a motion for leave

21    to amend a complaint to add Mr. Seery as a defendant.  That's

22    all we're talking about.  So, you know, the rest of it, it's

23    just noise.  And the only question is whether, and I think

24    it's pretty clear, that means pursuit.

25         Another version on the theme of was there any alternative

HCMLPHMIT00002996

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-71    Filed 08/26/25    Page 433 of 1011    PageID 2332
Exhibit 71    Page 283 of 299

282

1    to filing the motion in the District Court, I think there was.

2    The Sbaiti firm did file that suit against Acis in New York.

3    And if Your Honor checks the docket in the Acis bankruptcy, I

4    think you'll find that there's a motion from Mr. Rukavina, for

5    a comfort order, basically, saying that -- asking the court to

6    declare that the filing of the complaint in New York against

7    Acis didn't violate the plan injunction.  I think I have that

8    right.

9        But I point that out, Your Honor -- it's not evidence in

10   the record, but the Court can certainly take judicial notice

11   of what's on its docket -- I point that out because there's

12   another example of a lawyer who is very active in this case

13   who actually -- now, he already commenced the suit, so he did

14   -- they did both simultaneously, so I don't want to suggest

15   that that's the perfect thing to have done, but at least he's

16   here asking for -- he's bringing it to your attention, he's

17   telling you it's happened, he's asking for a comfort order,

18   and someday Your Honor may rule on it.  I don't know.

19       Number six, what's with the pursuit of Mr. Seery?  What is

20   with the pursuit of Mr. Seery?  Is there any doubt in

21   anybody's mind that the Debtor is going to have to indemnify

22   Mr. Seery and will bring in another law firm?  And while I

23   don't think it will ever happen in a hundred billion years, if

24   there is a judgment against Mr. Seery, isn't that going to be

25   the Debtor's responsibility?  Why are they even bothering to

001962

HCMLPHMIT00002997

1    do this?  I think it's a fair question for the Court to ask.

2       I think Mr. Taylor came up and talked about animosity.

3    How do you explain going after Jim Seery?  How do you do it?

4    He's going to be indemnified.  It's in -- it's in like three

5    different orders.  It's in the confirmation order.  It's in

6    the CEO order.  It's -- it's probably as a matter of law.

7    It's in the Strand partnership agreement.  It's -- he's been

8    indemnified like 12 different times.  What is the purpose,

9    other than to make Mr. Seery's life miserable?  There is none.

10   You'll never hear a rational explanation for why they're doing

11   this.

12             THE COURT:  Just so you know, I've not looked at any

13   of the pleadings in the District Court --

14             MR. MORRIS:  And I'm not asking you to.

15             THE COURT:  -- other than what has been presented to

16   me today.

17             MR. MORRIS:  Yeah.  That's fine, Your Honor.

18             THE COURT:  But I'm very flipped out about the causes

19   of action against the Debtor, --

20             MR. MORRIS:  Yeah.

21             THE COURT:   -- who hasn't reached an effective date.

22             MR. MORRIS:  Well, --

23             THE COURT:  And I'm most interested to know what the

24   defenses, motions --

25             MR. MORRIS:  We'll get to that.

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-71    Filed 08/25/25    Page 435 of 1011    PageID 2334
Exhibit 71    Page 285 of 299

284

```
 1              THE COURT:  -- are going to be raised in that regard.
 2              MR. MORRIS:  We will get to that in due course.
 3       I do want to point out, just to be clear, because we keep
 4   hearing that they learned about, you know, all of these
 5   horrible things after the fact.  In the complaint, which I
 6   think is Exhibit 12, --
 7              THE COURT:  I'm there.
 8              MR. MORRIS:  -- at Paragraph 127, the Plaintiffs
 9   allege, "Mr. Seery was informed in late December 2020 at an
10   in-person meeting in Dallas, to which Mr. Seery had to fly,
11   that HCO" -- excuse me "HCLF and HCM had to suspend trading in
12   MGM Studios' securities because Seery had learned from James
13   Dondero, who was on the board, of a potential purchase of the
14   company.  The news of the MGM purchase should have caused
15   Seery to revalue."
16       I cannot begin to tell you the problems with that
17   paragraph.  We're not going to discuss them today.  I made a
18   promise to these folks that we wouldn't get into the merits of
19   the complaint.  But Your Honor was onto something before, and
20   those issues, you know, may see the light of day one day.  And
21   if they do, folks are going to have to deal with it.  But I
22   will point out that at the time the communication was made,
23   the other TRO was in effect.  We didn't bring that one to the
24   Court's attention.  But the important point there, Your Honor,
25   is December 2020.  It is December 2020.  That is the
```

001964

HCMLPHMIT00002999

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 08/28/25   Page 436 of 1011   PageID 2335
Exhibit 71   Page 286 of 299

285

```
 1    allegation that's being made against Mr. Seery.  And the fact

 2    of the matter is, because I've done the research myself, the

 3    Court will find that on December 23rd, the day the HarbourVest

 4    settlement motion was filed, it was fully public knowledge

 5    that Amazon and Apple, I think, had shut down negotiations

 6    with MGM at that time.  Right?  So the big secret information,

 7    it was in the public domain on December 23rd.

 8        There will also never be any evidence ever that Mr. Seery

 9    got on a plane and flew to Dallas in December 2020, but that's

10    a minor point.

11        I'd like to just conclude, Your Honor, by saying I've

12    heard pleas that they understand.  They understand, Your

13    Honor, now they understand.  It would be good if they promised

14    the Court that they won't seek to assert claims against Mr.

15    Seery anywhere but in this Court and comply with the order as

16    it's written.  That, that, that would be taking a little bit

17    of responsibility.

18        I have nothing further, Your Honor.

19            THE COURT:  Okay.  Thank you.

20        All right.  Let me give you some clue of when I'm going to

21    be able to rule.  I've been glancing at my email in hopes that

22    something set tomorrow would go away, but that's not

23    happening.  I've got a hearing that I've been told will take

24    all day tomorrow on a case involving a half-built hotel,

25    luxury hotel in Palm Springs, California.  So I have to spend
```

001965

HCMLPHMIT00003000

```
 1   the next I don't know how long getting ready for that hearing
 2   tomorrow, and then I have what looks like a full day of
 3   hearings Thursday, including you people coming back on
 4   something.
 5           MR. POMERANTZ:  Your Honor, I was going to address
 6   that.  We have Dugaboy's motion to enforce compliance on the
 7   2015(3) reports.
 8           THE COURT:  That's what it was.
 9           MR. POMERANTZ:  Since we haven't gotten to the motion
10   to modify the Seery order, my suggestion would be we use that
11   time -- of course, Dugaboy, I'm not sure if they're on the
12   phone.  They're not here.  I'm not sure that's time sensitive.
13   But if Your Honor wanted to have a hearing on that motion,
14   which was contemplated to take place today, the Debtor would
15   be okay having that motion heard on Thursday, perhaps by
16   WebEx, unless Your Honor wants us to stay here, which we would
17   if you do, and then reschedule the 2015(3) motion.
18       But again, that wasn't my motion.  It's Dugaboy's.  I'm
19   not sure Mr. Draper is on.  But we obviously have some
20   calendar issues.
21           MR. MORRIS:  And Your Honor, just to complete it, I
22   think also on Thursday the Court is supposed to hear HCRE and
23   Highland Capital Management Services motions for leave to
24   amend their complaint in the promissory note litigation
25   against each of them.  I think that's also on the calendar for
```

001966

HCMLPHMIT00003001

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-71   Filed 288/25   299Page 438 of 1011   PageID 2337

287

```
 1   Thursday.  I don't expect that -- I hope that doesn't take

 2   very long, but that's also, I believe, on the calendar.

 3            THE COURT:  Okay.  Mr. Draper, are you out there?

 4            MR. PHILLIPS:  I didn't see him on the list, Your

 5   Honor.  I was just looking.  But --

 6            THE COURT:  Okay.  All right.  Well, --

 7            MR. PHILLIPS:  What is the question?  I can send him

 8   a text real quick.

 9            THE COURT:  Well, just have -- if you all could

10   follow up with Traci Ellison, my courtroom deputy, tomorrow, I

11   am perfectly happy to continue the motion to modify the Seery

12   order to Thursday morning at 9:30 if Draper is willing to

13   continue the 2015 motion.

14            MR. POMERANTZ:  I know, if I was him, my first

15   question would be is what times does the Court have available?

16   We could work that through Ms. Ellison.

17            THE COURT:  Yes.  And I'm just letting you know --

18   talk to her.  Okay.  Number one, I'll do these by video, okay?

19   WebEx.  But I know I don't have any time Wednesday, and

20   Thursday's a busy day.

21       We have court Friday morning at 9:30 in--?

22            THE CLERK:  Cici's Pizza.

23            THE COURT:  Cici's Pizza?  That's not going to take

24   very long, right?

25            THE CLERK:  I don't think so.
```

HCMLPHMIT00003002

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 14-71  Filed 08/28/25   Page 439 of 1011    PageID 2338
Exhibit 71   Page 289 of 299

288

```
 1              THE COURT:  I can potentially do something, you know,

 2   10:00 o'clock Friday morning.  Other than that, then you've

 3   got to wait a while, because I have a seven-day trial, live

 4   human beings in the courtroom starting next Monday.  And so my

 5   point is mainly to tell you, as much as I would like to rule

 6   very, very fast, it's going to be, it looks like, a couple of

 7   weeks or so before I can give you a ruling on this.

 8              MR. BRIDGES:  Your Honor?

 9              THE COURT:  Yes?

10              MR. BRIDGES:  May I?  It's our motion.  I would

11   propose, if counsel would agree, that we just submit it on the

12   papers.

13              THE COURT:  Everybody good with that?  I'm certainly

14   good with that.

15              MR. POMERANTZ:  Your Honor, I'd like there to be

16   argument.  I have a lengthy argument.  I think I'd like to

17   address a number of the things that -- Mr. Bridges made his

18   argument today.  Okay?

19              THE COURT:  Okay.

20              MR. POMERANTZ:  His deck, it was entitled, Motion to

21   Modify.

22              THE COURT:  Okay.

23              MR. POMERANTZ:  So that's very nice of him, but I

24   would like to make my argument.

25              THE COURT:  Okay.  Let's try to nail this down right
```

001968

HCMLPHMIT00003003

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71    Filed 12/20/25    Page 440 of 1011    PageID 2339
Exhibit 71    Page 290 of 299

289

```
 1   now.  Friday at 10:00 o'clock, can we do the oral argument
 2   WebEx?
 3            MR. POMERANTZ:  On that one, yes, Your Honor.
 4            THE COURT:  On that one?  Everybody good?  Okay.  So
 5   we'll come back Friday, 10:00 o'clock, WebEx, for that motion.
 6      You know, I'm going to say a couple of things where --
 7   I've leaned toward thinking this is a pretty simple motion
 8   before me, the motion for contempt, but when people offer into
 9   evidence documents, I read your documents.  Okay?  That's my
10   duty.  And so I have however many exhibits I admitted today
11   that I am going to look at and see how they sway me one way or
12   another on this issue.  But I will tell you that my gut is
13   there has been contempt of court.  Okay?  I don't see anything
14   ambiguous at all about Paragraph 5 of my July 16th, 2020
15   order.  Somebody may think I overreached, but if that was the
16   case, someone should have argued at the time I was
17   overreaching.  Someone should have appealed the order.  And I
18   think it's a *Shoaf/Espinosa* problem at this point for anyone
19   to argue about the enforceability of that order.
20      I think there's nothing ambiguous in the wording.  Pursue
21   is not ambiguous.  There's nothing confusing about the
22   requirement that any entity who wanted to sue or pursue a
23   claim, you know, commence claim, pursue a claim against Mr.
24   Seery, had to come to the Bankruptcy Court.  Standard-fare
25   gatekeeping order.
```

HCMLPHMIT00003004

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L      Document 14-71 Filed 07/01/25   Page 441 of 1011   PageID 2340
Exhibit 71   Page 291 of 299

290

```
 1        So what I'm going to be looking at is, do these documents

 2    I admitted into evidence change my view on that, and then the

 3    harder question is who of the alleged contemnors am I going to

 4    think it's clear and convincing committed contempt and -- who

 5    are the contemnors, and then, of course, what are the damages?

 6    Coercive or compensatory damages?

 7        So, again, you know how I feel, to the extent that's

 8    helpful in your planning purposes.  I'm pretty convinced

 9    contempt of court has occurred.  It's just a matter of who's a

10    contemnor and what are the damages.

11        I'll say a couple of remaining things.  I continue to be

12    frustrated, I think was the word people used, about

13    unproductive ways we all spend our time.  I am going to spend

14    I don't know how many more hours drafting another ruling on a

15    contempt motion, and attorneys' fees are through the roof.

16    And, you know, I dangled out there a question I couldn't

17    resist about MGM.

18        And I will tell you, I mean, someone mentioned about their

19    stomach aching.  Personal story, I could hardly sleep the

20    night it became public about the Amazon purchase, because,

21    silly me, maybe, I'm thinking game-changer.  This is such

22    potentially a windfall, an economic windfall.  Maybe this

23    could be the impetus to make everyone get in a room and say

24    look, we've got this wonderful windfall of money.  I don't

25    know how much is owned directly or indirectly by the Debtor of
```

001970

HCMLPHMIT00003005

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71 Filed 09/22/25   Page 442 of 1011   PageID 2341
Exhibit 71   Page 292 of 299

291

1  MGM stock.  I don't know how much the Debtor manages.  I

2  don't know how much, you know, some other entity.  I know it's

3  probably spread out in many different entities.  But I know, I

4  know because I listen, that one or more of the Highland-

5  managed CLOs has some of this, and I think I read -- remember

6  that HCLOF, which now Highland owns more than 50 percent of,

7  has some of this stock.  Right?

8       MR. DONDERO:  Do you want to know what happened?

9       THE COURT:  Oh.

10      A VOICE:  No.

11      THE COURT:  Well, okay.  So, you know, I can

12  understand I'm getting into maybe uncomfortable territory in a

13  public proceeding, so I'll stop.

14    But, you know, do we need to set up a status conference?

15  Do you all need to like talk about this?  Am I just being

16  naïve?  Couldn't this be a game-changer, where maybe it would

17  give new incentive to --

18      MR. POMERANTZ:  Your Honor, I would -- he's been

19  pretty quiet through the whole hearing, Mr. Clemente.  He has

20  the Committee, that a couple of people you've heard have sold

21  claims.  They're now held by other parties.

22    You know, the door is always open.  I don't think this is

23  going to be game-changer, unfortunately.  We would like

24  nothing more, as Debtor's counsel.  We don't enjoy coming to

25  Your Honor for contempt hearings.

HCMLPHMIT00003006

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-71    Filed 03/26    Page 443 of 1011    PageID 2342
Exhibit 71    Page 293 of 299

292

```
 1            Mr. Clemente said that it was productive.  We would sure

 2     participate.  But right now, we have creditors who are very

 3     angry that millions and millions of dollars have been spent on

 4     really a waste of time and a waste of the Court's time and a

 5     waste of everyone's time and eating into the creditors' money.

 6     So I would ask Mr. Clemente to address that.

 7                 MR. CLEMENTE:  I'm here.

 8                 THE COURT:  Yes, he's way in the back, hoping to be

 9     ignored.

10                 MR. CLEMENTE:  It's too cold, Your Honor, where I was

11     sitting.  For the record, Your Honor, --

12                 THE COURT:  I noticed some entity called Muck

13     Holdings bought HarbourVest, according to the docket.

14                 MR. CLEMENTE:  That's correct.  Muck Holdings bought

15     HarbourVest, and I believe also the Acis claim, and then

16     there's a different entity that bought the Redeemer claim.

17                 THE COURT:  Uh-huh.

18                 MR. CLEMENTE:  So, as we mentioned in our -- one of

19     our pleadings, I think it was the retention pleading for

20     Teneo, the Committee consists of two members currently, Meta-e

21     and UBS.

22                 THE COURT:  Uh-huh.

23                 MR. CLEMENTE:  Obviously, Your Honor just approved

24     the UBS settlement recently.  The U.S. Trustee is aware of the

25     make-up of the Committee, and is currently comfortable with
```

HCMLPHMIT00003007

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-71   Filed 04/25   Page 444 of 1011    PageID 2343
Exhibit 71   Page 294 of 299

293

1   the Committee maintaining a two-person membership at this

2   point.

3       In terms of whether the MGM transaction is a game-changer,

4   we've not yet seen, to Your Honor's point, how all of that

5   rolls up through the various interests that the Debtor may or

6   -- you know, may have --

7               THE COURT:  Okay.

8               MR. CLEMENTE:  -- that would be implicated by the MGM

9   transaction.  If ultimately the MGM transaction has to

10  actually occur, right?  I mean, so, you know, just based on

11  what I read in the public documents, we're not sure when that

12  transaction may actually happen.  But obviously it's a good

13  thing for the Debtor's estate because it's going to recognize

14  value for the estate.

15      In terms of whether it ultimately changes how Mr. Dondero,

16  you know, wishes to proceed, that's entirely up to him, Your

17  Honor.  But we don't see it as something at this point that

18  would suggest that there's an overall back to let's talk about

19  a pot plan because of where the MGM transaction might

20  ultimately come out.

21      So I don't know if that's helpful to Your Honor, but those

22  are -- that's my perspective.

23              THE COURT:  Well, and I'm not trying to, you know,

24  push a pot plan on anyone.

25              MR. CLEMENTE:  No, I understand.

001973

HCMLPHMIT00003008

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 71 Filed 06/06/25   Page 445 of 1011   PageID 2344
Exhibit 71   Page 295 of 299

294

```
 1          THE COURT:  I'm just saying it looked like an

 2   economic windfall.  I just -- I don't know how much is

 3   Highland versus other entities in the so-called byzantine

 4   complex, but, gosh, I just hoped that there might be something

 5   there to change the dynamic of, you know, lawsuit, lawsuit,

 6   lawsuit, lawsuit, motion for contempt, motion for contempt.

 7          MR. CLEMENTE:  Agreed, Your Honor.

 8          THE COURT:  Uh-huh.

 9          MR. CLEMENTE:  And like I said, it was a very

10   positive development obviously for the creditors for the

11   Debtor.  But whether it's the game-changer that Your Honor

12   would envision, I'm not sure that I can suggest at this point

13   that it is.

14      I think that, you know, obviously, we don't like to see

15   these lawsuits continue to be filed.  That's the whole point

16   of the gatekeeper order, Your Honor.

17          THE COURT:  Uh-huh.

18          MR. CLEMENTE:  I didn't say anything during the

19   hearing, but obviously the January 9th order, as Your Honor

20   has said many times, was in the context of a trustee being

21   appointed.

22          THE COURT:  Right.  Right.

23          MR. CLEMENTE:  Right?  So, and the July 16th order,

24   very similar vein, it's an outshoot of that.  In fact, it was

25   contemplated in the January 9th settlement that a CEO could be
```

001974

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 104-71   Filed 09/06/25   Page 446 of 1011   PageID 2345

295

1  appointed.

2      So I think, again, it's just -- it's important, the

3  context in which that January 9th order came into play, for

4  this very reason, so we could avoid this type of litigation,

5  Your Honor.

6          THE COURT:  Uh-huh.

7          MR. CLEMENTE:  And so again, I didn't -- I obviously

8  didn't rise to mention that during the hearing, but Your Honor

9  is already aware of that.  I didn't need to remind Your Honor

10  of that.

11          THE COURT:  Uh-huh.  Okay.

12          MR. CLEMENTE:  Anything else for me, Your Honor?

13          THE COURT:  No.  Thank you.

14          MR. CLEMENTE:  Okay, then, Your Honor.

15          THE COURT:  Sorry I picked on you.  But, all right.

16  Well, again, I hope the message has landed in the way I hope

17  will matter, and that is I'm going to look at your documents

18  but I feel very strongly that, unless there's something in

19  there that, whoa, is somehow eye-opening, I'm going to find

20  contempt of court.  It's just a matter of who and what the

21  damages are.  There's just not a thing in the world ambiguous

22  about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23  it as soon as we humanly can get to it.

24      Mr. Morris, anything else?

25          MR. MORRIS:  Nothing.  No, thank you.

HCMLPHMIT00003010

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-71 Filed 07/26/25   Page 447 of 1011   PageID 2346
Exhibit 71 Page 297 of 299

296

```
1                THE COURT:  I guess I'll see you Thursday on the

2      WebEx.  Thank you.

3                THE CLERK:  All rise.

4           (Proceedings concluded at 6:00 p.m.)

5                           --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                         CERTIFICATE

21           I certify that the foregoing is a correct transcript from
       the electronic sound recording of the proceedings in the
22     above-entitled matter.

23      /s/ Kathy Rehling                        06/09/2021

24     _____      _____
       Kathy Rehling, CETD-444                      Date
25     Certified Electronic Court Transcriber
```

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 71 Filed 08/26/25   Page 448 of 1011    PageID 2347
Exhibit 71   Page 298 of 299

297

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                                  21
- Mr. Sbaiti                                                  31
- Mr. Bridges                                                 52
- Mr. Anderson                                                80
- Mr. Phillips                                                83
- By Mr. Taylor                                               87
- By Mr. Pomerantz                                            88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                            95
- Cross-Examination by Mr. Anderson                          132
- Cross-Examination by Mr. Sbaiti                            135
- Redirect Examination by Mr. Morris                         137
- Examination by the Court                                   138
- Recross-Examination by Mr. Sbaiti                          142
- Recross-Examination by Mr. Phillips                        143
- Further Redirect Examination by Mr. Morris                 144

James D. Dondero
- Direct Examination by Mr. Morris                           147
- *Voir Dire* Examination by Mr. Sbaiti                      184
- Direct Examination (Resumed) by Mr. Morris                 199
- Cross-Examination by Mr. Taylor                            210

EXHIBITS

Debtor's Exhibits 1 through 11              Withdrawn 215
Debtor's Exhibits 12 through 53              Received 216
Debtor's Exhibits 15 and 16                  Received 214
Debtor's Exhibits 23 and 24                  Received 213
Debtor's Exhibits 54 and 55                  Received 217

Mark Patrick's Exhibits 1, 3 through 12,     Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46            Received 219

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HCMLPHMIT00003012

298

1                                    INDEX
                                    Page 2
2

3    CLOSING ARGUMENTS

4    - Mr. Morris                                          221
     - Mr. Sbaiti                                          230
5    - Mr. Bridges                                         255
     - Mr. Anderson                                        263
6    - Mr. Phillips                                        267
     - Mr. Taylor                                          276
7    - Mr. Morris                                          279

8    RULINGS

9    Motion for Entry of an Order Further Extending the Period    19
     Within Which It May Remove Actions Pursuant to 28 U.S.C.
10   § 1452 and Rule 9027 of the Federal Rules of Bankruptcy
     Procedure filed by Debtor (2304)
11

12   Show Cause Hearing (2255) - *Taken Under Advisement*      285

13   Motion to Modify Order Authorizing Retention of James     285
     Seery filed by Plaintiffs CLO Holdco, Ltd., The
14   Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement*

15   END OF PROCEEDINGS                                        296

16   INDEX                                                297-298

17

18

19

20

21

22

23

24

25

001978

HCMLPHMIT00003013

**EXHIBIT**

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                       FOR THE NORTHERN DISTRICT OF TEXAS
 2                               DALLAS DIVISION

 3                                    )    Case No. 19-34054-sgj-11
         In Re:                       )    Chapter 11
 4                                    )
         HIGHLAND CAPITAL             )    Dallas, Texas
         MANAGEMENT, L.P.,            )    June 8, 2023
 5                                    )    9:30 a.m. Docket
                                      )
 6            Reorganized Debtor.     )
                                      )    HMIT'S MOTION FOR LEAVE TO
 7                                    )    FILE VERIFIED ADVERSARY
                                      )    PROCEEDING (3699)
 8       _____)

 9                          TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                    UNITED STATES BANKRUPTCY JUDGE.

11       APPEARANCES:

12       For the Reorganized          John A. Morris
         Debtor:                      Gregory V. Demo
13                                    Hayley R. Winograd
                                      PACHULSKI STANG ZIEHL & JONES, LLP
14                                    780 Third Avenue, 34th Floor
                                      New York, NY  10017-2024
15                                    (212) 561-7700

16       For the Reorganized          Jeffrey Nathan Pomerantz
         Debtor:                      PACHULSKI STANG ZIEHL & JONES, LLP
17                                    10100 Santa Monica Blvd., 13th
                                       Floor
18                                    Los Angeles, CA  90067
                                      (310) 277-6910

19       For Hunter Mountain          Sawnie A. McEntire
         Investment Trust:            Timothy J. Miller
20                                    PARSONS MCENTIRE MCCLEARY, PLLC
                                      1700 Pacific Avenue, Suite 4400
21                                    Dallas, TX  75201
                                      (214) 237-4303

22       For Hunter Mountain          Roger L. McCleary
         Investment Trust:            PARSONS MCENTIRE MCCLEARY, PLLC
23                                    One Riverway, Suite 1800
                                      Houston, TX  77056
24                                    (713) 960-7305

25
```

HCMLPHMIT00003014

```
 1   APPEARANCES, cont'd.:

 2   For Hunter Mountain          Deborah Deitsch-Perez
     Investment Trust:           STINSON
 3                               2200 Ross Avenue, Suite 2900
                                 Dallas, TX  75201
 4                               (214) 560-2218

 5   For Muck Holdings, et al.:   Brent Ryan McIlwain
                                 HOLLAND & KNIGHT, LLP
 6                               300 Crescent Court, Suite 1100
                                 Dallas, TX  75201
 7                               (214) 964-9481

 8   For James P. Seery, Jr.:    Mark Stancil
                                 Joshua Seth Levy
 9                               WILLKIE FARR & GALLAGHER, LLP
                                 1875 K Street, NW
10                               Washington, DC  20006
                                 (202) 303-1133
11
     Recorded by:               Michael F. Edmond, Sr.
12                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
13                               Dallas, TX  75242
                                 (214) 753-2062
14
     Transcribed by:            Kathy Rehling
15                               311 Paradise Cove
                                 Shady Shores, TX  76208
16                               (972) 786-3063

17

18

19

20

21

22

23

24
           Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
```

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 7-4   Filed 04/22/25   Page 453 of 1011   PageID 2352
Exhibit 72 Page 420390

3

| | |
|---|---|
| 1 | DALLAS, TEXAS - JUNE 8, 2023 - 9:42 A.M. |
| 2 | THE CLERK:  All rise.  United States Bankruptcy Court |
| 3 | for the Northern District of Texas, Dallas Division, is now in |
| 4 | session, The Honorable Stacey Jernigan presiding. |
| 5 | THE COURT:  Good morning.  Please be seated.  All |
| 6 | right.  We are here this morning for a setting in Highland. |
| 7 | This is on a motion of Hunter Mountain for leave to file an |
| 8 | adversary proceeding.  I will start out by getting appearances |
| 9 | from lawyers in the courtroom. |
| 10 | MR. MCENTIRE:  Yes, Your Honor.  Sawnie McEntire |
| 11 | along with my partner Roger McCleary and Tim Miller on behalf |
| 12 | of Hunter Mountain Investment Trust, Ltd. |
| 13 | THE COURT:  Thank you. |
| 14 | MR. MORRIS:  Good morning, Your Honor.  John Morris, |
| 15 | Pachulski Stang Ziehl & Jones, for the Reorganized Highland, |
| 16 | for the Highland Claimant Trust.  I'm joined by Mr. Pomerantz, |
| 17 | Mr. Demo, and Ms. Winograd. |
| 18 | THE COURT:  Good morning. |
| 19 | MR. STANCIL:  Good morning, Your Honor.  Mark Stancil |
| 20 | from Willkie Farr & Gallagher for Mr. Seery.  I'm joined by my |
| 21 | colleague Josh Levy. |
| 22 | THE COURT:  Good morning. |
| 23 | MR. MCILWAIN:  Good morning, Your Honor.  Brent |
| 24 | McIlwain from Holland & Knight here for Muck Holding, LLC, |
| 25 | Jessup Holdings, LLC, Farallon Capital Management, LLC, and |

001982

HCMLPHMIT00003016

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 74    Filed 06/20/25    Page 454 of 1011    PageID 2353
Exhibit 72    Page 5 of 90

4

1  Stonehill Capital Management, LLC.

2          THE COURT:  Thank you.  All right.  Is that all of

3  our lawyer appearances?  I know we have observers on the

4  WebEx, but I assume you are just observers.  We scheduled this

5  to be a live hearing for participants.

6      All right.  Well, we had some ground rules for how this

7  would go forward today.  We, of course, have had two -- I call

8  them hearings on what kind of hearing we're going to have.

9  We've had two status conferences.  And so our ground rules

10  were set.  Three hours of total presentation time for each the

11  Movant and the aggregate Respondents.  We also had an order

12  regarding what discovery would or would not be allowed.

13      And to my surprise, there were a flurry of pleadings.

14  We're a few minutes late getting out here because we were

15  trying to digest what was filed late yesterday and into the

16  night.

17      So I understand we have a controversy about a couple of

18  expert witnesses who were listed on Monday on the Movants'

19  exhibit and witness list.  And I've seen a motion to exclude

20  the expert witnesses' testimony.  And I think we need to

21  address that right off the bat.  I don't want to take too much

22  time on this, because, again, we're going to finish today, and

23  I won't let this housekeeping matter eat into our three hours,

24  but I want to get going.  So I'll hear from Movant, Mr.

25  McEntire.

HCMLPHMIT00003017

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 71-4 Exhibit 72 Filed 06/20/25  Page 455 of 1011    PageID 2354

5

1          MR. STANCIL:  Your Honor, may --

2          THE COURT:  Go ahead.

3          MR. STANCIL:  We moved to exclude, so I would propose

4    that my colleague, Mr. Levy, address this motion very briefly

5    if --

6          THE COURT:  Well, I guess --

7          MR. STANCIL:  Or I will do as --

8          THE COURT:  -- that actually makes sense.

9          MR. STANCIL:  Okay.

10         THE COURT:  I was thinking Mr. McEntire teed up the

11   issue, but I suppose you did with the motion to exclude.  So,

12   Counsel?

13         MR. LEVY:  Thank you, Your Honor.  Josh Levy on

14   behalf of Mr. Seery.

15      So, we think our papers largely speak for themselves, but

16   two additional points we'd like to raise.  In the response

17   filed by Hunter Mountain this morning, and this is Docket

18   Entry 3828, in Paragraph 11, they argue that this is a bench

19   hearing on colorability, not a trial where junk science is a

20   concern.  But junk science is precisely what they're trying to

21   introduce here.  They have raised two expert witnesses, one

22   who purports to be an expert in compensation but has no

23   experience whatsoever in evaluating compensation, and they

24   provide no methodology for their conclusion.

25      For example, they claim to have identified red flags.

HCMLPHMIT00003018

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 74    Filed 07/02/25    Page 456 of 1011    PageID 2355
Exhibit 72    Page 7 of 13

6

1  They never explain what those red flags are, why they are red

2  flags, or how they determined they were red flags.  This is

3  junk science, precisely what the Federal Rules are designed to

4  exclude.

5      But that shouldn't detract from the broader procedural

6  point that this is the first time we're hearing about expert

7  witnesses, at 10:00 p.m. three days before the hearing.  This

8  is a trial by ambush.  This motion was filed in March, we've

9  been litigating this motion for over two months now, and this

10  is the first time we're hearing about any expert witnesses.

11      As Your Honor noted, we've had multiple conferences.

12  We've had rules setting the ground rules for this hearing.

13  We've had orders setting the scope of discovery.  But now

14  Hunter Mountain is trying to pull a bait-and-switch.  After

15  never mentioning any experts, after obtaining orders limiting

16  the scope of discovery, they then wait until right before the

17  hearing to disclose their experts, ensuring that these experts

18  are insulated from any kind of discovery and can ambush us at

19  the hearing.

20      I'm happy to answer any other questions, but we believe

21  they should be excluded and the accompanying exhibits should

22  also be excluded.

23          THE COURT:  All right.  Thank you.  And the

24  accompanying exhibits, I don't review exhibits before a trial

25  or a hearing because I don't know what's going to be objected

001985

HCMLPHMIT00003019

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 74   Filed 06/20/25   Page 457 of 1011   PageID 2356
Exhibit 72   Page 8 of 390

7

1    to and admitted.  So do you want to point out, were there

2    expert reports in the proposed exhibits?

3            MR. LEVY:  These were charts and analyses prepared by

4    their experts, not actual expert reports.

5            THE COURT:  Okay.

6            MR. LEVY:  In their witness and exhibit list, Hunter

7    Mountain included several paragraphs that I guess serves as

8    what would be their expert reports.  And then it would be

9    Exhibits 39 through 52, which consist of CVs, materials

10   reviewed, and then what they term "data charts" prepared by

11   their experts.

12           THE COURT:  39 through 52?  Oh, I'm looking at the

13   wrong exhibit notebook.  Oh.

14       (Pause.)

15           THE COURT:  Okay.  Here we go.  All right.  No

16   questions at this time.

17       Mr. McEntire?

18           MR. MCENTIRE:  Yes, Your Honor.  May I proceed?

19           THE COURT:  You may.

20           MR. MCENTIRE:  Again, my presentation and response is

21   subject to our objection concerning that any evidence is being

22   admitted for any purpose, other than what we believe is the

23   proper standard of review.  So my response and our offer of

24   these experts is subject to that objection.

25       With that said, Mr. Levy's argument he just presented to

HCMLPHMIT00003020

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 74   Filed 09/02/25   Page 458 of 1011   PageID 2357
Exhibit 72   Page 9 of 390

8

```
 1    the Court presupposes that my client has a duty under 9014 to

 2    provide a report, which we do not; to provide detailed

 3    disclosures, which we do not, because 9014 is specifically

 4    exempted from the scope of Rule 26.  What we did, we didn't

 5    have to do.  What we did, and I made the decision to provide

 6    them some disclosure and identification of who they were,

 7    their backgrounds, and --

 8              THE COURT:  Well, let me stop you.

 9              MR. MCENTIRE:  Certainly.

10              THE COURT:  "What we did, we didn't have to do."  The

11    Local Rules, first of all, do require an exhibit and witness

12    list.  And --

13              MR. MCENTIRE:  We've provided that.

14              THE COURT:  I know.  I know.  But you -- I thought I

15    heard you --

16              MR. MCENTIRE:  No, no.

17              THE COURT:  -- saying you didn't have to do that.

18    You do have to do that.

19              MR. MCENTIRE:  No, no, no.

20              THE COURT:  But I guess what you're saying is --

21              MR. MCENTIRE:  What we provided was more than what

22    the Local Rules require.

23              THE COURT:  How so?

24              MR. MCENTIRE:  We provided CVs.  We provided their

25    backgrounds.  We disclosed in the actual witness description
```

001987

HCMLPHMIT00003021

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4   Filed 02/02/25   Page 459 of 1011   PageID 2358
Exhibit 72   Page 10 of 390

9

1   who they were and the key components of their opinions.  And

2   we refer to their data charts.  That is not something that the

3   Local Rule requires.

4            THE COURT:  Okay.  Well, let me back up.  We have our

5   Local Rules, but then we had our two status conferences --

6            MR. MCENTIRE:  Yes.

7            THE COURT:  -- on what the format of the hearing --

8            MR. MCENTIRE:  Yes.

9            THE COURT:  -- would be.

10            MR. MCENTIRE:  Yes.

11            THE COURT:  And, of course, there was extensive

12   discussion, evidence or no evidence?  What did the legal

13   standard, colorability, require?

14            MR. MCENTIRE:  Yes.

15            THE COURT:  And I came out in the end and said, if

16   people want to put on witnesses, they're entitled to put on

17   witnesses.  I think there may be a mixture of a fact question

18   and law question on colorability.  So, and then I set a three-

19   hour time limit and I said, if someone wants to depose Mr.

20   Seery and Mr. Dondero, they can, but no more discovery other

21   than that.  Okay?

22            MR. MCENTIRE:  I understand.

23            THE COURT:  Why then did you not say, well, wait,

24   Judge, if it's going to be evidence, we're just letting you

25   know, in full disclosure, we might call a couple of experts,

HCMLPHMIT00003022

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 72  Filed 02/02/25390 Page 460 of 1011     PageID 2359

10

 1  and this may impact your decision on what kind of discovery

 2  can happen.  And this may impact your decision on whether

 3  three hours each side is enough.

 4          MR. MCENTIRE:  Well, Your Honor, in fairness, I don't

 5  think we had made a final decision to actually designate any

 6  experts.  And at the time, the focus was on other witnesses.

 7  But there was no exclusion, there was no limitation at all on

 8  my right to bring an expert.  And the Rules are very clear.

 9  And the Court's --

10          THE COURT:  But I specifically limited discovery, and

11  it was on your motion.  It was on your motion we set the

12  hearing on --

13          MR. MCENTIRE:  Actually, --

14          THE COURT:  You know, did you need a continuance,

15  because if we were going to have evidence, maybe you needed a

16  continuance.  And then there was a discovery issue raised.

17          MR. MCENTIRE:  To be clear, Your Honor, I'm looking

18  at your orders.

19          THE COURT:  Got them in front of me.

20          MR. MCENTIRE:  Your order of May 26, 2023.  You said,

21  You can put on your witnesses and the Court is going to rule.

22  You made no limitations as to who the witnesses would be.

23  Your order did not limit the scope of witnesses to simply Mr.

24  Seery or Mr. Dondero.  In fact, any suggestion that you did

25  limit the witnesses is contrary --

001989

HCMLPHMIT00003023

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-4 72 Filed 02/12/25390 Page 461 of 1011    PageID 2360

11

1          THE COURT:  Now, which order are you looking at?

2          MR. MCENTIRE:  I'm looking at the May 26, 2023 order,

3    Page 51, Lines 3 through 14.

4          THE COURT:  Okay.

5          MR. MCENTIRE:  You also stated --

6          THE COURT:  I have -- have I entered three orders on

7    this?  I've got a May 10th order.  I've got a May 22nd order.

8          MR. MCENTIRE:  And I would also point out, Your

9    Honor, --

10         THE COURT:  Could you answer my question?  I want to

11   look at what you're looking at.

12         MR. MCENTIRE:  Certainly.

13         THE COURT:  Here we -- this is the one.  Okay.  Aha.

14   Okay.  May 26.

15         MR. MCENTIRE:  Page 51, Lines 3 through 14.

16         THE COURT:  I've entered three orders on what kind of

17   hearing we're going to have.  Okay.  So you're looking where?

18         MR. MCENTIRE:  Page 51, Lines 3 through 14.  "You can

19   put on your witnesses."

20         THE COURT:  Page 51?

21         MR. MCENTIRE:  Yes, ma'am.

22         THE COURT:  Oh.  You're looking at a transcript, not

23   the order.

24         MR. MCENTIRE:  That's right.  I apologize.

25         THE COURT:  Okay.

001990

HCMLPHMIT00003024

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72  Filed 03/03/25 390 Page 462 of 1011   PageID 2361
Exhibit 72 Page 12 of

12

1          MR. MCENTIRE:  Yeah, I'm looking at the transcript

2     from the hearing.

3          THE COURT:  Okay.  Well, I'm looking at my order.

4          MR. MCENTIRE:  And the order, the order also

5     specifies no limitation at all in connection with the -- the

6     --

7          THE COURT:  But my order was based on what was

8     discussed that day.

9          MR. MCENTIRE:  And what was --

10         THE COURT:  If you had said, hmm, Judge, if you're

11    going to allow evidence, we may call a couple of experts, then

12    there would have been a whole discussion about that and did I

13    need to limit the discovery, as I did.  And there would have

14    been a whole discussion of, well, three hours, three hours

15    each side, is that going to be enough if we have experts?

16         MR. MCENTIRE:  The discovery ruling that you made was

17    on my motion, and at the time I was not seeking to take any

18    expert depositions.  And you denied my request to take ample

19    discovery.  You limited my right to take only one deposition,

20    without documents.

21        The issue of taking expert discovery was not even on the

22    table.  However, you made it very --

23         THE COURT:  Well, that's my point precisely.  The

24    whole purpose of the hearing was, what kind of hearing are we

25    going to have on June 8th?

001991

HCMLPHMIT00003025

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 172   Filed 04/05/390   Page 463 of 1011   PageID 2362

13

```
 1              MR. MCENTIRE:  I understand.  And our position --

 2              THE COURT:  We had already had one status conference

 3   on argument only versus evidence.  And I allowed you all to

 4   file some briefing, which you did.  And then I issued an order

 5   after the briefing, saying, I think I should allow evidence on

 6   the colorability question.  I'm not forcing anyone to put on

 7   evidence, but if you want to put on evidence, you can.

 8       And then you filed your motions and we had the next status

 9   conference on what kind of hearing we're going to have.  And

10   there was more argument:  We don't think the evidence is

11   appropriate, but if evidence is appropriate, we want you to

12   continue the hearing to allow all kinds of discovery.  I don't

13   know what.  And it was right before Memorial Day, and I hated

14   the fact that a bunch of subpoenas were going to go out and

15   ruin people's holidays.  But there was no discussion then of,

16   okay, but just so you know, since you have made the ruling

17   that evidence can come in, we're going to have a couple of

18   experts.

19              MR. MCENTIRE:  As I've already mentioned, Your Honor,

20   we had not made a decision to call experts at that time.  We

21   made a decision to call the experts shortly before we filed

22   our designations.

23       The point here is this.  The Rules do not require me to

24   provide any more disclosure than I have.  I have gone over and

25   above the Local Rules.
```

001992

HCMLPHMIT00003026

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-14    Filed 05/05/390    Page 464 of 1011    PageID 2363

14

```
 1        If the Court believes that it would have allowed more time

 2   for this hearing, I would advise the Court that opposing

 3   counsel vehemently opposed any type of postponement or

 4   continuance.  The discovery that I was requesting was

 5   discovery from fact witnesses.  Experts were not at issue at

 6   that time.  Experts are --

 7             THE COURT:  Because --

 8             MR. MCENTIRE:  -- at issue now.

 9             THE COURT:  -- nobody knew that experts might be

10   called.

11             MR. MCENTIRE:  I have a right to call experts, Your

12   --

13             THE COURT:  It changes the whole complexion.

14             MR. MCENTIRE:  But I have a right to call experts,

15   under the Rules.  I have a right, a fundamental due process --

16   let me -- may I finish, Your Honor?  A fundamental due process

17   right to call experts.  Their attempt to charge some type of

18   *Daubert* challenge is nothing but a shotgun blast on the wall,

19   having no meaning at all.  At a minimum, I have a right to put

20   the witnesses on the stand and we'll have a *Daubert* hearing.

21        If they want more time, they need to ask for it.  They

22   didn't ask for it.  Their solution is to strike my experts,

23   which is improper.  It would be improper for this Court to

24   strike my experts when they have been properly tendered under

25   the Local Rules.  They have not cited an alternative remedy.
```

001993

HCMLPHMIT00003027

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 06/10/25   Page 465 of 1011   PageID 2364
Exhibit 72   Page 16 of 390

15

```
 1   If they want the alternative remedy, they need to ask the

 2   Court.

 3          THE COURT:  My next question is:  How do you propose

 4   to get this all done in only three hours?

 5          MR. MCENTIRE:  We intend to move quickly.

 6          THE COURT:  But, see, now they, I'm guessing,

 7   prepared their case assuming there weren't going to be

 8   experts.  And they, if they're good lawyers, which I know you

 9   all are, they have their script of the kind of things they

10   were going to ask the witnesses.

11          MR. MCENTIRE:  Well, did they have a --

12          THE COURT:  And now they've got to carve out time for

13   two last-minute experts?

14          MR. MCENTIRE:  They had an option.  And one of the

15   options was they could have called me up on Tuesday and asked

16   for their depositions and I probably would have agreed.

17          THE COURT:  I already said no depositions except

18   Seery and Dondero.

19          MR. MCENTIRE:  Then they could have come and filed a

20   different kind of motion with the Court.

21      Their only remedy that they're seeking is a draconian one.

22   There are other options that are more consistent with the

23   implementation of due process here, Your Honor, not striking

24   my experts, which were properly identified under the Local

25   Rules.
```

HCMLPHMIT00003028

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-4 72 Filed 07/02/25390 Page 466 of 1011    PageID 2365

16

1      If the Court is going to strike my experts, note our

2   objection.  We are tendering our experts.  We will put -- like

3   to put a proffer on for the Fifth Circuit or for the appellate

4   process.  But if the Court is going to strike our experts,

5   then it needs to do so.  We object because we have done

6   everything correctly.

7           THE COURT:  Okay.  Here's another problem.  I have

8   not had time to process their motion to exclude.  Beyond the

9   procedural issues, they are saying junk science, that there's

10  inadequate expertise on the part of I guess at least one of

11  them regarding executive compensation.  I haven't had -- they

12  filed their motion to exclude at 4:00-something yesterday.

13  Okay?

14          MR. MCENTIRE:  I understand.

15          THE COURT:  Now, yeah, I could have stayed up all

16  night.  I stayed up pretty late anyway, by the way.  But --

17          MR. MCENTIRE:  Well, first of all, --

18          THE COURT:  -- I haven't even had the time to process

19  and intelligently rule on their motion --

20          MR. MCENTIRE:  I appreciate that, and I'll respect --

21          THE COURT:  -- as far as the --

22          MR. MCENTIRE:  I'll respect the Court's statement.

23          THE COURT:  -- junk science argument.

24          MR. MCENTIRE:  I'll respect the Court's statement.

25  Their process and the procedure they've adopted is improper,

HCMLPHMIT00003029

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 72 Filed 06/02/25 Page 467 of 1011    PageID 2366

17

1   because if you're going to have a *Daubert* hearing, that's a

2   live hearing.  Or they're going to have to have evidence to

3   support their challenge.  This is simply a conclusory shotgun

4   blast on the wall, Your Honor.

5       If you even want to consider a *Daubert* challenge, the

6   proper procedure is to put the witnesses on the stand and have

7   an opportunity to have a proffer of evidence and a cross-

8   examination.  That's the proper procedure.  Throwing something

9   and innuendo and rhetoric and conclusions is not a proper

10  *Daubert* motion at all.  The Court could deny their *Daubert*

11  motion just on those grounds.

12          THE COURT:  I'm not going to rule on a motion that

13  I've barely had a chance to read, not to mention your response

14  that was filed at 8:00-something this morning.

15          MR. MORRIS:  It was.

16          MR. MCENTIRE:  It was.  Well, then the option is you

17  need to continue the proceeding to allow the experts to take

18  the stand.

19          THE COURT:  Well, I know you have thought on that,

20  but here is something I'm contemplating doing.  We'll go

21  forward with the hearing in the manner my order said we would

22  go forward with it.  My, I guess, Order #3 of my three orders.

23  And at the end of the evidence, you can argue in closing, each

24  of you, why we should keep the evidence open to come back

25  another day on only the experts.  But time matters.  If you've

HCMLPHMIT00003030

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 06/30/25   Page 468 of 1011   PageID 2367
Exhibit 72 Page 09 of 390

18

1   all already used your three hours on each side, then are we

2   going to come back for five minutes on each of them?  I mean,

3   I don't know.

4       And then, of course, I would have to, if I ruled in that

5   way, I believe I would have to give them a chance to depose

6   these people.

7           MR. MCENTIRE:  I think that would be reasonable.

8           THE COURT:  Okay.  But you think you can get all of

9   your evidence in, other than your experts, and your opening

10  statement, if any, your closing argument, if any, in three

11  hours?

12          MR. MCENTIRE:  I'll do my best.

13          THE COURT:  Well, if you -- it's not a matter of --

14  I'm just saying this may all be an academic argument, because

15  I'm not increasing this to more than three hours each.  We've

16  fully vetted that.

17          MR. MCENTIRE:  Well, what the Court is then doing by

18  virtue of your ruling is that you're making me actually

19  present my evidence in a shortened form today, two hours, two

20  and a half hours, not knowing how -- whether or not you are

21  actually going to allow experts.

22      So, without the certainty, I will have to abbreviate my

23  entire presentation, giving them the advantage of putting more

24  evidence on than I, in an effort to anticipate a positive

25  ruling, which you're not prepared to provide yet.  And so I'm

HCMLPHMIT00003031

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 06/20/25   Page 469 of 1011   PageID 2368
Exhibit 72 Page 20 of 390

19

1   actually being penalized.

2           THE COURT:  Counsel, we had two status conferences on

3   what kind of hearing we were going to have.

4           MR. MCENTIRE:  I understand.

5           THE COURT:  Now, the fact that you had not decided

6   your strategy for this hearing, that's not my fault.  Again,

7   we had two hearings on what kind of hearing we were going to

8   have today.  We could have fully vetted this.  I could have

9   heard about the experts, I could have decided if we were going

10  to continue the hearing past June 8th, could have decided if

11  we were going to allow more depositions.

12          MR. MCENTIRE:  Your Honor, --

13          THE COURT:  I could have fully studied the merits of

14  the motion to exclude and decided if this is junk science or

15  not.

16          MR. MCENTIRE:  I would request a ruling at this time,

17  Your Honor, on the experts.  If you are not inclined to

18  provide a ruling to me on the experts at this time, I would

19  effectively be penalized on my time limits.  I will have to

20  set aside enough time to put the experts on, not knowing, not

21  knowing whether you're going to give me the opportunity to do

22  so until the end of the day.  And that would be -- that would

23  be punishment.

24          THE COURT:  Isn't this going to be just preparing

25  your case you would have -- I mean, going forward with your

HCMLPHMIT00003032

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-4  Exhibit 72 Filed 06/22/25390  Page 470 of 1011    PageID 2369

20

```
 1   case the way you would have?

 2           MR. MCENTIRE:  No, I don't -- really don't think so.

 3   I think there's --

 4           THE COURT:  I mean, --

 5           MR. MCENTIRE:  There's a difference.

 6           THE COURT:  -- you did not prepare your witnesses and

 7   your possible cross-examination with the expectation of I'll

 8   get my two experts in?

 9           MR. MCENTIRE:  My -- of course.  But the point is,

10   then I'm going to have to set aside a half an hour or maybe

11   even longer from my other witness preparations, not knowing

12   whether you'll even give me that time.

13           THE COURT:  Isn't the other side going to have to do

14   the very same thing?

15           MR. MCENTIRE:  No.

16           THE COURT:  Why not?  They don't know how I'm going

17   to rule.  I don't know how I'm going to rule.  I have not

18   studied the motion to exclude the way I should.

19           MR. MCENTIRE:  Okay.  Well, Your Honor, we request a

20   ruling now.  But if the Court is not inclined to do so, please

21   note our objection.

22           THE COURT:  All right.  I'll give the Movants the

23   last word.  And I say "Movants" plural.  I'm trying to

24   remember where I saw a joinder and when I did not.  Did I see

25   a joinder?  I can't remember.
```

001999

HCMLPHMIT00003033

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71-4   Filed 02/22/05390   Page 471 of 1011   PageID 2370

21

1          MR. MORRIS:  Can we just have a moment, Your Honor?

2          THE COURT:  Okay.  Okay.

3          MR. MCILWAIN:  Your Honor, my clients did file a

4    joinder, but --

5          THE COURT:  Okay.

6          MR. MCILWAIN:  -- I'm going to let them handle this.

7          THE COURT:  Okay.

8     (Pause.)

9          THE COURT:  Counsel?

10         MR. LEVY:  Thank you, Your Honor.  Two brief points

11   we'd like to make.  The first is on the Rules.  So, Hunter

12   Mountain is focused on Rule 26(a) regarding reports.  However,

13   Rule 26(b) applies to contested matters under Rule 9014.  And

14   as we explain in Paragraph -- we explain in our brief, that --

15   or, in Paragraph 19 of our brief, that under Rule 26(b) we're

16   entitled to depose the experts.

17      And so we agree with Your Honor's suggestion that if

18   there's going to be any sort of experts, then we need the

19   opportunity to depose them.  This is Rule 26(b)(4)(A), which

20   expressly does apply to contested matters under Bankruptcy

21   Rule 9014(b).

22      The second point is we agree with the approach Your Honor

23   has proposed.  We think, for today, both sides can put on

24   their full cases without expert witnesses.  Both sides can

25   have the full three hours, which should address Hunter

HCMLPHMIT00003034

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4 72 Filed 06/23/25390 Page 472 of 1011   PageID 2371

22

```
 1  Mountain's concern.  And if Your Honor decides at the

 2  conclusion of the hearing that expert testimony would be

 3  helpful, then we could take the opportunity to depose their

 4  experts and then come back for an additional half-hour for

 5  each side to address any expert testimony that Your Honor

 6  believes would be helpful.

 7          THE COURT:  Okay.  Is your proposal that you each

 8  today would be limited to two and a half/two and a half?  Or

 9  three/three, and then another hour, 30 minutes/30 minutes, if

10  I --

11          MR. LEVY:  Three/three.

12          THE COURT:  -- decide to allow any experts?

13          MR. LEVY:  Yeah.  Three.  Three and three for each

14  side, the hearing contemplated by Your Honor's orders, today.

15  And if Your Honor decides that expert testimony would be

16  helpful, we could come back for an hour, for half an hour on

17  each side, regarding experts.

18          THE COURT:  All right.  Mr. McEntire, what about

19  that?

20      Oh, I'm sorry, did you --

21          MR. STANCIL:  Oh, I'm sorry.  Just one additional

22  point, Your Honor.  We would ask that Your Honor's ruling on

23  the ultimate admissibility of this be limited to what they've

24  actually put in front of us.  The day for the hearing is

25  today, so I think I'd like -- I'd suspect Your Honor would
```

HCMLPHMIT00003035

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 74  Filed 04/24/25390 Page 473 of 1011    PageID 2372

23

```
 1    like to avoid another raft of submissions.  So we would just

 2    ask that they live or die with what they've said in the way of

 3    methodology, disclosures, and the like.

 4            THE COURT:  Okay.  Mr. McEntire, this seems like the

 5    best of all worlds, maybe.

 6            MR. MCENTIRE:  Well, it may be the best of the worlds

 7    in which we're operating.

 8      My first position is that the experts are admissible,

 9    period.  And the Rules do not require anything more than what

10    we've already done.  In fact, we've done more than we were

11    supposed to.

12            THE COURT:  What is your argument about 26(b)(4),

13    which --

14            MR. MCCLEARY:  If they want to take a deposition,

15    they could have called me up and asked for it.

16            MR. STANCIL:  Your Honor, I was --

17            THE COURT:  Wait a second.  They were under a court

18    order.  Okay?

19            MR. MCENTIRE:  They could have -- they could have

20    sought --

21            THE COURT:  They were under my order.  Okay?  They

22    would have been violating my order if they had done it.

23            MR. STANCIL:  I was also, Your Honor, I was in a --

24            THE COURT:  Not to mention that it was --

25            MR. STANCIL:  I was in an airplane from 9:00 a.m.
```

HCMLPHMIT00003036

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-4 Filed 06/25/25    Page 474 of 1011    PageID 2373
Exhibit 72 Filed 06/25/25390

24

1   Tuesday until 9:00 p.m. Tuesday.

2           THE COURT:  I'm surprised a lot of you got here, with

3   the Martian atmosphere that I saw pictures of.

4       Yes.  That's not realistic, to think that you disclose an

5   expert on Monday for a Thursday hearing and they can call you

6   up and --

7           MR. MCENTIRE:  The other --

8           THE COURT:  -- quickly put together a deposition.

9   So, --

10          MR. MCENTIRE:  Sure.  The other option, --

11          THE COURT:  Uh-huh.

12          MR. MCENTIRE:  -- of course, Your Honor, as I

13  mentioned before, and I'm not going to repeat myself, is they

14  -- there's other forms of relief they could seek.  But under

15  the circumstances, and in light of your apparent leaning on

16  the issue, then this is the best under the circumstances that

17  they've suggested.  We'd like an hour each.

18      I would also point out that -- well, anyway, that's it,

19  Your Honor.  Thank you.

20          THE COURT:  All right.  So we are going to go forward

21  as planned, three hours/three hours.  No experts today.  In

22  making your closings -- well, this is kind of awkward.  I'm

23  trying to think if we really have closing arguments, when you

24  don't know if it's -- it doesn't seem to make sense.  Like, I

25  guess we could have closing arguments if you want, subject to

HCMLPHMIT00003037

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4   Filed 06/26/25   Page 475 of 1011   PageID 2374
Exhibit 72  Page 26 of 390

25

1  supplementing your closing arguments if we come back a second

2  day with the experts.  Okay?

3     And I'm not making a ruling today on the motion to

4  exclude.  I'm going to hear what I hear.  And maybe what we'll

5  do is I'll give you a placeholder hearing if we're going to

6  come back on the experts.  Then I'll go back and read the

7  motion, the response, and make my ruling on are we coming back

8  for another day of experts.  Okay?  Got it?

9     And with regard to the comment about not adding to, I

10  think that's a fair point.  You can't add new exhibits that

11  the expert might talk about or that you might want me to

12  consider between now and whenever the tentative day two is.

13           MR. MCENTIRE:  Understand.  We agree with that.

14           THE COURT:  Okay.

15           MR. MCCLEARY:  Your Honor, there is one -- one

16  exhibit that has a small typo transcription of a number on it.

17  So we would like to substitute for that.  It's a minor detail.

18  But I'll provide opposing counsel with that.  But it's very

19  minor.

20           THE COURT:  You have it today, I presume?

21           MR. MCCLEARY:  Yes, we have it.

22           THE COURT:  Okay.  So as long as you hand it to them

23  today.

24           MR. STANCIL:  No objection, Your Honor.  We do -- I

25  think someone is back at the office working on a short reply

HCMLPHMIT00003038

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-4 72 Filed 07/22/25390 Page 476 of 1011    PageID 2375

26

1    on our motion, which I assume we could file in support of -- I

2    mean, we filed our motion.  They filed an opposition.  I

3    assume we would be entitled under the Rules to file a short

4    reply on the actual exclusion issue.

5            THE COURT:  That is fair, but let's talk about

6    timing.  You said someone is back at the office working on it.

7    Could you get it on file by Monday?

8            MR. STANCIL:  Yes, ma'am.

9            THE COURT:  Okay.  Then that'll be allowed if it's

10    filed by the end of the day Monday.

11            MR. MCCLEARY:  Your Honor, I'm providing a copy of

12    Exhibit 43 to opposing counsel, which is the substitute

13    exhibit.

14      And obviously, we'd like to have an opportunity to respond

15    to what their filing is on Monday.

16            THE COURT:  No.  I mean, motion, response, reply.

17    That's all our Rules permit.  Okay?  Motion, response, reply.

18    Okay.

19            MR. MCCLEARY:  Yes, Your Honor.

20            THE COURT:  All right.  Well, with that, do the

21    parties want to make opening statements?  If so, Mr. McEntire,

22    you go first.

23            MR. MCENTIRE:  Yes, Your Honor.  We have a PowerPoint

24    I would like to utilize, if I could.

25            THE COURT:  You may.

HCMLPHMIT00003039

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 71-4   Filed 06/20/25   Page 477 of 1011   PageID 2376
Exhibit 72   Page 26 of 390

27

1           MR. MORRIS:  Your Honor, before we get to that, the

2   Plaintiff has objected to virtually every single exhibit that

3   we have.  Should we deal with the evidence first, because I

4   don't want to refer to documents or evidence in my opening

5   that they're objecting to.  They've literally objected to

6   every single exhibit except one, although I think they're

7   withdrawing certain of those objections.

8       I don't -- I don't know if the Court has had an

9   opportunity to see the objection that was filed to the

10  exhibits.

11          THE COURT:  That was what was filed like at 11:00

12  last night or so?

13          MR. MORRIS:  That's right.

14          THE COURT:  Okay.

15          MR. MORRIS:  And so at 2:00, 3:00, 4:00, 5:00 o'clock

16  this morning, I actually typed out a response that I'd like to

17  hand up to the Court.  But we've got to resolve the

18  evidentiary issues before we get to this.

19          THE COURT:  Okay.  Well, --

20          MR. MORRIS:  And I don't know what their position is

21  going to be --

22          THE COURT:  -- as a housekeeping matter, let's do

23  that first.  And let's start with the Movants' exhibits.  Do

24  we have any stipulations on admissibility of Movants'

25  exhibits?

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4   Filed 06/29/25   Page 478 of 1011   PageID 2377
Exhibit 72   Page 29 of 390

28

1              MR. MORRIS:  So, if I understand correctly, Your

2    Honor, you'd like to know if we object to any of their

3    exhibits first?

4              THE COURT:  Yes.  And --

5              MR. MORRIS:  Okay.

6              THE COURT:  -- we'll hold --

7              MR. MORRIS:  Because we have very limited objections.

8              THE COURT:  Yes.  We're going to keep on hold for now

9    your exhibits to the expert-related, --

10             MR. MORRIS:  Yes.

11             THE COURT:  -- your objections to the expert-related

12   ones.

13             MR. MORRIS:  Right.  I think -- I think --

14             THE COURT:  So let's not talk about, for this moment,

15   --

16             MR. MORRIS:  39 --

17             THE COURT:  -- 39 through 52.

18             MR. MORRIS:  Okay.

19             THE COURT:  But as for 1 through 38 or 53 through 80,

20   do the Respondents have objections?

21             MR. LEVY:  Yes, Your Honor.  We have very limited

22   objections.

23             THE COURT:  Okay.

24             MR. LEVY:  So, the three to which we object in their

25   entirety are Exhibits 24, 25, and 76, all of which we object

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11 but 72 File 02/30/25 390 Page 479 of 1011   PageID 2378

29

1   to on relevance grounds.

2       Exhibits 24 and 25 are email correspondence between

3   counsel in an unrelated state court matter where Mr. Seery is

4   responding to a third-party subpoena regarding the

5   preservation of his text messages on his iPhone.  This has

6   absolutely nothing to do with whether or not the Movants have

7   stated a colorable claim for breach of fiduciary duties.

8       What this appears to be is related to an entirely separate

9   motion raised by Dugaboy regarding the preservation of Mr.

10  Seery's iPhone.  So we object to Exhibits 24 and 25 because

11  they have simply nothing to do with the issues in this

12  hearing.

13      We also object to Exhibit 76, which is a filing from two

14  years ago in a different bankruptcy matter, from *Acis*,

15  regarding an injunction in place in that -- in that plan about

16  issues that -- that occurred before the bankruptcy was in

17  place.  So this is just an entirely different case from issues

18  that arose many, many years ago that, again, has nothing to do

19  with this case.

20          THE COURT:  This was whether the *Acis* plan injunction

21  barred some lawsuit?

22          MR. LEVY:  Exactly.

23          THE COURT:  Okay.  Okay.  Is that all?

24          MR. LEVY:  We also have limited objections to certain

25  exhibits that we think are admissible for the -- for the fact

HCMLPHMIT00003042

1   they're said, but not the truth of the matter asserted.

2       For example, Exhibits 1 and 2 are complaints filed in

3   those actions.  We have no objection to those coming in, but

4   not for the truth of the matter asserted.  These are advocacy

5   pieces and pleadings.  They're not actually substantive

6   evidence.

7       And we would have similar -- similar objections to

8   Exhibits 4, 6, 11, --

9           THE COURT:  Wait.  4 is James Dondero Handwritten

10   Notes, May 2021.

11          MR. LEVY:  Yes.

12          THE COURT:  Okay.

13          MR. LEVY:  So, we have no objection to that coming

14   into evidence.

15          THE COURT:  Uh-huh.

16          MR. LEVY:  But there are -- those are hearsay.

17   They're not admissible standing by themselves for the truth of

18   the matter asserted.

19          THE COURT:  Okay.

20          MR. LEVY:  And Exhibit 6 are news articles.

21   Similarly, they're hearsay, but we have no objection to them

22   coming in.  They're admissible for the fact that they're

23   published, but not the truth of the matter asserted.

24          THE COURT:  Okay.

25          MR. LEVY:  Exhibit 11, which is a motion filed by the

HCMLPHMIT00003043

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 74   Filed 08/20/25   Page 481 of 1011   PageID 2380
Exhibit 72   Page 82 of 390

31

 1  Debtor.  Similarly, it's for -- we have no objection to

 2  anything on the docket coming in, but anything that's an

 3  advocacy piece, like a motion as opposed to an order, we think

 4  is not admissible for the truth of the matter asserted.

 5       And that would be a similar objection, then, for Exhibit

 6  58, which is a complaint.

 7       Exhibits 59, 60, and 61 are -- are letters by counsel for

 8  Mr. Dondero to the U.S. Trustee's Office.  We similarly have

 9  no objection to that coming in, but not for the truth of the

10  matter asserted.

11       And Exhibits 62 and 63, Exhibit 62 is an attorney

12  declaration attaching, similarly, documents that are -- that

13  are advocacy pieces.

14       And Exhibit 63 appears to be an asset chart prepared by

15  counsel.  So it would be a similar objection.

16       And Exhibit 66 also is a declaration attaching documents.

17       No objections to those coming in, but not for the truth of

18  the matter asserted.

19       Exhibits 72, 73, and 74 are all -- well, 72 are press

20  articles.  73 and 74 are briefs.  We don't object to that

21  coming in, but we object to it being admitted for the truth of

22  the matter asserted.

23       And similarly, Exhibit 80 is a pleading in an SDNY

24  bankruptcy.  We have no objection to that coming in, but not

25  for the truth of the matter asserted.

HCMLPHMIT00003044

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11 Filed 07/02/25   Page 482 of 1011   PageID 2381
Exhibit 72 Filed 06/23/25 Page 33 of 390

32

```
 1        And finally, Exhibits 81, 82, 83 don't specify particular
 2   documents.  They appear to largely be reservations of rights.
 3   And so we would likewise reserve our right to object once we
 4   see any specific documents --
 5             THE COURT:  Okay.
 6             MR. LEVY:  -- admitted under these exhibits.
 7             THE COURT:  Okay.  Mr. --
 8             MR. LEVY:  And I understand my colleague has an
 9   objection to Exhibit 5.
10             MR. MORRIS:  Exhibit 5, which is the subject, I
11   believe, of an unopposed sealing motion.  That document has to
12   do with purported restrictions on certain securities.  Since
13   it's subject to a sealing motion, I don't want to say too much
14   more than that, other than that -- we don't think it should be
15   admitted, because you can just see from the information on the
16   document that it was created after the termination of a shared
17   services agreement.
18        However, I'm hopeful that we can resolve the issue by
19   simply stipulating that in December 2020 MGM was on a
20   restricted list.  What that means, what the consequences of
21   it, the rest of it can be the subject of discussion.  But if
22   they're trying to get that document in for that particular
23   fact, we would stipulate to it in order to resolve that
24   dispute.
25             THE COURT:  All right.  Well, that's lots to respond
```

002011

HCMLPHMIT00003045

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 114   Filed 07/02/25   Page 483 of 1011    PageID 2382
Exhibit 72 Page 34 of 390

33

1   to, Mr. McCleary.  Why don't we start with the outright

2   objections:  24, 25.  It's apparently text messages related to

3   Mr. Seery's iPhone.  I know we've got another motion pending

4   out there that's not set today regarding Mr. Seery's iPhone.

5          MR. MCCLEARY:  Yes, Your Honor.  Well, as the Court

6   is aware, we've attempted to get discovery from Mr. Seery in

7   relation to the allegations in this lawsuit.  And by the way,

8   all of our exhibits that we're tendering are subject to our

9   objections that this should not be an evidentiary hearing.  I

10  just want to make that clear.

11         THE COURT:  Understood.

12         MR. MCCLEARY:  Okay.  Thank you.  So, we're not

13  waiving that.

14     The Exhibits 24 and 25 are relevant to the fact that he's

15  -- he's not preserving information that is relevant to the

16  claims in this lawsuit.  And that also is something that is a

17  factor in the colorability of our claims in this case.

18         THE COURT:  How?

19         MR. MCCLEARY:  Well, there is an effort, we believe,

20  underway to not have information available for us to discover.

21  And it reflects that they have been involved in providing --

22  we think supports -- providing material nonpublic information

23  to other people that would be in his phone.  And we want him

24  to preserve it.  And we think the fact that he is not is

25  evidence that supports the colorability of our claims.

HCMLPHMIT00003046

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 72   Filed 06/20/25   Page 484 of 1011   PageID 2383

34

```
 1              THE COURT:  So, --

 2              MR. MCENTIRE:  Your Honor, this --

 3              THE COURT:  No.  No.  I'm processing that.  You're

 4    wanting the Court to receive into evidence a text that may say

 5    something like, I delete messages periodically on my phone, to

 6    support your claim that you have a colorable claim that some

 7    sort of improper insider disclosure of information and insider

 8    trading is going on?  He said he had an automatic delete

 9    feature on his phone; therefore, he -- that must be evidence

10    of a colorable claim for insider trading.  That's the

11    argument?

12              MR. MCENTIRE:  May I add to it, supplement, Your

13    Honor?  Mr. Seery, in his deposition, indicated that he did

14    receive a text message that he had recently reviewed from

15    Stonehill in February of 2021.  To the extent, however, that

16    is inconsistent with the fact that he has an automatic delete

17    button, suggesting to me that certain text messages have been

18    selectively saved and some other messages have been not

19    selectively saved.

20              THE COURT:  We don't have that motion set today.

21              MR. MCENTIRE:  This is not -- that has nothing to do

22    with the motion.  It has to do with the fact that what is

23    being presented to the Court in response, the Respondents'

24    argument, is a selected window, a selected picture, that is --

25    distorts the reality of what we think has been destroyed
```

002013

HCMLPHMIT00003047

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02724-L Document 71-4 Filed 06/26/25 Page 485 of 1011 PageID 2384
Exhibit 72 Filed 06/26/25390

35

1  evidence.

2      Mr. Seery can't save one message that may be helpful to

3  them and not save others that may not be.  And it is

4  inconsistent with the notion that this automatic delete button

5  was already in effect, so why does he have one favorable

6  message?  That's why it's relevant.

7          THE COURT:  Maybe he stopped using the automatic

8  delete after --

9          MR. MCENTIRE:  No, he didn't at this time, Your

10  Honor.

11          THE COURT:  Well, --

12          MR. MCENTIRE:  That's the relevance.

13          THE COURT:  So, --

14          MR. MCCLEARY:  And he should never have used it, Your

15  Honor, given his role and responsibilities.

16          THE COURT:  We don't have that motion set today.

17  What is the content of these emails?  February 16th, March

18  10th, 2023?  What is the content, for me to really zero in --

19          MR. LEVY:  I have --

20          THE COURT:  -- on relevance or not.

21          MR. LEVY:  -- copies of the emails, if that would be

22  helpful --

23          THE COURT:  Okay.

24          MR. LEVY:  -- to Your Honor.

25          THE COURT:  Well, you know, now I'm seeing them, so I

HCMLPHMIT00003048

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 07/02/25   Page 486 of 1011   PageID 2385
Exhibit 72 Page 37 of 390

36

1   don't know what the big deal is if --

2          MR. LEVY:  As Your Honor can see, these are emails

3   between counsel regarding preservation, which has nothing to

4   do with whether there are colorable claims for fiduciary

5   duties.

6       I'll add that -- and to show that this has nothing to do

7   with this case and it is an attempt to generate a fishing

8   expedition for documents in an entirely unrelated motion, we

9   had a meet-and-confer where we represented to the counsel

10  bringing that motion that we have been able to recover the

11  text messages from the iCloud.

12      And so this is really just a sideshow.  It has nothing to

13  do with the issues of the colorability of claims for breach of

14  fiduciary duties.  It should not be introduced into evidence

15  in this hearing.

16         THE COURT:  All right.  I'm going to sustain the

17  objection, but this is without prejudice to you re-urging

18  admission of these messages at the hearing on the motion

19  regarding Mr. Seery's phone.  Okay?  Now, --

20         MR. MCCLEARY:  That's as to 24 and 25, Your Honor?

21         THE COURT:  Correct.  And let's go now to the other

22  one, the Exhibit 76, the *Acis*-related document, the relevance

23  of that.  Statement of Interested Party in Response to Motion

24  of NexPoint to Confirm Discharge or Plan Injunction Does Not

25  Bar Suit, or Alternatively, for Relief from All Applicable

002015

HCMLPHMIT00003049

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4 72 Filed 06/02/25390 Page 487 of 1011   PageID 2386

37

1    Injunctions.

2        What is the relevance for today's matter?

3            MR. MCCLEARY:  Your Honor, this is background of

4    pleadings and just background information generally to support

5    the allegations made in the case and the background.

6            THE COURT:  What do you mean, background?

7            MR. MCCLEARY:  Kind of the history relative to the

8    claims trading and relative to the claims of the use of

9    insider information.

10           THE COURT:  Okay.  Be more specific, because I

11   certainly have a background education on *Acis* litigation.

12       (Pause.)

13           MR. MCCLEARY:  Yeah.  Your Honor, this is a data

14   point that is referred to in one of our experts' data charts,

15   I believe, so --

16           THE COURT:  All right.  So let's just carry that to

17   --

18           MR. MCCLEARY:  Yes.

19           THE COURT:  I'm just going to mark it as carried

20   along with 39 through 62, related to the experts.

21       (HMIT's Exhibits 39 through 62 and Exhibit 76 carried.)

22           THE COURT:  Okay.  What about all of these objections

23   that we don't object *per se* but we want it clear that the

24   documents are not being offered for the truth of the matter

25   asserted because there's hearsay?

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-4    Filed 09/05/25    Page 488 of 1011    PageID 2387
Exhibit 72 Page 89 of 390

38

```
 1              MR. MCENTIRE:  Your Honor, I'll let Mr. McCleary

 2     address all of those.

 3          I want to point out one exception, and that is Exhibit #4,

 4     which are handwritten notes from Mr. Jim Dondero.  Those are

 5     not -- they are being offered for the truth of the matter

 6     asserted because it's an admission of a party opponent in

 7     these proceedings, and that's Farallon.  They reflect

 8     significant statements and admissions by Farallon, which are

 9     not hearsay.  It's an exception to the hearsay rule.  And

10     they're being offered for more -- they are being offered for

11     the truth of the matter asserted, because -- and it's

12     admissible in that format.

13              THE COURT:  But are you referring to hearsay within

14     hearsay?  Because there would be, I guess -- I guess the

15     handwritten notes of Mr. Dondero are his hearsay, and then

16     you're saying there's --

17              MR. MCENTIRE:  So, this is reflecting statements made

18     to Mr. Dondero that are admissions of a party opponent.

19              MR. LEVY:  None of that has been established.  These

20     are not notes from anybody at Farallon or Stonehill which

21     could potentially be a party admission.  These are notes by

22     Mr. Dondero about what was purportedly said by somebody else,

23     and there's no evidence that these were kept in the regular

24     course of business.

25          This is hearsay and hearsay within hearsay.  And this
```

HCMLPHMIT00003051

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11 72 Filed 07/02/25390    Page 489 of 1011    PageID 2388

39

```
 1   could be established in testimony, but it can't be admitted --
 2   the document can't be admitted to speak on behalf of a third
 3   person who's not here.
 4          MR. MCENTIRE:  Well, first of all, I agree, we'd need
 5   to lay a foundation.  But that's not the purpose of this
 6   discussion right now.  I am simply advising the Court that
 7   once I lay a foundation, it comes in for all purposes.  It
 8   comes in as an admission of a party opponent.
 9          MR. LEVY:  It is not an admission of a party
10   opponent.  It is not notes or statements by any actual
11   defendant.  These are notes by Mr. Dondero being introduced
12   for his own benefit.  It is not a party admission.
13          THE COURT:  Okay.  I'm going to carry that one.  If
14   one of the witnesses that's on the witness stand -- well,
15   presumably Mr. Dondero will be called -- we can get context at
16   that time and decide if it's appropriate to let it in and let
17   you cross-examine him on them if that's going to come in.  All
18   right?  So we'll carry this one.
19      Anything else, though, unique, or can we consider as a
20   batch all these other objections to -- most of them being
21   pleadings, not all of them but a lot of them -- that the
22   Respondents just want it clear that they're not being offered
23   for the truth of the matter asserted?  Your response?
24          MR. MCCLEARY:  They're, again, largely data points
25   relied on by experts in the course of coming up with their
```

HCMLPHMIT00003052

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 72    Filed 02/02/25    Page 490 of 1011    PageID 2389
Exhibit 72    Page 490 of 1011

40

1   opinions and just setting the background and history of the

2   claims trading.

3           THE COURT:  Well, then which ones are data points?

4   Because I just need to carry those, right?  If they're not

5   being offered for any other reason.

6           MR. MCCLEARY:  Well, I would have to -- we would have

7   to refer to the charts of the experts, Your Honor, to

8   determine that on all of them.

9           MR. MCENTIRE:  In order to facilitate this, may I

10  make a suggestion, Your Honor?  We'll agree that if we're

11  going to offer anything that he's identified other than for

12  the purposes indicated, we will advise the Court.  Otherwise,

13  we'll accept the limitations imposed.  And as we go through,

14  if we offer an exhibit that is more than the truth -- if we

15  are offering it for the truth of the matter asserted, we will

16  advise the Court, and then we could take it up then.  I'm just

17  trying to get the ball rolling.

18          THE COURT:  Okay.  Well, that's still going to be a

19  time-consuming thing, maybe.  But, okay.  Just, when we start

20  the clock here -- very shortly, I hope -- I want people clear

21  that when you make objections, that counts against your three

22  hours.  Okay?  All right?

23          MR. LEVY:  Okay.  Understood, Your Honor.

24          MR. MCCLEARY:  Your Honor, we have certainly made

25  objection to some of their exhibits.

HCMLPHMIT00003053

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 72   Filed 02/02/25   Page 491 of 1011    PageID 2390
Exhibit 72 Page 42 of 390

41

```
 1              THE COURT:  All right.  Well, shall we turn to those

 2    now?

 3              MR. MCCLEARY:  Yes, Your Honor.

 4              MR. MORRIS:  Your Honor, they objected to every

 5    single exhibit except one, so let's be clear.

 6              THE COURT:  Okay.

 7              MR. MORRIS:  If they're withdrawing them, that's

 8    fine.

 9              MR. MCCLEARY:  Well, --

10              MR. MORRIS:  But let's be clear.

11              MR. MCCLEARY:  -- we are not withdrawing our general

12    objection to all the evidence, of course.  Just --

13              THE COURT:  Okay.  Let me just say for the record

14    right now, I understand and you are preserving for all

15    purposes your ability to argue on appeal that it was error for

16    the Court to consider any evidence.  Okay?  You have not

17    waived that argument by --

18              MR. MCCLEARY:  Thank you.

19              THE COURT:  -- now --

20              MR. MCCLEARY:  Thank you.  We can have --

21              THE COURT:  -- agreeing to the admission of anybody's

22    exhibit or offering your own exhibits.

23              MR. MCCLEARY:  And we could have a running objection

24    on that basis, on relevance to all the witnesses and the

25    evidence that they offer on that basis.  I would request that.
```

002020

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 1-4   Filed 03/03/25   Page 492 of 1011    PageID 2391
Exhibit 72   Page 43 of 390

42

```
 1              THE COURT:  Well, okay, let me be clear.  Relevance.
 2    Your argument is that no evidence is relevant because the
 3    Court doesn't need to consider any evidence --
 4              MR. MCCLEARY:  Yes, Your Honor.
 5              THE COURT:  -- on the colorability issue.  You've got
 6    a running objection.  It's not destroyed for appeal purposes.
 7    Okay?
 8              MR. MCCLEARY:  Thank you, Your Honor.  Then, subject
 9    to that, in terms --
10              MR. MORRIS:  I'm sorry to interrupt, but --
11              MR. MCCLEARY:  Sure.
12              MR. MORRIS:  -- would it be helpful if I gave the
13    Court my list so she can see --
14              MR. MCCLEARY:  Sure.
15              MR. MORRIS:  -- what the --
16              MR. MCCLEARY:  Sure.
17              MR. MORRIS:  Okay.  May I approach, Your Honor?
18              THE COURT:  You may.  I'm not sure, if everything has
19    been objected to, I'm not sure how --
20              MR. MORRIS:  Because I've tried -- I've tried to
21    organize it in a way that would be helpful.
22              THE COURT:  Okay.
23         (Pause.)
24              MR. MCCLEARY:  Okay.  Your --
25              THE COURT:  I'm ready.
```

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 14   Filed 04/05/390   Page 493 of 1011    PageID 2392
Exhibit 72 Page 44 of

43

1            MR. MCCLEARY:  -- Honor, yes.

2            THE COURT:  Uh-huh.

3            MR. MCCLEARY:  So, we are withdrawing our objections,

4    other than the general objections to relevance based on the

5    evidentiary nature of the proceeding, to Exhibits 1 and 2.

6        With respect to 3, this is a verified petition to take

7    deposition for suit and seek documents filed on July 22, 2021.

8    We object on the grounds of relevance and hearsay to that.  Is

9    that --

10           THE COURT:  Well, --

11           MR. MORRIS:  I don't -- I don't understand this one.

12           THE COURT:  This --

13           MR. MCCLEARY:  Is that, I'm sorry, is that your #11?

14           MR. MORRIS:  Yeah.

15           MR. MCCLEARY:  All right.  We withdraw our objection

16   to #3, subject to our general objection.

17       On Exhibit 4, we object to relevance and hearsay on a

18   verified amended petition to take deposition before suit and

19   seek documents.

20           THE COURT:  Okay.  This is my time to hear your

21   argument.  And we're going to be here --

22           MR. MORRIS:  Can I -- can I do this here?  It's going

23   to be much quicker.

24           THE COURT:  What do you mean?  Do what here?

25           MR. MORRIS:  So, if you just follow the chart that I

002022

HCMLPHMIT00003056

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14   Filed 05/05/25   Page 494 of 1011   PageID 2393
Exhibit 72   Page 45 of 90

44

1  gave the Court, --

2          THE COURT:  Uh-huh.

3          MR. MORRIS:  -- Section A is a list of exhibits that

4  they've objected to.  Those exhibits are in the right-hand

5  column.

6      At the same time, they are offering the exact same

7  exhibits into evidence on their exhibit list.  I don't

8  understand how they can offer their exhibits and object to

9  ours.

10          MR. MCCLEARY:  Counsel.  I'm sorry.  We've already

11  told them that, subject to our general objection, we'll

12  withdraw the objections to those exhibits.

13          MR. MORRIS:  Right.  So can we agree that all

14  objections to Section A are withdrawn?

15          MR. MCCLEARY:  Subject to the general objection, yes.

16          MR. MORRIS:  Thank you.

17          THE COURT:  Okay.  So, --

18          MR. MORRIS:  That's going to be much quicker.

19          THE COURT:  -- 11, 34, 2, 46, 42, 38, 41, 39, 40,

20  and various attachments to Highland Exhibits 5 are withdrawn.

21  So, admitted by stipulation.

22      (Debtors' Exhibits 2, 11, 34, 38, 39, 40, 41, 42, 46 are

23  received into evidence.  Certain attachments to Debtors'

24  Exhibit 5 are received into evidence.)

25          MR. MORRIS:  And to make this easy, Your Honor, at

HCMLPHMIT00003057

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11 bit 72 Filed 06/06/25390 Page 495 of 1011   PageID 2394

45

1   some point I hope later today, but perhaps tomorrow, we'll

2   slap a caption on this, we'll file it on the docket, so that,

3   you know, an appellate court, if necessary, can follow along.

4   But I think that we've just stipulated that all of the

5   exhibits identified in Section A of this document are -- the

6   objections have been withdrawn.

7          THE COURT:  Okay.

8          MR. MCCLEARY:  Subject to the general objections.

9          MR. MORRIS:  Right.  That gets us -- I'm going to

10  jump to Section C, because I think the same is true.  Section

11  C identifies all exhibits that each party has taken from the

12  docket.  And you can see from Footnote 4, the Court can take

13  judicial notice under Federal Rule of Evidence 201, we've just

14  had the discussion about whether or not any of them would be

15  limited for purposes of the truth of the matter asserted, but

16  all of the exhibits identified in Section C I think the Court

17  can take judicial notice of because they're on a docket.

18         THE COURT:  Response?

19         MR. MORRIS:  And so I would respectfully request that

20  they withdraw their objections to anything in Section C.

21         THE COURT:  Response, Mr. McCleary?

22         MR. MCCLEARY:  I understand the Court can take

23  judicial notice of those, Your Honor, but they do contain

24  irrelevant and hearsay information also.

25         MR. MORRIS:  The hearsay, I think that we just had

002024

HCMLPHMIT00003058

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-14    Filed 07/02/25    Page 496 of 1011    PageID 2395
Exhibit 72 Page 42 of 390

46

```
 1   the discussion.  I mean, if there's something that he wants to

 2   really point out at this point that I can respond to.  But we

 3   would agree that advocacy pieces shouldn't be offered for the

 4   truth of the matter asserted.  Court orders, on the other

 5   hand, are law of the case.

 6           THE COURT:  So, I mean, it's the very same situation

 7   we just addressed with your own exhibits.  You have a lot of

 8   court filings.  And they didn't have a problem with it, as

 9   long as everyone knew advocacy was not being accepted for the

10   truth of the matter asserted.

11           MR. MCCLEARY:  Well, --

12           THE COURT:  Isn't this the same thing?

13           MR. MCCLEARY:  -- they're not offering it for the

14   truth of the matter asserted.  That's one thing.  And

15   certainly the Court can take judicial notice.  We do object to

16   the extent they're offering Exhibits 6 through 10 for the

17   truth of the matter asserted.

18           MR. MORRIS:  Well, let me check those.

19           THE COURT:  Well, --

20           MR. MCCLEARY:  I'm sorry.  6, 7, uh -- (pause).

21           THE COURT:  Those are orders of --

22           MR. MORRIS:  Yeah.

23           THE COURT:  -- courts.

24           MR. MORRIS:  Yeah.  They're orders of the Court.

25           MR. MCCLEARY:  The orders are not relevant, Your
```

002025

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 06/02/25   Page 497 of 1011   PageID 2396
Exhibit 72 Page 48 of 390

47

```
 1   Honor.

 2            THE COURT:  Explain.

 3            MR. MCCLEARY:  Well, they have not demonstrated that

 4   the orders that they seek to introduce are relevant.  They

 5   have orders regarding, for example, the contempt proceedings

 6   that are irrelevant to these proceedings.  And prejudicial

 7   under 403.

 8            THE COURT:  All right.  Shall I take a five- or ten-

 9   minute break?  Let me -- I think I've been very generous by

10   not starting the clock yet on the three hours/three hours.

11            MR. MCCLEARY:  Appreciate that.

12            THE COURT:  But here's how we do things in bankruptcy

13   court.  And I don't mean to talk down to anyone.  I don't

14   know, you may appear in bankruptcy court every day of your

15   life.  But we expect counsel to get together ahead of time and

16   stipulate to the admissibility of as many exhibits as you can.

17   If there's a preservation of rights here and there, fine.  But

18   we --

19            MR. MCCLEARY:  Maybe if we take --

20            THE COURT:  You know, --

21            MR. MCCLEARY:  We can try to --

22            THE COURT:  -- helping everyone to understand, --

23            MR. MCCLEARY:  Sure.

24            THE COURT:  -- we have thousands of cases in our

25   court.
```

HCMLPHMIT00003060

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 72   Filed 09/09/25   Page 498 of 1011   PageID 2397

48

```
 1              MR. MCCLEARY:  Sure.

 2              THE COURT:  And this is just something we have to do

 3    to give all parties their day in court when they need time.

 4    And so --

 5              MR. MCCLEARY:  If you'd like us to take ten minutes

 6    and try to narrow this, we certainly --

 7              THE COURT:  Okay.  With everybody understanding you

 8    should have taken the ten minutes before we got here.  But,

 9    again, when I say three hours, --

10              MR. MORRIS:  Yeah.

11              THE COURT:  -- that's what I meant.  Okay?

12              MR. MCCLEARY:  Yes, Your Honor.

13              THE COURT:  So we'll take a ten-minute break.

14              THE CLERK:  All rise.

15         (A recess ensued from 10:42 a.m. until 10:54 a.m.)

16              THE CLERK:  All rise.

17              THE COURT:  All right.  Please be seated.  Have we

18    reached agreements on some of these exhibits?

19              MR. MCCLEARY:  Your Honor, we have agreed on the ones

20    that we can agree on, and we announced that to the Court with

21    respect to the Paragraph A items that the Court's already

22    ruled on.

23         I would like to point out to the Court that we just got

24    their objections handed to us right before the hearing.  We

25    filed ours last night.  So we didn't --
```

```
 1              THE COURT:  At 11:00-something, right?

 2              MR. MCCLEARY:  Yes, Your Honor, but we did --

 3              THE COURT:  Okay.  Well, okay.  So I guess your point

 4   is you want to make sure I'm annoyed with everyone, not just

 5   selective of you.

 6              MR. MCCLEARY:  Well, --

 7              THE COURT:  I mean, exhibit lists were filed Monday.

 8   So I don't know why on Tuesday people were not on the phone

 9   saying, you know, or Wednesday morning at the latest.

10              MR. MCCLEARY:  Sure.  And we haven't had much of an

11   opportunity, in fairness, to consider their objections and

12   respond because we just received them right at the time of the

13   hearing, just before the hearing started.

14       Your Honor, we would urge our objections to Exhibit #4.

15   We've objected to this petition to take deposition before suit

16   and seek documents on the basis of relevance and hearsay.

17   They have a number of pleadings in other matters that have

18   nothing to do with, frankly, the colorability standard in this

19   case.  And this is an example.

20              THE COURT:  Okay.  This is the time for me to hear

21   specific objections and what the basis is, and not just --

22              MR. MORRIS:  Can we go back --

23              THE COURT:  -- a category.

24              MR. MCCLEARY:  Yeah.

25              MR. MORRIS:  Can we go back to my way?  Because it's
```

HCMLPHMIT00003062

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 1-4   Filed 02/25390   Page 500 of 1011    PageID 2399

50

```
 1    just going to be much faster.  It really will be.  Right?  We
 2    -- Category 1, A and C, we dealt with.  Category B, --
 3              THE COURT:  Well, we dealt with A.
 4              MR. MORRIS:  Right.  And --
 5              THE COURT:  All of those are withdrawn, and they are
 6    admitted by stipulation.
 7              MR. MORRIS:  Right.
 8              MR. MCCLEARY:  Subject to --
 9              THE COURT:  Category C, --
10              MR. MCCLEARY:  -- the general objections.
11              THE COURT:  -- I'm not sure we're to closure on.
12              MR. MORRIS:  Um, --
13              THE COURT:  Are we to closure on C?  Are you
14    stipulating?
15              MR. MCCLEARY:  No.  We are not stipulating on C.
16              MR. MORRIS:  Let's do them one at a time.
17              MR. MCCLEARY:  I have not had an opportunity to -- to
18    --
19              MR. MORRIS:  Let's do them one at a time.
20              MR. MCCLEARY:  Have not had an opportunity to look at
21    each and every one of these, Your Honor.  Because we did just
22    get these.
23              THE COURT:  Okay.
24              MR. MCCLEARY:  But generally --
25              THE COURT:  If we have not wrapped this up in 15
```

HCMLPHMIT00003063

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4 72   Filed 02/05/25 90   Page 501 of 1011   PageID 2400

51

```
 1    minutes, we're just going to start, and you can object the

 2    old-fashioned way.  But I'm telling all lawyers here,

 3    objections count against your time.  Okay?

 4            MR. MORRIS:  And I'd move for the admission of all of

 5    our exhibits right now, then.

 6            THE COURT:  Okay.

 7            MR. MORRIS:  So let him -- let -- put him on the

 8    clock and let's go.

 9            THE COURT:  Okay.  So, 15 minutes.  Let start going

10    through everything except Category A.

11            MR. MORRIS:  Number 4?

12            MR. MCCLEARY:  Number 4, Your Honor, we object on the

13    basis of relevance and hearsay.

14            MR. MORRIS:  Okay.  My response to that, Your Honor,

15    and this will be my response -- this is in Section B of my

16    outline --

17            THE COURT:  Uh-huh.

18            MR. MORRIS:  Okay?  They object to Exhibits 3, 4, 5,

19    and 9.  These are Mr. Dondero's prior sworn statements.  You

20    just heard his lawyer stand here and tell the Court that

21    somehow his handwritten notes should be admissible as an

22    admission.  You know what he did?  He testified four different

23    times under oath.  That's Exhibits 3, 4, 5, and 9.  Sworn

24    statements.

25        They come into evidence not as hearsay but under Federal
```

HCMLPHMIT00003064

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 72   Filed 02/02/25 90   Page 502 of 1011   PageID 2401

52

1  Rule of Evidence 801(d)(1).  It's beyond -- the notion that

2  they can prove a colorable claim and that it's not relevant

3  that he's got diametrically different -- he's got four

4  different statements, now five with his notes, he's got five

5  different statements.  Doesn't that go to the colorability of

6  these claims?

7      We believe it does.  That's the basis for the introduction

8  of these documents into evidence.

9          THE COURT:  Okay.  Mr. McCleary, your response?

10         MR. MCCLEARY:  Well, it's a verified amended

11  petition, Your Honor, in another matter, to -- before suit to

12  seek documents.  Has nothing to do with the merits of this

13  case and our motion for leave.  So we object on the grounds of

14  relevance and hearsay.

15         THE COURT:  Well, since they're prior sworn

16  statements of Mr. Dondero, --

17         MR. MCCLEARY:  Well, then they might -- if they want

18  to use it later to impeach, they can try to do that, but they

19  have to lay the foundation.

20         THE COURT:  What about 801(d)(1)?

21         MR. MCCLEARY:  Again, relevance, Your Honor.

22         THE COURT:  Okay.  I overrule.  Those are --

23         MR. MCCLEARY:  And Mr. --

24         MR. MORRIS:  Okay.

25         THE COURT:  Those are going to be admitted.

HCMLPHMIT00003065

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 11-4  Exhibit 72  Filed 06/04/25 390  Page 503 of 1011     PageID 2402

53

1          MR. MCCLEARY:  By the way, on hearsay, Mr. Dondero is

2     not Hunter Mountain.  So when he argues that these are

3     admissions, they're not admissions by Hunter Mountain.

4          MR. MORRIS:  Your Honor, the only piece of evidence,

5     literally the only piece of evidence they have are the words

6     out of Mr. Dondero's mouth.  There is no evidence, there will

7     be no evidence of a *quid*, a *pro*, or a *quo*.  There will be no

8     evidence other than what Mr. Dondero testifies to --

9          MR. MCCLEARY:  Well, --

10          MR. MORRIS:  -- about what he was told.  There will

11     be no evidence that there was a meaningful relationship

12     between Mr. Seery and Ms. -- and Farallon and Stonehill.

13     There will be no evidence, none, that Farallon and Stonehill

14     rubber-stamped Mr. Seery's compensation package.  Nothing.

15     The only thing we have are going to be the words out of Mr.

16     Dondero's mouth and these notes that just showed up.  And

17     these statements --

18          MR. MCCLEARY:  Your Honor?

19          THE COURT:  Okay.  Counsel, I mean, it just feels

20     like --

21          MR. MORRIS:  It's --

22          THE COURT:  -- if notes get in, then sworn statements

23     of Mr. Dondero should get in.  Right?

24          MR. MCCLEARY:  Your Honor, he's making arguments,

25     closing arguments, opening arguments, trying to run out the

HCMLPHMIT00003066

```
 1   clock.  We objected to relevance, and we stand on our

 2   objection.

 3            THE COURT:  Okay.

 4            MR. MCCLEARY:  And on hearsay.

 5            THE COURT:  I'll admit 3, 4, 5, and 9.

 6        (Debtors' Exhibits 3, 4, 5, and 9 are received into

 7   evidence.)

 8            MR. MORRIS:  Section E.

 9            MR. MCCLEARY:  I'm sorry.  So our objections are

10   overruled?

11            THE COURT:  They are overruled.

12            MR. MCCLEARY:  On 3, 4, 5?

13            THE COURT:  And 9.

14            MR. MORRIS:  Section E of my outline.

15            MR. MCCLEARY:  What about 6?

16            THE COURT:  That's not --

17            MR. MORRIS:  Well, --

18            THE COURT:  Well, I don't --

19            MR. MORRIS:  -- it would -- it would --

20            THE COURT:  Let's go back to C.  I'm not clear if

21   we're to closure on Section C.

22            MR. MORRIS:  I'll let Counsel go through --

23            THE COURT:  And 6 is within Section C.

24            MR. MORRIS:  I'll let Counsel go through each one,

25   one at a time.
```

HCMLPHMIT00003067

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 72   Filed 06/26/25   Page 505 of 1011     PageID 2404
Exhibit 72   Page 56 of 390

55

1          MR. MCCLEARY:  No.  That's all right.  If you want to

2    go through, you have them lumped in.  Yeah, I think it'd

3    probably be quickest if, frankly, we just go down the list,

4    Your Honor.  Frankly.

5          THE COURT:  Well, you've got ten minutes left.

6          MR. MCCLEARY:  Okay.  We object to #6, memorandum and

7    opinion order granting Dondero's motion to remand, on the

8    basis of relevance and hearsay.

9          THE COURT:  Overruled.  I can take judicial notice

10   under 201 of that.  So 6 is admitted.

11     (Debtors' Exhibit 6 is received into evidence.)

12          MR. MCCLEARY:   We object to Exhibits 7 and 8 on the

13   grounds of relevance.  7 on relevance and hearsay, and 8 on

14   relevance.

15          MR. MORRIS:  I'll take 7 first, Your Honor.

16          THE COURT:  Okay.

17          MR. MORRIS:  It's an order dismissing Mr. Dondero's

18   202 petition.  That 202 petition sought discovery on the basis

19   of the exact same so-called insider trading claims that Hunter

20   Mountain is asserting today.

21     I think it's not only relevant, it's almost dispositive

22   that a Texas state court heard the exact same -- or, actually,

23   not the exact same, because Mr. Dondero changed his story so

24   many times -- but heard a version, I think Versions 1, 2, and

25   3, of this insider trading and would not even give them

002034

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 72   Filed 07/02/25   Page 506 of 1011   PageID 2405
Exhibit 72   Page 57 of 390

56

1   discovery.

2       So when the Court considers whether or not there's a

3   colorable claim here, I think it ought to think about what a

4   Texas state court decided on not whether or not they have

5   colorable claims, whether or not they're even entitled to

6   discovery.  I think it's very relevant.  Move for its

7   admission right now.

8           MR. MCCLEARY:  Your Honor, it's ironic, because at

9   that hearing counsel for the Respondents was arguing that it

10  ought to be this Court that considers what discovery is

11  appropriate.

12          THE COURT:  Okay.  Well, obviously, you can argue

13  about that, but, again, I think I can take judicial notice of

14  this.  Right?

15          MR. MCCLEARY:  Well, we argue that it's not relevant,

16  Your Honor, and it is the --

17          THE COURT:  Okay.

18          MR. MCCLEARY:  7 is not relevant and is hearsay.

19          THE COURT:  Okay.

20          MR. MORRIS:  Number 8, --

21          THE COURT:  Objection is overruled.

22          MR. MCCLEARY:  Overruled?

23          THE COURT:  And so 7 is admitted.

24      (Debtors' Exhibit 7 is received into evidence.)

25          MR. MCCLEARY:  8 is our verified petition.  And we

002035

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 17-4   Filed 08/28/25   Page 507 of 1011   PageID 2406
Exhibit 72 Page 58 of 390

57

1  object on the grounds of relevance.

2          MR. MORRIS:  You know, Your Honor, if I really had

3  the time and the patience to do this, I think I'd find this

4  document attached to Mr. McEntire's affidavit that's on their

5  exhibit list.

6      But to speed this up just a little bit, how could their

7  202 petition that sought discovery on the basis of the very

8  same insider trading allegation not be relevant?  It's a

9  judicial order.  You can take notice of it.  And it's

10  incredibly relevant that a second Texas state court heard the

11  same allegations that they're presenting to you as colorable

12  and said no, you're not getting discovery.

13          MR. MCCLEARY:  We don't know why they made that

14  order, Your Honor.  They could have simply accepted the

15  opposition's arguments that this Court had jurisdiction and

16  should consider what discovery ought to be done.

17          THE COURT:  Overruled.

18          MR. MCCLEARY:  It's not relevant to our --

19          THE COURT:  I admit 8.

20          MR. MORRIS:  Next?

21          MR. MCCLEARY:  Overruled?

22          THE COURT:  Yes.

23      (Debtors' Exhibit 8 is received into evidence.)

24          MR. MCCLEARY:  The declaration of James Dondero.  I

25  think we withdrew the Dondero --

HCMLPHMIT00003070

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 72  Filed 09/05/25  Page 508 of 1011    PageID 2407
Exhibit 72  Page 59 of 390

58

```
 1              THE COURT:  Right.

 2              MR. MCCLEARY:  -- declarations.  If it --

 3              THE COURT:  It's --

 4              MR. MCCLEARY:  Numbered -- I'm sorry, #9.

 5              THE COURT:  9.  I've already checked it as admitted.

 6              MR. MCCLEARY:  If you want to -- if you want to offer

 7    #9, they can offer it.

 8              THE COURT:  It's admitted.  I've already --

 9              MR. MCCLEARY:  Okay.

10              THE COURT:  -- said.

11              MR. MCCLEARY:  Number 10.  It's an order denying our

12    second Rule 202 petition.  And we object to it on relevance,

13    Your Honor.

14              THE COURT:  Same objection.  It's overruled.  It's

15    admitted.

16         (Debtors' Exhibit 10 is received into evidence.)

17              MR. MCCLEARY:  Number 12, 13, and -- 12 and 13 are

18    correspondence regarding resignation letters.  We object on

19    grounds of relevance.

20              THE COURT:  Wait.  Did we skip 11 for a reason?

21              MR. MCCLEARY:  Pardon me?

22              THE COURT:  Did we skip 11 for a reason?

23              MR. MCCLEARY:  We only have it --

24              THE COURT:  Oh, wait.  It's already admitted by

25    stipulation.
```

HCMLPHMIT00003071

Case 19-34054-sgj11  Doc 4255-72  Filed 06/20/25  Entered 06/20/25 21:39:29  Desc
Case 3:25-cv-02724-L    Document 74  Filed 06/02/25  Page 509 of 1011    PageID 2408
Exhibit 72 Page 60 of 390

59

```
 1              MR. MCCLEARY:  Yeah, and we have --

 2              MR. MORRIS:  That's the one --

 3              MR. MCCLEARY:  We have our general objection.

 4              MR. MORRIS:  That's the one exhibit that they didn't

 5    object to.

 6              THE COURT:  Okay.

 7              MR. MCCLEARY:  We only had our general objection with

 8    respect to that.

 9              THE COURT:  Okay.  Thank you.  Thank you.

10              MR. MCCLEARY:  On 12 --

11              THE COURT:  Uh-huh.

12              MR. MCCLEARY:  -- and 13, those are correspondence

13    regarding resignations.  We object on the grounds of

14    relevance.

15              MR. MORRIS:  So, the relevance of that, Your Honor,

16    is to show that when Mr. Dondero sent this email to Mr. Seery

17    in December 2020, he had absolutely no relationship to

18    Highland, had absolutely no duty to Highland, had absolutely

19    no reason to send this email to Highland.  He wasn't in

20    control of Highland.  He wasn't --

21        If they'll stipulate to this, that's fine.  He wasn't in

22    control.  He had no authority to do anything.  He couldn't

23    effectuate trades.  He wasn't there.  And that's what these

24    documents are intended to prove.

25              THE COURT:  Okay.  Why are we -- this is --
```

HCMLPHMIT00003072

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 71-4  Filed 02/02/25  Page 510 of 1011    PageID 2409
Exhibit 72  Filed 02/02/25390

60

1          MR. MCCLEARY:  Because there are --

2          THE COURT:  Some of this stuff, I mean, --

3          MR. MCCLEARY:  There are other agreements.

4          THE COURT:  -- is no big deal.  Right?

5          MR. MCCLEARY:  Sub-advisory agreements, other

6    agreements that he had under which he had a responsibility to

7    make the communications regarding material nonpublic

8    information that he made.  So this is simply irrelevant, Your

9    Honor.

10         THE COURT:  I overrule.  I mean, again, I don't --

11         MR. MCCLEARY:  Okay.

12       (Debtors' Exhibits 12 and 13 are received into evidence.)

13         MR. MCCLEARY:   Number 14, --

14         THE COURT:  You're both giving me just a lot of

15   background that I already have, but of course a Court of

16   Appeals --

17         MR. MORRIS:  That's why we --

18         THE COURT:  -- isn't going to have it.

19         MR. MORRIS:  Yep.

20         MR. MCCLEARY:  Well, #14, Exhibit 14, we object on

21   the grounds of relevance and hearsay.

22         THE COURT:  Okay.  Wait a minute.  We skipped 13

23   because -- why?  Oh, wait, that was, I'm sorry, 12 and 13 --

24         MR. MORRIS:  Yes.

25         THE COURT:  -- where I've overruled the objection and

002039

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 72 Filed 06/02/05390 Page 511 of 1011   PageID 2410

61

1   admitted.

2        Okay.  Go ahead.

3        MR. MCCLEARY:  14, we object on the grounds of

4   relevance and hearsay, Your Honor.

5        MR. MORRIS:  I'm just going to make this real quick,

6   Your Honor.  Here's the thing.  This Court knows it.  It's

7   actually facts that cannot be disputed because they're subject

8   of court orders.

9        As the Court will recall, beginning in late November 2020

10  continuing through late December 2020, Mr. Dondero was engaged

11  in a continuous pattern of interference with Highland's

12  business and trading.  It was the subject of the TRO, which is

13  why the TRO is relevant.

14       Your Honor will recall that at the end of November Mr.

15  Dondero attempted to stop Mr. Seery from trading in Avaya

16  stock.  On December 3rd is when he sent this threatening

17  email, text message, to Mr. Dondero [sic].  It caused us to

18  get the TRO.

19       Your Honor will recall on December 16, 2020, that's when

20  we had the hearing on Mr. Dondero's motion to try to stop Mr.

21  Seery from trading in the CLOs that the Court dismissed as

22  frivolous and granted the directed verdict of Highland.

23       So, that's December 16.  He sends this email about MGM on

24  December 17th.  And what happens on December 18th?  More

25  interference with Highland's business.  It's a matter of --

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 174   Filed 06/03/25   Page 512 of 1011    PageID 2411
Exhibit 72   Page 63 of 390

62

1  beyond dispute.  It's law of the case at this point because

2  that's the subject of the contempt order.  And the Court found

3  that, after -- after hours, on December 18th, Hunter Covitz

4  told Mr. Dondero that Mr. Seery was again trying to trade in

5  Avaya stock, and within a day or two Mr. Dondero was again

6  interfering it, and that's what led to the second -- to the

7  first contempt order.

8       So all of these documents are relevant to show motive and

9  what was happening.  This email was not sent for any

10 legitimate purpose.  The evidence is just overwhelming.  And

11 it's not -- it's not like, oh, that's an argument we're

12 making.  Between the TRO and the contempt order, it's law of

13 the case.  He was interfering with Highland's business nonstop

14 for thirty days, including the day before he sent this email

15 and the day after he sent the email.

16           THE COURT:  Okay.

17           MR. MCCLEARY:  Your Honor, this is a lawsuit or an

18 effort to file a lawsuit on behalf of Hunter Mountain

19 Investment Trust, not James Dondero.  And as much as Counsel

20 wants to make this about Jim Dondero and attack him, this is a

21 different case.  So this exhibit has nothing to do with the

22 claims in this lawsuit.  It's not relevant.  And hearsay.

23           MR. MORRIS:  The only evidence is Mr. Dondero.  It's

24 -- could not be more relevant.

25           THE COURT:  Okay.  I overrule.  I'm admitting this.

HCMLPHMIT00003075

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 11-4 72 Filed 06/04/25390  Page 513 of 1011     PageID 2412

63

 1   And so we're --

 2              MR. MCCLEARY:  Uh, --

 3              THE COURT:  It's 14.  It's -- how far?

 4              MR. MCCLEARY:  14.  Exhibit 15 is where we are, Your

 5   Honor.

 6              THE COURT:  Okay.

 7        (Debtors' Exhibit 14 is received into evidence.)

 8              THE COURT:  15.

 9              MR. MORRIS:  Oh, that's -- that's the contempt order.

10   And so these contain the judicial findings that are now beyond

11   dispute that Mr. Dondero was engaged in interfering with

12   Highland's business after the TRO was entered on December

13   10th.

14              THE COURT:  Okay.  Again, my own orders, --

15              MR. MCCLEARY:  Your Honor, it's not --

16              THE COURT:  -- I can take judicial notice of --

17              MR. MCCLEARY:  It's --

18              THE COURT:  -- under the Federal Rules of Evidence.

19              MR. MCCLEARY:  It's --

20              THE COURT:  201.

21              MR. MCCLEARY:  We simply object as not relevant.  We

22   object based on Federal Rule of Evidence 403.  Any possible

23   relevance is outweighed by the prejudice.  And we object on

24   the grounds of hearsay, Your Honor.

25              THE COURT:  Prejudice?  Prejudice?  They're orders I

HCMLPHMIT00003076

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11b4 72 Filed 06/05/25390 Page 514 of 1011   PageID 2413

64

1    issued.  I'm going to be prejudiced by my own orders?

2            MR. MCCLEARY:  Uh, well, --

3            THE COURT:  I don't --

4            MR. MCCLEARY:  -- Hunter Mountain will be.

5            THE COURT:  Okay.  I'll overrule.

6       (Debtors' Exhibit 15 is received into evidence.)

7            THE COURT:  I'll tell you what.  We're out of our --

8    well, we've get probably 30 seconds left.  Anything that we

9    can maybe knock out to not have eat into your three hours?

10   Both of you?

11           MR. MCCLEARY:  Your Honor, we filed written

12   objections to all of these exhibits.  We urge those

13   objections.  16.

14           THE COURT:  I know, but this is your chance to argue

15   why your objections have merit.  I can -- we can just --

16           MR. MCCLEARY:  Because, well, obviously, we're

17   talking about pleadings and filings in other matters.  The

18   evidence that they're trying to use to impugn Jim Dondero,

19   which has nothing to do with the merits of HMIT's claims and

20   allegations of insider trades.

21           THE COURT:  Okay.  A lot of this is articles.

22   Articles, articles, articles about MGM.

23           MR. MCCLEARY:  On the articles, Your Honor, subject

24   to our general objection, we'll withdraw the objections to the

25   articles if they'll agree to the articles that we've offered.

002043

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 11-4   Exhibit 72   Filed 06/06/25   Page 515 of 1011    PageID 2414

65

1          MR. MORRIS:  Your Honor, we didn't lodge an objection

2     to their articles.

3          MR. MCCLEARY:  Okay.

4          MR. MORRIS:  And just so, if anybody is keeping track

5     at home, this is Item B on the list that I created earlier

6     this morning.

7          THE COURT:  Okay.  So, 25 through 30 are articles.

8     Those are admitted by stipulation.  Nothing is about the truth

9     of the matter asserted.  They're just articles that were out

10    there for --

11         MR. MORRIS:  Right.  I would just --

12         MR. MCCLEARY:  Yes.

13         THE COURT:  -- the world.

14         MR. MORRIS:  Just so we're clear, it's Exhibits 25, 6

15    -- 25, 26, 27, 28, 29, and 30.

16         THE COURT:  Right.

17      (Debtors' Exhibits 25 through 30 are received into

18    evidence.)

19         MR. MORRIS:  And so, yes, those are all articles.

20    They have their articles.  Exhibit 72.

21         THE COURT:  Oh, and 34 is another one.  So that's

22    admitted as well.

23         MR. MORRIS:  Yes.

24         MR. MCCLEARY:  Yes, Your Honor.

25      (Debtors' Exhibit 34 is received into evidence.)

HCMLPHMIT00003078

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-4    Filed 02/02/25    Page 516 of 1011    PageID 2415
Exhibit 72    Page 62 of 390

66

```
1              THE COURT:  Okay.  Well, we're out of time, so as for

2     the others, they can offer them the old-fashioned way if they

3     want to, you can object the old-fashioned way, and it eats

4     into both of your three hours.

5              MR. MCCLEARY:  Yes, Your Honor.

6              THE COURT:  Okay.  Let's hear opening statements.

7         And by the way, before we wrap up today, I'm going to say

8     out loud everything I've admitted so we're all crystal clear

9     on what's in the record.  This has been a bit chaotic.

10             MR. MCCLEARY:  Okay.  Understood.

11             THE COURT:  So, Caroline is going to be the keeper of

12    our time over here.  And if the judge ever interrupts you,

13    she's going to stop the timer.  Okay?

14             MR. MCENTIRE:  Thank you.

15             THE COURT:  I hope I won't any more, but you may

16    proceed.

17             MR. MCENTIRE:  No, I appreciate it.  Thank you.  Can

18    you see it, Your Honor?

19             THE COURT:  I can, yes.  Thanks.

20             MR. MCENTIRE:  Can opposing counsel see it?

21             MR. MORRIS:  Yes, sir.

22             MR. MCENTIRE:  All right.

23             THE COURT:  And I'm just going to ask everyone who

24    has a PowerPoint today, can I get a hard copy --

25             MR. MCENTIRE:  Certainly.
```

002045

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 74   Filed 06/02/25   Page 517 of 1011   PageID 2416
Exhibit 72   Page 68 of 390

67

```
 1            THE COURT:  -- before we close?

 2            MR. MCENTIRE:  Certainly.

 3            THE COURT:  Okay.  Thank you.

 4      OPENING STATEMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT

 5                              TRUST

 6            MR. MCENTIRE:  May it please the Court, Your Honor,

 7   at this time I'll be providing the opening statement on behalf

 8   of Hunter Mountain Investment Trust.  It is a Delaware trust.

 9   Mark Patrick, who's in the courtroom, is the Administrator.

10   He will be one of the witnesses that you'll hear today.

11        Hunter Mountain Investment Trust is the former 99.5

12   percent equity holder, currently classified as a Class 10

13   contingent beneficiary under the Claimant Trust Agreement.  It

14   is active in supporting various entities that in turn support

15   charities throughout North Texas.

16        Your Honor, this is not an ordinary claims-trading case.

17   I know the Court made those references in one of the hearings,

18   and I wanted to more clearly respond.  This has different

19   indicia.  An ordinary claims-trading case is normally outside

20   the purview of the bankruptcy court.  What makes this

21   different is that we're involving, we believe and allege,

22   breaches of fiduciary duty of the Debtor-in-Possession's CEO

23   and the Trustee.

24        It involves also aiding and abetting by the entities that

25   actually acquired the claims.  And that falls into the
```

HCMLPHMIT00003080

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-72    Filed 09/05/25    Page 518 of 1011    PageID 2417
Exhibit 72 Page 69 of 390

68

1 | category of willful misconduct.

2 |     It also involves injury to the Reorganized Debtor and to

3 | the Claimant Trust.  Ordinarily, a claims trade would not

4 | involve injury to the estate or the reorganized debtor.  Here,

5 | we have alleged that it has.  And the injury takes the form of

6 | unearned excessive fees that Mr. Seery has garnered as a

7 | result of his relationship and arrangements, as we have

8 | alleged, with the Claims Purchasers.

9 |     During the course of my presentation today, I'll be

10 | referring to the Claims Purchasers as the collective of

11 | Farallon, Stonehill, Muck, and Jessup.

12 |     I would like to briefly discuss some of the issues that

13 | have already been presented to the Court, just to make sure

14 | that this record is clear.

15 |     Can you please continue?

16 |     We don't believe the *Barton* Doctrine is applicable.  I

17 | believe that precedent is very clear that the *Barton* Doctrine

18 | deals with proceedings in other courts, and the various

19 | standards and requirements of *Barton* do not apply if in fact

20 | we're coming to the Court and filing the proceeding in the

21 | court where the Trustee was actually appointed.

22 |     And so I think that the law is clear.  And this is Judge

23 | Houser here in the Northern District of Texas in the case *In*

24 | *re Provider Meds*.  And she makes very clear that the standard

25 | for granting leave to sue here is actually less stringent than

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-4    Filed 07/02/25    Page 519 of 1011    PageID 2418
Exhibit 72 Page 70 of 390

69

1    a 12(b)(6) plausibility standard.  So if there is any issue as

2    to what standard this Court should be applying to the -- to

3    this process, we believe it's a 12(b)(6) standard, confined to

4    the four corners of the document.

5        If the Court wishes to consult the documents that are

6    referred to in the four corners of the petition or complaint,

7    it may do so.

8        But the standard here is even more flexible than a

9    standard plausibility.  Our evidence, though, achieves the

10   standard of plausibility as well.

11       The *In re Deepwater Horizon* case is another important

12   case.  That's a Fifth Circuit case.  A plaintiff's claim is

13   colorable if it can allege standing and the elements necessary

14   to state a claim on which relief could be granted.  Defining a

15   colorable claim as one with some possible validity.  I don't

16   have to prove my case today.  I didn't have to prove my case

17   in the prior hearings.  I have to prove sufficient

18   allegations, not evidence, but sufficient allegations to show

19   that it has some possible basis of validity.

20       Possible basis of validity.  We're not here talking about

21   likelihoods.  We're not here talking about *prima facie*

22   evidence.  We're not here talking about probabilities.  We're

23   talking about something less than plausibility.  But, again,

24   we achieve plausibility.

25       A colorable claim is defined as one which is plausible or

002048

HCMLPHMIT00003082

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 72   Filed 02/05/390 Page 520 of 1011   PageID 2419

70

1   not without merit.  These are various cases from around the

2   country.  The colorable claim requirement is met if a

3   committee has asserted claims for relief that, on appropriate

4   proof, would allow recovery.  On appropriate proof.  We're not

5   required to put on that proof today, Your Honor.

6       Courts have determined that a court need not conduct an

7   evidentiary hearing, but must ensure that the claims do not

8   lack any merit whatsoever.  We submit that our claims have

9   substantial merit and deserve the opportunity to initiate our

10  proceedings, have an opportunity to conduct discovery.  And if

11  they want to file a 12(b)(6) motion before this judge, before

12  you, they can do so.  If they want to file a motion for

13  summary judgment, they can do so.  But at this juncture, they

14  cannot, and at this juncture this Court should not consider

15  evidence in making its determination.

16      Standing under Delaware law.  The Funds have collectively

17  really hit the standing issue hard.  I think it's easily

18  resolved.  First of all, it's clear that a beneficial owner

19  has standing to bring a derivative action.  Under Delaware

20  law, a beneficial owner has a right to bring a derivative

21  action on behalf of the -- against the trustee.

22      So the issue is, am I a beneficial owner?  As a contingent

23  beneficiary in Class 10, and that's the Court's inquiry here,

24  do I qualify as a beneficial owner?  And I think that Delaware

25  law is clear that, by not limiting it to only vested

HCMLPHMIT00003083

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-72    Filed 02/02/05390    Page 521 of 1011    PageID 2420

71

1    interests, by not limiting it only to immediate beneficiaries,

2    they are not -- they are not extending the scope of the

3    statute to contingent beneficiaries.  And this is consistent

4    with the laws around the country, because even Texas

5    recognizes that an unvested contingent beneficiary has a

6    property right to protect.

7        Even Mr. Seery admitted in his deposition that a unvested

8    contingent interest is in the nature of a property right.  If

9    you have a property right, that property right can be abused.

10   If you have a property right, that property right, whether

11   it's inchoate or not, it can be abused, it can be

12   misappropriated, and you could become aggrieved.  And that is

13   the constitutional standard for standing:  Is Hunter Mountain

14   Investment Trust aggrieved?  And the answer is yes.

15       Contingent beneficiaries from around the country, in

16   addition to Mr. Seery's admission that we have a property

17   interest, contingent beneficiary has standing.  This is the

18   *Smith v. Clearwater* case on Slide 11.  Very clearly, they say

19   that even if it's subject to a future event.  Their argument

20   is that Mr. Seery has not certified Hunter Mountain as in the

21   money.  We believe we are in the money.  That's a different

22   issue.  We believe he should certify, in the discharge of his

23   duties.  That's a different issue.

24       But even assuming his case -- his argument for a moment,

25   their argument is that since he's not done that act, which we

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 11 Exhibit 72 Filed 03/03/25390 Page 522 of 1011    PageID 2421

72

```
1   also challenge and criticize that he's not done that act, that
2   we can't qualify to bring this case.  Well, that's not what
3   the law is, that even an unvested interest, a contingent
4   interest, has a right.
5        Slide 12.  This is the State of Illinois.  Despite the
6   fact that interest is contingent and may not vest in
7   possession, you still have a right to protect what you have.
8   And you have standing to bring a cause of action.
9        The Claimant Trust Agreement, by the way, suggests that we
10  have no vested interest, and they'll likely argue that point.
11  But the point there is the law says that's irrelevant.  If
12  it's an inchoate interest, if it's potentially vested in the
13  future, that's what imbues you with standing.
14       And in any event, the Claimant Trust Agreement is subject
15  to Delaware trust law, and they can't get around that.  They
16  can say whatever they want to say in the agreement to try to
17  block us from participation, but it's still subject to
18  Delaware trust law, and Delaware trust law does not draw a
19  distinction between vested or unvested.
20       The State of Missouri:  There is no dispute in this case
21  that the future -- that future beneficiaries have standing to
22  bring an accounting action, whether they're vested or
23  contingent.  The Bucksbaum case.  Article III standing exists,
24  constitutional standing, including discretionary
25  beneficiaries, have long been permitted to bring suits to
```

002051

HCMLPHMIT00003085

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 174   Filed 07/02/25   Page 523 of 1011   PageID 2422
Exhibit 72 Page 72 of 390

73

1    redress trustees' breaches of trust.  This applies not only to

2    our standing as an individual plaintiff, which we've brought,

3    but also in our standing -- in our capacity seeking to bring a

4    derivative action to benefit the Claimant Trust of the

5    Reorganized Debtor.  Both are permitted under this law under

6    these cases.

7        An interest -- in the *Mayfield* case, an interest is any

8    interest, whether legal or equitable or both, vested,

9    contingent, defeasible, or indefeasible.  So the unilateral

10   self-serving wording of the Claimant Trust does not abrogate

11   our right to bring the claim.

12       I'd like to talk briefly about fiduciary duties.  We know

13   that Mr. Seery has fiduciary duties to the estate when he was

14   the CEO prior to the effective date.  We allege that he

15   breached those fiduciary duties, and that gives us standing to

16   bring the claim that we have brought for breaching fiduciary

17   duties, causing damages that are accruing post-effective date.

18       In the *Xtreme Power* case, again, the directors can either

19   appear on both sides of the transaction or expect to derive

20   any personal financial benefit.  We are alleging that Mr.

21   Seery engaged in self-dealing.  We allege that he engaged in

22   self-dealing by arriving at an understanding where he could

23   put business allies -- whether you call them friends, business

24   allies, close acquaintances -- on the committee, the Oversight

25   Board that would ultimately oversee his compensation, which,

002052

HCMLPHMIT00003086

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11 72 Filed 06/20/25 390 Page 524 of 1011   PageID 2423

74

1  in the context of this case, makes no sense and it is

2  excessive.

3      Muck is a specially -- special-purpose entity of Farallon.

4  Farallon acquired the claims, created Muck to do the job.

5  Muck is now on the Oversight Board.

6      Jessup.  Jessup is a special-purpose entity, a shell

7  created by Stonehill.  Stonehill bought the claims, funneled

8  the money through Jessup.  Jessup is now on the Oversight

9  Board.  Jessup and Muck -- and by the way, the principals in

10 Farallon are actually the representatives from Muck on the

11 Oversight Board.  So there's no suggestion that there's really

12 a distinct corporate relationship here.

13     Michael Linn, who is a principal at Farallon.  You'll hear

14 his name today, throughout today.  He actually is a

15 representative of the Oversight Board, dealing with Mr. Seery

16 and negotiating Mr. -- I put negotiation in quotes --

17 negotiating Mr. Seery's compensation.

18     I'd like to talk very briefly about background.  We took

19 Mr. Seery's deposition.  I was unaware of this.  I now know

20 it.  Perhaps the Court was already aware of it.  This is Mr.

21 Seery's first job as a CEO of any debtor.  This is the first

22 time Mr. Seery has ever been a chief restructuring officer.

23 This is the first time Mr. Seery has ever been the CEO of a

24 reorganized debtor.  This is the first time that he's served

25 as a trustee post-effective date.  However, his compensation

HCMLPHMIT00003087

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 72   Filed 06/06/25   Page 525 of 1011    PageID 2424

75

1  is excessive and not market-driven, and there's a reason for

2  that.  We believe and we allege that it's a *quid pro quo*

3  because of prior relationships with Farallon and Stonehill.

4      Farallon and Stonehill are hedge funds, Your Honor.  They

5  created their special-purpose entities on the eve of this

6  transaction simply to take the title to the claims, but the

7  money is going upstream.

8      Seery has a relationship with Farallon.  Do we know the

9  full extent of that relationship?  No.  We have been deprived

10 of discovery.  We attempted to get the discovery in the state

11 court 202 process.  We were denied for reasons not articulated

12 in the court's order.

13     We attempted to get the discovery here that the Court

14 refused under the last hearing about these relationships.

15     So what we do have begins to put the pieces of the puzzle

16 together.  And sufficient is more than plausible.  It is more

17 than colorable.

18     We know that Mr. Seery went on a meet-and-greet trip to

19 Farallon's offices in 2017.  Didn't have to.  He was trying to

20 cultivate a business relationship.  Farallon was important to

21 him.

22     We know that in 2019 he was no longer with Guggenheim

23 Securities.  He goes out to Farallon's offices for another

24 meet-and-greet and he specifically meets with the two

25 principals who are reflected in Mr. Dondero's notes, Raj Patel

002054

HCMLPHMIT00003088

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 72   Filed 07/02/25   Page 526 of 1011   PageID 2425
Exhibit 72   Page 72 of 390

76

1   and Michael Linn.

2       We know that in June 2020 Farallon emailed Seery.  This is

3   after Mr. Seery becomes the CEO.  He says, "Congratulations.

4   We're monitoring what you're doing."

5       Seery's relationship with Stonehill.  These are all --

6   this is all before what we believe to be the events that are

7   at issue in this case.  We believe that -- represented

8   Stonehill in the *Blockbuster* bankruptcy proceeding.  There was

9   an objection to a document.  Mr. Seery was involved in the

10  *Blockbuster* proceedings.  Stonehill was one of his many

11  clients on the committee that he represented.

12      We know that Stonehill is actively involved in one of Mr.

13  Seery's charities in New York.  We know that he sent text

14  messages to Mr. Seery in February of 2021, wanting to know how

15  to get involved in this bankruptcy.

16      Farallon and Stonehill were strangers to this bankruptcy.

17  They weren't creditors.  They were encouraged and they came

18  into this process.

19      Farallon and Stonehill have not denied any of our

20  allegations.  They are not putting any evidence on today.  We

21  allege that these relationships was based and founded upon a

22  *quid pro quo*.  I'll scratch your back; you scratch mine.  You

23  give me some information; I want to evaluate these claims.

24  And, by the way, we're going to be on the Oversight Board, or

25  you're going to put us on the Oversight Board, or by default

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 11-4 72   Filed 02/05390   Page 527 of 1011     PageID 2426

77

1  we'll be on the Oversight Board, and we'll work out your

2  compensation agreement.

3      Mr. Seery also has an established relationship with

4  Stonehill.

5      I like to have a timeline of certain events.  This is not

6  all of the relevant events, but this can give you a quick

7  picture.  We know that Mr. Dondero sent an email to Mr. Seery

8  in December of 2020 relating to MGM.  It is undisputed that

9  Mr. -- that Farallon emailed Seery, Mr. Seery, in January of

10  2021 if there was a path to get information regarding the

11  claims for sales.  Mr. Seery says he never responded to it,

12  but we know that this entity, Farallon, got deeply involved in

13  buying these claims shortly after this email.

14      We have the Claimant Trust Agreement suddenly being

15  amended to not have a base fee, but now we're going to

16  incorporate a success participation fee.  As part of a plan,

17  we're not criticizing that, but suddenly the vehicle for post-

18  effective date bonuses is being created.

19      The Debtors' analysis comes out in association with the

20  plan confirmation.  It projects a 71.32 percent recovery for

21  Class 8 and Class 9, and those are the principal classes we're

22  talking about.  95 percent -- 98 percent of all of the claims

23  here are in Class 8 and Class 9, until you get to us, Class

24  10.

25      71.32 percent of Class 8 means that Farallon and Stonehill

HCMLPHMIT00003090

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 74 Filed 07/02/25   Page 528 of 1011   PageID 2427
Exhibit 72 Page 79 of 390

78

1    will get less than about a six percent internal rate return on

2    their $163 million investment, which they have never denied.

3    That is not a hedge fund investment goal.  Investment -- hedge

4    funds like these companies, they go for 38, 40, 50 percent of

5    returns.  Who would ever invest $163 million on a distressed

6    asset that's not collateralized with only an expectation of an

7    internal rate of turn of six percent?  But that's going to be

8    the evidence before the Court.  That does not make any

9    financial, rational wisdom at all.

10        The plan is confirmed.  It's undisputed that Stonehill

11   contacts Seery after the plan is confirmed to want to know how

12   to get involved.  They have phone calls after this text

13   message.  Muck is created on March 9.  We know from Mr.

14   Seery's deposition that Farallon told Seery that six days

15   later they bought the claims.  All the claims, by the way,

16   when I say bought the claims, it's everything except UBS.  To

17   our knowledge.  They may have negotiated the paperwork back

18   then, but the claims transfers did not occur until the summer.

19   All the other claims involved, the claims transfers were filed

20   with this Court in mid-April and at the end of April.

21        Tim Cournoyer removes MGM from the restricted list.  Tim

22   Cournoyer is an employee of Highland.  Well, it tells us that

23   MGM was on the restricted list and there should be no

24   discussion about MGM, but there was.  There was discussions

25   about MGM, and Mr. Dondero is going to testify to that.

002057

HCMLPHMIT00003091

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-72    Filed 02/02/25    Page 529 of 1011    PageID 2428
Exhibit 72 Page 80 of 390

79

1        And we also know that the HarbourVest settlement was

2    consummated during this period of time.  If it had been on the

3    restricted list, as it was, that transaction should never have

4    occurred.  But it did occur.  This Court ordered it.  It

5    approved it.  And I'm not challenging -- we're not challenging

6    that settlement.  It is done.  That is done.  What we are

7    challenging is the fact that Mr. Seery is actively involved in

8    using inside material nonpublic information.

9        Jessup Holdings is created shortly thereafter, on April

10    8th.  We have claims settling on April 30th.  The Acis claim

11    is transferred to Muck -- that's Farallon -- on April 16.  The

12    Redeemer and Crusader are all transferred on April 30th.

13        Stonehill and Farallon never deny that they did no due --

14    that they failed to do due diligence.  We allege that there

15    was no due diligence.  And that relies in significant part

16    upon Mr. Dondero.  But now, because we have Mr. Seery's

17    deposition, it also relies upon Mr. Seery's admissions in

18    deposition, because he says he never opened up a data room, he

19    doesn't know what due diligence they did.  Farallon says the

20    only due diligence they did is they talked to Jim Seery.  And

21    how do you invest $163 million, or $10 million or $50 million,

22    whatever the part is, with an internal rate of return six

23    percent, only on the advice of Mr. Seery, who's never been a

24    trustee or a CEO before, unless there's something going on?

25        Your Honor, public announcement of MGM on May 26th.  On

HCMLPHMIT00003092

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Exhibit 72   Filed 02/02/25   Page 530 of 1011   PageID 2429
Page 390

80

1   May 28th, two days later, Mr. Dondero calls Farallon.  It took

2   Mr. Dondero or his group a few days, a week or so, to even

3   understand who -- that Farallon was involved, because the

4   registrations for Muck and Jessup did not disclose their

5   principals, did not even disclose addresses.  They were shell

6   -- they were companies that came in in the last minute to buy

7   these claims incognito, frankly.

8       They found out that Farallon was involved.  They had a

9   call initially with Raj Patel, who is the principal of

10  Farallon.  He has three conversations total:  One with Mr.

11  Patel and two with Michael Linn.  Michael Linn was the one

12  responsible for these claim purchases.  Patel admitted that

13  Farallon relied exclusively on Seery and did no due diligence.

14  Linn rejected the premium to sell.  The evidence you'll hear

15  today, that Mr. Linn rejected a premium up to 40 percent to

16  sell the claims.  He actually said he would not sell at all

17  because he was told by Mr. Seery that the claims were too

18  valuable.

19      That is evidence of insider trading.  Specifically, they

20  said they were very optimistic about MGM and they were

21  unwilling to sell because Seery said too valuable.

22      We have -- these are the purchases.  This is where the

23  Class 9 claims fall.  And keep in mind -- Tim, go back -- that

24  $95 million of this upside potential is being told, at least

25  to the publicly available information, that you're never going

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 17-4 72 Filed 06/20/25 390 Page 531 of 1011    PageID 2430

81

1    to get there.  Yet 95 -- $95 million is allocated to this

2    category.  So Class 8 is $275 million.  Class 9 is 29 -- $95

3    million.

4        Next.

5        So we have the evidence that you'll hear today.  Farallon

6    admitted the timing.  No due diligence, never denied by the

7    Claim Purchasers.  Based upon material nonpublic information.

8    That's our allegation.  Purchased over $160 million.  This is

9    never denied by the Claims Purchasers.  They purchased claims

10    when the return on investment was highly doubtful.  Maximum

11    expected annual rate of return, assuming publicly-available

12    information, was approximately six percent, and that is

13    totally atypical of what a hedge fund would seek.

14        Insider information.  We're not talking about just MGM.

15    The Respondents want to narrow the Court's inquiry.  This is

16    much larger than MGM.  MGM is a part of it, it's a big part of

17    it, but it's not the only part of it.  It's other assets.

18    Portfolio companies.  Other invested assets.  There's a lot of

19    money out there, and it was never disclosed during the

20    ordinary course of the bankruptcy, for reasons that the Court

21    already knows, in terms of asset values.  How does someone

22    come in and purchase distressed assets, claims, without any

23    understanding of what assets are backing those claims, when

24    there's no publicly-available information there to do it and

25    there's no evidence, no indication, no statement that actually

HCMLPHMIT00003094

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-74   Filed 06/02/25390   Page 532 of 1011   PageID 2431

82

1   due diligence was done?

2        That right there, without anything else, makes our claims

3   plausible.  You don't have to prove insider trading by direct

4   evidence.  Nobody's going to admit that they did something

5   wrong.  You prove it circumstantially, and we've cited cases

6   and we'll give you cases to that effect.

7        Next.

8        We have material nonpublic information.  It is very clear

9   that Mr. Dondero on December 17th sent this email, not just to

10  Mr. Seery but to several other individuals, including lawyers.

11  It states that he'd just gotten off a board call.  A pre-board

12  call.  The update, he provides the update.  Active

13  diligencing.  It's probably a first-quarter event.  We can

14  scour all of the other media documents that are in evidence,

15  both from us and them, and you're not going to find any

16  indication anywhere that a board member has said, guys, gals,

17  it's going to be a probable first-quarter event.  That's

18  material nonpublic information.

19             THE COURT:  By the way, you all objected to this

20  exhibit.

21             MR. MCENTIRE:  No, this is my exhibit.

22             THE COURT:  We spent --

23             MR. MCENTIRE:  I did not.  They objected to this.

24             MR. MORRIS:  Your Honor, we didn't object to it, and

25  that is the one exhibit that they did not object to.

HCMLPHMIT00003095

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 72 Filed 08/04/25   Page 533 of 1011   PageID 2432
Exhibit 72 Page 84 of 390

83

```
 1              THE COURT:  Oh, it is?

 2              MR. MORRIS:  Nobody objected to this exhibit.

 3              MR. MCENTIRE:  I'm not going to object to this

 4    exhibit, Your Honor.

 5              THE COURT:  Okay.  It's a different version.

 6              MR. MCENTIRE:  Fair enough.

 7              THE COURT:  Okay.  It was a different email around

 8    that same time frame.

 9              MR. MCENTIRE:  So just --

10              THE COURT:  Apologies.  We stopped the clock.

11              MR. MCENTIRE:  This -- my next exhibit is simply a

12    demonstrative, but I just want the Court to understand that

13    MGM is no small matter here and Mr. Seery did testify in

14    deposition that it probably made up $450 million.  He was

15    pretty close.

16              MR. MORRIS:  Your Honor, I object to this

17    demonstrative.  There is no evidence in the record.  It's not

18    cited to anything.  We're not just going to start putting up

19    stuff on the screen that we like.

20              MR. MCENTIRE:  Excuse me.  I'm not offering this

21    document into evidence.

22              MR. MORRIS:  I don't care.  The Court shouldn't be

23    seeing a demonstrative exhibit that contains matters that are

24    never going to be in the record.

25              THE COURT:  Okay.
```

HCMLPHMIT00003096

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4  Filed 08/25/25   Page 534 of 1011   PageID 2433
Exhibit 72 Page 85 of 390

84

1            MR. MCENTIRE:  I disagree.  I can put the data in the

2    record.

3        May I proceed?

4            MR. MORRIS:  But you didn't.

5            THE COURT:  Okay.  I'm not considering the truth of

6    this until and unless I get evidence of this.

7            MR. MCENTIRE:  Fair enough.  But the point is this,

8    Mr. Seery has conceded in deposition that between the

9    institutional funds and the CLOs, there's a lot of MGM

10   securities and stock.  We're talking a lot of money.  We're

11   not talking about just Highland Capital's investment.

12       You can skip the next slide.  Skip.

13       So, rumors versus material nonpublic information.  They

14   can talk all day long, and if they want to use their time

15   doing this, they can.  There's a difference between rumor and

16   actual material nonpublic information.  Rumor from

17   undocumented sources, lack of clarity, lack of timing.  There

18   is no -- there's no debate that a lot of people knew that

19   maybe MGM might be for sale.  Maybe they wouldn't.  Sometimes

20   it falls apart, you know.  But the point is a board member is

21   telling someone that there's a probable event in the first

22   quarter of 2021.  That is definite, specific, and it comes

23   from the highest authority.  That is -- if that's not material

24   and public information, I don't know what could be.

25       Classic indications of insider trading.  You have to have

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 06/26/25   Page 535 of 1011   PageID 2434
Exhibit 72 Filed 06/26/25390

85

1   a tipper with access to MNPI.  Here, we know that Mr. Seery,

2   if he's the tipper, we allege he's the tipper -- and these are

3   words of art out of case law, by the way -- he has access to

4   information about MGM.  He has access about asset values,

5   projected values.  He has a relationship.  We believe he has a

6   very strong relationship.  It's more than just social

7   acquaintances.  He's giving congratulatory emails.  He's

8   getting solicitations.  He's solicited.  Benefits received.

9   We know what the benefits are.  They get the opportunity to

10  invest money with huge upside.

11      There was a point mentioned some time ago that, well, only

12  -- only the sellers really have the grievance.  Well, Your

13  Honor, we have a right to start our lawsuit and do some

14  discovery, because, frankly, a lot of sellers have big-boy

15  agreements.  They say, you don't sue me if I have MNPI.  I

16  don't sue you if you have MNPI.  We have mutual releases.

17  Let's go by our way.  Everybody's happy.  We're not going to

18  come back and see each other ever again.

19      That's one of the things we're being deprived of here.

20  But otherwise, what we have here is a colorable plan.  We've

21  asked for the communications with the sellers.  We can't get

22  it.  We have here an email.

23      Next.

24      We have here an email.  This actually -- you'll hear Mr.

25  Dondero say this actually reflects three communications.  Raj

002064

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4 72 Filed 06/30/25390 Page 536 of 1011   PageID 2435

86

 1  Patel, Farallon, bought it because of Seery.  Mr. Dondero

 2  contacted Mr. Patel and says, Raj Patel bought it because of

 3  Seery.  50 to 70 percent's not compelling.  Class 8.  50

 4  percent, 70 percent.  Give you a 30 percent to 40 percent

 5  premium.  Not compelling.  I ain't going to sell.  Ask what

 6  would be compelling.  Nothing.  No offer.  Bought in February/

 7  March.  We now know the time frame.  We know that Stonehill is

 8  communicating with them and we know that Farallon has been

 9  just communicating with Mr. Seery.  Bought assets with claims.

10  It's not just the MGM.  It's not just the portfolio companies

11  and other assets.  It's also the claims.

12      Well, what are the claims?  It's the claims against Mr.

13  Dondero.  Well, how would they know about all this if there's

14  no due diligence and there's no evidence of any due diligence

15  before you?  130 percent of costs, not compelling, no counter.

16  Mr. Dondero's angry.  Discovery is coming.

17      Atypical behaviors are also circumstantial evidence of

18  insider trading.  We have strange behaviors here, Judge.  We

19  have a vast majority of the claim value is acquired by only

20  two entities post-confirmation.  Most significant claims are

21  only owned by two entities who were strangers to the whole

22  process.

23      The removal of -- and Mr. Morris offered to stipulate.

24  The sudden removal of MGM from the compliance list in April of

25  2021 -- by the way, the removal doesn't cleanse the MNPI.  If

HCMLPHMIT00003099

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 72 Filed 08/28/25   Page 537 of 1011   PageID 2436
Exhibit 72 Filed 08/28/25390

87

1  you have material nonpublic information because you received

2  it from Mr. Dondero, the fact that Mr. Dondero's no longer

3  employed by Highland Capital or no longer directly or formally

4  affiliated doesn't cleanse the MNPI.

5      We have no due diligence, regardless of the significant

6  nine-digit numbers, and we have no rational explanation of why

7  this kind of money would be invested when they're projecting

8  an actual loss, if -- a modest return at best for Class 8 and

9  a loss for Class 9.

10      Insider trading can be proved by circumstantial evidence,

11  Your Honor.  No fraudster, no person who's done wrong is going

12  to admit to it, so you look for the classic -- you look for

13  the classic elements.  And that's what we had here.  And we

14  have alleged all of this in our pleadings.  Not in extraneous

15  evidence.  Within the four corners of our pleadings.  And

16  that's why we have a plausible claim.

17      You know, I believe it's Rule 8, Rule 9 of the Federal --

18  you have to require specificity in a fraud claim.  Well, this

19  is not a fraud claim.  This is a different claim.  But we have

20  provided specificity that passes the smell test of

21  colorability.  We have provided specificity that would satisfy

22  even more stringent requirements under 12(b)(6).

23      The plan analysis.  This is a, I think, a document

24  admitted by everyone.  Mr. Seery has testified that this

25  projection of 71.32 percent for Class 8 came out in February

HCMLPHMIT00003100

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-4   Filed 06/20/25   Page 538 of 1011   PageID 2437
Exhibit 72   Page 89 of 390

88

1   of 2021 and never changed, all the way up to the effective

2   date.

3       So this is what the public believed.  This is what the

4   public knew.  And if this was all that Farallon and if is all

5   that Stonehill had access to, that means that they were going

6   to lose their entire investment on Class 9.  They bought UBS

7   at a loss to begin with.  And on the other three investments,

8   they were going to get a very, very modest, minor return, six

9   percent over three years, or even less.  That is not what

10  hedge funds do.

11      Seery's excessive post-effective date compensation.  We

12  have obtained no discovery from Farallon or Stonehill in this

13  regard, but we know that he had no prior experience.  We know

14  that the award that was given him was not market-based, even

15  though the self-serving documents that have been produced and

16  that are attached to their exhibit list suggests a robust

17  negotiation.  Well, they were robust without any kind of

18  reality check in the real world about whether it was market-

19  supported.  None.  Mr. Seery has admitted to that.

20      It was not lowered.  He's making $1.8 million a year right

21  now, with most -- a lot of the assets already sold, the

22  reorganization done.  All they're doing now is monetizing

23  assets.  He's getting $1.8 million.  He's got 11 people

24  working for him.  And then he has a bonus, a bonus that is --

25  increases significantly with his ability to recover for Muck,

HCMLPHMIT00003101

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72 Filed 06/02/25   Page 539 of 1011   PageID 2438
Exhibit 72 Page 90 of 390

89

1    Jessup, Farallon, and Stonehill.

2        And in the absence of -- if we were really dealing with

3    uncertainty and risk, then that may be another issue, but here

4    we're dealing with entities that already know that they're

5    going to get a payday and they already have.  They've already

6    made about a $170 million return -- 170 percent return, excuse

7    me -- over and above the original investment, when they were

8    projected to actually lose money.

9        Just so you know, we have over $534 million of cash that

10   has been basically monetized, and out of that, $203 million in

11   total expenses -- $277 million to Class 8 and -- and -- 1

12   through 7, and Class 8 distributors.  Excuse me, creditors.

13   Even if you take -- if you take out the alleged obligations of

14   Mr. Dondero on the promissory note cases, that still leaves

15   over $100 million available, which puts us in the money.  Puts

16   us in the money.  And the fact that you have $203 million of

17   expenses in a case of this nature is part of our claim, is

18   that we have delay actions.  We have a situation where Mr.

19   Seery is continuing to receive $1.8 million a year on a slow

20   pace to monetize, paying other professionals, when this could

21   have been over a long time ago.  That's part of our

22   allegations.  It's not part of any valuation motion.  It's

23   actually in our allegations.

24       I'm going to reserve the rest.  I think that's my opening

25   statement, Your Honor.  I'm going to reserve the rest for my

HCMLPHMIT00003102

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 11-4 72 Filed 06/20/25390 Page 540 of 1011    PageID 2439

90

```
1   closing.  And let me see.  Yes, that's right.  And thank you
2   for your time.
3            THE COURT:  All right.  Caroline, how much time was
4   that?
5            THE CLERK:  Thirty-four minutes and 27 seconds.
6            THE COURT:  Thirty-four minutes and 37 seconds.
7   Okay.
8            THE CLERK:  Twenty-seven.
9            THE COURT:  Oh, 27.  Okay.
10           MR. MCENTIRE:  Thirty-four minutes?
11           MR. MCCLEARY:  Thirty-four minutes.
12           MR. MORRIS:  Your Honor, I do have hard copies of my
13  short slide presentation.
14           THE COURT:  All right.  You may approach.
15       And Mr. McEntire, are you going to give me your PowerPoint
16  later, hard copies later?
17           MR. MCENTIRE:  Yes, Your Honor.  I found one typo and
18  I'd like to fix one typo and then we'll give it to you.
19           THE COURT:  Okay.
20            OPENING STATEMENT ON BEHALF OF THE DEBTORS
21           MR. MORRIS:  Good morning, Your Honor.  John Morris,
22  Pachulski Stang Ziehl & Jones, for Highland Capital Management
23  and the Claimant Trust.
24       I want to be fairly brief because I really want to focus
25  on the evidence.  I look forward to Your Honor hearing from
```

002069

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 11-4 Filed 06/92/25390 Page 541 of 1011     PageID 2440

91

1   Mr. Seery so that he could clear up a lot of the misleading

2   statements that were just made.

3       The Court is here today on a gatekeeper function, and

4   we're delighted that the gatekeeper exists.  We're delighted

5   that the Court will have an opportunity, after considering

6   evidence, to determine whether or not these claims are

7   actually colorable.

8       There's -- there were a lot of conclusory statements I

9   just heard.  There were a lot of assumptions that were made.

10  There were a lot of misleading statements that were made.  At

11  the end of the day, what the Court is going to be asked to do

12  is to decide whether, in light of the evidence, do these

13  claims stand up on their own?  And they do not.

14      And let me begin by saying that I made a mistake a couple

15  of weeks ago.  If we can go to Slide 1.  I told Your Honor

16  that you were the sixth body to consider these insider trading

17  claims.  Based on Hunter Mountain's exhibit list, there is

18  actually one more, and I'll get to that in a moment.  So

19  you're actually -- this is the seventh attempt to peddle these

20  claims to one body or another.

21      The first was Mr. Dondero's 202 petition.

22      Everything I have here, Your Honor, is footnoted to

23  evidence.  Okay?

24      So, Footnote 1, you can look in the paragraphs of Mr.

25  Dondero's petition, his amended petition, his declaration,

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 1-72 Filed 06/23/25    Page 542 of 1011    PageID 2441

92

1    where he makes the same allegations.  Again, I misspeak.  Not

2    the same allegations.  Different versions of the allegations

3    that are being presented today concerning insider trading.

4        He did it three times.  The Texas state court said no

5    discovery.  In October of 2021, Douglas Draper wrote an

6    extensive letter to the U.S. Trustee, setting forth the same

7    allegations.  You can find them at our Exhibit 5.  It's

8    attachment Exhibit A, Pages 6 through 11.  Compare them to the

9    allegations that are being made by Hunter Mountain today.  The

10   U.S. Trustee's Office took no action.

11       Mr. Rukavina followed up with the same thing to the same

12   body in November of 2021.  You can see where his allegations

13   of insider trading are made and *quid pro quo* and all the rest

14   of it.  Again, they took no action.

15       The one that I don't have on this chart because I didn't

16   -- I made the chart last week and then was unavailable.  Mr.

17   Rukavina sent a second letter.  And you can find that at

18   Plaintiffs' Exhibit 61.  And in Plaintiffs' Exhibit 61, you'll

19   see that Mr. Rukavina sent yet another letter to the U.S.

20   Trustee's Office on May 11, 2022.

21       And these are all really important, right?  The U.S.

22   Trustee's Office has oversight responsibility for matters

23   including claims trading.  That's their job.  They took three

24   different swings at this.  And these are pages of allegations.

25   6 to 11.  9 to 13.  We think it's very important that the

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11 Filed 06/24/25   Page 543 of 1011   PageID 2442
Exhibit 72 Page 94 of 390

93

1   Court look at what was told to the U.S. Trustee's Office.  And

2   you're going to hear Mr. Seery testify that Highland has never

3   heard from the U.S. Trustee's Office concerning any of these

4   allegations or any of the other allegations that are set forth

5   in Mr. Rukavina and Mr. Draper's letter.  Never.  Declined to

6   even initiate an investigation.

7       Hunter Mountain filed its own 202 petition.  It boggles my

8   mind that they try to create distance with Mr. Dondero,

9   because the whole petition, like this whole complaint, is

10  based on Mr. Dondero.  He submitted a declaration alleging the

11  same insider trading case, and a second Texas state court said

12  I'm not even giving you discovery.  We know that's the result.

13      But the best is the Texas State Securities Board.  I think

14  we're going to hear testimony that Mr. Dondero or somebody

15  under his control is the one who filed the complaint with the

16  Texas State Securities Board.  Who would be the better body to

17  assess whether or not there's insider trading than a

18  securities board?  I can't imagine there's a better body.

19  They did an investigation.  Mr. Dondero could have told them

20  anything he wanted.  I'm sure he did.  And they wrote in their

21  motion in Paragraph 37 one of the reasons they have colorable

22  claims is the investigation is ongoing.

23      Much to their dismay, I'm sure, two days before our

24  opposition was due, the Texas State Securities Board said,

25  we've looked at the complaint, we've done our investigation,

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 72  Filed 06/25/25    Page 544 of 1011    PageID 2443
Exhibit 72 Page 95 of 390

94

1   and we're not taking any action.  You can find that, Your

2   Honor, Footnoted 5 at Exhibit 33.

3        You are now the seventh body who's being asked -- and

4   you're being asked to do substantially more than any of the

5   other prior bodies were.  The Texas state courts were being

6   asked, just let them have discovery.  They said no.  The U.S.

7   Trustee's Office, charged with the responsibility of looking

8   at claims trading, said, I'm not going to investigate.  I know

9   what you've told me.  No.  The Texas State Securities Board.

10  Insider trading, insider trading.  I'm not doing an

11  investigation.  I'm not doing anything.  And now they want to

12  come here and engage in, you know, in expensive, long

13  litigation over the same claims nobody else would touch.

14       Can we go to the next slide?

15       Mr. Dondero's email.  Good golly.  "Amazon and Apple are

16  in the data room."  There's a hundred articles out there that

17  they're putting into evidence that say that.  "Both continue

18  to express material interest."  There's a hundred articles out

19  there that say that.  "Probably a first-quarter event.  Will

20  update as facts change."

21       There will not be any evidence that he ever updated

22  anybody, because that wasn't the purpose of this, as Your

23  Honor will recall.  He had an axe to grind.

24       And I direct your -- I don't direct the Court to do

25  anything -- I ask the Court to take a look at our opposition

002073

1    to the motion, in Paragraphs 23 to 25, where we cite to

2    extensive evidence, all of which is now part of the record,

3    showing just what was happening, from the moment he got fired

4    on October 10th until the end of the year, with the

5    interference, with the interference, with the threats, with

6    the TRO.  It was nonstop.

7          Was this email sent in good faith by somebody who owed no

8    duty to anybody?  Or was it really just another attempt -- and

9    this is why the gatekeeper is so important, because I think

10   that's exactly what this Court is supposed to do:  Is this a

11   good-faith claim?  Is this a claim that's made in good faith?

12   It can't be.  And you know why?  You know what's -- you know

13   what's -- I'll just say it now.  I won't even save it for

14   cross.

15         Remember the HarbourVest settlement that they're making so

16   much, you know, about?  Mr. Dondero is the tipper.  According

17   to him, he gave Mr. Seery inside information.  According to

18   him, Mr. Seery abused it by engaging in the HarbourVest

19   transaction.  But Mr. Dondero filed an extensive objection to

20   the HarbourVest settlement and never said a word about this,

21   because that wasn't on his mind at the time.  The email was

22   sent in order to interfere.  And when that failed, he's trying

23   to play gotcha now.  It's ridiculous.

24         He owed no duty to Highland.  It would have been a breach

25   of his own duty to MGM to share that information at that

HCMLPHMIT00003108

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 1-1   Filed 06/02/25390   Page 546 of 1011    PageID 2445

96

1   period of time.

2       The shared services agreement.  They don't help him.  Mr.

3   Dondero has nothing to do with that.  Highland is providing

4   services.  He's not providing services to Highland.  Highland

5   was providing.  We had already given notice of termination.

6   We had already had our plan and disclosure -- we had already

7   had our disclosure statement approved.  We were weeks away

8   from confirmation.  Please.

9       And the *Wall Street Journal* article on December 21st at

10  Exhibit 27, that's not your garden-variety *Wall Street Journal*

11  article, because it specifically says that investment bankers

12  were engaged to start a formal process.  The investment

13  bankers are identified by name.  Something has changed.

14  Anybody could see that.

15      Yes, there were rumors for a long time.  Nobody had ever

16  said there was a formal process.  Nobody had ever said

17  investment bankers had ever been hired.  Nobody had ever

18  identified those investment bankers.  Right?  I mean, just the

19  world changed.

20      If you can go to the next slide.

21      You know, before I get to the next slide in too much

22  detail, *quid pro quo*.  We look at it as *quid*.  Did he -- is

23  there any evidence that he actually gave anybody material

24  nonpublic inside information?  The answer is going to be no.

25  The *quo* is the relationship.  And I'm not going to spend too

002075

HCMLPHMIT00003109

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 1-74   Filed 06/06/25   Page 547 of 1011    PageID 2446

97

1    much time on that now.  But wait until you hear Mr. Seery

2    testify as to the actual facts about his relationship.

3    Because some of what we just heard is mind-boggling, that

4    little -- that little page from the *Blockbuster* case, like, 14

5    years ago, where Farallon was one of a group of people who Jim

6    Seery never met.  Like, the stretch, what they're trying to do

7    is beyond the pale.  But I'm delighted to have Mr. Seery sit

8    in the box and answer all the questions they want to ask him

9    about his relationship with Farallon and Stonehill.

10        But getting to the point, the *quid pro quo*.  The *quo* is

11   they fixed his compensation?  Are you kidding me?  They

12   rubber-stamped his compensation?  Highland and Mr. Seery and

13   the board are alleged to have negotiated?  There's nothing

14   alleged.  There are facts.  There is evidence.  It is beyond

15   dispute.  If you look, just for example, right, they take

16   issue with his salary?  The salary was fixed by this Court in

17   2020.  Without objection.  He's getting the exact same salary

18   that he ever got.

19       You'll hear that it's a full-time job.  Your Honor knows

20   better than anybody in this courtroom, other than me, perhaps,

21   the litigation burden that's been placed on this man.  He has

22   no other income.  He doesn't do anything else.  This is a

23   full-time job.  It's the exact same job that he had when Your

24   Honor approved his compensation package three years ago,

25   without a raise.  They didn't give him a nickel more.  Not one

HCMLPHMIT00003110

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72   Filed 02/99/05390   Page 548 of 1011   PageID 2447

98

1   nickel.  It's outrageous.

2       The balance of his compensation, of which he has not yet

3   received a nickel, is exactly what this Court would want

4   somebody in Mr. Seery's position to do.  It aligns his

5   interests with his constituency.  Not with Stonehill.  Not

6   with Farallon.  With all creditors.  The greater the recovery,

7   the greater the bonus.  Outrageous, right?  Remarkable, isn't

8   it?  Only in their world.

9       If Your Honor can go back to Mr. Rukavina's letter,

10  because this is where it all -- that's where it all starts

11  from.  Like, excessive compensation.  Mr. Rukavina, I don't

12  know how he did this, why he did it, what it was based on.  He

13  actually told the U.S. Trustee's Office that they thought Mr.

14  Seery made $50 million.  It's in the letter.  $50 million,

15  they told the U.S. Trustee's Office he made.  It's footnoted,

16  so you can go find it.  It's right there, at Page 14.  Quote,

17  Seery's success fee could approximate $50 million.

18      $8.8 million is what he's making.  They think that's

19  excessive?  What do they think he should make?  Three?  Five?

20  We're not going to hear that.  But that's what this case is

21  about.  You just heard counsel in his opening statement.  He

22  literally said the only thing at issue is his compensation.

23  And that has to be the case, because if there was -- if there

24  was no claims trading, UBS and HarbourVest and Acis, right,

25  the Redeemer Committee, they would all still be holding these

HCMLPHMIT00003111

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 4-72   Filed 2100/25 390   Page 549 of 1011     PageID 2448

99

```
 1   claims today.

 2        When Stonehill and Farallon acquired the claims, they were

 3   all allowed.  There was no debate about what the claims were.

 4   If they held the claims today, they would be worth the exact

 5   same amount of money, only a different person would be

 6   benefitting from it.

 7        So the case actually is only about Mr. Seery's

 8   compensation.  And they've moved the goalposts, as often

 9   happens in this courtroom, from rubber-stamping -- I'll give

10   you what you want.  When I hear rubber-stamp, I hear, you make

11   a demand and I'll give it to you.  And now they realize, when

12   they see the negotiation -- because it's in evidence, it's

13   just the documents, you can see the board minutes -- what do

14   we, doctor the board minutes and they should get discovery

15   because we doctored the board minutes?  The board minutes show

16   a four-month negotiation with an Independent Board member

17   fully involved.  It's mind-boggling.  It's actually -- well,

18   I'll just leave it at that.

19        Next slide.  Last slide.  Let me finish up.  Three of the

20   four sellers were former Committee members.  Mr. Dondero

21   agreed that Committee members would have access to special

22   nonpublic inside information as part of the protocols, as part

23   of the corporate governance settlement.  He agreed to that.

24   These are the people who got abused?  These are the people who

25   didn't know what was happening?  Committee members and
```

HCMLPHMIT00003112

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 01/26    Page 550 of 1011    PageID 2449
Exhibit 72    Page 2101 of 390

100

1    HarbourVest, probably one of the biggest and most

2    sophisticated funds in the world, didn't know what was

3    happening?  They got abused?  Stonehill and Farallon took

4    advantage of them?

5        If you read their pleadings closely, they actually allege,

6    and I don't -- I don't know if there'll ever be any evidence

7    of this -- but they actually allege that -- I forget which --

8    oh, somebody is an investor in Stonehill and Farallon, and so

9    the theory is one of the sellers is an investor in Farallon.

10   So not only did they abuse, they abused one of their own

11   investors.  Like, this is not a colorable claim.  This is

12   ridiculous.

13       None of the claims sellers are here.  Sophisticated people

14   who -- who -- right?  Mr. Dondero could pick up the phone and

15   say, hey, guys, you got ripped off.  You sold your claims when

16   you shouldn't have.  They had an unfair advantage.

17       Nobody's here.  Where is anybody complaining?  They're not

18   going to because they cut a deal that they thought was good

19   for them at the time.  In hindsight, maybe they have regrets.

20   Right?  We all have regrets sometimes in hindsight.  But that

21   doesn't create a claim.

22       We've heard so much about what hedge funds would get and

23   how much and is this rational?  The fact of the matter is, at

24   the time Mr. Dondero had his phone call on May 28th, UBS had

25   not been purchased, although MGM had already been announced.

HCMLPHMIT00003113

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4172   Filed 02/26/390   Page 551 of 1011   PageID 2450

101

1    So when they talk about MGM, maybe it's the fact -- and this

2    is in evidence -- maybe it's the fact that, two days before,

3    the MGM-Amazon deal actually was publicly announced.  It

4    actually was.  So maybe when they say, hey, yeah, we like MGM,

5    because, you know, that just -- that just got announced.

6    Maybe that happened.

7        But at the end of the day, the claims that they bought, if

8    you just look at the claims that were purchased at the time he

9    had the conversation, all Mr. Seery had to do was meet

10   projections and they were going to get $33 million in two

11   years.  A 30 percent return in two years.  I don't know.  That

12   doesn't -- that doesn't sound crazy to me.  Doesn't sound

13   crazy to me.  It certainly doesn't create a colorable claim,

14   just because they think that Farallon or Stonehill -- there's

15   not going to be any evidence of Farallon or Stonehill's risk

16   profile.  There's not going to be any evidence of Farallon or

17   Stonehill's, you know, expected returns.  There's not going to

18   be any evidence at all about what due diligence they did or

19   didn't do, other than what comes out of Mr. Dondero's mouth,

20   as usual.

21       Mr. Dondero -- and let's look at what's going to come out

22   of Mr. Dondero's mouth.  He has multiple sworn statements.

23   I'm going to take his notes and they're going to become mine.

24   I'll put him on notice right now.  Because those notes bear no

25   relationship to the evolution of his sworn statements over

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 03/26/25   Page 552 of 1011   PageID 2451
Exhibit 72   Page 103 of 390

102

1    time.

2       The first time he mentions MGM in a sworn statement is two

3    years after the fact in Version #5.  That's a colorable claim?

4    You want -- you want to oversee a litigation, or maybe it gets

5    removed to the district court, maybe I get lucky to be in

6    front of a jury, and I'll have Mr. Dondero explain how it took

7    him five tries before he could write down the letters MGM.

8    Not a colorable claim.  No evidence against Stonehill

9    whatsoever.  Zero.  Zero.  Never spoke to them.  There's no

10   colorable claim here, Your Honor.

11      I'm going to turn the podium over to Mr. Stancil to talk

12   about the law.

13            THE COURT:  Okay.

14      OPENING STATEMENT ON BEHALF OF JAMES P. SEERY, JR.

15            MR. STANCIL:  Thank you, Your Honor.  Mark Stancil,

16   counsel for Mr. Seery.  But I'm going to just very briefly

17   address a few legal points.  And I actually mean briefly.

18            THE COURT:  Okay.

19            MR. STANCIL:  I'll come back to a good bit of this in

20   closing as time permits.

21      I heard Mr. McEntire say *Barton* doesn't apply.  I would

22   encourage him to start with what the gatekeeping order

23   actually says.  Here it is.  This is in -- it's in the plan.

24   Your Honor has confirmed it.  The question we have in terms of

25   what standard applies is, what does this order mean?  Well, we

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 11/04/25    Page 553 of 1011    PageID 2452

103

1    think that's going to be clear.  It's not what they think the

2    word "colorable" would mean in other contexts.  It's not what

3    they think they should have to satisfy now that they have a

4    theory.  It's, what does this mean?

5        And we'll get into some of the additional evidence from

6    Your Honor's order at the time, later in closing.

7        Next slide, please.

8        But let me just start to say I'm awfully surprised to hear

9    him say that he doesn't believe *Barton* applies, because the

10   order says that it does.  This is Paragraph 80 of the

11   confirmation order.  It says that the Court has statutory

12   authority to approve the gatekeeper provision under these

13   sections of the Bankruptcy Code.  The gatekeeper provision is

14   also within the spirit of the Supreme Court's *Barton* Doctrine.

15   The gatekeeper provision is also consistent with the notion of

16   a pre-filing injunction to deter vexatious litigants that has

17   been approved by the Fifth Circuit in such cases as *Baum v.*

18   *Blue Moon Ventures*.

19       So I think it is impossible, and respectfully, Your Honor,

20   it's law of the case.  This is what the order is based on.

21   The day for objecting to what's in the confirmation order is

22   long gone.

23       So let me come back, then -- first slide, please -- and

24   I'll just very briefly give you a little legal framework for

25   what we're going to be arguing to you later in closing.

HCMLPHMIT00003116

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 06/05/25   Page 554 of 1011    PageID 2453
Exhibit 72   Page 105 of 390

104

1      So, *Barton* does require a *prima facie* showing.  That is

2  *Vistacare* and plenty of other cases.  That is more than a

3  12(b)(6) standard, Your Honor.  Numerous courts agree.  And in

4  fact, as you'll hear us discuss later, Judge Houser's opinion

5  is not to the contrary, because she said explicitly, I'm not

6  applying *Barton*.  So anything that they're relying on for what

7  *Barton* requires from that opinion is *dicta*.  But we can show

8  you case after case after case, and we will, to show that

9  *Barton* requires evidentiary hearings.

10      Here's a point, this third bullet here is something I have

11  not heard a single word in all of the briefing and ink that

12  has been spilled and in as long as we've been here this

13  morning, is what is a gatekeeping order doing if all it does

14  is reproduce a 12(b)(6) standard?  That's what they say.  In

15  fact, they're actually saying it's even lower.  Now I think I

16  heard them say it's even lower than a 12(b)(6) standard.

17      That makes no sense whatsoever.  We've just shown you that

18  this gatekeeping order was imposed consistent with *Barton* and

19  vexatious litigant principles.  Later I will walk Your Honor

20  through factual findings that you made detailing the vexatious

21  litigation, detailing the abuses.  The notion that the gate is

22  the same gate that every other litigant who hasn't

23  demonstrated that record of bad faith is absurd, and it serves

24  no purpose.

25      And as Mr. Morris described, Hunter Mountain woefully,

HCMLPHMIT00003117

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 06/06/25 Page 555 of 1011   PageID 2454
Exhibit 72   Page 106 of 390

105

1   woefully violates any *prima facie* showing.  And we'll get into

2   a little bit more exactly how that works.

3       We are going to ask this Court, in addition to ruling that

4   *Barton* applies and that they've failed it, we're going to ask

5   this Court, respectfully, to please consider ruling on

6   multiple independent grounds as well.  We know there's a

7   penchant for appeals and appeals upon appeals.  So we will

8   argue to Your Honor, although we will largely spare you

9   another rehash of our briefs, but we will explain to Your

10  Honor why they do lack standing to bring this claim as a

11  matter of Delaware law.  And there was a lot of fuzzing up

12  about constitutional standing and Delaware law.  Not

13  necessary.

14      If -- we will be happy to rely on our pleadings here, but

15  on Page 27 of the Claimant Trust Agreement, that's what

16  defines their rights under Delaware law, and they were talking

17  about how beneficial owners under Delaware law have standing.

18  Well, are they beneficial owners?  They are not.  Equity

19  holders -- this is in Paragraph C, Page 27 of the Claimant

20  Trust Agreement -- Equity holders will only be deemed

21  beneficiaries under this agreement upon the filing of a

22  payment certification with the bankruptcy court, at which time

23  the contingent trust interests will vest and be deemed equity

24  trust interests.

25      They are not beneficial owners of squat.  That has not

HCMLPHMIT00003118

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 10/07/25    Page 556 of 1011    PageID 2455
Exhibit 72    Page 107 of 390

106

1   happened.

2        And last, Your Honor, we will -- and I will organize this

3   for Your Honor in closing as well -- we would ask you to rule

4   on a straight-up 12(b)(6) standard as an alternative, because

5   we know what's coming on appeal and we think their complaint

6   collapses under its own weight.  You heard Mr. Morris

7   detailing their own math shows significant returns.  You'll

8   also hear us describe how they have nothing but mere

9   conclusions and naked assertions upon information and belief

10  but unsupported.

11       *Iqbal* and *Twombly* would still apply under their 12(b)(6)

12  standard, especially, and perhaps even more with a heightened

13  standard under Rule 9(b), because they're essentially alleging

14  some version of fraud, it sounds like.

15       They're never going to get there, Your Honor.  All we

16  would ask is for a full record to take inevitably,

17  unfortunately, to the Court of Appeals.

18       And I think Mr. -- I'm not sure which of my colleagues

19  will be speaking briefly for Holland & Knight, but I'll just

20  turn it over to them.

21            THE COURT:  All right.  Mr. McIlwain?

22       OPENING STATEMENT ON BEHALF OF THE CLAIM PURCHASERS

23            MR. MCILWAIN:  Thank you, Your Honor.  I'll be even

24  briefer.  Brent McIlwain here for the Claim Purchasers.

25       Your Honor, Mr. McEntire stated to this Court that my

HCMLPHMIT00003119

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72   Filed 12/08/25   Page 557 of 1011   PageID 2456
Exhibit 72   Page 108 of 390

107

1   clients have never denied any of this.  In fact, in his reply,

2   he says, The Claim Purchasers do not deny that they invested

3   over $163 million.  We do not deny that we did not due

4   diligence, we do not deny that we refused to sell our claims

5   at any price, and we do not deny that we invested the claims

6   at what is, at best, a low ROI.

7        We had no duty to answer to HMIT or Mr. McEntire.  We had

8   no duty when we bought these claims to -- we had no duties to

9   any creditor.  We had -- it was a bilateral agreement with a

10  third party.  And frankly, Your Honor, it's not Mr. Dondero's

11  or HMIT's business what due diligence we did and what

12  information that we obtained.

13       But I will tell you right now, Your Honor, we were very

14  careful in our pleadings to not bring issues of fact, because

15  this -- HMIT has been chasing my clients, obviously, based on

16  the notes that were presented in the initial PowerPoint, it

17  was a -- it's retribution.  It's retribution for not agreeing

18  to sell the claims to Mr. Dondero when he offered to purchase

19  at a 40 percent premium.

20       And Your Honor, when I look at that note, it's

21  interesting, because I hadn't seen the note, obviously, until

22  it showed up on the exhibit list.  When you look at that note,

23  I think it's -- I think it's very interesting.  To the extent

24  it was contemporaneous, I don't know.  But what it shows, it

25  shows that if you're a hammer, everything's a nail.  And Mr.

002086

1   Dondero is a vexatious litigator.  And what did he write down?
2   Discovery to follow.
3        But my question is this.  Who was trying to trade on
4   inside information?  Mr. Dondero was offering a 40 percent
5   premium, allegedly, on the cost.  What information did he
6   have?  Certainly, he had inside information.
7        My client owed no duty to Mr. Dondero.  My client owed no
8   duty to anybody in this estate at the time of these claims
9   purchase.
10       And Your Honor, we talk a lot about -- or, it's been
11   talked a lot of insider trading.  These are claims trades.  I
12   think the Court honed in on this from the very get-go.  The
13   Court does not have a role in claims trades.  There's a 3001
14   notice that's filed post-claims trade, but there's no
15   requirement that there's Court approval.
16       And these aren't securities.  It's not as if we're trading
17   claims and it could benefit or hurt you based on some equity
18   position that you're going to obtain.  We obtained claims that
19   had been settled, they were litigated heavily, and the most
20   that we can obtain is the amount of the claim.  And that is,
21   as Mr. Morris stated, all that changed was the name of the
22   claimant.  That's all.  Because the claims didn't increase in
23   value based on the trade.
24       Your Honor, our pleadings, I think, speak for themselves
25   in terms of you really -- you really don't have to consider

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-72    Filed 10/02/25    Page 559 of 1011    PageID 2458

109

1   evidence, from our perspective, to determine that this

2   proposed complaint has no merit and is not plausible and

3   presents no colorable claims.

4        The gatekeeper provision, and we're going to talk a lot

5   about that today, obviously, right, requires that Mr. Dondero

6   establish a *prima facie* case that the claims have some

7   plausibility.  If you can simply write down allegations, file

8   a motion for leave and attach those allegations and say, Your

9   Honor, you have to take all these as true, the gatekeeper has

10  no meaning.  There's no point in having a gatekeeper

11  provision.

12       And in summary, Your Honor, what -- and I think Mr. Morris

13  honed in on this specifically -- this really comes down to

14  compensation.  Right?  Because this -- the allegation is that

15  my clients purchased claims, presumably at a discount, right,

16  based on some inside information, which we obviously deny, but

17  we don't have to put that at issue today.  For what purpose?

18  For what purpose?  So we got inside information from Mr. Seery

19  so that we could then scratch his back on compensation on the

20  back-end?

21       Your Honor, there is no reason that my clients need to be

22  involved in this litigation.  If HMIT thinks that this -- that

23  they have a claim against Mr. Seery for excessive

24  compensation, they can -- they could have brought such a

25  gatekeeper motion, or a motion for leave under the gatekeeper

HCMLPHMIT00003122

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 11/21/25   Page 560 of 1011   PageID 2459
Exhibit 72   Page 2101 of 390

110

1  provision, without including my clients.  Why did they include

2  my clients?  They included my clients because my clients did

3  not sell to Mr. Dondero when he called, unsolicited, to try to

4  get information.  It's retribution.  And that's what a

5  vexatious litigator does, and that's why the gatekeeper

6  provision is in place.

7       I'll reserve the rest for closing, Your Honor.

8            THE COURT:  All right.  Caroline, what was the

9  collective time of the Respondents?

10           THE CLERK:  Twenty-eight minutes and 37 seconds.

11           THE COURT:  Twenty-eight minutes, 37 seconds.

12     All right.  Well, let's talk about should we take a lunch

13  break now?  I'm thinking we should, because any witness is

14  going to be, I'm sure, more than an hour.  So can you all get

15  by with 30 minutes, or do you need 45 minutes?  I'll go with

16  the majority vote on this.

17      (Counsel confer.)

18           MR. MCENTIRE:  1:00 o'clock.  45 minutes.

19           MR. MORRIS:  40 minutes, whatever.  1:00 o'clock?

20           THE COURT:  We'll come back at 1:00 o'clock.

21           MR. MORRIS:  Thank you, Your Honor.

22           THE COURT:  Okay.  Thank you.

23           THE CLERK:  All rise.

24      (A luncheon recess ensued from 12:19 p.m. until 1:05 p.m.)

25           THE CLERK:  All rise.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 12/02/25   Page 561 of 1011   PageID 2460
Exhibit 72   Page 102 of 390

111

```
 1              THE COURT:  All right.  Please be seated.  We're
 2    going back on the record in the Highland matter, the Hunter
 3    Mountain motion for leave to file lawsuit.
 4        I'll just let you know that at 1:30 we're going to take
 5    probably what will be a five-minute break, maybe ten minutes
 6    at the most, because I have a 1:30 motion to lift stay docket.
 7    Just looking at the pleadings, I really think maybe one is
 8    going to be resolved and it won't be more than five or ten
 9    minutes.  So whoever is on witness stand can either just stay
10    there, because I think we won't be finished, or you can take a
11    bathroom break or whatever.  All right?  So, it's video, the
12    1:30 docket.
13        All right.  So, Mr. McEntire, are you ready to call your
14    first witness?
15              MR. MCENTIRE:  I am, Your Honor.
16              THE COURT:  Okay.
17              MR. MCENTIRE:  May I proceed?
18              THE COURT:  You may.
19              MR. MCENTIRE:  At this time, Hunter Mountain calls
20    Mr. James Dondero.
21              THE COURT:  All right.  Mr. Dondero, welcome.  If you
22    could find your way to the witness box, I will swear you in
23    once you're there.  It looks like you've got lots of notebooks
24    there.  Please raise your right hand.
25        (The witness is sworn.)
```

002090

Dondero - Direct                    112

```
 1              THE COURT:  All right.  Thank you.  You may be

 2    seated.

 3              MR. MCENTIRE:  I'm not familiar with your procedure.

 4    Should I approach the -- here to --

 5              THE COURT:  If you would, unless you're having --

 6              MR. MCENTIRE:  That's fine.

 7              THE COURT:  -- any kind of --

 8              MR. MCENTIRE:  That's fine.  I'm not.

 9              THE COURT:  -- knee issues or, you know, sometimes

10    people want to stay seated for that reason.

11              MR. MCENTIRE:  Your Honor, again, my tender of Mr.

12    Dondero as a witness is subject to our running objection on

13    the evidentiary format.

14              THE COURT:  Understood.

15        JAMES DAVID DONDERO, HUNTER MOUNTAIN INVESTMENT TRUST'S

16                          WITNESS, SWORN

17                        DIRECT EXAMINATION

18    BY MR. MCENTIRE:

19    Q    Mr. Dondero, would you state your full name for the

20    record, please?

21    A    James David Dondero.

22    Q    With whom are you currently -- what company are you

23    currently affiliated with?

24    A    Founder and president of NexPoint.

25    Q    All right.  And I think the Court is well aware, but would
```

002091

Dondero - Direct                          113

1    you just briefly describe your prior affiliation with -- was

2    it Highland Capital?

3    A    Yes.

4    Q    What was that affiliation?

5    A    President and founder for 30 years, and then to facilitate

6    an expeditious resolution of the estate I handed the reins to

7    three Independent Board members and I became a portfolio

8    manager until October of -- I was an unpaid portfolio manager

9    until October of '20.

10   Q    Thank you, sir.  Do you have any current official position

11   with Hunter Mountain Investment Trust?

12   A    No.

13   Q    Can you describe for us, sir, any actual or control you

14   attempt to exercise on the business affairs of Hunter Mountain

15   Investment Trust?

16   A    None.

17   Q    Are you -- do you have any official legal relationship

18   with Hunter Mountain Investment Trust where you can attempt to

19   exercise either direct or indirect control over Hunter

20   Mountain Investment Trust?

21   A    I do not.

22   Q    Did you participate -- personally participate in the

23   decision of whether or not to file the proceedings that are

24   currently pending before Judge Jernigan?

25   A    I did not.

HCMLPHMIT00003126

Dondero - Direct                                   114

1    Q    As the former CEO of Highland Capital, are you familiar

2    with the types of assets that Highland Capital owned?  On the

3    petition date?

4    A    Yes.

5    Q    And have you been monitoring these proceedings and the

6    disclosures in these proceedings since the petition date?

7    A    Yes.

8    Q    Okay.  Can you describe generally for me the types of

9    assets on the petition date that Highland Capital owned?  The

10   types of assets?  Describe the types of assets -- companies,

11   stocks, securities, whatever, whatever you -- however you

12   would describe it.

13   A    There were some securities, but it was primarily

14   investments in private equity companies and interests in

15   funds.

16   Q    Okay.  I've heard the term portfolio company.  What is a

17   portfolio company?

18   A    A portfolio company would be a private equity company that

19   we controlled a majority of the equity and appointed and held

20   accountable the management teams.

21   Q    Would there be separate management, separate boards, for

22   those portfolio companies?

23   A    Yes.

24   Q    All right.  How many portfolio companies were there on the

25   petition date, if you're aware?  If you recall?

002093

HCMLPHMIT00003127

Dondero - Direct                    115

1    A    Half a dozen, of different sizes.

2    Q    Can you identify the names, if you recall?

3    A    Yes.

4    Q    What are those names?

5    A    Trussway, Cornerstone, some small -- Carey International,

6    CFA, SSP Holdings.  Yeah, to a lesser extent, OmniCare.

7    Q    All right.

8    A    Or, um, --

9    Q    In addition to the portfolio --

10    A    Sorry.

11    Q    -- of companies in which Highland Capital would own

12    interests, did Highland also have interests in various funds?

13    A    Yes.  I said OmniCare.  I meant OmniMax, I think was the

14    name.

15    Q    What type of funds?

16    A    I'm sorry.  The funds were usually funds that we were

17    invested in or seeded or managed.  So they're things like

18    Multistrat, Restoration, a Korea fund, PetroCap.

19    Q    Are these managed funds by Highland Capital?  Or were

20    they?

21    A    Yes.  Pretty much, with the exception of PetroCap.  We

22    were a minority -- a minority -- a large -- a large minority

23    investor with a sub-advisor.

24    Q    Did Highland Capital Management on the petition date own

25    an interest, a direct security interest in MGM?

002094

Exhibit 72    Page 107 of

Dondero - Direct                                    116

1    A    Yes.  And I -- yes.

2    Q    Did the various portfolio companies that you've

3    identified, did one or more of those portfolio companies also

4    own MGM stock?

5    A    Yes.

6    Q    Did the various funds that you've identified, did one or

7    more of those funds also own MGM stock?

8    A    Yes.  Between -- yes.  Between the CLOs, the funds,

9    Highland directly, it was about $500 million that eventually

10   got taken out for about a billion dollars.

11   Q    Okay.  $500 million is what you said?

12   A    Approximately.  Depending on what mark, what time frame.

13   But ultimately they got taken out for about a billion dollars.

14   Q    Okay.  And as a consequence of these investments,

15   significant investment -- first of all, how would you describe

16   that magnitude of investments?  Is that a significant

17   investment from the perspective of MGM?

18   A    Yes.

19   Q    As a consequence, what role, if any, did you play in terms

20   of MGM's governance?  Were you -- did you become a member of

21   the board of directors?

22   A    Yes.  I was a board member for approximately ten years,

23   and myself and the president of Anchorage, between our two

24   entities, we had a majority of the equity in MGM.

25   Q    Okay.  If there was a third party, not familiar with the

HCMLPHMIT00003129

Dondero - Direct                    117

 1  management of Highland Capital, who had been monitoring these

 2  bankruptcy proceedings as you have, was there any way that a

 3  third-party stranger to this bankruptcy proceeding could, from

 4  your perspective, actually appreciate or identify the -- all

 5  the details of the investments that Highland Capital had?

 6          MR. MORRIS:  Objection to the form of the question.

 7  It calls for speculation.  He's not here as an expert today.

 8  He shouldn't be allowed to testify what a third party would or

 9  wouldn't have thought or known.

10          MR. MCENTIRE:  Well, I'll --

11          THE COURT:  I'll overrule.

12  BY MR. MCENTIRE:

13  Q    Mr. Dondero?

14  A    The disclosures in the Highland bankruptcy were scant.  I

15  think there was six or eight line items listed, the

16  descriptions of which were limited.  But it didn't include --

17  it didn't include a broad listing of all the funds, and it

18  didn't include subsidiaries or any net value or any offsetting

19  liabilities or risks of any of the underlying companies or

20  investments, either.

21          MR. MCENTIRE:  Would you put up Exhibit 3, please?

22  BY MR. MCENTIRE:

23  Q    Mr. Dondero, we're going to -- do you have a screen in

24  front of you as well?

25  A    Yes.

HCMLPHMIT00003130

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 4-72   Filed 10/09/25   Page 568 of 1011     PageID 2467
Exhibit 72   Page 2103 of 390

Dondero - Direct                    118

1  Q   We're going to put up Exhibit 3, and I'm going to ask you

2  some questions about it.  First of all, would you identify

3  Exhibit 3?

4  A   It didn't come up on my screen yet.

5  Q   Still not up there?

6  A   Yes.  Now it is.

7  Q   Can you identify Exhibit 3, please?

8      (Discussion.)

9  Q   There we go.  Mr. Dondero, would you identify Exhibit 3,

10  please?

11  A   This was an email I sent to Compliance and relevant people

12  to put -- to put MGM on the restricted list.

13  Q   It indicates it was on December 17, 2020.  Did you

14  personally author this email?

15  A   Yes.

16  Q   You sent it to multiple individuals, including Mr.

17  Surgent.  Was Mr. Surgent an attorney at Highland Capital at

18  the time?

19  A   He was head of compliance for both organizations.

20  Q   Scott Ellington?  Is he an attorney?  Was he an attorney

21  at the time?

22  A   He's the general counsel of Highland.

23  Q   You also sent it to someone at NexPoint Advisors, Jason

24  Post.  Who is Mr. Post?

25  A   Mr. Post was head of compliance at NexPoint Advisors and a

002097

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 21/20/25    Page 569 of 1011    PageID 2468
Exhibit 72    Page 120 of 390

Dondero - Direct                          119

1  subordinate of Thomas Surgent's.

2  Q    Jim Seery.  Mr. Seery, of course.  You also addressed it

3  to Mr. Seery?

4  A    Yes.

5  Q    It says, Trading Restrictions Re: MGM Material Nonpublic

6  Information.  What did you mean by the term "material

7  nonpublic information"?

8  A    Material nonpublic information is when you have material

9  nonpublic information that the public does not have, and it

10  essentially makes you an insider and restricts you from

11  trading.

12  Q    All right.  It says, Just got off a pre-board call.

13      First of all, you generated this in the ordinary course of

14  your business, did you not?

15  A    Um, --

16  Q    This email.

17  A    Yes.

18  Q    Okay.

19  A    Yes.

20  Q    And --

21  A    Any restricted list.  Restricted list items happen all the

22  time in the normal course of business.

23  Q    And you've maintained a copy of this email as well, have

24  you not?

25  A    I'm sure we have one.  I don't have it personally.

HCMLPHMIT00003132

Dondero - Direct                          120

1    Q    Fair enough.  But you're -- you have -- you have access

2    and custody over emails, correct?

3    A    Not any of my Highland emails.

4    Q    But those were left.  Right?

5    A    Yes.  Yes.

6              MR. MORRIS:  Your Honor, I mean, he's leading the

7    witness at this point, so I'm just --

8              MR. MCENTIRE:  That's fine.

9              MR. MORRIS:  I'm just --

10             THE COURT:  Okay.  Sustained.

11             MR. MORRIS:  -- going to be sensitive to it.

12             THE COURT:  Sustained.

13   BY MR. MCENTIRE:

14   Q    Mr. -- this is a true and accurate copy of the email that

15   you sent, is it not?

16   A    It appears to be.

17             MR. MCENTIRE:  At this time, I would offer Exhibit 3

18   into evidence, Your Honor.

19             THE COURT:  Okay.  I'm looking through what we

20   admitted earlier.  Did we not --

21             MR. MCENTIRE:  This already may be in evidence.

22             THE COURT:  Yes.  I'm --

23             MR. MCENTIRE:  I don't --

24             THE COURT:  Was there any objection?

25             MR. MORRIS:  There wasn't.  I mean, --

1           THE COURT:  I think there was an objection that I

2    overruled.

3           MR. MORRIS:  No.  There wasn't.  I mean,

4    unfortunately, we've gotten the short end of the stick here,

5    because all of their documents are in evidence, and I got

6    caught short because I'm going to have to do it the old-

7    fashioned way.  But yes, this is in evidence.

8           MR. MCENTIRE:  Okay.  Fair enough.

9           MR. MORRIS:  Because -- actually got through all of

10   their documents.

11          MR. MCENTIRE:  Fair enough.

12          THE COURT:  Okay.  All right.

13   BY MR. MCENTIRE:

14   Q   So, Mr. --

15          THE COURT:  So it's in evidence.

16   BY MR. MCENTIRE:

17   Q   -- Dondero, going back to Exhibit 3, it says, Just got off

18   a pre-board call.

19       Is that the MGM board, a pre-board call?

20   A   Yes.

21   Q   What is a pre-board call?

22   A   It's a pre-board call that usually sets the agenda.  And,

23   again, myself and the Anchorage guys, we would move in

24   locksteps, in a coordinated fashion, generally, in terms of

25   agenda and company policy.

002100

Dondero - Direct                    122

```
 1   Q    It says, Update is as follows.  Amazon and Apple actively
 2   diligencing in the data room.
 3        What was your understanding of -- of -- what was your
 4   intent in conveying that information to the recipients?
 5   A    The intent was really in the last sentence, or second-to-
 6   last sentence, that the transaction was likely to close.
 7   Amazon had come back.  We had turned Amazon away earlier in
 8   the year at $120 a share, and they said they wouldn't be
 9   willing to pay more.  And --
10            THE COURT:  Is there an objection?
11            MR. MORRIS:  There is an objection.  None of this was
12   shared with Mr. Seery, all of this background that we're --
13   that we're doing.  He -- I would request that we stick with
14   the -- only the information that was given to Mr. Seery, like
15   -- like he's talking about his intent.  Like, who cares at
16   this point?
17            MR. MCENTIRE:  Well, --
18            MR. MORRIS:  This is what Mr. Seery got.
19            THE COURT:  Okay.  What is your response to that?
20            MR. MCENTIRE:  I have a response to -- well, they've
21   -- they've questioned his intent in sending this in his
22   opening statement.
23            MR. MORRIS:  Ah.
24            MR. MCENTIRE:  And I'm trying to make it clear what
25   his intent was.
```

HCMLPHMIT00003135

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 12/24/25    Page 573 of 1011    PageID 2472
Exhibit 72    Page 2124 of 2390

Dondero - Direct                         123

1              MR. MORRIS:  So, you know what, Your Honor?  *Quid pro*

2     *quo*.  Now we're going to do a real *quid pro quo*.  He can ask

3     him about his intent, and then he can't object to all of the

4     other documents and exhibits that I say prove that this was

5     here only to interfere with Mr. Seery's trading activity.

6     I'll do that *quid pro quo*.

7              MR. MCENTIRE:  May I proceed, Your Honor?

8              THE COURT:  You may.  Objection is overruled.

9     BY MR. MCENTIRE:

10    Q    Mr. Dondero, what was your intent in communicating --

11    A    Okay.

12    Q    -- that probably a first-quarter event?  What was your

13    understanding?

14    A    After 30 years of compliance education:  Taint one, taint

15    all.  We were all sitting together.  I -- the trading desk was

16    right outside my desk.  All the employees of Highland that

17    would eventually move to NexPoint, all the ones that would

18    eventually move to Skyview, all the ones that eventually moved

19    to Jim Seery, were all within 30 feet of my desk.

20    Q    What do you mean by "Taint one, taint all"?

21    A    That's a compliance concept that, as a professional, you

22    have a responsibility, when you are in possession of material

23    nonpublic information, to put something on the restricted list

24    so that it's not traded.  Okay?  And you can't -- one person

25    can't sit in their cube and say they know something and not

HCMLPHMIT00003136

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 74 Filed 2125/26 390  Page 574 of 1011    PageID 2473
Exhibit 72   Page 2125/26

Dondero - Direct                                      124

1  tell anybody else, such that the rest of the organization

2  trades.  That's not the way compliance works.

3  Q    It says also no -- also, any sales are subject to a

4  shareholder agreement.

5       What was the meaning of that or the intent of that?

6  A    There was a stringent shareholder agreement, particularly

7  among the board members, that no shares could be bought or

8  sold without approval of the company.

9  Q    The company here being MGM?

10  A    MGM, yes.

11  Q    What is a restricted list?

12  A    A restricted list is when you believe as an investment

13  professional that you have material nonpublic information, you

14  notify Compliance, and then Compliance notifies the entire

15  organization and prevents any trading in that security.

16  Q    You mentioned the doctrine taint one, taint all.  If an

17  individual or -- if an individual within a company setting is

18  found to have traded on material nonpublic information, what

19  is the potential consequence or sanction?

20       MR. MORRIS:  Objection, Your Honor.  This is like a

21  legal conclusion.  He's not a law enforcement officer.  He's

22  not a securities officer.  What are we doing?

23       MR. MCENTIRE:  I can rephrase.

24       THE COURT:  Okay.  He's going to rephrase.

25  BY MR. MCENTIRE:

HCMLPHMIT00003137

Dondero - Direct                                    125

1    Q    Based upon your years -- based upon your years of

2    experience as a board member of MGM, based upon your years of

3    experience as a CEO of Highland Capital and an executive that

4    trades in securities and has sold securities, what is your

5    understanding, from a non-legal perspective, of what the risks

6    are associated with trading on material nonpublic information?

7    A    You could be -- you would be fired from the organization

8    if you did.  You could be banned from the securities industry.

9    The industry can shut down the -- or, the SEC can shut down

10   the advisor or they can fine the advisor.

11   Q    Do you know what a compliance log is?

12   A    Yes.

13   Q    Should MGM have been placed on a compliance log at

14   NexPoint?

15   A    Throughout the organization -- throughout the

16   organization, it should -- it should and it was on all -- at

17   all organizations, yes.

18   Q    Should it have been placed on a -- on a compliance log to

19   Highland Capital, from your perspective?

20   A    Yes.

21   Q    Can you give us any explanation of why, to your knowledge,

22   why MGM would be taken off the restricted list in April of

23   2021 at Highland Capital?

24   A    When an investment professional puts something on the

25   restricted list, in order for it to come off the restricted

002104

Dondero - Direct                    126

 1   list, the material nonpublic information has to be public.  So

 2   there has to be a cleansing that occurs by the company.

 3   Q    To the extent that you were no longer affiliated with

 4   Highland Capital in the early portion, the first quarter of

 5   2021, does that somehow cleanse the material nonpublic

 6   information that you identified?

 7   A    It does not.

 8   Q    Why not?

 9   A    Because the -- it -- the company hasn't -- the company

10   didn't come out and make public the information that we knew

11   from a private perspective that the transaction was about to

12   go through.

13   Q    You sat here during opening statements when Mr. Morris

14   referred to the various news coverage and media coverage

15   concerning MGM and the fact that people had expressed interest

16   in buying in the past?

17   A    Yes.  And at the board level, we had entertained numerous

18   ones.  There were rumors that had no basis in fact, and there

19   were negotiations we had with people that were never in the

20   news.  But none of them got to this degree of certainty where

21   it was going to close within a couple months.

22   Q    From your perspective as an investment professional, with

23   the years of experience that you described for the Court, what

24   is the difference between receiving an email from a board

25   member such as yourself and rumors or suggestions of possible

HCMLPHMIT00003139

1   sale in the media?

2   A    I knew with certainty from the board level that Amazon had

3   hit our price, agreed to hit our price, and it was going to

4   close in the next couple months.

5   Q    That's not rumor or innuendo; that's hard information from

6   a member of the MGM board?

7   A    Correct.

8           MR. MCENTIRE:  All right.  You can take that down,

9   please, Tim.

10  BY MR. MCENTIRE:

11  Q    I want to talk a little bit about due diligence.  When you

12  were the chief executive officer of Highland Capital, --

13  A    Yes.

14  Q    -- can you tell us whether Highland Capital ever involved

15  itself in the acquisition of distressed assets?

16  A    Yes.  We did a fair amount of investing in distressed

17  assets.

18  Q    What is a distressed asset?

19  A    It's something that trades at a discount, where the

20  certainty and the timing of realizations or contractual

21  obligations is uncertain.

22  Q    Is a -- well, let me back up.  Has Highland -- did

23  Highland Capital ever invest in unsecured claims in connection

24  with bankruptcy proceedings?

25  A    Yes.

002106

HCMLPHMIT00003140

Dondero - Direct                                    128

1    Q    And in terms of the -- on the spectrum of risk, where does

2    an unsecured creditor claim in a bankruptcy proceeding kind of

3    rank in terms of the uncertainties or risk, from your

4    perspective?

5    A    It's high risk.  It's a -- yeah, it would be highly-

6    distressed, generally.

7    Q    Explain to us -- I know the Court is very familiar with

8    claims trading.  Explain to us from your perspective as an

9    investment -- a seasoned investment expert or executive what

10   those risks are.  What types of risk are associated with such

11   an investment?

12   A    You have to evaluate the assets tied to the claim

13   specifically.  Or if it's an unsecured in general, the assets

14   in general in the estate.

15        You have to handicap the realization that a distressed

16   seller might not get full value for something.  You have to

17   handicap the likelihood around that.  And then you have to

18   handicap the timing, and then you have to handicap the

19   expenses and the other obligations of the estate, and then

20   handicap risk items that aren't known or that are difficult if

21   not impossible to underwrite, like unknown litigation or last-

22   minute litigation or claims or something.

23   Q    And all these handicapping, this handicapping process, how

24   does that impact the price or the investment that you're

25   willing to make?  Generally?

002107

 1  A    Generally, you put a much higher discount rate.  You know,

 2  like if you would do debt at 10 percent and a normal public

 3  equity at a 15 percent return, you would do distressed or

 4  private equity investing at a 20, 25 percent return

 5  expectation to offset the risk and the unknowns.

 6  Q    In order to handicap an investment in an unsecured

 7  creditor's claim appropriately to reach an informed decision,

 8  what type of data would you need to have access to?

 9          MR. MORRIS:  Objection to the form of the question.

10  He's not here as an expert.  He's here as a fact witness.  He

11  should -- he should limit himself to that instead of talking

12  about what investors should be doing.

13          MR. MCENTIRE:  Well, Your Honor, with all due

14  respect, he's here as the former CEO of Highland Capital.  He

15  has experience, firsthand knowledge experience, and he also

16  has expertise because of his education, his career, and

17  training.

18      And again, there's no limitation here under the Rules

19  about what type of information I can elicit from him in this

20  proceeding.  This is, whether you call it expert testimony, I

21  call it personal knowledge, but it has some expert aspects to

22  it, but I think that's fair and appropriate.

23          THE COURT:  Well, I think you can ask what kind of

24  data would you rely on, would Highland Capital or entities

25  he's been in charge of rely on, --

HCMLPHMIT00003142

Dondero - Direct                    130

1             MR. MCENTIRE:  I understand.

2             THE COURT:  -- but not what would people rely on.  So

3    I sustain the objection partially.

4             MR. MCENTIRE:  All right.

5    BY MR. MCENTIRE:

6    Q   Mr. Dondero, I'll rephrase the question.  When you were

7    the chief executive officer of Highland Capital before Mr.

8    Seery took the reins, and you, your company, Highland Capital,

9    was investing in an unsecured creditor's claims, what due

10   diligence, what type of information would you expect your team

11   to explore and investigate?

12   A    Sure.  Distressed investment in a trade claim would be

13   among our thickest folders, it would be among our most

14   diligenced items, because you have those three buckets, the

15   value of the assets, again, and the ability and timing of

16   monetization of those as a not strong -- as a weak seller, and

17   then you would have the litigation or claims against those,

18   and then you would have to also have a third section of

19   analysis for the litigation risk of the estate overall.

20   Q   What type of legal analysis or legal due diligence would

21   you have required as the CEO of Highland Capital?

22   A    At Highland, we would have had third-party law firms, in

23   addition to our own legal staff, in addition to our own

24   business professionals, reviewing all the analysis and the

25   assumptions.

002109

HCMLPHMIT00003143

Dondero - Direct                                    131

```
 1   Q   With regard to a financial analysis, what types of
 2   financial due diligence would you have required?
 3   A   It would have been a detailed -- a detailed analysis of
 4   all the cash flows on the particular underlying investments,
 5   and an evaluation and valuation of what those companies or
 6   investments were worth.
 7   Q   Why is it important to look at the underlying value of the
 8   asset?
 9   A   Because that -- those are what will be monetized in order
10   to give you a return on the claims or securities that you buy
11   in a distressed situation.
12           MR. MCENTIRE:  Tim, would you please put up Exhibit
13   4?
14           MR. MORRIS:  Your Honor, I don't mean to be
15   monitoring your time, but we're at the 1:30 --
16           THE COURT:  I was just checking the clock here.
17   Let's do take a break.  So, --
18           MR. MCENTIRE:  All right.
19           MR. MORRIS:  Your Honor, can we have an instruction
20   to the witness not to --
21           THE COURT:  Yes.
22           MR. MORRIS:  -- look at his phone and not to confer
23   with anybody?  Because we had that incident once before.
24           THE COURT:  Okay.  Well, I don't --
25           THE WITNESS:  I don't have my phone.
```

HCMLPHMIT00003144

```
1              THE COURT:  Okay.
2              THE WITNESS:  My phone's at the front desk.
3              THE COURT:  So, no discussions with your lawyers or
4   -- I guess he doesn't have his phone -- during this break.
5              MR. MORRIS:  Thank you, Your Honor.
6              THE COURT:  All right.  So, I really think this will
7   take five minutes, so don't go far.
8        (Off the record, 1:33 p.m. to 1:47 p.m.)
9              THE COURT:  Okay.  We will go back on the record,
10  then, in the Highland matter.
11             MR. MCENTIRE:  I'm just going to grab him right now.
12             THE COURT:  Okay.  We are, for the record, waiting on
13  Mr. Dondero to take his place again on the witness stand.
14        (Pause.)
15             THE COURT:  All right, Mr. Dondero.  We're ready for
16  you to resume your testimony.
17        All right.  Mr. McEntire, you may proceed.
18             MR. MCENTIRE:  Thank you, Your Honor.
19                     DIRECT EXAMINATION, RESUMED
20  BY MR. MCENTIRE:
21  Q   Mr. Dondero, when we left off, I was just putting up what
22  I requested as Exhibit 4.
23             MR. MCENTIRE:  And Tim, if you can put that back up,
24  please.
25  BY MR. MCENTIRE:
```

002111

HCMLPHMIT00003145

Dondero - Direct                              133

1   Q    Mr. Dondero, can you identify Exhibit #4, please?

2   A    Yes.  These are notes I took contemporaneous with three

3   conversations with guys at Farallon.

4   Q    I didn't quite hear you.  Did you say contemporaneous?

5   A    Yes.

6   Q    So, you say with three conversations.  Who were the

7   conversations with?

8   A    One was with Raj Patel that was fairly short, and he

9   deflected me to Mike Linn, who was the portfolio manager in

10  charge and had done the transactions.

11  Q    Which transactions?

12  A    The buying of the claim, the Highland claims.

13  Q    All right.  And what was your purpose in making these

14  notes?

15  A    We'd been trying nonstop to settle the case for two-plus

16  years.  We'd been counseled that it was a Kabuki dance that

17  would just, you know, all settle at the end, and it never

18  quite happened that way.  And when we heard the claims traded,

19  we realized there were new parties to potentially negotiate to

20  resolve the case.

21       The ownership was initially hidden, but we were able to

22  find out pretty quickly that Farallon was Muck.  So I reached

23  out the Farallon guys.

24  Q    All right.  And were you ever able at that time to

25  determine who was affiliated with Jessup, the other special-

002112

Dondero - Direct                          134

1  purpose entity?

2  A   We -- initially, we thought Farallon was all of the

3  entities.  We didn't find out about Stonehill -- it was more

4  difficult and they had taken more efforts to hide the

5  ownership in Stonehill.  We didn't find out for two more

6  months.

7  Q   So your first conversation was with Mr. Patel?

8  A   Yes.

9  Q   And did you call him?

10  A   Yes.

11  Q   Your first entry, there's a 28 on the left-hand side.

12  What does that 28 refer to, if you recall?

13  A   That was the date, I believe.

14  Q   Do you believe it was May 28th?

15  A   Yes.

16  Q   What makes you believe that?

17  A   That's what it says.

18  Q   Okay.  Raj Patel --

19          THE COURT:  Is there a way you can show the words

20  that are cut off?

21          MR. MCENTIRE:  On this particular one, I can't, Your

22  Honor.  We tried, but we can't.  No.

23          THE COURT:  If I look in the notebook, can I see it?

24          MR. MCENTIRE:  I don't think so.  I think this is --

25  what you see is exactly what's in the notebook.  It's the same

002113

1   document.  This is how -- how we -- this is how we have it.

2   BY MR. MCENTIRE:

3   Q    Mr. Patel.  Who is Mr. Patel?

4   A    He's Mike Linn's boss.  He's head of -- I believe head of

5   credit at Farallon.

6   Q    Okay.  And Farallon is based where, if you know?

7   A    San Francisco.

8   Q    And what kind of company is Farallon, if you know?

9   A    They -- they look a lot like Highland.  Well, they do real

10  estate.  They do hedge funds.  They do -- they don't do as

11  many 40 Act or retail funds, but they're -- they're an

12  investor.

13  Q    Mr. Patel.  What did he tell you during this phone call?

14  A    That he bought it because Seery told him to buy it and

15  they had made money with Seery before.

16  Q    All right.  And how long did the call last?

17  A    Not long.

18  Q    Okay.  You said he referred you to Mr. -- who was the

19  person?

20  A    To Mike Linn.

21  Q    Who is Mike Linn?

22  A    Mike Linn is a portfolio manager that works for Mr. Patel.

23  Q    And did you call Mr. Linn?

24  A    Yes.

25  Q    All right.  The notes here, do these reflect several

HCMLPHMIT00003148

Dondero - Direct                    136

1  conversations?

2  A    The first one reflects a conversation with Raj Patel, and

3  then the rest of it reflects two conversations with Mike Linn.

4  Q    All right.  Where does the first conversation with Mike

5  Linn start and where does it end?

6  A    It ends -- it begins at the 50, 70 cents.  We knew that

7  they had -- that the claims had traded around 50 cents.  And I

8  said we'd be willing to pay 70 cents.  We'd like to prevent

9  the $5 million-a-month burn.  We'd like to buy your claims.

10  Q    Why 70 cents?  What was -- what was that all about?

11  A    I was trying to give them a compelling premium that was

12  still less than I had offered the UCC three months earlier.

13  Q    And so you have:  Not compelling, Class 8.  What does that

14  mean?

15  A    He said that was -- he just said 70 cents wasn't

16  compelling.

17  Q    There's a reference to:  Asked what would be compelling.

18  Was that a question you asked him?

19  A    Yes.

20  Q    And what was his response?

21  A    He said he had no offer.  And he -- we had heard he paid

22  50 cents and I offered him 70 cents and then -- but he was

23  clear to me that he wouldn't tell me what he paid.  And so the

24  next time I called him I -- I -- instead of just making it

25  cents on the dollar, I said I'd pay 130 percent of whatever he

002115

Dondero - Direct                    137

1  did pay.  You don't have to tell me what you paid, but I'll

2  pay you 30 percent more than you paid, you know, a couple

3  months ago.  And -- or we thought they notified the Court when

4  they just bought it, but they had actually negotiated buying

5  it back in February.  January or February.  So --

6  Q   Who told you that they bought it in February or March time

7  frame?

8  A   He did.

9  Q   Okay.  Was this during the first or the second phone --

10         MR. MORRIS:  I apologize for interrupting.  Who's the

11  "he"?

12         MR. MCENTIRE:  Mike Linn.

13         THE WITNESS:  Mike Linn.

14         MR. MORRIS:  Thank you so much.

15         MR. MCENTIRE:  I'll make sure the record --

16  BY MR. MCENTIRE:

17  Q   Mike Linn --

18  A   Yes.

19  Q   -- told you that Farallon had bought their interest in the

20  claims back in the February or March time frame?

21  A   Yes.

22  Q   All right.  Bought assets with claims.  What does that

23  refer to?

24  A   He said it wasn't compelling because he said Seery told

25  him it would be worth a lot more.  He -- he confirmed what Raj

002116

```
 1   said, that -- I said, do you realize the estate is spending $5

 2   million a month on legal fees?  That, you know, you should

 3   want to sell this thing.  And he said Seery told him it was

 4   worth a lot more and there were claims and litigation beyond

 5   the asset value.

 6   Q   You offered him 40 to 50 percent premium.  What is that?

 7   A   That's what the 70 cents on the 50 cents represents.  And

 8   then I changed the dialogue to I'll pay you 130 percent of

 9   whatever your cost was.  And he said, not compelling.  And

10   then I, both -- both calls, I pressed him, what price would he

11   offer at?  And he said he had no offer, he wasn't willing to

12   sell.

13   Q   The 130 percent of cost, not compelling, was that in the

14   second or the third call with Mr. Linn?

15   A   It was at my third and final call with Farallon.  My

16   second call with Mike Linn was the 130 percent of cost.

17   Q   And he said not compelling?  You put it in quotation

18   marks?

19   A   Yep.

20   Q   And then you said, no counter.  What does that mean?

21   A   He wouldn't -- he wouldn't give an offer, he wouldn't give

22   a price at which he would sell.

23   Q   What did Mike Linn tell you, in effect, with regard to his

24   due diligence that Farallon had undertaken?

25   A   When I -- when I told him about the risks and the
```

002117

HCMLPHMIT00003151

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 10/20/25   Page 589 of 1011   PageID 2488
Exhibit 72   Page 140 of 390

Dondero - Direct                              139

```
1   litigation and the burn, he said he wasn't following the case,

2   he wasn't aware of it, he was depending on Jim Seery.

3   Q    What, if anything, did Michael Linn tell you about MGM?

4   A    That was more the initial Raj Patel call, where he said we

5   bought it because he was very optimistic regarding MGM.

6   Q    Okay.  Did you have any understanding when he first got

7   his optimism about MGM?

8   A    No.  He just said that's why they had bought it initially,

9   they were very optimistic about MGM.

10  Q    That's why they had bought it initially?

11  A    Yes.

12  Q    And they had bought it initially in the February-March

13  time frame?

14  A    Yes.

15  Q    And that -- would you -- does that predate the public

16  disclosure of the MGM sale to Amazon?

17  A    Yes.

18  Q    Substantially by a couple of months?

19  A    Yes.

20  Q    I'd like to turn your attention now to a different topic.

21       MR. MCENTIRE:  And Tim, if you could pull up Exhibit

22  8, please.

23       I believe this document is already in evidence, Your

24  Honor.

25       THE COURT:  8 is?
```

002118

```
 1              MR. MCENTIRE:  Oh, by the way, I offer Exhibit 4 into

 2    evidence.

 3    BY MR. MCENTIRE:

 4    Q   Let me ask you a couple quick questions.

 5              THE COURT:  Is there an objection?

 6              MR. MORRIS:  Nope.

 7              THE COURT:  Okay.  4 is admitted.

 8        (Hunter Mountain Investment Trust's Exhibit 4 is received

 9    into evidence.)

10    BY MR. MCENTIRE:

11    Q   Exhibit 8.

12              MR. MORRIS:  I apologize, Your Honor.  Just one

13    caveat.  It's not for the truth of the matter asserted; it's

14    for what his impressions were at the time.

15              MR. MCENTIRE:  Well, --

16              MR. MORRIS:  This is what he wrote down.  I don't --

17              MR. MCENTIRE:  I'm offering it for the truth of the

18    matter asserted.

19              MR. MORRIS:  Okay.  And I object to that extent.

20    This --

21              MR. MCENTIRE:  Let me --

22              MR. MORRIS:  Can I voir dire?  Can I voir dire?  May

23    I do --

24              MR. MCENTIRE:  May I finish my statement that I was

25    --
```

HCMLPHMIT00003153

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 12/12/25   Page 591 of 1011   PageID 2490
Exhibit 72   Page 142 of 390

Dondero - Direct                    141

```
 1            THE COURT:  Let him finish, and then --

 2            MR. MCENTIRE:  Thank you.

 3            THE COURT:  -- you can.

 4            MR. MCENTIRE:  I am offering it for the truth of the

 5   matter asserted because these are documents that were prepared

 6   contemporaneously, it's an exception to the hearsay rule and

 7   reflects admissions of a -- of an adverse party.  Admissions

 8   that are adverse to their interests.  Declarations of interest

 9   adverse to their interest and admissions of an adverse party

10   contemporaneously recorded.  And so that's why I'm offering

11   it.

12            MR. MORRIS:  For all purposes?

13            THE COURT:  Okay.  Let me have you point me to the

14   exact hearsay exception.  I understand this hearsay exception

15   you're arguing for the hearsay within the hearsay, the party

16   opponent exception.  But it's technically hearsay of Mr.

17   Dondero, even though he's here on the stand.

18            MR. MCENTIRE:  Well, I could lay a foundation, then.

19   BY MR. MCENTIRE:

20   Q   Mr. Dondero, --

21            THE COURT:  Well, no.  I'm asking for what your --

22            MR. MCENTIRE:  It's --

23            THE COURT:  -- rule reference is.

24            MR. MCENTIRE:  I don't have the Rules with me right

25   this second.  It's 803(1) --
```

002120

HCMLPHMIT00003154

Dondero - Direct                            142

 1          (Discussion.)

 2              MR. MCENTIRE:  All right.  Well, it's -- it's

 3   admissible under several categories.  It's not hearsay because

 4   it's an admission of a party opponent.  It's also an admission

 5   under 803(1), present sense impression.  It's also admissible

 6   --

 7              THE COURT:  So you say it's Mr. Dondero's statement

 8   describing or explaining an event --

 9              MR. MCENTIRE:  Yes.

10              THE COURT:  -- or admission made while or immediately

11   after the declarant perceived it?

12              MR. MCENTIRE:  Yes.  It's also a record of a

13   regularly-conducted activity, which is 803(6).  And I think

14   it's also not technically hearsay because it's also an

15   admission of a party.  So, this --

16              THE COURT:  Well, that's the hearsay within the

17   hearsay.

18              MR. MORRIS:  Yeah.

19              THE COURT:  But I'm -- I'm --

20              MR. MORRIS:  That can't possibly be right.  I can't

21   go back to my hotel right now and write down that he told me

22   that he did a bad thing and come in here tomorrow and say he

23   admitted he did a bad thing because it's in my notes.

24              MR. MCENTIRE:  Well, --

25              MR. MORRIS:  That's can't possibly be the law.

002121

HCMLPHMIT00003155

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 11/04/25   Page 593 of 1011    PageID 2492
Exhibit 72   Page 142 of 390

Dondero - Direct                      143

```
1              MR. MCENTIRE:  Well, --

2              MR. MORRIS:  That's not the law.

3              MR. MCENTIRE:  There are two hearsay issues here.

4   One is whether this is a business record or otherwise

5   qualifies as an exception to the hearsay rule, and then

6   there's an internal hearsay issue of whether or not what Mr.

7   Patel and Mr. --

8              THE COURT:  You haven't established the business

9   record exception.  Okay?

10             MR. MCENTIRE:  I'm prepared to lay the foundation

11  right this second.  At this moment.

12             THE COURT:  You may proceed.

13  BY MR. MCENTIRE:

14  Q   Mr. Dondero, is this a document that was generated by you

15  in the ordinary course of your business?

16  A   Yes.

17  Q   Did you have personal knowledge when you recorded this

18  document?

19  A   Yes.

20  Q   You personally recorded this document, correct?

21  A   Yes.

22  Q   And you have had custody of this document.  Correct?

23  A   Yes.

24  Q   And this is --

25             MR. MCENTIRE:  That's a -- that's a business record,
```

HCMLPHMIT00003156

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 2/45/25 390   Page 594 of 1011   PageID 2493
Exhibit 72   Page 2145 of

Dondero - Voir Dire                        144

1  Your Honor.

2          MR. MORRIS:  May I, Your Honor?

3          THE COURT:  You may.

4          MR. MORRIS:  Okay.

5                     VOIR DIRE EXAMINATION

6  BY MR. MORRIS:

7  Q    Where's the document now?  How come it's -- how come it's

8  cut off?

9  A    I don't know.

10 Q    Do you have the document today?  How come we're looking at

11 a document that's cut off?

12 A    I'm sure we have it somewhere.  I don't have it.

13         MR. MORRIS:  So, number one, Your Honor, we don't

14 have the actual document.  We have a partial document.

15     Number two, let's talk about it for a second.

16 BY MR. MORRIS:

17 Q    You say that you do this in the ordinary course of

18 business.  What's the purpose of taking these notes?

19 A    When I'm starting negotiation with somebody new on

20 something complicated and I don't know what their concerns or

21 rationale is going to be, I take little notes like this.

22 Q    And is it -- is it the purpose of it to capture the

23 important things that are going on in the conversation?

24 A    So I know next time how to address it differently, you

25 know.

HCMLPHMIT00003157

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4 72 Filed 06/06/25  Page 595 of 1011    PageID 2494

Exhibit 72   Page 146 of 390

Dondero - Voir Dire                    145

```
 1   Q    That's not my question.  My question is, is the purpose of

 2   taking notes so that you have a written record of the

 3   important points that you discussed?

 4   A    Yes, so I know how to address it the next time.

 5   Q    Okay.  And among the important points that you never put

 6   down on these notes was the letters MGM.  Is that correct?

 7   A    Correct.

 8   Q    Okay.  And you never put down here that Michael Linn told

 9   you he wasn't following the case, correct?

10   A    No, I did not.

11   Q    Okay.

12   A    But it was --

13   Q    And --

14   A    Yeah.  But I --

15   Q    That --

16           MR. MORRIS:  Your Honor, if this is --

17           MR. MCENTIRE:  (faintly)  This is *voir dire* of the

18   witness for a business record exception.

19           MR. MORRIS:  No, because --

20           THE COURT:  Overruled.

21           MR. MORRIS:  Thank you.

22   BY MR. MORRIS:

23   Q    Mr. Patel wouldn't tell you how much he paid and that's

24   why you didn't write it down, right?

25   A    Mr. Patel told me he bought it because of Seery.  My
```

HCMLPHMIT00003158

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 10/27/25    Page 596 of 1011    PageID 2495
Exhibit 72 Page 2147 of 390

Dondero - Voir Dire                                    146

```
1    conversation was very short with him.  That was one of the few

2    things he said.  Linn said he wouldn't sell it because he

3    didn't find it compelling.

4    Q    Okay.

5    A    And Linn was the one who wouldn't tell me --

6    Q    Okay.

7    A    -- the price.

8    Q    But -- but even though you took these notes to write down

9    things that you thought were important, you didn't write down

10   MGM.  Correct?

11   A    Yes.

12   Q    And you didn't write down that anybody was very optimistic

13   about MGM.  Correct?

14   A    No, I did not.

15   Q    And you didn't write down that Mr. Linn told you he wasn't

16   following the case.  Correct?

17   A    Well, he said the same thing Patel said about he bought it

18   because of Seery.  He did confirm that.  I didn't see any

19   reason to write that again.

20   Q    You didn't -- you never wrote it down.  Not once.  Not --

21   there's nothing about again, right.  You never wrote down that

22   --

23   A    No, I did write --

24   Q    -- anybody ever told you they weren't following the case.

25   Correct?
```

HCMLPHMIT00003159

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 12/18/25   Page 597 of 1011   PageID 2496
Exhibit 72   Page 148 of 390

Dondero - Voir Dire                              147

1   A    Correct.

2   Q    Okay.

3   A    But I wrote down that he bought it because of Seery.

4   Q    Okay.

5        MR. MORRIS:  Your Honor, no objection.  It can go in.

6        MR. MCENTIRE:  Okay.

7        THE COURT:  Wait.  Did you just say no objections?

8        MR. MORRIS:  Except -- except for the hearsay on

9   hearsay.  It can't possibly be an admission.  It's his -- it's

10  his notes.  This is what he wrote.  It can come in for that

11  purpose.  It's -- it's a -- that's what he's testified to, and

12  I can't object to that.  But it can't possibly come in as an

13  admission against Farallon.

14       MR. MCENTIRE:  Well, I disagree.

15       MR. MORRIS:  That's the point.

16       MR. MCENTIRE:  Well, first of all, I disagree.  This

17  is otherwise admissible, and it can come.  I think that's

18  really, Your Honor, that's really the weight it's going to be

19  given.  It comes in.  He's not making an objection to its

20  admissibility.  And if he wants to argue the weight of the

21  document, that's a different issue.

22       MR. STANCIL:  Your Honor, if I may.

23       THE COURT:  You may.

24       MR. STANCIL:  The second layer of hearsay goes to

25  whether this is a statement by Farallon.  It is a statement by

HCMLPHMIT00003160

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 09/29/25    Page 598 of 1011    PageID 2497
Exhibit 72 Page 149 of 390

Dondero - Direct                                148

1   Mr. Dondero of what he heard, what he says he heard Farallon

2   say.  801(d) refers to, when they're talking about an opposing

3   party statement, made by the party, not made by a listener who

4   says he heard the party.  This is classic hearsay within

5   hearsay.  It's not admissible for that purpose.

6              THE COURT:  Okay.  I sustain the objection, and --

7   but I'm still struggling to understand what the Respondents

8   have agreed to.  Because --

9              MR. MORRIS:  That -- that this is what he claims to

10  have written down.  I mean, right?  So, so --

11             THE COURT:  Okay.

12             MR. MORRIS:  -- a present sense impression.

13             THE COURT:  So, it is admitted as Mr. Dondero's

14  present sense impression, but it's not admitted as to the

15  truth of anything that Claims Purchasers may have said.

16             MR. MORRIS:  And -- and the --

17             THE COURT:  That's what you're saying?

18             MR. MORRIS:  Yes.  And the most important thing is

19  that he's testified that the purpose of the notes was to

20  capture the things that were important that he was told.  And

21  we've established what he wasn't told.

22             MR. MCENTIRE:  Okay.  I believe the document is in

23  evidence, Your Honor.

24             THE COURT:  Exhibit 4 is in evidence.  But, again,

25  there's no admission in here as to what Claims Purchasers

002127

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 74 Filed 250 26 390 Page 599 of 1011    PageID 2498
Exhibit 72 Page 150 of

Dondero - Direct                        149

```
 1   testified as to.
 2         MR. MCENTIRE:  Well, they haven't testified yet
 3   because --
 4         THE COURT:  This is what he --
 5         THE DEFENDANT:  I understand.  I understand.
 6         THE COURT:  -- he says he remembers.
 7         MR. MCENTIRE:  Okay.  So, --
 8         THE COURT:  It's sort of an --
 9         MR. STANCIL:  Your Honor, just so we're clear for our
10   record, this is not admitted for the truth of what Farallon is
11   purported to have said.
12         MR. MCENTIRE:  Correct.
13         THE COURT:  Correct.
14         MR. MCENTIRE:  This --
15         MR. STANCIL:  Thank you.
16         MR. MCENTIRE:  This is offered for the truth of what
17   Mr. -- Mr. Dondero recalls them saying.
18         THE COURT:  Okay.
19         MR. MCENTIRE:  In part.
20         THE COURT:  I think -- I think we're on the same page
21   now.  I think.  I think.
22      (Hunter Mountain Investment Trust's Exhibit 4 is received
23   into evidence.)
24         MR. MCENTIRE:  All right.  May I proceed, Your Honor?
25         THE COURT:  You may.
```

HCMLPHMIT00003162

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72  Filed 2151/26 390  Page 600 of 1011    PageID 2499
Exhibit 72  Page 2151 of 26

Dondero - Direct                    150

```
 1              MR. MCENTIRE:  Can you please put up Exhibit 8,
 2    please?  And I believe this document has been put into
 3    evidence --
 4              THE COURT:  It is.
 5              MR. MCENTIRE:  Thank you.
 6    BY MR. MCENTIRE:
 7    Q   Mr. Dondero, this document is a -- part of a -- the
 8    Court's docket.  It was filed on February 1, 2021, if you
 9    could go to the top upper banner.  It's Debtors' Notice of
10    Filing of Plan Supplement of the Fifth Amended Plan of
11    Reorganization of Highland Capital Management, as Modified.
12        Do you see that?
13    A   Yes.
14    Q   I'll direct your attention, --
15              MR. MCENTIRE:  If you could go to Page 4, please, for
16    me, Tim.
17    BY MR. MCENTIRE:
18    Q   Page 4 has a schedule, a plan analysis and a liquidation
19    analysis.  Do you see that?
20    A   Yes.
21    Q   All right.  For Class 8, what does it identify that is
22    being projected for distributions to the general unsecured
23    claims for Class 8?
24    A   71.3 percent.
25    Q   What percentage is being identified that will be
```

002129

HCMLPHMIT00003163

Dondero - Direct                              151

1   distributed to Class 9?

2   A    9, no distribution.

3   Q    No distribution?  All right.  Mr. Dondero, in Paragraph --

4   I'm going to give you a piece of paper.

5          MR. MCENTIRE:  Can you just give me a piece of paper

6   real quick?

7   BY MR. MCENTIRE:

8   Q    I'm handing you a piece of paper and I'm --

9   A    Okay.  Thank you.

10  Q    Mr. Dondero, in our complaint in this case, the proposed

11  complaint in this case, we allege that Class 8 had a total of

12  $270 million, the claims that were purchased by Farallon and

13  Stonehill had a face value in Class 8 of $270 million.  Would

14  you write that number down?

15      And assuming that this was public information that was

16  available in February of 2021 at 71.32 percent, --

17         MR. MORRIS:  Objection, Your Honor.  That's an

18  assumption not in evidence.  He hasn't laid a foundation for

19  what was available in February in 2021.

20  BY MR. MCENTIRE:

21  Q    Mr. Dondero, according to --

22         THE COURT:  Wait.  Are you going to respond, or are

23  you just going to --

24         MR. MCENTIRE:  I'll rephrase the question.

25         THE COURT:  -- rephrase?  Okay.

HCMLPHMIT00003164

 1   BY MR. MCENTIRE:

 2   Q    According to the document that is identified as Exhibit #8

 3   that says that 71.32 percent is the anticipated projected

 4   payout on Class 8 claims, what is 71.32 percent of the face

 5   value of the claims that were purchased?

 6   A    About $192 million.

 7   Q    $192 million?  And assuming for a moment that, as alleged

 8   by Hunter Mountain in this case, that $163 million was

 9   actually used to purchase the Class 8 claims, what is the

10   difference?

11   A    About $30 million.

12   Q    A little less than that, isn't it?  Or is the number --

13   A    Yeah.  $28 million or whatever.

14   Q    $28 million?  And based upon your years of experience in

15   running Highland Capital, being involved in the purchase of

16   unsecured claims, being involved in investigating and

17   acquiring distressed assets, that return over a two-year

18   period, is that the kind of return that a hedge fund would

19   typically -- you would expect to receive?

20          MR. MORRIS:  I just want to make sure that -- because

21   the question changed a little bit in the middle.  If he wants

22   to ask him if he would have made the investment, that's fine.

23   But he should not be permitted to testify as to what any other

24   investor, including the ones who purchased these claims, would

25   have done.  Every -- there's different risk profiles.  He can

HCMLPHMIT00003165

Dondero - Direct                    153

1  testify to whatever he wants about himself.

2              THE COURT:  Sustained.

3  BY MR. MCENTIRE:

4  Q   Go ahead.  Based upon your experience at Highland Capital,

5  would Highland Capital have ever acquired those claims based

6  upon that kind of return over two years?  For a distressed

7  asset such as this?

8  A   No.

9  Q   Why not?

10 A   It's below a debt level return that you could get on high-

11 rated assets with certainty.  It's --

12 Q   What do you mean by it's below -- below a debt return that

13 you could get on collateralized assets?  What do you mean by

14 that?

15 A   I think in this case the debt that the Debtor put in place

16 paid 12, 13 percent and was triple secured or whatever.  So no

17 one would buy the residual claims for an 8 percent compounded,

18 whatever that $28 million works out to.

19             MR. MORRIS:  I move to strike, Your Honor.  He

20 shouldn't be talking about or testifying to what other people

21 might do.

22             THE WITNESS:  Well, we --

23             THE COURT:  This is --

24             THE WITNESS:  We would never have done that.

25             THE COURT:  This is --

HCMLPHMIT00003166

Dondero - Direct                    154

```
 1              MR. MCENTIRE:  He would not have.

 2              THE COURT:  -- Highland, not nobody.  Okay.

 3   BY MR. MCENTIRE:

 4   Q   Mr. Dondero, and what is it about the fact that these

 5   claims are not collateralized that impacts the decision-

 6   makers, from your perspective?

 7   A   You have all the risk that the $205 million of expenses

 8   this estate has currently paid grows to $300 or $400 million.

 9   You know, you have the risk that other litigation regarding

10   Seery violating the Advisers Act --

11              MR. MORRIS:  I move to strike, Your Honor.

12              THE WITNESS:  -- results in --

13              THE COURT:  Sustained.

14              THE WITNESS:  -- expenses.

15   BY MR. MCENTIRE:

16   Q   Just respond to my question, sir.  What does the fact

17   about not being collateralized, how does that impact the

18   decision-maker's --

19   A   Well, I was trying to answer it.  You just have all kinds

20   of residual risk of bad acts that have happened at the estate

21   or expenses increasing or whatever.

22              MR. MORRIS:  I move to strike the phrase "bad acts,"

23   Your Honor.

24              THE COURT:  Overruled.

25   BY MR. MCENTIRE:
```

002133

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 11/06/25   Page 605 of 1011   PageID 2504

Exhibit 72   Page 156 of 390

Dondero - Direct                              155

1    Q    What did you mean by that?  What did you mean by "bad

2    acts"?

3    A    We've highlighted it in a lot of complaints.  There's been

4    several violations of the Advisers Act.

5              MR. MORRIS:  Move to strike, Your Honor.  It's a

6    legal conclusion.

7              THE COURT:  Sustained.

8    BY MR. MCENTIRE:

9    Q    Mr. Dondero, are you familiar with an entity known as NHF?

10   A    Yes.

11   Q    What is NHF?

12   A    A NexPoint hedge fund.  It was a closed-in fund that we

13   manage still to this day at NexPoint.  The name has changed to

14   NXDT.

15   Q    Was NHF publicly traded?

16   A    It -- yeah, it's a publicly-traded equity.  It's a closed-

17   in fund, technically, but it's a publicly-traded security.

18   Q    What -- what is your affiliation with NHF?

19   A    I'm the portfolio manager.

20   Q    And, again, what are your responsibilities as the

21   portfolio manager?

22   A    To optimize the portfolio and hopefully exceed investor

23   expectations.

24   Q    Have you become aware that Stonehill was purchasing MGM

25   stock in the first quarter of 2021?  And NHF?

002134

HCMLPHMIT00003168

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4 72  Filed 07/26 390  Page 606 of 1011    PageID 2505

Dondero - Direct                          156

 1   A    Yes.  We believe -- we're able to demonstrate from

 2   Bloomberg records, on the Bloomberg terminal, they show up as

 3   holders and purchasers in the -- in the first few months of

 4   2021.

 5   Q    What magnitude?

 6   A    I think it was one of their top equity positions.  It was

 7   about six million bucks.

 8            MR. MCENTIRE:  Can you put up the chart?  This is for

 9   demonstrative purposes only.

10        I'm not offering this chart into evidence, Your Honor.

11   It's simply a demonstration.  Or a demonstrative.

12            MR. MORRIS:  Your Honor, there's no such thing.

13            MR. MCENTIRE:  There is.

14            MR. MORRIS:  A demonstrative has to be based on

15   evidence.  A demonstrative is supposed to summarize evidence.

16   You don't put up a demonstrative until --

17            THE COURT:  All right.  What's your response to that?

18            MR. MCENTIRE:  That I'm about to walk through some

19   points where he can establish as a point of evidence, and then

20   we can talk about it.  Demonstratives, demonstratives are used

21   all the time, Your Honor.

22            MR. MORRIS:  It's to --

23            THE COURT:  Well, they summarize evidence.

24            MR. MORRIS:  It's to summarize evidence.

25            THE COURT:  Yes.  So, --

002135

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 12/58/25 390   Page 607 of 1011   PageID 2506

Dondero - Direct                    157

1           MR. MCENTIRE:  Well, this is --

2           THE COURT:  -- you can elicit the evidence, and then

3    if this chart seems to summarize whatever he testifies as to,

4    then --

5           MR. MCENTIRE:  All right.

6           THE COURT:  -- then I think maybe you can put it up.

7           MR. MCENTIRE:  Mr. -- you can take it down, Tim.

8    BY MR. MCENTIRE:

9    Q    Mr. Dondero, do you have an understanding of how much

10   total distributions have been paid to date in the Highland

11   bankruptcy?

12   A    I believe the Class 8 -- the 1 through 7 was only about

13   $10 million.  I believe Class 8 got $260 or $270 million so

14   far.

15   Q    All right.  And do you have an understanding of what the

16   total amount of expenses are?

17   A    Total expenses paid to date was $203 million.  $205

18   million.

19   Q    So the -- the -- there's a rough approximation between the

20   professional expenses and the actual all proofs of claim; is

21   that correct?

22   A    There is, yeah, a ratio, and -- yes.

23   Q    The total cash flow, if you add those two together, what

24   are they?  What are they approximately?

25   A    $470 million.

002136

HCMLPHMIT00003170

Dondero - Direct                        158

1    Q    $470 million?  And do you understand that the -- that the

2    Reorganized Debtor and the Claimant Trust would have more than

3    sufficient assets to reach Class 10 where Hunter Mountain is

4    currently located, even setting aside the claims against you?

5    A    Correct.  There's $57 million of cash on the balance

6    sheet, net of a couple million today, I guess.  And then

7    there's $100 million of other assets.

8              MR. MCENTIRE:  Reserve the rest of my questions.

9    Reserve the rest of my questions, Your Honor.

10             THE COURT:  Okay.  Pass the witness.

11             MR. MCENTIRE:  Could I have my time estimate?

12             THE COURT:  Yes.  Caroline?

13             THE CLERK:  (faintly)  As of right now, we are at 81

14   minutes, so --

15             MR. MCENTIRE:  Thank you.

16             THE COURT:  That was 81 minutes total?

17             THE CLERK:  Yes.

18             THE COURT:  Okay.

19             MR. MORRIS:  May I proceed, Your Honor?

20             THE COURT:  You may.

21                     CROSS-EXAMINATION

22   BY MR. MORRIS:

23   Q    Good afternoon, Mr. Dondero.

24   A    Good to see you.

25   Q    My pleasure.  Do you know an attorney named Ronak

HCMLPHMIT00003171

Dondero - Cross                              159

1    (phonetic) Patel?

2    A    Is that Rakhee that they call --

3    Q    Could be.  Do you know an attorney named Rakhee Patel?

4    A    There was a Rakhee Patel, I believe, early in the *Acis*

5    case.

6    Q    Let me try --

7    A    I'm not -- I've never met her.

8    Q    Let me try this differently.

9    A    Okay.

10   Q    Did you ever meet with the Texas State Securities Board?

11   A    No.

12   Q    Did anybody acting on your behalf ever file a complaint

13   with the Texas State Securities Board?

14   A    No.

15   Q    Do you know if anybody's filed a complaint with the Texas

16   State Securities Board?  About Highland?

17   A    I believe you covered it earlier.  Mark Patrick.

18   Q    Mark Patrick what?

19   A    I guess he did, or Hunter Mountain did, or the DAF did.  I

20   don't -- I don't know.

21   Q    Did you ever speak with Mark Patrick about a TSSB

22   investigation of Highland?

23   A    No.

24   Q    Okay.  Why do you think Mark Patrick knows about the TSSB

25   investigation of Highland?

HCMLPHMIT00003172

Dondero - Cross                          160

1              MR. MCENTIRE:  Objection to form.  Calls for

2     speculation.  He's just established that he's never --

3              THE WITNESS:  I don't know.

4              MR. MCENTIRE:  -- talked to Mark Patrick.

5              MR. MORRIS:  Okay.

6              THE COURT:  Okay.  Sustained.

7              MR. MORRIS:  Okay.

8     BY MR. MORRIS:

9     Q    Have you ever seen the draft Hunter Mountain complaint in

10    this case?

11    A    No.

12    Q    Okay.  I think you testified a moment ago that Amazon had

13    hit MGM's price by December 17th.  Do I have that right?

14    A    Yes.

15    Q    Okay.  Then how come you didn't say that in your email to

16    Mr. Seery?

17    A    Your best practices and typical practices, when you put it

18    on the restricted list, is to just give as little information

19    as possible so that the inside information isn't promulgated

20    specifically throughout the organization and leaked --

21    Q    So, --

22    A    -- throughout the organization.

23    Q    So, even though your intent was to convey information to

24    Mr. Seery, you didn't actually tell him the truth, right?  You

25    didn't tell him that Amazon had actually hit the stock price.

002139

HCMLPHMIT00003173

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 02/26/390   Page 611 of 1011   PageID 2510

Dondero - Cross                          161

1    Right?

2    A    I wouldn't characterize it that way.

3    Q    Okay.  In fact, all you told him was that they were

4    interested.  Isn't that right?

5    A    I wasn't telling him anything.  I was telling Compliance,

6    as an investment professional, that it needed to be on the

7    restricted list because we were in possession of material

8    nonpublic information regarding a merger that was going to go

9    through shortly.  Or in the next few months.

10   Q    Is it your testimony that, as of December 17th, Amazon had

11   made an offer that was acceptable to MGM?

12   A    Yeah, we were going into -- that's what the board meeting

13   was.  We were going into exclusive negotiations to culminate

14   the merger with them.

15   Q    Okay.  I think you have a binder there of our exhibits.

16   If you can go to #11.

17   A    Which one?

18        MR. MORRIS:  May I approach?

19        THE WITNESS:  Sure.

20     (Pause.)

21   BY MR. MORRIS:

22   Q    That's your email, sir, right?

23   A    Yes.

24   Q    Okay.  It doesn't say anything about Amazon hitting the

25   price, right?

002140

HCMLPHMIT00003174

1   A   It doesn't need to.

2   Q   In fact, it still mentions Apple, doesn't it?  Why did you

3   feel the need to mention Apple if Amazon had already hit the

4   price?

5   A   The only way you generally get something done at

6   attractive levels in business is if two people are interested.

7   Q   But why weren't you -- why were you creating a story for

8   the Compliance Department when the whole idea was to be

9   transparent so they would understand what was happening?  Why

10  would you create a story that differed from the facts?

11  A   It didn't differ from the facts, and it's not a story.

12  It's a, we have material nonpublic information.  Please put

13  this on the restricted list.  And --

14  Q   But that -- but you said Amazon and Apple are actively

15  diligencing and they're in the data room.  Do you see that?

16  A   That's true.

17  Q   So, even though -- you know what, I'll move on.  But this

18  -- this doesn't say what you testified to earlier, that Apple

19  hit the -- that Amazon hit the price.  Right?  Can we just

20  agree on that?

21  A   Well, agree that it doesn't have to and it's not supposed

22  to.

23          MR. MORRIS:  I move to strike.  I just want --

24          THE COURT:  Sustained.

25  BY MR. MORRIS:

HCMLPHMIT00003175

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 06/24/25    Page 613 of 1011    PageID 2512
Exhibit 72    Page 2164 of 390

Dondero - Cross                              163

1    Q    -- you to -- I want you to just work with me here.  You

2    did not tell the Compliance Department that Apple -- that

3    Amazon had hit the strike price.  Right?  Isn't that correct?

4    That's not what this email says?

5    A    The -- you can pull up a hundred of these type emails.

6    They're not specific.

7            MR. MORRIS:  I'm going to move to strike and I'm just

8    going to ask you, --

9            THE COURT:  Sustained.

10   BY MR. MORRIS:

11   Q    -- because you testified to one thing, and I just want to

12   make clear that you told the Compliance Department something

13   different.  Can we just agree on that?

14           MR. MCENTIRE:  Well, Your Honor, may I respond to his

15   motions to strike?  I think he's becoming argumentative.

16           THE COURT:  Could you speak into the mic, --

17           MR. MCENTIRE:  I can.

18           THE COURT:  -- please.

19           THE COURT:  He's becoming argumentative.  And I think

20   it's very clear that, if he asks a question, the witness has a

21   right to respond.  I think his answers are totally responsive.

22   And I don't think anything should be struck.

23           THE COURT:  Okay.  Your question was you didn't put

24   in there anything about it hit the strike price --

25           MR. MORRIS:  He didn't --

HCMLPHMIT00003176

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 2165/25  390 Page 614 of 1011    PageID 2513

Dondero - Cross                    164

```
 1              THE COURT:  -- or whatever?

 2              MR. MORRIS:  He didn't -- he didn't tell the

 3    Compliance Department what he just testified to.  In fact, he

 4    told the Compliance Department something very different.

 5    That's all I'm asking.

 6              THE COURT:  And I think that's just a yes or no.

 7              MR. MORRIS:  Okay.

 8    BY MR. MORRIS:

 9    Q    Yes or no?  You told the Compliance Department something

10    different than what was actually happening?

11    A    That's not true.

12    Q    Oh.

13    A    Exactly what was here, what was happening.  I didn't give

14    more detail, which is more hearsay.

15    Q    Okay.  If somebody was filing -- following the Highland

16    bankruptcy, they would have known that MGM was very important,

17    right?

18    A    You'd have to show me where.  I don't -- I don't see it in

19    any of the bankruptcy --

20    Q    You don't think that that's true?

21    A    I didn't see it in any of the public filings.

22    Q    Do you remember we were here two years ago on this very

23    day, June 8, 2021, for the second contempt hearing?  You sat

24    in that very witness box during the second contempt hearing?

25    Remember that?  That was two years ago.
```

HCMLPHMIT00003177

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 06/06/25   Page 615 of 1011    PageID 2514
Exhibit 72   Page 166 of 390

Dondero - Cross                                    165

1   A    I remember sitting in the box.  What are you asking?

2   Q    And do you remember that that was just a few days after

3   MGM had announced its deal with Amazon?

4   A    I -- I don't remember -- I -- was that the day the judge

5   was hopeful that would lead to a resolution of the case?

6   Q    Exactly.  So, --

7   A    Okay.

8   Q    -- Judge Jernigan certainly knew that MGM was important.

9   Right?

10  A    Yes.

11  Q    And she's a bankruptcy judge, right?

12  A    Yes.

13  Q    And she was overseeing the bankruptcy case, right?

14  Correct?

15  A    Yes.

16  Q    And the very first thing when she walked in the door two

17  years ago on this day was, oh my goodness, MGM, they have a

18  deal, maybe we can finally get to a settlement.  Right?

19  A    And I wish she had pushed on that.

20  Q    Do you --

21  A    And I remember you guys dismissing it.

22  Q    Do you think she had material nonpublic inside

23  information?

24  A    No, I don't think so.

25  Q    She probably learned it in the bankruptcy case, right?

HCMLPHMIT00003178

Dondero - Cross                                    166

1   A    Yeah.

2   Q    Okay.  Do you believe Mr. Seery sold any MGM securities

3   between the day you sent your email and the day the Amazon

4   deal was announced on May 26th?

5   A    I don't know.

6   Q    Do you -- so you have no knowledge?  Let's do this a

7   different way.  You have no basis to say that Mr. Seery sold

8   any MGM securities between the moment you sent this email on

9   December 17th and the day the Amazon deal was announced on May

10  26th.  Correct?

11  A    I'm sorry.  Just to clarify, you're saying sold, not

12  bought, right?  You're not asking me if --

13  Q    I'll do either way.

14  A    Okay.

15  Q    Fair point.

16  A    Sure.

17  Q    Very fair point.

18  A    Okay.

19  Q    Do you believe that Mr. Seery engaged in any transactions

20  of MGM securities between those two relevant data points?

21  A    Yes.

22  Q    Okay.  What do you think he did?

23  A    The HarbourVest transaction.

24  Q    Okay.  So, you learned about the HarbourVest transaction

25  when?

002145

HCMLPHMIT00003179

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 08/26/25    Page 617 of 1011    PageID 2516
Exhibit 72    Page 168 of 390

Dondero - Cross                          167

1    A    When it was filed.

2    Q    And that was on December 23rd.  Do you remember that?

3    A    Yes.

4    Q    It was just less than a week after you sent your email,

5    right?

6    A    Yes.

7    Q    And do you remember that you filed an objection to the

8    HarbourVest settlement?

9    A    Yes.

10    Q    And you're the one who gave Mr. Seery this material

11    nonpublic inside information, right?

12    A    Yes.

13    Q    Did you object to the HarbourVest settlement on the basis

14    that Mr. Seery was engaging in insider trading?

15    A    Not then, I don't think.  I believe --

16    Q    You didn't, right?  Even though it was happening at the

17    exact same moment, the very -- within a week of you giving him

18    this information.  He's announcing that he's doing this

19    settlement and you don't say a word.  Isn't that right?

20    A    Because I delegated the responsibility to Compliance by

21    notifying them of material nonpublic information, and

22    Compliance should hold the organization accountable.

23    Compliance is separate and discrete from management.

24    Compliance reports to the SEC.

25    Q    You filed a 15-page objection to the settlement, didn't

002146

HCMLPHMIT00003180

Dondero - Cross                            168

1   you?

2   A    I don't -- I don't know.

3   Q    Did you tell Judge Jernigan that Mr. Seery was doing bad?

4   A    Not then.  I think a month later, two months later.

5   Q    Even though you knew what was happening, you didn't say

6   anything, right?

7   A    I -- I'm not responsible for all the filings.  I --

8   Q    Even though it's under your name?

9   A    Correct.

10  Q    How about -- how about CLO Holdco?  Did CLO Holdco file an

11  objection to the HarbourVest settlement?

12  A    I -- I don't know which entities did, but it -- whatever

13  entities that were in control that could did, eventually, when

14  they found out, you know, and -- but did -- did they, within a

15  week or contemporaneously?  No.  It was right around the

16  holidays.  A lot of people weren't paying attention.  You guys

17  were trying to rush the HarbourVest thing through.

18  Q    Sir, CLO Holdco filed an objection, claiming that it was

19  entitled to purchase the HarbourVest interests in HCLOF

20  because it had a right of first refusal, right?  Isn't that

21  right?

22  A    Okay.  I -- what ultimately governs the --

23  Q    Isn't that right?

24  A    I don't -- okay.

25  Q    It's really just yes or no.

HCMLPHMIT00003181

Dondero - Cross                                169

1   A    I don't know.

2   Q    If you don't remember, that's fine.

3   A    I don't remember, yeah.

4           MR. MCENTIRE:  Your Honor, would he please give the

5   witness an opportunity to answer?  He's interrupted three

6   times in less than five seconds.  Give the witness an

7   opportunity to respond.

8           MR. MORRIS:  This is real easy stuff.

9           THE COURT:  Okay.

10          MR. MORRIS:  I'm trying to cross him here.

11          MR. MCENTIRE:  Your Honor, with all due respect, he's

12  making it very difficult because he's being very aggressive --

13          MR. MORRIS:  Nah.

14          MR. MCENTIRE:  -- and he's interrupting the witness.

15          MR. MORRIS:  I would never.

16          THE COURT:  Okay.  I don't feel the need to do that

17  right now, but I will -- I will consider your request.

18          THE WITNESS:  Can I give a complete answer to his

19  last question, or one that I'd like to be my answer on the

20  record?

21          THE COURT:  Go ahead.

22          THE WITNESS:  The governing responsibility as a

23  registered investment advisor is you're not allowed to buy

24  back from investors fund interests or investments unless you

25  offer it to everybody else, in writing, in that fund first.

002148

HCMLPHMIT00003182

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 07/21/25    Page 620 of 1011    PageID 2519
Exhibit 72    Page 2021 of 390

Dondero - Cross                        170

```
 1   That's the Investment Advisers Act as I understand it, and

 2   that is what was improper in the HarbourVest transaction.  I

 3   mean, besides the fact that the pricing was wrong, they misled

 4   HarbourVest.  And I know HarbourVest hasn't complained, but

 5   just because your investors don't complain doesn't mean you

 6   can rip them off.

 7           MR. MORRIS:  I'd really move to strike the entirety

 8   of the answer, Your Honor.

 9           THE COURT:  Granted.

10   BY MR. MORRIS:

11   Q   Mr. Dondero, HC --

12   A   I'm not going to -- I'm not answering any more questions

13   unless I can answer that question with that answer, --

14   Q   Mr. Dondero, do you --

15   A   -- because I believe it's responsive.

16   Q   Do you remember that CLO Holdco withdrew their objection?

17   A   I --

18   Q   To the HarbourVest settlement?

19   A   I don't remember.

20   Q   Do you remember that's really when Grant Scott left the

21   scene?

22   A   I don't --

23   Q   He thought it was inappropriate for them to withdraw,

24   right?

25   A   I don't remember all the details.  I know they made some
```

002149

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 02/02/26 390    Page 621 of 1011    PageID 2520

Dondero - Cross                                    171

1    mistakes, and there's a tolling agreement against Kane's

2    (phonetic) firm for making mistakes, and, you know, whatever.

3    But I -- I don't remember all the details.

4    Q    And a couple of months later, you conspired with Mr.

5    Patrick to try to sue Mr. Seery in order to try to get that

6    very same interest in HCLOF, right?

7               MR. MCENTIRE:  Your Honor, I have to object.  There's

8    no foundation and it's also highly argumentative and I move to

9    object.  That's a -- that's a question asked in bad faith.

10              THE WITNESS:  I deny any conspiring.

11              MR. MORRIS:  Okay.

12              THE COURT:  Sustained.

13   BY MR. MORRIS:

14   Q    In April, Mr. Patrick filed a lawsuit on behalf of CLO

15   Holdco a couple of weeks after getting appointed as the head

16   of CLO Holdco and the DAF about the HarbourVest settlement.

17   Isn't that right?

18   A    I believe so.

19   Q    Okay.  And you worked with him on that, right?

20   A    I -- I did not work with him on that.  I was very just

21   tangentially aware.

22   Q    Okay.

23              MR. MORRIS:  I'm just going to refer the Court -- I'm

24   going to move for the admission into evidence of the second

25   contempt order.

002150

HCMLPHMIT00003184

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 174   Filed 07/23/25   Page 622 of 1011   PageID 2521
Exhibit 72   Page 2173 of 390

Dondero - Cross                     172

 1          THE COURT:  Exhibit what?

 2          MR. MORRIS:  Just one moment, Your Honor.

 3      (Pause.)

 4          MR. MORRIS:  You know what, I don't know that I have

 5  it on the list.  I'm just going to ask the Court to take

 6  judicial notice.  We had a hearing two years ago to this day,

 7  and the Court found in the order that it entered at the

 8  conclusion of that hearing that Mr. Patrick had abdicated his

 9  responsibility to Mr. Seery.  It's one of the reasons why Mr.

10  Seery wasn't held in contempt of Court.  And I'd like -- I'd

11  like Counsel to address it now.

12          MR. MCENTIRE:  Yeah, I'll -- you said Seery, didn't

13  you?

14          MR. MORRIS:  Oh, sorry.  I said Seery.  I meant

15  Dondero.

16          MR. MCENTIRE:  (faintly)  Also, I believe it's

17  entirely irrelevant.  Judicial -- taking judicial --

18          THE COURT:  Would you speak in the microphone,

19  please?

20          MR. MCENTIRE:  I'm sorry.  Taking judicial notice of

21  something that is utterly irrelevant is not necessary, not

22  appropriate.  What this Court did two years ago roughly to the

23  day -- and I assume he's correct -- has no bearing on anything

24  before the Court today.  Nothing.  This has zero connection,

25  nexus, under any analysis, any fair scrutiny, dealing with the

HCMLPHMIT00003185

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 07/21/25   Page 623 of 1011   PageID 2522
Exhibit 72   Page 2172 of 2390

Dondero - Cross                    173

1    colorability of the claim that Hunter Mountain, who was not

2    involved in those proceedings, is trying to advance here.  And

3    it would be -- it would be improper for this Court to even

4    take it under judicial notice.

5              THE COURT:  Okay.  Response?

6              MR. MORRIS:  Can I respond?

7              THE COURT:  Uh-huh.

8              MR. MORRIS:  Okay.  So, Your Honor, I'm going to move

9    for the introduction into evidence of Exhibit 45.  It is the

10   Charitable DAF complaint that was filed in the federal

11   district court on April 12, 2021, under the direction of Mark

12   Patrick, who today stands here as the representative of Hunter

13   Mountain.

14      This was the complaint, if Your Honor will recall, that

15   they tried to amend and we had a hearing here about the

16   circumstances, because that amendment was going to name Mr.

17   Seery personally, in violation of the gatekeeper order.

18   Right?

19             THE COURT:  Uh-huh.

20             MR. MORRIS:  And so it is all tied together.  If you

21   go to Paragraph 77 of this exhibit, it says, HCLOF holds

22   equity in MGM Studio.  This is the exact same transaction,

23   right?  So, so Mr. Dondero says, I gave Mr. Seery inside

24   information, he violated all of these things in the

25   HarbourVest transaction, even though he didn't say a word

HCMLPHMIT00003186

Dondero - Cross                    174

 1   then, and here, while it's still on the restricted list,

 2   before the Amazon deal is announced, they're actually in court

 3   saying that they should be entitled to acquire that same asset

 4   that Mr. Seery supposedly acquired improperly.  He wants it

 5   for himself.

 6       I mean, are you kidding me?  It's not relevant?

 7           THE COURT:  I overrule the relevance objection.  It's

 8   admitted.

 9           MR. MORRIS:  Thank you.  And 45 is admitted, Your

10   Honor?

11           THE COURT:  45 is admitted.

12           MR. MORRIS:  Okay.

13       (Debtors' Exhibit 45 is received into evidence.)

14           MR. MCENTIRE:  Just, Your Honor, I was identifying my

15   objection in connection with his original request that you

16   take something under --

17           THE COURT:  Would you speak in the microphone?

18   Again, we --

19           MR. MCENTIRE:  Yes.  My original objection was

20   addressing his request of you, Your Honor, to take something

21   under judicial notice.  I want to make sure my objection is

22   also lodged with regard to Exhibit 45, which I understand

23   you've overruled.

24           THE COURT:  Correct.

25           MR. MCENTIRE:  Okay.

002153

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 11/03/25   Page 625 of 1011   PageID 2524
Exhibit 72   Page 2078/3390

Dondero - Cross                    175

1        THE COURT:  It is so noted.

2        MR. MORRIS:  Okay.

3        THE COURT:  You've objected and I've admitted it.

4        MR. MORRIS:  And I think I've said this already, but

5   the reason that we're requesting the Court take judicial

6   notice of its order on the second contempt proceeding is

7   because it shows that Mr. Dondero and Mr. Patrick worked

8   together, in violation of the gatekeeper, to try to suit Mr.

9   Seery to obtain the interest in HCLOF that he is sitting here

10  today saying somehow that Mr. Seery wrongfully acquired, even

11  though he didn't say a word at the time.

12       THE COURT:  Okay.  So now we're talking about not

13  Exhibit 45 --

14       MR. MORRIS:  Yes.

15       THE COURT:  -- but the order that was entered --

16       MR. MORRIS:  Correct.

17       THE COURT:  -- regarding the filing of Exhibit 45?

18       MR. MORRIS:  Exactly.

19       THE COURT:  Someone is going to need to give me a

20  docket entry number before we're done here.

21       MR. MORRIS:  Okay.

22       THE COURT:  I can and will take judicial notice of

23  that, but I need to have it --

24       MR. MCENTIRE:  So I assume, for the record, my

25  objection is overruled?

002154

HCMLPHMIT00003188

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 07/26   Page 626 of 1011    PageID 2525
Exhibit 72   Page 2107 of 390

Dondero - Cross                                    176

```
 1              THE COURT:  Your objection is overruled.

 2              MR. MCENTIRE:  Thank you.

 3              MR. MORRIS:  All right.

 4   BY MR. MORRIS:

 5   Q    You mentioned something about, I think, was it NXDT or

 6   NHF?

 7   A    Yes.

 8   Q    And just let me see if I can do it this way.  Right?  So

 9   there used to be a fund known as the NexPoint Strategic

10   Opportunities Fund, right?

11   A    Yes.

12   Q    Okay.  And in 2020 that was a closed-in fund.  Correct?

13   A    Yes.

14   Q    And it traded under the ticker symbol NHF, correct?

15   A    Yes.

16   Q    And then late in 2021 the name of the fund was changed to

17   NexPoint Diversified Real Estate Trust, correct?

18   A    Yes.

19   Q    And the ticker symbol changed from NHF to NXDT, correct?

20   A    Yes.

21   Q    And then it became a REIT the following year, right?

22   A    Yes.

23   Q    And I'm just going to refer to these letters as the Fund;

24   is that fair?

25   A    That's fine.
```

002155

HCMLPHMIT00003189

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 02/28/26   Page 627 of 1011    PageID 2526
Exhibit 72   Page 2078 of 2390

Dondero - Cross                177

1   Q    For purposes of these questions.  And you were the Fund's

2   portfolio manager, the president, the principal executive

3   officer, correct?

4   A    Yes.

5   Q    And another entity that you controlled, NexPoint Advisors,

6   provided advisory services to the Fund, correct?

7   A    Yes.

8   Q    And you controlled NexPoint Advisors at all times,

9   correct?

10  A    Yes.

11  Q    Okay.  And the Fund was publicly traded, right?

12  A    Yes.

13  Q    And the Fund owned shares of MGM at the end of 19 -- at

14  the end of 2020, correct?

15  A    Yes.

16  Q    In fact, as of December 2020, MGM was one of the Fund's

17  ten largest holdings, with -- valued at over $25 million.

18  Isn't that right?

19  A    Yes.

20  Q    And by the end of 2021, MGM was the Fund's fifth largest

21  holding, with assets -- with a value of over $40 million.

22  Correct?

23  A    Yes.

24  Q    And the Fund also held MGM common stock indirectly; isn't

25  that right?

002156

HCMLPHMIT00003190

Dondero - Cross                         178

1   A    Yes.

2   Q    In fact, when the Amazon deal closed at the -- in March of

3   2022, the Fund issued a press release disclosing that it stood

4   to receive over $125 million on the MGM shares that it held

5   directly and indirectly.  Correct?

6   A    We issued several press releases.  I don't remember --

7   Q    Okay.  Do you remember that, that as a result of the MGM

8   sale, the Fund was expected to receive approximately $126

9   million?

10  A    Yes.

11  Q    Okay.

12  A    Roughly.

13  Q    All right.  In October 2020, just a few weeks before you

14  sent your email, the Fund announced the commencement of a

15  tender offer to acquire outstanding shares at a certain price.

16  Correct?

17  A    Yeah, I believe so.

18  Q    And you authorized that, right?

19  A    Yes.

20  Q    And when a fund acquires shares and then retires them, the

21  shareholders who did not tender consequently own a larger

22  percentage of the fund than they did before the tender,

23  correct?

24  A    Yes.

25  Q    Okay.  And the tender was completed in January, in the

HCMLPHMIT00003191

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 07/08/25   Page 629 of 1011   PageID 2528
Exhibit 72   Page 180 of 390

Dondero - Cross                    179

```
 1   first week of January 2001 [sic], correct?

 2   A    I don't remember when it was complete.

 3   Q    It started at the end of October 2020, and it ended

 4   sometime in January '21.  Is that fair?

 5   A    Okay.  I don't remember.  Okay.

 6   Q    Do you want me to refresh your recollection?

 7   A    I'm just saying I don't remember.

 8   Q    Yeah, okay.

 9   A    I'm not dis...

10   Q    Okay.

11   A    -- denying it.  I just don't remember the exact dates.

12        (Discussion.)

13             MR. MORRIS:  Your Honor, can I mark for

14   identification purposes Plaintiffs' Exhibit -- I'm just going

15   to call it 100, to see if it refreshes the witness's

16   recollection?

17             THE COURT:  You may mark it.

18             MR. MORRIS:  Okay.

19             THE COURT:  We'll see where it goes from there.

20        (Debtors' Exhibit 100 is marked for identification.)

21   BY MR. MORRIS:

22   Q    So, I've put --

23             MR. MCENTIRE:  Hold it.  Your Honor, I think we're

24   now marking exhibits that we haven't put on an exhibit list.

25             MR. MORRIS:  I'm trying to refresh his recollection.
```

002158

HCMLPHMIT00003192

Dondero - Cross                            180

```
 1            MR. MCENTIRE:  Okay.

 2            MR. MORRIS:  Yeah.

 3            MR. MCENTIRE:  Well, --

 4            THE COURT:  Yes.

 5            MR. MORRIS:  Okay?  I haven't offered it in -- I

 6   haven't offered it --

 7            THE COURT:  I've not admitted -- I don't know what it

 8   is.  I haven't admitted it yet.  I'm waiting.

 9            MR. MORRIS:  I haven't offered it into evidence.  He

10   said he doesn't remember, --

11            THE COURT:  Okay.

12            MR. MORRIS:  -- I've got an SEC document here, and

13   I'm going to try and refresh his recollection.

14            THE COURT:  Okay.

15   BY MR. MORRIS:

16   Q    You're familiar with these forms, right?

17   A    Generally.

18   Q    In fact, in fact, you sign them in your capacity as the

19   fund portfolio manager, right?  Your signature is put on it,

20   anyway?

21   A    Generally.

22   Q    Yeah.  And do you see that this is the Form N-CSR that was

23   filed with the SEC at the end of 2001 [sic] on behalf of

24   NexPoint Diversified Real Estate Trust?

25   A    Yes.
```

002159

HCMLPHMIT00003193

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72  Filed 2182/26 390  Page 631 of 1011    PageID 2530

Dondero - Cross                    181

1  Q    Okay.  So if you just turn to Page 16.  And the numbers

2  are kind of at the bottom in the middle of the page.  You'll

3  see the notes to the consolidated financial statements.

4  A    Yes.

5  Q    Okay.  And Note 1 discusses the organization.  Do you see

6  that?

7  A    Yes.

8  Q    And at the bottom of the left-hand column, it says, On

9  January 8, 2021, the company announced the final result of its

10  exchange offer pursuant to which the company purchased the

11  company's outstanding -- the company's common shares in

12  exchange for certain consideration.

13       Do you see that?

14  A    Yes.

15  Q    That's a reference to the tender offer that you authorized

16  at the end of October, correct?

17  A    Yes.

18  Q    And then at the bottom it says, The company share --

19  company -- excuse me.  I strike that.  It says, quote, The

20  common shares at a price of $12 per common share, for an

21  aggregate purchase price of approximately $125 -- $105

22  million.  Upon retirement of the repurchased shares, the net

23  asset value was $152 million, or $17.41 million.

24       Do you see that?

25  A    Yes.

HCMLPHMIT00003194

1   Q    Does that refresh your recollection that the tender offer

2   was completed at the beginning of January?

3   A    Yes.

4   Q    And that's with all of the MGM stock that the Fund still

5   owned at that time, right?

6   A    Yeah.  We -- we didn't -- we didn't violate --

7   Q    You didn't --

8   A    We didn't -- we didn't violate like Seery did.  We didn't

9   sell any shares or buy shares.

10  Q    Okay.

11          MR. MORRIS:  I'm going to move to strike that, Your

12  Honor.

13          THE COURT:  So granted.

14          MR. MCENTIRE:  Well, Your Honor, I've actually got a

15  response to his motion to strike.  This entire inquiry is

16  irrelevant.

17          MR. MORRIS:  Not --

18          MR. MCENTIRE:  This has no relevance at all in

19  connection with the allegations that we're making in this

20  case.

21          THE COURT:  Your response?

22          MR. MORRIS:  My response, Your Honor, if you ask me

23  -- let me just get a few more questions.  He personally owned

24  shares in the Fund.  The Fund owned shares in MGM.  And

25  notwithstanding the restricted material, this is the insider,

HCMLPHMIT00003195

Dondero - Cross                              183

1   and he is benefiting from himself through the Fund's

2   repurchase of these shares in the tender offer, and he went

3   and he had substantial holdings.  I'll get to that in a

4   minute.

5        So he is actually doing something worse than what Mr.

6   Seery -- what he accuses Mr. Seery of, because he's buying

7   shares for his own personal benefit.  Right?  He's the

8   insider.  Right?  And the Fund owns the shares directly.

9   There's never going to be an allegation that HCLOF ever owned

10  any MGM stock.  Never.

11            THE COURT:  Okay.  I'm going to allow this.

12  Obviously, on redirect, you can further question on this --

13            MR. MCENTIRE:  Well, --

14            THE COURT:  -- to --

15            MR. MCENTIRE:  Well, first of all, his suggestions

16  and his accusations are purely argumentative.

17            THE COURT:  Would you please speak in the microphone?

18  We --

19            MR. MCENTIRE:  Well, he's standing in the way, Your

20  Honor.

21            THE COURT:  Well, --

22            MR. MCENTIRE:  It's irrelevant.

23            THE COURT:  There are two.  There's room for both of

24  you.

25        Continue.  Go ahead.

HCMLPHMIT00003196

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 4-72   Filed 08/05/25   Page 634 of 1011     PageID 2533
Exhibit 72   Page 185 of 390

Dondero - Cross                                      184

1          MR. MCENTIRE:  It's entirely irrelevant, and it's

2     argumentative.

3          THE COURT:  Okay.  Overruled.  You can continue.

4     BY MR. MORRIS:

5     Q    You did own an awful lot of the Fund's shares, didn't you?

6     A    I owned some.

7     Q    You owned some?  You owned millions, right?

8     A    Yes.

9     Q    Okay.  And as a result of the tender, you owned a greater

10    interest of the Fund, right?

11    A    Yes.

12    Q    And therefore you owned a greater number -- a greater

13    portion of the MGM stock, the $125 million of MGM stock that

14    was owned directly and indirectly by the Fund, correct?

15    A    You do know insiders weren't permitted to participate in

16    the tender, which would have kept my percentage the same.

17    Q    Sir, you benefitted -- you didn't stop the tender, right?

18    You didn't say, now I know what's going to happen, I should

19    stop it?  You benefitted from the tender.  Can we just agree

20    on that?

21    A    I did everything I was supposed to do, notifying

22    Compliance.  If they thought it was material, they would have

23    -- it was in their hands once I notified Compliance of the

24    material --

25    Q    Okay.

HCMLPHMIT00003197

Dondero - Cross                                185

1   A    -- nonpublic information.

2   Q    I appreciate that.  I just want --

3   A    It wasn't my responsibility to do Compliance's job to call

4   you or call --

5   Q    Okay.

6   A    -- the SEC or call anybody else.

7   Q    But you will agree that, even though you had material

8   nonpublic inside information, you didn't take any steps to

9   stop the tender, correct?

10  A    The tender was for a relatively small amount of the stock.

11  But I did -- I would -- it would not be my responsibility to

12  change or adjust the tender --

13  Q    Okay.

14  A    -- or what was happening.

15  Q    Okay.  And then the last question is, you benefitted from

16  the tender because the Fund repurchased shares, which

17  increased your percentage ownership of the Fund, and therefore

18  your percentage ownership of the MGM shares that were held

19  directly and indirectly.  Is that fair?

20  A    Marginally, I guess.  Yes.

21  Q    Okay.  From the -- from the millions of shares, you would

22  describe it as marginal?  Okay.

23       Let me move on.  You've testified now that you spoke with

24  representatives of Farallon in the late spring, I guess

25  beginning on May 28th.  Right?

002164

HCMLPHMIT00003198

Dondero - Cross                     186

1   A    Yes.

2   Q    And that was two days after the MGM deal was publicly

3   announced, correct?

4   A    Yes.

5   Q    Okay.  And had you ever communicated with Mr. Patel before

6   that phone call?

7   A    I don't believe so.

8   Q    And then you spoke with Mr. Linn shortly after?

9   A    Yes.

10  Q    Had you ever spoken with Mr. Linn before that phone call

11  with Mr. Linn?

12  A    I don't believe so.

13  Q    So these phone calls were the very first time that you

14  ever spoke to either one of these gentlemen.  Is that right?

15  A    That I can remember.

16  Q    Okay.

17  A    If I ran into them at --

18  Q    Uh-huh.

19  A    -- a conference a decade ago, I don't know, but --

20  Q    And they told you that they bought the shares in the

21  February-March time frame, right?

22  A    Yes.

23  Q    And you have no reason to dispute that, correct?

24  A    Correct.

25  Q    Okay.  And you didn't know how much they had paid for the

002165

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 08/26   Page 637 of 1011   PageID 2536

Dondero - Cross                           187

1    claims as a result of these conversations, correct?

2    A    They did not admit a price.

3    Q    Okay.  And it's your testimony that there wasn't

4    sufficient information in the public for them to buy -- this

5    is your view -- that there wasn't sufficient information in

6    the public to justify their purchases.  Is that your view?

7    A    Correct.

8    Q    And even though you didn't think there was sufficient

9    information in the public, you were prepared to pay 30 percent

10   more than they did, right?

11   A    Yes.

12   Q    And is that because you were 30 percent more irrational

13   than them or because you had material nonpublic inside

14   information?

15            MR. MCENTIRE:  Objection.  Argumentative, Your Honor.

16            THE COURT:  Overruled.

17            THE WITNESS:  Even at a 30 percent premium, it was

18   less than I offered the UCC several months earlier, number

19   one.

20       Number two, I was still under the illusion there was a

21   desire to resolve the place, not burn it down.  You know,

22   there was -- all the original members were happy to sell at

23   $150 million.  It was a $500 or $600 million estate.  There

24   should be $400 or $500 million of residual value.  It

25   shouldn't all be going out the door to lawyers and others.

002166

HCMLPHMIT00003200

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 14-72   Filed 08/08/25   Page 638 of 1011     PageID 2537
Exhibit 72   Page 189 of 390

Dondero - Cross                                    188

1  BY MR. MORRIS:

2  Q    You were willing to pay 30 percent more for an unknown

3  purchase price, 30 percent more of an unknown purchase price,

4  at a moment that you didn't believe there was sufficient

5  information to buy the claims, correct?

6  A    You have a couple misstatements in there.  The Grosvenor

7  piece was public.  The Grosvenor piece traded at $67 million.

8  So we knew that piece trade at around 50 cents.  We knew from

9  people in the marketplace the other pieces were trading right

10 around that level.

11      So I wasn't just offering 30 percent on any willy-nilly

12 number, 130 percent of any willy-nilly number.  I knew they

13 had paid around 50, 60 cents.  And so I was offering 30

14 percent more than that.  Thirty percent more than $150

15 million, call it $200 million.  I had offered $230 or $240

16 million to resolve the whole estate before the plan went

17 effective, and I got no response from the original UCC

18 members.

19 Q    So why didn't you just try to settle the case with them?

20 Why did you try to buy the claim?  Why, if you had these new

21 people, and your good intentions were to finally get to a

22 settlement of the case, why didn't you say, hey, guys, how do

23 we resolve the case?  Why did you want to buy the claims at a

24 30 percent premium over what they paid with no knowledge and

25 no diligence, according to you?  Can you explain that to Judge

HCMLPHMIT00003201

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 10/02/25   Page 639 of 1011   PageID 2538

Dondero - Cross                                    189

1  Jernigan?

2  A    Because Seery told them to hold on, don't worry, they were

3  going to make $270 million.

4  Q    That doesn't answer my question.  Why didn't you try --

5  you had new owners.  Why didn't you try to settle with them?

6  A    When someone owns an asset, buying their asset is settling

7  with them.  What claim does Farallon have against us?  At that

8  point, they had no claims against us.

9  Q    It doesn't settle the case, does it?

10  A    But if we owned all the claims, it would settle the case.

11  Just like if Seery had objected to the claims trading that

12  they were supposed to give written notice to the Court, he had

13  enough cash on the balance sheet to buy and retire all the

14  claims.

15  Q    All right.  Let's go back, I apologize, to that Exhibit

16  11.  No, it's not Exhibit 11.  I think it's their Exhibit 4,

17  your notes.

18           MR. MORRIS:  Your Honor, may I have -- just have one

19  moment?

20           THE COURT:  You may.

21           MR. MORRIS:  Can you tell me how long I've been

22  going?  That's really my question.

23           THE CLERK:  So, on cross, --

24           MR. MORRIS:  Yeah.

25           THE CLERK:  -- you've been going for 32 minutes.

002168

HCMLPHMIT00003202

Dondero - Cross                        190

 1              MR. MORRIS:  Okay.  Trying to speed this up.

 2    BY MR. MORRIS:

 3    Q   All right.  So, do we have your handwritten notes, which

 4    are Exhibit 4, in this binder?  Oh.

 5              THE COURT:  Do you want to put it up again on the

 6    screen?

 7              MR. MORRIS:  Ms. Canty, if you're listening and you

 8    can do that, that would be great.  If not, --

 9       (Discussion.)

10              MS. CANTY:  One second, John.

11              MR. MORRIS:  All right.  He -- he's got it.

12              THE COURT:  Okay.

13    BY MR. MORRIS:

14    Q   Okay.  So, I just -- I just want to make -- you know,

15    follow up on a few questions I asked you earlier on *voir dire*.

16    So, these are your notes, right, and you said you write down

17    the important stuff.  Correct?

18    A   I write down, yeah, the stuff I thought I would need for

19    the next call.

20    Q   Okay.  And, you know, again, just so we have it all in one

21    spot, it doesn't say anything about MGM.  Correct?

22    A   It does not.

23    Q   It doesn't say anything about a *quid pro quo*, correct?

24    A   *Quid pro*?  Uh, no, it does not.

25    Q   It doesn't say anything at all about Mr. Seery's

002169

Dondero - Cross                              191

1   compensation, correct?

2   A    It does not.

3   Q    It doesn't say anything about the sharing of material

4   nonpublic inside information, correct?

5   A    When I told them discovery was coming, that was my

6   response to I knew they had traded on material nonpublic

7   information.

8   Q    Okay.  That -- you told them that?

9   A    Yes.

10  Q    Is that what you're saying now?

11  A    Yes.

12  Q    Oh, so that's what you told them?  They didn't tell you

13  that; that's what you told them?

14  A    Yes.

15  Q    And that's why you wanted discovery, right?

16  A    I thought it would be a lot easier to get discovery on a

17  situation like this than it has been for the last two years,

18  yes.

19  Q    Okay.  Um, --

20  A    In fact, I told them that it would be coming in the next

21  few weeks.  And this has been a couple years.

22  Q    And that's exactly what you did, right?

23  A    Well, we've been trying for two years to get --

24  Q    Right.

25  A    -- discovery in this.

002170

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 10/03/25   Page 642 of 1011    PageID 2541

Dondero - Cross                              192

```
 1   Q    Okay.  So you filed your Texas 202, right?

 2   A    I don't know who filed what.

 3   Q    That was the one by Mr. Sbaiti that was filed under your

 4   name?  Do you remember that?

 5   A    Generally.

 6   Q    Okay.  Let's take a quick look at that document.  It's #3

 7   in our binder.

 8   A    Binder #3?

 9        (Discussion.)

10           MR. MORRIS:  Okay.  I think #3 is in evidence, Your

11   Honor.

12           THE WITNESS:  Number 3 is in evidence.

13           THE COURT:  Yes.

14           MR. MORRIS:  Okay.

15           THE COURT:  It is.

16   BY MR. MORRIS:

17   Q    And if you can turn to the last page, Mr. Dondero.  Page

18   8.

19   A    Yes.

20   Q    Okay.  And that's your signature, right?

21   A    Yes.

22   Q    And you verified that this document was true and correct

23   within the best of your personal knowledge, correct?

24   A    Yes.

25   Q    Did you read it before you signed it?
```

HCMLPHMIT00003205

Case 19-34054-sgj11  Doc 4255-72  Filed 06/20/25  Entered 06/20/25 21:39:29  Desc
Case 3:25-cv-02724-L    Document 14-72  Filed 07/24/25  Page 643 of 1011    PageID 2542
Exhibit 72  Page 194 of 390

Dondero - Cross                          193

1    A    Probably.

2    Q    You don't recall doing that?

3    A    Not at this moment.

4    Q    And you may not have.  Is that fair?

5    A    No, I probably did.  Do you have a question?

6    Q    I'm just wondering if you signed it or not.

7    A    I did sign it.

8    Q    Okay.  Good.  So, can you go to Paragraph 21?  Well, let's

9    start at Paragraph 20.  It says that Mr. Seery, quote, has an

10   age-old connection to Farallon, and upon information and

11   belief, advised Farallon to purchase the claims.

12        Do you see that?

13   A    Yes.

14   Q    And then the next paragraph you refer to the telephone

15   call that you had with Michael Linn, right?

16   A    Yes.

17   Q    It doesn't refer to any phone call with Mr. Patel,

18   correct?

19   A    It does not.

20   Q    And the only reason that you swore under oath you were

21   told that Farallon purchased the claims was because of

22   Farallon's, quote, prior dealings with Mr. Seery.  Correct?

23   In Paragraph 21, it says, Relying entirely on Mr. Seery's

24   advice solely because of their prior dealings?

25   A    Yes.

HCMLPHMIT00003206

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 03/05/26   Page 644 of 1011    PageID 2543
Exhibit 72   Page 195 of 390

Dondero - Cross                                      194

1   Q   Okay.  You didn't -- you didn't swear under oath at that

2   time that you were told that they bought the claims because of

3   MGM.  Right?

4   A   If you're asking if this is -- it seems like it's not

5   complete, if that's what you're asking me.

6   Q   I'm not asking you that.  I'm asking you what -- I'm

7   asking you to confirm that you swore under oath to the Texas

8   state court, just weeks after you had these conversations,

9   about what you were told concerning Farallon's purchase of the

10  claims.

11      I'm focused on Paragraph 21.  The only reason that you

12  gave, that you told the Texas state court under oath, was that

13  Farallon told you they bought their claims because of their

14  prior dealings with Seery.  Right?

15  A   Yeah.  And that's true.  And that's consistent with what

16  I've said.

17  Q   Okay.  You didn't say anything about MGM, correct?

18  A   Correct.

19  Q   You didn't say anything about a *quid pro quo*, correct?

20  A   Correct.

21  Q   You didn't say anything about Mr. Seery's compensation.

22  Correct?

23  A   I did not.

24  Q   You didn't say anything about the sharing of material

25  nonpublic inside information, correct?

HCMLPHMIT00003207

Dondero - Cross                           195

```
1    A    Different document, different purposes.

2    Q    Well, but that's now two documents.  You have your notes

3    and you had this document, neither one of which say any of

4    those things.  Fair?

5    A    Different documents, different purposes.  I don't know if

6    that's --

7    Q    Is it fair that neither one of those documents say any of

8    those things?

9    A    It's fair that they don't all match.

10   Q    Okay.  Okay.  Well, that's a fair statement.  Let's go to

11   the next one.  Do you remember the next year you filed an

12   amended petition?

13   A    What tab?

14   Q    That's -- I appreciate that.  It's Tab 4.  Do you see at

15   the last page you've again signed a verification?

16   A    Yep.

17   Q    And do you see this one's filed with the Texas state court

18   on May 2, 2022?

19   A    Yes.

20   Q    And you swore under oath that this statement was complete,

21   true, and accurate to the best of your knowledge, correct?

22   A    Yes.

23   Q    Okay.  Can you go to Page 5, please?

24   A    Yes.

25   Q    Directing your attention to Paragraph 23, do you see where
```

002174

HCMLPHMIT00003208

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 10/07/25   Page 646 of 1011    PageID 2545

Dondero - Cross                              196

1   you say now that Farallon was relying, quote, on Mr. Seery's

2   say-so because they had made so much money in the past when

3   Mr. Seery told them to purchase claims.

4       Do you see that?

5   A   Yes.

6   Q   Again, you don't say anything about MGM, correct?

7   A   Correct.

8   Q   Again, you don't say anything about material nonpublic

9   inside information, correct?

10  A   Well, on 24 it does.  Right?  Mr. Seery had inside

11  information on the price and value of claims.  So, you've got

12  to look at all of the bullet points.

13  Q   But that's not the paragraph where you're talking --

14  that's -- it says, in other words.  That's not the paragraph

15  where you're describing your conversation with Farallon.

16  That's your interpretation of it, correct, just as you just

17  said?

18  A   (no immediate response)

19  Q   You told -- I'm sorry.  I should let you finish the

20  answer.  That's your interpretation of it, correct?

21  A   Well, I'm reading all the bullets in aggregate, and it's

22  -- it's a picture of material information shared by Seery, not

23  just MGM or one particular investment, but on all the other

24  assets that aren't detailed in any of the public filings,

25  also.

002175

HCMLPHMIT00003209

Dondero - Cross                      197

1   Q    The only -- the only point I want to make, I think we can

2   agree on this --

3   A    Okay.

4   Q    -- is that you believed that Mr. Seery gave them material

5   nonpublic inside information.  Farallon never told you that.

6   Isn't that true?  That's why you wanted discovery?

7   A    They said they relied on him and did no diligence of their

8   own.  They were very express -- explicit about that.

9   Q    Okay.  Can you answer my question now?

10  A    Which -- I thought -- that does, --

11  Q    You concluded --

12  A    -- yes.

13  Q    -- that Mr. Seery gave them material nonpublic inside

14  information.  They never told you that.  Fair?

15  A    They said they relied on -- solely on Seery, didn't buy it

16  for any other reason, and they did no due diligence of their

17  own.

18  Q    Okay.  Let's go to the next one.  Now, the no-due-

19  diligence part, that's not in any version we've seen, right?

20  That's something that you just --

21  A    No, no, --

22  Q    -- that you're just testifying to now?  That's not in your

23  notes, it's not in Version 1, and it's not in this version,

24  correct?

25  A    Well, let's go back to the Linn one, because when I was

Dondero - Cross                        198

1   going back and forth and he wouldn't give a price, he kept

2   saying, Seery told us it's worth a lot more.  And I kept

3   saying, you've got to look at the burn, you've got to look at

4   the professionals.  And --

5   Q    Okay.

6   A    -- that's --

7   Q    Shortly after this, you filed yet another declaration,

8   right?

9   A    Yes.

10  Q    Uh-huh.  Can you turn to #5?  And this is another version

11  of your recollection of what you were told, correct?  In

12  Paragraph 2?

13  A    These are all -- I don't know why you're saying they're

14  different.  They're all the same.  They're just slightly

15  different verbiage.  What's the major difference between any

16  of them?

17  Q    I'll ask, I'll ask you the question.  The question is, you

18  had never written in any of the prior versions that they

19  didn't do any due diligence; isn't that right?  You never --

20  you never talked about their due diligence in any prior

21  version, correct?

22  A    It's all -- it's all the same version.  I don't -- some

23  versions --

24  Q    Can you answer my question?

25  A    I don't know.  I don't know --

002177

HCMLPHMIT00003211

Dondero - Cross                        199

1    Q    Which --

2    A    -- which ones included which -- I don't --

3    Q    We've just looked at them.  Do you want to look at them

4    again?

5    A    I just looked at one page in the other one and it was five

6    pages.  I just looked at the one page and I found two or three

7    things --

8    Q    Your notes --

9    A    -- it didn't include, but --

10          MR. MORRIS:  You know what.  I don't want to argue.

11   They say what they say, Your Honor, and I would ask the Court

12   to look carefully at our objection to the motion because we

13   lay all of this out.

14        Your Honor can -- here's the point, because I do want to

15   finish up right now.  There are five different versions of

16   this conversation.  They're laid out in the brief.  And the

17   question that you have to ask yourself, Your Honor, is, if you

18   allow this case to go forward, how do they make a colorable

19   claim when the story keeps changing?

20        And I'll just leave it at that, because, you know, the

21   last version says MGM for the first time.  Like, it comes out

22   of nowhere.  This -- his notes don't say it, he hasn't

23   testified that that's what he was told, but somehow that's in

24   his sworn statement.

25        So I'm just going to rest on the papers, because this is

HCMLPHMIT00003212

1    -- I don't want to be argumentative.

2              THE COURT:  Okay.

3              MR. MCENTIRE:  Well, I'll object to the argument of

4    counsel.  He's just doing another opening statement here, and

5    it's inappropriate and not proper.

6              THE COURT:  Okay.  I agree.  This is Q and A.

7              MR. MORRIS:  Okay.

8              THE COURT:  So, --

9    BY MR. MORRIS:

10   Q   Do you know -- do you have any knowledge or information as

11   to how Mr. Seery's compensation was established?

12   A   Uh, --

13   Q   Withdrawn.  I'm talking now not in his capacity as an

14   independent director or the CEO of the Debtor.  I'm only

15   talking about in his capacity as the CEO of the Reorganized

16   Debtor and the Claimant Trustee.  Do you have any personal

17   knowledge as to how his compensation was established?

18   A   The knowledge I have is that the Claimant Trust gives full

19   latitude to change it at almost any time they want.  Add more

20   to it, add more than that we've seen, double it in the future

21   if reserves are reversed.  It can do anything it wants.  And I

22   guess we've seen some redacted partial statements of his

23   compensation, but that's all I know.

24   Q   Okay.  You have no knowledge about how Mr. Seery's

25   compensation package was determined, correct?

HCMLPHMIT00003213

Dondero - Redirect                            201

1   A    I was not involved.

2   Q    Okay.  You've never -- I'll just leave it at that.

3            MR. MORRIS:  I have nothing further, Your Honor.

4            THE COURT:  Okay.  Pass the witness.  I'm sorry, I

5   guess I should ask, do any of the other responding parties

6   have examination?

7            MR. STANCIL:  No, Your Honor.

8            THE COURT:  No?  Okay.  Redirect?

9            MR. MCENTIRE:  Just very briefly, Your Honor.

10           THE COURT:  Okay.

11           MR. MCENTIRE:  Thank you, Your Honor.

12                         REDIRECT EXAMINATION

13  BY MR. MCENTIRE:

14  Q    Mr. Dondero, you remember the questions about Judge

15  Jernigan walking into the courtroom on June 8 two years ago

16  saying, MGM is sold, maybe we can settle this case?  Do you

17  recall those questions?

18  A    Yes.

19  Q    And do you remember Mr. Morris's dramatic suggestion that,

20  well, how did Judge Jernigan know, or to that effect?

21  A    Yes.

22  Q    Well, that had already been announced, had it not,

23  publicly?

24  A    Yes.

25  Q    Several weeks before?

002180

HCMLPHMIT00003214

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 10/03/25   Page 652 of 1011   PageID 2551
Exhibit 72   Page 203 of 390

Dondero - Redirect                    202

```
 1   A    Yes.

 2   Q    I'd like to direct your attention -- do you still have

 3   Exhibit 4 that he handed you?  Do you have Exhibit 4 there?

 4   A    Uh, --

 5   Q    His exhibit?

 6   A    Is that the notes?

 7   Q    No, it's -- Exhibit 4 is the verified amended petition to

 8   take deposition before suit -- take -- in the state court.  To

 9   -- deposition.

10   A    You've got to give me more of a clue.  I'm sorry.  There's

11   like six binders.

12          MR. MCENTIRE:  Mr. Morris, can you show us where the

13   exhibit --

14          MR. MORRIS:  Sure.  Which one is it?

15          MR. MCENTIRE:  It's Exhibit 4.  I'm going to talk to

16   him about Exhibit 4 (inaudible) that you've have used with

17   this witness.

18   BY MR. MCENTIRE:

19   Q    I assume -- Mr. Dondero, were you assuming from the tone

20   and the substantive content of his questions that Mr. Morris

21   is suggesting that your notes are not reliable?

22   A    He was trying to make it seem like the versions were

23   different.  They were all 90 percent the same.  Different --

24   it seemed like different emphasis for different purposes.  And

25   then you have to remember we learned more about Farallon and
```

002181

Dondero - Redirect                                    203

1   Stonehill over time.  Like, in the beginning, when I had --

2   when I -- we didn't even know Stonehill was involved when I --

3   Q    Sure.

4   A    -- first talked to -- when --

5   Q    Well, he made the big suggestion about you never talked

6   about due diligence before.  Turn to Exhibit 4, Paragraph 23,

7   which he did not address with you.  Can you turn to Paragraph

8   23 of Exhibit 4?  Mr. Morris omitted to refer you to this

9   particular paragraph.

10  A    23?  Go ahead.

11  Q    Would you read it into the record?

12  A    (reading)  On a telephone call between Petitioner and

13  Michael Linn, a representative of Farallon, Michael Linn

14  informed the Petitioner Farallon had purchased the claim

15  sight-unseen and with no due diligence, a hundred percent

16  relying on Mr. Seery's say-so, because they had made so much

17  in the past with Mr. -- when Mr. Seery had (overspoken).

18  Q    Now, since you've an opportunity to see other paragraphs

19  and other -- that he was otherwise not selecting, you did

20  refer to the -- to what Mr. Linn had told you about in May of

21  2021?

22  A    Yes.  I've been very consistent.  Listen, I believe

23  Farallon tapes all their conversations.  So, eventually, as

24  this goes further, I purposefully --

25  Q    Well, let's --

002182

HCMLPHMIT00003216

Dondero - Redirect                        204

```
 1            MR. MORRIS:  I move to strike, Your Honor.

 2            THE WITNESS:  Okay.

 3            THE COURT:  Sustained.

 4   BY MR. MCENTIRE:

 5   Q   He also did not direct your attention or the Court's

 6   attention to Paragraph 27 of Exhibit 4, selecting --

 7   presumably strategically selecting not to refer to that

 8   paragraph.  Do you see Paragraph 27?

 9   A   Yes.

10   Q   Could you read that into the record, please?

11   A   (reading)  However, Mr. Seery is privy to material

12   nonpublic information, inside information of many of the

13   securities that Highland deals in, as well as the funds that

14   Mr. Seery manages through Highland.  One of these assets was a

15   publicly-traded security that Highland was an insider of, and

16   therefore should not have traded, whether directly or

17   indirectly, given its possession of insider information.

18   Q   Isn't that paragraph just basically addressing MGM?

19   A   Yeah, that's the only major position we had that that

20   would apply to.

21   Q   So the suggestion that you're just making this MGM stuff

22   up is not true.  It's consistent with what you've (inaudible)

23   in other courts as well, correct?

24   A   Yes.  I believe it's disingenuous to say that there's

25   different versions of my story.
```

002183

HCMLPHMIT00003217

Dondero - Redirect                    205

1   Q   Well, let's continue with Mr. Morris's strategy.  Go to

2   Exhibit 3, please.  Mr. Morris suggested that there's no

3   reference at all in any of these prior pleadings about Mr.

4   Seery's excess conversation.  Do you recall that series of

5   questions?

6   A   Yes.  Or his statements, yes.

7   Q   Yes.  And he did not direct your --

8           MR. MORRIS:  I move to strike.  I asked him if he had

9   any knowledge of the man's compensation package.  That's what

10  I asked him.

11          MR. MCENTIRE:  No, sir.  Your Honor, that's not what

12  he asked him.  That was one of the questions he asked.  The

13  other question was, there's nothing in here about

14  compensation.  That's what I'd like to address now.

15          MR. MORRIS:  Oh, go right ahead.

16          THE COURT:  Okay.

17  BY MR. MCENTIRE:

18  Q   Directing your attention --

19          THE COURT:  You can ask.  I'd have to go back and

20  check the record whether you had that second question you

21  mentioned.  I remember questions about does he have knowledge

22  of Seery's compensation.  I just can't remember if he asked,

23  --

24          MR. MCENTIRE:  Fair enough.

25          THE COURT:  -- were there references to it in the --

002184

HCMLPHMIT00003218

Dondero - Redirect                    206

```
 1              MR. MCENTIRE:  Well, --

 2              THE COURT:  -- prior pleadings.

 3              MR. MCENTIRE:  -- for the record, we'll make it clear

 4    that there is a reference.

 5    BY MR. MCENTIRE:

 6    Q   If I could direct your attention to Paragraph 23, Exhibit

 7    -- as to --

 8              MR. MORRIS:  What exhibit is it?

 9              MR. MCENTIRE:  It's Exhibit 3.

10              MR. MORRIS:  Hold on one second.

11              MS. MUSGRAVE:  Your exhibit.

12              THE COURT:  Highland's Exhibit 3.

13              MR. MORRIS:  Give me a moment.

14              THE COURT:  Page what?

15              MR. MCENTIRE:  It's Paragraph 22 on Page 5.

16              THE WITNESS:  I'm sorry.  My Exhibit 3?

17    BY MR. MCENTIRE:

18    Q   Could you read for me, please, Mr. --

19              MR. MORRIS:  Hold on one second.  It's my Exhibit 3

20    or your exhibit?

21              MR. MCENTIRE:  It's your exhibit.  This is Hunter

22    Mountain's binder.

23              MR. MORRIS:  Ah, I apologize.

24              MR. MCENTIRE:  You were just using it.

25              MR. MORRIS:  Okay.  All right.  Go ahead.  What
```

002185

HCMLPHMIT00003219

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 08/26/390Page 657 of 1011   PageID 2556
Exhibit 72   Page 208 of 390

Dondero - Redirect                207

1   paragraph were you?

2   BY MR. MCENTIRE:

3   Q   I'd direct your attention, Mr. Dondero, to Paragraph 22.

4           MR. MORRIS:   Yeah.

5   BY MR. MCENTIRE:

6   Q   Would you read -- would you read Paragraph 22 into the

7   record, please?

8   A   (reading)  Mr. Seery had much to gain by brokering a sale

9   of the claim suggested to Muck, mainly his knowledge that

10   Farallon as a friendly investor would allow him to remain as

11   Highland's CEO with virtually unfettered discretion to

12   administer Highland.  In addition, Mr. Seery's written

13   compensation package incentivized him to continue the

14   bankruptcy for as long as possible.

15   Q   There was also a series of questions to you about a

16   transaction involving NexPoint -- NexPoint Diversified Real

17   Estate Trust.  Do you recall those questions?

18   A   Yeah.  Let's talk about that.

19   Q   All right.  Tell me what the transaction was.

20   A   I'm sorry.  The tender that he was asking about or --

21   Q   Yes, the tender.

22   A   There was -- investors wanted some shares retired, and we

23   didn't have enough cash on the balance sheets.  So we tendered

24   in the form of giving them Preferred, which was like equity

25   but a better dividend or a more secured dividend, and 20

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 2009/25 390   Page 658 of 1011   PageID 2557

Dondero - Redirect                    208

1   percent cash.  And then insiders weren't allowed to

2   participate.  But the whole tender was only for eight or ten

3   percent of the nominal amount outstanding.  And again, you've

4   got a package of securities, so you didn't get any -- you

5   didn't cash.  And although it reduced the share count, it also

6   increased the Preferred or the claims against the company.  So

7   it was marginally accretive, I guess.

8   Q    All right.

9   A    But, again, as far as inside information is concerned,

10  Compliance is a separate party organization that reports up to

11  the SEC.  Has a dotted line to me.  Reports to the SEC.  They

12  make sure everything we do is compliant.

13  Q    Mr. Dondero, --

14  A    Yeah.  Can --

15  Q    -- you didn't participate in the transaction, did you?

16  A    No.  Insiders weren't allowed to participate in the

17  transaction.

18          MR. MCENTIRE:  Reserve the rest of my questions, Your

19  Honor.

20          THE COURT:  Any recross?

21                    RECROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q    The reference to the compensation that we just looked at,

24  that was your own personal view, not something that anybody

25  from Farallon ever told you, correct?  You can go back and

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 10/20/25   Page 659 of 1011    PageID 2558
Exhibit 72   Page 210 of 390

Dondero - Recross                                209

1   look.

2   A    Yeah, that --

3   Q    I mean, it's not a trick question.

4   A    Yeah, that was my pleading.

5   Q    Okay.  And that was your own speculation, if you will?  It

6   had nothing to do with anything Farallon ever told you,

7   correct?

8   A    I never discussed Seery's compensation with Farallon.

9   Q    Okay.  Thank you, sir, very much.  Just one last question.

10  The price of the tender --

11  A    Yes.

12  Q    -- was based in part on the value of the MGM stock,

13  correct?

14  A    The tender was based on market price --

15  Q    And --

16  A    -- of where the closed-in fund was trading.  It was

17  trading at a discount.  And the discount to NAV, the NAV

18  included MGM accurately marked at whatever time.

19  Q    I appreciate that.

20          MR. MORRIS:  No further questions, Your Honor.

21          THE COURT:  All right.  Mr. Dondero, that concludes

22  your testimony.

23          THE WITNESS:  Thank you.

24          THE COURT:  You are excused from the witness box.

25      (The witness steps down.)

HCMLPHMIT00003222

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 01/21/26 390   Page 660 of 1011    PageID 2559

210

```
 1              THE COURT:  We probably should take a break, right?

 2              MR. MORRIS:  Okay.

 3              THE COURT:  Caroline, do you want to give them the

 4   aggregate time used?

 5              THE CLERK:  Yes.  The Defendants used 91 minutes

 6   right now.  And the Respondents together, 86 minutes.

 7              THE COURT:  Okay.  I thought it was going to be

 8   higher than that.

 9         (Laughter.)

10              MR. MCENTIRE:  That's what it feels like.

11              MR. MORRIS:  You were wishing.

12              THE COURT:  I was wishing.  Okay.  A ten-minute

13   break.

14              THE CLERK:  All rise.

15         (A recess ensued from 3:17 p.m. until 3:28 p.m.)

16              THE CLERK:  All rise.

17              THE COURT:  All right.  Please be seated.  We're back

18   on the record in the Highland matter.  Mr. McEntire, you may

19   call your next witness.

20              MR. MCENTIRE:  Your Honor, Hunter Mountain would call

21   Mr. Seery adversely.

22              MR. STANCIL:  Your Honor, we're waiting for Mr.

23   Morris for just 60 more seconds.  I think he's on his way back

24   to the courtroom.

25              THE COURT:  Okay.  I just noticed.
```

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4 Filed 212/26 390   Page 661 of 1011   PageID 2560
Exhibit 72   Page 212 of

Seery - Direct                                      211

```
 1        Did I hear you say you're going to call him virtually?

 2              MR. MCENTIRE:  Adversely.

 3              THE COURT:  Oh, adversely?  Okay.  I'm so used to

 4    hearing the word "virtually" the past few years.

 5        Oh, and there he is.  Okay.

 6              MR. SEERY:  I'm sorry, Your Honor.

 7              THE COURT:  Mr. Seery, welcome.

 8              MR. SEERY:  Good afternoon, Your Honor.

 9              THE COURT:  Please raise your right hand.

10        (The witness is sworn.)

11              THE WITNESS:  I do.

12              THE COURT:  All right.  You may be seated.

13        JAMES P. SEERY, JR., HUNTER MOUNTAIN INVESTMENT TRUST'S

14                    ADVERSE WITNESS, SWORN

15                    DIRECT EXAMINATION

16    BY MR. MCENTIRE:

17    Q    Mr. Seery, would you please state your full name for the

18    record?

19    A    James P. Seery, Jr.

20    Q    And you and I met for the first time I believe it was last

21    Friday in your deposition; is that correct?

22    A    You were by video.

23    Q    I mean, --

24    A    We didn't actually meet.

25    Q    Correct.  You are currently the CEO of the Reorganized
```

HCMLPHMIT00003224

1   Debtor?

2   A    That's correct.

3   Q    Prior to your appointment as the CEO of the Reorganized

4   Debtor, you've never served as a CEO of a reorganized debtor

5   in the past, have you?

6   A    I have not.

7   Q    You previously served as the chief executive officer of

8   Highland Capital as a Debtor-In-Possession.  Is that correct?

9   A    That's correct.

10  Q    And that was the first time you'd ever served in a

11  position such as that; is that correct?

12  A    As the CEO of a debtor, yes.

13  Q    Right.  You also now currently serve as a Trustee for the

14  Highland Claimant Trust, which was put into effect after the

15  effective date of the plan, correct?

16  A    Yes, I'm the Claimant Trustee.

17  Q    All right.  That's the first time --

18          THE COURT:  Mr. McEntire, we usually require standing

19  at the podium.  I mean, do you need --

20          MR. MCENTIRE:  That's fine.  I'm totally fine.

21          THE COURT:  Okay.  That's --

22          MR. MCENTIRE:  I forgot.

23          THE COURT:  Okay.  Thank you.

24  BY MR. MCENTIRE:

25  Q    That was -- and your capacity as the Trustee for the

HCMLPHMIT00003225

 1   Claimant Trust, that's a first experience as well, correct?

 2   A    As the Claimant Trustee, yes.

 3   Q    All right.  And in these various capacities as a CEO of

 4   the Reorganized Debtor, do you consider yourself to be subject

 5   to the Investment Advisers Act?

 6   A    No, I don't I'm subject to the Investment Advisers Act.  I

 7   think Highland in certain capacities could be.

 8   Q    All right.  But do you have any duties that -- that you

 9   are required to fulfill under the Investment Advisers Act

10   accordingly?

11   A    Do I?

12   Q    Yes.

13   A    I believe Highland does.  I don't know that I have any

14   personal duties.

15   Q    All right, sir.  Let me now talk a little bit about your

16   duties that you did have at Highland.  You agree that when you

17   were at Highland you had fiduciary duties that you owed to the

18   estate?

19   A    Yes.

20   Q    What were those duties?

21   A    To generally treat the estate on an honest and fair

22   matter.

23   Q    Avoid conflicts of interest?

24   A    Yes.

25   Q    Not self-deal?

HCMLPHMIT00003226

1  A    Yes.

2  Q    Do you agree with me that you would have a duty not to

3  trade on material inside -- material nonpublic information?

4  A    Generally, I would have a duty to not trade on material

5  nonpublic information, yes.

6  Q    Can you think of an exception?

7  A    There may be.  I just don't think of any one off the top

8  of my head.

9  Q    So, today, you would agree, for purposes of these

10  proceedings, that you would have an obligation as the CEO of

11  the Debtor-In-Possession not to participate in a transaction

12  involving material nonpublic information?  Agreed?

13  A    It would depend.  So, for example, if I was trading with

14  someone else who had material nonpublic information, that

15  might be a permissible transaction.

16  Q    The HarbourVest transaction, you were involved in

17  negotiating the HarbourVest settlement?

18  A    Yes, I was.

19  Q    Did that involve any component related to MGM stock?

20  A    No, it did not.

21  Q    There was no involvement at all concerning the transfer of

22  MGM stock to any entity as a result of that transaction?

23  A    None whatsoever.

24  Q    Okay.  And does HCLOF not have a participation at this

25  time in MGM stock?

HCMLPHMIT00003227

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 02/26/25   Page 665 of 1011   PageID 2564

Seery - Direct                                    215

1    A    We call it H-C-L-O-F.

2    Q    Yes.

3    A    It does not own MGM stock, and as I far as I know, never

4    owned MGM stock.

5    Q    Okay.  You agree you received an email from Mr. Dondero in

6    December of 2020.  We've had it here before.  You've seen it

7    in the courtroom, correct?

8    A    Yes.

9    Q    Okay.  Did you ever send -- forward that email to anyone

10   else?

11   A    I'm sorry.  Could you repeat that?

12   Q    Did you forward that email on to anyone else?

13   A    I believe I did, yes.

14   Q    To whom?

15   A    I certainly discussed it with counsel.  I believe I

16   forwarded it to counsel, both the Pachulski firm and the

17   WilmerHale firm.  Thomas Surgent had gotten it.  He was on the

18   email.  And I also forwarded it, I believe -- certainly,

19   discussed it -- with the other independent directors.

20   Q    Okay.  I'm not going to talk about your conversations with

21   other lawyers in-house, okay, or your outside counsel.  Did

22   you take any steps yourself personally to make sure that MGM

23   stock was placed on a restricted list at Highland Capital

24   after you received that email?

25   A    No.  MGM was already on the restricted list at Highland

002194

HCMLPHMIT00003228

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 12/17/25    Page 666 of 1011    PageID 2565
Exhibit 72    Page 217 of 390

Seery - Direct                                          216

 1  Capital.

 2  Q   Okay.  And is that because of Mr. Dondero's position on

 3  the board of MGM?

 4  A   It -- I believe that's the reason.  It was on before I got

 5  to Highland.

 6  Q   Okay.  And you agree, do you not, sir, that the email that

 7  you received from Mr. Dondero also contained material

 8  nonpublic information?

 9  A   I don't think so, no.

10         MR. MCENTIRE:  Would you put up Exhibit -- our

11  Exhibit 4, please?

12         MR. MORRIS:  4?

13         MR. MCENTIRE:  4.

14  BY MR. MCENTIRE:

15  Q   Did H-C-L-O-F -- I'll refer to it as HCLOF, you refer to

16  it as H-C-L-O-F -- did that -- did HCLOF own any funds that

17  owned MGM stock?

18  A   HCLOF had interest in certain Highland-managed CLOs that

19  did own some.

20  Q   As a result of the Highland settlement -- excuse me, the

21  HarbourVest settlement, was there any impact on who owned some

22  of those CLO funds?

23  A   No.

24  Q   Okay.  How was the CLOs, the funds, handled, if at all, in

25  the -- in the HarbourVest settlement?

HCMLPHMIT00003229

1    A    They didn't have any impact whatsoever on the HarbourVest

2    settlement.

3    Q    Looking at Exhibit 4 for a moment, please, did the

4    interests, did the interests in -- HarbourVest's interests in

5    any of those CLOs transfer?

6    A    No, they did not.

7    Q    Okay.  And did HCLOF acquire any interest in any of those

8    CLO's as a consequence of the HarbourVest settlement?

9    A    No, it did not.

10   Q    Looking at Exhibit 4.  Excuse me, Exhibit 3 is what I

11   meant to say.  Exhibit 3.

12            THE COURT:  Hunter Mountain Exhibit 3?

13            MR. MCENTIRE:  Yes, ma'am.

14            THE COURT:  Okay.

15            MR. MCENTIRE:  Yes, Your Honor.  Excuse me.

16   BY MR. MCENTIRE:

17   Q    This is the email that we were just referring to that you

18   received, correct?

19   A    Yes.

20   Q    And you don't think -- you knew that Mr. Dondero was on

21   the board of directors of MGM?

22   A    Yes.

23   Q    And he -- as a member of the board of directors, when you

24   received this, you see where he indicated that it was probably

25   a first-quarter event?  Do you see that?

1   A    I see what it says, yes.

2   Q    Okay.  And you did not think that that was material

3   nonpublic information?

4   A    No, I did not.

5   Q    When he indicated that Amazon and Apple were actively

6   diligencing -- are diligencing in the data room, both continue

7   to express material interest, coming from a member of the

8   board of directors of MGM, you did not think that was material

9   nonpublic information?

10  A    I did not, no.

11  Q    You know the difference between a newspaper article or a

12  media article that discusses rumors of a possible sale and the

13  difference between that and a member of the board of directors

14  saying that a sale is going to occur?  You understand the

15  difference between the two?

16  A    Between the two things you just outlined?

17  Q    Yes.

18  A    Yes.  One you said a sale is going to occur, and the other

19  you said a media report.  But it would depend on what's in the

20  media report.  Some media reports are pure speculation.

21  Others have a lot of detail, and they clearly came from an

22  inside source, and that's why the market moves on them.

23  Q    Okay.  So what you're suggesting to me, that there was

24  some indication in the media press before you received this

25  email suggesting that there was actually going to be a sale in

HCMLPHMIT00003231

1   the first quarter of 2021?

2   A    I don't know if it had a first-quarter event in it, but

3   certainly it was clear from the media reports and the actual

4   quotes from Kevin Ulrich of Anchorage, who was the chairman at

5   MGM, that a transaction had to take place very quickly.  And

6   in fact, the transaction did not take place in the first

7   quarter.

8   Q    Okay.  So you -- when you received this particular email,

9   you did not think that it was requiring any additional

10  protection at -- in any way?  Is that what you're suggesting

11  to this Court?

12  A    That the email required additional protection?

13  Q    That you didn't take additional steps to make sure that it

14  was maintained on the restricted list.

15  A    It was already on the restricted list, so there was no

16  change.

17  Q    Was it --

18  A    I --

19          MR. MORRIS:  Hold on.  Let him finish.

20  BY MR. MCENTIRE:

21  A    I was suspicious when I got the email, but I didn't think

22  I had to do anything else than the steps I told you I just

23  took.

24  Q    Yeah, I'm not asking whether you were suspicious or not.

25  My question's a little bit different.  You understand that MGM

002198

Seery - Direct                    220

1  was taken off your restricted list in April of 2021?

2  A   I understand that that's what you've recently shown me.  I

3  wasn't aware of that fact or I didn't have a recollection of

4  that fact, but certainly April of 2021 would be beyond the

5  first quarter.  Mr. Dondero was not an employee, an affiliate,

6  subject to a contractual relationship.  He had no duty to

7  Highland and Highland had no duty to him.  And in fact, it was

8  quite antagonistic by that time.  So it would be appropriate

9  to take MGM off the restricted list at the end of that time.

10  Q   Well, hopefully you won't take this as argumentative, but

11  I object as nonresponsive.  That really wasn't my question.

12  Okay?  My question --

13            THE COURT:  Sustained.

14  BY MR. MCENTIRE:

15  Q   -- is a little bit different.  As far as you were

16  concerned, MGM was on the restricted list and stayed on the

17  restricted list all the way until the public announcement in

18  May of 2021?

19  A   That's not true.

20  Q   When did you first become aware it was taken off the

21  restricted list?

22  A   I didn't -- I wasn't aware that it had come off the

23  restricted list.  I would have assumed it would have been off

24  the restricted list once Mr. Dondero had been severed from

25  Highland.

002199

HCMLPHMIT00003233

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 14-72  Filed 22/25/25 390  Page 671 of 1011    PageID 2570

Seery - Direct                          221

1   Q   I see.  Now, Mr. Dondero has relayed a conversation that

2   he had with Mr. Patel and Mr. Linn, suggesting that they were

3   particularly optimistic about MGM based upon what you told

4   them.

5   A   I --

6   Q   Let me finish.  If that occurred, are you suggesting that

7   that is a lie?

8   A   Two things.  One is I don't think he actually testified to

9   that.  I think he said he had a conversation with Mr. Patel.

10  Then he had a different conversation with Mr. Linn, and a

11  subsequent conversation with Mr. Linn.  So the way he laid it

12  out were multiple conversations.

13  Q   Agreed.

14  A   I don't -- I don't know which one you're talking about.

15  Q   Mr. Dondero testified that Mr. Patel was particularly

16  optimistic about the investment because of what he had learned

17  from Mr. -- from you about MGM.

18          MR. MORRIS:  I dispute that characterization.  Why

19  can't he just ask the question?

20          MR. MCENTIRE:  That is my question.  If that --

21          THE COURT:  What is the question?  I'm not sure I

22  hear the question.

23          MR. MCENTIRE:  I'm getting lost because I'm getting

24  interrupted.  I'll try to rephrase it again.

25          MR. MORRIS:  It's my first objection.

HCMLPHMIT00003234

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 12/23/25   Page 672 of 1011   PageID 2571
Exhibit 72   Page 223 of 390

Seery - Direct                           222

1              MR. MCENTIRE:  And I --

2              THE COURT:  Go ahead.

3              MR. MCENTIRE:  I'm just going to rephrase, Your

4    Honor.

5              THE COURT:  Just rephrase your question.

6              MR. MCENTIRE:  Thank you.

7    BY MR. MCENTIRE:

8    Q    Mr. Dondero has testified that Farallon advised him in May

9    of 2021 that they were optimistic about MGM based upon what

10   you told them.  Assuming that to be the case, do you deny that

11   happened?

12   A    I do deny that happened.  Because I can't -- I don't know

13   what Farallon told him, but I never told Farallon anything.

14   And a conversation on May 28th, after the May 26th

15   announcement that MGM was going through, might make people

16   optimistic that it could go through, but there was a very

17   difficult FTC process that MGM would have to go through.

18   Q    And I'm referring to that.  If Farallon stated that they

19   were optimistic about MGM based upon what you had told them,

20   --

21   A    That would not be true.

22   Q    -- that would be false?

23   A    That would not be true.

24   Q    And is Mr. Dondero says that's what Farallon told them,

25   that would also be false?

HCMLPHMIT00003235

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 2024/26390   Page 673 of 1011    PageID 2572
Exhibit 72   Page 222 of 26

Seery - Direct                                223

1   A    That's correct.

2   Q    So we have your statement, we have what may be Farallon's

3   statement, and we have what Mr. Dondero believes may have been

4   Farallon's statement, and you're saying the latter two are

5   just not true?

6   A    I didn't have a conversation with Farallon about MGM that

7   -- that I recall --

8   Q    Well, you're on the witness stand.

9   A    -- virtually at any time.

10   Q    You're on the witness stand.

11   A    Oh, I'm aware of where I am sitting.

12   Q    Yeah.  Good.  We've got that cleared up.  Now, are you

13   suggesting that -- that you may not specifically recall this

14   conversation?

15   A    No, I am not saying that at all.  After May 26th, when the

16   MGM announcement was made and it was public, I may have had

17   conversations with a number of people about MGM.

18   Q    Well, let's make sure the record is clear.  Did you call

19   Farallon on May 26th and say, hey, did you know that MGM just

20   sold?

21   A    No, I don't recall any such conversation, and I wouldn't

22   have had to, since it was in the paper.

23   Q    I'm not talking about what's in the paper.  I'm talking

24   about conversations between you and Farallon.

25   A    Yeah.  I don't recall having a conversation with Farallon

HCMLPHMIT00003236

Seery - Direct                           224

1    on May 26th.

2    Q    How about May 27th?

3    A    Not that I recall, no.

4    Q    How about May 28th?

5    A    Not that I recall off the top of my head.

6    Q    And we understand that that's the day that Mr. Dondero

7    actually had his conversation that he's reported, at least,

8    with Farallon.  Do you recall that?

9    A    That's what he claims, yes.

10   Q    You were with a company called River -- you're a lawyer,

11   correct?

12   A    I am.  I'm in retired status.

13   Q    Okay.  I wish I was.

14   A    It's simply retiring your license and not having to take

15   the CLE.

16   Q    Understood.  Now, you were with a company called River

17   Birch?

18   A    Yes.

19   Q    And from River Birch, you went to Guggenheim Securities?

20   A    That's correct.

21   Q    At Guggenheim Securities, did you go to Farallon and meet

22   with Mr. Patel in their offices in San Francisco?

23   A    I believe we did, yes.

24   Q    You call it a meet-and-greet?

25   A    I do, yes.

002203

HCMLPHMIT00003237

1    Q    That was in 2017?

2    A    2017, 2018.  I'm not exactly sure when it was.

3    Q    And one of the purposes of meet-and-greet is to solicit

4    business or to see if a business opportunity -- see if it

5    exists?

6    A    That's not correct, no.

7    Q    What is a meet-and-greet for, then?

8    A    It's to meet the people at the fund and to greet the

9    people at the fund.  Introduce them to other people in your

10   firm.

11   Q    Just because it's going to be fun, or does it have a

12   business angle to it?

13   A    Oh, it hopefully will be fun, yes, but it's done in order

14   to build a relationship over time.  You're not in there

15   soliciting business.  If you do that, you won't do very well.

16   Q    Okay.  Fair enough.  So you're there trying to develop a

17   relationship with Farallon?

18   A    Guggenheim was, yes.

19   Q    And you were part of it?

20   A    That's correct.

21   Q    And what was your job at Guggenheim?

22   A    I was co-head of credit.

23   Q    Is that a fairly significant position at Guggenheim?

24   A    Not really, no.

25   Q    It's not significant at all?

HCMLPHMIT00003238

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 07/23/25   Page 676 of 1011   PageID 2575
Exhibit 72   Page 227 of 390

Seery - Direct                                        226

1   A   No.

2   Q   All right.

3   A   Which is why --

4   Q   Well, you left --

5   A   Which is why they don't have that business.

6   Q   Okay.  So is that why you left Guggenheim?

7   A   It -- I did, yeah.  It wasn't a good fit for either

8   Guggenheim or for me, because it really wasn't something --

9   Q   When did you --

10  A   -- that they were set up to do.

11  Q   -- leave Guggenheim?

12  A   In 2019.

13  Q   And then you went back to Farallon to meet with them

14  again, did you not?

15  A   I met with Farallon while I was in San Francisco with my

16  wife.

17  Q   Okay.  Did you call ahead to arrange the meeting, or was

18  it just a --

19  A   I --

20  Q   -- a blind call?

21  A   I did call ahead, yes.

22  Q   A cold call, I guess, is the word -- the phrase that they

23  use.  Okay.  So -- and was that a meet-and-greet?

24  A   That was again, yes.

25  Q   Again, what were you trying to do?  Develop a relationship

HCMLPHMIT00003239

Seery - Direct                                    227

1    with Farallon?

2    A    I was trying to catch up with them after having met them

3    previously.  And that was just Raj Patel.  And this one I also

4    met Michael Linn.

5    Q    Okay.  What kind of business were you in when you met with

6    them the second time?

7    A    I wasn't doing anything.

8    Q    What were you hoping to do?

9    A    I was hoping to get back into the investing side of the

10   business, from running a credit-type lending business at

11   Guggenheim, which is what they tried to do and it didn't work

12   out.  And I wanted to get back to what I was doing more at

13   River Birch, but I was looking at other opportunities,

14   whatever came along.

15   Q    Well, what were the different options that you were

16   looking at?

17   A    I was looking at potentially getting back into investing,

18   joining potentially a restructuring firm, any options like

19   that.  I was not looking to become a lawyer again.

20   Q    And why would meeting and greeting with Farallon fit in

21   within that scenario, the strategic scenarios that you've just

22   discussed?

23   A    They're a giant hedge fund.

24   Q    A giant hedge fund?

25   A    Yes.

HCMLPHMIT00003240

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 02/29/25   Page 678 of 1011   PageID 2577
Exhibit 72   Page 229 of 390

Seery - Direct                      228

1   Q   And so it would be good to have a relationship with a

2   giant hedge fund, wouldn't it?

3   A   And to know what their thinking of the markets, where the

4   opportunity set might be, who they are dealing with and

5   interacting with.  Those are -- those are valuable things to

6   know over time.

7   Q   And --

8   A   And you need to maintain those relationships in order to

9   be --

10   Q   Sure.

11   A   -- part of any business.

12   Q   Sure.  These meet-and-greets can actually evolve and

13   provide relationship benefits, correct?

14   A   I don't -- I'm not sure what you mean by relationship

15   benefits.

16   Q   Sloppy words for -- on my part.  They can evolve into

17   something that is a meaningful relationship?

18   A   They could over time, yes.

19   Q   And we know that after you became the CEO of Highland

20   Capital that you received a call from, was it Farallon, to

21   congratulate you on your appointment?

22   A   It was an email.

23   Q   And that was in the summer of 2020, shortly after your

24   meet-and-greet out in San Francisco?

25   A   Your calendar's a bit off, but it was in June of 2020, so

002207

HCMLPHMIT00003241

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72  Filed 2/20/25 390  Page 679 of 1011   PageID 2578

Seery - Direct                                      229

```
1   that would have been more than shortly after, but yes.
2   Q    Okay.  And who contacted you to congratulate you on your
3   appointment?
4   A    This was my appointment as an independent director.  I had
5   not yet been appointed as CEO or CRO.  This was in June of
6   2020, and it was Michael Linn.
7   Q    Michael Linn?  Was it a telephone call?
8   A    I think 30 seconds ago I said it was an email.
9   Q    Fair enough.  Do you still have that email?
10  A    I do, yes.
11  Q    Okay.  He contacted you again, "he" being Michael Linn, he
12  contacted you again in January of 2021, did he not?
13  A    That's correct, yes.
14  Q    He wanted to see if he could get involved somehow in the
15  Highland bankruptcy?
16  A    Well, he congratulated -- he didn't congratulate -- he
17  wished me a happy new year, and he basically said it looks
18  like you're -- again, he's following the case -- it looks like
19  you're doing good work.  Is there any way for us to get
20  involved?  We're interested in claims or buying assets.
21  Q    Okay.  And Stonehill.  Now, you know the founder of
22  Stonehill, do you not?
23  A    No, I don't know him.  I've met him several times.
24  Q    Doesn't he come by and stop in and talk with you when
25  you're in Stonehill's offices?  And that's happened recently?
```

002208

HCMLPHMIT00003242

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 03/31/25    390  Page 680 of 1011    PageID 2579

Seery - Direct                          230

 1   A    Your use of the plural is incorrect, and you know that

 2   from the deposition.  I was in Stonehill's office one time,

 3   and I was in a meeting with Mr. Stern.  We ended up having a

 4   board meeting from Stonehill's office with the other

 5   participants on video, and Mr. Motulsky came in and said

 6   hello.

 7   Q    All right.  And who's Mr. Motulsky?

 8   A    He's the founder of Stonehill.

 9   Q    I see.  And did you know Mr. Motulsky before that?

10   A    I'd interacted with Mr. Motulsky over the years at --

11   mostly at industry-type functions.

12   Q    Okay.  Now, Stonehill is also a hedge fund?

13   A    Yes.

14   Q    Are they different than Farallon in that regard, or

15   similar?

16   A    I don't know as much about what their business is.  They

17   certainly do a direct lending component, so I know that they

18   -- they will do some direct lending, which I don't think is

19   something Farallon really does.  Farallon is much bigger, as I

20   understand it, but I don't really know the size of Stonehill.

21   Q    Okay.

22   A    I know they're not a $50 billion fund like Farallon.

23   Q    And do you know Mr. Stern at Farallon?

24   A    I now know him, yes, because he was -- he's really the

25   representative on the -- no, he's not the representative on

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 03/26   Page 681 of 1011    PageID 2580
Exhibit 72   Page 232 of 390

Seery - Direct                                231

1   the board, but he is the one who manages the Stonehill and

2   Jessup positions for Stonehill.

3   Q    Well, we know that after you were CEO of Highland, you

4   also got a text message, correct, a text message from someone

5   at Stonehill, correct?

6   A    Mr. Stern sent me a text message reintroducing himself --

7   I don't know if it was re- or just introducing -- and sent me

8   his email and asked me to contact him about the case.  This

9   was at the end of February/beginning of March 2021, after the

10  confirmation order.

11  Q    Okay.  After the -- after the confirmation order?

12  A    Yes.

13  Q    I believe the confirmation order -- I may be wrong -- I

14  thought it was like the 21st, 22nd, somewhere in there.  Does

15  that sound right to you?

16  A    Yes.

17  Q    Okay.  So, shortly after confirmation, then, Farallon

18  calls you to congratulate you and wants to see how they can

19  get involved?

20  A    No.  There was no congratulations there.  Shortly after

21  the confirmation order, which I believe was at least a week to

22  ten days after confirmation, I got the communication from Mr.

23  Stern to try to connect about the case.

24  Q    All right.

25  A    He's at Stonehill, not Farallon.

002210

HCMLPHMIT00003244

Exhibit 4-72   Page 233 of 390

```
1    Q    Correct.  Now, --

2    A    You said Farallon.

3    Q    I misspoke, then.  Thank you for correcting me.  Let's

4    talk about -- you live in New York?

5    A    I do.

6    Q    You're involved with a charity called Team Rubicon?

7    A    Yes.

8    Q    And Team Rubicon is a -- is that a veterans-type charity?

9    A    Yeah.  It's a veteran-led organization, and what it does

10   is connects veterans to disasters.  And mostly in the U.S.,

11   but also all over.  So if there's a flood, if there's a

12   hurricane, if there's an earthquake, veterans who have been

13   trained in -- by the military in ready response and really

14   being able to handle themselves when things are bad are

15   deployed to help the communities that are hit.  So I think

16   that Team Rubicon likes to think, you know, on your worst day

17   they're your best friend.

18   Q    So you're -- are you on the board?

19   A    No, I'm not.

20   Q    You're on the Host Committee?

21   A    I was on the Host Committee last year, and I'll be on the

22   Host Committee this year.

23   Q    Okay.  And you have charity events?

24   A    We have a charity event, yes.

25   Q    Okay.  And the purpose of the charity event is to raise a
```

002211

HCMLPHMIT00003245

Seery - Direct                                          233

```
 1   bunch of money?

 2   A    That's correct.

 3   Q    Okay.  Have you been successful in the past?

 4   A    I do my best.  Team Rubicon is a big organization.  It's

 5   done very well raising money.  It doesn't have an endowment.

 6   The founder's theory was that if people give us money, we're

 7   supposed to spend it on helping other people.  And so each

 8   year it has to raise more money.

 9   Q    And Stonehill has been -- has contributed to your charity?

10   A    I believe Stonehill, one or two years, and I should know

11   this, and I didn't look it up after our deposition, gave

12   $10,000.

13   Q    Okay.  Maybe once, maybe twice?

14   A    Maybe twice.

15   Q    Okay.

16   A    I hope more.

17   Q    Okay.  And they also attend your -- your actual charity

18   events, do they not?

19   A    No.

20   Q    All right.  They just give money?

21   A    That's right.  And the Mike Stern who's on the board of

22   Team Rubicon is not the Mike Stern who is at Stonehill.  It's

23   an older gentleman who's in Texas who just happens to give a

24   lot of money to --

25   Q    All right.
```

002212

HCMLPHMIT00003246

Seery - Direct                                234

1    A    -- Team Rubicon.

2    Q    You also represented Blockbuster.  Take that back.  Were

3    you the lawyer or the attorney representing the Creditors

4    Committee, the UCC, in the *Blockbuster* bankruptcy?

5    A    No, I was not.

6    Q    Tell me what your capacity was.

7    A    I represented a group of bondholders, secured bondholders.

8    So I represented the group.

9    Q    And was Stonehill a member of that group?

10   A    Not that I recall, but your pleadings seem to indicate

11   that they were.  So if they were, they were a small

12   participant.  The largest participant was Carl Icahn, who

13   owned about 30 percent of it.  Then the others who were big

14   were DK, Davidson Kempner, Monarch, Owl Creek.  Those were the

15   big players.

16   Q    Well, --

17   A    When Carl Icahn is in your group, you remember that.

18   Q    Yeah, well, Carl Icahn is not here.  We're talking about

19   Stonehill right now.

20   A    And I said I don't remember them actually being a part of

21   it.  If they were, --

22   Q    Okay.  Well, let me -- let me give you what I'm going to

23   mark as Exhibit 80.  That's your name at the top, right?

24       (Hunter Mountain Investment Trust's Exhibit 80 is marked

25   for identification.)

002213

1   A    That's correct, yes.

2   Q    You were at the time with Sidley & Austin?

3   A    That's correct, yes.

4   Q    This is *In re Blockbuster.*

5          MR. MCENTIRE:  Scroll down, please.

6   BY MR. MCENTIRE:

7   Q    And steering group of senior -- involves -- well, let's

8   count them.  Let's see.  One, two, three, four, five.  Five

9   entities comprising the backstop lenders.  Is that correct?

10  A    I think that's the steering group.  So, in order to

11  represent the group, you need to try to assemble a large-

12  enough group that it's material to the company.  And then the

13  company, if you're -- particularly if you're over 50 percent,

14  will pay the fees of the group.  And you don't represent any

15  individual member of the group.  I've never represented Carl

16  Icahn.  I represent the group.  And if folks want to stay in

17  the group, they can stay.  If they want to trade out of the

18  group, they do.  And the company will generally continue to

19  pay the fees, and you represent the group so long as you have

20  a controlling interest in the -- whatever the issue is.

21  Q    Well, that's interesting, because now what you're telling

22  me is that this group right here, this is kind of like the

23  executive committee of the group.

24  A    No, it's called the steering group, and it doesn't

25  necessarily --

HCMLPHMIT00003248

Seery - Direct                                      236

1    Q    That's fine.

2    A    Well, it's not an executive committee.  It doesn't

3    necessarily include just the largest.  Some large holders

4    won't be on it.  The largest holders here by a long shot were

5    Icahn, who --

6    Q    I'm not talking about --

7    A    -- unloaded, as I say, over 30 percent.  Monarch, Owl

8    Creek, and I just don't recall Stonehill being a part of it.

9    Q    I'm not really interested in Carl Icahn.  I just want to

10   establish this is a steering group in which you were the lead

11   counsel and Blockbuster was on it.  Is that correct?

12   A    Yes.

13   Q    Excuse me.  Not Blockbuster.

14   A    I'm sorry.

15   Q    Stonehill.

16   A    No, it's the Blockbuster case in 2010, and Stonehill was

17   apparently on it, but I just don't have a recollection of

18   their involvement.

19   Q    All right.  So when Mr. -- who sent you the text message

20   in February of 2021 from Stonehill?

21   A    Michael Stern.

22   Q    And had you actually met him before?

23   A    I think I had, but we didn't know each --

24   Q    All right.

25   A    You know, we certainly didn't know each other, we'd never

002215

HCMLPHMIT00003249

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 03/28/25   Page 687 of 1011   PageID 2586
Exhibit 72   Page 238 of 390

Seery - Direct                                    237

1    worked on anything together, but I --

2    Q    Do you have all your text messages from that period of

3    time, that first quarter of 2021?

4    A    I believe I do, yes.

5    Q    They're saved?

6    A    Yes.

7    Q    Okay.  When did the automatic delete button on your cell

8    phone start?

9            MR. STANCIL:  Your Honor, objection.  We've covered

10   this this morning.  I believe this is a motion coming down the

11   pike, and I thought we had -- thought we had had tabled this

12   preservation issue.

13           MR. MCENTIRE:  This has a direct bearing on his

14   communications with Farallon and Stonehill in this period of

15   time, Your Honor.  We have one text message that he's

16   identified, and I have a right to examine whether there are

17   others.  Or if not, why not.

18           MR. STANCIL:  Your Honor, he's --

19           MR. MCENTIRE:  That's a legitimate -- I'm not

20   finished.  That's a legitimate area of inquiry in this

21   examination.

22           MR. STANCIL:  He's testified he has them all.  Your

23   Honor did not order document discovery.  I think that's it for

24   purposes of today's hearing, Your Honor.

25           THE COURT:  Okay.  I sustain the objection.

HCMLPHMIT00003250

Seery - Direct                                  238

1    BY MR. MCENTIRE:

2    Q    After this text message that you received from Stonehill

3    in February 2021, did you have any follow-up?

4    A    Well, his text message, I don't recall what it said other

5    than I was -- I do recall that he gave me his email address,

6    because I didn't have it.  And we just didn't know each other

7    well enough.  But we definitely had follow -up.  He wanted to

8    talk to me, and at some point we talked.

9    Q    And when did you talk?

10   A    I'm sorry?

11   Q    When did you talk?

12   A    When?  I -- it was at the, initially, end of February,

13   beginning of March.  So it would have been somewhere in that

14   -- in that time period.

15   Q    End of February, beginning of March?  And we also know

16   that you next talked to Farallon, according to your testimony,

17   and they advised you they had already purchased all their

18   claims as of March 15, correct?

19   A    On March 15th, they sent me an email that said they had

20   purchased an interest in claims, and --

21   Q    So -- go ahead.

22   A    I'm not finished.  And then at some point after that, we

23   arranged a quick discussion, because that was a curious --

24   Q    I want to assure you I will always let you finish.

25   A    Thank you very much.

002217

HCMLPHMIT00003251

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 2/20/25 390   Page 689 of 1011   PageID 2588

Seery - Direct                                      239

1    Q    Unlike others.  So, with that said, Mr. Seery, can you

2    identify -- let me back up.  Was there a data room set up at

3    Highland Capital for claims investors to come in and look at

4    data?

5    A    No, there was not.

6    Q    Are you aware, sitting here today, that Farallon did any

7    due diligence in connection with its investment in the claims

8    it purchased that are at issue in this proceeding?

9    A    I have indication that they did some, yes.  I don't know

10   how much they did.

11   Q    What is the indication?

12   A    In the email in June of 2020, Mr. Linn said that he and

13   his associate were following the case, thought it was --

14   that's the one that congratulated me on being an independent

15   director, and that they were paying attention to the case.

16   And it -- I don't recall the exact other items in there, but

17   it was clear that they were following the Highland matter.

18   And then in the email in January 2021, he also indicated that

19   they'd been following the case further, and said, Looks like

20   you have things well in hand, or something to that effect.  So

21   --

22   Q    Do you have that email, too?  Have you saved that email?

23   A    They're all saved, yeah.

24   Q    Okay.  So let's talk about that.  But you had no data room

25   that would allow them to come in and actually investigate the

002218

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 12/11/25   Page 690 of 1011   PageID 2589

Exhibit 72   Page 241 of 390

Seery - Direct                         240

1  underlying assets.  Is that correct?

2  A    Not in respect of anybody trying to buy claims.  We did

3  have a data room with respect to financing.

4  Q    Please listen to my question.  I'll get to it.  Data room

5  for claims investors.  There was no data room set up on or

6  before March 15 to allow Farallon to come in and investigate

7  its investment in this claim?

8  A    That's correct.

9  Q    There was no data room set up prior to March 15 to allow

10  Stonehill to come in and investigate its investment in the

11  claims it purchased.  Is that correct?

12  A    That's correct.

13  Q    Can you identify any due diligence, sitting here today --

14  let me back up.  You heard Mr. Dondero's testimony about

15  portfolio companies, correct?

16  A    Yes.

17  Q    Portfolio companies are companies in which Highland

18  Capital has an interest that actually have separate and

19  distinct management.  Is that correct?

20  A    Generally.  And it -- I disagree with some of his

21  testimony, but generally that's correct, yes.

22  Q    Well, okay.  Let's just take on the part that you agree

23  with.  With regard to those portfolio companies, was there

24  anything that was disclosed in the Highland publicly-available

25  financials that would allowed a detailed analysis of

HCMLPHMIT00003253

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 04/24/25   Page 691 of 1011   PageID 2590

Seery - Direct                                     241

1   Highland's investments in each of those portfolio companies?

2   A    I don't know.  Certainly, in the four or five sets of

3   projections that were filed, there were financial projections.

4   I'm not sure exactly what was included in each one or in the

5   disclosure statement.

6   Q    Fair enough.  Well, I'll represent to you I don't think

7   there's detailed information on each individual portfolio

8   company.

9            MR. MORRIS:  Your Honor, he's not here to testify.  I

10   move to strike.

11           MR. MCENTIRE:  Okay.

12           THE COURT:  Sustained.

13   BY MR. MCENTIRE:

14   Q    In that regard, Mr. Seery, can you identify what Farallon

15   did to investigate the underlying asset value of any of these

16   portfolio companies?

17   A    I don't have any knowledge as to what Farallon did before

18   it bought claims.

19   Q    Can you identify what due diligence Stonehill did to

20   investigate the underlying asset value in any of these

21   portfolio companies?

22   A    I don't -- I mean, in connection with claims purchasing, I

23   have no idea what Stonehill did.

24   Q    Now, I understand that you solicited -- perhaps I don't

25   recall correctly.  Did you solicit both Farallon and Stonehill

002220

HCMLPHMIT00003254

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 07/03/25   Page 692 of 1011   PageID 2591

Seery - Direct                                          242

1   to participate in a bid to provide exit financing?

2   A    I don't think that's fair.  I solicited Farallon because I

3   knew they already owned claims.  Stonehill reached out to me,

4   and that was one of the things they were interested in doing,

5   if there was financing needs.

6   Q    Okay.

7   A    And at the time they reached out, which was right after

8   confirmation -- right after confirmation and the confirmation

9   order, we didn't know what our needs would be.  We didn't

10  really, at the early stage, think we needed exit financing.

11  When we looked at some of the difficulty we were going to have

12  -- for example, collecting notes and realizing on assets -- we

13  realized that we were going to need some exit financing in

14  order to have enough money to support the enterprise to

15  monetize the assets.

16  Q    And I think you used the -- I think the phrase you used,

17  you are the straw man or a straw man bid?  Is that what you

18  called it the other day?

19  A    We did.  You set up a very typical competitive process to

20  do exit financing.

21  Q    And what was the --

22  A    And what -- well, I --

23  Q    -- suggest --

24  A    I was going to get to your straw man.  And one of the

25  things you do is you assess what the market's going to look

HCMLPHMIT00003255

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 22/24/25    390    Page 693 of 1011    PageID 2592

Seery - Direct                                                    243

 1  like, what you think the market looks like, what you think a

 2  financing would be good for the enterprise, the flexibility

 3  you need, how you'd structure it.  And then you put that out

 4  to prospective lenders and say, Here's our straw man.  This is

 5  what we'd like you to consider in terms of financing.  And

 6  then they do their work and come back.  And they can either

 7  say, that looks great, or we have a totally different idea of

 8  what the financing might be, or some other combination of

 9  those things.

10  Q    Mr. Seery, thank you for that answer, but I need to ask

11  you to do me a favor.  I'm on the clock, and so I'd just like

12  to get my questions out, if you'd try to respond.  Okay?

13  A    Uh-huh.

14  Q    Because your answers, as long as they may be, are

15  impacting me a little bit.

16      So let me ask this question.  In the straw man proposal

17  that you put out for bid, what was the suggested interest

18  rate?

19  A    You know, you asked me that the other day, and I think I

20  was slightly off.  So it -- and I -- but I did tell you that

21  it depended.  There was -- I don't recall what the rate was,

22  but it starts -- if everybody wants to put out money -- and I

23  apologize for the length of the answer -- they look and they

24  say, well, what if I get paid back in six months?  Nobody

25  wants to do that.  So, duration makes a difference.  So

HCMLPHMIT00003256

Seery - Direct                                    244

1   there's an interest rate.  There's upfront fees.  There's
2   often exit fees.  And sometimes there's other amounts.  So,
3   our -- my recollection is that our straw man was somewhere in
4   the low teens on the high end, and then closer to high single-
5   digits on the low end.  Something in that range.
6   Q   And Farallon indicated to you they were not interested,
7   correct?
8   A   No, not exactly.  What Farallon said was they didn't --
9   they signed an NDA because we invited them in.  We invited in
10  six folks.   Five signed NDAs.  Two of the -- I invited in
11  Farallon.  I invited in Stonehill.  Well, Stonehill called me.
12  I invited in Contrarian because they had bought claims.  And
13  then two lenders that I knew.  And Farallon did the work and
14  came back and said, this isn't really what we do.  And the
15  other guys, you're telling me, which I was, that other people
16  are more competitive.  And so it's not really what we do, we
17  don't think the returns are good enough, but if you need us,
18  because now they're already invested in the claims, call us.
19  Q   Okay.
20          MR. MCENTIRE:  And again, I'll object as
21  nonresponsive.  Your Honor, that was a very long answer
22  talking about a lot of other entities.  My only question was
23  what the interest rate was.
24          MR. MORRIS:  Your Honor, we oppose the motion to
25  strike.  I think it's --

002223

HCMLPHMIT00003257

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 12/06/25   Page 695 of 1011   PageID 2594
Exhibit 72   Page 246 of 390

Seery - Direct                                    245

1        MR. MCENTIRE:  No, I didn't strike it.  I said -- my

2  objection was nonresponsive.  I will now follow it up with a

3  motion to strike his answer.

4        THE COURT:  Overruled.  Okay.

5  BY MR. MCENTIRE:

6  Q    Mr. Seery, you just told us that the interest rate was in

7  the high single digits to in the 12 and 13 percent range.

8  A    No, I was giving you the all-in return for the lender.

9  That's a very different --

10  Q    All-in return?

11  A    -- thing for the -- than an interest rate.

12  Q    That's even better.

13  A    And it depended on the time.

14  Q    Fair enough.

15  Q    So if -- the shorter the duration, the higher the

16  effective return, because he's not getting the return for as

17  long a period of time.  If I have $100 million and I get 10

18  percent, I get just $10 million.  But if I have that out for

19  $3 million, I've earned $30 million.  So maybe that gets

20  squeezed in the longer it's out.

21  Q    And Farallon said that the interest rate or the return

22  rate was not what they were looking for?

23  A    They indicated two things.  I believe I've said this

24  several times.  One is they said, this isn't really what we

25  do, a $50-ish million dollar loan to do an exit.  But we're in

002224

HCMLPHMIT00003258

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 09/27/25   Page 696 of 1011   PageID 2595
Exhibit 4    Page 247 of 390

Seery - Direct                                    246

1   the case.  If you need us, call us.  Included in that was, it

2   doesn't look attractive enough to us because you're telling me

3   other guys are more competitive.

4   Q    Okay.  And do you know what kind of rate of return they

5   were going to get on the investment of the -- on the claims at

6   a 71 percent projected return rate?

7   A    If we only hit the plan, Farallon's two purchases, based

8   on the numbers you get -- you gave, over a two-year period,

9   would be 38.9 percent.

10  Q    Okay, but we're going to talk about that in a second.

11  Okay.  How much -- how much did Farallon actually invest?

12  A    I'd have to look back at your numbers.  They're in your

13  pleading.  I don't know what they actually paid.  I just have

14  it from your pleading.

15  Q    Okay.  And do you have paperwork that -- can you

16  (inaudible) calculation here?

17  A    I have a calculator that, when I looked at your numbers, I

18  ran that, and I --

19  Q    I see.  All right.

20  A    I'm able to remember certain things.

21  Q    So, so if it's projected that the internal rate of return

22  is only six percent, do you disagree with that?

23  A    A hundred percent disagree.  There's -- that's virtually

24  impossible.

25  Q    Okay.

HCMLPHMIT00003259

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 12/08/25   Page 697 of 1011   PageID 2596
Exhibit 72   Page 248 of 390

Seery - Direct                    247

1  A   And that's, by the way, for hitting the plan.

2  Q   I'm sorry?

3  A   That's for hitting the 70 -- the 71-and-change percent.

4  Q   I want to ask you a question about that.  The 71-percent-

5  and-change --

6  A   Uh-huh.

7  Q   -- that came out of the plan for Class 8, --

8  A   Yes.

9  Q   -- that was for Class 8, correct?

10  A   Correct.

11  Q   There was zero expected return to Class 9, correct?

12  A   That's correct.  They would only get upside, and I think

13  it says in the projections, based upon our view at the time,

14  litigation that could ensue, and that was part of the plan.

15  Q   And as I understand it, that 71-and-some-change --

16  A   Uh-huh.

17  Q   -- projected return rate never changed from the date of

18  confirmation all the way up to the effective date.  Am I

19  correct?

20  A   The -- we didn't change the projections that we'd filed

21  with the plan because the plan was confirmed.  We didn't need

22  to change the projections that were filed with the plan.

23  Q   The NDAs, as you understand it, can you tell me

24  specifically when the NDAs were signed?

25  A   I know it's the first week of April to the second week of

002226

HCMLPHMIT00003260

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72  Filed 22/09/26 390  Page 698 of 1011    PageID 2597
Exhibit 72   Page 249 of

Seery - Direct                                    248

```
 1    April.  Blue Torch may have signed -- who actually ended up

 2    doing the financing -- they may have signed it a week or so

 3    before.  They'd been around offering financing a number of

 4    times in the past.

 5    Q    Fair enough.  But we know that you understood as of March

 6    15th that Farallon had already made their investments?  I

 7    mean, claims?

 8    A    That's what they told me in that email, yes.

 9    Q    Okay.  When did Stonehill sign the NDA?

10    A    In and around the same time.

11    Q    But you don't know when Stonehill actually purchased their

12    claims?

13    A    I don't know exactly when.  I know generally that by the

14    end of April, early May, they were -- they were the holder of

15    the Redeemer claim.  And --

16         (Interruption.)

17    A    -- I can't remember whether it was from them or whether it

18    was from --

19    Q    Did you ever communicate with Stonehill during the time

20    that they were doing their due diligence on the exit

21    financing?

22    A    Yes.

23    Q    Okay.  Did they come to your offices?

24    A    I don't know if we were back yet.  I think we were back,

25    but I don't recall them coming to our offices.  I think it was
```

002227

HCMLPHMIT00003261

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 250/26 390 Page 699 of 1011   PageID 2598
Exhibit 72   Page 250 of

Seery - Direct                                    249

```
 1   all virtual.  It's early '21, so there would have been

 2   vaccines.  It would have been very -- very -- I don't recall

 3   them coming to the offices at that time.

 4   Q    But just to be clear, you don't know, you can't give the

 5   Court a date when Stonehill actually completed their

 6   investments in either Redeemer or HarbourVest?

 7   A    No, I don't.  I don't know.  Did -- just --

 8   Q    That was my question.

 9   A    When you say Redeemer or HarbourVest, they never bought

10   HarbourVest.

11   Q    It was just Redeemer?

12   A    Correct.

13   Q    All right.  You understand that Muck is an entity, a

14   special-purpose entity created by Farallon?

15   A    That's my understanding, yes.

16   Q    And you understand Jessup is a special-purpose entity

17   created by Stonehill?

18   A    That's my understanding, yes.

19   Q    Muck and Jessup are both on the Oversight Committee?

20   A    They are.  They -- those entities are the --

21   Q    Is it the Oversight Committee or the Oversight Board?

22   A    Same thing.

23   Q    Fair enough.

24   A    I'll consider them the same.

25   Q    And there's a third member, too, correct?
```

HCMLPHMIT00003262

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 05/01/25   Page 700 of 1011   PageID 2599

Seery - Direct                                    250

 1  A    That's correct.

 2  Q    Okay.

 3  A    Independent member.

 4  Q    Okay.  So you have a three-person board; is that right?

 5  A    That's correct.

 6  Q    And one of their jobs is to make decisions concerning your

 7  compensation?

 8  A    The structure of the Claimant Trust Agreement provides

 9  that I'm to negotiate with the -- either the Committee or the

10  Oversight Board.  And the compensation in the Claimant Trust

11  Agreement is a base salary of $150,000, which is -- a month,

12  which is the same as the one in the case, plus severance, plus

13  a success fee.  And it's very specific that that will be

14  negotiated by the -- either the Committee or then the

15  Oversight Board.

16  Q    And Michael Linn, who Mr. Dondero has referred to, he's

17  actually on the Oversight Board, is he not?

18  A    He's the Muck representative on the Oversight Board.

19  Q    All right.

20  A    Yes.

21  Q    If I understand it correctly, you are currently receiving,

22  as the Trustee, $150,000 a month.  Is that correct?

23  A    That's incorrect.

24  Q    What are you receiving?

25  A    I receive $150,000 a month as the Trustee and the CEO of

002229

HCMLPHMIT00003263

Seery - Direct                              251

 1   Highland Capital.

 2   Q     Well, --

 3   A     So I have --

 4   Q     -- fair enough.

 5   A     I have both roles.  The Trustee, for example, doesn't

 6   manage the team, they actually work for Highland Capital, and

 7   I'm the CEO of Highland Capital.

 8   Q     There was some suggestion that the $150,000 was something

 9   that the Court had passed upon prior to the effective date or

10   part of the plan.  This is a separate negotiated item that you

11   -- that you allegedly negotiated that was awarded to you post-

12   effective date, correct?

13   A     That's false.

14   Q     Okay.  So the $150,000 had a discount that was supposed to

15   drop down to $75,000 after a period of time.  That never

16   happened, did it?

17   A     The -- you seem to be mixing concepts.  But the $150,000 a

18   month was set by the plan and the -- and the Claimant Trust

19   Agreement as the "base salary."  That wasn't going to move.

20   When we -- it never was supposed to move.

21         When I began negotiating with the Oversight Board for the

22   success fee, they pushed back and said, we would like that to

23   step down.  So in our -- I did not say, oh, that's a great

24   idea.  We ended up negotiating, and they included a provision

25   that we would renegotiate depending on the level of work.

002230

HCMLPHMIT00003264

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 253/26 390  Page 702 of 1011    PageID 2601
Exhibit 72   Page 252 of

Seery - Direct                              252

1  That's one of the provisions.

2  Q    Okay.  But renegotiate down to $75,000 after a period of

3  time, but that never happened?

4  A    Initially, I believe it was supposed to step down to

5  $75,000 automatic, subject to renegotiation that it go back

6  up, not a structure that I particularly liked.  And since

7  then, we've negotiated on that point.

8  Q    So you currently are making $150,000 a month?

9  A    That's correct.

10  Q    How often do you come to Dallas?

11  A    Usually I'm here at least once a month.  Usually it's

12  between two and four days.

13  Q    Okay.  And you have a staff here in Dallas at Highland

14  Capital, correct?

15  A    Yes.

16  Q    How many people?

17  A    Eleven.

18  Q    Eleven people?

19  A    Uh-huh.

20  Q    Working full-time?

21  A    Yes.

22  Q    And you're still making $1.8 million a year?

23  A    Yes.

24  Q    You also have a bonus structure, correct?

25  A    That's correct.

HCMLPHMIT00003265

Seery - Direct                                253

1   Q   And that's performance-based?

2   A   That's correct.

3          MR. MCENTIRE:  Can you pull up the agreement please?

4   Okay.

5       (Pause.)

6   BY MR. MCENTIRE:

7   Q   All right.  Do you see --

8          MR. MCENTIRE:  We're having technical difficulty

9   here.

10  BY MR. MCENTIRE:

11  Q   All right.  Can you identify this document?

12         MR. MCENTIRE:  What exhibit number is this?

13         MR. MILLER:  28.

14  BY MR. MCENTIRE:

15  Q   Exhibit 28.

16         MR. MCENTIRE:  I believe this is already in evidence.

17         THE COURT:  Hunter Mountain Exhibit 28?

18         MR. MCENTIRE:  Yes, Your Honor.

19         THE COURT:  Okay.

20  BY MR. MCENTIRE:

21  Q   This is the memorandum of agreement.  Do you see that?

22  A   Yes.

23  Q   On the third line, it says -- and your name is identified

24  here.  You're the Claimant Trustee, correct?

25  A   Claimant Trustee/CEO.

HCMLPHMIT00003266

Seery - Direct                                254

1   Q    Engaged in robust, arm's length, and good-faith

2   negotiations regarding the incentive compensation program.

3        As part of this robust, arm's length, and good-faith

4   negotiation, did you personally conduct any independent search

5   in the marketplace?

6   A    I did -- what do you mean by search in the marketplace?

7   Q    Well, did you try to do a market study?  I asked that

8   question in your deposition.

9   A    I didn't know if you were asking a different question.

10  Q    Same question.

11  A    You mean market study on compensation?

12  Q    Yes.

13  A    No, I did not.

14  Q    Are you aware of whether or not any member of the

15  Oversight Board or Oversight Committee did a market study?

16  A    On compensation?

17  Q    On compensation.

18  A    I'm not aware that they did one, no.

19  Q    So this robust, arm's length, and good-faith negotiation,

20  as far as you know, is divorced from any market study database

21  or -- or methods.  Is that correct?

22  A    I don't believe that's correct, no.

23  Q    I see.  So did -- was any third-party consultant hired?

24  A    Not by me or Highland or the Trust, no.

25  Q    All right.

002233

1          MR. MCENTIRE:  Can you scroll down a little bit,

2     please?

3     BY MR. MCENTIRE:

4     Q    You signed this agreement, correct?

5     A    Yes.

6     Q    And we have Michael Linn signing on behalf of Muck, who

7     also is with Farallon, correct?

8     A    That's correct.

9          MR. MCENTIRE:  Scroll down.

10    BY MR. MCENTIRE:

11    Q    And by the way, this is a heavily-redacted document.  The

12    redactions deal with what?

13    A    The redactions deal with the portion that would go to the

14    team as opposed to going to me.

15    Q    Are we talking about the 11-member team?

16    A    Correct.

17         MR. MCENTIRE:  Can you scroll down?  Stop.  Go back.

18    BY MR. MCENTIRE:

19    Q    So we have the assumed allowed claim amounts under Section

20    D.  Do you see that?

21    A    Yes.

22    Q    Class 9, $98 million and some change.  Class 8, $295

23    million and some change.  Then we go into the incentive

24    payment tiers.  Do you see that?

25    A    Yes.

HCMLPHMIT00003268

Seery - Direct                              256

1   Q    What's the purpose of the tiers?

2   A    The purpose of the tiers was to set additional

3   compensation so that, the more recovery, the higher the

4   compensation.  So, below Tier 1, there was really effectively

5   no bonus, is my recollection.  And then in each tier there

6   would be a percentage.

7        So the first tier is $10 million.  There would be a

8   percentage of that $10 million that could be allocated for

9   bonus.  Then in the next tier it would be $56 million.  A

10  portion of that would be allocated for bonus.  And it's

11  weighted more heavily to the higher-recovery tiers, meaning it

12  incentivizes both me and the team to try to reach deeper into

13  Class 8 and Class 9 and get higher recoveries.

14  Q    Okay.  So the idea is, the more difficult it is to get the

15  recoveries, the higher percentage you should get, because if

16  you're successful then you should be rewarded accordingly?  Is

17  that kind of how it works?

18  A    I'm not sure if difficult is the term, but it's a

19  combination of both expertise, difficulty, and time.

20           MR. MCENTIRE:  All right.  Can you scroll down,

21  please?  Next page.

22  BY MR. MCENTIRE:

23  Q    And here are your actual tier participations.  They go --

24  you said basically nothing Tier 1, up through 6 percent.  So

25  Tier 1 is the 71 percent, right?

002235

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 05/28/25   Page 707 of 1011   PageID 2606
Exhibit 72   Page 258 of 390

Seery - Direct                                              257

1    A    It's .72 percent, and it's of the -- that's the first

2    piece.  You have to get to Tier 1.  So if we had not -- I

3    believe it's structured is if we don't get to Tier 1, for

4    example, we don't hit the plan, right around the plan number

5    of 71-and-change cents, then there wouldn't -- there wouldn't

6    be upside.

7         So it was very much structured in a way that you had to

8    perform.  And then the better the performance, the bigger the

9    percentages of the tier.

10   Q    So, in theory, Mr. Seery, by the time you get down to Tier

11   4 and Tier 5, it's a little bit less certain that you're ever

12   going to get there.  Is that right?

13   A    Well, out of the gate, going deeper was uncertain.  It's a

14   question of being able to execute well on the assets and being

15   able to control the costs and being able to make

16   distributions.  It wasn't based on what we just got for the

17   assets.  It's actually based on actual distributions --

18   Q    I understand that.

19   A    -- to Class 8 and 9 claimants.

20   Q    I understand that.  And the idea is, is that it take a lot

21   more effort -- the theory was it might take a lot more effort

22   to get all the way to the bottom of Tier 5 to pay all the

23   Class 9 claims, right?

24   A    And maybe a little luck.

25   Q    Yeah.  And Class 10 is not even factored into this, is it?

002236

HCMLPHMIT00003270

Seery - Direct                          258

1   A    No, it is not.

2   Q    And so you didn't consider Class 10.  You stopped at Tier

3   5?

4   A    That's correct.

5   Q    So your entitlement to a 6 percent return, or a 6 percent

6   bonus on the recoveries, you say it's there to incentivize

7   you.  You didn't expect that to actually happen, did you, when

8   you signed this?  Is that your testimony?

9          MR. STANCIL:  I object to the form of the question.

10  It mischaracterizes the agreement.

11  BY MR. MCENTIRE:

12  Q    You didn't expect it to happen, did you, sir?

13         THE WITNESS:  Well, the six --

14         THE COURT:  Wait.  I'm sorry.  Could you rephrase the

15  question?

16         MR. MCENTIRE:  Sure.

17  BY MR. MCENTIRE:

18  Q    Are you telling the judge that you really didn't expect

19  that to happen and that's why you were entitled to a higher

20  percentage?

21  A    No.  We didn't expect to reach Class 9 and go deep into

22  Class 9, but we certainly held out the possibility that we

23  could.  And it's not six percent.  It's six percent of the

24  increment.  These are cumulative.  So you get .72 of Tier 1.

25  You get 1.17 of Tier 2.  And you can add those, and you earn

HCMLPHMIT00003271

Seery - Direct                                          259

1   them when you've actually made the distribution, but you don't

2   get paid until you get all your distribution or we're

3   relatively done or there's a renegotiation.  Because the

4   Committee wanted to make sure that I didn't say, hey, I hit

5   Tier 3, time to go, I got a better job.

6   Q    So, Mr. Seery, if Farallon told Mr. Dondero that they

7   wouldn't sell basically at any price because you said it was

8   too valuable, and they rejected a 40 or 50 percent premium, if

9   they said that, is that -- is that a lie?

10  A    That I -- rephrase that, please.  I don't -- didn't quite

11  understand your question.

12  Q    Yeah.  You've heard the testimony that Farallon, Michael

13  Linn, told Mr. Dondero that they were not going to sell their

14  claim at any amount because you had told them it was too

15  valuable.  Is that a lie?

16  A    I think that's -- yeah, I don't think that's true.

17  Q    Okay.  And obviously, if they're not going to be willing

18  to sell at any amount, they must be pretty certain they're

19  going to hit Tier 5.  Would that just be a lie?

20  A    That -- that conversation was before this negotiation.

21  That -- there's no -- they could not have had any expectation,

22  either when they had that conversation in May or when we had

23  this discussion that I was going to hit Tier 5 and I hadn't

24  hit Tier 5.  And the idea that they wouldn't sell at any price

25  is complete utter nonsense, because they're capped on what

002238

HCMLPHMIT00003272

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-02724-L Document 4-72 Filed 2/26/25 390 Page 710 of 1011 PageID 2609
Exhibit 72 Page 261 of

Seery - Direct                                          260

1  they can get.

2  Q   So if -- sure.  Okay.  So, but if Farallon told --

3  A   But that's what you said.

4  Q   If Farallon told Mr. Dondero that they wouldn't even sell

5  at 130 percent of the purchase price because you told them it

6  would be too valuable, is that a lie?

7  A   I never told them it would be too valuable.  I don't -- I

8  don't know any of the other parts that you're saying, the 130

9  percent of an unknown number, some guess number that Mr.

10 Dondero had.  I never told them it would be too valuable.

11 That would be their own assessment of where we were at the end

12 of May 2021.

13 Q   If they said that you told them not to sell, that it was

14 too valuable, is that a lie?

15 A   That's untrue, yes.

16 Q   If they told him -- if they told him that he told you --

17 that you told them it was too valuable because of MGM, is that

18 a lie?

19 A   Yes.

20 Q   How many shares of stock did Highland Capital own?

21       MR. MCENTIRE:  Well, one second.  What is my time?

22 How much time do I have?

23       THE CLERK:  Right now you're at --

24       MR. MCENTIRE:  So I'm almost two and a half hours in?

25       THE CLERK:  Just about.  A little under.

002239

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 2262/26 390   Page 711 of 1011   PageID 2610
Exhibit 72   Page 262 of 25

Seery - Direct                    261

1  BY MR. MCENTIRE:

2  Q    I'm going to have to speed up here, Mr. Seery.

3          THE COURT:  A little under two and a half, you said.

4  BY MR. MCENTIRE:

5  Q    Mr. Seery, I want to make sure.  Highland Capital owns

6  interests in the CLOs.  What is the CLOs' stake in the MGM

7  stock, or what was it?

8  A    Highland Capital does not own any interest in any of the

9  CLOs it manages.  It has a fee stream, and it can have certain

10  deferred fees that it can get, but it didn't own any interest

11  in any of the CLOs that it managed.

12  Q    Fair enough.  How about the portfolio companies?

13  A    Did Highland Capital own interests in the portfolio

14  companies?

15  Q    Yes.

16  A    Some of the ones Mr. Dondero listed, but they weren't

17  portfolio companies.  So he said OmniMax, but we didn't have

18  any management of OmniMax.  We just had debt that converted to

19  equity, but we didn't control the -- the thing.  That was

20  during the case, the company.

21  Q    Did Multistrat have an interest in MGM?

22  A    Multistrat owned MGM, yes.

23  Q    Okay.  And did your company, Highland Capital -- your

24  company -- Highland Capital have an interest in Multistrat?

25  A    Highland Capital owns 57 percent of Multistrat, yes.

HCMLPHMIT00003274

Seery - Direct                                                262

1    Q    And did Highland Capital have an interest in any other

2    portfolio companies that have an interest in -- had a stake in

3    MGM?

4    A    RCP.  Restoration Capital Partners.

5    Q    And do you recall what the value of that was?

6    A    It shifted over time.  I don't -- I don't know what time

7    you're talking about.

8    Q    And isn't it true that 90 percent of all the securities

9    that Highland Capital owned at the time that the sale went

10   public was roughly 90 percent of all of Highland Capital's

11   securities?

12          MR. STANCIL:  Objection, Your Honor.  I don't know

13   what that question is asking.

14          THE COURT:  I don't understand it, either.

15      Could you rephrase?

16          MR. MCENTIRE:  I'll try to.

17   BY MR. MCENTIRE:

18   Q    At the time that the announcement was made about Amazon

19   buying MGM in May of 2021, what percentage of all the

20   securities did MGM comprise of the securities that were owned

21   by Highland Capital?

22   A    Of the securities that were directly owned by Highland

23   Capital, it may have been -- I'm thinking of public or semi-

24   public securities, the 150,000 or 170,000 that we had that

25   were subject to the Frontier lien.  Might have been almost all

002241

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 14-72    Filed 22/24/25    390 Page 713 of 1011    PageID 2612

Seery - Direct                                          263

1    of the securities that we owned.  It wasn't -- it was a good

2    position, but it wasn't a huge driver for the directly-owned

3    shares.  There was more value in the Multistrat and the RCP.

4    Q    What percent of shares of all --

5              MR. STANCIL:  Your Honor, I'm sorry, I'm having

6    trouble hearing the end of Mr. Seery's answers.  So I know

7    it's not his --

8              THE WITNESS:  I'm sorry.

9              THE COURT:  Okay.  If you could make sure you speak

10   into the mic.

11             THE WITNESS:  Yeah.  I'm sorry.

12             MR. STANCIL:  I'm having trouble with Mr. McEntire

13   talking over the end of Mr. Seery's answers.

14             THE COURT:  Ah.

15             MR. STANCIL:  I'm having trouble following.

16             THE COURT:  Okay.

17             MR. STANCIL:  I apologize.

18             THE COURT:  Okay.  Could you --

19             MR. MCENTIRE:  I didn't know I was doing that.

20             THE COURT:  Well, --

21             MR. MCENTIRE:  I'll try to do better.

22   BY MR. MCENTIRE:

23   Q    Mr. Seery, of all the stock that Highland Capital owned in

24   May of 2021, what percentage of that was (inaudible) stock?

25   A    Hopefully this is clear.  Highland Capital did not own a

HCMLPHMIT00003276

1  lot of stock.  Highland Capital did have a direct ownership

2  interest in MGM, so that might have been the vast majority of

3  the stock that Highland Capital owned.  It did own interest in

4  other entities, like its investment in RCP or its investment

5  in Multistrat.  But of the stock that it owned directly, that

6  was probably it, and that's the one that was liened up to

7  Frontier.

8  Q   Mr. Seery, did Highland Capital own approximately 170,000

9  shares of MGM stock in May of 2021?

10 A   Yes.  You -- I'm sorry.  You asked me what percentage, and

11 I think I said roughly that amount of stock liened up to

12 Frontier, and that that might have been almost all of the

13 stock we owned.

14 Q   Does Highland Capital own a direct interest in HCLOF?

15 A   In HC --

16 Q   HCLOF?

17 A   HCLOF?  Yes.  Highland Capital owns a small direct

18 interest, and a large indirect interest which we got through

19 the settlement with HarbourVest.

20 Q   And the entity in which you acquired the indirect

21 interest, what's the name of that entity?

22 A   I don't recall.  It's a -- it's a single-shell special-

23 purpose entity that we own all of it and it has no other

24 assets.

25 Q   And just to make sure that the record is clear, you deny

002243

1  under oath that HCLOF has any interest -- or had any interest

2  in MGM stock?

3  A   HCLOF has never owned MGM stock and still doesn't own MGM

4  stock.  It's never owned it.

5  Q   Um, --

6  A   At least -- at least, as long as I've been in this case.

7          MR. MCENTIRE:  One second, Your Honor, please.

8      (Pause.)

9          MR. MCENTIRE:  I'm going to have to pass the witness

10 because of time sensitivities, Your Honor, so I'll pass the

11 witness at this time.

12         THE COURT:  Okay.  Cross?

13                     CROSS-EXAMINATION

14 BY MR. MORRIS:

15 Q   Mr. Seery?

16 A   Yes, sir.

17 Q   You just covered a lot of what we would have covered, so I

18 want to be really, really quick here.  Okay?  We're not

19 covering old ground.  Let's just start with the HarbourVest

20 settlement.  Do you recall that Mr. Dondero sent the email to

21 you on December 17th?

22 A   Yes.

23 Q   Okay.  When did you reach the agreement with HarbourVest

24 on the settlement?

25 A   December 10th.

Seery - Cross                    266

1  Q   Okay.

2       MR. MCENTIRE:  Your Honor, I'd like to move into

3  evidence Exhibit 31.  Actually, let me lay a foundation first.

4     Can you give the witness --

5       MR. MCENTIRE:  Is this a new exhibit?

6       MR. MORRIS:  No.  It's Exhibit 31.

7       MR. MCENTIRE:  Can I see it, Tim, please?

8       MR. MORRIS:  It's in your box.

9       MR. MCENTIRE:  Give me a minute.

10      MR. MORRIS:  Uh-huh.

11      THE COURT:  Okay.  We're about to focus on Highland

12 Exhibit what?

13      MR. MORRIS:  31.

14      THE COURT:  Okay.

15      MR. MORRIS:  Do you have it, Your Honor?

16      THE COURT:  I do.

17 BY MR. MORRIS:

18 Q   Do you have it, Mr. Seery?

19 A   I do, yes.

20      MR. MORRIS:  Do you have it, sir?

21      MR. MCENTIRE:  I do.  Thank you.

22      MR. MORRIS:  Okay.

23 BY MR. MORRIS:

24 Q   Can you just tell the Court what this is?

25 A   This is an email chain.  It starts from me to the other

002245

HCMLPHMIT00003279

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72 Filed 226/26/25 390   Page 717 of 1011   PageID 2616
Exhibit 72   Page 268 of 25

Seery - Cross                    267

1  independent directors, copying counsel, to outline the terms

2  of the HarbourVest settlement that I had just made the offer

3  to HarbourVest to settle on these terms on December 8th.  And

4  this was the product of a number of negotiations that had

5  taken place over the prior weeks, and this was the final offer

6  that I was making to them to settle.

7  Q   Directing your attention to the bottom of the first page,

8  the first email dated December 8, 2020 at 6:46 p.m., can you

9  just read the first sentence out loud.

10 A   I lost -- you lost me.

11 Q   That begins, "As discussed yesterday."

12 A   Oh.  "As discussed yesterday, after consultation with John

13 Morris" -- that would be you -- "regarding litigation risks,

14 this evening I made an offer" -- it says "and," but it should

15 have said "an" -- "offer to HarbourVest to settle their

16 claims.  The following are the proposed terms."

17 Q   Okay.  Just stop right there.  And you were -- this is the

18 report that you gave to the independent directors?

19 A   The other independent directors.

20 Q   Right.

21 A   I was also one.

22 Q   Right.  And did Mr. Dubel respond?

23 A   He did, yes.

24 Q   And can you just describe briefly what your understanding

25 was of his response?

HCMLPHMIT00003280

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 09/26/390    Page 718 of 1011    PageID 2617

Seery - Cross                                          268

1    A    Dubel responds a couple hours after I sent the original

2    email:  "Jim, this basically looks like a $10 million -- net

3    $10 million payment to HV." That's HarbourVest.  "Is that

4    correct?  Does the 72-cent recovery include the $22-1/2

5    million that we get from the transfer of HCLOF interests?

6    Remind me again, post-effective date, who is managing HCLOF?"

7         So I think my understanding was Mr. Dubel was querying me

8    on some of the terms that I had set forth here, including that

9    the value of the claim in our estimation was going to be about

10   $9.9 million, meaning they would have a $45 million senior

11   claim, a $35 million junior claim, and we thought, based on

12   the values we had then, it was going to pay out about $9.9

13   million.

14   Q    Okay.  And was this offer accepted?

15   A    Yes, it was.

16   Q    When was it accepted?

17   A    I think I just said.  On -- on December 10th.

18   Q    Okay.  And did the terms that you described for the other

19   independent directors on December 8th, did they change in any

20   way at all from that reflected in this email until the time we

21   got to the 9019 hearing?

22   A    Not at all, no.

23   Q    Okay.  I see that you mention in here that you -- it says,

24   quote, "The interests have a marked value of $22-1/2 million,

25   according to Hunter Covitz."  Do you see that?

002247

HCMLPHMIT00003281

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 10/22/25   Page 719 of 1011   PageID 2618
Exhibit 72   Page 270 of 390

Seery - Cross                                    269

1   A    That's correct, yes.

2   Q    Who's Hunter Covitz?

3   A    Hunter Covitz was a Highland employee.  He ran the

4   structured products business.  So he was responsible for

5   making sure that the CLO we managed, which was AC7, was

6   compliant and was -- with the indentures.  He also was

7   responsible for monitoring the -- what we call the 1.0 CLOs,

8   even though they weren't really CLOs, they were more like

9   closed-in funds.  And he also kept track of the Acis -- CLOs

10  that HCLOF had an interest in that were managed by Acis.

11  Q    Okay.  And do you recall how he conveyed to you the NAV?

12  A    Well, I talked to him numerous times, so this wasn't our

13  -- I didn't just call him up at the end and say, what's the

14  NAV?  I had had discussions with him while I was negotiating

15  with HarbourVest.  And at some point, he or someone -- he told

16  me the amount, and at some point he gave me a NAV statement

17  that actually showed the NAV of HCLOF, which at 11/30 was

18  roughly $45 million.

19  Q    Okay.  Can you turn to Exhibit 31-A, the next document in

20  the binder?

21  A    Mine's completely blacked out.

22          THE COURT:  I'm sorry, what number?

23          MR. MORRIS:  31-A.

24          THE COURT:  Oh.

25          MR. MORRIS:  And the first two pages are redacted

1   just because they're not relevant and they're business

2   information.

3   BY MR. MORRIS:

4   Q    But can you turn to the last page, sir?

5   A    Yes.

6   Q    Can you tell the judge what this is?

7   A    So this is a net asset value statement from HCLOF.  That's

8   Highland CLO Funding, Limited.  That's the Guernsey entity

9   that -- that held these interests.  And this is a net asset

10  amount, and it shows what the net -- what the net asset value

11  is as of this time on a carryforward basis of $45.191 million.

12  Q    Okay.  And where did you get this document?

13  A    I believe I got it from Covitz.  It's generated by an

14  entity called Elysium, which is the fund administrator for

15  HCLOF, and I believe they're out of Guernsey.

16  Q    And did you rely on this document in setting the proposal

17  to HarbourVest?

18  A    Well, both the conversations with Covitz and the document.

19  And frankly, HarbourVest got the same documents because they

20  were -- they held a membership interest in HCLOF.  So he --

21  Michael Pugatch knew what the NAV was.

22  Q    And would Mr. Dondero or entities controlled by him who

23  also have interests in HCLOF, is it your understanding that

24  they would have also had this document available?

25  A    All members would --

HCMLPHMIT00003283

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 02/22/25   Page 721 of 1011   PageID 2620
Exhibit 72   Page 272 of 390

Seery - Cross                                         271

```
 1              MR. MCENTIRE:  Excuse me.  Excuse me.  I object to

 2     that question, the question being "and the entities controlled

 3     by Mr. Dondero."  There's no foundation for this witness to

 4     answer a question like that.

 5     BY MR. MORRIS:

 6     Q    Who else owned --

 7              THE COURT:  Sustained.

 8     BY MR. MORRIS:

 9     Q    -- an interest in HCLOF?

10              THE COURT:  Go ahead.

11              THE WITNESS:  It would have been DAF.

12     BY MR. MORRIS:

13     Q    The DAF?

14     A    Yeah.

15     Q    Okay.  Let's just ask this question.  Is it your

16     understanding that these NAV valuation reports were made to

17     all holders of interests in HCLOF?

18     A    Yes.  And that would include the DAF.  And I did leave off

19     that there were three former Highland employees long gone, or

20     at least not around at this point, who also owned very small

21     interests, and they would have gotten those statements as

22     well.

23     Q    And does HCLOF also produce audited financial statements?

24     A    It does, yes.

25     Q    Can you go to Exhibit 60, please?
```

002250

HCMLPHMIT00003284

Seery - Cross                              272

1   A   Six zero?

2   Q   Yes, sir.  A couple of questions here.  Is this a document

3   that Highland would have received in the ordinary course of

4   business?

5   A   Yes, it is.

6   Q   Okay.  And what is the NAV depicted on this page as of the

7   end of the year 2020?

8   A   Well, you have to look through it, because this document

9   is actually dated 4/21/21, --

10  Q   Okay.

11  A   -- which you can see on Page 10 where it's signed.  And

12  that shows a net asset value of $50.4 million as of 12/31/21.

13  12/20.  I'm sorry.  And -- but it wasn't prepared until -- the

14  audits aren't done and we don't get this document until after

15  the directors sign off in April.

16  Q   Okay.

17         MR. MORRIS:  And Your Honor, I move for the admission

18  into evidence of these three HarbourVest-related documents,

19  30, 31-A, and 60.

20         MR. MCENTIRE:  No objection.

21         THE COURT:  They're admitted.

22         MR. MORRIS:  Okay.

23      (Debtors' Exhibits 30, 31-A, and 60 are received into

24  evidence.)

25  BY MR. MORRIS:

HCMLPHMIT00003285

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 07/14/25   Page 723 of 1011   PageID 2622
Exhibit 72   Page 2274 of 390

Seery - Cross                                         273

1  Q   Okay.  Let me move on.  We've seen Mr. Dondero's email

2  today.  You've seen that before, correct?

3  A   Yes.

4  Q   Okay.  What was your reaction when you got it?

5  A   I was highly suspicious.

6  Q   Why is that?

7  A   Well, not to replow too much old ground, but this came

8  after he threatened me.  He threatened me in writing.  I'd

9  never been threatened in my career.  I've never heard of

10 anyone else in this business who's been threatened in their

11 career.  So anything I would get from him, I was going to be

12 highly suspicious.

13     It also followed the imposition of a TRO for interfering

14 with the business.  He knew what was in the TRO and he knew

15 what it applied to, and it restricted him from communicating

16 with me or any of the other independent directors without

17 Pachulski being on it.

18     Furthermore, Pachulski had advised Mr. Dondero's counsel

19 that not only could they not communicate with us, if they

20 wanted to communicate they had to prescreen the topics.

21     And how do we know that?  Because Dondero filed a motion

22 to modify the TRO.  And that was all before this email.

23     In addition, that followed the termination of the shared

24 service arrangements, the approval of the disclosure

25 statement, and the demand to collect on the demand notes that

002252

HCMLPHMIT00003286

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 07/25/25   Page 724 of 1011   PageID 2623
Exhibit 72   Page 273 of 390

Seery - Cross                                    274

1  Mr. Dondero and his entities were liable for.

2       So at that point, he'd been interfering with the business,

3  he had threatened me, he was subject to a TRO, and I got this

4  email and I was highly suspicious.

5  Q   Did you ever share this email with anybody at Farallon?

6  A   No.

7  Q   Did you ever share this email with anybody at Stonehill?

8  A   No.  And just to be clear, not just the email, the

9  contents.  Never discussed it with them.

10 Q   That was going to be my next question.  Did you ever share

11 any information about MGM with anybody?

12          MR. MCENTIRE:  Objection.  Leading.

13          MR. MORRIS:  I'm asking the question.

14          MR. MCENTIRE:  No, you're leading.

15          MR. MORRIS:  This is the whole --

16          MR. MCENTIRE:  You're leading the witness.

17          THE COURT:  Overruled.  Finish the question.

18 BY MR. MORRIS:

19 Q   Did you ever share any information concerning with MGM

20 with anybody at Stonehill before you learned that they had

21 purchased claims?

22          MR. MCENTIRE:  Objection.  Leading.

23          THE COURT:  Overruled.

24          THE WITNESS:  No.  No, I did not.

25 BY MR. MORRIS:

002253

HCMLPHMIT00003287

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 22/28/25   Page 725 of 1011   PageID 2624
Exhibit 72   Page 278 of 390

Seery - Cross                                                    275

1   Q    Did you ever share any information with anybody at

2   Farallon concerning MGM before you learned that they purchased

3   their claims?

4             MR. MCENTIRE:  Objection.  Leading.

5             THE WITNESS:  No, I did not.

6             THE COURT:  Overruled.

7             THE WITNESS:  I'm sorry.

8        (Pause.)

9             THE WITNESS:  You know, you just asked me something

10  about Stonehill.

11            THE COURT:  No.

12            THE WITNESS:  I'm sorry.

13  BY MR. MORRIS:

14  Q    Yeah.  No question.

15  A    I wanted to clarify one.

16  Q    What did you want to clarify, sir?

17  A    Certainly didn't share anything about this email, any of

18  the contents of it.  I don't know if I ever -- I don't know

19  exactly when Stonehill bought their claims, and they were

20  subject to the NDA to do the financing process.  So I know

21  when Farallon told me they had bought their claims and I know

22  we never had any discussions at all before they acquired their

23  claims, and I don't know when Stonehill got those -- their

24  claims, so I don't know when -- what was in the data room or

25  what -- what might have been discussed about MGM while they

HCMLPHMIT00003288

Seery - Cross                                276

```
 1   were under an NDA.

 2   Q    Okay.

 3   A    But certainly nothing -- I never shared the contents of

 4   this email, the substance of this email, the email at all.

 5   That's what I wanted to clarify.

 6   Q    What data room are you talking about, sir?

 7   A    This was the data room related to the exit financing where

 8   we sought exit financing and ultimately got exit financing

 9   from Blue Torch Capital.

10   Q    And who put together the data room?

11   A    DSI, which was our financial consultants, and our finance

12   team.

13   Q    And why did you -- did you delegate responsibility for

14   creating the data room to DSI and the members of your team you

15   just identified?

16   A    Yeah, of course.

17   Q    How come?

18   A    I don't really know how to put together a data room.

19   Q    Did you -- did you direct them to put anything in the data

20   room?

21   A    Not specifically.  We had a deck that we -- that certainly

22   I worked on and commented on, which would have been a general

23   overview of the -- of the post-reorganized Highland and the --

24   and the -- and the Claimant Trust.  So I certainly commented

25   on that.  But the specific information in the data room, I
```

002255

Seery - Cross                                    277

1   don't -- I never looked at it.  I don't know what it is.

2   Q    How many -- how many entities who were participating in

3   the exit facility process wound up making bids or offers?

4   A    There were five that signed NDAs.  Three provided

5   substantive proposals.  One was verbal.  That was Bardin Hill,

6   who'd been contacting me throughout the case, and they do this

7   kind of financing, and they submitted a competitive bid.

8   Stonehill in writing, and then amended, a more aggressive one,

9   in writing.  And Blue Torch probably three, and the most

10  aggressive.

11  Q    And did you give the -- did you give the opportunity to

12  your age-old friends at Stonehill?

13  A    They're not my age-old friends.  And no, they lost.  They

14  were second, they were close, it was a good real proposal, but

15  they didn't win.

16  Q    So, --

17  A    Blue Torch won.

18  Q    So is it fair to say that you -- did you pick the best

19  proposal that you thought provided the best value for the

20  company that you were managing?

21          MR. MCENTIRE:  Your Honor, again, for the last ten

22  minutes, we've had nothing but leading questions.  And it just

23  is --

24          MR. MORRIS:  Fine.  Happy to --

25          THE COURT:  Sustained.  Rephrase.

002256

HCMLPHMIT00003290

Seery - Cross                                          278

1    BY MR. MORRIS:

2    Q    Why did you pick Stone -- why did you pick Blue -- Blue-?

3    A    Blue Torch.

4    Q    Blue Torch, over the other bids?

5    A    It was the best bid.  So, structurally, it was the least

6    expensive, although they were extremely close.  I had a lot of

7    confidence in Blue Torch because this type of financing is

8    what they do.  And while you can never have a hundred percent

9    confidence that if somebody goes through the -- this is an

10   LOI, right, so this is a letter of intent.  When they go

11   further, they may -- they may not complete it.  But I had a

12   high degree of confidence that they would get there, because,

13   again, that's what they do.  And they were the -- they were

14   just the better bid.

15   Q    Okay.  Do you recall that in Mr. Dondero's notes he wrote

16   down that he was told that Farallon had purchased their claims

17   in February or March?

18   A    I saw that on what he claimed, yes.

19   Q    And is that consistent with what you were told by Farallon

20   in March?

21   A    They told me they acquired the claims -- they had acquired

22   the claims on March 15th, by email.  I don't know if they

23   acquired them in February or March.  Or even January.  I know

24   they said they had them on March 15.

25   Q    Did you ever speak with Farallon about anything having to

002257

HCMLPHMIT00003291

Seery - Cross                           279

 1  do with the purchase of their claims?

 2          MR. MCENTIRE:  Objection.  Leading.

 3          THE COURT:  Overruled.

 4          THE WITNESS:  Not -- not before they sent me that

 5  email.

 6          MR. MORRIS:  I apologize.  Withdrawn.

 7  BY MR. MORRIS:

 8  Q    Before -- before learning of their purchase, had you had

 9  any discussions with them about potential claim purchases?

10          MR. MCENTIRE:  Objection.

11          THE WITNESS:  No.

12          MR. MCENTIRE:   Leading.

13          THE WITNESS:  I'm sorry.

14          THE COURT:  Overruled.

15          THE WITNESS:  No, I didn't.

16  BY MR. MORRIS:

17  Q    Okay.  Before you learned that Stonehill had purchased

18  claims in the Highland bankruptcy, had you ever had any

19  conversation with them about the potential purchase of claims?

20          MR. MCENTIRE:  Objection.  Leading.

21          THE WITNESS:  No, I don't -- I don't --

22          THE COURT:  Overruled.

23          THE WITNESS:  I'm sorry.  I don't -- I don't believe

24  so, no.

25  BY MR. MORRIS:

HCMLPHMIT00003292

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 2281/26 390   Page 730 of 1011    PageID 2629

Seery - Cross                                            280

1   Q    Do you have any knowledge at all as to how the sellers

2   went about selling their claims?

3   A    I have some knowledge now, post-effective date, that I

4   believe I have some understanding, but not a great one.

5   Q    Did you ever communicate with any of the sellers about the

6   potential sale of their claims prior to the time their claims

7   were sold?

8              MR. MCENTIRE:  Objection.  Leading.

9              THE COURT:  Overruled.

10             THE WITNESS:  I did have a conversation with Eric

11  Felton who was the Redeemer representative on the Creditors'

12  Committee.  And it came out of one of the emails I got.  I

13  think it indicated that --

14             MR. MCENTIRE:  Objection, hearsay, Your Honor.  I

15  mean, hearsay, Your Honor.

16             THE COURT:  Okay.

17             MR. MCENTIRE:  It's hearsay.

18             THE COURT:  Okay.  He's about to say something that's

19  hearsay is the objection.  Any response?

20             MR. MORRIS:  I'm not offering it for the truth of the

21  matter asserted.  I'm offering it for Mr. Seery's state of

22  mind and the extent of his communications.  How about that?

23             MR. MCENTIRE:  I don't see how you could offer it for

24  anything other than for the truth of the matter asserted.

25  It's coming from a third party, so I object to hearsay.

HCMLPHMIT00003293

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 74   Filed 08/28/25   Page 731 of 1011   PageID 2630
Exhibit 72   Page 282 of 390

Seery - Cross                                           281

```
 1              MR. MORRIS:  Okay.  You know what?  We --
 2   BY MR. MORRIS:
 3   Q    Other than the one conversation --
 4              THE COURT:  Are you withdrawing the question or do I
 5   need --
 6              MR. MORRIS:  Yeah.  This is just --
 7              THE COURT:  Okay.  You're withdrawing the question.
 8              MR. MORRIS:  I'll withdraw the question.
 9              THE COURT:  Okay.
10   BY MR. MORRIS:
11   Q    Other than the one conversation with Mr. Felton, did you
12   ever have a conversation with any seller prior to the time you
13   learned that Farallon or Stonehill --
14              MR. MCENTIRE:  Objection.  Leading.
15   BY MR. MORRIS:
16   Q     -- purchased the claims?
17              THE COURT:  Overruled.
18              THE WITNESS:  No.
19   BY MR. MORRIS:
20   Q    Did you play any role in facilitating or recommending to
21   Farallon or Muck that it purchase claims?
22              MR. MCENTIRE:  Objection.  Leading.
23              THE COURT:  Overruled.
24              THE WITNESS:  No.  None whatsoever.
25   BY MR. MORRIS:
```

HCMLPHMIT00003294

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 2/23/25   Page 732 of 1011   PageID 2631
Exhibit 72   Page 282 of 390

Seery - Cross                                    282

1   Q    Did you play any role in facilitating or recommending that

2   Stonehill or Jessup purchase claims?

3   A    No.

4              MR. MCENTIRE:  Objection.  Leading.

5              THE COURT:  Overruled.

6              THE WITNESS:  I'm sorry.

7   BY MR. MORRIS:

8   Q    All right.  Let's just finish up with compensation.  Can

9   you go to Exhibit 41, please?  Can you just identify that

10  document for the Court?

11  A    This is the -- it's a memorandum agreement that sits on

12  top of an outline.  It is the December 2 incentive

13  compensation agreed terms for Highland Capital --

14  Q    Okay.

15  A     -- and the Trust.

16  Q    And when was this signed?

17  A    It would have been -- the date is December 6th.

18  Q    And --

19  A    2021.  I'm sorry.

20  Q    Okay.  And when did you and the Committee members begin

21  discussing your compensation package?

22  A    Shortly after the effective date, which was August 11,

23  2021.

24  Q    And were there any negotiations during that intervening

25  three- or four-month period?

002261

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4 72   Filed 2284/25 390   Page 733 of 1011    PageID 2632
Exhibit 72   Page 2204 of 25

Seery - Cross                                283

```
 1   A    Considerable negotiations during that period, yes.

 2   Q    Can you go to the last page of Exhibit 41?  Can you

 3   describe that for the Court?  I know it's hard to read, but --

 4   A    I --

 5   Q    -- the numbers don't matter so much as the infor... you

 6   know, just, can you just describe --

 7   A    Yeah.

 8   Q     -- what's being conveyed?

 9   A    So it's very hard to read, but it says -- because it's

10   small -- Seery Proposal 1, Oversight Counter 1, Seery Proposal

11   2, Oversight Counter 2, and then it continues down.  My

12   recollection is that we had four or five rounds of back-and-

13   forth that were meaningful.  But it -- but it even took a

14   detour in the middle, because it started with my proposal,

15   which was pretty robust, and their response to me that they

16   didn't like the structure or the amount, and so then we

17   started talking about that.  And then they -- after we were

18   kind of hitting numbers and structure at the same time, they

19   came back to me and said, stop, we've got to agree on the

20   structure before we agree on the amounts.

21          MR. MCENTIRE:  Your Honor, I'm going to object as

22   it's hearsay and move to strike.  This is -- he's not talking

23   about the document.  He's talking about something outside of

24   the four corners of the document.  I object to hearsay.

25          MR. MORRIS:  Hearsay?  There's no statement.
```

HCMLPHMIT00003296

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 12/05/25   Page 734 of 1011   PageID 2633

Seery - Cross                                    284

```
 1              THE COURT:  There was --

 2              MR. MORRIS:  It's a description of what happened.

 3              MR. MCENTIRE:  But he's actually referring to

 4    statements in his substantive comments.

 5              THE COURT:  Overruled.  Okay.

 6              MR. MORRIS:  I move for the admission into evidence

 7    of Exhibit 41.

 8              THE COURT:  Any objection?

 9              MR. MCENTIRE:  That's the memorandum agreement, Mr.

10    Morris?  Is that it?

11              MR. MORRIS:  Yes, sir.

12              MR. MCENTIRE:  No objection.

13              THE COURT:  Admitted.

14        (Debtors' Exhibit 41 is received into evidence.)

15    BY MR. MORRIS:

16    Q   Can we go backwards to Exhibit 39, please?  Can you

17    describe for the Court what that is?

18    A   This is a redacted copy of minutes of the board meeting on

19    August 21 -- 26, 2021.

20    Q   And there's a lot of stuff redacted there.  Do you have an

21    understanding as to why there is redactions?

22    A   It would have nothing to do with these issues that we're

23    discussing or the alleged *quid pro quo*.

24    Q   Okay.  Can you just read out loud the last portion that's

25    unredacted on the second page, beginning with "Mr. Seery
```

HCMLPHMIT00003297

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 06/23/25   Page 735 of 1011   PageID 2634
Exhibit 72   Page 286 of 390

Seery - Cross                                285

1  reviewed"?

2  A    It actually says, "Mr. Seery also presented the board with

3  an overview of his incentive compensation program proposal,

4  which would include not only Mr. Seery but the current HCMLP

5  team.  The terms and structure of the proposal had been

6  previewed with the board in prior operating models presented

7  by Mr. Seery.  Mr. Seery reviewed the proposal and stated his

8  view that the proposal was market-based and was designed to

9  align incentive between himself and the HCMLP team on the one

10  hand and the Claimant Trust beneficiaries on the other.  The

11  board asked questions regarding the proposal and determined

12  that it would consider the proposal and revert to Mr. Seery

13  with a counterproposal."

14  Q    All right.  When you were -- when you were shown one of

15  these documents before, you were asked to identify Mr. Linn,

16  but you weren't asked about the others.  Do you see Richard

17  Katz there?

18  A    Yes.

19  Q    Who's that?

20  A    He's the independent member.

21  Q    Did he play any role in the negotiation of your

22  compensation package?

23  A    Yes.  He was actively involved.

24  Q    Okay.  And how about Mr. Provost?  Who's he?

25  A    He is the Jessup person.  Jessup is the board member.

002264

HCMLPHMIT00003298

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 02/27/25   Page 736 of 1011   PageID 2635
Exhibit 72   Page 287 of 390

Seery - Cross                                    286

1   He's their representative on the board.

2   Q    Okay.

3           MR. MORRIS:  And I move for admission into evidence

4   of Exhibit 39.

5           MR. MCENTIRE:  No objection, Your Honor.

6           THE COURT:  Admitted.

7       (Debtors' Exhibit 39 is received into evidence.)

8   BY MR. MORRIS:

9   Q    Let's go to Exhibit 40, please.  Can you just describe for

10  the Court what that is?

11  A    This is a subsequent board meeting minutes, August 30,

12  2021.

13  Q    And can you just read into the record -- why are there

14  redactions?

15  A    Again, they would -- if there are redactions, it would

16  have nothing to do with the issues that are being brought up

17  in this motion.

18  Q    And can you just read into the record the paragraph

19  beginning, "Mr. Katz"?

20  A    "Mr. Katz began the meeting by walking the Oversight Board

21  and Mr. Seery through the Oversight Board's counterproposal to

22  the HCMLP incentive compensation proposal, including the

23  review of the spreadsheet and summary of the counterproposal.

24  Discussion was joined by Mr. Linn and Mr. Stern.  Mr. Seery

25  asked numerous questions and received detailed responses from

HCMLPHMIT00003299

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 08/28/25   Page 737 of 1011   PageID 2636

Seery - Cross                                          287

1  the Oversight Board.  Mr. Seery and the Oversight Board agreed

2  to continue the discussion and negotiations regarding the

3  proposed incentive compensation plan for the Claimant Trustee

4  and the -- and the HCMLP."

5  Q   So they didn't accept your original proposal that you made

6  in the earlier document?

7  A   They did not.

8  Q   Okay.  And did negotiations continue?

9  A   They did, yes.

10          MR. MORRIS:  Before we go on, I move for admission

11  into evidence Exhibit 40.

12          THE COURT:  Any --

13          MR. MCENTIRE:  No objection.

14          THE COURT:  It's admitted.

15      (Debtors' Exhibit 40 is received into evidence.)

16  BY MR. MORRIS:

17  Q   Can you go to Exhibit 59, please?  Can you describe for

18  the Court what this is?

19  A   This is an email string between me and the Oversight Board

20  regarding the compensation proposal.

21  Q   Okay.  And directing your attention to the bottom, I

22  guess, of the second page, there is an email from Mr. Katz

23  dated October 26.  Do you see that?

24  A   At the bottom of the second -- oh, yes, yes.

25  Q   Okay.  Can you just read the sentence at the bottom of the

HCMLPHMIT00003300

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 2/89/25 390   Page 738 of 1011   PageID 2637

Seery - Cross                    288

1   page beginning "We propose"?

2        MR. MCENTIRE:  Well, Your Honor, I would, first of

3   all, object to him just reading from the document until it's

4   been put into evidence.

5        THE COURT:  I'm sorry, say again?

6        MR. MCENTIRE:  I would object to Exhibit --

7        THE COURT:  We can't pick things up on the record

8   when you don't speak in a mic.

9        MR. MCENTIRE:  I object to him simply reading from

10   the document before the document is offered into evidence.

11        MR. MORRIS:  Okay.

12        MR. MCENTIRE:  Accepted into evidence.

13        MR. MORRIS:  Sure.  I'd move it into evidence.

14        MR. MCENTIRE:  I object as hearsay.

15        MR. MORRIS:  This is a present sense recollection --

16   recorded.  It's a clear business record.  It's a negotiation

17   that's happening over time.  Mr. Seery is here to answer any

18   questions about authenticity.

19        MR. MCENTIRE:  Well, first of all, it's an email

20   string involving communications with third parties.  That's

21   hearsay in and of itself.  And it's not been established that

22   this is a business record.  And Mr. Morris's statements to

23   that effect, frankly, don't carry his burden.  There's

24   internal hearsay contained throughout the document, Your

25   Honor, even if it is a business record.

HCMLPHMIT00003301

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 72 Filed 290/26 390 Page 739 of 1011   PageID 2638

Seery - Cross                                           289

```
 1             MR. MORRIS:  Your Honor, just to be clear, let me

 2   respond.

 3             THE COURT:  Uh-huh.

 4             MR. MORRIS:  Exceptions to hearsay rule.  803(1)

 5   present sense impression; (2) -- (3) existing mental

 6   impression, state of mind about motive, (5) recorded

 7   recollection, (6) records of regularly-conducted activity, or

 8   Federal Rule of Evidence 807, residual exception for

 9   trustworthy and probative evidence.  I'll take any of them.

10             MR. MCENTIRE:  None of them apply.

11             MR. MORRIS:  Okay.

12             THE COURT:  Okay.  Overruled.

13             MR. MORRIS:  Thank you.

14             THE COURT:  I admit it.  59's admitted.

15        (Debtors' Exhibit 59 is received into evidence.)

16   BY MR. MORRIS:

17   Q   Can you just read that last sentence at the bottom of that

18   page?

19   A    This is from Rich Katz to me.

20   Q   Uh-huh.

21   A    (reading)  We propose doing this in two stages.  First,

22   we'd like to come to agreement on structural, underscored,

23   elements of the ICP.

24        ICP means incentive compensation program or plan.

25        Only after we'd done that, when the board had greater
```

HCMLPHMIT00003302

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 02/01/26    Page 740 of 1011    PageID 2639

Seery - Cross                                            290

1    understanding of what plan they were pricing, would we haggle

2    out the specific numbers, underscore, tier attachment points,

3    and percentage participation in each tier.

4    Q    Okay.  And going to the right-hand part of that, do you

5    see where it says, Salary J.S. Only?

6    A    Yes.

7    Q    Can you just, you know, generally describe for the Court

8    what the debate is or the negotiation that's happening on that

9    particular point?

10   A    Well, this was brought up earlier.  The salary was

11   $150,000 a month.  That was the same salary that I'd had

12   during the case that was approved by the Court.  It had been

13   approved by the Committee, approved by the other independent

14   members.  That was continuing.  It was also contained as an

15   actual base salary in the plan and the Claimant Trust

16   Agreement, and they were never amended.

17        The Committee came back to me and said, we'd like that to

18   step down.  And they'd like it to step down on a definitive

19   specific schedule, because they had a view that that would

20   incentivize me to work faster to make distributions before the

21   stepdown and that I wouldn't linger in the role.  And the

22   yellow --

23   Q    Can you just read the yellow out loud?

24   A    That's --

25   Q    Read the whole thing.

002269

HCMLPHMIT00003303

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 02/26 390   Page 741 of 1011   PageID 2640

Seery - Cross                                291

1   A    That's my response.

2   Q    Read the whole thing.

3   A    (reading)  Based on the required expertise, volume, and

4   personal risk of the work today, I do not think that any

5   formulaic reduction in base comp is appropriate.  With the

6   complexity and amount of issues that I have to manage on a

7   daily basis, I currently do not have capacity to take on

8   significant outside work.  Of course, things can change.  If

9   they do, I am open to discussing reduction in the base.  I

10  have no interest in sitting around doing nothing, having no

11  risk, and collecting the full base compensation.  We can

12  include prefatory language and an agreement to revisit our

13  terms, but I do not see an avenue to set parameters to lock in

14  an agreement for the future at this time.

15      And then there's another paragraph on severance.

16  Q    You can stop there.

17          MR. MORRIS:  I have no further questions.

18          THE COURT:  All right.  Pass the witness.

19          MR. MCENTIRE:  Do you have any questions?

20          A VOICE:  No.

21          MR. MCENTIRE:  Okay.  How much time do I have,

22  please?

23          THE CLERK:  So, the limit is at two hours and 32

24  minutes.

25          MR. MCENTIRE:  All right.

HCMLPHMIT00003304

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 22/93/25 390   Page 742 of 1011   PageID 2641

Seery - Redirect                                292

```
 1                      REDIRECT EXAMINATION
 2   BY MR. MCENTIRE:
 3   Q    Just a couple questions very quickly, Mr. Seery.  Highland
 4   Capital Management paid HarbourVest cash as part of the
 5   settlement, correct?
 6   A    That's incorrect.
 7   Q    There was no cash component at all?
 8   A    There was not.
 9   Q    And in connection with the HarbourVest settlement,
10   HarbourVest transferred an interest in HCLOF to Highland
11   Capital or an entity affiliated with Highland Capital; is that
12   not correct?
13   A    That's correct.
14   Q    And that -- that entity -- and HCLOF, and HCLOF had an
15   interest in various CLOs, correct?
16            MR. MORRIS:  Your Honor, I object.  This is beyond
17   the scope of my cross, or redirect, however you prefer.
18            MR. MCENTIRE:  Well, you spent a lot of time on
19   HarbourVest.  I'm just trying to clear it up.
20            MR. MORRIS:  I didn't say the word CLO.  I did not
21   say the word CLO.
22            THE COURT:  Overruled.  He can go there.
23        If you'd please move the mic towards your voice.
24   BY MR. MCENTIRE:
25   Q    And HCLOF had an interest in various CLOs, correct?
```

HCMLPHMIT00003305

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 04/24/25   Page 743 of 1011   PageID 2642
Exhibit 72   Page 294 of 390

Seery - Redirect                                    293

1   A   I believe it had an interest in five CLOs.  Oh, that's not

2   true.  It had an interest in five of the 1.0 CLOs.  It also

3   owned one hundred -- basically, somewhere between 87 and a

4   hundred percent of Acis 3, 4, 5, 6, and 7, which is about a

5   billion dollars of CLOs to 10 (inaudible) leveraged vehicles,

6   and they owned basically all the equity, so that was the

7   driver of the value.

8   Q   And various entities that were -- I mean, some of these

9   various CLOs had an interest in MGM stock, correct?

10  A   The 1. -- the Highland 1.0s did.  The value drivers I just

11  described -- Acis 3, 4, 5, 6, and 7 -- had no interest in MGM.

12  Q   But one of them did have an interest in MGM?

13  A   That's not correct.

14  Q   What did you just say?

15  A   3, 4, 5, 6, and 7 did not have any interest in MGM.

16  Q   Were there any CLOs that had an interest in MGM?

17  A   Some of the 1.0 CLOs did, --

18  Q   I see.

19  A   -- yes.

20          MR. MCENTIRE:  Pass the witness.

21          MR. MORRIS:  No further questions.

22          THE COURT:  Mr. Seery, I want to ask you one thing.

23          THE WITNESS:  Yes, Your Honor.

24                  EXAMINATION BY THE COURT

25          THE COURT:  We dance around it a lot.  The Highland

HCMLPHMIT00003306

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 06/25/25   Page 744 of 1011   PageID 2643
Exhibit 72   Page 295 of 390

Seery - Examination by the Court                294

1    ownership of MGM stock.  If think -- if you could confirm I've

2    heard this correct -- you said Highland itself owned 170,000

3    shares that were subject to a Frontier Bank lien?

4            THE WITNESS:  Yes, Your Honor.  I believe that's the

5    right amount.  So, Highland directly owned about 170,000

6    shares.  Those were liened up to Frontier.  They were -- they

7    were never transferred.  Highland never sold any MGM stock.

8            THE COURT:  Okay.  So Frontier still holds it or

9    what?

10           THE WITNESS:  No.  In fact, post-effective -- I

11   believe it was post-effective date, and with cash generated,

12   we -- we paid off the Frontier loan, --

13           THE COURT:  Uh-huh.

14           THE WITNESS:  -- released that lien, and then we held

15   those shares in MGM until the merger was consummated.

16           THE COURT:  Okay.

17           THE WITNESS:  So we tendered our shares into the --

18   into the merger and got the merger consideration, which was

19   cash.

20           THE COURT:  Okay.  And so there was that.  But other

21   than that, you said Highland owned 50 percent of Multistrat,

22   which owned some MGM stock?

23           THE WITNESS:  Multistrat had a -- I don't recall the

24   amount, but a material amount of MGM stock.  That also -- so,

25   Highland owned 57 percent of Multistrat.  Is also the manager

002273

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 74    Filed 08/06/25    Page 745 of 1011    PageID 2644
Exhibit 72    Page 296 of 390

Seery - Examination by the Court                              295

 1  of Multistrat.

 2              THE COURT:  Uh-huh.

 3              THE WITNESS:  Multistrat did not sell any MGM stock.

 4  It also tendered them into the merger as well.

 5              THE COURT:  Okay.  And then you said Highland owned

 6  some percentage of Restoration --

 7              THE WITNESS:  Restorations Capital Partners.

 8              THE COURT:   -- Capital Partners, which owned some

 9  MGM stock?

10              THE WITNESS:  Similarly, Highland is the manager of

11  what we call RCP.  RCP owned a material amount of MGM stock.

12  RCP did not sell any MGM stock.  However, in 2019, you'll

13  recall that Mr. Dondero sold $125 million of stock

14  postpetition out of RCP.  It was MGM stock.  He sold it back

15  to MGM.  We had a -- we had a hearing on it, because

16  subsequently the Independent Board learned about it, the

17  Committee learned about it, they had not -- it had not been

18  disclosed, but there was a -- what we thought was a binding

19  agreement with MGM, and MGM indicated that they were going to

20  hold us to it, and so we had a hearing about approving that

21  transaction.  The Committee was not happy.

22              THE COURT:  Okay.  I'm fuzzy on when that was.  You

23  said?

24              THE WITNESS:  That would have been in early 2020,

25  probably April-ish timeframe.

002274

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 07/25/25   Page 746 of 1011   PageID 2645
Exhibit 72   Page 297 of 390

Seery - Examination by the Court                    296

1            THE COURT:  Okay.

2            MR. MORRIS:  Your Honor?

3            THE WITNESS:  The transaction was in November, I

4    believe.

5            MR. MORRIS:  If it's helpful, Your Honor, you can

6    find it at Docket 487.

7            THE COURT:  Okay.

8            MR. MORRIS:  I think that's the objection from the

9    Committee where the issue was -- comes up at least at one

10   time.

11           THE COURT:  Okay.  And then I think this is the last

12   category I heard, that HCM and its specially-created sub owned

13   just over 50 percent of HCLOF, and it in turn owns interest in

14   a lot of CLOs, and a few of those, what you call the 1.0 CLOs,

15   did own some MGM stock?

16           THE WITNESS:  That's correct.  So if you look on the

17   audited financials that we had introduced into evidence,

18   you'll see actually every asset that HCLOF owns.  There's no

19   MGM in there.  It does own interest.  There were minority

20   interests in five or six of the 1.0 CLOs.  Grayson,

21   Greenbrier, Gleneagles, Brentwood, Liberty, and one other.

22   And it had interest in those, but it never owned any MGM stock

23   and it never traded any MGM stock.  It didn't own any.

24           THE COURT:  All right.  Did I cover the universe of

25   what MGM stock was owned by Highland or something Highland had

HCMLPHMIT00003309

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 09/28/25   Page 747 of 1011   PageID 2646
Exhibit 72   Page 298 of 390

Seery - Examination by the Court                297

 1  an interest in?

 2          THE WITNESS:  Yeah.  So, the ones that HCLOF had an

 3  interest in that I just listed, those -- Jasper was the other

 4  one.  I apologize.  The -- they owned -- they owned MGM stock

 5  among their other -- they had a lot of other assets.   The

 6  other CLOs, the 1.0 CLOs that Highland had, every one of them

 7  owned MGM stock.  None of them sold or bought any stock.

 8  Those all tendered into the merger as well.  Highland did not

 9  own any interest in any of those entities.

10          THE COURT:  Uh-huh.

11          THE WITNESS:  It just managed them.

12          THE COURT:  Okay.  And this is my last question.

13  Someone brought up or it came up today that exactly two years

14  ago today -- I didn't remember we were on an anniversary of

15  that -- but was when we had a hearing, and I think it was a

16  contempt hearing, but I had, I guess, read in the media, like

17  many other human beings, an article about the MGM-Amazon

18  transaction, and I had said I had hope in my heart and brain

19  that this could be an impetus or a triggering event for maybe

20  a settlement.  And that was kind of quickly pooh-poohed, if

21  you will.

22      Remind me why I was quickly persuaded, oh well, I guess

23  that's not going to happen.  I just can't remember what I

24  heard that day.

25          THE WITNESS:  Well, it was widely known that

HCMLPHMIT00003310

1    Highland, meaning not the 171,000 --

2           THE COURT:  Uh-huh.

3           THE WITNESS:  -- but the entities that Highland or

4    related entities, including DAF, the other Dondero entities,

5    controlled a lot of Highland stock, as even Mr. Dondero said

6    between Anchorage --

7           THE COURT:  You mean MGM?

8           THE WITNESS:  MGM, I'm sorry.  Between -- there were

9    only five major holders.  There was the two we just mentioned

10   and Davidson Kempner and Monarch and Owl Creek, and just a few

11   other big holders.

12        And so Your Honor would have learned it from the case, but

13   you also would have learned it from the paper, that any time a

14   holder is mentioned, it's first Anchorage, because they owned

15   the biggest piece, and Kevin Ulrich, who was the chairman of

16   Anchorage, was also the chairman of MGM.  And then Highland

17   was always mentioned.

18        The reason that it didn't have some great amount of

19   capital that went on to Highland, although there was money

20   from RCP and there was money from MGM, is Highland doesn't own

21   the stock that's -- or interests in the 1.0 CLOs that owned

22   all of it.  We just manage it.

23          THE COURT:  Uh-huh.

24          THE WITNESS:  And that goes to various other

25   entities, including, in large part, to Dondero entities.  So

HCMLPHMIT00003311

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4 72 Filed 2700/26 390Page 749 of 1011   PageID 2648
Seery - Examination by the Court          299

1   there wasn't a big windfall to Highland from that.

2       The possibility of some upside from HCLOF, because it

3   owned small interests in those five, there was some value in

4   that, but a lot of it got tied up in the litigation that other

5   entities, Dondero entities, are bringing against U.S. Bank and

6   Acis, which has tied up everything in that -- those

7   distributions.

8           THE COURT:  Okay.  All right.  Thank you.  You are

9   excused from the stand.

10          THE WITNESS:  Thank you, Your Honor.

11          MR. STANCIL:  I owe you a docket number, Your Honor.

12  You said don't let us leave before we give you a docket number

13  for that second contempt order.  We promised to come back.  It

14  was #2660.

15          THE COURT:  Okay.  Got it.

16          MR. STANCIL:  Which -- did we move that into

17  evidence?

18          MR. MORRIS:  No.  We asked the Court to take judicial

19  notice.

20          THE COURT:  I will take judicial notice of 2660, --

21          MR. STANCIL:  Thank you, Your Honor.

22          THE COURT:   -- I already said.  Thank you.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  You're excused.

25      (The witness steps down.)

HCMLPHMIT00003312

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 10/21/25   Page 750 of 1011   PageID 2649
Exhibit 72   Page 2301 of 2390

300

```
 1            THE COURT:  All right.  Are you going to have any

 2   other evidence, Mr. McEntire?

 3            MR. MCENTIRE:  Your Honor, as I respond to your

 4   question, I think we have 30 -- approximately 30 minutes left.

 5            THE CLERK:  Twenty-six, yes.

 6            MR. MCENTIRE:  Twenty-six.  We do have another

 7   witness.  We also have a closing final argument.  And we also

 8   have an opportunity -- we want to reserve an opportunity for

 9   our experts that is still under advisement.

10       So my first action would be to ask for an extension of

11   time, or we would like to add to our time limit.  Instead of

12   just three hours, we'd like to increase the time so we can

13   accomplish all these things.

14       I mean, if the Court is unwilling to give us additional

15   time, then I will be forced not to call another witness.  I

16   will move to a very short final argument.  I need to preserve

17   some time for my experts, should you allow them to testify.

18            THE COURT:  Well, --

19            MR. MORRIS:  May I respond?

20            THE COURT:   -- you don't have to preserve time.  I'm

21   either going to allow you to put on your experts, and we said

22   30 minutes/30 minutes, --

23            MR. MORRIS:  That was what I was going to say, Your

24   Honor.

25            THE COURT:  Okay.
```

HCMLPHMIT00003313

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    DocumenExhibi4 72 FilePag022/2602 390Page 751 of 1011    PageID 2650

301

```
 1              MR. MORRIS:  There's no prejudice here.  Nobody's
 2   being harmed.  There's no appellate issue.  I thought we were
 3   really clear.  Everybody gets their three hours today.  We
 4   will file our reply brief on Monday.  The Court will determine
 5   both whether it needs to hear expert testimony and whether or
 6   not our motion should be sustained.  If the Court denies the
 7   motion, we'll take a couple of depositions and each side will
 8   get whatever period of time the Court orders.
 9         But, you know, the attempts to create an appellate record
10   are just -- you know, that's not -- there's no issue here.  He
11   can -- he's got 26 minutes.  He can put on his witness, he can
12   make his closing in the 26 minutes that they've always had.
13              THE COURT:  All right.  Well, we have --
14              MR. MCENTIRE:  May I caucus?  May I caucus very
15   quickly, Your Honor?
16              THE COURT:  Okay.  Uh-huh.  And while you're
17   caucusing, we have our game plan on the experts.  We know how
18   that's going to happen.  And I'm not extending the three
19   hours.
20              MR. MORRIS:  (sotto voce)  We have 62 minutes?
21         (Pause.)
22              MR. MCENTIRE:  Your Honor, accordingly, I'll just --
23   we'll move into a final argument at this time.
24              THE COURT:  Okay.  So you rest?
25              MR. MCENTIRE:  I rest.
```

HCMLPHMIT00003314

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 03/03/26   Page 752 of 1011   PageID 2651
Exhibit 72   Page 202 of 390

Patrick - Direct                             302

```
 1             THE COURT:  All right.

 2             MR. MORRIS:  We call Mark Patrick.

 3             THE COURT:  All right.  Mr. Patrick, you've been

 4   called to the witness stand.

 5             MR. MORRIS:  I just need to find my examination

 6   notes.  Just give me one moment, please.

 7             THE COURT:  All right.  Please raise your right hand.

 8   Could you remain standing, please.

 9        (The witness is sworn.)

10             THE COURT:  All right.  You may be seated.

11             MARK PATRICK, DEBTORS' WITNESS, SWORN

12                     DIRECT EXAMINATION

13   BY MR. MORRIS:

14   Q   Hi, Mr. Patrick.

15   A   Hello.

16   Q   Did you ever meet with anybody at the Texas State

17   Securities Board?

18   A   No.

19   Q   Do you know if -- do you know anybody who ever met with

20   anybody at the Texas State Securities Board concerning

21   Highland?

22   A   Yes.

23   Q   And who met with the Texas State Securities Board

24   concerning Highland?

25   A   Ronnie (phonetic) Patel.
```

002281

Patrick - Direct                    303

1   Q    And is that a lawyer?

2   A    Yes.

3   Q    Do you know who retained Mr. -- that lawyer?

4   A    Yes.

5   Q    Who retained that lawyer?

6   A    The DAF, the Charitable DAF Fund.  Or one of its entities.

7   Q    Okay.  And is it your understanding that the DAF Fund or

8   one of its charitable entities filed a complaint with the

9   Texas State Securities Board?

10  A    Yes.

11  Q    Okay.  Thank you very much.  Does Hunter Mountain owe any

12  money to Mr. Dondero?

13  A    No.

14  Q    Is there a promissory note that's outstanding that Mr.

15  Dondero has pursuant to which Hunter Mountain owes him $60-

16  plus million?

17  A    No.

18  Q    Who created Hunter Mountain?

19  A    Well, I don't recall specifically.  I just recall the

20  facts that, when Hunter Mountain was created, Thomas Surgent,

21  the chief compliance officer of Highland Capital Management,

22  who was representing the Dugaboy Investment Trust as well as

23  Highland Capital legally with respect to that transaction,

24  requested to Rand that the Hunter Mountain Investment Trust be

25  created for purposes of Highland filing its ADV with the SEC.

002282

1   It was my understanding that when the ADV would be filed, sort

2   of the ownership change would -- chain would stop at Hunter

3   Mountain.

4   Q    Okay.  Dugaboy is Mr. Dondero's family trust, correct?

5   A    No.  But I'll help you along.  Just please use the full

6   name of the trust.

7   Q    If I refer to the Trust, will you know that that's -- is

8   that for the Hunter Mountain Investment Trust, or do you want

9   me to use trust --

10  A    There's no entity called Dugaboy.  Just Dugaboy.  There's

11  not.

12  Q    Okay.

13  A    It's a shorthand.  I'm --

14  Q    Okay.  I'll refer to Dugaboy then, okay?

15  A    What are we referring to?

16  Q    The trust known as Dugaboy.

17  A    Okay.  Fair enough.  Go ahead.

18  Q    Okay.  Did Dugaboy contribute a portion of its ownership

19  interest in Highland to the Highland -- to the Hunter Mountain

20  Investment Trust?

21  A    Contribute?  No.

22  Q    Did it transfer?

23  A    Yes.

24  Q    And did it receive in exchange a promissory note from

25  Hunter Mountain?

002283

HCMLPHMIT00003317

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 03/06/25   Page 755 of 1011    PageID 2654
Exhibit 72   Page 306 of 390

Patrick - Direct                            305

```
 1   A    Yes, it did.

 2   Q    Okay.  And Mr. Dondero is the lifetime beneficiary of

 3   Dugaboy, correct?

 4   A    Yes and no.  It's a placeholder -- a placeholder provision

 5   that's never been used.

 6             MR. MCCLEARY:  Your Honor, pardon me.  Pardon me.

 7   Objection, relevance, Your Honor.

 8             THE COURT:  Relevance?

 9             MR. MORRIS:  This is -- we've been told so many times

10   that Mr. Dondero has no interest in this case, he has nothing

11   to do with Hunter Mountain.  He's the lifetime beneficiary of

12   Dugaboy.  And if I --

13             THE WITNESS:  That provision has never been invoked.

14   He's received no money through that provision.

15             THE COURT:  Okay.  Just wait.  We're resolving --

16             MR. MORRIS:  Right.

17             THE COURT:   -- an objection at the moment.

18   BY MR. MORRIS:

19   Q    Can we turn to Exhibit 51?

20             THE COURT:  I'm still working on the objection.

21             MR. MORRIS:  I'm going to try and lay a foundation.

22   Okay?

23             THE COURT:  Okay.  So he's withdrawing the question.

24             MR. MCCLEARY:  He's withdrawing the question?  Okay.

25             THE COURT:  Okay.
```

002284

Patrick - Direct                                    306

1    BY MR. MORRIS:

2    Q   You have a binder in front of you, sir.  Can you go to

3    Exhibit 51?

4                THE COURT:  And this is Highland's Exhibit 51?

5                MR. MORRIS:  Yeah.

6                THE COURT:  Okay.

7    BY MR. MORRIS:

8    Q   And is that a promissory note that was made --

9    A   Yes, it is.

10   Q    -- that was made by Hunter Mountain in favor of Dugaboy

11   back in 2015?

12               MR. MCCLEARY:  Objection, relevance, Your Honor.

13               MR. MORRIS:  I'm trying to connect Mr. Dondero to

14   Hunter Mountain.

15               THE COURT:  Okay.  Overruled.

16               THE WITNESS:  Yeah.  It's a secured promissory note

17   with the amount of approximately $62.6 million signed by

18   Beacon Mountain, LLC, --

19               MR. MORRIS:  Uh-huh.

20               THE WITNESS:  -- as administrator for Hunter Mountain

21   Investment Trust.

22   BY MR. MORRIS:

23   Q   Okay.  And as the -- what's your role with Hunter Mountain

24   today?

25   A   And it's in favor, just to answer your question, it's in

002285

1   favor of the Dugaboy Investment Trust.  That's where I was

2   just being a little stickler --

3   Q    I appreciate that.

4   A     -- previously.  Sorry.

5   Q    I do.

6   A    Okay.  What is your question?

7   Q    What's your role with Hunter Mountain today?

8   A    I am the administrator.

9   Q    When did you become the administrator?

10  A    On or about August of 2022.

11  Q    Okay.  How did you become the administrator?

12  A    Through the acquisition of Rand Advisors.

13  Q    And does Hunter Mountain have any employees?

14  A    No.

15  Q    Does it have any operations?

16  A    No.

17  Q    Does it generate any revenue?

18  A    Not -- not currently.

19  Q    Okay.  Did it generate any revenue in 2022?

20  A    No.

21  Q    Does it own any assets?

22  A    Yes.

23  Q    What does it own?

24  A    It has -- it's my understanding it has a contingent

25  beneficiary interest in the Claimants Trust.

002286

HCMLPHMIT00003320

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 09/26/390  Page 758 of 1011    PageID 2657
Exhibit 72   Page 209 of 25

Patrick - Direct                              308

1  Q    And that's the only asset it has, right?

2  A    Correct.

3  Q    So that if it -- if that interest has no value, then

4  Hunter Mountain has no ability to pay the Dugaboy note.  Fair?

5  A    (sotto voce) If that interest has no value?

6       That is correct.

7  Q    Okay.

8            MR. MORRIS:  I move Exhibit 51 into evidence.

9            MR. MCCLEARY:  Your Honor, relevance.  Objection.

10           THE COURT:  Your response?

11           MR. MORRIS:  Mr. Dondero desperately needs Hunter

12  Mountain to win in this lawsuit because otherwise his family

13  trust will get nothing on this $63 million note.

14           THE COURT:  Okay.  Overrule the objection.  It's

15  admitted.

16      (Debtors' Exhibit 51 is received into evidence.)

17  BY MR. MORRIS:

18  Q    Neither you or any representative of Hunter Mountain has

19  ever spoken with any representative of Farallon, correct?

20  A    Correct.

21  Q    Neither you nor any representative of Hunter Mountain has

22  ever spoken with anybody at Stonehill, correct?

23  A    Correct.

24  Q    You have -- neither you nor Hunter Mountain have any

25  personal knowledge about a *quid pro quo*, correct?

HCMLPHMIT00003321

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 2/12/25   Page 759 of 1011    PageID 2658
Exhibit 72    Page 310 of 390

Patrick - Direct                          309

1  A    (sotto voce)  Nor Hunter Mountain have any personal

2  knowledge about a *quid pro quo*.

3      Correct.

4  Q    Neither you nor anybody at Hunter Mountain have any

5  personal knowledge about how Mr. Seery's compensation package

6  was determined, correct?

7  A    Correct.

8  Q    Neither you nor anybody at Hunter Mountain had any

9  knowledge about the terms of Mr. Seery's compensation package

10  until the Highland parties voluntarily disclosed that in

11  opposition to the Hunter Mountain motion, correct?

12  A    No.  I --

13          MR. STANCIL:  Objection, relevance, Your Honor.

14          THE COURT:  Overruled.

15          THE WITNESS:  No.  I seem to -- I seem to have an

16  awareness that the performance fee was amended at a certain

17  time post-confirmation, or, you know, around the confirmation

18  time period.  And so that's with respect to the compensation.

19  I -- just myself.

20  BY MR. MORRIS:

21  Q    Can you tell Judge Jernigan everything you know or

22  everything you knew before receiving Highland's opposition to

23  this motion about Mr. Seery's compensation as the CEO of the

24  Reorganized Debtor at the Claimant Trustee?

25          MR. MCCLEARY:  Objection, Your Honor.  That's

HCMLPHMIT00003322

Patrick - Direct                                310

1  overboard and an unclear question.

2          THE COURT:  Overruled.  He's gone through some

3  specific things now.  I guess he's just trying to encompass

4  anything we haven't covered.

5          THE WITNESS:  Yeah.  I had a -- I personally had a

6  general understanding that Mr. Seery's compensation changed

7  after the claims trading to put in a performance-based-type

8  measure.  But I do recall that it was always very -- it was

9  unclear exactly the terms.

10 BY MR. MORRIS:

11 Q    Okay.  Did you learn anything else?

12 A    Such as?

13 Q    Just, did you ever learn anything else about Mr. Seery's

14 compensation package that you haven't testified to yet?

15          MR. STANCIL:  Your Honor, objection.  Vague.

16          THE COURT:  Overruled.

17          THE WITNESS:  No.

18 BY MR. MORRIS:

19 Q    Okay.  Neither you nor Hunter Mountain has any personal

20 knowledge whatsoever about any due diligence that Stonehill

21 did in connection with the purchase of claims, correct?

22          MR. MCCLEARY:  Your Honor, he's getting into

23 allegations in the complaint which involve attorney work

24 product, so we object on the basis of invading the attorney

25 work product.

HCMLPHMIT00003323

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 12/12/25    Page 761 of 1011    PageID 2660
Exhibit 72    Page 312 of 390

Patrick - Direct                311

```
 1                THE COURT:  Overruled.

 2                THE WITNESS:  Can you restate the question again?

 3   BY MR. MORRIS:

 4   Q   Yes, sir.  Neither you nor Hunter Mountain have any

 5   personal knowledge as to what due diligence Stonehill did

 6   before purchasing its claims in this case, correct?

 7                MR. MCCLEARY:  Objection.  Attorney work product.

 8   Invasion of that.  Could I --

 9                THE COURT:  I just ruled.

10                MR. MCCLEARY:  I understand.

11                THE COURT:  I just --

12                MR. MCCLEARY:  Could I have a running objection to

13   this line of questioning on that basis, Your Honor, invasion

14   of attorney work product?

15                THE COURT:  Why don't you explain why it's attorney

16   work product.  I'm missing --

17                MR. MCCLEARY:  Because they might -- he would have

18   knowledge from the efforts and investigation through attorneys

19   in the case.  I assume he's not asking -- you can't separate

20   that, potentially.  So he's getting into attorney work

21   product.

22                MR. MORRIS:  I'm asking for facts.

23                THE COURT:  He's asking for facts.  I overrule.

24   BY MR. MORRIS:

25   Q   Can you answer the question, sir?
```

002290

HCMLPHMIT00003324

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 2/13/26   Page 762 of 1011   PageID 2661
Exhibit 72   Page 203 of 390

Patrick - Direct                    312

1    A    Yeah.  I'm not aware -- I'm not personally aware of how

2    much work Farallon did, or Stonehill.

3    Q    You have no knowledge whatsoever about the diligence

4    Stonehill did before purchasing its claims, correct?

5    A    Well, I would generalize now is that they did nothing.

6    Q    And that's on the basis of Mr. Dondero's testimony,

7    correct?

8    A    I would just call it on a basis of our general inquiry,

9    which would be including, in part, Mr. Dondero's testimony.

10   Q    What else are you relying upon for your conclusion that

11   you just described other than Mr. Dondero's?  What other

12   facts?

13   A    Yeah, we -- yeah, we have not uncovered any facts that

14   indicated that they did conduct any due diligence of any sort.

15   Q    Okay.  And are you -- do you have any personal knowledge

16   as to what Farallon did in connection with its due diligence

17   prior to buying its claim?

18   A    Yeah.  We have not been able to find any facts that would

19   suggest that Farallon conducted any due diligence of any kind.

20   Q    Okay.

21        MR. MORRIS:  One second, Your Honor.

22       (Pause.)

23   BY MR. MORRIS:

24   Q    Who's paying Hunter Mountain's legal fees?

25   A    Hunter Mountain is paying -- is legally obligated and

HCMLPHMIT00003325

Patrick - Direct                                          313

1   paying its own legal fees.

2   Q    If it generates no income and its only assets is the

3   interest in Highland, where is it getting the funds to pay

4   legal fees?

5            MR. MCCLEARY:  Objection, Your Honor.  This is

6   irrelevant and invades the attorney-client privilege.

7            MR. STANCIL:  Your Honor, I'm happy to read a Fifth

8   Circuit case that says the identity of a third-party payer of

9   attorneys' fees is not privileged.  I would refer them to *In*

10  *re Grand Jury Subpoena*, 913 F.2d 1118, a 1990 Fifth Circuit

11  case.  I can read from Judge Jones' opinion, but you tell me

12  how much you want to hear on this.

13           THE COURT:  Okay.  I overrule your objection.  He can

14  answer.

15           THE WITNESS:  There is a settlement agreement by

16  Hunter Mountain Investment Trust as well as the Dugaboy

17  Investment Trust that provides for the payment of attorney

18  fees.

19           MR. MORRIS:  No further questions, Your Honor.

20           THE COURT:  Okay.  Cross?

21           MR. MCCLEARY:  Yes, Your Honor, briefly.

22                      CROSS-EXAMINATION

23  BY MR. MCCLEARY:

24  Q    Mr. Patrick, how would you describe Mr. Dondero's

25  relationship with Hunter Mountain Investment Trust today?

HCMLPHMIT00003326

Patrick - Cross                            314

```
 1  A    None.
 2  Q    You were asked some -- let me ask you about litigation,
 3  and litigation involving the sub-trust.  Has Hunter Mountain
 4  been involved in litigation with Mr. Kirschner?
 5  A    Yes.
 6  Q    Okay.  And what is your understanding of Mr. Kirschner's
 7  role?
 8           MR. MORRIS:  Your Honor, while I would love for them
 9  to continue --
10           MR. MCCLEARY:  He's the --
11           MR. MORRIS:   -- to use their time, I object that
12  it's beyond the scope of my examination.  They passed on the
13  witness.  They rested their case.  He should be limited to the
14  scope of my inquiry.
15           THE COURT:  Okay.  How does this tie to direct?
16           MR. MCCLEARY:  Your Honor, it -- just very generally.
17  This is --
18           THE COURT:  Okay.  I need to know how it ties to the
19  direct.
20           MR. MCCLEARY:  This doesn't tie directly to the
21  direct, Your Honor.
22           THE COURT:  Then it's beyond the scope, you
23  acknowledge?
24           MR. MCCLEARY:  Yes, Your Honor.
25           THE COURT:  Okay.  Sustained, then.
```

002293

HCMLPHMIT00003327

```
 1              MR. MCCLEARY:  Okay.

 2    BY MR. MCCLEARY:

 3    Q   Mr. Patrick, has Hunter Mountain Investment filed any

 4    litigation as a plaintiff other than its efforts to be a

 5    plaintiff in this lawsuit and its action as a petitioner in

 6    the Rule 201 matter earlier this year in Dallas state court?

 7    A   The 202.

 8    Q   202, yes.

 9    A   No, it has not.

10    Q   All right.  And then it's -- has it been a party, then, to

11    any other litigation other than the efforts to file this

12    action, the Rule 202 action, and has it been a defendant in

13    any lawsuits?

14    A   To my understanding, no.

15    Q   Is it involved as a defendant in the Kirschner litigation?

16    A   Yes.

17    Q   Mr. Kirschner is suing Hunter Mountain; is that correct?

18    A   That is correct.

19    Q   Okay.  So, is Hunter Mountain a vexatious litigant?

20              MR. MORRIS:  Objection, Your Honor.  This is now

21    really beyond the scope.  We're not doing -- this is -- we're

22    not doing it.  I'm not letting -- because there's a vexatious

23    litigant motion pending now in the district court right now

24    before Judge Starr.  This has nothing to do with anything I

25    asked.
```

002294

HCMLPHMIT00003328

Patrick - Cross                              316

```
 1              THE COURT:  Okay.

 2              MR. MCCLEARY:  They're trying to draw --

 3              THE COURT:  You've already asked him is it a party in

 4   any other litigation besides the 202 and this attempted one,

 5   so where are we going with this?

 6              MR. MCCLEARY:  Well, they're just trying to draw Mr.

 7   Dondero into this and -- this vexatious litigant argument, and

 8   we're just developing the fact that obviously Hunter Mountain

 9   has only filed -- attempting to file this action and a Rule

10   202 proceeding.  So they're not involved in a lot of

11   litigation and they're not a vexatious litigant.

12              THE COURT:  Okay.  I think I'll sustain that and we

13   can just move on.

14              MR. MCCLEARY:  Okay.  Then I'll pass the witness.

15   Thank you, Your Honor.

16              THE COURT:  Okay.  Any redirect?

17              MR. MORRIS:  No, thank you, Your Honor.

18              THE COURT:  All right.  You are excused, Mr. Patrick.

19         (The witness steps down.)

20              THE COURT:  Anything else?

21              MR. MORRIS:  Just a time check for both sides and

22   let's get to closings.

23              THE COURT:  Okay.  Caroline?

24              THE CLERK:  Movant has 23 minutes left and the

25   Respondents have 47.
```

002295

HCMLPHMIT00003329

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 03/18/25   Page 767 of 1011    PageID 2666
Exhibit 72   Page 318 of 390

317

```
 1              THE COURT:  23 and 47.  Any other evidence from the
 2    Respondents?
 3              MR. MORRIS:  That is a fair question.
 4         (Discussion.)
 5              MR. MCCLEARY:  Your Honor, I just want to confirm
 6    that all the exhibits that they did not object to have been
 7    admitted into evidence.
 8              THE COURT:  All right.  Well, let me --
 9              MR. MCCLEARY:  We do offer them.
10              MR. MORRIS:  Oh.
11              THE COURT:  Hang on.
12              MR. MORRIS:  Did I get Exhibit 45, Your Honor?
13              THE COURT:  Just a moment.  I'm doing two things at
14    once here.  45 is in.
15              MR. MORRIS:  Okay.
16              THE COURT:  All right.  On HMIT's exhibits, okay,
17    first, as we all know, 29 through 52 are carried until -- if
18    we have another hearing with the experts.
19         (HMIT's Exhibits 29 through 52 carried.)
20              THE COURT:  I'm showing we have -- and speak up if
21    anyone questions this -- I show that we have Hunter Mountain
22    Exhibits 3 and 4, and then 7 through 10, 12 through 23, and 26
23    through 38, and 53 through 57, 64, 65, and then 67 through
24    seventy --
25         (HMIT's Exhibits 3, 4, 7-10, 12-23, 26-38, 53-57, 64, 65,
```

HCMLPHMIT00003330

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 10/13/25    Page 768 of 1011    PageID 2667

318

```
 1   67-70 are received into evidence.)

 2          MR. MCCLEARY:  Your Honor, I apologize.  From 36 --

 3   26 to 32 are in?

 4          THE COURT:  I believe that was part of the

 5   stipulation, Mr. Morris, right?

 6          MR. MCCLEARY:  Yes.

 7          MR. MORRIS:  I think that's right.

 8          THE COURT:  Okay.

 9          MR. MORRIS:  We really didn't object to very many.

10          THE COURT:  Yes.

11          MR. MCCLEARY:  That would be 25, too.  That would

12   include 25?

13          MR. STANCIL:  No.  Objection.  25 is not --

14          THE COURT:  It's not admitted.

15          MR. STANCIL:  It's not in evidence.

16          THE COURT:  25 and 24 were not admitted.

17          MR. MORRIS:  Correct.  Those are my emails.

18          THE COURT:  Okay.  So --

19          MR. MCCLEARY:  25 is an article.

20          THE COURT:  Your 25 was John Morris Email Re: Text

21   Messages dated March 10, 2023.

22          MR. MCCLEARY:  Okay.

23          THE COURT:  Okay.  I can't remember where I left off.

24   I think I left off -- I'll just repeat after the expert

25   exhibits that are carried.  I've admitted 53 through 57.  I
```

HCMLPHMIT00003331

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 2020/25   Page 769 of 1011   PageID 2668
Exhibit 72   Page 390

319

1  have admitted 64, 65, 67 through 71.

2       (HMIT's Exhibit 71 is received into evidence.)

3       Now, I'm not sure if I ended up admitting 72.  That was

4  the articles.  I can't remember if you stipulated on that

5  finally.

6            MR. MORRIS:  I said they --

7            MR. MCCLEARY:  They had no objection.

8            MR. MORRIS:  -- they come in --

9            THE COURT:  Not for the truth of the matter asserted.

10           MR. MORRIS:  -- self -- exactly.

11           THE COURT:  Okay.

12           MR. MORRIS:  Self-authenticating.

13           THE COURT:  So 72 is in.

14           MR. MCCLEARY:  Okay.

15      (HMIT's Exhibit 72 is received into evidence.)

16           THE COURT:  Then we had some pleadings.  I think 73,

17 74, 75 are in, but again, not for the truth of the matter

18 asserted in any advocacy on 73 and 74.  And then 77, 78, 79

19 are in.  And that's it.

20      (HMIT's Exhibits 73, 74, 75, 77, 78, and 79 are received

21 into evidence.)

22           MS. DEITSCH-PEREZ:  Your Honor, I didn't make an

23 appearance, but I was taking notes (inaudible).

24           MR. MCCLEARY:  Your Honor, I believe 80 should be in.

25           MR. MORRIS:  No objection to 80.  It's on our -- it's

002298

320

```
 1   part of our Exhibit 5.

 2           THE COURT:  Okay.  80 is in.  Admitted.

 3       (HMIT's exhibit 80 is received into evidence.)

 4           MR. MORRIS:  Yeah.  That's really Section A of that

 5   thing that I gave you this morning.

 6           THE COURT:  If Ms. Deitsch-Perez wants to consult

 7   with the Hunter Mountain lawyers, she can.  I don't know --

 8           MR. MORRIS:  Can I go through quickly mine, Your

 9   Honor?  Because we actually never had the opportunity to put

10   our exhibits in.

11           THE COURT:  Okay.  Let's make sure we're to --

12           MR. MORRIS:  Okay.  I'm sorry.  I'm sorry.

13           THE COURT:  -- closure on the Hunter Mountain

14   exhibits.

15           MR. MORRIS:  I'm sorry.

16           THE COURT:  Anything I said that you disagree with?

17   I don't think --

18       (Pause.)

19           THE COURT:  Okay.  Let's hurry up.  What is the

20   controversy?

21           A VOICE:  Roger?  The Court's addressing you.

22           MR. MCCLEARY:  Oh.  Excuse me, Your Honor.  So, just

23   a little unclear of whether you have Exhibits 21 through 25

24   admitted.

25           THE COURT:  I have 21, 22, and 23.  Not 24.  Not 25.
```

002299

HCMLPHMIT00003333

321

1    Okay.  Anything else?

2              MR. MCCLEARY:  Okay.  Then we do offer 24 and 25.

3              THE COURT:  You offered them.  I did not admit them.

4              MR. MCCLEARY:  Okay.  76.  I believe -- was that --

5    you're carrying?

6              MS. DEITSCH-PEREZ:  Carried.

7              MR. MCCLEARY:  You're carrying that?

8              THE COURT:  Okay.  I carried that and --

9              MR. MCCLEARY:  It's part of the expert issue.

10             THE COURT:  Okay.  Yes, part of the expert.  So it's

11   carried.

12        (HMIT's Exhibit 76 is carried.)

13        (Pause.)

14             MR. MCCLEARY:  I understand you've admitted 53

15   through 83, although some of them have now not been approved.

16             THE COURT:  All right.  Well, we need to clarify.  58

17   through 63, you think you offered them and I admitted them,

18   but not for the truth?  I remember that being discussed for 58

19   through 63.  Are you actually offering them?

20             MR. MCCLEARY:  Yes.  58 through 63.

21             THE COURT:  All right.  And Mr. Morris, you

22   ultimately agreed that yes, but not for the truth of the

23   matter asserted?

24             MR. MORRIS:  That's right, Your Honor.

25             THE COURT:  Okay.  So they are admitted.  Okay.

HCMLPHMIT00003334

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 02/23/26   Page 772 of 1011    PageID 2671
Exhibit 72   Page 322 of 390

322

```
 1       (HMIT's Exhibits 58 through 63 are received into

 2    evidence.)

 3            THE COURT:  And then there was an objection to the

 4    Mark Patrick declaration for the same thing, not for the truth

 5    of the matter asserted.

 6            MR. MORRIS:  Exactly.

 7            THE COURT:  But you agree as long as it's --

 8            MR. MORRIS:  Correct.

 9            THE COURT:  Okay.  So what that means is, to recap,

10    53 through 75 are admitted, although some of those are only --

11    they're not for the truth of the matter asserted.  And then 77

12    through 80 are admitted.  Okay?

13            MR. MCCLEARY:  And 76?  We offered 76.

14            THE COURT:  That's -- we carried it.  We carried it.

15    It relates to the expert.

16            MR. MCCLEARY:  Carried it.

17                         (Pause.)

18            MR. MCCLEARY:  Thank you, Your Honor.

19            THE COURT:  Okay.  Now let's straighten out

20    Highland's exhibits.  So, I'm showing 1 through 16 have been

21    admitted, and then 25 through 31-A?

22            MR. MORRIS:  25 through 31-A?

23            THE COURT:  I'm sorry.  Yes.  25 through 31-A.

24            MR. MORRIS:  Okay.

25            THE COURT:  And then 34.  And then 39, 40, 41, and
```

HCMLPHMIT00003335

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 11-72   Filed 2024/26 390  Page 773 of 1011   PageID 2672
Exhibit 72   Page 2024/26

323

1    then 45.  51, 59, and 60.

2            MR. MORRIS:  Okay.  So I'm going to do my best not to

3    burden the Court.  I'm trying to focus.  We move for the

4    admission into evidence of Exhibit 32, which is Mr. Dondero's

5    objection to the HarbourVest settlement.  And the reason that

6    we're offering it is because he made no mention of any concern

7    at all that the settlement implicated material nonpublic

8    inside information.

9            THE COURT:  All right.  Any objection?

10           MR. MCCLEARY:  32?

11           THE COURT:  Uh-huh.

12           MR. MCCLEARY:  Yes, Your Honor.  Relevance and

13   hearsay.

14           THE COURT:  Overruled.  And I can take judicial

15   notice of it in any event.

16       (Debtors' Exhibit 32 is received into evidence.)

17           MR. MORRIS:  We move for the admission into evidence

18   of Exhibit 33, which is the recent letter from the Texas State

19   Securities Board declining to take any action after conducting

20   an investigation of the Dugaboy complaint.

21           THE COURT:  Okay.  Any objection?

22           MR. MCCLEARY:  We object on the grounds of relevance,

23   403, hearsay, and authenticity, Your Honor.

24       And I also, I think it's important that the decision by a

25   regulatory body has no bearing on this cause of action or the

HCMLPHMIT00003336

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 06/25/25   Page 774 of 1011   PageID 2673
Exhibit 72   Page 2325 of 390

324

```
 1   colorability of this claim, and the Texas State Securities

 2   Board will tell you that.  This is completely and utterly

 3   irrelevant to your inquiry, Your Honor.

 4            THE COURT:  Okay.  I overrule the relevance

 5   objection.  Certainly, it goes to colorability.  It's some

 6   evidence.  It's some evidence.  A regulatory body did not

 7   choose to go forward --

 8            MR. MCCLEARY:  But that could be for --

 9            THE COURT:    -- on the complaint.

10            MR. MCCLEARY:  That could be for reasons entirely

11   unrelated.

12            THE COURT:  True, true.  It's some evidence.

13            MR. MORRIS:  That's speculation.

14            MR. MCCLEARY:  Not for this.

15            THE COURT:  But what is the authenticity objection?

16            MR. MCCLEARY:  Well, there's no demonstration.  I

17   don't believe they sponsored that with anyone.

18            THE COURT:  Pardon?  Say again?

19            MR. MCCLEARY:  They didn't sponsor that with anyone.

20            MR. MORRIS:  Your Honor, I actually -- if they really

21   put me to it, because I was reading the Rules of Evidence in

22   the wee hours of the morning, I am certain that there's an

23   exception for government documents and government statements

24   and government decisions.

25            MR. STANCIL:  Your Honor, as to its authenticity, I
```

HCMLPHMIT00003337

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 02/28/25    Page 775 of 1011    PageID 2674
Exhibit 72    Page 326 of 390

325

1    could produce a witness from Highland who said they got it, if

2    that's really what we're doing.  That it's the letter, they

3    got it from the TSSB, if we're really doing authenticity.

4            MR. MCENTIRE:  Well, first of all, it's hearsay and

5    there is no authenticity issue and it's irrelevant.  I

6    understand --

7            MR. STANCIL:  What is the authenticity issue, Mr.

8    McEntire?

9            THE COURT:  I'm trying to understand the authenticity

10    issue.  You think this is a --

11            MR. STANCIL:  Do you think it's a real letter or a

12    fake letter?

13            MR. MCENTIRE:  Well, first of all, I'm going to

14    address the Court and not you, okay?

15        Your Honor, --

16            THE COURT:  Well, address by speaking in a --

17            MR. MCENTIRE:  Yeah.  Thank you.

18            THE COURT:  Okay.  I'm just saving the court reporter

19    from grief, okay?

20            MR. MCENTIRE:  It is hearsay, and it is hearsay that

21    is calculated to be misrepresented or mischaracterized because

22    it's utter speculation as to the basis for their decision.

23    And if it's -- utter speculation is the basis of your

24    decision, it has no reason to come in.  There's no --

25            THE COURT:  What you're telling me, it goes to the

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4 72    Filed 22/27/26 390 Page 776 of 1011    PageID 2675

326

1  weight of the evidence.  Okay?

2        MR. MCENTIRE:  Your Honor, --

3        THE COURT:  Okay.  You're not telling me it's

4  inadmissible hearsay.

5        MR. MCENTIRE:  Well, it is inadmissible hearsay.

6        MR. MORRIS:  Can I just, for one second?

7        THE COURT:  Please.

8        MR. MORRIS:  Paragraph 34 of their motion, Your

9  Honor.  Quote, "The Court also should be aware that the Texas

10 State Securities Board opened an investigation into the

11 subject matter of the insider tradings at issue, and this

12 investigation has not been closed.  The continuing nature of

13 this investigation underscores HMIT's position that the claims

14 described in the attached adversary proceeding are plausible

15 and certainly far more than merely colorable."

16    They used the investigation to try to convince you that

17 their claims are colorable, and now we have a letter saying

18 there's nothing.

19        THE COURT:  Okay.  You want to explain that to me?

20        MR. MCENTIRE:  Well, we put no evidence in, in this

21 proceeding --

22        THE COURT:  You put what?

23        MR. MCENTIRE:  We have put no evidence in, in this

24 proceeding, --

25        THE COURT:  You filed a pleading under Rule 11

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14 72 Filed 23/28/26 390   Page 777 of 1011   PageID 2676

327

1   suggesting this was highly relevant, right?

2          MR. MCENTIRE:  We filed a motion.  Yes, we did.

3          THE COURT:  Under Rule 11.

4          MR. MCENTIRE:  Yes.  Of course we did.

5          THE COURT:  Okay.

6          MR. MCENTIRE:  Of course we did.

7          THE COURT:  Suggesting this Texas State Securities

8   Board complaint and investigation was highly relevant.

9          MR. MCENTIRE:  The fact that it had opened an

10  investigation and was conducting an investigation is

11  irrelevant.  Its decision to stop the investigation without

12  further elaboration or clarification, this is why it calls for

13  utter speculation.

14         MR. MORRIS:  Your --

15         THE COURT:  Okay.  Do you have the hearsay exception

16  that applies?  I'm looking at my evidence rules right now for

17  the government record or public record.  Is it 803(8) that we

18  need to have addressed here?

19         MR. STANCIL:  803(8), Your Honor.

20         A VOICE:  Yeah, public records.

21         THE COURT:  Okay.

22         MR. STANCIL:  Public record.  Sets out --

23         THE COURT:  Public records, 803(8), hearsay

24  exception.  Moreover, you pled allegations suggesting this

25  investigation was really relevant.  So I overrule your

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 4-72   Filed 03/29/25   Page 778 of 1011     PageID 2677
Exhibit 72   Page 329 of 390

328

1  objection, and so that means 33 is admitted.

2       (Debtors' Exhibit 33 is received into evidence.)

3           MR. MORRIS:  Thank you, Your Honor.  I continue.

4  Exhibit 36 --

5           MR. MCENTIRE:  Which one was that?

6           MR. MORRIS:  That was 33.

7      So now we're up to 36, Your Honor.  I'm going to skip some

8  of these.

9           THE COURT:  Okay.

10          MR. MORRIS:  But this is just the Court's order

11  approving Mr. Seery's original --

12          THE COURT:  I'm waiting for any objection for the

13  record.  Do we have an objection, Mr. McCleary?

14          MR. MCCLEARY:  36, relevance, Your Honor.

15          MR. MORRIS:  The relevance is that this Court

16  approved without objection Mr. Seery's compensation package in

17  an amount that included a base salary of $150,000, which the

18  Claimant Purchasers and the independent director saw fit to

19  continue.

20          THE COURT:  Objection overruled.  It's admitted.

21      (Debtors' Exhibit 36 is received into evidence.)

22          MR. MORRIS:  I think 38 may be on their list.  Yeah,

23  38 is in as their 26, right?  So that should be admitted.

24          THE COURT:  Admitted.

25      (Debtors' Exhibit 38 is received into evidence.)

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 10/26/25   Page 779 of 1011   PageID 2678
Exhibit 72   Page 330 of 390

329

```
 1              MR. MCCLEARY:  If it's on our list, we agree.

 2              THE COURT:  Okay.  It's admitted.

 3              MR. MORRIS:  That's it, Your Honor.

 4              THE COURT:  Okay.  Do you all need a five-minute

 5    break before we do closing arguments?

 6              MR. MORRIS:  I'd be grateful.

 7              THE COURT:  Okay.

 8              MR. MCCLEARY:  Yes, Your Honor.  Thank you.

 9              THE COURT:  Will do.

10              THE CLERK:  All rise

11         (A recess ensued from 5:49 p.m. to 5:57 p.m.)

12              THE CLERK:  All rise.

13              THE COURT:  All right.  Please be seated.

14         We're back on the record in the Highland matter.  Closing

15    arguments.  Just for everyone's benefit, time -- you said 47

16    minutes and 23 minutes back several minutes ago, and then we

17    had all the housekeeping stuff.  So I'm not sure if that's

18    where we are right now or if --

19              MR. MCENTIRE:  I'm waiting for my monitor guy to be

20    here.

21              THE COURT:  Okay.  Okay.

22         So Caroline, is it still 47 and 23?

23              THE CLERK:  Yes.

24              THE COURT:  That's when we started the housekeeping

25    stuff.
```

HCMLPHMIT00003342

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72   Filed 03/26 390   Page 780 of 1011   PageID 2679
Exhibit 72   Page 281 of

330

1              MR. MCENTIRE:  So 27 minutes?

2              THE COURT:  Twenty-three.

3              THE CLERK:  Twenty-three.

4              MR. MCENTIRE:  Twenty-three?  Can I get a five-minute

5    warning, please?  Would you pull up the PowerPoint?  And let's

6    go to Slide 39.

7         May I proceed, Your Honor?

8              THE COURT:  You may.

9    CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT TRUST

10             MR. MCENTIRE:  So, before I go to the PowerPoint, I'd

11   like to kind of give a high-altitude overview of the situation

12   as I see it from the evidence perspective.  We don't believe

13   this should have been an evidentiary hearing.  Evidence has

14   been allowed.

15        We had a situation where, if you believe Mr. Dondero's

16   testimony as contrasted with Mr. Seery's testimony, you have a

17   credibility issue.  So the Court is now conducting an inquiry

18   presumably on the basis in part on the credibility of

19   witnesses.  And if you engage -- and if you want to indulge

20   that type of inquiry, the credibility of witnesses, without

21   allowing the Plaintiff in this case or the Movant in this case

22   to conduct some level of meaningful discovery, I would suggest

23   we have been deprived of due process, because without

24   documents to test Mr. Seery's statements, we are being

25   deprived of something that's basically very fundamental in our

002309

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 02/32/25 390 Page 781 of 1011    PageID 2680

331

1    judicial process.

2        And therefore, it underscores our argument and our

3    rationale why this shouldn't be an evidentiary hearing,

4    because I don't believe the Court can consider credibility

5    issues.

6        We have, on the one hand, unequivocal notes from Mr.

7    Dondero prepared contemporaneously that would suggest that

8    someone admitted to him and stated to him that they did in

9    fact obtain material nonpublic information.  Mr. Seery says

10   that didn't happen.  I specifically said, is that a lie?  Yes,

11   it's not true.  Well, that's a real problem, because that's

12   not the criteria that this Court should use for determining

13   whether we have a colorable claim.  A colorable claim is

14   whether there is some possibility.  It's something less, even

15   less stringent than a 12(b)(6) standard, plausibility.  We

16   have that.

17       If you look at our pleadings, we have set forth all of the

18   facts we need, all the elements we need to establish a trade

19   on material inside information, nonpublic information.  We

20   have evidence -- we have allegations that there was no due

21   diligence.  And Farallon's lawyer stood up here -- well, I'm

22   not going to really address that today.  But if there was any

23   day to address it, it was today.  We have no evidence to

24   suggest they did do due diligence.  Even Mr. Seery said, I

25   don't know what due diligence they did.  We have evidence to

002310

HCMLPHMIT00003344

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   DocumeExhibit 72 Fil Pdge 233/26 390   Page 782 of 1011   PageID 2681

332

1   suggest that the only due diligence they did was to talk to

2   Mr. Seery, who has told -- who told them that this is very

3   valuable, don't -- this is a really good -- a good investment

4   here, it's a lot better than the 71 percent that's on our

5   disclosures.

6       And Judge, that evidence supports the colorability of the

7   claim.  And if you go down the pathway of saying, well, I'm

8   not sure about Mr. Dondero because he had been held in

9   contempt two years ago, that's a real problem.  That's a

10  problem for this Court.  And I'm going to suggest that's why

11  this should have been a four-corners deliberation.  Even

12  Farallon and Stonehill suggest this should be a four-corners

13  deliberation.

14      We have evidence now of no due diligence.  We have

15  evidence before you that suggests that they did learn about

16  MGM before the announcement date.  We have evidence that Mr.

17  Seery did trade on -- did -- was aware and received

18  information of material nonpublic information.  And for him, a

19  CEO of his reputed stature, to sit here and say that was not

20  material and that was nonpublic defies common sense.  It

21  defies reasonableness.  That goes to credibility.

22      Mr. Dondero's notes speak volumes.  The trades themselves

23  speak volumes.  Mr. Dondero established that the interest --

24  return of interest here is to be less than one -- it's in the

25  one digits, and hedge funds trade in the 30, 40, 50 percent

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 11/04/25    Page 783 of 1011    PageID 2682
Exhibit 72    Page 232 of 390

333

1   range.  Well, if that's the case, we have Farallon walking

2   away from a return on the exit financing of 13 percent, and

3   that wasn't good enough for him.  How could six percent be

4   good enough for him?  There's something missing here.  There's

5   something not right.

6       And we're entitled to get our lawsuit on file and do some

7   discovery.  And if they want to do a 12(b)(6), they do a

8   12(b)(6).  If they want to do a Rule 56 after discovery, they

9   could do a Rule 56, all in this Court.  But to address this

10  threshold issue now based upon this, what happened here today,

11  is a fundamental denial of due process.

12      I'd like to go to my pleadings.

13      Can you go to Slide 39, please?

14      First of all, let there be no doubt -- 39.  Slide 39.  38.

15  38, please.

16      We can plead on information and belief.  We have a right

17  to plead on information and belief.  And the Fifth Circuit --

18  that is an acknowledged procedural practice in the Fifth

19  Circuit.  And if some of our allegations are based upon

20  information and belief, so be it.  The test here is not at

21  this stage.  The test here is whether I have sufficient

22  factual allegations, whether on information and belief or

23  otherwise, to satisfy at most a plausibility standard.  That's

24  it.

25      And if they want to challenge us at a later date, they

HCMLPHMIT00003346

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 06/20/25   Page 784 of 1011   PageID 2683
Exhibit 72   Page 335 of 390

334

1   can.  Rule 56.  12(b)(6).  Or standing.  But we have standing.

2   We have standing.  We have standing under Delaware law.  We're

3   a contingent beneficial interest that has standing under

4   Delaware law and all other law.  All -- even Texas agrees that

5   a contingent interest has standing, an inchoate interest as

6   Mr. Seery described.  A property interest.  You have property

7   interest, you have standing.

8                THE COURT:  Let me ask you.

9        And Caroline, turn the clock off when the Court

10   interrupts.

11        Just so you know, I mean, my analysis here is standing

12   first.  Does your client have standing?  Because we all know

13   that's a subject matter jurisdiction inquiry and I have to

14   explore that first.  And then I've said many times the legal

15   standard question for colorability.  That's kind of the second

16   place I go --

17                MR. MCENTIRE:  Sure.

18                THE COURT:   -- if I find there's standing.  But can

19   you tell me, have there been appellate decisions that are

20   relevant today on standing?  Contrary to what people may

21   expect, I don't follow every appellate decision from every

22   appeal in the Highland case.  Okay?  I wait until I get a

23   mandate --

24                MR. MCENTIRE:  Sure.

25                THE COURT:   -- to where I have to act on something.

HCMLPHMIT00003347

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 4-72  Filed 08/26/25   Page 785 of 1011     PageID 2684
Exhibit 72   Page 336 of 390

335

```
 1                   MR. MCENTIRE:  Sure.

 2                   THE COURT:  So I feel like I've learned at some point

 3       that some either district judge or Fifth Circuit said some

 4       party didn't have standing.  And I don't know if it was Hunter

 5       Mountain or some other trust.

 6                   MR. MCENTIRE:  Not --

 7                   THE COURT:  And is there anything they said that, if

 8       it wasn't Hunter Mountain, could be relevant here?

 9                   MR. MCENTIRE:  I hope somebody kicks me if I'm wrong,

10       what I'm about to say.  I'm not aware of any such issue --

11                   THE COURT:  Okay.

12                   MR. MCENTIRE:  -- dealing with Hunter Mountain

13       Investment Trust.  I am not.

14                   THE COURT:  But any other party that might somehow

15       bear on this case?

16                   MR. MORRIS:  I apologize, Your Honor, I was

17       distracted.  For which issue?

18                   THE COURT:  Standing.  Because I was saying my first

19       thing I've got to tackle in ruling on this is standing of

20       Hunter Mountain.  And I seem to remember learning that either

21       the district court on an appeal or the Fifth Circuit on some

22       appeal from Highland --

23                   MR. MORRIS:  Correct.

24                   THE COURT:   -- said some party didn't have standing.

25                   MR. MORRIS:  Correct.
```

HCMLPHMIT00003348

```
 1              THE COURT:  And I don't know if it was --

 2              MR. MORRIS:  Dugaboy on the 2015.3, for sure, was a

 3   Fifth Circuit standing decision.

 4              THE COURT:  Okay.

 5              MR. MORRIS:  I think there was a district court order

 6   that preceded that.

 7              THE COURT:  Okay.

 8              MR. MORRIS:  That was the subject of the appeal.

 9              THE COURT:  The Dugaboy --

10              MR. MORRIS:  2015.3.

11              THE COURT:   -- motion to require those --

12              MR. MORRIS:  Yeah.

13              THE COURT:  -- 2015.3 statements.  Okay.

14              MR. MCENTIRE:  So what we have here -- we can go back

15   on the clock if you'd like.

16              THE COURT:  Yes, please.

17              MR. MCENTIRE:  How much time do I have?

18              THE CLERK:  You have just under 16 minutes.

19              MR. MCENTIRE:  Sixteen?  Okay.  Give me a two-minute

20   warning.  Sorry.

21         Your Honor, what we have here --

22              THE COURT:  I don't think the U.S. Supreme Court

23   justices will give you a two-minute warning, but maybe I'm

24   wrong.

25              MR. MCENTIRE:  Would you give me a two-minute
```

HCMLPHMIT00003349

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 07/08/25   Page 787 of 1011   PageID 2686
Exhibit 72   Page 338 of 390

337

1   warning, please?

2          THE COURT:  And I'm sure not a Supreme Court justice.

3          MR. MCENTIRE:  What we have here is we have a 99.5

4   percent equity interest that has now been relegated to a

5   category of contingent interest, which we don't believe we

6   should be, and that's part of our declaratory judgment relief

7   we're asking for, which we have standing to do that at a

8   minimum because we want to be treated like a Class 9.

9       If they want to treat us like a Class 10, I have an

10   argument for that, and it's more than colorable.  It's

11   persuasive.  It's -- it is a winning argument.  And that is we

12   do have standing in our individual capacity, and we have given

13   you a whole bunch of cases in our PowerPoint, or we will give

14   you a whole bunch of cases in our PowerPoint and in our

15   briefing to support that.

16      We also have given you Delaware case law that says we have

17   standing under Delaware trust law to bring a derivative action

18   against the Trustee.  We have done everything appropriate

19   here.

20      We have the -- a demand upon Seery obviously would be

21   futile to prosecute the claim.  A demand upon the Oversight

22   Board would be futile to make a demand on Muck and Jessup,

23   because they're Defendants and they're SPEs of Farallon and

24   Stonehill.  And a demand upon Mr. Kirschner would be futile.

25   They suggest that there's an assignment of some sort, but that

HCMLPHMIT00003350

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72   Filed 08/28/25   Page 788 of 1011   PageID 2687
Exhibit 72   Page 339 of 390

338

1  would be a modification -- of the claims over to the

2  Litigation Trust, but that would be a modification of the

3  plan.

4       There's been no assignment of this claim, or these claims,

5  to the Litigation Trust Trustee.  But even if there had been,

6  we pled that in the alternative as well.  And it would be

7  futile to make a demand on Mr. Kirschner because he's suing

8  Hunter Mountain.

9       So we are an appropriate party.  The only, then, issue

10  becomes whether or not we have standing under Delaware law to

11  bring a derivative action.  And we have briefed that and we --

12  and that's included in our PowerPoint.  The answer is yes.

13       I'd like to go briefly to Page -- next slide.

14       In our factual section, we set forth why this investment

15  would defy any kind of rational economic sense in the absence

16  of material nonpublic information as a factual allegation

17  supported by data, supported by dates, supported by time.

18       Based upon that, we also have allegations that are framed

19  around the admissions that Mr. Michael Linn provided.  We have

20  allegations that he turned down a 30 or 40 percent premium in

21  our petition.  We have allegations that they admitted that

22  they did no due diligence.  We have allegations that they

23  admitted that they got material -- basically information about

24  MGM.

25       And again, it's not all about MGM.  It's about the values

HCMLPHMIT00003351

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 2240/25 390   Page 789 of 1011   PageID 2688

339

1   of all the portfolio companies.  They want to make it about

2   MGM.  If they do, we win.  But it's much broader than that.

3       And we have standing to bring this claim because if we're

4   right Mr. Seery will have to return excess compensation and

5   the Claims Purchasers will have to disgorge.  And that's going

6   to help not just Hunter Mountain.  That's going to help other

7   creditors who haven't been paid yet.

8       So this is not exclusively -- Hunter Mountain would

9   substantially benefit.  I'm not suggesting otherwise.  But it

10  also benefits innocent stakeholders other than Hunter

11  Mountain.  And that's why we are an appropriate party.  We

12  don't have a conflict of interest to bring this.  Everybody on

13  their side of the table does.  There's no one else who could

14  bring this.

15      Your Honor, it's very clear when the trades took place.

16  We give dates and times.  It's very clear that -- next slide,

17  40.  It's very clear that their investment was over $160

18  million.  If it isn't, I don't see any denials.  All we got

19  today was a lame statement from the lawyer saying we're not

20  here today to deny this.

21          MR. MORRIS:  I'm offended.

22          THE COURT:  He's offended by being called lame.

23          MR. MCENTIRE:  Not you lame personally.

24          MR. MORRIS:  Oh, thanks for the clarification.

25          THE COURT:  Okay.

HCMLPHMIT00003352

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 12/21/25    Page 790 of 1011    PageID 2689
Exhibit 72   Page 341 of 390

340

```
 1              MR. MCENTIRE:  A lame statement by you.  In fact, it
 2   wasn't even you, so --
 3        In any event, Your Honor, --
 4              MR. MORRIS:  I've been called worse.
 5              MR. MCENTIRE:  -- the point being is that there was
 6   no -- there's not -- never been an attempt to deny the factual
 7   allegations in our pleadings dealing with Farallon and
 8   Stonehill.  None at all.
 9        And so -- not that that's ultimately relevant, because
10   that's an evidentiary issue outside of the four corners of our
11   pleading, but it does -- it just stands out and screams.  It
12   screams.  And it screams volumes.
13        So right, now based upon our pleadings -- we even plead in
14   Paragraph 42, Paragraph 42, exactly what they invested.  This
15   is what you have before you.  No one has disputed it.  It's in
16   the four corners of our pleading.  We've got dates, times,
17   amounts.  We have admissions to Mr. -- well, we have
18   admissions from Michael Linn, Paragraph 47.  We have -- we do
19   plead upon information and belief the quid pro quo on
20   compensation.  And frankly, the evidence here today is that
21   the compensation is excessive.  And the experts will further
22   confirm that it is excessive.  $1.8 million with a bonus
23   program in place to pay him another $8, $9, $10 million, when
24   in fact the risks don't exist and there's no uncertainty and
25   therefore the percentages make no sense.  That's --
```

HCMLPHMIT00003353

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 03/22/25   Page 791 of 1011   PageID 2690

341

1          THE COURT:  What do you mean, the risks don't exist

2    and there is no uncertainty?

3          MR. MCENTIRE:  If Mr. Seery is telling Farallon and

4    Stonehill don't sell, this could be really valuable, it's

5    inconsistent with the notion that the schedule and the

6    performance -- performance schedule in the compensation

7    agreement is rationally justified.  Because if it's really

8    certain or it's likely you're going to make a lot of money,

9    there's no reason to give him six percent to incentivize him

10   because it's already a done deal.

11       And the whole point here is that I scratch your back, you

12   scratch mine.  They make a lot of money on their deal and he

13   gets a lot of money on the backside post-effective date.

14   Post-effective date.

15       Next slide, 49.

16       It would have been impossible, based upon the publicly-

17   available information in Paragraph 49, impossible for

18   Stonehill and Farallon, in the absence of inside information,

19   to forecast any significant profit when they made their

20   investments.  It's not possible.  Because given the amount of

21   the Claim 8 and Claim 9 claims -- they actually invested in

22   Claim 9 with a zero return.  It's projected to be a negative

23   result.  On Claim 8, even if you allocate their entire

24   purchase price to Claim 8, they're going to get something less

25   than a 10 percent return paid out over a couple years.  Nobody

HCMLPHMIT00003354

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 23/3/25   Page 792 of 1011   PageID 2691
Exhibit 72   Page 343 of 390

342

1   invests that kind of money in an unsecured creditor asset that

2   hasn't been collateralized.  There's something wrong here.

3       And we have a right to have our day in court to show that.

4   We have our right to take a true deposition of Mr. Seery with

5   documents.  We have a right to take Farallon and Stonehill's

6   deposition with documents.  And we have tried to get

7   information and we have been turned down at every turn.  We

8   have a right to have our day in court, Your Honor.

9       We have allegations of excessive compensation.  I know Mr.

10  Morris suggested the other day that we didn't have any such

11  allegations.  They're here.  The whole idea here is that Mr.

12  Seery would really profit on the backside.  And, you know, he

13  actually testified, I believe -- I won't do that because

14  that's outside the four corners of our pleading.  But the --

15  there is a *quid pro quo*.  We allege there's a *quid pro quo*

16  upon information and belief.  And we also allege willfully and

17  knowingly, we allege conduct that falls clearly within the

18  exceptions.

19      None of this -- none of these claims were released.  Mr.

20  Seery's not an exculpated party in the context of how we --

21  proposing to sue him here.  None of the protected parties, to

22  the extent that Muck and Jessup claim to be protected parties,

23  they're not protected here, because all of the claims we're

24  making are on the basis of willful misconduct and bad faith,

25  which are the standards that they used and incorporated in the

002321

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72  Filed 2344/26 390 Page 793 of 1011    PageID 2692

343

```
 1   plan and in the gatekeeper provisions.

 2        How much time do I have?

 3             THE CLERK:  Right now you have --

 4             MR. MCENTIRE:  Thirty seconds?

 5             THE CLERK:  -- seven minutes left.

 6             MR. MCENTIRE:  Okay.  Next slide, please.

 7        Mr. Seery has admitted that he has a duty to avoid self-

 8   dealing.  We allege that he did self-deal.  There is clearly a

 9   relationship.  We have a right to explore the depths of that

10   relationship.  Well, already we know there is a relationship.

11   We have investments in charities, contributions to charities,

12   meet-and-greets, congratulatory emails.  It's not as if

13   Farallon and Stonehill are strangers, or Mr. Seery's a

14   stranger to them.  It's not like that at all.  They contacted

15   him to get involved.

16        And by placing -- by acquiring these claims -- and by the

17   way, this is the most significant trading activity in your

18   bankruptcy, in this bankruptcy proceeding.  Post-confirmation.

19   Post-confirmation.  By acquiring these claims, they were

20   guaranteed to be put onto the Oversight Board.  By acquiring

21   these claims, they were guaranteed to be put in a position --

22   into a position where they would adjust, monitor, compensate

23   Mr. Seery.  That's the terms of the Claimant Trust.  Those are

24   the terms.

25        And it's interesting, because one of the amendments that's
```

HCMLPHMIT00003356

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 09/05/25   Page 794 of 1011   PageID 2693

344

1   in evidence to the plan, I think it's either the third or the

2   fourth amendment, that came out of nowhere right before

3   confirmation, they changed the structure of the Claimant Trust

4   to go off a standard base pay and added in a bonus structure

5   at the last minute.  That's evidence.

6       Mr. Seery has acknowledged, we have alleged he had duties

7   to avoid self-dealing, to always look out for the best

8   interests of the estate, to avoid conflicts of interest.

9   Well, here, to the extent that there is a *quid pro quo*, he is

10  self-dealing and he has injured the Reorganized Debtor and

11  he's injured the Claimant Trust, because that's just less

12  money.

13      And we also allege, Your Honor, it's also an allegation

14  that --

15          THE COURT:  And let me ask, the sole injury here is

16  compensation was more than it would have been if not for the

17  sale of the claims to Farallon and Stonehill --

18          MR. MCENTIRE:  That's one of the injuries.

19          THE COURT:  -- and therefore less money at the end of

20  the day for creditors and ultimately Hunter Mountain?

21          MR. MCENTIRE:  Yes.  And we also allege that, as part

22  of this arrangement, conspiracy, as we allege conspiracy, we

23  have seen over $200 million flow out of the coffers of this

24  estate in the form of --

25          THE COURT:  What do you mean, as a result of the

HCMLPHMIT00003357

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4172   Filed 22/06/25   Page 795 of 1011   PageID 2694
Exhibit 72   Page 346 of 390

345

1    alleged conspiracy?  What do you mean?

2          MR. MCENTIRE:  A delay, a postponement, making long-

3    term payouts, keeping the litigation alive.  They actually

4    suggested to Mr. Linn, don't settle these claims, don't sell

5    out, because this is asset-backed, and we also have claims.

6    And so --

7          THE COURT:  Wait, what?  Say again?

8          MR. MCENTIRE:  One of the things that Mr. Linn told

9    Mr. Dondero, according to Mr. Dondero's notes, is we have --

10   this is very valuable, we're buying assets and we're buying

11   into claims, the litigation claims that are being asserted in

12   this bankruptcy proceeding.

13         THE COURT:  Yes.  Got it.

14         MR. MCENTIRE:  Yeah.  And so the whole idea here is,

15   is that people are funneling money in and taking money out of

16   the coffers of this estate to fuel future litigation in order

17   to have a bigger payday at the end for Class 8 and Class 9.

18   That's exactly what those notes suggest.

19         THE COURT:  I don't understand the correlation.  What

20   correlation are you making?  Because of the claims being

21   purchased, what?

22         MR. MCENTIRE:  The claims being purchased allow Muck

23   and Jessup to be in a position to award compensation.  We've

24   talked about that.

25         THE COURT:  I got that.

002324

HCMLPHMIT00003358

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 12/27/25   Page 796 of 1011   PageID 2695
Exhibit 72   Page 347 of 390

346

```
 1              MR. MCENTIRE:  That's one type of injury.  The other

 2    injury is, and we have alleged it, is the fact that these

 3    claims become very valuable not only because they're asset-

 4    backed but because also the litigation claims that Mr.

 5    Kirschner is prosecuting.

 6              THE COURT:  But how does the purchase of the claims

 7    impact that?  They were allowed claims at certain amounts

 8    before, and after the purchase they're still allowed claims.

 9              MR. MCENTIRE:  Mr. Seery is telling them that,

10    basically, this is our plan, this is what we're doing, this is

11    --

12              THE COURT:  That was the plan of reorganization that

13    was confirmed by the Court.  I don't get how something

14    changed.  I'm trying to get to what are the injuries that your

15    client has suffered.  And I get the compensation argument

16    you're making, but I don't get the rest of it.

17              MR. MCENTIRE:  If Mr. Dondero had been in a position,

18    or one of his entities had been in a position, or even Hunter

19    Mountain, and I'm not sure why Hunter Mountain -- be in a

20    position to have acquired the claims, then we would -- this

21    bankruptcy wouldn't even be in existence anymore.  It'd be

22    over.  All creditors would be paid.  It would be done.  Be

23    over.  And that is an allegation we have made --

24              THE COURT:  How do I know that?

25              MR. MCENTIRE:  Because all the creditors would have
```

002325

HCMLPHMIT00003359

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 12/18/25   Page 797 of 1011   PageID 2696

347

1   been paid off.

2          THE COURT:  How do I know, if he would have purchased

3   the claims, that's what would have happened?

4          MR. MCENTIRE:  Well, that's what he testified to

5   today here.  I don't want to get off on a rabbit trail.

6          THE COURT:  I'm trying to understand the injury, --

7          MR. MCENTIRE:  Sure.  I understand.

8          THE COURT:  -- because that's part of my analysis

9   here.

10          MR. MCENTIRE:  The focus, the focus is on the

11   compensation.  And once they aid and abet, once they aid and

12   abet a breach of fiduciary duties, they are subject to

13   disgorgement, and disgorgement of all of their ill-gotten

14   gains.  And the ill-gotten gains are now well over --

15   approaching over $100,000 million.

16          THE COURT:  How do you get to that number?

17          MR. MCENTIRE:  Easily.  We know how much they

18   purchased, which has never been denied.  We know how much has

19   been distributed to Class 8.  And we know what percentage of

20   Class 8 they own.  They own about 95 percent of all Class 8

21   claims.  So if $270,000 million has been distributed to Class

22   8, they got 90 percent of that, 95 percent of it has already

23   gone to them, Farallon and Stonehill.

24          THE COURT:  But it would have gone to the sellers of

25   the claims as well.  I'm trying to make the connection.

002326

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 07/09/25   Page 798 of 1011   PageID 2697
Exhibit 72   Page 349 of 390

348

```
 1              MR. MCENTIRE:  That's not the injury.  The injury is

 2    what -- that is a consequence of their conduct.  The injury is

 3    the compensation.  All right?  That's a distinct injury.  They

 4    are subject to disgorgement as a consequence because they have

 5    done wrong, and the law should not tolerate -- should not

 6    tolerate and allow wrongdoers to get away.  And that's where

 7    the unjust enrichment and disgorge --

 8              THE COURT:  And what are your best cases for that,

 9    that they would have to disgorge --

10              MR. MCENTIRE:  We have cited --

11              THE COURT:   -- the Purchasers would have to disgorge

12    --

13              MR. MCENTIRE:  We have cited cases in our brief.

14              THE COURT:  I'm asking you now to --

15              MR. MCENTIRE:  I don't have them in front of me right

16    this second.  But an aider and abettor --

17              THE COURT:  The *CVC* case, is that your best case?

18              MR. MCENTIRE:  I don't have the cases in front of me.

19    I can say this, that the case law is robust, and I can supply

20    you --

21              THE COURT:  It is not robust.  That's why I'm asking

22    you to zero in.  I read your *CVC* case from the Third Circuit,

23    and I'm wondering, is that your strongest case?

24              MR. MCENTIRE:  No.  I think we -- I think we have a

25    lot of strong cases.  I'm not sure that it is the strongest.
```

002327

HCMLPHMIT00003361

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 05/06/25   Page 799 of 1011   PageID 2698
Exhibit 72   Page 350 of 390

349

```
 1              THE COURT:  Tell me which ones, so I --
 2              MR. MCENTIRE:  Ma'am, I just said I don't have it in
 3    front of me.  If you'll look --
 4              THE COURT:  Okay.  Well, this is closing argument
 5    where you present law in support of your position.
 6              MR. MCENTIRE:  Well, actually, I'm arguing facts
 7    right now.  But Your Honor, what I want to tell you is if
 8    you'd like me to submit a letter brief on that, I will.
 9              THE COURT:  No.
10              MR. MCENTIRE:  Okay.  Then I won't.  It's in my
11    brief.  All of our authorities are in the brief.
12         In conclusion, --
13              THE COURT:  Okay.  So that was the CVC case from the
14    Third Circuit which dealt with an insider who purchased
15    claims, statutory insider, a board member, a 28-percent equity
16    owner, who purchased claims during the case to be in a
17    position to file a competing plan and didn't disclose to the
18    board or file a 3001(e) notice.  Okay.  There was -- claims
19    shouldn't be allowed at more than what the purchaser paid for
20    it.
21              MR. MCENTIRE:  Okay.
22              THE COURT:  Okay.  I'm asking you, is that your best
23    case?  Because you also cited Adelphia, which seemed kind of
24    factually off the mark.  And so I really --
25              MR. MCENTIRE:  I -- I'm sorry, --
```

002328

HCMLPHMIT00003362

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 14-72  Exhibit 72  Filed 03/51/26 390  Page 800 of 1011    PageID 2699

350

```
 1              THE COURT:  I need to know, because I've made clear
 2     from the beginning, --
 3              MR. MCENTIRE:  Yes.
 4              THE COURT:   -- I'm struggling with how is there a
 5     cause of action related to claims trading.
 6              MR. MCENTIRE:  (chuckles)
 7              THE COURT:  I don't know why you're giggling.  This
 8     is --
 9              MR. MCENTIRE:  No, I'm not.  But --
10              THE COURT:   -- serious stuff.  Okay?
11              MR. MCENTIRE:  Agreed.  Agreed.
12              THE COURT:  A bankruptcy estate is being charged ka-
13     ching, ka-ching -- not bankruptcy estate -- the post-
14     confirmation trust.  Ka-ching, ka-ching, ka-ching.  So this is
15     serious stuff.
16              MR. MCENTIRE:  Agreed.
17              THE COURT:  I need to, you know, colorable claim.
18              MR. MCENTIRE:  Agreed.
19              THE COURT:   Colorable claim.
20              MR. MCENTIRE:  Agreed.
21              THE COURT:  Even if plausibility is the standard,
22     which I've expressed my doubt about that, how do you have a
23     plausible claim?  What is your best case?
24              MR. MCENTIRE:  Okay.  This --
25              THE COURT:  Just to recap what I'm focused on,
```

HCMLPHMIT00003363

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 252/25 390   Page 801 of 1011   PageID 2700

351

1    purchaser and seller, okay?  I can see where breach of

2    contract, maybe some sort of torts between those two.  Okay.

3    I can see where the U.S. Trustee, the SEC, I don't know, the

4    Texas State Securities Board, they might get concerned about

5    allegations of insider trading and there might be a regulatory

6    action.  But the estate?  Again, the post-confirmation trust

7    --

8               MR. MCENTIRE:  Okay.

9               THE COURT:  -- and a contingent beneficiary.  I'm

10   trying to understand what is the best legal authority that

11   might support a colorable claim.  And we talked about the *CVC*

12   case and *Adelphia*.  I'm trying to figure out what are other

13   cases you think I should really hone in on to understand this.

14              MR. MCENTIRE:  All right.  At the very beginning this

15   morning, during my opening statement, I had said this is not

16   your typical claims-handling case, because I recall from our

17   last conference you asked that question a couple of times.

18   This is not your typical claims-handling case.  And it's not a

19   typical claims-handling case because we have a fiduciary that

20   we claim breached his duties that were owed to the estate.

21   And he self-dealt.  And he -- this has nothing to do with the

22   plan.  This has something to do with what Mr. Seery did

23   outside the corners of the plan.  Perhaps he used the plan

24   expediently.  He self-dealt.

25        That's why this is not just between a seller and a buyer

HCMLPHMIT00003364

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 08/28/25   Page 802 of 1011   PageID 2701
Exhibit 72   Page 352 of 390

352

1   of a claim.  That's number one.

2       We have been denied an opportunity to discover the

3   communications between the sellers and the buyers, and my

4   guess is we have big boy agreements that prevent the sellers

5   from ever coming back at anybody for fraud.  My expectation,

6   that's the case.  We should have a right to go explore that.

7   So that's why they're not here.

8           THE COURT:  Why?  I mean, what would that tell you?

9   What would that tell you?

10          MR. MCENTIRE:  That --

11          THE COURT:  If there's a big boy agreement, if

12  there's not, what --

13          MR. MCENTIRE:  It would tell us --

14          THE COURT:   -- consequence would that have for this

15  --

16          MR. MCENTIRE:  It would tell us --

17          THE COURT:   -- proposed lawsuit?

18          MR. MCENTIRE:  It would answer Mr. Morris's question

19  that he's raised several times, this is the seller's issue,

20  this is not -- this is not the Hunter Mountain's issue.  It is

21  Hunter Mountain's issue.  Hunter Mountain as an equity

22  interest-holder should be in a position to be certified as a

23  Class 9 beneficiary now pursuant to our declaratory judgment

24  action.  That's number one.

25      Number two.  As a contingent beneficiary, it is entitled

HCMLPHMIT00003365

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72 Filed 05/04/25   Page 803 of 1011   PageID 2702
Exhibit 72 Page 353 of 390

353

1   to protect its interests and bring suits if it sees that

2   something has happened that is incorrect and is a tort

3   involving the Reorganized Debtor and the Claimant Trust.  That

4   is the nature and the essence of our claim.

5       And as a consequence, the aiders and abettors should not

6   be allowed to walk away unharmed.  They should be required to

7   disgorge their ill-gotten profits.  And that calculation is

8   easily done, as I've just demonstrated.

9       Your Honor, that's all I have.  Thank you very much.

10          THE COURT:  Thank you.

11          MR. MCENTIRE:  And we talked -- we'd need an

12  opportunity to argue on the issue of experts, because --

13  whether you're just going to take it under advisement, I'm not

14  sure how you're going to handle that.

15          THE COURT:  I'm going to read the pleadings and then

16  I'm going to let you all know are we coming back for another

17  day.

18          MR. MCENTIRE:  Thank you.

19          THE COURT:  All right.  Who is making the closing

20  argument -- do we have three closing arguments?

21          MR. STANCIL:  Yes.

22          MR. MCILWAIN:  We're going to do it in reverse order.

23          MR. MORRIS:  Reverse order in.

24          THE COURT:  Okay.  Reverse order of --

25          MR. STANCIL:  Keep it interesting.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 07/03/26   Page 804 of 1011   PageID 2703
Exhibit 72   Page 355 of 390

354

```
 1              MR. MORRIS:  I think I was last on the opening.

 2              THE COURT:   -- importance?

 3         (Laughter.)

 4              THE COURT:  No.  Just kidding.  Just kidding.

 5              MR. MORRIS:  We're assuming you remember what the

 6    original order was.

 7              MR. STANCIL:  Yeah, right, right.

 8              MR. MORRIS:  It was so many hours ago.

 9              THE COURT:  Okay.  Oh, so many hours ago.

10              MR. MCILWAIN:  I think I was referred to earlier as

11    the lame lawyer.

12              THE COURT:  Oh, you were.  I think --

13              MR. MCILWAIN:  So I'll start.  I think --

14              THE COURT:  I think you --

15              MR. MCILWAIN:  Or maybe it was the lame argument,

16    whatever.  Whatever.

17              THE COURT:  I think you were the lame one.

18         CLOSING ARGUMENT ON BEHALF OF THE CLAIM PURCHASERS

19              MR. MCILWAIN:  Your Honor, Brent McIlwain here for

20    the Claim Purchasers.

21         Let me start, I guess, by saying I understand now why

22    Hunter Mountain did not want to put on evidence, because the

23    evidence that they put on, frankly, made their case much

24    worse.

25         As we argued or we stated in the opening statement, our
```

002333

HCMLPHMIT00003367

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 05/06/25    Page 805 of 1011    PageID 2704
Exhibit 72    Page 2256 of 390

355

1    position is that you can look within the four corners of this

2    document and determine that there is no plausible or colorable

3    claim.  What the evidence showed is that Mr. Dondero allegedly

4    had a call with one -- with Farallon, not with Stonehill, with

5    Farallon, Farallon wouldn't tell him what they paid, Farallon

6    did not accept an offer of 130 or 140 percent of whatever they

7    paid for the claim, and he thinks they did no due diligence,

8    right?  He had nothing in his notes about MGM.  So he can say

9    that he thought that they were positive because of MGM, but

10    it's certainly not -- I don't think the Court should take that

11    evidence with any credibility.

12        But interestingly, what Mr. Dondero says is, well, how do

13    you know how much they paid for these claims?  He goes, well,

14    there was a market for the claims, right?  They were all

15    trading at 50 or 60 cents.  But yet no one would ever buy

16    these claims without any due diligence because the projections

17    in the plan indicate that they wouldn't -- they wouldn't get a

18    return.

19        Well, if there's a market for the claims and he's willing

20    to pay 30 or 40 percent more than whatever someone purchased,

21    certainly there is a market for the claims.  And he is the

22    only one, frankly, that had inside information.  That's why he

23    was willing to maybe pay more.

24        Or, alternatively, the case that you were describing

25    before, Mr. Dondero maybe wanted to buy the claims so he could

HCMLPHMIT00003368

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 74    Filed 257/25 390    Page 806 of 1011    PageID 2705

356

1    control the case, right, so he could dismiss any litigation

2    that was pending against himself so he could avoid the ire of

3    the estate that is aimed at him.

4        It also -- the Court's inquiry as to what the injury is I

5    think is precisely on point.  The only injury offered at this

6    point really is that somehow my client's agreed-to higher

7    compensation that is reasonable or appropriate in return for

8    some inside information on claims that were allegedly trading

9    at 50 or 60 cents in any instance.  And what the evidence

10   showed is that, one, Mr. Dondero never had any information

11   about that, about the compensation that Seery is receiving

12   when this complaint was filed, when this motion for leave was

13   filed.

14       And so if you judge the complaint within the four corners,

15   there is no -- there is no *quid pro quo*, right?  Because he

16   says, well, there's obviously something up here because they

17   wouldn't have bought these claims without due diligence, and

18   they must have agreed to higher compensation, and that's why

19   it all happened.  And if we throw all this out here, then

20   we'll get to do the discovery that we wanted to do.

21       Importantly, if you look at his notes, right, the first

22   thing that's written down is discovery to follow, because

23   that's how he operates.  That's how a serial litigator

24   operates.  Discovery to follow so that I can pay you back for

25   not selling your claim to me.  Right?  So I can't control the

HCMLPHMIT00003369

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 05/28/25   Page 807 of 1011   PageID 2706

357

1   world, so I can't control this case, you're going to pay.  And

2   we're all paying.  Every one of us here.  Right?  There's 15

3   lawyers in the courtroom and probably 10 on the phone, right?

4   We're all paying.

5       And so when Mr. McEntire says I'm not getting my day in

6   court, we've had an entire day in court.  We've had three

7   hearings to decide what this hearing is going to be.  And he's

8   gotten more than his day in court for, frankly, what is word

9   salad.  This complaint doesn't pass any test, whether it's

10  12(b)(6) or under the *Barton* Doctrine.  It's simply

11  allegations that are thrown out there, and they're saying, so

12  that we can do more discovery to determine if we actually have

13  allegations.  Because they want to continue to harass people,

14  they want to continue to be a thorn in everyone's side, so

15  that perhaps they can avoid further litigation against Mr.

16  Dondero or they can convince somebody to settle with Mr.

17  Dondero.

18      It doesn't make any sense, Your Honor, and this is exactly

19  why there is a gatekeeper provision, right.  That's why the

20  Court imposed this.

21      And you ask yourself, why would someone sell these claims?

22  Obviously, the sellers of the claims have not shown up.

23  Whether they're big boy, it doesn't matter, because the Court

24  and this estate had nothing to do with those sales.  But they

25  haven't shown back up.  I can -- I can venture a guess why, if

HCMLPHMIT00003370

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72 Filed 05/05/25   Page 808 of 1011   PageID 2707

358

1   I was involved with Mr. Dondero, I would sell my claim, right?

2   Because I wouldn't have to be here.  And that's exactly why

3   the Court should not authorize this complaint to be filed and

4   the gatekeeper provision of the order should prevent it.  And

5   frankly, this should be shut down and we should not have to

6   have continued litigation over experts, or anything else, for

7   that matter.  And frankly, we should just be able to go on and

8   let Mr. Seery do his job.

9       Because I think the evidence was pretty clear that his

10  compensation is reasonable and it was in line, frankly, with

11  what he was making before.  And candidly -- and maybe it's

12  because Mr. McEntire is not involved in bankruptcy cases, but

13  this is similar compensation that I see in numerous cases, and

14  it's tiered to incentivize Mr. Seery to do his job, and he's

15  doing his job.

16      So, with that, Your Honor, I'll cede the rest of the time

17  to the other parties.

18          THE COURT:  Okay.  Thank you.

19      CLOSING ARGUMENT ON BEHALF OF JAMES P. SEERY, JR.

20          MR. STANCIL:  Thank you, Your Honor.  I'm going to

21  focus -- and I'm going to put my little clock up so Mr. Morris

22  doesn't, you know, give me the hook here.

23          THE COURT:  Okay.

24          MR. STANCIL:  But first --

25          THE COURT:  Next time we're all here, maybe I'll have

002337

HCMLPHMIT00003371

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 230/25 390   Page 809 of 1011    PageID 2708

359

1    one of those red, what do you call them, the buzzer.

2              MR. STANCIL:  Oh, the big light?

3              THE COURT:  The red light.

4              MR. STANCIL:  We used to joke that the judge I

5    clerked for wished he had a trapdoor and he could just pull

6    the lever when it was done.

7              THE COURT:  Okay.

8         (Laughter.)

9              MR. STANCIL:  Maybe I shouldn't have put that in your

10   head.

11             THE COURT:  Who was that?  Are we going to say who

12   that was?

13             MR. STANCIL:  So Your Honor, I'm going to try to set

14   the legal framework.  I'm going to ask you -- and I think we

15   have our -- we have the deck.  It's the little -- if we could

16   put that up and start on Slide 2.

17        I'd like to address what standard applies, and then I'd

18   like to spend a few minutes asking Your Honor again not only

19   to rule on multiple alternative grounds, but also I'd like to

20   walk through what if you did this on a pure 12(b)(6), because

21   it's going to collapse.

22        So, well, we'll just jump in.  I said at the beginning

23   that we know that the question here is not what does the word

24   colorable mean in isolation.  We wouldn't do that in any

25   context.  We would always look and see what the operative

HCMLPHMIT00003372

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 06/20/25   Page 810 of 1011   PageID 2709
Exhibit 72   Page 361 of 390

360

1   language here is in the Court's confirmation order.  So the

2   question is, what did the Court mean, it must represent a

3   colorable claim?

4        So we mentioned before Paragraph 80 of the confirmation

5   order.  That cites *Barton*.  It cites the vexatious litigant

6   cases.  I've not heard one word from Mr. McEntire answering

7   how it can be that we're here on a sub-12(b)(6) standard he

8   now says when the Court articulated this legal authority and

9   this legal basis in the confirmation order.  If he believed

10  that, the time to make that argument was on the confirmation

11  appeal, and that's over.

12       But let me then say, how did we get, how did the Court get

13  to Paragraph 80?  Well, that came after a series of factual

14  findings in the confirmation order -- in fact, actually, Josh,

15  do you have the hard copy of this?

16            MR. LEVY:  Yeah.

17            MR. STANCIL:  If I could hand that to the Court.

18       May I approach, Your Honor?

19            THE COURT:  You may.  Thanks.

20            MR. STANCIL:  And I don't propose to go through every

21  slide, Your Honor.

22            THE COURT:  Okay.

23            MR. STANCIL:  But if you could turn to Slide #5.

24  This is Paragraph 77 of the Court's confirmation order.

25  Factual support for gatekeeper provision.

002339

HCMLPHMIT00003373

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 4-72   Filed 202/26/390   Page 811 of 1011     PageID 2710

361

```
 1              MR. MCENTIRE:  Excuse me.  May I have a copy?  I
 2    can't see it.
 3              THE COURT:  Oh.
 4              MR. LEVY:  Oh, yeah, sure, sure.
 5              MR. STANCIL:  And can we get a copy of yours as well,
 6    --
 7              MR. MCENTIRE:  Sure.
 8              MR. STANCIL:  -- while we're at it?  Thanks.
 9         The facts supporting the need for the gatekeeper provision
10    are as follows.  I will not read them all, but if you scroll
11    about eight lines down, it says, During the last several
12    months, Mr. Dondero and the Dondero-related entities have
13    harassed the Debtor, which has resulted in further
14    substantial, costly, and time-consuming litigation for the
15    Debtor.  And then there are six separate enumerated examples
16    of that.
17         Paragraph 78 on the next slide.  Findings regarding
18    Dondero postpetition litigation.  The Bankruptcy Court finds
19    that the Dondero postpetition litigation was a result of Mr.
20    Dondero failing to obtain creditor support for his plan
21    proposal and consistent with his comments, as set forth in Mr.
22    Seery's credible testimony, that if Mr. Dondero's plan
23    proposal was not accepted he would, quote, burn down the
24    place.
25         Next slide.  This is Paragraph 79.  Necessity of the
```

HCMLPHMIT00003374

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 172   Filed 03/25/... Page 812 of 1011   PageID 2711

362

1   gatekeeper provision.  If you would just skim to the bottom of

2   that first column, it says, Approval of the gatekeeper

3   provision will prevent baseless litigation designed merely to

4   harass the post-confirmation entities charged with monetizing

5   the Debtors' assets for the benefit of its economic

6   constituents, will avoid abuse of the court system and preempt

7   the use of judicial time that properly could be used to

8   consider the meritorious claims of other litigants.

9       And then came Paragraph 80, which we've just discussed.

10  With respect, Your Honor, the question is, what is the meaning

11  of Paragraph 80?  And in context, following those paragraphs

12  regarding vexatious litigation and abuse of litigation, it is

13  simply implausible to suggest that colorability is a sub-

14  12(b)(6) standard.

15      And that is Mr. McEntire's contention today, that the

16  gatekeeping order is actually lower than the threshold that

17  every other litigant faces.  Everyone else has to file a

18  claim, pass a 12(b)(6), and on they go to get to discovery.

19  Mr. McEntire believes that the gatekeeping order imposes less

20  than that on him, and then he's treated just like everybody

21  else.  It makes no sense whatsoever.

22      So I'll skip Slides 8 and 9, Your Honor, but that's where

23  the Fifth Circuit described the gatekeeping orders, affirmed

24  them in relevant part, citing *Barton*.  There is no mystery

25  here.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-72 Filed 02/26/26 390   Page 813 of 1011   PageID 2712

363

1      If you could flip, Your Honor, to Slide 10 very briefly.

2    We've talked about this case a little bit in one of our status

3    hearings, *In re Vistacare Group*.  This is the leading case

4    that describes what it is that one does under a *Barton*

5    analysis, and it says that the trustee must make a -- pardon

6    me -- a party seeking leave to sue a trustee must make a *prima*

7    *facie* case against the trustee, showing that its claim is not

8    without foundation.  A *prima facie* case is more than a

9    12(b)(6).

10      And I would direct Your Honor to the language in the third

11    bullet.  It involves a greater degree of flexibility than a

12    Rule 12(b)(6) motion to dismiss because the bankruptcy court,

13    which, given its familiarity with the underlying facts and the

14    parties, is uniquely situated to determine whether a claim

15    against the trustee has merit.  Boy howdy, are we -- I'm

16    sorry.  My kids are going to tease me for that.

17      But this -- no case has ever proved the wisdom of that

18    statement, Your Honor.  We are here, and the Court is all too

19    familiar with the facts and the parties of this case.  And

20    we're not here on an adversary proceeding.  We're here on a

21    contested matter.  And Your Honor has the authority on any

22    contested matter to take evidence, and a broad, broad

23    discretion as to what evidence is appropriate to meet that

24    standard.

25      So we have laid out briefly in Slide 11 what -- why we

HCMLPHMIT00003376

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 11-72 Filed 06/25/26    Page 814 of 1011    PageID 2713
Exhibit 72    Page 365 of 390

364

 1   believe that -- or how we believe that the *prima facie* showing

 2   would work.  And in short -- and maybe this will help us going

 3   forward -- we believe that if they make -- if a party seeking

 4   relief under the gatekeeping order says things, we have the

 5   right to rebut them, like in a burden-shifting or a burden of

 6   production -- pardon me -- analysis.  So you can say that the

 7   sun rises in the west, but we can bring in evidence to say it

 8   doesn't, it rises in the east.  And that's the plausibility

 9   threshold.

10       And here, and if Your Honor would flip to the next slide,

11   I'm not sure it's entirely fair to say, even after they have

12   purported to withdraw their evidence, that they've really done

13   so.  And we disagreed with Mr. McEntire, and advised him of

14   such leading up to this hearing, that we do not agree that his

15   redactions fully excise all of the evidentiary assertions from

16   his motion.

17       And I'll just pick one example here on Slide 12.  On the

18   left is Paragraph 32 of the motion for leave prior to the

19   purported withdrawal.  On the right is Paragraph 32 after the

20   withdrawal.  Your Honor will see all they've withdrawn are the

21   citations.  It's verbatim.  It's the same allegations.  And

22   they have argued various facts and put them in evidence.  So

23   even if it were true, and it's not, but even if it were true

24   that all you get here is a 12(b)(6) ruling in the ordinary

25   case if you put no evidence in dispute, they forfeited that

HCMLPHMIT00003377

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 08/08/25    Page 815 of 1011    PageID 2714
Exhibit 72    Page 366 of 390

365

1    right by putting these facts and evidence in dispute in their

2    motion.

3       The fact that they have withdrawn evidentiary support for

4    their evidentiary assertions does not relieve them of the

5    reality that they have made all sorts of factual arguments in

6    their motion for leave, and as a contested matter we have the

7    right to address it.

8       I'm proposing, Your Honor, unless you have questions on

9    the cases on 13, 14, those are the cases where we have

10   described the hearings that have been held under *Vistacare* and

11   *Foster*, and I know more about the down-in-the-weeds of *Foster*

12   than I ever cared to, but I don't want to repeat what's in our

13   briefs.

14      If Your Honor is willing to flip to Page 15, this is an

15   argument I've alluded to briefly, but boy, we don't hear -- we

16   have not heard a single thing as to what function the

17   gatekeeper serves, particularly in context of Your Honor's

18   factual findings in the confirmation order, if all it means is

19   12(b)(6) or lower.  It just, it's an unanswerable point that

20   they just persist in ignoring.

21      But I'd like to address very briefly that third bullet,

22   because at various times and in their brief they have cited,

23   Hunter Mountain has cited, down here we call it *Louisiana*

24   *World*, I think in the Second Circuit we call it *STN*, but this

25   UCC derivative standing.  There are, in fact, two elements one

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 06/20/25   Page 816 of 1011   PageID 2715
Exhibit 72   Page 367 of 390

366

1   has to pass for that, and that's a different context.  The

2   first is colorability as it's used in that context, and that

3   is often a 12(b)(6) standard in that context.  But still to

4   have standing, to bring that claim on behalf of the estate,

5   you have to show a cost-benefit analysis.  As we've heard

6   today, we've probably spent more in legal fees today, or over

7   the last three months, than the purportedly excessive

8   compensation to Mr. Seery.  And so I would respectfully

9   submit, if we were here on a *Louisiana World* or *STN* hearing,

10   this would be an open-and-shut case just as well.

11      So if I could, Your Honor, if you are willing to jump

12   ahead to Slide 17, I'd like to ask you -- and I do want to

13   address the standing jurisdictional question a little bit.

14           THE COURT:  Okay.

15           MR. STANCIL:  Not to get into the weeds of standing,

16   because I think we have briefed that out the wazoo in our

17   papers, and I read this morning -- I think it was this morning

18   -- from the Claimant Trust Agreement, which says they're not a

19   beneficial interest.

20      But my understanding is that Article III standing, whether

21   there is a theoretical injury in any way, that is -- that goes

22   to Your Honor's subject matter jurisdiction under Article III,

23   but that is not true of statutory standing under Delaware law

24   or prudential standing.  Those are -- those go to basically

25   whether they state a claim.

002345

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4172   Filed 06/20/25   Page 817 of 1011   PageID 2716
Exhibit 72   Page 368 of 390

367

```
 1      So, Your Honor, I believe, can -- and I've confessed to my
 2   colleague that the only way I remember this is I screwed it up
 3   really, really badly when I was clerking years ago -- but I
 4   believe Your Honor can, and in this case should, rule on the
 5   standing ground in the alternative.  Not on the Article III.
 6   Article III is binary.  They either have it or they don't.
 7   But on the statutory standing, you can say -- I think you can
 8   hold that they do not have standing under Delaware law to
 9   pursue the claim, but even if they do have standing, and then
10   reach the remainder.
11      And we know we're headed for appeal.  We've heard --
12   pretty much two-thirds of the time this morning has been
13   laying the groundwork for an appeal.  And we would only like
14   -- we would like to make sure that we give the Fifth Circuit a
15   fulsome record.
16      So I would like to ask Your Honor to flip to Page 19.  And
17   this is really the end of, I think, what we need to do.  So,
18   Your Honor, what if we were here just on 12(b)(6)?  So we've
19   got a quid, we've got a pro, we've got a quo.  They fail at
20   each turn.  Let me spend most of my time on the quid.  I'll
21   let the documents of which the Court can take judicial notice
22   speak for themselves.  I will let the bare-bones nature of the
23   assertion -- and it's okay to put in a complaint something on
24   information and belief, but you still have to pass Iqbal and
25   Twombly.  I can't say upon information and belief that I was
```

HCMLPHMIT00003380

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 1-4 Filed 268/26/390   Page 818 of 1011   PageID 2717

368

1   denied a starting position on the Knicks, right?  I would like

2   to believe that's the case, but it still has to be a plausible

3   allegation.

4        Let's look at this chart.  And this chart is taken right

5   out of our brief.  These are their numbers.  This is at the

6   bottom.  And I want to -- I would like to take head-on this

7   proposition that this is not a rational investment on their

8   numbers.

9        So let's take the Stonehill purchase of Redeemer.  They

10  paid $78 million to earn a projected profit, according to the

11  November 30 disclosure statement, of $19.71 million.  By my

12  arithmetic, that is a return of 25.27 percent.  Even by Mr.

13  Dondero's lights, that's a pretty good return.

14       I'm going to come back to why that's not the end of the

15  return, but let's look at the Farallon purchase of Acis.

16  Spent $8 million.  Projected profit, $8.4 million.  I'll take

17  105 percent return any day.

18       Let's look at the Farallon purchase of HarbourVest.

19  Purchase price, $27 million.  Projected profit, $5.09 million.

20  That is -- oh, I can't read my own writing anymore -- I think

21  that is 18.85 percent.  I would again gladly take that every

22  day of the week, whether it's a distressed asset or otherwise.

23       But let me make one really important point that Mr.

24  Dondero obfuscated, Mr. McEntire does not acknowledge, and it

25  is just a fact.  These are projected profits if all Mr. Seery

HCMLPHMIT00003381

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 07/02/25    Page 819 of 1011    PageID 2718
Exhibit 72    Page 2370/26 390

369

1    does is hit the plan.  November 30, 2021.  If he does no

2    better than what he thought these assets were worth then, this

3    is the expected return.  So for those trades that we've talked

4    about, that's a slam dunk even on that.

5        But let's look about -- we'll talk about upside.  Because,

6    as Your Honor knows from doing bankruptcy cases, upside, it's

7    all about upside for people who are purchasing claims.  So it

8    isn't just that their returns were capped at these already-

9    ample percentages.  If Class 8, for example, of Redeemer paid

10   out in full, they would be making not -- oh, gosh, I'm not

11   sure I should do this on the fly -- but they'd be recovering

12   $137 million on the Class 8 claim, not the $97.71 million.  So

13   there's another $40 million of upside.

14       Even if it's a low-probability event, that's a -- hedge

15   funds do that all day every day.

16       Same here with Acis.  Paid $8 million, expected $16.4

17   million, but they could get up to $23 million.

18       Now, we've heard so much about how Class 9 was worthless,

19   worthless, worthless.  No, it's not.  There's always the

20   potential for upside.  Paid $27 million.  Could recover $45

21   million just on Class 8.  Could recover another $35 million on

22   Class 9.  They could recover $80 million on a $27 million

23   purchase.  Now, the probability of that is complicated, but

24   it's not zero.  We know that it's not zero.  All we've heard

25   from them today is that Mr. Seery is -- could pay off 8 and 9

HCMLPHMIT00003382

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 07/01/25   Page 820 of 1011   PageID 2719
Exhibit 72   Page 371 of 390

370

1   in full.  So I don't think that is even remotely plausible.

2       Let's talk briefly about UBS.  They like to talk about UBS

3   for the projected profit of $3.61 million in loss.  But that

4   was -- that's in August, and that claim trades.

5       So a couple of things that happened between the November

6   30 disclosure statement setting that projected value and the

7   purchase of the UBS claim in August.  Number one is we are

8   nine, ten months past the worst of COVID.  And Your Honor

9   could take judicial notice of massive market movements just if

10  you do nothing.

11      We don't need to get to that, because we talked all

12  morning about MGM.  May 26th, it's announced publicly.  May

13  26, 2021.

14      So the notion that a purchaser of a UBS claim in the

15  summer of 2021, after this MGM transaction is announced, would

16  think, you know what, I think these claims are only worth what

17  they were worth back in November, is not plausible.

18      And so this is why the comparisons to the debt, the exit

19  financing, well, 12 percent.  That's a 12 percent capped

20  return.  We're talking here about returns of 25 percent, 105

21  percent, 18.85 percent, just based on projections at the --

22  sort of in the darkest days post-COVID.

23      So it's not plausible.  If a court were looking at this

24  just under the 12(b)(6) standard, we would be -- we'd be

25  dismissing this claim as well.  And we really -- respectfully,

HCMLPHMIT00003383

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 472 Filed 07/21/26    Page 821 of 1011    PageID 2720
Exhibit 72    Page 372 of 390

371

1    Your Honor, we need that ruling.  We think we need that ruling

2    so that whatever the -- whatever they may say the standard is

3    in the Fifth Circuit, we only have to go one time.  And we

4    really believe that we're entitled to that.

5        I'll let Your Honor -- I will just stand on the deck and

6    our briefs on the *pro* and the *quo*.  But meet-and-greets, these

7    are just conclusory allegations in the complaint.  He says

8    they worked -- that he worked for them 10 or 15 years ago,

9    which some of that's not even true, but even if it were all

10   true, if I were beholden to every client I've met at a

11   schmooze fest or everybody I worked for in a group 20 years

12   ago or 15 years ago, you know, I would be incapable of

13   operating without a conflict of interest.  And it's just not

14   plausible.  This is something that needs to go.

15       Unless the Court has questions, I will cede the remainder

16   of our time to Mr. Morris.

17           THE COURT:  No questions.  Thank you.

18     CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

19           MR. MORRIS:  Thank you so much, Your Honor, for your

20   patience.  It's been a very long day.  I am very grateful that

21   we're going to finish today.

22       As I said at the beginning, I believe this exercise, as

23   difficult as it may have been, is so important and so vital,

24   preserving this estate and what's left of it.

25       The gatekeeper exists for very important reasons.  Your

HCMLPHMIT00003384

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4172   Filed 07/23/25   Page 822 of 1011    PageID 2721
Exhibit 72   Page 373 of 390

372

1    Honor made those findings in her order that has been upheld on

2    appeal.  And we're here to make sure that frivolous litigation

3    is not commenced against my clients, or, frankly, against

4    Stonehill and Farallon, given their capacity as Claimant

5    Oversight Board members.

6        Hunter Mountain confuses argument with facts.  There's no

7    facts here to support anything, and that's what the gatekeeper

8    is about.  The gatekeeper is making sure that there's a good-

9    faith basis to pursue claims.  And as Mr. Stancil points out,

10   it is certainly acceptable to state things upon information

11   and belief.  But the point of the gatekeeper is if somebody

12   says -- not somebody says -- somebody offers proof that those

13   beliefs are wrong, you no longer have a plausible claim.  And

14   that's why we thought it was so important to go through this

15   exercise today.  Because the facts show that their beliefs are

16   simply wrong, and the entire complaint is based on their

17   beliefs.

18       There is zero evidence concerning the compensation other

19   than their belief that the compensation is excessive.  The

20   case is over.  Like, you could stop there.  I'm going to go

21   through a bunch of things that -- you could stop there.

22       I want to actually begin backwards, though, in time, with

23   the HarbourVest settlement.  Right?  After two years of

24   litigation and re-litigation and re-litigation of the

25   HarbourVest settlement, the claims of insider trading, finally

002351

HCMLPHMIT00003385

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 07/24/25    Page 823 of 1011    PageID 2722
Exhibit 72    Page 374 of 390

373

1    the Court has before it admissible indisputable evidence that

2    Mr. Seery negotiated the terms of the HarbourVest settlement

3    before he ever got this notorious email from Mr. Dondero.

4    That should be a finding of fact in Your Honor's order and it

5    should never be -- nobody should ever make that allegation

6    again.  It's over.  You have the documents.  You have the

7    email from Mr. Seery to the board, here are the terms, and

8    those are the terms Your Honor approved.

9        And there's more.  Because this is so important for us,

10   because we're tired of being accused of wrongdoing.  We're

11   tired of being falsely accused of wrongdoing.

12       $22-1/2 million.  That's the valuation Mr. Seery put on

13   it.  You can see that he's doing it to his Independent Board

14   colleagues, copying his lawyers.  He's telling them where he

15   got it, from Hunter Covitz.  The evidence is now in the

16   record.  It came from a regularly-published NAV report from

17   November 30th.  It was seven days old.  It can never be

18   disputed again that $22.5 million was a fair value, not based

19   on some subjective view of Mr. Seery but based on the person

20   who gave him the report that everybody relies upon that Mr.

21   Dondero got.

22       And it was ratified yet again in the audited financial

23   statements that came out, and it shows for the period ending

24   -- this is Exhibit 60, I believe -- for the period ending

25   December 31, 2020, $50 million.  Okay, so it went up a few

HCMLPHMIT00003386

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72 Filed 07/25/25    Page 824 of 1011    PageID 2723
Exhibit 72    Page 373 of 390

374

1    million dollars in December.

2         This is their case?  This is the case?  Your Honor I know

3    is still working on the motion to dismiss.  That's Mark

4    Patrick, right?  That's the complaint that he brought.  That's

5    what this is about.  I don't mean to confuse the issue, but

6    it's time to put this stuff to rest, because it's wrong.  Mr.

7    Dondero has lost and he's got to get over it at some point.

8         But here's the best piece of evidence about this whole

9    shenanigans about MGM being inside information.  Mr. Dondero

10   filed a 15-page objection to the HarbourVest settlement and

11   didn't say a word about it.  How is that possible?  Six days

12   before the settlement, he sends this email.  Two weeks later,

13   in January, he files a 15-page objection and doesn't mention

14   anything about insider trading, MGM, or any wrongdoing by Mr.

15   Seery.  In fact, he argues the exact opposite, that Mr. Seery

16   cut a bad deal.  How is that possible?  This is a plausible

17   claim?

18        It gets better, or worse, depending on your point of view.

19   CLO Holdco filed an objection and they said they're entitled

20   to buy the asset.  This is Mr. Dondero's, you know, operating

21   arm of the DAF.  They lost -- they actually had an honorable

22   person who concluded, I don't really have that right.  But

23   these are the claims that Mr. Patrick is asserting, and he

24   asserted them on April -- in April, before the MGM deal was

25   announced.  Right?  And Your Honor found, and that's why it

HCMLPHMIT00003387

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4 72    Filed 07/8/25    Page 825 of 1011    PageID 2724
Exhibit 72    Page 378 of 390

375

1  was so important for the Court to take judicial notice of the

2  second contempt order, because Mr. Dondero was intimately

3  involved in bringing those claims and in bringing those claims

4  against -- or trying to bring those claims against Mr. Seery,

5  in violating of the gatekeeper.  This is all tied together.

6      I have to tell you, I don't know why we're not doing Rule

7  11.  Forget about colorable claims.  This is a fraud on the

8  Court.  It really is.  And I don't know when it's going to

9  stop.  I'd love to move on with my life, to be honest with

10  you.

11      The tender offer.  He's out there doing a tender offer

12  benefitting as the fund that he manages acquires more shares

13  and his interest goes up and the value goes up with all these

14  MGM holdings.  Really?  And he's going to accuse Mr. Seery of

15  wrongdoing?

16      There was one point of Mr. Dondero's testimony that made

17  my heart skip a beat.  It's when he referred to the need to

18  get discovery.  And why did it skip a beat?  Because he

19  actually had a moment of candor where he admitted that the

20  notion that Mr. Seery gave them material nonpublic inside

21  information was his thought.  It's not anything that Farallon

22  ever told him.  And then it spins and it spins and it spins,

23  and finally when he gets to the fifth version of his sworn

24  statement MGM suddenly appears.  It's not right.  Colorable

25  claims?  Fraudulent claims.

HCMLPHMIT00003388

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 14-72   Filed 07/25   Page 826 of 1011   PageID 2725
Exhibit 72   Page 207 of 390

376

1    What's the undisputed evidence right now?  I'll take Mr.

2    Dondero at his word that Mr. Patel told him that Farallon

3    bought the claims in February or March.  How did they

4    reconcile that with the undisputed testimony that Mr. Seery

5    thereafter invited Farallon to participate in the exit

6    financing?  And they signed an NDA in early April.  Why would

7    you sign an NDA if you already got inside information?  Who

8    would do that?  What would be the purpose of that?

9        How do you reconcile the fact that, according to Mr.

10   Dondero, the claims were already in Farallon's pocket when

11   they signed an NDA to get information for an exit facility.

12   Is that plausible?

13       We've heard Mr. McEntire say a bunch of times it's much

14   broader than MGM.  Not only not a scintilla of evidence, but

15   no substantive allegation.  Again, confusing argument with

16   facts.  Because he had -- yes, Mr. Seery had access to inside

17   information relative to Highland.  He's the CEO.  But where is

18   the evidence that he shared anything with anybody?  There is

19   nothing.

20       Mr. Dondero admitted in his motion -- in a moment of

21   candor, he said that's what he concluded based on the fact

22   that Mr. Patel supposedly told him, I bought because Seery

23   told me to.  He made the inference.  No evidence.  Nothing.

24       They're bringing this case for the benefit of innocent

25   parties?  These people have told you time and again that

HCMLPHMIT00003389

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 07/28/25    Page 827 of 1011    PageID 2726
Exhibit 72    Page 378 of 390

377

1    assets exceed liabilities.  What innocent parties?  Where are

2    they and how come they're not -- let's get to that point, too.

3    Because they're saying, oh, Mr. Seery is, like, just not

4    declaring the end of this.  Seriously?  How much do they think

5    Mr. Seery should reserve for indemnification claims as we do

6    trials like this with a mountain of lawyers billing $800,

7    $1,500 an hour?  Seriously?  Mr. Seery is somehow acting in

8    bad faith by not declaring the end of this case?  How much is

9    he supposed to reserve?  They keep skipping over that.  We'll

10    talk about that in the mediation motion.  We'll talk about

11    that in the Hunter Mountain motion in July.  Who's prosecuting

12    that?  Mr. Dondero's lawyer.  I know there's a really big

13    separation between Hunter Mountain and Mr. Dondero, but

14    Stinson is prosecuting that claim on behalf of Hunter Mountain

15    when they're seeking information.

16        And they complain about the legal fees?  We've put our

17    pens down.  Kirschner put his pens down.  We put down the

18    claim objection.  What we're doing is defense at this point.

19        We're awaiting the ruling on the notes litigation, and we

20    will very much prosecute the vexatious litigant motion if

21    Judge Starr grants the pending motion to exceed the page limit

22    that's been out there for months.  I'm not sure what's

23    happening there.  We'll do that for sure.  But otherwise,

24    we're just playing defense.

25        We're here today because they've made a motion, a motion

002356

HCMLPHMIT00003390

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 74   Filed 07/03/25   Page 828 of 1011   PageID 2727
Exhibit 72   Page 272 of 390

378

```
 1   that lacks any good-faith basis whatsoever.  And that's why

 2   today was so important, so the Court could hear the witnesses.

 3   They could -- the Court -- I mean, think about it.  Texas

 4   State Securities Board.  The audacity of saying that somehow a

 5   letter from the Texas State Securities Board saying they're

 6   taking no action after conducting an investigation of

 7   Dugaboy's claim of insider trading is irrelevant?  Like, what?

 8        I've told you before, all we do is play Whack-A-Mole.

 9   Whack-A-Mole.  They make an argument, we prove it's frivolous,

10   so they just make a new argument.  Their pleading says their

11   claims are colorable because there's an open investigation.

12   Now there's no investigation and they say that's irrelevant.

13   How can they say that with a straight face?  I couldn't.

14        I want to talk about Mr. Seery.  I want to finish with my

15   Mr. Seery.  I may not use all my time.  We can go home early.

16        (Laughter.)

17            THE COURT:  It's past early.

18            MR. MORRIS:  But this guy has worked doggedly, Your

19   Honor, and I will defend him until the end of time.  He's a

20   man who has so far exceeded expectations.  And they're saying

21   he's not -- he's overpaid?  The guy is overpaid?  When he's

22   into Class 9?  When he's being pursued with these frivolous

23   claims?  Every day he's being attacked.  How much do they

24   think he should be paid?  I would have loved to -- I hope --

25   no, I don't hope.  I don't think there's any reason to hear
```

HCMLPHMIT00003391

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L     Document 472 Filed 2/80/25 390 Page 829 of 1011     PageID 2728

379

1    expert testimony.  I think Your Honor should exercise -- the

2    Court should exercise its discretion and say there's no need,

3    the Court doesn't need to hear expert testimony.

4         But if we do, I'll be delighted to hear their expert's

5    view on what Mr. Seery -- if it's not $8.8 million for all

6    these years, what should it be, after he takes an estate from

7    71 percent on the 8s to, according to them, assets exceed

8    liabilities, 9s are paid in full?

9         You know what?  If they put their pens down, maybe there

10   would be a conversation.  But as long as we keep doing this

11   ridiculous, baseless, frivolous litigation, Mr. Seery is going

12   to conserve resources, because he's got to pay people like me

13   to defend him and to defend the estate.  This is a preview of

14   what we'll talk about at the mediation motion.  He's doing a

15   great job.  He's devoting his life to it.  He has no other

16   income.  He's got no other job.  It's wrong.

17        The claims are not only not colorable, they are frivolous.

18   I ask the Court to stop this in its tracks right now.

19        Thank you very much.

20            THE COURT:  Thank you.

21        All right.  Is there any time for the Movant to have the

22   last word, which we usually give the Movant the last word.

23            THE CLERK:  The Movant, I think, has a little under

24   -- maybe about a minute left.

25            THE COURT:  Anything you want to say in a minute?

002358

HCMLPHMIT00003392

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72  Filed 02/21/25   Page 830 of 1011    PageID 2729
Exhibit 72   Page 381 of 390

380

```
 1              MR. MCENTIRE:  Yes, just I'll take 30 seconds.  How
 2      is that?
 3              THE COURT:  Okay.
 4        REBUTTAL CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN
 5              MR. MCENTIRE:  I just want to direct your attention
 6      to our reply brief, specific paragraphs that address your
 7      question about authorities.  We do cite several cases on Page
 8      41, 40 and 41, dealing with the issue of unjust enrichment.
 9      That's it.
10          Thank you, Your Honor, very much.
11              THE COURT:  Okay.  Thank you.  Unjust enrichment?
12              MR. MCENTIRE:  Disgorgement.
13              THE COURT:  Okay.  But I was really, you know, claims
14      trading in the bankruptcy context, just your best --
15              MR. MCENTIRE:  Well, I think the cases that you
16      identified were our best cases.  The --
17              THE COURT:  Okay.
18              MR. MCENTIRE:  -- Adelphia and the other cases.
19              THE COURT:  All right.  Well, --
20              MR. MCENTIRE:  There are other cases, Your Honor, in
21      different contexts.  There's also the Washington Mutual case
22      dealing with equitable disallowance.  There's also the Mobile
23      Steel case, a Fifth Circuit --
24              THE COURT:  Mobile Steel?  Oh, my goodness.  Okay.
25              MR. MCENTIRE:  Okay.  All right.
```

HCMLPHMIT00003393

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 74    Filed 08/28/25    Page 831 of 1011    PageID 2730
Exhibit 72    Page 282 of 390

381

```
 1              THE COURT:  1968?  Or no.  That doesn't mean it isn't

 2    still quoted often, but --

 3              MR. MCENTIRE:  Those would also be relevant.

 4              THE COURT:  Equitable subordination --

 5              MR. MCENTIRE:  Yes, ma'am.

 6              THE COURT:   -- when there's bad acts.

 7              MR. MCENTIRE:  And Footnote #10 in the Mobile Steel

 8    case.  That is relevant, too.  Just, --

 9              THE COURT:  Okay.

10              MR. MCENTIRE:  Thank you.

11              THE COURT:  All right.  So I gave a deadline of

12    Monday, right, --

13              MR. STANCIL:  Yes.

14              THE COURT:   -- to reply to the response to the

15    motion in limine?

16              MR. STANCIL:  Yes, Your Honor.  Do you want time

17    before you leave for the day?  I mean, it's not going to be

18    that long, so 4:00 o'clock Monday?  Does that work for you?

19              THE COURT:  I don't care.  I probably won't start

20    looking at it until the next day.

21              MR. STANCIL:  But I will -- I'll just reserve and so

22    I don't have my associates --

23              THE COURT:  Yes.  I think these days midnight, 11:59

24    p.m., is what lawyers tend to want.

25              MR. STANCIL:  Oh, not this lawyer.
```

HCMLPHMIT00003394

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 74   Filed 03/23/25   Page 832 of 1011    PageID 2731
Exhibit 72   Page 2282 390

382

|   |   |
|---|---|
| 1 | THE COURT:  Oh, well, okay.  Okay.  So I'll just have |
| 2 | to look at this, and probably by Friday of next week I will |
| 3 | reach out through Traci and let you know what my decision is |
| 4 | on whether we're going to have another day of just 30 minutes, |
| 5 | 30 minutes of experts. |
| 6 | MR. MCENTIRE:  Your Honor, another housekeeping |
| 7 | matter.  You'd wanted a copy of our PowerPoint, -- |
| 8 | THE COURT:  Yes. |
| 9 | MR. MCENTIRE:  -- which I'm pleased to give you.  We |
| 10 | found a typo that we can correct electronically on the version |
| 11 | I showed. |
| 12 | THE COURT:  Uh-huh. |
| 13 | MR. MCENTIRE:  I likely will send that to you and I |
| 14 | can copy opposing counsel.  Is that -- |
| 15 | THE COURT:  Okay.  Send it to Traci Ellison, my |
| 16 | courtroom deputy. |
| 17 | MR. MCENTIRE:  All right. |
| 18 | THE COURT:  And she'll -- |
| 19 | MR. MCENTIRE:  We'll do that first thing in the |
| 20 | morning. |
| 21 | THE COURT:  Okay. |
| 22 | MR. MCENTIRE:  So you'll have a copy -- |
| 23 | MR. STANCIL:  Can we get the hard copy that -- from |
| 24 | today, though? |
| 25 | MR. MCENTIRE:  No, that had a typo on it.  I really |

HCMLPHMIT00003395

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 03/24/25   Page 833 of 1011    PageID 2732
Exhibit 72   Page 384 of 390

383

```
 1    don't want to share it.  We fixed it.

 2            THE COURT:  What?  I'm sorry, what?

 3            MR. MORRIS:  That's fine.

 4            MR. STANCIL:  Never mind.

 5            THE COURT:  Do I not need to know?

 6            MR. STANCIL:  Let's all go home.

 7            THE COURT:  Okay.  And then my last question is --

 8    and there was a mention of the CLO Holdco lawsuit, where

 9    there's a pending motion to dismiss.  There's an opinion I'm

10    writing well underway.  I just keep getting sidetracked by

11    other things.  Imagine that.  So I know that people are

12    wanting to get an answer to that.  So, trust me, it's going to

13    get done here pretty soon.

14       You mentioned Brantley Starr.  I mean, it is not my role

15    to pick up the phone and call him and say hey, --

16            MR. MCENTIRE:  No, I wasn't suggesting that.

17            THE COURT:   -- District Judge, get busy on that.

18            MR. MCENTIRE:  Yeah.

19            THE COURT:  But I'll at least tell you, I know the

20    man seems to have more jury trials than any judge I've seen in

21    this building, so I suspect he's working late hours trying to

22    get things done.

23            MR. MCENTIRE:  Yeah.

24            THE COURT:  What do we have upcoming?  We have what

25    you called the mediation motion.  When is that set?
```

HCMLPHMIT00003396

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 08/05/25    Page 834 of 1011    PageID 2733

Exhibit 72    Page 385 of 390

384

```
1              MR. MORRIS:  June 26.

2              THE COURT:  June 26th.  Be here before we know it.

3              MR. MORRIS:  Yeah.  And just to keep the Court

4    informed, the Movant's reply was due today.  We gave them a

5    week extension.  They asked earlier today.  I saw in my email

6    we gave them.  So I think you should expect the reply on the

7    15th.  The hearing is the 26th, and that's not in person.

8              THE COURT:  Okay.  Well, I'm very interested to dive

9    into those pleadings.  I knew the motion was coming because

10   one of the lawyers said at a prior hearing it would be coming.

11   So I haven't read any of those pleadings, but, well, I'm just

12   very interested to hear how this plays out.  I mean, I've said

13   it before.

14             MR. MORRIS:  Uh-huh.

15             THE COURT:  We had global mediation in summer of

16   2020.  We had two very fine mediators.  We had a heck of a lot

17   settled, to my amazement.  But we're now way down the road and

18   whole lot of money has been eaten up fighting lots of stuff.

19   I mean, it would have to be pens down.  There's an enormous

20   amount out there that would have to be part of it, and I just

21   don't know if everyone is fully appreciating that.  I hope

22   they are.  Anyone listening.  We're really, really far down

23   the road now, and there's just how many appeals?  Someone at

24   one time told me there were 26.  I bet it's more than that by

25   now.
```

HCMLPHMIT00003397

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L    Document 4-72   Filed 08/08/25   Page 835 of 1011    PageID 2734
Exhibit 72   Page 286 of 390

385

```
 1              MR. MORRIS:  I think that's right.  I think we argued

 2     on Monday, what is it, the sixth of nine appeals in the Fifth

 3     Circuit.  And we've got, you know, a cert petition that we're

 4     waiting to hear from on the Supreme Court.  And yeah, there's

 5     still a couple dozen matters in the district court.

 6              THE COURT:  Okay.

 7              MR. MORRIS:  Not one of them, not one of them we're

 8     prosecuting, with the exception of waiting on the Court to

 9     rule on the Report and Recommendation on the notes litigation

10     and vexatious litigant.  We are not the plaintiff, movant, in

11     anything.

12              THE COURT:  We've got adversaries.  The Reports and

13     Recommendations.  That's just made everything go a lot slower.

14     But all right.  So we have that.  And anything else coming up?

15              MR. MORRIS:  I think on July 11th maybe there is a

16     hearing scheduled on Hunter Mountain.  If you recall, Hunter

17     Mountain had that valuation motion last year that you denied

18     on the grounds that they didn't have a legal right to

19     valuation information.  They made a motion earlier this year

20     for leave to file an adversary proceeding to assert an

21     equitable claim and some other declaratory relief, is my

22     recollection.

23         While we filed an opposition, we didn't oppose the relief

24     requested, so that motion got resolved.  They have filed an

25     adversary proceeding.  And I think, if I remember correctly,
```

002364

HCMLPHMIT00003398

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72 Filed 06/27/25   Page 836 of 1011   PageID 2735
Exhibit 72   Page 2387 of 390

386

1    our response to the complaint, maybe that's what due.  Oh, the

2    11th is a status conference.  It could be a status conference,

3    maybe to set a scheduling order.

4              THE COURT:  Okay.

5              MR. MORRIS:  But that's it.  I think that's the only

6    thing on the calendar.

7              THE COURT:  That's a lot.

8              MR. MCENTIRE:  Thank you.

9              THE COURT:  Anything else?  Okay.

10             MR. STANCIL:  Thank you, Your Honor.

11             MR. MORRIS:  Thank you, Your Honor.

12             THE CLERK:  All rise.

13        (Proceedings concluded at 7:18 p.m.)

14                         --oOo--

15

16

17

18

19                      CERTIFICATE

20       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        **06/12/2023**

23   _____        _____

24   Kathy Rehling, CETD-444                        Date
     Certified Electronic Court Transcriber

25

002365

HCMLPHMIT00003399

387

INDEX

PROCEEDINGS                                               3

OPENING STATEMENTS

- By Mr. McEntire                                         67
- By Mr. Morris                                          90
- By Mr. Stancil                                        102
- By Mr. McIlwain                                       106

WITNESSES

Hunter Mountain Investment Trust's Witnesses

James David Dondero
- Direct Examination by Mr. McEntire                    112
  *Voir Dire* Examination by Mr. Morris                 144
- Cross-Examination by Mr. Morris                       158
- Redirect Examination by Mr. McEntire                  201
- Recross-Examination by Mr. Morris                     208

James P. Seery
- Direct Examination by Mr. McEntire                    211
- Cross-Examination by Mr. Morris                       265
- Redirect Examination by Mr. McEntire                  292
- Examination by the Court                              293

Debtors' Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                      302
- Cross-Examination by Mr. McCleary                     313

EXHIBITS

HMIT's Exhibits

Certain Exhibits                            Received 33-40

HMIT's Exhibit 3                             Received 317
HMIT's Exhibit 4                             Received 317
HMIT's Exhibit 4                         Received 140/149
HMIT's Exhibits 7-10                         Received 317
HMIT's Exhibits 12-23                        Received 317
HMIT's Exhibits 26-38                        Received 317
HMIT's Exhibits 29-52                         Carried 317

002366

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-02724-L    Document 4-72    Filed 08/28/25    Page 838 of 1011    PageID 2737
Exhibit 72    Page 288 of 390

388

```
1                              INDEX
                              Page 2
2

3   HMIT'S Exhibits, cont'd.

4   HMIT's Exhibits 39-62                        Carried 37
    HMIT's Exhibits 53-57                       Received 317
5   HMIT's Exhibits 58-63                       Received 321
    HMIT's Exhibit 64                           Received 317
6   HMIT's Exhibit 65                           Received 317
    HMIT's Exhibits 67-70                       Received 317
7   HMIT's Exhibit 71                           Received 318
    HMIT's Exhibit 72                           Received 319
8   HMIT's Exhibit 73                           Received 319
    HMIT's Exhibit 74                           Received 319
9   HMIT's Exhibit 75                           Received 319
    HMIT's Exhibit 76                        Carried 37/321
10  HMIT's Exhibit 77                           Received 319
    HMIT's Exhibit 78                           Received 319
11  HMIT's Exhibit 79                           Received 319
    HMIT's Exhibit 80                Marked 234 Received 320
12

13  Debtors' Exhibits

14  Debtors' Exhibit 2                          Received  44
    Debtors' Exhibit 3                          Received  54
15  Debtors' Exhibit 4                          Received  54
    Debtors' Exhibit 5                          Received  54
16  Debtors' Exhibit 6                          Received  55
    Debtors' Exhibit 7                          Received  56
17  Debtors' Exhibit 8                          Received  57
    Debtors' Exhibit 9                          Received  54
18  Debtors' Exhibit 10                         Received  58
    Debtors' Exhibit 11                         Received  44
19  Debtors' Exhibit 12                         Received  60
    Debtors' Exhibit 13                         Received  60
20  Debtors' Exhibit 14                         Received  63
    Debtors' Exhibit 15                         Received  64
21  Debtors' Exhibits 25-30                     Received  65
    Debtors' Exhibit 30                         Received 272
22  Debtors' Exhibit 31-A                       Received 272
    Debtors' Exhibit 32                         Received 323
23  Debtors' Exhibit 33                         Received 327
    Debtors' Exhibit 34                      Received 44/65
24  Debtors' Exhibit 36                         Received 328
25
```

HCMLPHMIT00003401

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-02724-L   Document 4-72   Filed 230/25   Page 839 of 1011   PageID 2738
Exhibit 72   Page 390 of 390

389

```
 1                              INDEX
                              Page 3
 2
 3   Debtors' Exhibits, cont'd.

 4   Debtors' Exhibit 38                    Received  44/328
     Debtors' Exhibit 39                    Received  44/286
 5   Debtors' Exhibit 40                    Received  44/287
     Debtors' Exhibit 41                    Received  44/284
 6   Debtors' Exhibit 42                        Received   44
     Debtors' Exhibit 45                        Received  174
 7   Debtors' Exhibit 46                        Received   44
     Debtors' Exhibit 51                        Received  308
 8   Debtors' Exhibit 59                        Received  289
     Debtors' Exhibit 60                        Received  272
 9   Debtors' Exhibit 100                         Marked  179

10   Judicial Notice to be Taken                            175

11   CLOSING ARGUMENTS

12
     - By Mr. McEntire                                      329
13   - By Mr. McIlwain                                      354
     - By Mr. Stancil                                       358
14   - By Mr. Morris                                        371
     - By Mr. McEntire                                      379
15
     RULINGS
16
     HMIT's Motion for Leave to File Verified Adversary     382
17   Proceeding (3699) - Taken Under Advisement

18   END OF PROCEEDINGS                                     386

19   INDEX                                              387-389

20

21

22

23

24

25
```

002368

HCMLPHMIT00003402

**EXHIBIT**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## ATLAS IDF GP, LLC

This Limited Liability Company Agreement (this "**Agreement**") of Atlas IDF GP, LLC (the "**Company**") is entered into as of October 29, 2015 by and between the Company and John Honis (the "**Managing Member**", and collectively with any individuals and/or entities who subsequently become members of the Company in the future in accordance with the terms hereof, "**Members**"), pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), as amended from time to time (the "**Act**").

> **Section 1**   **Name**.  The name of the limited liability company governed hereby is Atlas IDF GP, LLC.

> **Section 2**   **Certificates**.   The Managing Member, as an authorized person within the meaning of the Act, has executed, delivered and filed the certificate of formation of the Company (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware on October 29, 2015. Upon the execution of this Agreement, the Managing Member shall thereafter be designated as an authorized person within the meaning of the Act.  Hereafter, the Managing Member shall have the power to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

> **Section 3**   **Purpose**.  The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in all lawful activities for which limited liability companies may be formed under the Act, including, without limitation of the foregoing, serving as the general partner of Atlas IDF, LP, a Delaware limited partnership.

> **Section 4**   **Powers**.  The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Managing Member pursuant to this Agreement.

> **Section 5**   **Principal Business Office**.  The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from 87 Railroad Place, Suite 403, Saratoga Springs, NY 12866, or elsewhere as the Managing Member may from time to time determine.

> **Section 6**   **Registered Office**.  The address of the registered office of the Company in the State of Delaware is:  c/o Stellar Corporate Services LLC, 3500 South DuPont Highway, County of Kent, Dover, Delaware 19901.

> **Section 7**   **Registered Agent**.   The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is:  c/o Stellar Corporate Services LLC, 3500 South DuPont Highway, County of Kent, Dover, Delaware 19901.

> **Section 8**   **Members**. The names, the nature of the interests held, the mailing addresses, the initial capital contributions and the Percentage Interests (as defined below) of the Members are as set

HCMLPHMIT00003511

forth in **Schedule A** attached hereto.

      **Section 9**      **Term**.  The term of the Company commenced on the date of filing of the Certificate of Formation in accordance with the Act and shall continue until dissolution of the Company in accordance with **Section 23** of this Agreement.

      **Section 10**      **Limited Liability**.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, any Officer (as hereinafter defined), employee or agent of the Company (including a person having more than one such capacity) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of acting in such capacity.

      **Section 11**      **Initial Capital Contributions**.  Each Member is deemed admitted as a Member of the Company upon his, her or its execution and delivery of this Agreement.  The initial capital contributions of the Members are set forth on **Schedule A** attached hereto.

      **Section 12**      **Additional Capital Contributions**.  The Members are not required to make any capital contributions to the Company beyond their initial capital contributions, unless otherwise determined by the Managing Member.

      **Section 13**      **Capital Accounts**.  Separate capital accounts shall be maintained for each Member on the books of the Company, which accounts shall set forth the capital of such Member in the Company.  Each capital account shall be adjusted to reflect such Member's share of allocations and distributions as provided in **Sections 14 and 15** of this Agreement, and any additional capital contributions to the Company or withdrawals of capital from the Company.  Such capital accounts shall further be adjusted to conform to the Treasury Regs. under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the Managing Member.

      **Section 14**      **Allocations of Profit and Loss**.  All items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with their percentage interests as set forth on **Schedule A** attached hereto ("**Percentage Interests**").

      **Section 15**      **Distributions**.  Distributions shall be made to the Members at such times and in such amounts as may be determined in the sole discretion of the Managing Member.  Distributions shall be allocated among the Members in accordance with their Percentage Interests.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of their interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

      **Section 16**      **Management**.

      (a)      The business and affairs of the Company shall be managed by the Managing Member. Subject to the express limitations contained in any provision of this Agreement, the Managing Member shall have complete and absolute control of the affairs and business of the Company, and the Managing Member shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

      (b)      Subject to the rights and powers of the Managing Member and the limitations thereon contained herein, the Managing Member may delegate to any person any or all of his powers,

002371

HCMLPHMIT00003512

rights and obligations under this Agreement, and the Managing Member may appoint, contract or otherwise deal with any person to perform any acts or services for the Company as the Managing Member may reasonably determine.

(c)    No Member (other than the Managing Member) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Company except those expressly granted to it by, or pursuant to the terms of, this Agreement, or those conferred on it by law.

(d)    The Managing Member shall hold office until the earliest to occur of his death, disability or other inability to act in such capacity, at which time a successor Managing Member may be appointed by Members owning at least a majority of the Percentage Interests.

**Section 17    Officers.**  The Managing Member may, from time to time as he deems advisable, appoint officers of the Company (the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person.  Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.  Any delegation pursuant to this **Section 17** may be revoked at any time by the Managing Member.

**Section 18    Other Business.**  The Members (including, for the avoidance of doubt, the Managing Member) may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others.  Neither the Company nor any other Member shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

**Section 19    Exculpation and Indemnification.**  The Managing Member shall not be liable to the Company or to the other Members for any action taken or omitted to be taken in connection with the business or affairs of the Company, so long as he acted in good faith and is not found to be guilty of gross negligence or willful misconduct with respect thereto, as determined by a final non-appealable decision of a court of competent jurisdiction.  To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless:  (i) the Managing Member, and (ii) in the discretion of the Managing Member, the Company's managers, shareholders, partners, officers, employees, agents and affiliates and/or the other Members (each, an "**Indemnified Party**") from and against any and all claims, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding related to any action taken or omitted to be taken by any of them in connection with the business and affairs of the Company (including the settlement of any such claim or legal proceeding); *provided, however,* that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final non-appealable decision of a court of competent jurisdiction.  Any indemnity under this **Section 19** shall be provided out of and to the extent of Company assets only, and no Member (including the Managing Member) shall have personal liability on account thereof.

**Section 20    Admission of Additional Members.**  Additional Members may be admitted to the Company only with the written consent of the Managing Member.  The capital contribution required of, and the Percentage Interests assigned to, such newly-admitted Member shall be determined by the Managing Member.

**Section 21    Effect of Bankruptcy, Dissolution, Death or Incompetence of a Member.**  The bankruptcy, dissolution, death or disability of a Member, or an adjudication that such Member is

3

HCMLPHMIT00003513

incompetent (a Member experiencing any such event, a "**Disabled Member**"), shall not cause the termination or dissolution of the Company, and the business of the Company shall continue. If a Member is dissolved or becomes bankrupt, the trustee or receiver of such Disabled Member's estate or, if a Member dies, such Disabled Member's executor, administrator or trustee, or, if such Member is adjudicated incompetent, such Disabled Member's committee, guardian or conservator, or the personal representative of such Disabled Member, as applicable, shall have the rights of such Disabled Member for the purposes of settling or managing such Disabled Member's estate or property and such power as the Disabled Member possessed to dispose of all or any part of such Member's interest in the Company, and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a substitute Member.

> **Section 22**      **Assignments**.   A Member may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited liability company interest without the prior written consent of the Managing Member.

> **Section 23**      **Dissolution**.

>> (a)       The Company shall dissolve, and its affairs shall be wound-up upon the first to occur of the following: (i) the written consent of the Managing Member; (ii) the death, disability, bankruptcy or withdrawal of the Managing Member, in the event no successor managing member is appointed pursuant to **Section 16(d)**; and (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

>> (b)       In the event of dissolution, the Company shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Company in an orderly manner).

> **Section 24**      **Tax Matters Partner**.   John Honis shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code.   All expenses incurred by the tax matters partner in connection with his duties as tax matters partner shall be expenses of the Company.

> **Section 25**      **Elections**.   The Managing Member shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Company or any other method or procedure related to the preparation of such tax returns.   The Managing Member may cause the Company to make or refrain from making any and all elections permitted by such tax laws, and the Managing Member shall not be liable for any consequences to any previously admitted or subsequently admitted Members resulting from making or failing to make any such elections.

> **Section 26**      **Separability of Provisions**.   Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

> **Section 27**      **Counterparts**.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

> **Section 28**      **Entire Agreement**.   This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

002373

HCMLPHMIT00003514

**Section 29**     <u>**Governing Law, Personal Jurisdiction and Venue**</u>. The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines. The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York. The parties irrevocably waive any objections to the personal jurisdiction of these courts. The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement. Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it). The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

**Section 30**     <u>**Amendments**</u>. This Agreement may be modified, altered, supplemented or amended in the sole discretion of the Managing Member.

[<i>remainder of page intentionally left blank</i>]

002374
HCMLPHMIT00003515

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the date first written above.

THE COMPANY:

ATLAS IDF GP, LLC

By: _____
Name:  John Honis
Title:  Managing Member


MANAGING MEMBER:

_____
Name:  John Honis

6

002375

HCMLPHMIT00003516

## Schedule A

### Members of Atlas IDF GP, LLC

### As of October 29, 2015

| NAME | NATURE OF INTEREST | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|------|------|------|------|------|
| John Honis | Managing Member | 87 Railroad Place, Suite 403<br><br>Saratoga Springs, NY 12866 | $100 | 100% |

7

002376
HCMLPHMIT00003517

**EXHIBIT**

002377

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

COUNSEL FOR CLO HOLDCO, LTD., CHARITABLE DAF FUND, LP AND
HIGHLAND DALLAS FOUNDATION, INC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor | § | **Relates to Dkt. No. 2460** |

RESPONSE AND DISCLOSURES RELATED TO THE COURT'S ORDER REQUIRING DISCLOSURES



**002378**

1934054210709000000000015

HCMLPHMIT00003523

CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF Fund, LP ("DAF Fund"), Highland

Dallas Foundation, Inc., ("Highland Dallas Foundation," collectively, the "Charitable

Respondents"), [1] file this *Response* ("Response") and submit these *Disclosures* ("Disclosures") to

comply with the Court's *sua sponte Order Requiring Disclosures* (Dkt. No. 2460) (the

"Disclosures Order").

---

[1]    CLO Holdco and Highland Dallas Foundation have filed a *Motion to Withdraw the Reference* in Adversary Case No. 20-03195 (the "Adversary Proceeding"), at Dkt. No. 24 (in the Adversary Proceeding), and neither the fact nor content of this Response is intended to be nor shall be deemed a waiver of their right to a trial by jury on all claims asserted in the Adversary Proceeding nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court. DAF Fund is also a defendant in the Adversary Proceeding but has not been served. Neither the fact nor content of this Response by DAF Fund is intended to be nor shall be deemed: a waiver of service requirements in the Adversary Proceeding; acceptance of service of citation or summons in the Adversary Proceeding; waiver of its right to a trial by jury on all claims in the Adversary Proceeding (if ever served), nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court (again, if ever served). The Charitable Respondents submit this Response in the Bankruptcy Case solely because the Court has ordered them to do so, and because they have appeared before this Court previously.

002379

HCMLPHMIT00003524

TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................I

TABLE OF AUTHORITIES.....................................................................................................II

PRELIMINARY STATEMENT ................................................................................................1

PROCEDURAL HISTORY........................................................................................................4

RESPONSE...................................................................................................................................7

    I.       The Charitable Respondents are independently owned and controlled charitable organizations. .......................................................................................................7

        a)    CLO HoldCo.......................................................................................................... 9

        b)    DAF Fund .............................................................................................................. 9

        c)    DAF Holdco ........................................................................................................ 10

        d)    DAF GP ............................................................................................................... 11

        e)    The Supporting Organizations .......................................................................... 11

        f)    Mr. Patrick's role............................................................................................... 15

    II.       The Charitable Respondents have donated tens of millions of dollars to charitable causes .......................................................................................................................16

    III.       CLO HoldCo and DAF Fund may be creditors of the Debtor..............................18

    IV.       The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing.................................................20

        a)    The Court does not have the power to require non-parties to provide it with disclosures.......................................................................................................................... 20

        b)    The Court's *sua sponte* investigation into hypothetical standing is improper. .......... 22

        c)    The Disclosures Order is not just improper, it is prejudicial...................................... 26

    CONCLUSION...........................................................................................................................28

002380

HCMLPHMIT00003525

TABLE OF AUTHORITIES

Page(s)

## Cases

*Baum v. Blue Moon Ventures, LLC*,
  513 F.3d 181 (5th Cir. 2008) ............................................... 26

*Berry v. CIGNA/RSI-CIGNA*,
  975 F.2d 1188 (5th Cir. 1992) .............................................. 21

*Brackeen v. Haaland*,
  994 F.3d 249 (5th Cir. 2021) .............................................. 24

*Castro v. United States*,
  540 U.S. 375, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) ......................... 23

*In re Delta Underground Storage Co., Inc.*,
  165 B.R. 596 (Bankr. S.D. Miss. 1994) ..................................... 25

*Franklin v. Laughlin*,
  No. SA-10-CV-1027 XR, 2011 WL 598489 (W.D. Tex. Jan. 13, 2011) ............. 26

*In re Friede Goldman Halter Inc.*,
  600 B.R. 526 (Bankr. S.D. Miss. 2019) .................................... 25

*Greenlaw v. United States*,
  554 U.S. 237 (2008) ...................................................... 23

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.*,
  894 F.2d 696 (5th Cir.1990) .............................................. 22

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
  2 F.3d 1397 (5th Cir. 1993) ............................................. 21, 22

*Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*,
  No. 219CV184FTM99MRM, 2019 WL 3219667 (M.D. Fla. July 17, 2019) ........... 24

*In re Saldana*,
  531 B.R. 141 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R.
  678 (N.D. Tex. 2015) ..................................................... 22

*Sanchez-Llamas v. Oregon*,
  548 U.S. 331 (2006) ...................................................... 23

*Simon v. Taylor*,
  794 F. App'x 703 (10th Cir. 2019) ........................................ 23

002381

HCMLPHMIT00003526

*Thompson v. Gonzales*,
No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436 (E.D. Cal. Sept. 27, 2016) ........................22

*Uberoi v. Labarga*,
769 F. App'x 692 (11th Cir. 2019) .........................................................................................24

*United States v. Sineneng-Smith*,
140 S. Ct. 1575 (2020) ...........................................................................................................23

*Matter of Ward*,
978 F.3d 298 (5th Cir. 2020) ..................................................................................................21

*Wood v. Milyard*,
566 U.S. 463 (2012) ................................................................................................................23

**Statutes**

11 U.S.C. § 101(10) ........................................................................................................................20

11 U.S.C. § 105 ..........................................................................................................5, 20, 21, 24

**Other Authorities**

Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte
Decisions by Appellate Courts*, 69 TENN. L. REV. 245 (2002) .................................................23

Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General
Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832
(2000) ........................................................................................................................................24

Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The
Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR.
L.J. 461, 563 (2002) ................................................................................................................24

002382

HCMLPHMIT00003527

## PRELIMINARY STATEMENT

1. CLO HoldCo, DAF Fund, and Highland Dallas Foundation have each previously filed pleadings in this Court and are, at least arguably, parties to the Bankruptcy Case. As set forth herein, several targets of the Court's Disclosures Order have never made an appearance before this Court including Charitable DAF Holdco, Ltd.[2] ("DAF Holdco"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation"), and Highland Kansas City Foundation, Inc. ("Highland Kansas City Foundation," collectively with DAF Holdco and Highland Santa Barbara Foundation, the "Non-Party Targets").[3] The Court does not have the power to order a non-party to produce documents nor undertake *sua sponte* investigations, particularly into non-parties. The fact that these entities are non-parties and at the same time targets, is telling. Further the Non-Party Targets have not been served with the Disclosures Order.

2. Neither the Charitable Respondents nor undersigned counsel are authorized to make appearances for the Non-Party Targets, and the Non-Party Targets are not by this Response submitting themselves to this Court's jurisdiction. The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Non-Party Targets. Nonetheless, much of the Disclosures provided by the Charitable Respondents on their own behalf will be informative regarding the Non-Party Targets. Further, the Non-Party Targets have provided limited authorization for the

---

[2] Undersigned counsel has been retained to represent DAF Holdco; however, DAF Holdco has never made an appearance in this bankruptcy case and has not been served in the Adversary Proceeding. Nor has DAF Holdco been served with this Disclosures Order. DAF Holdco has not authorized undersigned counsel to accept service nor to make an appearance for it in this Bankruptcy Case.

[3] The Highland Dallas Foundation, the Highland Santa Barbara Foundation, and the Highland Kansas City Foundation are sometimes also referred to as "Supporting Organizations."

1

HCMLPHMIT00003528

Case 19-34054-sgj11 Doc 2475-1 Filed 07/09/20 Entered 07/09/20 12:05:31 Page 7 of 34
Case 3:25-cv-02724-L    Document 74    Filed 08/22/25    Page 855 of 1011    PageID 2754
Exhibit 74    Page 83 of 307

Charitable Respondents, through Mr. Mark Patrick ("Patrick"), to provide the information to the Court that is submitted by the Charitable Respondents in this Response.

3.      Further, the Disclosures Order does not mention the third-party foundation level entities included in the Structure Chart (*infra*) ("Foundations"); however, these Foundations have provided the Charitable Respondents with documents and important information regarding their charitable giving structures and the supporting organizations include the Highland Dallas Foundation and the supporting organizations that are Non-Party Targets.  The fact and content of this Response is not intended to be nor shall be deemed to be an appearance by these Foundations in this Bankruptcy Case, nor submission by them to this Court's jurisdiction.  The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Foundations.

4.      Patrick has provided a declaration regarding the information provided by and/or about the Foundations and the Supporting Organizations, and as provided herein within the Disclosures.  As well, he has reviewed the Response and Disclosures.  *See* **Exhibit 1** [Mark Patrick Declaration]

5.      As set forth herein, contrary to the Court's unsupported and highly prejudicial *sua sponte* assertions that the Charitable Respondents and Non-Party Targets "appear to be under the *de facto* control of Mr. Dondero," the Charitable Respondents and Non-Party Targets (along with the Foundations) make up a legal and viable charitable giving structure, established through a non-byzantine set of entities that has committed over $42 million in grants, and funded $32.5 million, to nonprofits across a wide-range of issues including education, support of military, veterans, and first-responders, and victims of family violence and child abuse.  With respect to Mr. Dondero, of course he is involved, personally in the capacity as the Donor personality.  In addition, as disclosed

2

HCMLPHMIT00003529

within the Disclosures, he holds positions within the Supporting Organizations, which are subject to the authority of the Foundations they support.  As well, and as established by Mr. Patrick's uncontroverted testimony before this Court, Mr. Dondero currently acts as an unpaid investment advisor to CLO HoldCo and DAF Fund.  However, as will be shown Mr. Dondero is not in "de facto" or legal control of the Charitable Respondents nor the Non-Party Targets (nor the Foundations).

6.      The Charitable Respondents take the time to refute the Court's assertions in the Disclosures Order because not only are they factually inaccurate—which will be shown herein and through the submitted Disclosures—but worse, these *sua sponte* findings bear directly upon the causes of action asserted by Official Committee of Unsecured Creditors (the "Committee") against CLO HoldCo, DAF Holdco, DAF Fund, and Highland Dallas Foundation (the "Charitable Defendants") in Adversary Proceeding No. 20-03195 (the "Adversary Proceeding").  While there are several motions to withdraw the reference pending in the Adversary Proceeding, this Court should, at an absolute minimum, refrain from espousing, *sua sponte*, any "findings" or "conclusions" that in fact are indistinguishable from allegations made in conclusory fashion (much like the Court's expositions) by a plaintiff party in litigation currently pending in this Court.  Such an "approach" to exercise of the judicial function (under the notion of maintaining the Court's docket) is, frankly, not recognizable as a constitutional approach to exercise of judicial power.  This Court, it appears has become litigant, investigator and decider, far outside the scope of case or controversy.  Through its assertions the Court appears to have decided integral issues in the Adversary Proceeding *sua sponte* without considering any evidence nor offering the Charitable Defendants any opportunity to present their case, and all this notwithstanding pending motions to

3

002385
HCMLPHMIT00003530

withdraw reference (that the Court has previously stayed over the objection of the Charitable

Defendant movers).

## PROCEDURAL HISTORY

7.     As the Court is aware, there was a show cause hearing on June 8, 2021 (the "Show

Cause Hearing") related to the lawsuit filed by CLO HoldCo and DAF Fund against the Debtor

captioned *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P. et al*., case no.

21-cv-00842, pending in the United States District Court for the Northern District of Texas (the

"District Court Suit").  In the District Court Suit, the plaintiffs filed a motion to amend their

complaint (the "Seery Motion"), and thereafter, the Court issued what it titled: *Order Requiring*

*the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two*

*Court Orders* [Dkt. No. 2255] (the "Show Cause Order") to determine if the "Violators" should

be held in contempt of court for filing the Seery Motion.  The Court ordered the "Violators," as

defined by the Court, including CLO HoldCo and DAF Fund, those persons who authorized the

filing of the Seery Motion and the District Court Suit (and the law firm representing the plaintiffs),

along with Mr. Dondero, to appear at the Show Cause Hearing.

8.     Patrick identified himself as the person who authorized the filing of the Seery

Motion and the District Court Suit and identified that he was vested with such authority by virtue

of his position as the director CLO HoldCo and control person of DAF Fund.  *See* Response, Dkt.

No. 2309.  The Debtor undertook extensive discovery related to the Show Cause Hearing with the

express purpose of attempting to prove that despite Mr. Patrick authorizing the filings and being

the control person of the plaintiffs, Mr. Dondero should nonetheless be held in contempt.

002386

HCMLPHMIT00003531

9.      Therefore, at the Show Cause Hearing, the respondents, including Patrick, introduced evidence reflecting the structure of the Charitable Respondents,[4] the ownership of the Charitable Respondents,[5] and the controlling entities/persons of the Charitable Respondents.[6]  At the Show Cause Hearing, Patrick further provided extensive testimony regarding the creation, structure, organization, purpose, and control of the Charitable Respondents. *See* **Exhibit 2** [Transcript, June 8, 2021 Hearing, Excerpts].

10.     On June 17, 2021, the Court issued its Disclosures Order *sua sponte* pursuant to Section 105 of the Bankruptcy Code and its "inherent ability to efficiently monitor its docket and evaluate standing of parties who ask for relief in the [Bankruptcy Case]." Disclosures Order, p. 1.

11.     Importantly, the Disclosures Order does not relate to and was not issued in connection with any contested matter or adversary proceeding before the Bankruptcy Court. Instead, the Court states that the Disclosures Order is "in furtherance of [its] desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings." Disclosures Order, p. 12.  As such, the Court appears to be attempting to ascertain some sort of generalized standing where there is no proceeding before it and contemplating the issuance of  pre-filing injunctions against the Charitable Respondents and Non-Party Targets.

12.     Based on the forgoing, the Disclosures Order requires numerous parties (whether before the Court or not), including the Charitable Respondents and Non-Party Targets, to file a notice in the Bankruptcy Case disclosing: (a) who owns the entity (showing percentages); (b)

---

[4] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 1)

[5] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 9, 10, 11, 12, 15, 16, 17, 18, 19, 20)

[6] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 3, 4, ,5, 6, 7, 8, 29)

002387

HCMLPHMIT00003532

whether Mr. Dondero or his family trusts have either a direct or indirect ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity (this itself looks to be a determination by this Court of "relationship" with damaging consequences); and (d) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims).

13.     The Disclosures Order does not even pretend to be concerned with such mundane matters as proper service, or the right of parties not before the Court, even if creditors, to remain outside the Court.  Certainly the Court does not exhibit a glimpse of concern about possible limitations upon the judicial power to compel parties to appear before it.  Because of its assertions concerning Mr. Dondero's "de facto control" of third party entities (again, outside of any pending case or controversy and in fact contrary to evidence put before the Court), the Court has (i) dispensed with case or controversy boundaries, and (ii) sent its Disclosures Order into the universe as an all-powerful compulsion imposed upon entities that have never made appearance before the Court - all without service.  All because this Court has concluded that these third parties are controlled by Mr. Dondero, and because this Court has power over Mr. Dondero, it need not think twice about its power over any entity it has determined (without ground) to be controlled by Mr. Dondero because such party may have some relation to Mr. Dondero.

14.     As mentioned above, the Charitable Respondents are responding.  But the entities outside the scope of the Court's authority are not appearing in Response.  As set forth below, the Charitable Respondents believe this Response and the Disclosures provided herein are sufficient and compliant.  The Charitable Respondents reserve all rights.

002388

HCMLPHMIT00003533

**RESPONSE**

15.    The Charitable Respondents file their Response to the Disclosures Order to comply with it, but with full reservations concerning the propriety of such a *sua sponte* investigation into standing where there is no proceeding before the Court and the prospective issuance of pre-filing injunctions against parties who have never participated in the Bankruptcy Case (i.e. the Non-Party Targets), or have only do so on a limited basis or were compelled to by order of the Court (i.e. the Charitable Respondents).

16.    The Charitable Respondents have already provided the Debtor and the Court with much of the information ordered by the Court, and do so again and more robustly herein, to show to the Court that the Charitable Respondents are not "under the *de facto* control of Mr. Dondero" and its directors do not act "at Mr. Dondero's direction."  *See* Disclosures Order, pp. 5, 11.

17.    The Charitable Respondents, however, take this opportunity to correct any misunderstanding regarding their structure and control, while noting and reserving all rights regarding the impropriety of such prejudicial *sua sponte* assertions.

**I.    The Charitable Respondents are independently owned and controlled charitable organizations.**

18.    The best starting point to understand the structure of the Charitable Respondents is the Structure Chart attached hereto as **Exhibit 3** ["Structure Chart"].  For ease of reference, the Structure Chart is reproduced as follows:

7

**002389**

HCMLPHMIT00003534



19.    Second, the Charitable Respondents provide the Court with a legal memorandum of Kenneth K. Bezozo, a partner with Haynes and Boone, LLP, determined by the Charitable Respondents to be a legal expert in the field of taxation and organizational structures. *See* **Exhibit 4** [Kenneth K. Bezozo Memorandum].  As the Bezozo Memorandum explains, the Structure Chart and the entity structure of which the Charitable Respondents are a part (along with the Supporting Organizations and the Foundations) is a structure including offshore entities that is a typical industry standard investment structure to facilitate tax-exempt ownership and charitable giving.  Given that the structure employed is in fact, within the tax-exempt, charitable entity structures neither unusual nor exotic, the Charitable Respondents submit that contrary to the jargon appropriated by the Court from the Committee and the Debtor and its counsel, this structure is not at all "Byzantine."

002390
HCMLPHMIT00003535

**The Entities**

    **a) CLO HoldCo**

    20.    As the Structure Chart reflects, CLO HoldCo is a company limited by shares incorporated in the Cayman Islands. *See* **Exhibit 5** [Certificate of Incorporation - CLO HoldCo, Ltd.]. CLO HoldCo was incorporated in 2010. *See* **Exhibit 6** [Memorandum of Association of CLO HoldCo, Ltd.]. CLO HoldCo is managed and controlled by directors who are appointed by resolution of shareholders of CLO HoldCo. *See* Memorandum of Association of CLO HoldCo, Ltd., p. 11-12 ("Directors"). The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 36** [CLO HoldCo - Register of Directors].

    21.    CLO HoldCo is owned by the holder of its sole share. The sole shareholder of CLO HoldCo was previously DAF Holdco who contributed the share on November 7, 2011 to DAF Fund. *See* **Exhibit 7** [Ordinary Share Registry - CLO HoldCo]. Therefore, CLO HoldCo is wholly owned by DAF Fund.[7]

    **b) DAF Fund**

    22.    DAF Fund is a limited partnership organized under the laws of the Cayman Islands. *See* **Exhibit 8** [Certificate of Registration of Exempted Limited Partnership - DAF Fund]. Pursuant to the *Amended and Restated Exempted Limited Partnership Agreement dated November 7, 2011* (the "DAF Fund LP Agreement"), DAF Holdco is the limited partner of the DAF Fund and the Charitable DAF GP, LLC ("DAF GP") is the general partner. *See* **Exhibit 9** [DAF Fund

---

[7]    While not appearing on the Structure Chart, nor made subject of the Disclosures Order, there are subsidiaries of CLO HoldCo as well, and these are named, with corresponding ownership and director exhibits identified as follows: (i) Liberty CLO Holdco, Ltd. (*see* **Exhibits 38 and 39** [Register of Directors and Share Register]); (ii) MGM Studios HoldCo, Ltd. (*see* **Exhibits 40 and 41** [Register of Directors and Share Register]); (iii) HCT HoldCo 2, Ltd. (*see* **Exhibits 42 and 43** [Register of Directors and Share Register]). Note, Dondero holds no directorship or ownership.

9

002391

HCMLPHMIT00003536

Case 1:23-cv-00345-sgj11 Doc 254255-4 07 Filed 06/20/25 Entered 06/20/23 21:39:20 Desc
Case 3:25-cv-02724-L    Document 74    Filed 06/06/25    Page 863 of 1011    PageID 2762
Exhibit 74    Page 36 of 307

LP Agreement]. Pursuant to the terms of the DAF Fund LP Agreement, DAF Holdco contributed its equity interest in CLO HoldCo to DAF Fund pursuant to a Contribution and Transfer Agreement dated November 7, 2011. Ordinary Share Class Transfers - CLO HoldCo; DAF Fund LP Agreement, ¶3.1.

23. The express purpose of DAF Fund is and always was to invest and trade in securities of all type and other investment vehicles for the purpose of befitting, direct and indirectly, the indirect equity owners of DAF Holdco, which were required to be Section 501(c)(3) of the IRS Code entities or organizations or have sole beneficiaries which are entities or organizations exempt from taxation under Section 501(c)(3) of the IRS Code. *See* DAF Fund LP Agreement, ¶1.3.

24. Because DAF Fund is a limited partnership, the DAF GP has the exclusive and complete discretion in the management and control of the DAF Fund. DAF Fund LP Agreement, ¶1.6, **Exhibit 10** [DAF Fund General Partner Register].

### c) DAF Holdco

25. DAF Holdco is a company limited by shares incorporated under the laws of the Cayman Islands. See **Exhibit 11** [Amended and Restated Memorandum of Association of DAF Holdco]. DAF Holdco's equity ownership consists of holders of Management and Participating Shares. *Id*. The Management Shares confer no right to participate in profits but rather to manage DAF Holdco, whereas Participating Shares confer the right to participate in profits or assets but not management rights. *Id*.

26. The Management Shares of DAF Holdco were allotted to Grant Scott ("Scott") in 2011 but as will be discussed herein, were transferred to Patrick in 2021. *See* **Exhibit 12** [Register of Management Shares DAF Holdco]. The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 37** [DAF Holdco - Register of Directors]. The Participating Shares of DAF

002392

HCMLPHMIT00003537

Holdco are held by the "Supporting Organizations," which are Highland Kanas City Foundation [32.78%], Highland Dallas Foundation [32.78%], Highland Santa Barbara Foundation [32.78%], and Highland Community Foundation of North Texas [1.63%].[8]  *See* **Exhibit 13** [Register of Participating Shares DAF Holdco].

27.     As set forth in the DAF Fund LP Agreement, DAF Fund's investments are for the benefit of the equity owners of  DAF Holdco which were required to be non-profit organizations. The Supporting Organizations are those non-profit organizations.

   **d)  DAF GP**

28.     DAF GP is a limited liability company organized under the laws of Delaware.  *See* **Exhibit 14** [Certificate of Formation of DAF GP].  Again, DAF GP is the general partner of DAF Fund who manages and controls DAF Fund.  Prior to March 2021, 100% of the limited liability company interests in the DAF GP (the "DAF GP Membership Interests") were held by Mr. Scott. Mr. Scott transferred all of the DAF GP Membership Interests to Mr. Patrick.  **Exhibit 15** [Assignment and Assumption of Membership Interests Agreement Dated March 24, 2021].

29.     As shown by the Exhibits hereto, Dondero holds no ownership, officer, or director status in any of:  CLO HoldCo; DAF Fund; DAF HoldCo; or DAF GP.

   **e)  The Supporting Organizations**

30.     As mentioned, the Supporting Organizations are Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and Highland Community Foundation of North Texas.  These Supporting Organizations were established by the Foundations.

_____

[8]     The Court has not included Highland Community Foundation of North Texas in its Disclosures Order.

11

002393

HCMLPHMIT00003538

- **Highland Dallas Foundation**

31.     Highland Dallas Foundation is a corporation incorporated in 2011 under the laws of Delaware. **Exhibit 16** [HDF Certificate of Incorporation]. The Highland Dallas Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code. **Exhibit 17** [IRS Determination - HDF].

32.     The Highland Dallas Foundation supports and benefits the Dallas Foundation. *See* HDF Certificate of Incorporation, **Exhibit 18** [Narrative Description of Activities]. The Dallas Foundation is a third-party and is the oldest community foundation in Texas.

33.     As set forth in the attached letter from the President and Chief Executive Officer of the Dallas Foundation, the Dallas Foundation is a Texas nonprofit corporation, and is the successor in interest to Dallas Community Trust, a charitable trust which was formed in 1929. **Exhibit 19** [reserved for supplementation]. The Dallas Foundation has hundreds of donors with whom it works regularly to make charitable grants supporting numerous worthy causes and regularly utilizes donor-advised funds and supporting organizations to carry out its charitable mission. *Id.*

34.     The Highland Dallas Foundation is a membership corporation, and its members have the ultimate authority to elect its Board of Directors. *Id.* **Exhibit 20** [HDF Bylaws]. The Highland Dallas Foundation has two (2) classes of members, an "Institutional Member" (the TDF), and an "Individual Member" (Mr. Dondero). *Id.*

35.     The Institutional Member has two (2) votes and the Individual Member has only one (1) vote on any matter submitted to the members. *Id.* Further, the Institutional Member elects two (2) of Highland Dallas Foundation's three (3) directors, and the Individual Member elects one (1) director. *Id.* The Board of Directors of Highland Dallas Foundation consists of Mr. Dondero, Julie Diaz (Chief Philanthropic Partnerships Officer of TDF) and Matthew Randazzo (President

002394

HCMLPHMIT00003539

& Chief Executive Officer of Dallas Foundation).  Mr. Dondero serves as President, Mr. Randazzo

serves as Vice President and Ms. Diaz serves as Secretary and Treasurer.

36.    So while Mr. Dondero is a member with some level of influence within the

Highland Dallas Foundation, he has 1/3 of the voting power, where TDF employees have 2/3 of

voting power.

37.    The Highland Dallas Foundation is an independent supporting organization of the

Dallas Foundation.  While Mr. Dondero is on the Board of Directors and is President of the

Highland Dallas Foundation, it cannot be said to be "under the control" (de facto or otherwise) of

Mr. Dondero, because of the control of the Board of Directors held by the Dallas Foundation.

- **Highland Santa Barbara Foundation**

38.    The Highland Santa Barbara Foundation was formed in November 2011 as a

Delaware nonprofit nonstock corporate to operate exclusively for the benefit of, to perform the

functions of, or carry out the purposes of Santa Barbara Foundation.  See **Exhibit 21** [HSBF

Certificate of Incorporation]; **Exhibit 22** [IRS Determination - HSBF].

39.    The Santa Barbara Foundation is a third-party community foundation incorporated

in 1928 as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through

philanthropy.  **Exhibit 23** [SBF Letter Overview].  The Santa Barbara Foundation funds a wide

range of initiatives, projects, and organizations and has supported nearly every Santa Barbara

County nonprofit organization and essential community sproject during its 93-year history.  *Id.*

40.    Similarly to the Dallas Foundation, the Santa Barbara Foundation works with

entities organized under Section 509(a)(3) of IRS Code as supporting organizations to Santa

Barbara Foundation for the specific and primary purpose of benefiting, performing functions of,

002395

HCMLPHMIT00003540

and engaging in activities consistent with Santa Barbara Foundation's charitable purposes. *Id.* Highland Santa Barbara Foundation is one such supporting organization. *Id.*

41.     Again as is common amongst supporting organizations, Highland Santa Barbara Foundation has two classes of members, institutional and individual, and one member in each class. *Id., see also* Bylaws HSBF. Santa Barbara Foundation is the institutional member and Mr. Dondero is the individual member. Highland Santa Barbara Foundation has three directors, two elected by SBF and one elected by Mr. Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors. *Id.* The directors are Mr. Dondero, Jacqueline M. Carrera (President & CEO of SBF), and Arnold Brier (Santa Barbara County community volunteer). Currently, Mr. Dondero serves as President, Jacqueline M. Carrera as Vice President, and the Secretary position is vacant pending board of directors election.

42.     Again, while Mr. Dondero positions in the Highland Santa Barbara Foundation, it is certainly not under his "de facto" control, nor do the other directors and officers act under Mr. Dondero's direction. The Highland Santa Barbara Foundation is an independent supporting organization of the Santa Barbara Foundation, and is controlled by the Santa Barbara Foundation. Imputing a lack of independence based on what is a typical structure for supporting organization management sets a unwarrantable precedent for charitable organizations.

- **Highland Kansas City Foundation**

43.     Highland Kansas City Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code, and to support and benefit the Greater Kansas City Community Foundation ("GKCCF"). *See* **Exhibit 24** [GKCCF Certificate of Formation].

14

HCMLPHMIT00003541

44.     The Greater Kansas City Community Foundation was created in 1978 and manages over $4 billion in assets, and again uses donor-advised funds and supporting organizations.  *See* **Exhibit 25** [GKCCF Letter].   As explained by the President & CEO of Greater Kansas City Community Foundation, Highland Kansas City Foundation is one of 18 supporting organizations that Greater Kansas City Community Foundation works with.  *Id*.

45.     Highland Kansas City Foundation has two classes of members, institutional and individual, and one member in each class.  *See* **Exhibit 26** [Bylaws HKCF].  Greater Kansas City Community Foundation is the institutional member and Mr. Dondero is the individual member.

46.     The Directors of Highland Kansas City Foundation are: Brenda Chumley (Senior Vice President of Greater Kansas City Community Foundation), Mr. Dondero, and Deborah Wilkerson (the President & CEO of Greater Kansas City Community Foundation).  The Highland Kansas City Foundation has not named officers. All three directors approve grants by unanimous consent.

### f)  Mr. Patrick's role

47.     Prior to March 24, 2021, Mr. Scott was the holder of Management Shares in the DAF Holdco.  On March 24, 2021, Mr. Scott executed the *Share Transfer Form*, in which he transferred the management shares in DAF Holdco to Mr. Patrick.  **Exhibit 27** [Share Transfer Form].  Further on March 24, 2021, Mr. Scott and Mr. Patrick entered into that certain *Assignment and Assumption of Membership Interest* whereby Mr. Scott assigned and Mr. Patrick assumed one hundred percent of the limited liability company interest in the DAF GP.  *See* Assignment and Assumption Agreement.

48.     As the holder of the management shares in DAF Holdco, Mr. Patrick executed a resolution removing Mr.  Scott as Director and appointing Mr. Patrick as Director.  **Exhibit 28** [March 25 Resolution - DAF Holdco].

15

HCMLPHMIT00003542

49.     On April 2, 2021, Mr. Patrick, as holder of one hundred percent of the interest in DAF GP, executed the shareholder resolution removing Mr. Scott as Director of CLO HoldCo and appointing Mr. Patrick as director.  **Exhibit 29** [April 2 Resolution - CLO HoldCo].

50.     While on paper the switch from Mr. Scott to Mr. Patrick was completed, it became obvious that this switch would be practically more complicated.  Therefore, there was a transitional period wherein Mr. Scott had to continue to authorize certain actions with Mr. Patrick assisting him.  As of the date of filing, Mr. Scott no longer has authority/ control over the Charitable Respondents.

51.     After Mr. Patrick's appointment, he determined that given the breadth of issues facing the Charitable Respondents, including but not limited to the Adversary Proceeding, it would be in the best interest of DAF Holdco, CLO HoldCo and others for another director to be appointed. As such, on April 22, 2021, Paul Murphy was appointed a director of DAF Holdco and CLO HoldCo.  **Exhibit 30** [Written Resolution - Murphy].

## II.     The Charitable Respondents have donated tens of millions of dollars to charitable causes

52.     The Court included the Charitable Respondents and Non-Party Targets as part of what it terms — borrowing from the Committee's verbiage in the Adversary Proceeding — Mr. Dondero's "byzantine" empire and made *sua sponte* assertions regarding their lack of independence and Mr. Dondero's "de facto" control.  Again, as will be set forth herein, these findings are procedurally improper and highly prejudicial to the Charitable Defendants.  But most importantly, they are wrong.

53.     The Charitable Respondents are part of a charitable structure that donates tens of millions of dollars to charitable causes focusing on education; support for military, veterans, and

002398
HCMLPHMIT00003543

first responders; health and medical research; economic and community development initiatives; and youth and family. *See* **Exhibit 31** [Charitable Giving Overview, Grant Summary: 2012-2020].

54.     Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations, and have funded $32 million of the total commitments (with the remaining commitments being comprised of future scheduled installments). *Id.*

55.     The Supporting Organizations' charitable giving has made a tangible impact on some of the most vulnerable including grants to the Dallas Children's Advocacy Center which serves over 8,000 abused children a year and The Family Place which serves more than 11,000 victims of family violence. *Id.* The CEO of The Family Place has submitted a letter in support which is attached hereto as **Exhibit 32** [The Family Place Letter]. The Family Place empowers victims of family violence by providing safe housing and counseling, and identifies its partnership with the Highland Dallas Foundation as "instrumental" in providing community exposure and awareness of domestic violence as well as providing essential services to family violence victims. *Id.* As stated by the CEO, The Family Violence Place would not be able to successfully serve its domestic violence clients without this support.

56.     Cristo Rey Dallas also submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 33** [Cristo Rey Letter]. Cristo Rey Dallas provides college preparatory high school curriculum accessible to those of limited financial resources. Highland Dallas Foundation provided impactful donations which allow Crito Rey Dallas to provide services to its 465 students, including funding work study programs and remote work places during COVID-19 pandemic. *Id.*

57.     Dallas Children's Advocacy Center submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 34** [DCAC Letter]. Dallas Children's

17

002399

HCMLPHMIT00003544

Advocacy Center's mission is to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues. *Id.* Highland Dallas Foundation has robustly supported this mission since 2016, including providing funding that has been critical to the sustainability of its programs. *Id.*

58.     The Supporting Organizations' grants to the Center for BrainHealth helped provide and training other programming to members of the military, veterans, and local law enforcements to improve their congestive health. *See* Charitable Giving Overview.

59.     The Friends of the Dallas Police grants show appreciation to men and women who risk their lives every day to make Dallas a safer city and the Supporting Organizations have funded awards programs and educational sponsorships for children of police officers. *Id.*

60.     The Charitable Respondents invite the Court, and others who have characterized the Supporting Organizations as mere "puppets" of Mr. Dondero, to review the Charitable Giving Overview provided herewith as well as the letters in support from The Family Place, Cristo Rey Dallas, Dallas Children's Advocacy Center,  the Santa Barbara Foundation, and the Highland Kansas City Foundation.  The Charitable Respondents have and will continue to make meaningful impacts on the communities they serve through the tens of millions of dollars of philanthropic giving they facilitate.

**III.     CLO HoldCo and DAF Fund may be creditors of the Debtor**

61.     In the Disclosures Order, the Court requires all entities to state whether the entity is a creditor of the Debtor and explain in reasonable detail the amount and substance of its claims. Disclosures Order, p. 13.

62.     All claims bar dates have long since passed [*see* General Claims Bar Date Order [Dkt. No. 498].

002400
HCMLPHMIT00003545

63.     The Court states that CLO HoldCo filed two proofs of claim.  Disclosures Order,
p. 11.  This is not correct.  CLO HoldCo filed a proof of claim on April 8, 2020 [Proof of Claim
No. 133] and on October 21, 2021, CLO HoldCo amended that same proof of claim [Proof of
Claim No. 198] (the "Amended Proof of Claim").  In the Amended Proof of Claim, CLO HoldCo
explained that as a result of certain proceedings that effectuated a termination of the Debtor's
participation interests in the funds referred to in the CLO HoldCo proof of claim, such termination
served to cancel the CLO HoldCo interests, as well, as the CLO HoldCo interests were in effect
derivative of the Debtor's interests.  Accordingly, the Amended Proof of Claim reflected that the
CLO HoldCo claim was reduced to $0.00, and therefore resolved.

64.     The Court stated in the Disclosures Order that it was unaware of whether DAF
Holdco, DAF Fund, Highland Dallas Foundation, Highland Santa Barbara Foundation, or
Highland Kansas City Foundation filed proofs of claims (notwithstanding this "uncertainty" the
Court deemed it appropriate nevertheless to try to compel appearance).  Disclosures Order, p. 11.
A review of the Court's Claims Register and that of the Debtor's claims and noticing agent reflects
that none of these entities filed proofs of claim against the Debtor.

65.     Therefore, none of the Charitable Respondents are pre-petition creditors of the
Debtor, as the claims bar date has long since passed and no claims were filed which have not been
fully resolved.

66.     It is unclear from the Disclosures Order whether the Court is referring to the term
"creditor" as defined in section 101(10) of the Bankruptcy Code or using creditor as a lay term.  If
it is the former, the Charitable Respondents are not creditors of the Debtor.  *See* 11 U.S.C. §
101(10) (defining a "creditor" an entity that has a claim against the debtor that arose at the time of
or before the order for relief concerning the debtor).

002401

HCMLPHMIT00003546

67.    As the Court is aware from the Show Cause Hearing, CLO HoldCo and DAF Fund filed the District Court Suit against the Debtor.  The causes of action asserted by CLO HoldCo and DAF Fund arose after the  order for relief.  **Exhibit 35** [Complaint].  The substance of these claims is set forth in the Complaint.

### IV.    The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing.

68.    The Charitable Defendants have fully complied with the Court's Disclosures Order and provided the Court with complete information regarding: (a) who owns each entity, (b) whether Mr. Donerdo or his family trusts have direct or indirect ownership, (c) who the officers, directors, and managers are, and (d) whether the entity is a creditor of the Debtor.  The Charitable Defendants have done so because they were expressly ordered by the Court do; however, the Disclosures Order is procedurally improper and highly prejudicial.

### a)    The Court does not have the power to require non-parties to provide it with disclosures.

69.    The Charitable Defendants are those named entities who have made appearances before this Court.  The Court does not have the power to order production or disclosures from non-parties including the Non-Party Targets.

70.    In the Disclosures Order, the Court states that the order is issued "*sua sponte* pursuant to Section 105 of the Bankruptcy Code and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties who ask for relief in the above-referenced case." Disclosures Order, p. 1.  But yet, the Disclosures Order goes on to target entities who have never asked for the relief in the Bankruptcy Case.

71.    Of course, it is undisputed that the Court has the inherent power to manage its own docket "to ensure the orderly and expeditious disposition of cases." *Berry v. CIGNA/RSI-CIGNA*, 975 F.2d 1188, 1191 (5th Cir. 1992) (quoting *Link v. Wabash R.R. Co*., 370 U.S. 626, 630-31

002402

HCMLPHMIT00003547

(1962)).  But this inherent authority is limited, as is the Court's authority pursuant to section 105 of the Bankruptcy Code.  *Matter of Ward*, 978 F.3d 298, 303 (5th Cir. 2020) (noting that "the powers afforded to bankruptcy courts pursuant to § 105, however, are not unlimited").

72.  In *Energy Gathering*, the Fifth Circuit considered whether the district court could *sua sponte* order a party's attorney, a non-party to the case, to produce documents.  *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc*., 2 F.3d 1397, 1412 (5th Cir. 1993).  In that case, the district court found that the attorney had purposefully withheld documents from the court, and "ordered [him] to produce every document in his possession relating to [his client] or business he had done with [his client]."  *Id*. at 1404. The district court did not explain the source of its perceived authority to do so.  *See id*. at 1405.

73.  On appeal by the attorney, the plaintiffs asserted that the district court had the inherent authority to order him to produce documents. *Id*. at 1406.  The Fifth Circuit disagreed with the plaintiffs.  *See id*. at 1408-09. Specifically addressing whether the district court had the inherent authority to issue its order, the Fifth Circuit acknowledged that the district court had certain limited power "to conduct discovery not recognized by rule or statute," observing that federal courts "possess[ ] all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion." *Id*. at 1409.  The Fifth Circuit suggested that the district court had the inherent authority to order the attorney to produce documents—if at all—under its power to issue a "bill of discovery," a common law "chancery tool" that the Supreme Court has described as "the forerunner of all modern discovery procedures." *Id*. at 1409.  But recognizing that bills of discovery "could not be used to obtain documents (or other discovery) from someone who was not a party," the Fifth Circuit

002403

HCMLPHMIT00003548

therefore concluded that district courts do not have the inherent authority to order non-parties to produce discovery. *Id.*

74.     Important here, the Fifth Circuit noted the impropriety of the *sua sponte* investigation by the district court. *Id.* at 1411 (noting "factors [that] contribute to the order's unreasonableness" as being the *sua sponte* nature of the order and that the "court engaged in a fishing expedition"). Expressly relying upon the *Energy Gathering* opinion, the court in *Thompson v. Gonzales* determined that the court lacked inherent authority to order disclosures from non-parties. *Thompson v. Gonzales*, No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436, at *8 (E.D. Cal. Sept. 27, 2016).

**b)   The Court's *sua sponte* investigation into hypothetical standing is improper.**

75.     As the Fifth Circuit noted in *Energy Gatherings* and this Court and others numerous have many times since, inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc*., 894 F.2d 696, 702 (5th Cir.1990); *In re Saldana,* 531 B.R. 141, 166 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015).

76.      Here, the Court has launched a *sua sponte* investigation into parties under the stated purpose of evaluating their hypothetical standing.

77.     The American adversarial system differs from its European (and other) inquisitorial counterparts in that its central features are "party presentation of evidence and arguments" for resolution before a "neutral and passive decision maker[]." Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245, 272 & n.143 (2002); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *Wood v. Milyard*, 566 U.S. 463, 472 (2012).

002404

HCMLPHMIT00003549

78.     The judge "does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006) (quotation omitted). Thus,"[i]t is normally incumbent on each party to prove its claims," and a *sua sponte* investigation upsets the normal burden of persuasion between the parties." Domitille Baizeau and Tessa Hayes, *The Arbitral Tribunal's Duty and Power to Address Corruption Sua Sponte*, in Andrea Menaker (ed), International Arbitration and the Rule of Law: Contribution and Conformity, ICCA Congress Series, Volume 19, pp. 225 -265.

79.     Thus, federal courts have been instructed to restrain from conducting such an inquest which is antithetical to the American adversarial system. *Simon v. Taylor*, 794 F. App'x 703, 718 (10th Cir. 2019) (noting that scientific evidence involving environmental contamination from the district court's own *sua sponte* investigation cannot be considered); *Wood*, 566 U.S. at 472 ("federal court does not have carte blanche to depart from the principle of party presentation basic to our adversary system"); *Castro v. United States*, 540 U.S. 375, 381–383, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).

80.     The Court asserts that it launched its investigation because standing is an issue of subject matter jurisdiction and that it must gain "clarity" with regard to standing. Disclosures Order, p. 2.  But what the Court proposes to do is render an impermissible advisory opinion on the hypothetical standing of the various entities, including some of have never filed a pleading in the Bankruptcy Case.  How can this Court have blanket power to compel investigation of entities that have never made appearances before the Court, or that have only been made parties because they have been sued, on the purported ground it needs to investigate standing?  As shown here, it cannot.

002405
HCMLPHMIT00003550

Case 1:23-cv-40534-...11 Doc 25 42 55-4 07 FD 06/20/25 ed En 06/20/23 21:39:29 Desc  
Case 3:25-cv-02724-L    Document 74    Filed 06/30/25    Page 877 of 1011    PageID 2776  
Exhibit 74    Page 30 of 307

81.     A bankruptcy case itself is not a justiciable controversy; rather, it is the individual proceedings (contested matters or adversary proceedings) which create a justiciable case or controversy.[9]  Here, there is no proceeding, and instead, the Court expressly stated that it will determine standing *sua sponte* pursuant to section 105 of the Bankruptcy Code.  While this general rule of justiciablity standing alone would prohibit such a determination, evaluating a party's hypothetical standing absent a justiciable controversy is acutely problematic.  *See Uberoi v. Labarga*, 769 F. App'x 692, 697 (11th Cir. 2019) ("The Court should not speculate concerning the existence of standing."); *Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*, No. 219CV184FTM99MRM, 2019 WL 3219667, at *2 (M.D. Fla. July 17, 2019) (noting that advisory opinions on standing are improper).

82.     This is because "standing is not dispensed in gross," rather, standing must be established for each claim a party seeks to press and for each form of relief that is sought.  *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021) (quoting *Town of Chester v. Laroe Estates, Inc.*, — — U.S. ——, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) and *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)).

83.     This is rule is no less applicable in a bankruptcy case.  The Bankruptcy Code does not define "party in interest," offering instead a non-exclusive list of who "may raise and may appear and be heard on any issue" in cases under chapter 11.  *In re Friede Goldman Halter Inc.*,

---

[9]     Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000); Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002) (explaining that: "the appropriate constitutional explanation for the entirety of federal bankruptcy jurisdiction materializes only when one recognizes that the fundamental jurisdictional unit in bankruptcy is an individual bankruptcy 'proceeding' raising a justiciable controversy between adverse parties.").

002406

HCMLPHMIT00003551

600 B.R. 526, 530–31 (Bankr. S.D. Miss. 2019). "The lack of definition was intentional." *In re*

*Delta Underground Storage Co., Inc.*, 165 B.R. 596, 598 (Bankr. S.D. Miss. 1994).

84. Congress' failure to define a party in interest specifically was discussed by both

Senator DeConcini and Representative Edwards during the proceedings preceding the enactment

of the Code. Senator DeConcini stated:

> Rules of bankruptcy procedure or court decisions will determine who is a party in
> interest **for the particular purposes of the provision in question.**' 124 Cong.Rec.
> § 12407 (daily ed. Oct. 6, 1978).... Party in interest is an expandable concept
> **depending on the particular factual context in which it is applied**.

*Id.* (citing *In re North American Oil & Gas, Inc.*, 130 B.R. 473, 479 (Bankr.W.D.Tex.1990))

(emphasis added). Congress has thus expressly directed that standing in a bankruptcy case must

be determined in the particular proceeding before the bankruptcy court.

85. But here, there is no "particular purpose" or "particular factual context" in which

this Court can properly evaluate party in interest standing. Instead, it appears that the Court

proposes to render an advisory opinion on the named entities' standing to file pleadings without

any requisite justiciable controversy before it. But none of this makes sense, with respect to entities

not before the Court or only before the Court in capacity as defendants. In fact the Disclosures

Order appears to be more of an investigation to find evidence that the Court could point to as

supporting its assertions about Dondero's *de facto* control.

86. Additionally, the Court further states that beyond determining the hypothetical

standing of such parties, it also must "ascertain whether their interests are sufficiently aligned such

that the parties might be required to file joint pleadings hence forth, rather than each file pleadings

that are similar in content." Disclosures Order, p. 1. What the Court is describing are pre-filing

injunctions, which "are an extreme remedy" that courts should not issue "with undue haste because

such sanctions can tread on a litigant's due process right of access to the courts." *Franklin v.*

002407

HCMLPHMIT00003552

*Laughlin*, No. SA-10-CV-1027 XR, 2011 WL 598489, at *7 (W.D. Tex. Jan. 13, 2011), *report
and recommendation adopted*, No. SA-10-CV-1027-XR, 2011 WL 672328 (W.D. Tex. Feb. 15,
2011).

87.    Specifically, the Fifth Circuit has explained that:

"In determining whether it should impose a pre-filing injunction or should modify
an existing injunction to deter vexatious filings, a court must weigh all the relevant
circumstances.  Four factors must be specifically considered: (1) the party's history
of litigation, in particular whether he has filed vexatious, harassing, or duplicative
lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or
simply intended to harass; (3) the extent of the burden on the courts and other
parties resulting from the party's filings; and (4) the adequacy of alternative
sanctions.

*Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008).

88.    What is more, this purported reason makes no sense, as multiple entities the Court
seeks to compel have never made an appearance and the Court has no basis to even suspect that
they might make an appearance.  With respect to parties who have filed pleadings, for example the
Charitable Defendants, the Court already knows that Highland Dallas Foundation and CLO
HoldCo have filed joint pleadings within the Adversary Proceeding (a single motion to dismiss for
failure to state claims and a single motion to withdraw reference). The Non-Party Targets are
nowhere to be found within the Bankruptcy Case or any proceedings before the Court; yet the
Court must conduct an investigation into these entities to see whether to compel the filing of joint
pleadings?  Cannot be.

### c)    The Disclosures Order is not just improper, it is prejudicial.

89.    As this Court is aware, the Charitable Defendants are defendants in the Adversary
Proceeding instituted by the Committee (DAF Fund and DAF Holdco are also defendants, though
yet unserved—despite the Adversary Proceeding being pending for over 6 months).  Central to the
Committee's claims against the Charitable Defendants are the conclusions posing as allegation(s)

002408

HCMLPHMIT00003553

that the Charitable Defendants are part of civil conspiracy to fraudulently transaction assets out of the estate orchestrated by Mr. Dondero whom the Committee characterized as: standing on top of byzantine empire, moving assets and funds from one entity to another to meet various needs. *See* Adversary Proceeding, Dkt. No. 6, ¶2.  (Sounds familiar).

90.     In the Disclosures Order, the Court, seemingly already deciding this highly disputed issue in the Adversary Proceeding (which is not even a dispute—CLO HoldCo and Highland Dallas Foundation have filed a (joint) motion to dismiss under Rule 7012 for failure to state a claim), as it borrows the Committee's "byzantine" characterization and states that the targets of its Disclosures Order "appear to be under the *de facto* control of Mr. Dondero" and that the DAF Fund's decisions are "presumably at Mr. Dondero's direction."  (the word "byzantine" is a much overworked word within this Bankruptcy Case, and its proceedings, pleadings, and orders of this Court).  Disclosures Order, pp. 5, 11.  This constitutes direct, specific, and express pre-judgment by this Court, and, of course, has tainted the Adversary Proceeding.

91.     First and foremost, as shown herein, these assertions/findings are wrong.  The Charitable Respondents and Non-Party Targets comprise an independent charitable giving structure that has facilitated the donation of tens of millions of dollars to important philanthropic causes.  They are not under the *de facto* control of Mr. Dondero nor does Mr. Dondero direct their decisions—though like any donor would expect, Mr. Dondero has some say in the causes which the Supporting Organizations donate to.

92.     But the fact that the Court has made these assertions/findings *sua sponte* outside of the Adversary Proceeding (or any case or controversy), when it has no authority to adjudicate the Adversary Proceeding (that is the subject of a motion to withdraw reference), is highly prejudicial to the Charitable Defendants. This Court, in its assumed posture as investigative body as well as

27

HCMLPHMIT00003554

prosecutor and decider, has given cover to the utterly conclusory assertions of the Committee, and has, practically, joined the Committee as a plaintiff.

93.     At an absolute minimum, the Court should refrain from deciding or even commenting upon contested issues of law and fact *sua sponte* outside of the Adversary Proceeding, and should retract its supposed findings (issued under the transparently incorrect suggestion of its power to manage its own docket [by pre-screening parties for standing????? - again, the case law cited above shows this is not proper]).  The Charitable Respondents urge the Court, particularly after reviewing the information and documents provided in this Response and Disclosures, to reconsider such findings, and respectfully request that this Court retract its Disclosure Order or at least the problematic content therein.

### CONCLUSION

By this Response and the Disclosures, the Charitable Respondents have fully complied with this Court's Disclosures Order, but have done so with the express reservations concerning the impropriety of the Disclosures Order and the non-appearance or submission by the Non-Party Targets.  But most important to the Charitable Respondents is that the Court closely review this Response and Disclosures and reconsider its assumptions/assertions/findings/conclusion that the Charitable Respondents are under the *de facto* control of or act at the direction of Mr. Dondero. The Charitable Respondents are real, independent charitable giving vehicles that have affected, very positively, the lives of countless people through the tens of millions of dollars donated to important philanthropic causes.

*[**signature block on following page**]*

002410

HCMLPHMIT00003555

**Respectfully submitted:**

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

<u>**CERTIFICATE OF SERVICE**</u>

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this July 9, 2021.

*/s/ Louis M. Phillips*
Louis M. Phillips

29

HCMLPHMIT00003556

# EXHIBIT 1

002412

HCMLPHMIT00003557

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Chapter 11 |
| | § | |
| Debtor | § | Relates to Dkt. No. 2460 |

### Declaration of Mark Patrick

I, Mark Patrick, hereby declare as follows:

1.  My name is Mark Patrick, and I am over the age of 21.  I have personal knowledge of the facts set forth herein, and make this declaration pursuant to 28 U.S.C. § 1746.

2.  I am a Director of Charitable DAF Holdco, Ltd. and the managing member of the sole general partner of Charitable DAF Fund, L.P. (Charitable DAF Holdco, Ltd. and Charitable DAF Fund, L.P., and their direct and indirect subsidiaries will be referred to herein as the "DAF"). A more robust discussion of these entities and their interrelation is set forth in the Response and Disclosures (defined herein).

3.  I appreciate the opportunity to describe the important charitable work the DAF is doing through its charitable beneficiaries.

4.  Since its inception in 2012, the DAF has had a significant impact in the communities where the supporting organizations that are the DAF's beneficiaries deploy their capital. In fact, such supporting organizations have funded more than $32 million in charitable contributions to numerous non-profit organizations. The DAF's charitable commitments are in excess of $42 million. The non-profit organizations that have received support from the DAF include The Family Place, which provides emergency shelter to those in need, and the Dallas Children's Advocacy Center, which serves the needs of abused and neglected children. A more

1

002413

HCMLPHMIT00003558

detailed summary of the DAF's charitable impact is an exhibit filed with the Response and Disclosures referenced herein.

5.      I ultimately agreed to take on the roles I currently hold with the DAF because I believe in the causes the DAF is supporting. In college, I was a guardian ad litem for abused and neglected children. I have seen firsthand how the DAF is helping people every day who are struggling with abuse or difficult life situations. I have visited the Cristo Rey Dallas school campus, where low income and disadvantaged children are receiving a high-quality education that they otherwise would likely not receive.

6.      The actions taken by me on behalf of the DAF in connection with the bankruptcy case of Highland Capital Management, L.P., and the lawsuit I authorized to be filed on behalf of CLO Holdco, Ltd. and DAF Fund against Highland Capital Management, L.P., were done so the DAF can continue to support these worthy causes. I am only trying to protect the DAF's investments, which are the source of the millions in charitable contributions the DAF has made over the past decade.

7.      My actions aren't taken under the direction of James Dondero, or to somehow protect a direct or indirect economic benefit Mr. Dondero receives from the DAF.  As the Response and Disclosures set forth  in  greater detail, Mr. Dondero has no direct or indirect economic ownership in the DAF.

8.      My concern in vigorously pursuing claims for the DAF, or defending claims against the DAF, is to protect the DAF's investments from being taken by creditors who have no credible basis to obtain such investments.

9.      I have been provided with and reviewed this Court's Order Requiring Disclosures (the "Disclosures Order").

002414

HCMLPHMIT00003559

10. In my capacity with the DAF, I assisted counsel in preparing the Response and Disclosures related to the Disclosures Order on behalf of CLO Holdco, Ltd., Charitable DAF Fund, L.P., and Highland Dallas Foundation, Inc. (the "Response and Disclosures," and capitalized terms used herein which are not otherwise defined are as defined in the Response and Disclosures).

11. With respect to the documents and Exhibits provided by the Foundations about the Supporting Organizations and Non-Party Targets I or those acting under my direction dealt with the Foundations to obtain such information. Multiple Exhibits have already been provided as evidence to the Bankruptcy Court at the Show Cause Hearing. I have reviewed the exhibits to the Response and Disclosures and affirm that the Exhibits provided about the Charitable Respondents are true and correct copies of what each document is identified as in the Response and Disclosures. With respect to the documents and Exhibits provided by the Foundations, I affirm, upon information and belief that these Exhibits are true and correct copies of what each document is identified as in the Response and Disclosures. As I am not a person with authority over the Supporting Organizations I cannot identify such documents and Exhibits of my own personal knowledge, but am satisfied that I can upon information and belief.

12. I have reviewed the Response and Disclosures and certify that the factual recitations therein are accurate.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.**

Executed on July 9, 2021

_____
**Mark Patrick**

3

002415

HCMLPHMIT00003560

# EXHIBIT 2

HCMLPHMIT00003561

Case 19-34054-sgj11 Doc 2545-74 Filed 07/08/25 Entered 07/08/25 21:39:29 Page 2 of 12
Case 3:25-cv-02724-L    Document 74    Filed 02/12/25    Page 888 of 1011    PageID 2787
Exhibit 74    Filed 02/12/25

```
 1                 IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3                                )    Case No. 19-34054-sgj-11
    In Re:                        )    Chapter 11
 4                                )
    HIGHLAND CAPITAL               )    Dallas, Texas
    MANAGEMENT, L.P.,              )    Tuesday, June 8, 2021
 5                                )    9:30 a.m. Docket
                                  )
 6           Debtor.              )
                                  )    - SHOW CAUSE HEARING (2255)
 7                                )    - MOTION TO MODIFY ORDER
                                  )      AUTHORIZING RETENTION OF
                                  )      JAMES SEERY (2248)
 8                                )    - MOTION FOR ORDER FURTHER
                                  )      EXTENDING THE PERIOD WITHIN
 9                                )      WHICH DEBTOR MAY REMOVE
                                  )      ACTIONS (2304)
10   _____)

11                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12                UNITED STATES BANKRUPTCY JUDGE.

13   APPEARANCES:

14   For the Debtor:            Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
15                              10100 Santa Monica Blvd.,
                                 13th Floor
16                              Los Angeles, CA  90067-4003
                                (310) 277-6910
17
     For the Debtor:            John A. Morris
18                              Gregory V. Demo
                                PACHULSKI STANG ZIEHL & JONES, LLP
19                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
20                              (212) 561-7700

21   For the Debtor:            Zachery Z. Annable
                                HAYWARD & ASSOCIATES, PLLC
22                              10501 N. Central Expressway,
                                 Suite 106
23                              Dallas, TX  75231
                                (972) 755-7104
24

25
```

002417

HCMLPHMIT00003562

Case 19-34054-sgj11 Doc 2547-25 Filed 07/08/20 Entered 07/08/20 06:29:39 Page 3 of 12
Case 3:25-cv-02724-L    Document 74    Filed 02/02/05    Exhibit 74    Page 889 of 1011    PageID 2788

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee  Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee  Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

002418

HCMLPHMIT00003563

1 | Transcribed by:               Kathy Rehling
2 |                          311 Paradise Cove
                          Shady Shores, TX  76208
3 |                          (972) 786-3063

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

002419

HCMLPHMIT00003564

Patrick - Cross                    135

1    Q    Was there any effort whatsoever to hide the prior order of

2    the Bankruptcy Court?

3    A    No.

4            MR. ANDERSON:  Pass the witness.

5            THE COURT:  Okay.  Other examination?

6            MR. SBAITI:  Yes, Your Honor.  Just a couple of

7    questions.

8                        CROSS-EXAMINATION

9    BY MR. SBAITI:

10   Q    Do you mind flipping to Exhibit 25, which I believe is the

11   org chart, the one that you were looking at before?

12   A    Okay.

13   Q    It'll still be in --

14   A    Okay.  Yeah.

15   Q    -- the defense binder.  No reason to swap out right now.

16   A    I've got the right binders.  Some of them are repeatable

17   exhibits, so --

18   Q    Yeah.

19   A    -- I have to grab the right binder.  Yes.

20   Q    As this org chart would sit today, is the only difference

21   that Grant Scott's name would instead be Mark Patrick?

22   A    Yes.

23   Q    Was there ever a period of time where Jim Dondero's name

24   would sit instead of Grant Scott's name prior?

25   A    Yes, originally, when this -- yes.

HCMLPHMIT00003565

Case 19-34054-sgj11 Doc 2547-74 Filed 07/06/21 Entered 07/06/21 06:29:39 Page 6 of 12
Case 3:25-cv-02724-L    Document 74    Filed 09/05/25    Page 892 of 1011    PageID 2791

Patrick - Cross                                    136

1   Q    So did Mr. Dondero both have the control shares of the GP,

2   LLC and DAF Holdco Limited?

3   A    No, I believe not.  I believe he only held the Charitable

4   DAF GP interest and that Mr. Scott at all times held the

5   Charitable DAF Holdco, LTD interest, until he decided to

6   transfer it to me.

7   Q    Can you just tell us how Mr. Scott came to hold the

8   control shares of the Charitable DAF Holdco, LTD?

9   A    When he was the independent trustee of the Charitable

10  Remainder Trust, he caused that -- the creation of that

11  entity, and that's how he became in receipt of those

12  management shares.

13  Q    And does the Charitable DAF GP, LLC have any control over

14  Charitable DAF Fund, LP's actions or activities?

15  A    Yes, it does.

16  Q    What kind of control is that?

17  A    I would describe complete control.  It's the managing

18  member of that entity and can -- and effectively owns, you

19  know, the hundred percent interest in the respective

20  subsidiaries, and so the control follows down.

21  Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22  managing member of the GP?

23  A    Well, I think as the -- and Mr. Morris had shown me with

24  respect to that transfer occurring on March 2012.

25  Q    So nine years ago?

HCMLPHMIT00003566

Patrick - Cross                      137

1   A    Yes.

2   Q    Does Mr. Dondero today exercise any control over the

3   activities of the DAF Charitable -- the Charitable DAF, GP or

4   the Charitable DAF Holdco, LTD?

5   A    No.

6   Q    Is he a board member of sorts for either of those

7   entities?

8   A    No.

9   Q    Is he a board members of CLO Holdco?

10  A    No.

11  Q    Does he have any decision-making authority at CLO Holdco?

12  A    None.

13  Q    The decision to authorize the lawsuit and the decision to

14  authorize the motion that you've been asked about, who made

15  that authorization?

16  A    I did.

17  Q    Did you have to ask for anyone's permission?

18  A    No.

19         MR. SBAITI:  No more questions, Your Honor.

20         THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21      All right.  Any redirect?

22                    REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Since becoming the authorized representative of the

25  Plaintiffs, have you ever made a decision on behalf of those

002422

HCMLPHMIT00003567

Patrick - Cross                    138

1  entities that Mr. Dondero disagreed with?

2  A    I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q    Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10 A    I didn't -- I don't -- I did not discuss with him prior to

11 making the decisions that I made that were adverse to his

12 economic interests.

13         MR. MORRIS:  Okay.  No further questions, Your Honor.

14         THE COURT:  Any further examination?  Recross on that

15 redirect?

16         MR. ANDERSON:  No further questions.

17         MR. SBAITI:  No further questions, Your Honor.

18         MR. ANDERSON:  Sorry.

19         THE COURT:  Nothing?

20         MR. ANDERSON:  I think we're good.

21         THE COURT:  Okay.  I have one question, Mr. Patrick.

22 My brain sometimes goes in weird directions.

23                EXAMINATION BY THE COURT

24         THE COURT:  I'm just curious.  What are these Cayman

25 Island entities, charitable organizations formed in the Cayman

HCMLPHMIT00003568

Patrick - Examination by the Court          140

1          THE COURT:  Uh-huh.

2          THE WITNESS:  The offshore master fund structure

3    typically will have two different types of -- they call it

4    foreign feeder funds.  One foreign feeder fund is meant to

5    accommodate foreign investors; the other foreign feeder fund

6    is meant to accommodate U.S. tax-exempt investors.

7          Why, why is it structured that way?  In order to avoid

8    something called -- I was trying not to be wonkish -- UBTI.

9    That's, let's see, Un -- Unrelated Trader Business Income.  I

10   probably have that slightly wrong.  But it's essentially,

11   it's a means to avoid active business income, which includes

12   debt finance income, which is what these CLOs tend to be, that

13   would throw off income that would be taxable normally if the

14   exempts did not go through this foreign blocker, and it

15   converts that UBTI income -- it's called (inaudible) income --

16   into passive income that flows -- that flows up to the

17   charities.

18         And so it's very typical that you'll have a U.S. tax-

19   exempt investor, when they make an investment in a fund,

20   prefer to go through an offshore feeder fund, which is

21   actually Charitable DAF Holdco, LTD.  That's essentially what,

22   from a tax perspective, represents as a UBTI blocker entity.

23   And then you have the offshore investments being held offshore

24   because there's a variety of safe harbors where the receipt of

25   interest, the portfolio interest exception, is not taxable.

HCMLPHMIT00003569

Case 19-34054-sgj11 Doc 4258-74 Filed 07/09/25 Entered 07/09/25 22:39:28 Desc
Case 3:25-cv-02724-L     Document 74  Filed 09/09/25     Page 896 of 1011     PageID 2795

Patrick - Examination by the Court                    141

1  The creation of capital gains or losses under the -- they call

2  it the trading, 864(b) trading safe harbor, is not taxable.

3  So that's why you'll find these structures operating offshore

4  to rely on those safe harbor provisions as well as -- as well

5  as what I indicated with respect to the two type blocker

6  entities.  It's very typical and industry practice to organize

7  these way.  And so when this was set --

8              THE COURT:  It's very typical in the charitable world

9  to --

10             THE WITNESS:  In the investment management --

11             THE COURT:  -- form this way?

12             THE WITNESS:  In the investment management world,

13 when you have charitable entities that are taking some

14 exposure to assets that are levered, to set this structure up

15 in this way.  It was modeled after -- they just call them

16 offshore master fund structures.  They're known as Mickey

17 Mouse structures, where you'll have U.S. investors --

18             THE COURT:  Yes.  I -- yes, I --

19             THE WITNESS:  -- enter through a U.S. partnership,

20 and the foreign investors enter through a blocker.

21             THE COURT:  It was really just the charitable aspect

22 of this that I was --

23             THE WITNESS:  Yeah.  Yeah.

24             THE COURT:  -- getting at.

25             THE WITNESS:  Yeah.  No, but I'm just trying to

002425

HCMLPHMIT00003570

Patrick - Recross                    142

1  emphasize if --

2          THE COURT:  All right.  It's --

3          THE WITNESS:  Yeah.

4          THE COURT:  -- neither here nor there.  All right.

5          MR. SBAITI:  Your Honor, may I ask a slightly

6  clarifying leading question on that, because I think I

7  understand what he was trying to say, just for the record?

8          THE COURT:  Well, --

9          MR. MORRIS:  I object.

10         THE COURT:  -- I tell you what.  Anyone who wants to

11 ask one follow-up question on the judge's question can do so.

12 Okay?  You can go first.

13         MR. SBAITI:  I'll approach, Your Honor.

14         THE COURT:  Okay.

15                 RECROSS-EXAMINATION

16 BY MR. SBAITI:

17 Q   Would it be a fair summary of what you were saying a

18 minute ago that the reason the bottom end of that structure is

19 offshore is so that it doesn't get taxed before the money

20 reaches the charities on the U.S. side?

21 A   Tax -- it converts the nature of the income that is being

22 thrown off by the investments so that it becomes a tax

23 friendly income to the tax-exempt entity.  Passive income.

24 That's --

25 Q   So, essentially, --

002426

HCMLPHMIT00003571

Patrick - Recross                                              143

```
 1              THE COURT:  Okay.  Okay.

 2              MR. SBAITI:  -- so it doesn't get taxed before it

 3    hits the --

 4              THE COURT:  I said one question.

 5              MR. SBAITI:  Sorry, Your Honor.

 6              THE COURT:  Okay.  He answered it.

 7              MR. PHILLIPS:  And I have one question, Your Honor

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  I don't know if I need to ask this

10    question, but I'd rather not ask you if I need to ask it.

11              THE COURT:  Go ahead.

12              MR. PHILLIPS:  But if I do, you know, I could --

13              THE COURT:  Go ahead.

14              MR. PHILLIPS:  Well, okay.

15                      RECROSS-EXAMINATION

16    BY MR. PHILLIPS:

17    Q   We've talked about the offshore structure.  Are the

18    foundations in the top two tiers of the organizational chart

19    offshore entities?

20    A   No.

21    Q   They're --

22    A   They're onshore entities.  They're tax-exempt entities.

23    Q   Thank you.

24    A   The investments are offshore.

25    Q   Thank you.
```

002427

HCMLPHMIT00003572

# EXHIBIT 3

HCMLPHMIT00003573

## Charitable DAF/CLO HoldCo
## Structure Chart



002429

HCMLPHMIT00003574

# EXHIBIT 4

HCMLPHMIT00003575

# MEMORANDUM

**Date: July 9, 2021**

**To:  Mark Patrick**

**Company:  Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From:  Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject:  Donor Advised Funds ("*DAFs*"), Sponsoring Organizations and
Supporting Organizations -- The Reasons for Making Investments in
Offshore Jurisdictions**

---

1. ***What are Donor Advised Funds, Sponsoring Organizations and Supporting
Organizations?***

A donor advised fund, or DAF, is a separately managed charitable investment account
established by a donor within a public charity (a section 501(c)(3) organization), which is
generally referred to as a sponsor.  Sponsors may include a community foundation, university,
religious organization, or financial institution.  The donor (or the donor's designee) typically
maintains certain advisory privileges over the DAF funds or account – specifically with respect
to charities that should receive donations, although the DAF account is fully and completely
owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a
Section 501(c)(3) public charity.  A supporting organization is a separate entity controlled by the
sponsor through its ability to elect a majority of the supporting organization's governing
board.  Because of this control, a supporting organization is treated financially as part of a
consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting
organization named Highland Dallas Foundation, Inc. ("***Highland Dallas Foundation***") to assist
The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of
community affairs.  Donations were made to the Highland Dallas Foundation as both the sponsor
and the supporting organization.  The Highland Dallas Foundation from time to time makes
distributions of funds to The Dallas Foundation which in turn makes further distributions to local
public charities.  ***Exhibit 1*** attached shows these above-described entities, as well as other
entities referenced herein that are pertinent to this donor advised fund.

2. ***How Does a Donor Establish a DAF Account?***

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets,
such as cash, stock or securities or other business or financial assets, to a sponsoring public
charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

4822-2891-9537 v.7

HCMLPHMIT00003576

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. *What Type of Investments Can be Made by a Sponsor/Supporting Organization?*

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. *Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?*

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to "block" this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

002432

HCMLPHMIT00003577

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

> b. *Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?*

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership.  In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.")  Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor).  This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds.  In fact, if a U.S. law firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4. *Who Has Control and Authority over the Assets Held by the Sponsor?*

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation.  Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

002433
HCMLPHMIT00003578

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a). But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. *What Are the Benefits to a Donor of a Contribution to a DAF account?*

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future. Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets. This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

002434

HCMLPHMIT00003579

**Exhibit 1**

**Charitable DAF/CLO Holdco**
**Structure Chart**



002435

HCMLPHMIT00003580

# EXHIBIT 5

HCMLPHMIT00003581

*WK–249232*

# Certificate Of Incorporation

*I, **V. DAPHENE WHITELOCKE** Assistant Registrar of Companies of the Cayman Islands
DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said
Law in respect of registration were complied with by*

### CLO HoldCo, Ltd.

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect
from the 13th day of December Two Thousand Ten*

*Given under my hand and Seal at George Town in the
Island of Grand Cayman this 13th day of December
Two Thousand Ten*



**Assistant Registrar of Companies,
Cayman Islands.**

PATRICK_000039

## 002437

HCMLPHMIT00003582

# EXHIBIT 6

HCMLPHMIT00003583

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CLO HOLDCO, LTD.



Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
**T** 345 949 0100  **F** 345 949 7886  www.walkersglobal.com
**REF: VC/CM/99957**

PATRICK_000062

002439

HCMLPHMIT00003584

REGISTERED AND FILED
AS NO. 249232 THIS 13 DAY
OF December, 2010

*Asst. Registrar of Companies*
*Cayman Islands*

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# CLO HOLDCO, LTD.

1.  The name of the company is CLO HoldCo, Ltd. (the "**Company**").

2.  The registered office of the Company will be situated at the offices of **Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands** or at such other location as the Directors may from time to time determine.

3.  The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4.  The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5.  The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6.  The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7.  The capital of the Company is **US$50,000.00** divided into **50,000** shares of a nominal or par value of **US$1.00 each** provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.  The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



1

PATRICK_000063

002440

HCMLPHMIT00003585

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
| --- | --- |
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands | ONE SHARE |

(Sgd) Virginia Czarnocki

Virginia Czarnocki
as Authorised Signatory of Walkers Nominees Limited

Dated:     13 December 2010

(Sgd) Carol MacDonald

Signature of Witness

Name:         Carol MacDonald

Address:      87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation:   Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

V. Daphene Whitelocke
Assistant Registrar

Date: 13th December, 2010



2

3760538_1

PATRICK_000064

002441

HCMLPHMIT00003586

# TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 3 |
| SHARES | 3 |
| MODIFICATION OF RIGHTS | 4 |
| CERTIFICATES | 4 |
| FRACTIONAL SHARES | 4 |
| LIEN | 5 |
| CALLS ON SHARES | 5 |
| FORFEITURE OF SHARES | 6 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 7 |
| REDEMPTION AND PURCHASE OF SHARES | 8 |
| GENERAL MEETINGS | 8 |
| NOTICE OF GENERAL MEETINGS | 9 |
| PROCEEDINGS AT GENERAL MEETINGS | 9 |
| VOTES OF SHAREHOLDERS | 10 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 11 |
| DIRECTORS | 11 |
| ALTERNATE DIRECTOR OR PROXY | 12 |
| POWERS AND DUTIES OF DIRECTORS | 12 |
| BORROWING POWERS OF DIRECTORS | 13 |
| THE SEAL | 14 |
| DISQUALIFICATION OF DIRECTORS | 14 |

i

PATRICK_000065

002442

HCMLPHMIT00003587

PROCEEDINGS OF DIRECTORS ............................................................................................................ 14

DIVIDENDS ......................................................................................................................................... 16

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION .................................................... 17

CAPITALISATION OF RESERVES ......................................................................................................... 17

SHARE PREMIUM ACCOUNT .............................................................................................................. 18

NOTICES ............................................................................................................................................. 18

INDEMNITY ......................................................................................................................................... 19

NON-RECOGNITION OF TRUSTS ........................................................................................................ 20

WINDING UP ....................................................................................................................................... 20

AMENDMENT OF ARTICLES OF ASSOCIATION .................................................................................. 21

CLOSING OF REGISTER OR FIXING RECORD DATE ........................................................................... 21

REGISTRATION BY WAY OF CONTINUATION ..................................................................................... 21

DISCLOSURE ....................................................................................................................................... 21

PATRICK_000066

002443

HCMLPHMIT00003588



COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

# CLO HOLDCO, LTD.

REGISTERED AND FILED
AS NO: *249282* THIS *18th* DAY
OF *December, 2010*

*Asst. Registrar of Companies*
*Cayman Islands*

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to CLO HoldCo, Ltd. (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

### INTERPRETATION

1.  In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

    "**Articles**" means these articles of association of the Company, as amended or substituted from time to time;

    "**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company;

    "**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof;

    "**Law**" means the Companies Law (as amended) of the Cayman Islands;

    "**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time;

    "**Office**" means the registered office of the Company as required by the Law;

    "**Ordinary Resolution**" means a resolution:

    (a)     passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and

1

PATRICK_000067

002444

HCMLPHMIT00003589

where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)      approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed;

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up;

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires;

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law;

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof;

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company;

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share;

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber;

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law;

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means; and

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)      passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)      approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

2.      In these Articles, save where the context requires otherwise:

(a)      words importing the singular number shall include the plural number and vice versa;

2

PATRICK_000068

002445

HCMLPHMIT00003590

(b)    words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)    the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)    reference to a dollar or dollars (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)    reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f)    reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)    reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3.    Subject to the last two preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

4.    The business of the Company may be commenced at any time after incorporation.

5.    The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.    The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.    The Directors shall keep, or cause to be kept, the Register at such place as the Directors may from time to time determine and, in the absence of any such determination, the Register shall be kept at the Office.

**SHARES**

8.    Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)    issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)    grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

PATRICK_000069

002446

HCMLPHMIT00003591

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9.    The Directors may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors.

10.    The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11.    The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12.    Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13.    The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

14.    No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

15.    The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or

4

PATRICK_000070

002447

HCMLPHMIT00003592

par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

### LIEN

16.   The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17.   The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18.   For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19.   The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

### CALLS ON SHARES

20.   The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21.   The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22.   If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23.   The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share,

PATRICK_000071

002448

HCMLPHMIT00003593

becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24.    The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25.    The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

## FORFEITURE OF SHARES

26.    If a Shareholder fails to pay any call or instalment of a call in respect of partly paid Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27.    The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28.    If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29.    A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30.    A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31.    A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32.    The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33.    The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the

6

PATRICK_000072

002449

HCMLPHMIT00003594

amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34.     The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35.     The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36.     The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37.     All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38.     The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share.  In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only Person recognised by the Company as having any title to the Share.

39.     Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40.     A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41.     The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42.     The Company may by Ordinary Resolution:

7

PATRICK_000073

002450
HCMLPHMIT00003595

(a)    consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)    convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)    subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)    cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43.    The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION AND PURCHASE OF SHARES

44.    Subject to the Law, the Company may:

(a)    issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may, before the issue of such Shares, determine;

(b)    purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder; and

(c)    make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law, including out of its capital, profits or the proceeds of a fresh issue of Shares.

45.    Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46.    The redemption or purchase of any Share shall not be deemed to give rise to the redemption or purchase of any other Share.

47.    The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## GENERAL MEETINGS

48.    The Directors may, whenever they think fit, convene a general meeting of the Company.

49.    General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later

8

than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

50.  If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

### NOTICE OF GENERAL MEETINGS

51.  At least seven days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

52.  The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

### PROCEEDINGS AT GENERAL MEETINGS

53.  All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, the appointment and removal of Directors and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

54.  No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

55.  If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

56.  If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

9

PATRICK_000075

002452

HCMLPHMIT00003597

57. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

58. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

59. The chairman may with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

60. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason, upon notice in writing to Shareholders. A postponement may be for a stated period of any length or indefinitely as the Directors may determine.

61. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

62. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

63. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

64. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

65. Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

66. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

PATRICK_000076

002453

HCMLPHMIT00003598

67.    A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

68.    No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

69.    On a poll votes may be given either personally or by proxy.

70.    The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised.  A proxy need not be a Shareholder.

71.    An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

72.    The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

73.    The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

74.    A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

75.    Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

76.    The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

77.    The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

78.    Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

PATRICK_000077

002454

HCMLPHMIT00003599

79. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

80. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

81. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

82. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR OR PROXY

83. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be an officer of the Company. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

84. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors at which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

85. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

86. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their

12

PATRICK_000078

002455

HCMLPHMIT00003600

number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

87. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

88. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

89. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an **"Attorney"** or **"Authorised Signatory"**, respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

90. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article .

91. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

92. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

93. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

### BORROWING POWERS OF DIRECTORS

94. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

13

PATRICK_000079

002456

HCMLPHMIT00003601

**THE SEAL**

95.   The Seal shall not be affixed to any instrument except by the authority of a resolution of the
      Directors provided always that such authority may be given prior to or after the affixing of the Seal
      and if given after may be in general form confirming a number of affixings of the Seal. The Seal
      shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the
      presence of any one or more Persons as the Directors may appoint for the purpose and every
      Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

96.   The Company may maintain a facsimile of the Seal in such countries or places as the Directors
      may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority
      of a resolution of the Directors provided always that such authority may be given prior to or after
      the affixing of such facsimile Seal and if given after may be in general form confirming a number
      of affixings of such facsimile Seal.  The facsimile Seal shall be affixed in the presence of such
      Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as
      aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence
      and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and
      effect as if the Seal had been affixed in the presence of and the instrument signed by a Director
      or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the
      Directors may appoint for the purpose.

97.   Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to
      affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of
      the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

98.   The office of Director shall be vacated, if the Director:

      (a)   becomes bankrupt or makes any arrangement or composition with his creditors;

      (b)   dies or is found to be or becomes of unsound mind;

      (c)   resigns his office by notice in writing to the Company;

      (d)   is removed from office by Ordinary Resolution;

      (e)   is removed from office by notice addressed to him at his last known address and signed
            by all of his co-Directors (not being less than two in number); or

      (f)   is removed from office pursuant to any other provision of these Articles.

**PROCEEDINGS OF DIRECTORS**

99.   The Directors may meet together (either within or without the Cayman Islands) for the despatch of
      business, adjourn, and otherwise regulate their meetings and proceedings as they think fit .
      Questions arising at any meeting shall be decided by a majority of votes.  In case of an equality of
      votes the chairman shall have a second or casting vote.  A Director may, and a Secretary or
      assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the
      Directors.

100.  A Director may participate in any meeting of the Directors, or of any committee appointed by the
      Directors of which such Director is a member, by means of telephone or similar communication

14

PATRICK_000080

002457

HCMLPHMIT00003602

equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

101.  The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one.  A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

102.  A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors.  A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made.  A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

103.  A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established.  A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

104.  Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

105.  The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a)   all appointments of officers made by the Directors;

(b)   the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c)   all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

106.  When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

15

PATRICK_000081

002458

HCMLPHMIT00003603

107.  A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

108.  The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

109.  The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

110.  Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

111.  A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

112.  All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

113.  Subject to any rights and restrictions for the time being attached to any Shares, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

114.  Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

115.  The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

16

PATRICK_000082

002459

HCMLPHMIT00003604

116.  Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

117.  The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

118.  Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

119.  If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

120.  No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

121.  The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

122.  The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

123.  The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

124.  The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

125.  The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

126.  Subject to the Law, the Directors may, with the authority of an Ordinary Resolution:

   (a)  resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

17

PATRICK_000083

002460

HCMLPHMIT00003605

(b)     appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

        (i)     paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

        (ii)     paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

        and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c)     make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)     authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

        (i)     the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

        (ii)     the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

        and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e)     generally do all acts and things required to give effect to the resolution.

## SHARE PREMIUM ACCOUNT

127.     The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share .

128.     There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

129.     Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the

PATRICK_000084

002461

HCMLPHMIT00003606

purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

130.   Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

131.   Any notice or other document, if served by:

(a)   post, shall be deemed to have been served five days after the time when the letter containing the same is posted;

(b)   facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c)   recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)   electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

132.   Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

133.   Notice of every general meeting of the Company shall be given to:

(a)   all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)   every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**INDEMNITY**

134.   Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an **"Indemnified Person"**) shall be indemnified and

19

PATRICK_000085

002462

HCMLPHMIT00003607

secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

135. No Indemnified Person shall be liable:

   (a) for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

   (b) for any loss on account of defect of title to any property of the Company; or

   (c) on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

   (d) for any loss incurred through any bank, broker or other similar Person; or

   (e) for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

   (f) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

## NON-RECOGNITION OF TRUSTS

136. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

137. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

138. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in

20

PATRICK_000086

002463

HCMLPHMIT00003608

trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

139.   Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

140.   For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

141.   In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

142.   If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

143.   The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## DISCLOSURE

144.   The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial

21

PATRICK_000087

002464

HCMLPHMIT00003609

authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

22

PATRICK_000088

002465

HCMLPHMIT00003610

## NAME, ADDRESS AND DESCRIPTION
## OF SUBSCRIBER

Walkers Nominees Limited, 87 Mary
Street, George Town, Grand Cayman
KY1-9001, Cayman Islands

(Sgd) Virginia Czarnocki

Virginia Czarnocki
as Authorised Signatory for and on behalf of Walkers
Nominees Limited

Dated:    13 December 2010

(Sgd) Carol MacDonald

Signature of Witness

Name:        Carol MacDonald

Address      87 Mary Street, George
             Town, Grand Cayman KY1-
             9001, Cayman Islands

Occupation:  Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

V. Daphene Whitelocke
Assistant Registrar

Date. 13th December, 2010



23

# EXHIBIT 7

002467

HCMLPHMIT00003612



Registration No.: **249232**

Date of Incorporation: **13 December 2010**

Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | | | | |
| | | | | | | **Nil** | **Nil** | 7 Nov 2011 |
| **CHARITABLE DAF FUND, LP** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF FUND, LP to CHARITABLE DAF FUND, LP pursuant to Contribution and Transfer Agreement dated 7 Nov 2011 | No Cert | | | |
| | | | | | | **100** | **1.00** | |
| **CHARITABLE DAF HOLDCO, LTD** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CHARITABLE DAF HOLDCO, LTD pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | No Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Transfer Agreement dated 7 Nov 2011 | | | | |
| | | | | | | **Nil** | **Nil** | 7 Nov 2011 |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 3]

PATRICK_000023

002469


HCMLPHMIT00003614



Registration No.: **249232**

Date of Incorporation: **13 December 2010**

Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

Notes:

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

PATRICK_000024

002470


# EXHIBIT 8

002471

HCMLPHMIT00003616



WK–53083

*Certificate of Registration of Exempted Limited Partnership*

I, **JOY A. RANKINE** *Assistant Registrar of Exempted Limited Partnership  in the Cayman Islands DO HEREBY CERTIFY, pursuant to the Exempted Limited Partnership Law, 1991 that all the requisitions of the said Law in respect of registration were complied with by*

**Charitable DAF Fund, LP**

*an Exempted Limited Partnership registered  in the Cayman Islands on the 28th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 28th day of October Two Thousand Eleven*

**Assistant Registrar of Exempted Limited Partnership Cayman Islands.**

PATRICK_000040

002472
HCMLPHMIT00003617

# EXHIBIT 9

HCMLPHMIT00003618

DATED NOVEMBER 7, 2011

AMENDED AND RESTATED

EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF

CHARITABLE DAF FUND, LP

---

WARNING

THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY

PATRICK_000041

002474

HCMLPHMIT00003619

# TABLE OF CONTENTS

PAGE

ARTICLE I    GENERAL PROVISIONS; COMPENSATION AND EXPENSES.................2
    1.1    Continuation...................................................................................2
    1.2    Name...............................................................................................2
    1.3    Purpose and Powers.......................................................................2
    1.4    Registered Office............................................................................2
    1.5    Partners...........................................................................................2
    1.6    Powers.............................................................................................2
    1.7    Term................................................................................................3
    1.8    Admission of New Partners............................................................3
    1.9    Taxable Year...................................................................................3
    1.10    Liability of Partners........................................................................3
    1.11    Limitation on Assignability of Partners' Interests. ........................3
    1.12    Definitions......................................................................................4
    1.13    Service Providers............................................................................4
    1.14    Partnership Expenses......................................................................4
    1.15    Withdrawal of Initial Limited Partner...........................................5

ARTICLE II    POWERS ........................................................................................5
    2.1    Partnership Powers.........................................................................5
    2.2    Rights, Powers, Limitations on Liability and Indemnification of General
        Partner. ...........................................................................................6

ARTICLE III    CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES........9
    3.1    Capital Contributions.....................................................................9
    3.2    Capital Account; Allocation of Profits and Losses. ......................9

ARTICLE IV    LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL
        WITHDRAWALS FROM CAPITAL ACCOUNT ...........................9
    4.1    Legal Interest.................................................................................9
    4.2    Distributions.................................................................................10
    4.3    Withdrawal...................................................................................10

ARTICLE V    DURATION OF PARTNERSHIP.................................................10
    5.1    Termination...................................................................................10
    5.2    Winding Up...................................................................................11

ARTICLE VI    MISCELLANEOUS........................................................................11
    6.1    Tax Matters Partner......................................................................11
    6.2    Right to Hire.................................................................................11
    6.3    Applicable Law, etc.....................................................................12
    6.4    Power of Attorney........................................................................12
    6.5    Tax Elections Under the Internal Revenue Code..........................12
    6.6    Amendments to Partnership Agreement ......................................12

i

PATRICK_000042

002475

HCMLPHMIT00003620

| 6.7 | Investment Representation | 13 |
| 6.8 | Notices | 13 |
| 6.9 | General Partner Determinations | 14 |
| 6.10 | Dispute Resolution | 14 |
| 6.11 | Successors and Assigns | 16 |
| 6.12 | Severability | 16 |
| 6.13 | No Third Party Rights | 16 |
| 6.14 | No Right to Partition | 16 |

ii

## AMENDED AND RESTATED
## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
## CHARITABLE DAF FUND, LP

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1)     Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2)     Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3)     Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4)     Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

PATRICK_000044

002477

HCMLPHMIT00003622

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

**ARTICLE I**
**GENERAL PROVISIONS; COMPENSATION AND EXPENSES**

1.1   <u>Continuation</u>.   The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2   <u>Name</u>.  The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3   <u>Purpose and Powers</u>.  The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments.  At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4   <u>Registered Office</u>.  The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5   <u>Partners</u>.  The name and addresses of the Partners are as follows:

| Name | Address |
|------|---------|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6   <u>Powers</u>.

(a)   Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and

2

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b)     Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7     <u>Term</u>.  The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8     <u>Admission of New Partners</u>.  The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9     <u>Taxable Year</u>.  The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10    <u>Liability of Partners</u>.

(a)     The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b)     Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner.  A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11    <u>Limitation on Assignability of Partners' Interests</u>.

(a)     A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

3

PATRICK_000046

002479

HCMLPHMIT00003624

    (b)    The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12   <u>Definitions</u>. For the purpose of this Agreement, unless the context otherwise requires:

    (a)    <u>General Partner</u>. The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

    (b)    <u>Indirect Charitable Owners</u>. The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

    (c)    <u>Limited Partner</u>. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

    (d)    <u>Partner</u>. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13   <u>Service Providers</u>. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14   <u>Partnership Expenses</u>. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

4

PATRICK_000047

002480

HCMLPHMIT00003625

1.15    <u>Withdrawal of Initial Limited Partner</u>.  The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

**ARTICLE II**
**POWERS**

2.1    <u>Partnership Powers</u>.  The Partnership shall have the following powers:

(a)    To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

5

PATRICK_000048

002481

HCMLPHMIT00003626

(b)     To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c)     To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d)     To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e)     To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f)     To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g)     To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2     <u>Rights, Powers, Limitations on Liability and Indemnification of General Partner</u>.

(a)     Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b)     To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the

6

PATRICK_000049

002482

HCMLPHMIT00003627

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)    Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)    To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of <u>nolo contendere</u> or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e)    Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f)    The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

7

PATRICK_000050

002483

HCMLPHMIT00003628

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g)    The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)    **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred.  In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.  No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i)    **<u>WAIVER OF CONSUMER RIGHTS</u>:  The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j)    No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person.  Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k)    This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

8

PATRICK_000051

002484

HCMLPHMIT00003629

## ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 <u>Capital Contributions</u>.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 <u>Capital Account; Allocation of Profits and Losses</u>.

(a) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(b) Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(c) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(d) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(e) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL
## WITHDRAWALS FROM CAPITAL ACCOUNT

4.1 <u>Legal Interest</u>. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

9

PATRICK_000052

002485

HCMLPHMIT00003630

4.2 <u>Distributions</u>.

    (a)    Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

    (b)    The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

        For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3 <u>Withdrawal</u>. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V
## DURATION OF PARTNERSHIP

5.1 <u>Termination</u>. The Partnership shall be required to be wound up and dissolved upon:

    (a)    the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

PATRICK_000053

002486

HCMLPHMIT00003631

  (b)  the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

  (c)  the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2  <u>Winding Up</u>. Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law.  Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement.  The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

**ARTICLE VI**
**MISCELLANEOUS**

6.1  <u>Tax Matters Partner</u>. The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership.  In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith.  All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2  <u>Right to Hire</u>.

  (a)  Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

  (b)  Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

11

PATRICK_000054

002487

HCMLPHMIT00003632

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c)     The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3     <u>Applicable Law, etc.</u>   This Limited Partnership Agreement:  (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require.  The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4     <u>Power of Attorney</u>.   Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.  This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5     <u>Tax Elections Under the Internal Revenue Code</u>.   The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6     <u>Amendments to Partnership Agreement</u>.   The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement.  Notwithstanding the foregoing, the General Partner shall have the right to effect

PATRICK_000055

002488

HCMLPHMIT00003633

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect:  a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 <u>Investment Representation</u>.  Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 <u>Notices</u>.  All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI.  Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

13

PATRICK_000056

002489

HCMLPHMIT00003634

Case 19-34054-sgj11 Doc 254-75 Filed 07/09/25 Entered 07/09/25 22:39:28 Page 18 of
Case 3:25-cv-02724-L    Document 74    Filed 11/24/25    Page 961 of 1011    PageID 2860
Exhibit 74    Page 204 of 307

6.9    <u>General Partner Determinations</u>.    Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10    <u>Dispute Resolution</u>.    The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person.    If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    <u>Mediation</u>.

(1)    Any Dispute shall be submitted to mediation by written notice to the other party or parties.    In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.    The mediator will be selected by agreement of the parties.    If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2)    The mediation will be conducted as specified by the mediator and agreed upon by the parties.    The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3)    The mediation will be treated as a settlement discussion and therefore will be confidential.    The mediator may not testify for either party in any later proceeding relating to the dispute.    No recording or transcript shall be made of the mediation proceedings.

(4)    Each party will bear its own costs in the mediation.    The fees and expenses of the mediator will be shared equally by the parties.

(b)    <u>Arbitration</u>.    If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.    A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed.    Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein.    The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**").    In the event of a conflict, the provisions of this document will control.

(1)    The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

14

PATRICK_000057

002490

HCMLPHMIT00003635

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however,* that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2)    The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3)    The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4)    No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The

15

PATRICK_000058

002491

HCMLPHMIT00003636

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5)    All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6)    The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11    <u>Successors and Assigns</u>. Subject to the limitations set forth in <u>Section 1.11</u>, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12    <u>Severability</u>. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13    <u>No Third Party Rights</u>. Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14    <u>No Right to Partition</u>. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

PATRICK_000059

002492

HCMLPHMIT00003637

**SIGNATURE PAGE FOR AMENDED AND RESTATED
EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated
Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the
day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____
    James D. Dondero
    Managing Member

Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:


By: _____
    Name:  Grant Scott
    Title:   Director


Witnessed By: _____

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:


By: _____
    Name:
    Title:


Witnessed by: _____

PATRICK_000060

002493

HCMLPHMIT00003638

SIGNATURE PAGE FOR AMENDED AND RESTATED
EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
CHARITABLE DAF FUND, LP

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated
Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the
day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____

        James D. Dondero
        Managing Member

Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: _____

        Name: Grant Scott
        Title:  Director

Witnessed By: _Candi L. Rizzo_
              Candi L. Rizzo

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: _____

        Name: ROD PALMER
        Title:

Witnessed by: _Grame O Clay_

PATRICK_000061

**002494**

HCMLPHMIT00003639

# EXHIBIT 10

HCMLPHMIT00003640

Case 1:23-mc-00054-sgj1 1 Doc 2654 2 10-74 ed 07/08/20/25 Entered 07/08/20/25 22:39:23 Page Desc 2
Exhibit 74    Page 120 of 307



Registration No.: **53083**

Date of Incorporation: **28 October 2011**

Client No.: **KY059900**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF FUND, LP**

| | |
|---|---|
| Share Class: | **General Partner** |
| Nominal Value: | **USD 0.00** |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **CHARITABLE DAF GP, LLC** The Corporation Trust Company Corporation Trust Center 1209 Orange St New Castle 19801 Wilmington DE USA | 25 Oct 2011 | New Partner | 1.00 | 25 Oct 2011 : Initial Exempted Limited Partnership Agreement dated 25 Oct 2011 | No Cert | | | |
| | | | | | | **Nil** | **1.00** | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

PATRICK_000016

002496



# EXHIBIT 11

HCMLPHMIT00003642

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)



**|||** WALKERS

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100   F +1 345 949 7886   www.walkersglobal.com

**REF: SSJ/VT/H0851-120776**

AMER_Docs   11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000090

002498

HCMLPHMIT00003643

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

**(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)**

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each and 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000091

002499

HCMLPHMIT00003644

## TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 4 |
| SHARES | 4 |
| MANAGEMENT SHARES | 5 |
| PARTICIPATING SHARES | 6 |
| MODIFICATION OF RIGHTS | 6 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |

AMER_Docs  11255406.3 H0851.120776

i



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000092

002500

HCMLPHMIT00003645

THE SEAL ........................................................................................................ 15

DISQUALIFICATION OF DIRECTORS ............................................................ 15

PROCEEDINGS OF DIRECTORS .................................................................. 16

DIVIDENDS ..................................................................................................... 18

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ............. 18

CAPITALISATION OF RESERVES .................................................................. 19

SHARE PREMIUM ACCOUNT ......................................................................... 20

NOTICES ......................................................................................................... 20

NON-RECOGNITION OF TRUSTS .................................................................. 21

WINDING UP .................................................................................................... 21

AMENDMENT OF ARTICLES OF ASSOCIATION .......................................... 22

CLOSING OF REGISTER OR FIXING RECORD DATE ................................... 22

REGISTRATION BY WAY OF CONTINUATION .............................................. 22

MERGERS AND CONSOLIDATION ................................................................. 22

DISCLOSURE .................................................................................................. 23

INDEMNITY ...................................................................................................... 23

DISPUTE RESOLUTION .................................................................................. 24

AMER_Docs  11255406.3 H0851.120776

ii



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000093

002501

HCMLPHMIT00003646

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

**(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)**

TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

INTERPRETATION

1.    In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Law and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

AMER_Docs  11255406.3 H0851.120776

1



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000094

002502

HCMLPHMIT00003647

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a)    passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)    approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Law and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "**Participating Shares**" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Restricted Person**" means any Person holding Participating Shares:

(a)    in breach of the law or requirements of any country or governmental authority;

(b)    that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the US Internal Revenue Code of 1986, as amended (the "**Code**") or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)    in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000095

**002503**

HCMLPHMIT00003648

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)    passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)    approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)    words importing the singular number shall include the plural number and vice versa;

(b)    words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)    the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)    reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)    reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000096

002504

HCMLPHMIT00003649

(f)    reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)    reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

2.    Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

### PRELIMINARY

3.    The business of the Company may be commenced at any time after incorporation.

4.    The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.    The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.    The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office.  The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

### SHARES

7.    Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)    issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)    grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8.    The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions,



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000097

002505

HCMLPHMIT00003650

preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9.  The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

12. Any Management Shares held by Grant Scott will be automatically redeemed by the Company upon his death or upon the Company receiving written notice from two board certified physicians confirming that he is of unsound mind or otherwise incapacitated ("**Automatic Redemption**").

13. If at the time of an Automatic Redemption, Grant Scott is the sole Director of the Company, such office will be automatically vacated by Grant Scott.

14. Upon an Automatic Redemption, the Company shall issue 100 Management Shares to a successor management shareholder ("**Successor Management Shareholder**") designated by James Dondero ("**Designator**"), or, if he is unable or declines to act, by an individual or individuals designated by James Dondero ("**Successor Designator**"), in either case within 15 days of the Automatic Redemption. If the Designator is:

    (a) deceased and has not named a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made in accordance with the provisions of the Designator's will, or if his will contains no such provisions, by the qualified personal representative of his estate (the "**Designator's Personal Representative**"); or

    (b) otherwise incapacitated and has not previously designated a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made by the Designator's attorney-in-fact appointed for such purpose, under a valid, effective power of attorney instrument (the "**Designator's Attorney**").

15. Any designation of a Successor Management Shareholder must be notified to the Company in writing and signed by either the Designator, the Successor Designator, the Designator's Personal Representative, or the Designator's Attorney, as appropriate, and accompanied by a consent to become a Shareholder signed by the Successor Management Shareholder ("**Issue Notice**"). The issue of the 100 Management Shares to the Successor Management Shareholder shall take effect upon receipt by the Company of the Issue Notice and the Register will be updated accordingly.



AMER_Docs  11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000098

002506

HCMLPHMIT00003651

16.   The Designator may name a Successor Designator (including an individual, or a series of individuals) at any time pursuant to a written notice delivered to the Company during his lifetime or by a provision in his will.  Each Successor Designator upon succeeding and replacing the Designator or a prior Successor Designator, may in the same manner as set out above, designate an individual, or a series of individuals, to succeed him as Successor Designator.  In the event of a conflict between such instruments, the one bearing the latest date shall control.  A Successor Designator will assume such office upon consenting to so act.

17.   The Successor Management Shareholder may not be a "disqualified person" (as that term is defined in Section 4946 of the United States Internal Revenue Code of 1986, as amended), other than a foundation manager, with respect to Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., or Highland Kansas City Foundation, Inc.

18.   In connection with the appointment of the Successor Management Shareholder, the Company and its registered office service provider will be entitled to rely on the advice of counsel confirming that the designation of the Successor Management Shareholder has been made in accordance with the procedures set out in these Articles.

## PARTICIPATING SHARES

19.   Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

20.   Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him.  For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

21.   The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.



AMER_Docs  11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000099

002507

HCMLPHMIT00003652

**CERTIFICATES**

22.     No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

**FRACTIONAL SHARES**

23.     The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

**TRANSFER OF SHARES**

24.     The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

25.     The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

26.     The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

27.     All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

28.     If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

**TRANSMISSION OF SHARES**

29.     The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share.  In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

30.     Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000100

**002508**

HCMLPHMIT00003653

could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

31.    A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

32.    The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

33.    The Company may by Ordinary Resolution:

(a)    consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)    convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)    subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)    cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

34.    The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

35.    Subject to the Law, the Company may:

(a)    issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b)    purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c)    make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d)    accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000101

## 002509

HCMLPHMIT00003654

36.    Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

37.    The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

38.    The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

### TREASURY SHARES

39.    Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

40.    No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

41.    The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a)    the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b)    a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

42.    Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

### GENERAL MEETINGS

43.    The Directors may, whenever they think fit, convene a general meeting of the Company.

44.    The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

45.    General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the

AMER_Docs 11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000102

002510

HCMLPHMIT00003655

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

46.    If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

47.    At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

48.    The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

49.    All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors.  No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

50.    No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business.  Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

51.    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved.  In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

52.    If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000103

002511

HCMLPHMIT00003656

53.    The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

54.    If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

55.    The chairman may adjourn a meeting from time to time and from place to place either:

(a)    with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

(b)    without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i)    secure the orderly conduct or proceedings of the meeting; or

(ii)    give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.   When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting.   Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

56.    At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

57.    If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

58.    In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

59.    A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith.   A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

### VOTES OF SHAREHOLDERS

60.    On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000104

002512

HCMLPHMIT00003657

Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

61. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

62. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

63. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

64. On a poll votes may be given either personally or by proxy.

65. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised.  A proxy need not be a Shareholder.

66. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

67. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

68. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

69. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

70. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

71. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

AMER_Docs  11255406.3 H0851.120776

12



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000105

002513

HCMLPHMIT00003658

72.    The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

73.    Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

74.    The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

75.    The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

76.    There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

77.    The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

### ALTERNATE DIRECTOR

78.    Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present.  Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote.  A Director may at any time in writing revoke the appointment of an alternate appointed by him.  Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate.  The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

79.    Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally.  The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

### POWERS AND DUTIES OF DIRECTORS

80.    Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company.  No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000106

002514

HCMLPHMIT00003659

81. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

82. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

83. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

84. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

85. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

86. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

87. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000107

002515
HCMLPHMIT00003660

88.     Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

89.     The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

90.     The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

91.     The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

92.     Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

93.     The office of Director shall be vacated, if the Director:

    (a)     becomes bankrupt or makes any arrangement or composition with his creditors;

    (b)     dies or is found to be or becomes of unsound mind;

    (c)     resigns his office by notice in writing to the Company;

    (d)     is removed from office by Ordinary Resolution;

    (e)     is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or



AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000108

002516

HCMLPHMIT00003661

(f)     is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

94.     The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit.  Questions arising at any meeting shall be decided by a majority of votes.  In case of an equality of votes the chairman shall have a second or casting vote.  A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

95.     A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

96.     The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one.  A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

97.     A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors.  A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made.  A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

98.     A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established.  A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

99.     Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000109

002517

HCMLPHMIT00003662

100.    The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

    (a)    all appointments of officers made by the Directors;

    (b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

    (c)    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

101.    When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

102.    A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

103.    The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

104.    The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

105.    Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

106.    A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

107.    All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



17

AMER_Docs    11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000110

002518

HCMLPHMIT00003663

## DIVIDENDS

108.    Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

109.    Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

110.    The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

111.    Any dividend may be paid in any manner as the Directors may determine.  If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.  Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

112.    The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

113.    Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

114.    If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

115.    No dividend shall bear interest against the Company.

### ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

116.    The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

117.    The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

118.    The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

18

AMER_Docs  11255406.3 H0851.120776

PATRICK_000111

002519

HCMLPHMIT00003664

being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

119.    The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

120.    The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

121.    Subject to the Law and these Articles, the Directors may:

(a)     resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b)     appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i)     paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii)    paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c)     make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)     authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i)     the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii)    the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares,



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000112

002520

HCMLPHMIT00003665

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e)    generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

122.    The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

123.    There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

124.    Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

125.    Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

126.    Any notice or other document, if served by:

(a)    post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b)    facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c)    recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)    electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

AMER_Docs    11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000113

002521

HCMLPHMIT00003666

127.    Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

128.    Notice of every general meeting of the Company shall be given to:

(a)    all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)    every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

### NON-RECOGNITION OF TRUSTS

129.    Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

### WINDING UP

130.    If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131.    Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a)    first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b)    second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132.    If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000114

002522

HCMLPHMIT00003667

assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

133.  Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

134.  For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

135.  In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

136.  If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

137.  The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

138.  The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.

22

AMER_Docs 11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000115

002523

HCMLPHMIT00003668

## DISCLOSURE

139.   The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

## INDEMNITY

140.   To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or Gross Negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

141.   Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

142.   To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).   The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

143.   Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK_000116

002524

HCMLPHMIT00003669

144. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

### DISPUTE RESOLUTION

145. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, its Shareholders and/or any Covered Person.  If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

    (a)    Mediation:

        (i)    any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.  The mediator will be selected by agreement of the parties.  If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

        (ii)    the mediation will be conducted as specified by the mediator and agreed upon by the parties.  The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

        (iii)    the mediation will be treated as a settlement discussion and therefore will be confidential.  The mediator may not testify for either party in any later proceeding relating to the dispute.  No recording or transcript shall be made of the mediation proceedings; and

        (iv)    each party will bear its own costs in the mediation.  The fees and expenses of the mediator will be shared equally by the parties,

    (b)    Arbitration:

if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.  A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed.  Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein.  The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in these Articles and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**").  In the event of a conflict, the provisions of these Articles will control:

        (i)    the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules.  Any

24

AMER_Docs  11255406.3 H0851.120776



issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however,* that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement.  No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii)    the arbitrators may not award non-monetary or equitable relief of any sort.  They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum.  In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii)   the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv)    no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it.  In any event, there shall be no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v)     all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement.  Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a

25

AMER_Docs  11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000118

**002526**

HCMLPHMIT00003671

reasonable opportunity to protect their interests.   In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered.   The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)     the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.



AMER_Docs  11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000119

002527

HCMLPHMIT00003672

# EXHIBIT 12

HCMLPHMIT00003673



Registration No.: **263805**
Date of Incorporation: **27 October 2011**
Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | |
|---|---|
| Share Class: | **Management** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | **Yes** |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **Grant Scott** Highland Capital Managment, L.P. 13455 Noel Road, Suite 800 Dallas Texas 75240 USA | 7 Nov 2011 | Allotment | 100.00 | 7 Nov 2011 : Allotment of 100.0 Management share(s) for USD0.01 / share to Mr. Grant Scott pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 25 Mar 2021 : Transfer of 100.0 Management share(s) from Mr. Grant Scott to Mark E. Patrick pursuant to resolutions dated 25 Mar 2021 | | | | |
| | | | | | | Nil | Nil | 25 Mar 2021 |
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Allotment | 1.00 | 7 Nov 2011 : Allotment of 1.0 Management share(s) for USD0.01 / share to WNL Limited pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Repurchase | (1.00) | 7 Nov 2011 : Repurchase of 1.0 Management share(s) from WNL Limited pursuant to resolutions | No Cert | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 2]

PATRICK_000017

**002529**
HCMLPHMIT00003674

Case 1:23-cv-10054-sgj1 Doc 2642-2 Filed 07/09/20 Entered 07/09/20 20:22:39 Page Desc 3
Exhibit 74    Page 154 of 307



Registration No.: **263805**
Date of Incorporation: **27 October 2011**
Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | Nil | Nil | 7 Nov 2011 |
|---|---|---|---|---|---|---|---|---|
| | | | | dated 07 Nov 2011. | | | | |
| **Mark E. Patrick** | 25 Mar 2021 | Transfer | 100.00 | 25 Mar 2021 : Transfer of 100.0 Management share(s) from Mr. Grant Scott to Mark E. Patrick pursuant to resolutions dated 25 Mar 2021 | No Cert | | | |
| | | | | | | 100 | 100.00 | |

Notes:

Date printed: 19 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

PATRICK_000018

002530


# EXHIBIT 13

HCMLPHMIT00003676



Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | |
|---|---|
| Share Class: | **Participating** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **The Highland Capital Management Partners Charitable Trust #2** Highland Capital Management, L.P. 13455 Noel Rd, Suite 800 Dallas TX 75240 USA | 7 Nov 2011 | Allotment | 300.00 | 7 Nov 2011 : Allotment of 300.0 Participating share(s) for USD0.01 / share to The Highland Capital Management Partners Charitable Trust #2 pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | New Certificate | 200.00 | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 200.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc | | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 3]

PATRICK_000019

002532

HCMLPHMIT00003677



Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | New Certificate | 100.00 | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 100.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | | | | | Nil | Nil | 30 Nov 2011 |
| Highland Kansas City Foundation, Inc | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 100.00 | |
| Highland Dallas Foundation, Inc | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 100.00 | |
| Highland Santa Barbara Foundation, Inc | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management | No Cert | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 3]

PATRICK_000020

002533



HCMLPHMIT00003678



Registration No.: **263805**
Date of Incorporation: **27 October 2011**
Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 100 | 100.00 | |
| **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Fort Worth TX 76102 USA | 13 Aug 2015 | Allotment | 5.00 | 13 Aug 2015 : Allotment of 5.0 Participating share(s) for USD0.01 / share to Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT pursuant to minutes/resolutions dated 12 Aug 2015 | No Cert | | | |
| | | | | | | 100 | 5.00 | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[3 / 3]

PATRICK_000021

002534
HCMLPHMIT00003679

# EXHIBIT 14

HCMLPHMIT00003680

Case 19-34054-sgj11 Doc 4255-74 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc 3
Case 19-34054-sgj11 Doc 2547-13 Filed 07/09/21 Entered 07/09/21 17:06:29 Page 2 of 3
Case 3:25-cv-02724-L    Document 74    Filed 06/02/25    Page 1007 of 1011    PageID 2906

# *Delaware*

*PAGE 1*

### *The First State*

 

    *I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF*

*DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT*

*COPY OF THE CERTIFICATE OF FORMATION OF "CHARITABLE DAF GP,*

*LLC", FILED IN THIS OFFICE ON THE TWENTY-FIFTH DAY OF OCTOBER,*

*A.D. 2011, AT 11:23 O'CLOCK A.M.*

 

 

*Jeffrey W. Bullock, Secretary of State*

**5056341   8100**

**111131792**

*AUTHENTICATION: 9113377*

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*DATE: 10-25-11*

PATRICK_000036

**002536**

HCMLPHMIT00003681

Case 19-34054-sgj11 Doc 4255-74 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc 3
Case 19-34054-sgj11 Doc 2547-13 Filed 07/09/21 Entered 07/09/21 17:06:29 Page 3 of 3
Case 3:25-cv-02724-L Document 104 Exhibit 74 Filed 06/26/26 Page 1008 of 1011 PageID 2907

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:26 AM 10/25/2011*
*FILED 11:23 AM 10/25/2011*
*SRV 111131792 – 5056341 FILE*

**CERTIFICATE OF FORMATION**

**OF**

**CHARITABLE DAF GP, LLC**

The undersigned hereby executes this Certificate of Formation of Charitable DAF GP, LLC (the "**Company**"), for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

1.    The name of the Company is **Charitable DAF GP, LLC.**

2.    The address of the registered office of the Company in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, County of New Castle, State of Delaware 19901. Its registered agent at such address is The Corporation Trust Company.

IN WITNESS WHEREOF, the undersigned, an authorized person of the Company, has caused this Certificate of Formation to be duly executed as of the **24th** day of October, 2011.

By: _____

James S. Seevers, Jr.
Authorized Person

78673.000002 EMF_US 37662262v2

PATRICK_000037

**002537**

HCMLPHMIT00003682

# EXHIBIT 15

HCMLPHMIT00003683

ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST AGREEMENT (this "Agreement") is made and entered into as of the 24 day of March, 2021, by and between Grant J. Scott (the "Assignor") and Mark E. Patrick.

WHEREAS, Assignor is the legal and beneficial owner of one hundred percent (100%) of the limited liability company interest (the "Membership Interest") in Charitable DAF GP, LLC, a Delaware limited liability company (the "Company"), and Assignor desires to assign the Membership Interest to Assignee, upon the terms and conditions set forth herein; and

WHEREAS, Assignee desires to accept an assignment of the Membership Interest (such right, title and interest in and to the Membership Interest, together with, if any: (i) Assignor's capital account, (ii) the Assignor's rights in and to specific Company property, (iii) Assignor's rights to participate in the management of the Company, (iv) Assignor's rights to distributions, reimbursements or other payments (including any distributions of cash flow which have not been distributed), (v) rights to profits, losses and other allocations, and (vi) all other rights and benefits of Assignor in the Company with respect to the Membership Interest assigned hereby to Assignee being herein sometimes collectively referred to as the "Assigned Interest").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.    Assignment and Assumption of Assigned Interest. Assignor does hereby unconditionally and irrevocably assign, transfer, set over and deliver unto the Assignee, its successors and assigns, the Assigned Interest, including, but not limited to the profits, losses, capital and cash flow, if any, allocable to the Assigned Interest, free and clear of any and all liens, security interests, encumbrances, claims, rights of another, rights of first refusal, covenants, conditions, reservations and any and all other restrictions. Assignee does hereby accept the Assigned Interest and agrees to be bound by and assume all obligations under the limited liability company agreement of the Company.

2.    Substitute Member. Assignor hereby acknowledges that Assignee is hereby admitted as a substitute member of the Company with respect to the Membership Interest from and after the date hereof as a result of this Agreement.

3.    Effective Date. This Agreement is effective as of the date first above mentioned.

4.    Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one Agreement. This Agreement and any signed agreement or instrument entered into in connection with this Agreement or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, PDF or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PATRICK_000006

002539

HCMLPHMIT00003684

ASSIGNOR:

Name: **Grant J. Scott**

ASSIGNEE:

Name: **Mark E. Patrick**

[Signature Page for Assignment of Membership Interest Agreement]

078673.0000002 EMF_US 84142968v2

PATRICK_000007

**002540**

HCMLPHMIT00003685