**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§

§   Case No   **19-34054-SGJ-11**

**The Dugaboy Investment Trust**
**- Appellant**

§

vs.                                     §

**Highland Claimant Trust**
-Appellee

§                           **3:25-CV-02724-L**

§

**[4401] Order Granting Motion for Order Fixing Allowed Amount of Class 11 Interests (related document # 4362) Entered on 9/22/2025.**

# Volume 5
# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

**Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and
Amended Designation of Items to be Included in the Record on Appeal From the
Bankruptcy Court's Order Fixing Allowed Amount of Class 11 Interests**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4423] on October 6, 2025, from the Bankruptcy Court's September 22, 2025 *Order Fixing Allowed Amount of Class 11 Interests* [Docket No. 4401], and having received the Clerk's letter of October 23, 2025 requesting corrections to the record designations, submits this *Statement of Issues to be Presented and Amended Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.  Did the Bankruptcy Court misapply the absolute-priority rule in determining that the Hunter Mountain Investment Trust's (HMIT's) Class 10 interests were entitled to 100% of any excess funds left over after all senior creditor classes were paid in full, in disregard of equity interests that allocated 99.5% to HMIT and 0.5% to Dugaboy?

2.  Did the Bankruptcy Court err when it allocated potential excess funds in a way that effectively gave HMIT *more than* 100% of what it was entitled to, in contravention of black-letter law holding that a senior class cannot receive more than 100% without the consent of the junior class? *See In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009).

3.  Did the Bankruptcy Court err in determining the value of Dugaboy's interest only as a fixed dollar amount, rather than a *pro rata* percentage reflecting its equity ownership share?

4.  Did the Bankruptcy Court err in allowing Highland to use a valuation methodology for determining the allowed amount of Dugaboy's claim based on limited partners' pre-petition capital accounts, which were derived from untested and unvetted figures created for tax purposes that bore little if any relation to true market value, when nothing in the confirmed Reorganization Plan allowed for such a method?

5.  Did the Bankruptcy Court err in believing that "res judicata" required it to use the same methodology to value Dugaboy's Class 11 interests as it had previously used to value HMIT's Class 10 interests?

---

[1] Because of its voluminous nature, Docket No. 4255 will be delivered to the Clerk on a flash drive that will arrive tomorrow.

1

6.    Did the Bankruptcy Court err at the hearing on September 18, 2025, when it invoked "res judicata" to threaten Dugaboy's counsel with Rule 11 sanctions for "recycling" arguments previously made by the "revolving door of lawyers" that had represented Dugaboy over the previous several years, thus seeking to impose a chilling effect on Dugaboy's right to zealous advocacy by its chosen counsel?

7.    Did the Bankruptcy Court's Order Fixing Allowed Amount of Class 11 Interests (Docket No. 4401) constitute a "final" judgment or order, thereby giving the District Court jurisdiction for appellate review of the Bankruptcy Court's Order denying Dugaboy's Motion to Recuse?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4423] filed by Appellant;

*000009*

2. Bankruptcy Court's *Order Fixing Allowed Amount of Class 11 Interests* [Docket No. 4401];

*000013*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact, and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s) 1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 9/14/2022 | 3521-5 | Claimant Trust Agreement |
| 2/27/2024 | 4199 | Stipulated and Agreed Order resolving (A) HCLOM, Ltd.'s Scheduled claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a bad faith |

*000619*

*000780*

*000820*

| | | | finding and an award of attorney's fees against HCLOM, Ltd., and James Dondero in connection therewith (related document #3657, 4176) Entered on 12/27/2024. (Dugan, Sue) |
|---|---|---|---|
| | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s) 4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s) 4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255 (to be submitted to | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related |

| | *Clerk on flash drive*) | | document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 |

VOL 6

003542

| | | | |
|---|---|---|---|
| | | | U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| *Vol. 6*<br><br>*0035415* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 7*<br><br>*0003865* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *0003889* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s) 4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8, 8, Exhibit 9 (Curry, David) |
| *0004016* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *0004031* | 6/23/2025 | 4275 | Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| *0004042* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |

*vol. B*

*004259*

| | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
|---|---|---|---|
| *004270* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)).           (Attachments: #1 Exhibit 126 (Annable, Zachery) |
| *004295* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *004296* | 6/25/2025 | 4296 | Transcript of hearing held June 25, 2025, before Chief Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297] |
| *004562* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4223 Objection). (Annable, Zachery) |
| *004291* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an |

6

*vol. 8*

*0004577*

*0004581*

*0004583*

*0004592*

*0004594*

*vol. 9*

*0004690*

| | | | |
|---|---|---|---|
| | | | order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| | 6/30/2025 | 4297 | Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025. (Okafor, M.) |
| | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo) |
| | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s) 4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |

| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s) 4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
|---|---|---|---|
| | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: # 1 Exhibit A) (Harper, Geoffrey) |
| | 8/8/2025 | 4362 | Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) Filed by Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A--Proposed Order) (Annable, Zachery) |
| | 8/12/2025 | 4368 | Amended appellant designation of contents for inclusion in record on appeal and statement of issues on appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4365 Appellant designation). (Harper, Geoffrey) |
| | 8/15/2025 | 4371 | Notice of hearing filed by Other Professional Highland Claimant Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) Filed by Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 9/18/2025 at 02:30 PM at https://us-courts.webex.com/meet/jerniga for 4362, (Annable, Zachery) |
| | 8/29/2025 | 4378 | Order Approving Motion to Conform Plan to Fifth Circuit Mandate (related document # 4302) Entered on 8/29/2025. (Okafor, M.) |
| | 9/8/2025 | 4384 | Response opposed to (related document(s): 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust) filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| | 9/11/2025 | 4389 | Stipulation by Highland Claimant Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust (RE: related document(s) 4384 Response). (Annable, Zachery) |
| | 9/15/2025 | 4393 | Reply to (related document(s): 4384 Response filed by Creditor The Dugaboy Investment Trust) (Reply in Support of Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust. (Annable, Zachery) |

*Handwritten annotations in left margin:* Vol 10, 004963, 004979, 005001, 005012, 005023, 005029, 005032, 005047, 005051

| | | | |
|---|---|---|---|
| *vol 10* | 9/15/2025 | 4394 | Amended Witness and Exhibit List (Highland Claimant Trust's Witness and Exhibit List with Respect to Hearing to Be Held on September 18, 2025) filed by Other Professional Highland Claimant Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10) (Annable, Zachery) |
| *005061* | | | |
| *005213* | 9/15/2025 | 4395 | Witness and Exhibit List for Hearing to be Held on September 18, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests)). (Harper, Geoffrey) |
| *005216* | 9/18/2025 | 4398 | Court admitted exhibits date of hearing September 18, 2025 (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust (Court Admitted Debtors/Highland Capital Mgmt., L.P. exhibits #1, #2, #3, #4, #5, #6, #7, #8, #9 & #10 offered by attorney John Morris, found at doc. #4394.) (Edmond, Michael) |
| *005217* | 9/22/2025 | 4401 | Order Granting Motion for Order Fixing Allowed Amount of Class 11 Interests (related document # 4362) Entered on 9/22/2025. (Grandstaff, Travis) |

Dated: October 23, 2025    Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

***Counsel for Appellant***
***The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

    I certify that on October 23, 2025, a copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

        */s/ Geoffrey S. Harper*
        Geoffrey S. Harper

# EXHIBIT 16

HCMLPHMIT00003686

Form 1023                    Highland Dallas Foundation, Inc.              TIN: 45-3961755

## **Attachment 2**

**_Part II, Line 1_**          Certificate of Incorporation

78673.000002 EMF_US 38799980v1

002542

HCMLPHMIT00003687

# Delaware

PAGE 1

### *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND DALLAS
FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY
OF NOVEMBER, A.D. 2011, AT 7:34 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE
NEW CASTLE COUNTY RECORDER OF DEEDS.

5069985   8100

111224468

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177054

DATE: 11-23-11

002543

HCMLPHMIT00003688

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:34 PM 11/22/2011
SRV 111224468 - 5069985 FILE

# CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND DALLAS FOUNDATION, INC.

FIRST: The name of the corporation is Highland Dallas Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

HCMLPHMIT00003689

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to The Dallas Foundation. If The Dallas Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I. THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22 day of November, 2011.

_____
James Dondero

002545

HCMLPHMIT00003690

# EXHIBIT 17

HCMLPHMIT00003691

INTERNAL REVENUE SERVICE                               DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201

Date:                                          Employer Identification Number:
    JAN 19 2013                                ████1755
                                               DLN:
HIGHLAND DALLAS FOUNDATION INC                    ██████8022
C/O HUNTON & WILLIAMS LLP                       Contact Person:
MARGARET S ALFORD                                 SHEILA M ROBINSON        ID# █1220
1445 ROSS AVE STE 3700                         Contact Telephone Number:
DALLAS, TX  75202                                 (877) 829-5500
                                               Accounting Period Ending:
                                                  December 31
                                               Public Charity Status:
                                                  509(a)(3)
                                               Form 990 Required:
                                                  Yes
                                               Effective Date of Exemption:
                                                  November 22, 2011
                                               Contribution Deductibility:
                                                  Yes
                                               Addendum Applies:
                                                  No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

Specifically, we have determined that you are a Type I supporting organization
under section 509(a)(3).  A Type I supporting organization is operated,
supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, for some helpful information about your responsibilities as an
exempt organization.

                                               Letter  947 (DO/CG)

002547

HCMLPHMIT00003692

HIGHLAND DALLAS FOUNDATION INC

Sincerely,



Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure:  Publication 4221-PC

Letter  947 (DO/CG)

002548

HCMLPHMIT00003693

# EXHIBIT 18

002549

HCMLPHMIT00003694

Form 1023                    Highland Dallas Foundation, Inc.                    TIN: 45-3961755

## **Attachment 4**

***Part IV***      <u>Narrative Description of Activities</u>

        The Applicant is organized and will be operated exclusively as a supporting organization within the meaning of section 509(a)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), to support and benefit The Dallas Foundation ("TDF"), a Texas nonprofit corporation. TDF is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code and a public charity described in section 509(a)(1) of the Code.

        The Applicant received its funding as one of three charitable remainder beneficiaries of a charitable remainder trust created by James Dondero, which terminated on November 30, 2011. As the attached Schedule D reflects, the Applicant qualifies as a Type I supporting organization within the meaning of section 509(a)(3)(B)(i) because a majority of its board is elected by TDF.

        The Applicant's supported organization, TDF, is the oldest community foundation in Texas and serves donors and nonprofit agencies throughout North Texas. As a community foundation, TDF offers a range of ways for local philanthropists to assist the community, including donor advised funds, designated and agency endowment funds, field of interest funds, scholarship funds, and unrestricted funds. TDF focuses on challenges facing North Texas and searches for nonprofit agencies that address these issues most efficiently and effectively, and it assists in connecting donors to causes they care about. In 2010, TDF paid out $31,408,988 in grants to charitable organizations in North Texas. The Applicant will support and benefit TDF by making grants directly to TDF in support of its charitable purposes. In addition, upon the direction and on behalf of TDF, the Applicant may make grants to such other public charities that TDF wishes to benefit in furtherance of TDF's exempt purposes. The total annual grants from the Applicant to or on behalf of TDF are expected to average approximately $1,000,000 per year.

002550

HCMLPHMIT00003695

# EXHIBIT 19

Reserved for Possible Supplementation

HCMLPHMIT00003696

# EXHIBIT 20

002552

HCMLPHMIT00003697

Form 1023             Highland Dallas Foundation, Inc.         TIN: 45-3961755

## Attachment 3

**_Part II, Line 5_**       Bylaws

78673.000002 EMF_US 38799980v1

002553

HCMLPHMIT00003698

# BYLAWS
## OF

## HIGHLAND DALLAS FOUNDATION, INC.

002554

HCMLPHMIT00003699

# TABLE OF CONTENTS

| | | Page |
|---|---|---|

**ARTICLE I OFFICES** ...................................................................................1

Section 1.1     Registered Office .......................................................1
Section 1.2     Other Offices .............................................................1

**ARTICLE II MEMBERSHIP** .......................................................................1

Section 2.1     Classes and Number....................................................1
Section 2.2     Voting ........................................................................1
Section 2.3     Transfer of Membership .............................................1
Section 2.4     Resignation of Member ..............................................2
Section 2.5     Place of Meetings .......................................................2
Section 2.6     Annual Meetings ........................................................2
Section 2.7     Special Meetings ........................................................2
Section 2.8     Notice of Meetings of Members ..................................2
Section 2.9     Quorum ......................................................................3
Section 2.10    Voting ........................................................................3
Section 2.11    Proxies.......................................................................3
Section 2.12    Action by Written Consent .........................................3

**ARTICLE III DIRECTORS** .........................................................................4

Section 3.1     General Powers ..........................................................4
Section 3.2     Number of Directors ..................................................4
Section 3.3     Vacancies ...................................................................4
Section 3.4     Place of Meetings .......................................................4
Section 3.5     Committees of Directors ............................................4
Section 3.6     Compensation of Directors ........................................4
Section 3.7     Annual Meeting .........................................................4
Section 3.8     Additional Regular Meetings .....................................5
Section 3.9     Special Meetings ........................................................5
Section 3.10    Method and Timing of Notice .....................................5
Section 3.11    Purpose not Required in Notice ..................................5
Section 3.12    Waiver of Notice ........................................................5
Section 3.13    Action by Written Consent.........................................6
Section 3.14    Validation of Action by Consent ................................6
Section 3.15    Quorum and Manner of Acting ...................................6
Section 3.16    Resignation and Removal of Directors .......................6

**ARTICLE IV OFFICERS**.............................................................................6

Section 4.1     Officers ......................................................................6
Section 4.2     Election, Term of Office and Eligibility ......................7

002555

HCMLPHMIT00003700

Section 4.3    Subordinate Officers ......................................................................7
Section 4.4    Removal .........................................................................................7
Section 4.5    The President .................................................................................7
Section 4.6    The Secretary ................................................................................7
Section 4.7    The Assistant Secretaries ..............................................................7
Section 4.8    Chairman .......................................................................................8
Section 4.9    The Chief Financial Officer ..........................................................8
Section 4.10   The Assistant Chief Financial Officers .........................................8
Section 4.11   Delegation of Duties .....................................................................8

ARTICLE V BOOKS AND RECORDS .................................................................8

Section 5.1    Location .........................................................................................8
Section 5.2    Inspection ......................................................................................9

ARTICLE VI MISCELLANEOUS PROVISIONS ................................................9

Section 6.1    Fiscal Year ....................................................................................9
Section 6.2    Depositories ..................................................................................9
Section 6.3    Checks, Drafts and Notes .............................................................9
Section 6.4    Contracts and Other Instruments ..................................................9
Section 6.5    Conflicts of Interest ......................................................................9
Section 6.6    Waivers of Notice .......................................................................10
Section 6.7    Ownership Interests in Other Entities .........................................10
Section 6.8    Indemnification ...........................................................................10
Section 6.9    Amendment of Bylaws ................................................................11

002556

HCMLPHMIT00003701

BYLAWS

OF

HIGHLAND DALLAS FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1   <u>Registered Office</u>.  The registered office of Highland Dallas Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2   <u>Other Offices</u>.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1   <u>Classes and Number</u>.  The Corporation shall have two classes of members and one member in each such class:  the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2   <u>Voting</u>.  Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members.  In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3   <u>Transfer of Membership</u>.  Institutional Membership in the Corporation is not transferable or assignable.  The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member.  Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member.  Each successor Individual Member shall succeed to the rights of the initial Individual Member.  Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

-1-

002557

HCMLPHMIT00003702

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

-2-

002558
HCMLPHMIT00003703

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9     Quorum.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws.  If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy.  At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10     Voting.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11     Proxies.  At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law.  Any member represented by proxy shall be counted as present at such meeting for all purposes.  Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12     Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12.  Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action.  Each such consent must state the date of each member's signature.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

002559

HCMLPHMIT00003704

# ARTICLE III

# DIRECTORS

Section 3.1    <u>General Powers</u>.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    <u>Number of Directors</u>.  The number of Directors that shall constitute the Board of Directors shall be three (3).  Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member.  Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    <u>Vacancies</u>.  If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy.  If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director.  Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    <u>Place of Meetings</u>.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    <u>Committees of Directors</u>.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    <u>Compensation of Directors</u>.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    <u>Annual Meeting</u>.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors.  If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

002560



HCMLPHMIT00003705

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11    Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12    Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

002561

HCMLPHMIT00003706

Section 3.13   <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   <u>Validation of Action by Consent</u>.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held.  At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice.  If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   <u>Quorum and Manner of Acting</u>.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors.  Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.  Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting.  In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present.  Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16   <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation.  A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events.  A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable.  The Institutional Member may remove an Institutional Director at any time, with or without cause.  The Individual Member may remove an Individual Director at any time, with or without cause.

## **ARTICLE IV**

## **OFFICERS**

Section 4.1   <u>Officers</u>.  The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer.  A person may hold multiple offices.

002562


HCMLPHMIT00003707

Section 4.2    Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3    Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4    Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5    The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary. The Secretary shall:

(a)    keep the minutes of the meetings of the members and of the Board of Directors;

(b)    see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)    in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

-7-

002563

HCMLPHMIT00003708

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    <u>Chairman</u>.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9    <u>The Chief Financial Officer</u>.  The Chief Financial Officer, if any, shall:

(a)    receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)    in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10    <u>The Assistant Chief Financial Officers</u>.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11    <u>Delegation of Duties</u>.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

<div align="center">

**ARTICLE V**

**BOOKS AND RECORDS**

</div>

Section 5.1    <u>Location</u>.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

<div align="center">-8-</div>

002564

HCMLPHMIT00003709

Section 5.2     Inspection.  The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1     Fiscal Year.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2     Depositories.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3     Checks, Drafts and Notes.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4     Contracts and Other Instruments.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5     Conflicts of Interest.  No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment.  All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

002565

HCMLPHMIT00003710

Section 6.6    <u>Waivers of Notice</u>.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7    <u>Ownership Interests in Other Entities</u>.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8    <u>Indemnification</u>.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators.  The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise.  The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

-10-

002566

HCMLPHMIT00003711

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)     The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)     To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9     <u>Amendment of Bylaws</u>. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the

-11-

002567

HCMLPHMIT00003712

Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

002568

HCMLPHMIT00003713

# EXHIBIT 21

HCMLPHMIT00003714

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA

BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE

TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE

NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177064

DATE: 11-23-11

**5069989  8100**

**111224480**

You may verify this certificate online
at corp.delaware.gov/authver.shtml

002570

HCMLPHMIT00003715

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

## CERTIFICATE OF INCORPORATION

### OF

### HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST: The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

HCMLPHMIT00003716

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH:  The corporation shall have perpetual existence.

SEVENTH:  To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH:  Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation. If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH:  In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH:  The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22 day of November, 2011.

James Dondero

- 2 -

002572

HCMLPHMIT00003717

# EXHIBIT 22

HCMLPHMIT00003718

IRS  DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI OH   45999-0023

Date of this notice:  12-02-2011

Employer Identification Number:
█████2008

Form:  SS-4

Number of this notice:  CP 575 E

HIGHLAND SANTA BARBARA FOUNDATION
INC
13455 NOEL RD STE 800
DALLAS, TX  75240

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.


              WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

     Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN █████2008.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

     When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

     Assigning an EIN does not grant tax-exempt status to non-profit organizations.
Publication 557, *Tax Exempt Status for Your Organization*, has details on the
application process, as well as information on returns you may need to file.  To apply
for formal recognition of tax-exempt status, most organizations will need to complete
either Form 1023, *Application for Recognition of Exemption Under Section 501(c)(3) of
the Internal Revenue Code*, or Form 1024, *Application for Recognition of Exemption
Under Section 501(a)*.  Submit the completed form, all applicable attachments, and the
required user fee to:

Internal Revenue Service
PO Box 12192
Covington, KY  41012-0192

     The Pension Protection Act of 2006 contains numerous changes to the tax law
provisions affecting tax-exempt organizations, including an annual electronic
notification requirement (Form 990-N) for organizations not required to file an annual
information return (Form 990 or Form 990-EZ).  Additionally, if you are required to
file an annual information return, you may be required to file it electronically.
Please refer to the Charities & Non-Profits page at www.irs.gov for the most current
information on your filing requirements and on provisions of the Pension Protection
Act of 2006 that may affect you.

     To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov.  If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.


002574

HCMLPHMIT00003719

**IMPORTANT REMINDERS:**

* Keep a copy of this notice in your permanent records.  **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.**

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

* Provide future officers of your organization with a copy of this notice.

   If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice.  If you write, please tear off the stub at the bottom of this notice and send it along with your letter.  If you do not need to write us, do not complete and return the stub.  Thank you for your cooperation.

                    Keep this part for your records.        CP 575 E (Rev. 7-2007)

--------------------------------------------------------------------------------------

   Return this part with any correspondence
so we may identify your account.  Please                              CP 575 E
correct any errors in your name or address.
                                                                9999999999

   Your Telephone Number  Best Time to Call  DATE OF THIS NOTICE:  12-02-2011
   (    )     -                              EMPLOYER IDENTIFICATION NUMBER: ▮▮▮2008
   _____  _____  FORM:  SS-4              NOBOD


   INTERNAL REVENUE SERVICE                  HIGHLAND SANTA BARBARA FOUNDATION
   CINCINNATI  OH  45999-0023                INC
   [barcode]                                 13455 NOEL RD STE 800
                                             DALLAS, TX  75240

002575

HCMLPHMIT00003720

# EXHIBIT 23

002576

HCMLPHMIT00003721



**SANTA BARBARA**
**FOUNDATION**

**BOARD OF TRUSTEES**

Pamela Cann
**Chair**

Stephen Hicks
**Vice Chair**

Susan T. Richards
**Treasurer**

Nicolasa Sandoval, Ph.D.
**Secretary**

Diane Adam
Phil Alvarado
Randall Day
Donna France
Angel Iscovich, M.D.
Danna McGrew
Robert C. Nakasone
Ernesto Paredes
Cathy Pepe
James Rogers
Matt Rowe
Ginger Salazar
Tracy Stouffer
Michael D. Young, Ph.D.

**President & CEO**
Jacqueline M. Carrera

South County Headquarters
1111 Chapala Street, Suite 200
Santa Barbara, CA 93101-3100
Phone: (805) 963-1873
Fax: (805) 966-2855

North County Headquarters
2625 S. Miller Street, Suite 101
Santa Maria, CA 93455-1777
Phone: (805) 346-6123
Fax: (805) 346-6125

SBFoundation.org

f @sbfoundation
@sbfoundation
/santa-barbara-foundation
@santabarbarafoundation

July 9, 2021

Honorable Stacy G. C. Jernigan
United States Bankruptcy Judge
Northern District of Texas

Re:     Highland Dallas Foundation, Inc.

Dear Judge Jernigan:

The Santa Barbara Foundation ("SBF") is a community foundation incorporated in 1928 under the laws of the state of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. The mission of SBF is to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. Working in partnership with individuals, families, community organizations, nonprofits, businesses, and government, SBF funds a wide range of initiatives, projects, and organizations. SBF has supported nearly every Santa Barbara County nonprofit organization and essential community project during its 93-year history and continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

In 2020, SBF awarded $31 million in grants, received $36 million in contributions, and had $514 million in assets. Nonprofit support included annual grant programs (behavioral health, health care, food, shelter & safety, and child care), laying the groundwork for workforce development strategies, and creating the Collaboration for Social Impact to help nonprofits with capacity building and leadership development. Additionally, SBF co-organized and co-led the countywide COVID-19 Joint Response Effort, broadened its grantmaking to include small businesses through the Santa Barbara Better Together Fund, co-led the 2020 census efforts with the County of Santa Barbara, sponsored and produced educational events to promote diversity, equity, inclusion and access, and continued its annual funding of the Scholarship Foundation of Santa Barbara. Grants are made through SBF from various types of funds, including donor advised, donor designated, and field of interest. Discretionary grants, totaling over $7 million in 2020, are also supported by SBF's unrestricted contributions and investment income.

<u>Supporting Organizations</u>

SBF works with entities organized under Section 509(a)(3) of the Internal Revenue Code as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. Each organization is a separate legal entity required to file

HCMLPHMIT00003722

Case 19-34054-sgj11 Doc 2644-33 Filed 08/20/25 Entered 08/20/25 22:39:29 Desc
Case 3:25-cv-02724-L Document 11-574 Filed 02/02/25 Page 50 of 1013 PageID 2960

Honorable Stacy G. C. Jernigan                    July 9, 2021                    Page 2

its own IRS Form 990, "Return of Organization Exempt from Income Tax". SBF and its supporting organizations are considered under SBF's control and thus consolidated in SBF's audited financial statements.

Overview of Highland Santa Barbara Foundation, Inc.

Highland Santa Barbara Foundation, Inc. (HSBF) was formed in November 2011 as a Delaware nonprofit nonstock corporation to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of SBF. HSBF is a Type I supporting organization under Section 509(a)(3) of the Internal Revenue Code. SBF is a supported organization under Section 509(a)(1) of the Internal Revenue Code.

The Bylaws of HSBF describe the governance of HSBF by its members, directors, and officers. HSBF has two classes of members, institutional and individual, and one member in each class. SBF is the institutional member. James Dondero is the individual member. HSBF has three directors, two elected by SBF and one elected by James Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors.

SBF and HSBF have an operating agreement whereby SBF provides grant administration and other services to HSBF and HSBF pays support fees to SBF. The fees are calculated using a tiered schedule based on the fair market value of 100 participation shares of Charitable DAF HoldCo, Ltd., which is the primary asset of HSBF. The fair market value is determined by an independent valuation firm at least annually.

Relationship and Mission Advancement

SBF meets annually with HSBF to discuss SBF activities, alignment of SBF priorities and focus areas with HSBF philanthropic objectives, and proposed HSBF funding for the upcoming year. Since its inception, HSBF has funded over $5 million of the grants awarded by SBF, including nearly $3 million in Santa Barbara County. See HSBF, Inc. History, attached.

HSBF has augmented SBF's discretionary grants in the areas of: early childhood, youth, and workforce development and education; scholarships; veterans and military education and job training; Community Caregiving Initiative; and Food Action Plan. HSBF has also funded grants to specific organizations, including: $400,000 to Children's Museum of Santa Barbara d.b.a. MOXI - The Wolf Museum of Exploration and Innovation; $90,000 to Reasoning Mind, Inc. for identified local schools to participate in a math literacy program; and $30,000 to Boy Scouts of America - Los Padres Council for rebuilding of Camp Rancho Alegre following the Whittier Fire.

Thank you.

Sincerely,

Jacqueline M. Carrera
President & Chief Executive Officer

HCMLPHMIT00003723

# EXHIBIT 24

HCMLPHMIT00003724

Case 19-34054-sgj11 Doc 4255-74 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc 4
Case 19-34054-sgj11 Doc 2547-23 filed 07/09/21 Entered 07/09/21 17:46:129 Page 2 of 4
Case 3:25-cv-02724-L Document 10-574 Filed 04/02/05307 Page 52 of 1013 PageID 2962

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND KANSAS CITY FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-THIRD DAY OF NOVEMBER, A.D. 2011, AT 4:23 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Jeffrey W. Bullock, Secretary of State

**5070449  8100**

**111227849**

AUTHENTICATION: 9179752

DATE: 11-28-11

You may verify this certificate online
at corp.delaware.gov/authver.shtml

002580

HCMLPHMIT00003725

Case 19-34054-sgj11 Doc 4255-74 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc 4
Case 19-34054-sgj11 Doc 2547-23 Filed 07/09/21 Entered 07/09/21 17:16:129 Page 3 of 4
Case 3:25-cv-02724-L Document 1-574 Filed 2/05/05307 Page 53 of 1013 PageID 2963

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:03 PM 11/23/2011
FILED 04:23 PM 11/23/2011
SRV 111227849 - 5070449 FILE

# CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

FIRST: The name of the corporation is Highland Kansas City Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit the Greater Kansas City Community Foundation, a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by the Greater Kansas City Community Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation

002581

HCMLPHMIT00003726

exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to the Greater Kansas City Community Foundation. If the Greater Kansas City Community Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22 day of November, 2011.

James Dondero

- 2 -

78673.000002 EMF_US 37829386v4

002582

HCMLPHMIT00003727

# EXHIBIT 25

HCMLPHMIT00003728



July 7, 2021

To Whom It May Concern:

Thank you for this opportunity to share our experience working with the Highland Kansas City Foundation, Inc.

I represent the Greater Kansas City Community Foundation, which exists to serve philanthropic donors by providing vehicles for their charitable giving. The Community Foundation was founded in 1978, and now has an asset base of more than $4 billion, housing thousands of donor-advised funds, scholarship funds, supporting organizations and other charitable funds and accounts established by individuals, families and businesses. In 2020, the Community Foundation's donors used their charitable dollars to grant over $550 million to their favorite causes across the country.

The Community Foundation currently works with 18 supporting organizations, one of which is the Highland Kansas City Foundation, established in 2011. Supporting organizations operate under their own legal entities but require the Community Foundation's active oversight and involvement. The Community Foundation's Board of Directors controls the Board of the Highland Kansas City Foundation. The Community Foundation oversees all of the Highland Kansas City Foundation's grants, ensuring every dollar is distributed for charitable purposes.

Since 2011, the Highland Kansas City Foundation has granted more than $9 million to support education and college preparation, historical preservation, medical research, veterans, the arts, the environment and more.

The Community Foundation's mission is to increase philanthropy and connect donors to the causes they care about, and we are honored to further the Highland Kansas City Foundation's generosity through significant annual distributions to important causes in our country.

Sincerely,

Deborah L. Wilkerson
President & CEO

002584

HCMLPHMIT00003729

# EXHIBIT 26

002585

HCMLPHMIT00003730

# BYLAWS

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

HCMLPHMIT00003731

# TABLE OF CONTENTS

**Page**

ARTICLE I          OFFICES............................................................................1

    Section 1.1          Registered Office ..........................................1
    Section 1.2          Other Offices................................................1

ARTICLE II         MEMBERSHIP....................................................................1

    Section 2.1          Classes...........................................................1
    Section 2.2          Voting............................................................1
    Section 2.3          Transfer of Membership ...............................1
    Section 2.4          Resignation of Member.................................2
    Section 2.5          Place of Meetings.........................................2
    Section 2.6          Annual Meetings...........................................2
    Section 2.7          Special Meetings...........................................2
    Section 2.8          Members' List...............................................2
    Section 2.9          Notice of Meetings of Members ....................2
    Section 2.10         Quorum..........................................................3
    Section 2.11         Voting............................................................3
    Section 2.12         Proxies...........................................................3
    Section 2.13         Action by Written Consent ............................3

ARTICLE III        DIRECTORS .......................................................................4

    Section 3.1          General Powers ..............................................4
    Section 3.2          Number of Directors .....................................4
    Section 3.3          Vacancies.......................................................4
    Section 3.4          Place of Meetings..........................................4
    Section 3.5          Committees of Directors ................................4
    Section 3.6          Compensation of Directors ............................4
    Section 3.7          Annual Meeting .............................................5
    Section 3.8          Additional Regular Meetings.........................5
    Section 3.9          Special Meetings............................................5
    Section 3.10         Method and Timing of Notice........................5
    Section 3.11         Purpose not Required in Notice .....................6
    Section 3.12         Waiver of Notice ...........................................6
    Section 3.13         Action by Written Consent ............................6
    Section 3.14         Validation of Action by Consent ...................6
    Section 3.15         Quorum and Manner of Acting.......................6
    Section 3.16         Resignation and Removal of Directors ...........7
    Section 3.17         Chairman Presiding........................................7

ARTICLE IV         OFFICERS ..........................................................................7

    Section 4.1          Officers ..........................................................7

002587

HCMLPHMIT00003732

Section 4.2        Election, Term of Office and Eligibility ..............................................7
Section 4.3        Subordinate Officers .........................................................................7
Section 4.4        Removal ..............................................................................................7
Section 4.5        The President ......................................................................................8
Section 4.6        The Secretary ......................................................................................8
Section 4.7        The Assistant Secretaries ..................................................................8
Section 4.8        The Chief Financial Officer ..............................................................8
Section 4.9        The Assistant Chief Financial Officers .............................................9
Section 4.10       Delegation of Duties .........................................................................9

ARTICLE V        BOOKS AND RECORDS ...................................................................9

Section 5.1        Location ..............................................................................................9
Section 5.2        Inspection ..........................................................................................9

ARTICLE VI       MISCELLANEOUS PROVISIONS ....................................................9

Section 6.1        Fiscal Year ..........................................................................................9
Section 6.2        Depositories ......................................................................................9
Section 6.3        Checks, Drafts and Notes ..................................................................9
Section 6.4        Contracts and Other Instruments ....................................................10
Section 6.5        Waivers of Notice ............................................................................10
Section 6.6        Ownership Interests in Other Entities .............................................10
Section 6.7        Indemnification. ...............................................................................10
Section 6.8        Amendment of Bylaws. ...................................................................12

002588

HCMLPHMIT00003733

BYLAWS

OF

HIGHLAND KANSAS CITY FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1    Registered Office.  The registered office of Highland Kansas City Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1    Classes.  The Corporation shall have two classes of members, the Institutional Member, which shall be the Greater Kansas City Community Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.  Except as otherwise provided in these Bylaws, each member shall be entitled to one vote upon each matter submitted to a vote of the members.  In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.  Institutional Membership in the Corporation is not transferable or assignable.  Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document designate an individual, or series of individuals, to serve as a successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member.  Each successor Individual Member shall succeed to the rights of the initial Individual Member.  Each successor Individual Member may in the same manner designate an individual, or

-1-

002589


HCMLPHMIT00003734

series of individuals, to serve as successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such appointments, the one bearing the earliest date shall control. Each Individual Member may at any time revoke his or her appointment notice or other document in whole or in part by written notice delivered to the Institutional Member. If at any time there is no Individual Member and no individual has been designated in accordance with the foregoing provisions of this Section to act as such, then the Individual Member shall be the individual designated by a majority of the eldest generation of then living descendants of James Dondero that has at least one descendant then living.

Section 2.4    Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings. All meetings of the members shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings. An annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.7    Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting.   The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.8    Members' List. At least ten days before every meeting of members, a complete list of the members entitled to vote at said meeting, arranged in alphabetical order, shall be prepared by the Secretary. Such list shall be open to the examination of any member, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any member who is present.

Section 2.9    Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting. Notice shall be given (a) by written notice delivered personally,

-2-

002590
HCMLPHMIT00003735

(b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.10    Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business except as otherwise provided by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall again be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.11    Voting. When a quorum is present at any meeting, the vote of a majority of the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.12    Proxies. At any meeting of the members, a member is entitled to be counted as present and to vote by written proxy executed by that member or his or her duly authorized attorney-in-fact. No proxy shall be valid after three (3) months from the date of its execution.

Section 2.13    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of members necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a

002591
HCMLPHMIT00003736

meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1    General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and

-4-

002592

HCMLPHMIT00003737

expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice. When notice is required to be given for a meeting of the Board of Directors, such notice shall specify the date, time, and location of the meeting and shall be given to each Director at least ten (10) days prior to the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

002593
HCMLPHMIT00003738

Section 3.11   Purpose not Required in Notice.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12   Waiver of Notice.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice.  A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13   Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of Directors necessary to authorize or take such action at a meeting at which all Directors entitled to vote thereon were present and voted.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13.  Prompt notice of the taking of an action by the Board of Directors without a meeting by less than unanimous written consent shall be given to each Director who did not consent in writing to the action.  Each such consent must state the date of each Director's signature.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   Validation of Action by Consent.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held.  At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice.  If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   Quorum and Manner of Acting.  Except as otherwise provided in these Bylaws, a quorum for the transaction of business at any meeting of the Board of Directors shall consist of all three of the then serving Directors.  Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.  A Director shall be considered present at any meeting of the Board of Directors if the Director participates in person or by proxy or if during the meeting he or she can communicate with all other persons

-6-

002594

HCMLPHMIT00003739

participating in the meeting by using conference telephone or another suitable electronic communications system. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16    <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation.  The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

Section 3.17    <u>Chairman Presiding</u>.  If a Chairman is appointed by the Board of Directors, the Chairman shall preside at all meetings of the Board of Directors and in general shall perform all duties incident to a nonexecutive chairman of a board of directors.

## ARTICLE IV

## OFFICERS

Section 4.1    <u>Officers</u>.  The officers of the Corporation shall be a President, a Secretary and a Chief Financial Officer.  One person may hold any number of said offices.

Section 4.2    <u>Election, Term of Office and Eligibility</u>.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof.  Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal.  None of the officers need be members of the Board of Directors.

Section 4.3    <u>Subordinate Officers</u>.  The Board of Directors may appoint such Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine.  The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4    <u>Removal</u>.  The President, the Secretary and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause.  Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

-7-

002595

HCMLPHMIT00003740

Section 4.5    The President.  The President shall be the chief executive officer of the Corporation.  He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation.  In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary.  The Secretary shall:

(a)    Keep the minutes of the meetings of the members and of the Board of Directors;

(b)    See that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    Be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized;

(d)    In general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    The Chief Financial Officer.  The Chief Financial Officer shall:

(a)    Receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    Render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation;

-8-

002596


HCMLPHMIT00003741

(c)    In general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.9    <u>The Assistant Chief Financial Officers</u>.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.10    <u>Delegation of Duties</u>.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1    <u>Location</u>.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2    <u>Inspection</u>.  The books, accounts, and records of the Corporation shall be open to inspection by any member of the Board of Directors at all times; and open to inspection by the members at such times, and subject to such regulations as the Board of Directors may prescribe, except as otherwise provided by statute.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    <u>Fiscal Year</u>.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    <u>Depositories</u>.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    <u>Checks, Drafts and Notes</u>.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or

002597


HCMLPHMIT00003742

agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5    Waivers of Notice.  Whenever any notice is required to be given under the provisions of the statutes or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.6    Ownership Interests in Other Entities.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.7    Indemnification.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any

002598

HCMLPHMIT00003743

such proceeding in advance of its final disposition upon receipt by the corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise.  The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim.  It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation.  Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any Director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)    To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

002599

HCMLPHMIT00003744

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.8     Amendment of Bylaws.

(a)     The members, by the affirmative unanimous vote of the members entitled to vote, may, at any annual or special meeting if notice of such alteration or amendment of the Bylaws is contained in the notice of such meeting, adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

(b)     The Board of Directors, by unanimous vote, may adopt, amend, or repeal these Bylaws at any meeting, except as provided in Section 6.8(a), above.  Any alterations or amendments to these Bylaws made by the Board of Directors may be altered or repealed by the members.

-12-

002600

HCMLPHMIT00003745



HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202-2799

TEL  214 • 979 • 3000
FAX  214 • 880 • 0011

ANDREW W. LAWRENCE
DIRECT DIAL: 214 • 979 • 3052
EMAIL: alawrence@hunton.com

FILE NO: 78673.000002

November 9, 2011

Deborah L. Wilkerson                                        *Via E-Mail*
General Counsel
Greater Kansas City Community Foundation
9001 W. 110th Street, Suite 220
Overland Park, KS  66210

Re:    Highland Capital Management Partners Charitable Trust #2

Dear Debbie:

In accordance with your request during our telephone conversation last week, the paragraphs below describe briefly the proposed distribution of assets from Highland Capital Management Partners Charitable Trust #2 (the "Trust") to a to-be-formed supporting organization (i.e., Highland Kansas City Foundation, Inc.) with respect to which the Greater Kansas City Community Foundation ("GKCCF") is the supported organization.

1.    The Trust.  As you know, James Dondero, as the Settlor, and Grant Scott, as the Trustee, established the Trust by a trust agreement dated December 1, 2006 (the "Trust Agreement").  Under the terms of the Trust Agreement, Mr. Dondero, as Settlor, is entitled to name remainder beneficiaries and substitute new remainder beneficiaries from time to time until the remainder interest is ultimately distributed.

2.    Assets of the Trust/Cayman Islands Company.  The remainder interest will be comprised solely of one hundred percent (100%) of the non-voting shares (the "Shares") of Charitable DAF HoldCo, Ltd., a Cayman Islands corporation ("HoldCo").  Highland Kansas City Foundation, Inc. will receive one-third (1/3) of the Shares.  HoldCo will own one hundred percent (100%) of the limited partner interests in Charitable DAF Fund, LP, a Cayman Island limited partnership, which, in turn, will own one hundred percent (100%) of the shares of CLO Holdco, Ltd., a Cayman Islands exempted company, which, in turn, owns minority equity interests in Cayman Islands investment companies that own portfolios of debt instruments issued by various public companies.

---

ATLANTA  AUSTIN  BANGKOK  BEIJING  BRUSSELS  CHARLOTTE  DALLAS  HOUSTON  LONDON  LOS ANGELES
McLEAN  MIAMI  NEW YORK  NORFOLK  RALEIGH  RICHMOND  SAN FRANCISCO  TOKYO  WASHINGTON
www.hunton.com

002601

HCMLPHMIT00003746



November 9, 2011
Page 2

     3.    <u>The Supporting Organizations</u>.  Mr. Dondero intends to name as the remainder beneficiaries of the Trust three supporting organizations (each an "SO", collectively, the "SOs"), each of which will support one of three separate community foundations.  Each SO will receive an equal number of HoldCo Shares.  Highland Capital Management, L.P. currently receives management fees from the companies that own the corporate debt portfolios and will continue to receive those fees under existing agreements with those companies after the Holdco Shares are transferred to the SOs.

     4.    <u>Use of Multiple Supporting Organizations</u>.  Rather than the remainder interest being distributed in its entirety to just one or two SOs, the remainder interest is being distributed in equal shares to the three SOs out of an abundance of caution in light of the excess benefit transaction rules under Section 4958(c)(3) of the Code, such that no SO will own more than fifty percent (50%) of the stock of HoldCo.

     Please let me know if you have additional questions regarding this matter.

                    Very truly yours,

                    Andrew W. Lawrence

AWL/bt

cc:   Alexander G. McGeoch, Esq.
      Douglas M. Mancino, Esq.

002602

HCMLPHMIT00003747

# EXHIBIT 27

HCMLPHMIT00003748

**CHARITABLE DAF HOLDCO, LTD**

(the "Company")

**SHARE TRANSFER FORM**

Dated 24 March 2021

I, **Grant James Scott** (the "**Transferor**"), for good and valuable consideration received by me from **Mark E. Patrick** (the "**Transferee**"), do hereby:

1.       transfer to the Transferee 100 Management Shares (the "**Shares**") for the par value of $0.01 each standing in my name in the register of members of the Company to hold unto the Transferee, his executors, administrators and assigns, subject to the several conditions on which I held the same at the time of execution of this Share Transfer Form; and

2.       consent that my name remains on the register of the Company until such time as the Company enters the Transferee's name in the register of the Company.

SIGNED by **TRANSFEROR**:                    )
                                                              )
                                                              Name: Grant J. Scott

And the Transferee does hereby agree to take the Shares subject to the same conditions.

SIGNED by **TRANSFEREE**:                    )
                                                              )
                                                              Name: Mark E. Patrick

1

078673.0000002 EMF_US 84436263v1

PATRICK_000005

002604

HCMLPHMIT00003749

# EXHIBIT 28

HCMLPHMIT00003750

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF THE COMPANY DATED** ~~March 25~~ **2021**

---

1. **SHARE TRANSFER**

1.1 **IT IS NOTED** that the Director has received a duly executed share transfer form relating to the transfer by Grant James Scott of 100 Management Shares to Mark E. Patrick.

1.2 **IT IS RESOLVED** that:

(a) the following share transfer (the "**Transfer**") be and is hereby ratified, confirmed and approved:

| TRANSFEROR | TRANSFEREE | NO OF SHARES | DATE OF TRANSFER |
|---|---|---|---|
| Grant James Scott | Mark E. Patrick | 100 Management Shares | 24 March 2021 |

(b) the Company's registered office provider be instructed to update the Register of Members of the Company to reflect the Transfer.

2. **GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as the Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3. **RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of the Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

1

PATRICK_000003

002606

HCMLPHMIT00003751

These written resolutions are signed by the sole Director of the Company.

**Mark E. Patrick**

PATRICK_000004

**002607**

HCMLPHMIT00003752

# EXHIBIT 29

002608

HCMLPHMIT00003753

CLO HOLDCO, LTD.
(THE "COMPANY")

---

WRITTEN SHAREHOLDER RESOLUTIONS OF THE SOLE
SHAREHOLDER OF THE COMPANY
MADE ON _April 2_ 2021

---

The undersigned, being the sole holder of Shares of the Company having the right to receive notice of, attend and vote at general meetings hereby resolves the following shareholder resolutions.

**1.** **REMOVAL OF DIRECTOR AND APPOINTMENT OF NEW DIRECTOR**

1.1 **IT IS RESOLVED** by ordinary resolutions that:

(a) Grant James Scott be and is hereby removed as a Director of the Company with effect from the date of these resolutions;

(b) Mark E. Patrick be and is hereby appointed as a Director of the Company with effect from the date of these resolutions until such time as such Director resigns or is removed or otherwise disqualified in accordance with the Articles of Association of the Company;

(c) the Register of Directors of the Company be amended to note the removal of the Director and the appointment of the new Director, all as set out in these resolutions; and

(d) the Company's registered office be and is hereby instructed to notify the Registrar of Companies in the Cayman Islands of the removal of Mark E. Patrick as a Director of the Company and the appointment of Grant James Scott as a Director of the Company.

BY _Mark Patrick_

Mark E. Patrick for and on behalf of

Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, L.P.

PATRICK_000002

**002609**

HCMLPHMIT00003754

# EXHIBIT 30

002610

HCMLPHMIT00003755

**THE COMPANIES LISTED IN THE ATTACHED SCHEDULE**
**(EACH A "COMPANY" AND TOGETHER THE "COMPANIES")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF EACH COMPANY DATED** _April 22,_ **2021**

---

**1.      APPOINTMENT OF DIRECTOR**

1.1     **IT IS NOTED** that the Directors wish to appoint Paul Murphy as a Director of each Company with effect from the date of these resolutions and that such proposed Director has indicated a willingness to hold such office and has executed a letter of consent and/or a services agreement in relation thereto (such appointment, the "**Director's Appointment**").

1.2     **IT IS RESOLVED** that:

(a)     the Director's Appointment be and is hereby approved with effect from the date of these resolutions until such time as the Director resigns or is removed from office in accordance with the Articles of Association of each Company; and

(b)     the registered office service provider be and is hereby instructed to update the Register of Directors of each Company and to make the necessary filings with the Registrar of Companies to reflect the Director's Appointment.

**2.      GENERAL AUTHORISATION**

2.1     **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director or any officer or (if applicable) any attorney or duly authorised signatory of each Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of each Company, to do such further acts and things as the Director or any officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of each Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3.      RATIFICATION OF PRIOR ACTIONS**

3.1     **IT IS RESOLVED** that any and all actions of each Company, or of the Director or any officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

_[Remainder of page left blank intentionally]_

1

002611

HCMLPHMIT00003756

These written resolutions are signed by the sole Director of the Company.

**Mark E. Patrick**

3

**Error! Unknown document property name.**

002612

HCMLPHMIT00003757

**Schedule**
***(List of Companies)***

**Charitable DAF HoldCo, Ltd.**

**CLO HoldCo, Ltd.**

**Liberty CLO Holdco, Ltd.**

**Liberty Sub, Ltd.**

**HCT Holdco 2, Ltd.**

**MGM Studios Holdco, Ltd.**

3

002613

HCMLPHMIT00003758

# EXHIBIT 31

002614

HCMLPHMIT00003759

Case 19-34054-sgj11    Doc 4255-74    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 74    Page 239 of 307
Case 19-34054-sgj11 Doc 2547-31 8 Filed 07/09/21    / Entered 07/09/21 17:0: r29    6 age 2 oP
1f

# Charitable Giving Overview

GRANT SUMMARY : 2012-2020

002615

HCMLPHMIT00003760

# Highlights

**$42M+**   Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations operating across a range of issue areas.

The following provides an overview of philanthropic activities across the group of charitable entities that operate as supporting organizations to community foundation: the Highland Dallas Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the Highland Kansas City Foundation, Inc. (together the "Supporting Organizations" or "we").

**$32M+**   We have funded over $32 million of our total commitments; remaining commitments are comprised of future scheduled installments of multiyear grants.

**$3.7M**   Average annual grant payments total $3.7 million.

Each of the entities within the Supporting Organizations has its own independent board, which provides oversight for the organization's grantmaking activity.

**275+**   The Supporting Organizations have made donations to more than 275 individual organizations.

Data represents activity between January 1, 2012, and December 31, 2020 unless otherwise noted.

**2029**   Through our multiyear grants we have over $10 million in funds committed through 2029.



002616

HCMLPHMIT00003761

G R A N T S   O V E R V I E W

# Total committed: $42.7 million[1]

The Supporting Organizations have committed **$42,688,403** in grants to nonprofits across a range of issue areas, with a focus on:

- civic and cultural institutions in the Dallas-Ft. Worth area;

- education;

- support for military, veterans, and first responders;

- health and medical research;

- economic and community development initiatives; and

- youth and family.

GRANT COMMITMENTS BY ISSUE AREA[2]

- Civic & Cultural Institutions

- Education & Research

- Military, Veterans & First Responders

- Health

- Economic & Community Development

- Youth & Family

- Other



1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

HCMLPHMIT00003762

GRANTS OVERVIEW

# Total funded: $32.5 million[1]

The Supporting Organizations have funded **$32,548,403** in grants, representing payments made directly to nonprofit organizations that are improving lives and addressing pressing issues in our local community—and beyond.



GRANTS FUNDED BY ISSUE AREA[2]

- Civic & Cultural Institutions
- Education & Research
- Military, Veterans & First Responders
- Health
- Economic & Community Development
- Youth & Family
- Other

1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

002618

HCMLPHMIT00003763

GRANTS OVERVIEW

# Average annual funding: $3.7 million[1]

TOTAL GRANT PAYMENTS ($M)[2]



1. As of 12/31/2020.  Figures rounded to the nearest hundred thousand.  2. Represents amount paid in grants and/or grant installments during each calendar year. Not inclusive of grants committed but not funded.

002619
HCMLPHMIT00003764

GRANTS OVERVIEW

# Highlights of grants' impact

### Supporting **4,000** military and law enforcement members

Grants to the Center for BrainHealth helped provide training and other programming to members of the military, veterans, and local law enforcement that aims to improve the cognitive health—all at no cost.

### Enabling **1.2M** visitors to make memorable experiences with wildlife

Grants funding the construction of the new hippo exhibit and providing support for the organization's membership program helped the Dallas Zoo draw a record-breaking 1.2 million visitors in 2017.

### Providing a path to safety for **11,000** victims of family violence

Grants to The Family Place helped the organization serve more than 11,000 clients in 2019, including providing more than 62,000 days of Emergency Shelter.

### Supporting and defending **8,000** abused children

Grants to the Dallas Children's Advocacy Center helped the organization serve over 8,000 children who have been abused each year,

### Providing educational opportunities for **600** low-income students in southeast Dallas

Grants to expand the Cristo Rey Dallas campus in Pleasant Grove enable the school to accommodate up to 600 students. 95% of CRD students are the first in their families to attend college, and with a 100% college acceptance rate, the expansion will help create an estimated 570 first-generation college students every four years.

002620

HCMLPHMIT00003765

GRANT HIGHLIGHT

# Dallas Zoo

### About the Dallas Zoo

The Dallas Zoological Society (the "Zoo"), the largest zoological park in Texas, has become a staple in the Dallas community over its 130-year history. Home to over 430 different species, the Dallas Zoo engages and educates visitors, while seeking to create a better world for animals.

### Promoting Visitor Engagement: Grant to Support Zoo Membership

The Supporting Organizations have supported the Zoo's membership program since 2014 through a series of multiyear grants that help the Dallas Zoo continue to reach new audiences. In the first full year of the grant, the Zoo welcomed a record 600,000 guests, and that number has steadily increased since. With our support, the Zoo continues to find new ways to deliver unforgettable experiences. As a result, it regularly ranks in the top-10 zoos in the U.S. by USA Today.

### Increasing Community Access: Grant to Support Discounted Admission

The Supporting Organizations pursue grant opportunities that increase community access to local civic and cultural institutions. With this goal, we expanded our support of the Zoo in 2017 to include the annual sponsorship of the "Penguin Days" program. The grant enables the Zoo to reduce the price of general admission to $7 on select days from December-February, making the Zoo more accessible to the North Texas Community and allowing families who might not otherwise visit the Zoo to do so in an affordable way.

### Opening a New Exhibit: Grant to Support Construction of an Educational/Event Space at the Hippo Exhibit

The Zoo announced in early 2016 that it was planning to break ground on a new exhibit that would bring hippos to the Zoo for the first time in 16 years. The project also marked the first major exhibit opening at the Zoo since 2010. The Supporting Organizations contributed to this project through a grant that helped establish a 4,485-square-foot indoor/outdoor multipurpose event space, which engages visitors in interactive activities that further the Zoo's animal education mission. Currently, the space is a walkthrough exhibit highlighting conservation efforts of hippo habitats around the world. This exhibit helped increase attendance to a record-breaking 1.2 million visitors in 2017.

Issue Area: **Civic & Cultural Institutions**





002621

HCMLPHMIT00003766

GRANT HIGHLIGHT

# George W. Bush Presidential Center

## About the George W. Bush Presidential Center

The George W. Bush Presidential Center (the "Bush Center") is comprised of the George W. Bush Presidential Library and Museum, which houses the official records of the presidency of George W. Bush, and the George W. Bush Institute, an action-oriented, nonpartisan policy organization. Through these dual operations, the Bush Center works to both preserve history and shape the future. The Bush Center is uniquely equipped to promote leadership development, advance policy initiatives, and inspire action on a local, national, and global scale. Its work covers three major Impact Centers: Domestic Excellence; Global Leadership; and Engagement. Through these Impact Centers, the Bush Center is dedicated to solving some of today's most pressing challenges.

### Driving a Local Institution's Ambitious Global Agenda: Grant Supporting the Construction of the Bush Center in Dallas

In 2008, the Bush Center officially selected Dallas as its permanent home, announcing plans to construct its building on the campus of SMU. The Supporting Organizations helped make the vision of the Bush Center's Dallas home a reality, making a grant to help complete construction and design for the building. On May 1, 2013, the Bush Center opened its doors to the public. In its first five years after opening, the Bush Center welcomed over $1.6 million visitors.

### Securing a Legacy and Driving Engagement: Grant Supporting the Center's Long-term Operations and Engagement Agenda

In 2018, the Bush Center launched an important fundraising initiative to ensure its mission endures for generations to come. With its "A Charge to Keep" capital campaign, the Bush Center aimed to raise funds that would sustain its operations beyond the lifetimes of President and Mrs. Bush.

The Supporting Organizations made a grant to help ensure the Bush Center can continue its important work well into the future. The grant specifically focused on the public speaker series, Engage at the Bush Center. The series brings newsmakers, thought leaders, and authors to the Bush Center for thought-provoking panel discussions and keynote conversations that allow guests to connect with the Bush Center in a meaningful way and dive deeper into many of today's most pressing policy areas and issues.

Issue Area: **Civic & Cultural Institutions**



002622

HCMLPHMIT00003767

G R A N T   H I G H L I G H T

# Perot Museum

### About the Perot Museum

The Perot Museum of Nature and Science (the "Perot") promotes science and education in the North Texas community through hands-on exhibits, educator resources, unique films, and other special programming that engages audiences of all ages.

**Helping Establish a World Class Museum in Downtown Dallas: Grant to Support Construction of the New Perot Museum:**

With support from Dallas' philanthropic community, the Perot Museum opened a new building in December 2012. With its bold architectural design, it quickly became a fixture in its new location in Dallas' Victory Park. The project also sparked a renewed commitment to inspire minds and improve community achievement, giving rise to new initiatives that promote science learning.

The Supporting Organizations contributed to the project by issuing a challenge grant, which matched donations, inciting additional giving and helping complete the project's capital campaign. Since then, we have contributed additional funding to support ongoing educational programming, special exhibitions, and community engagement initiatives.

### Increasing Community Access: Grant to Support the Perot's Traveling Exhibition Programs

In 2014, the Supporting Organizations began issuing a series of grants to support the traveling exhibitions program. The initial exhibition, the "The World's Largest Dinosaurs" exhibition, educated audiences on the gigantic sauropods that once roamed the earth, drawing nearly 200,000 visitors to the museum. Since then, our grants have made possible the many captivating exhibitions that have been hosted by the Perot, covering a range of subject areas. With two special exhibitions held each year, the grants enable the museum to deliver new experiences that give visitors a reason to keep coming back and serve as a complement to the museum's 11 permanent exhibit halls. The program draws exhibitions from around the globe to the Perot, providing the North Texas community with access to world-class educational experiences. All the special exhibition grants include funding that allows the Perot to make all traveling exhibitions bilingual (with programming in both English and Spanish). These exhibits have helped increase community access to the North Texas Hispanic population.

Issue Area: **Civic & Cultural Institutions**



002623

HCMLPHMIT00003768

GRANT HIGHLIGHT

# Cristo Rey Dallas

### About Cristo Rey Dallas

Cristo Rey Dallas College Prep ("CRD") is a private, independent Catholic high school located in the Pleasant Grove area of Southeast Dallas. The Cristo Rey Network's formula for success is a proven, revolutionary model of college preparatory high school curriculum accessible to those of limited financial resources. It integrates rigorous college preparatory academics with professional work experience through the Corporate Work Study Program—a key component of the fiscal sustainability of the Cristo Rey model. Through the Work Study Program, students work in a professional setting five days per month to earn the majority of their tuition. The 144 job partners include some of Dallas's most prominent companies.



*The Cristo Rey model is proven, with 100% of graduates gaining acceptance to a two- or four-year college and 90% matriculating. For students in Pleasant Grove—where only 4% of the population graduated from college—CRD offers access and opportunity that can change their trajectory.*

**Building Space for Innovation: Grant to Support CRD Campus Expansion and Renovations**

The 30th school in the nationwide Cristo Rey network, CRD opened in August 2015, operating out of an old elementary school and aging gymnasium. They quickly outgrew the space and had to begin turning away prospective students. In 2019, CRD launched a $15 million capital campaign to expand the campus, adding new academic and athletic buildings and conducting much needed renovations on the existing buildings.

The Supporting Organizations issued the campaign's lead grant, helping build a new 37,000 sq. ft. Innovation Center, which boasts spaces for fine arts and counseling. The campaign also created a new cafeteria and gymnasium, as well as a new soccer field – something the school never had before. The new buildings opened in time for the 2020 school year.

The Supporting Organizations also helped provide space for CRD students off campus in a centrally located office building near Downtown Dallas. The space gave students a place to study and complete work study programs that were moved to Work From Home due to the pandemic.

Issue Area: **Education & Research**



002624

HCMLPHMIT00003769

GRANT HIGHLIGHT

# Education Is Freedom

### About Education Is Freedom

Education Is Freedom ("EIF") is committed to transforming students' lives through education. With a focus on college planning, the organization provides underserved students in the North Texas community with a range of resources to ensure every student has the opportunity to pursue a college education.

EIF's higher education advisors work onsite at public high schools across the region, helping students and their families navigate the college process. In 20XX, EIF helped high school seniors complete 21,000 college applications and receive over $132 million in scholarships.

In addition to their college planning initiatives, EIF operates a number of supplementary programs to enhance access to postsecondary education and promote workforce readiness.

**Developing a Skilled and Educated Workforce: Grant Supporting the Mayor's Intern Fellows Program**

In 2008, EIF worked with the Mayor's Office to create the Mayor's Intern Fellows Program ("MIFP"), an initiative to provide workforce readiness. The program provides Dallas high school students with internship opportunities at local companies, nonprofits, and government entities. Through the eight-week, paid internship, students gain real-world experience and insight into the professional opportunities available to them. Not only does the program prepare students for future careers, but it also connects local businesses with the future workforce, promoting collaboration to strengthen the pipeline of talent.

The Supporting Organizations have issued grants to EIF to support the MIFP. The grants have helped EIF put on the program's annual Job Fair. Held in the spring, the Job Fair provides an opportunity for students to interview with prospective employers in the hopes of securing an internship for the summer. Education Is Freedom conducts extensive training with the students throughout the program, offering workshops and coaching on everything from interview preparation to professional etiquette.

In 2018, over 2,400 students from 52 high schools applied for the program. Of those applicants, 1,050 were selected to attend the Job Fair. At the 2018 Job Fair, over 200 employers from across the Dallas-Fort Worth region interviewed internship candidates, ultimately offering positions to 395 students for the summer. In addition to the Job Fair, our grants have funded internships at various nonprofit partners, covering the cost for organizations that might not otherwise be able to hire paid interns.

Issue Area: **Education & Research**



002625

HCMLPHMIT00003770

G R A N T   H I G H L I G H T

# SMU Tower Center

### About the SMU Tower Scholars Program

The Southern Methodist University ("SMU") Tower Scholars Program provides top undergraduate students with an opportunity to integrate public policy and international affairs into their studies through a dedicated curriculum of academic coursework and real-world experiences. Students in the program receive a minor in public policy and international affairs, offered through SMU's John Goodwin Tower Center for Political Studies (the "Tower Center").

> *"The Tower Scholar Program's resources and curriculum allow me to not only learn public policy principles through lectures, but also gain tactile experience with practicums and classes taught by policy practitioners. Without this program, I would have been unable to experience and explore my interest in public policy."*
>
> *– Tower Scholar, Class of 2020*

### Investing in the Next Generation of Policymakers: Grant to Endow the Tower Scholars Undergraduate Program at SMU

In 2014, the Supporting Organizations worked with the Tower Center to create a dedicated undergraduate program that carries out the center's mission of bridging the gap between the scholarship and practice of politics and striving to inspire ethical public service. The grant established an endowment that provides long-term funding for the Tower Scholars Program.

A hallmark of the program is its interdisciplinary focus. Over 75% of the Tower Scholars either earned or are pursuing more than one major—and that is in addition to the minor they earn in the program. Outside the classroom, each student is involved in multiple on-campus organizations, many in leadership positions.

The Supporting Organizations' grant makes possible the unique academic experiences—from meeting with global leaders, to working on real policy issues for major corporations—offered to the Tower Scholars. The program accepts 10 students each year, and recently welcomed its eighth cohort.

Issue Area: **Education & Research**



002626

HCMLPHMIT00003771

GRANT HIGHLIGHT

# Center for BrainHealth

### About the Center for BrainHealth

The Center for BrainHealth ("CBH"), part of The University of Texas at Dallas, is a research institute committed to enhancing, protecting and restoring brain health across the lifespan. CBH is composed of independent labs that are responsible for more than 60 fully funded research projects that investigate brain health, injury, and disease. Many of the center's programs use functional and structural neuroimaging techniques to better understand the neurobiology supporting cognition and emotion in health and disease. Areas of research include addiction, aging, Alzheimer's disease, autism, multiple sclerosis, social cognition, and traumatic brain injuries.

**Applying Innovative Research to Improve the Lives of Post-9/11 Veterans and First Responders: Grant Supporting the Warriors Program Through the Brain Performance Institute**

In 2015, CBH broke ground on new building dedicated to translating leading-edge science to scalable solutions for the public at large. Through construction of the Brain Performance Institute, CBH sought to extend the reach and applications of its research, providing solutions to the public to maximize brain performance in health, injury, and disease.

The Supporting Organizations made a grant to help fund the construction of the Brain Performance Institute and expand CBH's Warrior Initiative, which that focused on translating research into cognitive therapies for former military personnel. The Warrior Initiative was established to provide high performance brain training to current and former military service men and women and their families.

The goal of the Warrior Initiative program is to arm veteran and active-duty service members with the necessary tools to achieve successful, enriching, and fulfilling lives by proactively optimizing brain performance, building resilience in cognitive brain function, and reversing losses in cognitive capacity. The program was expanded in 2016 to support first responders, specifically focusing on local law enforcement.

The grant help create a space in the Brain Performance Institute building specifically for veterans, first responders, and their families, where these groups are able to come together in a safe, relaxing environment and get to know other members of service before and after training sessions.

*Issue Area:* **Military, Veterans & First Responders**



002627

HCMLPHMIT00003772



GRANT HIGHLIGHT

# Friends of the Dallas Police

### About Friends of the Dallas Police

The Friends of Dallas Police was founded in 1982 to recognize the commitment that the employees of the Dallas Police Department make to better the city and its residents' quality of life. The organization's mission is to raise and provide funds to be used to host a major awards banquet each year honoring Dallas Police Department personnel for outstanding performance in the line of duty. Over the years, approximately 4,400 awards have been presented to officers and civilian staff, and more than $43,000 in educational scholarships have been awarded to their children.

Helping Show Appreciation and Recognition to Local Law Enforcement: Grant Supporting the Annual Awards Program

The Supporting Organizations have provided grants to help the Friends of the Dallas Police show appreciation to the men and women of the Dallas Police Department who risk their lives every day to make Dallas a safer city. Our grants have helped fund the annual awards event hosted by the Friends of the Dallas Police, which honors and recognizes outstanding employees throughout the Dallas Police Department.

Through our grants, the Supporting Organizations have facilitated the production of the annual awards program, enabled sworn and non-sworn employees and their spouses to attend the event, and provided educational sponsorships for children of police officers.

The Supporting Organizations have also drawn on its philanthropic network to provide gifts to award recipients and their families, including tickets to visit organizations like the Dallas Zoo, George W. Bush Presidential Center, and Perot Museum.

Issue Area: **Military, Veterans & First Responders**



002628



HCMLPHMIT00003773

G R A N T   H I G H L I G H T

# Snowball Express

### About  Snowball Express

Snowball Express (now part of the Gary Sinise Foundation) serves the children of fallen military heroes. By providing events and other experiences in a stress-free environment, the organization is creating a community to learn, grow, and make lasting memories with new friends.

The organization hosts an annual five-day experience for 1,750+ children of the fallen and their surviving parent or guardian. As a therapeutic retreat with a blend of fun and inspiring programs, these families can lean on their peers for support. The organization also hosts community-driven events for these families all year long. From baseball games, to arts and educational opportunities, to camping trips, the events strengthen the local networks of Gold Star families, helping children and surviving spouses to build bonds with the only people who can truly understand their loss: each other.

### Supporting Families of Fallen Service Members: Grant to Support Programming for Gold Star Children

In 2014, Myles Eckert, the nine-year-old son of U.S. Army Sergeant was killed in Iraq on active duty, gave a $20 bill that he found to a veteran in a pay-it-forward act of kindness towards our military. Myles's story was shared widely online, and the gift quickly received national attention.

In honor of Myles Eckert's gift, the Supporting Organizations issued a challenge grant to Snowball Express to support the organization's programming for children that have lost one or both parents during active service.

The grant inspired significant giving from individuals and organizations around the world, enabling Snowball Express to expand its services for Gold Star children and their families.

Snowball Express used the proceeds from the challenge grant to provide services to over 8,000 Gold Star children in 2014—almost 6,000 more than the year before and a new record for the organization.

Issue Area: **Military, Veterans & First Responders**



002629

HCMLPHMIT00003774

Case 19-34054-sgj11    Doc 4255-74    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 74    Page 254 of 307
Case 19-34054-sgj11 Doc 2547-31 8ffel 07d09d21 / Eretel 07d09d21 17r0: r29 6age 17 oP
1f

GRANT HIGHLIGHT

# Dallas Children's Advocacy Center

## About Dallas Children's Advocacy Center

Dallas Children's Advocacy Center ("DCAC") is the only agency of its kind in Dallas County, working in agreement with public and private agencies to investigate, prosecute, and provide healing services for child abuse cases in Dallas County. DCAC reduces the re-victimization of the child, removes barriers to investigation and treatment, and enhances criminal prosecution with its distinctive multidisciplinary approach to these complex and severe cases.

**Fostering Crucial Collaboration: Grant to Support DCAC's Operations and Strengthen Collaboration Among Agencies Involved in Child Abuse Cases**

The Supporting Organizations have been a longtime partner of the Dallas Children's Advocacy Center ("DCAC"), issuing annual grants that provide funding for a range of operating costs. The grants help DCAC serve over 8,000 children (and their non-offending family members) each year who were sexually abused, severely physically abused, or who had witnessed a violent crime. DCAC's average client is a 9-year-old girl, sexually abused by someone she knows and trusts.

The grants also support DCAC in its efforts to foster crucial collaboration across government agencies and other organizations involved in child abuse cases. The DCAC building houses the Child Abuse Unit of the Dallas Police Department, six units of CPS, and a Dallas County Assistant District Attorney. Having all of these professionals under one roof drives collaboration and communication in the very sensitive cases that DCAC coordinates.

Not only have the Supporting Organizations been a long-time financial supporter of DCAC, we have also provided support in other ways, leveraging connections with our network of nonprofit partners. Most recently, we worked with the Dallas Zoo to provide animal encounter demonstrations during DCAC's summer camps, which serve as a way to deliver ongoing support to—and help build a community for—children who have experienced trauma.

Issue Area: **Youth & Family**



002630
HCMLPHMIT00003775

GRANT HIGHLIGHT

# The Family Place

### About The Family Place

The Family Place was founded in 1978 and has grown to become the largest family violence prevention agency in North Texas, providing shelter and assistance to victims across the region along with counseling and education. Since its founding, the organization has served over 839,000 clients through counseling, shelter, and hotline responses.

In 2019, The Family Place served nearly 12,000 clients, providing over 62,000 days of emergency shelter, over 36,000 days of transitional housing, and over 18,000 hours of counseling to nonresidential clients, and over 8,000 hours of counseling to batterers. All services are in Spanish and in English.

**Providing Support for Victims of Family Violence Across North Texas**

The Family Place empowers victims of family violence by providing safe housing, counseling, and skills that create independence while building community engagement and advocating for social change to stop family violence.

While The Family Place supports clients in several different ways, its Residential Services, which provide safe shelter for families affected by violence, are one of crucial components of its work. These services include the Emergency Shelter Services, which provide immediate shelter for families escaping abuse, and the Supportive Living Program, which provides long-term housing for families as they rebuild their lives. Not only does the organization provide necessities like food, clothing, and transportation, but it also offers childcare, legal services, counseling, and case management.

As The Family Place expanded, its Residential Services were constrained by the capacity of its emergency shelters, and at many times the organization had to house clients in hotels and other temporary housing in order to meet demand.

In 2016, the Supporting Organizations issued a challenge grant to help The Family Place build a new shelter facility to expand its Residential Services. The new facility provides space and support services for over 2,000 victims per year. It also includes onsite Medical and Dental Clinics and even an Animal Kennel so families can bring their beloved pets with them to safety. The shelter has been operating at full capacity since October 2017. With the new facility, The Family Place now has three emergency shelters, providing 177 shelter beds each night, and three counseling centers.

Issue Area: **Youth & Family**



002631

HCMLPHMIT00003776

# EXHIBIT 32

HCMLPHMIT00003777

*the family place*
*Where family violence stops*

July 7, 2021

BOARD OF DIRECTORS
*PRESIDENT*
Harold Ginsburg
*TREASURER*
Wes McCown
*SECRETARY*
Thomas McCollum
*V.P. COMMUNITY ENGAGEMENT*
Clarisa Lindenmeyer
*V.P. DEVELOPMENT*
Lindsay Jacaman
*V.P. FACILITIES*
Jim Buddrus
*V.P. HUMAN CAPITAL*
David Oliver
*V.P. LONG RANGE PLANNING*
Radhika Zaveri
*V.P. NOMINATIONS*
Belinda Griffin
*V.P. PUBLIC AFFAIRS*
Delia Jasso
*GENERAL COUNSEL*
Kristin Bauer
Eric White

Sandra Aguirre
Lisa Armstrong
Mandy Austin
Steven Bauer
Melinda Bell
Laurie Berger
Nancy Bierman
Julie Bosché
Eric Chandler
Kerry Cole
Nicole Collins
Barbara Durham
Monika Flood
Theresa Flores
Beth Garvey
Lauran Goldberg
Carlos Gonzalez-Jaime
Michelle Goolsby
Rhonda Green
Tasha Grinnell
Johnese Howard
Stacee Johnson-Williams
Linda Knox
Holly Krug
Emily Maduro
Margo McClinton Stoglin
Mary McNulty
Sam Megally
Aaliyah Miranda
Mike Montgomery
Tiffany Moon
Elizabeth Saab
Nathaniel St. Clair
Kristen Sanger
Ryan Scripps
Carol Seay
Lisa Singleton
Ghousuddin Syed
Jill Tananbaum
Samantha Wortley
Ana Yoder

*Chief Executive Officer*
Paige Flink

To Whom It May Concern:

I am pleased to write this letter outlining the relationship between The Family Place and the Highland Dallas Foundation. The Family Place empowers victims of family violence by providing safe housing, counseling and skills that create independence while building community engagement and advocating for social change to stop family violence. Our agency provides emergency shelter, individual and group counseling, case management, transitional housing as well as other essential services to help those seeking refuge from family violence. The Family Place provides free, comprehensive services in both Spanish and English that prevent violence and fully support women, children, and men on their path from fear to safety.

In 2020, The Family Place successfully navigated through COVID-19 and the barriers it presented, serving 11,933 unduplicated clients across our programs. Our emergency shelters served 678 women, 886 children and 58 men for a total of 62,118 shelter nights. 98% of our shelter clients did not return to their abuser after exiting one of our shelters. In our counseling programs, we served 2,258 clients, an 11.5% increase over 2019. 98% of our counseling clients reported feeling safer after attending counseling at The Family Place. At our on-site medical and dental clinics, we treated 778 clients and referred 571 clients to more intensive medical and dental services.

The Highland Dallas Foundation has been a long-standing partner with The Family Place in providing services to domestic violence clients. In 2016, The Family Place launched a 5-year, $16.5 million dollar capital campaign to build a new facility specifically designed to provide all necessary services for victims seeking shelter and counseling. The Family Place successfully reached our capital campaign goal due in large part to the commitment of a $1 million matching grant by the Highland Dallas Foundation. In December 2016, the Highland Dallas Foundation donated $13,950 for Christmas gifts for our clients. In 2017, when the Highland Hippo Hut was opened at the Dallas Zoo, the Highland Dallas Foundation generously invited our shelter clients to a special Mother's Day luncheon.

The collaboration between the Highland Dallas Foundation and The Family Place has been instrumental in providing community exposure and awareness of domestic violence in our community as well as providing essential services to family violence victims. With our new facility, completed in 2017, The Family Place has been able to expand programs and execute on the long-range plans developed for these programs. For victims of family violence, The Family Place is the Dallas area's leading organization delivering proven programs that address emotional and physical abuse and incest. Without the ongoing support of the Highland Dallas Foundation, The Family Place would not be able to successfully serve our domestic violence clients who are in desperate need of support.

Sincerely,

Paige Flink
CEO, The Family Place

*P.O. Box 7999*
*Dallas, Texas 75209*
*214 559 2170*
*fax 214 443 7797*
*www.familyplace.org*



002633

HCMLPHMIT00003778

# EXHIBIT 33

002634

HCMLPHMIT00003779

9701 San Leon Ave. Dallas, TX 75217

### Cristo Rey Dallas Update

Cristo Rey Dallas (CRD) is incredibly grateful for the gifts from Highland Dallas Foundation, Inc. CRD is excited to have the Highland Capital Academic Center and the NexBank Gymnasium in the Innovation Center on our campus. These naming rights were given as the result of a donation that Highland Dallas Foundation, Inc.made to our Innovation Center Capital Campaign. These facilities truly impact our students and allow us to provide our services to our population of 465 students.

CRD also receives support from Highland Dallas Foundation, Inc. through the Corporate Work Study Program (CWSP). Cornerstone Healthcare and NexBank both currently have one job team (a team of 4 students) that work in their offices. In the upcoming year, NexBank will host two teams of students. One team is funded through the gift from Highland Dallas Foundation, Inc. and the other is supported by NexBank. The work study program allows students to earn about 60% percent of their tuition to CRD, and the involvement in the work study program makes such a difference in the lives of the 8 students that work in those businesses.

Finally, CRD is incredibly thankful for the remote workspace at Cityplace Tower. CWSP has been greatly affected by COVID-19. This year, many partners were unable to host students in their offices. The space at Cityplace Tower allows 30 students to work remotely for their job partners each day which means that about 120 students benefit from the offices each week. Without this space, CRD would not have the capacity to allow these students to work remotely.

The support of Highland Dallas Foundation, Inc. has meant so much to us at CRD. We are so appreciative, and we look forward to continuing our partnership for many years.



cristoreydallas.org

002635

HCMLPHMIT00003780

# EXHIBIT 34

002636

HCMLPHMIT00003781



**Dallas Children's Advocacy Center (DCAC)**
**Partnership with Highland Dallas Foundation, Inc.**

**Organization Mission and History**
The mission of DCAC is *to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues*. Since opening its doors in 1991, DCAC has served more than 60,000 of the most severely abused children and their non-offending family members in Dallas County. In FY2021, DCAC will serve 8,400 children and their non-offending family members.

DCAC was created to coordinate the investigation of child abuse cases that rise to the criminal level in a seamless, collaborative process. We facilitate a coordinated approach to child abuse cases that results in more successful investigation and prosecution outcomes and provides a less traumatic response to child victims and families. DCAC partners with 39 organizations to form a Multidisciplinary Team (MDT) that includes medical, legal, and law enforcement and is designed to ensure child clients receive the appropriate services for healing and safety.

In 2015 DCAC's Partner Relations Team began reading all reports of abuse and neglect made to DFPS in Dallas County as part of a state-wide effort to ensure every child who needs services from a children's advocacy center (CAC) gets them. In FY2019 we read 28,131 reports of child abuse for Dallas County. At the beginning of March 2020 before COVID-19 safety measures were implemented, we had experienced a 15% increase in the number of cases read. While case reports went down during quarantine, we have projected and experienced a dramatic increase in cases; at the end of February 2021, we had experienced a 35% increase in cases read year-over-year.

In addition to supportive services provided by the MDT, DCAC also provides the following Core Programs at no cost to our clients. Please note, for the second half of FY2020, DCAC provided therapy and family advocacy services via a HIPPA-approved telehealth platform, Doxy.me. Forensic interviews were always conducted on-site during quarantine. Below you will find details and outcomes for FY 2020.

***Forensic Interview Program***
Trained DCAC forensic interviewers conduct interviews of children, both as a first step in the child's healing process and as a vital component of the investigation and prosecution of alleged perpetrators. The result is a legally defensible investigative interview of each alleged child victim. During FY2020, DCAC conducted 1,921 forensic interviews.

***Family Advocacy Program***
The Family Advocacy Team is committed to helping each family navigate the complex process of investigation, prosecution and healing after a child makes an outcry of abuse. The team helps the family learn about their rights and resources available to them during crisis as well as provides tangible, critical needs items like clothing, toiletries, and financial assistance on an as-needed basis. During FY 2020, the Family Advocacy Program supported 7,431 children and their non-offending family members.

***Evidence-Based Therapy Program***

HCMLPHMIT00003782



The Evidence-Based Therapy Program provides clients and their non-offending caregivers with cutting-edge, no-cost therapeutic services. Treatment is informed by an initial assessment to enhance engagement between families and therapists toward the recovery of children. When clients are assessed at the end of treatment, over 70% report a reduction in trauma symptoms. During FY 2020, the DCAC Therapy Program provided services to 2,498 clients.

***Education Program***

DCAC has pioneered a comprehensive, multi-part training curriculum that provides holistic responses to Texas child abuse reporting laws. In the past year, 100,405 people were educated in our curriculum by means of in-person instruction or online learning. In addition to our cutting-edge curriculum, we also host a Lecture Series at the Center. Lecture Series topics are designed to provide continuing education for medical, legal, clinical, law enforcement and other children's advocacy professionals. Since the start of the pandemic, we moved all lecture series' online; we continue to provide this education virtually and as such have discovered we can reach even more professional.

**Partnership with Highland Dallas Foundation, Inc.**

Since 2016, Highland Dallas Foundation, Inc. has supported DCAC through yearly, general operating investments towards our mission. We have received over $85,000 over the past five years through sponsorship of our Art for Advocacy event as well as from a golf tournament where DCAC was the dedicated beneficiary. This funding has been critical to the sustainability of our programs and each dollar allows us to serve our clients with transformative services at no cost to them. Alongside the financial commitment, Highland Dallas Foundation, Inc. has gone above and beyond in introducing us to additional community advocates who individually support our efforts as well. The ripple effect of our partnership with Highland Dallas Foundation, Inc. is invaluable and for that we are so grateful.

002638

HCMLPHMIT00003783

# EXHIBIT 35

002639
HCMLPHMIT00003784

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| CHARITABLE DAF FUND, L.P. | § | |
| and CLO HOLDCO, LTD., | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Cause No. _____** |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P. , HIGHLAND HCF ADVISOR, LTD., | § | |
| and HIGHLAND CLO FUNDING, LTD., | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

# ORIGINAL COMPLAINT

---

# I.

# INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

002640

HCMLPHMIT00003785

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

002641

HCMLPHMIT00003786

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1. Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2. Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3. Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4. Defendant Highland HCF Advisor, Ltd. is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5. Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6. Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

002642

HCMLPHMIT00003787

### III.

### JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

### IV.

### RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

---

Original Complaint

Page 4

002643

HCMLPHMIT00003788

12. At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13. On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14. Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15. On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16. On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

---

002644

HCMLPHMIT00003789

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

002645
HCMLPHMIT00003790

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

002646

HCMLPHMIT00003791

**32.**     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

**33.**     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

**34.**     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

**35.**     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

**36.**     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

**37.**     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

**38.**     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

**39.**     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

---

002647

HCMLPHMIT00003792

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.      Typically, the value of the securities reflected by a market price quote.

41.      However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.      There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.      Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.      Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.      It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.      For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

002648
HCMLPHMIT00003793

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47. Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48. Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49. Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50. Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51. That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52. The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

002649

HCMLPHMIT00003794

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### Breaches of Fiduciary Duty

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

---

002650

HCMLPHMIT00003795

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory
Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually
and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-
in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that
have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance
with the then current valuation policy of the Investment Advisor [HCM], a copy of which will
provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of
others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it
purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that
harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which
HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its
subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed
to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to
the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the
advisor must put the ends of the client before its own ends or the ends of a third party.

---

Original Complaint                                                                Page 12

002651

HCMLPHMIT00003796

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

---

002652

HCMLPHMIT00003797

**71.**     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

**72.**     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

**73.**     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

**74.**     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

**75.**     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

---

002653

HCMLPHMIT00003798

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

002654

HCMLPHMIT00003799

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

002655

HCMLPHMIT00003800

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.    Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.    What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.    Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.    For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.    HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.    Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

---

HCMLPHMIT00003801

## SECOND CAUSE OF ACTION
### *Breach of HCLOF Company Agreement*
### (By Holdco against HCLOF, HCM and HCFA)

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

002657

HCMLPHMIT00003802

100. Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

101. No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

102. Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### *Negligence*
### (By the DAF and CLO Holdco against HCM and HCFA)

103. Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

104. Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

105. Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106. Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

107. It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

---

Original Complaint <span style="float:right">Page 19</span>

002658

HCMLPHMIT00003803

**108.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.** Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.** Plaintiff is thus entitled to damages.

<div align="center">

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

</div>

**113.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.** Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.** HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

---

002659
HCMLPHMIT00003804

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

002660

HCMLPHMIT00003805

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

    **121.**    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

    **122.**    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

    **123.**    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

    **124.**    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

    **125.**    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

---

002661

HCMLPHMIT00003806

126.    In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.    Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.    In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equalization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.    Seery was at all relevant times operating as an agent of HCM.

130.    This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.    The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

002662

HCMLPHMIT00003807

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132. Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133. Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

<div align="center">

**FIFTH CAUSE OF ACTION**
*Tortious Interference*
**(CLO Holdco against HCM)**

</div>

134. Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135. At all relevant times, HCM owned a 0.6% interest in HCLOF.

136. At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137. Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138. HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

---

Original Complaint

002663

HCMLPHMIT00003808

139.     HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.     But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.     Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## <u>JURY DEMAND</u>

142.     Plaintiff demands trial by jury on all claims so triable.

## VII.

## <u>PRAYER FOR RELIEF</u>

143.     Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

   a.   Actual damages;

   b.   Disgorgement;

   c.   Treble damages;

   d.   Exemplary and punitive damages;

   e.   Attorneys' fees and costs as allowed by common law, statute or contract;

   f.   A constructive trust to avoid dissipation of assets;

   g.   All such other relief to which Plaintiff is justly entitled.

002664

HCMLPHMIT00003809

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

_/s/  Mazin A. Sbaiti_
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com


**Counsel for Plaintiffs**

---

Original Complaint

002665

HCMLPHMIT00003810

# EXHIBIT 36

HCMLPHMIT00003811



Registration No.: **249232**

Client No.: **KY057017**

REGISTER OF DIRECTORS
FOR:
**CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 17 Dec 2010 | 17 Dec 2010 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 17 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | 31 Mar 2021 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 31 Mar 2021 | 02 Apr 2021 |
| **Mark E. Patrick**<br>. | Director | 02 Apr 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Graves, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed:  19 May,  2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

002667


HCMLPHMIT00003812

# EXHIBIT 37

002668

HCMLPHMIT00003813



Registration No.: **263805**

Client No.: **KY059904**

REGISTER OF DIRECTORS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 04 Nov 2011 | 04 Nov 2011 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 04 Nov 2011 | 25 Mar 2021 |
| **Patrick Mark**<br>Highland Capital Management, L.P.; 13455 Noel Rd, Suite 800; Dallas; TX 75240; USA. | Director | 25 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Graves, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed:  19 May,  2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

002669


HCMLPHMIT00003814

# EXHIBIT 38

HCMLPHMIT00003815


**intertrust**
GROUP

Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| | | |
|---|---|---|
| Share Class: | **Ordinary** | |
| Nominal Value: | **USD 0.01** | |
| Voting Rights: | Yes | |
| Conditional: | No | |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 6 Jun 2012 | Allotment | 1.00 | 6 Jun 2012 : Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | | | | |
| | | | | | | Nil | Nil | 26 Jun 2012 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 26 Jun 2012 | Transfer | 1.00 | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 2]

002671
HCMLPHMIT00003816




Registration No.: **269389**

Date of Incorporation: **6 June 2012**

Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

Date printed: 19 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

002672



# EXHIBIT 39

002673

HCMLPHMIT00003818



Registration No.: **269389**

Client No.: **KY061847**

REGISTER OF DIRECTORS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 26 Jun 2012 | 26 Jun 2012 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 26 Jun 2012 | 24 Mar 2021 |
| **Mark E. Patrick**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

002674

HCMLPHMIT00003819

# EXHIBIT 40

002675

HCMLPHMIT00003820



Registration No.: **293607**

Client No.: **KYO73541**

REGISTER OF DIRECTORS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>190 Elgin Avenue; George Town; Grand Cayman KY1-9001; Cayman Islands. | Director | 12 Nov 2014 | 12 Nov 2014 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 12 Nov 2014 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Graves, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

002676

HCMLPHMIT00003821



# EXHIBIT 41

002677

HCMLPHMIT00003822



Registration No.: **293607**

Date of Incorporation: **12 November 2014**

Client No.: **KY073541**

REGISTER OF MEMBERS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| WNL Limited 190 Elgin Avenue George Town Grand Cayman KY1-9001 Cayman Islands | 12 Nov 2014 | Allotment | 1.00 | 12 Nov 2014: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | | | | |
| | | | | | | Nil | Nil | 12 Nov 2014 |
| CLO HOLDCO, LTD. Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 12 Nov 2014 | Transfer | 1.00 | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

002678



HCMLPHMIT00003823

# EXHIBIT 42

002679

HCMLPHMIT00003824



Registration No.: **249848**

Client No.: **KYO58111**

REGISTER OF DIRECTORS
FOR:
**HCT HOLDCO 2, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited: Walker House: 87 Mary Street; George Town: Grand Cayman KY1-9005: Cayman Islands. | Director | 30 Dec 2010 | 30 Dec 2010 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.: 13455 Noel Road, Suite 800: Dallas; Texas 75240: USA. | Director | 30 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques: Les Graves, St Peter Port: Guernsey: Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 21 May, 2021

[1 / 1]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

002680

HCMLPHMIT00003825

# EXHIBIT 43

HCMLPHMIT00003826



Registration No.: **249848**

Date of Incorporation: **29 December 2010**

Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 1.00** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| WNL Limited Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 29 Dec 2010 | Allotment | 1.00 | 29 Dec 2010: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | | | | |
| | | | | | | Nil | Nil | 30 Dec 2010 |
| Highland Capital Management Partners, Charitable Trust #2 13455 Noel Road Suite 800 Dallas TX 75240 USA | 30 Dec 2010 | Transfer | 1.00 | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | No Cert | | | |
| | | Transfer | (1.00) | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution | | | | |

Date printed: 21 May, 2021

[1 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED



002682

HCMLPHMIT00003827



Registration No.: **249848**

Date of Incorporation: **29 December 2010**

Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | Agreement | | | | |
| | | | | | | Nil | Nil | 24 Oct 2011 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 24 Oct 2011 | Transfer | 1.00 | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution Agreement | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 21 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

002683


**EXHIBIT 75**

002684

HUNTER MOUNTAIN INVESTMENT TRUST

APPOINTMENT OF SUCCESSOR ADMINISTRATOR

August 12, 2022


Reference is made to that certain Trust Agreement of Hunter Mountain Investment Trust dated December 17, 2015 (the "Trust Agreement").  Capitalized terms not otherwise defined shall have the meaning given them in the Trust Agreement.  Pursuant to section 16 of the Trust Agreement, upon the occurrence of a Honis Trigger Event, the current Administrator is immediately removed.  Pursuant to that certain Membership Interest Purchase Agreement dated August 1, 2022 ("MIPA"), by and among John Honis (as "Seller"), Rand Advisors Holding Corp., a Delaware corporation (as "Buyer"), and CLO Holdco, Ltd., a Cayman limited company (as "Guarantor"), the Buyer acquired all the membership interests in, and therefore voting control of, Rand Advisors, LLC ("Rand").  A Honis Trigger Event under the Trust Agreement includes a change in ownership of Rand, such that John Honis fails to retain majority voting control.

Pursuant to section 17 of the Trust Agreement, upon the occurrence of a Honis Trigger Event and the immediate removal of John Honis as Administrator, Beacon Mountain, LLC ("Beacon") shall appoint a successor Administrator.  Accordingly, Beacon hereby appoints Mark E. Patrick as Administrator of Hunter Mountain Investment Trust, effective as of the date first written above.


BEACON MOUNTAIN, LLC, a Delaware limited liability company
By: Rand PE Fund I, L.P., its sole member
By: Rand PE Fund Management, LLC, its general partner
By: Rand Advisors Holding Corp., its sole member


By:_____
Name: Mark Patrick
Title: President

002685

HCMLPHMIT00003872

**EXHIBIT 7**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## RAND PE FUND MANAGEMENT, LLC

This Limited Liability Company Agreement (this "**Agreement**") of Rand PE Fund Management, LLC (the "**Company**") is entered into as of October 29, 2015 by and between the Company and John Honis (the "**Managing Member**", and collectively with any individuals and/or entities who subsequently become members of the Company in the future in accordance with the terms hereof, "**Members**"), pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), as amended from time to time (the "**Act**").

Section 1        **Name**.  The name of the limited liability company governed hereby is Rand PE Fund Management, LLC.

Section 2        **Certificates**.  The Managing Member, as an authorized person within the meaning of the Act, has executed, delivered and filed the certificate of formation of the Company (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware on September 18, 2015. Upon the execution of this Agreement, the Managing Member shall thereafter be designated as an authorized person within the meaning of the Act.  Hereafter, the Managing Member shall have the power to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

Section 3        **Purpose**.  The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in all lawful activities for which limited liability companies may be formed under the Act, including, without limitation of the foregoing, serving as the general partner of Rand PE Fund I, L.P., a Delaware limited partnership.

Section 4        **Powers**.  The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Managing Member pursuant to this Agreement.

Section 5        **Principal Business Office**.  The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from 87 Railroad Place, Suite 403, Saratoga Springs, NY 12866, or elsewhere as the Managing Member may from time to time determine.

Section 6        **Registered Office**.  As of the date hereof, the address of the registered office of the Company in the State of Delaware is:  c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

Section 7        **Registered Agent**.  As of the date hereof, the name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is:  The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

Section 8        **Members**.  The names, the nature of the interests held, the mailing addresses, the

002687

HCMLPHMIT00003873

initial capital contributions and the Percentage Interests (as defined below) of the Members are as set forth in **Schedule A** attached hereto.

   **Section 9**  **Term**.  The term of the Company commenced on the date of filing of the Certificate of Formation in accordance with the Act and shall continue until dissolution of the Company in accordance with **Section 23** of this Agreement.

   **Section 10**  **Limited Liability**.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, any Officer (as hereinafter defined), employee or agent of the Company (including a person having more than one such capacity) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of acting in such capacity.

   **Section 11**  **Initial Capital Contributions**.  Each Member is deemed admitted as a Member of the Company upon his, her or its execution and delivery of this Agreement.  The initial capital contributions of the Members are set forth on **Schedule A** attached hereto.

   **Section 12**  **Additional Capital Contributions**.  The Members are not required to make any capital contributions to the Company beyond their initial capital contributions, unless otherwise determined by the Managing Member.

   **Section 13**  **Capital Accounts**.  Separate capital accounts shall be maintained for each Member on the books of the Company, which accounts shall set forth the capital of such Member in the Company.  Each capital account shall be adjusted to reflect such Member's share of allocations and distributions as provided in **Sections 14 and 15** of this Agreement, and any additional capital contributions to the Company or withdrawals of capital from the Company.  Such capital accounts shall further be adjusted to conform to the Treasury Regs. under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the Managing Member.

   **Section 14**  **Allocations of Profit and Loss**.  All items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with their percentage interests as set forth on **Schedule A** attached hereto ("**Percentage Interests**").

   **Section 15**  **Distributions**.  Distributions shall be made to the Members at such times and in such amounts as may be determined in the sole discretion of the Managing Member.  Distributions shall be allocated among the Members in accordance with their Percentage Interests.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of their interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

   **Section 16**  **Management**.

    (a)  The business and affairs of the Company shall be managed by the Managing Member. Subject to the express limitations contained in any provision of this Agreement, the Managing Member shall have complete and absolute control of the affairs and business of the Company, and the Managing Member shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

    (b)  Subject to the rights and powers of the Managing Member and the limitations

<div align="center">2</div>

HCMLPHMIT00003874

thereon contained herein, the Managing Member may delegate to any person any or all of his powers, rights and obligations under this Agreement, and the Managing Member may appoint, contract or otherwise deal with any person to perform any acts or services for the Company as the Managing Member may reasonably determine.

(c) No Member (other than the Managing Member) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Company except those expressly granted to it by, or pursuant to the terms of, this Agreement, or those conferred on it by law.

(d) The Managing Member shall hold office until the earliest to occur of his death, disability or other inability to act in such capacity, at which time a successor Managing Member may be appointed by Members owning at least a majority of the Percentage Interests.

Section 17 **Officers**. The Managing Member may, from time to time as he deems advisable, appoint officers of the Company (the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person. Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this **Section 17** may be revoked at any time by the Managing Member.

Section 18 **Other Business**. The Members (including, for the avoidance of doubt, the Managing Member) may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. Neither the Company nor any other Member shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 19 **Exculpation and Indemnification**. The Managing Member shall not be liable to the Company or to the other Members for any action taken or omitted to be taken in connection with the business or affairs of the Company, so long as he acted in good faith and is not found to be guilty of gross negligence or willful misconduct with respect thereto, as determined by a final non-appealable decision of a court of competent jurisdiction. To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless: (i) the Managing Member, and (ii) in the discretion of the Managing Member, the Company's managers, shareholders, partners, officers, employees, agents and affiliates and/or the other Members (each, an "**Indemnified Party**") from and against any and all claims, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding related to any action taken or omitted to be taken by any of them in connection with the business and affairs of the Company (including the settlement of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final non-appealable decision of a court of competent jurisdiction. Any indemnity under this **Section 19** shall be provided out of and to the extent of Company assets only, and no Member (including the Managing Member) shall have personal liability on account thereof.

Section 20 **Admission of Additional Members**. Additional Members may be admitted to the Company only with the written consent of the Managing Member. The capital contribution required of, and the Percentage Interests assigned to, such newly-admitted Member shall be determined by the Managing Member.

Section 21 **Effect of Bankruptcy, Dissolution, Death or Incompetence of a Member**.

002689

HCMLPHMIT00003875

The bankruptcy, dissolution, death or disability of a Member, or an adjudication that such Member is incompetent (a Member experiencing any such event, a "**Disabled Member**"), shall not cause the termination or dissolution of the Company, and the business of the Company shall continue. If a Member is dissolved or becomes bankrupt, the trustee or receiver of such Disabled Member's estate or, if a Member dies, such Disabled Member's executor, administrator or trustee, or, if such Member is adjudicated incompetent, such Disabled Member's committee, guardian or conservator, or the personal representative of such Disabled Member, as applicable, shall have the rights of such Disabled Member for the purposes of settling or managing such Disabled Member's estate or property and such power as the Disabled Member possessed to dispose of all or any part of such Member's interest in the Company, and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a substitute Member.

  **Section 22**  **Assignments**. A Member may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited liability company interest without the prior written consent of the Managing Member.

  **Section 23**  **Dissolution**.

    (a)  The Company shall dissolve, and its affairs shall be wound-up upon the first to occur of the following: (i) the written consent of the Managing Member; (ii) the death, disability, bankruptcy or withdrawal of the Managing Member, in the event no successor managing member is appointed pursuant to **Section 16(d)**; and (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

    (b)  In the event of dissolution, the Company shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Company in an orderly manner).

  **Section 24**  **Tax Matters Partner**. John Honis shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code. All expenses incurred by the tax matters partner in connection with his duties as tax matters partner shall be expenses of the Company.

  **Section 25**  **Elections**. The Managing Member shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Company or any other method or procedure related to the preparation of such tax returns. The Managing Member may cause the Company to make or refrain from making any and all elections permitted by such tax laws, and the Managing Member shall not be liable for any consequences to any previously admitted or subsequently admitted Members resulting from making or failing to make any such elections.

  **Section 26**  **Separability of Provisions**. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

  **Section 27**  **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

  **Section 28**  **Entire Agreement**. This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

4

002690

HCMLPHMIT00003876

**Section 29      Governing Law, Personal Jurisdiction and Venue**.  The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines.  The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York.  The parties irrevocably waive any objections to the personal jurisdiction of these courts.  The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement.  Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it).  The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

**Section 30      Amendments**.  This Agreement may be modified, altered, supplemented or amended in the sole discretion of the Managing Member.

*[remainder of page intentionally left blank]*

5

002691

HCMLPHMIT00003877

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the date first written above.

THE COMPANY:

RAND PE FUND MANAGEMENT, LLC

By: _____
Name: John Honis
Title: Managing Member


MANAGING MEMBER:

_____
Name: John Honis

6

**002692**

HCMLPHMIT00003878

**Schedule A**

**Members of Rand PE Fund Management, LLC**

**As of October 29, 2015**

| NAME | NATURE OF INTEREST | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|---|
| John Honis | Managing Member | 87 Railroad Place, Suite 403 | $100 | 100% |
| | | Saratoga Springs, NY 12866 | | |

7

002693

HCMLPHMIT00003879

# EXHIBIT 77

002694

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## RAND ADVISORS, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "*Agreement*") is entered into as of the 28th day of August, 2013 by John Honis, an individual (the "*Member*"), as the sole member of Rand Advisors, LLC, a limited liability company formed pursuant to the Delaware Limited Liability Company Act (the "*Act*"). The Member desires to form a limited liability company pursuant to the Act upon the following terms and conditions:

## ARTICLE 1
## NAME, REGISTERED AGENT AND OFFICES

The name of the Company is Rand Advisors, LLC (the "*Company*"). Its registered office in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801, in the County of New Castle. The name of its registered agent at such address is The Corporation Trust Company. The principal office of the Company shall be located at such place within or without the State of Delaware, and the Company shall maintain such records as the Member shall determine from time to time. The Company may have such other offices as the Member may designate from time to time.

## ARTICLE 2
## BUSINESS, PURPOSE, AND TERM OF COMPANY

Section 2.1 <u>Purposes</u>. The purpose of the Company shall be to do all such things for which limited liability companies may be formed under the Act.

Section 2.2 <u>Term</u>. The term of the Company shall commence on the date the Certificate of Formation is filed with the Delaware Secretary of State in accordance with the provisions *of* the Act and shall continue on a perpetual basis unless dissolved pursuant to ARTICLE 6 of this Agreement. Matt McGraner is hereby designed as an "Authorized Person" for the purpose of executing the Certificate of Formation and arranging for its filing.

Section 2.3 <u>Powers</u>. In addition to the purpose set forth in Section 2.1 above, the Company shall have the power:

(a) to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(b) to acquire, by purchase, mortgage, lease, contribution of property or otherwise, and to own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

002695

HCMLPHMIT00003880

(c)     to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Member or any person or other entity that directly or indirectly controls, is controlled by, or is under common control with the Member, or any agent of the Company necessary to, in connection with, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(d)     to lend or borrow money and to invest its funds;

(e)     to sue and be sued;

(f)     to appoint employees and fix their compensation;

(g)     to indemnify any person; and

(h)     to guarantee obligations of an affiliate or subsidiary.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS

Section 3.1     <u>Capital Contribution by Members</u>.  Upon the formation of the Company, the Member shall not be required to make a Capital Contribution.  Capital Contributions shall be made from time to time as the Member shall determine.

Section 3.2     <u>Capital Accounts</u>.  A Capital Account shall be maintained for the Member to which shall be credited (i) the Member's Capital Contributions, if any and (ii) all Company revenues.  The Capital Account shall be debited with (i) all costs, expenses, and losses of the Company and (ii) the amount of any distributions (including return of capital) made to the Member.  No interest shall be paid on the Member's Capital Account.

## ARTICLE 4
## ALLOCATIONS OF PROFITS AND DISTRIBUTIONS

Section 4.1     <u>Allocation of Profits and Losses</u>.  All profits and losses of the Company shall be allocated to the Member.

Section 4.2     <u>Allocation of Distributions</u>.  All distributions of cash or other assets of the Company shall be made to the Member when and as determined by the Member.

## ARTICLE 5
## MANAGEMENT OF THE COMPANY

Section 5.1     <u>General</u>.  The Member shall be the Managing Member and shall be responsible for the management of the Company.  The Managing Member shall have the right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company.

2

HCMLPHMIT00003881

Section 5.2    Delegation of Powers of Managing Member.   The Managing Member shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to delegate the management, control, administration, and operation of the business and affairs of the Company or the custody of the Company's assets for all purposes stated in this Agreement.   Such delegation shall be as provided in such documentation as the Managing Member shall determine. Any such delegation shall not cause the Managing Member to cease to be the Managing Member.

Section 5.3    Officers.  The Managing Member may appoint individuals with or without such titles as it may elect, including the titles of President, Vice President, Treasurer, and Secretary, to act on behalf of the Company with such power and authority as the Managing Member may delegate in writing to any such persons.

Section 5.4    Powers of Managing Member.   The Managing Member shall have the right, power and authority, in the management of the business and affairs of the Company, to do or cause to be done any and all acts deemed by the Managing Member to be necessary or appropriate to effectuate the business, purposes and objectives of the Company at the expense of the Company, including but not limited to the execution of all documents or instruments in all matters necessary, desirable, convenient or incidental to the purpose of the Company or the making of investments of Company funds.

Section 5.5    Reliance by Third Parties.   Any person or entity dealing with the Company may rely on a certificate signed by the Managing Member as to:

(a)    the identity of the Managing Member;

(b)    the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Managing Member or are in any matter germane to the affairs of the Company;

(c)    the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(d)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company.

Section 5.6    Actions Requiring Member Approval.   Notwithstanding any other provision of this Agreement, the written consent of the Member shall be required to approve the following matters:

(a)    the dissolution or winding up of the Company;

(b)    the merger or consolidation of the Company;

(c)    the sale, transfer, contribution, exchange, mortgage, pledge, encumbrance, lease or other disposition or transfer of all or substantially all of the assets of the Company;

3

002697

HCMLPHMIT00003882

(d)    the declaration of any distributions by the Company; and

(e)    amendments to this Agreement.

## ARTICLE 6
## DISSOLUTION

The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

(a)    the determination by the Member to dissolve the Company; or

(b)    the entry of a decree of judicial dissolution pursuant to Section 18.802 of the Act.

## ARTICLE 7
## GOVERNING LAW AND JURISDICTION

This Agreement, including its existence, validity, construction and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

## ARTICLE 8
## INDEMNIFICATION

Section 8.1    <u>Indemnification and Liability</u>.

(a)    To the maximum extent permitted by applicable law, the Managing Member shall not be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, or (iii) for losses due to any such mistakes, action or inaction.

(b)    Except as may be restricted by applicable law, the Managing Member shall not be liable for and the Company shall indemnify the Managing Member against, and agrees to hold the Managing Member harmless from, all liabilities and claims (including reasonable attorney's fees and expenses in defending against such liabilities and claims) against the Managing Member, arising from the Managing Member's performance of its duties in conformance with the terms of this Agreement.

(c)    The Managing Member may consult with legal counsel or accountants selected by the Managing Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

(d)    The Company shall also have the power to indemnify the Trustee to the extent, and under the conditions and terms, as may be provided in the Trust Agreement.

4



HCMLPHMIT00003883

## ARTICLE 9
## ASSIGNMENT OF INTERESTS

The Member may Transfer all or part of its Membership Interest in the Company.

## ARTICLE 10
## WINDING UP AND DISTRIBUTION OF ASSETS

Section 10.1    <u>Winding Up</u>.  If the Company is dissolved, the Member shall wind up the affairs of the Company.

Section 10.2    <u>Distribution of Assets</u>.  Upon the winding up of the Company, subject to the provisions of the Act, the Member shall pay or make reasonable provision to pay all claims and obligations of the Company, including all costs and expenses of the liquidation and all contingent, conditional or unmatured claims and obligations that are known to the Member but for which the identity of the claimant is unknown.  If there are sufficient assets, such claims and obligations shall be paid in full and any such provision shall be made in full.  If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefore.  Any remaining assets shall be distributed to the Member.

## ARTICLE 11
## DEFINITIONS

As used herein, the following terms shall have the indicated definitions.

"***Act***" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as may be amended from time to time.

"***Agreement***" means this Limited Liability Company Agreement, as may be amended from time to time.

"***Capital Account***" means a separate accounting maintained with respect to the Member pursuant to section 3.2 of this Agreement.

"***Capital Contribution***" means the contribution by the Member to capital of the Company.

"***Certificate of Formation***" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State on August 27, 2013, as the same may be amended from time to time.

"***Company***" means Rand Advisors, LLC, a Delaware limited liability company.

"***Managing Member***" means the Member.

"***Member***" means John Honis, an individual.

5

002699


HCMLPHMIT00003884

"***Membership Interest***" means the ownership interest of the Member in the Company, including any and all rights, powers, benefits, duties or obligations conferred or imposed on the Member under the Act or this Agreement.

"***Transfer***" means a transfer, assignment, pledge or encumbrance relative to any Membership Interest in the Company.

**[SIGNATURE PAGE FOLLOWS]**

6

002700
HCMLPHMIT00003885

IN WITNESS WHEREOF, the Member has executed and delivered this Agreement the day and year first above written.

SOLE MEMBER

JOHN HONIS

002701

HCMLPHMIT00003886

**EXHIBIT 7**

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## RAND PE FUND I, L.P.

This Agreement of Limited Partnership (this "**Agreement**") of Rand PE Fund I, L.P., is entered into as of October 29, 2015 by and among: (i) Rand PE Fund Management, LLC, a Delaware limited liability company (the "**General Partner**"), and (ii) John Honis (collectively with any individuals who may become limited partners of the Partnership in the future, the "**Limited Partners**"; and, collectively with the General Partner, the "**Partners**") pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (6 Del.C. § 17-101, et seq.), as amended from time to time (the "**Act**").

     1.    **Name**. The name of the partnership governed hereby is Rand PE Fund I, L.P. (the "**Partnership**").

     2.    **Certificate of Limited Partnership**. The General Partner filed a Certificate of Limited Partnership for the Partnership with the Secretary of State of the State of Delaware on September 18, 2015, and the Partners shall take such further actions as shall be appropriate to comply with all requirements of law for the formation and operation of a limited partnership in the State of Delaware, and all other counties and states where the Partnership may elect to do business.

     3.    **Purpose**. The Partnership is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Partnership is, engaging in all lawful activities for which partnerships may be formed under the Act, including, without limitation of the foregoing, serving as a private insurance-dedicated investment fund.

     4.    **Powers**. The Partnership shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Partnership and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Partnership by the General Partner pursuant to this Agreement.

     5.    **Principal Business Office**. The principal place of business and office of the Partnership shall be located at, and the Partnership's business shall be conducted from, such place or places as may hereafter be determined by the General Partner.

     6.    **Registered Office**. The address of the registered office of the Partnership in the State of Delaware is: c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

     7.    **Registered Agent**. The name and address of the registered agent of the Partnership for service of process on the Partnership in the State of Delaware is: The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

     8.    **Term**. The term of the Partnership commenced on the date of filing of the Certificate of Limited Partnership of the Partnership in accordance with the Act and shall continue until dissolution of the Partnership in accordance with **Section 21** of this Agreement.

     9.    **Limitation on Liabilities of Limited Partners**. Notwithstanding any provision

HCMLPHMIT00003887

of this Agreement, the Limited Partners shall not be liable for any of the losses, debts or liabilities of the Partnership in excess of their respective capital contributions.

10.    **Capital Contributions**.  Each Partner is deemed admitted as a Partner of the Partnership upon his, her or its execution and delivery of this Agreement.  The initial capital contributions of the Partners consist of the assets set forth on Schedule A attached hereto.

11.    **Additional Contributions**.  The Partners are not required to make additional capital contributions to the Partnership, beyond their initial contributions.

12.    **Capital Accounts**.  Separate capital accounts shall be maintained for each Partner on the books of the Partnership.  Each capital account shall be adjusted to reflect such Partner's shares of allocations and distributions as provided in **Section 13** of this Agreement, and any additional capital contributions to the Partnership or withdrawals of capital from the Partnership.  Such capital accounts shall further be adjusted to conform to the Treasury Regulations under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the General Partner.

13.    **Allocations and Distributions**.

(i)    *Allocations of Profit and Loss*.  All items of income, gain, loss, deduction and credit shall be allocated among the Partners in accordance with their Percentage Interests (as indicated on Schedule A attached hereto).

(ii)    *Distributions*.  Distributions shall be made to the Partners at such times and in such amounts as may be determined in the sole discretion of the General Partner.  Distributions shall be shared among the Partners in accordance with their Percentage Interests.  Notwithstanding any provision to the contrary contained in this Agreement, the Partnership shall not make a distribution to the Partners on account of their interest in the Partnership if such distribution would violate Section 17-607 of the Act or other applicable law.

14.    **Management**.

(i)    The business and affairs of the Partnership shall be managed by the General Partner.  Subject to the express limitations contained in any provision of this Agreement, the General Partner shall have complete and absolute control of the affairs and business of the Partnership, and shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Partnership, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.  The General Partner has the authority to bind the Partnership.

(ii)    Subject to the rights and powers of the General Partner and the limitations thereon contained herein, the General Partner may delegate to any person any or all of its powers, rights and obligations under this Agreement and may appoint, contract or otherwise deal with any person to perform any acts or services for the Partnership as the General Partner may reasonably determine.

(iii)    No Partner (other than the General Partner) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Partnership except those expressly granted to it by the terms of this Agreement, or those conferred on it by law.

{00269496.DOC; 2}                    2

002704

HCMLPHMIT00003888

(iv)    The General Partner shall remain general partner of the Partnership until the earliest to occur of its termination, dissolution or other inability to act in such capacity, at which time a majority in Percentage Interests of the Limited Partners shall appoint a successor general partner. Upon the termination, dissolution or other inability of such successor General Partner to act in such capacity, a successor general partner will be appointed by the designee of the General Partner.

15.    **Officers**.  The General Partner may, from time to time as it deems advisable, appoint officers of the Partnership (the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person. Unless the General Partner decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this **Section 15** may be revoked at any time by the General Partner.

16.    **Other Business**.  The Partners may engage in or possess an interest in other business ventures (unconnected with the Partnership) of every kind and description, independently or with others. The Partnership shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

17.    **Liability of General Partner**.

(i)    None of the General Partner or the Officers shall be liable, responsible or accountable in damages to the Limited Partner or the Partnership for: (x) any act or omission on behalf of the Partnership performed or omitted to be taken by it in good faith and in a manner reasonably believed by it to be within the scope of the authority granted to it by this Agreement and in, or not opposed to, the best interests of the Partnership; *provided* that the General Partner is not guilty of gross negligence or willful misconduct, (y) any action or omission taken or suffered by any other Partner, or (z) any mistake, negligence, dishonesty or bad faith of any broker or other agent of the Partnership selected by the General Partner with reasonable care. To the extent that, at law or in equity, the General Partner has duties (including fiduciary duties) and liabilities relating thereto to the Partnership or to another Partner, the General Partner acting under this Agreement shall not be liable to the Partnership or such other Partner for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they expand or restrict the duties and liabilities of the General Partner otherwise existing at law or in equity, are agreed by the Partners to modify to that extent such other duties and liabilities of the General Partner. To the fullest extent permitted by law, the Partnership shall indemnify the General Partner against any loss, damage or expense (including amounts paid in satisfaction of judgments, in settlements, as fines and penalties and legal and other costs and expenses of investigation or defense) incurred by it by reason of any act or omission so performed or omitted by it (and not involving gross negligence or willful misconduct) and any such amount shall be paid by the Partnership to the extent assets are available, but the Limited Partner shall not have any personal liability to the General Partner or the Partnership on account of such loss, damage or expense.

(ii)    The General Partner may consult with legal counsel, accountants and other professional experts selected by it and any act or omission suffered or taken by it on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith in reliance upon and in accordance with the advice of such counsel, accountants or other professional experts shall be full justification for any such act or omission, and the General Partner shall be fully protected in so acting or omitting to act; *provided* that such counsel, accountants or other professional experts were selected with reasonable care.

(iii)    To the fullest extent permitted by law, expenses incurred by the General Partner

002705

HCMLPHMIT00003889


in defense or settlement of any claim that may, at the determination of the General Partner, be subject to a right of indemnification hereunder may be paid by the Partnership in advance of the final disposition thereof upon receipt of an undertaking by or on behalf of the General Partner to repay such amount to the Partnership if it shall be determined, by a court of competent jurisdiction pursuant to a final non-appealable judgment, order or decree, that the General Partner is not entitled to be indemnified hereunder.

18. **Admission of Additional Partners**. One (1) or more additional persons may be admitted to the Partnership as Partners with the written consent of the General Partner.

19. **Dissolution of Partners**. Subject to **Section 21**, the termination, dissolution, death, bankruptcy or adjudicated incompetency of a Partner shall not cause a dissolution of the Partnership, but the rights of such Partner to share in the allocations and distributions pursuant to the terms hereof and to assign his, her or its interest in the Partnership pursuant to the terms hereof shall, on the happening of such an event, devolve on his, her or its legal representative for the purpose of settling his estate or administering its property.

20. **Assignments**. A Partner may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited partnership interest without the prior written consent of the General Partner.

21. **Dissolution**.

(i) The Partnership shall dissolve, and its affairs shall be wound-up upon the first to occur of the following: (A) the written consent of the General Partner, (B) the death, disability, termination, dissolution, bankruptcy or withdrawal of the last remaining General Partner (subject to **Section 14(iv)**), and (C) the entry of a decree of judicial dissolution under Section 17-802 of the Act.

(ii) In the event of dissolution, the Partnership shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Partnership in an orderly manner).

22. **Tax Matters Partner**. The General Partner shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code. All expenses incurred by the tax matters partner in connection with its duties as tax matters partner shall be expenses of the Partnership.

23. **Elections**. The General Partner shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Partnership or any other method or procedure related to the preparation of such tax returns. The General Partner may cause the Partnership to make or refrain from making any and all elections permitted by such tax laws, and the General Partner shall not be liable for any consequences to any previously admitted or subsequently admitted Partners resulting from their making or failing to make any such elections.

24. **Separability of Provisions**. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

25. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

002706

HCMLPHMIT00003890

26.     **Entire Agreement**.  This Agreement constitutes the entire agreement of the Partners with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

27.     **Governing Law, Personal Jurisdiction and Venue**.  The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines.  The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York.  The parties irrevocably waive any objections to the personal jurisdiction of these courts.  The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement.  Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it).  The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

28.     **Amendments**.  This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Partners.

*[remainder of page intentionally left blank]*


002707
HCMLPHMIT00003891

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement of Limited Partnership as of the date first written above.

GENERAL PARTNER:

Rand PE Fund Management, LLC

By: _____
Name: John Honis
Title: Managing Member

LIMITED PARTNER:

_____
Name: John Honis

002708
HCMLPHMIT00003892

**Schedule A**

**As of October 29, 2015**

| NAME | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|
| John Honis | 87 Railroad Place, Suite 403 Saratoga Springs, NY 12866 | $99 | 99% |
| Rand PE Fund Management, LLC | 87 Railroad Place, Suite 403 Saratoga Springs, NY 12866 | $1 | 1% |

002709

HCMLPHMIT00003893

**EXHIBIT 7**

SadisGoldberg LLP

# Amended and Restated Limited Partnership Agreement of Atlas IDF, LP

### A DELAWARE "SERIES" LIMITED PARTNERSHIP

As of November 30, 2015

# Exhibit A

Neither Atlas IDF, LP nor the limited partner interests therein ("**Interests**") have been or will be registered under the Securities Act of 1933, as amended ("**Securities Act**"), the Investment Company Act of 1940, as amended, or the securities laws of any of the States of the United States.  The offering of the Interests is being made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, and analogous exemptions under state securities laws.

These securities are subject to restrictions on transferability and resale, may not be transferred or resold, except:  (i) as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom, and (ii) in accordance with the requirements and conditions set forth in this Amended and Restated Limited Partnership Agreement.

HCMLPHMIT00003894

This Amended and Restated Limited Partnership Agreement of Atlas IDF, LP, a Delaware "series" limited partnership ("**Partnership**"), is entered into as of November 30, 2015 ("**Agreement**") by and among: (i) Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), with an address at 87 Railroad Place, Suite 403, Saratoga Springs, New York, 12866; (ii) such persons and entities who are or may become limited partners in accordance with the terms hereof ("**Limited Partners**"; and, together with the General Partner, shall collectively be referred to as the "**Partners**"); (iii) John Honis, as the initial Limited Partner ("**Initial Limited Partner**"); and (iv) such other persons who may become parties to this Agreement from time to time.

**WITNESSETH:**

**WHEREAS**, the General Partner and the Initial Limited Partner entered into a Limited Partnership Agreement, dated and effective as of October 29, 2015 ("**Current Agreement**"); and

**WHEREAS**, the General Partner desires to amend and restate the Current Agreement in its entirety pursuant to, and in accordance with the terms of, **Section 28** thereof, to reflect the conversion of the Partnership into a "series" limited partnership.

**NOW THEREFORE**, in consideration of the mutual promises of the parties hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties agree to amend and restate the Current Agreement in its entirety with the following terms and conditions:

| ARTICLE I |
| --- |
| GENERAL PROVISIONS |

**Section 1.01**  **Formation of Partnership**. The Partnership was formed as a limited partnership under the Delaware Revised Uniform Limited Partnership Act (as in effect on the date hereof and as amended from time to time, the "**Act**") by the filing of its Certificate of Limited Partnership (the "**Certificate**") with the Secretary of State of the State of Delaware (the "**Delaware Secretary**") on October 29, 2015.  On November 19, 2015, an amended Certificate was filed with the Delaware Secretary to convert the Partnership into a "series" limited partnership under Section 17-218 of the Act.  The General Partner, for itself and as agent for the Limited Partners, shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all the requirements for the formation and operation of the Partnership as a limited partnership under this Agreement and the Act and under all other laws of the State of Delaware and such other jurisdictions in which the General Partner determines that the Partnership may conduct business.  Each Limited Partner admitted to the Partnership by the General Partner shall promptly execute all relevant certificates and other documents, as the General Partner shall request.

**Section 1.02**  **Partnership Name**.  The name of the Partnership is Atlas IDF, LP.

**Section 1.03**  **Purpose**.  The Partnership was organized for the purpose of investing and trading in a wide variety of securities and financial instruments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including but not limited to, common and preferred stocks, bonds and other debt securities, convertible securities, limited partner interests, mutual fund shares, options, warrants, commodities, futures, derivatives (including swaps, forward contracts and structured instruments), currencies, monetary instruments, and cash and cash equivalents. In furtherance of the foregoing, the Partnership may engage in any lawful act or activity for which limited partnerships may be formed under the Act, and any and all activities necessary or incidental thereto, including any other business activities described in the Partnership's confidential private placement memorandum (as amended and supplemented from time to time, the "**Memorandum**").  In addition to investing in individual traded assets, the Partnership may invest a significant portion of its assets in other investment vehicles, including, without limitation, hedge funds, managed accounts and other private investment funds (collectively, the "**Portfolio Funds**"), including those managed by, or otherwise affiliated or related to, the Investment Manager (as defined in **Section 3.01**). Portfolio Funds may allocate their assets to Illiquid Investments (as defined in **Section 9.07(a)**).

**Section 1.04**  **Place of Business**.  The Partnership shall have offices located at 87 Railroad Place, Suite

002712

HCMLPHMIT00003895

403, Saratoga Springs, New York, 12866, or elsewhere as the General Partner may from time to time determine.  The Partnership may have more than one (1) office as may from time to time be determined by the General Partner.

**Section 1.05**   **Fiscal Year**.  The fiscal year of the Partnership (the "**Fiscal Year**") shall end on December 31 of each year, except that it may be changed at any time by the General Partner in its sole discretion.  In the event that the General Partner changes the Partnership's Fiscal Year, the dates and time periods referred to in this Agreement shall be appropriately adjusted.

**Section 1.06**   **Term of Partnership**.  The term of the Partnership commenced upon filing of the Partnership's Certificate with the Delaware Secretary and shall continue indefinitely; *provided, however,* that the Partnership shall be dissolved forthwith upon the occurrence of any one of the events set forth in **Section 13.01**.

---

## ARTICLE II
### COMPOSITION; ADMISSIONS

**Section 2.01**   **Names of the Partners**.  Atlas IDF GP, LLC, a Delaware limited liability company, is the sole general partner of the Partnership as of the date hereof.  The names and addresses of the General Partner and of each of the Limited Partners shall be set forth in the records of the Partnership to be kept on file at all times at the principal place of business of the Partnership.

**Section 2.02**   **Admission of Partners**.  Additional Limited Partners (as defined in **Section 8.01**) may be admitted to the Partnership at such times as provided in **Article VIII**.  In connection with the admission of a Limited Partner to the Partnership, such Limited Partner shall, in advance of such admission and as a condition thereto, sign a copy of this Agreement or an agreement to become bound by the provisions of this Agreement and such other subscription materials as shall be determined by the General Partner.  Upon the admission of a Limited Partner, the Initial Limited Partner listed on the signature page hereof shall automatically be deemed to have withdrawn from the Partnership. For the avoidance of doubt, the General Partner shall be permitted to make an investment in the Partnership and be issued Partnership Interests hereunder, and such Interests of the General Partner shall be treated as a Limited Partner's Partnership Interests hereunder.  A substitute general partner and additional general partners may be admitted to the Partnership as provided in **Article IV**.

**Section 2.03**   **Partnership Interests**.

(a)   For purposes of this Agreement, the term "**Partnership Interest**" shall mean the quotient resulting from dividing (i) the amount in a Partner's Capital Account (as defined in **Section 9.01**), including the fair value of such Partner's interests in any Side Pocket Accounts (as defined in **Section 9.07**) or New Issues Accounts (as defined in **Section 9.08(a)**) and other memorandum accounts, by (ii) the aggregate amount in the Capital Accounts of all Partners, including the fair value of any Side Pocket Accounts, New Issues Accounts and other memorandum accounts.  "**Partnership Interests**" shall mean the sum of all amounts in the Capital Accounts of all Partners (including all Side Pocket Accounts, New Issues Accounts and other memorandum accounts).

(b)   The Partnership is an "insurance-dedicated" fund.  The Partnership Interests are being offered only to Limited Partners that are:  (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state or local government pension plans, qualified tuition plans ("**§529 plans**"), and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3).  In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet certain suitability standards, as further set forth in the Memorandum.  While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies.

002713

HCMLPHMIT00003896

Each life insurance company Limited Partner will be deemed to hold a Partnership Interest in respect of the account of each Policy Owner and will be treated as a separate Limited Partner with respect to each such Partnership Interest.

**Section 2.04**      **Issuance of Interests in Series**.

(a)   Pursuant to Section 17-218 of the Act, the Partnership Interests will be offered in separate series ("**Series**").  The Partnership is currently offering one Series of Partnership Interests: "**Series 1 Partnership Interests**".  Each Series of Partnership Interests will have separate rights and obligations.

(b)   In addition, each Series of Partnership Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies.  The Partnership may issue additional Series of Partnership Interests in the future, which may have rights and obligations that differ from those of the Series 1 Partnership Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined) and other rights and terms. The terms of such additional Series shall be determined by the General Partner, in its sole discretion.

(c)   Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations.  The Partnership shall maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.  The Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.

(d)   Pursuant to Section 17-218 of the Act, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

(e)   As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined in **Section 2.04(f)**).  However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(f)   As of the date hereof, (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction (as defined in the Memorandum), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal (as defined in the Memorandum) is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series, as further set forth in the Memorandum.

(g)   Unless the context otherwise requires, Series 1 Partnership Interests and any other Series of Partnership Interests shall be collectively referred to throughout this Agreement as the "**Partnership Interests**."  As the context may require, the holders of Series 1 Partnership Interests may be referred to herein as "**Series 1 Limited Partners**".  Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Agreement the "**Limited Partners**".

002714

HCMLPHMIT00003897

(h)  References herein to the Partnership shall include, where appropriate, each Series of the Partnership.  The terms of the other Series may be set forth in an amended version of this Agreement and/or in a separate supplement thereto.

## ARTICLE III
### MANAGEMENT

**Section 3.01**    **Management of Partnership**

(a)    The business and affairs of the Partnership shall be managed exclusively by the General Partner.  The Limited Partners shall take no part in the management or control of the Partnership's business and shall have no authority to act for or bind the Partnership.  The General Partner shall have sole discretion and authority to select investments, shall invest the funds of the Partnership from time to time as the General Partner deems appropriate in accordance with the purposes set forth in **Section 1.03**, and shall have (without limitation) the powers set forth in **Section 3.02**.  The General Partner may select an investment manager ("**Investment Manager**") to provide all or any portion of the portfolio management services required by the Partnership, including the valuation of assets of the Partnership.  The Investment Manager may be changed from time to time by the General Partner in its sole and absolute discretion.  The initial Investment Manager shall be Rand Advisors, LLC, a Delaware limited liability company and an affiliate of the General Partner.  If at any time there is no Investment Manager, then the General Partner shall provide such portfolio management services, and be subject to the provisions of this Agreement applicable to the Investment Manager.

(b)    Each of the General Partner and the Investment Manager shall not be required to devote its full time to the business of the Partnership, but shall devote so much of its time and efforts to the affairs of the Partnership as may in its judgment be necessary to accomplish the purposes of the Partnership.  Nothing herein contained shall prevent the General Partner or the Investment Manager from conducting any other business, including any business with respect to securities (and/or other investments), whether or not such business ventures are in direct or indirect competition with the Partnership.  Each of the General Partner and the Investment Manager is not prohibited from buying or selling securities for its own account, including the same securities (and/or other investments) as are purchased, sold or held by the Partnership, but none of the General Partner, the Investment Manager or any of their respective affiliates (which shall not include, for purposes of this paragraph, advisory clients or managed funds) shall buy securities (and/or other investments) from or sell securities (and/or other investments) to the Partnership without the written consent of either all Limited Partners or a committee of independent Limited Partners.

**Section 3.02**    **Powers of the General Partner**.  Without in any way intending to limit the powers of the General Partner, the General Partner shall have the right, power and authority on behalf of the Partnership (or to delegate any portion of such rights, power and authority):

(a)    As provided in **Section 3.01**, to allocate all of the assets of the Partnership among securities (and/or other investments) to be selected by the General Partner in its sole and absolute discretion, including, but not limited to the right to:

(i)    purchase, hold and sell securities (and/or other investments) and rights therein of any kind or nature;

(ii)    allocate any and all of the assets of the Partnership among a number of Portfolio Funds;

(iii)    purchase, hold, sell and otherwise deal in put and call options, monetary instruments and any combinations thereof and any other financial instruments or contracts of any nature or kind;

002715

HCMLPHMIT00003898

(iv)    maintain margin accounts with brokers, pledge securities for loans and, in connection with any such pledge, effect borrowings from brokers or banks in such amounts as may be determined from time to time; and

(v)    transact business through brokers and dealers and other persons selected by the General Partner in its sole discretion, and in selecting such brokers, dealers and other persons, and determining the compensation payable to such persons, it shall seek to obtain the best execution for the Partnership taking into account the value of any research and brokerage services or products provided by such persons to the General Partner or the Partnership even though other persons may be able to provide transactional services (without any accompanying research or brokerage services or products) at lower rates of compensation;

(b)    To acquire and enter into any contract of insurance that the General Partner deems necessary or appropriate for the protection of the Partnership and the General Partner or for any purpose convenient or beneficial to the Partnership;

(c)    To engage in any transaction with affiliates of the General Partner, including entering into and amending and restating an investment management agreement with the Investment Manager (any such agreement, in effect from time to time, "**Investment Management Agreement**"), subject to the restrictions in **Section 3.01(b)**;

(d)    To employ persons, whether full-time or part-time, in the operation and management of the business of the Partnership, on such terms and for such compensation as the General Partner shall determine, regardless of whether or not such persons also may be employed by the General Partner or its affiliates;

(e)    To file, conduct and defend legal proceedings of any form, including proceedings against Partners, and to compromise and settle any such proceedings or any claims, including claims against Partners, on whatever terms deemed appropriate by the General Partner;

(f)    To open brokerage, bank and other accounts and, to the extent that funds are not invested, to deposit and maintain such funds in the name of the Partnership in such accounts and to temporarily invest such funds in short term United States and/or foreign government securities, money market accounts and/or other short term interest-bearing instruments; *provided, however*, that the Partnership's funds shall not be commingled with the funds of any other person or entity;

(g)    To cause the Partnership to make or revoke any of the elections referred to in Section 754 of the Internal Revenue Code of 1986, as amended ("**Code**"), or any similar provision enacted in lieu thereof;

(h)    To act as the "tax matters partner" of the Partnership within the meaning of Section 6231(a)(7) of the Code;

(i)    To select as its accounting year the annual period ending December 31 or any other Fiscal Year as is permitted by the Internal Revenue Service ("**IRS**");

(j)    To engage independent accountants, attorneys, investment managers, sub-advisers, broker-dealers, administrators, custodians, consultants and such other persons as the General Partner may deem necessary or advisable;

(k)    To establish and maintain for the conduct of Partnership affairs one or more offices and in connection therewith rent or acquire office space, engage personnel, whether part time or full time, and do such other acts and incur such expenses as the General Partner may deem necessary or advisable in connection with the maintenance or administration of such office;

(l)    To require a provision in any Partnership contract that the General Partner shall not have any personal liability therefor, but that the person or entity contracting with the

002716

HCMLPHMIT00003899

Partnership is to look solely to the Partnership and its assets for satisfaction;

(m) To purchase and sell Partnership assets at such price or amount for cash, securities or other property and upon such terms as are deemed in the General Partner's absolute discretion to be in the best interests of the Partnership;

(n) To prepare (or cause to be prepared), execute, acknowledge and/or deliver any and all instruments to effectuate the business of the Partnership, including, but not limited to, annual and/or interim reports, a copy of which shall be delivered to each Partner, as provided in **Sections 3.06(b) and 13.05**;

(o) To effect on behalf of the Partnership any "agency cross transaction" (as contemplated in Rule 206(3)-2 under the U.S. Investment Advisers Act of 1940, as amended ("**Advisers Act**")) through the General Partner or any of its affiliates that is registered as a broker or dealer; *provided* that the authority granted in this subsection may be revoked at any time by the General Partner or by vote or consent of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners;

(p) To "cross" any transaction for the purchase or sale of securities between two or more advisory clients or managed funds, including the Partnership (as contemplated in Rule 206(3) under the Advisers Act and interpretations thereunder) ("**Cross Trading**"); *provided* that the General Partner receives no additional compensation in connection with such Cross Trading activities, and subject to the restrictions in **Section 3.01(b)**;

(q) To waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on Capital Contributions (as defined in **Section 8.01**), withdrawals of capital, any fee, any payment to the General Partner and/or any requirement imposed on a Limited Partner by this Agreement, regardless of whether such notice period, minimum amount, limitation, restriction, withdrawal provision, fee, payment or other requirement of this Agreement, or the waiver or reduction thereof, operates for the benefit of the Partnership, the General Partner or fewer than all the Limited Partners;

(r) To establish such reserves for the Partnership as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with U.S. generally accepted accounting principles ("**GAAP**"));

(s) To value the assets and liabilities of the Partnership;

(t) To create special purpose vehicles to make or pursue investments either alone or as a joint-venture with other persons or entities;

(u) To establish and offer multiple Series of Partnership Interests with such rights and privileges as the General Partner shall determine, and to amend this Agreement in connection therewith to reflect such multi-Series structure;

(v) To convert the Partnership from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, and to amend this Agreement pursuant thereto to reflect such master-feeder structure;

(w) To create a liquidating fund entity (e.g., a liquidating trust or similar vehicle), and to transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership assets; and

(x) To do any act, engage in any activity or execute any agreement of any nature, necessary or incidental to the accomplishment of the purposes of the Partnership in accordance with the provisions of this Agreement, the Memorandum and all applicable federal, state and local laws and regulations.

002717

HCMLPHMIT00003900

**Section 3.03**    **Actions of General Partner**. The General Partner is authorized, directed and empowered to act individually on behalf of the Partnership, and in accordance therewith, to execute all documents and instruments on behalf of the Partnership. Third parties may rely on the execution of any documents on behalf of the Partnership by the General Partner.

**Section 3.04**    **Liability and Indemnification**

(a)    None of the General Partner, the Investment Manager or any of the Investment Manager Affiliates (as defined in **Section 6.02(a)**) shall be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. It shall be conclusively presumed and established that the General Partner, the Investment Manager and such persons acted in good faith if any action is taken, or not taken, by any of them on the advice of legal counsel or other independent outside consultants; *provided* that the General Partner, the Investment Manager and such persons did not act with gross negligence or willful misconduct in the selection of such counsel or consultants. Any exculpation under this **Section 3.04(a)** shall apply only to the extent that such exculpation does not violate applicable federal and state laws.

(b)    The Partnership shall indemnify and hold harmless the General Partner, the Investment Manager and the Investment Manager Affiliates (which, for purposes of this **Section 3.04(b)**, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided, however,* that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction. Any indemnity under this **Section 3.04(b)** shall be paid from and to the extent of Partnership assets only, and shall apply only to the extent that such indemnity does not violate applicable federal and state laws. The Partnership shall, in the sole discretion of the General Partner, advance amounts and/or pay expenses as incurred in connection with the indemnification obligation herein. In the event this indemnification obligation shall be deemed unenforceable, whether in whole or in part, such unenforceable portion shall be stricken or modified so as to give effect to this paragraph to the fullest extent permitted by law. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis.

(c)    If, to the extent, and at such times as, any assets of the Partnership are deemed to be "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), of any Limited Partner that is an employee benefit plan governed by ERISA, the General Partner shall be, and hereby acknowledges that it shall be considered to be, a fiduciary within the meaning of Section 3(21) of ERISA as to that Limited Partner. In such an event, or if any manager, member, officer, employee, agent or affiliate of the General Partner, is ever held to be a fiduciary of any Limited Partner, then, in accordance with Sections 405(b)(1), 405(c)(2) and 405(d) of ERISA, the fiduciary responsibilities of that person shall be limited to the person's duties in administering the business of the Partnership, and the person shall not be responsible for any other duties to such Limited Partner, specifically including evaluating the initial or continued appropriateness of this investment in the Partnership under Section 404(a)(1) of ERISA.

**Section 3.05**    **No Prohibition Against Other Business Ventures**. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage and hold interests in other business ventures of every kind and description for its own account, including, without limitation, other investment entities similar to the Partnership, whether or not such

002718

HCMLPHMIT00003901

business ventures are in direct or indirect competition with the Partnership, and whether or not the Partnership or any of the Partners also has an interest therein, without having to account to the Partnership or any Partner for any profits or other benefits derived therefrom and without incurring any obligation to offer any interest in any such activity to the Partnership or any Partner.

**Section 3.06**    **Duty to Keep Books, Financial and Tax Reports**

(a)    At all times during the existence of the Partnership, the General Partner shall keep true and complete records and books of account, in which each transaction of the Partnership shall be entered fully and accurately.  The General Partner has the power, in its sole and absolute discretion, to delegate some or all of the administrative bookkeeping functions relating to the Partnership to an administrator or other agent, which may be the Partnership's accountants.

(b)    The General Partner shall cause to be prepared and distributed to each Partner as soon as practicable following each Fiscal Year the Partnership's annual financial statements prepared in accordance with GAAP (except to the extent that the Memorandum or this Agreement states or contemplates that such statements may be inconsistent with GAAP) and audited by an independent certified public accounting firm.  The General Partner shall also have prepared and filed all federal, state and local income, franchise, gross receipts, payroll and other tax returns that the Partnership is obligated to file.  Subject to the limitations set forth in **Section 5.04**, copies of all Partnership tax returns, information returns or reports shall be available to all Partners as soon as possible after the close of the Partnership's Fiscal Year at the principal office of the Partnership.  Copies of each Partner's Schedule K-1 of the Partnership's Tax Return (Form 1065) shall be distributed to such Partner as soon as practicable after the close of the Partnership's Fiscal Year.  The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information.  For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

(c)    The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**IFRS**").  In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

<div style="background:#333;color:#fff;">

**ARTICLE IV**

**GENERAL PARTNER RESIGNATION; TRANSFER OF GENERAL PARTNER INTEREST; CONTINUATION OF PARTNERSHIP; SUBSTITUTION OF GENERAL PARTNER**

</div>

**Section 4.01**    **General Partner Resignation and Involuntary Withdrawal; Admission of Additional General Partners and Transfer by General Partner**

(a)    The General Partner shall not be permitted to voluntarily withdraw or resign as the general partner of the Partnership, except upon no less than thirty (30) days' prior written notice to all Limited Partners.  In the event of dissolution of the General Partner, or if a voluntary or involuntary petition for bankruptcy shall be filed by or against the General Partner, or the General Partner shall make any assignment for the benefit of its creditors (any of the foregoing, an "**Involuntary Withdrawal**"), the General Partner or the General Partner's trustee, receiver or assignee shall have none of the rights and powers of a general partner hereunder, and shall have no authority to act on behalf of the Partnership or have any voice in the management and operation of the Partnership, except as provided in **Section 13.02**.

(b)    The General Partner may admit additional general partners to the Partnership at such times as the General Partner shall determine, without the consent of the Limited Partners.  Notwithstanding anything herein to the contrary, the General Partner shall have the right to transfer its interest, as the general partner of the Partnership, to any affiliate of the General Partner, including any person or entity controlled by the

002719

HCMLPHMIT00003902

General Partner, controlling the General Partner or under common control with the General Partner, without the consent of the Limited Partners. In the event of such transfer by the General Partner to an affiliate, the General Partner shall not be deemed to have resigned or withdrawn from the Partnership for purposes of **Section 13.01(a)**. Any affiliate transferee of the General Partner under this **Section 4.01(b)** shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to such transfer. The General Partner shall not assign, transfer, sell, mortgage or otherwise encumber or transfer its interest as the general partner of the Partnership, except as set forth herein. Any additional general partner or transferee of the General Partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate. For the avoidance of doubt, should the General Partner transfer its interest, as the general partner of the Partnership, to any non-affiliate of the General Partner, the Limited Partners shall have the right to revoke such appointment within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners.

Section 4.02    **Continuation of Partnership; Appointment of Substitute General Partner by Limited Partners**. If an event as set forth in **Section 13.01(a)** occurs, the Limited Partners shall have the right, within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, to appoint a substitute general partner, in which event the Partnership shall not dissolve and shall continue its existence.

Section 4.03    **Substitute General Partner Requirements**. Any substitute general partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a substitute general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate. Any successor to such office of general partner shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to its withdrawal, resignation or Involuntary Withdrawal from the Partnership.

## ARTICLE V
### STATUS, RIGHTS, POWERS AND VOTING RIGHTS OF LIMITED PARTNERS

Section 5.01    **Limited Liability**. No Limited Partner, Substitute Limited Partner (as defined in **Section 10.02**) or Additional Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Partner's Capital Account in the relevant Series, from time to time, including any amounts thereof attributable to Capital Contributions, except that such Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership (x) in an amount up to its aggregate Capital Contributions in the relevant Series (including any income or gains thereon) to the Partnership in order to pay such Partner's *pro rata* share of any Partnership liabilities that arose while such Partner held Partnership Interests, and (y) as required under **Section 5.02(b)**.

Section 5.02    **Capital Contributions**

(a)    No Limited Partner shall be entitled to a return of such Limited Partner's Capital Contribution or any portion thereof, except as set forth in **Section 7.01**, and no time has been agreed upon for the return of any Partner's Capital Contribution, except as herein provided.

(b)    Each Limited Partner, if such Limited Partner receives a return of all or any part of such Limited Partner's Capital Contribution, may, to the extent provided for in the Act, be liable to the Partnership or the relevant Series for an amount equal to such distribution, if at the time of such distribution, the Limited Partner knew the

002720

HCMLPHMIT00003903

Partnership or the relevant Series was prohibited from making such distribution under the Act.

**Section 5.03**  **Liability of Limited Partner for Additional Contributions and Loans**.  No Limited Partner shall be obligated to provide any contributions to the Partnership, other than the Original Capital Contribution (as defined in **Section 9.02**) of such Limited Partner.  No Limited Partner shall be obligated to make any loan to the Partnership.

**Section 5.04**  **Rights of Limited Partners to Inspect Books, Records, and Partnership Documents**.  Upon reasonable advance written notice and during reasonable business hours, a Limited Partner may inspect and copy, at the Limited Partner's expense and solely for a purpose reasonably related to the Limited Partner's interest as a Partner, the records of the Partnership required to be maintained pursuant to Section 17-305 of the Act and any financial statements maintained by the Partnership.  Any such inspection must be in good faith without any intent to damage the Partnership or any of its Partners in any manner.  Notwithstanding the foregoing, the General Partner in its discretion may limit the information that a Limited Partner may obtain pursuant to this **Section 5.04** to the extent that such information shall allow a Limited Partner to identify any other Limited Partner.  As a result, each Limited Partner agrees and acknowledges that any books and records of the Partnership made available to a Limited Partner for inspection may be redacted to exclude any information concerning the identity of the other Limited Partners, and, to the extent such books and records cannot be so redacted, such books and records may be withheld for inspection to such requesting Limited Partner.  Copies of this Agreement and all amendments hereto shall be furnished to each Limited Partner upon request.  For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

**Section 5.05**  **No Restriction on Other Activities**.  Limited Partners may engage and hold interests in business ventures of every kind and description for their own accounts, including, without limitation, business ventures which are, directly or indirectly, in competition with the Partnership and whether or not the Partnership or any of the Partners also has an interest therein.  Neither the Partnership nor any of the Partners shall have any rights in such independent business ventures by virtue of this Agreement.

**Section 5.06**  **Voting Rights**.  In addition to the rights to vote conferred upon the Limited Partners in **Sections 3.01(b), 3.02, 4.02 and 13.02** or otherwise specifically set forth herein, Limited Partners shall have the right to vote on amendments to this Agreement to the extent provided in **Section 14.08**.

**Section 5.07**  **Constructive Consent by Limited Partners**.  In the event that the General Partner requires the consent of the Limited Partners in order to take action (including approving amendments to this Agreement), and written notice of such action is sent to any such Limited Partners by (i) certified mail, return receipt requested, (ii) electronic mail, or (iii) overnight delivery by a reputable private carrier or by the postal service, those Limited Partners not affirmatively objecting in writing within thirty (30) days after such notice is deemed to have been mailed or sent (under **Section 14.01**) be deemed to have consented to the proposed action set forth in the General Partner's notice.

**Section 5.08**  **Rights as to Dissolution**.  The Limited Partners shall have no right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise or to withdraw or reduce their Capital Contributions, except as set forth in the Certificate and this Agreement.  No Limited Partner shall have the right to bring an action for partition against the Partnership, and each Partner hereby waives any right to partition of the Partnership's property.

**Section 5.09**  **Consent by Partners in Lieu of Meeting**.  Any action required by this Agreement or the Act to be taken at any regular or special meeting of the Partners, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Partners (or shall be deemed signed by the Partners pursuant to **Section 5.07**) having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Partners entitled to vote thereon were present and voted.

**Section 5.10**  **Non-Voting Interests of BHC Limited Partners; Other Non-Voting Interests**

002721

HCMLPHMIT00003904

(a)    The portion of any Partnership Interest held for its own account by a BHC Limited Partner (as defined in this **Section 5.10(a)**) whose interests in the Partnership are determined, at any time, to be in excess of 4.99% (or such greater or lesser percentage as may be permitted or required from time to time under Section 4(c)(6) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) of the aggregate outstanding Partnership Interests of all Limited Partners, excluding any other Partnership Interests that are non-voting Partnership Interests pursuant to this **Section 5.10**, shall be deemed to be non-voting Partnership Interests to the extent of such excess above 4.99% (whether or not subsequently transferred, in whole or in part, to any other person or entity) (collectively, "**Non-Voting Interests**"); *provided* that such Non-Voting Interests shall be permitted to participate in any vote by the Limited Partners on (i) any proposal to dissolve or continue the business of the Partnership under this Agreement, (ii) any vote pursuant to **Section 4.02**, and (iii) matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to this Agreement or modifications of the terms of its Partnership Interest). Except as provided in **Section 13.01(a)**, a BHC Limited Partner shall not be permitted to vote on the selection of any successor general partner of the Partnership, and each BHC Limited Partner irrevocably waives its right to vote its Non-Voting Interest on the selection of a successor general partner of the Partnership under Section 17-801 of the Act, which waiver shall be binding upon such BHC Limited Partner or any person or entity that succeeds to its Partnership Interest. A "**BHC Limited Partner**" shall mean any Limited Partner that is, or is an affiliate of, a bank holding company (as defined in Section 2(a) of the BHCA) that is subject to the provisions of Regulation Y issued by the Board of Governors of the Federal Reserve System.

(b)    To the extent permitted by the BHCA, and except as otherwise provided in this **Section 5.10**, Non-Voting Interests shall not be counted as Partnership Interests held by any Limited Partner for purposes of determining whether any vote or consent required by this Agreement has been approved or given by the requisite percentage of the Limited Partners.

(c)    Notwithstanding the foregoing, any BHC Limited Partner may elect to no longer be treated as a BHC Limited Partner for the purposes of this Agreement by delivering written notice of such election to the General Partner. Any such election made by a BHC Limited Partner may be rescinded at any time by providing written notice thereof to the General Partner.

(d)    The General Partner may, for legal, regulatory or other reasons, designate any other Partnership Interests as non-voting, in whole or in part. Except as provided in this **Section 5.10**, a Partnership Interest held by a Limited Partner as a non-voting Partnership Interest shall be identical in all regards to all other Partnership Interests held by Limited Partners.

(e)    For the avoidance of doubt, the provisions of this **Section 5.10** shall apply on a Series-by-Series basis.

<div style="background-color:#3a3a3a;color:white;text-align:right;padding:8px;">

**ARTICLE VI**
**FEES AND EXPENSES; BROKERAGE PRACTICES**

</div>

**Section 6.01**    **Management Fee**.

(a)    In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager shall receive a quarterly management fee ("**Management Fee**") equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined in **Section 9.04**), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|

002722

HCMLPHMIT00003905


| $0 - $99,999,999 | 0.5500% |
|---|---|
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis. For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually. The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each Capital Account will be charged a blended Management Fee based on the above schedule.

The Management Fee shall be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee shall be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee shall be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's Capital Account during any calendar quarter. Management Fees shall be payable with respect to the Partnership Interests of a Limited Partner in any Side Pocket Account.

(b)   For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments (each as defined in **Section 9.07**) shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

(c)   With respect to any Limited Partner who has requested to withdraw all of its Partnership Interests from the Partnership, with the exception of any Partnership Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Partnership Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account shall remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve shall be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, shall be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

(d)   The Partnership will also bear its *pro rata* share of the management fees charged by the managers of the Portfolio Funds. Notwithstanding the foregoing, the Investment Manager intends to waive any management fees due to the Investment Manager with respect to any investment of the Partnership in any Affiliated Funds (as defined in the Memorandum), including the PE Portfolio Fund (as defined in the Memorandum). Accordingly, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees.

**Section 6.02**   **Expenses**

(a)   **Organizational and Initial Offering Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or their respective managers, members, shareholders, directors, officers, partners, employees, agents and/or affiliates (collectively, "**Investment Manager Affiliates**") for all organizational

002723
HCMLPHMIT00003906

and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including blue sky filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to sixty (60) months from the date the Partnership commences operations. Amortization of such expenses is a divergence from GAAP. In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in Fiscal Year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of this Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within sixty (60) months of its commencement, any unamortized expenses shall be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

(b)      **Operating Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Partnership Interests, including, but not limited to, printing of the Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Partnership's administrator ("**Administrator**"), costs of communications with Limited Partners, and ongoing legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership. Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses. Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

The Partnership will also bear its *pro rata* share of the expenses of each Portfolio Fund.

(c)      **Allocation of Expenses Among Series**. The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

002724

HCMLPHMIT00003907

(d)    **General Partner and Investment Manager Expenses**.  The General Partner and the Investment Manager shall pay for their own general operating and overhead expenses associated with providing the management and investment management services required under this Agreement and the Investment Management Agreement, respectively.  These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above. The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended, as set forth in the Memorandum.

Section 6.03    **Marketing Fees and Sales Charges**.  The General Partner and/or the Investment Manager may sell Partnership Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the Capital Contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer shall be disclosed to, and acknowledged by, such Limited Partner.

Section 6.04    **Directed Brokerage**.  The Investment Manager is authorized to direct Partnership brokerage transactions to brokers or other persons who refer prospective Limited Partners to the Partnership.  The Investment Manager is authorized to pay finders' fees or other compensation at its own expense to such persons.

Section 6.05    **Allocation of Investment Opportunities**.  The Investment Manager may at times determine that certain investments shall be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, the Investment Manager's own accounts or accounts of an affiliate.  If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager shall endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable.  The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

Section 6.06    **Aggregation of Orders**.  The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership shall be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors.  In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities.  Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold.  In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

002725

HCMLPHMIT00003908

## ARTICLE VII
### WITHDRAWALS FROM CAPITAL ACCOUNT; DISTRIBUTIONS

**Section 7.01**   **Permissible Withdrawals**.  A Limited Partner may withdraw all or any of the value in such Limited Partner's Capital Account in any Series in the manner and to the extent provided in **Section 7.02**.  Each of the General Partner and its principals and affiliates may withdraw all or any of the value in its respective Capital Account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.

**Section 7.02**   **Withdrawal Procedures**

(a)   Subject to the Lock-Up Period (as defined in **Section 7.02(b)**) and certain other restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date shall be referred to herein as a "**Withdrawal Date**"), upon at least ninety-one (91) days' prior written notice to the Administrator, with a copy to the General Partner.  Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's Capital Account balance below $500,000.  All withdrawals shall be deemed made prior to the commencement of the following calendar quarter (or other relevant period).

(b)   Each Capital Contribution by a Limited Partner to the Partnership will be subject to a twelve (12)-month lock-up period ("**Lock-Up Period**") during which such capital may not be withdrawn from the Partnership, unless the Lock-Up Period is waived or reduced by the General Partner.  If a Limited Partner purchases Partnership Interests on multiple dates, each tranche of Partnership Interests will be tracked separately for purposes of the Lock-Up Period, and withdrawals will be deemed made from Partnership Interests purchased on the earliest date (as adjusted for changes in the Net Asset Value).  For the avoidance of doubt, the foregoing Lock-Up provisions shall apply on a Series-by-Series basis.

(c)   The General Partner believes (but cannot guarantee) that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests.  The General Partner may, in its sole discretion:  (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Partnership Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal.   In addition, notwithstanding anything to the contrary herein, the General Partner may limit and/or suspend withdrawals in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(d)   A Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's Capital Account.  At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined in **Section 9.07**).  **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

(e)   The following provision shall apply to withdrawals, on a Series-by-Series basis:

(i)   A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, less than ninety percent (90%) of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts) shall be paid

002726

HCMLPHMIT00003909

within ninety (90) days after the applicable Withdrawal Date.

(ii)   In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, ninety percent (90%) or more of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute, in the aggregate during such Fiscal Year ninety percent (90%) of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within ninety (90) days after the applicable Withdrawal Date. The balance of the amount payable upon such withdrawal shall be paid, without interest, within ninety (90) days after completion of the audited financial statements for the Fiscal Year in which the withdrawal occurs. Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full Capital Account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within ninety (90) days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

(f)   The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's Capital Accounts on at least five (5) days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

(g)   The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's Capital Account under this **Article VII**.

(h)   All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.

(i)   All notices of withdrawal must specify the dollar amount or percentage of value of a Limited Partner's Capital Account to be withdrawn. The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts, notice periods and the Lock-UP Period, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

(j)   If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal. Such fee shall be payable to the relevant Series of the Partnership and shall be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

(k)   Upon withdrawal of all of the capital in its Capital Account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner shall be deemed to have withdrawn from the Partnership or the relevant Series and, upon notice of such withdrawal, a Limited Partner shall not be entitled to exercise any voting rights afforded to Limited Partners under this Agreement.

002727

HCMLPHMIT00003910

(I)      In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds, as applicable.  For example, the ability of the Partnership to provide withdrawal proceeds to a Limited Partner may be subject to, among other things, various notice period requirements of the Portfolio Funds.

**Section 7.03      Limitations on Withdrawals**

(a)      The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from Capital Accounts:

(i)      during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners;

(ii)     where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation, including any diversification requirements applicable to insurance-dedicated investment funds;

(iii)    if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications;

(iv)     a Portfolio Fund suspends the right to, or the payment of proceeds due upon, withdrawal and/or a Portfolio Fund allocates assets to its side pocket account;

(v)      a Portfolio Fund satisfies a withdrawal request by making an in-kind distribution; or

(vi)     for such other reasons or for such other periods as the General Partner may in good faith determine.

(b)      All Limited Partners shall be notified in writing of any such suspension or postponement and the termination thereof.   Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement shall be effected as of the first Withdrawal Date following the recommencement of withdrawals.

(c) For the avoidance of doubt, the following "gate" provisions shall apply on a Series-by-Series basis.   In the event that Limited Partners, in the aggregate, request, as of any Withdrawal Date, withdrawals of more than twenty-five percent (25%) of the aggregate balances of the Partnership's Capital Accounts (excluding any Side Pocket Accounts), the requested amounts may, in the General Partner's sole discretion, be reduced to an amount equal to twenty-five percent (25%) of the aggregate Capital Account balances of the Partnership (excluding any Side Pocket Accounts) as of such date, and satisfied on a *pro rata* basis, based on the respective amounts of requested withdrawals of capital by each withdrawing Limited Partner.   Capital withdrawal requests that are deferred due to such limitation may be revoked by the withdrawing Limited Partner, and if not revoked, will be aggregated with other withdrawal requests received for subsequent Withdrawal Dates.   In the interim, all of the remaining capital in such Limited Partner's Capital Account (including the capital subject to such deferred withdrawal request) shall remain subject to the performance of the Partnership.

**Section 7.04      Distributions**

002728
HCMLPHMIT00003911

(a)     The Partnership (or any Series) is not required, and generally does not intend, to make any distributions of cash or other property.  However, the Partnership (or any Series) may make such distributions at such times and in such amounts as the General Partner shall determine in its sole discretion.

(b)     All distributions hereunder (other than those made related to withdrawals from Capital Accounts) shall be made *pro rata* to all Partners in accordance with their relative Capital Accounts (or Side Pocket Accounts, New Issues Accounts or other memorandum accounts, as applicable) at the time of any such distribution.  The General Partner may set up such reserves as it shall determine shall be appropriate or necessary to accomplish the purposes of the Partnership (even if such reserves are not in accordance with GAAP).  If the Partnership (or a Series) shall distribute property other than cash pursuant to this **Section 7.04**, the Capital Accounts of the Partners shall be adjusted as if such property were sold at the value of such property as determined under **Section 9.04**, and the cash proceeds of such sale were distributed.

(c)     Notwithstanding anything to the contrary herein, to the extent that the Partnership makes any distributions, the General Partner may limit such distributions, in its sole discretion, in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds.

## ARTICLE VIII
### ADDITIONAL LIMITED PARTNERS

**Section 8.01**   **Future Issuance of Partnership Interests**.  The General Partner may admit as of the first day of each month (each such date, a "**Contribution Date**"), or at any other time that the General Partner determines in its sole and absolute discretion, as additional Limited Partners ("**Additional Limited Partners**"), persons who contribute cash or, in the General Partner's sole discretion, persons who contribute securities (and/or other investments), for Partnership Interests ("**Capital Contributions**").  If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including, but not limited to, the costs of liquidating, or otherwise adjusting the Partnership's portfolio to accommodate, such securities (and/or other investments), and legal, accounting and administration costs.  Such special charge shall be assessed as of such dates deemed appropriate by the General Partner.  Any securities (and/or other investments) accepted as a Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

## ARTICLE IX
### CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS; NET ASSET VALUE ADJUSTMENTS; TAXABLE INCOME AND LOSS AND DISTRIBUTIONS

**Section 9.01**   **Capital Accounts**.  A Partner's "**Capital Account**" as of a particular date shall consist of the following:

(a)  an amount equal to the Partner's Original Capital Contribution;

(b)  the increases, if any, to such account by reason of Additional Capital Contributions (as defined in **Section 9.03(a)**);

(c)  the decreases, if any, to such account by reason of withdrawals (and distributions) from such Capital Account; and

(d)  the increases or decreases, if any, to such Capital Account in accordance with the provisions of this **Article IX**.

Capital Accounts shall be maintained in accordance with the provisions of Treasury

HCMLPHMIT00003912

Regulations Section 1.704-1(b)(2), or any successor provisions thereto.

**Section 9.02**   **Original Capital Contributions**.  A Partner's "**Original Capital Contribution**" shall be the amount of the cash, or in the sole discretion of the General Partner, securities (and/or other investments), contributed by such party upon such Partner's admission as a Partner.  The General Partner may establish such minimum Original Capital Contribution as the General Partner deems appropriate and that minimum may thereafter be waived or changed by the General Partner.  In the event an Original Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement.  At any time that a Partner is admitted, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Original Capital Contribution, and commence a new accounting period on the date of such admission, and upon such admission, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners.

**Section 9.03**   **Additional Capital Contributions**

(a)   A Partner shall be permitted, with the consent of the General Partner, to make additional Capital Contributions in an amount deemed appropriate by the General Partner in cash or, in the sole discretion of the General Partner, securities (and/or other investments) ("**Additional Capital Contributions**") to the capital of the Partnership as of any Contribution Date, or at any other time that the General Partner determines in its sole and absolute discretion. In the event an Additional Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement.  At any time that Additional Capital Contributions are accepted pursuant to this **Section 9.03**, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Additional Capital Contributions, and commence a new accounting period on the date of such acceptance, and upon such acceptance, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners.  Any securities accepted as an Additional Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

(b)   In connection with an Additional Capital Contribution by an existing Limited Partner, the General Partner shall (i) treat such Additional Capital Contribution as a Capital Contribution with respect to one of such Limited Partner's existing Capital Accounts or (ii) establish a new Capital Account to which such Capital Contribution shall be credited and which shall be maintained for the benefit of such Limited Partner separately from any existing Capital Account of such Limited Partner.  Such separate Capital Account may be maintained for any purpose, in the discretion of the General Partner, including the calculation of the Incentive Fee, the Loss Carryforward (each as defined in **Section 9.05**) and/or the Lock-Up Period.  If a Limited Partner has more than one Capital Account, any withdrawals by or distributions to such Limited Partner shall be applied to such Capital Accounts in such manner and proportion as the General Partner shall determine in its sole discretion.

**Section 9.04**   **Determination of Net Asset Value**

(a)   The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, shall be determined on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to sixty (60) months from the date the Partnership commences operations and (y) reserves may be taken that are inconsistent with GAAP), the Memorandum and the following:

(1)   No value shall be assigned to goodwill;

(2)   All accrued debts and liabilities shall be treated as liabilities, including, but

002730

HCMLPHMIT00003913

not limited to, all compensation payable to the Investment Manager that has been earned but not yet paid (e.g., Management Fees and Incentive Fees), any allowance for the Partnership's estimated annual audit and legal fees and other operating expenses and any contingencies for which reserves are required;

(3)     Securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, shall be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date;

(4)     Options that are listed on a securities or commodities exchange shall be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; provided that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options shall be valued at the midpoint between the last "bid" and "ask" prices for such options on such date;

(5)     Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, shall be valued based upon quotations obtained from market makers, dealers or pricing services;

(6)     Securities (and/or other investments) contributed to the Partnership as subscription proceeds shall be treated as if purchased by the Partnership at market value on the date of contribution, and securities (and/or other investments) distributed from the Partnership as withdrawal proceeds shall be treated as if sold by the Partnership at market value on the date of distribution;

(7)     Net profits and net losses from New Issues (as defined in **Section 9.08(a)**) shall only be credited or debited to the Net Asset Value of the New Issues Accounts, except to the extent permitted by the applicable rules of the FINRA (as defined in **Section 9.08(a)**), in which case a portion of the net profits and net losses from New Issues may be credited or debited to the Net Asset Value of the Capital Accounts of Limited Partners who are Restricted Persons (as defined in **Section 9.08(a)**) up to an amount permitted by applicable FINRA rules;

(8)     Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, shall be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value; and

(9)     In the case of investments in Portfolio Funds, which investments are expected to constitute most of the Partnership's assets, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value. The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund. None of the General Partner, the Investment Manager or any of their respective affiliates will be responsible for calculating the net asset value of the Portfolio Funds or for verifying the

002731

HCMLPHMIT00003914

accuracy and completeness of any such values received.

(b)   If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument does not fairly represent its market value, the Investment Manager shall value such security, commodity, option or other financial instrument as it reasonably determines.

(c)   In connection with the determination of the Net Asset Value of the Partnership, the Investment Manager may consult with and is entitled to rely upon the advice of the Partnership's brokers and any other third parties deemed appropriate by the Investment Manager.  In no event and under no circumstances shall the Investment Manager, the Partnership's brokers or such other third parties incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

(d)   Absent bad faith or manifest error, all Net Asset Value determinations pursuant to this Agreement are conclusive and binding as to all Partners.

(e)   After the foregoing determinations have been made, a further calculation shall be made to determine the increase or decrease in Net Asset Value of the Partnership during the month (or other time period, as the case may be) just ended.  The term "**increase in Net Asset Value**" shall be the excess of Net Asset Value at the end of any month (or other time period, as the case may be) over that of the Net Asset Value of the Partnership as of the end of the preceding period, after adjusting for Capital Contributions, distributions and withdrawals.  The term "**decrease in Net Asset Value**" shall be the amount by which the Net Asset Value at the end of the month (or other time period, as the case may be) is less than the Net Asset Value of the Partnership as of the end of the preceding period, after making the adjustments specified above.

**Section 9.05**   **Allocation of Increases and Decreases in Net Asset Value; Incentive Fee**

(a)   Any net increase or decrease in Net Asset Value during any month (or such other period, as the case may be) shall be allocated as of the end of such month (or such other period, as the case may be) to the Capital Account of each Partner in the proportion which such Partner's Capital Account bore to the sum of the Capital Accounts of all the Partners as of the beginning of such month (or such other period, as the case may be); *provided* that net increases or decreases in Side Pocket Accounts, New Issues Accounts and other memorandum accounts shall be allocated as provided in **Sections 9.07 and 9.08**, respectively.

(b)   In consideration for the management services provided pursuant to this Agreement, the General Partner shall receive an incentive fee ("**Incentive Fee**") at the close of each Fiscal Year (or such other applicable period that this payment is made in accordance with this Agreement, as the case may be) equal to five percent (5%) of the net increase in Net Asset Value (including realized and unrealized gains and losses and net of the Management Fee) attributable to each Limited Partner's Capital Account for such Fiscal Year (or other applicable period), as determined on the accrual basis of accounting; *provided*, *however*, that the Incentive Fee shall be subject to a Loss Carryforward (as described below in **Section 9.05(g)**).

(c)   The Incentive Fee shall not include any change in the value of an Illiquid Investment held in a Side Pocket Account until such Illiquid Investment (or the sales proceeds thereof) has been reallocated from such Side Pocket Account to the Capital Accounts of participating Partners.  Notwithstanding the foregoing, any income generated from an Illiquid Investment shall be transferred to and included in the Capital Accounts of participating Partners for purposes of calculating the Incentive Fee.

(d)   The Partnership will also bear its *pro rata* share of the incentive-based fees/allocations charged by the managers of the Portfolio Funds.  Notwithstanding the foregoing, (x) the General Partner intends to waive any incentive-based fees/allocations due to the General Partner and/or any affiliate thereof with respect to

002732

HCMLPHMIT00003915

any investment of the Partnership in any Affiliated Funds, including the PE Portfolio Fund, such that, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees; and (y) to the extent that the Partnership is subject to a waiver or reduction of incentive-based fees/allocations, or any other special arrangement, with respect to its investment in the PE Portfolio Fund, the General Partner shall nevertheless not charge any such fees or allocations (or otherwise change such arrangement) at the level of the Partnership.

(e)     The General Partner shall also receive the Incentive Fee with respect to any amounts withdrawn by a Limited Partner, whether voluntary or involuntary, and upon dissolution of the Partnership under **Article XIII**.  The Incentive Fee shall be paid to the General Partner in addition to, and separately from, the allocations of net increases or decreases in Net Asset Value to its Capital Account pursuant to **Section 9.05(a)**.

(f)     In the event of a net decrease in the Net Asset Value of the Capital Account of any Limited Partner in any Fiscal Year (or other relevant Incentive Fee period), the amount of such net decrease shall be recorded and carried forward as a "**Loss Carryforward**".  Any net increase in the Net Asset Value of the Capital Account of such Limited Partner in a subsequent Fiscal Year (or other period) shall be applied to reduce (but not below zero) such Loss Carryforward balance (and, conversely, any net decrease in Net Asset Value shall be applied to increase such Loss Carryforward balance).  No Incentive Fee shall be paid in any subsequent Fiscal Year (or other period) in respect of such Capital Account until the Loss Carryforward has been fully recovered as described above, and in such Fiscal Year (or other period) of such recovery, the Incentive Fee shall be calculated based on the excess net increase in Net Asset Value of such Capital Account (i.e., after being applied to reduce the Loss Carryforward to zero).  However, in the event that a Limited Partner withdraws funds at a time in which such Limited Partner's Capital Account has a Loss Carryforward, the amount of such Loss Carryforward at such Withdrawal Date applicable to such Limited Partner's Capital Account shall be reduced by a percentage equal to one hundred percent (100%) multiplied by a fraction, the numerator of which is the amount to be withdrawn from the Limited Partner's Capital Account, and the denominator of which is the amount in such Capital Account immediately prior to the withdrawal.

(g)     Notwithstanding the provisions set forth above, if the Partnership has a material item of income or loss in any fiscal period which relates to a matter or transaction occurring during a prior fiscal period (e.g., if the Partnership wins a cash settlement in a case it began in a prior period) the item of income or loss may, at the sole discretion of the General Partner, be shared among the Partners (including persons who ceased to be Partners) in accordance with each such Partner's Partnership Interest in the Partnership during the prior period.

**Section 9.06**     **Allocations for Tax Purposes; General Partner Discretion on Allocations; Withholding**

(a)     Ordinary income, gains, losses and deductions of the Partnership for each Fiscal Year shall accrue to, and be borne by, the Partners in proportion to their sharing of net increases or decreases in Net Asset Value, the allocations of various types of taxable income and losses likewise being as nearly as possible proportionate.

(b)     All allocations under this **Section 9.06** shall be made pursuant to the principles of Section 704 of the Code and in conformity with Treasury regulations promulgated thereunder ("**Regulations**"), or the successor provisions to such Code Section and Regulations.

(c)     All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion, and the General Partner is expressly permitted to use the aggregate method of apportioning taxable gain and loss under Treasury Regulation Section

002733

HCMLPHMIT00003916

704(b).  The General Partner is expressly authorized to make special allocations to the Partners of such gains or income as shall be necessary to satisfy the "qualified income offset" requirements of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).  The General Partner's determination of the foregoing matters shall be final and conclusive as to all parties.

(d)  Notwithstanding anything to the contrary contained in this Agreement, in the event a Partner withdraws all of the capital in its Capital Account from the Partnership (excluding any amounts held in Side Pocket Accounts), the General Partner shall have the discretion to specially allocate an amount of the Partnership's taxable gains or losses to the withdrawing Partner to the extent that the Partner's Capital Account exceeds, or is less than, its federal income tax basis in its Partnership Interest.

(e)  Any taxes, fees or other charges that the Partnership is required to withhold under applicable law with respect to any Partner shall be withheld by the Partnership (and paid to the appropriate government authority) and shall be deducted from the Capital Account of such Partner as of the last day of the Fiscal Year (or earlier if the Partner withdraws) with respect to which amounts are required to be withheld.

(f)  For the avoidance of doubt, the provisions of this **Section 9.06** shall apply on a Series-by-Series basis.

Section 9.07    **Side Pocket Accounts**

(a)  The Investment Manager may designate that certain investments held by a Series of the Partnership and/or by the Portfolio Fund(s) be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines.  Such investments may include: (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; (iii) an investment into a Portfolio Fund with an extended lock-up period and/or that invests in illiquid assets; (iv) that portion of an investment in a Portfolio Fund that is attributable to side pocket accounts designated by the manager of such Portfolio Fund (which may be designated with respect to assets that are subject to legal or contractual restrictions on transferability, or that the Investment Manager believes either lack a readily assessable market value (without impairing the value of such investments) or should be held until the resolution of a special event or circumstance; and (v) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**").  **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in a Side Pocket Account, and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely**.  Illiquid Investments held in a Side Pocket Account shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.  For the avoidance of doubt, each Policy Owner investing through the relevant Limited Partner will indirectly participate in the economics from a *pro rata* portion of a Side Pocket Account and the corresponding Illiquid Investment.

(b)  At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event.  Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) shall be reallocated, *pro rata*, from the Side Pocket Account to the Capital Accounts of participating Partners in accordance with their respective interests in such Side Pocket Account.  Until such reallocation, a Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of Illiquid Investments held in a Side Pocket Account.  Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account shall receive an amount equal to its interest

002734

HCMLPHMIT00003917

in such Side Pocket Account (net of: (i) any accrued Management Fees and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve), and (ii) any accrued Incentive Fee, with respect thereto) within ninety (90) days after such reallocation. A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

(c)    Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission. **For the avoidance of doubt, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.** Notwithstanding any provisions of this Agreement to the contrary, any expenses relating specifically to a Side Pocket Account shall be charged to the Partners participating in such account in proportion to their respective interests therein, as of the commencement of such Side Pocket Account.

(d)    If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment (each, a "**Follow-On Investment**"), only the Partners participating in such original investment shall participate in such Follow-On Investment in proportion to their interest in the related Side Pocket Account; *provided, however,* that if a Partner shall have withdrawn from the Partnership, the General Partner shall equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the Follow-On Investment. In its discretion, the Investment Manager need not designate as a "Follow-On Investment" an additional investment in the same or similar opportunity as the investment for which a Side Pocket Account has been established, but instead may designate such investment as a new investment with a separate Side Pocket Account. Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment.

Section 9.08    <u>**New Issues; Other Memorandum Accounts for Restricted Transactions**</u>.

(a)    From time to time, the Partnership may invest in initial public offerings of equity securities ("**New Issues**"). Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in New Issues, each subject to a de minimis exemption ("**De Minimis Limit**"). To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular Capital Accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**"). Participation in New Issues Accounts shall be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed the De Minimis Limit. To the extent not prohibited by applicable FINRA rules, the General Partner shall be entitled to receive the Incentive Fee with respect to any profits arising from New Issues trades.

(b)    In the event a New Issues Account is established, to effect a transaction in New Issues, the requisite funds shall be transferred from the Partnership to the New Issues Account. Securities held in the New Issues Account shall be held there until they are eventually sold or transferred. Upon the sale or other disposition of New

002735
HCMLPHMIT00003918

Issues (including any transfer of the underlying securities in the New Issues Account to the Capital Accounts of all of the Partners after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period shall be credited or debited to the Capital Accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein.  In the event that the Partnership establishes one or more New Issues Accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that Limited Partners that are not Restricted Persons were receiving profits based in part on the capital of Limited Partners that are Restricted Persons.  Such adjustment may, in the sole and absolute discretion of the General Partner, and to the extent not prohibited by rules of FINRA, consist of: (i) assessing an interest charge to the Capital Accounts of Limited Partners that are not Restricted Persons, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by Limited Partners that are not Restricted Persons in connection with New Issue trades; or (ii) such other adjustment as the General Partner considers equitable and is not inconsistent with the rules of FINRA.

(c)    In addition to the foregoing provisions with respect to New Issues Accounts and Side Pocket Accounts, to the extent that certain Limited Partners are restricted from participating in any transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such non-participating Limited Partners.  Only those Limited Partners who the General Partner determines are eligible shall participate in such accounts.  In the event that the Partnership establishes one or more memorandum accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that participating Limited Partners were receiving profits based in part on the capital of non-participating Limited Partners.  Such adjustment may, in the sole and absolute discretion of the General Partner, consist of: (i) assessing an interest charge to the Capital Accounts of participating Limited Partners, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by participating Limited Partners in connection with such trades; or (ii) such other adjustment as the General Partner considers equitable.

## ARTICLE X
### RESTRICTIONS ON TRANSFERS OF PARTNERSHIP INTERESTS OF LIMITED PARTNERS; ADMISSION OF SUBSTITUTE LIMITED PARTNERS; OTHER MATTERS AFFECTING PARTNERSHIP INTERESTS

**Section 10.01**    **Restrictions on Transfer of Partnership Interests of Limited Partners**

(a)    Except for transfers by will or intestate succession or by operation of law, no Limited Partner may offer, sell, transfer, assign, exchange, hypothecate or pledge, or otherwise dispose of or encumber (hereinafter collectively, "**Transfer**" or "**Transferred**"), in whole or in part, such Limited Partner's Partnership Interest without the consent of the General Partner, which may be given or withheld in the sole and absolute discretion of the General Partner.

(b)    No Limited Partner may Transfer, in whole or in part, such Limited Partner's Partnership Interest if, in the General Partner's discretion, such Transfer could result in the termination of the Partnership for federal income tax purposes, and any purported Transfer that could result in the termination of the Partnership for federal income tax purposes shall be void *ab initio*.  In its sole and absolute discretion, the General Partner may request a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) as to whether any contemplated Transfer could result in the termination of the Partnership for federal income tax purposes, and the General Partner shall be entitled to rely conclusively upon such opinion in determining whether such Transfer could result in the termination of the Partnership and whether consent to such disposition should be given.

002736

HCMLPHMIT00003919

(c)    The Partnership Interests may not be transferred without documentation acceptable to the General Partner, which may include a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) that such proposed Transfer may be effected without:

    (i)    registration of the Partnership Interest being made under the Securities Act of 1933, as amended;

    (ii)    violating any applicable state securities or "blue sky" law (including investment suitability standards) or the laws of any other jurisdiction;

    (iii)    the Partnership becoming subject to the Investment Company Act of 1940, as amended ("**1940 Act**"); or

    (iv)    violating the Act.

(d)    In no event shall the Partnership Interest of a Limited Partner or any portion thereof be Transferred to a minor or incompetent, unless by will or intestate succession.

**Section 10.02**    **Admission of Substitute Limited Partner**

(a)    Subject to the provisions of this **Article X**, an assignee of the Partnership Interest of a Limited Partner (which shall include any purchaser, transferee, donee or other recipient of any disposition of such Partnership Interest) shall be deemed admitted to the Partnership as a Limited Partner (a "**Substitute Limited Partner**") only upon the satisfactory completion of the following:

    (i)    consent of the General Partner shall have been given, which may be given or withheld in the sole and absolute discretion of the General Partner and which shall be evidenced by a written document executed by the General Partner;

    (ii)    the assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement (as it may be amended from time to time) by executing a counterpart hereof and such assignee shall have expressly assumed all of the rights and obligations of the assignor Limited Partner hereunder, and shall have executed such other documents or instruments as the General Partner may require in its sole and absolute discretion in order to effect the admission of such person as a Limited Partner;

    (iii)    an amendment to the Certificate, if required by the Act (in the opinion of the General Partner), evidencing the admission of such person as a Limited Partner shall have been filed;

    (iv)    the assignee shall have delivered a letter containing a representation that the assignee's acquisition of the Partnership Interest is made as a principal, for the assignee's own account, for investment purposes only and not with a view to the resale or distribution of such Partnership Interest, and that the assignee will not Transfer such Partnership Interest or any fraction thereof to anyone in violation of this Agreement;

    (v)    if the assignee is a corporation, partnership, limited liability company, trust or other entity, the assignee shall have provided to the General Partner evidence satisfactory to the General Partner of its authority to become a Limited Partner under the terms and provisions of this Agreement;

    (vi)    the assignee shall have complied with all applicable governmental rules and regulations, if any;

    (vii)    the assignee meets the suitability requirements for investing in the Partnership and the assignee completes the subscription documents

002737

HCMLPHMIT00003920

("**Subscription Documents**") provided by the General Partner; and

(viii)   all costs and expenses incurred by the Partnership and the General Partner in connection with this **Section 10.02** shall be paid by the person or entity seeking to become a Substitute Limited Partner (or the transferor Limited Partner).

Section 10.03    **Rights of Assignee of Partnership Interest**

(a)    Subject to **Section 10.01(b)**, if a Limited Partner Transfers all or a portion of such Limited Partner's Partnership Interest, involuntarily, by operation of law or voluntarily, without the consent required by this **Article X**, the transferee or assignee shall: (i) be entitled only to receive that proportion of profit and loss, and any distribution of Partnership assets, attributable to the Partnership Interest acquired by reason of such disposition from and after the effective date of such disposition, and only upon written notification of same to the General Partner consistent with **Section 10.03(b)**; and (ii) have no other rights as a Limited Partner unless admitted as a Substitute Limited Partner in accordance with the terms of this Agreement.

(b)    Subject to the provisions of **Section 10.01**, and except as required by operation of law, the Partnership shall not be obligated for any purposes whatsoever to recognize the assignment by any Limited Partner of such Limited Partner's Partnership Interest until the General Partner has received notice thereof.

(c)    Any person or entity who is the assignee of all or any portion of the Partnership Interest of a Limited Partner, but who has not become a Substitute Limited Partner, and desires to make a further disposition of such Partnership Interest, shall be subject to all the provisions of this **Article X** to the same extent and in the same manner as any Limited Partner desiring to make a disposition of such Limited Partner's Partnership Interest.

Section 10.04    **Effect of Bankruptcy, Death or Incompetence of a Limited Partner.**   The bankruptcy, dissolution or winding up of a Limited Partner, the death of a Limited Partner or an adjudication that a Limited Partner is incompetent (which term shall include, but not be limited to, insanity), shall not cause the termination, wind-down or dissolution of the Partnership and the business of the Partnership shall continue.  If a Limited Partner becomes bankrupt, dissolved or wound up, the trustee or receiver of such Limited Partner's estate or, if a Limited Partner dies, such Limited Partner's executor, administrator or trustee, or, if such Limited Partner is adjudicated incompetent, such Limited Partner's committee, guardian or conservator, shall have the rights of such Limited Partner for the purposes of settling or managing such Limited Partner's estate or property and such power as the bankrupt, deceased or incompetent Limited Partner possessed to dispose of all or any part of such Limited Partner's Interest and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a Substitute Limited Partner.

Section 10.05    **Attachment by Creditors**.  If a Partnership Interest is subjected to attachment by a creditor, or is assigned for the benefit of any creditor, the Partnership Interest obtained by such creditor shall be only that of an assignee, and in no event shall such creditor have the rights of a Substitute Limited Partner or an Additional Limited Partner.

| | ARTICLE XI |
|---|---|
| | **REPRESENTATIONS, WARRANTIES AND COVENANTS** |

Section 11.01    **Limited Partners**.   Each Limited Partner represents, warrants and covenants to the Partnership and to every other Partner as follows:

(a)    Such Limited Partner shall provide promptly, upon request by the General Partner, all financial data, documents, reports, certifications or other information necessary or appropriate to enable the Partnership to apply for and obtain an exemption from the registration provisions of applicable law and any other information required by governmental agencies having jurisdiction over the Partnership.

002738

HCMLPHMIT00003921

(b)     There is no misrepresentation contained in the Subscription Documents and the forms attached thereto completed by such Limited Partner.

(c)     If such Limited Partner is a corporation, partnership, limited liability company, trust or other entity, that the officer (or other signatory) signing on its behalf has been duly authorized to execute and deliver this Agreement and, to the extent requested by the General Partner, the Certificate.

(d)     Such Limited Partner that is an entity that would be an "investment company" under the 1940 Act, but for an exclusion under either Section 3(c)(1) or Section 3(c)(7) thereof, has advised the General Partner of the number of persons that constitute "beneficial owners of such Limited Partner's outstanding securities (other than short-term paper)" within the meaning of Section 3(c)(1)(A) of the 1940 Act, and shall advise the General Partner promptly upon any change in that number.

## ARTICLE XII
## SPECIAL POWER OF ATTORNEY

**Section 12.01**     **Execution and Consent**.  Each Limited Partner hereby irrevocably constitutes and appoints the General Partner and its respective successors (hereinafter referred to as "**Special Attorney**") as the attorney-in-fact for such Limited Partner with power and authority to act in the Limited Partner's name and on the Limited Partner's behalf to execute, acknowledge, swear to and file documents and instruments necessary or appropriate to the conduct of the Partnership's business, which shall include, but not be limited to, the following:

(a)     the Certificate and this Agreement, as well as amendments thereto as required by the laws of any state, or any other jurisdiction, or as otherwise permitted under the terms of this Agreement;

(b)     any other certificates, instruments and documents, including fictitious name certificates, as may be required by, or may be appropriate under, the laws of any state;

(c)     the amendment and/or restatement of this Agreement in accordance with **Section 14.08**; and

(d)     any documents that may be required to effect the continuation of the Partnership, the admission of an Additional Limited Partner or a Substitute Limited Partner, the withdrawal of a Limited Partner, or the dissolution and termination of the Partnership, *provided* that such continuation, admission, withdrawal or dissolution and termination are in accordance with the terms of the Certificate and this Agreement.

**Section 12.02**     **Procedural Aspects**.  The power of attorney granted by each Limited Partner to the Special Attorney:

(a)     is a special power of attorney, coupled with an interest, and is accordingly irrevocable;

(b)     may be exercised by the Special Attorney for each Limited Partner either by signing separately as attorney-in-fact for each Limited Partner or, by executing any instrument with the single signature of such Special Attorney acting as attorney-in-fact for all of the Limited Partners; and

(c)     shall survive the assignment by a Limited Partner of the whole or any portion of such Limited Partner's Partnership Interest; *provided* that where the assignee has been approved in accordance with the provisions of this Agreement for admission to the Partnership as a Substitute Limited Partner, the Power of Attorney shall survive such assignment for the sole purpose of enabling the Special Attorney to execute, acknowledge and file any instrument necessary to effect such substitution.

002739
HCMLPHMIT00003922

| | ARTICLE XIII |
|---|---|
| | DISSOLUTION AND LIQUIDATION |

**Section 13.01**  **Dissolution**.  The Partnership shall be dissolved upon the earliest to occur of:

(a)  the withdrawal, resignation or Involuntary Withdrawal of the General Partner, or any other event that results in such entity ceasing to be a general partner, unless the remaining Limited Partners agree, within ninety (90) days after such event, to continue the Partnership with a new and qualified substitute general partner pursuant to and in accordance with the terms and conditions set forth in **Article IV**;

(b)  an election to dissolve the Partnership made by the General Partner, in its discretion, upon thirty (30) days' prior written notice to the Limited Partners; or

(c)  the happening of any other event, including the entry of a decree of judicial dissolution under Section 17-802 of the Act, that under the law of the State of Delaware, mandatorily requires the dissolution of the Partnership.

For the avoidance of doubt, the termination of the Partnership shall constitute the termination of all Series.  For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership.

**Section 13.02**  **Liquidation**.  Upon the dissolution of the Partnership, the "**Liquidators**", namely:  (i) the General Partner or, if there is no general partner at the time, or if the principal(s) of the General Partner are unable to act on its behalf, (ii) (A) the person or persons previously designated in writing by the General Partner and notified to the Partnership's auditors, or (B) if the General Partner has not made such a designation, the person or persons designated by Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, shall cause the cancellation of the Certificate, liquidate (or distribute) the assets of the Partnership, and apply and distribute the balance of the proceeds of such liquidation in accordance with the following order of priority: (1) pay off known liabilities; (2) establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP); and (3) distribute the remainder to the Partners in proportion to the Capital Account balances maintained in accordance with the provisions of **Section 9.01** and the Act.  The Liquidators shall take all other steps necessary to wind up the affairs of the Partnership as promptly as practicable.  To the extent reasonable, the business of the Partnership may continue to be conducted until liquidation is complete.  For purposes hereof, the term "Liquidators" shall also include the trustees, receivers or other persons required by law to wind up the affairs of the Partnership.

**Section 13.03**  **Notice of Dissolution**

(a)  Upon the dissolution of the Partnership or the relevant Series, the Liquidators shall promptly notify the Partners of such dissolution as well as known creditors and claimants whose addresses appear on the Partnership's or the relevant Series' records.

(b)  The General Partner shall give at least fifteen (15) days' prior written notice to each Limited Partner that is a BHC Limited Partner (as defined in **Section 5.10**) of any proposal to distribute property in-kind to such Limited Partner and the proposed date of such distribution, and shall not make any such distribution in-kind to the extent that such Limited Partner advises the General Partner at least five (5) days prior to the date set forth in such notice for such distribution that such distribution in-kind could reasonably be expected to cause it to violate the BHCA. In the event that a BHC Limited Partner notifies the General Partner to such effect, the General Partner shall be authorized to make such arrangements for the property that it would have otherwise distributed in-kind as the General Partner shall determine in its reasonable discretion.

**Section 13.04**  **Deferred Liquidation; Distribution In-Kind of Joint Interests in Property**.  For the avoidance of doubt, the following provisions of this **Section 13.04** shall apply on a Series-by-

002740
HCMLPHMIT00003923

Series basis. Notwithstanding the provisions of **Section 13.02**, if on dissolution of the Partnership the Liquidators shall determine that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners, the Liquidators may, in their absolute discretion, either defer for a reasonable time the liquidation of any assets, except those necessary to satisfy liabilities of the Partnership (other than those to Partners), or distribute to the Partners, in lieu of cash, as tenants in common and in proportion to their respective interests in the Partnership, undivided interests in such Partnership assets as the Liquidators deem not suitable for liquidation. To the extent that the General Partner exercises its right, power and authority under **Section 3.02(w)**, this Section shall be construed by the Liquidators in their reasonable discretion to give effect thereto.

Section 13.05    **Final Statement**. As soon as practicable after the dissolution of the Partnership or the relevant Series, a final statement of its assets and liabilities shall be prepared by the General Partner and/or the internal accountants for the Partnership or the relevant Series and furnished to the Partners.

## ARTICLE XIV
### GENERAL PROVISIONS

Section 14.01    **Address and Notices**. The address of each Partner (other than the General Partner) for all purposes shall be the address set forth on the signature page to this Agreement or such other address of which the General Partner has received written notice in accordance with this **Section 14.01**. The address of the General Partner for all purposes shall be the address set forth in **Section 1.04** or such other address of which the General Partner has provided written notice to the Partners in accordance with this **Section 14.01**. Any notice, demand or request required or permitted to be given or made hereunder shall be in writing and shall be deemed given or made (i) when delivered in person, (ii) when sent to such Partner at such address by registered or certified mail, return receipt requested, or by electronic mail, or (iii) when delivered by overnight delivery by a reputable private carrier or by the postal service.

Section 14.02    **Titles and Captions**. All Article and Section titles and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

Section 14.03    **Pronouns and Plurals**. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms. The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

Section 14.04    **Further Action**. The Limited Partners shall execute and deliver all documents, provide all information and take or forbear from taking all such action as may be necessary or appropriate, in the discretion of the General Partner, to achieve the purposes set forth in this Agreement.

Section 14.05    **Governing Law, Personal Jurisdiction and Venue**. **EACH LIMITED PARTNER ACKNOWLEDGES AND AGREES THAT ANY CLAIM, CONTROVERSY, DISPUTE OR ACTION RELATING IN ANY WAY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP SHALL BE GOVERNED SOLELY AND EXCLUSIVELY BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICT OF LAWS DOCTRINES. EACH LIMITED PARTNER UNDERSTANDS AND AGREES THAT IT IS WAIVING THE PROTECTION OF STATUTES IN ITS STATE OF RESIDENCE THAT PROVIDE IT WITH CERTAIN RIGHTS, REMEDIES AND PROTECTIONS IN THE CASE OF FRAUD OR MISREPRESENTATION AND AGREES TO RELY SOLELY UPON THE LAWS OF THE STATE OF DELAWARE AND ANY APPLICABLE FEDERAL LAWS. EACH LIMITED PARTNER MAKES THIS WAIVER KNOWINGLY AND REPRESENTS THAT IT HAS CONSULTED INDEPENDENT COUNSEL, OR THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH SUCH INDEPENDENT COUNSEL BUT HAS ELECTED NOT TO DO SO, AND AGREES THAT THE ONLY STATE LAWS THAT WILL APPLY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT AND ITS INVESTMENT IN THE PARTNERSHIP ARE THE LAWS OF THE STATE OF DELAWARE.**

002741

HCMLPHMIT00003924

**EACH OF THE LIMITED PARTNERS, FUND COUNSEL AND ANY OTHER PARTY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR ANY OTHER AGREEMENT REGARDING SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP (COLLECTIVELY, FOR PURPOSES OF THIS CLAUSE, THE "PARTIES") IRREVOCABLY CONSENTS TO BEING SERVED WITH LEGAL PROCESS ISSUED FROM THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK AND IRREVOCABLY CONSENTS TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE FEDERAL AND STATE COURTS SITUATED IN THE STATE OF NEW YORK. THE PARTIES IRREVOCABLY WAIVE ANY OBJECTIONS TO THE PERSONAL JURISDICTION OF THESE COURTS. SAID COURTS SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL CLAIMS, CONTROVERSIES, DISPUTES AND ACTIONS, OF ANY KIND OR MANNER, WHICH IN ANY WAY RELATE TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT, OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP. THE PARTIES ALSO IRREVOCABLY WAIVE ANY OBJECTIONS THAT THESE COURTS CONSTITUTE AN OPPRESSIVE, UNFAIR, OR INCONVENIENT FORUM AND AGREE NOT TO SEEK TO CHANGE VENUE ON THESE GROUNDS OR ANY OTHER GROUNDS. THE PARTIES FURTHER AGREE THAT THEY WILL NOT FILE SUIT IN A JURISDICTION OTHER THAN NEW YORK AND THAT, SHOULD THEY DO SO, THEY SHALL BE LIABLE FOR ALL DAMAGES AS A RESULT OF MAKING SUCH A FILING AND SHALL PAY ALL ATTORNEYS' FEES INCURRED BY ANY PARTY IN CONNECTION WITH MOVING TO DISMISS THE SUIT FOR FAILURE TO COMPLY WITH THIS PROVISION.**

In the event that (i) any current or prior Limited Partner ("**Claiming Party**") initiates or asserts any litigation, arbitration or similar claim or counterclaim, or joins, offers substantial assistance to or has a direct financial interest in any claim ("**Claim**") against the Partnership, the General Partner, the Investment Manager or any Investment Manager Affiliates, including any Claim purportedly filed on behalf of the Partnership or any Limited Partner, and (ii) the Claiming Party (or the third party that received substantial assistance from the Claiming Party or in whose Claim the Claiming Party had a direct financial interest) does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then each Claiming Party shall be obligated jointly and severally to reimburse the Partnership and/or the General Partner, the Investment Manager or any such Investment Manager Affiliate for all fees, costs and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses) that the parties may incur in connection with such Claim.

**Section 14.06**   **Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns; *provided*, however, that fund counsel shall be a party to this Agreement solely with respect to **Sections 3.04(b) and 14.05** hereof in order to benefit from and enforce such Sections, and a conformed signature page for fund counsel is included as a counterpart to this Agreement.

**Section 14.07**   **Entire Agreement**.  This Agreement, together with the related Subscription Documents and any other written agreement between the General Partner, on behalf of the Partnership (acting severally in the name of and for the account of any individual Series), and any Limited Partner of that Series, shall constitute the entire agreement and understanding among all the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter, including, without limitation, the Current Agreement. The parties hereto acknowledge that, notwithstanding any other provision of this Agreement or the Subscription Documents, the General Partner, on its own behalf or on behalf of the Partnership, without any act, consent or approval of any other Partner, may enter into side letters or other writings to or with one or more Limited Partners that have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or the Subscription Documents ("**Side Letters**"). The parties agree that any rights established, or any terms of this Agreement or the Subscription Documents altered or supplemented, in a Side Letter to or with one or more Limited Partners shall govern with respect to such Limited Partner(s) notwithstanding any other provision of this Agreement or the Subscription Documents.  No covenant, representation or condition not expressed in this Agreement or such Subscription Documents (and, if applicable, any Side Letter) shall affect or be deemed to interpret, change or restrict the express provisions hereof and thereof.

002742

HCMLPHMIT00003925

**Section 14.08**   **Amendment**.  This Agreement may be modified or amended only by the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of all of the outstanding Partnership Interests of each Series; *provided* that the General Partner may amend this Agreement from time to time (x) only with the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners of a specific Series of Partnership Interests, if such amendment, in the opinion of the General Partner, only has a material effect on such Series of Partnership Interests, and (y) without the consent, approval or other authorization of, or notice to, any of the Limited Partners (including pursuant to **Sections 3.02(u)** and **(v)**) if, in the opinion of the General Partner, the amendment does not have a material adverse effect on any Limited Partner.  Notwithstanding the foregoing, no amendment may:  (i) convert a Limited Partner's interest to that of a general partner or, modify the limited liability of any Limited Partner, without the consent of each affected Partner or (ii) amend any provision hereof which requires the consent or approval of a specified percentage in interest of the Limited Partners without the consent of such specified percentage in interest of the Limited Partners.

**Section 14.09**   **Creditors**.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership or the relevant Series.

**Section 14.10**   **Waiver by Partner**

(a)      Any Partner by notice to the General Partner may, but shall be under no obligation to, waive any of its rights or any conditions to its obligations hereunder, or any duty, obligation or covenant of any other Partner to such first mentioned Partner.

(b)      No such waiver shall affect or alter the remainder of this Agreement, but each and every covenant, agreement, term and condition hereof shall continue in full force and effect with respect to any other existing or subsequent breach.

**Section 14.11**   **Rights and Remedies**

(a)      The rights and remedies of any of the Partners hereunder shall not be mutually exclusive, and the implementation of one or more of the provisions of this Agreement shall not preclude the implementation of any other provision.

(b)      Each of the Partners confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof.  The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any Partner aggrieved as against the other Partners for a breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear that the respective rights and obligations of the Partners hereunder shall be enforceable in equity as well as at law or otherwise, except as provided in **Section 5.08**.

**Section 14.12**   **Counterparts**.  This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on all parties, notwithstanding that all the parties are not signatories to the original or the same counterpart.  Each party shall become bound by this Agreement immediately upon affixing his, her or its signature hereto, independently of the signature of any other party.

**Section 14.13**   **Certain Tax Matters**

(a)      *Tax Matters Partner*

(i)      The Tax Matters Partner (as such term is defined in Section 6231(a)(7) of the Code) of the Partnership shall be the General Partner.  The General Partner shall have all powers necessary to perform fully in its capacity as Tax Matters Partner and, in such capacity, the General Partner shall use its reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including the Regulations) and

002743
HCMLPHMIT00003926

shall have any powers necessary to perform fully in such capacity.

(ii) In furtherance of the foregoing, the General Partner is authorized to represent the Partnership before taxing authorities and courts in tax matters affecting the Partnership and the Partners in their capacity as such and shall keep the Partners informed of any such administrative and judicial proceedings. The General Partner shall be entitled to be reimbursed by the Partnership for all costs and expenses incurred by it in connection with any administrative or judicial proceeding affecting tax matters of the Partnership and the Partners in their capacity as such and to be indemnified by the Partnership (solely out of Partnership assets) with respect to any action brought against it in connection with any judgment in or settlement of any such proceeding, except in the case of the General Partner's own fraud, gross negligence, willful misconduct or conduct that is the subject of a criminal proceeding (where the General Partner has a reasonable cause to believe that such conduct was unlawful).

(iii) Any Partner that is in dispute with any tax authority in relation to any Partnership matter shall notify the General Partner within thirty (30) calendar days, and if the General Partner reasonably determines that the matter is of material relevance to the tax position of the Partnership, such Partner shall consult with the General Partner (or any advisor appointed by the General Partner for the purpose) as to how that dispute shall be handled. Any Partner who enters into a settlement agreement with respect to any Partnership item shall notify the Tax Matters Partner of such settlement agreement and its terms within thirty (30) calendar days after the date of settlement.

(iv) The provisions of this **Section 14.13(a)** shall survive any termination of this Agreement.

(b) *Tax Elections.* Each Partner agrees to provide the Partnership with such information which may be necessary or desirable in order for the General Partner to carry out its powers under this **Section 14.13** and **Section 3.02(q)**, including, without limitation, to facilitate compliance with Section 743 of the Code and elections permitted thereunder.

(c) *Classification as a Partnership.* The parties hereto intend that the Partnership be classified as a partnership for federal income tax purposes. The General Partner shall not elect to have the Partnership classified as an association taxable as a corporation for federal income tax purposes pursuant to Regulation Section 301.7701–3. The General Partner shall, for and on behalf of the Partnership, take all steps as it may deem reasonably necessary to maintain the Partnership's classification as a partnership for federal income tax purposes.

(d) *Tax Audits.* Each Limited Partner shall reasonably cooperate with the General Partner in connection with any tax audit of the Partnership or any existing or former investment.

[*remainder of page intentionally left blank*]

002744
HCMLPHMIT00003927

**IN WITNESS WHEREOF**, this Amended and Restated Limited Partnership Agreement has been duly executed as of the day and year first above written.

> **Atlas IDF GP, LLC**, as General Partner
> (acting severally in the name of and for the account of each individual Series)
>
> By: _____
> Name: John Honis
> Title: Managing Member

INITIAL LIMITED PARTNER:

/s/ John Honis
John Honis

[SIGNATURES OF ADDITIONAL LIMITED PARTNERS AND OTHER PARTIES ARE SET FORTH ON SEPARATE SIGNATURE PAGES]

002745
HCMLPHMIT00003928

**EXHIBIT**

002746

Sadis Goldberg LLP

| FOR THE EXCLUSIVE USE OF: | | COPY NO. | |
|---|---|---|---|

## Atlas IDF, LP

### A DELAWARE "SERIES" LIMITED PARTNERSHIP

GENERAL PARTNER:
ATLAS IDF GP, LLC

INVESTMENT MANAGER:
RAND ADVISORS, LLC

OFFERING OF SERIES 1 LIMITED PARTNERSHIP INTERESTS

**November 30, 2015**

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE INTERESTS DESCRIBED HEREIN IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

002747

HCMLPHMIT00003929

## DIRECTORY

| INVESTMENT MANAGER | GENERAL PARTNER |
|---|---|
| RAND ADVISORS, LLC | ATLAS IDF GP, LLC |
| 87 RAILROAD PLACE, SUITE 403 | 87 RAILROAD PLACE, SUITE 403 |
| SARATOGA SPRINGS, NY 12866 | SARATOGA SPRINGS, NY 12866 |
| ATTENTION: JOHN HONIS | ATTENTION: JOHN HONIS |
| TELEPHONE: (214) 335-7969 | TELEPHONE: (214) 335-7969 |
| EMAIL: JHONIS@RANDADVISORS.COM | EMAIL: JHONIS@RANDADVISORS.COM |

LEGAL COUNSEL

SADIS & GOLDBERG LLP
551 FIFTH AVENUE, 21ST FLOOR
NEW YORK, NEW YORK 10176
ATTENTION: STEVEN HUTTLER, ESQ.
TELEPHONE: (212) 573-8424
FACSIMILE: (212) 573-8151
EMAIL: SHUTTLER@SGLAWYERS.COM

002748

HCMLPHMIT00003930

## TABLE OF CONTENTS

CAPTION                                                                        PAGE

OVERVIEW .......................................................................................................... 1

IMPORTANT GENERAL CONSIDERATIONS ...................................................... 4

SUMMARY OF OFFERING AND PARTNERSHIP TERMS ...................................... 7

MANAGEMENT ..................................................................................................... 24

SERVICE PROVIDERS .......................................................................................... 26

INVESTMENT PROGRAM ...................................................................................... 29

BROKERAGE PRACTICES ..................................................................................... 38

RISK FACTORS AND CONFLICTS OF INTEREST .................................................. 41

ERISA CONSIDERATIONS .................................................................................... 79

TAXATION ............................................................................................................. 81


EXHIBITS

AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT ...................... EXHIBIT A

SUBSCRIPTION DOCUMENTS ............................................................................... EXHIBIT B

PART 2 OF RAND ADVISORS, LLC'S FORM ADV ............................................... EXHIBIT C

002749

HCMLPHMIT00003931

<div align="right">**OVERVIEW**</div>

### DESCRIPTION OF INTERESTS AND STRUCTURE

Atlas IDF, LP ("**Partnership**"), a "series" limited partnership organized under the Delaware Revised Uniform Limited Partnership Act, is offering limited partner interests in the Partnership ("**Interests**") in a private placement pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended ("**Securities Act**"), and Regulation D promulgated thereunder.  The Partnership may offer Interests in separate Series (as defined and described herein).  Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

Only persons that are Accredited Investors (as defined in Rule 501 of Regulation D promulgated under the Securities Act), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")) may purchase Interests.  The Subscription Documents (as defined below) set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser. If an investor is an insurance company, such investor must require its Policy Owners (as defined herein) to meet the same suitability standards.

The Partnership was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

In addition to noting the investor qualifications listed above, Limited Partners should note that the Partnership is an insurance-dedicated investment fund.  As such, the Interests are being offered only to Limited Partners that are:  (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state and local governmental pension plans, qualified tuition plans ("**§529 plans**"), and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3).   In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards described herein.  While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies. See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Investor Control" herein.

Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**").  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000.  The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000.  In each case, the General Partner has discretion to accept lesser amounts.  Generally, new Limited Partners will be admitted on the first day

002750


HCMLPHMIT00003932

of each month, and withdrawals may be made on the last day of each calendar quarter upon 91 days' prior written notice, subject to certain restrictions as described herein (unless, in each case, the General Partner, in its sole discretion, permits subscriptions or withdrawals at another time).



## INVESTMENT OBJECTIVE AND STRATEGY

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation. The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.** See "INVESTMENT PROGRAM" herein for further details.

As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined herein) that: (x) is expected to initially invest in the Highland Transaction (as defined herein), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction. However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein. **Further, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts (as defined herein) at the time of such admission.**

002751

HCMLPHMIT00003933

### RISK FACTORS, CONFLICTS OF INTERESTS AND OTHER CONSIDERATIONS

Before purchasing an Interest in the Partnership, you should carefully consider various risk factors and conflicts of interest, as well as suitability requirements, restrictions on transfers and withdrawals of Interests and various legal, tax and other considerations, all of which are discussed elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**").

002752

HCMLPHMIT00003934

**IMPORTANT GENERAL CONSIDERATIONS**

You should not construe the contents of this Memorandum as legal, tax or investment advice and, if you acquire an Interest, you will be required to make a representation to that effect. You should review the proposed investment and the legal, tax and other consequences thereof with your own professional advisors. The purchase of an Interest involves certain risks and conflicts of interest among the General Partner, the Investment Manager and the Partnership. See "RISK FACTORS AND CONFLICTS OF INTEREST". The General Partner reserves the right to refuse any subscription for any reason.

In making an investment decision, you must rely on your own examination of the Partnership and the terms of the offering of Interests, including the merits and risks involved. You and your representative(s), if any, are invited to ask questions and obtain additional information from the General Partner concerning the terms and conditions of the offering, the Partnership, and any other relevant matters to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense.

Neither the SEC nor any state securities commission has passed upon the merits of participating in the Partnership, nor has the SEC or any state securities commission passed upon the adequacy or accuracy of this Memorandum. Any representation to the contrary is a criminal offense. The General Partner anticipates that: (i) the offer and sale of the Interests will be exempt from registration under the Securities Act and the various state securities laws; (ii) the Partnership will not be registered as an investment company under the Investment Company Act, pursuant to an exemption provided by Section 3(c)(7) thereunder; and (iii) neither the General Partner nor the Investment Manager will be registered as a commodity pool operator under the Commodity Exchange Act, as amended ("CEA"), based upon an exemption available under Rule 4.13(a)(3) thereunder. Consequently, you will not be entitled to certain protections afforded by those statutes.

The Investment Manager is registered as an investment adviser with the SEC. A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

Pursuant to Rule 4.13(a)(3) of the CEA, each of the General Partner and the Investment Manager is exempt from registration with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator and therefore, unlike a registered commodity pool operator, it is not required to deliver a Disclosure Document (as such term is defined under CFTC rules) and a certified annual report to participants in the pool. The foregoing registration exemption is based on the Partnership's limited commodity trading activity and its undertaking that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions, determined at the time the most recent position was established, will not exceed 5% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions; or (b) the aggregate net notional value of the Partnership's commodity interest positions, determined at the time the most recent position was established, will not exceed 100% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions. Similar limitations will apply with respect to investments in Portfolio Funds. Certain types of swaps are included in the definition of "commodity interests". These swaps include interest rate swaps, currency swaps, energy and metal swaps, agricultural swaps, swaps on broad-based indices, swaps on government securities and certain mixed swaps.

As a Limited Partner, you may withdraw from the Partnership and receive payment for your Interests, subject to certain restrictions, as specified in the Amended and Restated Limited Partnership Agreement of the Partnership (as the same may be

002753

HCMLPHMIT00003935

amended and/or restated from time to time, the "Partnership Agreement"), a copy of which is attached hereto as Exhibit A.

The offering of Interests is made only by delivery of a copy of this Memorandum to the person whose name appears hereon.  The offering is made only to potential investors who are Accredited Investors, Qualified Clients and Qualified Purchasers. If an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards.  By accepting delivery of this Memorandum, you agree not to reproduce or divulge its contents, in whole or in part, and, if you do not purchase any Interests, to return this Memorandum and the exhibits attached hereto to the General Partner or the Partnership's administrator, a provider of administrative services ("Administrator"), as further set forth herein under "SERVICE PROVIDERS—Administrator".

Notwithstanding any provision in this Memorandum to the contrary, prospective Limited Partners (and their employees, representatives, and other agents) may disclose to any and all persons the U.S. federal income tax treatment and tax structure of the Interests offered hereby.  For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income tax treatment of the Interests, and does not include information relating to the identity of the issuer, its affiliates, agents or advisors.

There is no public market for the Interests nor is any expected to develop.  Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted, except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Partnership Agreement.  Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner.  Accordingly, if you purchase an Interest, you will be required to represent and warrant that you have read this Memorandum and are aware of and can afford the risks of an investment in the Partnership for an indefinite period of time.  You will also be required to represent that you are acquiring the Interest for your own account, for investment purposes only, and not with any intention to resell or transfer all or any part of the Interest.  This investment is suitable for you only if you have adequate means of providing for your current and future needs, have no need for liquidity in this investment and can afford to lose the entire amount of your investment.

Although this Memorandum contains summaries of certain terms of certain documents pertaining to the Partnership, you should refer to the actual documents (copies of which are attached hereto or are available from the General Partner or the Partnership) for complete information concerning the rights and obligations of the parties thereto.  All such summaries are qualified in their entirety by the terms of the actual documents.  No person has been authorized to make any representations or furnish any information with respect to the Partnership or the Interests, other than the representations and information set forth in this Memorandum or other documents or information furnished by the General Partner upon request, as described above.

Certain information contained in this Memorandum constitutes "forward-looking statements", which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those set forth under "RISK FACTORS AND CONFLICTS OF INTEREST", actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

No rulings have been sought from the Internal Revenue Service ("IRS") with respect to any tax matters discussed in this Memorandum.  You are cautioned that the views contained herein are subject to material qualifications and subject to

002754

HCMLPHMIT00003936

possible changes in regulations by the IRS or by the U.S. Congress in existing tax statutes or in the interpretation of existing statutes and regulations.

**NOTICE TO BERMUDA RESIDENTS**

THE INTERESTS MAY BE OFFERED OR SOLD IN OR FROM BERMUDA ONLY IN COMPLIANCE WITH THE PROVISIONS OF THE INVESTMENT BUSINESS ACT 2003 OF BERMUDA (THE "BERMUDA ACT") AND THE REQUIREMENTS OF THE RELATED REGULATIONS OF BERMUDA WHICH REGULATE THE SALE OF SECURITIES IN OR FROM BERMUDA. TO THE EXTENT THAT THE INTERESTS ARE OFFERED OR SOLD IN OR FROM BERMUDA, SUCH OFFER OR SALE WILL BE MADE IN ACCORDANCE WITH THE BERMUDA ACT.

THE BERMUDA MONETARY AUTHORITY, THE BERMUDA REGISTRAR OF COMPANIES AND THE BERMUDA MINISTER OF ECONOMIC DEVELOPMENT ACCEPT NO RESPONSIBILITY FOR THE FINANCIAL SOUNDNESS OF ANY PROPOSAL OR FOR THE CORRECTNESS OF ANY OF THE STATEMENTS MADE OR OPINIONS EXPRESSED HEREIN.

NO INVITATION, WHETHER DIRECTLY OR INDIRECTLY, MAY BE MADE TO THE PUBLIC IN OR FROM BERMUDA TO SUBSCRIBE FOR THE INTERESTS.

The information contained herein is current only as of the date hereof and you should not, under any circumstances, assume that there has not been any change in the matters discussed herein since the date hereof.

002755

HCMLPHMIT00003937

## SUMMARY OF OFFERING AND PARTNERSHIP TERMS

The following summary is qualified in its entirety by other information contained elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**") and by Amended and Restated the Limited Partnership Agreement of the Partnership (as defined below) (as the same may be amended and/or restated from time to time, the "**Partnership Agreement**"), a copy of which is attached to this Memorandum as Exhibit A. You should read this entire Memorandum and the Partnership Agreement, carefully before making any investment decision regarding the Partnership and should pay particular attention to the information under the heading "RISK FACTORS AND CONFLICTS OF INTEREST". To the extent relevant, you should also read the offering and governing documents of the PE Portfolio Fund (as defined herein) in which the Partnership intends to initially invest on behalf of the initial Limited Partners (as defined herein), which are available from the Partnership upon request. In addition, you should consult your own advisors in order to understand fully the consequences of an investment in the Partnership.

**The Partnership**  Atlas IDF, LP, a Delaware "series" limited partnership ("**Partnership**"), was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein. See "INVESTMENT PROGRAM" and "—Portfolio Funds" below.

The Partnership may offer Interests in separate Series (as defined and described herein). Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

**Management**  Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets. The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**"). A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis ("**Principal**") controls all of the Partnership's operations and activities. See "MANAGEMENT" for additional information.

**Issuance of Interests in Multiple Series**  The Interests will be offered in separate series ("**Series**"). The Partnership is currently offering one Series of Interests: "**Series 1 Interests**". Each Series of Interests will have separate rights and obligations. In addition, each Series of Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies. The Partnership may issue additional Series of Interests in the future, which may have rights and obligations that differ from those of the Series 1 Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined herein) and other rights and terms. The terms of such additional Series will be determined by the General Partner, in its sole discretion.

Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations. The Partnership will maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series. **The Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.**

Under Delaware law, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the

002756

HCMLPHMIT00003938

assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

Unless the context otherwise requires, Series 1 Interests and any other Series of Interests shall be collectively referred to throughout this Memorandum as the "**Interests**." As the context may require, the holders of Series 1 Interests may be referred to herein as "**Series 1 Limited Partners**". Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Memorandum as the "**Limited Partners**".

References herein to the Partnership shall include, where appropriate, each Series of the Partnership. The terms of the other Series may be set forth in an amended version of this Memorandum and/or in a separate supplement hereto.

|  |  |
|---|---|
| **Portfolio Funds** | In addition to investing in individual traded assets, the Partnership may invest a significant portion of its assets in other investment vehicles, including, without limitation, hedge funds, managed accounts and other private investment funds (collectively, the "**Portfolio Funds**"), including those managed by, or otherwise affiliated or related to, the Investment Manager. Portfolio Funds may allocate their assets to Illiquid Investments (as defined herein). As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined herein). However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein. |

As of the date hereof, (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction (as defined herein), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; and (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC, as further set forth herein.

The Portfolio Funds will bear their own operating and investment related expenses, which will be shared by the partners in such Portfolio Funds, including the Partnership. These fees and expenses may result in greater expenses than if Limited Partners invested directly in the Portfolio Funds or the relevant underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees and expenses.

|  |  |
|---|---|
| **The Offering** | The Partnership is offering limited partner interests in the Partnership ("**Interests**") to persons who are Accredited Investors (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended ("**Securities Act**")), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")). Interests represent a percentage interest in the Partnership proportionate to the capital accounts of all Partners. |

In addition to noting the investor qualifications listed above, Limited Partners should note that the Partnership is an insurance-dedicated investment fund. As such, the Interests are being offered only to Limited Partners that are: (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state and local governmental pension plans, qualified tuition plans ("**§529 plans**"), and

002757

HCMLPHMIT00003939

private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3).  In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards described in the previous paragraph.  While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies.  See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Investor Control" herein.

Each life insurance company Limited Partner ("**Insurance Company Limited Partner**") will be deemed to hold an Interest in respect of the account of each Policy Owner and will be treated as a separate Limited Partner with respect to each such Interest.

**Marketing Fees and Sales Charges**.  The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner.  See "BROKERAGE PRACTICES—Referral of Investors and Sales Charges".

|                            |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
|----------------------------|--|
| How to Subscribe           | Attached as Exhibit B to this Memorandum are the subscription documents and instructions for subscribing ("**Subscription Documents**").  In order to subscribe for Interests, you must complete the Subscription Documents and return them to the Partnership's administrator, a provider of administrative services ("**Administrator**"), as further set forth herein under "SERVICE PROVIDERS—Administrator".  You must pay 100% of your investment at the time you subscribe.  Payment must be made by wire transfer of immediately available funds to the Partnership.  To ensure compliance with applicable laws, regulations and other requirements relating to money laundering, the General Partner and/or the Administrator may require additional information to verify the identity of any person who subscribes for an Interest in the Partnership. |
|                            | If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including the costs of liquidating, or otherwise adjusting the Partnership's portfolio to accommodate, such securities (and/or other investments).  Such special charge will be assessed as of such dates deemed appropriate by the General Partner.  Any investor who contributes securities (and/or other investments) in lieu of cash to the Partnership should consult with such person's counsel or advisors as to the tax effect of such contribution. |
| Eligible Investors and Suitability | In order to invest in the Partnership, you must meet certain minimum suitability requirements, including qualifying as an Accredited Investor under the Securities Act, a Qualified Client under the Advisers Act and a Qualified Purchaser under the Investment Company Act.  The Subscription Documents set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser.  You must check the appropriate places in the Subscription Documents to represent to the Partnership that you are an Accredited Investor, a Qualified Client and a Qualified Purchaser in order to be able to purchase Interests.  In addition, you must check the appropriate places in the Subscription Documents and/or make the appropriate representations that you are an insurance company investor.  If an investor is an insurance company, such investor must require its Policy Owners to meet the same suitability standards.  The General Partner, in its sole discretion, can accept or reject any initial subscriptions from prospective Limited Partners |

002758

HCMLPHMIT00003940

and any additional capital contributions from existing Limited Partners for any reason or for no reason.

Qualified pension or retirement plans subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and other tax-exempt entities described in Treasury Regulation 1.817-5(f)(3) may purchase Interests. However, investment in the Partnership by such entities requires special consideration. Trustees or administrators of such entities should consult their own legal and tax advisors. The General Partner intends to use reasonable efforts to limit the aggregate equity participation by "benefit plan investors" in the Partnership to less than 25% of the value of any class of Interests in the Partnership. See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

|   |   |
|---|---|
| **Minimum Investment** | The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000. The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000. In each case, the General Partner has discretion to accept lesser amounts. Limited Partners are not required to make any additional capital contributions to the Partnership. There is no minimum or maximum aggregate amount of funds that must or may be contributed by all Partners to the Partnership. |
| **Admission of Limited Partners** | Capital contributions generally will be accepted as of the first day of each month, although the General Partner, in its sole discretion, has the right to admit new Limited Partners and to accept additional funds from existing Limited Partners at any time. Upon such admission or receipt of additional capital contributions, the Interests of the Partners will be readjusted in accordance with their capital accounts. |
|   | In connection with an additional capital contribution by an existing Limited Partner, the General Partner will: (i) treat such additional capital contribution as a capital contribution with respect to one of such Limited Partner's existing capital accounts, or (ii) establish a new capital account to which such capital contribution will be credited and which will be maintained for the benefit of such Limited Partner separately from any existing capital account of such Limited Partner. Such separate capital accounts may be maintained for any purpose, in the discretion of the General Partner. |
| **Management Fee** | The Partnership has entered into an investment management agreement (as the same may be amended and/or restated from time to time, the "**Investment Management Agreement**") by and among the Partnership and the Investment Manager. In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager will receive a quarterly management fee ("**Management Fee**"), equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined herein), and based on the Partnership's total Net Asset Value, as follows: |

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis. For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually. The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each capital account will be charged a blended Management Fee based on the above schedule.

002759

HCMLPHMIT00003941

The Management Fee will be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee will be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee will be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's capital account during any calendar quarter. Management Fees will be payable with respect to the Interests of a Limited Partner in any Side Pocket Account (as defined below). For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

With respect to any Limited Partner who has requested to withdraw all of its Interests from the Partnership, with the exception of any Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account will remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve will be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, will be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

The Partnership will also bear its *pro rata* share of the management fees charged by the managers of the Portfolio Funds. Notwithstanding the foregoing, the Investment Manager intends to waive any management fees due to the Investment Manager with respect to any investment of the Partnership in any Affiliated Funds (as defined herein), including the PE Portfolio Fund. Accordingly, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees.

| Expenses | **Organizational and Initial Offering Expenses.** The Partnership will pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates (as defined herein) for all organizational and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including "blue sky" filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to 60 months from the date the Partnership commences operations. Amortization of such expenses is a divergence from U.S. generally accepted accounting principles ("**GAAP**"). In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses, or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in fiscal year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of the Partnership Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within 60 months of its commencement, any unamortized expenses will be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly. |

**Operating Expenses.** The Partnership will pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Interests, including, but not limited to, printing of this Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Administrator, costs of communications with Limited Partners, and ongoing

002760


HCMLPHMIT00003942

legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership.

Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses.  Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

The Partnership will also bear its *pro rata* share of the expenses of each Portfolio Fund.

**Allocation of Expenses Among Series**.  The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

**General Partner's and Investment Manager's Expenses**.  The General Partner and the Investment Manager will pay their own general operating and overhead expenses associated with providing the management and investment management services required under the Partnership Agreement and the Investment Management Agreement, respectively.  These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above.

The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended ("**Exchange Act**"), as further described herein.  See "BROKERAGE PRACTICES—Soft Dollar Arrangements".

Withdrawals    **Limited Partner Withdrawals Generally**.  Subject to certain restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date, a "**Withdrawal Date**"), upon at least 91 days' prior written notice to the Administrator, with a copy to the General Partner.  Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's capital account balance below $500,000.  All withdrawals will be deemed made prior to the commencement of the following calendar quarter (or other relevant period).

If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital

002761
HCMLPHMIT00003943

other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal. Such fee will be payable to the relevant Series of the Partnership and will be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

**Ability to Withdraw Is Not Guaranteed**. The General Partner believes (but cannot guarantee) that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests. The General Partner may, in its sole discretion: (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal.

In addition, notwithstanding anything to the contrary herein, the General Partner may limit and/or suspend withdrawals in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein.

**Payments with Respect to Withdrawals; Applicable on a Series-by-Series Basis**. A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, less than 90% of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts) will be paid within 90 days after the applicable Withdrawal Date. In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, 90% or more of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute, in the aggregate during such fiscal year, 90% of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within 90 days after the applicable Withdrawal Date. The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs. Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full capital account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within 90 days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

Upon withdrawal of all of the capital in its capital account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner will be deemed to have withdrawn from the Partnership or the relevant Series, and upon notice of such withdrawal, a Limited Partner will not be entitled to exercise any voting rights afforded to Limited Partners under the Partnership Agreement.

The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's capital account.

**Limitations on Withdrawals**. The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from capital accounts: (i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners; (ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation, including any diversification requirements applicable to insurance-dedicated investment funds; (iii) if the General Partner determines, in its sole discretion, that such suspension or

002762

HCMLPHMIT00003944

postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications; (iv) a Portfolio Fund suspends the right to, or the payment of proceeds due upon, withdrawal and/or a Portfolio Fund allocates assets to its side pocket account; (v) a Portfolio Fund satisfies a withdrawal request by making an in-kind distribution; or (vi) for such other reasons or for such other periods as the General Partner may prudently and in good faith determine.

All Limited Partners will be notified in writing of any such suspension or postponement and the termination thereof.  Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement will be effected as of the first Withdrawal Date following the recommencement of withdrawals.

<u>Required Withdrawals</u>.  The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's capital accounts on at least five days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

<u>Side Pocket Accounts</u>.  A Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's capital account.  At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined below).  **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

<u>Reserves</u>.  All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.  See "—Management Fee" for more information on the Management Fee Reserve.

<u>Other Limitations on Withdrawals</u>.  In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds, as applicable.  For example, the ability of the Partnership to provide withdrawal proceeds to a Limited Partner may be subject to, among other things, various notice period requirements of the Portfolio Funds.

<u>Waiver</u>.  The General Partner may, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts and notice periods, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

**Withdrawals, Resignation and Transfers by General Partner and its Affiliates**

Each of the General Partner, the Investment Manager and/or any Investment Manager Affiliate may withdraw all or any of the value in its respective capital account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.  The General Partner may resign as the general partner of the Partnership upon 30 days' prior written notice to the Limited Partners.  Upon such resignation of the General Partner, or upon its bankruptcy or dissolution, the remaining Limited Partners have the right to appoint a substitute general partner; otherwise, the Partnership will be dissolved pursuant to the procedures set forth in the Partnership Agreement.  The Partnership Agreement permits the General Partner to appoint additional general partners and to transfer its general partner interest to an affiliate of the General Partner without the consent of Limited Partners.

**Leverage**

The Investment Manager may cause the Partnership to undertake leverage.  Leverage may take a variety of forms, including, but not limited to, the following: long-term loans,

002763

HCMLPHMIT00003945

convertible notes and repurchase arrangements.  Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.  See "INVESTMENT PROGRAM" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

**Determination of Net Asset Value**

The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, is determined in accordance with the Partnership Agreement and is generally equal to the amount by which the value of the Partnership's assets exceeds the amount of its liabilities.  Net Asset Value calculations will be made by the Administrator (based on the information provided by the Investment Manager) on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with GAAP, consistently applied (except that:  (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to 60 months from the date the Partnership commences operations, and (y) reserves may be taken that are inconsistent with GAAP), this Memorandum and the Partnership Agreement.

In making such determinations, securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, will be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date.  Options that are listed on a securities or commodities exchange will be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; *provided* that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options will be valued at the midpoint between the last "bid" and "ask" prices for such options on such date.  Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, will be valued based upon quotations obtained from market makers, dealers or pricing services.

In the case of investments in Portfolio Funds, which investments are expected to constitute most of the Partnership's assets, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund.  None of the General Partner, the Investment Manager or any of their respective affiliates will be responsible for calculating the net asset value of the Portfolio Funds or for verifying the accuracy and completeness of any such values received.

If the Investment Manager, in its sole discretion, determines that the valuation of any security, commodity, option or other financial instrument pursuant to the foregoing does not fairly represent its market value, the Investment Manager will value such security, commodity, option or other financial instrument as it reasonably determines.  Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value.  Absent bad faith or manifest error, all Net Asset Value determinations pursuant to the Partnership Agreement are conclusive and binding as to all Partners.

**Allocation of Profit and Loss**

To determine how the economic gains and losses of the Partnership will be shared, the Partnership Agreement allocates net income or loss (increases and decreases in Net Asset Value) to each Partner's capital account.  Net income or loss includes all portfolio gains and losses, whether realized or unrealized, plus all other Partnership items of income (such as interest) and less all Partnership expenses.  Generally, net income and

---

ATLAS IDF, LP                                                    15

HCMLPHMIT00003946

net loss for each month (or other period, as the case may be) will be allocated to the Partners in proportion to their capital account balances as of the start of such month (or such other period). Net income and net losses in any Side Pocket Accounts or other memorandum accounts will be allocated to those Partners participating in such accounts in proportion to their capital account balances in such accounts. All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of the Partnership Agreement will be determined by the General Partner in its sole discretion. Capital account balances will reflect capital contributions, previous allocations of increases and decreases in Net Asset Value, withdrawals, distributions (if any), and expenses. For the avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

**Allocation of Taxable Income and Loss**

For income tax purposes, all items of taxable income, gain, loss, deduction and credit will be allocated among the Partners at the end of each fiscal year in a manner consistent with their economic interests in the Partnership. In light of the fact that the Partnership does not intend to make distributions, to the extent that the Partnership's investment activities are successful, Limited Partners should expect to receive allocations of income and loss, and may incur tax liabilities from an investment in the Partnership without receiving cash distributions from the Partnership with which to pay those liabilities. To obtain cash from the Partnership to pay taxes, if any, Limited Partners may be required to make withdrawals, subject to the limitations in the Partnership Agreement. For the avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

**Side Pocket Accounts**

The Investment Manager may designate that certain investments held by a Series of the Partnership and/or by the Portfolio Fund(s) be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines. Such investments may include: (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; (iii) an investment into a Portfolio Fund that invests in illiquid assets; (iv) that portion of an investment in a Portfolio Fund that is attributable to side pocket accounts designated by the manager of such Portfolio Fund (which may be designated with respect to assets that are subject to legal or contractual restrictions on transferability, or that the Investment Manager believes either lack a readily assessable market value (without impairing the value of such investments) or should be held until the resolution of a special event or circumstance; and (v) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**"). Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment, or that a follow-on investment should be categorized as a new Illiquid Investment. **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.** Illiquid Investments held in a Side Pocket Account will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager. For the avoidance of doubt, each Policy Owner investing through the relevant Limited Partner will indirectly participate in the economics from a *pro rata* portion of a Side Pocket Account and the corresponding Illiquid Investment.

At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event. Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) will be reallocated, *pro rata*, from the Side Pocket Account to the capital accounts of participating Partners in accordance with their respective interests in such Side Pocket Account. Until such reallocation, a Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of Illiquid Investments held in a Side Pocket Account. Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account will receive an

002765

HCMLPHMIT00003947

amount equal to its interest in such Side Pocket Account (net of any accrued Management Fee and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve) with respect thereto), within 90 days after such reallocation. **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission. **For the avoidance of doubt, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.** Any expenses relating specifically to a Side Pocket Account will be charged to the Partners participating in such account. If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment, only the Partners participating in such original investment will participate in such follow-on investment in proportion to their interest in the related Side Pocket Account; *provided, however*, that, if a Partner shall have withdrawn from the Partnership, the General Partner will equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the follow-on investment.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest" herein.

**New Issues Accounts; Other Memorandum Accounts**

From time to time, the Partnership may purchase securities that are part of a public distribution. Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in initial public offerings of equity securities ("**New Issues**"), each subject to a *de minimis* exemption. To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**"). Participation in New Issues Accounts will be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed levels permitted under applicable FINRA rules.

In addition, as a matter of fairness to Partners that do not participate in New Issues, a use-of-funds charge may be debited to the capital accounts of those Partners that do participate in New Issues and credited to the capital accounts of all the Partners. The General Partner may calculate such charge, in its discretion, in any manner consistent with applicable FINRA rules, including, debiting amounts equal to interest, (i) on the funds used to purchase the New Issues at the annual rate being paid by the Partnership, or (ii) that would be paid by the Partnership on borrowed funds during the applicable period.

Upon the sale or other disposition of New Issues (including any transfer of the underlying securities in the New Issues Account to the capital accounts of all of the Partners, after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period will be credited or

002766

HCMLPHMIT00003948

debited to the capital accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein. Accordingly, the returns to Limited Partners on their investments in the Partnership may differ depending upon whether or not they are a Restricted Person.

In addition to the foregoing with respect to Side Pocket Accounts and New Issues Accounts, to the extent that certain Limited Partners are restricted from participating in any other transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such restricted Limited Partners. Only those Limited Partners who the General Partner determines are eligible will participate in such accounts.

|  |  |
|---|---|
| **Side Letters** | The Partnership, the General Partner and/or the Investment Manager may from time to time enter into side letters or other similar agreements (collectively, "**Side Letters**") with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement. Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners. Specifically, certain Insurance Company Limited Partners may have additional withdrawal rights not offered to other Limited Partners. See "RISK FACTORS AND CONFLICTS OF INTEREST—Partnership Risks—Impact of Side Letters" herein. |
| **Reports to Limited Partners** | Each Limited Partner will receive the following, with respect to the relevant Series: (i) annual financial statements of the Partnership audited by an independent certified public accounting firm; (ii) quarterly unaudited performance information; (iii) copies of such Limited Partner's Schedule K-1 to the Partnership's tax returns; and (iv) other periodic reports or letters as determined by the General Partner in its sole discretion. The financial statements of the Partnership will be prepared in accordance with GAAP (except to the extent that this Memorandum or the Partnership Agreement states or contemplates that such statements may be inconsistent with GAAP). |
|  | The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**IFRS**"). In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP. |
|  | The Partnership will bear all fees incurred in providing such tax returns and reports. |
|  | The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, which may affect investment and withdrawal decisions, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information. |
| **Transferability of Interests** | As a Limited Partner, you may not assign or transfer your Interest (except by operation of law) without the consent of the General Partner, which consent may be given or withheld in its sole discretion. No transfer of an Interest by a Limited Partner will be permitted if it would result in the termination of the Partnership for federal income tax purposes. Transfers of Interests are subject to other restrictions set forth in the Partnership Agreement, including compliance with ERISA and federal and state securities laws. |
|  | Due to these limitations on transferability, Limited Partners may be required to hold their Interests indefinitely, unless they withdraw from the Partnership in accordance with the provisions set forth in the Partnership Agreement. |
| **Distributions; Distributions** | The Partnership does not expect to make any distributions to Limited Partners from profits or capital, except pursuant to requests for withdrawals and upon termination of the |

002767

HCMLPHMIT00003949

| | |
|---|---|
| **Upon Termination of the Partnership** | Partnership or the relevant Series. Upon the termination of the Partnership (as further described in the Partnership Agreement), the assets of the Partnership or the relevant Series will be liquidated (or distributed) and the proceeds of liquidation will be used to pay off known liabilities, establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP), and any remaining balance will be applied and distributed in proportion to the respective capital accounts of the Partners. The Partnership or the relevant Series may satisfy any distributions to Limited Partners in cash, in-kind or any combination thereof.   Additionally, the General Partner may create a liquidating fund entity (e.g., a liquidating trust or similar vehicle) and may transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership or Series assets, including, but not limited to Side Pocket Accounts, and may distribute ownership interests in such entity to Limited Partners. |
| | Notwithstanding anything to the contrary herein, to the extent that the Partnership makes any distributions, the General Partner may limit such distributions, in its sole discretion, in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds. |
| | The termination of the Partnership shall constitute the termination of all Series.  For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership. |
| **Bank Holding Companies** | Limited Partners that are Bank Holding Companies ("**BHC Limited Partners**") (as defined by Section 2(a) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) are limited to 4.99% of the voting Interest in the Partnership under Section 4(c)(6) of the BHCA.  The portion of the Interest in the Partnership held by a BHC Limited Partner in excess of 4.99% of the aggregate outstanding voting Interests of all Limited Partners will be deemed non-voting Interests in the Partnership.  BHC Limited Partners holding non-voting Interests in the Partnership are permitted to vote such Interests (i) on any proposal to dissolve or continue the business of the Partnership under the Partnership Agreement and (ii) on matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to the Partnership Agreement or modifications of the terms of its Interest).  For the avoidance of doubt, the foregoing provisions shall apply on a Series-by-Series basis.  Except with regard to restrictions on voting, non-voting Interests are identical to all other Interests held by Limited Partners. |
| **Voting Rights and Amendments** | The voting rights of Limited Partners are very limited.  Other than as explicitly set forth in the Partnership Agreement, Limited Partners have no voting rights as to the Partnership or its management.  Generally, the Partnership Agreement may be amended only with the consent of the General Partner and Limited Partners owning more than 50% of all of the outstanding Interests of each Series; *provided* that:  (x) for matters only relating to one Series, only the Limited Partners of that Series will vote on such matters, and (y) that the General Partner may amend the Partnership Agreement without the consent of or notice to any of the Limited Partners if, in the opinion of the General Partner, the amendment does not materially adversely affect any Limited Partner. |
| **Liability of Limited Partners** | No Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Limited Partner's capital account in the relevant Series, from time to time, including any amounts thereof attributable to capital contributions, except that such Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership or the relevant Series in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership or the relevant Series in order to pay such Limited Partner's *pro rata* share of any Partnership or Series liabilities that arose while such Limited Partner held Interests.  Subject to the foregoing, no Limited Partner shall be obligated to provide any contributions to the Partnership or the relevant Series, other than its initial capital contribution. No Limited Partner shall be obligated to make any loan to the Partnership or a Series. |

002768

HCMLPHMIT00003950

Under the Delaware Revised Uniform Limited Partnership Act ("**Delaware Act**"), when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership or a Series for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership or the relevant Series was prohibited from making such distribution pursuant to the Delaware Act.

**Brokerage Practices**

Portfolio transactions for the Partnership will be allocated by the Investment Manager to brokers on the basis of best execution and in consideration of, among other factors, such brokers' ability to effect transactions, operational efficiency, reputation and financial strength. See "BROKERAGE PRACTICES".

**Other Activities of the General Partner, the Investment Manager, the Principal and Affiliates**

None of the General Partner, the Investment Manager, the Principal or any of their respective partners, managers, members, directors, officers, employees, agents and affiliates (collectively, "**Investment Manager Affiliates**") is required to manage the Partnership as its sole and exclusive function. In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage other accounts and/or establish other private investment funds in the future (both domestic and offshore) (such accounts and funds, collectively, "**Affiliated Funds**"), including those that may employ an investment program and strategy similar to that of the Partnership.

Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

See "MANAGEMENT" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

**Exculpation and Indemnification**

The Partnership Agreement provides that none of the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager and the Investment Manager Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis. The Investment Management Agreement also provides similar protections to the Investment Manager.

**Investor Control**

The Partnership is an insurance-dedicated investment fund. In certain circumstances, the owner of a variable life insurance or annuity contract invested in a Separate Account may, for federal income tax purposes, be considered the owner of the assets of the Separate Account that funds the variable contract under an "investor control" theory. Each Policy Owner should consult his or her own tax advisors regarding the "investor control" theory

002769

HCMLPHMIT00003951

and the particular tax risks, if any, posed by the Policy Owner's selection of the Partnership as its investment option under a related Policy.

Policy Owners have no right to communicate with or direct the investment policies or decisions of the Partnership and/or the Investment Manager Affiliates relating in any way to the Partnership.  For purposes of this Memorandum, the term Policy Owner includes: (i) any trustees of a Policy Owner; (ii) any Policy beneficiaries; (iii) any affiliated person (as this term is defined in Section 2(a)(3) of the Investment Company Act) of the foregoing persons; or (iv) any person that represents the Policy Owner.

There is not, nor shall there be, a pre-arranged binding agreement between the General Partner, the Administrator and the Investment Manager, on the one hand, and any Policy Owner, on the other hand, relating to the investments of the Partnership.  Furthermore, Limited Partners have no right or power to take part in the management of the Partnership.

None of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be held responsible to any Limited Partner or Policy Owner for any loss, damage, liability or expense resulting from a violation of the "investor control" theory to the extent such violation is attributable to conduct of a Policy Owner.

Notwithstanding the foregoing, the Partnership's investment program permits investments in Portfolio Funds, Illiquid Investments and other investments that are managed by, or otherwise affiliated with or related to the Investment Manager.  None of such investments, if made, will be deemed to be directed by the Policy Owner or be part of a pre-arranged binding agreement as a result of such affiliation or relation.

A substantial portion of the Partnership is expected to be invested in illiquid Portfolio Funds and/or Illiquid Investments.  Such investments are often structured as "pass-through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments.  As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

**Tax Considerations**

The Partnership intends to invest its assets in compliance with the diversification requirements imposed by Section 817(h) of the U.S. Internal Revenue Code of 1986, as amended ("**Code**"), and regulations promulgated thereunder and expects to be treated as a partnership and not as an association or a publicly traded partnership taxable as a corporation for federal tax purposes. Accordingly, the Partnership should not be subject to federal income tax, and each Limited Partner will be required to report on its own annual tax return such Limited Partner's distributive share of the Partnership's taxable income or loss. Prospective purchasers are responsible for determining the tax considerations of an investment in the Partnership and should consult their own tax advisors with specific reference to their own situations as they relate to an investment in the Partnership.

The Investment Manager will be required to endeavor to invest the assets of the Partnership in compliance with the diversification requirements imposed by Section 817(h) of the Code, and regulations promulgated thereunder.  The Investment Manager will be required to notify the Limited Partners within a commercially reasonable time upon having a reasonable basis for believing that the Partnership has ceased to meet the standards set forth in Section 817(h) of the Code and to take all commercially reasonable steps to comply with the diversification requirements within the grace period afforded under Treasury Regulation Section 1.817-5. None of the Partnership, the General Partner, the Investment Manager or any of their respective affiliates has any obligation to:   (i) determine if any state's diversification requirements or other regulatory requirements applicable to insurance companies or variable contract separate accounts are applicable to the Partnership or to any Limited Partner, or (ii) take any steps to facilitate compliance with any such requirements.

The Investment Manager will not accept investment recommendations, or make any investment decisions regarding the direct or indirect investment of the Partnership's assets based, in whole or in part, on information regarding any investment or group of

002770

HCMLPHMIT00003952

investments received from any Limited Partner or Policy Owner. No Limited Partner or Policy Owners will have the right or be permitted to select or recommend any particular investment or group of investments to be made directly or indirectly with the assets of the Partnership, and there is not, nor will there be, any direct or indirect pre-arrangements or agreement between any Limited Partner or its Policy Owners and the Investment Manager regarding the investments to be made directly or indirectly by the Partnership. See "TAXATION" herein.

**Term**     The term of the Partnership will continue indefinitely until terminated in accordance with the Partnership Agreement. Under the Partnership Agreement, the Partnership may be terminated at the election of the General Partner.

**Fiscal Year**     The fiscal year of the Partnership will end on December 31 of each year. However, the fiscal year may be changed at any time by the General Partner, in its sole and absolute discretion.

**Auditor**     The Partnership intends to engage a nationally recognized public accounting firm to act as the Partnership's auditor. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

**Administrator**     The Partnership intends to engage a provider of administrative services to acts as the Partnership's Administrator, as further set forth herein. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. See "SERVICE PROVIDERS—Administrator" herein.

**Shared Services Arrangement**     In addition, the Investment Manager has entered into a shared services agreement ("**Shared Services Agreement**") with Highland Capital Management, L.P., a Delaware limited partnership (in its capacity with respect to the Shared Services Agreement, the "**Shared Services Provider**"), pursuant to which the Shared Services Provider will provide certain administrative, accounting, tax, back-office and other services to the Investment Manager. The Partnership will not incur any additional fees as a result of the arrangements with the Shared Services Provider. See "RISK FACTORS AND CONFLICTS OF INTEREST" herein. Also see "SERVICE PROVIDERS—Administrator" herein.

**Introducing Broker**     The Partnership intends to engage a nationally recognized introducing broker to act as the introducing broker for the Partnership ("**Introducing Broker**"). Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

**Clearing Broker and Custodian**     The Partnership intends to engage a nationally recognized clearing broker and custodian to act as the clearing broker and custodian for the Partnership ("**Custodian**"). Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

**Regulatory Compliance Provider**     The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

**Legal Counsel**     Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters. Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum. Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel.

There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted. In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the

002771

HCMLPHMIT00003953

Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership.  Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues.  Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof.  In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest—Lack of Separate Representation; Potential Conflicts of Counsel" herein.

**Address for Inquiries**   You are invited to, and it is highly recommended that you do, meet with the General Partner and/or the Administrator (to the extent applicable) for a further explanation of the terms and conditions of this offering of Interests and to obtain any additional information necessary to verify the information contained in this Memorandum, to the extent that the General Partner and/or the Administrator (to the extent applicable) possesses such information or can acquire it without unreasonable effort or expense.  Requests for such information should be directed to:

Atlas IDF GP, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention:  John Honis
Telephone:  (214) 335-7969
Email: Jhonis@RandAdvisors.com

002772

HCMLPHMIT00003954


<div style="text-align: right">**MANAGEMENT**</div>

### BACKGROUND OF THE GENERAL PARTNER AND THE INVESTMENT MANAGER

The General Partner of the Partnership is Atlas IDF GP, LLC, a Delaware limited liability company.  The General Partner is responsible for the management of the Partnership's affairs.

The Investment Manager of the Partnership is Rand Advisors, LLC, a Delaware limited liability company.  The Investment Manager has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the SEC.  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

Limited Partners do not have any right to participate in the management of the Partnership and have very limited voting rights.

<div style="text-align: right">### BACKGROUND OF THE PRINCIPAL</div>

***John Honis, Principal***

Mr. Honis has more than 25 years of investment management and business experience.  He has a background in the credit markets and private equity.  Throughout his career in the investment management industry, Mr. Honis has guided many portfolio companies across several continents.  Mr. Honis' business experience includes roles as CEO, CRO and board-level advisory positions to both high-growth and distressed companies, in a wide range of manufacturing and service industries.

Mr. Honis founded Barrier Advisors, a recognized provider of strategic, operational and financial advice to private equity, venture capital and money management institutions.  He led many turnarounds and strategic growth initiatives and has attracted many of the nation's reputable turnaround practitioners to the Barrier team.

Previously, Mr. Honis was a high-tech executive, having served as President, CEO or Chief Restructuring Officer of five telecommunications firms.  His experiences in all aspects of growth management, strategic/operational turnarounds, financial restructuring, mergers and acquisitions and capital markets were the foundational elements of Barrier Advisors' charter.  Mr. Honis was previously a Partner and Co-Head of Private Equity at Highland Capital Management, L.P. ("**Highland**") (which now serves as the Shared Services Provider to the Investment Manager).

Mr. Honis' early career started at J.P. Morgan in New York where he was worked in the firm's global consulting practice. At J.P. Morgan, he specialized in the design and implementation of worldwide corporate finance processes and systems. Mr. Honis received a BA Degree in Economics from Syracuse University.

Mr. Honis currently serves on the Board of Trustees for each of Highland's affiliated registered investment companies and on the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland.

See "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

***Additional Personnel***

The General Partner and the Investment Manager may employ additional personnel in the future.

<div style="text-align: right">002773</div>
<div style="text-align: right">HCMLPHMIT00003955</div>

### OTHER ACTIVITIES OF THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates is required to manage the Partnership as its sole and exclusive function. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage in other business activities, including competing ventures and/or other unrelated employment, and is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership.

In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership.

Specifically, as of the date hereof:  (i) the Investment Manager acts as the investment manager to the PE Portfolio Fund that:  (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series. See "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

### INVESTMENTS BY THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

Capital contributions by the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates will generally be on the same basis as capital contributions made by other investors, except that, in the discretion of the Investment Manager, no Management Fee may be assessed to such persons.  Neither the Partnership Agreement nor the Investment Management Agreement requires the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates to maintain any minimum capital account balance.

002774

HCMLPHMIT00003956

### SERVICE PROVIDERS

#### ADMINISTRATOR

The Partnership intends to engage an Administrator and enter into an Administration Agreement with the Administrator ("**Administration Agreement**"). The Administrator may be: (x) a nationally recognized provider of administrative services or (y) Highland (i.e., the Shared Services Provider); *provided* that, for the avoidance of doubt, any Administration Agreement with Highland, to the extent applicable, will be in addition to the Shared Services Agreement. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Administration Agreement will include industry-standard provisions relating to scope of services, fees, termination and indemnification.

The Administrator will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership, and therefore accepts no responsibility for any information contained in this Memorandum. The Administrator will not participate in the Partnership's investment decision-making process.

#### AUDITOR

The Partnership intends to engage a nationally recognized public accounting firm to act as the auditor for the Partnership. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

#### INTRODUCING BROKER

The Partnership intends to engage a nationally recognized Introducing Broker to act as the Partnership's introducing broker. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Introducing Broker will act as the executing broker to the Partnership, and will clear the Partnership's transactions through the Custodian. Accordingly, the Introducing Broker may receive a substantial amount of brokerage commissions related to the securities transactions of the Partnership. The Partnership will not be committed to continuing its introducing brokerage relationship with the Introducing Broker for any minimum period, and may enter into introducing brokerage relationships with other introducing brokers.

The Introducing Broker will not participate in the investment decision-making process of the Partnership and will have no obligation to review, monitor or otherwise ensure compliance by the Partnership with the investment policies, restrictions or guidelines applicable to it or any other term or condition of this Memorandum. The Introducing Broker will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership and therefore will accept no responsibility for any information contained in this Memorandum.

#### CLEARING BROKER AND CUSTODIAN

The Partnership intends to engage a nationally recognized Custodian to act as the Partnership's clearing broker and custodian. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Custodian will act as the clearing broker and custodian for the Partnership, and will generally clear (on the basis of payment against delivery) the securities transactions of the Partnership which are effected through other brokerage firms, specifically including the

002775

HCMLPHMIT00003957

Introducing Broker.  The Partnership may also utilize the Custodian, its affiliates and other brokers and dealers for the purpose of executing transactions for the Partnership. Accordingly, the Custodian may receive a substantial amount of brokerage commissions and/or margin interest related to the securities transactions of the Partnership.  The Partnership will not be committed to continuing its clearing brokerage and custodial relationship with the Custodian for any minimum period, and may enter into clearing brokerage and custodial relationships with other clearing brokers and custodians.

The Custodian will not participate in the investment decision-making process of the Partnership and will have no obligation to review, monitor or otherwise ensure compliance by the Partnership with the investment policies, restrictions or guidelines applicable to it or any other term or condition of this Memorandum.  The Custodian will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership and therefore will accept no responsibility for any information contained in this Memorandum.

## REGULATORY COMPLIANCE PROVIDER

The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

## LEGAL COUNSEL

Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters.  Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum.  Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel.

There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted.  In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership.  Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues.  Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof.  In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain

002776

HCMLPHMIT00003958

of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

002777
HCMLPHMIT00003959

## INVESTMENT PROGRAM

### INTRODUCTION

The Partnership was organized for the purpose of investing and trading in a wide variety of investments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including, but not limited to, the following:  common and preferred stocks, bonds and other debt securities, convertible securities, limited partnership interests, other investment funds (including the Portfolio Funds), CLO securities, mutual fund shares, options, warrants, futures, derivatives (including swaps, forward contracts and structured instruments), monetary instruments, other financial instruments, cash and cash equivalents.  The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the Commodity Exchange Act, as amended ("**CEA**"), that provides an exemption from registration as a commodity pool operator.

References herein to the Partnership shall include, where appropriate:  (i) each Series of the Partnership; (ii) the instances whereby the Investment Manager directly invests the Partnership's assets, and (iii) the Partnership's investments through Portfolio Funds.

The following is a general description of the principal types of investments which the Investment Manager currently contemplates making for the Partnership, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio.  The following description is merely a summary, and a Limited Partner should not assume that any descriptions of the specific activities in which the Partnership may engage are intended in any way to limit the types of investment activities which the Partnership may undertake or the allocation of Partnership capital among such investments.

### INVESTMENT OBJECTIVE

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation.  **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.**

As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund that:  (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction.  However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth herein.  **Further, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.**

### INVESTMENT STRATEGY

Philosophy

The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities.  The following principles generally guide the Investment Manager's portfolio management strategy and allocation of capital:

- invest with a long-term perspective, minimize turnover and avoid market-timing;
- hold a concentrated investment portfolio; and

002778

HCMLPHMIT00003960

- view each investment relative to other investment opportunities.

*Long-Term Perspective*.  The Investment Manager intends to invest with a long-term perspective, typically holding an ownership position in a company until it reaches its intrinsic value.  In general, when the Investment Manager will be looking to invest in a company, it intends to avoid trying to time the market, but rather intends to focus on the intrinsic value of the company and then find the right entry or purchase point.

*Concentration*.  The Investment Manager intends to have a concentrated portfolio of investments.  The Investment Manager believes that this may provide the Partnership with a competitive advantage over most other private investment vehicles in that:  (i) the Investment Manager's best ideas would be rarely and/or marginally diluted by its lesser ideas; (ii) the extra time saved by not trading may allow the Investment Manager to concentrate on finding other investment ideas; and (iii) careful analysis may allow the Investment Manager to make intelligent and deliberated decisions.

*Relative Analysis*.  The Investment Manager intends to evaluate potential investments in companies of varying market capitalization in an attempt to isolate those securities with the greatest potential for capital appreciation.  As part of its strategy, the Investment Manager intends to invest in those industries, sectors and securities which may provide value on a relative basis.  The Investment Manager intends to seek to understand a company and its industry before investing.

**Strategies**

The following is a general description of the principal types of securities in which the Partnership may invest, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio.  The following description is merely a summary, and the Investment Manager has discretion to cause the Partnership to invest in other types of securities and to follow other investment criteria and guidelines.

*Long Equity*.  The Investment Manager expects that a portion of the Partnership's investments will generally be in equities.  In connection with the foregoing, the Partnership's focus will be on companies of varying size that have a reasonable expectation of producing above-average returns.  The Investment Manager intends to favor private companies that are not actively traded in the U.S. but may be willing to invest in companies without respect to market capitalization, geographic location or market sector.

Before investing in a company, the Investment Manager intends to analyze certain financial measures, such as the company's historical and expected cash flows, its projected earnings growth, its valuation relative to its growth and to that of its industry, the historical trading patterns of the company's securities, and forecasts and projections for the relevant industry group.  The Investment Manager will at times gather information about a company from consultants, analysts, competitors, suppliers and customers that may help the effectiveness of the analysis performed.

*Short Selling*.  The Investment Manager may sell short individual stocks as a means of attempting to reduce risk and increase performance.  Stocks are generally sold short for a variety of reasons, including, without limitation, the following:  (i) temporary overvaluation due to short-term market euphoria for a sector; (ii) faulty business model; (iii) poor earnings; (iv) questionable accounting practices; (v) deteriorating fundamentals; (vi) negative tangible book value; and (vii) weak management unable to adapt to changes in technology, regulation or the competitive environment.  The Investment Manager believes that, by focusing on specific companies that are experiencing any one or more of these elements, the Investment Manager may be able to identify profitable short sale candidates in most stock market environments.  In addition, technical analysis may also be used to help in the decision-making process.

*Event-Driven Investments*.  When the opportunity arises, in the opinion of the Investment Manager, the Partnership may invest in companies based upon certain situations or

002779

HCMLPHMIT00003961

events, such as launching of a new product, changes in management, a corporate restructuring, a merger or an acquisition. These situations or events may also include investments that are based on market-timing and impact analysis.

Occasionally, the Partnership may engage in arbitrage transactions that the Investment Manager believes may represent an exceptional risk/reward opportunity. Risk arbitrage opportunities generally arise during corporate mergers, leveraged buyouts or takeovers. Frequently, the stock of the company being acquired will trade at a significant discount to the announced deal price. This discount compensates investors for the time value of money and the risk that the transaction may be canceled. If the discount is significantly greater than the Investment Manager's assessment of the underlying risk, the strategy will be implemented. The Investment Manager intends to use event-driven investments as a tactical, opportunistic strategy and not as part of the Partnership's normal operations.

### Bank Loans

In general, a portion of the Partnership's net assets will be invested and traded in senior secured floating rate bank loans ("**Bank Loans**") denominated in U.S. dollars. Bank Loans represent amounts borrowed by corporate entities from banks and other lenders. In many cases, they are issued in connection with re-capitalizations, acquisitions, leveraged buyouts and re-financings. Most, if not all, of the Bank Loans in which the Partnership intends to invest will have a below investment-grade credit rating or will not be rated by a major credit rating agency. The Bank Loans in which the Partnership intends to invest are often referred to as "leveraged loans" because the borrowing companies have significantly more debt than equity.

Bank Loans have the highest seniority within a borrower's capital structure. Therefore, in the event of a bankruptcy, holders of Bank Loans are typically paid (to the extent assets are available) before certain other creditors, such as bondholders. Bank Loan maturities typically range from 5 to 8 years, although loan prepayments and re-financings generally result in effective average lives of approximately 3 years depending on market conditions.

Bank Loans generally pay interest at rates that are determined periodically by reference to a base lending rate plus a premium. These rates often are re-determined daily, monthly, quarterly or semi-annually. As a result, the Investment Manager believes that the Partnership may experience less sensitivity to changes in market interest rates and lower volatility than if the Partnership invested exclusively in fixed rate obligations.

The Bank Loan market has grown significantly in recent years, as investors have been drawn into the market by the advantageous characteristics of Bank Loans, which include floating interest rates, senior secured status, lower volatility, growing liquidity, greater control over an issuer in times of stress, and lower correlation with other asset classes.

### Other Securities

When, in the opinion of the Investment Manager, appropriate investments cannot be found or when market conditions dictate a more conservative stance, the Partnership may maintain significant cash positions or invest in money market instruments (e.g., money market funds or U.S. Treasury securities).

### Fixed Income Securities

The Investment Manager may invest in fixed income securities (bonds) as part of the strategic operations of the Partnership. The Investment Manager may take advantage of special investment opportunities in the high yield and convertible segments of the fixed income market. The Investment Manager considers these investments to be equity substitutes, with the expectation of providing both current income and capital appreciation. The Investment Manager may also seek opportunities in government-issued fixed income securities, as deemed appropriate.

### High Yield Bonds

002780

HCMLPHMIT00003962

The price and yield of lower-quality (i.e., high yield, high risk) bonds, commonly referred to as "junk bonds," can be expected to fluctuate more than the price and yield of higher-quality bonds.  Because these bonds are rated below BBB or are in default, they are regarded as predominantly speculative with respect to the issuer's continuing ability to meet principal and interest payments. Successful investment in lower-medium- and low-quality bonds involves greater investment risk and is highly dependent on credit analysis.  A real or perceived economic downturn or higher interest rates could cause a decline in high yield bond prices by lessening the ability of issuers to make principal and interest payments.  These bonds can be more difficult to sell and value accurately than high-quality bonds. Because objective pricing data may be less available, judgment may play a greater role in the valuation process.  In addition, the entire high yield bond market can experience sudden and sharp price swings due to a variety of factors, including changes in economic forecasts, stock market activity, large or sustained sales by major investors, a high-profile default, or just a change in the market's psychology.  This type of volatility is usually associated more with stocks than bonds, but junk bond investors should be prepared for it.

### Derivative Transactions

The Partnership may enter into derivative transactions, including credit default swaps to hedge the market risk of its Bank Loan portfolio.  The Investment Manager may purchase and write put and call options that are traded on national securities exchanges or over-the-counter markets, as well as on electronic communications networks.  Options can be used in many ways, such as to increase market exposure (i.e., leverage), to reduce overall market exposure (i.e., hedge), to increase the portfolio's current income, or to reduce the cost basis of a new position.  The Partnership may also utilize certain options, such as various types of index or "market-basket" options, in an effort to hedge against certain market-related risks, as the Investment Manager deems appropriate.  The Investment Manager believes that the use of options and other derivatives may help reduce risk and enhance investment performance of the Partnership's portfolio.

### Foreign Investments

Although the Investment Manager intends to focus primarily on the U.S. marketplace, it may invest in U.S. dollar-denominated securities of foreign issuers or loans of foreign borrowers traded in the U.S.

### Special Situations

The Partnership may invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions.

### Money Market Instruments

From time to time, the Investment Manager may also invest some of the Partnership's assets in short-term U.S. government obligations, certificates of deposit, commercial paper and other money market instruments.  A greater percentage of Partnership assets may be invested in such obligations if the Investment Manager believes that a defensive position is appropriate because of expected economic or business conditions or the outlook for security prices.  From time to time, in the sole discretion of the Investment Manager, cash balances in the Partnership's brokerage account may be placed in a money-market fund or other cash equivalents.

### CLO Securities Generally

A portion of the Partnership's assets will also be invested in: (i) rated and unrated, debt relating to collateralized loan obligations ("**CLOs**" or "**CLO Securities**") in the primary and secondary markets, and (ii) collateralized debt obligations that also have leveraged loans as part of their underlying investments.

### Currency Hedging Transactions

002781

HCMLPHMIT00003963

The Investment Manager may, but is not required, to engage in currency hedging transactions to protect against adverse changes in currency and interest rates. Currency hedging instruments may include, without limitation, forward contracts, futures contracts, options contracts, cross-currency swaps, exchange-traded funds ("**ETFs**"), treasury locks, shorting non-U.S. debt and any other instrument deemed reasonable in the Investment Manager's discretion to hedge the non-U.S. currency exposure of the Partnership.

**Description of CLO Investments**

An investment in CLO tranches represents varying levels of exposure primarily to credit performance of the underlying assets and is characterized by a combination of expected significant current cash flow, as well as the opportunity for positive returns through long-term gains on the underlying portfolios. CLO investments often have a relatively short expected duration (usually less than 10 years), as a typical CLO distributes excess cash flows quarterly or semi-annually concurrent with the payment of interest on its liabilities, subject to compliance with overall collateral quality tests and other performance criteria. The Investment Manager believes that CLO debt securities may offer significant relative value in the current market. The Investment Manager believes the attractive spreads currently offered by investments in CLOs have been created by technical factors, mainly rating agency driven, rather than fundamentals of the underlying collateral.

A cash flow CLO is generally analogous to a special purpose finance company. The CLO owns a portfolio consisting of corporate loans and other investments from which it typically receives interest income, together with capital gains and losses. The CLO is often financed with equity, which may be in the form of preference shares or income notes and several levels of long-term debt. CLO debt is typically rated by the rating agencies based on the deal structure as well as outstanding principal amount of portfolio securities and, in most cases, is not contingent on the market value of the underlying portfolio. CLO equity is almost always unrated.

In addition to the opportunities in the secondary market, the Investment Manager believes that it may be able to source attractive opportunities from the growing issuance of CLOs in the primary market as well. The CLO market generally is characterized by a lack of liquidity, transparency and the absence of uniform standards. The Investment Manager believes that market participants often tend to lack the expertise and analytic tools to systematically and comprehensively analyze either primary or secondary market CLO tranches. The market for CLO tranches is also highly fragmented and, to date, many investors have had limited leverage in negotiating CLO terms, such as structure and fees. The Investment Manager believes that the Partnership may benefit from the Investment Manager's ability to use its CLO management expertise, proprietary analytics and direct market access to assess value opportunities and effectively execute transactions. In the primary market, the Investment Manager will seek situations where it can influence structures, fees and timing of CLO transactions to achieve favorable terms not directly available to other investors.

The Investment Manager generally intends to invest the Partnership's gross assets in CLO debt that is diversified across maturities, underlying assets and managers. In addition to implementing its rigorous investment process and utilizing proprietary analytical tools to evaluate and select investments for the Partnership, the Investment Manager intends to use its market knowledge and industry position to seek to add value by addressing what it believes may be material inefficiencies of the existing CLO execution process. For example, within the primary new issuance market, the Investment Manager will look to invest in CLOs where it can leverage its expertise and market relationships to achieve the timing, structural and financial terms especially advantageous to the Partnership's investments. In addition, the Investment Manager will look to assess value dislocations of CLOs and other structured investments within the secondary market, as the Investment Manager believes structured products markets may have inherent inefficiencies that often cause significant differentials between intrinsic value and market value.

The Investment Manager will seek to achieve the following specific objectives:

---

ATLAS IDF, LP    33

002782


HCMLPHMIT00003964

- seek consistent above-average returns while minimizing volatility;
- access and initiate deal flow directly and through arrangements with underwriters and broker-dealers;
- take advantage of value dislocations in the secondary market;
- reduce risk through efficient, cost-effective transaction execution;
- add value through optimization of terms and structures;
- and leverage expertise in CLO investments and management to create a well-balanced, broadly diversified portfolio.

**Structural Optimization and Transaction Terms with Respect to CLOs**

Typically, CLO securities are offered to investors after the structure has been developed and agreed to by the collateral manager, underwriter and rating agencies. Investors have limited ability to effect significant changes to the structure and/or the key terms. Also, very few investors have the expertise or the tools to model and analyze proposed CLO investments; most are believed to rely on the underwriters to provide analytical support. Proactive, early involvement with select managers and underwriters, and significant investment participation, are expected to enable the Investment Manager to use its structuring capability and proprietary analytics to identify and achieve desirable structural features and transaction terms.

**CLO Investment Process**

*General*. The investment process used by the Investment Manager to evaluate potential CLO tranches will generally employ a combination of rigorous qualitative (manager, portfolio and legal considerations) and quantitative (structural, cash-flow, collateral valuation and pricing/relative value) analysis. Among other resources, the Investment Manager intends to use its proprietary quantitative analytical tool, Rand CLO Insight, as well as INTEX data service, Wall Street Analytics, Moody's Investor Services and Wall Street Office in connection with gathering information with respect to CLO investments by the Partnership.

*Asset/Portfolio Assessment*. The Investment Manager believes the most critical component of investing in CLO securities is the ability to quickly and effectively understand the characteristics of the CLO's underlying collateral, primarily consisting of corporate Bank Loans. The Investment Manager believes that its capability to develop accurate, up-to-date portfolio quality indicators may be critical to the foregoing task because these indicators are key inputs for the subsequent quantitative component of the investment analysis.

Further assessment by the Investment Manager will generally include additional portfolio-level analysis. The Investment Manager intends to consider, among other factors, the following key parameters of a CLO:

- historical par loss due to defaults and distressed sales as a key indicator of prior portfolio performance;
- defaulted securities currently held in the portfolio and prospective recovery levels for such securities;
- aggregate ratings of the performing securities (statistically, lower ratings generally indicate higher probability of default);
- liquidity as measured by the average facility size and percent of the portfolio with private credit ratings, among other metrics;
- projected future portfolio par loss, based on the security-level analysis and the resulting ratings adjustments;
- portfolio market value and portfolio segment trading at distressed prices as another indicator of future portfolio performance; and
- degree of industry and issuer diversification/concentration.

*Manager Evaluation*. The underlying CLO manager is responsible for selecting the assets and for managing them within the ratings-constrained environment according to the specified procedures and limitations that exist in each CLO's indenture. The review of the

002783

HCMLPHMIT00003965

CLO manager will generally encompass historical performance, investment management and structured finance expertise, quality and size of the investment team, co-investment history, investment philosophy and credit process, platform scalability, systems and back office operations. The review process will generally focus on evaluating the manager's performance and capabilities in the following areas:

- Past CLO performance, including par erosion through defaults, recoveries and trading history (gains/losses) of current and prior CLO managed;
- proficiency in the underlying asset classes, integrity of the investment process, investment criteria, decision-making and monitoring processes;
- consistency of historic performance, with an emphasis on performance during a credit down cycle;
- knowledge of CLO structures and the ability to manage the assets within the limitations imposed by indenture constraints;
- upgrade and downgrade history of its prior transactions;
- key personnel, retention arrangements and succession plan, and experience and depth of the entire investment team; and
- technical self-reliance, such as degree of independence from trustee/underwriter to assess impact of potential trades, indenture interpretation, etc.; and
- sophistication of systems, compliance procedures and reporting capabilities.

*Structural Considerations*. A review of the CLO structure will generally focus on the indenture (the governing document of the transaction) provisions that determine which assets may be purchased by the vehicle, as well as the mechanics behind the cash-flow "waterfall" (i.e., priority of payments). The cash-flow "waterfall" determines the order in which cash disbursements are made on each payment date according to the performance of the transaction. In the event of performance deterioration, cash flow may be diverted from lower tranches of the capital structure to prepay the senior or mezzanine tranches, reduce the leverage, and, if possible, restore compliance with the appropriate tests.

Further structural analysis by the Investment Manager includes a thorough review of indenture provisions which generally include:

- asset eligibility – the types and required features of the assets permitted to be purchased for the CLO (e.g., loans, rating requirements, maturity restrictions, interest payment frequency, etc.);

- "basket" limitations – percentage limits on securities bearing certain ratings, maximum permitted percentages for certain asset types (e.g., synthetic instruments, structured notes, zero-coupon bonds, etc.);

- trading restrictions – the level of discretionary trading allowed, rules for trading and how they may change in the event that the liabilities are downgraded;

- reinvestment criteria – the rules that govern reinvestment of principal proceeds generated from sales, maturities, calls and tenders during and after the reinvestment period;

- priority of payments – structure of the CLO's cash-flow waterfall and cash-flow diversion mechanisms (the over-collateralization and interest coverage tests); if earlier cash-flow diversion results in deferral of interest payments to certain tranches, these rules determine how deferred interest gets paid when the funds are available and what the protections or risks are for each investor in the CLO;

- management fee structure – senior, subordinate, incentive, contingent fees; generally, proper fee structure is key in aligning the manager's interest with various note holders; and an equity investor would favor a structure that compensates the manager for managing the transaction while providing an incentive to maintain equity distributions without sacrificing the future health of the transaction;

- collateral quality tests haircuts – if a certain "basket" is larger than its limitation, overcollateralization tests may be reduced by the amount above the limitation;

002784

HCMLPHMIT00003966

- analysis of the hedging strategy and of the hedge structure is important in evaluating implications of any mismatch between fixed rate assets and floating rate liabilities; the hedge instrument is valued and the effectiveness of the strategy is evaluated based on various criteria, such as where the termination payments are positioned in the waterfall, whether payments are made upfront or over time and how the notional amount changes over time; improper hedging can prove very costly to investors at all levels of the capital structure;

- governance provisions and voting rights – the rights of investors in different tranches of the capital structure to effect changes (e.g., manager removal, collateral disposition, note redemption, etc.);

- events of default – definitions and implications for each tranche holder; and

- reporting – the frequency and detail provided to the investors updating the portfolio and liability performance and composition.

*Legal/Other Issue Analysis*.   Legal review will generally be an integral part of the Investment Manager's overall investment process with the goal of understanding and interpreting the numerous documents that govern a typical CLO.   Reviewed documents and legal issues may include the following:

- the indenture – the CLO's governing document that acts as a "roadmap" for the entire transaction;

- legal opinions – these provide guidance as to tax treatment and other legal areas that may impact the management of the transaction;

- the management/advisory agreements – these dictate the role, rights and responsibilities of the manager;

- legal structure of equity securities – the structure of the preference shares or income notes may have an impact on the tax treatment;

- financial guaranty agreements – a financial guarantor is typically a monoline insurance company which in the past may have given its rating, usually Aaa/AAA to the senior class of notes to guarantee payments of principal and interest in exchange for a fee and additional rights within the CLO; such rights are important to evaluate as they may have an impact on the rights of the equity investors;

- ratings – agency, analyst, location, timing and basic assumptions used to arrive at the ratings; and

- offering memoranda, deal pitch books and other marketing materials.

*Detailed Quantitative Analysis Using Proprietary Analytics*.   A detailed cash flow analysis is crucial in determining the return characteristics and profile of the tranche under consideration.   The cash flows will generally be stress-tested using multiple economic scenarios and assumptions to assess the risk and return profile of the proposed CLO investment.   Among other items, the quantitative analysis will also include the following:

- a review of the portfolio market value, the resulting market value coverage of the proposed CLO investment, and its change over time;

- the likelihood of future cash flows being diverted or interrupted, as well as the potential severity in the event that it happens;

- analysis of par value and interest coverage cushions.   Cushions in the overcollateralization and the interest coverage tests may indicate the level of losses that can be sustained before a potential cash flow diversion; and

002785

HCMLPHMIT00003967

- analysis of sector and issuer concentrations, largest exposures and level of diversification.

*Final Screen/ Pricing.* The Investment Manager's investment decision will generally be based on the qualitative and quantitative analysis of each investment and on the correlation between the proposed investment and the existing holdings in an effort to ensure an appropriate level of diversification. The Investment Manager will generally compare the risk and return characteristics of the proposed CLO investment against similar CLO bond trade prices in its proprietary pricing database. The combined assessment of the underlying portfolio characteristics, structural considerations, legal and cash flow scenario analyses will generally be compared with the relative value analysis to determine the value of the proposed CLO investment.

## Leverage

The Investment Manager may cause the Partnership to undertake leverage. Leverage may take a variety of forms, including, but not limited to, the following: long-term loans, convertible notes and repurchase arrangements. Entering into short sales and certain types of derivative instruments may also increase the Partnership's use of leverage. Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.

## Important Notice

The foregoing description of the Partnership's investment program does not purport to be a complete explanation of all the asset classes or securities in which the Partnership may invest. In general, the Investment Manager intends to follow a flexible approach in order to place the Partnership in the best position to capitalize on opportunities in the financial markets. Accordingly, the Investment Manager may employ other strategies and may take advantage of opportunities in diverse asset classes if they meet the Investment Manager's standards of investment merit.

### DEVELOPMENT AND RISKS OF INVESTMENT MANAGER'S INVESTMENT STRATEGY

The development of an investment strategy is a continuous process, and the Partnership's investment strategy and methods may therefore be modified from time to time. The Partnership's investment methods are confidential, and the descriptions of them in this Memorandum are not exhaustive. The Partnership's investment strategies may differ from those used by the Investment Manager and its affiliates with respect to other accounts they manage. Investment decisions require the exercise of judgment by the Investment Manager. The Investment Manager may, at times, decide not to make certain investments, thereby foregoing participation in price movements, which would have yielded profits or avoided losses. Limited Partners cannot be assured that the strategies or methods utilized by the Investment Manager will result in profitable investing for the Partnership.

**The Partnership's investment program entails substantial risks, and there can be no assurance that its investment objectives will be achieved. The practices of options trading, short selling, the use of leverage and other investment techniques employed by the Partnership can, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject. See "RISK FACTORS AND CONFLICTS OF INTEREST—Market Risks".**

002786

HCMLPHMIT00003968

## BROKERAGE PRACTICES

References herein to the Partnership shall be deemed to apply with respect to the Partnership's traded investments.

### BROKERAGE ARRANGEMENTS

The Investment Manager is responsible for the placement of the portfolio transactions of the Partnership and the negotiation of any commissions paid on such transactions. Portfolio securities normally are purchased through brokers on securities exchanges or directly from the issuer or from an underwriter or market maker for the securities. Purchases of portfolio instruments through brokers involve a commission to the broker. Purchases of portfolio securities from dealers serving as market makers include the spread between the "bid" and the "ask" price. The Investment Manager will not commit to provide any level of brokerage business to any broker. The Investment Manager may utilize the services of one or more introducing brokers who will execute the Partnership's brokerage transactions through a broker or custodian who will clear the Partnership's transactions.

Securities transactions for the Partnership are executed through brokers selected by the Investment Manager in its sole discretion and without the consent of the Partnership. In placing portfolio transactions, the Investment Manager will seek to obtain the best execution for the Partnership, taking into account the following factors: the ability to effect prompt and reliable executions at favorable prices (including the applicable dealer spread or commission, if any); the operational efficiency with which transactions are effected and the efficiency of error resolution, taking into account the size of order and difficulty of execution; the financial strength, integrity and stability of the broker; special execution capabilities; reputation; clearance, settlement, on-line pricing, block trading and block positioning capabilities; willingness to execute related or unrelated difficult transactions in the future; order of call; online access to computerized data regarding clients' accounts; performance measurement data; the quality, comprehensiveness and frequency of available brokerage and research products and services considered to be of value; the availability of stocks to borrow for short trades; and the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria.

### SOFT DOLLAR ARRANGEMENTS

The term "soft dollars" refers to commissions accumulated by brokers based on an investment manager's transactions, on behalf of its clients, which may be used by the investment manager to acquire various products or services. The use of client commissions, known as soft dollars, to pay for these products and services, including research and brokerage products and services, presents investment managers with potential conflicts of interest and may give incentives for investment managers to use certain brokers without regard to their obligations to their clients.

The Investment Manager may use soft dollars generated by the Partnership's brokerage transactions to pay for brokerage and research products and services that fall within the safe harbor afforded by Section 28(e) of the Exchange Act ("**Section 28(e)**"). Section 28(e) provides a "safe harbor" to investment managers who use soft dollars to obtain investment research and brokerage products and services. In order to qualify for the safe harbor, the products or services must provide assistance to the investment manager in the performance of its investment decision-making responsibilities, or must relate to the execution, clearance or settlement of a trade.

### REFERRAL OF INVESTORS AND SALES CHARGES

The Investment Manager may direct some Partnership brokerage business to brokers who refer prospective investors to the Partnership. Because such referrals, if any, are likely to benefit the Investment Manager and its affiliates but will provide an insignificant (if any)

002787

HCMLPHMIT00003969

benefit to Limited Partners, the Investment Manager will have a conflict of interest with the Partnership when allocating Partnership brokerage business to a broker who has referred investors to the Partnership.  To prevent Partnership brokerage commissions from being used to pay investor referral fees, the Investment Manager will not allocate Partnership brokerage business to a referring broker unless the Investment Manager determines in good faith that the commissions payable to such broker are reasonable in relation to those available from non-referring brokers offering services of substantially equal value to the Partnership.

The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the Investment Manager and/or the General Partner, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner.

## ALLOCATION OF INVESTMENT OPPORTUNITIES

The Investment Manager may at times determine that certain investments will be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, including Affiliated Funds, the Investment Manager's own accounts or accounts of an affiliate.  If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager will endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable.  The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

## AGGREGATION OF ORDERS

The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership will be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors.

In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities.  Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold.  In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

## TRADE ERROR POLICY

The Investment Manager has internal controls in place to prevent trade errors from occurring.  On those occasions when such an error nonetheless occurs, the Investment

---

ATLAS IDF, LP                                                                          39

HCMLPHMIT00003970

Manager will use reasonable efforts to correct the error. If the error cannot be corrected, the Investment Manager does not intend to make any adjustment, regardless of whether the error works to the benefit or detriment of the Partnership. The Investment Manager will endeavor to maintain a record of each trade error, including information about the trade and how such error was corrected or attempted to be corrected. The Partnership (and not the General Partner, the Investment Manager or any of the Investment Manager Affiliates) will be responsible for any losses resulting from trading errors and similar human errors, unless such errors are due to gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction.

002789
HCMLPHMIT00003971

## RISK FACTORS AND CONFLICTS OF INTEREST

An investment in the Partnership (and any Series thereof) involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment. There can be no assurances or guarantees that: (i) the Partnership's (or any Series') investment strategy will prove successful, or (ii) investors will not lose all or a portion of their investment in the Partnership (or any particular Series).

References herein to the Partnership shall include, where appropriate: (i) each Series of the Partnership; (ii) the instances whereby the Investment Manager directly invests the Partnership's assets, and (iii) the Partnership's investments through Portfolio Funds.

In addition, to the extent relevant, you should also read the offering and governing documents of the PE Portfolio Fund in which the Partnership intends to initially invest on behalf of the initial Limited Partners, which are available from the Partnership upon request.

You should consider the Partnership as a supplement to an overall investment program and should only invest if you are willing to undertake the risks involved. In addition, investors who are subject to income tax should be aware that an investment in the Partnership (or any Series thereof) is likely (if the Partnership (or such Series) is successful) to create taxable income or tax liabilities in excess of cash distributions to pay such liabilities. You should therefore bear in mind the following risk factors and conflicts of interest before purchasing an Interest:

### PARTNERSHIP RISKS

**Dependence Upon the General Partner, the Investment Manager and the Principal; No Participation in Management.** The Partnership's success will depend on the management of the General Partner and the Investment Manager and on the skill and acumen of the Principal. If the Principal should cease to participate in the Partnership's business, the Partnership's ability to select attractive investments and manage its portfolio could be severely impaired.

As a Limited Partner, you should be aware that you will have no right to participate in the management of the Partnership, and you will have no opportunity to select or evaluate any of the Partnership's investments or strategies. Accordingly, you should not invest in the Partnership unless you are willing to entrust all aspects of the management of the Partnership and its investments to the discretion of the General Partner and the Investment Manager.

**Limited or Lack of Operating History.** Each of the Partnership, the Investment Manager and the General Partner are recently-formed entities that have no operating history upon which prospective investors may evaluate the Partnership's future performance. Although the Principal has experience with investments of the type the Partnership intends to make, any prior performance of the Principal (or the Investment Manager Affiliates) is not necessarily indicative of results that he may achieve with respect to the Partnership. As such, there can be no assurances that the Partnership will be able to implement its investment strategy or achieve its investment objective. In addition, any prior performance of the Principal or the Investment Manager Affiliates is not indicative of the results each may achieve for the Partnership in the future.

**Reliance on the Shared Services Provider.** The Investment Manager relies on the Shared Services Provider to provide certain administrative and other services. In the event that the Shared Services Agreement is terminated for any reason, the Investment Manager may not be able to engage another third party to provide such services and may not have the resources to continue advising the Partnership without the provision of such services by the Shared Services Provider. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

002790


HCMLPHMIT00003972

<u>Limited Liquidity of Interests</u>.  An investment in the Partnership involves substantial restrictions on liquidity, and its Interests are not freely transferable.  There is no market for the Interests in the Partnership, and no market is expected to develop.  Additionally, transfers are subject to the consent of the General Partner, which consent may be granted or withheld in the General Partner's sole discretion.  Consequently, Limited Partners will be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the Partnership Agreement.  Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.  Although a Limited Partner may attempt to increase its liquidity by borrowing from a bank or other institution, Interests may not readily be accepted as collateral for a loan.  In addition, the transfer of an Interest as collateral or otherwise to achieve liquidity may result in adverse tax consequences to the transferor.

A portion of the Partnership's assets may be invested in securities and other financial instruments or obligations for which no market exists and/or which are restricted as to their transferability under federal or state securities laws.  Such investments may be segregated from other Partnership assets and carried in Side Pocket Accounts, which are subject to restrictions on withdrawals.  Because of the absence of any trading market for these investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities.  Although these securities may be resold in privately negotiated transactions, the prices realized on these sales could be less than those originally paid by the Partnership.  Further, companies whose securities are not publicly traded may not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities.

<u>Lack of Registration</u>.  The Interests have neither been registered under the Securities Act nor under the securities laws of any state and, therefore, are subject to transfer restrictions.  In connection with your purchase of an Interest, you must represent that you are purchasing the Interest for investment purposes only and not with a view toward resale or distribution.  Neither the Partnership nor the General Partner has any plans or assumed any obligation to register the Interests.  Accordingly, the Interests may not be transferred without documentation acceptable to the General Partner, which may include an opinion of counsel to the Partnership that the transfer will not involve a violation of the registration requirements of the Securities Act or require registration by the Partnership under the Investment Company Act.  These restrictions on transfer are in addition to those found in the Partnership Agreement.  Ordinarily, this means that transfers will be restricted to instances of death, gift or passage by operation of law.

<u>Withdrawal of Capital</u>.  A Limited Partner's ability to withdraw funds from the Partnership is restricted in accordance with the withdrawal provisions contained in this Memorandum under "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Withdrawals" and the withdrawal provisions contained in the Partnership Agreement.  In addition, substantial withdrawals by investors within a short period of time could require the Partnership to liquidate securities positions and other investments more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the Partnership's investment strategy.  Reduction in the size of the Partnership could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds.

**For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**  In addition, because of the absence of any trading market Illiquid Investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities.  Each of the foregoing may impact a Limited Partner's ability to withdraw.

002791

HCMLPHMIT00003973

**Concentration of Investments**. The Investment Manager implements its investment program in a manner which, in light of investment considerations, market risks and other factors, it believes will provide the best opportunity for attractive risk-adjusted returns in the value of the Partnership's assets. The Partnership Agreement does not formally limit the amount of the Partnership's assets that may be invested in a single company, security, country, industry, sector or asset class. In addition, the Partnership Agreement does not limit the amount of the Partnership's assets that may be invested in a single Portfolio Fund. The concentration of the Partnership's portfolio in any manner described above would subject the Partnership to a greater degree of risk with respect to the failure of one or a few investments, or with respect to economic downturns in relation to an individual industry or sector, or single company, security, country, industry, sector or asset class. See "—Regulatory and Tax Risks—Diversification" herein.

**Operating Deficits**. The expenses of operating the Partnership (including the Management Fee) may exceed its income, thereby requiring that the difference be paid out of the Partnership's capital, reducing the Partnership's investments and potential for profitability. In addition to the Partnership's own operating expenses, the Partnership will also bear its *pro rata* share of the operating expenses of the relevant Portfolio Fund. As such, the Partnership is subject to layering of operating expenses due to the expenses charged by the managers and the Portfolio Funds.

**No Distributions**. The General Partner does not intend to make distributions to the Limited Partners, but intends instead to reinvest substantially all Partnership income and gain, if any. Cash that might otherwise be available for distribution will also be reduced by payment of Partnership obligations, payment of Partnership expenses (including fees payable and expense reimbursements to the General Partner) and establishment of appropriate reserves. As a result, if the Partnership is profitable, Limited Partners in all likelihood will be credited with Partnership net income, and will incur the consequent income tax liability (to the extent that they are subject to income tax), even though Limited Partners receive little or no Partnership distributions. In addition, notwithstanding anything to the contrary herein, the General Partner may limit withdrawals in order to ensure that the Partnership meets the diversification requirements applicable to insurance-dedicated investment funds.

**Investment Expenses**. The investment expenses (e.g., expenses related to the investment and custody of the Partnership's assets, such as brokerage commissions, custodial fees and other trading and investment charges and fees) as well as other Partnership fees may, in the aggregate, constitute a high percentage relative to other investment entities. The Partnership will bear these costs regardless of its profitability.

**Cross-Series Liability**. Section 17-218 of the Delaware Act provides that limited partnerships can be established in separate series in a manner that the liabilities and obligations incurred with respect to any series are only enforceable against the assets of such series, and not against the assets of the limited partnership generally or any other series. The relevant provisions of the Delaware Act provide the legal requirements for how limited partnerships can be established and operated to maintain this segregation. The statute includes such requirements as the maintenance of separate books and records for each series, and separation of the assets of each series from other series. Despite these statutory provisions, there may be instances where the assets of a particular Series may be exposed to the liabilities of one or more other Series. For example, there may be certain counterparties which resist entering into a contract with a particular Series and insist that one or more other Series, or the Partnership itself acting on behalf of the Series together, enter into such contract.

**Supervision of Trading Operations**. The Investment Manager, with assistance from its brokerage and clearing firms, intends to supervise and monitor trading activity in the Partnership's account to ensure compliance with the Partnership's objectives. Despite the Investment Manager's efforts, however, there is a risk that unauthorized or otherwise inappropriate trading activity may occur in the Partnership account.

**Impact of Side Letters**. The Partnership, the General Partner and/or the Investment

002792

HCMLPHMIT00003974

Manager may from time to time enter into Side Letters with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement.  Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such written agreements or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners.  Specifically, certain Insurance Company Limited Partners may have additional withdrawal rights not offered to other Limited Partners.  The other Limited Partners will have no recourse against the Partnership, the General Partner, the Investment Manager and/or any of their respective affiliates in the event that certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters.

<u>Broad Discretionary Power to Choose Investments and Strategies</u>.  The Investment Management Agreement gives the Investment Manager broad discretionary power to decide what investments the Partnership will make and what strategies it will use.  While the Investment Manager currently intends to use the strategies described in "INVESTMENT PROGRAM", it is not obligated to do so, and it may choose any other investments and strategies that it believes are advisable.

<u>Limitation of Liability and Indemnification of the General Partner, the Investment Manager and Affiliates</u>.  The Partnership Agreement provides that none of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct.  The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Investment Management Agreement also provides similar protections to the Investment Manager.  Therefore, a Limited Partner may have a more limited right of action against the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates than a Limited Partner would have had absent these provisions in the Partnership Agreement and the Investment Management Agreement. **It is the policy of the SEC that indemnification for violations of securities laws is against public policy and therefore unenforceable.**

<u>No Minimum Size of Partnership</u>.  The Partnership may begin or continue operations without attaining or maintaining any particular level of capitalization.  At low asset levels, the Partnership may be unable to make its investments as fully as would otherwise be desirable or to take advantage of potential economies of scale, including the ability to obtain the most timely and valuable research and trading information from securities brokers.  It is possible that even if the Partnership operates for a period with substantial capital, investors' withdrawals could diminish the Partnership assets to a level that does not permit the most efficient and effective implementation of the Partnership's investment program.  As a result of losses or withdrawals, the Partnership may not have sufficient capital to diversify its investments to the extent desired or currently contemplated by the Investment Manager.

<u>Portfolio Valuation</u>.  Valuation of the Partnership's portfolio, which will affect the amount of the Management Fee, involves uncertainties and determinations based on judgments.

002793

HCMLPHMIT00003975

Third-party pricing information may, at times, not be available regarding certain of the Partnership's investments. A disruption in the secondary markets for the Partnership's investments may limit the ability of the Partnership to obtain accurate market quotations for purposes of valuing its investments. In addition, material events occurring after the close of a principal market upon which a portion of the investments of the Partnership are traded may require it to make a determination of the effect of a material event on the value of the investments traded on the market for purposes of determining the value of the Partnership's investments on a valuation date. Further, because of the overall size and concentrations in particular markets and maturities of positions that may be held by the Partnership from time to time, the liquidation values of the Partnership's securities and other investments may differ significantly from the interim valuations of these investments derived from the valuation methods described herein. Moreover, because of the inherent uncertainty of valuing an illiquid security, the quoted valuation may be higher than the actual final liquidation value, and these differences could be material. If the Partnership's valuation should prove to be incorrect, the value of the Partnership's investments could be adversely affected.

**Liability of a Limited Partner for the Return of Capital Contributions**. If the Partnership should become insolvent, Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership in order to pay such Limited Partner's *pro rata* share of any Partnership liabilities that arose while such Limited Partner held Interests.

Under the Delaware Act, when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership was prohibited from making such distribution pursuant to the Delaware Act.

**Delayed Schedule K-1s**. The General Partner will endeavor to provide a Schedule K-1 to each Limited Partner for any given calendar year prior to April 15 of the following year. In addition, the Partnership will first have to receive a Schedule K-1 from each Portfolio Fund. In the event that the Schedule K-1 is not available by such date, a Limited Partner may have to request an extension of time to file or may have to pay taxes based on an estimated amount.

**Lack of Insurance**. The assets of the Partnership are not insured by any government or private insurer, except to the extent portions may be deposited in bank accounts insured by the United States Federal Deposit Insurance Corporation or with brokers insured by the Securities Investor Protection Corporation and such deposits and securities are subject to such insurance coverage (which, in any event, is limited in amount). Therefore, in the event of the insolvency of a depository or custodian, the Partnership may be unable to recover all of its funds or the value of its securities so deposited.

**Forward-Looking Statements; Opinions**. Statements contained in this Memorandum that are not historical facts are based on current expectations, estimates, projections, opinions and/or beliefs of the Partnership. Such statements involve known and unknown risks, uncertainties and other factors, and undue reliance should not be placed thereon. Moreover, certain information contained in this Memorandum constitutes "forward-looking" statements, which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those set forth herein, actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

<div align="right">

MARKET RISKS

</div>

**General**

**Competition Generally**. The securities industry and the varied strategies and techniques

002794

HCMLPHMIT00003976

to be engaged in by the Investment Manager are extremely competitive and each involves a degree of risk. The Partnership will compete with firms, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs. Further, lower fees for comparable services may be available from these or other firms.

<u>Market Volatility</u>. The profitability of the Partnership substantially depends upon the Investment Manager correctly assessing the future price movements of bonds, stocks, options on stocks, and other financial instruments, and the movements of interest rates. The Partnership cannot guarantee that the Investment Manager will be successful in accurately predicting those prices and interest rate movements.

<u>Partnership's Investment Activities</u>. The Partnership's investment activities involve a significant degree of risk. The performance of any investment is subject to numerous factors which are neither within the control of nor predictable by the Investment Manager. Such factors include a wide range of economic, political, competitive, technological and other conditions (including natural disasters, acts of terrorism and war) that may affect investments in general or specific industries or companies. The securities markets may be volatile, which may adversely affect the ability of the Partnership to realize profits. As a result of the nature of the Partnership's investing activities, it is possible that the Partnership's financial performance may fluctuate substantially over time and from period to period.

<u>Terrorist Actions</u>. There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in the global market. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced. The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

<u>Unforeseen Events</u>. The Partnership may be adversely affected by unforeseen events involving such matters as changes in interest rates or the credit status of an issuer, forced withdrawals of securities or acquisition proposals, break-up of planned mergers, unexpected changes in relative value, short squeezes, inability to short stock or changes in tax treatment.

<u>Potential Cybersecurity Breaches and Identity Theft</u>. The Investment Manager relies, to a certain extent, on the use of information technology. The Investment Manager's information and technology systems may be vulnerable to damage and/or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by its professionals, power outages, and/or catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time and/or cease to function properly, the Investment Manager and/or the Partnership may have to make a significant investment to fix or replace them. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's and/or the Partnership's operations and may result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors). Such a failure could harm the Investment Manager's and/or the Partnership's reputation, subject any such entity and their respective affiliates to legal claims and/or otherwise affect their business and financial performance.

<u>Long-Biased Investment Program</u>. The Investment Manager expects that its strategy with respect to the Partnership will have a long bias. Therefore, any decline in the overall market may result in a decline in the value of the Partnership's assets.

<u>Market Liquidity and Leverage</u>. The Partnership may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Partnership's ability to adjust its positions. The size of the Partnership's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in

002795

HCMLPHMIT00003977

overall market leverage, deleveraging as a consequence of a decision by the brokers and/or custodians, or other counterparties with which the Partnership enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Partnership's portfolio.

<u>Material Non-Public Information</u>.  By reason of their responsibilities in connection with other activities of the Investment Manager and/or its affiliates, the Principal or employees of the Investment Manager and/or its affiliates may acquire confidential or material non-public information or be restricted from initiating transactions in certain securities.  The Partnership will not be free to act upon any such information.  Due to these restrictions, the Partnership may not be able to initiate a transaction that it otherwise might have initiated and may not be able to sell an investment that it otherwise might have sold.

<u>Accuracy of Public Information</u>.  The Investment Manager may select investments for the Partnership, in part, on the basis of information and data filed by issuers with various government regulators or made directly available to the Investment Manager by the issuers or through sources other than the issuers.  Although the Investment Manager evaluates certain such information and data and sometimes seeks independent corroboration when the Investment Manager considers it is appropriate and when it is reasonably available, the Investment Manager is not in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information is not available.  Investments may not perform as expected if information is inaccurate.

<u>Directorships on Boards of Portfolio Companies</u>.  The principals and other members and employees of the Investment Manager or its designees may serve as directors of companies the securities of which are purchased or sold on behalf of the Partnership and may be compensated for such service.  In the event that material non-public information obtained with respect to such companies becomes subject to trading restrictions pursuant to the internal trading policies of such companies or as a result of applicable law or regulations, the Partnership may be prohibited for a period of time from purchasing or selling the securities of such companies, which prohibition may have an adverse effect on the Partnership.

<u>Short-Swing Liability and Other Limitations</u>.  From time to time, the Partnership, acting alone or as part of a group, may acquire beneficial ownership of more than 10% of a certain class of securities of a public company, or may place a director on the board of directors of such a company.  As a result, under Section 16 of the Exchange Act, the Partnership may be subject to certain additional reporting requirements and may be required to disgorge certain short-swing profits arising from purchases and sales of such securities.  In addition, in such circumstances the Partnership will be prohibited from entering into a short position in such issuer's securities, and therefore limited in its ability to hedge such investments.

<u>Disruptions or Inability to Trade Due to a Failure to Receive Timely and Accurate Market Data from Third-Party Vendors</u>.  The Investment Manager's strategy may depend on the receipt of timely and accurate market data from third-party vendors. Any failure to receive such data in a timely manner or the receipt of inaccurate data for any reason could disrupt and adversely affect the Partnership's trading until such failure or inaccuracy is corrected.

<u>Use of Automated Order Routing and Execution Systems Generally</u>.  The Investment Manager may use automated order routing and execution systems in its trading.  Such systems are typically provided on an "as is" basis.  Such systems may experience technical difficulties which may render them temporarily unavailable.  In addition, such systems may fail to properly perform.  Such failures may result in losses to the Partnership, for which losses the providers of such services have disclaimed all liability.  In an effort to mitigate such risks, the Investment Manager intends to closely monitor trades executed through automated order routing and execution systems and the operation of the systems themselves.

002796


HCMLPHMIT00003978

**Electronic Trading Facilities**.  The Partnership may make use of electronic trading facilities (including ECNs), which are generally supported by computer-based component systems for the order-routing, execution, matching, registration or clearing of trades.  As with all facilities and systems, they are vulnerable to temporary disruption or failure.  Trading on an electronic trading system (including an ECN) may differ not only from trading in an open-outcry market or telephonic market but also from trading on other electronic trading systems. The Partnership, in undertaking transactions on an electronic trading system, will be exposed to risk associated with the system including the failure of hardware and software. The result of any system failure may be that the Partnership's order is either not executed according to its instructions or is not executed at all.  The Partnership's ability to limit or recover certain losses may be subject to limits on liability imposed by, without limitation, foreign or domestic law or regulation, the Partnership's own or its broker's internet service provider, other systems providers, market factors, foreign or domestic banking or other market regulations and/or telephonic or other communications providers, foreign or domestic.

**Technology Risk**.  The Investment Manager's investment strategy may rely on the use of proprietary and non-proprietary software, data and intellectual property.  Any such reliance on this technology and data is subject to a number of important risks.  First, the Partnership may be severely and adversely affected by the malfunction of the technology and/or data feed.  For example, an unforeseeable software or hardware malfunction could occur, as a result of a virus or other outside force, or as result of a design flaw in the Partnership's system or in its continued implementation.  In the past, occurrences of this nature to other funds have sometimes resulted in dramatically negative consequences for the portfolio of the related fund.  In addition, changes in the market for publicly available data or in regulatory reporting requirements could cause a severe diminution in the data available for the technology to operate as designed.  Such events can also have dramatically negative consequences for the Partnership.  Furthermore, if any of the Partnership's software, hardware, data and/or other intellectual property is found to infringe on the rights of any third party, the Partnership could be severely and adversely affected.

**Trading Errors**.  The Investment Manager's computerized trading systems rely on the ability of the Investment Manager's personnel to accurately process such systems' outputs and to use the proper trading orders, including stop-loss or limit orders, to execute the transactions called for by the systems. In addition, the Investment Manager relies on its staff to properly operate and maintain the computer and communication systems upon which the trading systems rely.  The Investment Manager's systems are accordingly subject to human errors, including the failure to implement, or the inaccurate implementation of any of the Investment Manager's systems, in addition to errors in properly executing transactions.  This could cause substantial losses on transactions, and any such losses could substantially and adversely affect the performance of the Partnership.  See "BROKERAGE PRACTICES–Trade Error Policy" herein.

**Co-Investments with Third Parties**.  The Partnership may co-invest with third parties through joint ventures or other entities.  Such investments may involve risks in connection with such third- party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are inconsistent with those of the Partnership or be in a position to take (or block) action in a manner contrary to the Partnership's investment objectives.  In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements.    Such compensation arrangements will reduce the returns to participants in the investments.

**Other Investment Vehicles; Limited Recourse**.  The Investment Manager may allocate a portion of the Partnership's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers.  Such investment vehicles may trade wholly-independently of one another and may at times hold economically-offsetting positions.  To the extent that such investment vehicles do, in fact, hold such positions, the Partnership, considered as a whole, may not achieve any gain or loss despite incurring expenses.  Additionally, a creditor having a claim that relates to a

002797

HCMLPHMIT00003979

particular investment held by any such investment vehicle may be able to satisfy such claim against all assets of such investment vehicle, without regard to the participation rights of the Partnership and other investors of such investment vehicle in the assets of such investment vehicle.

Since the Partnership may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region.  Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist).  Even in the event that such information may be available to the Partnership, the Partnership's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

**Risks Associated with ETFs**.  The Partnership may invest in ETFs.  ETFs represent an interest in a passively managed portfolio of securities and financial instruments selected to replicate a securities or financial instruments index.  Unlike open-end mutual funds, the shares of ETFs are not purchased and redeemed by investors directly with the ETF, but instead are purchased and sold through broker-dealers in transactions on an exchange.  Because ETF shares are traded on an exchange, they may trade at a discount from or a premium to the net asset value per share of the underlying portfolio of securities or financial instruments.  In addition to bearing the risks related to investments in securities or financial instruments, investors in ETFs intended to replicate an index bear the risk that the ETFs performance may not correctly replicate the performance of the index.  Investors in ETFs, closed-end funds and other investment companies bear a proportionate share of the expenses of those funds, including management fees, custodial and accounting costs, and other expenses.  As such, the Partnership is subject to layering of such fees.  Trading in ETF and closed-end fund shares also entails payment of brokerage commissions and other transaction costs.

**Illiquid Securities**.  From time to time, the Partnership may invest in financial instruments that are not publicly traded.  The Partnership may also invest in securities and other financial instruments that trade regularly but may be only thinly traded, either periodically or on an on-going basis.  The Partnership may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a specified period of time.  Accordingly, the Partnership may be forced to sell its more liquid positions at a disadvantageous time, resulting in a greater percentage of the portfolio consisting of illiquid securities.  In addition, the market prices, if any, for such financial instruments tend to be volatile, and the Partnership may not be able to sell them when it desires to do so or to realize what it perceives to be their fair value in the event of a sale.  The sale of illiquid securities also often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets.  Furthermore, there may be limited information available about the assets of such issuers of the financial instruments which may make valuation of such financial instruments difficult or uncertain.  It also should be noted that, even those markets which the Investment Manager expects to be liquid can experience periods, possibly extended periods, of illiquidity.

**Investments in Securities and Other Assets Believed to Be Undervalued**.  The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in securities and other assets that the Investment Manager believes to be undervalued.  The identification of such investment opportunities is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired.  While such investments offer the opportunities for above-average capital appreciation, they also involve a high degree of financial risk and can result in substantial losses.  Returns generated from the Partnership's investments may not adequately compensate for the business and financial risks assumed.  The current economic conditions and any future major economic recession can severely disrupt the

002798


HCMLPHMIT00003980

markets for such investments and significantly impact their value.  In addition, any such economic downturn can adversely affect the ability of the issuers of such obligations to repay principal and pay interest thereon and increase the incidence of default for such securities.  Additionally, there can be no assurance that other investors will ever come to realize the value of some of these investments, and that they will ever increase in price. Furthermore, the Partnership may be forced to hold such investments for a substantial period of time before realizing their anticipated value.  During this period, a portion of the Partnership's funds would be committed to the investments made, thus possibly preventing the Partnership from investing in other opportunities.

<u>Short Sales</u>.  The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in selling securities short.  Although the Investment Manager may sell short a variety of assets, it expects most short trades to be in equity securities.  Short selling involves the sale of a security that the Partnership does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price.  In order to make delivery to the purchaser, the Partnership must borrow securities from a third-party lender.    The Partnership subsequently returns the borrowed securities to the lender by delivering to the lender the securities it receives in the transaction or by purchasing securities in the open market. The Partnership must generally pledge cash with the lender equal to the market price of the borrowed securities.  This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities.  During the period in which the securities are borrowed, the lender typically retains its right to receive interest and dividends accruing to the securities.  In exchange, in addition to lending the securities, the lender generally pays the Partnership a fee for the use of the Partnership's cash.  This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed.  In addition, the supply of securities that can be borrowed fluctuates from time to time.  The Partnership may be subject to substantial losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

<u>Small Companies</u>.  The Investment Manager may invest a portion of the Partnership's assets in small and/or unseasoned companies with small market capitalizations.  While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification and competitive strength of larger companies.  In addition, in many instances, the frequency and volume of their trading may be substantially less than is typical of larger companies.  As a result, the securities of smaller companies may be subject to wider price fluctuations.  When making large sales, the Partnership may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the lower trading volume of smaller company securities.

<u>Leverage</u>.   When deemed appropriate by the Investment Manager and subject to applicable regulations, the Partnership will incur leverage in its investment program, whether directly through the use of borrowed funds, or indirectly through investment in certain types of financial instruments with inherent leverage, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market price of those underlying securities.  While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss.  To the extent that the Partnership purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Partnership.  If the interest expense on this leverage were to exceed the net return on the investments made with borrowed funds, the Partnership's use of leverage would result in a lower rate of return than if the Partnership were not leveraged.

002799

HCMLPHMIT00003981

If the amount of leverage which the Partnership may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Partnership's portfolio will have disproportionately large effects in relation to the Partnership's capital and the possibilities for profit and the risk of loss will therefore be increased.  Any investment gains made with the additional leverage will generally cause the Net Asset Value of the Partnership to rise more rapidly than would otherwise be the case.  Conversely, if the investment performance of the leveraged capital fails to cover its cost to the Partnership, the Net Asset Value of the Partnership will generally decline faster than would otherwise be the case.

Certain of the Partnership's trading and investment activities in securities and other financial instruments may be subject to Federal Reserve Board margin requirements, which are computed each day.  When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made.  If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customer's position may be closed out.  In the event of a precipitous drop in the value of the assets managed by the Partnership, the Partnership might not be able to liquidate assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses.  With respect to the Partnership's trading activities, the Partnership, and not the Limited Partners personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss.

**Options and Other Derivative Instruments**.  The Investment Manager may invest, from time to time, a portion of the Partnership's assets in options and derivative instruments, including buying and writing puts and calls on some of the securities held by the Partnership.  The prices of many derivative instruments, including many options and swaps, are highly volatile.  The value of options and swap agreements depend primarily upon the price of the securities, indexes, currencies or other instruments underlying them.  Price movements of options contracts and payments pursuant to swap agreements are also influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies.  The Partnership is also subject to the risk of the failure of any of the exchanges on which its positions trade or of their clearinghouses or of counterparties.  The cost of options is related, in part, to the degree of volatility of the underlying securities, currencies or other assets.  Accordingly, options on highly volatile securities, currencies or other assets may be more expensive than options on other investments.

Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument or asset on which they are purchased or sold.  A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer the obligation to buy, the underlying security, index, currency or other instrument or asset at the exercise price.  A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument or asset at the exercise price.

If a put or call option purchased by the Partnership were permitted to expire without being sold or exercised, the Partnership would lose the entire premium it paid for the option.  The risk involved in writing a put option is that there could be a decrease in the market value of the underlying instrument or asset caused by rising interest rates or other factors.  If this occurred, the option could be exercised and the underlying instrument or asset would then be sold to the Partnership at a higher price than its current market value.  The risk involved in writing a call option is that there could be an increase in the market value of the underlying instrument or asset caused by declining interest rates or other factors.  If this occurred, the option could be exercised and the underlying instrument or asset would then be sold by the Partnership at a lower price than its current market value.

Purchasing and writing put and call options and, in particular, writing "uncovered" options

002800


HCMLPHMIT00003982

are highly specialized activities and entail greater than ordinary investment risks.  In particular, the writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying instrument or asset above the exercise price of the option.  This risk is enhanced if the instrument or asset being sold short is highly volatile and there is a significant outstanding short interest.  These conditions exist in the stocks of many companies.  The instrument or asset necessary to satisfy the exercise of the call option may be unavailable for purchase except at much higher prices.  Purchasing instruments or assets to satisfy the exercise of the call option can itself cause the price of the instruments or assets to rise further, sometimes by a significant amount, thereby exacerbating the loss.  Accordingly, the sale of an uncovered call option could result in a loss by the Partnership of all or a substantial portion of its assets.

Swaps and certain options and other custom instruments are subject to the risk of non-performance by the counterparty, including risks relating to the financial soundness and creditworthiness of the counterparty.

**Hedging Transactions.**  Investments in financial instruments such as options and interest rate swaps, caps and floors, and other derivatives are commonly utilized by investment funds to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, interest rates and/or the equity markets or sectors thereof.  Any hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value.  Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase.  Moreover, it may not be possible for the Partnership to hedge against a fluctuation at a price sufficient to protect the Partnership's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations.  For example, the cost of options is related, in part, to the degree of volatility of the underlying instruments or assets.  Accordingly, options on highly volatile instruments or assets may be more expensive than options on other instruments or assets and of limited utility in hedging against fluctuations in their prices.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so.  To the extent that hedges are implemented, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

**Market or Interest Rate Risk.**  The Partnership may, from time to time, invest in fixed income securities and instruments.  The price of most fixed income securities move in the opposite direction of the change in interest rates.  For example, as interest rates rise, the prices of fixed income securities fall.  If the Partnership holds a fixed income security to maturity, the change in its price before maturity may have little impact on the Partnership's performance.  However, if the Partnership has to sell the fixed income security before the maturity date, an increase in interest rates could result in a loss to the Partnership.

**Callable Securities.**  Many bonds, including agency, corporate and municipal bonds, and mortgage-backed securities, sometimes contain a provision that allows the issuer to "call" (i.e., redeem) all or part of the issue before the bond's maturity date.  The issuer usually retains this right to refinance the bond in the future if market interest rates decline below the coupon rate on the outstanding debt security.  From the investor's perspective, there are three disadvantages to the call provision.  First, the cash flow pattern of a callable bond is not known with certainty.  Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk – the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates.  Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**Maturity Risk.**  In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity.  Ordinarily, under these

002801

HCMLPHMIT00003983

circumstances, the Partnership will make an adjustment to account for the interest rate risk differential in the two bonds.  This adjustment, however, makes an assumption about how the interest rates at different maturities will move.  To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk.  Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

<u>Inflation Risk</u>.  Inflation risk results from the variation in the value of cash flows from a fixed income security or instrument due to inflation, as measured in terms of purchasing power.  For example, if the Partnership purchases a 5-year bond with a coupon rate of 5%, but the rate of inflation is 6%, then the purchasing power of the cash flow has declined.  For all but inflation-linked bonds, adjustable bonds or floating rate bonds, the Partnership is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security.  To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

<u>Downgrades in Fixed Income Debt Securities</u>.  Unless required by applicable law, the Partnership is not required to sell or dispose of any debt security that either loses its rating or has its rating reduced after the Partnership purchases such security.

<u>Investments in Non-U.S. Investments</u>.  From time to time, the Investment Manager may invest and trade a portion of the Partnership's assets in non-U.S. securities and other assets (through ADRs and otherwise), which will give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and non-U.S. issuers and markets are subject.  Such risks may include:

- Political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.

- Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.

- Non-U.S. securities and other assets often trade in currencies other than the U.S. dollar, and the Partnership may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts.  Changes in currency exchange rates will affect the Partnership's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of investments.  An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Partnership's investments to decline.  Some foreign currencies are particularly volatile.  Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of the Partnership's foreign currency holdings.  If the Partnership enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates.  On the other hand, if the Partnership enters forward contracts for the purpose of increasing return, it may sustain losses.

- Non-U.S. securities and other markets may be less liquid, more volatile and less closely supervised by the government than in the United States.  Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about the operations of issuers in such markets.

<u>Risks Associated with ADRs</u>.  The Partnership may purchase ADRs, which are certificates evidencing ownership of shares of a non-U.S. issuer, acting as alternatives to directly purchasing the underlying non-U.S. securities in their national markets and currencies.  Such investments are subject to many of the risks associated with investing directly in non-U.S. securities.  These risks include the political and economic risks of the underlying issuer's country, as well as, in the case of depositary receipts traded on non-U.S. markets, foreign exchange risk.  ADRs may be sponsored or unsponsored.  Unsponsored ADRs are established without the participation of the issuer.  In addition, unsponsored ADRs may involve higher expenses, may not carry pass-through voting or

002802

HCMLPHMIT00003984

other shareholder rights, and may be less liquid.  The performance of ADRs may be different from the performance of the ordinary shares of the non-U.S. issuers to which they relate.

**Emerging Markets**.  The Partnership may invest a portion of its assets in investments related to emerging market countries.  The securities markets of emerging market countries as a whole have been volatile and the loans and securities of issuers in emerging markets tend to be subject to abrupt or erratic price movements.  Investing a significant portion of the Partnership's assets in issuers in emerging markets will make the Partnership susceptible to a greater degree than otherwise would be the case to factors affecting emerging markets in general and issuers in emerging markets included in the Partnership's portfolio in particular, and may increase the volatility of the value of the Partnership's portfolio investments.  The economies of these markets may differ significantly from the economies of certain developed countries in such respects as gross domestic product or gross national product, rate of inflation, currency depreciation, capital reinvestment, resource self-sufficiency, structural unemployment and balance of payments position.  In particular, these economies frequently experience high levels of inflation.  In addition, such countries may have:  (1) restrictive national policies that limit the Partnership's investment opportunities; (2) limited information about their issuers; (3) a general lack of uniform accounting, auditing and financial reporting standards, auditing practices and requirements compared to the standards of developed countries; (4) less governmental supervision and regulation of business and industry practices, securities exchanges, brokers and listed companies; (5) economic developments that may be slowed or reversed by unanticipated political or social events in such countries; and (6) a lack of capital market structure or market-oriented economy.

Systemic and market factors may affect the acquisition, payment for or ownership of investments including:  (a) the prevalence of crime and corruption; (b) the inaccuracy or unreliability of business and financial information; (c) the instability or volatility of:  (i) banking and financial systems, or the absence or inadequacy of an infrastructure to support such systems, (ii) custody and settlement infrastructure of the market in which such investments are traded and held, and (iii) the acts, omissions and operation of any securities depository; (d) the risk of the bankruptcy or insolvency of banking agents, counterparties to cash and securities transactions, registrars or transfer agents; and (e) the existence of market conditions that prevent the orderly execution or settlement of transactions or that affect the value of assets.  Different clearance and settlement procedures may prevent the Partnership from making intended security purchases causing the Partnership to miss attractive investment opportunities, possibly resulting in either losses to or contract claims against the Partnership.  The investment markets of many of the countries in which the Partnership may invest may also be smaller, less liquid, and subject to greater price volatility than developed markets.  The Partnership's assets may be denominated in a variety of currencies subject to changes in currency exchange rates and in exchange control regulations.

**Volatility of Currency Prices**.  In general, price movements of currencies are difficult to predict accurately because they are influenced by, among other things, changing supply and demand relationships; governmental, trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates.  Governments from time to time intervene in certain markets in order to influence prices directly.

**Currency Control**.  It is sometimes the case that governments alter the exchange rate policy of a currency without advance notice, and it may not always be possible to foresee a change in policy.

**Exchange Rate Fluctuations**.  Investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies.  The Partnership intends to value its holdings and to make distributions in U.S. dollars.  Thus, changes in currency exchange rates adverse to the U.S. dollar may affect adversely the value of such holdings.  Among the factors that may affect currency values are trade balances, the appropriateness of interest rates, the shape of the yield curve, the degree of central bank independence and credibility, differences in relative values of similar assets in different currencies, long-term opportunities for

002803


HCMLPHMIT00003985

investment and capital appreciation and political developments.

**Risks of Trading Futures**.  The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the CEA that provides an exemption from registration as a commodity pool operator.  Trading futures is a highly risky strategy.  Whenever the Partnership purchases a particular future, there is a possibility that the Partnership may sustain a total loss of its purchase price.  The equity values of leveraged positions using futures are, in general, much more volatile than the prices of securities, such as stocks and bonds.  As a result, the risk of loss in trading futures is substantially greater than in trading those securities.  The prices of futures react strongly to the prices of the underlying commodities.  The prices of these underlying products, in turn, rise and fall based on changes in interest rates, international balances of trade, changes in governments, wars, weather events and a host of other factors that are entirely beyond the Investment Manager's control and very difficult (and perhaps impossible) to predict.

**Forward Trading**.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable.  The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration.  There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  Disruptions can occur in any market traded by the Partnership due to unusual trading volume, political intervention or other factors.  The imposition of controls by governmental authorities might also limit such forward trading to less than that which the Investment Manager would otherwise recommend, to the possible detriment of the Partnership. Market illiquidity or disruption could result in major losses to the Partnership.

**Over-the-Counter-Trading**.  Financial instruments that may be purchased or sold by the Partnership may include instruments not traded on an exchange.  The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Partnership can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument.  In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange.  Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Partnership engages in these transactions, the Partnership must rely on the creditworthiness of its counterparty.  In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades.  To reduce their credit risk exposure, the Partnership may trade in the forward foreign currency market through money center banks and leading brokerage firms.

**Position Limits**.  Position limits imposed by various regulators or regulations may also limit the Partnership's ability to affect desired trades.  Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument.  All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded.  Thus, even if the Partnership does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated.  If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Partnership, to the extent necessary to come within those limits.  Further, to avoid exceeding the position limits, the Partnership might have to forego

002804


HCMLPHMIT00003986

or modify certain of its contemplated trades.

<u>**Risk of Default or Bankruptcy of Third Parties**</u>.  The Partnership may engage in transactions in securities and other financial instruments and assets that involve counterparties.  Under certain conditions, the Partnership could suffer losses if a counterparty to a transaction were to default or if the market for certain securities or other financial instruments or assets were to become illiquid.  In addition, the Partnership could suffer losses if there were a default or bankruptcy by certain other third parties, including brokerage firms and banks with which the Partnership does business, or to which securities or other financial instruments or assets have been entrusted for custodial purposes.

<u>**Custody and Brokerage Risk**</u>.  There are risks involved in dealing with the custodians or other brokers who settle Partnership trades. The Partnership maintains custody accounts with the Custodian.  Although the Investment Manager generally monitors both the Introducing Broker and the Custodian and believes they are appropriate service providers, there is no guarantee that such service providers, or any other introducing broker and/or clearing broker and custodian that the Partnership may use from time to time, will not become bankrupt or insolvent.  While both the U.S. Bankruptcy Code, as amended, and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a bankruptcy, insolvency, failure, or liquidation of a broker-dealer, there is no certainty that, in the event of a failure of a broker-dealer that has custody of Partnership assets, the Partnership would not incur losses due to its assets being unavailable for a period of time, the ultimate receipt of less than full recovery of its assets, or both.

The Partnership and/or the Custodian may appoint sub-custodians in certain non-U.S. jurisdictions to hold the assets of the Partnership. The Custodian may not be responsible for cash or assets which are held by sub-custodians in certain non-U.S. jurisdictions, nor for any losses suffered by the Partnership as a result of the bankruptcy or insolvency of any such sub-custodian.  The Partnership may therefore have a potential exposure on the default of any sub-custodian and, as a result, many of the protections that would normally be provided to a fund by a custodian may not be available to the Partnership.  Under certain circumstances, including certain transactions where the Partnership's assets are pledged as collateral for leverage from a non-broker-dealer custodian or a non-broker-dealer affiliate of the Custodian, or where the Partnership's assets are held at a non-U.S. custodian, the securities and other assets deposited with the custodian or broker may not be clearly identified as being assets of the Partnership and hence the Partnership could be exposed to a credit risk with regard to such parties.  Custody services in certain non-U.S. jurisdictions remain undeveloped and, accordingly, there is a transaction and custody risk of dealing in certain non-U.S. jurisdictions.  Given the undeveloped state of regulations on custodial activities and bankruptcy, insolvency, or mismanagement in certain non-U.S. jurisdictions, the ability of the Partnership to recover assets held by a sub-custodian in the event of the sub-custodian's bankruptcy or insolvency could be in doubt, as the Partnership may be subject to significantly less favorable laws than many of the protections that would be available under U.S. laws.  In addition, there may be practical or time problems associated with enforcing the Partnership's rights to its assets in the case of a bankruptcy or insolvency of any such party.

<u>**Temporary Defensive Investments**</u>.  If warranted under certain economic or market conditions or for other reasons, the Investment Manager may temporarily invest up to 100% of the Partnership's assets outside the scope of its principal investment focus in U.S. government securities, such as Treasury bills, notes and bonds, cash, money-market funds, certificates of deposit, time deposits, bankers' acceptances and other short-term debt instruments bearing a reasonable rate of interest.  In such circumstances, the Partnership may not achieve its investment objectives.

<u>**Other Instruments**</u>.  The Partnership may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Partnership and legally permissible. Special risks may apply to instruments that are invested in by the Partnership in the future that cannot be determined at this time or until such instruments are developed or invested

002805


HCMLPHMIT00003987

in by the Partnership.

**Specific Risks Associated with Investing in Bank Loans**

You should note that certain of the following risk factors specifically applicable with respect to Bank Loans have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Senior Loans Risk**.  Senior loans are usually rated below investment grade or may also be unrated.  As a result, the risks associated with senior loans are similar to the risks of below investment grade fixed income instruments, although senior loans are senior and secured in contrast to other below investment grade fixed income instruments, which are often subordinated or unsecured.  Investment in senior loans rated below investment grade is considered speculative because of the credit risk of their issuers.  Such companies are more likely than investment grade issuers to default on their payments of interest and principal owed to the Partnership, and such defaults could have a materially adverse effect on the Partnership's performance.  An economic downturn would generally lead to a higher non-payment rate, and a senior loan may lose significant market value before a default occurs.  Moreover, any specific collateral used to secure a senior loan may decline in value or become illiquid, which would adversely affect the senior loan's value.  Senior loans are subject to a number of risks described elsewhere in this Memorandum, including liquidity risk and the risk of investing in below investment grade fixed income instruments.

There may be less readily available and reliable information about most senior loans than is the case for many other types of securities, including securities issued in transactions registered under the Securities Act or registered under the Exchange Act.  As a result, the Investment Manager will rely primarily on its own evaluation of a borrower's credit quality rather than on any available independent sources.  Therefore, the Partnership will be particularly dependent on the analytical abilities of the Investment Manager.

In general, the secondary trading market for senior loans is not well developed.  No active trading market may exist for certain senior loans, which may make it difficult to value them.  Illiquidity and adverse market conditions may mean that the Partnership may not be able to sell senior loans quickly or at a fair price.  To the extent that a secondary market does exist for certain senior loans the market for them may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods.

**Variable Interest Rate Risk**.  Because senior loans with floating or variable rates reset their interest rates periodically, changes in prevailing interest rates can be expected to cause some fluctuations in the value of the Partnership's investments.  Similarly, a sudden and significant increase in market interest rates may cause a decline in the value of the Partnership's investments.  In addition, senior loans or similar securities may allow the borrower or issuer to opt between LIBOR-based interest rates and interest rates based on bank prime rates, which may have an impact on value of the Partnership's investments.

**Bank Loans**.  The Partnership's investment program will include investments in significant amounts of Bank Loans and participations.  These obligations are subject to unique risks, including:  (i) the possible invalidation of an investment transaction as a fraudulent conveyance under relevant creditors' rights laws; (ii) so-called lender-liability claims by the issuer of the obligations; (iii) environmental liabilities that may arise with respect to collateral securing the obligations; and (iv) limitations on the ability of the Partnership to directly enforce its rights with respect to participations.  In analyzing each Bank Loan or participation, the Investment Manager compares the relative significance of the risks against the expected benefits of the investment.  Successful claims by third parties arising from these and other risks will be borne by the Partnership.

**DIP Loans**.  From time to time, the Partnership may invest in loans to companies that have filed for protection under Chapter 11 of the U.S. Bankruptcy Code, as amended.  DIP loans are typically asset-based, revolving working-capital facilities put into place at the outset of a Chapter 11 bankruptcy to provide both immediate cash as well as ongoing

002806

HCMLPHMIT00003988

working capital during the reorganization process.  Such loans are risky and present significant exposure for default risk to the Partnership.

**Adjustments to Terms of Investments**.  The terms and conditions of loan agreements and related assignments may be amended, modified or waived only by the agreement of the lenders.  Generally, any such agreement must include a majority or a super majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders.  Consequently, the terms and conditions of the payment obligation arising from loan agreements could be modified, amended or waived in a manner contrary to the preferences of the Partnership if a sufficient number of the other lenders concurred with such modification, amendment or waiver.  There can be no assurance that any obligations arising from a loan agreement will maintain the terms and conditions to which the Partnership originally agreed.

The exercise of remedies may also be subject to the vote of a specified percentage of the lenders thereunder.  The Investment Manager will have the authority to cause the Partnership to consent to certain amendments, waivers or modifications to the Partnership's investments requested by obligors or the lead agents for loan syndication agreements.  The Investment Manager may, in accordance with its investment management standards, cause the Partnership to extend or defer the maturity, adjust the outstanding balance of any investment, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder.  The Investment Manager will make such determinations in accordance with its investment management standards.  Any amendment, waiver or modification of the terms of an investment could adversely impact the Partnership's investment returns.

**Prepayments**.  Certain of the Partnership's investments may be prepaid more quickly than expected.  Prepayment rates are influenced by changes in interest rates and a variety of economic, geographic and other factors beyond the Partnership's control and consequently cannot be predicted with certainty.  Early prepayments give rise to increased re-investment risk, as the Partnership might realize excess cash earlier than it expected.  If the Partnership is unable to reinvest the principle portion of a prepayment in a new investment with an expected rate of return at least equal to that of the investment repaid, this may reduce the Partnership's net investment income and, consequently, could have an adverse impact on the Partnership's ability to make distributions.

**Investments in Loans Secured by Real Estate**.  While direct real estate investment is not intended to be the focus of the Partnership, it is possible that, from time to time, the Partnership may, as a result of default, foreclosure or otherwise, hold real estate assets.  Special risks associated with such investments include changes in the general economic climate or local conditions (such as an oversupply of space or a reduction in demand for space), competition based on rental rates, attractiveness and location of the properties, changes in the financial condition of tenants, and changes in operating costs.  Real estate values are also affected by such factors as government regulations (including those governing usage, improvements, zoning and taxes), interest rate levels, the availability of financing, and potential liability under changing environmental and other laws.  Of particular concern may be those mortgaged properties which are, or have been, the site of manufacturing, industrial or disposal activity.  Such environmental risks may give rise to a diminution in the value of property (including real property securing any portfolio investment) or liability for cleanup costs or other remedial actions, which liability could exceed the value of such property or the principal balance of the related portfolio investment.  In certain circumstances, a lender may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

**Environmental Hazards**.  Under environmental laws enacted by the United States and the various states, owners of property may be liable for the cleanup and removal of hazardous substances even where the owner was not responsible for placing the hazardous substances on the property or where the property was contaminated prior to the time the owner took title.  The kinds of hazardous substances for which liability may be incurred include, among other things, chemicals and other materials commonly used by

002807

HCMLPHMIT00003989


small businesses and manufacturing operations. The costs of removal and clean-up of hazardous substances and wastes can be extremely expensive and, in some cases, can exceed the value of a property. If any property acquired by the Partnership through foreclosure or otherwise subsequently were found to have an environmental problem, such acquiring entity could incur substantial costs and suffer a complete loss of its investment in such property as well as of other assets. Similarly, real estate is subject to loss due to so-called "special hazards" (e.g., floods, earthquakes and hurricanes). It may be impractical or impossible to fully insure against such events and, should such an event occur, the Partnership could incur substantial costs and suffer a loss of its investment in such property.

<u>Fraud</u>. Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Partnership to perfect or effectuate a lien on the collateral securing the loan. The Partnership will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Partnership may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

<u>Debt Securities</u>. The Partnership intends to invest in bonds or other fixed income securities, including, without limitation, commercial paper and "higher yielding" (and, therefore, higher risk) debt securities. It is likely that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

<u>Investing in High Yield Securities</u>. The Partnership intends to invest in high-yield securities. Such securities are generally not exchange traded and, as a result, these instruments trade in the over-the-counter marketplace, which is less transparent than the exchange-traded marketplace. In addition, the Partnership will invest in bonds of issuers that do not have publicly traded equity securities, making it more difficult to hedge the risks associated with such investments. High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments. The market values of certain of these lower- rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities. Companies that issue such securities are often highly leveraged and may not have available to them more traditional methods of financing. It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

<u>Timing Risk</u>. Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk, i.e., the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

<u>Maturity Risk</u>. In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these

002808


HCMLPHMIT00003990

circumstances, the Partnership will make an adjustment to account for the differential interest rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

**Revolving Credit Facilities**. From time to time the Partnership may incur contingent liabilities in connection with an investment. For example, the Partnership may purchase from a lender a revolving credit facility that has not yet been fully drawn. If the borrower subsequently draws down on the facility, the Partnership would be obligated to fund the amounts due.

**Investments in Stressed Debt**. The Partnership is authorized to invest in securities and other obligations of stressed issuers. Stressed issuers are issuers that are not yet deemed distressed or bankrupt and whose debt securities are trading at a discount to par, but not yet at distressed levels. An example would be an issuer that is in technical default of its credit agreement, or undergoing strategic or operational changes, which results in market pricing uncertainty.

**Investments in Distressed Securities**. The Partnership may invest in securities and obligations of issuers in weak financial condition, experiencing poor operating results, having substantial capital needs or negative net worth, facing special competitive or product obsolescence problems, including companies involved in bankruptcy or other reorganization and liquidation proceedings. These securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns. Among the risks inherent in investments in troubled entities is the fact that it frequently may be difficult to obtain information as to the true condition of such issuers. Such investments may also be adversely affected by laws relating to, among other things, fraudulent transfers and other voidable transfers or payments, lender liability and the bankruptcy court's power to disallow, reduce, subordinate or disenfranchise particular claims. Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry or specific developments within such companies. In addition, there is no minimum credit standard that is a prerequisite to the Partnership's investment in any instrument, and a significant portion of the obligations and securities in which the Partnership invests may be less than investment grade. The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial difficulties is unusually high. There is no assurance that the Investment Manager will correctly evaluate the value of the assets collateralizing the Partnership's loans or the prospects for a successful reorganization or similar action. In any reorganization or liquidation proceeding relating to a company in which the Partnership invests, the Partnership may lose its entire investment, may be required to accept cash or securities with a value less than the Partnership's original investment and/or may be required to accept payment over an extended period of time. Under such circumstances, the returns generated from the Partnership's investments may not compensate the Limited Partners adequately for the risks assumed. In liquidation (both in and out of bankruptcy) and other forms of corporate reorganization, there exists the risk that the reorganization either will be unsuccessful (due to, for example, failure to obtain requisite approvals), will be delayed (for example, until various liabilities, actual or contingent, have been satisfied) or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Partnership of the security in respect to which such distribution was made.

**Troubled Origination**. The investments chosen by the Investment Manager may have been originated by financial institutions or other entities that are, or may be in the future be, insolvent, in serious financial difficulty, or no longer in existence. As a result, the standards by which such investments were originated, the recourse to the selling institution, or the standards by which such investments are being serviced or operated

002809


HCMLPHMIT00003991

may be adversely affected.

**Issuer Default Risk; Negative Loan Performance**. There are varying sources of statistical default and recovery rate data for commercial loans and numerous methods for measuring default and recovery rates. The levels of defaults and delinquencies with respect to loans have been increasing, and slowing economic activity continues to contribute to a decline in overall credit quality. The historical performance of the loan market is not necessarily indicative of its future performance, and there is no way to determine whether such trends in the credit markets will improve or worsen in the future.

A substantial portion of the Partnership's income is expected to be derived, directly or indirectly, from repayments of principal and interest received in respect of debt securities. A wide range of factors may adversely affect an obligor's ability to make repayments, including: adverse changes in the financial condition of such obligor or the industries or regions in which it operates; the obligor's exposure to counterparty risk; systemic risk in the financial system and settlement; changes in law or taxation; changes in governmental regulations or other policies; natural disasters; terrorism; social unrest, civil disturbances; or general economic conditions. Default rates tend to accelerate during economic downturns. A continuing decreased ability of borrowers to obtain refinancing may result in a further economic decline that could delay an economic recovery and cause a further deterioration in loan performance generally.

To the extent that the Partnership invests in debt securities secured by collateral, there can be no assurance that the liquidation of any collateral securing any of the Partnership's investments would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that the collateral could be readily liquidated. In the event of bankruptcy or insolvency of a borrower, the Partnership could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing such investment. The collateral securing an investment may lose all or substantially all of its value in the event of the bankruptcy or insolvency of a borrower.

Any defaults will have a negative impact on the value of the Partnership's investments and may reduce the return that such Partnership receives from its investments in certain circumstances. While some amount of defaults is expected to occur in the Partnership's portfolio, in the event that the Partnership elects to apply leverage to an investment, defaults in or declines in the value of the portfolio investments in excess of these expected amounts may result in breaches of covenants under applicable financing arrangements, triggering credit enhancement requirements or accelerated repayment provisions and, if not cured within the relevant grace periods, permitting the finance provider to enforce its security over all the assets of the Partnership.

In the case of debt ranking equally with the loans or debt securities in which the Partnership invests, the Partnership would have to share on an equal basis any distributions with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the relevant company's debt securities. Each jurisdiction in which the Partnership invests has its own insolvency laws. As a result, investments in similarly situated companies in different jurisdictions may confer different rights in the event of insolvency.

**Nature of Reorganization Proceedings**. The Partnership will hold debt of companies and may, under certain circumstances, hold equity of companies as a result of the recapitalization or restructuring of debt obligations. Investments in the debt or equity of companies involved in reorganization proceedings typically entail a number of risks that do not normally apply to investments in financially sound companies. For example, if the Investment Manager's evaluation of the anticipated outcome of a reorganization or the timing of such outcome should prove incorrect, the Partnership could experience losses. A wide variety of considerations make any evaluation of the outcome of an investment in such a company uncertain. Such considerations include, for example, the possibility of litigation between the participants in a reorganization or liquidation proceeding or a requirement to obtain mandatory or discretionary consents from various governmental authorities or others. The uncertainties inherent in evaluating such investments may be

002810

HCMLPHMIT00003992

increased by legal and practical considerations which limit the access of the Investment Manager to reliable and timely information concerning material developments affecting a company, or which cause lengthy delays in the completion of a reorganization or liquidation proceeding. Competition from other investors may also render it difficult or impossible for the Partnership to achieve intended results or promptly effect transactions.

**Insolvency and Enforceability of Security.** The Partnership's investments may be secured by mortgages, charges, pledges, liens or other security interests. Depending on the jurisdiction in which such security interests are created, enforcement of such security interests may be a complicated and difficult process.  For example, enforcement of security interests in certain jurisdictions may require a court order and a sale of the secured property through public bidding or auction.  In addition, some jurisdictions grant courts the power to declare security interest arrangements to be void if they deem the security interest to be excessive.

**Risks Associated with Bankruptcy Cases**.  Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors.  While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Partnership.  Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated.  The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court.  This process can involve substantial legal, professional and administrative costs to the company and the Partnership; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately.  In some cases, the company may not be able to reorganize and may be required to liquidate assets.  Although the Partnership intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value.  Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Partnership's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class.  In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor.  In those cases where the Partnership, by virtue of such action, is found to exercise "domination and control" of a debtor, the Partnership may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Partnership.

The Partnership may invest in companies based outside the United States.  Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the classification, seniority and treatment of claims.  In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The Investment Manager, on behalf of the Partnership, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation or

002811

HCMLPHMIT00003993

enhancement of the Partnership position as a creditor or equity holder.  A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents.  If the Investment Manager concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Partnership, it will resign from that committee or group, and the Partnership may not realize the benefits, if any, of participation on the committee or group. In addition, and also as discussed above, if the Partnership is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Partnership may purchase creditor claims subsequent to the commencement of a bankruptcy case.  Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

**Equitable Subordination**.  Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of such other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "equitable subordination").  The Partnership does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Partnership may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

**Liability Following the Disposal of Investments**.  While the Partnership may hold certain of its investments to maturity, the Partnership may dispose of investments in some circumstances prior to termination and, in connection therewith, may be required to pay damages to the extent that any representations or warranties given in connection with such investments turn out to be inaccurate.  The Partnership may become involved in disputes or litigation concerning such representations and warranties and may be required to make payments to third parties as a result of such disputes or litigation.  In the event that the Partnership does not have cash available to conduct such litigation or make such payments, it may be forced to sell investments to obtain funds. Such sales may be effected on unsatisfactory terms.

**Potential Involvement in Litigation**.  In the event that the Partnership holds investments in distressed investments, there is a possibility that the Investment Manager may participate in restructuring activities, it is possible that the Partnership may become involved in litigation respecting creditor disputes and similar issues among classes of claimants.  Litigation entails expense and the possibility of counterclaims against the Partnership and the Investment Manager and ultimately judgments may be rendered against the Partnership for which the Partnership does not carry insurance.

**Specific Risks Associated with Investing in CLOs**

You should note that certain of the following risk factors specifically applicable with respect to CLOs have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Dependence Upon Other Unrelated Managers**.  The success of a CLO may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the Partnership as an

002812

HCMLPHMIT00003994

investor in such CLO. Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Partnership's investments in such CLOs will depend on the performance of unrelated managers.

**Multiple Levels of Fees**. The Partnership and the CLOs are expected to impose management fees, administrative fees, and/or transaction-based fees. This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a CLO may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees). Additionally, some of the CLOs may invest themselves in underlying hedge funds or CLOs. In such case, additional management costs and other administrative expenses may be incurred.

**Limited Diversification**. CLOs may invest in concentrated portfolios of assets. The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs to a greater degree of risk with respect to economic downturns relating to such industry. The Partnership may have a concentrated exposure to CLOs of a particular type of CLO.

**CLO Embedded Leverage Risk**. The Partnership's participation in CLOs involves varying amounts of leverage. Leverage is embedded in all classes of a CLO other than the most senior tranche. If the Partnership retains either the most or one of the most subordinate tranches of the CLO's securities, it will hold the most leveraged investment in the CLO. While leverage presents opportunities for increasing the Partnership's total return, it has the effect of potentially increasing losses as well. Accordingly, any event which adversely affects the value of an investment in a CLO would be magnified to the extent such CLO is leveraged. The cumulative effect of the use of leverage by a CLO in a market that moves adversely to the CLO's investments could result in a substantial loss to the CLO which would be greater than if the CLO were not leveraged. The borrowing arrangements of CLOs will contain events of default that, under certain circumstances, could result in early amortization or in the acceleration of the maturities of these obligations. In the event of acceleration of the borrowing arrangements of a CLO, in whole or in part, it may be required to dispose of all or a significant portion of its investments. Such a forced disposal of securities could result in realization of value of such investments significantly below the anticipated market values for such securities. When the Partnership invests in derivative transactions, it may also gain leverage through such derivative transactions, which will expose the Partnership to a greater risk of loss.

**Risks of Investment Focus**. The Partnership's portfolio may consist of CLO Securities. CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks.

The value of the CLO Securities that the Partnership may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("**CLO Collateral**"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof. If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation. The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution. CLO Collateral may consist

002813

HCMLPHMIT00003995

of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality). Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower ratings of below investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest. Such investments may be speculative.

**Interest Rate Mismatch**. CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate. As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("**Fixed Rate Assets**"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("**Floating Rate Assets**"). In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt or Equity. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO securities. In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

**Lower Credit Quality Securities**. There are no restrictions on the credit quality of the investments of the Partnership. CLO Securities in which the Partnership will invest may have no ratings or may be deemed by rating agencies to have substantial vulnerability to default in payment of interest and/or principal and have the lowest quality ratings. The Partnership may purchase CLO Securities which have ratings that have been downgraded or placed on "credit watch" for future downgrading. Lower rated and unrated securities in which the Partnership may invest have large uncertainties or major risk exposures to adverse conditions and are considered to be predominantly speculative and may become a defaulted asset for a variety of reasons. Generally, such securities offer a higher return potential than higher rated securities, but involve greater volatility of price and greater risk of loss of income and principal.

The market values of certain of these securities (such as subordinated securities) also tend to be more sensitive to changes in economic conditions than higher rated securities. The value of leveraged loans and other assets underlying a CLO may also be affected by changes in the market's perception of the entity issuing or guaranteeing them, or by changes in government regulations and tax policies. Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications. Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities. In addition, historically the trading volume in the loan market has been small relative to the high-yield debt securities market, and such illiquidity has been exacerbated during the current liquidity crisis.

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities. There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the assets underlying CLO Securities.

In general, the ratings of nationally recognized rating organizations represent the opinions of such agencies as to the quality of securities that they rate. Such ratings may be used by the Investment Manager as an initial basis for the selection of portfolio securities. Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not evaluate the market value risk of the securities. Such ratings also do not reflect macroeconomic or systematic risk, including the risk of increased illiquidity in the credit markets. It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events.

002814
HCMLPHMIT00003996

**Defaulted Assets Underlying CLO Securities**.  If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset.  In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset.  The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon.  Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO security.  Therefore, if any CLO security has defaulted assets which correspond to the exposure of the Partnership's interest in the CLO security, the Partnership may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities in the event of a liquidity crisis.  Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security.  These additional risks may affect the returns on the investments in the Partnership's portfolio.

**Subordination of CLO Debt**.  The Partnership's portfolio may subordinate CLO Debt.  Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches.  Thus, some of the investments of the Partnership in a CLO may rank behind other creditors of the CLO.  To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches.  In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO.  Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt.  Investments of the Partnership may be the first to absorb any losses by the CLO on its underlying portfolio.  This may result in losses on the invested proceeds of the Partnership and could result in the complete loss of invested proceeds.

**Mandatory Redemption of CLO Senior Tranches and CLO Debt**.  Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt will be used to redeem the related CLO senior tranches.  This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt, which could adversely impact the returns to the holders of such CLO Debt.

**Optional Redemption of CLO Senior Tranches and CLO Debt**.  An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO securities, including the Partnership).  As a result of any such rapid liquidation of a CLO, a holder of the related CLO securities (including the Partnership) could lose all or a substantial portion of its investment in such CLO securities.

**Insolvency Risks**.  Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "**Insolvent Company**").  The information in this paragraph and the following paragraph is applicable

002815

HCMLPHMIT00003997

with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Partnership) or from subsequent transferees of such payments (such as the Limited Partners). However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets. Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable. Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States federal and state laws. Insofar as the Partnership's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

**"Widening" Risk**. For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Partnership invests may decline substantially. In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale. It may not be possible to predict, or to hedge against, such "spread widening" risk.

**There Is Limited Disclosure about the CLO Securities and the Underlying CLO Collateral in this Memorandum**. The Investment Manager will not be required to provide the investors in the Partnership with financial or other information (which may include material non-public information) it receives related to the CLO Securities. The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Partnership to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor. In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or

002816

HCMLPHMIT00003998

terms of, or the identity of any obligor on, any CLO Securities.

**Impact of the Volcker Rule on the Liquidity of the Notes.**  Section 619 of the Dodd-Frank Act added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions.  The Volcker Rule also provides for certain supervised nonbank financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions.  The conformance period for the Volcker Rule has been extended to July 21, 2015, and to July 21, 2017 for CLOs.  Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities.  This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Partnership's ability to liquidate these positions on a timely basis.

**Specific Risks Associated with Investing in Portfolio Funds and Illiquid Investments**

You should note that certain of the following risk factors specifically applicable with respect to Portfolio Funds and Illiquid Investments have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Special Situations.**  The Portfolio Funds may invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions.  In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, take considerable time or result in a distribution of cash or a new security the value of which will be less than the purchase price to the Portfolio Funds of the security or other financial instrument in respect of which such distribution is received.  Similarly, if an anticipated transaction does not in fact occur, the Partnership may be required to sell its investment at a loss.  In connection with such transaction (or otherwise), the Portfolio Funds may purchase securities on a when-issued basis, which means that delivery and payment take place sometime after the date of the commitment to purchase and are often conditioned upon the occurrence of a subsequent event, such as approval and consummation of a merger, reorganization or debt restructuring.  The purchase price and/or interest create receivable with respect to a when-issue security are fixed when the Partnership enters into the commitment.  Such securities are subject to changes in market value prior to their delivery.  Because there is substantial uncertainty concerning the outcome of transactions involving companies in which the Portfolio Funds may invest, there is a potential risk of loss by a Portfolio Fund of its entire investment in such companies.

**Alternative Investments.**  In the alternative asset class, the Investment Manager may invest assets of the Partnership in other pooled investment vehicles managed by the Investment Manager.  The pooled investment vehicles managed by the Investment Manager may follow a variety of investment strategies including investments in commodities, managed futures, inflation-adjusted bonds, global real estate, "hedge fund strategies", which may be broadly characterized as "hedge funds", and mezzanine debt or Illiquid Investments.

**Withdrawal Considerations.**  The Partnership may be subject to withdrawal restrictions of the individual Portfolio Fund(s) in which it will invest.   In addition, the Partnership is permitted to invest in Illiquid Investments.  There is no market for the Interests, and no market is expected to develop.  Therefore, in certain circumstances, the Partnership may not be able to withdraw invested assets from a particular Portfolio Fund or with respect to Illiquid Investments at a time that would be most advantageous to the Partnership or at a time that would allow the Partnership to comply with its withdrawal obligations to its

002817

HCMLPHMIT00003999

Limited Partners.  In this regard, the General Partner has the right to suspend in whole or in part certain withdrawal rights of the Limited Partners to the extent that the Partnership is unable to obtain liquidity from its investments in one or more of the Portfolio Funds.  The illiquidity of Illiquid Investments and restrictions on withdrawals at the level of the individual Portfolio Funds could have a material adverse effect on the Partnership, as well as the ability of the Limited Partners to liquidate their investments in the Partnership during permitted withdrawal periods. Consequently, Limited Partners may be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the terms of this Memorandum, and, even in such event, payment of withdrawal proceeds may be delayed for a significant period of time.  One or more affiliates of the Investment Manager may serve as general partner or manager of such Portfolio Funds, and will not be required to liquidate Portfolio Fund investments other than when they determine such liquidation is advisable or appropriate in their sole discretion, without regard to withdrawal provisions applicable to the Partnership.  Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.

**High Growth Industry Related Risks.**  Portfolio Funds may have significant investments in the securities of high growth companies (e.g., technology, communications and healthcare).  It is noted that these securities may be very volatile.  In addition, these companies may face undeveloped or limited markets, have limited products, have no proven profit-making history, may operate at a loss or with substantial variations in operating results from period to period, have limited access to capital and/or be in the developmental stages of their businesses, have limited ability to protect their rights to certain patents, copyrights, trademarks and other trade secrets, or be otherwise adversely affected by the extremely competitive markets in which many of their competitors operate.

**Risk of Illiquid Investments.**  Illiquid Investments involve a high degree of financial risk.  There can be no assurance that Illiquid Investments will be profitable or that substantial losses will not occur.  The companies in which the Illiquid Investments will invest are often dependent on the skills of a small number of executives and are vulnerable to changes in technology, fluctuations in demand for their products, changing interest rates and other factors.  There can also be no assurance that the Illiquid Investments will be repaid, be able to sell or otherwise liquidate their investments at the optimal time or price.  Therefore, there can be no assurance that the rate of return objectives of the Illiquid Investments will be realized or that there will be any return of capital to the Limited Partners.

**Illiquid and Long-Term Investments.**  It is anticipated that there will be a significant period of time before certain Illiquid Investments will have completed their investments.  Such investments may take several years from the date of initial investment to reach a state of maturity when realization of the investment can be achieved.  Although investments by Illiquid Investments occasionally may generate some current income, private investment transaction structures typically will not provide for liquidity of the Illiquid Investment's investment prior to that time.  The return of capital and the realization of gains, if any, from such investment will generally occur only upon the partial or complete disposition or refinancing of the investment.  In light of the foregoing, it is likely that no significant return from the disposition of Illiquid Investment's underlying investments will occur for a substantial period of time from the commencement of the Illiquid Investment's operations.  It is unlikely that there will be a public market for the securities held by the Illiquid Investment and/or its portfolio companies at the time of their acquisition.  The Illiquid Investment generally will not be able to sell its securities publicly unless the issuer has consummated a public offering of its securities and such offered securities are registered under applicable securities laws, unless an exemption from such registration requirements is available.  In addition, in some cases, the Partnership may be prohibited by contract from selling certain securities for a period of time and, as a result, may not be permitted to sell an underlying investment at a time it might otherwise desire to do so.  Further, disposition of such investments may require a lengthy time period or may result in distributions in kind to investors.

**Investments in Less Established Companies.**  The Partnership may invest a portion of its assets in the securities of less established companies, or early stage companies.  Investments in such early stage companies may involve greater risks than those generally associated with investments in more established companies.  For instance, less

002818


HCMLPHMIT00004000

established companies tend to have smaller capitalizations and fewer resources and, therefore, are often more vulnerable to financial failure. Such companies also may have shorter operating histories on which to judge future performance and in many cases, if operating, will have negative cash flow. In the case of start-up enterprises, such companies may not have significant or any operating revenues. In addition, less mature companies could be more susceptible to irregular accounting or other fraudulent practices. Furthermore, to the extent there is any public market for the securities held by the Illiquid Investment, securities of less established companies may be subject to more abrupt and erratic market price movements than those of larger, more established companies.

Some of the investments expected to be made by an Illiquid Investment would be considered highly speculative and may result in the loss of the Special Situation Investment's entire investment therein. There can be no assurance that any such losses will be offset by gains (if any) realized on the Illiquid Investment's other investments.

**Investments in Restructurings or Underperforming Companies.** The Partnership may make investments in companies that are experiencing or are expected to experience financial difficulties, which such companies may never overcome. Such investments could, in certain circumstances, subject the Partnership to additional potential liabilities, which may exceed the value of the Partnership's original investment therein. Such investments of the Partnership could also be subject to federal bankruptcy law and state fraudulent transfer laws, which may vary from state to state, if the securities relating to such investments were issued with the intent of hindering, delaying or defrauding creditors or, in certain circumstances, if the issuer receives less than reasonably equivalent value or fair consideration in return for issuing such securities. If such investments constitute debt and such debt is used for a buyout of shareholders, this risk is greater than if the debt proceeds are used for day-to-day operations or organic growth. If a court were to find that the issuance of the securities was a fraudulent transfer or conveyance, the court could void the payment obligations under the securities, further subordinate the securities to other existing and future indebtedness of the issuer or require the Partnership to repay any amounts received by it with respect to the securities. In the event of a finding that a fraudulent transfer or conveyance occurred, the Partnership may not receive any repayment on the securities.

Under the Bankruptcy Code, a lender that has inappropriately exercised control of the management and policies of a company may have its claims against the company subordinated or disallowed, or may be found liable for damages suffered by parties as a result of such actions. In addition, under certain circumstances, payments to the Partnership and distributions by the Partnership ion Investment to its limited partners may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment. Such debt may also be disallowed or subordinated to the claims of other creditors if the Partnership is found to have engaged in other inequitable conduct resulting in harm to other parties. The Partnership's underlying investment may be treated as equity if it is deemed to be a contribution to capital, or if the Partnership attempts to control the outcome of the business affairs of a company prior to its filing under the Bankruptcy Code. While the Partnership will attempt to avoid taking the types of action that would lead to such liability, there can be no assurance that such claims will not be asserted or that the Partnership will be able successfully to defend against them.

## REGULATORY AND TAX RISKS

**General Regulatory Risks.** Statutes, regulations and policies are continually under review by the U.S. Congress and state legislatures and federal and state regulatory agencies. The introduction of new legislation or amendments to existing legislation and regulations (including changes in how they are interpreted or implemented) by governments, the decisions of courts and tribunals and the rulings and decisions of regulatory authorities, can adversely impact the Partnership's returns. The regulatory environment for private investment funds is evolving, and changes in the regulation of these funds may adversely affect the value of investments held by the Partnership, the cost of compliance with applicable regulations, and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies.

002819

HCMLPHMIT00004001

**Regulatory Risks Related to the Highland Transaction**.  In connection with the Highland Transaction (if consummated), there can be no assurance that such transaction (if consummated) will not result in adverse regulatory consequences (including, without limitation, being characterized as a "change of control" under applicable laws), even though the Highland Transaction only contemplates the acquisition of non-voting limited partnership interests in Highland.

**Strategy Restrictions**.  Certain institutions may be restricted from directly utilizing investment strategies of the type in which the Partnership may engage.  Such institutions, including entities subject to ERISA, should consult their own advisors, counsel and accountants to determine what restrictions may apply and whether an investment in the Partnership is appropriate.

**Trading Limitations**.  For all securities, instruments and/or assets listed on an exchange, including options listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances.  Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Partnership to loss.  Also, such a suspension could render it impossible for the Investment Manager to liquidate positions and thereby expose the Partnership to potential losses relating thereto.

**Limited Regulatory Oversight**.  The Partnership's investments are not supervised or monitored by any regulatory authority.  The Partnership is not registered as an "investment company" under the Investment Company Act.  Although the Investment Manager is registered as an investment adviser with the SEC, neither the General Partner nor the Investment Manager is registered as a commodity pool operator, pursuant to an exemption provided under Rule 4.13(a)(3) of the CEA.  Consequently, Limited Partners will not benefit from some of the protections afforded by these statutes, including oversight by the Commodity Futures Trading Commission.

**Prevention of Money Laundering and Terrorism**.  The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "**USA PATRIOT Act**"), signed into law on and effective as of October 26, 2001, requires that financial institutions, a term that includes banks, broker-dealers and investment companies, establish and maintain compliance programs to guard against money laundering activities.  The USA PATRIOT Act requires the Secretary of the U.S. Treasury ("**Treasury**") to prescribe regulations in connection with anti- money laundering policies of financial institutions.  The U.S. Federal Reserve Board, the Treasury and the SEC are currently studying what types of investment vehicles should be required to adopt anti-money laundering procedures, and it is unclear at this time whether such procedures will apply to pooled investment vehicles such as the Partnership.  Future rules and regulations regarding money laundering or proceeds of crime could regulate the Partnership.  In addition, in April 2000, the Treasury Department published proposed regulations that would require certain investment advisors to establish an anti-money laundering program.  It is possible that there could be promulgated legislation or regulations that would require the Partnership or its affiliates, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Interests.  Such legislation and/or regulations could require the Partnership to implement additional restrictions on the transfer of the Interests.  The Partnership reserves the right to request such information as is necessary to verify the identity of investors in the Interests, and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by Financial Crimes Enforcement Network and/or the SEC or such information as may be required in order for the Partnership to discharge its obligations under the laws of the Cayman Islands (including pursuant to the Proceeds of Criminal Conduct Law (2005 Revision)).  In the event of delay or failure by the applicant to produce any information required for verification purposes, an application for or transfer of the Interests and the subscription monies relating thereto may be refused.

**Recent Developments in the Financial Services Industry**.  Recent developments in the U.S. financial markets have heightened the risks associated with the investment activities and operations of hedge funds, including without limitation, those resulting from a

002820


HCMLPHMIT00004002

substantial reduction in the availability of credit and the increased cost of short-term credit, a decrease in market liquidity and an increased risk of insolvency of brokers and other counterparties. In addition, in July of 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. Even with the passage of Dodd-Frank, the implications of its passage for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory, or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Partnership or the Partnership's business, operations and performance.

**Enhanced Regulation of Swaps.** The Wall Street Transparency and Accountability Act of 2010 (the "**WSTAA**") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "**DCO**") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer", and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts. Due to the new requirements imposed by the WSTAA, the Partnership may experience increased transaction costs to pay for the clearing, execution and segregation obligations. In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Partnership's ability to engage in leverage and limit the Partnership's return. The application of position limits to swap contracts may also limit the Partnership's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Partnership's ability to take advantage of current market trends or conditions. Any tightening in the market for swaps may significantly impact the Partnership and its returns. In addition, if the Partnership were deemed to be a swap dealer or a major swap participant under WSTAA, the Partnership may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Partnership's legal obligations and its returns.

**Tax Risk.** The tax aspects of an investment in the Partnership are complicated and each investor should have them reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. The Partnership is not intended and should not be expected to provide any tax shelter, but is organized as a limited partnership to avoid corporate taxation and to permit any distributions it might make to be made without being taxed as dividends. No assurance can be given that legislative, administrative or judicial changes will not occur which will alter, either prospectively or retroactively, the tax considerations or risk factors discussed in this Memorandum.

The tax consequences to a Limited Partner of an investment in the Partnership are uncertain. A significant portion of the Partnership is expected to be invested in illiquid Portfolio Funds and/or Illiquid Investments. Such investments are often structured as "pass through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments. As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

Neither the General Partner nor the Investment Manager makes any representations or warranties regarding any tax matters. Prospective investors are strongly urged to consult their own tax advisors regarding the U.S. federal, state and local and non-U.S. tax consequences to them arising from an investment in the Partnership, and should rely on the advice of their own tax advisors with respect to the possible impact on its investment in the Partnership of any future legislation or administrative or judicial action. You should review the section entitled "TAXATION" for a more complete discussion of certain of the

002821
HCMLPHMIT00004003

tax risks inherent in the acquisition of Interests.

<u>Tax-Exempt Entities</u>.  Certain prospective Limited Partners may be subject to federal and state laws, rules and regulations that may regulate their participation in the Partnership, or their engaging, directly or indirectly through an investment in the Partnership, in investment strategies of the types that the Partnership utilizes from time to time.  Tax-exempt entities should consider the applicability to them of the provisions relating to UBTI (as defined below).  Investments in the Partnership by entities subject to ERISA and other tax-exempt entities require special consideration.  See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

<u>Diversification</u>.  The tax benefits of the Policies may not be available in the event that the methodology used by the Partnership does not satisfy the diversification rules as described under "TAXATION" herein, including the risk that, if the Partnership fails to meet such diversification rules, owners of Policies funded by a Separate Account that is treated as holding interests in the Partnership would be subject to current taxation on the annual earnings of the Separate Account.

<u>Diversification of Contracts</u>.  Interests in the Partnership will be held only by variable contract separate asset accounts of Insurance Companies and state and local governmental pension plans, §529 plans, and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). Variable contract separate asset accounts are subject to certain investment diversification requirements (the "<u>Diversification Rules</u>") of Section 817(h) of the Code and the Regulations with respect to assets held in such separate accounts. These rules apply to the investments made by separate accounts (such separate accounts are referred to as "segregated asset accounts") that are used to fund benefits under Policies that are "variable contracts" within the meaning of Section 817(d) of the Code, other than "pension plan contracts."

For purposes of satisfying the Diversification Rules, the assets of the Partnership must be invested in securities such that no more than 55% of total assets of the Partnership may be invested in the securities of any one (1) issuer, no more than 70% of total assets of the Partnership may be invested in the securities of any two (2) issuers, no more than 80% of total assets of the Partnership may be invested in the securities of any three (3) issuers, and no more than 90% of total assets of the Partnership may be invested in the securities of any four (4) issuers. For purposes of these Diversification Rules, all securities of the same issuer are treated as a single investment and in the case of government securities, each government agency or instrumentality is treated as a separate issuer. Thus, all securities issued by the Treasury would be considered a single investment, but securities issued by the Federal Home Loan Banks would be considered a separate investment from Treasury securities. The assets of the Partnership will be invested in compliance with these rules.

Under a "look-through" rule established by the IRS, if:  (i) all Interests of the Partnership are held by one or more segregated asset accounts of Insurance Companies (other than Interests held by persons listed in §1.817-5(f)(3) of the Regulations) and (ii) public access to the Partnership is available exclusively through the purchase of a variable contract as defined in Section 817(d) of the Code, then the test for diversification is made by looking to the assets held by the Partnership. So long as the Partnership is subject to the "look-through" rule, Interests in the Partnership will not constitute a single investment for purposes of the Diversification Rules.  For purposes of applying such Diversification Rules, the Partnership's investment on behalf of Series 1 in the PE Portfolio Fund will be treated as a single asset, since the "look-through" rule will not apply to the PE Portfolio Fund.

In the event that the Partnership fails to satisfy the look-through requirements of the Diversification Rules, any Policy based on a segregated asset account that has invested in the Partnership may not be treated as a life insurance or annuity contract for federal income tax purposes. For this purpose, a Policy is based on a segregated asset account if amounts received under such Policy, or earnings thereon, are allocated to such segregated asset account. If a Policy is no longer treated as a life insurance or annuity

002822


HCMLPHMIT00004004

contract, then the owner of the Policy would be subject to current taxation on the income on the Policy for taxable years in which such failure occurs, and thereafter. If the Policy is a life insurance or annuity contract under local law, however, then certain amounts paid as death benefits will be treated as amounts paid under a life insurance or annuity contract for federal income tax purposes. If the failure to meet the Diversification Rules is shown to be inadvertent, the Insurance Company that issued the Policy is permitted to bring the segregated asset account into compliance with those rules. In such cases, the Diversification Rules contemplate adjustments or the payment of a "toll charge" for the period during which the account failed to meet the Diversification Rules. Accordingly, compliance with the Diversification Rules, as they may be modified from time to time, is important and will be carefully monitored by the Investment Manager. Compliance with the Diversification Rules may have the effect of reducing the return of the Partnership, as the investments and strategies utilized by the Investment Manager may be different from what the Investment Manager might otherwise believe to be desirable.

**Investor Control**.  The Partnership is an insurance-dedicated investment fund.  In certain circumstances, the owner of a variable life insurance or annuity contract invested in a Separate Account may, for federal income tax purposes, be considered the owner of the assets of the Separate Account that funds the variable contract under an "investor control" theory.  Each Policy Owner should consult his or her own tax advisors regarding the "investor control" theory and the particular tax risks, if any, posed by the Policy Owner's selection of the Partnership as his or her investment option under a related Policy.

Policy Owners have no right to communicate with or direct the investment policies or decisions of the General Partner, any administrator, Investment Manager, or Investment Manager relating in any way to the Partnership.  For purposes of this Memorandum, the term Policy Owner includes: (i) any trustees of a Policy Owner; (ii) any Policy beneficiaries; (iii) any affiliated person (as this term is defined in Section 2(a)(3) of the Investment Company Act) of the foregoing persons; or (iv) any person that represents the Policy Owner.

There is not, nor shall there be, a pre-arranged binding agreement between the General Partner, the Administrator and the Investment Manager, on the one hand, and any Policy Owner, on the other hand, relating to the investments of the Partnership.  Furthermore, Limited Partners have no right or power to take part in the management of the Partnership.

None of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be held responsible to any Limited Partner or Policy Owner for any loss, damage, liability or expense resulting from a violation of the "investor control" theory to the extent such violation is attributable to conduct of a Policy Owner.

Policy Owners should consult their own tax advisors regarding the "investor control" theory.

**This Memorandum Intended for Limited Partners**.  This Memorandum does not address the tax treatment afforded by Policy Owners.  Policy Owners should refer to their insurance contract and related explanatory materials for such a discussion.  The Limited Partners are the owners of Interests in the Interests.  Policy Owners are not Limited Partners of the Partnership and do not have rights as such.

**Accounting Rules**.  The Partnership's assets and liabilities are valued in accordance with the Partnership Agreement.  However, for purposes of preparing the Partnership's annual audited financial statements, which are prepared in accordance with GAAP, certain of the Partnership's assets and liabilities may be valued in a manner that, while consistent with GAAP, may be different from the manner in which such assets are valued in accordance with the valuation policies set forth in the Partnership Agreement.

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the IFRS.  In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

002823
HCMLPHMIT00004005

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Limited Partners.

**No Obligation of Full-Time Service**.  None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates has any obligation to devote its full time to the business of the Partnership.  Each is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership, and each may engage in other business activities, including competing ventures and/or unrelated employment, which may result in various conflicts of interest between such persons and the Partnership.

**Services to Affiliated Funds**.  In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership.  Specifically, as of the date hereof:  (i) the Investment Manager acts as the investment manager to the PE Portfolio Fund that:  (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC.  As such, the Investment Manager and the Principal owe fiduciary duties to different investment vehicles, which may conflict with each other; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

The investments made by Affiliated Funds that may be managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates in the future may compete with investments for the Partnership's account, and the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates may decide to invest the funds of these Affiliated Funds rather than the assets of the Partnership in a particular security or strategy.  In addition, the Investment Manager and/or such other persons will determine the allocation of funds by and among the Partnership and the Affiliated Funds to investment strategies and techniques on whatever basis they decide is appropriate or desirable in their sole and absolute discretion.  The records of these Affiliated Funds will not be made available to Limited Partners.  Nonetheless, in the event that certain securities, instruments and other assets are suitable for acquisition by the Partnership and by other accounts managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates, and the Investment Manager or such other persons are not able to acquire the desired aggregate amount of such securities, instruments and other assets on terms and conditions which they deem advisable, the Investment Manager and such persons will endeavor in good faith to allocate the limited amount of such investment opportunities among the various accounts for which they consider to be suitable.

**Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests**.  The Principal was previously a Partner and Co-Head of Private Equity at Highland, an investment manager with significant assets under management located in Dallas, Texas.  Although Mr. Honis has retired from that position, he still currently serves on:  (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland, and receives compensation in connection with each of the foregoing.  Additionally, as part of his retirement, Mr. Honis has received or is in the process of receiving payments in the total

002824


HCMLPHMIT00004006

amount of approximately $3 million from certain affiliates of Highland.

In addition, pursuant to the Shared Services Agreement, Highland serves as the Shared Services Provider, which provides the Investment Manager and the Partnership with certain administrative, information technology, accounting, tax, back-office and other services. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

Further, the Investment Manager and Highland have had preliminary discussions concerning the potential acquisition of all or substantially all of the non-voting limited partnership interests in Highland for the first series of the PE Portfolio Fund (such purchases or other acquisitions, if any, collectively, the "**Highland Transaction**"). Although, as of the date hereof, the PE Portfolio Fund and Highland have not actively negotiated documentation for the legal and economic terms of the Highland Transaction (and there can be no assurances that such transaction will be consummated), it is nonetheless the intention of such parties that the transaction should come about.

In light of the foregoing, the Principal, and indirectly the Investment Manager, are in a position of conflict with respect to the ultimate decision by the Partnership regarding whether it pursues the Highland Transaction, and under what terms (if any) it agrees to participate in any such transaction.

Also see "—Potential Directorship Positions; Other Roles" herein.

**Highland Transaction; Limited Control**. If the Highland Transaction is consummated, it is currently contemplated that the PE Portfolio Fund would acquire only limited partnership interests in Highland. As with investments in non-controlling interests in other partnerships, the Highland Transaction may involve special risks associated with the possibility that the controlling principals of Highland may: (i) have economic or business interests or goals that are inconsistent with those of the PE Portfolio Fund and therefore the Partnership, (ii) take actions contrary to the instructions or requests of the PE Portfolio Fund or contrary to the PE Portfolio Fund's policies or objectives, (iii) be unable or unwilling to fulfill its obligations under the organizational/governing documents, and/or (iv) experience financial difficulties. The occurrence of such problems could have a material adverse effect on the business and prospects of the PE Portfolio Fund's investment in the Highland Transaction and may affect management decisions and exit strategies in a manner adverse to the PE Portfolio Fund's and the Partnership's interests.

**Conflicts Related to Shared Services Provider**. The Investment Manager has certain affiliated entities that may provide services with respect to the Partnership, the Portfolio Funds (generally and the PE Portfolio Fund specifically) and certain investments held by the Partnership. The Shared Services Provider may provide services for the benefit of the Partnership under the Shared Services Agreement and/or may incur reimbursable expenses on behalf of the Partnership and/or the Investment Manager. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement. The Principal is a former Partner and former Co-Head of Private Equity of the Shared Services Provider.

**Potential Directorship Positions; Other Roles**. The Investment Manager Affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Partnership or other entities that operate in the same or a related line of business as the Partnership, for other clients managed by the Investment Manager or any of the Investment Manager Affiliates, or for any Portfolio Fund or portfolio company of the Partnership, and the Partnership shall have no right to any such fees. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Partnership. Also see "—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

002825

HCMLPHMIT00004007


The Investment Manager and/or the Investment Manager Affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Partnership. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Investment Manager and/or the Investment Manager Affiliates and the Partnership shall not have any right to any such fees.

<u>Potential Cross-Trades</u>. The Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Partnership and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Partnership any time that the Investment Manager believes such transaction to be fair to the Partnership and such other client. By purchasing an Interest in the Partnership, a Limited Partner is deemed to have consented to such client cross-transactions between the Partnership and another client of the Investment Manager or one of its affiliates.

<u>Diverse Limited Partners</u>. The Limited Partners may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions. As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one type of Limited Partner than for another. In making such decisions, the General Partner intends to consider the investment objectives of the Partnership as a whole, not the investment objectives of any Limited Partner individually.

<u>Soft Dollars</u>. The General Partner and the Investment Manager may be offered soft dollars in the form of research and brokerage and other products or services, which may be utilized by the General Partner, the Investment Manager and their respective affiliates in connection with the services they offer to clients other than the Partnership. The use of soft dollars presents the Investment Manager with potential conflicts of interest and may provide the Investment Manager with incentives to: (i) use certain brokers who may provide certain soft dollar benefits that other brokers may not, without regard to its obligations to the Partnership (including, without limitation, its best execution obligations); or (ii) trade more actively in order to generate more soft dollars and thereby reduce its expenses.

<u>Referral of Investors</u>. The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense. The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership. Such broker-dealers may have a conflict of interest in advising prospective investors to purchase Interests, as the broker-dealers are often only compensated upon the investment of the prospective investors.

<u>Lack of Separate Representation; Potential Conflicts of Counsel</u>. Neither the Partnership Agreement nor any of the agreements, contracts and arrangements between the Partnership, on the one hand, and the General Partner or the Investment Manager, on the other hand, were or will be the result of arm's-length negotiations. The attorneys, accountants and others who have performed services for the Partnership in connection with this offering, and who will perform services for the Partnership in the future, have been and will be selected by the General Partner. No independent counsel has been retained to represent the interests of prospective investors or Limited Partners. You are therefore urged to consult your own counsel as to the terms and provisions of the Partnership Agreement and all subscription and other related documents.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different

002826


HCMLPHMIT00004008

times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

<u>Valuation of Assets</u>.  The Administrator will calculate the net asset value of the Partnership (based upon information provided by the Investment Manager). In the case of investments in Portfolio Funds that are not readily marketable, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value.  Such calculations could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Partnership's investments.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund.  If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument pursuant to the valuation methodologies described herein does not fairly represent its market value, the Investment Manager will value such security, option or other financial instrument as it reasonably determines.  Likewise, any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value.  The Investment Manager has a conflict of interest in that it will receive a higher Management Fee if the Partnership's assets are given a favorable valuation.  See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS— Determination of Net Asset Value".

**The foregoing list of risk factors and conflicts of interest does not purport to be a complete enumeration or explanation of the risks and conflicts of interest involved in an investment in the Partnership.  Offerees should read this entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding to purchase Interests.**

002827


HCMLPHMIT00004009

## ERISA CONSIDERATIONS

An investment of benefit plan assets in the Partnership may raise issues under ERISA and the Code. ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan (as defined below) and prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of a Plan or the management or disposition of the assets of a Plan, or who renders investment advice for a fee or other compensation to a Plan, is generally considered to be a fiduciary of the Plan.

In considering an investment in the Partnership of a portion of the assets of any employee benefit plan (including a "**Keogh**" plan) subject to the fiduciary and prohibited transaction provisions of ERISA or the Code or similar provisions under applicable state law (collectively, a "**Plan**"), a Plan fiduciary should determine, in light of the risks and limited liquidity inherent in an investment in the Partnership, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Interests with the assets of any Plan if the Investment Manager or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "**party in interest**") with respect to such Plan.

## PLAN ASSETS

Regulations promulgated under ERISA by the U.S. Department of Labor ("**Plan Asset Regulations**") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company", in each case as defined in the Plan Asset Regulations. The Interests will not constitute "publicly offered" securities or securities issued by an investment company registered under the Investment Company Act, and it is not expected that the Partnership will qualify as an "operating company" under the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" so long as they own, in the aggregate less than 25%, directly or indirectly, of the value of each class of such entity's equity. For purposes of such calculation, equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof, are disregarded. For purposes of this 25% test ("**Benefit Plan Investor Test**"), "benefit plan investors" include: employee benefit plans subject to the provisions of Part 4 of Title I of ERISA and plans subject to Section 4975 of the Code, including "Keogh" plans and individual retirement accounts ("**IRAs**"). The following are not included in the definition of benefit plan investor: employee benefit plans maintained outside the U.S. by foreign companies that cover non-U.S. persons, governmental plans, and certain church plans. Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of Interests in the Partnership were owned by benefit plan investors, an undivided interest in each of the underlying assets of the Partnership would be deemed to be "plan assets" of any Plan subject to Title I of ERISA or Section 4975 of the Code that invested in the Partnership.

Consequently, the General Partner intends to use reasonable efforts either (i) to prohibit plans subject to Title I of ERISA or Section 4975 of the Code from investing in the Partnership or (ii) to provide that investment by "benefit plan investors" in the Partnership will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by benefit plan investors in the Partnership to less than 25% of the value of each class of Interests in the Partnership as described above. However, each Plan fiduciary should be aware that even if the Partnership were to avoid plan asset status

002828


HCMLPHMIT00004010

under the Benefit Plan Investor Test at the time a Plan acquires Interests in the Partnership, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or withdrawals of Interests in the Partnership, and that Interests held by benefit plan investors may be subject to mandatory withdrawal in such event in order for the Partnership to continue to avoid plan asset status under the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Partnership, the Partnership will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Partnership will otherwise satisfy the Plan Asset Regulations or that the underlying assets of the Partnership will not otherwise be deemed to include ERISA plan assets.

## PLAN ASSET CONSEQUENCES

If the assets of the Partnership were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Partnership and (ii) certain transactions in which the Partnership might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the Investment Manager and any other fiduciary that has engaged in the prohibited transaction could be required (x) to restore to the Plan any profit realized on the transaction and (y) to reimburse the Plan for any losses suffered by the Plan as a result of the investment. In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. Plan fiduciaries that decide to invest in the Partnership could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Partnership or as co-fiduciaries for actions taken by or on behalf of the Partnership or the Investment Manager. With respect to an IRA that invests in the Partnership, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA to lose its tax-exempt status.

Under the Partnership Agreement, the General Partner has the power to take certain actions to avoid having the assets of the Partnership characterized as plan assets, including, without limitation, the right to refuse a subscription, exclude a Limited Partner from an investment or to compulsorily redeem a Limited Partner's Interests in the Partnership. While the General Partner does not expect that it will need to exercise such power, it cannot give any assurance that such power will not be exercised.

**Each Plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Partnership.**

002829

HCMLPHMIT00004011

## TAXATION

**Prospective investors are advised that: (i) any U.S. federal tax advice contained herein, including any opinion of counsel referred to herein, is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer; (ii) any such advice is written to support the promotion or marketing of the transactions described herein (or in any such opinion of counsel); and (iii) each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

### INTRODUCTION

The following is a summary of certain aspects of the taxation of the Partnership and its Partners, which should be considered by a potential purchaser of an Interest in the Partnership. A complete discussion of all tax aspects of an investment in the Partnership is beyond the scope of this Memorandum. The following summary is only intended to identify and discuss certain salient issues.

This summary of certain tax considerations applicable to the Partnership is considered to be a correct interpretation of existing laws and regulations in force on the date of this Memorandum. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that any such future guidance or interpretation will not be applied retroactively.

**The following summary is not intended as a substitute for careful tax planning. The tax matters relating to the Partnership are complex and are subject to varying interpretations. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Partners will vary with the particular circumstances of each Partner. Accordingly, each prospective investor must consult with and rely solely on his or its professional tax advisors with respect to the tax results of the investor's investment in the Partnership. In no event will the General Partner, its affiliates, counsel or other professional advisors be liable to any Limited Partner for any federal, state, local or other tax consequences of an investment in the Partnership, whether or not such consequences are as described below.**

### CLASSIFICATION OF THE PARTNERSHIP

Under the provisions of the Code and the Treasury Regulations promulgated thereunder ("**Regulations**"), in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement, the Partnership should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

The Partnership has been formed under the Delaware Act as a series limited partnership and may offering its Interests in multiple separate Series. Under the provisions of the Code and the Regulations, as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement and the Delaware Act, each Series of Interests in the Partnership should be classified for U.S. federal income tax purposes as equity interests in a separate partnership and not as equity interests in an association taxable as a corporation.

The Partnership has not sought and will not seek a ruling from the Internal Revenue Service ("**IRS**") with respect to its status as a partnership. If a Series of Interests in the Partnership should be classified as an association taxable as a corporation (e.g., as a result of a change in law or a material change in facts), the taxable income of the Partnership allocable to such Series would be subject to corporate income taxation; and distributions from the Partnership to the Limited Partners owning Interests in such Series would be treated as dividend income when received by such Limited Partners to the extent of the current or accumulated earnings and profits of the Partnership allocable to

002830

HCMLPHMIT00004012

such Series.  Furthermore, the Insurance Company Limited Partners would lose their look-through treatment for the purposes of complying with the diversification requirements imposed by Section 817(h) of the Code.

Certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly traded partnership rules set forth in the Code and the Regulations, and a Series of the Partnership may not qualify for one of the safe harbors under the Regulations if such Series has more than 100 Partners.  The Partnership expects that, under the facts and circumstances test set forth in the Regulations, the Interests will not be readily tradable on a secondary market (or the substantial equivalent thereof) and therefore, the Series partnerships will not be treated as publicly traded partnerships under the Regulations.  It is assumed in the following discussion of tax considerations that each Series of the Partnership will be treated as a partnership for U.S. federal income tax purposes.

Unless otherwise indicated, references in the discussion below to the tax consequences of the "Partnership's" investments, activities, income and expenses refer to the investments, activities, income and expenses attributable to each Series that is treated as a separate tax partnership.  Prospective investors should note that each Series will issue its annual Schedule K-1 tax reporting form to its Partners.  Therefore, investors that own Interests in more than one Series will receive separate Schedule K-1 reporting forms for each Series in which the investor is treated as owning an equity interest.

## TAXATION OF PARTNERSHIP OPERATIONS

As a partnership, the Partnership is not itself subject to U.S. federal income tax but will file an annual partnership information return with the IRS.  Each Limited Partner, in computing his own federal income tax liability for a taxable year, is required to take into account such Partner's distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or loss and any separately stated income items, deductions and credits for the taxable year of the Partnership that ends with or within such Partner's taxable year. The Partnership may utilize a variety of investment and trading strategies, which produce both short-term and long-term capital gain (or loss), as well as ordinary income (or loss).  The Partnership will send annually to each Limited Partner a Schedule K-1 form reporting such Partner's distributive share of the Partnership items of income, gain, loss, deduction and credit. The Partnership intends to use the calendar year as its taxable year unless a different fiscal year is required under the Code.

Each Limited Partner will be subject to tax, and liable for such tax, on such Partner's distributive share of the Partnership's taxable income regardless of whether the Limited Partner has received or will receive any distribution of cash from the Partnership.  Thus, in any particular year, a Limited Partner's distributive share of taxable income from the Partnership (and, generally, the taxes imposed on that income) could exceed the amount of cash, if any, such Limited Partner received or is entitled to withdraw from the Partnership.

Under Section 704 of the Code, a Limited Partner's distributive share of any Partnership item of income, gain, loss, deduction or credit is governed by the Partnership Agreement unless the allocation provided by the Partnership Agreement does not have "substantial economic effect".  The Regulations promulgated under Section 704(b) of the Code provide certain "safe harbors" with respect to allocations, which, under the Regulations, will be deemed to have substantial economic effect.  The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Partners.  While no assurance can be given, the allocations provided by the Partnership Agreement should have substantial economic effect and should be sustained under the facts and circumstances test.  However, if it were determined by the IRS or otherwise that the allocations provided in the Partnership Agreement with respect to a particular item do not have substantial economic effect, each Limited Partner's distributive share of that item would be determined for tax purposes in accordance with that Limited Partner's interest in the Partnership, taking into account all facts and circumstances.

002831

HCMLPHMIT00004013

Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's tax basis in such Partner's interest in the Partnership, should not result in taxable gain to that Limited Partner, but reduce the tax basis in the Interest by the amount distributed or withdrawn.  Cash distributed to a Limited Partner in excess of the tax basis of his or its Interest is generally taxable either as capital gain or ordinary income, depending on the circumstances.  A distribution of property other than cash generally will not result in taxable income or loss to the Limited Partner to whom it is distributed until such time that the property is sold.

For financial statement presentation and capital account maintenance purposes, all securities held by the Partnership will be marked-to-market at the end of each relevant accounting period and the net gain or loss from marking to market will be reported as income or loss.  This treatment differs from the general tax rule applicable to many securities transactions that a transaction does not result in gain or loss until it is closed by an actual sale or other disposition.  The divergence between such accounting and tax treatments frequently may result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Partnership.

The income tax treatment of the Partnership will depend upon the tax treatment of the Portfolio Funds in which the Partnership invests.

The Partnership expects to be treated as engaged in a trade or business by reason of its anticipated investment, on behalf of Series 1, in the PE Portfolio Fund, which will own equity interests in one or more business partnerships.  The Partnership may also engage in other trade or business activities, either directly or through investments in portfolio partnerships.  Prospective investors that are U.S. tax-exempt entities should consider the impact of UBTI on an investment in the Partnership.  See "—Tax-Exempt Investors" below.

The Partnership will also engage in investing and trading securities for its own account.  Accordingly, a portion of the Partnership's direct and indirect expenses are expected to be deductible as trade or business expenses under Section 162 of the Code.  Certain other expenses may be classified as Section 212 investment expenses, which, for certain types of Limited Partners, including trusts, would be classified as miscellaneous itemized deductions.  Prospective investors that are classified as trusts for U.S. federal income tax purposes should consult their tax advisors concerning the limitations in the Code on deductions for miscellaneous itemized deductions.

### LIMITATIONS ON LOSSES AND DEDUCTIONS

**In General.**  A Limited Partner is not permitted to deduct Partnership losses that exceed the Partner's adjusted tax basis in its Interest at the end of the year in which such loss is incurred.  A Limited Partner's basis for its Interest is generally equal the amount of such Partner's cash contributions made to the Partnership, increased by (i) the Partner's allocable share of Partnership taxable income, (ii) the Partner's allocable share of Partnership tax-exempt income, and (iii) the Partner's allocable share of nonrecourse liabilities of the Partnership (if any); and decreased by (w) the Limited Partner's allocable share of Partnership taxable losses and non-deductible expenses, (x) any distributions of cash received by the Limited Partner from the Partnership, (y) the tax basis of any property distributed by the Partnership to such Partner and (z) any decrease in the Partner's share of Partnership nonrecourse liabilities (if any).   There are several other Code provisions that may limit the ability of a Limited Partner to claim deductions attributable to an investment in the Partnership.  The most significant of these limitations are discussed below.

**At Risk Limitations.** Section 465 of the Code limits certain taxpayers' losses from certain activities to the amount they are "at risk" in the activities.  Taxpayers subject to the "at risk" rules are non-corporate taxpayers, including trusts, and certain closely-held corporations.  The activities subject to the "at risk" limitations include all activities in which the Partnership expects to engage.  A Partner subject to the "at risk" rules will not be permitted to deduct in any year losses arising from its interest in the Partnership to the extent that the losses exceed the amount it is considered to have "at risk" in the

002832


HCMLPHMIT00004014

Partnership at the close of that year.

A taxpayer is considered to be "at risk" in any activity to the extent of his cash contribution to the activity, his basis in other property contributed to the activity and his personal liability for repayments of amounts borrowed for use in the activity. With respect to amounts borrowed for use in the activity, the taxpayer is not considered to be "at risk" even if he is personally liable for repayment if the borrowing was from a person who has an "interest" in the activity other than an interest as a creditor. Even if a taxpayer is personally liable for repayment of amounts borrowed for use in the activity, and even if the amount borrowed is borrowed from a person whose only interest in the activity is an interest as a creditor, a taxpayer will not be considered "at risk" in the activity to the extent his investment in the activity is protected against loss through guarantees, stop loss agreements, or other similar arrangements.

Each Limited Partner will be at risk initially for the amount of his capital contribution. A Partner's amount "at risk" will be increased by his distributive share of income from the Partnership and will be decreased by his distributive share of losses from the Partnership and distributions to him. If a Partner's amount "at risk" decreases to zero, he can take no further losses until he has an "at risk" amount to cover the losses. A Partner is subject to a recapture of losses previously allowed to the extent that his amount "at risk" is reduced below zero (limited to loss amounts previously allowed to the Partner over any amounts previously recaptured).

<u>Investment Interest Limitations</u>. To the extent that the Partnership incurs interest expense or short sale expenses, a non-corporate Limited Partner, including a trust, will likely be subject to the "investment interest expense" limitations of Section 163(d) of the Code. Investment interest expense includes (i) interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment and (ii) any amounts deductible in connection with a short sale. The deduction for investment interest expense is limited to the taxpayer's net investment income for the taxable year; i.e., the excess of investment income over investment expenses. Excess investment interest expense that is disallowed is not lost permanently but may be carried forward to succeeding years subject to the Section 163(d) limitation. Net capital gain (i.e., net long-term capital gain over net short-term capital loss) on property held for investment and qualified dividends are only included in investment income to the extent that the taxpayer elects to subject some or all of such gain or dividend income to taxation at ordinary income tax rates. The Section 163(d) limitations will apply at the Partner level with regard to the Partner's distributive share of the Partnership's interest expense.

To the extent that the Partnership is treated as engaged in a trade or business by reason of being deemed a trader, a non-corporate Limited Partner's share of the Partnership's interest expense from such trading activity would retain its character as investment interest subject to the Section 163(d) investment income limitation, but the allowable investment interest deduction would be deducted "above the line" in determining adjusted gross income and therefore fully deductible, rather than being treated as an itemized deduction.

Section 265(a)(2) of the Code disallows any deduction for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations. The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment", and that a limited partnership interest will be regarded as a "portfolio investment". Therefore, if the Partnership holds tax-exempt obligations, the IRS might take the position that all or part of the interest expense incurred by a Limited Partner in connection with the purchase of such Partner's Interest should be viewed as incurred to enable such Limited Partner to continue carrying tax-exempt obligations, and that such Limited Partner should not be allowed to deduct all or a portion of such interest.

<u>Itemized Deduction Limitations</u>. Under Section 67 of the Code, for non-corporate taxpayers, including trusts, certain miscellaneous itemized deductions are allowable only to the extent they exceed a "floor" amount equal to 2% of the taxpayer's adjusted gross income ("<u>2% Floor</u>"). To the extent that the Partnership's operations do not constitute a

002833

HCMLPHMIT00004015


trade or business within the meaning of Section 162 and other provisions of the Code, a non-corporate Limited Partner's distributive share of the Partnership's investment expenses, other than investment interest expense, would be deductible only as miscellaneous itemized deductions, subject to the 2% Floor. Moreover, a non-corporate taxpayer's investment expenses that are miscellaneous itemized deductions are also not deductible in calculating the taxpayer's alternative minimum tax liability.

Capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of excess capital losses per year against ordinary income.  Corporate taxpayers may carry back unused capital losses for three years and may carry forward such losses for five years; non-corporate taxpayers may not carry back unused capital losses but may carry forward unused capital losses indefinitely.

## ADDITIONAL TAX ISSUES

Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent that the property used to close the short sale constitutes a capital asset in the Partnership's hands.

The "wash sale" rules of Section 1091 of the Code disallow any deduction for losses arising from the sale or other disposition of "stock or securities", where, within a period beginning 30 days before such sale or disposition and ending 30 days afterwards, the taxpayer acquires "substantially identical" stocks of securities by purchase or by an exchange on which the entire amount of gain or loss is recognized.  This disallowance rule also applies where, within such 61-day period, the taxpayer enters into a contract or option to acquire substantially identical stock or securities.  Thus, if the Partnership were to engage in such a "wash sale" transaction, the Partners would not be able to recognize their distributive share of any loss realized in connection with such sale in the current year.

**Currency Fluctuations - "Section 988" Gains and Losses.**   To the extent that the Partnership's investments are made in securities denominated in a foreign currency, gain or loss realized by the Partnership frequently will be affected by the fluctuation in the value of such foreign currencies relative to the value of the U.S. dollar.  Generally, gains or losses with respect to the Partnership's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the Partnership's sale of such stock. However, under Section 988 of the Code, gains or losses of the Partnership on the acquisition or disposition of foreign currency (i.e., the purchase of foreign currency and subsequent use of such currency to acquire stock) will be treated as ordinary income or loss.  Moreover, under Section 988, gains and losses from disposition of debt securities denominated in a foreign currency  that are attributable to the fluctuations in such currency between the date of acquisition of the debt security and the date of its disposition will be treated as ordinary income or loss.  Since the Code provides limitations on the ability of taxpayers to deduct capital losses against ordinary income, a Partner's share of capital losses realized by the Partnership on sale of foreign securities would not be available to offset the Partner's share of ordinary income realized by the Partnership on its currency hedging transactions.

The Partnership may acquire foreign currency forward contracts, enter into foreign currency futures contracts and acquire put and call options on foreign currencies. Generally, foreign currency regulated futures contracts and option contracts that qualify as "Section 1256 contracts" will not be subject to ordinary income and loss treatment under Section 988.  However, if the Partnership acquires currency futures contracts or options contracts that are not Section 1256 contracts, or any currency forward contracts, any gain or loss realized by the Partnership with respect to such instruments will be ordinary income or loss, unless (i) the contract is a capital asset in the hands of the Partnership and is not part of a straddle transaction and (ii) the Partnership makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

The taxation of debt obligations under the Code is complex; the following discussion is intended to provide only a general description of these rules.  Generally, interest income and income items similar to stated interest, such as original issue discount (in general, the

| ATLAS IDF, LP | 85 |
| --- | --- |

HCMLPHMIT00004016

annual portion of the discount on original issuance of debt obligations issued for less than their stated principal amount) and market discount (the amount by which debt obligations are acquired in the secondary market for less than their principal) are treated as items of ordinary income.  Generally, debt obligations that are disposed of in a taxable transaction for an amount greater than their adjusted cost basis give rise to capital gain, which will be long-term if the debt obligation is held for longer than one year, and short-term, if held for a period of one year or less.  Generally, debt obligations that are disposed of in a taxable transaction for an amount less than their adjusted cost basis give rise to capital loss, which will be long-term if the debt obligation is held for longer than one year, and short-term if held for a period of one year or less.  In the event that any such debt obligations are not held as capital assets, such dispositions will generally give rise to ordinary gain or loss, as the case may be.

Section 1259 of the Code requires that the Partnership recognize gain on the constructive sale of any appreciated financial position in stock, a partnership interest, or certain debt instruments.  A constructive sale of an appreciated financial position occurs if, among other things, the Partnership enters into (1) a short sale of the same or substantially identical property (a transaction commonly known as a "short sale against the box"), (2) an offsetting notional principal contract with respect to the same or substantially identical property, or (3) a futures or forward contract to deliver the same or substantially identical property.  Exceptions to the foregoing apply to certain transactions closed within 30 days after the close of the taxable year if the underlying appreciated financial position remains "unhedged" for at least 60 days thereafter, and to transactions involving certain contracts to sell stock, debt instruments, or partnership interests if the contract settles within one year.

The IRS may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Partnership as "straddles" for federal income tax purposes.  The application of the "straddle" rules in such a case could affect a Partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities.  In addition, if either of the Partner's positions in such a transaction is an "appreciated financial position", application of the "straddle" rules may trigger a constructive sale of that position under the rules described above.

Section 1258 of the Code recharacterizes capital gain from a "conversion transaction" as ordinary income, with certain limitations.  Conversion transactions are defined as transactions in which substantially all the expected return is attributable to the time value of money and either: (a) the transaction consists of the acquisition of property by the taxpayer and a substantially contemporaneous agreement to sell the same or substantially identical property in the future; (b) the transaction qualifies as a "straddle" (within the meaning of Section 1092(c) of the Code); (c) the transaction is one that was marketed or sold to the taxpayer on the basis that it would have the economic characteristics of a loan but the interest-like return would be taxed as capital gain; or (d) the transaction is described as a conversion transaction in the Regulations.  The amount of gain so recharacterized will not exceed the amount of interest that would have accrued on the taxpayers' net investment for the relevant period at a yield equal to 120% of the "applicable rate".

## INVESTMENTS IN NON-U.S. CORPORATIONS

The Partnership may invest in certain foreign corporations that will be classified as "passive foreign investment companies" ("**PFICs**") for U.S. tax purposes.  Under the PFIC rules, unless the Partnership makes one of the elections described below, any gain realized by the Partnership on the sale or disposition of stock in a PFIC that is allocable to Partners that are U.S. Persons (as defined in the Code) will be treated as ordinary income and will be subject to U.S. federal income tax as if (i) the gain had been realized ratably over the Partnership's holding period and (ii) the amount deemed realized had been subject to tax in each year of that holding period at the highest applicable federal income tax rate; in addition, an interest charge at the rate generally applicable to underpayments of federal income tax will be imposed on the amount.  Further, any "excess distributions" from a PFIC (as defined in the Regulations) are treated as ordinary income (regardless of their original character) and subject to this deferred tax and interest charge.

002835

HCMLPHMIT00004017


Provided the PFIC complies with certain reporting requirements, the Partnership may elect to have the PFIC treated as a "qualified electing fund", in which case the Partnership would include annually in its gross income its *pro rata* share of the PFIC's net ordinary income and net realized capital gains, whether or not such amounts are actually distributed to the Partnership.  Generally, any net operating losses or net capital losses of the PFIC will not pass through to the Partnership and will not offset any ordinary income or capital gains of the PFIC reportable to the Partnership in subsequent years.  Alternatively, the Partnership could elect to "mark-to-market" stock in certain PFICs if such stock is considered "marketable stock" under the Code, and thereby avoid being subject to the deferred tax and interest charge discussed above.  However, there can be no assurance that the Partnership will be able to make either of these elections with respect to any PFICs in which it invests.  Further, Limited Partners may be subject to IRS reporting requirements with respect to the Partnership's investments in PFICs.

The Partnership may also invest in certain foreign corporations that will be considered "controlled foreign corporations" ("**CFCs**") for U.S. tax purposes.  A CFC is a non-U.S. corporation in which certain U.S. shareholders own, directly or indirectly, more than 50% of either the total voting power of all classes of stock entitled to vote or the total value of all classes of stock.  Under the CFC rules, certain U.S. shareholders are subject to U.S. federal income tax on certain types of income (generally passive income) realized by the CFC regardless of whether any amounts are distributed from the CFC to such U.S. shareholder.  Further, such U.S. shareholders may be subject to IRS reporting requirements with respect to investments in CFCs.

In addition, if the Partnership invests in stock of foreign corporations that become PFICs or CFCs after the Partnership has made such investment, this may also result in adverse tax consequences for the Limited Partners that are U.S. Persons and may subject them to IRS reporting requirements with respect to such investments.

### TAX-EXEMPT INVESTORS

If the Partnership derives income which would be considered "unrelated business taxable income" (as defined in Section 512 of the Code) ("**UBTI**"), if derived directly by a Limited Partner that is a qualified retirement plan or other organization exempt from tax under Sections 401 or 501(a) of the Code or an individual retirement account ("**IRA**") exempt under Section 408(e) of the Code (each, a "**Tax-Exempt Entity**"), such Limited Partner's allocable share of such Partnership income would be subject to tax.  A Tax-Exempt Entity which is subject to tax on its allocable share of the Partnership's UBTI, including an IRA, may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by a Tax-Exempt Entity (or by a partnership of which the Tax-Exempt Entity is a member) over the deductions attributable to such trade or business.  UBTI generally does not include certain passive income, including dividends, interest, annuities, royalties and gain or loss from the disposition of property held for investment, unless such income items are debt-financed income (as discussed below).

While UBTI itself is taxable, the receipt of UBTI by a Tax-Exempt Entity generally has no effect upon that entity's tax-exempt status or upon the exemption from tax of its other income.  However, for certain types of Tax-Exempt Entities, the receipt of any UBTI may have extremely adverse consequences.  In particular, for charitable remainder trusts (as defined under Section 664 of the Code), the receipt of any taxable income from UBTI during a taxable year will result in the imposition of an excise tax equal to the amount of such UBTI.

A Tax-Exempt Entity also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) pursuant to Section 514 of the Code.  In general, unrelated debt-financed income consists of: (i) income derived by a Tax-Exempt Entity (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness"

002836


HCMLPHMIT00004018

at any time during the taxable year; and (ii) gains derived by a Tax-Exempt Entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness". Acquisition indebtedness is generally defined as debt incurred to purchase or carry an investment. Such income and gains derived by a Tax-Exempt Entity from the ownership and sale of debt-financed property are taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

**Income From the Partnership's Private Equity Investments**. The Investment Manager will invest a substantial portion of the Partnership's Series 1 assets in the PE Portfolio Fund, and such partnership expects to invest in equity interests of other partnerships which will be engaged in business activities. It is anticipated that such portfolio companies may also use borrowed funds to acquire property. Accordingly, Limited Partners that are Tax-Exempt Entities should anticipate that a substantial portion, and possibly all, of their distributive share of the Partnership's net income realized from ownership of equity interests in such portfolio companies, including gain realized upon sales of such equity investments, will be subject to federal income tax as UBTI.

**Income From the Partnership's Other Activities**. The Investment Manager expects that the Partnership will incur indebtedness in connection with its operations from time to time. The law is not entirely clear regarding the appropriate method to be used to determine what portion of a tax-exempt Limited Partner's share of the Partnership's income is attributable to debt financing and therefore constitutes "debt-financed income". Accordingly while the Partnership will compute each tax-exempt Limited Partner's share of "debt-financed income" from the Partnership in a manner which the Partnership considers to be reasonable, there can be no assurance that the IRS will accept the method of computation used by the Partnership.

Tax-exempt Limited Partners will also realize UBTI if the Partnership acquires equity interests of publicly traded partnerships or private partnerships that are engaged in trade or business activities or the Partnership directly carries on other trade or business activities (other than as a securities trader).

## OTHER TAXES

Partners may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions. Each prospective investor should consider the potential consequences of such taxes due to an investment in the Partnership. It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Partnership under state law, including the laws of the state(s) of its, his or her domicile and residence, by obtaining advice from such investor's own tax advisors, and to file all appropriate tax returns that may be required.

Income received by the Partnership from sources within non-U.S. countries may be subject to withholding and other taxes imposed by such countries. Each Partner may be entitled either to deduct (as an itemized deduction) such Partner's proportionate share of the non-U.S. taxes of the Partnership in computing such Partner's taxable income or to use the amount as a foreign tax credit against his or its U.S. federal income tax liability, subject to limitations. Generally, a credit for non-U.S. taxes is subject to the limitation that it may not exceed the taxpayer's U.S. tax attributable to his or its non-U.S. source taxable income. With respect to Partners that are U.S. Persons: (i) certain currency fluctuation gains, including fluctuation gains from non-U.S.-Dollar-denominated debt securities, receivables and payables, will be treated as ordinary income derived from U.S. sources; and (ii) Partnership gains from the sale of securities also will be treated as derived from U.S. sources. The limitation on the foreign tax credit is applied separately to non-U.S. source passive income (as defined for purposes of the foreign tax credit), including the non-U.S. source passive income realized by the Partnership. The foreign tax credit limitation rules do not apply to certain electing individual taxpayers who have limited creditable non-U.S. taxes and no non-U.S. source income other than passive investment-type income. The foreign tax credit generally is eliminated with respect to non-U.S. taxes withheld on income and gain if the Partnership fails to satisfy minimum holding period

002837


HCMLPHMIT00004019

requirements with respect to the property giving rise to the income and gain.

## TAX ELECTIONS; RETURNS; TAX AUDITS

If the General Partner determines that the Partnership is treated as a securities trader for federal income tax purposes, the General Partner may cause the Partnership to elect to "mark-to-market" its securities at the end of each taxable year, in which case such securities would be treated for federal income tax purposes as though sold for fair market value on the last business day of such taxable year. Such an election under Code Section 475(f) would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the IRS. If the Partnership were to make such an election, all or a portion of the Partnership's gains and losses would be considered ordinary income or loss, rather than capital gain or loss. Since for federal income tax purposes capital losses generally may be deducted only against capital gains, a Limited Partner may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Partnership's income.

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death); provided that a partnership election has been made pursuant to Section 754 of the Code. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election. Any such election, once made, cannot be revoked without the IRS's consent. The General Partner also has the authority and sole discretion to make or refrain from making other tax elections that are available to the Partnership.

Additionally, even if a partnership has not made a Section 754 election, Section 743 of the Code provides for a mandatory basis adjustment to partnership property on certain transfers of partnership interests (including transfers by reason of death), if the partnership has a "substantial built-in loss" immediately after such transfer. A partnership is treated as having a "substantial built-in loss" if the partnership's adjusted basis in partnership property exceeds the property's fair market value by more than $250,000. Section 734 of the Code also provides for mandatory basis adjustments in the case of certain property distributions to partners. Such Code provisions could cause the Partnership to decrease the basis of its remaining assets in such circumstances.

The General Partner will decide how to report partnership items on the Partnership's tax returns and all Limited Partners are required to treat such tax items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. Since the Partnership may engage in transactions whose treatment for tax purposes is not clear, there is a risk that a claim of tax liability could be asserted against the Partnership or its Partners. In the event that the income tax returns of the Partnership are audited by the IRS, the tax treatment of Partnership income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Partners. As the "Tax Matters Partner", the General Partner has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Partnership items. The General Partner may, in its sole discretion, consult with, and rely upon, the Partnership's auditors and their determinations or advice as to tax and/or accounting matters.

It is possible that the Partnership and or certain transactions executed by the Partnership would be subject to tax shelter disclosure registration and listing requirements under applicable U.S. tax laws and regulations.

**PFIC Reporting.** The Code provides that each U.S. Person (as defined herein) that is a direct or indirect shareholder of a PFIC (generally, an investment corporation organized under the laws of a foreign jurisdiction) is required to file an annual information return containing such information as the IRS may require. Limited Partners would be indirect shareholders of stock in any PFICs owned by the Partnership, and would satisfy such filing requirement (if applicable to such Partner) by completing a copy of IRS Form 8621

002838


HCMLPHMIT00004020

for the reportable PFIC investment and submitting such forms to the IRS with the Partner's federal income tax return.

**FATCA Withholding and Compliance**. The provisions of the Code known as the Foreign Account Tax Compliance Act ("**FATCA**") provide that a 30% withholding tax will be imposed on payments of U.S.-source dividends and interest (and certain other items of U.S.-source income) to certain foreign financial entities, and beginning on January 1, 2017 with regard to other withholdable payments (including gross proceeds from the sale of property that give rise to U.S.-source, interest or dividends), unless the foreign financial entity has registered with the IRS and agreed to provide specified U.S. tax information concerning "specified U.S. persons" that own interests in the foreign entity. The Partnership is a withholding agent with respect to such withholding taxes that may be imposed on any of its Partners.  U.S. and non-U.S. Partners will be required to furnish appropriate documentation certifying as to their U.S. or non-U.S. tax status, together with such other additional tax information as the Partnership may from time to time request. Limited Partners that are "non-financial foreign entities" (as defined in Code Section 1472) are required to certify whether they have any "substantial United States owners" and, if so, to disclose the identity and tax identification numbers of such persons to the Partnership. Failure to provide such information may subject a Limited Partner to withholding taxes or mandatory withdrawal of its entire interest in the Partnership.  Limited Partners are encouraged to consult with their own tax advisors regarding the possible impact of the FATCA legislation on their investment in the Partnership.

## OTHER MATTERS

The Partnership may incur certain expenses in connection with its organization and the marketing of the Interests.  Amounts paid or incurred to organize the Partnership are being amortized, for tax purposes, over a period of 180 months from the date the Partnership commenced operations.  Amounts paid or incurred to market interests in a partnership (marketing and syndication expenses) are not deductible or amortizable.

002839

HCMLPHMIT00004021

## SPECIAL CONSIDERATIONS FOR PARTNERS THAT ARE NOT U.S. PERSONS

A "**U.S. Person**" is (a) a citizen or resident of the United States, (b) a corporation, partnership, or other entity organized under the laws of the United States, any state, or the District of Columbia, other than a partnership that is not treated as a U.S. Person under the Regulations, (c) an estate whose income is subject to United States income tax, regardless of its source, or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in the Regulations, "U.S. Person" includes certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, that have elected to be treated as U.S. Persons.  Partners that are not U.S. Persons are referred to below as "non-U.S. Partners".

**Taxation of Effectively Connected Income**.  The Partnership expects to be treated for U.S. tax purposes as being engaged in the conduct of a U.S. trade or business.   As a result, non-U.S. Limited Partners that acquire interests in the Partnership will generally be treated as being engaged in the conduct of a U.S. trade or business.  Thus, each non-U.S. Limited Partner will be subject to U.S. federal income taxation, at graduated rates, on its distributive share of the Partnership's income, gain or loss (whether ordinary or capital) that is effectively connected with the conduct of the Partnership's U.S. trade or business ("**ECI**").  Such Limited Partners will be required to file annual U.S. federal income tax returns with respect to such ECI, and the Partnership will be required to withhold and remit to the U.S. Treasury a portion of the non-U.S. Limited Partner's distributive share of such ECI.  The Limited Partner would be entitled to claim a credit on his U.S. federal income tax return for the amount withheld by the Partnership with respect to such ECI.  Non-U.S. Limited Partners may also be required to file applicable state and local tax returns in jurisdictions in which the Partnership is engaged in business or in which its real property interests are located.

**U.S. Branch Profits Tax**.  In the case of a Limited Partner that is a non-U.S. corporation, in addition to the regular corporate income tax that must be paid on its ECI, the Code provides for an additional 30% "branch profits" tax.  The branch profits tax is 30% (or lower rate permitted by tax treaty) of the foreign corporation's "dividend equivalent amount".  This is the amount of the foreign corporation's effectively connected after-tax earnings that are not reinvested in a U.S. trade or business by the end of the tax year or disinvested in a later tax year.  Certain income tax treaties may reduce or eliminate the branch profits tax; however, under certain circumstances, the branch profits tax may override income tax treaty benefits.

**FIRPTA**.  The Foreign Investment in Real Property Tax Act of 1980, as amended ("**FIRPTA**"), imposes a  tax on gain realized on disposition by a foreign person of a "U.S. real property interest" ("**USRPI**") by treating such gain as ECI, generally giving rise to the tax consequences described above.  A USRPI  includes a direct investment in U.S. real estate and buildings and also investments in stock and certain types of debt interests of a U.S. corporation that is classified as a "U.S. real property holding corporation" (as defined in the Code).  A USRPI held by a partnership is deemed to be held proportionately by its partners.

**Taxation of Non-ECI**.  The Partnership also expects to realize certain types of periodic income from U.S. sources (e.g., dividends and certain types of interest) which are not classified as ECI.  Each non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income.  Such withholding tax is sometimes reduced or eliminated by an applicable income tax treaty, provided that the proper certification is provided by the non-U.S. Limited Partner when necessary.  The applicable IRS form or forms (W-8 series) should be submitted to the Partnership by each non-U.S. Limited Partner at the time such Limited Partner acquires an Interest in the Partnership, and should be resubmitted every three years thereafter (or earlier, if the information on such form changes before such date).

**Disposition of Partnership Interests**.  A non-U.S. Limited Partner that disposes of its Interest in the Partnership, by sale or otherwise, may be subject to U.S. federal income

002840


HCMLPHMIT00004022

taxation on such disposition.   A transferee of an Interest in the Partnership may be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition.  Any amount so withheld can be applied as a credit against the U.S. federal income tax liability of the non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment.

**U.S. Estate and Gift Taxation of Interests**.   Non-U.S. Limited Partners that are individuals should also be aware that Interests in the Partnership will be treated as U.S. situs property by reason of the Partnership's ownership of U.S. real property interests, and thus subject to U.S. estate taxation upon the death on a non-U.S. individual owner, or U.S. gift taxation upon a donative transfer of such Interest.

## STATE TAXATION

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Partnership.   No attempt is made herein to provide a discussion of such state tax consequences.  State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit.   A Partner's distributive share of the taxable income or loss of the Partnership generally will be required to be included in determining the Partner's reportable income for state tax purposes in the jurisdiction in which such Partner a resident.   Each prospective investor must consult such investor's own tax advisors regarding such state tax consequences.

## FUTURE TAX LEGISLATION

Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Partnership, with or without advance notice, and retroactively or prospectively.

002841

HCMLPHMIT00004023

**EXHIBIT**

002842

SadisGoldberg LLP

| FOR THE EXCLUSIVE USE OF: | | COPY NO. | |

## Rand PE Fund I, L.P.

### A DELAWARE "SERIES" LIMITED PARTNERSHIP

**GENERAL PARTNER:**
RAND PE FUND MANAGEMENT, LLC

**INVESTMENT MANAGER:**
RAND ADVISORS, LLC

### OFFERING OF SERIES 1 LIMITED PARTNERSHIP INTERESTS

**November 30, 2015**

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE INTERESTS DESCRIBED HEREIN IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

002843

HCMLPHMIT00004024

## DIRECTORY

| INVESTMENT MANAGER | GENERAL PARTNER |
|---|---|
| RAND ADVISORS, LLC | RAND PE FUND MANAGEMENT, LLC |
| 87 RAILROAD PLACE, SUITE 403 | 87 RAILROAD PLACE, SUITE 403 |
| SARATOGA SPRINGS, NY 12866 | SARATOGA SPRINGS, NY 12866 |
| ATTENTION: JOHN HONIS | ATTENTION: JOHN HONIS |
| TELEPHONE: (214) 335-7969 | TELEPHONE: (214) 335-7969 |
| EMAIL: JHONIS@RANDADVISORS.COM | EMAIL: JHONIS@RANDADVISORS.COM |

LEGAL COUNSEL

SADIS & GOLDBERG LLP
551 FIFTH AVENUE, 21ST FLOOR
NEW YORK, NEW YORK 10176
ATTENTION: STEVEN HUTTLER, ESQ.
TELEPHONE: (212) 573-8424
FACSIMILE: (212) 573-8151
EMAIL: SHUTTLER@SGLAWYERS.COM

HCMLPHMIT00004025

## TABLE OF CONTENTS

CAPTION                                                                    PAGE

OVERVIEW ......................................................................................................... 1

IMPORTANT GENERAL CONSIDERATIONS ............................................................ 3

SUMMARY OF OFFERING AND PARTNERSHIP TERMS ............................................ 6

MANAGEMENT .................................................................................................. 20

SERVICE PROVIDERS ......................................................................................... 22

INVESTMENT PROGRAM ..................................................................................... 24

BROKERAGE PRACTICES .................................................................................... 27

RISK FACTORS AND CONFLICTS OF INTEREST ..................................................... 30

ERISA CONSIDERATIONS .................................................................................. 55

TAXATION ......................................................................................................... 57


EXHIBITS

AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT ....................................... EXHIBIT A

SUBSCRIPTION DOCUMENTS ........................................................................... EXHIBIT B

PART 2 OF RAND ADVISORS, LLC's FORM ADV ........................................................ EXHIBIT C

002845

HCMLPHMIT00004026

<div align="right">**OVERVIEW**</div>

### DESCRIPTION OF INTERESTS AND STRUCTURE

Rand PE Fund I, L.P. ("**Partnership**"), a "series" limited partnership organized under the Delaware Revised Uniform Limited Partnership Act, is offering limited partner interests in the Partnership ("**Interests**") in a private placement pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended ("**Securities Act**"), and Regulation D promulgated thereunder. The Partnership may offer Interests in separate Series (as defined and described herein). Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

Only persons that are Accredited Investors (as defined in Rule 501 of Regulation D promulgated under the Securities Act), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")) may purchase Interests. The Subscription Documents (as defined below) set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser.

The Partnership was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

Rand PE Fund Management, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets. The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**"). A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000. The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000. In each case, the General Partner has discretion to accept lesser amounts. Generally, new Limited Partners will be admitted on the first day of each month, and withdrawals may be made on the last day of each calendar quarter upon 91 days' prior written notice, subject to certain restrictions as described herein (unless, in each case, the General Partner, in its sole discretion, permits subscriptions or withdrawals at another time).

<div align="center">[<em>remainder of this page intentionally left blank</em>]</div>

002846

HCMLPHMIT00004027



## INVESTMENT OBJECTIVE AND STRATEGY

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation. The Investment Manager intends to invest the Partnership's portfolio in small- to medium-sized companies (i.e., generally with market capitalization of under $1 billion) that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions. The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. The Partnership (x) is expected to initially invest all or substantially all of the assets attributable to Series 1 in the Highland Transaction (as defined herein), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction. **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.** See "INVESTMENT PROGRAM" herein for further details.

## RISK FACTORS, CONFLICTS OF INTERESTS AND OTHER CONSIDERATIONS

Before purchasing an Interest in the Partnership, you should carefully consider various risk factors and conflicts of interest, as well as suitability requirements, restrictions on transfers and withdrawals of Interests and various legal, tax and other considerations, all of which are discussed elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**").

002847

HCMLPHMIT00004028

**IMPORTANT GENERAL CONSIDERATIONS**

You should not construe the contents of this Memorandum as legal, tax or investment advice and, if you acquire an Interest, you will be required to make a representation to that effect. You should review the proposed investment and the legal, tax and other consequences thereof with your own professional advisors. The purchase of an Interest involves certain risks and conflicts of interest among the General Partner, the Investment Manager and the Partnership. See "RISK FACTORS AND CONFLICTS OF INTEREST". The General Partner reserves the right to refuse any subscription for any reason.

In making an investment decision, you must rely on your own examination of the Partnership and the terms of the offering of Interests, including the merits and risks involved. You and your representative(s), if any, are invited to ask questions and obtain additional information from the General Partner concerning the terms and conditions of the offering, the Partnership, and any other relevant matters to the extent that the General Partner possesses such information or can acquire it without unreasonable effort or expense.

Neither the SEC nor any state securities commission has passed upon the merits of participating in the Partnership, nor has the SEC or any state securities commission passed upon the adequacy or accuracy of this Memorandum. Any representation to the contrary is a criminal offense. The General Partner anticipates that: (i) the offer and sale of the Interests will be exempt from registration under the Securities Act and the various state securities laws; (ii) the Partnership will not be registered as an investment company under the Investment Company Act, pursuant to an exemption provided by Section 3(c)(7) thereunder; and (iii) neither the General Partner nor the Investment Manager will be registered as a commodity pool operator under the Commodity Exchange Act, as amended ("CEA"), based upon an exemption available under Rule 4.13(a)(3) thereunder. Consequently, you will not be entitled to certain protections afforded by those statutes.

The Investment Manager is registered as an investment adviser with the SEC. A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

Pursuant to Rule 4.13(a)(3) of the CEA, each of the General Partner and the Investment Manager is exempt from registration with the Commodity Futures Trading Commission ("CFTC") as a commodity pool operator and therefore, unlike a registered commodity pool operator, it is not required to deliver a Disclosure Document (as such term is defined under CFTC rules) and a certified annual report to participants in the pool. The foregoing registration exemption is based on the Partnership's limited commodity trading activity and its undertaking that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions, determined at the time the most recent position was established, will not exceed 5% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions; or (b) the aggregate net notional value of the Partnership's commodity interest positions, determined at the time the most recent position was established, will not exceed 100% of the liquidation value of the Partnership's portfolio, after taking into account unrealized profits and losses on any such positions. Certain types of swaps are included in the definition of "commodity interests". These swaps include interest rate swaps, currency swaps, energy and metal swaps, agricultural swaps, swaps on broad-based indices, swaps on government securities and certain mixed swaps.

As a Limited Partner, you may withdraw from the Partnership and receive payment for your Interests, subject to certain restrictions, as specified in the Amended and Restated Limited Partnership Agreement of the Partnership (as the same may be amended and/or restated from time to time, the "Partnership Agreement"), a copy of

002848

HCMLPHMIT00004029

which is attached hereto as Exhibit A.

The offering of Interests is made only by delivery of a copy of this Memorandum to the person whose name appears hereon.  The offering is made only to potential investors who are Accredited Investors, Qualified Clients and Qualified Purchasers.  By accepting delivery of this Memorandum, you agree not to reproduce or divulge its contents, in whole or in part, and, if you do not purchase any Interests, to return this Memorandum and the exhibits attached hereto to the General Partner or the Partnership's administrator, a provider of administrative services ("<u>Administrator</u>"), as further set forth herein under "SERVICE PROVIDERS—Administrator".

Notwithstanding any provision in this Memorandum to the contrary, prospective Limited Partners (and their employees, representatives, and other agents) may disclose to any and all persons the U.S. federal income tax treatment and tax structure of the Interests offered hereby.  For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income tax treatment of the Interests, and does not include information relating to the identity of the issuer, its affiliates, agents or advisors.

There is no public market for the Interests nor is any expected to develop.  Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted, except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Partnership Agreement.  Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner.  Accordingly, if you purchase an Interest, you will be required to represent and warrant that you have read this Memorandum and are aware of and can afford the risks of an investment in the Partnership for an indefinite period of time.  You will also be required to represent that you are acquiring the Interest for your own account, for investment purposes only, and not with any intention to resell or transfer all or any part of the Interest.  This investment is suitable for you only if you have adequate means of providing for your current and future needs, have no need for liquidity in this investment and can afford to lose the entire amount of your investment.

Although this Memorandum contains summaries of certain terms of certain documents pertaining to the Partnership, you should refer to the actual documents (copies of which are attached hereto or are available from the General Partner or the Administrator) for complete information concerning the rights and obligations of the parties thereto.  All such summaries are qualified in their entirety by the terms of the actual documents.  No person has been authorized to make any representations or furnish any information with respect to the Partnership or the Interests, other than the representations and information set forth in this Memorandum or other documents or information furnished by the General Partner upon request, as described above.

Certain information contained in this Memorandum constitutes "forward-looking statements", which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those set forth under "RISK FACTORS AND CONFLICTS OF INTEREST", actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

No rulings have been sought from the Internal Revenue Service ("<u>IRS</u>") with respect to any tax matters discussed in this Memorandum.  You are cautioned that the views contained herein are subject to material qualifications and subject to possible changes in regulations by the IRS or by the U.S. Congress in existing tax statutes or in the interpretation of existing statutes and regulations.

002849

HCMLPHMIT00004030

**The information contained herein is current only as of the date hereof and you should not, under any circumstances, assume that there has not been any change in the matters discussed herein since the date hereof.**

002850
HCMLPHMIT00004031

## SUMMARY OF OFFERING AND PARTNERSHIP TERMS

The following summary is qualified in its entirety by other information contained elsewhere in this Confidential Private Placement Memorandum (this "**Memorandum**") and by Amended and Restated the Limited Partnership Agreement of the Partnership (as defined below) (as the same may be amended and/or restated from time to time, the "**Partnership Agreement**"), a copy of which is attached to this Memorandum as Exhibit A.  You should read this entire Memorandum and the Partnership Agreement, carefully before making any investment decision regarding the Partnership and should pay particular attention to the information under the heading "RISK FACTORS AND CONFLICTS OF INTEREST".  In addition, you should consult your own advisors in order to understand fully the consequences of an investment in the Partnership.

**The Partnership**

Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**Partnership**"), was formed to pool investment funds of its investors (each, a "**Limited Partner**" and, collectively, "**Limited Partners**"; and, together with the General Partner (as defined below), "**Partners**") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

The Partnership (x) is expected to initially invest all or substantially all of the assets attributable to Series 1 in all or substantially all of the non-voting limited partnership interests in Highland Capital Management, L.P. which the Partnership currently expects to acquire after the launch of its operations (such purchase or other acquisition, if any, collectively, the "**Highland Transaction**"), and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction.

See "INVESTMENT PROGRAM" and "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

The Partnership may offer Interests in separate Series (as defined and described herein). Only Series 1 Interests (as defined herein) are offered at this time pursuant to this Memorandum.

**Management**

Rand PE Fund Management, LLC, a Delaware limited liability company ("**General Partner**"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs.

Rand Advisors, LLC, a Delaware limited liability company ("**Investment Manager**"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("**SEC**").  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis ("**Principal**") controls all of the Partnership's operations and activities.  See "MANAGEMENT" for additional information.

**Issuance of Interests in Multiple Series**

The Interests will be offered in separate series ("**Series**").  The Partnership is currently offering one Series of Interests: "**Series 1 Interests**".  Each Series of Interests will have separate rights and obligations.  In addition, each Series of Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies.  The Partnership may issue additional Series of Interests in the future, which may have rights and obligations that differ from those of the Series 1 Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined herein) and other rights and terms.  The terms of such additional Series will be determined by the General Partner, in its sole discretion.

Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with

002851

HCMLPHMIT00004032

such portfolio, property and obligations.  The Partnership will maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.

Under Delaware law, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

Unless the context otherwise requires, Series 1 Interests and any other Series of Interests shall be collectively referred to throughout this Memorandum as the "**Interests**."  As the context may require, the holders of Series 1 Interests may be referred to herein as "**Series 1 Limited Partners**".  Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Memorandum as the "**Limited Partners**".

References herein to the Partnership shall include, where appropriate, each Series of the Partnership.  The terms of the other Series may be set forth in an amended version of this Memorandum and/or in a separate supplement hereto.

| | |
|---|---|
| **The Offering** | The Partnership is offering limited partner interests in the Partnership ("**Interests**") to persons who are Accredited Investors (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended ("**Securities Act**")), Qualified Clients (as defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended ("**Advisers Act**")), and Qualified Purchasers (as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended ("**Investment Company Act**")).  Interests represent a percentage interest in the Partnership proportionate to the capital accounts of all Partners. |

**Marketing Fees and Sales Charges**.  The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner.  See "BROKERAGE PRACTICES—Referral of Investors and Sales Charges".

| | |
|---|---|
| **How to Subscribe** | Attached as Exhibit B to this Memorandum are the subscription documents and instructions for subscribing ("**Subscription Documents**").  In order to subscribe for Interests, you must complete the Subscription Documents and return them to the Partnership's administrator, a provider of administrative services ("**Administrator**"), as further set forth herein under "SERVICE PROVIDERS—Administrator".  You must pay 100% of your investment at the time you subscribe.  Payment must be made by wire transfer of immediately available funds to the Partnership.  To ensure compliance with applicable laws, regulations and other requirements relating to money laundering, the General Partner and/or the Administrator may require additional information to verify the identity of any person who subscribes for an Interest in the Partnership. |

If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including the costs of liquidating, or otherwise adjusting the

002852

HCMLPHMIT00004033

Partnership's portfolio to accommodate, such securities (and/or other investments).  Such special charge will be assessed as of such dates deemed appropriate by the General Partner.  Any investor who contributes securities (and/or other investments) in lieu of cash to the Partnership should consult with such person's counsel or advisors as to the tax effect of such contribution.

**Eligible Investors and Suitability**

In order to invest in the Partnership, you must meet certain minimum suitability requirements, including qualifying as an Accredited Investor under the Securities Act, a Qualified Client under the Advisers Act and a Qualified Purchaser under the Investment Company Act.  The Subscription Documents set forth in detail the definitions of Accredited Investor, Qualified Client and Qualified Purchaser.  You must check the appropriate places in the Subscription Documents to represent to the Partnership that you are an Accredited Investor, a Qualified Client and a Qualified Purchaser in order to be able to purchase Interests.  The General Partner, in its sole discretion, can accept or reject any initial subscriptions from prospective Limited Partners and any additional capital contributions from existing Limited Partners for any reason or for no reason.

Entities subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and other tax-exempt entities may purchase Interests.  However, investment in the Partnership by such entities requires special consideration.  Trustees or administrators of such entities should consult their own legal and tax advisors.  The General Partner intends to use reasonable efforts to limit equity participation by "benefit plan investors" in the Partnership to less than 25% of the value of any class of Interests in the Partnership.  See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Minimum Investment**

The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000.  The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000.  In each case, the General Partner has discretion to accept lesser amounts.  Limited Partners are not required to make any additional capital contributions to the Partnership.  There is no minimum or maximum aggregate amount of funds that must or may be contributed by all Partners to the Partnership.

**Admission of Limited Partners**

Capital contributions generally will be accepted as of the first day of each month, although the General Partner, in its sole discretion, has the right to admit new Limited Partners and to accept additional funds from existing Limited Partners at any time.  Upon such admission or receipt of additional capital contributions, the Interests of the Partners will be readjusted in accordance with their capital accounts.

In connection with an additional capital contribution by an existing Limited Partner, the General Partner will:  (i) treat such additional capital contribution as a capital contribution with respect to one of such Limited Partner's existing capital accounts, or (ii) establish a new capital account to which such capital contribution will be credited and which will be maintained for the benefit of such Limited Partner separately from any existing capital account of such Limited Partner.  Such separate capital accounts may be maintained for any purpose, in the discretion of the General Partner.

**Management Fee**

The Partnership has entered into an investment management agreement (as the same may be amended and/or restated from time to time, the "**Investment Management Agreement**") by and among the Partnership and the Investment Manager.  In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager will receive a quarterly management fee ("**Management Fee**"), equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined herein), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
| --- | --- |
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |

002853

HCMLPHMIT00004034

| $200,000,000 - $249,999,999 | 0.4500% |
|---|---|
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis. For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually. The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each capital account will be charged a blended Management Fee based on the above schedule.

The Management Fee will be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee will be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee will be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's capital account during any calendar quarter. Management Fees will be payable with respect to the Interests of a Limited Partner in any Side Pocket Account (as defined below). For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments (as defined herein) will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

With respect to any Limited Partner who has requested to withdraw all of its Interests from the Partnership, with the exception of any Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account will remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve will be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, will be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

**Expenses**    **Organizational and Initial Offering Expenses.** The Partnership will pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates (as defined herein) for all organizational and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including "blue sky" filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to 60 months from the date the Partnership commences operations. Amortization of such expenses is a divergence from U.S. generally accepted accounting principles ("**GAAP**"). In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses, or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in fiscal year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of the Partnership Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within 60 months of its commencement, any unamortized expenses will be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

**Operating Expenses.** The Partnership will pay or reimburse the General Partner, the

002854

HCMLPHMIT00004035

Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Interests, including, but not limited to, printing of this Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Administrator, costs of communications with Limited Partners, and ongoing legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership.

Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses. Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

**Allocation of Expenses Among Series**. The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

**General Partner's and Investment Manager's Expenses.** The General Partner and the Investment Manager will pay their own general operating and overhead expenses associated with providing the management and investment management services required under the Partnership Agreement and the Investment Management Agreement, respectively. These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above.

The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended ("**Exchange Act**"), as further described herein. See "BROKERAGE PRACTICES—Soft Dollar Arrangements".

| Withdrawals | **Limited Partner Withdrawals Generally**. Subject to certain restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date, a "**Withdrawal Date**"), upon at least 91 days' prior written notice to the Administrator, with a copy to the General Partner. Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's capital account balance below $500,000. All withdrawals will be |

002855

HCMLPHMIT00004036

deemed made prior to the commencement of the following calendar quarter (or other relevant period).

If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal.  Such fee will be payable to the relevant Series of the Partnership and will be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

**Ability to Withdraw Is Not Guaranteed**.  Notwithstanding the foregoing, the General Partner cannot guarantee that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests.  The General Partner may, in its sole discretion:  (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal.

**Payments with Respect to Withdrawals; Applicable on a Series-by-Series Basis**.  A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, less than 90% of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts) will be paid within 90 days after the applicable Withdrawal Date.  In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any fiscal year, 90% or more of the value of such Limited Partner's capital account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute,  in the aggregate during such fiscal year, 90% of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within 90 days after the applicable Withdrawal Date.  The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs.  Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full capital account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within 90 days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

Upon withdrawal of all of the capital in its capital account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner will be deemed to have withdrawn from the Partnership or the relevant Series, and upon notice of such withdrawal, a Limited Partner will not be entitled to exercise any voting rights afforded to Limited Partners under the Partnership Agreement.

The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's capital account.

**Limitations on Withdrawals**.  The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from capital accounts:  (i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners; (ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation; (iii) if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications; or (iv) for such other reasons or for such other periods as the

002856

HCMLPHMIT00004037

General Partner may prudently and in good faith determine.

All Limited Partners will be notified in writing of any such suspension or postponement and the termination thereof.  Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement will be effected as of the first Withdrawal Date following the recommencement of withdrawals.

<u>Required Withdrawals</u>.  The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's capital accounts on at least five days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

<u>Side Pocket Accounts</u>.  A Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's capital account.  At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined below).  **For the avoidance of doubt, any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

<u>Reserves</u>.  All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.  See "—Management Fee" for more information on the Management Fee Reserve.

<u>Waiver</u>.  The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts and notice periods, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

|  |  |
|---|---|
| **Withdrawals, Resignation and Transfers by General Partner and its Affiliates** | Each of the General Partner, the Investment Manager and/or any Investment Manager Affiliate may withdraw all or any of the value in its respective capital account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.  The General Partner may resign as the general partner of the Partnership upon 30 days' prior written notice to the Limited Partners.  Upon such resignation of the General Partner, or upon its bankruptcy or dissolution, the remaining Limited Partners have the right to appoint a substitute general partner; otherwise, the Partnership will be dissolved pursuant to the procedures set forth in the Partnership Agreement.  The Partnership Agreement permits the General Partner to appoint additional general partners and to transfer its general partner interest to an affiliate of the General Partner without the consent of Limited Partners. |
| **Leverage** | The Investment Manager may cause the Partnership to undertake leverage.  Leverage may take a variety of forms, including, but not limited to, the following: long-term loans, convertible notes and repurchase arrangements.  Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.  See "INVESTMENT PROGRAM" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein. |
| **Determination of Net Asset Value** | The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, is determined in accordance with the Partnership Agreement and is generally equal to the amount by which the value of the Partnership's assets exceeds the amount of its liabilities.  Net Asset Value calculations will be made by the Administrator (based on the information provided by the Investment Manager) on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with |

002857

HCMLPHMIT00004038

GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to 60 months from the date the Partnership commences operations, and (y) reserves may be taken that are inconsistent with GAAP), this Memorandum and the Partnership Agreement.

In making such determinations, securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, will be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date. Options that are listed on a securities or commodities exchange will be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; *provided* that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options will be valued at the midpoint between the last "bid" and "ask" prices for such options on such date. Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, will be valued based upon quotations obtained from market makers, dealers or pricing services.

The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments.

If the Investment Manager, in its sole discretion, determines that the valuation of any security, commodity, option or other financial instrument pursuant to the foregoing does not fairly represent its market value, the Investment Manager will value such security, commodity, option or other financial instrument as it reasonably determines. Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value. Absent bad faith or manifest error, all Net Asset Value determinations pursuant to the Partnership Agreement are conclusive and binding as to all Partners.

**Allocation of Profit and Loss**  To determine how the economic gains and losses of the Partnership will be shared, the Partnership Agreement allocates net income or loss (increases and decreases in Net Asset Value) to each Partner's capital account. Net income or loss includes all portfolio gains and losses, whether realized or unrealized, plus all other Partnership items of income (such as interest) and less all Partnership expenses. Generally, net income and net loss for each month (or other period, as the case may be) will be allocated to the Partners in proportion to their capital account balances as of the start of such month (or such other period). Net income and net losses in any Side Pocket Accounts or other memorandum accounts will be allocated to those Partners participating in such accounts in proportion to their capital account balances in such accounts. All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of the Partnership Agreement will be determined by the General Partner in its sole discretion. Capital account balances will reflect capital contributions, previous allocations of increases and decreases in Net Asset Value, withdrawals, distributions (if any), and expenses. For the avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

**Allocation of Taxable Income and Loss**  For income tax purposes, all items of taxable income, gain, loss, deduction and credit will be allocated among the Partners at the end of each fiscal year in a manner consistent with their economic interests in the Partnership. In light of the fact that the Partnership does not intend to make distributions, to the extent that the Partnership's investment activities are successful, Limited Partners should expect to receive allocations of income and loss, and may incur tax liabilities from an investment in the Partnership without receiving cash distributions from the Partnership with which to pay those liabilities. To obtain cash from the Partnership to pay taxes, if any, Limited Partners may be required to make withdrawals, subject to the limitations in the Partnership Agreement. For the

---

002858

HCMLPHMIT00004039

avoidance of doubt, the foregoing provisions will apply on a Series-by-Series basis.

**Side Pocket Accounts**    The Investment Manager may designate that certain investments held by a Series of the Partnership be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines.  Such investments may include:  (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; and (iii) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**").  Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment, or that a follow-on investment should be categorized as a new Illiquid Investment.  **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**  Illiquid Investments held in a Side Pocket Account will be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event.  Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) will be reallocated, *pro rata*, from the Side Pocket Account to the capital accounts of participating Partners in accordance with their respective interests in such Side Pocket Account.  Until such reallocation, a Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of Illiquid Investments held in a Side Pocket Account.  Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account will receive an amount equal to its interest in such Side Pocket Account (net of any accrued Management Fee and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve) with respect thereto), within 90 days after such reallocation.  **For the avoidance of doubt, any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission.  Any expenses relating specifically to a Side Pocket Account will be charged to the Partners participating in such account.  If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment, only the Partners participating in such original investment will participate in such follow-on investment in proportion to their interest in the related Side Pocket Account; *provided, however*, that, if a Partner shall have withdrawn from the Partnership, the General Partner will equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the follow-on investment.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest" herein.

002859
HCMLPHMIT00004040

<table>
<tr><td>

**New Issues
Accounts; Other
Memorandum
Accounts**

</td><td>

From time to time, the Partnership may purchase securities that are part of a public distribution.  Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in initial public offerings of equity securities ("**New Issues**"), each subject to a *de minimis* exemption.  To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**").  Participation in New Issues Accounts will be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed levels permitted under applicable FINRA rules.

</td></tr>
</table>

In addition, as a matter of fairness to Partners that do not participate in New Issues, a use-of-funds charge may be debited to the capital accounts of those Partners that do participate in New Issues and credited to the capital accounts of all the Partners.  The General Partner may calculate such charge, in its discretion, in any manner consistent with applicable FINRA rules, including, debiting amounts equal to interest, (i) on the funds used to purchase the New Issues at the annual rate being paid by the Partnership, or (ii) that would be paid by the Partnership on borrowed funds during the applicable period.

Upon the sale or other disposition of New Issues (including any transfer of the underlying securities in the New Issues Account to the capital accounts of all of the Partners, after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period will be credited or debited to the capital accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein.  Accordingly, the returns to Limited Partners on their investments in the Partnership may differ depending upon whether or not they are a Restricted Person.

In addition to the foregoing with respect to Side Pocket Accounts and New Issues Accounts, to the extent that certain Limited Partners are restricted from participating in any other transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such restricted Limited Partners.  Only those Limited Partners who the General Partner determines are eligible will participate in such accounts.

<table>
<tr><td>

**Side Letters**

</td><td>

The Partnership, the General Partner and/or the Investment Manager may from time to time enter into side letters or other similar agreements (collectively, "**Side Letters**") with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement.  Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners.

</td></tr>
<tr><td>

**Reports to Limited
Partners**

</td><td>

Each Limited Partner will receive the following, with respect to the relevant Series: (i) annual financial statements of the Partnership audited by an independent certified public accounting firm; (ii) quarterly unaudited performance information; (iii) copies of such Limited Partner's Schedule K-1 to the Partnership's tax returns; and (iv) other periodic reports or letters as determined by the General Partner in its sole discretion.  The financial statements of the Partnership will be prepared in accordance with GAAP (except to the extent that this Memorandum or the Partnership Agreement states or contemplates that such statements may be inconsistent with GAAP).

</td></tr>
</table>

002860

HCMLPHMIT00004041

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**IFRS**").  In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

The Partnership will bear all fees incurred in providing such tax returns and reports.

The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, which may affect investment and withdrawal decisions, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information.

|  |  |
|---|---|
| **Transferability of Interests** | As a Limited Partner, you may not assign or transfer your Interest (except by operation of law) without the consent of the General Partner, which consent may be given or withheld in its sole discretion.  No transfer of an Interest by a Limited Partner will be permitted if it would result in the termination of the Partnership for federal income tax purposes.  Transfers of Interests are subject to other restrictions set forth in the Partnership Agreement, including compliance with ERISA and federal and state securities laws. |

Due to these limitations on transferability, Limited Partners may be required to hold their Interests indefinitely, unless they withdraw from the Partnership in accordance with the provisions set forth in the Partnership Agreement.

|  |  |
|---|---|
| **Distributions; Distributions Upon Termination of the Partnership** | The Partnership does not expect to make any distributions to Limited Partners from profits or capital, except pursuant to requests for withdrawals and upon termination of the Partnership or the relevant Series. Upon the termination of the Partnership (as further described in the Partnership Agreement), the assets of the Partnership or the relevant Series will be liquidated (or distributed) and the proceeds of liquidation will be used to pay off known liabilities, establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP), and any remaining balance will be applied and distributed in proportion to the respective capital accounts of the Partners. The Partnership or the relevant Series may satisfy any distributions to Limited Partners in cash, in-kind or any combination thereof.   Additionally, the General Partner may create a liquidating fund entity (e.g., a liquidating trust or similar vehicle) and may transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership or Series assets, including, but not limited to Side Pocket Accounts, and may distribute ownership interests in such entity to Limited Partners. |

The termination of the Partnership shall constitute the termination of all Series.  For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership.

|  |  |
|---|---|
| **Bank Holding Companies** | Limited Partners that are Bank Holding Companies ("**BHC Limited Partners**") (as defined by Section 2(a) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) are limited to 4.99% of the voting Interest in the Partnership under Section 4(c)(6) of the BHCA.  The portion of the Interest in the Partnership held by a BHC Limited Partner in excess of 4.99% of the aggregate outstanding voting Interests of all Limited Partners will be deemed non-voting Interests in the Partnership.  BHC Limited Partners holding non-voting Interests in the Partnership are permitted to vote such Interests (i) on any proposal to dissolve or continue the business of the Partnership under the Partnership Agreement and (ii) on matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to the Partnership Agreement or modifications of the terms of its Interest).  For the avoidance of doubt, the foregoing provisions shall apply on a Series-by-Series basis.  Except with regard to restrictions on voting, non-voting Interests are identical to all other Interests held by Limited Partners. |

|  |  |
|---|---|
| **Voting Rights and Amendments** | The voting rights of Limited Partners are very limited.  Other than as explicitly set forth in the Partnership Agreement, Limited Partners have no voting rights as to the Partnership or its management.  Generally, the Partnership Agreement may be amended only with the |

002861

HCMLPHMIT00004042

consent of the General Partner and Limited Partners owning more than 50% of all of the outstanding Interests of each Series; *provided* that: (x) for matters only relating to one Series, only the Limited Partners of that Series will vote on such matters, and (y) that the General Partner may amend the Partnership Agreement without the consent of or notice to any of the Limited Partners if, in the opinion of the General Partner, the amendment does not materially adversely affect any Limited Partner.

|  |  |
|---|---|
| **Liability of Limited Partners** | No Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Limited Partner's capital account in the relevant Series, from time to time, including any amounts thereof attributable to capital contributions, except that such Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership or the relevant Series in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership or the relevant Series in order to pay such Limited Partner's *pro rata* share of any Partnership or Series liabilities that arose while such Limited Partner held Interests.  Subject to the foregoing, no Limited Partner shall be obligated to provide any contributions to the Partnership or the relevant Series, other than its initial capital contribution. No Limited Partner shall be obligated to make any loan to the Partnership or a Series. |

Under the Delaware Revised Uniform Limited Partnership Act ("**Delaware Act**"), when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership or a Series for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership or the relevant Series was prohibited from making such distribution pursuant to the Delaware Act.

|  |  |
|---|---|
| **Brokerage Practices** | Portfolio transactions for the Partnership will be allocated by the Investment Manager to brokers on the basis of best execution and in consideration of, among other factors, such brokers' ability to effect transactions, operational efficiency, reputation and financial strength. See "BROKERAGE PRACTICES". |
| **Other Activities of the General Partner, the Investment Manager, the Principal and Affiliates** | None of the General Partner, the Investment Manager, the Principal or any of their respective partners, managers, members, directors, officers, employees, agents and affiliates (collectively, "**Investment Manager Affiliates**") is required to manage the Partnership as its sole and exclusive function.  In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage other accounts and/or establish other private investment funds in the future (both domestic and offshore) (such accounts and funds, collectively, "**Affiliated Funds**"), including those that may employ an investment program and strategy similar to that of the Partnership. |

Specifically, as of the date hereof:  (i) the Investment Manager acts as the investment manager to Atlas IDF, LP, a Delaware "series" limited partnership ("**IDF Fund**") that is structured as an insurance-dedicated fund and is expected to invest a portion of its assets in the Partnership; (ii) Atlas IDF GP, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the IDF Fund; (iii) the Principal is the managing member and controlling person of Atlas IDF GP, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

See "MANAGEMENT" and "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

|  |  |
|---|---|
| **Exculpation and Indemnification** | The Partnership Agreement provides that none of the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct.  The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager and the Investment Manager |

002862

HCMLPHMIT00004043

Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis. The Investment Management Agreement also provides similar protections to the Investment Manager.

| | |
|---|---|
| **Term** | The term of the Partnership will continue indefinitely until terminated in accordance with the Partnership Agreement.  Under the Partnership Agreement, the Partnership may be terminated at the election of the General Partner. |
| **Fiscal Year** | The fiscal year of the Partnership will end on December 31 of each year.  However, the fiscal year may be changed at any time by the General Partner, in its sole and absolute discretion. |
| **Auditor** | The Partnership intends to engage a nationally recognized public accounting firm to act as the Partnership's auditor.  Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. |
| **Administrator** | The Partnership intends to engage a provider of administrative services to acts as the Partnership's Administrator, as further set forth herein.  Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.  See "SERVICE PROVIDERS—Administrator" herein. |
| **Shared Services Arrangement** | In addition, the Investment Manager has entered into a shared services agreement ("**Shared Services Agreement**") with Highland Capital Management, L.P., a Delaware limited partnership (in its capacity with respect to the Shared Services Agreement, the "**Shared Services Provider**"), pursuant to which the Shared Services Provider will provide certain administrative, information technology, accounting, tax, back-office and other services to the Investment Manager.  The Partnership will not incur any additional fees as a result of the arrangements with the Shared Services Provider.  See "RISK FACTORS AND CONFLICTS OF INTEREST" herein. Also see "SERVICE PROVIDERS—Administrator" herein. |
| **Regulatory Compliance Provider** | The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details. |
| **Legal Counsel** | Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters.  Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum.  Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel. |
| | There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted.  In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or |

002863

HCMLPHMIT00004044

disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership. Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues. Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof. In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade. It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the IDF Fund, the possible consummation of the Highland Transaction, and certain related matters. The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

Also see "RISK FACTORS AND CONFLICTS OF INTEREST—Conflicts of Interest—Lack of Separate Representation; Potential Conflicts of Counsel" herein.

**Address for Inquiries**    You are invited to, and it is highly recommended that you do, meet with the General Partner and/or the Administrator (to the extent applicable) for a further explanation of the terms and conditions of this offering of Interests and to obtain any additional information necessary to verify the information contained in this Memorandum, to the extent that the General Partner and/or the Administrator (to the extent applicable) possesses such information or can acquire it without unreasonable effort or expense. Requests for such information should be directed to:

Rand PE Fund Management, LLC
87 Railroad Place, Suite 403
Saratoga Springs, NY 12866
Attention: John Honis
Telephone: (214) 335-7969
Email: Jhonis@RandAdvisors.com

002864
HCMLPHMIT00004045

<div align="right">**MANAGEMENT**</div>

### BACKGROUND OF THE GENERAL PARTNER AND THE INVESTMENT MANAGER

The General Partner of the Partnership is Rand PE Fund Management, LLC, a Delaware limited liability company.  The General Partner is responsible for the management of the Partnership's affairs.

The Investment Manager of the Partnership is Rand Advisors, LLC, a Delaware limited liability company.  The Investment Manager has discretionary investment authority over the Partnership's assets.  The Investment Manager is registered as an investment adviser with the SEC.  A copy of Part 2 of the Investment Manager's Form ADV is attached hereto as Exhibit C.

As the managing member and controlling person of the General Partner and the Investment Manager, John Honis controls all of the Partnership's operations and activities.

Limited Partners do not have any right to participate in the management of the Partnership and have very limited voting rights.

<div align="right">### BACKGROUND OF THE PRINCIPAL</div>

***John Honis, Principal***

Mr. Honis has more than 25 years of investment management and business experience. He has a background in the credit markets and private equity.  Throughout his career in the investment management industry, Mr. Honis has guided many portfolio companies across several continents.  Mr. Honis' business experience includes roles as CEO, CRO and board-level advisory positions to both high-growth and distressed companies, in a wide range of manufacturing and service industries.

Mr. Honis founded Barrier Advisors, a recognized provider of strategic, operational and financial advice to private equity, venture capital and money management institutions. He led many turnarounds and strategic growth initiatives and has attracted many of the nation's reputable turnaround practitioners to the Barrier team.

Previously, Mr. Honis was a high-tech executive, having served as President, CEO or Chief Restructuring Officer of five telecommunications firms. His experiences in all aspects of growth management, strategic/operational turnarounds, financial restructuring, mergers and acquisitions and capital markets were the foundational elements of Barrier Advisors' charter.  Mr. Honis was previously a Partner and Co-Head of Private Equity at Highland Capital Management, L.P. ("**Highland**") (which now serves as the Shared Services Provider to the Investment Manager).

Mr. Honis' early career started at J.P. Morgan in New York where he was worked in the firm's global consulting practice. At J.P. Morgan, he specialized in the design and implementation of worldwide corporate finance processes and systems. Mr. Honis received a BA Degree in Economics from Syracuse University.

Mr. Honis currently serves on the Board of Trustees for each of Highland's affiliated registered investment companies and on the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland.

***Additional Personnel***

The General Partner and the Investment Manager may employ additional personnel in the future.

002865


HCMLPHMIT00004046

## OTHER ACTIVITIES OF THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates is required to manage the Partnership as its sole and exclusive function. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage in other business activities, including competing ventures and/or other unrelated employment, and is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership.

In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership.

Specifically, as of the date hereof:  (i) the Investment Manager acts as the investment manager to the IDF Fund that is structured as an insurance-dedicated fund and is expected to invest a portion of its assets in the Partnership; (ii) Atlas IDF GP, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the IDF Fund; (iii) the Principal is the managing member and controlling person of Atlas IDF GP, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.  See "RISK FACTORS AND CONFLICTS OF INTEREST" herein.

### INVESTMENTS BY THE GENERAL PARTNER, THE INVESTMENT MANAGER, THE PRINCIPAL AND AFFILIATES

Capital contributions by the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates will generally be on the same basis as capital contributions made by other investors, except that, in the discretion of the Investment Manager, no Management Fee may be assessed to such persons.  Neither the Partnership Agreement nor the Investment Management Agreement requires the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates to maintain any minimum capital account balance.

002866

HCMLPHMIT00004047

<div style="background:black;color:white">SERVICE PROVIDERS</div>

### ADMINISTRATOR

The Partnership intends to engage an Administrator and enter into an Administration Agreement with the Administrator ("**Administration Agreement**"). The Administrator may be: (x) a nationally recognized provider of administrative services or (y) Highland (i.e., the Shared Services Provider); provided that, for the avoidance of doubt, any Administration Agreement with Highland, to the extent applicable, will be in addition to the Shared Services Agreement. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

The Administration Agreement will include industry-standard provisions relating to scope of services, fees, termination and indemnification.

The Administrator will be a service provider to the Partnership and will not be responsible for the preparation of this Memorandum or the activities of the Partnership, and therefore accepts no responsibility for any information contained in this Memorandum. The Administrator will not participate in the Partnership's investment decision-making process.

### AUDITOR

The Partnership intends to engage a nationally recognized public accounting firm to act as the auditor for the Partnership. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

### REGULATORY COMPLIANCE PROVIDER

The Investment Manager intends to engage a reputable regulatory compliance provider for the Investment Manager, the General Partner and certain of their respective affiliates. Shortly after such engagement, the Partnership intends to distribute a supplement to this Memorandum to all then-current investors with the relevant details.

### LEGAL COUNSEL

Sadis & Goldberg LLP acts as legal counsel to the General Partner, the Investment Manager, the Partnership and certain of their respective affiliates in connection with the offering of Interests and other ongoing matters. Sadis & Goldberg LLP has been retained to prepare offering documentation in connection with the offering but not to conduct any due diligence on the Principal, the General Partner, the Investment Manager or any of the information in this Memorandum. Sadis & Goldberg LLP does not represent the Limited Partners, and each Limited Partner is urged to consult with its own counsel.

There may exist other matters that could have a bearing on the Partnership as to which Sadis & Goldberg LLP has not been consulted. In addition, Sadis & Goldberg LLP does not undertake to monitor compliance by the Investment Manager, the General Partner, the Principal and their respective affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Sadis & Goldberg LLP monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Sadis & Goldberg's responsibility is limited to matters of U.S. securities and federal tax law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Partnership, there are times when the interests of Limited Partners may differ from those of the Partnership. Sadis & Goldberg LLP does not represent the Limited Partners' interests in resolving these issues. Sadis & Goldberg LLP is a party to certain offering related documents to the limited extent that it can benefit from and enforce certain provisions thereof. In preparing this Memorandum, Sadis & Goldberg LLP has relied upon information furnished to it by the General Partner, the Investment Manager and their respective affiliates and is not obligated to investigate or verify the accuracy and completeness of information set forth

002867

HCMLPHMIT00004048

herein concerning the Partnership.

Furthermore, if a conflict of interest or dispute arises between the General Partner and/or the Investment Manager, on the one hand, and the Partnership or any Limited Partner, on the other hand, by investing in the Partnership, the Limited Partners acknowledge that Sadis & Goldberg LLP may act as counsel to the General Partner and/or the Investment Manager and not counsel to the Partnership or the Limited Partners, notwithstanding the fact that, in certain cases, the fees paid to Sadis & Goldberg LLP are paid through or by the Partnership.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the IDF Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

002868

HCMLPHMIT00004049

## INVESTMENT PROGRAM

### INTRODUCTION

The Partnership was organized for the purpose of investing and trading in a wide variety of investments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including, but not limited to, the following: common and preferred stocks, bonds and other debt securities, convertible securities, limited partnership interests, other investment funds, CLO securities, mutual fund shares, options, warrants, futures, derivatives (including swaps, forward contracts and structured instruments), monetary instruments, other financial instruments, cash and cash equivalents. The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the Commodity Exchange Act, as amended ("**CEA**"), that provides an exemption from registration as a commodity pool operator.

References herein to the Partnership shall include, where appropriate, each Series of the Partnership.

The following is a general description of the principal types of investments which the Investment Manager currently contemplates making for the Partnership, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio. The following description is merely a summary, and a Limited Partner should not assume that any descriptions of the specific activities in which the Partnership may engage are intended in any way to limit the types of investment activities which the Partnership may undertake or the allocation of Partnership capital among such investments.

### INVESTMENT OBJECTIVE

The Partnership's primary objective is to seek consistent above-average returns primarily through capital appreciation. **No assurance can be given, however, that the Investment Manager will achieve the Partnership's investment objective, and investment results may vary substantially over time and from period to period.**

### INVESTMENT STRATEGY

#### General

The Investment Manager intends to invest the Partnership's portfolio in small- to medium-sized companies (i.e., generally with market capitalization of under $1 billion) that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions. The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. The Partnership (x) is expected to initially invest all or substantially all of the assets attributable to Series 1 in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction.

#### Philosophy

The Investment Manager intends to use a disciplined investment philosophy by combining thorough fundamental research and in-depth analysis of investment opportunities. The following principles generally guide the Investment Manager's portfolio management strategy and allocation of capital:

- invest with a long-term perspective, minimize turnover and avoid market-timing;
- hold a concentrated investment portfolio; and

RAND **PE** FUND I, L.P.                                        24



002869

HCMLPHMIT00004050

- view each investment relative to other investment opportunities.

_Long-Term Perspective_.  The Investment Manager intends to invest with a long-term perspective, typically holding an ownership position in a company until it reaches its intrinsic value.  In general, when the Investment Manager will be looking to invest in a company, it intends to avoid trying to time the market, but rather intends to focus on the intrinsic value of the company and then find the right entry or purchase point.

_Concentration_.  The Investment Manager intends to have a concentrated portfolio of investments.  The Investment Manager believes that this may provide the Partnership with a competitive advantage over most other private investment vehicles in that:  (i) the Investment Manager's best ideas would be rarely and/or marginally diluted by its lesser ideas; (ii) the extra time saved by not trading may allow the Investment Manager to concentrate on finding other investment ideas; and (iii) careful analysis may allow the Investment Manager to make intelligent and deliberated decisions.  **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

_Relative Analysis_.  The Investment Manager intends to evaluate potential investments in companies of varying market capitalization in an attempt to isolate those securities with the greatest potential for capital appreciation.  As part of its strategy, the Investment Manager intends to invest in those industries, sectors and securities which may provide value on a relative basis.  The Investment Manager intends to seek to understand a company and its industry before investing.

**Leverage**

The Investment Manager may cause the Partnership to undertake leverage.  Leverage may take a variety of forms, including, but not limited to, the following: long-term loans, convertible notes and repurchase arrangements.  To the extent applicable, entering into short sales and certain types of derivative instruments may also increase the Partnership's use of leverage.  Leverage arrangements used by the Partnership when financing is contingent on the market value of the financed assets may include those which may be subject to mark-to-market collateral or margin calls.

**Important Notice**

The foregoing description of the Partnership's investment program does not purport to be a complete explanation of all the asset classes or securities in which the Partnership may invest.  In general, the Investment Manager intends to follow a flexible approach in order to place the Partnership in the best position to capitalize on opportunities in the financial markets.  Accordingly, the Investment Manager may employ other strategies and may take advantage of opportunities in diverse asset classes if they meet the Investment Manager's standards of investment merit.

## DEVELOPMENT AND RISKS OF INVESTMENT MANAGER'S INVESTMENT STRATEGY

The development of an investment strategy is a continuous process, and the Partnership's investment strategy and methods may therefore be modified from time to time.  The Partnership's investment methods are confidential, and the descriptions of them in this Memorandum are not exhaustive.  The Partnership's investment strategies may differ from those used by the Investment Manager and its affiliates with respect to other accounts they manage.  Investment decisions require the exercise of judgment by the Investment Manager.  The Investment Manager may, at times, decide not to make certain investments, thereby foregoing participation in price movements, which would have yielded profits or avoided losses.  Limited Partners cannot be assured that the strategies or methods utilized by the Investment Manager will result in profitable investing for the Partnership.

002870

HCMLPHMIT00004051

The Partnership's investment program entails substantial risks, and there can be no assurance that its investment objectives will be achieved.  The practices of options trading, short selling, the use of leverage and other investment techniques that may be employed by the Partnership can, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject. See "RISK FACTORS AND CONFLICTS OF INTEREST—Market Risks".

002871
HCMLPHMIT00004052

## BROKERAGE PRACTICES

References herein to the Partnership shall be deemed to apply with respect to the Partnership's traded investments.

### BROKERAGE ARRANGEMENTS

The Investment Manager is responsible for the placement of the portfolio transactions of the Partnership and the negotiation of any commissions paid on such transactions. Portfolio securities normally are purchased through brokers on securities exchanges or directly from the issuer or from an underwriter or market maker for the securities. Purchases of portfolio instruments through brokers involve a commission to the broker. Purchases of portfolio securities from dealers serving as market makers include the spread between the "bid" and the "ask" price. The Investment Manager will not commit to provide any level of brokerage business to any broker. The Investment Manager may utilize the services of one or more introducing brokers who will execute the Partnership's brokerage transactions through a broker or custodian who will clear the Partnership's transactions.

Securities transactions for the Partnership are executed through brokers selected by the Investment Manager in its sole discretion and without the consent of the Partnership. In placing portfolio transactions, the Investment Manager will seek to obtain the best execution for the Partnership, taking into account the following factors: the ability to effect prompt and reliable executions at favorable prices (including the applicable dealer spread or commission, if any); the operational efficiency with which transactions are effected and the efficiency of error resolution, taking into account the size of order and difficulty of execution; the financial strength, integrity and stability of the broker; special execution capabilities; reputation; clearance, settlement, on-line pricing, block trading and block positioning capabilities; willingness to execute related or unrelated difficult transactions in the future; order of call; online access to computerized data regarding clients' accounts; performance measurement data; the quality, comprehensiveness and frequency of available brokerage and research products and services considered to be of value; the availability of stocks to borrow for short trades; and the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria.

### SOFT DOLLAR ARRANGEMENTS

The term "soft dollars" refers to commissions accumulated by brokers based on an investment manager's transactions, on behalf of its clients, which may be used by the investment manager to acquire various products or services. The use of client commissions, known as soft dollars, to pay for these products and services, including research and brokerage products and services, presents investment managers with potential conflicts of interest and may give incentives for investment managers to use certain brokers without regard to their obligations to their clients.

The Investment Manager may use soft dollars generated by the Partnership's brokerage transactions to pay for brokerage and research products and services that fall within the safe harbor afforded by Section 28(e) of the Exchange Act ("**Section 28(e)**"). Section 28(e) provides a "safe harbor" to investment managers who use soft dollars to obtain investment research and brokerage products and services. In order to qualify for the safe harbor, the products or services must provide assistance to the investment manager in the performance of its investment decision-making responsibilities, or must relate to the execution, clearance or settlement of a trade.

### REFERRAL OF INVESTORS AND SALES CHARGES

The Investment Manager may direct some Partnership brokerage business to brokers who refer prospective investors to the Partnership. Because such referrals, if any, are likely to benefit the Investment Manager and its affiliates but will provide an insignificant (if any)

002872

HCMLPHMIT00004053

benefit to Limited Partners, the Investment Manager will have a conflict of interest with the Partnership when allocating Partnership brokerage business to a broker who has referred investors to the Partnership.  To prevent Partnership brokerage commissions from being used to pay investor referral fees, the Investment Manager will not allocate Partnership brokerage business to a referring broker unless the Investment Manager determines in good faith that the commissions payable to such broker are reasonable in relation to those available from non-referring brokers offering services of substantially equal value to the Partnership.

The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the Investment Manager and/or the General Partner, the arrangement, if any, with such broker-dealer will be disclosed to, and acknowledged by, such Limited Partner.

## ALLOCATION OF INVESTMENT OPPORTUNITIES

The Investment Manager may at times determine that certain investments will be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, including Affiliated Funds, the Investment Manager's own accounts or accounts of an affiliate.  If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager will endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable.  The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

## AGGREGATION OF ORDERS

The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership will be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors.

In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities.  Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold.  In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

## TRADE ERROR POLICY

The Investment Manager has internal controls in place to prevent trade errors from occurring.  On those occasions when such an error nonetheless occurs, the Investment

---

002873

HCMLPHMIT00004054

Manager will use reasonable efforts to correct the error.  If the error cannot be corrected, the Investment Manager does not intend to make any adjustment, regardless of whether the error works to the benefit or detriment of the Partnership.  The Investment Manager will endeavor to maintain a record of each trade error, including information about the trade and how such error was corrected or attempted to be corrected.  The Partnership (and not the General Partner, the Investment Manager or any of the Investment Manager Affiliates) will be responsible for any losses resulting from trading errors and similar human errors, unless such errors are due to gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction.

002874
HCMLPHMIT00004055

## RISK FACTORS AND CONFLICTS OF INTEREST

An investment in the Partnership (and any Series thereof) involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment. There can be no assurances or guarantees that: (i) the Partnership's (or any Series') investment strategy will prove successful, or (ii) investors will not lose all or a portion of their investment in the Partnership (or any particular Series).

References herein to the Partnership shall include, where appropriate, each Series of the Partnership.

You should consider the Partnership as a supplement to an overall investment program and should only invest if you are willing to undertake the risks involved. In addition, investors who are subject to income tax should be aware that an investment in the Partnership (or any Series thereof) is likely (if the Partnership (or such Series) is successful) to create taxable income or tax liabilities in excess of cash distributions to pay such liabilities. You should therefore bear in mind the following risk factors and conflicts of interest before purchasing an Interest:

### PARTNERSHIP RISKS

**Dependence Upon the General Partner, the Investment Manager and the Principal; No Participation in Management**. The Partnership's success will depend on the management of the General Partner and the Investment Manager and on the skill and acumen of the Principal. If the Principal should cease to participate in the Partnership's business, the Partnership's ability to select attractive investments and manage its portfolio could be severely impaired.

As a Limited Partner, you should be aware that you will have no right to participate in the management of the Partnership, and you will have no opportunity to select or evaluate any of the Partnership's investments or strategies. Accordingly, you should not invest in the Partnership unless you are willing to entrust all aspects of the management of the Partnership and its investments to the discretion of the General Partner and the Investment Manager.

**Limited or Lack of Operating History**. Each of the Partnership, the Investment Manager and the General Partner are recently-formed entities that have no operating history upon which prospective investors may evaluate the Partnership's future performance. Although the Principal has experience with investments of the type the Partnership intends to make, any prior performance of the Principal (or the Investment Manager Affiliates) is not necessarily indicative of results that he may achieve with respect to the Partnership. As such, there can be no assurances that the Partnership will be able to implement its investment strategy or achieve its investment objective. In addition, any prior performance of the Principal or the Investment Manager Affiliates is not indicative of the results each may achieve for the Partnership in the future.

**Reliance on the Shared Services Provider**. The Investment Manager relies on the Shared Services Provider to provide certain administrative and other services. In the event that the Shared Services Agreement is terminated for any reason, the Investment Manager may not be able to engage another third party to provide such services and may not have the resources to continue advising the Partnership without the provision of such services by the Shared Services Provider. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

**Limited Liquidity of Interests**. An investment in the Partnership involves substantial restrictions on liquidity, and its Interests are not freely transferable. There is no market for the Interests in the Partnership, and no market is expected to develop. Additionally, transfers are subject to the consent of the General Partner, which consent may be granted or withheld in the General Partner's sole discretion. Consequently, Limited Partners will

002875

HCMLPHMIT00004056

be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the Partnership Agreement. Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason. Although a Limited Partner may attempt to increase its liquidity by borrowing from a bank or other institution, Interests may not readily be accepted as collateral for a loan. In addition, the transfer of an Interest as collateral or otherwise to achieve liquidity may result in adverse tax consequences to the transferor.

A portion of the Partnership's assets may be invested in securities and other financial instruments or obligations for which no market exists and/or which are restricted as to their transferability under federal or state securities laws. Such investments may be segregated from other Partnership assets and carried in Side Pocket Accounts, which are subject to restrictions on withdrawals. Because of the absence of any trading market for these investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities. Although these securities may be resold in privately negotiated transactions, the prices realized on these sales could be less than those originally paid by the Partnership. Further, companies whose securities are not publicly traded may not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities.

<u>Lack of Registration</u>. The Interests have neither been registered under the Securities Act nor under the securities laws of any state and, therefore, are subject to transfer restrictions. In connection with your purchase of an Interest, you must represent that you are purchasing the Interest for investment purposes only and not with a view toward resale or distribution. Neither the Partnership nor the General Partner has any plans or assumed any obligation to register the Interests. Accordingly, the Interests may not be transferred without documentation acceptable to the General Partner, which may include an opinion of counsel to the Partnership that the transfer will not involve a violation of the registration requirements of the Securities Act or require registration by the Partnership under the Investment Company Act. These restrictions on transfer are in addition to those found in the Partnership Agreement. Ordinarily, this means that transfers will be restricted to instances of death, gift or passage by operation of law.

<u>Withdrawal of Capital</u>. A Limited Partner's ability to withdraw funds from the Partnership is restricted in accordance with the withdrawal provisions contained in this Memorandum under "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Withdrawals" and the withdrawal provisions contained in the Partnership Agreement. In addition, substantial withdrawals by investors within a short period of time could require the Partnership to liquidate securities positions and other investments more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the Partnership's investment strategy. Reduction in the size of the Partnership could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

**For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.** In addition, because of the absence of any trading market Illiquid Investments, the Partnership may take longer to liquidate these positions than would be the case for publicly traded securities. Each of the foregoing may impact a Limited Partner's ability to withdraw.

<u>Concentration of Investments</u>. The Investment Manager implements its investment program in a manner which, in light of investment considerations, market risks and other factors, it believes will provide the best opportunity for attractive risk-adjusted returns in the value of the Partnership's assets. The Partnership Agreement does not formally limit the amount of the Partnership's assets that may be invested in a single company, security, country, industry, sector or asset class. **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.** The

002876

HCMLPHMIT00004057

concentration of the Partnership's portfolio in any manner described above would subject the Partnership to a greater degree of risk with respect to the failure of one or a few investments, or with respect to economic downturns in relation to an individual industry or sector, or single company, security, country, industry, sector or asset class.

**Operating Deficits**.   The expenses of operating the Partnership (including the Management Fee) may exceed its income, thereby requiring that the difference be paid out of the Partnership's capital, reducing the Partnership's investments and potential for profitability.

**No Distributions**. The General Partner does not intend to make distributions to the Limited Partners, but intends instead to reinvest substantially all Partnership income and gain, if any.  Cash that might otherwise be available for distribution will also be reduced by payment of Partnership obligations, payment of Partnership expenses (including fees payable and expense reimbursements to the General Partner) and establishment of appropriate reserves.  As a result, if the Partnership is profitable, Limited Partners in all likelihood will be credited with Partnership net income, and will incur the consequent income tax liability (to the extent that they are subject to income tax), even though Limited Partners receive little or no Partnership distributions.

**Investment Expenses**.   The investment expenses (e.g., expenses related to the investment and custody of the Partnership's assets, such as brokerage commissions, custodial fees and other trading and investment charges and fees) as well as other Partnership fees may, in the aggregate, constitute a high percentage relative to other investment entities.  The Partnership will bear these costs regardless of its profitability.

**Cross-Series Liability**.   Section 17-218 of the Delaware Act provides that limited partnerships can be established in separate series in a manner that the liabilities and obligations incurred with respect to any series are only enforceable against the assets of such series, and not against the assets of the limited partnership generally or any other series.  The relevant provisions of the Delaware Act provide the legal requirements for how limited partnerships can be established and operated to maintain this segregation.  The statute includes such requirements as the maintenance of separate books and records for each series, and separation of the assets of each series from other series.  Despite these statutory provisions, there may be instances where the assets of a particular Series may be exposed to the liabilities of one or more other Series.  For example, there may be certain counterparties which resist entering into a contract with a particular Series and insist that one or more other Series, or the Partnership itself acting on behalf of the Series together, enter into such contract.

**Supervision of Trading Operations**.  The Investment Manager, with assistance from its brokerage and clearing firms, intends to supervise and monitor trading activity in the Partnership's account to ensure compliance with the Partnership's objectives.  Despite the Investment Manager's efforts, however, there is a risk that unauthorized or otherwise inappropriate trading activity may occur in the Partnership account.

**Impact of Side Letters**.  The Partnership, the General Partner and/or the Investment Manager may from time to time enter into Side Letters with one or more Limited Partners that provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, minimum investment amounts and liquidity terms) than such Limited Partner(s) have pursuant to this Memorandum and the Partnership Agreement.  Neither the General Partner nor the Investment Manager will be required to notify any or all of the other Limited Partners of any such written agreements or any of the rights and/or terms or provisions thereof, nor will the General Partner or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners.  The other Limited Partners will have no recourse against the Partnership, the General Partner, the Investment Manager and/or any of their respective affiliates in the event that certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters.

**Broad Discretionary Power to Choose Investments and Strategies**.  The Investment Management Agreement gives the Investment Manager broad discretionary power to

002877

HCMLPHMIT00004058

decide what investments the Partnership will make and what strategies it will use.  While the Investment Manager currently intends to use the strategies described in "INVESTMENT PROGRAM", it is not obligated to do so, and it may choose any other investments and strategies that it believes are advisable.

**Limitation of Liability and Indemnification of the General Partner, the Investment Manager and Affiliates**.  The Partnership Agreement provides that none of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates will be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct.  The Partnership (but not the Limited Partners individually) is obligated to indemnify the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates (which, for purposes of this indemnity, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided* that such indemnity will not extend to conduct determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. The Investment Management Agreement also provides similar protections to the Investment Manager.  Therefore, a Limited Partner may have a more limited right of action against the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates than a Limited Partner would have had absent these provisions in the Partnership Agreement and the Investment Management Agreement.  **It is the policy of the SEC that indemnification for violations of securities laws is against public policy and therefore unenforceable.**

**No Minimum Size of Partnership**.  The Partnership may begin or continue operations without attaining or maintaining any particular level of capitalization.  At low asset levels, the Partnership may be unable to make its investments as fully as would otherwise be desirable or to take advantage of potential economies of scale, including the ability to obtain the most timely and valuable research and trading information from securities brokers.  It is possible that even if the Partnership operates for a period with substantial capital, investors' withdrawals could diminish the Partnership assets to a level that does not permit the most efficient and effective implementation of the Partnership's investment program.  As a result of losses or withdrawals, the Partnership may not have sufficient capital to diversify its investments to the extent desired or currently contemplated by the Investment Manager.

**Portfolio Valuation**.  Valuation of the Partnership's portfolio, which will affect the amount of the Management Fee, involves uncertainties and determinations based on judgments. Third-party pricing information may, at times, not be available regarding certain of the Partnership's investments.  A disruption in the secondary markets for the Partnership's investments may limit the ability of the Partnership to obtain accurate market quotations for purposes of valuing its investments.  In addition, material events occurring after the close of a principal market upon which a portion of the investments of the Partnership are traded may require it to make a determination of the effect of a material event on the value of the investments traded on the market for purposes of determining the value of the Partnership's investments on a valuation date.  Further, because of the overall size and concentrations in particular markets and maturities of positions that may be held by the Partnership from time to time, the liquidation values of the Partnership's securities and other investments may differ significantly from the interim valuations of these investments derived from the valuation methods described herein.  Moreover, because of the inherent uncertainty of valuing an illiquid security, the quoted valuation may be higher than the actual final liquidation value, and these differences could be material.  If the Partnership's valuation should prove to be incorrect, the value of the Partnership's investments could be adversely affected.

002878

HCMLPHMIT00004059

**Liability of a Limited Partner for the Return of Capital Contributions**. If the Partnership should become insolvent, Limited Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership in an amount up to its aggregate capital contributions (including any income or gains thereon) to the Partnership in order to pay such Limited Partner's *pro rata* share of any Partnership liabilities that arose while such Limited Partner held Interests.

Under the Delaware Act, when a Limited Partner receives a return of all or any part of such Limited Partner's capital contribution, the Limited Partner may be liable to the Partnership for any sum, not in excess of such return of capital (together with interest), if at the time of such distribution the Limited Partner knew that the Partnership was prohibited from making such distribution pursuant to the Delaware Act.

**Delayed Schedule K-1s**. The General Partner will endeavor to provide a Schedule K-1 to each Limited Partner for any given calendar year prior to April 15 of the following year. In the event that the Schedule K-1 is not available by such date, a Limited Partner may have to request an extension of time to file or may have to pay taxes based on an estimated amount.

**Lack of Insurance**. The assets of the Partnership are not insured by any government or private insurer, except to the extent portions may be deposited in bank accounts insured by the United States Federal Deposit Insurance Corporation or with brokers insured by the Securities Investor Protection Corporation and such deposits and securities are subject to such insurance coverage (which, in any event, is limited in amount). Therefore, in the event of the insolvency of a depository or custodian, the Partnership may be unable to recover all of its funds or the value of its securities so deposited.

**Forward-Looking Statements; Opinions**. Statements contained in this Memorandum that are not historical facts are based on current expectations, estimates, projections, opinions and/or beliefs of the Partnership. Such statements involve known and unknown risks, uncertainties and other factors, and undue reliance should not be placed thereon. Moreover, certain information contained in this Memorandum constitutes "forward-looking" statements, which can be identified by the use of forward-looking terminology, such as "may", "will", "seek", "should", "expect", "anticipate", "project", "estimate", "intend", "continue" or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those set forth herein, actual events or results or the actual performance of the Partnership may differ materially from those reflected or contemplated in such forward-looking statements.

MARKET RISKS

**General**

**Competition Generally**. The securities industry and the varied strategies and techniques to be engaged in by the Investment Manager are extremely competitive and each involves a degree of risk. The Partnership will compete with firms, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs. Further, lower fees for comparable services may be available from these or other firms.

**Market Volatility**. The profitability of the Partnership substantially depends upon the Investment Manager correctly assessing the future price movements of bonds, stocks, options on stocks, and other financial instruments, and the movements of interest rates. The Partnership cannot guarantee that the Investment Manager will be successful in accurately predicting those prices and interest rate movements.

**Partnership's Investment Activities**. The Partnership's investment activities involve a significant degree of risk. The performance of any investment is subject to numerous factors which are neither within the control of nor predictable by the Investment Manager. Such factors include a wide range of economic, political, competitive, technological and other conditions (including natural disasters, acts of terrorism and war) that may affect investments in general or specific industries or companies. The securities markets may

002879

HCMLPHMIT00004060

be volatile, which may adversely affect the ability of the Partnership to realize profits. As a result of the nature of the Partnership's investing activities, it is possible that the Partnership's financial performance may fluctuate substantially over time and from period to period.

**Terrorist Actions**. There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in the global market. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced. The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

**Unforeseen Events**. The Partnership may be adversely affected by unforeseen events involving such matters as changes in interest rates or the credit status of an issuer, forced withdrawals of securities or acquisition proposals, break-up of planned mergers, unexpected changes in relative value, short squeezes, inability to short stock or changes in tax treatment.

**Potential Cybersecurity Breaches and Identity Theft**. The Investment Manager relies, to a certain extent, on the use of information technology. The Investment Manager's information and technology systems may be vulnerable to damage and/or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by its professionals, power outages, and/or catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time and/or cease to function properly, the Investment Manager and/or the Partnership may have to make a significant investment to fix or replace them. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's and/or the Partnership's operations and may result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors). Such a failure could harm the Investment Manager's and/or the Partnership's reputation, subject any such entity and their respective affiliates to legal claims and/or otherwise affect their business and financial performance.

**Long-Biased Investment Program**. The Investment Manager expects that its strategy with respect to the Partnership will have a long bias. Therefore, any decline in the overall market may result in a decline in the value of the Partnership's assets.

**Market Liquidity and Leverage**. The Partnership may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Partnership's ability to adjust its positions. The size of the Partnership's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in overall market leverage, deleveraging as a consequence of a decision by any brokers and custodians, or other counterparties with which the Partnership enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Partnership's portfolio.

**Material Non-Public Information**. By reason of their responsibilities in connection with other activities of the Investment Manager and/or its affiliates, the Principal or employees of the Investment Manager and/or its affiliates may acquire confidential or material non-public information or be restricted from initiating transactions in certain securities. The Partnership will not be free to act upon any such information. Due to these restrictions, the Partnership may not be able to initiate a transaction that it otherwise might have initiated and may not be able to sell an investment that it otherwise might have sold.

**Accuracy of Public Information**. The Investment Manager may select investments for the Partnership, in part, on the basis of information and data filed by issuers with various government regulators or made directly available to the Investment Manager by the issuers or through sources other than the issuers. Although the Investment Manager

002880

HCMLPHMIT00004061

evaluates certain such information and data and sometimes seeks independent corroboration when the Investment Manager considers it is appropriate and when it is reasonably available, the Investment Manager is not in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information is not available.  Investments may not perform as expected if information is inaccurate.

**Directorships on Boards of Portfolio Companies**.  The principals and other members and employees of the Investment Manager or its designees may serve as directors of companies the securities of which are purchased or sold on behalf of the Partnership and may be compensated for such service.  In the event that material non-public information obtained with respect to such companies becomes subject to trading restrictions pursuant to the internal trading policies of such companies or as a result of applicable law or regulations, the Partnership may be prohibited for a period of time from purchasing or selling the securities of such companies, which prohibition may have an adverse effect on the Partnership.

**Short-Swing Liability and Other Limitations**.  From time to time, the Partnership, acting alone or as part of a group, may acquire beneficial ownership of more than 10% of a certain class of securities of a public company, or may place a director on the board of directors of such a company.  As a result, under Section 16 of the Exchange Act, the Partnership may be subject to certain additional reporting requirements and may be required to disgorge certain short-swing profits arising from purchases and sales of such securities.  In addition, in such circumstances the Partnership will be prohibited from entering into a short position in such issuer's securities, and therefore limited in its ability to hedge such investments.

**Disruptions or Inability to Trade Due to a Failure to Receive Timely and Accurate Market Data from Third-Party Vendors**.  The Investment Manager's strategy may depend on the receipt of timely and accurate market data from third-party vendors. Any failure to receive such data in a timely manner or the receipt of inaccurate data for any reason could disrupt and adversely affect the Partnership's trading until such failure or inaccuracy is corrected.

**Use of Automated Order Routing and Execution Systems Generally**.  The Investment Manager may use automated order routing and execution systems in its trading.  Such systems are typically provided on an "as is" basis.  Such systems may experience technical difficulties which may render them temporarily unavailable. In addition, such systems may fail to properly perform.  Such failures may result in losses to the Partnership, for which losses the providers of such services have disclaimed all liability.  In an effort to mitigate such risks, the Investment Manager intends to closely monitor trades executed through automated order routing and execution systems and the operation of the systems themselves.

**Electronic Trading Facilities**.  The Partnership may make use of electronic trading facilities (including ECNs), which are generally supported by computer-based component systems for the order-routing, execution, matching, registration or clearing of trades.  As with all facilities and systems, they are vulnerable to temporary disruption or failure.  Trading on an electronic trading system (including an ECN) may differ not only from trading in an open-outcry market or telephonic market but also from trading on other electronic trading systems. The Partnership, in undertaking transactions on an electronic trading system, will be exposed to risk associated with the system including the failure of hardware and software. The result of any system failure may be that the Partnership's order is either not executed according to its instructions or is not executed at all.  The Partnership's ability to limit or recover certain losses may be subject to limits on liability imposed by, without limitation, foreign or domestic law or regulation, the Partnership's own or its broker's internet service provider, other systems providers, market factors, foreign or domestic banking or other market regulations and/or telephonic or other communications providers, foreign or domestic.

**Technology Risk**.  The Investment Manager's investment strategy may rely on the use of proprietary and non-proprietary software, data and intellectual property.  Any such reliance

002881

HCMLPHMIT00004062

on this technology and data is subject to a number of important risks. First, the Partnership may be severely and adversely affected by the malfunction of the technology and/or data feed. For example, an unforeseeable software or hardware malfunction could occur, as a result of a virus or other outside force, or as result of a design flaw in the Partnership's system or in its continued implementation. In the past, occurrences of this nature to other funds have sometimes resulted in dramatically negative consequences for the portfolio of the related fund. In addition, changes in the market for publicly available data or in regulatory reporting requirements could cause a severe diminution in the data available for the technology to operate as designed. Such events can also have dramatically negative consequences for the Partnership. Furthermore, if any of the Partnership's software, hardware, data and/or other intellectual property is found to infringe on the rights of any third party, the Partnership could be severely and adversely affected.

<u>Trading Errors</u>. The Investment Manager's computerized trading systems rely on the ability of the Investment Manager's personnel to accurately process such systems' outputs and to use the proper trading orders, including stop-loss or limit orders, to execute the transactions called for by the systems. In addition, the Investment Manager relies on its staff to properly operate and maintain the computer and communication systems upon which the trading systems rely. The Investment Manager's systems are accordingly subject to human errors, including the failure to implement, or the inaccurate implementation of any of the Investment Manager's systems, in addition to errors in properly executing transactions. This could cause substantial losses on transactions, and any such losses could substantially and adversely affect the performance of the Partnership. See "BROKERAGE PRACTICES—Trade Error Policy" herein.

<u>Co-Investments with Third Parties</u>. The Partnership may co-invest with third parties through joint ventures or other entities. Such investments may involve risks in connection with such third- party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are inconsistent with those of the Partnership or be in a position to take (or block) action in a manner contrary to the Partnership's investment objectives. In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements. Such compensation arrangements will reduce the returns to participants in the investments.

<u>Other Investment Vehicles; Limited Recourse</u>. The Investment Manager may allocate a portion of the Partnership's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers. Such investment vehicles may trade wholly-independently of one another and may at times hold economically offsetting positions. To the extent that such investment vehicles do, in fact, hold such positions, the Partnership, considered as a whole, may not achieve any gain or loss despite incurring expenses. Additionally, a creditor having a claim that relates to a particular investment held by any such investment vehicle may be able to satisfy such claim against all assets of such investment vehicle, without regard to the participation rights of the Partnership and other investors of such investment vehicle in the assets of such investment vehicle.

Since the Partnership may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region. Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist). Even in the event that such information may be available to the Partnership, the Partnership's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

<u>Risks Associated with ETFs</u>. The Partnership may invest in ETFs. ETFs represent an

002882

HCMLPHMIT00004063

interest in a passively managed portfolio of securities and financial instruments selected to replicate a securities or financial instruments index. Unlike open-end mutual funds, the shares of ETFs are not purchased and redeemed by investors directly with the ETF, but instead are purchased and sold through broker-dealers in transactions on an exchange. Because ETF shares are traded on an exchange, they may trade at a discount from or a premium to the net asset value per share of the underlying portfolio of securities or financial instruments. In addition to bearing the risks related to investments in securities or financial instruments, investors in ETFs intended to replicate an index bear the risk that the ETFs performance may not correctly replicate the performance of the index. Investors in ETFs, closed-end funds and other investment companies bear a proportionate share of the expenses of those funds, including management fees, custodial and accounting costs, and other expenses. As such, the Partnership is subject to layering of such fees. Trading in ETF and closed-end fund shares also entails payment of brokerage commissions and other transaction costs.

**Illiquid Securities**. From time to time, the Partnership may invest in financial instruments that are not publicly traded. The Partnership may also invest in securities and other financial instruments that trade regularly but may be only thinly traded, either periodically or on an on-going basis. The Partnership may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a specified period of time. Accordingly, the Partnership may be forced to sell its more liquid positions at a disadvantageous time, resulting in a greater percentage of the portfolio consisting of illiquid securities. In addition, the market prices, if any, for such financial instruments tend to be volatile, and the Partnership may not be able to sell them when it desires to do so or to realize what it perceives to be their fair value in the event of a sale. The sale of illiquid securities also often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. Furthermore, there may be limited information available about the assets of such issuers of the financial instruments which may make valuation of such financial instruments difficult or uncertain. It also should be noted that, even those markets which the Investment Manager expects to be liquid can experience periods, possibly extended periods, of illiquidity.

**Investments in Securities and Other Assets Believed to Be Undervalued**. The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in securities and other assets that the Investment Manager believes to be undervalued. The identification of such investment opportunities is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired. While such investments offer the opportunities for above-average capital appreciation, they also involve a high degree of financial risk and can result in substantial losses. Returns generated from the Partnership's investments may not adequately compensate for the business and financial risks assumed. The current economic conditions and any future major economic recession can severely disrupt the markets for such investments and significantly impact their value. In addition, any such economic downturn can adversely affect the ability of the issuers of such obligations to repay principal and pay interest thereon and increase the incidence of default for such securities. Additionally, there can be no assurance that other investors will ever come to realize the value of some of these investments, and that they will ever increase in price. Furthermore, the Partnership may be forced to hold such investments for a substantial period of time before realizing their anticipated value. During this period, a portion of the Partnership's funds would be committed to the investments made, thus possibly preventing the Partnership from investing in other opportunities.

**Short Sales**. The Investment Manager's investment program contemplates that a portion of the Partnership's portfolio may be invested in selling securities short. Although the Investment Manager may sell short a variety of assets, it expects most short trades to be in equity securities. Short selling involves the sale of a security that the Partnership does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price. In order to make delivery to the purchaser, the Partnership must borrow securities from a third-party lender. The Partnership subsequently returns the borrowed securities to the lender by delivering to the lender the

002883

HCMLPHMIT00004064

securities it receives in the transaction or by purchasing securities in the open market. The Partnership must generally pledge cash with the lender equal to the market price of the borrowed securities. This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities. During the period in which the securities are borrowed, the lender typically retains its right to receive interest and dividends accruing to the securities. In exchange, in addition to lending the securities, the lender generally pays the Partnership a fee for the use of the Partnership's cash. This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed. In addition, the supply of securities that can be borrowed fluctuates from time to time. The Partnership may be subject to substantial losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

<u>Small Companies</u>. The Investment Manager may invest a portion of the Partnership's assets in small and/or unseasoned companies with small market capitalizations. While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification and competitive strength of larger companies. In addition, in many instances, the frequency and volume of their trading may be substantially less than is typical of larger companies. As a result, the securities of smaller companies may be subject to wider price fluctuations. When making large sales, the Partnership may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the lower trading volume of smaller company securities.

<u>Leverage</u>. When deemed appropriate by the Investment Manager and subject to applicable regulations, the Partnership will incur leverage in its investment program, whether directly through the use of borrowed funds, or indirectly through investment in certain types of financial instruments with inherent leverage, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market price of those underlying securities. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent that the Partnership purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Partnership. If the interest expense on this leverage were to exceed the net return on the investments made with borrowed funds, the Partnership's use of leverage would result in a lower rate of return than if the Partnership were not leveraged.

If the amount of leverage which the Partnership may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Partnership's portfolio will have disproportionately large effects in relation to the Partnership's capital and the possibilities for profit and the risk of loss will therefore be increased. Any investment gains made with the additional leverage will generally cause the Net Asset Value of the Partnership to rise more rapidly than would otherwise be the case. Conversely, if the investment performance of the leveraged capital fails to cover its cost to the Partnership, the Net Asset Value of the Partnership will generally decline faster than would otherwise be the case.

Certain of the Partnership's trading and investment activities in securities and other financial instruments may be subject to Federal Reserve Board margin requirements, which are computed each day. When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made. If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customer's position may be closed out. In the event of a precipitous drop in the value of the assets managed by the Partnership, the Partnership might not be able to liquidate

002884
HCMLPHMIT00004065

assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses.  With respect to the Partnership's trading activities, the Partnership, and not the Limited Partners personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss.

**Options and Other Derivative Instruments**.  The Investment Manager may invest, from time to time, a portion of the Partnership's assets in options and derivative instruments, including buying and writing puts and calls on some of the securities held by the Partnership.  The prices of many derivative instruments, including many options and swaps, are highly volatile.  The value of options and swap agreements depend primarily upon the price of the securities, indexes, currencies or other instruments underlying them.  Price movements of options contracts and payments pursuant to swap agreements are also influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies.  The Partnership is also subject to the risk of the failure of any of the exchanges on which its positions trade or of their clearinghouses or of counterparties.  The cost of options is related, in part, to the degree of volatility of the underlying securities, currencies or other assets.  Accordingly, options on highly volatile securities, currencies or other assets may be more expensive than options on other investments.

Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument or asset on which they are purchased or sold.  A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer the obligation to buy, the underlying security, index, currency or other instrument or asset at the exercise price.  A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument or asset at the exercise price.

If a put or call option purchased by the Partnership were permitted to expire without being sold or exercised, the Partnership would lose the entire premium it paid for the option.  The risk involved in writing a put option is that there could be a decrease in the market value of the underlying instrument or asset caused by rising interest rates or other factors.  If this occurred, the option could be exercised and the underlying instrument or asset would then be sold to the Partnership at a higher price than its current market value.  The risk involved in writing a call option is that there could be an increase in the market value of the underlying instrument or asset caused by declining interest rates or other factors.  If this occurred, the option could be exercised and the underlying instrument or asset would then be sold by the Partnership at a lower price than its current market value.

Purchasing instruments and, in particular, writing put and call options and, in particular, writing "uncovered" options are highly specialized activities and entail greater than ordinary investment risks.  In particular, the writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying instrument or asset above the exercise price of the option.  This risk is enhanced if the instrument or asset being sold short is highly volatile and there is a significant outstanding short interest.  These conditions exist in the stocks of many companies.  The instrument or asset necessary to satisfy the exercise of the call option may be unavailable for purchase except at much higher prices.  Purchasing instruments or assets to satisfy the exercise of the call option can itself cause the price of the instruments or assets to rise further, sometimes by a significant amount, thereby exacerbating the loss.  Accordingly, the sale of an uncovered call option could result in a loss by the Partnership of all or a substantial portion of its assets.

Swaps and certain options and other custom instruments are subject to the risk of non-performance by the counterparty, including risks relating to the financial soundness and creditworthiness of the counterparty.

**Hedging Transactions**.  Investments in financial instruments such as options and interest

002885

HCMLPHMIT00004066

rate swaps, caps and floors, and other derivatives are commonly utilized by investment funds to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, interest rates and/or the equity markets or sectors thereof. Any hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value. Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase. Moreover, it may not be possible for the Partnership to hedge against a fluctuation at a price sufficient to protect the Partnership's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations. For example, the cost of options is related, in part, to the degree of volatility of the underlying instruments or assets. Accordingly, options on highly volatile instruments or assets may be more expensive than options on other instruments or assets and of limited utility in hedging against fluctuations in their prices.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so. To the extent that hedges are implemented, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

<u>Market or Interest Rate Risk</u>. The Partnership may, from time to time, invest in fixed income securities and instruments. The price of most fixed income securities move in the opposite direction of the change in interest rates. For example, as interest rates rise, the prices of fixed income securities fall. If the Partnership holds a fixed income security to maturity, the change in its price before maturity may have little impact on the Partnership's performance. However, if the Partnership has to sell the fixed income security before the maturity date, an increase in interest rates could result in a loss to the Partnership.

<u>Callable Securities</u>. Many bonds, including agency, corporate and municipal bonds, and mortgage-backed securities, sometimes contain a provision that allows the issuer to "call" (i.e., redeem) all or part of the issue before the bond's maturity date. The issuer usually retains this right to refinance the bond in the future if market interest rates decline below the coupon rate on the outstanding debt security. From the investor's perspective, there are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk – the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

<u>Maturity Risk</u>. In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these circumstances, the Partnership will make an adjustment to account for the interest rate risk differential in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

<u>Inflation Risk</u>. Inflation risk results from the variation in the value of cash flows from a fixed income security or instrument due to inflation, as measured in terms of purchasing power. For example, if the Partnership purchases a 5-year bond with a coupon rate of 5%, but the rate of inflation is 6%, then the purchasing power of the cash flow has declined. For all but inflation-linked bonds, adjustable bonds or floating rate bonds, the Partnership is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

<u>Downgrades in Fixed Income Debt Securities</u>. Unless required by applicable law, the

002886

HCMLPHMIT00004067

Partnership is not required to sell or dispose of any debt security that either loses its rating or has its rating reduced after the Partnership purchases such security.

**Investments in Non-U.S. Investments**.  From time to time, the Investment Manager may invest and trade a portion of the Partnership's assets in non-U.S. securities and other assets (through ADRs and otherwise), which will give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and non-U.S. issuers and markets are subject. Such risks may include:

- Political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.

- Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.

- Non-U.S. securities and other assets often trade in currencies other than the U.S. dollar, and the Partnership may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts.  Changes in currency exchange rates will affect the Partnership's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of investments.  An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Partnership's investments to decline.  Some foreign currencies are particularly volatile.  Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of the Partnership's foreign currency holdings.  If the Partnership enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates.  On the other hand, if the Partnership enters forward contracts for the purpose of increasing return, it may sustain losses.

- Non-U.S. securities and other markets may be less liquid, more volatile and less closely supervised by the government than in the United States.  Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about the operations of issuers in such markets.

**Risks Associated with ADRs**.  The Partnership may purchase ADRs, which are certificates evidencing ownership of shares of a non-U.S. issuer, acting as alternatives to directly purchasing the underlying non-U.S. securities in their national markets and currencies.  Such investments are subject to many of the risks associated with investing directly in non-U.S. securities.  These risks include the political and economic risks of the underlying issuer's country, as well as, in the case of depositary receipts traded on non-U.S. markets, foreign exchange risk.  ADRs may be sponsored or unsponsored. Unsponsored ADRs are established without the participation of the issuer.  In addition, unsponsored ADRs may involve higher expenses, may not carry pass-through voting or other shareholder rights, and may be less liquid.  The performance of ADRs may be different from the performance of the ordinary shares of the non-U.S. issuers to which they relate.

**Emerging Markets**.  The Partnership may invest a portion of its assets in investments related to emerging market countries.  The securities markets of emerging market countries as a whole have been volatile and the loans and securities of issuers in emerging markets tend to be subject to abrupt or erratic price movements.  Investing a portion of the Partnership's assets in issuers in emerging markets will make the Partnership susceptible to a greater degree than otherwise would be the case to factors affecting emerging markets in general and issuers in emerging markets included in the Partnership's portfolio in particular, and may increase the volatility of the value of the Partnership's portfolio investments.  The economies of these markets may differ significantly from the economies of certain developed countries in such respects as gross domestic product or gross national product, rate of inflation, currency depreciation, capital reinvestment, resource self-sufficiency, structural unemployment and balance of payments position.  In particular, these economies frequently experience high levels of inflation.  In addition, such countries may have:    (1) restrictive national policies that limit the Partnership's investment opportunities; (2) limited information about their issuers; (3) a

002887

HCMLPHMIT00004068

general lack of uniform accounting, auditing and financial reporting standards, auditing practices and requirements compared to the standards of developed countries; (4) less governmental supervision and regulation of business and industry practices, securities exchanges, brokers and listed companies; (5) economic developments that may be slowed or reversed by unanticipated political or social events in such countries; and (6) a lack of capital market structure or market-oriented economy.

Systemic and market factors may affect the acquisition, payment for or ownership of investments including:  (a) the prevalence of crime and corruption; (b) the inaccuracy or unreliability of business and financial information; (c) the instability or volatility of:  (i) banking and financial systems, or the absence or inadequacy of an infrastructure to support such systems, (ii) custody and settlement infrastructure of the market in which such investments are traded and held, and (iii) the acts, omissions and operation of any securities depository; (d) the risk of the bankruptcy or insolvency of banking agents, counterparties to cash and securities transactions, registrars or transfer agents; and (e) the existence of market conditions that prevent the orderly execution or settlement of transactions or that affect the value of assets.  Different clearance and settlement procedures may prevent the Partnership from making intended security purchases causing the Partnership to miss attractive investment opportunities, possibly resulting in either losses to or contract claims against the Partnership.  The investment markets of many of the countries in which the Partnership may invest may also be smaller, less liquid, and subject to greater price volatility than developed markets.  The Partnership's assets may be denominated in a variety of currencies subject to changes in currency exchange rates and in exchange control regulations.

<u>Volatility of Currency Prices</u>.  In general, price movements of currencies are difficult to predict accurately because they are influenced by, among other things, changing supply and demand relationships; governmental, trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates.  Governments from time to time intervene in certain markets in order to influence prices directly.

<u>Currency Control</u>.  It is sometimes the case that governments alter the exchange rate policy of a currency without advance notice, and it may not always be possible to foresee a change in policy.

<u>Exchange Rate Fluctuations</u>.  Investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies.  The Partnership intends to value its holdings and to make distributions in U.S. dollars.  Thus, changes in currency exchange rates adverse to the U.S. dollar may affect adversely the value of such holdings.  Among the factors that may affect currency values are trade balances, the appropriateness of interest rates, the shape of the yield curve, the degree of central bank independence and credibility, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments.

<u>Risks of Trading Futures</u>.  The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the CEA that provides an exemption from registration as a commodity pool operator.  Trading futures is a highly risky strategy.  Whenever the Partnership purchases a particular future, there is a possibility that the Partnership may sustain a total loss of its purchase price.  The equity values of leveraged positions using futures are, in general, much more volatile than the prices of securities, such as stocks and bonds.  As a result, the risk of loss in trading futures is substantially greater than in trading those securities.  The prices of futures react strongly to the prices of the underlying commodities.  The prices of these underlying products, in turn, rise and fall based on changes in interest rates, international balances of trade, changes in governments, wars, weather events and a host of other factors that are entirely beyond the Investment Manager's control and very difficult (and perhaps impossible) to predict.

<u>Forward Trading</u>.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward

002888
HCMLPHMIT00004069

and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. Disruptions can occur in any market traded by the Partnership due to unusual trading volume, political intervention or other factors. The imposition of controls by governmental authorities might also limit such forward trading to less than that which the Investment Manager would otherwise recommend, to the possible detriment of the Partnership. Market illiquidity or disruption could result in major losses to the Partnership.

<u>Over-the-Counter-Trading</u>. Financial instruments that may be purchased or sold by the Partnership may include instruments not traded on an exchange. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Partnership can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Partnership engages in these transactions, the Partnership must rely on the creditworthiness of its counterparty. In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades. To reduce their credit risk exposure, the Partnership may trade in the forward foreign currency market through money center banks and leading brokerage firms.

<u>Position Limits</u>. Position limits imposed by various regulators or regulations may also limit the Partnership's ability to affect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Partnership does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated. If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Partnership, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Partnership might have to forego or modify certain of its contemplated trades.

<u>Risk of Default or Bankruptcy of Third Parties</u>. The Partnership may engage in transactions in securities and other financial instruments and assets that involve counterparties. Under certain conditions, the Partnership could suffer losses if a counterparty to a transaction were to default or if the market for certain securities or other financial instruments or assets were to become illiquid. In addition, the Partnership could suffer losses if there were a default or bankruptcy by certain other third parties, including brokerage firms and banks with which the Partnership does business, or to which securities or other financial instruments or assets have been entrusted for custodial purposes.

<u>Potential Custody and Brokerage Risk</u>. The Partnership may rely on its relationship(s) with brokers and/or custodians. There are risks involved in dealing with the custodians or brokers who may settle Partnership trades. The Partnership may maintain custody accounts with a broker. Although the Investment Manager intends to monitor the Partnership's broker(s) and/or custodian(s), if any, there is no guarantee that such broker(s) and/or custodian(s) that the Partnership may use from time to time, will not become bankrupt or insolvent. While both the U.S. Bankruptcy Code, as amended, and

002889

HCMLPHMIT00004070

the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a bankruptcy, insolvency, failure, or liquidation of a broker-dealer, there is no certainty that, in the event of a failure of a broker-dealer that has custody of Partnership assets, the Partnership would not incur losses due to its assets being unavailable for a period of time, the ultimate receipt of less than full recovery of its assets, or both.

The Partnership and/or its broker or custodian, if any, may appoint sub-custodians in certain non-U.S. jurisdictions to hold the assets of the Partnership. The appointing broker and/or custodian may not be responsible for cash or assets which are held by sub-custodians in certain non-U.S. jurisdictions, nor for any losses suffered by the Partnership as a result of the bankruptcy or insolvency of any such sub-custodian.  The Partnership may therefore have a potential exposure on the default of any sub-custodian and, as a result, many of the protections that would normally be provided to a fund by a custodian may not be available to the Partnership.  Under certain circumstances, including certain transactions where the Partnership's assets are pledged as collateral for leverage from a non-broker-dealer custodian or a non-broker-dealer affiliate of the broke and/or custodian, or where the Partnership's assets are held at a non-U.S. custodian, the securities and other assets deposited with the custodian or broker may not be clearly identified as being assets of the Partnership and hence the Partnership could be exposed to a credit risk with regard to such parties.  Custody services in certain non-U.S. jurisdictions remain undeveloped and, accordingly, there is a transaction and custody risk of dealing in certain non-U.S. jurisdictions.  Given the undeveloped state of regulations on custodial activities and bankruptcy, insolvency, or mismanagement in certain non-U.S. jurisdictions, the ability of the Partnership to recover assets held by a sub-custodian in the event of the sub-custodian's bankruptcy or insolvency could be in doubt, as the Partnership may be subject to significantly less favorable laws than many of the protections that would be available under U.S. laws.  In addition, there may be practical or time problems associated with enforcing the Partnership's rights to its assets in the case of a bankruptcy or insolvency of any such party.

**Temporary Defensive Investments**.  If warranted under certain economic or market conditions or for other reasons, the Investment Manager may temporarily invest up to 100% of the Partnership's assets outside the scope of its principal investment focus in U.S. government securities, such as Treasury bills, notes and bonds, cash, money-market funds, certificates of deposit, time deposits, bankers' acceptances and other short-term debt instruments bearing a reasonable rate of interest.  In such circumstances, the Partnership may not achieve its investment objectives.

**Other Instruments**.  The Partnership may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Partnership and legally permissible. Special risks may apply to instruments that are invested in by the Partnership in the future that cannot be determined at this time or until such instruments are developed or invested in by the Partnership.

**Specific Risks Associated with Investing in Illiquid Investments**

You should note that certain of the following risk factors specifically applicable with respect to Illiquid Investments have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Special Situations**.  The Partnership will invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions.  In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, take considerable time or result in a distribution of cash or a new security the value of which will be less than the purchase price to the Partnership of the security or other financial instrument in respect of which such distribution is received.  Similarly, if an anticipated transaction does not in fact occur, the Partnership may be required to sell its investment at a loss.  In connection with such transaction (or otherwise), the Partnership may purchase securities on a when-issued

002890

HCMLPHMIT00004071

basis, which means that delivery and payment take place sometime after the date of the commitment to purchase and are often conditioned upon the occurrence of a subsequent event, such as approval and consummation of a merger, reorganization or debt restructuring. The purchase price and/or interest create receivable with respect to a when-issue security are fixed when the Partnership enters into the commitment. Such securities are subject to changes in market value prior to their delivery. Because there is substantial uncertainty concerning the outcome of transactions involving companies in which the Partnership may invest, there is a potential risk of loss by the Partnership of its entire investment in such companies.

**Alternative Investments.** In the alternative asset class, the Investment Manager may invest assets of the Partnership in other pooled investment vehicles managed by the Investment Manager. The pooled investment vehicles managed by the Investment Manager may follow a variety of investment strategies including investments in commodities, managed futures, inflation-adjusted bonds, global real estate, "hedge fund strategies", which may be broadly characterized as "hedge funds", and mezzanine debt or Illiquid Investments.

**Withdrawal Considerations.** The Partnership is permitted to invest in Illiquid Investments. There is no market for the Interests, and no market is expected to develop. Therefore, in certain circumstances, the Partnership may not be able to withdraw invested assets with respect to Illiquid Investments at a time that would be most advantageous to the Partnership or at a time that would allow the Partnership to comply with its withdrawal obligations to its Limited Partners. In this regard, the General Partner has the right to suspend in whole or in part certain withdrawal rights of the Limited Partners to the extent that the Partnership is unable to obtain liquidity from its investments in one or more of the Illiquid Investments. The illiquidity of Illiquid Investments could have a material adverse effect on the Partnership, as well as the ability of the Limited Partners to liquidate their investments in the Partnership during permitted withdrawal periods. Consequently, Limited Partners may be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the terms of this Memorandum, and, even in such event, payment of withdrawal proceeds may be delayed for a significant period of time. Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason. **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

**High Growth Industry Related Risks.** The Partnership may have significant investments in the securities of high growth companies (e.g., technology, communications and healthcare). It is noted that these securities may be very volatile. In addition, these companies may face undeveloped or limited markets, have limited products, have no proven profit-making history, may operate at a loss or with substantial variations in operating results from period to period, have limited access to capital and/or be in the developmental stages of their businesses, have limited ability to protect their rights to certain patents, copyrights, trademarks and other trade secrets, or be otherwise adversely affected by the extremely competitive markets in which many of their competitors operate.

**Risk of Illiquid Investments.** Illiquid Investments involve a high degree of financial risk. There can be no assurance that Illiquid Investments will be profitable or that substantial losses will not occur. The companies in which the Illiquid Investments will invest are often dependent on the skills of a small number of executives and are vulnerable to changes in technology, fluctuations in demand for their products, changing interest rates and other factors. There can also be no assurance that the Illiquid Investments will be repaid, be able to sell or otherwise liquidate their investments at the optimal time or price. Therefore, there can be no assurance that the rate of return objectives of the Illiquid Investments will be realized or that there will be any return of capital to the Limited Partners.

**Illiquid and Long-Term Investments.** It is anticipated that there will be a significant period of time before certain Illiquid Investments will have completed their investments. Such investments may take several years from the date of initial investment to reach a state of maturity when realization of the investment can be achieved. Although

002891

HCMLPHMIT00004072

investments by Illiquid Investments occasionally may generate some current income, private investment transaction structures typically will not provide for liquidity of the Illiquid Investment's investment prior to that time.  The return of capital and the realization of gains, if any, from such investment will generally occur only upon the partial or complete disposition or refinancing of the investment.  In light of the foregoing, it is likely that no significant return from the disposition of Illiquid Investment's underlying investments will occur for a substantial period of time from the commencement of the Illiquid Investment's operations.  It is unlikely that there will be a public market for the securities held by the Illiquid Investment and/or its portfolio companies at the time of their acquisition.  The Illiquid Investment generally will not be able to sell its securities publicly unless the issuer has consummated a public offering of its securities and such offered securities are registered under applicable securities laws, unless an exemption from such registration requirements is available.  In addition, in some cases, the Partnership may be prohibited by contract from selling certain securities for a period of time and, as a result, may not be permitted to sell an underlying investment at a time it might otherwise desire to do so.  Further, disposition of such investments may require a lengthy time period or may result in distributions in kind to investors.

**Investments in Less Established Companies.**  The Partnership may invest a portion of its assets in the securities of less established companies, or early stage companies.  Investments in such early stage companies may involve greater risks than those generally associated with investments in more established companies.  For instance, less established companies tend to have smaller capitalizations and fewer resources and, therefore, are often more vulnerable to financial failure.  Such companies also may have shorter operating histories on which to judge future performance and in many cases, if operating, will have negative cash flow.  In the case of start-up enterprises, such companies may not have significant or any operating revenues.  In addition, less mature companies could be more susceptible to irregular accounting or other fraudulent practices.  Furthermore, to the extent there is any public market for the securities held by the Illiquid Investment, securities of less established companies may be subject to more abrupt and erratic market price movements than those of larger, more established companies.

Some of the investments expected to be made by an Illiquid Investment would be considered highly speculative and may result in the loss of the Special Situation Investment's entire investment therein.  There can be no assurance that any such losses will be offset by gains (if any) realized on the Illiquid Investment's other investments.

**Investments in Restructurings or Underperforming Companies.**  The Partnership may make investments in companies that are experiencing or are expected to experience financial difficulties, which such companies may never overcome.  Such investments could, in certain circumstances, subject the Partnership to additional potential liabilities, which may exceed the value of the Partnership's original investment therein.  Such investments of the Partnership could also be subject to federal bankruptcy law and state fraudulent transfer laws, which may vary from state to state, if the securities relating to such investments were issued with the intent of hindering, delaying or defrauding creditors or, in certain circumstances, if the issuer receives less than reasonably equivalent value or fair consideration in return for issuing such securities. If such investments constitute debt and such debt is used for a buyout of shareholders, this risk is greater than if the debt proceeds are used for day-to-day operations or organic growth.  If a court were to find that the issuance of the securities was a fraudulent transfer or conveyance, the court could void the payment obligations under the securities, further subordinate the securities to other existing and future indebtedness of the issuer or require the Partnership to repay any amounts received by it with respect to the securities.  In the event of a finding that a fraudulent transfer or conveyance occurred, the Partnership may not receive any repayment on the securities.

Under the Bankruptcy Code, a lender that has inappropriately exercised control of the management and policies of a company may have its claims against the company subordinated or disallowed, or may be found liable for damages suffered by parties as a result of such actions.  In addition, under certain circumstances, payments to the Partnership and distributions by the Partnership ion Investment to its limited partners may be reclaimed if any such payment or distribution is later determined to have been a

002892

HCMLPHMIT00004073

fraudulent conveyance or a preferential payment. Such debt may also be disallowed or subordinated to the claims of other creditors if the Partnership is found to have engaged in other inequitable conduct resulting in harm to other parties. The Partnership's underlying investment may be treated as equity if it is deemed to be a contribution to capital, or if the Partnership attempts to control the outcome of the business affairs of a company prior to its filing under the Bankruptcy Code. While the Partnership will attempt to avoid taking the types of action that would lead to such liability, there can be no assurance that such claims will not be asserted or that the Partnership will be able successfully to defend against them.

## REGULATORY AND TAX RISKS

**General Regulatory Risks**. Statutes, regulations and policies are continually under review by the U.S. Congress and state legislatures and federal and state regulatory agencies. The introduction of new legislation or amendments to existing legislation and regulations (including changes in how they are interpreted or implemented) by governments, the decisions of courts and tribunals and the rulings and decisions of regulatory authorities, can adversely impact the Partnership's returns. The regulatory environment for private investment funds is evolving, and changes in the regulation of these funds may adversely affect the value of investments held by the Partnership, the cost of compliance with applicable regulations, and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies.

**Regulatory Risks Related to the Highland Transaction**. In connection with the Highland Transaction (if consummated), there can be no assurance that such transaction (if consummated) will not result in adverse regulatory consequences (including, without limitation, being characterized as a "change of control" under applicable laws), even though the Highland Transaction only contemplates the acquisition of non-voting limited partnership interests in Highland.

**Strategy Restrictions**. Certain institutions may be restricted from directly utilizing investment strategies of the type in which the Partnership may engage. Such institutions, including entities subject to ERISA, should consult their own advisors, counsel and accountants to determine what restrictions may apply and whether an investment in the Partnership is appropriate.

**Trading Limitations**. For all securities, instruments and/or assets listed on an exchange, including options listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Partnership to loss. Also, such a suspension could render it impossible for the Investment Manager to liquidate positions and thereby expose the Partnership to potential losses relating thereto.

**Limited Regulatory Oversight**. The Partnership's investments are not supervised or monitored by any regulatory authority. The Partnership is not registered as an "investment company" under the Investment Company Act. Although the Investment Manager is registered as an investment adviser with the SEC, neither the General Partner nor the Investment Manager is registered as a commodity pool operator, pursuant to an exemption provided under Rule 4.13(a)(3) of the CEA. Consequently, Limited Partners will not benefit from some of the protections afforded by these statutes, including oversight by the Commodity Futures Trading Commission.

**Prevention of Money Laundering and Terrorism**. The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "**USA PATRIOT Act**"), signed into law and effective as of October 26, 2001, requires that financial institutions, a term that includes banks, broker-dealers and investment companies, establish and maintain compliance programs to guard against money laundering activities. The USA PATRIOT Act requires the Secretary of the U.S. Treasury ("**Treasury**") to prescribe regulations in connection with anti- money laundering policies of financial institutions. The U.S. Federal Reserve Board, the Treasury and the SEC are currently studying what types of investment vehicles should be required to adopt anti-money laundering procedures, and it is unclear at this time whether such

002893

HCMLPHMIT00004074

procedures will apply to pooled investment vehicles such as the Partnership. Future rules and regulations regarding money laundering or proceeds of crime could regulate the Partnership. In addition, in April 2000, the Treasury Department published proposed regulations that would require certain investment advisors to establish an anti-money laundering program. It is possible that there could be promulgated legislation or regulations that would require the Partnership or its affiliates, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Interests. Such legislation and/or regulations could require the Partnership to implement additional restrictions on the transfer of the Interests. The Partnership reserves the right to request such information as is necessary to verify the identity of investors in the Interests, and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by Financial Crimes Enforcement Network and/or the SEC or such information as may be required in order for the Partnership to discharge its obligations under the laws of the Cayman Islands (including pursuant to the Proceeds of Criminal Conduct Law (2005 Revision)). In the event of delay or failure by the applicant to produce any information required for verification purposes, an application for or transfer of the Interests and the subscription monies relating thereto may be refused.

**Recent Developments in the Financial Services Industry.** Recent developments in the U.S. financial markets have heightened the risks associated with the investment activities and operations of hedge funds, including without limitation, those resulting from a substantial reduction in the availability of credit and the increased cost of short-term credit, a decrease in market liquidity and an increased risk of insolvency of brokers, custodians and other counterparties. In addition, in July of 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. Even with the passage of Dodd-Frank, the implications of its passage for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory, or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Partnership or the Partnership's business, operations and performance.

**Enhanced Regulation of Swaps.** The Wall Street Transparency and Accountability Act of 2010 (the "**WSTAA**") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "**DCO**") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer", and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts. Due to the new requirements imposed by the WSTAA, the Partnership may experience increased transaction costs to pay for the clearing, execution and segregation obligations. In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Partnership's ability to engage in leverage and limit the Partnership's return. The application of position limits to swap contracts may also limit the Partnership's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Partnership's ability to take advantage of current market trends or conditions. Any tightening in the market for swaps may significantly impact the Partnership and its returns. In addition, if the Partnership were deemed to be a swap dealer or a major swap participant under WSTAA, the Partnership may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Partnership's legal obligations and its returns.

**Tax Risk.** The tax aspects of an investment in the Partnership are complicated and each investor should have them reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and

002894

HCMLPHMIT00004075

private investment vehicles. The Partnership is not intended and should not be expected to provide any tax shelter, but is organized as a limited partnership to avoid corporate taxation and to permit any distributions it might make to be made without being taxed as dividends. No assurance can be given that legislative, administrative or judicial changes will not occur which will alter, either prospectively or retroactively, the tax considerations or risk factors discussed in this Memorandum.

The tax consequences to a Limited Partner of an investment in the Partnership are uncertain. All or substantially all of the assets of the Partnership are expected to be invested in Illiquid Investments. Such investments are often structured as "pass through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments. As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

Neither the General Partner nor the Investment Manager makes any representations or warranties regarding any tax matters. Prospective investors are strongly urged to consult their own tax advisors regarding the U.S. federal, state and local and non-U.S. tax consequences to them arising from an investment in the Partnership, and should rely on the advice of their own tax advisors with respect to the possible impact on its investment in the Partnership of any future legislation or administrative or judicial action. You should review the section entitled "TAXATION" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests.

**Tax-Exempt Entities**. Certain prospective Limited Partners may be subject to federal and state laws, rules and regulations that may regulate their participation in the Partnership, or their engaging, directly or indirectly through an investment in the Partnership, in investment strategies of the types that the Partnership utilizes from time to time. Tax-exempt entities should consider the applicability to them of the provisions relating to UBTI (as defined below). Investments in the Partnership by entities subject to ERISA and other tax-exempt entities require special consideration. See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Accounting Rules**. The Partnership's assets and liabilities are valued in accordance with the Partnership Agreement. However, for purposes of preparing the Partnership's annual audited financial statements, which are prepared in accordance with GAAP, certain of the Partnership's assets and liabilities may be valued in a manner that, while consistent with GAAP, may be different from the manner in which such assets are valued in accordance with the valuation policies set forth in the Partnership Agreement.

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the IFRS. In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

## CONFLICTS OF INTEREST

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Limited Partners.

**No Obligation of Full-Time Service**. None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates has any obligation to devote its full time to the business of the Partnership. Each is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership, and each may engage in other business activities, including competing ventures and/or unrelated employment, which may result in various conflicts of interest between such persons and the Partnership.

**Services to Affiliated Funds**. In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including

002895

HCMLPHMIT00004076

those that may employ an investment program and strategy similar to that of the Partnership. Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to the IDF Fund that is structured as an insurance-dedicated fund and is expected to invest a portion of its assets in the Partnership; (ii) Atlas IDF GP, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the IDF Fund; (iii) the Principal is the managing member and controlling person of Atlas IDF GP, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

The investments made by Affiliated Funds that may be managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates in the future may compete with investments for the Partnership's account, and the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates may decide to invest the funds of these Affiliated Funds rather than the assets of the Partnership in a particular security or strategy. In addition, the Investment Manager and/or such other persons will determine the allocation of funds by and among the Partnership and the Affiliated Funds to investment strategies and techniques on whatever basis they decide is appropriate or desirable in their sole and absolute discretion. The records of these Affiliated Funds will not be made available to Limited Partners. Nonetheless, in the event that certain securities, instruments and other assets are suitable for acquisition by the Partnership and by other accounts managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates, and the Investment Manager or such other persons are not able to acquire the desired aggregate amount of such securities, instruments and other assets on terms and conditions which they deem advisable, the Investment Manager and such persons will endeavor in good faith to allocate the limited amount of such investment opportunities among the various accounts for which they consider to be suitable.

**Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests**. The Principal was previously a Partner and Co-Head of Private Equity at Highland, an investment manager with significant assets under management located in Dallas, Texas. Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland, and receives compensation in connection with each of the foregoing. Additionally, as part of his retirement, Mr. Honis has received or is in the process of receiving payments in the total amount of approximately $3 million from certain affiliates of Highland.

In addition, pursuant to the Shared Services Agreement, Highland serves as the Shared Services Provider, which provides the Investment Manager and the Partnership with certain administrative, information technology, accounting, tax, back-office and other services. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

Further, the Investment Manager and Highland have had preliminary discussions concerning the potential Highland Transaction. Although, as of the date hereof, the Partnership and Highland have not actively negotiated documentation for the legal and economic terms of the Highland Transaction (and there can be no assurances that such transaction will be consummated), it is nonetheless the intention of such parties that the transaction should come about.

In light of the foregoing, the Principal, and indirectly the Investment Manager, are in a position of conflict with respect to the ultimate decision by the Partnership regarding whether it pursues the Highland Transaction, and under what terms (if any) it agrees to participate in any such transaction.

Also see "—Potential Directorship Positions; Other Roles" herein.

002896

HCMLPHMIT00004077

**Highland Transaction; Limited Control**.  If the Highland Transaction is consummated, it is currently contemplated that the Partnership would acquire only limited partnership interests in Highland.  As with investments in non-controlling interests in other partnerships, the Highland Transaction may involve special risks associated with the possibility that the controlling principals of Highland may:  (i) have economic or business interests or goals that are inconsistent with those of the Partnership, (ii) take actions contrary to the instructions or requests of the Partnership or contrary to the Partnership's policies or objectives, (iii) be unable or unwilling to fulfill its obligations under the organizational/governing documents, and/or (iv) experience financial difficulties.   The occurrence of such problems could have a material adverse effect on the business and prospects of the Partnership's investment in the Highland Transaction and may affect management decisions and exit strategies in a manner adverse to the Partnership's interests.

**Conflicts Related to Shared Services Provider**.  The Investment Manager has certain affiliated entities that may provide services with respect to the IDF Fund, as well as the Partnership and certain investments held by the Partnership.  The Shared Services Provider may provide services for the benefit of the Partnership under the Shared Services Agreement and/or may incur reimbursable expenses on behalf of the Partnership and/or the Investment Manager.   In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.  The Principal is a former Partner and former Co-Head of Private Equity of the Shared Services Provider.

**Potential Directorship Positions; Other Roles**.  The Investment Manager Affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Partnership or other entities that operate in the same or a related line of business as the Partnership, for other clients managed by the Investment Manager or any of the Investment Manager Affiliates, or for any portfolio company of the Partnership, and the Partnership shall have no right to any such fees.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Partnership.  Also see "—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

The Investment Manager and/or the Investment Manager Affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Partnership.  Such transactions are on an arm's-length basis and may be subject to arm's-length fees.  There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Investment Manager and/or the Investment Manager Affiliates and the Partnership shall not have any right to any such fees.

**Potential Cross-Trades**.  The Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Partnership and another client advised by it or any of its affiliates.  The Investment Manager may engage in a client cross-transaction involving the Partnership any time that the Investment Manager believes such transaction to be fair to the Partnership and such other client.  By purchasing an Interest in the Partnership, a Limited Partner is deemed to have consented to such client cross-transactions between the Partnership and another client of the Investment Manager or one of its affiliates.

**Diverse Limited Partners**.  The Limited Partners may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions.  As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one type of Limited Partner than for another.  In making such decisions, the General Partner intends to consider the investment objectives of the Partnership as a whole, not the investment objectives of any Limited Partner individually.

002897
HCMLPHMIT00004078

**Soft Dollars.**  The General Partner and the Investment Manager may be offered soft dollars in the form of research and brokerage and other products or services, which may be utilized by the General Partner, the Investment Manager and their respective affiliates in connection with the services they offer to clients other than the Partnership.  The use of soft dollars presents the Investment Manager with potential conflicts of interest and may provide the Investment Manager with incentives to: (i) use certain brokers who may provide certain soft dollar benefits that other brokers may not, without regard to its obligations to the Partnership (including, without limitation, its best execution obligations); or (ii) trade more actively in order to generate more soft dollars and thereby reduce its expenses.

**Referral of Investors.**  The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  Such broker-dealers may have a conflict of interest in advising prospective investors to purchase Interests, as the broker-dealers are often only compensated upon the investment of the prospective investors.

**Lack of Separate Representation; Potential Conflicts of Counsel.**  Neither the Partnership Agreement nor any of the agreements, contracts and arrangements between the Partnership, on the one hand, and the General Partner or the Investment Manager, on the other hand, were or will be the result of arm's-length negotiations.  The attorneys, accountants and others who have performed services for the Partnership in connection with this offering, and who will perform services for the Partnership in the future, have been and will be selected by the General Partner.  No independent counsel has been retained to represent the interests of prospective investors or Limited Partners.  You are therefore urged to consult your own counsel as to the terms and provisions of the Partnership Agreement and all subscription and other related documents.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the IDF Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

**Valuation of Assets.**  The Administrator will calculate the net asset value of the Partnership (based upon information provided by the Investment Manager).  Such calculations could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Partnership's investments.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments.  Partnership If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument pursuant to the valuation methodologies described herein does not fairly represent its market value, the Investment Manager will value such security, option or other financial instrument as it reasonably determines.  Likewise, any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value.  The Investment Manager has a conflict of interest in that it will receive a higher Management Fee if the Partnership's assets are given a favorable valuation.  See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Determination of Net Asset Value".

002898
HCMLPHMIT00004079

The foregoing list of risk factors and conflicts of interest does not purport to be a complete enumeration or explanation of the risks and conflicts of interest involved in an investment in the Partnership.  Offerees should read this entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding to purchase Interests.

002899
HCMLPHMIT00004080

## ERISA CONSIDERATIONS

An investment of benefit plan assets in the Partnership may raise issues under ERISA and the U.S. Internal Revenue Code of 1986, as amended ("**Code**"). ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan (as defined below) and prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of a Plan or the management or disposition of the assets of a Plan, or who renders investment advice for a fee or other compensation to a Plan, is generally considered to be a fiduciary of the Plan.

In considering an investment in the Partnership of a portion of the assets of any employee benefit plan (including a "**Keogh**" plan) subject to the fiduciary and prohibited transaction provisions of ERISA or the Code or similar provisions under applicable state law (collectively, a "**Plan**"), a Plan fiduciary should determine, in light of the risks and limited liquidity inherent in an investment in the Partnership, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Interests with the assets of any Plan if the Investment Manager or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "**party in interest**") with respect to such Plan.

### PLAN ASSETS

Regulations promulgated under ERISA by the U.S. Department of Labor ("**Plan Asset Regulations**") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company", in each case as defined in the Plan Asset Regulations. The Interests will not constitute "publicly offered" securities or securities issued by an investment company registered under the Investment Company Act, and it is not expected that the Partnership will qualify as an "operating company" under the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" so long as they own, in the aggregate less than 25%, directly or indirectly, of the value of each class of such entity's equity. For purposes of such calculation, equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof, are disregarded. For purposes of this 25% test ("**Benefit Plan Investor Test**"), "benefit plan investors" include: employee benefit plans subject to the provisions of Part 4 of Title I of ERISA and plans subject to Section 4975 of the Code, including "Keogh" plans and individual retirement accounts ("**IRAs**"). The following are not included in the definition of benefit plan investor: employee benefit plans maintained outside the U.S. by foreign companies that cover non-U.S. persons, governmental plans, and certain church plans. Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of Interests in the Partnership were owned by benefit plan investors, an undivided interest in each of the underlying assets of the Partnership would be deemed to be "plan assets" of any Plan subject to Title I of ERISA or Section 4975 of the Code that invested in the Partnership.

Consequently, the General Partner intends to use reasonable efforts either (i) to prohibit plans subject to Title I of ERISA or Section 4975 of the Code from investing in the Partnership or (ii) to provide that investment by "benefit plan investors" in the Partnership will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by benefit plan investors in the Partnership to less than 25% of the value of each class of Interests in the Partnership as described above. However, each Plan fiduciary should be aware that even if the Partnership were to avoid plan asset status

002900


HCMLPHMIT00004081

under the Benefit Plan Investor Test at the time a Plan acquires Interests in the Partnership, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or withdrawals of Interests in the Partnership, and that Interests held by benefit plan investors may be subject to mandatory withdrawal in such event in order for the Partnership to continue to avoid plan asset status under the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Partnership, the Partnership will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Partnership will otherwise satisfy the Plan Asset Regulations or that the underlying assets of the Partnership will not otherwise be deemed to include ERISA plan assets.

### PLAN ASSET CONSEQUENCES

If the assets of the Partnership were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Partnership and (ii) certain transactions in which the Partnership might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the Investment Manager and any other fiduciary that has engaged in the prohibited transaction could be required (x) to restore to the Plan any profit realized on the transaction and (y) to reimburse the Plan for any losses suffered by the Plan as a result of the investment. In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. Plan fiduciaries that decide to invest in the Partnership could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Partnership or as co-fiduciaries for actions taken by or on behalf of the Partnership or the Investment Manager. With respect to an IRA that invests in the Partnership, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA to lose its tax-exempt status.

Under the Partnership Agreement, the General Partner has the power to take certain actions to avoid having the assets of the Partnership characterized as plan assets, including, without limitation, the right to refuse a subscription, exclude a Limited Partner from an investment or to compulsorily redeem a Limited Partner's Interests in the Partnership. While the General Partner does not expect that it will need to exercise such power, it cannot give any assurance that such power will not be exercised.

**Each Plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Partnership.**

002901
HCMLPHMIT00004082

<div style="text-align:right">**TAXATION**</div>

**Prospective investors are advised that: (i) any U.S. federal tax advice contained herein, including any opinion of counsel referred to herein, is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer; (ii) any such advice is written to support the promotion or marketing of the transactions described herein (or in any such opinion of counsel); and (iii) each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

## INTRODUCTION

The following is a summary of certain aspects of the taxation of the Partnership and its Partners, which should be considered by a potential purchaser of an Interest in the Partnership.  A complete discussion of all tax aspects of an investment in the Partnership is beyond the scope of this Memorandum.   The following summary is only intended to identify and discuss certain salient issues.

This summary of certain tax considerations applicable to the Partnership is considered to be a correct interpretation of existing laws and regulations in force on the date of this Memorandum.  No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that any such future guidance or interpretation will not be applied retroactively.

**The following summary is not intended as a substitute for careful tax planning.  The tax matters relating to the Partnership are complex and are subject to varying interpretations.  Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Partners will vary with the particular circumstances of each Partner.  Accordingly, each prospective investor must consult with and rely solely on his or her professional tax advisors with respect to the tax results of his or her investment in the Partnership.  In no event will the General Partner, its affiliates, counsel or other professional advisors be liable to any Limited Partner for any federal, state, local or other tax consequences of an investment in the Partnership, whether or not such consequences are as described below.**

## CLASSIFICATION OF THE PARTNERSHIP

Under the provisions of the Code and the Treasury Regulations promulgated thereunder ("**Regulations**"), as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement, the Partnership should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

The Partnership has been formed under the Delaware Act as a series limited partnership and may offering its Interests in multiple separate Series.  Under the provisions of the Code and the Regulations, as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement and the Delaware Act, each Series of Interests in the Partnership should be classified for U.S. federal income tax purposes as equity interests in a separate partnership and not as equity interests in an association taxable as a corporation.

The Partnership has not sought and will not seek a ruling from the Internal Revenue Service ("**IRS**") with respect to its status as a partnership.  If a Series of Interests in the Partnership should be classified as an association taxable as a corporation (e.g., as a result of a change in law or a material change in facts), the taxable income of the Partnership allocable to such Series would be subject to corporate income taxation; and distributions from the Partnership to the Limited Partners owning Interests in such Series would be treated as dividend income when received by such Limited Partners to the extent of the current or accumulated earnings and profits of the Partnership allocable to

002902


HCMLPHMIT00004083

such Series.

Certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly traded partnership rules set forth in the Code and the Regulations, and a Series of the Partnership may not qualify for one of the safe harbors under the Regulations if such Series has more than 100 Partners.  The Partnership expects that, under the facts and circumstances test set forth in the Regulations, the Interests will not be readily tradable on a secondary market (or the substantial equivalent thereof) and therefore, the Series partnerships will not be treated as publicly traded partnerships under the Regulations.  It is assumed in the following discussion of tax considerations that each Series of the Partnership will be treated as a partnership for U.S. federal income tax purposes.

Unless otherwise indicated, references in the discussion below to the tax consequences of the "Partnership's" investments, activities, income and expenses refer to the investments, activities, income and expenses attributable to each Series that is treated as a separate tax partnership.  Prospective investors should note that each Series will issue its annual Schedule K-1 tax reporting form to its Partners.  Therefore, investors that own Interests in more than one Series will receive separate Schedule K-1 reporting forms for each Series in which the investor is treated as owning an equity interest.

### TAXATION OF PARTNERSHIP OPERATIONS

As a partnership, the Partnership is not itself subject to U.S. federal income tax but will file an annual partnership information return with the IRS.  Each Limited Partner, in computing his own federal income tax liability for a taxable year, is required to take into account such Partner's distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or loss and any separately stated income items, deductions and credits for the taxable year of the Partnership that ends with or within such Partner's taxable year. The Partnership may utilize a variety of investment and trading strategies, which produce both short-term and long-term capital gain (or loss), as well as ordinary income (or loss).  The Partnership will send annually to each Limited Partner a Schedule K-1 form reporting such Partner's distributive share of the Partnership items of income, gain, loss, deduction and credit. The Partnership intends to use the calendar year as its taxable year unless a different fiscal year is required under the Code.

Each Limited Partner will be subject to tax, and liable for such tax, on such Partner's distributive share of the Partnership's taxable income regardless of whether the Limited Partner has received or will receive any distribution of cash from the Partnership.  Thus, in any particular year, a Limited Partner's distributive share of taxable income from the Partnership (and, generally, the taxes imposed on that income) could exceed the amount of cash, if any, such Limited Partner received or is entitled to withdraw from the Partnership.

Under Section 704 of the Code, a Limited Partner's distributive share of any Partnership item of income, gain, loss, deduction or credit is governed by the Partnership Agreement unless the allocation provided by the Partnership Agreement does not have "substantial economic effect".  The Regulations promulgated under Section 704(b) of the Code provide certain "safe harbors" with respect to allocations, which, under the Regulations, will be deemed to have substantial economic effect.  The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Partners.  While no assurance can be given, the allocations provided by the Partnership Agreement should have substantial economic effect and should be sustained under the facts and circumstances test.  However, if it were determined by the IRS or otherwise that the allocations provided in the Partnership Agreement with respect to a particular item do not have substantial economic effect, each Limited Partner's distributive share of that item would be determined for tax purposes in accordance with that Limited Partner's interest in the Partnership, taking into account all facts and circumstances.

Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's tax basis in such Partner's interest in the Partnership, should not result in taxable gain to

002903
HCMLPHMIT00004084


that Limited Partner, but reduce the tax basis in the Interest by the amount distributed or withdrawn.  Cash distributed to a Limited Partner in excess of the tax basis of his or its Interest is generally taxable either as capital gain or ordinary income, depending on the circumstances.  A distribution of property other than cash generally will not result in taxable income or loss to the Limited Partner to whom it is distributed until such time that the property is sold.

In the event a Limited Partner withdraws all of the capital in such Partner's capital account, the General Partner will have the discretion to specially allocate an amount of the Partnership's taxable gains or losses to the withdrawing Partner to the extent that the Partner's capital account exceeds, or is less than, its federal income tax basis in its Partnership Interest.  However, there can be no assurances that the IRS will accept such a special allocation.  If the special allocation were to be successfully challenged by the IRS, the Partnership's taxable gains or losses allocable to the remaining Partners would be increased.

For financial statement presentation and capital account maintenance purposes, all securities held by the Partnership will be marked-to-market at the end of each relevant accounting period and the net gain or loss from marking to market will be reported as income or loss.  This treatment differs from the general tax rule applicable to many securities transactions that a transaction does not result in gain or loss until it is closed by an actual sale or other disposition.  The divergence between such accounting and tax treatments frequently may result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Partnership.

The Partnership may be required to determine (on an annual basis) whether it will take the position for U.S. federal income tax purposes that it is (i) carrying on a trade or business as a trader in securities, or (ii) an investor in securities.  This determination will be made each year based primarily on the frequency, extent and regularity of the Partnership's trading activity during the particular year.  The Partnership expects to be treated as engaged in a trade or business by reason of its anticipated investment in the Highland Transaction.  The Partnership may also engage in other trade or business activities, either directly or through investments in portfolio partnerships.  Prospective investors that are U.S. tax-exempt entities should consider the impact of UBTI on an investment in the Partnership.  See "—Tax-Exempt Investors" below.  The Partnership's status as a trader or investor may vary from year to year.

If the Partnership is a trader, each Limited Partner who is an individual may deduct his share of the Partnership's expenses (other than interest expense) under Code section 162 as a business expense.  Alternatively, if the Partnership is characterized as an investor, an individual Limited Partner's share of the Partnership's expenses (other than interest expense) would pass through to the Partner as separately stated investment expenses deductible under Code section 212 as "miscellaneous itemized deductions".  An individual taxpayer's itemized deductions of this type are subject to deduction limitations and phase-out rules that are discussed below in "Limitations on Losses and Deductions—Itemized Deduction Limitations".  The limitations on deductions for "investment interest" are discussed below in "Limitations on Losses and Deductions—Investment Interest Limitations".

A Limited Partner may, with the consent of the General Partner, contribute securities to the capital of the Partnership.  However, a Limited Partner's contribution of appreciated securities may be a taxable exchange under Section 721(b) of the Code.

The Partnership will also engage in investing and trading securities for its own account.  Accordingly, a portion of the Partnership's direct and indirect expenses are expected to be deductible as trade or business expenses under Section 162 of the Code.  Certain other expenses may be classified as Section 212 investment expenses, which, for certain types of Limited Partners, including trusts, would be classified as miscellaneous itemized deductions.  Prospective investors that are classified as trusts for U.S. federal income tax purposes should consult their tax advisors concerning the limitations in the Code on deductions for miscellaneous itemized deductions.



002904

HCMLPHMIT00004085

## LIMITATIONS ON LOSSES AND DEDUCTIONS

**In General.**  A Limited Partner is not permitted to deduct Partnership losses that exceed the Partner's adjusted basis in its Interest at the end of the year in which such loss is incurred.  A Limited Partner's basis for its Interest is generally equal the amount of such Partner's cash contributions made to the Partnership, increased by (i) the Partner's allocable share of Partnership taxable income, (ii) the Partner's allocable share of Partnership tax-exempt income, and (iii) the Partner's allocable share of nonrecourse liabilities of the Partnership (if any); and decreased by (w) the Limited Partner's allocable share of Partnership taxable losses and non-deductible expenses, (x) any distributions of cash received by the Limited Partner from the Partnership, (y) the basis of any property distributed by the Partnership to such Partner and (z) any decrease in the Partner's share of Partnership nonrecourse liabilities (if any).   There are several other Code provisions that may limit the ability of a Limited Partner to claim deductions attributable to an investment in the Partnership.  The most significant of these limitations are discussed below.

**At Risk Limitations.** Section 465 of the Code limits certain taxpayers' losses from certain activities to the amount they are "at risk" in the activities.  Taxpayers subject to the "at risk" rules are non-corporate taxpayers, including trusts, and certain closely-held corporations.  The activities subject to the "at risk" limitations include all activities in which the Partnership expects to engage.  A Partner subject to the "at risk" rules will not be permitted to deduct in any year losses arising from its interest in the Partnership to the extent that the losses exceed the amount it is considered to have "at risk" in the Partnership at the close of that year.

A taxpayer is considered to be "at risk" in any activity to the extent of his cash contribution to the activity, his basis in other property contributed to the activity and his personal liability for repayments of amounts borrowed for use in the activity.  With respect to amounts borrowed for use in the activity, the taxpayer is not considered to be "at risk" even if he is personally liable for repayment if the borrowing was from a person who has an "interest" in the activity other than an interest as a creditor.  Even if a taxpayer is personally liable for repayment of amounts borrowed for use in the activity, and even if the amount borrowed is borrowed from a person whose only interest in the activity is an interest as a creditor, a taxpayer will not be considered "at risk" in the activity to the extent his investment in the activity is protected against loss through guarantees, stop loss agreements, or other similar arrangements.

Each Limited Partner will be at risk initially for the amount of his capital contribution.  A Partner's amount "at risk" will be increased by his distributive share of income from the Partnership and will be decreased by his distributive share of losses from the Partnership and distributions to him.  If a Partner's amount "at risk" decreases to zero, he can take no further losses until he has an "at risk" amount to cover the losses.  A Partner is subject to a recapture of losses previously allowed to the extent that his amount "at risk" is reduced below zero (limited to loss amounts previously allowed to the Partner over any amounts previously recaptured).

**Investment Interest Limitations.** To the extent that the Partnership incurs interest expense or short sale expenses, a non-corporate Limited Partner, including a trust, will likely be subject to the "investment interest expense" limitations of Section 163(d) of the Code.  Investment interest expense includes (i) interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment and (ii) any amounts deductible in connection with a short sale.  The deduction for investment interest expense is limited to the taxpayer's net investment income for the taxable year; i.e., the excess of investment income over investment expenses.  Excess investment interest expense that is disallowed is not lost permanently but may be carried forward to succeeding years subject to the Section 163(d) limitation.  Net capital gain (i.e., net long-term capital gain over net short-term capital loss) on property held for investment and qualified dividends are only included in investment income to the extent that the taxpayer elects to subject some or all of such gain or dividend income to taxation at ordinary income tax rates.  The Section 163(d) limitations will apply at the Partner level with regard to the Partner's distributive share of the Partnership's interest expense.

002905

HCMLPHMIT00004086

To the extent that the Partnership is treated as engaged in a trade or business by reason of being deemed a trader, a non-corporate Limited Partner's share of the Partnership's interest expense from such trading activity would retain its character as investment interest subject to the Section 163(d) investment income limitation, but the allowable investment interest deduction would be deducted "above the line" in determining adjusted gross income and therefore fully deductible, rather than being treated as an itemized deduction.

Section 265(a)(2) of the Code disallows any deduction for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations.  The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment", and that a limited partnership interest will be regarded as a "portfolio investment".  Therefore, if the Partnership holds tax-exempt obligations, the IRS might take the position that all or part of the interest expense incurred by a Limited Partner in connection with the purchase of such Partner's Interest should be viewed as incurred to enable such Limited Partner to continue carrying tax-exempt obligations, and that such Limited Partner should not be allowed to deduct all or a portion of such interest.

**Itemized Deduction Limitations**.  Under Section 67 of the Code, for non-corporate taxpayers, including trusts, certain miscellaneous itemized deductions are allowable only to the extent they exceed a "floor" amount equal to 2% of the taxpayer's adjusted gross income ("**2% Floor**").  To the extent that the Partnership's operations do not constitute a trade or business within the meaning of Section 162 and other provisions of the Code, a non-corporate Limited Partner's distributive share of the Partnership's investment expenses, other than investment interest expense, would be deductible only as miscellaneous itemized deductions, subject to the 2% Floor. In addition, Section 68 of the Code further restricts the ability of high income individuals with adjusted gross incomes in excess of specified threshold amounts to deduct certain itemized deductions.  Under this limitation (the "3% Phase-Out Rule"), miscellaneous itemized deductions in excess of the 2% Floor described above, along with certain other itemized deductions (not including investment interest expense), are reduced by 3% of the amount by which the taxpayer's adjusted gross income exceeds the applicable threshold, which, for 2015, is $309,900 for joint return filers and $258,250 for single taxpayers.  However, the amount of otherwise deductible itemized deductions is not reduced by more than 80% under the 3% Phase-Out Rule.  Moreover, a non-corporate taxpayer's investment expenses that are miscellaneous itemized deductions are also not deductible in calculating the taxpayer's alternative minimum tax liability.

Capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of excess capital losses per year against ordinary income.  Corporate taxpayers may carry back unused capital losses for three years and may carry forward such losses for five years; non-corporate taxpayers may not carry back unused capital losses but may carry forward unused capital losses indefinitely.

## ADDITIONAL TAX ISSUES

Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent that the property used to close the short sale constitutes a capital asset in the Partnership's hands.

The "wash sale" rules of Section 1091 of the Code disallow any deduction for losses arising from the sale or other disposition of "stock or securities", where, within a period beginning 30 days before such sale or disposition and ending 30 days afterwards, the taxpayer acquires "substantially identical" stocks or securities by purchase or by an exchange on which the entire amount of gain or loss is recognized.  This disallowance rule also applies where, within such 61-day period, the taxpayer enters into a contract or option to acquire substantially identical stock or securities.  Thus, if the Partnership were to engage in such a "wash sale" transaction, the Partners would not be able to recognize their distributive share of any loss realized in connection with such sale in the current year.

002906

HCMLPHMIT00004087

**Currency Fluctuations - "Section 988" Gains and Losses.** To the extent that the Partnership's investments are made in securities denominated in a foreign currency, gain or loss realized by the Partnership frequently will be affected by the fluctuation in the value of such foreign currencies relative to the value of the U.S. dollar. Generally, gains or losses with respect to the Partnership's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the Partnership's sale of such stock. However, under Section 988 of the Code, gains or losses of the Partnership on the acquisition or disposition of foreign currency (i.e., the purchase of foreign currency and subsequent use of such currency to acquire stock) will be treated as ordinary income or loss. Moreover, under Section 988, gains and losses from disposition of debt securities denominated in a foreign currency that are attributable to the fluctuations in such currency between the date of acquisition of the debt security and the date of its disposition will be treated as ordinary income or loss. Since the Code provides limitations on the ability of taxpayers to deduct capital losses against ordinary income, a Partner's share of capital losses realized by the Partnership on sale of foreign securities would not be available to offset the Partner's share of ordinary income realized by the Partnership on its currency hedging transactions.

The Partnership may acquire foreign currency forward contracts, enter into foreign currency futures contracts and acquire put and call options on foreign currencies. Generally, foreign currency regulated futures contracts and option contracts that qualify as "Section 1256 contracts" will not be subject to ordinary income and loss treatment under Section 988. However, if the Partnership acquires currency futures contracts or options contracts that are not Section 1256 contracts, or any currency forward contracts, any gain or loss realized by the Partnership with respect to such instruments will be ordinary income or loss, unless (i) the contract is a capital asset in the hands of the Partnership and is not part of a straddle transaction and (ii) the Partnership makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

The taxation of debt obligations under the Code is complex; the following discussion is intended to provide only a general description of these rules. Generally, interest income and income items similar to stated interest, such as original issue discount (in general, the annual portion of the discount on original issuance of debt obligations issued for less than their stated principal amount) and market discount (the amount by which debt obligations are acquired in the secondary market for less than their principal) are treated as items of ordinary income. Generally, debt obligations that are disposed of in a taxable transaction for an amount greater than their adjusted cost basis give rise to capital gain, which will be long-term if the debt obligation is held for longer than one year, and short-term, if held for a period of one year or less. Generally, debt obligations that are disposed of in a taxable transaction for an amount less than their adjusted cost basis give rise to capital loss, which will be long-term if the debt obligation is held for longer than one year, and short-term if held for a period of one year or less. In the event that any such debt obligations are not held as capital assets, such dispositions will generally give rise to ordinary gain or loss, as the case may be.

Section 1259 of the Code requires that the Partnership recognize gain on the constructive sale of any appreciated financial position in stock, a partnership interest, or certain debt instruments. A constructive sale of an appreciated financial position occurs if, among other things, the Partnership enters into (1) a short sale of the same or substantially identical property (a transaction commonly known as a "short sale against the box"), (2) an offsetting notional principal contract with respect to the same or substantially identical property, or (3) a futures or forward contract to deliver the same or substantially identical property. Exceptions to the foregoing apply to certain transactions closed within 30 days after the close of the taxable year if the underlying appreciated financial position remains "unhedged" for at least 60 days thereafter, and to transactions involving certain contracts to sell stock, debt instruments, or partnership interests if the contract settles within one year.

The IRS may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Partnership as "straddles" for federal income tax purposes. The application of the "straddle" rules in such a case could

002907
HCMLPHMIT00004088

affect a Partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities.  In addition, if either of the Partner's positions in such a transaction is an "appreciated financial position", application of the "straddle" rules may trigger a constructive sale of that position under the rules described above.

Section 1258 of the Code recharacterizes capital gain from a "conversion transaction" as ordinary income, with certain limitations.   Conversion transactions are defined as transactions in which substantially all the expected return is attributable to the time value of money and either: (a) the transaction consists of the acquisition of property by the taxpayer and a substantially contemporaneous agreement to sell the same or substantially identical property in the future; (b) the transaction qualifies as a "straddle" (within the meaning of Section 1092(c) of the Code); (c) the transaction is one that was marketed or sold to the taxpayer on the basis that it would have the economic characteristics of a loan but the interest-like return would be taxed as capital gain; or (d) the transaction is described as a conversion transaction in the Regulations.   The amount of gain so recharacterized will not exceed the amount of interest that would have accrued on the taxpayers' net investment for the relevant period at a yield equal to 120% of the "applicable rate".

## INVESTMENTS IN NON-U.S. CORPORATIONS

The Partnership may invest in certain foreign corporations that will be classified as "passive foreign investment companies" ("**PFICs**") for U.S. tax purposes.  Under the PFIC rules, unless the Partnership makes one of the elections described below, any gain realized by the Partnership on the sale or disposition of stock in a PFIC that is allocable to Partners that are U.S. Persons (as defined in the Code) will be treated as ordinary income and will be subject to U.S. federal income tax as if (i) the gain had been realized ratably over the Partnership's holding period and (ii) the amount deemed realized had been subject to tax in each year of that holding period at the highest applicable federal income tax rate; in addition, an interest charge at the rate generally applicable to underpayments of federal income tax will be imposed on the amount.  Further, any "excess distributions" from a PFIC (as defined in the Regulations) are treated as ordinary income (regardless of their original character) and subject to this deferred tax and interest charge.

Provided the PFIC complies with certain reporting requirements, the Partnership may elect to have the PFIC treated as a "qualified electing fund", in which case the Partnership would include annually in its gross income its *pro rata* share of the PFIC's net ordinary income and net realized capital gains, whether or not such amounts are actually distributed to the Partnership.  Generally, any net operating losses or net capital losses of the PFIC will not pass through to the Partnership and will not offset any ordinary income or capital gains of the PFIC reportable to the Partnership in subsequent years.  Alternatively, the Partnership could elect to "mark-to-market" stock in certain PFICs if such stock is considered "marketable stock" under the Code, and thereby avoid being subject to the deferred tax and interest charge discussed above.  However, there can be no assurance that the Partnership will be able to make either of these elections with respect to any PFICs in which it invests.  Further, Limited Partners may be subject to IRS reporting requirements with respect to the Partnership's investments in PFICs.

The Partnership may also invest in certain foreign corporations that will be considered "controlled foreign corporations" ("**CFCs**") for U.S. tax purposes.  A CFC is a non-U.S. corporation in which certain U.S. shareholders own, directly or indirectly, more than 50% of either the total voting power of all classes of stock entitled to vote or the total value of all classes of stock.  Under the CFC rules, certain U.S. shareholders are subject to U.S. federal income tax on certain types of income (generally passive income) realized by the CFC regardless of whether any amounts are distributed from the CFC to such U.S. shareholder.   Further, such U.S. shareholders may be subject to IRS reporting requirements with respect to investments in CFCs.

In addition, if the Partnership invests in stock of foreign corporations that become PFICs or CFCs after the Partnership has made such investment, this may also result in adverse tax consequences for the Limited Partners that are U.S. Persons and may subject them to IRS reporting requirements with respect to such investments.

002908


HCMLPHMIT00004089

## 3.8 % MEDICARE SURTAX ON NET INVESTMENT INCOME

High income U.S. individuals are subject to an annual 3.8% Medicare contribution tax on their "net investment income" (the "**NII Tax**"). The NII Tax is an "add on" federal surtax which must be paid in addition to the regular federal income tax on such income. The NII Tax applies to single taxpayers with "modified" adjusted gross income ("**MAGI**") in excess of $200,000 and married persons filing jointly with MAGI in excess of $250,000. THE NII Tax also applies, in modified form, to the undistributed net investment income of certain trusts and estates.

For purposes of the NII Tax, "investment income" is defined to include (1) interest, dividends, annuities, royalties and rents (subject to certain exceptions); (2) income from a trade or business that consists of trading financial instruments or commodities (i.e., income from trader funds); (3) income from a trade or business that is a passive activity for the individual (i.e., income from an equity interest in a partnership engaged in a trade or business in which the partner does not actively participate); and (4) net gain attributable to disposition of capital assets and certain other property.

It is anticipated that a U.S. individual Limited Partner's distributive share of taxable income from the Partnership will be classified as investment income of the type subject to the NII Tax. To the extent the Partnership generates income from activities that constitute a trade or business (e.g., originating loans), such trade or business income would still be classified as investment income under the NII Tax because the Limited Partner will not be considered an active participant in the Partnership's business.

Net investment income for purposes of calculating the NII Tax is (i) investment income (as defined above) reduced by (ii) any deductions allowed under the regular rules applicable for federal income tax purposes that are properly allocable to such gross income or net gain. If the Partnership is not engaged in a trade or business, an individual Limited Partner's distributive share of investment-related expenses (other than investment interest) would pass through to such Partners as Code Section 212 expenses which are deductible for regular income tax purposes and the NII Tax only as itemized deductions and are subject to the Section 67 (2% Floor) and Section 68 (3% Phase-Out Rule) limitations previously discussed.

## TAX-EXEMPT INVESTORS

If the Partnership derives income which would be considered "unrelated business taxable income" (as defined in Section 512 of the Code) ("**UBTI**"), if derived directly by a Limited Partner that is a qualified retirement plan or other organization exempt from tax under Sections 401 or 501(a) of the Code or an individual retirement account ("**IRA**") exempt under Section 408(e) of the Code (each, a "**Tax-Exempt Entity**"), such Limited Partner's allocable share of such Partnership income would be subject to tax. A Tax-Exempt Entity which is subject to tax on its allocable share of the Partnership's UBTI, including an IRA, may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by a Tax-Exempt Entity (or by a partnership of which the Tax-Exempt Entity is a member) over the deductions attributable to such trade or business. UBTI generally does not include certain passive income, including dividends, interest, annuities, royalties and gain or loss from the disposition of property held for investment, unless such income items are debt-financed income (as discussed below).

While UBTI itself is taxable, the receipt of UBTI by a Tax-Exempt Entity generally has no effect upon that entity's tax-exempt status or upon the exemption from tax of its other income. However, for certain types of Tax-Exempt Entities, the receipt of any UBTI may have extremely adverse consequences. In particular, for charitable remainder trusts (as defined under Section 664 of the Code), the receipt of any taxable income from UBTI during a taxable year will result in the imposition of an excise tax equal to the amount of such UBTI.

002909


HCMLPHMIT00004090

A Tax-Exempt Entity also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) pursuant to Section 514 of the Code.  In general, unrelated debt-financed income consists of: (i) income derived by a Tax-Exempt Entity (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year; and (ii) gains derived by a Tax-Exempt Entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness". Acquisition indebtedness is generally defined as debt incurred to purchase or carry an investment.  Such income and gains derived by a Tax-Exempt Entity from the ownership and sale of debt-financed property are taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

<u>Income From the Partnership's Private Equity Investments</u>.  The Investment Manager expects to invest a substantial portion of the Partnership's Series 1 assets in the Highland Transaction.  The Partnership expects to incur acquisition indebtedness with respect to the Highland Transaction (if it occurs) and may use borrowed funds to acquire other property.  Accordingly, Limited Partners that are Tax-Exempt Entities should anticipate that a substantial portion, and possibly all, of their distributive share of the Partnership's net income realized from ownership of equity interests in Highland and other portfolio companies that are business partnerships, including gain realized upon sales of such equity investments, will be subject to federal income tax as UBTI.

<u>Income From the Partnership's Other Activities</u>. The Investment Manager expects that the Partnership will incur indebtedness in connection with its operations from time to time. The law is not entirely clear regarding the appropriate method to be used to determine what portion of a tax-exempt Limited Partner's share of the Partnership's income is attributable to debt financing and therefore constitutes "debt-financed income". Accordingly while the Partnership will compute each tax-exempt Limited Partner's share of "debt-financed income" from the Partnership in a manner which the Partnership considers to be reasonable, there can be no assurance that the IRS will accept the method of computation used by the Partnership.

Tax-exempt Limited Partners will also realize UBTI if the Partnership acquires equity interests of publicly traded partnerships or private partnerships that are engaged in trade or business activities or the Partnership directly carries on other trade or business activities (other than as a securities trader).

<div align="right">

OTHER TAXES

</div>

Partners may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions.  Each prospective investor should consider the potential consequences of such taxes due to an investment in the Partnership.  It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Partnership under state law, including the laws of the state(s) of its, his or her domicile and residence, by obtaining advice from such investor's own tax advisors, and to file all appropriate tax returns that may be required.

Income received by the Partnership from sources within non-U.S. countries may be subject to withholding and other taxes imposed by such countries.  Each Partner may be entitled either to deduct (as an itemized deduction) such Partner's proportionate share of the non-U.S. taxes of the Partnership in computing such Partner's taxable income or to use the amount as a foreign tax credit against his or its U.S. federal income tax liability, subject to limitations.  Generally, a credit for non-U.S. taxes is subject to the limitation that it may not exceed the taxpayer's U.S. tax attributable to his or its non-U.S. source taxable income.  With respect to Partners that are U.S. Persons: (i) certain currency fluctuation gains, including fluctuation gains from non-U.S.-Dollar-denominated debt securities, receivables and payables, will be treated as ordinary income derived from U.S. sources; and (ii) Partnership gains from the sale of securities also will be treated as derived from U.S. sources.  The limitation on the foreign tax credit is applied separately to non-U.S.

002910

HCMLPHMIT00004091

source passive income (as defined for purposes of the foreign tax credit), including the non-U.S. source passive income realized by the Partnership. The foreign tax credit limitation rules do not apply to certain electing individual taxpayers who have limited creditable non-U.S. taxes and no non-U.S. source income other than passive investment-type income. The foreign tax credit generally is eliminated with respect to non-U.S. taxes withheld on income and gain if the Partnership fails to satisfy minimum holding period requirements with respect to the property giving rise to the income and gain.

## TAX ELECTIONS; RETURNS; TAX AUDITS

If the General Partner determines that the Partnership is treated as a securities trader for federal income tax purposes, the General Partner may cause the Partnership to elect to "mark-to-market" its securities at the end of each taxable year, in which case such securities would be treated for federal income tax purposes as though sold for fair market value on the last business day of such taxable year. Such an election under Code Section 475(f) would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the IRS. If the Partnership were to make such an election, all or a portion of the Partnership's gains and losses would be considered ordinary income or loss, rather than capital gain or loss. Since for federal income tax purposes capital losses generally may be deducted only against capital gains, a Limited Partner may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Partnership's income.

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death); provided that a partnership election has been made pursuant to Section 754 of the Code. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election. Any such election, once made, cannot be revoked without the IRS's consent. The General Partner also has the authority and sole discretion to make or refrain from making other tax elections that are available to the Partnership.

Additionally, even if a partnership has not made a Section 754 election, Section 743 of the Code provides for a mandatory basis adjustment to partnership property on certain transfers of partnership interests (including transfers by reason of death), if the partnership has a "substantial built-in loss" immediately after such transfer. A partnership is treated as having a "substantial built-in loss" if the partnership's adjusted basis in partnership property exceeds the property's fair market value by more than $250,000. Section 734 of the Code also provides for mandatory basis adjustments in the case of certain property distributions to partners. Such Code provisions could cause the Partnership to decrease the basis of its remaining assets in such circumstances.

The General Partner will decide how to report partnership items on the Partnership's tax returns and all Limited Partners are required to treat such tax items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. Since the Partnership may engage in transactions whose treatment for tax purposes is not clear, there is a risk that a claim of tax liability could be asserted against the Partnership or its Partners. In the event that the income tax returns of the Partnership are audited by the IRS, the tax treatment of Partnership income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Partners. As the "Tax Matters Partner", the General Partner has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Partnership items. The General Partner may, in its sole discretion, consult with, and rely upon, the Partnership's auditors and their determinations or advice as to tax and/or accounting matters.

It is possible that the Partnership and or certain transactions executed by the Partnership would be subject to tax shelter disclosure registration and listing requirements under applicable U.S. tax laws and regulations.

002911

HCMLPHMIT00004092

**PFIC Reporting**. The Code provides that each U.S. Person (as defined herein) that is a direct or indirect shareholder of a PFIC (generally, an investment corporation organized under the laws of a foreign jurisdiction) is required to file an annual information return containing such information as the IRS may require.  Limited Partners would be indirect shareholders of stock in any PFICs owned by the Partnership, and would satisfy such filing requirement (if applicable to such Partner) by completing a copy of IRS Form 8621 for the reportable PFIC investment and submitting such forms to the IRS with the Partner's federal income tax return.

**FATCA Withholding and Compliance**. The provisions of the Code known as the Foreign Account Tax Compliance Act ("**FATCA**") provide that a 30% withholding tax will be imposed on payments of U.S.-source dividends and interest (and certain other items of U.S.-source income) to certain foreign financial entities, and beginning on January 1, 2017 with regard to other withholdable payments (including gross proceeds from the sale of property that give rise to U.S.-source, interest or dividends), unless the foreign financial entity has registered with the IRS and agreed to provide specified U.S. tax information concerning "specified U.S. persons" that own interests in the foreign entity. The Partnership is a withholding agent with respect to such withholding taxes that may be imposed on any of its Partners.  U.S. and non-U.S. Partners will be required to furnish appropriate documentation certifying as to their U.S. or non-U.S. tax status, together with such other additional tax information as the Partnership may from time to time request. Limited Partners that are "non-financial foreign entities" (as defined in Code Section 1472) are required to certify whether they have any "substantial United States owners" and, if so, to disclose the identity and tax identification numbers of such persons to the Partnership. Failure to provide such information may subject a Limited Partner to withholding taxes or mandatory withdrawal of its entire interest in the Partnership.  Limited Partners are encouraged to consult with their own tax advisors regarding the possible impact of the FATCA legislation on their investment in the Partnership.

## OTHER MATTERS

The Partnership may incur certain expenses in connection with its organization and the marketing of the Interests.  Amounts paid or incurred to organize the Partnership are being amortized, for tax purposes, over a period of 180 months from the date the Partnership commenced operations.  Amounts paid or incurred to market interests in a partnership (marketing and syndication expenses) are not deductible or amortizable.

002912

HCMLPHMIT00004093

## SPECIAL CONSIDERATIONS FOR PARTNERS WHO ARE NOT U.S. PERSONS

A "**U.S. Person**" is (a) a citizen or resident of the United States, (b) a corporation, partnership, or other entity organized under the laws of the United States, any state, or the District of Columbia, other than a partnership that is not treated as a U.S. Person under the Regulations, (c) an estate whose income is subject to United States income tax, regardless of its source, or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in the Regulations, "U.S. Person" includes certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, that have elected to be treated as U.S. Persons.  Partners that are not U.S. Persons are referred to below as "non-U.S. Partners".

**Taxation of Effectively Connected Income**.  The Partnership expects to be treated for U.S. tax purposes as being engaged in the conduct of a U.S. trade or business.   As a result, non-U.S. Limited Partners that acquire interests in the Partnership will generally be treated as being engaged in the conduct of a U.S. trade or business.  Thus, each non-U.S. Limited Partner will be subject to U.S. federal income taxation, at graduated rates, on its distributive share of the Partnership's income, gain or loss (whether ordinary or capital) that is effectively connected with the conduct of the Partnership's U.S. trade or business ("**ECI**").  Such Limited Partners will be required to file annual U.S. federal income tax returns with respect to such ECI, and the Partnership will be required to withhold and remit to the U.S. Treasury a portion of the non-U.S. Limited Partner's distributive share of such ECI.  The Limited Partner would be entitled to claim a credit on his U.S. federal income tax return for the amount withheld by the Partnership with respect to such ECI.  Non-U.S. Limited Partners may also be required to file applicable state and local tax returns in jurisdictions in which the Partnership is engaged in business or in which its real property interests are located.

**U.S. Branch Profits Tax**.  In the case of a Limited Partner that is a non-U.S. corporation, in addition to the regular corporate income tax that must be paid on its ECI, the Code provides for an additional 30% "branch profits" tax.  The branch profits tax is 30% (or lower rate permitted by tax treaty) of the foreign corporation's "dividend equivalent amount".  This is the amount of the foreign corporation's effectively connected after-tax earnings that are not reinvested in a U.S. trade or business by the end of the tax year or disinvested in a later tax year.  Certain income tax treaties may reduce or eliminate the branch profits tax; however, under certain circumstances, the branch profits tax may override income tax treaty benefits.

**FIRPTA**.   The Foreign Investment in Real Property Tax Act of 1980, as amended ("**FIRPTA**"), imposes a  tax on gain realized on disposition by a foreign person of a "U.S. real property interest" ("**USRPI**") by treating such gain as ECI, generally giving rise to the tax consequences described above.  A USRPI  includes a direct investment in U.S. real estate and buildings and also investments in stock and certain types of debt interests of a U.S. corporation that is classified as a "U.S. real property holding corporation" (as defined in the Code).  A USRPI held by a partnership is deemed to be held proportionately by its partners.

**Taxation of Non-ECI**.  The Partnership also expects to realize certain types of periodic income from U.S. sources (e.g., dividends and certain types of interest) which are not classified as ECI.  Each non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income.  Such withholding tax is sometimes reduced or eliminated by an applicable income tax treaty, provided that the proper certification is provided by the non-U.S. Limited Partner when necessary.  The applicable IRS form or forms (W-8 series) should be submitted to the Partnership by each non-U.S. Limited Partner at the time such Limited Partner acquires an Interest in the Partnership, and should be resubmitted every three years thereafter (or earlier, if the information on such form changes before such date).

**Disposition of Partnership Interests**.  A non-U.S. Limited Partner that disposes of its Interest in the Partnership, by sale or otherwise, may be subject to U.S. federal income

002913

HCMLPHMIT00004094

taxation on such disposition.   A transferee of an Interest in the Partnership may be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition.   Any amount so withheld can be applied as a credit against the U.S. federal income tax liability of the non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment.

**U.S. Estate and Gift Taxation of Interests**.   Non-U.S. Limited Partners that are individuals should also be aware that Interests in the Partnership will be treated as U.S. situs property by reason of the Partnership's ownership of U.S. real property interests, and thus subject to U.S. estate taxation upon the death on a non-U.S. individual owner, or U.S. gift taxation upon a donative transfer of such Interest.

## STATE TAXATION

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Partnership.   No attempt is made herein to provide a discussion of such state tax consequences.   State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit.   A Partner's distributive share of the taxable income or loss of the Partnership generally will be required to be included in determining the Partner's reportable income for state tax purposes in the jurisdiction in which he or she is a resident.   Each prospective investor must consult such investor's own tax advisors regarding such state tax consequences.

## FUTURE TAX LEGISLATION

Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Partnership, with or without advance notice, and retroactively or prospectively.

002914

HCMLPHMIT00004095

**EXHIBIT**

MEMBER AND MANAGER CONSENT
OF
ATLAS IDF GP, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of ATLAS IDF GP, LLC, a Delaware limited liability company (the "**General Partner**"), the general partner of ATLAS IDF, LP, a Delaware limited partnership (the "**Partnership**"), acting pursuant to the Delaware Limited Liability Company Act and the Amended and Restated Company Agreement of the General Partner, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the General Partner;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| **Name** | **Office** |
|---|---|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers. As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the General Partner but not named above is hereby removed from the office of the General Partner;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the General Partner and the Partnership, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the General Partner and/or the Partnership prior to the date

002916

HCMLPHMIT00004124

hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the General Partner and/or the Partnership; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the General Partner.

*[Signature Page to Follow]*

2

002917

HCMLPHMIT00004125

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

<u>MEMBER</u>

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By:_____
       Mark Patrick, Sole Director

<u>SOLE MANAGER</u>

_____
Mark Patrick

*Signature Page*

002918

HCMLPHMIT00004126

**EXHIBIT**

002919

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

ATLAS IDF GP, LLC

A Delaware Limited Liability Company

002920

HCMLPHMIT00004127

# AMENDED AND RESTATED COMPANY AGREEMENT

*of*

## ATLAS IDF GP, LLC

### A Delaware Limited Liability Company

 

This AMENDED AND RESTATED COMPANY AGREEMENT (collectively, the "Agreement," which shall include all amendments and exhibits hereto) dated effective as of the 1ˢᵗ day of August, 2022 (the "Effective Date"), are entered into by and among those Persons executing the signature page hereto as the Members of ATLAS IDF GP, LLC, a Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

## ARTICLE I

### INTRODUCTION

1.01    <u>Formation of Limited Liability Company</u>  The Company was formed by the filing of the Certificate of Formation (the "Certificate") with the Secretary of State of Delaware on the October 29, 2015. The Company's business shall be conducted under the name "ATLAS IDF GP, LLC" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replaces, in its entirety, all prior governing agreements for the Company, including any and all amendments thereto.

This Agreement is subject to, and governed by, the Delaware laws governing limited liability companies (the "DELAWARE LAWS") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DELAWARE LAWS or the provisions of the Certificate, such provisions of the DELAWARE LAWS or the Certificate, as the case may be, will be controlling.

1.02    <u>Registered Office and Agent</u>  The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.03    <u>Other Offices</u>  The Company may also have offices at such other places, both within and without the State of Delaware, as the Board of Managers may from time to time determine or the business of the Company may require.

1.04    <u>Defined Terms</u>  The terms used in this Agreement with their initial letter capitalized shall, unless the context requires otherwise, have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a)    "DELAWARE LAWS" shall mean the Delaware laws governing limited liability companies, as the same may be amended from time to time.

(b)    "Affiliate" shall mean, as to any Person, any Person controlled by, controlling, or under common control with such Person, and, in the case of a Person who is an individual, a member of the family of such individual consisting of a spouse, sibling, in-law, lineal descendant, or ancestor (including by adoption). For purposes of this definition, "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, alone or in concert with others, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise, and no Person shall be deemed in control of another solely by virtue of being a director, officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

HCMLPHMIT00004128

(c)      "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d)      "Book Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e)      "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i)      the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii)      the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii)      the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv)      the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 8.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v)      if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i), 1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f)      "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

3

HCMLPHMIT00004129

prior Member for the interest of such then Member, reduced by any distribution to such Member in return of its capital as contemplated herein.

(g)    "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, Losses, Distributable Cash, and assets upon liquidation of the Company as described in this Agreement.

(h)    "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i)    Intentionally Blank.

(j)    Intentionally Blank.

(k)    "Code" shall mean the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)    "Company" shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)    "Debtor Relief Laws" shall mean any federal or state bankruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)    Intentionally Blank.

(o)    "Distributable Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for a working cash reserve in accordance with Section 8.07 below.

(p)    "Fiscal Year" shall mean the calendar year.

(q)    "Former Member" shall mean a member that causes a Dissolution Event.

(r)    "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, Losses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)    Intentionally Blank

(t)    "Manager" shall mean an individual elected to the Board of Managers of the Company pursuant to Sections 3.02 and 3.04 below.

(u)    "Member(s)" shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof. The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit B, attached hereto and incorporated herein by reference. Reference to a "Member" shall be to any one of the Members.

(v)    "Percentage Interest" of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms hereof.

(w)    "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

4

002923

HCMLPHMIT00004130

(x)      "Pro Rata Part" shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y)      "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)      income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y) shall be added to such taxable income or loss;

(ii)      any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y), shall be subtracted from such taxable income or loss;

(iii)      if the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(iv)      gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(v)      in lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation; and

(vi)      notwithstanding any other provision of this Section 1.04(y), any items that are specially allocated pursuant to Section 8.02 or Section 8.03 shall not be taken into account in computing Profits and Losses.

(z)      "Regulatory Allocations" shall mean the special allocations of items of income, gain, loss, and deduction, if any, set forth in Section 8.02 hereof.

(aa)      "Transfer" or "Transferred" shall mean the sale, assignment, conveyance, gift, bequest, devise, transfer under the rules of intestate succession, pledge, mortgage, or other encumbrance.  In addition, the term "Transfer" or "Transferred" shall mean an "ownership change" of a Member as defined in Section 382(g) of the Code in effect as of the Effective Date, except that the term "Member" shall be substituted for "shareholder" wherever it appears.

(bb)      "Treasury Regulations" shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc)      "Unanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTICLE II

## MEMBERS AND MEMBERSHIP INTERESTS

2.01      <u>Members</u>.  The Members of the Company shall be those Persons listed on <u>Exhibit B</u>. Except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit B</u>, and except as provided in Section 7.05 below, a Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers, plus one or more Members whose Percentage Interests total more than fifty percent (50%); provided, however, that no Person will be recognized as a Member of the

002924

HCMLPHMIT00004131

Company until he/she shall have executed this Agreement, or a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02    Annual Meetings    An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting.    At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03    Special Meetings    A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%.    Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04    Place of Meetings    The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers.    Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03.    If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05    Notice.    Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06    Voting List    At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member.    For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours.    Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member.    The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07    Voting of Interests.    Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company.    Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her.    Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee.    Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.    Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine.    A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.08    Quorum.    The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement.    At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.09    Vote; Withdrawal of Quorum.    If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in Exhibit A or Exhibit B, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of all Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

002925

HCMLPHMIT00004132

Certificate, or this Agreement a different vote is required, in which event such express provision shall govern and control the decision of such question.  The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding any withdrawal of Members that may leave less than a quorum remaining.

2.10    Method of Voting; Proxies.  Except as otherwise may be provided in Exhibit A or Exhibit B, each Member shall be entitled to that number of votes on each matter submitted to the Members for their vote equal to such Member's Percentage Interest multiplied by 100.  At any meeting of Members, every Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorney-in-fact.  Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.  If no date is stated on a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11    Closing of Transfer Books; Record Date .  For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any reconvening thereof, or entitled to receive payment of any distribution, or in order to make a determination of Members for any other proper purpose, the Board of Managers may provide that the membership interest transfer books of the Company shall be closed for a stated period but not to exceed in any event 50 days.  If the membership interest transfer books are closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members, such books shall be closed for at least 10 days immediately preceding such meeting.  In lieu of closing the membership interest transfer books, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action requiring such determination of Members is to be taken.  If the membership interest transfer books are not closed and if no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or entitled to receive payment of a distribution, the date on which the notice of the meeting is to be mailed or the date on which the resolution of the Board of Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

2.12    Presiding Officials at Meetings  The President shall preside at, and the Secretary shall prepare minutes of, each meeting of Members, and in the absence of either such officer, his other duties shall be performed by some person appointed at the meeting.

## ARTICLE III

## MANAGERS

3.01    Management.  The business and affairs of the Company shall be managed EXCLUSIVELY by the Board of Managers.  Subject to the restrictions imposed by law, the Certificate, or this Agreement, the Board of Managers may exercise all the powers of the Company.

3.02    Number; Election; Term; Qualification.  The first Board of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents.  Thereafter, except as otherwise may be restricted by this Agreement, the number of Managers that shall constitute the entire Board of Managers shall be determined by resolution of the Board of Managers at any meeting thereof or by the Members at any meeting thereof, but shall never be less than one (1).  At each annual meeting of Members, Managers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and qualified.  No Manager need be a Member, a resident of the State of Delaware, or a citizen of the United States.

3.03    Removal  Except as otherwise may be provided by the Members, at any meeting of Members called expressly for that purpose, any Manager or the entire Board of Managers may be removed, with or without cause, by a vote of one or more Members whose Percentage Interests total more than fifty percent (50%).

3.04    Change in Number; Vacancies.  No decrease in the number of Managers constituting the entire Board of Managers shall have the effect of shortening the term of any incumbent Manager.  In the case of any increase in the number of Managers, or in the case of the death, retirement, resignation, or removal of a Manager, the vacancies to be filled by such increase or death, retirement, resignation, or removal may be filled by (a) the Board of Managers for a term of office



002926

HCMLPHMIT00004133

continuing only until the next election of one or more Managers by the Members; or (b) the Members at any annual or special meeting of the Members. A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

     3.05    <u>Place of Meetings</u> . The Board of Managers may hold its meetings in such place or places, including by telephonic or other electronic method of communication, within or without the State of Delaware as the Board of Managers may from time to time determine.

     3.06    <u>First Meeting</u> . Each newly elected Board of Managers may hold its first meeting, if a quorum is present, for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of Members, and no notice of such meeting shall be necessary.

     3.07    <u>Regular Meetings</u> . Regular meetings of the Board of Managers may be held without notice at such times and places, including by telephonic or other electronic method of communication, as may be designated from time to time by resolution of the Board of Managers and communicated to all Managers. Regular meetings of the Board of Managers may be held when and if needed, and no more than one regular meeting of the Board of Managers shall be required in any calendar year.

     3.08    <u>Special Meetings</u> . A special meeting of the Board of Managers shall be held whenever called by any Manager at such time and place, including by telephonic or other electronic method of communication, as such Manager shall designate in the notice of such special meeting. The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Managers need be specified in the notice or waiver of notice of any special meeting.

     3.09    <u>Quorum; Vote</u> . At all meetings of the Board of Managers, a majority of the Managers fixed in the manner provided in this Agreement shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting, a majority of the Managers present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the Managers present at a meeting at which a quorum is in attendance shall be the act of the Board of Managers, unless the vote of a different number is required by law, the Certificate, or this Agreement.

     3.10    <u>Procedure; Minutes</u> . At meetings of the Board of Managers, business shall be transacted in such order as the Board of Managers may determine from time to time. The Board of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute book of the Company.

     3.11    <u>Presumption of Assent</u> . A Manager of the Company who is present at any meeting of the Board of Managers at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof, or shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

     3.12    <u>Compensation</u> . Except as otherwise may be restricted in this Agreement, Managers, in their capacity as Managers, may receive, by resolution of the Board of Managers, a stated salary or a fixed sum and expenses of attendance, if any, for attending meetings of the Board of Managers. No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

<div align="center">

**ARTICLE IV**

**COMMITTEES**

</div>

     4.01    <u>Designation</u> . The Board of Managers may, by a resolution adopted by a majority of the entire Board of Managers, designate executive and other committees.

<div align="center">8</div>

HCMLPHMIT00004134

4.02    Number; Qualification; Term .  Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire Board of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire Board of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03    Authority .  The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in the management of the business and affairs of the Company.  Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in such other matters and affairs concerning the Company.  However, no committee shall have the authority of the Board of Managers in reference to any of the following:

(a)    amending the Certificate;

(b)    approving a plan of merger or consolidation;

(c)    recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d)    recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e)    filling vacancies in, or removing members of, the Board of Managers or of any committee thereof;

(f)    filling any vacancy to be filled by reason of an increase in the number of Managers;

(g)    electing or removing officers or committee members;

(h)    fixing the compensation of any committee member; or

(i)    altering or repealing any resolution of the Board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04    Committee Changes .  The Board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee.  However, a committee member may be removed by the Board of Managers only if, in the judgment of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05    Regular Meetings .  Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06    Special Meetings .  A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.07    Quorum; Majority Vote .  At all meetings of any committee, a majority of the number of committee members designated by the Board of Managers shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

9

HCMLPHMIT00004135

4.08   <u>Minutes</u> . Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board of Managers. The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute books of the Company.

4.09   <u>Compensation</u> . Except as otherwise may be restricted in this Agreement, committee members may, by resolution of the Board of Managers, be allowed a stated salary or a fixed sum and expenses of attendance, if any, for attending any committee meetings.

4.10   <u>Responsibility</u> . The designation of any committee and the delegation of authority to it shall not operate to relieve the Board of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTICLE V

## GENERAL PROVISIONS RELATING TO MEETINGS

5.01   <u>Notice</u>  Whenever by law, the Certificate, or this Agreement notice is required to be given to any Member, Manager, or committee member and no provision is made as to how such notice shall be given, it shall be construed to mean that notice may be given either (a) in person; (b) in writing, by mail; (c) by telegram, telex, cable, telecopy or facsimile transmission, or similar means; or (d) by any other method permitted by law. Any notice required or permitted to be given hereunder (other than personal notice) shall be addressed to such Member, Manager, or committee member at his address as it appears on the books on the Company or, in the case of a Member, on the membership interest transfer records of the Company or at such other place as such Member, Manager, or committee member is known to be at the time notice is mailed or transmitted. Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the United States mail, postage prepaid. Any notice required or permitted to be given by telegram, telex, cable, telecopy or facsimile transmission, or similar means shall be deemed to be delivered and given at the time transmitted.

5.02   <u>Waiver of Notice</u> . Whenever by law, the Certificate, or this Agreement any notice is required to be given to any Member, Manager, or committee member of the Company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time notice should have been given, shall be equivalent to the giving of such notice. Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meeting, except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.03   <u>Telephone and Similar Meetings</u>  Members, Managers, or committee members may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04   <u>Action Without Meeting</u> . Any action that may be taken, or is required by law, the Certificate, or this Agreement to be taken at a meeting of the Members, the Board of Managers, or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members owning the required Percentage Interests of all Members (as set forth herein for the respective action or decision), a majority of the  Managers or committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such Members, Managers, or committee members, as the case may be, and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person. The consent may be in one or more counterparts so long as each Member, Manager, or committee member signs one of the counterparts. The signed consent shall be placed in the minute books of the Company.

## ARTICLE VI

## OFFICERS AND OTHER AGENTS

002929


HCMLPHMIT00004136

6.01    <u>Number; Titles; Election; Term</u>  The Company shall have a president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Board of Managers shall determine), a secretary, a treasurer, and such officers and agents as the Board of Managers may deem desirable.  The Board of Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present after the annual meeting of Members or whenever a vacancy exists.  The Board of Managers then, or from time to time, may also elect or appoint one or more other officers or agents as it shall deem advisable.  Except as otherwise may be provided by separate agreement, each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified.  Unless otherwise provided in the resolution of the Board of Managers electing or appointing an officer or agent, his term of office shall extend to and expire at the meeting of the Board of Managers following the next annual meeting of Members or, if earlier, at his death, resignation, or removal.  Any two or more offices may be held by the same person.  No officer or agent need be a Member, a Manager, a resident of the State of Delaware, or a citizen of the United States.

6.02    <u>Removal</u> .  Any officer or agent elected or appointed by the Board of Managers may be removed by a majority of the Board of Managers only if, in the judgment of a majority of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

6.03    <u>Vacancies</u> .  Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

6.04    <u>Authority</u> .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.

6.05    <u>Compensation</u> .  Except as otherwise may be provided by separate agreement, the compensation, if any, of officers  or any salaried employee shall be fixed, increased, or decreased from time to time by the Board of Managers, provided, however, that the Board of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06    <u>Chairman of the Board</u> .  The Chairman of the Board, if any, shall be an officer of the Company and, subject to the direction of the Board of Managers, shall perform such executive, supervisory, and management functions and duties as may be assigned to him from time to time by the Board of Managers.

6.07    <u>President, CEO and COO</u> .  The Board of Managers may designate and appoint a President, CEO and/or COO, with rights, duties and responsibilities established by the Board of Managers.

6.08    <u>Vice Presidents</u> .  Each Vice President shall have such powers and duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President and (in the order as designated by the Board of Managers, or in the absence of such designation, as determined by the length of time each has held the office of Vice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.09    <u>Treasurer</u> .  The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board of Managers.  The Treasurer shall audit all payrolls and vouchers of the Company; shall receive, audit, and consolidate all operating and financial statements of the Company and its various departments; shall supervise the accounting and auditing practices of the Company; and shall have charge of matters relating to taxation.  Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company.  The Treasurer shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.10    <u>Assistant Treasurers</u> .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Treasurers (in the order as designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

002930


HCMLPHMIT00004137

6.11    Secretary .  The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings.  The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.12    Assistant Secretaries .  Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## ARTICLE VII

### CAPITALIZATION AND CAPITAL ACCOUNTS

7.01    Capital Contributions .  The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers.  No Member shall be entitled to make any additional Capital Contributions except as provided in Section 7.02 and 7.03 below.

7.02    Additional Capital Contributions .  If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given.  The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

7.03    Failure to Make Additional Capital Contributions .  If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

7.04    Effect of Failure to Make Additional Capital Contributions .  In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 7.02 and 7.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 7.02 and 7.03 above.

7.05    Recapitalization by Admission of Additional Members .  If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 7.02 and 7.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein.  Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

002931

HCMLPHMIT00004138

7.06    <u>Maintenance of Capital Accounts</u> .  The Company shall maintain for each Member a separate Capital Account in accordance with this Section 7.06, which shall control the allocation of Profits and Losses and the division of assets upon liquidation of the Company as provided in Section 12.01.  Each Capital Account shall be maintained in accordance with the following provisions:

(a)    a Member's Capital Account shall initially be zero and shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b)    such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company; and

(c)    if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest, provided, however, that if the Transfer causes a termination of the Company under Code Section 708(b)(1)(B), the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in liquidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed liquidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board of Managers may authorize such modifications, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Sections 8.06 and 12.01 hereof.

7.07    <u>Negative Capital Accounts</u> .  If any Member has a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or to make any Capital Contribution to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

7.08    <u>Interest</u> .  No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

7.09    <u>No Withdrawal</u> .  No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company, except as provided in Sections 11.02 and 12.01 of this Agreement.

7.10    <u>Loans From Members</u> .  Loans by a Member to the Company shall not be considered Capital Contributions.

## ARTICLE VIII

### ALLOCATIONS AND DISTRIBUTIONS

8.01    <u>Allocation of Profits and Losses</u>.

(a)    <u>Allocation of Profits</u>.  Except as provided on any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, and after giving effect to all distributions of cash or property (other than cash or

002932

HCMLPHMIT00004139

property to be distributed pursuant to Section 12.01), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

(i)    first, to each Member with a negative balance in its Capital Account, pro rata in accordance with such negative Capital Account balances, until such negative Capital Account balances have been eliminated;

(ii)    next, to all of the Members in accordance with their respective Percentage Interests.

(b)    <u>Allocation of Losses</u>.  Except as provided in any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, Losses for any Fiscal Year shall be allocated to the Members in the following manner:

(i)    to all of the Members in accordance with their respective Percentage Interests.

8.02    <u>Special Allocations of Profits and Losses</u> .

(a)    <u>Minimum Gain Chargeback–Company Nonrecourse Liabilities</u>.  If there is a net decrease in Company minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Treasury Regulations Section 1.704-2(f)(2), (3), (4) and (5).  This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f) relating to Company nonrecourse liabilities, as defined in Treasury Regulations Section 1.704-2(b)(3) and shall be so interpreted.

(b)    <u>Minimum Gain Chargeback–Member Nonrecourse Debt</u>.  If there is a net decrease in Member minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii).  This Section 8.02(b) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(i)(4) relating to Member nonrecourse debt, as defined in Treasury Regulations Section 1.704-2(b)(4) and shall be so interpreted.

(c)    <u>Qualified Income Offset</u>.  If, after applying Section 8.02(a) and Section 8.02(b), any Member has an adjusted Capital Account deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as quickly as possible.  This Section 8.02(c) is intended to comply with the "qualified income offset" requirement set for the in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be so interpreted.

(d)    <u>Optional Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken in to account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(f)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.704-2(b)(4) and (i)(1) to the Member who bears the economic risk of loss with respect to such deductions.

8.03    <u>Curative Allocations</u> .  The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.03.  Therefore, notwithstanding any other provisions of this Article VIII, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.01(a) and Section 8.01(b) hereof.

14

002933

HCMLPHMIT00004140

8.04    <u>Tax Allocations: Code Section 704(c)</u>.

(a)    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.

(b)    If the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the Board of Managers. Allocations pursuant to this Section 8.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account, or share of Profits, Losses, and other items or distribution pursuant to any provision of this Agreement.

8.05    <u>Other Allocation Rules</u>.

(a)    For purposes of determining the Profits, Losses, or any other item allocable to any period, Profits, Losses, and any such other item shall be determined on a daily, monthly, or other   basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)    For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 8.01, 8.02, 8.03, and 8.04.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections 8.01, 8.02, 8.03, and 8.04 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

8.06    <u>Distributions of Distributable Cash</u>.   Except as otherwise may be provided in this Agreement, the Board of Managers shall cause the Company to make distributions of Distributable Cash at such intervals and in such amounts as the Board of Managers in its sole discretion shall determine by majority vote.   Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

8.07    <u>Working Cash Reserve</u>.   The Board of Managers may from time to time establish a working cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

## <u>ARTICLE IX</u>

## CERTIFICATES

9.01    <u>Certificated and Uncertificated Interests</u>.   The membership interests of the Company may be either certificated interests or uncertificated interests.   As used herein, the term "certificated interests" means Interests represented by instruments in bearer or registered form, and the term "uncertificated interests" means Interests not represented by such instruments and the transfers of which are registered upon books maintained for that purpose by or on behalf of the Company.

9.02    <u>Certificates for Certificated Interests</u>.   The certificates for certificated interests shall be in such form as shall be approved by the Board of Managers in conformity with law.   The certificates shall be consecutively numbered, shall be entered as they are issued in the books of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

002934

HCMLPHMIT00004141

other matters as may be required by law.  The certificates shall be signed by the President or any Vice President and also by the Secretary, an Assistant Secretary, or any other officer, and may be sealed with the seal of the Company or a facsimile thereof.  If any certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Company itself or an employee of the Company, the signatures of the foregoing officers may be a facsimile.

9.03    Lost, Stolen, or Destroyed Certificates .  The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following requirements:

(a)    the registered owner makes proof in affidavit form that a previously issued certificate for Interests has been lost, destroyed, or stolen;

(b)    the registered owner requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c)    the registered owner gives a bond in such form, and with such surety or sureties, with fixed or open penalty, as the Board of Managers may direct, in its discretion, to indemnify the Company (and its transfer agent and registrar, if any) against any claim that may be made on account of the alleged loss, destruction, or theft of the certificate; and

(d)    the registered owner satisfies any other reasonable requirements imposed by the Board of Managers.

When a certificate has been lost, destroyed, or stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of it, if the Company registers a transfer of the Interests represented by the certificate before receiving such notification, the Member of record is precluded from making any claim against the Company for the transfer or for a new certificate.

9.04    Transfer of Interests .  Interests of the Company shall be transferable only on the books of the Company by the Members thereof in person or by their duly authorized attorneys or legal representatives, but only as authorized in this COMPANY AGREEMENT.  With respect to certificated interests, upon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books.  With respect to uncertificated interests, upon delivery to the Company of proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall record the transaction upon its books.

9.05    Registered Members .  The Company shall be entitled to treat the Member of record as the Member in fact of any Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have actual or other notice thereof, except as otherwise provided by law.

9.06    Legends .  If the Company is authorized to issue Interests of more than one class, each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or back of the certificate a full statement of all of the designations, preferences, limitations, and relative rights of the Interests of each class authorized to be issued; or (b) shall conspicuously state on the face or back of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement; and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 1933, the transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transfer, or registration of the transfer, of Interests shall be imposed or agreed to by the Company, each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate; (b) shall set forth such statement on the back of the certificate and conspicuously refer to the same on the face of the certificate; or (c) shall conspicuously state on the face or back of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written request to the Company at its principal place of business or registered

16

002935

HCMLPHMIT00004142

office a copy of the specified document; or (ii) if such document is one required or permitted by law to be and has been filed, that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTICLE X

### ACCOUNTING AND RECORDS

10.01    <u>Records and Accounting</u> .  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

10.02    <u>Access to Accounting Records</u> .  All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member owning a Percentage Interest of at least ten percent (10%), and his duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.03    <u>Annual and Tax Information</u> .  The Company shall deliver to each Member within 90 days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return.  The Company shall prepare, within 120 days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a statement of the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

10.04    <u>Accounting Decisions</u> .  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05    <u>Federal Income Tax Elections</u> .  The Company may make all elections for federal income tax purposes, including, but not limited to, the following:

(a)    to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b)    in case of a transfer of all or part of the Interest of any Member, the election pursuant to Section 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## <u>ARTICLE XI</u>

### CHANGES IN MEMBERS

The provisions of this Article XI are subject to, and may be superceded by, one or more separate agreements entered into by and among one or more Members.  The provisions of this Article XI shall continue to control with respect to matters not covered by, or Members not parties to, such agreement(s).

11.01    <u>Intentionally Blank</u> .

11.02    <u>Transfer and Assignment of Members' Interest</u> .  Except as approved by the Manager, plus a Member or Members owning a Percentage Interest greater than fifty percent (50%), no Member shall be entitled to Transfer any part of its Interest in the Company.  The Company and, if applicable, the remaining Members shall be entitled to match the terms of the proposed Transfer, with consideration being only set forth in traditional monetary terms.  If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire Interest, or portion thereof, the Member proposing to make the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.

002936


HCMLPHMIT00004143

11.03   <u>Further Restrictions on Transfer</u>.  No Member shall Transfer any part of his Interest in the Company:  (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior thereto, would result in the termination of the Company under Code Section 708.

11.04   <u>Substitute Members</u>.  A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.03 hereof are met; (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05   <u>Effect of Transfer</u>.

(a)   Any permitted Transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an Interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b)   Upon any Transfer of a Member's Interest in the Company in violation of this Agreement, and if such Member's Interest is not purchased pursuant to Section 11.01, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee shall be entitled to receive only the allocable share of Profits, Losses, Distributive Cash, and other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06   <u>No Dissolution or Withdrawal: Advanced Consent</u>.  Upon the occurrence of a Dissolution Event with regard to a respective Member, all remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  By executing this Agreement, however, all Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital.  If any Member shall breach the agreement represented by this Section 11.06, the agreement of such breaching Member shall not be specifically performable, but shall be actionable for damages, and shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's Interest, or as otherwise set forth herein (whichever is greater), which shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder.  The value of the breaching Member's Interest shall be determined pursuant to Section 11.01, to which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

<center><b><u>ARTICLE XII</u></b></center>

<center><b>TERMINATION</b></center>

12.01   <u>Termination of the Company</u>.

(a)   The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following events:

(i)   a determination by the Managers, plus the Unanimous Consent of the Members that the Company should be dissolved;

(ii)   a sale of all or substantially all of the assets of the Company;

(iii)   the expiration of the Company's term as stated in its Certificate; or

(iv)   at such earlier time as provided by applicable law.

<center>18</center>

002937

HCMLPHMIT00004144

(b)    In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following order, all as required by the DELAWARE LAWS:

(i)    those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their Capital Contributions;

(ii)    to the Members, pro rata, in accordance with the positive balances, if any, in their Capital Accounts; and

(iii)    to the Members in proportion to their relative Percentage Interests.

## ARTICLE XIII

## INDEMNIFICATION

13.01    <u>Indemnification of Members, Managers, and Other Persons</u> .

(a)    To the greatest extent not inconsistent with the laws and public policies of Delaware, the Company shall indemnify any Member, Manager, or officer of the Company made a party to any proceeding because such individual is or was a Member, Manager, or officer of the Company (an "Indemnitee"), as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 13.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 13.01.  The Company shall advance, pay for, or reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 13.01; (ii) the Indemnitee furnishes the Company a written undertaking, executed personally or on such Indemnitee's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct; and (iii) a determination is made in accordance with subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 13.01.  The undertaking described in subsection (a)(ii) above must be a general obligation of the Indemnitee, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company shall indemnify an Indemnitee who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section 13.01.  Upon demand by an Indemnitee for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 13.01.  The indemnification and advancement of expenses provided for under this Section 13.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 13.01.

(b)    The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Manager, or officer of the Company.

(c)    Indemnification is permissible under this Section 13.01 only if (i) the Indemnitee conducted himself in good faith; (ii) he or she reasonably believed that his conduct was in, or at least not opposed to, the Company's best interest; (iii) in the case of any criminal proceeding, he or she had no reasonable cause to believe his conduct was unlawful; and (iv) such Indemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d)    A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

19

002938

HCMLPHMIT00004145


(i) by the Board of Managers or by a majority vote consisting of Members not at the time parties to the proceeding; or

(ii) by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e) An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction.  On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i) in a proceeding in which the Indemnitee is wholly successful, on the merits or otherwise, the Indemnitee is entitled to indemnification under this Section 13.01, in which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii) the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 13.01.

(f) Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g) Nothing contained in this Section 13.01 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Manager, or officer of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not.  Nothing contained in this Section 13.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual.  It is the intent of this Section 13.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 13.01.  Indemnification shall be provided in accordance with this Section 13.01 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this Section 13.01:

(i) The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 13.01, applicable law, or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section 13.01, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

002939

HCMLPHMIT00004146

## ARTICLE XIV

### MISCELLANEOUS

14.01    <u>Complete Agreement</u> .  This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, or condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02    <u>Governing Law</u> .  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03    <u>Binding Effect</u> .  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04    <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.  Any reference to the DELAWARE LAWS, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05    <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06    <u>Severability</u> .  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07    <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.  However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.08    <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.09    <u>No Third-Party Beneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10    <u>References to this Agreement</u> .  Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11    <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit B</u> hereto.  Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

002940

HCMLPHMIT00004147


14.12    <u>Amendments</u> .  Except as otherwise may be provided in this Agreement, all amendments to this Agreement must be approved by the Managers, plus one or more Members whose aggregate Percentage Interests total more than fifty percent (50%).

14.13    <u>Title to Company Property</u> .  Legal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> .  In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15    <u>S-Corp Election</u>.  In the event the Company elects to be treated as a S-Corporation for federal tax purposes, the provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as required in order to pertain to a S-corporation.

14.16    <u>Company Indemnification</u>.  In the event any Member is personally liable for any debt or obligations associated with a Company asset, then the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is required to pay or perform, as measured by the Percentage Interest of the Members, except as otherwise agreed by the Members.

***14.17    <u>Management by Members</u>.  The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member <u>may</u> reflect management by members, and not management by managers.  As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.***

002941

HCMLPHMIT00004148

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____
       Mark Patrick, Director and President

002942

HCMLPHMIT00004149

**EXHIBIT A**

THE CLASS A MEMBERS AND INTERESTS

The sole Class A Member shall be RAND ADVISORS HOLDING CORP., a Delaware corporation, and it shall own the Percentage Interest set forth on Exhibit "B" hereto.  In addition to such other rights as a Member described in this Agreement, the holders of record of the Class A Interests shall have no additional rights.

002943
HCMLPHMIT00004150

## EXHIBIT B

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HOLDING CORP. 2101 Cedar Springs Road Suite 1200, Dallas, TX 75201 Attn: Mark Patrick | 8/1/2022 | 100% | 100% |

002944

HCMLPHMIT00004151

**EXHIBIT**

002945

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

RAND ADVISORS, LLC

A Delaware Limited Liability Company

002946

HCMLPHMIT00004152

## AMENDED AND RESTATED COMPANY AGREEMENT

*of*

### RAND ADVISORS, LLC

### A Delaware Limited Liability Company

This AMENDED AND RESTATED COMPANY AGREEMENT (collectively, the "Agreement," which shall include all amendments and exhibits hereto) dated effective as of the 1st day of August, 2022 (the "Effective Date"), are entered into by and among those Persons executing the signature page hereto as the Members of RAND ADVISORS, LLC, a Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

### ARTICLE I

### INTRODUCTION

1.01    Formation of Limited Liability Company    The Company was formed by the filing of the Certificate of Formation (the "Certificate") with the Secretary of State of Delaware on the August 27, 2013. The Company's business shall be conducted under the name "RAND ADVISORS, LLC" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replaces, in its entirety, all prior governing agreements for the Company, including but not limited to that certain Amended and Restated Limited Liability Company Agreement dated March 1, 2016, and any and all amendments thereto.

This Agreement is subject to, and governed by, the Delaware laws governing limited liability companies (the "DELAWARE LAWS") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DELAWARE LAWS or the provisions of the Certificate, such provisions of the DELAWARE LAWS or the Certificate, as the case may be, will be controlling.

1.02    Registered Office and Agent    The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.03    Other Offices    The Company may also have offices at such other places, both within and without the State of Delaware, as the Board of Managers may from time to time determine or the business of the Company may require.

1.04    Defined Terms    The terms used in this Agreement with their initial letter capitalized shall, unless the context requires otherwise, have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a)    "DELAWARE LAWS" shall mean the Delaware laws governing limited liability companies, as the same may be amended from time to time.

(b)    "Affiliate" shall mean, as to any Person, any Person controlled by, controlling, or under common control with such Person, and, in the case of a Person who is an individual, a member of the family of such individual consisting of a spouse, sibling, in-law, lineal descendant, or ancestor (including by adoption). For purposes of this definition, "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, alone or in concert with others, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise, and no Person shall be deemed in control of another solely by virtue of being a director, officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

002947


HCMLPHMIT00004153

(c) "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d) "Book Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e) "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i) the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii) the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii) the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv) the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 8.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v) if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i),1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f) "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

3

002948

HCMLPHMIT00004154

prior Member for the interest of such then Member, reduced by any distribution to such Member in return of its capital as contemplated herein.

(g)     "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, Losses, Distributable Cash, and assets upon liquidation of the Company as described in this Agreement.

(h)     "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i)     Intentionally Blank.

(j)     Intentionally Blank.

(k)     "Code" shall mean the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)     "Company" shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)     "Debtor Relief Laws" shall mean any federal or state bankruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)     Intentionally Blank.

(o)     "Distributable Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for a working cash reserve in accordance with Section 8.07 below.

(p)     "Fiscal Year" shall mean the calendar year.

(q)     "Former Member" shall mean a member that causes a Dissolution Event.

(r)     "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, Losses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)     Intentionally Blank

(t)     "Manager" shall mean an individual elected to the Board of Managers of the Company pursuant to Sections 3.02 and 3.04 below.

(u)     "Member(s)" shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof.  The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit B, attached hereto and incorporated herein by reference.  Reference to a "Member" shall be to any one of the Members.

(v)     "Percentage Interest" of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms hereof.

(w)     "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

002949

HCMLPHMIT00004155

(x) "Pro Rata Part" shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y) "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

 (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y) shall be added to such taxable income or loss;

 (ii) any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y), shall be subtracted from such taxable income or loss;

 (iii) if the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

 (iv) gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

 (v) in lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation; and

 (vi) notwithstanding any other provision of this Section 1.04(y), any items that are specially allocated pursuant to Section 8.02 or Section 8.03 shall not be taken into account in computing Profits and Losses.

(z) "Regulatory Allocations" shall mean the special allocations of items of income, gain, loss, and deduction, if any, set forth in Section 8.02 hereof.

(aa) "Transfer" or "Transferred" shall mean the sale, assignment, conveyance, gift, bequest, devise, transfer under the rules of intestate succession, pledge, mortgage, or other encumbrance. In addition, the term "Transfer" or "Transferred" shall mean an "ownership change" of a Member as defined in Section 382(g) of the Code in effect as of the Effective Date, except that the term "Member" shall be substituted for "shareholder" wherever it appears.

(bb) "Treasury Regulations" shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc) "Unanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTICLE II

### MEMBERS AND MEMBERSHIP INTERESTS

2.01 <u>Members</u>. The Members of the Company shall be those Persons listed on <u>Exhibit B</u>. Except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit B</u>, and except as provided in Section 7.05 below, a Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers, plus one or more Members whose Percentage Interests total more than fifty percent (50%); provided, however, that no Person will be recognized as a Member of the



002950

HCMLPHMIT00004156

Company until he/she shall have executed this Agreement, or a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02    Annual Meetings  An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting.  At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03    Special Meetings  A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%.  Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04    Place of Meetings  The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers.  Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03.  If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05    Notice.  Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06    Voting List  At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member.  For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours.  Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member.  The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07    Voting of Interests.  Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company.  Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her.  Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee.  Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.  Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine.  A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.08    Quorum.  The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement.  At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.09    Vote; Withdrawal of Quorum.  If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in Exhibit A or Exhibit B, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of all Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

002951

HCMLPHMIT00004157

Certificate, or this Agreement a different vote is required, in which event such express provision shall govern and control the decision of such question. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding any withdrawal of Members that may leave less than a quorum remaining.

2.10 <u>Method of Voting; Proxies</u>. Except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit B</u>, each Member shall be entitled to that number of votes on each matter submitted to the Members for their vote equal to such Member's Percentage Interest multiplied by 100. At any meeting of Members, every Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting. No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy. If no date is stated on a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted. Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11 <u>Closing of Transfer Books; Record Date</u>. For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any reconvening thereof, or entitled to receive payment of any distribution, or in order to make a determination of Members for any other proper purpose, the Board of Managers may provide that the membership interest transfer books of the Company shall be closed for a stated period but not to exceed in any event 50 days. If the membership interest transfer books are closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members, such books shall be closed for at least 10 days immediately preceding such meeting. In lieu of closing the membership interest transfer books, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action requiring such determination of Members is to be taken. If the membership interest transfer books are not closed and if no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or entitled to receive payment of a distribution, the date on which the notice of the meeting is to be mailed or the date on which the resolution of the Board of Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

2.12 <u>Presiding Officials at Meetings</u>. The President shall preside at, and the Secretary shall prepare minutes of, each meeting of Members, and in the absence of either such officer, his other duties shall be performed by some person appointed at the meeting.

## <u>ARTICLE III</u>

## **MANAGERS**

3.01 <u>Management</u>. The business and affairs of the Company shall be managed EXCLUSIVELY by the Board of Managers. Subject to the restrictions imposed by law, the Certificate, or this Agreement, the Board of Managers may exercise all the powers of the Company.

3.02 <u>Number; Election; Term; Qualification</u>. The first Board of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents. Thereafter, except as otherwise may be restricted by this Agreement, the number of Managers that shall constitute the entire Board of Managers shall be determined by resolution of the Board of Managers at any meeting thereof or by the Members at any meeting thereof, but shall never be less than one (1). At each annual meeting of Members, Managers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and qualified. No Manager need be a Member, a resident of the State of Delaware, or a citizen of the United States.

3.03 <u>Removal</u>. Except as otherwise may be provided by the Members, at any meeting of Members called expressly for that purpose, any Manager or the entire Board of Managers may be removed, with or without cause, by a vote of one or more Members whose Percentage Interests total more than fifty percent (50%).

3.04 <u>Change in Number; Vacancies</u>. No decrease in the number of Managers constituting the entire Board of Managers shall have the effect of shortening the term of any incumbent Manager. In the case of any increase in the number of Managers, or in the case of the death, retirement, resignation, or removal of a Manager, the vacancies to be filled by such increase or death, retirement, resignation, or removal may be filled by (a) the Board of Managers for a term of office

7

002952

HCMLPHMIT00004158

continuing only until the next election of one or more Managers by the Members; or (b) the Members at any annual or special meeting of the Members.  A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

3.05    Place of Meetings .  The Board of Managers may hold its meetings in such place or places, including by telephonic or other electronic method of communication, within or without the State of Delaware as the Board of Managers may from time to time determine.

3.06    First Meeting .  Each newly elected Board of Managers may hold its first meeting, if a quorum is present, for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of Members, and no notice of such meeting shall be necessary.

3.07    Regular Meetings .  Regular meetings of the Board of Managers may be held without notice at such times and places, including by telephonic or other electronic method of communication, as may be designated from time to time by resolution of the Board of Managers and communicated to all Managers.  Regular meetings of the Board of Managers may be held when and if needed, and no more than one regular meeting of the Board of Managers shall be required in any calendar year.

3.08    Special Meetings .  A special meeting of the Board of Managers shall be held whenever called by any Manager at such time and place, including by telephonic or other electronic method of communication, as such Manager shall designate in the notice of such special meeting.  The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Managers need be specified in the notice or waiver of notice of any special meeting.

3.09    Quorum; Vote .  At all meetings of the Board of Managers, a majority of the Managers fixed in the manner provided in this Agreement shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting, a majority of the Managers present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The vote of a majority of the Managers present at a meeting at which a quorum is in attendance shall be the act of the Board of Managers, unless the vote of a different number is required by law, the Certificate, or this Agreement.

3.10    Procedure; Minutes .  At meetings of the Board of Managers, business shall be transacted in such order as the Board of Managers may determine from time to time.  The Board of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting.  The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute book of the Company.

3.11    Presumption of Assent .  A Manager of the Company who is present at any meeting of the Board of Managers at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof, or shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.

3.12    Compensation .  Except as otherwise may be restricted in this Agreement, Managers, in their capacity as Managers, may receive, by resolution of the Board of Managers, a stated salary or a fixed sum and expenses of attendance, if any, for attending meetings of the Board of Managers.  No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

## ARTICLE IV

## COMMITTEES

4.01    Designation .  The Board of Managers may, by a resolution adopted by a majority of the entire Board of Managers, designate executive and other committees.

002953

HCMLPHMIT00004159

4.02    Number; Qualification; Term .  Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire Board of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire Board of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03    Authority .  The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in the management of the business and affairs of the Company.  Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in such other matters and affairs concerning the Company.  However, no committee shall have the authority of the Board of Managers in reference to any of the following:

(a)    amending the Certificate;

(b)    approving a plan of merger or consolidation;

(c)    recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d)    recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e)    filling vacancies in, or removing members of, the Board of Managers or of any committee thereof;

(f)    filling any vacancy to be filled by reason of an increase in the number of Managers;

(g)    electing or removing officers or committee members;

(h)    fixing the compensation of any committee member; or

(i)    altering or repealing any resolution of the Board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04    Committee Changes .  The Board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee.  However, a committee member may be removed by the Board of Managers only if, in the judgment of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05    Regular Meetings .  Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06    Special Meetings .  A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.07    Quorum; Majority Vote .  At all meetings of any committee, a majority of the number of committee members designated by the Board of Managers shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

002954

HCMLPHMIT00004160

4.08   <u>Minutes</u> .  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board of Managers.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute books of the Company.

4.09   <u>Compensation</u> .  Except as otherwise may be restricted in this Agreement, committee members may, by resolution of the Board of Managers, be allowed a stated salary or a fixed sum and expenses of attendance, if any, for attending any committee meetings.

4.10   <u>Responsibility</u> .  The designation of any committee and the delegation of authority to it shall not operate to relieve the Board of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

<div align="center">

### ARTICLE V

### GENERAL PROVISIONS RELATING TO MEETINGS

</div>

5.01   <u>Notice</u>  Whenever by law, the Certificate, or this Agreement notice is required to be given to any Member, Manager, or committee member and no provision is made as to how such notice shall be given, it shall be construed to mean that notice may be given either (a) in person; (b) in writing, by mail; (c) by telegram, telex, cable, telecopy or facsimile transmission, or similar means; or (d) by any other method permitted by law.  Any notice required or permitted to be given hereunder (other than personal notice) shall be addressed to such Member, Manager, or committee member at his address as it appears on the books on the Company or, in the case of a Member, on the membership interest transfer records of the Company or at such other place as such Member, Manager, or committee member is known to be at the time notice is mailed or transmitted.  Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the United States mail, postage prepaid.  Any notice required or permitted to be given by telegram, telex, cable, telecopy or facsimile transmission, or similar means shall be deemed to be delivered and given at the time transmitted.

5.02   <u>Waiver of Notice</u> .  Whenever by law, the Certificate, or this Agreement any notice is required to be given to any Member, Manager, or committee member of the Company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time notice should have been given, shall be equivalent to the giving of such notice.  Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meeting, except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.03   <u>Telephone and Similar Meetings</u>  Members, Managers, or committee members may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04   <u>Action Without Meeting</u> .  Any action that may be taken, or is required by law, the Certificate, or this Agreement to be taken at a meeting of the Members, the Board of Managers, or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members owning the required Percentage Interests of all Members (as set forth herein for the respective action or decision), a majority of the  Managers or committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such Members, Managers, or committee members, as the case may be, and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person.  The consent may be in one or more counterparts so long as each Member, Manager, or committee member signs one of the counterparts.  The signed consent shall be placed in the minute books of the Company.

<div align="center">

### ARTICLE VI

### OFFICERS AND OTHER AGENTS

</div>

<div align="center">

10

</div>

002955

HCMLPHMIT00004161

6.01    Number; Titles; Election; Term  The Company shall have a president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Board of Managers shall determine), a secretary, a treasurer, and such officers and agents as the Board of Managers may deem desirable.  The Board of Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present after the annual meeting of Members or whenever a vacancy exists.  The Board of Managers then, or from time to time, may also elect or appoint one or more other officers or agents as it shall deem advisable.  Except as otherwise may be provided by separate agreement, each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified.  Unless otherwise provided in the resolution of the Board of Managers electing or appointing an officer or agent, his term of office shall extend to and expire at the meeting of the Board of Managers following the next annual meeting of Members or, if earlier, at his death, resignation, or removal.  Any two or more offices may be held by the same person.  No officer or agent need be a Member, a Manager, a resident of the State of Delaware, or a citizen of the United States.

6.02    Removal .  Any officer or agent elected or appointed by the Board of Managers may be removed by a majority of the Board of Managers only if, in the judgment of a majority of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

6.03    Vacancies .  Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

6.04    Authority .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.

6.05    Compensation .  Except as otherwise may be provided by separate agreement, the compensation, if any, of officers  or any salaried employee shall be fixed, increased, or decreased from time to time by the Board of Managers, provided, however, that the Board of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06    Chairman of the Board .  The Chairman of the Board, if any, shall be an officer of the Company and, subject to the direction of the Board of Managers, shall perform such executive, supervisory, and management functions and duties as may be assigned to him from time to time by the Board of Managers.

6.07    President, CEO and COO .  The Board of Managers may designate and appoint a President, CEO and/or COO, with rights, duties and responsibilities established by the Board of Managers.

6.08    Vice Presidents .  Each Vice President shall have such powers and duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President and (in the order as designated by the Board of Managers, or in the absence of such designation, as determined by the length of time each has held the office of Vice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.09    Treasurer .  The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board of Managers.  The Treasurer shall audit all payrolls and vouchers of the Company; shall receive, audit, and consolidate all operating and financial statements of the Company and its various departments; shall supervise the accounting and auditing practices of the Company; and shall have charge of matters relating to taxation.  Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company.  The Treasurer shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.10    Assistant Treasurers .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Treasurers (in the order as designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

11

002956

HCMLPHMIT00004162

6.11     Secretary .   The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings.  The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.12     Assistant Secretaries .   Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## ARTICLE VII

### CAPITALIZATION AND CAPITAL ACCOUNTS

7.01     Capital Contributions .   The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers.  No Member shall be entitled to make any additional Capital Contributions except as provided in Section 7.02 and 7.03 below.

7.02     Additional Capital Contributions .   If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given.  The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

7.03     Failure to Make Additional Capital Contributions .   If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

7.04     Effect of Failure to Make Additional Capital Contributions .   In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 7.02 and 7.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 7.02 and 7.03 above.

7.05     Recapitalization by Admission of Additional Members .   If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 7.02 and 7.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein.  Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

12

002957

HCMLPHMIT00004163


7.06    <u>Maintenance of Capital Accounts</u> .  The Company shall maintain for each Member a separate Capital Account in accordance with this Section 7.06, which shall control the allocation of Profits and Losses and the division of assets upon liquidation of the Company as provided in Section 12.01.  Each Capital Account shall be maintained in accordance with the following provisions:

(a)    a Member's Capital Account shall initially be zero and shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b)    such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company; and

(c)    if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest, provided, however, that if the Transfer causes a termination of the Company under Code Section 708(b)(1)(B), the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in liquidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed liquidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board of Managers may authorize such modifications, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Sections 8.06 and 12.01 hereof.

7.07    <u>Negative Capital Accounts</u> .  If any Member has a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or to make any Capital Contribution to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

7.08    <u>Interest</u> .  No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

7.09    <u>No Withdrawal</u> .  No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company, except as provided in Sections 11.02 and 12.01 of this Agreement.

7.10    <u>Loans From Members</u> .  Loans by a Member to the Company shall not be considered Capital Contributions.

## ARTICLE VIII

## ALLOCATIONS AND DISTRIBUTIONS

8.01    <u>Allocation of Profits and Losses</u>.

(a)    <u>Allocation of Profits</u>.  Except as provided on any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, and after giving effect to all distributions of cash or property (other than cash or

13

002958

HCMLPHMIT00004164


property to be distributed pursuant to Section 12.01), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

(i)    first, to each Member with a negative balance in its Capital Account, pro rata in accordance with such negative Capital Account balances, until such negative Capital Account balances have been eliminated;

(ii)    next, to all of the Members in accordance with their respective Percentage Interests.

(b)    <u>Allocation of Losses</u>.  Except as provided in any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, Losses for any Fiscal Year shall be allocated to the Members in the following manner:

(i)    to all of the Members in accordance with their respective Percentage Interests.

8.02    <u>Special Allocations of Profits and Losses</u> .

(a)    <u>Minimum Gain Chargeback–Company Nonrecourse Liabilities</u>.  If there is a net decrease in Company minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Treasury Regulations Section 1.704-2(f)(2), (3), (4) and (5).  This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f) relating to Company nonrecourse liabilities, as defined in Treasury Regulations Section 1.704-2(b)(3) and shall be so interpreted.

(b)    <u>Minimum Gain Chargeback–Member Nonrecourse Debt</u>.  If there is a net decrease in Member minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii).  This Section 8.02(b) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(i)(4) relating to Member nonrecourse debt, as defined in Treasury Regulations Section 1.704-2(b)(4) and shall be so interpreted.

(c)    <u>Qualified Income Offset</u>.  If, after applying Section 8.02(a) and Section 8.02(b), any Member has an adjusted Capital Account deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as quickly as possible.  This Section 8.02(c) is intended to comply with the "qualified income offset" requirement set for the in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be so interpreted.

(d)    <u>Optional Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken in to account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(f)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.704-2(b)(4) and (i)(1) to the Member who bears the economic risk of loss with respect to such deductions.

8.03    <u>Curative Allocations</u> .  The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.03.  Therefore, notwithstanding any other provisions of this Article VIII, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.01(a) and Section 8.01(b) hereof.

002959


HCMLPHMIT00004165

8.04    <u>Tax Allocations: Code Section 704(c)</u> .

(a)    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.

(b)    If the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the Board of Managers. Allocations pursuant to this Section 8.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account, or share of Profits, Losses, and other items or distribution pursuant to any provision of this Agreement.

8.05    <u>Other Allocation Rules</u> .

(a)    For purposes of determining the Profits, Losses, or any other item allocable to any period, Profits, Losses, and any such other item shall be determined on a daily, monthly, or other   basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)    For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 8.01, 8.02, 8.03, and 8.04.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections 8.01, 8.02, 8.03, and 8.04 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

8.06    <u>Distributions of Distributable Cash</u> .   Except as otherwise may be provided in this Agreement, the Board of Managers shall cause the Company to make distributions of Distributable Cash at such intervals and in such amounts as the Board of Managers in its sole discretion shall determine by majority vote.   Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

8.07    <u>Working Cash Reserve</u> .   The Board of Managers may from time to time establish a working cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

## <u>ARTICLE IX</u>

## CERTIFICATES

9.01    <u>Certificated and Uncertificated Interests</u>.   The membership interests of the Company may be either certificated interests or uncertificated interests.   As used herein, the term "certificated interests" means Interests represented by instruments in bearer or registered form, and the term "uncertificated interests" means Interests not represented by such instruments and the transfers of which are registered upon books maintained for that purpose by or on behalf of the Company.

9.02    <u>Certificates for Certificated Interests</u> .   The certificates for certificated interests shall be in such form as shall be approved by the Board of Managers in conformity with law.   The certificates shall be consecutively numbered, shall be entered as they are issued in the books of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

15



002960

HCMLPHMIT00004166

other matters as may be required by law. The certificates shall be signed by the President or any Vice President and also by the Secretary, an Assistant Secretary, or any other officer, and may be sealed with the seal of the Company or a facsimile thereof. If any certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Company itself or an employee of the Company, the signatures of the foregoing officers may be a facsimile.

9.03    Lost, Stolen, or Destroyed Certificates . The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following requirements:

(a)    the registered owner makes proof in affidavit form that a previously issued certificate for Interests has been lost, destroyed, or stolen;

(b)    the registered owner requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c)    the registered owner gives a bond in such form, and with such surety or sureties, with fixed or open penalty, as the Board of Managers may direct, in its discretion, to indemnify the Company (and its transfer agent and registrar, if any) against any claim that may be made on account of the alleged loss, destruction, or theft of the certificate; and

(d)    the registered owner satisfies any other reasonable requirements imposed by the Board of Managers.

When a certificate has been lost, destroyed, or stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of it, if the Company registers a transfer of the Interests represented by the certificate before receiving such notification, the Member of record is precluded from making any claim against the Company for the transfer or for a new certificate.

9.04    Transfer of Interests . Interests of the Company shall be transferable only on the books of the Company by the Members thereof in person or by their duly authorized attorneys or legal representatives, but only as authorized in this COMPANY AGREEMENT. With respect to certificated interests, upon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books. With respect to uncertificated interests, upon delivery to the Company of proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall record the transaction upon its books.

9.05    Registered Members . The Company shall be entitled to treat the Member of record as the Member in fact of any Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have actual or other notice thereof, except as otherwise provided by law.

9.06    Legends . If the Company is authorized to issue Interests of more than one class, each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or back of the certificate a full statement of all of the designations, preferences, limitations, and relative rights of the Interests of each class authorized to be issued; or (b) shall conspicuously state on the face or back of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement; and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 1933, the transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transfer, or registration of the transfer, of Interests shall be imposed or agreed to by the Company, each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate; (b) shall set forth such statement on the back of the certificate and conspicuously refer to the same on the face of the certificate; or (c) shall conspicuously state on the face or back of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written request to the Company at its principal place of business or registered

002961

HCMLPHMIT00004167

office a copy of the specified document; or (ii) if such document is one required or permitted by law to be and has been filed, that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTICLE X

### ACCOUNTING AND RECORDS

10.01    <u>Records and Accounting</u> .  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

10.02    <u>Access to Accounting Records</u> .  All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member owning a Percentage Interest of at least ten percent (10%), and his duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.03    <u>Annual and Tax Information</u> .  The Company shall deliver to each Member within 90 days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return.  The Company shall prepare, within 120 days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a statement of the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

10.04    <u>Accounting Decisions</u> .  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05    <u>Federal Income Tax Elections</u> .  The Company may make all elections for federal income tax purposes, including, but not limited to, the following:

(a)    to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b)    in case of a transfer of all or part of the Interest of any Member, the election pursuant to Section 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE XI

### CHANGES IN MEMBERS

The provisions of this Article XI are subject to, and may be superceded by, one or more separate agreements entered into by and among one or more Members.  The provisions of this Article XI shall continue to control with respect to matters not covered by, or Members not parties to, such agreement(s).

11.01    <u>Intentionally Blank</u> .

11.02    <u>Transfer and Assignment of Members' Interest</u> .  Except as approved by the Manager, plus a Member or Members owning a Percentage Interest greater than fifty percent (50%), no Member shall be entitled to Transfer any part of its Interest in the Company.  The Company and, if applicable, the remaining Members shall be entitled to match the terms of the proposed Transfer, with consideration being only set forth in traditional monetary terms.  If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire Interest, or portion thereof, the Member proposing to make the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.

002962


HCMLPHMIT00004168

11.03    <u>Further Restrictions on Transfer</u> .  No Member shall Transfer any part of his Interest in the Company:  (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior thereto, would result in the termination of the Company under Code Section 708.

11.04    <u>Substitute Members</u> .  A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.03 hereof are met; (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05    <u>Effect of Transfer</u> .

(a)    Any permitted Transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an Interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b)    Upon any Transfer of a Member's Interest in the Company in violation of this Agreement, and if such Member's Interest is not purchased pursuant to Section 11.01, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee shall be entitled to receive only the allocable share of Profits, Losses, Distributive Cash, and other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06    <u>No Dissolution or Withdrawal: Advanced Consent</u> .  Upon the occurrence of a Dissolution Event with regard to a respective Member, all remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  By executing this Agreement, however, all Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital.  If any Member shall breach the agreement represented by this Section 11.06, the agreement of such breaching Member shall not be specifically performable, but shall be actionable for damages, and shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's Interest, or as otherwise set forth herein (whichever is greater), which shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder.  The value of the breaching Member's Interest shall be determined pursuant to Section 11.01, to which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

<div align="center">

**ARTICLE XII**

**TERMINATION**

</div>

12.01    <u>Termination of the Company</u> .

(a)    The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following events:

(i)    a determination by the Managers, plus the Unanimous Consent of the Members that the Company should be dissolved;

(ii)    a sale of all or substantially all of the assets of the Company;

(iii)    the expiration of the Company's term as stated in its Certificate; or

(iv)    at such earlier time as provided by applicable law.

<div align="center">18</div>

002963

HCMLPHMIT00004169

(b)    In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following order, all as required by the DELAWARE LAWS:

(i)    those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their Capital Contributions;

(ii)    to the Members, pro rata, in accordance with the positive balances, if any, in their Capital Accounts; and

(iii)    to the Members in proportion to their relative Percentage Interests.

## ARTICLE XIII

## INDEMNIFICATION

13.01    <u>Indemnification of Members, Managers, and Other Persons</u> .

(a)    To the greatest extent not inconsistent with the laws and public policies of Delaware, the Company shall indemnify any Member, Manager, or officer of the Company made a party to any proceeding because such individual is or was a Member, Manager, or officer of the Company (an "Indemnitee"), as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 13.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 13.01.  The Company shall advance, pay for, or reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 13.01; (ii) the Indemnitee furnishes the Company a written undertaking, executed personally or on such Indemnitee's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct; and (iii) a determination is made in accordance with subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 13.01.  The undertaking described in subsection (a)(ii) above must be a general obligation of the Indemnitee, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company shall indemnify an Indemnitee who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section 13.01.  Upon demand by an Indemnitee for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 13.01.  The indemnification and advancement of expenses provided for under this Section 13.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 13.01.

(b)    The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Manager, or officer of the Company.

(c)    Indemnification is permissible under this Section 13.01 only if (i) the Indemnitee conducted himself in good faith; (ii) he or she reasonably believed that his conduct was in, or at least not opposed to, the Company's best interest; (iii) in the case of any criminal proceeding, he or she had no reasonable cause to believe his conduct was unlawful; and (iv) such Indemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d)    A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

002964

HCMLPHMIT00004170


(i)      by the Board of Managers or by a majority vote consisting of Members not at the time parties to the proceeding; or

(ii)      by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e)      An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction.  On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i)      in a proceeding in which the Indemnitee is wholly successful, on the merits or otherwise, the Indemnitee is entitled to indemnification under this Section 13.01, in which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii)      the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 13.01.

(f)      Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g)      Nothing contained in this Section 13.01 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Manager, or officer of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not.  Nothing contained in this Section 13.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual.  It is the intent of this Section 13.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 13.01.  Indemnification shall be provided in accordance with this Section 13.01 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h)      For purposes of this Section 13.01:

(i)      The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 13.01, applicable law, or otherwise.

(ii)      The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii)      The term "party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

(iv)      The term "proceeding" means any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

(v)      The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section 13.01, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

20

HCMLPHMIT00004171

## ARTICLE XIV

## MISCELLANEOUS

14.01    <u>Complete Agreement</u> .  This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, or condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02    <u>Governing Law</u> .  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03    <u>Binding Effect</u> .  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04    <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.  Any reference to the DELAWARE LAWS, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05    <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06    <u>Severability</u> .  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07    <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.  However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.08    <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.09    <u>No Third-Party Beneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10    <u>References to this Agreement</u> .  Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11    <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit B</u> hereto.  Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

21

002966



HCMLPHMIT00004172

14.12    <u>Amendments</u> .  Except as otherwise may be provided in this Agreement, all amendments to this Agreement must be approved by the Managers, plus one or more Members whose aggregate Percentage Interests total more than fifty percent (50%).

14.13    <u>Title to Company Property</u> .  Legal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> .  In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15    <u>S-Corp Election</u> .  In the event the Company elects to be treated as a S-Corporation for federal tax purposes, the provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as required in order to pertain to a S-corporation.

14.16    <u>Company Indemnification</u> .  In the event any Member is personally liable for any debt or obligations associated with a Company asset, then the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is required to pay or perform, as measured by the Percentage Interest of the Members, except as otherwise agreed by the Members.

*14.17    <u>**Management by Members**</u>.  **The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member <u>may</u> reflect management by members, and not management by managers.  As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.**

002967

HCMLPHMIT00004173

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____
        Mark Patrick, Director and President

23

002968

HCMLPHMIT00004174

**EXHIBIT A**

THE CLASS A MEMBERS AND INTERESTS

The sole Class A Member shall be RAND ADVISORS HOLDING CORP., a Delaware corporation, and it shall own the Percentage Interest set forth on Exhibit "B" hereto.  In addition to such other rights as a Member described in this Agreement, the holders of record of the Class A Interests shall have no additional rights.

002969

HCMLPHMIT00004175

## EXHIBIT B

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HOLDING CORP. 2101 Cedar Springs Road Suite 1200, Dallas, TX 75201 Attn: Mark Patrick | 8/1/2022 | 100% | 100% |

25

002970

HCMLPHMIT00004176

**EXHIBIT  5**

002971

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

RAND PE FUND MANAGEMENT, LLC

A Delaware Limited Liability Company

002972

HCMLPHMIT00004177

**AMENDED AND RESTATED COMPANY AGREEMENT**

*of*

**RAND PE FUND MANAGEMENT, LLC**

**A Delaware Limited Liability Company**

This AMENDED AND RESTATED COMPANY AGREEMENT (collectively, the "Agreement," which shall include all amendments and exhibits hereto) dated effective as of the 1st day of August, 2022 (the "Effective Date"), are entered into by and among those Persons executing the signature page hereto as the Members of RAND PE FUND MANAGEMENT, LLC, a Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

## ARTICLE I

### INTRODUCTION

1.01    Formation of Limited Liability Company    The Company was formed by the filing of the Certificate of Formation (the "Certificate") with the Secretary of State of Delaware on the September 18, 2015. The Company's business shall be conducted under the name "RAND PE FUND MANAGEMENT, LLC" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replaces, in its entirety, all prior governing agreements for the Company, including any and all amendments thereto.

This Agreement is subject to, and governed by, the Delaware laws governing limited liability companies (the "DELAWARE LAWS") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DELAWARE LAWS or the provisions of the Certificate, such provisions of the DELAWARE LAWS or the Certificate, as the case may be, will be controlling.

1.02    Registered Office and Agent    The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.03    Other Offices    The Company may also have offices at such other places, both within and without the State of Delaware, as the Board of Managers may from time to time determine or the business of the Company may require.

1.04    Defined Terms    The terms used in this Agreement with their initial letter capitalized shall, unless the context requires otherwise, have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a)    "DELAWARE LAWS" shall mean the Delaware laws governing limited liability companies, as the same may be amended from time to time.

(b)    "Affiliate" shall mean, as to any Person, any Person controlled by, controlling, or under common control with such Person, and, in the case of a Person who is an individual, a member of the family of such individual consisting of a spouse, sibling, in-law, lineal descendant, or ancestor (including by adoption). For purposes of this definition, "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, alone or in concert with others, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise, and no Person shall be deemed in control of another solely by virtue of being a director, officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

002973


HCMLPHMIT00004178

(c)    "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d)    "Book Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period.  If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e)    "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i)    the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii)    the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times:  (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii)    the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv)    the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 8.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v)    if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i),1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f)    "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time.  Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

3

HCMLPHMIT00004179

prior Member for the interest of such then Member, reduced by any distribution to such Member in return of its capital as contemplated herein.

(g)    "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, Losses, Distributable Cash, and assets upon liquidation of the Company as described in this Agreement.

(h)    "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i)    Intentionally Blank.

(j)    Intentionally Blank.

(k)    "Code" shall mean the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)    "Company" shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)    "Debtor Relief Laws" shall mean any federal or state bankruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)    Intentionally Blank.

(o)    "Distributable Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for a working cash reserve in accordance with Section 8.07 below.

(p)    "Fiscal Year" shall mean the calendar year.

(q)    "Former Member" shall mean a member that causes a Dissolution Event.

(r)    "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, Losses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)    Intentionally Blank

(t)    "Manager" shall mean an individual elected to the Board of Managers of the Company pursuant to Sections 3.02 and 3.04 below.

(u)    "Member(s)" shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof.  The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit B, attached hereto and incorporated herein by reference.  Reference to a "Member" shall be to any one of the Members.

(v)    "Percentage Interest" of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms hereof.

(w)    "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

4

002975

HCMLPHMIT00004180

(x)      "Pro Rata Part" shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y)      "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

     (i)      income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y) shall be added to such taxable income or loss;

     (ii)      any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y), shall be subtracted from such taxable income or loss;

     (iii)      if the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

     (iv)      gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

     (v)      in lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation; and

     (vi)      notwithstanding any other provision of this Section 1.04(y), any items that are specially allocated pursuant to Section 8.02 or Section 8.03 shall not be taken into account in computing Profits and Losses.

(z)      "Regulatory Allocations" shall mean the special allocations of items of income, gain, loss, and deduction, if any, set forth in Section 8.02 hereof.

(aa)      "Transfer" or "Transferred" shall mean the sale, assignment, conveyance, gift, bequest, devise, transfer under the rules of intestate succession, pledge, mortgage, or other encumbrance.  In addition, the term "Transfer" or "Transferred" shall mean an "ownership change" of a Member as defined in Section 382(g) of the Code in effect as of the Effective Date, except that the term "Member" shall be substituted for "shareholder" wherever it appears.

(bb)      "Treasury Regulations" shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc)      "Unanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTICLE II

### MEMBERS AND MEMBERSHIP INTERESTS

2.01      <u>Members</u>.  The Members of the Company shall be those Persons listed on <u>Exhibit B</u>. Except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit B</u>, and except as provided in Section 7.05 below, a Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers, plus one or more Members whose Percentage Interests total more than fifty percent (50%); provided, however, that no Person will be recognized as a Member of the

002976

HCMLPHMIT00004181

Company until he/she shall have executed this Agreement, or a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02    Annual Meetings   An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting.   At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03    Special Meetings   A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%.   Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04    Place of Meetings   The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers.   Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03.   If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05    Notice.   Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06    Voting List   At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member.   For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours.   Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member.   The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07    Voting of Interests.   Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company.   Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her.   Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee.   Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.   Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine.   A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.08    Quorum.   The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement.   At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.09    Vote; Withdrawal of Quorum.   If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in Exhibit A or Exhibit B, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of all Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

6

HCMLPHMIT00004182

Certificate, or this Agreement a different vote is required, in which event such express provision shall govern and control the decision of such question.  The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding any withdrawal of Members that may leave less than a quorum remaining.

2.10    Method of Voting; Proxies.  Except as otherwise may be provided in Exhibit A or Exhibit B, each Member shall be entitled to that number of votes on each matter submitted to the Members for their vote equal to such Member's Percentage Interest multiplied by 100.   At any meeting of Members, every Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorney-in-fact.  Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.  If no date is stated on a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11    Closing of Transfer Books; Record Date .  For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any reconvening thereof, or entitled to receive payment of any distribution, or in order to make a determination of Members for any other proper purpose, the Board of Managers may provide that the membership interest transfer books of the Company shall be closed for a stated period but not to exceed in any event 50 days.  If the membership interest transfer books are closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members, such books shall be closed for at least 10 days immediately preceding such meeting.  In lieu of closing the membership interest transfer books, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action requiring such determination of Members is to be taken.  If the membership interest transfer books are not closed and if no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or entitled to receive payment of a distribution, the date on which the notice of the meeting is to be mailed or the date on which the resolution of the Board of Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

2.12    Presiding Officials at Meetings  The President shall preside at, and the Secretary shall prepare minutes of, each meeting of Members, and in the absence of either such officer, his other duties shall be performed by some person appointed at the meeting.

## ARTICLE III

## MANAGERS

3.01    Management.  The business and affairs of the Company shall be managed EXCLUSIVELY by the Board of Managers.  Subject to the restrictions imposed by law, the Certificate, or this Agreement, the Board of Managers may exercise all the powers of the Company.

3.02    Number; Election; Term; Qualification.  The first Board of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents.  Thereafter, except as otherwise may be restricted by this Agreement, the number of Managers that shall constitute the entire Board of Managers shall be determined by resolution of the Board of Managers at any meeting thereof or by the Members at any meeting thereof, but shall never be less than one (1).  At each annual meeting of Members, Managers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and qualified.  No Manager need be a Member, a resident of the State of Delaware, or a citizen of the United States.

3.03    Removal  Except as otherwise may be provided by the Members, at any meeting of Members called expressly for that purpose, any Manager or the entire Board of Managers may be removed, with or without cause, by a vote of one or more Members whose Percentage Interests total more than fifty percent (50%).

3.04    Change in Number; Vacancies.  No decrease in the number of Managers constituting the entire Board of Managers shall have the effect of shortening the term of any incumbent Manager.  In the case of any increase in the number of Managers, or in the case of the death, retirement, resignation, or removal of a Manager, the vacancies to be filled by such increase or death, retirement, resignation, or removal may be filled by (a) the Board of Managers for a term of office

002978

HCMLPHMIT00004183


continuing only until the next election of one or more Managers by the Members; or (b) the Members at any annual or special meeting of the Members. A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

3.05   <u>Place of Meetings</u> . The Board of Managers may hold its meetings in such place or places, including by telephonic or other electronic method of communication, within or without the State of Delaware as the Board of Managers may from time to time determine.

3.06   <u>First Meeting</u> . Each newly elected Board of Managers may hold its first meeting, if a quorum is present, for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of Members, and no notice of such meeting shall be necessary.

3.07   <u>Regular Meetings</u> . Regular meetings of the Board of Managers may be held without notice at such times and places, including by telephonic or other electronic method of communication, as may be designated from time to time by resolution of the Board of Managers and communicated to all Managers. Regular meetings of the Board of Managers may be held when and if needed, and no more than one regular meeting of the Board of Managers shall be required in any calendar year.

3.08   <u>Special Meetings</u> . A special meeting of the Board of Managers shall be held whenever called by any Manager at such time and place, including by telephonic or other electronic method of communication, as such Manager shall designate in the notice of such special meeting. The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Managers need be specified in the notice or waiver of notice of any special meeting.

3.09   <u>Quorum; Vote</u> . At all meetings of the Board of Managers, a majority of the Managers fixed in the manner provided in this Agreement shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting, a majority of the Managers present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the Managers present at a meeting at which a quorum is in attendance shall be the act of the Board of Managers, unless the vote of a different number is required by law, the Certificate, or this Agreement.

3.10   <u>Procedure; Minutes</u> . At meetings of the Board of Managers, business shall be transacted in such order as the Board of Managers may determine from time to time. The Board of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute book of the Company.

3.11   <u>Presumption of Assent</u> . A Manager of the Company who is present at any meeting of the Board of Managers at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof, or shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

3.12   <u>Compensation</u> . Except as otherwise may be restricted in this Agreement, Managers, in their capacity as Managers, may receive, by resolution of the Board of Managers, a stated salary or a fixed sum and expenses of attendance, if any, for attending meetings of the Board of Managers. No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

<div align="center">

**ARTICLE IV**

**COMMITTEES**

</div>

4.01   <u>Designation</u> . The Board of Managers may, by a resolution adopted by a majority of the entire Board of Managers, designate executive and other committees.

<div align="center">8</div>

HCMLPHMIT00004184


4.02    <u>Number; Qualification; Term</u> .  Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire Board of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire Board of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03    <u>Authority</u> .  The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in the management of the business and affairs of the Company.  Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in such other matters and affairs concerning the Company.  However, no committee shall have the authority of the Board of Managers in reference to any of the following:

(a)    amending the Certificate;

(b)    approving a plan of merger or consolidation;

(c)    recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d)    recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e)    filling vacancies in, or removing members of, the Board of Managers or of any committee thereof;

(f)    filling any vacancy to be filled by reason of an increase in the number of Managers;

(g)    electing or removing officers or committee members;

(h)    fixing the compensation of any committee member; or

(i)    altering or repealing any resolution of the Board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04    <u>Committee Changes</u> .  The Board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee.  However, a committee member may be removed by the Board of Managers only if, in the judgment of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05    <u>Regular Meetings</u> .  Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06    <u>Special Meetings</u> .  A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.07    <u>Quorum; Majority Vote</u> .  At all meetings of any committee, a majority of the number of committee members designated by the Board of Managers shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

002980

HCMLPHMIT00004185

4.08 <u>Minutes</u> . Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board of Managers. The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute books of the Company.

4.09 <u>Compensation</u> . Except as otherwise may be restricted in this Agreement, committee members may, by resolution of the Board of Managers, be allowed a stated salary or a fixed sum and expenses of attendance, if any, for attending any committee meetings.

4.10 <u>Responsibility</u> . The designation of any committee and the delegation of authority to it shall not operate to relieve the Board of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

<div align="center">

**ARTICLE V**

**GENERAL PROVISIONS RELATING TO MEETINGS**

</div>

5.01 <u>Notice</u> Whenever by law, the Certificate, or this Agreement notice is required to be given to any Member, Manager, or committee member and no provision is made as to how such notice shall be given, it shall be construed to mean that notice may be given either (a) in person; (b) in writing, by mail; (c) by telegram, telex, cable, telecopy or facsimile transmission, or similar means; or (d) by any other method permitted by law. Any notice required or permitted to be given hereunder (other than personal notice) shall be addressed to such Member, Manager, or committee member at his address as it appears on the books on the Company or, in the case of a Member, on the membership interest transfer records of the Company or at such other place as such Member, Manager, or committee member is known to be at the time notice is mailed or transmitted. Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the United States mail, postage prepaid. Any notice required or permitted to be given by telegram, telex, cable, telecopy or facsimile transmission, or similar means shall be deemed to be delivered and given at the time transmitted.

5.02 <u>Waiver of Notice</u> . Whenever by law, the Certificate, or this Agreement any notice is required to be given to any Member, Manager, or committee member of the Company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time notice should have been given, shall be equivalent to the giving of such notice. Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meeting, except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.03 <u>Telephone and Similar Meetings</u> Members, Managers, or committee members may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04 <u>Action Without Meeting</u> . Any action that may be taken, or is required by law, the Certificate, or this Agreement to be taken at a meeting of the Members, the Board of Managers, or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members owning the required Percentage Interests of all Members (as set forth herein for the respective action or decision), a majority of the Managers or committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such Members, Managers, or committee members, as the case may be, and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person. The consent may be in one or more counterparts so long as each Member, Manager, or committee member signs one of the counterparts. The signed consent shall be placed in the minute books of the Company.

<div align="center">

**ARTICLE VI**

**OFFICERS AND OTHER AGENTS**

</div>

002981

HCMLPHMIT00004186

6.01    Number; Titles; Election; Term  The Company shall have a president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Board of Managers shall determine), a secretary, a treasurer, and such officers and agents as the Board of Managers may deem desirable.  The Board of Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present after the annual meeting of Members or whenever a vacancy exists.  The Board of Managers then, or from time to time, may also elect or appoint one or more other officers or agents as it shall deem advisable.  Except as otherwise may be provided by separate agreement, each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified.  Unless otherwise provided in the resolution of the Board of Managers electing or appointing an officer or agent, his term of office shall extend to and expire at the meeting of the Board of Managers following the next annual meeting of Members or, if earlier, at his death, resignation, or removal.  Any two or more offices may be held by the same person.  No officer or agent need be a Member, a Manager, a resident of the State of Delaware, or a citizen of the United States.

6.02    Removal .  Any officer or agent elected or appointed by the Board of Managers may be removed by a majority of the Board of Managers only if, in the judgment of a majority of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

6.03    Vacancies .  Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

6.04    Authority .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.

6.05    Compensation .  Except as otherwise may be provided by separate agreement, the compensation, if any, of officers  or any salaried employee shall be fixed, increased, or decreased from time to time by the Board of Managers, provided, however, that the Board of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06    Chairman of the Board .  The Chairman of the Board, if any, shall be an officer of the Company and, subject to the direction of the Board of Managers, shall perform such executive, supervisory, and management functions and duties as may be assigned to him from time to time by the Board of Managers.

6.07    President, CEO and COO .  The Board of Managers may designate and appoint a President, CEO and/or COO, with rights, duties and responsibilities established by the Board of Managers.

6.08    Vice Presidents .  Each Vice President shall have such powers and duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President and (in the order as designated by the Board of Managers, or in the absence of such designation, as determined by the length of time each has held the office of Vice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.09    Treasurer .  The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board of Managers.  The Treasurer shall audit all payrolls and vouchers of the Company; shall receive, audit, and consolidate all operating and financial statements of the Company and its various departments; shall supervise the accounting and auditing practices of the Company; and shall have charge of matters relating to taxation.  Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company.  The Treasurer shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.10    Assistant Treasurers .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Treasurers (in the order as designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

11

HCMLPHMIT00004187

6.11    <u>Secretary</u> .  The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings.  The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.12    <u>Assistant Secretaries</u> .  Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## <u>ARTICLE VII</u>

### <u>CAPITALIZATION AND CAPITAL ACCOUNTS</u>

7.01    <u>Capital Contributions</u> .  The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers.  No Member shall be entitled to make any additional Capital Contributions except as provided in Section 7.02 and 7.03 below.

7.02    <u>Additional Capital Contributions</u> .  If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given.  The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

7.03    <u>Failure to Make Additional Capital Contributions</u> .  If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

7.04    <u>Effect of Failure to Make Additional Capital Contributions</u> .  In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 7.02 and 7.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 7.02 and 7.03 above.

7.05    <u>Recapitalization by Admission of Additional Members</u> .  If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 7.02 and 7.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein.  Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

12

002983

HCMLPHMIT00004188


7.06    <u>Maintenance of Capital Accounts</u> .   The Company shall maintain for each Member a separate Capital Account in accordance with this Section 7.06, which shall control the allocation of Profits and Losses and the division of assets upon liquidation of the Company as provided in Section 12.01.   Each Capital Account shall be maintained in accordance with the following provisions:

(a)    a Member's Capital Account shall initially be zero and shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b)    such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company; and

(c)    if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest, provided, however, that if the Transfer causes a termination of the Company under Code Section 708(b)(1)(B), the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in liquidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed liquidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board of Managers may authorize such modifications, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Sections 8.06 and 12.01 hereof.

7.07    <u>Negative Capital Accounts</u> .   If any Member has a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or to make any Capital Contribution to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

7.08    <u>Interest</u> .   No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

7.09    <u>No Withdrawal</u> .   No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company, except as provided in Sections 11.02 and 12.01 of this Agreement.

7.10    <u>Loans From Members</u> .   Loans by a Member to the Company shall not be considered Capital Contributions.

## **ARTICLE VIII**

### **ALLOCATIONS AND DISTRIBUTIONS**

8.01    <u>Allocation of Profits and Losses</u>.

(a)    <u>Allocation of Profits</u>.  Except as provided on any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, and after giving effect to all distributions of cash or property (other than cash or

13

002984

HCMLPHMIT00004189

property to be distributed pursuant to Section 12.01), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

> (i) first, to each Member with a negative balance in its Capital Account, pro rata in accordance with such negative Capital Account balances, until such negative Capital Account balances have been eliminated;

> (ii) next, to all of the Members in accordance with their respective Percentage Interests.

(b) <u>Allocation of Losses</u>. Except as provided in any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, Losses for any Fiscal Year shall be allocated to the Members in the following manner:

> (i) to all of the Members in accordance with their respective Percentage Interests.

8.02    <u>Special Allocations of Profits and Losses</u> .

(a) <u>Minimum Gain Chargeback–Company Nonrecourse Liabilities</u>. If there is a net decrease in Company minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Treasury Regulations Section 1.704-2(f)(2), (3), (4) and (5). This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f) relating to Company nonrecourse liabilities, as defined in Treasury Regulations Section 1.704-2(b)(3) and shall be so interpreted.

(b) <u>Minimum Gain Chargeback–Member Nonrecourse Debt</u>. If there is a net decrease in Member minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii). This Section 8.02(b) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(i)(4) relating to Member nonrecourse debt, as defined in Treasury Regulations Section 1.704-2(b)(4) and shall be so interpreted.

(c) <u>Qualified Income Offset</u>. If, after applying Section 8.02(a) and Section 8.02(b), any Member has an adjusted Capital Account deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as quickly as possible. This Section 8.02(c) is intended to comply with the "qualified income offset" requirement set for the in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be so interpreted.

(d) <u>Optional Basis Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken in to account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(f) <u>Partner Nonrecourse Deductions</u>. Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.704-2(b)(4) and (i)(1) to the Member who bears the economic risk of loss with respect to such deductions.

8.03    <u>Curative Allocations</u> . The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.03. Therefore, notwithstanding any other provisions of this Article VIII, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.01(a) and Section 8.01(b) hereof.

<div align="center">14</div>

002985

HCMLPHMIT00004190

8.04    <u>Tax Allocations: Code Section 704(c)</u> .

(a)    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.

(b)    If the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the Board of Managers. Allocations pursuant to this Section 8.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account, or share of Profits, Losses, and other items or distribution pursuant to any provision of this Agreement.

8.05    <u>Other Allocation Rules</u> .

(a)    For purposes of determining the Profits, Losses, or any other item allocable to any period, Profits, Losses, and any such other item shall be determined on a daily, monthly, or other   basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)    For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 8.01, 8.02, 8.03, and 8.04.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections 8.01, 8.02, 8.03, and 8.04 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

8.06    <u>Distributions of Distributable Cash</u> .   Except as otherwise may be provided in this Agreement, the Board of Managers shall cause the Company to make distributions of Distributable Cash at such intervals and in such amounts as the Board of Managers in its sole discretion shall determine by majority vote.   Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

8.07    <u>Working Cash Reserve</u> .   The Board of Managers may from time to time establish a working cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

<div align="center">

**ARTICLE IX**

**CERTIFICATES**

</div>

9.01    <u>Certificated and Uncertificated Interests</u>.   The membership interests of the Company may be either certificated interests or uncertificated interests.   As used herein, the term "certificated interests" means Interests represented by instruments in bearer or registered form, and the term "uncertificated interests" means Interests not represented by such instruments and the transfers of which are registered upon books maintained for that purpose by or on behalf of the Company.

9.02    <u>Certificates for Certificated Interests</u>.   The certificates for certificated interests shall be in such form as shall be approved by the Board of Managers in conformity with law.   The certificates shall be consecutively numbered, shall be entered as they are issued in the books of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

<div align="center">15</div>

002986

HCMLPHMIT00004191



other matters as may be required by law.  The certificates shall be signed by the President or any Vice President and also by the Secretary, an Assistant Secretary, or any other officer, and may be sealed with the seal of the Company or a facsimile thereof.  If any certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Company itself or an employee of the Company, the signatures of the foregoing officers may be a facsimile.

9.03    Lost, Stolen, or Destroyed Certificates .  The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following requirements:

(a)    the registered owner makes proof in affidavit form that a previously issued certificate for Interests has been lost, destroyed, or stolen;

(b)    the registered owner requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c)    the registered owner gives a bond in such form, and with such surety or sureties, with fixed or open penalty, as the Board of Managers may direct, in its discretion, to indemnify the Company (and its transfer agent and registrar, if any) against any claim that may be made on account of the alleged loss, destruction, or theft of the certificate; and

(d)    the registered owner satisfies any other reasonable requirements imposed by the Board of Managers.

When a certificate has been lost, destroyed, or stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of it, if the Company registers a transfer of the Interests represented by the certificate before receiving such notification, the Member of record is precluded from making any claim against the Company for the transfer or for a new certificate.

9.04    Transfer of Interests .  Interests of the Company shall be transferable only on the books of the Company by the Members thereof in person or by their duly authorized attorneys or legal representatives, but only as authorized in this COMPANY AGREEMENT.  With respect to certificated interests, upon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books.  With respect to uncertificated interests, upon delivery to the Company of proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall record the transaction upon its books.

9.05    Registered Members .  The Company shall be entitled to treat the Member of record as the Member in fact of any Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have actual or other notice thereof, except as otherwise provided by law.

9.06    Legends .  If the Company is authorized to issue Interests of more than one class, each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or back of the certificate a full statement of all of the designations, preferences, limitations, and relative rights of the Interests of each class authorized to be issued; or (b) shall conspicuously state on the face or back of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement; and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 1933, the transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transfer, or registration of the transfer, of Interests shall be imposed or agreed to by the Company, each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate; (b) shall set forth such statement on the back of the certificate and conspicuously refer to the same on the face of the certificate; or (c) shall conspicuously state on the face or back of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written request to the Company at its principal place of business or registered

002987


HCMLPHMIT00004192

office a copy of the specified document; or (ii) if such document is one required or permitted by law to be and has been filed, that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTICLE X

## ACCOUNTING AND RECORDS

10.01    <u>Records and Accounting</u> .  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

10.02    <u>Access to Accounting Records</u> .  All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member owning a Percentage Interest of at least ten percent (10%), and his duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.03    <u>Annual and Tax Information</u> .  The Company shall deliver to each Member within 90 days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return.  The Company shall prepare, within 120 days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a statement of the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

10.04    <u>Accounting Decisions</u> .  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05    <u>Federal Income Tax Elections</u> .  The Company may make all elections for federal income tax purposes, including, but not limited to, the following:

(a)    to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b)    in case of a transfer of all or part of the Interest of any Member, the election pursuant to Section 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE XI

## CHANGES IN MEMBERS

The provisions of this Article XI are subject to, and may be superceded by, one or more separate agreements entered into by and among one or more Members.  The provisions of this Article XI shall continue to control with respect to matters not covered by, or Members not parties to, such agreement(s).

11.01    <u>Intentionally Blank</u> .

11.02    <u>Transfer and Assignment of Members' Interest</u> .  Except as approved by the Manager, plus a Member or Members owning a Percentage Interest greater than fifty percent (50%), no Member shall be entitled to Transfer any part of its Interest in the Company.  The Company and, if applicable, the remaining Members shall be entitled to match the terms of the proposed Transfer, with consideration being only set forth in traditional monetary terms.  If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire Interest, or portion thereof, the Member proposing to make the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.

17

002988

HCMLPHMIT00004193

11.03   <u>Further Restrictions on Transfer</u> .  No Member shall Transfer any part of his Interest in the Company:  (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior thereto, would result in the termination of the Company under Code Section 708.

11.04   <u>Substitute Members</u> .  A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.03 hereof are met; (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05   <u>Effect of Transfer</u> .

(a)   Any permitted Transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an Interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b)   Upon any Transfer of a Member's Interest in the Company in violation of this Agreement, and if such Member's Interest is not purchased pursuant to Section 11.01, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee shall be entitled to receive only the allocable share of Profits, Losses, Distributive Cash, and other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06   <u>No Dissolution or Withdrawal: Advanced Consent</u> .  Upon the occurrence of a Dissolution Event with regard to a respective Member, all remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  By executing this Agreement, however, all Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital.  If any Member shall breach the agreement represented by this Section 11.06, the agreement of such breaching Member shall not be specifically performable, but shall be actionable for damages, and shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's Interest, or as otherwise set forth herein (whichever is greater), which shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder.  The value of the breaching Member's Interest shall be determined pursuant to Section 11.01, to which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

<div align="center">

**ARTICLE XII**

**TERMINATION**

</div>

12.01   <u>Termination of the Company</u> .

(a)   The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following events:

(i)   a determination by the Managers, plus the Unanimous Consent of the Members that the Company should be dissolved;

(ii)   a sale of all or substantially all of the assets of the Company;

(iii)   the expiration of the Company's term as stated in its Certificate; or

(iv)   at such earlier time as provided by applicable law.

<div align="center">18</div>

002989


HCMLPHMIT00004194

(b)    In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following order, all as required by the DELAWARE LAWS:

(i)    those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their Capital Contributions;

(ii)    to the Members, pro rata, in accordance with the positive balances, if any, in their Capital Accounts; and

(iii)    to the Members in proportion to their relative Percentage Interests.

## ARTICLE XIII

## INDEMNIFICATION

13.01    <u>Indemnification of Members, Managers, and Other Persons</u> .

(a)    To the greatest extent not inconsistent with the laws and public policies of Delaware, the Company shall indemnify any Member, Manager, or officer of the Company made a party to any proceeding because such individual is or was a Member, Manager, or officer of the Company (an "Indemnitee"), as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 13.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 13.01.  The Company shall advance, pay for, or reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 13.01; (ii) the Indemnitee furnishes the Company a written undertaking, executed personally or on such Indemnitee's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct; and (iii) a determination is made in accordance with subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 13.01.  The undertaking described in subsection (a)(ii) above must be a general obligation of the Indemnitee, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company shall indemnify an Indemnitee who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section 13.01.  Upon demand by an Indemnitee for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 13.01.  The indemnification and advancement of expenses provided for under this Section 13.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 13.01.

(b)    The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Manager, or officer of the Company.

(c)    Indemnification is permissible under this Section 13.01 only if (i) the Indemnitee conducted himself in good faith; (ii) he or she reasonably believed that his conduct was in, or at least not opposed to, the Company's best interest; (iii) in the case of any criminal proceeding, he or she had no reasonable cause to believe his conduct was unlawful; and (iv) such Indemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d)    A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

19

002990

HCMLPHMIT00004195

(i)        by the Board of Managers or by a majority vote consisting of Members not at the time parties to the proceeding; or

(ii)        by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e)        An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction.  On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i)        in a proceeding in which the Indemnitee is wholly successful, on the merits or otherwise, the Indemnitee is entitled to indemnification under this Section 13.01, in which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii)        the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 13.01.

(f)        Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g)        Nothing contained in this Section 13.01 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Manager, or officer of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not.  Nothing contained in this Section 13.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual.  It is the intent of this Section 13.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 13.01.  Indemnification shall be provided in accordance with this Section 13.01 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h)        For purposes of this Section 13.01:

(i)        The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 13.01, applicable law, or otherwise.

(ii)        The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii)        The term "party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

(iv)        The term "proceeding" means any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

(v)        The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section 13.01, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

002991

HCMLPHMIT00004196

## ARTICLE XIV

### MISCELLANEOUS

14.01   <u>Complete Agreement</u> .  This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, or condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02   <u>Governing Law</u> .  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03   <u>Binding Effect</u> .  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04   <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.  Any reference to the DELAWARE LAWS, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05   <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06   <u>Severability</u> .  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07   <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.  However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.08   <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.09   <u>No Third-Party Beneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10   <u>References to this Agreement</u> .  Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11   <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit B</u> hereto.  Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

21

002992

HCMLPHMIT00004197

14.12    <u>Amendments</u> .  Except as otherwise may be provided in this Agreement, all amendments to this Agreement must be approved by the Managers, plus one or more Members whose aggregate Percentage Interests total more than fifty percent (50%).

14.13    <u>Title to Company Property</u> .  Legal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> .  In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15    <u>S-Corp Election</u>.   In the event the Company elects to be treated as a S-Corporation for federal tax purposes, the provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as required in order to pertain to a S-corporation.

14.16    <u>Company Indemnification</u>.   In the event any Member is personally liable for any debt or obligations associated with a Company asset, then the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is required to pay or perform, as measured by the Percentage Interest of the Members, except as otherwise agreed by the Members.

*14.17    <u>**Management by Members**</u>.  **The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.***

002993

HCMLPHMIT00004198

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____

    Mark Patrick, Director and President

002994

HCMLPHMIT00004199

## EXHIBIT A

THE CLASS A MEMBERS AND INTERESTS

     The sole Class A Member shall be RAND ADVISORS HOLDING CORP., a Delaware corporation, and it shall own the Percentage Interest set forth on Exhibit "B" hereto.  In addition to such other rights as a Member described in this Agreement, the holders of record of the Class A Interests shall have no additional rights.

24

002995

HCMLPHMIT00004200

## EXHIBIT B

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HOLDING CORP. 2101 Cedar Springs Road Suite 1200, Dallas, TX 75201 Attn: Mark Patrick | 8/1/2022 | 100% | 100% |

25

002996

HCMLPHMIT00004201

**EXHIBIT**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as August 1, 2022, is entered into by and among JOHN HONIS ("**Seller**"), RAND ADVISORS HOLDING CORP., a Delaware corporation ("**Buyer**"), and CLO HOLDCO, LTD. a Cayman limited company (the "**Guarantor**").

## RECITALS

WHEREAS, Seller owns one hundred (100%) percent of the issued and outstanding membership interests, (the "**Interests**") of each of Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**") and Rand Advisors, LLC, a Delaware limited liability company ("**Advisor**", and together with Atlas GP and Rand GP, each a "**Company**" and collectively, the "**Companies**");

WHEREAS, the Companies collectively manage certain private investment funds, including two (2) insurance-dedicated funds ("**IDFs**") and one (1) one private equity fund that one of the IDFs invests in (collectively, the "**Client Funds**");

WHEREAS, in addition to the foregoing with respect to the Client Funds, Advisor acts as the investment sub-advisor to Rand Advisors Series I Insurance Fund of SALI Multi-Series Fund, L.P., a Delaware series limited partnership (such, product, the "**SALI Fund**");

WHEREAS, Rand GP as the general partner of Rand PE Fund I, LP, ("**Rand LP**") manages: a) Rand LP; b) Rand LP's wholly owned subsidiary Beacon Mountain, LLC ("**Beacon**"); and c) Beacon's sponsorship and administration of the Hunter Mountain Investment Trust ("**HMIT**", and together with Rand LP and Beacon, the "**Managed Companies**"); and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Interests, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Interests, free and clear of any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance. In connection with such sale of the Interests, Seller acknowledges that he retains no rights to any commissions or other compensation or consideration from (a) any Company, (b) any of the Client Funds, (c) the SALI Fund, (d) any of the Managed Funds, and/or (e) any person or entity affiliated with any of the foregoing, that has not been paid as of the Closing.

**Section 1.02   Purchase Price.** The purchase price payable by Buyer for the Interests shall be equal to One Million One Hundred Twenty Thousand ($1,120,000.00) Dollars (the "**Purchase Price**").  The Purchase Price shall be due and payable in sixteen (16) equal quarterly installments of Seventy Thousand ($70,000.00) Dollars (each, an "**Installment Payment**") with the first Installment Payment payable on the Closing Date and subsequent Installment Payments made quarterly thereafter on March 31, June 30, September 30 and December 31 of each calendar year until the Purchase Price has been paid in full; *provided, however,* that if any Installment Payment is due and owing on a day that is not a Business Bay, such Installment Payment shall be paid on the next Business Day.  For purposes of this Agreement, the term "Business Day" means any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York. Each Installment Payment shall be paid to Seller pursuant to the wiring instructions provided in writing at least two (2) days prior to Closing; *provided* that Seller may provide alternative wiring instructions in writing at least two (2) days prior to any Installment Payment.


## ARTICLE II
## CLOSING

**Section 2.01   Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place electronically as of the Effective Date, with the parties executing and exchanging all material closing documents by counterpart, as applicable, on the date that all deliverables pursuant to Sections 2.02 and 2.03 have been delivered, or at such other time, date or place as Seller and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 2.02   Seller Closing Deliverables.** At the Closing, Seller shall deliver to Buyer the following:

(a)    The resignation letter, resigning in all capacities from each of the Companies.

(b)    The independent contractor agreement, by and between Seller and Buyer, dated as of the date hereof (the "**Independent Contractor Agreement**"), countersigned by Seller.

(c)    The books and records of the Companies.

**Section 2.03   Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

(a)    The Purchase Price.

(b)    The Independent Contractor Agreement, countersigned by Buyer.

002999

HCMLPHMIT00004203

(c)    Evidence of compliance with <u>Section 5.01(b)</u>.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01    Organization and Authority of Seller.** Seller is a natural person and resident of the State of New York. Seller has all necessary authority to enter into this Agreement, to carry out his obligations hereunder and to consummate the transactions contemplated hereby. This Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 3.02    Organization, Authority, Qualification and Ownership of the Companies.** Each Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted. Each Company is duly licensed or qualified to do business and is in good standing in each jurisdiction where the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a material adverse effect. Seller is the sole owner and member of each Company.

**Section 3.03    Employment Matters.** Seller is the only employee of each of the Companies.

**Section 3.04    Title to Interests.** Seller has exclusive and valid title to all of the Interests, with the absolute right to sell, assign and transfer the same to Buyer free and clear of all liens, pledges, security interests and encumbrances. Seller has not assigned, transferred or sold any rights, options or other benefits associated with the Interests. Further, Seller represents and warrants that the assets of the Companies are free and clear of any and all liens, pledges, security interests and other encumbrances.

**Section 3.05    No Restrictions Against Sale.** Seller has full right, power and authority to sell the Interests to Buyer as provided in this Agreement without obtaining the consent or approval of any creditor, third party or governmental body.

**Section 3.06    Intentionally Blank**



003000 HCMLPHMIT00004204

**Section 3.07  No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE III, none of Seller, the Companies or any other person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or any Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Companies furnished or made available to Buyer as to the future revenue, profitability or success of each Company, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01  Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.02  No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation or by-laws of Buyer; (b) violate or conflict with any provision of any law or governmental order applicable to Buyer; (c) require the consent, notice or other action by any person under, violate or conflict with, or result in the acceleration of any agreement to which Buyer is a party; or (d) require any consent, permit, governmental order, filing or notice from, with or to any governmental authority; except, in the cases of clauses (b) and (c), where the violation, conflict, acceleration or failure to obtain consent or give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and, in the case of clause (d), where such consent, permit, governmental order, filing or notice which, in the aggregate, would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

**Section 4.03  Legal Proceedings.** There are no actions pending or, to Buyer's knowledge, threatened against or by Buyer or any of its affiliates that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

4



003001

HCMLPHMIT00004205

**Section 4.04   Buyer Acknowledgement of SALI Agreement and CG Agreement**. Buyer acknowledges the obligations of (i) the Advisor pursuant to the Subadvisor Agreement dated September 25, 2013 between the Advisor and SALI Fund Management, LLC (the **"SALI Agreement"**) and (ii) Atlas IDF, LP and the Advisor pursuant to the Participation Agreement dated as of November 30, 2015 among Crown Global Life Insurance Ltd., Atlas IDF, LP and the Advisor (the **"CG Agreement"**).   The purchase and sale of the Interests pursuant to this Agreement will not cause a violation of either Exhibit C to the SALI Agreement or Schedule D to the CG Agreement ("**Schedule D**").

**Section 4.05   Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund for such purpose.   Buyer represents and warrants that it is aware that the Companies are involved in multiple litigations, the ultimate liability under such litigations may not be quantified and accepts any risk related thereto.   Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE III of this Agreement; and (b) none of Seller, any Company or any other person has made any representation or warranty as to Seller, any Company, any Managed Company, any Client Funds, the SALI Fund or this Agreement, except as expressly set forth in ARTICLE III of this Agreement.

## ARTICLE V
## COVENANTS

**Section 5.01   Director, Manager and Officer Indemnification Liability.**

      **(a)**    Buyer agrees that all rights to indemnification, advancement of expenses and exculpation by each Company now existing in favor of each person who is now, or has been at any time prior to the date hereof, an officer, manager, member or director of such Company, in each case as in effect on the date of this Agreement, or pursuant to any other agreements in effect on the date hereof, shall survive the Closing Date and shall *continue in full force and effect in accordance with their respective terms.*

      **(b)**    Each Company shall, and Buyer shall cause each Company to (i) maintain in effect for a period of six (6) years after the Closing Date the current policies of Investment Adviser and Fund Professional and Directors and Officers Liability Insurance (or similar policy) maintained by each Company immediately prior to the Closing Date (provided that each Company may substitute policies, of at least the same coverage and amounts and containing terms and conditions that are not less advantageous to the directors, members, managers and officers of such Company when compared to the insurance maintained by such Company as of the date hereof), or (ii) obtain as of the Closing Date "tail" insurance policies with a claims period of six (6) years from the

5

003002

HCMLPHMIT00004206

Closing Date with at least the same coverage and amounts, and containing terms and conditions that are not less advantageous to the mangers and officers of such Company, in each case with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement). The parties acknowledge and agree that the coverages required by this Section 5.01(b) shall not be required to cover the Excluded Claims referenced in Section 5.04 hereinafter.

(c)     The obligations of Buyer and each Company under this Section 5.01 shall not be terminated or modified in such a manner as to adversely affect Seller.

(d)     In the event that Buyer, any Company or any of their respective successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in either such case, proper provision shall be made so that the successors and assigns of Buyer or such Company, as the case may be, shall assume all of the obligations set forth in this Section 5.01.

**Section 5.02   Further Assurances.** Following the Closing:

(a)     each of the parties hereto shall, and shall cause their respective affiliates to, execute and deliver such additional documents and instruments and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

(b)     The parties agree that certain matters in which any of the Affected Parties will be involved may necessitate Seller's cooperation in the future. Accordingly, for any reason, to the extent requested by any of the Affected Parties or their representatives and/or agents, Seller shall reasonably cooperate with the Affected Parties in connection with any matters in which any of the Affected Parties asserts that Seller's assistance is necessary, including, but not limited to, the Kirschner Litigation, the HCMLP Bankruptcy, and any other disputes; provided that, any of the Affected Parties shall make reasonable efforts to minimize disruption of Seller's other activities. The respective Affected Parties shall reimburse Seller for reasonable expenses incurred in connection with such reasonable cooperation and, to the extent that Seller is required to spend substantial time on such matters, the respective Affected Parties shall compensate Seller at an hourly rate of $350.00 per hour. Such reasonable cooperation shall include, but is not limited to, providing interviews, truthful testimony, documents, assistance, information, and executing and returning documents related to any litigation or disputes in which any of the Affected Parties is involved, including, but not limited to, the Kirschner Litigation and/or the HCMLP Bankruptcy and any disputes related thereto. "Affected Parties" shall collectively mean Buyer, Companies, Client Funds, SALI Fund and Managed Companies.

6

(c)      Additionally, Seller agrees that he will not voluntarily provide reasonable assistance to or cooperate with any party that has any adverse interests to any of the Affected Parties without prior written consent from the respective Affected Parties, and Seller will notify the Affected Parties if any third-party seeks such reasonable assistance or cooperation from Seller.   Any failure to comply with this clause by Seller shall constitute a material breach of this Agreement.   Seller shall not, except as required by law, disclose to any third party this Agreement, its terms and particularly this cooperation clause.  If, at any time, Seller is ordered or subpoenaed by any court, regulator, agency, or legislative body to disclose, or is served with a subpoena or discovery request seeking or requiring disclosure of, this Agreement or any of its terms, Seller shall so notify the Affected Parties at least two (2) business days in advance of the time for compliance with the order, subpoena or discovery request.

**Section 5.03   Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Seller shall cooperate with respect thereto as necessary).

**Section 5.04   Release.** Effective as of the Closing, (i) Buyer shall, (ii) Buyer shall cause the Companies, (iii) Buyer shall cause the Companies to cause the Client Funds, and (iv) Buyer shall cause the Companies to cause the Managed Companies (together, the "**Buyer Releasors**") generally, irrevocably, unconditionally and completely to release and forever discharge Seller and his partners, affiliates, employees, consultants, counsel and agents, and the counsel, consultants and agents of the Companies, the Managed Companies, and the Client Funds (each, a "**Seller Releasee**" and collectively, the "**Seller Releasees**") from, and irrevocably, unconditionally and completely to waive and relinquish each and all past, present and future disputes, claims, controversies, demands, rights, obligations, liabilities, actions and causes of action of every kind and nature, including any unknown, unsuspected or undisclosed claim (collectively "**Claims**"), that the Buyer Releasors may have had in the past, may now have or may have in the future against any of the Seller Releasees and has arisen or arises directly or indirectly out of, or relates directly or indirectly to, this Agreement and the transactions contemplated hereby, or the operation of the Companies, the Managed Companies, the SALI Fund or the Client Funds, other than any claim that Buyer may have against any of the Seller Releasees that arises under this Agreement.  Buyer Releasors, acknowledges that the laws of many states provide substantially the following: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."   The Buyer Releasors acknowledge that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist. Nonetheless, the Buyer Releasors, agree that, effective as of the Closing, the Companies, the Client Funds and the Managed Companies shall be deemed to waive any such provision. Buyer shall not permit any Company, Client Fund or Managed Company to institute, solicit or encourage, or participate, assist or cooperate in, any legal proceeding based upon, arising out of, or relating to any of the disputes, claims, controversies, demands, rights,

7

003004
HCMLPHMIT00004208

obligations, liabilities, actions and causes of action waived under this Section 5.04. Notwithstanding the foregoing, the parties acknowledge and agrees that the Claims released by this Section 5.04 shall not include any and all Claims that are found by a court of competent jurisdiction to be a result of a Seller Releasees fraud, gross negligence or willful misconduct (each an "**Excluded Claim**" and/or collectively, the "**Excluded Claims**").

**Section 5.05   Guaranty.**

    **(a)**    The Guarantor hereby irrevocably and unconditionally guarantees to Seller full and punctual performance of and compliance with all of Buyer's obligations pursuant to this Agreement. The guaranty set forth in this Section 5.05(a) is an absolute, present, primary and continuing guaranty of performance, payment and compliance.   The Guarantor acknowledges and agrees that upon any default by Buyer, Seller shall not be obligated to first attempt enforcement against Buyer.  The Guarantor hereby waives any and all defenses to enforcement of the guaranty set forth in this Section 5.05(a), now existing or hereafter arising, which may be available to guarantors, sureties and other secondary parties at law or in equity.  The Guarantor further agrees to pay all reasonable costs and expenses, including reasonable attorney fees and related costs, incurred by any Seller Releasee in enforcing the guaranty set forth in this Section 5.05(a).

    **(b)**    The Guarantor represents and warrants to Seller that (i) the execution and delivery of this Agreement, and the Guarantor's performance under this Agreement, including the Guarantor's performance under this Section 5.05, does not violate any law, decree or contractual restriction binding on the Guarantor, (ii) this Agreement has been duly executed and delivered by the Guarantor and constitutes the valid and legally binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditor's rights generally and general principles of equity and (iii) the Guarantor has the financial capacity necessary to perform its obligations under the guaranty set forth in Section 5.05(a).

    **Section 5.06   Ownership of Work Product of the Companies**.  Seller hereby agrees that all work product, designs, graphics, processes, trade secrets, proprietary information and confidential investor information of the Companies, that is not (i) generally available to the public other than by virtue of a disclosure by Seller after the Closing Date and in violation of this Agreement or (ii) independently developed by Seller from sources not known by Seller to be bound by an obligation of confidentiality to the Companies (collectively, "**Confidential Information**") and shall remain the property of the applicable Company without any further act on Seller's or any Company's part, and that Seller shall not have any past, current or future copyright, trademark right, intellectual property right, property interest and/or any other right, title or interest in such Confidential Information.  Seller acknowledges and agrees that all right, title and interest in such Confidential Information, including, without limitation, all conceivable intellectual property rights, including, without limitation, all copyrights, trademarks, service marks, patents, and discoveries shall remain the property of the applicable Company on and after the Closing Date.  Notwithstanding anything in this Section 5.06 or otherwise in this Agreement

8

003005

HCMLPHMIT00004209

to the contrary, Seller may retain the phone that he used in the management and ownership of the Companies as his own personal property, and all "personal" information/data on such phone shall not constitute Confidential Information.

**Section 5.07    Client Information.** Seller hereby covenants and agrees at all times following the execution hereof to hold in strictest confidence, and not to use (for himself or for any other person), or to disclose to any person, firm or entity, any such Confidential Information. The provisions of this Section 5.07 shall survive the execution hereof.

**Section 5.08    Buyer Obligations Pursuant to CG Agreement.** Buyer covenants and agrees to ensure that after the Closing, either (x) Buyer and each person that would be an "Adviser Party" within the meaning of Schedule D immediately after the Closing is not affiliated with any "Policy Party" within the meaning of Schedule D or (y) each such person that would be such an Adviser Party immediately after the closing and that is affiliated with any such Policy Party has established or will establish procedures pursuant to a legally binding written agreement to prevent any communication prohibited by Schedule D.

**Section 5.09    Managed Companies Counsel.** Buyer expressly acknowledges that counsel who have appeared for or represented the Managed Companies prior to the execution of this Agreement shall withdraw as counsel from any existing litigation and shall be replaced by counsel of Buyer's choice or designation. The Managed Companies existing counsel shall cooperate with Buyer's designated replacement counsel in all respects, including filing any necessary pleadings or motions with the applicable court and turning over all documents, correspondence or other work product heretofore generated in connection with any such existing litigation to Buyer's designated replacement counsel; *provided* that Buyer acknowledges existing counsel may retain one copy of each such document, correspondence or work product for record keeping purposes.

## ARTICLE VI
## INDEMNIFICATION AND OTHER REMEDIES

**Section 6.01    Indemnification by Buyer.** Buyer shall defend and indemnify each Seller Releasee against, and hold each Seller Releasee harmless from, all Claims (other than Excluded Claims), including those related to Seller's ownership of the Interests or any actions or inaction by any Company, any Managed Company, any Client Fund or the SALI Fund.

**Section 6.02    Indemnification by Seller.** Seller shall have no obligations of indemnification with respect to any Claims (other than Excluded Claims), including those related to this Agreement or the transactions contemplated hereby.

**Section 6.03    Intentionally Blank**

**Section 6.04    Exclusive Remedies.** The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims for any breach of any representation,


003006    HCMLPHMIT00004210

warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this ARTICLE VI. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their affiliates arising under or based upon any law, except pursuant to the indemnification and other provisions set forth in this ARTICLE VI. Nothing in this Section 6.04 shall limit any person's right to seek and obtain any equitable relief to which such person shall be entitled or to seek any remedy on account of any fraud by any party hereto. The provisions of this Articles VI shall survive the execution hereof.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01 Expenses.** All costs and expenses incurred in connection with the preparation and negotiation of this Agreement and the transactions contemplated hereby shall be paid by Buyer at Closing.

**Section 7.02 Notices.** All notices, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid, if sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

If to Seller:

> John Honis
> 42 Regatta View Drive
> Saratoga Springs, NY 12866
> Email: jwhonis@icloud.com

with a copy (which shall not constitute notice) to:

> Sadis & Goldberg LLP
> 551 Fifth Avenue, 21st Floor
> New York, NY 10176
> Attn: Steven Huttler
> Email: SHuttler@sadis.com

If to Buyer:

> Rand Advisors Holding Corp.
> 6716 Glenhurst Dr.
> Dallas, TX 75254

003007

HCMLPHMIT00004211

Email: mpatricktax1040@gmail.com
Attention: Mark Patrick

with a copy (which shall not
constitute notice) to:

Leggett Clemons Crandall, PLLC
5700 Granite Parkway, Ste. 950
Plano, TX 75024
Email: sclemons@lcclawfirm.com
Attention: Steve H. Clemons

**Section 7.03   Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.04   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05   Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

**Section 7.06   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other parties. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.07   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.08   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

**(a)**     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware any other jurisdiction).

11

003008

HCMLPHMIT00004212

**(b)**    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**(c)**    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.08(c).

**Section 7.09   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 7.10   AS-IS, WHERE-IS.** Except as expressly set forth in this Agreement to the contrary, Buyer is expressly purchasing the Interests "AS-IS, WHERE-IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions, and defects, and Seller has no obligation to determine or correct any such facts, circumstances, conditions, or defects or to compensate Buyer for same. Except as expressly set forth in this Agreement, Seller has specifically bargained for the assumption by Buyer of all responsibility to investigate Seller, the Companies, the Client Funds, the SALI Fund, the Managed Companies and the Interests, and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof.  Except for the representations set forth in ARTICLE III, Buyer is and will be relying strictly and solely on its own inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel, and officers. Except as set forth

003009
HCMLPHMIT00004213

in ARTICLE III and otherwise in this Agreement, Buyer assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition, or defect pertaining to Seller, any Company, any Client Fund, the SALI Fund, any Managed Company or the Interests. The provisions of this <u>Section 7.10</u> shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

 **Section 7.11  Specific Performance**. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

 **Section 7.12  Privileges; Conflicts**. It is acknowledged by each of the parties hereto that the Seller has retained Sadis & Goldberg LLP ("**Sadis**") to act as their counsel in connection with the transactions contemplated hereby and that Sadis has not acted as counsel for Buyer, any Company, any Client Fund, SALI Fund, any Managed Company or any of their respective affiliates in connection with the transactions contemplated hereby and that no other party has the status of a client of Sadis for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that, in the event that a dispute arises between Buyer or any of its affiliates (including, after the Closing, the Companies) and the Seller or any of his affiliates, Sadis may represent the Seller or any such affiliate in such dispute even though the interests of the Seller or such affiliate may be directly adverse to Buyer or any of its affiliates (including, after the Closing, the Companies), and even though Sadis may have represented such Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Companies, and Buyer and the Companies hereby waive, on behalf of themselves and each of their affiliates, any claim they have or may have that Sadis has a conflict of interest in connection with, or is otherwise prohibited from engaging in, such representation. Buyer further agrees that, as to all communications among Sadis, Seller, any Company, or their respective affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong to Seller and may be controlled by Seller and shall not pass to or be claimed by Buyer, any Company or their affiliates. Buyer agrees to take, and to cause its affiliates to take, all reasonable steps necessary to implement the intent of this <u>Section 7.12</u>. Buyer and Seller further agree that Sadis and its partners and employees are third-party beneficiaries of this <u>Section 7.12</u>.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

003010
HCMLPHMIT00004214

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER**:

JOHN HONIS

**BUYER**:

RAND ADVISORS HOLDING CORP

By

Name: Mark Patrick
Title: Director

**GUARANTOR**:

CLO HOLDCO, LTD.,
a Cayman limited company

By

Name: Mark Patrick
Title: Director

14

003011
HCMLPHMIT00004215

**EXHIBIT  7**

003012

MEMBER AND MANAGER CONSENT
OF
RAND ADVISORS, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of RAND ADVISORS, LLC, a Delaware limited liability company (the "**C mpan** "), acting pursuant to the Delaware Limited Liability Company Act, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the Company;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| Name | Office |
|------|--------|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the Company but not named above is hereby removed from the office of the Company;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the Company; and

003013
HCMLPHMIT00004216

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

2

**003014**

HCMLPHMIT00004217

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

SOLE MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By:_____
          Mark Patrick, Sole Director

SOLE MANAGER

_____
Mark Patrick

*Signature Page*

003015

HCMLPHMIT00004218

# EXHIBIT

MEMBER AND MANAGER CONSENT
OF
RAND PE FUND MANAGEMENT, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of RAND PE FUND MANAGEMENT, LLC, a Delaware limited liability company (the "**General Partner**"), the general partner of RAND PE FUND I, L.P., a Delaware limited partnership (the "**Partnership**"), acting pursuant to the Delaware Limited Liability Company Act and the Amended and Restated Company Agreement of the General Partner, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the General Partner;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| **Name** | **Office** |
|---|---|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the General Partner but not named above is hereby removed from the office of the General Partner;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the General Partner and the Partnership, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the General Partner and/or the Partnership prior to the date

003017

HCMLPHMIT00004219

hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the General Partner and/or the Partnership; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the General Partner.

*[Signature Page to Follow]*

2

003018
HCMLPHMIT00004220

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____
        Mark Patrick, Sole Director

SOLE MANAGER

_____
Mark Patrick

003019

HCMLPHMIT00004221

EXHIBIT

003020

FORM ADV

# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| Primary Business Name: RAND ADVISORS, LLC | CRD Number: 172839 |
|---|---|
| Annual Amendment - All Sections | Rev. 10/2021 |
| 3/17/2025 8:51:05 AM | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

## Item 1 Identifying Information

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):
    **RAND ADVISORS, LLC**

B.  (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
    **RAND ADVISORS, LLC**

    List on *Section 1.B. of Schedule D* any additional names under which you conduct your advisory business.

    (2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

    If you check this box, complete a Schedule R for each relying adviser.

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
    ☐ your legal name or ☐ your primary business name:

D.  (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-80265**
    (2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:
    (3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

| CIK Number |
|---|
| 1660386 |
| 1660401 |

E.  (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **172839**

    If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.

    (2) If you have additional *CRD* Numbers, your additional *CRD* numbers:

    No Information Filed

F.  *Principal Office and Place of Business*
    (1) Address (do not use a P.O. Box):
    Number and Street 1:                                   Number and Street 2:
    2101 CEDAR SPRINGS ROAD                   SUITE 1200
    City:                State:                Country:                  ZIP+4/Postal Code:
    DALLAS            Texas              United States          75201

    If this address is a private residence, check this box: ☐

    List on *Section 1.F. of Schedule D* any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.

    (2) Days of week that you normally conduct business at your *principal office and place of business*:
    ⦿ Monday - Friday  ○ Other:

    Normal business hours at this location:
    9AM-5PM
    (3) Telephone number at this location:
    214-908-8130
    (4) Facsimile number at this location, if any:

HCMLPHMIT00003465

214-550-4459

(5) What is the total number of other than your principal office and place of business at which you conduct investment advisory business as of the end of your most recently completed fiscal year?

Case 19-34054-sgj11 Doc 4255-89 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Exhibit 89 Page 3 of 30

Case 3:25-cv-02724-L    Document 17-5    Filed 12/02/25    Page 494 of 1013    PageID 3404

G.  Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:                              Number and Street 2:

City:                    State:                   Country:              ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H.  If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                              Number and Street 2:

City:                    State:                   Country:              ZIP+4/Postal Code:

|  |  | **Yes** | **No** |
|---|---|---|---|

I.  Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)?          ◉  ○

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J.  Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:                                            Other titles, if any:

Telephone number:                               Facsimile number, if any:

Number and Street 1:                            Number and Street 2:

City:                    State:                  Country:              ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:

IRS Employer Identification Number:

K.  Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:                                            Titles:

Telephone number:                               Facsimile number, if any:

Number and Street 1:                            Number and Street 2:

City:                    State:                  Country:              ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

|  |  | **Yes** | **No** |
|---|---|---|---|

L.  Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?          ◉  ○

*If "yes," complete Section 1.L. of Schedule D.*

|  |  | **Yes** | **No** |
|---|---|---|---|

M.  Are you registered with a *foreign financial regulatory authority*?          ○  ◉

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

|  |  | **Yes** | **No** |
|---|---|---|---|

N.  Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?          ○  ◉

|  |  | **Yes** | **No** |
|---|---|---|---|

O.  Did you have $1 billion or more in assets on the last day of your most recent fiscal year?          ○  ◉
If yes, what is the approximate amount of your assets:

$1 billion to less than $10 billion

$10 billion to less than $50 billion

$50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P.   Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

---

**SECTION 1.B. Other Business Names**

No Information Filed

---

**SECTION 1.F. Other Offices**

No Information Filed

---

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:   HTTP://WWW.RANDADVISORS.COM/

---

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
HIGHGATE CONSULTING GROUP INC

| Number and Street 1: | | Number and Street 2: | |
| --- | --- | --- | --- |
| 2101 CEDAR SPRINGS RD | | SUITE 1200 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

Telephone Number:                     Facsimile number, if any:
214-550-4459

This is (check one):
○ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
ALL BOOKS AND RECORDS OF THE ADVISER

---

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A.   To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). *Part 1A Instruction 2* provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑   (1)   are a **large advisory firm** that either:

  (a)  has regulatory assets under management of $100 million (in U.S. dollars) or more; or

  (b)  has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐   (2)   are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

  (a)  not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

  (b)  not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

    *Click HERE for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.*

     (3)   Reserved

☐   (4)   have your *principal office and place of business* **outside the United States**;

☐   (5)   are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐   (6)   are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐   (7)   are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐   (8)   are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

    *If you check this box, complete Section 2.A.(8) of Schedule D.*

☐   (9)   are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days**;

    *If you check this box, complete Section 2.A.(9) of Schedule D.*

☐   (10)  are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

    *If you check this box, complete Section 2.A.(10) of Schedule D.*

☐   (11)  are an **Internet adviser** relying on rule 203A-2(e);

    *If you check this box, complete Section 2.A.(11) of Schedule D.*

☐   (12)  have **received an SEC order** exempting you from the prohibition against registration with the SEC;

    *If you check this box, complete Section 2.A.(12) of Schedule D.*

☐   (13)  are **no longer eligible** to remain registered with the SEC.

---

**State Securities Authority Notice Filings** and State Reporting by *Exempt Reporting Advisers*

C.   Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |

HCMLPHMIT00003468

| CA | | KY | | NM | | UT |
| CO | | | | | | |
| DE | | MD | | ND | | VA |
| DC | | MA | | OH | | WA |
| FL | | MI | | OK | | WV |
| GA | | MN | | OR | | WI |
| GU | | MS | | PA | | WY |
| HI | | MO | | PR | | |
| ID | | MT | | RI | | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

---

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

---

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

---

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

---

**SECTION 2.A.(11) Internet Adviser**

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐ I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

**SECTION 2.A.(12) SEC Exemptive Order**

If you are relying on this exemptive order, you must make certain representations and undertakings, and provide the name of the exemptive order.

Application Number:

803-

Date of *order*:

---

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A. How are you organized?

  ○ Corporation

  ○ Sole Proprietorship

  ○ Limited Liability Partnership (LLP)

  ○ Partnership

  ◉ Limited Liability Company (LLC)

  ○ Limited Partnership (LP)

  ○ Other (specify):

    *If you are changing your response to this Item, see Part 1A Instruction 4.*

B. In what month does your fiscal year end each year?
DECEMBER

C. Under the laws of what state or country are you organized?

  State    Country

  Delaware  United States

    *If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

    *If you are changing your response to this Item, see Part 1A Instruction 4.*

---

**Item 4 Successions**

                                                             **Yes No**

A. Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)?   ○ ◉

    *If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B. Date of Succession: (MM/DD/YYYY)

    *If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

---

**SECTION 4 Successions**

                              No Information Filed

---

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. *Part 1A Instruction 5.a.* provides additional guidance to newly formed advisers for completing this Item 5.

*Employees*

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

003026

HCMLPHMIT00003470

A. Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

1

B. (1) Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

1

(2) Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

0

(4) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once – do not count each of the firm's employees that solicit on your behalf.*

## Clients

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2) Approximately what percentage of your *clients* are non-*United States persons*?

0%

D. *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*

*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (1)(d) or (3)(d) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of *Client* | (1) Number of Client(s) | (2) Fewer than 5 Clients | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | 0 | ☐ | $ 0 |
| (b) *High net worth individuals* | 0 | ☐ | $ 0 |
| (c) Banking or thrift institutions | 0 | ☐ | $ 0 |
| (d) Investment companies | 0 | | $ 0 |
| (e) Business development companies | 0 | | $ 0 |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 153,660,847 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 0 | ☐ | $ 0 |
| (h) Charitable organizations | 0 | ☐ | $ 0 |
| (i) State or municipal *government entities* (including government pension plans) | 0 | ☐ | $ 0 |
| (j) Other investment advisers | 0 | ☐ | $ 0 |

HCMLPHMIT00003471

| | | | |
|---|---|---|---|
| (k) Insurance companies | 0 | ☐ | $ 0 |
| (l) Sovereign wealth funds and foreign official institutions | 0 | ☐ | $ 0 |
| (m) Corporations or other businesses not listed above | 0 | ☐ | $ 0 |
| (n) Other: | 0 | ☐ | $ 0 |

## Compensation Arrangements

E.    You are compensated for your investment advisory services by (check all that apply):

- ☑ (1)  A percentage of assets under your management
- ☐ (2)  Hourly charges
- ☐ (3)  Subscription fees (for a newsletter or periodical)
- ☐ (4)  Fixed fees (other than subscription fees)
- ☐ (5)  Commissions
- ☐ (6)  *Performance-based fees*
- ☐ (7)  Other (specify):

---

## Item 5 Information About Your Advisory Business - Regulatory Assets Under Management

### Regulatory Assets Under Management

|  |  | Yes | No |
|---|---|---|---|

F.    (1)  Do you provide continuous and regular supervisory or management services to securities portfolios?    ◉ Yes    ○ No

   (2)  If yes, what is the amount of your regulatory assets under management and total number of accounts?

| | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|
| Discretionary: | (a) $ 153,660,847 | (d) | 80 |
| Non-Discretionary: | (b) $ 0 | (e) | 0 |
| Total: | (c) $ 153,660,847 | (f) | 80 |

   *Part 1A Instruction 5.b.* explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.

   (3)  What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

   $ 0

---

## Item 5 Information About Your Advisory Business - Advisory Activities

### Advisory Activities

G.    What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1)  Financial planning services
- ☐ (2)  Portfolio management for individuals and/or small businesses
- ☐ (3)  Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☑ (4)  Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5)  Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐ (6)  Pension consulting services
- ☐ (7)  Selection of other advisers (including *private fund* managers)
- ☐ (8)  Publication of periodicals or newsletters
- ☐ (9)  Security ratings or pricing services
- ☐ (10)  Market timing services
- ☐ (11)  Educational seminars/workshops
- ☐ (12)  Other(specify):

   Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in *Section 5.G.(3) of Schedule D*.

H.    If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○  0
- ○  1 - 10
- ○  11 - 25
- ○  26 - 50
- ○  51 - 100
- ○  101 - 250
- ○  251 - 500
- ○  More than 500
      If more than 500, how many?
      (round to the nearest 500)

*In your response to this Item 5.I. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

|  |  | Yes | No |
|---|---|---|---|
| I. | (1) Do you participate in a *wrap fee program*? | ○ | ● |

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

    (a) *sponsor* to a *wrap fee program*
       $

    (b) portfolio manager for a *wrap fee program*?
       $

    (c) *sponsor* to and portfolio manager for the same *wrap fee program*?
       $

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

|  |  | Yes | No |
|---|---|---|---|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ● |
|  | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ● |

**K.** Separately Managed Account *Clients*

|  | Yes | No |
|---|---|---|
| (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ● |

*If yes, complete Section 5.K.(1) of Schedule D.*

| (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ● |

*If yes, complete Section 5.K.(2) of Schedule D.*

| (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ● |

*If yes, complete Section 5.K.(2) of Schedule D.*

| (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ● |

*If yes, complete Section 5.K.(3) of Schedule D for each custodian.*

**L.** Marketing Activities

|  | Yes | No |
|---|---|---|
| (1) Do any of your *advertisements* include: |  |  |
|   (a) Performance results? | ○ | ● |
|   (b) A reference to specific investment advice provided by you (as that phrase is used in rule 206(4)-1(a)(5))? | ○ | ● |
|   (c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ● |
|   (d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ● |
|   (e) *Third-party ratings*? | ○ | ● |
| (2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash or non-cash compensation, directly or indirectly, in connection with the use of *testimonials*, *endorsements*, or *third-party ratings*? | ○ | ○ |
| (3) Do any of your *advertisements* include *hypothetical performance*? | ○ | ● |

HCMLPHMIT00003473

| SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies |
|---|
| No Information Filed |

| SECTION 5.I.(2) *Wrap Fee Programs* |
|---|
| No Information Filed |

**SECTION 5.K.(1) Separately Managed Accounts**

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | Mid-year | End of year |
|---|---|---|
| (i)    Exchange-Traded Equity Securities | % | % |
| (ii)   Non Exchange-Traded Equity Securities | % | % |
| (iii)  U.S. Government/Agency Bonds | % | % |
| (iv)   U.S. State and Local Bonds | % | % |
| (v)    *Sovereign Bonds* | % | % |
| (vi)   Investment Grade Corporate Bonds | % | % |
| (vii)  Non-Investment Grade Corporate Bonds | % | % |
| (viii) Derivatives | % | % |
| (ix)   Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x)    Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi)   Cash and Cash Equivalents | % | % |
| (xii)  Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | End of year |
|---|---|
| (i)    Exchange-Traded Equity Securities | % |
| (ii)   Non Exchange-Traded Equity Securities | % |
| (iii)  U.S. Government/Agency Bonds | % |
| (iv)   U.S. State and Local Bonds | % |
| (v)    *Sovereign Bonds* | % |
| (vi)   Investment Grade Corporate Bonds | % |
| (vii)  Non-Investment Grade Corporate Bonds | % |
| (viii) Derivatives | % |
| (ix)   Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x)    Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development | % |

003030

| | | |
|---|---|---|
| Companies) | | |
| (xi) Cash and Cash Equivalents | Case 19-34054-sgj11    Doc 4255-89    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc | % |
| (xii) Case 3:25-cv-02724-L | Exhibit 89    Page 12 of 30<br>Document 17-5    Filed 12/02/25    Page 503 of 1013    PageID 3413 | |

Generally describe any assets included in "Other"

---

**SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings* and Derivatives**

☑ No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a)  In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| Less than 10% | $ | $ | % | % | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| Less than 10% | $ | $ | % | % | % | % | % | % |
| 10-149% | $ | $ | % | % | % | % | % | % |
| 150% or more | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b)  In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.


HCMLPHMIT00003475

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any borrowings and (b) the gross notional value of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| Less than 10% | $ | $ |
| 10-149% | $ | $ |
| 150% or more | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

---

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

---

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A.  You are actively engaged in business as a (check all that apply):
☐ (1)   broker-dealer (registered or unregistered)
☐ (2)   registered representative of a broker-dealer
☐ (3)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (4)   futures commission merchant
☐ (5)   real estate broker, dealer, or agent
☐ (6)   insurance broker or agent
☐ (7)   bank (including a separately identifiable department or division of a bank)
☐ (8)   trust company
☐ (9)   registered municipal advisor
☐ (10)  registered security-based swap dealer
☐ (11)  major security-based swap participant
☐ (12)  accountant or accounting firm
☐ (13)  lawyer or law firm
☐ (14)  other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|
| B. (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ● |
| (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

|  |  | Yes | No |
|---|---|---|---|
| (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ● |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

---

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

HCMLPHMIT00003476

**SECTION 6.B.(3) Description of Other Products and Services**  Exhibit 89 , Page 14 of 30

Describe other products or services you sell to your *clients*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

---

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A.   This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1)   broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☐ (2)   other investment adviser (including financial planners)
- ☐ (3)   registered municipal advisor
- ☐ (4)   registered security-based swap dealer
- ☐ (5)   major security-based swap participant
- ☐ (6)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7)   futures commission merchant
- ☐ (8)   banking or thrift institution
- ☐ (9)   trust company
- ☐ (10)  accountant or accounting firm
- ☐ (11)  lawyer or law firm
- ☐ (12)  insurance company or agency
- ☐ (13)  pension consultant
- ☐ (14)  real estate broker or dealer
- ☐ (15)  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☐ (16)  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

---

**SECTION 7.A. Financial Industry Affiliations**

No Information Filed

---

**Item 7 *Private Fund* Reporting**

**Yes**  **No**

B.  Are you an adviser to any *private fund*?                                                           ◉    ○

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

003033

HCMLPHMIT00003477


Funds per Page:   15   Total Funds: 2

---

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a)  Name of the *private fund*:

 ATLAS IDF, LP

 (b)  *Private fund* identification number:

 (include the "805-" prefix also)

 805-9274628204

2.  Under the laws of what state or country is the *private fund* organized:

 State:  Country:

 Delaware  United States

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| ATLAS IDF GP, LLC |

 (b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
|---|

4.  The *private fund* (check all that apply: you must check at least one):

 ☐  (1)  qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

 ☑  (2)  qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
|---|

 **Yes  No**

6.  (a)  Is this a "master fund" in a master-feeder arrangement?  ○  ◉

 (b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
|---|

 **Yes  No**

 (c)  Is this a "feeder fund" in a master-feeder arrangement?  ○  ◉

 (d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

 Name of *private fund*:

 *Private fund* identification number:

 (include the "805-" prefix also)

 NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
|---|

 NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

8.   (a)  Is this *private fund* a "fund of funds"?      Yes ○   No ○

NOTE: In answering this question, disregard *private funds* and registered investment companies, and count private funds and other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

   (b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?    Yes ○   No ○

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?     Yes ○   No ◉

10.  What type of fund is the *private fund*?

   ○ hedge fund   ○ liquidity fund   ◉ private equity fund   ○ real estate fund   ○ securitized asset fund   ○ venture capital fund   ○ Other *private fund*:

   NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:

   $ 29,902,788

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:

   $ 500,000

   NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:

   2

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

   0%

15.  (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

   0%

   (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?    Yes ○   No ○

16.  What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

   100%

**Your Advisory Services**

17.  (a)  Are you a subadviser to this *private fund*?    Yes ○   No ◉

   (b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

18.  (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?    Yes ○   No ◉

   (b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

19.  Are your *clients* solicited to invest in the *private fund*?    Yes ○   No ◉

   *NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20.  Approximately what percentage of your *clients* has invested in the *private fund*?

   0%

**Private Offering**

   Yes   No

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?

Case 19-34054-sgj11   Doc 4255-89   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Exhibit 89   Page 17 of 30

22. If you checked "yes" to Form D question immediately above:

Case 3:25-cv-02724-L   Document 1-5   Filed 12/02/25   Page 508 of 1013   PageID 3418

| No Information Filed |
|---|

**B. SERVICE PROVIDERS**

<u>Auditors</u>

|  | Yes | No |
|---|---|---|

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
COHEN & CO.

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

|  | Yes | No |
|---|---|---|

(d) Is the auditing firm an *independent public accountant*?

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?

If yes, Public Company Accounting Oversight Board-Assigned Number:
925

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?

|  | Yes | No |
|---|---|---|

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

○ Yes  ○ No  ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

<u>Prime Broker</u>

|  | Yes | No |
|---|---|---|

24. (a) Does the *private fund* use one or more prime brokers?

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|---|

<u>Custodian</u>

|  | Yes | No |
|---|---|---|

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
US BANK

(c) Primary business name of custodian:
US BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(e) Is the custodian a *related person* of your firm?    Yes ○  No ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

26. (a) Does the *private fund* use an administrator other than your firm?    Yes ◉  No ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(d) Is the administrator a *related person* of your firm?    Yes ○  No ◉

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors)   ○ Some (provided to some but not all investors)   ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?    Yes ○  No ○

HCMLPHMIT00003481

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund*
Case 19-34054-sgj11   Doc 4255-89   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Exhibit 89   Page 19 of 30
uses. If you engage in more than one of these capacities (b) through (g), you must complete a separate Schedule D, Section 7.B.(1) for each such

| No Information Filed |
|---|

---

## A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
   RAND PE FUND I, L.P.

   (b) *Private fund* identification number:
   (include the "805-" prefix also)
   805-7357834832

2. Under the laws of what state or country is the *private fund* organized:

   | State: | Country: |
   |---|---|
   | Delaware | United States |

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

   | Name of General Partner, Manager, Trustee, or Director |
   |---|
   | RAND PE FUND MANAGEMENT, LLC |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

   | No Information Filed |
   |---|

4. The *private fund* (check all that apply: you must check at least one):
   - ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   - ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

   | No Information Filed |
   |---|

                                                                                                    **Yes  No**
6. (a) Is this a "master fund" in a master-feeder arrangement?                                        ○    ◉

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

   | No Information Filed |
   |---|

                                                                                                    **Yes  No**
   (c) Is this a "feeder fund" in a master-feeder arrangement?                                        ○    ◉

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
   Name of *private fund*:

   *Private fund* identification number:
   (include the "805-" prefix also)

   NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

   | No Information Filed |
   |---|

   NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their

003038
HCMLPHMIT00003482

assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares, interests, or units, each of which invests substantially all of its assets in a single master fund.

Case 3:25-cv-02724-L    Document 17-5    Filed 12/02/25    Page 511 of 1013    PageID 3421

Exhibit 89    Page 20 of 30

Case 3:25-cv-04054-sgj11    Doc 255-89    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 89    Page 20 of 30

|  |  | Yes | No |
|---|---|---|---|
| 8. | (a)  Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?     ○   ○

| | | Yes | No |
|---|---|---|---|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
$ 0

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
$ 500,000
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
3

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
0%

15. (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
0%

|  |  | Yes | No |
|---|---|---|---|
|  | (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ● | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
100%

**Your Advisory Services**

|  |  | Yes | No |
|---|---|---|---|
| 17. | (a)  Are you a subadviser to this *private fund*? | ○ | ● |

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  |  | Yes | No |
|---|---|---|---|
| 18. | (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  |  | Yes | No |
|---|---|---|---|
| 19. | Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*?
0%

HCMLPHMIT00003483

|  | Yes | No |
|--|-----|-----|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? |  | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|----------------------|

## B. SERVICE PROVIDERS

### Auditors

|  | Yes | No |
|--|-----|-----|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
COHEN & CO

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|-------|--------|----------|
| AKRON | Ohio | United States |

|  | Yes | No |
|--|-----|-----|
| (d) Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:
925

|  | Yes | No |
|--|-----|-----|
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

|  | Yes | No |
|--|-----|-----|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes   ○ No   ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

### Prime Broker

|  | Yes | No |
|--|-----|-----|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ○ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|----------------------|

### Custodian

|  | Yes | No |
|--|-----|-----|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(c)  Primary business name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

|  |  | Yes | No |
|---|---|---|---|
| (e)  Is the custodian a *related person* of your firm? |  | ○ | ◉ |

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 69862
CRD Number (if any):
285852

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

---

**Administrator**

|  | Yes | No |
|---|---|---|
| 26.  (a)  Does the *private fund* use an administrator other than your firm? | ◉ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b)  Name of administrator:

HIGHGATE CONSULTING GROUP INC

(c)  Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

|  | Yes | No |
|---|---|---|
| (d)  Is the administrator a *related person* of your firm? | ○ | ◉ |

(e)  Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors)   ○ Some (provided to some but not all investors)   ○ No (provided to no investors)

(f)  If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

---

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

28. (a)  Does the *private fund* use the services of someone other than you or your employees for marketing purposes?   ○ Yes ● No

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or sales solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

**Funds per Page:** 15 ▾ **Total Funds: 2**

---

**SECTION 7.B.(2)** *Private Fund* Reporting

1. Name of the *private fund*:

   RAND ADVISORS SERIES I INSURANCE FUND SERIES INTERESTS OF THE SALI MULTISERIES

2. *Private fund* identification number:
   (include the "805-" prefix also)

   805-9425927696

3. Name and SEC File number of adviser that provides information about this *private fund* in Section 7.B.(1) of Schedule D of its Form ADV filing
   Name:

   SALI FUND SERVICES

   SEC File Number:

   801 - 61702

4. Are your *clients* solicited to invest in this *private fund*?   ○ Yes ● No

   In answering this question, disregard feeder funds' investment in a master fund. For purposes of this question, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

---

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients'* transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

|   |   | Yes | No |
|---|---|---|---|
| A. Do you or any *related person*: | | | |
| (1) buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | | ○ | ● |
| (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | | ● | ○ |
| (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | | ● | ○ |

**Sales Interest in *Client* Transactions**

|   |   | Yes | No |
|---|---|---|---|
| B. Do you or any *related person*: | | | |
| (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | | ○ | ● |
| (2) recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? | | ● | ○ |
| (3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | | ○ | ● |

**Investment or Brokerage Discretion**

|   |   | Yes | No |
|---|---|---|---|
| C. Do you or any *related person* have *discretionary authority* to determine the: | | | |
| (1) securities to be bought or sold for a *client's* account? | | ● | ○ |

(2) amount of securities to be bought or sold for a *client's* account?  ⊙ ○

(3) broker or dealer to be used for a purchase or sale of securities for a *client's* account?  ⊙ ○

(4) commission rates to be paid to a broker or dealer for a *client's* securities transactions?  ⊙ ○

D. If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*?  ○ ⊙

E. Do you or any *related person* recommend brokers or dealers to *clients*?  ⊙ ○

F. If you answer "yes" to E. above, are any of the brokers or dealers *related persons*?  ○ ⊙

G. (1) Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions?  ⊙ ○

(2) If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934?  ⊙ ○

H. (1) Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals?  ○ ⊙

(2) Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)?  ○ ⊙

I. Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals?  ○ ⊙

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

---

## Item 9 Custody

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

**Yes  No**

A. (1) Do you have *custody* of any advisory *clients':*

(a) cash or bank accounts?  ⊙ ○

(b) securities?  ⊙ ○

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody:*

U.S. Dollar Amount          Total Number of *Clients*
(a) $ 153,649,022            (b) 3

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

**Yes  No**

B. (1) In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients':*

(a) cash or bank accounts?  ○ ⊙

(b) securities?  ○ ⊙

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody:*

U.S. Dollar Amount          Total Number of *Clients*
(a) $                        (b)

C. If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

(1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage.  ☐

(2) An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited fin...  ☑

000303...
HCMLPHMIT00003487

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities.

(4) are distributed to the investors in the pools.

(4) An *independent public accountant* prepares an internal control report with respect to *custodians* that are related *persons* of you or your *related persons* and are qualified custodians for *client* funds and securities.

*If you checked Item 9.C.(2), C.(3) or C.(4), list in* Section 9.C. of Schedule D *the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in* Section 9.C. of Schedule D *if you already provided this information with respect to the private funds you advise in* Section 7.B.(1) of Schedule D).

D. Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?  **Yes No**

(1) you act as a qualified custodian  ○ ⦿

(2) your *related person(s)* act as qualified custodian(s)  ○ ⦿

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in* Section 7.A. of Schedule D, *regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons*, act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?
2

---

**SECTION 9.C. *Independent Public Accountant***

No Information Filed

---

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

**Yes No**

A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies?  ○ ⦿

*If yes, complete* Section 10.A. of Schedule D.

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

---

**SECTION 10.A. *Control Persons***

No Information Filed

---

**SECTION 10.B. *Control Person* Public Reporting Companies**

No Information Filed

---

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you.

If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

If you are registered or registering with the SEC or if you are an *exempt reporting adviser*, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a *state*, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

|  | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ● |

**For "yes" answers to the following questions, complete a Criminal Action DRP:**

|  | Yes | No |
|---|---|---|
| A.   In the past ten years, have you or any *advisory affiliate*: | | |
| (1)  been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ● |
| (2)  been *charged* with any *felony*? | ○ | ● |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

|  | Yes | No |
|---|---|---|
| B.   In the past ten years, have you or any *advisory affiliate*: | | |
| (1)  been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ● |
| (2)  been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ● |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

**For "yes" answers to the following questions, complete a Regulatory Action DRP:**

|  | Yes | No |
|---|---|---|
| C.   Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | |
| (1)  *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ● |
| (2)  *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ● |
| (3)  *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ● |
| (4)  entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ● |
| (5)  imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ● |
| D.   Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
| (1)  ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ● |
| (2)  ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ● |
| (3)  ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ● |
| (4)  in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ● |
| (5)  ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ● |
| E.   Has any *self-regulatory organization* or commodities exchange ever: | | |
| (1)  *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ● |
| (2)  *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? | ○ | ● |
| (3)  *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ● |
| (4)  disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? | ○ | ● |
| F.   Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? | ○ | ● |
| G.   Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? | ○ | ● |

**For "yes" answers to the following questions, complete a Civil Judicial Action DRP:**

|  | Yes | No |
|---|---|---|
| H.   (1)  Has any domestic or foreign court: | | |

HCMLPHMIT00003489

| | | Yes | No |
|---|---|---|---|
| (a) | in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? | ○ | ● |
| (b) | ever *found* that you or any *advisory affiliate* were involved in a violation of *investment-related* statutes or regulations? | ○ | ● |
| (c) | ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted by a state or *foreign financial regulatory authority*? | ○ | ● |
| (2) | Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? | ○ | ● |

---

**Item 12 Small Businesses**

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

| | | Yes | No |
|---|---|---|---|
| A. | Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |

*If "yes," you do not need to answer Items 12.B. and 12.C.*

| | | | Yes | No |
|---|---|---|---|---|
| B. | Do you: | | | |
| | (1) | *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| | (2) | *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| C. | Are you: | | | |
| | (1) | *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| | (2) | *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

---

**Schedule A**

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;
   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and
   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.
3. Do you have any indirect owners to be reported on Schedule B?  ● Yes  ○ No
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.
5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are:     NA - less than 5%          B - 10% but less than 25%     D - 50% but less than 75%
                                              A - 5% but less than 10%     C - 25% but less than 50%     E - 75% or more
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| CHARITABLE DAF HOLDINGS CORP. | DE | OWNER | 08/2022 | E | Y | N | |
| Patrick, Mark | I | CCO | 08/2022 | NA | Y | N | 7626259 |

## Schedule B

### Indirect Owners

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:   C - 25% but less than 50%      E - 75% or more
                          D - 50% but less than 75%      F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| LIBERTY CLO HOLDCO, LTD. | FE | CHARITABLE DAF HOLDINGS CORP. | OWNER OF CHARITABLE DAF HOLDINGS CORP. | 04/2023 | E | Y | N | |
| CHARITABLE DAF HOLDCO LTD. | FE | LIBERTY CLO HOLDCO, LTD. | OWNER OF CHARITABLE DAF FUND, L.P. | 11/2011 | E | Y | N | |
| CDH GP, LTD | DE | LIBERTY CLO HOLDCO, LTD. | GNEREAL PARTNER OF CHARITABLE DAF FUND, L.P | 03/2024 | F | Y | N | |
| Patrick, Mark | I | CDH GP, LTD | SOLE OWNER AND SOLE DIRECTOR OF CDH GP, LTD. | 03/2024 | E | Y | N | 7626259 |

## Schedule D - Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

## Schedule R

No Information Filed

## DRP Pages

HCMLPHMIT00003491

CRIMINAL DISCLOSURE REPORTING PAGE (ADV)

No Information Filed

---

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients. If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

Are you exempt from delivering a brochure to all of your clients under these rules?                    Yes  No
                                                                                                        ○   ⦿

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 400181 | ADV PART 2A | Private funds or pools |
| 409351 | ADV PART 2 | Private funds or pools |

---

**Part 3**

| CRS | Type(s) | Affiliate Info | Retire |
|---|---|---|---|

There are no CRS filings to display.

---

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature: | Date: MM/DD/YYYY |
| SHAWN RAVER | 03/17/2025 |
| Printed Name: | Title: |
| SHAWN RAVER | OPERATIONS |

003048

HCMLPHMIT00003492

**NON-RESIDENT INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

## 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

## 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                          Date: MM/DD/YYYY

Printed Name:                                       Title:

Adviser *CRD* Number:
172839

003049

HCMLPHMIT00003493

**EXHIBIT**

**SIGNATURE PAGE**

This page constitutes the signature page for the Subscription Agreement, the Prospective Investor Questionnaire and the Partnership Agreement, and execution of this signature page constitutes execution of each.

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement, the Prospective Investor Questionnaire and the Partnership Agreement this *21* day of *December*, 20*15*.

$ *7,000,000*
Capital Contribution

Series *1*

**For Individuals:**

_____
Name of Prospective Investor (print or type)

_____
(Signature)

_____
Name of Joint Prospective Investor (print or type)
(if applicable)

_____
(Joint Signature, if applicable)

**For Entities:**

*Atlas IDF LP*
Name of Prospective Investor (print or type)

By: _____
(Signature)

Name: *Don Honis*

Title: *Managing Member of GP*

_____
(Name and Initials of IRA custodian, if applicable)

$ *7,000,000*
Capital Contribution Accepted
Series *1*

Accepted and Agreed, as of *Dec 21*, 20*15*:

**RAND PE FUND I, L.P.**
By:  Rand PE Fund Management, LLC, as its general partner
(acting severally in the name of and for the account of each individual Series)

By: _____
Name: John Honis
Title: Managing Member

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

Give Form to the
requester. Do not
send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

_Atlas IDF LP_

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☒ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

(Applies to accounts maintained outside the U.S.)

**5** Address (number, street, and apt. or suite no.)

_87 Railroad Place - Suite 403_

**6** City, state, and ZIP code

_Saratoga Springs, NY 12866_

Requester's name and address (optional)

**7** List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see _How to get a TIN_ on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

or

Employer identification number

| 4 | 7 | – | 5 | 4 | 5 | 5 | 3 | 4 | 3 |

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**   Signature of U.S. person ▶   Date ▶ _12/21/15_

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at _www.irs.gov/fw9_.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

_If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding._ See _What is backup withholding?_ on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See _What is FATCA reporting?_ on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

003052

## PART I – SUBSCRIBER INFORMATION PAGE

Subscriber Name: _____    Joint Subscriber Name (if necessary): _____

-or-

Entity Name: _At/as  IDF, LP_

Subscriber Social Security/Tax ID No.:    Joint Subscriber Social Security/Tax ID No. (if necessary):
_42-5455343_    _____

Subscriber Date of Birth/Date of Incorporation or Formation:    Joint Subscriber Date of Birth/Date of Incorporation or
_Oct  2015_    Formation (if necessary): _____

State, or if not in the U.S., Country in which the Subscription
Agreement was signed: _New York_

Residence (for individuals) or Principal Place of Business (for
entities) (May not be a P.O. Box):

Address: _87 Railroad Place_    Telephone: _714-335-7969_
_Suite 403_    Facsimile: _____

City: _Saratoga_    State: _NY_   Zip: _12866_   Email: _jhonie@randadvisors.com_
Country: _US_

**Mailing Address (if other than above)**

Address: _____    Telephone: _____

_____    Facsimile: _____

City: _____   State: _____   Zip: _____   Email: _____

Country: _____

### Subscriber Type:

☐ Individual          ☐ Joint Tenants with Right of      ☐ Trust      ☒ Partnership      ☐ Corporation      ☐ LLC
                         Survivorship

☐ IRA (Self-directed)   ☐ IRA (Custodian)        ☐ Tenants in Common       ☐ Other: _____

                         If through a custodian, please
                         provide details:

                         _____

☐ Community Property (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington or Wisconsin).
**PLEASE NOTE: if you are married and live in a community property state, both you and your spouse must sign the
Signature Page to the Subscription Agreement.**

### Series of Interests:

Please indicate which Series of Interests you are subscribing for:

☒  Series 1 Interests

*Prior to selecting a Series of Interests, Subscribers are advised to review the detailed descriptions of the rights and
obligations applicable to such Series of Interests, which are set forth in the Memorandum (and/or a supplement to any such
document), the Partnership Agreement and/or this Agreement.*

### Form PF Investor Type:

003053

Under the reporting requirements on Form PF (Reporting Form for Investment Advisers to Private Funds and Certain Commodity Pool Operators and Commodity Trading Advisors), a reporting entity must organize its investors by certain specified investor groups set forth in Form PF.  Accordingly, please check below the investor type that best describes the Subscriber.  (*If the Subscriber is acting as trustee, agent, representative or nominee for a beneficial owner, please check the item that best describes the beneficial owner.*)

**Please check one**:

☐  Individual that is a United States person[4] (or a trust of such a person)
☐  Individual that is not a United States person (or a trust of such a person)
☐  Broker-dealer
☐  Insurance company
☐  Investment company registered with the SEC
☒  Private fund[5]
☐  Non-profit
☐  Pension plan (other than a governmental pension plan)
☐  Banking or thrift institution (proprietary)
☐  State or municipal government entity (other than a governmental pension plan)
☐  State or municipal government pension plan
☐  Sovereign wealth fund or foreign official institution
☐  Investor that is not a United States person and about which the foregoing beneficial ownership information is not known and cannot reasonably be obtained because the beneficial interest is held through a chain involving one or more third-party intermediaries
☐  Other (*please specify*): _____

**Payment Information:**

Please insert your payment information.  Please note **you must wire the payment from an account in your name**.

Bank Name: _BBVA Compas_          Swift Code*: _____
Bank ABA#: _062001186_             For Further Credit to: _____
City/State/Country: _Dallas, TX_   Account Name: _____
Account Name: _Atlas IDF, LP_      Account #: _____
Account #: _6733738776_

*       Required for U.S. dollar wire transfer to non-U.S. banks.  Please contact your bank for more information.

**Was the Subscriber referred to the Partnership by a placement agent?**

☐ Yes          ☒ No

If yes, please provide the name of placement agent: _____

**COMMUNICATIONS TO SUBSCRIBER:**

**Please send all communications to (please check one):**

☒     Residence or Principal Place of Business

_____

[4] For purposes of Form PF, the term "United States person" has the meaning provided in Rule 203(m)-1 under the Advisers Act, which includes any natural person that is resident in the United States.
[5] For purposes of Form PF, the term "private fund" means any issuer that would be an investment company as defined in Section 3 of the Investment Company Act, but for Section 3(c)(1) or 3(c)(7) thereof.

003054

☒ Mailing Address

**Duplicate communications should be sent to an authorized representative as follows (complete if desired; otherwise, leave blank):**

Name: _____

Address: _____

_____

_____

Facsimile: _____

Email: _____

**Preferred Methods of Communication**: Choose **one** for the Subscriber and **one** for the authorized representative whose address appears immediately above, if any; **Note**: each of the Partnership, the Administrator, the Investment Manager, and the General Partner is permitted to send notices and other information relating to the Subscriber's investment in the Partnership in any manner it chooses but will send notices and other information by the method selected below if possible and may charge a related fee to the Subscriber in connection therewith.

|  | Mail | Facsimile | Email/Web-based Delivery |
|---|---|---|---|
| Subscriber | ☐ | ☐ | ☒ |
| Authorized Representative | ☐ | ☐ | ☐ |

**Electronic Delivery of Reports and Other Communications:**

If you elected "Email/Web-based Delivery" above, at their discretion, the Partnership, the Administrator, the Investment Manager and/or the General Partner may provide to you (or your authorized representative) statements, reports and other communications relating to the Partnership and/or your investment in the Partnership in electronic form, such as email.

Do you consent to the sending of such statements, reports and other communications regarding the Partnership and your investment in the Partnership (including Net Asset Value information, subscription and withdrawal activity, and annual and other updates of the Partnership's consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies?

☒ Yes          ☐ No

By consenting you also acknowledge that emails from the Partnership, the Administrator, the Investment Manager and/or the General Partner may be accessed by recipients other than you and may be interfered with, may contain computer viruses or other defects and may not be successfully replicated on other systems. The Partnership, the Administrator, the Investment Manager and the General Partner each give no warranties in relation to these matters. If you have any doubts about the authenticity of an email purportedly sent by the Partnership, the Administrator, the Investment Manager and/or the General Partner, please contact the purported sender immediately.

**Schedule K-1s:**

The annual Schedule K-1 statement will be sent to the Subscriber in physical form unless the Subscriber consents below to receive it electronically. Does the Subscriber grant permission for the annual Schedule K-1 to be sent electronically?

☒ Yes          ☐ No

Please note that this choice will apply until the Subscriber informs the Administrator that it is electing to alter such permission, which the Subscriber is able to do at any time by contacting the Administrator and in such contact specifying the effective date of the new election. The Administrator will confirm the receipt of the Subscriber's

003055

change in election and will specify the date on which such change will take effect. If the Subscriber has chosen to receive the Schedule K-1 electronically, a paper copy can be obtained by contacting the Administrator, and such a request will NOT alter the election noted above. The Schedule K-1s will only be sent for those periods for which the Subscriber was an investor in the Partnership. Subscribers should note that the electronic versions of the Schedule K-1 will be sent as Microsoft Word documents or .pdf files and that the Schedule K-1 may be required to be printed by the Subscriber for the purpose of attaching it to the Subscriber's federal, state and/or local income tax returns, if required by applicable law.

**Compliance with the PATRIOT Act:**

To comply with applicable anti-money laundering/OFAC rules and regulations, you and/or the institution remitting payment are required to provide the following payment information:

1.    Name of the bank from which your payment to the Partnership is being wired (the "**Wiring Bank**")?

_BBVA Compass_

2.    Is the Wiring Bank located in the United States or another "**FATF Member**"[6]?

[X] Yes        ☐  No

If **yes**, please answer question 3 below.

If **no**, please provide the information described in Footnote 7 below and contact the Administrator.[7]

3.    Are you a customer of the Wiring Bank?

_Yes_

[6] As of November 1, 2015, members of the Financial Action Task Force on Money Laundering (each, an "**FATF Member**") include: Argentina; Australia; Austria; Belgium; Brazil; Canada; China; Denmark; the European Commission; Finland; France; Germany; Greece; the Gulf Co-operation Council; Hong Kong; China; Iceland; India; Ireland; Italy; Japan; the Kingdom of the Netherlands (including the Netherlands, Aruba, Curaçao and Saint Maarten); Luxembourg; Mexico; New Zealand; Norway; Portugal; the Republic of Korea; the Russian Federation; Singapore; South Africa; Spain; Sweden; Switzerland; Turkey; the United Kingdom; and the United States. This list may be expanded, from time to time, to include future FATF Members and FATF-compliant countries, as appropriate.

[7] Subscribers who responded "no" to question 2 or 3 of "Compliance with the PATRIOT Act" above must provide the following additional information and materials to the Administrator, and contact the Administrator to obtain further anti-money laundering schedules:

For Individual Investors: (i) a government-issued form of picture identification (e.g., passport or driver's license); and (ii) proof of the individual's current address (e.g., current utility bill), if not included in the form of picture identification.

For Funds-of-Funds or Entities that Invest on Behalf of Third Parties Not Located in the United States or Other FATF Members: (i) a certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (e.g., certificate of good standing); (ii) an incumbency certificate attesting to the title of the individual executing the Subscription Agreement on behalf of the prospective Subscriber; (iii) a completed form certifying that the entity has adequate anti-money laundering policies and procedures in place that are consistent with the PATRIOT Act, OFAC and other relevant federal, state or foreign anti-money laundering laws and regulations; and (iv) a letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in the United States or other FATF Member certifying that the prospective Subscriber (i.e., the fund-of-funds or the entity investing on behalf of third parties) has maintained an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective Subscriber's integrity.

For All Other Entity Subscribers: (i) a certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (e.g., certificate of good standing); (ii) an incumbency certificate attesting to the title of the individual executing the Subscription Agreement on behalf of the prospective Subscriber; (iii) a letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in the United States or other FATF Member certifying that the prospective Subscriber has maintained an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective Subscriber's integrity; (iv) if the prospective Subscriber is a privately-held entity, a completed form listing the name of each person who directly, or indirectly through intermediaries, is the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the prospective Subscriber; and (v) if the prospective Subscriber is a trust, a list of current beneficiaries of the trust that have, directly or indirectly, 25% or more of any interest in the trust, the settlors or grantors of the trust, and the trustees.

003056

☒ Yes          ☐ No

If **yes**, the information described in Footnote 7 below is not required.

If **no**, please provide the information described in Footnote 7 below and contact the Administrator.

003057

---

## PART III – TO BE COMPLETED BY IRAS (OTHER THAN SELF-DIRECTED IRAS), KEOGHS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, TRUSTS AND OTHER ENTITIES

**A.    General Information**

6.    Is the Subscriber subscribing for an Interest as agent, nominee, trustee or otherwise on behalf of, for the account of or jointly with any other person or entity?

☐ Yes        ☒ No

7.    Will any other person or persons have a beneficial interest in the Interest acquired (other than as a shareholder, partner, member, trust beneficiary or other beneficial owner of equity interests in the Subscriber)?

☐ Yes        ☒ No

8.    Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Partnership?

☐ Yes        ☒ No

*PLEASE NOTE: If any of the above questions were answered "Yes", please provide identifying information or contact the Administrator.*

9.    Legal form of the Subscriber: _____ *LP* _____

10.    U.S. state or foreign jurisdiction in which the Subscriber was incorporated or formed: _____ *Delaware* _____

11.    Date of incorporation or formation of the Subscriber: _____ *Oct 2015* _____

12.    Is the Subscriber in any way affiliated with the General Partner or the Partnership?

☒ Yes        ☐ No

If yes, please describe the relationship below.

*Fund managed by the same General Partner as the Partnership*

13.    Is the Subscriber in any way affiliated with a senior foreign government, political or military official, or an immediate family member or close associate of such person (a *"politically exposed person"*)?

☐ Yes        ☒ No

If yes,    (a)    which government? _____

(b)    what position in the government? _____

(c)    if an immediate family member or close associate of a politically exposed person, what relationship to the politically exposed person? _____

14.    Authorized individual who is executing the Subscription Agreement on behalf of the investing entity is:

Name: _____ *John Honis* _____        *Partner*

Current position or title: _____ *Managing member of the General Partnership* _____

Telephone number: _____ *214-335-7969* _____

003058

Facsimile number: _____

Email: _JHONIO@RANDADVISORS.COM_____

**B.**     *Subscriber Qualification*

1.     **Accredited Investor.** Interests will be sold only to investors who are "*accredited investors*" (as defined in Rule 501 of Regulation D promulgated under the Securities Act). Please indicate the basis of "*accredited investor*" status of the Subscriber by checking the applicable statement or statements.

    ☒ The Subscriber has total assets in excess of $5,000,000, was not formed for the purpose of investing in the Partnership and is one of the following:
- a corporation
- a partnership
- a limited liability company
- a business trust
- a tax-exempt organization described in Section 501(c)(3) of the Code.

    ☐ The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 which was not formed for the purpose of investing in the Partnership and whose decision to invest in the Partnership has been directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the investment.

    ☐ The Subscriber is licensed, or subject to supervision, by U.S. federal or state examining authorities as a "*bank*", "*savings and loan association*", "*insurance company*", or "*small business investment company*" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

    ☐ The Subscriber is registered with the SEC as a broker or dealer or an investment company, or has elected to be treated or qualifies as a "*business development company*" (within the meaning of Section 2(a)(48) of the Investment Company Act or Section 202(a)(22) of the Advisers Act).

    ☐ The Subscriber is an employee benefit plan within the meaning of ERISA (including an IRA), which satisfies at least one of the following conditions:

        ___ it has total assets in excess of $5,000,000; or

        ___ the investment decision is being made by a plan fiduciary which is a bank, savings and loan association, insurance company or registered investment adviser; or

        ___ it is a self-directed plan (i.e., a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to the participant's account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

    ☐ The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, which has total assets in excess of $5,000,000.

    ☐ The Subscriber is an entity in which all of the equity owners are at least one of the following: (a) natural persons who are "accredited investors", (b) grantor trusts where the individual grantors are "accredited investors" or (c) non-natural persons described above.

If the Subscriber does not qualify in any accredited investor category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

    ☐ The Subscriber does not qualify in any of the above accredited investor categories.

003059

2.    **Qualified Client.** Interests will be sold only to investors who are "*qualified clients*" (as defined in Rule 205-3 promulgated under the Advisers Act).  Please indicate the basis of "*qualified client*" status of the Subscriber by checking the applicable statement or statements.

(a)    Is the Subscriber an entity with net assets at the time of entering into the Subscription Agreement exceeding $2,000,000?

☐ Yes          ☐ No

(b)    Is the Subscriber an entity that has at least $1,000,000 under the management of the Investment Manager immediately after entering into the Subscription Agreement?

☐ Yes          ☐ No

(c)    Is the Subscriber a "*qualified purchaser*" as defined in Section 2(a)(51)(A) of the Investment Company Act at the time of entering into the Subscription Agreement?

☒ Yes          ☐ No

If the Subscriber does <u>not</u> qualify in any qualified client category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

☐ The Subscriber does not qualify in any of the above qualified client categories.

3.    **Qualified Purchaser.** The Partnership intends to claim exemption from registration under the Investment Company Act in reliance on Section 3(c)(7) thereof, and accordingly Interests will be sold only to investors who are "*qualified purchasers*" (as defined in Section 2(a)(51) of the Investment Company Act).  Please indicate the basis of "*qualified purchaser*" status of the Subscriber by checking the applicable statement or statements. In connection therewith, **the Subscriber must read Annexes B and C to these Subscription Documents** for the definition of "*investments*" and for information regarding the valuation of "*investments*," respectively.

☐ (a)    A company, partnership or trust that owns not less than $5,000,000 in "*investments*" and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons.

☐ (b)    A trust that is not covered by (a) above as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (a), (c), (d) or (e) hereof (or under Part II, Section (B)(3) above).

☐ (c)    An entity, acting for its own account or the accounts of other qualified purchasers, which, in the aggregate, owns and invests on a discretionary basis not less than $25,000,000 in "*investments.*"

☐ (d)    A qualified institutional buyer as defined in paragraph (a) of Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser; *provided* that:  (i) a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer and (ii) a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☒ (e) An entity, each beneficial owner of which is a qualified purchaser. **_PLEASE NOTE_**: *This certification does not apply to beneficiaries of an irrevocable trust.*

If the Subscriber does <u>not</u> qualify in a qualified purchaser category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

☐    The Subscriber does not qualify in any of the above qualified purchaser categories.

4.    **Supplemental Data**

(a)    Was the Subscriber organized or reorganized for the specific purpose of acquiring Interests in the Partnership?

☐ Yes        ☒ No

*PLEASE NOTE: If the answer to question 4(a) is "Yes", each person who is an equity owner of the Subscriber must complete a copy of the Prospective Investor Questionnaire as if such person were directly purchasing an Interest.*

(b)    With respect to its acquisition of the Interests, is the Subscriber a participant-directed defined contribution plan (such as a 401(k) plan), or a partnership or other investment vehicle (1) in which its partners or participants have or will have any discretion as to their level of investment in the Subscriber or in investments made by the Subscriber (including the Subscriber's investment in an Interest), or (2) that is otherwise an entity managed to facilitate the individual decisions of its beneficial owners to invest in the Partnership?

☐ Yes        ☒ No

(c)    Will the Subscriber, at any time, invest more than 40% of the Subscriber's assets in the Partnership?

☒ Yes        ☐ No

5.    **ERISA and Tax-Exempt Information**

(a)    Is the Subscriber a pension, profit-sharing, annuity or employee benefit plan (a "**Plan**") described in ERISA, whether or not subject to ERISA, or a "*plan*" (as defined in Section 4975(e)(i) of the Code), or is the Subscriber an entity whose underlying assets include Plan assets by reason of a Plan's investment in the Subscriber?

☐ Yes        ☒ No

If the answer to question 5(a) is "No", please skip to question 4(b) below.

If the answer to question 5(a) is "Yes", is the Subscriber subject to ERISA?

☐ Yes        ☐ No

If the answer to question 5(a) is "Yes", is the Subscriber a "*governmental plan*" (as defined in Section 3(32) of ERISA) or a "*church plan*" (as defined in Section 3(33) of ERISA)?

☐ Yes        ☐ No

(b)    Is the Subscriber a partnership, a limited liability company, an S Corporation, trust or other pass-through entity?

☒ Yes        ☐ No

003061

If the answer to question 5(b) is "*Yes*", please supply the approximate percentage of ERISA plan assets to be invested in the Partnership by the Subscriber as compared to the total assets of such Subscriber?

____0___ %          *John Homer*
Please identify a contact for confirmation

If the answer to question 5(b) is "*Yes*", please provide the approximate percentage of ERISA plan assets to be invested in the Partnership as compared with the total assets of the ERISA plan sponsor ___0___ %

If the answer to question 5(b) is "*Yes*", please provide the percentage of assets of such entity that constitute "plan assets" as defined in DOL Reg. Sec. 2510.3-101.

____0___ %

(c)    If the Subscriber is subscribing as a trustee or custodian for an IRA, is the Subscriber a qualified IRA custodian or trustee?

☐ Yes          ☒ No          ☐ N/A

(d)    If applicable, if the Subscriber is an IRA, the IRA beneficiary must complete the Subscription Agreement.  The IRA custodian must approve the Subscription Agreement and retain legal title of the Interest for the benefit of the IRA beneficiary.  By initialing on the line below, the Subscriber represents that the IRA custodian has approved the Subscription Agreement and will retain legal title of the Interest for the benefit of the IRA beneficiary.

_____          _____
Initial          Name of IRA Custodian (Note: cannot be an individual)

6.    **Bank Holding Company Act Information**

Does the Subscriber wish to be treated as if it were subject to the Bank Holding Company Act of 1956, as amended from time to time ("**BHCA**")?

☐ Yes          ☒ No

By checking "*Yes*", the Subscriber acknowledges and agrees that the Partnership shall not be deemed to be providing any legal advice to Limited Partners that are subject to the BHCA and that all such Limited Partners should consult their own counsel regarding an investment in the Partnership.

7.    **Tax Information**

(a)    Is the Subscriber a "*United States person*" as defined in Section 7701(a)(30) of the Code and the regulations promulgated thereunder?[10]

☒ Yes          ☐ No

If the answer to question 7(a) is "*Yes*", has the Subscriber included a fully executed Form W-9 with this Prospective Investor Questionnaire?

_____

[10] As per Section 7701(a)(30) of the Code and the regulations promulgated thereunder, "United States person" means (i) a citizen or resident of the United States, (ii) a U.S. partnership, (iii) a U.S. corporation, (iv) any estate (other than a non-United States estate, within the meaning of Section 7701(a)(31) of the Code), (v) any trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (vi) any trust which has elected to be taxed as a trust described in (v).

003062

☒ Yes      ☐ No

If the answer to question 7(a) is "No", has the Subscriber included a fully executed Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable, with this Prospective Investor Questionnaire?

     ☐ Yes      ☐ No

(b)      Please provide the Subscriber's U.S. state or foreign country of residence for tax purposes:

_____ *Delaware* _____

(c)      The Subscriber reports income for federal income tax purposes on the following basis:

☒ calendar year taxable year;

☐ other taxable year (please specify):_____; or

☐ N/A

(d)      Is the Subscriber exempt from U.S. federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax-exempt organization described in Section 501(c)(3) of the Code)?

     ☐ Yes      ☐ No      ☐N/A

(e)      Is the Subscriber treated as a "disregarded entity" for U.S. federal income tax purposes?

     ☐ Yes      ☐ No

If the answer to question 7(e) is "No", pleas skip to question 7(f) below.

If the answer to question 7(e) is "*Yes*", is the owner of the Subscriber a "*United States person*"?

     ☐ Yes      ☐ No

If the answer to the previous question is "*Yes*", please provide a fully executed Form W-9.

If the answer to the previous question is "*No*", please provide a fully executed Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable.

(f)      Is the Subscriber a "*simple trust*" or a "*grantor trust*" for U.S. federal income tax purposes?

     ☐ Yes      ☐ No

If the answer to question 7(f) is "Yes", please provide a fully executed Form W-9 or Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable, with respect to the persons who are subject to U.S. federal income tax on the trust's income.

(g)      Is the Subscriber a "*grantor trust*", "*S Corporation*" or an entity treated as a partnership for U.S. federal income tax purposes?

     ☐ Yes      ☐ No

*[remainder of page intentionally left blank]*

003063

## PART IV—NEW ISSUES CERTIFICATION TO BE COMPLETED BY ALL SUBSCRIBERS

The Subscriber must complete this Certification in order for the Partnership to be able to determine the extent to which the Subscriber may participate in "new issue" securities in accordance with Rule 5130 (the "**New Issues Rule**") of the Securities Offering and Trading Standards and Practices of FINRA.  If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity or a nominee for another person, the person completing this Certification with respect to the Subscriber *must* be a person authorized to represent the beneficial owner(s) of the Subscriber, or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s) of the Subscriber.

INSTRUCTIONS:  Each Subscriber must complete this Certification by checking the box next to all applicable categories under Section A below to determine whether the Subscriber is a restricted person under the New Issues Rule (a "**Restricted Person**") or indicating that none of the Restricted Person categories apply to it and the Subscriber is eligible to participate in new issues.  A Subscriber that is an entity and that is also a Restricted Person under Section A may still be able to participate fully in new issue investments if it indicates in Section B that it is also an exempted entity (an "**Exempted Entity**").  Accordingly, each such Subscriber should check the box next to any applicable categories under Section B to determine whether or not the Subscriber is an Exempted Entity.

If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity (including a hedge fund, fund-of-funds, investment partnership or any other collective investment vehicle, or a broker-dealer organized as an investment fund) (any of the foregoing, an "**Entity Investor**"), such Entity Investor must complete the certification of beneficial ownership in Section C.  Based on such information and the size of the investment by such Entity Investor in the Partnership, such Entity Investor may be deemed to be a Restricted Person with respect to the entirety of its investment in the Partnership or any portion thereof (such determination of Restricted Person status by the Partnership shall be final and conclusive).

 *The Subscriber does not wish to participate in new issues and will be deemed a Restricted Person.*  If this box is checked, no further responses to Section A, B or C are necessary.

**A.    Determination of Restricted Person Status.**  Please check all appropriate boxes.

The Subscriber is:

☐    (i) a broker-dealer;

☐    (ii) an officer, director, general partner, associated person[11] or employee of a broker-dealer (other than a limited business broker-dealer)[12];

☐    (iii) an agent of a broker-dealer (other than a limited business broker-dealer) that is engaged in the investment banking or securities business;

☐    (iv) an immediate family member[13] of a person described in (ii) or (iii) above.  Under certain circumstances, a Subscriber who checks this box may be able to participate in new issue investments.  The Partnership may request additional information in order to determine the eligibility of a Subscriber under this Restricted Person category;

---

[11] A person "associated with" a broker-dealer includes any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a broker-dealer, or any partner, director, officer or sole proprietor of a broker-dealer.

[12] A "limited business broker-dealer" is any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

[13] The term "immediate family" includes the Subscriber's: (i) parents, (ii) mother-in-law or father-in-law, (iii) husband or wife, (iv) brother or sister, (v) brother-in-law or sister-in-law, (vi) son-in-law or daughter-in-law, (vii) children, and (viii) any other person who is supported, directly or indirectly, to a material extent by an officer, director, general partner, employee, agent of a broker-dealer or person associated with a broker-dealer.

003064

☐    (v) a finder or any person acting in a fiduciary capacity to a managing underwriter, including, but not limited to, attorneys, accountants and financial consultants. Notwithstanding the foregoing, a Subscriber who is a finder or fiduciary but who is not acting in such capacity with respect to the security being offered, may be able to participate in new issue investments, and, accordingly, the Partnership may request additional information from a Subscriber who checks this box in order to determine the Subscriber's eligibility under this Restricted Person category;

☐    (vi) a person who has authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor or collective investment account[14] (including a private investment vehicle such as a hedge fund);

☐    (vii) an immediate family member of a person described in (v) or (vi) above who materially supports[15], or receives material support from, the Subscriber;

☐    (viii) a person listed or required to be listed in Schedule A, B or C of a Form BD (other than with respect to a limited business broker-dealer), except persons whose listing on Schedule A, B or C is related to a person identified by an ownership code of less than 10% on Schedule A;

☐    (ix) a person that (A) directly or indirectly owns 10% or more of a public reporting company listed, or required to be listed, in Schedule A of a Form BD, or (B) directly or indirectly owns 25% or more of a public reporting company listed, or required to be listed in Schedule B of a Form BD, in each case (A) or (B), other than a reporting company that is listed on a national securities exchange, or other than with respect to a limited business broker-dealer;

☐    (x) an immediate family member of a person described in (viii) or (ix) above. Under certain circumstances, a Subscriber who checks this box may be able to participate in new issue investments. The Partnership may request additional information in order to determine the eligibility of a Subscriber under this Restricted Person category; or

☐    (xi) any entity (including a corporation, partnership, limited liability company, trust or other entity) in which any person or persons listed in (i)-(x) above has a beneficial interest[16].

☐   None of the above categories apply and the Subscriber is eligible to participate in new issue securities.

---

[14] A "collective investment account" is any hedge fund, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities. Investment clubs (groups of individuals who pool their money to invest in stock or other securities and who are collectively responsible for making investment decisions) and family investment vehicles (legal entities that are beneficially owned solely by immediate family members (as defined above)) are not considered collective investment accounts.

[15] The term "material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to materially support each other.

[16] The term "beneficial interest" means any economic interest such as the right to share in gains or losses. The initial receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account; however, if such payments are accumulated and subsequently invested into the account (as a deferred fee arrangement or otherwise), they would constitute a beneficial interest in that account.

003065

**B.** **Determination of Exempted Entity Status.** A Subscriber that is an entity and that is also a Restricted Person under Section A may still be able to participate fully in new issue investments, whether directly or through an account in which such Subscriber has a beneficial interest, if it indicates below that it is also an Exempted Entity. Please check all appropriate boxes.

The Subscriber is:

☐      (i) a publicly-traded entity (other than a broker-dealer or an affiliate of a broker-dealer, where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that is listed on a national securities exchange, or is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

☐      (ii) an investment company registered under the Investment Company Act;

☐      (iii) an investment company organized under the laws of a foreign jurisdiction and:

         (a)      the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; <u>and</u>

         (b)      no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐      (iv) (A) an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code and that is not sponsored solely by a broker-dealer, (B) a state or municipal government benefits plan that is subject to state and/or municipal regulation or (C) a church plan under Section 414(e) of the Code;

☐      (v) a tax-exempt charitable organization under Section 501(c)(3) of the Code;

☐      (vi) a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and the fund

         (a)      has investments from 1,000 or more accounts, <u>and</u>

         (b)      does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐      (vii) an insurance company general, separate or investment account, and

         (a)      the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders, <u>and</u>

         (b)      the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons; or

☐      (viii) an entity (including a private investment vehicle, such as a hedge fund or fund of hedge funds) (a) in which the beneficial interests of Restricted Persons do not exceed in the aggregate 10% of such entity, or (b) that limits participation in New Issue profits by Restricted Persons to not more than 10% of the profits from New Issues.

003066

**C.    Determination of Beneficial Ownership.**

If the box for (viii) in Section B above is checked, please specify the current percentage of the net profits from New Issues allocable to beneficial owners of such entity who are Restricted Persons:

_____%

*[remainder of page intentionally left blank]*

003067

**PART V—SPINNING PROHIBITION CERTIFICATION TO BE COMPLETED BY ALL SUBSCRIBERS**

The Subscriber must complete this Certification in order for the Partnership to be able to determine the extent to which the Subscriber may participate in "new issue" securities in accordance with FINRA Rule 5131(b) (the "**Spinning Prohibition Rule**"), which prohibits a FINRA member who provides investment banking services from allocating new issues to accounts in which officers and directors of certain current, former or prospective investment banking clients have an interest.   To enable the Partnership to purchase new issues, the Partnership must determine whether the Subscriber is an executive officer or director or person materially supported by an executive officer or director of a public company or a "covered non-public company" under the Spinning Prohibition Rule.  Please note that the Spinning Prohibition Rule (FINRA Rule 5131(b)) is in addition to, not a replacement of, the New Issues Rule (FINRA Rule 5130) covered in Part IV of this Questionnaire.

If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity or a nominee for another person, the person completing this Certification with respect to the Subscriber *must* be a person authorized to represent the beneficial owner(s) of the Subscriber, or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s) of the Subscriber.

INSTRUCTIONS:  Each Subscriber must complete this Certification by checking the box next to all applicable categories under Section A below to determine whether the Subscriber is a restricted investor under the Spinning Prohibition Rule (a "**Restricted Investor**"), or indicating that none of the Restricted Investor categories apply to it and that the Subscriber is eligible to participate in new issues.  A Subscriber that is an entity which is deemed a Restricted Investor under Section A may still be able to participate in new issues if it indicates in Section B below that it is an unrestricted investor under the Spinning Prohibition Rule (an "**Unrestricted Investor**").

   *The Subscriber does not wish to participate in new issues and will be deemed a Restricted Investor.  If this box is checked, no further responses to Section A or B are necessary.*

**A.**   **Determination of Restricted Investor Status.**  Please check all appropriate boxes.

The Subscriber is:

☐   (i) an executive officer or director of a public company[17] or a covered non-public company[18].

If this box is checked, please provide the name and ticker symbol (where applicable) of each such company (include additional sheets if necessary):

_____

_____

_____

☐   (ii) a person who receives material support[19] from an executive officer or director of a public company or a covered non-public company.

If this box is checked, please provide the name and ticker symbol (where applicable) of each such company (include additional sheets if necessary):

_____

---

[17] A "public company" is any company that is registered under Section 12 of the Exchange Act, or files periodic reports pursuant to Section 15(d) of the Exchange Act.

[18] A "covered non-public company" is any non-public company satisfying the following criteria: (i) income of at least $1 million in the last fiscal year or in two of the last three fiscal years and shareholders' equity of at least $15 million; (ii) shareholders' equity of at least $30 million and a two-year operating history; or (iii) total assets and total revenue of at least $75 million in the latest fiscal year or in two of the last three fiscal years.

[19] The term "material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year.  Persons living in the same household are deemed to be providing each other with material support.

_____

_____

☐   (iii) an entity (including a corporation, partnership, limited liability company, trust or other entity) in which a person or persons listed in (i) and (ii) above has a beneficial interest[20] (each such person, a "**Restricted Participant**").

If this box is checked, please indicate the company or companies (and ticker symbol(s) where applicable) on whose behalf such executive officers or directors serve and the percentage share of profits or losses attributable to new issues to be received by all Restricted Participants related to each company (include additional sheets if necessary):

Name and ticker symbol of each such company:         Share of profits:

_____      _____

_____      _____

_____      _____

☐   (iv) None of the above categories apply and the Subscriber is not a Restricted Investor and is eligible to participate in new issues. The Subscriber does not need to complete Section B below.

B.     **Determination of Unrestricted Investor Status.** A Subscriber that is an entity which is deemed a Restricted Investor under Section A may still be able to participate in new issues if it indicates below that it is also an Unrestricted Investor. Please check all appropriate boxes.

The Subscriber is:

☐   (i) an entity (including a corporation, partnership, limited liability company, trust or other entity) in which a Restricted Participant(s) has/have a beneficial interest, but the Subscriber hereby represents and warrants that such Restricted Participant(s) affiliated with the same public company or covered non-public company in aggregate (as to each such public company or covered non-public company) is/are allocated no more than 25% of any profits or losses attributable to new issues received by the Subscriber.

If this box is checked, please indicate the company or companies (and ticker symbol(s) where applicable) on whose behalf such executive officers or directors serve and the percentage share of profits or losses attributable to new issues to be received by all Restricted Participants related to each company (include additional sheets if necessary):

Name and ticker symbol of each such company:         Share of profits:

_____      _____

_____      _____

_____      _____

☐   (ii) a publicly-traded entity (other than a broker-dealer or an affiliate of a broker-dealer, where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that is listed on a national securities exchange, or is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

_____

[20] The term "beneficial interest" means any economic interest such as the right to share in gains or losses. The initial receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is <u>not</u> considered a beneficial interest in the account; however, if such payments are accumulated and subsequently invested into the account (as a deferred fee arrangement or otherwise), they would constitute a beneficial interest in that account.

003069

☐    (iii) an investment company registered under the Investment Company Act;

☐    (iv) an investment company organized under the laws of a foreign jurisdiction and:

    (a)    the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; <u>and</u>

    (b)    no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐    (v) (A) an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code and that is not sponsored solely by a broker-dealer, (B) a state or municipal government benefits plan that is subject to state and/or municipal regulation or (C) a church plan under Section 414(e) of the Code;

☐    (vi) a tax-exempt charitable organization under Section 501(c)(3) of the Code;

☐    (vii) a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and the fund

    (a)    has investments from 1,000 or more accounts, <u>and</u>

    (b)    does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons; or

☐    (viii) an insurance company general, separate or investment account, and

    (a)    the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders, <u>and</u>

    (b)    the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons.

*[remainder of page intentionally left blank]*

003070

**EXHIBIT**

**ADDITIONAL CONTRIBUTION FORM**

Rand PE Fund I, L.P.
c/o Administrator
[address to be provided upon request]

Dear Sir or Madam:

The undersigned hereby wishes to make an additional capital contribution ("**Additional Capital Contribution**") to Rand PE Fund I, L.P., a Delaware limited partnership (the "**Partnership**").   Subject to the discretion of the Partnership's general partner, Rand PE Fund Management, LLC, a Delaware limited liability company (the "**General Partner**"), to accept a lower amount, the minimum Additional Capital Contribution is $500,000.  The amount of the undersigned's Additional Capital Contribution to Series ___1___ is: $ 9,253,000.

The undersigned acknowledges and agrees that:  (i) the undersigned is making the Additional Capital Contribution on the terms and conditions contained in the Subscription Agreement, dated 12/21/15, previously executed by the undersigned and accepted by the General Partner (the "**Subscription Agreement**"); (ii) the representations of the undersigned contained in the Subscription Agreement are true and correct in all material respects as of the date set forth below; (iii) the undersigned has complied in all material respects through the date set forth below with all covenants contained in the Subscription Agreement; and (iv) the information provided by the undersigned in the Prospective Investor Questionnaire submitted with the Subscription Agreement is true and correct as of the date set forth below.  **THE UNDERSIGNED AGREES TO NOTIFY THE PARTNERSHIP PROMPTLY SHOULD THERE BE ANY CHANGE IN ANY OF THE FOREGOING INFORMATION.**

Dated: Dec 23, 2015

**For Individuals:**

_____
Name of Investor (print or type)

_____
(Signature)

_____
Name of Joint Investor (print or type) (if applicable)

_____
(Joint Signature, if applicable)

**For Entities:**

_Atlas IDF, LP_____
Name of Investor (print or type)

By: _____
(Signature)

Name: _Ivan Hsuie_____
Title: _Managing Member_

_of the General Partners_____
(Name and Initials of IRA custodian, if applicable)

**FOR INTERNAL USE ONLY:**

$ 9,253,000.00_____
Additional Capital Contribution Accepted

Accepted and Agreed, as of _Dec 23_, 20_15_.

**RAND PE FUND I, L.P.**
By:  Rand PE Fund Management, LLC, as its general partner
(acting severally in the name of and for the account of each individual Series)

By: _____
Name: John Honis
Title: Managing Member

003072

**EXHIBIT**

003073

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

OMB APPROVAL

| | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

**CIK (Filer ID Number)**

0001660386

**Previous Names**  [X] None

**Entity Type**

[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

**Name of Issuer**
Atlas IDF, LP

**Jurisdiction of Incorporation/Organization**
DELAWARE

**Year of Incorporation/Organization**
[X] Over Five Years Ago
[ ] Within Last Five Years (Specify Year)
[ ] Yet to Be Formed

---

### 2. Principal Place of Business and Contact Information

**Name of Issuer**
Atlas IDF, LP

| Street Address 1 | Street Address 2 |
|---|---|
| C/O ATLAS IDF GP, LLC | 2101 CEDAR SPRINGS ROAD, SUITE 1200 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| DALLAS | TEXAS | 75201 | (214) 288-9555 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Atlas IDF GP, LLC | N/A | |

| Street Address 1 | Street Address 2 |
|---|---|
| 2101 Cedar Springs Road | Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [ ] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

The Issuer's General Partner

| Last Name | First Name | Middle Name |
|---|---|---|

003074

HCMLPHMIT00003518

Patrick
Mark

| Street Address 1 | Street Address 2 |
|---|---|
| c/o Atlas IDF GP, LLC | 2101 Cedar Springs Road, Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Controlling Person

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services
- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [X] Pooled Investment Fund
  - [X] Hedge Fund
  - [ ] Private Equity Fund
  - [ ] Venture Capital Fund
  - [ ] Other Investment Fund

  Is the issuer registered as an investment company under the Investment Company Act of 1940?
  - [ ] Yes
  - [X] No

- [ ] Other Banking & Financial Services

[ ] Business Services

Energy
- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

Health Care
- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

[ ] Manufacturing

Real Estate
- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [ ] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology
- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel
- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

[ ] Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |

003075

HCMLPHMIT00003519

☐ $1,000,001 - $5,000,000     ☐ $5,000,001 - $25,000,000

☐ $5,000,001 - $25,000,000     ☐ $25,000,001 - $50,000,000

☐ $25,000,001 - $100,000,000     ☐ $50,000,001 - $100,000,000

☐ Over $100,000,000     ☐ Over $100,000,000

☐ Decline to Disclose     ☒ Decline to Disclose

☐ Not Applicable     ☐ Not Applicable

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☒ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not i, (ii) or (iii))    ☐ Section 3(c)(1)    ☐ Section 3(c)(9)

☐ Rule 504 (b)(1)(i)    ☐ Section 3(c)(2)    ☐ Section 3(c)(10)

☐ Rule 504 (b)(1)(ii)    ☐ Section 3(c)(3)    ☐ Section 3(c)(11)

☐ Rule 504 (b)(1)(iii)    ☐ Section 3(c)(4)    ☐ Section 3(c)(12)

☒ Rule 506(b)    ☐ Section 3(c)(5)    ☐ Section 3(c)(13)

☐ Rule 506(c)    ☐ Section 3(c)(6)    ☐ Section 3(c)(14)

☐ Securities Act Section 4(a)(5)    ☒ Section 3(c)(7)

---

## 7. Type of Filing

☐ New Notice   Date of First Sale 2015-12-15   ☐ First Sale Yet to Occur

☒ Amendment

---

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   ☒ Yes ☐ No

---

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity      ☒ Pooled Investment Fund Interests

☐ Debt      ☐ Tenant-in-Common Securities

☐ Option, Warrant or Other Right to Acquire Another Security      ☐ Mineral Property Securities

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security      ☐ Other (describe)

---

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   ☐ Yes ☒ No

Clarification of Response (if Necessary):

---

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

003076
HCMLPHMIT00003520

## 12. Sales Compensation

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number   [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

[ ] All States   [ ] Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount          USD  or [X] Indefinite

Total Amount Sold        $37,975,518 USD

Total Remaining to be Sold       USD  or [X] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:

[ 3 ]

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [X] Estimate

Clarification of Response (if Necessary):

Atlas IDF GP, LLC and/or its affiliates receive customary management fees, as described in the Issuer's Confidential Private Placement Memorandum.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

003077

HCMLPHMIT00003521

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Atlas IDF, LP | /s/ Mark Patrick | Mark Patrick | Controlling Person | 2025-02-24 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

003078
HCMLPHMIT00003522

**EXHIBIT**

003079

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

**OMB APPROVAL**

| | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)

0001660401 ✎

Previous Names

[X] None

Entity Type

[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

Name of Issuer

Rand PE Fund I, L.P.

Jurisdiction of Incorporation/Organization

DELAWARE

Year of Incorporation/Organization

[X] Over Five Years Ago
[ ] Within Last Five Years (Specify Year)
[ ] Yet to Be Formed

---

### 2. Principal Place of Business and Contact Information

Name of Issuer

Rand PE Fund I, L.P.

| Street Address 1 | Street Address 2 |
|---|---|
| C/O RAND PE FUND MANAGEMENT, LLC | 2101 CEDAR SPRINGS ROAD, SUITE 1200 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| DALLAS | TEXAS | 75201 | (214) 288-9555 ✎ |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Rand PE Fund Management, LLC | N/A | |

| Street Address 1 | Street Address 2 |
|---|---|
| 2101 Cedar Springs Road | Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [ ] Executive Officer  [ ] Director  [X] Promoter

Clarification of Response (if Necessary):

The Issuer's General Partner

---

| Last Name | First Name | Middle Name |
|---|---|---|

003080

HCMLPHMIT00004096

Patrick
Mark

| Street Address 1 | Street Address 2 |
|---|---|
| c/o Rand PE Fund Management, LLC | 2101 Cedar Springs Road, Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

Controlling Person

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services

  [ ] Commercial Banking

  [ ] Insurance

  [ ] Investing

  [ ] Investment Banking

  [X] Pooled Investment Fund

    [X] Hedge Fund

    [ ] Private Equity Fund

    [ ] Venture Capital Fund

    [ ] Other Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes      [X] No

  [ ] Other Banking & Financial Services

[ ] Business Services

Energy

  [ ] Coal Mining

  [ ] Electric Utilities

  [ ] Energy Conservation

  [ ] Environmental Services

  [ ] Oil & Gas

  [ ] Other Energy

Health Care

  [ ] Biotechnology

  [ ] Health Insurance

  [ ] Hospitals & Physicians

  [ ] Pharmaceuticals

  [ ] Other Health Care

[ ] Manufacturing

Real Estate

  [ ] Commercial

  [ ] Construction

  [ ] REITS & Finance

  [ ] Residential

  [ ] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology

  [ ] Computers

  [ ] Telecommunications

  [ ] Other Technology

Travel

  [ ] Airlines & Airports

  [ ] Lodging & Conventions

  [ ] Tourism & Travel Services

  [ ] Other Travel

[ ] Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |

003081

HCMLPHMIT00004097

☐ $1,000,001 - $5,000,000

☐ $5,000,001 - $25,000,000

☐ $25,000,001 - $100,000,000

☐ Over $100,000,000

☐ Decline to Disclose

☐ Not Applicable

☐ $5,000,001 - $25,000,000

☐ $25,000,001 - $50,000,000

☐ $50,000,001 - $100,000,000

☐ Over $100,000,000

☒ Decline to Disclose

☐ Not Applicable

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☒ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☒ Rule 506(b)

☐ Rule 506(c)

☐ Securities Act Section 4(a)(5)

☐ Section 3(c)(1)

☐ Section 3(c)(2)

☐ Section 3(c)(3)

☐ Section 3(c)(4)

☐ Section 3(c)(5)

☐ Section 3(c)(6)

☒ Section 3(c)(7)

☐ Section 3(c)(9)

☐ Section 3(c)(10)

☐ Section 3(c)(11)

☐ Section 3(c)(12)

☐ Section 3(c)(13)

☐ Section 3(c)(14)

---

## 7. Type of Filing

☐ New Notice   Date of First Sale 2015-12-17   ☐ First Sale Yet to Occur

☒ Amendment

---

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   ☒ Yes ☐ No

---

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity

☐ Debt

☐ Option, Warrant or Other Right to Acquire Another Security

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☒ Pooled Investment Fund Interests

☐ Tenant-in-Common Securities

☐ Mineral Property Securities

☐ Other (describe)

---

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   ☐ Yes ☒ No

Clarification of Response (if Necessary):

---

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

---

003082
HCMLPHMIT00004098

## 12. Sales Compensation

Recipient

Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None

(Associated) Broker or Dealer CRD Number [X] None

Street Address 1

Street Address 2

City

State/Province/Country

ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

[ ] All States

[ ] Foreign/non-US

## 13. Offering and Sales Amounts

| | | |
|---|---|---|
| Total Offering Amount | USD or [X] Indefinite | |
| Total Amount Sold | $16,417,187 USD | |
| Total Remaining to be Sold | USD or [X] Indefinite | |

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:  [ 3 ]

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [X] Estimate

Clarification of Response (if Necessary):

Rand PE Fund Management, LLC and/or its affiliates receive customary management fees, as described in the Issuer's Confidential Private Placement Memorandum.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

003083
HCMLPHMIT00004099

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Rand PE Fund I, L.P. | /s/ Mark Patrick | Mark Patrick | Controlling Person | 2025-02-24 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

003084
HCMLPHMIT00004100

**EXHIBIT**

003085

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF
BEACON MOUNTAIN LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement"), dated as of the 24th day of September, 2015, has been entered into by Rand PE Fund I, L.P. – Series 1 (the "Member"). The Member's LLC Interest (as hereinafter defined) is as set forth on Schedule A hereto.

WHEREAS, the initial Limited Liability Company Agreement, also dated as of the 24th day of September, 2015 ("Initial Agreement"), contained a scrivener's error with respect to the name of the single member of the Company (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Initial Agreement is hereby amended and restated in its entirety to read as follows:

1.      Name, Business, Address and Registered Agent.

(a)      The Member hereby acknowledges that a limited liability company under the name of "Beacon Mountain LLC" (the "Company") was formed under the Delaware Limited Liability Company Act (the "Act") for the purpose of engaging in any business of any kind necessary to, in connection with, related to or incidental to such purposes as the Member shall from time to time deem desirable.

(b)      The principal office of the Company shall be at such place as the Member may from time to time designate.

(c)      The initial registered office of the Company for purposes of the Act shall be at 1675 South State Street, Suite B, in the City of Dover, County of Kent, Delaware 19901. The initial registered agent of the Company for purposes of the Act shall be Capitol Services, Inc., whose business office is identical to the Company's registered office.

2.      Member.  The sole responsibility for managing the business and affairs of the Company, except as otherwise provided herein or in the Act, shall be vested in the Member. Except as expressly provided herein, voting power shall be vested solely in the Member, and all matters requiring a vote pursuant to this Agreement or the Act shall be determined by the vote of the Member and the Member may act by written consent.

3.      Officers.

(a)      Election of Officers; Term.  Officers, including assistant and subordinate officers, may from time to time be appointed by the Member. All officers shall hold office until their successors are appointed by the Member. Any two or more offices may be combined in the same person as the Member may determine. No officer may act in more than one capacity where the action of two or more officers is required.

003086

HCMLPHMIT00004115

(b)   <u>Removal of Officers: Vacancies</u>.  Any officer of the Company may be removed summarily with or without cause, at any time, by the Member.  Vacancies may be filled by the Member.

(c)   <u>Duties</u>.  The officers of the Company shall have only such powers and duties as are from time to time conferred by the Member in writing or as are set forth in writing and executed by either of the President or the Secretary.  The Member shall determine the compensation of all officers of the Company.

4.   <u>Term</u>.  The term of the Company shall be perpetual, except that the Company shall be dissolved upon the first to occur of any of the following events:

(a)   The election of the Member to dissolve and terminate the Company;

(b)   At any time there are no remaining members, except as may be avoided pursuant to §18-801(a)(4) of the Act;

(c)   The entry of a decree of judicial dissolution under §18-802 of the Act; or

(d)   Automatic cancellation of the Company's certificate of formation pursuant to §18-1108 of the Act.

5.   <u>Capital</u>.  The Member may contribute such capital, in cash or other property, as it so chooses in its sole discretion.  No capital contributions shall be required unless the Member consents thereto in writing, in its sole and absolute discretion.

6.   <u>Bank Accounts</u>.  The President and the Secretary and any other officer, including any assistant or subordinate officer, as may be authorized to do so in writing by either of the President or the Secretary, are authorized to open commercial banking accounts for and in the name of the Company throughout the United States, at any time and from time to time, and to deposit to the credit of the Company in such banking accounts any monies, checks, drafts, orders or other commercial paper payable to the Company, and from time to time to withdraw all or any part of the funds on deposit in the name of the Company by check drawn in the name of the Company and signed by such officer.

7.   <u>Voting of Shares</u>.  Unless otherwise provided by written resolution of the Member, either of the President or the Secretary may from time to time appoint an attorney or attorneys or agent or agents of the Company, in the name and on behalf of the Company, to cast the vote which the Company may be entitled to cast as a stockholder or otherwise in any corporation, partnership, limited liability company, joint venture or any other entity, any of whose securities may be held by the Company, at meetings of the holders of the shares or other securities of such entity or to consent in writing to any action by any such entity.  Such officer shall instruct the person or persons so appointed as to the manner of casting such votes or giving such consent and may execute or cause to be executed on behalf of the Company such written proxies, consents, waivers or other instruments as may be necessary or proper in the premises. In lieu of such appointment, either of the President or the Secretary may himself attend any meetings of the holders of the shares or other securities of any such entity and there vote or

003087

HCMLPHMIT00004116

exercise any or all power of the Company as the holder of such shares or other securities of such entity or consent in writing to any action by any such entity.

8.    <u>Distributions</u>. Any cash or other property of the Company not required for the operation of the Company shall be distributable to the Member at such times and in such amounts as determined by the Member.

9.    <u>Certificates; "Opt-In" to Article 8; Transferability of Interests</u>.

(a)    The Company may issue one or more certificates evidencing the limited liability company interests in the Company ("<u>LLC Interest</u>") in the form attached hereto as <u>Exhibit A</u>. Certificates shall be executed on behalf of the Company by one of its executive officers. The Member hereby agrees that the LLC Interest held by such Member shall be treated as a "security" for purposes of and shall be governed by Article 8 of the Delaware Uniform Commercial Code--Investment Securities, as amended from time to time.

(b)    The Member may transfer, sell, assign, mortgage, grant a lien on, give or otherwise dispose of, whether voluntarily or by operation of law, at judicial sale or otherwise, all or any part of its LLC Interest in the Company; <u>provided</u>, <u>however</u>, that there shall not at any time be more than one member until this Agreement is amended to provide generally (in addition to <u>Section 12</u> hereof) for having more than one member. If, in connection with any such transfer, less than 100% of the LLC Interest of the transferor member is transferred, then this Agreement shall be amended to include appropriate provisions, including those relating to partnership accounting and tax issues, necessary to address the fact that the Company has more than one member.

10.    <u>Liquidation</u>. Any net proceeds from the sale, exchange or other disposition (including a disposition pursuant to foreclosure or deed in lieu of foreclosure) of the assets of the Company following the dissolution of the Company shall be distributed to the Member.

11.    <u>Other Activities</u>. The Member may engage in or possess any interest in another venture or business of any nature or description, independently or with others.

12.    <u>Tax Classification</u>. The Member intends that the Company be disregarded for U.S. federal income tax purposes as long as there is only one member, and that if there is ever more than one member or more than one owner of the Company as determined for U.S. federal income tax purposes, that the Company be classified as a partnership for U.S. federal income tax purposes and this Agreement shall be interpreted accordingly.

13.    <u>Limited Liability</u>. The Member shall not have any personal obligation for any debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member, except as provided under the Act.

14.    <u>Exculpation; Indemnification</u>.

(a)    Except as otherwise provided by any written employment, consulting or similar agreement, if applicable, or unless otherwise expressly required by law, no officer or member of the Company (including any former executive officer or member) (each such person

003088

HCMLPHMIT00004117

referred to herein as a "Covered Person") shall have any liability to the Company or to any member for any loss suffered by the Company or any member which arises out of any act or omission or alleged act or omission of the Covered Person in the Covered Person's capacity as a Covered Person to the extent the Covered Person acted in good faith and to the extent such course of conduct did not constitute willful misconduct or gross negligence of the Covered Person. Each Covered Person shall be indemnified by the Company against any losses, judgments, liabilities, claims, damages, costs, expenses (including reasonable legal fees and other expenses actually incurred in investigating or defending against any such losses, judgments, liabilities or claims and expenses actually incurred enforcing this Agreement) and amounts paid in settlement of any claim (approved in advance and in good faith by the Member) sustained by any of them by reason of any act or omission or alleged act or omission in connection with the activities of the Company (including any subsidiaries thereof) unless there is a final judicial determination by a court of competent jurisdiction to which all rights of appeal have been exhausted or expired that the same were the result of bad faith, willful misconduct or gross negligence of the Covered Person. The Covered Person may rely in good faith upon the advice of legal counsel.

(b)     To the extent available on commercially reasonable terms, the Company may purchase, at the Company's expense, insurance (including without limitation, liability insurance policies and errors and omissions policies) to cover any liabilities covered by this Section 14 in such amount and with such deductibles as the Company may determine; provided, however, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person. Any such insurance may extend beyond the termination of the Company for a commercially reasonable period. The Company shall be subrogated to the Covered Person's rights under such indemnification or insurance. If any Covered Person recovers any amounts in respect of any such liabilities from insurance coverage or any third party source, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to it by the Company in respect of such liabilities. The Company shall not incur the cost of that portion of any insurance, other than public liability insurance, which insures any party against any liability the indemnification of which is herein prohibited.

(c)     The Company may, as determined in good faith by the Member, pay the legal fees and other expenses reasonably incurred by any Covered Person hereunder in connection with any proceeding in advance of the final disposition of such proceeding, so long as the Company receives a written undertaking, in form and content approved by the Company's counsel, by such Covered Person to repay the full amount advanced if there is a final judicial determination by a court of competent jurisdiction, as to which all rights of appeal have been exhausted or expired, that such Covered Person did not satisfy the standards which entitle it to indemnification pursuant to the terms of this Section 14.

(d)     The right of indemnification hereby provided shall not be exclusive of, and shall not affect, any other rights to which any Covered Person may be entitled. Nothing contained in this Section 14 shall limit any lawful rights to indemnification existing independently of this Section 14.

Page 4

003089

HCMLPHMIT00004118

(e)    The indemnification rights provided by this <u>Section 14</u> shall not be construed to increase the liability of the Member.

(f)    The indemnification rights provided by this <u>Section 14</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

(g)    The provisions of this <u>Section 14</u> shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this <u>Section 14</u> and regardless of any subsequent amendment to this Agreement; <u>provided</u>, <u>however</u>, that no such amendment shall reduce or restrict the extent to which the indemnification provisions of this <u>Section 14</u> apply to actions taken or omissions made or alleged actions taken or omissions made prior to the date of such amendment.

(h)    If deemed appropriate or necessary by the Member, the Company may establish reserves, escrow accounts or similar accounts to fund its obligations under this <u>Section 14</u>.

(i)    The provisions of this <u>Section 14</u> shall survive the termination or dissolution of the Company.

15.    <u>No Third Party Beneficiary</u>.  No creditor or other third party having dealings with the Company shall have the right to enforce the right or obligation of the Member to make capital contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the Member, the Covered Persons (to the extent granted herein) and the Company and their respective successors and permitted assigns.

[Signature Page Follows]

003090

HCMLPHMIT00004119

IN WITNESS WHEREOF, the undersigned member has executed this Amended and Restated Limited Liability Company Agreement as of the date first set forth above.

RAND PE FUND I, L.P. – Series 1

By:  RAND PE FUND MANAGEMENT, LLC
Its:   General Partner

By:
Its:   MANAGING MEMBER

Page 6

*Signature Page to Beacon Mountain LLC*
*Company Agreement*

003091

HCMLPHMIT00004120

## SCHEDULE A

## MEMBER

| Member | LLC Interest |
|--------|--------------|
| Rand PE Fund I, L.P. – Series 1 | 100% |

003092

HCMLPHMIT00004121

# EXHIBIT A

## CERTIFICATE NO. __

## CERTIFICATE OF LLC INTEREST

of

## BEACON MOUNTAIN LLC

### A Delaware Limited Liability Company

This Certificate of LLC Interest (this "Certificate") is issued and shall be held subject to the provisions of the Certificate of Formation of Beacon Mountain, LLC, a limited liability company organized under the laws of the State of Delaware (the "Company"), filed on September ___, 2015 with the Secretary of State of the State of Delaware, and the Limited Liability Company Agreement of the Company, dated as of September ___, 2015, as each may be amended from time to time.

This Certificate of LLC Interest certifies that _____, a Member of the Company, is the registered holder of ___% of the "LLC Interest" (as such term is defined in the above-referenced Limited Liability Company Agreement) of the Company, which LLC Interest shall be transferable only on the books of the Company by the holder hereof in person or by a duly authorized attorney upon surrender of this Certificate with a proper endorsement.

### *SEE RESTRICTIONS ON REVERSE SIDE.*

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by its duly authorized officer as of the ____ day of _____, 2__.

BEACON MOUNTAIN LLC

By: _____
Name: _____
Title: _____

Page 8

003093

HCMLPHMIT00004122

## [REVERSE SIDE OF CERTIFICATE]

## BEACON MOUNTAIN LLC

For value received, the undersigned hereby sells, assigns, and transfers to _____ and its successors and assigns, ___% of the LLC Interest of Beacon Mountain LLC standing in the name of _____, on the books of said limited liability company represented by certificate No. _____ and does hereby irrevocably constitute and appoint _____, and its successors and assigns, attorney to transfer said interests on the books of the limited liability company with full power of substitution.

Dated: _____

_____

By: _____
Name: _____
Title: _____

THE LLC INTEREST REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES ACT OR OTHER SIMILAR STATUTE IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. WITHOUT SUCH REGISTRATION, THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS RESTRICTED, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR SUCH OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT THE TRANSFER IS NOT IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAW.  THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS ALSO SUBJECT TO THE RESTRICTIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, WHICH MAY BE AMENDED FROM TIME TO TIME.

003094
HCMLPHMIT00004123

**EXHIBIT  5**

003095



2

003097







d r    d    r       d       d
d d  d    d    d          d        d  r    r
r                      r

r    d

M r    r
M    r

**SCHEDULE A**

**MEMBER**

| Member | LLC Interest |
|--------|--------------|
| d      |              |

003102

**EXHIBIT A**

**CERTIFICATE NO.＿＿**

**CERTIFICATE OF LLC INTEREST**

**of**

**BEACON MOUNTAIN LLC**

**A Delaware Limited Liability Company**



*SEE RESTRICTIONS ON REVERSE SIDE.*



**[REVERSE SIDE OF CERTIFICATE]**

003103

**BEACON MOUNTAIN LLC**

003104

**EXHIBIT**

003105

**BYLAWS**

**OF**

**THE OKADA FAMILY FOUNDATION, INC.**

003106

# TABLE OF CONTENTS

Page

ARTICLE I.   OFFICES...................................................................................................1

    Section 1.1  Registered Office ...................................................................................1
    Section 1.2  Other Offices .........................................................................................1

ARTICLE II.  MEMBERSHIP.........................................................................................1

    Section 2.1  Classes and Number ..............................................................................1
    Section 2.2  Voting ....................................................................................................1
    Section 2.3  Transfer of Membership ........................................................................1
    Section 2.4  Resignation of Member .........................................................................2
    Section 2.5  Place of Meetings ..................................................................................2
    Section 2.6  Annual Meetings ...................................................................................2
    Section 2.7  Special Meetings ...................................................................................2
    Section 2.8  Notice of Meetings of Members ............................................................2
    Section 2.9  Quorum ..................................................................................................3
    Section 2.10  Voting ..................................................................................................3
    Section 2.11  Proxies .................................................................................................3
    Section 2.12  Action by Written Consent ..................................................................3
    Section 2.13  Control of Investments .........................................................................3

ARTICLE III. DIRECTORS ............................................................................................4

    Section 3.1  General Powers ......................................................................................4
    Section 3.2  Number of Directors ..............................................................................4
    Section 3.3  Vacancies ..............................................................................................4
    Section 3.4  Place of Meetings ..................................................................................5
    Section 3.5  Committees of Directors ........................................................................5
    Section 3.6  Compensation of Directors ....................................................................5
    Section 3.7  Annual Meeting .....................................................................................5
    Section 3.8  Additional Regular Meetings .................................................................5
    Section 3.9  Special Meetings ...................................................................................5
    Section 3.10  Method and Timing of Notice..............................................................5
    Section 3.11  Purpose not Required in Notice ...........................................................6
    Section 3.12  Waiver of Notice .................................................................................6
    Section 3.13  Action by Written Consent ..................................................................6
    Section 3.14  Validation of Action by Consent .........................................................6
    Section 3.15  Quorum and Manner of Acting ...........................................................6
    Section 3.16  Resignation and Removal of Directors ................................................7

ARTICLE IV. OFFICERS ...............................................................................................7

    Section 4.1  Officers .................................................................................................7
    Section 4.2  Election, Term of Office and Eligibility ................................................7
    Section 4.3  Subordinate Officers .............................................................................7

003107

Section 4.4  Removal ...................................................................................................7
Section 4.5  The President and Co-President ................................................................7
Section 4.6  The Secretary ...........................................................................................8
Section 4.7  The Assistant Secretaries .........................................................................8
Section 4.8  Chairman and Co-Chairs .........................................................................8
Section 4.9  The Chief Financial Officer .....................................................................8
Section 4.10  The Assistant Chief Financial Officers ..................................................9
Section 4.11  Delegation of Duties ..............................................................................9

ARTICLE V.  BOOKS AND RECORDS ..............................................................................9

Section 5.1  Location ...................................................................................................9
Section 5.2  Inspection ................................................................................................9

ARTICLE VI. MISCELLANEOUS PROVISIONS ................................................................9

Section 6.1  Fiscal Year ...............................................................................................9
Section 6.2  Depositories .............................................................................................9
Section 6.3  Checks, Drafts and Notes .......................................................................10
Section 6.4  Contracts and Other Instruments ...........................................................10
Section 6.5  Conflicts of Interest ...............................................................................10
Section 6.6  Waivers of Notice ..................................................................................10
Section 6.7  Ownership Interests in Other Entities ....................................................10
Section 6.8  Indemnification ......................................................................................11
Section 6.9  Amendment of Bylaws ...........................................................................12

6646907.1/SP/12409/0104/030915

003108

BYLAWS

OF

THE OKADA FAMILY FOUNDATION, INC.

## ARTICLE I.

### OFFICES

Section 1.1    Registered Office.  The registered office of THE OKADA FAMILY FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II.

### MEMBERSHIP

Section 2.1    Classes and Number.  The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be Mark Okada or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.  Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.  Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Okada, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the

-1-

003109

death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member.  A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings.  All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings.  Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2015, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings.  Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members.  When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting) Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the

telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    <u>Quorum</u>.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. lf, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    <u>Voting</u>.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    <u>Proxies.</u>    At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13    <u>Control of Investments</u>. Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of

the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments.  The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities. The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto.  The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any. The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors.  The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies.  If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual

6646907.1/SP/12409/0104/030915

003112

Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings.  The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings.  Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice.  Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered

6646907.1/SP/12409/0104/030915

personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

Section 3.11   <u>Purpose not Required in Notice</u>.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12   <u>Waiver of Notice</u>.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13   <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   <u>Validation of Action by Consent</u>.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   <u>Quorum and Manner of Acting</u>.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such

-6-

003114

participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16    <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV.

## OFFICERS

Section 4.1    <u>Officers</u>.  The officers of the Corporation shall include a President  and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2    <u>Election, Term of Office and Eligibility</u>.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3    <u>Subordinate Officers</u>.  The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4    <u>Removal</u>.  The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5    <u>The President and The Co-Presidents</u>.  The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the

003115

Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors. A second person may be appointed by the Board of Directors having the same duties and powers as provided for under this Section 4.5, and in the case of such an appointment, each person serving pursuant to this Section 4.5 shall be referred to as Co-President. When Co-Presidents are serving either Co-President may act alone without the concurrence of the other Co-President. Should the Co-Presidents disagree as to the taking or not taking of an action provided for by this Section 4.5, then the Members shall decide whether to take or not take such action.

Section 4.6    The Secretary.  The Secretary shall:

(a)    keep the minutes of the meetings of the members and of the Board of Directors;

(b)    see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)    in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    Chairman and Co-Chairs.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time. A second person may be appointed by the Board of Directors having the same duties and powers as provided for under this Section 4.8, and in the case of such an appointment, each person serving pursuant to this Section 4.8 shall be referred to as a Co-Chair. When Co-Chairs are serving either Co-Chair may act alone without the concurrence of the other Co-Chair.

Section 4.9    The Chief Financial Officer.  The Chief Financial Officer, if any, shall:

(a)    receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the

-8-

Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)      render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)      in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10    The Assistant Chief Financial Officers.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11    Delegation of Duties.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1    Location.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2    Inspection.  The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

6646907.1/SP/12409/0104/030915

003117

Section 6.3    <u>Checks, Drafts and Notes</u>.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    <u>Contracts and Other Instruments</u>.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

Section 6.5    <u>Conflicts of Interest</u>.  No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6    <u>Waivers of Notice</u>.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7    <u>Ownership Interests in Other Entities</u>.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or

6646907.1/SP/12409/0104/030915

by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8     <u>Indemnification</u>.

(a)     Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)     If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea

-11-

of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)    To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)    Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)    The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9    Amendment of Bylaws.  Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

*  *  *  *  *

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing initial Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation by unanimous written consent on __March 9__, 2015.

Digitally signed by Gary Garcia
DN: cn=Gary Garcia, o=The Dallas Foundation, ou, email=gwgarcia@dallasfoundation.org, c=US
Date: 2015.03.09 16:09:08 -05'00'

Gary W. Garcia, Secretary

6646907.1/SP/12409/0104/030915

003120

6646907.1/SP/12409/0104/030915

003121

**EXHIBIT 97**

003122

**BYLAWS**

**OF**

**EMPOWER DALLAS FOUNDATION, INC.**

003123

## TABLE OF CONTENTS

**Page**

ARTICLE I.   OFFICES ..................................................................................................... 1

    Section 1.1  Registered Office .................................................................................... 1
    Section 1.2  Other Offices ........................................................................................... 1

ARTICLE II.  MEMBERSHIP ......................................................................................... 1

    Section 2.1  Classes and Number ............................................................................... 1
    Section 2.2  Voting ...................................................................................................... 1
    Section 2.3  Transfer of Membership ......................................................................... 1
    Section 2.4  Resignation of Member .......................................................................... 2
    Section 2.5  Place of Meetings ................................................................................... 2
    Section 2.6  Annual Meetings ..................................................................................... 2
    Section 2.7  Special Meetings ..................................................................................... 2
    Section 2.8  Notice of Meetings of Members ............................................................. 2
    Section 2.9  Quorum .................................................................................................... 3
    Section 2.10  Voting .................................................................................................... 3
    Section 2.11  Proxies ................................................................................................... 3
    Section 2.12  Action by Written Consent .................................................................... 3
    Section 2.13  Control of Investments .......................................................................... 3

ARTICLE III. DIRECTORS ............................................................................................ 4

    Section 3.1  General Powers ........................................................................................ 4
    Section 3.2  Number of Directors ............................................................................... 4
    Section 3.3  Vacancies ................................................................................................ 4
    Section 3.4  Place of Meetings ................................................................................... 5
    Section 3.5  Committees of Directors ......................................................................... 5
    Section 3.6  Compensation of Directors ..................................................................... 5
    Section 3.7  Annual Meeting ....................................................................................... 5
    Section 3.8  Additional Regular Meetings .................................................................. 5
    Section 3.9  Special Meetings ..................................................................................... 5
    Section 3.10  Method and Timing of Notice ............................................................... 5
    Section 3.11  Purpose not Required in Notice ............................................................. 6
    Section 3.12  Waiver of Notice ................................................................................... 6
    Section 3.13  Action by Written Consent .................................................................... 6
    Section 3.14  Validation of Action by Consent ........................................................... 6
    Section 3.15  Quorum and Manner of Acting .............................................................. 6
    Section 3.16  Resignation and Removal of Directors .................................................. 7

ARTICLE IV. OFFICERS ............................................................................................... 7

    Section 4.1  Officers .................................................................................................... 7
    Section 4.2  Election, Term of Office and Eligibility ................................................. 7
    Section 4.3  Subordinate Officers ............................................................................... 7

010036 000016 14282559.2

003124

Section 4.4  Removal ............................................................................................................7
Section 4.5  The President ....................................................................................................7
Section 4.6  The Secretary ....................................................................................................8
Section 4.7  The Assistant Secretaries .................................................................................8
Section 4.8  Chairman ...........................................................................................................8
Section 4.9  The Chief Financial Officer .............................................................................8
Section 4.10  The Assistant Chief Financial Officers .........................................................9
Section 4.11  Delegation of Duties ......................................................................................9

ARTICLE V.  BOOKS AND RECORDS ...................................................................................9

Section 5.1  Location .............................................................................................................9
Section 5.2  Inspection ..........................................................................................................9

ARTICLE VI. MISCELLANEOUS PROVISIONS ....................................................................9

Section 6.1  Fiscal Year ........................................................................................................9
Section 6.2  Depositories ......................................................................................................9
Section 6.3  Checks, Drafts and Notes .................................................................................9
Section 6.4  Contracts and Other Instruments .....................................................................9
Section 6.5  Conflicts of Interest .......................................................................................10
Section 6.6  Waivers of Notice ..........................................................................................10
Section 6.7  Ownership Interests in Other Entities ...........................................................10
Section 6.8  Indemnification ..............................................................................................10
Section 6.9  Amendment of Bylaws ..................................................................................12

003125

BYLAWS

OF

EMPOWER DALLAS FOUNDATION, INC.

## ARTICLE I.

### OFFICES

Section 1.1    Registered Office.    The registered office of EMPOWER DALLAS FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.    The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II.

## MEMBERSHIP

Section 2.1    Classes and Number.    The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be Grant Scott or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.    Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.    Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Scott, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the

-1-

003126

death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member.  A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings.  All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings.  Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2015, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings.  Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members.  When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the

telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. lf, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies.  At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13    Control of Investments. Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of

the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments.  The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities. The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto.  The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any. The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1     General Powers.   The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2     Number of Directors.   The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3     Vacancies.   If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual

Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.   The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.   Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings.  The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings.  Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice.   Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered

personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

Section 3.11    <u>Purpose not Required in Notice</u>.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12    <u>Waiver of Notice</u>.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13    <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14    <u>Validation of Action by Consent</u>.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15    <u>Quorum and Manner of Acting</u>.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such

010036 000016 14282559.2

participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16   <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## **ARTICLE IV.**

## **OFFICERS**

Section 4.1   <u>Officers</u>.  The officers of the Corporation shall include a President  and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2   <u>Election, Term of Office and Eligibility</u>.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3   <u>Subordinate Officers</u>.  The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4   <u>Removal</u>.  The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5   <u>The President</u>.  The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the

003132

President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    <u>The Secretary</u>.  The Secretary shall:

(a)    keep the minutes of the meetings of the members and of the Board of Directors;

(b)    see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)    in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    <u>The Assistant Secretaries</u>.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    <u>Chairman</u>.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9    <u>The Chief Financial Officer</u>.  The Chief Financial Officer, if any, shall:

(a)    receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)    in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10    The Assistant Chief Financial Officers.    If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11    Delegation of Duties.    In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1    Location.    The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2    Inspection.    The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year.    The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories.    The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes.    All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments.    The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

010036 000016 14282559.2

003134

Section 6.5     Conflicts of Interest.  No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6     Waivers of Notice.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7     Ownership Interests in Other Entities.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8     Indemnification.

(a)     Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held

-10-

003135

harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense,

010036 000016 14282559.2

003136

liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)     To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9     <u>Amendment of Bylaws</u>.  Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

*  *  *  *  *

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing initial Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation by unanimous written consent on ___March 9___, 2015.

Digitally signed by Gary Garcia
DN: cn=Gary Garcia, o=The Dallas Foundation,
ou, email=gwgarcia@dallasfoundation.org,
c=US
Date: 2015.03.09 15:47:15 -05'00'

Gary W. Garcia, Secretary

010036 000016 14282559.2

003137

**EXHIBIT 9**

003138



**Deferred Variable Annuity Policy**

**Crown Global Life Insurance Ltd.**

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Goertzen,

12/16/15 Janita Burke,

**THIS IS A LEGAL CONTRACT.**

**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

*continued on next page*

30218



**Deferred Variable Annuity Policy**

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.

NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.

**Crown Global
Life Insurance Ltd.**

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com



## Policy Data Page

### General Policy Data

All amounts expressed in "$" or "dollars" are in United States dollars

Proposed Policyholder:

Empower Dallas Foundation, Inc

Proposed Annuitant:

Grant Scott

Proposed Annuitant's Date of Birth:

29 May, 1962

Gender:

Male

Policy Effective Date: 10 Dec, 2015

Issue Date: 10 Dec, 2015

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

at the latest

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
|---|---|---|
| Empower Dallas Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30218

### Premium Amounts

Initial Premium:

$ 15,903,108.54

Premium Limit:

n/a

Premium Deposit:

n/a

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

003141



## Policy Data Page

**Initial Allocation of Payments to Investment Options**

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank:       n/a

Investment Manager:   n/a

003142



# Policy Data Page

## Policy Fees and Charges

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br><br>0.45% p.a  $10mm of  Premium<br><br>0.35% p.a. $11-20mm of Premium<br><br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br><br>(adjusted for additional premium payments and withdrawals, as applicable)<br><br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |

**CROWN GLOBAL**
INSURANCE

## Table of Contents

General Policy Data ........................................................................................................... 3

Initial Allocation of Payments to Investment Options ................................................. 4

Policy Fees and Charges ................................................................................................. 5

**Article I      General Provisions ...........................................................................15**
Section 1.1      Consideration ..................................................................... 15
Section 1.2      Entire Policy ........................................................................ 15
Section 1.3      Survival of Representations, Warrants, Covenants ...................... 15
Section 1.4      Amendment or Modification ................................................ 15
Section 1.5      Misstatement of Age ........................................................... 15
Section 1.6      Non-Participating Policy ...................................................... 16
Section 1.7      Ownership of Assets ........................................................... 16
Section 1.8      Rule of Construction ........................................................... 16
Section 1.9      Governing Law .................................................................... 16
Section 1.10    Effective Date of Coverage ................................................. 16

**Article II     Premium Provisions ........................................................................17**
Section 2.1      Premiums ............................................................................ 17
Section 2.2      Insurer's Right to Refuse Premiums .................................... 17
Section 2.3      Nonpayment of Premium ..................................................... 18

**Article III   Termination Provisions ..................................................................19**
Section 3.1      Insurer's Cancellation Rights .............................................. 19
Section 3.2      Reinstatement ..................................................................... 20

**Article IV   Premium Investment; Policy Account Values ................................21**
Section 4.1      The Separate Account .......................................................... 21
Section 4.2      Premiums ............................................................................ 21
Section 4.3      Allocations to Investment Options ...................................... 21
Section 4.4      Compliance with Investor Control Rules .............................. 22
Section 4.5      Changes in Allocations to Investment Options ..................... 23
Section 4.6      Responsibility for Selecting Investment Options .................. 23
Section 4.7      Appointment of Investment Manager and Custodian Bank ........... 24
Section 4.8      Timing of Allocations .......................................................... 24
Section 4.9      Investment of Separate Account Assets ................................ 24
Section 4.10    Request for Extension of Investment Rights  With Respect
                      to Adequate Diversification ................................................ 26
Section 4.11    Changes in Investment Options ........................................... 26



Section 4.12  Policy Account Value ................................................................................ 27

**Article V    Transfers Among Investment Options ..............................................28**
Section 5.1    General .................................................................................................. 28
Section 5.2    Conditions on Transfer ......................................................................... 28
Section 5.3    Liability .................................................................................................. 29
Section 5.4    Limits on Right of Transfer .................................................................. 29

**Article VI    Annuity Provisions ..............................................................................30**
Section 6.1    Annuity Payments ................................................................................ 30
Section 6.2    Annuity Percentage ............................................................................. 30
Section 6.3    No Guaranteed Payments ................................................................... 30
Section 6.4    Annuity Starting Date ........................................................................... 31
Section 6.5    Change of Annuity Starting Date ......................................................... 31
Section 6.6    Annuity Income Options ....................................................................... 31
Section 6.7    Maturity Payment ................................................................................. 32

**Article VII   Loan Provisions ...................................................................................33**
Section 7.1    Policy Loans ......................................................................................... 33

**Article VIII  Surrender Provisions ...........................................................................34**
Section 8.1    General .................................................................................................. 34
Section 8.2    Full Surrender ...................................................................................... 34
Section 8.3    Partial Surrender .................................................................................. 34

**Article IX    Policy Fees and Charges .....................................................................36**
Section 9.1    Policy Administration Fee .................................................................... 36
Section 9.2    DAC Charges ........................................................................................ 36
Section 9.3    Management & Expense Fee ................................................................ 36
Section 9.4    Policy Set-Up Deposit .......................................................................... 36
Section 9.5    Acceptance Fee .................................................................................... 36
Section 9.6    Surrender Charge ................................................................................ 37
Section 9.7    Taxes ..................................................................................................... 37
Section 9.8    Agreed Upon Procedures Fee ............................................................. 37
Section 9.9    Deductions for Fees and Charges ....................................................... 37
Section 9.10   Custodian Bank and Investment Manager Fees ............................ 37

**Article X     Death Benefit Provisions ....................................................................39**
Section 10.1   Death Benefit ....................................................................................... 39
Section 10.2   Due Proof of Death .............................................................................. 40



**Article XI  Owner, Beneficiary, Assignment** ......................................................................41

    Section 11.1   Proposed Policyholder ........................................................... 41

    Section 11.2   Change of Proposed Policyholder ......................................... 41

    Section 11.3   Proposed Annuitant ............................................................... 41

    Section 11.4   Change of Proposed Annuitant .............................................. 41

    Section 11.5   Beneficiary ............................................................................ 42

    Section 11.6   Change of Beneficiary ........................................................... 42

    Section 11.7   Assignment ........................................................................... 42

**Article XII Other General Provisions** ..................................................................................44

    Section 12.1   Periodic Reports ................................................................... 44

    Section 12.2   Currency and Place of Payment ............................................ 44

    Section 12.3   Notices, Requests and Elections ........................................... 44

    Section 12.4   Policy Settlement .................................................................. 45

    Section 12.5   Deferment ............................................................................. 45

    Section 12.6   Incontestability ..................................................................... 45

    Section 12.7   Policyholder Information ....................................................... 46

    Section 12.8   Tax Matters ........................................................................... 46

    Section 12.9   Limitation on Liability of Insurer .......................................... 47



## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** –  A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,



exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda,  email: info@crownglobalinsurance.com,  facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company

003148



(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer. For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.



**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.



**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.



**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.

003152



## Article I        General Provisions

### Section 1.1        Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2        Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3        Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4        Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5        Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on



whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

### Section 1.6      Non-Participating Policy

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

### Section 1.7      Ownership of Assets

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

### Section 1.8      Rule of Construction

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

### Section 1.9      Governing Law

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

### Section 1.10      Effective Date of Coverage

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.



## Article II Premium Provisions

**Section 2.1 Premiums**

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

**Section 2.2 Insurer's Right to Refuse Premiums**

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.

003155



The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3        Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.



## Article III    Termination Provisions

### Section 3.1    Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1.  The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2.  The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3.  The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4.  Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5.  If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination.  The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.

003157



**Section 3.2       Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.



---

# Article IV    Premium Investment; Policy Account Values

### Section 4.1    The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

### Section 4.2    Premiums

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

### Section 4.3    Allocations to Investment Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the



Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories:  IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

**Section 4.4**      **Compliance with Investor Control Rules**

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.



### Section 4.5 Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6 Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the



performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section 4.7**        **Appointment of Investment Manager and Custodian Bank**

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager).   A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section 4.8**        **Timing of Allocations**

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days  following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section 4.9**        **Investment of Separate Account Assets**

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1.        Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes



of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2.      The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3.      No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4.      The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5.      In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.



**Section 4.10    Request for Extension of Investment Rights
With Respect to Adequate Diversification**

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

**Section 4.11    Changes in Investment Options**

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any



such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12      Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.

CROWN GLOBAL
INSURANCE

## Article V        Transfers Among Investment Options

**Section 5.1        General**

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

**Section 5.2        Conditions on Transfer**

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1.      Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2.      Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3.      Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4.      Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5.      The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6.      No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7.      In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.



**Section 5.3     Liability**

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

**Section 5.4     Limits on Right of Transfer**

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested.  For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.



## Article VI    Annuity Provisions

### Section 6.1    Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2    Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3    No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.



### Section 6.4    Annuity Starting Date

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty- fifth (85th) birthday shall be the Annuity Starting Date.

### Section 6.5    Change of Annuity Starting Date

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

### Section 6.6    Annuity Income Options

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's



actuary each year (and recomputed on the annual anniversary date each year
thereafter) by multiplying the applicable Annuity Percentage in the Annuity
Percentage Table attached as Appendix I to this Policy by the then current Policy
Account Value as of the Annuity Starting Date and predetermined on the annual
anniversary date each year thereafter. If the Policy Account Value is zero, then all
payments will cease.  All Annuity Payments shall be made to an account outside the
U.S. The Insurer may consider the adoption of additional benefit options at the
request of a Proposed Policyholder.

**Section 6.7**        **Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint
Annuitants), the Insurer will pay to the Beneficiaries, or their successors as
Beneficiaries, as the case may be, the balance of the Policy Account Value.



## Article VII    Loan Provisions

**Section 7.1    Policy Loans**

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.



## Article VIII    Surrender Provisions

### Section 8.1    General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2    Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3    Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than



$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.



## Article IX    Policy Fees and Charges

### Section 9.1    Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2    DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate.  The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3    Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4    Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer.  Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee.  If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5    Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.



### Section 9.6    Surrender Charge

Surrender charges will not apply to this Policy.

### Section 9.7    Taxes

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account.  These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

### Section 9.8    Agreed Upon Procedures Fee

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

### Section 9.9    Deductions for Fees and Charges

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

### Section 9.10    Custodian Bank and Investment Manager Fees

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the



custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.

003176



## Article X        Death Benefit Provisions

**Section 10.1        Death Benefit**

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries

003177



elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

### Section 10.2    Due Proof of Death

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1.    A certified copy of a death certificate;

2.    A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or

3.    Any other proof of death satisfactory to the Insurer.



## Article XI    Owner, Beneficiary, Assignment

### Section 11.1    Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2    Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3    Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4    Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.



### Section 11.5    Beneficiary

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

### Section 11.6    Change of Beneficiary

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

### Section 11.7    Assignment

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.

003180



The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier. Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder. For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein. The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy  and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.



## Article XII    Other General Provisions

### Section 12.1    Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2    Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3    Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions

003182



received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4   Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5   Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible.  The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6   Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.

003183



### Section 12.7    Policyholder Information

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

### Section 12.8    Tax Matters

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.

003184



**Section 12.9**   **Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

30218

003185



## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

**EXHIBIT 99**

003187



## *TERMSHEET*

| | | |
|---|---|---|
| Policy Number | : | # 30218 Separate Account |
| Policyholder | : | Empower Dallas Foundation, Inc |
| Annuitant | : | Grant Scott |
| Beneficiary | : | Empower Dallas Foundation, Inc |
| Premiums planned | : | Approx. US$ 20'000'000 |
| Premium Date | : | TBA |
| Policy Date | : | TBA |
| Policy Type | : | Deferred Variable Annuity (DVA) |
| Issuing Company | : | Crown Global Life Insurance Ltd., Bermuda (953d) |
| Custodian Bank | : | n/a |
| Account/Portfolio Number | : | n/a |
| Investment Manager | : | n/a |
| Asset Allocation/Investment Profile | : | IDF: Atlas IDF, LP/ Rand Advisors LLC |
| Investment of Funds Model: | : | n/a |
| Acceptance Fee | : | Zero |
| Mgmt. & Expense Fee | : | 0.45% p.a  $10mm of  Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+ of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm. |
| Policy Administration Fee | : | US$ 2,900 p.a. |
| DAC Tax | : | 0.25% of all premium payments |
| Federal Excise Tax – 1% of Premium | : | n/a |
| Surrender Charge | : | US$ 5'000 |
| Policy Audit (optional) | : | US$ 1'975 p.a. |

Place, Date                          *GRAND CAYMAN , DEC 9TH 2015 .*

Signature

*[signature]*
Policyholder

003188

# EXHIBIT

003189



**Deferred Variable Annuity Policy**

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Greertzen

12/16/15 Janita Burke

**THIS IS A LEGAL CONTRACT.**

**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

*continued on next page*

30219



**Deferred Variable Annuity Policy**

Crown Global Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.

NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.



## Policy Data Page

### General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

| | |
|---|---|
| Proposed Policyholder: | Proposed Annuitant: |
| The Okada Family Foundation, Inc | Mark Okada |

| | |
|---|---|
| Proposed Annuitant's Date of Birth: | Gender: |
| 11 May, 1962 | Male |

Policy Effective Date: 11 Dec, 2015    Issue Date: 11 Dec, 2015

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
|---|---|---|
| The Okada Family Foundation, Inc | 100% | Irrevocable |

Separate Account number · 30219

### Premium Amounts

| | |
|---|---|
| Initial Premium: | $ 5,301,065.12 |
| Premium Limit: | n/a |
| Premium Deposit: | n/a |

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

003192



## Policy Data Page

**Initial Allocation of Payments to Investment Options**

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank:  n/a

Investment Manager: n/a

30219                    **4 of 48**

003193



# Policy Data Page

### Policy Fees and Charges

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value: 0.45% p.a  $10mm of  Premium  0.35% p.a. $11-20mm of Premium  0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm  (adjusted for additional premium payments and withdrawals, as applicable)  *See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |



## Table of Contents

General Policy Data ............................................................................................... 3

Initial Allocation of Payments to Investment Options ............................................. 4

Policy Fees and Charges ....................................................................................... 5

**Article I    General Provisions..............................................................15**

Section 1.1    Consideration ............................................................. 15

Section 1.2    Entire Policy................................................................ 15

Section 1.3    Survival of Representations, Warrants, Covenants....... 15

Section 1.4    Amendment or Modification ........................................ 15

Section 1.5    Misstatement of Age................................................... 15

Section 1.6    Non-Participating Policy ............................................. 16

Section 1.7    Ownership of Assets................................................... 16

Section 1.8    Rule of Construction ................................................... 16

Section 1.9    Governing Law ........................................................... 16

Section 1.10   Effective Date of Coverage........................................ 16

**Article II   Premium Provisions...........................................................17**

Section 2.1    Premiums ................................................................... 17

Section 2.2    Insurer's Right to Refuse Premiums ........................... 17

Section 2.3    Nonpayment of Premium ............................................ 18

**Article III  Termination Provisions......................................................19**

Section 3.1    Insurer's Cancellation Rights ...................................... 19

Section 3.2    Reinstatement ........................................................... 20

**Article IV  Premium Investment; Policy Account Values ..................21**

Section 4.1    The Separate Account ................................................ 21

Section 4.2    Premiums ................................................................... 21

Section 4.3    Allocations to Investment Options .............................. 21

Section 4.4    Compliance with Investor Control Rules...................... 22

Section 4.5    Changes in Allocations to Investment Options ............ 23

Section 4.6    Responsibility for Selecting Investment Options .......... 23

Section 4.7    Appointment of Investment Manager and Custodian Bank .......... 24

Section 4.8    Timing of Allocations................................................... 24

Section 4.9    Investment of Separate Account Assets...................... 24

Section 4.10   Request for Extension of Investment Rights  With Respect
to Adequate Diversification.......................................... 26

Section 4.11   Changes in Investment Options .................................. 26



Section 4.12    Policy Account Value ...................................................................... 27

**Article V    Transfers Among Investment Options ..........................................28**
Section 5.1    General ............................................................................................. 28
Section 5.2    Conditions on Transfer .................................................................... 28
Section 5.3    Liability ............................................................................................ 29
Section 5.4    Limits on Right of Transfer .............................................................. 29

**Article VI   Annuity Provisions ....................................................................30**
Section 6.1    Annuity Payments ............................................................................ 30
Section 6.2    Annuity Percentage .......................................................................... 30
Section 6.3    No Guaranteed Payments ................................................................ 30
Section 6.4    Annuity Starting Date ...................................................................... 31
Section 6.5    Change of Annuity Starting Date ..................................................... 31
Section 6.6    Annuity Income Options .................................................................. 31
Section 6.7    Maturity Payment ............................................................................. 32

**Article VII  Loan Provisions .........................................................................33**
Section 7.1    Policy Loans .................................................................................... 33

**Article VIII Surrender Provisions .................................................................34**
Section 8.1    General ............................................................................................. 34
Section 8.2    Full Surrender .................................................................................. 34
Section 8.3    Partial Surrender .............................................................................. 34

**Article IX   Policy Fees and Charges ...........................................................36**
Section 9.1    Policy Administration Fee ................................................................ 36
Section 9.2    DAC Charges .................................................................................... 36
Section 9.3    Management & Expense Fee ............................................................ 36
Section 9.4    Policy Set-Up Deposit ..................................................................... 36
Section 9.5    Acceptance Fee ............................................................................... 36
Section 9.6    Surrender Charge ............................................................................. 37
Section 9.7    Taxes ................................................................................................ 37
Section 9.8    Agreed Upon Procedures Fee .......................................................... 37
Section 9.9    Deductions for Fees and Charges .................................................... 37
Section 9.10   Custodian Bank and Investment Manager Fees ............................ 37

**Article X    Death Benefit Provisions ...........................................................39**
Section 10.1   Death Benefit .................................................................................. 39
Section 10.2   Due Proof of Death ......................................................................... 40

003196



**Article XI  Owner, Beneficiary, Assignment** ....................................................**41**
    Section 11.1   Proposed Policyholder ................................................. 41
    Section 11.2   Change of Proposed Policyholder ................................. 41
    Section 11.3   Proposed Annuitant ..................................................... 41
    Section 11.4   Change of Proposed Annuitant ..................................... 41
    Section 11.5   Beneficiary .................................................................. 42
    Section 11.6   Change of Beneficiary .................................................. 42
    Section 11.7   Assignment .................................................................. 42

**Article XII Other General Provisions** ...............................................................**44**
    Section 12.1   Periodic Reports ......................................................... 44
    Section 12.2   Currency and Place of Payment ................................... 44
    Section 12.3   Notices, Requests and Elections .................................. 44
    Section 12.4   Policy Settlement ......................................................... 45
    Section 12.5   Deferment ................................................................... 45
    Section 12.6   Incontestability ............................................................ 45
    Section 12.7   Policyholder Information ............................................... 46
    Section 12.8   Tax Matters ................................................................. 46
    Section 12.9   Limitation on Liability of Insurer ................................... 47



## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** –  A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,



exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda, email: info@crownglobalinsurance.com, facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company



(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer.  For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.



**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.



**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.

**003202**



**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.



## Article I    General Provisions

### Section 1.1    Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2    Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3    Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4    Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5    Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on



whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

### Section 1.6    Non-Participating Policy

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

### Section 1.7    Ownership of Assets

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

### Section 1.8    Rule of Construction

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

### Section 1.9    Governing Law

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

### Section 1.10    Effective Date of Coverage

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.



## Article II    Premium Provisions

**Section 2.1    Premiums**

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

**Section 2.2    Insurer's Right to Refuse Premiums**

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.



The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3      Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.



## Article III    Termination Provisions

**Section 3.1    Insurer's Cancellation Rights**

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1.    The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2.    The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3.    The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4.    Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5.    If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination.  The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.



**Section 3.2**      **Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.

003209



## Article IV    Premium Investment; Policy Account Values

### Section 4.1    The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

### Section 4.2    Premiums

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

### Section 4.3    Allocations to Investment Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the



Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories:  IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

**Section 4.4     Compliance with Investor Control Rules**

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.



### Section 4.5    Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6    Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the



performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section 4.7      Appointment of Investment Manager and Custodian Bank**

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager).  A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section 4.8      Timing of Allocations**

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days  following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section 4.9      Investment of Separate Account Assets**

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1.      Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes



of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2.     The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3.     No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4.     The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5.     In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.



### Section 4.10 Request for Extension of Investment Rights With Respect to Adequate Diversification

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

### Section 4.11 Changes in Investment Options

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any



such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12    Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.



## Article V    Transfers Among Investment Options

**Section 5.1    General**

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

**Section 5.2    Conditions on Transfer**

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1.    Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2.    Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3.    Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4.    Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5.    The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6.    No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7.    In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.



## Section 5.3    Liability

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

## Section 5.4    Limits on Right of Transfer

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested.  For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.



## Article VI    Annuity Provisions

### Section 6.1    Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2    Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3    No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.



## Section 6.4        Annuity Starting Date

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday shall be the Annuity Starting Date.

## Section 6.5        Change of Annuity Starting Date

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

## Section 6.6        Annuity Income Options

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's



actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease.  All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

**Section 6.7    Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.



---

## Article VII    Loan Provisions

**Section 7.1    Policy Loans**

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.



## Article VIII   Surrender Provisions

### Section 8.1   General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2   Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3   Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than



$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.



## Article IX    Policy Fees and Charges

### Section 9.1    Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2    DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate.  The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3    Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4    Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer.  Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee.  If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5    Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.

30219

003225



### Section 9.6    Surrender Charge

Surrender charges will not apply to this Policy.

### Section 9.7    Taxes

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account.  These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

### Section 9.8    Agreed Upon Procedures Fee

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

### Section 9.9    Deductions for Fees and Charges

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

### Section 9.10    Custodian Bank and Investment Manager Fees

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the



custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.

003227



# Article X    Death Benefit Provisions

**Section 10.1    Death Benefit**

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries



elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

**Section 10.2    Due Proof of Death**

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1.    A certified copy of a death certificate;

2.    A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or

3.    Any other proof of death satisfactory to the Insurer.



## Article XI   Owner, Beneficiary, Assignment

### Section 11.1   Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2   Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3   Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4   Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.



### Section 11.5    Beneficiary

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

### Section 11.6    Change of Beneficiary

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

### Section 11.7    Assignment

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.



The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier.  Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder.  For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein.   The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy  and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.



# Article XII    Other General Provisions

### Section 12.1    Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2    Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3    Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions



received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4      Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5      Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible.  The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6      Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.



### Section 12.7    Policyholder Information

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

### Section 12.8    Tax Matters

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.



**Section 12.9**    **Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**



## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

**EXHIBIT**

003238



# CROWN GLOBAL
## INSURANCE

### *TERMSHEET*

| | | |
|---|---|---|
| Policy Number | : | # 30219 Separate Account |
| Policyholder | : | The Okada Family Foundation, Inc |
| Annuitant | : | Mark Okada |
| Beneficiary | : | The Okada Family Foundation, Inc |
| Premiums planned | : | Approx. US$ 20'000'000 |
| Premium Date | : | TBA |
| Policy Date | : | TBA |
| Policy Type | : | Deferred Variable Annuity (DVA) |
| Issuing Company | : | Crown Global Life Insurance Ltd., Bermuda (953d) |
| Custodian Bank | : | n/a |
| Account/Portfolio Number | : | n/a |
| Investment Manager | : | n/a |
| Asset Allocation/Investment Profile | : | IDF: Atlas IDF, LP/ Rand Advisors LLC |
| Investment of Funds Model: | : | n/a |
| Acceptance Fee | : | Zero |
| Mgmt. & Expense Fee | : | 0.45% p.a  $10mm of  Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+ of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm. |
| Policy Administration Fee | : | US$ 2,900 p.a. |
| DAC Tax | : | 0.25% of all premium payments |
| Federal Excise Tax – 1% of Premium | : | n/a |
| Surrender Charge | : | US$ 5'000 |
| Policy Audit (optional) | : | US$ 1'975 p.a. |

Place, Date                           GRAND CAYMAN , DEC 9TH 2015 .

Signature                             *Christopher Pezalla*
                                      Policyholder

003239

# EXHIBIT

# PARTICIPATION AGREEMENT

among

**CROWN GLOBAL LIFE INSURANCE LTD.**

and

**CROWN GLOBAL LIFE INSURANCE LTD.** acting on behalf of each its Separate
Accounts set out in Schedule A hereto as may be amended from time to time

and

**ATLAS IDF, LP**

and

**RAND ADVISORS, LLC**

**Dated as of**

**November 30, 2015**

{00290535.DOC; 3}

003241

## TABLE OF CONTENTS

Page

ARTICLE I. CERTAIN DEFINITIONS ................................................................1

ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS ..................................3

ARTICLE III. NET ASSET VALUE ..................................................................5

ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS ...............6

ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER
OBLIGATIONS ..........................................................................................122

ARTICLE VI. EXPENSES. ............................................................................13

ARTICLE VII. INDEMNIFICATION ................................................................13

ARTICLE VIII. TERMINATION ......................................................................15

ARTICLE IX. NOTICES, REQUESTS OR CONSENTS ......................................16

ARTICLE X. PRIVACY OBLIGATIONS ............................................................16

ARTICLE XI. MISCELLANEOUS ....................................................................17

003242

**THIS PARTICIPATION AGREEMENT** (this "**Agreement**") is made and entered into by and among **CROWN GLOBAL LIFE INSURANCE LTD.** ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A hereto ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**"), as the same may be amended from time to time, **ATLAS IDF, LP**, a Delaware limited partnership (the "**Fund**"), and **RAND ADVISORS, LLC**, a Delaware limited liability company (the "**Adviser**") (collectively, the "**Parties**" and each, a "**Party**"), and shall be effective as of the date set forth on the counterpart signature page hereto.

## WITNESSETH:

**WHEREAS**, the Fund was organized as a private investment vehicle and is offering its limited partnership interests ("**Interests**") to Eligible Insurance Funds and to separate accounts, or subaccounts thereof, that fund Variable Contracts offered by Eligible Insurance Companies, as such terms are defined below;

**WHEREAS**, the offering and sale of Interests will be exempt from registration or qualification under the U.S. Securities Act of 1933, as amended (the "**1933 Act**");

**WHEREAS**, the Company has established a Separate Account, and may in the future establish additional Separate Accounts (and subaccounts thereof) to hold one or more Interests; and

**WHEREAS**, the Company desires to purchase, and the Fund desires to issue, Interests in accordance with this Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

## ARTICLE I. Certain Definitions

1.1    "**Business Day**" means each day the NYSE is open for regular trading, unless defined differently on Schedule A-2 hereto.

1.2    "**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

1.3    "**Company Contracts**" means those Variable Contracts issued by the Company and listed on Schedule A hereto, as the same may be amended from time to time.

1.4    "**Compliant Seed Investment**" means an investment in the Fund by the Adviser made in compliance with the Tax Requirements.

1.5    "**Confidential Information**" as used in this provision means any term of this Agreement, any transaction in connection with this Agreement, and any other non-public information concerning the Parties and their respective businesses and affiliates that may be acquired by reason of this Agreement or any transaction in connection therewith, but shall not include any information that is in or has entered the public domain other than due to a breach of Section 10 hereof.

1.6    "**Contract PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, utilized in connection with the offering of the Company Contracts.

003243

**1.7**   "**Customer Information**" means any "non-public personal information" (as defined in Regulation S-P of the U.S. Securities and Exchange Commission (the "**SEC**")) about a Policy Owner or prospective Policy Owner.  Customer Information includes, but is not limited to, a Policy Owner's (or prospective Policy Owner's) name, social security number and health and financial information.

**1.8**   "**Eligible Insurance Company**" means a life insurance company that is taxed as a U.S. life insurance company under Subchapter L of the Code and is eligible to purchase and hold Interests under the Tax Requirements.

**1.9**   "**Eligible Insurance Fund**" means a regulated investment company, real estate investment trust, limited liability company, limited partnership or trust that is eligible to purchase and hold Interests under the Tax Requirements and is in compliance with Revenue Ruling 2005-7.

**1.10**   "**Fund PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, provided by the Fund or the Adviser to the Company in connection with the offering of Interests.

**1.11**   "**Fund Agreements**" means the Operating Agreement and the subscription documents of the Fund.

**1.12**   "**Fund Reports**" shall have the meaning set forth in Section 5.2(b) hereof.

**1.13**   "**Interest Owner**" means (a) any Eligible Insurance Fund that and (b) any separate account (or a subaccount thereof) of an Eligible Insurance Company on behalf of which the Eligible Insurance Company has invested in one or more Interests.

**1.14**   "**Operating Agreement**" means the Fund's amended and restated limited partnership agreement dated as of the date set forth on Schedule A-2 hereto.

**1.15**   "**Policy Owner**" means the owner of a Company Contract.

**1.16**   "**Policy Representative**" means any agent or representative of a Policy Owner, the grantor or beneficiary of any Policy Owner that is a trust, or any agent or representative of such grantor or beneficiary.

**1.17**   "**Privacy Law**" means any applicable privacy law.

**1.18**   "**Sales Literature**" means (i) the Fund PPM and reports provided to the Company by the Fund or the Adviser, (ii) any written or other communication distributed or made available to existing or potential investors or their agents or employees, including brochures, circulars, research reports, market letters, form letters, seminar texts, or reprints of or excerpts from any other advertisement, sales literature, or published article, with respect to the Fund, and (iii) any other material regarding the Fund constituting sales literature or advertising, including all offering materials.

**1.19**   "**Separate Accounts**" means those separate accounts (or subaccounts thereof) established by the Company for the purpose of holding one or more Interests and listed on

003244

Schedule A hereto, as the same may be amended from time to time. Each Separate Account shall be a separate and distinct owner of Interest(s).

**1.20** "**Tax Requirements**" means the requirements of Section 817(h) of the Code, Regulations 1.817-5 thereunder and any amendments or successor provisions thereto.

**1.21** "**Valuation Date**" means the last Business Day of each calendar month.

**1.22** "**Variable Contract**" means a variable life insurance policy, variable annuity policy or other variable insurance policy that is characterized as a "variable contract" under Section 817(d) of the Code.

### ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS

**2.1** **Offering and Sale of Interests**.

**(a)** Subject to Section 8.2 and subject to and on the terms of the Fund PPM, the Fund may offer Interests for purchase in any amount by the Company on behalf of the Separate Accounts, subject to the minimum initial investment amount set forth on Schedule A-2 hereto. The Fund may accept additional capital contributions in any amount, subject to the minimum additional investment amount set forth on Schedule A-2 hereto. Capital contributions will be accepted as of the first Business Day of each calendar month or quarter (as specified on Schedule A-2 hereto) (each, a "**Subscription Date**"). The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than the date and time set forth on Schedule A-2 hereto. The Company shall complete and send to the Fund the Subscription Form set forth in Appendix A. The Company shall not be required to enter into any agreement other than this Agreement and the Fund Agreements in order to purchase Interests.

**(b)** The Fund may suspend or discontinue its offering of Interests solely in conformity with the Fund PPM upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto.

**(c)** The issuance and transfer of Interests shall be by book entry only, and certificates therefor shall not be issued to the Company or the Separate Accounts.

**2.2** **Payment for Interests**. The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than the date and time set forth on Schedule A-2 hereto. Federal funds received after that time and date shall be held in a subscription account of the Fund's custodian until the next Subscription Date or returned to the Company upon its request.

**2.3** **Withdrawal of Interests**.

**(a)** **General Withdrawal Terms.** Any withdrawal request shall specify the number and value of the Interest(s) to be withdrawn, shall not be less than the amount set forth on Schedule A-2 hereto and shall be subject to any other requirements set forth on Schedule A-2 hereto. Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than the amount set forth on Schedule A-2 hereto as of the date of withdrawal shall be deemed a complete withdrawal. (See Appendix

**003245**

B for Withdrawal Form.) The terms of this Section 2.3(a) shall apply unless otherwise provided in Sections 2.3(b) through 2.3(f) or on Schedule A-2 hereto.

(b)     **Standard Withdrawals.**  Subject to Section 2.3(f), the Company will be permitted to redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Standard Withdrawal Request**") as of the last day of any calendar month or quarter as set forth on Schedule A-2 hereto (each, a "**Standard Withdrawal Date**") following the lock-up period set forth on Schedule A-2 hereto.  The Adviser may waive the notice period in its discretion.   The withdrawal proceeds in connection with a Standard Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(c)     **Death Benefit Withdrawals.**  Subject to Section 2.3(f), with respect to withdrawals required for the payment of a death benefit, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Death Benefit Withdrawal Request**") as of the last day of any calendar month (each, a "**Death Benefit Withdrawal Date**").   The Adviser may waive the notice period in its discretion.  The withdrawal proceeds in connection with a Death Benefit Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(d)     **Special Withdrawals.**  Subject to Section 2.3(f), with respect to withdrawals required for the payment of any insurance charges and/or expenses of the Company Contracts or as otherwise agreed upon by the Adviser, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Special Withdrawal Request**") as of the last day of any calendar month (each, a "**Special Withdrawal Date**").   The Adviser may waive the notice period in its discretion.   The withdrawal proceeds in connection with a Special Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(e)     **Withdrawal Events.**  Subject to Section 2.3(f), the Company may redeem for cash Interests if any of the following events ("**Withdrawal Events**") occur: (i) the Fund fails to comply with the Tax Requirements, and such noncompliance cannot be cured in a reasonable period of time pursuant to the regulations and proceedings of the U.S. Department of the Treasury (the "**Treasury**") and the U.S. Internal Revenue Service; or (ii) there is a violation of the requirements set forth on Schedule D hereto.  The Adviser shall notify the Company as soon as any Withdrawal Event occurs.  Upon the occurrence of a Withdrawal Event, the Company may redeem its Interests as of the last day of any calendar month (each, an "**Event Withdrawal Date**") upon not less than 30 days' prior written notice to the Adviser (each such notice an "**Event Withdrawal Request**").  Upon an Event Withdrawal Request, the Fund shall pay 100% of the withdrawal proceeds within 30 days following the Event Withdrawal Date.  Event Withdrawal Requests shall not be subject to any lock-up withdrawal requests.

(f)     **Limitations on Withdrawal Rights Granted Hereunder.** Notwithstanding the foregoing provisions of this Section 2.3, and any other terms of this Agreement, if the

003246

Adviser determines that compliance with any of the withdrawal and payment rights granted pursuant to this Section 2.3 or any other provisions of this Agreement shall (i) cause it or the Fund to fail to adhere to the Tax Requirements, or (ii) require it to liquidate any asset which is then illiquid and/or part of a Side Pocket Account (as defined in the Operating Agreement), then it may defer such compliance until such failure or requirement shall no longer exist; *provided* that for so long as (x) such condition continues and (y) the Company shall not be receiving payment of any insurance charges and/or expenses of the Company Contracts as a result of such delayed compliance, the Adviser agrees that it shall defer its fees pursuant to Operating Agreement, and such amounts otherwise payable to the Adviser shall instead be paid by the Fund to the Company for such insurance charges and/or expenses.

### 2.4 Payment of Withdrawal Proceeds.

(a) **Payment of Withdrawal Proceeds Generally.** Subject always to any liquidity limitations set out in the Fund PPM, the Fund shall transfer to the Company, or to any person designated by the Company in writing, any withdrawal proceeds via wire transfer in the form of federal funds.

(b) **Payment of Withdrawal Proceeds In-Kind.** The Fund may, but only if permitted by applicable law and in conformity with the Operating Agreement and the Fund PPM, transfer in-kind interests in an underlying investment of the Fund to (i) the Company and/or the Separate Accounts in full or partial satisfaction of any withdrawal request, or (ii) a Policy Owner in full or partial satisfaction of a full or partial surrender of a Company Contract, or to a beneficiary under a Company Contract in full or partial satisfaction of a death benefit payment under such Company Contract; provided, however, that such transfer to a Policy Owner is conducted as a transaction exempt from registration under the 1933 Act. For the avoidance of doubt, notwithstanding the foregoing, the provisions of this Section 2.4(b) shall be subject to the limitations on liquidity and withdrawals, and terms therein on payments with withdrawal proceeds (including, in particular, the payment of withdrawal proceeds in-kind) set forth in in the Fund Agreements.

### 2.5 Company Contracts.
The Fund and the Adviser acknowledge and agree that, subject to each Company Contract, CGLI shall have the exclusive right, in its sole discretion, to suspend the offer or sale of any of the Company Contracts or to reject any application for the purchase of any Company Contract.

### ARTICLE III. NET ASSET VALUE

### 3.1 NAV Generally.
The Fund shall determine its net asset value (the "NAV") on each Valuation Date in the manner prescribed in the Operating Agreement and the Fund PPM. The Adviser shall make the NAV available to the Company in an electronic data file in a format specified by the Company, and shall do so as soon as reasonably practicable after each Valuation Date, and in any event no later than the date and time set forth on Schedule A-2 hereto.

### 3.2 Adjustments.
The NAV information provided pursuant to Section 3.1 hereof may be based on estimated values and/or values determined by the Adviser acting in good faith and using reasonable judgment ("**Reasonable Valuations**"), and prospective adjustments shall be made, if necessary, to correct the NAV within a reasonable period of time after the Fund or

003247

the Adviser is in receipt of the Fund's audited financials. No retroactive adjustments shall be made.

## ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS

**4.1      Representations, Warranties and Covenants of the Company.** The Company represents and warrants to, and for the benefit of, and covenants and agrees with the Fund and the Adviser that:

(a)      CGLI is an Eligible Insurance Company that is duly organized, validly existing and in good standing under the laws of Bermuda.

(b)      The Separate Account(s) are legally and validly established segregated asset accounts (or subaccounts thereof) under the laws of Bermuda (including, without limitation the Bermuda Insurance Act 1978, as amended ("Bermuda Insurance Act") and related rules and regulations and any Bermuda private act to which CGLI or the Separate Accounts are subject), applicable state insurance and tax laws and regulations, and were established by CGIL to set aside and invest premiums attributable to Company Contracts.

(c)      CGLI has the power and is duly qualified and has all necessary licences, consents, permits and authorities necessary (including those referred to in paragraph 4.1(a) above) to offer and sell the Company Contracts and for the Company to purchase the Interests, all of which are valid and subsisting.

(d)      The Company shall be an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the 1933 Act (an "**Accredited Investor**"), a "qualified client" within the meaning of Rule 205-3 promulgated under the U.S. Investment Advisers Act of 1940, as amended, and a "qualified purchaser" within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (a "**Qualified Purchaser**"; such statute, the "**1940 Act**").

(e)      The Company Contracts shall be offered and sold, and the Contract PPM and the Fund PPM shall be disseminated to prospective or existing Policy Owners, in compliance in all material respects with all applicable Bermuda, U.S. and other foreign securities, commodities, tax and insurance laws and regulations.

(f)      CGLI shall sell Company Contracts only to persons that CGLI or its agents reasonably believe to be Accredited Investors and Qualified Purchasers.

(g)      The Company Contracts shall be treated as Variable Contracts under the Code, provided that the Fund and the Adviser comply with all of the terms of the Operating Agreement and this Agreement, and CGLI shall promptly notify the Fund and the Adviser in writing upon forming a reasonable belief that the Company Contracts will or may no longer qualify for such treatment.

(h)      The Separate Accounts shall not be subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(i)      The Contract PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Fund or the Adviser for

**003248**

inclusion in the Contract PPM. For the avoidance of doubt, the Company is not representing whether the Contract PPM meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

(j)     The Company shall not disseminate any information, or make any representation or statement, to any person concerning the offer or sale of Interests or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, Fund Reports, or any Sales Literature approved by the Adviser for such purposes. This Section 4.1(j) shall not in any way restrict the right of the Company to disseminate materials (such as illustrations) describing the Company, its operations and its products, as well as those materials describing the insurance industry and insurance products generally.

(k)     The Company shall establish and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited the Company's Know Your Client (KYC) and due diligence requirements under the Bermuda Proceeds of Crime (Anti-Money Laundering and Anti-Terrorist Financing) Regulations 2008, as amended the regulations of the Treasury and the Executive Orders related to the Treasury's Office of Foreign Assets Control ("**OFAC**"; and, together, the "**AML Procedures**"). The Fund and the Adviser acknowledge that in connection with, and as a complement to its own AML Procedures, where permitted by applicable law, the Company shall be entitled to rely on AML Procedures implemented by third parties with respect to Policy Owners; provided that such acknowledgement shall not limit any rights of the Fund or the advisor relating to AML under the Fund Agreements.

The Company's AML Procedures shall include those reasonably designed to ensure the accuracy of the following representations of the Company:

(i)     the identity of each purchaser of a Company Contract has been established by evidence that the Company reasonably believes is genuine;

(ii)     the Company reasonably believes that no premium funds tendered for the purchase of a Company Contract are derived directly or indirectly from activities that may contravene relevant U.S. federal or state, or international, laws or regulations related to money laundering; and

(iii)     unless the Fund, in its sole discretion, lawfully waives such a requirement, CGIL shall not issue a Variable Contract to any person or entity that the Company reasonably believes, at the time of the possible purchase of the Company Contract, to be:

1. a country, territory, organization, person or entity named in OFAC's List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time;

2. a person or entity that resides or has a place of business in a country or territory named on an OFAC list, or that is designated as a

003249

"Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose premium funds tendered for the acquisition of a Company Contract are transferred from or through any such country or territory;

3. a "foreign shell bank" as such term is defined in 31 U.S.C. § 5318(j) and Treasury regulations thereunder;

4. a person or entity that resides in, or is organized under, the laws of a jurisdiction designated by the Secretary of the Treasury as a "jurisdiction of primary money laundering concern" pursuant to 31 U.S.C. § 5318A; or

5. a "senior foreign political figure," or a "family member" or "close associate" of a senior foreign political figure as such terms are defined in the *Guidance on Enhanced Scrutiny for Transactions that May Involve the Proceeds of Foreign Official Corruption* issued by the Treasury, unless CGIL has diligently scrutinized the proposed purchase of the Company Contract by or for the benefit of such person and has determined to permit such purchase.

**(l)**     The Company shall promptly notify the Fund and the Adviser of any change in the information set forth in this Section 4.1.

**(m)**     The Company is not aware of any conflict between this Agreement and any law or regulation to which it may be subject (including under any Bermuda private act).

**4.2     Of the Fund.** The Fund represents and warrants to, and for the benefit of, and covenants and agrees with the Company that:

**(a)**     The Fund has been established under the laws of the jurisdiction of its formation and is in good standing thereunder, and qualifies for the exclusion from the definition of "investment company" provided by Section 3(c)(7) of the 1940 Act.

**(b)**     The Interests shall be offered and sold in compliance in all material respects with all applicable federal and state laws and regulations.

**(c)**     None of the Fund; any predecessor of the Fund; any affiliated issuer of the Fund; any director, executive officer, other officer who is participating in the offering of interests in the Fund, general partner or managing member of the Fund; any beneficial owner of 20% or more of the Fund's outstanding voting equity securities (calculated on the basis of voting power); any promoter connected with the Fund in any capacity; the Adviser; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of interests in the Fund (a "**Solicitor**"); any general partner or managing member of the Adviser or a Solicitor; or any director, executive officer or other officer who is participating in the offering of interests in the Fund of the Adviser or a Solicitor or general partner or managing member of the Adviser or a Solicitor is subject to any event listed in Rule 506(d)(1).

**(d)**     The Fund shall offer and sell Interests only to Eligible Insurance Funds and Eligible Insurance Companies that have certified that they (i) are Accredited Investors and

003250

Qualified Purchasers and (ii) will purchase and hold Interests, directly or indirectly, solely for the benefit of policy owners that they reasonably believe are Accredited Investors and Qualified Purchasers; provided, however, that the Fund may offer and sell Interests to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code that meet the requirements of clause (i). Further, the Fund shall, with the exception of any Compliant Seed Investment, issue Interests only to Eligible Insurance Funds and Eligible Insurance Companies with which it has entered into an agreement containing provisions substantially similar to those provisions of this Agreement listed on Schedule A-2 hereto.

(e)    The Fund shall invest, hold and dispose of its assets in compliance with the Tax Requirements. The Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to comply with the Tax Requirements, and shall cure any non-conformance within the period for cure afforded by Regulations 1.817-5. The Fund and the Adviser acknowledge that the Fund's compliance with the Tax Requirements is material to their performance under this Agreement.

(f)    The Fund shall be operated so as to maintain its treatment for U.S. federal income tax purposes as a partnership, or if there is only one Interest Owner, a disregarded entity, under the Code, and the Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to qualify for such tax treatment.

(g)    The Fund, the Adviser and their respective officers, directors, employees, principals, affiliates and other representatives shall comply with the requirements set forth on Schedule D hereto so as to prevent any Policy Owner from having "incidents of control" under the Investor Control Doctrine (as defined on Schedule D hereto).

(h)    The Fund's assets shall be invested in compliance with the investment restrictions set forth on Schedule B hereto, as the same may be modified from time to time pursuant to Section 5.1.

(i)    The Adviser is and will exercise commercially reasonable best efforts to remain registered with the SEC as an investment adviser; provided that the Adviser shall be deemed to be so registered if it qualifies as a "relying" Adviser. If the Adviser applies to withdraw its registration, the Adviser shall notify the Company at least thirty (30) days prior to the intended effective date of its withdrawal.

(j)    The Adviser is exempt from registration as a commodity pool operator ("**CPO**") pursuant to CFTC Rule 4.13(a)(3) and shall notify the Company as soon as reasonably practicable upon forming a reasonable belief that such exempt status will change.

(k)    The Adviser shall have the sole discretionary authority over the Fund's investments and shall manage the Fund in accordance with the Operating Agreement and the Fund PPM; provided that, for the avoidance of doubt, the Fund may invest in Portfolio Funds (as defined in the Fund PPM) and the like, in the manner contemplated in the Fund PPM.

(l)    The Fund PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Company for inclusion in the Fund PPM. For the avoidance of doubt, the Fund is not representing whether the Fund PPM

003251

meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

**(m)**     No material change shall be made to the Operating Agreement or the Fund PPM (e.g., a change to the Fund's investment objective or strategies) without at least thirty (30) days' prior notice to the Company.  Any updates thereto shall be promptly delivered to the Company.

**(n)**     Subject to Section 4.1(k), the Fund shall be responsible for anti-money laundering compliance related to its activities, and shall maintain and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited to, the USA PATRIOT Act of 2001, the regulations of the Treasury and the Executive Orders related to OFAC; provided that for the avoidance of doubt the Fund may delegate such compliance in a manner that is substantially consistent with standard practices of private investment funds in the U.S.

**(o)**     The Company shall be provided the most recent audited financial statements of the Fund as soon as reasonably practicable after they become available.

**(p)**     Neither the Fund nor the Adviser shall disseminate any information, or make any representation or statement, to any person concerning the Company or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, any Sales Literature approved by the Company pursuant to Section 5.3, or available in the public domain.

**(q)**     Unless the Company otherwise consents, the Fund and the Adviser shall use its commercially reasonable best efforts to ensure that all communications related specifically to the Company Contracts, shall only be between the Company and a Policy Owner or Policy Representative.

**(r)**     The Fund shall maintain and implement commercially reasonable procedures to safeguard the confidentiality and integrity of their records with respect to the Fund and the Company.

**(s)**     The Fund shall promptly notify the Company upon any change to a service provider to the Company.

**(t)**     The Fund is not aware of any conflict between this Agreement and any law or other obligation to which it or the Advisor may not be subject.

**(u)**     The Fund shall promptly notify the Company of any change in the information set forth in this Section 4.2.

**(v)**     The Fund shall not invest in a "passive foreign investment company" (a "**PFIC**") as defined in Section 1297(a) of the Code unless, prior to making such investment, the Fund has certified to the Company that (i) such PFIC will comply with the requirements of Section 1295(a)(2) of the Code and the Treasury regulations thereunder (e.g., that the PFIC provide its "qualifying electing fund" ("**QEF**") shareholders with a PFIC Annual

003252

Information Statement) or (ii) the Fund will provide information reasonably equivalent to the information contained in a PFIC Annual Information Statement. If the Fund or the Company determines that a PFIC is not in compliance with its QEF reporting requirements, the Fund shall take any steps necessary to cause the PFIC to comply therewith.

**4.3   Of the Adviser.** The Adviser represents, warrants and covenants to the Company that the Adviser shall use reasonable efforts to provide the Company with any information concerning the Adviser that the Company requires in making any filings with any government authority having regulatory authority over the Company.

**4.4   Mutual Representations, Warranties and Covenants.** Each of the Company and the Fund hereto represents and warrants to, and for the benefit of, and covenants and agrees with the other Parties that:

(a)   it shall use reasonable efforts to cooperate with each other Party and any governmental authority in respect of any such authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated hereby;

(b)   the Adviser and the Company are not in an affiliate or agency relationship;

(c)   upon reasonable notice, the execution and delivery of this Agreement and the consummation of the transactions contemplated herein (i) have been duly authorized by all necessary corporate or other formal action by such Party and, when executed and delivered, this Agreement shall be a valid and binding obligation upon such Party enforceable in accordance with its terms; and (ii) the transactions contemplated thereto do not and will not violate, conflict with or constitute a default under any requirement of any law or any regulation of Bermuda, the U.S. or otherwise (including, without limitation, any Bermuda private act);

(d)   except as otherwise set forth herein, the provisions of this Agreement shall be deemed to control in the case of any conflict between the provisions of this Agreement and the provisions of the Fund PPM, Operating Agreement, or any other agreement entered into between the Company and the Fund or the Adviser;

(e)   the Operating Agreement and the Fund PPM, as currently in effect, shall have been delivered to the Company prior to the signing of this Agreement; and

(f)   the representations, warranties and covenants contained in this Agreement and the Fund Agreements (collectively, the "**Party Documents**") are the only representations, warranties and covenants that have been made by any Party to any other Party, and in entering into this Agreement, each Party has relied solely on the information contained in the Party Documents or that it obtained by its own independent investigation.

**4.5   Duration.** The representations, warranties and covenants contained in this Article IV shall be deemed continuing at all times until the termination of this Agreement.

**003253**

## ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS

**5.1    Revision of Investment Restrictions.**    The investment restrictions of the Company are as set forth on Schedule B hereto.  The Company shall be permitted to request a change in such investment restrictions only if such change is necessitated by a change in the laws, regulations or interpretations thereof to which the Company is subject.  The Company shall make a request for a change in its investment restrictions in writing to the Fund and the Adviser.  If the Adviser determines in its absolute discretion that causing the Fund to comply with the revised investment restrictions proposed by the Company is in the best interests of the Interest Owners, the Parties shall amend Schedule B hereto accordingly.  If the Adviser determines otherwise, it shall notify the Company within thirty (30) days of such determination.

**5.2    Provision of Reports and Information.**    The Company shall provide to the Adviser, upon request, a specimen copy of the Contract PPM and each Company Contract.  The Fund shall on a timely basis provide to the Company the following without charge:

**(a)**    a current copy of the Fund PPM (and any amendment or supplement thereto) in any form the Company may reasonably request;

**(b)**    electronic copies of those reports and other communications that the Fund provides to its Interest Owners, including its periodic performance reports (collectively, the "**Fund Reports**");

**(c)**    any reports and information that the Company requires as a U.S. taxpayer; and

**(d)**    any other documents that the Company may reasonably request of the Fund, including, but not limited to, its governing instruments, tax reports, marketing materials, and any government filings and updates and amendments thereto, including, but not limited to, the Adviser's Form ADV; provided that neither the Fund nor the Adviser need supply any agreements or documents of the Fund or the Adviser that are confidential.

**5.3    Review of Sales Literature.**    Neither the Fund, the Adviser nor any person acting on their behalf shall use any Sales Literature in which the Company is named without the consent of the Company which shall not be unreasonably withheld or delayed.

**5.4    Distribution of Certain Information by the Company.**    The Company shall be permitted, without further review or consent of the Fund or the Adviser, to deliver to Policy Owners, prospective Policy Owners, and their agents and representatives, the Fund PPM (and any amendments or supplements thereto), Fund Reports and any Sales Literature approved for such purposes by the Adviser.

**5.5    Provision of Information Prior to Signing of Agreement.**    Prior to signing this Agreement, the Adviser has provided the Company with its most recent Form ADV, and any amendments thereto, as filed with the SEC.

Prior to signing this Agreement, the Fund or the Adviser has provided the Company with (a) the name and address of the Fund's independent auditor(s) and (b) upon the Company's

**003254**

request, a consent and authorization for the Company to contact the auditor(s) for information reasonably required about the auditor(s) and its/their relationship with the Fund and the Adviser. At any time the Fund retains a different independent auditor, the Fund or the Adviser shall provide the Company with the same consent and authorization upon request.  For avoidance of doubt, the Company shall not be entitled to obtain access to the Fund's books and records pursuant to this Section 5.5.

Prior to signing this Agreement, CGIL has provided the Fund with its Class C certificate of registration issued to it by the Bermuda Monetary Authority and any directions and/or approvals relating to it issued by the Bermuda Monetary Authority pursuant to the Bermuda Insurance Act.

**5.6    Certification of Investment Diversification.**  As soon as reasonably practicable after the end of each calendar quarter, but in no event later than the number of days after the end of such calendar quarter set forth on Schedule A-2 hereto, the Adviser shall deliver to the Company a written certification in the form of Schedule C hereto.

### ARTICLE VI. EXPENSES

**6.1    Expenses Borne by the Company.**  The Company shall bear all of the costs incurred in connection with the (i) filing and qualification of the Company Contracts under any applicable state insurance or securities laws; (ii) preparation of the Contract PPM and any other necessary disclosure documents or regulatory filings with respect to the Company Contracts or the Separate Accounts; (iii) preparation and dissemination to Policy Owners of Fund Reports and of all statements, notices or other documents required by applicable federal and state laws and regulations; (iv) dissemination of the Fund PPM to Policy Owners and prospective Policy Owners; and (v) performance of its obligations under this Agreement.

**6.2    Expenses Borne by the Fund.**  The Fund shall bear all of the costs incurred in connection with the offering and sale of Interests to Interest Owners and the performance of its obligations under this Agreement, in addition to the other expenses it bears pursuant to the Operating Agreement and the Fund PPM.

### ARTICLE VII. INDEMNIFICATION

**7.1    Indemnification of Fund Parties.**  The Company shall indemnify and hold harmless the Fund and the Adviser (collectively, the "**Fund Parties**" and each, a "**Fund Party**"), against any and all claims, losses, damages or expenses, including without limitation any judgment, settlement, reasonable attorney's and accountant's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding (collectively, "**Claims**" and each, a "**Claim**"); provided, however, that a Fund Party shall be entitled to indemnification in respect of a Claim only if:

(a)    the Claim does not arise out of its or another Fund Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill any of its representations, warranties or covenants contained herein, and

(b)    the Claim arises out of, or is based upon, one of the following:

003255

(i)    the Company's fraud, willful default or gross negligence in performing its obligations under this Agreement; or

(ii)    the Company's breach of, or material failure to fulfill, any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

7.2    **Indemnification of Company Parties.**  The Fund shall indemnify and hold harmless the Company and the Separate Accounts (collectively, the "**Company Parties**" and each, a "**Company Party**"), against any and all Claims; provided, however, that a Company Party shall be entitled to indemnification in respect of a Claim only if:

(a)    the Claim does not arise out of its or another Company Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill to satisfy any of its representations, warranties or covenants contained herein, and

(b)    the Claim arises out of, or is based upon, one of the following:

(i)    the fraud, willful default or gross negligence of a Fund Party in performing its obligations under this Agreement; or

(ii)    the breach of, or material failure to fulfill, by any Fund Party any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

7.3    **Other Indemnification Provisions.**    No indemnification, hold harmless, limitation of liability or similar provision in the Fund's Certificate of Formation, the Operating Agreement or any agreement to which the Fund or the Adviser is a party shall preclude or serve as a defense to the indemnification by the Fund of a Company Party pursuant to Section 7.2.

7.4    **Notice of Claim of Indemnification.**  A Fund Party or Company Party seeking indemnification under this Article VII (an "**Indemnified Party**") shall give the Party obliged to provide indemnification under this Article VII (an "**Indemnifying Party**") written notice within a reasonable time after the Indemnified Party receives notice of a Claim; provided, however, that a failure to provide, or delay in providing, such notice shall not relieve the Indemnifying Party of any obligation it may have under this Article VII to indemnify the Indemnified Party, unless such failure or delay is the sole or primary cause of the Indemnifying Party's inability to effectively defend against the Claim and materially disadvantages the Indemnifying Party.

7.5    **Assumption of or Participation in Defense Against Claims.**  In any situation where an Indemnified Person is directly involved in defending against a Claim, an Indemnifying Party shall be entitled to, at its own expense, (i) participate in the defense of the Claim or (ii) assume the defense against the Claim with counsel reasonably satisfactory to the Indemnified Party.  If the Indemnifying Party elects to assume the defense of a Claim, the Indemnifying Party shall, after notice to the Indemnified Party of such election, have no obligation to bear any subsequent fees and expenses independently incurred by the Indemnified Party in connection with the defense of the Claim (excluding reasonable costs of investigation), except that the Indemnifying Party shall be liable for reasonable fees and expenses associated with additional counsel retained by the Indemnified Party where the Indemnifying Party and the Indemnified

003256

Person are both parties to the Claim and their representation by the same counsel would be inappropriate due to an actual or potential conflict of interests. Any assumption or participation in the defense of a Claim pursuant to this Section 7.5 shall not be construed as, or be deemed to create a presumption or inference of, an admission of liability or responsibility by the Indemnifying Party, and shall not estop or otherwise limit the Indemnifying Party from contesting liability in respect of the Claim.

    **7.6**    **Settlements.**  An Indemnifying Party shall not be obliged to indemnify an Indemnified Party for the settlement of any Claim that is effected without the former's prior written consent. An Indemnifying Party may settle any Claim on behalf of an Indemnified Party without the Indemnified Party's consent; provided, however, that the settlement involves solely the payment of damages, such damages are fully paid and results in a total release of the Indemnified Party from the Claim. To the extent that its consent to a settlement is required, an Indemnified Party shall not unreasonably withhold its consent to any settlement not involving injunctive relief.

    **7.7**    **Successors.**  A successor to any Party shall be entitled to all of the benefits, and shall be subject to the burdens, of this Article VII.

    **7.8**    **Survival.**  This Article VII shall survive the termination of this Agreement including, without limitation, a termination by reason of the breach or alleged breach of any representation, warranty or covenant of this Agreement.

### ARTICLE VIII. Termination

    **8.1**    **Termination Generally.**  Except as otherwise set forth in this Article VIII, no term of this Agreement shall terminate until the Separate Accounts no longer hold any Interests.

    **8.2**    **Effectiveness of Termination of Offering Obligation.**  A termination of the Offering Obligation pursuant to Section 8.2(a) shall take effect immediately. A termination pursuant to Section 8.2(b), (c), (d), (e) or (f) shall be effective immediately after the Fund provides notice to the Company of such termination.

    **8.3**    **Mandatory Withdrawal.**  The Fund shall have the right to require the Company, upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto, to redeem any Interest(s) attributable to any Company Contract that ceases to qualify as a Variable Contract or that the Fund reasonably believes will fail to so qualify. The timing of such mandatory withdrawal shall be specified in the Fund's notice to the Company and shall be determined with reference to Section 817(h) of the Code.

    **8.4**    **Termination by Company.**  Notwithstanding anything in this Agreement to the contrary, either the Fund or the Company may terminate this Agreement immediately and without penalty to such party:

    **(a)**    from the date hereof until November 30, 2017, upon at least 30 days' prior written notice to the Fund and the Adviser, or

    **(b)**    if the Fund or the Adviser has materially breached a representation, warranty or covenant under this Agreement and has failed to cure such breach after being given a reasonable opportunity to cure; provided, however, that the Company need not provide the

**003257**

Fund or the Adviser a reasonable opportunity to cure if the material breach may, in the Company's reasonable judgment, materially and adversely affect the Company or any of its Separate Accounts or Company Contracts, or any regulatory authority, including, but not limited to, the SEC and any state regulatory authority, has instituted a formal proceeding against the Fund or the Adviser, and the anticipated outcome of such proceeding would, in the Company's reasonable judgment, materially impair the Fund's or the Adviser's ability to perform its obligations under this Agreement or under the Operating Agreement.

## ARTICLE IX. NOTICES, REQUESTS OR CONSENTS

**9.1**    Any notice, consent, request or other communication required or permitted by this Agreement (a "**Communication**") to the Fund or the Adviser shall be sent to its address set forth on Schedule A-2 hereto or such other address as the Fund or the Adviser shall designate in writing to the other Parties.  Any Communication to the Company required or permitted by this Agreement shall be sent to the address set forth below.  Every Communication shall be in writing; shall be sent by registered or certified U.S. mail with return receipt requested, by overnight delivery with a nationally recognized courier, or by electronically transmitted facsimile or other electronic transmission, including electronic mail, with confirmed electronic receipt; and shall be effective upon the earlier of actual receipt and the 10th Business Day after sending.

|  |  |
|---|---|
| **If to the Company:** | Crown Global Life Insurance Ltd.<br>Canon's Court<br>22 Victoria Street<br>Hamilton HM 12<br>Bermuda |
| With a copy to: | Crown Global Life Insurance (Cayman) Ltd<br>Landmark Square, 2nd Floor<br>64 Earth Close, SMB, P.O. Box 10467<br>Grand Cayman KY1-1004<br>Cayman Islands |

**9.2**    Each Party may rely conclusively upon, and shall not incur any liability for any action taken in reliance upon, any Communication that it reasonably believes, in good faith, to be genuine and properly authorized by another Party.

## ARTICLE X. PRIVACY OBLIGATIONS

**10.1**    The Company is, and each of the Fund and the Adviser may be, a financial institution subject to Privacy Law.  To the extent that a Party is subject to Privacy Law, it shall not use or disclose any Customer Information received from another Party unless such use or disclosure is:

**(a)**    required by law, regulation or rule, or permitted by Privacy Law;

**(b)**    necessary to carry out the purposes for which the Party was given the Customer Information; or

003258

(c)      authorized by the express written consent of the Policy Owner or prospective Policy Owner to which the Customer Information relates, where such consent specifies the purposes for which such Customer Information may be used or disclosed.

10.2     Each Party shall establish and maintain safeguards against any unauthorized access to, or destruction, loss or alteration of, any Customer Information in its possession or control, which safeguards must be at least as rigorous as those the Party uses to secure its own information of a similar nature.

10.3     Notwithstanding anything in this Agreement to the contrary, including Section 11.7, each Party is expressly authorized hereby to disclose to any person, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials related thereto that are or were provided to such Party.

10.4     Each Party agrees to keep confidential any Confidential Information that such Party may acquire as a result of this Agreement or any transaction in connection therewith and to ensure that no such Confidential Information is disclosed to or utilized by any of such Party's affiliates or any of its or their respective officers, directors, employees, agents or other representatives (each, a "**Relevant Person**") except for the purpose of permitting a Party to perform its obligations and/or enforce such Party's rights under this Agreement, the Fund Agreements or any transaction in connection therewith or pursuant to this Section 10 and Section 11.4 hereof.

## ARTICLE XI. MISCELLANEOUS

11.1     **Governing Law.**  It is the intention of the Parties that the internal laws of Bermuda, as the same may be amended from time to time, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Parties.

11.2     **Entire Agreement.**  This Agreement, together with any amendments hereto and any other agreements referred to herein (including, without limitation, the Fund Agreements), shall constitute the entire agreement among the Parties with respect to the subject matter hereof, and shall supersede any prior agreement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

11.3     **Waiver.**  A Party's failure to insist, or delay in insisting, upon another Party's performance of any term of this Agreement shall not be construed as a waiver of the performance of such term.

11.4     **Access to Books and Records.**  Each Party shall, upon request, provide each other Party and any governmental authority with reasonable access to its books and records to the extent that such request relates to a governmental authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated herein.  To the extent permitted by applicable law, the access provided pursuant to this Section 11.4 shall not extend to any attorney work product or information protected by the attorney-client privilege.

11.5     **Assignment.**  No Party shall assign any right or obligation under this Agreement to a third party without the prior written consent of all of the Parties, which consent shall not be unreasonably withheld.  Notwithstanding the previous sentence, the Company may assign,

003259

without the consent of the Fund or the Adviser, any right or obligation under this Agreement to another insurance company that controls, is controlled by or under common control with the Company; provided, however, that the Company provides the Fund and the Adviser with notice as soon as reasonably practicable after such assignment.

    **11.6**    **Third-Party Beneficiary.**  This Agreement is not intended to and shall not convey any rights to persons not party to this Agreement.

    **11.7**    **Confidentiality.**  No Party shall disclose the terms of this Agreement to any persons not party to this Agreement, except that a Party may disclose the terms of this Agreement to comply with a legal or regulatory requirement or request, or to its representatives where such disclosure is necessary to the Party's performance of its obligations under this Agreement; provided that the Company agrees and acknowledges the disclosures concerning the subject matter hereof set forth in the Fund PPM, and disclosures of a similar nature.

    **11.8**    **Amendment.**  No amendment or modification to this Agreement shall be binding upon any Party unless reduced to a writing signed by all of the Parties.

    **11.9**    **Rights and Remedies.**  The rights, remedies and obligations contained in this Agreement are in addition to any and all rights, remedies and obligations, at law or in equity, to which the Parties are entitled under state and federal laws.

    **11.10**  **Severability.**  In the event that any provision of this Agreement shall be declared invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement, it being hereby agreed that such provisions are severable and that this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

    **11.11**  **Headings.**  The headings in this Agreement are inserted for convenience of reference only and shall not be considered part of this Agreement or affect this Agreement's interpretation.

    **11.12**  **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.

<div align="center">**SIGNATURE PAGE FOLLOWS**</div>

003260

IN WITNESS WHEREOF, each of the Parties hereto has caused this Participation Agreement to be executed in its name and on its behalf by its duly authorized representative hereto as of November 30, 2015.

CROWN GLOBAL LIFE INSURANCE LTD.,

By: _____

Name: TERRIA GODWIN

Title: Director

By: _____

Name: Avi Hasen

Title: Director

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of each of its Separate Accounts, as set out in Schedule A hereto as may be amended from time to time.

By: _____

Name: TERRIA GODWIN

Title: Director

By: _____

Name: Avi Hasen

Title: Director

{00260335.DOC; 3}

003261

**ATLAS IDF, LP**

By: Atlas IDF GP, LLC, it general partner

By: _____

Name: _John Hovis_

Title: _Managing Member_

**RAND ADVISORS, LLC**

By: _____

Name: _John Hovis_

Title: _Managing Member_

{00290535.DOC; 3}

003262

**SCHEDULE A**
**As of November 30, 2015**

## SEPARATE ACCOUNTS AND ASSOCIATED POLICIES

| No. | Name of Separate Account and each Subaccount, if any, thereof: | Form Nos. of Policies Funded by Separate Account: |
|-----|---------------------------------------------------------------|---------------------------------------------------|
|     |                                                               |                                                   |

003263

**SCHEDULE A-2**
**As of November 30, 2015**

**SUPPLEMENT TO PARTICIPATION AGREEMENT**

FUND: Atlas IDF, LP
ADVISER: Rand Advisors, LLC

To the extent that the information below is also provided in the Fund PPM or the Operating Agreement, the parties agree that the information below is the same as the information contained in the Fund PPM or Operating Agreement and is provided for ease of reference.

| | |
|---|---|
| **Section 1.2** "Business Day" | No change to standard definition. |
| **Section 1.13** "Operating Agreement" | Dated as of November 30, 2015. |
| **Section 2.1(a)** Minimum Initial and Additional Investment Amounts / Notice of Intent to Purchase / "Subscription Date" | Minimum initial investment amount: $500,000 or as otherwise consented to in writing by Adviser |
| | Minimum additional investment amount: $500,000, or as determined by the Adviser in its sole discretion. |
| | The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than 12:00 am Eastern time on the 3rd Business Day prior to the relevant Subscription Day. |
| | The Subscription Date shall be the first Business Day of each calendar month. |
| **Section 2.1(b)** Suspension or Discontinuation of Offering | The Fund may suspend or discontinue its offering of Interests at the discretion of the Adviser upon at least **30** Business Days' prior written notice to the Company. |
| **Section 2.2** Payment for Interests | The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than 5:00pm Eastern time on the 3rd Business Day prior to the relevant Subscription Day. |
| **Section 2.3(a)** General Withdrawal Terms | Minimum withdrawal amount: $100,000 |
| | Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than $500,000 as of the date of withdrawal shall be deemed a complete withdrawal. |
| | Payment of Withdrawal Proceeds: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement. |
| **Section 2.3(b)** Standard Withdrawals | Notice Period: 91 days |
| | Standard Withdrawal Date: Last day of each calendar quarter. |

003264

**Lock-up Period**: 12 months.

Payment of Withdrawal Proceeds: 90% of the withdrawal proceeds shall be paid within 90 days following the Standard Withdrawal Date. The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs.

Payment of Withdrawal Proceeds: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement.

| | |
|---|---|
| **Section 2.3(c)**<br>Death Benefit<br>Withdrawals | Notice Period: 91 days prior to Death Benefit Withdrawal Date on prior written notice to the Adviser.<br><br>Death Benefit Withdrawal Date: Last day of any calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid as soon as reasonably practicable, but in no case more than 330 days following the Death Benefit Withdrawal Date. For the avoidance of doubt, such withdrawals may be satisfied by payments in kind. |
| **Section 2.3(d)**<br>Special Withdrawals | Notice Period: 91 days prior to a Special Withdrawal Date prior written notice to the Adviser.<br><br>Special Withdrawal Date: Last day of each calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid within 90 days following the Special Withdrawal Date. |
| **Section 3.1**<br>NAV Generally | The Adviser shall make the NAV available to the Company no later than 12am Eastern time on the 20th Business Day following each Valuation Date. |
| **Section 4.3(a)**<br>Errors and Omissions<br>Insurance Policy | The Fund shall obtain commercially reasonable coverage in favor of the Adviser, within a reasonable period following the execution of this Agreement. |
| **Section 5.6**<br>Certification of<br>Investment<br>Diversification | The Adviser shall deliver the certification required by Section 5.6 no later than 20 Business Days after the end of the calendar quarter following the quarter to which such certification relates. |
| **Section 8.4**<br>Mandatory Withdrawal | The Fund must provide the Company with at least 5 days' prior written notice of a Mandatory Withdrawal. |
| **Section 9.1**<br>Notices, Consents,<br>Requests or Other<br>Communications | **If to the Fund:**<br>Atlas IDF, LP<br>c/o Atlas IDF GP, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866<br><br>**If to the Adviser:**<br>Rand Advisors, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866 |

003265

**SCHEDULE B**
**As of November 30, 2015**

**INVESTMENT RESTRICTIONS**

The Company will not participate in the allocation of gains or losses derived from "New Issues" as defined in the Rules of the U.S. Financial Industry Regulatory Authority ("**FINRA**"), except that the Fund, in its sole discretion, may allocate de minimis levels of such gains or losses in a manner consistent with applicable FINRA Rules.

003266

## SCHEDULE C

## FORM OF COMPLIANCE CERTIFICATION

This compliance certificate ("**Compliance Certificate**") is given by Rand Advisors, LLC, as the adviser (the "**Adviser**") of Atlas IDF, LP (the "**Fund**"), pursuant to Section 5.6 of that Participation Agreement, dated as of November 30, 2015, among the Fund, the Adviser, Crown Global Life Insurance Ltd. ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company (on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A of the Participation Agreement (as defined below), as such Schedule A may be amended from time to time) ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**")), as the same may be amended, restated, supplemented or otherwise modified from time to time (the "**Participation Agreement**"). Capitalized terms used, but not defined, in this Compliance Certificate shall have the meanings set forth in the Participation Agreement.

By executing this Compliance Certificate, the Adviser certifies that, as of the calendar quarter ended [March 31/June 30/September 30/December 31], 201[-]:

1. The Fund's assets have been invested in compliance with the diversification requirements of Regulations 1.817-5(b) under the Code.

a. No more than 55% of the value of the total assets of the Fund is represented by any one investment;

b. No more than 70% of the value of the total assets of the Fund is represented by any two investments;

c. No more than 80% of the value of the total assets of the Fund is represented by any three investments; and

d. No more than 90% of the value of the total assets of the Fund is represented by any four investments.

| Diversification Test | Name of Issuer | % of Total Assets | Cum % | Test |
|---|---|---|---|---|
| Largest Issuer | [Issuer one] | x.xx% | x.xx% | < 55% TA |
| Second Largest Issuer | [Issuer two] | x.xx% | x.xx% | < 70% TA |
| Third Largest Issuer | [Issuer three] | x.xx% | x.xx% | < 80% TA |
| Fourth Largest Issuer | [Issuer four] | x.xx% | x.xx% | < 90% TA |

2. If the Fund relied on the "look through" provision of Regulation 1.817-5(f), the investments of any underlying investment vehicle must be sufficiently diverse to permit the Fund to comply with the diversification requirements of Regulation 1.817-5(b).

3. The Adviser has in all respects complied with the requirements set forth on Schedule D to the Participation Agreement.

4. The Adviser has reviewed the foregoing statements and certifies that they are true and correct.

IN WITNESS WHEREOF, the Adviser has caused this Compliance Certificate to be executed by one of its authorized officers this _____ day of _____, 201__.

**Rand Advisors, LLC**

Authorized Signature:  _____

Name:  _____

003267

## SCHEDULE D

### INVESTOR CONTROL REQUIREMENTS

The Adviser and each of its officers, employees, agents, affiliates or sub-advisers that is in any capacity responsible for, or involved in the determination of, the Fund's investments or investment objective, strategies or policies (each, an "**Adviser Party**"), shall not take any action that would cause any Policy Owner or Policy Representative (together with such Policy Owner, a "**Policy Party**") to be deemed to have such incidents of control as would cause the Fund's income and gains to be currently taxable to the Policy Owner pursuant to the "Investor Control Doctrine" as set forth in Revenue Rulings 77-85, 80-274, 81-225, 82-54, 2003-91, 2003-92, or 2007-7, or described in other materials published by the U.S. Department of the Treasury or the U.S. Internal Revenue Service. In seeking to ensure that no Policy Party is deemed to have incidents of control, each Adviser Party shall at all times act in compliance with the requirements of this Schedule D, as set forth below:

1. All decisions involving the investment of the Fund's assets shall be made by the relevant Adviser Party in its sole and absolute discretion, without any direct or indirect input from any Policy Party.

2. No Adviser Party shall enter into, directly or indirectly, any agreement, plan or other arrangement, whether written or otherwise, with a Policy Party regarding (i) the Fund's investments or investment objective, strategies or policies; (ii) the availability of the Fund as an investment option under the Policy Owner's policy; or (iii) the assets to be held by the Fund.

3. To the extent that the Adviser provides information (i) to a prospective Policy Owner or representative thereof as part of a direct or indirect sale of a Variable Contract, or (ii) to the Company for the Company to communicate with a Policy Party, any Adviser Party may describe: (a) the past performance of the Fund or related performance information with respect to the Fund; (b) its general view of market and industry trends (e.g., its belief that interest rates will rise in the short-term or that technology stocks are over-valued); (c) the background, education and past employment of its staff, including the performance of other funds under its management; and (d) other due diligence information that the Adviser generally provides to prospective investors with respect to the Adviser's other funds and accounts so long as such information does not relate to the quality or rate of return of any investment or group of investments of the Fund.

4. Without limiting the foregoing, no Adviser Party shall knowingly discuss, communicate or solicit in any manner, whether directly or indirectly, the views of any Policy Party on the current or future investments, objectives, strategies or policies of the Fund, either in general or specific terms.

5. No Adviser Party shall at any time be affiliated with a Policy Party; provided, however, that an Adviser Party may maintain such an affiliation if it establishes, pursuant to a legally binding written agreement, procedures to prevent any communication prohibited by this Schedule D.

6. The Company understands that the Adviser provides investment management services to a variety of clients outside the context of Variable Contracts. The Company further understands that the Adviser may provide such services to clients that are Policy Parties. The Adviser recognizes that these relationships could present an opportunity for a Policy Party to communicate with any Adviser Party concerning the Fund in a manner prohibited by this Schedule D. The Adviser shall take appropriate steps to comply with this Schedule D in the context of any such relationships.

003268

## APPENDIX A

**Instructions:**

A completed and signed copy of the Subscription Form must be delivered by electronic mail to:

jhonis@randadvisors.com

**Payment Instructions for Subscription:**

All contributions should be made by wire transfer to the following account:

        [bank name/address]
        ABA:
        ABA:
        For the account of:

        Account No.:
        For further credit to the account of:    [         ]
        Account No.:       [   ]
        Ref:          [subscriber's name]

After you have given your bank these wire instructions, please notify the Fund of the exact amount and date of your wire using the contact information above.  Doing so will help us identify your payment and credit it to the appropriate account.

003269

**APPENDIX A (Continued)**
**SUBSCRIPTION FORM**
**FOR ATLAS IDF, LP**

**Subscriber's Name:**

_____Crown Global Life Insurance Ltd._____ on Behalf of Separate Account _____, _____
Division [Fund #].

**Tax I.D. Number:** _____

**Type of entity (check one):**
☐ *Corporation*
☐ *Other (_____)*

**Subscription Amount in US $** _____    **Policy/Series Identifier (if any):** _____
☐ *Initial Subscription (minimum US $[_____])\**
☐ *Additional Subscription (minimum US $[_____])\**

**Date of Investment:** ____/____/____

| **Subscriber's Domicile Address:** | **Subscriber's Mailing Address:** |
|---|---|
| Canon's Court | Landmark Square, 2nd Floor |
| 22 Victoria Street | 64 Earth Close |
| Hamilton HM 12 | P.O. Box 10467 |
| Bermuda | Grand Cayman KY1-1004 |
| | Cayman Islands |

| *Contact Name:* | [_____] | *Contact Name:* | [_____] |
|---|---|---|---|
| *Tel:* | [_____] | *Tel:* | [_____] |
| *Fax:* | [_____] | *Fax:* | [_____] |
| *E-Mail:* | [_____] | *E-Mail* | [_____] |

\* Each subscription shall be treated as a separate Interest/Capital Account.

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank* _____
*ABA #* _____
*For the Account of* _____
*Account #:* _____
*Reference:* _____

003270

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

By: _____    By: _____

Name:                           Name:

Title:                          Title:

_____

Date of Execution

**APPENDIX B**
**WITHDRAWAL FORM**
**FOR ATLAS IDF, LP**

Date:_____

To:

[Tel.:  ]
[Fax:  ]
Attn:  [contact name]

The undersigned hereby requests to redeem the amounts specified below on the next available date following the Fund's receipt of this Withdrawal Request.

**Subscriber's Name:**

_____Crown Global Life Insurance Ltd._____  on Behalf of Separate Account _____, _____ Division [Fund #].

**Policy/Series Identifier (if any):** _____

**Withdrawal Amount:**
☐ *Full Withdrawal*
☐ *Partial Withdrawal\* – Amount in US$* _____
*(minimum US $100,000)*

**Type of Withdrawal:**
☐ *Standard Withdrawal*          ☐ *Special Withdrawal*
☐ *Death Benefit Withdrawal*      ☐ *Event Withdrawal*

**Date of Withdrawal**      ___/___/____

| **Subscriber's Domicile Address:** | **Subscriber's Mailing Address:** |
|---|---|
| Canon's Court | Landmark Square, 2nd Floor |
| 22 Victoria Street | 64 Earth Close |
| Hamilton HM 12 | P.O. Box 10467 |
| Bermuda | Grand Cayman KY1-1004 |
| | Cayman Islands |

| *Contact Name:* | [_____] | *Contact Name:* | [_____] |
|---|---|---|---|
| *Tel:* | [_____] | *Tel:* | [_____] |
| *Fax:* | [_____] | *Fax:* | [_____] |
| *E-Mail:* | [_____] | *E-Mail* | [_____] |

*Crown Global Life Insurance Ltd.*

\* Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by an Account at less than **$500,000** as of the date of withdrawal shall be deemed a complete withdrawal.

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank*          _____
*ABA #*         _____
*For the Account of* _____
*Account #:*    _____
*Reference:*    _____

003272

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

By: _____          By: _____

Name:                                 Name:

Title:                                Title:

_____
Date of Execution

003273

**EXHIBIT**

## CERTIFICATE OF HIGHLAND CAPITAL MANAGEMENT, LP

Reference is hereby made to that certain U.S. federal income tax opinion, dated January 29, 2016 (the "**Tax Opinion**"), attached hereto as Exhibit A, which Highland Capital Management, L.P. ("**HCM**") has requested from Sadis & Goldberg LLP ("**S&G**") to provide to HCM regarding certain U.S. federal income tax issues described in Part IV of such Tax Opinion.  Each term herein with an initial capital not required by standard capitalization rules is a defined term, and each such term not parenthetically defined herein shall have the meaning ascribed to it in the Tax Opinion.

HCM acknowledges and understands that S&G is relying upon the validity of each of the statements set forth below as the factual basis for the conclusions expressed in the Tax Opinion and that any inaccuracy in the matters set forth herein could adversely affect the conclusions in such Tax Opinion.

Pursuant to the foregoing, HCM hereby represents, warrants, covenants and certifies, after reasonable investigation and review and consultation as appropriate, as follows:

1. The Statement of Facts set forth in Part II of the Tax Opinion is accurate and complete in all material respects.  The Assumptions Made set forth in Part III of the Tax Opinion are believed by HCM to be reasonable, and to the extent that factual matters appear in Part III, they are accurate.

2. We have reviewed the Tax Opinion attached as Exhibit A hereto and, to the best of our knowledge, information and belief, there are no additional facts, conditions or circumstances which should have been disclosed to S&G for purposes of preparing this Tax Opinion.

3. S&G has been provided with true, correct and complete copies of the Relevant Documents as well as any other documents provided to S&G in connection with its services in connection with the Tax Opinion (collectively, "**Opinion Documents**").  Except to the extent made clear in the Opinion Documents themselves, each of the Opinion Documents has not been further amended, altered, modified, or restated and, to the extent that such document is an agreement, is in full force and effect on the date hereof and has been at all times since the date of such amendments. No resolution, proceeding or other action has been taken for the further amendment, alteration, modification or restatement of such Opinion Documents.

[Signature Page follows.]

003275

Highland Capital Management, L.P.
Certificate of Representations

IN WITNESS WHEREOF, HCM has executed this Certificate under seal by its
duly authorized representative as of January 29, 2016.

**HIGHLAND CAPITAL
MANAGEMENT, L.P.**

By: Strand Advisors, Inc.

Its:  General Partner

By:

Name and Title:

James Dondero, President

003276

**EXHIBIT**

003277

www.sglawyers.com

**SadisGoldberg**LLP

January 29, 2016

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, Texas  75201

Dear Sirs:

You have requested our ("our", "we" or "Sadis & Goldberg LLP" as the context may require) opinion concerning certain U.S. federal income tax issues relating to investments made by two tax-exempt supporting organizations identified herein in variable annuity contracts issued by Crown Global Life Insurance Ltd. under the facts discussed below.

Part I of this letter describes our factual investigation. Part II of this letter sets forth a statement of the relevant facts which you have reviewed and confirmed to us to be accurate and complete in all material respects.  Part III of this letter then lists certain assumptions that you have authorized us to make in rendering our opinion, and which you have confirmed are correct and reasonable, and Part IV of this letter states the opinion that is being requested.  In Part V of this letter, we describe the relevant U.S. federal income tax provisions, rulings of the Internal Revenue Service and relevant tax cases relating to the opinion requested.  Part VI of this letter sets forth our opinion, together with your permitted use of and reliance on this opinion letter.

I.    **FACTUAL INVESTIGATION**

**For purposes of rendering the opinions expressed below, we have been furnished and have reviewed the following documentation (the "Relevant Documents"):**

1.    The Okada Family Foundation, Inc. certificate of incorporation filed on February 10, 2015.

2.    The Okada Family Foundation, Inc. bylaws dated March 9, 2015.

3.    The Okada Family Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

4.    The Supporting Organization Operating Agreement entered into between The Okada Family Foundation, Inc. and The Dallas Foundation.

5.    Empower Dallas Foundation, Inc. certificate of incorporation filed on February 10, 2015.

6.    Empower Dallas Foundation, Inc. bylaws dated March 9, 2015.

7.    Empower Dallas Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

8.    The Supporting Organization Operating Agreement entered into between Empower Dallas Foundation, Inc. and The Dallas Foundation.

1

**003278**

9.   Mark Okada 12/08/2015 donation of $5,345,021.50 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

10.  Mark Okada 12/22/2015 donation of $2,138,333.33 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

**11.** Jim Dondero 12/08/2015 donation of $16,034.978.50 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

**12.** Jim Dondero 12/22/2015 donation of $6,415,000 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

13.  The Okada Family Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

14.  Empower Dallas Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

15.  The Okada Family Foundation, Inc.:  Crown Global Due Diligence Declaration Signed 12/09/2015

16.   The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30219, effective December 11, 2015

17.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30219, Term Sheet 12/09/2015

18.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Application Form, 12/09/2015

19.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

20.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

21.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

22.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

23.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

24.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

25.  The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

003279

26.    The Okada Family Foundation, Inc.:  Nexbank Wire Transfer Department: $5,301,065.12 wire premium to Crown Global on 12/10/2015

27.    The Okada Family Foundation, Inc.:  Nexbank Transaction detail entries from 11/28/2015 to 12/28/2015 for additional wire premium to Crown Global of $2,117,423.00 on 12/22/2015.

28.    The Empower Dallas Foundation, Inc.:  Crown Global Due Diligence Declaration Signed 12/09/2015

29.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30218, effective December 11, 2015

30.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30218, Term Sheet 12/09/2015

31.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Application Form, 12/09/2015

32.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

33.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

34.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

35.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

36.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

37.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

38.    The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

39.    The Empower Dallas Foundation, Inc.:  Nexbank Wire Transfer Department: $15,903,108.54 wire premium to Crown Global on 12/10/2015

40.    Empower Dallas Foundation, Inc.:  Nexbank Transaction Account detail from 11/28/2015 to 12/28/2015 indicating wire of $6,352,270 for additional premium to Crown Global on 12/22/2015

41.    Back Office Shared Services Agreement by and among Highland Capital Management, L.P. and Rand Advisors, LLC dated October 10, 2013.

3

003280

42. Amendment to Back Office Shared Services Agreement between Highland Capital Management, L.P. and Rand Advisors, LLC dated October 14, 2014.

43. Contribution Agreement between Highland Capital Management, L.P. and Hunter Mountain Investment Trust, dated December 21, 2015

44. Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 21st, 2015

45. Partnership Interest Purchase Agreement among The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, Mark K. Okada, and Hunter Mountain Investment Trust, dated December 24, 2015

46. Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24th, 2015.

We are not aware of any documents other than the Relevant Documents that would alter our conclusions. We have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals and the conformity with original documents of all documents submitted to us as copies, the fact that each party to an agreement has the power and capacity to execute, deliver and perform all obligations under such documents, the due authorization of all requisite action with respect to such documents (including the execution and delivery thereof) by each party thereto, and the validity and binding effect of such documents upon each party. We have also assumed that all factual assertions in the Relevant Documents are accurate and complete in all material respects. We have no reason to believe that any of the foregoing assumptions are unreasonable.

## II. STATEMENT OF FACTS

A. The Dallas Foundation ("TDF") is a Texas non-profit corporation exempt from federal income taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as amended ("Code"), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code.

B. The principal objective of TDF is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily, but not exclusively in or for the benefit of Dallas County, Texas. TDF is not controlled by James Dondero, Mark Okada or Highland Capital Management, L.P.

C. Empower Dallas Foundation, Inc. ("Supporting Organization #1") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

D. The Okada Family Foundation, Inc. ("Supporting Organization #2") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

E. Supporting Organization #1 and Supporting Organization #2 each expect to obtain a determination letter from the U.S. Internal Revenue Service ("IRS") that each such Supporting Organization,

003281

respectively, is a tax-exempt organization described in Section 501(c)(3) of the Code and a "Type I" supporting organization described in Section 509(a)(3) of the Code. For the avoidance of doubt, such tax-exempt status is expected to be effective retroactively to the date of each Supporting Organization's formation, respectively.

F.  As a result of qualifying as Type I supporting organizations under Section 509(a)(3) of the Code, Supporting Organization #1 and Supporting Organization #2 will each be exempted from private foundation status under Section 509(a) of the Code.

G.  Mary M. Jalonick is the President and Chief Executive Officer of TDF, and is the Incorporator of both Supporting Organization #1 and Supporting Organization #2.[1]

H.  Supporting Organization #1 has been formed at the request of James Dondero. On December 8, 2015, Mr. Dondero contributed $16,034,978.50 to Supporting Organization #1. On December 22, 2015, Mr. Dondero contributed $6,415,000 to Supporting Organization #1. At the present time, Mr. Dondero is the only contributor to Supporting Organization #1. Although Mr. Dondero made a recommendation to the Board as to how the Board should invest such contributions (as described below), the Board of Supporting Organization #1 is not contractually obligated to follow the investment recommendations of Mr. Dondero at the time such contributions are made or at any later date.

I.  Supporting Organization #2 has been formed at the request of Mark Okada. On December 8, 2015, Mr. Okada contributed $5,345,021.50 to Supporting Organization #2. On December 22, 2015 Mr. Okada contributed $2,138,333.33 to Supporting Organization #2. Although Mr. Okada made a recommendation to the Board as to how such contributions should be invested (as described below), the Board of Supporting Organization #2 is not contractually obligated to follow the investment recommendations of Mr. Okada at the time such contributions are made or at any later date.

J.  Under the relevant governing documents, TDF has total control over both Supporting Organization #1 and Supporting Organization #2, as the institutional member ("Institutional Member") of each Supporting Organization. The Institutional Member appoints the majority of each Supporting Organization's Board of Directors. The Board of Directors of each Supporting Organization appoints the officers of the Supporting Organization. The officers of each Supporting Organization can be removed with or without cause by the Board of Directors of such Supporting Organization.

K.  Supporting Organization #1 currently has a three-person Board of Directors. Mary M. Jalonick and Gary W. Garcia are the institutional directors ("Institutional Directors") of the Board of Supporting Organization #1. Gary W. Garcia currently serves as Senior Director of Development of TDF. The third member of the Board is W. Grant Scott II. Mr. Scott is an attorney engaged in private practice at Myers Bigel Sibley Sajovec, P.A. in Raleigh, North Carolina and knows Mr. Dondero from college.

L.  Supporting Organization #2 also currently has a three-person Board of Directors. Mary M. Jalonick and Gary W. Garcia are the Institutional Directors. Mark Okada is the third member of the Board.

M.  Mr. Dondero has recommended to the Board of Supporting Organization #1 that it invest its assets

---

[1] See Dallas Foundation's web page for background: www.dallasfoundation.org.

5

003282

in a private placement deferred variable annuity policy ( referred to herein as a "Variable Contract" or "Deferred Variable Annuity Policy") to be issued by Crown Global Life Insurance Ltd., a Bermuda-based insurance company ("Crown Global") that is a life insurance company within the meaning of the Code. Mr. Okada has made the same investment recommendation to the Board of Supporting Organization #2. However, the Boards of each Supporting Organization are not bound by those recommendations, and retain the authority to reallocate premiums or assets to different IDFs or managed accounts available under the Crown Global Variable Contracts.

N.  Crown Global maintains a segregated asset account ("Separate Account") pursuant to Bermuda law to hold assets that fund obligations arising under each Variable Contract issued by it. Under the terms of the Contracts and Bermuda law, assets allocated or credited to each Separate Account are the property of the insurance company and the policyholder has no direct proprietary interest in such assets. Rather, the Supporting Organizations have only a contractual claim against Crown Global to collect cash from Crown Global in the form of annuity payments or other withdrawals available under the Variable Contract. The performance of the investments held in the applicable Separate Account provide the measure for the economic return to the investor in the Variable Contract. The Crown Global Variable Contracts purchased by the Supporting Organizations provided that the investor was permitted to choose among certain "insurance dedicated funds" ("IDF" as further defined below) and managed accounts selected by Crown Global as available investments that could be held in the Separate Account identified in the Contract. One such IDF that was designated by Crown Global as an available investment option that the investors in the Variable Contract were permitted to select is Atlas IDF, LP ("Atlas IDF"), a newly formed Delaware "series" limited partnership managed by Rand Advisors, LLC ("Rand Advisors"). The Variable Contract also lists two other IDFs as investment options which the policyholder is able to select, JP Morgan Access Growth Strategies Insurance Fund, and JP Morgan Hedge Growth Strategies Insurance Fund. None of the IDFs or other managed funds available under the Variable Contracts will be funds that are offered to the general public under the IRS rulings discussed herein.

O.  The Variable Contract does not immediately payout distributions in accordance with a distribution schedule. The policyholders, Supporting Organization #1 and Supporting Organization #2 have the ability to make partial(s) or a full surrender of the Variable Contract at quarterly intervals, subject to applicable surrender charges. Further, as policyholders, Supporting Organization #1 and Supporting Organization #2 can decide at quarterly intervals (but no more than twice per calendar year) to reallocate funds from one investment option provided under the Variable Contract to another investment option offered by Crown Global under the Variable Contract.

P.  Crown Global, in its sole and exclusive discretion, can determine the investment offering within its offered insurance products and is under no legal requirement to make any particular offering of an investment strategy currently or in the future or to maintain an investment strategy offering. Crown Global, in its sole and absolute discretion, can terminate or remove an investment offering at any time in the future. All decisions as to the choice of IDFs or managed accounts that are made available for selection by the investor in the Variable Contract are made by Crown Global in its sole and absolute discretion. Mr. Dondero recommended to the Board of Supporting Organization #1 that it select Atlas IDF as the measuring investment under its Variable Contract. Mr. Okada made the same investment recommendations to the Board of Supporting Organization #2 as those made by Mr. Dondero to Supporting Organization #1.

Q.  On December 9, 2015, the Directors of Supporting Organization #1 and Supporting Organization #2 each unanimously approved resolutions authorizing the acquisition by the Supporting Organization

6

003283

of the Deferred Variable Annuity Policy from Crown Global, and authorized the officers of the Supporting Organization to take any and all further actions to carry out such acquisition.

R.  On December 10, 2015, Supporting Organization #1 wired an initial premium to Crown Global of $15,903,108.54 with respect to the Variable Contract.  On December 22, 2015, Supporting Organization #1 wired additional premium of $6,352,270 to Crown Global with respect to the Variable Contract.

S.  Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30218 to Supporting Organization #1.  Supporting Organization #1 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

T.  On December 10, 2015, Supporting Organization #2 wired an initial premium to Crown Global of $5,301,065.12 with respect to the Variable Contract.  On December 22, 2015, Supporting Organization #2 wired additional premium of $2,117,423.00 to Crown Global with respect to the Variable Contract.

U.  Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30219 to Supporting Organization #2.  Supporting Organization #2 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

V.  Crown Global is a subsidiary of Crown Global Insurance Group and is not affiliated with or controlled by Mr. Dondero or Mr. Okada, or Highland Capital Management, L.P. ("Highland"), which is the business conducted by Messrs. Dondero and Okada.  Highland is an investment manager business, with significant assets under management, located in Dallas, Texas.  Crown Global has made an election under the Code to be treated as a domestic life insurance company.

W.  In addition to acting as the investment manager of Atlas IDF, Rand Advisors will also act as the investment manager of Rand PE Fund I, L.P., a Delaware "series" limited partnership private investment fund ("PE Portfolio Fund"), to which Atlas IDF will initially allocate 55% of its investment portfolio and which: (x) is expected to initially invest in the Highland Transaction (as defined below), and (y) will potentially make investments in other private equity transactions.  The Supporting Organizations have not been offered the opportunity to invest directly in the PE Portfolio Fund, and Crown Global has not designated the PE Fund as an available investment option for inclusion in a Separate Account with respect to the Variable Contracts purchased by the Supporting Organizations.

X.  Atlas IDF has been organized by Rand Advisors as an "insurance-dedicated fund" (i.e., an investment fund that only admits institutional investors that are insurance companies and certain other eligible investors described in Treasury Regulation section 1.817(h)-5(f)(3)).  The confidential private placement memorandum of Atlas IDF provides that Series 1 of Atlas IDF will invest: (x) approximately 45% of its portfolio in traded assets (including, without limitation, distressed debt instruments), to be selected and managed by Rand Advisors, and (y) approximately (but not more than) 55% of its portfolio in private equity investments, to be selected and managed by Rand Advisors.  The percentage of Atlas IDF's assets invested in specific private equity investments is not fixed, and is subject to change by Rand Advisors.  However, Atlas IDF is required to satisfy the portfolio diversification requirements set forth in Section 1.817-5(b)(1) of the Treasury Regulations.

003284

Y.  At the outset, Crown Global will be the only insurance company owning a limited partnership interest in Atlas IDF.  However, the governing documents of Atlas IDF permit other insurance companies to invest directly in Atlas IDF on behalf of their separate accounts established in connection with variable annuities and insurance contracts. Thus, Interests in Atlas IDF are not being offered for sale to the "general public" (within the meaning of IRS Rulings and Regulations discussed below), and thus such other investors could invest in Atlas IDF only indirectly by purchasing a Variable Contract from Crown Global (if Crown Global were to make the Atlas IDF available as an eligible investment).  The PE Portfolio Fund in which Atlas IDF will invest is not an IDF.  PE Portfolio Fund will have other direct investors that are not affiliates of Crown Global.  Rand Advisors anticipates that it will market PE Portfolio Fund, or subsequent series thereof, to other investors in the future.

Z.  Rand Advisors is owned and controlled by John Honis.  In addition, Mr. Honis owns and controls the general partner entities of Atlas IDF and PE Portfolio Fund.  Mr. Honis has over 25 years of investment management and business experience, and is not controlled by Highland, nor by Mr. Dondero, nor Mr. Okada.

AA.  Mr. Honis was previously a Partner and Head of Private Equity at Highland.  Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies for investment funds operated by Highland, and receives compensation in connection with each of the foregoing.  Mr. Honis does not currently own any limited partnership interests in Highland and does not have any direct share in the profits or revenues of such company.  However, as part of his retirement, Mr. Honis is in the process of receiving payments in the total amount of $3 million from certain affiliates of Highland.

BB.  The governing documents of Atlas IDF require such fund to comply with the portfolio diversification requirements in Section 817(h) of the Code.  Similarly, the Variable Contracts each require the Separate Accounts established in connection with such Contracts to satisfy such portfolio diversification requirements.  Each of the Variable Contracts specifically provides that the policyholder is not permitted to have direct contact with the investment manager of any IDF or managed subaccount held in the Separate Account and may not participate in the management of the Separate Account or any IDF or managed subaccount.

CC.  It was anticipated solely among Rand Advisors, Strand Advisors (the General Partner of Highland Capital Management), James Dondero, and Mark Okada that the first series of PE Portfolio Fund would acquire all or substantially all of the non-voting limited partnership interests in Highland from Highland, including newly-issued limited partnership interests, or from trusts or other affiliates of Mr. Dondero or Mr. Okada (collectively, the "Highland Transaction").  Although with respect to any trusts, the Trustees would have to evaluate and approve any transaction independently and during the time of the relevant acquisition.  During this time, the PE Portfolio Fund and Highland did not negotiate documentation for the legal terms of the Highland Transaction.  Further, there was no assurances that such transaction would be consummated as it was understood that it would have to be negotiated, the respective parties had not made any offer (and would not until after the PE Portfolio Fund had assets), and that all parties would be separately represented by legal counsel.  It was nonetheless the intention of such parties that the

003285

transaction should come about.

DD. At the time that the Supporting Organizations acquired their ownership interests in their Variable Contracts and had selected the Rand IDF as to investment to be held in the Separate Account, PE Portfolio Fund had not entered into a binding contract to acquire the previously described limited partnership interests in Highland, and the Institutional Members of the Boards of the Supporting Organizations did not have any knowledge of the terms of the investment subsequently made by the Rand PE Fund in Highland.

EE. On December 21, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust (a special purpose vehicle of PE Portfolio Fund) acquired through a contribution of cash and note, newly issued limited partnership interests in Highland Capital Management, L.P.

FF. On December 24, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust acquired through purchase from trusts affiliated with Mr. Dondero and Mr. Okada, and Mr. Okada individually, newly reclassified limited partnership interests in Highland Capital Management, L.P.

GG. Hunter Mountain Investment Trust's acquisition of substantially all the interests in Highland Capital Management, L.P. was at a substantial discount to book value. The substantial discount offered reflects the overall donative intent of Mr. Dondero and Mr. Okada to engage in the transaction.

HH. The Variable Contract/Separate Account structure may provide a federal income tax advantage to the Supporting Organizations if the income realized by such Supporting Organizations as a result of ownership of their Variable Contracts would not be treated as taxable unrelated business taxable income ("UBTI") under the Code. In contrast, if either Supporting Organization were to acquire a direct ownership interest in an investment partnership such as Atlas IDF, such Supporting Organization would almost certainly realize taxable UBTI if Atlas IDF owned, directly, or through other partnerships, equity interests in business partnerships (such as Highland) or debt-financed assets.

II. The Variable Contract/Separate Account structure may also provide state and local tax advantages to the Supporting Organizations since the structure enables the Supporting Organizations to avoid being treated as engaged in business in the states and localities in which the underlying portfolio companies that are partnerships are engaged in business.

JJ. Crown Global has represented that (1) it qualifies as a life insurance company under the Code; (2) it has made an effective election to be treated as a domestic corporation for U.S. federal income tax purposes; and (3) the terms of the Variable Contracts to be purchased by the Supporting Organizations would meet the requirements of Section 72 of the Code to be treated as annuity contracts under such Code Section if such Contracts were held by a "natural person" (within the meaning of Code Section 72(u)).

KK. Mr. Dondero and Mr. Okada (the "Donors") are entering into the transactions described herein based on a donative intent to provide funds to be used by TDF, a public charity.

LL. Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Dallas Foundation had their independent financial consultant evaluate John Honis, as an investment

003286

manager acting through Rand Advisors, and the proposed investment strategy offered by him through an insurance dedicated fund that combined a private equity and liquid investment strategy for the Supporting Organizations.

MM.    The Dallas Foundation's independent financial consultant recommended to The Dallas Foundation that such investment strategies used by John Honis would be a prudent investment by each of the Supporting Organizations through a deferred variable contract policy issued by an insurance company.

NN.    Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Board of each Supporting Organization received (1) the confidential private placement memorandum prepared by Crown Global with respect to the Variable Contracts, and (2) the confidential private placement memorandum detailing the terms of the Atlas IDF.

OO.    The decision made by each Board to invest in its Variable Contract and to designate the Atlas IDF as the designated investment to be made by the Separate Account of Crown Global were made on the basis of the anticipated investment returns on the underlying investments that will be made and managed by Rand Advisors.


## III. ASSUMPTIONS MADE

You have authorized us to make the following assumptions for the purpose of rendering our opinion stated herein:

A.    Mr. Honis will manage the investments of Rand IDF and the PE Portfolio Fund in order to provide attractive returns to the current and future investors in such funds.  Mr. Honis' performance will affect his ability to attract additional investors to such funds (including separate series funds) as well as any other funds subsequently managed by Rand Advisors.

B.    Atlas IDF will, at all times, comply with the applicable diversification requirements under Section 817(h) of the Code.  In order to achieve such compliance, Atlas IDF will restrict the ownership of equity interests in Atlas IDF to those investors described in Treasury Regulation 1.817-5(f).

C.    The Boards of the Supporting Organizations will control any decisions made to be made as the owner of the Variable Contract, including any decisions to withdraw funds from the Variable Contract, to move funds from Atlas IDF to other investments that Crown Global may offer under the Variable Contract, or to invest additional funds of the Supporting Organization in Atlas IDF through the Variable Contract.

D.    Highland is a successful investment management firm and it would be able to raise additional capital from other sources if it chose to do so.

E.    The intentions of the parties are that, for federal income tax purposes,: (1) Crown Global will at all times be treated as the owner of the limited partnership interests in Atlas IDF that provide an

003287

economic return for the Variable Contracts owned by the Supporting Organizations; (2) each Supporting Organization will be treated as the owner of its Variable Contract; (3) Mr. Dondero and Mr. Okada will each be treated as having made charitable contributions in cash to their Supporting Organizations in the amounts described in the facts above; (4) any sales of partnership interests in Highland by Mr. Dondero or Mr. Okada, any trust established by M. Dondero or Mr. Okada or any related party to such Donors, to the PE Portfolio Fund will be treated as sales occurring between the applicable seller and the PE Portfolio Fund.

F. Neither Supporting Organization will incur "acquisition indebtedness" within the meaning of Section 514 of the Code with respect to its Variable Contract at any time.

## IV. REQUESTED OPINIONS

You have asked us to render an opinion on the following issues:

1. Whether the Internal Revenue Service could successfully contend that, under the facts and assumptions described above, the owners of the Variable Contracts, i.e., the two Supporting Organizations, are to be treated as owners for federal income tax purposes of the underlying investments held in the Crown Global Separate Accounts established in connection with such Variable Contracts.

2. Whether the income realized by the Supporting Organizations from their investment in the Variable Contracts will be exempt from the tax imposed under Section 511 of the Code on the "unrelated business taxable income" of tax-exempt entities described in Section 511(a).

## V. LEGAL ANALYSIS

### Tax Benefits for Tax-Exempt Organizations Investing in Variable Annuity Contracts

U.S. tax-exempt entities described in Section 501 of the Code, such as the Supporting Organizations, are subject to federal income tax on their unrelated business taxable income (UBTI). UBTI is defined in Section 512 as income from a "trade or business" that is regularly carried on by the tax-exempt organization, or a partnership in which it a partner, and which is not substantially related to the exempt organization's exempt purpose or function. UBTI also includes income from "debt-financed property" as defined in Section 514. Debt-financed property is property held to produce income with respect to which "acquisition indebtedness" exists at any time in the taxable year (or, if the property is sold or disposed during the year, with respect to which there was any acquisition indebtedness at any time during the 12-month period ending on the date of such disposition).

Section 512(b)(1) specifically exempts "annuities" from UBTI, along with other notable categories of investment income, including interest, dividends, capital gains and rent from real property. However, the specific statutory exemptions from UBTI do not apply to the extent such income items are unrelated debt-financed income under Code Section 514. Where debt-financed property is involved, UBTI includes the income from the property multiplied by its "debt-basis percentage" (a percentage equal to "average acquisition indebtedness" divided by "average adjusted basis").

11

003288

The term "annuities" is not defined in Section 512 or the Treasury regulations ("Regulations") thereunder.  There is also no comprehensive definition of annuity or "annuity contract' in Section 72 (governing tax treatment of distributions from life insurance and annuity contracts) or elsewhere in the Code.  The Regulations under Section 72 provide that an annuity contract that is subject to the rules of Section 72 includes a contract that is recognizable as an annuity under the "customary" practices of life insurance companies.  See Treas. Reg. Section 1.72-2(a)(1).  Under Section 72, if the entire value of an annuity contract is applied to a stream of periodic payments, each of these payments will be partly included in income and (because of nondeductible premium payments) partly excludible as a return of capital, pursuant to an "exclusion ratio".  Under Section 72(e)(2)(A), any non-annuity amount received under an annuity contract (including withdrawals and partial surrenders) on or after the "annuity starting date" are treated as "gross income".  Any non-annuity amounts received **before** the annuity starting date may be treated as gross income or a return of the policyholder's investment in the contract under rules set forth in Section 72(e)(3).

**Tax Status of Separate Accounts**.  Life insurance companies have segregated asset accounts that are created and regulated under the laws of various states or foreign jurisdictions.  These accounts are typically formed for the purpose of segregating assets attributable to variable life insurance contracts, variable annuities and group contracts from the general assets of the life insurance company.  In Revenue Ruling 78-204, the IRS ruled that a segregated asset account established by a life insurance company is not an organization that can be taxed separately from the insurance company.  The Ruling states that if a segregated asset account holds assets pursuant to contracts described in former Code section 801(g)(1) (which includes variable annuity contracts or contracts with reserves based on a segregated asset account), it is taxed as part of the insurance company.

**Code Section 817: Statutory Diversification Requirements**.  To discourage consumer use of various insurance type products as investment vehicles, Congress in 1984 granted the Treasury authority to prescribe diversification standards for the investment of variable contract assets held in segregated asset accounts.  The legislative history states the Congress's goal in so doing was "to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor."  *H.R. Conf. Rep. No. 98-561, at p. 1055 (1984)*.

Under the Treasury Regulations, a separate account will be considered adequately diversified if no more than 55% of the total value of the account is represented by any one investment; no more than 70% of the total value of the account is represented by any two investments; no more than 80% of the total value is represented by any three investments; and no more than 90% of the total value is represented by any four investments. Treas. Regs. Sec. 1.817-5(b)(1).

For purposes of testing diversification, Section 817(h)(4) and Section 1.817-5(f) of the Regulations provide a look through for assets held in certain investment entities, including partnerships, trusts and investment companies, provided that the beneficial interest in the investment entity are held by one or more segregated asset accounts of one or more insurance companies, and public access to such investment entity is available exclusively (except as otherwise permitted by Regs. Sec. 1.817-5(f)(3)) through the purchase of a variable contract.   As previously discussed, the Separate Accounts established in connection with the Variable Contracts are expected to satisfy the diversification

requirements of Code Section 817.  In order to satisfy the diversification requirements, Atlas IDF will satisfy the requirements of the Section 817 regulations to qualify for "look through" treatment.

## A. **INVESTOR CONTROL ISSUES.**

In the 1970's the IRS grew concerned that taxpayers were avoiding federal income tax by "wrapping" their investments in "investment annuity contracts" which created the possibility of major tax shelter abuse.  Such transactions were structured as follows:  Each investment annuity contract paid an annuity based on the investment return and market value of the contract's segregated asset account.  A third party custodian, typically a bank, held and invested the segregated account's assets according to the annuity owner's directions.  In response to such transactions, the IRS issued four revenue rulings between 1977 and 1982 describing the circumstances in which owners of variable annuity contracts or variable life insurance contracts would be treated and taxed as owners of the underlying assets because of their control of the investments.  The revenue rulings applied to variable annuity contracts and variable life insurance contracts the federal income tax principle that a person other than the person holding legal title to the property is treated as the owner for tax purposes if that other person possesses the "benefit and burdens" or "incidents of ownership" of such property.  See generally *Commissioner v. Sunnen*, 33 U.S. (1948); *Helvering v. Clifford*, 309 U.S. 331 (1940); *Corliss v. Bowers*, 281 U.S. 376 (1930).

**Revenue Ruling 77-85**.  This Ruling concludes that the annuity owner is, for federal income tax purposes, the owner of the separate account assets under the following conditions:

1.  the annuity owner controls the investment of the separate account assets;

2.  the annuity has the power to vote any securities in the account; and

3.  the annuity owner can withdraw any or all of the assets at any time.

**Revenue Ruling 80-274**.  The second Ruling similarly concludes that the investor in the annuity contract was treated as the owner of a bank certificate of deposit (CD) underlying a variable annuity contract when the contract owner transferred the CD to the life insurance company in exchange for the variable annuity contract and the insurance company is expected to hold the CD for the investor's benefit.

**Revenue Ruling 81-225**.  This Ruling applies the investor control principle to five different situations, and thus is considered the most important ruling on the principle.  In four of the fact patterns considered, the annuity owner- not the insurance company- is considered the owner of the mutual fund investments underlying the annuity contract because the mutual fund investments were available for direct purchase by the general public.  In the fifth fact pattern, the insurance company, rather than the annuity owner, is considered the owner of the mutual fund investments because such shares were not available for direct purchase by the general public; they were only available through the purchase of a variable contract. The Ruling states that in factual situations one through four, the insurance company is "little more than a conduit between the policyholders and their mutual fund shares."

**Revenue Ruling 82-54**.  In this fourth "investor control" Ruling, the annuity owners direct the insurance company to invest in shares of any or all of three mutual funds that are **not** available to the public.  One mutual fund invests primarily in common stocks, another in bonds, and the third in money market

13

003290

instruments.  The investors chose the original allocation of the investments among the three funds and have the unlimited right reallocate before the annuity contract's maturity date.   The IRS held that the annuity owners' ability to choose the contract's investments did not constitute sufficient control to cause them to be treated as owners of the mutual fund shares.  In its analysis, the IRS reiterated its position in Revenue Ruling 81-225 that public availability of investments will cause annuity owners to be treated as owners of the underlying mutual fund shares.

**Christoffersen v. United States**.  In 1984, the United States Court of Appeals for the Eighth Circuit upheld the IRS's investor control theory of Revenue Ruling 81-225 in *Christoffersen v. United States*.  The taxpayers in *Christoffersen* had purchased a variable annuity contract that reflected the investment return and market value of the insurance company's separate account assets.  The taxpayers had the power to direct the investment of premiums in any one or all of six publicly available mutual funds, to reallocate their investment among such funds at any time, to make withdrawals, to surrender the contract, and to apply the contract's accumulated value to provide annuity payments.

**Post-Christoffersen Legislation**.   After the Eighth Circuit Court's decision in the *Christoffersen* case, the Congress enacted Code section 817, which aims to discourage use of variable annuities and life insurance primarily as investment vehicles.   Before the issuance of further revenue rulings in 2003 (discussed below), some commentators had suggested that the enactment of the diversification requirements under Code section 817(h) (and other measures) effectively rendered *Christoffersen* (and Revenue Ruling 81-225) obsolete.  This view was supported by language in the General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 ("DEFRA Blue Book") indicating that the Congress introduced the diversification requirements in Section 817(h) to address any and all concerns with respect to investor control of assets underlying insurance company variable contracts.  The Joint Committee on Taxation wrote the following:

> In authorizing Treasury to prescribe diversification standards, the Congress intended that the standards be designed to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor.

When the Treasury issued its proposed regulations under Code section 817(h), it sidestepped the investor control issue.  In its preamble to such regulations, the Treasury expressly noted that the regulations "do not provide guidance concerning the circumstances in which investor control of the investments of a segregated asset account may cause the investor, rather than the insurance company, to be treated as the owner of the asset in the account."  The preamble further stated that guidance on investor control issues would be provided in separate regulations or rulings.

**Revenue Rulings 2003-91 and 2003-92**.  The subsequent major guidance issued by the IRS on the investor control issues with respect to variable contracts was in the form of two revenue rulings issued in 2003.  Revenue Ruling 2003-91 involved a life insurance company that offered variable life insurance and variable annuity contracts.  The assets that funded the contracts were held in a separate account that was divided into various sub-accounts.  Each sub-account offered a different strategy.  Under the facts of this ruling, an individual purchased a life insurance contract and at the time of purchase, the

003291

holder specified the allocation of premiums paid among the sub-accounts. The investments could be reallocated, at the direction of the holder, among the twelve sub-accounts, each representing a different investment strategy, at any time. Investment in the sub-accounts was available solely through the purchase of the insurance contract.

All decisions concerning the choice of the investment adviser, and any changes with respect to the sub-accounts offered, were made by the insurance company in its sole and absolute discretion. No arrangement, plan, contract, or agreement exists between the contract holder and the insurance company or between the contract holder and the investment advisor regarding the specific investments or investment objective of the sub-accounts. The contract holder could not communicate directly or indirectly with the insurance company concerning the selection or substitution of the investment advisor or other managers of the account or sub-accounts. The contract holder had no legal, equitable, direct, or indirect interest in any of the assets held by a sub-account; rather the contract holder had only a contractual claim against the insurance company to collect cash from the insurance company in the form of death benefits, or cash surrender values under the contract. Revenue Ruling 2003-91 concluded that the holder of a variable contract under such facts was not the owner of the assets that funded the variable contract for federal income tax purposes because the holder did not have direct or indirect control over the separate account.

Revenue Ruling 2003-92 clarified and amplified Revenue Ruling 81-22, by stating that a variable contract holder was the owner of interests in an unregistered partnership (e.g., a hedge fund or private equity fund) where the interests in such partnership were not available exclusively through the purchase of a life insurance policy or annuity contract. In effect this Ruling confirmed the position taken by the IRS in private letter rulings that the term "general public" included individuals purchasing partnership interests in private placement transactions. More recently, the IRS has confirmed that the fact that a similar fund is available to the public will not cause the fund held by the insurance company's separate account to be treated as being publicly available. See, e.g., Private Letter Ruling 20147007 (April 25, 2014).

**Webber v. Commissioner.** On June 30, 2015, the Tax Court issued a 92-page opinion in the case of *Webber v. Commissioner* affirming the enforceability of the IRS' investor control doctrine. Mr. Webber was a venture capital investor and private equity fund manager who established a grantor trust to purchase private placement variable life insurance policies insuring the lives of two elderly relatives. The policies were purchased from a Cayman life insurance company and the taxpayer and his family members were listed as the beneficiaries. The premiums paid for each policy, after deduction of a mortality risk premium and other applicable charges, were placed in a separate account underlying the policy. The Tax Court summarized the investor control doctrine[2] as follows:

> The "investor control" doctrine posits that, if a policyholder has sufficient "incidents of ownership" over the assets in a separate account underlying a variable life insurance or annuity policy, the policyholder rather than the insurance company will be considered the owner of those assets for Federal income tax purposes. The critical "incident of ownership" that emerges from these rulings is the power to decide what specific

---

[2] *Webber v. Com'r*, 144 T.C. No. 17 (2015), at pp. 55-56.

003292

investments will be held in the account. . . . Other "incidents of ownership" emerging from these rulings include the powers to vote securities in the separate account; to exercise other rights or options relative to these investments; to extract money from the account by withdrawal or otherwise; and to derive, in other ways, what the Supreme Court has termed "effective benefit" from the underlying assets.

The assets in these separate accounts purchased investments in startup companies which, as the Tax Court noted, the taxpayer was intimately familiar with, and also in which he invested personally and through the funds he managed.  After examining the facts, including thousands of emails sent by Webber to parties acting as his agent with "recommendations" that were routinely followed by the "investment managers" of the accounts, the Tax Court determined that the taxpayer effectively dictated both the companies in which the separate accounts would invest and all actions taken with respect to these investments.

The IRS cited the "investor control" doctrine and other principles, and concluded that the taxpayer had retained sufficient control and incidents of ownership over the assets in the separate accounts to be treated as their owner for federal income tax purposes.  The IRS thus treated the taxpayer as having received the dividends, interest, capital gains, and other income realized by the separate accounts.  The IRS also assessed accuracy related penalties on the taxpayer under Code section 6662.

The Tax Court held that the IRS' pronouncements enunciating the investor control doctrine are entitled to deference and weight and that Webber "retained control and incidents of ownership over the assets" and was therefore "taxable on the income earned on those assets during the taxable years at issue."  In holding that the taxpayer was the owner of investments held under the variable annuity contract , as contract owner, the taxpayer had (a) unfettered ability to select investments for the separate accounts under the contract, and neither the issuer nor the investment manager of the separate account exercised any independent investment discretion, (b) dictated all actions the separate account took with respect to ongoing investments,[3] (c) had numerous ways to extract cash from the contract without a surrender of the contract[4] and without loans against the contract, and he frequently exercised such power (e.g., by selling assets to the separate accounts, by borrowing money from the separate accounts, and by having the separate account make investments that generated liquidity for the taxpayer), and (d) derived other economic benefits, including causing the separate accounts to make investments that were used for personal pleasure by the taxpayer (including a winery, a Big Sur resort, and a Canadian hunting lodge), that discharged the contract owner's personal commitments, and that bolstered investments held by the taxpayer outside the contract.

Consequently, the Tax Court upheld the IRS' deficiency determinations for the most part but concluded that the taxpayer as not liable for the penalty assessments (even though the taxpayer was widely believed by tax advisors to have flagrantly disregarded the most minimal of standards to avoid investor control).  The facts described herein concerning the investments made by the Supporting Organizations

---

[3] Giving the contract owner SEC-mandated voting rights with respect to underlying investments is not sufficient to establish investor control.  Rev. Rul. 81-225, 1981-2 C.B. 12.

[4] The contract owner's right to surrender the contract is not sufficient to establish investor control.  Rev. Rul. 81-225, 1981-2 C.B. 12.

003293

in the Variable Contracts issued by Crown Global in no way resemble the facts considered by the court in the *Webber* case.

**Application of the Investor Control Precedents to the Variable Contracts.**

Both Supporting Organizations certificates of incorporation state in the "Second" clause:

"The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. . . . [T]he corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code."

The "Second" paragraph quoted from each certificate of incorporation is clear that the respective Supporting Organization is formed to operate exclusively "to support and benefit" The Dallas Foundation. Further the "Eighth" paragraph of the certificate of incorporation for each Supporting Organization indicates that upon its dissolution, all of its assets are to be distributed to The Dallas Foundation.

Each Supporting Organization will be classified as a "Tier 1" supporting organization for federal income tax purposes. A "Tier 1" Supporting Organization, from time to time, will provide its supported organization, The Dallas Foundation, distributions of cash. The IRS web page describes the relationship as:

"**Type I.** A Type I supporting organization must be operated, supervised or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. The relationship between the supported organization(s) and the supporting organization is sometimes described as *similar to a parent-subsidiary relationship*. (emphasis added.)"[5]

Section 2.13 "Control of Investments" within the bylaws of each Supporting Organization provide that The Dallas Foundation, as Institutional Member, "shall have the sole and exclusive power and authority to direct the management and investment of the assets" of each Supporting Organization. This power affirmatively rests exclusively in the hands of The Dallas Foundation's Institutional Members and no other officer or director of the respective Supporting Organization. This mandate is reflected in the bylaws' Section 2.13 as:

"Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of the

---

[5]See, https://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Supporting-Organizations-Requirements-and-Types

003294

Corporation **which have no power or authority** with respect to the matters delegated hereby to the Institutional Member with respect to investments" (emphasis added).

Therefore, the Supporting Organizations' Individual Directors and officers, including Grant Scott or Mark Okada, have no power or authority with respect to matters assigned to The Dallas Foundation with respect the decision to purchase the Variable Contracts.

This power within Section 2.13(d) vested with the Institutional Member includes control of decisions with respect to:

"the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) ..."

Section 2.13(e) of the bylaws extends the power to the Institutional Members to include:

"the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments."

The Dallas Foundation holds the Institutional Member seats on the board of the Supporting Organizations per Section 2.1 of the respective bylaws. The Dallas Foundation has appointed as Directors Gary W. Garcia and Mary M. Jalonick per the respective "Statement of Incorporator."

Thus, the corporate provisions for each Supporting Organization's certificate of incorporation and bylaws is absolutely clear that The Dallas Foundation controls all of the respective Supporting Organization's activities, including investments, purchases of the Variable Contracts, grants, and operating costs and expenses, and is entitled solely and exclusively to the economic benefit of such Supporting Organization's investments, including from the Variable Contracts.

Supporting Organization #1 received a donation of cash of $16,034,978.50 on December 8, 2015 from Mr. Dondero. Supporting Organization #2 received a donation of cash of $5,345,021.50 from Mr. Okada on December 8, 2015. After the cash donation was made, the Board of Directors of each Supporting Organization authorized the purchase of a Variable Contract offered by Crown Global through a Resolution of Unanimous Consent on December 9, 2015. Effective December 11, 2015, Crown Global issued Variable Contracts #30218 and #30219 to Supporting Organization #1 and Supporting Organization #2, respectively. The Variable Contracts offered investment opportunities in three Insurance Dedicated Funds, including Atlas IDF. The Dallas Foundation, acting as the Institutional Board member of each Supporting Organization, directed the premiums to be allocated 100% to Atlas IDF.

Each Variable Contract, in the respective "Policy Data Page" to the Deferred Variable Annuity Policy, indicates under "Beneficiary" the sole beneficiary as the respective purchasing Supporting Organization #1 and Supporting Organization #2, and such designation is "irrevocable".

003295

Therefore, it is without question that the investment decision to purchase the Variable Contract and allocate the premium to Atlas IDF was made by The Dallas Foundation.  Through this decision by The Dallas Foundation, the investment performance of Atlas IDF will accrete to each respective Supporting Organization, and therefore, ultimately, to The Dallas Foundation.   Ultimately, The Dallas Foundation will solely and exclusively derive any and all of the economic benefits from the Variable Contracts issued by Crown Global.   Concomitantly, neither the Donors nor the Donors' agents, affiliates, related parties etc. derive any of the economic benefits from the Variable Contract's performance through the investment decisions made by Rand Advisors within Atlas IDF.

Each Variable Contract policy provides in Sections 4.5 and 5.1 the allowance that the Supporting Organization can reallocate funds, at quarterly intervals (but no more than twice per calendar year), among the available investment options provided in the Contract.  Therefore, The Dallas Foundation, should it no longer want exposure to Atlas IDF, has the right to reallocate funds to another investment offering.

Crown Global, through Sections 4.7 and 4.11 of each Variable Contract policy, has the sole and absolute discretion to terminate Atlas IDF as an investment offering available to each Supporting Organization. Each Supporting Organization has the right to fully or partially surrender the Variable Contract back to Crown Global, in accordance with Sections 8.2 and 8.3 of the policies.  No more than one partial surrender may be requested by the policyholder during each quarter of a policy year.

As discussed above, Atlas IDF will qualify for look through treatment for purposes of satisfying the diversification requirements of Section 817 of the Code.  In order to qualify for such look through treatment, it is essential to conclude that the equity interests in the Rand IDF have not been offered to the "general public".  Since the offering documents for the Rand IDF provide for such restricted access to the fund, we have assumed that the Rand IDF has satisfied, and will continue to satisfy this requirement.

The PPM for Atlas IDF provides that approximately 45 percent of its assets will be invested in a portfolio of high yield debt instruments and other securities selected by, and managed by the investment manager of the IDF, Rand Advisors.  Under the governing documents of the Variable Contracts and the Atlas IDF, the Supporting Organizations are not provided with any opportunities to participate in any purchase or sale or other investment decisions made with respect to the IDF's debt portfolio, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to do so.

The PPM for Atlas IDF further provides that approximately (but no more than) 55 percent of the IDF's portfolio will be invested in private equity investments through an investment made by the IDF in the Rand PE Fund 1.  Although it was anticipated that the Rand PE Fund would seek to make an investment in limited partnership interests in Highland, the terms of such investment were negotiated by Rand Advisors, as investment manager of the PE Fund, the Supporting Organizations were not provided with any opportunity to participate in such negotiations, and in fact purchased their Variable Contracts before any such investment in Highland was made by the PE Fund.  There was no guarantee that the Highland investment would in fact be made and there was no provision for unwinding the investment by

003296

Crown Global in Atlas IDF or the investments made by each Supporting Organization in its Variable Contract if such were the case.

Further, the governing documents of the Rand PE Fund provide that all investment decisions with respect to such Fund are to be made by Rand Advisors, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to participate in such decisions.  The owners of the Variable Contracts will not have the ability to exercise any voting rights with respect to securities held by the Atlas IDF or Rand PE Fund, and such owners of the Variable Contracts will not have the ability to require any distributions by the insurance company pursuant to withdrawal rights in such contracts to be made in kind rather than in cash.  Due to the nature of the illiquid private equity investments in the Separate Accounts, the Variable Contracts contain certain limitations on the ability of the owners of such contracts to withdraw funds.

On December 21, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Contribution Agreement with Highland Capital Management. L.P., in exchange for newly-issued limited partnership interests in Highland Capital Management, L.P. (the "Contribution Transaction").   On December 24, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Purchase and Sale Agreement to acquire interests in Highland Capital Management, L.P. from The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, and Mark K. Okada (the "Purchase Transaction" and together with the Contribution Transaction, the "Highland Transaction").

The Highland Transaction was negotiated between Rand Advisors and the respective Highland counterparties and their legal representatives.  Prior to consummation of the Highland Transaction, neither The Dallas Foundation nor the Supporting Organizations directed, compelled, or caused Rand Advisors to make the investment in the Highland Transaction.

The investor control doctrine was created to prevent the policyholder or beneficiary of an insurance product that qualifies under Section 72 of the Code from directly or indirectly making investment decisions with respect to the investment assets within the insurance product.  The concern was that policyholders and beneficiaries should not be able to direct the investments and receive the economic benefit of those directions within an insurance product.  That is the fundamental principle laid out in in the recent Tax Court case of *Webber v. Commissioner*.

Therefore, applying that *Webber* principle of the investor control doctrine to the Highland Transaction, it is not a legally significant fact that the Donors to each of the Supporting Organization are also participants in the Highland Transaction because the beneficiary of the economics from the investment performance of the Variable Contracts are not the Donors but rather are the Supporting Organizations and ultimately The Dallas Foundation.

As further support for our view, Rand Advisors made the independent investment decision to participate and negotiate the Highland Transaction.  Moreover, it is clear that Rand Advisors was not taking directions nor compelled by The Dallas Foundation or the Supporting Organizations to enter into the Highland Transaction.  Accordingly, there is no way the Highland Transaction can in any way be

003297

characterized as "control" by The Dallas Foundation or the Supporting Organizations over the investment activities of Atlas IDF and its respective investment accounts.

The facts and circumstances of the purchase of the Variable Contracts by the Supporting Organizations support the conclusion that Crown Global is the owner of Atlas IDF and its investments, and that the Supporting Organizations will not be treated as the owner of the investments. The facts present none of the factors that the Tax Court found determinative in *Webber*. In particular:

- Neither The Dallas Foundation nor the Supporting Organizations have any ability to select investments in Atlas IDF held by the Variable Contracts;
- Neither The Dallas Foundation nor the Supporting Organizations have any ability to vote securities owned by Atlas IDF or the ability to exercise other options with respect to such investments;
- Other than the right to partially or fully surrender the Variable Contracts, the Supporting Organizations cannot withdraw funds indirectly out of the Variable Contracts. In particular, neither The Dallas Foundation nor the Supporting Organizations can cause Atlas IDF to purchase assets from The Dallas Foundation or the Supporting Organizations. Nor can The Dallas Foundation or the Supporting Organizations borrow funds from Atlas IDF or otherwise engage in any transaction with Atlas IDF.

In addition, the facts and circumstances closely track the facts and circumstances of Revenue Ruling 2003-91's safe harbor provisions. In addition to the facts recited above:

- There is no arrangement, plan, contract, or agreement between The Dallas Foundation or the Supporting Organizations and Crown Global or Rand Advisers as to the investments to be held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no right to, and will not, communicate with any investment officer of Crown Global or its affiliates or with any Investment Manager regarding the selection, quality, or rate of return of any specific investment or group of investments held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no legal, equitable, direct, or indirect interest in any of the assets held by Atlas IDF. Rather the Supporting Organizations only have a contractual claim against Crown Global to collect cash from the Variable Contracts.
- All decisions concerning the choice of Insurance Dedicated Fund offerings, or any of Crown Global's investment officers involved in the investment activities of any Insurance Dedicated Fund, are made by Crown Global in its sole and absolute discretion.[6]

---

[6] See also, P.L.R. 9752061 (Dec. 24,1997) ("Policyholder influence over the way the investments are managed will be limited to selecting an investment manager from a pool of investment managers whose credentials have been evaluated and approved by Taxpayer. These investment managers may be recommended to Taxpayer by one or more Policyholders. Taxpayer will be under no obligation to approve any such recommendations. Moreover, once Policyholder makes an initial selection, the investment manager can only be changed by Taxpayer and not by Policyholder"; Taxpayer (the issuing insurance company) was held to be the owner of the assets held under the contract).

003298

- Neither The Dallas Foundation nor the Supporting Organizations have any right to, and will not, communicate with Crown Global concerning the selection or substitution of any investment manager or insurance dedicated fund involved in the investment activities of Atlas IDF.

In sum, based upon these facts, we believe that the Supporting Organizations will not be treated as the owners of the investments and other assets held in the Separate Accounts, since the Supporting Organizations will not have the types of control which the IRS has viewed as essential in order to apply the investor control doctrine to make another person other that the holder of the assets (i.e., the insurance company) the owner for tax purposes.

B. **UNRELATED BUSINESS TAXABLE INCOME ISSUES FOR INVESTORS IN DEFERRED VARIABLE ANNUITY CONTRACTS**.

As discussed above, we have reached the conclusion that under the facts and assumptions set forth herein, for federal income tax purposes, the insurance company should be treated as the owner of the assets in the Separate Account (i.e., the equity interests in the Rand IDF), and each of the Supporting Organizations should be treated as owners of their respective Variable Contract. We have also been instructed to assume that neither Supporting Organization has, or will ever, incur "acquisition indebtedness" with respect to its Variable Contract.

**Possible Application of Section 72(u) of the Code**. In 1986, Congress was concerned that employers were utilizing deferred annuity contracts to fund nonqualified deferred compensation arrangements on a tax-favored basis, and that this was acting as a disincentive to employers to fund benefits through qualified retirement plans. Section 72(u) was added to the Code to curtail such activity. The legislative history to section 72(u) states:

> The committee believes that the present-law rules relating to deferred annuity contracts present an opportunity for employers to fund, on a tax-favored basis, significant amounts of deferred compensation for employees. This favorable tax treatment may create a disincentive for employers to provide benefits to employees under qualified pension plans, which are subject to significantly greater restrictions.[7]

Section 72(u) states, in relevant part, that "any annuity contract" owned by "a person who is not a natural person" (e.g., a corporation) shall not be treated as an annuity contract for purposes of the income tax provisions of the Code (Sections 1-1563, known as Subtitle A), other than Subchapter L (i.e., Sections 801-848 relating to insurance companies). The effect of this rule was to eliminate the deferral of income tax for the corporate investor in the contract on the "inside buildup" income of the annuity contract. If a non-natural person does hold an annuity contract and no exception applies, then Section 72(u)(1)(B) provides that the "income of the contract" for any taxable year is "ordinary income" that the owner is treated as receiving or accruing during that taxable year.

---

[7] S. Rep. No. 99-313, at 567 (1986).

003299

**Exemptions under Section 72(u)**. We would also note that the drafters of Section 72(u) also inserted some specific exemptions in Section 72(u)(3). For example, Section 72(u)(3)(B) provides that Section 72(u) does not apply to any annuity contract held under a qualified plan described in Section 401(a) of the Code or an "individual retirement plan" (i.e., individual retirement accounts and individual retirement annuities described in Section 7701(a)(37)). Section 72(u) also contains an exemption for "immediate annuities" held by any non-natural person. The inclusion of these exemptions indicates that Section 72(u) is designed to eliminate the tax deferral benefit that taxable corporations could derive from investments in deferred annuity contracts. We are not aware of any policy reason why a deferred annuity contract held by a qualified plan or an IRA should be exempted from Section 72(u) but one held by a tax-exempt corporation should be covered, and we have found nothing in the brief legislative history of this Code provision that addresses this issue. Consequently, the failure of the drafters to include an exemption from Section 72(u) for other tax-exempt entities that are not qualified plans or IRAs appears to be an oversight or drafting error.

**Definition of "Income on the Contract"**. Section 72(u) provides its own special definition of "income on the contract" in Section 72(u)(2). Such income is defined as the *excess of* (1) the sum of the "net surrender value' of the contract at the close of the taxable year plus all distributions under the contract received during the taxable year or any prior taxable year, *over* (2) the sum of premiums paid on the contract (net of dividends) plus all amounts includible in income for prior taxable years under Section 72(u). It is significant that the income to be recognized by the owner of the annuity contract is the net change in value of the contract rather than the actual net income realized by the separate account of the insurance company that has issued the annuity contract backed by the separate account. In effect, Section 72(u) does **not** provide for income taxation of the holder of the contract as if the contract owner owned the underlying assets in the insurance company's separate account.

The Supporting Organizations are corporations, and thus non-natural persons within the meaning of Section 72(u). Section 512(b), which contains a specific exclusion from UBTI for "annuities" is in Subtitle A of the Code. Thus, the Section 72(u) could be interpreted to provide that the UBTI exclusion for "annuities" would not apply to a tax-exempt corporation that owned a variable annuity contract. We have found no evidence in the legislative history that would indicate that Section 72(u) was intended to change the character of the income recognized by tax-exempt corporations that owned variable annuity contracts. Even if the specific exclusion from UBTI for "annuities" were held inapplicable to the income derived by the Supporting Organizations from the Variable Contracts, there are alternative provisions of the tax law that could be cited to support an exclusion of the income from such Contracts from UBTI.

**Treasury Regulations Defining Investment Income Excluded from UBTI.** Section 512(b) of the Code states that certain income items, including "annuities", interest, dividends, royalties, real property rents and gains realized on sale, exchange or disposition of property (other than inventory or property held primarily for sale to customers in the ordinary course of a trade or business) are specifically excluded from UBTI. Congress subsequently amended Section 512(b)(1) to add "payments with respect to securities loans" and "amounts received or accrued as consideration for entering into agreements to make loans" to the list of items excluded from UBTI. In the 1990's there were many new types of financial instruments, including equity swaps and total return swaps, that were made available and tax counsel sought advice from the Treasury for further clarification of the UBTI rules for investments made

by tax-exempt entities in such financial instruments.   In 1992, the Treasury amended Section 1.512(b)-1 of the Regulations to provide that the specific exclusion from UBTI in Section 512(b)(1) also applies to "income from notional principal contracts" (as defined in the Regulations) and "other substantially similar income from ordinary and routine investments to the extent determined by the Commissioner...."

Thus, it can be argued that the income required to be recognized by a Supporting Organization under Section 72(u) as a result of its investment in the Variable Contract could still qualify for exclusion under this Treasury Regulation as "substantially similar income from ordinary and routine investments".  We have found no revenue ruling or case which has addressed this issue.  We would note, however, that Section 72(u) by its terms is only applicable to "annuity contracts".  Thus, if the Supporting Organizations had instead purchased variable life insurance policies, Section 72(u), by its terms, would not be applicable.  If Congress intended to eliminate the UBTI exemptions applicable to tax-exempt corporations that invested in variable contracts, it is unclear why the Section 72(u) provision by its terms is only applicable to "annuities" and not variable life insurance policies.

**Unrelated Trade or Business.**

The tax on UBTI was passed into law to rectify situations where an exempt organization could engage in any trade or business, secure in the knowledge that the profits generated from such trade or businesses would not be subject to tax, assuming the funds from such trade or business were received by the exempt organization.  As stated in the House Committee Report:

> The problem at which the tax on unrelated business income is directed here is primarily that of unfair competition.   The tax-free status of these section 101 organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes.  Also, a number of examples have arisen where these organizations have, in effect, used their tax exemption to buy an ordinary business.[8]

Under Section 511 of the Code, gross income of a tax-exempt organization will be treated as UBTI if:

1. It is income from a "trade or business";

2. The trade or business is "regularly carried on" by the organization or a partnership in which it is a member; and

3. The conduct of the "trade or business" is not substantially related to the purposes of the organization.

In order for the IRS to assert that some or all of the income from Variable Contracts constitutes UBTI, the IRS will need to establish that some or all of the income from the Variable Contracts is "trade or business" income.  Thus, unless the Variable Contracts were deemed to be partnership interests, or the

---

[8] H. Rep't No. 2319, 81st Cong., 2d Sess. 33-37 (1950).

003301

activity of acquiring such Variable Contracts were deemed to be a business activity, the income items recognized by the Supporting Organizations would not be treated as UBTI.

In general, a trade or business for UBTI purposes is based on Section 162 principles, and is viewed as an activity that produces income from the sale of a product or performance of services.  In a 1969 Revenue Ruling, the IRS held that a tax-exempt entity's investment in insurance and annuity contracts was not a business activity.  See Revenue Ruling 69-74.  The IRS will not be able to establish an unrelated trade or business with respect to either Supporting Organization.  The Variable Contracts are contractual entitlements only, and any economics paid or accrued are paid or accrued with respect to such contract.

As discussed in detail in this letter, we do not believe that the Supporting Organizations could be treated as the tax owners of the underlying partnership investments of the Separate Accounts under the IRS's "investor control" doctrine discussed in detail above.  The facts and assumptions described above do not support treating the Supporting Organizations as partners in the Atlas IDF, the Rand PE Fund or the underlying Highland limited partnership.

**Code Section 514(g) Amendment**.  Section 72(u) was added to the Code in 1986.  Two years **earlier**, Congress had amended Code Section 514 (by adding a new subsection (g)) to specifically grant regulatory authority to the Treasury to issue regulations "necessary or appropriate" to prevent the avoidance of the debt-financed income rules through the use of "segregated asset accounts"**.**  The legislative history of the 1984 legislation specifically states that such regulations, if issued, shall only apply prospectively.  We have found no reference to the 1984 amendment to Section 514 in the legislative history of Section 72(u).  As of the date of this letter, the Treasury has not issued any proposed regulations to implement Section 514(g). Further, there have been no regulations issued or proposed under Section 72(u).

**Private Letter Rulings under Section 72(u).**  There are two IRS private letter rulings, published in 2002 and 1997, that appear to have addressed the tax treatment of tax-exempt corporations that have made investments in variable annuities backed by separate accounts that held UBTI generating assets**.**  PLR 20020647 (dated Nov. 13, 2001); PLR 9708022 (dated Nov. 26, 1996). These PLRs focus on the application of Section 72(u) and the use of group annuity contracts (GACs) purchased by a foundation or endowment (i.e., a non-natural person).  The underlying investment of the GAC was a real estate partnership (presumably funded with debt financing).  The PLRs state that while the GAC was subject to Section 72(u) in the hands of the tax-exempt organizations, the annuity continued to be treated as a valid variable contract under Section 817(d) of the Code.  As a result of Section 72(u) being applicable, the life insurer would issue a Form 1099 to the endowment or foundation for any current income required to be recognized by reason of Section 72(u).

The tax issue is the character of the income to such tax-exempt entities.  The two letter rulings, state, in essence, that in the view that the contract's status as an annuity contract under Subchapter L of the Code (relating to insurance company taxation), "the tax treatment of the contract holder under Section 72(u)(1)(A) does not preclude the contract from satisfying the requirements of Section 817(d)(2)(A) for purposes of determining the taxpayer's income."  As such, the rulings conclude that the contracts do provide for the "payment of annuities."  This would support the conclusion that the "income on the

contract" received by the Supporting Organizations constitutes "annuity" income and therefore does not constitute UBTI.  It is our understanding the counsel for insurance companies generally are of the view that such PLRs support the position that the character of the contract holder's income is "annuity" income or other investment income exempt from UBTI despite the fact that the GAC is subject to Section 72(u).

In addition, another private letter ruling, published in 1990, supports the contention that the income reportable by each Supporting Organization does not constitute UBTI.  In PLR 9009047, a trust was requesting a ruling that it qualified as a charitable remainder unitrust.  The trustee of the trust intended to invest all the trust's assets in a deferred annuity contract.  The ruling acknowledges that the annuity contract to be acquired by the trust will be subject to Code section 72(u) because the trust is not a natural person and the trust is not holding the annuity as an agent for a natural person.  The ruling concludes that the trust will qualify as a charitable remainder unitrust and therefore the trust "will be exempt from taxes imposed by subtitle A of the Code unless it has any unrelated business taxable income as defined in section 512 of the Code and the regulations applicable thereto."  Immediately thereafter, the ruling states that the trust will include in its ordinary income for any tax year the "income on the [annuity] contract" in accordance with Code section 72(u).  This again supports the conclusion that amounts reportable by a tax-exempt organization with respect to an annuity contract will not constitute UBTI.[9]

Private letter rulings of this type are issued to a particular taxpayer in response to a request from the taxpayer for an interpretation of the tax law to a particular set of facts. PLRs may not be cited as precedent and generally may not be relied upon by as taxpayer other than the taxpayer which applied for and received the PLR.  However, PLRs are typically viewed by tax counsel as indicative of the interpretations of the tax law that IRS personnel would likely apply to other taxpayers with the same issue.

**Mark to Market Taxation of an Annuity Contract under Section 72(u) Supports Exclusion from UBTI.**  Even if the "income on the contract" that will be reported to each Supporting Organization is not considered an amount from an annuity because of Code section 72(u), alternative arguments exist that support the contention that the "income on the contract" does not constitute UBTI.

As discussed above, the "income on the contract" that will be reportable to each Supporting Organization will represent the increase in value of the assets underlying the Variable Contracts.  The manner in which the contract owner's annual income inclusion is calculated under Section 72(u) resembles a mark-to-market approach to determining the investor's gain from ownership of the contract during the applicable taxable year.  Essentially, the "income on the contract" represents the amount that would be realized if all the assets underlying the Separate Accounts were sold for their fair market value at the close of each taxable year.  As noted above, Section 512(b)(5) contains a broad exemption from UBTI for gains realized on sales, exchanges or "other dispositions" of property (other

---

[9] This conclusion is also supported by commentators.  *See* Zaritsky, Lane & Danforth, <u>Federal Income Taxation of Estates and Trusts</u>, §14.03[6][a][iv] ("Because the income option CRUT is tax exempt, no tax is due on the current accumulations").

26

003303

than inventory or dealer assets). Furthermore, gain realized by tax-exempt investors under the mark-to-market rules of Code Section 1256 are entitled to the UBTI exclusion provided by Section 512(b)(5).

The UBTI exclusion does not apply to gains or losses from the sale, exchange, or other disposition of property that is (i) stock in trade or other property of a kind which would properly be included in the inventory of the organization if on hand at the close of the taxable year, or (ii) property held primarily for sale to customers in the ordinary course of the trade or business. The investments underlying the Variable Contracts should not constitute inventory or property held primarily for sale to customers in the ordinary course of a trade or business. Accordingly, even if the "income on the contract" does not constitute annuity income, it is analogous to gains from the sale, exchange or other disposition of property that is not inventory or held for sale to customers, which is excluded from UBTI.

**Notional Principal Contract or Other Ordinary or Routine Investment Income.** Additionally, each Supporting Organization is an owner of an investment contract issued by Crown Global. Even if such contract is excluded from being treated as an annuity contract under the literal reading of Section 72(u), such contract more closely resembles a "notional principal contract" or "other ordinary or routine investment" referred to in the exclusions from UBTI of Section 1.512(b)-1(a) of the Regulations.

**Failure to Qualify for the Section 512(b)(1) Exclusion Does Not Result in UBTI.** Section 512(b) provides a special exclusion for certain types of investment income, but the failure to qualify for the specific exclusions in such Section does not automatically result in UBTI classification for the income items. Section 72(u) provides that the income to be recognized by the non-natural owner of the annuity account is treated as "ordinary income". Ordinary income is not of necessity characterized as UBTI; interest income, royalties and real property rents, for example, are also items of ordinary income that qualify for exemption from UBTI.

**There is No Federal Income Tax Authority to Support an IRS Position that the Income from the Variable Contracts is UBTI.**

Unable to find an unrelated trade or business upon which to base a conclusion that the Supporting Organizations receive UBTI (as discussed above), the IRS would need to develop a legal theory that the character of trade or business income that flows to Crown Global maintains its character as the income (i.e., UBTI) received by the Supporting Organizations. The IRS would encounter at least three problems with any such legal theory.

First, corporate entities similar to Crown Global are regularly used to "block" a tax-exempt organization from receiving UBTI. Under this planning technique, the corporate blocker reports any income that would have been UBTI if received directly by the tax-exempt on its own corporate tax return. Any amounts distributed by such corporation to its shareholder are generally dividend income, which is excluded from UBTI.[10] In this instance, any trade or business income will be reported by Crown Global on its own federal income tax return. Therefore, any amounts received by the Supporting Organizations should be classified as a dividend or other distribution that would not constitute UBTI.

---

[10] Code § 512(b)(1).

003304

Second, the Variable Contracts are similar to a derivative contract, as both are contractual obligations between two unrelated parties who both rely on other party's credit quality and risk, which may be significantly different than the risk profile of the reference assets underlying the contract. Further, one party to the contract typically "hedges" its obligations, similar to Crown Global hedging its obligations by purchasing interests in Atlas IDF, L.P.[11] Derivative financial instruments are regularly used to convert or block certain types of income to the desired derivative income by changing the legal relationship and risks from holding the investments directly versus obtaining a counterparty's promise to return similar economics.

Similar examples are found in the context of FIRPTA assets[12] and a foreign investor investing in U.S. assets indirectly through derivative contracts. With respect to FIRPTA, foreign investors can avoid the application of FIRPTA withholding by acquiring a synthetic long position in U.S. real estate through a derivative product. The IRS has concluded that this type of position is not a U.S. real property interest that would be subject to FIRPTA withholding.[13] Another example is a foreign investor gaining exposure to U.S. investment assets by entering into a derivative contract with a foreign counterparty bank. The foreign bank will acquire the investment assets. From the foreign investor's standpoint, the derivative contract converts U.S. source income on the U.S. investment assets into foreign source income, thereby avoiding exposure to U.S. income tax or withholding tax.[14]

The above examples demonstrate that federal tax laws respect the difference between holding a certain investment asset directly and another where one has economic exposure to the investment asset indirectly through a contractual promise by a counterparty. These examples are closely analogous, if not nearly identical, to the issuance of a variable annuity contract by a life insurance company that provides the investor a return measured by a Separate Account owned by the insurance company. The only difference is that the contractual relationship is also regulated under an insurance regime.

Third, an IRS legal theory that some portion of the Variable Contract's income is UBTI would expose a significant flaw. Such a legal theory would require that the same amount of income be taxed twice, without reduction for the amount paid by the first party. Specifically, the income from the Variable Contract is reported on Crown Global's U.S. federal income tax return. To then require the Supporting Organizations to also report such income as UBTI would be axiomatic to tax law principles of not taxing different taxpayers on the same income received. Even double tax regimes, such as the corporate income and dividend tax, do not tax the same amount of income to two different taxpayers twice. Rather, first the corporate earnings are taxed at a corporate rate; then the corporation only has the after-tax dollars to distribute to shareholders in the form of a dividend.

---

[11] Generally, it does not make a difference from a tax perspective if one of the parties to the derivative is fully hedged or is not, or actually owns the referenced assets. The income from the derivative contract is not treated for tax purposes as income on the underlying referenced investment assets. *See* Rubinger, Jeffrey, *IRS Rules Total Return Swap Tied to Real Estate Index Is Not Subject to FIRPTA,* Journal of Taxation (Sept. 2008).

[12] FIRPTA refers to the provisions of the Code added by the Foreign Investment in Real Property Tax Act of 1980 (FIRPTA), which impose federal income tax on foreign persons disposing of United States real property interests.

[13] Rev. Rul. 2008-31, 2008-26 I.R.B.1180.

[14] Treas. Reg. § 1.863-7(b)(1).

003305

**A Possible Legal Theory Available to Support a UBTI Position by the IRS Would Be to Disregard the Variable Contracts Issued by Crown Global as Shams**

The discussion above indicates that the IRS would not have a strong legal basis to support the position that the Variable Contract income is UBTI. Therefore, the only plausible legal theory the IRS could assert to cause the underlying UBTI earned within a Variable Contract flow directly to a Supporting Organization would be to make a sham transaction (*i.e.*, economic substance) argument. Under such an argument, the IRS would treat each Supporting Organization as direct investors in Atlas IDF and ignore, for tax purposes, Crown Global and its contractual relationship with each Supporting Organization. As discussed below, the IRS will encounter substantial factual hurdles to overcome before it could successfully apply such a legal theory to the Variable Contracts in order to treat any underlying UBTI received by Crown Global as taxable to the Supporting Organizations.

The focus of the sham transaction doctrine is to determine whether a transaction has economic effects other than the creation of tax benefits.[15] Courts have stated that a multi-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, containing tax-independent considerations, and not structured solely by tax-avoidance features should be respected.[16] Furthermore, "the existence of a tax benefit resulting from a transaction does not automatically make it a sham as long as the transaction is imbued with tax-independent considerations."[17] If an investment is one for which Congress has specifically bestowed a tax incentive, the investment, if imbued with economic substance, will not be considered a sham merely because the taxpayer could not expect profits apart from tax benefits.[18]

The transactions between each Supporting Organization and Crown Global, as represented, appear to have ample economic substance and are far from empty transactions entered into solely to generate tax benefits. In fact, the following facts support the assertion that the transactions between the Supporting Organizations and Crown Global have economic substance and are not "shams":

- Crown Global is a Bermuda-based insurance company subject to the insurance laws of Bermuda;
- Crown Global was not formed solely for the purpose of entering into the transactions; rather it has been existence for many years prior to issuing the Variable Contracts;
- Crown Global has customers beyond the Supporting Organizations;
- Crown Global continues to market a variety of insurance-based products;
- Crown Global has employees who are undertaking the respective roles befitting an insurance company, according to its website;
- The Variable Contracts were negotiated between Crown Global and each Supporting Organization with specified pricing and contractual terms being agreed upon;

---

[15] *Kirchman v. Com'r,* 862 F.2d 1486, 1492 (11th Cir. 1989).
[16] *Frank Lyon Co. v. United States,* 435 U.S. 561, 583-84 (1978).
[17] *Holladay v. Com'r,* 649 F.2d 1176, 1179 (5th Cir. 1981).
[18] Bittker & Lokken: Federal Taxation of Income, Estates, and Gifts, § 4.3.4A. *But see In re CM Holdings, Inc.,* 301 F.3d 96, 105 (3rd Cir. 2002) ("Choosing a tax-favored investment vehicle is fine, but engaging in an empty transaction that shuffles payments for the sole purpose of generating a deduction is not.")

003306

- Crown Global received a premium for each Variable Contract which was deposited in accounts owned and controlled by Crown Global;
- Crown Global's fee charged within the Variable Contracts is based upon the value of the respective Variable Contracts and not upon any anticipated tax benefits;
- Crown Global's fee appears commensurate with fees charged by other insurers;
- Presumably, Crown Global will continue to operate as an insurance company after any termination of the Variable Contracts;
- Each Supporting Organization's creation and existence is not transitory;
- Crown Global negotiated and entered into a Participation Agreement with the investment manager for Atlas IDF; and
- Crown Global received the Atlas IDF Private Placement Memorandum and completed the applicable subscription documents when Crown Global received a premium that was allocated to Atlas IDF.

Based upon such facts, a court would likely determine that Crown Global (a) is a real third-party insurance company, independently owned, and not affiliated with the Supporting Organizations (or their respective principals and agents) in any form, (b) has many customers, (c) operates in a regulatory environment and that it offers a variety of insurance products, and (d) it was not formed for the specific purpose of entering into the transactions. The Variable Contracts were intended to comply with the insurance regulatory laws governing Crown Global. Any conflicts between Crown Global and each Supporting Organization would have to be resolved under the terms of the respective Variable Contracts. Each Supporting Organization has no legal rights normally associated with a subscriber to the Atlas IDF. Nor have the Supporting Organizations completed subscription documents with Atlas IDF. Rather, Crown Global invested the premium received from each Supporting Organization in Atlas IDF, and has all the rights and entitlements normally associated with an investor in entities similar to Atlas IDF.

The foregoing demonstrates that a court would likely reject the application of the sham transaction or economic substance doctrine to the Variable Contracts issued by Crown Global to each Supporting Organization, and therefore reject any assertion that any UBTI realized with respect to the assets held in the Separate Account referenced in the Variable Contract should flow to the Supporting Organization. Rather, the IRS would have to address analogous legal positions directly adverse to such an assertion.

**Overall Conclusion with Respect to UBTI.**

After reviewing the respective legal authorities, arguments, and positions that the IRS could attempt to assert, we believe there are at least three supportive arguments, when considered together and presented to a court, to support our opinion. These supportive arguments are as follow: (1) the Variable Contracts income would not generate UBTI to the Supporting Organizations because such income is annuity income; 2) if the "income on the contract" was not considered annuity income, but rather (a) income reported on a "mark to market" method (which represents the changes in value of the Variable Contracts on year over year basis), (b) income from a notional principal contract, or (c) income from ordinary and routine investments, such "income on the contract" would still not be UBTI; and 3) IRS

003307

would have little, if any, legal support for its position supporting UBTI inclusion by the Supporting Organizations but rather have adverse legal authorities in other financial contexts.

Therefore, we feel that if challenged by the IRS, each of Supporting Organization #1 and Supporting Organization #2 would have a more likely than not (a greater than 50% chance of success) in a court of law, to uphold the position that any income from the Variable Contracts reported by each Supporting Organization would not be UBTI income.

Although we have reached this level of opinion, it is not to suggest that the likelihood of success is not much greater than may be indicated by our opinion level, but rather, reflects only upon the lack of direct legal precedents which we can refer for giving our opinion.  If the IRS were to litigate this position, we would anticipate that the taxpayer would likely win, and that legal authority would exist, such that if at that time we would have been able to reach a higher opinion level.  We reiterate that our opinion is a very strong "more likely than not" level of opinion.

## VI. OPINION RENDERED

Based upon the accuracy of the statement of facts contained herein and the assumptions set forth above, and the legal analysis set forth above it is our opinion that:

1. If the Internal Revenue Service were to assert, in reliance on the "investor control doctrine", as currently interpreted, that  Supporting Organization #1 and Supporting Organization #2 should be treated as the owners, for federal income tax purposes, of the investments held in the Separate Accounts of Crown Global associated with the Variable Contracts owned by Supporting Organization #1 and Supporting Organization #2, a court should conclude that such investor control doctrine should not apply to  Supporting Organization #1 and Supporting Organization #2 (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service), but rather, for federal income tax purposes, a court should conclude Crown Global is the owner of the investments held in such Separate Accounts, including without limitation, to those investments held in Atlas IDF (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service).

2. It is more likely than not (*i.e.*, a greater than 50% likelihood) that the position that the income realized by the Supporting Organization #1 and Supporting Organization #2 from their ownership of the Variable Contracts will not be classified as unrelated business table income within the meaning of Section 511 of the Code, will be upheld by a court if challenged by the Internal Revenue Service.

*************

The legal opinion expressed above is subject to the assumptions, exceptions, restrictions, and qualifications stated herein as well as the following qualifications and limitations:

1.  **This letter and the legal opinion contained herein are limited to the matters expressly set forth herein, and no legal opinion shall be implied or may be inferred beyond the matters expressly so stated.   As such,**

003308

(a)  The opinion is limited to the specific federal tax issues addressed herein;

(b)  Additional issues may exist that could affect the federal income tax treatment of matters that are the subject of this opinion and this opinion does not provide a conclusion with respect to any additional issues; and

(c)  With respect to any significant federal tax issues outside the limited scope of this opinion, this opinion was not written, and cannot be used by the taxpayer, for the purpose of avoiding penalties that may be imposed by the taxpayer.

2.  The legal opinion set forth herein represents our best professional judgment and is not a guarantee or warranty of any of the matters discussed herein.

3.  This letter and the legal opinion expressed herein are rendered as of the date hereof, and are based upon relevant provisions of the Code and the Treasury regulations thereunder, and upon relevant judicial precedents and other authorities, as they exist as of the date of this legal opinion. These authorities are subject to change at any time, and if they do change, it may be necessary to re-examine this legal opinion.  In that regard, we expressly disclaim any undertaking to advise you of any changes in applicable law, facts or any other matters that may come to our attention after the date hereof which may alter, in whole or in part, the legal opinion expressed herein.  In addition, the legal opinion expressed in this letter is based solely on the accuracy of the facts and assumptions expressly stated herein, and the conclusions, statements and views expressed herein cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect.

4.  This letter communicates legal advice, and has been prepared in anticipation of potential litigation concerning the tax consequences described herein.  It is intended that this letter be protected from discovery under the attorney-client privilege and work product doctrine to the extent provided by law. Disclosure of this letter and the information communicated in it should be carefully controlled so that disclosure is not made in a manner that will invalidate the protected status of the information.

5.  We confirm that there is no limitation on the disclosure by you or any other parties to the transaction discussed of the tax treatment or tax structure as described in this letter.  The implications of any such disclosure on attorney-client privilege or other applicable legal protections should be carefully considered prior to any such disclosure.

This letter may be relied upon by the addressee only and may not be relied upon by, nor may copies be delivered to, any other person without our prior written consent.

Very truly yours,

*Sadis & Goldberg LLP*

003309

**EXHIBIT**

003310

# PROMISSORY NOTE

**$24,268,621.69**                                                        **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in its entirety that certain promissory note dated May 31, 2017, in the original face amount of **$24,198,069.28** (the "**Amended Note**"), which was in substitution for and superseded in its entirety that certain promissory note dated December 28, 2016, in the original face amount of **$23,817,639.58** (the "**Original Note**"), from The Dugaboy Investment Trust, as Maker, and The Get Good Non-Exempt Trust as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

WHEREAS, The Get Good Non-Exempt Trust sold, transferred and assigned 97.6835% of its interest in the Original Note to Highland Capital Management, L.P. pursuant to that Purchase and Sale Agreement dated December 28, 2016 between Highland Capital Management, L.P. and The Get Good Non-Exempt Trust.

FOR VALUE RECEIVED, THE DUGABOY INVESTMENT TRUST ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. and THE GET GOOD NON-EXEMPT TRUST (collectively, the "**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY FOUR MILLION, TWO HUNDRED SIXTY-EIGHT THOUSAND, SIX HUNDRED TWENTY ONE AND 69/100 DOLLARS ($24,268,621.69), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of three and twenty-six hundredths percent (3.26%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. 97.6835% of each Annual Installment shall be paid to Highland Capital Management, L.P. and the remaining 2.3165% shall be paid to The Get Good Non-Exempt Trust. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    <u>Final Payment Date</u>.  The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

003311

HCMLPHMIT00001327

3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.  <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.  <u>Prior Notes</u>.  The original of each of the Original Note and the Amended Note superseded hereby shall be marked "VOID" by Payee.


**MAKER:**

THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy Dondero
Title:  Trustee


2

003312

HCMLPHMIT00001328

**EXHIBIT**

003313

# THE DUGABOY INVESTMENT TRUST
## OFFERING[1] OF $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP
## FEBRUARY 2024



[1] Any offering of the Dugaboy Note will be subject to Oversight Board approval

003314

HCMLPHMIT00002323

Case 19-34054-sgj11    Doc 4255-106    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 106    Page 3 of 6

 **DUGABOY INVESTMENT TRUST**

| SUMMARY TERMS OF DUGABOY PROMISSORY NOTE | |
|---|---|
| **Maker:** | The Dugaboy Investment Trust |
| **Facility:** | Promissory Note dated 5/31/2017 in the principal amount of $24,268,621.69 payable to Highland Capital Management, LP (97.6835% = $23,706,439.07) and The Get Good Non-Exempt Trust (2.3165% = $562,182.62) |
| **Current Principal:** | Principal Payable to Highland Capital Management is currently $18,174,936.62 (76.67% of original principal amount following amortization payments which occurred between 2017 - 2023) |
| **Security:** | None |
| **Guarantor:** | None |
| **Maturity:** | 12/31/2046[1] |
| **Interest Rate:** | 3.26%, compounding annually on May 31 and payable annually on December 31 |
| **Amortization:** | 1 / 30 of original principal amount payable annually on December 31 (4.35% of current principal amount) |
| **Call Protection:** | None; Maker may prepay in whole or in part the unpaid principal or accrued interest of the Note |
| **Event of Default:** | Failure to pay this Note or any installment as it becomes due; immediate acceleration upon default |
| **Cost of Collection:** | Expressly included in note terms |
| **Covenants:** | None |

[1] Based on amortization schedule. The promissory note states the final payment date is 12/31/47 due to a scrivener's error

003315
HCMLPHMIT00002324



## DUGABOY INVESTMENT TRUST

### POTENTIAL TRANSACTION EXECUTIVE SUMMARY [1]

The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")

Dugaboy is believed to be one of Dondero's most significant personal assets, holding among other items:

    100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform

    Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments

    A potential claim to a contingent unvested derivative interest in the HCMLP estate through Dugaboy's purported claim on Hunter Mountain Investment Trust

Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [2] as Payee

    The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%

    The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17

    The current face amount owed to HCMLP under the Note is $18,174,936.62 [3]

    Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [4]

    Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [5]

Terms of the Note:

    Unsecured note due 12/31/46 [6]

    Interest: 3.26% payable annually on December 31

    Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)

[1] Any offering of the Dugaboy Note will be subject to Oversight Board approval
[2] Dondero trust which is currently not believed to hold significant assets
[3] Principal amount owed following the December 2023 amortization payment
[4] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[5] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[6] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

003316
HCMLPHMIT00002325



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE CASHFLOWS

| | Beginning Principal | Amort Payment | Interest Payment | Total Payment | Ending Principal |
|---|---|---|---|---|---|
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 18,174,936.62 | $ 7,115,540.26 | $ 25,290,476.88 | |



003317
HCMLPHMIT00002326

 **DUGABOY INVESTMENT TRUST**

## ESTIMATED DUGABOY BALANCE SHEET

The Dugaboy Investment Trust
*Est Current Non-GAAP Balance Sheet, Net of Secured Debt* [1]
*$ in 000*

| Assets | | Liabilities | |
|--------|--|-------------|--|
| Private Investments | $ 111,067,696 | Note Owed to Jim Dondero [2] | $ 110,530,584 |
| Net Securities + Real Estate | $ 69,253,250 | Note Owed to HCMLP | $ 18,174,937 |
| Notes Receivable | $ 22,757,955 | Other Off Balance Sheet Debt | $ 11,401,584 |
| Cash | $ 17,710,240 | Note Owed to CDO Fund --> UBS | $ 2,603,822 |
| Other Assets | $ 46,586 | Accounts Payable, Other | $ 1,833,939 |
| | | Note Owed to HCM Services | $ 373,406 |
| | | Total Liabilities | $ 144,918,272 |
| | | | |
| | | Equity | $ 75,917,455 |
| Total Assets | $ 220,835,727 | Total Liabilities + Equity | $ 220,835,727 |
| | | | |
| | | LTV: | 65.6% |
| | | LTV excluding Dondero Note: | 15.6% |

[1] Adjust 9/30/20 Accrual Based Balance Sheet to Est Current FMV, Assets Shown Net of Corresponding Secured Debt
[2] Note potentially subject to creditor dispute

NOTE: Historical financial statement summaries are presented as prepared by Jim Dondero's accountant on an Accrual Basis. These financial statements are not audited, do not include a cashflow statement and do not include supporting notes. Adjustments to the most recently available financial statements (9/30/20) are made by HCMLP to as many items as can be supported to create a "Pro Forma" balance sheet which is intended to reflect a good faith estimate of current fair market value. HCMLP makes no representation as to the completeness or accuracy of these financial statements, and are included in this presentation for illustrative purposes.

CONFIDENTIAL

4

003318

HCMLPHMIT00002327

## EXHIBIT   7

003319



**PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES**

_____

### TRANSACTION SPECIFIC TERMS

THIS PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Participation in the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Participations for Par/Near Par Trades, published as of July 21, 2023 (the "Standard Terms"). The Standard Terms and (if applicable) the Collateral Annex are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms, the Collateral Annex (if applicable) and the Transaction Specific Terms together constitute a single integrated Participation Agreement for Par/Near Par Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| **TRANSACTION SUMMARY** | | |
|---|---|---|
| Trade Date: | **Agreement Date** | |
| Agreement Date: | **July 18, 2024** | |
| Seller: | **Highland Capital Management, L.P.** | |
| Buyer: | **HIGHLAND INDEMNITY TRUST** | |
| Credit Agreement: | **That certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as the Payee (the "Note")** | |
| Borrower: | **The Dugaboy Investment Trust** | |
| Purchase Amount(s): | **$18,174,936.62** | |
| Tranche(s): | | |
| CUSIP Number(s), if available: | | |
| Delivery of Credit Documents: | Yes ☒ | No ☐ |
| Netting Arrangements: | Yes ☐ | No ☒ |
| Set-Off Applicable: | Yes ☐ | No ☒ |
| Collateral Annex Applicable: | Yes ☐ | No ☒ |
| Elevation: | Yes ☒ | No ☐ |

### A.    DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means none.

LSTA EFFECTIVE JULY 21, 2023                    Copyright © LSTA 2023.  All rights reserved.

003320

HCMLPHMIT00002594

"Assignment" means an assignment of the Loans.

"Buyer Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Collateral Annex" means the Collateral Annex to the Participation Agreement for Par/Near Par Trades published by the LSTA as of July 21, 2023.

"Commitments" select one:
☒ none.
☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Elevation Transfer Fee" means none.

"Loans" means the outstanding principal amount of the Note as of the Trade Date payable to Seller pursuant to the Note (which amount, for the avoidance of doubt, equals 97.6835% of the total outstanding principal amount of the Note).

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Participation Required Consents" means none.

"Participation Transfer Fee" means the transfer fee (if any) set forth in Section E.1 payable to Seller in connection with the assignment by Buyer of all or any portion of the Participation, subject to Section 10.1 of the Standard Terms and Conditions.

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Unfunded Commitments" means none.

## B.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

HCMLPHMIT00002595

C.  **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS; COMMITMENT REDUCTIONS)**

**C.1**   Section 8.3 (Wire Instructions).

Buyer's Wire Instructions:

Bank:  M&T Bank
ABA No.: 031100092
Acct.: Highland Indemnity Trust
Acct. No.: 150474-000
Attn.: Neumann Marlett III
Ref.: True Sale Participation 100% Dugaboy Note

Seller's Wire Instructions:

Bank:  East West Bank
ABA No.: 322070381
Acct.: Highland Capital Management, LP
Acct. No.: 5500014686
Attn.: Corporate Accounting
Ref.: True Sale Participation 100% Dugaboy Note

**C.2**   Section 8.8 (Set-Off).

If "Yes" is specified opposite "Set-Off" in the Transaction Summary, clause (i) of the proviso to the second sentence of Section 8.8 shall apply.

**D.   SECTION 9 (NOTICES; RECORDS)**

Buyer's Address for Notices and Delivery:

Highland Indemnity Trust
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Electronic Mail Address: jpseeryjr@gmail.com; jseery@highlandcapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Attention: Highland Capital Lead Partner

Seller's Address for Notices and Delivery:

Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: Chief Financial Officer
Electronic Mail Address: Notices@highlandcapital.com

**E.   SECTION 10 (FURTHER TRANSFERS)**

**E.1**   Select one:

☒   There is no Participation Transfer Fee.

☐   There is a Participation Transfer Fee, in the amount of $/£/€_____.

**E.2**   If an Affiliate of Buyer that is a buyer under a participation agreement with Seller entered into as of the same day as this Agreement makes a Pre-Elevation Transfer (whether or not such transfer is so defined under such participation agreement) of loans and commitments (if any) under the Credit Documents subject

HCMLPHMIT00002596

to such participation agreement, on the same day as Buyer, pursuant to substantially similar documents and to the same Entity as Buyer:

☐    Buyer and such Affiliate(s) of Buyer shall pay only one Participation Transfer Fee.

☐    Buyer and each such Affiliate of Buyer shall pay a separate Participation Transfer Fee in respect of each such Pre-Elevation Transfer.

☒    Not applicable (there is no Participation Transfer Fee).

**E.3**    Section 10.1 Right of Buyer to sell subparticipations:

☒    Buyer may sell subparticipations in respect of the Transferred Rights without Seller's prior consent. Section 10.1(b) of the Standard Terms and Conditions will apply.

☐    Buyer may not sell subparticipations in respect of the Transferred Rights without Seller's prior consent. Section 10.1(b) of the Standard Terms and Conditions will not apply.

**F.**    **SECTION 11 (VOTING)**

**F.1**    "Voting" select one:

☒    Buyer shall have voting rights with respect to the Transferred Rights, subject to Section 11.1(a) of the Standard Terms and Conditions.

☐    Buyer shall have no voting rights in respect of the Transferred Rights, subject to Section 11.1(b) of the Standard Terms and Conditions, except with respect to the following matters: _____.

**F.2**    For purposes of determining the Majority Holders or Majority Claims Holders pursuant to Section 11.1(a) of the Standard Terms and Conditions:

☐    the interests or claims held by Seller for its own account shall be counted;

☐    the interests or claims held by Seller for its own account shall not be counted;

☒    Not applicable;

AND

☐    the interests or claims held by Affiliates of Seller shall be counted.

☐    the interests or claims held by Affiliates of Seller shall not be counted.

☒    Not applicable.

**G.**    **SECTION 15 (ELEVATION)**

**G.1**    Select one:

☒    There is no Elevation Transfer Fee.

☐    The Elevation Transfer Fee shall be paid as follows:

☐    The Elevation Transfer Fee shall be paid by Seller to the Agent and Buyer shall reimburse Seller in an amount equal to
  ☐ one-half thereof.
  ☐ [other relevant fraction or percentage] _____ thereof.
☐    The Elevation Transfer Fee shall be paid by Buyer to the Agent and Seller shall reimburse Buyer in an amount equal to
  ☐ one-half thereof.
  ☐ [other relevant fraction or percentage] _____ thereof.

**G.2**    If "No" is specified opposite "Elevation" in the Transaction Summary, then select one:

HCMLPHMIT00002597

☐    Subject to Section 15, Seller may at any time request an Elevation and Buyer may request an Elevation only in the following circumstances: _____
_____.

## H.    <u>SECTION 31 (ADDITIONAL PROVISIONS)</u>

The following additional provisions, including any modifications to existing provisions, apply:

"**Claimant Trust**" has the meaning set forth in the Indemnity Trust Agreement

"**Direction Letter**" means that certain Direction Letter, dated as of the Agreement Date, by and among Seller, HCMLP GP LLC, Highland Claimant Trust, and Buyer.

"**Indemnity Trust Agreement**" means that certain First Amended and Restated Indemnity Trust Agreement, dated as of July 1, 2024, by and among the Highland Claimant Trust, as grantor (the "**Grantor**"), James P. Seery, Jr., as indemnity trust administrator, Wilmington Trust, National Association, a national banking association, as indemnity trustee, for the benefit of Beneficiaries, and as the Delaware trustee, as the same may be amended, modified or supplemented from time to time.

"**Lender**" means a Payee under the Note.

"**Purchase Price**" means none (for the avoidance of doubt, the Participation shall constitute a contribution by the Grantor to Buyer pursuant to the Direction Letter and in accordance with the Indemnity Trust Agreement).

"**Settlement Date**" means the Agreement Date.

For the avoidance of doubt, Buyer is entitled to all interest accrued and unpaid on the Note through the Agreement Date.

Until the earlier of (x) the termination of this Agreement and (y) thirty (30) day's prior written notice by either Party to the Party, Seller shall provide the following services for the benefit of Buyer with respect to the Note:

(i)    Maintain the schedule of Annual Installments (as defined in the Note);

(ii)    Monitor the Borrower's compliance with the terms of the Note;

(iii)    Confirm wire instructions and amounts for payments under the Note with the Borrower's personnel;

(iv)    Communicate with the Borrower as needed, including with respect to noticing any events of default;

(v)    Provide bookkeeping and fair value information to Buyer and perform other related miscellaneous requests with respect to the Note and the Participation, in each case, as reasonably requested by Buyer.

     As consideration for providing such services, Buyer shall pay to Seller an annual fee equal to 10 bps of Buyer's share of the then outstanding principal amount of the Note. Such fee shall be payable only to the extent the Borrower makes its required Annual Installment payment to Seller under the Note, and notwithstanding anything in this Agreement to the contrary, Seller shall be permitted to set-off the amount of such fee against Buyer's right to receive payments with respect to the Transferred Rights and the Participation.

HCMLPHMIT00002598

Case 19-34054-sgj11 Doc 4255-107 Filed 06/20/25 Entered 06/20/25 21:39:29
Case 3:25-cv-02724-E Document 1-2 Exhibit 2 Pages of Page 797 of 1013 PageID 3707
officers or representatives as of the Agreement Date.

**SELLER**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**By: HCMLP GP LLC, its General Partner**

By:_____

    Name: James P. Seery, Jr.
    Title: President

**BUYER**

**HIGHLAND INDEMNITY TRUST**

By:_____

    Name: James P. Seery, Jr.
    Title: Indemnity Trust Administrator

HCMLPHMIT00002599

**ANNEX TO PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES**

This Participation is a "true-participation" intending to transfer all of Seller's right, title and beneficial interest in and to the Loans to Buyer.

The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is $0.

003326

HCMLPHMIT00002600

# EXHIBIT

003327

Case 19-34054-sgj11   Doc 4255-108   Filed 06/20/25   Entered 06/20/25 21:39:29
Desc Exhibit 108   Page 2 of 3

| $18.5mm Dugaboy Note Attempted Sale -- Process Update | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Potential Buyer Firm | Person Contacted | Title | Date Contacted | Information/Materials Provided | Initial Responses | Follow-Up | Notes |
| Riva Ridge Capital Management | Stephn Golden | Founding Partner- PM | 2/27/2024 | Over telephone  discussed information in HCMLP prepared materials and the opportunity | Asked questions regarding the counter-party; rejected receipt of the materials; no interest at all; "life's too short" | None | Acutally laughed; stated that while the note was performing, that was for now; in his view the note was an invitation to litigate |
| Cyrus Capital Partners | Svetoslav Nikov | Partner/Analyst | 2/27/2024 | Over telephone, discussed information in HCMLP materials and the opportunity | Very quick; no interest in the materials; believes owning the note is asymetric risk to the downside -- if it pays back, a modest return for the risk; if it defaults, your investors will want to know why you would voluntarily become a creditor to Dondero. Compared the opportunity to the chance to lend money to Phil Falcone. Once again said "lifes too short to be a creditor of Dondero" | None | |
| Carronade Capital Management | Dan Gropper | Managing Partner/CIO | 2/23/2024 | Initial email mentioning note; lunch meeting with Gropper and head of research Andy Taylor on 2/29/24; reviewed materials at lunch meeting | Gropper and Taylor quickly expressed no interest in the note; upside vs. downside skewed (far too much downside); even if the upside was better balanced, the likihood of litigation over such a small note made the investment unattactive (even if you got costs of collection); asset transfers out of maker also a concern | None.  Did not want to keep the materials | Small note with likely costly litigation that would be never ending makes the opportunity completely unattactive |
| UBS | Nader Attalla | Structured Credit Trading; responsible for day-to-day management of UBS actions against Dondero | 2/23/2024 | Initial email mentioning note; follow up call and emailing of "teaser" | Two calls in March and early April; He has been too busy to focus on it; troubled by the fact that it does not cross-default with other Dugaboy obligations | Has Teaser; follow-up discussion required | UBS is suing Dondero and Dugaboy on other obligations/torts; could be useful to them at the right price |

003328

Case 19-34054-sgj11   Doc 4255-108   Filed 06/20/25   Entered 06/20/25 21:39:29
Desc Exhibit 108   Page 3 of 3

| $18.5mm Dugaboy Note Attempted Sale -- Process Update | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| Potential Buyer Firm | Person Contacted | Title | Date Contacted | Information/Materials Provided | Initial Responses | Follow-Up | Notes |
| | | | | | | Dave Klos sent email on 5/23/24 thanking DC Sauter for response. "As you are not interested in the note, we will move forward with another transaction." | |
| NexPoint | Matt McGraner and DC Sauter | CIO / General Counsel | 5/16/2024 | Email with description of note. Indicated nonbinding offer price of $12mm, subject to approval of oversight board. | DC Sauter responded via email on 5/22/24 that they were not currently interested in the terms outlined. If the terms change, they would be interested in taking another look. | | |
| Bardin Hill Investment Partners | Pratik Desai | Partner/Portfolio Manager | 6/7/2024 | Initial email with "teaser" and requesting follow-up call | 30 min call on June 10, 2024; reviewed teaser with Desai; questions regarding backgorund of note; why it had not been accelerated; payment history; terms; Dugaboy assets and liabilities; payback period at various discounts; ultimately would require a material discount to 50% soft offer; Desai asks about lending against the note and other Claimant Trust assets with material hair-cuts. Bardin Hill would not be interested in being a direct counterpart to Dondero especially if that was their only recourse. | Desai and Claimant Trust to consider ways to lend against the note and other assets in the event the Claimant Trust desires $10 million to $20 million of liquidity | Thoughtful approach; no interest in Dondero as a counterparty but would like to provided liquidity to the Trust and use a variety of assets to secure the BH advances. |

003329

**EXHIBIT   9**

PRIVILEGED AND CONFIDENTIAL

# THE DUGABOY INVESTMENT TRUST
## $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP
## FEBRUARY 2024



003331

HCMLPHMIT00002602



**DUGABOY INVESTMENT TRUST**

## EXECUTIVE SUMMARY

- The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")
- ██████████████████████████████████████████████████████████████:
  - 100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform
  - Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments
  - ████████████████████████████████████████████████████████████████████████████████████
- Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [1] as Payee
  - The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%
  - The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17
  - The current face amount owed to HCMLP under the Note is $18,174,936.62 [2]
  - Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [3]
  - Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [4]
- Terms of the Note:
  - Unsecured note due 12/31/46 [5]
  - Interest: 3.26% payable annually on December 31
  - Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)
- HCMLP is offering this Note at 50% of par, or $9,087,468.31 / IRR of 13.6%
  - Proposed sale process will include a $3mm overbid should another bidder come in at a higher price than initial bidder

[1] Dondero trust which is currently not believed to hold significant assets
[2] Principal amount owed following the December 2023 amortization payment
[3] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[4] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[5] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

003332
HCMLPHMIT00002603



**DUGABOY INVESTMENT TRUST**

## SUMMARY PROPOSED SALE TIMELINE AND PROCESS

| | |
|---|---|
| **Sale Period** | • First Round marketing February – March, Executed Stalking Horse Agreement Signed by April 30 with $1mm deposit<br>• Second Round Marketing May, Auction week of June 10-14<br>• Closing week of June 24-28 |
| **Materials / Documentation** | • Initial outreach with one slide teaser (executive summary slide)<br>• Potential buyers sign NDA and receive full deck along with [the note; historical Dugaboy financials]<br>• Negotiate / sign Stalking Horse Agreement<br>• Negotiate / sign final PSA with winner of auction |
| ▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Sale Terms** | • $1mm deposit due upon execution of Stalking Horse Agreement<br>• Stalking Horse bidder receives $2mm breakup fee from Seller<br>• Winning bid must be $3mm over Stalking Horse Bid<br>• Example: Stalking Horse Bid of $6mm, buyer puts up $1mm deposit, another party bids $9mm at auction, Seller nets $7mm (receives $9mm from buyer, refunds $1mm deposit to Stalking Horse bidder and pays Stalking Horse bidder $2m breakup fee)<br>• All sales are for cash only due at closing; all accrued interest travels to buyer<br>• 100% of purchase price due next business day<br>• Deposit due in advance of auction<br>• Second place bidder must agree that his bid must remain open and can be accepted 36 hours after the auction |

DRAFT · PRIVILEGED AND CONFIDENTIAL

003333

HCMLPHMIT00002604



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE CASHFLOWS

**Dugaboy promissory note owed to HCMLP**

| | | |
|---|---|---|
| Beginning principal owed to HCMLP | $ 18,174,936.62 | |
| Interest rate | 3.26% | |
| Maturity | 12/31/2046 | |
| Years to Maturity | 22.52 | |
| Amort / Yr | 4.35% | |
| WAL (years) | 10.48 | |
| | | |
| Purchase Price (% of Par) | 50.00% | [Illustrative] |
| Purchase Price ($) | $ 9,087,468.31 | [trades flat] |
| Closing Date | 6/30/2024 | [Illustrative] |
| IRR: | 13.62% | |
| Return % | 178.30% | |
| P/L | $ 16,203,008.57 | |
| Years to breakeven | 6.5 | |

| | Amort schedule | | | | |
|---|---|---|---|---|---|
| | Beg principal | Amort Payment | Interest Payment | Total Payment | Eding Principal |
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 7,115,540.26 | $ 25,290,476.88 | | |
| | | Purchase Price: | $ (9,087,468.31) | [Illustrative] | |
| | | P/L: | $ 16,203,008.57 | [Illustrative] | |

DRAFT   PRIVILEGED AND CONFIDENTIAL

3

003334
HCMLPHMIT00002605

 **DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE PURCHASE PRICE SENSITIVITY

| | | | | | |
|---|---|---|---|---|---|
| Note Purchase Price ($) | $ 6,361,227.82 | $ 7,269,974.65 | $ 8,178,721.48 | $ 9,087,468.31 | $ 9,996,215.14 |
| Note Purchase Price (% of Par) | 35.00% | 40.00% | 45.00% | 50.00% | 55.00% |
| IRR | 21.80% | 18.38% | 15.74% | 13.62% | 11.87% |
| Return | 297.57% | 247.88% | 209.22% | 178.30% | 153.00% |
| Total Cashflows Received | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 |
| P/L | $ 18,929,249.06 | $ 18,020,502.23 | $ 17,111,755.40 | $ 16,203,008.57 | $ 15,294,261.74 |
| Years to Breakeven | 4.5 | 5.5 | 6.5 | 6.5 | 7.5 |

N    F r    rd    r

Assumes 6/30/2024 closing date

D R A F T    P R I V I L E G E D  A N D  C O N F I D E N T I A L

003335
HCMLPHMIT00002606

 **DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

003336

HCMLPHMIT00002607

**EXHIBIT**

003337

PRIVILEGED & CONFIDENTIAL

# THE DUGABOY INVESTMENT TRUST
## $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP
### FEBRUARY 2024



003338

HCMLPHMIT00002608

 **DUGABOY INVESTMENT TRUST**

## EXECUTIVE SUMMARY

- The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")
- ███████████████████████████████████████████████████████████
  - 100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform
  - Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments
  - █████████████████████████████████████████████████████████████████████████████████████
- Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [1] as Payee
  - The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%
  - The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17
  - The current face amount owed to HCMLP under the Note is $18,174,936.62 [2]
  - Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [3]
  - Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [4]
- Terms of the Note:
  - Unsecured note due 12/31/46 [5]
  - Interest: 3.26% payable annually on December 31
  - Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)
- HCMLP is offering this Note at 50% of par, or $9,087,468.31 / IRR of 13.6%
  - Proposed sale process will include a $3mm overbid should another bidder come in at a higher price than initial bidder

[1] Dondero trust which is currently not believed to hold significant assets
[2] Principal amount owed following the December 2023 amortization payment
[3] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[4] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[5] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

003339
HCMLPHMIT00002609

 **DUGABOY INVESTMENT TRUST**

## SUMMARY PROPOSED SALE TIMELINE AND PROCESS

| | |
|---|---|
| **Sale Period** | • First Round marketing February – March, Executed Stalking Horse Agreement Signed by April 30 with $1mm deposit<br>• Second Round Marketing May, Auction week of June 10-14<br>• Closing week of June 24-28 |
| **Materials / Documentation** | • Initial outreach with one slide teaser (executive summary slide)<br>• Potential buyers sign NDA and receive full deck along with [the note; historical Dugaboy financials]<br>• Negotiate / sign Stalking Horse Agreement<br>• Negotiate / sign final PSA with winner of auction |
| ▮ | ▮ ▮ |
| **Sale Terms** | • $1mm deposit due upon execution of Stalking Horse Agreement<br>• Stalking Horse bidder receives $2mm breakup fee from Seller<br>• Winning bid must be $3mm over Stalking Horse Bid<br>• Example: Stalking Horse Bid of $6mm, buyer puts up $1mm deposit, another party bids $9mm at auction, Seller nets $7mm (receives $9mm from buyer, refunds $1mm deposit to Stalking Horse bidder and pays Stalking Horse bidder $2m breakup fee)<br>• All sales are for cash only due at closing; all accrued interest travels to buyer<br>• 100% of purchase price due next business day<br>• Deposit due in advance of auction<br>• Second place bidder must agree that his bid must remain open and can be accepted 36 hours after the auction |

DRAFT · PRIVILEGED AND CONFIDENTIAL

003340
HCMLPHMIT00002610



**DUGABOY INVESTMENT TRUST**

| SUMMARY TERMS OF DUGABOY PROMISSORY NOTE | |
|---|---|
| Maker | The Dugaboy Investment Trust |
| acility | Promissory Note dated 5/31/2017 in the principal amount of $24,268,621.69 payable to Highland Capital Management, LP (97.6835% $23,706,439.07) and The Get Good Non-Exempt Trust (2.3165%   $562,182.62) |
| Current Principal | Principal Payable to Highland Capital Management is currently $18,174,936.62 (76.67% of original principal amount following amortization payments which occurred between 2017 - 2023) |
| Security | None |
| uarantor | None |
| Maturity | 12/31/2046 |
| nterest  ate | 3.26%, compounding annually on May 31 and payable annually on December 31 |
| Amorti ation | 1 / 30 of original principal amount payable annually on December 31 (4.35% of current principal amount) |
| Call Protection | None. Maker may prepay in whole or in part the unpaid principal or accrued interest of the Note |
| vent o  De ault | Failure to pay this Note or any installment as it becomes due; immediate acceleration upon default. Cost of collection expressly included in note terms. |
| Covenants | None |

¹ Based on amortization schedule. The promissory note states the final payment date is 12/31/47 due to a scrivener's error

003341
HCMLPHMIT00002611



## DUGABOY INVESTMENT TRUST

### SUMMARY OF DONDERO AFFILIATED NOTES DUE TO HCMLP

Highland is in the process of collecting on notes owed by Dondero-affiliated entities, which are in default [1]

Dondero-affiliates raised a number of defenses, including the existence of an alleged oral agreement with Nancy Dondero as Trustee of Dugaboy and holder of a majority of HCMLP units that the notes would be forgiven contingent on Dondero's monetization of certain assets [2]

On 1/17/23, the Bankruptcy Court filed a supplemental report and recommendation finding the Dondero-affiliates liable for the notes under Highland's motion for summary judgement

On 7/6/23, the United States District Court, Northern District of Texas, Dallas Division adopted and approved the Bankruptcy Court's Report and Recommendation on HCMLP's motion for summary judgement on the notes and subsequently entered amended final judgements against the Dondero entities

Defendants have paid the judgement amounts into the court registry, pending appeal to the United States Court of Appeals for the Fifth Circuit

| Party | udgement Amount | ndividual Bond Amount |
|-------|-----------------|-----------------------|
| NexPoint Advisors, LP | $25,849,816.94 | $28,693,296.80 |
| NexPoint Real Estate Partners, LLC | $13,251,661.00 | $14,709,343.70 |
| James Dondero | $10,152,391.87 | $11,269,154.90 |
| NexPoint Asset Management, LP | $8,441,524.65 | $9,370,092.36 |
| Highland Capital Management Services, Inc. | $7,578,620.41 | $8,412,268.66 |
| NexPoint Asset Management, LP | $3,628,692.37 | $4,027,848.53 |
| Total | | |

[1] Nexpoint Assset Management, LP was a defendant in two adversary actions and final judgements were handed down in both, which is why there are two discrete judgements against this entity
[2] ███████████████████████████████████████████████████████████████████

003342
HCMLPHMIT00002612

 **DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE CASHFLOWS

### Dugaboy promissory note owed to HCMLP

| | | |
|---|---|---|
| Beginning principal owed to HCMLP | $ 18,174,936.62 | |
| Interest rate | 3.26% | |
| Maturity | 12/31/2046 | |
| Years to Maturity | 22.52 | |
| Amort / Yr | 4.35% | |
| WAL (years) | 10.48 | |
| | | |
| Purchase Price (% of Par) | 50.00% | [Illustrative] |
| Purchase Price ($) | $ 9,087,468.31 | [trades flat] |
| Closing Date | 6/30/2024 | [Illustrative] |
| IRR: | 13.62% | |
| Return % | 178.30% | |
| P/L | $ 16,203,008.57 | |
| Years to breakeven | 6.5 | |

| | Beg principal | Amort Payment | Interest Payment | Total Payment | Eding Principal |
|---|---|---|---|---|---|
| | Amort schedule | | | | |
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 7,115,540.26 | $ 25,290,476.88 | | |
| | | Purchase Price: | $ (9,087,468.31) | [Illustrative] | |
| | | P/L: | $ 16,203,008.57 | [Illustrative] | |


003343
HCMLPHMIT00002613



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE PURCHASE PRICE SENSITIVITY

| | | | | | |
|---|---|---|---|---|---|
| Note Purchase Price ($) | $ 6,361,227.82 | $ 7,269,974.65 | $ 8,178,721.48 | $ 9,087,468.31 | $ 9,996,215.14 |
| Note Purchase Price (% of Par) | 35.00% | 40.00% | 45.00% | 50.00% | 55.00% |
| IRR | 21.80% | 18.38% | 15.74% | 13.62% | 11.87% |
| Return | 297.57% | 247.88% | 209.22% | 178.30% | 153.00% |
| Total Cashflows Received | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 |
| P/L | $ 18,929,249.06 | $ 18,020,502.23 | $ 17,111,755.40 | $ 16,203,008.57 | $ 15,294,261.74 |
| Years to Breakeven | 4.5 | 5.5 | 6.5 | 6.5 | 7.5 |

N   F r   rd   r

Assumes 6/30/2024 closing date

D R A F T    P R I V I L E G E D   A N D   C O N F I D E N T I A L

003344

HCMLPHMIT00002614



DRAFT - PRIVILEGED AND CONFIDENTIAL

003345



DRAFT - PRIVILEGED AND CONFIDENTIAL



**DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

003347



**DUGABOY INVESTMENT TRUST**

DRAFT · PRIVILEGED AND CONFIDENTIAL

10

003348

HCMLPHMIT00002618



**DUGABOY INVESTMENT TRUST**

## THE DUGABOY INVESTMENT TRUST ORG CHART



003349
HCMLPHMIT00002619

Case 19-34054-sgj11    Doc 4255-110    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 110    Page 14 of 24

 **DUGABOY INVESTMENT TRUST**

APPENDIX

DRAFT   PRIVILEGED AND CONFIDENTIAL

003350

HCMLPHMIT00002620



**DUGABOY INVESTMENT TRUST**



Current Share Count / Current Price



DRAFT - PRIVILEGED AND CONFIDENTIAL

003351

 **DUGABOY INVESTMENT TRUST**

## DUGABOY SECURITIES PORTFOLIO  NXRT

### Business   verview

NexPoint Residential Trust, Inc ("N  RT") is an externally advised, publicly traded real estate investment trust (REIT)focused on the acquisition, asset management, and disposition of multifamily assets, located primarily in the Sun Belt region of the United States.

The company pursues investments in class B multifamily real estate properties, typically with a value-add component, where it can invest significant amounts of capital to provde "life-style" amenities to "workforce" housing.

N  RT was formed via a spin-off from the predecessor to N  DT, which at the time was a closed end fund (NHF)

N  RT is NexPoint's flagship investment product

### Capital Structure

NexPoint Residential Trust, Inc
*Capital Structure as of 9/30/23*

|  | $mm | x LTM EBITDA |
|---|---|---|
| Mortgages payable | $ 1,575 | |
| Credit Facility | $ 41 | |
| Total Debt | $ 1,616 | 11.7x |
| | | |
| Cash | $ 10 | |
| Net Debt | $ 1,606 | 11.6x |
| | | |
| Equity Value | $ 769 | |
| Enterprise Value | $ 2,375 | 17.2x |

### T C art



### Considerations

Dugaboy owns 7.6% of outstanding N  RT shares

N  RT benefited from 2015-21 from era of low interest rates

Growth story has been challenged recently as company forced to sell assets to reduce leverage

Currently 36% of debt matures by 2026 and carries a weighted average floating rate of 6.3%

$21.6mm of run-rate annual fees are being waived by NexPoint Advisors, whose LP interest is 100% owned by Dugaboy, therefore if N  RT fundamentals can improve it represents significant upside to Dugaboy through both share appreciation and revenue

003352

HCMLPHMIT00002622

 **DUGABOY INVESTMENT TRUST**

## DUGABOY REAL ESTATE PORTFOLIO



DRAFT - PRIVILEGED AND CONFIDENTIAL

003353

HCMLPHMIT00002623

 **DUGABOY INVESTMENT TRUST**



DRAFT · PRIVILEGED AND CONFIDENTIAL

16

003354

HCMLPHMIT00002624

 **DUGABOY INVESTMENT TRUST**





DRAFT - PRIVILEGED AND CONFIDENTIAL

003355
HCMLPHMIT00002625



**DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

003356

HCMLPHMIT00002626

 **DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

003357

HCMLPHMIT00002627

Case 19-34054-sgj11    Doc 4255-110    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 110    Page 22 of 24

 **DUGABOY INVESTMENT TRUST**



003358

HCMLPHMIT00002628



**DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

003359

HCMLPHMIT00002629



**DUGABOY INVESTMENT TRUST**



003360

HCMLPHMIT00002630

**EXHIBIT**

003361

# HIGHLAND CLAIMANT TRUST

## PRIVILEGED & CONFIDENTIAL
## RECOMMENDED DUGABOY NOTE CONTRIBUTION
## 6.27.24



CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003362

HCMLPHMIT00002631



## SUMMARY OF BACKGROUND AND RECOMMENDATION

- As has been discussed at several prior meetings, Dugaboy is the Maker and HCMLP is a Payee under a promissory note with a long-dated maturity and annual P&I payments

- The note has a current principal balance of approximately $18.2 million and has accrued interest of approximately $0.3 million as of June 30, 2024 and has no restrictions with respect to assignment.
  - The next payment is due December 31, 2024, with $0.8 million of principal and $0.6 million of interest due
  - Subsequent payments are due on December 31 of each year - $0.8 million of principal, plus accrued interest
  - See next slide for amortization schedule

- During 1H 2024, Highland has engaged with numerous parties in an attempt to determine the market for the note and ultimately to assign the note if a willing buyer was prepared to offer reasonable value in exchange

- These efforts (as described in greater detail herein) ultimately proved unsuccessful as neither Dondero parties nor third parties ultimately made any (let alone an attractive) bid for the note

- While the asset lacks a liquid market and carries with it all the stigma and risks associated with its Maker, the note is nevertheless currently performing and has some value
  - However, the time horizon to monetization is long and mismatched with the timing of other remaining assets of HCMLP and the Claimant Trust

- Separately, regarding reserves for indemnification obligations, the Indemnity Trust remains well short of it's 9-figure target



CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003363
HCMLPHMIT00002632

Case 19-34054-sgj11    Doc 4255-111    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 111    Page 4 of 7



## AMORTIZATION SCHEDULE – PAYMENTS DUE TO HCMLP UNDER NOTE

| | Beginning principal owed to HCMLP | 18,174,937 | | |
| --- | --- | --- | --- | --- |
| | Interest rate (fixed) | 3.26% | | |
| | WAL (years) | 10.48 | | |
| | | | | |
| | **Amortization schedule** | | | |
| | Beg prin | Principal | Interest | End prin |
| 12/31/2023 | | | | 18,174,937 |
| 12/31/2024 | 18,174,937 | (790,215) | (594,126) | 17,384,722 |
| 12/31/2025 | 17,384,722 | (790,215) | (566,742) | 16,594,507 |
| 12/31/2026 | 16,594,507 | (790,215) | (540,981) | 15,804,293 |
| 12/31/2027 | 15,804,293 | (790,215) | (515,220) | 15,014,078 |
| 12/31/2028 | 15,014,078 | (790,215) | (490,800) | 14,223,863 |
| 12/31/2029 | 14,223,863 | (790,215) | (463,698) | 13,433,649 |
| 12/31/2030 | 13,433,649 | (790,215) | (437,937) | 12,643,434 |
| 12/31/2031 | 12,643,434 | (790,215) | (412,176) | 11,853,220 |
| 12/31/2032 | 11,853,220 | (790,215) | (387,474) | 11,063,005 |
| 12/31/2033 | 11,063,005 | (790,215) | (360,654) | 10,272,790 |
| 12/31/2034 | 10,272,790 | (790,215) | (334,893) | 9,482,576 |
| 12/31/2035 | 9,482,576 | (790,215) | (309,132) | 8,692,361 |
| 12/31/2036 | 8,692,361 | (790,215) | (284,147) | 7,902,146 |
| 12/31/2037 | 7,902,146 | (790,215) | (257,610) | 7,111,932 |
| 12/31/2038 | 7,111,932 | (790,215) | (231,849) | 6,321,717 |
| 12/31/2039 | 6,321,717 | (790,215) | (206,088) | 5,531,502 |
| 12/31/2040 | 5,531,502 | (790,215) | (180,821) | 4,741,288 |
| 12/31/2041 | 4,741,288 | (790,215) | (154,566) | 3,951,073 |
| 12/31/2042 | 3,951,073 | (790,215) | (128,805) | 3,160,858 |
| 12/31/2043 | 3,160,858 | (790,215) | (103,044) | 2,370,644 |
| 12/31/2044 | 2,370,644 | (790,215) | (77,495) | 1,580,429 |
| 12/31/2045 | 1,580,429 | (790,215) | (51,522) | 790,215 |
| 12/31/2046 | 790,215 | (790,215) | (25,761) | (0) |
| | | | | |
| | | (18,174,937) | (7,115,540) | |
| | | | | |
| | Total Principal & Interest if paid current through maturity | | | 25,290,477 |

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003364
HCMLPHMIT00002633

 **SUMMARY OF OUTREACH EFFORTS**

| Potential buyer | Person contacted | Title | Initial date contacted | Information/materials provided | Responses |
|---|---|---|---|---|---|
| Riva Ridge Capital Management | Stephen Golden | Founding Partner/PM | 2/27/24 | Over telephone, discussed information in HCMLP-prepared materials and the opportunity | Asked questions regarding the counter-party; rejected receipt of the materials; no interest at all; "life's too short"; actually laughed; stated that while the note was performing, that was for now; in his view the note was an invitation to litigate |
| Cyrus Capital Partners | Svetoslav Nikov | Partner/Analyst | 2/27/24 | Over telephone, discussed information in HCMLP materials and the opportunity | Very quick no; no interest in the materials; believes owning the note is asymmetric risk to the downside – if it pays back, a modest return for the risk; if it defaults, your investors will want to know why you would voluntarily become a creditor of Dondero.  Compared the opportunity to the chance to lend money to Phil Falcone.  Once again said "life's too short to be a creditor of Dondero" |
| Carronade Capital Management | Dan Gropper | Managing Partner/CIO | 2/23/24 | Initial email mentioning note; lunch meeting with Gropper and head of research Andy Taylor on 2/29/24; reviewed materials at lunch meeting | Gropper and Taylor quickly expressed no interest in the note; upside vs. downside skewed (far too much downside); even if the upside was better balanced, the likelihood of litigation over such a small note made the investment unattractive (even if you got costs of collection); asset transfers out of Maker also a concern; Gropper and Taylor did not want to keep the materials |
| UBS | Nader Attalla | Structured Credit Trading; responsible for day-to-day management of UBS actions against Dondero | 2/23/24 | Initial email mentioning note; follow-up call and emailing of "teaser" | Two calls in March and early April; he has been too busy to focus on it; troubled by the fact that it does not cross-default with other Dugaboy obligations; while UBS is suing Dondero and Dugaboy on other obligations torts, making this note potentially useful at the right price, UBS ultimately did not have a bid |
| Bardin Hill Investment Partners | Pratik Desai | Partner/PM | 6/7/24 | Initial email with "teaser" and requesting follow-up call | 30 minute call on June 10, 2024; reviewed teaser with Desai; questions regarding background of note; why it had not been accelerated; payment history; terms; Dugaboy's assets and liabilities; payback period at various discounts; ultimately would require a material discount to 50% soft offer; asked about lending against the note and/or other Claimant Trust assets with material haircuts.  Bardin Hill would not be interested in being a direct counterpart to Dondero especially if that was their only recourse; Bardin Hill would consider ways to lend against the note or other assets if the Claimant Trust was in need of $10-$20 million of liquidity |
| NexPoint/affiliates | Matt McGraner & DC Sauter | CIO General Counsel | 5/16/24 | Email with description of note; Indicated nonbinding offer price of $12M, subject to approval of Oversight Board | DC Sauter responded via email of 5/22/24 that they were not currently interested in the terms outlined.  If the terms change, they would be interested in taking another look.  They did not have a bid of their own. |

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

4

003365
HCMLPHMIT00002634



## VALUATION AND DISCLOSURE DISCUSSION



- Based on these and other factors considered, we believe the actual fair value of the note for a non-Dondero-related buyer is approximately *$3.9* million or *21.5%* of the current par value outstanding

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003366

HCMLPHMIT00002635



CONFIDENTIAL  INTERNAL USE ONLY  NOT FOR PUBLIC DISTRIBUTION.

HCMLPHMIT00002636

# EXHIBIT

003368

**From:** "David Klos" <DKlos@HighlandCapital.com>
**To:** "DC Sauter" <DSauter@Nexpoint.com>
**Cc:** "Matt McGraner" <mmcgraner@nexpoint.com>
**Subject:** RE: Dugaboy note and misc
**Date:** Thu, 23 May 2024 20:50:39 -0000
**Importance:** Normal
**Inline-Images:** image001.jpg

---

DC,
Thanks for the response. As you are not interested in the note, we will move forward with another transaction. With respect to other settlements, we would be happy to engage whenever you are ready. Thanks and have a nice long weekend.
-Dave


**From:** DC Sauter <DSauter@Nexpoint.com>
**Sent:** Wednesday, May 22, 2024 5:16 PM
**To:** David Klos <DKlos@HighlandCapital.com>; Matt McGraner <mmcgraner@nexpoint.com>
**Subject:** RE: Dugaboy note and misc

Dave, thanks for following up, and sorry for not responding. We're not currently interested in the terms you outline below, but I think it's a positive thing if we can continue to resolve some of these outlying issues on mutually agreeable terms. If the terms of your proposed transaction change, we'd certainly be interested in taking another look.


Regards,


D.C. Sauter

# NEXPOINT

O: 214.550.8278 | C: 469.877.6440
dsauter@nexpoint.com | https://www.nexpoint.com

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at NexPoint Advisors. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at NexPoint Advisors.

**From:** David Klos <DKlos@HighlandCapital.com>
**Sent:** Wednesday, May 22, 2024 6:11 PM
**To:** Matt McGraner <MMcGraner@nexpoint.com>
**Cc:** DC Sauter <DSauter@Nexpoint.com>
**Subject:** RE: Dugaboy note and misc

Matt/DC,
I have not heard anything back from you on the Dugaboy note and other assets mentioned in my email last week. Please let me know if there is any interest in the assets for NexPoint or any of its affiliates. If not, we will go forward with other transactions. I understand you are likely busy but would appreciate if you would confirm that you are passing by tomorrow morning. Thanks.
-Dave



003369

HCMLPHMIT00002637

**From:** David Klos
**Sent:** Thursday, May 16, 2024 4:26 PM
**To:** Matt McGraner <MMcGraner@Nexpoint.com>
**Cc:** DC Sauter <DSauter@Nexpoint.com>
**Subject:** Dugaboy note and misc

Matt/DC,

I wanted to reach out to you on a few points to see if there was any interest amongst the NexPoint affiliated entities.  While much of this doesn't fit neatly into your team's world like SE Multi and NHT, the fact that we were able to get those assets traded gives me some hope that traction may be possible in other places.  Hoping you may have some feedback on the following:

Dugaboy Note
I'd be happy to provide more details on the note itself, or you could verify these points with Dugaboy's accountant, but the basics are as follows and it's quite a simple asset:

- Principal outstanding to Highland - $18,174,936.62
- Interest rate – 3.26% fixed
- WAL (yrs) – 10.5
- Payments – P+I Due December 31 each year (next payment due 12/31/24)
  - Minimum principal amort to Highland - $790,214.64 each year
  - Next interest payment to Highland is $594,126.23
  - Combined payment of $1,384,340.87 due 12/31/24
- Final payment date– December 31, 2046

This note wasn't part of the "notes litigation" and has not been accelerated because Dugaboy has stayed current on its payments.

Before we complete a transfer of the Dugaboy note, we wanted to at least check NexPoint's/Dondero's interest in buying it back.  The following is a summary of the price and terms by which Highland would consider offering to sell the note.  These terms are indicative and nonbinding and nothing in this email constitutes a firm commitment.  Any firm offer to sell must be in a writing signed by Highland's CEO after approval of the Claimant Trust Oversight Board.

> Purchaser – NexPoint Advisors, LP or its affiliates
> Proposed purchase price (the "Purchase Price") - $12,000,000.00 in cash
>   a. Purchase Price as % of principal outstanding – Approximately 66%
>   b. Discount to current principal outstanding - $6,174,936.62
>   c. Implied purchaser IRR – Approximately 9%
>
> Trades flat – Purchase Price represents the total amount of consideration to be paid
> Closing – on or before May 31, 2024
> "As-is, where-is" with no reps or warranties, except ownership and authority to sell

Our willingness to consider any discount is simply to facilitate an immediate sale of the note and does not impact our view of value.

Please revert to us by close of business on Wednesday, May 22, 2024 with any feedback you may have.  If you desire to move forward, we will promptly seek Oversight Board approval and prepare documentation with a firm offer.  If we don't hear from you, we'll be taking that to mean there is no interest.

Ginn
It's a small stub position, but Highland/Highland-managed funds have ownership interests in Ginn (A & B loans and LLC units).  We believe NexPoint also has ownership through its affiliated entities, and understand Matt DiOrio is currently serving as a Director of G-LA Resorts Holdings, LLC.  We'd be willing to sell these interests to NexPoint or one of its affiliates for nominal consideration to facilitate the further wind down of entities, which will cost more to maintain than the prospective value that may eventually come out of Ginn, which we understand could take up to several more years.  We thought this might be appealing to you since it wouldn't create incremental monitoring burden to your team.  If interested, just let me know and I'd be happy to help coordinate documentation.

003370

HCMLPHMIT00002638


Global resolution

Since the unsuccessful mediation last October, it's been quiet on this front, but the framework that Highland would consider is essentially unchanged.  The level of indemnification reserves needed for indemnified parties and the cash on hand that needs to be maintained for future expenses could be reduced with agreement to broad, unequivocal releases and a permanent cessation of litigation.  Dondero's counsel has Highland's position with respect to the scope of these items, which have not changed since the mediation and remain the gating issue to begin a substantive conversation.   I raise this point only to highlight that the door is open if he'd like to engage at all – whether now or in the future.  I don't want to be wasting peoples' time, but it shouldn't go unsaid either.

Thank you,
Dave

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

**EXHIBIT**

003372

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2018**

003373

HCMLPHMIT00002548

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2018**

**Page**

**Report of Independent Auditors** ........................................................................................................1

**Consolidated Financial Statements**

Consolidated Balance Sheet ..............................................................................................................2

Consolidated Statement of Income ....................................................................................................3

Consolidated Statement of Changes in Partners' Capital ..................................................................4

Consolidated Statement of Cash Flows .............................................................................................5

Notes to Consolidated Financial Statements .................................................................................6-39

Supplemental Information…………………………………………………………………………...40-44

003374

HCMLPHMIT00002549



## Report of Independent Auditors

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2018, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31. 2018, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

### Other Matter

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

June 3, 2019

*PricewaterhouseCoopers LLP, 2121 N Pearl Street, Suite 2000, Dallas, Texas 75201*
*T: (214) 999 1400, F: (214) 754 7991, www.pwc.com/us*

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 5,034 |
| Investments at fair value (cost $922,027) | | 845,186 |
| Management and incentive fees receivable | | 2,393 |
| Due from broker for securities sold, not yet settled | | 598 |
| Other assets | | 9,255 |
| Notes and other amounts due from affiliates | | 173,398 |
| Intangible assets | | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | | 4,581 |
| **Total assets** | $ | 1,043,467 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | | 32,357 |
| Withdrawals payable | | 57,009 |
| Due to brokers | | 116,560 |
| Due to brokers for securities purchased, not yet settled | | 1,640 |
| Accrued and other liabilities | | 40,246 |
| Notes payable | | 55,752 |
| Investment liabilities | | 46,092 |
| **Total liabilities** | | 354,639 |
| Non-controlling interest | | 316,867 |
| **Partners' capital** | | 371,961 |
| **Total liabilities and partners' capital** | $ | 1,043,467 |

The accompanying notes are an integral part of these consolidated financial statements.

2

003376

HCMLPHMIT00002551

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

**Revenue:**

| | | |
|---|---|---:|
| Management fees | $ | 36,600 |
| Interest and investment income | | 15,831 |
| Incentive fees | | 70 |
| Shared services fees | | 9,187 |
| Other income | | 2,622 |
| Total revenue | | 64,310 |

**Expenses:**

| | |
|---|---:|
| Compensation and benefits | 34,475 |
| Professional fees | 17,679 |
| Interest expense | 5,670 |
| Marketing and advertising expense | 2,413 |
| Depreciation and amortization | 1,317 |
| Investment and research consulting | 1,082 |
| Bad debt expense | 7,862 |
| Other operating expenses | 10,027 |
| Total expenses | 80,525 |

**Other Income/(Expense):**

| | |
|---|---:|
| Other income | 9,826 |
| Impairment on intangible assets | (2,830) |
| Total other income | 6,996 |

| | |
|---|---:|
| Loss before investment and derivative activities | (9,219) |

**Realized and unrealized loss on investments and derivatives:**

| | |
|---|---:|
| Net realized loss on investments and derivatives | (31,517) |
| Net change in unrealized loss on investments and derivatives | (93,755) |
| Net realized and unrealized loss on investments and derivatives | (125,272) |

| | | |
|---|---|---:|
| Net loss | | (134,491) |
| Net loss attributable to non-controlling interest | | (61,313) |
| Net loss attributable to Highland Capital Management, L.P. | $ | (73,178) |

The accompanying notes are an integral part of these consolidated financial statements.

003377

HCMLPHMIT00002552

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2018**

*(in thousands)*

|  | General Partner | | Limited Partners | | Total | |
|---|---|---|---|---|---|---|
| Partners' capital, December 31, 2017 | $ | 163 | $ | 450,014 | $ | 450,177 |
| Net loss attributable to Highland Capital Management, L.P. | $ | (183) | $ | (72,995) | $ | (73,178) |
| Partner distributions | $ | (13) | $ | (5,025) | $ | (5,038) |
| Partners' capital, December 31, 2018 | $ | (33) | $ | 371,994 | $ | 371,961 |

The accompanying notes are an integral part of these consolidated financial statements.

003378

HCMLPHMIT00002553

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---|---:|
| **Cash flows from operating activities:** | | |
| Net loss | $ | (134,491) |
| Adjustment to reconcile net loss to net cash | | |
| provided from operating activities: | | |
| Net realized loss on investments and derivative transactions | | 31,517 |
| Net change in unrealized loss on investments and derivative transactions | | 93,755 |
| Amortization and depreciation | | 1,317 |
| Changes in assets and liabilities: | | |
| Management and incentive fee receivable | | 9,468 |
| Due from brokers | | 1,689 |
| Due from affiliate | | (10,989) |
| Other assets | | 4,272 |
| Intangible assets | | 3,308 |
| Accounts payable | | 546 |
| Accrued and other liabilities | | 1,214 |
| Due to brokers for securities purchased, not yet settled | | 1,886 |
| Due to brokers | | 11,665 |
| Net cash provided from operating activities | | 15,157 |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (67) |
| Purchases of investments | | (195,263) |
| Proceeds from dispositions of investments | | 258,858 |
| Proceeds from securities sold, not yet purchased | | 46,550 |
| Issuance of notes receivable to affiliates | | (2,400) |
| Proceeds from repayments of notes receivable from affiliates | | 3,395 |
| Purchases of investments to cover securities sold, not yet purchased | | (127,954) |
| Net cash used in investing activities | | (16,881) |
| **Cash flows from financing activities:** | | |
| Payments on notes payable & investment liabilities | | (2,743) |
| Proceeds from long-term debt | | 38,501 |
| Capital contributions from minority interest investors of consolidated entities | | 14,615 |
| Capital withdrawals by minority interest investors of consolidated entities | | (141,986) |
| Partner distributions | | (5,060) |
| Net cash used in financing activities | | (96,673) |
| Net decrease in cash and cash equivalents | | (98,397) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 103,479 |
| De-consolidating funds adjustment | | (48) |
| End of year | $ | 5,034 |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | (5,629) |
| Taxes paid during the year | | (510,961) |
| Investments acquired for non-cash consideration | | 26,018 |
| Investments disposed for non-cash consideration | | 116 |

The accompanying notes are an integral part of these consolidated financial statements.

003379

HCMLPHMIT00002554

# Highland Capital Management, L.P.
## Notes to Consolidated Financial Statements
December 31, 2018

1. **Description of Business**

Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware.  The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds.  The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business.  The Partnership's affiliated general partner is Strand Advisors, Inc. (the "General Partner").  The Partnership is owned by an unaffiliated (other than through its direct ownership) trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

As of December 31, 2018, the Partnership provided investment advisory services for eighteen CLOs, five separate accounts, one master limited partnership, and nine hedge funds or private equity structures, with total fee-earning assets under management of approximately $3.1 billion. The Partnership also provides investment services on behalf of affiliate advisors.

2. **Summary of Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Partnership in preparation of its consolidated financial statements.

**Basis of Accounting**
The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles in the United States of America ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification and are stated in the United States Dollar.

**Use of Estimates**
The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements.  Actual results could differ from those estimates and those differences could be material.

**Principles of Consolidation**
The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries ("Consolidated Entities"), which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties.  If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

003380

HCMLPHMIT00002555

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership assesses consolidation requirements pursuant to ASU 2015-02: Consolidation, which was adopted using the modified retrospective method and resulted in an effective date of adoption of January 1, 2016.

The Partnership and its affiliate's involvement with unconsolidated VIEs is generally limited to that of an advisory services provider, and their investment, if any, represents an insignificant interest in the relevant investment entities' assets under management. The Partnership's affiliate's exposure to risk in these entities is generally limited to any capital contribution it has made or is required to make and any earned but uncollected asset based and performance fees. The Partnership has not issued any investment performance guarantees to these VIEs or their investors, except that the Partnership has agreed to subject the full value of its equity interest in Highland Prometheus Fund to dollar-for-dollar reduction to the extent the third party investor in such fund does not achieve an annual target return.

As of December 31, 2018, the net assets of the unconsolidated VIEs and the Partnership's maximum risk of loss were as follows:

*(in thousands)*

|  | Unconsolidated VIE Net Assets | | Carrying Value and Maximum Risk of Loss | |
|---|---|---|---|---|
| Sponsored investment funds | $ | 206,329 | $ | 12,178 |

## Consolidation of Variable Interest Entities

The Partnership consolidates the following VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., and Highland Select Equity Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 15, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strategy Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008; and

7

003381
HCMLPHMIT00002556

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

**Consolidation of Majority Owned Entities**

The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master SubFund, LLC, a Delaware limited liability company that commenced operations on July 19, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC, a Delaware limited liability company that commenced operations on February 22, 2007;

- 100% interest in Highland Brasil, LLC, a Delaware limited liability company that commenced operations on January 28, 2014;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd. ("HCM Singapore"), a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd. ("HCM Korea"), a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in Highland Capital Management Latin America, L.P., ("HCM Latin America"), a Cayman company that was formed on April 13, 2017;

- 100% interest in HE Capital, LLC, a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Eames, Ltd, a Cayman company that was formed on December 12, 2012;

- 99.9% interest in Penant Management, L.P., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

003382

HCMLPHMIT00002557

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in Highland ERA Management, LLC, a Delaware limited liability company that was formed on February 1, 2013;

- 100% interest in The Dondero Insurance Rabbi Trust., a trust that was formed on May 27, 2004;

- 100% interest in The Okada Insurance Rabbi Trust, a trust that was formed on May 27, 2004;

- 100% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26, 2009;

- 100% interest in Highland Diversified Credit Fund, L.P. ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P.;

- 99.6% interest in Highland Select Equity Master Fund, LP, and Highland Select Equity Fund, LP Delaware limited partnerships which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Highland Fund Holdings, LLC, a Delaware limited liability company that was formed on May 24, 2016;

- 100% interest in Maple Avenue Holdings, LLC, a Texas limited liability company formed on August 17, 2016;

- 100% interest in Highland HCF Advisor, Ltd., a Cayman company that was formed on October 27, 2017;

- 100% interest in Asury Holdings, LLC, a Delaware limited liability company formed on February 14, 2017 and;

- 100% interest in Highland CLO Management, Ltd., a Cayman company that was formed on October 27, 2017.

All inter-partnership and intercompany accounts and transactions involving the above listed Consolidated Entities have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

003383

HCMLPHMIT00002558


**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The following table includes a rollforward of non-controlling interests from December 31, 2017, to December 31, 2018.

*(in thousands)*

| | | |
|---|---|---|
| Noncontrolling interest, December 31, 2017 | $ | 424,844 |
| Net loss attributable to noncontrolling interest | | (61,313) |
| Noncontrolling partner contributions | | 14,615 |
| Noncontrolling partner distributions | | (58,061) |
| Noncontrolling interest of deconsolidated entities | | (3,218) |
| Noncontrolling interest, December 31, 2018 | $ | 316,867 |

**Investment Transactions**
Investment transactions are recorded on a trade date basis.  Investments in securities are valued at market or fair value at the date of the consolidated financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements.  Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value.  The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages.  During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized management fees and incentive fees of approximately $36.6 million and $0.1 million, respectively.

**Shared Services Revenue**
The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized shared services revenue of approximately $9.2 million, which has been presented in *Shared services fees* in the Consolidated Statement of Income. See further discussion in Note 8.

003384

HCMLPHMIT00002559

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

### Income and Expense Recognition
Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

### Income Taxes
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these consolidated financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 13.

### Cash and Cash Equivalents
Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Cash equivalents are carried at cost, which approximates market value. At December 31, 2018, the Partnership and Consolidated Entities held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Entities regularly monitor the credit quality of these institutions.

### Notes Receivable
Notes receivable consists of secured promissory notes with maturities greater than one year. When available, the Partnership uses observable market data, including pricing on recent closed transactions to value notes. When appropriate, these notes may be valued using collateral values. Adjustments to the value may be performed in circumstances where attributes specific to the collateral exist suggesting impairment.

### Other Intangible Assets
Goodwill and other intangible assets are recorded on the Consolidated Balance Sheet at current carrying values. The Partnership and its Consolidated Entities perform an impairment test on an annual basis. Any impairment in the value of other intangible assets is accounted for in the year when it occurs.

### Fixed Assets and Leasehold Improvements
Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

003385

HCMLPHMIT00002560

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and its Consolidated Entities are depreciating fixed assets as follows:

|  | Period |
|---|---|
| Leasehold improvements | Lease term |
| Buildings | 29 - 40 years |
| Furniture and fixtures | 7 years |
| Computer and equipment | 3 - 5 years |
| Computer software | 3 years |

**Securities Sold, Not Yet Purchased**
Certain of the Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

**Due to/from Brokers**
Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Partnership's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Options Contracts**
The Partnership and the Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership or the Consolidated Entities purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the Partnership or the Consolidated Entities enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership or the Consolidated Entities purchasing a security at a price different from the current market value.

003386

HCMLPHMIT00002561

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and the Consolidated Entities are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Entities is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Entities consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

### Margin Transactions
To obtain more investable cash, certain of the Consolidated Entities may use various forms of leverage including purchasing securities on margin. A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

### Withdrawals Payable
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2018. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2018, the Consolidated Investment Funds had withdrawals payable of $57.0 million.

### Foreign Currency Transactions
The Partnership's subsidiaries HCM Singapore and HCM Korea use Singapore dollars and Korean won, respectively, as their functional currency. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2018. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the Consolidated Statement of Income.

The Consolidated Entities do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments* on the Consolidated Statement of Income.

### Life Settlement Contracts
One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows. At December 31, 2018, the Consolidated Investment Fund was invested in 13 policies, which had a total face value of approximately $145.3 million and a fair value of $35.7 million.


003387
HCMLPHMIT00002562

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Financing**
The Partnership and its Consolidated Entities may finance the acquisition of its investments in securities and loans through financing arrangements which are classified in Notes payable and Investment liabilities on the Consolidated Balance Sheet. The Partnership and its Consolidated Entities recognize interest expense on all borrowings on the accrual basis in the Consolidated Statement of Income.

**Financial Instruments**
The Partnership and its Consolidated Entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable, withdrawals payable, debt and notes payable, due to brokers, investment liabilities and accrued liabilities approximate their fair values. For fair value of investment, see Note 5.

**Accounts Payable, Accrued and Other Liabilities**
Expenses are recorded on an accrual basis, as incurred. Current liabilities are included in Accounts payable. Long-term liabilities are included in Accrued and other liabilities.

**Partners' Capital**
The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

003388

HCMLPHMIT00002563

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

3.     **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2018:

*(in thousands)*

| | | |
|---|---|---:|
| Leasehold improvements | $ | 7,193 |
| Buildings | | 2,595 |
| Furniture and fixtures | | 2,796 |
| Computer and equipment | | 2,863 |
| Computer software | | 331 |
| Accumulated depreciation | | (11,197) |
| | $ | 4,581 |

Depreciation expense in 2018 totaled approximately $1.3 million for the Partnership and its subsidiaries.

4.     **Investments**

Detailed below is a summary of the Partnership and its Consolidated Entities' investments at December 31, 2018:

| *(in thousands)* | Amortized Cost/Cost | | Fair Value | |
|---|---:|---|---:|---|
| Common equity securities | $ | 423,306 | $ | 535,374 |
| Closed-end mutual funds | | 100,788 | | 94,845 |
| Floating rate syndicated bank loans | | 142,586 | | 72,622 |
| Real Estate Investment Trusts | | 28,271 | | 57,475 |
| Life settlement contracts | | 65,276 | | 35,744 |
| Limited partnership interests | | 24,892 | | 30,521 |
| Rights & warrants | | 26,661 | | 7,446 |
| LLC interests | | 10,629 | | 2,775 |
| Preferred equity | | 258 | | 8,282 |
| Asset-backed securities | | 7,350 | | 102 |
| Participation interests | | 6,590 | | - |
| Corporate bonds | | 85,421 | | - |
| Total investments | $ | 922,027 | $ | 845,186 |

| | Proceeds | | Fair Value | |
|---|---:|---|---:|---|
| Securities sold, not yet purchased | $ | (26,135) | $ | (32,357) |

003389

HCMLPHMIT00002564

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

5.    **Fair Value of Financial Instruments**

**Fair Value Measurement**

U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

- Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Entities have the ability to access as of the measurement date.  Valuations utilizing Level 1 inputs do not require any degree of judgment.

- Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

- Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction.  When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs.  For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above.  In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Entities use prices and inputs that are current as of the measurement dates.  The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Entities use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities.  In cases where observable inputs are not available, the Partnership and Consolidated Entities  develop methodologies that provide appropriate fair value estimates.  These methodologies are reviewed on a continuous basis to account for changing market conditions.

003390

HCMLPHMIT00002565

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2018, the Partnership and its Consolidated Entities' investments consisted primarily of common equity securities, closed-end mutual funds, floating rate syndicated bank loans, real estate investment trusts, life settlement contracts, limited partnership interests, rights and warrants, LLC interests, asset-backed securities, and preferred equity. In addition, certain of the Consolidated Entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges and management is required to use significant judgment to estimate their values.

**Public Equity Investments**
Publicly traded equities, including closed-end mutual funds and publicly traded REITs are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

**Private Equity Investments**
The Partnership and Consolidated Entities hold private equity investments which often resulted from the restructuring of other instruments which are classified as common equity securities.  These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available.  In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Partnership and Consolidated Entities  will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis.  When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

003391

HCMLPHMIT00002566

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Consolidated Entities also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

## Debt Securities
The Partnership and Consolidated Entities invest in various types of debt, including floating rate syndicated bank loans, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Partnership and Consolidated Entities first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Partnership and Consolidated Entities may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

## Life Settlement Contracts
Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

At December 31, 2018, the Consolidated Entities' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 1-2 | - | $ - | $ - |
| 2-3 | 3 | 33,785 | 16,940 |
| 3-4 | - | - | - |
| 4-5 | - | - | - |
| Thereafter | 10 | 111,500 | 18,804 |
| Total | 13 | $ 145,285 | $ 35,744 |

003392

HCMLPHMIT00002567

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Asset-Backed Securities**
The Consolidated Entities invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity.  The Consolidated Entities generally utilize an independent third parties to provide the relevant inputs. The Consolidated Entities evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Entities may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

**Limited Partnership and LLC Interests**
The Partnership and its Consolidated Entities hold limited partnership and LLC interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2018:

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/18 |
|---|---|---|---|---|
| Common equity securities | $ 139,236 | $ 296,695 | $ 99,443 | $ 535,374 |
| Closed-end mutual funds | 94,845 | - | - | 94,845 |
| Floating rate syndicated bank loans | - | 21 | 72,601 | 72,622 |
| Real Estate Investment Trusts | 46,594 | 10,881 | - | 57,475 |
| Life settlement contracts | - | - | 35,744 | 35,744 |
| Limited partnership interests | - | - | 30,521 | 30,521 |
| Rights & warrants | 20 | 123 | 7,303 | 7,446 |
| LLC interests | - | - | 2,775 | 2,775 |
| Preferred equity | 8,282 | - | - | 8,282 |
| Asset-backed securities | - | - | 102 | 102 |
| **Total** | $ 288,977 | $ 307,720 | $ 248,489 | $ 845,186 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 32,357 | $ - | - | $ 32,357 |

19

003393
HCMLPHMIT00002568

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2018:

(in thousands)

| | Fair Value at December 31, 2017 | Purchases | Sales and Maturities | Restructures | Transfers Into Level 3 | Net Realized Gains / (Losses) | Net Unrealized Gains / (Losses) | Fair Value at December 31, 2018 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 141,201 | $ 1,058 | $ (116) | $ - | $ - | $ - | $ (42,700) | $ 99,443 |
| Floating rate syndicated bank loans | 64,307 | 12,146 | (1,952) | - | - | (2,799) | 899 | 72,601 |
| Life settlement contracts | 28,959 | 7,353 | - | - | - | - | (568) | 35,744 |
| Limited partnership interests | 27,863 | 4,600 | (4,766) | - | 928 | 351 | 1,545 | 30,521 |
| Rights & warrants | 8,013 | - | - | - | - | - | (710) | 7,303 |
| LLC interests | 3,352 | 165 | (1,312) | - | - | 985 | (415) | 2,775 |
| Asset-backed securities | 6,477 | 1 | (3,051) | (2,171) | (928) | (39,580) | 39,354 | 102 |
| | $ 280,172 | $ 25,323 | $ (11,197) | $ (2,171) | $ - | $ (41,043) | $ (2,595) | $ 248,489 |

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $41.8 million of the net unrealized losses presented in the table above relate to investments held as of December 31, 2018.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

003394

HCMLPHMIT00002569

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

| Category | Ending Balance at 12/31/2018 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| Common equity securities | $ 99,443 | Multiples Analysis | Multiple of EBITDA | 2.5x - 7.0x |
| | | | Cap Rate | 8.0 - 10.0% |
| | | | Multiple of Revenue | 0.20x - 0.30x |
| | | | Liquidity Discount | 25% |
| | | Discounted Cash Flow | Discount Rate | 10.5 - 40.0% |
| | | | Terminal Multiple | 1.25x - 6.50x |
| | | | Long-Term Grow th Rate | 2% |
| | | Transaction Analysis | Multiple of EBITDA | 4.0x - 7.75x |
| | | | Cap Rate | 8 - 10% |
| | | Bid Indications | Enterprise Value ($mm) | $720.0 - $765.0 |
| | | Impairment Analysis | Recoverable Value | 0% |
| | | Appraisal | N/A | N/A |
| Floating rate syndicated bank loans | 72,601 | Multiples Analysis | Multiple of EBITDA | 2.0x - 5.0x |
| | | | Multiple of Revenue | 0.35x - 0.50x |
| | | Escrow Recovery Analysis | Risk Discount | 40% |
| | | Appraisal | N/A | N/A |
| | | Bid Indications | Transaction Price | 10% |
| | | Sales Proceeds Analysis | Discount Rate | 6.0% |
| | | Discounted Cash Flow | Discount Rate | 12.3% - 40.0% |
| | | | Terminal Multiple | 1.25x |
| | | | Spread Adjustment | 0.0% - 6.3% |
| Life settlement contracts | 35,744 | Discounted Cash Flow | Discount Rate | 15.0 - 16.0% |
| Limited partnership interests | 30,521 | Net Asset Value | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Rights & w arrants | 7,303 | Discounted Cash Flow | Discount Rate | 11.0% - 17.0% |
| | | | Terminal Multiple | 6.5x |
| | | Multiples Analysis | Multiple of EBITDA | 6.0x - 7.0x |
| | | Transaction Analysis | Multiple of EBITDA | 7.25x - 7.75x |
| | | Bid Indication of Value | Enterprise Value (in millions) | $720.0 - $765.0 |
| LLC interests | 2,775 | Discounted Cash Flow | Discount Rate | 6% |
| | | Adjusted Appraisal | Minority Discount | 25% |
| | | Bid Indication | Total Purchase Price (in millions) | $130.00 |
| Asset-backed securities | 102 | Adjusted NAV | N/A | N/A |
| **Total** | $ 248,489 | | | |

In addition to the unobservable inputs utilized for various valuation methodologies, the Partnership often uses a combination of two or more valuation methodologies to determine fair value for a single holding. In such instances, the Partnership assesses the methodologies and ascribes weightings to each methodology. The selection of weightings is an inherently subjective process, dependent on professional judgement. These selections may have a material impact to the concluded fair value for such holdings.

The significant unobservable inputs used in the fair value measurement of the Partnership's assets could fluctuate significantly, resulting in a significantly higher or lower fair value measurement.

003395

HCMLPHMIT00002570

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

6.    **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**
The Partnership and its Consolidated Entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans. The Consolidated Entities may also invest in derivative instruments, including total return and credit default swaps. Investments in these derivative instruments throughout the year subject the Consolidated Entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Entities due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Entities' exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Entities investments. Volatility or illiquidity could impair the Partnership and its Consolidated Entities performance or result in losses. The Partnership and its Consolidated Entities may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**
Credit risk is the potential loss the Partnership and its Consolidated Entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the Consolidated Entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the Consolidated Entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**
The Consolidated Entities' limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Entities nor their manager expects such a market to develop.

**Business Risk**
The Partnership provides advisory services to the Consolidated Entities. Consolidated Entities could be materially affected by the liquidity, credit and other events of the Partnership.

003396

HCMLPHMIT00002571

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**High Yield Bonds and Loans**

The Partnership and its Consolidated Entities' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Entities' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Entities purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Entities have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Entities may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Debt Obligations**

The Partnership and its Consolidated Entities' investment portfolio consists of collateralized loan obligations that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of these investments, the Partnership's best estimates may differ significantly from values that would have been used had broader market for the investments existed.

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Entities invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

003397

HCMLPHMIT00002572

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Corporate Bonds, Preferred Securities, and Loans**
The Consolidated Entities may invest in corporate bonds, floating rate syndicated bank loans, and preferred securities which are rated in the lower rating categories by the various credit rating agencies (or in comparable non-rated securities). Securities in the lower rating categories are subject to greater risk of loss of principal and interest than higher-rated securities and are generally considered to be predominantly speculative with respect to the issuer's capacity to pay interest and repay principal. They are also subject to greater risks than securities with higher ratings in the case of deterioration of general economic conditions. Because of these greater risks associated with the lower-rated securities, the yields and prices of such securities may be more volatile than those for higher-rated securities. The market for lower-rated securities is thinner and less active than that for higher-rated securities, which could adversely affect the prices at which these securities may be sold by the Consolidated Entities.

**Limited Diversification**
The Investment Manager attempts to diversify the Consolidated Entities' investments. However, the Consolidated Entities' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Entities. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Entities to losses that are disproportionate to market movements as a whole.

At December 31, 2018, the Consolidated Entities' investments were predominantly concentrated in the United States and Cayman Islands.

**Exit Difficulties**
The Partnership and its Consolidated Entities cannot assure investors that it will be able to exit its investments by sale or other disposition at attractive prices, if at all. The mergers and acquisitions and public securities markets are highly cyclical, which means that the Consolidated Entities' investments, even its best performing investments, may be illiquid for extended periods of time despite the Consolidated Entities' efforts to identify attractive exit opportunities. Additionally, a significant portion of the Consolidated Entities' assets at any time will likely consist of debt obligations and other securities that are thinly-traded, for which no market exists and/or are restricted as to their transferability under applicable law and/or documents governing particular transactions of the Consolidated Entities. In some cases, the Consolidated Entities may be unable to realize an investment prior to the date on which the Consolidated Entities are scheduled to terminate and/or have to sell or otherwise dispose of one or more investments on disadvantageous terms as a result of the Consolidated Entities' termination, or distribute such investments in kind.

**Custody Risk**
The clearing operations for the Partnership and its Consolidated Entities are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Entities' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Entities may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Entities might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

003398

HCMLPHMIT00002573

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Leverage Risk**

The Consolidated Entities may borrow funds from brokers, banks and other lenders to finance its trading operations.  The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Entities' investment portfolio may be subject.  The use of margin and short-term borrowings creates several risks for the Consolidated Entities.  If the value of the Consolidated Entities' securities fall below the margin level required by a counterparty, additional margin deposits would be required.  If the Consolidated Entities are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Entities' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Entities to incur significant losses.  In addition, to the extent the Consolidated Entities have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Entities' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Entities.  In addition, because the use of leverage allows the Consolidated Entities to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Entities may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Entities' assets, the Consolidated Entities may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements.  As a result, the Consolidated Entities may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets.  The banks and dealers that provide financing to the Consolidated Entities have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies.  Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**

The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar.  The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**

At December 31, 2018, the Consolidated Entities' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Litigation Risk**

The Partnership and its Consolidated Entities are periodically subject to legal actions arising from the ordinary course of business.  The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Entities.  Refer to Note 14 for a discussion of open litigation.

003399



HCMLPHMIT00002574

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

### 7. Intangible Assets

On May 12, 2017, HCM Latin America, as manager, purchased all rights and obligations for management of a certain hedge fund. As of December 31, 2018, the current carrying value of these rights and obligations is $3.0 million, which consists of the original purchase price of $2.0 million and a deferred purchase price of $1.0 million and is reflected in the Consolidated Balance Sheet.

The Partnership and its Consolidated Entities perform an impairment test as required by U.S. GAAP on a yearly basis. The Partnership has determined that an impairment charge was necessary for the value obtained on December 19, 2017, for subadvisory and shared servicing rights from an affiliate. As of December 31, 2018, the asset was determined to be fully impaired and an impairment expense of $2.8 million is reflected in the Consolidated Statement of Income.

### 8. Related Party Transactions

**Investments Under Common Control**

Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. As of December 31, 2018, the Partnership and its Consolidated Entities held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 296,695 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 59,539 |
| OmniMax International, Inc. | Term Loan | 52,464 |
| JHT Holdings Inc. | Common Stock | 25,099 |
| OmniMax International, Inc. | Common Equity | 7,804 |
| Carey International, Inc. | Term Loan | 5,401 |
| CCS Medical, Inc. | Loan | 5,960 |
| Trussway Holdings, LLC | Common Equity | 4,582 |
| JHT Holdings Inc. | Term Loan | 4,160 |
| OmniMax International, Inc. | Warrants | 551 |

003400
HCMLPHMIT00002575



# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2018, the Partnership and the Consolidated Entities held the following investments that were issued and managed by affiliates of the Partnership:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| Harko, LLC | LLC Units | $ 2,721 |
| Highland CLO Funding | Partnership Interest | 610 |
| Highland Energy MLP Fund | Mutual Fund Shares | 1,363 |
| Highland Floating Rate Opportunities Fund | Closed-end mutual fund shares | 832 |
| Highland Global Allocation Fund | Mutual Fund Shares | 2,173 |
| Highland Long/Short Equity Fund | Mutual Fund Shares | 267 |
| Highland Long/Short Healthcare Fund | Mutual Fund Shares | 2,963 |
| Highland Master Loan Fund | Limited Partnership interest | 106 |
| Highland Merger Arbitrage Fund | Mutual Fund Shares | 1,321 |
| Highland Opportunistic Credit Fund | Mutual Fund Shares | 5,477 |
| Highland Premier Growth Equity Fund | Mutual Fund Shares | 64 |
| Highland Small Cap Equity Fund | Mutual Fund Shares | 465 |
| NexPoint Strategic Opportunities Fund | Mutual Fund Shares | 36,563 |
| NexPoint Multi Family Capital Trust | REIT | 10,881 |
| NexPoint Real Estate Strategies Fund | Closed-end mutual fund shares | 1,454 |
| NexPoint Residential Trust | REIT | 85,223 |

### Expenses Reimbursable by Funds Managed

In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2018, approximately $6.4 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other Assets* in the accompanying Consolidated Balance Sheet.

### Accounts Held with Related Party

During the year the Partnership and its Consolidated Entities maintained bank accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2018, balances in these accounts were approximately $0.5 million, a portion of which exceeds Federal deposit insurance limits.

### Investment in Affiliated Loans

During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $10.4 million and is included in interest and investment income in the Consolidated Statement of Income. At December 31, 2018, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $83.3 million and $56.5 million, respectively.

003401

HCMLPHMIT00002576

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Notes and Other Amounts Due from Affiliates**

During the year ended December 31, 2018, Highland Capital Management Fund Advisors, L.P. ("HCMFA") did not issue any new promissory notes to the Partnership. The outstanding promissory notes accrue interest at a rate ranging from 1.97 - 2.62%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $5.3 million and is payable on demand. The Partnership will not demand payment on amounts owed that exceed HCMFA's excess cash availability prior to May 31, 2021. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, NexPoint Advisors, L.P. ("NPA") did not issue any new promissory notes to the Partnership. The outstanding promissory note accrues interest at a rate of 6.0%. As of December 31, 2018 total interest and principal due on the outstanding promissory note was approximately $28.6 million and is payable in annual installments throughout the term of the loan. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, HCRE Partners, LLC ("HCRE") issued a promissory note to the Partnership in the amount of $0.8 million. The note accrues interest at a rate of 8.0%. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $9.4 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Highland Capital Management Services, Inc. ("HCMSI") issued promissory notes to the Partnership in the aggregate amount of $0.4 million. All outstanding promissory notes accrue interest at a rate ranging from 2.75% – 3.05%, the long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $14.0 million and is generally payable in annual installments throughout the term of the notes. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, James Dondero ("Dondero") issued promissory notes to the Partnership in the aggregate amount of $14.9 million. The outstanding promissory notes accrue interest at a rate ranging from 2.03% – 2.95%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $29.2 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Mark Okada ("Okada") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 2.25%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $1.3 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

003402

HCMLPHMIT00002577

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

During the year ended December 31, 2018, The Dugaboy Investment Trust ("Dugaboy") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 3.26%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $20.1 million and is payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

On December 21, 2015, the Partnership entered into a contribution agreement (the "Contribution Agreement") with an affiliated trust.  Pursuant to the Contribution Agreement, a note (the "Note Receivable") in the amount of $63.0 million was due to the Partnership.  The Note Receivable will mature on December 21, 2030.  The Note Receivable accrues interest at a rate of 2.61% per annum. Accrued interest is paid-in-kind, with principal receipts occurring pursuant to a note amortization schedule, with such annual receipts commencing December 21, 2019. During the year, the trust pre-paid $2.1 million. As of December 31, 2018 total interest and principal due on the Note Receivable was approximately $60.2 million.

**Services Performed by or on Behalf of an Affiliate**
In March 2007, Highland Capital of New York, Inc. a New York corporation ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager.  The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. Separately, the Partnership pays for, and seeks reimbursement for, various operating expenses on behalf of Highland New York. For the year ended December 31, 2018, total marketing fee expense charged to the Partnership by Highland New York was approximately $0.9 million. Because the Partnership funded Highland New York's operations, including amounts above the marketing fee, as of December 31, 2018, net amounts owed to the Partnership by Highland New York was approximately $4.9 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of HCMFA, a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to HCMFA was approximately $2.7 million and as of December 31, 2018, amount owed to the Partnership by HCMFA was approximately $0.2 million.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to Falcon was approximately $0.2 million and as of December 31, 2018, no amounts were owed to the Partnership by Falcon for services rendered.

003403

HCMLPHMIT00002578

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
Notes to Consolidated Financial Statements
December 31, 2018

Effective March 17, 2017, pursuant to the Third Amended and Restated Sub-Advisory Agreement and the Fourth Amended and Restated Shared Services Agreement, the Partnership continued performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Subadvisory services include investment advisory services and shared services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fees charged by the Partnership to Acis for shared services and subadvisory fees were approximately $2.6 million and $3.4 million, respectively. As of December 31, 2018, amount owed to the Partnership by Acis was approximately $6.0 million. Although such fees were earned in 2018, all related revenues and receivables recorded by the Partnership have been fully reserved against based on estimated collectability.

Effective January 1, 2018, pursuant to the Third Amended and Restated Shared Services Agreement, the Partnership commenced performing services on behalf of NPA. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexPoint was approximately $2.0 million and as of December 31, 2018, no amounts were owed to the Partnership by NexPoint for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Shared Services Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank Capital was approximately $0.2 million and as of December 31, 2018, $0.1 million was owed to the Partnership by NexBank Capital for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Investment Advisory Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank was approximately $3.6 million and as of December 31, 2018, amounts owed by NexBank to the Partnership for services rendered were approximately $0.9 million.

Effective April 1, 2015, the Partnership commenced performing services on behalf of NexPoint Real Estate Advisors, L.P. ("NREA"). Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. NREA is charged a fee for the services provided. For the year ended December 31, 2018, the total fee charged to NREA by the Partnership was approximately $1.0 million and as of December 31, 2018, no amounts were owed by NREA to the Partnership for services rendered.

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with HCMFA. Under the Agreement, HCMFA reimburses the Partnership for the cost of any dual employees of the Partnership and HCMFA and who provide advice to registered investment companies advised by HCMFA. For the year ended December 31, 2018, the total fees charged by the Partnership to HCMFA was approximately $6.2 million and as of December 31, 2018, no amounts were owed by HCMFA to the Partnership for services rendered.

003404
HCMLPHMIT00002579

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with NPA. Under the Agreement, NPA reimburses the Partnership for the cost of any dual employees of the Partnership and NPA and who provide advice to registered investment companies advised by NPA. For the year ended December 31, 2018, the total fees charged by the Partnership to NPA was approximately $4.3 million and as of December 31, 2018, no amounts were owed by NPA to the Partnership for services rendered.

**Investment liability**

On December 28, 2016, the Partnership entered into a purchase and sale agreement with The Get Good Nonexempt Trust ("Get Good"). In consideration for a note receivable from an affiliate, the Partnership sold or participated certain investments that it already held, with the participated investments carrying an aggregate market value of $21.3 million as of the date of the transaction. The fair value of the Agreement will fluctuate with the fair value of the securities, throughout the term of the Agreement. As of December 31, 2018, the fair value of the participated investments was $12.1 million.

On December 5, 2016, Select entered in to Stock Purchase Agreements with two counterparties for shares of Trussway Industries ("Trussway"), in exchange for promissory notes in the aggregate amount of $15.4 million. The promissory notes accrue interest at a rate of 2.07%, the long-term Applicable Federal Rate, compounded annually. Select must pay one-twenty-fifth of the initial note amounts, plus any additional principal attributable to the sale of Trussway, along with accumulated interest on an annual basis. The promissory notes will mature on December 5, 2041. As of December 31, 2018 the remaining principal payable on the promissory notes was $14.8 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

During 2014 and 2015, Select received multiple master securities loan agreements (the "Securities Agreements") for securities borrowed from an affiliate. The Securities Agreements accrue interest at a rate ranging from 0.38 - 0.48%, the short term Applicable Federal Rate. The fair value of the securities loans will fluctuate with the fair value of the borrowed securities, throughout the term of the Securities Agreements. As of December 31, 2018, the fair value of the loans was $19.2 million. The fair value of Select's securities loans approximates the carrying value of the securities loans.

9. **Notes Payable**

**Promissory Notes and Loan Agreements**

On August 17, 2015, the Partnership entered in to a promissory note with Frontier State Bank ("Frontier") in the amount of $9.5 million. Pursuant to the First Amended and Restated Loan Agreement, dated March 29, 2018, Frontier made an additional loan to the Partnership in the amount of $1.0 million. The promissory note accrues interest at the 3 month LIBOR rate plus 4.75%, adjusted each date of change, per annum. Accrued interest shall be paid quarterly. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc and will mature on August 17, 2021. As of December 31, 2018 the remaining principal payable on the promissory note was $7.2 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 25, 2015, Highland Select Equity Fund, L.P. ("Select") entered in to a promissory note with Dugaboy in the amount of $1.0 million. The promissory note accrues interest at a rate of 2.82%, the long-term Applicable Federal Rate, compounded annually. The accrued interest and principal of the promissory note is due and payable on demand. As of December 31, 2018 the remaining principal payable on the promissory note was $1.0 million.  The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

003405

HCMLPHMIT00002580


**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On October 7, 2016, the Partnership entered in to a promissory note with Acis in the amount of $12.7 million. The Partnership is required to make certain payments of the initial note amount, plus accumulated interest on May 31 of each year, until maturity. The promissory note is set to mature on May 31, 2020. The promissory note accrues interest at a rate of 3.00% per annum. Pursuant to an Assignment and Transfer Agreement dated November 3, 2017, between Acis and an affiliate of the Partnership, Acis transferred the promissory note to the affiliate. As of December 31, 2018 the remaining principal payable on the promissory note was $9.5 million.

On August 29, 2016, Maple Avenue Holdings, LLC ("Maple") entered in to a promissory note with Great Southern Bank in the amount of $3.9 million. Maple must pay principal and accrued interest installments on a monthly basis until maturity. The promissory note will mature on August 29, 2019. The promissory note accrues interest at a rate of 3.26% per annum. As of December 31, 2018 the remaining principal payable on the promissory note was $3.4 million. The fair value of Maple's outstanding notes payable approximates the carrying value of the notes payable.

On May 1, 2018, Multi Strategy Master executed a loan agreement (the "Loan Agreement") with NexBank SSB, an affiliate of the Partnership. The original principal borrowed under the Loan Agreement was $36.5 million. The loan bears interest at the 1-month LIBOR rate plus 3.25%. The maturity date is May 1, 2021. For the year ended December 31, 2018, the Multi Strategy Master incurred and paid approximately $1.3 million of interest expense, and made aggregate principal payments of approximately $1.9 million. Shares of Metro-Goldwyn Mayer, Inc. are pledged as collateral on the loan. The loan was used to purchase an outstanding redemption of $38.7 million at a discount resulting in a reallocation of partners' capital on the Statement of Changes in Partners' Capital. As of December 31, 2018 the remaining principal payable on the loan was $34.6 million. The fair value of Multi Strategy Master's outstanding loan approximates the carrying value of the loan.

**10.    Due to Broker**

As of December 31, 2018 the due to broker balance of approximately $116.6 million is payable to financing counterparties for margin transactions.

**11.    Commitments and Contingencies**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss.   The Partnership regularly co-invests in vehicles it advises. The amounts committed are within the Partnerships capacity to fund when capital is called. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant. Also refer to Note 8 for commitments of certain subsidiaries in affiliated loans.

**Loans as Co-Borrower**
The Partnership is a named co-borrower in a Bridge Loan Agreement ("Loan") dated September 26, 2018 with Key Bank for $556.3 million. The Loan accrues interest at the 3 month LIBOR rate plus 3.75%, per annum. Accrued interest shall be paid monthly by a borrower other than the Partnership ("Lead Borrower"). The Loan will mature on September 26, 2019. The carrying value of the Loan is reflected on the financial statements of the Lead Borrower.

003406

HCMLPHMIT00002581


**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Legal Proceedings**

The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, Consolidated statement of Income, or its liquidity.  See Note 14.

**Operating Leases**

The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or non-cancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| Years Ending December 31, | |
| --- | --- |
| 2019 | 1,550 |
| 2020 | 1,566 |
| 2021 | 1,567 |
| 2022 | 522 |
| Total | $ 5,205 |

Total rental expense of the Partnership and its Consolidated Entities for operating leases was approximately $1.5 million for the year ended December 31, 2018.

**12.     Post Retirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements.  The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals.  A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2018 expense reflects a service cost charge for the value of the new participant's benefit earned during 2018.

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2018 are reconciled in the tables below.

003407

HCMLPHMIT00002582

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

*(in thousands)*

| **Change in projected benefit obligation** | | **2018** |
|---|---|---|
| Benefit obligation at beginning of year | $ | 2,578 |
| Service cost | | 6 |
| Interest cost | | 80 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 386 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (121) |
| Benefit obligation at end of year | $ | 2,929 |

| **Change in plan assets** | | **2018** |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 2,924 |
| Actual return on plan assets | | 449 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (121) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 3,252 |

| **Reconciliation of Funded Status** | | **2018** |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 2,929 |
| Projected benefit obligation at end of year | | 2,929 |
| Fair value of assets at end of year | | 3,252 |
| Funded status at end of year | $ | 323 |

The Partnership did not contribute to the plan during 2018.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Rate of compensation increase | N/A |

003408

HCMLPHMIT00002583

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Expected long-term return on plan assets | 3.19% |
| Rate of compensation increase | N/A |

As of December 31, 2018, there were no plan assets categorized as Level 3.

**13.    Income Taxes**

**The Partnership**
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable.  As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority.  The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

**Multi Strategy Master**
For U.S. income tax purposes, Multi Strategy Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Multi Strategy Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Master business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices.

Dividends as well as certain interest and other income received by Multi Strategy Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2018, a minimal withholding tax liability of $0.9 million is classified within accrued and other liabilities on the Consolidated Balance Sheet.

003409

HCMLPHMIT00002584

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Multi Strategy Master applies authoritative guidance which requires management to determine whether a tax position Multi Strategy Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority.  Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

Multi Strategy Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates.  In the normal course of business, Multi Strategy Master is subject to examination by federal and foreign jurisdictions, where applicable.  As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

**Restoration Onshore**
Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines.  Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income.  Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance.  The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.  Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates.  In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable.  As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

**Restoration Offshore**
Restoration Offshore is a Cayman Islands exempted company.  Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore.  Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

003410

HCMLPHMIT00002585

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position.  For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. As of December 31, 2018, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

003411

HCMLPHMIT00002586

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**14.    Legal Proceedings**

The Partnership and certain affiliated investment vehicles are defendants in a complaint filed on February 24, 2009 New York state court by UBS Securities LLC and UBS AG, London Branch relating to a CLO warehouse facility with respect to which UBS is attempting to extend liability beyond the two entities that bore sole risk of loss under the governing documents.  On February 19, 2010, the court dismissed all claims against the Partnership.  UBS since has filed additional claims against the Partnership and certain additional investment vehicles.  On July 21, 2011, the First Appellate Division again dismissed two of UBS's four claims against the Partnership, severely limiting the remaining two claims.  Additional claims were dismissed in a further appellate ruling on October 31, 2017.  Certain claims were tried in July 2018 against two Highland-affiliated defendants, but the trial court has neither ruled on those claims nor indicated when it will set UBS's remaining claims for trial.  The second trial, if it occurs, will try all claims against the Partnership and certain affiliated investment vehicles.

From time to time the Partnership is party to disputes with disgruntled former employees.  One such matter involves a former employee that improperly recorded internal conversations in violation of the Partnership's internal policies and procedures and potentially certain criminal and regulatory provisions.  The former employee obtained a $7.9 million judgment against Highland affiliate Acis Capital Management, L.P. ("Acis").  The employee currently is attempting to collect this judgment through various proceedings in Texas state and federal court, including claims against Highland for receipt of assets from Acis.

In another matter, a Court ruled that a former employee breached his fiduciary duty to the Partnership, owed damages to the Partnership, and ordered the former employee to cease using or disclosing the Partnership's confidential information.   Additionally, an award was entered in favor of the employee against a separate incentive compensation entity for an interest that was already escrowed in his name prior to trial and in which he was already vested.  The dispute over the amount of his vested interest is on-going.  Additionally, the Partnership from time to time must take action to enforce the permanent injunction against the former employee's continuing improper disclosures of the Partnership's confidential information.

The Partnership is engaged in litigation and arbitration with a group of investors relating to the post-financial crisis wind down and distribution of the remaining assets in the Crusader hedge fund vehicle.

The Partnership currently is and has been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. We currently do not anticipate these proceedings will have a material negative impact to the Partnership.

**15.    Subsequent Events**

On March 18, 2019, SSP Holdings, LLC issued a promissory note to the Partnership in the amount of $2.0 million. The note accrues interest at a rate of 18%.

On March 26, 2019, Trussway Holdings, LLC issued a promissory note to the Partnership in the amount of $1.0 million. The note accrues interest at a rate of 10%.

003412

HCMLPHMIT00002587

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On March 28, 2019, the Partnership distributed equity to its partners in the aggregate amount of $3.7 million.

On March 28, 2019, the Partnership received a $3.7 million pay down on the outstanding Contribution Agreement.

Over the course of 2019, through the report date, HCMFA issued promissory notes to the Partnership in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%.

The Partnership has performed an evaluation of subsequent events through June 3, 2019, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

003413

HCMLPHMIT00002588

**Highland Capital Management, L.P.**

**(A Delaware Limited Partnership)**

**As of And Year Ended December 31, 2018**

**Supplemental Information**

003414

HCMLPHMIT00002589

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Balance Sheet**
**December 31, 2018**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 2,567 | $ 2,467 | $ - | $ 5,034 |
| Investments at fair value (cost $922,027) | 161,939 | 683,247 | - | 845,186 |
| Equity method investees | 121,936 | - | (121,936) | - |
| Management and incentive fees receivable | 2,242 | 158 | (7) | 2,393 |
| Due from brokers | - | 598 | - | 598 |
| Other assets | 8,421 | 5,660 | (4,826) | 9,255 |
| Notes and other amounts due from affiliates | 176,963 | - | (3,565) | 173,398 |
| Intangible assets | - | 3,022 | - | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | 4,538 | 43 | - | 4,581 |
| **Total assets** | $ 478,606 | $ 695,195 | $ (130,334) | $ 1,043,467 |
| | | | | |
| **Liabilities and partners' capital** | | | | |
| | | | | |
| **Liabilities** | | | | |
| | | | | |
| Accounts payable | $ 4,838 | $ 145 | $ - | $ 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | - | 32,357 | - | 32,357 |
| Withdrawals payable | - | 57,009 | - | 57,009 |
| Due to affiliates | 4,542 | - | (4,542) | - |
| Due to brokers | 31,194 | 86,108 | (742) | 116,560 |
| Due to brokers for securities purchased, not yet settled | 1,640 | - | - | 1,640 |
| Accrued and other liabilities | 35,574 | 4,276 | 396 | 40,246 |
| Notes payable | 16,722 | 42,540 | (3,510) | 55,752 |
| Investment liabilities | 12,135 | 33,957 | - | 46,092 |
| **Total liabilities** | 106,645 | 256,392 | (8,398) | 354,639 |
| | | | | |
| Non-controlling interest | - | 316,867 | - | 316,867 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| **Partners' capital** | 371,961 | 121,936 | (121,936) | 371,961 |
| | | | | |
| **Total liabilities and partners' capital** | $ 478,606 | $ 695,195 | $ (130,334) | $ 1,043,467 |

003415

HCMLPHMIT00002590

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
## Supplemental Consolidating Statement of Income
### Year Ended December 31, 2018

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Management fees | $ 35,264 | $ 1,336 | $ - | $ 36,600 |
| Interest and investment income | 4,857 | 10,974 | - | 15,831 |
| Incentive fees | 17 | 53 | - | 70 |
| Shared services fees | 9,187 | - | - | 9,187 |
| Other income | 1,038 | 1,584 | - | 2,622 |
| Total revenue | 50,363 | 13,947 | - | 64,310 |
| **Expenses:** | | | | |
| Compensation and benefits | 33,670 | 805 | - | 34,475 |
| Professional fees | 14,624 | 3,055 | - | 17,679 |
| Interest expense | 1,695 | 3,975 | - | 5,670 |
| Marketing and advertising expense | 2,413 | - | - | 2,413 |
| Depreciation and amortization | 1,304 | 13 | - | 1,317 |
| Investment and research consulting | 1,082 | - | - | 1,082 |
| Bad debt expense | 7,862 | - | - | 7,862 |
| Other operating expenses | 6,786 | 3,241 | - | 10,027 |
| Total expenses | 69,436 | 11,089 | - | 80,525 |
| **Other Income/(Expense):** | | | | |
| Other income | 9,816 | 10 | - | 9,826 |
| Impairment on intangible assets | (2,830) | - | - | (2,830) |
| Total other income | 6,986 | 10 | - | 6,996 |
| Income/(loss) before investment and derivative activities | (12,087) | 2,868 | - | (9,219) |
| **Realized and unrealized gain/(loss) on investments and derivatives:** | | | | |
| Net realized gain/(loss) on investments and derivatives | 13,397 | (44,914) | - | (31,517) |
| Net change in unrealized loss on investments and derivatives | (406) | (93,349) | - | (93,755) |
| Net realized and unrealized loss on investments and derivatives | 12,991 | (138,263) | - | (125,272) |
| Net unrealized losses from equity method investees | (74,082) | - | 74,082 | - |
| Net loss | (73,178) | (135,395) | 74,082 | (134,491) |
| Net loss attributable to non-controlling interest | - | (61,313) | - | (61,313) |
| Net loss attributable to Highland Capital Management, L.P. | $ (73,178) | $ (74,082) | $ 74,082 | $ (73,178) |

42

003416
HCMLPHMIT00002591

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

Current assets:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 2,567 |
| Investments at fair value (cost $263,008*) | | 259,460 |
| Equity method investees | | 24,415 |
| Management and incentive fees receivable | | 2,242 |
| Intangible assets | | 8,421 |
| Notes and other amounts due from affiliates | | 176,963 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,177 | | 4,538 |
| **Total assets** | $ | 478,606 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,838 |
| Due to affiliate | | 4,542 |
| Due to brokers | | 31,194 |
| Due to brokers for securities purchased not yet settled | | 1,640 |
| Accrued and other liabilities | | 35,574 |
| Notes payable | | 16,722 |
| Investment liabilities | | 12,135 |
| Total liabilities | | 106,645 |
| Partners' capital | | 371,961 |
| **Total liabilities and partners' capital** | $ | 478,606 |

*Investments, at fair value includes $97.5 million of limited partnership interest ownership of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2018 consolidated financial statements of Highland Capital Management, L.P.  This information should be read in conjunction with such audited financial statements.

003417
HCMLPHMIT00002592

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---|---:|
| **Revenue:** | | |
| Management fees | $ | 35,264 |
| Incentive fees | | 17 |
| Shared services fees | | 9,187 |
| Interest and investment income | | 4,857 |
| Miscellaneous income | | 1,038 |
| Total revenue | | 50,363 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 33,670 |
| Professional fees | | 14,624 |
| Marketing and advertising expense | | 2,413 |
| Interest expense | | 1,695 |
| Depreciation and amortization | | 1,304 |
| Investment and research consulting | | 1,082 |
| Bad debt expense | | 7,862 |
| Other operating expenses | | 6,786 |
| Total expenses | | 69,436 |
| | | |
| **Other Income/(Expense):** | | |
| Other income | | 9,816 |
| Impairment on intangible assets | | (2,830) |
| Total other income | | 6,986 |
| | | |
| Loss before investment activities | | (12,087) |
| | | |
| **Realized and unrealized gains/losses on investments:** | | |
| Net realized gain on sale of investments | | 13,397 |
| Net change in unrealized loss on investments* | | (56,529) |
| Total realized and unrealized loss on investments | | (43,132) |
| | | |
| Loss from equity method investees: | | (17,959) |
| | | |
| **Net loss** | $ | (73,178) |

*Net change in unrealized gain on investments includes $56.1 million of unrealized loss from holdings of limited partnership interests of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2018 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited consolidated financial statements.

003418

HCMLPHMIT00002593

**EXHIBIT**

003419

# FOURTH AMENDED AND RESTATED

## AGREEMENT OF LIMITED PARTNERSHIP

### OF

## HIGHLAND CAPITAL MANAGEMENT, L.P.

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

<u>TABLE OF CONTENTS</u>

ARTICLE 1   GENERAL ................................................................. 1
    1.1.   Continuation ............................................................ 1
    1.2.   Name ..................................................................... 1
    1.3.   Purpose .................................................................. 1
    1.4.   Term. .................................................................... 1
    1.5.   Partnership Offices; Addresses of Partners. .............................. 1

ARTICLE 2   DEFINITIONS ............................................................. 2
    2.1.   Definitions .............................................................. 2
    2.2.   Other Definitions ....................................................... 6

ARTICLE 3   FINANCIAL MATTERS ...................................................... 6
    3.1.   Capital Contributions ................................................... 6
    3.2.   Allocations of Profits and Losses ....................................... 8
    3.3.   Allocations on Transfers ................................................ 9
    3.4.   Special Allocations ..................................................... 9
    3.5.   Curative Allocations ................................................... 10
    3.6.   Code Section 704(c) Allocations ........................................ 10
    3.7.   Capital Accounts ....................................................... 11
    3.8.   Distributive Share for Tax Purpose ..................................... 12
    3.9.   Distributions. ......................................................... 12
    3.10.   Compensation and Reimbursement of General Partner ..................... 14
    3.11.   Books, Records, Accounting, and Reports .............................. 14
    3.12.   Tax Matters .......................................................... 14

ARTICLE 4   RIGHTS AND OBLIGATIONS OF PARTNERS .................................... 15
    4.1.   Rights and Obligations of the General Partner .......................... 15
    4.2.   Rights and Obligations of Limited Partners ............................. 19
    4.3.   Transfer of Partnership Interests ...................................... 19
    4.4.   Issuances of Partnership Interests to New and Existing Partners ........ 21
    4.5.   Withdrawal of General Partner .......................................... 21
    4.6.   Admission of Substitute Limited Partners and Successor General Partner . 21

ARTICLE 5   DISSOLUTION AND WINDING UP ............................................. 22
    5.1.   Dissolution ............................................................ 22
    5.2.   Continuation of the Partnership ........................................ 23
    5.3.   Liquidation ............................................................ 23
    5.4.   Distribution in Kind ................................................... 24
    5.5.   Cancellation of Certificate of Limited Partnership ..................... 24
    5.6.   Return of Capital ...................................................... 24
    5.7.   Waiver of Partition. ................................................... 24

ARTICLE 6   GENERAL PROVISIONS .................................................... 24
    6.1.   Amendments to Agreement ................................................ 24

i

003421

HCMLPHMIT00002642

| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

003422

HCMLPHMIT00002643

# FOURTH AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in <u>Article 2</u>.

## ARTICLE 1

## GENERAL

**1.1.    Continuation.** Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act. Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.** The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P. The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.** The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act. Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.** The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners.**

(a)    <u>Partnership Offices.</u> The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate. The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate. The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    <u>Addresses of Partners.</u> The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201. The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership. Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

003423
HCMLPHMIT00002644

## ARTICLE 2

## DEFINITIONS

2.1.    **Definitions.** The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

003424

HCMLPHMIT00002645

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in Section 3.1(c)(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.1(c).

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in Section 3.11(b).

003425

HCMLPHMIT00002646

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

003426

HCMLPHMIT00002647

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

5

003427

HCMLPHMIT00002648

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims).  The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2.    **Other Definitions**.  All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

### ARTICLE 3

### FINANCIAL MATTERS

3.1.    **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

HCMLPHMIT00002649

(i)    The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)    Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)    Consequences to Defaulting Partners. In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)    Default Loans. If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***"). A Default Loan shall be deemed advanced on the date actually advanced. Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full. The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion. If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid. Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner. Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner. The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan. In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges). If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement. The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest. Such appointment and authorization are coupled with an interest and shall be irrevocable. The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

HCMLPHMIT00002650

(ii)    <u>Reduction of Percentage Interest</u>. If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.**     **Allocations of Profits and Losses.**

(a)    <u>Allocations of Profits</u>. Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)    <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(ii)    <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(iii)    <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

(b)    <u>Allocations of Losses</u>. Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

(i)    <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

(ii)    <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)    <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

8

003430
HCMLPHMIT00002651

(c)    Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

3.3.    **Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

3.4.    **Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)    Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)    Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)    Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)    Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

HCMLPHMIT00002652

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

(e)     Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)     Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)     Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)     Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

3.5.     Curative Allocations.  The "*Basic Regulatory Allocations*" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

3.6.     Code Section 704(c) Allocations.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property. Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

10

003432
HCMLPHMIT00002653

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

3.7.    **Capital Accounts**.

(a)    <u>Maintenance of Capital Accounts</u>.  The Partnership shall establish and maintain a separate capital account *("Capital Account")* for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    <u>Negative Capital Accounts</u>.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    <u>No Withdrawal</u>.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e)    <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    <u>Revaluations</u>.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

003433

HCMLPHMIT00002654

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions.**

(a)    General.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited.  Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    Priority Distributions.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("*Priority Distributions*") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

HCMLPHMIT00002655

(iii)     No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)     No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)     Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "*Tax Distribution*").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)     Payments Not Deemed Distributions.     Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)     Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner. Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled. Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)     Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)     Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

003435

HCMLPHMIT00002656

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

### 3.10. Compensation and Reimbursement of General Partner.

(a)    Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)    Reimbursement for Expenses.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

### 3.11. Books, Records, Accounting, and Reports.

(a)    Records and Accounting.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law.  Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)    Fiscal Year.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)    Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)    Distribution Reporting to Class B Limited Partner and Class C Limited Partner.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

### 3.12. Tax Matters.

(a)    Tax Returns.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)     Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)     Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)     Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.     Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)     Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hypothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)    Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)    Reliance by Third Parties.  Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)    Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

HCMLPHMIT00002659

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)     Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

(i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)     The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)     Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)     Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)     Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

HCMLPHMIT00002660

the "**GP Party**"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act.  Notwithstanding anything to the contrary in this <u>Section 4.1(h)</u> or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this <u>Section 4.1(h)</u> unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment.  In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

     (i)    <u>Liability of General Partner.</u>

       (i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

       (ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

     (j)    <u>Reliance by General Partner.</u>

       (i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

       (ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

     (k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership.  No officer need be a Partner.  Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them.  The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer.  Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

18

003440

HCMLPHMIT00002661

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

    **4.2.**    **Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

    (a)    <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

    (b)    <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

    (c)    <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

    (d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

    (e)    <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

    **4.3.**    **Transfer of Partnership Interests**.

    (a)    <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

<div align="center">19</div>

HCMLPHMIT00002662

(b)    <u>Transfers by General Partner</u>.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this <u>Section 4.3(b)</u> to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under <u>Section 4.5(a)</u>, <u>Section 5.1(b)</u>, or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to <u>Section 5.2</u>.

(c)    <u>Transfers by Limited Partners</u>.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    <u>Distributions and Allocations in Respect of Transferred Partnership Interests</u>.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of <u>Article 4</u> and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under <u>Section 3.4</u>.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; ***provided, however,*** if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 4.3(d)</u>, whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    <u>Forfeiture of Partnership Interests Pursuant to the Contribution Note</u>.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this <u>Section 4.3(e)</u> over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    <u>Transfers of Partnership Interests Pursuant to the Purchase Notes</u>.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

003442
HCMLPHMIT00002663

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4. Issuances of Partnership Interests to New and Existing Partners.

(a)     Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)     Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5. Withdrawal of General Partner

(a)     Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "**Departing Partner**") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)     Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6. Admission of Substitute Limited Partners and Successor General Partner.

(a)     Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "**Substitute Limited Partner**"),

21

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as <u>Exhibit B</u> (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     <u>Admission of Successor General Partner</u>.  A successor General Partner selected pursuant to <u>Section 5.2</u> or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to <u>Section 4.3(b)</u> shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     <u>Action by General Partner</u>.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of <u>Exhibit A</u> and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.     Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to <u>Section 4.3(b)</u>);

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this <u>Section 5.1</u>, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

003444


HCMLPHMIT00002665

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership.**  Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation.**  Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest.  The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

003445
HCMLPHMIT00002666

(a)    To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)    To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)    To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)    To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

<div align="center">

**ARTICLE 6**

**GENERAL PROVISIONS**

</div>

**6.1.    Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

<div align="center">24</div>

003446

HCMLPHMIT00002667

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

6.2.  **Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

6.3.  **Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement. All Exhibits hereto are incorporated herein by reference.

6.4.  **Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

6.5.  **Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

6.6.  **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

6.7.  **Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

6.8.  **Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

6.9.  **Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

6.10.  **Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

6.11.  **Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

6.12.  **Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

003447
HCMLPHMIT00002668

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

6.13.   **General Partner Discretion.**   Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

6.14.   **Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.   The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.   A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.   The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.   Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.   The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.   Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.   In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.   All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.   Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.   The duty to arbitrate described above shall survive the termination of this Agreement.   Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.   All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

26

003448

HCMLPHMIT00002669

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

003449

HCMLPHMIT00002670

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**
_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

003450
HCMLPHMIT00002671

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

003451

HCMLPHMIT00002672

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:      President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

003452

HCMLPHMIT00002673

## EXHIBIT A

| CLASS A PARTNERS | Percentage Interest | |
| --- | --- | --- |
| | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

003453

HCMLPHMIT00002674

**EXHIBIT B**

**ADDENDUM
TO THE
FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____ desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**003454**

HCMLPHMIT00002675

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Title: _____


NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

003455

HCMLPHMIT00002676

**EXHIBIT**

003456

| Form **1065** | | **U.S. Return of Partnership Income** | | | | OMB No. 1545-0123 |
|---|---|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | For calendar year 2018, or tax year beginning _____, 2018, ending _____, 20 ____ ▶ Go to *www.irs.gov/Form1065* for instructions and the latest information. | | | | **2018** |

| **A** Principal business activity | Name of partnership | | | **D** Employer identification number |
|---|---|---|---|---|
| INVESTMENT MANAGEMENT | HIGHLAND CAPITAL MANAGEMENT, LP | | | 75-2716725 |
| **B** Principal product or service | Type or Print | Number, street, and room or suite no. If a P.O. box, see instructions. | | **E** Date business started |
| INVESTMENT SERVICES | | 300 CRESCENT COURT, SUITE 700 | | 07/07/1997 |
| **C** Business code number | | City or town, state or province, country, and ZIP or foreign postal code | | **F** Total assets (see instructions) |
| 523900 | | DALLAS, TX 75201 | | $ 1,043,466,149. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☒ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ 6

**J** Check if Schedules C and M-3 are attached. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**Caution:** Include only trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | | |
|---|---|---|---|---|---|
| **Income** | **1a** Gross receipts or sales. . . . . . . . . . . . . . . . . . . . . . | **1a** | 45,840,305. | | |
| | **b** Returns and allowances . . . . . . . . . . . . . . . . . . | **1b** | | | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . | | | **1c** | 45,840,305. |
| | **2** Cost of goods sold (attach Form 1125-A). . . . . . . . . . . . . . . . . . . . . . . | | | **2** | |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . . . | | | **3** | 45,840,305. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) STMT. 1 | | | **4** | -17,273,319. |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040)). . . . . . . . . . . . . . . . | | | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . . | | | **6** | |
| | **7** Other income (loss) (attach statement) . . . . . . . . . . . . SEE STATEMENT 1 . | | | **7** | 1,286,935. |
| | **8** Total income (loss). Combine lines 3 through 7 . . . . . . . . . . . . . . . . . . . . | | | **8** | 29,853,921. |
| **Deductions** (see instructions for limitations) | **9** Salaries and wages (other than to partners) (less employment credits) . . . . . . . | | | **9** | 33,449,969. |
| | **10** Guaranteed payments to partners. . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **10** | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **11** | 26,410. |
| | **12** Bad debts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **12** | 6,583,982. |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **13** | 1,615,192. |
| | **14** Taxes and licenses . . . . . . . . . . . . . . . . . . . . SEE STATEMENT 1 . | | | **14** | 1,918,825. |
| | **15** Interest (see instructions) . . . . . . . . . . . . . . . . . SEE STATEMENT 1 . | | | **15** | 1,674,962. |
| | **16a** Depreciation (if required, attach Form 4562). . . . . . . . | **16a** | 539,809. | | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | | **16c** | 539,809. |
| | **17** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . . . . . . | | | **17** | |
| | **18** Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **18** | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **19** | 1,890,053. |
| | **20** Other deductions (attach statement) . . . . . . . . . . . . . SEE STATEMENT 1 . | | | **20** | 23,266,179. |
| | **21** Total deductions. Add the amounts shown in the far right column for lines 9 through 20 . . . | | | **21** | 70,965,381. |
| | **22** Ordinary business income (loss). Subtract line 21 from line 8 . . . . . . . . . . . . . | | | **22** | -41,111,460. |
| **Tax and Payment** | **23** Interest due under the look-back method - completed long-term contracts (attach Form 8697). | | | **23** | |
| | **24** Interest due under the look-back method - income forecast method (attach Form 8866) . . . . | | | **24** | |
| | **25** BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . . . . . . . | | | **25** | |
| | **26** Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **26** | |
| | **27** Total balance due. Add lines 23 through 27 . . . . . . . . . . . . . . . . . . . . . . | | | **27** | |
| | **28** Payment (see instructions). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **28** | |
| | **29** Amount owed. If line 28 is smaller than line 27, enter amount owed. . . . . . . . . . | | | **29** | |
| | **30** Overpayment. If line 28 is larger than line 27, enter overpayment . . . . . . . . . . | | | **30** | |

| Sign Here | Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge. | | May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No |
|---|---|---|---|
| | ▶ _Signature of partner or limited liability company member_ | Date ▶ 9-15-19 | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | TODD CRAWFORD | *Todd Crawford* | 09/12/2019 | | P00848788 |
| | Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86-1065772 | |
| | Firm's address ▶ 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591 | | | Phone no. 713-982-2000 | |

For Paperwork Reduction Act Notice, see separate instructions.  Form **1065** (2018)

JSA 8P1010 2.000  1128CM  1216  V18-6.3F

003457

HCMLPHMIT00001332

Form **1065**
Department of the Treasury
Internal Revenue Service

# U.S. Return of Partnership Income

For calendar year 2018, or tax year beginning _____, 2018, ending _____, 20 ___.
▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2018**

| | | |
|---|---|---|
| **A** Principal business activity<br>INVESTMENT MANAGEMENT | Name of partnership<br>HIGHLAND CAPITAL MANAGEMENT, LP | **D** Employer identification number<br>75-2716725 |
| **B** Principal product or service<br>INVESTMENT SERVICES | **Type or Print** Number, street, and room or suite no. If a P.O. box, see instructions.<br>300 CRESCENT COURT, SUITE 700 | **E** Date business started<br>07/07/1997 |
| **C** Business code number<br>523900 | City or town, state or province, country, and ZIP or foreign postal code<br>DALLAS, TX 75201 | **F** Total assets (see instructions)<br>$ 1,043,466,149. |

**G** Check applicable boxes: **(1)** ☐ Initial return  **(2)** ☐ Final return  **(3)** ☐ Name change  **(4)** ☐ Address change  **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash  **(2)** ☒ Accrual  **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ 6

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | |
|---|---|---|---:|---:|
| **Income** | **1a** Gross receipts or sales . . . . . . . . . . . . . . | **1a** | 45,840,305. | |
| | **b** Returns and allowances . . . . . . . . . . . . . | **1b** | | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . | | **1c** | 45,840,305. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . | | **2** | |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . | | **3** | 45,840,305. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) STMT. 1 | | **4** | -17,273,319. |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040)) . . . . . . . | | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | **6** | |
| | **7** Other income (loss) (attach statement) . . . . . . . . SEE STATEMENT 1 | | **7** | 1,286,935. |
| | **8** **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . | | **8** | 29,853,921. |
| **Deductions** (see instructions for limitations) | **9** Salaries and wages (other than to partners) (less employment credits) | | **9** | 33,449,969. |
| | **10** Guaranteed payments to partners . . . . . . . . . . . . . | | **10** | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . | | **11** | 26,410. |
| | **12** Bad debts . . . . . . . . . . . . . . . . . . . . . | | **12** | 6,583,982. |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . . | | **13** | 1,615,192. |
| | **14** Taxes and licenses . . . . . . . . . . . . SEE STATEMENT 1 | | **14** | 1,918,825. |
| | **15** Interest (see instructions) . . . . . . . . . . SEE STATEMENT 1 | | **15** | 1,674,962. |
| | **16a** Depreciation (if required, attach Form 4562) . . . . . . . | **16a** | 539,809. | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | | **16c** | 539,809. |
| | **17** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . | | **17** | |
| | **18** Retirement plans, etc. . . . . . . . . . . . . . . . . | | **18** | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . | | **19** | 1,890,053. |
| | **20** Other deductions (attach statement) . . . . . . . SEE STATEMENT 1 | | **20** | 23,266,179. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | **21** | 70,965,381. |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 . . . | | **22** | -41,111,460. |
| **Tax and Payment** | **23** Interest due under the look-back method - completed long-term contracts (attach Form 8697) . | | **23** | |
| | **24** Interest due under the look-back method - income forecast method (attach Form 8866) . . | | **24** | |
| | **25** BBA AAR imputed underpayment (see instructions) . . . . . . . | | **25** | |
| | **26** Other taxes (see instructions) . . . . . . . . . . . . . | | **26** | |
| | **27** **Total balance due.** Add lines 23 through 27 . . . . . . . . . | | **27** | |
| | **28** Payment (see instructions) . . . . . . . . . . . . . . | | **28** | |
| | **29** **Amount owed.** If line 28 is smaller than line 27, enter amount owed . | | **29** | |
| | **30** **Overpayment.** If line 28 is larger than line 27, enter overpayment . | | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____   ▶ _____
Signature of partner or limited liability company member   Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

| **Paid Preparer Use Only** | Print/Type preparer's name<br>TODD CRAWFORD | Preparer's signature<br>*Todd Crawford* | Date<br>09/12/2019 | Check ☐ if self-employed | PTIN<br>P00848788 |
|---|---|---|---|---|---|
| | Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86-1065772 | |
| | Firm's address ▶ 1111 BAGBY STREET, SUITE 4500<br>HOUSTON, TX 77002-2591 | | | Phone no.<br>713-982-2000 | |

**For Paperwork Reduction Act Notice, see separate instructions.**

JSA   8P1010 2.000

1128CM   1216

V18-6.3F

Form **1065** (2018)

003458

HCMLPHMIT00001336

Case 19-34054-sgj11   Doc 4255-115   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc Exhibit 115 Page 24 of 9   Page 931 of 1013

Case 3:25-cv-02724-L   Document 7-15   Filed 12/02/25   Page 931 of 1013   PageID 36418

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

For calendar year 2018, or tax year

beginning ___/___/ 2018    ending ___/___/___

**2018**

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

## Partner's Share of Income, Deductions, Credits, etc.

**➤ See back of form and separate instructions.**

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (103,105) | 15 | Credits |
| 2 | Net rental real estate income (loss) 10,876 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| | | A | VARIOUS |
| 4 | Guaranteed payments | B | 213,008 |
| 5 | Interest income 25,256 | C | 203,560 |
| 6a | Ordinary dividends 10,556 | G | 9,448 |
| 6b | Qualified dividends 1,549 | I | 25,111 |
| 6c | Dividend equivalents | J | 238,918 |
| 7 | Royalties 2,603 | * | SEE STMT |
| 8 | Net short-term capital gain (loss) (80,700) | 17 | Alternative minimum tax (AMT) items |
| 9a | Net long-term capital gain (loss) 68,910 | A | 7 |
| 9b | Collectibles (28%) gain (loss) | D | 5,475 |
| | | * | SEE STMT |
| 9c | Unrecaptured section 1250 gain | 18 | Tax-exempt income and nondeductible expenses |
| 10 | Net section 1231 gain (loss) 12,132 | C | 9,036 |
| 11 | Other income (loss) A 4,351 | | |
| | I 5,119 | 19 | Distributions |
| | | A | 12,637 |
| 12 | Section 179 deduction | 20 | Other information |
| 13 | Other deductions A 89 | A | 42,819 |
| | H 20,910 | B | (2,330) |
| | * SEE STMT | T | 742 |
| 14 | Self-employment earnings (loss) | * | SEE STMT |

## Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II   Information About the Partner

**E** Partner's identifying number
95-4440863

**F** Partner's name, address, city, state, and ZIP code
STRAND ADVISORS, INC
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I1** What type of entity is this partner?   S - CORPORATION

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.250795 % | 0.250795 % |
| Loss | NONE % | NONE % |
| Capital | 0.250795 % | 0.250795 % |

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 467,696 | $ 310,721 |
| Qualified nonrecourse financing | $ NONE | $ 102,634 |
| Recourse | $ 150,598,314 | $ 136,641,607 |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 1,129,023 |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ (183,519) |
| Withdrawals & distributions | $ ( 12,637 ) |
| Ending capital account | $ 932,867 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain) BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2018

P10180B265567 08/21/2019 14:26

Partner # 1

003459

HCMLPHMIT00001414

# Schedule K-1
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

**2018**

For calendar year 2018, or tax year

beginning __/__/2018 ending __/__/__

## Partner's Share of Income, Deductions, Credits, etc.
➤ See back of form and separate instructions.

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (20,015) | 15 | Credits |
| 2 | Net rental real estate income (loss) 2,111 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| | | A | VARIOUS |
| 4 | Guaranteed payments | B | 41,349 |
| 5 | Interest income 4,903 | C | 39,515 |
| 6a | Ordinary dividends 2,049 | G | 1,834 |
| 6b | Qualified dividends 301 | I | 4,875 |
| 6c | Dividend equivalents | J | 46,378 |
| 7 | Royalties 505 | * | SEE STMT |
| 8 | Net short-term capital gain (loss) (15,665) | 17 | Alternative minimum tax (AMT) items |
| 9a | Net long-term capital gain (loss) 13,377 | A | 1 |
| | | D | 1,063 |
| 9b | Collectibles (28%) gain (loss) | * | SEE STMT |
| 9c | Unrecaptured section 1250 gain | 18 | Tax-exempt income and nondeductible expenses |
| 10 | Net section 1231 gain (loss) 2,355 | C | 1,754 |
| 11 | Other income (loss) A 845 | | |
| | I 994 | 19 | Distributions |
| | | A | 2,455 |
| 12 | Section 179 deduction | 20 | Other information |
| 13 | Other deductions A 17 | A | 8,312 |
| | H 4,059 | B | (452) |
| | * SEE STMT | T | 144 |
| 14 | Self-employment earnings (loss) | * | SEE STMT |

## Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II   Information About the Partner

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
MARK OKADA
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner?   INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.048684 % | 0.048684 % |
| Loss | NONE % | NONE % |
| Capital | 0.048684 % | 0.048684 % |

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse $ | 90,788 | 60,316 |
| Qualified nonrecourse financing $ | NONE | 19,923 |
| Recourse $ | 12,000,000 | 12,000,000 |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account $ | 219,163 |
| Capital contributed during the year $ | |
| Current year increase (decrease) $ | (35,622) |
| Withdrawals & distributions $ | ( 2,455 ) |
| Ending capital account $ | 181,086 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain)   BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

*See attached statement for additional information.

For IRS Use Only

**For Paperwork Reduction Act Notice, see Instructions for Form 1065.**   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2018

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

☐ Final K-1      ☐ Amended K-1      OMB No. 1545-0123

## 2018

For calendar year 2018, or tax year

beginning __/__/2018  ending __/__/__

## Partner's Share of Income, Deductions, Credits, etc.

**➤ See back of form and separate instructions.**

### Part I  Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II  Information About the Partner

**E** Partner's identifying number
74-6494106

**F** Partner's name, address, city, state, and ZIP code
THE MARK AND PAMELA OKADA
FAMLY TRUST, EXEMPT TRUST #1
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner?  TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 0.009777 % | 0.009777 % |
| Loss | NONE % | NONE % |
| Capital | 0.009777 % | 0.009777 % |

**K** Partner's share of liabilities:

|  | Beginning | Ending |
|---|---|---|
| Nonrecourse $ | 18,232 | $ 12,113 |
| Qualified nonrecourse financing $ | NONE | $ 4,001 |
| Recourse $ | NONE | $ NONE |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account $ | 44,012 |
| Capital contributed during the year $ | |
| Current year increase (decrease) $ | (7,153) |
| Withdrawals & distributions $( | 494) |
| Ending capital account $ | 36,365 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain) BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

### Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) (4,019) | 15 | Credits | |
| 2 | Net rental real estate income (loss) 424 | 16 | Foreign transactions | |
| 3 | Other net rental income (loss) | A | | VARIOUS |
| 4 | Guaranteed payments | B | | 8,304 |
| 5 | Interest income 985 | C | | 7,936 |
| 6a | Ordinary dividends 412 | G | | 368 |
| 6b | Qualified dividends 60 | I | | 979 |
| 6c | Dividend equivalents | J | | 9,314 |
| 7 | Royalties 101 | * | | SEE STMT |
| 8 | Net short-term capital gain (loss) (3,146) | 17 | Alternative minimum tax (AMT) items | |
| 9a | Net long-term capital gain (loss) 2,686 | A | | |
| 9b | Collectibles (28%) gain (loss) | D | | 213 |
| 9c | Unrecaptured section 1250 gain | * | | SEE STMT |
| 10 | Net section 1231 gain (loss) 473 | 18 | Tax-exempt income and nondeductible expenses | |
| 11 | Other income (loss) A 170 | C | | 352 |
| | I 200 | | | |
| 12 | Section 179 deduction | 19 | Distributions | |
| | | A | | 494 |
| 13 | Other deductions A 3 | 20 | Other information | |
| | H 815 | A | | 1,670 |
| | * SEE STMT | B | | (91) |
| 14 | Self-employment earnings (loss) | T | | 29 |
| | | * | | SEE STMT |

*See attached statement for additional information.

**For IRS Use Only**

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2018

P10180B265567 08/21/2019 14:26

Partner # 3

003461

HCMLPHMIT00001424

☐ Final K-1          ☐ Amended K-1                OMB No. 1545-0123

| **Schedule K-1**<br>**(Form 1065)**<br>Department of the Treasury<br>Internal Revenue Service | | 20**18** | **Part III** | **Partner's Share of Current Year Income,<br>Deductions, Credits, and Other Items** |
|---|---|---|---|---|

For calendar year 2018, or tax year

beginning ___ / ___ / 2018  ending ___ / ___ / ___

## Partner's Share of Income, Deductions, Credits, etc. ► See back of form and separate instructions.

| | | |
|---|---|---|
| **1** Ordinary business income (loss)<br>(1,723) | **15** Credits | |
| **2** Net rental real estate income (loss)<br>182 | | |
| **3** Other net rental income (loss) | **16** Foreign transactions | |
| **4** Guaranteed payments | **A** VARIOUS | |
| **5** Interest income<br>422 | **B** 3,559 | |
| **6a** Ordinary dividends<br>176 | **C** 3,401 | |
| **6b** Qualified dividends<br>26 | **G** 158 | |
| **6c** Dividend equivalents | **I** 420 | |
| **7** Royalties<br>43 | **J** 3,992 | |
| **8** Net short-term capital gain (loss)<br>(1,348) | ***** SEE STMT | |
| **9a** Net long-term capital gain (loss)<br>1,151 | **17** Alternative minimum tax (AMT) items | |
| **9b** Collectibles (28%) gain (loss) | **A** | |
| **9c** Unrecaptured section 1250 gain | **D** 91 | |
| **10** Net section 1231 gain (loss)<br>203 | ***** SEE STMT | |
| **11** Other income (loss)<br>**A** 73<br>**I** 85 | **18** Tax-exempt income and<br>nondeductible expenses<br>**C** 151 | |
| **12** Section 179 deduction | **19** Distributions<br>**A** 212 | |
| **13** Other deductions<br>**A** 1<br>**H** 349<br>***** SEE STMT | **20** Other information<br>**A** 715<br>**B** (39)<br>**T** 12 | |
| **14** Self-employment earnings (loss) | ***** SEE STMT | |

### Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II   Information About the Partner

**E** Partner's identifying number
68-6203494

**F** Partner's name, address, city, state, and ZIP code
THE MARK AND PAMELA OKADA
FAMLY TRUST, EXEMPT TRUST #2
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner?  TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.004190 % | 0.004190 % |
| Loss | NONE % | NONE % |
| Capital | 0.004190 % | 0.004190 % |

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 7,814 | $ 5,191 |
| Qualified nonrecourse financing | $ NONE | $ 1,715 |
| Recourse | $ NONE | $ NONE |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 18,862 |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ (3,065) |
| Withdrawals & distributions | $ ( 212 ) |
| Ending capital account | $ 15,585 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain)  BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

*See attached statement for additional information.

*For IRS Use Only*

**For Paperwork Reduction Act Notice, see Instructions for Form 1065.**   www.irs.gov/Form1065   Cat. No. 11394R   **Schedule K-1 (Form 1065) 2018**

P10180B265567 08/21/2019 14:26

Partner # 4

003462

HCMLPHMIT00001429

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

For calendar year 2018, or tax year

beginning _____ / _____ / 2018   ending _____ / _____ / _____

**2018**

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

### Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (76,695) | 15 | Credits |
| 2 | Net rental real estate income (loss) 8,090 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| | | A | VARIOUS |
| 4 | Guaranteed payments | B | 158,446 |
| 5 | Interest income 18,786 | C | 151,418 |
| 6a | Ordinary dividends 7,852 | G | 7,028 |
| 6b | Qualified dividends 1,153 | I | 18,679 |
| 6c | Dividend equivalents | J | 177,719 |
| 7 | Royalties 1,936 | * | SEE STMT |
| 8 | Net short-term capital gain (loss) (60,028) | 17 | Alternative minimum tax (AMT) items |
| 9a | Net long-term capital gain (loss) 51,259 | A | 5 |
| | | D | 4,073 |
| 9b | Collectibles (28%) gain (loss) | * | SEE STMT |
| 9c | Unrecaptured section 1250 gain | 18 | Tax-exempt income and nondeductible expenses |
| 10 | Net section 1231 gain (loss) 9,024 | C | 6,722 |
| 11 | Other income (loss) A 3,236 | | |
| | I 3,808 | 19 | Distributions |
| | | A | 9,406 |
| 12 | Section 179 deduction | 20 | Other information |
| 13 | Other deductions A 66 | A | 31,850 |
| | H 15,554 | B | (1,733) |
| | * SEE STMT | T | 552 |
| 14 | Self-employment earnings (loss) | * | SEE STMT |

**Partner's Share of Income, Deductions, Credits, etc.**    ➤ See back of form and separate instructions.

### Part I  Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II  Information About the Partner

**E** Partner's identifying number
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

**F** Partner's name, address, city, state, and ZIP code
THE DUGABOY INVESTMENT TRUST
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner?   TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.186554 % | 0.186554 % |
| Loss | NONE % | NONE % |
| Capital | 0.186554 % | 0.186554 % |

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 347,896 | $ 231,130 |
| Qualified nonrecourse financing | $ NONE | $ 76,344 |
| Recourse | $ 35,000,000 | $ 35,000,000 |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ 839,824 |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ (136,505) |
| Withdrawals & distributions | $ ( 9,406) |
| Ending capital account | $ 693,914 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain)  BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

*See attached statement for additional information.

For IRS Use Only

**For Paperwork Reduction Act Notice, see Instructions for Form 1065.**   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2018



HCMLPHMIT00001434

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

For calendar year 2018, or tax year

beginning ___ / ___ / 2018 ending ___ / ___ / ___

**20**18

| | Final K-1 | | Amended K-1 | OMB No. 1545-0123 |

## Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

**Partner's Share of Income, Deductions, Credits, etc.**     ► See back of form and separate instructions.

### Part I — Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return
OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II — Information About the Partner

**E** Partner's identifying number
47-5145562

**F** Partner's name, address, city, state, and ZIP code
HUNTER MOUNTAIN INVESTMENT TRUST
F/B/O BEACON MOUNTAIN, LLC
87 RAILROAD PLACE, SUITE 403
SARATOGA SPRINGS, NY 12866

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H** ☒ Domestic partner   ☐ Foreign partner

**I1** What type of entity is this partner? TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 99.500000 % | 99.500000 % |
| Loss | NONE % | NONE % |
| Capital | 99.500000 % | 99.500000 % |

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse . . $ | 185,553,010 | $ 123,274,967 |
| Qualified nonrecourse financing . . $ | NONE | $ 40,718,835 |
| Recourse . . $ | NONE | $ NONE |

**L** Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account . . . . $ | 447,926,317 |
| Capital contributed during the year . $ | |
| Current year increase (decrease) . . $ | (72,807,286) |
| Withdrawals & distributions . . . $( | 5,015,296) |
| Ending capital account . . . . . $ | 370,103,735 |

☐ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☒ Other (explain) BOOK

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No
If "Yes," attach statement (see instructions)

| | | |
|---|---|---|
| 1 | Ordinary business income (loss) | (40,905,903) |
| 2 | Net rental real estate income (loss) | 4,314,785 |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | 10,019,919 |
| 6a | Ordinary dividends | 4,187,952 |
| 6b | Qualified dividends | 614,699 |
| 6c | Dividend equivalents | |
| 7 | Royalties | 1,032,631 |
| 8 | Net short-term capital gain (loss) | (32,016,601) |
| 9a | Net long-term capital gain (loss) | 27,339,116 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | 4,813,197 |
| 11 | Other income (loss) | |
| | A | 1,726,088 |
| | I | 2,030,832 |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| | A | 35,183 |
| | H | 8,295,974 |
| | * | SEE STMT |
| 14 | Self-employment earnings (loss) | |

| | | |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions | |
| | A | VARIOUS |
| | B | 84,508,257 |
| | C | 80,759,899 |
| | G | 3,748,358 |
| | I | 9,962,559 |
| | J | 94,787,981 |
| | * | SEE STMT |
| 17 | Alternative minimum tax (AMT) items | |
| | A | 2,588 |
| | D | 2,172,179 |
| | * | SEE STMT |
| 18 | Tax-exempt income and nondeductible expenses | |
| | C | 3,585,104 |
| 19 | Distributions | |
| | A | 5,015,296 |
| 20 | Other information | |
| | A | 16,987,726 |
| | B | (924,462) |
| | T | 294,297 |
| | * | SEE STMT |

*See attached statement for additional information.

**For IRS Use Only**

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2018

**EXHIBIT**

003465

Form **1065**

**U.S. Return of Partnership Income**

OMB No. 1545-0123

For calendar year 2019, or tax year beginning _____, 2019, ending _____, 20_____.

▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

**2019**

| | | |
|---|---|---|
| **A** Principal business activity | Name of partnership | **D** Employer identification number |
| INVESTMENT MANAGEMENT | HIGHLAND CAPITAL MANAGEMENT, LP | 75-2716725 |
| **B** Principal product or service | Number, street, and room or suite no. If a P.O. box, see instructions. | **E** Date business started |
| INVESTMENT SERVICES | 300 CRESCENT COURT, SUITE 700 | 07/07/1997 |
| **C** Business code number | City or town, state or province, country, and ZIP or foreign postal code | **F** Total assets (see instructions) |
| 523900 | DALLAS, TX 75201 | $ 1,015,968,222. |

Type or Print

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 6

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**K** Check if Partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | | |
|---|---|---|---|---:|---:|
| **Income** | **1a** | Gross receipts or sales . . . . . . . . . . . . . . . . . . . | **1a** | 32,009,311. | |
| | **b** | Returns and allowances . . . . . . . . . . . . . . . . . . | **1b** | | |
| | **c** | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . . . | **1c** | | 32,009,311. |
| | **2** | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | | |
| | **3** | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | | 32,009,311. |
| | **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) STMT. 1 | **4** | | -3,799,517. |
| | **5** | Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) . . . . . . . . . . . . . | **5** | | |
| | **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . . . . . . | **6** | | |
| | **7** | Other income (loss) (attach statement) . . . . . . . . . . . SEE. STATEMENT. 1. | **7** | | -2,886,805. |
| | **8** | Total income (loss). Combine lines 3 through 7 . . . . . . . . . . . . . . . . . . . . . . | **8** | | 25,322,989. |
| **Deductions (see instructions for limitations)** | **9** | Salaries and wages (other than to partners) (less employment credits) . . . . . . . . . . . . | **9** | | 28,941,198. |
| | **10** | Guaranteed payments to partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | | |
| | **11** | Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | | 18,389. |
| | **12** | Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | | 5,139,915. |
| | **13** | Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | | 1,377,540. |
| | **14** | Taxes and licenses . . . . . . . . . . . . . . . . . . . . SEE. STATEMENT. 1. | **14** | | 1,761,610. |
| | **15** | Interest (see instructions) . . . . . . . . . . . . . . . . . SEE. STATEMENT. 1. | **15** | | 1,910,445. |
| | **16a** | Depreciation (if required, attach Form 4562) . . . . . . . . | **16a** | 423,258. | |
| | **b** | Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | | |
| | | | **16c** | | 423,258. |
| | **17** | Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . . . . . . . | **17** | | |
| | **18** | Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **18** | | |
| | **19** | Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **19** | | 1,808,577. |
| | **20** | Other deductions (attach statement) . . . . . . . . . . . . SEE. STATEMENT. 1. | **20** | | 15,611,953. |
| | **21** | Total deductions. Add the amounts shown in the far right column for lines 9 through 20 . . . | **21** | | 56,992,885. |
| | **22** | Ordinary business income (loss). Subtract line 21 from line 8 . . . . . . . . . . . . . . . | **22** | | -31,669,896. |
| **Tax and Payment** | **23** | Interest due under the look-back method - completed long-term contracts (attach Form 8697) . | **23** | | |
| | **24** | Interest due under the look-back method - income forecast method (attach Form 8866) . . . . | **24** | | |
| | **25** | BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . . . . . . . . | **25** | | |
| | **26** | Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **26** | | |
| | **27** | Total balance due. Add lines 23 through 26 . . . . . . . . . . . . . . . . . . . . . . . | **27** | | |
| | **28** | Payment (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **28** | | |
| | **29** | Amount owed. If line 28 is smaller than line 27, enter amount owed . . . . . . . . . . . . | **29** | | |
| | **30** | Overpayment. If line 28 is larger than line 27, enter overpayment . . . . . . . . . . . . . | **30** | | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _[signature]_

Signature of partner or limited liability company member

▶ 9/10/20

Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

| | | | | | |
|---|---|---|---|---|---|
| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
| | TODD CRAWFORD | _Todd Crawford_ | 9/6/2020 | | P00848788 |
| | Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86-1065772 | |
| | Firm's address ▶ 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591 | | | Phone no. 713-982-2000 | |

For Paperwork Reduction Act Notice, see separate instructions.

Form **1065** (2019)

JSA
9P1010 1.000
1128CM   1216

V19-6.4F

003466

HCMLPHMIT00001762

| Form **1065** | | **U.S. Return of Partnership Income** | | | | | OMB No. 1545-0123 |
|---|---|---|---|---|---|---|---|
| Department of the Treasury<br>Internal Revenue Service | | For calendar year 2019, or tax year beginning _____, 2019, ending _____, 20 _____<br>▶ Go to *www.irs.gov/Form1065* for instructions and the latest information. | | | | | **20** **19** |

| **A** Principal business activity<br>INVESTMENT MANAGEMENT | | Name of partnership<br>HIGHLAND CAPITAL MANAGEMENT, LP | | **D** Employer identification number<br>75-2716725 |
|---|---|---|---|---|
| **B** Principal product or service<br>INVESTMENT SERVICES | Type or Print | Number, street, and room or suite no. If a P.O. box, see instructions.<br>300 CRESCENT COURT, SUITE 700 | | **E** Date business started<br>07/07/1997 |
| **C** Business code number<br>523900 | | City or town, state or province, country, and ZIP or foreign postal code<br>DALLAS, TX 75201 | | **F** Total assets (see instructions)<br>$ 1,015,968,222. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☒ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☒ Accrual **(3)** ☐ Other (specify) ▶

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 6

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**K** Check if Partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | **1a** Gross receipts or sales . . . . . . . . . . . . . . . . . . | **1a** | 32,009,311. | |
| | **b** Returns and allowances . . . . . . . . . . . . . . . . . | **1b** | | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . | | **1c** | 32,009,311. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . | | **2** | |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . | | **3** | 32,009,311. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) STMT 1 | | **4** | −3,799,517. |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) . . . . . . . | | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . | | **6** | |
| | **7** Other income (loss) (attach statement) . . . . . . . . SEE STATEMENT 1 . . | | **7** | −2,886,805. |
| | **8** **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . . . | | **8** | 25,322,989. |
| **Deductions** (see instructions for limitations) | **9** Salaries and wages (other than to partners) (less employment credits) . . . . . . | | **9** | 28,941,198. |
| | **10** Guaranteed payments to partners . . . . . . . . . . . . . . . . | | **10** | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . . . . | | **11** | 18,389. |
| | **12** Bad debts . . . . . . . . . . . . . . . . . . . . . . . | | **12** | 5,139,915. |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . . . . | | **13** | 1,377,540. |
| | **14** Taxes and licenses . . . . . . . . . . . . . SEE STATEMENT 1 . . | | **14** | 1,761,610. |
| | **15** Interest (see instructions) . . . . . . . . . . SEE STATEMENT 1 . . | | **15** | 1,910,445. |
| | **16a** Depreciation (if required, attach Form 4562) . . . . . . . | **16a** | 423,258. | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | | **16c** | 423,258. |
| | **17** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . | | **17** | |
| | **18** Retirement plans, etc. . . . . . . . . . . . . . . . . . . . | | **18** | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . . . . | | **19** | 1,808,577. |
| | **20** Other deductions (attach statement) . . . . . . . SEE STATEMENT 1 . . | | **20** | 15,611,953. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | **21** | 56,992,885. |
| | **22** Ordinary business income (loss). Subtract line 21 from line 8 . . . . . . . . | | **22** | −31,669,896. |
| **Tax and Payment** | **23** Interest due under the look-back method - completed long-term contracts (attach Form 8697) . | | **23** | |
| | **24** Interest due under the look-back method - income forecast method (attach Form 8866) . . | | **24** | |
| | **25** BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . | | **25** | |
| | **26** Other taxes (see instructions) . . . . . . . . . . . . . . . . . | | **26** | |
| | **27** **Total balance due.** Add lines 23 through 26 . . . . . . . . . . . . | | **27** | |
| | **28** Payment (see instructions) . . . . . . . . . . . . . . . . . . | | **28** | |
| | **29** **Amount owed.** If line 28 is smaller than line 27, enter amount owed . . . . . . | | **29** | |
| | **30** **Overpayment.** If line 28 is larger than line 27, enter overpayment . . . . . . . | | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____<br>Signature of partner or limited liability company member ▶ _____ Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

| **Paid Preparer Use Only** | Print/Type preparer's name<br>TODD CRAWFORD | Preparer's signature<br>*Todd Crawford* | Date<br>9/6/2020 | Check ☐ if self-employed | PTIN<br>P00848788 |
|---|---|---|---|---|---|
| | Firm's name ▶ DELOITTE TAX LLP | | | Firm's EIN ▶ 86-1065772 | |
| | Firm's address ▶ 1111 BAGBY STREET, SUITE 4500<br>HOUSTON, TX 77002-2591 | | | Phone no. 713-982-2000 | |

**For Paperwork Reduction Act Notice, see separate instructions.** | JSA | 9P1010 1.000 | | Form **1065** (2019)

1128CM   1216                V19-6.4F

003467

HCMLPHMIT00001766

Case 19-34054-sgj11 Doc 4255-116 Filed 06/20/25 Entered 06/20/25 21:39:29
Desc Exhibit 116 Page 254 of 9 Page 940 of 1013 PageID 53637
Case 3:25-cv-02724-L Document 7-6 Filed 06/12/25 Page 254 of 9 Page 940 of 1013 PageID 3859

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

20**19**

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

For calendar year 2019, or tax year

beginning ___/___/ 2019    ending ___/___/___

**Partner's Share of Income, Deductions, Credits, etc.**    ▶ See back of form and separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (79,427) | 15 | Credits |
| 2 | Net rental real estate income (loss) 59,057 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| | | A | VARIOUS |
| 4a | Guaranteed payments for services | B | 271,740 |
| 4b | Guaranteed payments for capital | C | 275,214 |
| 4c | Total guaranteed payments | G | (3,473) |
| 5 | Interest income 24,413 | I | 19,783 |
| 6a | Ordinary dividends 6,149 | J | 167,808 |
| 6b | Qualified dividends 332 | * | SEE STMT |
| 6c | Dividend equivalents | 17 | Alternative minimum tax (AMT) items |
| | | A | (8) |
| 7 | Royalties 2,891 | D | 5,336 |
| 8 | Net short-term capital gain (loss) (22,160) | * | SEE STMT |
| 9a | Net long-term capital gain (loss) 53,724 | 18 | Tax-exempt income and nondeductible expenses |
| 9b | Collectibles (28%) gain (loss) | C | 14,285 |
| 9c | Unrecaptured section 1250 gain 7 | | |
| 10 | Net section 1231 gain (loss) (3,439) | 19 | Distributions |
| 11 | Other income (loss) | A | 9,351 |
| A | 38 | | |
| * | SEE STMT | 20 | Other information |
| 12 | Section 179 deduction | A | 38,729 |
| 13 | Other deductions | B | 623 |
| A | 11 | | |
| H | 14,992 | T | 717 |
| * | SEE STMT | * | SEE STMT |
| 14 | Self-employment earnings (loss) | | |

## Part I — Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II — Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
95-4440863

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
STRAND ADVISORS, INC
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H1** ☒ Domestic partner    ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner? S CORPORATION

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.250795 % | 0.250795 % |
| Loss | NONE % | NONE % |
| Capital | 0.250795 % | 0.250795 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 310,721 | $ 294,988 |
| Qualified nonrecourse financing | $ 102,634 | $ 352,799 |
| Recourse | $ 136,641,607 | $ 211,263,413 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 932,867 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (46,485) |
| Other increase (decrease) (attach explanation) | $ 95 |
| Withdrawals & distributions | $ ( 9,351 ) |
| Ending capital account | $ 877,126 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No    If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning ............ $
Ending ............ $

**21** ☐ More than one activity for at-risk purposes*
**22** ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.*

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    www.irs.gov/Form1065    Cat. No. 11394R    Schedule K-1 (Form 1065) 2019

P14409B330613 08/26/2020 18:00

Partner # 1

003468



HCMLPHMIT00001865

## Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

**20 19**

For calendar year 2019, or tax year

beginning ___/___/ 2019    ending ___/___/___

### Partner's Share of Income, Deductions, Credits, etc.    ▶ See back of form and separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (15,418) | 15 | Credits |
| 2 | Net rental real estate income (loss) 11,464 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4a | Guaranteed payments for services | A | VARIOUS |
| 4b | Guaranteed payments for capital | B | 52,750 |
| 4c | Total guaranteed payments | C | 53,424 |
| 5 | Interest income 4,739 | G | (674) |
| 6a | Ordinary dividends 1,194 | I | 3,840 |
| 6b | Qualified dividends 64 | J | 32,575 |
| 6c | Dividend equivalents | * | SEE STMT |
| 7 | Royalties 561 | 17 | Alternative minimum tax (AMT) items |
| 8 | Net short-term capital gain (loss) (4,302) | A | (2) |
| 9a | Net long-term capital gain (loss) 10,429 | D | 1,036 |
| 9b | Collectibles (28%) gain (loss) | * | SEE STMT |
| 9c | Unrecaptured section 1250 gain 1 | 18 | Tax-exempt income and nondeductible expenses |
| 10 | Net section 1231 gain (loss) (668) | C | 2,773 |
| 11 | Other income (loss) A 7 | 19 | Distributions |
| | * SEE STMT | A | 17,945 |
| 12 | Section 179 deduction | 20 | Other information |
| 13 | Other deductions A 2 | A | 7,518 |
| | H 2,910 | B | 121 |
| | * SEE STMT | T | 139 |
| 14 | Self-employment earnings (loss) | * | SEE STMT |

### Part I    Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II    Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
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

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
MARK OKADA
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner    ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN ___ Name ___

**I1** What type of entity is this partner?    INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.048684 % | 0.048684 % |
| Loss | NONE % | NONE % |
| Capital | 0.048684 % | 0.048684 % |

Check if decrease is due to sale or exchange of partnership interest . ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse . . $ | 60,316 | $ 57,262 |
| Qualified nonrecourse financing . . $ | 19,923 | $ 68,484 |
| Recourse . . $ | 12,000,000 | $ 12,000,000 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**    **Partner's Capital Account Analysis**

| | |
|---|---|
| Beginning capital account . . $ | 181,086 |
| Capital contributed during the year . $ | |
| Current year net income (loss) . . $ | (9,024) |
| Other increase (decrease) (attach explanation) $ | 16,149 |
| Withdrawals & distributions . . $ ( | 17,945 ) |
| Ending capital account . . $ | 170,265 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No    If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . $ ___
Ending . . . . $ ___

21 ☐ More than one activity for at-risk purposes*

22 ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    www.irs.gov/Form1065    Cat. No. 11394R    Schedule K-1 (Form 1065) 2019

P14409B330613 08/26/2020 18:00

Partner # 2
003469

HCMLPHMIT00001870

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning __/__/ 2019  ending __/__/__

**2019**

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

**Partner's Share of Income, Deductions, Credits, etc.**   ▶ See back of form and separate instructions.

## Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) (3,096) | 15 | Credits |
| 2 | Net rental real estate income (loss) 2,302 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4a | Guaranteed payments for services | A | VARIOUS |
| 4b | Guaranteed payments for capital | B | 10,594 |
| 4c | Total guaranteed payments | C | 10,729 |
| 5 | Interest income 952 | G | (135) |
| 6a | Ordinary dividends 240 | I | 771 |
| 6b | Qualified dividends 13 | J | 6,542 |
| 6c | Dividend equivalents | * | SEE STMT |
| 7 | Royalties 113 | 17 | Alternative minimum tax (AMT) items |
| 8 | Net short-term capital gain (loss) (864) | A | NONE |
| 9a | Net long-term capital gain (loss) 2,094 | D | 208 |
| 9b | Collectibles (28%) gain (loss) | * | SEE STMT |
| 9c | Unrecaptured section 1250 gain NONE | 18 | Tax-exempt income and nondeductible expenses |
| 10 | Net section 1231 gain (loss) (134) | C | 557 |
| 11 | Other income (loss) A 1 | 19 | Distributions |
| * | SEE STMT | A | 366 |
| 12 | Section 179 deduction | 20 | Other information |
| 13 | Other deductions A NONE | A | 1,510 |
| | H 584 | B | 24 |
| | | T | 28 |
| | * SEE STMT | * | SEE STMT |
| 14 | Self-employment earnings (loss) | | |

## Part I — Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II — Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
74-6494106

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
THE MARK AND PAMELA OKADA
FAMLY TRUST, EXEMPT TRUST #1
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner?  TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.009777 % | 0.009777 % |
| Loss | NONE % | NONE % |
| Capital | 0.009777 % | 0.009777 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 12,113 | $ 11,499 |
| Qualified nonrecourse financing | $ 4,001 | $ 13,753 |
| Recourse | $ NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 36,365 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (1,812) |
| Other increase (decrease) (attach explanation) | $ 5 |
| Withdrawals & distributions | $ ( 366 ) |
| Ending capital account | $ 34,192 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning _____ $
Ending _____ $

**21** ☐ More than one activity for at-risk purposes*
**22** ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2019

P14409B330613 08/26/2020 18:00

Partner # 3

003470

HCMLPHMIT00001875

## Schedule K-1
### (Form 1065)

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning ___/___/ 2019 ending ___/___/___

**20 19**

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

### Partner's Share of Income, Deductions,
### Credits, etc.

▶ See back of form and separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits |
| | (1,327) | | |
| 2 | Net rental real estate income (loss) | | |
| | 987 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| | | A | VARIOUS |
| 4a | Guaranteed payments for services | B | 4,540 |
| 4b | Guaranteed payments for capital | C | 4,598 |
| 4c | Total guaranteed payments | G | (58) |
| 5 | Interest income | I | 331 |
| | 408 | J | 2,804 |
| 6a | Ordinary dividends | | |
| | 103 | * | SEE STMT |
| 6b | Qualified dividends | | |
| | 6 | 17 | Alternative minimum tax (AMT) items |
| 6c | Dividend equivalents | A | NONE |
| 7 | Royalties | D | 89 |
| | 48 | | |
| 8 | Net short-term capital gain (loss) | * | SEE STMT |
| | (370) | 18 | Tax-exempt income and nondeductible expenses |
| 9a | Net long-term capital gain (loss) | | |
| | 898 | C | 239 |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| | NONE | | |
| 10 | Net section 1231 gain (loss) | 19 | Distributions |
| | (57) | A | 157 |
| 11 | Other income (loss) | | |
| A | 1 | | |
| * | SEE STMT | 20 | Other information |
| 12 | Section 179 deduction | A | 647 |
| 13 | Other deductions | B | 10 |
| A | NONE | T | 12 |
| H | 250 | | |
| * | SEE STMT | * | SEE STMT |
| 14 | Self-employment earnings (loss) | | |

### Partner's Share of Income, Deductions,
### Credits, etc.

| Part I | Information About the Partnership |
|---|---|

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |
|---|---|

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
68-6203494

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
THE MARK AND PAMELA OKADA
FAMLY TRUST, EXEMPT TRUST #2
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager    ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner    ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner?    TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.004190 % | 0.004190 % |
| Loss | NONE % | NONE % |
| Capital | 0.004190 % | 0.004190 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse $ | 5,191 | $ 4,928 |
| Qualified nonrecourse financing $ | 1,715 | $ 5,894 |
| Recourse $ | NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

| L | Partner's Capital Account Analysis |
|---|---|

Beginning capital account . . . $ 15,585
Capital contributed during the year . $ _____
Current year net income (loss) . . $ (777)
Other increase (decrease) (attach explanation) $ 3
Withdrawals & distributions . . $ ( 157 )
Ending capital account . . . $ 14,654

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes    ☒ No    If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . $ _____
Ending . . . . . $ _____

21 ☐ More than one activity for at-risk purposes*
22 ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.    www.irs.gov/Form1065    Cat. No. 11394R    Schedule K-1 (Form 1065) 2019

P14409B330613 08/26/2020 18:00    Partner # 4

003471

HCMLPHMIT00001880

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

**20 19**

For calendar year 2019, or tax year

beginning ___/___/ 2019   ending ___/___/___

☐ Final K-1   ☐ Amended K-1     OMB No. 1545-0123

**Partner's Share of Income, Deductions, Credits, etc.**   ▶ See back of form and separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| # | Item | Amount | # | Item | Amount |
|---|---|---|---|---|---|
| 1 | Ordinary business income (loss) | (59,081) | 15 | Credits | |
| 2 | Net rental real estate income (loss) | 43,929 | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions | |
| | | | A | | VARIOUS |
| 4a | Guaranteed payments for services | | B | | 202,134 |
| 4b | Guaranteed payments for capital | | C | | 204,718 |
| 4c | Total guaranteed payments | | G | | (2,584) |
| 5 | Interest income | 18,160 | I | | 14,716 |
| 6a | Ordinary dividends | 4,574 | J | | 124,824 |
| 6b | Qualified dividends | 247 | * | | SEE STMT |
| 6c | Dividend equivalents | | 17 | Alternative minimum tax (AMT) items | |
| | | | A | | (6) |
| 7 | Royalties | 2,151 | D | | 3,969 |
| 8 | Net short-term capital gain (loss) | (16,484) | * | | SEE STMT |
| 9a | Net long-term capital gain (loss) | 39,963 | 18 | Tax-exempt income and nondeductible expenses | |
| 9b | Collectibles (28%) gain (loss) | | C | | 10,626 |
| 9c | Unrecaptured section 1250 gain | 5 | | | |
| 10 | Net section 1231 gain (loss) | (2,558) | 19 | Distributions | |
| 11 | Other income (loss) | | A | | 151,785 |
| A | | 28 | | | |
| * | | SEE STMT | 20 | Other information | |
| 12 | Section 179 deduction | | A | | 28,809 |
| 13 | Other deductions | | B | | 463 |
| A | | 8 | | | |
| H | | 11,152 | T | | 534 |
| * | | SEE STMT | * | | SEE STMT |
| 14 | Self-employment earnings (loss) | | | | |

**Partner's Share of Income, Deductions, Credits, etc.**   ▶ See back of form and separate instructions.

| Part I | Information About the Partnership |
|---|---|

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |
|---|---|

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
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

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
JAMES DONDERO
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☒ If the partner is a disregarded entity (DE), enter the partner's:
TIN NONE   Name THE DUGABOY INVESTMENT TRUST

**I1** What type of entity is this partner?   INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.186554 % | 0.186554 % |
| Loss | NONE % | NONE % |
| Capital | 0.186554 % | 0.186554 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 231,130 | $ 219,427 |
| Qualified nonrecourse financing | $ 76,344 | $ 262,430 |
| Recourse | $ 35,000,000 | $ 35,000,000 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

| L | Partner's Capital Account Analysis |
|---|---|

Beginning capital account . . . $ 693,914
Capital contributed during the year . $ _____
Current year net income (loss) . . $ (34,578)
Other increase (decrease) (attach explanation) $ 144,900
Withdrawals & distributions . . $ (151,785)
Ending capital account . . . $ 652,451

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . $ _____
Ending . . . . . . $ _____

21 ☐ More than one activity for at-risk purposes*
22 ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2019

P14409B330613 08/26/2020 18:00

Partner # 5

003472

HCMLPHMIT00001885

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning ___ / ___ / 2019   ending ___ / ___ / ___

**2019**

| | Final K-1 | | Amended K-1 | OMB No. 1545-0123 |

## Partner's Share of Income, Deductions, Credits, etc. ▶ See back of form and separate instructions.

### Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
47-5261938

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
RAND PE FUND I, LP
87 RAILROAD PLACE, SUITE 403
SARATOGA SPRINGS, NY 12866

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☒ If the partner is a disregarded entity (DE), enter the partner's:
TIN 47-5145562   Name HNTR MNTN INV TRST FBO BCN MN

**I1** What type of entity is this partner?   PARTNERSHIP

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 99.500000 % | 99.500000 % |
| Loss | NONE % | NONE % |
| Capital | 99.500000 % | 99.500000 % |

☐ Check if decrease is due to sale or exchange of partnership interest

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 123,274,967 | $ 117,033,004 |
| Qualified nonrecourse financing | $ 40,718,835 | $ 139,968,727 |
| Recourse | $ NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 370,103,735 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (18,442,312) |
| Other increase (decrease) (attach explanation) | $ 39,227 |
| Withdrawals & distributions | $ ( 3,711,456 ) |
| Ending capital account | $ 347,989,195 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . $
Ending . . . . . $

*For IRS Use Only*

### Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) (31,511,547) | 15 | Credits | |
| 2 | Net rental real estate income (loss) 23,429,983 | | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions | |
| | | A | VARIOUS | |
| 4a | Guaranteed payments for services | B | 107,809,792 | |
| 4b | Guaranteed payments for capital | C | 109,187,851 | |
| 4c | Total guaranteed payments | G | (1,378,061) | |
| 5 | Interest income 9,685,521 | I | 7,848,766 | |
| 6a | Ordinary dividends 2,439,576 | J | 66,575,961 | |
| 6b | Qualified dividends 131,590 | * | SEE STMT | |
| 6c | Dividend equivalents | 17 | Alternative minimum tax (AMT) items | |
| | | A | (3,101) | |
| 7 | Royalties 1,147,036 | D | 2,116,810 | |
| 8 | Net short-term capital gain (loss) (8,791,920) | * | SEE STMT | |
| 9a | Net long-term capital gain (loss) 21,314,362 | 18 | Tax-exempt income and nondeductible expenses | |
| 9b | Collectibles (28%) gain (loss) | C | 5,667,593 | |
| 9c | Unrecaptured section 1250 gain 2,880 | | | |
| 10 | Net section 1231 gain (loss) (1,364,433) | 19 | Distributions | |
| 11 | Other income (loss) | A | 3,711,456 | |
| A | 14,893 | | | |
| * | SEE STMT | 20 | Other information | |
| 12 | Section 179 deduction | A | 15,365,420 | |
| 13 | Other deductions | B | 247,031 | |
| A | 4,238 | | | |
| H | 5,947,873 | T | 284,597 | |
| * | SEE STMT | * | SEE STMT | |
| 14 | Self-employment earnings (loss) | | | |
| | | 21 | ☐ More than one activity for at-risk purposes* | |
| | | 22 | ☐ More than one activity for passive activity purposes* | |

*See attached statement for additional information.

For Paperwork Reduction Act Notice, see Instructions for Form 1065.     www.irs.gov/Form1065     Cat. No. 11394R     Schedule K-1 (Form 1065) 2019

P14409B330613 08/26/2020 18:00

Partner # 6

003473

HCMLPHMIT00001890

**EXHIBIT   7**

003474

**Monthly Operating Report**
ACCRUAL BASIS-1

| CASE NAME: | Highland Capital Management, LP |
| --- | --- |
| CASE NUMBER: | 19-12239-CSS |

**Comparative Balance Sheet**
(in thousands)

|  | 10/15/2019 | 10/31/2019 | 11/30/2019 |
| --- | --- | --- | --- |
| **Assets** | | | |
| Cash and cash equivalents | 2,529 | 2,286 | 6,343 |
| Investments, at fair value [3] | 232,620 | 235,144 | 233,776 |
| Equity method investees [3] | 161,819 | 161,813 | 175,381 |
| Management and incentive fee receivable | 2,579 | 3,202 | 1,223 |
| Fixed assets, net | 3,754 | 3,672 | 3,601 |
| Due from affiliates [1] | 151,901 | 152,124 | 152,523 |
| Other assets | 11,311 | 11,260 | 10,621 |
| **Total assets** | **$ 566,513** | **$ 569,501** | **$ 583,468** |
|  | | | |
| **Liabilities and Partners' Capital** | | | |
| Pre-petition accounts payable [4] | 1,176 | 1,135 | 1,250 |
| Post-petition accounts payable [4] | - | 102 | 236 |
| Secured debt: | | | |
| Frontier | 5,195 | 5,195 | 5,195 |
| Jefferies | 30,328 | 30,315 | 30,268 |
| Accrued expenses and other liabilities [4] | 59,203 | 59,184 | 60,848 |
| Accrued re-organization related fees [5] | - | - | - |
| Claim accrual [2] | 73,997 | 73,997 | 73,997 |
| Partners' capital | 396,614 | 399,573 | 411,674 |
| **Total liabilities and partners' capital** | **$ 566,513** | **$ 569,501** | **$ 583,468** |

[1] Includes various notes receivable at carrying value (fv undetermined).

[2] Uncontested portion of claim less appplicable offsets. Potential for additional liability based on future events. No interest has been accrued beyond petition date.

[3] Mark to market gains/(losses) on investments include pricing updates for publicly traded securities and other positions with readily available market price information. Limited partnership interests normally marked to a NAV statement have not been updated as of period end as statements are generally available on a one-month lag.

[4] Note on accruals: expenses recorded in Accounts Payable and Accrued Expenses and Other Liabilities reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices. For balance sheet dates other than the Petition Date, amounts include both pre-petition and post-petition liabilities.

[5] Debtor funded various retainers totaling $790k prior to the petition date, which were entirely expensed prior to the petition date. No additional amounts were accrued between October 16, 2019 and November 30, 2019

Assets

Cash and cash equivalents

| | | | |
|---|---|---|---|
| 10010 10010 | 10010 OPERATING | 4,399,685.76 |
| 10011 10011 | 10011 OPERATING - CASH CLEARING | (5,357,965.85) |
| 10012 10012 | 10012 OPERATING - DEPOSITS IN TRANSIT | 3,058,753.60 |
| 10020 10020 | 10020 INSURANCE ACCT | 291,109.28 |
| 10030 10030 | 10030 MONEY MARKET | 136,658.61 |
| 10060 10060 | 10060 BROKERAGE | 93.74 |
| 10100 10100 | 10100 MISC OPERATING 1 | (1,132,704.16) |
| 10102 10102 | 10102 MISC OPERATING 1 - DEPOSITS IN TRANSIT | 1,132,895.00 |
| | Total cash and cash equivalents | 2,528,525.98 |

Investments, at fair value

| | | |
|---|---|---|
| 11100 11100 | 11100 INVESTMENT SECURITIES - COST | 66,751,143.30 |
| 11150 11150 | 11150 INVESTMENT SECURITIES - MARK TO MARKET | (7,702,195.68) |
| 17140 17140 | 17140 LT INVSTMT HIGHLAND CLO FUNDING | 481,354.43 |
| 17207 17207 | 17207 LT INVSTMT - NXRT | 49,648,257.65 |
| 17209 17209 | 17209 LT INVSTMT - NHT | 10,718,068.67 |
| 17210 17210 | 17210 LT INVSTMT - NEXPOINT REAL ESTATE STRATEGIES FUND | 1,721,458.16 |
| 17405 17405 | 17405 LT INVSTMT - CRUSADER | 5,431,955.00 |
| 17440 17440 | 17440 LT INVSTMT - CREDIT STRATEGIES FUND | 132,002.75 |
| 17445 17445 | 17445 LT INVSTMT - MULTI STRAT CREDIT FUND | 20,244,908.67 |
| 17460 17460 | 17460 LT INVSTMT - RESTORATION CAPITAL PARTNERS | 36,949,197.43 |
| 17462 17462 | 17462 LT INVSTMT - PETROCAP PARTNERS II | 12,065,754.32 |
| 17466 17466 | 17466 LT INVSTMT - PETROCAP INCENTIVE PARTNERS III | 380.00 |
| 17467 17467 | 17467 LT INVSTMT - PETROCAP PARTNERS III | 1,254,168.41 |
| 17471 17471 | 17471 LT INVSTMT - HIGHLAND LOAN FUND | 261,889.71 |
| 17474 17474 | 17474 LT INVSTMT - HIGHLAND MERGER ARBITRAGE FUND | 1,397,752.04 |
| 17540 17540 | 17540 LT INVSTMT - HIGHLAND OPPORTUNISTIC CREDIT FUND | 5,427,536.32 |
| 17542 17542 | 17542 LT INVSTMT - HIGHLAND PREMIER GROWTH EQUITY FUND | 67,639.33 |
| 17543 17543 | 17543 LT INVSTMT - HIGHLAND SMALL CAP EQUITY FUND | 533,357.32 |
| 17550 17550 | 17550 LT INVSTMT - NEXPOINT CREDIT STRATEGIES | 13,275,503.51 |
| 17555 17555 | 17555 LT INVSTMT - L/S EQUITY FUND | - |
| 17560 17560 | 17560 LT INVSTMT - ENERGY AND MATERIALS FUND | 8,928.17 |
| 17561 17561 | 17561 LT INVSTMT - FLOATING RATE OPPORTUNITIES | 792,313.43 |
| 17562 17562 | 17562 LT INVSTMT - GLOBAL ALLOCATION | 1,573,054.32 |
| 17592 17592 | 17592 LT INVSTMT - HEALTH CARE FUND | 2,752,533.87 |
| | Total investments, at fair value | 223,786,961.13 |

Equity method investees

| | | |
|---|---|---|
| 17410 17410 | 17410 LT INVSTMT - SELECT EQUITY FUND | 130,213,244.86 |
| 17475 17475 | 17475 LT INVSTMT - EAMES, LTD | 5,908,796.26 |
| 17480 17480 | 17480 LT INVSTMT - STARCK, LTD | 6,960,671.89 |
| 17485 17485 | 17485 LT INVSTMT - WRIGHT, LTD | 22,303,199.33 |
| 17835 17835 | 17835 LT INVSTMT - HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA | - |
| 17840 17840 | 17840 LT INVSTMT - HIGHLAND CAPITAL MANAGEMENT SINGAPORE | 457,809.57 |
| 17850 17850 | 17850 LT INVSTMT - HIGHLAND CAPITAL MANAGEMENT KOREA | 1,011,300.61 |
| 17880 17880 | 17880 LT INVSTMT - PENANT MANAGEMENT | 302,358.21 |
| 17881 17881 | 17881 LT INVSTMT - EAGLE EQUITY ADVISORS | 22,803.05 |
| 17885 17885 | 17885 LT INVSTMT - MAPLE AVENUE HOLDINGS | 547,633.82 |
| 17900 17900 | 17900 LT INVSTMT - OTHER LONG-TERM INVESTMENTS | 2,924,323.00 |
| | Total equity method investees | 170,652,140.60 |

Management and incentive fees receivable

| | | |
|---|---|---|
| 12145 12145 | 12145 MGMT FEES RECVBL - VALHALLA | 12,287.85 |
| 12150 12150 | 12150 MGMT FEES RECVBL - SOUTHFORK | 7,941.94 |
| 12160 12160 | 12160 MGMT FEES RECVBL - JASPER | 35,443.91 |
| 12165 12165 | 12165 MGMT FEES RECVBL - GLENEAGLES | 19,494.83 |
| 12170 12170 | 12170 MGMT FEES RECVBL - LIBERTY | 45,288.78 |
| 12175 12175 | 12175 MGMT FEES RECVBL - ROCKWALL | 18,213.61 |

003476

| | | | |
|---|---|---|---|
| 12180 12180 | 12180 MGMT FEES RECVBL - RED RIVER | | 30,118.03 |
| 12190 12190 | 12190 MGMT FEES RECVBL - GRAYSON | | 99,945.24 |
| 12210 12210 | 12210 MGMT FEES RECVBL - EASTLAND | | 83,341.49 |
| 12215 12215 | 12215 MGMT FEES RECVBL - BRENTWOOD | | 36,565.44 |
| 12225 12225 | 12225 MGMT FEES RECVBL - ROCKWALL II | | 121,756.83 |
| 12230 12230 | 12230 MGMT FEES RECVBL - WESTCHESTER | | 130,594.11 |
| 12235 12235 | 12235 MGMT FEES RECVBL - HIGHLAND PARK | | 24,144.35 |
| 12265 12265 | 12265 MGMT FEES RECVBL - STRATFORD | | 42,557.64 |
| 12270 12270 | 12270 MGMT FEES RECVBL - GREENBRIAR | | 60,028.30 |
| 12280 12280 | 12280 MGMT FEES RECVBL - ABERDEEN | | 15,288.93 |
| 12445 12445 | 12445 MGMT FEES RECVBL - MULTI STRAT CREDIT FUND | | 20,567.91 |
| 12466 12466 | 12466 MGMT FEES RECVBL - PROMETHEUS | | 22,237.17 |
| 12471 12471 | 12471 MGMT FEES RECVBL - HIGHLAND LOAN FUND | | 1,736.85 |
| 12475 12475 | 12475 MGMT FEES RECVBL - LIFE SETTLEMENTS PROGRAM | | 0.01 |
| 12635 12635 | 12635 MGMT FEES RECVBL - LONGHORN A | | 8,439.48 |
| 12640 12640 | 12640 MGMT FEES RECVBL - LONGHORN B | | 128,482.29 |
| 12660 12660 | 12660 MGMT FEES RECVBL - BANDERA STRATEGIC CREDIT PARTNERS | | 4.10 |
| 12665 12665 | 12665 MGMT FEES RECVBL - PENSION DENMARK | | 430,691.12 |
| 12670 12670 | 12670 MGMT FEES RECVBL - NEXBANK | | 813,275.89 |
| 12675 12675 | 12675 MGMT FEES RECVBL - DAF | | 163,043.48 |
| 12680 12680 | 12680 MGMT FEES RECVBL - TRUSSWAY | | 10,080.65 |
| 12685 12685 | 12685 MGMT FEES RECVBL - SSP | | 197,173.42 |
| 14125 14125 | 14125 SUBADVISOR FEES RECEIVABLE - HCLOH | | 53,863.81 |
| | | | |
| | Total management and incentive fees receivable | | 2,632,607.46 |
| | | | |
| | Investment income receivable | | |
| 14010 14010 | 14010 CASH INTEREST RECEIVABLE | | 1,243,304.26 |
| | | | |
| | Total investment income receivable | | 1,243,304.26 |
| | | | |
| | Deferred incentive fees | | |
| 12906 12906 | 12906 INCTV FEES RECVBL - CRUSADER - OFFSHORE | | 15,020,930.06 |
| 12999 12999 | 12999 ALLOWANCE FOR UNCOLLECTIBLE ACCOUNTS | | (15,020,930.06) |
| | Fixed assets | | |
| 16100 16100 | 16100 BUILDINGS | | 2,594,846.58 |
| 16150 16150 | 16150 BUILDINGS - ACCUM DEPRECIATION | | (891,978.45) |
| 16200 16200 | 16200 FURNITURE AND FIXTURES | | 2,796,433.00 |
| 16250 16250 | 16250 FURNITURE AND FIXTURES - ACCUM DEPRECIATION | | (2,678,004.27) |
| 16300 16300 | 16300 COMPUTERS AND EQUIPMENT | | 2,805,720.49 |
| 16350 16350 | 16350 COMPUTERS AND EQUIPMENT - ACCUM DEPRECIATION | | (2,484,405.74) |
| 16400 16400 | 16400 COMPUTER SOFTWARE | | 331,195.05 |
| 16450 16450 | 16450 COMPUTER SOFTWARE - ACCUM DEPRECIATION | | (269,706.55) |
| 16500 16500 | 16500 LEASEHOLD IMPROVEMENTS | | 7,191,571.54 |
| 16550 16550 | 16550 LEASEHOLD IMPROVEMENTS - ACCUM DEPRECIATION | | (5,641,290.05) |
| | | | |
| | Total fixed assets | | 3,754,381.60 |
| | | | |
| | Other assets | | |
| 13110 13110 | 13110 REIMB EXP - PAMCO CAYMAN | | 151,270.77 |
| 13115 13115 | 13115 REIMB EXP - PAM CAPITAL | | 1,071.55 |
| 13120 13120 | 13120 REIMB EXP - LEGACY | | 146,431.94 |
| 13125 13125 | 13125 REIMB EXP - HIGHLAND V | | 19,535.41 |
| 13140 13140 | 13140 REIMB EXP - BRISTOL BAY | | 2,187.28 |
| 13145 13145 | 13145 REIMB EXP - VALHALLA | | 5,832.60 |
| 13150 13150 | 13150 REIMB EXP - SOUTHFORK | | 5,978.91 |
| 13160 13160 | 13160 REIMB EXP - JASPER | | 25,365.46 |
| 13165 13165 | 13165 REIMB EXP - GLENEAGLES | | 39,707.18 |
| 13170 13170 | 13170 REIMB EXP - LIBERTY | | 39,248.30 |
| 13175 13175 | 13175 REIMB EXP - ROCKWALL | | 13,040.05 |
| 13180 13180 | 13180 REIMB EXP - RED RIVER | | 17,189.51 |
| 13190 13190 | 13190 REIMB EXP - GRAYSON | | 42,151.73 |
| 13200 13200 | 13200 REIMB EXP - HIGHLAND FINANCIAL TRUST | | 8,381.53 |

| | | | |
|---|---|---|---|
| 13210 13210 | 13210 REIMB EXP - EASTLAND | | 41,315.16 |
| 13215 13215 | 13215 REIMB EXP - BRENTWOOD | | 91,010.17 |
| 13225 13225 | 13225 REIMB EXP - ROCKWALL II | | 45,707.94 |
| 13230 13230 | 13230 REIMB EXP - WESTCHESTER | | 115,662.06 |
| 13235 13235 | 13235 REIMB EXP - HIGHLAND PARK | | 17,797.31 |
| 13265 13265 | 13265 REIMB EXP - STRATFORD | | 15,332.69 |
| 13270 13270 | 13270 REIMB EXP - GREENBRIAR | | 27,252.17 |
| 13276 13276 | 13276 REIMB EXP - ACIS CLO MANAGEMENT | | 3,946.72 |
| 13280 13280 | 13280 REIMB EXP - ABERDEEN | | 4,861.52 |
| 13281 13281 | 13281 REIMB EXP - HEWETT'S ISLAND | | - |
| 13282 13282 | 13282 REIMB EXP - ACIS CLO 2018-VIII | | 12,297.70 |
| 13284 13284 | 13284 REIMB EXP - ACIS CLO 2017-VII | | 34,229.54 |
| 13285 13285 | 13285 REIMB EXP - ACIS CLO 2013-1 | | 115,828.83 |
| 13286 13286 | 13286 REIMB EXP - ACIS CLO 2013-II | | 0.03 |
| 13287 13287 | 13287 REIMB EXP - ACIS CLO 2014-III | | 141,187.64 |
| 13288 13288 | 13288 REIMB EXP - ACIS CLO 2014-IIII | | 161,700.16 |
| 13289 13289 | 13289 REIMB EXP - ACIS CLO 2014-V | | 175,460.76 |
| 13290 13290 | 13290 REIMB EXP - ACIS CLO 2015-VI | | 210,400.78 |
| 13298 13298 | 13298 REIMB EXP - ACIS CLO 2017-VII | | 86,292.45 |
| 13403 13403 | 13403 REIMB EXP - HIGHLAND PROMETHEUS FUND | | 2,390.26 |
| 13404 13404 | 13404 REIMB EXP - HIGHLAND LATIN AMERICA OPPORTUNITY FUND | | (300.00) |
| 13410 13410 | 13410 REIMB EXP - SELECT EQUITY FUND | | 44,673.00 |
| 13420 13420 | 13420 REIMB EXP - REAL ESTATE FUND | | 8.92 |
| 13435 13435 | 13435 REIMB EXP - CDO OPPORTUNITIES FUND | | 21,722.21 |
| 13440 13440 | 13440 REIMB EXP - CREDIT STRATEGIES FUND | | 21.24 |
| 13445 13445 | 13445 REIMB EXP - MULTI STRAT CREDIT FUND | | 71,217.26 |
| 13450 13450 | 13450 REIMB EXP - MULTI-STRAT INSURANCE DEDICATED FUND | | 600.00 |
| 13460 13460 | 13460 REIMB EXP - RESTORATION CAPITAL PARTNERS | | 32,683.10 |
| 13462 13462 | 13462 REIMB EXP - GRANITE BAY | | 2,150.79 |
| 13465 13465 | 13465 REIMB EXP - CLO VALUE FUND | | 47.62 |
| 13467 13467 | 13467 REIMB EXP - BB HIGHLAND FLOATING RATE FUND I | | 250.00 |
| 13468 13468 | 13468 REIMB EXP - BB VOTORANTIM HIGHLAND INFRASTRUCTURE LLC | | 8,604.01 |
| 13471 13471 | 13471 REIMB EXP - HIGHLAND LOAN FUND | | 10,569.33 |
| 13475 13475 | 13475 REIMB EXP - LIFE SETTLEMENTS PROGRAM | | 4,606.55 |
| 13515 13515 | 13515 REIMB EXP - FLOATING RATE | | 6,607.38 |
| 13521 13521 | 13521 REIMB EXP - FLOATING RATE OPPORTUNITIES | | 2,042.05 |
| 13540 13540 | 13540 REIMB EXP - HIGHLAND OPPORTUNISTIC CREDIT FUND | | 139.53 |
| 13550 13550 | 13550 REIMB EXP - NEXPOINT CREDIT STRATEGIES | | 48,761.50 |
| 13580 13580 | 13580 REIMB EXP - HIGHLAND INCOME FUND | | 23,648.49 |
| 13591 13591 | 13591 REIMB EXP - HC MULTI-STRATEGY FUND | | 9,120.88 |
| 13592 13592 | 13592 REIMB EXP - HEALTH CARE FUND | | 10.21 |
| 13610 13610 | 13610 REIMB EXP - CALPERS DISTRESSED | | 11.56 |
| 13635 13635 | 13635 REIMB EXP - LONGHORN A | | 10,220.09 |
| 13640 13640 | 13640 REIMB EXP - LONGHORN B | | 24,732.66 |
| 13660 13660 | 13660 REIMBURSABLE FUND EXPNESES - PYXIS L/S EQUITY FUND | | 1,263.26 |
| 13661 13661 | 13661 REIMBURSABLE FUND EXPNESES - PYXIS L/S HEALTHCARE FUND | | 12,331.25 |
| 13665 13665 | 13665 REIMBURSABLE FUND EXPNESES - PYXIS SMALL CAP EQUITY FU | | 342.25 |
| 13670 13670 | 13670 REIMBURSABLE FUND EXPNESES - HIGHLAND OPPORTUNISTIC CR | | 858.02 |
| 13672 13672 | 13672 REIMBURSABLE FUND EXPNESES - PYXIS ENERGY & MATERIALS | | 219.00 |
| 13676 13676 | 13676 EXP REIMB GLOBAL ALLOCATION FUND | | 7,509.40 |
| 13685 13685 | 13685 EXP REIMB IBOXX SENIOR LOAN ETF | | 4,857.87 |
| 13690 13690 | 13690 EXP REIMB - NEXPOINT RESIDENTIAL TRUST | | 35,354.89 |
| 13691 13691 | 13691 EXP REIMB - NEXPOINT CAPITAL | | 62,057.74 |
| 13692 13692 | 13692 EXP REIMB - NEXPOINT MULTI FAMILY REALTY TRUST | | 168.38 |
| 13905 13905 | 13905 REIMBURSABLE FUND EXPENSES - COMPANY REIMB | | 4,176,204.78 |
| 13910 13910 | 13910 REIMBURSABLE FUND EXPENSES - OTHER | | (1,166,137.22) |
| 13990 13990 | 13990 REIMBURSABLE FUND EXPNESES - OTHER | | 662,179.33 |
| 13999 13999 | 13999 REIMBURSABLE FUND EXPNESES - CLEARING | | 1,726,654.35 |
| 14130 14130 | 14130 MISCELLANEOUS RECEIVABLE | | 8,900.00 |
| 14135 14135 | 14135 SHARED SVCS FEE RECVBL - FALCON | | 0.09 |
| 14140 14140 | 14140 SHARED SVCS FEE RECVBL - PYXIS | | 143,384.01 |
| 14142 14142 | 14142 SHARED SVCS FEE RECVBL - HCLOH | | 37,290.33 |
| 14143 14143 | 14143 SHARED SVCS FEE RECVBL - HCM LATIN AMERICA | | 10,000.00 |
| 14148 14148 | 14148 SHARED SVCS FEE RECVBL - RAND ADVISORS | | 9,999.92 |
| 14149 14149 | 14149 SHARED SVCS FEE RECVBL - NREA | | (0.01) |
| 14199 14199 | 14199 UNAPPLIED RECEIPTS | | (20,825.39) |

003478

| | | | | |
|---|---|---|---|---|
| 14520 14520 | 14520 DUE FROM HIGHLAND CAPITAL MANAGEMENT EUROPE LTD. | - | | |
| 14530 14530 | 14530 DUE FROM HIGHLAND CAPITAL MANAGEMENT SERVICES | 7,482,480.88 | | |
| 14531 14531 | 14531 DUE FROM HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS | 10,413,539.53 | | |
| 14532 14532 | 14532 DUE FROM NEXPOINT ADVISORS | 24,534,644.03 | | |
| 14533 14533 | 14533 DUE FROM HCRE PARTNERS | 10,394,680.47 | | |
| 14535 14535 | 14535 DUE FROM HERA | 3,349,587.22 | | |
| 14540 14540 | 14540 DUE FROM SSP | 2,198,610.05 | | |
| 14545 14545 | 14545 DUE FROM TRUSSWAY | 1,056,956.03 | | |
| 14555 14555 | 14555 DUE FROM HIGHLAND CAPITAL MANAGEMENT SINGAPORE PTE LTD | 35,158.50 | | |
| 14565 14565 | 14565 DUE FROM OTHER - TAX LOANS | 10,670,299.84 | | |
| 14575 14575 | 14575 DUE FROM HIGHLAND CAPITAL OF NEW YORK | 5,023,073.12 | | |
| 14580 14580 | 14580 DUE FROM NEXBANK | 69,677.42 | | |
| 14585 14585 | 14585 DUE FROM HUNTER MOUNTAIN INVESTMENT TRUST | 56,873,209.22 | | |
| 14590 14590 | 14590 DUE FROM OTHER AFFILIATE | 5,288,256.35 | | |
| 14595 14595 | 14595 DUE FROM HIGHLAND CAPITAL KOREA | 3,132,278.05 | | |
| 14750 14750 | 14750 LONG TERM NOTES RECEIVABLE | 18,286,268.16 | | |
| 14900 14900 | 14900 INTERCOMPANY RECEIVABLE | 1,663.65 | | |
| 15010 15010 | 15010 PREPAID INSURANCE | 316,404.81 | | |
| 15020 15020 | 15020 PREPAID RENT | (708,213.81) | | |
| 15025 15025 | 15025 PREPAID RESEARCH | 496,846.51 | | |
| 15030 15030 | 15030 OTHER PREPAID EXPENSES | 11,250.00 | | |
| 15490 | 15490 PREPAID EXPENSE CLEARING | 27,223.80 | | |
| 15510 15510 | 15510 DEPOSITS | 129,871.65 | | |

|  | | | |
|---|---|---|---|
| Total other assets | 166,938,592.22 | | |
| Total assets | 571,536,513.25 | | |

Liabilities and Partners' Capital

Current liabilities:

Securities sold, not yet purchased

| | | | | |
|---|---|---|---|---|
| 22010 22010 | 22010 SECURITIES SOLD, NOT YET PURCHASED - PROCEEDS | (180.71) x | | pre |

| | | |
|---|---|---|
| Total securities sold, not yet purchased | (180.71) | |

Due to broker

| | | | | |
|---|---|---|---|---|
| 20700 20700 | 20700 DUE TO BROKERS | (30,328,462.58) | | |

| | | |
|---|---|---|
| Total due to broker | | |

Due to broker for securities purchased, not yet settled
Payable to Highland Capital Management Services, Inc.

| | | | | |
|---|---|---|---|---|
| 23015 23015 | 23015 DUE TO MAPLE AVENUE HOLDINGS | (4,975,000.00) x | | pre |
| 23035 23035 | 23035 DUE TO HIGHLAND CAPITAL OF NEW YORK | 5,446.00 x | | |
| 23045 23045 | 23045 DUE TO HIGHLAND CAPITAL MANAGEMENT SINGAPORE PTE LTD | (248,745.28) x | | pre |
| 23050 23050 | 23050 DUE TO AFFILIATE - OTHER | (208,051.44) x | | pre |
| 23099 23099 | 23099 PAYABLES - OTHER AFFILIATE | (2,059,337.01) x | | pre |

| | | |
|---|---|---|
| Total payable to Highland Capital Management Services, Inc | (7,485,687.73) | |

Accounts payable

| | | | | |
|---|---|---|---|---|
| 20100 20100 | 20100 ACCOUNTS PAYABLE | (1,176,300.44) | | |
| 20200 20200 | 20200 INTEREST PAYABLE | (613,638.07) x | | mix |

| | | |
|---|---|---|
| Total accounts payable | | |

| | | | |
|---|---|---|---|
| | Accrued and other liabilities | | |
| 20900 20900 | 20900 INTERCOMPANY PAYABLE | - | |
| 21010 21010 | 21010 ACCRUED LIABILITIES - INTEREST | 225.00 | x |
| 21030 21030 | 21030 ACCRUED LIABILITIES - LEGAL | (8,761,799.69) | x |
| 21040 21040 | 21040 ACCRUED LIABILITIES - AUDIT FEES | (165,967.74) | x |
| 21080 21080 | 21080 ACCRUED LIABILITIES - INCOME TAX | (175,023.00) | x |
| 21090 21090 | 21090 ACCRUED LIABILITIES - OTHER | (3,166.60) | x |
| 21110 21110 | 21110 ACCRUED LIABILITIES - HCNY HEALTH INS PREMIUMS | (119,062.29) | x |
| 21111 21111 | 21111 ACCRUED LIABILITIES - HCMFA HEALTH INS PREMIUMS | (95,045.39) | x |
| 21113 21113 | 21113 ACCRUED LIABILITIES - HC FUNDS DISTRIBUTOR HEALTH INS | (754,170.28) | x |
| 21114 21114 | 21114 ACCRUED LIABILITIES - NEXBANK HEALTH INS PREMIUMS | 544,043.98 | x |
| 21115 21115 | 21115 ACCRUED LIABILITIES - DRUGCRAFTERS HEALTH INS PREMIUMS | 206,721.33 | x |
| 21116 21116 | 21116 ACCRUED LIABILITIES - MARKHAM HEALTH INS PREMIUMS | 196,640.32 | x |
| 21117 21117 | 21117 ACCRUED LIABILITIES - NEXBANK SECURITIES HEALTH INS PR | 38,116.34 | x |
| 21118 21118 | 21118 ACCRUED LIABILITIES - HCMLP HEALTH INS PREMIUMS | 68,737.06 | x |
| 21119 21119 | 21119 ACCRUED LIABILITIES - PCP HEALTH INS PREMIUMS | (8,854.67) | x |
| 21120 21120 | 21120 ACCRUED LIABILITIES - JMIJM HEALTH INS PREMIUMS | (6,252.54) | x |
| 21121 21121 | 21121 ACCRUED LIABILITIES - NXRT HEALTH INS PREMIUMS | (9,034.91) | x |
| 21122 21122 | 21122 ACCRUED LIABILITIES - NPA HEALTH INS PREMIUMS | (25,017.59) | x |
| 21123 21123 | 21123 ACCRUED LIABILITIES - EAGLE EQUITY HEALTH INS PREMIUMS | (4,458.02) | x |
| 21124 21124 | 21124 ACCRUED LIABILITIES - VINEBROOK HEALTH INS PREMIUMS | (592.82) | x |
| 21125 21125 | 21125 ACCRUED LIABILITIES - NHT HEALTH INS PREMIUMS | (1,185.64) | x |
| 21200 21200 | 21200 ACCRUED LIABILITIES - HCMLP SHARED SERVICES | (18,014.97) | x |
| 21205 21205 | 21205 ACCRUED LIABILITIES - HCFD SHARED SERVICES | (36,698.75) | x |
| 21510 21510 | 21510 ACCRUED PAYROLL LIABILITIES - BONUS | (13,688,973.83) | x |
| 21520 21520 | 21520 ACCRUED PAYROLL LIABILITIES - FEDERAL INC TAX W/H | - | x |
| 21550 21550 | 21550 ACCRUED PAYROLL LIABILITIES - FICA | - | x |
| 21560 21560 | 21560 ACCRUED PAYROLL LIABILITIES - MEDICARE | (13,310.19) | x |
| 21600 21600 | 21600 ACCRUED PAYROLL LIABILITIES - 401(K) EE CONTRIBUTION | 3,262.35 | x |
| 21630 21630 | 21630 ACCRUED PAYROLL LIABILITIES - LIFE INSURANCE | (13,761.35) | x |
| 21640 21640 | 21640 ACCRUED PAYROLL LIABILITIES - FLEXIBLE SPENDING ACCOUN | (354,881.89) | x |
| 21670 21670 | 21670 ACCRUED PAYROLL LIABILITIES - EE EXPENSE REIMBURSEMENT | (5,000.00) | x |
| 21680 21680 | 21680 ACCRUED PAYROLL LIABILITIES - VACATION | (939,324.00) | x |
| 21695 21695 | 21695 ACCRUED PAYROLL LIABILITY - SUSPENSE | 21,811.26 | x |
| 25445 25445 | 25445 DEFERRED MANAGEMENT FEES - MULTI STRAT CREDIT | (431,483.88) | x |
| 25461 25461 | 25461 DEFERRED INCENTIVE FEES - UNEARNED RCP CARRY | (4,392,937.00) | x |
| 25500 25500 | 25500 DEFERRED MANAGEMENT FEES - DAF | 0.02 | x |
| | | | |
| | Total accrued and other liabilities | (28,944,459.38) | |
| | | | |
| | Other current liabilities | | |
| 24150 24150 | 24150 CLAIMS PAYABLE | (73,997,399.28) | |
| | | | |
| | Total other current liabilities | (73,997,399.28) | |
| | | | |
| | Total current liabilities | | |
| | | | |
| | Debt and notes payable | | |
| 26100 26100 | 26100 NOTES PAYABLE | (5,194,651.00) | |
| 26110 26110 | 26110 CLASS A TERM NOTES PAYABLE | (9,541,446.00) | x |
| 26200 26200 | 26200 REVOLVING CREDIT FACILITY | (11,340,751.26) | x |
| | | | |
| | Total debts and notes payable | (26,076,848.26) | |
| | | (64,225,759) | |
| | Payable to Highland Capital Management Services, Inc. | 5,023,073 | |
| | Deferred compensation | (59,202,686) | |
| 27200 27200 | 27200 PROFIT SHARING PLAN | (632,258.10) | x |
| 27265 27265 | 27265 2017 DEFERRED SHARES | (3,411,606.44) | x |
| 27266 27266 | 27266 2018 DEFERRED SHARES | (1,758,391.79) | x |
| 27267 27267 | 27267 2019 DEFERRED SHARES | (497,339.23) | x |

|  | | | |
|---|---|---|---|
| | | Total deferred compensation | (6,299,595.56) |
| | | Other liabilities | |
| | | Total liabilities | (174,922,572.01) |
| | | Commitments | |
| | | Partners' capital | |
| 31000 31000 | | 31000 PARTNERS' CAPITAL | (6,509,576.64) |
| 32000 32000 | | 32000 SUBSCRIPTIONS | (91,499,999.99) |
| 33000 33000 | | 33000 REDEMPTIONS | 503,589,902.86 |
| 39000 39000 | | 39000 RETAINED EARNINGS | (765,702,051.50) |
| 40145 40145 | | 40145 MGMT FEE REV - VALHALLA | (50,628.85) |
| 40150 40150 | | 40150 MGMT FEE REV - SOUTHFORK | (27,757.53) |
| 40160 40160 | | 40160 MGMT FEE REV - JASPER | (145,851.77) |
| 40165 40165 | | 40165 MGMT FEE REV - GLENEAGLES | (140,043.03) |
| 40170 40170 | | 40170 MGMT FEE REV - LIBERTY | (165,929.40) |
| 40175 40175 | | 40175 MGMT FEE REV - ROCKWALL | (66,518.03) |
| 40180 40180 | | 40180 MGMT FEE REV - RED RIVER | (189,123.14) |
| 40190 40190 | | 40190 MGMT FEE REV - GRAYSON | (465,501.18) |
| 40210 40210 | | 40210 MGMT FEE REV - EASTLAND | (436,949.87) |
| 40215 40215 | | 40215 MGMT FEE REV - BRENTWOOD | (190,598.12) |
| 40225 40225 | | 40225 MGMT FEE REV - ROCKWALL II | (524,333.53) |
| 40230 40230 | | 40230 MGMT FEE REV - WESTCHESTER | (328,847.76) |
| 40235 40235 | | 40235 MGMT FEE REV - HIGHLAND PARK | (96,479.77) |
| 40265 40265 | | 40265 MGMT FEE REV - STRATFORD | (178,461.48) |
| 40270 40270 | | 40270 MGMT FEE REV - GREENBRIAR | (258,673.40) |
| 40280 40280 | | 40280 MGMT FEE REV - ABERDEEN | (41,945.72) |
| 40445 40445 | | 40445 MGMT FEE REV - MULTI STRAT CREDIT FUND | (484,270.56) |
| 40466 40466 | | 40466 MGMT FEE REV - PROMETHEUS | (86,688.68) |
| 40471 40471 | | 40471 MGMT FEE REV - HIGHLAND LOAN FUND | (180,409.31) |
| 40473 40473 | | 40473 MGMT FEE REV - HIGHLAND FLEXIBLE INCOME UCITS FUND | (41,013.32) |
| 40635 40635 | | 40635 MGMT FEE REV - LONGHORN A | (39,412.35) |
| 40640 40640 | | 40640 MGMT FEE REV - LONGHORN B | (518,445.68) |
| 40644 40644 | | 40644 MGMT FEE REV - PENSION DENMARK | (1,163,257.92) |
| 40646 40646 | | 40646 MGMT FEE REV - NEXBANK | (2,505,695.14) |
| 40647 40647 | | 40647 MGMT FEE REV - DAF | (3,596,743.32) |
| 40684 40684 | | 40684 MGMT FEE REV - TRUSSWAY | (114,247.30) |
| 40685 40685 | | 40685 MGMT FEE REV - SSP | (197,173.42) |
| 40690 40690 | | 40690 SUBADVISORY FEES - HCLOH | (206,475.99) |
| 41455 41455 | | 41455 INCTV FEE REV - HIGHLAND DYNAMIC INCOME FUND | (150,925.36) |
| 45100 45100 | | 45100 INTEREST INCOME | (96.17) |
| 45200 45200 | | 45200 DIVIDEND INCOME | (2,625,125.09) |
| 45445 45445 | | 45445 ROYALTY FEES | (875,539.73) |
| 45509 45509 | | 45509 SUBADVISOR FEES - HCMFA | (3,945,290.32) |
| 45511 45511 | | 45511 SUBADVISOR FEES - NEXPOINT ADVISORS | (2,389,935.48) |
| 45515 45515 | | 45515 SHARED SVCS FEE REV - NEXPOINT | (1,593,290.32) |
| 45530 45530 | | 45530 SHARED SVCS FEE REV - NEXBANK | (189,677.42) |
| 45535 45535 | | 45535 SHARED SVCS FEE REV - FALCON | (135,000.00) |
| 45540 45540 | | 45540 SHARED SVCS FEE REV - PYXIS | (2,950,803.13) |
| 45541 45541 | | 45541 SHARED SVCS FEE REV - HCLOH | (142,944.91) |
| 45543 45543 | | 45543 SHARED SVCS FEE REV - HCM LATIN AMERICA | (100,000.00) |
| 45555 45555 | | 45555 SHARED SVCS FEE REV - RAND ADVISORS | (171,053.46) |
| 45560 45560 | | 45560 SHARED SVCS FEE REV - NREA | (720,000.00) |
| 45690 45690 | | 45690 ADMIN FEES - ALL CAP EQUITY FUND | - |
| 45900 45900 | | 45900 MISCELLANEOUS INCOME | (69,625.13) |
| 50110 50110 | | 50110 SALARIES | 9,150,582.76 |
| 50130 50130 | | 50130 OVERTIME | 443,209.60 |
| 50150 50150 | | 50150 SEVERANCE | 480,800.00 |
| 50210 50210 | | 50210 CASH BONUS | 9,248,793.64 |
| 50230 50230 | | 50230 PROFIT SHARING | 632,258.10 |
| 50240 50240 | | 50240 401(K) MATCH | 333,561.32 |
| 50255 50255 | | 50255 SHORT-TERM INCENTIVE PLAN | (436,285.82) |
| 50265 50265 | | 50265 2017 DEFERRED SHARES | 1,097,191.17 |

| | | | |
|---|---|---|---|
| 50266 50266 | 50266 2018 DEFERRED SHARES | | 822,120.61 |
| 50267 50267 | 50267 2019 DEFERRED SHARES | | 497,339.14 |
| 50268 50268 | 50268 2016 DEFERRED SHARES | | (25,311.95) |
| 50290 50290 | 50290 OTHER COMPENSATION | | 1,155,780.58 |
| 50310 50310 | 50310 HEALTH INSURANCE | | 1,523,588.77 |
| 50320 50320 | 50320 LIFE INSURANCE | | 54,361.18 |
| 50410 50410 | 50410 EMPLOYER FICA | | 583,174.17 |
| 50420 50420 | 50420 EMPLOYER MEDICARE | | 375,760.29 |
| 50430 50430 | 50430 EMPLOYER FUTA | | 4,744.82 |
| 50440 50440 | 50440 EMPLOYER SUTA | | 12,959.77 |
| 60100 60100 | 60100 PERIODICALS | | 22,386.10 |
| 60200 60200 | 60200 RESEARCH | | 916,140.49 |
| 61100 61100 | 61100 LEGAL | | 4,595,085.91 |
| 61200 61200 | 61200 AUDIT | | 169,967.74 |
| 61300 61300 | 61300 CONSULTING | | 3,452,054.35 |
| 61325 61325 | 61325 ASSET PLACEMENT FEES | | 104,945.38 |
| 61350 61350 | 61350 ADMINISTRATION FEES | | 57,121.04 |
| 61355 61355 | 61355 DATA SERVICE FEES | | 43,875.13 |
| 61400 61400 | 61400 PAYROLL SERVICE | | 19,604.39 |
| 61450 61450 | 61450 PLACEMENT FEES | | 38,750.00 |
| 61510 61510 | 61510 VIRTUAL RECRUITING | | 16,255.54 |
| 61530 61530 | 61530 CANDIDATE REIMBURSEMENT | | 745.33 |
| 61540 61540 | 61540 TRAINING | | 3,078.00 |
| 62100 62100 | 62100 DEPRECIATION EXPENSE - BUILDING | | 48,653.37 |
| 62200 62200 | 62200 DEPRECIATION EXPENSE - FURNITURE AND FIXTURES | | 100,107.56 |
| 62300 62300 | 62300 DEPRECIATION EXPENSE - COMPUTERS AND EQUIPMENT | | 151,012.94 |
| 62400 62400 | 62400 DEPRECIATION EXPENSE - COMPUTER SOFTWARE | | (13,361.00) |
| 62500 62500 | 62500 DEPRECIATION EXPENSE - LEASEHOLD IMPROVEMENTS | | 498,088.99 |
| 69110 69110 | 69110 RENT - DALLAS | | 994,874.28 |
| 69140 69140 | 69140 RENT - STORAGE | | 11,023.33 |
| 69210 69210 | 69210 UTILITIES | | 55,034.52 |
| 69220 69220 | 69220 OFFICE SUPPLIES | | 143,507.22 |
| 69232 69232 | 69232 TELEPHONES - OFFICE | | 86,573.03 |
| 69234 69234 | 69234 TELEPHONES - MOBILE | | 102,030.73 |
| 69238 69238 | 69238 INTERNET | | 213,470.37 |
| 69240 69240 | 69240 COMPUTER HARDWARE | | 66,426.65 |
| 69250 69250 | 69250 COMPUTER SOFTWARE | | 400,694.97 |
| 69260 69260 | 69260 MAINTENANCE | | 18,021.65 |
| 69270 69270 | 69270 POSTAGE | | 19,179.88 |
| 69280 69280 | 69280 TEMPORARY SERVICES | | 2,579.33 |
| 69281 69281 | 69281 FOOD SUPPLIES | | 144,648.14 |
| 69282 69282 | 69282 PARKING | | 138,958.85 |
| 69290 69290 | 69290 OFFICE OVERHEAD - OTHER | | 227,701.36 |
| 69310 69310 | 69310 DIRECTORS AND OFFICERS | | 247,662.00 |
| 69320 69320 | 69320 WORKERS COMPENSATION | | 34,662.88 |
| 69330 69330 | 69330 BUY/SELL | | 14,875.00 |
| 69340 69340 | 69340 ADDITIONAL LIFE INSURANCE | | 41,601.38 |
| 69350 69350 | 69350 OTHER INSURANCE | | 88,305.83 |
| 69410 69410 | 69410 AIRFARE | | 136,385.18 |
| 69420 69420 | 69420 MEALS | | 64,817.22 |
| 69430 69430 | 69430 LODGING | | 44,258.29 |
| 69440 69440 | 69440 ENTERTAINMENT | | 509,735.88 |
| 69450 69450 | 69450 EMPLOYEE LUNCH | | 283,814.86 |
| 69460 69460 | 69460 GROUND TRANSPORTATION | | 23,557.78 |
| 69490 69490 | 69490 TRAVEL - OTHER | | 5,972.71 |
| 69500 69500 | 69500 MARKETING AND ADVERTISING | | 561,172.46 |
| 69600 69600 | 69600 CHARITABLE CONTRIBUTIONS | | 67,700.00 |
| 69610 69610 | 69610 BUSINESS GIFTS | | 116,780.19 |
| 69722 69722 | 69722 STATE CORPORATE TAX | | 50.00 |
| 69730 69730 | 69730 TAXES - OTHER | | 537,045.85 |
| 69832 69832 | 69832 CONFERENCE REGISTRATION | | 12,420.78 |
| 69910 69910 | 69910 FEES AND DUES | | 208,428.87 |
| 69920 69920 | 69920 BANK CHARGES | | 14,052.09 |
| 69950 69950 | 69950 BAD DEBT | | 79,835.57 |
| 69990 69990 | 69990 MISCELLANEOUS - OTHER | | 684.72 |
| 80100 80100 | 80100 INTEREST INCOME - NON-OPERATING | | (5,765,215.32) |

003482

| | | | |
|---|---|---|---|
| 80200 80200 | 80200 INTEREST EXPENSE - NON-OPERATING | 1,344,399.09 | |
| 80800 80800 | 80800 COMPANY DISCOUNT ON SHARE PURCHASES | (768,566.33) | |
| 80900 80900 | 80900 OTHER INCOME/EXPENSE | 74,007,399.28 | |
| 90100 90100 | 90100 REALIZED CAPITAL GAINS/LOSSES | (3,959,534.93) | |
| 91100 91100 | 91100 INVESTMENT SECURITIES | 5,784,240.27 | |
| 91207 91207 | 91207 NXRT | (15,997,586.35) | |
| 91209 91209 | 91209 NHT | 163,219.32 | |
| 91403 91403 | 91403 HIGHLAND PROMETHEUS FUND | 20.00 | |
| 91410 91410 | 91410 SELECT EQUITY FUND | (109,058,363.77) | |
| 91445 91445 | 91445 CREDIT OPPORTUNITIES FUND | 6,830,992.36 | |
| 91460 91460 | 91460 RESTORATION CAPITAL PARTNERS | 9,909,464.57 | |
| 91462 91462 | 91462 PETROCAP PARTNERS II | (468,147.29) | |
| 91463 91463 | 91463 PETROCAP PARTNERS III | 9,472.57 | |
| 91471 91471 | 91471 HIGHLAND LOAN FUND | (4,746.24) | |
| 91480 91480 | 91480 STARCK | 2,346,668.27 | |
| 91485 91485 | 91485 WRIGHT | (19,196,588.45) | |
| 91495 91495 | 91495 HIGHLAND CLO FUNDING, LTD | 129,003.42 | |
| 91835 91835 | 91835 HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA, LP | 4,004,360.11 | |
| 91840 91840 | 91840 HIGHLAND CAPITAL MANAGEMENT SINGAPORE | (9,123.39) | |
| 91850 91850 | 91850 HIGHLAND CAPITAL MANAGEMENT KOREA | 225,509.80 | |
| 91881 91881 | 91881 EAGLE EQUITY ADVISORS | 247,196.95 | |
| 91885 91885 | 91885 MAPLE AVENUE HOLDINGS | (83,374.05) | |
| 91900 91900 | 91900 OTHER INVESTMENTS | 424,641.00 | |
| 99990 99990 | 99990 SYSTEM DEFAULT | (4,458.02) | |

|  | Total partners capital | (396,613,941.24) | |
|---|---|---|---|
|  | Total liabilities and partners' capital | (571,536,513.25) | - |

**EXHIBIT**

003484

Case 19-34054-sgj11    Doc 4255-118    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 118    Page 2 of 3
20191015 Hunter Mountain Note Receivable

| Balance Type | | | | | Actual | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ledger | | * List - Text | Highland Capital Management US | | | | | | | |
| Category | | * List - Text | Adjustment | | | | | Uploaded by:_____ | | |
| Source | | * List - Text | Spreadsheet | | | | | | | |
| Currency | | * List - Text | USD | | | | | | | |
| Accounting Date | | * List - Date | 10/15/2019 | | | | | Posted by:_____ | | |
| Journal Name | | Text | 20191015 Hunter Mountain Note R | | | | | | | |
| Journal Description | | Text | Hunter Mountain Note Receivable | | | | | | | |

| Upl | Entity | Department | Account | Business Unit | Future | Debit | Credit | Line Description | Messages |
|---|---|---|---|---|---|---|---|---|---|
| | * List - Text | | | | | * Number | * Number | Text | |
| ○ | 0010 | 000 | 14010 | 00 | 0000 | 61,002.36 | - | Hunter Mountain Note Receivable - Interest | ⊙ |
| ○ | 0010 | 000 | 14010 | 00 | 0000 | | | Hunter Mountain Note Receivable Update - PIK | ⊙ |
| ○ | 0010 | 000 | 14585 | 00 | 0000 | - | | Hunter Mountain Note Receivable Update - PIK | ⊙ |
| ○ | 0010 | 210 | 80100 | 10 | 0000 | | 61,002.36 | Hunter Mountain Note Receivable - Interest | ⊙ |
| | Totals: | | | | | 61002.36 | 61002.36 | | |

Tip: This is not the end of the Template.  Unprotect the sheet and insert as many rows as needed.

003485

Case 19-34054-sgj11    Doc 4255-118    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 118    Page 3 of 3

**T**

**I**

| | | |
|---|---|---|
| Beginning Principal | 63,000,000 | |
| Interest Rate | 2.61% | December 2015 Long-term AFR |
| Effective Date | 12/21/2015 | |

**I**                                              **7**

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | PIK | Ending Prin Bal | Total Paid | |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/17 | 43,260.12 | - | 43,260.12 | 60,663,611.75 | - | - | 60,663,611.75 | - | |
| 03/31/18 | 390,407.74 | - | 433,667.86 | 60,663,611.75 | - | - | 60,663,611.75 | - | |
| 06/30/18 | 394,745.60 | - | 828,413.46 | 60,663,611.75 | - | - | 60,663,611.75 | - | |
| 09/30/18 | 399,083.46 | - | 1,227,496.92 | 60,663,611.75 | - | - | 60,663,611.75 | - | |
| 10/31/18 | 134,473.78 | - | 1,361,970.70 | 60,663,611.75 | - | - | 60,663,611.75 | | |
| 11/30/18 | 130,135.91 | - | 1,492,106.61 | 60,663,611.75 | - | - | 60,663,611.75 | | |
| 12/19/18 | 82,419.41 | (1,574,526.02) | - | 60,663,611.75 | (504,879.98) | - | 60,158,731.77 | (2,079,406.00) | prepayment |
| 12/21/18 | 8,603.52 | (8,603.52) | - | 60,158,731.77 | - | 8,603.52 | 60,167,335.29 | - | |
| 12/31/18 | 43,023.77 | - | 43,023.77 | 60,167,335.29 | - | - | 60,167,335.29 | | |
| 01/31/19 | 133,373.67 | - | 176,397.44 | 60,167,335.29 | - | - | 60,167,335.29 | | |
| 02/28/19 | 120,466.54 | - | 296,863.98 | 60,167,335.29 | - | - | 60,167,335.29 | | |
| 03/28/19 | 120,466.54 | (417,330.52) | - | 60,167,335.29 | (3,294,125.95) | - | 56,873,209.34 | (3,711,456.47) | prepayment |
| 03/31/19 | 12,200.47 | - | 12,200.47 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 04/30/19 | 122,004.72 | - | 134,205.19 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 05/31/19 | 126,071.54 | - | 260,276.73 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 06/30/19 | 122,004.72 | - | 382,281.45 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 07/31/19 | 126,071.54 | - | 508,352.99 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 08/31/19 | 126,071.54 | - | 634,424.53 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 09/30/19 | 122,004.72 | - | 756,429.25 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 10/15/19 | 61,002.36 | - | 817,431.61 | 56,873,209.34 | | | 56,873,209.34 | | |
| 10/31/19 | 65,069.18 | - | 882,500.79 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 11/30/19 | 122,004.72 | - | 1,004,505.51 | 56,873,209.34 | - | - | 56,873,209.34 | | |
| 12/21/19 | 85,403.30 | (1,089,908.81) | - | 56,873,209.34 | - | 1,089,908.81 | 57,963,118.15 | - | |
| 12/21/20 | 1,516,982.14 | (1,516,982.14) | - | 57,963,118.15 | - | 1,516,982.14 | 59,480,100.29 | - | |
| 12/21/21 | 1,552,430.62 | (1,552,430.62) | - | 59,480,100.29 | (4,033,126.51) | 1,552,430.62 | 56,999,404.40 | (4,033,126.51) | |
| 12/21/22 | 1,487,684.45 | (1,487,684.45) | - | 56,999,404.40 | (5,000,000.00) | 1,487,684.45 | 53,487,088.85 | (5,000,000.00) | |
| 12/21/23 | 1,396,013.02 | (1,396,013.02) | - | 53,487,088.85 | (5,000,000.00) | 1,396,013.02 | 49,883,101.87 | (5,000,000.00) | |

003486

EXHIBIT   9

003487



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

FSD NO.     OF 2025 (     )

IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO LTD AND THE CHARITABLE DAF FUND LP

---

### AFFIDAVIT OF JAMES DAVID DONDERO

---

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, **MAKE OATH AND SAY** as follows:

1.   I am the President of NexPoint Advisors, L.P. (**NexPoint**), an investment advisor registered with the U.S. Securities and Exchange Commission (**SEC**). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2.   I make this affidavit in support of the petition (the **Petition**) filed by the Supporting Organizations (as defined below) seeking the winding up on the just and equitable basis of Charitable DAF HoldCo, Ltd (the **LP**) and the Charitable DAF Fund, LP (the **Fund**) pursuant to section 92(e) of the Companies Act (2025 Revision) (the **Act**) and Order 3, rule 3 of the Companies Winding Up Rules (2025 Consolidation) (the **CWR**).

3.   I make this affidavit from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4.   Now produced and shown to me and marked "**JDD-1**" is a bundle of true copy documents to which I refer in this affidavit. References to page numbers in this affidavit are references to that exhibit unless otherwise specified.

003488

HCMLPHMIT00003429

Case 19-34054-sgj11    Doc 4255-119    Filed 06/20/25    Entered 06/20/25 21:39:29
Case 3:25-cv-02724-L    Document Exhibit 119    Filed 12/03/23 of 14 Page 961 of 1013    PageID 3871

FSD2025-0099                    **Page 2 of 10**                    2025-04-16

### BACKGROUND

5.     I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding US$16 billion in value.

6.     I was formerly the President of Highland Capital Management, L.P. (**Highland**), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or my affiliates. In December 2015, I divested my majority stake of Highland (**2015 Transaction**). On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (**Highland Bankruptcy**) in the Northern District of Texas. The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

7.     In February 2021, as part of the Highland Bankruptcy, the employment contracts of the majority of Highland's employees were terminated. Many of the former back-office employees of Highland thereafter became employees of a newly formed company called Skyview Group (**Skyview**) that provides middle and back-office services to various clients, including companies in which I hold an interest such as NexPoint.

### THE FUND

8.     In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

9.     In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the **Supporting Organizations**) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the **Charities**).

10.    The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (**ARLPA**), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (**Articles**), govern the Fund and its partners.

11.    The LP holds 99% ninety-nine percent (99%) of the economic interest in the Fund. The remaining one percent (1%) is (or at least was as at the time of the Fund's formation) held by its general partner, Charitable DAF GP, LLC (the **GP**), a Delaware company incorporated on 25 October 2011.

003489

HCMLPHMIT00003430

12. In addition to the Participation Shares, the LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

13. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

**GRANT SCOTT**

14. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

15. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr Scott as the Control Person. However, Mr Scott had complete discretion in adopting or rejecting the investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr Scott was paid $60,000 USD per annum.

16. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

17. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax-deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr Patrick served that role at Highland from 2008 until his departure in February 2021.

18. In March 2021, Mr Patrick was hired by Skyview as Tax Counsel and continued to perform

003490

HCMLPHMIT00003431

Case 19-34054-sgj11   Doc 4255-119   Filed 06/20/25   Entered 06/20/25 21:39:29
Case 3:25-cv-02724-L   Document 1-8 Exhibit Filed 12/09/25 of 11 Page 963 of 1013   PageID 3873

FSD2025-0099                   **Page 4 of 10**                       2025-04-16

substantially similar tax counsel duties for me. At Mr Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

19. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr Patrick working with outside counsel. Mr Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

20. In March 2021, Mr Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the Highland Bankruptcy, and he did not believe he was equipped to handle those disputes. Mr Patrick suggested to Mr Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr Patrick was my attorney and Mr Scott was my trusted friend, and I was happy for Mr Scott to pass the Control Position to Mr Patrick.

21. On 25 March 2021, Mr Scott: (i) resigned as director of the LP, (ii) appointed Mr Patrick as director of the LP, and (iii) transferred to Mr Patrick the Management Shares for nominal consideration. Mr Patrick therefore assumed the Control Position from that date.

22. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr Murphy, Mr Patrick's vote counts as the tiebreaker for corporate voting.

**MR PATRICK'S CONTROL OF THE FUND**

23. In the initial period following Mr Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr Patrick was free (as Mr Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

24. Subsequently, however, communications between Mr Patrick and Skyview and me began to become less frequent, and over time I came to suspect that Mr Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the Fund, but rather for his own personal enrichment.

25. On 28 June 2023, Mr Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas

003491
HCMLPHMIT00003432

Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms Short learned that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

26.   Ms Short discussed the matter with Mr Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on 5 September 2023, but Mr Patrick was informed that further payments were unlikely. I was informed of this process by Ms Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

27.   As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

28.   Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr Cronin was known to me personally. In September 2023, Mr Cronin and I met, and he informed me that he had been approached by Mr Patrick with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation. Mr Cronin informed me that he had asked Mr Patrick if this arrangement would amount to fraud, and that Mr Patrick's response had been: "*you can't steal from yourself.*"

29.   Mr Cronin informed me that he understood from this statement that Mr Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr Cronin further informed me that he was uncomfortable about Mr Patrick's proposal and that he subsequently communicated this to Mr Patrick, Mr Patrick cut off all further communications between them.

30.   Mr Cronin's allegations that Mr Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my U.S. attorneys that, had Mr Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr Cronin contacted me, I met with Mr Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations

003492

HCMLPHMIT00003433

about the matter and Mr Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr Patrick's powers or remove him from his position.

31. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the **Expense Summary**) which indicated substantial increases in expenditures during Mr Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

   (a) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased even further to around US$2.25 million in the first half of 2024 alone.

   (b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

32. The Expense Summary reinforced my concern that Mr Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

33. In August 2024, I became aware of yet another issue concerning Mr Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (**MNPI**) related to those investments.  As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (**Compliance Policy**). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading.  Mr Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

34. I was informed that my director of charitable giving had been contacted by Ms Diaz, the CEO of the Highland Dallas Foundation, Inc. (**Dallas Foundation**), one of the Charities. Ms Diaz stated that on 28 August 2024, Mr Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI,

003493

HCMLPHMIT00003434

which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

35.  Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations. On 1 October 2024, as part of the finalisation of the investigation report, Skyview's chief compliance officer interviewed Ms Diaz about the allegations against Mr Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on 11 October 2024 and concluded that Mr Patrick had attempted a serious breach of U.S. securities laws. A copy of the report and its attachments is at **page 1**.

36.  On 2 October 2024, Mr Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr Patrick became aware of the investigation into his behaviour and resigned before the report was published.

37.  On the same day that Mr Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr Patrick as my counsel, I believe that Mr Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

38.  After his resignation from Skyview and the termination of Skyview's services agreement with the Fund, I have received repeated reports and evidence of Mr Patrick causing certain DAF entities to liquidate their assets, some at below-market value. For example, on 20 February 2025, Mr Patrick's subordinate Shawn Raver asked for the in-bound wire instructions for one of my affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain owns most of the distribution rights of the equity position in the Highland Bankruptcy, meaning most of the residual value of the estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy. According to

003494

HCMLPHMIT00003435

Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value.

39.  After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. I am familiar with the Highland Bankruptcy estate and there is no valuation, net, gross, or otherwise, that I can imagine that would support a $1 million sales price. Additionally, given my founding and my affiliates' ownership of Highland, Mr Patrick would know that I was one of a few natural buyers of the Hunter Mountain position. While Mr Patrick of course would not be obliged to sell Hunter Mountain to me, the fact that Mr Patrick authorized the sale of Hunter Mountain at a below-market value without even approaching a natural buyer indicates a non-market, non-fiduciary reason for the sale.

40.  Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the DAF. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policy holder is Empower Dallas Foundation, a charitable foundation for which I serve as President whose purpose is to benefit the Dallas Foundation.

41.  On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of my affiliates) dated 7 May 2014 in the amount of $2,3M and 27 May 2014 in the amount of $5M, held by the Partnership; and (iii) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the two Notes, including accumulated interest, was in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 attempted sale of the Notes to an affiliate.

42.  On 27 February 2025, H&K as counsel for the Empower Dallas Foundation (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes to CLO Holdco. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and

003495

HCMLPHMIT00003436

proposed $500,000 sale price was confusing given that HCRE Partners had offered to pay the full amounts due in an amortizing schedule. After the withholding of consent, the revised offer of 28 February 2025 still is confusing given that the amortization schedule is longer than 12 months.

**ATTORNEY GENERAL INVESTIGATION**

43.  I have become aware that, on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organization, conduct and management of Charitable DAF GP, LLC, and its related entities.

44.  I understand that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

45.  I understand that the Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**DONATIONS TO THE CHARITIES**

46.  Until Mr Patrick's departure in October 2024, I regularly donated to through the Charities to the Fund as part of my charitable giving program. My affiliates and I, which donated through the Charities to the DAF entities in 2023 and in various years prior, and are the primary funding source for the Fund. As allowed pursuant to US law, I direct the Charities to utilize the Fund's assets to sponsor charitable causes I particularly value, including underprivileged youth education, cancer research, heart health, veterans' services, and local institutions such as zoos and museums. Though I wish to continue to support these charitable causes, I will not give any future donations through the Charities to the Fund while it is under Mr Patrick's management and/or control.

**FUNDING OF PROCEEDINGS**

47.  As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations simply for the purpose of overseeing how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. In this context, I became aware that the Supporting Organizations were meeting to vote on the decision to take legal action to take steps to preserve the assets of the Charities they exist to support. Given my connection with the Fund and personal relationship with Mr Patrick, I recused myself from that meeting and was not otherwise involved in the decision taken by the Supporting Organizations to commence these proceedings.

48.  The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not

003496
HCMLPHMIT00003437

at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

| | |
|---|---|
| **SWORN** by the above named | ) |
| **JAMES DAVID DONDERO** | ) |
| This 9th day of April 2025 | ) |
| at 4:46 pm | ) |

_____
**JAMES DAVID DONDERO**

**BEFORE ME:**

_____
**NOTARY PUBLIC**



KRYSTAL HUGHES
Notary ID #129488160
My Commission Expires
July 12, 2025

THIS AFFIDAVIT was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (Ref:AJ/RZ/0016)

003497

HCMLPHMIT00003438

**EXHIBIT**

003498

| **From:** | John A. Morris |
|---|---|
| **Sent:** | Thursday, June 19, 2025 6:10 PM |
| **To:** | Andrea T. Bates; Hayley R. Winograd |
| **Subject:** | FW: Highland -- Request to File Rule 2019 Statement |

---

**From:** Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Sent:** Monday, June 16, 2025 4:24 PM
**To:** David Curry <dcurry@okinadams.com>; Matthew Okin <mokin@okinadams.com>
**Cc:** John A. Morris <jmorris@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>
**Subject:** Highland -- Request to File Rule 2019 Statement

Gentlemen –

As your law firm purports to represent  multiple parties in connection with the Highland bankruptcy case and next week's hearing we hereby request that you comply with your obligations to file promptly a Rule 2019 statement with the Bankruptcy Court.

Best,
Jeff

**Jeff Pomerantz**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Cell: 310.489.0285 | Fax: 310.201.0760
jpomerantz@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

1

003499

**EXHIBIT**

003500

Docket #1808 Date Filed: 01/22/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

- 1 -



¨1¤934054210122000000000013
1934054210122000000000013

Article I  .B.1-5

cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.    The Claimant Trust**[2]

      *1.*              *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

003503

Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.        *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.        *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and

27

monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

    *4.*        *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

    *5.*        *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

    (i)     the payment of the Claimant Trust Expenses;

    (ii)    the payment of other reasonable expenses of the Claimant Trust;

    (iii)   the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

    (iv)   the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

    (v)   the orderly monetization of the Claimant Trust Assets;

    (vi)   litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

    (vii)  the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

    (viii)  the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

    (ix)   the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

003505

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

      (i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

      (ii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

      (iii)   the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

     *6.*       *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust

003506

Article I .B.7

Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.        *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.        *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.        *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

003508

Article I .B.10

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.    _Claimant Trust Assets._

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.    _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.    _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.    _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are

31

003510

**Article I  .D**

5.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in

the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

### E.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of

003513

Article   II.D.1-2

003514

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### A.     Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

### B.     Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

### C.     Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### D.     Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1. _Allowance of Claims_

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2. _Estimation_

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3. _Disallowance of Claims_

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH**

## Article   I

003517

Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or

003518

expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such

54

003519

orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement

55

**EXHIBIT**

Case 19-34054-sgj11 Doc 1811-2 Filed 02/22/21 Entered 01/29/21 Entered 02/22/21 10:29 of 38
Case 3:25-cv-02724-L    Document Exhibit 122 17 Page 2 of 12  Page 994 of 1013    PageID 3904
DRAFT

# CLAIMANT TRUST AGREEMENT

This Claimant Trust Agreement, effective as of _____ , 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee"), and [____] as Delaware trustee (the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve Disputed Claims as set forth herein and in the Plan; and

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2]  For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

003522

(vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1     Certain Definitions.  Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.  For all purposes of this Agreement, the following terms shall have the following meanings:

(a)     "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)     "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)     "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

2

003523

ection 2.2(a)-(b)

2.2    <u>Objectives</u>.

(a)    The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries.  The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC.  The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan.  In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

(b)    It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations.  In furtherance of this objective, the Claimant Trustee shall, in his business judgment, make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

2.3    <u>Nature and Purposes of the Claimant Trust</u>.

(a)    The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d).  The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement.  The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date.  On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, <u>provided</u>, <u>however</u>, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement.  For the avoidance of doubt, the Claimant Trust,

003525

ection 3.2(a)-(b)

003526

2.5 <u>Principal Office</u>. The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:[_____].

2.6 <u>Acceptance</u>. The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7 <u>Further Assurances</u>. The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8 <u>Incidents of Ownership</u>. The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

<div align="center">

### <u>ARTICLE III.</u>
### <u>THE TRUSTEES</u>

</div>

3.1 <u>Role</u>. In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2 <u>Authority</u>.

(a) In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust. The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law. The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b) The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; <u>provided</u>, <u>however</u>, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate. To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or

<div align="center">11</div>

<div align="right">003527</div>

otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)    Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)    solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)    open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)    as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)    settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)    sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)    upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)    exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)    protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)    obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and

003528

ection 3.2(c)(iv)

otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)    Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)    solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)    open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)    as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)    settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)    sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)    upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)    exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)    protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)    obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and

12

003530

ection 2.3(b)(i  )

pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

(b)    The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

(i)    to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

(ii)    to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); provided, however, that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

(iii)    to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

(iv)    to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

(v)    to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

(vi)    to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

(vii)    to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

(viii)    to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

(ix)    to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

003532

# EXHIBIT

003533

Case 19-34054-sgj11 Doc 1811-4 Filed 01/22/21 Entered 01/22/21 00:29 Page 29 of 23
Case 3:25-cv-02724-L    Document 17 Exhibit 1 Filed 12/19/25   Page 1006 of 1013    PageID 3916
*Draft*

# LITIGATION SUB-TRUST AGREEMENT

This Litigation Sub-Trust Agreement, effective as of _____, 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among James P. Seery, Jr., as trustee of the Highland Claimant Trust (the "Claimant Trustee"), [____] as Delaware Trustee, and Marc S. Kirschner as trustee (the "Litigation Trustee," and together with the Claimant Trustee and Delaware Trustee, the "Parties") of the Litigation Sub-Trust for the benefit of the Claimant Trust as sole Litigation Sub-Trust Beneficiary.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "Debtor") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Litigation Sub-Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Litigation Sub-Trust Assets are hereby to be transferred by the Claimant Trust to the Litigation Sub-Trust (each as defined herein) created and evidenced by this Agreement so that (i) Estate Claims can be investigated, prosecuted, settled, abandoned, resolved, and otherwise monetized as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement; (ii) proceeds of Estate Claims can be remitted to the Claimant Trust as Claimant Trust Assets for distribution to the Claimant Trust Beneficiaries (as defined in the Claimant Trust Agreement) in accordance with the Plan and Claimant Trust Agreement; (iii) the Litigation Trustee can investigate, litigate, settle, or otherwise resolve any Filed Claims relating to the Estate Claims, including the Employee Claims; and (iv) administrative services relating to the activities of the Litigation Sub-Trust can be performed by the Litigation Trustee.

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

ection 2.2

## ARTICLE II.
## ESTABLISHMENT OF THE LITIGATION SUB-TRUST

2.1    Establishment of Sub-Trust.

(a)    The Parties, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish a statutory trust under the Delaware Statutory Trust Act on behalf of the Claimant Trust as the sole Litigation Sub-Trust Beneficiary, which shall be known as the "Highland Litigation Sub-Trust," on the terms set forth herein. The Litigation Trustee may use this name in accordance with the terms and conditions set forth herein as the Litigation Trustee sees fit.

(b)    The Litigation Trustee shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in his capacity as Litigation Trustee, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

2.2    Nature and Purposes of the Litigation Sub-Trust. The Litigation Sub-Trust is organized and established as a trust for the purpose of monetizing the Estate Claims and making distributions to Litigation Sub-Trust Beneficiary in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d). The Litigation Sub-Trust shall serve as a mechanism for investigating, prosecuting, settling, resolving, and otherwise monetizing all Estate Claims and distributing the proceeds of such Estate Claims to the Claimant Trust in a timely fashion in accordance with the Plan, the Confirmation Order, and this Agreement. The Litigation Sub-Trust and Litigation Trustee shall have and retain any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Estate Claim as of the Petition Date. Except as otherwise provided herein, the Litigation Sub-Trust shall have the sole responsibility for the pursuit and settlement of the Estate Claims, and, subject to the terms of the Claimant Trustee Agreement, the sole power and authority to allow or settle and compromise any Claims related to the Estate Claims, including, without limitation, Employee Claims. For the avoidance of doubt, the Litigation Sub-Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement).

2.3    Transfer of Assets and Rights to the Litigation Sub-Trust.

(a)    On or as soon as practicable after the Effective Date, the Claimant Trust shall automatically an irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims, Employee Claims, and Privileges. For purposes of the transfer of documents, the Litigation Sub-Trust is an assignee and successor to the Debtor in respect of the Estate Claims and Employee Claims and shall be treated as such in any review of confidentiality restrictions in requested documents. For the avoidance of doubt, following the Effective Date, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

003536

ection 3.2(a)
ection 3.2(b)
ection 3.2(c)(v)

3.2    <u>Authority</u>.

(a)    In connection with the administration of the Litigation Sub-Trust, in addition to any and all of the powers enumerated elsewhere herein, the Litigation Trustee shall, in an expeditious but orderly manner, investigate, prosecute, settle, and otherwise resolve the Estate Claims.  The Litigation Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Litigation Sub-Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.

(b)    The Litigation Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Estate Claims and Employee Claims (in accordance with the terms of the Claimant Trust Agreement).  To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any such Estate Claims or Employee Claims prior to the Effective Date, on the Effective Date the Litigation Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "Marc Kirschner, not individually but solely as Litigation Trustee for the Highland Litigation Sub-Trust, et al. v. [Defendant]".

(c)    Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Litigation Trustee shall have the power and authority to:

(i)    hold legal title to any and all rights in or arising from the Litigation Sub-Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Litigation Sub-Trust (including any proceeds of the Litigation Sub-Trust Assets);

(ii)    perform the duties, exercise the powers, and asserts the rights of a trustee under sections 1123(b)(3)(B) of the Bankruptcy Code with respect to the Litigation Sub-Trust Assets, including the right to assert claims, defenses, offsets, and privileges;

(iii)    subject to any approval of the Oversight Board that may be required under Section 3.3(b), protect and enforce the rights of the Litigation Sub-Trust with respect to any Litigation Sub-Trust Assets by any method deemed appropriate, including, without limitation, by judicial proceeds, or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(iv)    determine and satisfy any and all liabilities created, incurred, or assumed by the Litigation Sub-Trust;

(v)    subject to any approval of the Oversight Board that may be required under Section 3.3(b), investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, all

7

003538

Estate Claims, Employee Claims, or any other Causes of Action in favor of or against the Litigation Sub-Trust;

(vi)    with respect to any Estate Claim, avoid and recover transfers of the Debtor's property as may be permitted by the Bankruptcy Code or applicable state law;

(vii)    subject to applicable law, seek the examination of any Entity or Person with respect to the Estate Claims;

(viii)    make all payments relating to the Litigation Sub-Trust Assets;

(ix)    assess, enforce, release, or waive any privilege or defense on behalf of the Litigation Sub-Trust, the Litigation Sub-Trust Assets, or the Litigation Sub-Trust Beneficiary, if applicable;

(x)    prepare, or have prepared, and file, if necessary, with the appropriate taxing authority any and all tax returns, information returns, and other required documents with respect to the Litigation Sub-Trust, and pay taxes properly payable by the Litigation Sub-Trust;

(xi)    if not otherwise covered by insurance coverage obtained by the Claimant Trust, obtain reasonable insurance coverage with respect to any liabilities and obligations of the Litigation Trustee, solely in his capacity as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Litigation Sub-Trust Expense and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Reserve;

(xii)    without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Litigation Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Litigation Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Litigation Trustee shall be Litigation Sub-Trust Expenses and paid by the Litigation Trustee from the Litigation Sub-Trust Expense Cash Reserve;

(xiii)    to the extent applicable, assert, enforce, release, or waive any Privilege or defense on behalf of the Litigation Sub-Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Litigation Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xiv)    take all steps and execute all instruments and documents necessary to effectuate the purpose of the Litigation Sub-Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the

003539

ection 3.3(b)(iii)

Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder; and

(xv)     exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order (the foregoing subparagraphs (i)-(xv) being collectively, the "Authorized Acts").

(d)     The Litigation Trustee has the power and authority to act as trustee of the Litigation Sub-Trust and perform the Authorized Acts through the date such Litigation Trustee resigns, is removed, or is otherwise unable to serve for any reason.

(e)     Any determinations by the Liquidation Trustee, under the direction of the Oversight Board, with respect to the amount or timing of settlement or other disposition of any Estate Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Litigation Sub-Trust Beneficiary and all other parties of interest following the entry of an order of a court of competent jurisdiction approving such settlement or other disposition to the extent required or obtained.

3.3     Limitation of Authority.

(a)     Notwithstanding anything herein to the contrary, the Litigation Sub-Trust and the Litigation Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Estate Claims as required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, or (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement.

(b)     Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Litigation Trustee must receive the consent by vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 of the Claimant Trust Agreement, in order to:

(i)     terminate or extend the term of the Litigation Sub-Trust;

(ii)     commence litigation with respect to any Estate Claims and, if applicable under the terms of the Claimant Trust Agreement, the Employee Claims, including, without limitation, to (x) litigate, resolve, or settle coverage and/or the liability of any insurer under any insurance policy or legal action related thereto, or (y) pursue avoidance, recovery, or similar remedies that may be brought under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes or common law, including fraudulent transfer law;

(iii)     settle, dispose of, or abandon any Estate Claims (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such Estate Claim);

(iv)     borrow funds as may be necessary to fund litigation or other costs of the Litigation Sub-Trust;

003541