**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|  |  |  |  |
|---|---|---|---|
| | § | | |
| | § | Case No | **19-34054-SGJ-11** |

**The Dugaboy Investment Trust**
**- Appellant**

|  |  |
|---|---|
| | § |
| vs. | § |

**Highland Claimant Trust**
-Appellee

|  |  |  |
|---|---|---|
| | § | **3:25-CV-02724-L** |
| | § | |

 **[4401] Order Granting Motion for Order Fixing Allowed Amount of Class 11 Interests (related document # 4362) Entered on 9/22/2025.**

<div align="center">

**Volume 7**
**APPELLANT RECORD**

</div>

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

*INDEX*

**Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and Amended Designation of Items to be Included in the Record on Appeal From the Bankruptcy Court's Order Fixing Allowed Amount of Class 11 Interests**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4423] on October 6, 2025, from the Bankruptcy Court's September 22, 2025 *Order Fixing Allowed Amount of Class 11 Interests* [Docket No. 4401], and having received the Clerk's letter of October 23, 2025 requesting corrections to the record designations, submits this *Statement of Issues to be Presented and Amended Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. Did the Bankruptcy Court misapply the absolute-priority rule in determining that the Hunter Mountain Investment Trust's (HMIT's) Class 10 interests were entitled to 100% of any excess funds left over after all senior creditor classes were paid in full, in disregard of equity interests that allocated 99.5% to HMIT and 0.5% to Dugaboy?

2. Did the Bankruptcy Court err when it allocated potential excess funds in a way that effectively gave HMIT *more than* 100% of what it was entitled to, in contravention of black-letter law holding that a senior class cannot receive more than 100% without the consent of the junior class? *See In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009).

3. Did the Bankruptcy Court err in determining the value of Dugaboy's interest only as a fixed dollar amount, rather than a *pro rata* percentage reflecting its equity ownership share?

4. Did the Bankruptcy Court err in allowing Highland to use a valuation methodology for determining the allowed amount of Dugaboy's claim based on limited partners' pre-petition capital accounts, which were derived from untested and unvetted figures created for tax purposes that bore little if any relation to true market value, when nothing in the confirmed Reorganization Plan allowed for such a method?

5. Did the Bankruptcy Court err in believing that "res judicata" required it to use the same methodology to value Dugaboy's Class 11 interests as it had previously used to value HMIT's Class 10 interests?

---

[1] Because of its voluminous nature, Docket No. 4255 will be delivered to the Clerk on a flash drive that will arrive tomorrow.

1

6.   Did the Bankruptcy Court err at the hearing on September 18, 2025, when it invoked "res judicata" to threaten Dugaboy's counsel with Rule 11 sanctions for "recycling" arguments previously made by the "revolving door of lawyers" that had represented Dugaboy over the previous several years, thus seeking to impose a chilling effect on Dugaboy's right to zealous advocacy by its chosen counsel?

7.   Did the Bankruptcy Court's Order Fixing Allowed Amount of Class 11 Interests (Docket No. 4401) constitute a "final" judgment or order, thereby giving the District Court jurisdiction for appellate review of the Bankruptcy Court's Order denying Dugaboy's Motion to Recuse?

### DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

1.   Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4423] filed by Appellant;

2.   Bankruptcy Court's *Order Fixing Allowed Amount of Class 11 Interests* [Docket No. 4401];

3.   Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4.   Any opinion, findings of fact, and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings; and

5.   Each of the additional documents and items designated below:

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s) 1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 9/14/2022 | 3521-5 | Claimant Trust Agreement |
| 2/27/2024 | 4199 | Stipulated and Agreed Order resolving (A) HCLOM, Ltd.'s Scheduled claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a bad faith |

*Handwritten annotations in left margin:*
Vol. 1
000001
000009
000013

Vol. 2
000619
000780
000820

| | | | |
|---|---|---|---|
| | | | finding and an award of attorney's fees against HCLOM, Ltd., and James Dondero in connection therewith (related document #3657, 4176) Entered on 12/27/2024. (Dugan, Sue) |
| *Vol. 2*  *000827* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *000845* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *000848* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *Vol. 3*  *000873* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *000881* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s) 4230 Objection). (Lang, Michael) |
| *000883* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s) 4230 Objection). (Lang, Michael) |
| *000885*  *Thru Vol 5* | 6/20/2025 | 4255  *(to be submitted to* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related |

| | *Clerk on flash drive*) | document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 |

VOL. 6

003542

4

| | | | |
|---|---|---|---|
| | | | U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s) 4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8, 8, Exhibit 9 (Curry, David) |
| | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| | 6/23/2025 | 4275 | Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. B*<br><br>*004259* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *004270* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)).          (Attachments:#1 Exhibit 126 (Annable, Zachery) |
| *004295* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *004296* | 6/25/2025 | 4296 | Transcript of hearing held June 25, 2025, before Chief Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297] |
| *004562* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4223 Objection). (Annable, Zachery) |
| *004291* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an |

| | | | |
|---|---|---|---|
| Vol. 8 | | | order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| 0045 77 | 6/30/2025 | 4297 | Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025. (Okafor, M.) |
| 0045 81 | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| 0045 83 | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| 0045 92 | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 0045 94 | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| Vol. 9<br><br>0046 90 | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s) 4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |

| | | | |
|---|---|---|---|
| Vol 10<br>0049b3 | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s) 4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| 0049Ɛ9 | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion).  Appellant  Designation  due  by  08/18/2025. (Attachments: # 1 Exhibit A) (Harper, Geoffrey) |
| 005001 | 8/8/2025 | 4362 | Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) Filed by Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A--Proposed Order) (Annable, Zachery) |
| 005012 | 8/12/2025 | 4368 | Amended appellant designation of contents for inclusion in record on appeal and statement of issues on appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4365 Appellant designation). (Harper, Geoffrey) |
| 005023 | 8/15/2025 | 4371 | Notice of hearing filed by Other Professional Highland Claimant Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) Filed by Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held  on  9/18/2025  at  02:30  PM  at https://us-courts.webex.com/meet/jerniga for 4362, (Annable, Zachery) |
| 005029 | 8/29/2025 | 4378 | Order Approving Motion to Conform Plan to Fifth Circuit Mandate (related document # 4302) Entered on 8/29/2025. (Okafor, M.) |
| 005032 | 9/8/2025 | 4384 | Response opposed to (related document(s): 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust) filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005047 | 9/11/2025 | 4389 | Stipulation by Highland Claimant Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust (RE: related document(s) 4384 Response). (Annable, Zachery) |
| 005051 | 9/15/2025 | 4393 | Reply to (related document(s): 4384 Response filed by Creditor The Dugaboy Investment Trust) (Reply in Support of Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust. (Annable, Zachery) |

| | 9/15/2025 | 4394 | Amended Witness and Exhibit List (Highland Claimant Trust's Witness and Exhibit List with Respect to Hearing to Be Held on September 18, 2025) filed by Other Professional Highland Claimant Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10) (Annable, Zachery) |
|---|---|---|---|
| | 9/15/2025 | 4395 | Witness and Exhibit List for Hearing to be Held on September 18, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests)). (Harper, Geoffrey) |
| | 9/18/2025 | 4398 | Court admitted exhibits date of hearing September 18, 2025 (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust (Court Admitted Debtors/Highland Capital Mgmt., L.P. exhibits #1, #2, #3, #4, #5, #6, #7, #8, #9 & #10 offered by attorney John Morris, found at doc. #4394.) (Edmond, Michael) |
| | 9/22/2025 | 4401 | Order Granting Motion for Order Fixing Allowed Amount of Class 11 Interests (related document # 4362) Entered on 9/22/2025. (Grandstaff, Travis) |

Dated: October 23, 2025       Respectfully submitted,

**WINSTON & STRAWN LLP**

By:  */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

***Counsel for Appellant***
***The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

     I certify that on October 23, 2025, a copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

        */s/ Geoffrey S. Harper*
        Geoffrey S. Harper

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,*
*L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as*
*Litigation Trustee of The Highland*
*Litigation Sub-Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |

**HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND**
**LITIGATION SUB-TRUST'S AMENDED WITNESS AND EXHIBIT LIST WITH**
**RESPECT TO HEARING TO BE HELD ON JUNE 25, 2025**

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland,"

as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and
service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

003865

Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by and through their undersigned counsel, submit the following amended witness and exhibit list with respect to the *Motion for an Order Further Extending Duration of Trusts* [Docket No. 4213], which the Court has set for hearing at 9:30 a.m. (Central Time) on June 25, 2025 (the "Hearing") in the Bankruptcy Case.

> A.  **Witnesses:**

> 1.  James P. Seery, Jr.;

> 2.  Any witness identified by or called by any other party; and

> 3.  Any witness necessary for rebuttal.

> B.  **Amended Exhibits:**[2]

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 1. | Ex A – Listing of remaining unliquidated/non-cash or treasury assets by entity as of May 31, 2025 [HCMLPDT003156] | | |
| 2. | Promissory Note in amount of $24,268,621.69, dated May 31, 2017 [HCMLPDT000001-HCMLPDT000002] | | |
| 3. | Presentation - The Dugaboy Investment Trust Offering of $18.17 Million Promissory Note Owed to HCMLP February 2024 [HCMLPDT000020-HCMLPDT000024] | | |
| 4. | LSTA Participation Agreement for Par/Near Par Trades (Dugaboy Note) - HCMLP - Highland Indemnity Trust [HCMLPDT000028-HCMLPDT000034] | | |
| 5. | *Draft* Presentation of The Dugaboy Investment Trust Offering of $18.17 Million Promissory Note Owed to HCMLP February 2024 (Redacted) [HCMLPDT000036-HCMLPDT000041] | | |

---

[2] The amendments to the original exhibit list, filed at Docket No. 4253, include the additions of two exhibits: Exhibit Nos. 66 & 67, in bold font below.

003866

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 6. | *Draft* Presentation of The Dugaboy Investment Trust Offering of $18.17 Million Promissory Note Owed to HCMLP February 2024 (Redacted) <br> [HCMLPDT000042-HCMLPDT000064] | | |
| 7. | *Draft* Presentation of Highland Claimant Trust Recommended Dugaboy Note Contribution 6.7.24 (Redacted) <br> [HCMLPDT000065-[HCMLPDT000070] | | |
| 8. | Email dated May 23, 2024 from David Klos to DC Sauter re: Dugaboy note and misc <br> [HCMLPDT000071-[HCMLPDT000073] | | |
| 9. | Dugaboy Note Valuation 6-28-24 <br> [HCMLPDT000019] | | |
| 10. | Dugaboy note worksheet January 2024 <br> [HCMLPDT000025] | | |
| 11. | Potential Buyer Tracking Sheet June 10 <br> [HCMLPDT000035] | | |
| 12. | Complaint for (1) Disallowance of Claim No. 205 in Its Entirety, (2) Estimation of Claim No. 205 for Allowance Purposes, or (3) Subordination of Any Allowed Portion of Claim No. 205 of Patrick Hagaman Daugherty <br> [HCMLPDT000003-HCMLPDT000018] | | |
| 13. | Adv. Proc. No. 25-03055 – Dkt. No. 5 Patrick Daugherty's Motion to Dismiss <br> [HCMLPDT001697-[HCMLPDT001709] | | |
| 14. | Adv. Proc. No. 21-03076 – Dkt. No. 158 Amended Complaint and Objection to Claims <br> [HCMLPDT000208-[HCMLPDT000353] | | |
| 15. | Notice of Transmittal of NexPoint Real Estate Partners, LLC Second Amended Notice of Appeal <br> [[HCMLPDT000358-[HCMLPDT000688] | | |
| 16. | Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith Dkt. No. 4216 <br> [HCMLPDT002917-HCMLPDT002934] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025 (TRUSTS)**    **PAGE 3 OF 9**
SF 4902-5663-1886.2 36027.002 DOCS_NY:42648.1 36027/002

003867

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 17. | Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, Dkt. No. 4217 [HCMLPDT002935-HCMLPDT002962] | | |
| 18. | Confidentiality and Non-Disclosure Agreement dated March 18, 2024 (Redacted) [HCMLPDT003098-HCMLPDT003103] | | |
| 19. | *Confidential Draft* of Presentation of Highland Capital Management on HCM Korea Overview dated March 2024 [HCMLPDT003116-HCMLPDT003133] | | |
| 20. | *Confidential Draft* of Presentation of Highland Capital Management on HCM Korea Overview dated October 2023 [HCMLPDT003134-HCMLPDT003152] | | |
| 21. | USCA Second Circuit Docket No. 25-643 Dkt. Entry 24.1 Order (granting Appellants' extension of time to file opening brief) [HCMLPDT001710] | | |
| 22. | SEC Amendment No. 1 to Form S-1 for Caris Life Sciences, Inc. [[HCMLPDT001711-[HCMLPDT002072] | | |
| 23. | SEC Form S-1 for Caris Life Sciences, Inc [HCMLPDT002073-HCMLPDT002439] | | |
| 24. | Highland Claimant Trust Letter to Patrick Daugherty dated May 20, 2025 re: Eighth Distribution [HCMLPDT000026] | | |
| 25. | USCA Second Circuit Case No. 25-643, Dkt Entry 21.1, Appellants' Unopposed Motion for Extension of Time to File Brief [HCMLPDT002984-HCMLPDT002987] | | |
| 26. | *Confidential Draft* of Presentation of Highland Capital Management on US Healthcare Growth Equity Opportunity dated October 2023 [HCMLPDT003104-HCMLPDT003115] | | |
| 27. | Indicative Sales Agreement (HCMLP Comments 12/30/2024) for US Gaming, LLC (Redacted) [HCMLPDT003153-HCMLPDT003155] | | |
| 28. | Post-Confirmation Report for Reorganized Debtor Dkt. No. 2949 for the Quarter Ending 09/30/2021 [HCMLPDT002440-HCMLPDT002444] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025 (TRUSTS)** **PAGE 4 OF 9**
SF 4902-5663-1886.2 36027.002 DOCS_NY:42648.1 36027/002

003868

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 29. | Post-Confirmation Report for Reorganized Debtor Dkt. No. 3004 for the Quarter Ending 09/30/2021 [HCMLPDT002445-HCMLPDT002449] | | |
| 30. | Post-Confirmation Report for Highland Claimant Trust Dkt. No. 3005 for the Quarter Ending 09/30/2021 [HCMLPDT002450-HCMLPDT002454] | | |
| 31. | *Amended* Post-Confirmation Report for Reorganized Debtor Dkt. No. 3200 for the Quarter Ending 09/30/2021 [HCMLPDT002455-HCMLPDT002463] | | |
| 32. | Post-Confirmation Report for Reorganized Debtor Dkt. No. 3201 for the Quarter Ending 12/31/2021 [HCMLPDT002464-HCMLPDT002471] | | |
| 33. | Post-Confirmation Report for Highland Claimant Trust Dkt. No. 3202 for the Quarter Ending 12/31/2021 [HCMLPDT002472-HCMLPDT002478] | | |
| 34. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 3325 for the Quarter Ending 03/31/2022 [HCMLPDT002479-HCMLPDT002486] | | |
| 35. | Post-Confirmation Report for Highland Claimant Trust Dkt. No. 3326 for the Quarter Ending 03/31/2022 [HCMLPDT002487-HCMLPDT002494] | | |
| 36. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 3409 for the Quarter Ending 06/30/2022 [HCMLPDT002495-HCMLPDT002507] | | |
| 37. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 3410 for the Quarter Ending 06/30/2022 [HCMLPDT002508-HCMLPDT002519] | | |
| 38. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 3582 for the Quarter Ending 09/30/2022 [HCMLPDT002520-HCMLPDT002531] | | |
| 39. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 3583 for the Quarter Ending 09/30/2022 [HCMLPDT002532-HCMLPDT002543] | | |
| 40. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 3652 for the Quarter Ending 12/31/2022 [HCMLPDT002544-HCMLPDT002555] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025 (TRUSTS)**
SF 4902-5663-1886.2 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 5 OF 9**

003869

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 41. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 3653 for the Quarter Ending 12/31/2022 [HCMLPDT002556-HCMLPDT002567] | | |
| 42. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 3756 for Quarter Ending 03/31/2023 [HCMLPDT002568-HCMLPDT002582] | | |
| 43. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 3757 for the Quarter Ending 03/31/2023 [HCMLPDT002583-HCMLPDT002597] | | |
| 44. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 3888 for Quarter Ending 06/30/2023 [HCMLPDT002598-HCMLPDT002609] | | |
| 45. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 3889 for the Quarter Ending 06/30/2023 [HCMLPDT002610-HCMLPDT002621] | | |
| 46. | Post-Confirmation Report (error message) Dkt. No. 3953 [HCMLPDT002622-HCMLPDT002624] | | |
| 47. | Post-Confirmation Report (error message) Dkt. No. 3954 [HCMLPDT002625-HCMLPDT002627] | | |
| 48. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 3955 for Quarter Ending 09/30/2023 [HCMLPDT002628-HCMLPDT002639] | | |
| 49. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 3956 for Quarter Ending 09/30/2023 [HCMLPDT002640-HCMLPDT002651] | | |
| 50. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 4020 for Quarter Ending 12/31/2023 [HCMLPDT002652-HCMLPDT002663] | | |
| 51. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 4021 for Quarter Ending 12/31/2023 [HCMLPDT002664-HCMLPDT002675] | | |
| 52. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 4049 for Quarter Ending 03/31/2024 [HCMLPDT002676-HCMLPDT002687] | | |
| 53. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 4050 for Quarter Ending 03/31/2024 [HCMLPDT002688-HCMLPDT002699] | | |

AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025 (TRUSTS)          PAGE 6 OF 9
SF 4902-5663-1886.2 36027.002 DOCS_NY:42648.1 36027/002

003870

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 54. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 4130 for Quarter Ending 06/30/2024<br>[HCMLPDT002700-HCMLPDT002711] | | |
| 55. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 4131 for Quarter Ending 06/30/2024<br>[HCMLPDT002712-HCMLPDT002723] | | |
| 56. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 4171 for Quarter Ending 09/30/2024<br>[HCMLPDT002758-HCMLPDT002769] | | |
| 57. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 4172 for Quarter Ending 09/30/2024<br>[HCMLPDT002770-HCMLPDT002781] | | |
| 58. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 4201 for Quarter Ending 12/31/2024<br>[HCMLPDT002782-HCMLPDT002793] | | |
| 59. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 4202 for Quarter Ending 12/31/2024<br>[HCMLPDT002794-HCMLPDT002805] | | |
| 60. | Post-Confirmation Report for Reorganized Debtor, Dkt. No. 4207 for Quarter Ending 03/31/2025<br>[HCMLPDT002806-HCMLPDT002817] | | |
| 61. | Post-Confirmation Report for Highland Claimant Trust, Dkt. No. 4208 for Quarter Ending 03/31/2025<br>[HCMLPDT002818-HCMLPDT002829] | | |
| 62. | Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust, Dkt. No. 3872<br>[HCMLPDT002879-HCMLPDT002884] | | |
| 63. | *Claimant Trust Agreement*, Section 9.1 (entire document can be found at Docket No. 1811-2, as modified by Docket No. 1875-4) | | |
| 64. | *Litigation Sub-Trust Agreement*, Section 9.1 (entire document can be found at (entire document can be found at Docket No. 1811-4) | | |
| 65. | *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Section IV.B.14 (entire document can be found at Docket No. 1808) | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025 (TRUSTS)**     **PAGE 7 OF 9**
SF 4902-5663-1886.2 36027.002 DOCS_NY:42648.1 36027/002

003871

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 66. | **Loan Agreement with Highland Capital Management, L.P. and Highland Capital Management Korea Limited dated April 21, 2017 [HCMLPDT00003157-HCMLPDT00003164]** | | |
| 67. | **Amended and Restated Promissory Note, dated January 25, 2024 [HCMLPDT00003165-HCMLPDT00003169]** | | |
| 68. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| 69. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 70. | All exhibits identified by or offered by any other party at the Hearing | | |

*[Remainder of Page Intentionally Left Blank]*

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025 (TRUSTS)**   **PAGE 8 OF 9**
SF 4902-5663-1886.2 36027.002 DOCS_NY:42648.1 36027/002

003872

Dated:  June 23, 2025

| | |
|---|---|
| **PACHULSKI STANG ZIEHL & JONES LLP** | **QUINN EMANUEL URQUHART & SULLIVAN LLP** |
| Jeffrey N. Pomerantz (admitted *pro hac vice*) | |
| John A. Morris (admitted *pro hac vice*) | Deborah J. Newman (admitted *pro hac vice*) |
| Gregory V. Demo (admitted *pro hac vice*) | Robert S. Loigman (admitted *pro hac vice*) |
| Jordan A. Kroop (admitted *pro hac vice*) | 51 Madison Avenue, 22nd Floor |
| Hayley R. Winograd (admitted *pro hac vice*) | New York, NY 10010 |
| 10100 Santa Monica Blvd., 13th Floor | Telephone: (212) 849-7000 |
| Los Angeles, CA 90067 | |
| Tel: (310) 277-6910 | |
| Fax: (310) 201-0760 | -and- |
| Email: jpomerantz@pszjlaw.com | |
| jmorris@pszjlaw.com | **SIDLEY AUSTIN LLP** |
| gdemo@pszjlaw.com | |
| jkroop@pszjlaw.com | Paige Holden Montgomery |
| hwinograd@pszjlaw.com | 2021 McKinney Avenue |
| | Suite 2000 |
| | Dallas, Texas 75201 |
| - and - | Telephone: (214) 981-3300 |
| **HAYWARD PLLC** | |
| | *Co-Counsel for Marc S. Kirschner, as* |
| */s/ Zachery Z. Annable* | *Litigation Trustee of the Highland Litigation* |
| Melissa S. Hayward | *Sub-Trust* |
| Texas Bar No. 24044908 | |
| MHayward@HaywardFirm.com | |
| Zachery Z. Annable | |
| Texas Bar No. 24053075 | |
| ZAnnable@HaywardFirm.com | |
| 10501 N. Central Expy, Ste. 106 | |
| Dallas, Texas 75231 | |
| Tel: (972) 755-7100 | |
| Fax: (972) 755-7110 | |
| | |
| *Counsel for Highland Capital Management, L.P.* | |
| *and the Highland Claimant Trust* | |

003873

# EXHIBIT 66

003874

# LOAN AGREEMENT

This Loan Agreement (this "**Loan Agreement**") is entered into by and between **HIGHLAND CAPITAL MANAGEMENT, L.P.** (the "**Lender**") and **HIGHLAND CAPITAL MANAGEMENT KOREA LIMITED** (the "**Borrower**," together with the Lender, the "**Parties**") this 21ˢᵗ day of April, 2017.

Subject to the terms and conditions set forth in this Loan Agreement and the Note (as defined below) (the Loan Agreement and the Note collectively being referred to as the "**Loan Documents**"), Lender agrees to make to Borrower a loan in the aggregate original principal amount up to of TWENTY MILLION DOLLARS ($20,000,000) (the "**Loan**"). In connection with the Loan, Lender and Borrower agree as follows:

1.    **Loan Terms.**

(a)    The Loan shall be evidenced by a promissory note (herein called, together with any renewals, extensions and increases thereof, the "**Note**") in the original principal amount of $20,000,000.00.

(i) *Interest Rate*. The Parties agree that the Note will not bear interest.

(ii) *Maturity Date*. The Note shall be due and payable in full on the earlier to occur of (i) April 21, 2037 and (ii) the date upon which the Loan is accelerated in accordance with Section 4 hereof (the "**Maturity Date**").

(iii) *Mechanics*.  Borrower shall permitted to draw up to the principal amount of the Loan in one or more borrowings.  Each borrowing hereunder, along with any payment made with respect thereto, shall be endorsed or recorded on the schedule attached to the Note. Any amounts drawn or repaid may not be re-borrowed.

(b)    Manner of Payment.  All payments to be made by the Borrower under this Loan Agreement shall be made in United States Dollars, in immediately available funds, by wire transfer to an account at a commercial bank located in the United States of America which account shall be identified in a notice to the Borrower, not later than 1:00 p.m. Dallas, Texas time on the date on which such payment shall become due (any such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day). All amounts payable under this Loan Agreement shall be paid free and clear of, and without reduction by reason of, any deduction, set-off or counterclaim. If the due date of payment under this Loan Agreement would otherwise fall on a day that is not a Business Day, such due date shall be extended to the next succeeding Business Day.

(c)    Prepayment. Borrower may, at its option, prepay all or a portion of the unpaid principal balance of the Loan and any and all other sums payable to the Lender hereunder prior to the Maturity Date without the consent of the Lender and without penalty.

HCMLPDT003157

2.      **Representations, Warranties and Covenants.**    Borrower hereby represents, warrants and covenants to Lender as follows:

(a)      Organization, Power and Authority, and Enforceability.    Borrower is duly organized, validly existing and in good standing under the laws of the Republic of Korea. Borrower has full power and authority to execute and deliver this Loan Agreement and the Note and to perform and observe the provisions of the Loan Documents. The execution, delivery and performance by Borrower of this Loan Agreement and the Note have been duly authorized by all necessary entity action, and do not contravene the organizational or governing documents of Borrower, any law or contractual restriction binding on Borrower or any of Borrower's property. No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by Borrower of this Loan Agreement and the Note. This Loan Agreement and the Note constitute the legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(b)      No Violations.    Neither the execution and delivery by Borrower of this Loan Agreement and the Note, nor the consummation of the transactions herein or therein contemplated, nor compliance with the provisions hereof or thereof will, to the best of Borrower's knowledge, violate any law or regulation or any order or decree of any court or governmental instrumentality, or conflict with or result in the breach of or constitute a default under any material agreement or other instrument to which Borrower is a party or by which it may be bound, which default, if any, would have a material adverse effect on the business or condition (financial or otherwise) of Borrower or any of its properties, or result in the creation or imposition of any material lien, charge or encumbrance upon any of the property of Borrower.

(c)      No Litigation.    There are no actions, suits or proceedings pending against or affecting Borrower before any court, arbitrator or governmental or administrative body or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition (financial or otherwise) of Borrower.

(d)      Solvency.    Borrower is, and after giving effect to the incurrence of the debt contemplated by this Loan Agreement and the obligations incurred in connection herewith will be, able to pay its debts and liabilities as they mature and become due.

(e)      Use of Proceeds.    The proceeds of the Loan will not be used for personal, family or household purposes.

3.      **Events of Default.**    The occurrence at any time of any of the following events shall constitute an event of default (each an "**Event of Default**"):

003876

HCMLPDT003158

(a)     The failure of Borrower to pay the principal and interest (if any) on the Note when the same becomes due in accordance with the terms hereof;

(b)     Borrower's breach of any representation, warranty or covenant contained in this Loan Agreement or the Note;

(c)     Borrower's (i) execution of an assignment for the benefit of creditors; (ii) admission in writing of its inability, or the generally inability, to pay its debts generally as they become due; (iii) voluntarily seeking the benefit or benefits of any Debtor Relief Law; or (iv) voluntarily becoming a party to any proceeding provided for by any Debtor Relief Law that could suspend or otherwise affect any of the rights of Lender granted in this Loan Agreement or the Note;

(d)     The commencement against Borrower of any proceeding in bankruptcy or other insolvency law, either voluntary or involuntary, or any other judicial proceeding intended to effect a discharge of the debts of Borrower in whole or in part, or a postponement of the maturity or collection thereof, or a suspension of any of the rights or powers of a trustee or any of the rights or powers granted herein to Lender, or in any other documents executed in connection herewith, and Borrower's failure to cause the dismissal of such proceedings within sixty (60) days after commencement; or

(e)     The appointment of a trustee or receiver, if not discharged within sixty (60) days, for the assets, or any part thereof, of Borrower.

The foregoing Events of Default are cumulative and in addition to any defaults or events of default as may be contained in any other documents modifying, renewing, extending, evidencing, securing or pertaining to this Loan Agreement, the Note or the debt evidenced hereby. For purposes of <u>Section 3(c)</u>, "**Debtor Relief Laws**" means any applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, fraudulent conveyance, reorganization or similar debtor relief laws affecting the rights of creditors generally from time to time in effect.

4.     <u>Remedies</u>.

(a)     If an Event of Default shall have occurred (other than an Event of Default specified in <u>Section 3(c)</u>, 3<u>(d)</u> or 3<u>(e)</u>), Lender may in its sole discretion exercise any or all of the following remedial rights and in such order as Lender may elect: (i) accelerate the maturity of the principal balance owed under the Note, and/or (ii) proceed to protect and enforce its rights either by suit in equity and/or by action at law, or by other appropriate proceedings, whether for the specific performance of any covenant or agreement contained in this Loan Agreement or the Note or in aid of the exercise of any power or right granted by this Loan Agreement or the Note or to enforce any other legal or equitable right of Lender under this Loan Agreement or the Note.

(b)     Upon the occurrence of an Event of Default specified in <u>Section 3(c)</u>, 3<u>(d)</u> or 3<u>(e)</u>, Borrower's principal balance outstanding under the Note shall thereupon automatically and concurrently therewith become immediately due and payable, all without any action by

003877

HCMLPDT003159

Lender and without presentment, demand, protest or other notice of any kind, all of which are expressly waived, anything in this Loan Agreement or the Note to the contrary notwithstanding.

(c)    The rights of Lender under this <u>Section 4</u> are in addition to other rights and remedies which Lender may have under this Loan Agreement and the Note or at law or equity.

5.    <u>Rights Cumulative</u>.  All rights of Lender under the terms of this Loan Agreement shall be cumulative of, and in addition to, the rights of Lender under any and all other agreements between Borrower and Lender (including, but not limited to, the Note), and not in substitution or diminution of any rights now or hereafter held by Lender under the terms of any other agreement.

6.    <u>Waiver and Agreement</u>.  Neither the failure nor any delay on the part of Lender to exercise any right, power or privilege under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No waiver of any provision in any of the Loan Documents and no departure by Borrower therefrom shall be effective unless the same shall be in writing and signed by Lender, and then shall be effective only in the specific instance and for the purpose for which given and to the extent specified in such writing.  No modification or amendment to any of the Loan Documents shall be valid or effective unless the same is signed by Borrower and Lender.

7.    <u>Costs of Collection</u>.  If this Loan Agreement or the Note is placed in the hands of an attorney for collection after an Event of Default, or if all or any part of the indebtedness represented hereby is proved, established or collected in any bankruptcy, receivership, debtor relief, probate, or other court proceedings, Borrower agrees to pay to Lender its attorneys' fees and collection costs incurred by Lender in the exercise of any of its rights and remedies in accordance with this Loan Agreement or the Note.

8.    <u>Benefits</u>.  This Loan Agreement shall be binding upon and inure to the benefit of Lender and Borrower, and their respective successors and assigns, provided, however, that Borrower may not, without the prior written consent of Lender, assign any rights, powers, duties or obligations under any of the Loan Documents.

9.    <u>Notices</u>.  Any notice or other communications provided for in this Loan Agreement shall be in writing and shall be given to the party to whom addressed at the following address:

If to Borrower:    Highland Capital Management Korea Limited
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Email: CorporateAccounting@hcmlp.com

003878

HCMLPDT003160

If to Lender:     Highland Capital Management, L.P.
                       300 Crescent Court, Suite 700
                       Dallas, Texas 75201
                       Email: CorporateAccounting@hcmlp.com

Except as otherwise provided herein, all notices and other communications given pursuant to this Loan Agreement and the Note shall be in writing, and shall be (a) mailed by first class, United States mail, postage prepaid, certified, with return receipt requested, and addressed to the Parties hereto at the address listed in <u>Section 9</u> hereto; (b) hand delivered to the intended addressee; (c) sent by nationally recognized overnight courier; or (d) sent by facsimile transmission followed by a confirmatory letter pursuant to a method described in clause (a), (b) or (c) above. Notice sent by certified mail, postage prepaid, shall be effective three (3) Business Days after being deposited in the United States mail; notice sent by facsimile transmission shall be effective on the day of receipt by the addressee if received on a Business Day prior to 5:00 p.m. Dallas, Texas time (otherwise, such notice shall be effective on the Business Day immediately following such day of receipt); all other notices shall be effective upon delivery to the address of the addressee (even if such addressee refuses delivery thereof). The Parties hereto may change their addresses by giving notice thereof to the other parties hereto in conformity with this provision. For purposes of this Loan Agreement, "**Business Day**" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in Dallas, Texas are authorized or required by law to remain closed.

     10.   **Indemnification**. Borrower agrees to indemnify Lender and its successors, assigns, officers, partners, employees, attorneys and agents (each such Person, an "**Indemnitee**") against, and to hold each Indemnitee harmless from, any and all losses, claims, actions, judgments, suits, disbursements, penalties, damages (other than consequential damages), liabilities and related expenses and reasonable legal counsel fees and expenses, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of:

          (a)   the execution, delivery and enforcement of this or any transactions contemplated by this Loan Agreement or the Note or any agreement or instrument contemplated thereby;

          (b)   the fraudulent actions or misrepresentations of Borrower in connection with the transactions contemplated by this Loan Agreement and the Note, or any breach by Borrower of its obligations under this Loan Agreement or the Note; or

          (c)   any claim, litigation, investigation or proceeding relating to any of the foregoing or relating to any transaction contemplated hereby, whether or not any Indemnitee is a party thereto;

provided that such indemnity shall not, as to any Indemnitee, apply to any such losses, claims, actions, judgments, suits, disbursements, penalties, damages, liabilities or related expenses arising from the gross negligence or willful misconduct of such Indemnitee as finally determined by a court of competent jurisdiction in a non-appealable judgment.

003879

HCMLPDT003161

11. **Severability**. If any provision of this Loan Agreement is held to be illegal, invalid or unenforceable under present or future laws during the term hereof, such provision shall be fully severable, this Loan Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Loan Agreement, a legal, valid and enforceable provision as similar in terms to the illegal, invalid or unenforceable provision as may be possible.

12. **Governing Law**. This Loan Agreement is performable in Dallas County, Texas, and shall be governed by the laws of the State of Texas (regardless of the laws that might otherwise govern under applicable Texas principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies. The state and federal district courts in Dallas County, Texas, shall have exclusive jurisdiction over any claim or action involving the rights of the Parties hereunder, and each Party submits to the jurisdiction of the state and federal district courts in Dallas County, Texas.

13. <u>**WAIVER OF JURY TRIAL**</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS LOAN AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

14. **Entire Agreement**. This Loan Agreement and the Note contain the entire agreement and understanding between the Parties and supersedes all prior agreements and understandings between such Parties relating to the subject matter hereof and may not be contradicted by evidence of prior or contemporaneous agreements of the Parties. There are no unwritten oral agreements between the Parties with respect to the subject matter hereof.

15. **Construction**. This Loan Agreement has been freely and fairly negotiated among the Parties. If an ambiguity or question of intent or interpretation arises, this Loan Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Loan Agreement.

16. **Counterparts**. This Loan Agreement may be separately executed in any number of counterparts, each of which shall be an original, but all of which, taken together, shall be deemed to constitute one and the same agreement.

003880

HCMLPDT003162

17.    **Amendment.**    No provision hereof may be amended, modified, waived, or supplemented, except by a writing signed by the Party to be charged thereby.  No waiver by Lender of an Event of Default shall be a waiver of any other Event of Default.

18.    **Assignment**.    Borrower shall not assign any of its rights or obligations under this Loan Agreement without the prior written consent of Lender and any such assignment in contravention of the foregoing shall be null and void.  Lender may at any time and from time to time, without the consent of Borrower, assign all or any portion of its rights under this Loan Agreement to one or more persons, and, upon Lender giving notice of such assignment to Borrower specifying the interest hereunder being assigned and the person to which such interest is being assigned, each reference herein to Lender shall (solely in respect of the interest so assigned) constitute a reference to such assignee (as if such assignee were named herein) rather than Lender.

19.    **Amounts Payable at Maturity**.  It is expressly understood and agreed that this Loan Agreement will require a "balloon" payment of all unpaid principal and accrued but unpaid interest (if any) at maturity.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]*

003881

HCMLPDT003163

**IN WITNESS WHEREOF**, the parties hereto have caused this Loan Agreement to be duly executed and delivered as of the day and year first above written.

<u>LENDER:</u>

**HIGHLAND CAPITAL MANAGEMENT. L.P.**

By: Strand Advisors, Inc., its General Partner

By: _____

       Name:  Frank Waterhouse
       Title:   Treasurer

<u>BORROWER</u>:

**HIGHLAND CAPITAL MANAGEMENT
KOREA LIMITED**

서울시 중구 세종대로 136, 21층
(태평로1가,서울파이낸스센터)
하이랜드캐피탈메니지먼트코리아㈜

By: 대표이사  박  준  범

Name: Jun Park
Title:  Representative Director

*Signature Page to Loan Agreement*

003882

HCMLPDT003164

**EXHIBIT 67**

003883

## AMENDED AND RESTATED PROMISSORY NOTE

**January 25, 2024**

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT KOREA LIMITED ("***Borrower***"), promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("***Lender***"), in legal and lawful tender of the United States of America, the principal amount of the Loan of the Lender outstanding from time to time in accordance with the provisions of the Loan Agreement, dated as of April 21, 2017, among the Borrower and Lender (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "***Loan Agreement***"), a copy of which is attached hereto as <u>Exhibit A</u>. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Loan Agreement.

1.      Reference is hereby made to that certain Amended and Restated Promissory Note, dated April 14, 2022, issued by Borrower for the benefit of Lender pursuant to the Loan Agreement (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "***Prior Note***").   This Amended and Restated Promissory Note (this "***Promissory Note***") amends, restates, supersedes and replaces the Prior Note in its entirety.

2.      Borrower promises to pay the unpaid principal amount of the Loan on the Maturity Date. All payments made by Borrower under this Promissory Note shall be made in accordance with Section 1(b) of the Loan Agreement.

3.      This Promissory Note is the Note referred to in the Loan Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. Upon the occurrence and continuation of any Event of Default under the Loan Agreement, all principal then remaining unpaid on this Promissory Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan Agreement.

4.      The Loan made by Lender shall be evidenced by one or more records or accounts maintained by Lender in the ordinary course of business. <u>Schedule 1</u> attached hereto sets for the amount and maturity of Loan outstanding as of a given date and all payments made on the Loan; *provided* that any failure of Lender to make any such recordation or endorsement shall not affect the obligations of Borrower under this Promissory Note.

5.      Borrower hereby waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

6.      THIS PROMISSORY NOTE AND THE OBLIGATIONS OF BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

*[Signature Page Follows.]*

**003884**
HCMLPDT003165

**BORROWER:**

HIGHLAND CAPITAL MANAGEMENT KOREA
LIMITED

By: _____
Name: Jun Park
Title: Representative Director

**003885**

HCMLPDT003166

**SCHEDULE 1**

The record set forth below is the record referred to in, and forming part of the Amended and Restated Promissory Note dated December 23, 2021 to which this page is attached.

| Date | Amount of Loan | Amount of Payment | Aggregate Unpaid Principal Balance |
|---|---|---|---|
| October 20, 2017 | $2,300,000 | $0 | $2,300,000 |
| December 3, 2018 | $1,200,000 | $0 | $3,500,000 |
| February 19, 2019 | $0 | $2,800,000[1] | $700,000 |
| April 19, 2019 | $1,100,000 | $0 | $1,800,000 |
| July 2, 2019 | $630,000 | $0 | $2,430,000 |
| July 16, 2019 | $630,000 | $0 | $3,060,000 |
| July 15, 2020 | $700,000 | $0 | $3,760,000 |
| May 5, 2021 | $800,000 | $0 | $4,560,000 |
| December 23, 2021 | $0 | $1,000,000[2] | $3,560,000 |

[1] $2,300,000 shall be applied to the loan made on October 20, 2017 and $500,000 shall be applied to the loan made on December 3, 2018.
[2] $700,000 shall be applied to the loan made on December 3, 2018, and $300,000 shall be applied to the loan made on April 19, 2019.

| | | | |
|---|---|---|---|
| April 14, 2022 | $0 | $600,000[3] | $2,960,000 |
| January 25, 2024 | $0 | $500,000[4] | $2,460,000 |

[3] The full $600,000 shall be applied to the loan made on April 19, 2019.
[4] $200,000 shall be applied to the loan made on April 19, 2019, and $300,000 shall be applied to the loan made on July 2, 2019.

4

003887

HCMLPDT003168

**EXHIBIT A**

**LOAN AGREEMENT**

[*Attached.*]

003888

HCMLPDT003169

Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
Okin Adams Bartlett Curry LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158
mokin@okinadams.com
dcurry@okinadams.com

**ATTORNEYS FOR THE DALLAS FOUNDATION AND
CROWN GLOBAL LIFE INSURANCE, LTD**.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.
AMENDED WITNESS AND EXHIBIT LIST FOR JUNE 25, 2025 HEARING**

The Dallas Foundation and Crown Global Life Insurance, Ltd. file this Witness and

Exhibit List for the December 25, 2025 hearing in the above-captioned case.

**WITNESSES**

The Dallas Foundation and Crown Global Life Insurance, Ltd. designate the following

individuals who may be called as witnesses at the June 25, 2025 Hearing (exclusive of those that

may be used for impeachment purposes):

1. Torrey Littleton, Chief Financial Officer, The Dallas Foundation;

2. Mark Patrick;

003889

3. All witnesses designated by any other party.

## EXHIBITS

The Dallas Foundation and Crown Global Life Insurance, Ltd. designate the following exhibits that may be used at the June 25, 2025 Hearing (exclusive of those that may be used for impeachment purposes):

| Ex. # | DESCRIPTION | MARKED | OFFERED | OBJECT | ADMIT | Disp. After Trial |
|---|---|---|---|---|---|---|
| 1. | Charitable DAF/CLO HoldCo Organization Chart | | | | | |
| 2. | Rand Structure Chart | | | | | |
| 3. | Haynes & Boone July 9, 2021 Memo on DAFs and Sponsoring Orgs [ECF #2547-4] | | | | | |
| 4. | Charitable Respondents' Response and Disclosures Related to the Court's Order Requiring Disclosures with Exhibits 1 – 43 [ECF #2547] | | | | | |
| 5. | CrownGlobal Deferred Variable Annuity Policy | | | | | |
| 6. | P. McGettigan email to T. Littleton 5/20/25 | | | | | |
| 7. | CrownGlobal Quarterly Policy Statement December 31, 2024 | | | | | |
| 8. | CrownGlobal Quarterly Policy Statement March 31, 2025 | | | | | |

003890

| Ex. # | DESCRIPTION | MARKED | OFFERED | OBJECT | ADMIT | Disp. After Trial |
|-------|-------------|--------|---------|--------|-------|-------------------|
| 9. | First Affidavit of Geoffrey Sykes, In re Charitable DAF Holdco, Ltd., Cause No: FSD 2025-0099, in the Grand Court of the Cayman Islands, Financial Services Division | | | | | |
| 10. | Any exhibits designated by other parties | | | | | |

The Dallas Foundation and Crown Global Life Insurance, Ltd. reserve the right to use additional demonstrative exhibits as they deem appropriate in connection with the June 25, 2025 Hearing. The Dallas Foundation and Crown Global Life Insurance, Ltd reserve the right to use any exhibits presented by any other party and reserve the right to amend and/or supplement this exhibit list.

Respectfully submitted on this 23rd day of June 2025.

**OKIN ADAMS BARTLETT CURRY LLP**

By: /s/ *David L. Curry, Jr.*
Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158
Email: mokin@okinadams.com
Email: dcurry@okinadams.com

**ATTORNEYS FOR THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.**

# EXHIBIT 5



**Deferred Variable Annuity Policy**

**Crown Global Life Insurance Ltd.**

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Goertzen,

12/16/15 Janita Burkey

**THIS IS A LEGAL CONTRACT.**

**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

*continued on next page*



## Deferred Variable Annuity Policy

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.

NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.



## Policy Data Page

### General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

Proposed Policyholder:                     Proposed Annuitant:

Empower Dallas Foundation, Inc            Grant Scott


Proposed Annuitant's Date of Birth:       Gender:

29 May, 1962                               Male

Policy Effective Date: 10 Dec, 2015       Issue Date: 10 Dec, 2015

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

at the latest

Beneficiary:                    Beneficiary Interest          Revocable/Irrevocable?

Empower Dallas Foundation, Inc  100%                          Irrevocable


Separate Account number : 30218
### Premium Amounts

Initial Premium:              $ 15,903,108.54

Premium Limit:                n/a

Premium Deposit:              n/a

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

003895



## Policy Data Page

**Initial Allocation of Payments to Investment Options**

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank: n/a

Investment Manager: n/a

003896



## Policy Data Page

**Policy Fees and Charges**

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value: 0.45% p.a  $10mm of  Premium  0.35% p.a. $11-20mm of Premium  0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm  (adjusted for additional premium payments and withdrawals, as applicable)  *See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |

003897



## Table of Contents

General Policy Data ........................................................................................... 3

Initial Allocation of Payments to Investment Options ................................ 4

Policy Fees and Charges ................................................................................. 5

**Article I    General Provisions ................................................................15**

Section 1.1    Consideration ................................................................. 15

Section 1.2    Entire Policy .................................................................... 15

Section 1.3    Survival of Representations, Warrants, Covenants ....... 15

Section 1.4    Amendment or Modification ........................................... 15

Section 1.5    Misstatement of Age ....................................................... 15

Section 1.6    Non-Participating Policy ................................................. 16

Section 1.7    Ownership of Assets ....................................................... 16

Section 1.8    Rule of Construction ....................................................... 16

Section 1.9    Governing Law ................................................................ 16

Section 1.10   Effective Date of Coverage ............................................ 16

**Article II    Premium Provisions ...........................................................17**

Section 2.1    Premiums ........................................................................ 17

Section 2.2    Insurer's Right to Refuse Premiums ............................... 17

Section 2.3    Nonpayment of Premium ................................................ 18

**Article III    Termination Provisions .....................................................19**

Section 3.1    Insurer's Cancellation Rights ......................................... 19

Section 3.2    Reinstatement ................................................................. 20

**Article IV    Premium Investment; Policy Account Values ...................21**

Section 4.1    The Separate Account ..................................................... 21

Section 4.2    Premiums ........................................................................ 21

Section 4.3    Allocations to Investment Options .................................. 21

Section 4.4    Compliance with Investor Control Rules ......................... 22

Section 4.5    Changes in Allocations to Investment Options ............... 23

Section 4.6    Responsibility for Selecting Investment Options ............ 23

Section 4.7    Appointment of Investment Manager and Custodian Bank ........... 24

Section 4.8    Timing of Allocations ...................................................... 24

Section 4.9    Investment of Separate Account Assets .......................... 24

Section 4.10   Request for Extension of Investment Rights  With Respect
                to Adequate Diversification ............................................ 26

Section 4.11   Changes in Investment Options ..................................... 26

003898



Section 4.12   Policy Account Value ........................................................... 27

**Article V   Transfers Among Investment Options ...............................................28**
Section 5.1   General ......................................................................... 28
Section 5.2   Conditions on Transfer .......................................................... 28
Section 5.3   Liability ....................................................................... 29
Section 5.4   Limits on Right of Transfer .................................................... 29

**Article VI   Annuity Provisions .........................................................................30**
Section 6.1   Annuity Payments ................................................................ 30
Section 6.2   Annuity Percentage .............................................................. 30
Section 6.3   No Guaranteed Payments .......................................................... 30
Section 6.4   Annuity Starting Date ........................................................... 31
Section 6.5   Change of Annuity Starting Date ................................................. 31
Section 6.6   Annuity Income Options .......................................................... 31
Section 6.7   Maturity Payment ................................................................ 32

**Article VII  Loan Provisions .............................................................................33**
Section 7.1   Policy Loans .................................................................... 33

**Article VIII Surrender Provisions .......................................................................34**
Section 8.1   General ......................................................................... 34
Section 8.2   Full Surrender .................................................................. 34
Section 8.3   Partial Surrender ............................................................... 34

**Article IX   Policy Fees and Charges ...................................................................36**
Section 9.1   Policy Administration Fee ....................................................... 36
Section 9.2   DAC Charges .................................................................... 36
Section 9.3   Management & Expense Fee ......................................................... 36
Section 9.4   Policy Set-Up Deposit ........................................................... 36
Section 9.5   Acceptance Fee .................................................................. 36
Section 9.6   Surrender Charge ................................................................ 37
Section 9.7   Taxes .......................................................................... 37
Section 9.8   Agreed Upon Procedures Fee ...................................................... 37
Section 9.9   Deductions for Fees and Charges ................................................. 37
Section 9.10  Custodian Bank and Investment Manager Fees ...................................... 37

**Article X   Death Benefit Provisions ...................................................................39**
Section 10.1  Death Benefit ................................................................... 39
Section 10.2  Due Proof of Death .............................................................. 40

003899



**Article XI  Owner, Beneficiary, Assignment** ......................................................**41**
    Section 11.1   Proposed Policyholder .......................................................... 41
    Section 11.2   Change of Proposed Policyholder .......................................... 41
    Section 11.3   Proposed Annuitant ................................................................ 41
    Section 11.4   Change of Proposed Annuitant ............................................. 41
    Section 11.5   Beneficiary ............................................................................. 42
    Section 11.6   Change of Beneficiary ........................................................... 42
    Section 11.7   Assignment ............................................................................ 42

**Article XII Other General Provisions** ...............................................................**44**
    Section 12.1   Periodic Reports .................................................................... 44
    Section 12.2   Currency and Place of Payment ............................................ 44
    Section 12.3   Notices, Requests and Elections ........................................... 44
    Section 12.4   Policy Settlement ................................................................... 45
    Section 12.5   Deferment .............................................................................. 45
    Section 12.6   Incontestability ....................................................................... 45
    Section 12.7   Policyholder Information ......................................................... 46
    Section 12.8   Tax Matters ............................................................................ 46
    Section 12.9   Limitation on Liability of Insurer ............................................ 47



## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** – A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,



exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda,  email: info@crownglobalinsurance.com,  facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company



(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer. For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.



**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.



**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.



**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.



## Article I       General Provisions

### Section 1.1       Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2       Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3       Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4       Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5       Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on

003907



whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

**Section 1.6     Non-Participating Policy**

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

**Section 1.7     Ownership of Assets**

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

**Section 1.8     Rule of Construction**

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

**Section 1.9     Governing Law**

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

**Section 1.10     Effective Date of Coverage**

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.



## Article II      Premium Provisions

**Section 2.1      Premiums**

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

**Section 2.2      Insurer's Right to Refuse Premiums**

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.



The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3        Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.



## Article III      Termination Provisions

### Section 3.1      Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1.     The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2.     The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3.     The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4.     Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5.     If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination.  The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.



---

**Section 3.2**      **Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.



## Article IV        Premium Investment; Policy Account Values

**Section 4.1        The Separate Account**

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

**Section 4.2        Premiums**

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

**Section 4.3        Allocations to Investment Options**

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the



Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories:  IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

**Section 4.4     Compliance with Investor Control Rules**

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.



### Section 4.5    Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6    Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the



performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section 4.7        Appointment of Investment Manager and Custodian Bank**

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager).   A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section 4.8        Timing of Allocations**

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days  following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section 4.9        Investment of Separate Account Assets**

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1.        Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes



of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2.      The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3.      No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4.      The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5.      In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.

003917



### Section 4.10 Request for Extension of Investment Rights With Respect to Adequate Diversification

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

### Section 4.11 Changes in Investment Options

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any



such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12      Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.



## Article V      Transfers Among Investment Options

**Section 5.1**     **General**

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

**Section 5.2**     **Conditions on Transfer**

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1.    Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2.    Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3.    Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4.    Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5.    The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6.    No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7.    In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.



### Section 5.3        Liability

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

### Section 5.4        Limits on Right of Transfer

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested.  For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.

CROWN GLOBAL
INSURANCE

## Article VI        Annuity Provisions

### Section 6.1        Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2        Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3        No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.



### Section 6.4    Annuity Starting Date

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty- fifth (85th) birthday shall be the Annuity Starting Date.

### Section 6.5    Change of Annuity Starting Date

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

### Section 6.6    Annuity Income Options

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's



actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease.  All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

**Section 6.7     Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.



## Article VII    Loan Provisions

**Section 7.1    Policy Loans**

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.

CROWN GLOBAL
I N S U R A N C E

## Article VIII    Surrender Provisions

### Section 8.1    General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2    Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3    Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than



$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.

**CROWN GLOBAL**
INSURANCE

# Article IX    Policy Fees and Charges

### Section 9.1    Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2    DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate.  The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3    Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4    Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer.  Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee.  If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5    Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.

003928



### Section 9.6        Surrender Charge

Surrender charges will not apply to this Policy.

### Section 9.7        Taxes

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account.  These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

### Section 9.8        Agreed Upon Procedures Fee

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

### Section 9.9        Deductions for Fees and Charges

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

### Section 9.10        Custodian Bank and Investment Manager Fees

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the



custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.



## Article X      Death Benefit Provisions

**Section 10.1      Death Benefit**

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries

30218

003931



elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

**Section 10.2    Due Proof of Death**

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1.    A certified copy of a death certificate;

2.    A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or

3.    Any other proof of death satisfactory to the Insurer.



## Article XI    Owner, Beneficiary, Assignment

### Section 11.1    Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2    Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3    Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4    Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.



### Section 11.5   Beneficiary

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

### Section 11.6   Change of Beneficiary

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

### Section 11.7   Assignment

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.



The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier.  Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder.  For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein.   The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy  and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.

![Crown Global Insurance logo]

# Article XII    Other General Provisions

### Section 12.1    Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2    Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3    Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions

003936



received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4    Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5    Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible.  The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6    Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.



### Section 12.7    Policyholder Information

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

### Section 12.8    Tax Matters

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.



**Section 12.9     Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR
ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED
TO THE POLICY ACCOUNT VALUE.**

003939

CROWN GLOBAL
I N S U R A N C E

## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

**EXHIBIT 6**

003941

## David Curry

| | |
|---|---|
| **From:** | Torrey Littleton <tlittleton@dallasfoundation.org> |
| **Sent:** | Saturday, June 21, 2025 10:50 AM |
| **To:** | David Curry; Matthew Okin |
| **Cc:** | Julie Diaz |
| **Subject:** | Fw: [EXTERNAL]-RE: -30219/30218 Q1 Policy Statement. |

**REDACTED**

███████████████████████████

**From:** Pauline McGettigan <pmcgettigan@crownglobalinsurance.com>
**Sent:** Tuesday, May 20, 2025 12:50 PM
**To:** Torrey Littleton <tlittleton@dallasfoundation.org>; Policy Admin <policyadminsys@crownglobalinsurance.com>
**Cc:** Gary García <gwgarcia@dallasfoundation.org>; Lindsay Fountain <LFountain@dallasfoundation.org>
**Subject:** [EXTERNAL]-RE: -30219/30218 Q1 Policy Statement.

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

| ☒ | REGISTERED EMAIL™ | ENCRYPTED TRANSMISSION |

This is an encrypted email from **Pauline McGettigan**. To reply to this email encrypted, you may **Click here**.

Hi Torrey,

Please see below response from the fund –

Here's a summary of the key changes between the initial 12/31/2024 NAV close and 12/31/2024 audited financials.

- FMV of Atlas interest in Rand PE Fund I increased by ~$918k
  - Rand PE Fund I interest in HMIT was sold on or around 2/25/2025 for $1mm
- Investment manager deemed the HCRE notes uncollectible and wrote off the notes and accrued interest
  - ~$12.039mm write-off
    - $7.3mm principal
    - ~$4.74mm interest

| | |
|---|---|
| Rand PE FMV Adj. | 917,659.43 |
| HCRE Interest | (4,738,693.12) |
| HCRE Principal | (7,300,000.00) |
| Total | (11,121,033.69) |

Let us know if you need any further information.

Kind regards,
Pauline.

003942

Pauline McGettigan | CAMS
Compliance Analyst

Suite 3206A, 2nd Floor, 39 Market Street, P.O. Box 10467,
Camana Bay, Grand Cayman KY1-1004, Cayman Islands
T: (345) 747-4000 x1  F: (345) 945-6121
pmcgettigan@crownglobalinsurance.com



Partnering to Enhance Alternatives

Please click here for Crown Global's Privacy Policy and contact us at info@crownglobalinsurance.com if you have any questions.

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret.  If you are not the intended recipient, you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. Any U.S. Federal Tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code of 1986, as amended, or (2) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein.  Prospective investors should consult their own tax advisors regarding such issues. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.  Messages sent to and from us may be monitored.  Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late, or incomplete, or contain viruses.  Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachment, that have arisen as a result of e-mail transmission.  If verification is required, please request a hard-copy version. Any views or opinions presented are solely those of the author and do not necessarily represent those of the company.

---

**From:** Torrey Littleton <tlittleton@dallasfoundation.org>
**Sent:** Tuesday, May 20, 2025 9:06 AM
**To:** Policy Admin <policyadminsys@crownglobalinsurance.com>
**Cc:** Gary García <gwgarcia@dallasfoundation.org>; Lindsay Fountain <LFountain@dallasfoundation.org>
**Subject:** Re: -30219/30218 Q1 Policy Statement.

Hi Pauline,

I hope you're doing well. I'm reaching out to better understand the 40% decline in value across both accounts. Could you provide some insight into the cause of this change? Is it primarily related to market exposure?

Thanks,
Torrey

---

**From:** Crown Global Admin <policyadminsys@crownglobalinsurance.com>
**Sent:** Monday, May 19, 2025 8:00 AM
**To:** dmunson@thekippgroupllc.com <dmunson@thekippgroupllc.com>; Torrey Littleton <tlittleton@dallasfoundation.org>; Gary García <gwgarcia@dallasfoundation.org>
**Subject:** [EXTERNAL]-30219 Q1 Policy Statement.

003943

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Warning:** This email contains password-protected attachments, often used in phishing attacks to avoid virus scanning.
Make sure you trust the sender and expect this email before opening these attachments.

Dear Policyholder,

Please see attached for your records. The Policy Statement is password protected, and will be the same password each quarter.
If you have any questions contact Suzanne Reynolds at 1-345-747-4000, extension 4.

Regards,
Pauline.
**Pauline McGettigan |CAMS**
Compliance Analyst
**Crown Global Life Insurance (Cayman) Ltd**
Suite 3206A, 2nd Floor, 45 Market Street, Camana Bay,
PO Box 10467, Grand Cayman KY1-1004, Cayman Islands
Telephone: +1 345 747 4000 Ex 1
Facsimile: +1 345 945 6121

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient, you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. Any U.S Federal Tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code of 1986, as amended, or (2) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein. Prospective investors should consult their own tax advisors regarding such issues. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer. Messages sent to and from us may be monitored. Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late, or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachment, that have arisen as a result of e-mail transmission. If verification is required, please request a hard-copy version. Any views or opinions presented are solely those of the author and do not necessarily represent those of the company.



**Torrey Littleton**
Chief Financial Officer
**P** 2146942512
**C** 8178754354
**E** tlittleton@dallasfoundation.org
**L**
**W** dallasfoundation.org

  

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

RPost® Patented

003944



**Torrey Littleton**
Chief Financial Officer
**P** 2146942512
**C** 8178754354
**E** tlittleton@dallasfoundation.org
**L**
**W** dallasfoundation.org

  

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

The Dallas Foundation will be closed from Monday, June 30 through Friday July 4. Grant recommendations to be processed before June 30 or during this holiday week must be submitted to the Foundation no later than 3pm on Wednesday, June 18 using My TDF Login.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

003945

**EXHIBIT 7**

003946



## Quarterly Policy Statement
### Statement Date: December 31, 2023

### Policy Data:

| | | | |
|---|---|---|---|
| Policy Owner: | Empower Dallas Foundation, Inc | Telephone: | 214 741 9898 |
| | 3963 Maple Ave | Facsimile: | 214 741 9848 |
| | Suite 390 | Contact Person: | Torrey Littleton |
| | Dallas, TX 75219 | Email: | tlittleton@dallasfoundation.org |
| | USA | | |
| Policy Number: | 30218 | | |
| Issuing Company: | Crown Global Life Insurance Ltd. | | |
| Insurance Type: | Variable Annuity | | |
| Issue Date: | December 10, 2015 | | |

### Quarterly Account Activity:

| | |
|---|---|
| Account Value - October 1, 2023 | $17,643,441.00 |
| less Policyowner Withdrawals and Loans | ($300,000.00) |
| less Quarterly M&E Charge | ($10,847.80) |
| less Administrative Fee | ($725.00) |
| plus (less) Earnings on Separate Account Assets | $833,527.80 |
| Account Value - December 31, 2023 | $18,165,396.00 |

### Asset Allocation:

| | | |
|---|---|---|
| Atlas IDF, LP : 30218 | $18,165,396.00 | 100.0% |
| Total | $18,165,396.00 | 100.0% |

### Account Performance *

| Investment | Q1 | Q2 | Q3 | Q4 | YTD | Since Inception |
|---|---|---|---|---|---|---|
| Atlas IDF, LP | 7.43 % | 4.81 % | -4.14 % | 4.81 % | 13.13 % | -13.95 % |
| Account Performance | 7.43 % | 4.81 % | -4.14 % | 4.80 % | 13.12 % | -13.85 % |
| Policy Performance | 7.36 % | 4.73 % | -4.20 % | 4.74 % | 12.82 % | -15.97 % |

* Performance data is adjusted for withdrawals, premiums, transfers and other transactions.

Crown Global Insurance Group
Bermuda • Cayman Islands
Suite 3206A, 2nd Floor • 39 Market Street • Camana Bay
P.O. Box 10467 • Grand Cayman • KY1-1004 • Cayman Islands
Telephone +1 345 747 4000 • Facsimile +1 345 945 6121

003947

**EXHIBIT 8**



## Quarterly Policy Statement
### Statement Date: December 31, 2024

### Policy Data:

| | | | |
|---|---|---|---|
| **Policy Owner:** | Empower Dallas Foundation, Inc | **Telephone:** | 214 741 9898 |
| | 3000 Pegasus Park Drive | **Facsimile:** | 214 741 9848 |
| | Suite 930 | **Contact Person:** | Torrey Littleton |
| | Dallas, TX 75247 | **Email:** | tlittleton@dallasfoundation.org |
| | US | | |
| **Policy Number:** | 30218 | | |
| **Issuing Company:** | Crown Global Life Insurance Ltd. | | |
| **Insurance Type:** | Variable Annuity | | |
| **Issue Date:** | December 10, 2015 | | |

### Quarterly Account Activity:

| | |
|---|---|
| **Account Value - October 1, 2024** | $20,695,496.00 |
| **less Policyowner Withdrawals and Loans** | ($580,000.00) |
| **less Quarterly M&E Charge** | ($12,820.43) |
| **less Administrative Fee** | ($725.00) |
| **plus (less) Earnings on Separate Account Assets** | $4,131,002.69 |
| **Account Value - December 31, 2024** | **$24,232,953.26** |

### Asset Allocation:

| | | |
|---|---|---|
| **Atlas IDF, LP (July 31, 2024) : 30218** | $24,232,839.00 | 100.0% |
| **Accrued fees, net of Cash on Hand** | $114.26 | 0.0% |
| **Total** | **$24,232,953.26** | **100.0%** |

### Account Performance *

| Investment | Q1 | Q2 | Q3 | Q4 | YTD | Since Inception |
|---|---|---|---|---|---|---|
| Atlas IDF, LP (July 31, 2024) | 10.04 % | 3.35 % | 0.39 % | 20.15 % | **37.16 %** | **18.03 %** |
| **Account Performance** | 10.04 % | 3.35 % | 0.39 % | 20.14 % | **37.15 %** | **18.16 %** |
| **Policy Performance** | 10.04 % | 3.20 % | 0.32 % | 20.07 % | **36.80 %** | **14.93 %** |

**\* Performance data is adjusted for withdrawals, premiums, transfers and other transactions.**

Crown Global Insurance Group
Bermuda • Cayman Islands
Suite 3206A, 2nd Floor • 39 Market Street • Camana Bay
P.O. Box 10467 • Grand Cayman • KY1-1004 • Cayman Islands
Telephone +1 345 747 4000 • Facsimile +1 345 945 6121

003949

# **EXHIBIT 9**



1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

CAUSE NO:   **FSD 99 OF 2025 (JAJ)**

**IN THE MATTER OF:**      **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF: CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)**

**BETWEEN**           **(1) THE HIGHLAND DALLAS FOUNDATION, INC.**

**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**

**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**

**(4) THE HCMLP CHARITABLE FUND**

<u>**PLAINTIFFS**</u>

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

<u>**DEFENDANT**</u>

---

**FIRST AFFIDAVIT OF GEOFFREY SYKES**

---

36068369.1.C8689.187150                                                    1

I, **GEOFFREY SYKES**, of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands being duly sworn **MAKE OATH and SAY** as follows:

**Preliminary**

1.   I am an Attorney-at-Law and Associate in the Insolvency and Dispute Resolution Group at Walkers (Cayman) LLP ("**Walkers**"), and I act for Charitable DAF HoldCo, Ltd (in Voluntary Liquidation) (the "**Company**").

2.   I make this Affidavit in response to the winding up petition by which Cause No. FSD 99 of 2025 was commenced, and the summons listed in that proceeding seeking, among other things, "*An order appointing joint provisional liquidators over Charitable DAF HoldCo…*".

3.   There is now shown to me a bundle of documents marked Exhibit "**GS-1**" and references to page numbers herein are to pages of that Exhibit. For the avoidance of doubt, no privilege is waived by the inclusion of the information set out herein.

4.   Save where the contrary is stated to be the case, the facts and matters to which I depose are within my own knowledge and are true. Where the facts and matters are not within my own knowledge, they derive from my instructions by the company, acting either through its directors or the Joint Voluntary Liquidators (defined below) as the case may be at the relevant time, or I identify the source of my knowledge and confirm that those facts and matters are true to the best of my knowledge and belief.

**Recent events and documents**

5.   On 24 April 2025, Johnstone Law served on the Company at its registered office a bundle of documents including the winding up petition and the summons referred to above.  A copy of the cover letter to this bundle of documents is at

**page 1** (noting that the remainder of the documents will already be before the Court).

6.   On 25 April 2025, Walkers sent to Johnstone Law a letter enclosing the following documents:

(a)   A consent to act as joint voluntary liquidators of the Company by Mitchell Mansfield and William Clarke of Kroll Cayman Ltd (the "**Joint Voluntary Liquidators**"), dated 29 March 2025;

(b)   Written resolutions of the directors of the Company including to recommend to the management shareholder that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(c)   Special resolutions of the management shareholder of the Company that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(d)   A declaration of solvency by the directors of the Company, dated 2 April 2025;

(e)   An extract from Gazette Issue No. 8/2025, which includes notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the Joint Voluntary Liquidators were appointed, dated 14 April 2025;

(f)   The current Memorandum and Articles of the Company, dated 20 February 2025;

(g)   The current Register of Members of the Company, dated 25 April 2025; and

(h) An email chain between Walkers and Johnstone law, dated 23-24 April 2025.

7. That letter and its enclosures are at **pages 2 – 53**.

8. On 24 April 2025, emails were exchanged between Campbells LLP as the registered office of the Company, and Shields Legal (acting for the directors of the Company), in respect of the bundle of documents served by Johnstone Law. A copy of that email chain is at **pages 54 – 56**.

9. On 27 April 2025, Mark Patrick (in his capacity as the management shareholder and a director of the Company) sent an email to the Joint Voluntary Liquidators in respect of the joint voluntary liquidation. A copy of that email is at **page 57**.

10. A copy of the structure chart of the Company prior to 27 March 2025 is at **page 58**. A copy of the current structure chart Company as of 27 March 2025 is at **page 59**.

**SWORN** at George Town, )
Grand Cayman )
on the 27th day of April 2025 )
before me )

**GEOFFREY SYKES**

**NOTARY PUBLIC**

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 2026**
**Date:** 27th April 2025

This **AFFIDAVIT** is filed by Walkers (Cayman) LLP, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Applicant whose address for service is care of said Attorneys-at-Law.

**FSD2025-0099**                    **Page 5 of 5**                    **2025-04-28**

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO:   FSD 99 OF 2025 (JAJ)

IN THE MATTER OF:     SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER     CHARITABLE   DAF   HOLDCO,   LTD   (IN   VOLUNATRY
OF:                   LIQUIDATION)

BETWEEN               (1) THE HIGHLAND DALLAS FOUNDATION, INC.
                      (2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.
                      (3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.
                      (4) THE HCMLP CHARITABLE FUND

                                                            <u>PLAINTIFFS</u>

                                    **and**

                      CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY
                      LIQUIDATION)

                                                            <u>DEFENDANT</u>

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

Fiona MacAdam
Notary Public in and for the Cayman Islands
My commission expires January 31, 20 26

Date: 27 April 2025 .

_____
**NOTARY PUBLIC**

**FSD2025-0099**                                        **2025-04-28**
36068395.1.C8689.187150

003955

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO:   FSD 99 OF 2025 (JAJ)

IN THE MATTER OF:    SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF:    CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)

BETWEEN    (1) THE HIGHLAND DALLAS FOUNDATION, INC.
(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.
(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.
(4) THE HCMLP CHARITABLE FUND

PLAINTIFFS

and

CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)

DEFENDANT

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

Fiona MacAdam
Notary Public in and for the Cayman Islands
My commission expires January 31, 20 26
Date: 27 April 2025 .

**NOTARY PUBLIC**



003956

36068395.1.C8689.187150

# JOHNSTONE

### L A W

24 April 2025

Charitable DAF HoldCo Ltd
c/o Campbells Corporate Services Limited
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

Dear Sir or Madam

**In the matter of Charitable DAF HoldCo Ltd | FSD No. 99 of 2025 | Service of Documents**

We act for the participating shareholders of the Charitable DAF HoldCo Ltd (**Company**), namely: (i) Highland Dallas Foundation, Inc., (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) HCMLP Charitable Fund (**Supporting Organisations**) which presented a winding up petition in relation to the Company (**Petition**), and a summons dated 10 April 2025 (**Summons**).

The Summons is listed for hearing before Justice Asif at 2pm on 28 April 2025.

Please find enclosed by way of service copies of the following:

1. The Petition (including Notice of Hearing)
2. The Summons
3. Affirmation of Julie Diaz and Exhibit JD-1
4. Affirmation of James Dondero and Exhibit JDD-1
5. Consent to act of Margot MacInnis and Exhibit MM-1
6. Consent to act of Sandipan Bhowmik and Exhibit SB-1

*Acknowledgment of Service*

I _____ am duly authorised to accept service of the enclosed documents, which were served at _____ pm on 24 April 2025.

_____
**Signed**

If you have any questions in relation to the above, please contact our office.

Yours faithfully

*Johnstone Law*

**Johnstone Law**



Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman
PO Box 926, 10 Market St, Grand Cayman, KY1-9006
345 929 3000 | info@j-law.ky | www.j-law.ky | LinkedIn

1

**003957**

**||| Walkers**

**BY EMAIL**

25 April 2025                                                                 Our Ref: PP/PA/187150

Johnstone Law
10 Market Street, PO Box 926
Grand Cayman KY1-9006

Dear Mr Johnstone

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

1.     We act as Cayman Islands counsel to the Company.

2.     We refer to the documents served yesterday by your firm on the Company at its registered office, which include a winding up petition (**"Petition"**), an application for the appointment of provisional liquidators (**"PL Application"**), and a cover letter of service (**"Service Letter"**).

**The Company is already in Voluntary Liquidation**

3.     Please note the following (all documents enclosed):

(a)     On 29 March 2025, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd executed a consent to act as joint voluntary liquidators of the Company (**"JVLs"**).

(b)     On 2 April 2025: (i) the directors of the Company executed written resolutions including to recommend to the management shareholder that the Company be wound up voluntarily and the JVLs be appointed; (ii) the management shareholder executed special resolutions that the Company be wound up voluntarily and the JVLs be appointed; and (iii) the directors of the Company executed a declaration of solvency.

(c)     On 14 April 2025, Gazette Issue No. 8/2025 was published, which included notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the JVLs appointed.

4.     Further, please see enclosed:

(a)     The current Memorandum and Articles of the Company, dated 20 February 2025 (**"M&A"**).

2

**003958**

**WALKERS**                                                                      Page 2

    (b)      The current Register of Members of the Company, dated 25 April 2025.

    (c)      An email chain between your firm and our firm dated 23-24 April 2025.

5.      As outlined above, the Company is in Voluntary Liquidation.

6.      That fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice referred to at paragraph 3(c) above.

7.      Further, the email chain referred to at paragraph 4(c) above is all that we received from your firm by way of pre-action correspondence.  We enquired as to the nature of the proceedings to be served, and had we been informed that it was a winding up petition and application for the appointment of provisional liquidators (rather than simply that the proceedings were in the process of being served on the Company's registered office), we would have informed you that the Company was already in Voluntary Liquidation.

8.      There is nothing in the M&A which entitles your clients to receive notice from the Company of its entry into Voluntary Liquidation.

**The appropriate course of action**

9.      As the Company is already in Voluntary Liquidation, the Petition and PL Application are plainly redundant, and we invite your clients to withdraw them without delay.

10.    If the JVLs (or your clients) consider it appropriate that the Voluntary Liquidation be brought under the supervision of the court, any of them may make an application for a supervision order pursuant to the Companies Act section 131.  If your clients would like to discuss such an application with the JVLs, including in respect of funding, please let us know.

11.    In the event that the Petition and PL Application are not withdrawn, or at the very least the hearing of the PL Application (which we understand from your firm's Service Letter is listed on Monday 28 April 2025 at 2pm) is not adjourned, this letter must be brought to the attention of the Court, and we will appear on behalf of the Company.

12.    If it becomes appropriate to do so, we will put this letter before the Court including on the question of costs.

Yours faithfully

*Walkers (Cayman) LLP*

**WALKERS (CAYMAN) LLP**

Direct Tel: +1 345 914 6365
Email: Barnaby.Gowrie@walkersglobal.com

3

**003959**

**THE COMPANIES ACT (AS AMENDED)**

**JOINT VOLUNTARY LIQUIDATORS' CONSENT TO ACT**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

To:     The Registrar of Companies

**TAKE NOTICE** that we, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, hereby consent to act as Joint Voluntary Liquidators of the above-named Company with effect from the commencement of the liquidation.

**DATED** this 29th day of March, 2025.

_____

**Mitchell Mansfield**
**Joint Voluntary Liquidator**

E: mitchell.mansfield@kroll.com
T: +1 345 743 8805

_____

**William Clarke**
**Joint Voluntary Liquidator**

E: will.clarke@kroll.com
T: +1 345 623 9905

4

003960

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY DATED 2 APRIL 2025**

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025), unless the context otherwise requires.

The undersigned, being all the Directors of the Company for the time being, hereby take the following actions and adopt the following resolutions.

1. **VOLUNTARY LIQUIDATION**

1.1 **IT IS NOTED** that:

    (a)    the Company's sole investment, being 100% of the limited liability company interests in CDMCFAD, LLC, a Delaware limited liability company, was redeemed on 27 March 2025 (the "**CDMCFAD Redemption**");

    (b)    proceeds lawfully available for distribution from the CDMCFAD Redemption in the amount of $1,612,192 were distributed to holders of Participating Shares of the Company by way of a cash dividend paid on April 2;

    (c)    the Company will not be engaging in any further business or investment activity and the operations of the Company have been fully wound down;

    (d)    the Company has no assets and no liabilities;

    (e)    in the circumstances, there is no reason for the Company to continue as a going concern and the Directors are of the view that the Company should therefore be wound up voluntarily;

    (f)    Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands have indicated that they consent to act as joint voluntary liquidators of the Company (the "**JVLs**") if so appointed;

    (g)    the Directors have received and reviewed a liquidation proposal from the JVLs, together with its terms and conditions (the "**Liquidation Proposal**");

    (h)    the Directors have conducted a full enquiry into the Company's affairs and to the best of the Directors' knowledge and belief the Company will be able to pay its debts in full together with interest at the prescribed rate within twelve-month period from the commencement of the voluntary winding up; and

    (i)    the Directors have received a form of the declaration of solvency for execution pursuant to section 124 of the Companies Act (as amended) (the "**Declaration of Solvency**").

1.2    **IT IS RESOLVED** that:

(a)    the Liquidation Proposal be approved;

(b)    the Directors recommend to Mark Patrick, being the only Shareholder having the right to receive notice of, attend, speak at and vote at general meetings of the Company, that:

(i)    the Company be wound up voluntarily; and

(ii)    Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company; and

(c)    if the Company is wound up voluntarily, each Director execute the Declaration of Solvency.

2.    **GENERAL AUTHORISATION**

2.1    **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively), and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3.    **RATIFICATION OF PRIOR ACTIONS**

3.1    **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.


_____
Mark Patrick
**Director**


_____
Paul Murphy
**Director**

35894721.2.C8689.187150

6

003962

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE VOTING SHAREHOLDER**
**OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025) (the "**Articles**"), unless the context otherwise requires.

The undersigned, being the only Shareholder of the Company having the right to receive notice of, attend, speak at and vote at general meetings and having considered the written resolutions of the Directors dated 2 April 2025 which state that the Directors recommend that the Company be wound up voluntarily and that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands be appointed as the joint voluntary liquidators of the Company (the "**JVLs**"), hereby consents to the following actions and adopts the resolutions set out below.

**1.      VOLUNTARY LIQUIDATION**

1.1    **IT IS RESOLVED BY SPECIAL RESOLUTION** that:

      (a)      the Company be wound up voluntarily; and

      (b)      Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company.

1.2    **IT IS RESOLVED BY ORDINARY RESOLUTION** that:

      (a)      the JVLs be authorised, in accordance with Article 123 of the Articles, to divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for that purpose, set such value as they deem fair upon any property to be divided as aforesaid and may determine how such division will be carried out as between the Participating Shareholders or different Classes; and

      (b)      the JVLs shall have the power to retain the Company's administrator, manager or such other person as determined by the JVLs to assist them in discharging any registration and notification obligations and any obligation to complete the Company's final filings and retain records pursuant to the US Foreign Account Tax Compliance Act and/or Common Reporting Standard and/or Economic Substance Reporting.

Mark Patrick

003963

THE COMPANIES ACT (AS AMENDED)

**DECLARATION OF SOLVENCY**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

We, Mark Patrick and Paul Murphy, being the Directors of the Company do solemnly and sincerely declare that we have made a full inquiry into the affairs of the Company and that, having done so, we believe that the Company will be able to pay its debts in full, together with interest at the prescribed rate within a period of twelve (12) months from the commencement of the winding up.

**Mark Patrick**

6716 Glenhurst Drive, Dallas, Texas, TX 75254, United States

Date of signature: 4/2/2025

Date of appointment as Director: 25 March 2021

**Paul Murphy**

Windsor Village, Unit 24, South Sound, Grand Cayman, Cayman Islands

Date of signature: 2nd April 2025

Date of appointment as Director: 22 April 2021

003964

Case 19-34054-sgj11    Doc 4272-5    Filed 06/23/25    Entered 06/23/25 17:57:21    Desc
Exhibit 9    Page 16 of 66

**Contacts for enquiries:**
Bryce Doran or Zhouming Kang
Telephones: (345) 949 7576 or +852 2583 1167
Emails: BDoran@RHRestructuring.com
or zhouming.kang@acclime.com

### GATN FINANCE LIMITED
#### Notice of Voluntary Winding Up (O.13, r.2)
#### (In Voluntary Liquidation)
#### The Companies Act (As Amended)

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman, KY1-1102 Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded by the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation:  2 April 2025**
WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

### AMP FUNDING LIMITED
#### (In Voluntary Liquidation)
#### The Companies Act (As Amended)
#### Notice of Voluntary Winding Up (O.13, r.2)

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century

Yard, Cricket Square, Grand Cayman KY1-1102, Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation:  2 April 2025**
WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

### CHARITABLE DAF HOLDCO, LTD.
#### (In Voluntary Liquidation)
#### ("The Company")
#### The Companies Act (As Amended)
#### Notice Of Voluntary Winding Up
#### Registration No: 263805

TAKE NOTICE that the Company was put into liquidation on 2 April 2025 by a special resolution passed by written resolution of the sole voting shareholder of the Company, executed on 2 April 2025.

AND FURTHER TAKE NOTICE that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, have been appointed as joint voluntary liquidators of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice and to establish any title they may have under the Companies Act (as amended) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of

9

003965

any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated this 14th day of April 2025**

MITCHELL MANSFIELD AND WILLIAM CLARKE

Joint Voluntary Liquidators

**Contact for enquiries:**

William Clarke
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Town KY1-1204
Cayman Islands
E: will.clarke@kroll.com
T: +1 345 623 9905

**Address for service:**

Kroll (Cayman) Ltd
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman, KY1-1204
Cayman Islands

**AARO DIRECTIONAL CRYPTO
MULTIFUND LIMITED
(In Voluntary Liquidation)
(the Company)
Notice Of Voluntary Winding Up
Registration No: 390083**

TAKE NOTICE that the Company was placed into voluntary liquidation on 28 March 2025 by a special resolution passed by written resolution of the voting shareholder of the Company.

AND FURTHER TAKE NOTICE that R&H Restructuring VL Services Ltd. of Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands has been appointed voluntary liquidator of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice to establish any title they may have under the Companies Act (as revised) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of any distribution made before such debts and/or claims

are proved or from objecting to the distribution.

Dated: 03 April 2025

OWEN WALKER
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator
MARTIN TROTT
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator

**Contact for Enquiries:**

Robert Knight
Telephone: +1 (345) 949 7576
Email: RKnight@RHRestructuring.com

**XP PHALANX CT FUND
(In Voluntary Liquidation)
(the "Company")
The Companies Act (as amended)
Notice of Voluntary Winding Up
Registration No: 391110**

TAKE NOTICE that the above-named Company was put into liquidation on 26 March 2025 by a Special Resolution passed by the sole voting shareholder by way of a written resolution in lieu of a meeting.

AND FURTHER TAKE NOTICE that FFP Limited of 2nd Floor Harbour Centre, 159 Mary Street, George Town, Grand Cayman, Cayman Islands has been appointed Voluntary Liquidator of the Company.

CREDITORS OF THE COMPANY are to prove their debts or claims within 21 days of the publication of this notice, and to establish any title they may have under the Companies Act (as amended) or are to be excluded from the benefit of any distribution made before the debts are proved or from objecting to the distribution.

**Dated this 3rd day of April 2025**

FFP LIMITED
Voluntary Liquidator

**Contact for enquiries:**

James Allen
FFP Limited
2nd Floor Harbour Centre
159 Mary Street
George Town, Grand Cayman
Cayman Islands

10

003966

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)



11

003967

www.verify.gov.ky File#: 263805

Filed 21-Feb-2025 09:26 EST
Auth Code: E90228166495

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1.   The name of the Company is Charitable DAF HoldCo, Ltd.

2.   The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3.   The objects for which the Company is established are:

    (a)   to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

    (b)   to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4.   The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5.   The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6.   The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7.   The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power

003968

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.   The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

35631852.5.C8689.187150

13

**003969**

www.verify.gov.ky File#: 263805

1-Feb-2025 09:26 EST
Auth Code: E90228166495

## TABLE OF CONTENTS

**CLAUSE**                                                                                      **PAGE**

TABLE A ................................................................................................................ 1

INTERPRETATION ................................................................................................. 1

PRELIMINARY ....................................................................................................... 5

SHARES .................................................................................................................. 6

MANAGEMENT SHARES ....................................................................................... 6

PARTICIPATING SHARES ..................................................................................... 7

MODIFICATION OF RIGHTS .................................................................................. 7

CERTIFICATES ...................................................................................................... 7

FRACTIONAL SHARES .......................................................................................... 7

TRANSFER OF SHARES ........................................................................................ 8

TRANSMISSION OF SHARES ............................................................................... 8

ALTERATION OF SHARE CAPITAL ...................................................................... 9

REDEMPTION, PURCHASE AND SURRENDER OF SHARES .............................. 9

TREASURY SHARES ............................................................................................ 10

GENERAL MEETINGS .......................................................................................... 11

NOTICE OF GENERAL MEETINGS ..................................................................... 11

PROCEEDINGS AT GENERAL MEETINGS ........................................................ 11

VOTES OF SHAREHOLDERS .............................................................................. 13

CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS ................. 14

DIRECTORS .......................................................................................................... 14

POWERS AND DUTIES OF DIRECTORS ............................................................ 15

003970

www.verify.gov.ky File#: 263805

BORROWING POWERS OF DIRECTORS ................................................................................. 17

THE SEAL ......................................................................................................................................... 17

DISQUALIFICATION OF DIRECTORS .......................................................................................... 17

PROCEEDINGS OF DIRECTORS ................................................................................................... 18

DIVIDENDS ....................................................................................................................................... 21

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ...................................... 21

CAPITALISATION OF RESERVES ................................................................................................. 22

SHARE PREMIUM ACCOUNT ....................................................................................................... 23

NOTICES ............................................................................................................................................ 23

NON-RECOGNITION OF TRUSTS ................................................................................................. 24

WINDING UP ..................................................................................................................................... 25

AMENDMENT OF ARTICLES OF ASSOCIATION ...................................................................... 25

CLOSING OF REGISTER OR FIXING RECORD DATE .............................................................. 25

REGISTRATION BYWAY OF CONTINUATION ........................................................................... 26

MERGERS AND CONSOLIDATION ............................................................................................... 26

DISCLOSURE .................................................................................................................................... 26

INDEMNITY ....................................................................................................................................... 27

DISPUTE RESOLUTION .................................................................................................................. 28

AEOI .................................................................................................................................................... 30

15

003971

*www.verify.gov.ky File#: 263805*

*Filed 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1.  In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

    "**Act**" means the Companies Act (as amended) of the Cayman Islands.

    "**AEOI**" means:

    (i)     sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

    (ii)     the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

    (iii)     any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



003972

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv)    any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a)    passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a

003973

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a)     in breach of the law or requirements of any country or governmental authority;

(b)     that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)     in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



003974

Filed 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a)     passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)      approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)     words importing the singular number shall include the plural number and vice versa;

(b)     words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

**003975**

(c)     the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)     reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)     reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h)     any requirements as to execution or signature under the Articles including the execution  of the Articles themselves can be satisfied in the form of an electronic signature as  defined in the Electronic Transactions Act; and

(i)     sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2.     Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

3.     The business of the Company may be commenced at any time after incorporation.

4.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company.  Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.     The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office.  The Directors may



003976

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

## SHARES

7.     Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)     issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b)     and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8.     The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9.     The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares.  Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other.  The Company may also pay such brokerage as may be lawful on any issue of Shares.

10.     The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MANAGEMENT SHARES

11.     The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company.  In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles.  Management Shares confer no other right to participate in the profits or assets of the Company.



21

003977

Filed 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## PARTICIPATING SHARES

12.    Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13.    Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting.  To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him.  For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14.    The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15.    No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16.    The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share.  If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

22

**003978**

### TRANSFER OF SHARES

17.    The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer.  The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18.    The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19.    The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20.    All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21.    If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

### TRANSMISSION OF SHARES

22.    The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share.  In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23.    Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



www.verify.gov.ky File#: 263805

**003979**

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24.    A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

25.    The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26.    The Company may by Ordinary Resolution:

(a)    consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)    convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)    subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)    cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27.    The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

28.    Subject to the Act, the Company may:

(a)    issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;



003980
www.verify.gov.ky File#: 263805

(b)      purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c)      make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d)      accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29.    Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30.    The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31.    The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

### TREASURY SHARES

32.    Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act.  In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33.    No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34.    The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a)      the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b)      a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



**003981**

35.     Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

36.     The Directors may, whenever they think fit, convene a general meeting of the Company.

37.     The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38.     If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

39.     At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40.     The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

41.     All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42.     No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



**003982**

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

   (i) secure the orderly conduct or proceedings of the meeting; or

   (ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



003983

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.



11-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

003984

58.    An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59.    The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60.    The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61.    A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

62.    Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

63.    The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64.    The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65.    Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66.    The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67.    The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68.    There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



003985

www.verify.gov.ky File#: 263805    21-Feb-2025 09:26 EST
Auth Code: E90228166495

69.   The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70.   The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

### POWERS AND DUTIES OF DIRECTORS

71.   Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company.  No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72.   The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit.  Any natural person or corporation so appointed by the Directors may be removed by the Directors or



www.verify.gov.ky File#: 263805

21-Feb-2025 09:26 EST
Auth Code: E90228166495

by the Company by Ordinary Resolution.  The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73.     The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit.  Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74.     The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75.     The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76.     The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77.     The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78.     The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



003987

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79.    Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

80.    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

81.    The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal.  The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82.    The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal.  The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83.    Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

84.    The office of Director shall be vacated, if the Director:

(a)    becomes bankrupt or makes any arrangement or composition with his creditors;



003988

21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805          Auth Code: E90228166495

(b)      dies or is found to be or becomes of unsound mind;

(c)      resigns his office by notice in writing to the Company;

(d)      is removed from office by Ordinary Resolution;

(e)      is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

(f)      is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

85.      The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86.      A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87.      The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88.      A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89.      A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director

35631852.5.C8689.187150                                     18                                     33



003989

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established.  A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90.     Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91.     The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a)     all appointments of officers made by the Directors;

(b)     the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c)     all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92.     When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93.     A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be.  When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94.     The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



003990
21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805                                    Auth Code: E90228166495

95. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

Filed 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## DIVIDENDS

99.   Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100.  Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101.  The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102.  Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103.  The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104.  Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105.  If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106.  No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

107.  The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.



003992

108.    The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109.    The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110.    The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111.    The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

112.    Subject to the Act and these Articles, the Directors may:

(a)    resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b)    appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i)    paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii)    paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c)    make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or

35631852.5.C8689.187150          22          37


003993

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

## NOTICES

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



003994
21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

117.    Any notice or other document, if served by:

(a)    post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b)    facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c)    recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)    electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118.    Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119.    Notice of every general meeting of the Company shall be given to:

(a)    all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b)    every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

### NON-RECOGNITION OF TRUSTS

120.    Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial



003995

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

<div align="center">**WINDING UP**</div>

121.    If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122.    Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a)    first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b)    second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123.    If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes.  The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

<div align="center">**AMENDMENT OF ARTICLES OF ASSOCIATION**</div>

124.    Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

<div align="center">**CLOSING OF REGISTER OR FIXING RECORD DATE**</div>

125.    For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days.  If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,



**003996**

01-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126.    In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127.    If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

### REGISTRATION BYWAY OF CONTINUATION

128.    The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing.  In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

### MERGERS AND CONSOLIDATION

129.    The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

### DISCLOSURE

130.    The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.



003997

## INDEMNITY

131.    To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132.    Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133.    To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).  The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134.    Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

42



003998

1-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

135.  The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

136.  Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)  Mediation:

(i)  subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii)  the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii)  the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv)  each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b)  Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i)  the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue

003999

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act

(**"FAA"**), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii)     the arbitrators may not award non-monetary or equitable relief of any sort.  They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum.  In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii)    the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv)     no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it.  In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v)      all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement.  Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable

004000

opportunity to protect their interests.  In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered.  The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)    the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c)    Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137.    Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138.    In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a)    compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b)    deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i)    comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii)    allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;

45

000401

Verified 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

(iii)  ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139.  In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a)  create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b)  may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c)  allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d)  adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



004002

www.verify.gov.ky File#: 263805

**Annexure**

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.


004003

21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

Case 19-34054-sgj11    Doc 4272-5    Filed 06/23/25    Entered 06/23/25 17:57:21    Desc
Exhibit 9    Page 55 of 66

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Share Class: Management**

**Authorised Capital of USD 1.00 divided into 100.00 Management shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **WNL Limited** 190 Elgin Avenue George Town Grand Cayman KY1-9001 Cayman Islands | 7-Nov-2011 | | 1.00 | 0.01 | In Full | 7-Nov-2011 : Allotment of 1.00 Management share(s) | 7-Nov-2011 | 1.00 | | 0.00 | 7-Nov-2011 : Repurchase of 1.00 Management share(s) |
| 2 | **Grant James Scott** Highland Capital Managment, L.P. 13455 Noel Road, Suite 800 Dallas, TX  75240 USA | 7-Nov-2011 | | 100.00 | 1.00 | In Full | 7-Nov-2011 : Allotment of 100.00 Management share(s) | 25-Mar-2021 | 100.00 | | 0.00 | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick |
| 3 | **Mark E. Patrick** 6716 Glenhurst Dr Dallas, TX  75254 USA | 25-Mar-2021 | | 100.00 | 1.00 | In Full | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick | | 0.00 | | 100.00 | |

Notes
1    Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.

48

**004004**

CONFIDENTIAL
Printed on 25 April 2025

Register of Members of

**Charitable DAF HoldCo, Ltd**

Registration No: 263805

<u>**Summary**</u>

| Name | Number and Class of Shares Held | |
|---|---|---|
| Mark E. Patrick | 100.00 | Management |
| | | |
| **Total Management Shares outstanding: 100.00** | | |
| **Total Management Shares remaining unissued: 0.00** | | |

**CONFIDENTIAL**
Printed on 25 April 2025

Case 19-34054-sgj11    Doc 4272-5    Filed 06/23/25    Entered 06/23/25 17:57:21    Desc
Exhibit 9    Page 57 of 66

Register of Members of

**Charitable DAF HoldCo, Ltd**

Registration No: 263805

**Share Class: Participating**

**Authorised Capital of USD 49,999.00 divided into 4,999,900.00 Participating shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **The Highland Capital Management Partners CharitableTrust #2** Highland Capital Management, L.P 13455 Noel Rd, Suite 800 TX 75240 Dallas Texas USA | 7-Nov-2011 | | 300.00 | 3.00 | In Full | 7-Nov-2011 : Allotment of 300.00 Participating share(s) | 30-Nov-2011 | 300.00 | | 0.00 | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc |
| 2 | **Highland Kansas City Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc | | 0.00 | | 100.00 | |
| 3 | **Highland Dallas Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc | | 0.00 | | 100.00 | |
| 4 | **Highland Santa Barbara Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc | | 0.00 | | 100.00 | |

50

CONFIDENTIAL
Printed on 25 April 2025

004006

Case 19-34054-sgj11    Doc 4272-5    Filed 06/23/25    Entered 06/23/25 17:57:21    Desc
Exhibit 9    Page 58 of 66

Register of Members of

**Charitable DAF HoldCo, Ltd**

Registration No: 263805

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Forth Worth TX 76102 USA | 13-Aug-2015 | | 5.00 | 0.05 | In Full | 13-Aug-2015 : Allotment of 5.00 Participating share(s) | | 0.00 | | 5.00 | |
| 6 | **DFW Charitable Foundation** The Corporation Trust Company 1209 Orange Street Wilmington, DE  19801 United States | 7-Feb-2025 | | 318.00 | 3.18 | In Full | 7-Feb-2025 : Allotment of 318.00 Participating share(s) | | 0.00 | | 318.00 | |

Notes

1    Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Highland Kansas City Foundation, Inc | 100.00 | Participating |
| Highland Dallas Foundation, Inc | 100.00 | Participating |
| Highland Santa Barbara Foundation, Inc | 100.00 | Participating |
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5.00 | Participating |
| DFW Charitable Foundation | 318.00 | Participating |
| **Total Participating Shares outstanding: 623.00** | | |
| **Total Participating Shares remaining unissued: 4,999,277.00** | | |

**CONFIDENTIAL**
Printed on 25 April 2025

51

004007

**Geoffrey Sykes**

| | |
|---|---|
| **From:** | Andrew Johnstone <aj@j-law.ky> |
| **Sent:** | 24 April 2025 11:46 AM |
| **To:** | Geoffrey Sykes; Barnaby Gowrie |
| **Cc:** | Rhiannon Zanetic; Philip Aubry; Nicholas Geldard; Chris Beck |
| **Subject:** | Re: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181] |

**[this message is from an external sender]**

Hi Geoff

Given your failure to respond yesterday, we are in the course of serving on Charitable DAF HoldCo Ltd at its registered office.

Best

AJ

**Andrew Johnstone**
Founder | Partner



+1 (345) 929-3000
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 April 2025 11:35
**To:** Andrew Johnstone <aj@j-law.ky>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181]

Dear Mr Johnstone

Please could you confirm the nature of the proceeding to be served.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Andrew Johnstone <aj@j-law.ky>
**Sent:** 23 April 2025 13:42
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>
**Subject:** Charitable DAF HoldCo, Ltd

52

004008

[this message is from an external sender]

Dear Colleagues

We act for the Participating Shareholders of Charitable DAF HoldCo, Ltd (the **Company**).

Please can you confirm whether you are instructed to act for and accept service on behalf of the Company.

Best

AJ

**Andrew Johnstone**
Founder | Partner

**JL**

+1 (345) 929-3000
**www.j-law.ky | LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

## Geoffrey Sykes

| | |
|---|---|
| **From:** | Brandon R. Schaller <bschaller@shieldslegal.com> |
| **Sent:** | 24 April 2025 4:52 PM |
| **To:** | Barnaby Gowrie; Philip Aubry; Geoffrey Sykes; Chris Beck |
| **Cc:** | mpatrick@dafholdco.com; Paul Murphy; sraver@dafholdco.com; Bart Higgins |
| **Subject:** | FW: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232] |
| **Attachments:** | 2025 24 04 - Charitable DAF HoldCo Ltd.zip |
| | |
| **Importance:** | High |

---

[this message is from an external sender]

FYI

## Brandon R. Schaller
ATTORNEY

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

---

**From:** Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 4:45 PM
**To:** Michelle Richie | Campbells <MRichie@campbellslegal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]
**Importance:** High

---

CAUTION: This email originated from outside of the organization.

All

Johnstone law, who are acting for the participating shareholders of Charitable DAF HoldCo Ltd, served the following documents this afternoon (via Campbells, as we remain Charitable DAF's registered office):

- A Petition seeking orders that Charitable DAF be wound up and that joint official liquidators be appointed.
- A Summons seeking an order appointing joint provisional liquidators over Charitable DAF.
- Supporting affirmations of Julie Diaz (of The Dallas Foundation) and James Dondero.
- Consent to acts as a liquidator from Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton.

The Summons seeking the appointment of joint provisional liquidators over Charitable DAF has been listed for hearing before Justice Asif at 2pm on **Monday, 28 April 2025**.

We will forward copies of the attached materials to Kroll, as the voluntary liquidators of Charitable DAF. Our understanding is that Kroll will be taking point on next steps as the voluntary liquidators, but we will review and are available to assist. We will also forward these materials onto Walkers, who have requested a copy.

Kind regards

54

004010

Matheo Vinciullo
Associate

E mvinciullo@campbellslegal.com
T +1 345 949 2648   D +1 345 914 6931   C +1 345 327 6931

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman  KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

**From:** Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 1:00 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]


Brandon

We have not received anything as yet but will provide copies when we do.  We have received a similar request from Walkers attached.  Do we have authorisation to provide the same to them?

**Michelle Richie**
Partner

E mrichie@campbellslegal.com
T +1 345 949 2648   D +1 345 914 6933   C +1 345 525 6933

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman  KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Thursday, April 24, 2025 12:48 PM
**To:** Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Charitable DAF HoldCo, Ltd.


**EXTERNAL EMAIL: This email originated from outside of Campbells.**

Campbells team,

55

004011

We heard that Johnstone law is attempting service on Charitable DAF HoldCo, Ltd. as its registered office. Can you please advise if you have received anything, and if not, provide us a copy when you do?

Thanks,
Brandon

## Brandon R. Schaller

**ATTORNEY**

16400 Dallas Parkway, Suite 300
Dallas, TX 75248

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

## SHIELDSLEGAL.COM

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

56

004012

**Geoffrey Sykes**

| | |
|---|---|
| **From:** | Mark Patrick <mpatrick@dafholdco.com> |
| **Sent:** | 27 April 2025 12:51 AM |
| **To:** | Mansfield, Mitchell |
| **Cc:** | Paul Murphy |
| **Subject:** | Voluntary Liquidators |

**[this message is from an external sender]**

Dear Voluntary Liquidators

I write to you in my capacity as the management shareholder and director of the company. My fellow director, Paul Murphy, is copied to this email and agrees with its contents.

Please note the following:

The management shareholder of the company and its directors intend in providing cooperation to the voluntary liquidators in accordance with Cayman law.
The management shareholder has no intention of taking any steps to remove the voluntary liquidators from office.
Assuming the voluntary liquidators consider it appropriate having consulted with relevant stakeholders of the company, the management shareholder and the directors have no objections to the voluntary liquidators making the necessary court application to have the voluntary liquidation brought under the supervision of the Cayman Court.
If you have any questions, please do not hesitate to contact me.

Kind regards.

Mark Patrick
Management Shareholder

57

004013

Case 19-34054-sgj11    Doc 4272-5    Filed 06/23/25    Entered 06/23/25 17:57:21    Desc
Exhibit 9    Page 65 of 66

# Before



58

004014

# Current – DAF Holdco



004015

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
Crawford, Wishnew & Lang PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| *In re* | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## DUGABOY INVESTMENT TRUST'S OBJECTIONS TO HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND LITIGATION SUB-TRUST EXHIBITS WITH RESPECT TO HEARING TO BE HELD ON JUNE 25, 2025

COMES NOW, Dugaboy Investment Trust ("Dugaboy") and files these Objections (the "Objections") to the Exhibits submitted by Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust (collectively, "Highland") with respect to the hearing to be held on June 25, 2025 (the "Hearing").

| Highland Exhibit No. | Description | Objection(s) | Offered | Admitted |
|---|---|---|---|---|
| **1.** | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to a Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Agreement with the HMIT* | | | |

004016

| | *Entities and Authorizing Actions Consistent Therewith* [Docket No. 4217] [HCMLPHMIT00002688-HCMLPHMIT00002715] | | | |
|---|---|---|---|---|
| **2.** | Email from L. Phillips to J. Morris dated March 5, 2025 [HCMLPHMIT00000015-HCMLPHMIT00000017] | | | |
| **3.** | Email from L. Phillips to J. Morris dated March 13, 2025 [HCMLPHMIT00000022-00000026] | | | |
| **4.** | Email from L. Phillips to J. Morris dated March 18, 2025 [HCMLPHMIT00000028-HCMLPHMIT00000029] | | | |
| **5.** | Email from L. Phillips to J. Morris dated March 19, 2025 [HCMLPHMIT00000030-HCMLPHMIT00000031] | | | |
| **6.** | Confidentiality Agreement-M Patrick and Related Entities [HCMLPHMIT00000032-HCMLPHMIT00000045] | | | |
| **7.** | Email from L. Phillips to J. Morris and A. Hurt dated March 22, 2025 [HCMLPHMIT00000046-HCMLPHMIT00000048] | | | |
| **8.** | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000052-HCMLPHMIT00000054] | | | |
| **9.** | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000055-HCMLPHMIT00000056] | | | |
| **10.** | Email from L. Phillips to J. Morris dated March 28, 2025 [HCMLPHMIT00000057] | Incomplete document (does not include attachments) | | |
| **11.** | Email from L. Phillips to J. Morris dated March 30, 2025 [HCMLPHMIT00000058] | | | |
| **12.** | Email from L. Phillips to J. Morris dated March 31, 2025 [HCMLPHMIT00000059] | Incomplete document (does not include attachments) | | |

| 13. | HCLOM Intercreditor and Participation Agreement [HCMLPHMIT00000060-HCMLPHMIT00000063] | Irrelevant (FRE 401, 402 and 403) | | |
| 14. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000075-HCMLPHMIT00000078] | | | |
| 15. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000079-HCMLPHMIT00000080] | | | |
| 16. | Email from L. Phillips to J. Morris dated April 3, 2025 with attachment - Paul Murphy Joinder to Confidentiality Agreement [HCMLPHMIT00000081-HCMLPHMIT00000083] | | | |
| 17. | Email from L. Phillips to J. Morris dated April 4, 2025 [HCMLPHMIT00000089] | | | |
| 18. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000090-HCMLPHMIT00000092] | | | |
| 19. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachment – Shawn Raver Joinder to Confidentiality Agreement [HCMLPHMIT00000093-HCMLPHMIT00000096] | | | |
| 20. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000099-HCMLPHMIT00000102] | | | |
| 21. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachments- Phillips Joinder to Confidentiality Agreement (signed by Phillips) and A. Hurt Joinder to Confidentiality Agreement (signed by Hurt) [HCMLPHMIT00000103-HCMLPHMIT00000107] | | | |
| 22. | Email from L. Phillips to J. Morris dated April 8, 2025 with fully executed HCLOM Remittance Agreement | | | |

|  | [HCMLPHMIT00000108-HCMLPHMIT00000112] |  |  |  |
|---|---|---|---|---|
| **23.** | Email from L. Phillips to J. Morris dated April 10, 2025 with HMIT 2022 Settlement Agreement [HCMLPHMIT00000118-HCMLPHMIT00000130] |  |  |  |
| **24.** | Email from L. Phillips to J. Morris dated April 17, 2025 with attachment James Shields Joinder to Confidentiality Agreement [HCMLPHMIT00000135-HCMLPHMIT00000150] |  |  |  |
| **25.** | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000157-HCMLPHMIT00000158] |  |  |  |
| **26.** | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000159-HCMLPHMIT00000161] |  |  |  |
| **27.** | Email from L. Phillips to J. Morris dated May 13, 2025 [HCMLPHMIT00000162-HCMLPHMIT00000163] |  |  |  |
| **28.** | Email from L. Phillips to J. Morris dated May 14, 2025 [HCMLPHMIT00000164-HCMLPHMIT00000166] |  |  |  |
| **29.** | Email from L. Phillips to J. Morris dated May 14, 2025 with Redlines of Settlement Agreement [HCMLPHMIT00000167-HCMLPHMIT00000218] |  |  |  |
| **30.** | Email from L. Phillips to J. Morris dated May 15, 2025 [HCMLPHMIT00000226-HCMLPHMIT00000234] |  |  |  |
| **31.** | Email from L. Phillips to J. Morris dated May 16, 2025 with Clean and Redline of Rand Settlement Agreement [HCMLPHMIT00000235-HCMLPHMIT00000283] |  |  |  |
| **32.** | Email from L. Phillips to T. Cournoyer dated May 16, 2025 |  |  |  |

| | | | | |
|---|---|---|---|---|
| | [HCMLPHMIT00000287-HCMLPHMIT00000289] | | | |
| **33.** | Email from L. Phillips to J. Seery, M. Patrick, S. Raver, J. Shields, A. Hurt dated May 17, 2025 [HCMLPHMIT00000290] | | | |
| **34.** | Email from L. Phillips to J. Morris dated May 17, 2025 [HCMLPHMIT00000291-HCMLPHMIT00000292] | | | |
| **35.** | Email from L. Phillips to J. Morris, J. Pomerantz dated May 19, 2025 with attachment HMIT Redlined Pages only to Settlement Agreement [HCMLPHMIT00000295-HCMLPHMIT00000297] | | | |
| **36.** | Email from L. Phillips to G. Demo, A. Hurt, J. Shields dated May 19, 2025 [HCMLPHMIT00000342-HCMLPHMIT00000344] | | | |
| **37.** | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 with attachment - M. Patrick signature o HMIT Rand Settlement Agreement [HCMLPHMIT00000345-HCMLPHMIT00000370] | | | |
| **38.** | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz date May 19, 2025 [HCMLPHMIT00000371-HCMLPHMIT00000372] | | | |
| **39.** | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000373-HCMLPHMIT00000374] | | | |
| **40.** | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000423-HCMLPHMIT00000428] | | | |
| **41.** | Email from J. Morris to L. Phillips dated March 22, 2025 [HCMLPHMIT00000562-HCMLPHMIT00000563] | | | |

| 42. | Email from J. Morris to L. Phillips, A. Hurt dated March 22, 2025 with attachment – fully executed Confidentiality Agreement [HCMLPHMIT00000564-HCMLPHMIT00000580] | | | |
|---|---|---|---|---|
| 43. | Email from J. Morris to L. Phillips dated April 4, 2025 with attachment Litigation Protections M. Patrick [HCMLPHMIT00000621-HCMLPHMIT00000631] | | | |
| 44. | Email from J. Morris to L. Phillips dated April 7, 2025 [HCMLPHMIT00000642-HCMLPHMIT00000644] | | | |
| 45. | Email from J. Morris to L. Phillips dated April 8, 2025 with attachment – current snapshot of remaining assets [HCMLPHMIT00000656--HCMLPHMIT00000661] | | | |
| 46. | Email from J. Morris to L. Phillips dated April 16, 2025 with attachment – Second Amended and Restated Indemnity Trust Agreement [HCMLPHMIT00000672-HCMLPHMIT00000727] | | | |
| 47. | April 15, 2025 Draft Illustrative Highland Indemnity Trust Payout Schedule [HCMLPHMIT00000724-HCMLPHMIT00000727] | | | |
| 48. | Email from J. Morris to L. Phillips dated May 15, 2025 with attachment – Draft Rand Settlement Agreement and Redline [HCMLPHMIT00000766-HCMLPHMIT00000820] | | | |
| 49. | Email from J. Morris to L. Phillips dated May 15, 2025 with Clean and Redline Settlement Agreement [HCMLPHMIT00000829-HCMLPHMIT00000877] | | | |
| 50. | Email from L. Phillips to D. Klos dated April 17, 2025 [HCMLPHMIT00000947] | | | |

| | | | | |
|---|---|---|---|---|
| **51.** | Email re: Microsoft Teams call from D. Klos to J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt dated April 7, 2025 [HCMLPHMIT00000949] | | | |
| **52.** | Microsoft Teams Appointment for J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt scheduled for April 8, 2025 [HCMLPHMIT00000950] | | | |
| **53.** | Email from D. Klos to J. Shields dated April 22, 2025 with attachment – Potential Settlement Structure with DAF and HMIT [HCMLPHMIT00000987-HCMLPHMIT00001000] | | | |
| **54.** | Email from J. Seery to M. Patrick, S. Raver, L. Phillips, A. Hurt, J. Shields dated April 28, 2025 with attachment – Draft Rand Settlement Agreement [HCMLPHMIT00001001-HCMLPHMIT00001025] | | | |
| **55.** | Email Microsoft Teams appointment from D. Klos to J. Seery, K. Hendrix, M. Patrick, S. Raver, Paul dated April 3, 2025 [HCMLPHMIT00001037] | | | |
| **56.** | Email from D. Klos to M. Patrick dated April 2, 2025 [HCMLPHMIT00001042] | | | |
| **57.** | Email from J. Seery to J. Morris, T. Cournoyer, D. Klos, M. Gray dated June 11, 2025 with attachment – Class 9 Consent to Rand Settlement and Release [HCMLPHMIT00001220-HCMLPHMIT00001245] | Hearsay (FRE 801); Incomplete (does not include attachments) | | |
| **58.** | Letter to P. Daugherty from J. Seery re: Eighth Distribution re: Highland Claimant Trust dated May 20, 2025 [HCMLPHMIT00002329] | | | |
| **59.** | Written Consent of Holders of Class 9 Subordinated Claim Trust Interests in | Hearsay (FRE 801) | | |

| | | | | |
|---|---|---|---|---|
| | the Highland Claimant Trust dated May 16, 2025 [HCMLPHMIT00002677-HCMLPHMIT00002682] | | | |
| 60. | Tolling Agreement Extending Claim Objection Deadline dated July 27, 2022 | | | |
| 61. | Amendment No. 1 to Tolling Agreement Extending the Claim Objection Deadline dated December 21, 2022 | | | |
| 62. | Amendment No. 2 to Tolling Agreement Extending Claim Objection Deadline dated November 6, 2023 | | | |
| 63. | Amendment No. 3 to Tolling Agreement Extending Claim Objection Deadline November 20, 2024 | | | |
| 64. | Email from L. Phillips to J. Morris dated January 6, 2025 [HCMLPHMIT00000008-HCMLPHMIT00000009] | Irrelevant (FRE 401, 402 and 403) | | |
| 65. | Email from L. Phillips to J. Morris, A. Hurt dated January 11, 2025 [HCMLPHMIT00000010-HCMLPHMIT00000012] | Irrelevant (FRE 401, 402 and 403) | | |
| 66. | *Highland Capital Management, L.P.'s Motion for (A) a Bad Faith Finding and (B) and Award of Attorney's Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* [Docket No. 4176] [HCMLPHMIT00000441-HCMLPHMIT00000500] | Irrelevant (FRE 401, 402 and 403) | | |
| 67. | Hearing Transcript dated December 18, 2024 [Docket No. 4197] [HCMLPHMIT00003829-HCMLPHMIT00003859] | Irrelevant (FRE 401, 402 and 403) | | |
| 68. | *Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award for Attorney's Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4716]* [Docket No. 4199] | Irrelevant (FRE 401, 402 and 403) | | |

| | [HCMLPHMIT00003860-HCMLPHMIT00003866] | | | |
|---|---|---|---|---|
| **69.** | Intercreditor and Participation Agreement with HCLOM dated January 10, 2025 [HCMLPHMIT00003868-HCMLPHMIT00003871] | Irrelevant (FRE 401, 402 and 403) | | |
| **70.** | Trust Agreement of Hunter Mountain dated December 17, 2015 [HCMLPHMIT00004103-HCMLPHMIT00004114] | | | |
| **71.** | Show Cause Hearing Transcript June 8, 2021 [HCMLPHMIT00002716-HCMLPHMIT00003013] | | | |
| **72.** | HMIT Hearing Transcript June 8, 2023 [HCMLPHMIT00003014-HCMLPHMIT00003402] | | | |
| **73.** | Limited Liability Company Agreement of Atlas IDF GP, LLC dated October 29, 2015 [HCMLPHMIT00003511-HCMLPHMIT00003517] | | | |
| **74.** | HOLDCO Responses and Disclosures Related to the Court's Order Requiring Disclosures [Docket No. 2547] HCMLPHMIT00003523-HCMLPHMIT00003828] | | | |
| **75.** | HMIT Appointment of Successor Administrator dated 8/12/2022 [HCMLPHMIT00003872] | | | |
| **76.** | Limited Liability Company Agreement of Rand PE Fund Management, LLC dated October 29, 2015 [HCMLPHMIT00003873-HCMLPHMIT00003879] | | | |
| **77.** | Limited Liability Company Agreement of Rand Advisors, LLC dated August 28, 2013 [HCMLPHMIT00003880-HCMLPHMIT00003886] | | | |
| **78.** | Agreement of Limited Partnership of Rand PE Fund I, L.P. dated October 29, 2015 [HCMLPHMIT00003887-HCMLPHMIT00003893] | | | |

| | | | | |
|---|---|---|---|---|
| **79.** | Amended and Restated Limited Partnership Agreement of Atlas IDF, LP dated November 30, 2015 [HCMLPHMIT00003894-HCMLPHMIT00003928] | | | |
| **80.** | Atlas IDF, LP Offering of Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00003929-HCMLPHMIT00004023] | | | |
| **81.** | Rand PE Fund I, LP Offering Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00004024-HCMLPHMIT00004095] | | | |
| **82.** | Member and Manager Consent of Atlas IDF GP, LLC dated October 13, 2022 [HCMLPHMIT00004124-HCMLPHMIT00004126] | | | |
| **83.** | Amended and Restated Company Agreement of Atlas IDF GP, LLC dated August 8, 2022 [HCMLPHMIT00004127-HCMLPHMIT00004151] | | | |
| **84.** | Amended and Restated Company Agreement of Rand Advisors, LLC dated August 1, 2022 [HCMLPHMIT00004152-HCMLPHMIT00004176] | | | |
| **85.** | Amended and Restated Company Agreement of Rand PE Fund Management, LLC dated August 1, 2022 [HCMLPHMIT00004177-HCMLPHMIT00004201] | | | |
| **86.** | Membership Interest Purchase Agreement Rand Advisors dated August 1, 2022 [HCMLPHMIT00004202-HCMLPHMIT00004215] | | | |
| **87.** | Member and Manager Consent of Rand Advisors, LLC dated October 13, 2022 [HCMLPHMIT00004216-HCMLPHMIT00004218] | | | |

| | | | | |
|---|---|---|---|---|
| **88.** | Member and Manager Consent of Rand PE Fund Management, LLC dated October 13, 2022 [HCMLPHMIT00004219-HCMLPHMIT00004221] | | | |
| **89.** | 3/17/2025 Rand Advisors Form ADV [HCMLPHMIT00003465-HCMLPHMIT00003493] | | | |
| **90.** | Atlas IDF, LP Subscription 12/21/2015 (signature pages only) | | | |
| **91.** | Atlas IDF, LP Subscription 12/23/2015 (signature page only) | | | |
| **92.** | Atlas IDF LP SEC Form D dated February 24, 2025 [HCMLPHMIT00003518-HCMLPHMIT00003522] | | | |
| **93.** | Rand PE Fund I, L.P. SEC Form D dated February 24, 2025 [HCMLPHMIT00004096-HCMLPHMIT00004100] | | | |
| **94.** | Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated September 24, 2015 [HCMLPHMIT00004115-HCMLPHMIT00004123] | | | |
| **95.** | Second Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated February 12, 2025 | | | |
| **96.** | Bylaws of The Okada Family Foundation, Inc. (final version) | | | |
| **97.** | Bylaws of Empower Dallas Foundation, Inc. | | | |
| **98.** | Crown Global DVA Policy 30218 (signed) | | | |
| **99.** | Crown Global DVA Termsheet 30218 | | | |
| **100.** | Crown Global DVA Policy 30219 (signed) | | | |
| **101.** | Crown Global DVA Termsheet 30219 | | | |
| **102.** | Crown Global Rand Participation Agreement (Executed) | | | |
| **103.** | S&G HMIT Opinion Rep Letter dated January 29, 2016 | | | |
| **104.** | S&G HMIT Opinion dated January 29, 2016 | | | |

| 105. | Promissory Note $24,268,621.69 dated May 31, 2017 [HCMLPHMIT00001327-HCMLPHMIT00001328] | | | |
|---|---|---|---|---|
| 106. | The Dugaboy Investment Trust Offering of $1817M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002323-HCMLPHMIT00002327] | | | |
| 107. | Participation Agreement for Par/Near Par Trades dated July 18, 2024 [HCMLPHMIT00002594-HCMLPHMIT00002600] | | | |
| 108. | $18.5mm Dugaboy Note Attempted Sale – Process Update [HCMLPHMIT00002601] | | | |
| 109. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002602-HCMLPHMIT00002607] | | | |
| 110. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002608-HCMLPHMIT00002630] | | | |
| 111. | Highland Claimant Trust Recommended Dugaboy Note Contribution dated June 7, 2024 [HCMLPHMIT00002631-HCMLPHMIT00002636] | | | |
| 112. | Email from D. Klos to DC Sauter dated May 23, 2024 [HCMLPHMIT00002637-HCMLPHMIT00002639] | | | |
| 113. | Highland Capital Management, L.P. Consolidated Financial Statement and Supplemental Information dated December 31, 2018 [HCMLPHMIT00002548-HCMLPHMIT00002593] | | | |
| 114. | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24, 2015 | | | |

| | | | | |
|---|---|---|---|---|
| | [HCMLPHMIT00002641-HCMLPHMIT00002676] | | | |
| 115. | 2018 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT) [HCMLPHMIT00001332; HCMLPHMIT00001336; HCMLPHMIT00001414; HCMLPHMIT00001419; HCMLPHMIT00001424; HCMLPHMIT00001429; HCMLPHMIT00001434; HCMLPHMIT00001439] | | | |
| 116. | 2019 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT) [HCMLPHMIT00001726; HCMLPHMIT00001766; HCMLPHMIT00001865; HCMLPHMIT00001870; HCMLPHMIT00001875; HCMLPHMIT00001880; HCMLPHMIT00001885; HCMLPHMIT00001890] | | | |
| 117. | Monthly Operating Report – FINAL November 2019 [HCMLPHMIT00001329] | | | |
| 118. | Hunter Mountain Note Receivable October 15, 2019 [HCMLPHMIT00001330] | | | |
| 119. | Affidavit of James Dondero in the Grand Court of Cayman Islands FSD2025-0099 dated April 16, 2025 [HCMLPHMIT00003429-HCMLPHMIT00003438] | | | |
| 120. | Email from J. Pomerantz to D. Curry, M. Okin dated June 19, 2025 | | | |
| 121. | *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as Modified), Pages 26-29, (entire document can be found at Docket No. 1808) | | | |

| | | | | |
|---|---|---|---|---|
| | Excerpts:<br>Article IV. B.1-5 (pages 26-28)<br>Article IV. B.5 (pages 28-29)<br>Article IV. B.7 (page 30)<br>Article IV. B.10 (page 31)<br>Article IV. D. (pages 34-35)<br>Article VII. D.1-2 (pages 44-45)<br>Article XI (pages 53-55) | | | |
| **122.** | *Claimant Trust Agreement*, (entire document can be found at Docket No. 1811-2, as modified by Docket No. 1875-4)<br>Excerpts:<br>Fourth "Whereas" clause (page 1)<br>Section 2.2(a)-(b) (page 8)<br>Section 3.2(a)-(b) (pages 11-12)<br>Section 3.2(c)(iv) (page 12)<br>Section 2.3(b)(ix) (page 9) | | | |
| **123.** | *Litigation Sub-Trust Agreement*, (entire document can be found at Docket No. 1811-4)<br>Excerpts:<br>Fourth "Whereas" clause (page 1)<br>Section 2.2 (page 5)<br>Section 3.2(a) (page 7)<br>Section 3.2(b) (page 7)<br>Section 3.2(c)(v) (page 7)<br>Section 3.3 (b)(iii) (page 9) | | | |
| **124.** | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | No specific exhibit designated, reserves the right to object to any document actually introduced | | |
| **125.** | All exhibits necessary for impeachment and/or rebuttal purposes | No specific exhibit designated, reserves the right to object to any document actually introduced | | |
| **126.** | All exhibits identified by or offered by any other party at the Hearing | No specific exhibit | | |

| | | designated, reserves the right to object to any document actually introduced | | |
|---|---|---|---|---|

Dugaboy reserves the supplement and/or amend these Objections, including at the time they are offered at the Hearing.

Dated: June 23, 2025,　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　Crawford, Wishnew & Lang PLLC

　　　　　　　　　　　　　　　　　　By: */s/ Michael J. Lang*　　　　　
　　　　　　　　　　　　　　　　　　Michael J. Lang
　　　　　　　　　　　　　　　　　　Texas State Bar No. 24036944
　　　　　　　　　　　　　　　　　　mlang@cwl.law
　　　　　　　　　　　　　　　　　　Alexandra Ohlinger
　　　　　　　　　　　　　　　　　　Texas State Bar No. 24091423
　　　　　　　　　　　　　　　　　　aohlinger@cwl.law
　　　　　　　　　　　　　　　　　　1700 Pacific Ave, Suite 2390
　　　　　　　　　　　　　　　　　　Dallas, Texas 75201
　　　　　　　　　　　　　　　　　　Telephone: (214) 817-4500

　　　　　　　　　　　　　　　　　　***Counsel for Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned certifies that, on June 23, 2025, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

　　　　　　　　　　　　　　　　　　*/s/ Michael J. Lang*　　　　
　　　　　　　　　　　　　　　　　　Michael J. Lang

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of The Highland Litigation Sub-Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) | **Re: Docket Nos. 4216, 4217, 4229, 4230, 4231** |
|  | ) |  |

## OMNIBUS REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

The Movants hereby submit this reply (the "Reply") in support of their *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

"Motion")[2] and in opposition to (i) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Obj.") filed by Patrick Daugherty ("Daugherty"); (ii) *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Obj.") filed by The Dugaboy Investment Trust ("Dugaboy"); and (iii) *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Crown Obj." and together with the Daugherty Objection and the Dugaboy Objection, the "Objections") filed by The Dallas Foundation (on behalf of Empower Dallas Foundation and The Okada Family Foundation), and Crown Global Life Insurance, Ltd. (collectively, the "Purported Beneficiaries," and together with Daugherty and Dugaboy, the "Objectors"). In further support of the Motion, the Movants state as follows:

## I.     PRELIMINARY STATEMENT

1.     The Objectors' lack of any meaningful economic interest in the outcome of the Motion or substantive connection to, or interests in, the Movants calls into question their motives. Dugaboy, James Dondero's family trust, has no allowed Claims or Interests, is subordinated to HMIT, and would be hopelessly out-of-the money even if its unvested Class 11 Interest were ever allowed. Daugherty's allowed Class 8 and Class 9 Claims have been paid in full, and his disputed Class 8 Claim has been fully reserved at an agreed-upon amount for years. And the Purported Beneficiaries are complete strangers to this case, cannot be heard, and are

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

being bankrolled by Dondero—both here and in their litigation in the Cayman Islands. Nor does any Objector articulate how the Settlement Agreement adversely affects *its* alleged Claims or Interests in the Highland estate. Rather, the Objectors point to perceived inconsistencies with the Plan and the Claimant Trust Agreement to argue how Class 9 Claim holders—all of whom have either been paid or consented to the Settlement Agreement—are somehow negatively affected.

2. None of the Objectors has a cognizable pecuniary interest in the estate; none of the Objections has merit.

3. To the contrary, the Settlement Agreement is in the best interests of Highland's estate—and particularly holders of Class 9 Claims. It will (i) stop costly and time-consuming litigation; (ii) dispose of certain illiquid Estate assets; (iii) dispose of the Estate Claims and certain Causes of Action; (iv) resolve all disputes concerning HMIT's Class 10 Interests; and (v) protect against and prevent future value-destructive litigation. As a result, if approved, the Settlement Agreement will bring the Movants substantially closer to fully consummating the Plan. The Objections—transparent efforts to keep the litigation machine running—are frustrating, familiar, and tired.

4. The Court should overrule the Objections, approve the Motion, and allow the estate to move towards completion of the Plan and dissolution of the Trusts.

## II. REPLY

### A. The Objections Are Meritless

5. As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See, e.g.*, *In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). In making this determination, courts review the following factors: (i) probability of success in the litigation, with due consideration for the uncertainty of law and fact;

(ii) complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (iii) all other factors bearing on the wisdom of the compromise, including (a) "the paramount interest of creditors with proper deference to their reasonable views" and (b) whether the settlement is the product of arm's length bargaining and not of fraud or collusion. *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted); *see also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995). Settlements, like the Settlement Agreement which contemplates the transfer and release of estate assets or claims, are further authorized under section 363(b) if "'supported by an articulated business justification, good business judgment, or sound business reasons.'" *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 327 (5th Cir. 2019) (quoting *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)).

6.      Each element is satisfied here, and the Objections should be overruled.

**B.      Dugaboy Objection**

7.      Dugaboy asserts (i) the Settlement Agreement violates the Plan and Claimant Trust Agreement because it allows payments on HMIT's Class 10 Interest notwithstanding that HMIT's Class 10 Interest has not vested and will not vest under the terms of the Settlement Agreement; (ii) there is insufficient evidence to support the relief requested in the Motion; and (iii) the mutual releases in the Settlement Agreement are overly broad and could (somehow) release claims that Dugaboy or its affiliates have against the Highland Entities or the HMIT Entities. The Dugaboy Objection should be overruled.

**1.      The Settlement Agreement Does Not Violate the Plan or Claimant Trust Agreement**

8.      Dugaboy argues HMIT cannot receive anything on account of its Class 10 Interest

until the Claimant Trustee files a "GUC Payment Certification" pursuant to Section 5.1(c) of the Claimant Trust Agreement. Dugaboy Obj. ¶ 10. Dugaboy is wrong. Upon the filing of a GUC Payment Certification, Contingent Trust Interests vest, and allowed interests in Class 10 and Class 11 gain rights under the Claimant Trust Agreement. That is all. Section 5.1(c) does not prohibit (or even address) the allowance of a Class 10 Interest—which is entirely separate from vesting—nor does it prohibit settlements agreed to by all affected parties that further the intent of the Plan and Claimant Trust, *i.e.*, monetizing assets and making distributions.

9.      The Claimant Trust Agreement (CTA §§ 2.2(a)-(b), 3.2(a)-(b), 3.2(c)(iv)) and the Litigation Sub-Trust Agreement (LTA §§ 2.2, 3.2(a)-(b), 3.2(c)(v)) expressly authorize the Claimant Trustee and Litigation Trustee to resolve and settle Claims and to implement those settlements. The Plan also permits Claimants and Equity Interest holders (including those in Class 9 and Class 10) to accept "other less favorable" treatment. Plan, Art. III.H.9, 10. Here, the documentary evidence proves that the holders of the remaining Class 9 claims consented to the proposed payments being made to HMIT *before* payment in full on their Class 9 Interests to bring this case closer to completion. Docket No. 4255, Ex. 59. For its part, HMIT has agreed that its Class 10 Interest will not vest; it will not have rights under the Claimant Trust Agreement; and it will voluntarily provide broad Litigation Protections in exchange for the consideration being provided to it under the proposed Settlement Agreement. Parties' willing waiver of their rights and acceptance of reduced rights otherwise provided for by a plan as part of a settlement agreement is neither atypical nor frowned upon. It is encouraged.

10.      More specifically, holders of Class 9 Claims—the only parties with a pecuniary interest in the payments to HMIT—signed consents agreeing that (i) Daugherty's Class 9 Claim could be paid in full (which payment occurred on or about May 20, 2025) and (ii) HMIT could

receive certain payments under the Settlement Agreement before their Class 9 Claims are paid in full.[3]

11.     In sum, all parties economically affected by the Settlement Agreement have knowingly and voluntarily waived rights in order to settle with HMIT because the settlement resolves existing litigation, limits future litigation, and creates a scenario where those parties may receive their final distributions.

### 2.     Sufficient Evidence Supports Approval of the Motion

12.     Dugaboy contends the Movants failed to offer evidence sufficient to support their Motion and has requested significant discovery. In response, the Movants expeditiously produced more than 4,000 pages of documents to Dugaboy (and others) and made four witnesses available for deposition. As will be shown at the hearing, the evidence overwhelmingly supports approval of the Motion.

### 3.     The Release Is Neither Vague nor Overbroad

13.     Finally, Dugaboy alleges the releases in the Settlement Agreement are vague and overbroad and could limit Dondero's ability or the ability of the legion of entities controlled by him to sue the estate. Dugaboy cites no language to support its assertions and is wrong. The release is a broad, mutual release, but it is a standard provision necessary to effectuate the intent of the settlement and which does not release any purported claims of Dugaboy against any party.

### C.     Daugherty Objection

14.     Like Dugaboy, Daugherty alleges the Settlement Agreement violates the Plan and Claimant Trust Agreement as well as the absolute priority rule. Daugherty also alleges the

---

[3] All Class 8 Claims—other than Daugherty's disputed Claim—have been fully resolved and paid in full. Daugherty's disputed Class 8 Claim has been fully reserved for in accordance with the Plan and in an amount ($2,650,353) plus interest Daugherty agreed to years ago. Finally, all Claims junior to Class 8 have been fully resolved and paid.

004036

Settlement Agreement is contrary to the estate's interests because it settles litigation rather than propagates it. Daugherty is wrong on both counts.

**1.    The Settlement Agreement Does Not Violate the Claimant Trust Agreement, the Plan, or the Bankruptcy Code**

15.    First, as set forth above, the Settlement Agreement does not violate the Plan or Claimant Trust Agreement. It effectuates a settlement among the affected parties; Daugherty is not an affected party. His allowed Class 8 and Class 9 Claims have been paid in full, and his disputed Class 8 Claim has been fully reserved in an amount he agreed to and in accordance with the Disputed Claims Reserve requirements in the Plan (Plan, Art. I.B.49, I.B.50, VI.E; Docket No. 4255, Exhibits. 58, 60-63).[4] Nevertheless, Daugherty asserts no settlement with HMIT can be reached until his disputed Class 8 Claim has been resolved to Daugherty's satisfaction. Given the status of Daugherty's claims, that assertion is wholly without basis.

16.    Second, the Settlement Agreement does not implicate the absolute priority rule because that is a requirement for plan confirmation; it does not apply to a settlement occurring nearly four years after the Plan Effective Date.

17.    Ultimately, Daugherty's objection is a transparent attempt to create leverage in the negotiation of his Class 8 Claim.[5]

**2.    The Settlement Agreement Is in the Estate's Best Interests**

18.    Daugherty also argues the Settlement Agreement is not in the best interests of the

---

[4] Daugherty cannot unilaterally increase the amount reserved for his Class 8 Claim. Under the Plan, the "Disputed Claims Reserve Amount" can be increased, in pertinent part, (i) with Highland's agreement or (ii) by an order of this Court disallowing, in whole or in part, or estimating Daugherty's Class 8 Claim. Plan, Art. I.B.50. Highland will not agree to increase Daugherty's Disputed Claim Reserve Amount. In fact, Highland filed a complaint to disallow, subordinate, or estimate Daugherty's Class 8 Claim. Adv. Pro. No. 25-03055. In response, Daugherty moved to dismiss, seeking to delay adjudication of that Complaint indefinitely. Daugherty is bound by his actions and cannot refuse to adjudicate his Claim while simultaneously demanding that his Disputed Claims Reserve Amount be increased.

[5] The evidence will show Daugherty recently threatened to sue Highland's employees and object to the Motion if Highland did not pay him $20 million.

estate because Highland should sue HMIT to recover "hundreds of millions of dollars." *See, e.g.*, Daugherty Obj. ¶ 26. Daugherty misconstrues the economics of the estate and the terms of the Claimant Trust Agreement and Plan. In the absence of a settlement, the Litigation Trustee's claims against HMIT were a potential source of cash that might have been needed to pay senior claims and obligations, including indemnification obligations. With the settlement of HMIT's Class 10 Interest—which represents 99.5% of Highland's prepetition equity—and resulting limitation of future litigation, the need for litigation funding is reduced, making further distributions possible. In any event, Daugherty fails to explain why he cares about the settlement or how it affects him. Rather, the facts are undisputed: Daugherty's disputed Class 8 Claim is fully reserved, and the reserve is fully funded. Any amounts recovered from HMIT through litigation would never have flowed to Daugherty. They would have been used to pay senior obligations, whatever remained of Class 9, and then returned to HMIT as payment on its Class 10 Interest.

**D.      Crown Objection**

19.      As an initial matter, the Purported Beneficiaries are not parties in interest under 11 U.S.C. § 1109 and have no right to appear or be heard with respect to the Motion. As the Purported Beneficiaries admitted during their depositions:

- They have (i) never appeared in Highland's bankruptcy case; (ii) never filed a claim against Highland in its bankruptcy case; (iii) no claims or interests in Highland or the Claimant Trust; and (iv) have never had an interest—direct or otherwise—in Highland.

- Neither Highland nor the Claimant Trust owes any Purported Beneficiary any duty—contractual, fiduciary, or otherwise.

- They had no direct interest in HMIT before the reorganization discussed in the Crown Objection.

- They had no interest—direct or indirect—in HMIT after the reorganization.

- If the Settlement Agreement is consummated, the Purported Beneficiaries would have no claims against Highland or any Movant related to the Settlement Agreement or otherwise.

- Their concern is not the Settlement Agreement before the Court but whether they will share in the cash and assets HMIT will recover if the Court grants the Motion.

Based on their deposition testimony and other evidence, the Purported Beneficiaries are strangers to these proceedings with no interest in the Motion or Settlement Agreement.

20. Even under the most capacious interpretation of what constitutes a "party in interest" under Bankruptcy Code § 1109, and even assuming 11 U.S.C. § 1109 applies four years post-confirmation, the Purported Beneficiaries do not have a sufficient interest in the relief requested in the Motion—either before or after the reorganization described in the Crown Objection—to object to the Motion. According to the Supreme Court, the ability to be heard under Section 1109 requires an entity to have a "direct financial stake in the outcome." *Truck Ins. Exch. v. Kaiser Gypsum Co.,* 602 U.S. 268, 277–78 (2024) (quoting 7 COLLIER ON BANKRUPTCY ¶ 1109.01 (16th ed. 2023)). A "direct financial interest" requires "an actual interest in the controversy, as distinguished from a nominal party"—*i.e.*, a "pecuniary interest … directly affected by the bankruptcy proceeding." *Id.* at 278, n.3. "Where a proposed plan 'allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed.'" *Id.* at 282 (quoting *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 204 (3d Cir. 2011)). The Movants have no interest in the Purported Beneficiaries' pockets. The Purported Beneficiaries are interlopers falling well outside the

Supreme Court's definition of "party in interest" under Section 1109.[6] They epitomize the "truly peripheral parties" lacking any "direct interest" to whom the Supreme Court denies the ability to be heard. *Id.*, 602 U.S. at 284. Because the Purported Beneficiaries do not have sufficient interest in the relief requested in the Motion or in the bankruptcy case under Section 1109, the Court should strike the Crown Objection and decline to hear their arguments pertaining to the Motion.[7]

21.    Substantively, the Crown Objection is meritless. The Purported Beneficiaries argue the Motion must be denied or stayed because Mark Patrick allegedly violated his fiduciary obligations to the Purported Beneficiaries. On this basis, the Purported Beneficiaries conclude that the Settlement Agreement could be jeopardized by protracted costly litigation.[8] In so arguing, the Purported Beneficiaries conflate whether Patrick's *corporate restructuring* was a breach of his fiduciary duty with whether Patrick had the *authority* to execute the Settlement Agreement. Whether the Purported Beneficiaries or the Cayman liquidators (who, tellingly, are not before this Court) have claims against Patrick is not a question of corporate authority and is irrelevant to whether Highland can meet its burden under Bankruptcy Rule 9019 and 11 U.S.C. § 363. Regardless, the evidence will demonstrate that Patrick is authorized to enter into the Settlement Agreement and that he required no one's consent to do so.

---

[6] This would be true even if the restructuring outlined in the Crown Objection were reversed and the Purported Beneficiaries retained their remote interest in HMIT. *Truck Insurance* left undisturbed a long line of cases holding that "a shareholder of a party in interest is not, by virtue of its equity holding, itself a party in interest." *In re AIO US, Inc.*, 2025 Bankr. LEXIS 1369, at *29 (Bankr. D. Del. June 6, 2025); *see also, e.g.*, *In re Refco*, 505 F.3d 109, 117 (2d Cir. 2007); *In re Vantage Drilling Int'l*, 603 B.R. 538, 545 (D. Del. 2019).

[7] Ignoring the Movants' written request (Docket No. 4255, Ex. 120), the Purported Beneficiaries also failed to file a disclosure statement as required by Federal Rule of Bankruptcy Procedure 2019, which is independent grounds to refuse to permit the Purported Beneficiaries to be heard and to assess sanctions against them. FED. R. BANKR. PROC. 2019(e)(2)(A)-(C).

[8] The Purported Beneficiaries also conceded during their depositions that (i) Dondero is funding their pursuit of the Crown Objection and (ii) they had not even read the Settlement Agreement. The Purported Beneficiaries also testified, among other things, that (i) HMIT had the corporate authority to enter into the Settlement Agreement and (ii) they had no reason to believe the Settlement Agreement was not the product of good faith and arm's length negotiations or that the terms of the Settlement Agreement were unfair to either side.

WHEREFORE, for the reasons set forth above and in the Motion, the Movants

respectfully request that the Court overrule the Objections and grant the Motion.

DATED: June 23, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P., and
the Highland Claimant Trust*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/ Robert S. Loigman*
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation
Trustee of the Highland Litigation Sub-Trust*

004041

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,
L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of The Highland
Litigation Sub-Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

## HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND LITIGATION SUB-TRUST AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO HEARING TO BE HELD ON JUNE 25, 2025

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland,"

as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**          **PAGE 1 OF 15**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004042

Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by and through their undersigned counsel, submit the following amended witness and exhibit list with respect to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216], which the Court has set for hearing at 9:30 a.m. (Central Time) on June 25, 2025 (the "Hearing") in the Bankruptcy Case.

A.   **Witnesses**:

1.   James P. Seery, Jr.;

2.   James Dondero;

3.   Deborah Deitsch-Perez, Esq;

4.   Julie Diaz (by deposition transcript);

5.   Any witness identified by or called by any other party; and

6.   Any witness necessary for rebuttal.

B.   **Amended Exhibits:**[2]

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| **A.** | **Settlement Agreement** | | |
| 1. | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to a Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Agreement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4217] [HCMLPHMIT00002688-HCMLPHMIT00002715] | | |
| **B.** | **Negotiation Documents** | | |

[2] The amendments to the original exhibit list, filed at Docket No. 4255, include the additions of two exhibits: Exhibit Nos. 124 & 125, in bold font below.

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 2. | Email from L. Phillips to J. Morris dated March 5, 2025 [HCMLPHMIT00000015-HCMLPHMIT00000017] | | |
| 3. | Email from L. Phillips to J. Morris dated March 13, 2025 [HCMLPHMIT00000022-00000026] | | |
| 4. | Email from L. Phillips to J. Morris dated March 18, 2025 [HCMLPHMIT00000028-HCMLPHMIT00000029] | | |
| 5. | Email from L. Phillips to J. Morris dated March 19, 2025 [HCMLPHMIT00000030-HCMLPHMIT00000031] | | |
| 6. | Confidentiality Agreement-M Patrick and Related Entities [HCMLPHMIT00000032-HCMLPHMIT00000045] | | |
| 7. | Email from L. Phillips to J. Morris and A. Hurt dated March 22, 2025 [HCMLPHMIT00000046-HCMLPHMIT00000048] | | |
| 8. | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000052-HCMLPHMIT00000054] | | |
| 9. | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000055-HCMLPHMIT00000056] | | |
| 10. | Email from L. Phillips to J. Morris dated March 28, 2025 [HCMLPHMIT00000057] | | |
| 11. | Email from L. Phillips to J. Morris dated March 30, 2025 [HCMLPHMIT00000058] | | |
| 12. | Email from L. Phillips to J. Morris dated March 31, 2025 [HCMLPHMIT00000059] | | |
| 13. | HCLOM Intercreditor and Participation Agreement [HCMLPHMIT00000060-HCMLPHMIT00000063] | | |
| 14. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000075-HCMLPHMIT00000078] | | |
| 15. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000079-HCMLPHMIT00000080] | | |
| 16. | Email from L. Phillips to J. Morris dated April 3, 2025 with attachment - Paul Murphy Joinder to Confidentiality Agreement [HCMLPHMIT00000081-HCMLPHMIT00000083] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 3 OF 15**

004044

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 17. | Email from L. Phillips to J. Morris dated April 4, 2025 [HCMLPHMIT00000089] | | |
| 18. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000090-HCMLPHMIT00000092] | | |
| 19. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachment – Shawn Raver Joinder to Confidentiality Agreement [HCMLPHMIT00000093-HCMLPHMIT00000096] | | |
| 20. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000099-HCMLPHMIT00000102] | | |
| 21. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachments- Phillips Joinder to Confidentiality Agreement (signed by Phillips) and A. Hurt Joinder to Confidentiality Agreement (signed by Hurt) [HCMLPHMIT00000103-HCMLPHMIT00000107] | | |
| 22. | Email from L. Phillips to J. Morris dated April 8, 2025 with fully executed HCLOM Remittance Agreement [HCMLPHMIT00000108-HCMLPHMIT00000112] | | |
| 23. | Email from L. Phillips to J. Morris dated April 10, 2025 with HMIT 2022 Settlement Agreement [HCMLPHMIT00000118-HCMLPHMIT00000130] | | |
| 24. | Email from L. Phillips to J. Morris dated April 17, 2025 with attachment James Shields Joinder to Confidentiality Agreement [HCMLPHMIT00000135-HCMLPHMIT00000150] | | |
| 25. | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000157-HCMLPHMIT00000158] | | |
| 26. | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000159-HCMLPHMIT00000161] | | |
| 27. | Email from L. Phillips to J. Morris dated May 13, 2025 [HCMLPHMIT00000162-HCMLPHMIT00000163] | | |
| 28. | Email from L. Phillips to J. Morris dated May 14, 2025 [HCMLPHMIT00000164-HCMLPHMIT00000166] | | |
| 29. | Email from L. Phillips to J. Morris dated May 14, 2025 with Redlines of Settlement Agreement [HCMLPHMIT00000167-HCMLPHMIT00000218] | | |

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 30. | Email from L. Phillips to J. Morris dated May 15, 2025 [HCMLPHMIT00000226-HCMLPHMIT00000234] | | |
| 31. | Email from L. Phillips to J. Morris dated May 16, 2025 with Clean and Redline of Rand Settlement Agreement [HCMLPHMIT00000235-HCMLPHMIT00000283] | | |
| 32. | Email from L. Phillips to T. Cournoyer dated May 16, 2025 [HCMLPHMIT00000287-HCMLPHMIT00000289] | | |
| 33. | Email from L. Phillips to J. Seery, M. Patrick, S. Raver, J. Shields, A. Hurt dated May 17, 2025 [HCMLPHMIT00000290] | | |
| 34. | Email from L. Phillips to J. Morris dated May 17, 2025 [HCMLPHMIT00000291-HCMLPHMIT00000292] | | |
| 35. | Email from L. Phillips to J. Morris, J. Pomerantz dated May 19, 2025 with attachment HMIT Redlined Pages only to Settlement Agreement [HCMLPHMIT00000295-HCMLPHMIT00000297] | | |
| 36. | Email from L. Phillips to G. Demo, A. Hurt, J. Shields dated May 19, 2025 [HCMLPHMIT00000342-HCMLPHMIT00000344] | | |
| 37. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 with attachment - M. Patrick signature of HMIT Rand Settlement Agreement [HCMLPHMIT00000345; HCMLPHMIT00000347-HCHMLPHMIT00000370] | | |
| 38. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz date May 19, 2025 [HCMLPHMIT00000371-HCMLPHMIT00000372] | | |
| 39. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000373-HCMLPHMIT00000374] | | |
| 40. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000423-HCMLPHMIT00000428] | | |
| 41. | Email from J. Morris to L. Phillips dated March 22, 2025 [HCMLPHMIT00000562-HCMLPHMIT00000563] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 5 OF 15**

004046

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 42. | Email from J. Morris to L. Phillips, A. Hurt dated March 22, 2025 with attachment – fully executed Confidentiality Agreement<br>[HCMLPHMIT00000564-HCMLPHMIT00000580] | | |
| 43. | Email from J. Morris to L. Phillips dated April 4, 2025 with attachment Litigation Protections M. Patrick<br>[HCMLPHMIT00000621-HCMLPHMIT00000631] | | |
| 44. | Email from J. Morris to L. Phillips dated April 7, 2025<br>[HCMLPHMIT00000642-HCMLPHMIT00000644] | | |
| 45. | Email from J. Morris to L. Phillips dated April 8, 2025 with attachment – current snapshot of remaining assets<br>[HCMLPHMIT00000656--HCMLPHMIT00000661] | | |
| 46. | Email from J. Morris to L. Phillips dated April 16, 2025 with attachment – Second Amended and Restated Indemnity Trust Agreement<br>[HCMLPHMIT00000672-HCMLPHMIT00000727] | | |
| 47. | April 15, 2025 Draft Illustrative Highland Indemnity Trust Payout Schedule<br>[HCMLPHMIT00000724-HCMLPHMIT00000727] | | |
| 48. | Email from J. Morris to L. Phillips dated May 15, 2025 with attachment – Draft Rand Settlement Agreement and Redline<br>[HCMLPHMIT00000766-HCMLPHMIT00000820] | | |
| 49. | Email from J. Morris to L. Phillips dated May 15, 2025 with Clean and Redline Settlement Agreement<br>[HCMLPHMIT00000829-HCMLPHMIT00000877] | | |
| 50. | Email from L. Phillips to D. Klos dated April 17, 2025<br>[HCMLPHMIT00000947] | | |
| 51. | Email re: Microsoft Teams call from D. Klos to J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt dated April 7, 2025<br>[HCMLPHMIT00000949] | | |
| 52. | Microsoft Teams Appointment for J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt scheduled for April 8, 2025<br>[HCMLPHMIT00000950] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 6 OF 15**

004047

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 53. | Email from D. Klos to J. Shields dated April 22, 2025 with attachment – Potential Settlement Structure with DAF and HMIT<br>[HCMLPHMIT00000987-HCMLPHMIT00001000] | | |
| 54. | Email from J. Seery to M. Patrick, S. Raver, L. Phillips, A. Hurt, J. Shields dated April 28, 2025 with attachment – Draft Rand Settlement Agreement<br>[HCMLPHMIT00001001-HCMLPHMIT00001025] | | |
| 55. | Email Microsoft Teams appointment from D. Klos to J. Seery, K. Hendrix, M. Patrick, S. Raver, Paul dated April 3, 2025<br>[HCMLPHMIT00001037] | | |
| 56. | Email from D. Klos to M. Patrick dated April 2, 2025<br>[HCMLPHMIT00001042] | | |
| 57. | Email from J. Seery to J. Morris, T. Cournoyer, D. Klos, M. Gray dated June 11, 2025 with attachment – Class 9 Consent to Rand Settlement and Release<br>[HCMLPHMIT00001220-HCMLPHMIT00001245] | | |
| **C.** | **Class 9 Documents** | | |
| 58. | Letter to P. Daugherty from J. Seery re: Eighth Distribution re: Highland Claimant Trust dated May 20, 2025<br>[HCMLPHMIT00002329] | | |
| 59. | Written Consent of Holders of Class 9 Subordinated Claim Trust Interests in the Highland Claimant Trust dated May 16, 2025<br>[HCMLPHMIT00002677-HCMLPHMIT00002682] | | |
| 60. | Tolling Agreement Extending Claim Objection Deadline dated July 27, 2022 | | |
| 61. | Amendment No. 1 to Tolling Agreement Extending the Claim Objection Deadline dated December 21, 2022 | | |
| 62. | Amendment No. 2 to Tolling Agreement Extending Claim Objection Deadline dated November 6, 2023 | | |
| 63. | Amendment No. 3 to Tolling Agreement Extending Claim Objection Deadline dated November 20, 2024 | | |
| **D.** | **HCLOM/HMIT** | | |

AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025          PAGE 7 OF 15
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004048

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 64. | Email from L. Phillips to J. Morris dated January 6, 2025 [HCMLPHMIT00000008-HCMLPHMIT00000009] | | |
| 65. | Email from L. Phillips to J. Morris, A. Hurt dated January 11, 2025 [HCMLPHMIT00000010-HCMLPHMIT00000012] | | |
| 66. | *Highland Capital Management, L.P.'s Motion for (A) a Bad Faith Finding and (B) and Award of Attorney's Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* [Docket No. 4176] [HCMLPHMIT00000441-HCMLPHMIT00000500] | | |
| 67. | Hearing Transcript dated December 18, 2024 [Docket No. 4197] [HCMLPHMIT00003829-HCMLPHMIT00003859] | | |
| 68. | *Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award for Attorney's Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4716]* [Docket No. 4199] [HCMLPHMIT00003860-HCMLPHMIT00003866] | | |
| 69. | Intercreditor and Participation Agreement with HCLOM dated January 10, 2025 [HCMLPHMIT00003868-HCMLPHMIT00003871] | | |
| **E.** | **Patrick Authority** | | |
| 70. | Trust Agreement of Hunter Mountain dated December 17, 2015 [HCMLPHMIT00004103-HCMLPHMIT00004114] | | |
| 71. | Show Cause Hearing Transcript June 8, 2021 [HCMLPHMIT00002716-HCMLPHMIT00003013] | | |
| 72. | HMIT Hearing Transcript June 8, 2023 [HCMLPHMIT00003014-HCMLPHMIT00003402] | | |
| 73. | Limited Liability Company Agreement of Atlas IDF GP, LLC dated October 29, 2015 [HCMLPHMIT00003511-HCMLPHMIT00003517] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 8 OF 15**

004049

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 74. | HOLDCO Responses and Disclosures Related to the Court's Order Requiring Disclosures [Docket No. 2547] HCMLPHMIT00003523-HCMLPHMIT00003828] | | |
| 75. | HMIT Appointment of Successor Administrator dated 8/12/2022 [HCMLPHMIT00003872] | | |
| 76. | Limited Liability Company Agreement of Rand PE Fund Management, LLC dated October 29, 2015 [HCMLPHMIT00003873-HCMLPHMIT00003879] | | |
| 77. | Limited Liability Company Agreement of Rand Advisors, LLC dated August 28, 2013 [HCMLPHMIT00003880-HCMLPHMIT00003886] | | |
| 78. | Agreement of Limited Partnership of Rand PE Fund I, L.P. dated October 29, 2015 [HCMLPHMIT00003887-HCMLPHMIT00003893] | | |
| 79. | Amended and Restated Limited Partnership Agreement of Atlas IDF, LP dated November 30, 2015 [HCMLPHMIT00003894-HCMLPHMIT00003928] | | |
| 80. | Atlas IDF, LP Offering of Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00003929-HCMLPHMIT00004023] | | |
| 81. | Rand PE Fund I, LP Offering Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00004024-HCMLPHMIT00004095] | | |
| 82. | Member and Manager Consent of Atlas IDF GP, LLC dated October 13, 2022 [HCMLPHMIT00004124-HCMLPHMIT00004126] | | |
| 83. | Amended and Restated Company Agreement of Atlas IDF GP, LLC dated August 8, 2022 [HCMLPHMIT00004127-HCMLPHMIT00004151] | | |
| 84. | Amended and Restated Company Agreement of Rand Advisors, LLC dated August 1, 2022 [HCMLPHMIT00004152-HCMLPHMIT00004176] | | |
| 85. | Amended and Restated Company Agreement of Rand PE Fund Management, LLC dated August 1, 2022 [HCMLPHMIT00004177-HCMLPHMIT00004201] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 9 OF 15**

004050

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 86. | Membership Interest Purchase Agreement Rand Advisors dated August 1, 2022 [HCMLPHMIT00004202-HCMLPHMIT00004215] | | |
| 87. | Member and Manager Consent of Rand Advisors, LLC dated October 13, 2022 [HCMLPHMIT00004216-HCMLPHMIT00004218] | | |
| 88. | Member and Manager Consent of Rand PE Fund Management, LLC dated October 13, 2022 [HCMLPHMIT00004219-HCMLPHMIT00004221] | | |
| 89. | 3/17/2025 Rand Advisors Form ADV [HCMLPHMIT00003465-HCMLPHMIT00003493] | | |
| 90. | Atlas IDF, LP Subscription 12/21/2015 (signature pages only) | | |
| 91. | Atlas IDF, LP Subscription 12/23/2015 (signature page only) | | |
| 92. | Atlas IDF LP SEC Form D dated February 24, 2025 [HCMLPHMIT00003518-HCMLPHMIT00003522] | | |
| 93. | Rand PE Fund I, L.P. SEC Form D dated February 24, 2025 [HCMLPHMIT00004096-HCMLPHMIT00004100] | | |
| 94. | Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated September 24, 2015 [HCMLPHMIT00004115-HCMLPHMIT00004123] | | |
| 95. | Second Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated February 12, 2025 | | |
| 96. | Bylaws of The Okada Family Foundation, Inc. (final version) | | |
| 97. | Bylaws of Empower Dallas Foundation, Inc. | | |
| 98. | Crown Global DVA Policy 30218 (signed) | | |
| 99. | Crown Global DVA Termsheet 30218 | | |
| 100. | Crown Global DVA Policy 30219 (signed) | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**    **PAGE 10 OF 15**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004051

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 101. | Crown Global DVA Termsheet 30219 | | |
| 102. | Crown Global Rand Participation Agreement (Executed) | | |
| 103. | S&G HMIT Opinion Rep Letter dated January 29, 2016 | | |
| 104. | S&G HMIT Opinion dated January 29, 2016 | | |
| **F.** | **Dugaboy Note** | | |
| 105. | Promissory Note $24,268,621.69 dated May 31, 2017 [HCMLPHMIT00001327-HCMLPHMIT00001328] | | |
| 106. | The Dugaboy Investment Trust Offering of $1817M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002323-HCMLPHMIT00002327] | | |
| 107. | Participation Agreement for Par/Near Par Trades dated July 18, 2024 [HCMLPHMIT00002594-HCMLPHMIT00002600] | | |
| 108. | $18.5mm Dugaboy Note Attempted Sale – Process Update [HCMLPHMIT00002601] | | |
| 109. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002602-HCMLPHMIT00002607] | | |
| 110. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002608-HCMLPHMIT00002630] | | |
| 111. | Highland Claimant Trust Recommended Dugaboy Note Contribution dated June 7, 2024 [HCMLPHMIT00002631-HCMLPHMIT00002636] | | |
| 112. | Email from D. Klos to DC Sauter dated May 23, 2024 [HCMLPHMIT00002637-HCMLPHMIT00002639] | | |
| **G.** | **Capital Account Amounts** | | |

AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025                PAGE 11 OF 15
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004052

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 113. | Highland Capital Management, L.P. Consolidated Financial Statement and Supplemental Information dated December 31, 2018<br>[HCMLPHMIT00002548-HCMLPHMIT00002593] | | |
| 114. | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24, 2015<br>[HCMLPHMIT00002641-HCMLPHMIT00002676] | | |
| 115. | 2018 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT)<br>[HCMLPHMIT00001332; HCMLPHMIT00001336; HCMLPHMIT00001414; HCMLPHMIT00001419; HCMLPHMIT00001424; HCMLPHMIT00001429; HCMLPHMIT00001434; HCMLPHMIT00001439] | | |
| 116. | 2019 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT)<br>[HCMLPHMIT00001762; HCMLPHMIT00001766; HCMLPHMIT00001865; HCMLPHMIT00001870; HCMLPHMIT00001875; HCMLPHMIT00001880; HCMLPHMIT00001885; HCMLPHMIT00001890] | | |
| 117. | Monthly Operating Report – FINAL November 2019<br>[HCMLPHMIT00001329] | | |
| 118. | Hunter Mountain Note Receivable October 15, 2019<br>[HCMLPHMIT00001330] | | |
| H. | **Dallas Foundation Issues** | | |
| 119. | Affidavit of James Dondero in the Grand Court of Cayman Islands FSD2025-0099 dated April 16, 2025<br>[HCMLPHMIT00003429-HCMLPHMIT00003438] | | |
| 120. | Email from J. Pomerantz to D. Curry, M. Okin dated June 19, 2025 | | |
| I. | **Plan, CTA, and Litigation Trust Agreement** | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**            PAGE 12 OF 15
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004053

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 121. | *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Pages 26-29, (entire document can be found at Docket No. 1808)<br><br>Excerpts:<br>Article IV. B.1-5 (pages 26-28)<br>Article IV. B.5 (pages 28-29)<br>Article IV. B.7 (page 30)<br>Article IV. B.10 (page 31)<br>Article IV. D. (pages 34-35)<br>Article VII. D.1-2 (pages 44-45)<br>Article XI (pages 53-55) | | |
| 122. | *Claimant Trust Agreement*, (entire document can be found at Docket No. 1811-2, as modified by Docket No. 1875-4)<br><br>Excerpts:<br>Fourth "Whereas" clause (page 1)<br>Section 2.2(a)-(b) (page 8)<br>Section 3.2(a)-(b) (pages 11-12)<br>Section 3.2(c)(iv) (page 12)<br>Section 2.3(b)(ix) (page 9) | | |
| 123. | *Litigation Sub-Trust Agreement*, (entire document can be found at Docket No. 1811-4)<br><br>Excerpts:<br>Fourth "Whereas" clause (page 1)<br>Section 2.2 (page 5)<br>Section 3.2(a) (page 7)<br>Section 3.2(b) (page 7)<br>Section 3.2(c)(v) (page 7)<br>Section 3.3 (b)(iii) (page 9) | | |
| **J.** | **Deposition Transcripts** | | |
| 124. | **Deposition Transcript of Julie Diaz dated June 22, 2025** | | |
| 125. | **Deposition Transcript of Torrey Littleton dated June 22, 2025** | | |
| 126. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**       **PAGE 13 OF 15**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004054

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 127. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 128. | All exhibits identified by or offered by any other party at the Hearing | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**            **PAGE 14 OF 15**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004055

Dated:  June 24, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com


 - and -

**HAYWARD PLLC**

*/s/  Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.
and the Highland Claimant Trust*

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**

Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of the Highland Litigation
Sub-Trust*

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**          **PAGE 15 OF 15**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004056

**EXHIBIT 124**

004057

```
 1              UNITED STATES BANKRUPTCY COURT

 2          FOR THE NORTHERN DISTRICT OF TEXAS

 3                   DALLAS DIVISION

 4     --------------------------

 5     In Re:                    Case No. 19-34054-sgj11

 6     HIGHLAND CAPITAL MANAGEMENT,

 7     L.P.,

 8          Debtor.              Chapter 11

 9     -------------------------X.

10

11

12

13          REMOTE VIDEO-RECORDED DEPOSITION of

14                    JULIE DIAZ

15               Sunday, June 22, 2025

16               1:37 p.m. Central Time

17

18

19

20     Reported Stenographically by:

21     Gail L. Inghram,

22     BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02724-L    Document 7    Filed 02/05/25    Page 207 of 406    PageID 4465
Deposition of Julie Diaz                                              Exhibit 124 Page 202 of 102    Highland Capital Management, L.P.

```
 1

 2

 3

 4

 5

 6

 7

 8                    WHEREUPON, the remote video-recorded

 9      deposition of JULIE DIAZ was held via

10      video-conferencing on Sunday, June 22, 2025,

11      beginning at approximately 1:37 p.m. Central

12      Time, the proceedings being recorded

13      stenographically by Gail Inghram, Registered

14      Diplomate Reporter, Certified Realtime Reporter,

15      Certified Shorthand Reporter, and transcribed

16      under her direction, there being present:

17

18

19

20

21

22

23

24

25
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 7124 Filed 02/05/02 Page 208 of 406   Highland Capital Mgmt. L.P.
Exhibit 124   Page 92 of 102   Page 203 of 406   PageID 4466

```
 1   A P P E A R A N C E S:

 2   [All parties appeared via remote videoconferencing.]

 3

 4   On behalf of Highland Capital Management, and the Highland

 5   Claimant Trust:

 6       JOHN MORRIS, ESQ.

 7       jmorris@pszjlaw.com

 8       GREGORY V. DEMO, ESQ.

 9       gdemo@pszjlaw.com

10       JEFFREY POMERANTZ, ESQ.

11       jpomerantz@pszjlaw.com

12       HAYLEY WINOGRAD, ESQ.

13       hwinograd@pszjlaw.com

14          PACHULSKI STANG ZIEHL & JONES

15          780 Third Avenue, 34th Floor

16          New York, New York 10017-2024

17          310.277.6910

18

19   On behalf of Highland Litigation Trustee:

20       ROBERT S. LOIGMAN, ESQ.

21       robertloigman@quinnemanuel.com

22          QUINN EMANUEL URQUHART & SULLIVAN, LLP

23          51 Madison Avenue 22nd Floor

24          New York, New York 10010

25          212.849.7615
```

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   On behalf of Defendant Dallas Foundation and Crown Global

 4   Life Insurance:

 5       MATTTHEW OKIN, ESQ.

 6       mokin@okinadams.com

 7       DAVID CURRY, ESQ.

 8       dcurry@okinadams.com

 9          OKIN ADAMS BARTLETT CURRY LLP

10          1113 Vine Street, Suite 240

11          Houston, Texas 77002

12          713.228.4100

13

14   On behalf of Defendant Dugaboy Investment Trust:

15       MICHAEL LANG, ESQ.

16       mlang@cwl.law.com

17          CRAWFORD WISHNEW & LANG PLLC

18          1700 Pacific Avenue, Suite 2390

19          Dallas, Texas 75201

20          214.817.4500

21

22

23

24

25
```

```
 1    A P P E A R A N C E S  (Cont'd):

 2

 3    On Behalf of Hunter Mountain Investment Trust:

 4         LOUIS M. PHILLIPS, ESQ.

 5         lphillips@kellyhart.com

 6         AMELIA L. HURT, ESQ.

 7         ahurt@kellyhart.com

 8            KELLY HART & HALLMAN LLP

 9            301 Main Street, Suite 1600

10            Baton Rouge, Louisiana 70801

11            225.381.9643

12

13    VIDEOGRAPHER:

14         PAUL D'AMBRA

15

16

17    ALSO PRESENT:

18         NATHAN HALL, Pachulski Stang Ziehl & Jones

19         JAMES SEERY

20         TORREY LITTLETON

21         SHAWN RAVER

22

23

24

25
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02724-L    Document 1-7    Filed 02/05/25    Page 211 of 406    PageID 4469
Deposition of Highland Select Equity Master Fund, L.P.    Exhibit 7    Page 210 of 405    Highland Capital Management L.P.

```
 1                    - - -

 2               I N D E X

 3                    - - -

 4   EXAMINATION OF:                        PAGE

 5   JULIE DIAZ

 6         By Attorney Morris ...............8

 7

 8

 9

10

11

12               E X H I B I T S
     HIGHLAND:                             PAGE

13

14   Highland 1    Objection of the Dallas ..........63

15                 Foundation and Crown Global to

16                 Motion for Entry of An Order

17                 Approving Settlement

18                 (15 pages)

19

20

21

22

23

24

25
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17   Filed 08/26/25   Page 212 of 406   PageID 4470
Deposition of Eric Van Orden   Exhibit 124   Page 82 of 102   Highland Capital Management, L.P.

```
1                 DEPOSITION SUPPORT INDEX

2

3    QUESTIONS INSTRUCTED NOT TO ANSWER:

4    PAGE   LINE

5    (None)

6

7    REQUEST FOR PRODUCTION OF DOCUMENTS

8    PAGE   LINE

9    (None)

10

11

12   STIPULATIONS

13   PAGE   LINE

14   (None)

15

16   QUESTIONS MARKED

17   PAGE   LINE

18   (None)

19

20

21              REPORTER'S NOTE:

22   QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY

23   REFLECT A DIRECT QUOTE.

24

25
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 7   Filed 09/02/25   Page 213 of 406   PageID 4471
Deposition of Julie Diaz   Exhibit 124   Page 02102   In re: Highland Capital Mgmt. L.P.

```
 1                    -   -   -

 2               P R O C E E D I N G S

 3                    -   -   -

 4   WHEREUPON,

 5                    JULIE DIAZ,

 6   being first duly sworn or affirmed to testify to the

 7   truth, the whole truth, and nothing but the truth,

 8   was examined and testified as follows:

 9

10                    EXAMINATION

11    BY ATTORNEY MORRIS:

12        Q.    Good afternoon, Ms. Diaz.  Can you

13    hear me okay?

14        A.    I can.

15        Q.    My name is John Morris.  I'm an

16    attorney for Highland Capital Management, and

17    we're here to take your deposition today in

18    connection with the Dallas Foundation's objection

19    to a certain settlement.

20             Are you aware of that?

21        A.    Yes, I am.

22        Q.    Have you ever been deposed before?

23        A.    Yes, I have.

24        Q.    Okay.  So just some quick ground rules

25    so we're on the same page.
```

```
 1                    I'm going to ask a series of

 2      questions, and it's very important that you allow

 3      me to finish my question before you begin the

 4      answer.

 5                    Is that fair?

 6           A.    Yes.

 7           Q.    I will try to allow you to finish your

 8      answer before I begin a question; but if I fail

 9      to do so, will you let me know that?

10           A.    Yes, I will.

11           Q.    If I ask a question that you don't

12      understand, will you let me know that?

13           A.    I will.

14           Q.    If you need a break at any time, I'm

15      happy to accommodate you; but I just ask that you

16      not seek a break while a question is pending

17      unless you need to consult with your lawyer about

18      privilege questions.

19                    Is that fair?

20           A.    Yes.

21           Q.    Are you affiliated with the Dallas

22      Foundation?

23           A.    Yes.  I am the president and CEO.

24           Q.    When did you become the president and

25      CEO of the Dallas Foundation?
```

```
 1          A.    Formally, April 1st, 2024.  Prior to
 2    that, I was interim CEO; and have been with the
 3    foundation for six years.
 4          Q.    Are you familiar with the company
 5    called Highland Capital Management, LP?
 6          A.    Yes, I am.
 7          Q.    Are you aware that Highland Capital
 8    Management, LP, filed for bankruptcy back in
 9    2019?
10          A.    Yes, I am.
11          Q.    Are you aware that the Dallas
12    Foundation recently filed in the bankruptcy court
13    an objection to a proposed settlement between
14    certain Highland affiliates and certain
15    affiliates of Hunter Mountain Investment Trust?
16          A.    Yes, I am.
17          Q.    Are you aware of the parties to the
18    settlement agreement that the Dallas Foundation
19    has objected to?
20          A.    Can you clarify that question.
21          Q.    Can you identify the parties on the
22    Highland side that are -- that executed the
23    settlement agreement that the Dallas Foundation
24    objected to?
25          A.    No.
```

```
 1          Q.    Can you identify the parties --
 2    withdrawn.
 3                Are you aware that there are
 4    parties -- are you aware that Hunter Mountain
 5    Investment Trust is a party to the settlement
 6    agreement?
 7          A.    Yes, I am.
 8          Q.    Are you aware that a gentleman named
 9    Mark Patrick signed the agreement on behalf of
10    the Hunter Mountain Investment Trust?
11          A.    I'm aware of his involvement.
12          Q.    But you're not aware as you sit here
13    right now that Mr. Patrick signed on behalf of
14    Hunter Mountain Investment Trust?
15          A.    No.
16          Q.    Can I refer to Hunter Mountain
17    Investment Trust as "HMIT" for purposes of the
18    deposition?
19          A.    Yes, you may.
20          Q.    Are you aware that there are other
21    entities that are affiliated with HMIT that are
22    also party to the settlement agreement?
23          A.    Yes, I am.
24          Q.    Can we generally refer to all of the
25    affiliates of HMIT and HMIT itself as "the HMIT
```

```
 1    entities" for purposes of today's deposition?

 2         A.    Yes.

 3         Q.    Did you review the Dallas Foundation's

 4    objection before it was filed?

 5         A.    Yes, I did.

 6         Q.    Were you responsible for authorizing

 7    its filing?

 8         A.    Yes.

 9         Q.    Are you aware that the objection was

10    filed on behalf of an entity called Empower

11    Dallas Foundation?

12         A.    Yes.

13         Q.    Are you familiar with that entity?

14         A.    Yes, I am.

15         Q.    What is the Empower Dallas Foundation?

16         A.    Empower Dallas Foundation is a

17    supporting organization that is sponsored by the

18    Dallas Foundation.  It's a grant-making

19    organization that's been in existence for at

20    least 10 years.

21         Q.    Do you know who formed Empower Dallas

22    Foundation?

23         A.    Yes.  I'm aware that it came from Jim

24    Dondero.

25         Q.    What do you mean that it came from Jim
```

```
 1   Dondero?
 2        A.    Well, that the donation was made from
 3   Mr. Dondero.
 4        Q.    Did Mr. Dondero make a donation to
 5   Empower Dallas Foundation?
 6        A.    Yes.
 7        Q.    And does Empower Dallas Foundation
 8   fund the Dallas Foundation?
 9        A.    Technically, it is a -- we are a -- it
10   is a supporting organization of the Dallas
11   Foundation, which is an IRS entity for which it
12   makes grant recommendations that then flow to a
13   donor-advised fund that then the Dallas
14   Foundation effectuates, basically, the grant.
15        Q.    Do you know if the Dallas -- did I
16   step on your words?
17        A.    No.
18        Q.    Do you know if the Dallas --
19   withdrawn.
20              Do you know if Empower Dallas
21   Foundation had any contractual obligation to make
22   donations to the Dallas Foundation?
23        A.    I believe that through its charitable
24   status, it is required to make contributions on a
25   regular basis.  And we also have governance that
```

Deposition of 3:25-cv-02724-L    Document 117-4    Filed 02/05/25    Page 219 of 406    Capital Mgmt. L.P.

```
 1    oversees activity within all of our charitable

 2    funds.

 3         Q.    Is there an agreement of any kind

 4    between the Dallas Foundation and Empower Dallas

 5    Foundation?

 6         A.    Yes.  We have a fund agreement.

 7         Q.    And under that fund agreement, is the

 8    Dallas Foundation entitled to receive

 9    contributions from Empower Dallas?

10         A.    Yes.  I don't know the technical

11    language offhand.

12         Q.    Do you know if Mr. Dondero plays any

13    role in the management of Empower Dallas

14    Foundation?

15         A.    What do you mean by "management"?

16         Q.    Does he have any involvement in --

17         A.    Yes.  As any fundholder, he would have

18    involvement in making recommendations for grants

19    he would like to put into the community, as all

20    of our fundholders do.

21         Q.    Does he play any other role, to the

22    best of your knowledge, with respect to the

23    Empower Dallas Foundation?

24         A.    No.

25         Q.    Are you familiar with --
```

```
 1           A.    Oh, sorry.  May I correct myself?
 2                 The Empower Dallas Foundation does
 3     have its own governance, of which he is president
 4     of the foundation.  I'm the vice president.  And
 5     we have a treasurer.  As with all of our
 6     supporting orgs, the Dallas Foundation has
 7     majority oversight.
 8           Q.    The Dallas Foundation has majority
 9     oversight of Empower Dallas Foundation?
10           A.    Yes.
11           Q.    And how does it exercise that
12     oversight?
13           A.    In voting.
14           Q.    And who gets to vote?
15           A.    The officers:  the president, the vice
16     president, and the treasurer.
17           Q.    Of which entity?
18           A.    Of the supporting organization, the
19     Empower Dallas Foundation.
20           Q.    Can you identify who those people are.
21           A.    Jim Dondero is the president; I'm the
22     vice president; and our CFO, Torrey Littleton, is
23     the treasurer.
24           Q.    How about the Okada Family Foundation?
25     Are you familiar with that?
```

```
 1          A.    Oh, excuse me -- sorry.

 2                I'm -- I need to correct myself.  That

 3     is for Empower Dallas, because we have two funds

 4     I'm confusing.  Empower Dallas Foundation, I am

 5     the president; Torrey is the treasurer; and we

 6     have a secretary.

 7                For consent agendas, Jim Dondero plays

 8     an individual member role.

 9          Q.    Ma'am, what are you reading right now?

10          A.    I'm looking at the structure of our

11     supporting organizations.

12          Q.    Can you just hold that up for me so I

13     can see what you're looking at.

14          A.    It literally lists that for all of

15     them.

16          Q.    Do you have any other documents with

17     you today?

18          A.    Just my notes.

19          Q.    Can I ask you to put those away for

20     now.

21          A.    Oh, sure.

22          Q.    How about the Okada Family Foundation;

23     is that another supporting organization?

24          A.    Yes, it is.

25          Q.    And do you know if Mr. Dondero has any
```

```
 1    involvement with that entity?
 2         A.    It does not have any involvement with
 3    that entity.
 4         Q.    Okay.  Do you know if Mr. Dondero
 5    played any role in the Dallas Foundation's
 6    decision to object to the proposed settlement
 7    between the Highland entities and the HMIT
 8    entities?
 9         A.    Did not have any role.
10         Q.    Did you ever speak to him about the
11    objection?
12         A.    I have spoken to him in the last six
13    months.
14         Q.    Did you ever speak with him about the
15    objection?
16         A.    No.
17         Q.    Did you speak with him about any of
18    the facts that are set forth in the objection?
19         A.    No.
20         Q.    Was Mr. Dondero a source for some of
21    the facts that are set forth in the Dallas
22    Foundation's objection?
23         A.    No.
24         Q.    Did Mr. Dondero or anyone acting on
25    his behalf provide any information to the Dallas
```

```
 1    Foundation that the Dallas Foundation used in its
 2    objection?
 3         A.    Repeat the question.
 4         Q.    Did Mr. Dondero or anybody you believe
 5    was acting on his behalf provide any information
 6    that the Dallas Foundation used in its objection?
 7         A.    I'll abstain from answering that.
 8         Q.    Excuse me?
 9         A.    I'd rather not answer that question.
10         Q.    I appreciate that, but you have to.
11         A.    Well, there's a lot of context around
12    the formation of where we are today.  So I have
13    been engaged with our counterpart over the last
14    six years, so I have a lot of information from
15    working through our grant-making and the
16    management of the assets over the past six years.
17              So in that same vein, I've learned a
18    lot from many interested parties.
19         Q.    Okay.  So I ask you to listen
20    carefully to my question, because it's rather
21    precise.
22              Do you know if Mr. Dondero or anybody
23    you believed was acting on his behalf provided
24    the Dallas Foundation with any information that
25    is -- that was used to prepare the objection?
```

```
 1              A.     No.

 2              Q.     Are you familiar with the objection?

 3              A.     I am familiar.  I authorized it and

 4       read it.

 5              Q.     And it's your testimony that Jim

 6       Dondero wasn't the source of any information

 7       that's in that objection.  Is that fair?

 8              A.     That is fair.

 9              Q.     Do you know where the idea of filing

10       the objection originated?

11              A.     I don't.

12              Q.     Do you know whose idea, who came up

13       with the idea to object to this -- withdrawn.

14                     Do you know whose idea it was to

15       object to the Highland/HMIT settlement?

16                     ATTORNEY OKIN:  Okay.  Actually,

17       Ms. Diaz, before you answer, just want to caution

18       you that as long as it's not conveying advice of

19       counsel, you can answer the question.

20              A.     You'll have to repeat that.  I don't

21       understand that.

22       BY ATTORNEY MORRIS:

23              Q.     Do you know who came up with the idea

24       of objecting to the proposed Highland/HMIT

25       settlement?
```

```
 1         A.    I believe it came out of discussions
 2   in another settlement.
 3         Q.    What settlement are you referring to?
 4         A.    In the Cayman Islands.
 5         Q.    What settlement is that?
 6         A.    Well, it has to do with the three
 7   large supporting orgs and an entity called
 8   DAF Holdco.
 9         Q.    Which three large supporting orgs are
10   you referring to?
11         A.    Kansas City Foundation; Santa Barbara
12   Foundation; Highland Dallas Foundation; and
13   really in a small way, North Texas Community
14   Foundation.  All --
15         Q.    And I apologize.  What did you just
16   refer to those entities as?  Supporting
17   organizations?
18         A.    Yes.
19         Q.    The Kansas -- and you called it the
20   Kansas City --
21         A.    Foundation.
22         Q.    -- Foundation, the Santa Barbara
23   Foundation and the Dallas Foundation?  And those
24   are three additional supporting organizations of
25   the Dallas Foundation?
```

Deposition of: 3:25-cv-02724-L    Document 157-124   File 06/22/05102 Page 226 of 406   Highland Capital Management L.P.

```
 1        A.    Sorry.  We have three -- four

 2   community foundations; right?  Dallas Foundation,

 3   Santa Barbara Foundation, Kansas City Foundation,

 4   and North Texas Community Foundations.

 5            The three -- Kansas City, Dallas and

 6   Highland -- I'm sorry -- Dallas, Kansas City, and

 7   Santa Barbara all have supporting organizations

 8   that were the result of contributions from

 9   Highland Capital in 2011.

10        Q.    Do you know if Mr. Dondero has any

11   relationship to the Dallas, Kansas City, or

12   Santa Barbara Foundations that you just

13   identified?

14        A.    My understanding is they have -- he

15   has the same structure of supporting org with

16   Kansas City, Santa Barbara, and Dallas.

17        Q.    Is he the president of each, to the

18   best of your knowledge?

19        A.    Yes.

20        Q.    And are those the entities that

21   commenced the Cayman Islands proceedings, to the

22   best of your understanding?

23        A.    Yes.

24        Q.    Is it your understanding that

25   Mr. Dondero directed those entities to do so?
```

```
 1          A.    No.

 2          Q.    Who directed those entities to do so,

 3    to the best of your knowledge?

 4          A.    CEOs of the organizations.

 5          Q.    And who are they?

 6          A.    Debbie Wilkerson is the CEO of

 7    Kansas City.  Jackie Carrera is the CEO of

 8    Santa Barbara.  Rose Bradshaw is the CEO of North

 9    Texas Community Foundation, although she did not

10    enter in, in the formal filing.  They have a very

11    de minimis role in the asset.

12          Q.    Are you aware that Mr. Dondero filed a

13    declaration or an affidavit in the Cayman Islands

14    in support of the Community Foundation's

15    litigation that they commenced?

16          A.    I did see that.

17          Q.    Did you read it?

18          A.    Yeah.

19          Q.    Did you see any familiarity between

20    that declaration and the Dallas Foundation's

21    objection?

22          A.    I think there were some similarities

23    because of the nature of the activities that have

24    been happening.

25          Q.    Did you learn, when you read
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02724-L    Document 17-124    Filed 04/25/102    Page 228 of 406    PageID 4486
Deposition of James Seery   Exhibit 124   Page 02/25/102   Page 228 of 406 Highland Capital Management, L.P.

```
 1     Mr. Dondero's declaration in the Cayman Islands,

 2     that he's actually funding that litigation on

 3     behalf of the supporting organizations?

 4          A.    No, that's not when I learned that.

 5          Q.    That's not when you learned it or --

 6     withdrawn.

 7               Are you aware that he's funding that

 8     litigation?

 9          A.    Yes.

10          Q.    When did you learn that he was funding

11     that litigation?

12          A.    Before we got into litigation.

13          Q.    Is he funding this litigation on

14     behalf of the Dallas Foundation?

15          A.    Yes, he is.

16          Q.    And how much money did he provide for

17     the funding of this litigation?

18          A.    We have not agreed on an amount.  As

19     with any of our fundholders', legal expenses will

20     get paid through by the fund.  So that's a very

21     common business practice.  And it would go until

22     the legal issues ceased.

23          Q.    But he's made a commitment to fund --

24     to personally fund the expenses of the Dallas

25     Foundation in connection with this litigation; is
```

```
 1    that right?
 2         A.    Yes.
 3         Q.    Are you aware of any particular reason
 4    that that's not disclosed in the Dallas
 5    Foundation's objection?
 6         A.    I'm not aware.
 7         Q.    Why did the Dallas Foundation file the
 8    objection on behalf of Empower Dallas Foundation?
 9         A.    Well, we filed the objection on behalf
10    of both Empower and Okada Family Foundation, in
11    essence, because the person who has been
12    overseeing the activity ceased to communicate
13    with us as of last fall.  And there were enough
14    irregularities in our communication and
15    accounting leading up to then some pretty
16    dramatic changes in valuations that raised a red
17    flag for us.
18         Q.    Who is the person that you're
19    referring to?
20         A.    Mark Patrick.
21         Q.    And did the Empower Dallas Foundation
22    ask the Dallas Foundation to file this objection
23    on its behalf?
24         A.    As fiduciaries of all of our
25    charitable assets, we oversee the activity; and
```

```
 1   when there is any irregular activity, we
 2   investigate.
 3       Q.   I appreciate that.  I'm just asking
 4   you if the Empower Dallas Foundation asked the
 5   Dallas Foundation to file the objection on its
 6   behalf.
 7       A.   Well, since I am representative of the
 8   Empower Dallas Foundation, I don't have to ask
 9   anybody except ourselves to do that.
10       Q.   And did you confer with Mr. Dondero
11   about that decision?
12       A.   I think we informed him.
13       Q.   Did he review a copy of the objection
14   before it was filed?
15       A.   Not to my knowledge, no.
16       Q.   Are you aware that the Dallas
17   Foundation also filed the objection on behalf of
18   certain segregated accounts held at Crown Global
19   Life Insurance Limited?
20       A.   Yes.
21       Q.   Can I refer to Crown Global Life
22   Insurance Limited as just "Crown Global"?
23       A.   Yes.
24       Q.   And can I refer to the segregated
25   accounts that are identified in the Dallas
```

```
 1   Foundation's objection as "the segregated
 2   accounts"?
 3        A.    Yes.
 4        Q.    And are you familiar with those
 5   segregated accounts?
 6        A.    At a high level.
 7        Q.    What's your understanding at a high
 8   level of what those segregated accounts are?
 9        A.    That the Crown Global assets are
10   really insurance annuities that pay out to the
11   fund; and that's the source of income for
12   charitable purposes.
13        Q.    Where does the income from the annuity
14   flow to?
15        A.    Flows to the supporting organizations.
16        Q.    And then the supporting organizations
17   have the proceeds from the annuity available for
18   the foundations; is that fair?
19        A.    Yes.
20        Q.    And do you know who took out these
21   insurance policies or these annuities?  Which of
22   the -- withdrawn.
23             Can you identify the supporting
24   organization that funded the purchase of the
25   annuities?
```

```
 1              A.      Empower Dallas Foundation and Okada

 2       Family Foundation.

 3              Q.      And is the cash that is thrown off

 4       from the annuities -- withdrawn.

 5                      To the best of your understanding, is

 6       the cash that's thrown off from the annuities the

 7       sole source of income for Empower Dallas

 8       Foundation and the Okada Foundation?

 9              A.      That's my understanding.

10              Q.      Is it your understanding that the

11       Dallas Foundation has not received anything of

12       value from Empower Dallas Foundation or the Okada

13       Family Foundation other than proceeds from the

14       annuities?

15              A.      That's my understanding.

16              Q.      Do you know why the Dallas Foundation

17       filed the objection on behalf of the segregated

18       accounts at Crown Global?

19              A.      Yes.

20              Q.      Why did the Dallas Foundation file its

21       objection on behalf of the segregated accounts?

22              A.      As I said earlier, because there had

23       been activity and essentially a write-down of

24       40 percent of value, we were concerned that there

25       were activities within Crown Global for the
```

```
 1    organizations that support that that we did not

 2    have any, you know, access to, vision or

 3    communication around.

 4         Q.    Does the Dallas Foundation have any

 5    relationship with Crown Global?

 6         A.    Yes.

 7         Q.    As it pertains to -- what relationship

 8    does the Dallas Foundation have with

 9    Crown Global?

10         A.    Well, I don't understand on a

11    transactional, but we get quarterly reports from

12    them.  They obviously send the proceeds to us.  I

13    mean, they are a fiduciary to us in the same way

14    we are to others.

15         Q.    Crown Global is?

16         A.    Yeah.

17         Q.    With respect to the disbursement of

18    proceeds from the annuity?

19         A.    Yes.

20         Q.    Okay.  So the proceeds from the

21    annuity don't go to Empower Dallas or the Okada

22    Family Foundation; they get remitted directly to

23    the Dallas Foundation.

24              Do I have that right?

25         A.    No.  They go -- they go to the
```

1  supporting organizations.  But in our governance

2  that -- I refer to both as -- it flows into our

3  finance office, and then they get allocated to

4  the foundations.

5      Q.   You mentioned that there was a

6  40 percent write-down in value.  Is that with

7  respect to the annuities?

8      A.   I don't know all of the transactions

9  that led up to that.  But what we understood,

10  there were a few -- sorry.

11           There are a few requests for us to

12  approve that we didn't understand and sent them

13  to our counsel, and then got the first-quarter

14  report for March 30th, and it was significantly

15  lower and we didn't know why.

16           So in asking for that, we found out

17  there was a decline.

18      Q.   And is that -- is it your

19  understanding that it's the decline in value --

20  withdrawn.

21           Is it your understanding that it's the

22  unexplained decline in value that caused the

23  Dallas Foundation to file the objection on behalf

24  of the segregated accounts?

25      A.   Yes.

```
 1          Q.    Did anybody ask the Dallas Foundation

 2    to file the objection on behalf of the segregated

 3    accounts?

 4          A.    No.

 5          Q.    Can you identify the owner of the

 6    segregated accounts on behalf of -- on whose

 7    behalf the Dallas Foundation filed the objection?

 8                Withdrawn.  Too many words.

 9                Do you know who owns the segregated

10    accounts?

11          A.    No.  I won't guess.

12          Q.    Are you aware that the owner of the

13    segregated accounts is Crown Global?

14          A.    Oh, yes.

15          Q.    And so is that your understanding,

16    that Crown Global --

17          A.    Yes.

18          Q.    -- owns the segregated accounts?

19          A.    Yes.

20          Q.    Did anybody from the Dallas Foundation

21    seek Crown Global's consent and approval before

22    filing the objection on behalf of the segregated

23    accounts?

24          A.    Yes.

25          Q.    Yes?
```

```
 1              And who at Crown Global gave the

 2      authorization, if you know?

 3          A.    Mr. -- the CEO and their chief legal,

 4      Hernandez -- Paul --

 5              ATTORNEY OKIN:  Let me interrupt here

 6      too, John.  You're acting as though the objection

 7      was filed solely by the Dallas Foundation.  We

 8      represent two clients here.  We represent the

 9      Dallas Foundation and Crown Global.

10              And you're putting Ms. Diaz in a

11      position where I think she thinks she has to

12      justify having -- Crown Global's actions when

13      they -- we represent them as well.

14              ATTORNEY MORRIS:  Well, as I read the

15      pleading that you filed, it said the Dallas

16      Foundation -- I won't --

17              ATTORNEY OKIN:  I think that's a --

18              ATTORNEY MORRIS:  I'll ask the

19      questions, and we'll --

20              ATTORNEY OKIN:  Take a look at our

21      signature block.  It says clearly that we're

22      doing it on behalf of the Dallas Foundation and

23      Crown Global.

24      BY ATTORNEY MORRIS:

25          Q.    Ms. Diaz, do you know if the Dallas
```

```
 1   Foundation ever appeared in the Highland
 2   bankruptcy case before it filed this objection?
 3        A.    I do not believe so.
 4        Q.    To the best of your knowledge, the
 5   Dallas Foundation never filed a claim against
 6   Highland in the Highland bankruptcy case;
 7   correct?
 8        A.    No.
 9        Q.    To the best of your knowledge --
10   withdrawn.
11              Have you ever heard of the Highland
12   Claimant Trust?
13        A.    No.
14        Q.    So is it fair to say that you have no
15   reason to believe that the Dallas Foundation has
16   any interest in the Highland Claimant Trust?
17        A.    No.  That is not -- that's not fair to
18   claim.
19        Q.    So is it your testimony that you
20   believe the Dallas Foundation has a direct or
21   indirect interest in the Highland Claimant Trust?
22        A.    What you asked me was had we ever
23   participated and did we then have any result
24   from it.
25              I don't know the answer to that
```

```
 1    question.
 2         Q.    I apologize if my questioning wasn't
 3    clear to you.  Let me try again.
 4               To the best of your knowledge, the
 5    Dallas Foundation has never appeared in the
 6    Highland bankruptcy case until it filed the
 7    objection that we're talking about today;
 8    correct?
 9         A.    I don't know the answer to that.
10         Q.    But to the -- you have no knowledge
11    that they ever did; is that fair?
12         A.    I have no knowledge.
13         Q.    Okay.  And you have no knowledge that
14    the Dallas Foundation ever filed a claim against
15    Highland in the Highland bankruptcy case;
16    correct?
17         A.    I have no knowledge of that.
18         Q.    And you have no knowledge that the
19    Dallas Foundation has any interest of any kind in
20    the Highland Claimant Trust; correct?
21         A.    I do not agree with that statement.
22         Q.    What knowledge do you have that the
23    Dallas Foundation has an interest in the Highland
24    Claimant Trust?
25         A.    Because of the relationship between
```

```
 1    Hunter Mountain and how it feeds up to
 2    Crown Global and, therefore, the supporting
 3    organizations.
 4         Q.    It might be my fault that I'm not
 5    being clear, but I'm really just focused on
 6    Highland right now.  Has nothing to do with
 7    Crown Global --
 8         A.    Okay.
 9         Q.    -- or Hunter Mountain; it's just
10    Highland.
11         A.    Okay.
12         Q.    Are you aware that as a result of the
13    bankruptcy, an entity Called the Highland
14    Claimant Trust was formed?
15         A.    I was not, no.
16         Q.    Okay.  So if you weren't aware that an
17    entity called the Highland Claimant Trust was
18    formed, is it also fair to say you have no
19    knowledge that the Dallas Foundation has an
20    interest in the Highland Claimant Trust?
21         A.    Okay.
22         Q.    Okay.  And does the Dallas Foundation
23    have any contractual relationship with Highland
24    Capital Management, LP?
25         A.    No.
```

 1         Q.     Has the Dallas Foundation ever had a

 2    contractual relationship with Highland Capital

 3    Management, LP, to the best of your knowledge?

 4         A.     No.

 5         Q.     Does the Dallas Foundation have any

 6    contractual relationship with an entity called

 7    the Highland Claimant Trust, to the best of your

 8    knowledge?

 9         A.     No.

10         Q.     And to the best of your knowledge, has

11    the Dallas Foundation ever had a contractual

12    relationship with an entity called the Highland

13    Claimant Trust?

14         A.     No.

15         Q.     Do you have any reason to believe, as

16    you sit here today, that Highland Capital

17    Management, LP, owes any duties or obligations to

18    the Dallas Foundation?

19              ATTORNEY OKIN:  Object to form.

20    BY ATTORNEY MORRIS:

21         Q.     You can answer.

22         A.     Can you ask the question again.

23         Q.     Sure.

24              As you sit here today, do you have any

25    reason to believe that Highland Capital

```
 1    Management, LP, owes any duties or obligations to

 2    the Dallas Foundation?

 3              ATTORNEY OKIN:  Object to form.

 4        A.    No.

 5    BY ATTORNEY MORRIS:

 6        Q.    As you sit here today, do you have any

 7    reason to believe that Highland Capital

 8    Management, LP, ever had any duties or

 9    obligations that it owed to the Dallas

10    Foundation?

11              ATTORNEY OKIN:  Object to form.

12        A.    No.

13    BY ATTORNEY MORRIS:

14        Q.    Are you aware that if the settlement

15    agreement between the Highland entities and the

16    HMIT entities is approved, the HMIT entities will

17    receive cash and other assets pursuant to the

18    terms of the settlement agreement?

19        A.    I'm assuming that there is assets

20    within the agreement.

21        Q.    Have you reviewed the settlement

22    agreement yourself, Ms. Diaz?

23        A.    No.

24        Q.    Are you generally familiar with the

25    terms of the settlement agreement?
```

```
 1           A.      At a high level.

 2           Q.      What's your understanding at a high

 3     level?

 4           A.      That once the settlement is complete,

 5     that Hunter Mountain will receive assets of some

 6     size that will flow up to Crown Global.

 7           Q.      Do you know if the requirement that

 8     the assets flow up to Crown Global is part of the

 9     settlement agreement that's before the Court and

10     that the Dallas Foundation is objecting to?

11           A.      That was our understanding.

12           Q.      From the agreement itself?

13           A.      I have not seen the settlement

14     agreement.

15           Q.      So you authorized an objection to a

16     settlement agreement that you haven't seen; is

17     that fair?

18           A.      That's fair.

19           Q.      Do you have any reason to believe that

20     the Dallas Foundation has a right to recover any

21     of the assets you just described that HMIT will

22     receive if the settlement is approved by the

23     Court?

24                   ATTORNEY OKIN:  Object to form.

25           A.      Can you repeat the question.
```

```
 1   BY ATTORNEY MORRIS:

 2        Q.    Do you have any reason to believe that

 3   the Dallas Foundation has a right to recover any

 4   portion of the assets that HMIT will receive if

 5   the settlement agreement is approved by the

 6   bankruptcy court?

 7             ATTORNEY OKIN:  Object to form.

 8        A.    My job is to protect the charitable

 9   assets under our organization's fiduciary

10   compliance role; and so if there is any

11   opportunity for assets to either be diminished or

12   not move forward, it's my job to ensure that I've

13   done everything I can to recover them.

14   BY ATTORNEY MORRIS:

15        Q.    But do you have an understanding as to

16   whether or not -- withdrawn.

17             I think you just testified that it's

18   your understanding at a high level that HMIT will

19   receive certain assets if the settlement

20   agreement is approved.

21             Do I have that right?

22        A.    Yes.

23        Q.    Do you have an understanding that the

24   Dallas Foundation is entitled to receive all or

25   any portion of the assets that HMIT would receive
```

```
 1    under the settlement agreement?

 2              ATTORNEY OKIN:  Object to form.

 3         A.    I don't know that.

 4    BY ATTORNEY MORRIS:

 5         Q.    You don't know that?

 6         A.    (Shakes head.)

 7         Q.    Have you asked anybody whether the

 8    Dallas Foundation has a right to recover any

 9    portion of the assets that HMIT will receive

10    under the settlement agreement?

11              ATTORNEY OKIN:  Before you answer

12    that, Ms. Diaz, I'll just remind you:  Other than

13    disclosing any of your conversations with counsel

14    for you or for the foundation.

15    BY ATTORNEY MORRIS:

16         Q.    But you can answer the question.

17         A.    You'll have to ask the question again.

18         Q.    No problem.  I appreciate that.

19              Did you ever ask anybody whether the

20    Dallas Foundation had a right to receive any of

21    the assets that HMIT will receive under the

22    settlement agreement?

23         A.    Like somebody-who in your question?

24         Q.    Anybody.  Did you ever ask the

25    question of anybody?  Let's just start with "yes"
```

 1   or "no."

 2        A.    Yes.

 3        Q.    And who did you ask?

 4        A.    I'll strike that, because it would

 5   be -- I couldn't tell you definitively I did

 6   that.

 7        Q.    Did Mr. Dondero tell you that the

 8   Dallas Foundation had a right to the assets that

 9   HMIT was going to receive under the settlement

10   agreement?

11        A.    No.

12        Q.    And you don't recall asking that

13   question of anybody; is that fair?

14        A.    The only person I talked to this --

15   about these assets to is Mark Patrick.

16        Q.    And did Mr. Patrick tell you that the

17   Dallas Foundation had a right to recover any of

18   the proceeds under the HMIT/Highland settlement

19   agreement?

20        A.    I don't know.

21        Q.    Have you ever received any documents

22   that lead you to believe that the Dallas

23   Foundation has an ownership interest in any of

24   the assets that HMIT will receive under the

25   settlement agreement?

```
 1                ATTORNEY OKIN:  Object to form.

 2        A.    My understanding is that through the

 3   Hunter Mountain settlement, that those assets

 4   flow into the Atlas fund that I know Mark Patrick

 5   was managing.  So indirectly.

 6   BY ATTORNEY MORRIS:

 7        Q.    Is there a document that you reviewed

 8   that leads you to believe that the assets HMIT

 9   receives will go to the Atlas fund?

10        A.    No.

11        Q.    Can you identify with any specificity

12   which Atlas entity you have in mind that's

13   expected to receive the proceeds from the

14   HMIT/Highland settlement?

15        A.    No.

16        Q.    Do you know if the Atlas entity that

17   you just identified, does that have any

18   obligation to disburse any of the assets it may

19   receive from HMIT?

20        A.    I don't know.

21        Q.    Okay.  Let's -- do you have any reason

22   to believe that the Dallas Foundation will be

23   impacted in any way if the settlement between

24   Highland and the HMIT entities is approved?

25        A.    As I said, because the Crown Global is
```

```
 1    to disburse money that it receives from Atlas,

 2    then there would be an impact.  That's why we

 3    filed the objection.

 4         Q.    Is it fair to say that the Dallas

 5    Foundation's concern is what happens to the

 6    assets that HMIT receives after the settlement is

 7    approved and it's not with the agreement itself?

 8         A.    I can't answer that.

 9         Q.    If Mark Patrick hadn't done anything

10    to change any of the structure that's described

11    in the Dallas Foundation's objection such that

12    the Dallas Foundation's expectations as set forth

13    in its objection were met, would the Dallas

14    Foundation have any reason to object to this

15    settlement?

16              ATTORNEY OKIN:  Objection; form.

17         A.    I don't know.

18    BY ATTORNEY MORRIS:

19         Q.    Isn't the problem here that you're

20    concerned about what happens to the money after

21    it's received by HMIT?

22         A.    I'm concerned that the case that's

23    pending in the Cayman Islands shows that

24    $300 million of charitable assets have vanished

25    and that the same type of behavior is happening
```

```
 1    in Crown Global and impacts those funds to the
 2    tune of $25 million.
 3        Q.    But that has nothing to do with
 4    Highland.
 5            Fair enough?
 6        A.    I don't know.
 7        Q.    Do you have any basis to say that
 8    Highland has any involvement in anything you just
 9    described?
10        A.    Well, I'm not a lawyer and,
11    technically, I don't know how to answer that.
12    But Highland has been involved from day one.
13        Q.    Involved in what?
14        A.    The original contribution to set up
15    the supporting orgs with those shares; like I
16    said, I -- all the different legal entities --
17    GPs, LPs, et cetera -- I leave you all to track.
18        Q.    If the Court approved the settlement
19    and Mark Patrick decided to give all of the
20    proceeds to the Dallas Foundation, would the
21    Dallas Foundation have any reason to object to
22    the settlement?
23            ATTORNEY OKIN:   Object to form.
24        A.    I think we'd want to know more.
25    ///
```

```
 1    BY ATTORNEY MORRIS:
 2         Q.    What would you want to know?
 3         A.    What are the assets that we would be
 4    receiving?  What would the structure be?
 5         Q.    Well, the assets are set forth in the
 6    settlement agreement; right?  So there's no
 7    mystery about the assets.
 8               Fair enough?
 9         A.    I don't know that.  I don't know --
10    are they -- is it cash?  Is it securities?  What
11    are the nature of the -- I would want to know a
12    lot more before accepting all things like that.
13         Q.    Do you know if Crown Global ever
14    appeared in the Highland bankruptcy?
15         A.    I don't know.
16         Q.    Do you know if the segregated accounts
17    ever filed a notice of appearance in the Highland
18    bankruptcy?
19         A.    I don't know.
20         Q.    Do you know if Crown Global ever filed
21    a claim against Highland in the Highland
22    bankruptcy?
23         A.    I don't know.
24         Q.    Do you know if the segregated accounts
25    ever filed a claim against Highland in the
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02724-L    Document 17-124   Filed 06/06/25   Page 250 of 406   PageID 4508
Depo... 3:25-cv-02724-L   Exhibit 124   Page 46 of 102   Highland Capital Management L.P.

```
 1    Highland bankruptcy?

 2         A.    I don't know.

 3         Q.    Do you know if Crown Global has an

 4    interest in the Highland Claimant Trust?

 5         A.    No.  No, I don't know.

 6         Q.    Do you know if the segregated accounts

 7    have an interest in the Highland Claimant Trust?

 8         A.    I don't know.

 9         Q.    Do you know if Crown Global has any

10    contractual relationship with Highland?

11         A.    I don't know.

12         Q.    Do you know if Crown Global has any

13    contractual relationship with the Highland

14    Claimant Trust?

15         A.    No.

16         Q.    I'm going to take Mr. -- I think it's

17    Mr. Littleton's deposition next.

18         A.    Yep.

19         Q.    Do you know if he is affiliated with

20    Crown Global in any way?

21         A.    No.  He's an employee of the Dallas

22    Foundation.

23         Q.    Thank you.

24               Do you know if Crown Global has any

25    right to recover any of the assets that HMIT and
```

```
 1    the HMIT entities may receive under the

 2    settlement agreement?

 3              ATTORNEY OKIN:  Object to form.

 4         A.    I don't know.

 5    BY ATTORNEY MORRIS:

 6         Q.    Have you asked that question of

 7    anybody?

 8              ATTORNEY OKIN:  Other than your

 9    lawyers, you can answer that, Ms. Diaz.

10              ATTORNEY MORRIS:  Please --

11    BY ATTORNEY MORRIS:

12         Q.    Was the answer "no," Ms. Diaz?

13         A.    Ask the question again, please.

14         Q.    Have you ever asked anybody whether

15    Crown Global had the right to receive any of the

16    assets that Highland will convey to HMIT under

17    the settlement agreement?

18         A.    No.

19         Q.    We're using the phrase "HMIT entities"

20    to mean the entities on whose behalf Mark Patrick

21    signed the settlement agreement; right?  Are we

22    on the same page?

23         A.    That's what you're telling me.

24         Q.    Okay.  Are you familiar with any of

25    those entities?
```

```
 1              A.     Tell me what they are.

 2              Q.     Are you familiar with any of the Rand

 3      entities?

 4              A.     I'm familiar with Rand.

 5              Q.     And what's your familiarity with Rand?

 6              A.     Certainly it was another vehicle that

 7      flowed through to Atlas.  And when Mr. Patrick

 8      came to see me last October, told me that there

 9      might be some issues with Rand and that structure

10      might be changing.  That's vague.

11              Q.     Let's stick with the Hunter Mountain

12      Investment Trust.

13                     Are you aware of any assets that the

14      Hunter Mountain Investment Trust owns today?

15              A.     No.

16              Q.     Was it your understanding that

17      Mr. Patrick controlled Rand?

18              A.     Yes.

19              Q.     And is it your understanding that he

20      controls Rand today?

21              A.     Yes.

22              Q.     And going back to Hunter Mountain

23      Investment Trust, you're not aware of any assets

24      that that entity holds today; correct?

25              A.     No.
```

```
 1        Q.      Were you --

 2        A.      I'm assuming Rand is one of the

 3   assets, I guess.

 4        Q.      Were you ever -- did you ever know --

 5   were you ever aware of any asset that HMIT owned?

 6        A.      Well, Atlas.

 7        Q.      It's your understanding --

 8        A.      Yeah, I feel like I'm being quizzed on

 9   Hunter Mountain Trust.

10              ATTORNEY OKIN:  Let me interrupt here.

11   John, two things.

12              One, if you want to show her an org

13   chart so she can actually see these entities in a

14   way that actually would help her remember them.

15   Nobody can possibly keep them in their mind cold.

16              And, second, Ms. Diaz is not going to

17   be our witness on this Hunter Mountain structure

18   and the Rand structure.  You can keep asking her

19   questions about it and testing her memory on it,

20   but I don't think you're going to find that the

21   answers are going to be any different.

22              Mr. Littleton will talk to these

23   issues, yes.  I can't promise you he'll be able

24   to answer every one of your questions.  But to

25   the extent you want somebody with the Dallas
```

```
 1      Foundation's knowledge of the workings of that
 2      structure, he's the one to ask about that.
 3              ATTORNEY MORRIS:  I'll continue to ask
 4      the questions, but I appreciate that.
 5      BY ATTORNEY MORRIS:
 6          Q.    Do you know if the Dallas Foundation
 7      ever received anything of value from any of the
 8      HMIT entities?
 9          A.    Crown Global.
10          Q.    Crown Global is not an HMIT entity.
11      So I'm asking you to just focus on the entities
12      that Mark Patrick controlled, the Rand entities,
13      the Atlas entities and Hunter Mountain.
14              Did any of those entities ever give
15      anything of value to the Dallas Foundation?
16          A.    Not directly that I'm aware of, no.
17          Q.    Did any of those entities ever have
18      any business dealings with the Dallas Foundation?
19          A.    Only in the relationship with
20      Crown Global.
21          Q.    Do you have any understanding as to
22      whether any of the HMIT entities owes any duties
23      or obligations to the Dallas Foundation today?
24              ATTORNEY OKIN:  Objection to form.
25          A.    I don't know.
```

Case 19-34054-sgj11 Doc 4277-1 Filed 06/24/25 Entered 06/24/25 10:20:25 Desc
Case 3:25-cv-02724-L Document 17-124 Filed 06/12/25 Page 255 of 406 PageID 4518
Deposition of Jason Post Exhibit 71 Page 52 of 102 Highland Capital Management L.P.

```
 1    BY ATTORNEY MORRIS:

 2         Q.    I understand there was some corporate

 3    reorganization earlier this year.  I think that's

 4    described in the Dallas Foundation's objection.

 5              Is that just generally fair?

 6         A.    As it relates to Mr. Patrick?

 7         Q.    Yes.

 8         A.    (Nods head.)

 9         Q.    Okay.  Do you have any reason to

10    believe that before Mr. Patrick effectuated those

11    changes, that any of the HMIT entities owed any

12    duty or obligation to the Dallas Foundation?

13              ATTORNEY OKIN:  Objection to form.

14         A.    I don't know.

15    BY ATTORNEY MORRIS:

16         Q.    Are you aware that HMIT filed a couple

17    of years ago a motion in the bankruptcy court for

18    permission to bring certain claims against

19    Highland Capital Management and a gentleman named

20    James Seery?

21         A.    No.

22         Q.    Nobody ever told you that; is that

23    fair?

24         A.    Fair.

25         Q.    Are you aware that Highland contends
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02724-L    Document 17-124    Filed 06/02/25    Page 256 of 406    PageID 4514
Deposition of ... Exhibit 124 ... Page 52 of 102 ... Highland Capital Management, L.P.

1    that the settlement agreement that it has entered

2    into with the HMIT entities is the product of

3    good-faith, arm's-length negotiations?

4         A.    Am I aware?  No.

5         Q.    Do you have any knowledge of the

6    nature of any negotiations between the Highland

7    entities and the HMIT entities?

8         A.    I'm aware that it's been going on for

9    four years.

10        Q.    I'm just talking about the settlement

11   agreement now.

12        A.    Okay.

13        Q.    Do you have any knowledge of any facts

14   concerning the negotiation of that particular

15   settlement agreement?

16        A.    No.

17        Q.    Do you have any knowledge of any facts

18   that might suggest that the settlement agreement

19   was not the product of good-faith, arm's-length

20   negotiations?

21        A.    No.

22        Q.    Do you have any reason to believe that

23   the proposed settlement is unfair to Highland

24   Capital Management, LP?

25               ATTORNEY OKIN:  Object to form.

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L    Document 17-124 Filed 05/20/102 Page 257 of 406 CapitalPageID 4515 L.P.
Deposition of Christine... Exhibit 124 Filed 06/05/25 Page 53 of 102    Highland Capital Management

```
 1   BY ATTORNEY MORRIS:

 2         Q.    You can answer, ma'am.

 3         A.    I don't know.

 4         Q.    Do you know whether the proposed

 5   settlement is unfair to the Highland Claimant

 6   Trust?

 7         A.    I don't know.

 8               ATTORNEY OKIN:  Object to form.

 9   BY ATTORNEY MORRIS:

10         Q.    You don't have a view on that; is that

11   fair?

12         A.    Yes.

13         Q.    And is it fair that in connection with

14   the preparation and the filing of the

15   objection -- withdrawn.

16               The Dallas Foundation, in its

17   objection, does not contend that the settlement

18   is unfair to Highland Capital Management; is that

19   correct?

20         A.    I don't know.

21         Q.    You reviewed and authorized the filing

22   of the objection; isn't that right, ma'am?

23         A.    Right.

24         Q.    And you're familiar with the document

25   that you authorized to be filed; fair?
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17-124   Filed 02/25/102   Page 253 of 406   PageID 4516
Deposition of... v. Highland Capital Management L.P.

```
 1         A.    Yes.

 2         Q.    And based on your recollection, do you

 3   recall the Dallas Foundation making any assertion

 4   or claim that the settlement agreement was unfair

 5   to Highland Capital Management, LP, or any of its

 6   affiliates?

 7         A.    The claim was that it was unfair to

 8   the supporting organizations.

 9         Q.    And how is the settlement agreement

10   unfair to the supporting organizations?

11         A.    Because we would -- well, what we

12   claimed is that because of our lack of

13   transparency of the flow of those funds and the

14   changes in the fund recently, that the supporting

15   organizations were losing their assets and any

16   potential future assets.

17         Q.    Is there any other basis that you're

18   aware of by which the Dallas Foundation contends

19   that the settlement agreement is unfair to it?

20         A.    No.

21         Q.    Does the Dallas Foundation contend

22   that the settlement agreement is unfair to Hunter

23   Mountain Investment Trust?

24         A.    I don't know.

25         Q.    As the person who authorized the
```

```
 1    filing of the objection on behalf of the Dallas
 2    Foundation, do you have any reason to believe
 3    that the terms of the settlement are unfair to
 4    the Hunter Mountain Investment Trust?
 5         A.    I do not.
 6         Q.    Are you aware that under the
 7    settlement agreement, the HMIT entities and the
 8    Highland entities are releasing each other from
 9    all liabilities except for the liabilities
10    arising under the settlement agreement?
11         A.    I'm assuming that's what the
12    settlement is intended to do.
13         Q.    And the Dallas Foundation doesn't have
14    any concern about the scope of the mutual
15    releases; is that fair?
16              ATTORNEY OKIN:  Objection to form.
17         A.    I don't know.
18    BY ATTORNEY MORRIS:
19         Q.    As the person who authorized the
20    filing of the objection on behalf of the Dallas
21    Foundation, do you recall there being any
22    statement in the objection where the Dallas
23    Foundation expressed any concern at all about the
24    scope of the mutual releases that are in the
25    settlement agreement?
```

```
 1              ATTORNEY OKIN:  Object to form.  The
 2    document speaks for itself.  I mean, if you want
 3    to show it to her and ask her to find it, that's
 4    fine.
 5    BY ATTORNEY MORRIS:
 6         Q.    You can answer, ma'am.
 7         A.    I don't --
 8         Q.    I'm sorry?
 9         A.    I don't recall that.
10         Q.    Okay.  Thank you.
11              Are you aware of any facts that could
12    give rise to a claim by the Dallas Foundation
13    against any Highland entity?
14              ATTORNEY OKIN:  Object to form.
15         A.    Repeat the question.
16    BY ATTORNEY MORRIS:
17         Q.    Are you aware of any facts that would
18    support a claim by the Dallas Foundation against
19    Highland Capital Management, LP, or the Highland
20    Claimant Trust?
21              ATTORNEY OKIN:  Object to form.
22         A.    No.
23    BY ATTORNEY MORRIS:
24         Q.    Do you understand the basis for the
25    Dallas Foundation's objection?
```

```
 1          A.    Yes.

 2          Q.    Can you articulate that for me.

 3   What's your understanding of the basis of the

 4   Dallas Foundation's objection?

 5                ATTORNEY OKIN:  Object to form.

 6          A.    Our objection --

 7   BY ATTORNEY MORRIS:

 8          Q.    Pardon me?  What's that, ma'am?

 9                ATTORNEY OKIN:  I said I object to the

10   form of the question.

11                Go ahead.  You can answer.

12          A.    Our objection is based on -- and I've

13   said this before -- the fact that there's been

14   irregular significant erosion of the assets to

15   date by the party who seems to control a lot of

16   the liquidity flows and oversight of the assets.

17                And so with the backdrop of all of the

18   work we're doing in the Cayman Islands to recover

19   300-plus million dollars, this seemed not

20   insignificant to protect the $25 million for

21   these two supporting organizations.

22                So as this happens on Wednesday, what

23   we've learned is that every opportunity we can to

24   slow down decisions that are made give us time to

25   understand where -- what is happening with these
```

```
 1   charitable assets and where they are.

 2   BY ATTORNEY MORRIS:

 3        Q.    Do you have any reason to believe that

 4   Mark Patrick does not have the authority to enter

 5   into the settlement agreement on behalf of each

 6   of the HMIT entities?

 7             ATTORNEY OKIN:  Object to the form of

 8   the question.

 9        A.    I don't know what authority he has to

10   enter into that.

11   BY ATTORNEY MORRIS:

12        Q.    Do you have any facts that you can

13   share with me that suggest that Mr. Patrick does

14   not have the legal authority to enter into the

15   settlement agreement on behalf of any of the HMIT

16   entities?

17             ATTORNEY OKIN:  Object to the form of

18   the question.

19        A.    I don't.

20   BY ATTORNEY MORRIS:

21        Q.    Is it your understanding that

22   Mr. Patrick was required to obtain the Dallas

23   Foundation or Crown Global's consent before

24   entering into this settlement agreement?

25        A.    I think what we would have appreciated
```

```
 1    and what had been our business as usual was
 2    information prior to and during anything that
 3    involved the assets under our aegis.
 4        Q.    Do you know if any of the HMIT
 5    entities had an obligation or duty to provide
 6    information to the Dallas Foundation or
 7    Crown Global before entering into the settlement
 8    agreement?
 9            ATTORNEY OKIN:  Object to the form of
10    the question.
11        A.    I don't --
12    BY ATTORNEY MORRIS:
13        Q.    I'm sorry.  Ms. Diaz, you don't know?
14        A.    I don't contractually know that.  But
15    whether it's authority that he was given or
16    assumed, he should have communicated with us.
17        Q.    Should he have communicated with you
18    before filing a lawsuit against the Highland --
19    withdrawn.
20            Do you believe that Mr. Patrick should
21    have communicated with the Dallas Foundation
22    before filing a lawsuit on behalf of Hunter
23    Mountain Investment Trust against Highland,
24    Mr. Seery, and others?
25        A.    I don't know.
```

```
 1            Q.    You don't have a view on that; is that
 2    fair?
 3            A.    Fair.
 4            Q.    I apologize if I asked this, but do
 5    you have any reason to believe that Mr. Patrick
 6    was required to obtain either the Dallas
 7    Foundation's or Crown Global's consent before
 8    entering into the settlement on behalf of the
 9    HMIT entities?
10            ATTORNEY OKIN:  Object to form of the
11    question.
12            A.    I don't know.
13    BY ATTORNEY MORRIS:
14            Q.    Do you have any reason to believe that
15    the Dallas Foundation or Crown Global has --
16    withdrawn.
17            Do you know if the Dallas Foundation
18    has a direct ownership interest in any of the
19    HMIT entities that are party to the settlement
20    agreement?
21            A.    I don't believe so.
22            Q.    Do you know if Crown Global has a
23    direct ownership interest in any of the HMIT
24    entities that are party to the settlement
25    agreement?
```

```
 1          A.    I don't know.

 2          Q.    Do you know if the Dallas Foundation

 3    has an indirect ownership interest in any of the

 4    HMIT entities that are party to the settlement

 5    agreement?

 6          A.     Indirect ownership?

 7                ATTORNEY OKIN:  Object to the form of

 8    the question.

 9          A.    I don't know.

10    BY ATTORNEY MORRIS:

11          Q.    Did you ever ask anybody?

12          A.    No.

13          Q.    No?

14          A.    No.

15          Q.    Do you know if Crown Global has an

16    indirect ownership interest in any of the HMIT

17    entities that are party to the settlement

18    agreement?

19                ATTORNEY OKIN:  Object to the form of

20    the question.

21          A.    I don't know.

22    BY ATTORNEY MORRIS:

23          Q.    Do you know if the Dallas Foundation

24    has any right to control any of the HMIT

25    entities?
```

1          A.     No.

2          Q.     No, you don't know; or, no, they don't

3     have that right?

4          A.     No, we don't have that right.

5          Q.     Do you know if Crown Global has the

6     right to control any of the HMIT entities?

7          A.     I don't know.

8          Q.     Do you know if the Dallas Foundation

9     has the right to approve transactions that are

10    entered into by any of the HMIT entities?

11         A.     I don't know.

12         Q.     Do you know if Crown Global has the

13    right to approve any transaction that's entered

14    into by any of the HMIT entities?

15         A.     I don't know.

16         Q.     Do you know if Crown Global or the

17    segregated accounts has any right to control any

18    of the HMIT entities?

19         A.     I don't know.

20         Q.     Do you know if Crown Global or the

21    segregated accounts has any right to approve

22    transactions that any of the HMIT entities might

23    enter into?

24         A.     I don't know.

25         Q.     Do you know if any of the HMIT

```
 1    entities were required to obtain the segregated

 2    accounts' consent before entering into the

 3    settlement agreement?

 4             ATTORNEY OKIN:  Object to the form of

 5    the question.

 6        A.    I don't know.

 7             ATTORNEY MORRIS:  Okay.  We're going

 8    to put up on the screen -- Nathan, can you please

 9    put up on the screen the Dallas Foundation's

10    objection.

11    BY ATTORNEY MORRIS:

12        Q.    And while we wait, Ms. Diaz, I will

13    tell you that, you know, the good news with

14    COVID -- or at least one piece of the good

15    news -- is that we learned to do these remote

16    depositions so people don't have to travel and

17    it's much less expensive for clients.

18             The bad news is that I'm not in the

19    room with you and we have to put documents on the

20    screen, and sometimes that can be a little bit

21    cumbersome.

22             The Dallas Foundation's objection is

23    fairly lengthy.  This is not a test at all.  I am

24    going to point to certain parts of the objection.

25    But if you believe that you need to see any other
```

```
 1    portion of the document, will you let me know

 2    that so that I give you a chance to be fully

 3    informed?

 4         A.    Yes.

 5              ATTORNEY MORRIS:  Okay.  I think it's

 6    towards the end, Nathan, paragraph 32.

 7              This will be -- let's just call it

 8    Highland 1.

 9              (Whereupon, Exhibit Highland 1

10              was marked for identification and

11              is attached hereto.)

12    BY ATTORNEY MORRIS:

13         Q.    So we've got up on the screen

14    paragraph 32 of the objection.  And the third

15    sentence states, "Unfortunately, it does not

16    appear, however, that joint official liquidators

17    are parties to or have authorized the

18    settlement."

19              Do you see that?

20         A.    I see it.

21         Q.    Okay.  Are you aware that joint

22    official liquidators were appointed by a Cayman

23    court?

24         A.    Yes.

25         Q.    Do you know the entity over which the
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17-124   Filed 06/25/25   Page 269 of 406   PageID 4527
Deposition of Rebecca Diaz   Exhibit 124   Page 69 of 406   Highland Capital Management L.P.

```
 1    joint official liquidators were appointed?
 2         A.    I've met with them.
 3               Entity?
 4               ATTORNEY OKIN:  Ms. Diaz, maybe you
 5    need the question repeated.  You seem to be
 6    confused by the wrong part of it.
 7               THE WITNESS:  Okay.
 8               ATTORNEY MORRIS:  Thank you, Matt.
 9    That's fine.  That's fine.  I'll ask the question
10    again.
11    BY ATTORNEY MORRIS:
12         Q.    Can you identify the entity that's the
13    subject of the Cayman Islands liquidation
14    proceeding?
15         A.    Yes; the DAF Holdco.
16         Q.    Are you aware that all of the HMIT
17    entities are Delaware corporations?  Withdrawn.
18               Are you aware that all of the HMIT
19    entities were formed under the laws of the State
20    of Delaware?
21         A.    Sounds familiar.
22         Q.    And have you ever communicated with
23    the joint official liquidators?
24         A.    Yes.
25         Q.    When did you do that?
```

```
 1          A.     Two weeks ago.
 2          Q.     Did you make them aware of Highland's
 3   motion to have the settlement between the
 4   Highland entities and the HMIT entities approved?
 5          A.     I'd have to look at my calendar.
 6          Q.     Do you need your calendar to refresh
 7   your recollection as to whether or not you
 8   informed them of the Highland settlement motion?
 9          A.     I would want to make sure that the day
10   I met with them is clear in my mind as to this
11   versus when we've talked to them.
12          Q.     Fair enough.
13          A.     As you can imagine, there's been a lot
14   of detail around all of these cases.
15          Q.     Sure.  And I don't mean to be
16   disrespectful at all, ma'am.  I apologize if you
17   took it that way.
18                 Do you recall ever making the joint
19   official liquidators aware of the Dallas
20   Foundation's objection to the settlement motion?
21          A.     As I said, I don't know if we've made
22   them aware of the objection, except as it relates
23   to ancillary activity that we're concerned about
24   regarding Mark Patrick.
25                 So this was filed on June 9th, and I
```

```
 1    would want to make sure that I spoke with them

 2    before or after that; and I don't have that.

 3         Q.    Do you know if anybody provided a copy

 4    of the Dallas Foundation's objection to the joint

 5    official liquidators?

 6         A.    I don't know that.

 7         Q.    Did you ever consider doing that?

 8         A.    I will after today.

 9         Q.    Do you know if anybody asked the joint

10    official liquidators to make an appearance in

11    this case?

12         A.    I don't know that.

13         Q.    Did you ever ask the joint official

14    liquidators to appear in this case?

15         A.    We've already precluded that we don't

16    know whether I've actually talked to them about

17    this case, so that's moot; right?

18         Q.    Okay.  Do you believe that Mr. Patrick

19    was required to obtain the joint official

20    liquidators' authorization before entering into

21    the settlement agreement?

22         A.    I don't know that.

23              ATTORNEY OKIN:  Object to the form of

24    the question.

25    ///
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Deposition 3:25-cv-02724-L    Document 117-124   Filed 06/08/25   Page 272 of 406   Page ID 4530 L.P.
Exhibit 124   Page 68 of 102   Page 271 of 406

```
 1    BY ATTORNEY MORRIS:

 2         Q.    I'm sorry, ma'am.  What did you say?

 3         A.    I don't know that.

 4         Q.    Did you have any reason to believe

 5    that Mr. Patrick was required to obtain the joint

 6    official liquidators' consent before entering

 7    into this settlement agreement?

 8         A.    I don't know.

 9         Q.    Do you have any reason to believe that

10    the joint official liquidators have any authority

11    to reject the proposed settlement?

12              ATTORNEY OKIN:  Object to the form.

13         A.    I don't know.

14    BY ATTORNEY MORRIS:

15         Q.    A little bit further down, towards the

16    bottom of this paragraph, there's a reference, it

17    says that the Court-appointed fiduciary, quote,

18    may -- withdrawn.

19              It says:

20              "Indeed, many of Mr. Patrick's

21         actions, including the insertion of

22         newly created entities into the fund's

23         structure for the apparent purpose of

24         diverting charitable assets, will now be

25         subject to the scrutiny of an
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17-124 Filed 06/05/25   Page 273 of 406   PageID 4531
Deposition of Exhibit 124   Page 273 of 406   Highland Capital Management, L.P.

```
 1              independent, Court-appointed fiduciary

 2              and may be subject to clawback or other

 3              avoidance actions in the Cayman

 4              liquidation or such other tribunal as

 5              has jurisdiction."

 6                   Do you see that?

 7         A.    No.  You need to scroll down on the --

 8         Q.    It's just at the end of paragraph 32

 9    here.  It's the last sentence of 32.

10         A.    And so what's your question?

11         Q.    I just want to make sure that you and

12    I are on the same page, because I'm going to ask

13    some questions about this sentence.

14         A.    Yeah.

15         Q.    You're not an expert in Cayman Islands

16    law; fair?

17         A.    Fair.

18         Q.    You're not a lawyer, are you?

19         A.    Nope.

20         Q.    You're not an expert on clawback or

21    other avoidance actions, as that phrase is used

22    in the Dallas Foundation's objection in

23    paragraph 32; fair?

24         A.    Fair.

25         Q.    Do you have any understanding as to
```

```
 1    what facts must be established to succeed in a

 2    clawback or other avoidance action?

 3        A.    Repeat the question.

 4        Q.    Do you have any understanding as to

 5    what facts somebody needs to prove in order to

 6    succeed on a clawback or other avoidance action?

 7        A.    Not in a corporate setting.

 8        Q.    Is there any other type of setting

 9    that would pertain to the Dallas Foundation's

10    claims against Mr. Patrick?

11        A.    No.

12        Q.    Okay.  Do you have a view as to the

13    likelihood that the Dallas Foundation might

14    succeed in clawing back or asserting another

15    avoidance action to set aside the settlement

16    agreement if it's approved by the bankruptcy

17    court?

18            ATTORNEY OKIN:  Object to form.

19        A.    I don't know.

20    BY ATTORNEY MORRIS:

21        Q.    And you don't have a view; is that

22    fair?

23        A.    No, I just really don't know --

24        Q.    If we could --

25        A.    -- whether we will.
```

```
 1          Q.    Okay.  You would have to speculate; is

 2     that fair?

 3          A.    Yes.

 4                ATTORNEY MORRIS:  Can we scroll down

 5     to paragraph 33, please.

 6                ATTORNEY OKIN:  John, how much longer

 7     do you anticipate going?  We talked about these

 8     being an hour and a half.

 9                ATTORNEY MORRIS:  Correct.  And we

10     started at exactly 2:37 New York time.  I expect

11     to finish at 4:07 New York time.

12                ATTORNEY OKIN:  Are we doing

13     additional questions from anybody else?

14                ATTORNEY MORRIS:  Mr. Phillips, do you

15     have any questions?

16                You're on mute, sir.

17                We'll be done in the 90 minutes.

18                ATTORNEY PHILLIPS:  Not at this time.

19                ATTORNEY MORRIS:  Okay.  Thank you.

20     BY ATTORNEY MORRIS:

21          Q.    So in paragraph 33, it says at the

22     end, quote:  "Even if approved by this Court,

23     consummation of the settlement is not likely to

24     buy the peace the debtor now seeks."

25                Do you see that?
```

1       A.      Yes.

2       Q.      Are you aware of anything in the

3   Dallas Foundation's objection that suggests the

4   Highland parties have done anything wrong here?

5       A.      Repeat that question.

6       Q.      Is there anything in the Dallas

7   Foundation objection that you read and authorized

8   to be filed that suggests that any of the

9   Highland parties have done anything wrong?

10          ATTORNEY PHILLIPS:  I'm going to

11  object to that question because you said that she

12  read and authorized it to be filed.

13          ATTORNEY MORRIS:  I apologize.  I

14  apologize.  Thank you.

15  BY ATTORNEY MORRIS:

16      Q.      Let me start again, Ms. Diaz.

17          Do you recall whether there's anything

18  in the Dallas Foundation objection that asserts

19  that any of the Highland parties have done

20  anything wrong in connection with the entry into

21  the settlement agreement?

22      A.      I don't recall.

23      Q.      Are you aware of any facts that cause

24  you to believe that any of the Highland entities

25  did anything wrong in negotiating and entering

```
 1    into the settlement agreement?
 2         A.    I don't know.
 3         Q.    If you're not aware of any facts
 4    suggesting that Highland has engaged in
 5    wrongdoing, do you know why the Dallas Foundation
 6    has informed the Court that consummation of the
 7    settlement is not likely to buy the peace the
 8    debtor now seeks?
 9              ATTORNEY OKIN:  Object to form.
10         A.    I'll abstain from answering that.
11    BY ATTORNEY MORRIS:
12         Q.    That's not a thing, respectfully.
13              ATTORNEY MORRIS:  If -- Matt, if you
14    want to just help your witness out.
15              ATTORNEY OKIN:  You want me to give
16    her the answer?
17    BY ATTORNEY MORRIS:
18         Q.    Well, there's no abstention, so you
19    have to answer the question, ma'am.
20              ATTORNEY OKIN:  As best you can answer
21    it, Ms. Diaz, answer it.  If you can't answer it,
22    tell him you can't answer it.
23         A.    And I'll just say, when you say
24    "Highland," you want to be more specific?
25    ///
```

```
 1    BY ATTORNEY MORRIS:

 2        Q.    Sure.  Highland Capital Management,

 3    LP, the Highland Claimant Trust or the Highland

 4    Litigation Subtrust.

 5        A.    And so repeat the question.

 6        Q.    Okay.  If you don't have any facts

 7    suggesting that they've done anything wrong, why

 8    did the Dallas Foundation inform the Court, at

 9    the end of paragraph 33, that consummation of the

10    settlement is not likely to buy the peace the

11    debtor now seeks?

12            ATTORNEY OKIN:  Object to form.

13    BY ATTORNEY MORRIS:

14        Q.    You can answer.

15            ATTORNEY OKIN:  If you can answer it.

16        A.    Again, I'll just repeat that the peace

17    that the debtor seeks will be tainted because of

18    the harm that will come to the Dallas Foundation.

19    BY ATTORNEY MORRIS:

20        Q.    Anything else?

21        A.    No.

22        Q.    Is the Dallas Foundation considering

23    bringing any claims against Highland, the

24    Highland Claimant Trust or any of its

25    fiduciaries?
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17-124   Filed 07/03/25   Page 279 of 406   PageID 4537
Deposition of ... Exhibit 124 ... Page 73 of 102 ... High Capital Ventures L.P.

```
 1            A.    (No audible response.)

 2            Q.    I'm sorry, ma'am.  Did you answer?

 3            A.    I did.  I said, "No."

 4            Q.    Thank you.

 5                  In paragraph 34 --

 6                  ATTORNEY MORRIS:  Yeah, right there.

 7    Thank you Nathan --

 8    BY ATTORNEY MORRIS:

 9            Q.    -- it says, quote:  "There is ample

10    evidence that Mr. Patrick has acted and is acting

11    well outside the scope of his authority and

12    fiduciary obligations."

13                  Have I read that correctly?

14            A.    Yes.

15            Q.    Focusing solely on the settlement

16    agreement, do you have any reason to believe that

17    Mr. Patrick is acting outside of the scope of his

18    authority in entering into the settlement

19    agreement on behalf of each of the HMIT entities?

20                  ATTORNEY OKIN:  Object to form.

21            A.    And I don't know.

22    BY ATTORNEY MORRIS:

23            Q.    Okay.  Focusing solely on the

24    settlement agreement, do you have any reason to

25    believe that Mr. Patrick is breaching his
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02724-L    Document 17-1    Filed 06/06/25    Page 280 of 406    PageID 4538
Deposition of Exhibit 124 Page 75 of High Capital Management, L.P.

```
 1    fiduciary obligations by entering into the

 2    settlement agreement on behalf of each of the

 3    HMIT entities?

 4         A.    I don't know.

 5              ATTORNEY MORRIS:  Can we scroll up to

 6    paragraph 16, please.

 7              Do you see paragraph 16 concerns

 8    material nonpublic inside information?

 9         A.    Yes.

10         Q.    And was Mr. Dondero the source of the

11    information in this particular paragraph?

12         A.    No.

13         Q.    Who was?

14         A.    My attorneys.

15         Q.    That's how you learned about it; is

16    that fair?

17         A.    Yes.

18         Q.    Do you see there's a reference to a

19    put option in the last line of this paragraph?

20         A.    Yes.

21         Q.    Are you generally familiar with that

22    put option?

23         A.    Yes.

24         Q.    And do you know who the counterparty

25    is for that put option?
```

```
 1          A.    No, I don't.

 2          Q.    You don't know?

 3          A.    No.

 4          Q.    Did you ever ask?

 5          A.    I'm sure when we --

 6                ATTORNEY OKIN:  Louis, you're not on

 7     mute, by the way.

 8     BY ATTORNEY MORRIS:

 9          Q.    Go ahead, Ms. Diaz.  I'm sorry.

10          A.    I'm sure when we received the

11     contribution, we asked.  And you can ask our CFO

12     that question.

13                My understanding from the original

14     call in Labor Day weekend to our attorney was

15     that we should call the put.  That was a 10-year,

16     I believe, and this would have been at year 7;

17     and we didn't understand why he would be calling

18     to ask that.  And ...

19          Q.    Has the Dallas Foundation exercised

20     the put as of today?

21          A.    Absolutely not.

22          Q.    Why not?

23          A.    We stopped all activity because this,

24     again, was the beginning of, why is somebody

25     doing that, not giving us the information, not
```

 1   talking to us directly; and that -- and at advice

 2   of counsel, we -- we have been very careful with

 3   any of our activities to date.

 4        Q.    And do you know what material

 5   nonpublic inside information Mr. Patrick

 6   supposedly misused?

 7        A.    I'll just tell you the quote he gave

 8   us, which was Jim Dondero's spiraling out of

 9   control and you need to do this because nothing

10   appears to be what it is.

11        Q.    He didn't tell you who -- withdrawn.

12              Is that your basis for alleging that

13   he had material nonpublic inside information --

14        A.    I'll -- well, I guess, I can't

15   abstain.  I don't know.

16        Q.    Do you have any other --

17        A.    If my --

18        Q.    I'm sorry.

19        A.    Well, if my attorney says, "Don't do

20   that," we don't do it.

21        Q.    I appreciate that.  I don't quarrel

22   with you.  I'm just trying to learn facts here.

23              Can you identify any information that

24   you believe Mr. Patrick had that constitutes

25   material nonpublic inside information, as that

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17-124   Filed 07/02/25   Page 283 of 406   PageID 4541
Deposition of 3:25-cv-02724-L      Document Exhibit 124   Filed 07/02/25   Page 283 of 406 Capital Mgmt., L.P.

```
 1    phrase is used in the Dallas Foundation's

 2    objections?

 3         A.    Right.

 4              ATTORNEY OKIN:  Hold on, John.  I

 5    assume you're not -- I assume we're talking about

 6    information that's no longer nonpublic?

 7              ATTORNEY MORRIS:  If -- if you all

 8    want to mark this -- I don't know what it is,

 9    Matt, so I can't say.  And it's not my

10    information either.  So I'm happy to mark it

11    confidential if you really prefer.

12              ATTORNEY OKIN:  I -- I don't even know

13    if she knows the answer to the question.

14         A.    I don't know the answer to that.  But

15    I will tell you that we quickly got a call from

16    Skyview saying that Mark Patrick was no longer

17    employed there and that that was confidential,

18    yeah, insider information.

19    BY ATTORNEY MORRIS:

20         Q.    Oh, so somebody at Skyview told you

21    that; is that fair?

22         A.    That's fair.

23         Q.    And who was that at Skyview?

24         A.    Well, it was an attorney for Skyview.

25         Q.    Was it D.C. Sauder?
```

```
 1            A.    No.  A woman.

 2            Q.    Okay.  So a female attorney at Skyview

 3    told you that Mark Patrick had been terminated

 4    and that he had material nonpublic inside

 5    information.

 6                  Do I have that right?

 7            A.    That they were investigating him and

 8    understood that we had called the -- he had

 9    called -- told us to call the put option.

10            Q.    Okay.  But as you sit here today,

11    you're not able to tell me what material

12    nonpublic inside information Mr. Patrick

13    supposedly had; fair?

14            A.    Fair.

15                  ATTORNEY MORRIS:  Ma'am, thank you so

16    much.  I appreciate your time.

17                  Matt, thank you for a professional

18    deposition.

19                  We'll see you all, I guess, in a

20    little bit for the next deposition.

21                  Thanks, folks.

22                  THE COURT REPORTER:  Do you want a

23    copy of the transcript?

24                  ATTORNEY OKIN:  Yes, rushed, please.

25    Whenever John gets it.
```

```
 1                  ATTORNEY PHILLIPS:  Yes, expedited,

 2      like everybody else.

 3                  THE COURT REPORTER:  Mr. Lang, do you

 4      want a copy of the transcript?

 5                  ATTORNEY LANG:  Yes, please.

 6                  (Whereupon, at 3:08 p.m. Central

 7                  Time, the proceedings concluded.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              INSTRUCTIONS TO DEPONENT

 2              After reading this volume of your

 3     deposition, indicate any corrections or changes

 4     to your testimony and the reasons therefor on the

 5     Errata Sheet supplied to you and sign it.  DO NOT

 6     make marks or notations on the transcript volume

 7     itself.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E R R A T A

 2

 3          I wish to make the following changes,

 4      for the following reasons:

 5    Page  Line

 6    _____  _____   CHANGE: _____

 7    REASON: _____

 8    _____  _____   CHANGE: _____

 9    REASON: _____

10    _____  _____   CHANGE: _____

11    REASON: _____

12    _____  _____   CHANGE: _____

13    REASON: _____

14    _____  _____   CHANGE: _____

15    REASON: _____

16    _____  _____   CHANGE: _____

17    REASON: _____

18    _____  _____   CHANGE: _____

19    REASON: _____

20    _____  _____   CHANGE: _____

21    REASON: _____

22    _____  _____   CHANGE: _____

23    REASON: _____

24

25
```

```
 1

 2

 3                   C E R T I F I C A T I O N

 4

 5

 6              I hereby certify that I have read the

 7    foregoing transcript of my deposition testimony,

 8    and that my answers to the questions propounded,

 9    with the attached corrections or changes, if any,

10    are true and correct.

11

12    ------------------------------------
      JULIE DIAZ
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of ... Case 3:25-cv-02724-L    Document 17-124 Filed 03/25/102 Page 289 of 406 Capital Mgmt. L.P.

1

2                CERTIFICATE OF SHORTHAND REPORTER

3

4

5                I, Gail Inghram, Registered Diplomate

6     Reporter, Certified Realtime Reporter, Realtime

7     Systems Administrator, CA-Certified Shorthand

8     Reporter No. 8635, and Notary Public, the officer

9     before whom the foregoing proceedings were taken,

10    do hereby certify that the foregoing transcript

11    is a true and correct record of the proceedings;

12    that said proceedings were taken by me

13    stenographically and thereafter reduced to

14    typewriting under my supervision; and that I am

15    neither counsel for, related to, nor employed by

16    any of the parties to this case and have no

17    interest, financial or otherwise, in its outcome.

18    _____

19    *[signature: Gail Inghram]*

20

21    Gail Inghram,
      BA, RDR, CRR, RSA, CA-CSR No. 8635

22

23

24

25

## WORD INDEX

**< $ >**
**$25**  43:*2*  56:*20*
**$300**  42:*24*

**< 1 >**
**1**  6:*14*  63:*8, 9*
**1:37**  1:*16*  2:*11*
**10**  12:*20*
**10010**  3:*24*
**10017-2024**  3:*16*
**10-year**  76:*15*
**11**  1:*8*
**1113**  4:*10*
**15**  6:*18*
**16**  75:6, *7*
**1600**  5:*9*
**1700**  4:*18*
**19-34054-sgj11**  1:*5*
**1st**  10:*1*

**< 2 >**
**2:37**  70:*10*
**2011**  21:*9*
**2019**  10:*9*
**2024**  10:*1*
**2025**  1:*15*  2:*10*
**212.849.7615**  3:*25*
**214.817.4500**  4:*20*
**22**  1:*15*  2:*10*
**225.381.9643**  5:*11*
**22nd**  3:*23*
**2390**  4:*18*
**240**  4:*10*

**< 3 >**
**3:08**  80:*6*
**300-plus**  56:*19*
**301**  5:*9*
**30th**  29:*14*
**310.277.6910**  3:*17*
**32**  63:6, *14*  68:8, 9, *23*
**33**  70:5, *21*  73:*9*
**34**  74:*5*
**34th**  3:*15*

**< 4 >**

**4:07**  70:*11*
**40**  27:*24*  29:*6*

**< 5 >**
**51**  3:*23*

**< 6 >**
**63**  6:*14*

**< 7 >**
**7**  76:*16*
**70801**  5:*10*
**713.228.4100**  4:*12*
**75201**  4:*19*
**77002**  4:*11*
**780**  3:*15*

**< 8 >**
**8**  6:*6*
**8635**  1:*22*  84:8, *21*

**< 9 >**
**90**  70:*17*
**9th**  65:*25*

**< A >**
**able**  48:*23*  79:*11*
**Absolutely**  76:*21*
**abstain**  18:7  72:*10*  77:*15*
**abstention**  72:*18*
**accepting**  44:*12*
**access**  28:*2*
**accommodate**  9:*15*
**accounting**  24:*15*
**accounts**  25:*18, 25*  26:*2, 5, 8*  27:*18, 21*  29:*24*  30:*3, 6, 10, 13, 18, 23*  44:*16, 24*  45:*6*  61:*17, 21*  62:*2*
**acted**  74:*10*
**acting**  17:*24*  18:*5, 23*  31:6  74:*10, 17*
**action**  69:*2, 6, 15*
**actions**  31:*12*  67:*21*  68:*3, 21*
**activities**  22:*23*  27:*25*  77:*3*

**activity**  14:*1*  24:*12, 25*  25:*1*  27:*23*  65:*23*  76:*23*
**ADAMS**  4:*9*
**additional**  20:*24*  70:*13*
**Administrator**  84:*7*
**advice**  19:*18*  77:*1*
**aegis**  58:*3*
**affidavit**  22:*13*
**affiliated**  9:*21*  11:*21*  45:*19*
**affiliates**  10:*14, 15*  11:*25*  53:*6*
**affirmed**  8:*6*
**afternoon**  8:*12*
**agendas**  16:*7*
**ago**  50:*17*  65:*1*
**agree**  33:*21*
**agreed**  23:*18*
**agreement**  10:*18, 23*  11:6, *9, 22*  14:*3, 6, 7*  36:*15, 18, 20, 22, 25*  37:*9, 12, 14, 16*  38:*5, 20*  39:*1, 10, 22*  40:*10, 19, 25*  42:7  44:*6*  46:*2, 17, 21*  51:*1, 11, 15, 18*  53:*4, 9, 19, 22*  54:*7, 10, 25*  57:*5, 15, 24*  58:*8*  59:*20, 25*  60:*5, 18*  62:*3*  66:*21*  67:7  69:*16*  71:*21*  72:*1*  74:*16, 19, 24*  75:*2*
**ahead**  56:*11*  76:*9*
**ahurt@kellyhart.com**  5:*7*
**alleging**  77:*12*
**allocated**  29:*3*
**allow**  9:*2, 7*
**AMELIA**  5:*6*
**amount**  23:*18*
**ample**  74:*9*
**ancillary**  65:*23*
**annuities**  26:*10, 21, 25*  27:*4, 6, 14*  29:*7*
**annuity**  26:*13, 17*  28:*18, 21*
**ANSWER**  7:3  9:*4, 8*  18:*9*  19:*17, 19*  32:*25*

**33:9**  35:*21*  39:*11, 16*  42:8  43:*11*  46:*9, 12*  48:*24*  52:*2*  55:*6*  56:*11*  72:*16, 19, 20, 21, 22*  73:*14, 15*  74:*2*  78:*13, 14*
**answering**  18:*7*  72:*10*
**answers**  48:*21*  83:*8*
**anticipate**  70:*7*
**anybody**  18:*4, 22*  25:*9*  30:*1, 20*  39:*7, 19, 24, 25*  40:*13*  46:*7, 14*  60:*11*  66:*3, 9*  70:*13*
**apologize**  20:*15*  33:*2*  59:*4*  65:*16*  71:*13, 14*
**apparent**  67:*23*
**appear**  63:*16*  66:*14*
**appearance**  44:*17*  66:*10*
**appeared**  3:*2*  32:*1*  33:*5*  44:*14*
**appears**  77:*10*
**appointed**  63:*22*  64:*1*
**appreciate**  18:*10*  25:*3*  39:*18*  49:*4*  77:*21*  79:*16*
**appreciated**  57:*25*
**approval**  30:*21*
**approve**  29:*12*  61:*9, 13, 21*
**approved**  36:*16*  37:*22*  38:*5, 20*  41:*24*  42:7  43:*18*  65:*4*  69:*16*  70:*22*
**Approving**  6:*17*
**approximately**  2:*11*
**April**  10:*1*
**arising**  54:*10*
**arm's-length**  51:*3, 19*
**articulate**  56:*2*
**aside**  69:*15*
**asked**  25:*4*  32:*22*  39:7  46:*6, 14*  59:*4*  66:*9*  76:*11*
**asking**  25:*3*  29:*16*  40:*12*  48:*18*  49:*11*
**asserting**  69:*14*

assertion 53:*3*
asserts 71:*18*
asset 22:*11* 48:*5*
assets 18:*16* 24:*25*
26:*9* 36:*17, 19* 37:*5,
8, 21* 38:*4, 9, 11, 19,
25* 39:*9, 21* 40:*8, 15,
24* 41:*3, 8, 18* 42:*6,
24* 44:*3, 5, 7* 45:*25*
46:*16* 47:*13, 23* 48:*3*
53:*15, 16* 56:*14, 16*
57:*1* 58:*3* 67:*24*
assume 78:*5*
assumed 58:*16*
assuming 36:*19* 48:*2*
54:*11*
Atlas 41:*4, 9, 12, 16*
42:*1* 47:*7* 48:*6*
49:*13*
attached 63:*11* 83:*9*
Attorney 6:*6* 8:*11,
16* 19:*16, 22* 31:*5, 14,
17, 18, 20, 24* 35:*19,
20* 36:*3, 5, 11, 13*
37:*24* 38:*1, 7, 14*
39:*2, 4, 11, 15* 41:*1, 6*
42:*16, 18* 43:*23* 44:*1*
46:*3, 5, 8, 10, 11*
48:*10* 49:*3, 5, 24*
50:*1, 13, 15* 51:*25*
52:*1, 8, 9* 54:*16, 18*
55:*1, 5, 14, 16, 21, 23*
56:*5, 7, 9* 57:*2, 7, 11,
17, 20* 58:*9, 12* 59:*10,
13* 60:*7, 10, 19, 22*
62:*4, 7, 11* 63:*5, 12*
64:*4, 8, 11* 66:*23*
67:*1, 12, 14* 69:*18, 20*
70:*4, 6, 9, 12, 14, 18,
19, 20* 71:*10, 13, 15*
72:*9, 11, 13, 15, 17, 20*
73:*1, 12, 13, 15, 19*
74:*6, 8, 20, 22* 75:*5*
76:*6, 8, 14* 77:*19*
78:*4, 7, 12, 19, 24*
79:*2, 15, 24* 80:*1, 5*
attorneys 75:*14*
audible 74:*1*

authority 57:*4, 9, 14*
58:*15* 67:*10* 74:*11,
18*
authorization 31:*2*
66:*20*
authorized 19:*3*
37:*15* 52:*21, 25*
53:*25* 54:*19* 63:*17*
71:*7, 12*
authorizing 12:*6*
available 26:*17*
Avenue 3:*15, 23* 4:*18*
avoidance 68:*3, 21*
69:*2, 6, 15*
aware 8:*20* 10:*7, 11,
17* 11:*3, 4, 8, 11, 12,
20* 12:*9, 23* 22:*12*
23:*7* 24:*3, 6* 25:*16*
30:*12* 34:*12, 16*
36:*14* 47:*13, 23* 48:*5*
49:*16* 50:*16, 25* 51:*4,
8* 53:*18* 54:*6* 55:*11,
17* 63:*21* 64:*16, 18*
65:*2, 19, 22* 71:*2, 23*
72:*3*

< B >
BA 1:*22* 84:*21*
back 10:*8* 47:*22*
69:*14*
backdrop 56:*17*
bad 62:*18*
BANKRUPTCY 1:*1*
10:*8, 12* 32:*2, 6* 33:*6,
15* 34:*13* 38:*6* 44:*14,
18, 22* 45:*1* 50:*17*
69:*16*
Barbara 20:*11, 22*
21:*3, 7, 12, 16* 22:*8*
BARTLETT 4:*9*
based 53:*2* 56:*12*
basically 13:*14*
basis 13:*25* 43:*7*
53:*17* 55:*24* 56:*3*
77:*12*
Baton 5:*10*
beginning 2:*11* 76:*24*
behalf 3:*4, 19* 4:*3,
14* 5:*3* 11:*9, 13*
12:*10* 17:*25* 18:*5, 23*

23:*3, 14* 24:*8, 9, 23*
25:*6, 17* 27:*17, 21*
29:*23* 30:*2, 6, 7, 22*
31:*22* 46:*20* 54:*1, 20*
57:*5, 15* 58:*22* 59:*8*
74:*19* 75:*2*
behavior 42:*25*
believe 13:*23* 18:*4*
20:*1* 32:*3, 15, 20*
35:*15, 25* 36:*7* 37:*19*
38:*2* 40:*22* 41:*8, 22*
50:*10* 51:*22* 54:*2*
57:*3* 58:*20* 59:*5, 14,
21* 62:*25* 66:*18* 67:*4,
9* 71:*24* 74:*16, 25*
76:*16* 77:*24*
believed 18:*23*
best 14:*22* 21:*18, 22*
22:*3* 27:*5* 32:*4, 9*
33:*4* 35:*3, 7, 10*
72:*20*
bit 62:*20* 67:*15*
79:*20*
block 31:*21*
bottom 67:*16*
Bradshaw 22:*8*
breaching 74:*25*
break 9:*14, 16*
bring 50:*18*
bringing 73:*23*
business 23:*21* 49:*18*
58:*1*
buy 70:*24* 72:*7*
73:*10*

< C >
CA-Certified 84:*7*
CA-CSR 1:*22* 84:*21*
calendar 65:*5, 6*
call 63:*7* 76:*14, 15*
78:*15* 79:*9*
called 10:*5* 12:*10*
20:*7, 19* 34:*13, 17*
35:*6, 12* 79:*8, 9*
calling 76:*17*
CAPITAL 1:*6* 3:*4*
8:*16* 10:*5, 7* 21:*9*
34:*24* 35:*2, 16, 25*
36:*7* 50:*19* 51:*24*

52:*18* 53:*5* 55:*19*
73:*2*
careful 77:*2*
carefully 18:*20*
Carrera 22:*7*
Case 1:*5* 32:*2, 6*
33:*6, 15* 42:*22* 66:*11,
14, 17* 84:*16*
cases 65:*14*
cash 27:*3, 6* 36:*17*
44:*10*
cause 71:*23*
caused 29:*22*
caution 19:*17*
Cayman 20:*4* 21:*21*
22:*13* 23:*1* 42:*23*
56:*18* 63:*22* 64:*13*
68:*3, 15*
ceased 23:*22* 24:*12*
Central 1:*16* 2:*11*
80:*6*
CEO 9:*23, 25* 10:*2*
22:*6, 7, 8* 31:*3*
CEOs 22:*4*
certain 8:*19* 10:*14*
25:*18* 38:*19* 50:*18*
62:*24*
Certainly 47:*6*
CERTIFICATE 84:*2*
Certified 2:*14, 15*
84:*6*
certify 83:*6* 84:*10*
cetera 43:*17*
CFO 15:*22* 76:*11*
chance 63:*2*
change 42:*10* 82:*6, 8,
10, 12, 14, 16, 18, 20,
22*
changes 24:*16* 50:*11*
53:*14* 81:*3* 82:*3*
83:*9*
changing 47:*10*
Chapter 1:*8*
charitable 13:*23*
14:*1* 24:*25* 26:*12*
38:*8* 42:*24* 57:*1*
67:*24*
chart 48:*13*
chief 31:*3*

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17124   Filed 08/05/02   Page 292 of 406   PageID 4550
Deposition of David A. Curry   Exhibit 7   Filed 02/88/85102   Page 292 of 406   Capital Markets, L.P.

**City** 20:*11, 20* 21:*3, 5, 6, 11, 16* 22:7
**claim** 32:*5, 18* 33:*14* 44:*21, 25* 53:*4, 7* 55:*12, 18*
**Claimant** 3:*5* 32:*12, 16, 21* 33:*20, 24* 34:*14, 17, 20* 35:*7, 13* 45:*4, 7, 14* 52:*5* 55:*20* 73:*3, 24*
**claimed** 53:*12*
**claims** 50:*18* 69:*10* 73:*23*
**clarify** 10:*20*
**CLARITY** 7:*22*
**clawback** 68:*2, 20* 69:*2, 6*
**clawing** 69:*14*
**clear** 33:*3* 34:*5* 65:*10*
**clearly** 31:*21*
**clients** 31:*8* 62:*17*
**cold** 48:*15*
**come** 73:*18*
**commenced** 21:*21* 22:*15*
**commitment** 23:*23*
**common** 23:*21*
**communicate** 24:*12*
**communicated** 58:*16, 17, 21* 64:*22*
**communication** 24:*14* 28:*3*
**community** 14:*19* 20:*13* 21:*2, 4* 22:*9, 14*
**company** 10:*4*
**complete** 37:*4*
**compliance** 38:*10*
**concern** 42:*5* 54:*14, 23*
**concerned** 27:*24* 42:*20, 22* 65:*23*
**concerning** 51:*14*
**concerns** 75:*7*
**concluded** 80:*7*
**confer** 25:*10*
**confidential** 78:*11, 17*
**confused** 64:*6*
**confusing** 16:*4*

**connection** 8:*18* 23:*25* 52:*13* 71:*20*
**consent** 16:*7* 30:*21* 57:*23* 59:*7* 62:*2* 67:*6*
**consider** 66:*7*
**considering** 73:*22*
**constitutes** 77:*24*
**consult** 9:*17*
**consummation** 70:*23* 72:*6* 73:*9*
**Cont'd** 4:*1* 5:*1*
**contend** 52:*17* 53:*21*
**contends** 50:*25* 53:*18*
**context** 18:*11*
**continue** 49:*3*
**contractual** 13:*21* 34:*23* 35:*2, 6, 11* 45:*10, 13*
**contractually** 58:*14*
**contribution** 43:*14* 76:*11*
**contributions** 13:*24* 14:*9* 21:*8*
**control** 56:*15* 60:*24* 61:*6, 17* 77:*9*
**controlled** 47:*17* 49:*12*
**controls** 47:*20*
**conversations** 39:*13*
**convey** 46:*16*
**conveying** 19:*18*
**copy** 25:*13* 66:*3* 79:*23* 80:*4*
**corporate** 50:*2* 69:*7*
**corporations** 64:*17*
**correct** 15:*1* 16:*2* 32:*7* 33:*8, 16, 20* 47:*24* 52:*19* 70:*9* 83:*10* 84:*11*
**corrections** 81:*3* 83:*9*
**correctly** 74:*13*
**counsel** 19:*19* 29:*13* 39:*13* 77:*2* 84:*15*
**counterpart** 18:*13*
**counterparty** 75:*24*
**couple** 50:*16*
**COURT** 1:*1* 10:*12* 37:*9, 23* 38:*6* 43:*18* 50:*17* 63:*23* 69:*17*

70:*22* 72:*6* 73:*8* 79:*22* 80:*3*
**Court-appointed** 67:*17* 68:*1*
**COVID** 62:*14*
**CRAWFORD** 4:*17*
**created** 67:*22*
**Crown** 4:*3* 6:*15* 25:*18, 21, 22* 26:*9* 27:*18, 25* 28:*5, 9, 15* 30:*13, 16, 21* 31:*1, 9, 12, 23* 34:*2, 7* 37:*6, 8* 41:*25* 43:*1* 44:*13, 20* 45:*3, 9, 12, 20, 24* 46:*15* 49:*9, 10, 20* 57:*23* 58:*7* 59:*7, 15, 22* 60:*15* 61:*5, 12, 16, 20*
**CRR** 1:*22* 84:*21*
**cumbersome** 62:*21*
**CURRY** 4:*7, 9*

**< D >**
**D.C** 78:*25*
**DAF** 20:*8* 64:*15*
**DALLAS** 1:*3* 4:*3, 19* 6:*14* 8:*18* 9:*21, 25* 10:*11, 18, 23* 12:*3, 11, 15, 16, 18, 21* 13:*5, 7, 8, 10, 13, 15, 18, 20, 22* 14:*4, 8, 9, 13, 23* 15:*2, 6, 8, 9, 19* 16:*3, 4* 17:*5, 21, 25* 18:*1, 6, 24* 20:*12, 23, 25* 21:*2, 5, 6, 11, 16* 22:*20* 23:*14, 24* 24:*4, 7, 8, 21, 22* 25:*4, 5, 8, 16, 25* 27:*1, 7, 11, 12, 16, 20* 28:*4, 8, 21, 23* 29:*23* 30:*1, 7, 20* 31:*7, 9, 15, 22, 25* 32:*5, 15, 20* 33:*5, 14, 19, 23* 34:*19, 22* 35:*1, 5, 11, 18* 36:*2, 9* 37:*10, 20* 38:*3, 24* 39:*8, 20* 40:*8, 17, 22* 41:*22* 42:*4, 11, 12, 13* 43:*20, 21* 45:*21* 48:*25* 49:*6, 15, 18, 23* 50:*4, 12* 52:*16* 53:*3,*

18, 21* 54:*1, 13, 20, 22* 55:*12, 18, 25* 56:*4* 57:*22* 58:*6, 21* 59:*6, 15, 17* 60:*2, 23* 61:*8* 62:*9, 22* 65:*19* 66:*4* 68:*22* 69:*9, 13* 71:*3, 6, 18* 72:*5* 73:*8, 18, 22* 76:*19* 78:*1*
**D'AMBRA** 5:*14*
**date** 56:*15* 77:*3*
**DAVID** 4:*7*
**day** 43:*12* 65:*9* 76:*14*
**dcurry@okinadams.com** 4:*8*
**de** 22:*11*
**dealings** 49:*18*
**Debbie** 22:*6*
**Debtor** 1:*8* 70:*24* 72:*8* 73:*11, 17*
**decided** 43:*19*
**decision** 17:*6* 25:*11*
**decisions** 56:*24*
**declaration** 22:*13, 20* 23:*1*
**decline** 29:*17, 19, 22*
**Defendant** 4:*3, 14*
**definitively** 40:*5*
**Delaware** 64:*17, 20*
**DEMO** 3:*8*
**DEPONENT** 81:*1*
**deposed** 8:*22*
**DEPOSITION** 1:*13* 2:*9* 7:*1* 8:*17* 11:*18* 12:*1* 45:*17* 79:*18, 20* 81:*3* 83:*7*
**depositions** 62:*16*
**described** 37:*21* 42:*10* 43:*9* 50:*4*
**detail** 65:*14*
**DIAZ** 1:*14* 2:*9* 6:*5* 8:*5, 12* 19:*17* 31:*10, 25* 36:*22* 39:*12* 46:*9, 12* 48:*16* 58:*13* 62:*12* 64:*4* 71:*16* 72:*21* 76:*9* 83:*12*
**different** 43:*16* 48:*21*
**diminished** 38:*11*
**Diplomate** 2:*14* 84:*5*

**DIRECT** 7:23 32:20 59:18, 23

**directed** 21:25 22:2

**direction** 2:16

**directly** 28:22 49:16 77:1

**disburse** 41:18 42:1

**disbursement** 28:17

**disclosed** 24:4

**disclosing** 39:13

**discussions** 20:1

**disrespectful** 65:16

**DISTRICT** 1:2

**diverting** 67:24

**DIVISION** 1:3

**document** 41:7 52:24 55:2 63:1

**DOCUMENTS** 7:7 16:16 40:21 62:19

**doing** 31:22 56:18 66:7 70:12 76:25

**dollars** 56:19

**donation** 13:2, 4

**donations** 13:22

**Dondero** 12:24 13:1, 3, 4 14:12 15:21 16:7, 25 17:4, 20, 24 18:4, 22 19:6 21:10, 25 22:12 25:10 40:7 75:10

**Dondero's** 23:1 77:8

**donor-advised** 13:13

**dramatic** 24:16

**Dugaboy** 4:14

**duly** 8:6

**duties** 35:17 36:1, 8 49:22

**duty** 50:12 58:5

**< E >**

**earlier** 27:22 50:3

**effectuated** 50:10

**effectuates** 13:14

**either** 38:11 59:6 78:10

**EMANUEL** 3:22

**employed** 78:17 84:15

**employee** 45:21

**Empower** 12:10, 15, 16, 21 13:5, 7, 20 14:4, 9, 13, 23 15:2, 9, 19 16:3, 4 24:8, 10, 21 25:4, 8 27:1, 7, 12 28:21

**engaged** 18:13 72:4

**ensure** 38:12

**enter** 22:10 57:4, 10, 14 61:23

**entered** 51:1 61:10, 13

**entering** 57:24 58:7 59:8 62:2 66:20 67:6 71:25 74:18 75:1

**entities** 11:21 12:1 17:7, 8 20:16 21:20, 25 22:2 36:15, 16 41:24 43:16 46:1, 19, 20, 25 47:3 48:13 49:8, 11, 12, 13, 14, 17, 22 50:11 51:2, 7 54:7, 8 57:6, 16 58:5 59:9, 19, 24 60:4, 17, 25 61:6, 10, 14, 18, 22 62:1 64:17, 19 65:4 67:22 71:24 74:19 75:3

**entitled** 14:8 38:24

**entity** 12:10, 13 13:11 15:17 17:1, 3 20:7 34:13, 17 35:6, 12 41:12, 16 47:24 49:10 55:13 63:25 64:3, 12

**Entry** 6:16 71:20

**erosion** 56:14

**Errata** 81:5

**ESQ** 3:6, 8, 10, 12, 20 4:5, 7, 15 5:4, 6

**essence** 24:11

**essentially** 27:23

**established** 69:1

**et** 43:17

**everybody** 80:2

**evidence** 74:10

**exactly** 70:10

**EXAMINATION** 6:4

8:10

**examined** 8:8

**excuse** 16:1 18:8

**executed** 10:22

**exercise** 15:11

**exercised** 76:19

**Exhibit** 63:9

**existence** 12:19

**expect** 70:10

**expectations** 42:12

**expected** 41:13

**expedited** 80:1

**expenses** 23:19, 24

**expensive** 62:17

**expert** 68:15, 20

**expressed** 54:23

**extent** 48:25

**< F >**

**fact** 56:13

**facts** 17:18, 21 51:13, 17 55:11, 17 57:12 69:1, 5 71:23 72:3 73:6 77:22

**fail** 9:8

**fair** 9:5, 19 19:7, 8 26:18 32:14, 17 33:11 34:18 37:17, 18 40:13 42:4 43:5 44:8 50:5, 23, 24 52:11, 13, 25 54:15 59:2, 3 65:12 68:16, 17, 23, 24 69:22 70:2 75:16 78:21, 22 79:13, 14

**fairly** 62:23

**fall** 24:13

**familiar** 10:4 12:13 14:25 15:25 19:2, 3 26:4 36:24 46:24 47:2, 4 52:24 64:21 75:21

**familiarity** 22:19 47:5

**Family** 15:24 16:22 24:10 27:2, 13 28:22

**fault** 34:4

**feeds** 34:1

**feel** 48:8

**female** 79:2

**fiduciaries** 24:24 73:25

**fiduciary** 28:13 38:9 67:17 68:1 74:12 75:1

**file** 24:7, 22 25:5 27:20 29:23 30:2

**filed** 10:8, 12 12:4, 10 22:12 24:9 25:14, 17 27:17 30:7 31:7, 15 32:2, 5 33:6, 14 42:3 44:17, 20, 25 50:16 52:25 65:25 71:8, 12

**filing** 12:7 19:9 22:10 30:22 52:14, 21 54:1, 20 58:18, 22

**finance** 29:3

**financial** 84:17

**find** 48:20 55:3

**fine** 55:4 64:9

**finish** 9:3, 7 70:11

**first** 8:6

**first-quarter** 29:13

**flag** 24:17

**Floor** 3:15, 23

**flow** 13:12 26:14 37:6, 8 41:4 53:13

**flowed** 47:7

**Flows** 26:15 29:2 56:16

**focus** 49:11

**focused** 34:5

**Focusing** 74:15, 23

**folks** 79:21

**following** 82:3, 4

**follows** 8:8

**foregoing** 83:7 84:9, 10

**form** 35:19 36:3, 11 37:24 38:7 39:2 41:1 42:16 43:23 46:3 49:24 50:13 51:25 52:8 54:16 55:1, 14, 21 56:5, 10 57:7, 17 58:9 59:10 60:7, 19 62:4 66:23 67:12 69:18 72:9 73:12 74:20

formal  22:*10*
**Formally**  10:*1*
**formation**  18:*12*
**formed**  12:*21*  34:*14,*
*18*  64:*19*
**forth**  17:*18, 21*
*42:12*  44:*5*
**forward**  38:*12*
**found**  29:*16*
**Foundation**  4:*3*  6:*15*
*9:22, 25*  10:*3, 12, 18,*
*23*  12:*11, 15, 16, 18,*
*22*  13:*5, 7, 8, 11, 14,*
*21, 22*  14:*4, 5, 8, 14,*
*23*  15:*2, 4, 6, 8, 9, 19,*
*24*  16:*4, 22*  18:*1, 6,*
*24*  20:*11, 12, 14, 21,*
*22, 23, 25*  21:*2, 3*
*22:9*  23:*14, 25*  24:*7,*
*8, 10, 21, 22*  25:*4, 5, 8,*
*17*  27:*1, 2, 8, 11, 12,*
*13, 16, 20*  28:*4, 8, 22,*
*23*  29:*23*  30:*1, 7, 20*
*31:7, 9, 16, 22*  32:*1, 5,*
*15, 20*  33:*5, 14, 19, 23*
*34:19, 22*  35:*1, 5, 11,*
*18*  36:*2, 10*  37:*10, 20*
*38:3, 24*  39:*8, 14, 20*
*40:8, 17, 23*  41:*22*
*42:14*  43:*20, 21*
*45:22*  49:*6, 15, 18, 23*
*50:12*  52:*16*  53:*3, 18,*
*21*  54:*2, 13, 21, 23*
*55:12, 18*  57:*23*  58:*6,*
*21*  59:*15, 17*  60:*2, 23*
*61:8*  69:*13*  71:*7, 18*
*72:5*  73:*8, 18, 22*
*76:19*
**foundations**  21:*2, 4,*
*12*  26:*18*  29:*4*
**Foundation's**  8:*18*
*12:3*  17:*5, 22*  22:*14,*
*20*  24:*5*  26:*1*  42:*5,*
*11, 12*  49:*1*  50:*4*
*55:25*  56:*4*  59:*7*
*62:9, 22*  65:*20*  66:*4*
*68:22*  69:*9*  71:*3*
*78:1*
**four**  21:*1*  51:*9*
**fully**  63:*2*

**fund**  13:*8, 13*  14:*6, 7*
*23:20, 23, 24*  26:*11*
*41:4, 9*  53:*14*
**funded**  26:*24*
**fundholder**  14:*17*
**fundholders**  14:*20*
*23:19*
**funding**  23:*2, 7, 10,*
*13, 17*
**funds**  14:*2*  16:*3*
*43:1*  53:*13*
**fund's**  67:*22*
**further**  67:*15*
**future**  53:*16*

< G >
**Gail**  1:*21*  2:*13*  84:*5,*
*21*
**gdemo@pszjlaw.com**
*3:9*
**generally**  11:*24*
*36:24*  50:*5*  75:*21*
**gentleman**  11:*8*
*50:19*
**give**  43:*19*  49:*14*
*55:12*  56:*24*  63:*2*
*72:15*
**given**  58:*15*
**giving**  76:*25*
**Global**  4:*3*  6:*15*
*25:18, 21, 22*  26:*9*
*27:18, 25*  28:*5, 9, 15*
*30:13, 16*  31:*1, 9, 23*
*34:2, 7*  37:*6, 8*  41:*25*
*43:1*  44:*13, 20*  45:*3,*
*9, 12, 20, 24*  46:*15*
*49:9, 10, 20*  58:*7*
*59:15, 22*  60:*15*  61:*5,*
*12, 16, 20*
**Global's**  30:*21*  31:*12*
*57:23*  59:*7*
**go**  23:*21*  28:*21, 25*
*41:9*  56:*11*  76:*9*
**going**  9:*1*  40:*9*
*45:16*  47:*22*  48:*16,*
*20, 21*  51:*8*  62:*7, 24*
*68:12*  70:*7*  71:*10*
**Good**  8:*12*  62:*13, 14*
**good-faith**  51:*3, 19*

**governance**  13:*25*
*15:3*  29:*1*
**GPs**  43:*17*
**grant**  13:*12, 14*
**grant-making**  12:*18*
*18:15*
**grants**  14:*18*
**GREGORY**  3:*8*
**ground**  8:*24*
**guess**  30:*11*  48:*3*
*77:14*  79:*19*

< H >
**half**  70:*8*
**HALL**  5:*18*
**HALLMAN**  5:*8*
**happening**  22:*24*
*42:25*  56:*25*
**happens**  42:*5, 20*
*56:22*
**happy**  9:*15*  78:*10*
**harm**  73:*18*
**HART**  5:*8*
**HAYLEY**  3:*12*
**head**  39:*6*  50:*8*
**hear**  8:*13*
**heard**  32:*11*
**held**  2:*9*  25:*18*
**he'll**  48:*23*
**help**  48:*14*  72:*14*
**hereto**  63:*11*
**Hernandez**  31:*4*
**high**  26:*6, 7*  37:*1, 2*
*38:18*
**HIGHLAND**  1:*6*  3:*4,*
*19*  6:*12, 14*  8:*16*
*10:5, 7, 14, 22*  17:*7*
*20:12*  21:*6, 9*  32:*1, 6,*
*11, 16, 21*  33:*6, 15, 20,*
*23*  34:*6, 10, 13, 17, 20,*
*23*  35:*2, 7, 12, 16, 25*
*36:7, 15*  41:*24*  43:*4,*
*8, 12*  44:*14, 17, 21, 25*
*45:1, 4, 7, 10, 13*
*46:16*  50:*19, 25*  51:*6,*
*23*  52:*5, 18*  53:*5*
*54:8*  55:*13, 19*  58:*18,*
*23*  63:*8, 9*  65:*4, 8*
*71:4, 9, 19, 24*  72:*4,*
*24*  73:*2, 3, 23, 24*

**Highland/HMIT**
*19:15, 24*
**Highland's**  65:*2*
**HMIT**  11:*17, 21, 25*
*17:7*  36:*16*  37:*21*
*38:4, 18, 25*  39:*9, 21*
*40:9, 24*  41:*8, 19, 24*
*42:6, 21*  45:*25*  46:*1,*
*16, 19*  48:*5*  49:*8, 10,*
*22*  50:*11, 16*  51:*2, 7*
*54:7*  57:*6, 15*  58:*4*
*59:9, 19, 23*  60:*4, 16,*
*24*  61:*6, 10, 14, 18, 22,*
*25*  64:*16, 18*  65:*4*
*74:19*  75:*3*
**HMIT/Highland**
*40:18*  41:*14*
**hold**  16:*12*  78:*4*
**Holdco**  20:*8*  64:*15*
**holds**  47:*24*
**hour**  70:*8*
**Houston**  4:*11*
**Hunter**  5:*3*  10:*15*
*11:4, 10, 14, 16*  34:*1,*
*9*  37:*5*  41:*3*  47:*11,*
*14, 22*  48:*9, 17*  49:*13*
*53:22*  54:*4*  58:*22*
**HURT**  5:*6*
**hwinograd@pszjlaw.c**
**om**  3:*13*

< I >
**idea**  19:*9, 12, 13, 14,*
*23*
**identification**  63:*10*
**identified**  21:*13*
*25:25*  41:*17*
**identify**  10:*21*  11:*1*
*15:20*  26:*23*  30:*5*
*41:11*  64:*12*  77:*23*
**imagine**  65:*13*
**impact**  42:*2*
**impacted**  41:*23*
**impacts**  43:*1*
**important**  9:*2*
**including**  67:*21*
**income**  26:*11, 13*
*27:7*
**independent**  68:*1*

Deposition of Michael Wartell    Exhibit 124    Highland Capital Management, L.P.

**INDEX**  7:*1*
**indicate**  81:*3*
**indirect**  32:*21*  60:*3, 6, 16*
**indirectly**  41:*5*
**individual**  16:*8*
**inform**  73:*8*
**information**  17:*25*  18:*5, 14, 24*  19:*6*  58:*2, 6*  75:*8, 11*  76:*25*  77:*5, 13, 23, 25*  78:*6, 10, 18*  79:*5, 12*
**informed**  25:*12*  63:*3*  65:*8*  72:*6*
**Inghram**  1:*21*  2:*13*  84:*5, 21*
**insertion**  67:*21*
**inside**  75:*8*  77:*5, 13, 25*  79:*4, 12*
**insider**  78:*18*
**insignificant**  56:*20*
**INSTRUCTED**  7:*3*
**INSTRUCTIONS**  81:*1*
**Insurance**  4:*4*  25:*19, 22*  26:*10, 21*
**intended**  54:*12*
**interest**  32:*16, 21*  33:*19, 23*  34:*20*  40:*23*  45:*4, 7*  59:*18, 23*  60:*3, 16*  84:*17*
**interested**  18:*18*
**interim**  10:*2*
**interrupt**  31:*5*  48:*10*
**investigate**  25:*2*
**investigating**  79:*7*
**Investment**  4:*14*  5:*3*  10:*15*  11:*5, 10, 14, 17*  47:*12, 14, 23*  53:*23*  54:*4*  58:*23*
**involved**  43:*12, 13*  58:*3*
**involvement**  11:*11*  14:*16, 18*  17:*1, 2*  43:*8*
**irregular**  25:*1*  56:*14*
**irregularities**  24:*14*
**IRS**  13:*11*

**Islands**  20:*4*  21:*21*  22:*13*  23:*1*  42:*23*  56:*18*  64:*13*  68:*15*
**issues**  23:*22*  47:*9*  48:*23*
**its**  12:*7*  13:*23*  15:*3*  18:*1, 6*  24:*23*  25:*5*  27:*20*  42:*13*  52:*16*  53:*5*  73:*24*  84:*17*

**< J >**
**Jackie**  22:*7*
**JAMES**  5:*19*  50:*20*
**JEFFREY**  3:*10*
**Jim**  12:*23, 25*  15:*21*  16:*7*  19:*5*  77:*8*
**jmorris@pszjlaw.com**  3:*7*
**job**  38:*8, 12*
**JOHN**  3:*6*  8:*15*  31:*6*  48:*11*  70:*6*  78:*4*  79:*25*
**joint**  63:*16, 21*  64:*1, 23*  65:*18*  66:*4, 9, 13, 19*  67:*5, 10*
**JONES**  3:*14*  5:*18*
**jpomerantz@pszjlaw.c om**  3:*11*
**JULIE**  1:*14*  2:*9*  6:*5*  8:*5*  83:*12*
**June**  1:*15*  2:*10*  65:*25*
**jurisdiction**  68:*5*
**justify**  31:*12*

**< K >**
**Kansas**  20:*11, 19, 20*  21:*3, 5, 6, 11, 16*  22:*7*
**keep**  48:*15, 18*
**KELLY**  5:*8*
**kind**  14:*3*  33:*19*
**know**  9:*9, 12*  12:*21*  13:*15, 18, 20*  14:*10, 12*  16:*25*  17:*4*  18:*22*  19:*9, 12, 14, 23*  21:*10*  26:*20*  27:*16*  28:*2*  29:*8, 15*  30:*9*  31:*2, 25*  32:*25*  33:*9*  37:*7*  39:*3, 5*  40:*20*  41:*4, 16, 20*  42:*17*  43:*6, 11,*

24  44:*2, 9, 11, 13, 15, 16, 19, 20, 23, 24*  45:*2, 3, 5, 6, 8, 9, 11, 12, 19, 24*  46:*4*  48:*4*  49:*6, 25*  50:*14*  52:*3, 4, 7, 20*  53:*24*  54:*17*  57:*9*  58:*4, 13, 14, 25*  59:*12, 17, 22*  60:*1, 2, 9, 15, 21, 23*  61:*2, 5, 7, 8, 11, 12, 15, 16, 19, 20, 24, 25*  62:*6, 13*  63:*1, 25*  65:*21*  66:*3, 6, 9, 12, 16, 22*  67:*3, 8, 13*  69:*19, 23*  72:*2, 5*  74:*21*  75:*4, 24*  76:*2*  77:*4, 15*  78:*8, 12, 14*
**knowledge**  14:*22*  21:*18*  22:*3*  25:*15*  32:*4, 9*  33:*4, 10, 12, 13, 17, 18, 22*  34:*19*  35:*3, 8, 10*  49:*1*  51:*5, 13, 17*
**knows**  78:*13*

**< L >**
**L.P**  1:*7*
**Labor**  76:*14*
**lack**  53:*12*
**LANG**  4:*15, 17*  80:*3, 5*
**language**  14:*11*
**large**  20:*7, 9*
**law**  68:*16*
**laws**  64:*19*
**lawsuit**  58:*18, 22*
**lawyer**  9:*17*  43:*10*  68:*18*
**lawyers**  46:*9*
**lead**  40:*22*
**leading**  24:*15*
**leads**  41:*8*
**learn**  22:*25*  23:*10*  77:*22*
**learned**  18:*17*  23:*4, 5*  56:*23*  62:*15*  75:*15*
**leave**  43:*17*
**led**  29:*9*
**legal**  23:*19, 22*  31:*3*  43:*16*  57:*14*
**lengthy**  62:*23*

**level**  26:*6, 8*  37:*1, 3*  38:*18*
**liabilities**  54:*9*
**Life**  4:*4*  25:*19, 21*
**likelihood**  69:*13*
**Limited**  25:*19, 22*
**LINE**  7:*4, 8, 13, 17*  75:*19*  82:*5*
**liquidation**  64:*13*  68:*4*
**liquidators**  63:*16, 22*  64:*1, 23*  65:*19*  66:*5, 10, 14, 20*  67:*6, 10*
**liquidity**  56:*16*
**listen**  18:*19*
**lists**  16:*14*
**literally**  16:*14*
**Litigation**  3:*19*  22:*15*  23:*2, 8, 11, 12, 13, 17, 25*  73:*4*
**little**  62:*20*  67:*15*  79:*20*
**LITTLETON**  5:*20*  15:*22*  48:*22*
**Littleton's**  45:*17*
**LLP**  3:*22*  4:*9*  5:*8*
**LOIGMAN**  3:*20*
**long**  19:*18*
**longer**  70:*6*  78:*6, 16*
**look**  31:*20*  65:*5*
**looking**  16:*10, 13*
**losing**  53:*15*
**lot**  18:*11, 14, 18*  44:*12*  56:*15*  65:*13*
**LOUIS**  5:*4*  76:*6*
**Louisiana**  5:*10*
**lower**  29:*15*
**LP**  10:*5, 8*  34:*24*  35:*3, 17*  36:*1, 8*  51:*24*  53:*5*  55:*19*  73:*3*
**lphillips@kellyhart.co m**  5:*5*
**LPs**  43:*17*

**< M >**
**Ma'am**  16:*9*  52:*2, 22*  55:*6*  56:*8*  65:*16*  67:*2*  72:*19*  74:*2*

*79:15*
**Madison** *3:23*
**Main** *5:9*
**majority** 15:7, 8
**making** 14:*18* 53:*3*
*65:18*
**MANAGEMENT** 1:*6*
*3:4* 8:*16* 10:5, *8*
14:*13*, *15* 18:*16*
34:*24* 35:*3*, *17* 36:*1*,
*8* 50:*19* 51:*24* 52:*18*
53:*5* 55:*19* 73:*2*
**managing** 41:*5*
**March** 29:*17*
**Mark** 11:*9* 24:*20*
40:*15* 41:*4* 42:*9*
43:*19* 46:*20* 49:*12*
57:*4* 65:*24* 78:*8*, *10*,
*16* 79:*3*
**MARKED** 7:*16*
*63:10*
**MARKS** 7:*22* 81:*6*
**material** 75:*8* 77:*4*,
*13*, *25* 79:*4*, *11*
**Matt** 64:*8* 72:*13*
*78:9* 79:*17*
**MATTTHEW** 4:*5*
**mean** 12:*25* 14:*15*
28:*13* 46:*20* 55:*2*
*65:15*
**member** 16:*8*
**memory** 48:*19*
**mentioned** 29:*5*
**met** 42:*13* 64:*2*
*65:10*
**MICHAEL** 4:*15*
**million** 42:*24* 43:*2*
56:*19*, *20*
**mind** 41:*12* 48:*15*
*65:10*
**minimis** 22:*11*
**minutes** 70:*17*
**misused** 77:*6*
**mlang@cwl.law.com**
*4:16*
**mokin@okinadams.co**
**m** 4:*6*
**money** 23:*16* 42:*1*, *20*
**months** 17:*13*
**moot** 66:*17*

**MORRIS** 3:*6* 6:*6*
8:*11*, *15* 19:*22* 31:*14*,
*18*, *24* 35:*20* 36:*5*, *13*
38:*1*, *14* 39:*4*, *15*
41:*6* 42:*18* 44:*1*
46:*5*, *10*, *11* 49:*3*, *5*
50:*1*, *15* 52:*1*, *9*
54:*18* 55:*5*, *16*, *23*
56:*7* 57:*2*, *11*, *20*
58:*12* 59:*13* 60:*10*,
*22* 62:*7*, *11* 63:*5*, *12*
64:*8*, *11* 67:*1*, *14*
69:*20* 70:*4*, *9*, *14*, *19*,
*20* 71:*13*, *15* 72:*11*,
*13*, *17* 73:*1*, *13*, *19*
74:*6*, *8*, *22* 75:*5* 76:*8*
78:*7*, *19* 79:*15*
**Motion** 6:*16* 50:*17*
65:*3*, *8*, *20*
**Mountain** 5:*3* 10:*15*
11:*4*, *10*, *14*, *16* 34:*1*,
*9* 37:*5* 41:*3* 47:*11*,
*14*, *22* 48:*9*, *17* 49:*13*
53:*23* 54:*4* 58:*23*
**move** 38:*12*
**mute** 70:*16* 76:*7*
**mutual** 54:*14*, *24*
**mystery** 44:*7*

**< N >**
**name** 8:*15*
**named** 11:*8* 50:*19*
**NATHAN** 5:*18* 62:*8*
63:*6* 74:*7*
**nature** 22:*23* 44:*11*
51:*6*
**NECESSARILY** 7:*22*
**need** 9:*14*, *17* 16:*2*
62:*25* 64:*5* 65:*6*
68:*7* 77:*9*
**needs** 69:*5*
**negotiating** 71:*25*
**negotiation** 51:*14*
**negotiations** 51:*3*, *6*,
*20*
**neither** 84:*15*
**never** 32:*5* 33:*5*
**New** 3:*16*, *24* 70:*10*,
*11*

**newly** 67:*22*
**news** 62:*13*, *15*, *18*
**Nods** 50:*8*
**nonpublic** 75:*8* 77:*5*,
*13*, *25* 78:*6* 79:*4*, *12*
**Nope** 68:*19*
**North** 20:*13* 21:*4*
22:*8*
**NORTHERN** 1:*2*
**Notary** 84:*8*
**notations** 81:*6*
**NOTE** 7:*21*
**notes** 16:*18*
**notice** 44:*17*

**< O >**
**object** 17:*6* 19:*13*, *15*
35:*19* 36:*3*, *11* 37:*24*
38:*7* 39:*2* 41:*1*
42:*14* 43:*21*, *23* 46:*3*
51:*25* 52:*8* 55:*1*, *14*,
*21* 56:*5*, *9* 57:*7*, *17*
58:*9* 59:*10* 60:*7*, *19*
62:*4* 66:*23* 67:*12*
69:*18* 71:*11* 72:*9*
73:*12* 74:*20*
**objected** 10:*19*, *24*
**objecting** 19:*24*
37:*10*
**Objection** 6:*14* 8:*18*
10:*13* 12:*4*, *9* 17:*11*,
*15*, *18*, *22* 18:*2*, *6*, *25*
19:*2*, *7*, *10* 22:*21*
24:*5*, *8*, *9*, *22* 25:*5*, *13*,
*17* 26:*1* 27:*17*, *21*
29:*23* 30:*2*, *7*, *22*
31:*6* 32:*2* 33:*7*
37:*15* 42:*3*, *11*, *13*, *16*
49:*24* 50:*4*, *13* 52:*15*,
*17*, *22* 54:*1*, *16*, *20*, *22*
55:*25* 56:*4*, *6*, *12*
62:*10*, *22*, *24* 63:*14*
65:*20*, *22* 66:*4* 68:*22*
71:*3*, *7*, *18*
**objections** 78:*2*
**obligation** 13:*21*
41:*18* 50:*12* 58:*5*
**obligations** 35:*17*
36:*1*, *9* 49:*23* 74:*12*
75:*1*

**obtain** 57:*22* 59:*6*
62:*1* 66:*19* 67:*5*
**obviously** 28:*12*
**October** 47:*8*
**offhand** 14:*11*
**office** 29:*3*
**officer** 84:*6*
**officers** 15:*15*
**official** 63:*16*, *22*
64:*1*, *23* 65:*19* 66:*5*,
*10*, *13*, *19* 67:*6*, *10*
**Oh** 15:*1* 16:*1*, *21*
30:*14* 78:*20*
**Okada** 15:*24* 16:*22*
24:*10* 27:*1*, *8*, *12*
28:*21*
**okay** 8:*13*, *24* 17:*4*
18:*19* 19:*16* 28:*20*
33:*13* 34:*8*, *11*, *16*, *21*,
*22* 41:*21* 46:*24* 50:*9*
51:*12* 55:*10* 62:*7*
63:*5*, *21* 64:*7* 66:*18*
69:*12* 70:*1*, *19* 73:*6*
74:*23* 79:*2*, *10*
**OKIN** 4:*5*, *9* 19:*16*
31:*5*, *17*, *20* 35:*19*
36:*3*, *11* 37:*24* 38:*7*
39:*2*, *11* 41:*1* 42:*16*
43:*23* 46:*3*, *8* 48:*10*
49:*24* 50:*13* 51:*25*
52:*8* 54:*16* 55:*1*, *14*,
*21* 56:*5*, *9* 57:*7*, *17*
58:*9* 59:*10* 60:*7*, *19*
62:*4* 64:*4* 66:*23*
67:*12* 69:*18* 70:*6*, *12*
72:*9*, *15*, *20* 73:*12*, *15*
74:*20* 76:*6* 78:*4*, *12*
79:*24*
**once** 37:*4*
**opportunity** 38:*11*
56:*23*
**option** 75:*19*, *22*, *25*
79:*9*
**Order** 6:*16* 69:*5*
**org** 21:*15* 48:*12*
**organization** 12:*17*,
*19* 13:*10* 15:*18*
16:*23* 26:*24*
**organizations** 16:*11*
20:*17*, *24* 21:*7* 22:*4*

23:3 26:15, 16 28:1
29:1 34:3 53:8, 10,
15 56:21
**organization's** 38:9
**orgs** 15:6 20:7, 9
43:15
**original** 43:14 76:13
**originated** 19:10
**outcome** 84:17
**outside** 74:11, 17
**oversee** 24:25
**overseeing** 24:12
**oversees** 14:1
**oversight** 15:7, 9, 12
56:16
**owed** 36:9 50:11
**owes** 35:17 36:1
49:22
**owned** 48:5
**owner** 30:5, 12
**ownership** 40:23
59:18, 23 60:3, 6, 16
**owns** 30:9, 18 47:14

< P >
**p.m** 1:16 2:11 80:6
**PACHULSKI** 3:14
5:18
**Pacific** 4:18
**PAGE** 6:4, 12 7:4, 8,
13, 17 8:25 46:22
68:12 82:5
**pages** 6:18
**paid** 23:20
**paragraph** 63:6, 14
67:16 68:8, 23 70:5,
21 73:9 74:5 75:6, 7,
11, 19
**Pardon** 56:8
**part** 37:8 64:6
**participated** 32:23
**particular** 24:3
51:14 75:11
**parties** 3:2 10:17, 21
11:1, 4 18:18 63:17
71:4, 9, 19 84:16
**parts** 62:24
**party** 11:5, 22 56:15
59:19, 24 60:4, 17

**Patrick** 11:9, 13
24:20 40:15, 16 41:4
42:9 43:19 46:20
47:7, 17 49:12 50:6,
10 57:4, 13, 22 58:20
59:5 65:24 66:18
67:5 69:10 74:10, 17,
25 77:5, 24 78:16
79:3, 12
**Patrick's** 67:20
**PAUL** 5:14 31:4
**pay** 26:10
**peace** 70:24 72:7
73:10, 16
**pending** 9:16 42:23
**people** 15:20 62:16
**percent** 27:24 29:6
**permission** 50:18
**person** 24:11, 18
40:14 53:25 54:19
**personally** 23:24
**pertain** 69:9
**pertains** 28:7
**PHILLIPS** 5:4
70:14, 18 71:10 80:1
**phrase** 46:19 68:21
78:1
**piece** 62:14
**play** 14:21
**played** 17:5
**plays** 14:12 16:7
**pleading** 31:15
**Please** 46:10, 13
62:8 70:5 75:6
79:24 80:5
**PLLC** 4:17
**point** 62:24
**policies** 26:21
**POMERANTZ** 3:10
**portion** 38:4, 25
39:9 63:1
**position** 31:11
**possibly** 48:15
**potential** 53:16
**practice** 23:21
**precise** 18:21
**precluded** 66:15
**prefer** 78:11
**preparation** 52:14

**prepare** 18:25
**present** 2:16 5:17
**president** 9:23, 24
15:3, 4, 15, 16, 21, 22
16:5 21:17
**pretty** 24:15
**Prior** 10:1 58:2
**privilege** 9:18
**problem** 39:18 42:19
**proceeding** 64:14
**proceedings** 2:12
21:21 80:7 84:9, 11,
12
**proceeds** 26:17
27:13 28:12, 18, 20
40:18 41:13 43:20
**product** 51:2, 19
**PRODUCTION** 7:7
**professional** 79:17
**promise** 48:23
**proposed** 10:13 17:6
19:24 51:23 52:4
67:11
**propounded** 83:8
**protect** 38:8 56:20
**prove** 69:5
**provide** 17:25 18:5
23:16 58:5
**provided** 18:23 66:3
**Public** 84:8
**purchase** 26:24
**purpose** 67:23
**purposes** 11:17 12:1
26:12
**pursuant** 36:17
**put** 14:19 16:19
62:8, 9, 19 75:19, 22,
25 76:15, 20 79:9
**putting** 31:10

< Q >
**quarrel** 77:21
**quarterly** 28:11
**question** 9:3, 8, 11, 16
10:20 18:3, 9, 20
19:19 33:1 35:22
37:25 39:16, 17, 23,
25 40:13 46:6, 13
55:15 56:10 57:8, 18
58:10 59:11 60:8, 20

62:5 64:5, 9 66:24
68:10 69:3 71:5, 11
72:19 73:5 76:12
78:13
**questioning** 33:2
**QUESTIONS** 7:3, 16
9:2, 18 31:19 48:19,
24 49:4 68:13 70:13,
15 83:8
**quick** 8:24
**quickly** 78:15
**QUINN** 3:22
**quizzed** 48:8
**QUOTATION** 7:22
**QUOTE** 7:23 67:17
70:22 74:9 77:7

< R >
**raised** 24:16
**Rand** 47:2, 4, 5, 9, 17,
20 48:2, 18 49:12
**RAVER** 5:21
**RDR** 1:22 84:21
**read** 19:4 22:17, 25
31:14 71:7, 12 74:13
83:6
**reading** 16:9 81:2
**really** 20:13 26:10
34:5 69:23 78:11
**Realtime** 2:14 84:6
**reason** 24:3 32:15
35:15, 25 36:7 37:19
38:2 41:21 42:14
43:21 50:9 51:22
54:2 57:3 59:5, 14
67:4, 9 74:16, 24
82:7, 9, 11, 13, 15, 17,
19, 21, 23
**reasons** 81:4 82:4
**recall** 40:12 53:3
54:21 55:9 65:18
71:17, 22
**receive** 14:8 36:17
37:5, 22 38:4, 19, 24,
25 39:9, 20, 21 40:9,
24 41:13, 19 46:1, 15
**received** 27:11 40:21
42:21 49:7 76:10
**receives** 41:9 42:1, 6
**receiving** 44:4

recollection 53:*2*
65:*7*
recommendations
13:*12* 14:*18*
record 84:*11*
recorded 2:*12*
recover 37:*20* 38:*3*,
*13* 39:*8* 40:*17* 45:*25*
56:*18*
red 24:*16*
reduced 84:*13*
refer 11:*16*, *24* 20:*16*
25:*21*, *24* 29:*2*
reference 67:*16*
75:*18*
referring 20:*3*, *10*
24:*19*
REFLECT 7:*23*
refresh 65:*6*
regarding 65:*24*
Registered 2:*13* 84:*5*
regular 13:*25*
reject 67:*11*
related 84:*15*
relates 50:*6* 65:*22*
relationship 21:*11*
28:*5*, *7* 33:*25* 34:*23*
35:*2*, *6*, *12* 45:*10*, *13*
49:*19*
releases 54:*15*, *24*
releasing 54:*8*
remember 48:*14*
remind 39:*12*
remitted 28:*22*
REMOTE 1:*13* 2:*8*
3:*2* 62:*15*
reorganization 50:*3*
Repeat 18:*3* 19:*20*
37:*25* 55:*15* 69:*3*
71:*5* 73:*5*, *16*
repeated 64:*5*
report 29:*14*
Reported 1:*20*
Reporter 2:*14*, *15*
79:*22* 80:*3* 84:*2*, *6*, *8*
REPORTER'S 7:*21*
reports 28:*11*
represent 31:*8*, *13*
representative 25:*7*

REQUEST 7:*7*
requests 29:*11*
required 13:*24*
57:*22* 59:*6* 62:*1*
66:*19* 67:*5*
requirement 37:*7*
respect 14:*22* 28:*17*
29:*7*
respectfully 72:*12*
response 74:*1*
responsible 12:*6*
result 21:*8* 32:*23*
34:*12*
review 12:*3* 25:*13*
reviewed 36:*21* 41:*7*
52:*21*
right 11:*13* 16:*9*
21:*2* 24:*1* 28:*24*
34:*6* 37:*20* 38:*3*, *21*
39:*8*, *20* 40:*8*, *17*
44:*6* 45:*25* 46:*15*, *21*
52:*22*, *23* 60:*24* 61:*3*,
*4*, *6*, *9*, *13*, *17*, *21*
66:*17* 74:*6* 78:*3*
79:*6*
rise 55:*12*
ROBERT 3:*20*
robertloigman@quinn
emanuel.com 3:*21*
role 14:*13*, *21* 16:*8*
17:*5*, *9* 22:*11* 38:*10*
room 62:*19*
Rose 22:*8*
Rouge 5:*10*
RSA 1:*22* 84:*21*
rules 8:*24*
rushed 79:*24*

< S >
Santa 20:*11*, *22* 21:*3*,
*7*, *12*, *16* 22:*8*
Sauder 78:*25*
saying 78:*16*
says 31:*21* 67:*17*, *19*
70:*21* 74:*9* 77:*19*
scope 54:*14*, *24*
74:*11*, *17*
screen 62:*8*, *9*, *20*
63:*13*

scroll 68:*7* 70:*4*
75:*5*
scrutiny 67:*25*
second 48:*16*
secretary 16:*6*
securities 44:*10*
see 16:*13* 22:*16*, *19*
47:*8* 48:*13* 62:*25*
63:*19*, *20* 68:*6* 70:*25*
75:*7*, *18* 79:*19*
seek 9:*16* 30:*21*
seeks 70:*24* 72:*8*
73:*11*, *17*
seen 37:*13*, *16*
SEERY 5:*19* 50:*20*
58:*24*
segregated 25:*18*, *24*
26:*1*, *5*, *8* 27:*17*, *21*
29:*24* 30:*2*, *6*, *9*, *13*,
*18*, *22* 44:*16*, *24* 45:*6*
61:*17*, *21* 62:*1*
send 28:*12*
sent 29:*12*
sentence 63:*15* 68:*9*,
*13*
series 9:*1*
set 17:*18*, *21* 42:*12*
43:*14* 44:*5* 69:*15*
setting 69:*7*, *8*
Settlement 6:*17* 8:*19*
10:*13*, *18*, *23* 11:*5*, *22*
17:*6* 19:*15*, *25* 20:*2*,
*3*, *5* 36:*14*, *18*, *21*, *25*
37:*4*, *9*, *13*, *16*, *22*
38:*5*, *19* 39:*1*, *10*, *22*
40:*9*, *18*, *25* 41:*3*, *14*,
*23* 42:*6*, *15* 43:*18*, *22*
44:*6* 46:*2*, *17*, *21*
51:*1*, *10*, *15*, *18*, *23*
52:*5*, *17* 53:*4*, *9*, *19*,
*22* 54:*3*, *7*, *10*, *12*, *25*
57:*5*, *15*, *24* 58:*7*
59:*8*, *19*, *24* 60:*4*, *17*
62:*3* 63:*18* 65:*3*, *8*,
*20* 66:*21* 67:*7*, *11*
69:*15* 70:*23* 71:*21*
72:*1*, *7* 73:*10* 74:*15*,
*18*, *24* 75:*2*
Shakes 39:*6*

share 57:*13*
shares 43:*15*
SHAWN 5:*21*
Sheet 81:*5*
Shorthand 2:*15* 84:*2*,
*7*
show 48:*12* 55:*3*
shows 42:*23*
side 10:*22*
sign 81:*5*
signature 31:*21*
signed 11:*9*, *13* 46:*21*
significant 56:*14*
significantly 29:*14*
similarities 22:*22*
sir 70:*16*
sit 11:*12* 35:*16*, *24*
36:*6* 79:*10*
six 10:*3* 17:*12*
18:*14*, *16*
size 37:*6*
Skyview 78:*16*, *20*, *23*,
*24* 79:*2*
slow 56:*24*
small 20:*13*
sole 27:*7*
solely 31:*7* 74:*15*, *23*
somebody 48:*25*
69:*5* 76:*24* 78:*20*
somebody-who 39:*23*
sorry 15:*1* 16:*1*
21:*1*, *6* 29:*10* 55:*8*
58:*13* 67:*2* 74:*2*
76:*9* 77:*18*
Sounds 64:*21*
source 17:*20* 19:*6*
26:*11* 27:*7* 75:*10*
speak 17:*10*, *14*, *17*
speaks 55:*2*
specific 72:*24*
specificity 41:*11*
speculate 70:*1*
spiraling 77:*8*
spoke 66:*1*
spoken 17:*12*
sponsored 12:*17*
STANG 3:*14* 5:*18*
start 39:*25* 71:*16*
started 70:*10*
State 64:*19*

statement  33:21
54:22
STATES  1:1  63:15
status  13:24
Stenographically
1:20  2:13  84:13
step  13:16
stick  47:11
STIPULATIONS
7:12
stopped  76:23
Street  4:10  5:9
strike  40:4
structure  16:10
21:15  42:10  44:4
47:9  48:17, 18  49:2
67:23
subject  64:13  67:25
68:2
Subtrust  73:4
succeed  69:1, 6, 14
suggest  51:18  57:13
suggesting  72:4  73:7
suggests  71:3, 8
Suite  4:10, 18  5:9
SULLIVAN  3:22
Sunday  1:15  2:10
supervision  84:14
supplied  81:5
SUPPORT  7:1
22:14  28:1  55:18
supporting  12:17
13:10  15:6, 18  16:11,
23  20:7, 9, 16, 24
21:7, 15  23:3  26:15,
16, 23  29:1  34:2
43:15  53:8, 10, 14
56:21
supposedly  77:6
79:13
sure  16:21  35:23
65:9, 15  66:1  68:11
73:2  76:5, 10
sworn  8:6
Systems  84:7

< T >
tainted  73:17
take  8:17  31:20

45:16
taken  84:9, 12
talk  48:22
talked  40:14  65:11
66:16  70:7
talking  33:7  51:10
77:1  78:5
technical  14:10
Technically  13:9
43:11
tell  40:5, 7, 16  47:1
62:13  72:22  77:7, 11
78:15  79:11
telling  46:23
terminated  79:3
terms  36:18, 25  54:3
test  62:23
testified  8:8  38:17
testify  8:6
testimony  19:5
32:19  81:4  83:7
testing  48:19
TEXAS  1:2  4:11, 19
20:13  21:4  22:9
Thank  45:23  55:10
64:8  70:19  71:14
74:4, 7  79:15, 17
Thanks  79:21
therefor  81:4
thing  72:12
things  44:12  48:11
think  22:22  25:12
31:11, 17  38:17
43:24  45:16  48:20
50:3  57:25  63:5
thinks  31:11
Third  3:15  63:14
three  20:6, 9, 24
21:1, 5
thrown  27:3, 6
Time  1:16  2:12
9:14  56:24  70:10, 11,
18  79:16  80:7
today  8:17  16:17
18:12  33:7  35:16, 24
36:6  47:14, 20, 24
49:23  66:8  76:20
79:10
today's  12:1

told  47:8  50:22
78:20  79:3, 9
TORREY  5:20
15:22  16:5
track  43:17
transaction  61:13
transactional  28:11
transactions  29:8
61:9, 22
transcribed  2:15
transcript  79:23
80:4  81:6  83:7
84:10
transparency  53:13
travel  62:16
treasurer  15:5, 16, 23
16:5
tribunal  68:4
true  83:10  84:11
Trust  3:5  4:14  5:3
10:15  11:5, 10, 14, 17
32:12, 16, 21  33:20,
24  34:14, 17, 20  35:7,
13  45:4, 7, 14  47:12,
14, 23  48:9  52:6
53:23  54:4  55:20
58:23  73:3, 24
Trustee  3:19
truth  8:7
try  9:7  33:3
trying  77:22
tune  43:2
two  16:3  31:8  48:11
56:21  65:1
type  42:25  69:8
typewriting  84:14

< U >
understand  9:12
19:21  28:10  29:12
50:2  55:24  56:25
76:17
understanding  21:14,
22, 24  26:7  27:5, 9,
10, 15  29:19, 21
30:15  37:2, 11  38:15,
18, 23  41:2  47:16, 19
48:7  49:21  56:3
57:21  68:25  69:4

76:13
understood  29:9  79:8
unexplained  29:22
unfair  51:23  52:5,
18  53:4, 7, 10, 19, 22
54:3
Unfortunately  63:15
UNITED  1:1
URQUHART  3:22
usual  58:1

< V >
vague  47:10
valuations  24:16
value  27:12, 24  29:6,
19, 22  49:7, 15
vanished  42:24
vehicle  47:6
vein  18:17
versus  65:11
vice  15:4, 15, 22
videoconferencing  3:2
video-conferencing
2:10
VIDEOGRAPHER
5:13
VIDEO-RECORDED
1:13  2:8
view  52:10  59:1
69:12, 21
Vine  4:10
vision  28:2
volume  81:2, 6
vote  15:14
voting  15:13

< W >
wait  62:12
want  19:17  43:24
44:2, 11  48:12, 25
55:2  65:9  66:1
68:11  72:14, 15, 24
78:8  79:22  80:4
way  20:13  28:13
41:23  45:20  48:14
65:17  76:7
Wednesday  56:22
weekend  76:14
weeks  65:1

**Well** 13:*2* 18:*11*
20:*6* 24:*9* 25:*7*
28:*10* 31:*13, 14*
43:*10* 44:*5* 48:*6*
53:*11* 72:*18* 74:*11*
77:*14, 19* 78:*24*
**we're** 8:*17, 25* 31:*21*
33:*7* 46:*19* 56:*18*
62:*7* 65:*23* 78:*5*
**we've** 56:*23* 63:*13*
65:*11, 21* 66:*15*
**Wilkerson** 22:*6*
**WINOGRAD** 3:*12*
**wish** 82:*3*
**WISHNEW** 4:*17*
**withdrawn** 11:*2*
13:*19* 19:*13* 23:*6*
26:*22* 27:*4* 29:*20*
30:*8* 32:*10* 38:*16*
52:*15* 58:*19* 59:*16*
64:*17* 67:*18* 77:*11*
**witness** 48:*17* 64:*7*
72:*14*
**woman** 79:*1*
**words** 13:*16* 30:*8*
**work** 56:*18*
**working** 18:*15*
**workings** 49:*1*
**write-down** 27:*23*
29:*6*
**wrong** 64:*6* 71:*4, 9,*
*20, 25* 73:*7*
**wrongdoing** 72:*5*

**< Y >**
**Yeah** 22:*18* 28:*16*
48:*8* 68:*14* 74:*6*
78:*18*
**year** 50:*3* 76:*16*
**years** 10:*3* 12:*20*
18:*14, 16* 50:*17* 51:*9*
**Yep** 45:*18*
**York** 3:*16, 24* 70:*10,*
*11*

**< Z >**
**ZIEHL** 3:*14* 5:*18*

## WORD LIST

**< $ >**
**$25**  *(2)*
**$300**  *(1)*

**< 1 >**
**1**  *(3)*
**1:37**  *(2)*
**10**  *(1)*
**10010**  *(1)*
**10017-2024**  *(1)*
**10-year**  *(1)*
**11**  *(1)*
**1113**  *(1)*
**15**  *(1)*
**16**  *(2)*
**1600**  *(1)*
**1700**  *(1)*
**19-34054-sgj11**  *(1)*
**1st**  *(1)*

**< 2 >**
**2:37**  *(1)*
**2011**  *(1)*
**2019**  *(1)*
**2024**  *(1)*
**2025**  *(2)*
**212.849.7615**  *(1)*
**214.817.4500**  *(1)*
**22**  *(2)*
**225.381.9643**  *(1)*
**22nd**  *(1)*
**2390**  *(1)*
**240**  *(1)*

**< 3 >**
**3:08**  *(1)*
**300-plus**  *(1)*
**301**  *(1)*
**30th**  *(1)*
**310.277.6910**  *(1)*
**32**  *(5)*
**33**  *(3)*
**34**  *(1)*
**34th**  *(1)*

**< 4 >**
**4:07**  *(1)*

**40**  *(2)*

**< 5 >**
**51**  *(1)*

**< 6 >**
**63**  *(1)*

**< 7 >**
**7**  *(1)*
**70801**  *(1)*
**713.228.4100**  *(1)*
**75201**  *(1)*
**77002**  *(1)*
**780**  *(1)*

**< 8 >**
**8**  *(1)*
**8635**  *(3)*

**< 9 >**
**90**  *(1)*
**9th**  *(1)*

**< A >**
**able**  *(2)*
**Absolutely**  *(1)*
**abstain**  *(3)*
**abstention**  *(1)*
**accepting**  *(1)*
**access**  *(1)*
**accommodate**  *(1)*
**accounting**  *(1)*
**accounts**  *(20)*
**acted**  *(1)*
**acting**  *(6)*
**action**  *(3)*
**actions**  *(4)*
**activities**  *(3)*
**activity**  *(7)*
**ADAMS**  *(1)*
**additional**  *(2)*
**Administrator**  *(1)*
**advice**  *(2)*
**aegis**  *(1)*
**affidavit**  *(1)*
**affiliated**  *(3)*
**affiliates**  *(4)*
**affirmed**  *(1)*

**afternoon**  *(1)*
**agendas**  *(1)*
**ago**  *(2)*
**agree**  *(1)*
**agreed**  *(1)*
**agreement**  *(59)*
**ahead**  *(2)*
**ahurt@kellyhart.com**  *(1)*
**alleging**  *(1)*
**allocated**  *(1)*
**allow**  *(2)*
**AMELIA**  *(1)*
**amount**  *(1)*
**ample**  *(1)*
**ancillary**  *(1)*
**annuities**  *(7)*
**annuity**  *(4)*
**ANSWER**  *(30)*
**answering**  *(2)*
**answers**  *(2)*
**anticipate**  *(1)*
**anybody**  *(16)*
**apologize**  *(6)*
**apparent**  *(1)*
**appear**  *(2)*
**appearance**  *(2)*
**appeared**  *(4)*
**appears**  *(1)*
**appointed**  *(2)*
**appreciate**  *(6)*
**appreciated**  *(1)*
**approval**  *(1)*
**approve**  *(4)*
**approved**  *(10)*
**Approving**  *(1)*
**approximately**  *(1)*
**April**  *(1)*
**arising**  *(1)*
**arm's-length**  *(2)*
**articulate**  *(1)*
**aside**  *(1)*
**asked**  *(8)*
**asking**  *(5)*
**asserting**  *(1)*
**assertion**  *(1)*
**asserts**  *(1)*
**asset**  *(2)*
**assets**  *(38)*

**assume**  *(2)*
**assumed**  *(1)*
**assuming**  *(3)*
**Atlas**  *(8)*
**attached**  *(2)*
**Attorney**  *(126)*
**attorneys**  *(1)*
**audible**  *(1)*
**authority**  *(7)*
**authorization**  *(2)*
**authorized**  *(9)*
**authorizing**  *(1)*
**available**  *(1)*
**Avenue**  *(3)*
**avoidance**  *(5)*
**aware**  *(42)*

**< B >**
**BA**  *(2)*
**back**  *(3)*
**backdrop**  *(1)*
**bad**  *(1)*
**BANKRUPTCY**  *(15)*
**Barbara**  *(7)*
**BARTLETT**  *(1)*
**based**  *(2)*
**basically**  *(1)*
**basis**  *(6)*
**Baton**  *(1)*
**beginning**  *(2)*
**behalf**  *(35)*
**behavior**  *(1)*
**believe**  *(31)*
**believed**  *(1)*
**best**  *(12)*
**bit**  *(3)*
**block**  *(1)*
**bottom**  *(1)*
**Bradshaw**  *(1)*
**breaching**  *(1)*
**break**  *(1)*
**bring**  *(1)*
**bringing**  *(1)*
**business**  *(3)*
**buy**  *(3)*

**< C >**
**CA-Certified**  *(1)*
**CA-CSR**  *(2)*

Deposition of DAVID CURRY - 5/27/2021    Exhibit 124    Highland Capital Management, L.P.

| | | | |
|---|---|---|---|
| calendar  (2) | commitment  (1) | couple  (1) | disbursement  (1) |
| call  (5) | common  (1) | COURT  (14) | disclosed  (1) |
| called  (10) | communicate  (1) | Court-appointed  (2) | disclosing  (1) |
| calling  (1) | communicated  (4) | COVID  (1) | discussions  (1) |
| CAPITAL  (17) | communication  (2) | CRAWFORD  (1) | disrespectful  (1) |
| careful  (1) | community  (6) | created  (1) | DISTRICT  (1) |
| carefully  (1) | company  (1) | Crown  (45) | diverting  (1) |
| Carrera  (1) | complete  (1) | CRR  (2) | DIVISION  (1) |
| Case  (10) | compliance  (1) | cumbersome  (1) | document  (4) |
| cases  (1) | concern  (3) | CURRY  (2) | DOCUMENTS  (4) |
| cash  (4) | concerned  (4) | | doing  (5) |
| cause  (1) | concerning  (1) | < D > | dollars  (1) |
| caused  (1) | concerns  (1) | D.C  (1) | donation  (2) |
| caution  (1) | concluded  (1) | DAF  (2) | donations  (1) |
| Cayman  (10) | confer  (1) | DALLAS  (160) | Dondero  (20) |
| ceased  (2) | confidential  (2) | D'AMBRA  (1) | Dondero's  (2) |
| Central  (3) | confused  (1) | date  (2) | donor-advised  (1) |
| CEO  (7) | confusing  (1) | DAVID  (1) | dramatic  (1) |
| CEOs  (1) | connection  (4) | day  (3) | Dugaboy  (1) |
| certain  (7) | consent  (6) | dcurry@okinadams.co | duly  (1) |
| Certainly  (1) | consider  (1) | m  (1) | duties  (4) |
| CERTIFICATE  (1) | considering  (1) | de  (1) | duty  (2) |
| Certified  (3) | constitutes  (2) | dealings  (1) | |
| certify  (2) | consult  (1) | Debbie  (1) | < E > |
| cetera  (1) | consummation  (3) | Debtor  (5) | earlier  (2) |
| CFO  (2) | Cont'd  (2) | decided  (1) | effectuated  (1) |
| chance  (1) | contend  (1) | decision  (2) | effectuates  (1) |
| change  (10) | contends  (2) | decisions  (1) | either  (3) |
| changes  (6) | context  (1) | declaration  (3) | EMANUEL  (1) |
| changing  (1) | continue  (1) | decline  (3) | employed  (2) |
| Chapter  (1) | contractual  (7) | Defendant  (2) | employee  (1) |
| charitable  (8) | contractually  (1) | definitively  (1) | Empower  (25) |
| chart  (1) | contribution  (2) | Delaware  (2) | engaged  (2) |
| chief  (1) | contributions  (3) | DEMO  (1) | ensure  (1) |
| City  (8) | control  (5) | DEPONENT  (1) | enter  (5) |
| claim  (9) | controlled  (2) | deposed  (1) | entered  (3) |
| Claimant  (18) | controls  (1) | DEPOSITION  (11) | entering  (9) |
| claimed  (1) | conversations  (1) | depositions  (1) | entities  (55) |
| claims  (3) | convey  (1) | described  (4) | entitled  (2) |
| clarify  (1) | conveying  (1) | detail  (1) | entity  (19) |
| CLARITY  (1) | copy  (4) | DIAZ  (20) | Entry  (1) |
| clawback  (4) | corporate  (2) | different  (2) | erosion  (1) |
| clawing  (1) | corporations  (1) | diminished  (1) | Errata  (1) |
| clear  (3) | correct  (11) | Diplomate  (2) | ESQ  (10) |
| clearly  (1) | corrections  (2) | DIRECT  (4) | essence  (1) |
| clients  (2) | correctly  (1) | directed  (2) | essentially  (1) |
| cold  (1) | counsel  (5) | direction  (1) | established  (1) |
| come  (1) | counterpart  (1) | directly  (3) | et  (1) |
| commenced  (2) | counterparty  (1) | disburse  (2) | everybody  (1) |

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02724-L    Document 17-124    Filed 06/02/25    Page 303 of 406    PageID 4561
Deposition of Carol Capitalized Management, L.P. — Exhibit 124    Page 303 of 406    PageID 4561

| | | | |
|---|---|---|---|
| evidence *(1)* | flowed *(1)* | grant *(2)* | impacts *(1)* |
| exactly *(1)* | Flows *(3)* | grant-making *(2)* | important *(1)* |
| EXAMINATION *(2)* | focus *(1)* | grants *(1)* | including *(1)* |
| examined *(1)* | focused *(1)* | GREGORY *(1)* | income *(3)* |
| excuse *(2)* | Focusing *(2)* | ground *(1)* | independent *(1)* |
| executed *(1)* | folks *(1)* | guess *(4)* | INDEX *(1)* |
| exercise *(1)* | following *(2)* | | indicate *(1)* |
| exercised *(1)* | follows *(1)* | < H > | indirect *(4)* |
| Exhibit *(1)* | foregoing *(3)* | half *(1)* | indirectly *(1)* |
| existence *(1)* | form *(33)* | HALL *(1)* | individual *(1)* |
| expect *(1)* | formal *(1)* | HALLMAN *(1)* | inform *(1)* |
| expectations *(1)* | Formally *(1)* | happening *(3)* | information *(19)* |
| expected *(1)* | formation *(1)* | happens *(3)* | informed *(4)* |
| expedited *(1)* | formed *(4)* | happy *(2)* | Ingraham *(4)* |
| expenses *(2)* | forth *(4)* | harm *(1)* | insertion *(1)* |
| expensive *(1)* | forward *(1)* | HART *(1)* | inside *(6)* |
| expert *(2)* | found *(1)* | HAYLEY *(1)* | insider *(1)* |
| expressed *(1)* | Foundation *(145)* | head *(2)* | insignificant *(1)* |
| extent *(1)* | foundations *(5)* | hear *(1)* | INSTRUCTED *(1)* |
| | Foundation's *(24)* | heard *(1)* | INSTRUCTIONS *(1)* |
| < F > | four *(2)* | held *(2)* | Insurance *(5)* |
| fact *(1)* | fully *(1)* | he'll *(1)* | intended *(1)* |
| facts *(13)* | fund *(11)* | help *(2)* | interest *(13)* |
| fail *(1)* | funded *(1)* | hereto *(1)* | interested *(1)* |
| fair *(36)* | fundholder *(1)* | Hernandez *(1)* | interim *(1)* |
| fairly *(1)* | fundholders *(2)* | high *(5)* | interrupt *(2)* |
| fall *(1)* | funding *(5)* | HIGHLAND *(82)* | investigate *(1)* |
| familiar *(14)* | funds *(4)* | Highland/HMIT *(2)* | investigating *(1)* |
| familiarity *(2)* | fund's *(1)* | Highland's *(1)* | Investment *(13)* |
| Family *(6)* | further *(1)* | HMIT *(54)* | involved *(3)* |
| fault *(1)* | future *(1)* | HMIT/Highland *(2)* | involvement *(6)* |
| feeds *(1)* | | hold *(2)* | irregular *(2)* |
| feel *(1)* | < G > | Holdco *(2)* | irregularities *(1)* |
| female *(1)* | Gail *(4)* | holds *(1)* | IRS *(1)* |
| fiduciaries *(2)* | gdemo@pszjlaw.com | hour *(1)* | Islands *(8)* |
| fiduciary *(6)* | *(1)* | Houston *(1)* | issues *(3)* |
| file *(6)* | generally *(4)* | Hunter *(19)* | its *(13)* |
| filed *(25)* | gentleman *(2)* | HURT *(1)* | |
| filing *(10)* | give *(6)* | hwinograd@pszjlaw.c | < J > |
| finance *(1)* | given *(1)* | om *(1)* | Jackie *(1)* |
| financial *(1)* | giving *(1)* | | JAMES *(2)* |
| find *(2)* | Global *(41)* | < I > | JEFFREY *(1)* |
| fine *(3)* | Global's *(4)* | idea *(5)* | Jim *(6)* |
| finish *(3)* | go *(7)* | identification *(1)* | jmorris@pszjlaw.com |
| first *(1)* | going *(13)* | identified *(3)* | *(1)* |
| first-quarter *(1)* | Good *(3)* | identify *(8)* | job *(2)* |
| flag *(1)* | good-faith *(2)* | imagine *(1)* | JOHN *(7)* |
| Floor *(2)* | governance *(3)* | impact *(1)* | joint *(11)* |
| flow *(6)* | GPs *(1)* | impacted *(1)* | JONES *(2)* |

jpomerantz@pszjlaw.c
om  (1)
JULIE  (5)
June  (3)
jurisdiction  (1)
justify  (1)

< K >
Kansas  (9)
keep  (2)
KELLY  (1)
kind  (2)
know  (122)
knowledge  (21)
knows  (1)

< L >
L.P  (1)
Labor  (1)
lack  (1)
LANG  (4)
language  (1)
large  (2)
law  (1)
laws  (1)
lawsuit  (2)
lawyer  (3)
lawyers  (1)
lead  (1)
leading  (1)
leads  (1)
learn  (3)
learned  (6)
leave  (1)
led  (1)
legal  (5)
lengthy  (1)
level  (5)
liabilities  (2)
Life  (3)
likelihood  (1)
Limited  (2)
LINE  (6)
liquidation  (2)
liquidators  (11)
liquidity  (1)
listen  (1)
lists  (1)
literally  (1)

Litigation  (10)
little  (3)
LITTLETON  (3)
Littleton's  (1)
LLP  (3)
LOIGMAN  (1)
long  (1)
longer  (3)
look  (2)
looking  (2)
losing  (1)
lot  (6)
LOUIS  (2)
Louisiana  (1)
lower  (1)
LP  (11)
lphillips@kellyhart.co
m  (1)
LPs  (1)

< M >
Ma'am  (10)
Madison  (1)
Main  (1)
majority  (2)
making  (3)
MANAGEMENT
 (19)
managing  (1)
March  (1)
Mark  (14)
MARKED  (2)
MARKS  (2)
material  (6)
Matt  (4)
MATTTHEW  (1)
mean  (6)
member  (1)
memory  (1)
mentioned  (1)
met  (3)
MICHAEL  (1)
million  (4)
mind  (3)
minimis  (1)
minutes  (1)
misused  (1)
mlang@cwl.law.com
 (1)

mokin@okinadams.co
m  (1)
money  (3)
months  (1)
moot  (1)
MORRIS  (69)
Motion  (5)
Mountain  (19)
move  (1)
mute  (2)
mutual  (2)
mystery  (1)

< N >
name  (1)
named  (2)
NATHAN  (4)
nature  (3)
NECESSARILY  (1)
need  (8)
needs  (1)
negotiating  (1)
negotiation  (1)
negotiations  (3)
neither  (1)
never  (2)
New  (6)
newly  (1)
news  (3)
Nods  (1)
nonpublic  (7)
Nope  (1)
North  (3)
NORTHERN  (1)
Notary  (1)
notations  (1)
NOTE  (1)
notes  (1)
notice  (1)

< O >
object  (35)
objected  (2)
objecting  (2)
Objection  (63)
objections  (1)
obligation  (4)
obligations  (6)
obtain  (5)

obviously  (1)
October  (1)
offhand  (1)
office  (1)
officer  (1)
officers  (1)
official  (11)
Oh  (5)
Okada  (7)
okay  (29)
OKIN  (52)
once  (1)
opportunity  (2)
option  (4)
Order  (7)
org  (2)
organization  (6)
organizations  (15)
organization's  (1)
orgs  (4)
original  (2)
originated  (1)
outcome  (1)
outside  (2)
oversee  (1)
overseeing  (1)
oversees  (1)
oversight  (4)
owed  (2)
owes  (3)
owned  (1)
owner  (2)
ownership  (6)
owns  (3)

< P >
p.m  (3)
PACHULSKI  (2)
Pacific  (1)
PAGE  (10)
pages  (1)
paid  (1)
paragraph  (13)
Pardon  (1)
part  (2)
participated  (1)
particular  (3)
parties  (11)
parts  (1)

| | | | |
|---|---|---|---|
| **party** *(7)* | **proposed** *(6)* | **reduced** *(1)* | **RSA** *(2)* |
| **Patrick** *(31)* | **propounded** *(1)* | **refer** *(6)* | **rules** *(1)* |
| **Patrick's** *(1)* | **protect** *(2)* | **reference** *(2)* | **rushed** *(1)* |
| **PAUL** *(2)* | **prove** *(1)* | **referring** *(3)* | |
| **pay** *(1)* | **provide** *(4)* | **REFLECT** *(1)* | **< S >** |
| **peace** *(4)* | **provided** *(1)* | **refresh** *(1)* | **Santa** *(7)* |
| **pending** *(2)* | **Public** *(1)* | **regarding** *(1)* | **Sauder** *(1)* |
| **people** *(2)* | **purchase** *(1)* | **Registered** *(2)* | **saying** *(1)* |
| **percent** *(2)* | **purpose** *(1)* | **regular** *(1)* | **says** *(6)* |
| **permission** *(1)* | **purposes** *(3)* | **reject** *(1)* | **scope** *(4)* |
| **person** *(5)* | **pursuant** *(1)* | **related** *(1)* | **screen** *(4)* |
| **personally** *(1)* | **put** *(11)* | **relates** *(2)* | **scroll** *(3)* |
| **pertain** *(1)* | **putting** *(1)* | **relationship** *(11)* | **scrutiny** *(1)* |
| **pertains** *(1)* | | **releases** *(2)* | **second** *(1)* |
| **PHILLIPS** *(5)* | **< Q >** | **releasing** *(1)* | **secretary** *(4)* |
| **phrase** *(3)* | **quarrel** *(1)* | **remember** *(1)* | **securities** *(1)* |
| **piece** *(1)* | **quarterly** *(1)* | **remind** *(1)* | **see** *(13)* |
| **play** *(1)* | **question** *(39)* | **remitted** *(1)* | **seek** *(2)* |
| **played** *(1)* | **questioning** *(1)* | **REMOTE** *(4)* | **seeks** *(4)* |
| **plays** *(2)* | **QUESTIONS** *(12)* | **reorganization** *(1)* | **seen** *(2)* |
| **pleading** *(1)* | **quick** *(1)* | **Repeat** *(8)* | **SEERY** *(3)* |
| **Please** *(7)* | **quickly** *(1)* | **repeated** *(1)* | **segregated** *(20)* |
| **PLLC** *(2)* | **QUINN** *(1)* | **report** *(1)* | **send** *(1)* |
| **point** *(1)* | **quizzed** *(1)* | **Reported** *(1)* | **sent** *(1)* |
| **policies** *(1)* | **QUOTATION** *(1)* | **Reporter** *(9)* | **sentence** *(3)* |
| **POMERANTZ** *(1)* | **QUOTE** *(5)* | **REPORTER'S** *(1)* | **series** *(1)* |
| **portion** *(4)* | | **reports** *(1)* | **set** *(6)* |
| **position** *(1)* | **< R >** | **represent** *(3)* | **setting** *(2)* |
| **possibly** *(1)* | **raised** *(1)* | **representative** *(1)* | **Settlement** *(84)* |
| **potential** *(1)* | **Rand** *(9)* | **REQUEST** *(1)* | **Shakes** *(1)* |
| **practice** *(1)* | **RAVER** *(1)* | **requests** *(1)* | **share** *(1)* |
| **precise** *(1)* | **RDR** *(2)* | **required** *(6)* | **shares** *(1)* |
| **precluded** *(1)* | **read** *(8)* | **requirement** *(1)* | **SHAWN** *(1)* |
| **prefer** *(1)* | **reading** *(2)* | **respect** *(3)* | **Sheet** *(1)* |
| **preparation** *(1)* | **really** *(5)* | **respectfully** *(1)* | **Shorthand** *(3)* |
| **prepare** *(1)* | **Realtime** *(3)* | **response** *(1)* | **show** *(2)* |
| **present** *(2)* | **reason** *(29)* | **responsible** *(1)* | **shows** *(1)* |
| **president** *(10)* | **reasons** *(2)* | **result** *(3)* | **side** *(1)* |
| **pretty** *(1)* | **recall** *(7)* | **review** *(2)* | **sign** *(1)* |
| **Prior** *(2)* | **receive** *(17)* | **reviewed** *(1)* | **signature** *(1)* |
| **privilege** *(1)* | **received** *(5)* | **right** *(31)* | **signed** *(3)* |
| **problem** *(2)* | **receives** *(3)* | **rise** *(1)* | **significant** *(1)* |
| **proceeding** *(1)* | **receiving** *(1)* | **ROBERT** *(1)* | **significantly** *(1)* |
| **proceedings** *(6)* | **recollection** *(2)* | **robertloigman@quinn** | **similarities** *(1)* |
| **proceeds** *(8)* | **recommendations** *(2)* | **emanuel.com** *(1)* | **sir** *(1)* |
| **product** *(2)* | **record** *(1)* | **role** *(7)* | **sit** *(5)* |
| **PRODUCTION** *(1)* | **recorded** *(1)* | **room** *(1)* | **six** *(4)* |
| **professional** *(1)* | **recover** *(7)* | **Rose** *(1)* | **size** *(1)* |
| **promise** *(1)* | **red** *(1)* | **Rouge** *(1)* | **Skyview** *(5)* |

slow  (1)
small  (1)
sole  (1)
solely  (3)
somebody  (4)
somebody-who  (1)
sorry  (11)
Sounds  (1)
source  (5)
speak  (3)
speaks  (1)
specific  (1)
specificity  (1)
speculate  (1)
spiraling  (1)
spoke  (1)
spoken  (1)
sponsored  (1)
STANG  (2)
start  (2)
started  (1)
State  (1)
statement  (2)
STATES  (2)
status  (1)
Stenographically  (3)
step  (1)
stick  (1)
STIPULATIONS  (1)
stopped  (1)
Street  (2)
strike  (1)
structure  (9)
subject  (3)
Subtrust  (1)
succeed  (3)
suggest  (2)
suggesting  (2)
suggests  (2)
Suite  (3)
SULLIVAN  (1)
Sunday  (2)
supervision  (1)
supplied  (1)
SUPPORT  (4)
supporting  (23)
supposedly  (2)
sure  (9)
sworn  (1)

Systems  (1)

< T >
tainted  (1)
take  (3)
taken  (2)
talk  (1)
talked  (4)
talking  (4)
technical  (1)
Technically  (2)
tell  (10)
telling  (1)
terminated  (1)
terms  (3)
test  (1)
testified  (2)
testify  (1)
testimony  (4)
testing  (1)
TEXAS  (6)
Thank  (9)
Thanks  (1)
therefor  (1)
thing  (1)
things  (2)
think  (11)
thinks  (1)
Third  (2)
three  (5)
thrown  (2)
Time  (9)
today  (14)
today's  (1)
told  (5)
TORREY  (3)
track  (1)
transaction  (1)
transactional  (1)
transactions  (3)
transcribed  (1)
transcript  (5)
transparency  (1)
travel  (1)
treasurer  (4)
tribunal  (1)
true  (2)
Trust  (32)
Trustee  (1)

truth  (3)
try  (2)
trying  (1)
tune  (1)
two  (5)
type  (2)
typewriting  (1)

< U >
understand  (8)
understanding  (26)
understood  (2)
unexplained  (1)
unfair  (9)
Unfortunately  (1)
UNITED  (1)
URQUHART  (1)
usual  (1)

< V >
vague  (1)
valuations  (1)
value  (7)
vanished  (1)
vehicle  (1)
vein  (1)
versus  (1)
vice  (3)
videoconferencing  (1)
video-conferencing  (1)
VIDEOGRAPHER  (1)
VIDEO-RECORDED  (2)
view  (4)
Vine  (1)
vision  (1)
volume  (2)
vote  (1)
voting  (1)

< W >
wait  (1)
want  (16)
way  (7)
Wednesday  (1)
weekend  (1)
weeks  (1)

Well  (17)
we're  (9)
we've  (5)
Wilkerson  (1)
WINOGRAD  (1)
wish  (1)
WISHNEW  (1)
withdrawn  (16)
witness  (3)
woman  (1)
words  (2)
work  (1)
working  (1)
workings  (1)
write-down  (2)
wrong  (6)
wrongdoing  (1)

< Y >
Yeah  (6)
year  (2)
years  (6)
Yep  (1)
York  (6)

< Z >
ZIEHL  (2)

**EXHIBIT 125**

```
 1              UNITED STATES BANKRUPTCY COURT

 2            FOR THE NORTHERN DISTRICT OF TEXAS

 3                     DALLAS DIVISION

 4       --------------------------

 5   In Re:                      Case No. 19-34054-sgj11

 6   HIGHLAND CAPITAL MANAGEMENT,

 7   L.P.,

 8        Debtor.               Chapter 11

 9       -------------------------X.

10

11

12         REMOTE VIDEO-RECORDED DEPOSITION of

13                  TORREY LITTLETON

14              Sunday, June 22, 2025

15              3:30 p.m. Central time

16

17

18

19

20   Reported Stenographically by:

21   Gail L. Inghram,

22   BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02734-L   Document 1-25   Filed 02/25/25   Page 309 of 406   PageID 4567
Deposition of Torrey Littleton   Exhibit 125   Page 2 of 100   Highland Capital Management L.P.

```
 1

 2

 3

 4

 5

 6

 7

 8                   WHEREUPON, the remote video-recorded

 9     deposition of TORREY LITTLETON was held via

10     video-conferencing on Sunday, June 22, 2025,

11     beginning at approximately 3:30 p.m. Central

12     Time, the proceedings being recorded

13     stenographically by Gail Inghram, Registered

14     Diplomate Reporter, Certified Realtime Reporter,

15     Certified Shorthand Reporter, and transcribed

16     under her direction, there being present:

17

18

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2   [All parties appeared via remote videoconferencing.]

 3

 4   On behalf of Highland Capital Management, and the Highland

 5   Claimant Trust:

 6       JOHN MORRIS, ESQ.

 7       jmorris@pszjlaw.com

 8       GREGORY V. DEMO, ESQ.

 9       gdemo@pszjlaw.com

10       JEFFREY POMERANTZ, ESQ.

11       jpomerantz@pszjlaw.com

12       HAYLEY WINOGRAD, ESQ.

13       hwinograd@pszjlaw.com

14           PACHULSKI STANG ZIEHL & JONES

15           780 Third Avenue, 34th Floor

16           New York, New York 10017-2024

17           310.277.6910

18

19   On behalf of Highland Litigation Trustee:

20       ROBERT S. LOIGMAN, ESQ.

21       robertloigman@quinnemanuel.com

22           QUINN EMANUEL URQUHART & SULLIVAN, LLP

23           51 Madison Avenue 22nd Floor

24           New York, New York 10010

25           212.849.7615
```

```
 1    A P P E A R A N C E S (Cont'd):

 2

 3    On behalf of Defendant Dallas Foundation and Crown Global

 4    Life Insurance:

 5        MATTTHEW OKIN, ESQ.

 6        mokin@okinadams.com

 7        DAVID CURRY, ESQ.

 8        dcurry@okinadams.com

 9           OKIN ADAMS BARTLETT CURRY LLP

10           1113 Vine Street, Suite 240

11           Houston, Texas 77002

12           713.228.4100

13

14    On behalf of Defendant Dugaboy Investment Trust:

15        MICHAEL LANG, ESQ.

16        mlang@cwl.law.com

17           CRAWFORD WISHNEW & LANG PLLC

18           1700 Pacific Avenue, Suite 2390

19           Dallas, Texas 75201

20           214.817.4500

21

22

23

24

25
```

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   On Behalf of Hunter Mountain Investment Trust:

 4       LOUIS M. PHILLIPS, ESQ.

 5       lphillips@kellyhart.com

 6       AMELIA L. HURT, ESQ.

 7       ahurt@kellyhart.com

 8          KELLY HART & HALLMAN LLP

 9          301 Main Street, Suite 1600

10          Baton Rouge, Louisiana 70801

11          225.381.9643

12

13   VIDEOGRAPHER:

14       PAUL D'AMBRA

15

16

17   ALSO PRESENT:

18       NATHAN HALL, Pachulski Stang Ziehl & Jones

19       JAMES SEERY

20       SHAWN RAVER

21       JULIE DIAZ

22

23

24

25
```

```
 1                    - - -

 2                  I N D E X

 3                    - - -

 4

 5   EXAMINATION OF:                    PAGE

 6   TORREY LITTLETON

 7         Attorney Morris ..................8

 8

 9

10

11   PREVIOUSLY MARKED EXHIBITS REFERENCED:

12   NUMBER                    PAGE

13   Exhibit Highland 1 ..........58

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 7   Filed 08/26/25   Page 314 of 406   PageID 4572
Deposition of 3:25-cv-02724-L   Exhibit 125   Page 8 of 100   Page 314 of 406   Capital Management L.P.

```
 1                    DEPOSITION SUPPORT INDEX

 2    INSTRUCTION NOT TO ANSWER:

 3    PAGE   LINE

 4     67      21

 5

 6

 7    REQUEST FOR PRODUCTION OF DOCUMENTS

 8    PAGE   LINE

 9    (None)

10

11

12    STIPULATIONS

13    PAGE   LINE

14    (None)

15

16    QUESTIONS MARKED

17    PAGE   LINE

18    (None)

19

20

21                    REPORTER'S NOTE:

22    QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY

23    REFLECT A DIRECT QUOTE.

24

25
```

```
 1                     -   -   -

 2                P R O C E E D I N G S

 3                     -   -   -

 4    WHEREUPON,

 5                    TORREY LITTLETON,

 6    being first duly sworn or affirmed to testify to the

 7    truth, the whole truth, and nothing but the truth,

 8    was examined and testified as follows:

 9

10                    EXAMINATION

11     BY ATTORNEY MORRIS:

12         Q.    Actually, I just want to start by

13    apologizing to the witness that I did not tell

14    him that Sunday depositions were casual.  Thanks

15    for dressing up.

16         A.    I appreciate it.  No worries.

17         Q.    And for some of us, Mr. Littleton,

18    every day is Sunday unless we're going to court.

19              It's nice to meet you, sir.

20         A.    Same here.

21         Q.    Can you hear me okay, sir?

22         A.    Yes, I can hear you.

23         Q.    Okay.  Good afternoon.  My name is

24    John Morris.  I'm an attorney at a law firm who

25    represents Highland Capital Management, LP, and
```

```
 1    the Highland Claimant Trust.  And we're here

 2    today for your deposition in connection with the

 3    Dallas Foundation's objection to a certain

 4    proposed settlement agreement between Highland

 5    and some affiliates and some entities that are

 6    controlled by Mark Patrick.

 7              Do you understand that?

 8        A.    Yes.

 9        Q.    Have you ever been deposed before,

10    sir?

11        A.    No.  This is my first time.

12        Q.    Okay.  It's not -- just relax.  It's

13    a -- it's a formal process, but it's not a

14    complicated process.  I'm going to ask you a

15    series of questions, and it's very important that

16    you let me finish my question before you begin

17    your answer.  Okay?

18        A.    Yes, sir.

19        Q.    It's important that I allow you to

20    finish your answer before I begin my next

21    question; and if I fail to do that, will you let

22    me know?

23        A.    Yes, sir, I will.

24        Q.    Do you understand that your testimony

25    today is being transcribed by Gail, the court
```

```
 1    reporter?

 2         A.    Yes.

 3         Q.    So everything you and I say is going

 4    to be written down verbatim, or that's the goal

 5    anyway.

 6              Do you understand that?

 7         A.    Yes, I do.

 8         Q.    Okay.  If there's a question that I

 9    ask that you don't understand, will you let me

10    know and I'll try to rephrase it?

11         A.    Yes.

12         Q.    From time to time your lawyer might

13    object to some of my questions.  It will give --

14    it's formal, legal stuff, lawyer stuff.  It gives

15    me a chance to think about whether there's a

16    legal infirmity in my question, and it gives me

17    an opportunity to rephrase it if I want.

18              But unless he directs you not to

19    answer, I'm going to ask you to answer the

20    question anyway.  Okay?

21         A.    Okay.

22         Q.    Just so you're not surprised by the

23    process.

24              If you need a break for any reason at

25    any time, let me know, and I'll try to
```

```
 1    accommodate you as long as a question is not

 2    pending.  Okay?

 3         A.     Yes.

 4         Q.     Are you affiliated with the Dallas

 5    Foundation, sir?

 6         A.     Yes, I am.

 7         Q.     In what capacity?

 8         A.     I am the CFO here at the Dallas

 9    Foundation.

10         Q.     How long have you been the CFO of the

11    Dallas Foundation?

12         A.     I've been the CFO here since

13    January 1st of 2022, but I've been with the

14    organization for 13 years.

15         Q.     And what are your duties and

16    responsibilities as the CFO?

17         A.     As the CFO, my main duty is to ensure

18    the proper oversight and fiduciary stewardship of

19    our charitable assets.  That means having

20    fiduciary oversight of our investments, our

21    financial reporting, any legal aspects that may

22    impact the foundation in any capacity.

23              I also serve as a board director as

24    relates to some of our supporting organizations,

25    part of our conversation here today with Empower
```

```
 1    Foundation and the Okada Family Foundation.

 2            Q.    Are you a lawyer?

 3            A.    No, sir.

 4            Q.    Are you familiar with a company called

 5    Highland Capital Management, LP?

 6            A.    Yes, sir.

 7            Q.    Are you aware that that entity filed

 8    for bankruptcy a number of years ago?

 9            A.    Yes, sir.

10            Q.    Are you aware that that entity used to

11    be controlled by a gentleman named Jim Dondero?

12            A.    Yes, sir.

13            Q.    Okay.  Are you aware that the Dallas

14    Foundation recently filed an objection in the

15    bankruptcy court overseeing Highland's bankruptcy

16    and the objection pertaining to a proposed

17    settlement agreement between Highland and certain

18    affiliates and certain entities that are

19    controlled by Mr. Patrick?

20            A.    Yes, sir.

21            Q.    Did you review that objection before

22    it was filed?

23            A.    Yeah, I read through the objections.

24    But for the most part, I rely on our legal team

25    to give us a summary and kind of walk us through
```

```
 1    some of the pertinent details.
 2         Q.    Are you familiar with the entities
 3    that Mr. Patrick signed that agreement on behalf
 4    of?
 5         A.    Yeah; I believe it's the Hunter
 6    Mountain Investment Trust.
 7         Q.    Right.  And you're aware that in
 8    addition to the Hunter Mountain -- can we refer
 9    to Hunter Mountain Investment Trust as "HMIT"
10    today?
11         A.    Yes.
12         Q.    And are you aware that certain
13    affiliates of HMIT are also party to the
14    settlement agreement that is the subject of this
15    proceeding?
16         A.    I am.
17         Q.    And can we refer to HMIT and those
18    affiliates that are party to the agreement as
19    "the HMIT entities"?
20         A.    Yes.
21         Q.    Okay.  It's going to make our day a
22    little bit quicker and a little bit easier.
23         A.    Sure.
24         Q.    Do you know who approved the filing of
25    the objection on behalf of the Dallas Foundation?
```

 1          A.    Yeah, so it was approved by President

 2   Julie Diaz.

 3          Q.    Anybody else?

 4          A.    Then our legal team helped us kind of

 5   put together the objection.

 6          Q.    Do you know, have you ever met

 7   Jim Dondero?

 8          A.    I have never met him personally, no.

 9          Q.    Have you ever spoken with him?

10          A.    I think I was on one conference call

11   with him one time that I can recall.

12          Q.    Okay.  Do you know if he had any role

13   in the preparation of the Dallas Foundation's

14   objection?

15          A.    I didn't have any exposure with

16   Mr. Dondero.  So, no, I do not know.

17          Q.    Do you know where the idea of filing

18   the objection originated?  Like, whose idea was

19   it?

20          A.    Yes -- yes.

21          Q.    Whose idea was it to file the

22   objection?

23          A.    Well, it's a combination of the

24   Empower and Okada Foundation boards.  Just

25   looking at some of the investment activity that

```
 1    transpired through the first quarter, we had some

 2    concerns about the activity.  And a portion of

 3    that activity was the sale of Hunter Mountain

 4    interests through the Rand PE Fund I that

 5    ultimately rolled up to the Atlas, LP Fund, which

 6    impacted the economic value of the portfolio

 7    that's held by Crown Global.

 8         Q.    That's why the -- let's unpack that a

 9    little bit.  I asked where did the -- who came up

10    with the idea of objecting?  Let's take that

11    first.

12         A.    Sure, sure.  Yeah, I think it was the

13    board of the foundations, so primarily Julie Diaz

14    and myself just kind of thinking through the

15    activity that we became aware of.

16         Q.    And Mr. Dondero is a member of the

17    board; right?

18         A.    That's correct.

19         Q.    And it's just the three of you;

20    correct?

21         A.    That's correct.

22              ATTORNEY OKIN:  Object to form.

23    BY ATTORNEY MORRIS:

24         Q.    The Dallas Foundation's objection

25    refers to certain litigation pending in the
```

```
 1    Cayman Islands.

 2               Are you aware of that?

 3         A.    Yes.

 4         Q.    Are you aware that Mr. Dondero is

 5    funding that litigation on behalf of the

 6    supporting organizations that commenced it?

 7         A.    Yes, sir.

 8         Q.    And you're aware that he's funding

 9    this litigation on behalf of the Dallas

10    Foundation; correct?

11         A.    That's correct.

12         Q.    Do you know why Empower Dallas

13    Foundation and the Okada Family Foundation didn't

14    just file the objection in their own name rather

15    than having the Dallas Foundation do it for them?

16               ATTORNEY OKIN:  Object to form.

17         A.    I think we looked it as the Dallas

18    Foundation is the supporting organization of the

19    two entities.  And we felt that the Dallas

20    Foundation and our president, Julie Diaz, we just

21    decided to file it under the foundation based on

22    a recommendation from our legal counsel.

23    BY ATTORNEY MORRIS:

24         Q.    Are you aware that the objection is

25    also filed on behalf of Crown Global Life
```

```
 1    Insurance, Limited?
 2         A.    Yes, sir.
 3         Q.    Okay.  And what is Crown Global Life
 4    Insurance, Limited?
 5         A.    The Crown Global Life Insurance,
 6    Limited, is an issuer of insurance annuities.
 7         Q.    What -- what role does it play with
 8    respect to the Dallas Foundation?
 9         A.    Yeah, so it plays a role more so with
10    the Empower Dallas and Okada Family Foundation.
11    They each hold policies with Crown Global through
12    the insurance annuities.  So the legal contract
13    is between Empower Dallas and Okada Family
14    Foundation with Crown Global.
15         Q.    And -- and is the withdrawn.
16               Does the annuity pay dividends or make
17    other distributions?
18         A.    Yeah, it makes distributions to the
19    fund as fixed payments through the contract, yes,
20    sir.
21         Q.    And do those fixed payments go
22    directly from Crown Global to Empower Dallas and
23    the Okada Family Foundation respectively?
24         A.    That's correct.
25         Q.    And do you know what the annuities are
```

```
 1    invested in?

 2         A.    I don't know the actual underlying

 3    investments.  I know the annuities have within

 4    them the Atlas IDF, LP Fund, and that they --

 5    what ultimately rolls up is the Rand Fund I, the

 6    Beacon Mountain and the Hunter Mountain, HMIT,

 7    ultimately rolls up.

 8         Q.    And is -- are the annuities the sole

 9    source of Empower Dallas and the Okada Family

10    Foundation's income, to the best of your

11    knowledge?

12         A.    That's correct, yes, sir.

13         Q.    And does a portion of that income then

14    flow up to the Dallas Foundation?

15         A.    Well, the income doesn't flow to the

16    Dallas Foundation.  What does happen is, as

17    Empower and the Okada Family Foundations make

18    recommendations, those recommendations flow to

19    the Dallas Foundation, to the corresponding

20    donor-advised fund; and then ultimately those

21    donor-advised funds make the grants out to the

22    community.

23              We typically don't get any of the

24    income through the Crown Global vehicle -- the

25    Dallas Foundation doesn't get any income through
```

```
 1    the Crown Global vehicle.

 2         Q.    Is there anybody in the room with you

 3    right now?

 4         A.    No, sir.

 5         Q.    Do you have any device on other than

 6    the computer that we're sharing right now?

 7         A.    No.  I have a fan on.  Is it causing

 8    feedback?

 9         Q.    No, but I have a fan on too.  Maybe

10    it's --

11         A.    Okay.  Sorry.  Yeah.  Sorry about

12    that.

13         Q.    Do you have any notes or anything that

14    you're reading from or that you're looking at?

15         A.    No, sir, no.

16         Q.    Okay.  So there are these annuities.

17    How did those annuities get funded?  Do you know?

18         A.    Yes.  So back in 2015, I believe, in

19    November of 2015, we funded the annuities with

20    about $29 million.  So contributions from -- I

21    think it was about $22 million from the --

22    Mr. Dondero, and then I believe another $7

23    million from Mr. Okada, which ultimately were

24    sent over to Crown Global to invest in the

25    annuities.
```

```
 1        Q.    And under the annuities, they pay
 2   fixed amounts to both supporting organizations?
 3        A.    Yes, sir, that's correct.
 4        Q.    And is there any market risk that the
 5   supporting organizations have, or is this a -- is
 6   it your understanding that it's a contractual
 7   obligation of Crown Global to pay that fixed
 8   amount for some duration?
 9        A.    Yeah, I believe Crown Global takes the
10   risk.  They have to pay a fixed amount through
11   the obligation.  I believe they take an M&E
12   expense, which compensates for the risk.
13        Q.    What's that last piece?  I missed --
14        A.    The M&E expenses, it's part of
15   their -- we receive their statements quarterly.
16   They have an administrative fee that they take,
17   and then they have what they call an M&E expense,
18   which it was explained a while back that's a
19   percentage that they take to compensate for the
20   risk associated with insurance annuities.
21        Q.    And is the annuity tied to a -- is it
22   a fixed period of time, or is it tied to a
23   particular event?
24        A.    That, I cannot answer.
25        Q.    Okay.  But is it fair to say that the
```

```
 1    supporting organizations paid money to Crown

 2    Royal -- Crown Global -- it's getting late.

 3    Sorry.

 4              ATTORNEY OKIN:  Sounds good.

 5              THE WITNESS:  No.  Sounds good, yeah.

 6    BY ATTORNEY MORRIS:

 7         Q.    Let me restate the question.

 8              Is it your understanding that the

 9    supporting organizations paid money to

10    Crown Global; and in exchange, they got annuities

11    which produced a fixed stream of income for a

12    period of time in the future?  Is that right?

13         A.    That's correct.

14         Q.    Okay.  And that the assets -- the

15    segregated accounts themselves are owned by

16    Crown Global; correct?

17         A.    I believe the Atlas IDF Fund, I

18    believe Crown Global has partnership interests in

19    that particular fund.  I don't think they have

20    any ownership of the other underlying segregated

21    accounts.  Not that I'm aware of.

22         Q.    Do the segregated accounts hold

23    anything other than the annuities?  Withdrawn.

24              Do the segregated accounts hold the

25    annuities?
```

```
 1         A.    The segregated accounts, not to my
 2   knowledge do they hold the annuities.  What I
 3   believe hold the annuities is the Atlas IDF, LP
 4   Fund holds the annuities.
 5         Q.    But Crown Global is the one who takes
 6   the risk with respect to the investments in the
 7   annuities; correct?
 8         A.    That's correct.
 9         Q.    And do they take the risk as well with
10   respect to the value of Atlas, for example?
11         A.    Yes, they do take the risk with the
12   value of Atlas.
13         Q.    So whether Atlas is worth a dollar or
14   a billion dollars, Crown Global has the same
15   obligation to the supporting organizations to pay
16   the fixed stream of income that it agreed to when
17   it sold the annuity to them; correct?
18         A.    That's my understanding.
19         Q.    Okay.  So that regardless of the value
20   of the segregated accounts, the supporting
21   organizations are guaranteed to receive the exact
22   same amount of money over time as long as
23   Crown Global complies with its obligations in the
24   annuity contract; correct?
25         A.    Yes, sir.
```

```
 1         Q.    Okay.  Do you know if the Dallas
 2   Foundation ever appeared in the Highland
 3   bankruptcy before it filed this objection?
 4         A.    No, sir, I don't believe we did.
 5         Q.    And as the CFO, is it fair to say that
 6   you know that the Dallas Foundation never filed a
 7   claim in the Highland bankruptcy?
 8         A.    Yes, sir.
 9         Q.    And do you also know that the Dallas
10   Foundation does not have an interest in the
11   Highland Claimant Trust that was formed as part
12   of the plan of reorganization?
13               ATTORNEY OKIN:  Object to form.
14   BY ATTORNEY MORRIS:
15         Q.    Withdrawn.  Let me lay a little bit of
16   foundation.
17               Are you familiar with an entity called
18   the Highland Claimant Trust?
19         A.    Yes.
20         Q.    Okay.  Does the Dallas Foundation
21   have, directly or indirectly, any interest in the
22   Highland Claimant Trust?
23               ATTORNEY OKIN:  Object to form.
24         A.    What I could say is that it depends on
25   the settlement with relationship with Hunter
```

```
 1    Mountain and indirectly with the roll-up that the
 2    beneficial interest to Empower and Okada
 3    Foundation and how that settlement impacts the
 4    economic interest there.  I think that's where
 5    the Dallas Foundation could indirectly have some
 6    interest.  While we're not the sole ownership of
 7    the Crown Global policy, we do have a
 8    relationship with Empower Dallas and the Okada
 9    supporting organizations.
10    BY ATTORNEY MORRIS:
11        Q.    Well, you don't have an interest in
12    what, did you say?  The annuities?
13        A.    We do have an interest in the annuity
14    contracts.
15        Q.    The Dallas Foundation didn't fund the
16    annuity contracts; correct?
17        A.    No, we did not fund them.  But --
18        Q.    And the Dallas Foundation doesn't own
19    the annuity contracts; correct?
20        A.    No, we don't own the annuity
21    contracts.  But what we do is we do have a
22    fiduciary responsibility for any relationship
23    that they financially to protect, preserve and to
24    grow these charitable assets.  And, ultimately,
25    the supporting organizations, they roll up into
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-00724-L   Document 17-125 Filed 06/26/25   Page 332 of 406   PageID 4590
Deposition of Stanley Beyer, Exhibit 17 Filed 06/26/25 Page 332 of 406 Capital Holdings L.P.

```
 1   our financial statements.
 2        Q.   Is it your understanding that
 3   Crown Global has a duty to distribute --
 4   withdrawn.
 5             Is it your understanding that
 6   Crown Global has a duty to make distributions to
 7   the Dallas Foundation?
 8        A.   No, sir.  They make distributions to
 9   Empower and Okada supporting organizations.
10        Q.   Do you have any reason to believe that
11   Crown Global owes any duty at all to the Dallas
12   Foundation with respect to the annuities?
13             ATTORNEY OKIN:  Object to form.
14        A.   There's no direct responsibility from
15   Crown Global to the Dallas Foundation.  But
16   because of our relationship with Okada and
17   Empower, there is an indirect relationship there,
18   that we have an interest.
19   BY ATTORNEY MORRIS:
20        Q.   And let's go beyond the annuities.
21             Do you know whether Crown Global has
22   any direct duty to the Dallas Foundation for any
23   reason?
24             ATTORNEY OKIN:  Object to form.
25        A.   I'm going to say not directly.
```

```
 1    BY ATTORNEY MORRIS:

 2         Q.    Okay.  Thank you.

 3               Does the Dallas Foundation carry on

 4    its balance sheet any interest in the Highland

 5    Claimant Trust?

 6         A.    No, sir.

 7         Q.    Do you know if the Dallas Foundation

 8    has any contractual relationship with Highland

 9    Capital Management or the Highland Claimant

10    Trust?

11         A.    No, sir, we don't.

12         Q.    Do you have any reason to believe

13    today that Highland Capital Management or the

14    Highland Claimant Trust owes any duties or

15    obligations to the Dallas Foundation?

16               ATTORNEY OKIN:  Object to form.

17         A.    I wouldn't say there was any duties or

18    obligations to the Dallas Foundation.  But I do

19    think we have, again, some interest in the

20    settlements and how the funds originally were

21    supposed to flow up to Empower and Okada.

22               Empower and Okada, they roll up to the

23    Dallas Foundation's financial statements.  So I

24    think there is some indirect interest in Highland

25    Capital Claimant Trust and the decisions that are
```

```
 1   being made as it relates to the settlement.

 2   BY ATTORNEY MORRIS:

 3       Q.    I'm going to respectfully move to

 4   strike and ask you to listen carefully to my

 5   question --

 6       A.    Yes, sir.

 7       Q.    -- and this will go very smoothly.

 8             Do you have any reason to believe that

 9   Highland Capital Management or the Highland

10   Claimant Trust owes any duties or obligations to

11   the Dallas Foundation?

12             ATTORNEY OKIN:  Objection; form.

13             THE WITNESS:  My apologies.

14             ATTORNEY OKIN:  Go ahead.

15       A.    No, sir.

16   BY ATTORNEY MORRIS:

17       Q.    Are you aware that if the settlement

18   between the Highland entities and the HMIT

19   entities is approved, that the HMIT entities will

20   receive cash and other assets as set forth in the

21   agreement?

22       A.    Yes.

23       Q.    Do you have any reason to believe that

24   the Dallas Foundation has a right to receive any

25   of the cash or other assets that would be
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17-125 Filed 06/29/25   Page 335 of 406   PageID 4598
Deposition of ... Exhibit 7   Page 100 of 100   ... Highland Capital Management, L.P.

```
 1    delivered to HMIT if the settlement is approved?
 2               ATTORNEY OKIN:  Object to form.
 3        A.    Like I say based on the facts is that
 4    the interest in HMIT were sold for a million
 5    dollars.  So I believe the current structure as
 6    of now, the two supporting organizations would
 7    not receive any settlements.  They would not have
 8    any economic benefit of the settlement payout.
 9               Based on the historical structure,
10    yes, I would have said yes.  We had interest in
11    that settlement that would ultimately impact the
12    fair market values for Empower and Okada.
13    BY ATTORNEY MORRIS:
14        Q.    Are you familiar with the fair market
15    value of Empower and Okada?
16        A.    So the fair market value is through
17    the insurance annuity.  So based on the --
18        Q.    I'm sorry.  Through the insurance
19    what?
20        A.    It's the insurance through
21    Crown Global, so they produce a fund statement on
22    a quarterly basis.  We use that to state the fair
23    market value.
24        Q.    And is the fair market value based on
25    anything other than the projected future income
```

```
 1   stream that you described earlier?

 2        A.    I believe there is impact related to

 3   some of the sub accounts.  One thing we do know

 4   is in February of 2025, we saw the fair market

 5   value increased by 918,000 due to the sale of

 6   Rand's interest in Hunter Mountain.  So we do

 7   believe there are other assets that impact the

 8   fair market value.

 9        Q.    But that's the fair market value of

10   the annuities; is that right?

11        A.    The sale of the Rand -- the interest

12   in the Hunter Mountain, the Rand?

13        Q.    Yeah, yeah.  Is what you're describing

14   the fair market value of the annuities that flows

15   up to the supporting organizations?

16        A.    I believe we have a couple of

17   investments that are within the Crown Global

18   structure.  I think you have insurance annuities,

19   and then you have other assets that are also

20   within that structure through the Atlas platform.

21   The way I understand it, the Atlas platform

22   allows for other alternative investments to be

23   wrapped within the insurance annuities.

24        Q.    Did the supporting organizations have

25   an ownership interest in Crown Global?
```

```
 1        A.    Yeah.  They hold the policy, right?

 2   The supporting organizations hold the policy

 3   through Crown Global, so absolutely.

 4        Q.    And the policy that you're referring

 5   to are the annuity policies?

 6        A.    The annuity policies, that's correct.

 7        Q.    And, again, just for clarity, it does

 8   not matter to the supporting organization what

 9   the value of the assets that are held by

10   Crown Global is; what matters is the agreed-upon

11   future flow of distributions; fair?

12        A.    That's fair, yes, sir.  Yes.

13        Q.    Are you familiar at all with the

14   structure of the Highland Claimant Trust?

15        A.    Not with the Highland Claimant Trust,

16   no.  I'm familiar with the structure of the --

17   the Rand structure here as relates to the Empower

18   Dallas, and then I'm familiar with the DAF Holdco

19   structure.

20        Q.    Are you familiar with the HMIT

21   structure?

22        A.    I'm familiar -- I know how the

23   structure flows up to the Atlas IDF Fund.

24        Q.    Have you reviewed any of the governing

25   documents for HMIT or any of the Rand funds or
```

```
 1    any of the Atlas funds?  Have you ever reviewed
 2    the governing documents?
 3        A.    At a high level, I took a glance at
 4    the governing documents to get an understanding
 5    of the flow.  I've seen organizational flow
 6    charts to kind of give me an idea of who owns
 7    what and how does it roll up ultimately to
 8    Crown Global.
 9        Q.    Do you have any knowledge as to what,
10    if any, role Crown Global played in the Highland
11    bankruptcy?
12        A.    No, sir.
13        Q.    So we've talked about the Rand and the
14    Atlas entities and Hunter Mountain, and we've
15    referred to those that signed on to the agreement
16    as "the HMIT entities"; right?
17        A.    Yes.
18        Q.    Do you know why each of the HMIT
19    entities was created?  Do you know what purpose
20    they served?
21        A.    You know, I know that they create some
22    vehicles that allow some different types of
23    investments.  I would imagine -- I don't know why
24    the structures were created the way they were.
25    We don't have that kind of insight.  That's just
```

```
 1    an assumption.
 2         Q.    Can you identify any assets that HMIT
 3    owns today?
 4         A.    No, sir.
 5         Q.    Were you ever able to identify any
 6    assets that HMIT owned?
 7         A.    No.
 8         Q.    In your duties as the CFO for the
 9    Dallas Foundation, did you ever make an inquiry
10    as to what assets HMIT owned?
11         A.    We made an inquiry to the Atlas
12    structure unsuccessfully over the years because
13    they were able to get to the underlying assets to
14    have a clear understanding of the holdings; so,
15    no, I couldn't tell you that I was successful in
16    understanding the underlying assets.
17         Q.    So you've been the CFO for three years
18    now --
19         A.    Yes, sir.
20         Q.    -- and a half?
21               But you were with the organization for
22    about six; right?
23         A.    For 13, 13 total.
24         Q.    Thank you.
25               So you've been with the organization
```

```
 1    long before Mark Patrick ever had any role with

 2    respect to the HMIT entities; right?

 3         A.    Yes, sir.

 4         Q.    Okay.  At any time that you've been

 5    with the Dallas Foundation, were you ever

 6    informed as to the assets that were held by HMIT?

 7         A.    No, sir.

 8         Q.    No; right?

 9         A.    That's correct -- no.

10         Q.    Do you know today what assets are held

11    by any of the HMIT entities?

12         A.    No, sir.

13         Q.    At any time during your tenure at the

14    Dallas Foundation, were you ever informed as to

15    what the assets were that any of the HMIT

16    entities owned?

17         A.    No, sir.

18         Q.    Okay.  And did you ever think that, as

19    part of your duties and responsibilities working

20    for the Dallas Foundation, that you needed to

21    know that information?

22         A.    Absolutely.  Yeah, we inquired on

23    multiple occasions to get our auditors

24    comfortable with the investment vehicle.

25         Q.    And you were never able to get that
```

```
 1     information, is that right?

 2          A.    That's right.

 3          Q.    And that was true for the entire time

 4     of your tenure at the Dallas Foundation?

 5          A.    Yes, sir.

 6          Q.    Okay.  In the course of your duties,

 7     did you ever communicate with anybody who was

 8     acting on behalf of HMIT?

 9          A.    I had some communications with

10     Mark Patrick, but I don't think he was over HMIT

11     at the time.  I don't know.  So it's kind of hard

12     to understand the transfer of a trustee or

13     ownership or oversight those accounts had.

14               So at a high level, he was probably

15     the person I tried to communicate with if we had

16     any questions around the valuations.

17          Q.    But it wasn't necessarily because he

18     was wearing the HMIT hat; it was because he wore

19     a lot of hats.  Is that fair?

20          A.    That's fair, yes.

21          Q.    During the course of your tenure at

22     the Dallas Foundation, did you ever once say to

23     yourself, I need to speak to the guy who's the

24     head of HMIT?

25          A.    No, we've never said that.
```

1    Q.    Okay.  Did you ever say to yourself at

2    any time during your tenure at the Dallas

3    Foundation, I need to speak to the head of any of

4    the HMIT entities?

5        A.    No, sir.

6        Q.    Do you know if the Dallas Foundation

7    ever received anything of value from HMIT

8    directly?

9        A.    I can't say directly, no.  I just

10   assumed it had rolled up.  It was -- we had some

11   value through the structure, I would imagine.

12       Q.    Do you know if the Dallas Foundation

13   ever received anything of value directly from any

14   of the HMIT entities?

15       A.    No, sir.

16       Q.    Do you know if any of the --

17   withdrawn.

18           Do you have any reason to believe that

19   any of the HMIT entities owes a duty or

20   obligation to the Dallas Foundation today?

21           ATTORNEY OKIN:  Object to the form.

22       A.    I believe that there's going to be

23   impact to our economic interest in Crown Global.

24   I do believe there's a fiduciary obligation to

25   the Dallas Foundation to have communication if

1    there are investment decisions that are being

2    made that's going to impact that economic

3    interest, positive or negatively.

4    BY ATTORNEY MORRIS:

5         Q.    Sorry.  I may not have heard it

6    clearly.

7              But do you believe that Highland

8    Capital Management or the Highland Claimant Trust

9    owes a fiduciary duty to the Dallas Foundation?

10        A.    Sorry.  No.  No.  No.  I thought you

11    said HMIT.  Sorry.

12        Q.    You know what?  I probably did.  Let's

13    do that.

14        A.    Yeah.

15        Q.    Did you believe -- do you believe that

16    any of the HMIT entities owes a fiduciary duty to

17    the Dallas Foundation?

18              ATTORNEY OKIN:  Object to form.

19        A.    Again, I'll just restate what I said.

20              If it's starting to impact the

21    economic interest for the value of the

22    Crown Global policies, I do think there's a

23    fiduciary obligation to have a conversation to

24    inform of any investment decisions that are being

25    made that could have significant impact to that

```
 1    value.

 2    BY ATTORNEY MORRIS:

 3         Q.    Okay.  Are you aware that HMIT filed a

 4    motion in the bankruptcy court a couple of years

 5    ago seeking permission to file a lawsuit against

 6    Highland Capital Management and others?

 7         A.    Yes, sir, I am aware of that.

 8         Q.    You are.

 9               Did HMIT seek the Dallas Foundation's

10    approval before filing that motion?

11         A.    No, sir, not that I'm aware of.

12         Q.    Do you believe that HMIT was required

13    to seek the Dallas Foundation's approval before

14    filing that lawsuit?

15         A.    Again, I think it -- I don't know if

16    "seek approval" is the right language I would

17    use.  But I do think informing the Dallas

18    Foundation, that this could impact the economic

19    interests of Empower and Okada Foundation.

20         Q.    And nobody ever told you that; is that

21    right?

22         A.    That's correct.

23         Q.    How did you learn about the lawsuit

24    that HMIT commenced against Highland and others a

25    couple of years ago?
```

```
 1         A.    Well, as we kind of got -- one, it was
 2   kind of some news that was -- that came about
 3   through some other research.  Currently, as of
 4   today, we have our legal team working, pulling
 5   together facts so they kind of reiterated some of
 6   the facts that could impact the overall case.  So
 7   I will just lean on our legal team to kind of
 8   bring us up to speed on this fact-finding.
 9         Q.    Do you know who authorized the filing
10   of that motion?
11         A.    From HMIT?
12               ATTORNEY OKIN:  Object to form.  Which
13   motion do you mean, John?
14               ATTORNEY MORRIS:  The same one we're
15   talking about, the motion for permission from the
16   bankruptcy court to sue Highland and other
17   parties.
18               ATTORNEY OKIN:  The one he told you he
19   didn't even know about what was filed.
20               ATTORNEY MORRIS:  Hey, Matt, he did
21   tell me.  He actually did tell me --
22               ATTORNEY OKIN:  He told you he heard
23   about it after, but go ahead.
24   BY ATTORNEY MORRIS:
25         Q.    So...
```

```
 1          A.    Yes, sir, I believe it was

 2   Mr. Mark Patrick that filed them.

 3          Q.    That authorized the filing of that

 4   lawsuit?

 5          A.    Yes, sir.

 6          Q.    Do you think he did anything wrong in

 7   doing that?

 8                ATTORNEY OKIN:   Object to form.

 9          A.    What I can say is that it has

10   impact -- it can potentially have some impact on

11   the -- it's convoluted.  I can't say he did

12   anything wrong with filing that motion.  But if

13   it's going to impact the Empower and Okada

14   Foundation, which is why I'm here today, is to

15   represent those supporting orgs, you know, I

16   think we have interest in the decisions that he's

17   making, right?

18   BY ATTORNEY MORRIS:

19          Q.    Okay.  But we can agree that he never

20   sought nor obtained the Dallas Foundation's

21   approval to file that motion; correct?

22          A.    Yes, sir, we can agree.

23          Q.    And can we also agree that you only

24   heard about that lawsuit after it was commenced

25   or after the motion was filed?
```

```
 1        A.    Yes, sir.
 2        Q.    Okay.  Have you read the settlement
 3   agreement that is the subject of the Dallas
 4   Foundation's objection?
 5        A.    Yeah, I've got some high-level facts
 6   related to the settlement agreement.  We had a
 7   legal team kind of -- again, we leaned on them to
 8   kind of pull out some of the important facts that
 9   could impact the Empower and Okada Foundation.
10        Q.    Do you know generally what HMIT is
11   proposing to give and receive under the
12   settlement agreement?
13        A.    Yes, sir, generally, I do know.  I
14   believe they're trying to release liability on
15   some of the claims.  I think that's part of the
16   settlement agreement.  I'm also aware that there
17   are future payouts that will be made to Hunter
18   Mountain.
19        Q.    And are you aware of other assets that
20   Hunter Mountain might receive if the settlement
21   agreement is pursued?
22        A.    Yes.
23        Q.    And what other assets are you aware
24   of?
25        A.    I know there's a large sum of assets,
```

```
 1    you know, in the -- 300 million, I think that's

 2    the amount of it that I don't recall.  But I

 3    couldn't go verbatim.

 4         Q.    It's not your understanding that

 5    there's $300 million worth of anything that's

 6    related to that agreement --

 7         A.    Oh, yeah, yeah, yeah.  But, yeah, it's

 8    not -- it's not there -- I was thinking about

 9    there was some data around -- I apologize if I'm

10    getting my facts confused.

11         Q.    That's okay.

12         A.    Yeah, actually, there's a -- as it

13    relates to the Empower and Okada, I believe there

14    was an impact of roughly 23-plus million dollars,

15    potentially.

16         Q.    But that has nothing to do with

17    Highland; correct?

18         A.    That's correct.

19         Q.    And it has nothing to do with this

20    settlement agreement; correct?

21              ATTORNEY OKIN:  Object to form.

22         A.    Well, I think if it has impact,

23    ultimately, again, to Empower and Okada, again,

24    we sold our interest in Highland Capital

25    Management -- or Hunter Mountain for a million
```

```
 1    dollars.  So based on what we know is if there is

 2    a payout of $23 million, Empower and Okada, we

 3    won't benefit from it.

 4    BY ATTORNEY MORRIS:

 5        Q.    So is it fair to say that the Dallas

 6    Foundation's concern is not with the terms of the

 7    settlement agreement itself but with the

 8    disposition of the assets that Hunter Mountain

 9    will receive if the settlement agreement is

10    approved?

11            ATTORNEY OKIN:  Object to form.

12        A.    Well, the only thing I would say about

13    that is we have individuals making some

14    questionable decisions and, you know, with

15    charitable assets.  I believe Highland Dallas has

16    entered into a settlement agreement with this

17    individual.  I think that's -- that's what I

18    could say is somewhat problematic.

19    BY ATTORNEY MORRIS:

20        Q.    What's problematic?

21        A.    Oh, we have an individual that's

22    shifting around charitable assets out of the

23    responsibility of Empower and Okada; right?  And,

24    you know, Highland Capital has entered into an

25    agreement with this individual.  I think we all
```

```
 1    understand the facts that are at play.

 2         Q.    Do you have any reason to believe that

 3    the settlement agreement was not the product of

 4    an arm's-length, good-faith negotiation between

 5    adverse parties?

 6              ATTORNEY OKIN:  Object to form.

 7         A.    I can't say anything.  Yeah, I wasn't

 8    a part of those conversations, so I can't opine.

 9    BY ATTORNEY MORRIS:

10         Q.    And you don't have any facts that

11    would suggest that the settlement agreement is

12    anything other than the product of good-faith,

13    arm's-length negotiations; correct?

14              ATTORNEY OKIN:  Object to the form.

15         A.    I wasn't part of the conversation, so

16    I can't opine.  But what I can state is that I

17    believe there's significant impact to the Okada

18    and Empower Dallas Foundation.

19    BY ATTORNEY MORRIS:

20         Q.    And that's as -- not as a result of

21    the settlement agreement, but as a result of what

22    the Dallas Foundation contends was the

23    restructuring that Mr. Patrick engaged in earlier

24    this year; fair?

25              ATTORNEY OKIN:  Object to form.
```

```
 1        A.     For the most part, I'd say that's

 2    fair.

 3    BY ATTORNEY MORRIS:

 4        Q.     Okay.  Do you have any concerns that

 5    the settlement agreement is not the product of

 6    arm's-length, good-faith negotiations?

 7        A.     I'd have to restate that, again, we

 8    have an individual who's moving around charitable

 9    assets.  And, again, I think we understand the

10    facts of restructuring, and the agreement was

11    made to settle with this individual.  So from our

12    standpoint, again, it impacts the two supporting

13    organizations that we are here representing.

14            So I think there's two things at play.

15    The negotiations that you had with this

16    individual, I can't opine whether or not that it

17    wasn't done in good faith; but the impact of that

18    settlement agreement does impact Okada and

19    Empower Dallas.

20        Q.     And that's because as a result of

21    Mr. Patrick's restructuring, the Dallas

22    Foundation is concerned that it may not have --

23    it may not receive as much as it would have

24    indirectly had the restructuring not taken place;

25    fair?
```

```
 1        A.     That's fair.
 2               ATTORNEY OKIN:   Object to form.
 3     BY ATTORNEY MORRIS:
 4        Q.     Okay.  Do you have any reason to
 5     believe that the proposed settlement is unfair to
 6     Highland Capital Management, LP?
 7        A.     Yeah, I don't have any reason to
 8     opine, no.
 9        Q.     Okay.  Do you have any reason to opine
10     as to whether or not the proposed settlement
11     agreement is unfair to the Highland Claimant
12     Trust?
13        A.     No, sir.
14        Q.     Do you have any reason to opine that
15     the proposed settlement agreement is unfair to
16     the Highland Litigation Subtrust?
17        A.     No, sir.
18        Q.     Do you have any reason to opine that
19     the settlement agreement is unfair to Hunter
20     Mountain Investment Trust?
21        A.     No, sir.  We can make good-faith
22     settlements, given that there are facts that
23     certain organizations or entities could be
24     impacted, given what we've already talked about,
25     what Mark Patrick has done with the
```

```
 1    restructuring.

 2         Q.    So two things can be true, at the same

 3    time --

 4         A.    Two things can be true.

 5         Q.    Two things can be true at the same

 6    time; right, sir?  The settlement agreement can

 7    be a fair and reasonable settlement that's the

 8    product of arm's-length and good-faith

 9    negotiations; while at the same time, the Dallas

10    Foundation can still have concerns over the

11    disposition of the assets that Hunter Mountain

12    receives as a result of this restructuring; fair?

13         A.    I think for the most part, that's

14    fair.  The only caveat I would add to that is if

15    I'm negotiating with an individual that we know

16    is causing harm to other organizations, I just

17    say maybe we don't care about that.  But from our

18    standpoint, we do.

19         Q.    Do you have any reason to believe that

20    the proposed settlement is unfair to any of the

21    HMIT entities?

22         A.    No, sir.

23         Q.    Are you aware that under the

24    settlement agreement, the HMIT entities are

25    releasing the Highland parties from any liability
```

```
 1    other than that which arises out of the

 2    settlement agreement itself?

 3         A.    Yeah.  I believe that was a part of

 4    the settlement.  That's why we have the

 5    settlement.  Yeah.

 6         Q.    Do you have any concern about the

 7    scope of the releases that the HMIT entities are

 8    providing?

 9              ATTORNEY OKIN:  Object to form.

10    BY ATTORNEY MORRIS:

11         Q.    You can answer, sir.

12         A.    No, sir; only as it impacts, how does

13    it impact or potentially can impact lost income

14    for Okada and Empower.

15         Q.    Do you have any reason to believe that

16    the granting of the releases in the proposed

17    settlement agreement by the HMIT entities will

18    have any impact at all on the supporting

19    organizations?

20              ATTORNEY OKIN:  Object to form.

21         A.    Again, I think there's an economic

22    interest in what does the settlement -- the loss

23    of income streams to Empower and Okada, which we

24    believe is true.

25    ///
```

```
 1    BY ATTORNEY MORRIS:

 2        Q.    I'm just focused on the releases now.

 3        A.    Sure.

 4        Q.    Do you have any reason to believe that

 5    the releases that the HMIT parties are granting

 6    under the proposed settlement will have any

 7    economic impact on the supporting organizations?

 8              ATTORNEY OKIN:  Object to form.

 9        A.    No, sir.

10    BY ATTORNEY MORRIS:

11        Q.    Okay.  Are you aware of any facts that

12    could give rise to a claim by the Dallas

13    Foundation against Highland?

14              ATTORNEY OKIN:  Object to form.

15        A.    Can you elaborate on that a little bit

16    for me.

17    BY ATTORNEY MORRIS:

18        Q.    Sure.

19              So I'm just -- I'm wondering if you

20    know of any facts that might give rise to a claim

21    or a cause of action by the Dallas Foundation

22    against Highland Capital Management.

23              ATTORNEY OKIN:  Object to form.

24        A.    Not directly, no, sir.

25    ///
```

```
 1   BY ATTORNEY MORRIS:

 2        Q.     Okay.   Are you aware of any facts that

 3   might give rise to a claim or cause of action

 4   that the Dallas Foundation could assert against

 5   the Highland Claimant Trust?

 6             ATTORNEY OKIN:   Object to form.

 7        A.     No, sir, not directly, no.

 8   BY ATTORNEY MORRIS:

 9        Q.     Do you understand the basis for the

10   Dallas Foundation's objection to the proposed

11   settlement?

12        A.     Absolutely, yes, I do.

13        Q.     Can you describe for me in your own

14   words what your understanding is of the basis of

15   the objection.

16        A.     Yeah.   We are aware that we sold Rand

17   PE Fund, which rolls up to the Atlas IDF Fund,

18   sold its interest in the Hunter Mountain for a

19   million dollars; and we believe that we have

20   significant future economic payments that would

21   be paid out to Hunter Mountain that Empower and

22   Okada would no longer benefit from.

23        Q.     Is it fair to say that the Dallas

24   Foundation is concerned, not with the terms of

25   the settlement agreement itself, but with the
```

1    possibility that it may not get its fair share of

2    the consideration that the HMIT entities are to

3    receive under the settlement agreement?

4                    ATTORNEY OKIN:  Object to form.

5         A.    Yeah, for the most part, that's the

6    key -- that's our concern.

7    BY ATTORNEY MORRIS:

8         Q.    Okay.  Do you understand that Mark

9    Patrick has entered into the settlement agreement

10   with the Highland entities on behalf of each of

11   the HMIT entities?

12        A.    That's my understanding.

13        Q.    Do you have any reason to believe that

14   the governing documents for the HMIT entities did

15   not authorize Mr. Patrick to enter into the

16   settlement agreement on behalf of each of the

17   HMIT entities?

18                    ATTORNEY OKIN:  Object to form.

19        A.    You know, what I would say to that is,

20   you know, regardless of the governing documents,

21   I do believe there's a fiduciary obligation that

22   Mr. Patrick had to the supporting organizations,

23   to inform us of any significant investment

24   decisions that could impact the economic interest

25   in the Crown Global vehicle.

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02734-L    Document 17-1  Filed 06/24/25  Page 358 of 406  PageID 4616
Deposition of Grant Patrick    Exhibit 125    Page 52 of 100    Highland Capital Mgmt., L.P.

```
 1              So I just believe that, you know, just
 2      like any trustee investment advisor/control
 3      person, those are just normal conversations that
 4      we expect to have; and we not did not have that
 5      in this situation.
 6      BY ATTORNEY MORRIS:
 7          Q.    Okay.  Anything else?
 8          A.    No, sir.
 9          Q.    Okay.  You don't believe that
10      Mr. Patrick was required to obtain the Dallas
11      Foundation's consent before entering into the
12      settlement agreement; fair?
13          A.    That's fair.
14          Q.    And you don't have any reason to
15      believe that the Dallas Foundation has any right
16      or ability to prevent Mr. Patrick from entering
17      into the settlement agreement on behalf of the
18      HMIT entities; fair?
19              ATTORNEY OKIN:  Object to form.
20          A.    You know, I think there's two things
21      can be true again.  I think there's documentation
22      which I haven't seen, but, again, there's a
23      fiduciary obligation to the interested parties, I
24      believe, just as any relationship with an
25      investment advisor or control person.
```

```
 1    BY ATTORNEY MORRIS:

 2         Q.    And in your view, does the fiduciary

 3    duty that you believe Mr. Patrick had as the

 4    representative of the HMIT entities, does that

 5    extend anywhere beyond the duty to inform?

 6              ATTORNEY OKIN:  Object to form.

 7         A.    Well, I'm just trying to think

 8    about -- you know, we advised $650 million of

 9    assets under management.  We have advisors all

10    the time, before they make any decisions on the

11    sale of investments, we're informed about it.

12    They kind of let us know if it's going to have

13    impact to our portfolios.  And that's just an

14    expectation that we have of any investment

15    advisor or control person.

16    BY ATTORNEY MORRIS:

17         Q.    I appreciate that you have that

18    expectation.  Do you have an expectation that the

19    HMIT entities needed to obtain the Dallas

20    Foundation's consent before entering into the

21    settlement agreement?

22         A.    I'm not a legal person.  But I would

23    imagine if you have the documentation legally, I

24    don't know if you had to get our consent.  It's

25    more so just a fiduciary obligation.
```

Case 19-34054-sgj11 Doc 4277-2 Filed 06/24/25 Entered 06/24/25 10:20:25 Desc
Case 3:25-cv-02734-L Document 157-2 Filed 05/25/100 Page 360 of 406 PageID 4618
Deposition of ... Exhibit 125 Page 52 of 100 ... Capital Management L.P.

```
 1        Q.    And, legally, do you have any reason

 2    to believe that the Dallas Foundation has a legal

 3    right over transactions that Mark Patrick, in his

 4    capacity as the representative of any of the HMIT

 5    entities, wanted to enter into?

 6              ATTORNEY OKIN:  Object to form.

 7        A.    As an interested party, I think we

 8    have an ability to have conversations to see if

 9    this decision was made that negatively impacted

10    the supporting organizations.  I think we do have

11    a right there to really understand why this

12    decision was made.  Why are we selling the

13    interest for a million dollars?  Why now?  Why is

14    the timing that happened now?  Because if nothing

15    happened, what we know is we would have benefited

16    from the settlement payouts.

17    BY ATTORNEY MORRIS:

18        Q.    Does the Dallas Foundation have a

19    direct ownership interest in any of the HMIT

20    entities?

21        A.    Not a direct ownership, no, sir.

22        Q.    Does the Dallas Foundation have any

23    indirect ownership interest in any of the HMIT

24    entities?

25              ATTORNEY OKIN:  Object to form.
```

Case 19-34054-sgj11    Doc 4277-2    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-00724-L    Document 7-125    Filed 05/05/25    Page 361 of 406    PageID 4619
Deposition of 3:25-cv-00724-L    Exhibit 125    Filed 05/05/100    Page 361 of 406    Capital Management L.P.

```
 1          A.    Not directly.  The Dallas Foundation

 2    does not.

 3    BY ATTORNEY MORRIS:

 4          Q.    So no direct interest -- withdrawn.

 5                No direct ownership interest and no

 6    indirect ownership interest; fair?

 7                ATTORNEY OKIN:  Object to form.

 8          A.    We do have an interest in -- because

 9    the assets roll up to our balance sheet overall,

10    they would present an audited financial

11    statement.  So we do have to understand the

12    fluctuations in market value to explain not just

13    to our board but to our auditors what's happened.

14    So we do have indirect interest.

15    BY ATTORNEY MORRIS:

16          Q.    And none of the HMIT entities appear

17    as an asset on the Dallas Foundation's balance

18    sheet; correct?

19          A.    Not directly.  But if they roll up and

20    they feed into the Atlas IDF Fund, right, and

21    then the Atlas IDF Fund, which is a part of the

22    Crown Global annuities, feeds into our balance

23    sheet, there is an indirect interest in HMIT.

24                Fair to say?

25          Q.    Does any Atlas entity appear on the
```

1    Dallas Foundation balance sheet?

2         A.    Yeah, through the Crown Global

3    annuity.  So if you look at the Crown Global

4    statement, it lists an Atlas LP as the investment

5    vehicle.

6         Q.    Do you know if the Dallas Foundation

7    has any right to control any of the HMIT

8    entities?

9              ATTORNEY OKIN:  Object to form.

10        A.    No, we can't directly control the HMIT

11   entities.

12   BY ATTORNEY MORRIS:

13        Q.    Do you know if the Dallas Foundation

14   has any right to approve or disapprove of any

15   potential transaction that an HMIT entity was

16   contemplating entering into?

17        A.    Yeah, so with the Atlas IDF Fund, what

18   I can say is the Empower and Okada, they do have

19   the opportunity to consent.

20              We had some notes that were -- there

21   were some notes that Mark Patrick wanted to sell

22   in February.  We had to get the consent of

23   Crown Global in order to sell these notes; and we

24   had -- we opined with Crown Global to withdraw

25   consent, right?

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17-125 Filed 02/15/100 Page 363 of 406 Capital Gen Desc
Deposition of 3:25-cv-02724-L   Exhibit 7125 Filed 02/52/25 100 Page 363 of 406 CapitalMgmt, L.P.

```
 1              So he did reach out to Crown Global
 2      for consent in which the Empower and Okada had an
 3      opportunity to provide our recommendation.
 4         Q.    Let's focus on the settlement
 5      agreement.
 6              Do you have any reason to believe that
 7      Mr. Patrick was required to obtain the consent of
 8      the Dallas Foundation before he signed it on
 9      behalf of the HMIT entities?
10              ATTORNEY OKIN:  Object to form.
11         A.    No.
12      BY ATTORNEY MORRIS:
13         Q.    Do you have any reason to believe that
14      Mr. Patrick was required to obtain the consent of
15      the supporting organizations before entering into
16      the settlement agreement on behalf of the HMIT
17      entities?
18              ATTORNEY OKIN:  Object to form.
19         A.    No, sir.
20      BY ATTORNEY MORRIS:
21         Q.    Do you have any reason to believe that
22      Mr. Patrick was required to obtain the consent of
23      Crown Global before entering into the proposed
24      settlement agreement on behalf of each of the
25      HMIT entities?
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L    Document 17-1   Filed 06/28/25   Page 364 of 406   PageID 4622
Deposition of ... Exhibit 125 Page 58 of 100 ... Capital Management, L.P.

```
 1                ATTORNEY OKIN:  Object to form.
 2        A.    No, sir.
 3   BY ATTORNEY MORRIS:
 4        Q.    Do you have any reason to believe that
 5   Crown Global has any right to control any of the
 6   HMIT entities?
 7                ATTORNEY OKIN:  Object to form.
 8        A.    Not that I'm aware of, no.
 9   BY ATTORNEY MORRIS:
10        Q.    Do you have any reason to believe
11   that -- we're going to move on.
12                So we're going to put up on the screen
13   the Dallas Foundation's objection.
14        A.    Yes, sir.
15        Q.    It will just take a moment for my
16   colleague to do that.
17                While he's doing that, let me just
18   tell you that this can be a little bit of a
19   cumbersome process.  I'm doing this by Zoom.  If
20   there's any aspect of the document that you
21   recall that you think you need to review to
22   refresh your recollection or to put it in
23   context, will you just let me know that so that I
24   give you a full and fair opportunity to answer
25   the questions?
```

```
 1          A.    Yes, sir.

 2                ATTORNEY MORRIS:  Okay.  Can we go to

 3     paragraph 32, please.

 4                (Previously marked Highland Exhibit

 5                1 introduced by counsel.)

 6     BY ATTORNEY MORRIS:

 7          Q.    So I've put up on the screen,

 8     Mr. Littleton, the portion of the Dallas

 9     Foundation's objection that was filed in this

10     case.

11                And you're familiar with that

12     document; is that right?

13          A.    Yeah.  I couldn't repeat it back to

14     you verbatim, but I understand some of the

15     high-level facts in this objection.

16          Q.    You give me comfort when you say that.

17     You should not be able to repeat verbatim what

18     this document is.  So --

19                ATTORNEY OKIN:  And, Mr. Littleton,

20     although he didn't say it this time, he did say

21     it in the prior one:  If you need to see any more

22     of this in order to be able to answer his

23     questions, be sure to point that out.

24                THE WITNESS:  Absolutely.

25                ATTORNEY MORRIS:  I actually did say
```

```
 1    that.  That's okay.

 2              ATTORNEY OKIN:  Did you say that this

 3    time?  I know you said it last time.

 4              ATTORNEY MORRIS:  Sorry, I must be

 5    putting you to sleep.

 6              ATTORNEY OKIN:  That's a possibility.

 7    BY ATTORNEY MORRIS:

 8         Q.    Looking at the third line, I'm just

 9    going to read this quote:  "Unfortunately, it

10    does not appear, however, that joint official

11    liquidators are parties to or have authorized the

12    settlement."

13              Do you see that sentence?

14         A.    Yes, sir.

15         Q.    Do you know the entity over which the

16    joint official liquidators were appointed?

17         A.    Yes, sir.  It's the DAF Foundation

18    Holdco.

19         Q.    And that's in the Cayman Islands; is

20    that right?

21         A.    Yes, sir; that's correct.

22         Q.    Are you aware that all of the HMIT

23    entities are Delaware organizations?

24         A.    Yes, sir; that's correct.

25         Q.    Have you ever communicated with the
```

```
 1   joint official liquidators?

 2        A.    No, not officially.  We do have a

 3   planned communication this week.

 4        Q.    Do you know if anybody acting on

 5   behalf of the Dallas Foundation has ever informed

 6   the joint official liquidators of Highland's

 7   motion to have the settlement agreement approved?

 8        A.    No, sir.

 9        Q.    Do you know if anybody acting on

10   behalf of the Dallas Foundation has provided a

11   copy of the objection that's on the screen to the

12   joint official liquidators?

13        A.    Not that I'm aware of, sir.

14        Q.    Do you have any reason to believe, as

15   you sit here today, that the joint official

16   liquidators have any knowledge of the settlement

17   agreement that is going to be before the Court on

18   Wednesday?

19             ATTORNEY OKIN:  Object to form.

20        A.    I can't directly say.

21   BY ATTORNEY MORRIS:

22        Q.    Okay.  You haven't had any

23   communications with anybody in the world at any

24   time that led you to believe that the joint

25   official liquidators were informed of the
```

```
 1    proposed settlement agreement or the Dallas

 2    Foundation's objection; fair?

 3         A.    That's fair, sir.

 4         Q.    Okay.  Do you have any reason to

 5    believe that Mr. Patrick was required to obtain

 6    the authorization of the joint official

 7    liquidators before entering into this settlement

 8    agreement on behalf of the HMIT entities?

 9              ATTORNEY OKIN:  Object to form.

10         A.    No, sir, I can't.  I can't speak to

11    that.

12    BY ATTORNEY MORRIS:

13         Q.    Can you speak to whether or not the

14    joint official liquidators have any right to veto

15    or prevent the HMIT entities from entering into

16    the settlement agreement?

17         A.    Again, I'm not a legal person, so I

18    can't really opine on the official capacity of

19    the joint liquidators and what they're capable of

20    doing and not doing.  So I'm going to have to

21    say, no, I can't answer that question.

22         Q.    Further down in the paragraph it

23    states that:

24              "Indeed, many of Mr. Patrick's

25         actions, including the insertion of
```

```
 1            newly created entities into the fund's

 2            structure for the apparent purpose of

 3            diverting charitable assets will now be

 4            subject to the scrutiny of an

 5            independent, Court-appointed fiduciary

 6            and may be subject to clawback or other

 7            avoidance actions in the Cayman

 8            liquidation or such other tribunal as

 9            has jurisdiction."

10                 Have I read that correctly, sir?

11       A.    Yes, sir, you have.

12       Q.    Okay.  You're not an expert in Cayman

13   Islands law; correct?

14       A.    No, sir.

15       Q.    I think you said earlier you're not a

16   lawyer.  Right?

17       A.    That's correct.

18       Q.    Do you have any understanding as to

19   what facts must be established in order to

20   succeed in a clawback or avoidance action?

21       A.    It would just be assumption of mine

22   that I would have, whether it's a breach of

23   contract, discovery of various actions

24   decision-making.  But, no, I can't give you a

25   legal opinion.
```

```
 1          Q.    Do you have any view at all as to
 2    likelihood that the supporting organizations or
 3    the Dallas Foundation might succeed in clawing
 4    back or succeeding in other avoidance actions to
 5    set aside the settlement agreement if it's
 6    approved by the Court?
 7               ATTORNEY OKIN:  Object to form.
 8               And I'll also just remind you,
 9    Mr. Littleton, to the extent it's implicated,
10    don't go into attorney-client privileged
11    information that you may have received.
12          A.    Yeah, I can't -- I can't answer your
13    question, Mr. Morris, on that one.
14    BY ATTORNEY MORRIS:
15          Q.    Is it fair to say you'd have to
16    speculate as to whether or not -- let me just
17    finish the question.
18               Is it fair to say that you would have
19    to speculate as to whether or not the Dallas
20    Foundation or anybody else might succeed in
21    clawing back or avoiding the settlement agreement
22    if it's approved by the Court?
23               ATTORNEY OKIN:  Object to form.
24          A.    It would be my opinion.  It would be
25    speculation of how I feel, given the facts that
```

```
 1    I've seen and just some of the impact that we've

 2    seen on our supporting organizations; and I would

 3    just leave it there.

 4              ATTORNEY MORRIS:  Okay.  If we could

 5    scroll up to paragraph 33, please.

 6    BY ATTORNEY MORRIS:

 7         Q.   Okay.  The last sentence of

 8    paragraph 33 says:  "Thus, even if approved by

 9    this Court, consummation of the settlement is not

10    likely to buy the peace the debtor now seeks."

11              Do you see that?

12         A.   Yes, sir.

13         Q.   Do you have any reason to believe that

14    the Highland parties have done anything wrong in

15    entering into this proposed settlement agreement?

16              ATTORNEY OKIN:  Object to form.

17         A.   You know, what I would say is we have

18    an individual, in Mr. Patrick, that's moving

19    around charitable assets; and we -- Highland

20    Capital or the Highland entities have settled --

21    have made a settlement agreement with this

22    individual, knowing some of the facts of how the

23    charities are being negatively impacted.

24    That's -- that would be my comment there.

25    ///
```

Case 3:25-cv-02734-L   Document 7   Filed 06/26/25   Page 372 of 406 Highland Capital Management, L.P.

```
 1    BY ATTORNEY MORRIS:

 2          Q.    I'm not asking about the impact on the

 3    charitable foundations, and I'm not asking about

 4    Mr. Patrick.  I'm just asking if you have any

 5    facts that lead you to believe that Highland has

 6    engaged in any wrongdoing with respect to

 7    negotiation and entry into the proposed

 8    settlement agreement.

 9                ATTORNEY OKIN:  Object to form.  He

10    answered your question.

11    BY ATTORNEY MORRIS:

12          Q.    You can answer, sir.

13          A.    No, sir.  I'll just leave it as I

14    stated.  That was my answer.

15          Q.    All right.  So I didn't hear any

16    facts, so you don't have any facts.  Is that

17    fair?

18                ATTORNEY OKIN:  Object to form;

19    argumentative.  Come on, John.

20                ATTORNEY MORRIS:  Matt, I'm being --

21                ATTORNEY OKIN:  You asked him if they

22    did anything wrong.  He told you they did

23    something wrong by --

24                (Indiscernible cross-talk.)

25                THE COURT REPORTER:  I'm sorry.  I
```

```
 1    can't understand you both when you are talking at

 2    the same time.

 3    BY ATTORNEY MORRIS:

 4         Q.    Mr. Littleton, are you aware of any

 5    facts that cause you to believe that the Highland

 6    parties have done anything wrong in entering into

 7    this agreement?

 8              ATTORNEY OKIN:  Object to form.

 9         A.    Again, I would just state that we have

10    an individual who is moving around charitable

11    assets, and I think we all are aware of the facts

12    of what has taken place.  Now, whether we want to

13    consider that as anything wrong, in quotations,

14    that's up for opinion.

15              In terms of "facts" facts, I can't --

16    no, I'm going to say, no, I don't have facts that

17    I can with share you, Mr. Morris.

18    BY ATTORNEY MORRIS:

19         Q.    And you don't even have any facts that

20    suggest Highland had any role in moving the

21    assets around that you just described; fair?

22         A.    Yeah, I don't understand that Highland

23    has moved around the assets.  But I think when

24    you're making a deal knowing that the individual

25    that I'm settling with has done some things that
```

```
 1    are questionable, you know, I think that

 2    discussion can be up for debate, whether -- you

 3    know, charities are being impacted; significant

 4    dollars are not going to be going out to the

 5    community; there's a lot of uncertainty with

 6    these assets.

 7              And we all know the facts.  The facts

 8    are clearly outlined.

 9        Q.    Do you know why the Dallas Foundation

10    contends that:  "Even if approved by the Court,

11    consummation of the settlement is not likely to

12    buy the peace that the debtor now seeks"?

13              What's the basis for that, if you have

14    any understanding at all?

15        A.    That one there, sir, I'm not going to

16    be able to answer that one for you.

17        Q.    Are you aware of any potential claims

18    that the Dallas Foundation is considering

19    bringing against Highland Capital Management or

20    the Highland Claimant Trust?

21              ATTORNEY OKIN:  I'm going to instruct

22    him not to answer that.  To the extent that he

23    would be aware of those, that would be --

24              ATTORNEY MORRIS:  Why don't we just do

25    "yes" or "no," Matt.  Okay?
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02734-L    Document 17-125 Filed 06/09/25    Page 375 of 406   Capital Management L.P.
Exhibit 125   Page 69 of 100   Page 375 of 406   Page ID 4638

```
 1              ATTORNEY OKIN:  No.  I think -- I
 2    think whether or not there are any claims and
 3    whether we're considering any claims is
 4    attorney-client privilege.  It's not a "yes" or
 5    "no" or detail; it's a not answer.
 6              ATTORNEY MORRIS:  I'll ask him on
 7    Wednesday.
 8              ATTORNEY OKIN:  Okay.
 9    BY ATTORNEY MORRIS:
10         Q.    Let's go to -- yeah, paragraph 34 says
11    that "there is ample evidence that Mr. Patrick
12    has acted and is acting well outside the scope of
13    his authority and fiduciary obligations."
14              Do you see that?
15         A.    Yes, sir, I do.
16         Q.    Okay.  I want to focus solely on the
17    negotiation and execution of the settlement
18    agreement.
19              Focusing --
20         A.    Yes, sir.
21         Q.    Focusing solely on the settlement
22    agreement, do you believe that Mr. Patrick acted
23    outside of the scope of his authority to
24    negotiate and enter into the settlement agreement
25    on behalf of each of the HMIT entities?
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02734-L   Document 17-1   Filed 07/02/25   Page 376 of 406   PageID 4634
Deposition of 3:25-cv-02734-L Document Exhibit 125 Filed 07/06/25100 Page 376 of 406 Capital Management L.P.

```
 1              ATTORNEY OKIN:  Object to form of the
 2      question.
 3          A.    Again, I think it's something that
 4      I've stated a few times now.  Two things can be
 5      true.  I think we've already agreed on that.
 6      BY ATTORNEY MORRIS:
 7          Q.    Which two things can be true here?
 8          A.    The good-faith conversation with the
 9      settlement; but at the same time, it could have a
10      consequential impact on the Okada and Empower
11      Dallas supporting organizations.
12          Q.    Okay.  Do you believe -- do you have
13      any reason to believe that Mr. Patrick acted
14      outside of his fiduciary obligations with respect
15      to his negotiation and execution of the
16      settlement agreement on behalf of the HMIT
17      entities?
18              ATTORNEY OKIN:  Object to form.  Are
19      you asking him personally or the organization
20      that filed this?
21              ATTORNEY MORRIS:  It's not a 30(b)(6)
22      witness.  I know the difference.
23              ATTORNEY OKIN:  Just so we're clear.
24          A.    Yeah, I do think there was a fiduciary
25      obligation to inform and have a conversation with
```

Deposition of Brian Collins — Highland Capital Management, L.P.

```
 1    the interested parties.
 2    BY ATTORNEY MORRIS:
 3         Q.    Okay.  So, again, it's a duty to
 4    inform but nothing more; is that fair?
 5              ATTORNEY OKIN:  Object to form.
 6         A.    Yeah, yeah, again, I think it's, you
 7    know, something that we all expect to have,
 8    again, with our investment advisors, control
 9    persons, trustees.
10    BY ATTORNEY MORRIS:
11         Q.    Okay.  Can we go to paragraph 16,
12    please.
13              Do you see paragraph 16 refers to
14    material nonpublic information?
15         A.    Yes, sir.  I see it.
16         Q.    Do you know what material nonpublic
17    information is being referred to there?
18         A.    No, sir.
19         Q.    Did you ever ask anybody?
20         A.    No.  I didn't want to get involved in
21    that conversation, no, sir.  I did not ask
22    anybody.
23         Q.    Do you know where -- withdrawn.
24              Do you know the Dallas Foundation's
25    source of information that enabled it to state,
```

```
 1    upon information and belief, that the information

 2    provided was obtained by Mr. Patrick through his

 3    employment at Skyview and constituted MNPI?

 4              ATTORNEY OKIN:  Object to form.

 5        A.    No, sir, I was not -- no.

 6    BY ATTORNEY MORRIS:

 7        Q.    You don't know where that information

 8    came from?

 9        A.    No, sir.

10        Q.    The next sentence refers to a put

11    option.

12              Do you see that?

13        A.    Yes, sir.

14        Q.    Did the foundation have a put option?

15        A.    Yeah, the Highland Dallas Foundation

16    had a put option agreement with the Dugaboy

17    Investment Trust.  I think we had 1.5 million

18    shares of NexPoint Hospitality Trust.  I think it

19    was a contribution that was given in 2019 with

20    the 7-year put option.

21        Q.    And is that option now expired?

22        A.    I believe it converted into a

23    different investment vehicle now.

24        Q.    So the Dallas Foundation never

25    exercised that option; correct?
```

Case 19-34054-sgj11    Doc 4277-2    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-00724-L    Document 17-5    Filed 07/03/25    Page 379 of 406    PageID 4637
Deposition of Brian Shaw - 02-734-L    Exhibit 125    Page 02/03/25100    Page 379 of 406    Highland Capital Management L.P.

 1          A.    Correct.

 2          Q.    Why not?

 3          A.    We didn't have a -- we didn't feel we

 4     had any reason to exercise the put option.

 5          Q.    Did you ever do any analysis to try to

 6     determine what the economic impact would be on

 7     the Dallas Foundation if they actually exercised

 8     that put option?

 9          A.    We had some conversations with our

10     internal investment advisor, and at the time his

11     recommendation was not to make any changes or

12     call the put option.

13          Q.    Who was that advisor?

14          A.    Madden & Associates at the time --

15     excuse me.  Madden Asset Management.

16          Q.    Do you have the shares to exercise the

17     put today?

18          A.    To be honest, Mr. Morris, there's a

19     little bit of discovery we have to understand now

20     that the shares have converted.  I believe they

21     converted to a different vehicle in April of this

22     year.

23          Q.    Are you aware that the Dallas

24     Foundation lost $9 million by not exercising the

25     put option before it converted?

```
 1              ATTORNEY OKIN:  Object to form.
 2         A.    I think we -- so we do have some
 3    information that we just need to understand
 4    thoroughly about what's happened now that the
 5    assets transferred into a different vehicle.
 6    BY ATTORNEY MORRIS:
 7         Q.    Well, you're the CFO; right?  And I
 8    think you said that your duty is to be
 9    responsible for the foundation's assets; right?
10         A.    That's fair; yes, sir.
11         Q.    Were you aware that the put was going
12    to convert before it actually converted?
13         A.    I was not aware of that.  I was not
14    informed of that.
15         Q.    Were you ever told what the value
16    would be to the Dallas Foundation if the Dallas
17    Foundation exercised the put?
18         A.    Yeah, I believe you're correct, it was
19    in the ballpark range of $9 million.
20         Q.    So is it fair to say that had the
21    Dallas Foundation exercised the put, then it
22    would have recovered $9 million?
23         A.    Yeah, I think that's fair, yeah.
24         Q.    What's the value of the shares that it
25    received upon conversion?  Do you know that?
```

```
 1        A.    No, I don't know that.  We were just
 2   notified recently that the shares had converted.
 3        Q.    Is one of the reasons that you didn't
 4   exercise the put option is because Dugaboy,
 5   Mr. Dondero's family trust, was the counterparty?
 6             ATTORNEY OKIN:  Object to the form.
 7        A.    No, sir, that wouldn't be the reason.
 8   BY ATTORNEY MORRIS:
 9        Q.    Do you think Mark Patrick breached his
10   fiduciary duty by telling the Dallas Foundation
11   that it should consider exercising a put that was
12   worth $9 million?
13             ATTORNEY OKIN:  Object to form.
14        A.    You know, I think there was
15   information that was not privy to individuals, so
16   I don't know if we could rely on that information
17   to make a decision.
18   BY ATTORNEY MORRIS:
19        Q.    This was a put that was owned by the
20   Dallas Foundation; do I have that right?
21        A.    The Highland Dallas Foundation,
22   supporting organization.
23        Q.    And what's the relationship between
24   the Dallas Foundation and the Highland Dallas
25   Foundation?
```

```
 1        A.    Very similar to the relationship

 2   between Empower Dallas and Okada Dallas.  The

 3   Highland Dallas Foundation is the supporting org

 4   that we have indirect oversight of.

 5        Q.    And if the Highland Dallas Foundation

 6   had exercised the put, would that have inured to

 7   the benefit of the Dallas Foundation?

 8             ATTORNEY OKIN:  Object to form.

 9        A.    It ultimately would have.  What it

10   would have benefited was the supporting

11   organization to allow for more impactful

12   grant-making.  So you would have had $9 million

13   of liquidity that could be pushed out into the

14   community.

15             ATTORNEY MORRIS:  Okay.  How much time

16   do I have left, Matt?  I know you're watching.

17             ATTORNEY OKIN:  I lost track, I was so

18   enraptured by your questions.

19             18 minutes.

20             ATTORNEY MORRIS:  You wouldn't be the

21   first one.

22             Why don't we take a short break here.

23   I've got 18 minutes left.  If we could just take

24   a five-minute break.

25   ///
```

```
 1                   (Recess taken from 4:42 p.m. to

 2                   4:49 p.m.)

 3      BY ATTORNEY MORRIS:

 4           Q.    Mr. Littleton, I think you answered

 5      this.  If I did, I apologize.

 6                   Can you confirm for me that you've

 7      never communicated with the joint official

 8      liquidators?

 9           A.    Yes, sir.  That is correct, other than

10      emails to set up a conversation.

11           Q.    Conversations that you did not

12      participate in; is that right?

13           A.    Yeah, just for -- yeah, just for some

14      questions they wanted to ask of the Dallas

15      Foundation's finance team.

16           Q.    But did you participate -- so you

17      spoke with the joint official liquidators'

18      finance team?

19           A.    No.  They wanted to set up a call.

20      That's the only time -- the only communication

21      I've had.

22           Q.    And you haven't had that call yet; is

23      that right?

24           A.    That's correct.

25           Q.    And that call is going to be scheduled
```

```
 1    for sometime in the future; fair?

 2         A.    Yes, sir.

 3              ATTORNEY MORRIS:  I have no further

 4    questions.

 5              ATTORNEY PHILLIPS:  No questions.

 6              ATTORNEY OKIN:  All right.

 7              ATTORNEY MORRIS:  Mr. Littleton, thank

 8    you very, very much for your time and patience.

 9              Matt, thank you for arranging this on

10    short notice.

11              Gail, do you need anything else from

12    anybody?

13              THE COURT REPORTER:  Okay.  I have

14    copies for Mr. Morris, Mr. Lang, Mr. Okin,

15    and Mr. Phillips.

16              Anybody else?

17              ATTORNEY OKIN:  Gail, we do want to

18    read and sign both transcripts.

19              (Whereupon, at 4:50 p.m. Central

20              Time the proceedings concluded.)

21

22

23

24

25
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-02724-L   Document 17-125   Filed 02/05/25   Page 385 of 406   PageID 4643
Deposition of Nancy Dottin   Exhibit 125   Page 385 of 406 Highland Capital Management L.P.

```
 1              INSTRUCTIONS TO DEPONENT

 2              After reading this volume of your

 3    deposition, indicate any corrections or changes

 4    to your testimony and the reasons therefor on the

 5    Errata Sheet supplied to you and sign it.  DO NOT

 6    make marks or notations on the transcript volume

 7    itself.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              E  R  R  A  T  A

 2

 3         I wish to make the following changes,

 4    for the following reasons:

 5   Page  Line

 6   _____  _____   CHANGE: _____

 7   REASON: _____

 8   _____  _____   CHANGE: _____

 9   REASON: _____

10   _____  _____   CHANGE: _____

11   REASON: _____

12   _____  _____   CHANGE: _____

13   REASON: _____

14   _____  _____   CHANGE: _____

15   REASON: _____

16   _____  _____   CHANGE: _____

17   REASON: _____

18   _____  _____   CHANGE: _____

19   REASON: _____

20   _____  _____   CHANGE: _____

21   REASON: _____

22   _____  _____   CHANGE: _____

23   REASON: _____

24

25
```

```
1

2

3              C E R T I F I C A T I O N

4

5

6              I hereby certify that I have read the

7      foregoing transcript of my deposition testimony,

8      and that my answers to the questions propounded,

9      with the attached corrections or changes, if any,

10     are true and correct.

11

12     ------------------------------------
       TORREY LITTLETON
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                CERTIFICATE OF SHORTHAND REPORTER

3

4

5             I, Gail Inghram, Registered Diplomate

6    Reporter, Certified Realtime Reporter, Realtime

7    Systems Administrator, CA-Certified Shorthand

8    Reporter No. 8635, and Notary Public, the officer

9    before whom the foregoing proceedings were taken,

10   do hereby certify that the foregoing transcript

11   is a true and correct record of the proceedings;

12   that said proceedings were taken by me

13   stenographically and thereafter reduced to

14   typewriting under my supervision; and that I am

15   neither counsel for, related to, nor employed by

16   any of the parties to this case and have no

17   interest, financial or otherwise, in its outcome.

18

19

20

21   _____
     Gail Inghram,
22   BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25

## WORD INDEX

< $ >
$22  19:21
$23  42:2
$29  19:20
$300  41:5
$650  52:8
$7  19:22
$9  72:24  73:19, 22
 74:12  75:12

< 1 >
1  6:13  58:5
1.5  71:17
10010  3:24
10017-2024  3:16
11  1:8
1113  4:10
13  11:14  32:23
16  70:11, 13
1600  5:9
1700  4:18
18  75:19, 23
19-34054-sgj11  1:5
1st  11:13

< 2 >
2015  19:18, 19
2019  71:19
2022  11:13
2025  1:14  2:10  29:4
21  7:4
212.849.7615  3:25
214.817.4500  4:20
22  1:14  2:10
225.381.9643  5:11
22nd  3:23
2390  4:18
23-plus  41:14
240  4:10

< 3 >
3:30  1:15  2:11
30(b)(6  69:21
300  41:1
301  5:9
310.277.6910  3:17
32  58:3

33  64:5, 8
34  68:10
34th  3:15

< 4 >
4:42  76:1
4:49  76:2
4:50  77:19

< 5 >
51  3:23
58  6:13

< 6 >
67  7:4

< 7 >
70801  5:10
713.228.4100  4:12
75201  4:19
77002  4:11
780  3:15
7-year  71:20

< 8 >
8  6:7
8635  1:22  81:8, 21

< 9 >
918,000  29:5

< A >
ability  51:16  53:8
able  32:5, 13  33:25
 58:17, 22  67:16
absolutely  30:3
 33:22  49:12  58:24
accommodate  11:1
accounts  21:15, 21,
 22, 24  22:1, 20  29:3
 34:13
acted  68:12, 22  69:13
acting  34:8  60:4, 9
 68:12
action  48:21  49:3
 62:20
actions  61:25  62:7,
 23  63:4
activity  14:25  15:2,

3, 15
actual  18:2
ADAMS  4:9
add  46:14
addition  13:8
administrative  20:16
Administrator  81:7
adverse  43:5
advised  52:8
advisor  51:25  52:15
 72:10, 13
advisor/control  51:2
advisors  52:9  70:8
affiliated  11:4
affiliates  9:5  12:18
 13:13, 18
affirmed  8:6
afternoon  8:23
ago  12:8  37:5, 25
agree  39:19, 22, 23
agreed  22:16  69:5
agreed-upon  30:10
agreement  9:4  12:17
 13:3, 14, 18  27:21
 31:15  40:3, 6, 12, 16,
 21  41:6, 20  42:7, 9,
 16, 25  43:3, 11, 21
 44:5, 10, 18  45:11, 15,
 19  46:6, 24  47:2, 17
 49:25  50:3, 9, 16
 51:12, 17  52:21  56:5,
 16, 24  60:7, 17  61:1,
 8, 16  63:5, 21  64:15,
 21  65:8  66:7  68:18,
 22, 24  69:16  71:16
ahead  27:14  38:23
ahurt@kellyhart.com
 5:7
allow  9:19  31:22
 75:11
allows  29:22
alternative  29:22
AMELIA  5:6
amount  20:8, 10
 22:22  41:2
amounts  20:2
ample  68:11
analysis  72:5
annuities  17:6, 12, 25
 18:3, 8  19:16, 17, 19,

25  20:1, 20  21:10, 23,
 25  22:2, 3, 4, 7  24:12
 25:12, 20  29:10, 14,
 18, 23  54:22
annuity  17:16  20:21
 22:17, 24  24:13, 16,
 19, 20  28:17  30:5, 6
 55:3
ANSWER  7:2  9:17,
 20  10:19  20:24
 47:11  57:24  58:22
 61:21  63:12  65:12,
 14  67:16, 22  68:5
answered  65:10  76:4
answers  80:8
Anybody  14:3  19:2
 34:7  60:4, 9, 23
 63:20  70:19, 22
 77:12, 16
anyway  10:5, 20
apologies  27:13
apologize  41:9  76:5
apologizing  8:13
apparent  62:2
appear  54:16, 25
 59:10
appeared  3:2  23:2
appointed  59:16
appreciate  8:16
 52:17
approval  37:10, 13,
 16  39:21
approve  55:14
approved  13:24  14:1
 27:19  28:1  42:10
 60:7  63:6, 22  64:8
 67:10
approximately  2:11
April  72:21
argumentative  65:19
arises  47:1
arm's-length  43:4, 13
 44:6  46:8
arranging  77:9
aside  63:5
asked  15:9  65:21
asking  65:2, 3, 4
 69:19
aspect  57:20

aspects 11:*21*
assert 49:*4*
asset 54:*17* 72:*15*
assets 11:*19* 21:*14*
24:*24* 27:*20*, *25* 29:*7*,
*19* 30:*9* 32:*2, 6, 10,
13, 16* 33:*6, 10, 15*
40:*19, 23, 25* 42:*8, 15,
22* 44:*9* 46:*11* 52:*9*
54:*9* 62:*3* 64:*19*
66:*11, 21, 23* 67:*6*
73:*5, 9*
associated 20:*20*
Associates 72:*14*
assumed 35:*10*
assumption 32:*1*
62:*21*
Atlas 15:*5* 18:*4*
21:*17* 22:*3, 10, 12, 13*
29:*20, 21* 30:*23* 31:*1,
14* 32:*11* 49:*17*
54:*20, 21, 25* 55:*4, 17*
attached 80:*9*
Attorney 6:*7* 8:*11,
24* 15:*22, 23* 16:*16,
23* 21:*4, 6* 23:*13, 14,
23* 24:*10* 25:*13, 19,
24* 26:*1, 16* 27:*2, 12,
14, 16* 28:*2, 13* 35:*21*
36:*4, 18* 37:*2* 38:*12,
14, 18, 20, 22, 24* 39:*8,
18* 41:*21* 42:*4, 11, 19*
43:*6, 9, 14, 19, 25*
44:*3* 45:*2, 3* 47:*9, 10,
20* 48:*1, 8, 10, 14, 17,
23* 49:*1, 6, 8* 50:*4, 7,
18* 51:*6, 19* 52:*1, 6,
16* 53:*6, 17, 25* 54:*3,
7, 15* 55:*9, 12* 56:*10,
12, 18, 20* 57:*1, 3, 7, 9*
58:*2, 6, 19, 25* 59:*2, 4,
6, 7* 60:*19, 21* 61:*9,
12* 63:*7, 14, 23* 64:*4,
6, 16* 65:*1, 9, 11, 18,
20, 21* 66:*3, 8, 18*
67:*21, 24* 68:*1, 6, 8, 9*
69:*1, 6, 18, 21, 23*
70:*2, 5, 10* 71:*4, 6*
73:*1, 6* 74:*6, 8, 13, 18*

75:*8, 15, 17, 20* 76:*3*
77:*3, 5, 6, 7, 17*
attorney-client 63:*10*
68:*4*
audited 54:*10*
auditors 33:*23* 54:*13*
authority 68:*13, 23*
authorization 61:*6*
authorize 50:*15*
authorized 38:*9*
39:*3* 59:*11*
Avenue 3:*15, 23* 4:*18*
avoidance 62:*7, 20*
63:*4*
avoiding 63:*21*
aware 12:*7, 10, 13*
13:*7, 12* 15:*15* 16:*2,
4, 8, 24* 21:*21* 27:*17*
37:*3, 7, 11* 40:*16, 19,
23* 46:*23* 48:*11* 49:*2,
16* 57:*8* 59:*22* 60:*13*
66:*4, 11* 67:*17, 23*
72:*23* 73:*11, 13*

< B >
BA 1:*22* 81:*21*
back 19:*18* 20:*18*
58:*13* 63:*4, 21*
balance 26:*4* 54:*9,
17, 22* 55:*1*
ballpark 73:*19*
BANKRUPTCY 1:*1*
12:*8, 15* 23:*3, 7*
31:*11* 37:*4* 38:*16*
BARTLETT 4:*9*
based 16:*21* 28:*3, 9,
17, 24* 42:*1*
basis 28:*22* 49:*9, 14*
67:*13*
Baton 5:*10*
Beacon 18:*6*
beginning 2:*11*
behalf 3:*4, 19* 4:*3,
14* 5:*3* 13:*3, 25* 16:*5,
9, 25* 34:*8* 50:*10, 16*
51:*17* 56:*9, 16, 24*
60:*5, 10* 61:*8* 68:*25*
69:*16*
belief 71:*1*

believe 13:*5* 19:*18,
22* 20:*9, 11* 21:*17, 18*
22:*3* 23:*4* 25:*10*
26:*12* 27:*8, 23* 28:*5*
29:*2, 7, 16* 35:*18, 22,
24* 36:*7, 15* 37:*12*
39:*1* 40:*14* 41:*13*
42:*15* 43:*2, 17* 45:*5*
46:*19* 47:*3, 15, 24*
48:*4* 49:*19* 50:*13, 21*
51:*1, 9, 15, 24* 52:*3*
53:*2* 56:*6, 13, 21*
57:*4, 10* 60:*14, 24*
61:*5* 64:*13* 65:*5*
66:*5* 68:*22* 69:*12, 13*
71:*22* 72:*20* 73:*18*
beneficial 24:*2*
benefit 28:*8* 42:*3*
49:*22* 75:*7*
benefited 53:*15*
75:*10*
best 18:*10*
beyond 25:*20* 52:*5*
billion 22:*14*
bit 13:*22* 15:*9*
23:*15* 48:*15* 57:*18*
72:*19*
board 11:*23* 15:*13,
17* 54:*13*
boards 14:*24*
breach 62:*22*
breached 74:*9*
break 10:*24* 75:*22,
24*
bring 38:*8*
bringing 67:*19*
buy 64:*10* 67:*12*

< C >
CA-Certified 81:*7*
CA-CSR 1:*22* 81:*21*
call 14:*10* 20:*17*
72:*12* 76:*19, 22, 25*
called 12:*4* 23:*17*
capable 61:*19*
capacity 11:*7, 22*
53:*4* 61:*18*
CAPITAL 1:*6* 3:*4*
8:*25* 12:*5* 26:*9, 13,
25* 27:*9* 36:*8* 37:*6*

41:*24* 42:*24* 45:*6*
48:*22* 64:*20* 67:*19*
care 46:*17*
carefully 27:*4*
carry 26:*3*
Case 1:*5* 38:*6* 58:*10*
81:*16*
cash 27:*20, 25*
casual 8:*14*
cause 48:*21* 49:*3*
66:*5*
causing 19:*7* 46:*16*
caveat 46:*14*
Cayman 16:*1* 59:*19*
62:*7, 12*
Central 1:*15* 2:*11*
77:*19*
certain 9:*3* 12:*17, 18*
13:*12* 15:*25* 45:*23*
CERTIFICATE 81:*2*
Certified 2:*14, 15*
81:*6*
certify 80:*6* 81:*10*
CFO 11:*8, 10, 12, 16,
17* 23:*5* 32:*8, 17*
73:*7*
chance 10:*15*
CHANGE 79:*6, 8, 10,
12, 14, 16, 18, 20, 22*
changes 72:*11* 78:*3*
79:*3* 80:*9*
Chapter 1:*8*
charitable 11:*19*
24:*24* 42:*15, 22* 44:*8*
62:*3* 64:*19* 65:*3*
66:*10*
charities 64:*23* 67:*3*
charts 31:*6*
claim 23:*7* 48:*12, 20*
49:*3*
Claimant 3:*5* 9:*1*
23:*11, 18, 22* 26:*5, 9,
14, 25* 27:*10* 30:*14,
15* 36:*8* 45:*11* 49:*5*
67:*20*
claims 40:*15* 67:*17*
68:*2, 3*
CLARITY 7:*22* 30:*7*
clawback 62:*6, 20*

clawing 63:3, 21
clear 32:14 69:23
clearly 36:6 67:8
colleague 57:16
combination 14:23
Come 65:19
comfort 58:16
comfortable 33:24
commenced 16:6
 37:24 39:24
comment 64:24
communicate 34:7, 15
communicated 59:25
 76:7
communication 35:25
 60:3 76:20
communications 34:9
 60:23
community 18:22
 67:5 75:14
company 12:4
compensate 20:19
compensates 20:12
complicated 9:14
complies 22:23
computer 19:6
concern 42:6 47:6
 50:6
concerned 44:22
 49:24
concerns 15:2 44:4
 46:10
concluded 77:20
conference 14:10
confirm 76:6
confused 41:10
connection 9:2
consent 51:11 52:20,
 24 55:19, 22, 25 56:2,
 7, 14, 22
consequential 69:10
consider 66:13 74:11
consideration 50:2
considering 67:18
 68:3
constituted 71:3
consummation 64:9
 67:11
Cont'd 4:1 5:1

contemplating 55:16
contends 43:22 67:10
context 57:23
contract 17:12, 19
 22:24 62:23
contracts 24:14, 16,
 19, 21
contractual 20:6
 26:8
contribution 71:19
contributions 19:20
control 51:25 52:15
 55:7, 10 57:5 70:8
controlled 9:6 12:11,
 19
conversation 11:25
 36:23 43:15 69:8, 25
 70:21 76:10
conversations 43:8
 51:3 53:8 72:9
 76:11
conversion 73:25
convert 73:12
converted 71:22
 72:20, 21, 25 73:12
 74:2
convoluted 39:11
copies 77:14
copy 60:11
correct 15:18, 20, 21
 16:10, 11 17:24
 18:12 20:3 21:13, 16
 22:7, 8, 17, 24 24:16,
 19 30:6 33:9 37:22
 39:21 41:17, 18, 20
 43:13 54:18 59:21,
 24 62:13, 17 71:25
 72:1 73:18 76:9, 24
 80:10 81:11
corrections 78:3 80:9
correctly 62:10
corresponding 18:19
counsel 16:22 58:5
 81:15
counterparty 74:5
couple 29:16 37:4, 25
course 34:6, 21
COURT 1:1 8:18
 9:25 12:15 37:4
 38:16 60:17 63:6, 22

64:9 65:25 67:10
77:13
Court-appointed 62:5
CRAWFORD 4:17
create 31:21
created 31:19, 24
 62:1
cross-talk 65:24
Crown 4:3 15:7
 16:25 17:3, 5, 11, 14,
 22 18:24 19:1, 24
 20:7, 9 21:1, 2, 10, 16,
 18 22:5, 14, 23 24:7
 25:3, 6, 11, 15, 21
 28:21 29:17, 25 30:3,
 10 31:8, 10 35:23
 36:22 50:25 54:22
 55:2, 3, 23, 24 56:1,
 23 57:5
CRR 1:22 81:21
cumbersome 57:19
current 28:5
Currently 38:3
CURRY 4:7, 9

< D >
DAF 30:18 59:17
DALLAS 1:3 4:3, 19
 9:3 11:4, 8, 11 12:13
 13:25 14:13 15:24
 16:9, 12, 15, 17, 19
 17:8, 10, 13, 22 18:9,
 14, 16, 19, 25 23:1, 6,
 9, 20 24:5, 8, 15, 18
 25:7, 11, 15, 22 26:3,
 7, 15, 18, 23 27:11, 24
 30:18 32:9 33:5, 14,
 20 34:4, 22 35:2, 6,
 12, 20, 25 36:9, 17
 37:9, 13, 17 39:20
 40:3 42:5, 15 43:18,
 22 44:19, 21 46:9
 48:12, 21 49:4, 10, 23
 51:10, 15 52:19 53:2,
 18, 22 54:1, 17 55:1,
 6, 13 56:8 57:13
 58:8 60:5, 10 61:1
 63:3, 19 67:9, 18
 69:11 70:24 71:15,
 24 72:7, 23 73:16, 21

74:10, 20, 21, 24 75:2,
3, 5, 7 76:14
D'AMBRA 5:14
data 41:9
DAVID 4:7
day 8:18 13:21
dcurry@okinadams.co
m 4:8
deal 66:24
debate 67:2
Debtor 1:8 64:10
 67:12
decided 16:21
decision 53:9, 12
 74:17
decision-making
 62:24
decisions 26:25 36:1,
 24 39:16 42:14
 50:24 52:10
Defendant 4:3, 14
Delaware 59:23
delivered 28:1
DEMO 3:8
depends 23:24
DEPONENT 78:1
deposed 9:9
DEPOSITION 1:12
 2:9 7:1 9:2 78:3
 80:7
depositions 8:14
describe 49:13
described 29:1 66:21
describing 29:13
detail 68:5
details 13:1
determine 72:6
device 19:5
DIAZ 5:21 14:2
 15:13 16:20
difference 69:22
different 31:22
 71:23 72:21 73:5
Diplomate 2:14 81:5
DIRECT 7:23 25:14,
 22 53:19, 21 54:4, 5
direction 2:16
directly 17:22 23:21
 25:25 35:8, 9, 13

48:*24*  49:7  54:*1, 19*
55:*10*  60:*20*
**director**  11:*23*
**directs**  10:*18*
**disapprove**  55:*14*
**discovery**  62:*23*
72:*19*
**discussion**  67:*2*
**disposition**  42:*8*
46:*11*
**distribute**  25:*3*
**distributions**  17:*17,*
*18*  25:*6, 8*  30:*11*
**DISTRICT**  1:*2*
**diverting**  62:*3*
**dividends**  17:*16*
**DIVISION**  1:*3*
**document**  57:*20*
58:*12, 18*
**documentation**  51:*21*
52:*23*
**DOCUMENTS**  7:*7*
30:*25*  31:*2, 4*  50:*14,*
*20*
**doing**  39:*7*  57:*17, 19*
61:*20*
**dollar**  22:*13*
**dollars**  22:*14*  28:*5*
41:*14*  42:*1*  49:*19*
53:*13*  67:*4*
**Dondero**  12:*11*  14:*7,*
*16*  15:*16*  16:*4*  19:*22*
**Dondero's**  74:*5*
**donor-advised**  18:*20,*
*21*
**dressing**  8:*15*
**due**  29:*5*
**Dugaboy**  4:*14*  71:*16*
74:*4*
**duly**  8:*6*
**duration**  20:*8*
**duties**  11:*15*  26:*14,*
*17*  27:*10*  32:*8*  33:*19*
34:*6*
**duty**  11:*17*  25:*3, 6,*
*11, 22*  35:*19*  36:*9, 16*
52:*3, 5*  70:*3*  73:*8*
74:*10*

**< E >**

**earlier**  29:*1*  43:*23*
62:*15*
**easier**  13:*22*
**economic**  15:*6*  24:*4*
28:*8*  35:*23*  36:*2, 21*
37:*18*  47:*21*  48:*7*
49:*20*  50:*24*  72:*6*
**elaborate**  48:*15*
**emails**  76:*10*
**EMANUEL**  3:*22*
**employed**  81:*15*
**employment**  71:*3*
**Empower**  11:*25*
14:*24*  16:*12*  17:*10,*
*13, 22*  18:*9, 17*  24:*2,*
*8*  25:*9, 17*  26:*21, 22*
28:*12, 15*  30:*17*
37:*19*  39:*13*  40:*9*
41:*13, 23*  42:*2, 23*
43:*18*  44:*19*  47:*14,*
*23*  49:*21*  55:*18*  56:*2*
69:*10*  75:*2*
**enabled**  70:*25*
**engaged**  43:*23*  65:*6*
**enraptured**  75:*18*
**ensure**  11:*17*
**enter**  50:*15*  53:*5*
68:*24*
**entered**  42:*16, 24*
50:*9*
**entering**  51:*11, 16*
52:*20*  55:*16*  56:*15,*
*23*  61:*7, 15*  64:*15*
66:*6*
**entire**  34:*3*
**entities**  9:*5*  12:*18*
13:*2, 19*  16:*19*  27:*18,*
*19*  31:*14, 16, 19*  33:*2,*
*11, 16*  35:*4, 14, 19*
36:*16*  45:*23*  46:*21,*
*24*  47:*7, 17*  50:*2, 10,*
*11, 14, 17*  51:*18*  52:*4,*
*19*  53:*5, 20, 24*  54:*16*
55:*8, 11*  56:*9, 17, 25*
57:*6*  59:*23*  61:*8, 15*
62:*1*  64:*20*  68:*25*
69:*17*
**entity**  12:*7, 10*  23:*17*
54:*25*  55:*15*  59:*15*

**entry**  65:*7*
**Errata**  78:*5*
**ESQ**  3:*6, 8, 10, 12, 20*
4:*5, 7, 15*  5:*4, 6*
**established**  62:*19*
**event**  20:*23*
**evidence**  68:*11*
**exact**  22:*21*
**EXAMINATION**  6:*5*
8:*10*
**examined**  8:*8*
**example**  22:*10*
**exchange**  21:*10*
**excuse**  72:*15*
**execution**  68:*17*
69:*15*
**exercise**  72:*4, 16*
74:*4*
**exercised**  71:*25*  72:*7*
73:*17, 21*  75:*6*
**exercising**  72:*24*
74:*11*
**Exhibit**  6:*13*  58:*4*
**EXHIBITS**  6:*11*
**expect**  51:*4*  70:*7*
**expectation**  52:*14, 18*
**expense**  20:*12, 17*
**expenses**  20:*14*
**expert**  62:*12*
**expired**  71:*21*
**explain**  54:*12*
**explained**  20:*18*
**exposure**  14:*15*
**extend**  52:*5*
**extent**  63:*9*  67:*22*

**< F >**

**fact-finding**  38:*8*
**facts**  28:*3*  38:*5, 6*
40:*5, 8*  41:*10*  43:*1,*
*10*  44:*10*  45:*22*
48:*11, 20*  49:*2*  58:*15*
62:*19*  63:*25*  64:*22*
65:*5, 16*  66:*5, 11, 15,*
*16, 19*  67:*7*
**fail**  9:*21*
**fair**  20:*25*  23:*5*
28:*12, 14, 16, 22, 24*
29:*4, 8, 9, 14*  30:*11,*
*12*  34:*19, 20*  42:*5*

43:*24*  44:*2, 25*  45:*1*
46:*7, 12, 14*  49:*23*
50:*1*  51:*12, 13, 18*
54:*6, 24*  57:*24*  61:*2,*
*3*  63:*15, 18*  65:*17*
66:*21*  70:*4*  73:*10, 20,*
*23*  77:*1*
**faith**  44:*17*
**familiar**  12:*4*  13:*2*
23:*17*  28:*14*  30:*13,*
*16, 18, 20, 22*  58:*11*
**Family**  12:*1*  16:*13*
17:*10, 13, 23*  18:*9, 17*
74:*5*
**fan**  19:*7, 9*
**February**  29:*4*  55:*22*
**fee**  20:*16*
**feed**  54:*20*
**feedback**  19:*8*
**feeds**  54:*22*
**feel**  63:*25*  72:*3*
**felt**  16:*19*
**fiduciary**  11:*18, 20*
24:*22*  35:*24*  36:*9, 16,*
*23*  50:*21*  51:*23*  52:*2,*
*25*  62:*5*  68:*13*  69:*14,*
*24*  74:*10*
**file**  14:*21*  16:*14, 21*
37:*5*  39:*21*
**filed**  12:*7, 14, 22*
16:*25*  23:*3, 6*  37:*3*
38:*19*  39:*2, 25*  58:*9*
69:*20*
**filing**  13:*24*  14:*17*
37:*10, 14*  38:*9*  39:*3,*
*12*
**finance**  76:*15, 18*
**financial**  11:*21*  25:*1*
26:*23*  54:*10*  81:*17*
**financially**  24:*23*
**finish**  9:*16, 20*  63:*17*
**firm**  8:*24*
**first**  8:*6*  9:*11*  15:*1,*
*11*  75:*21*
**five-minute**  75:*24*
**fixed**  17:*19, 21*  20:*2,*
*7, 10, 22*  21:*11*  22:*16*
**Floor**  3:*15, 23*
**flow**  18:*14, 15, 18*

26:21  30:11  31:5
**flows**  29:14  30:23
**fluctuations**  54:12
**focus**  56:4  68:16
**focused**  48:2
**Focusing**  68:19, 21
**following**  79:3, 4
**follows**  8:8
**foregoing**  80:7  81:9,
10
**form**  15:22  16:16
23:13, 23  25:13, 24
26:16  27:12  28:2
35:21  36:18  38:12
39:8  41:21  42:11
43:6, 14, 25  45:2
47:9, 20  48:8, 14, 23
49:6  50:4, 18  51:19
52:6  53:6, 25  54:7
55:9  56:10, 18  57:1,
7  60:19  61:9  63:7,
23  64:16  65:9, 18
66:8  69:1, 18  70:5
71:4  73:1  74:6, 13
75:8
**formal**  9:13  10:14
**formed**  23:11
**forth**  27:20
**Foundation**  4:3  11:5,
9, 11, 22  12:1, 14
13:25  14:24  16:10,
13, 15, 18, 20, 21  17:8,
10, 14, 23  18:14, 16,
19, 25  23:2, 6, 10, 16,
20  24:3, 5, 15, 18
25:7, 12, 15, 22  26:3,
7, 15, 18  27:11, 24
32:9  33:5, 14, 20
34:4, 22  35:3, 6, 12,
20, 25  36:9, 17  37:18,
19  39:14  40:9  43:18,
22  44:22  46:10
48:13, 21  49:4, 24
51:15  53:2, 18, 22
54:1  55:1, 6, 13  56:8
59:17  60:5, 10  63:3,
20  67:9, 18  71:14, 15,
24  72:7, 24  73:16, 17,
21  74:10, 20, 21, 24,
25  75:3, 5, 7

**foundations**  15:13
18:17  65:3
**Foundation's**  9:3
14:13  15:24  18:10
26:23  37:9, 13  39:20
40:4  42:6  49:10
51:11  52:20  54:17
57:13  58:9  61:2
70:24  73:9  76:15
**full**  57:24
**Fund**  15:4, 5  17:19
18:4, 5, 20  21:17, 19
22:4  24:15, 17  28:21
30:23  49:17  54:20,
21  55:17
**funded**  19:17, 19
**funding**  16:5, 8
**funds**  18:21  26:20
30:25  31:1
**fund's**  62:1
**Further**  61:22  77:3
**future**  21:12  28:25
30:11  40:17  49:20
77:1

**< G >**
**Gail**  1:21  2:13  9:25
77:11, 17  81:5, 21
**gdemo@pszjlaw.com**
3:9
**generally**  40:10, 13
**gentleman**  12:11
**getting**  21:2  41:10
**give**  10:13  12:25
31:6  40:11  48:12, 20
49:3  57:24  58:16
62:24
**given**  45:22, 24
63:25  71:19
**gives**  10:14, 16
**glance**  31:3
**Global**  4:3  15:7
16:25  17:3, 5, 11, 14,
22  18:24  19:1, 24
20:7, 9  21:2, 10, 16,
18  22:5, 14, 23  24:7
25:3, 6, 11, 15, 21
28:21  29:17, 25  30:3,
10  31:8, 10  35:23
36:22  50:25  54:22

55:2, 3, 23, 24  56:1,
23  57:5
**go**  17:21  25:20  27:7,
14  38:23  41:3  58:2
63:10  68:10  70:11
**goal**  10:4
**going**  8:18  9:14
10:3, 19  13:21  25:25
27:3  35:22  36:2
39:13  52:12  57:11,
12  59:9  60:17  61:20
66:16  67:4, 15, 21
73:11  76:25
**Good**  8:23  21:4, 5
44:17
**good-faith**  43:4, 12
44:6  45:21  46:8
69:8
**governing**  30:24
31:2, 4  50:14, 20
**granting**  47:16  48:5
**grant-making**  75:12
**grants**  18:21
**GREGORY**  3:8
**grow**  24:24
**guaranteed**  22:21
**guy**  34:23

**< H >**
**half**  32:20
**HALL**  5:18
**HALLMAN**  5:8
**happen**  18:16
**happened**  53:14, 15
54:13  73:4
**hard**  34:11
**harm**  46:16
**HART**  5:8
**hat**  34:18
**hats**  34:19
**HAYLEY**  3:12
**head**  34:24  35:3
**hear**  8:21, 22  65:15
**heard**  36:5  38:22
39:24
**held**  2:9  15:7  30:9
33:6, 10
**helped**  14:4
**Hey**  38:20
**high**  31:3  34:14

**HIGHLAND**  1:6  3:4,
19  6:13  8:25  9:1, 4
12:5, 17  23:2, 7, 11,
18, 22  26:4, 8, 9, 13,
14, 24  27:9, 18  30:14,
15  31:10  36:7, 8
37:6, 24  38:16  41:17,
24  42:15, 24  45:6, 11,
16  46:25  48:13, 22
49:5  50:10  58:4
64:14, 19, 20  65:5
66:5, 20, 22  67:19, 20
71:15  74:21, 24  75:3,
5
**Highland's**  12:15
60:6
**high-level**  40:5  58:15
**historical**  28:9
**HMIT**  13:9, 13, 17,
19  18:6  27:18, 19
28:1, 4  30:20, 25
31:16, 18  32:2, 6, 10
33:2, 6, 11, 15  34:8,
10, 18, 24  35:4, 7, 14,
19  36:11, 16  37:3, 9,
12, 24  38:11  40:10
46:21, 24  47:7, 17
48:5  50:2, 11, 14, 17
51:18  52:4, 19  53:4,
19, 23  54:16, 23  55:7,
10, 15  56:9, 16, 25
57:6  59:22  61:8, 15
68:25  69:16
**hold**  17:11  21:22, 24
22:2, 3  30:1, 2
**Holdco**  30:18  59:18
**holdings**  32:14
**holds**  22:4
**honest**  72:18
**Hospitality**  71:18
**Houston**  4:11
**Hunter**  5:3  13:5, 8,
9  15:3  18:6  23:25
29:6, 12  31:14  40:17,
20  41:25  42:8  45:19
46:11  49:18, 21
**HURT**  5:6
**hwinograd@pszjlaw.c**
**om**  3:13

**< I >**
**idea** 14:*17, 18, 21*
*15:10* 31:*6*
**identify** 32:*2, 5*
**IDF** 18:*4* 21:*17*
22:*3* 30:*23* 49:*17*
54:*20, 21* 55:*17*
**imagine** 31:*23* 35:*11*
52:*23*
**impact** 11:*22* 28:*11*
29:*2, 7* 35:*23* 36:*2,
20, 25* 37:*18* 38:*6*
39:*10, 13* 40:*9* 41:*14,
22* 43:*17* 44:*17, 18*
47:*13, 18* 48:*7* 50:*24*
52:*13* 64:*1* 65:*2*
69:*10* 72:*6*
**impacted** 15:*6* 45:*24*
53:*9* 64:*23* 67:*3*
**impactful** 75:*11*
**impacts** 24:*3* 44:*12*
47:*12*
**implicated** 63:*9*
**important** 9:*15, 19*
40:*8*
**including** 61:*25*
**income** 18:*10, 13, 15,
24, 25* 21:*11* 22:*16*
28:*25* 47:*13, 23*
**increased** 29:*5*
**independent** 62:*5*
**INDEX** 7:*1*
**indicate** 78:*3*
**indirect** 25:*17* 26:*24*
53:*23* 54:*6, 14, 23*
75:*4*
**indirectly** 23:*21*
24:*1, 5* 44:*24*
**Indiscernible** 65:*24*
**individual** 42:*17, 21,
25* 44:*8, 11, 16* 46:*15*
64:*18, 22* 66:*10, 24*
**individuals** 42:*13*
74:*15*
**infirmity** 10:*16*
**inform** 36:*24* 50:*23*
52:*5* 69:*25* 70:*4*
**information** 33:*21*
34:*1* 63:*11* 70:*14, 17,*

*25* 71:*1, 7* 73:*3*
74:*15, 16*
**informed** 33:*6, 14*
52:*11* 60:*5, 25* 73:*14*
**informing** 37:*17*
**Inghram** 1:*21* 2:*13*
81:*5, 21*
**inquired** 33:*22*
**inquiry** 32:*9, 11*
**insertion** 61:*25*
**insight** 31:*25*
**instruct** 67:*21*
**INSTRUCTION** 7:*2*
**INSTRUCTIONS**
78:*1*
**Insurance** 4:*4* 17:*1,
4, 5, 6, 12* 20:*20*
28:*17, 18, 20* 29:*18,
23*
**interest** 23:*10, 21*
24:*2, 4, 6, 11, 13*
25:*18* 26:*4, 19, 24*
28:*4, 10* 29:*6, 11, 25*
35:*23* 36:*3, 21* 39:*16*
41:*24* 47:*22* 49:*18*
50:*24* 53:*13, 19, 23*
54:*4, 5, 6, 8, 14, 23*
81:*17*
**interested** 51:*23*
53:*7* 70:*1*
**interests** 15:*4* 21:*18*
37:*19*
**internal** 72:*10*
**introduced** 58:*5*
**inured** 75:*6*
**invest** 19:*24*
**invested** 18:*1*
**Investment** 4:*14* 5:*3*
13:*6, 9* 14:*25* 33:*24*
36:*1, 24* 45:*20* 50:*23*
51:*2, 25* 52:*14* 55:*4*
70:*8* 71:*17, 23* 72:*10*
**investments** 11:*20*
18:*3* 22:*6* 29:*17, 22*
31:*23* 52:*11*
**involved** 70:*20*
**Islands** 16:*1* 59:*19*
62:*13*
**issuer** 17:*6*

**its** 22:*23* 26:*4* 49:*18*
50:*1* 81:*17*

**< J >**
**JAMES** 5:*19*
**January** 11:*13*
**JEFFREY** 3:*10*
**Jim** 12:*11* 14:*7*
**jmorris@pszjlaw.com**
3:*7*
**JOHN** 3:*6* 8:*24*
38:*13* 65:*19*
**joint** 59:*10, 16* 60:*1,
6, 12, 15, 24* 61:*6, 14,
19* 76:*7, 17*
**JONES** 3:*14* 5:*18*
**jpomerantz@pszjlaw.c
om** 3:*11*
**JULIE** 5:*21* 14:*2*
15:*13* 16:*20*
**June** 1:*14* 2:*10*
**jurisdiction** 62:*9*

**< K >**
**KELLY** 5:*8*
**key** 50:*6*
**kind** 12:*25* 14:*4*
15:*14* 31:*6, 25* 34:*11*
38:*1, 2, 5, 7* 40:*7, 8*
52:*12*
**know** 9:*22* 10:*10, 25*
13:*24* 14:*6, 12, 16, 17*
16:*12* 17:*25* 18:*2, 3*
19:*17* 23:*1, 6, 9*
25:*21* 26:*7* 29:*3*
30:*22* 31:*18, 19, 21,
23* 33:*10, 21* 34:*11*
35:*6, 12, 16* 36:*12*
37:*15* 38:*9, 19* 39:*15*
40:*10, 13, 25* 41:*1*
42:*1, 14, 24* 46:*15*
48:*20* 50:*19, 20* 51:*1,
20* 52:*8, 12, 24* 53:*15*
55:*6, 13* 57:*23* 59:*3,
15* 60:*4, 9* 64:*17*
67:*1, 3, 7, 9* 69:*22*
70:*7, 16, 23, 24* 71:*7*
73:*25* 74:*1, 14, 16*
75:*16*
**knowing** 64:*22* 66:*24*

**knowledge** 18:*11*
22:*2* 31:*9* 60:*16*

**< L >**
**L.P** 1:*7*
**LANG** 4:*15, 17*
77:*14*
**language** 37:*16*
**large** 40:*25*
**late** 21:*2*
**law** 8:*24* 62:*13*
**lawsuit** 37:*5, 14, 23*
39:*4, 24*
**lawyer** 10:*12, 14*
12:*2* 62:*16*
**lay** 23:*15*
**lead** 65:*5*
**lean** 38:*7*
**leaned** 40:*7*
**learn** 37:*23*
**leave** 64:*3* 65:*13*
**led** 60:*24*
**left** 75:*16, 23*
**legal** 10:*14, 16* 11:*21*
12:*24* 14:*4* 16:*22*
17:*12* 38:*4, 7* 40:*7*
52:*22* 53:*2* 61:*17*
62:*25*
**legally** 52:*23* 53:*1*
**level** 31:*3* 34:*14*
**liability** 40:*14* 46:*25*
**Life** 4:*4* 16:*25* 17:*3,
5*
**likelihood** 63:*2*
**Limited** 17:*1, 4, 6*
**LINE** 7:*3, 8, 13, 17*
59:*8* 79:*5*
**liquidation** 62:*8*
**liquidators** 59:*11, 16*
60:*1, 6, 12, 16, 25*
61:*7, 14, 19* 76:*8, 17*
**liquidity** 75:*13*
**listen** 27:*4*
**lists** 55:*4*
**Litigation** 3:*19*
15:*25* 16:*5, 9* 45:*16*
**little** 13:*22* 15:*9*
23:*15* 48:*15* 57:*18*
72:*19*

**LITTLETON** 1:*13*
2:*9* 6:*6* 8:*5*, *17* 58:*8*,
*19* 63:*9* 66:*4* 76:*4*
77:*7* 80:*12*
**LLP** 3:*22* 4:*9* 5:*8*
**LOIGMAN** 3:*20*
**long** 11:*1*, *10* 22:*22*
33:*1*
**longer** 49:*22*
**look** 55:*3*
**looked** 16:*17*
**looking** 14:*25* 19:*14*
59:*8*
**loss** 47:*22*
**lost** 47:*13* 72:*24*
75:*17*
**lot** 34:*19* 67:*5*
**LOUIS** 5:*4*
**Louisiana** 5:*10*
**LP** 8:*25* 12:*5* 15:*5*
18:*4* 22:*3* 45:*6* 55:*4*
**lphillips@kellyhart.co
m** 5:*5*

**< M >**
**M&E** 20:*11*, *14*, *17*
**Madden** 72:*14*, *15*
**Madison** 3:*23*
**Main** 5:*9* 11:*17*
**making** 39:*17* 42:*13*
66:*24*
**MANAGEMENT** 1:*6*
3:*4* 8:*25* 12:*5* 26:*9*,
*13* 27:*9* 36:*8* 37:*6*
41:*25* 45:*6* 48:*22*
52:*9* 67:*19* 72:*15*
**Mark** 9:*6* 33:*1*
34:*10* 39:*2* 45:*25*
50:*8* 53:*3* 55:*21*
74:*9*
**MARKED** 6:*11* 7:*16*
58:*4*
**market** 20:*4* 28:*12*,
*14*, *16*, *23*, *24* 29:*4*, *8*,
*9*, *14* 54:*12*
**MARKS** 7:*22* 78:*6*
**material** 70:*14*, *16*
**Matt** 38:*20* 65:*20*
67:*25* 75:*16* 77:*9*

**matter** 30:*8*
**matters** 30:*10*
**MATTTHEW** 4:*5*
**mean** 38:*13*
**means** 11:*19*
**meet** 8:*19*
**member** 15:*16*
**met** 14:*6*, *8*
**MICHAEL** 4:*15*
**million** 19:*20*, *21*, *23*
28:*4* 41:*1*, *5*, *14*, *25*
42:*2* 49:*19* 52:*8*
53:*13* 71:*17* 72:*24*
73:*19*, *22* 74:*12*
75:*12*
**mine** 62:*21*
**minutes** 75:*19*, *23*
**missed** 20:*13*
**mlang@cwl.law.com**
4:*16*
**MNPI** 71:*3*
**mokin@okinadams.co
m** 4:*6*
**moment** 57:*15*
**money** 21:*1*, *9* 22:*22*
**MORRIS** 3:*6* 6:*7*
8:*11*, *24* 15:*23* 16:*23*
21:*6* 23:*14* 24:*10*
25:*19* 26:*1* 27:*2*, *16*
28:*13* 36:*4* 37:*2*
38:*14*, *20*, *24* 39:*18*
42:*4*, *19* 43:*9*, *19*
44:*3* 45:*3* 47:*10*
48:*1*, *10*, *17* 49:*1*, *8*
50:*7* 51:*6* 52:*1*, *16*
53:*17* 54:*3*, *15* 55:*12*
56:*12*, *20* 57:*3*, *9*
58:*2*, *6*, *25* 59:*4*, *7*
60:*21* 61:*12* 63:*13*,
*14* 64:*4*, *6* 65:*1*, *11*,
*20* 66:*3*, *17*, *18* 67:*24*
68:*6*, *9* 69:*6*, *21* 70:*2*,
*10* 71:*6* 72:*18* 73:*6*
74:*8*, *18* 75:*15*, *20*
76:*3* 77:*3*, *7*, *14*
**motion** 37:*4*, *10*
38:*10*, *13*, *15* 39:*12*,
*21*, *25* 60:*7*
**Mountain** 5:*3* 13:*6*,
*8*, *9* 15:*3* 18:*6* 24:*1*

29:*6*, *12* 31:*14* 40:*18*,
*20* 41:*25* 42:*8* 45:*20*
46:*11* 49:*18*, *21*
**move** 27:*3* 57:*11*
**moved** 66:*23*
**moving** 44:*8* 64:*18*
66:*10*, *20*
**multiple** 33:*23*

**< N >**
**name** 8:*23* 16:*14*
**named** 12:*11*
**NATHAN** 5:*18*
**NECESSARILY** 7:*22*
34:*17*
**need** 10:*24* 34:*23*
35:*3* 57:*21* 58:*21*
73:*3* 77:*11*
**needed** 33:*20* 52:*19*
**negatively** 36:*3* 53:*9*
64:*23*
**negotiate** 68:*24*
**negotiating** 46:*15*
**negotiation** 43:*4*
65:*7* 68:*17* 69:*15*
**negotiations** 43:*13*
44:*6*, *15* 46:*9*
**neither** 81:*15*
**never** 14:*8* 23:*6*
33:*25* 34:*25* 39:*19*
71:*24* 76:*7*
**New** 3:*16*, *24*
**newly** 62:*1*
**news** 38:*2*
**NexPoint** 71:*18*
**nice** 8:*19*
**nonpublic** 70:*14*, *16*
**normal** 51:*3*
**NORTHERN** 1:*2*
**Notary** 81:*8*
**notations** 78:*6*
**NOTE** 7:*21*
**notes** 19:*13* 55:*20*,
*21*, *23*
**notice** 77:*10*
**notified** 74:*2*
**November** 19:*19*
**NUMBER** 6:*12* 12:*8*

**< O >**

**object** 10:*13* 15:*22*
16:*16* 23:*13*, *23*
25:*13*, *24* 26:*16* 28:*2*
35:*21* 36:*18* 38:*12*
39:*8* 41:*21* 42:*11*
43:*6*, *14*, *25* 45:*2*
47:*9*, *20* 48:*8*, *14*, *23*
49:*6* 50:*4*, *18* 51:*19*
52:*6* 53:*6*, *25* 54:*7*
55:*9* 56:*10*, *18* 57:*1*,
*7* 60:*19* 61:*9* 63:*7*,
*23* 64:*16* 65:*9*, *18*
66:*8* 69:*1*, *18* 70:*5*
71:*4* 73:*1* 74:*6*, *13*
75:*8*
**objecting** 15:*10*
**objection** 9:*3* 12:*14*,
*16*, *21* 13:*25* 14:*5*, *14*,
*18*, *22* 15:*24* 16:*14*,
*24* 23:*3* 27:*12* 40:*4*
49:*10*, *15* 57:*13* 58:*9*,
*15* 60:*11* 61:*2*
**objections** 12:*23*
**obligation** 20:*7*, *11*
22:*15* 35:*20*, *24*
36:*23* 50:*21* 51:*23*
52:*25* 69:*25*
**obligations** 22:*23*
26:*15*, *18* 27:*10*
68:*13* 69:*14*
**obtain** 51:*10* 52:*19*
56:*7*, *14*, *22* 61:*5*
**obtained** 39:*20* 71:*2*
**occasions** 33:*23*
**officer** 81:*8*
**official** 59:*10*, *16*
60:*1*, *6*, *12*, *15*, *25*
61:*6*, *14*, *18* 76:*7*, *17*
**officially** 60:*2*
**Oh** 41:*7* 42:*21*
**Okada** 12:*1* 14:*24*
16:*13* 17:*10*, *13*, *23*
18:*9*, *17* 19:*23* 24:*2*,
*8* 25:*9*, *16* 26:*21*, *22*
28:*12*, *15* 37:*19*
39:*13* 40:*9* 41:*13*, *23*
42:*2*, *23* 43:*17* 44:*18*
47:*14*, *23* 49:*22*
55:*18* 56:*2* 69:*10*
75:*2*

okay  8:*21, 23*  9:*12,
17*  10:*8, 20, 21*  11:*2*
12:*13*  13:*21*  14:*12*
17:*3*  19:*11, 16*  20:*25*
21:*14*  22:*19*  23:*1, 20*
26:*2*  33:*4, 18*  34:*6*
35:*1*  37:*3*  39:*19*
40:*2*  41:*11*  44:*4*
45:*4, 9*  48:*11*  49:*2*
50:*8*  51:*7, 9*  58:*2*
59:*1*  60:*22*  61:*4*
62:*12*  64:*4, 7*  67:*25*
68:*8, 16*  69:*12*  70:*3,
11*  75:*15*  77:*13*
**OKIN**  4:*5, 9*  15:*22*
16:*16*  21:*4*  23:*13, 23*
25:*13, 24*  26:*16*
27:*12, 14*  28:*2*  35:*21*
36:*18*  38:*12, 18, 22*
39:*8*  41:*21*  42:*11*
43:*6, 14, 25*  45:*2*
47:*9, 20*  48:*8, 14, 23*
49:*6*  50:*4, 18*  51:*19*
52:*6*  53:*6, 25*  54:*7*
55:*9*  56:*10, 18*  57:*1,
7*  58:*19*  59:*2, 6*
60:*19*  61:*9*  63:*7, 23*
64:*16*  65:*9, 18, 21*
66:*8*  67:*21*  68:*1, 8*
69:*1, 18, 23*  70:*5*
71:*4*  73:*1*  74:*6, 13*
75:*8, 17*  77:*6, 14, 17*
**once**  34:*22*
**opine**  43:*8, 16*  44:*16*
45:*8, 9, 14, 18*  61:*18*
**opined**  55:*24*
**opinion**  62:*25*  63:*24*
66:*14*
**opportunity**  10:*17*
55:*19*  56:*3*  57:*24*
**option**  71:*11, 14, 16,
20, 21, 25*  72:*4, 8, 12,
25*  74:*4*
**order**  55:*23*  58:*22*
62:*19*
**org**  75:*3*
**organization**  11:*14*
16:*18*  30:*8*  32:*21, 25*
69:*19*  74:*22*  75:*11*
**organizational**  31:*5*

**organizations**  11:*24*
16:*6*  20:*2, 5*  21:*1, 9*
22:*15, 21*  24:*9, 25*
25:*9*  28:*6*  29:*15, 24*
30:*2*  44:*13*  45:*23*
46:*16*  47:*19*  48:*7*
50:*22*  53:*10*  56:*15*
59:*23*  63:*2*  64:*2*
69:*11*
**orgs**  39:*15*
**originally**  26:*20*
**originated**  14:*18*
**outcome**  81:*17*
**outlined**  67:*8*
**outside**  68:*12, 23*
69:*14*
**overall**  38:*6*  54:*9*
**overseeing**  12:*15*
**oversight**  11:*18, 20*
34:*13*  75:*4*
**owes**  25:*11*  26:*14*
27:*10*  35:*19*  36:*9, 16*
**owned**  21:*15*  32:*6,
10*  33:*16*  74:*19*
**ownership**  21:*20*
24:*6*  29:*25*  34:*13*
53:*19, 21, 23*  54:*5, 6*
**owns**  31:*6*  32:*3*

**< P >**

**p.m**  1:*15*  2:*11*  76:*1,
2*  77:*19*
**PACHULSKI**  3:*14*
5:*18*
**Pacific**  4:*18*
**PAGE**  6:*5, 12*  7:*3, 8,
13, 17*  79:*5*
**paid**  21:*1, 9*  49:*21*
**paragraph**  58:*3*
61:*22*  64:*5, 8*  68:*10*
70:*11, 13*
**part**  11:*25*  12:*24*
20:*14*  23:*11*  33:*19*
40:*15*  43:*8, 15*  44:*1*
46:*13*  47:*3*  50:*5*
54:*21*
**participate**  76:*12, 16*
**particular**  20:*23*
21:*19*

**parties**  3:*2*  38:*17*
43:*5*  46:*25*  48:*5*
51:*23*  59:*11*  64:*14*
66:*6*  70:*1*  81:*16*
**partnership**  21:*18*
**party**  13:*13, 18*  53:*7*
**patience**  77:*8*
**Patrick**  9:*6*  12:*19*
13:*3*  33:*1*  34:*10*
39:*2*  43:*23*  45:*25*
50:*9, 15, 22*  51:*10, 16*
52:*3*  53:*3*  55:*21*
56:*7, 14, 22*  61:*5*
64:*18*  65:*4*  68:*11, 22*
69:*13*  71:*2*  74:*9*
**Patrick's**  44:*21*  61:*24*
**PAUL**  5:*14*
**pay**  17:*16*  20:*1, 7, 10*
22:*15*
**payments**  17:*19, 21*
49:*20*
**payout**  28:*8*  42:*2*
**payouts**  40:*17*  53:*16*
**PE**  15:*4*  49:*17*
**peace**  64:*10*  67:*12*
**pending**  11:*2*  15:*25*
**percentage**  20:*19*
**period**  20:*22*  21:*12*
**permission**  37:*5*
38:*15*
**person**  34:*15*  51:*3,
25*  52:*15, 22*  61:*17*
**personally**  14:*8*
69:*19*
**persons**  70:*9*
**pertaining**  12:*16*
**pertinent**  13:*1*
**PHILLIPS**  5:*4*  77:*5,
15*
**piece**  20:*13*
**place**  44:*24*  66:*12*
**plan**  23:*12*
**planned**  60:*3*
**platform**  29:*20, 21*
**play**  17:*7*  43:*1*
44:*14*
**played**  31:*10*
**plays**  17:*9*
**please**  58:*3*  64:*5*

70:*12*
**PLLC**  4:*17*
**point**  58:*23*
**policies**  17:*11*  30:*5,
6*  36:*22*
**policy**  24:*7*  30:*1, 2, 4*
**POMERANTZ**  3:*10*
**portfolio**  15:*6*
**portfolios**  52:*13*
**portion**  15:*2*  18:*13*
58:*8*
**positive**  36:*3*
**possibility**  50:*1*  59:*6*
**potential**  55:*15*  67:*17*
**potentially**  39:*10*
41:*15*  47:*13*
**preparation**  14:*13*
**present**  2:*16*  5:*17*
54:*10*
**preserve**  24:*23*
**President**  14:*1*  16:*20*
**prevent**  51:*16*  61:*15*
**PREVIOUSLY**  6:*11*
58:*4*
**primarily**  15:*13*
**prior**  58:*21*
**privilege**  68:*4*
**privileged**  63:*10*
**privy**  74:*15*
**probably**  34:*14*
36:*12*
**problematic**  42:*18, 20*
**proceeding**  13:*15*
**proceedings**  2:*12*
77:*20*  81:*9, 11, 12*
**process**  9:*13, 14*
10:*23*  57:*19*
**produce**  28:*21*
**produced**  21:*11*
**product**  43:*3, 12*
44:*5*  46:*8*
**PRODUCTION**  7:*7*
**projected**  28:*25*
**proper**  11:*18*
**proposed**  9:*4*  12:*16*
45:*5, 10, 15*  46:*20*
47:*16*  48:*6*  49:*10*
56:*23*  61:*1*  64:*15*
65:*7*

Case 19-34054-sgj11    Doc 4277-2    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02734-L    Document 15-7    Filed 06/06/25    Page 91 of 100    Page ID 4655
Exhibit 125    Page 92 of 100    Page 397 of 406    High Capital Funding, L.P.

proposing  40:*11*
propounded  80:*8*
protect  24:*23*
provide  56:*3*
provided  60:*10*  71:*2*
providing  47:*8*
Public  81:*8*
pull  40:*8*
pulling  38:*4*
purpose  31:*19*  62:*2*
pursued  40:*21*
pushed  75:*13*
put  14:*5*  57:*12, 22*
58:*7*  71:*10, 14, 16, 20*
72:*4, 8, 12, 17, 25*
73:*11, 17, 21*  74:*4, 11,*
*19*  75:*6*
putting  59:*5*

< Q >
quarter  15:*1*
quarterly  20:*15*
28:*22*
question  9:*16, 21*
10:*8, 16, 20*  11:*1*
21:*7*  27:*5*  61:*21*
63:*13, 17*  65:*10*  69:*2*
questionable  42:*14*
67:*1*
QUESTIONS  7:*16*
9:*15*  10:*13*  34:*16*
57:*25*  58:*23*  75:*18*
76:*14*  77:*4, 5*  80:*8*
quicker  13:*22*
QUINN  3:*22*
QUOTATION  7:*22*
quotations  66:*13*
QUOTE  7:*23*  59:*9*

< R >
Rand  15:*4*  18:*5*
29:*11, 12*  30:*17, 25*
31:*13*  49:*16*
Rand's  29:*6*
range  73:*19*
RAVER  5:*20*
RDR  1:*22*  81:*21*
reach  56:*1*

read  12:*23*  40:*2*
59:*9*  62:*10*  77:*18*
80:*6*
reading  19:*14*  78:*2*
really  53:*11*  61:*18*
Realtime  2:*14*  81:*6*
reason  10:*24*  25:*10,*
*23*  26:*12*  27:*8, 23*
35:*18*  43:*2*  45:*4, 7, 9,*
*14, 18*  46:*19*  47:*15*
48:*4*  50:*13*  51:*14*
53:*1*  56:*6, 13, 21*
57:*4, 10*  60:*14*  61:*4*
64:*13*  69:*13*  72:*4*
74:*7*  79:*7, 9, 11, 13,*
*15, 17, 19, 21, 23*
reasonable  46:*7*
reasons  74:*3*  78:*4*
79:*4*
recall  14:*11*  41:*2*
57:*21*
receive  20:*15*  22:*21*
27:*20, 24*  28:*7*  40:*11,*
*20*  42:*9*  44:*23*  50:*3*
received  35:*7, 13*
63:*11*  73:*25*
receives  46:*12*
Recess  76:*1*
recollection  57:*22*
recommendation
16:*22*  56:*3*  72:*11*
recommendations
18:*18*
record  81:*11*
recorded  2:*12*
recovered  73:*22*
reduced  81:*13*
refer  13:*8, 17*
REFERENCED  6:*11*
referred  31:*15*  70:*17*
referring  30:*4*
refers  15:*25*  70:*13*
71:*10*
REFLECT  7:*23*
refresh  57:*22*
regardless  22:*19*
50:*20*
Registered  2:*13*  81:*5*
reiterated  38:*5*

related  29:*2*  40:*6*
41:*6*  81:*15*
relates  11:*24*  27:*1*
30:*17*  41:*13*
relationship  23:*25*
24:*8, 22*  25:*16, 17*
26:*8*  51:*24*  74:*23*
75:*1*
relax  9:*12*
release  40:*14*
releases  47:*7, 16*
48:*2, 5*
releasing  46:*25*
rely  12:*24*  74:*16*
remind  63:*8*
REMOTE  1:*12*  2:*8*
3:*2*
reorganization  23:*12*
repeat  58:*13, 17*
rephrase  10:*10, 17*
Reported  1:*20*
Reporter  2:*14, 15*
10:*1*  65:*25*  77:*13*
81:*2, 6, 8*
REPORTER'S  7:*21*
reporting  11:*21*
represent  39:*15*
representative  52:*4*
53:*4*
representing  44:*13*
represents  8:*25*
REQUEST  7:*7*
required  37:*12*
51:*10*  56:*7, 14, 22*
61:*5*
research  38:*3*
respect  17:*8*  22:*6, 10*
25:*12*  33:*2*  65:*6*
69:*14*
respectfully  27:*3*
respectively  17:*23*
responsibilities  11:*16*
33:*19*
responsibility  24:*22*
25:*14*  42:*23*
responsible  73:*9*
restate  21:*7*  36:*19*
44:*7*
restructuring  43:*23*
44:*10, 21, 24*  46:*1, 12*

result  43:*20, 21*
44:*20*  46:*12*
review  12:*21*  57:*21*
reviewed  30:*24*  31:*1*
Right  13:*7*  15:*17*
19:*3, 6*  21:*12*  27:*24*
29:*10*  30:*1*  31:*16*
32:*22*  33:*2, 8*  34:*1, 2*
37:*16, 21*  39:*17*
42:*23*  46:*6*  51:*15*
53:*3, 11*  54:*20*  55:*7,*
*14, 25*  57:*5*  58:*12*
59:*20*  61:*14*  62:*16*
65:*15*  73:*7, 9*  74:*20*
76:*12, 23*  77:*6*
rise  48:*12, 20*  49:*3*
risk  20:*4, 10, 12, 20*
22:*6, 9, 11*
ROBERT  3:*20*
robertloigman@quinn
emanuel.com  3:*21*
role  14:*12*  17:*7, 9*
31:*10*  33:*1*  66:*20*
roll  24:*25*  26:*22*
31:*7*  54:*9, 19*
rolled  15:*5*  35:*10*
rolls  18:*5, 7*  49:*17*
roll-up  24:*1*
room  19:*2*
Rouge  5:*10*
roughly  41:*14*
Royal  21:*2*
RSA  1:*22*  81:*21*

< S >
sale  15:*3*  29:*5, 11*
52:*11*
saw  29:*4*
says  64:*8*  68:*10*
scheduled  76:*25*
scope  47:*7*  68:*12, 23*
screen  57:*12*  58:*7*
60:*11*
scroll  64:*5*
scrutiny  62:*4*
see  53:*8*  58:*21*
59:*13*  64:*11*  68:*14*
70:*13, 15*  71:*12*
seek  37:*9, 13, 16*

seeking 37:5
seeks 64:10 67:12
seen 31:5 51:22
 64:1, 2
SEERY 5:19
segregated 21:15, 20,
 22, 24 22:1, 20
sell 55:21, 23
selling 53:12
sent 19:24
sentence 59:13 64:7
 71:10
series 9:15
serve 11:23
served 31:20
set 27:20 63:5
 76:10, 19
settle 44:11
settled 64:20
settlement 9:4 12:17
 13:14 23:25 24:3
 27:1, 17 28:1, 8, 11
 40:2, 6, 12, 16, 20
 41:20 42:7, 9, 16
 43:3, 11, 21 44:5, 18
 45:5, 10, 15, 19 46:6,
 7, 20, 24 47:2, 4, 5, 17,
 22 48:6 49:11, 25
 50:3, 9, 16 51:12, 17
 52:21 53:16 56:4, 16,
 24 59:12 60:7, 16
 61:1, 7, 16 63:5, 21
 64:9, 15, 21 65:8
 67:11 68:17, 21, 24
 69:9, 16
settlements 26:20
 28:7 45:22
settling 66:25
share 50:1 66:17
shares 71:18 72:16,
 20 73:24 74:2
sharing 19:6
SHAWN 5:20
sheet 26:4 54:9, 18,
 23 55:1 78:5
shifting 42:22
short 75:22 77:10
Shorthand 2:15 81:2,
 7
sign 77:18 78:5

signed 13:3 31:15
 56:8
significant 36:25
 43:17 49:20 50:23
 67:3
similar 75:1
sir 8:19, 21 9:10, 18,
 23 11:5 12:3, 6, 9, 12,
 20 16:7 17:2, 20
 18:12 19:4, 15 20:3
 22:25 23:4, 8 25:8
 26:6, 11 27:6, 15
 30:12 31:12 32:4, 19
 33:3, 7, 12, 17 34:5
 35:5, 15 37:7, 11
 39:1, 5, 22 40:1, 13
 45:13, 17, 21 46:6, 22
 47:11, 12 48:9, 24
 49:7 51:8 53:21
 56:19 57:2, 14 58:1
 59:14, 17, 21, 24 60:8,
 13 61:3, 10 62:10, 11,
 14 64:12 65:12, 13
 67:15 68:15, 20
 70:15, 18, 21 71:5, 9,
 13 73:10 74:7 76:9
 77:2
sit 60:15
situation 51:5
six 32:22
Skyview 71:3
sleep 59:5
smoothly 27:7
sold 22:17 28:4
 41:24 49:16, 18
sole 18:8 24:6
solely 68:16, 21
somewhat 42:18
Sorry 19:11 21:3
 28:18 36:5, 10, 11
 59:4 65:25
sought 39:20
Sounds 21:4, 5
source 18:9 70:25
speak 34:23 35:3
 61:10, 13
speculate 63:16, 19
speculation 63:25
speed 38:8

spoke 76:17
spoken 14:9
standpoint 44:12
 46:18
STANG 3:14 5:18
start 8:12
starting 36:20
state 28:22 43:16
 66:9 70:25
stated 65:14 69:4
statement 28:21
 54:11 55:4
statements 20:15
 25:1 26:23
STATES 1:1 61:23
Stenographically
 1:20 2:13 81:13
stewardship 11:18
STIPULATIONS
 7:12
stream 21:11 22:16
 29:1
streams 47:23
Street 4:10 5:9
strike 27:4
structure 28:5, 9
 29:18, 20 30:14, 16,
 17, 19, 21, 23 32:12
 35:11 62:2
structures 31:24
stuff 10:14
sub 29:3
subject 13:14 40:3
 62:4, 6
Subtrust 45:16
succeed 62:20 63:3,
 20
succeeding 63:4
successful 32:15
sue 38:16
suggest 43:11 66:20
Suite 4:10, 18 5:9
SULLIVAN 3:22
sum 40:25
summary 12:25
Sunday 1:14 2:10
 8:14, 18
supervision 81:14
supplied 78:5
SUPPORT 7:1

supporting 11:24
 16:6, 18 20:2, 5 21:1,
 9 22:15, 20 24:9, 25
 25:9 28:6 29:15, 24
 30:2, 8 39:15 44:12
 47:18 48:7 50:22
 53:10 56:15 63:2
 64:2 69:11 74:22
 75:3, 10
supposed 26:21
Sure 13:23 15:12
 48:3, 18 58:23
surprised 10:22
sworn 8:6
Systems 81:7

< T >
take 15:10 20:11, 16,
 19 22:9, 11 57:15
 75:22, 23
taken 44:24 66:12
 76:1 81:9, 12
takes 20:9 22:5
talked 31:13 45:24
talking 38:15 66:1
team 12:24 14:4
 38:4, 7 40:7 76:15,
 18
tell 8:13 32:15
 38:21 57:18
telling 74:10
tenure 33:13 34:4,
 21 35:2
terms 42:6 49:24
 66:15
testified 8:8
testify 8:6
testimony 9:24 78:4
 80:7
TEXAS 1:2 4:11, 19
Thank 26:2 32:24
 77:7, 9
Thanks 8:14
therefor 78:4
thing 29:3 42:12
things 44:14 46:2, 4,
 5 51:20 66:25 69:4,
 7
think 10:15 14:10
 15:12 16:17 19:21

21:*19*  24:*4*  26:*19, 24*
29:*18*  33:*18*  34:*10*
36:*22*  37:*15, 17*  39:*6,*
*16*  40:*15*  41:*1, 22*
42:*17, 25*  44:*9, 14*
46:*13*  47:*21*  51:*20,*
*21*  52:*7*  53:*7, 10*
57:*21*  62:*15*  66:*11,*
*23*  67:*1*  68:*1, 2*  69:*3,*
*5, 24*  70:*6*  71:*17, 18*
73:*2, 8, 23*  74:*9, 14*
76:*4*

**thinking**  15:*14*  41:*8*
**Third**  3:*15*  59:*8*
**thoroughly**  73:*4*
**thought**  36:*10*
**three**  15:*19*  32:*17*
**tied**  20:*21, 22*
**time**  1:*15*  2:*12*  9:*11*
10:*12, 25*  14:*11*
20:*22*  21:*12*  22:*22*
33:*4, 13*  34:*3, 11*
35:*2*  46:*3, 6, 9*  52:*10*
58:*20*  59:*3*  60:*24*
66:*2*  69:*9*  72:*10, 14*
75:*15*  76:*20*  77:*8, 20*
**times**  69:*4*
**timing**  53:*14*
**today**  9:*2, 25*  11:*25*
13:*10*  26:*13*  32:*3*
33:*10*  35:*20*  38:*4*
39:*14*  60:*15*  72:*17*
**told**  37:*20*  38:*18, 22*
65:*22*  73:*15*
**TORREY**  1:*13*  2:*9*
6:*6*  8:*5*  80:*12*
**total**  32:*23*
**track**  75:*17*
**transaction**  55:*15*
**transactions**  53:*3*
**transcribed**  2:*15*
9:*25*
**transcript**  78:*6*  80:*7*
81:*10*
**transcripts**  77:*18*
**transfer**  34:*12*
**transferred**  73:*5*
**transpired**  15:*1*
**tribunal**  62:*8*
**tried**  34:*15*

**true**  34:*3*  46:*2, 4, 5*
47:*24*  51:*21*  69:*5, 7*
80:*10*  81:*11*
**Trust**  3:*5*  4:*14*  5:*3*
9:*1*  13:*6, 9*  23:*11, 18,*
*22*  26:*5, 10, 14, 25*
27:*10*  30:*14, 15*  36:*8*
45:*12, 20*  49:*5*  67:*20*
71:*17, 18*  74:*5*
**Trustee**  3:*19*  34:*12*
51:*2*
**trustees**  70:*9*
**truth**  8:*7*
**try**  10:*10, 25*  72:*5*
**trying**  40:*14*  52:*7*
**two**  16:*19*  28:*6*
44:*12, 14*  46:*2, 4, 5*
51:*20*  69:*4, 7*
**types**  31:*22*
**typewriting**  81:*14*
**typically**  18:*23*

**< U >**
**ultimately**  15:*5*  18:*5,*
*7, 20*  19:*23*  24:*24*
28:*11*  31:*7*  41:*23*
75:*9*
**uncertainty**  67:*5*
**underlying**  18:*2*
21:*20*  32:*13, 16*
**understand**  9:*7, 24*
10:*6, 9*  29:*21*  34:*12*
43:*1*  44:*9*  49:*9*  50:*8*
53:*11*  54:*11*  58:*14*
66:*1, 22*  72:*19*  73:*3*
**understanding**  20:*6*
21:*8*  22:*18*  25:*2, 5*
31:*4*  32:*14, 16*  41:*4*
49:*14*  50:*12*  62:*18*
67:*14*
**unfair**  45:*5, 11, 15,*
*19*  46:*20*
**Unfortunately**  59:*9*
**UNITED**  1:*1*
**unpack**  15:*8*
**unsuccessfully**  32:*12*
**URQUHART**  3:*22*
**use**  28:*22*  37:*17*

**< V >**
**valuations**  34:*16*
**value**  15:*6*  22:*10, 12,*
*19*  28:*15, 16, 23, 24*
29:*5, 8, 9, 14*  30:*9*
35:*7, 11, 13*  36:*21*
37:*1*  54:*12*  73:*15, 24*
**values**  28:*12*
**various**  62:*23*
**vehicle**  18:*24*  19:*1*
33:*24*  50:*25*  55:*5*
71:*23*  72:*21*  73:*5*
**vehicles**  31:*22*
**verbatim**  10:*4*  41:*3*
58:*14, 17*
**veto**  61:*14*
**videoconferencing**  3:*2*
**video-conferencing**
2:*10*
**VIDEOGRAPHER**
5:*13*
**VIDEO-RECORDED**
1:*12*  2:*8*
**view**  52:*2*  63:*1*
**Vine**  4:*10*
**volume**  78:*2, 6*

**< W >**
**walk**  12:*25*
**want**  8:*12*  10:*17*
66:*12*  68:*16*  70:*20*
77:*17*
**wanted**  53:*5*  55:*21*
76:*14, 19*
**watching**  75:*16*
**way**  29:*21*  31:*24*
**wearing**  34:*18*
**Wednesday**  60:*18*
68:*7*
**week**  60:*3*
**Well**  14:*23*  18:*15*
22:*9*  24:*11*  38:*1*
41:*22*  42:*12*  52:*7*
68:*12*  73:*7*
**we're**  8:*18*  9:*1*  19:*6*
24:*6*  38:*14*  52:*11*
57:*11, 12*  68:*3*  69:*23*
**we've**  31:*13, 14*
34:*25*  45:*24*  64:*1*

69:*5*
**WINOGRAD**  3:*12*
**wish**  79:*3*
**WISHNEW**  4:*17*
**withdraw**  55:*24*
**withdrawn**  17:*15*
21:*23*  23:*15*  25:*4*
35:*17*  54:*4*  70:*23*
**witness**  8:*13*  21:*5*
27:*13*  58:*24*  69:*22*
**wondering**  48:*19*
**words**  49:*14*
**wore**  34:*18*
**working**  33:*19*  38:*4*
**world**  60:*23*
**worries**  8:*16*
**worth**  22:*13*  41:*5*
74:*12*
**wrapped**  29:*23*
**written**  10:*4*
**wrong**  39:*6, 12*
64:*14*  65:*22, 23*  66:*6,*
*13*
**wrongdoing**  65:*6*

**< Y >**
**Yeah**  12:*23*  13:*5*
14:*1*  15:*12*  17:*9, 18*
19:*11*  20:*9*  21:*5*
29:*13*  30:*1*  33:*22*
36:*14*  40:*5*  41:*7, 12*
43:*7*  45:*7*  47:*3, 5*
49:*16*  50:*5*  55:*2, 17*
58:*13*  63:*12*  66:*22*
68:*10*  69:*24*  70:*6*
71:*15*  73:*18, 23*
76:*13*
**year**  43:*24*  72:*22*
**years**  11:*14*  12:*8*
32:*12, 17*  37:*4, 25*
**York**  3:*16, 24*

**< Z >**
**ZIEHL**  3:*14*  5:*18*
**Zoom**  57:*19*

Case 19-34054-sgj11    Doc 4277-2    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-02734-L    Document 17-125    Filed 06/24/25    Page 401 of 406    PageID 4658
Exhibit 125    Page 92 of 100    Page 400 of 406    Capital Nexus L.P.

**WORD LIST**

**< $ >**
$22  (1)
$23  (1)
$29  (1)
$300  (1)
$650  (1)
$7  (1)
$9  (5)

**< 1 >**
1  (2)
1.5  (1)
10010  (1)
10017-2024  (1)
11  (1)
1113  (1)
13  (3)
16  (2)
1600  (1)
1700  (1)
18  (2)
19-34054-sgj11  (1)
1st  (1)

**< 2 >**
2015  (2)
2019  (1)
2022  (1)
2025  (3)
21  (1)
212.849.7615  (1)
214.817.4500  (1)
22  (2)
225.381.9643  (1)
22nd  (1)
2390  (1)
23-plus  (1)
240  (1)

**< 3 >**
3:30  (2)
30(b)(6  (1)
300  (1)
301  (1)
310.277.6910  (1)
32  (1)
33  (2)

34  (1)
34th  (1)

**< 4 >**
4:42  (1)
4:49  (1)
4:50  (1)

**< 5 >**
51  (1)
58  (1)

**< 6 >**
67  (1)

**< 7 >**
70801  (1)
713.228.4100  (1)
75201  (1)
77002  (1)
780  (1)
7-year  (1)

**< 8 >**
8  (1)
8635  (3)

**< 9 >**
918,000  (1)

**< A >**
ability  (2)
able  (6)
absolutely  (4)
accommodate  (1)
accounts  (8)
acted  (3)
acting  (4)
action  (3)
actions  (4)
activity  (4)
actual  (1)
ADAMS  (1)
add  (1)
addition  (1)
administrative  (1)
Administrator  (1)
adverse  (1)
advised  (1)

advisor  (4)
advisor/control  (1)
advisors  (2)
affiliated  (1)
affiliates  (4)
affirmed  (1)
afternoon  (1)
ago  (3)
agree  (3)
agreed  (2)
agreed-upon  (1)
agreement  (57)
ahead  (2)
ahurt@kellyhart.com  (1)
allow  (3)
allows  (1)
alternative  (1)
AMELIA  (1)
amount  (4)
amounts  (1)
ample  (1)
analysis  (1)
annuities  (26)
annuity  (12)
ANSWER  (16)
answered  (2)
answers  (1)
Anybody  (11)
anyway  (2)
apologies  (1)
apologize  (2)
apologizing  (1)
apparent  (1)
appear  (3)
appeared  (2)
appointed  (1)
appreciate  (2)
approval  (4)
approve  (1)
approved  (10)
approximately  (1)
April  (1)
argumentative  (1)
arises  (1)
arm's-length  (4)
arranging  (1)
aside  (1)
asked  (2)

asking  (4)
aspect  (1)
aspects  (1)
assert  (1)
asset  (2)
assets  (34)
associated  (1)
Associates  (1)
assumed  (1)
assumption  (2)
Atlas  (19)
attached  (1)
Attorney  (143)
attorney-client  (2)
audited  (1)
auditors  (2)
authority  (2)
authorization  (1)
authorize  (1)
authorized  (3)
Avenue  (3)
avoidance  (3)
avoiding  (1)
aware  (32)

**< B >**
BA  (2)
back  (5)
balance  (5)
ballpark  (1)
BANKRUPTCY  (9)
BARTLETT  (1)
based  (6)
basis  (4)
Baton  (1)
Beacon  (1)
beginning  (1)
behalf  (22)
belief  (1)
believe  (62)
beneficial  (1)
benefit  (4)
benefited  (2)
best  (1)
beyond  (2)
billion  (1)
bit  (7)
board  (4)
boards  (1)

breach *(1)*
breached *(1)*
break *(3)*
bring *(1)*
bringing *(1)*
buy *(2)*

< C >
CA-Certified *(1)*
CA-CSR *(2)*
call *(6)*
called *(2)*
capable *(1)*
capacity *(4)*
CAPITAL *(16)*
care *(1)*
carefully *(1)*
carry *(1)*
Case *(4)*
cash *(2)*
casual *(1)*
cause *(3)*
causing *(2)*
caveat *(1)*
Cayman *(4)*
Central *(3)*
certain *(6)*
CERTIFICATE *(1)*
Certified *(3)*
certify *(2)*
CFO *(9)*
chance *(1)*
CHANGE *(9)*
changes *(4)*
Chapter *(1)*
charitable *(9)*
charities *(2)*
charts *(1)*
claim *(4)*
Claimant *(16)*
claims *(4)*
CLARITY *(2)*
clawback *(2)*
clawing *(2)*
clear *(1)*
clearly *(2)*
colleague *(1)*
combination *(1)*
Come *(1)*

comfort *(1)*
comfortable *(1)*
commenced *(3)*
comment *(1)*
communicate *(2)*
communicated *(2)*
communication *(3)*
communications *(2)*
community *(3)*
company *(3)*
compensate *(1)*
compensates *(1)*
complicated *(1)*
complies *(1)*
computer *(1)*
concern *(3)*
concerned *(2)*
concerns *(3)*
concluded *(1)*
conference *(1)*
confirm *(1)*
confused *(1)*
connection *(1)*
consent *(10)*
consequential *(1)*
consider *(2)*
consideration *(1)*
considering *(2)*
constituted *(1)*
consummation *(2)*
Cont'd *(2)*
contemplating *(1)*
contends *(2)*
context *(1)*
contract *(4)*
contracts *(4)*
contractual *(2)*
contribution *(1)*
contributions *(1)*
control *(6)*
controlled *(3)*
conversation *(7)*
conversations *(5)*
conversion *(1)*
convert *(1)*
converted *(6)*
convoluted *(1)*
copies *(1)*
copy *(1)*

correct *(36)*
corrections *(2)*
correctly *(1)*
corresponding *(1)*
counsel *(3)*
counterparty *(1)*
couple *(3)*
course *(2)*
COURT *(13)*
Court-appointed *(1)*
CRAWFORD *(1)*
create *(1)*
created *(3)*
cross-talk *(1)*
Crown *(45)*
CRR *(2)*
cumbersome *(1)*
current *(1)*
Currently *(1)*
CURRY *(1)*

< D >
DAF *(2)*
DALLAS *(116)*
D'AMBRA *(1)*
data *(1)*
DAVID *(1)*
day *(2)*
dcurry@okinadams.com *(1)*
deal *(1)*
debate *(1)*
Debtor *(3)*
decided *(1)*
decision *(3)*
decision-making *(1)*
decisions *(7)*
Defendant *(2)*
Delaware *(1)*
delivered *(1)*
DEMO *(1)*
depends *(1)*
DEPONENT *(1)*
deposed *(1)*
DEPOSITION *(6)*
depositions *(1)*
describe *(1)*
described *(2)*
describing *(1)*

detail *(1)*
details *(1)*
determine *(1)*
device *(1)*
DIAZ *(4)*
difference *(1)*
different *(4)*
Diplomate *(2)*
DIRECT *(7)*
direction *(1)*
directly *(12)*
director *(2)*
directs *(1)*
disapprove *(1)*
discovery *(2)*
discussion *(2)*
disposition *(2)*
distribute *(1)*
distributions *(5)*
DISTRICT *(1)*
diverting *(1)*
dividends *(1)*
DIVISION *(1)*
document *(3)*
documentation *(2)*
DOCUMENTS *(6)*
doing *(5)*
dollar *(1)*
dollars *(7)*
Dondero *(6)*
Dondero's *(1)*
donor-advised *(2)*
dressing *(1)*
due *(1)*
Dugaboy *(3)*
duly *(1)*
duration *(1)*
duties *(7)*
duty *(13)*

< E >
earlier *(3)*
easier *(1)*
economic *(12)*
elaborate *(1)*
emails *(1)*
EMANUEL *(1)*
employed *(1)*
employment *(1)*

Empower (33)
enabled (1)
engaged (2)
enraptured (1)
ensure (1)
enter (3)
entered (3)
entering (10)
entire (1)
entities (48)
entity (6)
entry (1)
Errata (1)
ESQ (10)
established (1)
event (1)
evidence (1)
exact (1)
EXAMINATION (2)
examined (1)
example (1)
exchange (1)
excuse (1)
execution (2)
exercise (3)
exercised (5)
exercising (2)
Exhibit (2)
EXHIBITS (1)
expect (2)
expectation (3)
expense (2)
expenses (1)
expert (1)
expired (1)
explain (1)
explained (1)
exposure (1)
extend (1)
extent (2)

< F >
fact-finding (1)
facts (28)
fail (1)
fair (42)
faith (1)
familiar (10)
Family (8)

fan (2)
February (2)
fee (1)
feed (1)
feedback (1)
feeds (1)
feel (2)
felt (1)
fiduciary (16)
file (5)
filed (12)
filing (7)
finance (2)
financial (5)
financially (1)
finish (3)
firm (1)
first (5)
five-minute (1)
fixed (8)
Floor (2)
flow (7)
flows (2)
fluctuations (1)
focus (2)
focused (1)
Focusing (2)
following (2)
follows (1)
foregoing (3)
form (53)
formal (2)
formed (1)
forth (1)
Foundation (101)
foundations (3)
Foundation's (20)
full (1)
Fund (18)
funded (2)
funding (2)
funds (4)
fund's (1)
Further (2)
future (6)

< G >
Gail (7)
gdemo@pszjlaw.com

(1)
generally (2)
gentleman (1)
getting (2)
give (10)
given (4)
gives (2)
glance (1)
Global (44)
go (10)
goal (1)
going (23)
Good (4)
good-faith (6)
governing (5)
granting (2)
grant-making (1)
grants (1)
GREGORY (1)
grow (1)
guaranteed (1)
guy (1)

< H >
half (1)
HALL (1)
HALLMAN (1)
happen (1)
happened (4)
hard (1)
harm (1)
HART (1)
hat (1)
hats (1)
HAYLEY (1)
head (2)
hear (3)
heard (3)
held (5)
helped (1)
Hey (1)
high (2)
HIGHLAND (59)
Highland's (2)
high-level (2)
historical (1)
HMIT (65)
hold (7)
Holdco (2)

holdings (1)
holds (1)
honest (1)
Hospitality (1)
Houston (1)
Hunter (18)
HURT (1)
hwinograd@pszjlaw.com (1)

< I >
idea (5)
identify (2)
IDF (8)
imagine (3)
impact (29)
impacted (5)
impactful (1)
impacts (3)
implicated (1)
important (3)
including (1)
income (10)
increased (1)
independent (1)
INDEX (1)
indicate (1)
indirect (7)
indirectly (4)
Indiscernible (1)
individual (11)
individuals (1)
infirmity (1)
inform (5)
information (12)
informed (6)
informing (1)
Inghram (4)
inquired (1)
inquiry (2)
insertion (1)
insight (1)
instruct (1)
INSTRUCTION (1)
INSTRUCTIONS (1)
Insurance (12)
interest (34)
interested (3)
interests (3)

**internal** *(1)*
**introduced** *(1)*
**inured** *(1)*
**invest** *(1)*
**invested** *(1)*
**Investment** *(18)*
**investments** *(7)*
**involved** *(1)*
**Islands** *(3)*
**issuer** *(1)*
**its** *(5)*

**< J >**
**JAMES** *(1)*
**January** *(1)*
**JEFFREY** *(1)*
**Jim** *(2)*
**jmorris@pszjlaw.com** *(1)*
**JOHN** *(4)*
**joint** *(12)*
**JONES** *(2)*
**jpomerantz@pszjlaw.com** *(1)*
**JULIE** *(4)*
**June** *(2)*
**jurisdiction** *(1)*

**< K >**
**KELLY** *(1)*
**key** *(1)*
**kind** *(13)*
**know** *(76)*
**knowing** *(2)*
**knowledge** *(4)*

**< L >**
**L.P** *(1)*
**LANG** *(3)*
**language** *(1)*
**large** *(1)*
**late** *(1)*
**law** *(2)*
**lawsuit** *(5)*
**lawyer** *(4)*
**lay** *(1)*
**lead** *(1)*
**lean** *(1)*
**leaned** *(1)*

**learn** *(1)*
**leave** *(2)*
**led** *(1)*
**left** *(2)*
**legal** *(14)*
**legally** *(2)*
**level** *(2)*
**liability** *(2)*
**Life** *(4)*
**likelihood** *(1)*
**Limited** *(3)*
**LINE** *(6)*
**liquidation** *(1)*
**liquidators** *(12)*
**liquidity** *(1)*
**listen** *(1)*
**lists** *(1)*
**Litigation** *(5)*
**little** *(7)*
**LITTLETON** *(12)*
**LLP** *(3)*
**LOIGMAN** *(1)*
**long** *(4)*
**longer** *(1)*
**look** *(1)*
**looked** *(1)*
**looking** *(3)*
**loss** *(1)*
**lost** *(3)*
**lot** *(2)*
**LOUIS** *(1)*
**Louisiana** *(1)*
**LP** *(7)*
**lphillips@kellyhart.com** *(1)*

**< M >**
**M&E** *(3)*
**Madden** *(2)*
**Madison** *(1)*
**Main** *(2)*
**making** *(3)*
**MANAGEMENT** *(15)*
**Mark** *(9)*
**MARKED** *(3)*
**market** *(11)*
**MARKS** *(2)*
**material** *(2)*

**Matt** *(5)*
**matter** *(1)*
**matters** *(1)*
**MATTHEW** *(1)*
**mean** *(1)*
**means** *(1)*
**meet** *(1)*
**member** *(1)*
**met** *(2)*
**MICHAEL** *(1)*
**million** *(18)*
**mine** *(1)*
**minutes** *(2)*
**missed** *(1)*
**mlang@cwl.law.com** *(1)*
**MNPI** *(1)*
**mokin@okinadams.com** *(1)*
**moment** *(1)*
**money** *(3)*
**MORRIS** *(79)*
**motion** *(9)*
**Mountain** *(19)*
**move** *(2)*
**moved** *(1)*
**moving** *(4)*
**multiple** *(1)*

**< N >**
**name** *(2)*
**named** *(1)*
**NATHAN** *(1)*
**NECESSARILY** *(2)*
**need** *(7)*
**needed** *(2)*
**negatively** *(3)*
**negotiate** *(1)*
**negotiating** *(1)*
**negotiation** *(4)*
**negotiations** *(4)*
**neither** *(1)*
**never** *(7)*
**New** *(4)*
**newly** *(1)*
**news** *(1)*
**NexPoint** *(1)*
**nice** *(1)*
**nonpublic** *(2)*

**normal** *(1)*
**NORTHERN** *(1)*
**Notary** *(1)*
**notations** *(1)*
**NOTE** *(1)*
**notes** *(4)*
**notice** *(1)*
**notified** *(1)*
**November** *(1)*
**NUMBER** *(2)*

**< O >**
**object** *(53)*
**objecting** *(1)*
**objection** *(22)*
**objections** *(1)*
**obligation** *(10)*
**obligations** *(6)*
**obtain** *(6)*
**obtained** *(2)*
**occasions** *(1)*
**officer** *(1)*
**official** *(12)*
**officially** *(1)*
**Oh** *(2)*
**Okada** *(33)*
**okay** *(51)*
**OKIN** *(71)*
**once** *(1)*
**opine** *(8)*
**opined** *(1)*
**opinion** *(3)*
**opportunity** *(4)*
**option** *(11)*
**order** *(3)*
**org** *(1)*
**organization** *(8)*
**organizational** *(1)*
**organizations** *(27)*
**orgs** *(1)*
**originally** *(1)*
**originated** *(1)*
**outcome** *(1)*
**outlined** *(1)*
**outside** *(3)*
**overall** *(2)*
**overseeing** *(1)*
**oversight** *(4)*
**owes** *(6)*

owned  (5)
ownership  (9)
owns  (2)

< P >
p.m  (5)
PACHULSKI  (2)
Pacific  (1)
PAGE  (7)
paid  (3)
paragraph  (7)
part  (13)
participate  (2)
particular  (2)
parties  (11)
partnership  (1)
party  (3)
patience  (1)
Patrick  (27)
Patrick's  (2)
PAUL  (1)
pay  (5)
payments  (3)
payout  (2)
payouts  (2)
PE  (2)
peace  (2)
pending  (2)
percentage  (1)
period  (2)
permission  (2)
person  (6)
personally  (2)
persons  (1)
pertaining  (1)
pertinent  (1)
PHILLIPS  (3)
piece  (1)
place  (2)
plan  (1)
planned  (1)
platform  (2)
play  (3)
played  (1)
plays  (1)
please  (3)
PLLC  (1)
point  (1)
policies  (4)

policy  (4)
POMERANTZ  (1)
portfolio  (1)
portfolios  (1)
portion  (3)
positive  (1)
possibility  (2)
potential  (2)
potentially  (3)
preparation  (1)
present  (3)
preserve  (1)
President  (2)
prevent  (2)
PREVIOUSLY  (2)
primarily  (1)
prior  (1)
privilege  (1)
privileged  (1)
privy  (1)
probably  (2)
problematic  (2)
proceeding  (1)
proceedings  (5)
process  (4)
produce  (1)
produced  (1)
product  (4)
PRODUCTION  (1)
projected  (1)
proper  (1)
proposed  (13)
proposing  (1)
propounded  (1)
protect  (1)
provide  (1)
provided  (2)
providing  (1)
Public  (1)
pull  (1)
pulling  (1)
purpose  (2)
pursued  (1)
pushed  (1)
put  (20)
putting  (1)

< Q >
quarter  (1)

quarterly  (2)
question  (13)
questionable  (2)
QUESTIONS  (11)
quicker  (1)
QUINN  (1)
QUOTATION  (1)
quotations  (1)
QUOTE  (2)

< R >
Rand  (8)
Rand's  (1)
range  (1)
RAVER  (1)
RDR  (2)
reach  (1)
read  (6)
reading  (2)
really  (2)
Realtime  (3)
reason  (39)
reasonable  (1)
reasons  (3)
recall  (1)
receive  (10)
received  (4)
receives  (1)
Recess  (1)
recollection  (1)
recommendation  (3)
recommendations  (2)
record  (1)
recorded  (1)
recovered  (1)
reduced  (1)
refer  (2)
REFERENCED  (1)
referred  (2)
referring  (1)
refers  (3)
REFLECT  (1)
refresh  (1)
regardless  (2)
Registered  (2)
reiterated  (1)
related  (4)
relates  (4)
relationship  (9)

relax  (1)
release  (1)
releases  (4)
releasing  (1)
rely  (2)
remind  (1)
REMOTE  (3)
reorganization  (1)
repeat  (2)
rephrase  (2)
Reported  (1)
Reporter  (10)
REPORTER'S  (1)
reporting  (1)
represent  (1)
representative  (2)
representing  (1)
represents  (1)
REQUEST  (1)
required  (6)
research  (1)
respect  (7)
respectfully  (1)
respectively  (1)
responsibilities  (2)
responsibility  (3)
responsible  (1)
restate  (3)
restructuring  (6)
result  (4)
review  (2)
reviewed  (2)
Right  (38)
rise  (3)
risk  (7)
ROBERT  (1)
robertloigman@quinn
emanuel.com  (1)
role  (6)
roll  (5)
rolled  (1)
rolls  (3)
roll-up  (1)
room  (1)
Rouge  (1)
roughly  (1)
Royal  (1)
RSA  (2)

< S >
sale  *(4)*
saw  *(1)*
says  *(2)*
scheduled  *(1)*
scope  *(3)*
screen  *(3)*
scroll  *(1)*
scrutiny  *(1)*
see  *(8)*
seek  *(3)*
seeking  *(1)*
seeks  *(2)*
seen  *(4)*
SEERY  *(1)*
segregated  *(6)*
sell  *(2)*
selling  *(1)*
sent  *(1)*
sentence  *(3)*
series  *(1)*
serve  *(1)*
served  *(1)*
set  *(4)*
settle  *(1)*
settled  *(1)*
settlement  *(68)*
settlements  *(3)*
settling  *(1)*
share  *(2)*
shares  *(5)*
sharing  *(1)*
SHAWN  *(1)*
sheet  *(6)*
shifting  *(1)*
short  *(1)*
Shorthand  *(3)*
sign  *(2)*
signed  *(3)*
significant  *(5)*
similar  *(1)*
sir  *(87)*
sit  *(1)*
situation  *(1)*
six  *(1)*
Skyview  *(1)*
sleep  *(1)*
smoothly  *(1)*
sold  *(5)*

sole  *(2)*
solely  *(2)*
somewhat  *(1)*
Sorry  *(9)*
sought  *(1)*
Sounds  *(2)*
source  *(2)*
speak  *(4)*
speculate  *(2)*
speculation  *(1)*
speed  *(1)*
spoke  *(1)*
spoken  *(1)*
standpoint  *(2)*
STANG  *(2)*
start  *(1)*
starting  *(1)*
state  *(4)*
stated  *(2)*
statement  *(3)*
statements  *(3)*
STATES  *(2)*
Stenographically  *(3)*
stewardship  *(1)*
STIPULATIONS  *(1)*
stream  *(3)*
streams  *(1)*
Street  *(2)*
strike  *(1)*
structure  *(13)*
structures  *(1)*
stuff  *(2)*
sub  *(1)*
subject  *(4)*
Subtrust  *(1)*
succeed  *(3)*
succeeding  *(1)*
successful  *(1)*
sue  *(1)*
suggest  *(2)*
Suite  *(3)*
SULLIVAN  *(1)*
sum  *(1)*
summary  *(1)*
Sunday  *(4)*
supervision  *(1)*
supplied  *(1)*
SUPPORT  *(1)*
supporting  *(30)*

supposed  *(1)*
Sure  *(6)*
surprised  *(1)*
sworn  *(1)*
Systems  *(1)*

< T >
take  *(9)*
taken  *(5)*
takes  *(2)*
talked  *(2)*
talking  *(2)*
team  *(7)*
tell  *(5)*
telling  *(1)*
tenure  *(4)*
terms  *(3)*
testified  *(1)*
testify  *(1)*
testimony  *(3)*
TEXAS  *(3)*
Thank  *(4)*
Thanks  *(1)*
therefor  *(1)*
thing  *(2)*
things  *(8)*
think  *(50)*
thinking  *(2)*
Third  *(2)*
thoroughly  *(1)*
thought  *(1)*
three  *(2)*
tied  *(2)*
time  *(31)*
times  *(1)*
timing  *(1)*
today  *(12)*
told  *(5)*
TORREY  *(5)*
total  *(1)*
track  *(1)*
transaction  *(1)*
transactions  *(1)*
transcribed  *(2)*
transcript  *(3)*
transcripts  *(1)*
transfer  *(1)*
transferred  *(1)*
transpired  *(1)*

tribunal  *(1)*
tried  *(1)*
true  *(10)*
Trust  *(24)*
Trustee  *(3)*
trustees  *(1)*
truth  *(3)*
try  *(3)*
trying  *(2)*
two  *(10)*
types  *(1)*
typewriting  *(1)*
typically  *(1)*

< U >
ultimately  *(10)*
uncertainty  *(1)*
underlying  *(4)*
understand  *(17)*
understanding  *(13)*
unfair  *(5)*
Unfortunately  *(1)*
UNITED  *(1)*
unpack  *(1)*
unsuccessfully  *(1)*
URQUHART  *(1)*
use  *(2)*

< V >
valuations  *(1)*
value  *(21)*
values  *(1)*
various  *(1)*
vehicle  *(8)*
vehicles  *(1)*
verbatim  *(4)*
veto  *(1)*
videoconferencing  *(1)*
video-conferencing  *(1)*
VIDEOGRAPHER  *(1)*
VIDEO-RECORDED  *(2)*
view  *(2)*
Vine  *(1)*
volume  *(2)*

< W >

walk  *(1)*
want  *(6)*
wanted  *(4)*
watching  *(1)*
way  *(2)*
wearing  *(1)*
Wednesday  *(2)*
week  *(1)*
Well  *(10)*
we're  *(10)*
we've  *(6)*
WINOGRAD  *(1)*
wish  *(1)*
WISHNEW  *(1)*
withdraw  *(1)*
withdrawn  *(7)*
witness  *(5)*
wondering  *(1)*
words  *(1)*
wore  *(1)*
working  *(2)*
world  *(1)*
worries  *(1)*
worth  *(3)*
wrapped  *(1)*
written  *(1)*
wrong  *(7)*
wrongdoing  *(1)*

< Y >
Yeah  *(41)*
year  *(2)*
years  *(6)*
York  *(4)*

< Z >
ZIEHL  *(2)*
Zoom  *(1)*