**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§

§   Case No  **19-34054-SGJ-11**

**The Dugaboy Investment Trust**
**- Appellant**

§

vs.                                                     §

**Highland Claimant Trust**
-Appellee

§                         **3:25-CV-02724-L**

§

**[4401] Order Granting Motion for Order Fixing Allowed Amount of Class 11 Interests (related document # 4362) Entered on 9/22/2025.**

# Volume 8
# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

*INDEX*

**Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and Amended Designation of Items to be Included in the Record on Appeal From the Bankruptcy Court's Order Fixing Allowed Amount of Class 11 Interests**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4423] on October 6, 2025, from the Bankruptcy Court's September 22, 2025 *Order Fixing Allowed Amount of Class 11 Interests* [Docket No. 4401], and having received the Clerk's letter of October 23, 2025 requesting corrections to the record designations, submits this *Statement of Issues to be Presented and Amended Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.    Did the Bankruptcy Court misapply the absolute-priority rule in determining that the Hunter Mountain Investment Trust's (HMIT's) Class 10 interests were entitled to 100% of any excess funds left over after all senior creditor classes were paid in full, in disregard of equity interests that allocated 99.5% to HMIT and 0.5% to Dugaboy?

2.    Did the Bankruptcy Court err when it allocated potential excess funds in a way that effectively gave HMIT *more than* 100% of what it was entitled to, in contravention of black-letter law holding that a senior class cannot receive more than 100% without the consent of the junior class? *See In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009).

3.    Did the Bankruptcy Court err in determining the value of Dugaboy's interest only as a fixed dollar amount, rather than a *pro rata* percentage reflecting its equity ownership share?

4.    Did the Bankruptcy Court err in allowing Highland to use a valuation methodology for determining the allowed amount of Dugaboy's claim based on limited partners' pre-petition capital accounts, which were derived from untested and unvetted figures created for tax purposes that bore little if any relation to true market value, when nothing in the confirmed Reorganization Plan allowed for such a method?

5.    Did the Bankruptcy Court err in believing that "res judicata" required it to use the same methodology to value Dugaboy's Class 11 interests as it had previously used to value HMIT's Class 10 interests?

---

[1] Because of its voluminous nature, Docket No. 4255 will be delivered to the Clerk on a flash drive that will arrive tomorrow.

1

6. Did the Bankruptcy Court err at the hearing on September 18, 2025, when it invoked "res judicata" to threaten Dugaboy's counsel with Rule 11 sanctions for "recycling" arguments previously made by the "revolving door of lawyers" that had represented Dugaboy over the previous several years, thus seeking to impose a chilling effect on Dugaboy's right to zealous advocacy by its chosen counsel?

7. Did the Bankruptcy Court's Order Fixing Allowed Amount of Class 11 Interests (Docket No. 4401) constitute a "final" judgment or order, thereby giving the District Court jurisdiction for appellate review of the Bankruptcy Court's Order denying Dugaboy's Motion to Recuse?

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4423] filed by Appellant;

*000009*

2. Bankruptcy Court's *Order Fixing Allowed Amount of Class 11 Interests* [Docket No. 4401];

*000013*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact, and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s) 1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 9/14/2022 | 3521-5 | Claimant Trust Agreement |
| 2/27/2024 | 4199 | Stipulated and Agreed Order resolving (A) HCLOM, Ltd.'s Scheduled claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a bad faith |

*000619*
*000780*
*000820*

2

| | | | |
|---|---|---|---|
| *Vol. 2* | | | finding and an award of attorney's fees against HCLOM, Ltd., and James Dondero in connection therewith (related document #3657, 4176) Entered on 12/27/2024. (Dugan, Sue) |
| *000827* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *000845* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *000848* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *Vol. 3*  *000873* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *000881* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s) 4230 Objection). (Lang, Michael) |
| *000883* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s) 4230 Objection). (Lang, Michael) |
| *000885*  *Thru Vol 5* | 6/20/2025 | 4255  *(to be submitted to* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related |

3

| | *Clerk on flash drive*) | | document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 |

*VOl. 6*

*003542*

4

| | | | |
|---|---|---|---|
| | | | U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s) 4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8, 8, Exhibit 9 (Curry, David) |
| | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| | 6/23/2025 | 4275 | Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |

*vol. B*

*004259*

*004270*

*004295*

*004296*

*004562*

*004291*

| | | | |
|---|---|---|---|
| 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) | |
| 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)).          (Attachments:#1 Exhibit 126 (Annable, Zachery) | |
| 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) | |
| 6/25/2025 | 4296 | Transcript of hearing held June 25, 2025, before Chief Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297] | |
| 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4223 Objection). (Annable, Zachery) | |
| 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an | |

6

| | | | |
|---|---|---|---|
| *Vol. 8* | | | order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| *0045?7* | 6/30/2025 | 4297 | Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025. (Okafor, M.) |
| *004581* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *004583* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *004592* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *004594* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo) |
| *Vol. 9* *004690* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s) 4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |

| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s) 4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
|---|---|---|---|
| | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: # 1 Exhibit A) (Harper, Geoffrey) |
| | 8/8/2025 | 4362 | Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) Filed by Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A--Proposed Order) (Annable, Zachery) |
| | 8/12/2025 | 4368 | Amended appellant designation of contents for inclusion in record on appeal and statement of issues on appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4365 Appellant designation). (Harper, Geoffrey) |
| | 8/15/2025 | 4371 | Notice of hearing filed by Other Professional Highland Claimant Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) Filed by Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 9/18/2025 at 02:30 PM at https://us-courts.webex.com/meet/jerniga for 4362, (Annable, Zachery) |
| | 8/29/2025 | 4378 | Order Approving Motion to Conform Plan to Fifth Circuit Mandate (related document # 4302) Entered on 8/29/2025. (Okafor, M.) |
| | 9/8/2025 | 4384 | Response opposed to (related document(s): 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust) filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| | 9/11/2025 | 4389 | Stipulation by Highland Claimant Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust (RE: related document(s) 4384 Response). (Annable, Zachery) |
| | 9/15/2025 | 4393 | Reply to (related document(s): 4384 Response filed by Creditor The Dugaboy Investment Trust) (Reply in Support of Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust. (Annable, Zachery) |

| | 9/15/2025 | 4394 | Amended Witness and Exhibit List (Highland Claimant Trust's Witness and Exhibit List with Respect to Hearing to Be Held on September 18, 2025) filed by Other Professional Highland Claimant Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10) (Annable, Zachery) |
| | 9/15/2025 | 4395 | Witness and Exhibit List for Hearing to be Held on September 18, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests)). (Harper, Geoffrey) |
| | 9/18/2025 | 4398 | Court admitted exhibits date of hearing September 18, 2025 (RE: related document(s) 4362 Motion to allow claims (Motion for Order Fixing Allowed Amount of Class 11 Interests) filed by Other Professional Highland Claimant Trust (Court Admitted Debtors/Highland Capital Mgmt., L.P. exhibits #1, #2, #3, #4, #5, #6, #7, #8, #9 & #10 offered by attorney John Morris, found at doc. #4394.) (Edmond, Michael) |
| | 9/22/2025 | 4401 | Order Granting Motion for Order Fixing Allowed Amount of Class 11 Interests (related document # 4362) Entered on 9/22/2025. (Grandstaff, Travis) |

Dated: October 23, 2025                Respectfully submitted,

                                       WINSTON & STRAWN LLP

                                       By: /s/ Geoffrey S. Harper

                                       Geoffrey S. Harper
                                       Texas Bar No. 00795408
                                       gharper@winston.com
                                       John Michael Gaddis
                                       Texas Bar No. 24069747
                                       mgaddis@winston.com
                                       2121 N. Pearl Street, Suite 900
                                       Dallas, TX 75201
                                       (214) 453-6500
                                       (214) 453-6400 (fax)

                                       *Counsel for Appellant*
                                       *The Dugaboy Investment Trust*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on October 23, 2025, a copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

                                       /s/ Geoffrey S. Harper
                                       Geoffrey S. Harper

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| *In re* | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## THE DUGABOY INVESTMENT TRUST'S WITNESS AND EXHIBIT LIST
## FOR THE JUNE 25, 2025 HEARING

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Witness and

Exhibit List with respect to the *Motion for an Order Further Extending Duration of Trus*ts [Docket

No. 4213], which the Court has set for hearing at 9:30 a.m. (Central Time) on June 25, 2025 (the

"Hearing") in the Bankruptcy Case.

## WITNESSES

Dugaboy designate the following individual who may be called as witness(es) at the June

25, 2025 Hearing. Dugaboy reserves the right to call or cross-examine any witness called by any

other party, to supplement and/or amend this Witness List, and to call additional witnesses as necessary to rebut testimony or evidence introduced at the hearing.

| | **Witness** |
|---|---|
| 1 | James P. Seery, Jr.<br>c/o John A. Morris<br>Pachulski Stang Ziehl & Jones LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>jmorris@pszjlaw.com<br>(212) 561-7760 |

## **EXHIBITS**

Dugaboy designates the following exhibit that may be used at the June 25, 2025 Hearing. Dugaboy reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 2025.04.08 Email from John Morris to Louis Phillips | HCMLPHMIT00000656 – HCMLPHMIT00000661 |

Date:  June 24, 2025

Respectfully submitted,

**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com
*Counsel for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 24, 2025, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

**004261**

# EXHIBIT 1

004262

**EXHIBIT 45**

S. Davis
JAMES SEERY
6/23/2025
**1**

004263

**From:** "John A. Morris" <jmorris@pszjlaw.com>

**To:** "Louis Phillips" <Louis.Phillips@kellyhart.com>

**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "amelia.hurt@kellyhart.com"
<Amelia.Hurt@kellyhart.com>

**Subject:** Highland: Privileged and confidential settlement communication and materials

**Date:** Tue, 8 Apr 2025 20:22:22 +0000

**Importance:** Normal

**Attachments:** Privileged_and_confidential_-_DRAFT_4.8.25_discussion_materials.pdf;
PRIVILEGED_AND_CONFIDENTIAL_DRAFT_SETTLEMENT_STRUCTURE_4.8.25.p
df; HFP_-_Entity_Chart_-_2011.pdf

**Inline-Images:** image001.jpg

---

E-MAIL AND ATTACHMENTS DELIVERED PURSUANT TO FED. R. EVID. 408
AND APPLICABLE CONFIDENTIALITY AGREEMENT

Louis,

Thank you and your team for your time today.

As a follow up, attached are the following:

1. Discussion materials from today (draft numbers)
2. Discussion materials from today (draft structure)
3. HFP entity chart from 2011

On your end, please send us the following at your earliest convenience:

1. Copy of settlement agreement circa 2022 between HMIT and Dugaboy/Okada entities
2. Copy of operative document relating to the [redemption] of the Dolomiti/Hakusan entities limited
partnership interest in Rand PE Fund I
3. Copy of operative document providing for the [extinguishment] of participating shares of the supporting
organizations of Charitable DAF Holdco, Ltd.

Let's confer as soon as you've had a chance to consider these matters with your team.

Please let us know if you have any questions in the interim.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

**004264**

HCMLPHMIT00000656



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

HCMLPHMIT00000657

Case 19-34054-sgj11     Doc 4279-1     Filed 06/24/25     Entered 06/24/25 15:38:17     Desc
Exhibit Exhibit 1     Page 5 of 8

Case 19-34054-sgj11     Doc 4255-45     Filed 06/20/25     Entered 06/20/25 21:39:29     Desc
Exhibit 45     Page 4 of 7

**Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties**

**Current Snapshot - remaining assets [1]**
*in USD millions, except percentages*

| Asset description | Ref | Claimant Trust [2] | Indemnity Trust [3] | Combined |
|---|---|---|---|---|
| Cash/treasuries | [4] | $    20.3 | $    67.9 | $    88.1 |
| Disputed Claims Reserve | [5] | 2.7 | - | 2.7 |
| Dugaboy Note receivable | [6] | - | 17.6 | 17.6 |
| HCM Korea (note and equity) | [7] | 3.0 | - | 3.0 |
| HCLOF shares | [8] | 2.5 | - | 2.5 |
| HCRE bad faith sanction | [9] | 0.9 | - | 0.9 |
| Kirschner Litigation (main adversary) | [10] | *See footnote* | - | - |
| HMIT note | [11] | *See footnote* | - | - |
| **Total assets** | | **$    29.4** | **$    85.5** | **$    114.8** |

[1] As of April 3, 2025. This disclosure is NOT a balance sheet prepared in accordance with US GAAP. In some instances, values are estimated and actual amounts retained may ultimately differ materially. No liabilities are included herein, including contingent liabilities, indemnification obligations, or considerations for future expenses, including costs of liquidation that have not yet been, but will be incurred.

[2] Claimant Trust, including consolidation of the various "Plan" entities other than the Indemnity Trust (HCMLP GP, LLC, Highland Capital Management, LP, Litigation Sub-Trust), each on a standalone basis, with intercompany balances eliminated.

[3] Stand-alone assets retained by the Indemnity Trust. Other than less than <$1M retained in cash, remainder of cash is invested in US treasuries with maturities less than 1 year. Excludes <$1M of cash/treasuries on account of the Okada settlement. Pursuant to the Okada settlement, these funds are segregated and are to be repaid to Okada as first-out funds to the extent that any excess exists in the Indemnity Trust. Accordingly, in a settlement scenario, these funds would not be available to Class 10 interest holders.

[4] Cash and treasuries includes full face amount of treasuries maturing within 6 months and has also been adjusted up to assume the near-term receipt of approximately $5 million from Highland CLO Funding, Ltd.

[5] Segregated funds invested in US treasuries with near-term maturities. Funds are reserved for the Daugherty tax proof of claim, which remains pending. If Highland successfully objects to the proof of claim, funds would be released from the Disputed Claims Reserve. If the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim and any excess remaining would be released from the Disputed Claims Reserve.

[6] Note receivable from The Dugaboy Investment Trust ("Dugaboy"). ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day. Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046. Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024. Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines. The next interest payment due December 31, 2025 is $566,677. No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[7] 100% equity interest in Highland Capital Management Korea Limited ("HCM Korea"), plus $2.5 million note from HCM Korea. Ultimate value dependent on the monetization of the Caris Life Sciences investment through an expected 2025 IPO, which is expected to be in the range of $2 million to $5 million, but could also exceed or fall short of this range.

[8] Shares of Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey company. Value has been adjusted down to assume a near-term cash dividend of approximately $5 million. Remaining value is primarily tied up in the "Acis 6" asset, for which a NexPoint entity has recently initiated an appeal in the 2nd Circuit Court of Appeals. Ultimate value dependent on the Acis 6 litigation and costs of winding down HCLOF and expected to be in the range of $2 million to $4 million, but could also exceed or fall short of this range.

[9] Bad faith sanction against HCRE of $825,940.55, currently on appeal in the District Court. Fully briefed since November 2024. Award was posted in the court registry and is accruing post-judgment interest at a rate of $118.80/day. Approximately $870k is outstanding, including post-judgment interest currently. No assurance that the appeal will resolve favorably and as a result, there is no assurance that any amounts will ultimately be collected.

[10] Litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust. Adversary proceeding is currently stayed. The value of the claims, their collectibility, and the costs of their continued pursuit is ultimately unknown. For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

[11] Within the litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust were claims against HMIT relating to the "HMIT note" receivable, which had originally been a portion of the consideration HMIT paid for acquiring limited partnership interests in Highland in 2015. These claims are also stayed as part of the overall stay in the case. The value of the note, its collectibility, and the costs of their continued pursuit is ultimately unknown. For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

HCMLPHMIT00000658

004266

Case 19-34054-sgj11    Doc 4279-1    Filed 06/24/25    Entered 06/24/25 15:38:17    Desc
Exhibit Exhibit 1    Page 6 of 8

Case 19-34054-sgj11    Doc 4255-45    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 45    Page 5 of 7

Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties

**Uses: how much could be left after satisfying Class 9 claims?**
*in USD millions*

| | | | |
|---|---|---|---|
| **Total combined assets** | $ | **114.8** | *see "current snapshot"* |
| Less: | | | |
| Oustanding Class 9, including interest | | (21.0) | |
| Existing Incentive Compensation triggered through full payment of Class 9 | | (2.5) | |
| Long-dated assets - Dugaboy Note receivable | | (17.6) | [1] |
| Wind down expenses and accrued liabilities | | (20.0) | [2] |
| Pending Class 8 claims (Daugherty tax) | | See footnote | [3] |
| Indemnification obligations | | See footnote | [4] |
| **Net expected cash prior to any indemnification considerations and necessary reserves** | $ | **53.7** | [5] |
| **Plus: Non-cash assets - Dugaboy Note receivable** | $ | **17.6** | |

[1] Note receivable from The Dugaboy Investment Trust ("Dugaboy"). ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day. Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046. Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024. Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines. The next interest payment due December 31, 2025 is $566,677. No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[2] Amount is ultimately TBD and will ultimately depend on litigation, timing of monetization of remaining assets, and operational needs. For example, if additional litigation is brought forth, outside counsel will incur additional time and expense and certain employees may need to be retained for a longer period of time. If actual expenses exceed $20 million, less cash would be potentially available after Class 9; if actual expenses fall short of $20 million, more cash would be potentially available after Class 9.

[3] For illustrative purposes of this presentation, $0 is assumed. However, if the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim, which would reduce cash potentially available after Class 9. No assurances can be provided that the claim will be completely disallowed.

[4] For illustrative purposes of this presentation, $0 is assumed. Thus, all funds utilized for purposes of satisfying indemnification obligations will reduce the funds available dollar for dollar. Under current conditions, it is believed that at least $100 million may be needed for indemnification obligations and as a result, there is not sufficient liquidity at this time to even make any further payments to Class 9 interest holders. Assuming a final/non-appealable order, providing for among other things, a complete cessation of litigation and comprehensive releases from the HMIT/DAF parties, the need for indemnification reserves could be greatly reduced.

[5] Assumes HCM Korea, HCLOF, and HCRE bad faith sanctions are monetized for the amounts described for the "current snapshot" ($6.4 million in aggregate). Monetization in excess of these amounts would result in more cash remaining; monetization below those amounts would result in less cash remaining.

HCMLPHMIT00000659

004267

Case 19-34054-sgj11    Doc 4279-1    Filed 06/24/25    Entered 06/24/25 15:38:17    Desc
Exhibit Exhibit 1    Page 7 of 8

Case 19-34054-sgj11    Doc 4255-45    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 45    Page 6 of 7

*Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties*
**Information request made April 7, 2025**

**(i) Accrued liabilities**

| | Entity | | Amount | |
|---|---|---|---|---|
| End of case/severance bonuses - remaining employees | HCMLP | $ | 1,230,000 | |
| Accounts payable book balance (as of March 31, 2025) | HCMLP | | 576,207 | |
| Estimate of other incurred, but not invoiced for work performed | HCMLP | | 500,000 | *general estimate* |
| **Sub-total (i)** | | **$** | **2,306,207** | A |
| | | | | |
| **Other liabilities not included in section totals above** | Entity | | Amount | |
| Distribution payable | HCT | $ | 2,656,732 | *previously authorized distributions related to pending Daugherty claim (has offsetting cash reserve; see current snapshot); to be released following resolution of the pending claim* |
| Okada settlement payable | Indemnity Trust | $ | 870,000 | *first-out dollars in treasuries (amount is face of such treasuries) - for purposes of settlement discussions, the cash reserved related to the Okada settlement and the potential first-out dollars are excluded as irrelevant* |

**(ii) Anticipated success or severance (or completion) payments or bonuses**

| | Entity | | Amount | |
|---|---|---|---|---|
| Incentive Compensation Plan | HCMLP/HCT | $ | 2,480,088 | *assuming full payment of the Class 9; calc'd as 14.71516% on remaining distributions to Class 9 with a time discount applied to the first-out dollars distributed* |
| Retention Date payments - employees | HCMLP | | 925,000 | *Retention Date is 9/30/2025* |
| Nate Burns (employee) incentive comp | HCMLP | | - | *Nate receives a portion of the performance fees earned related to HCM Korea; assuming zero for presentation purposes as amounts would be a percentage of incremental value received from HCM Korea* |
| **Sub-total (ii)** | | **$** | **3,405,088** | B |

**(iii) Continuing admin budget for the Claimant Trust, Indemnification sub trust and/or litigation sub trust**

| | | | | |
|---|---|---|---|---|
| See subsequent page; Sub-total (iii) | | $ | 16,768,874 | C - *additional detail contained on separate page* |
| | | | | |
| **Sum of A, B, and C** | | **$** | **22,480,169** | |

**(iv) Identity and amount and basis for any holdback(s)**

| Identity: | | Amount | Basis for amount |
|---|---|---|---|
| Sum of A, B, and C from above | $ | 22,480,169 | *from above; See notes and assumptions related to items A, B, and C* |
| Incremental operational reserve | | 5,000,000 | *Excess cash to retain to cover potential cost overages - largest risk is incremental litigation and resulting time and expense of PSZJ plus longer retention of employees/CEO to assist with litigation, if applicable* |
| Indemnification reserves | | 35,000,000 | *Assumes comprehensive releases and settlement amongst the HMIT/DAF Parties; at least $100 million if no settlement* |
| Sum of items above | $ | 62,480,169 | *to below* |
| | | | |
| **Calc of estimated cash available for a prelim distribution to Class 10, assuming settlement** | | $ millions | |
| Current cash/treasuries (see previous page) | $ | 88.1 | *Cash and treasuries (including all Plan entities)* |
| Assets expected to monetize in next 12 months | | 6.4 | *HCM Korea, remainder of HCLOF, bad faith sanction (but excluding near-term Dugaboy Note P&I amortization due December 2025)* |
| **Sub-total** | **$** | **94.5** | |
| | | | |
| less: outstanding Class 9, including interest | | (21.0) | *current outstanding Class 9 with interest* |
| less: holdbacks (from above) | | (62.5) | *from above* |
| | | | |
| Remaining cash available for initial distribution to Class 10 | $ | 11.1 | [1] |
| **Round to nearest million** | **$** | **11.0** | |

[1] *Possibility of incremental amount of up to $2.7 million in the event of a successful opposition to the pending Daugherty tax POC, along with incremental interim cash received from Dugaboy Note P&I amortization. Amount also does not include non-cash assets (litigation, outstanding Dugaboy Note, etc.)*

3

HCMLPHMIT00000660

004268

Case 19-34054-sgj11    Doc 4279-1    Filed 06/24/25    Entered 06/24/25 15:38:17    Desc
Exhibit Exhibit 1    Page 8 of 8

Case 19-34054-sgj11    Doc 4255-45    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 45    Page 7 of 7

*Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties*
**Projected Budget Build-Up**

Remaining expected budget assuming a comprehensive settlement with HMIT/DAF Parties (excluding accrued liabilities and contingencies separately discussed)

| Description | Total for budget | Notes and assumptions |
|---|---|---|
| Pachulski Stang and other litigation or BK-related | $    5,000,000 | Primary issues: expected new litigation to defend (actual causes of action unknown) from Dondero parties, incorporation of HMIT/DAF settlement and approval/appeals of same, appeals of "valuation complaint" and "HCRE bad faith", extension of the Trust for 1 yr. and dissolution issues. Ultimate amount required could vary materially higher or lower. |
| HCMLP employees salary and benefits (other than CEO) | 4,084,354 | Assumes declining headcount from 6 to 3, ending August 2026 (monthly trending from approx. $300k/month currently to approx. $200k/month at end) |
| Claimant Trustee/CEO salary | 2,700,000 | Assumes 18 months at $150k/month |
| Litigation Trustee | 360,000 | Assumes 18 months at $20k/month |
| Independent Member | 225,000 | Assumes 18 months at $12.5k/month |
| Litigation trust (other than Trustee) | 250,000 | Assuming minimal time and expense other than in conjunction with transfer of main case |
| Incentive Compensation on distributions to Cl. 10 | TBD | Provide for alignment in regards to quantum and timing of distributions and management of costs |
| _Overhead related_ | | |
| Facilities/offsite storage and related | 1,079,121 | Office space through end of 2026 and offsite document retention through 2028 |
| External tax | 1,000,000 | Declining each year with final year for tax year 2027 |
| IT costs | 701,760 | Cloud storage, network infrastructure through 2027, email storage through 2030 |
| Accounting systems and information | 331,045 | General retention and maintenance through 2028 (primarily Oracle maintenance) |
| Other professionals | 200,000 | Misc reserve for other professionals |
| Other misc overhead | 200,000 | Misc reserve for other overhead, T&E, entity wind-up costs, etc |
| Indemnification expenses | 200,000 | Assuming misc. expenses from misc. matters |
| US Trustee | 437,594 | Assuming 0.8% of budget + accruals + distributions (assuming $30M total) |
| **Grand total** | $    **16,768,874**  to previous page | |

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

HCMLPHMIT00000661

004269

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,*
*L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as*
*Litigation Trustee of The Highland*
*Litigation Sub-Trust*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

### HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND LITIGATION SUB-TRUST SECOND AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO HEARING TO BE HELD ON JUNE 25, 2025

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland,"

as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 1 OF 15**

004270

Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by and through their undersigned counsel, submit the following second amended witness and exhibit list with respect to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216], which the Court has set for hearing at 9:30 a.m. (Central Time) on June 25, 2025 (the "Hearing") in the Bankruptcy Case.

A.   **Witnesses:**

    1.   James P. Seery, Jr.;

    2.   James Dondero;

    3.   Deborah Deitsch-Perez, Esq;

    4.   Julie Diaz (by deposition transcript);

    5.   Any witness identified by or called by any other party; and

    6.   Any witness necessary for rebuttal.

B.   **Amended Exhibits:**[2]

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| **A.** | **Settlement Agreement** | | |
| 1. | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to a Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Agreement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4217] [HCMLPHMIT00002688-HCMLPHMIT00002715] | | |
| **B.** | **Negotiation Documents** | | |

---

[2] The amendments to the original exhibit list, filed at Docket Nos. 4255 & 4277, include the addition of one exhibit: Exhibit No. 126 in bold font below.

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**   **PAGE 2 OF 15**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

004271

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 2. | Email from L. Phillips to J. Morris dated March 5, 2025 [HCMLPHMIT00000015-HCMLPHMIT00000017] | | |
| 3. | Email from L. Phillips to J. Morris dated March 13, 2025 [HCMLPHMIT00000022-00000026] | | |
| 4. | Email from L. Phillips to J. Morris dated March 18, 2025 [HCMLPHMIT00000028-HCMLPHMIT00000029] | | |
| 5. | Email from L. Phillips to J. Morris dated March 19, 2025 [HCMLPHMIT00000030-HCMLPHMIT00000031] | | |
| 6. | Confidentiality Agreement-M Patrick and Related Entities [HCMLPHMIT00000032-HCMLPHMIT00000045] | | |
| 7. | Email from L. Phillips to J. Morris and A. Hurt dated March 22, 2025 [HCMLPHMIT00000046-HCMLPHMIT00000048] | | |
| 8. | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000052-HCMLPHMIT00000054] | | |
| 9. | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000055-HCMLPHMIT00000056] | | |
| 10. | Email from L. Phillips to J. Morris dated March 28, 2025 [HCMLPHMIT00000057] | | |
| 11. | Email from L. Phillips to J. Morris dated March 30, 2025 [HCMLPHMIT00000058] | | |
| 12. | Email from L. Phillips to J. Morris dated March 31, 2025 [HCMLPHMIT00000059] | | |
| 13. | HCLOM Intercreditor and Participation Agreement [HCMLPHMIT00000060-HCMLPHMIT00000063] | | |
| 14. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000075-HCMLPHMIT00000078] | | |
| 15. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000079-HCMLPHMIT00000080] | | |
| 16. | Email from L. Phillips to J. Morris dated April 3, 2025 with attachment - Paul Murphy Joinder to Confidentiality Agreement [HCMLPHMIT00000081-HCMLPHMIT00000083] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 3 OF 15**

004272

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 17. | Email from L. Phillips to J. Morris dated April 4, 2025 [HCMLPHMIT00000089] | | |
| 18. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000090-HCMLPHMIT00000092] | | |
| 19. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachment – Shawn Raver Joinder to Confidentiality Agreement [HCMLPHMIT00000093-HCMLPHMIT00000096] | | |
| 20. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000099-HCMLPHMIT00000102] | | |
| 21. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachments- Phillips Joinder to Confidentiality Agreement (signed by Phillips) and A. Hurt Joinder to Confidentiality Agreement (signed by Hurt) [HCMLPHMIT00000103-HCMLPHMIT00000107] | | |
| 22. | Email from L. Phillips to J. Morris dated April 8, 2025 with fully executed HCLOM Remittance Agreement [HCMLPHMIT00000108-HCMLPHMIT00000112] | | |
| 23. | Email from L. Phillips to J. Morris dated April 10, 2025 with HMIT 2022 Settlement Agreement [HCMLPHMIT00000118-HCMLPHMIT00000130] | | |
| 24. | Email from L. Phillips to J. Morris dated April 17, 2025 with attachment James Shields Joinder to Confidentiality Agreement [HCMLPHMIT00000135-HCMLPHMIT00000150] | | |
| 25. | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000157-HCMLPHMIT00000158] | | |
| 26. | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000159-HCMLPHMIT00000161] | | |
| 27. | Email from L. Phillips to J. Morris dated May 13, 2025 [HCMLPHMIT00000162-HCMLPHMIT00000163] | | |
| 28. | Email from L. Phillips to J. Morris dated May 14, 2025 [HCMLPHMIT00000164-HCMLPHMIT00000166] | | |
| 29. | Email from L. Phillips to J. Morris dated May 14, 2025 with Redlines of Settlement Agreement [HCMLPHMIT00000167-HCMLPHMIT00000218] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 4 OF 15**

004273

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 30. | Email from L. Phillips to J. Morris dated May 15, 2025 [HCMLPHMIT00000226-HCMLPHMIT00000234] | | |
| 31. | Email from L. Phillips to J. Morris dated May 16, 2025 with Clean and Redline of Rand Settlement Agreement [HCMLPHMIT00000235-HCMLPHMIT00000283] | | |
| 32. | Email from L. Phillips to T. Cournoyer dated May 16, 2025 [HCMLPHMIT00000287-HCMLPHMIT00000289] | | |
| 33. | Email from L. Phillips to J. Seery, M. Patrick, S. Raver, J. Shields, A. Hurt dated May 17, 2025 [HCMLPHMIT00000290] | | |
| 34. | Email from L. Phillips to J. Morris dated May 17, 2025 [HCMLPHMIT00000291-HCMLPHMIT00000292] | | |
| 35. | Email from L. Phillips to J. Morris, J. Pomerantz dated May 19, 2025 with attachment HMIT Redlined Pages only to Settlement Agreement [HCMLPHMIT00000295-HCMLPHMIT00000297] | | |
| 36. | Email from L. Phillips to G. Demo, A. Hurt, J. Shields dated May 19, 2025 [HCMLPHMIT00000342-HCMLPHMIT00000344] | | |
| 37. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 with attachment - M. Patrick signature of HMIT Rand Settlement Agreement [HCMLPHMIT00000345; HCMLPHMIT00000347-HCHMLPHMIT00000370] | | |
| 38. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz date May 19, 2025 [HCMLPHMIT00000371-HCMLPHMIT00000372] | | |
| 39. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000373-HCMLPHMIT00000374] | | |
| 40. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000423-HCMLPHMIT00000428] | | |
| 41. | Email from J. Morris to L. Phillips dated March 22, 2025 [HCMLPHMIT00000562-HCMLPHMIT00000563] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 5 OF 15**

004274

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 42. | Email from J. Morris to L. Phillips, A. Hurt dated March 22, 2025 with attachment – fully executed Confidentiality Agreement<br>[HCMLPHMIT00000564-HCMLPHMIT00000580] | | |
| 43. | Email from J. Morris to L. Phillips dated April 4, 2025 with attachment Litigation Protections M. Patrick<br>[HCMLPHMIT00000621-HCMLPHMIT00000631] | | |
| 44. | Email from J. Morris to L. Phillips dated April 7, 2025<br>[HCMLPHMIT00000642-HCMLPHMIT00000644] | | |
| 45. | Email from J. Morris to L. Phillips dated April 8, 2025 with attachment – current snapshot of remaining assets<br>[HCMLPHMIT00000656--HCMLPHMIT00000661] | | |
| 46. | Email from J. Morris to L. Phillips dated April 16, 2025 with attachment – Second Amended and Restated Indemnity Trust Agreement<br>[HCMLPHMIT00000672-HCMLPHMIT00000727] | | |
| 47. | April 15, 2025 Draft Illustrative Highland Indemnity Trust Payout Schedule<br>[HCMLPHMIT00000724-HCMLPHMIT00000727] | | |
| 48. | Email from J. Morris to L. Phillips dated May 15, 2025 with attachment – Draft Rand Settlement Agreement and Redline<br>[HCMLPHMIT00000766-HCMLPHMIT00000820] | | |
| 49. | Email from J. Morris to L. Phillips dated May 15, 2025 with Clean and Redline Settlement Agreement<br>[HCMLPHMIT00000829-HCMLPHMIT00000877] | | |
| 50. | Email from L. Phillips to D. Klos dated April 17, 2025<br>[HCMLPHMIT00000947] | | |
| 51. | Email re: Microsoft Teams call from D. Klos to J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt dated April 7, 2025<br>[HCMLPHMIT00000949] | | |
| 52. | Microsoft Teams Appointment for J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt scheduled for April 8, 2025<br>[HCMLPHMIT00000950] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 6 OF 15**

004275

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 53. | Email from D. Klos to J. Shields dated April 22, 2025 with attachment – Potential Settlement Structure with DAF and HMIT [HCMLPHMIT00000987-HCMLPHMIT00001000] | | |
| 54. | Email from J. Seery to M. Patrick, S. Raver, L. Phillips, A. Hurt, J. Shields dated April 28, 2025 with attachment – Draft Rand Settlement Agreement [HCMLPHMIT00001001-HCMLPHMIT00001025] | | |
| 55. | Email Microsoft Teams appointment from D. Klos to J. Seery, K. Hendrix, M. Patrick, S. Raver, Paul dated April 3, 2025 [HCMLPHMIT00001037] | | |
| 56. | Email from D. Klos to M. Patrick dated April 2, 2025 [HCMLPHMIT00001042] | | |
| 57. | Email from J. Seery to J. Morris, T. Cournoyer, D. Klos, M. Gray dated June 11, 2025 with attachment – Class 9 Consent to Rand Settlement and Release [HCMLPHMIT00001220-HCMLPHMIT00001245] | | |
| **C.** | **Class 9 Documents** | | |
| 58. | Letter to P. Daugherty from J. Seery re: Eighth Distribution re: Highland Claimant Trust dated May 20, 2025 [HCMLPHMIT00002329] | | |
| 59. | Written Consent of Holders of Class 9 Subordinated Claim Trust Interests in the Highland Claimant Trust dated May 16, 2025 [HCMLPHMIT00002677-HCMLPHMIT00002682] | | |
| 60. | Tolling Agreement Extending Claim Objection Deadline dated July 27, 2022 | | |
| 61. | Amendment No. 1 to Tolling Agreement Extending the Claim Objection Deadline dated December 21, 2022 | | |
| 62. | Amendment No. 2 to Tolling Agreement Extending Claim Objection Deadline dated November 6, 2023 | | |
| 63. | Amendment No. 3 to Tolling Agreement Extending Claim Objection Deadline dated November 20, 2024 | | |
| **D.** | **HCLOM/HMIT** | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**     **PAGE 7 OF 15**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

004276

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 64. | Email from L. Phillips to J. Morris dated January 6, 2025 [HCMLPHMIT00000008-HCMLPHMIT00000009] | | |
| 65. | Email from L. Phillips to J. Morris, A. Hurt dated January 11, 2025 [HCMLPHMIT00000010-HCMLPHMIT00000012] | | |
| 66. | *Highland Capital Management, L.P.'s Motion for (A) a Bad Faith Finding and (B) and Award of Attorney's Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* [Docket No. 4176] [HCMLPHMIT00000441-HCMLPHMIT00000500] | | |
| 67. | Hearing Transcript dated December 18, 2024 [Docket No. 4197] [HCMLPHMIT00003829-HCMLPHMIT00003859] | | |
| 68. | *Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award for Attorney's Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4716]* [Docket No. 4199] [HCMLPHMIT00003860-HCMLPHMIT00003866] | | |
| 69. | Intercreditor and Participation Agreement with HCLOM dated January 10, 2025 [HCMLPHMIT00003868-HCMLPHMIT00003871] | | |
| E. | **Patrick Authority** | | |
| 70. | Trust Agreement of Hunter Mountain dated December 17, 2015 [HCMLPHMIT00004103-HCMLPHMIT00004114] | | |
| 71. | Show Cause Hearing Transcript June 8, 2021 [HCMLPHMIT00002716-HCMLPHMIT00003013] | | |
| 72. | HMIT Hearing Transcript June 8, 2023 [HCMLPHMIT00003014-HCMLPHMIT00003402] | | |
| 73. | Limited Liability Company Agreement of Atlas IDF GP, LLC dated October 29, 2015 [HCMLPHMIT00003511-HCMLPHMIT00003517] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**   **PAGE 8 OF 15**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

004277

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 74. | HOLDCO Responses and Disclosures Related to the Court's Order Requiring Disclosures [Docket No. 2547] HCMLPHMIT00003523-HCMLPHMIT00003828] | | |
| 75. | HMIT Appointment of Successor Administrator dated 8/12/2022 [HCMLPHMIT00003872] | | |
| 76. | Limited Liability Company Agreement of Rand PE Fund Management, LLC dated October 29, 2015 [HCMLPHMIT00003873-HCMLPHMIT00003879] | | |
| 77. | Limited Liability Company Agreement of Rand Advisors, LLC dated August 28, 2013 [HCMLPHMIT00003880-HCMLPHMIT00003886] | | |
| 78. | Agreement of Limited Partnership of Rand PE Fund I, L.P. dated October 29, 2015 [HCMLPHMIT00003887-HCMLPHMIT00003893] | | |
| 79. | Amended and Restated Limited Partnership Agreement of Atlas IDF, LP dated November 30, 2015 [HCMLPHMIT00003894-HCMLPHMIT00003928] | | |
| 80. | Atlas IDF, LP Offering of Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00003929-HCMLPHMIT00004023] | | |
| 81. | Rand PE Fund I, LP Offering Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00004024-HCMLPHMIT00004095] | | |
| 82. | Member and Manager Consent of Atlas IDF GP, LLC dated October 13, 2022 [HCMLPHMIT00004124-HCMLPHMIT00004126] | | |
| 83. | Amended and Restated Company Agreement of Atlas IDF GP, LLC dated August 8, 2022 [HCMLPHMIT00004127-HCMLPHMIT00004151] | | |
| 84. | Amended and Restated Company Agreement of Rand Advisors, LLC dated August 1, 2022 [HCMLPHMIT00004152-HCMLPHMIT00004176] | | |
| 85. | Amended and Restated Company Agreement of Rand PE Fund Management, LLC dated August 1, 2022 [HCMLPHMIT00004177-HCMLPHMIT00004201] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 9 OF 15**

004278

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 86. | Membership Interest Purchase Agreement Rand Advisors dated August 1, 2022<br>[HCMLPHMIT00004202-HCMLPHMIT00004215] | | |
| 87. | Member and Manager Consent of Rand Advisors, LLC dated October 13, 2022<br>[HCMLPHMIT00004216-HCMLPHMIT00004218] | | |
| 88. | Member and Manager Consent of Rand PE Fund Management, LLC dated October 13, 2022<br>[HCMLPHMIT00004219-HCMLPHMIT00004221] | | |
| 89. | 3/17/2025 Rand Advisors Form ADV<br>[HCMLPHMIT00003465-HCMLPHMIT00003493] | | |
| 90. | Atlas IDF, LP Subscription 12/21/2015 (signature pages only) | | |
| 91. | Atlas IDF, LP Subscription 12/23/2015 (signature page only) | | |
| 92. | Atlas IDF LP SEC Form D dated February 24, 2025<br>[HCMLPHMIT00003518-HCMLPHMIT00003522] | | |
| 93. | Rand PE Fund I, L.P. SEC Form D dated February 24, 2025<br>[HCMLPHMIT00004096-HCMLPHMIT00004100] | | |
| 94. | Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated September 24, 2015<br>[HCMLPHMIT00004115-HCMLPHMIT00004123] | | |
| 95. | Second Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated February 12, 2025 | | |
| 96. | Bylaws of The Okada Family Foundation, Inc. (final version) | | |
| 97. | Bylaws of Empower Dallas Foundation, Inc. | | |
| 98. | Crown Global DVA Policy 30218 (signed) | | |
| 99. | Crown Global DVA Termsheet 30218 | | |
| 100. | Crown Global DVA Policy 30219 (signed) | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**                    **PAGE 10 OF 15**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

004279

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 101. | Crown Global DVA Termsheet 30219 | | |
| 102. | Crown Global Rand Participation Agreement (Executed) | | |
| 103. | S&G HMIT Opinion Rep Letter dated January 29, 2016 | | |
| 104. | S&G HMIT Opinion dated January 29, 2016 | | |
| **F.** | **Dugaboy Note** | | |
| 105. | Promissory Note $24,268,621.69 dated May 31, 2017 [HCMLPHMIT00001327-HCMLPHMIT00001328] | | |
| 106. | The Dugaboy Investment Trust Offering of $1817M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002323-HCMLPHMIT00002327] | | |
| 107. | Participation Agreement for Par/Near Par Trades dated July 18, 2024 [HCMLPHMIT00002594-HCMLPHMIT00002600] | | |
| 108. | $18.5mm Dugaboy Note Attempted Sale – Process Update [HCMLPHMIT00002601] | | |
| 109. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002602-HCMLPHMIT00002607] | | |
| 110. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002608-HCMLPHMIT00002630] | | |
| 111. | Highland Claimant Trust Recommended Dugaboy Note Contribution dated June 7, 2024 [HCMLPHMIT00002631-HCMLPHMIT00002636] | | |
| 112. | Email from D. Klos to DC Sauter dated May 23, 2024 [HCMLPHMIT00002637-HCMLPHMIT00002639] | | |
| **G.** | **Capital Account Amounts** | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**          **PAGE 11 OF 15**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

004280

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 113. | Highland Capital Management, L.P. Consolidated Financial Statement and Supplemental Information dated December 31, 2018<br>[HCMLPHMIT00002548-HCMLPHMIT00002593] | | |
| 114. | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24, 2015<br>[HCMLPHMIT00002641-HCMLPHMIT00002676] | | |
| 115. | 2018 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT)<br>[HCMLPHMIT00001332; HCMLPHMIT00001336; HCMLPHMIT00001414; HCMLPHMIT00001419; HCMLPHMIT00001424; HCMLPHMIT00001429; HCMLPHMIT00001434; HCMLPHMIT00001439] | | |
| 116. | 2019 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT)<br>[HCMLPHMIT00001762; HCMLPHMIT00001766; HCMLPHMIT00001865; HCMLPHMIT00001870; HCMLPHMIT00001875; HCMLPHMIT00001880; HCMLPHMIT00001885; HCMLPHMIT00001890] | | |
| 117. | Monthly Operating Report – FINAL November 2019<br>[HCMLPHMIT00001329] | | |
| 118. | Hunter Mountain Note Receivable October 15, 2019<br>[HCMLPHMIT00001330] | | |
| H. | **Dallas Foundation Issues** | | |
| 119. | Affidavit of James Dondero in the Grand Court of Cayman Islands FSD2025-0099 dated April 16, 2025<br>[HCMLPHMIT00003429-HCMLPHMIT00003438] | | |
| 120. | Email from J. Pomerantz to D. Curry, M. Okin dated June 19, 2025 | | |
| I. | **Plan, CTA, and Litigation Trust Agreement** | | |

AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025      PAGE 12 OF 15
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

004281

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 121. | *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Pages 26-29, (entire document can be found at Docket No. 1808)<br><u>Excerpts:</u><br>Article IV. B.1-5 (pages 26-28)<br>Article IV. B.5 (pages 28-29)<br>Article IV. B.7 (page 30)<br>Article IV. B.10 (page 31)<br>Article IV. D. (pages 34-35)<br>Article VII. D.1-2 (pages 44-45)<br>Article XI (pages 53-55) | | |
| 122. | *Claimant Trust Agreement*, (entire document can be found at Docket No. 1811-2, as modified by Docket No. 1875-4)<br><u>Excerpts:</u><br>Fourth "Whereas" clause (page 1)<br>Section 2.2(a)-(b) (page 8)<br>Section 3.2(a)-(b) (pages 11-12)<br>Section 3.2(c)(iv) (page 12)<br>Section 2.3(b)(ix) (page 9) | | |
| 123. | *Litigation Sub-Trust Agreement*, (entire document can be found at Docket No. 1811-4)<br><u>Excerpts:</u><br>Fourth "Whereas" clause (page 1)<br>Section 2.2 (page 5)<br>Section 3.2(a) (page 7)<br>Section 3.2(b) (page 7)<br>Section 3.2(c)(v) (page 7)<br>Section 3.3 (b)(iii) (page 9) | | |
| **J.** | **<u>Deposition Transcripts</u>** | | |
| 124. | Deposition Transcript of Julie Diaz dated June 22, 2025 | | |
| 125. | Deposition Transcript of Torrey Littleton dated June 22, 2025 | | |
| **K.** | **<u>Other Docs</u>** | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**    **PAGE 13 OF 15**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

004282

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 126. | ***Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Article III, (entire document can be found at Docket No. 1808)** | | |
| 127. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| 128. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 129. | All exhibits identified by or offered by any other party at the Hearing | | |

AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025                    PAGE 14 OF 15
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

004283

Dated:  June 24, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com

 - and -

**HAYWARD PLLC**

*/s/  Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*
*and the Highland Claimant Trust*

**QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**

Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**

Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as*
*Litigation Trustee of the Highland Litigation*
*Sub-Trust*

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4930-7823-1120.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 15 OF 15**

004284

EXHIBIT 126

004285

Case 19-34054-sgj11 Doc 1808 Filed 01/22/21 Entered 01/22/21 15:36:25 Page 1 of 66
Case 3:25-cv-02724-L Document 1-2 Filed 12/02/25 Page 40 of 443 PageID 4704

Docket #1808 Date Filed: 01/22/2021

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000013

Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.    Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.    Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

004287

**B.**   <u>**Summary of Classification and Treatment of Classified Claims and Equity Interests**</u>

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.**   <u>**Elimination of Vacant Classes**</u>

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.**   <u>**Impaired/Voting Classes**</u>

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.**   <u>**Unimpaired/Non-Voting Classes**</u>

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.**   <u>**Impaired/Non-Voting Classes**</u>

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.**   <u>**Cramdown**</u>

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the

004288

Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.**     **Classification and Treatment of Claims and Equity Interests**

    *1.*      *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

    *2.*      *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

004289

3.    <u>*Class 3 – Other Secured Claims*</u>

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.    <u>*Class 4 – Priority Non-Tax Claims*</u>

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    <u>*Class 5 – Retained Employee Claims*</u>

- *Classification*: Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

004290

- *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*: Class 6 consists of the PTO Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

22

004291

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.   *Class 9 – Subordinated Claims*

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.   *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

004292

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.  *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.  **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

24

004293

**J.**     **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

**A.**     **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be

004294

BTXN 208 (rev. 07/09)

| IN RE: Highland Capital Management, L.P. | Motion for Approval of Settlement with the HMIT Entities Rule 9019 doc. #4216 | Case # 19−34054−sgj11 |

DEBTOR

## TYPE OF HEARING

| Highland Capital Management, L.P. | *VS* | James Dondero/Patrick Daugherty |

**PLAINTIFF / MOVANT**                                    **DEFENDANT / RESPONDENT**

| John Morris/Louis M. Phillips | | Michael Justin Lang/Andrew K. York |

**ATTORNEY**                                                  **ATTORNEY**

## EXHIBITS

SEE EXHIBIT & WITNES LIST AT DOC. #4253, #4255, & #4271

Court Admitted Exhibits #1 through #9; #11 through #56; #58 through #123 & #126

SEE EXHIBIT & WITNESS LIST AT DOC. #4266

Court Admitted All Exhibits; #1 through #42

Dugaboy Exhibit #3 Letter dated June 24 2025: Admitted by Michael Lang

Michael Edmond

REPORTED BY

June 25, 2025

HEARING DATE

Stacey G Jernigan

JUDGE PRESIDING

004295

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
 2                              DALLAS DIVISION

 3                               )   Case No. 19-34054-sgj-11
      In Re:                     )   Chapter 11
 4                               )
      HIGHLAND CAPITAL           )   Dallas, Texas
 5    MANAGEMENT, L.P.,          )   June 25, 2025
                                 )   9:30 a.m. Docket
 6         Reorganized Debtor.   )
                                 )   - MOTION TO EXTEND DURATION OF
 7                               )     TRUSTS (4213)
                                 )   - MOTION TO APPROVE SETTLEMENT
 8    _____)     (4216)

 9                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                    UNITED STATES BANKRUPTCY JUDGE.

11    APPEARANCES:

12    For the Highland Capital    John A. Morris
      Management Claimant Trust:  PACHULSKI STANG ZIEHL & JONES, LLP
13                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
14                                (212) 561-7760

15    For the Highland Capital    Hayley R. Winograd
      Management Claimant Trust:  Gregory V. Demo
16                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  1700 Broadway, 36th Floor
17                                New York, NY  10019
                                  (212) 561-7732

18
      For the Highland Capital    Jeffrey N. Pomerantz
19    Management Claimant Trust:  PACHULSKI STANG ZIEHL & JONES, LLP
                                  10100 Santa Monica Blvd.,
20                                 13th Floor
                                  Los Angeles, CA  90067
21                                (310) 277-6910

22    For Marc S. Kirschner,      Robert Scott Loigman
      Litigation Trustee:         QUINN EMANUEL URQUHART & SULLIVAN,
23                                 LLP
                                  295 5th Avenue
24                                New York, NY  10016
                                  (212) 849-7000

25
```

004296

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-8   Filed 07/02/25   Page 51 of 443   PageID 4715
Main Document   Page 2 of 268

2

APPEARANCES, cont'd.:

For the Hunter Mountain          Louis M. Phillips
Entities:                        Amelia L. Hurt
                                 KELLY HART & PITRE
                                 301 Main Street, Suite 1600
                                 Baton Rouge, LA  70801
                                 (225) 381-9643

For the Dugaboy                  Deborah Rose Deitsch-Perez
Investment Trust:                STINSON, LLP
                                 2200 Ross Avenue, Suite 2900
                                 Dallas, TX  75201
                                 (214) 560-2201

For the Dugaboy                  Michael Justin Lang
Investment Trust:                CRAWFORD WISHNEW & LANG, PLLC
                                 1700 Pacific Avenue, Suite 2390
                                 Dallas, TX  75201
                                 (214) 817-4500

For Crown Global Life            David L. Curry, Jr.
Insurance, Ltd. and              OKIN ADAMS, LLP
The Dallas Foundation:           1113 Vine Street, Suite 240
                                 Houston, TX  77002
                                 (713) 228-4100

For Patrick Daugherty:           Andrew K. York
                                 Drake Rayshell
                                 Joshua Smeltzer
                                 GRAY REED & MCGRAW, LLP
                                 1601 Elm Street, Suite 4600
                                 Dallas, TX  75201
                                 (214) 954-4135

For the U.S. Trustee:            Erin Marie Schmidt
                                 OFFICE OF THE UNITED STATES
                                     TRUSTEE
                                 1100 Commerce Street, Room 976
                                 Dallas, TX  75242-1496
                                 (214) 767-1075

Recorded by:                     Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
                                 (214) 753-2062

004297

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-8   Filed 02/25/26   Page 52 of 443   PageID 4716
Main Document   Page 25 of 266

3

1   Transcribed by:            Kathy Rehling
                               311 Paradise Cove
2                              Shady Shores, TX   76208
                               (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.

004298

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 1-8   Filed 02/25/25   Page 53 of 443   PageID 4717
Main Document   Page 25 of 266

4

<u>DALLAS, TEXAS - JUNE 25, 2025 - 9:38 A.M.</u>

1

2          THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas, Dallas Division, is

4   now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.

6          MR. LANG:  Good morning, Judge.

7          THE COURT:  All right.  We have Highland settings

8   this morning, Case No. 19-34054.  We have two motions:  a

9   motion to extend the duration of the Plan Trust, and then a

10  motion under Rule 9019 to approve a settlement between the

11  estate entities and Hunter Mountain entities.

12       All right.  So, lots to get to.  Let's quickly get

13  appearances from the participating parties in interest this

14  morning.

15         MR. MORRIS:  Good morning, Your Honor.  John Morris;

16  Pachulski Stang Ziehl & Jones.  I'm joined by my colleagues

17  Jeffery Pomerantz, Gregory Demo, and Hayley Winograd.  And we

18  represent the Highland Capital Management Claimant Trust and

19  Highland Capital Management, LP.

20         THE COURT:  Okay.  Good morning.  Other appearances?

21         MR. LOIGMAN:  Good morning, Your Honor.  Robert

22  Loigman from Quinn Emanuel.  We represent the Highland

23  Litigation Trustee, Marc Kirschner.

24         THE COURT:  Good morning.

25         MS. DEITSCH-PEREZ:  Good morning, Your Honor.  This

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-8   Filed 02/25/25   Page 54 of 443   PageID 4718
Main Document   Page 54 of 266

5

1    is Deborah Deitsch-Perez from Stinson representing the Dugaboy

2    Trust on the motion to extend the duration of the Trust.

3            THE COURT:  Good morning.

4            MS. DEITSCH-PEREZ:  Good morning.

5            MR. LANG:  Michael Lang for Dugaboy Investment Trust

6    on the 9019 motion.

7            THE COURT:  Good morning.

8            MR. LANG:  Good morning.

9            MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

10   Phillips and Amelia L. Hurt; Kelly Hart Hallman -- Kelly Hart

11   Pitre, Louisiana trade name, I don't know why -- appearing on

12   behalf of Hunter Mountain Investment Trust and the Hunter

13   Mountain entities in connection with the 9019 motion.

14           THE COURT:  Good morning.

15           MR. YORK:  Good morning, Your Honor.  Drew York along

16   with Joshua Smeltzer and Drake Rayshell from Gray Reed on

17   behalf of Patrick Daugherty with regard to the 9019 motion.

18           THE COURT:  Good morning.  Ms. Schmidt?

19           MS. SCHMIDT:  Erin Schmidt on behalf of the U.S.

20   Trustee.

21           THE COURT:  Good morning.

22           MR. CURRY:  Good morning, Your Honor.  David Curry

23   from Okin Adams on behalf of The Dallas Foundation and Crown

24   Global Life Insurance, Ltd.

25           THE COURT:  Good morning.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 10-6    Filed 02/25 Page 25 of 266    Page 55 of 443    PageID 4719

6

1    All right.  Well, let me ask.  I'll start with Mr. Morris,

2    given these are your motions.  Do you have any agreements

3    about how you're going to proceed?  I'm wondering, first off,

4    are we going to have joint presentations, joint evidence on

5    both motions, or are we going to take one at the time?

6        MR. MORRIS:  Good morning, Your Honor.  Thank you

7    very much for hearing us yesterday.  It's kind of a big day in

8    the case.  We have a milestone that we hope will greatly

9    advance the prosecution of this case, and, frankly, what

10   remains to be done to complete the wind-up of Highland.

11       There are two motions before the Court.  The first is the

12   motion to extend the Trusts.  That was filed at Docket No.

13   4213.  We're going to address that one first, Your Honor,

14   because we have a resolution and a stipulation.  There's only

15   one objecting party.  That was the Dugaboy Investment Trust.

16   And early this morning we reached an agreement whereby Dugaboy

17   is going to withdraw its objection, with prejudice, subject to

18   a stipulation that we will file with the Court but that

19   contains the following terms.

20       THE COURT:  Okay.

21       MR. MORRIS:  Number one, Dugaboy agrees to withdraw

22   its objection to the motion, with prejudice.

23       Number two, the Trusts expect to dissolve by August 11th,

24   2026, so that no further extension of the duration of the

25   Trusts will be necessary.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-8   Main Document   Filed 07/02/25   Page 56 of 443   Page 2 of 263   PageID 4720

7

```
 1                 THE COURT:  Okay.

 2                 MR. MORRIS:  And number three, Dugaboy hereby

 3      preserves and does not waive its right, if any, to object to

 4      any further attempts to extend the date by which the Trusts

 5      must be dissolved or to extend the duration of the Trusts.

 6                 THE COURT:  Wait.  I don't understand that third one.

 7      Could you repeat it?

 8                 MR. MORRIS:  It's a reservation of rights.

 9                 THE COURT:  Okay.

10                 MR. MORRIS:  And so Dugaboy preserves and does not

11      waive its right, if any, to object --

12                 THE COURT:  Well, okay.  I'm sorry.  Maybe I zoned

13      out or heard something different.

14                 MR. MORRIS:  Uh-huh.

15                 THE COURT:  I thought number two of the agreement was

16      August 11th, 2026 would be it; there would be no further

17      extensions.

18                 MR. MORRIS:  It's a statement of expectation.  It's

19      not a representation.  It's not a warranty.  We do not believe

20      today, based on the facts and circumstances that we know of,

21      that a further extension will be necessary, but we're not

22      waiving the right to seek it if circumstances change or

23      something unforeseen happens.  And all Dugaboy is saying is

24      that, okay, we reserve the right, if any, to object.

25                 THE COURT:  Okay.
```

004302

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-8   Filed 07/02/25   Page 57 of 443   PageID 4721
Main Document   Page 25 of 263

8

1            MR. MORRIS:  It's that simple.

2            THE COURT:  Okay.  It's sort of confusing, right?

3            MR. MORRIS:  Yeah.

4            THE COURT:  Okay.

5            MR. MORRIS:  Perhaps.  If you have any questions, let

6    me try and clarify.

7            THE COURT:  Well, I guess I'll just start with Ms.

8    Deitsch-Perez.  Would you come to the podium?  We've got I

9    don't know who on the camera, but we want to make sure

10   everyone hears.

11           MS. DEITSCH-PEREZ:  Okay.  I'll take a stab at --

12           THE COURT:  Do you confirm what you heard and do you

13   have any clarification of Points 2 and 3?

14           MS. DEITSCH-PEREZ:  Maybe I can make it clear.  I

15   confirm that is the stipulation that we agreed upon, and I

16   think all that was intended is the Trusts and the Debtor are

17   saying they expect to be done by August 11, 2026, so that they

18   will not need to make this motion again, but they could not

19   and would not promise that they will be done by then.  So

20   Dugaboy is withdrawing the objection to this particular

21   extension but is not waiving the right to object to a further

22   request for an extension.  And that's the sum of it.  Does

23   that make sense to Your Honor?

24           THE COURT:  It does.

25           MS. DEITSCH-PEREZ:  Okay.

004303

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-6   Filed 02/25/2 5Main Document   Page 58 of 443   Page 25 of 268   PageID 4722

9

1          THE COURT:  I'm hoping it'll be over by August 11th,

2    2026, and we'll see where we are at that time.

3      Well, one of my reasons for a slight bit of confusion is,

4    in reading the 9019 settlement that is before the Court, I saw

5    that there were some future installments payments, if you

6    will, to HMIT, I think up through 2029, maybe.

7          MR. MORRIS:  Sure.

8          THE COURT:  So I was --

9          MR. MORRIS:  So let me clarify.

10         THE COURT:  Okay.

11         MR. MORRIS:  The only thing that we said that we

12   expect to happen as of, you know, by August 11th, 2026 is that

13   the Trusts will be dissolved.  But that is not the end of

14   their life.  It is a process.  Once you file for dissolution,

15   then you have to complete the wind-down.  And completing the

16   wind-down will require the completion of all litigation.  It

17   will -- right?

18     All we're talking about is dissolving the Highland

19   Claimant Trust and the Highland Litigation Subtrust so that

20   what remains after that is the Indemnity Trust.  And the

21   Indemnity Trust will be fully funded and will be prepared to

22   go forward.  And if we ever get to a point when there's no

23   further litigation, the corpus of that will be distributed to

24   whatever stakeholders are entitled to it at that time.

25     But when we talk about being done by next year, it doesn't

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 8 Main Document Filed 07/21/25 Page 105 of 266 Page 59 of 443   PageID 4723

10

1    mean the case will be over.  It simply means that the Claimant

2    Trust and the Highland Litigation Subtrust will be dissolved.

3    But they still have to complete the wind-up.

4             THE COURT:  Okay.  Gotcha.

5             MS. DEITSCH-PEREZ:  And Dugaboy is reserving its

6    rights to object to -- if something is happening that seems

7    improper or untoward or they're seeking additional relief,

8    obviously, we're not waiving the unknown now.

9             THE COURT:  Okay.  Gotcha.  All right.  Well, I

10   appreciate the resolution of these issues.  I assume no other

11   party in interest is going to weigh in since we only had a

12   Dugaboy objection.

13            MR. MORRIS:  That was the only objection we had.  I'm

14   prepared to, if Your Honor thinks it's necessary or

15   appropriate, or both, to make a very short proffer.  A

16   proffer.

17            THE COURT:  Okay.  I'll accept that proffer at this

18   time.

19            MR. MORRIS:  Okay.  So, Your Honor, we filed on the

20   docket at No. 4253 Exhibits 1 through 65, and we supplemented

21   our exhibit list at Docket No. 4271 with two additional

22   documents, which are Exhibits 66 and 67.  We don't believe

23   there's any objection to any of those documents, and we would

24   respectfully move for their admission into evidence.

25            THE COURT:  All right.  Could you repeat the numbers

1  once again?

2          MR. MORRIS:  Yes, Your Honor.  So, for the motion for

3  an order further extending the duration of the Trusts, we have

4  two docket entries that contain Highland's exhibits.  The

5  first is Docket No. 4253, and that has Exhibits 1 through 65.

6          THE COURT:  Okay.

7          MR. MORRIS:  And then we supplemented at 4271 with

8  Docket -- with Exhibit Numbers 66 and 67.

9          THE COURT:  All right.  I presume there's no

10  objection to these exhibits.

11     All right.  They are admitted.

12     (Claimant Trust's Exhibits 1 through 67 are admitted into

13  evidence.)

14          JAMES P. SEERY, JR., PROFFER OF TESTIMONY

15          MR. MORRIS:  Okay.  So, Your Honor, if called to

16  testify, James P. Seery, Jr., the Claimant Trustee of the

17  Highland Claimant Trust, would testify as follows.

18     At Exhibits 63 and 64, Highland filed excerpts of the

19  Litigation Trust and the Litigation Subtrust -- the Claimant

20  Trust and the Litigation Subtrust, and each of those excerpts

21  contain Section 9.1, respectively.  That's the section of the

22  Trusts that deal with the extensions that may be necessary

23  from to the original three-year term.  And Mr. Seery would

24  testify that he's familiar with those provisions and that he

25  understands the requirements of those provisions include,

004306

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Main Document Filed 07/21/25 Page 125 of 266 Page 61 of 443   PageID 4725

Seery - Proffer                              12

 1    among other things, the requirement that all objections to

 2    claims and equity interests have been resolved and that all

 3    assets that the Trustee believes might yield sufficient value

 4    to the estate have been sold.

 5        Mr. Seery would also testify that the Highland estate has

 6    a number of assets in its possession today, certain of which

 7    will be conveyed to Hunter Mountain if the 9019 motion is

 8    approved.

 9        Among those assets, Mr. Seery would testify that, in

10    accordance with the proposed settlement agreement, which is at

11    Exhibit 17, in Paragraph 5(b), the Court will see reference to

12    what's known as the Dugaboy Note.  The Dugaboy Note is an

13    asset of the estate that will go to Hunter Mountain if the

14    9019 motion is approved.  If it's not approved, then Mr. Seery

15    would testify that he's got to find another way to dispose of

16    it.  But it is an asset with a face amount today of about $17

17    million, so it has substantial value.

18        There is a note from Hunter Mountain.  That also will be

19    disposed of as set forth in Paragraph 4(a) of the proposed

20    settlement agreement.  That note is going to be used to reduce

21    the allowed amount of Hunter Mountain's Class 10 claim if the

22    settlement is approved.  But that note is also an asset of the

23    estate.  It's worth over $60 million.  I believe it actually

24    might be in the fifties.  But somewhere in the $50 to $60

25    million range.  And that's an asset that needs to be disposed

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Main Document Filed 07/21/25 Page 62 of 443   Page 62 of 265   PageID 4726

Seery - Proffer                    13

of.

     The estate has a contingent right to receive certain funds
under its settlement with Mr. Okada, and it has the Kirschner
Litigation.  All of these assets will be disposed of.  They're
very illiquid assets, I'd call them, and it would be very
helpful to the estate in moving this case forward if the 9019
motion is approved.

     There are other assets that the estate has that will not
be monetized by August 11th and which therefore require the
extension of the Trusts.  Mr. Seery would testify, if called
to the stand, that the pursuit of the sale of these assets
will yield proceeds that justified the continued pursuit of
their monetization.  They include interests in Highland CLO
Funding, Ltd.  Documents pertaining to that can be found at
Exhibits 21 and 25.

     The Claimant Trust also owns shares in Highland Capital
Management Korea, Ltd.  Documents relating to that asset can
be found at Exhibits 18 through 20.  That's an asset that, if
Mr. Seery were to testify, he would say that he has been
actively engaged in trying to liquidate that asset, but it's
not going to be completed by August 11th.

     There's also a note that is due from Highland Capital
Management Korea, Ltd.  That can be found at Exhibit 67.
That's another asset that Mr. Seery has concluded and would
testify to that he thinks is valuable for the estate but will

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Main Document Filed 06/23/25 Page 125 of 266 Page 63 of 443   PageID 4727

Seery - Proffer                          14

1   not be monetized by the end of this extension period.

2        And then there's the bad faith award that the estate

3   obtained against HCRE, which remains on appeal.  The appeal of

4   that order can be found at Exhibit 15.  And there's no further

5   cost, really, to waiting for the Court's decision, but that is

6   an asset of the estate that remains to be monetized.

7        So there's two buckets of assets, one of which, hopefully,

8   if the 9019 motion is approved, will go to HMIT and that will

9   be helpful.  But there's another bucket of assets that are not

10  implicated by the HMIT settlement that will not be monetized

11  before August 11th that Mr. Seery would testify we need a

12  little bit more time and that's why we're going to extend the

13  Trusts.

14       Mr. Seery would also testify, finally, that there are

15  claims and equity interests that remain unresolved.  They

16  include Mr. Daugherty's Class 8 claim.  As Your Honor is

17  probably aware at this point, Highland has objected to that

18  claim.  It seeks to disallow, subordinate, that particular

19  claim.  Otherwise, have it monetized for purposes of winding

20  up the estate.

21       Mr. Daugherty has moved to dismiss that complaint.  That's

22  his right.  But our scheduling order already takes us past

23  August 11th.

24       And then, finally, we've got Dugaboy's Class 11 interest,

25  which has not yet been allowed.  If the 9019 motion is

 1   approved today, we do expect to move quickly to get to that

 2   point so that we can finish that up.  But we don't foresee

 3   that being completed before August 11th, either.

 4       So, in sum, Mr. Seery would testify that, from his

 5   perspective, the estate still has assets that are valuable to

 6   the estate that will not be monetized by August 11th, and

 7   there are still one claim and one equity interest that need to

 8   be resolved in order to satisfy the test, you know, to get to

 9   the dissolution.

10       So that would be the sum total of his testimony.  That's

11   the completion of the proffer.  And unless Your Honor has any

12   objections, we're prepared to move to the next motion.

13             THE COURT:  I have a couple of questions.

14             MR. MORRIS:  Sure.

15             THE COURT:  But first I'm going to go ahead and swear

16   in Mr. Seery --

17             MR. MORRIS:  Great.

18             THE COURT:  -- to affirm this, as well as swear him

19   in for what I'm sure will be future testimony today.

20             MR. MORRIS:  Sure.

21             MR. SEERY:  Would you like me to come --

22             THE COURT:  Well, you can just stand in place.  Just

23   make sure we hear you.

24       (The witness is sworn as to both his proffer and future

25   testimony.)

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Document Filed 10/02/25 of 266 Page 65 of 443   PageID 4729

16

```
 1                  THE COURT:  Okay.  Thank you.

 2          All right.  My question is probably for you.

 3                  THE WITNESS:  Uh-huh.

 4                  THE COURT:  Just confirm my understanding.  We have

 5     one claim and one --

 6                  MR. MORRIS:  Equity interest.

 7                  THE COURT:  -- equity interest to resolve?  Mr.

 8     Daugherty's Class 8 claim and the Dugaboy what would be Class

 9     11 interest?

10                  MR. MORRIS:  That is correct.

11                  THE COURT:  Did I hear that correctly, Mr. Seery?

12                  THE WITNESS:  That's correct, Your Honor.

13                  THE COURT:  Okay.  Thank you.

14          And then my other question is, once again, a

15     clarification.  I pulled out of your attachments to your

16     motion to extend the Exhibit B, Unresolved Pending Litigation.

17                  MR. MORRIS:  Uh-huh.

18                  THE COURT:  And at the time this was filed, May 8th,

19     2025, it showed nine pending matters at all court levels.  And

20     I think two of them now are finished.  I'm sorry.  This is a

21     long question.  But maybe I'm wrong.  The first two matters,

22     the recusal matter that was at the Fifth Circuit, as well as

23     the gatekeeper appeal, which I know a motion to stay the

24     mandate was at the Supreme Court, both of those are finished

25     now?  Done?
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Doc 8ment Filed 02/25 Page 2175 of 266 Page 66 of 443   PageID 4730

17

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.  So the nine pending matters is now

3   down to seven.  And if the Court were to approve the 9019

4   today, I understand that, well, it looks like, at a minimum,

5   two more would go away?

6          MR. MORRIS:  Precisely.

7          THE COURT:  We have an appeal at the District Court,

8   what we call the Claims Trading Appeal, where Highland had

9   sued -- I'm sorry, Hunter Mountain had sued Highland and

10  others regarding the claims trading issue, I'll call it.  So

11  that would go away?

12         MR. MORRIS:  Yes, Your Honor.

13         THE COURT:  And then let me see what else.  I've

14  marked all over my chart.

15         MR. MORRIS:  And then I believe Hunter Mountain's

16  motion for leave to file a complaint in the Delaware Chancery

17  Court --

18         THE COURT:  Ah.

19         MR. MORRIS:  -- to remove Mr. Seery will also be

20  dismissed with prejudice --

21         THE COURT:  Okay.

22         MR. MORRIS:  -- if the 9019 motion is approved.

23         THE COURT:  Okay.  So, that, yes, Hunter Mountain v.

24  Seery, the Court issued a stay on that being able to go

25  forward in Delaware.

004312

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document DocumenFiled Page 28 of 266age 67 of 443    PageID 4731

18

1          MR. MORRIS:  Precisely.

2          THE COURT:  So that would go away.

3       So, of the nine matters listed, we're down to five.  But

4  I'll hear, I guess, about this later with Mr. Seery, the big

5  what I would call Kirschner adversary against lots of

6  defendants which has been abated for a long, long time now.

7  Hunter Mountain would basically receive that lawsuit with

8  those claims?  The claims against it go away?  And I don't

9  know what we'll hear, I don't know what Hunter Mountain will

10  do with that big adversary, but maybe it doesn't know yet.  I

11  don't know.

12          MR. MORRIS:  Yeah.

13          THE COURT:  So, --

14          MR. MORRIS:  Not a question we've concerned ourselves

15  with, Your Honor.

16          THE COURT:  Okay.  So that, again, I'm kind of

17  recapping everything.

18       (Counsel confer.)

19          MR. MORRIS:  Go ahead, Your Honor.

20          THE COURT:  So, again, I'm looking at the chart.  If

21  anyone wants to know what I'm looking at, it's at Docket No.

22  4213-2, filed May 8th.  We're down to the HCRE --

23          MR. MORRIS:  Appeal.

24          THE COURT:  -- appeal.

25          MR. MORRIS:  Uh-huh.  Which is fully briefed and

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Main Document Filed 06/30/25 Page 125 of 266 Page 68 of 443   PageID 4732

19

1   we're just waiting for a decision.

2          THE COURT:  Okay.  So that bad faith decision may or

3   may not stick, but it's hanging there on appeal.

4          MR. MORRIS:  Uh-huh.

5          THE COURT:  We're down to a Dugaboy -- what we called

6   the Imaging Motion.  Or no?

7          MR. MORRIS:  Correct.  I guess that's been stayed,

8   but that's out there.

9          THE COURT:  We have the valuation motion of Dugaboy,

10  but I don't know, is it going to be moot after today?  I don't

11  know what I'm going to hear today as far as the evidence.

12         MR. MORRIS:  So, that has -- great question -- two

13  plaintiffs in that lawsuit, HMIT and Dugaboy.

14         THE COURT:  Oh, that's right.  So --

15         MR. MORRIS:  HMIT is going to dismiss it with

16  prejudice.  Dugaboy will still have an active complaint.

17         THE COURT:  Appeal.

18         MR. MORRIS:  My hope is that --

19         THE COURT:  It's an appeal of --

20         MR. MORRIS:  Yes.

21         THE COURT:  Okay.

22         MR. MORRIS:  My hope is that, because we produced so

23  much valuation information to HMIT, which we then had to make

24  available to Dugaboy because that's the way discovery works,

25  that they'll withdraw that complaint.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Dicument Filed Page 22505 of 266age 69 of 443   PageID 4733

20

1          THE COURT:  Okay.

2          MR. MORRIS:  I'm going to make that plea right on the

3   record here, because they've now gotten everything they've

4   asked for.  But that's their decision to make, and it's out

5   there.  But HMIT is withdrawing itself as a party to that

6   lawsuit, but it does remain in Dugaboy's lap.

7          THE COURT:  Okay.  So those potentially three things?

8          MR. MORRIS:  Yeah.

9          THE COURT:  Plus the Daugherty matter?

10         MR. MORRIS:  Yeah.

11         THE COURT:  Okay.  Mr. Seery, did I miss something?

12         THE WITNESS:  One clarification, Your Honor.  My

13  apologies.  One clarification.  In the Class 11 subordinated

14  interests, there's a Dugaboy capital account of $740,000.

15  There's also the Strand capital account -- both of these are

16  controlled by Mr. Dondero -- of $994,000.  And then Mr. Okada

17  and his affiliates have a combined capital account of

18  $248,000.  So we'll -- I said just Dugaboy, but it's actually

19  Dugaboy, Strand, and then Okada and two family trusts of his.

20         THE COURT:  Okay.

21         MR. MORRIS:  And if the 9019 motion is granted, --

22         THE WITNESS:  It's in the footnote.  It's in the

23  footnote in the motion.

24         THE COURT:  Yes.  I actually had that in my notes.

25         MR. MORRIS:  Yeah.

004315

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document Docent Filed Page 225 of 266age 70 of 443    PageID 4734

21

1          THE COURT:  So I glossed over Class 11 just being

2     Dugaboy.  There are Strand and Okada.

3       All right.  So I appreciate that clarification.  We're

4     down hopefully to very little litigation.  But we have no

5     control over higher courts, when they have time to look at it.

6          MR. MORRIS:  Or future litigation, now that the

7     gatekeeper has been curtailed.

8          THE COURT:  Okay.  All right.

9       Anyone wish to say anything about this motion to extend?

10      All right.  Well, based on the pleadings, the argument,

11    the evidence, I do think it is necessary and appropriate and

12    reasonable to extend the duration of the Highland Trusts

13    through August 11th, 2026.  The relief is something that is

14    contemplated as a possibility under the trust documents.

15    Moreover, I think the Court has some authority under

16    Bankruptcy Rule 9006(b) and Bankruptcy Code Section 105 to

17    grant this relief.

18      The evidence shows there are unliquidated assets and some

19    unfinished litigation that must be resolved before the Trust

20    is in a position to wind down.  So, again, I think it's

21    necessary, prudent, and in the best interest.  The motion is

22    granted, and the Court duly acknowledges the comments with

23    regard to the stipulation of Dugaboy and the estate.  All

24    right.

25          MR. MORRIS:  Thank you very much.  So, may I move to

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Document Filed 02/22/25 of 266age 71 of 443   PageID 4735

22

1   the 9019 motion?

2           THE COURT:  You may.

3           MR. MORRIS:  Okay.  With respect to the 9019 motion,

4   there were originally three Objecting Parties:  the Dugaboy

5   Investment Trust, Patrick Daugherty, and The Dallas Foundation

6   and an entity called Crown Global.

7       I'm pleased to report, and I think Your Honor may already

8   be aware, that a settlement has been reached to dispose of The

9   Dallas Foundation and the Crown Global objection.  There is a

10  written agreement to that effect that effectuates that.  And

11  I'd like to just turn the podium over to Mr. Phillips.  Louis

12  Phillips represents the HMIT Entities.  I know Mr. Curry is

13  here on behalf of the objecting parties, The Dallas

14  Foundation, but I think -- I think I'll let Mr. Phillips

15  address, you know, the specific terms of the resolution of

16  that objection.

17          THE COURT:  All right.  Thank you.  And I will say

18  that my staff reached out yesterday to -- I don't know if it

19  was Mr. Curry or someone in your office -- wanting to know

20  have you delivered exhibit notebooks.  And it was at that

21  point my staff heard, well, we've resolved.

22          MR. CURRY:  We had just finished.

23          THE COURT:  Okay.  All right.  So I'm happy to hear

24  what the resolution is.

25          MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Main Document   Filed 06/30/25   Page 72 of 443   PageID 4736   Page 225 of 266

23

 1  Phillips on behalf of the Hunter Mountain Investment Trust and

 2  the named parties therein.

 3      We had a written stipulation that has been signed by my

 4  firm, by Mr. Curry's firm, by the Pachulski firm, and by the

 5  Quinn Emanuel firm that is to be submitted to the -- is to be

 6  filed on the record.  It also contains a reference to a

 7  settlement agreement that will be attached.  But we will read

 8  the stipulation into the record, if Your Honor would allow me

 9  to.

10          THE COURT:  All right.  You may.

11          MR. PHILLIPS:  And Mr. Curry is here, and he can tell

12  me whether or not I have read correctly, but I think I have

13  it.

14          THE COURT:  Okay.  All right.

15          MR. PHILLIPS:  (reading)  Now, wherefore, it is

16  jointly -- hereby jointly stipulated and agreed as follows.

17  The Foundation Parties -- Mr. Curry's clients -- withdraw The

18  Foundation Objection, which is a defined term in the

19  stipulation, with prejudice, in accordance with the terms of

20  the term sheet annexed hereto as Attachment 1.  And Attachment

21  1 will be attached to the stipulation.

22      Paragraph 2.  The Foundation Parties, the HMIT Entities --

23  that's Hunter Mountain Entities and the Movants; that is, Mr.

24  Morris' client and Quinn Emanuel on behalf of the Litigation

25  Subtrust -- agree that the following language shall be

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Main Document   Document   Filed 07/22/25   Page 225 of 266   Page 73 of 443   PageID 4737

24

1    contained in the proposed order on the 9019 motion.  And

2    that's clearly the proposed order.  This is not dependent upon

3    the motion being granted.  Notwithstanding anything in the

4    settlement agreement or the 9019 order to the contrary, none

5    of The Dallas Foundation, EDF, Okada Family, or Crown (The

6    Foundation Parties) are or will be included in the definition

7    of HMIT Releasors or Highland Releasors.  For the avoidance of

8    doubt, however, any attempt by The Foundation Parties to

9    assert a claim against an HMIT released party by, through, or

10   under, including derivatively a Highland entity, or against a

11   Highland released party by, through, or under, including

12   derivatively an HMIT entity, is barred by this order and the

13   settlement agreement.

14       That is the sum and substance of the stipulation.  The

15   settlement agreement we don't think needs to be read to the

16   Court because it's a signed settlement agreement that will be

17   attached as Attachment 1 to the stipulation.  And I believe I

18   read it correctly.

19            THE COURT:  Mr. Curry, did he read it correctly?

20            MR. CURRY:  Mr. Phillips did read it correctly, Your

21   Honor.  And thank you.

22       And we want to thank Trustee's counsel and Mr. Phillips

23   for working with us to address some very real concerns.  And

24   through the stipulation, we still have some work to do, but we

25   have the time to do it, and maybe move it to where we can

004319

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 8   Filed 07/02/25   Page 225 of 266   Page 74 of 443   PageID 4738

25

1   actually get it resolved.

2           THE COURT:  Okay.  Well, there are some things I am

3   concerned -- well, I should say, all I really feel the need to

4   go into is you're releasing your objection, your clients are,

5   and all of the parties here, parties to the proposed

6   settlement and the estates, the Debtors, Hunter Mountain, are

7   agreeing that your clients are not releasors under the 9019

8   settlement if the Court approves it.

9           MR. CURRY:  Correct, Your Honor.  Unless and except

10  our clients were to attempt to assert a released claim against

11  a released party, and that's what the "provided, however" was

12  to clarify.

13          MR. PHILLIPS:  And this doesn't affect the estate at

14  all.  It basically affects the HMI -- the Hunter Mountain

15  entities.  But the language that we have read in the

16  stipulation has been agreed to and is contained within the

17  order that will be proposed.

18          THE COURT:  Okay.  You said it better than I said it.

19  The estate is releasing claims --

20          MR. PHILLIPS:  I can't believe that, Your Honor, but

21  thank you.

22          THE COURT:  Well, the estate is releasing claims that

23  it has --

24          MR. PHILLIPS:  Correct.

25          THE COURT:  -- or in Trusts have -- I shouldn't have

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Doc 8 merFiled Page 226 of 266age 75 of 443   PageID 4739

26

1   said the estate.  It's the Trust entities and what's left of

2   the Reorganized Debtors are releasing any claims they have

3   against Hunter Mountain in the proposed settlement --

4           MR. PHILIPS:  Yes.

5           THE COURT:  -- if it's approved.  But any direct

6   claims of your clients are not --

7           MR. CURRY:  Well, direct claims that our client has

8   or derivative claims, for example, against Hunter Mountain

9   that are derivative through Hunter Mountain.

10          THE COURT:  Okay.  All right.

11          MR. PHILLIPS:  Yeah.

12          MR. CURRY:  Yeah.  That was the -- what we were

13   trying to make sure.

14          THE COURT:  Yes.  All right.  Well, and when I said

15   this is all I care about, what I mean is I don't even know who

16   the heck Crown Insurance is.

17          MR. PHILLIPS:  Correct.

18          THE COURT:  There was a very interesting party in

19   interest objection asserted by the Debtor.  And I've learned a

20   lot about a lot of entities during all these years, but that

21   was a new one on me.  I understood that it's somewhere in the

22   framework of the --

23          MR. PHILLIPS:  Yes, Your Honor.

24          THE COURT:  -- Charitable DAF.

25          MR. PHILLIPS:  Let's say it's somewhere in the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 8   Main Document   Filed 06/22/25   Page 225 of 266   Page 76 of 443   PageID 4740

27

```
1    universe, Your Honor.

2              THE COURT:  The universe?  Okay.

3              MR. PHILLIPS:  The universe.  Not necessarily the

4    Charitable DAF or Hunter Mountain.

5              THE COURT:  Okay.

6              MR. PHILLIPS:  But in the universe.

7              THE COURT:  Well, but the point is, we've announced

8    anything relevant to --

9              MR. PHILLIPS:  Correct.

10             THE COURT:  -- the Reorganized Debtor, --

11             MR. PHILLIPS:  Correct.

12             THE COURT:  -- Claimant Trust, Subtrust.

13             MR. PHILLIPS:  And the motion -- and the objections

14   of all these entities are withdrawn with prejudice.

15             THE COURT:  All right.

16             MR. CURRY:  And Your Honor, the one thing that I will

17   note, part of our agreement, and it's in the signed term sheet

18   that you'll see, is that we've agreed that if there's a

19   dispute over the settlement to withdraw our objection, this

20   Court will have at least concurrent jurisdiction to resolve

21   that dispute, because it is a settlement to resolve an

22   objection to a core proceeding.

23             THE COURT:  Okay.  Thank you.

24             MR. PHILLIPS:  And we have agreed and we do agree

25   that the Court has jurisdiction.  It has jurisdiction.
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Doc Main Document    Filed Page 228 of 266 Page 77 of 443    PageID 4741

28

1          THE COURT:  Okay.  For what that is worth.

2          MR. PHILLIPS:  Well, that's what we can agree to.

3          THE COURT:  All right.  I appreciate that.

4      Anyone wish to say anything about what's been announced?

5      All right.  Well, I accept this resolution and withdrawal

6  of --

7          MR. PHILLIPS:  Okay.  We will be filing --

8          THE COURT:  -- the objection.

9          MR. PHILLIPS:  We will be filing, at the close of

10  this hearing, this stipulation, and we will be clicking

11  whatever ECF box request that the Court so ordered on the

12  stipulation.

13          THE COURT:  Okay.  We will be on the lookout for

14  that.

15      All right.  Well, Mr. Lang, you stood up on behalf of

16  Dugaboy.

17          MR. LANG:  I just want to make the Court aware of a

18  letter that was sent last night that involves this from the

19  Caymans, from Grant Thornton.

20          MR. PHILLIPS:  We object.

21          MR. LANG:  I just want to make the Court -- they were

22  asking for a 45-day that the Joint Liquidators --

23          MR. PHILLIPS:  We object to this, Your Honor.  That's

24  not a part of the record.  This is a person from outer space.

25  Not outer space, but the Cayman Islands.  And it's a letter

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Document Filed Page 225 of 266 age 78 of 443   PageID 4742

29

1    that we --

2              THE COURT:  Coming from someone --

3              MR. PHILLIPS:  It looks like a letter --

4              THE COURT:  -- who is called Yosemite Sam, I

5    understand, outside of court.

6              MR. PHILLIPS:  Yeah.  Yeah.  I didn't want to bring

7    that up, but Mr. Morris --

8              THE COURT:  Okay.  Well, it's stuck in my brain

9    forever now.

10             MR. PHILLIPS:  -- says it's his favorite cartoon

11   character, so it must be okay.

12             THE COURT:  Okay.  Well, okay, I don't want to make

13   light.  I think this goes back to what I was saying about

14   there are certain things I care about and certain things I

15   don't care about.  And I read from the pleadings, I haven't

16   heard evidence but I've read from the pleadings that there is

17   a lot going on in the Cayman Islands with regard to what I

18   call the Charitable DAF structure or Hunter Mountain.

19             MR. LANG:  Yes.

20             THE COURT:  Parties in that universe.  And I don't

21   plan to exercise any control or jurisdiction over that, so I'm

22   hesitant to hear what it is you want to present.  I don't

23   know, maybe on cross-examination of Mark Patrick today it may

24   or may not be relevant.  But what is it --

25             MR. LANG:  All they ask for is a 45-day basically

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document Document Filed Page 2305 of 266age 79 of 443    PageID 4743

30

1   abeyance or continuance of the decision on the 9019, to allow

2   them to investigate and weigh in on it.

3          MR. PHILLIPS:  Your Honor?

4          MR. LANG:  They're Joint Liquidators.  That's -- I'm

5   just making the Court aware of the request.

6          THE COURT:  Okay.  Well, they're not here to

7   articulate that.  So I respect your wanting to be transparent

8   and whatnot, but I'm not going to let it stop me from going

9   forward today.  Okay.

10          MR. LANG:  Thank you.

11          THE COURT:  Thank you.

12          MR. PHILLIPS:  Your Honor, if I may be excused,

13   that's our position with respect to the withdrawal.  We

14   appreciate Your Honor's attention.  Thank you.

15          THE COURT:  Okay.  Thank you.

16          MR. CURRY:  Thank you, Your Honor.

17          THE COURT:  Anyone else wish to weigh in?

18     All right.  Well, I do, as I was saying, accept the

19   withdrawal of The Dallas Foundation and related entities'

20   objection to the 9019 settlement.

21     So does that leave only the Daugherty objection to the

22   settlement?  Well, and the Dugaboy.

23          MR. MORRIS:  And the Dugaboy, yes.

24          THE COURT:  And Dugaboy, of course.

25          MR. MORRIS:  That's right.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Document Filed Page 235 of 266 Page 80 of 443   PageID 4744

31

```
1              THE COURT:  Okay.

2              MR. MORRIS:  So, --

3              THE COURT:  So how did you want to proceed?

4              MR. MORRIS:  So, the way I propose to proceed, Your

5    Honor, I have an opening statement to make --

6              THE COURT:  Okay.

7              MR. MORRIS:  -- with a PowerPoint presentation to

8    present.  I would propose that, as the Movant, I go first.

9    Then we can hear from Dugaboy, we can hear from Mr. Daugherty,

10   and then we can put Mr. Seery on the stand.

11        Assuming that there is no challenge to Mark Patrick's

12   authority to enter into the settlement agreement on behalf of

13   all of the HMIT entities, I would not plan on calling either

14   Mr. Dondero or Ms. Deitsch-Perez, who are under subpoena here,

15   because the challenge to authority was really coming from The

16   Dallas Foundation.  Their objection has now been withdrawn.

17   So as long as Mr. Daugherty -- well, really, as long as

18   Dugaboy doesn't challenge Mr. Patrick's authority to enter

19   into the settlement agreement on behalf of the HMIT entities,

20   I think we'll just put on the one witness and be done.

21             THE COURT:  All right.  Just so we know what lies

22   ahead, --

23             MR. MORRIS:  Uh-huh.

24             THE COURT:  -- I don't think that Dugaboy objected to

25   Mr. Patrick's authority.  I do recall it was just The
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 8   Main Document   Filed 07/02/25   Page 225 of 266   Page 81 of 443    PageID 4745

32

 1   Foundation.

 2          MR. LANG:  There was no objection on the -- there was

 3   no objection.

 4          THE COURT:  Okay.  And same with Mr. Daugherty?  No

 5   objection about the authority of Mark Patrick to enter into

 6   the settlement?

 7          MR. YORK:  There was no objection.

 8          THE COURT:  All right.

 9          MR. MORRIS:  All right.  May I proceed?

10          THE COURT:  You may proceed.

11          MR. MORRIS:  Okay.  So, may I approach, Your Honor?

12   I've got a --

13          THE COURT:  You may.  Is this a PowerPoint?  And

14   everyone else has it, correct?

15      (Pause.)

16          THE COURT:  You may proceed.

17          MR. MORRIS:  Thank you, Your Honor.  John Morris;

18   Pachulski Stang Ziehl & Jones; for Highland Capital

19   Management, LP and the Highland Claimant Trust.

20      Before I begin, Your Honor, I'd like to move my exhibits

21   into evidence because I will be referring to them in my

22   opening.

23          THE COURT:  All right.  So I think I said on Monday

24   the first thing I was going to ask, and I've already blown

25   that, was did you all have good faith discussions regarding

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Doc 8ment   Filed 07/02/25   Page 235 of 266 Page 82 of 443   PageID 4746

33

1    admission of each other's exhibits?  And I did see Mr. Lang

2    filed a day or two ago his list of objections.  It looked like

3    you were like you were down to about nine or eleven exhibits

4    you were objecting to.

5        (Counsel confer.)

6            THE COURT:  Out of 123 designations, which I think

7    probably grew overnight to --

8            MR. MORRIS:  Oh, okay.  Well, --

9            MR. LANG:  I just have to make clear for the record.

10           MR. MORRIS:  You go ahead and do that.

11           MR. LANG:  Your Honor, I've been told that Dugaboy

12   does challenge the authority.  It is not in our objection.

13           MR. PHILLIPS:  It's not in his --

14           THE COURT:  Well, can I ask why it was not in your

15   objection?

16           MR. LANG:  I do not know.  I was not counsel of

17   record when the objection was filed.  I do not know what was

18   known or not known at that time.

19           THE COURT:  So, --

20           MR. LANG:  So I guess we just seek leave to --

21           THE COURT:  -- if you did not have him on -- was Mark

22   Patrick on your exhibit list?  I don't think he was, right?

23           MR. LANG:  He was not.

24           THE COURT:  Okay.  So how would you address that?

25   Again, we've had, I know, some back and forth over who was

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 8   Main Document   Filed 07/02/25   Page 234 of 266   Page 83 of 443    PageID 4747

34

1  going to represent Dugaboy on this matter.

2             MR. LANG:  Yes.

3             THE COURT:  I remember the substitutions and whatnot.

4  But --

5             MR. LANG:  We found out late last night that The

6  Foundation was resolving their issue, and that kind of left us

7  in a position.

8             THE COURT:  So what are you saying?  You all were

9  relying on --

10            MR. LANG:  Well, the issue had --

11            THE COURT:  -- The Foundation to carry the flag on

12  this one?

13            MR. LANG:  They had raised the issue.  They were

14  pursuing the issue.  We went through discovery and they were

15  pursuing it.  It was already in front of the Court.

16            THE COURT:  All right.  What would you like to say,

17  Mr. Morris?

18            MR. MORRIS:  Your Honor, this is more than

19  disappointing.  The fact of the matter is Mr. Dondero is

20  funding both the Cayman Islands litigation as well as The

21  Dallas Foundation's prosecution of the objection.  The fact

22  that The Dallas Foundation settled doesn't open the door to

23  Mr. Dondero to assert objections that he's never asserted

24  before.

25       I will tell you what will happen.  If Your Honor allows

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Document   Filed Page 235 of 266   Page 84 of 443   PageID 4748

35

1   this, I will have to call Mr. Dondero and Ms. Deitsch-Perez to

2   the stand to offer evidence under subpoena that they

3   personally acknowledge and understand, because Mr. Dondero's

4   signature is on documents that were signed in the year 2025,

5   that Mr. Patrick is authorized to represent HMIT.  I really

6   didn't want to do that.  But if they want to pursue it, I'll

7   have to do my job.

8           THE COURT:  All right.

9           MR. LANG:  And I want to clarify one thing.

10          THE COURT:  Uh-huh.

11          MR. LANG:  And it goes back to something we already

12   discussed, which is the authority issue is derived from the

13   Cayman Island Joint Liquidators' appointment on May 6th, 2020.

14   And so how that changes the authority, it's -- I think the

15   issue is does he have authority, like Mr. Morris --

16          THE COURT:  All right.  Well, before I comment, Mr.

17   Phillips, it's your client representative that we're talking

18   about here.  What do you say?

19          MR. PHILLIPS:  Very disappointing, but -- and further

20   revealing the limits of my imagination.  There is no objection

21   to authority.  There's no evidence of record of objection to

22   authority.  There's no evidence even in The Dallas

23   Foundation's papers about authority.  Dugaboy did not raise

24   objections to authority.  Daugherty did not raise objections

25   to authority.  And Mr. Morris was willing to release Ms.

1   Deitsch-Perez and Mr. Dondero from subpoena in connection with

2   an order that this Court entered that Hunter Mountain objected

3   to.  And outside the Court, the evidence will establish, the

4   evidence submitted by Mr. Morris will establish that Hunter

5   Mountain, through authority of Mr. Patrick, objected to Ms.

6   Deitsch-Perez signing on behalf of Hunter Mountain because she

7   did not seek approval and did not have authorization to sign a

8   stipulation before this Court.

9   Subsequently, after signing the stipulation and entry of

10  the order, we suggested that we would not deal with Ms.

11  Deitsch-Perez, we would only deal with unconflicted counsel,

12  and we dealt with unconflicted counsel to make an agreement

13  with HCLOM and another of Mr. Dondero's entities to avoid

14  filing a motion for reconsideration before this Court based on

15  the fact that, as we have suggested in the motion that we

16  didn't file, Hunter Mountain's approval was not real.

17  So Mr. Morris has these people under subpoena because we

18  signed an agreement that Mr. Dondero signed to avoid the

19  filing of a motion for reconsideration before this Court,

20  recognizing that Mr. Patrick had authority for Hunter Mountain

21  to sign the agreement.  And so that's the purpose of his

22  subpoena.

23  But our position is there's no suggestion in pleadings by

24  Dugaboy or Daugherty that challenge the authority of Mr.

25  Patrick to execute on behalf of any of the Hunter Mountain

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document Document Filed Page 275 of 266 Page 86 of 443    PageID 4750

37

 1   entities.  And the one party who, without suggesting an

 2   evidentiary basis, but that's fine, they say maybe they did

 3   have an evidentiary -- we -- and they withdrew their

 4   objection.

 5           THE COURT:  Okay.  Let me --

 6           MR. MORRIS:  Okay.  I'm sorry.  Just really --

 7           THE COURT:  Thirty second.

 8           MR. MORRIS:  Really quickly.

 9           THE COURT:  Uh-huh.

10           MR. MORRIS:  The letter that Mr. Lang just referred

11   to from the Joint Official Liquidators, addressed to us,

12   asking for an extension of time, doesn't even challenge Mr.

13   Patrick's authority to act today on behalf of the HMIT

14   entities to enter into the settlement agreement.  The Joint

15   Official Liquidators wrote to us last night, and they don't

16   say what Mr. Lang is now saying.

17           MR. PHILLIPS:  And the only thing I would say is we

18   got a letter by email from somebody who says, I am who I am.

19   It came through email PDF.  We don't challenge the authority.

20   But we would respectfully request -- we're not there.  We've

21   made no appearance.  We don't challenge the authority.  But

22   please wait -- ask the Court to wait the 45 minutes -- 45 days

23   for us.  We got a letter.  PDF.  We don't know who sent it.

24           THE COURT:  Okay.

25           MR. PHILLIPS:  It wouldn't be admissible even if

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document Main Document Filed Page 235 of 265 Page 87 of 443    PageID 4751

38

1    someone tried to introduce it as evidence.

2           THE COURT:  Okay.  Let me just say a few things here.

3    This has felt like a very strange sideshow, I'm going to say.

4    When I read The Foundation's objection, I was, again,

5    scratching my head, who in the heck is Crown Insurance?  I

6    know who Dallas Foundation is because there have been charts

7    submitted to me in the past, and I know it's part of the I'm

8    going to say Mr. Phillips' client set over the months, the

9    Charitable Foundation structure.  But I'm like, how in the

10   heck do these people have standing?  Okay?  I have to always

11   consider standing.  That's every trial judge's first

12   obligation, does this party have standing?  Not a creditor.

13   Not an equity holder.  But somehow I guess they're going to

14   explain through evidence how they're a person aggrieved by the

15   proposed settlement.

16      So that's why I kind of -- hopefully, it doesn't sound

17   flippant -- thought this sounded like a sideshow, because this

18   is a stranger, really, to weigh in.

19      Okay.  So now I'm hearing that a party in interest, which

20   Dugaboy is -- I guess some might argue that, but I think

21   they're affected by the settlement, so that makes them a party

22   in interest -- you're making the same argument.  And it's

23   because of a rotation of counsel you didn't make it sooner.

24      Okay.  So I'm just trying to be transparent here, tell you

25   what the Court is thinking.  I guess what the Court is

1   thinking is Mark Patrick is the client representative, so I'm

2   told by the Movants on the 9019, and you, Mr. Phillips, he's

3   the party representative for Hunter Mountain.

4         MR. PHILLIPS:  Yes, Your Honor.

5         THE COURT:  I don't, I guess, know what harm there

6   is, except a longer hearing, in, okay, put him on the stand to

7   testify about the bona fides of the settlement.  It's more

8   evidence.  But if you all want to call Mr. Dondero, I'm going

9   to require that.

10        MR. MORRIS:  Your Honor?

11        THE COURT:  I mean, as a counterbalance, since it's

12   appearing from the pleadings to be --

13        MR. MORRIS:  Your Honor, respectfully, Mr. Patrick is

14   not on their witness list.  He's not on our witness list.

15        THE COURT:  Wasn't he on somebody's witness list?

16        MR. MORRIS:  He was on The Dallas Foundation's

17   witness list.

18        THE COURT:  Oh.

19        MR. MORRIS:  He's not on their witness list.  He's

20   not on our witness list.  He should not testify today because

21   they're raising an issue that they didn't raise ever before.

22   This is improper.  They should just be shut down here.

23        THE COURT:  I think probably you should be shut down.

24   But I kind of go back and forth, what's the harm in having the

25   representative, the person I'm told is the representative of

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Doc 8 ment Filed Page 07/02/25 of 266 Page 89 of 443   PageID 4753

40

```
 1   Highland?

 2             MR. PHILLIPS:  Your Honor?

 3             THE COURT:  I could limit it to one hour.  And the

 4   flip side is that Dondero himself, as I guess the

 5   representative of Dugaboy, would have to also take the stand,

 6   limited to one hour.

 7             MR. PHILLIPS:  I'd like to make one note, Your Honor,

 8   about the documents that Mr. Morris has introduced.  That

 9   document list -- and I don't have the numbers in front of me

10   -- but part of the presentation and the reason Mr. Patrick is

11   not on the Movants' motion -- witness and exhibit list, the

12   documents that have been introduced are all of -- include all

13   of the documents evidencing Mr. Patrick's authority as the

14   control person of the entire Hunter Mountain group.

15             THE COURT:  Which they've stipulated.

16             MR. PHILLIPS:  Which they've stipulated to.

17             THE COURT:  Uh-huh.

18             MR. MORRIS:  And to be clear, Your Honor, they can be

19   found at Exhibits 70 through 104.  We've got 34 documents in

20   evidence that establish that Mr. Patrick is authorized to act

21   on behalf of each of the HMIT entities.  All that's going to

22   happen is we're now going to spend time dealing with an issue

23   that you already described as a sideshow, and we're going to

24   do it for a party who didn't put Mr. Patrick on a witness

25   list, who hasn't objected on this basis, and we've got a
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 8   Main Document   Filed 07/02/25   Page 241 of 266   Page 90 of 443   PageID 4754

41

1    mountain of evidence that shows that he's completely

2    authorized to do this.  I just --

3            MR. PHILLIPS:  To which there's no objection.

4            MR. MORRIS:  And you can also look, Your Honor, at

5    Exhibit 69.  That's the agreement that Mr. Dondero signed with

6    Mr. Patrick after he got outed for authorizing Ms. Deitsch-

7    Perez to sign a document on behalf of HMIT without Mark

8    Patrick's knowledge or approval.  He signed that.  Six months

9    ago.  And we're going to have a trial here over whether Mark

10   Patrick is authorized to act on behalf of HMIT?

11           A VOICE:  That was long ago.

12           MR. MORRIS:  This is not -- this is not --

13           THE COURT:  We're not going to have a trial.  And I

14   fully acknowledge that I am possibly abusing discretion by

15   allowing this.  We have our rules, and our rules were not

16   complied with, and it does feel a little bit like ambush.

17   Okay?

18       But on the flip side of it, it doesn't seem entirely

19   unreasonable to have the representative, the purported

20   representative of Hunter Mountain, who is the counterparty, if

21   you will, to this very major settlement, take the stand.  And

22   I'll limit it.  And, again, I condition it on Mr. Dondero, the

23   ultimate beneficiary of the Dugaboy Trust, as it's been

24   represented to me in prior filings, --

25           MR. MORRIS:  Correct.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document Document Filed Page 2425 of 266 Page 91 of 443    PageID 4755

42

1          THE COURT:  -- he'll have to stay an equal amount of

2     time on the stand.  Okay?

3          MR. MORRIS:  Okay.

4          THE COURT:  Okay.  Hang on.  I've got my smarter

5     staff member handing me a note.  Okay.

6       (Pause.)

7          THE COURT:  Okay.  Well, so that's how we're going to

8     stand.

9       Now, I am going to address Mr. Daugherty here.  We're not

10    going to let Mr. Daugherty cross-examine Patrick.  Clearly,

11    his objection has been around, and he never said anything

12    about --

13         MR. YORK:  Certainly not as to authority.  However,

14    we should be able to examine him as it relates to the portion

15    of the objection that goes to whether the settlement is in the

16    best interest, given the claims that are being -- the

17    Kirschner claims that are being transferred by Highland to the

18    HMIT entities.

19         THE COURT:  All right.  Well, you all are going to

20    have to share your 30 minutes.

21         MR. YORK:  That's fine.

22         THE COURT:  Okay?  We're giving 30 minutes to Debtor

23    entities, Highland entities, and Hunter Mountain entities

24    collectively, and 30 minutes to Dugaboy and Daugherty

25    collectively.  Okay?  So, I'm going to have my law clerk

004337

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 8   Main Document   Filed 07/02/25   Page 2425 of 266   Page 92 of 443   PageID 4756

43

 1   timing you like you're on the clock.

 2           MR. MORRIS:  Okay.

 3           THE COURT:  Okay?

 4           MR. MORRIS:  May I proceed?

 5           THE COURT:  You may proceed.

 6           MR. MORRIS:  Thank you, Your Honor.  So, appearing at

 7   Docket 4255 is the Movants' exhibit list, with Exhibits 1

 8   through 123.  At Docket 4277 are Exhibits 124 and 125.  And at

 9   Docket 4280, we've got Exhibit 126.

10      The Movants respectfully move into evidence all of those

11   documents, with the exception of Exhibits 124 and 125 on

12   Docket No. 4277.  Those are the transcripts of The Dallas

13   Foundation representatives, and since we have reached an

14   agreement and The Dallas Foundation has withdrawn their

15   objection, we are not going to offer those two transcripts

16   into evidence as part of the record in this matter.

17      But Exhibits 1 through 123, and Exhibit 126, we move into

18   evidence.

19           THE COURT:  All right.  And as I thought we were

20   going to start talking about a moment ago, Mr. Lang objected

21   to 11 of these 123 designations.  Do those still remain?  If

22   they do, we're just going to see if they want to be I think

23   offered --

24           MR. LANG:  No, I think we've --

25           THE COURT:  -- the old-fashioned way, but I think

004338

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document Document   Filed 07/02/25   Page 93 of 443    PageID 4757
Main Document   Page 445 of 466

44

 1  that might be more efficient.  I have, in your objection,

 2  which is at Docket 4273, you objected to Numbers 10, 12, 13,

 3  57 and 59, and then 64 through 69.  Eleven items.

 4          MR. LANG:  Mr. Morris clarified that 12 and 13 are

 5  one document.  But I still, I think that, again, for purposes

 6  of the authority issue, Exhibit 13 we don't think is relevant.

 7          MR. MORRIS:  Exhibit 13, Your Honor.  We'll just take

 8  them one at a time.

 9          THE COURT:  Yes, go ahead and address it.

10          MR. MORRIS:  Is relevant because it's simply a

11  document that was provided to Highland by Hunter Mountain as

12  part of the negotiations.  And we've been asked to produce all

13  of the documents related to the negotiations.  This is one of

14  the documents that we received.

15          THE COURT:  Okay.  And do I understand 12 and 13 are

16  actually the same thing, or --

17          MR. MORRIS:  Yeah.  Well, 12 is the email, 13 is the

18  attachment.

19          THE COURT:  Okay.  I overrule the relevance

20  objection.  Those will be admitted.

21      (Claimant Trust's Exhibits 12 and 13 are admitted into

22  evidence.)

23          MR. LANG:  57.

24          MR. MORRIS:  57 is also a part of the settlement

25  documents.  It's, I think, an email exchange between Mr. Seery

004339

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document Document Filed Page 2455 of 266 age 94 of 443    PageID 4758

45

1    and UBS, which was one of the Class 9 claimants, and we had to

2    obtain their consent and that's part of the process of getting

3    to the settlement agreement.

4              MR. LANG:  I think the objection is it doesn't

5    include the attachment.

6              MR. MORRIS:  It's got all -- it's got numerous

7    attachments on it.

8              MR. LANG:  To 57?

9              MR. MORRIS:  Yeah.

10              MR. LANG:  Mine did not.

11              MR. MORRIS:  Your Honor, we'll withdraw the exhibit.

12              THE COURT:  Okay.

13              MR. MORRIS:  Okay.

14              THE COURT:  59.  Well, you didn't address #10.

15              MR. LANG:  Oh, sorry.

16              THE COURT:  That was the first one.

17              MR. LANG:  Yeah.

18              MR. MORRIS:  We'll withdraw #10.

19              THE COURT:  All right.

20              MR. MORRIS:  Okay.

21              THE COURT:  So, 59?

22              MR. MORRIS:  59?  Your Honor, I'm not surprised they

23    object, because it's at the core of the Court's ability to

24    authorize this settlement.

25              MR. LANG:  We withdrew that.

 1              MR. MORRIS:  Oh, you withdrew that?

 2              MR. LANG:  Withdrew.

 3              MR. MORRIS:  Oh, okay.  They withdrew that.

 4              THE COURT:  Okay.  So, 59 will be admitted.

 5         (Claimant Trust's Exhibit 59 is admitted into evidence.)

 6              MR. MORRIS:  And then I think the last is 64 to 69.

 7              THE COURT:  Uh-huh.

 8              MR. MORRIS:  We were actually prepared to withdraw

 9   those exhibits because we didn't think there was a challenge

10   to authority.  Now that there's a challenge to authority,

11   we're going to offer all of those in because they're highly

12   relevant to the acknowledge of Mr. Patrick's authority.

13              THE COURT:  All right.  And your objection was solely

14   to relevance?

15              MR. LANG:  The objection was relevance because they

16   predate the May 6th issue in the Caymans, which is what caused

17   the entire structure to -- the authority from the top down to

18   be questioned.

19              THE COURT:  All right.  Well, you can cross-examine

20   if you want on those items.

21              MR. LANG:  Okay.

22              THE COURT:  But I find they're relevant so they will

23   be admitted, 64 through 69.

24         (Claimant Trust's Exhibits 64 through 69 are admitted into

25   evidence.)

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document Doc8menffiled 062-2425of 265age 96 of 443    PageID 4760

47

1      *[Court Edit:  Claimant Trust's Exhibits 1 through 9, 11*

2      *through 56, 58 through 123, and 126 are admitted into*

3      *evidence.]*

4              THE COURT:  All right.  And as far as the exhibits of

5      Dugaboy, I think it was just the plan and settlement agreement

6      were all that had been designated.  Correct?

7              MR. LANG:  Yes.

8              MR. MORRIS:  No objection.

9              THE COURT:  So, no objection.  Those will be

10     admitted.

11         (Dugaboy Investment Trust's exhibits are admitted into

12     evidence.)

13             THE COURT:  And Daugherty's exhibits?

14             MR. YORK:  Yes, Your Honor.  So, Mr. Morris and I

15     conferred yesterday about both sides' exhibits.  And my

16     understanding is we've reached an agreement that both sides'

17     exhibits are not objected to.  And so therefore we'd move to

18     admit Daugherty's as well.

19             THE COURT:  All right.

20             MR. YORK:  1 through 42, I believe, it is.

21             THE COURT:  All right.  So you confirm?

22             MR. MORRIS:  Yes, Your Honor.

23             THE COURT:  All right.  The Court will admit all of

24     Daugherty's 1 through 42, and they appear at Docket Entry

25     4266.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 11   Main Document   Filed 07/02/25   Page 243 of 266   Page 97 of 443   PageID 4761

48

1       (Patrick Daugherty's Exhibits 1 through 42 are admitted

2   into evidence.)

3           THE COURT:  All right.  Opening statements.

4         OPENING STATEMENT ON BEHALF OF THE CLAIMANT TRUST

5           MR. MORRIS:  All right.  Good morning, Your Honor.

6   John Morris; Pachulski Stang Ziehl & Jones; for Highland

7   Capital Management, LP and the Highland Claimant Trust.

8       If we can go to the first slide, Your Honor.  This is a

9   9019 motion.  It's not a terribly high bar.  What the Movant

10  has to show here is that the settlement agreement was the

11  product of arm's-length, good-faith negotiations, and

12  effectively that it's in the best interests of its

13  stakeholders.

14          THE COURT:  Did you want this put on the screen, or

15  does everyone have a hard copy?

16          MR. MORRIS:  Counsel have a hard copy.

17          THE COURT:  Oh, okay.

18          MR. MORRIS:  Yeah.  The evidence is going to show,

19  and there really is no dispute, that the settlement agreement

20  is the product of arm's-length, good-faith negotiations.  Mr.

21  Seery is going to testify that the negotiations began in late

22  March and they concluded on May 19th.  Exhibits 2 through 57,

23  with the exception of the one or two I just withdrew, reflect

24  the parties' negotiations.  Mr. Seery is going to testify that

25  the negotiations were conducted by Zoom, by phone call, there

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 8   Main Document   Filed 06/30/25   Page 425 of 266   Page 98 of 443   PageID 4762

49

1   was one in-person meeting, there was many, many email

2   exchanges that are reflected in the exhibits.

3        Mr. Seery is going to testify about the substance of the

4   negotiations at a high level.  Originally, we had sought to

5   have one agreement with Hunter Mountain and the DAF entities.

6   Mr. Patrick was not comfortable with that.  He wanted to run

7   them separately.  And there was a DAF agreement that was

8   ultimately entered into but that nobody believed required

9   court approval.

10        So, once that got completed and one of the Fifth Circuit

11   appeals got dismissed as a result, we moved to the Hunter

12   Mountain discussions.  Those discussions were robust.  There

13   were issues about the timing of the effectiveness of certain

14   of the benefits under the proposed agreement.  Highland wanted

15   the releases, for example, to be effective upon signing.  Mr.

16   Patrick was unwilling to agree to anything without this

17   Court's approval.

18        So there were changes that were made over time in terms of

19   the timing of the transfer of the consideration.  There were

20   discussions and negotiations and bids and asks about the

21   amounts that would be paid, when they would be paid, the

22   circumstances under -- that they would be paid.  There was an

23   enormous amount of information that was exchanged pursuant to

24   a confidentiality agreement that now became public because

25   it's relevant to the Debtors' burden or the Claimant Trust's

1    burden to carry the day here.

2        That information included claims information, the trust

3    agreement itself, budgets, asset/liability valuation

4    information, forecasted expenses, because HMIT rightly

5    wondered, you know, what's going to happen to the money?  Is

6    it going to be gone before it got its agreed-upon share?  So,

7    you know, there will be, I think, indisputable evidence at the

8    end of the day that the settlement is the product of arm's-

9    length, good-faith negotiations.

10        If we move to the next slide, the evidence will also show

11    that the proposed settlement is indisputably in the best

12    interest of the Highland entities and their stakeholders.

13    Upon court approval, all of the pending litigation that Your

14    Honor identified earlier will be dismissed with prejudice,

15    thereby greatly reducing litigation risk and attendant costs.

16        The stakeholders will also benefit from the allowance of

17    the HMIT claim at a fixed amount of $337 million.  And we will

18    explain -- Mr. Seery will explain to the Court how that number

19    was arrived at.

20        The estates and their stakeholders will also benefit

21    because, under the proposed settlement, as I indicated

22    earlier, Highland will be able to monetize or otherwise

23    dispose of a number of illiquid assets, including the Dugaboy

24    Note and the estate claims in the Kirschner Litigation.  And

25    perhaps most importantly to the estate, we are getting very,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 1-36   Filed 10/22/25   Page 100 of 443   PageID 4764
Main Document   Page 51 of 266

51

1   very broad what we refer to as litigation protections from all

2   of the Hunter Mountain entities.  It includes not only a

3   release but a covenant not to sue as well as, you know, we

4   could go through it, but -- but we believe that even if Mr.

5   Dondero or somebody else obtains control of Hunter Mountain,

6   unless somebody sets aside this agreement, those protections

7   are going to inure to the benefit of the Trusts, the Indemnity

8   Trust and all of its stakeholders until the end of time, and

9   nobody is ever going to be able to set this agreement aside

10  because it was negotiated in good faith, it was the product of

11  arm's-length negotiations, and it's fair and reasonable to

12  both sides.

13       So those litigation protections are paramount and they

14  provide another indicator of the benefits that the Claimant

15  Trust is going to receive.

16       The next slide, Your Honor, is a demonstrative exhibit,

17  although, as always, we have citations to the very specific

18  documents that are now in the record.  Mr. Seery will describe

19  for you at a high level how the allowed claim of HMIT was

20  calculated, and it's really just based on the limited

21  partners' capital accounts as of the petition date.  And I'll

22  just leave it at that for the moment.  There's no magic to it.

23  It's objectively reasonable.  It's mathematics.  There's

24  really no subjectivity that I'm aware of that goes into this.

25  It's just, hey, let's look at the tax returns, let's look at

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-6   Main Document   Filed 07/25/25   Page 101 of 443   Page 52 of 266   PageID 4765

52

1    the financial statements, and let's look at the partnership

2    agreement, and let's see how the capital account was

3    structured as of the petition date.  And that's how you get

4    to, really, $396 million less the amount of the Dugaboy Note.

5    I mean, the HMIT note.

6        The next slide.  With the settlement, the transfer of the

7    Kirschner Litigation is in the best interests of the Movants.

8    I think Mr. Daugherty somehow suggests that really the best

9    thing to do would be to prosecute that litigation.  We

10   respectfully disagree.  In the Debtors' business -- in the

11   Claimant Trust's business judgment, that would be exactly the

12   wrong thing to do when you are settling with HMIT.

13       And why is that?  When we commenced the Kirschner

14   Litigation a number of years ago, the Kirschner Litigation

15   represented a potential source of funding for indemnification

16   expenses, and at that time, for the payment in full to

17   creditors.

18       By 2023, 2024, with the success of the Highland team's

19   monetization of assets, the need to pursue and monetize the

20   Kirschner claims became less clear, so we put it on ice.  And

21   we voluntarily stayed the litigation to conserve resources.

22       The settlement with HMIT changes everything.  The claims

23   are as valid today as they were yesterday, as they were before

24   we signed the agreement, as they were when we commenced the

25   action.  But they have very different value to Highland when

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-6   Filed 10/02/25   Page 102 of 443   PageID 4766

53

1   you're settling with HMIT.  And that's why we're prepared to

2   transfer the claims today.

3       Why?  Because at this point, unlike when we commenced the

4   action, Class 8 has been paid in full except for Mr.

5   Daugherty's fully-reserved claim, right, in an amount that he

6   agreed to for years and that he ratified and reaffirmed three

7   different times in three different stipulations.  That's the

8   only thing that remains in Class 8.

9            THE COURT:  And remind me of the dollar amounts on

10  reserve.

11           MR. MORRIS:  It's approximately $2.5 million.  I can

12  --

13           THE COURT:  Okay.

14           MR. MORRIS:  It's -- the dollar amount is

15  specifically set forth --

16       (Pause.)

17           MR. MORRIS:  It would be, I believe, in Exhibit 60,

18  --

19           THE COURT:  Okay.

20           MR. MORRIS:  -- is the original tolling agreement.

21  And in Paragraph 1 it has the very specific dollar amount.

22  And then in Exhibits 62, 63 -- 61, 62, and 63, those are

23  amendments to the tolling agreement that fully incorporated

24  the original tolling agreement, including the reserve amount.

25  So that amount has been there for years.  Nobody has ever said

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 1    Main Document Filed 07/02/25    Page 54 of 266    Page 103 of 443    PageID 4767

54

1    anything about it.  Nobody has ever tried to adjust it.

2    Nobody has ever identified a change in circumstances that

3    would suggest a change was appropriate.  But here we are.

4        So, why is it different and why does the Kirschner

5    Litigation not have so much value to us when we're settling

6    with Class 11?  Because Class 8 has been paid in full.  Class

7    9 has been paid 80 percent.  If the HMIT settlement is

8    approved, it will receive another 10 percent.  So that all

9    that remains is 10 percent of the Class 9s.

10       And most importantly, Your Honor, with the settlement with

11   HMIT and the Claimant Trust's receipt of the litigation

12   protections, the need for indemnification expenses is going to

13   be greatly reduced.  We can give the money where it belongs

14   because all we'll have left is Mr. Dondero and Dugaboy.  It

15   really will literally be the only thing.  And we need a lot to

16   deal with that, but not as much as we needed when we had to

17   deal with them and HMIT.

18       And at the end of the day, once you're settling with HMIT,

19   prosecution of the claims would only benefit HMIT, so why

20   should we undertake the expense of doing that?

21       Is that clear to Your Honor?

22            THE COURT:  It is.

23            MR. MORRIS:  It is?  So, it's -- this has nothing to

24   do -- and you're going to hear questions of Mr. Seery, did you

25   value the Kirschner claims?  Are you giving them away for

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10   Main Document   Filed 02/55 of 266 Page 104 of 443   PageID 4768   Page 55 of 266

55

1   free?  No, we didn't value them, because once you're settling

2   with HMIT it doesn't really matter.  Once you have the

3   litigation protections, once you know that HMIT is never going

4   to be an adversary of yours, the monetization of the Kirschner

5   claims would insure to their benefit because they will have an

6   allowed claim of $330 million.  So even if we sued and even if

7   we got a hundred million dollars, that's going to go to them.

8   Why would we pick up the tab today?  A very different scenario

9   than when we prosecuted the case, when the case was commenced.

10      So, really, really, in the estate's best interest to get

11  value for those claims.  The value is reflected in the

12  totality of the agreement.  The Court really should look at

13  the body of the consideration that's being received, including

14  the litigation protections.

15      If we can go to the next slide, Your Honor.  As long as

16  we're on the topic of Mr. Patrick's authority, Mr. Seery is

17  going to testify to the work that he did to satisfy himself

18  that Mr. Patrick was duly authorized to act on behalf of each

19  of the HMIT entities in this case.

20      The next slide here shows an excerpt from the Hunter

21  Mountain Trust Agreement.  It's Paragraph 7.  And it says,

22  among other things, the Administrator -- who is Mark Patrick

23  -- shall be duly authorized, from time to time, in his sole

24  discretion, to manage the business and affairs of the Trust.

25      It continues by saying that the Administrator, Mr.

004350

1    Patrick, shall also have the power to settle, compromise,

2    submit to arbitration, or to submit to any court having

3    jurisdiction in any matter, any matters that are in dispute.

4        So, you know, this is just one document.  It's the Hunter

5    Mountain document.  We focus on the Hunter Mountain document

6    because that's the only one of the HMIT entities that has a

7    stake in the Claimant Trust.  But, again, Your Honor, if you

8    just -- Mr. Seery will, at a high level, confirm that Exhibits

9    70 through 104 are documents that definitively establish that

10   Mr. Patrick has the authority to enter into each of these

11   agreements on behalf of the HMIT entities.

12       Not only that, but he will describe, if asked by you or

13   anybody cross-examining him, why nobody has the ability to

14   interfere with the effectuation of his authority.  He doesn't

15   have to get anybody's consent.  He doesn't have to -- right?

16   This is all just crystal clear.  And whatever entity far up

17   the chain may exist, Your Honor should just think of as a

18   shareholder.  And if Coca-Cola came in here and they wanted to

19   do a 9019 motion, a shareholder can't come in and stop Coca-

20   Cola from doing that.  If they don't like what Coca-Cola is

21   doing, go file a derivative suit.  Go sue Coca-Cola in another

22   court at another time.  Not that I'm inviting litigation

23   against Mr. Patrick, but by analogy, this is what we're

24   talking about.

25       There is no restriction on Mr. Patrick's authority.  The

004351

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10   Main Document   Filed 10/02/25   Page 257 of 266   Page 106 of 443   PageID 4770

57

1    settlement is fair and reasonable.  He has authority under the

2    governing documents to do what he has done here, and that is

3    act in the best interests of the HMIT entities.  And so this

4    is just one page.  Mr. Seery will explain, you know, just the

5    work that he's done to satisfy himself.

6        The next slide, Your Honor, there's objections about how

7    somehow the settlement agreement violates the plan or the

8    absolute priority rule, all of that.  It's not accurate.  I'll

9    just leave it at that in terms of how I characterize it.

10       The next slide is excerpts of -- I think it's the plan of

11   reorganization, Your Honor.  And I think we admitted the plan

12   last night.  That's Exhibit 126.  And they're -- these

13   excerpts are really important because what they show is that

14   Classes 9 and 10 have the indisputable right to accept less

15   favorable treatment.  And that's what they've done.  Okay?

16   And I think it's Article III, Section H, Subparts 9 and 10.

17   Holders of Class 9 and 10 interests have the right to accept

18   less favorable treatment.

19       And if we can go to the next slide, I'll just briefly

20   describe the less favorable treatment that these stakeholders

21   have in fact accepted.  As permitted by the plan, holders of

22   Class 9 claims consented to the payment in full of Mr.

23   Daugherty's Class 9 claim and the Class 10 distributions, in

24   accordance with the settlement agreement, before their Class 9

25   claim is paid in full.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Document Filed 1202/25 of 266 ge 107 of 443   PageID 4771

58

1          And that's Exhibit 59.  It may be among the most important

2     documents that have been admitted this morning.  Exhibit 59 is

3     the consent of the Class 9 holders other than Mr. Daugherty to

4     accept lesser treatment.

5          So there's no violation of the plan at all.  HMIT is also

6     accepting less favorable treatment than it might otherwise be

7     entitled to if it ever successfully prosecuted its claim.  It

8     has less favorable treatment because it's agreeing that it's

9     not a Claimant Trust beneficiary, that its rights are limited

10    to the rights that are given to it under the settlement

11    agreement and nowhere else.  It's accepting less favorable

12    treatment because it's agreeing that the Highland entities owe

13    no duty of any kind to any HMIT entity except as provided for

14    in the settlement agreement.  It's accepting restrictions on

15    its ability to transfer its Class 10 interests -- more less-

16    favorable treatment -- as a condition to the first and second

17    distributions.  They have agreed that they are subject to Mr.

18    Seery's determination that the Highland entities are not at

19    that time under any Threat.  "Threat" is a defined term, and

20    it has to do with litigation.

21         And so if Mr. Seery, in his sole discretion, believes that

22    he needs to conserve resources because he remains years in the

23    future under threat of litigation, he's not going to make the

24    payments to HMIT, and HMIT is okay with that because they

25    understand.

004353

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 1   Main Document   Filed 12/29/25   Page 108 of 266   Page 108 of 443   PageID 4772

59

1        And, of course, in the end, they're accepting less

2   favorable treatment because they're granting to the Claimant

3   Trust the litigation protections.

4        All stakeholders have been paid in full except for the 10

5   percent of Class 9 and Mr. Daugherty's Class 8 claim.  That

6   claim is the subject of an objection, and as I just walked

7   Your Honor through, it has been fully reserved in an agreed-

8   upon amount for years.

9        There was some questioning during Mr. Seery's -- one of

10  Mr. Seery's I think three depositions in the last week --

11  about why he didn't offer Mr. Daugherty the same treatment

12  that he offered to the other Class 9 holders because Mr.

13  Daugherty had about an $800,000 Class 9 claim.  Your Honor

14  will see in Exhibit 58 that that claim was paid in full, and

15  Mr. Seery will explain that he found negotiating with Mr.

16  Patrick to be difficult, number one.  And number two, it was

17  an amount of money that the estate could afford.  And so the

18  other Class 9 claims are substantially bigger, so rather than

19  going through the process of attempting to negotiate with Mr.

20  Daugherty, he just paid it in full.  The Claimant Trust had

21  every right to do that.  And Mr. Daugherty should not be heard

22  to complain that he actually got everything that he could have

23  ever been entitled to.

24            THE COURT:  And --

25            MR. MORRIS:  Uh-huh?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10   Main Document   Filed 02/05   Page 102 of 266   Page 109 of 443   PageID 4773

60

|    |                                                                 |
|----|-----------------------------------------------------------------|
| 1  | THE COURT:  I don't mean to get you off-track.                  |
| 2  | MR. MORRIS:  That's all right.                                  |
| 3  | THE COURT:  But Class 9 claimants, I'm trying to                |
| 4  | remember who else was in that class.  Was it a UBS --           |
| 5  | MR. MORRIS:  UBS.                                                |
| 6  | THE COURT:  -- claim?                                           |
| 7  | MR. MORRIS:  Exactly right.                                     |
| 8  | THE COURT:  Okay.                                               |
| 9  | MR. MORRIS:  And then affiliates of Stonehill and               |
| 10 | Farallon.                                                       |
| 11 | THE COURT:  Okay.                                               |
| 12 | MR. MORRIS:  Because they had purchased --                      |
| 13 | THE COURT:  They had Class 9 --                                 |
| 14 | MR. MORRIS:  They had purchased originally I think it           |
| 15 | was Josh Terry, and the Redeemer Committee may have had a       |
| 16 | piece.  No, no.  No, no, no.  HarbourVest.  HarbourVest had a   |
| 17 | piece.  Right?  So, HarbourVest sold their claim, including     |
| 18 | the Class 9 claim.  Josh Terry sold his claim, including his    |
| 19 | Class 9 claim.  Then there's UBS, who still holds a piece of    |
| 20 | their claim, and Mr. Daugherty.  So, UBS, if you look at        |
| 21 | Exhibit 59, you'll see the signatures of UBS and the           |
| 22 | affiliates of Stonehill and Farallon, who all agreed to accept  |
| 23 | lesser treatment.                                               |
| 24 | THE COURT:  Okay.                                               |
| 25 | MR. MORRIS:  So, at the end of the day, Your Honor,             |

004355

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 16   Main Document   Filed 07/02/25   Page 65 of 266   Page 110 of 443   PageID 4774

61

1   the last slide is a slide that I didn't intend to present,

2   frankly, because I didn't ever believe that there was going to

3   be a challenge to authority by anybody other than The Dallas

4   Foundation.  But as long as we have it attached, we might as

5   well see it.

6        As you can see, Your Honor, in the lower right-hand

7   corner, you can see Hunter Mountain is owned by Beacon

8   Mountain, which is owned by CLO Holdco.  Like, there is no --

9   and Mr. Patrick controls it.  And it's really on the other

10  side of the ledger, in the DAF house, so to speak, that any of

11  The Dallas Foundation got interested.

12       Dugaboy is not even on here, by the way.  Like, Dugaboy is

13  nobody.  The people in here who are now going to challenge the

14  authority of Mr. Patrick, no, not on here.  And they're going

15  to do it, they're going to do it without ever having given us

16  notice.

17       I know Your Honor made your ruling and we'll deal with it,

18  but I don't know if Your Honor was aware of this:  They're not

19  on here.

20       Your Honor, at the end of the day, this is a really,

21  really easy call to make from our perspective.  We have been

22  waiting for this moment for years.  Finally, a responsible

23  person understands that the way to preserve value is to put

24  the sword down.

25       Mr. Patrick, I don't know what happened between him and

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document Document Filed 06/02/25 of 286ge 111 of 443    PageID 4775

62

```
 1   Mr. Dondero.  I don't care.  I have no knowledge of that.  But

 2   clearly he is exercising independence.  And that's why we're

 3   here, because we finally have somebody who says, you know

 4   what, give me everything I can possibly get and I will stop

 5   fighting.  I wish other people would say that, because then

 6   this case would be over.  Then the case would really be over.

 7        But getting to a settlement with the Class 10 interest

 8   holder who is going to have an allowed claim of $337 million,

 9   such that any value in the future is going to go to HMIT, I

10   hope that that -- you know, this is an easy call to make, Your

11   Honor.

12        I have nothing further at this time, but I look forward to

13   putting Mr. Seery on the stand and making sure that Your Honor

14   has, you know, an adequate, sufficient, overwhelming basis,

15   frankly, to approve this motion.

16             THE COURT:  Okay.  I don't mean to stifle you, but --

17             MR. MORRIS:  Yeah.

18             THE COURT:  -- anything more for an opening

19   statement?  Mr. Phillips, I'm doing friendlies and then

20   friendlies.

21     OPENING STATEMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

22             MR. PHILLIPS:  Your Honor, just briefly.  Louis M.

23   Phillips on behalf of the Hunter Mountain entities.

24        We fully embrace and concur with everything that Mr.

25   Morris has told the Court.  From our perspective, and the
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10   Main Document   Filed 06/26/25   Page 112 of 266   Page 112 of 443   PageID 4776

63

1   reason that -- and you'll see, the documents include all of

2   the back and forth -- we required the Court approval before

3   the effectiveness of any releases, litigation protections, et

4   cetera, for exactly the reason that we needed the Class 9 to

5   agree.  And we obtained -- the Highland entities obtained the

6   approval of the Class 9 creditors to our treatment, and I

7   think that the bona fides of this settlement and the value of

8   the settlement and our -- what we are giving in the settlement

9   is, I think, established beyond even the slightest bit of

10  question by the fact that the Class 9 creditors and the

11  Oversight Board of the Claimant Trust all agreed that it was

12  important enough to the estate to get this settlement with

13  Hunter Mountain Investment Trust that they agreed to allow

14  Hunter Mountain Investment Trust to receive the money set

15  forth in the settlement upon the approval.  And we have agreed

16  that, notwithstanding appeal rights of some people who really

17  don't have the right to be here, but that's going to be

18  determined by Your Honor, we're not worried about that.  We

19  are giving our releases.  And the releases are effective upon

20  approval by this Court.  We are not requiring any type of

21  final unappealable order that doesn't -- that waits for years

22  before the releases are effective.

23        Very importantly, it seems to me, from Your Honor's

24  perspective, and I'm reluctant to suggest that I know about

25  that, but our releases are given upon the approval by this

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Document Filed 02/24 of 286ge 113 of 443   PageID 4777

64

1   Court of the settlement.  They're not -- if the settlement is

2   reversed on appeal, our releases stay.

3       So the Class 9s that are above the Class 10 have voted,

4   and they have approved, and Mr. Seery is going to testify

5   about that.  And we think that in and of itself is a

6   monumental accomplishment.  And we appreciate everything Mr.

7   Morris has said.  We agree with everything Mr. Morris has

8   said.  We agree with everything Mr. Morris has said about the

9   absence of true objection.  We agree with everything Mr.

10  Morris has said about the fallacy of suggesting that Mr. Seery

11  had to value the Hunter Mountain -- the Kirschner Litigation

12  proceeds, of which would come to us.

13      The idea that we need to worry about how much Mr. Dondero

14  entities can pay in connection with the Kirschner Litigation

15  so that we could value the Kirschner Litigation based on what

16  Mr. Dondero can pay, so that to suffice with an objection by

17  Dugaboy maybe that there was no value given.  I mean, that's

18  all backwards.  Value was given as described by Mr. Morris and

19  will be established by the evidence submitted by Mr. Seery's

20  testimony and the documents that are already in evidence.

21      And that is it from our standpoint, Your Honor.  Thank

22  you.

23          THE COURT:  Thank you.  All right.  I'll hear from

24  the Objectors.  Daugherty's counsel, are you going to go

25  first?

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 1-1    Main Document    Filed 02/25    Page 114 of 443    Page 114 of 266    PageID 4778

65

OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

1

2          MR. YORK:  Thank you, Your Honor.  If I may approach.

3          THE COURT:  You may.

4          MR. YORK:  Good morning, Your Honor.  Drew York on

5   behalf of Mr. Daugherty.

6       We're here today regarding the 9019 and Mr. Daugherty's

7   objection.  The 9019 motion should be denied.  If you turn to

8   the third slide in there, we say that Highland -- Highland,

9   I'm referring to Highland collectively for the Movants --

10  attempts to put the cart before the horse.  So really what's

11  going on here, Your Honor, is we're just asking the Court to

12  follow the rules of the road that it set forth in the plan,

13  the confirmation order, and, frankly, even Highland to follow

14  the terms of the settlement agreement it entered into with Mr.

15  Daugherty.

16      None of that is happening here as a result of this

17  proposed settlement that's being presented to you today for

18  consideration.

19      The first problem with the motion and the proposed

20  settlement is that it violates the absolute priority rule, it

21  violates the express terms of the Court's plan, the

22  confirmation order, as well as the Claimant Trust Agreement,

23  because it attempts to fund the contingent Class 10 claims

24  without first resolving, let alone satisfying, Mr. Daugherty's

25  remaining Class 8 claim.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 10    Main Document    Filed 02/05    Page 115 of 443    Page 115 of 266    PageID 4779

66

1          And then, secondly, the settlement agreement does not

2     satisfy the *Jackson Brewing* factors because it prioritizes the

3     HMIT insiders over the estate creditors, including Mr.

4     Daugherty, and it forfeits potential recovery that would go to

5     the benefit of those to creditors to appease litigation

6     pressure.

7          So, first, I'm going to talk about why the settlement

8     violates the plan, the confirmation order, and the Trust

9     Agreement.

10         As everyone is aware, the HMIT entities are asserting a

11    Class 10 claim.

12         If you turn to the next page, as Mr. Morris has

13    acknowledged and admitted here today, Mr. Daugherty has a

14    remaining Class 8 claim.  And, importantly, Your Honor,

15    because Mr. Morris and Highland continue to argue that that

16    claim is fully reserved, I would point out that in the

17    settlement agreement between Mr. Daugherty and Highland the

18    parties characterized that claim as a contingent unliquidated

19    claim.  A contingent unliquidated claim.  And in fact, they

20    went so far, Highland did, in its adversary complaint on the

21    next slide, Your Honor, to again refer to it as an

22    unliquidated and contingent claim that is dependent on the

23    final outcome of the 2008 audit, including the magnitude of

24    any adjustments.

25         And so Highland cannot come into this courtroom and on the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document Document Filed Page 266 of 266 Page 116 of 443   PageID 4780

67

1   one hand argue that that claim is fully reserved, and at the

2   same time admit that it is a contingent unliquidated claim

3   that is subject to a myriad of adjustments depending upon the

4   outcome of that audit.

5       And in reality, when you look at the tolling agreement,

6   there is nothing that the parties said that that was a fully

7   reserved claim at all.  That's simply not what they agreed to.

8   They just simply put a number in there, which was put into the

9   reserve account at the time.  But it did not constitute a

10  fully reserved claim at all.

11      Nor has Highland pointed to anything -- in the plan, the

12  confirmation order, or the Claimant Trust Agreement -- that

13  allows Highland to come in and violate those documents by

14  simply saying that we fully reserved for Mr. Daugherty's

15  claim.

16          THE COURT:  Okay.  Well, we're going to hear the

17  evidence, but as I understood it, it was an agreed reserved

18  amount.  And I asked earlier, was it $2.5 million or -- I feel

19  like it was an agreed amount plus even some interest,

20  acknowledging there might be time.  I don't remember every

21  detail from this case, but I'm just telling you that's what my

22  memory is.  Am I correct?

23          MR. YORK:  The --

24          THE COURT:  Mr. Daugherty agreed, here's what we'll

25  agree is enough to set aside for our ultimately potentially

004362

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 1-06    Filed 1-02/25 of 206    Page 117 of 443    PageID 4781
Main Document    Page 65 of 206

68

1    allowed claim, *x* amount plus interest?  Can you confirm?

2    MR. YORK:  What the tolling agreement provides is

3    that Mr. Daugherty agreed to provide the tolling of the

4    objection deadline.  Okay.  And Highland then agreed to put

5    $2.56 million into the reserve.

6    And what the footnote says in the tolling agreement,

7    Exhibit 60, is that the estimated amount of that claim as of

8    -- and let's be clear about this -- as of October 23rd of

9    2020, was $2.56 million and change.  And that's it.  And I'm

10    happy to have my colleague, Mr. Smeltzer, who is a tax

11    attorney and deals with these issues all the time, can come up

12    and explain why, at the end of the day, this is still a

13    contingent unliquidated claim and it's subject to a myriad of

14    factors that make it that that amount that Highland has set

15    aside is not necessarily going to be a fully-reserved amount.

16    That is why the parties have -- had called it both in the

17    settlement agreement and the tolling agreement, and Highland

18    has continued to call it -- characterize it in its adversary

19    complaint as a contingent unliquidated claim.  So --

20    THE COURT:  Okay.  It's hard to wrap my brain around

21    it.  It's a claim that I understood really couldn't be

22    liquidated with certainty until this potential audit of 2008

23    is final, and there was some discussion of how close to it

24    being final was it.  But I guess -- well, I don't know where

25    I'm going here except to say this could be a contingent

1    unliquidated claim for a -- you know, it's already, what, 17

2    years?

3             MR. YORK:  Based -- from when the tax return was

4    filed?  I think that's correct, Your Honor.

5             THE COURT:  Okay.  Well, this is what the adversary

6    is about, right?  I guess they're finally saying it should be

7    estimated, liquidated, pursuant to the Bankruptcy Code and

8    we'll be done.

9             MR. YORK:  Correct.  In violation of the terms of the

10   settlement agreement between Mr. Daugherty and Highland.  Yes,

11   that's --

12            THE COURT:  Wait.  Wait.  What?

13            MR. YORK:  So, the settlement agreement between

14   Daugherty and Mr. Highland provides --

15            THE COURT:  Mr. Highland?

16            MR. YORK:  I'm sorry.  I apologize.  Between Mr.

17   Daugherty and Highland --

18            THE COURT:  Uh-huh.

19            MR. YORK:  -- provides that the -- as long as the IRS

20   audit has not had a final -- there's not a final

21   determination, --

22            THE COURT:  Uh-huh.

23            MR. YORK:  -- then any litigation concerning the

24   validity or the amount of Mr. Daugherty's claim is stayed and

25   cannot be brought before the Court.  And that's exactly what

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 10    Filed 10/02/25    Page 119 of 443    PageID 4783
Main Document    Page 120 of 266

70

1  their adversary complaint did, which is -- because they admit

2  in their adversary complaint --

3          THE COURT:  Well, okay.  I won't pursue this anymore.

4  But what's an estate to do?  They're getting criticized for

5  the Trust going on too long.  Not by your client, but -- and

6  meanwhile you want, I mean, 2032, are we still going to be

7  waiting on the IRS?

8          MR. YORK:  I don't know because we don't have any

9  insight into what the IRS audit is.

10         THE COURT:  Well, it's been 17 years.

11         MR. YORK:  I understand, Your Honor.

12         THE COURT:  So, --

13         MR. YORK:  But the bottom line is this.  The plan --

14  that Highland entered into the terms of that settlement

15  agreement.

16         THE COURT:  I'm going to say it right now.  I'm not

17  keeping this estate open until 2032.  I just, I was --

18         MR. YORK:  I presume that --

19         THE COURT:  -- kind of flippantly throwing that out

20  there.

21         MR. YORK:  And --

22         THE COURT:  But this happens in bankruptcy cases a

23  lot, where you've got a contingent unliquidated claim, and

24  there are provisions in the Bankruptcy Code to say what can be

25  done in that scenario.  The Court can estimate or liquidate.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-6   Filed 02/02/25   Page 120 of 443   PageID 4784
Main Document    Page 120 of 266

71

1          MR. YORK:  Understood.  Your point to me was --

2     before was that's why Highland brought the adversary

3     complaint, and I was simply pointing out that, pursuant to the

4     express terms of the agreement that Highland reached with Mr.

5     Daugherty, Highland was -- is not allowed to bring the

6     adversary complaint to challenge the validity or amount of Mr.

7     Daugherty's claim so long as the IRS audit has not been -- had

8     a final determination.  That's exactly what's going on here

9     with the adversary complaint that they have filed.

10          THE COURT:  Okay.

11          MR. YORK:  Okay.  So I think Your Honor is familiar

12     with the terms of the plan, the Fifth Amended Plan and the

13     subordination.  But specifically we have two issues.  One

14     begins with the Claimant Trust Agreement in Section 5.1(c),

15     which provides that the equity holders shall not have any

16     rights under the agreement unless and until the Claimant

17     Trustee files with the Bankruptcy Court a certification that

18     all of general unsecured creditor beneficiaries have been paid

19     indefeasibly, in full, including, to the extent applicable,

20     all accrued and unpaid postpetition interest, consistent with

21     the plan, and all disputed claims have been resolved.

22        That has not happened here and it cannot happen because,

23     for one, Mr. Daugherty's unresolved Class 8 claim, and also

24     the remaining Class 9 claims, as I think you'll hear from Mr.

25     Seery.  And so there are no rights that can be given to the

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-02724-L Document Document Filed 122/25 of 286ge 121 of 443 PageID 4785

72

1    HMIT entities pursuant to -- as a Class 10 holder, an allowed

2    Class 10 holder, pursuant to the Claimant Trust Agreement. So

3    the proposed settlement violates the Claimant Trust

4    Agreement's express terms.

5        It also violates the Court's confirmation order that was

6    entered at -- specifically on Page 45 of the order, in

7    Subparagraph (a): The holders of the equity interests --

8    which would be the Class 10 and Class 11 equity interests --

9    that are junior to the claims in Class 8 and Class 9 will not

10   receive or retain under the plan, on account of such junior

11   claim interest, any property, unless and until the claims --

12   the claims, not the allowed claims, but the claims -- in Class

13   8 and Class 9 are paid in full, plus applicable interest.

14       That's exactly what the settlement that is proposed here

15   is designed to do.

16       And if you turn two pages in, you'll see that in addition

17   to the assignment of the Kirschner claims, what we're also

18   having under this proposed settlement are interim cash

19   distributions that would be made to the HMIT entities, interim

20   cash distributions that theoretically could be made before the

21   resolution of Mr. Daugherty's Class 8 claim, which would be in

22   violation of the plan, the Claimant Trust Agreement, and the

23   confirmation order.

24       And that is, as best as they put in their agreement,

25   that's approximately $23 million in cash that would be paid

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-6   Filed 09/23/25   Page 122 of 443   PageID 4786

73

1    out theoretically in those interim distributions.

2         One of the things that Mr. Morris said in his opening was

3    that they did not -- Mr. Seery did not negotiate with Mr.

4    Daugherty because he was difficult to deal with.  Well, that's

5    surprising, Your Honor, considering, on the other hand, Mr.

6    Morris says to the Court that there were repeated tolling

7    agreements or amendments to the tolling agreement that were

8    entered into by Mr. Daugherty willingly and voluntarily to

9    benefit Highland.

10        And what really happened when Mr. Morris says that there

11   were good-faith arm's-length negotiations, well, there may

12   have been good-faith, arm's-length negotiations between the

13   HMIT entities and Highland, but what happened here was that

14   Highland actually sought to ice out Mr. Daugherty from all of

15   this completely.

16        And how did that happen?  Well, the evidence is going to

17   show that Highland reached out to the other Class 9 creditors

18   over a month in advance of the motion being filed, sought

19   their consent to the proposed settlement, told them that Mr.

20   Daugherty was not going to be a part of it, told them that Mr.

21   Daugherty's Class 8 claim was going to have an adversary

22   complaint filed against it, told them that once that adversary

23   complaint was granted and the claim was disallowed, then those

24   funds would waterfall down to Class 9, so the Class 9

25   creditors would get that -- those funds that theoretically are

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 12   Main Document   Filed 02/25   Page 123 of 443   Page 123 of 266   PageID 4787

74

1    part of Mr. Daugherty's Class 8 claim.

2        So at no point in time prior to the filing of the

3    adversary proceeding, or even prior to the filing of the

4    motion for approval of this proposed settlement, did Highland

5    ever contact Mr. Daugherty to attempt to discuss any of this,

6    because they simply wanted to ice him out.

7            THE COURT:  Okay.  I'm going to hear evidence.  I

8    don't mean to cut you off, but --

9            MR. YORK:  Sure.

10           THE COURT:  -- I was told that Mr. Daugherty was paid

11   $800,000 --

12           MR. YORK:  With respect to his --

13           THE COURT:  -- on his Class 9 claim.

14           MR. YORK:  Correct.

15           THE COURT:  Is that not true?

16           MR. YORK:  So, the day --

17           THE COURT:  Is that true?

18           MR. YORK:  It is true.  The day after the motion for

19   entry of the proposed settlement was filed, Mr. Demo sent a

20   letter to my office that was a payoff --

21           THE COURT:  I just wanted to -- I don't need to know

22   every detail.

23           MR. YORK:  Yes.  Sure.

24           THE COURT:  Has he been paid?

25           MR. YORK:  His Class 9 claim was paid in full the day

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document Document Filed 02/25 of 266ge 124 of 443   PageID 4788

75

1    after the proposed settlement was filed.

2          THE COURT:  Okay.  So what is the asserted amount of

3    his Class 8 claim?

4          MR. YORK:  We -- again, both sides do not know

5    because they do not have --

6          THE COURT:  What was the asserted amount in the proof

7    of claim that's been reserved for, the Class 8 proof of claim?

8    What was the asserted amount?

9          MR. YORK:  It was listed as contingent unliquidated.

10    And as I understood it, and Your Honor --

11          MR. MORRIS:  No.  I think it's approximately $1.7

12    million, Your Honor.

13          MR. DAUGHERTY:  That's not true.

14          THE COURT:  $1.7 million?

15          MR. DAUGHERTY:  No.

16          THE COURT:  I would look it up, but I don't know if

17    we --

18          MR. DAUGHERTY:  Your Honor, I'll tell you.  It was

19    like $1.45 million, and then the interest to October, which

20    was like another $1.3 million.  I'm estimating it.  But the

21    total is around $2.6 million, $2.7 million at October/November

22    2020.  Up to that point.

23          THE COURT:  Okay.  Well, that's kind of a weird

24    process here for an opening statement.  But I'm asking

25    because, you know, I always try to stray people into let's be

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 10-6    Filed 02/26/26    Page 125 of 443    PageID 4789
Main Document    Page 125 of 286

76

1    pragmatic whenever I can.  And a pragmatic approach here might

2    have been, if your client didn't think the reserve was big

3    enough, you all could have a discussion about, oh, instead of

4    $2.56 million, it now should, I don't know, $3 million,

5    whatever you say the number is.  And there could have been a

6    give and take, instead of all these people showing up in the

7    court and having an all-day hearing.

8        So I'm just trying to understand that.  And you're saying,

9    okay, violation of the absolute priority, when your client

10   took a full payment on his Class 9 claim without Class 8 being

11   quite paid in full.  I'm just trying to be pragmatic here.

12   What would it take to make Mr. Daugherty happy?  Again, that's

13   just the bankruptcy judge speaking on Chapter 11 world that's

14   trying to get to a pragmatic result.

15           MR. YORK:  We're happy to have that discussion with

16   the other side.  We were -- we --

17           THE COURT:  Well, what --

18           MR. YORK:  Yes.

19           THE COURT:  You can't tell me right now?  You're here

20   ready to go to battle over this settlement, and I'm trying to

21   figure out what might happen here that would make you all

22   withdraw your objection.  And that's what we do in Chapter 11.

23   If there's a way we can pragmatically resolve things, we do.

24           MR. YORK:  Sure.

25           THE COURT:  And it just, I'm picking on you because

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 3 Main Document    Filed 07/25 Page 2 of 286 Page 126 of 443    PageID 4790

77

1    we're talking about a $2.5 or so million claim in a situation

2    where people are wanting the estate wrapped up and it's

3    holding hundreds of millions of dollars, I guess.

4            MR. MORRIS:  Not that much, Your Honor.

5            THE COURT:  Not that much anymore.  Not that much

6    anymore.  A lot has been paid out.  But a lot more than $2.56

7    million, shall we say.

8            MR. YORK:  Understood, Your Honor.  And I'm happy to

9    have a conversation with Mr. Morris and see if we can reach a

10   number that's agreeable to accept as, you know, the reserve.

11           THE COURT:  How hard could that be?  I don't mean to

12   be --

13           MR. YORK:  Happy to do so.  Sure.

14           THE COURT:  How hard could that be, when we're

15   talking about he's been paid $800,000 on his Class 9 ahead of

16   his Class 8, which, to understand your argument, would be an

17   absolute priority rule problem.  But, you know, --

18           MR. YORK:  Correct.  We indicated that --

19           THE COURT:  -- no picking and choosing what is

20   problematic here.  And we're talking about $2.56 million is

21   set aside, and we're talking about the prospect of liquidating

22   it and paying whatever is appropriate way before the IRS is

23   finished.  Maybe.  I don't know.  So how hard could it be to

24   figure out --

25           MR. YORK:  I'm sure we can -- we can have a

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-02724-L Document Document Filed 06/27/25 of 266 Page 127 of 443 PageID 4791

78

1 conversation real quick and try to see if we can --

2    THE COURT: Okay. Well, it'll have to be during a

3 break, --

4    MR. YORK: Sure. Happy to.

5    THE COURT: -- because we're plowing ahead. Okay.

6 Anything else on your opening statement?

7    MR. YORK: The only other thing I would point out

8 with respect to the best interests of the estate is that the

9 -- as part of the settlement, the Class 9 holders and the

10 Class 10 holders are actually getting more favorable treatment

11 than Mr. Daugherty's Class 8 claim because of the mutual

12 releases that they're getting pursuant to the terms of the

13 proposed settlement, including the fact that the Class 9

14 written consent holders who are all -- all have served on the

15 board here are getting those releases as well under the

16 proposed settlement.

17    THE COURT: It's not a release by your client.

18    MR. YORK: No, I understand that. I understand that.

19 But they're getting mutual releases from each other on

20 litigation that Highland has -- the Claimant Trust, excuse me,

21 has -- Trustee has, you know, consistently said that they had

22 all of those parties, all of those defendants, dead to rights

23 on.

24  So, that's all I have.

25    THE COURT: Okay. I really, I'm trying to focus on

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-6   Filed 12/29/25   Page 128 of 443   PageID 4792
Main Document   Page 79 of 286

79

```
 1   people's standing.  Your client has standing.  He has a proof
 2   of claim that's unresolved.  But I'm just trying to understand
 3   the economic impact, I guess, on your client.  And all I'm
 4   hearing is, I don't know, that maybe he thinks more than $2.56
 5   million ought to be reserved.  I mean, I'm --
 6           MR. YORK:  Given the passage of time, and also given
 7   the fact that it's still undetermined as to what's going to
 8   happen with that audit and what the penalties might be,
 9   considering that the amount that was --
10           THE COURT:  But, again, this is bankruptcy-land.  We
11   can't wait around 20 years, 30 years.  The Bankruptcy Code
12   contemplates we can at some point estimate --
13           MR. YORK:  Sure.
14           THE COURT:  -- a contingent unliquidated claim.
15           MR. YORK:  I understand.
16           THE COURT:  So I -- all right.  Thank you.
17           MR. YORK:  Thank you.
18           THE COURT:  And Mr. Lang?
19    OPENING STATEMENT ON BEHALF OF THE DUGABOY INVESTMENT TRUST
20           MR. LANG:  We're down to three issues, one of which
21   is the scope the release, which I think we can work out
22   with Mr. Morris, just to make sure people are carved out,
23   being Dugaboy.
24      The second issue is the use of the dollar value from the
25   capital account as the basis for the Class 10 claim versus
```

004374

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-6   Filed 12/22/25   Page 129 of 443   PageID 4793
Main Document   Page 80 of 266

80

1    using the -- well, they're using it on the petition date

2    versus using it -- the current capital account balance or the

3    percentage interest of 99.5 percent, because that prevents the

4    class, as structured, class level (inaudible).  And so we have

5    an issue with why they're using the capital account as the

6    basis for the allowed claim, when the plan is silent on how

7    that equity interest is to be valued.

8        Does that make sense?

9            THE COURT:  Okay.  You have a problem with the

10   valuation methodology used here, which was taking the capital

11   account balances from --

12           MR. LANG:  On the petition date.

13           THE COURT:  -- on the petition date?

14           MR. LANG:  Versus using the ownership percentage of

15   the equity on, as repeatedly stated, 99.5 percent of Highland

16   is owned by HMIT, .5 is owned by the Class 11.

17           THE COURT:  Okay.  Well, I'm not sure what -- I guess

18   you'll cross-examine Mr. Seery on different possible

19   methodologies.

20           MR. LANG:  Yes.

21           THE COURT:  Okay.

22           MR. LANG:  And so then the third one is the authority

23   issue on Mr. Patrick's authority to enter into the settlement

24   agreement and the transfer of the Dugaboy Note to Mr.

25   Patrick's entity, HMIT.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10   Main Document   Filed 02/25   Page 130 of 443   Page 130 of 266   PageID 4794

81

1    THE COURT:  All right.  And, again, I'll just clarify

2  my understanding.  Dugaboy -- this came up earlier -- itself

3  has a .1866 percent Class A limited partnership interest?

4    MR. LANG:  I think that's approximately right.  Not

5  exact.  Is that Mr. Morris' sheet?

6    THE COURT:  It was in several pleadings.

7    MR. LANG:  Okay.  Yeah.

8    THE COURT:  Okay.  So the question will be, should

9  that be valued at $740,000 or something different?

10    MR. LANG:  More -- there's $65 to $70 million in

11  assets in the estate.  There's $20 million in Class 9 debt, is

12  what Mr. Seery -- unpaid Class 9, is what Mr. Seery testified

13  to.

14    THE COURT:  Uh-huh.

15    MR. LANG:  So it's $45 to $50 million would be left

16  after payment of the Class 9.  And if they use the ownership

17  percentages, Class 11 gets some money.  If they use a $333

18  million capital account, Class 11 gets nothing.

19    THE COURT:  Okay.  I presume that's a material

20  difference, and I'm going to hear about that.

21    MR. LANG:  Yes.

22    THE COURT:  Okay.  And then I guess my other thoughts

23  on his interest -- I say his; it's Dugaboy.  We tend to equate

24  Dugaboy with Mr. Dondero since we've heard he and his family

25  are the hundred percent beneficiaries.  There I guess is a

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 1-6eriFiled 06/27/25 of 266ge 131 of 443    PageID 4795

82

1    note that is addressed in the settlement.

2            MR. LANG:  Yes.

3            THE COURT:  I called it the $24.2 million note in my

4    --

5            MR. LANG:  That was --

6            THE COURT:  -- preparation, but it's down to --

7            MR. LANG:  Seventeen-ish.

8            THE COURT:  -- $17 million or whatever.  So, right

9    now, Highland is a payee on that note, as well as Get Good

10   Trust, and Hunter Mountain under the proposed settlement gets

11   to substitute in as a co-payee.

12       So I guess I'm just trying to, in my brain, figure out all

13   the, just like I was doing with Mr. Daugherty, the economic

14   impact of this settlement on your client.  And have I just

15   addressed the two things in your view?

16           MR. LANG:  Yes.

17           THE COURT:  Okay.

18           MR. LANG:  I believe so.

19           THE COURT:  Okay.  Thank you.

20       All right.  Can we start with evidence?  At some point,

21   we'll break for lunch, but we'll figure out as we go.  I don't

22   want to be inconvenient to people if people have ordered lunch

23   or something.

24           MR. MORRIS:  We are going to be finished with Mr.

25   Seery on direct well before lunch.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 16   Main Document   Filed 02/23   Page 132 of 266   Page 132 of 443   PageID 4796

Seery - Direct                            83

1           THE COURT:  Okay.

2           MR. MORRIS:  Or by lunch, for sure.

3           THE COURT:  It's 11:30.

4           MR. MORRIS:  Yeah.

5           THE COURT:  So, all right.

6           MR. MORRIS:  I do -- I would be remiss if I didn't

7    point out that Mr. Lang just raised yet another issue, the

8    calculation of the allowed amount of HMIT's Class 10 claim.

9    Nowhere in his pleading.  Again, hearing about this for the

10   first time as I'm standing here.  He raised three issues, only

11   one of which is in their pleading, only one of which I ever

12   heard about from Dugaboy, and that is the scope of the

13   release.

14          THE COURT:  Okay.  I don't know if it makes a

15   material difference or not.  I am not a mathematician.  But --

16          MR. MORRIS:  So Highland -- the Movants call Mr.

17   Seery.

18          THE COURT:  All right.  Mr. Seery, if you could

19   approach the witness box.  I swore you in earlier for purposes

20   of all testimony today, so you are under oath.

21          MR. SEERY:  Thank you, Your Honor.

22      JAMES SEERY, CLAIMANT TRUST'S WITNESS, PREVIOUSLY SWORN

23                    DIRECT EXAMINATION

24   BY MR. MORRIS:

25   Q    Good morning, Mr. Seery.

004378

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L     Document 10-6   Main Document   Filed 02/24   Page 133 of 443   Page 133 of 266   PageID 4797

Seery - Direct                    84

 1   A    Good morning.

 2   Q    Do you have three binders in front of you?

 3   A    I have four binders in front of me.

 4   Q    Okay.  I just want to make sure you have ours.

 5   A    I think -- yes, sir.

 6   Q    The fourth has the last few exhibits that we filed on the

 7   docket.

 8        Should we wait for Mr. Edmond?

 9             THE WITNESS:  That would be good.

10             THE COURT:  Yes.  I just noticed.  Okay.  The

11   recording is always going, so never fear.

12        (Pause.)

13             THE COURT:  All right.

14             THE WITNESS:  Apologies, Your Honor.

15             THE COURT:  Oh, I didn't see what happened.  Was

16   there a spill episode?

17        And please, if people need breaks, let me know.  I

18   sometimes go long without appropriate breaks, so let me know,

19   anybody, if we need to break for bathroom.

20             MR. MORRIS:  May I proceed, Your Honor.

21             THE COURT:  You may.

22             MR. MORRIS:  All right.

23   BY MR. MORRIS:

24   Q    Are you comfortable, Mr. Seery?

25   A    Yes.

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-02724-L Document Document Filed 02/25 Page 134 of 443 PageID 4798
Main Document Page 25 of 266

Seery - Direct                                             85

 1  Q   I want to actually start a little unscripted with the

 2  argument that was just made on behalf of Mr. Daugherty.  Did

 3  you listen to that?

 4  A   I did, Your Honor.  Yes, I did.  I'll speak to Your Honor.

 5  Yes, I did, Your Honor.

 6  Q   Did Mr. Daugherty have a Class 9 claim?

 7  A   He did have a Class 9 claim.

 8  Q   And what was the value of the Class 9 interest that he

 9  held?

10  A   It was approximately $3.7 million.

11  Q   And who are the other Class 9 claim holders?

12  A   There are three -- I'm sorry, there are four other Class 9

13  holders.  There is Muck Holdings, LLC.  There is Jessup

14  Holdings, LLC.  There is UBS AG.  And there's UBS Securities,

15  LLC.

16  Q   Okay.  And if you can turn to Exhibit 58, which is in

17  Volume 1.

18           A VOICE:  Mr. Morris, what was the exhibit number?

19           MR. MORRIS:  It's 58.

20           A VOICE:  Thank you.

21           MR. MORRIS:  You're welcome.

22  BY MR. MORRIS:

23  Q   Do you have that in front of you, sir?

24  A   Yes.

25  Q   What is that?

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-02724-L Document 10-6 Main Document Filed 12/02/25 Page 135 of 443 Page 135 of 266 PageID 4799

Seery - Direct                                          86

1   A    That is a distribution notice to Mr. Daugherty from the

2   Highland Claimant Trust with the eighth distribution.  And I

3   believe this would be related to his Class 9 claim.  It may be

4   some 8 -- some Class 8 as well.  But March 25 is -- I'm sorry,

5   May 25, my eyes are not that great for close up, this is just

6   related to the payoff of his Class 9 claim.  So he'd had a

7   $3.7 million.  This was the last -- final payment, so he's

8   been paid in full on his Class 9 claim.

9   Q    So do I have this right, that before you sent this

10  $800,000-plus to him, he had already received $2.9 million on

11  account of his Class 9 claim?

12  A    That's approximately correct, yes.

13  Q    And how many different distributions were made to Mr.

14  Daugherty on account of his Class 9 claim before this last

15  one?

16  A    Two -- two or three.  I believe the way we had phrased and

17  put 8 is our total distributions including 8 and 9.  So he had

18  a larger Class 8 claim as well.  I think it was approximately

19  $8.25 million.  That's been paid in full.  His Class 9 claim

20  was getting paid in full by this one.

21  Q    Okay.  And did Mr. Daugherty receive these prior

22  distributions -- withdrawn.  Did the other holders of Class 9

23  claims also receive pro rata their Class 9 distributions at

24  the same time as Mr. Daugherty?

25  A    Yes.  The distributions were pro rata.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 10-6   Maint Document   Filed 12/22/25   Page 136 of 443    Page 136 of 266    PageID 4800

Seery - Direct                                        87

1   Q    Okay.  Did Mr. Daugherty ever return any of the Class 9

2   checks that he received and say, oh my goodness, it violates

3   the plan and the absolute priority rule and everything else

4   because his Class 8 claim hasn't been paid in full?

5   A    No, he did not.

6   Q    Did he -- did he suggest that UBS or Muck or Jessup should

7   return their checks that they received on account of their

8   Class 9 claims because his Class 8 claim had remained

9   unresolved?

10  A    No, he did not.

11  Q    Okay.  Let's go to the reason that we're really here

12  today, the agreement itself.  Did you negotiate the settlement

13  on behalf of the Highland entities?

14  A    Yes, I did.

15  Q    Can you describe for the Court how that came about?

16  A    In December, we had a hearing on -- this is a little bit

17  convoluted, I apologize -- but in December we had a hearing on

18  the HCLOM claim in court, and we settled that claim as a $10

19  million Class 10 interest.

20       We moved into the new year and we heard some -- at some

21  point that HMIT disagreed with that settlement, even though

22  HMIT had signed that settlement as acceptable to it in form

23  and substance.  And the reason was because HMIT had been the

24  only Class 10 -- not allowed, but the only Class 10 interest

25  in -- under the plan, and defined that way, and we had agreed

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 10-6   Main Document   Filed 12/23/25   Page 137 of 443   Page 138 of 266   PageID 4801

Seery - Direct                                          88

1    pursuant to the plan to put HCLOM in there.

2        And although HMIT had signed in form and substance

3    acceptable by its attorney, we learned that Mark Patrick had

4    not been consulted and that attorney had simply -- because we

5    were in the room -- had gone in and gotten permission from Mr.

6    Dondero to approve that settlement in form and substance.  We

7    didn't know it at the time.

8        That went away pretty quickly, and we understood that

9    somehow it got resolved.

10       Shortly after that, sometime I believe in January or early

11   February, there was contact between HMIT counsel and our

12   counsel about a potential settlement.  And we had two issues,

13   really, with Mr. Patrick, who controlled two separate

14   entities.  There's the DAF entities he controlled and there's

15   the HMIT entities.  And we wanted to make sure -- and we had

16   disputes with both of them.  We had a Fifth Circuit appeal

17   coming up in DAF and HMIT.  And so we were contacted and said,

18   okay, we're willing to settle this if we can get to a place

19   that makes sense to us.  And so that was the commencement of

20   those negotiations.

21   Q    And can you describe -- how long did the negotiations

22   last?

23   A    Well, there was negotiation around the NDA, which took

24   some time, and I think we probably got that finalized at

25   around the middle to end of March.  And then we began

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L      Document 10  Main Document    Filed 12/22/25   Page 138 of 443   Page 138 of 443      PageID 4802

Seery - Direct                                89

 1  negotiations in earnest during April.  And we took pretty much

 2  the full month to get these negotiations done, maybe a month

 3  and a half.

 4  Q   Can you describe for the Court just how the negotiations

 5  were conducted?

 6  A   Well, initially, we ensured that the ground rules would be

 7  set.  We didn't want to waste our time and expense if we

 8  weren't going to reach agreement around particularly

 9  litigation protections, because that's essential to us, and

10  having any settlement required that.

11      Secondly, we then -- from their side, they wanted

12  information.  So, pursuant to that NDA, which was rather

13  robust, we provided substantial information.

14      We then had a -- I believe one or two Zoom calls, and then

15  a face-to-face meeting, and then subsequently a number of Zoom

16  calls with our counsel -- usually, these were always with

17  counsel -- so, our counsel, their counsel, principals, my

18  team, Mr. Patrick and his team, to go through each of the

19  items that we exchanged.  And then we worked through a

20  framework to -- back and forth on that to a term sheet, to a

21  negotiated structured settlement along the lines of the one

22  you see.

23  Q   And did the parties exchange information as part of the

24  process?

25  A   Yeah.  As I explained, we, under our NDA, we gave a lot of

Seery - Direct                                    90

1    information.  We got information back from Mr. Patrick, Mr.

2    Phillips, their teams, about the structure of their entities,

3    how we could interact with them, who was responsible for each

4    entity.  And that caused us to, frankly, move from just HMIT

5    to a couple other entities to make sure we had full

6    protection.

7    Q    Did you provide information concerning assets, budgets,

8    expenses, and the like?

9    A    Yeah.  The detailed information we provided, it was pretty

10   extensive.  So we gave a high-level view of our budget,

11   assuming that we had a settlement with them.  We have an asset

12   list that we keep and where each asset was located.  So,

13   dollars amounts, what kind of form it was in, whether it was

14   cash, whether it was U.S. Treasuries, whether it was, you

15   know, equity interests.  Some couple other assets, as Mr.

16   Morris explained in the opening, had not yet been disposed of.

17   And the valuations we put on those assets.

18   Q    Can you turn, I guess, to any volume, and let's just look

19   at the exhibit list.  Are you generally familiar with the

20   documentation concerning the negotiations?

21   A    Yes.

22   Q    Can you confirm that Exhibits 2 through 57 are the emails

23   and information that were disclosed between the Highland side

24   and the HMIT side during the negotiations?

25   A    Yes.  And I -- I could look through 2 through 57 now, but

004385

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 10 Document Filed 1 Page 25 of 286 Page 140 of 443    PageID 4804

Seery - Direct                                        91

```
 1   --

 2   Q    Yeah.

 3   A    -- I have looked through them before, and this is the

 4   information back and forth.  We generally exchanged, other

 5   than at the face-to-face meeting, we exchanged information on

 6   Zoom calls as well, but when we get documents we gave them

 7   counsel-to-counsel.

 8   Q    Okay.  And did you instruct me to produce all of the

 9   communications with the HMIT side in connection with the

10   discovery requests that were served in this case?

11   A    Yes.  We had discovery requests that we went through in

12   detail and reviewed them, and we produced in accordance with

13   those requests.

14   Q    Are you aware of any document that we didn't produce that

15   reflects the parties' negotiations of this agreement?

16   A    No, not at all.

17   Q    Can you describe for the Court the general deal points

18   that were negotiated?  Withdrawn.  Who was your counterparty

19   to these negotiations?

20   A    The principal on the HMIT side is Mr. Mark Patrick.  He

21   had his team.  And I was responsible on our side with my team.

22   Q    And can you just describe for the Court what the primary

23   negotiating points were between the two teams?

24   A    Yeah.  Number one for us was dismissal of outstanding

25   litigations.  So we needed, with prejudice, dismissal of those
```

004386

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L     Document 1-6   Main Document   Filed 12/02/25   Page 141 of 443   Page 141 of 443     PageID 4805

Seery - Direct                                        92

1   litigations.  Otherwise, why are we bothering?

2       Number two, we wanted to make sure that we had litigation

3   protections.  These have been around since -- we came up with

4   them during our mediation.  They're really important to us.

5   They set up a structure where we can actually count on the

6   estate and the principals of the estate and the indemnified

7   parties of the estate not being attacked.  So that was

8   essential to us.

9       In exchange, we had to fix their claim and allow it in an

10  amount pursuant to the plan, which requires us to fix an

11  amount.  And that's the Class 10 interest that they have,

12  which is senior to the Class 11 interests under the plan and

13  the Claimant Trust Agreement.

14      And then the way the Trust is set up in the plan, it's a

15  waterfall.  They -- we advocated for getting everything for us

16  upfront and putting everything for them at the back.  They,

17  understandably, didn't like that as much and wanted

18  distributions upfront.  So we negotiated around those terms.

19  And I think those are the biggest terms.

20      We had some assets that we were -- we were -- difficult to

21  monetize that we also were happy to dispose of in this way,

22  with a credit, you know, towards their claim amount.

23  Q   Did you -- and I may have missed this; I apologize if I

24  did -- but did you also negotiate the amounts and the timing

25  of the distributions that would be made to the HMIT entities?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 1-6   Filed 12/02/25   Page 142 of 443   PageID 4806
Main Document   Page 93 of 266

Seery - Direct                                      93

1    A    Yeah.  That's what I alluded to, where we -- we had hoped

2    to get everything for us upfront, give them everything later.

3    I think it's the *Wimpy* 'For a hamburger you give me today,

4    I'll gladly pay you Tuesday' structure.  That didn't like that

5    as much, so we did work on timing.  And that did bring into

6    consideration the other Class 9 holders and timing with

7    respect to payments to the Class 9.

8    Q    Was the topic of the allowed amount of HMIT's Class 10

9    interest the subject of negotiation?

10   A    The topic of the allowed --

11   Q    Did you discuss how the amount of its allowed interest

12   would be calculated?

13   A    Oh, yeah, that was a, you know, a critical part of the --

14   or, you know, essential part of the structure.  What's the

15   allowed amount they're going to get?  The plan requires an

16   amount fixed for that class.  We had already had a $10 million

17   HCLOM amount allowed into that class.  So we needed to fix

18   that amount.

19   Q    So let's transition to that particular topic, the

20   calculation of HMIT's Class 10 interest.  Are you familiar

21   with the methodology that was used to arrive at the Class 10

22   amount?

23   A    Yes.

24   Q    Can you tell me the process, before we get to the

25   methodology itself?  Like, what work was done to figure that

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10   Main Document   Filed 12/22/25   Page 94 of 266   Page 143 of 443   PageID 4807

Seery - Direct                                    94

 1  out?

 2  A    Well, the structure of limited partnership is that the

 3  equity account is treated as what's called a capital account.

 4  Each limited partner in a limited partnership has a capital

 5  account that tracks their equity interest.  As a default rule,

 6  it's the amount that a limited partner can expect to get on a

 7  sale of the partnership or a liquidation of the partnership.

 8  So we used the capital account that had been maintained

 9  continuously by Highland to set their capital account amount.

10       I think the partnership agreement talks about 99-1/2

11  percent for HMIT.  It doesn't talk about dollars because

12  that's kept in the accounting for the partnership.  And that

13  amount was consistently kept by Highland up to the petition

14  date.  And even after the petition date in the monthly

15  operating reports.

16  Q    If you take a look back at the exhibit list, I would

17  direct your attention to Page 12 of 15.  Actually, it starts

18  at the Page 11.  At the bottom, it's got the heading, Capital

19  Account Amounts.  Are you familiar with Exhibits 113 through

20  118?  And if you need to look at the exhibits, take your time.

21  A    Oh, I'm sorry.  I thought you told me 15.

22  Q    No.  One -- I did.  I mentioned Page 15.  But we're just

23  looking at Exhibits 113 to 118.

24            THE COURT:  113 to what?

25            MR. MORRIS:  18.

004389

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 10-6   Filed 02/02/25   Page 144 of 443   PageID 4808
Main Document   Page 95 of 266

Seery - Direct                                    95

 1          THE COURT:  Okay.

 2          THE WITNESS:  Um, --

 3          MR. MORRIS:  If you look at the index, Your Honor, at

 4  the bottom of Page 15 -- 11, you'll see a heading, Capital

 5  Accounts --

 6          THE COURT:  Right.

 7          MR. MORRIS:  -- Amounts.  And then that captures

 8  Exhibits 113 to 118.

 9          THE WITNESS:  Yes.

10  BY MR. MORRIS:

11  Q    Are those the documents that you and your team relied upon

12  in order to calculate the amount of the allowed Class 10

13  interest for HMIT?

14  A    These are some of them.  I don't know if you have the tax

15  returns in here and the K-1s.  Oh, here they are.  115.

16  Q    Yeah.  That's 115?

17  A    Yeah.  You've got the K-1s for 2018, which fix an amount.

18  Those are signed by Mr. Dondero, and they give the amounts to

19  each partner.  And then you've got the adjustments, because

20  those are done in -- they're 2018 year-end.  They were done in

21  September of 2019, about a month before the filing.

22  Q    And is that Exhibit 116?

23  A    It's 115 and 116.  I believe that's -- 116 is 2019, I

24  believe, and that would have been signed postpetition by -- I

25  believe that was signed by Waterhouse.

1   Q    Okay.

2   A    So it sets out the K-1.  The numbers that we have are

3   slightly different because they're in the -- they're not

4   middle of the year, but they're for the petition date of

5   10/16/19.  And there are -- there's economic activity that

6   happens during the year, that you take the year-end from '18

7   and you have economic activity that would affect, pursuant to

8   the partnership, the capital account of each partner during

9   that year,  fixed it on the petition date, and then it's been

10  forward since.

11  Q    Did you apply any of your own subjective views or beliefs

12  in the calculation of the amount of the Class 10 interest held

13  by HMIT?

14  A    No.  This was math.

15  Q    And did you hear Dugaboy's counsel suggest in the opening

16  that there was a different methodology that perhaps you could

17  have used, a pro rata methodology, instead of the methodology

18  you used?

19  A    I heard what he said, but it doesn't make any sense.  You

20  can't fix an amount that way.

21  Q    And do you understand that Dugaboy, under the partnership

22  agreement, is subordinated to HMIT?

23  A    Dugaboy is subordinated under the partnership agreement

24  for certain distributions.  But importantly for our purposes,

25  they're subordinated under the plan.  So the Class 11

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 10    Main Document    Filed 07/02/25    Page 146 of 443    Page 146 of 266    PageID 4810

Seery - Direct                                              97

1   interests are explicitly subordinated to the Class 10

2   interests, in both the plan and the Claimant Trust Agreement.

3   Q    Did the Debtor consider putting Dugaboy and HMIT in the

4   same class?  Back when the plan was being formulated?

5   A    I -- I don't recall.

6   Q    Do you recall why they're in separate classes?

7   A    They -- they're in separate classes because HMIT had a

8   senior -- a right to senior distributions under the

9   partnership agreement.  We set it up that way.  Nobody

10  objected to it.  That was part of the confirmed plan and the

11  confirmed order.

12  Q    Thank you very much.  Let's talk for just a moment about

13  Mr. Patrick's authority.  Before entering into the settlement

14  agreement, did you do anything to satisfy yourself that Mr.

15  Patrick had the authority to enter into the settlement

16  agreement on behalf of each of the HMIT entities?

17  A    Yes.

18  Q    What did you do to satisfy yourself?

19  A    Well, as a default rule, I always look at the agreements

20  that I'm going to enter into and the organizational docs.  And

21  we did do that.  We looked at each of the organizational docs

22  to --

23  Q    Let me stop you there for a second.  Are those the

24  documents that are in the exhibit list from 70 through 104?

25  A    I'd have to check the actual numbers, but --

1    Q    If you just look at the exhibit list.

2    A    Oh.

3    Q    It's at the front.  You'll see on Page 8 of 15 of the

4    exhibit list there's a heading, --

5    A    Yes.

6    Q    -- E, Patrick Authority, and then I'm asking you if you

7    are aware of what Exhibits 70 through 104 are?

8    A    Yes.  So, these, these are -- there's a number of

9    organizational documents that we looked and made sure that Mr.

10   Patrick had authority.

11       We also knew from our own files that Mr. Patrick, you

12   know, previously had different interests assigned to him, and

13   we know from Mr. Patrick and documents he's given us that John

14   Honis, who was a former controller of some of -- controlled

15   some of these entities and a friend of Dondero's who

16   previously worked at Highland, is on some retail boards, in

17   2022 transferred those interests to an entity controlled by

18   Mr. Patrick.

19       Moreover, Mr. Patrick was here in court as the HMIT

20   Administrator, trying to sue the Highland estate.  He

21   testified on behalf of HMIT as the Administrator.  And the

22   documents are very clear that the Administrator has full

23   control of these entities.

24   Q    We've heard some argument about a Cayman Islands

25   proceeding.  Are you generally aware of what's happening in

004393

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L      Document 10-6    Main Document    Filed 07/02/25    Page 148 of 443    Page 148 of 266    PageID 4812

Seery - Direct                                99

 1  the Cayman Islands?

 2  A    I hesitate to say generally aware.  I'm aware that there's

 3  a proceeding in the Cayman Islands about involving a blocker

 4  corp.  And there's disclosure in this Court about what that

 5  entity is.  It's a blocker corp. in the Caymans that prevents

 6  the ultimate charitable entities -- and I put that in quotes

 7  -- to -- from receiving UBTI, which is Unrelated Business

 8  Income.  And in that case, they would have to pay tax on it,

 9  and the idea is that they don't want to pay taxes and they

10  don't pay taxes.  So that corp. apparently is in some sort of

11  proceeding.  That's on the DAF side.  That is not on the HMIT

12  side.

13  Q    Okay.  So, based on the work that you did and the

14  documents that you reviewed, did you form a view as to whether

15  or not Mr. Patrick is authorized to enter into the settlement

16  agreement on behalf of each of the HMIT entities?

17  A    Yes.

18  Q    And what view did you reach?

19  A    He has complete authority over each of these entities.

20  They run up to entities that he controls or he owns.  And he's

21  had that, and it's the structure that was set up a long time

22  ago, and any changes to that structure are just consistent

23  with the documents that let him do these things.  And the

24  proceeding in Cayman, whatever that is, has no impact on Mr.

25  Patrick's authority over these entities or any of the entities

Seery - Direct                                    100

1    in this chain.

2    Q    Did you see anything in the diligence that you conducted

3    that required Mr. Patrick to seek anybody's authority,

4    consent, or approval before entering into the settlement

5    agreement on behalf of the HMIT entities?

6    A    No.  And we could go through each document.  He has

7    complete authority on each of these entities.  And even the

8    objections that were filed that were withdrawn from The Dallas

9    Foundation, they have no -- it's absolutely clear that they

10   have no rights to deal with at all the management of each of

11   these entities.  They don't have an ownership interest in it.

12   Crown issued an annuity policy that's a variable policy.  They

13   have no rights.

14   Q    All right.  Let's turn to the agreement itself.  Can you

15   tell the Court why you believe that the settlement agreement

16   is in the Claimant Trust's best interests?

17   A    Number one, this case has been going on for a full five

18   years.  We have spent tens of millions of dollars dealing with

19   vexatious and frivolous litigation and attacks.  The

20   opportunity to settle with a Class 10 holder and allow their

21   claim under the terms of the settlement is extremely valuable

22   because it moves us much, much closer to a potential

23   resolution of this case, which we would all love to resolve.

24        Number two, it's fair value for the estate.  We are making

25   sure, while we're paying some money out in front, we have

004395

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed 07/21/25   Page 150 of 443   PageID 4814   Page 150 of 443

Seery - Direct                                101

1    triggers on the backend payments to ensure that the Indemnity

2    Trust has enough assets to protect parties if there are

3    unforeseen litigations.  And I can almost bet there'll be at

4    least one or two of those.  So it's really, really valuable in

5    that respect.

6        Three, it cuts down tremendously on what future expenses

7    could be.  Because we have gotten these litigation

8    protections, we've basically walled off a potential avenue to

9    be attacked.  And I think the structure of this deal is

10   valuable, not only to the fiduciaries and folks who have been

11   responsible for managing this process and who are indemnified

12   by the Claimant Trust or HCMLP, it also enables us to, down

13   the road, pay off the Class 9s and ultimately make

14   distributions to the Class 10s.

15   Q    Is one of the other benefits to this agreement is that it

16   enables the Claimant Trust to dispose of certain illiquid

17   assets?

18   A    Well, that's a -- that is a benefit, because we do have to

19   resolve these claims and dispose of these assets, and we're

20   not in a position to hang around until 2030 or more to do

21   that.

22       So we've got the Kirschner claims, which would go to HMIT.

23   Again, the way that the waterfall is set up, to the extent

24   that they have value, they are very expensive to pursue.

25   We've spent a ton of money setting them up.  We've produced

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Main Document    Document 75    Filed 07/21/25    Page 152 of 266    Page 151 of 443    PageID 4815

Seery - Direct                                            102

 1    seven million documents, pages, and received zero in return.

 2    We stayed them because we didn't think we needed them for the

 3    Class 8 and 9 and it was prudent to do so, and the question

 4    was would we need them for indemnification.  So disposing of

 5    those claims now at this time as part of this settlement,

 6    where that value would go to Class 10 anyway, is very

 7    valuable.

 8    Q    Had you made any efforts prior to entering into this

 9    agreement to monetize or otherwise sell the Dugaboy Note?

10    A    Yes.

11    Q    Can you describe for the Court what your efforts were in

12    that regard?

13    A    So, we set out to try to monetize the Dugaboy Note.  I

14    contacted -- we put together what we call a teaser, laying out

15    what we knew about Dugaboy, at least up until the time that

16    Dugaboy was no longer part of our computer system.  Laid out

17    what we thought the assets were.  There's not a lot of public

18    information.  Laid out the amortizing of the note.  It's a 3.2

19    percent-ish, 3.26 percent note, I believe, goes to 2047, '46

20    on the amortization, 2047.   And then presented that to I

21    think it's five different investors in distressed funds.  Had

22    no interest whatsoever.  One investor laughed at me, which I

23    understood that he was aware of the parties and the principals

24    and the collection efforts that would be difficult on that

25    note.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L      Document 7  Main Document   Filed Page 2123 of 266  Page 152 of 443    PageID 4816

Seery - Direct                                103

1     The note is performing, because if it hadn't performed I

2   would have accelerated on the first second and we would have

3   collected the whole thing.  But we've seen that show in the

4   other Notes Litigation.  And so we didn't -- we didn't get any

5   reception.

6      We also reached out to Mr. Dondero, in writing, through

7   D.C. Sauder, and made them an offer and tried to get them to

8   respond, and they indicated they had no interest in the note.

9   Q    Turning back to the exhibit list, if you can turn your

10  attention to Page 11 of 15 of the exhibit list, is Section F,

11  Exhibits 105 through 112, the documents that reflect the note

12  and your efforts to dispose of the note?

13  A    Yes.

14  Q    And let's take a look at Exhibit 112 quickly, since that

15  involves Mr. Dondero.  Can you just tell the Court what this

16  exhibit is?

17  A    Yes.  This is an exchange between D.C. Sauder, Matt

18  McGraner, both of whom work for Dondero, and Dave Klos, our

19  CFO.  I'd authorized Dave to make an offer to them to see if

20  we could get cash for the Dugaboy Note.  And as you see right

21  below the reply from Mr. Klos, which is -- this is friendly,

22  but Mr. Sauder's indication that they have no interest.

23  Q    Okay.  So Highland offered to sell the Dugaboy Note to Mr.

24  Dondero or entities controlled by him, and that offer was

25  rejected without a counteroffer.  Do I have that right?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Main Document   Filed 07/02/25   Page 153 of 443   Page 153 of 266   PageID 4817

Seery - Direct                          104

1   A    That's correct.

2   Q    Okay.  Let's finish up here.  Are you familiar with the

3   objections of Dugaboy and Mr. Daugherty that the settlement

4   somehow violates the plan because it's making distributions to

5   Class 10 before junior classes are paid in full?

6   A    Yes.  I'm familiar with those.

7   Q    Do you believe the settlement violates the plan?

8   A    Not at all.

9   Q    And why is that?

10  A    The plan specifically contemplates that -- I don't think

11  it's -- we showed the 9 and 10s, but I think it's any claimant

12  could take less than is being offered by the plan.  What we

13  did very specifically is go to the Class 9 claimants and

14  discuss with them this opportunity to settle with HMIT and

15  what it would take, which included some, as I described

16  earlier, payments upfront.

17       After being fully informed -- they asked a lot of

18  questions, they pushed back quite a bit, as you can expect

19  that they would -- and we reached agreement with those Class 9

20  claimants in writing to approve the structure of the deal and

21  the settlement and the concurrent payments, as well as the

22  final small payment to Mr. Daugherty on behalf of his Class 9

23  claim.

24  Q    Could I trouble you to turn to Exhibit 59, please, Mr.

25  Seery?

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 154 of 443    PageID 4818
Main Document    Page 105 of 266

Seery - Direct                                    105

 1    A    I've got it.

 2    Q    Are you familiar with that document?

 3    A    I am, yes.

 4    Q    Can you explain to the Court what that document is?

 5    A    This document is the written consent that we entered into

 6    with the Class 9 claimants, approving the settlement agreement

 7    as well as the payment to Mr. Daugherty.

 8    Q    Okay.

 9    A    And -- and -- so these -- the payment to Mr. Daugherty

10    would have been non-pro rata, so they agreed to that.  And the

11    concurrent payments under the settlement agreement to Class 10

12    were agreed to by the Class 9 claim holders.

13    Q    So looking at Page 2 at the top, do I have this right,

14    that Mr. Daugherty's original Class 9 subordinated claim was

15    in the amount of $3.75 million, and that with the payment

16    described in this document his claim was paid in full?

17    A    That's correct, yes.

18    Q    And did he complain that he was getting paid in full but

19    the other Class 9 holders were not?

20    A    No.  That had never been his complaint.

21    Q    Did he complain that he was getting paid in full on his

22    Class 9 claim but his Class 8 claim remained unresolved?

23    A    No.  I think that, as indicated before in my testimony and

24    indicated here, this was the last payment, the 781.  Before

25    that, he'd received almost $3 million on account of his Class

004400

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed Page 2126 of 266   Page 155 of 443   PageID 4819

Seery - Direct                                    106

```
 1    9 claim.  And pro rata with the other Class 9 claimants.

 2    Q    I think you mentioned that your understanding is that,

 3    under the plan, creditors can elect to receive less favorable

 4    treatment than the plan otherwise provides.  Is that right?

 5    A    That's correct.  And I think that's a pretty standard

 6    provision in virtually every plan that I see.

 7    Q    Can we just grab that for a second?  It's the last

 8    exhibit, 126, which is probably in the skinny binder, if you

 9    have one.

10    A    Yes.  Do you want me to go to the section?

11    Q    Yeah.  Just one minute.  I want to make sure the judge is

12    with us.  Give her a second.

13              MR. MORRIS:  Are you with us, Your Honor?

14              THE COURT:  Yes.

15              MR. MORRIS:  Okay.

16    BY MR. MORRIS:

17    Q    So if you can turn to Page 23 of Exhibit 126.  Does

18    Section 9, under Treatment, Romanette (ii), is that the

19    provision that you were just describing that gives Class 9

20    holders the ability to receive such other less-favorable

21    treatment as to which such holder and the Claimant Trust may

22    agree upon in writing?

23    A    That's correct.

24    Q    And the same is true with respect to the Class 10 claims,

25    at the top of Page 24?
```

004401

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Main Document Filed 07/21/25    Page 2125 of 266    Page 156 of 443    PageID 4820

Seery - Direct                                    107

1   A    That's also correct, yes.

2   Q    All right.  And so was the consent that was executed by

3   the Class 9 holders that's Exhibit 59 done in satisfaction of

4   these plan provisions?

5   A    I'd say it's consistent with these.  They could elect to

6   receive it or not, but this was, you know, did it under this

7   provision and they were entitled to elect to take lesser

8   treatment, if that's what they agree to.

9   Q    Okay.  Can you describe for the Court why you believe that

10  the Class 9 claim holders are receiving less-favorable

11  treatment under -- as a result of this settlement agreement

12  than they would otherwise be entitled to under the plan?

13  A    Well, they would be entitled to receive payments in front

14  of any payments that would be made to Class 10.  In addition,

15  they would have been entitled to receive a pro rata

16  distribution of the $800,000 that was paid to Mr. Daugherty,

17  and they agreed to waive those provisions.

18  Q    Okay.  Is it your understanding that HMIT is also

19  accepting less favorable treatment than it might otherwise

20  receive if it pursued and succeeded in the prosecution of its

21  claim?

22  A    I suppose, ultimately, if everything was resolved, that

23  they could have gotten a Class 10 interest that wasn't

24  structured along the lines of the settlement agreement.  So

25  the settlement agreement takes some of that structure and what

004402

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7    Main Document    Filed 07/20/25    Page 210 of 266    Page 157 of 443    PageID 4821

Seery - Direct                    108

1    arguably would be value away from them, and this is the amount

2    that they've agreed to have as their allowed claim, as

3    structured by the settlement agreement.

4    Q    And is it your understanding that under the settlement

5    agreement HMIT has disavowed any rights under the Claimant

6    Trust Agreement?

7    A    Under the Claimant Trust Agreement, yes.  They have rights

8    under the settlement agreement to receive distributions, and

9    those will ultimately come from the Indemnity Trust as we wind

10   down the Claimant Trust.

11   Q    And did HMIT also agree that it would not be a Claimant

12   Trust beneficiary under the Claimant Trust?

13   A    Yes.  And that's very important to us because we have seen

14   lots of litigation, lots of emails, trying to use these types

15   of structures just to create claims, even when there's

16   literally no basis for it.  I should -- well, I'll control

17   myself.

18   Q    Yeah.  We can stop there.

19        MR. MORRIS:  Your Honor, I have no further questions

20   at this time.

21        THE COURT:  All right.  We're going to figure out,

22   are we taking a bathroom break or a short lunch break.  I'll

23   poll the audience and then I'll decide.  Do people want to

24   take maybe a 30 to 45-minute lunch break, or just a bathroom

25   break and keep going?

1            THE WITNESS:  Thirty minutes.

2            THE COURT:  I'll say -- are you going to have any

3    further examination?

4            MR. PHILLIPS:  I'm going to maybe ask one question,

5    just to bring it up.  It's already been -- but one question.

6            THE COURT:  Okay.  And then what about Dugaboy and

7    Daugherty?  Guesstimate how much examination you'll have.

8            MR. YORK:  Fifteen minutes, maybe.

9            MR. LANG:  Twenty minutes or so.

10           THE COURT:  Why don't we take a five-minute bathroom

11   break, --

12           MR. PHILLIPS:  Sure.

13           THE COURT:  -- and then we'll at least finish this

14   witness.

15           MR. PHILLIPS:  Perfect.

16           THE COURT:  All right?

17           MR. PHILLIPS:  Thank you, Your Honor.

18           THE WITNESS:  Thank you.

19           THE CLERK:  All rise.

20      (A recess ensued from 12:07 p.m. until 12:15 p.m.)

21           THE CLERK:  All rise.

22           THE COURT:  Please be seated.

23      (Pause.)

24           THE COURT:  All right.  Can I get some help rounding

25   people up?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7-6   Filed 12/02/25   Page 159 of 443   PageID 4823
Main Document   Page 210 of 266

Seery - Cross                            110

```
 1        (Pause.)

 2             THE COURT:  All right.  We're missing -- okay.  We're

 3   going back on the record in Highland Capital.  We still have

 4   Mr. Seery on the witness stand.  Mr. Phillips, you had

 5   examination.  You said one question.

 6             MR. PHILLIPS:  I did, Your Honor.  And I meant it.

 7             THE COURT:  Okay.

 8                       CROSS-EXAMINATION

 9   BY MR. PHILLIPS:

10   Q    Could you look at Exhibit 118, please?

11   A    You said 118?

12   Q    Yes, sir.

13   A    Certainly.

14   Q    Did the calculation of the Class 10 claim amount of

15   $336,940,230.58, is that the result of applying the full value

16   to the Highland or Highland Claimant Trust of the HMIT note

17   receivable?

18   A    Apologies, because I can't read this because it's too

19   small, but I can answer the question.

20             THE COURT:  Would you like this?

21             THE WITNESS:  I think I can answer the question

22   without it.

23             THE COURT:  Okay.

24             THE WITNESS:  The -- what we used was the petition

25   date capital account.
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7-5   Filed 10/02/25   Page 160 of 443   PageID 4824
Main Document    Page 115 of 266

Seery - Cross                          111

 1  BY MR. PHILLIPS:

 2  Q    Correct.

 3  A    And just like every other claim in bankruptcy, fixed at

 4  the petition date.  And what we subtracted from that petition

 5  date was the petition date amount principal and interest of

 6  that HMIT note which was owed to Highland Capital.

 7  Q    Thank you.

 8          THE COURT:  All right.  That was one question.

 9       All right.  Counsel?

10          MR. YORK:  Thank you, Your Honor.  Get it organized

11  here.

12                      CROSS-EXAMINATION

13  BY MR. YORK:

14  Q    Good afternoon, Mr. Seery.

15  A    Good afternoon.

16  Q    Would you take a look at Exhibit 1 in Daugherty's witness

17  and exhibit binder?  It's the settlement agreement between

18  Highland and Mr. Daugherty, I believe.

19  A    Yes, I have it.

20  Q    All right.  And can you confirm that is the settlement

21  agreement that Highland and Mr. Daugherty entered into in

22  connection with the claims Mr. Daugherty asserted in the

23  bankruptcy?

24  A    It appears to be, yes.

25  Q    Would you turn to Section 9, then, which is on Page #11,

Seery - Cross                                    112

1  starts on Page #11?

2  A    Yes.

3  Q    And that relates to a reserved claim that Mr. Daugherty

4  had as part of his proof of claim against Highland in the

5  bankruptcy, correct?

6  A    That's correct.

7  Q    And would you agree with me that the second line of

8  Section 9 there of the settlement agreement describes that

9  claim as a contingent unliquidated claim against the Debtor?

10 A    I would not agree with you on that, no.

11 Q    Why not?

12 A    Because it says, Daugherty contends --

13 Q    Ah.  Daugherty contends.

14 A    -- he has a contingent unliquidated claim against the

15 Debtor.

16 Q    Okay.  Well, why don't you then turn with me to Daugherty

17 Exhibit #2, which is the -- which is the -- Highland's

18 adversary complaint that was filed against Mr. Daugherty on I

19 believe May 2nd of 2025.  Correct?

20 A    I don't recall the specific date and it's blurred at the

21 top.  So if you say so, I'll accept that.

22 Q    All right.  And if you look at Paragraph 1, the third

23 line, there's a sentence there that says, All of Mr.

24 Daugherty's claims were settled except his unliquidated

25 contingent claim that the Debtor has a continuing and

Seery - Cross                        113

1   indefinite obligation to make him whole if a tax refund he

2   apparently received for tax year 2008 on account of his

3   partnership interest is ever successfully challenged by the

4   IRS.

5        Did I read that correctly?

6   A   You did read that correctly, yes.

7   Q   All right.  This reserved claim under the settlement

8   agreement is a Class 8 unsecured claim, correct?

9   A    It is the claim that he asserted and that we initially

10  classed under Class 8 in a fixed amount for a tax refund which

11  is on his statement that he got that he claims he's entitled

12  to more, which would be unsecured as of the petition date.  I

13  believe the amount on his payment statement from 2009 is

14  $1.475 million.

15  Q   All right.

16            THE COURT:  Could you pull the microphone closer to

17  you?

18            THE WITNESS:  I'm sorry, Your Honor.

19            THE COURT:  Okay.  Good.

20            MR. YORK:  All right.

21  BY MR. YORK:

22  Q   And, again, my question is pretty simple.  And it's a

23  Class 8 unsecured claim, right?

24  A   It's not a Class 8.  It was in Class 8.  It's been

25  objected to.

Seery - Cross                                    114

1  Q   Right.

2  A   So it is not in a class now at all.  We seek to disallow

3  it in its entirety, or, at worst, subordinate it to all

4  creditor claims.

5  Q   Understood.  But it has been asserted as a Class 8 general

6  unsecured claim, right?

7  A   He asserted it as that, yes.

8  Q   Okay.  And is it fair to say that in the adversary

9  complaint, if you go to Page -- I'm sorry, Paragraph 4 --

10 Highland alleges that:  However, even if Mr. Daugherty's claim

11 is not disallowed in its entire -- I think that should be

12 entirety.  Right?

13 A   It should be, yes.

14 Q   It remains contingent on the outcome of the 2008 audit.

15 Correct?  Did I read that correctly?

16 A   You did read that correctly, yes.

17 Q   And the next sentence says, It is unclear when, how, or if

18 the 2008 audit will finally be resolved.  Correct?

19 A   Correct.

20 Q   And in fact, if you go to, then, Page #7 of the complaint

21 and you look at Footnote 6, at the very end of that footnote

22 it indicates that Highland has an understanding that the

23 resolution may not be expected until approximately 2029.  Is

24 that correct?

25 A   The litig... I can't read it because it's small, but the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 57   Filed 10/02/25   Page 164 of 443   PageID 4828
Main Document   Page 115 of 266

Seery - Cross                              115

1    litigation may not be resolved.  The IRS has already issued a

2    final determination on the audit.

3    Q    How do you know that?

4    A    I was advised that by another partner.

5    Q    Who?

6    A    Kurt Plumer.

7    Q    Have you seen the FPAA that was issued by the IRS?

8    A    No, I have not.

9    Q    Have you asked for it?

10   A    Yes.

11   Q    You did, personally?

12   A    My lawyers did.

13   Q    Your lawyers did?

14   A    Yes.

15   Q    Okay.  But you -- but you did not, right?  Just to be

16   clear.

17   A    No, I did not.  My lawyers, acting at my direction, did.

18   Q    Asked the tax matters partner for Highland for that

19   information?

20   A    Asked Mr. Daugherty.

21   Q    Asked Mr. --

22   A    I think asked you, I'm sorry.

23   Q    Oh, asked me for that information?

24   A    Yes.

25   Q    Well, so tell me, why is Mr. Daugherty -- first off, do

Seery - Cross                              116

 1  you know if Mr. Daugherty has received the FPAA?

 2  A    I don't know.

 3  Q    Okay.  Do you know if anybody else has received an FPAA?

 4  A    I was told there was a final determination.  I don't know

 5  if they've actually received an FPAA.  But I do know that Mr.

 6  Daugherty has produced a document where the IRS has requested

 7  additional information for him.  Since they hadn't done that

 8  for 17 years, I suspect that they've reached a final

 9  determination of the audit.

10  Q    All right.  So you don't know whether an FPAA has actually

11  been issued?

12  A    I --

13  Q    True?

14  A    I don't know.  And for the Court's benefit, that's a Final

15  Partnership something Determination.

16  Q    Okay.  What -- where --

17          THE COURT:  F-A --

18          THE WITNESS:  F-P-P -- I think it's --

19          MR. YORK:  F-P-A-A.

20          THE WITNESS:  -- F-P-A-A.

21          THE COURT:  Okay.  The court reporter will no doubt

22  ask, so good.

23  BY MR. YORK:

24  Q    Tell me, where in the universe is it that -- is it Mr.

25  Daugherty's obligation to provide Highland with the FPAA?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed 07/02/25   Page 166 of 443   Page 117 of 266   PageID 4830

Seery - Cross                                117

 1   A    I don't -- I don't think there's any such obligation that
 2   I've seen.
 3   Q    And in fact, the IRS audit is handled by the tax matters
 4   partner for Highland Capital, correct?
 5   A    The IRS audit for Highland Capital's -- from Highland
 6   Capital's position is handled by that.  The IRS handles their
 7   side.
 8   Q    Right.  From Highland's side.  Okay.  And that tax matters
 9   partner is doing that on behalf of Highland Capital, right?
10   A    I think at this point it's doing it on behalf of the old
11   Highland Capital, not Reorg Highland Capital.  We don't have
12   any liability with respect to it, nor do we have any
13   visibility as to what's going on in the tax audit.
14   Q    So even though, under the partnership agreement, that's
15   the tax matters partner that's referred to, Highland Capital
16   cannot compel that tax matters partner to provide that
17   information to them, if an FPAA actually exists?
18   A    I don't think so.  That partnership agreement is the pre-
19   effective date partnership agreement.
20   Q    All right.
21   A    The new Highland Reorg Debtor doesn't have these partners
22   and is not a tax matter partner for those -- those audits.
23   Q    So let's go back, then, to Paragraph 4 of the adversary
24   complaint that was filed.  And I want to look at the next
25   sentence that Highland wrote there.  It says:  Moreover, if

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 57   Filed 07/02/25   Page 167 of 443    PageID 4831

Main Document   Page 213 of 266

Seery - Cross                          118

1    the claim is not disallowed, it will need to be estimated,

2    after taking into account the likely outcome of the 2008

3    audit, including adjustments that result therefrom.

4        Did I read that correctly?

5    A    You read that correctly.

6    Q    Have -- has anyone at Highland conducted any analysis as

7    of today to determine what Mr. Daugherty's potential liability

8    would be from that IRS audit if that audit was completed today

9    and all interest and penalties were assessed as of today?

10   A    Yes.

11   Q    How much?

12   A    It would be $1.475 million, the amount of his prepetition

13   claim in his proof of claim.  Since it's unsecured, whatever

14   happens with the IRS is not a concern of Highland.  His claim

15   is that he didn't get that amount as a refund.  Either he got

16   that amount or he got some -- some lower amount.  It would be

17   a petition -- prepetition-date amount.  And under Texas law,

18   he would be entitled to prejudgment interest from 2009 to the

19   petition date at a rate of five percent.

20   Q    Which would be how much?

21   A    It would be approximately $2.2 million in aggregate.

22   Q    Okay.  And there would be -- you're saying there would be

23   no penalties or any other -- any other interests or

24   assessments that would -- Mr. Daugherty would be liable for

25   that Highland would also then be liable for under that claim?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 12/02/25   Page 168 of 443   PageID 4832
Main Document   Page 215 of 286

Seery - Cross                        119

 1  A    No.  There would not.  It would not impact his claim

 2  against Highland.  His claim against Highland is simply:  I

 3  did not get this refund.

 4      He got the refund.  He's now claiming it might be

 5  adjusted.  If the IRS otherwise has penalties, interest

 6  against him for his tax attributes somewhere between 2009 and

 7  2019, that wouldn't be subject to his proof of claim and it

 8  wouldn't be the responsibility of Highland.

 9  Q    Even if Highland had promised at the time that that refund

10  was made that it would -- it would make him whole with respect

11  to any IRS audit whatsoever?

12  A    It simply --

13          MR. MORRIS:  Objection to the form of the question.

14          THE WITNESS:  It simply didn't do that.

15          MR. MORRIS:  Yeah.

16          THE COURT:  Okay.  Overruled.

17          THE WITNESS:  We can -- you could litigate the claim,

18  but that's just not what it says.

19  BY MR. YORK:

20  Q    So you talked earlier about the Class 9 consent that was

21  obtained, and no one from Highland reached out to Mr.

22  Daugherty to try to seek his consent.  Right?

23  A    That's correct.

24  Q    Why not?

25  A    Because I didn't want to.

004414

Seery - Cross                                           120

1   Q    Why?

2   A    Because Mr. Daugherty is an extremely difficult person to

3   deal with.  The last time I dealt with Mr. Daugherty on the

4   phone with respect to anything, I had extreme difficulty and

5   got sucked into a stalking lawsuit that I had to testify to

6   that is a complete mess that I want nothing to do with.  So

7   originally my counsel said, have no communication with him.

8   But with respect to this, we were objecting to his claim.  We

9   knew he would try to hold this up.  You have tried to do that

10  and demanded $20 million.  So that's why we didn't reach out

11  to you.  We just paid the 9 and we have a fully-reserved

12  amount on the 8.

13  Q    You thought that the stalking case that you were pulled

14  into was completely fabricated, didn't you?

15  A    I thought that at the time.  I'm not as sure anymore.

16  Q    Oh, really?

17  A    Yeah.

18  Q    Okay.  And you actually also told Mr. Daugherty that Mr.

19  Ellington, who brought that case, was a complete liar and POS,

20  right?

21  A     I don't know if I used POS, but I do not think Mr.

22  Ellington is an honest person.

23          MR. MORRIS:  Your Honor, at some point I'm going to

24  on relevance grounds.  I think we've got a settlement

25  agreement before the Court that we're trying to get approved

004415

1    today, not to take discovery on any other matters.

2           THE COURT:  Okay.  I'm going to overrule to the

3    extent there was an objection, but I think it's appropriate to

4    worry that we're straying down a road that is not relevant.

5    So, --

6           MR. YORK:  Understood.

7           THE COURT:  -- reign it in.

8           MR. YORK:  All right.

9    BY MR. YORK:

10   Q    You'd agree that the -- under the terms of the proposed

11   settlement, there will be some interim distributions will be

12   made to the HMIT entities in cash totaling approximately $23

13   million.  Correct?

14   A    Not necessarily, no.

15   Q    Why not?

16   A    Because there's an initial distribution.  I believe it's

17   $10 million.

18   Q    Yes.

19   A    And then subsequent distributions are predicated on

20   whether there are threats, either outstanding litigation or

21   threats as defined in the agreement.

22   Q    And so long as those threats don't occur, then those

23   interim -- those additional interim distributions will be

24   made, right?

25   A    Yes.  The Indemnity Trust would make those distributions

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 171 of 443    PageID 4835
Main Document    Page 122 of 266

Seery - Cross                                             122

1    at those times, and then I have to make -- it's a double

2    trigger, because it has to be no threats and I have to

3    determine that the Indemnity Trust had sufficient assets to

4    meet its obligations for both actual and contingent

5    indemnification obligations.

6    Q    But at a minimum, the HMIT entities will receive at least

7    $10 million?

8    A    Yes.

9    Q    On an interim basis?

10   A    Yes.

11   Q    All right.  And you'd agree with me that, under the terms

12   of the plan, the plan provides that the classes get paid in

13   order of priority, correct?

14   A    That's correct.

15   Q    All right.  And if you turn to Daugherty Exhibit 4, which

16   is the confirmation order, at Page 45.  And Subsection A there

17   in the middle of that has a sentence that says:  Accordingly,

18   as the holders of the equity -- excuse me.  Strike that.  Let

19   me start over.  Are you there yet, Mr. --

20   A    Now I am.

21   Q    All right.  Accordingly, as the holders of equity

22   interests that are junior to the claims in Class 8 and Class 9

23   will not receive or retain under the plan on account of such

24   junior claim interest in any property unless and until the

25   claims in Class 8 and Class 9 are paid in full, plus

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 172 of 443   PageID 4836
Main Document   Page 123 of 266

Seery - Cross                              123

1   applicable interest, --

2        Did I read all that correctly?

3   A    Yes.

4   Q    Okay.  And the term "Claim" there is a capitalized term,

5   right?

6   A    Yes.

7   Q    It's not -- it doesn't say allowed claims.  It just says

8   claims.  Right?

9   A    That's correct.

10  Q    All right.  All right.  Now, if you'd turn with me to the

11  Claimant Trust Agreement, which is Daugherty Exhibit 5, and go

12  to Section 5(c).  Excuse me.  5.1(c).  I apologize.

13  A    Yes.

14  Q    And this is -- this is -- relates to the contingent trust

15  interests associated with the Class 10 and Class 11 limited

16  partnership interests in Highland, correct?

17  A    Generally, yes.

18  Q    All right.  And you'd agree with me that, in the -- about

19  four lines down, it says:  The Claimant Trustee shall allocate

20  to each holder of allowed Class 10-B and C limited partnership

21  interests and each holder of allowed Class 11 Class A limited

22  partnership interests a contingent trust interest equal to the

23  ratio that the amount of each holder's allowed Class 10 or

24  Class 11 interest bears to the total amount of the Class 11 or

25  -- Class 10 or Class 11 interest, excuse me, as applicable

004418

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed 08/21/25   Page 173 of 443   Page 173 of 260   PageID 4837

Seery - Cross                                        124

1    under the plan.

2         Did I read all of that correctly?

3    A    I believe you did, yes.

4    Q    All right.  And under the terms of the proposed

5    settlement, the HMIT entities are getting an allowed Class 10

6    interest, correct?

7    A    That's correct, yes.

8    Q    All right.  And then the next sentence goes on to say:

9    The contingent trust interest shall not vest and the equity

10   holder shall not have any rights under this agreement unless

11   and until the Claimant Trustee files with the Bankruptcy Court

12   a certification that all GUC beneficiaries have been paid

13   indefeasibly in full, including, to the extent applicable, all

14   accrued and unpaid postpetition interest consistent with the

15   plan and all disputed claims have been resolved.  The GUC

16   Payment Certification.

17        Did I read that correctly?

18   A    You did, except you used the article "The" before

19   "contingent trust interest" at the start of the sentence.

20   Q    Fair enough.  And the GUC beneficiaries there would be the

21   general unsecured creditor beneficiaries, correct?

22   A    That's correct.

23   Q    And this certification has not been issued yet by the

24   Claimant Trustee in this bankruptcy, correct?

25   A    That's correct.

Seery - Cross                          125

1    Q    In part because of Mr. Daugherty's remaining unresolved

2    Class 8 claim, correct?

3    A    In part, yes.

4    Q    And also in part because of the remaining Class 9 claimant

5    holders who still have money owed to them on their Class 9

6    claims?

7    A    In part, yes.

8    Q    Okay.  Does the term of the proposed settlement agreement

9    provide those Class 9 consent holders with releases from the

10   HMIT entities?

11   A    No.

12   Q    It does not?

13   A    No.

14   Q    At all?

15   A    No.

16   Q    Even if they were in their capacity serving as board

17   members for Highland Capital?

18   A    Certain of the Class 9 holders are also on the Oversight

19   Board.  In their capacity as Oversight Board members, yes,

20   they get -- they get broad releases.  UBS, for example, is

21   not.  There are no releases in there for the two UBS entities.

22   Q    Would you now -- you can set that binder aside.  And if

23   you'd turn with me to Exhibit 60 in the -- Highland's exhibit

24   list.

25   A    Six zero?

004420

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L     Document 7   Filed 07/02/25   Page 175 of 443     PageID 4839
Main Document     Page 175 of 266

Seery - Cross                                      126

1    Q    Yes, sir.

2    A    Yes.

3    Q    This is a copy of the tolling agreement extending

4    objection deadline between -- that's on -- dated July 27th of

5    2022 between Mr. Daugherty and Highland Capital Management, LP

6    and Highland Claimant Trust.  Correct?

7    A    Yes.  That's what it appears to be, yes.

8    Q    All right.  If you would, go with me to Page 2 at the

9    bottom.  There is a Footnote #3.  Do you see that?

10   A    Yes.

11   Q    And that footnote relates to, up above, a defined term

12   called a "Reserved Claim," the Reserved Claim being what was

13   discussed earlier in Mr. Daugherty's settlement agreement with

14   Highland, right?

15   A    That's correct, yes.

16   Q    And it states in here that that Reserved Claim means "the

17   contingent and unliquidated claim as referenced in Proof of

18   Claim #205."

19        Did I read that portion of the footnote correctly?

20   A    Yes.

21   Q    All right.  And it goes further to say that the amount

22   listed there of 2.65 million three hundred -- two point six --

23   let me start ever.  $2,650,353 is the amount estimated as of

24   October 23, 2020.  Correct?

25   A    That's correct.

004421

Seery - Cross                    127

1    Q    All right.  It doesn't say it's -- anywhere in there that

2    it's a fully -- it fully reserves that unliquidated contingent

3    claim.  Correct?

4    A    In what you just read, no.

5    Q    All right.  And if you go to Page 1 -- or, I'm sorry, to

6    Page 3, Paragraph 1, the covenant to reserve where Highland

7    agrees to reserve $2,650,353 on account of the reserved claim,

8    does it say anywhere in there that that is -- fully reserves

9    that contingent unliquidated claim anywhere?

10   A    It says exactly what it says.  And you read it.

11   Q    That's not my question.  Does it say --

12   A    I don't -- well, it says, Further agree to reserve $2.650

13   [million] on account of the reserved claim in disputed claim

14   reserve.

15   Q    All right.  Does it say anywhere in there that that is the

16   fully-reserved amount of that claim?

17   A    Not in that sentence, no.

18   Q    Thank you.  All right.

19        MR. YORK:  Your Honor, give me one second.  Let me

20   confer.

21        THE COURT:  Okay.

22      (Pause.)

23   BY MR. YORK:

24   Q    Mr. Seery, UBS is one of the consent holders, Class 9

25   consent holders related to the HMIT settlement.  Correct?

004422

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 17   Filed 07/02/25   Page 177 of 443   PageID 4841
Main Document   Page 123 of 266

Seery - Cross                          128

1    A    There are two UBS entities, UBS AG 66 and UBS Securities,

2    LLC.

3    Q    All right.  Did either of those entities sit on the

4    Unsecured Creditors' Committee in this bankruptcy?

5    A    A UBS entity did.  I'm not sure which of those did, or

6    whether it was both with one counsel.  I don't -- there's a

7    UBS entity on that Creditors' Committee.

8    Q    Is the -- are the members of the Unsecured Creditors'

9    Committee within the definition of the Highland released

10   parties under the proposed HMIT settlement?  Do you know?

11   A    I don't know.  The members of the Creditors' Committee, I

12   believe, have exculpation anyway, so I don't -- I don't -- I

13   don't know if it captures the old members of the Creditors'

14   Committee.  I don't -- for example -- I don't think so.  I

15   don't -- I don't know.

16           MR. YORK:  Pass the witness.

17           THE COURT:  All right.  Mr. Lang?

18           THE WITNESS:  Do you have a separate binder?

19           MR. LANG:  No.

20           THE WITNESS:  Okay.  Will you be using Mr.

21   Daugherty's binder?

22           MR. LANG:  No.

23                    CROSS-EXAMINATION

24   BY MR. LANG:

25   Q    All right, Mr. Seery.  Just to be clear, the Class B and C

004423

Seery - Cross                    129

     1   -- or the Class A interests and the -- of Highland under the

     2   plan, they have 99.5 percent of the -- Highland Capital

     3   Management.  Correct?

     4   A    Could --

     5   Q    Sorry.  The Class B and C --

     6   A    Limited partnership interest.

     7   Q    -- shareholder -- limited partnership interests were 99

     8   point -- or, were .5 percent of Highland Capital Management?

     9   A    I -- I'm not trying to be difficult.

    10   Q    No, it's fine.  It's a terrible -- terrible --

    11   A    I don't -- I just don't -- I don't understand your

    12   question.  I apologize.

    13   Q    Okay.  So, at the time of the petition, --

    14   A    Yes.

    15   Q    -- Hunter Mountain Investment Trust owned 99.5 percent of

    16   Highland Capital Management?

    17   A    It owned 99-1/2 percent of the limited partnership

    18   interest in Highland Capital Management.

    19   Q    And the remainder -- and HMIT has the Class 10 claims.

    20   Correct?

    21   A    You said something, the remainder?  The --

    22   Q    Oh, sorry.  The remaining interests are owned by the Class

    23   11 claims under the plan.

    24   A    The remaining partnership interests are among those

    25   entities I testified earlier to, which are Dugaboy, Strand, --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Filed 07/02/25   Page 179 of 443    PageID 4843
Main Document   Page 2125 of 266

Seery - Cross                                130

1   Q    And Okada?

2   A    -- Mark Okada individually, and two Mark Okada and Pamela

3   Okada trusts.

4   Q    Okay.  And the total assets in the estate right currently

5   you testified are between $65 to $70 million?

6   A    I -- off the top of my head, I don't recall, but it --

7   rough range, it could be in that general vicinity.  That does

8   not include the payments that have to be made to the 9s and

9   expenses.  So I believe there's documents in here that we

10  could go through, if you like.

11  Q    And I believe you testified that the remaining unpaid 9s

12  are owed approximately $20 million?

13  A    Approximately $20 million, yes.

14  Q    Okay.  And the plan does not say that the equity claims

15  for Class 10 and 11 are to be determined by the capital

16  account values of the limited partnership interests in the

17  Debtor LP?

18  A    That's correct.  It says to set an amount.  It doesn't

19  tell you how to do the amount.

20  Q    Okay.  And under the settlement agreement, Class 10

21  interests will be allowed in the amount of $336,940,230.58?

22  A    Approximately $336 million, yes.

23  Q    $336 million.  Fair.  And this is the capital account

24  balance as of -- HMIT's capital account balance as of the

25  petition date, less, I believe, the HMIT note?

1    A    That's correct.  So that amount is the net amount.

2    Q    The net?  And do you know how the capital account balances

3    were calculated --

4    A    Yes.

5    Q    -- on the petition date?

6    A    Yes.

7    Q    And how were they calculated?

8    A    So, you take the 2018 year-end capital account amount, and

9    then there's activity in the company that gets passed through

10   through the partnership.  The partnership agreement -- in this

11   instance, the prepetition Debtor partnership agreement passed

12   through profits and losses on a pro rata basis.  There was

13   activity in the first half of the year that affected that

14   capital account.  You can see that reflected in the year-end

15   auditeds as well as the K-1 statement that -- for 2018 that

16   was given to HMIT.  That would be their 2018 year-end.  That

17   then, from an accounting perspective, was used and brought

18   down to the petition date.  And between the petition date and

19   year-end 2019, there was additional capital activity, the

20   biggest one of which was the reserve -- full reserve for the

21   $50-plus million for the HMIT note.  And so then you'll see

22   the 2009 auditeds that are signed off by Mr. Waterhouse.  And

23   in those interim months, then you also see the gross amount of

24   the partner capital each month in the monthly operating

25   reports.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Main Document   Filed 07/09/25   Page 2132 of 266   Page 181 of 443    PageID 4845

Seery - Cross                              132

1  Q   And correct me if I'm wrong, but I believe you testified

2  that the capital account balances continued to go down after

3  2019.  So you have the petition date, you have the next year,

4  and did they continue to --

5  A   I don't think I testified to that.  What I testified to is

6  that there was economic activity in 2019 that affected the

7  year-end '18 to the petition date.  And then from the petition

8  date there was year-end activity -- there was activity from

9  the petition date to year-end '19 that would affect the

10 capital account as reflected in the 2018 auditeds -- they

11 weren't auditeds -- 2018 tax returns signed off by Waterhouse.

12 The biggest part of that activity was the application or the

13 reserve for the Hunter Mountain Note.

14 Q   And was there any activity after the 2019 tax return?

15 A   There was postpetition activity in the partnership,

16 certainly.

17 Q   And did it reduce the capital accounts during those years?

18 A   I assume it would have reduced all of the capital accounts

19 pro rata.

20 Q   Okay.  And why'd you use the petition date as the date to

21 determine the value of the capital accounts?

22 A   Because this is bankruptcy and that's the date on which

23 you fix all your claims and interests.

24 Q   If you used -- have you ever used equity ownership

25 percentages to determine the payment to the equity versus

004427

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 182 of 443   PageID 4846
Main Document   Page 133 of 266

Seery - Cross                                    133

1    their capital account balances?

2    A    In this case, or elsewhere?

3    Q    Elsewhere.

4    A    I think that's standard.  I can't cite you a specific

5    thing, but typically when a partnership liquidates or a

6    partnership is sold, amounts get distributed pursuant to the

7    capital accounts and -- and -- in up to amounts in the capital

8    accounts.

9    Q    You would agree, if you use the percentage of ownership,

10   being 99.5 percent for Class 10 and the .5 percent for Class

11   11, would potentially leave money for the Class 11 creditors

12   to recover?

13   A    I don't think so.  No, I don't agree with that.

14   Q    Why do you say that?

15   A    Because Class 11 is subordinated to Class 10.

16   Q    Okay.  So explain how, if $60 million exists and you pay

17   $20 million to the Class 9, --

18   A    Roughly.  Yeah.

19   Q    Rough.  Just rough math.

20   A    Okay.

21   Q    That leaves $40 million.

22   A    Okay.

23   Q    Correct?  And if the ownership interests or the allowed

24   claim for HMIT was 99.5 percent, wouldn't that leave .5

25   percent of $40 million for the remaining creditors?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/09/25   Page 183 of 443   PageID 4847
Main Document   Page 2124 of 266

Seery - Cross                               134

1    A    That doesn't make any sense, because 99-1/2 percent of a

2    senior thing means you get everything.  So that Class 10 has

3    to be paid in full before the 11.

4         In addition, there's already an agreed-upon amount on

5    HCLOM for $10 million.  So how do I give HCLOM $10 million and

6    99-1/2 percent to somebody else?  There has to be numbers.

7    Q    But to be clear, the plan does not say that the equity

8    claims are determined on capital accounts.  Correct?

9    A    That's correct.

10   Q    All right.

11              MR. LANG:  No further questions.

12              THE COURT:  All right.  Any redirect?

13              MR. MORRIS:  Just one moment, Your Honor.

14       (Pause.)

15              MR. MORRIS:  We have no questions, Your Honor.

16              THE COURT:  All right.  Any redirect from --

17              MR. PHILLIPS:  No, Your Honor.  Thank you.

18              THE COURT:  -- the one question?

19       Okay.  Thank you, Mr. Seery.  You are excused from the

20   witness box.

21              THE WITNESS:  Thank you, Your Honor.

22       (The witness steps down.)

23              THE COURT:  Okay.  I'm going to again take proposals.

24   I can live with a 30-minute lunch break.  I and my staff can.

25   But it's easier for us than all of you.  So do you all want to

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/22/25   Page 184 of 443    PageID 4848

135

 1    negotiate for more?

 2          MR. MORRIS:  I just wanted to let the Court know

 3    that, with that, the Movants rest.  We're not -- we're not

 4    going to call anybody else.

 5          THE COURT:  Okay.

 6          MR. MORRIS:  We reserve the right to cross-examine.

 7    We reserve the right to call rebuttal witnesses, including Ms.

 8    Deitsch-Perez and Mr. Dondero, depending on what testimony is

 9    elicited.  So we reserve the right to call rebuttal witnesses.

10    But we're not calling anybody further on our direct case, and

11    we rest.

12          THE COURT:  Okay.  So let me --

13          MR. MORRIS:  I'll let them --

14          THE COURT:  -- follow up on that point.

15          MR. MORRIS:  Uh-huh.

16          THE COURT:  There had been a discussion of Mr.

17    Patrick.

18          MR. MORRIS:  Uh-huh.

19          THE COURT:  Limited to one total hour.  Thirty

20    minutes collectively, Debtor and HMIT.  Thirty minutes

21    collectively, Dugaboy and Daugherty.

22          MR. MORRIS:  You know what, Your Honor.

23          THE COURT:  You're -- you're not asking --

24          MR. MORRIS:  No, maybe I -- I forgot that you had

25    told us we could do it, too.  So let's take the lunch break,

Case 19-34054-sgj11  Doc 4296  Filed 06/30/25  Entered 06/30/25 11:25:22  Desc
Case 3:25-cv-02724-L  Document 7  Filed 06/27/25  Page 185 of 443  PageID 4849
Main Document  Page 136 of 266

136

1      let us figure it out, we'll let you know when we come back.

2              THE COURT:  Well, I'm clarifying because I'm deciding

3      --

4              MR. MORRIS:  Yeah.

5              THE COURT:  -- who gets to go first.

6              MR. MORRIS:  Understood.

7              THE COURT:  Each witness.

8              MR. MORRIS:  Understood.

9              THE COURT:  And I presume --

10             MR. MORRIS:  Understood.

11             THE COURT:  -- the Debtor/HMIT would go first.

12             MR. MORRIS:  Yeah.

13             THE COURT:  And then with regard to Dondero, --

14             MR. MORRIS:  Yeah.

15             THE COURT:  -- you all would go first.

16             MR. MORRIS:  So I withdraw what I said.  Let us

17     confer during the lunch break and we'll figure out who's going

18     first, whether we do rest or whether we put Mr. Patrick on for

19     a short direct.

20             THE COURT:  Okay.  Which leads me to our lunch break.

21     Do people want to negotiate for more than 30 minutes?  I don't

22     want to make someone collapse if --

23             MR. MORRIS:  Thirty minutes, or 1:30?

24             MR. PHILLIPS:  1:30.

25             MR. MORRIS:  1:30, Your Honor.  It's nice and round.

004431

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 137 of 266    Page 186 of 443    PageID 4850

137

 1          MR. PHILLIPS:  One clarification, Your Honor.

 2   Because I don't -- I don't -- if one side doesn't take the

 3   half hour, does that go over to the other side, or --

 4          THE COURT:  No.

 5          MR. PHILLIPS:  No?

 6          THE COURT:  I don't think -- I'm just giving --

 7          MR. PHILLIPS:  Great.  Thank you.

 8          THE COURT:  And my law clerk said maybe I was

 9   confusing about that earlier today.

10          MR. MORRIS:  Yeah.

11          THE COURT:  One hour total, but 30 minutes each.  And

12   if one collective team doesn't use the whole 30 minutes, we're

13   not --

14          MR. MORRIS:  Yeah.

15          THE COURT:  -- giving it to the other side.  Okay?

16          MR. PHILLIPS:  That was my question.

17          MR. MORRIS:  Understood, Your Honor.

18          THE COURT:  And while I'll let you all discuss

19   whatever you want, what I envisioned is you all would go first

20   with Mr. Patrick, --

21          MR. MORRIS:  Uh-huh.

22          THE COURT:  -- and then Dugaboy and Daugherty would

23   go first on Mr. Dondero.  But if you all collectively think it

24   makes sense to do something different, I'll hear.

25          MR. MORRIS:  No.  That makes sense, Your Honor.

Case 19-34054-sgj11  Doc 4296  Filed 06/30/25  Entered 06/30/25 11:25:22  Desc
Case 3:25-cv-02724-L  Document 57  Filed 07/02/25  Page 187 of 443  PageID 4851
Main Document  Page 123 of 266

138

1          MR. PHILLIPS:  Thank you, Your Honor.

2          THE COURT:  All right.  So we'll come back at 1:30 --

3          MR. YORK:  Yes.

4          THE COURT:  -- and resume.

5          MR. YORK:  Thank you so much.

6          THE COURT:  Okay.  Thank you.

7          THE CLERK:  All rise.

8      (A luncheon recess ensued from 12:51 p.m. until 1:33 p.m.)

9          THE CLERK:  All rise.

10         THE COURT:  Please be seated.  All right.  We're back

11  on the record in the Highland Capital matter, the Rule 9019

12  motion for approval of a settlement.  When we broke, we were

13  waiting to talk about Mr. Patrick and Mr. Dondero as

14  witnesses.  Are they going -- is Patrick going to be your

15  witness?

16         MR. MORRIS:  No, Your Honor.  We're going to reserve

17  our 30 minutes for rebuttal.

18         THE COURT:  Okay.  Thank you.

19     All right.  I'll hear from the Objectors now.

20     (Pause.)

21         MR. YORK:  Sorry, Your Honor.  I didn't realize they

22  were going to observe.  So, --

23         THE COURT:  Well, yes.  If you understood what I was

24  saying before the break, I presumed they might want to go

25  first with Mr. Patrick, but it was -- you're the one who

004433

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 17   Filed 02/21/25   Page 188 of 443   PageID 4852
Main Document   Page 139 of 266

139

1    wanted him, so if they want to go second, they can go second.

2              MR. YORK:  Well, --

3              THE COURT:  Well, I say "you're."  I'm sorry.

4              MR. LANG:  No, it's okay.

5              THE COURT:  Mr. Lang wanted to go --

6              MR. YORK:  Yeah.  So are we definitely doing Mark

7    Patrick now?

8              MR. PHILLIPS:  No.

9              MR. YORK:  Oh, okay.

10             MR. PHILLIPS:  We just rested.

11             THE COURT:  Okay.

12             MR. MORRIS:  They can call whoever they want.

13             THE COURT:  They have rested.  If you don't want to

14   go forward with any witnesses, you don't have to.

15             MR. YORK:  Oh, we --

16             THE COURT:  But you had wanted to go forward -- you

17   wanted to question Patrick and I said, if he's going to be a

18   witness, then Dondero should also be a witness.  Okay?  And at

19   most an hour collectively for each witness.  If you don't want

20   to call either one of them, you don't have to call either one

21   of them.

22             MR. LANG:  We're going to.  I think that they were

23   just going to call Daugherty first.  I didn't know if you had

24   an order that you wanted to do this in.

25             THE COURT:  Well, no.  I don't care.  I guess I don't

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 189 of 443   PageID 4853
Main Document   Page 214 of 266

140

```
 1    care.  Was Daugherty listed?  I mean, --

 2              MR. YORK:  Yes.

 3              THE COURT:  I'm sorry.  Did you say Daugherty or

 4    Dondero?

 5              MR. LANG:  Daugherty.

 6              THE COURT:  Okay.  I'm sorry.  So you want to call

 7    Daugherty?

 8              MR. YORK:  Yes.

 9              THE COURT:  And you listed him as a witness?

10              MR. YORK:  Yes.

11              THE COURT:  So you may call Daugherty.

12              MR. YORK:  All right.

13              MR. MORRIS:  Yes.  I --

14              MR. YORK:  We'll call Patrick Daugherty, then.

15              THE COURT:  Okay.

16              MR. MORRIS:  I don't believe Dugaboy did, but --

17              MR. YORK:  Right.

18              MR. MORRIS:  -- if they -- if they want to call him,

19    by all means.

20              THE COURT:  Okay.

21              MR. MORRIS:  Yep.

22              THE COURT:  All right.  Mr. Daugherty, if you could

23    approach the witness box, I will swear you in.  Please raise

24    your right hand.

25         PATRICK DAUGHERTY, PATRICK DAUGHERTY'S WITNESS, SWORN
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L      Document 7    Filed 07/02/25    Page 190 of 443    PageID 4854
Main Document    Page 125 of 266

Daugherty - Direct                     141

```
 1              THE COURT:  All right.  Please be seated.

 2              THE WITNESS:  Oh, wow.  A lot of water up here.

 3              THE COURT:  Plenty of water for everyone.

 4                        DIRECT EXAMINATION

 5   BY MR. YORK:

 6   Q   Good afternoon, Mr. Daugherty.  Could you state your name

 7   for the record, please?

 8   A   Patrick H. Daugherty.

 9   Q   Mr. Daugherty, are you a creditor in the Highland Capital

10   bankruptcy?

11   A   Yes, I am.

12   Q   All right.  And would you turn to, in the Daugherty

13   exhibit binder, turn to Exhibit 1, please?

14   A   Yes.

15   Q   And this is a settlement agreement between you and

16   Highland Capital Management relating to claims -- your proof

17   of claim that you made in this bankruptcy, correct?

18   A   Yes.

19   Q   And we looked earlier.  You were in the courtroom for Mr.

20   Seery's testimony, correct?

21   A   I was.

22   Q   All right.  And we talked in Section 9 about the defined

23   Reserved Claim in there.  Do you remember that?

24   A   I did.

25   Q   All right.  Can you describe what --
```

004436

Daugherty - Direct                    142

1    A    I consider it the Compensation Claim, but yes.

2    Q    Can you describe what the Reserved Claim is?

3    A    Yeah.  Basically, it, background, it dates back to the

4    financial crisis of 2008, 2009.  Highland was on the brink of

5    filing for bankruptcy.  We had a creditor bank led by Bank of

6    America and Scotia, and we were in default.  And so the banks

7    came in, declared default, and basically put a limit or

8    terminated our ability to pay cash bonuses.  And that -- right

9    after Lehman Brothers failed, so call it September 2008 and

10   going into 2009.

11       And the problem with that is we were losing people right

12   and left.  We had about 22 senior-level guys.  We were down --

13   and I say guys.  I think there were some women, too.  But we

14   were down to about 12 people.  And they were trying to stem

15   the tide of people running out of the doors in order to save

16   the value of Highland.  We started the year at about $40

17   billion under management, and by that time, we were -- I think

18   we were as low as $19 or $20 billion under management.

19       Hedge funds were rolling up.  CLOs did fine.  Private

20   equity did fine.  Retail funds were having problems.  And

21   separate accounts were okay.  But we were definitely a firm in

22   crisis and trying to hold on to people.

23       So the nature of this compensation claim, you know, every

24   year, everybody except Dondero and Okada would get what's

25   called a compensations and award letter.  Because Dondero and

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 192 of 443   PageID 4856
Main Document   Page 215 of 266

Daugherty - Direct                143

1   Okada were really the only partners.  I think you can kind of

2   see that, given your experience.  They were called the

3   founding partners.  They were the only ones that got true

4   distributions from the firm annually.  Guys like us, you know,

5   the other 12 or so, we got cash bonuses and incentive comp and

6   deferred comp.  And, you know, obviously, cash compensation

7   was a big part of our compensation, and they were prohibited

8   from the banks from paying it.

9       So Dondero, with the help of Rick Swadley and some of the

10   other tax people, I don't know if we used out outside firms or

11   not, they came up with this scheme, if you will, where

12   Highland was going to go and use whatever they came up with

13   with the partnerships and whatnot and then generate a tax

14   refund to the senior-level guys.  As or in lieu of the cash

15   bonuses that couldn't be paid, they were going to go make

16   these elections and then we were going to get this money.

17       And if you look at our awards agreement, it says you're

18   going to get $x$ amount of money.  And it's in the line that

19   historically is the cash bonus.

20       Also, when we got like our email or whatever that year

21   from Patrick Boyce, our CFO, he was like, Congratulations,

22   your bonus this year was $x$.  And it was whatever that amount

23   was on your compensation and award letter.

24       Well, several of us had the same accountant, John Garvey,

25   at Bland Garvey.  Me, Joe Daugherty, and Davis Deadman.  And

Daugherty - Direct                144

1    we took this concept to our accountant and he's like, man,

2    that's really precedent.  And so you guys are going to have to

3    basically protect yourselves from -- sorry, go ahead.  Make

4    your objection.  I'm sure I'm --

5              MR. MORRIS:  I just, I just don't remember what the

6    question was at this point and he's testifying to --

7              THE WITNESS:  Why I got this thing.

8              THE COURT:  It was --

9              THE WITNESS:  My apologies.

10             MR. MORRIS:  -- to conversations and hearsay.

11             THE COURT:  What is the --

12             MR. YORK:  Let me ask a question and I'm going to try

13   to --

14             THE COURT:  -- proof of claim about, was the essence

15   of the question.

16             MR. YORK:  Yeah.  Right.

17             THE COURT:  So I sustain.  We're getting a little

18   narrative, shall we say.

19             THE WITNESS:  My apologies.

20             MR. YORK:  So, --

21             THE WITNESS:  I'll tighten it up.

22   BY MR. YORK:

23   Q   All right.  So, Mr. Daugherty, what you were getting under

24   this scheme, as you describe it, was a cash bonus that was

25   masked as a refund, correct?

004439

Daugherty - Direct                    145

1  A    Look, Highland paid for it however they're going to pay

2  for it.  They're the one who created whatever that they did.

3  But for us, it was a cash bonus.

4  Q    Okay.

5  A    But given that I was -- what I was just alluding to, there

6  were concerns about the tax impacts if the IRS didn't agree

7  with Highland.  And so what we did is we negotiated for and

8  got from Dondero -- really, I mean, Jim ultimately made the

9  decisions at Highland.  He said, look, if you don't -- if this

10  doesn't work, if it doesn't go through, we'll make you whole.

11  And so we got that provision in the compensation and award

12  letter that says if the actual refund deviates materially from

13  the refund, then you'll get substitute compensation.  And that

14  was enough for us, --

15  Q    And --

16  A    -- and that's what led to this claim.

17  Q    And was it your understanding that, in terms of making you

18  whole, that was not just whatever you had to pay back for the

19  refund, but also interest and penalties?

20  A    Yeah.

21            MR. MORRIS:  Objection.  Leading.

22            THE COURT:  Sustained.

23            THE WITNESS:  That's fair enough.

24  BY MR. YORK:

25  Q    What was your understanding as to what that 'make you

004440

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7 Main DocumentFiled 07/21/25 Page 195 of 443 Page 195 of 443    PageID 4859

Daugherty - Direct                                    146

1   whole' constituted?

2   A    It was basically to put me and the others back in the

3   position of getting to that number that was listed in the

4   document.  So if there were any interest, penalties, pullbacks

5   from the IRS, then we would be made whole at that -- we'd get

6   back the net of that number.  However, if the IRS was fine

7   with it, we wouldn't get anything.

8   Q    So there's a chance, depending on how the IRS audit turns

9   out, if the IRS says what Highland did was fine, then you

10  don't owe the IRS anything, right?

11  A    Yeah.  That's been a critical thing, that I may not owe

12  the IRS anything, and certainly I wouldn't expect Highland to

13  give me anything.

14  Q    And at that point, what's been reserved as your reserved

15  claim would effectively at that point, from the IRS

16  perspective, the IRS audit perspective, would be a zero dollar

17  amount, right?

18  A    Yeah.  I mean, more so.  I mean, Jim Seery offered to buy

19  me out with an amount of the reserved claim.  And I said,

20  listen, I'm not looking for a windfall here.  What I'm looking

21  for is to be made whole, --

22  Q    Right.

23  A    -- it's my insurance policy on what I earned back in 2008,

24  because the alternative is I will have ended up working for

25  free in 2008, plus have to pay penalties and interest going

004441

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L     Document 7   Main Document   Filed 07/22/25   Page 215 of 266   Page 196 of 443     PageID 4860

Daugherty - Direct                    147

1   forward that could wipe out my net worth.

2   Q    All right.

3   A    So I wanted the insurance policy aspect of it.

4   Q    So you heard Mr. Seery's testimony earlier where he said

5   the total amount you would owe was somewhere in the range of

6   $1.4 to $1.5 million if there was --

7   A    He's wrong about that, if that's what he said.

8   Q    Why?

9   A    At the time -- I think the number he was referencing was

10  in our claim number that I filed back in, I want to say,

11  October 2020.  And the $1.45 million, what was in the

12  compensation -- was the number in the compensation and awards

13  letter.

14       The other number that I spoke about from the gallery out

15  there was one point -- I don't know, whatever the interest --

16  whatever I guessed the interest might be.  And then I didn't

17  have anything for penalties.  So, at that particular time,

18  took those numbers and said, okay, if the IRS says no way on

19  all this, this is what I'd have to pay, not including

20  penalties.

21  Q    All right.  So you've seen today and you listened to the

22  testimony about the footnote in Highland's adversary complaint

23  against you in which they say that the resolution may not be

24  until 2029 of this IRS audit?

25  A    That's correct.  I've heard that.

Daugherty - Direct                      148

1    Q    All right.

2    A    I've seen it and heard it.

3    Q    All right.  As you've sat here today, have you done any

4    calculation back of the napkin to try to estimate what your

5    potential exposure would be to the IRS in terms of interest

6    and penalties as a result of that audit dispute if it wasn't

7    resolved until 2029?

8    A    Yeah.  I listened to the judge.  I went and ran '33

9    because that was a number that was just thrown out.  At '33,

10   if it's 2033, it's $7.4 million, and if it's 2029 it's $5.7

11   million.

12   Q    What sort of financial impact would that have on you?

13   A    The latter would pretty much wipe me out.  I'm sorry.  The

14   former would -- the $5.7 million would wipe me out.  The

15   latter would cause me to file for bankruptcy.

16   Q    Okay.  Mr. Seery also discussed his -- that he had heard

17   through the grapevine that the IRS audit had been resolved.

18   Has anyone from Highland ever told you that the IRS audit is

19   resolved?

20   A    No one's told me that from anywhere, anyhow, anyway.

21   Q    Have you had a conver... have you had -- so nobody at all,

22   right?

23   A    No one at all.

24   Q    Have you -- did you have a conversation recently with Kurt

25   Plumer over it?

004443

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 198 of 443    PageID 4862
Main Document    Page 215 of 266

Daugherty - Direct                      149

 1  A    I did.  I had lunch with him at Hillstone.

 2  Q    Did he mention it at all?

 3  A    No.

 4  Q    All right.  Could you turn with me to, in your exhibit

 5  binder, Exhibit 8, please?

 6  A    Yeah.

 7  Q    All right.  Can you just identify for us what this

 8  document is?

 9  A    This is a letter I got from the IRS dated November 20th,

10  2024, basically telling me that the case is open and I may owe

11  money.

12  Q    And specifically, if we look at the first paragraph, it

13  says, "Why You're Receiving This Letter," in bold, right?

14  A    It does.

15  Q    And then below that it says:  We might have to adjust your

16  tax return based on our examination of the Highland Capital

17  Management listed above.

18      Did I read that part correctly?

19  A    Yes.

20  Q    And so is it your understanding that your -- that this is

21  related to the IRS audit of Highland?

22  A    That is my understanding.

23  Q    And that your tax return, your personal tax return may be

24  adjusted as a result of that?

25  A    Mine and my wife's.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 199 of 443   PageID 4863
Main Document   Page 198 of 266

Daugherty - Direct                    150

 1    Q    Which would mean you're subject to interests and penalties

 2    as well?

 3    A    As is she.

 4    Q    Okay.  And is this the only letter you've ever received

 5    from the IRS?

 6    A    No.

 7    Q    Related to the Highland Capital Management audit?

 8    A    No.

 9    Q    All right.  Do you receive these periodically?

10    A    Yes.  The initial one came I want to say about five months

11    after we filed the returns in two thousand -- it was for the

12    calendar year 2008, so it was April 15th, 2009, I want to say.

13    Maybe it was -- I think the first one came around October,

14    late October 2009.

15    Q    And --

16    A    Like this.  I can't -- I don't remember it verbatim.

17    Q    Is this the last communication you have received from the

18    IRS relating to Highland's IRS audit?

19    A    This was it.  Yeah.

20    Q    Okay.  Has anyone from the IRS ever told you that an FPAA

21    has been issued --

22    A    No.

23    Q    -- with respect to the Highland's audit?

24    A    No.  I don't even know what that -- I didn't even know

25    what that was.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Main Document Filed Page 200 of 266 Page 200 of 443   PageID 4864

Daugherty - Direct                151

 1  Q   And you've never received an FPAA from the IRS, right?

 2  A   I have not.

 3  Q   And you've never -- nobody else has ever sent you an FPAA

 4  related to the Highland audit, right?

 5  A   No.

 6        MR. MORRIS:  I'm being kind, but this is just --

 7        THE COURT:  It's leading.

 8        MR. MORRIS:  -- testifying from the podium.

 9        THE COURT:  Sustained.

10        THE WITNESS:  Yeah.

11  BY MR. YORK:

12  Q   All right.  Mr. Daugherty, would you turn -- we'll switch

13  topics real quick to the tolling agreement.  Would you turn in

14  Volume 1 of the Highland exhibits to Exhibit 60, please?

15  A   Volume 1, and then which one, I'm sorry?

16  Q   Exhibit 60.

17  A   Yeah.  Yes, I'm there.

18  Q   Why did you enter into -- well, back up.  Strike that.

19  Start over.  This is the tolling agreement extending a claim

20  objection deadline between you and Highland Capital and the

21  Highland Claimant Trust as of July 27th, 2022, correct?

22  A   That is correct.

23  Q   And is it your signature on Page 6 or 7 of the document on

24  the left-hand side?

25  A   It appears to be, yes.

Daugherty - Direct                                    152

1    Q    All right.  Why did you enter in this tolling agreement?

2    Why did you enter into --

3    A    I'm sorry, what was your question?

4    Q    Why did you enter into this tolling agreement?

5    A    Jim Seery had reached out to me in 2022 and said that they

6    had a problem with -- the Court had an objection deadline that

7    was running and that was somewhat inconsistent with the

8    settlement agreement that we had just gotten approved in early

9    March of 2022 that said they couldn't object, they being

10   Highland, object to the legitimacy or amount of my

11   compensation claim.

12        So he said, look, you know, we're in a little bit of a

13   predicament here.  We can go to the Court or we can try and

14   work this out.  And I'm like, hey, I'm fine to work it out.  I

15   don't want the estate to be burdened or any way.  So we went

16   back and forth on the document, and ultimately I felt that it

17   was the right thing to do.  The spirit of our settlement was,

18   you know, I -- they couldn't -- they couldn't challenge this

19   part of my claim, but the *quid pro quo* was I'm not going to be

20   able to beat them out on a technicality by running in here,

21   saying, ah, the objection deadline, you know, expired.

22        So his solution seemed to be a reasonable one.  And we

23   worked with their counsel, I think Demo and to some degree

24   Morris, to work that out for them.

25   Q    How did the estimate come about in Footnote 3?

004447

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Main Document    Filed    Page 202 of 443    Page 202 of 443    PageID 4866

Daugherty - Direct                    153

1    A    I don't know.  Nobody ever asked me about it.  There was

2    no -- Mr. Morris is right, there was no negotiation about it.

3    Because, frankly, I didn't see that as my problem.  They had

4    something to fulfill pursuant to the plan.  And there was no

5    back and forth on that reserve amount with Seery whatsoever.

6    He just said, This is what we're doing and, you know, we're

7    going to put this -- and my perception is I didn't have any

8    right to challenge it other than what was in my settlement

9    agreement.  And I looked at that as a one-time right to go and

10   seek an estimate, and I didn't want to do it that early in the

11   process.

12   Q    Would you take a look with me at the last recital that's

13   on Page 3 of the document?  All right.  It says, --

14   A    Oh.  You're going to make me read.  All right.

15   Q    It says:  Whereas, solely to avoid the expense,

16   inconvenience, and uncertainty associated with litigation, and

17   without any party admitting liability, fault, or wrongdoing,

18   or releasing or waiving any rights or defenses with respect to

19   the reserved claim, the parties desire to enter into this

20   agreement to extend the claim objection deadline solely with

21   respect to the reserved claim to January 11th, 2023 at 5:00

22   p.m. Central Time, defined as the Objection Deadline.

23        Did I read that part correctly?

24   A    You did.

25   Q    What was your understanding of this recital provision

Daugherty - Direct                          154

1  being put in here?

2  A    Well, I think I just kind of summarized it.  There was a

3  problem that the parties didn't, you know, fully recognize

4  could occur that would give me a windfall, and so this was to

5  kind of solve that on an interim basis until we got to a final

6  resolution on this tax refund thing.

7        I mean, the honest truth, God -- Judge.  Not God, Judge.

8  But the honest-to-God's truth is Seery and I had a very good

9  relationship, and we were going back and forth, and his view

10 was that this thing could get resolved in 2022.

11 Q    Did you have an understanding as to whether or not you

12 were reserving all rights with respect to your reserved claim

13 under the terms of the tolling agreement?

14 A    Absolutely I did.  Both in emails and in the document.

15 Q    All right.

16           MR. YORK:  Pass the witness.

17           THE COURT:  All right.  Any cross?  I'm assuming

18 Dugaboy did not have questions.  And, Mr. Daugherty, I should

19 have --

20           MR. LANG:  No, we do not.

21           THE COURT:  Okay.  Thank you.  Cross?

22                     CROSS-EXAMINATION

23 BY MR. MORRIS:

24 Q    Good afternoon, Mr. Daugherty.  Take your time.

25 A    How are you, Mr. Morris?

004449

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Main Document   Filed   Page 204 of 443   PageID 4868

Daugherty - Cross                    155

1   Q    Good.  I just have a few questions.  You have been paid in

2   full on your Class 9 claim, correct?

3   A    Evidently, yes.

4   Q    And that Class 9 claim was for $3.7 million, correct?

5   A    I believe it was $3.75 million.

6   Q    Thank you for the clarification.  Do you recall how many

7   payments you received that resulted in your receipt of $3.75

8   million?

9   A    I don't.

10  Q    When you received those payments, did you tell Mr. Seery

11  -- did you send it back to Mr. Seery out of any concern that

12  your Class 8 claim has not been resolved?

13  A    No.

14  Q    When you received those payments, did you object to Mr.

15  Seery or to anybody else that it was improper for the other

16  Class 9 holders to receive the payments when your Class 8

17  claim had not been resolved?

18  A    I had no idea what they were receiving.

19  Q    Did you have any reason to believe that you were receiving

20  a benefit that the other Class 9 claim holders were not

21  receiving?

22  A    Again, I had no idea what they were receiving, so I can't

23  compare the two.

24  Q    Okay.  But it is true that you accepted without protest

25  your Class 9 payments, even though your Class 8 claim had not

Daugherty - Cross                                    156

1    been resolved, correct?

2    A    I think that's accurate.

3    Q    Okay.  I think you mentioned in your proof of claim it had

4    $1.4 million; is that right?

5    A    Again, I'm cuffing it.  If you could grab it, I'll -- I

6    want to say it was -- the proof of claim had two components,

7    as I mentioned.  There was a, as I mentioned, there was the

8    compensation award amount from my compensation letter of like

9    $1.475 million.

10   Q    Uh-huh.

11   A    Don't quote me on that, but close enough.

12   Q    Approximate.

13   A    And then an interest component that would take me up to

14   that particular time if the IRS reversed it.

15   Q    Okay.

16   A    But no penalties were included.

17   Q    And that approximately $1.45 million, that's money that

18   you received back in 2009?

19   A    I didn't get that full amount in 2009.  That was -- I

20   don't want to broaden this up too much, but many times what

21   was promised was not what was delivered.  So I got a lesser

22   amount from the IRS.

23   Q    How much less did you receive?

24   A    I want to say, on a net basis, it was just under $1.2

25   million.

004451

Daugherty - Cross                      157

1    Q    Okay.  And so it's true that you've had the benefit of the

2    $1.2 million for 15 years now?

3    A    When you say the benefit, what do you mean?

4    Q    It went into your pocket 15 years ago.

5    A    Yeah, but it's a contingent liability I have back to the

6    IRS, so I can't say that it's, you know, not without

7    reservations.

8    Q    But you've had possession of that million and a half

9    dollars now for 15 years, correct?

10   A    Right.  And with it comes an obligation --

11   Q    Okay.

12   A    -- contingent back to the IRS.

13   Q    Your claim is a prepetition claim; is that right?

14   A    What do you mean by my claim?  Are you talking about the

15   compensation one?

16   Q    Yes.

17   A    Yeah.  I mean, that -- that contractual obligation

18   originated in, well, yeah, February 2009.

19   Q    It's not an administrative claim, right?

20   A    I don't believe so, no.

21   Q    It's just -- it's just a claim that existed prior to the

22   petition date.  Fair?

23   A    That is fair.

24   Q    Okay.  With respect to the reserve, you did agree to that

25   amount of the reserve, fair?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed 10/22/25   Page 207 of 443   Page 207 of 443   PageID 4871

Daugherty - Cross                                    158

1   A   I did not.  I mean, I -- I signed the document, but I did

2   not agree to that amount.

3   Q   Well, --

4   A   I did not negotiate for it or anything like that.

5   Q   Well, but if you turn to Exhibit 60 that you just looked

6   at, --

7   A   sure.

8   Q   -- and you go towards the end of the document, that is

9   your signature on the first Page 7, right?

10  A   Yeah.  I've already admitted that.

11  Q   And Paragraph 1 of the agreement that you signed

12  specifically set the reserve at the amount set forth in

13  Paragraph 1, correct?

14  A   That much is true.

15  Q   Okay.  And you --

16  A   You just said, did I agree to it, and I'm like, it was in

17  the document.

18  Q   It's in the agreement that you signed, correct?

19  A   For sure.

20  Q   Okay.  And you've never asked for that amount to be

21  adjusted, correct?

22  A   I've spoken many times to Mr. Seery and told him that it

23  will need to be adjusted upward as years go by.  We've had

24  quite a dialogue along those lines.

25  Q   Okay.  But he's never agreed to do that, correct?

004453

Daugherty - Cross                                159

1   A    He said when the time comes, we'll figure out -- listen,

2   we had a very collaborative relationship up until like the

3   last year.  And so it was like, hey, I'm not going to press

4   you.  You don't -- he's fighting off Dondero right and left.

5   You know, and I'm like, I don't want to get in the middle of

6   all this.  You go do what you've got to do.  We'll both sit

7   tight.  In fact, there was dialogue to that very effect.

8   Q    Uh-huh.

9   A    And so this was just all part of sitting tight, thinking

10  that the right thing would be done when we got final analysis

11  to this.

12  Q    Okay.  So would you just agree with me that, since signing

13  this agreement, you haven't come to court to seek an

14  adjustment --

15  A    No.

16  Q    -- of the reserve?

17  A    I did not want to be a burden.

18  Q    Okay.  And since signing this agreement back in 2022, you

19  and Mr. Seery have not come to an agreement on any adjustment

20  to the reserve, correct?

21  A    We have not.

22  Q    Okay.  Do you believe that you have claims against

23  Highland's employees?

24       MR. YORK:  I'm going to object on relevance grounds.

25  Also, outside the scope.

004454

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed 06/20/25   Page 209 of 443   Page 209 of 266   PageID 4873

Daugherty - Cross                    160

1          THE COURT:  What is the relevance?

2          MR. MORRIS:  We're going to get to the $20 million

3    demand in a moment.  I'm laying the foundation.  But we have

4    anybody on anybody --

5          THE COURT:  But what's the $20 million demand?

6          MR. MORRIS:  I'll get to it in a moment.

7          THE WITNESS:  There's --

8          THE COURT:  I can't figure out if --

9          MR. MORRIS:  I can make a proffer if you'd like.

10          THE COURT:  -- that's relevant.

11          MR. MORRIS:  I can make a proffer, Your Honor.  I'll

12    tell you.  I'll tell you right now.

13       On June 5th, Mr. York called me and said that Mr.

14    Daugherty asserts that he has claims against the Highland

15    employees, and if Highland didn't pay him $20 million he was

16    going to sue them, and he was going to file this objection

17    together with a petition in the Supreme Court opposing

18    Highland's request to stay the issuance of a mandate in the

19    Fifth Circuit.

20          MR. YORK:  First off, if Mr. Morris is going to

21    become a witness, we've got a problem here.  Secondly, any

22    sort of communications between us would be 408.  And third,

23    it's not relevant to the issue we're here on today.

24          THE COURT:  Okay.

25          MR. MORRIS:  My response to that, Your Honor?

004455

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 210 of 443   PageID 4874
Main Document   Page 211 of 266

Daugherty - Cross                          161

1          THE COURT:  All right.  I'm going to allow a little

2   latitude, --

3          MR. MORRIS:  Yeah.

4          THE COURT:  -- but I'm still unclear --

5          MR. MORRIS:  It's about -- it's about three

6   questions.

7          THE COURT:  Okay.

8          MR. MORRIS:  It's about three questions.

9          THE COURT:  You may proceed.

10  BY MR. MORRIS:

11  Q    Do you believe you have claims against Highland's

12  employees?

13  A    Me personally, no.

14  Q    Okay.  Do you -- did you authorize your lawyer to call me

15  and to demand $20 million in exchange for a release and your

16  standing down from filing any objection to this motion?

17  A    I'm not aware that that ever happened.  Nobody demanded

18  anything of you.

19  Q    Really?

20  A    Yeah.

21  Q    Do you know that your lawyer used the number $20 million

22  to me?

23  A    Oh, I've read the emails back and forth between you.

24  Q    So why don't you explain to Judge Jernigan what your

25  understanding is as to what your lawyer meant when used $20

004456

Daugherty - Cross                                    162

1    million to me.

2    A    I can't say for sure what he meant, but I can tell you

3    from my perspective what I understood.

4    Q    What did you understand?

5    A    I have another entity that I picked up in the settlement

6    with Highland called the Highland Employee Retention Asset

7    Fund.  And again, pursuant to the settlement agreement, I mean

8    -- I guess supposedly, I guess, when I think about it, I do

9    have claims individually, because it's with me, that

10   agreement.

11        But it said that Highland had to turn over all the books

12   and records of the HERA fund.  And Mr. Morris was on many of

13   those emails.  And they had turned over some of the books and

14   records, but they didn't turn over any of the books and

15   records that implicated Thomas Surgent and David Klos in

16   defrauding HERA in allocating Highland's expenses when they

17   were litigating me, against me, back to HERA.

18        So I do have a settlement agreement with Highland and

19   these employees, but Highland Employee Retention Assets needs

20   their books and records.  And we've made it very clear to you

21   on numerous emails where you, you know, kind of muscled up on

22   us and said this is all you're going to get and tough if you

23   don't like it or whatever.

24        And so the deeper we get into this, we did get discovery

25   from others, we found that Highland's been withholding

004457

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 212 of 443    PageID 4876
Main Document    Page 212 of 266

Daugherty - Cross                          163

1  material information.

2       So as it relates to -- I mean, you're doing that little

3  squeaky thing, and I think he's a fantastic lawyer, but the

4  reality is you guys have created some damages to HERA that you

5  may be accountable for.  Your clients, not you.

6  Q    Okay.  In the four years since we signed the settlement

7  agreement, you've never asserted a breach of contract claim,

8  have you?

9  A    Well, because we thought you were complying with it.  So

10 if you want to go into the details there, in 2022, we were --

11 asked for more information.  2023, we asked for more

12 information.  2024, we asked for more information.  And so

13 those are continuing breaches.

14      Again, I -- I don't want to go to war with Highland.

15 You're too damn good of an attorney, you're scaring me a

16 little bit.  But --

17 Q    I don't want to.

18 A    You know, listen.  You know I think well of you.

19 Q    I appreciate that.

20 A    But, you know, I mean, I just wanted the information.  I'm

21 not looking to go to war with you guys.  I got enough battles

22 that I've got to fight.  And so, you know, I guess a number

23 was thrown out or whatever.  I don't know the full context of

24 it.  But it wasn't -- it wasn't for this IRS compensation

25 issue.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 57    Main Document    Filed 07/21/25    Page 213 of 266    Page 213 of 443    PageID 4877

Daugherty - Cross                    164

1    Q    But what was the -- my last question.  What was the $20

2    million demand for?

3    A    Again, it's just a number.  Y'all were having settlement

4    negotiations.  So, I mean, you work off of it.

5    Q    All right.

6              MR. MORRIS:  I have no further questions, Your Honor.

7              THE WITNESS:  Yeah.

8              THE COURT:  All right.  Any redirect?

9              MR. PHILLIPS:  I have no questions, Your Honor.

10             THE COURT:  All right.  Okay.

11             MR. YORK:  Apologies.  I wanted to make sure.

12             THE COURT:  Yes.

13             MR. YORK:  No redirect, Your Honor.

14                        EXAMINATION BY THE COURT

15             THE COURT:  Okay.  If you've watched Highland

16   hearings, you know the judge sometimes has questions.  I am

17   still trying to understand the 1.4, the 1.2, the 1.475.  I

18   understand broadly that, in essence, a cash bonus was

19   negotiated back in early 2009, I think you said.

20             THE WITNESS:  Yes.

21             THE COURT:  After 2008.  And so that's, in essence,

22   what was contractually negotiated.  But I understand there was

23   a hook, if you will, we're calling it a contingency, whatever

24   word you want to use, where if one day there was an IRS audit

25   and I guess Highland had extra liability for 2008, that this

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 5   Filed 07/02/25   Page 214 of 443   PageID 4878

Daugherty - Examination by the Court                165

 1   -- I don't know if I understood it or not.

 2            THE WITNESS:  Do you want me to try and guess what

 3   you're asking, or --

 4            THE COURT:  Try to guess what I'm asking.  Again, I'm

 5   --

 6            THE WITNESS:  The liability -- so, Highland chose to

 7   use this tax scheme as a currency to pay us a cash bonus.

 8   From our perspective, we weren't stupid.  We're like, well,

 9   okay, that's great, but if the IRS says --

10            THE COURT:  Okay, I just want to know what -- you say

11   you were contractually entitled to $1.4 million.

12            THE WITNESS:  That's what I was supposed to get for

13   that bonus year.

14            THE COURT:  Okay.  But there was a tax contingency,

15   if you will, where -- that's where I want you to jump in.

16            THE WITNESS:  So, Highland had a tax problem.  They

17   came up with this mechanism to use whatever they were doing

18   with the IRS to create the cash to pay us a bonus.  We looked

19   at it and said, well, this looks fishy -- by the way, every

20   year before that and after that, I've just gotten a cash

21   bonus.  But for this one year, when the banks are saying, no,

22   no, no, we get this.  And so we looked at this and said, look,

23   this sounds fishy, but if you can't pull it off, we need to be

24   made whole.  I can't be in a situation where here I am in 2025

25   and I may have to pay $5, $6 million to the IRS for the

004460

Daugherty - Examination by the Court          166

1    pleasure of working at Highland.

2              THE COURT:  Okay.  See, that's where my disconnect

3    is.

4              THE WITNESS:  Uh-huh.

5              THE COURT:  Because I thought this all turned on a

6    Highland tax return.

7              THE WITNESS:  Oh, no, no.  So, Highland did the

8    planning and the creation of the scheme, and I guess

9    ultimately it was Highland's tax return, but it flowed through

10   to us as pass-throughs.  K-1s, what have you.

11             THE COURT:  Right.

12             THE WITNESS:  So I guess it's both.

13             THE COURT:  Okay.  You were a partner.

14             THE WITNESS:  Well, that's debatable, too.  That's

15   debatable, too, because I had a --

16             THE COURT:  Okay.  I thought you weren't, but --

17             THE WITNESS:  Well, I wasn't --

18             THE COURT:  But you got -- okay.  Let me just skip

19   to, --

20             THE WITNESS:  Yeah.

21             THE COURT:  -- I guess, the important part.  You did,

22   you got paid?  You said $1.2 million?

23             THE WITNESS:  Yeah.  I got a refund back from the IRS

24   for around that amount.  Slightly under $1.2 million.

25             THE COURT:  So the contingency you are worried about

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 57   Filed 07/02/25   Page 216 of 443   PageID 4880
Daugherty - Examination by the Court                    167

1    that you think gives you a contingent claim against Highland

2    is, what, the IRS comes back and says --

3           THE WITNESS:  And they say, Give us that money back

4    plus interest plus penalties or we're taking your house.  And

5    it's a very real threat, because this has gone on, as you've

6    noted, forever.  And I went from having a one-point-whatever

7    bonus to possibly having to pay six, seven, eight, I don't

8    know how long this lasts, million dollars back to the IRS for

9    an election that was made by them.  As a substitute for paying

10   me a cash bonus the regular way, they did it this way.  And

11   that's why we put and negotiated for that term in the

12   compensation agreement that said, if for whatever reason the

13   actual refund is different, we get made whole.

14          THE COURT:  Okay.  I may be overthinking this, I do

15   do that sometimes, but I'm still, I'm trying to understand why

16   your claim would escalate up to, you know, you said maybe $5.7

17   million if, in 2029, this all plays out with the IRS.

18          THE WITNESS:  That --

19          THE COURT:  Because you've gotten the benefit of that

20   money and --

21          THE WITNESS:  Well, no, because if the IRS says --

22          THE COURT:  -- return on that.

23          THE WITNESS:  Sorry.  I didn't mean to interrupt.

24          THE COURT:  You know what I'm saying?  So I'm trying

25   to figure out why it would grow in the way that you're

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 12/12/25   Page 217 of 443   PageID 4881
Main Document   Page 2163 of 2663

Daugherty - Examination by the Court                168

 1  suggesting.

 2          THE WITNESS:  Can I respond?

 3          THE COURT:  Yes.

 4          THE WITNESS:  So I've gotten money that the IRS says

 5  is not mine.  Right?  And the IRS says --

 6          THE COURT:  And you've had the use of it.

 7          THE WITNESS:  Oh, yes.

 8          THE COURT:  You've presumably invested it and --

 9          THE WITNESS:  Well, no, I mean, you can't --

10          THE COURT:  Well, you've had the ability to.  Uh-huh.

11          THE WITNESS:  But you don't want to take risk with

12  something that's not yours, so you're kind of limited, right?

13  But I have, I have that amount of money.  Here's the problem,

14  Your Honor, with that.  If the IRS says, Give us back our

15  money, here's the interest, here's the principal.  Oh, by the

16  way, if it's $7, $8 million, I can't -- I don't have that.

17  I've got to file for bankruptcy in order to give the IRS back

18  money that I'm having to pay them for the pleasure that I had

19  of working for Highland in 2008 when I helped save the company

20  and create a lot of the assets that paid all these people in

21  the room.  MGM Studios, Trussway.

22          THE COURT:  Okay.

23          THE WITNESS:  Okay.

24          THE COURT:  Yeah.  We are going beyond this.

25          THE WITNESS:  Fair enough.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 57   Filed 07/21/25   Page 218 of 443   PageID 4882
Main Document   Page 169 of 266

Daugherty - Examination by the Court                    169

1    THE COURT:  I was just, I'm zeroing in on this

2    because I'm trying to figure out, I mean, it matters to me if

3    that reserve is likely fair enough, the reserve I'm told you

4    agreed to is fair enough.  And I'm having trouble figuring

5    out, I mean, if you've had the use of this money for 17 years

6    or whatever that is, why you would get this extra interest

7    add-on that you're -- $5.7 million or whatever it would be.

8    You know, $3 million more.

9        THE WITNESS:  Can I answer that question?

10       THE COURT:  Uh-huh.

11       THE WITNESS:  Because the IRS didn't look at it as my

12   money.  They looked at it as their money.  And so if you look

13   at the plain language of the compensation award letter, if the

14   actual amount deviates from the amount that was granted, then

15   Highland was going to give me substitute compensation to make

16   me whole.  Making me whole includes the penalties and the

17   interest that I would owe the IRS.  Because if you look at it

18   any other way, I had to pay money to work at Highland.

19       THE COURT:  Do I have that letter in my evidence?

20       THE WITNESS:  You should.  Drew?

21       THE COURT:  Do I?  Maybe I'll just cut this off and

22   look at the letter.

23       MR. YORK:  It's at Daugherty 2, and it's at the back

24   of --

25       THE WITNESS:  There's multiple letters, but this is

004464

Daugherty - Examination by the Court          170

1    one of them.

2              THE COURT:  The letter that you say this claim stems

3    from.

4              THE WITNESS:  Sure.

5              THE COURT:  I'll just cut it off and look at that.

6              THE WITNESS:  Yeah, you can tell her where it is.

7              MR. YORK:  So I think it's at the back of the

8    statement on PD-2.  It's at the last page, Your Honor.

9              THE COURT:  Which one?

10             MR. YORK:  P -- Daugherty 2.

11             THE COURT:  Oh, 2?  I've got emails.

12             THE WITNESS:  P-2?  I don't think so.

13             THE COURT:  Okay.  We can move on.

14             MR. YORK:  That's fine.  We'll work this out.

15             THE COURT:  Before we're done here today, I want to

16   look at the letter to better understand how the claim could

17   grow substantially to --

18             MR. YORK:  Yeah.

19             THE COURT:  -- $5.7 million by 2029.  Okay.  Thank

20   you.

21             THE WITNESS:  Thank you, Your Honor.

22             THE COURT:  You're excused.

23             THE WITNESS:  Oh, I found -- I just found it and then

24   I closed it.

25             THE COURT:  Okay.  Well, you can --

004465

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Filed 07/01/25   Page 220 of 443    PageID 4884
Main Document   Page 171 of 266

Patrick - Direct                    171

 1              THE WITNESS:  My bad.

 2              THE COURT:  -- call my attention to it when you find

 3     it.

 4              THE WITNESS:  All right.

 5          (The witness steps down.)

 6              THE COURT:  All right.  Your next witness?

 7              MR. YORK:  I believe we're calling Mark Patrick.

 8              THE COURT:  All right, Mr. Patrick.  All right.

 9     Please raise your right hand.

10        MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

11              THE COURT:  All right.  Please be seated.

12          And, Courtney, you're going to start the clock going.  I

13     show 2:12.  I don't know if my clock's right.

14          You may proceed.

15              MR. LANG:  And, Your Honor, may I hand the witness --

16     this is from Mr. Morris' opening.  May I use this as Exhibit

17     3?

18              THE COURT:  Oh, okay.  You're talking about the back

19     page of his PowerPoint?

20              MR. LANG:  Yes.  Org chart.

21              THE COURT:  Yes.  I've got it in front of me.  And

22     for the record, I'm going to put this PowerPoint, even though

23     it's not an exhibit *per se*, as a demonstrative aid in the file

24     for this matter.  And so it's the last item of the Highland

25     PowerPoint.  All right.

Patrick - Direct                    172

1          MR. LANG:  Yes.

2                      DIRECT EXAMINATION

3    BY MR. LANG:

4    Q   Mr. Patrick, does this Hunter Mountain Investment Trust

5    org chart that I just handed you accurately reflect the

6    structure of the Hunter Mountain Investment Trust ownership

7    today?

8    A   Just give me a few moments to review.

9    Q   Sure.

10          MR. LEWIS:  Your Honor, I had mentioned early on that

11   we object to this whole line of questioning because it's

12   outside the scope of the objection of Dugaboy.  And I don't

13   want to interrupt, but I want to make sure that my objection

14   is continuing, because this has nothing to do with the

15   objection presented by Dugaboy.

16          THE COURT:  All right.

17          MR. PHILLIPS:  So we object to the question.

18          THE COURT:  Okay.  So the record will reflect

19   basically a running objection from Hunter Mountain?

20          MR. PHILLIPS:  We would appreciate that, Your Honor.

21          THE COURT:  Okay.  In light of the failure of Dugaboy

22   to disclose Mark Patrick as a witness, as well as the failure

23   to challenge in a written objection his authority.  Okay.  So

24   I recognized that this was quite a persuasive objection, but

25   given the magnitude, I would say, of what is going on here,

004467

Patrick - Direct                        173

1    potentially a settlement that could come very close to ending

2    this long-running plan implementation process, I'm erring, if

3    it's an error, I'm erring on the side of allowing this.  All

4    right.  But you have a running objection that the record will

5    reflect if one day there is an appeal.

6              MR. MORRIS:  And, Your Honor, the Highland Claimant

7    Trust and the Highland Litigation Subtrust and Highland

8    Capital Management, LP join Mr. Phillips' objection.

9              THE COURT:  Okay.  Understood.

10             MR. PHILLIPS:  Thank you very much, Your Honor.

11             THE COURT:  All right.

12   BY MR. LANG:

13   Q   Mr. Patrick, have you had time to study this Hunter

14   Mountain Investment Trust org chart?

15   A   Yes, I have.

16   Q   And does this accurately show the ownership structure for

17   Hunter Mountain Investment Trust today?

18   A   I'm not sure, without reviewing the underlying corporate

19   documents on some of these entities that you have listed here.

20   Q   Did you help prepare this chart?

21   A   No.

22   Q   No?  Okay.  So Hunter Mountain Investment Trust is owned

23   by Beacon Mountain, LLC, correct?

24   A   Yes.

25   Q   And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 17   Main Document Filed 07/21/25   Page 223 of 443   PageID 4887   Page 174 of 266

Patrick - Direct                           174

1   correct?

2   A    Correct.

3   Q    And CLO Holdco, LLC is owned by CLO Holdco, Limited?

4   A    That's correct.

5   Q    And CLO Holdco, Limited is owned by Charitable DAF Fund,

6   LP?

7   A    Correct.

8   Q    And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

9   A    The ultimate beneficial owner is DFW Charitable

10  Foundation.  To my -- to the best of my recollection, I would

11  say that appears accurate.  I'm just not a hundred percent.

12  Q    Okay.  And --

13  A    But I am a hundred percent that DFW Charitable Foundation

14  is the ultimate beneficial owner.  And I'm a hundred percent

15  that Dugaboy Investment Trust has no interest in it.  And I'm

16  also a hundred percent that The Dallas Foundation or any --

17            MR. LANG:  Judge, I haven't asked --

18            THE WITNESS:  -- or any other nonprofit has any --

19            MR. LANG:  -- any of these questions.

20            THE COURT:  Okay.  There's an objection,

21  nonresponsive.  I sustain.

22  BY MR. LANG:

23  Q    Mr. Patrick, before December of 2024, Charitable DAF Fund,

24  LP was owned by Charitable DAF Holdco, correct?

25  A    (Pause.)  I'm just waiting for a relevancy.  I don't

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Filed 07/02/25   Page 224 of 443    PageID 4888
                        Main Document    Page 2175 of 2366

                        Patrick - Direct                        175

 1    understand how that's relevant to my authority --

 2              THE COURT:  Okay.  You're not allowed to make a

 3    relevancy objection.  Okay.

 4              MR. PHILLIPS:  Your Honor, I think the problem is

 5    that, if I could, we have made an objection.  And our

 6    objection, our running objection is founded on relevancy and

 7    founded on improper process.  So I would like to just tell the

 8    Court, and so my client representative can hear it, that the

 9    fact that I'm not standing up every time there's a problematic

10    question, --

11              THE COURT:  Okay.

12              MR. PHILLIPS:  -- because every question is

13    problematic, my objection is being maintained to every

14    question that's being asked.

15              THE COURT:  Okay.  You understand that, right?

16              THE WITNESS:  I --

17              THE COURT:  There's a running relevancy objection.

18    You're the witness.  You can't make the objection.  But it's

19    on the record for whatever use it might have down the road.

20              MR. PHILLIPS:  I have objected to every question

21    that's coming in connection with this line of questioning on

22    the basis of relevance.

23              THE COURT:  I got it.  I think we all have it.

24              MR. PHILLIPS:  I'm just --

25              MR. LANG:  Understood.

Patrick - Direct                    176

1          THE COURT:  Yes.  And you're thinking he's eating

2     into your 30 minutes?

3          MR. LANG:  Yes.

4          THE COURT:  Okay.  We've got it.

5          THE CLERK:  I stopped the time.

6          MR. LANG:  So -- thank you.

7          THE COURT:  Did you stop the time for a minute?

8          THE CLERK:  Yes, I did.

9          MR. LANG:  Thank you.

10         THE COURT:  Okay.

11    BY MR. LANG:

12    Q    So, to my question, before December of 2024, Charitable

13    DAF Fund, LP was owned by Charitable DAF Holdco, correct?

14    Charitable DAF Holdco, Limited?

15    A    And where is that on the chart?

16    Q    I'm asking, before December of 2024, Charitable DAF Fund,

17    LP was owned by Charitable DAF Holdco, Limited.

18    A    Can you show me a corporate document so I know the precise

19    corporation you're referring to?

20    Q    You're the -- you are the manager of -- or the control

21    person of CDHGP Limited, correct?

22    A    Again, I'd have to refresh my recollection, but I am the

23    control person over CDMC.

24    Q    Okay.  And CDMC --

25    A    As well as Charitable DAF Fund.  I'll represent that to

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Main Document   Filed 06/30/25   Page 226 of 443   PageID 4890
Page 225 of 266

Patrick - Direct                                    177

 1  you.

 2  Q   Okay.  Was there a transaction in December of 2024 where

 3  Charitable DAF Holdco, Limited sold its interest or

 4  transferred its interest in Charitable DAF Fund, LP to CDMC

 5  FAD, LLC?

 6  A   I know you're trying to help other litigation and --

 7           MR. PHILLIPS:  Mark.

 8           THE COURT:  Okay.  Nonresponsive.

 9           THE WITNESS:  Your Honor, he's using your time to

10  fish for other litigation to support that --

11           THE COURT:  Okay.  Okay.  We have a running objection

12  to relevance.  I'm going to say that one more time.  Okay.

13  Just answer the question as best you can.

14           THE WITNESS:  I'd have to review the corporate

15  documents to refresh my recollection for that time period.

16  BY MR. LANG:

17  Q   Up until December of 2024, Charitable DAF Fund, LP was

18  owned 100 percent by Charitable DAF Holdco, Limited, wasn't

19  it?

20  A   I don't know what entity you're referring to without a

21  refreshment of corporate documents of that entity.  There

22  could be a lot of entities called that.

23  Q   You're aware that there is a proceeding in the Caymans

24  investigating the December 2024 transaction that sold -- where

25  Charitable DAF Holdco, Limited sold its interest in -- and or

004472

```
 1    transferred its interest in Charitable DAF Fund, LP to CDMC

 2    FAD, LLC?

 3    A    There are several parts to that question.  So the answer

 4    is no.

 5    Q    Are you aware of a proceeding pending in the Caymans

 6    involving Charitable DAF Holdco, Limited?

 7    A    Again, I don't know what entity you're referring to.  Show

 8    me a -- show me a corporate document.

 9             MR. LANG:  Your Honor, this was on the Foundation's

10    exhibit list.  We cross-designated any document designated as

11    an exhibit by any other party in this case.  And I'd like to

12    hand this to the witness.

13             MR. MORRIS:  Which exhibit is it?

14             THE COURT:  Which is -- yes.

15             MR. LANG:  It was on the -- it was on the DAF -- or,

16    the Foundation's exhibit list.

17             MR. MORRIS:  They haven't been admitted into evidence

18    and they've withdrawn their objection.  We object, Your Honor.

19             THE COURT:  Yes, they've not been admitted.

20             MR. LANG:  Okay.  Well, can I --

21             MR. PHILLIPS:  We object to that, Your Honor.  We

22    object to any witness --

23             MR. LANG:  We cross-designated every --

24             THE COURT:  I already discussed at the beginning what

25    we were admitting and that was not disclosed.
```

004473

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 228 of 443   PageID 4892
Main Document   Page 179 of 266

Patrick - Direct                                    179

 1          MR. LANG:  Okay.

 2          THE COURT:  As I recall, I said you've only

 3   designated the plan and settlement agreement, and the answer

 4   was yes.

 5          MR. LANG:  Okay.

 6   BY MR. LANG:

 7   Q    And we're aware that the Joint Official -- are you aware

 8   that there is a Joint Official Liquidator appointed over a

 9   Charitable DAF entity in the Cayman Islands?

10          MR. PHILLIPS:  Objection to form.

11          THE WITNESS:  Again, without more specific --

12          THE COURT:  Overruled.  Yes.

13          THE WITNESS:  -- specificity, there could be a

14   thousand different actions that you're referring to, in my

15   mind.

16   BY MR. LANG:

17   Q    Are you aware that the Joint Official Liquidators in the

18   Caymans are investigating transactions involving Charitable

19   DAF Fund, LP and Charitable DAF Holdco, Limited?

20   A    Again, again, I don't specifically know what you're

21   referring to.

22          MR. PHILLIPS:  Your Honor, may I -- excuse me.  I

23   don't know that my running objection includes an objection to

24   form for each of the questions.  This objection is to form of

25   the questions about, quote, --

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Main Document    Filed 06/23/25    Page 229 of 443    Page 229 of 443    PageID 4893

Patrick - Direct                                    180

1          THE COURT:  What's wrong with the form?

2          MR. PHILLIPS:  -- investigation.

3          THE COURT:  What is wrong with the form of that

4     question?  I'm not clear.

5          MR. PHILLIPS:  My objection to form is that the

6     question is an open-ended question with an undefined term,

7     investigation.

8          THE COURT:  Overruled.  I don't think that's a vague

9     term.  So you may answer.

10          THE WITNESS:  If you show me some document, some

11    complaint or something, I'll be very happy to verify whatever

12    questions related to that.  But just giving me verbal words of

13    entities and names and actions, I don't know precisely what

14    you are talking about.

15    BY MR. LANG:

16    Q    Mr. Patrick, who set up the entities in the Hunter

17    Mountain Investment Trust org chart that is sitting in front

18    of you?

19    A    I'm sorry.  Repeat the question?

20    Q    Who set up the various entities that are in the org chart

21    that is on your -- on the stand?

22          MR. PHILLIPS:  Objection to form.  Set up.  What does

23    that mean?

24          THE WITNESS:  It -- yeah, it's very --

25          THE COURT:  I think we know what it means.  Creating,

004475

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 230 of 443    PageID 4894
Main Document    Page 231 of 266

Patrick - Direct                                    181

 1  perhaps.

 2  BY MR. LANG:

 3  Q    Created?

 4  A    Who?  Are you asking if I created it?

 5  Q    Did you participate in creating them?

 6  A    Did I participate?  In which ones?

 7  Q    CDMC FAD, LLC.

 8  A    What do you mean by participate?

 9  Q    Were you involved in creating -- did you initiate the

10  creation of CDMC FAD, LLC?

11  A    Lawyers were.

12  Q    Did you engage in any capacity on behalf of any entity?

13  Were you involved in engaging the lawyers to set up CDMC FAD,

14  LLC?

15  A    Yes, I engaged lawyers to set up entities.

16          MR. LANG:  Objection.  Nonresponsive.

17          THE COURT:  Sustained.

18          MR. LANG:  Did you --

19          THE COURT:  He asked about this one particular

20  entity, I think.

21  BY MR. LANG:

22  Q    Did you --

23  A    Which entity, again, did you ask?

24  Q    CDMC FAD, LLC.

25  A    Yes, I believe I hired a lawyer.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 57   Main Document Filed 07/17/25   Page 2132 of 266ge 231 of 443   PageID 4895

Patrick - Direct                    182

 1   Q    And when did CDMC FAD, LLC become a hundred percent owner

 2   of Charitable DAF Fund, LP?

 3   A    Around the end of March of 2025.  I believe.

 4   Q    And were you involved in the transaction between -- in

 5   which CDMC FAD, LLC obtained a hundred percent interest in

 6   Charitable DAF Fund, LP?

 7   A    What do you mean by involved?  How?

 8        THE COURT:  Okay.  I can see what's happening here or

 9   I have an impression of what's happening here.  I feel like

10   you're slowing down this process where I've given 30 minutes

11   to this lawyer.  Okay?  And I feel like you're feigning

12   confusion.  I don't mean to be insulting, but that's how it

13   comes across.  Okay?  So I need you to speed up your answers

14   and not be confused about things you shouldn't be confused

15   about.  Okay?

16        THE WITNESS:  Okay.

17        THE COURT:  I feel like it's late 1980s *Dondi*.  Does

18   anyone know what I mean by that?  Okay.  We've been there,

19   done that, in the federal courts, and we don't like the

20   looking at -- you're not looking up at the ceiling.  That's

21   what they did in *Dondi*.  Confusion.  Delay.  Okay?

22        So I don't mean to chastise you.  I'm just telling you

23   that you're going to make us be here a lot longer, and nobody

24   wants that, because I will give him extra time for this.

25   Okay?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 57    Filed 07/02/25    Page 232 of 443    PageID 4896
Main Document    Page 183 of 266

Patrick - Direct                                    183

1          THE WITNESS:  Understood.

2          THE COURT:  Thank you.

3    BY MR. LANG:

4    Q    Okay.  So you were involved in the transaction in which

5    CDMC FAD, LLC acquired 100 percent ownership interest in

6    Charitable DAF Fund, LP in or around March of 2025, correct?

7    A    Correct.

8    Q    Who did CDMC FAD, LLC obtain its interests in Charitable

9    DAF Fund, LP from in March of 2025?

10   A    From an -- from an entity called Charitable DAF Holdco,

11   Ltd.

12   Q    Charitable DAF Holdco, Ltd., the entity that I asked about

13   earlier, correct?

14   A    Of the same name.

15   Q    Yes.  And Charitable DAF Holdco, Ltd. has had Joint

16   Liquidated -- Liquidators, Joint Official Liquidators

17   appointed over it in the Cayman Islands, correct?

18   A    Yes.

19   Q    And those Joint Official Liquidators were appointed over

20   Charitable DAF Holdco, Limited in or around May 6th, 2025?

21   A    In May is what I recall.

22         MR. LANG:  Your Honor, we'll pass the witness.

23         THE COURT: All right.  Do we have any questions?

24         MR. YORK:  No questions, Your Honor.

25         THE COURT:  Okay.  Any cross?

004478

1    MR. MORRIS:  Just briefly, Your Honor.

2                        CROSS-EXAMINATION

3    BY MR. MORRIS:

4    Q    Mr. Patrick, do you know who initiated the proceedings to

5    get the appointment of the Joint Official Liquidators in the

6    Cayman Islands?

7    A    The director and myself, we initially filed for a

8    voluntary joint liquidation in May.

9    Q    And did there come a time when the Cayman court appointed

10   the Joint Official Liquidators?

11   A    Yes.

12   Q    Do you know who asked the court to appoint the Joint

13   Official Liquidators?

14   A    We did, as well as other -- it was an agreement with the

15   participation holders of that entity.

16   Q    And who are the participation holders of that entity?

17   A    It was the DFW Charitable Foundation as a 51 percent

18   holder as well as the Highland Dallas Foundation, Highland

19   Santa Barbara Foundation, and the Highland Kansas City

20   Foundation.

21   Q    And those three foundations that you just mentioned, do

22   you know who controls them?

23   A    Jim Dondero.

24   Q    Is it your understanding that Mr. Dondero was funding the

25   litigation in the Cayman Islands?

Patrick - Cross                                          185

1    A    Yes.

2    Q    The Joint Official Liquidators, are you aware of any

3    statement that they've ever made that you are not authorized

4    to act on behalf of any of the HMIT entities?

5    A    Yeah, they've never made a statement that I'm not

6    authorized to act under any of those entities.

7    Q    Okay.  Did you receive a letter last night that was

8    purportedly authored by the Joint Official Liquidators?

9    A    Yes.

10   Q    Did you review that letter?

11   A    Yes.

12   Q    Did that letter refer to today's hearing?

13   A    Yes.

14   Q    Are you aware of the Joint Official Liquidators making any

15   appearance in this proceeding?

16   A    No, I'm not aware they made any appearance in this

17   proceeding.

18   Q    Based on your recollection of the contents of that letter,

19   did the Joint Official Liquidators challenge your authority to

20   enter into the settlement agreement on behalf of the HMIT

21   entities?

22   A    No, they did not, because there's no ownership interest.

23   Q    Okay.  And what do you mean by that?

24   A    The entity in liquidation owns nothing.  And the DFW

25   Charitable Foundation is the ultimate beneficial owner.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 57   Main Document   Filed 06/27/25   Page 235 of 443   Page 235 of 443   PageID 4899

Patrick - Cross                              186

1    Q    Are you aware that The Dallas Foundation filed an

2    objection to the settlement agreement on behalf of Empower

3    Dallas Foundation, the Okada Family Foundation, and Crown

4    Global?

5    A    Yes.

6    Q    Are you aware that that objection was withdrawn?

7    A    Yes.

8    Q    Was the withdrawal of that objection the product of

9    negotiations that your counsel had with lawyers for The Dallas

10   Foundation and Crown Global?

11   A    Yes, it was.

12   Q    Did The Dallas Foundation or Crown Global require you to

13   surrender your control position of the HMIT entities as a

14   condition to the withdrawal of their objection?

15   A    To give up my control?  No.

16   Q    They didn't ask you to do that, did they?

17   A    No.  No.

18   Q    You are the control person for each of the HMIT entities

19   that are party to the settlement agreement, correct?

20   A    That is correct.

21   Q    Are you aware of any requirement in any of the governance

22   documents --

23            MR. CURRY:  Your Honor, I'm not questioning, but I'm

24   going to object to the line of questioning here about what was

25   asked and what was not received into negotiations, because,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed   Page 235 of 266   Page 236 of 443   PageID 4900

Patrick - Cross                                187

1    frankly, you're getting an imperfect picture there.  And I

2    don't think it should be misrepresented.  The communications

3    didn't happen with Mr. Patrick.

4              THE COURT:  Okay.  I don't know if that objection was

5    a confidential settlement communications.

6              MR. CURRY:  It's a combination of foundation and that

7    he's going into confidential settlement discussions.

8              MR. MORRIS:  Your Honor, it's a very simple question.

9    I'll ask it again.

10             THE COURT:  Okay.  We'll let --

11   BY MR. MORRIS:

12   Q    To the best of best of your knowledge, Mr. Patrick, did

13   The Dallas Foundation or any of the entities on whose behalf

14   it filed its objection require you to surrender your position

15   as the control person of the HMIT entities in exchange for the

16   withdrawal of their objection?

17   A    No, they did not.

18   Q    Thank you.  Are you aware -- are you familiar with the

19   governance documents for the HMIT entities?

20   A    Yes, I am.

21   Q    Are you aware of any restriction on your ability to act on

22   behalf of those HMIT entities with respect to -- withdrawn.

23   Are you required to obtain the consent of anyone in order to

24   enter into the settlement agreement on behalf of the HMIT

25   entities?

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7 Main Document Filed Page 12/8 of 266 Page 237 of 443    PageID 4901

Patrick - Cross                          188

1    A    No, I am not.  I'm the sole authority and control person

2    for that entity.

3    Q    And do you believe that you're entering into the

4    settlement agreement on behalf of the HMIT entities in good

5    faith?

6    A    Yes, I do.

7    Q    Have you received legal counsel before entering into the

8    agreement?

9    A    Yes, I have.

10   Q    Do you believe that you've negotiated the best terms that

11   you could get on behalf of the HMIT entities?

12   A    Yes, I do.

13   Q    Do you believe that you received the information that you

14   believed you required in order to make an informed decision

15   before you entered into the settlement agreement on behalf of

16   the HMIT entities?

17   A    Yes, I did.

18           MR. MORRIS:  I have no further questions, Your Honor.

19           THE COURT:  All right.  Mr. Phillips, anything from

20   you?

21           MR. PHILLIPS:  No questions.

22           THE COURT:  Okay.  Any redirect?

23           MR. LANG:  Briefly.

24           THE COURT:  Uh-huh.

25           MR. LANG:  Your Honor, because they mentioned the

1   letter of last night from Grant Thornton, the Liquidators, I'm

2   going to offer that into evidence as the letter that we talked

3   about this morning.  But Mr. Morris directly asked him if he

4   reviewed it and asked him questions about it.

5            THE COURT:  Response?

6            MR. MORRIS:  No objection, Your Honor.  Go right

7   ahead.

8            THE COURT:  I'll admit it.

9            MR. LANG:  This is --

10            THE COURT:  Do I have it in my notebook?

11            MR. LANG:  -- Dugaboy --

12            THE COURT:  Okay.

13                    REDIRECT EXAMINATION

14   BY MR. LANG:

15   Q   Mr. Patrick, I've handed you --

16            THE COURT:  We're going to call this Dugaboy 3?

17            MR. LANG:  Dugaboy 3.

18            THE COURT:  Okay.

19      (Dugaboy Investment Trust's Exhibit 3 is admitted into

20   evidence.)

21   BY MR. LANG:

22   Q   Mr. Patrick, I've handed you a letter.  It's from Grant

23   Thornton dated June 24th, 2025.  Do you see that?

24   A   Yes.

25   Q   And is this a true and correct copy of the letter that you

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L      Document 7     Filed Page 290 of 266   Page 239 of 443      PageID 4903

Patrick - Redirect                              190

 1   received or that you reviewed from the Joint Liquidators that
 2   you referred to in your answers to Mr. Morris' questions?
 3   A    Well, it's a PDF.  I mean, I'm assuming it's from the
 4   Official Liquidators.
 5   Q    But this is the letter you were referring to in your
 6   testimony a few minutes ago?
 7   A    Yes.
 8   Q    And do you see on the second paragraph it says that, on
 9   May 6th, 2025, the Grand Court of Cayman Islands Financial
10   Services Division appointed Margot MacInnis and Sandipan
11   Bhowmik, each of Grant Thornton Special Services (Cayman)
12   Limited, as the Joint Official Liquidators of the company.  Do
13   you see that?
14   A    Yes.
15   Q    And do you see on the second page, it says:  Since our
16   appointment, we have been diligently investigating these
17   transactions, including a corporate transaction that occurred
18   in or around December 2024 where the company transferred a
19   hundred percent of its interest in the Fund to CDMC FAD, LLC,
20   which resulted in the company being the sole member of CDM and
21   subsequent redemptions of the company's interests in CDM.
22        Do you see that?
23   A    Yes.
24   Q    Is that your understanding of what is happening in the
25   Caymans right now, is investigating these transactions?

Patrick - Recross                        191

1    A    Correct.

2              MR. LANG:  Pass the witness.

3              MR. MORRIS:  May I just have that letter, please?

4              THE COURT:  Any recross?

5              MR. MORRIS:  Yeah, just real brief.

6                        RECROSS-EXAMINATION

7    BY MR. MORRIS:

8    Q    None of the transactions that you were just asked about

9    has anything to do with any of the HMIT entities, correct?

10   A    That's absolutely correct.

11   Q    Okay.  And now that we have the letter in the record, if

12   you could look at the third paragraph.  Do you see --

13   A    Yeah.

14   Q    Do you see it refers to the Highland Dallas Foundation,

15   Highland Santa Barbara Foundation, and Highland Kansas City

16   Foundation?

17   A    Yes.

18   Q    Are those the three entities that you referred to earlier

19   that are, to the best of your understanding, controlled by Mr.

20   Dondero?

21   A    Yes.

22   Q    Okay.  And this is the letter that you said you reviewed

23   and concluded that the Joint Official Liquidators weren't

24   challenging your authority to enter into the agreement on

25   behalf of the HMIT entities; do I have that right?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Filed 07/02/25    Page 241 of 443    PageID 4905
Main Document    Page 192 of 266

Patrick - Examination by the Court                192

1    A    Yes.  Yes, you do.

2                 MR. MORRIS:  I have no further questions, Your Honor.

3                 THE COURT:  Okay.  I have a question or two.

4                          EXAMINATION BY THE COURT

5                 THE COURT:  And again, I apologize if I sounded harsh

6    earlier.  I recognize different people present different ways

7    when they testify.  It just appeared to me that maybe we were

8    slowing things down unnecessarily.  All right?

9                 THE WITNESS:  I apologize, too.  I'm just a little

10   emotionally upset they're using this proceeding for a benefit

11   someplace else.

12                THE COURT:  Okay.  My question, very general

13   question:  Do you think this settlement is fair and equitable

14   as far as HMIT is concerned?

15                THE WITNESS:  Absolutely.

16                THE COURT:  And could you tell me why?

17                THE WITNESS:  Yeah.  There was no obvious pathway for

18   HMIT to, in my mind, to receive the residual interest of the

19   bankruptcy estate without a settlement with the Debtor.

20   Otherwise, it just seemed to me that it would go on forever.

21   And then I balanced that against the existing litigation and

22   the probability of the outcome weighted against the costs, and

23   determined that it made sense from HMIT's perspective to enter

24   into the settlement agreement.

25                THE COURT:  Okay.  And you understand that, as part

004487

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 5    Filed 07/02/25    Page 242 of 443    PageID 4906
Main Document    Page 195 of 266

Patrick - Examination by the Court                193

1  of this, you're giving up some litigation claims that have

2  been waged now for a couple of years or more?

3          THE WITNESS:  That is correct, but I'm also receiving

4  the Kirschner Litigation, which I did negotiate to receive.

5          THE COURT:  Okay.  And there was a note that the

6  estate -- I've heard it called at some point the $57 million

7  note that HMIT owed Highland, a December 2015 note -- that

8  basically gets credited against the capital account.  You

9  understand that?

10          THE WITNESS:  Yes, I do.

11          THE COURT:  Okay.  And then you understand that if I

12  approve this deal, I'm not sure why there's going to be

13  $500,000 to HMIT and then also another $10 million to HMIT,

14  but subsequent payments could get held up if there are

15  litigation threats to the Highland Claimant Trust.  You

16  understand that, correct?

17          THE WITNESS:  Yes, I do.

18          THE COURT:  Okay.  I just, I have to ask.  I'm

19  confused about what's going on here.  I thought that -- well,

20  let me just ask this:  Would you consider yourself crossways

21  with Mr. Dondero now?

22          THE WITNESS:  No, but I'll answer the question.  Upon

23  advice of counsel, I quit Skyview Group.  And upon advice of

24  counsel, I terminated the back office services that Skyview

25  Group was providing to the DAF.

Patrick - Examination by the Court                194

1          THE COURT:  Okay.  Well, you said you're getting

2     maybe a little emotional because of other litigation.  I'm

3     just trying -- I don't understand what all that other --

4          THE WITNESS:  Unrelated -- well, unrelated to that.

5     They're clearly trying to use this forum to benefit their

6     Cayman actions.  They hired U.S. counsel called Reed Smith,

7     and they've been begging for an organization chart to issue a

8     variety of frivolous lawsuits against the operating DAF

9     entities.  So I do apologize, but that's a little upsetting to

10    me because I know we're going to -- that I've just fed them a

11    list of targets in another unrelated matter.

12         THE COURT:  Okay.  Reed Smith.  Here we go again with

13    -- they've made an appearance for Mr. Seery in this

14    litigation.

15         MR. MORRIS:  Exactly.  And we have raised that issue.

16         THE COURT:  Okay.

17         MR. MORRIS:  And I'm surprised to hear that they

18    think they still have the ability to do this.  But we will

19    pursue that later.

20         THE COURT:  Okay.  All right.  I had nothing further.

21    Thank you, Mr. Patrick.

22       (The witness steps down.)

23         THE COURT:  All right.  So where are we now?  I said

24    that, again, just trying to balance the playing field, if

25    Dugaboy was given the ability to question Mr. Patrick, then I

004489

Dondero - Direct                    195

1    would allow I guess you want to call it rebuttal in the form

2    of the Debtor, Reorganized Debtor/Claimant to call Mr.

3    Dondero.  Do you choose to call him?

4                MR. MORRIS:  I'm not.

5                THE COURT:  Oh, and I guess I'll allow you, --

6                MR. MORRIS:  Yeah.

7                THE COURT:  -- if you want to put on your client

8    representative, Mr. Lang.

9                MR. LANG:  We call Jim Dondero.

10               THE COURT:  All right.  Yes, we are timing.

11          Please raise your right hand, sir, Mr. Dondero.

12   JAMES "JIM" DONDERO, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

13               THE COURT:  All right.  Thank you.  The time is

14   running.

15               THE WITNESS:  Thank you for the time.

16                         DIRECT EXAMINATION

17   BY MR. LANG:

18   Q    Mr. Dondero, do you claim that Mr. Patrick lost authority

19   to enter into the 9019 settlement -- or, the settlement

20   agreement that's the subject of the 9019 motion today?

21   A    Yes.

22   Q    And when do you claim Mr. Patrick lost authority to enter

23   into that settlement agreement?

24   A    I think it's best if I give a timeline.  He left Sky --

25   can I give a --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Main Document   Filed Page 2196 of 266   Page 245 of 443   PageID 4909

Dondero - Direct                               196

1          MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

2          THE COURT:  Overruled.  He can give a timeline.

3          THE WITNESS:  He left Skyview in October, November,

4    walked out the door, never talked to anybody again, never

5    talked to the charities again except through counsel.  Never

6    collected severance, anything else.  Just walked out the door.

7        As part of Skyview's review of what he'd been working on

8    and what was the nature and what might have been happening,

9    they discovered numerous abnormalities.  They discovered--

10          THE COURT:  Do we have an objection?

11          MR. MORRIS:  We do.  We're not going to use this

12   opportunity to smear Mr. Patrick.  If the notion is that the

13   breach of the ability to act with authority occurred in May,

14   he should start his timeline in May.

15          THE COURT:  Well, I assumed he was just giving

16   background to explain.

17          THE WITNESS:  Yes.

18          THE COURT:  So I'll overrule.

19          THE WITNESS:  Thank you.  I'm going to just give you

20   a little bit of background.  Everything that I'm stating is in

21   the public record.  I won't do anything to besmirch Mark

22   Patrick.  It's all in the public record.  It's all in the

23   Cayman pleadings.  But there was affidavits regarding

24   embezzlements by vendors where he would request overbilling

25   and the money sent to his house.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Main Document   Filed 06/30/25   Page 246 of 443   Page 197 of 266   PageID 4910

Dondero - Direct                    197

 1          MR. PHILLIPS:  Your Honor, we're talking about

 2   documents outside the scope, not identified, not listed.

 3   Objection.

 4          THE WITNESS:  It's all --

 5          MR. PHILLIPS:  This is not a timeline.

 6          THE COURT:  This --

 7          THE WITNESS:  It's --

 8          THE COURT:  Sustained.  We don't have anything in the

 9   record.  This is --

10          THE WITNESS:  Okay.  It's all in the public arena.

11   And so is the insider trading.

12          MR. PHILLIPS:  Objection, Your Honor.

13          THE WITNESS:  So, --

14          THE COURT:  Okay.  I sustain.

15          THE WITNESS:  Okay.  All right.

16       And then, yeah, and then there was monies missing.  There

17   were large amounts of monies missing from the estate.  There

18   was unexplained $16 million of expenses in '23.

19          MR. PHILLIPS:  Objection, Your Honor.  They're --

20          THE COURT:  Okay.  Explain the relevance, Mr. Lang.

21          MR. LANG:  I thought he was just giving a background.

22          THE COURT:  It's getting rather --

23          THE WITNESS:  Okay, Your Honor.  Well, --

24          THE COURT:  -- colorful, shall we say.  All right?

25          THE WITNESS:  Okay.  Without giving specifics

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7-7   Main Document   Filed 10/02/25   Page 123 of 266   Page 247 of 443   PageID 4911

Dondero - Direct                                    198

 1   regarding the embezzlement or --

 2            MR. PHILLIPS:  Your Honor?

 3            MR. MORRIS:  We move to strike, Your Honor.

 4            MR. PHILLIPS:  We move to strike all of this.

 5            MR. MORRIS:  We move to strike all of this.

 6            THE COURT:  Okay.  I grant.  We don't have any

 7   evidence of embezzlement.

 8            THE WITNESS:  Okay.  All right.  Without detailing

 9   any of the bad acts that we -- that it looked like happened

10   from the investigation, we took all the bad acts and all the

11   investigations and we gave them to the three underlying

12   charities.  Let's remember the DAF is a legacy charity I set

13   up 15 years ago, or actually, Mark Patrick did the

14   documentation back when he was a loyal employee.  And it was

15   three -- around $300 million and about $600 million of

16   liability, I mean, legal claims and other things that were

17   meant to be a family legacy, where the donations would help

18   the community.  We've given out more than $50 million over the

19   years.  And the recognition would help our various companies

20   or our families.  That's what it was.  Okay?

21        Went to the three underlying charities who were the

22   beneficiaries of the DAF as it existed:  Santa Barbara, Dallas

23   Foundation, Kansas City.  These are large charities that have

24   been around for a hundred years.  I don't control them by any

25   form or fashion.  As a matter of fact, the Hunts are $4

004493

Dondero - Direct                    199

1    billion out of the $6 billion in Kansas City.  I think I'm a

2    hundred million or whatever.  The DAF was a hundred million.

3    I think the Hunts would be disturbed to hear that I control

4    it.

5        Anyway, so all those charities were beneficiaries.  And so

6    we went to them with all the investigative results.  And at

7    first, they tried to verify, they tried to have an audience

8    with Mark Patrick.  They wanted details.  They wanted what --

9    financials.  They wanted to know what was happening.  And

10   nothing was forthcoming from Mark Patrick.  He didn't think he

11   owed them any fiduciary responsibilities.

12            MR. PHILLIPS:  Objection.  Hearsay.

13            THE WITNESS:  No, that's --

14            THE COURT:  What is the out-of-court statement?  I'm

15   not sure.

16            MR. MORRIS:  Mark Patrick thinks that he doesn't owe

17   any fiduciary duties.

18            MR. PHILLIPS:  They did an investigation.  They tried

19   to do *x*.  They tried to do *y*.

20            THE COURT:  Oh, okay.  Technically not hearsay, but I

21   think we're getting --

22            THE WITNESS:  Okay.

23            THE COURT:  -- a little far beyond the subject

24   matter.  So if we could reign it in, please.

25            THE WITNESS:  Okay.  In February, they were noted,

004494

Dondero - Direct                              200

1   they were notified, or, in particular, Dallas Foundation was

2   notified that their Empower subsidary, which owned a hundred

3   percent of the HMIT interests that we were talking about, was

4   transferred to an undisclosed company for a million dollars.

5   Without any transparency, without any understanding of who the

6   new owner was, they filed for receivership in Cayman.  To the

7   best of the charity's knowledge and based on all the

8   documentation --

9            MR. PHILLIPS:  Your Honor, objection.

10           THE COURT:  Okay.  Let me try to understand the

11   relevance.  Do you think I opened this up by asking if there

12   was a falling out essentially between you and Patrick?  Is

13   that why you're going into this?  Or --

14           THE WITNESS:  No, no, no.  No.  The falling-out is

15   much bigger than this.  But I'm just saying the day

16   receivership was filed was the day Mark Patrick lost

17   authority.  And I think anybody would look at it that way.  It

18   was for liquidation in the Cayman --

19           THE COURT:  Okay.  That's his view and we'll either

20   see the --

21           THE WITNESS:  Okay.

22           THE COURT:  -- documents that support that or not.

23           THE WITNESS:  All right.  So, your -- yes.  Because

24   the question was when do I think he lost authority.  I -- you

25   could make the argument he lost it a lot sooner, because for

004495

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Main Document    Filed Page 250 of 443    PageID 4914

Dondero - Direct                    201

 1    months beforehand the charities had written him letters saying

 2    they wanted their assets distributed in kind, they lost faith

 3    in --

 4              THE COURT:  Okay.

 5              THE WITNESS:  Yeah.

 6              MR. PHILLIPS:  Again, Your Honor, objection.

 7              THE COURT:  This is hearsay.  Okay.  I sustain.

 8              THE WITNESS:  Okay.  Well, they did.

 9         So, eventually, and it takes a lot to get four little old

10    ladies at different charities to get together and agree to

11    file a charity in liquidation, but they did in the Caymans.

12    Okay?  And then lo and behold, the response from Mark Patrick

13    was, ha-ha, there are no assets there anymore, I moved them

14    all to my living room --

15              MR. PHILLIPS:  Move to strike, Your Honor.

16              THE WITNESS:  -- at DFW.

17              MR. PHILLIPS:  There's no evidence in the record of

18    this.  There was no evidence of any statement.  Move to

19    strike.

20              THE COURT:  There's not, right?

21              THE WITNESS:  Well, no, there is, because what Mark

22    Patrick --

23              THE COURT:  Sustained.  I don't have it.

24              MR. PHILLIPS:  Your Honor, there is no evidence of

25    any of this.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 57 Filed 0ain Document 202 of 266age 251 of 443    PageID 4915

Dondero - Direct                    202

```
 1          THE WITNESS:  Well, Mark Patrick's testimony, he said
 2   -- he said that our receivership was right after his
 3   receivership.  He had liquidated and taken all the assets out
 4   from Dallas, Santa Barbara, and whatever, and moved it all to
 5   his charity.  So when we tried -- when the poor charities in
 6   Texas in the U.S. tried to file for liquidation, his response
 7   was ha-ha.  And there were no assets there, you know, because
 8   he had already filed --
 9          MR. PHILLIPS:  Objection.
10          THE WITNESS:  He -- he --
11          THE COURT:  Okay, I've sustained the objection to the
12   ha-ha.  Okay.
13          THE WITNESS:  Okay.  But he had, he had filed --
14          MR. PHILLIPS:  Your Honor, please, move to strike.
15          THE COURT:  Okay.  Let's strike everything after that
16   last question.  Ask your next question.
17          MR. LANG:  I don't remember what the first question
18   was.
19   BY MR. LANG:
20   Q    What happened -- or, what's your understanding of the
21   proceedings in the Caymans?
22          MR. PHILLIPS:  Your Honor, objection.  Form.
23   Understanding of the proceedings in the Caymans?
24          MR. LANG:  His understanding is, I mean, his
25   understanding.  What's his endgame?
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/22/25   Page 252 of 443   PageID 4916
Main Document   Page 225 of 266

Dondero - Direct                    203

1          THE COURT:  All right.  I sustain.

2          MR. LANG:  Okay.

3          THE WITNESS:  The Cayman Islands --

4          MR. PHILLIPS:  Your Honor?

5          MR. LANG:  Hold --

6          THE COURT:  I sustained, so --

7          THE WITNESS:  Oh, sustained.  Sorry.  Okay.

8   BY MR. LANG:

9   Q    What is your endgame with respect to your objection over

10  the authority of Mr. Patrick to enter into the settlement

11  agreement that is subject of the 9019?

12  A    The three charities in the U.S. are affected materially.

13  Dallas Foundation can't make payroll as of October.  Dallas

14  Foundation --

15          MR. PHILLIPS:  Your Honor, I'll object to this

16  testimony.  The Dallas Foundation has withdrawn its objection

17  on behalf of -- Dallas Foundation appearing on behalf of

18  Empower, the Okada Family Foundation, and Crown Global.  The

19  Dallas Foundation is no longer a party here and did not even

20  object in its -- an individual capacity.  Object.

21          THE COURT:  I sustain the objection.  They had an

22  objection.  They withdrew it.

23      Moreover, as I announced early on today, I was really

24  questioning their standing to weigh in.

25      So in light of all of that, I'm not going to allow

004498

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 12/22/24   Page 253 of 443   PageID 4917

Dondero - Direct                                204

1   testimony regarding the impact there has been on Dallas

2   Foundation as a result of something Mark Patrick may have

3   done.  Okay?

4            THE WITNESS:  Okay.  I can answer it differently.

5            THE COURT:  Well, wait for your question.  Okay.

6   BY MR. LANG:

7   Q   Well, what -- what is the --

8   A   What is my goal?

9   Q   Well, yes, what is your goal?

10           THE COURT:  Okay.  Yes.  Why are you objecting?  Why

11  is Dugaboy objecting?  How about that?

12           MR. LANG:  Safely.

13           THE WITNESS:  Safely.  Without stating where the

14  assets are or might be, they are not with the three charities

15  they were with a year ago.  They have zero.  And I would like

16  to get those assets back.

17      (Pause.)

18           THE COURT:  Okay.  Go ahead.  I have a couple of

19  questions, but maybe you'll hit on them.

20           MR. LANG:  Oh.

21  BY MR. LANG:

22  Q   Mr. Dondero, are you asking the Court to -- are you

23  objecting to the settlement agreement that is the subject of

24  the 9019, asking the Court to allow the Joint Liquidators in

25  the Caymans to weigh in on the settlement agreement?

004499

Dondero - Direct                    205

1    A    Yes.  Or described a little differently, there's no

2    irreparable harm --

3          MR. PHILLIPS:  Objection.  Nonresponsive.

4    BY MR. LANG:

5    Q    Well, let me ask you this:  Are you asking --

6          THE COURT:  Let him answer.

7          MR. LANG:  Yes.

8          THE COURT:  Go ahead and answer.

9    BY MR. LANG:

10   Q    Go ahead.

11   A    There's no irreparable harm for a bit of delay to get to

12   the bottom of where the assets are and what bad deeds have

13   occurred.

14   Q    Is that the reason why you're objecting, is to delay this

15   for 45 days or so?

16   A    Well, I believe the HMIT million-dollar transaction in

17   February was a steal.  I believe it was a stolen asset that he

18   -- Mark Patrick's trying to monetize.  And I don't believe

19   it's monetized at nearly its fair value.  And so I believe

20   that it needs to be reviewed.

21   Q    Are you asking the Court to -- are you objecting simply to

22   allow the Liquidators in the Caymans time to review this

23   transaction and the settlement agreement?

24   A    Yes.  There needs to be more time.

25   Q    Okay.

004500

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L     Document 7   Main Document   Filed 07/02/25   Page 206 of 266   Page 255 of 443     PageID 4919

Dondero - Cross                               206

| | |
|---|---|
| 1 | MR. LANG:  I'll pass the witness. |
| 2 | THE COURT:  All right.  Cross? |
| 3 | CROSS-EXAMINATION |
| 4 | BY MR. MORRIS: |
| 5 | Q    Good afternoon, Mr. Dondero. |
| 6 | A    How's it going? |
| 7 | Q    Okay.  You referred to the three underlying charities as |
| 8 | being The Dallas Foundation, The Highland Santa Barbara |
| 9 | Foundation, and The Highland Kansas City Foundation.  Do I |
| 10 | have that right? |
| 11 | A    The three are The Dallas Foundation, Santa Barbara, Kansas |
| 12 | City.  There's a holding company or there's an entity below |
| 13 | it, below each one that I'm on the board of, but it's separate |
| 14 | and distinct from the overall charity. |
| 15 | Q    Okay.  But the ones that are separate and distinct that |
| 16 | have the Highland name, -- |
| 17 | A    Yes. |
| 18 | Q    -- those are the ones that you control, correct? |
| 19 | A    No.  I'm on the board.  There's three or four people on |
| 20 | the board. |
| 21 | Q    Okay.  But -- |
| 22 | A    But we don't control.  Otherwise, you know, we would have |
| 23 | not recommended the settlement. |
| 24 | Q    Does the Hunt family make their contributions to The |
| 25 | Dallas Foundation, The Santa Barbara Foundation, and The |

004501

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Main Document    Filed Page 2207 of 266    Page 256 of 443    PageID 4920

Dondero - Cross                    207

1   Kansas City Foundation, or do they make them to The Highland

2   Dallas Foundation, The Highland Santa Barbara Foundation, and

3   The Highland Kansas City Foundation?

4   A    Most families do it through DAF, so they probably have

5   their own -- they're just involved with Kansas City, as far as

6   I know.  I don't know if they're involved in any of these

7   others.  But they probably have a Hunt Kansas City.

8   Q    But the ones with the Highland name are the ones who

9   initiated the proceeding in the Cayman Islands to get the

10  Joint Official Liquidators appointed over this entity down

11  there, right?

12  A    Yes, I believe so.

13  Q    And you personally funded that litigation, correct?

14  A    The charities can't make payroll.

15  Q    And the charities, did you tell the charities what's

16  happening here?

17  A    Yes.  They're aware.

18  Q    When did you tell the charities what's happening here?

19  A    They've known it for weeks.

20  Q    And they haven't filed any objection in this court,

21  correct?

22  A    They thought it was best for Dallas to file it.

23  Q    And Dallas settled; isn't that right?

24  A    To the surprise of all the other charities.

25  Q    Okay.  So today, there's actually no charity who is

004502

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Main Document   Filed 07/22/25   Page 208 of 280   Page 257 of 443    PageID 4921

Dondero - Cross                                       208

1   objecting to the settlement agreement, correct?

2   A    Because it was -- she got bludgeoned in depositions over

3   the weekend and it happened last night and nobody was aware of

4   it.

5   Q    I didn't bludgeon anybody.

6   A    Well, --

7   Q    I don't bludgeon people.

8   A    She switched course after a Sunday full-day deposition or

9   half-day deposition.

10  Q    Okay.  So the charities that you speak of aren't

11  objecting, correct?

12  A    Well, if we had more time.  We only had six hours' notice

13  that Dallas fell away.  I think they probably would object.

14  Q    And you say -- you began to have concerns about Mark

15  Patrick going all the way back to 2023, right?

16  A    2023?  A little bit, yeah.

17  Q    And then you had real concerns in 2024, right?

18  A    Yeah.  I mean, he's an odd duck, but he was really odd

19  towards the end.

20  Q    Did you file a declara... is one of those public documents

21  you mentioned in the Cayman Islands, that's your affidavit,

22  right?

23  A    I believe so.

24  Q    Do you want to grab Binder 3 of 3?

25  A    Sure.

004503

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed 07/02/25   Page 2205 of 266   Page 258 of 443   PageID 4922

Dondero - Cross                                          209

1    Q    And turn to Exhibit 119?

2    A    Yes.

3    Q    Okay.  And this is the declara... this is the affidavit

4    that you filed in the Cayman Islands?

5    A    Yes.

6    Q    And if you turn to Page 4, in Paragraph 25 you begin to

7    recite events concerning Mark Patrick that concerned you,

8    correct?

9    A    Yes.  I'm glad you're bringing this into evidence.

10   Q    Yes.  And in the two years since you started having

11   concerns, has anybody sued Mark Patrick for breach of

12   fiduciary duty?

13   A    No.

14   Q    Have you recommended to any of these charities:  Mark

15   Patrick is doing wrong, let's go sue him?

16   A    We were unaware on 90 percent of it until he left.

17   Q    You were aware of everything that's in your declaration.

18   It says in 2023, you have notice of these emails.  Right?  And

19   you did an investigation in 2024, correct?

20   A    Yes.  But it took a while to get the affidavits from third

21   parties.

22   Q    You had the whole investigation done in 2024 and nobody

23   sued Mark Patrick, right?

24   A    We didn't sue him.  Correct.

25   Q    You're just mad that you lost control.  Isn't that right?

 1  A    No.

 2  Q    Turn to Paragraph 33, please.  You accuse Mr. Patrick of

 3  misusing material nonpublic inside information.  Is that

 4  right?

 5  A    Yes.

 6  Q    What material nonpublic inside information did he abuse?

 7  A    I wasn't involved in the specifics.  My understanding is

 8  that he had an awareness of a tender or some financial

 9  transaction and then was providing inside information to

10  attorneys and then had them do something.  But I don't -- I

11  don't know the specifics.

12  Q    Sir, under oath, in this affidavit that you submitted to

13  the Cayman Islands, you accuse Mark Patrick of obtaining and

14  abusing material nonpublic inside information.  Can you just

15  tell Judge Jernigan what you had in mind?

16  A    Whatever it says I have in mind.  I'm just saying I didn't

17  remember the specifics.  I can read it, though, if you'd like

18  me to read it.

19  Q    Well, was it something about a put option?

20  A    Yes.

21  Q    Did he tell The Dallas Foundation that it had a put

22  option?  Does that refresh your recollection?

23  A    I don't remember the details.

24  Q    Do you remember who the counterparty was to the put

25  option?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7  Main Document   Filed 07/02/25   Page 225 of 443   Page 260 of 443   PageID 4924

Dondero - Cross                                    211

```
 1   A    Counterparty.  One of the mutual funds.

 2   Q    Does it refresh your recollection that it was the Dugaboy?

 3   A    No.

 4   Q    Do you remember, sir?

 5   A    I don't remember.

 6   Q    I'm going to try.  I'm going to try and refresh your

 7   recollection.  Do you remember that Mark Patrick suggested to

 8   The Dallas Foundation that it could recover millions of

 9   dollars if it simply exercised the put option with Dugaboy?

10   A    My recollection is it was a mutual fund, and it wasn't

11   millions of dollars, but it would disrupt the transaction that

12   was already in place.  That's my recollection.

13   Q    Okay.

14   A    And I don't see Dugaboy anywhere in here, by the way.

15   Q    I know.  I was wondering if you could just -- I asked you,

16   but it doesn't sound like you know specifically what the

17   material nonpublic --

18   A    Well, --

19   Q    -- inside information is that you accused Mr. Patrick of

20   abusing at that time.

21   A    I know it's been reported.  We can get you the details.

22   Q    Okay.  You, in fact, acted on behalf of HMIT, didn't you?

23   A    Who is HMIT?

24   Q    Apologies.  You personally -- there's no question in your

25   mind that Mark Patrick is the Administrator at HMIT, correct?
```

004506

Dondero - Cross                              212

1   A    I'm sorry, I'm drawing a blank on HMIT.  What is HMIT?

2   Q    I apologize.  Hunter Mountain Investment Trust.

3   A    Oh.  Okay.

4   Q    I'm calling it HMIT.

5   A    Okay.  All right.  Sorry.

6   Q    I probably not saying it clearly.  I apologize.  H-M-I-T.

7   HMIT, that's what I call it.  Is there something better that

8   you prefer?

9   A    No, that's fine.  Yeah.

10  Q    Okay.  So HMIT.  Mark Patrick is the Administrator at

11  HMIT, right?

12  A    I believe his status, his dirty hands, I believe he's

13  trying to monetize a stolen asset.

14           MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

15           THE COURT:  Sustained.

16           THE WITNESS:  No, I -- I saw it.  I don't agree --

17           MR. PHILLIPS:  Objection, Your Honor.

18           THE COURT:  Sustained.

19           MR. PHILLIPS:  Move to strike.

20           THE COURT:  Granted.

21           THE WITNESS:  I do not agree.

22  BY MR. MORRIS:

23  Q    Okay.  Has he -- he was at one time the Administrator.

24  You would agree with that, right?

25  A    Yes.

004507

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 262 of 443    PageID 4926
Main Document    Page 213 of 266

Dondero - Cross                        213

1   Q   And did he stop becoming the Administrator in your mind

2   when the Joint Official Liquidators were appointed?

3   A   Yes.  I believe.

4   Q   Okay.  So, in your mind, that's when it happened?

5       Can you describe for the Court the relationship between

6   the entity in the Cayman Islands and HMIT?

7   A   The entity in the Cayman Island, as far as we knew, was

8   the org structure that all the assets were either in or

9   controlled by in the organizational structure before all the

10  HGEQ things that you went over earlier with Mark Patrick.

11  Q   Okay.  I'm not asking -- it's my fault.  Do you believe

12  the entity in the Cayman Islands controls HMIT?

13  A   HMIT was one of the assets that were owned by the

14  charities until it was moved for a million dollar to who know

15  who.

16  Q   And do you know how many layers there are between the

17  Cayman Islands entity and HMIT?

18  A   I do not.

19  Q   Is it fair to -- in your view, do you believe that the

20  Cayman Islands entity had a direct -- withdrawn.  Do you

21  believe that the Cayman Islands entity had an indirect

22  ownership interest in HMIT?

23  A   We believed it was direct.

24  Q   Direct.  So it was the owner?

25  A   Well, it was -- it was the direct before it got moved in

004508

Dondero - Cross                                   214

1    February.

2    Q    Hasn't Beacon always been the owner of -- the beneficial

3    owner of HMIT?

4    A    Then it was Beacon that was moved.  There was -- charities

5    were notified in February that, for $1 million, the HMIT was

6    sold to an undisclosed, unknown person.

7    Q    Do you believe that the entity in the Cayman Islands ever

8    had the ability to control Hunter Mountain Investment Trust?

9    A    Yeah.  It was an asset in the portfolio.

10   Q    And do you believe that that gives it the right to control

11   HMIT?

12   A    Yes.  I think the Liquidators will prove that.  I think

13   they can go back in time on bad acts and bad behavior and they

14   can regroup assets to their rightful owners.

15   Q    So your concern here is not with corporate authority, it's

16   with the bad acts.  Is that fair?

17   A    Well, no.  I think you lose your corporate authority when

18   you're fiducially irresponsible or commit corporate crimes.

19   Q    Okay.  But you've never -- you've never brought a lawsuit

20   accusing him of that.  Fair?

21   A    I think you'll see a litany of stuff come out of the

22   Cayman Islands.

23           MR. PHILLIPS:  Objection.  Nonresponsive.

24           MR. MORRIS:  I'm sure we might someday.

25           THE COURT:  Sustained.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 17    Filed 07/03/25    Page 264 of 443    PageID 4928
Main Document    Page 215 of 266

Dondero - Cross                                215

1          THE WITNESS:  Yeah.  But, no.  But I have not, no.

2   BY MR. MORRIS:

3   Q    Yeah.  But you personally, have you ever been the

4   Administrator of Hunter Mountain Investment Trust?

5   A    Not that I'm aware of.

6   Q    Have you ever had any role whatsoever with respect to the

7   Hunter Mountain Investment Trust?

8   A    Not that I -- not that I recall.

9   Q    Okay.  Do you recall last December we were here on some

10  litigation concerning HCLOM's scheduled claim?

11  A    You have to give me more of a clue.

12  Q    Remember HCLOM had that $10 million scheduled claim and

13  Highland had filed a bad faith motion and we were all here in

14  court and we wound up settling that matter and HCLOM got a

15  Class 10 interest for $10 million?

16  A    Yes, I vaguely remember that.

17  Q    Okay.  And you were here and you were representing HCLOM,

18  right?

19  A    Okay.  I don't remember specifics, but, yes, go ahead.

20  Q    Okay.  And do you recall that Highland required Hunter

21  Mountain Investment Trust's consent as part of the

22  transaction?

23  A    Vaguely.

24  Q    And you personally authorized that consent back in

25  December, didn't you?

Dondero - Cross                                    216

1    A    No.

2    Q    Who did?

3    A    Whoever would have spoke for HMIT at the time.

4    Q    Okay.  Let's take a look at Exhibit 68, please.

5    A    So, Binder 2?

6    Q    Yes, please.

7    A    Sorry, this says Pat Daugherty.  This is 1 of 3.  This

8    one.  Okay.  Did you say 68?

9    Q    Yes.

10   A    It's not in here, either.  68.

11   Q    So you see that's an order of the Court?

12   A    Yes.

13   Q    And this resolves HCLOM's claim?  Take your time.

14   A    I'll leave it in case someone else needs it.  Okay.

15   Q    And do you see on the last page of the document there's an

16   electronic signature by Deborah Deitsch-Perez at the Stinson

17   firm as counsel for Hunter Mountain Investment Trust and

18   Dugaboy Investment Trust?  Do you see that?

19   A    I'm sorry.  I went to the very last page with Mark and I.

20   Is there another page?  Oh, okay.  Yes.  Okay.

21   Q    So you see Stinson has signed both on behalf of you

22   personally and HCLOM, and at the bottom, Stinson and Ms.

23   Deitsch-Perez has also signed on behalf of Hunter Mountain

24   Investment Trust and the Dugaboy Investment Trust?  Do you see

25   that?

004511

Dondero - Cross                              217

1  A    Yes.  But then it's separate on 69, right?

2  Q    Yeah.  We're just looking at 68.

3  A    Okay.

4  Q    Do you know who authorized Ms. Deitsch-Perez to sign her

5  name and tell the Court that the Dugaboy Investment Trust had

6  approved this form of order both as to form and substance?

7  Who acted on behalf of Dugaboy?

8  A    I have no idea.  I hope she keeps it straight when she's

9  signing stuff.

10 Q    Well, on whose behalf are you here today?

11 A    Dugaboy's.

12 Q    And are you a representative of Dugaboy?

13 A    Representative?  I'm primary beneficiary until I pass.

14 Q    And who's the trustee of Dugaboy?

15 A    I believe it's my sister at the moment.

16 Q    Does she know you're here today testifying on behalf of

17 Dugaboy?

18 A    She knows I'm in court.  I didn't -- I wasn't specific.

19 Q    Did you talk to her about the Dugaboy -- does she -- does

20 she even know about the Dugaboy objection?

21 A    I don't know.

22 Q    Okay.  So how about Hunter Mountain Investment Trust?  Do

23 you know who authorized Ms. Deitsch-Perez to sign this

24 document on behalf of Hunter Mountain Investment Trust?

25 A    When was this?  In December or January?

004512

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 17   Main Document   Filed 07/02/25   Page 223 of 266   Page 267 of 443   PageID 4931

Dondero - Cross                                     218

1   Q   Yeah.

2   A   I'm assuming -- I'm assuming Mark Patrick.

3   Q   Late December.

4   A   I'm assuming Mark Patrick.  But I don't know.

5   Q   Did you hear about a week later that Mr. Phillips called

6   your lawyer and accused her of signing this document without

7   authority from Hunter Mountain Investment Trust's authorized

8   representative, Mr. Patrick?

9   A   In hindsight, he's been in on it for a while, so --

10  Q   What do you mean, he's been in on it for a while?

11  A   I think he knows the plan Mark Patrick's been putting in

12  place for quite a while.

13  Q   But this document was signed without his knowledge or

14  consent; isn't that right?

15  A   I don't know.

16  Q   And you had to sign a new agreement with Mark Patrick as

17  the authorized representative of HMIT.  Didn't you do that,

18  sir?

19  A   I don't know.

20  Q   Okay.  Let's take a look at guess I guess probably Exhibit

21  69.  So this is an intercreditor and participation agreement.

22  Do you see that?

23  A   Yes.

24  Q   And it's dated January 10th, 2025, correct?

25  A   Yes.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed Page 225 of 266   Page 268 of 443   PageID 4932

Dondero - Cross                                    219

1   Q   And even though you -- even though Skyview had completed

2   this investigation in which it was alleged that Mr. Patrick

3   misused material nonpublic inside information and he had

4   terminated his relationship with Skyview, you still entered

5   into this agreement with him as the authorized representative

6   of HMIT, correct?

7   A   Those were different work streams, you know, so they were

8   -- but yes.

9           MR. PHILLIPS:  Objection.  Nonresponsive.

10          THE COURT:  Sustained.

11  BY MR. MORRIS:

12  Q   That is -- that is your signature on the last page,

13  correct?

14  A   Yeah.  I mean, --

15  Q   It's a simple question.  That's your signature, right?

16  A   Yes.

17  Q   And you understood that you were signing an agreement with

18  Mark Patrick, correct?

19  A   Yes.

20  Q   And you signed this agreement in order to avoid Mr.

21  Phillips filing a motion in this court for reconsideration of

22  an order that she signed not knowing that Hunter Mountain had

23  given its consent without authority.  Isn't that right?

24  A   No, I had no -- none of that --

25  Q   So what's your memory?  Why do you think you entered into

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 17    Filed 07/02/25    Page 269 of 443    PageID 4933
Main Document    Page 225 of 266

Dondero - Cross                                        220

 1  this agreement?

 2  A    Because the lawyers put it in front of me as a finished

 3  product from what had been going on recently.

 4  Q    And you had no understanding of what it was?

 5  A    Not with the innuendo and agenda that you were describing.

 6  No.  I mean, I just -- I knew what it generally involved.

 7  That's it.

 8  Q    But you would agree with me that you entered into an

 9  agreement knowing that Mark Patrick was signing on behalf of

10  Hunter Mountain, correct?

11  A    Yes.

12  Q    I mean, it's right below your name, right?

13  A    Yes.

14  Q    You couldn't have missed it.

15  A    Yes.  That part, I'll agree with.

16  Q    Okay.  And you signed the agreement with Mark acting as

17  the authorized agent and representative of Hunter Mountain,

18  notwithstanding all of the bad acts that you supposedly were

19  aware of at the time.  Correct?

20  A    Object to aware of at the time.  They were all coming

21  together in parallel work paths.

22            THE COURT:  Okay.

23            MR. PHILLIPS:  Object.  Nonresponsive.

24            THE COURT:  Sustained.  Like I told Mr. Patrick, the

25  witness does not get to object.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L        Document 7    Filed 07/02/25    Page 270 of 443        PageID 4934
Main Document    Page 221 of 266

Dondero - Cross                              221

1              THE WITNESS:  Okay.

2      BY MR. MORRIS:

3      Q    And just to close the loop, Mr. Dondero, you fully funded

4      The Dallas Foundation's objection, correct?

5      A    And I made additional donations so that they could pursue

6      bad actors and get their money back.

7      Q    You funded the litigation so that The Dallas Foundation

8      could pursue their objection, correct?

9      A    I made additional donations so that they could get some

10     assets back so that they could be a charity again and make

11     donations.

12     Q    Do you get a tax deduction for that donation?

13     A    Yes.

14     Q    Okay.  That's nice.

15          Let's just finish up with the Joint Official Liquidators.

16     Have you spoken to them?

17     A    I do not believe so.

18     Q    Has anybody acting on your behalf spoken with the Joint

19     Official Liquidators?

20     A    I don't know.  I think the Joint Official Liquidators are

21     an accounting firm.  I think they're Grant Thornton.  I think

22     people have spoken to the attorneys down there, but I don't

23     know -- I haven't spoken to Grant Thornton and I don't know if

24     anybody else has.

25     Q    Okay.  Did you see the letter that your counsel marked as

004516

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L        Document 7    Filed 07/20/25    Page 271 of 443    PageID 4935
Main Document    Page 222 of 266

Dondero - Cross                                222

```
 1   the exhibit, the one that was sent last night?

 2   A    I've not heard it -- I've not read it, but I've heard you

 3   guys read it today.

 4   Q    Yeah.  Are you aware of the Joint Official Liquidators

 5   saying at any time that they didn't believe Mark Patrick had

 6   the authority to enter into the settlement agreement on behalf

 7   of the HMIT entities?

 8   A    I have not.

 9   Q    Okay.

10           MR. MORRIS:  No further questions, Your Honor.

11           THE COURT:  All right.  Mr. Phillips?

12           MR. PHILLIPS:  Yeah.

13           THE COURT:  Wait.  What are we at timewise?

14           THE CLERK:  So their 30 minutes is over.  If you

15   intended to give them 30 minutes for Patrick and --

16           THE COURT:  Yes.  Yes.  They collectively got 30

17   minutes.

18           THE CLERK:  For both of those --

19           THE COURT:  Yes.

20           THE CLERK:  -- witnesses.  Okay.  Yes, they're out.

21           THE COURT:  How much did Mr. Morris use?

22           THE CLERK:  Well, I don't know.  I just was --

23           THE COURT:  No, no, no, no.  30 minutes for each side

24   for each Patrick and Dondero.

25           MR. MORRIS:  About eight minutes.
```

004517

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/08/25   Page 272 of 443   PageID 4936
Main Document   Page 223 of 266

Dondero - Cross                                    223

 1              THE CLERK:  Yes.  Mr. Morris -- I think Mr. Phillips

 2    may have asked one question, but Mr. Morris mostly -- 30

 3    minutes.

 4              THE COURT:  No.  On this witness, Phillips hadn't

 5    gone.

 6              THE CLERK:  No, not this witness.

 7              THE COURT:  Okay.  That's all I care about, this

 8    witness.

 9              THE CLERK:  I don't know this witness.

10              THE COURT:  Okay.  Do you have a question, Mr.

11    Phillips?

12              THE CLERK:  I was doing 30 minutes for the total.

13              THE COURT:  No, no, no, no, no.

14              MR. PHILLIPS:  Your Honor, I can resolve this.  I can

15    resolve this.  We have no questions.

16              THE COURT:  Okay.  Thank you.  Where are we?  Mr.

17    Lang, any redirect?

18              MR. LANG:  I'm not sure.

19              THE COURT:  Okay.

20              THE WITNESS:  The last one.

21              MR. PHILLIPS:  Your Honor, the witness is telling the

22    lawyer what question to ask.

23              THE COURT:  Okay.

24              MR. LANG:  I believe I've already asked, which is the

25    endgame.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 17   Filed 07/02/25   Page 273 of 443   PageID 4937
Main Document   Page 224 of 266

Dondero - Redirect                          224

| 1 | THE COURT:  Okay.  Just let's move on.  Anything |
| 2 | else?  What was the question? |
| 3 | REDIRECT EXAMINATION |
| 4 | BY MR. LANG: |
| 5 | Q    Mr. Dondero, what are you looking to accomplish through |
| 6 | this objection? |
| 7 | MR. PHILLIPS:  Asked and answered. |
| 8 | THE COURT:  Sustained.  Sustained.  He did.  He was |
| 9 | asked and answered. |
| 10 | BY MR. LANG: |
| 11 | Q    The endgame in general. |
| 12 | MR. PHILLIPS:  Asked and answered. |
| 13 | THE COURT:  Answered and answered.  Move on. |
| 14 | THE WITNESS:  No, no.  No, I haven't.  No, I -- |
| 15 | MR. PHILLIPS:  Asked and answered.  Move to strike. |
| 16 | THE COURT:  You asked him this on your direct |
| 17 | earlier. |
| 18 | MR. LANG:  I did. |
| 19 | THE WITNESS:  But, in general, regarding the -- |
| 20 | MR. PHILLIPS:  Your Honor? |
| 21 | THE WITNESS:  Not just this. |
| 22 | THE COURT:  Sustained.  Ask another question. |
| 23 | MR. LANG:  I don't have any more questions. |
| 24 | THE COURT:  Okay.  I have a question. |
| 25 | EXAMINATION BY THE COURT |

004519

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Main Document   Filed Page 225 of 260   Page 274 of 443    PageID 4938

Dondero - Examination by the Court          225

1          THE COURT:  Here is something that I want to

2   understand.  What I have before me is whether a settlement

3   with Hunter Mountain, a settlement between the Highland

4   entities, the Claimant Trust, the Subtrusts, and the Hunter

5   Mountain entities, seven of them, is fair and equitable, is in

6   the best interest of the estate.  If you were the director,

7   the manager, the representative of Hunter Mountain estate,

8   what would your answer be?

9          THE WITNESS:  It's not in the ZIP Code.

10          THE COURT:  It's not in the ZIP Code?

11          THE WITNESS:  Of fair.  Yes.

12          THE COURT:  Okay.  Why do you think it's not in the

13   ZIP Code of fair?

14          THE WITNESS:  Okay.  We filed in Delaware on a $100

15   million judgment.  Pachulski was our counsel.  They told us --

16          THE COURT:  I know all this.

17          THE WITNESS:  It just --

18          THE COURT:  I'm talking about the settlement in front

19   of me right now.

20          THE WITNESS:  -- we'd be in and out in three months,

21   right?  We got liquidated instead.  We got liquidated for over

22   $850 million, which not enough people talk about.  Okay?  It

23   would've been $950 million if Seery had done a good job, but

24   it was $850 million we got liquidated for.  Okay?  The POCs

25   were pumped up.  People who supposedly had no claim, all of a

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 17   Filed 06/22/25   Page 275 of 443    PageID 4939
Main Document   Page 275 of 266

Dondero - Examination by the Court                226

1   sudden, $300 million.

2       There's $700 million missing or misallocated from the

3   estate.  Okay?  There was -- all the original creditors, all

4   the original creditors sold 99 percent of their interest for

5   $160 million.  The Farallon and Stonehill went to the beach.

6   There was enough money on the balance sheet.  Seery could have

7   given them the $160 million and tossed us the keys.  Instead,

8   he had relations, deep relations, undisclosed business

9   relationships with Farallon and Stonehill, --

10          THE COURT:  Okay.  I do want you to know --

11          THE WITNESS:  No, but --

12          THE COURT:  -- I've read all this many times.

13          THE WITNESS:  Okay.  But so -- so these --

14          THE COURT:  I promise I read every piece of paper

15   submitted.

16          THE WITNESS:  Okay.  So, so he sold the POCs to them,

17   and it's been -- they've tripled their money in two and a half

18   years.  The professional fees have been $300-odd million.

19   There's interrelationships between all the professionals --

20   Farallon, Stonehill, Grosvenor, the Hellman & Friedman guys,

21   the Millennium guys who took whatever.  All this stuff has to

22   come out.

23       We're on the edge of a giant RICO case eventually.  We're

24   -- that's -- we're on the edge of a giant RICO case.  And they

25   should not be giving up their rights for $10, $20 million.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 5-7    Filed 10/22/25    Page 276 of 443    PageID 4940
Dondero - Examination by the Court                    227

 1  It's crazy for them to give up their rights at Dallas

 2  Foundation for 10 or 20 million bucks.

 3      There's $700 million missing.  All the original creditors

 4  sold for $160 million.  The estate was sold for over $850

 5  million.  Where'd all the money go?  Where'd all the money go

 6  and why?  You know.

 7      We get updates quarterly, once in a while, well, this much

 8  went out to this law firm, this much went out to this,

 9  whatever, but no one looks at the gross amount and where'd all

10  the money go?  And why?  Why did it have to -- why did it have

11  to go down like that?  Why do we have to fire --

12          THE COURT:  Okay.  I know you have an objection.

13          THE WITNESS:  -- all the employees?

14          THE COURT:  This is narrative.

15          MR. MORRIS:  Yeah.  And --

16          THE COURT:  I understand all --

17          MR. MORRIS:  -- I'm not going to cross-examine him,

18  but this is -- this is not accurate.

19          THE COURT:  I understand all of these arguments.  You

20  know, I --

21          THE WITNESS:  But I'm just --

22          THE COURT:  Your lawyers at least know, if you don't

23  know, that we wrote a 100-plus-page opinion on the motion of

24  Hunter Mountain to sue for all of this.  Okay?  So I promise

25  I've heard this and looked at it.  But right now, Hunter

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 277 of 443   PageID 4941
Main Document   Page 223 of 266

Dondero - Examination by the Court                    228

 1  Mountain, through Mark Patrick, you question his authority,

 2  but they are ready to lay down their swords and not pursue

 3  that motion for leave to sue based on the claims trading, and

 4  --

 5          THE WITNESS:  Have you seen all the insider trading,

 6  Farallon, Stonehill?  Have you seen the trading and claims on

 7  insider information?  Have you seen all that stuff?

 8          THE COURT:  I've seen the allegations but I --

 9          THE WITNESS:  Well, why would you release all those

10  people right now before the RICO?

11          THE COURT:  So I -- Dugaboy -- you've been asked what

12  is your goal?  Dugaboy a .18 limited partnership interest --

13          THE WITNESS:  Correct.

14          THE COURT:  -- that is subordinated to Hunter

15  Mountain.  I'm just trying to understand the scenario where it

16  makes sense to keep fighting for years to come.

17          THE WITNESS:  Well, RICO transcends this, right?  I

18  mean, RICO brings everybody in.  Until we get --

19          THE COURT:  Okay.  You think it's -- and my question,

20  why is this not fair and equitable and in the best interest of

21  the estate, you think it's better to litigate several more

22  years and maybe have a chance, you know, --

23          THE WITNESS:  At $600 mill.  At $600 million.

24          THE COURT:  -- Hunter Mountain would have a chance to

25  --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 278 of 443   PageID 4942
Main Document   Page 229 of 266

Dondero - Examination by the Court          229

1          THE WITNESS:  $600 million.  Yes.

2          THE COURT:  Okay.

3          THE WITNESS:  Versus $20 million now.  But you have

4   to remember, it's all part of -- you have to pay attention to

5   this Mark Patrick stuff.

6          MR. PHILLIPS:  Your Honor?

7          THE COURT:  Okay.  Yes.  I asked my question.  I'm

8   trying to understand why Dugaboy, why its position is this is

9   not fair and equitable and in the best interest and in the

10   range of reasonableness.  Those are the buzz words that a

11   judge has to focus on.

12          THE WITNESS:  It's not fair to the charities.  I

13   still think no one's ever seen --

14          THE COURT:  The charities aren't parties here.

15          THE WITNESS:  Not yet.  Give them a little time.

16   They just heard about the settlement yesterday.

17          THE COURT:  Well, isn't that what the Cayman Islands

18   is all about?  What I do doesn't necessarily affect what's

19   happening there.

20          THE WITNESS:  Well, no, but you're saying they're not

21   here today.  If you delayed this three weeks, they'd be here.

22   It's just a couple --

23          THE COURT:  They were here and they chose to

24   withdraw.

25          THE WITNESS:  One.  One.  Just one charity.  But the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 57   Filed 07/02/25   Page 279 of 443   PageID 4943

Dondero - Examination by the Court                        230

1    others, if you give them some time, they'll be here.

2            THE COURT:  Okay.  Okay.  I think you've answered my

3    question, your theory of how this should play out and how you

4    want it to play out.  Okay.  All right.

5            THE WITNESS:  Thank you.

6            THE COURT:  That's all.  Thank you.

7            THE WITNESS:  Thank you for the time.

8            THE COURT:  Uh-huh.

9        (The witness steps down.)

10           THE COURT:  All right.  I think that concludes our

11   evidence, correct?

12           MR. YORK:  Yes, Your Honor.  At least from

13   Daugherty and --

14           THE COURT:  Okay.  The Objectors rest.  Any rebuttal?

15           MR. PHILLIPS:  No, Your Honor.

16           THE COURT:  Okay.

17           MR. YORK:  Your Honor, would it be okay if we took a

18   five-minute comfort break?

19           THE COURT:  Yes.  We may as well turn it into a 10-

20   minute break because that's what's going to happen.  All

21   right.  We'll be back at 3:40.

22           THE CLERK:  All rise.

23       (A recess ensued from 3:30 p.m. until 3:44 p.m.)

24           THE CLERK:  All rise.

25           THE COURT:  Please be seated.  We're back on the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/22/25   Page 280 of 443   PageID 4944
Main Document   Page 231 of 266

231

 1  record in Highland Capital.  I will hear closing arguments.

 2  And I dangled something out there before lunch and I've never

 3  heard any follow-up.  I guess no agreement with Daugherty

 4  could be reached on the reserve?

 5          MR. YORK:  Haven't had that conversation, Your Honor.

 6          THE COURT:  You didn't have that conversation?  Oh,

 7  well.  Why didn't you have that conversation?

 8          MR. YORK:  We were, during the lunch break, working

 9  busily to prepare the rebuttal to Mr. Seery's testimony, --

10          MR. MORRIS:  Yeah.

11          MR. YORK:  -- Your Honor.  And so --

12          THE COURT:  Okay.  You told me you'd talk about it.

13          MR. MORRIS:  May I proceed, Your Honor?

14          THE COURT:  I guess I don't matter.  Do I not matter

15  when I suggest something like that?

16      Okay.  Go ahead.

17      CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

18          MR. MORRIS:  Good afternoon, Your Honor.  John

19  Morris; Pachulski, Stang, Ziehl & Jones; for Highland Capital

20  Management, LP and the Highland Claimant Trust and on behalf

21  of the Highland Litigation Subtrust.

22      I know that we've got Bob Loigman in the courtroom, but I

23  know that -- at least I hope he joins me in this closing

24  argument.  I suspect he does.

25      I don't want to be too long here, Your Honor.  We don't

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L     Document 17    Filed 06/22/25    Page 281 of 443     PageID 4945
Main Document    Page 232 of 266

232

1    have a high burden.  This is a 9019 motion, for goodness'

2    sakes.  I've never been involved in such a contentious 9019

3    motion in my life.  We had three depositions on Friday.  We

4    had two on Sunday.  I think we had two on Monday.  For a 9019,

5    I've had one witness sit multiple times.

6        It's been an extraordinary experience.  But at the end of

7    the day, nobody's really challenging the settlement agreement.

8    You've got people challenging, you know, the Cayman Islands.

9    You've got people challenging, is it -- you know, can you jam

10   it in under the plan?  We're not jamming anything under the

11   plan.  We're following the plan provisions.

12       Nobody's challenging the bona fides of the motion.  Nobody

13   is challenging whether it's the product of good-faith, arm's-

14   length negotiations.

15       You heard Mr. Seery testify at length about the process.

16   You've got 55 different documents in the record proving that

17   this agreement is the product of arm's-length, good-faith

18   negotiations between parties represented by sophisticated

19   counsel that resulted from an exchange of information, an

20   exchange of proposals, back and forth, and here we are.

21       It's also in the best interests of the estate.  Really not

22   challenged by anybody.  Nobody is contending that Highland is

23   getting a raw deal here.  Nobody.  And the proof that Highland

24   is getting fair consideration and that this settlement is in

25   the best interest of the Claimant Trust and its stakeholders,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 233 of 266   Page 282 of 443   PageID 4946

233

1    it's obvious we are terminating costly, wasteful, and I dare

2    say frivolous litigation.  We are disposing of several

3    illiquid assets.  We are getting litigation protections that

4    will inure to the benefit of the released parties, the

5    Highland release parties and it will, we believe, provide the

6    protection that we deserve.

7        It's not just releases.  It's covenants not to sue.  It's

8    all kinds of bells and whistles in there.  Substantial

9    benefits to the estate.  And so nobody's really objecting to

10   that.

11       Nobody's really objecting to the fairness of the

12   settlement to the HMIT parties except for Mr. Dondero, and

13   he's just mad that peace is breaking out.  He's just mad

14   because he's not going to be able to litigate anymore.  It's

15   not relevant to a 9019 motion.  But even if it was, it's

16   ridiculous.  It's just ridiculous.

17       The settlement is fair and reasonable and in the best

18   interest of the creditors.  It's the product of good-faith,

19   arm's-length negotiations.  And on that alone, it should be

20   approved.

21       We've had a lot of testimony today about Mark Patrick's

22   authority.  The only actual evidence that concerns Mark

23   Patrick's authority are the exhibits in the binder and Jim

24   Seery's testimony about the diligence that he did.  And the

25   exhibits in the binder all prove that Mark Patrick has the

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7-5    Filed 07/02/25    Page 283 of 443    PageID 4947
Main Document    Page 283 of 443

234

1    authority to act and bind the HMIT entities to the settlement

2    agreement.  It's Paragraph 7 of the HMIT trust agreement

3    itself.

4        Did the objecting parties point you to one single document

5    to support their speculative argument, because it's not

6    anything more than that, that somehow Mark Patrick isn't

7    authorized to do this?  There is not a scintilla of evidence

8    that Mark Patrick is not authorized to do this.

9        And if Your Honor had any concerns about Mr. Patrick, I

10   think he answered them at the end.  That he understood exactly

11   what the terms of the agreement are.  That he had a reasonable

12   opportunity to consult with counsel and to negotiate.  That he

13   knows exactly what he's doing on behalf of these entities.

14   That he believes the best path forward from the HMIT entities

15   is to grab the value today instead of letting it waste.

16       We welcome Mr. Patrick to the table.  It makes a lot of

17   sense.  We've been trying to get to this point forever.

18       Mr. Daugherty.  You know, I have no gripes with Mr.

19   Daugherty.  I don't know quite what's motivating him these

20   days, but he admitted and the evidence is clear that when he

21   was a Class 9 claim holder, I forget if it's two or three or

22   four occasions, he accepted $3.7 million in multiple payments,

23   without any concern at all as to whether or not it violated

24   the plan, even though his Class 8 claim had remained

25   unresolved.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed Page 2235 of 266   Page 284 of 443   PageID 4948

235

1    He didn't send the money back.  He didn't say, Mr. Seery,

2    you can't do this because it violates the plan.  He knowingly

3    and willingly accepted the benefits of being a Class 9 claim

4    holder.  And now he comes and objects on the basis that

5    somehow it's not fair to him as a Class 8 holder?  This is

6    what we call estoppel.  Right?

7        I wasn't in a position to really make the argument because

8    I didn't quite understand it until today.  Like, how does he

9    come in today and say you can't do this, Your Honor?  You

10   can't allow Class 9 and 10 to get a nickel until he's done,

11   when he himself has accepted millions of dollars before his

12   claim is resolved?  That doesn't sound right to me.  And I

13   don't think the Court should accept that argument.

14       Just quickly, because I don't want to give it any weight,

15   frankly, but this whole business of the Cayman Islands and the

16   JOLs, the only facts Your Honor has to take into account are

17   that they were appointed before this motion was filed.

18   They've never appeared here.  They've never objected.  And

19   there is no evidence in the record to suggest, let alone to

20   prove, that the JOLs contend that Mark Patrick does not have

21   the authority to enter into the settlement on behalf of the

22   HMIT entities.  There's no evidence of any kind.

23       What you need to know and need to remember, though, is

24   that whole proceeding in the Cayman Islands is being brought

25   on behalf of not The Kansas City Foundation or The Dallas

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed Page 236 of 266   Page 285 of 443   PageID 4949

236

```
 1   Foundation, but The Highland Kansas City Foundation, The
 2   Highland Dallas.  It's Mr. Dondero, and he's funding it, and
 3   it says it in Paragraph I think 47 or 48 of his declaration.
 4   He's funding all of that.  And he funded The Dallas
 5   Foundation's objection here.
 6        And that's why he's upset, because they settled last night
 7   without telling him because they didn't want any part of this,
 8   Your Honor.  That's the truth.  That's why they're not here.
 9   And they, right, they're the people who suggested that maybe
10   something untoward happened and maybe someday -- because this
11   is the way their objection is characterized.  Complete
12   speculation.
13        If you go back and look at the objection, it's someday,
14   somebody might do something and might someday set it aside.
15   That wasn't a proper basis at the time, but we know that Mark
16   Patrick remains in control of the HMIT entities today because
17   nobody has told the Court otherwise.  And we know that The
18   Dallas Foundation has withdrawn its objection.  As I asked Mr.
19   Patrick, have you been, you know, removed or clipped or
20   terminated or in any way restricted in your capacity as the
21   Administrator and control person of the HMIT entities as a
22   result of the settlement, and the answer was no.
23        There's nothing to see here, Your Honor, except the
24   opportunity for the Highland Claimant Trust and its affiliated
25   entities in moving this case forward in an enormously positive
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Filed 07/02/25   Page 286 of 443    PageID 4950
Main Document   Page 237 of 260

237

 1 | and constructive direction.

 2 | We have the opportunity today to put to rest a lot of

 3 | pending litigation.  We have the opportunity today to put to

 4 | rest a lot of future potential litigation that undoubtedly

 5 | would have come to pass had these entities remained under the

 6 | indirect control of Mr. Dondero, because we know that that was

 7 | the case.

 8 | If you remember, Your Honor, we sat here two years ago,

 9 | June 8th, 2023, on the evidentiary hearing on Hunter

10 | Mountain's motion for leave to bring the claims trading case.

11 | And if Your Honor will remember, Mr. Patrick at that time was

12 | forced to admit that the entirety of that case came in from

13 | Mr. Dondero, that he had no knowledge of any facts that

14 | related to anything.

15 | I would ask Your Honor to go and compare The Dallas

16 | Foundation's objection with Mr. Dondero's declaration that he

17 | filed in the Cayman Islands.  I'm not going to say they're

18 | verbatim, but they are largely, largely the same.  This is

19 | just Jim Dondero being Jim Dondero, and that is not a basis to

20 | overrule or deny the motion under Rule 9019.

21 | It's a product of good faith negotiations, it is clearly

22 | in the best interests of the estate, and we respectfully

23 | request that as soon as possible Your Honor grant motion.

24 | THE COURT:  Okay.

25 | MR. MORRIS:  Thank you, Your Honor.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed Page 223 of 260   Page 287 of 443   PageID 4951

238

1            THE COURT:  Any closing from the Movant, Co-Movant?

2            MR. PHILLIPS:  Your Honor, thank you very much.

3    Louis M. Phillips on behalf of the --

4            THE COURT:  I don't know if you're the Co-Movant.

5    You're a party to the proposed settlement.

6            MR. PHILLIPS:  I'm not a Co-Movant.

7            THE COURT:  Okay.

8            MR. PHILLIPS:  I'm a party to the settlement.

9            THE COURT:  Uh-huh.

10           MR. PHILLIPS:  I didn't quite make it to that status

11   to be a Co-Movant.

12     CLOSING ARGUMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

13           MR. PHILLIPS:  But anyway, we appreciate the Court's

14   time.  We appreciate the Court's attention.  This was, as the

15   evidence established, we provided and were provided an immense

16   amount of information.

17       Much of the information, certainly the information about

18   Mr. Patrick's control of the HMIT entities, was provided by

19   us.  It was reviewed by Mr. Seery.  And Mr. Seery made a very

20   strong case for the amount of diligence he did on our side of

21   the equation.  It's not nearly as relevant to Your Honor's

22   decision about whether to approve the settlement whether we

23   got a good deal or not, but the deal we got, we think, is very

24   fair.

25       The deal we got was negotiated with counsel, with

004533

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Main Document    Filed 07/01/25    Page 239 of 266    Page 288 of 443    PageID 4952

239

 1  businesspeople who are very sophisticated.  We have agreed on

 2  the methodology and of the calculation of our Class 10 claim.

 3  The Debtor and the Debtor estate or the Claimant Trust or

 4  whoever held the HMIT note got full value for the HMIT note.

 5  Any additional value from the HMIT note would come back to

 6  HMIT.  The Kirschner Litigation would be for the benefit of

 7  HMIT.  The Dugaboy Note would be for the benefit of HMIT.

 8      All of that is being put into a package and is being

 9  resolved, affiliated, administered in a very effective and

10  efficient manner.  We are getting some money.  We appreciate.

11  We tried to get more.  We couldn't.  They tried to pay less.

12  We made a deal.

13      So, Your Honor, I echo and thank Mr. Morris for all of his

14  comments.  I appreciate counsel being involved here today.  We

15  think this is a fair and equitable settlement.  There is no

16  question under 9019 that this settlement should be approved.

17  And the suggestion that this Court should allow itself to just

18  be a vehicle for continued litigation, when we have analyzed

19  it, perhaps from a different perspective, and made the

20  decision that it is time to make our deal now, it is time to

21  take HMIT out of the litigation picture and into the fold of a

22  party in interest of a fixed claim with fixed treatment that's

23  different from the plan, authorized by the plan.  And we

24  appreciate it.

25      Thank you, Your Honor.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/10/25   Page 289 of 443   PageID 4953
Main Document   Page 225 of 266

240

```
 1              THE COURT:  Thank you.  All right.  Mr. Loigman, we

 2    didn't mean to ignore you.

 3       CLOSING ARGUMENT ON BEHALF OF MARC S. KIRSCHNER, LITIGATION

 4                              TRUSTEE

 5              MR. LOIGMAN:  Thank you, Your Honor.  Robert Loigman,

 6    Quinn Emanuel.  You didn't ignore me.  Louis was just quicker

 7    to jump up than I was.

 8         And I step up solely because you asked whether the Co-

 9    Movant had anything to add.  And we have nothing further to

10    add to what Mr. Morris said.  We agree with it wholly.  We

11    think this is a fair and complete settlement, and we would ask

12    that the Court approve the settlement under the 9019 motion.

13              THE COURT:  Thank you.

14              MR. LOIGMAN:  Thank You, Your Honor.

15              THE COURT:  All right.  The Objectors?

16              MR. MORRIS:  Your Honor?

17              THE COURT:  Oh.

18              MR. MORRIS:  Just to clarify, the motion was made

19    under 9019 and Section 363.  I just don't want that to get

20    lost.  That's all.

21              THE COURT:  Okay.  363, use of property.  Okay.

22         The Objectors?

23           CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

24              MR. YORK:  Thank you, Your Honor.  I'll be very

25    brief.
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Main Document   Filed Page 225 of 266   Page 290 of 443   PageID 4954

241

1          I certainly appreciate that the Court desires to have this

2     bankruptcy wrapped up, given how long it's gone on now, for

3     six -- approximately six years in this court.  The fact of the

4     matter is that the settlement agreement that Highland proposes

5     to enter into with Hunter Mountain Investment Trust entities

6     violates the express terms of the plan, the confirmation

7     order, and the Claimant Trust Agreement.

8          And they have not pointed to any language in there or to

9     argue otherwise.  Their only argument has been that they've

10    set a reserve aside.  And there's no provision in any of those

11    documents that provides that that's an excuse for them to

12    violate the express terms of the confirmation order, the plan,

13    or the Claimant Trust Agreement, including specifically the

14    language that Class 10 claims are not to receive or retain

15    anything under the plan on account of their interest unless

16    and until the Class 8 and Class 9 claims are paid in full plus

17    applicable interest.  And --

18              THE COURT:  I really want to understand that

19    argument.  Mr. Seery correctly testified that, pretty much in

20    every Chapter 11 plan we see, there's a disputed claim

21    reserve.  Well, I guess unless we have really unsophisticated

22    creditors who don't insist on that.  But we had sophisticated

23    creditors.  So why doesn't that mechanism, which I would call

24    tried and true, we see it in most cases, why doesn't that

25    resolve this issue you're raising?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 291 of 443   PageID 4955
Main Document   Page 242 of 266

242

```
 1              MR. YORK:  Well, --

 2              THE COURT:  And I focused in more than maybe I needed

 3   to about the nature of Mr. Daugherty's remaining claim, his

 4   Class 8 claim.  What was the scope?  What's the maximum amount

 5   it could be?  When might it be resolved?  Because I think we

 6   have a tried-and-true mechanism that addresses his concerns.

 7   Tell me why it doesn't.

 8              MR. YORK:  Well, --

 9              THE COURT:  Really, I want to understand what you

10   think I'm missing.

11              MR. YORK:  Well, so I think twofold, Your Honor.  The

12   first is that the dispute reserve that exists normally would

13   be for whatever the amount of the disputed claim is.  And here

14   we're dealing with, as both sides have acknowledged, a claim

15   that they at best could estimate, but they don't know for

16   certain, given all of the machinations that could come out of

17   the IRS audit.

18       And secondly, specifically with respect to the

19   confirmation order, if it had said that the net 10 and 11

20   claims could be paid as long as the allowed 8 and 9 claims

21   were paid, then the dispute reserve would provide that

22   protection.  But that's not what the language in the

23   confirmation order says.  It says claims, not allowed claims.

24   And therefore it's referring to all claims, including disputed

25   claims.  And --
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 7   Filed 07/02/25    Page 292 of 443    PageID 4956
Main Document    Page 243 of 266

243

1          THE COURT:  But we have a disputed claim reserve.

2    Okay.  We have a disputed claim reserve.

3          MR. YORK:  There is, yes, there is a reserve.

4          THE COURT:  So is it your argument that I can't

5    approve a settlement like this until Mr. Daugherty's claim has

6    been resolved with certainty, which might be in 2033 or

7    whatever?  I can't keep a bankruptcy estate open, allowing

8    administrative expenses to continue to accrue, because of one

9    contingent unliquidated claim that may never even develop.

10          MR. YORK:  Your Honor, I appreciate the Court's

11   frustration with that, but that's the way that the documents

12   are written in terms of the confirmation order.  And so it's

13   an --

14          THE COURT:  So the disputed claim reserve is

15   meaningless?

16          MR. YORK:  No, it is not -- a disputed claim reserve

17   exists, but it does not, under the terms of the confirmation

18   order, in terms of allowing the payment of Class 10 and Class

19   11 claims, those can't be done until the Class 8 claims are

20   resolved.

21          THE COURT:  You would have -- just a moment -- you

22   would have me keep this estate open for as long as it takes,

23   2033, whatever, without allowing Class 10 and Class 11

24   theoretically to get anything?

25          MR. YORK:  At least under --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed 07/06/25   Page 293 of 443   Page 293 of 443   PageID 4957

244

1          THE COURT:  Let's just let the -- with all respect to

2     Mr. Seery, he's charging a handsome amount.  It was agreed to

3     or approved by the Court.  Let's just let him continue

4     accruing until 2033 because of Mr. Daugherty's prospect of the

5     IRS saying you owe $1.4 million plus interest and penalties,

6     when he's gotten the use of that all?  Help me.  This doesn't

7     make sense to me.

8          MR. YORK:  Sure.  One way this could be solved is

9     that the payments to -- the cash payments, for example, that

10    are to be made to the HMIT entities, under the proposed

11    settlement could be held in abeyance until the resolution of

12    the Class 8 claim.  The Court could modify the proposed

13    settlement based on that.  That's one way to deal with the

14    issue, for example.

15         THE COURT:  Do what?  Hold it in abeyance?

16         MR. YORK:  Yes.  For -- the payments to be made to

17    the Hunter Mountain Investment Trust under the proposed

18    settlement could be -- could be done in accordance with the

19    terms of the confirmation order.  We'll just hold those

20    payments until such time.

21         THE COURT:  We who?  Put it in the Court Registry?

22         MR. YORK:  Or --

23         THE COURT:  Where it will earn 0.18 percent?

24         MR. YORK:  No.  No.  It can remain within the

25    Claimant Trust until the time at which the Class 8 claim is

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 294 of 443    PageID 4958
Main Document    Page 225 of 266

245

 1   finally and fully resolved.

 2            THE COURT:  Okay.  Meanwhile, I've approved the

 3   extension of the Trusts for one year, with Dugaboy saying, we

 4   don't think this should happen again and again and again.  We

 5   reserve our rights.  That's not a good solution.

 6            MR. YORK:  Your Honor, I understand the Court's

 7   frustration, but this is the terms of the plan and the

 8   confirmation order that were entered.  Highland needs to

 9   follow it.

10            THE COURT:  Okay.  What about the estoppel argument

11   that I heard Mr. Morris make?

12            MR. YORK:  Well, sure.  So, the first time they raise

13   it is here today.  And the one thing that -- the difference is

14   that allowing this settlement to go forward is an effective

15   liquidation of the estate versus where things are now, in

16   which any payments that were made is not an effective

17   liquidation.  It doesn't expose anyone that would have

18   priority to Class 10 with respect to anything that happens in

19   the future from, you know, not having sufficient funds to deal

20   with it.  That's all.

21            THE COURT:  Okay.

22            MR. YORK:  Thank you, Your Honor.

23            THE COURT:  Thank you.  All right.  Mr. Lang?

24       CLOSING ARGUMENT ON BEHALF OF DUGABOY INVESTMENT TRUST

25            MR. LANG:  I'll be brief.  Your Honor, there are

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 295 of 443   PageID 4959

246

1    three issues that we've raised.  One is the capital account

2    balance being used for the claim for the Class 10 holders.

3    The plan does not specify that the capital account balance is

4    to be used.  Allowing the $336 million claim to Class 10

5    ensures that Class 11 will not ever receive a dime.  That's

6    guaranteed.

7         Alternatively, upon the satisfaction of the Class 9, the

8    $20 million approximately owed to Class 9, the holders of HMIT

9    should receive 99.5 percent of the total residual.  We think

10   that would be a more fair outcome to the Class 11 claimants.

11             THE COURT:  Wait, say again?

12             MR. LANG:  That, so, of total assets, $70 million

13   approximately, $20 million is owed to Class 9.

14             THE COURT:  Uh-huh.

15             MR. LANG:  Of the remainder from that, HMIT should

16   receive 99.5 percent of those assets, whatever they are, the

17   value, rather than a $336 million claim.  That was the

18   objection.

19             THE COURT:  But I didn't get any evidence of a

20   separate way of competing -- of doing that.  I heard credible

21   testimony from Mr. Seery about why he used the math he used

22   and I didn't hear any countervailing evidence of, wait, this

23   is a more fair, realistic way of computing it.  And what I did

24   hear is the .5 percent limited partnership interest of Dugaboy

25   is subordinated in its payment rights under the limited

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 17   Filed 07/02/25   Page 296 of 443   PageID 4960

247

1  partnership agreement of Highland.

2         MR. LANG:  It's subordinated under the plan, but yes,

3  the plan does not say to use --

4         THE COURT:  Under the partnership agreement is the

5  reason the plan did it, is what I've been presented.

6         MR. LANG:  I believe Mr. Seery -- and I could be

7  wrong -- I think I heard him say that he has used the other

8  method, but I could have misheard him in the testimony.

9         THE COURT:  Well, that's not what I heard.  I heard

10  him emphasizing the fact that the Class 8 interests, including

11  that of Dugaboy, are subordinated with regard to payment

12  rights under the Highland partnership agreement.  And so

13  that's why he didn't think it made sense to just apply

14  percentages.

15         MR. LANG:  That's what he testified to.

16         THE COURT:  So I'm just -- anyway, I'm just trying to

17  figure out what the countervailing evidence is here to suggest

18  his methodology is wrong.

19         MR. LANG:  I believe the partner -- or, the plan says

20  that the Class 10, when the GUC certification is a Class 10,

21  and the Class 11 received pro rata, it doesn't specify the

22  account balance is to be used as the number to determine what

23  they receive.

24         THE COURT:  Okay.  You want to point out what you are

25  focused on?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 223 of 266   Page 297 of 443   PageID 4961

248

1          MR. LANG:  I believe it's under Treatment.

2          THE COURT:  Okay.

3          MR. LANG:  Section --

4          THE COURT:  I don't want to hunt.  I want you to tell

5     me what the language is that you think is supportive of that.

6          MR. LANG:  And the second -- I guess the secondary

7     issue that we probably should just get to is the release.  We

8     think it's broad, and just Dugaboy and Dondero are carved out.

9     And Mr. Morris did send me a proposal last -- yesterday

10    evening that I haven't gotten to.  But that is an objection

11    that we have, is just to make sure that the -- that nobody can

12    argue that the release covers any claim Dugaboy might have, if

13    any.

14         THE COURT:  Okay.  I think many hours ago I remember

15    this being mentioned.  I guess it was a little bit more broad

16    than just -- I think it was Highland employees.  I don't know.

17        What is the agreement, Mr. Morris, if you're awake there,

18    on --

19         MR. MORRIS:  I am awake, Your Honor.  Apologies.

20         THE COURT:  Okay.  I didn't mean to be flippant.

21         MR. MORRIS:  Yeah.

22         THE COURT:  I get punchy and --

23         MR. MORRIS:  That's okay.  With respect to the

24    release?

25         THE COURT:  Right.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed 07/22/25   Page 225 of 266   Page 298 of 443   PageID 4962

249

1          MR. MORRIS:  We don't have an agreement.  We have an

2     agreement -- well, I sent a proposal last night, but it didn't

3     get responded to.  If they want to accept that proposal,

4     that's terrific.

5          THE COURT:  Okay.  I don't know what the agreement

6     says.  Are you saying you want to accept what they proposed

7     last night?

8          MR. LANG:  No, I have edits to it.  I just couldn't

9     --  I was tied up on another filing last night.  I have not

10    been able to get to it today.

11         THE COURT:  Okay.  I'm going to make a ruling today.

12    Okay?  If it means y'all sit here in the courtroom a while,

13    fine.  But just like all of you, I have a mountain of other

14    stuff waiting for me, so I really want to rule today.  So, --

15         MR. LANG:  Understood.

16         THE COURT:  Yeah.

17         MR. LANG:  Maybe we can work on it as soon as I'm

18    done and I can get back to 'em --

19         THE COURT:  Okay.

20         MR. LANG:  -- and get back to you.

21      Your Honor, the -- it's on Page 23 of the plan.  It talks

22    about the Class 10 and Class 11, where the partnership

23    interests, that their treatment, they shall receive as pro

24    rata share of the contingent Claimant Trust interests.  And

25    all we're asking is that be used or applied as a 99.5/.5

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Main Document   Filed Page 250 of 266   Page 299 of 443   PageID 4963

250

 1   distribution.

 2        (Pause.)

 3             THE COURT:  I'm sorry.  Go ahead.

 4             MR. LANG:  Oh, sorry.  I thought you were looking for

 5   it.

 6        And the last issue is authority.  The only point of the

 7   authority argument, Your Honor, is that the Joint

 8   Administrators were appointed down in the Caymans to

 9   investigate the transaction that moved basically the entire

10   ownership, because it's owned a hundred percent down to HMIT,

11   out.  They're investigating the transactions.  They have not

12   stipulated to authority.  They're looking at everything.

13   They've requested a 45-day delay on this motion.  And that's

14   all that -- not even asking to deny the 9019.  They were just

15   asking time to basically bless this transaction so that nobody

16   could come back and make an issue of it.  But I understand

17   your desire to rule today.

18             THE COURT:  Okay.  Any rebuttal?

19             MR. MORRIS:  Yeah, briefly, Your Honor.

20     REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

21             MR. MORRIS:  I just want to point the Court to two

22   provisions of the operative documents that I think --

23             THE COURT:  Okay.

24             MR. MORRIS:  -- will resolve even further the issues

25   that we've presented today.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 251 of 266   Page 300 of 443   PageID 4964

251

1    The Claimant Trust Agreement -- and I apologize, I don't

2    know if the whole document is in evidence, but I will

3    respectfully suggest to the Court that the Claimant Trust

4    Agreement provides in Article 5, Section 5.1(c), --

5              THE COURT:  Okay.  Let me catch up.

6              MR. MORRIS:  Yes.

7         (Counsel confer.)

8              THE COURT:  It's not Debtor's Exhibit 5.

9              MR. MORRIS:  Yeah.

10             THE COURT:  Daugherty's Exhibit 5?

11             MR. MORRIS:  It's Daugherty Exhibit 5?

12             MR. YORK:  Yes.

13             THE COURT:  Okay.

14             MR. YORK:  So we have a full copy at Daugherty --

15             THE COURT:  I've got it.  Daugherty's Exhibit 5.

16             MR. MORRIS:  Okay.  So if you could just go to Page

17   27, Your Honor.  And this is in response to Mr. Lang's

18   argument about the calculation of the allowed claim.  You'll

19   see it deals with contingent trust interests.  And the very

20   last sentence says the equity trust --

21             THE COURT:  Wait.  What page again?

22             MR. MORRIS:  27.

23             THE COURT:  Okay.

24             MR. MORRIS:  Do you see Section C in the middle is

25   Contingent Trust Interests?

004546

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 252 of 266   Page 301 of 443   PageID 4965

252

1          THE COURT:  No.

2          THE CLERK:  It's 26 of the Claimant Trust Agreement,

3     27 of the --

4          THE COURT:  Ah, it's 26.  Yes.  On the bottom, it's

5     26; on the top, it's 27 of 38.

6          MR. MORRIS:  Okay.

7          THE COURT:  Okay.

8          MR. MORRIS:  And at the end of Section C, it says

9     explicitly:  The equity trust interests distributed to allowed

10    holders of Class A limited partnership interests -- that's

11    Dugaboy --

12         THE COURT:  Uh-huh.

13         MR. MORRIS:  -- shall be subordinated to the equity

14    interests distributed to the allowed holders of Class B and C.

15    That's Hunter Mountain.  Okay?

16       So the trust agreement provides for exactly what we're

17    doing here.  Dugaboy is in fact subordinated to HMIT.  It

18    doesn't get paid until HMIT gets paid in full.  And Mr. Seery

19    I think compellingly testified as to the reasonable

20    calculation that he did based on very objective numbers to

21    determine each respective limited partner's capital account.

22       With respect to Mr. Daugherty, the plan, which is on the

23    docket at 1943, has a definition of Disputed Claim Reserve.

24    And it states, among other things, that the amount of the

25    disputed claim upon which the disputed claim --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 253 of 266   Page 302 of 443   PageID 4966

253

1              THE COURT:  Give me the page number.

2              MR. MORRIS:  I apologize, Your Honor.

3              THE COURT:  I've got it right in front of me.

4              MR. MORRIS:  It's Page 7 of the plan.

5              THE COURT:  Okay.  All right.  I'm there.  The

6     Defined Term.

7              MR. MORRIS:  So the Defined Term "Disputed Claim,

8     Claims Reserve Amount" in the middle says:  The amount of the

9     disputed claim upon which the disputed claims reserve is

10    calculated shall be -- they've got an A and then a B -- the

11    amount agreed to by the holder of the disputed claim and the

12    Claimant Trustee or Reorganized Debtor, as applicable.  And

13    then it says D:  Or is otherwise ordered by the Bankruptcy

14    Court, including an estimated -- an order estimating the

15    disputed claim.

16         And that last provision is vital, Your Honor, because that

17    is the hook upon which you can always hang your hat when you

18    decide that we are not going to wait until 2023 [sic] when the

19    IRS audit may be resolved, because you have the ability, as

20    ordered by the Bankruptcy Court, including estimating the

21    amount of the disputed claim.  Which is one of the causes of

22    action that we've asserted in the complaint.  It's either to

23    subordinate -- actually, it's to disallow, to subordinate, or

24    to estimate.  Because this case does have to end, Your Honor.

25    We actually think he should be bound by the definition in B.

004548

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 303 of 443   PageID 4967

254

1    It is an agreed-upon amount.

2         I've heard the testimony from Mr. Daugherty that there was

3    no negotiation, but he didn't deny that he signed a document

4    that is called an agreement that sets forth the disputed claim

5    amount.  And that is an agreement, and I think that satisfies

6    that definition.  And even if it didn't, at some point this

7    case has to end.

8         Thank you, Your Honor.

9              THE COURT:  Okay.  Thank you.

10        All right.  Well, it's been a long day and even a longer

11   case.  I think a lot of people were on the receiving end of a

12   little bit of my grumpiness at times today, and I apologize

13   for that.

14        I always feel compelled to say to the lawyers and parties

15   when I rule from the bench that I can assure you it's not

16   knee-jerk.  I can assure you my law clerk and I have read

17   every piece of paper submitted.  And we come in here I think

18   well-prepared and we just want to listen to the evidence to

19   see if it supports -- who it supports.  So I am going to rule

20   from the bench.

21        I first want to make clear that with regard to the motion

22   before the Court, the motion which was filed May 19th at

23   Docket Entry 4216, pursuant to Bankruptcy Rule 9019 and

24   Bankruptcy Code Section 363, the Court is being asked to

25   approve a very broad settlement that is between what are

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 17    Filed 04/22/25    Page 255 of 266    Page 304 of 443    PageID 4968

255

1    defined as the HMIT entities, seven entities in all; Hunter

2    Mountain Investment Trust; as well as Beacon Mountain, LLC;

3    Rand Advisors, LLC; Rand PE Fund 1, LP; Rand PE Fund

4    Management, LLC; Atlas IDF, LP; and Atlas IDF GP, PLLC.  So

5    this proposed compromise and settlement is between all of

6    those Hunter Mountain entities as well as the Reorganized

7    Debtor, the Highland Claimant Trust, the Highland Litigation

8    Subtrust, and the Highland Indemnity Trust.

9        I first will note that notice has been fulsome, reasonable

10   under the circumstances, to provide due process to anyone

11   affected by the proposed compromise.

12       The Court would note that the legal standard is a very

13   well-known and established legal standard here.  Among other

14   things, the Court is to look at whether the settlement is

15   fair, reasonable, and in the best interest of the estate;

16   whether it would appear reasonable business judgment has been

17   exercised; is the compromise and settlement within the range

18   of reasonableness?

19       And this involves looking at, among other things, the

20   probability of success in the litigation -- that would be all

21   the various litigation involving HMIT, if it were to go

22   forward; the complexity and likely duration of further

23   litigation and attendant expense, inconvenience, and delay;

24   and all other factors bearing on the wisdom of the compromise.

25   We know that's *Cajun Electric*, *Jackson Brewing*, *Foster*

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 07/02/25   Page 255 of 266   Page 305 of 443   PageID 4969

256

1    *Mortgage*, among other cases.  I probably left out *AWECO*.

2          Anyway, applying all of those legal standards here, I do

3    think the evidence was very thorough in showing that the

4    compromise is a product of good faith and arm's-length

5    negotiations.  Indeed, it was almost shocking to this Court

6    when I saw the motion, having the history I have with all of

7    the contested issues, adversary proceedings that have

8    transpired over the past few years between Hunter Mountain and

9    the Debtor.

10         I do think the evidence is that it's fair and equitable

11   and in the best interest of the estate and within the range of

12   reasonableness, given due regard for all of the expense,

13   delay, and likelihood of success.

14         I'll just briefly recount that, as noted early today,

15   there was an Exhibit B attached to the 9019 motion that listed

16   nine unresolved pending pieces of litigation that the Highland

17   entities are embroiled in.  Two of those are now gone.  This

18   was filed May 8th, and as of January 25th, they're gone.  So

19   seven pieces of litigation, of which two will go entirely away

20   if I approve this settlement.  The Kirschner adversary claims

21   against Hunter Mountain will go away.

22         We have very little, very little, relatively speaking,

23   left in this bankruptcy case to resolve if I approve this

24   settlement.  That alone is very, very significant.  Again, we

25   have large shall I say issues with Hunter Mountain.  Highland

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/02/25    Page 257 of 366    Page 306 of 443    PageID 4970

257

1   says Hunter Mountain owes the Highland entities something like

2   $57.69 million on a note that Hunter Mountain is payor on

3   dated December 21st, 2015.

4       The flip side of that is that Hunter Mountain was sued by

5   Kirschner in the Kirschner action on various claims, including

6   this $57 million note.  We have had Hunter Mountain file

7   multiple motions for leave to sue Highland, the Claimant

8   Trust, Mr. Seery.  And those have been denied, but are in

9   appeal status or remand status or some further litigation

10  status.

11      And again, we have numerous issues.  Hunter Mountain

12  having sought valuation.  The Court denied that.  It's on

13  appeal.

14      So, so much goes away, so much further litigation goes

15  away and we make a monumental step in ending this long-running

16  case if I approve this settlement.

17      Now, on the flip side of this, I know that Dugaboy,

18  through the voice of Mr. Dondero today, expressed that Hunter

19  Mountain is, I forget the words he used, but not -- this isn't

20  close to being fair and equitable as far as he was concerned

21  for Hunter Mountain.  That Hunter Mountain, in addition to

22  being through with litigation in this bankruptcy-land, would

23  be paid $500,000 within five days.  They would also be paid

24  separately $10 million as an initial distribution, with the

25  hope of two more $6.5 million distributions in '27 and '28.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed Page 253 of 266   Page 307 of 443   PageID 4971

258

1   And it would get a note, which I think has $24 million -- I

2   think it was less than that, $17 or $18 million left on it,

3   perhaps, on which Dugaboy is a maker.  The debtor is one of

4   the two payees.  The Debtor gives up its rights in that note.

5       It looks like Hunter Mountain is getting a lot.  And

6   again, the way this estate has been liquidated, there is money

7   that can flow to it as a Class 10 equity here, as the evidence

8   has shown.

9       So I am approving the settlement.  I am specifically

10  overruling the remaining objections of both Dugaboy and Mr.

11  Daugherty.

12      As far as Mr. Daugherty's argument that the settlement

13  violates the absolute priority rule or violates the terms of

14  the plan or the confirmation order or the trust agreement by,

15  putting words in his mouth, skipping over the full payment of

16  whatever his Class 8 claim is going to be and allowing a

17  subordinate class, Class 10, to get paid, I have flipped and

18  studied the wording of the plan and the confirmation order and

19  the defined term for Disputed Reserve.  And I referred to a

20  disputed reserve as a tried-and-true provision in Chapter 11

21  plans.  I think it does what needs to happen for precisely

22  this kind of situation, that as long as an appropriate amount

23  is being held in reserve, and the Court can decide what is an

24  appropriate amount, we don't have to hold up a bankruptcy

25  estate for years and years.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 17   Filed 12/22/25   Page 308 of 443   PageID 4972
Main Document   Page 259 of 266

259

1    So the disputed claim reserve is what allows me to find

2    this is fair and equitable and this isn't some sort of

3    violation of the absolute priority rule.  I think this is

4    precisely the reason the disputed claim reserve mechanism is

5    in place, so that we can get on with the business of getting

6    more people paid sooner.

7    And based on the evidence I've heard, it is an appropriate

8    amount, I think.  We're doing a lot of crystal-balling, what

9    may or may not ever happen when, but I think, based on all the

10   persuasive evidence I've heard, the Daugherty objection should

11   be overruled.

12   As far as Dugaboy, I, as noted, am overruling that

13   objection.  I didn't have any persuasive evidence, solid

14   evidence to show me that Mark Patrick doesn't have appropriate

15   corporate governance authority to enter into this settlement

16   agreement.

17   I realize there's a lot swirling around in the Cayman

18   Islands, and that's going to play out however it plays out.

19   But as of today, I don't have any evidence that he doesn't

20   have authority currently to enter into the settlement.  And it

21   speaks volumes that The Foundation backed down.  It would seem

22   that they have been convinced that the lack-of-authority

23   argument was not one they wanted to press today.  So that is

24   overruled.

25   I feel like we have all seen this movie many times before.

004554

Case 19-34054-sgj11  Doc 4296  Filed 06/30/25  Entered 06/30/25 11:25:22  Desc
Case 3:25-cv-02724-L  Document 7  Filed 07/22/25  Page 260 of 266  Page 309 of 443  PageID 4973

260

1  I wanted to understand, perhaps I went deeper than I needed

2  to, I know Mr. Phillips thinks I went deeper than I needed in

3  hearing some of the testimony from Mr. Patrick and Mr.

4  Dondero, but I'm just trying to understand what's happening

5  here.  Why people who were so lockstep and friendly for years

6  of this case suddenly, when we're right on the brink of maybe

7  the case being put to bed -- I'm optimistic; it's not quite

8  that close -- all of a sudden they're at loggerheads.

9       And so how many times have I seen this over the years,

10  whether it's a breakdown in business and personal

11  relationships, Mr. Daugherty, Mr. Terry, Grant Scott, now Mark

12  Patrick?  I'm probably leaving out someone.  I don't know.  I

13  feel like I'm watching the same movie.  Okay, now these two

14  have parted ways.  Now these two have parted ways.

15       And then, as I recall, when Grant Scott withdrew his

16  objection to the HarbourVest settlement all these years ago,

17  2020, 2021, which he had been lodging for Charitable DAF, I

18  think it was, --

19            MR. MORRIS:  Yes, Your Honor.

20            THE COURT:  -- then what happens?  Well, I think Mark

21  Patrick came in to work or replace Grant Scott, and then a

22  bunch of people ended up getting sued in a different court

23  regarding the settlement I approved, the HarbourVest

24  settlement I approved.

25       So why am I saying this?  I just, I'm trying to understand

004555

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7    Filed 07/23/25    Page 310 of 443    PageID 4974
Main Document    Page 261 of 266

261

1    things I'll never understand.  I wanted to maybe hear

2    something that would make me better understand what's happened

3    now between Hunter Mountain, Mark Patrick, and Dondero and

4    Dugaboy, because it sure seems like they were on the same team

5    for many years.  But it was very likely irrelevant, as Mr.

6    Phillips kept getting up and down and saying.  I just was

7    seeing if it would lead to something relevant that would bear

8    on the wisdom of this compromise, since that's one of my other

9    legal standards.  I'm supposed to consider all factors that

10   might bear on the wisdom of the compromise.  And so I guess

11   that's where I was going in allowing all of that to come in.

12       All right.  Well, while everyone is not thrilled with this

13   compromise and settlement, I heartily congratulate the human

14   beings that made it happen, and they know who they are.  Maybe

15   I do, maybe I don't.  But I think it's rather amazing.  And I

16   hope that we are not coming to court for hearings in 2032.  I

17   don't know who among us will be alive.  I'm not going to be

18   alive by then.  Certain people might cheer if that's the case.

19   But I congratulate the human beings who made this happen.  And

20   you know who you are.  Maybe I do, maybe I don't, but I

21   congratulate you.

22       All right.  So I reserve the right to supplement or amend

23   this oral bench ruling in a more fulsome written order.  I am

24   asking Mr. Morris and his team to be the scriveners on that

25   order.  And obviously, you're going to run it by the other

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L   Document 7   Filed 06/30/25   Page 262 of 266   Page 311 of 443   PageID 4975

262

1    lawyers here who participated today.

2        Is there anything else before we wrap it up?

3            MR. MORRIS:  Just one other thing, Your Honor.  And I

4    greatly appreciate your comments.

5        When we draft the order, are we authorized to say that

6    this settlement is approved not only pursuant to 9019 but to

7    363?  Because there are asset sales that are part of this.  We

8    moved under that provision, and I didn't hear Your Honor

9    reference that, --

10           THE COURT:  Okay.

11           MR. MORRIS:  -- but we would like to include that in

12   the order.

13           THE COURT:  You may.  And that is precisely why I

14   said I reserve the right to supplement or amend, because many

15   times I get out of here and look at this transcript and, ooh,

16   I forgot to say whatever.

17           MR. MORRIS:  Yeah.

18           THE COURT:  So I meant to say that and I didn't, so

19   you may add that.

20           MR. MORRIS:  And I assume all Your Honor wants is a

21   fairly simple form of order that incorporates --

22           THE COURT:  I do not want a 40-page order.

23           MR. MORRIS:  Right.

24           THE COURT:  Okay?

25           MR. MORRIS:  Just an order that incorporates your

1    comments on the record, and to the extent that Your Honor

2    wants to amend that, you'll do so at your leisure?

3            THE COURT:  Yes.

4            MR. MORRIS:  Perfect.

5            THE COURT:  All right.

6            MR. MORRIS:  Thank you.

7            THE COURT:  Thank you all.  We're adjourned.

8            MR. PHILLIPS:  Thank you, Your Honor.

9            THE CLERK:  All rise.

10        (Proceedings concluded at 4:38 p.m.)

11                         --oOo--

12

13

14

15

16

17

18

19

20                     CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                      **06/27/2024**

24   _____      _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

004558

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-02724-L    Document 7  Filed 07/02/25    Page 313 of 443    PageID 4977
Main Document    Page 264 of 266

264

                          INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

By Mr. Morris                                                 48
By Mr. Phillips                                              62
By Mr. York                                                 64
By Mr. Lang                                                 79

WITNESSES

Claimant Trust's Witnesses

James P. Seery
- Proffer of Testimony by Mr. Morris                        11
- Direct Examination by Mr. Morris                          83
- Cross-Examination by Mr. Phillips                        110
- Cross-Examination by Mr. York                            111
- Cross-Examination by Mr. Lang                            128

Patrick Daugherty's Witnesses

Patrick Daugherty
- Direct Examination by Mr. York                           141
- Cross-Examination by Mr. Morris                          154
- Examination by the Court                                 164

Dugaboy Investment Trust's Witnesses

Mark Patrick
- Direct Examination by Mr. Lang                           171
- Cross-Examination by Mr. Morris                          184
- Redirect Examination by Mr. Lang                         189
- Recross-Examination by Mr. Morris                        191
- Examination by the Court                                 192

James "Jim" Dondero
- Direct Examination by Mr. Lang                           195
- Cross-Examination by Mr. Morris                          206
- Redirect Examination by Mr. Lang
- Examination by the Court                                 224
- Recross-Examination by Mr. Morris

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

004559

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-02724-L Document 57 Main Document Filed 08/22/25 Page 265 of 443 Page 314 of 443 PageID 4978

265

INDEX
Page 2

EXHIBITS

Claimant Trust's Exhibits (Motion to Extend Duration)

1 through 67                                    Received   11

Claimant Trust's Exhibits (Motion to Approve Settlement)

1 through 123, 126                               Offered   43
10                                            Withdrawn   45
12                                             Received   44
13                                             Received   44
57                                            Withdrawn   45
59                                             Received   46
64-69                                          Received   46

Dugaboy Investment Trust's Exhibits

Plan and Settlement Agreement                  Received   47
Exhibit 3                                      Received  189

Patrick Daugherty's Exhibits

1-42                                           Received   47

CLOSING ARGUMENTS

By Mr. Morris                                             231
By Mr. Phillips                                          238
By Mr. Loigman                                           240
By Mr. York                                              240
By Mr. Lang                                              245
By Mr. Morris                                            250

RULINGS

Motion for an Order Further Extending Duration of Trusts   21
(4213)

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-02724-L    Document 57   Main Document   Filed 07/02/25   Page 315 of 443   PageID 4979   Page 266 of 266

266

1                                    INDEX
2                                  Page 3

3       RULINGS, cont'd.

4       Motion for Entry of an Order Pursuant to Bankruptcy        28/254
        Rule 9019 and 11 U.S.C. § 363 Approving Settlement
5       with HMIT Entities and Authorizing Actions Consistent
        Therewith (4216)

6
        END OF PROCEEDINGS                                              263
7
        INDEX                                                       264-266
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | **STIPULATION WITHDRAWING THE DUGABOY INVESTMENT TRUST'S OBJECTION TO MOTION FOR ORDER EXTENDING DURATION OF TRUSTS** |

## STIPULATION WITHDRAWING THE DUGABOY INVESTMENT TRUST'S OBJECTION TO MOTION FOR ORDER EXTENDING DURATION OF TRUSTS

This stipulation (the "Stipulation") is made and entered into in the above-captioned bankruptcy case by and between The Highland Claimant Trust and the Highland Litigation Sub-Trust (together, the "Trusts"), on the one hand, and The Dugaboy Investment Trust ("Dugaboy"), on the other hand, by and through their respective undersigned counsel.

004562

## RECITALS

WHEREAS, on May 8, 2025, Trusts filed a Motion for an Order Further Extending Duration of Trusts [Dkt. No. 4213] (the "Motion"), requesting the Bankruptcy Court to enter an order further extending the duration of the Trusts through and including August 11, 2026;

WHEREAS, on May 29, 2025, Dugaboy filed its Objection of The Dugaboy Investment Trust to Motion for an Order Further Extending Duration of Trusts [Dkt. No. 4223] (the "Objection");

WHEREAS, the Trusts and Dugaboy hereby enter into this Stipulation in order to resolve the Motion and the Objection;

NOW, WHEREFORE, IT IS HEREBY JOINTLY STIPULATED AND AGREED, as follows:

1.      Dugaboy agrees to withdraw its Objection to the Motion with prejudice;

2.      The Trusts expect to dissolve by August 11, 2026 so that no further extension of the duration of the Trusts will be necessary;

3.      Dugaboy hereby preserves and does not waive its right, if any, to object to any further attempts to extend the date by which the Trusts must dissolve or to extend the duration of the Trusts;

4.      This Stipulation may be executed in counterparts. A facsimile, electronic, or photocopy of this Stipulation and the signatures hereto shall have the same effect and may be accepted with the same authority as if it were an original; and

5.      The Trusts and Dugaboy agree that the Bankruptcy Court shall retain jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Stipulation and any order related to same.

[*Remainder of Page Intentionally Blank*]

Dated: June 26, 2025

**HAYWARD PLLC**

By:*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

- and –

**PACHULSKI STANG ZIEHL
& JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com

***Counsel for The Highland Claimant Trust***

**STINSON LLP**

By:*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

***Counsel for The Dugaboy Investment Trust***

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

By:*/s/ Robert S. Loigman*
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

- and –

**SIDLEY AUSTIN LLP**

Paige Holden Montgomery
Spencer M. Stephens
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

***Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of The Highland
Litigation Sub-Trust***



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 27, 2025**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) **Re: Docket No. 4231** |
| | ) |

**STIPULATION WITHDRAWING OBJECTION OF THE DALLAS FOUNDATION
AND CROWN GLOBAL LIFE INSURANCE, LTD TO MOTION FOR ENTRY OF
AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363
APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING
ACTIONS CONSISTENT THEREWITH**

'        This stipulation (the "Stipulation") is made by and among Hunter Mountain Investment

Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand

Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand

_____

[1]        Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service
address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1

004566

GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT,

Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities");

The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada

Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd.

("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation

Parties"); Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or

"Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the

Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the

"Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by

and through their respective undersign counsel.

RECITALS

**WHEREAS**, on May 19, 2025, the Movants filed that certain *Motion for Entry of an Order*

*Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT*

*Entities and Authorizing Actions Consistent Therewith* [Dkt. No. 4216] (the "9019 Motion");

**WHEREAS**, on June 9, 2025, the Foundation Parties filed that certain *Objection* [Dkt. No.

4231] to the 9019 Motion (the "Foundation Objection");

**WHEREAS**, on June 24, 2025, the Foundation Parties and the HMIT Entities entered into

that certain *Settlement Term Sheet* which is annexed hereto as Attachment 1 to this Stipulation (the

"Term Sheet");

**NOW, WHEREFORE, IT IS HEREBY JOINTLY STIPULATED AND AGREED** as

follows:

1.  The Foundation Parties withdraw the Foundation Objection with prejudice in accordance

    with the terms of the Term Sheet annexed hereto as **Attachment 1**.

2

2. The Foundation Parties, the HMIT Entities, and the Movants agree that the following language shall be contained in the proposed order on the 9019 Motion:

Notwithstanding anything in the Settlement Agreement or the 9019 Order to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (the "Foundation Parties") are or will be included in the definitions of HMIT Releasors or Highland Releasors. For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com
***Counsel for the HMIT Entities***

and

**OKIN ADAMS BARTLETT CURRY LLP**
*By: /s/ David L. Curry*
Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
1113 Vine Street, Suite 240
Houston, Texas 77002
Telephone: (713) 28-4100
Facsimile: (346)247-7158

3

004568

Email: mokin@okinadams.com
dcurry@okinadams.com
**ATTORNEYS FOR THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.**

and

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/John A. Morris* _____
Jeffrey N. Pomerantz (admitted pro hac vice)
John A. Morris (admitted pro hac vice)
Gregory V. Demo (admitted pro hac vice)
Jordan A. Kroop (admitted pro hac vice)
Hayley R. Winograd (admitted pro hac vice)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com
- and -

**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

and

4

004569

QUINN EMANUEL URQUHART &
SULLIVAN LLP

*/s/ Robert S. Loigman*

Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
-and  SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
***Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of the Highland
Litigation Sub-Trust***

CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties
receiving notice in this chapter 11 case through this Court's CM/ECF System on this June 25,
2025.

*/s/ Louis M. Phillips*

Louis M. Phillips (#10505)

004570

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Debtor. | § | |

### BINDING TERM SHEET

This Summary of Terms and Conditions (this "<u>Term Sheet</u>") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Trust, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

---

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments. |
| | The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ). |
| | At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction. |
| | At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

004572

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties. |
| | Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution. |
| | If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick. |
| | The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

Julie Diaz, Chief Executive Officer

The HMIT Entities

Mark Patrick

004573

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Debtor. | § | |

**BINDING TERM SHEET**

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

---

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

004574

| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments. |
| --- | --- |
| | The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

004575

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties. |
| | Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution. |
| | If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick. |
| | The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

The HMIT Entities

_____

_____

Julie Diaz, Chief Executive Officer

Mark Patrick

004576



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

### ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the Settlement Agreement, as applicable.

LA:4938-1326-1904.9 36027.002

004577

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation ("Okada Family"), and Crown Global Life Insurance, Ltd., not individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the "Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and the Court having found that the legal and factual bases set forth in the Motion establish sufficient

004578

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1.      The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2.      Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3.      The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4.      The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5.      The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6.      The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7.      The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8.      The Motion is **GRANTED**.

004579

9.      As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10.      All other Objections to the Motion are overruled.

11.      The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12.      HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13.      The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14.      The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15.      Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors."  For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

### ### END OF ORDER ###



# KEN PAXTON

ATTORNEY GENERAL OF TEXAS

**July 9, 2025**

Honorable Stacey G.C. Jernigan
United States Bankruptcy Court
Northern District of Texas
1100 Commerce Street, Room 1254
Dallas, Texas 75242

      Re:    Request for a Stay; Case No. 19-34054-sgj11

Dear Judge Jernigan:

The Office of the Texas Attorney General (the "OAG") respectfully ask that the Court enter a brief stay of this bankruptcy proceeding.

The OAG, as the representative of the public's interest in charity, is charged under Texas law with the power and duty to protect and enforce the public interest in nonprofit organizations, foundations and charitable trusts. See Tex. Prop. Code § 123.002 (authorizing the Attorney General to intervene in a "proceeding involving a charitable trust."). Federal courts have recognized this principle. *See, e.g., Tex. v. Veterans Support Org.*, 166 F. Supp. 3d 816, 820-21 (W.D. Tex. 2015).

The OAG is further charged with protecting the public interest as it relates to unlawful acts or practices in trade or commerce under the Texas Deceptive Trade Practices-Consumer Protection Act. Tex. Bus. & Com. Code § 17.41 *et seq.* (the "DPTA"). The OAG reviews charitable, nonprofit, and for-profit entities to determine whether they are compliant with Texas laws including, *inter alia*, the DTPA, the Business Organizations Code, the Property Code, the Texas Health & Safety Code, and the Uniform Unincorporated Nonprofit Association Act. The OAG can also investigate and enforce breaches of the common law fiduciary duties of trustees of charitable trusts and officers, directors, and employees of nonprofit organizations to protect the public interest.

The OAG has issued Civil Investigative Demands to persons and entities, some of whom are involved in this bankruptcy proceeding, in response to complaints. *See* Tex. Bus. & Com. Code § 17.61. One of the complaints under investigation involves conduct allegedly taken by persons or entities during this bankruptcy proceeding.

A brief stay of the bankruptcy proceedings will assist the OAG in its investigation and permit it time to determine whether any further action, as it relates to this bankruptcy, is necessary to ensure protection of the public interest.

Please contact the undersigned if the Court requires additional information.

004581

Respectfully submitted,

*/s/ Johnathan Stone*
**JOHNATHAN STONE**
Chief, Consumer Protection Division
Texas State Bar No. 24071779

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711
Telephone: (512) 936-2613
Fax: (512) 473-8301
Johnathan.Stone@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

## NOTICE OF APPEAL OF ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s):

The Dugaboy Investment Trust

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding:
□ Plaintiff
□ Defendant
□ Other (describe)

For appeals in a bankruptcy case and not in an adversary proceeding:
□ Debtor
X Creditor
□ Trustee
□ Other (describe)

004583

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

> **ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. §
> 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND
> ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS
> CONSISTENT THEREWITH**
>
> A true and correct copy of the Order is attached hereto as Exhibit A.

2. State the date on which the judgment, order, or decree was entered: signed June 30,
2025 [Dkt. No. 4297]

3. **Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the
names, addresses, and telephone numbers of their attorneys:

1. *Party/Appellee:*      Highland Capital Management, L.P.

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

2. *Party/Appellee:*     Highland Claimant Trust

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110


3. *Party/Appellee:* The Highland Litigation Sub-Trust

Attorneys:

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor New York, NY 10010
T: (212) 849-7000

And

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
T: (214) 981-3300

004585

4. Party/Appellee: Hunter Mountain Investment Trust

KELLY HART PITRE
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
T: (225) 381-9643
F: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
T: (504) 522-1812
F: (504) 522-1813
Email: amelia.hurt@kellyhart.com

Dated: July 14, 2025,

Respectfully submitted,

**CRAWFORD, WISHNEW & LANG PLLC**

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 14, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Michael J. Lang*
Michael J. Lang

004586

# EXHIBIT A

004587



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Reorganized Debtor. | § |  |

### ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the Settlement Agreement, as applicable.

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation ("Okada Family"), and Crown Global Life Insurance, Ltd., not individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the "Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and the Court having found that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1.     The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2.     Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3.     The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4.     The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5.     The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6.     The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7.     The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8.     The Motion is **GRANTED**.

9.      As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10.     All other Objections to the Motion are overruled.

11.     The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12.     HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13.     The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14.     The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15.     Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors."  For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

### ### END OF ORDER ###

004591

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In Re:<br>Highland Capital Management, L.P.<br><br>                                Debtor(s)<br><br>: The Dugaboy Investment Trust<br><br>                                Appellant(s)<br>           vs.<br>Highland Capital Management, L.P., et al.<br><br>                                Appellee(s) | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No.:   19−34054−sgj11<br>Chapter No.:   11 |

# NOTICE REGARDING THE RECORD FOR A BANKRUPTCY APPEAL

Federal Rule of Bankruptcy Procedure 8009 prescribes the deadlines for filing the designations of items to be included in the record, requires copies to be submitted to the bankruptcy clerk to prepare the record, and directs all parties to "take any other action necessary to enable the clerk to assemble and transmit the record." Fed.R.Bankr.P. 8009(g). The purpose of this notice is to provide guidance on the local application of this rule.

## DESIGNATION OF THE RECORD

- If you are the appellant, when designating items for inclusion in the record,

  - list the following items first, in this order: (1) the notice of appeal, (2) the judgment, order, or decree appealed from, (3) any opinion, findings of fact, and conclusions of law of the bankruptcy court, and (4) the docket sheet;

  - then list the *other* items to be included, leaving for the end of your list any sealed documents, any exhibits, and any transcripts.

- If you are the appellee, cross−appellant, or cross−appellee and are designating additional items,

  - list the following items first, in this order: (1) any notice of cross−appeal, (2) any judgment, order, or decree appealed from that the appellant has not designated, and (3) any opinion, findings of fact, and conclusions of law of the bankruptcy court that the appellant has not designated;

  - then list the *other* items to be included, leaving for the end of your list any sealed documents , any exhibits, and any transcripts.

- All parties designating items to be included in the record on appeal must

  - for each item, specify the document number shown on the docket sheet. If an item does not have a document number, specify the date the item was filed.

004592

♦ If you have designated a transcript that has not been filed, order it immediately by contacting the presiding bankruptcy judge's courtroom deputy or following the instructions at http://www.txnb.uscourts.gov/transcript−and−tape−orders.

## ASSEMBLY OF THE RECORD

Within 14 days of filing your designation of the record, pursuant to Rule 8009, submit to the bankruptcy clerk any item that is **not available in the ECF system**, using this procedure:

- Enclose sealed items and non−documentary items (e.g., removable media) in 8.5" x 11" envelopes.

- Copy all other items in PDF files to a removable storage device (e.g., USB drives, DVDs, etc.), organized in the sequence in which they were designated. Limit files to 5.0 MB in size and do not include color.

- Save copies of court exhibits in PDF files to a removable storage device, organized in the sequence in which they are designated. Limit files to 5.0 MB in size and do not include color. (Use a separate removable storage device for each hearing.)

- Label any submission with the case caption and bankruptcy court case and/or adversary proceeding number.

## TRANSMITTAL OF THE RECORD

- The bankruptcy clerk will electronically transmit the record to the district clerk. The parties must provide a paper copy of the record, if required.

## REQUIREMENTS REGARDING PAPER RECORD

- If the district judge requires a paper copy, the district clerk will notify you that you are required to provide a copy of the items in *your* designation **to the bankruptcy clerk**, for quality review.

- If you are notified to provide a paper copy, organize the record according to the volumes maintained in the **district court's ECF system**.

- Even if a paper copy is not required when an appeal is entered on the docket, the district judge or the district clerk may later notify you that a paper copy is required for the use of the district judge or the court of appeals.

DATED:  7/16/25                          FOR THE COURT:
                                         Stephen J Manz, Clerk of Court

                                         by: /s/Sheniqua Whitaker, Deputy Clerk

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
Crawford, Wishnew & Lang PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500


Johnny Sutton
Ashcroft Sutton
919 Congress Avenue, Suite 1325
Austin, Texas 78701
(512) 370-1800 (phone)
(703) 247-5446 (fax)

jsutton@ashcroftlawfirm.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| *In re* | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor.[1] | § | |
| | § | |

**THE DUGABOY INVESTMENT TRUST'S MOTION TO STAY 9019 ORDER**

The Dugaboy Investment Trust ("Dugaboy") hereby files this Motion to Stay 9019 Order and

would respectfully show the court the following:

---

[1] The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., (As Modified)* [Dkt. 1808] ("*Plan*"), filed by Highland Capital Management, L.P. ("*HCMLP*") became effective on August 11, 2021 (the "*Effective Date*").

004594

## I.    SUMMARY OF MOTION

1.    On June 30, 2025, the Court signed its Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Order") [Dkt. No. 4297]. Dugaboy files this motion seeking a 90-day stay of the 9019 Order so that it and other parties can investigate the allegations made in the recently filed request for a stay of all Highland bankruptcy proceedings made by the Texas Attorney General, and the complaint (the "JOL Petition") the Joint Official Liquidators ("JOL") of Charitable DAF HoldCo LTD ("Holdco")filed on July 15, 2025, by. That Petition, annexed hereto as Exhibit A, outlines a massive fraudulent scheme.

2.    According to the JOL Petition, Mark Patrick manipulated the ownership of the HMIT entities to convert $270 million of assets and pay himself and co-conspiring professionals millions that were supposed to be used for the benefit of the long-established charities, including assets Dugaboy and its beneficiary, James Dondero, contributed to the Charitable DAF for the benefit of the charities supported by Dugaboy. The Dallas Foundation, The Greater Kansas City Foundation, The Santa Barbara Foundation, and the Community Foundation of North Texas (the "Charities" or the "Participating Shareholders")  were left with nothing in favor of a new entity with no track record or professional staff run out of Mr. Patrick's house.[2] This Court should stay any transfers of assets to the control of Mr. Patrick, given that his express instructions to create a web of new entities that were: "*Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.*" JOL Petition ¶ 82. A clearer indication of an intention to abscond with assets could hardly be found.

---

[2] The interests of the charities are affected through supporting organizations who for ease of reference are included in the definition of "Charities" and "Participating Shareholders" for the purposes of this Motion.

004595

3.     The relief sought in this Motion is necessary to provide all stakeholders with time to investigate a motion under Rule 60 to vacate the 9019 Order (and all resulting orders, such as the dismissals effected as a result of the 9019 Order) in light of evidence suggesting that the settlement approved by this Court was a key element of the alleged fraudulent scheme.  Transfers of assets to companies controlled by Mr. Patrick must be halted, lest those assets are moved to companies "hard to find or track."

## II.    ARGUMENT

### A.    The Court Enters the 9019 Order Over the Objection of Dugaboy

4.     On May 19, 2025, a Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith [Docket No. 4216] (the "Motion") was filed by Highland Capital Management, L.P.'s ("Debtor" or "Highland"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust").

5.     Over the objection of several parties, including Dugaboy, on June 30, 2025, the Court signed its Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Order") [Dkt. No. 4297].

6.     At the hearing Dugaboy presented the Court with the letter request of the JOLs to stay the proceeding for 45 days pending their investigation, but the Court entered the 9019 Order. Transcript of Hearing on June 25, 2025 on 9019 Motion ("9019 Tr.") at 189:22-191:1.

### B.    The JOL Files a Complaint Alleging Illegal Acts by Mr. Patrick

7.     The JOL Petition makes serious allegations against Mr. Patrick.

8.     Specifically, the Complaint alleges that Mr. Patrick, a director and sole Management Shareholder of HoldCo, unbeknownst to the Charities (holders of the Participating Shares of HoldCo)

004596

: (1) caused HoldCo to assign its interest in certain assets to a Delaware limited liability company formed and controlled by Mr. Patrick; (2) caused HoldCo to issue Participating Shares to a Delaware company incorporated and controlled by Mr. Patrick; (3) caused the Delaware limited liability company to redeem HoldCo's membership interest; and (4) caused HoldCo to be placed into voluntary liquidation after making a final distribution to the Participating Shareholders in HoldCo. JOL Petition at ¶¶ 6-6.4. These machinations are referred to in the JOL Petition and herein as the "restructuring."

9.      As the Complaint states, the restructuring was undertaken specifically to bring ownership of these assets, with a net value of $270 million (as of September 30, 2024), under Mr. Patrick's effective control, with the express purpose of leaving the Charities, as the original, and rightful, ultimate beneficiaries of the fund, with nothing. JOL Petition at ¶ 7. Mr. Patrick testified that the "entity in liquidation [Holdco] owns nothing," confirming the conversion at the hearing on the 9019 Motion. 9019 Tr. 185:18-24) (Dkt. No. 4296).

10.     In short, the JOL Petition details how Mr. Patrick caused HoldCo, originally the sole limited partner of Charitable DAF Fund, LP (the "Fund"), to sell off the Fund, with its $270 million in assets for $1.6 million, using manipulated and fraudulent valuations. JOL Petition ¶¶ 136-150.

11.     Showing just how difficult it was to achieve his false valuation, Mr. Patrick initially sought to have PwC, which had historically conducted valuations of the HoldCo's assets and which had as recently as late 2024 confirmed the $270 million valuation, conduct a post "restructuring" valuation that would discount the value of the assets sufficiently to justify the sale of the Fund for $1.6 million. JOL Petition ¶¶ 123-125.  PwC refused, saying it did not see a basis for the proposed discount. JOL Petition ¶125.

12.     Undeterred, Mr. Patrick and the professionals assisting him sought a valuation from FTI Consulting in London ("FTI"). Using the fact that the charities could not force distributions, FTI

004597

authored a memo presuming one could assert a very small discount on the value of the Fund if the Charities were aligned with the Fund's mission, but a 95% discount if they were not. JOL Petition ¶¶ 126-128. Thus, if Mr. Patrick could arbitrarily say that the Funds were no longer aligned with the charities' missions (notwithstanding the fact that nothing had changed in the charities' missions) he could apparently say devalue the Fund. *Id.*

13.    Indeed, the question Mr. Patrick's counsel posed to FTI was "would Mark still be able to shareholder structure to ensure the existing participating shareholders [the charities] got nothing?" JOL Petition ¶134. Ultimately, recognizing Mr. Patrick's clearly improper machinations, FTI refused to lift limits it had placed on use of its memo, cautioning Walkers, that its memo was "not a valuation" and could "not be used to support a transaction." JOL Petition ¶¶ 133, 135.

14.    Thwarted by FTI, one of Mr. Patrick's United States counsel, Shields Legal, then asked a Dallas-based firm, Valuscope, to value the Fund, using a discounted cash flow ("DCF") analysis with a 99.2% discount for lack of control and an additional 20% discount for lack of marketability, with no justification for the use of a DCF analysis or either, let alone both, discounts. JOL Petition ¶¶ 139-45. This resulted in an astonishing purported 99.29% drop in the value of the assets in just a six-month period. On its face, this manipulation is fraudulent, but this is what was used to justify selling the Fund to an entity controlled by Mr. Patrick and owned by a new charity he owned and controlled for $1.6 million. That $1.6 million was distributed to the Charities, and then Mr. Patrick attempted to cover his tracks with an expedited voluntary liquidation process, controlled by Mr. Patrick's counsel with Kroll as the proposed liquidator, to sweep all of the wrongdoing under the rug. JOL Petition ¶ 151.

15.    This effort was halted only because the Charities, not knowing of the pending liquidation effort, brought their own official liquidation proceeding in the Cayman Court. That

proceeding resulted in the JOL being appointed and Kroll and Walkers resigning as proposed liquidators and counsel. JOL Petition ¶ 152-54.

16.     The JOL's investigation revealed that Mr. Patrick:

    a.  increased the Directors' fees from $40,000 per annum in 2022 to $600,000 in 2023 and to $2.25 million for just the first half of 2024. JOL Petition ¶ 85;

    b.  added a salary for himself of $850,000 a year in September 2024; and

    c.  added a provision for a "long term incentive" ("LTI") tied to the Funds returns (when he is not a registered investment advisor, or any sort of financial advisor, for that matter, but simply a tax lawyer). JOL Petition ¶ 86. The LTI was 7.5% of the Funds returns over 10%, with a provision allowing for a greater bonus the more he spent on legal fees. JOL Petition ¶ 86.3.

What's troubling is that the LTI created an incentive to increase legal spending through the proliferation of lawyers and lawsuits, thereby increasing legal expenses and Mr. Patrick's personal bonuses.

17.     Less than a month later, Mr. Patrick also gave himself an LTI payment of $975,000 and an annual discretionary bonus for 2023 of 2.5 times his annual salary. JOL Petition ¶¶ 87.1-87.2. He also gave himself a retroactive LTI payment for the period March 2023 to March 2024 of $4.8 million and authorized additional annual and discretionary bonuses at his sole and absolute discretion. *Id*. By contrast, the prior the prior controlling shareholder and director of Holdco and the Fund, Grant Scott, during his entire tenure was paid $60,000 a year. JOL Petition ¶ 88.

18.     As a result, the JOL Petition alleges that Mr. Patrick's acts constitute breaches of fiduciary duty and seek to have a receiver appointed. JOL Petition ¶¶ 160-81.

**C.    The 9019 Order Should Be Reevaluated in Light of the Allegations in the JOL Complaint**

19.     These allegations are essential to evaluating or re-evaluating the 9019 Order for three primary reasons. *First*, a change in control of HoldCo will affect not just HoldCo, but all the

companies owned and controlled by HoldCo, including Hunter Mountain and the entities that entered into the settlement agreement that is the subject of the 9019 Order.

20.     The JOL, if they are able to rescind all of the restructuring, and on these facts it certainly appears that they will be able to do so, will be able to appoint new controlling persons in all the former subsidiaries. Then, under honest management, seeking the best for the Charities, the subsidiaries will determine what transactions to ratify and which to rescind or reform. This Court should stay the effectiveness of the 9019 Order to minimize what must be reformed or rescinded.

21.     _Second_, the allegations in the JOL Petition set forth a pattern of behavior by Mr. Patrick with respect to these entities and his self-dealing that unquestionably leads to the conclusion that the same illegal behavior could well have taken place with respect to the 9019 Order and the related settlement agreement. The newly discovered communications detailed throughout the JOL Petition show the steps that Mr. Patrick engaged in to effectuate his scheme. The HMIT Settlement occurred over the same time period, making it a part of that scheme.

22.     _Third_, showing a real danger of manufactured evidence being used to justify the ends desired, Mr. Patrick purported to justify his actions by contending that Mr. Dondero was imperiling the charities' 501(c)(3) status (JOL Petition ¶ 146.1), using an opinion of counsel that post-dated all of the planning for the restructuring (JOL Petition ¶ 146.5). Creating an echo chamber of evidence, he himself made false reports to the IRS to attempt to imperil the charities' tax-exempt status. JOL Petition ¶¶ 113, 146.4. These acts demonstrate that Mr. Patrick's actions and testimony with respect to the 9019 Order must be examined and evaluated.

**D.     The Highland Entities Allowed These Illegal Acts to Proceed Uninvestigated**

23.     It is also important to note the Highland Entities' role in allowing their 9019 Motion to proceed and the 9019 Order to be entered in light of the above. While the Highland Entities claim they performed due diligence with respect to the transactions at issue in the 9019 Order, including the

004600

authority of Mr. Patrick, to agree to the settlement agreement (9019 Tr. 97:12-17) (Dkt. No. 4296),
they did not know of the alleged improprieties raised above. Instead, they elected to look only at the
organizational documents (9019 Tr. 98:6-23) and ignored the Cayman proceeding, Mr. Seery was
"hesitant" to even say he was "generally" aware of the Cayman proceeding (9019 Tr. 98:24-99:1).
Moreover, with respect to Mr. Dondero's complaints about what Mr. Patrick was doing to the
Charities, counsel for the Highland Entities stated: "Mr. Patrick, I don't know what happened between
him and Mr. Dondero. I don't care. I have no knowledge of that." (9019 61:25-62:1) (Dkt. No. 4296).
The transcript evidences that the HCMLP entities ignored the Cayman proceeding to rush through the
9019 Settlement before evidence of the fraud could be presented to this Court.

E.     **The Texas Attorney General Requests Additional Time to Investigate These Allegations**

24.     On July 9, 2009, the Office of the Texas Attorney General wrote a letter to the Court
asking the Court to enter a stay of this bankruptcy proceeding because it was investigating conduct
allegedly taken by persons or entities in this bankruptcy proceeding. Dkt. No. 4308. Upon information
and belief, Mr. Patrick and the entities he controls, as well as the 9019 Order, are the subject of this
investigation. This request of the Texas Attorney General is consistent with what Dugaboy seeks by
way of this motion and therefore Dugaboy urges the Court to follow this recommendation so that the
Texas Attorney General will have an adequate opportunity to address the illegal and inequitable
conduct by Mr. Patrick and his entities that are being investigated by the JOL.

25.     These allegations rise to the level of a basis for a Federal Rule of Civil Procedure 60
motion seeking reconsideration of the 9019 Order based on newly discovered evidence. *Hesling v.
CSX Transp., Inc.*, 396 F.3d 632, 638 (5th Cir. 2005) ("Rule 60(b)(2) provides that a court may relieve
a party from a final judgment based on 'newly discovered evidence which by due diligence could not
have been discovered in time to move for a new trial under Rule 59(b). Rule 60(b)(3) provides for
relief based on 'fraud . . . misrepresentation, or other misconduct of an adverse party,' and Rule

004601

60(b)(6) further provides for relief based on 'any other reason justifying relief from the operation of the judgment.' The purpose of Rule 60(b) is to balance the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of the facts."). Entering a stay will preserve the status quo so that interested parties may conduct a sufficient investigation.

     **F.**    **The Court Has the Power to Stay the 9019 Order for 90 Days.**

26.    Pursuant to Bankruptcy Code § 105(a), the Court "may issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Moreover, the Supreme Court has held: [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936).

27.    This Court possesses broad discretion to grant stays, particularly where doing so is unlikely to cause harm to any other party. *See, e.g., Fishman Jackson PLLC v. Israely*, 180 F. Supp. 3d 476, 483 (N.D. Tex. 2016) ("Courts have 'broad' discretion to grant stay[s] . . . especially when there is not a 'fair possibility' that the stay 'will work damage to someone else.'"); *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990) ("The stay of a pending matter is ordinarily within the trial court's wide discretion to control the course of litigation . . . . This authority has been held to provide the court the 'general discretionary power to stay proceedings before it in control of its docket and in the interests of justice.'" (internal citations omitted)).

28.    While stays should "not be immoderate or of an indefinite duration," *Fishman*, 180 F. Supp. 3d at 483, courts routinely grant stays of six months where doing so promotes judicial efficiency. *See, e.g., 14th St. Props., LLC v. S. Fid. Ins. Co.*, No. CV 22-1593, 2023 WL 416317, at *1 (E.D. La. Jan. 26, 2023) (granting stay and administratively closing matter for six months due to

state insolvency proceedings); *Integrated Claims Sys., LLC v. Old Glory Ins. Co.*, No. 2:15CV-00412-JRG, 2020 WL 1027771, at *1 (E.D. Tex. Mar. 3, 2020) (granting motion to stay for six months); *Cleveland Air Serv., Inc. v. Pratt & Whitney Canada*, No. 4:13-CV-161-DMB-DAS, 2016 WL 4179987, at *2 n.3 (N.D. Miss. Aug. 5, 2016) (staying discovery for six months); *Maples v. Donzinger*, No. CIV.A. 13-223, 2014 WL 688965, at *2 (E.D. La. Feb. 21, 2014) (granting a six month stay).

29.     Courts have also granted stays which may only be lifted by the parties after a determined time. *See, e.g., Scarborough v. Integricert, LLC*, No. 6-12-CV-00396, 2014 WL 12662272, at *3 (W.D. La. Apr. 4, 2014) ("Lastly, this Court's intention is not to stay the case for an indefinite period. To the contrary, the Court will issue a stay for a period of one-hundred and twenty days, at the end of which, either party may move to lift the stay upon a showing of good cause. Thus, the stay will not last for an 'indefinite' period such as Scarborough fears.").

30.     Consistent with these authorities, the implementation of the 9019 Order should be stayed for 90 days in the interests of judicial economy and efficiency in order to allow Dugaboy and other interested parties sufficient time to investigate the allegations in the JOL Petition. A grant of the requested stay will enable the Court to fairly evaluate the putative settlement between the Highland Entities and the HMIT Entities.

31.     Additionally, a stay will benefit the Highland Entities, the HMIT Entities, and estate stakeholders, not harm them. All parties undoubtedly want certainty regarding the legitimacy and future enforceability of their actions and bargains. For example, if the Cayman Proceeding determines that Mr. Patrick may retain his control position in the DAF and its subsidiaries, then such a decision would likely remove any additional obstacles to the HMIT settlement. By contrast, if the Cayman Proceeding subsequently determines that Mr. Patrick engaged in ultra vires acts or acted without

appropriate authority, that decision could throw the settlement, and all subsequent actions taken in furtherance of the settlement, into question.

32.     In sum, the Court has broad discretion to enter a stay of not more than six months (and the requested 90 days is half of what other courts have allowed) - which is neither "immoderate" nor "of an indefinite duration.."  *Fishman*, 180 F. Supp. 3d at 483; *see also McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982) (vacating indefinite stay that could last for seven years or longer where trial court "gave no reason for such a protracted stay"). The requested stay serves the interests of judicial economy, ensures efficient management of this bankruptcy proceeding, and is in the best interests of the parties to the putative settlement and all remaining stakeholders.

33.     Therefore, Dugaboy requests that the Court adhere to the request by the Texas Attorney General and stay the 9019 Order for 90 days so that these newly discovered allegations can be investigated by Dugaboy and other stakeholders and a determination can be made as to whether a FRCP 60 motion is necessary.

### III.     CONCLUSION

For the foregoing reasons, Dugaboy requests that the Court stay the 9019 Order for 90 days.

Respectfully submitted,

By: */s/Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
Crawford, Wishnew & Lang PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

004604

Johnny Sutton
Ashcroft Sutton
919 Congress Avenue, Suite 1325
Austin, Texas 78701
(512) 370-1800 (phone)
(703) 247-5446 (fax)
jsutton@ashcroftlawfirm.com

*Counsel for The Dugaboy Investment Trust*

### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 17, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Michael J. Lang*
Michael J. Lang

004605

# EXHIBIT A

004606



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (      )**

BETWEEN:

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

AND

| | | |
|---|---|---|
| (1) | **MARK ERIC PATRICK** | |
| (2) | **PAUL MURPHY** | |
| (3) | **CDMCFAD, LLC** | |
| (4) | **DFW CHARITABLE FOUNDATION** | |
| (5) | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** | |
| (6) | **CLO HOLDCO, LTD.** | |

<u>Defendants</u>

---

**WRIT OF SUMMONS**

---

TO:    (1)    **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

(2)      **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3)      **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4)      **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5)      **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6)      **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

**IMPORTANT**

Directions for Acknowledgment of Service are given with the accompanying form

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 ( )

BETWEEN:

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

AND

| | | |
|---|---|---|
| (1) | **MARK ERIC PATRICK** | |
| (2) | **PAUL MURPHY** | |
| (3) | **CDMCFAD, LLC** | |
| (4) | **DFW CHARITABLE FOUNDATION** | |
| (5) | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** | |
| (6) | **CLO HOLDCO, LTD.** | |

<u>Defendants</u>

---

**STATEMENT OF CLAIM**

---

**INTRODUCTION**

1    The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2    The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3    The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**").  At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4    The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5    In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company.  In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6    By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**") of the Company, Mr Patrick caused:

6.1    the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

2

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2     the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3     the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4     the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the "**Impugned Transactions**".

7       The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8       Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

3

FSD2025-0201                                                                          2025-07-15

## THE PARTIES

<u>The Company</u>

9      The Company is a Cayman Islands exempted company, incorporated on 27 October 2011,
       having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George
       Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10     The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy
       (appointed by Mr Patrick on 22 April 2021).

11     The Company has been governed by the following memorandum and articles of association
       from time to time:

       11.1    The memorandum and articles of association dated 27 October 2011; and

       11.2    The amended and restated memoranda and articles of association dated 19 January
               2015; 24 January 2024; and 20 February 2025 respectively.

       The Company remains governed by the memorandum and articles of association as amended
       and restated on 20 February 2025 (the "**Articles**") save that the Company reserves the right
       to challenge the validity of the Articles.

12     Save as set out above, the Company will rely on the Articles and all previous iterations for their
       applicable full terms and effect.

13     Pursuant to the Articles and at all relevant times, the authorised share capital of the Company
       was US$50,000 divided into 100 Management Shares of US$0.01 par value each and
       4,999,900 Participating Shares of US$0.01 par value each.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO  Box  309,  Ugland  House,  Grand  Cayman,  KY1-1104,  Cayman  Islands.  (Ref:
CJM/JRN/TQR/858403.000001/83559387)

4

14      The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15      The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16      The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17      The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18      On 7 November 2011, the Company issued:

18.1    300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2    100 Management Shares to Grant Scott.

19      On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1    Highland Kansas City Foundation, Inc.;

19.2    Highland Dallas Foundation, Inc.[1]; and

19.3    Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

---

[1]Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

5

20     On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21     On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22     The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23     Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24     As a result of the Impugned Transactions, the Company now has no material assets.

DFW

25     DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26     DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

6

The Fund

27    The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28    The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021).  The Company will rely on the LPA for its applicable full terms and effect.

29    Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30    Until 18 December 2024, the Company was the sole limited partner of the Fund.

31    On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32    The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33    On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34    The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

7

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35    The assets of the Fund were valued at c. $270 million in September 2024.

<u>The New GP</u>

36    The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37    Mr Patrick is the New GP's sole director and sole shareholder.

38    The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

<u>CDM</u>

39    CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40    CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41    Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42    The sole manager of CDM is Mark Patrick.

43    From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

8

44      On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

<u>CLO HoldCo</u>

45      CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46      The directors of CLO Holdco are Messrs Patrick and Murphy.

47      The sole shareholder of CLO Holdco is the Fund.

<u>The Directors</u>

*Mark Patrick*

48      Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1    a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2    the Manager of CDM (the Third Defendant);

48.3    the sole director and the sole member of DFW (the Fourth Defendant);

48.4    the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5    a director of CLO HoldCo (the Sixth Defendant).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

9

49      Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**")
        from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group
        from March 2021 to October 2024.

*Paul Murphy*

50      Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

        50.1    a director of the Company;

        50.2    a director of CLO HoldCo (the Fifth Defendant); and

        50.3    a director of various other entities in the Charitable DAF structure.[2]

51      Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

**THE CHARITABLE PURPOSE OF THE FUND**

52      The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S.
        resident and the founder of Highland to enable certain assets, held through the shares in CLO
        Holdco, to be donated to a charitable foundation.

53      Upon the formation of the Fund, the Company was admitted as a limited partner and, by way
        of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the
        Fund.

54      The purpose of the Fund was to make investments for the ultimate benefit of the Original
        Participating Shareholders and the Charities:

---

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd.,
HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

                                                                                                    10

54.1   The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*…".

54.2   Clause 1.3 of the LPA provides that "… *the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3   Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4   "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5   Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses*…".

54.6   The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55   The Charities are the following four US charitable or non-profit foundations:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

11

55.1    *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2    *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3    *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4    *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56    The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57    CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58    As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

12

58.1 S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income ("**UBTI**"); and

58.2 the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59 As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60 In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61 The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62 Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63 Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

13

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64      The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1    S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations.  The supported organisations must also be s501(c)(3) entities;

64.2    There are three types of supporting organisations, known as "Type I", "Type II" and "Type III". S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each "Type", respectively;

64.3    S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4    S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65      The Supporting Organisations are so controlled by the respective Supported Organisations.

66      The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67      The Certificates of Incorporation provide (amongst other things) that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

14

67.1    the Supporting Organisation:

    (a)    is organised and shall be operated exclusively for charitable, educational and scientific purposes;

    (b)    is organised and operated exclusively to support and benefit the particular charity that controls it; and

    (c)    is a non-profit non-stock corporation and cannot issue any capital stock;

67.2    no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3    net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68    The Bylaws provide that (amongst other things):

68.1    There are two classes of members of the Supporting Organisations with one member in each such class:

    (a)    the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

    (b)    the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2    In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

15

(a)    the Institutional Member is entitled to two votes; and

(b)    the Individual Member is entitled to one vote.

68.3    Institutional membership is not transferable or assignable.

68.4    Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5    Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6    There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69    The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1    the Supported Organisation will provide certain services to the Supporting Organisation;

69.2    the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3    in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

16

70     Mr Dondero sits on the board of each of the Supporting Organisations with two other directors
       from each of the Supported Organisations respectively.

71     The relationships, rights and obligations created by and between the Supported Organisations
       and the Supporting Organisations pursuant to the agreements entered into between them were
       at all material times in summary that:

   71.1    the Supported Organisations control the Supporting Organisations through their
           majority voting interest and their ability to elect a majority of the directors of the
           Supporting Organisations;

   71.2    the Supporting Organisations support the Supported Organisations by way of making
           grants to them from time to time from their assets, including any dividends received
           from the Company;

   71.3    the Supporting Organisations have no ability to pay dividends to any private person or
           make payments to their directors (save reasonable reimbursement for reasonable out-
           of-pocket expenses) and can only make grants to the relevant Charity in furtherance of
           their charitable purposes; and

   71.4    while Mr Dondero sits on the board of the Supporting Organisations, he does not control
           them, as a supermajority of the votes are always held by the respective Charity.

72     The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and
       terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73     The terms of the LPA grant sole control over the management and distribution of the Fund's
       assets to the General Partner. The terms of the Articles grant sole control over the
       management and distribution of the Company's assets to the Management Shareholder.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

17

The LPA

73.1   Clause 1.12

(i)   The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2   Clause 1.6

(i)   *Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(ii)   *Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

18

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

<u>The Articles</u>

73.3   Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4   Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5   Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6   Article 84 (d)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

19

*The office of Director shall be vacated if the Director…is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7   Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8   Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74   The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1   In or around November 2011:

(a)   Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b)   Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

20

thereby assuming the Control Position from that date.

74.2    In or around 24 March 2021, Mr Scott:

(a)    assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b)    transferred to Mr Patrick the 100 Management Shares in the Company; and

(c)    resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3    On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4    Mr Patrick therefore assumed the Control Position from that date.

74.5    On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6    On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7    Mr Patrick is the sole shareholder and director of the New GP.

74.8    Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

21

75      Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant).  Mr
        Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021
        and 22 April 2021 respectively.

76      The Control Position was not and is not a term of art but was nevertheless a legal and factual
        position:

    76.1    where a single individual was the sole Management, and therefore voting, Shareholder
            of the Company;

    76.2    where the same individual was a director of the Company;

    76.3    where the same individual was the sole shareholder or controller of the General
            Partner;

    76.4    where the same individual was a director of the General Partner;

    76.5    where the same individual was in complete and effective control of at least the
            Company, of the General Partner, of the Fund and of CLO Holdco;

    76.6    where the same individual was in effective sole control of all assets of the Fund;

    76.7    where the same individual had no economic, residual, beneficial or winding up interest
            in assets of the Company;

    76.8    where the same individual had no economic, residual, beneficial or winding up interest
            in assets of the General Partner;

    76.9    where the same individual had no economic, residual, beneficial or winding up interest
            in assets of the Fund;


FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

22

76.10   where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11   where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12   in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

<u>Plan to defeat the interests of the Original Participating Shareholders</u>

77      On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78      It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79      The Work Plan stated that (amongst other things):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

23

79.1 the advice required related to "…*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*..."; and

79.2 "…*we may need to rely on opinions and memoranda in potential future disputes*..."

80 The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1 'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2 'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3 'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4 'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5 'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81 The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1 On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things)*:*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

24

(a)     the Directors have power under the Articles to issue new Participating Shares that dilute the current Participating Shareholders, but must consider their fiduciary duties (including the duty to act in the best interests of the Company) when issuing such shares;

(b)     the Participating Shares are non-redeemable;

(c)     while payment of a dividend or other distribution is at the discretion of the Directors, if the Company were to have distributable reserves available, there may be a question of whether the Directors would be acting in its best interests to not pay some dividend or distribution; and

(d)     the Directors have fiduciary duties to the Company which are paramount when considering (i) making a distribution and (ii) the distributable reserves available from which to make payments; they must have regard to what is in the Company's best interests, its future cash requirements, and its present and future solvency.

82      In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.*"

83      On 27 February 2024, without telling the Supporting Organisations or the Charities, the New GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84      On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and without telling the Supporting Organisations or the Charities, executed a written consent for the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

25

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85    In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1    directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2    expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86    On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1    to increase Mr Patrick's salary to US$850,000 per annum;

86.2    include a long-term incentive (**"LTI"**) tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3    the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87    On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1    the Directors resolved (amongst other things) that Mr Patrick would receive:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

26

(a) an LTI payment of US$975,000; and

(b) an 'annual discretionary bonus' for 2023 at an amount of 2.5 times his base salary.

87.2  Previously, in or around October 2021, Mr Patrick had signed an 'employment agreement' for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a) shall receive a base salary of US$850,000;

(b) shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c) is eligible for both annual and discretionary bonuses as determined at the 'sole and absolute discretion of the Directors'.

88  Comparatively, Mr Scott's salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors' fees, remuneration and/or benefits.

89  In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund.  Mr Patrick did not do so.

90  On 11 November 2024, Holland and Knight ("**H&K**"), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**").


FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

27

91   On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations so as to weaken any winding-up petition brought by the Supporting Organisations on just and equitable grounds. Mr Murphy wrote that:

> "*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…*"

92   On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help.

93   On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware, by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the Fund structure. The sole member of DFW was and is Mr Patrick.

94   On 7 February 2025, 318 Participating Shares were issued to DFW.

95   On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved to adopt the Amended and Restated Memorandum and Articles of Association dated 20 February 2025 which, among other things:

95.1   Amended the Memorandum at paragraph 3 to give the Company charitable objects;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

28

95.2 Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3 Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96 The Company reserves its position in respect of the validity of these amendments.

The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM

97 On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1 "*…would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2 "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

29

    98.3    As a Delaware limited liability company (CDM): "…*as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99    On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

    99.1    The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

    99.2    The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

    99.3    CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100    On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101    The LLC Agreement, materially provides (amongst other things) that:

    *"Fair Market Value shall have the meaning set forth in Section 6.9(b).*

    …

    *The initial Manager shall be Mark Patrick.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

30

…

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

…

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

…

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

31

*Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion."*

102   The Company will rely on the terms of the LLC Agreement for their applicable full terms and effect.

103   The effect of these transactions was that:

103.1   CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the limited partnership interest in the Fund previously held by the Company; and

103.2   The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been its limited partnership interest in the Fund, was exchanged for the CDM Membership Interest

(the "**Restructuring**")

104   The Restructuring was at an undervalue and not in the interests of the Company (in that the CDM Membership Interest was less valuable than the limited partnership interest that the Company assigned to CDM) because (amongst other things)*:*

104.1   The General Partner owed fiduciary duties to the Company in the Fund, but the Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2   The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e. a "good faith determination of the value".

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

32

105    On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the steps taken by the Company in December 2024 to effect the Restructuring and whether the transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1    refers to the justifications for the decisions taken as set out in the Restructuring Resolutions, and considers that, if called upon to justify the purpose of those decisions, the Directors would need to explain:

(a)    how the penalisation or loss of tax-exempt status any of the current Participating Shareholders could have "*imperil[ed]" the "assets"* of the Company;

(b)    the detrimental issues the Company was facing that the Directors believed would be mitigated by the interposition of CDM into the Fund structure; and

(c)    how and/or why the Restructuring would (i) benefit the Company and (ii) reduce the influence of Mr Dondero; and

105.2    considers that a shareholder reviewing the reasons listed in the Restructuring Resolutions "*might suggest that the contents of the resolution are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board*".

<u>Persistent and continual lack of information for the Supporting Organisations</u>

106    On 23 January 2025, having received no response from Mr Murphy to the No-Confidence Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that the Supporting Organisations needed to better understand the Company's/Fund's asset position, and requesting certain information be provided by 10 February 2025.

107    Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors expressing serious concern (i) that the Supporting Organisations' requests for information

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

33

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108    On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

108.1    had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

108.2    are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109    On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: "*[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions.*"

110    On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111    On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112    On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

34

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113   On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114   On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115   Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1   four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2   two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

35

115.3   one (1) week after the Directors and/or the Company redeemed the Company's interest in CDM without telling the Supporting Organisations or the Charities (see below);

115.4   one (1) day after the Directors placed the Company in voluntary liquidation, without telling the Supporting Organisations or the Charities.

<u>Purported Share Issuance and allotment to DFW</u>

116     In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders - "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations.

117     On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the exercise of the power, the Articles grant the Directors power to issue new shares that dilute the Participating Shareholders, and recommended the shares be issued sooner than later, and before any winding up petition was presented, since any alteration to the Company's membership made after the presentation of the petition would be void.

118     On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**"). The Share Issue Resolutions provided that:

118.1   Participating Shareholders had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

36

118.2  Based apparently on U.S. tax advice:

(a)  There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

(b)  Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

(c)  The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3  The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119  On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1  where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "…*deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2  the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

37

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3   it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4   the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

<u>Plan to redeem the Original Participating Shareholders</u>

120   In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121   At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

38

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122    The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated 7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024 (the "**September 2024 Valuation**").

*PwC and FTI*

123    On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the Supporting Organisations as "*potential adverse parties*".

124    On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure and requested that a second valuation be prepared of all the CDM Membership Interest, which valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

39

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125    On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> "*... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently.*"

*The FTI Memo*

126    On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

40

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127    On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128    On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129    On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130    On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

41

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131   On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

> "*Agree we need to finalise the [FTI valuation] reports …We should request any limits on use removed.*
>
> *We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests.  After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled.  That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions …*
>
> *We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*
>
> *Note US LLC would make DFW its sole owner.*"

132   The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

42

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133  On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things:

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission".  However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*
>
> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders?*
>
> …
>
> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*
>
> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states "Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed".*
>
> …

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

43

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

…

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134   On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows:

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

44

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

…

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135   On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

45

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

FTI: *What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction."*

*March 2025 ValueScope Valuation*

136     Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1   100% Membership Interest in CDM; and

136.2   Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137     The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

46

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138    A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| Valuation Date | DLOC* | DLOM** | Valuation Basis | FMV (100 Shares) |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

*DLOC – Discounted for Lack of Control

**DLOM – Discounted for Lack of Marketability

***DCF – Discounted Cash Flow

139    The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously].  When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.  However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

47

140   ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141   For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> *'Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality'.*

142   Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1   applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2   determined the FMV of 100 Participating Shares to be US$536,784;

142.3   applied a discount of 99.2% for DLOC; and

142.4   applied a discount of 20.00% for DLOM.

143   The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

48

144    Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of
       100 Participating Shares in the Company apparently declined from US$75,961,370 to
       US$536,784, representing a reduction in value of 99.29% in less than a six month period, in
       which the Restructuring occurred, attributable to a change in valuation basis (amongst other
       things) from NAV to DCF.

145    Furthermore, ValueScope does not appear to have sense-tested their valuation.  Although they
       identified "total equity" of c. US$270 million and concluded that all of the Participation Shares
       had a value of only c. US$1.6 million, they did not address themselves to who benefitted from
       the residual value of c. US$268 million.

<u>Admission and Redemption</u>

146    On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager
       Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the
       terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and
       (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a
       Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together
       with the Admission Agreement, the "**Restructure Agreements**"):

146.1  The recitals to the Manager Consent stated that the redemption of the Company's
       membership interest was justified by reason of alleged attempts by the Supporting
       Organisations to exert control, and the potential loss of their (i.e. the Supporting
       Organisations') non-profit and tax-exempt status:

                   *"… the Manager has formed the view that the Current Member, by virtue of
                   being a member of the Company and having as Participating Shareholders the
                   Highland Foundations, poses a material risk to the Company, its assets, and
                   the Mission Statement of DAF due to, among other things, (i) officers and
                   directors of the Highland Foundations seeking to assert dominion and control*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

49

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)"*

146.2   The Manager Consent further stated:

*"WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests"*

146.3   Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4   Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a)      there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. ("**HDF**") due to the undue influence and control exercised over HDF by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

50

(b)   the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

(c)   such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5   Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

(a)   asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

(b)   suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

(c)   concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6   Exhibit E contained two valuation reports:

(a)   The first was a ValueScope valuation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

51

(b)     The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

  (i)     expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

  (ii)     permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7  On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

  (a)     Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

  (b)     Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147    On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148    On 2 April 2025, the Directors of the Company, by way of written resolution:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

52

148.1  Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2  Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149  The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150  The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1  The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2  The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3  The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4  The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

53

004662

Case 19-34054-sgj11    Doc 4326    Filed 07/17/25    Entered 07/17/25 10:54:33    Desc
Case 3:25-cv-02724-L    Document 1-12    Filed 12/03/25    Page 417 of 443    PageID 5081
Main Document    Page 57 of 83

**FSD2025-0201**    **Page 57 of 83**    **2025-07-15**

<u>Voluntary Liquidation and Supervision Order</u>

151    On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152    However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations presented a petition seeking the winding up of the Company on a just and equitable basis, under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153    On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition.  Following that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the Court.

154    On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary liquidation of the Company was to be continued under the supervision of the Court pursuant to s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155    At all material times, the Directors, as directors, owed the following duties individually to the Company:

155.1    A fiduciary duty to act *bona fide* in what he considers to be the best interests of the Company (the "**Best Interests Duty**").

155.2    A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

54

155.3 A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4 A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5 A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6 A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7 A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156 With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157 The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

55

**ATTRIBUTION OF KNOWLEDGE AND INTENTION**

158    As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

158.1    As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

158.2    As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the "**Manager Consent**") approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

158.3    As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159    Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

**CLAIMS AGAINST THE DEFENDANTS**

<u>Breaches of fiduciary and other duty</u>

160    The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

56

Restructuring, including the CDM Assignment

161     The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

161.1   The Plaintiff relies on paragraphs 77 to 105 above.

161.2   With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3   Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4   The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

57

161.5    The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6    The Directors (and each of them) acted when each of them:

(a)    knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b)    knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c)    knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d)    knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7    It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8    Further, and in any event, the Directors (and each of them) acted when each of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

58

(a)     knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b)     knew or ought to have known that:

(i)     the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(ii)    the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

(iii)   other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

(iv)    even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

59

(v)    the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(c)    knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162    By reason of the foregoing breaches of duty or any of them:

162.1    The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2    CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3    CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Share Issuance</u>

163    The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

163.1    The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

60

**Page 64 of 83**

163.2   The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

(a)   diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

(b)   inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3   The Directors (and each of them) acted when each of them:

(a)   knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

(b)   knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

(c)   knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

61

(d) knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4 Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164 By reason of the foregoing breaches of duty or any of them:

164.1 the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2 DFW holds its shares on trust or constructive trust for the Company.

164.3 DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

62

164.4   The Company's register of shareholders shall be rectified accordingly.

<u>Admission and Redemption</u>

165   The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1   The Plaintiff relies on paragraphs 120 to 150 above.

165.2   The Directors (and each of them) acted when each of them:

(a)   knew or ought to have known that:

(i)   proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

(ii)   proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(iii)   the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(iv)   proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

63

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v)    the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b)    knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3  Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166    By reason of the foregoing breaches of duty or any of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

64

166.1   DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2   DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

Further claims against Mr Murphy

167   In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1   At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2   Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3   Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4   Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5   Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6   Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7   As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

65

Directors' Fees, Remuneration and Expenses

168  The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169  As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170  Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171  Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023. Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings. The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172  The Company claims:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

66

172.1   Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2   Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3   Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

<u>Unlawful Means Conspiracy</u>

173   The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1   It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2   The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3   As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4   The conspiracy was a conspiracy to injure the Company.

173.5   The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

67

173.6    The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7    Each of the conspirators intended to injure the Company.  This averment is an inference from all the facts and matters pleaded above.

173.8    As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

<u>Proprietary claim and/or unconscionable receipt</u>

174    The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1    CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2    The knowledge of CDM was and is that of Mr Patrick.

174.3    The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4    CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5    By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

68

Unjust Enrichment

175    In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the
Company's expense and is liable to the Company in restitution:

175.1    The Partnership Interest was transferred on the basis that there was a valid assignment
agreement effecting that transfer.

175.2    That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176    In order to obtain the return to it of the Partnership Interest in the Fund, together with an
Account of Profits, the Company does not need as a matter of law to make any allegation of
"alter ego" or to lift the corporate veil in relation to CDM or DFW.

177    If, contrary to the paragraph above, the Company does so need, it makes the following
allegations for the purposes of all relevant claims or causes of action set out above.

177.1    CDM is the "alter ego" of Mr Patrick.

177.2    DFW is the "alter ego" of Mr Patrick.

177.3    In relation to the receipt of any property by CDM directly or indirectly from the Company
or the accrual of any profits or benefits by reason of such receipt, the corporate veil
should be lifted, with the consequence that such receipt and such profits or benefits
should be treated as those of Mr Patrick personally.

177.4    In relation to the receipt of any property by DFW directly or indirectly from the Company
or the accrual of any profits or benefits by reason of such receipt, the corporate veil
should be lifted, with the consequence that such receipt and such profits or benefits
should be treated as those of Mr Patrick personally.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

69

PARTICULARS

(a)     In relation to CDM:

    (i)     Mr Patrick was and is the Manager. There are no other officers or managers.

    (ii)    Mr Patrick was and is the managing member.

    (iii)   CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

    (iv)    CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

    (v)     CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b)     In relation to DFW:

    (i)     Mr Patrick was and is the 'President'. There are no other officers or managers.

    (ii)    Mr Patrick was and is the sole member.

    (iii)   Mr Patrick was and is the sole registered director.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

70

(iv)     DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v)     DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi)     DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

<u>Loss and Damage</u>

178     As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1   Its Partnership Interest in the Fund.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

71

178.2 The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3 Excessive Directors' fees or remuneration or emoluments or benefits.

178.4 Improper expenses (if any).

178.5 The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6 The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179 The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180 CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181 The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

72

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

**PRAYER FOR RELIEF**

In the premises, the Company claims:

(1)     Damages or equitable compensation.

(2)     Orders for restitution or disgorgement.

(3)     Orders for the restoration of property to the Company.

(4)     Interlocutory or final injunctions as may be necessary or appropriate.

(5)     Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6)     Orders for the provision of documents or information at an early interlocutory stage.

(7)     Orders for the cancellation of the Share Issuance, as appropriate.

(8)     Rectification of the register of the Company, as appropriate.

(9)     Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10)    An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11)    An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

73

(12)   All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13)   All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14)   All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15)   Interest as above.

(16)   Further or other relief.

(17)   Costs.

DATED  this 15th day of July 2025

**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

74

**DIRECTIONS FOR ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

182    The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

After completion it must be delivered or sent by post to the Law Courts, PO Box 495G, George Town, Grand Cayman, KY1-1106, Cayman Islands.

183    A Defendant who states in the Defendant's Acknowledgment of Service that the Defendant intends to contest the proceedings must also serve a Defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

If a Statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

If the Defendant fails to serve his Defence within the appropriate time, the Plaintiffs may enter judgment against the Defendant without further notice.

184    A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered.  If a Defendant to an action for a debt or liquidated demand (i.e. a fixed sum) who does not intend to contest the proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiffs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

states, in answer to Question 3 in the Acknowledgment of Service, that the Defendant intends to apply for a stay, execution will be stayed for 14 days after that Defendant's Acknowledgment, but the Defendant must, within that time, issue a Summons for a stay of execution, supported by an affidavit of the Defendant's means.  The affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See overleaf for Notes for Guidance**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

2

**Notes for Guidance**

1    Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2    For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to the Defendant.

3    Where the Defendant is sued in a name different from the Defendant's own, the form must be completed by the Defendant with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4    Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "Partner in the firm of (......................................)" after that Partner's name.

5    Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN THAT PERSON'S OWN, the form must be completed by the Defendant with the addition in paragraph 1 of the description "trading as (...........................)" after that Defendant's name.

6    Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on its behalf.

7    Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian *ad litem*.

8    A Defendant acting in person may obtain help in completing the form at the Courts Office.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

3

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

CAUSE NO: FSD        OF 2025 (      )

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

<u>Plaintiff</u>

AND

| | |
|---|---|
| **(1)** | **MARK ERIC PATRICK** |
| **(2)** | **PAUL MURPHY** |
| **(3)** | **CDMCFAD, LLC** |
| **(4)** | **DFW CHARITABLE FOUNDATION** |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| **(6)** | **CLO HOLDCO, LTD.** |

<u>Defendants</u>

**ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

If you intend to instruct an Attorney to act for you, give that Attorney this form IMMEDIATELY.

Important.  Read the accompanying directions and notes for guidance carefully before completing this form.  If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

1.    State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

2.    State whether the Defendant intends to contest the proceedings (tick appropriate box)

---

|            | yes            | no         |
| ---------- | -------------- | ---------- |

3.    If the claim against the Defendant is for a debt or liquidated demand, AND the Defendant does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box)

yes                    no

---

Service of the Writ is acknowledged accordingly

(Signed).......................................................

Attorney for

2

**Notes on address for service**

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands. A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, the Defendant must give the Defendant's post office box number and the physical address of the Defendant's residence or, if the Defendant does not reside in the Cayman Islands, the Defendant must give an address in Grand Cayman where communications for the Defendant should be sent. In the case of a limited company, "residence" means its registered or principal office.


Indorsement by plaintiff's Attorney (or by plaintiff if suing in person) of that Plaintiff's name, address and reference, if any, in the box below.

> Maples and Calder (Cayman) LLP
> PO Box 309 Ugland House
> Grand Cayman KY1-1104
>
> Cayman Islands: CJM/JRN/LRA/TQR/858403-01


Indorsement by defendant's Attorney (or by defendant if suing in person) of that defendant's name, address and reference, if any, in the box below.

3

004689